IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

MCKESSON INFORMATION SOLUTIONS LLC, )
                                  Plaintiff, )
                                    v. )
THE TRIZETTO GROUP, INC., )
                              Defendant. )

CIVIL ACTION NO. 04-1258-SLR

**PLAINTIFF'S OPENING BRIEF IN SUPPORT OF ITS MOTION FOR
SUMMARY JUDGMENT REGARDING DEFENDANT'S SEVENTH
AFFIRMATIVE DEFENSE OF INEQUITABLE CONDUCT AND
COUNTERCLAIM FOR DECLARATION OF UNENFORCEABILITY**

Thomas J. Allingham II (#0476)
Michael A. Barlow (#3928)
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
One Rodney Square
P.O. Box 636
Wilmington, Delaware 19899
(302) 651-3000

OF COUNSEL:
Jeffrey G. Randall
David W. Hansen
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
525 University Avenue, Suite 1100
Palo Alto, California 94301
(650) 470-4500

Attorneys for Plaintiff
McKesson Information Solutions LLC

Dated: December 15, 2005

# TABLE OF CONTENTS

**Page**

I.   NATURE AND STAGE OF PROCEEDINGS ........................................................1

II.  SUMMARY OF ARGUMENT ...........................................................................2

III. SUMMARY OF RELEVANT FACTS ...............................................................3

     A.   The '164 Patent ....................................................................................3

     B.   TriZetto's Inequitable Conduct Allegations ................................................6

IV.  SUMMARY JUDGMENT OF NO INEQUITABLE CONDUCT IS
     WARRANTED BECAUSE TRIZETTO CANNOT PROVE EVERY
     ELEMENT OF ITS DEFENSES AS A MATTER OF LAW.....................................7

     A.   Summary Judgment Standard ....................................................................7

     B.   Law Regarding Inequitable Conduct ..........................................................8

     C.   TriZetto Cannot Show by Clear and Convincing Evidence that the
         Allegedly Undisclosed Information Was Material .........................................9

         1.   The Egdahl & Hertenstein Article ..................................................9

         2.   The Harvard Business School Case Study.....................................10

         3.   Allegedly Undisclosed Facts Regarding Inventorship and
             Government Funding .....................................................................13

     D.   The Court Should Grant Summary Judgment Because TriZetto
         Lacks any Evidence of Deceptive Intent ...................................................15

V.   CONCLUSION............................................................................................19

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986)...................................................................................7

*Boston Scientific Scimed, Inc. v. Cordis Corp.*,
    392 F. Supp. 2d 676 (D. Del. 2005)..............................................................7

*Ethicon, Inc. v. United States Surgical Corp.*,
    135 F.3d 1456 (Fed. Cir. 1998) ..................................................................14

*Hebert v. Lisle Corp.*,
    99 F.3d 1108 (Fed. Cir. 1996) ......................................................................8

*Kingsdown Med. Consultants Ltd. v. Hollister, Inc.*,
    863 F.2d 867 (Fed. Cir. 1988) ......................................................................8

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986).....................................................................................7

*Ruiz v. A.B. Chance Co.*,
    234 F.3d 654 (Fed. Cir. 2000) ....................................................................10

*TAP Pharm. Prods., Inc. v. OWL Pharms., LLC*,
    419 F.3d 1346 (Fed. Cir. 2005) ....................................................................8

*Tenneco Auto. Operating Co. Inc. v. Visteon Corp.*,
    375 F. Supp. 2d 366 (D. Del. 2005)............................................................16

*Trinity Indus. v. Rd. Sys.*,
    235 F. Supp. 2d 536 (E.D. Tex. 2002)........................................................15

*Warner-Lambert Co. v. Teva Pharms. USA, Inc.*,
    418 F.3d 1326 (Fed. Cir. 2005).....................................................................8

## STATUTES

FED. R. CIV. P. 56(c) .........................................................................................7

## OTHER AUTHORITIES

M.P.E.P. § 2137.01 ..........................................................................................14

Plaintiff McKesson Information Solutions LLC ("McKesson") respectfully submits its opening brief in support of its motion for summary judgment on defendant The TriZetto Group, Inc.'s ("TriZetto") Seventh Affirmative Defense of unenforceability due to inequitable conduct and its Counterclaim seeking a declaration of unenforceability on the same ground.

## I.    NATURE AND STAGE OF PROCEEDINGS.

On September 13, 2004, McKesson filed this lawsuit against TriZetto for willfully infringing McKesson's U.S. Patent No. 5,253,164 ("the '164 patent"). (D.I. 1.) McKesson filed a First Amended Complaint on October 1, 2004. (D.I. 7.) TriZetto filed an Answer and Counterclaim on November 1, 2004. (D.I. 10.) As one of its counterclaims and its Seventh Affirmative Defense, TriZetto asserted that the '164 patent is unenforceable due to inequitable conduct. (*Id.* at 5-7.) Specifically, TriZetto alleged that the named inventors and/or their agents intentionally withheld the following information to the U.S. Patent and Trademark Office ("PTO"):

1.   Richard Egdahl, M.D. & Robert Hertenstein, M.D., *An Access-oriented Negotiated Fee Schedule--The Caterpillar Experience*, ANN. SURG. 206(3), pp. 349-357 (Sept. 1987) ("the Egdahl & Hertenstein article");

2.   "[T]he fact that the claimed software to review claims was obvious and disclosed in commonly available books on expert systems as admitted by Marcia Radosevich, President of HPR, the assignee of the patent-in-suit, in a case study at the Harvard Business School in 1989";

3.   "[T]hat four programming and code review consultants participated in the development of the claimed software as described by Marcia Radosevich to the Harvard Business School"; and

4.   "[T]hat the invention was conceived by some individuals who were employed by Boston University's Health Policy Institute, and that the work was funded by U.S. Government sponsored research."

(D.I. 10 at 5-6.)[1]  McKesson has denied TriZetto's allegations of inequitable conduct.
(D.I. 55.)

The parties have engaged in extensive discovery in this case, including the
production of many thousands of documents and the depositions of dozens of witnesses.
For example, TriZetto issued document subpoenas to the named inventors and
prosecuting attorneys for the '164 patent and deposed all four named inventors for a total
of seven days.  Other than a few matters pending before Special Master Bechtle, fact and
expert discovery is now closed.

With discovery completed, McKesson now moves for summary judgment as to
TriZetto's inequitable conduct defense and counterclaim on the ground that TriZetto
cannot establish the essential elements of inequitable conduct by clear and convincing
evidence.

## II.    SUMMARY OF ARGUMENT.

McKesson is entitled to summary judgment for the following reasons:

1.    TriZetto cannot establish by clear and convincing evidence that any of the
four alleged nondisclosures involved the failure to disclose material information.  *First*,
the Egdahl & Hertenstein article was not material because the article disclosed
information that had already been provided to the PTO--namely, the fact that medical
claims had previously been reviewed for coding errors on a manual basis.  *Second*, Dr.
Radosevich's statements in the Harvard Business School case study were not material
because she never stated or suggested that the patented invention was obvious or
disclosed in publicly available books.  *Third*, the alleged participation of four consultants

---

[1]  It is unclear whether TriZetto is currently asserting inequitable conduct based on the third and
fourth alleged nondisclosures listed above.  In response to an interrogatory seeking the full basis
for its inequitable conduct defense, TriZetto repeated its allegations regarding the first two
nondisclosures listed above, but did not mention anything regarding the third or fourth alleged
nondisclosure.  (Declaration of Michael Barlow in Support of Plaintiffs' Motion for Summary
Judgment Regarding Defendant's Seventh Affirmative Defense of Inequitable Conduct and
Counterclaim for Declaration of Unenforceability ("Barlow Decl."), Exh. 1 at 17-18.)

in developing the claimed software is irrelevant because the evidence shows that these
consultants did not help conceive of the patented invention. *Fourth*, whether or not the
patented invention was developed with federal government funding is not material
because it has no bearing on patentability.

      2.      TriZetto also cannot prove the requisite intent to deceive by clear and
convincing evidence. After months of discovery, TriZetto has failed to develop any
evidence to show that those substantively involved in prosecuting the '164 patent
intended to deceive the PTO or that they even considered the allegedly undisclosed
information to be material. Instead, the facts evidence a lack of intent because the named
inventors would not have considered the allegedly undisclosed information to be material
and did not consider or discuss withholding any of the allegedly undisclosed information
from the PTO.

      Because TriZetto has insufficient evidence to be able to prove inequitable conduct,
McKesson is entitled to judgment as a matter of law. Accordingly, McKesson
respectfully requests that the Court grant its motion for summary judgment as to
TriZetto's inequitable conduct defense and counterclaim.

## III.    SUMMARY OF RELEVANT FACTS.

### A.    The '164 Patent.

      McKesson is the current assignee of the asserted '164 patent, which is entitled
"System and Method for Detecting Fraudulent Medical Claims Via Examination of
Service Codes." (D.I. 7, Exh. A.) The named inventors of the patent are Don Holloway,
Robert Hertenstein, George Goldberg, and Kelli Dugan. The patent issued on October 13,
1993, and claims priority from an application filed on September 30, 1988. Three
attorneys-- Jason Honeyman, Jason Mirabito, and Peter Corless--were involved in
prosecuting the '164 patent at various times between the original filing in September
1988 and the patent's issuance in October 1993. (Barlow Decl., Exh. 2 at 7-8.)

3

The '164 patent describes and claims computer systems and methods to analyze medical service codes submitted on a medical claim in order to detect and correct errors that may result in an inappropriate amount being paid for the services billed. An example of the types of errors addressed by the '164 patent is a practice known as "unbundling," which refers to "unpackaging services [on a medical claim] that were intended to be bundled into a single code." (D.I. 7, Exh. A at col. 2, ll. 12-14.) Claim 3 is illustrative of the '164 patent's claims:

> 3. A computer system including a central processing unit and associated memory for processing input claims containing at least one medical service code, comprising:
>
> a predetermined database stored in the associated memory, the database containing medical service codes and a set of relationships among the medical service codes defining whether selected ones of the medical service codes are valid when received with other selected ones of the medical service codes;
>
> means for receiving at least one claim;
>
> means for ascertaining whether the at least one claim contains a plurality of medical service codes;
>
> means for determining whether one of the medical service codes in the plurality of medical service codes is valid or invalid by interacting with the database and the set of relationships contained in the database;
>
> means for authorizing medical service codes which are valid in response to the means for determining; and
>
> means for rejecting medical service codes which are invalid in response to the means for determining.

(*Id.* at col. 117, ll. 41-64.)

Prior to the invention of the '164 patent, coding problems, such as unbundling, were known, but little was done to solve them. (*Id.* at col. 2, ll. 43-45.) Those insurers that did address the problem only did so by manually reviewing claims for coding errors. The '164 patent expressly disclosed this manual review as the precursor to the patented invention:

4

> CodeReview, a product of HPR, Inc., the assignee of the
> present invention, uses expert systems techniques
> especially suited to representing the medical judgment
> required to assign appropriate codes to surgeon's claims.
> CodeReview prompts the user for additional information
> not already entered into the computer, and will either
> recommend appropriate code(s) or recommend pending the
> claims until additional information is received form the
> physician's office. *The prompts and recommendations
> provided by CodeReview are based on the decision rules
> that physician reviewers have already used on a manual
> basis to solve identical problems and are consistent with
> informed surgical opinion.*

(*Id*. at col. 3, ll. 17-29 (emphasis added).) The '164 patent made clear, however, that

manually reviewing claims was an impractical and expensive endeavor that presented a

risk of inconsistent results. (*Id*. at col. 2, l. 57 - col. 3, l. 5.) Thus, the patented invention

represented a vast improvement by providing a cost-effective system for resolving coding

errors efficiently and consistently. (*Id*.)

The named inventors also viewed the patented invention as being significantly

different from the prior manual review. For example, at his deposition in this case, Dr.

Holloway distinguished the invention of the '164 patent from the manual review that co-

inventor Dr. Hertenstein had been performing on medical claims submitted to his

employer Caterpillar Corporation:

> ...while you say Dr. Hertenstein did this manually, he did
> not use these rules [in the patent] manually. He didn't have
> a list of these rules anywhere. He didn't -- he couldn't
> describe these rules if you had asked him.
>
> What he did was look at a claim and come up with
> an answer. He had no idea what process he was using to go
> from what was on the [medical] claim to his answer.
>
> So I would argue or I'm -- I'm responding now
> saying, no, these are not -- this is not what Dr. Hertenstein
> did. The answer corresponded to the answer he came up
> with, but this was not the process he used to get there.

(Barlow Decl., Exh. 3 at 278:6-279:3.)

5

**B.    TriZetto's Inequitable Conduct Allegations.**

As discussed above, TriZetto asserts inequitable conduct based on the alleged

failure to disclose a prior art reference and other information to the PTO.  The allegedly

undisclosed reference--the Egdahl & Hertenstein article--is a 12-page article describing

the system used by Caterpillar Corporation, a self-insured company, to negotiate and

implement fee schedules for surgical procedures.  (Barlow Decl., Exh. 4 at 349.)  Much

of the article focuses on Caterpillar's access-oriented approach to preventing

overpayment of medical fees by working with physicians to negotiate fee schedules that

are reasonable and help ensure that Caterpillar's employees and their families have broad

access to medical providers.  (*Id.* at 350-54.)  However, the article also briefly discusses

Caterpillar's manual review of physician bills for coding errors:

> CAT claims processors subject each incoming physician
> bill to a coding analysis of CPT-4 codes as a first step, and
> recode claims where irregularities are found.  Obvious
> simple coding errors are corrected first.  Individuals with
> clinical knowledge and judgment then compare the
> provider's description of services with submitted codes;
> operative reports are requested for most surgical claims and
> follow-up calls to provider offices for clarifying
> information are common.  Once the claim reviewer is
> satisfied that enough information is available to code the
> bill consistent with CAT procedures, recoding is finalized,
> and the correct codes are compared with established
> regional fee schedules.  Reviewers with clinical experience
> consult the CAT M.D. as needed, assuring that a high level
> of understanding of the surgical experience is applied in the
> review process.

(*Id.* at 351.)  Following this description, the article provides four examples of claims with

specific coding errors and the corrections that would be made to those claims.  (*Id.* at

351-52.)

TriZetto also alleges inequitable conduct based on statements made in a 1994

Harvard Business School case study--Amar Bhide & Brian Mohan, *Marcia Radosevich*

*and Health Payment Review: 1989(A)*, HARVARD BUSINESS SCHOOL CASE, 9-394-204

(Feb. 1999) ("Harvard Business School case study").  Marcia Radosevich was the

6

president of HPR, the original assignee of the '164 patent. As the title of the document suggests, the case study describes the authors' discussions with Dr. Radosevich regarding her work at HPR in the 1989 timeframe.[2] In particular, the case study discusses her work relating to the launch of HPR and HPR's early efforts to sell its CodeReview product. The specific statements relating to TriZetto's inequitable conduct allegations are discussed in the argument below.

## IV. SUMMARY JUDGMENT OF NO INEQUITABLE CONDUCT IS WARRANTED BECAUSE TRIZETTO CANNOT PROVE EVERY ELEMENT OF ITS DEFENSE AS A MATTER OF LAW.

### A. Summary Judgment Standard.

Summary judgment is proper if "there is no genuine issue as to any material fact and … the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). The moving party bears the burden of proving that no genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 n.10 (1986). If the moving party has shown an absence of material fact, the nonmoving party then "must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 587 (quoting FED. R. CIV. P. 56(e)). The mere existence of some evidence supporting the nonmoving party will not defeat a motion for summary judgment. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Rather, there must exist "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* As this Court has held, "[i]f the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law." *Boston Scientific Scimed, Inc. v. Cordis Corp.*, 392 F. Supp. 2d 676, 680 (D. Del. 2005).

---

[2] TriZetto incorrectly implies in its Answer that the case study existed in 1989. Although the case study related to events that took place in 1989, the case study was prepared and first published in 1994. (Barlow Decl., Exh. 5 at 1.)

**B.    Law Regarding Inequitable Conduct.**

To prove inequitable conduct based on a failure to disclose material information, an alleged infringer must "'offer clear and convincing proof of the materiality of the prior art, knowledge chargeable to the applicant of that prior art and of its materiality, and the applicant's failure to disclose the prior art, coupled with an intent to mislead the PTO.'" *Warner-Lambert Co. v. Teva Pharms. USA, Inc.*, 418 F.3d 1326, 1342-43 (Fed. Cir. 2005) (quoting *Molins PLC v. Textron, Inc.*, 48 F.3d 1172, 1178 (Fed. Cir. 1995)). "Clear and convincing evidence is evidence that 'could place in the ultimate factfinder an abiding conviction that the truth of [the] factual contentions are "highly probable."'" *Boston Scientific*, 392 F. Supp. 2d at 680 (quoting *Colorado v. New Mexico*, 467 U.S. 310, 316 (1984)) (brackets in original).

Information is material if "there is a substantial likelihood that a reasonable examiner would have considered the information important in deciding whether to allow the application to issue as a patent." *TAP Pharm. Prods., Inc. v. OWL Pharms., LLC*, 419 F.3d 1346, 1351 (Fed. Cir. 2005). "If the withheld information is merely cumulative in light of other references considered by the examiner, the information is not material." *Id.*

Proof of materiality does not establish or presume knowledge or intent. *See Warner-Lambert*, 418 F.3d at 1346 ("[D]etermining whether there was intent to deceive is still a contextual exercise, and materiality does not presume intent, which is a separate and essential component of inequitable conduct.") (internal quotations omitted). Similarly, deceptive intent cannot be inferred from the nondisclosure of information alone. *See Hebert v. Lisle Corp.*, 99 F.3d 1108, 1116 (Fed. Cir. 1996). Conduct amounting to "'gross negligence' also does not of itself justify an inference of intent to deceive; the involved conduct, viewed in light of all the evidence, including evidence indicative of good faith, must indicate sufficient culpability to require a finding of intent to deceive." *Kingsdown Med. Consultants Ltd. v. Hollister, Inc.*, 863 F.2d 867, 876 (Fed. Cir. 1988).

8

C.     **TriZetto Cannot Show by Clear and Convincing Evidence that the Allegedly Undisclosed Information Was Material.**

1.     **The Egdahl & Hertenstein Article.**

TriZetto cannot establish the threshold element of materiality with regard to the alleged nondisclosure of the Egdahl & Hertenstein article because the article is cumulative of information that was already provided to the PTO. TriZetto contends that by not disclosing the article, the inventors of the '164 patent withheld information regarding the manual review of medical claims for coding errors. However, that information was already disclosed to the PTO in the '164 patent's specification.

The '164 patent's specification explicitly disclosed to the PTO that physician reviewers had been reviewing medical claims on a manual basis to address the same types of coding errors addressed by the invention of the '164 patent:

> CodeReview, a product of HPR, Inc., the assignee of the present invention, uses expert systems techniques especially suited to representing the medical judgment required to assign appropriate codes to surgeon's claims. CodeReview prompts the user for additional information not already entered into the computer, and will either recommend appropriate code(s) or recommend pending the claims until additional information is received form the physician's office. *The prompts and recommendations provided by CodeReview are based on the decision rules that physician reviewers have already used on a manual basis to solve identical problems and are consistent with informed surgical opinion.*

(D.I. 7., Exh. A at col. 3, ll. 17-29 (emphasis added).)

The Egdahl & Hertenstein article similarly states that claims reviewers were manually reviewing medical claims to identify and correct coding irregularities:

> CAT claims processors subject each incoming physician bill to a coding analysis of CPT-4 codes as a first step, and recode claims where irregularities are found. Obvious simple coding errors are corrected first. Individuals with clinical knowledge and judgment then compare the provider's description of services with submitted codes; operative reports are requested for most surgical claims and follow-up calls to provider offices for clarifying information are common. Once the claim reviewer is satisfied that enough information is available to code the bill consistent with CAT procedures, recoding is finalized,

9

and the correct codes are compared with established
regional fee schedules. Reviewers with clinical experience
consult the CAT M.D. as needed, assuring that a high level
of understanding of the surgical experience is applied in the
review process.

(Barlow Decl., Exh. 4 at 351.)

The '164 patent and the Egdahl & Hertenstein article both disclose that claims
reviewers were manually reviewing medical claims, that they were reviewing those
claims to check for coding errors and to determine the appropriate codes to assign to the
claims, and that they sought additional information about the claims when necessary.
Thus, because the '164 patent already provided the examiner with the relevant
background regarding the prior manual review of medical claims, the Egdahl &
Hertenstein article was cumulative and not material. *See Ruiz v. A.B. Chance Co.*, 234
F.3d 654, 670 (Fed. Cir. 2000) (finding no inequitable conduct based on nondisclosure of
prior art because the specification of the patents-in-suit disclosed the relevant information
from the undisclosed prior art).

That the Egdahl & Hertenstein article is not material is further demonstrated by
the fact that TriZetto has no affirmative evidence that anyone considered the article to be
material. Although TriZetto deposed all four named inventors, it never examined any of
them regarding whether or not they considered the article to be material. Moreover,
TriZetto's own expert on validity and infringement testified that he has no opinion
regarding whether any prior art was material to the examination of the patent and did not
intend to express any opinion on that subject in his expert report. (Barlow Decl., Exh. 16
at 250:3-13.)

Accordingly, TriZetto cannot prove inequitable conduct based on the
nondisclosure of the Egdahl & Hertenstein article.

### 2. The Harvard Business School Case Study.

TriZetto also cannot show inequitable conduct based on statements Dr. Radosevich
made in the Harvard Business School case study. TriZetto alleges that Dr. Radosevich

admitted in the case study that the patented invention was obvious and disclosed in commonly available books on expert systems. (D.I. 10 at 5.) TriZetto argues that HPR should have disclosed these admissions to the PTO during prosecution. The evidence, however, does not support TriZetto's characterization of Dr. Radosevich's statements.

TriZetto first argues that Dr. Radosevich admitted that the patented invention was obvious because she made the following statement in the case study:

> I was immensely attracted to the concept. I liken the product [CodeReview] to a paper clip or the Post-It note pads. I couldn't believe that no one else had developed software to review claims. It was such a simple and ho-hum idea--and yet an incredible amount of money could be made.

(Barlow Decl., Exh. 5 at 3.) Although Dr. Radosevich does not state that the invention was obvious, TriZetto infers that opinion solely from her use of the phrase "a simple and ho-hum idea." (Barlow Decl., Exh. 1 at 18.) TriZetto's argument is without merit. As an initial matter, TriZetto's reliance on a statement made in a case study published in 1994--*i.e.*, after the '164 patent issued in October 1993--is improper because the statement does not evidence what Dr. Radosevich believed during the prosecution of the '164 patent. More importantly though, TriZetto misconstrues Dr. Radosevich's statement.

The statement on its face does not establish that Dr. Radosevich believed the patented invention was obvious. To the contrary, Dr. Radosevich makes clear that despite the commercial success of the invention, "no one else had developed software to review claims." She also likened the patented invention to two other products--the paper clip and Post-It notes--both of which are patented. *See, e.g.,* U.S. Patent No. 868,747 ("Paper-Clip"); No. 4,237,587 ("Paper clip"); No. 5,194,299 ("Repositionable pressure-sensitive adhesive sheet material").

Dr. Radosevich's deposition testimony in this case confirms that she believed that the invention was not obvious and, in fact, was "a little stroke of genius":

> Q.    Why did you believe that developing this type of software was such a simple and ho-hum idea?

11

> A.    It seemed so obvious that CPT-4 codes should be
>        looked at in this way that I was surprised to learn
>        that they hadn't been, and not only had they not
>        been but no one had done anything about it.
>
>        So that's why I compared it to a paper clip or a
>        Post-It. It's one of those things that once you have
>        it, you have the idea it's, like, oh, yeah, duh, you
>        know. But coming up with the idea was actually a
>        little stroke of genius.

(Barlow Decl., Exh. 6 at 86:11-21.) Moreover, Dr. Radosevich testified that she was not

referring to the patented invention when she used the phrase "simple and ho-hum idea,"

but to the general idea of reviewing and correcting CPT codes prior to payment:

> Q.    And was the, what you referred to here as a simple
>        and ho-hum idea, were you referring to the idea of
>        developing software to use CPT-4 codes?
>
> A.    I don't -- I think I was just referring to the whole
>        idea of reviewing CPT codes and making sure they
>        are correct before you pay them. You know, that's
>        your business.
>
> Q.    Did you have anything else in you mind when you
>        were referring to the "simple and ho-hum idea"?
>
> A.    Not that I remember.

(*Id.* at 87:12-21.) Because TriZetto lacks sufficient evidence to show that Dr. Radosevich

considered the patented invention to be obvious, TriZetto cannot prove inequitable

conduct based on the nondisclosure of that information.

TriZetto also contends that Dr. Radosevich admitted that the patented invention

was disclosed in commonly available books on expert systems based on the following

statement in the case study:

> Rule 101 in software development is: you never sell the
> prototype. But, we were running out of money, because
> William Ryker [Don Holloway[3]], who's brilliant, decided
> he wanted to be vice president for software development.
> He went to the BU bookstore, bought a book on expert
> systems, and decided how to build the system.

---

[3] At her deposition, Dr. Radosevich explained that William Ryker was a pseudonym that she
gave to named inventor Don Holloway. (Barlow Decl., Exh. 6 at 91:4-14.)

(Barlow Decl., Exh. 5 at 5.) TriZetto, however, again misreads Dr. Radosevich's statement. Dr. Radosevich did not indicate that the patented invention was disclosed in a book on expert systems or that such a book was used to develop the original invention. In fact, her statement refers to work being performed on the mainframe version of the system in 1989, after the '164 patent was applied for and after the PC version of the invention had already been reduced to practice. (*Id.*)

Dr. Radosevich also provided no information as to what, if anything, a book on expert systems was used for. Indeed, Dr. Radosevich confirmed at her deposition that, in fact, she did not know whether a book on expert systems was used in any way. (Barlow Decl., Exh. 6 at 90:20-92:3.) Moreover, Dr. Holloway testified at his deposition that he was not aware of anyone who purchased a book on expert systems as part of the development of CodeReview. (Barlow Decl., Exh. 3 at 209:22-210:1.) Because the evidence does not support TriZetto's inference that the patented invention was disclosed in a book on expert systems, TriZetto's inequitable conduct defense based on the nondisclosure of such information fails as a matter of law.

### 3. Allegedly Undisclosed Facts Regarding Inventorship and Government Funding.

McKesson is also entitled to summary judgment of no inequitable conduct based on the alleged failures to disclose that "four programming and code review consultants participated in the development of the claimed software" and that "the work [to develop the invention] was funded by U.S. Government sponsored research." (D.I. 10 at 5.) Both alleged nondisclosures concern information that is not relevant to patentability and therefore is not material.

The alleged participation of programming and code review consultants in "the development of the claimed software" is only relevant to inventorship if the consultants participated in the conception of the patented invention. The Manual of Patent Examining Procedure, which guides an examiner's decision regarding patentability,

13

makes clear that "[u]nless a person contributes to the conception of the invention, he is not an inventor. ... Insofar as defining an inventor is concerned, reduction to practice, *per se*, is irrelevant." M.P.E.P. § 2137.01 (internal quotations omitted). *See also Ethicon, Inc. v. United States Surgical Corp.*, 135 F.3d 1456, 1460 (Fed. Cir. 1998) ("[O]ne does not qualify as a joint inventor by merely assisting the actual inventor after conception of the claimed invention.").

The "four programming and code review consultants" referenced by TriZetto were identified by Dr. Radosevich in the Harvard Business School case study. (D.I. 10 at 5.) Specifically, in a section titled "March 1989," Dr. Radosevich stated:

> We have monthly expenses of $85,000. We now have on staff three full-time employees and five full-time consultants--two programmers (the two in Iowa), two product developers--who generate the coding rules--and one salesperson who is an MD.

(Barlow Decl., Exh. 5 at 6.)

There is no evidence that these programmers and product developers participated in the conception of the patented invention. Dr. Radosevich discussed these individuals in connection with work occurring at HPR in 1989--after the '164 patent was applied for in September 1988. (*Id.*) Nothing in the article suggests that they were working for HPR prior to September 1988, let alone that they contributed to the conception of the patented invention.

In addition, Dr. Radosevich confirmed at her deposition that the programmers identified in the article could not have helped conceive of the invention because they joined HPR after the invention had been reduced to practice:

> Q.    Did these individuals living in Iowa assist with the mainframe version?
>
> A.    Yes.
>
> Q.    Did they do anything on the PC version?
>
> A.    No.

14

> Q.    The PC version had already been finished before
>        they were retained?
>
> A.    Finished.

(Barlow Decl., Exh. 6 at 92:10-17.)  Because TriZetto cannot prove that the four

consultants contributed to the conception of the patented invention, their identities were

not material and did not need to be disclosed to the PTO.

The alleged nondisclosure of government funding also is not relevant.  First,

TriZetto has no documentary or testimonial evidence that any of the development work

regarding the patented invention was funded by the federal government.  Indeed, TriZetto

took little or no discovery on this issue.  Moreover, information about government

funding is irrelevant:

> Defendants have not even suggested that the information
> regarding [the government] funding and the government's
> subsequent rights would possibly cause an examiner to
> deny the patent.  *Had the information been disclosed, it
> would not have been considered by the examiner, because
> the funding information does not have a logical
> relationship to the decision on whether or not to issue the
> '928 patent.*

*Trinity Indus. v. Rd. Sys.*, 235 F. Supp. 2d 536, 541 (E.D. Tex. 2002) (emphasis added).

Thus, as a matter of law, the alleged nondisclosure of government funding cannot support

a finding of inequitable conduct.

Because TriZetto cannot present clear and convincing evidence that any of the

allegedly undisclosed information was material, the Court should grant summary

judgment of no inequitable conduct.

### D.    The Court Should Grant Summary Judgment Because TriZetto Lacks any Evidence of Deceptive Intent.

Summary judgment of no inequitable conduct is also proper because TriZetto

cannot prove deceptive intent by clear and convincing evidence.  Despite ample

opportunities during discovery, TriZetto has failed to develop any evidence that those

substantively involved in the '164 patent's prosecution intended to deceive the PTO.

15

First, TriZetto cannot prove that the attorneys who prosecuted the '164 patent intended to deceive the PTO because there is no evidence that they even knew of the allegedly undisclosed information. *See Tenneco Auto. Operating Co. v. Visteon Corp.*, 375 F. Supp. 2d 366, 375 (D. Del. 2005) (granting summary judgment of no inequitable conduct because defendant failed to present any evidence that prosecuting attorneys had knowledge of undisclosed prior art or its materiality). During discovery, TriZetto subpoenaed the three prosecuting attorneys for numerous categories of documents regarding the patented invention and the prosecution of the '164 patent, including documents relating to the Egdahl & Hertenstein article. (Barlow Decl., Exhs. 7, 8, 9.) All of the attorneys responded that they did not have any responsive documents. (Barlow Decl., Exhs. 10, 11, 12.) Moreover, TriZetto elected not to depose any of the prosecuting attorneys, even though it was fully aware of the fact that they all reside in Massachusetts and therefore could not be subpoenaed to testify at trial in this case. Thus, the only evidence available to TriZetto indicates that the attorneys had no documents bearing on the issues, and TriZetto can adduce no further evidence at trial concerning what the attorneys did or did not know regarding the allegedly undisclosed information.

TriZetto also has failed to develop any evidence that the named inventors intended to deceive the PTO. Despite deposing the four inventors for a total of seven days, TriZetto asked few questions regarding their knowledge of the allegedly undisclosed information or the alleged nondisclosure of such information to the PTO.[4] For example, TriZetto did not ask the inventors any questions regarding whether they considered any of the allegedly undisclosed information to be material or why they did not disclose that information to the PTO. Other than the Egdahl & Hertenstein article, TriZetto also did not examine any of the inventors about whether they considered or discussed withholding from the PTO any of the allegedly undisclosed information.

---

[4] As with the prosecuting attorneys, all of the named inventors reside outside the jurisdiction of the Court. They also are not employed by either party.

With regard to the Egdahl & Hertenstein article, inventors Holloway and Dugan testified that they recalled not having any discussions about whether or not to disclose the article. (Barlow Decl., Exh. 3 at 293:15-19 ("Q. ...Were there any discussions at HPR or HPI about whether those articles should be given to the Patent Office? A. Not that I remember.") & Exh. 13 at 106:24-107:6 ("Q. Do you recall any discussion with Dr. Holloway or Dr. Hertenstein about the disclosing of this article to the patent office? A. No. Q. Did anyone tell you that -- that either Dr. Hertenstein, Dr. Holloway or somebody at HPI, was not going to disclose this to the patent office? A. No.").) Moreover, TriZetto has no evidence that Dr. Hertenstein considered or discussed withholding his article from the PTO because TriZetto never examined him about the nondisclosure of his article.

The evidence also shows that none of the inventors would have considered the Egdahl & Hertenstein article to be material because they did not believe that Dr. Hertenstein's manual review of claims at Caterpillar disclosed the rules or system described in the patent. Dr. Hertenstein testified that he "didn't think it was possible to develop a system to do" what he did manually. (Barlow Decl., Exh. 15 at 222:5-9.) Dr. Holloway also testified that he did not believe that Dr. Hertenstein's manual review used or revealed the rules or process disclosed in the '164 patent:

> ...while you say Dr. Hertenstein did this manually, he did not use these rules [in the patent] manually. He didn't have a list of these rules anywhere. He didn't -- he couldn't describe these rules if you had asked him.
>
> What he did was look at a claim and come up with an answer. He had no idea what process he was using to go from what was on the [medical] claim to his answer.
>
> So I would argue or I'm -- I'm responding now saying, no, these are not -- this is not what Dr. Hertenstein did. The answer corresponded to the answer he came up with, but this was not the process he used to get there.

(Barlow Decl., Exh. 3 at 278:6-279:3.) Inventors Kelli Dugan and George Goldberg provided similar testimony. (Barlow Decl., Exh. 13 at 21:16-17 ("The way you talk about a manual process makes it sound like it was something more than it was.") & Exh.

14 at 168:7-8 ("I'm not sure he [Dr. Hertenstein] ever methodized [his manual process] in the sense of systematized it.").) Thus, TriZetto cannot show that the inventors viewed the allegedly undisclosed information as material or that they ever considered withholding such information from the PTO.

There is also no evidence of deceptive intent with regard to Dr. Radosevich. Even assuming that TriZetto can prove that Dr. Radosevich was substantively involved in the '164 patent's prosecution, TriZetto cannot establish that she intended to deceive the PTO because at her deposition, TriZetto chose not to examine Dr. Radosevich regarding any of the alleged nondisclosures.

Because TriZetto has failed to develop any evidence, let alone clear and convincing evidence, that anyone substantively involved in the '164 patent's prosecution intended to deceive the PTO, McKesson is entitled to summary judgment of no inequitable conduct.

18

## V.    CONCLUSION.

For the foregoing reasons, McKesson respectfully requests that the Court grant its motion for summary judgment as to TriZetto's Seventh Affirmative Defense of unenforceability due to inequitable conduct and its Counterclaim for a declaration of unenforceability due to inequitable conduct.

By: _____

Thomas J. Allingham II (#0476)
Michael A. Barlow (#3928)
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
One Rodney Square
P.O. Box 636
Wilmington, Delaware  19899
(302) 651-3000

Attorneys for Plaintiff
McKesson Information Solutions LLC

OF COUNSEL:
Jeffrey G. Randall
David W. Hansen
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
525 University Avenue, Suite 1100
Palo Alto, CA  94301
(650) 470-4500

Dated:  December 15, 2005