# EXHIBIT 5

**Harvard Business School**

9-394-204
Rev. February 5, 1999

# Marcia Radosevich and Health Payment Review: 1989 (A)

Marcia Radosevich, president of Health Payment Review (HPR), wondered what it would take to convert prospects into customers.

Marcia and several health care experts had launched HPR in 1987 to develop and market software that would review reimbursement claims submitted by doctors, hospitals, and laboratories. HPR management believed that reviewing claims for overcharges and inconsistencies could result in significant savings for providers of health plans such as HMOs, insurance companies, and corporations. Payments for surgical procedures, for example, could be reduced by 5% to 15%. And, using software would be far less costly than manually inspecting claims.

With $750,000 provided by the Caterpillar company, a leading manufacturer of earth-moving equipment, HPR had begun developing its first product, *CodeReview*. Two years later, in 1989, it had developed a prototype that ran on personal computers (PCs) and that it hoped to convert to a mainframe-based product. The company had nearly exhausted its cash, however, and Marcia decided to sell the PC version in order to fund development of the mainframe product. By March, her sales efforts had come to naught: many potential customers had shown great interest, but none had given HPR an order.

## Background

Marcia, the third of six children, was born and raised in Iowa. Her father had died when she was 13. I n 1974, after graduating with a sociology degree from Cornell College in Iowa, she worked as legal secretary and paralegal. After nine months, she decided against a legal career and entered graduate school at the University of Iowa. A Ph.D. in sociology in 1982 led her to faculty positions at Boston College and Yale, where she studied social deviance and white-collar crime. Marcia found her research enjoyable, but not her teaching assignments and, in 1984, decided on another career change. She ruled out law and government, where she feared the excessive bureaucracy and red tape, and although she felt that business was where "dumb people went," she enrolled in Wharton Business School's summer program. The program, which limited enrollment to 40 and compressed an academic year's worth of courses into a summer term, attracted many other "refugees from the world of academia."

*Professor Amar Bhidé and Brian Mohan, MBA '94, prepared this case as the basis for class discussion rather than to illustrate either effective or ineffective handling of an administrative situation.*

Copyright © 1994 by the President and Fellows of Harvard College. To order copies or request permission to reproduce materials, call 1-800-545-7685, write Harvard Business School Publishing, Boston, MA 02163, or go to http://www.hbsp.harvard.edu. No part of this publication may be reproduced, stored in a retrieval system, used in a spreadsheet, or transmitted in any form or by any means—electronic, mechanical, photocopying, recording, or otherwise—without the permission of Harvard Business School.

1



DEPOSITION
EXHIBIT

TRZ 034271

Her certificate in Business Administration and fascination for quantitative analysis and research led Marcia to a job with a premier health care consulting firm. There she managed high-visibility projects with Chrysler, General Motors, and the UAW, developing expertise in analyzing health care costs as well as in compiling and interpreting clinical and statistical data.

Marcia left the consulting firm in 1986. She recalled:

> It was a tremendous organization with outstanding people. But I still felt stifled by the research. It was too academic and we didn't have the power to implement real change. I wanted to make things happen.

In her next job, as regional director for Managed Health Care Services (MHCS), Marcia developed and managed a preferred provider organization (PPO) for the Travelers Insurance Companies. She enjoyed her experience at MHCS:

> I used my skills to create something—putting together hospital and physician PPO deals. I could make things happen, even when others said it was impossible. I developed networks, which were among the fastest growing in the country, in markets that skeptics in the company said were saturated. And, I learned how to sell and negotiate from the two principals of the firm. They were the best teachers I've ever had.

> I had imagined salespeople to be slick, fast-talking, amusing persons. I had imagined negotiating was pounding your shoe on the table. These guys taught me that selling is about building a relationship. It's about getting in early, defining the playing ground and the rules of the game, creating a sense of urgency, and building toward a conclusion. It's about being nonthreatening: "Go ahead and think I'm some nice girl from Iowa, and I'm a Ph.D., and I would never be threatening to anyone." It's about patience, it's about controlling the timing.

> These guys never raised their voices. They were smart, unassuming, and their egos didn't get in the way. They let somebody else take credit for their ideas. They spent all the time they needed to—morning, noon and night—being available. Clients would sometimes say to them, "Here's the language I want in the contract" and it would be totally unacceptable. They'd never say "No"; they'd say "let me understand what your concern is here. What's the problem you are trying to solve with this language?" Then they'd find out that you didn't really want their first-born child.

When a large company acquired MHCS, in 1988, Marcia prepared to take a six-month sabbatical and go scuba diving. Instead, the HPR opportunity came along.

## Launching Health Payment Review

HPR began as a joint research project between Boston University (BU) and Caterpillar, Inc. headquartered in Peoria, Illinois. For many years, Dr. Robert Hertenstein, medical director of Group Insurance at Caterpillar, had reviewed reimbursement claims manually for accidental or intentional errors and saved the company about $500,000-$600,000 a year. For example, Hertenstein often found "unbundling" claim errors—billing separately for the components of a treatment instead of for a less expensive inclusive procedure. Thus he would look for doctors who submitted an "a la carte" bill of $4,500 for the components of a hysterectomy rather than the $2,400 bundled flat fee.

TRZ 034272

Concerned about its growing health care claims and its reliance on the skills of one individual, Caterpillar sought the help of BU's Health Policy Institute (HPI). The HPI team working on the Caterpillar project—Drs. Richard Egdahl, George Goldberg, and William Ryker—were well-known researchers in health care cost containment who also had extensive clinical experience. In the course of their study, the team concluded that an automated system to review claims would produce considerable savings for organizations such as Caterpillar. And, they decided to form a private, for-profit company to develop and sell such systems.

Marcia got involved with the HPI team as a result of her friendship with Goldberg, whom she had worked with in her previous consulting job. For about six months, before HPR was formally launched, she served as a consultant to the HPI doctors. In this capacity, she urged them to seek financing from Caterpillar and helped negotiate the terms. Then, in July 1988, the doctors appointed Marcia president.

> They needed a businessperson, and as far as they were concerned, I was a business genius! These men were brilliant researchers and academics, but they were completely without a clue on all aspects of the business. I had been out of academia for four years at the time, and they thought I was very experienced. I was immensely attracted to the concept. I liken the product to a paper clip or the Post-It note pads. I couldn't believe that no one else had developed software to review claims. It was such a simple and ho-hum idea—and yet an incredible amount of money could be made.

Although by June, Caterpillar had agreed, in principle, to provide $750,000 in return for a royalty on HPR's product, the parties had not signed a contract. Marcia recalled:

> When I walked in the door, it was through an academic BU appointment at HPI. There was no money in HPR, just these incomplete agreements, with brackets around paragraphs for the incomplete stuff. My first job was to try to do this deal. I was being paid an academic salary, with the proviso that as soon as I got the money from Caterpillar I could go back to a quasi-normal private-sector level. So I was highly motivated.

> I knew the negotiations could go on forever. They had been going on forever. Nobody knew what they were doing. The guy at Caterpillar who was trying to do it was the benefits manager, and the guy at HPI was a Ph.D. in Operations Research. They would talk on the phone, and then two weeks would go by before they had another discussion. Every time somebody would change something, they would give it back to the lawyers to have them completely redraft the whole thing.

> We had to create a sense of urgency. The first day I walked in, I called the guy at Caterpillar and said, "We have to get this done within 30 days, or else I'm going to shop it. I'm not getting paid, and there are other people interested in this. Just do it or not." He tried to tell me that Caterpillar goes on vacation in August. I said, "No, this has all got to be done by then."

> We ended up signing in six weeks. I worked night and day. I was calling this guy at home. I was faxing things to him, I was courier-ing things to him at home. He never had this done to him before. He kept wanting to wait until next week. I said, "No." I was driving everybody crazy. He said, his lawyers couldn't turn documents around that fast. I asked him for the names of the lawyers. I would call them: "Please do this for me. I'm desperate, I'm not getting paid, we've got to get this done." I think that's one of the many areas where being a woman really helped

3

Marcia Radosevich and Health Payment Review: 1989 (A)

me, because they perceived me as much less threatening.  This was all I did—morning, noon, and night.  I wrote stuff, and I would try to keep lawyers out of it as much as I could.  I had this Ph.D. in operations research writing things.  He said, "Marcia, I'm not a lawyer."  I said, "It doesn't matter.  Write it up, write it in English."  Then we gave it to HPR's lawyer and I told him, "You have to write this up immediately."  He was a BU patent attorney who said he wasn't a corporate lawyer.  And I said, "William give me this . . . just write it up."  He had a couple of percentage points of HPR because he had incorporated the company.  I said, "You've got to earn your money here.  Come on, I'm going to make you rich."  So he worked late weekends, and he wrote this agreement up.  It's far from being a perfect legal document, but it was legal; it was enough, and they signed it.  (See Exhibit 1 for excerpts from the Caterpillar agreement).

Caterpillar agreed to put up $750,000 in three equal installments.  At the very beginning, they had said, "Rather than give you the money, we'll just develop the software ourselves."  We asked, "How much would it cost you?"  They said $750,000.  We agreed to do it for them for $750,000, and we promised to throw in on-going maintenance and support for free.  We knew that $750,000 wasn't enough, but it would get us through the first 6 to 12 months, and we could get a PC version done.  We would need more money for a mainframe version, but we would cross that bridge when we got there.

The deal could have been structured in a variety of ways.  The most obvious way for Caterpillar to take a large equity position.  That I badly did not want.  I didn't want a big company as a partner.  They would want to try to run everything.  They wouldn't understand the business I was in:  They build earth-moving equipment, they don't build software.  I was hoping to grow the company and take it public; but big-company partners that don't need you to make a lot of money are less likely to let you do the kinds of things that you need to do in order to get rich.  Big companies often use little companies as a think tank or an R&D extension.

We tried to figure out a deal that would give Caterpillar some upside potential, and then when I was still a consultant, we came up with the idea of a royalty stream.  Then William Ryker wrote it up—he has to write up everything—and I reviewed and edited it.  He then just wanted to send it to the Caterpillar guys, but I made William call first and read it over the phone and then follow up in writing.  We went through many iterations, with William writing quite elaborate equations for the royalty, which amounted to about 5% of net and 1% of gross.  I wonder if the Caterpillar people really understood William's equations—I don't think our chairman, Dick Egdahl, who is brilliant, understood.  But, by the time I joined HPR full time, they had agreed to the formula.  William is very sincere, and we were able to show them how much money they would make, if we were successful, without all the hassles of equity.

Then the problem became that they wanted an open-ended royalty stream.  But deals are good only if you can get out of them.  I didn't want this ongoing obligation to Caterpillar; one of these days, we would go public, and I didn't want to write in my prospectus that I owed Caterpillar 1% of the gross revenues of my flagship product.  At first, it seemed unfair, to them, but we eventually obtained an option to buy them out, according to a formula we negotiated.  They didn't want us to be able to buy them out, but they understood, from a business perspective, why it made sense.

TRZ 034274

They began wanting to postpone final agreement on the buyout provision, and I wouldn't let them. I knew if we got the deal signed, if we got the money, and if they got their software, we were never going to agree on how I could buy them out early. So I told them to sign the entire deal, or I would shop it somewhere else. I told them Aetna would give me money. And I gave them all the reasons why I would not buy them out early, while I was getting them to tell me that I could. They finally just agreed. Part of it was creating the momentum and the sense of urgency. It had to be done by the end of August, or I would go elsewhere. I had to get paid. Part of it was forcing them to agree to all of it at once. And finally, we just outlasted them. They had been in negotiations at this point almost a year. They just wanted to get it over with and get on with doing the work.

We also gave a little bit of equity in HPR to BU's venture capital fund. Our chairman, Dick Egdahl, wanted to create a model whereby for-profit enterprises could be spun out of universities, where the university would not be a stone around the entrepreneur's neck, yet would have some recognition and upside. We didn't use any of BU's money; still, the fact is that the Caterpillar relationship came about as a result of the university. And by giving a little bit of equity, we got a lot of attention from the BU people. They felt great: they hadn't given us any money, and they got equity.

### March 1989

With Caterpillar's money in hand, HPR began developing *CodeReview*, which belonged to the category of software known as expert systems. Expert-systems software helped users in fields such as oil exploration, process control, and medical diagnosis solve difficult problems by incorporating the rules of thumb of experienced practitioners. Similarly, HPR planned to draw upon the knowledge of more than 50 experienced physicians, surgeons, and subspecialists and include tens of thousands of clinical-decision rules in *CodeReview*. It would update this knowledge base annually, as procedures and their payment schedules changed.

The company planned to develop a PC-based prototype and then a version for mainframe computers. HPR programmers could develop the PC prototype relatively quickly using D-Base, a popular off-the-shelf database package. Caterpillar would use this version immediately, as a substitute for its manual reviews. The prototype would not, however, process large numbers of claims quickly.. Moreover, because most organizations processed their medical claims on mainframes, they would have to enter data twice—on the PC for review and then for normal processing. Therefore, HPR planned to follow the PC-based prototype with a mainframe version. But developing the mainframe version would be more time consuming and difficult. HPR wanted a program that could easily be adapted to many types of mainframes and, unlike the PC version, could not build on an off-the-shelf package like D-base.

In accordance with its plan, in 1989, HPR delivered a PC product to Caterpillar on January 2. It covered, Marcia said, "just the surgical section, but it was enough to call it a product, and it was all Caterpillar wanted at the time." Soon thereafter she decided to try to sell the PC prototype to other customers, before HPR had developed the mainframe version. Marcia recalled:

Rule 101 in software development is: you never sell the prototype. But, we were running out of money, because William Ryker, who's brilliant, decided he wanted to be vice president for software development. He went to the BU bookstore, bought a book on expert systems, and decided how to build the system. And he's been giving much of the money we got from Caterpillar over to two computer consultants who aren't building anything useful. They live in Iowa so that they can meditate with the Maharishi Yogi there. I've been sweating bullets. It's like an

TRZ 034275

hourglass; every drop of sand is another dollar. But, William is a founder of the company . . .

We have monthly expenses of $85,000. We now have on staff three full-time employees and five full-time consultants—two programmers (the two in Iowa), two product developers—who generate the coding rules—and one salesperson who is an MD.

I thought, we're going to go bankrupt. I looked around for things to sell, and the only thing we can sell is the prototype. I thought, "Screw the rules, we've got to sell this PC thing, even if it wasn't built as a commercial system." We hired a consultant to do some technical writing and the documentation to make it look like a product, and we started trying to sell it. We drew up a licensing agreement — $100,000 for installation and $60,000 for annual maintenance and updates of the knowledge base.

There are a lot of people in the industry who know me or Dick Egdahl, so it wasn't any problem getting an audience. Dick also lent us the services of Steve, a young M.D. at the Health Policy Institute who wanted to learn how to sell. Steve and I visited several dozen potential customers.

We've really worked at building relationships with prospects. To build a relationship, you have to spend time with someone. You have to have face time, and you have to spend money on airfares to get it. And you send them little articles to keep your name visible: "I saw this article in the *Wall Street Journal*; you might be interested." Of course, the guy has seen the article, but you thought of him and talked it over with him. That helps a lot. So I've been working to get as much face time as I can, and I've been coaching Steve as well.

Steve, who has a great personality, can play the doctor bit up to the hilt. He tells them war stories about working in the Emergency Room, and they feel that they were in there, too, and that maybe they are as smart as Steve. Dick Egdahl says that most people don't get five minutes with their doctor, and now here's Steve lavishing attention on them. And when benefits managers deal with doctors or Ph.D.s, it makes them more comfortable: We are not salespeople; we are not even businesspeople. We are intellectuals, right?

But, we haven't made a sale yet. We've encountered great skepticism. *CodeReview* runs only on PCs, and many of the guys we've talked to run big mainframe shops and have severe mainframitis. Nobody has done anything like this before, and they're afraid that doctors will react negatively to reviewing claims. The payers of health care still have a lot of doctor fear. It's OK for Caterpillar, they say, because they own Peoria. HPR is a brand-new company—what if they use it, make it an integral part of their operations, and then HPR sinks? They have a million reasons not to do it. I actually think a number of them are interested, but they're afraid to be the first ones.

And we have only a couple of weeks' worth of cash left. Beyond that, I suppose we could ask BU's venture capital fund for a short-term loan. Dick Egdahl also has some grants at the HPI, and we could put some more people on the Institute payroll and pay the Institute back when we get some revenues. But that can only be a stopgap.

We have to make a sale.

Exhibit 1    Excerpts from License Agreement with Caterpillar Inc.

**Background**

HPR is a start-up company which intends to develop and market a computer software product which, in general, is useful in applying medical judgment to the evaluation of medical claims submitted by health care practitioners prior to payment of such claims.

CATERPILLAR desires to facilitate the development of such computer software product and to use the product at any of its facilities or the facilities of its subsidiaries, wherever located.

**Section 2.1**

HPR shall initially develop a microcomputer version of the SOFTWARE to run on IBM AT or PS/2, or compatible hardware, with 640k RAM and 10mb hard disk drive, and deliver the same to CATERPILLAR for acceptance testing.....

**Section 2.4**

After completion of said microcomputer version above, HPR shall develop a version of the SOFTWARE that will interface with CATERPILLAR's mainframe computer claims processing system in a language mutually agreed upon by the parties and deliver a prototype version of the same to CATERPILLAR within 6 months of the completion of said microcomputer version.....

**Section 2.5**

To assist HPR in the development of the SOFTWARE and as additional consideration of the rights herein granted to CATERPILLAR, CATERPILLAR agrees to provide, at no charge, the services of Robert D. Hertenstein, M.D. to serve as a consultant to HPR.

**Section 4.1**

Upon acceptance as herein provided, HPR shall grant to CATERPILLAR a non-exclusive, non-transferable and perpetual CORPORATE LICENSE to use the OBJECT CODE of the SOFTWARE, as provided herein.....

**Section 5.1**

For the rights to be granted to CATERPILLAR, CATERPILLAR shall pay HPR a total sum of Three Hundred Thousand Dollars ($300,000.00).....

**Section 11.1**

For a period of twenty (20) years from the date of this Agreement, HPR shall provide MAINTENANCE SERVICE to CATERPILLAR.....to the extent that it is made available to HPR's other customers. Such MAINTENANCE SERVICE shall include, but is not limited to:

One copy of each UPDATE to the SOFTWARE and SOURCE CODE at the time of its release.

Reasonable written or telephone consultations regarding use of or problems with the SOFTWARE.....

Excerpts from Loan Agreement:

TRZ 034277

**Section 2.01**

.....to make a loan in the principal amount of Four Hundred Fifty Thousand Dollars ($450,000.00) (the "Loan") to the Borrower in three equal installments as follows:

> 1. One Hundred Fifty Thousand Dollars ($150,000.00) within 20 days after Lender's acceptance (as such term is used in the License Agreement) of the first prototype version.

> 2. One Hundred Fifty Thousand Dollars ($150,000.00) within 20 days after Lender's acceptance of the second prototype version.

> 3. One Hundred Fifty Thousand Dollars ($150,000.00) within 20 days after Lender's acceptance of the third prototype version.

**Section 2.02**

(a)  REPAYMENT. Borrower shall repay said Four Hundred Fifty Thousand Dollars ($450,000.00) plus interest thereon by making the following two types of payments to Lender:

> (1) Borrower shall pay Lender an amount equal to five percent (5%) of Borrower's gross sales from the date of this Agreement, until an amount equal to Seven Hundred Fifty Thousand Dollars ($750,000.00) has been paid to Lender. If, however, an amount equal to $750,000.00 has not been paid to Lender as of December 31, 1983, on that date Borrower shall pay that portion of said $750,000.00 which has not been previously been paid.

> (2) Immediately following the payment of the foregoing Seven Hundred Fifty Thousand Dollars ($750,000.00), Borrower shall pay Lender for a period of twenty years (measured from the date of the final installment on such $750,000.00 payment) less the number of years for which it takes Lender to repay said $750,000.00, the greater of 1% of gross sales for each fiscal year or 5% of net after-tax profit for each fiscal year.....

(b)  SALE OF STOCK. In the event that a majority of the issued stock of Borrower is, in a single transaction, either a) sold to a third party not presently a stockholder.....

> .....In the event that a sale is made prior to full payment by the Borrower of the $750,000.00 due under Section 2.02 (a) (1), or, made after such payment but prior to two full calendar years of Section 2.02 (a) (2) payments, the amount to be paid to the Lender shall equal a) any remaining amount due under Section 2.02 (a) (2), plus b) the average of the amounts which were paid by the Borrower under Section 2.02 (a) (2), or would have been paid by Borrower under such Section had the amount in 2.02 (a) (1) previously been paid, for the two full calendar years preceding the sale, multiplied by the number of years remaining under the Section 2.02 (a) (2) payment obligation.

8

TRZ 034278

 **Harvard Business School**

**9-394-205**
Rev. August 10, 1998

# Marcia Radosevich and Health Payment Review: 1989 (B)

Marcia recalled:

We were within a week of having to shut the doors when I thought of the classic puppy dog sale. The product was great. It had a cute interface. When you saw it and started using it and saving money, I knew it would be like heroin. You couldn't do without it. But people were afraid to make a commitment and look like a fool. So I thought, "Let's take away the risk."

We'd offer prospects a PC with our software loaded on it. They wouldn't have to pay us anything except 50% of anything they saved.

*Professor Amar Bhidé and Brian Mohan, MBA '94, prepared this case as the basis for class discussion rather than to illustrate either effective or ineffective handling of an administrative situation.*

Copyright © 1994 by the President and Fellows of Harvard College. To order copies or request permission to reproduce materials, call 1-800-545-7685, write Harvard Business School Publishing, Boston, MA 02163, or go to http://www.hbsp.harvard.edu. No part of this publication may be reproduced, stored in a retrieval system, used in a spreadsheet, or transmitted in any form or by any means—electronic, mechanical, photocopying, recording, or otherwise—without the permission of Harvard Business School.

TRZ 034279

**Harvard Business School**

9-394-206
Rev. August 10, 1998

# Marcia Radosevich and Health Payment Review: 1989 (C)

Marcia continued:

We made a list of the people who we thought were the most intrigued, but were afraid, and who fit a number of characteristics: They could make the decision themselves—sometimes our primary contact was the medical director who couldn't make this kind of a decision. We needed a vice president for claims— which is where the software would be used—who was in a small-enough company or who had a large-enough responsibility to do this kind of experiment, and who was on the verge of saying yes.

About a dozen or so of the people on our list turned us down.

Perry, who worked at the Globe Insurance Company in Milwaukee, was next. He had signing authority, and although he, too, had been unwilling to sign a license agreement, he seemed to want the software.

Steve, our doctor who was trying to learn how to become a salesperson, had established a relationship with Perry. Steve and I had made the first sales call together, but then Steve made several trips to Milwaukee by himself. Perry was a vice president in a small insurance company and loved the fact that this smart surgeon was his friend.

So I told Steve, "Call up Perry, tell him you're going to be in Milwaukee and you'd like to stop by." Steve said, "That's a lie." I said, "It's not a lie; I'm sending you to Milwaukee. When you get to Perry's office, you drop off a little PC and say he can just use our software for three months and he doesn't have to pay us anything except half of what he saves."

*Professor Amar Bhidé and Brian Mohan MBA '94, prepared this case as the basis for class discussion rather than to illustrate either effective or ineffective handling of an administrative situation.*

Copyright © 1994 by the President and Fellows of Harvard College. To order copies or request permission to reproduce materials, call 1-800-545-7685, write Harvard Business School Publishing, Boston, MA 02163, or go to http://www.hbsp.harvard.edu. No part of this publication may be reproduced, stored in a retrieval system, used in a spreadsheet, or transmitted in any form or by any means—electronic, mechanical, photocopying, recording, or otherwise—without the permission of Harvard Business School.

TRZ 034280

**Harvard Business School**

**9-394-207**
Rev. August 11, 1998

# Marcia Radosevich and Health Payment Review: 1989 (D)

Marcia continued:

Although I had met Perry and done the initial presentation to him, I didn't go along because his relationship was with Steve. If I had gone out with Steve, there would have been a change in the pattern: it had always been Steve on the phone, Steve taking Perry out to dinner. If I had gone, it might have caused Perry to think, "Oh, this is a deal."

I wanted to make it casual, sort of an afterthought: "I'm in Milwaukee; I'll stop by." Perry was afraid to make a commitment, and we made it so there was none. Steve was not climbing into an airplane specifically to see him. This was just his buddy Steve, in town for some reason—God knows why.

Steve didn't even ask Perry to sign a piece of paper. To address Perry's concerns about doctor reaction, Steve said that if he had to, he would move in and personally answer to physicians on the phone. That's where Steve being a doctor came in handy. We took care of the risk.

We then called a couple of other people with the same offer, but they wanted to wait to see what Perry's experience would be like.

I suspended the consultants who were writing our mainframe software, and we waited. In a couple of weeks, Perry called and said he wanted out of the deal. He already owed me $60,000 from the $120,000 he had saved for Globe Insurance. He wanted to go back to the original $100,000 license with the annual $60,000 maintenance fee. Could we mail him the license? I said to Steve, "You don't mail it. You get out there, sign the deal, and tell him he has to give us a check when he signs."

*Professor Amar Bhidé and Brian Mohan, MBA '94, prepared this case as the basis for class discussion rather than to illustrate either effective or ineffective handling of an administrative situation.*

Copyright © 1994 by the President and Fellows of Harvard College. To order copies or request permission to reproduce materials, call 1-800-545-7685, write Harvard Business School Publishing, Boston, MA 02163, or go to http://www.hbsp.harvard.edu. No part of this publication may be reproduced, stored in a retrieval system, used in a spreadsheet, or transmitted in any form or by any means—electronic, mechanical, photocopying, recording, or otherwise—without the permission of Harvard Business School.

TRZ 034281

Harvard Business School

**9-394-208**
Rev. August 11, 1998

# Marcia Radosevich and Health Payment Review: 1989 (E)

Marcia continued:

We then called a sister company of Globe Insurance who had been waiting to see what Perry's experience would be. We offered to share their savings as well, but they went directly to the license.

Then we started calling everybody. We thought we had to have a name for it, so we called it a pilot study. I wrote a simple one- and one-half-page agreement, with no legalese. I didn't want it to sound like a lawyer had written it, although I had our lawyers look at it to make sure I wasn't getting into trouble. We offered prospects the option of splitting the savings or paying us $5,000 a month—anybody can afford $5,000 a month. In some cases, we even let them test it for free, but I always wanted to try and get money, because then people would value the trial. At the end of the pilot, customers could convert to a full license. We sold a zillion of those, and most converted, but we looked forward to the day when we were well enough established so that we wouldn't have to go through these pilots.

*Professor Amar Bhidé and Brian Mohan, MBA '94 prepared this case as the basis for class discussion rather than to illustrate either effective or ineffective handling of an administrative situation.*

Copyright © 1994 by the President and Fellows of Harvard College. To order copies or request permission to reproduce materials, call 1-800-545-7685, write Harvard Business School Publishing, Boston, MA 02163, or go to http://www.hbsp.harvard.edu. No part of this publication may be reproduced, stored in a retrieval system, used in a spreadsheet, or transmitted in any form or by any means—electronic, mechanical, photocopying, recording, or otherwise—without the permission of Harvard Business School.

TRZ 034282

 **Harvard Business School**

9-394-209
Rev. August 11, 1998

# Marcia Radosevich and Health Payment Review: 1989 (F)

The summer of 1989 found Marcia in Fort Wayne, Indiana, trying to presell the mainframe version of *CodeReview* to an insurance company client. She recalled:

> After we sold our pilots, we began work on the mainframe version.
>
> Our design is quite clever. Business applications on mainframes have traditionally been written in a programming language called COBOL. Our software is being written—behind schedule and over budget by William's meditators in Iowa—in a language called C. It will run on several types of hardware "servers." These servers will be connected to but outside the mainframe, because we need to update our knowledge bases frequently, and we don't want to bring the whole system down while we do it. Besides, adding servers is much cheaper than adding more mainframe capacity.
>
> I've been trying to sell this concept all over the country, and I've just been laughed at. This is an industry that is hooked on 1970s' technology. When I use words like servers, C, and Unix, they act like I am a communist, feminist radical from Boston.
>
> So now I'm in Fort Wayne, Indiana, talking to the systems guy of an insurance company. He's a great big guy, with a great big brass belt buckle. I'm standing at a board, like a professor, doing price-performance charts, trying to convince him this is the cheapest way: you don't have to buy more iron, and you don't have to hire more people. This great big guy hitches up his belt buckle, slams his hand down on the table, and says, "Little lady." I look at him, and he says, "I run me a COBOL shop and got me a bank of 3090 mainframes, and I got me an army of COBOL programmers. Don't give me this C s_ _t."

*Professor Amar Bhidé and Brian Mohan, MBA '94, prepared this case as the basis for class discussion rather than to illustrate either effective or ineffective handling of an administrative situation.*

Copyright © 1994 by the President and Fellows of Harvard College. To order copies or request permission to reproduce materials, call 1-800-545-7685, write Harvard Business School Publishing, Boston, MA 02163, or go to http://www.hbsp.harvard.edu No part of this publication may be reproduced, stored in a retrieval system, used in a spreadsheet, or transmitted in any form or by any means—electronic, mechanical, photocopying, recording, or otherwise—without the permission of Harvard Business School.

TRZ 034283

 **Harvard Business School**

9-394-210
Rev. August 11, 1998

# Marcia Radosevich and Health Payment Review: 1989 (G)

Marcia continued:

It was summer. It was hot. I had had it. I looked at him and said, "If I give this to you in COBOL to reside on your mainframe, would you buy it?" He said, "Yes." I said "Done." We signed a deal. We would give him a PC version as an interim measure until we got to the mainframe.

I now came home to Boston and wondered, "What are we going to do?" We had to architect an affordable, flexible, and maintainable COBOL product that would reside on a host without having to rewrite it for every different database manager and every different telecommunication system. It took a little while to get there, but we finally hit upon it, and then it all seemed easy and natural.

It actually is a very simple program. It only has about 6,000 lines of code. Quite a number of times big companies say, "I have me an army of COBOL programmers; I don't need you." I say to them, "Fine, I will give you the software for free. You just pay me for my knowledge base, and it changes every year because the codes change. There is a built-in obsolescence in 12 months. When I put it to them that way, then they begin to see that the value isn't really in the software; it's in the knowledge base.

*Professor Amar Bhidé and Brian Mohan, MBA '94, prepared this case as the basis for class discussion rather than to illustrate either effective or ineffective handling of an administrative situation.*

Copyright © 1994 by the President and Fellows of Harvard College. To order copies or request permission to reproduce materials, call 1-800-545-7685, write Harvard Business School Publishing, Boston, MA 02163, or go to http://www.hbsp.harvard.edu. No part of this publication may be reproduced, stored in a retrieval system, used in a spreadsheet, or transmitted in any form or by any means—electronic, mechanical, photocopying, recording, or otherwise—without the permission of Harvard Business School.

TRZ 034284

# EXHIBIT 6

Page 1

1              UNITED STATES DISTRICT COURT
             SOUTHERN STATES DISTRICT COURT
2                CASE NO.   04-1258 SLR

3

MCKESSON INFORMATION SOLUTIONS, LLC.
4

5          Plaintiff,

6    -vs-

7    THE TRIZETTO GROUP, INC.,

8          Defendant.

9    _____

10        DEPOSITION OF MARCIA J. RADOSEVICH

11

                Thursday, July 7, 2005
12              9:00 a.m. - 5:00 p.m.

13                 VOLUME I

14

15      H I G H L Y      C O N F I D E N T I A L

16

17            505 South Flagler Drive
                  Suite 600
18        West Palm Beach, Florida 33401

19

20

21   Reported By:
     Kathy Szabo, RPR
22   Notary Public, State of Florida
     Esquire Deposition Services
23   West Palm Beach Office    Job #739660

24

25

Page 86

1    clip or the Post-It note pads.  I couldn't believe

2    that no one else had developed software to review

3    claims.  It was such a simple and ho-hum idea and

4    yet an incredible amount of money could be made."

5    Was that -- do you believe that was an accurate

6    quote that you gave to Professor Bhide?

7         A.    Uh-huh.

8         Q.    I'm sorry, for the record you need to say

9    yes.  "Uh-huhs" don't come out very well.

10         A.    Yes. I'm sorry.  Yes.

11         Q.    Why did you believe that developing this

12    type of software was such a simple and ho-hum idea?

13         A.    It seemed so obvious that CPT-4 codes

14    should be looked at in this way that I was surprised

15    to learn that they hadn't been, and not only had

16    they not been but no one had done anything about it.

17              So that's why I compared it to a paper

18    clip or a Post-It.  It's one of those things that

19    once you have it, you have the idea it's, like, oh,

20    yeah, duh, you know.  But coming up with the idea

21    was actually a little stroke of genius.

22         Q.    Now, you knew at the time that at least

23    Dr. Hertenstein had been manually looking at CPT-4

24    codes during part of the Caterpillar claim

25    processing system?

Page 87

1       A.    At what time did I know it?

2             MR. RANDALL:   Objection.   It assume facts

3       not in evidence.

4   BY MR. THOMAS:

5       Q.    At the time that you spoke with Professor

6   Bhide for this study.

7       A.    Yes.

8       Q.    You knew that prior to HPR being formed

9   Dr. Hertenstein had looked at CPT-4 codes as part of

10  the manual process at Caterpillar?

11      A.    Yes.

12      Q.    And was the, what you referred to here as

13  a simple and ho-hum idea, were you referring to the

14  idea of developing software to use CPT-4 codes?

15      A.    I don't -- I think I was just referring to

16  the whole idea of reviewing CPT codes and making

17  sure they are correct before you pay them.   You

18  know, that's your business.

19      Q.    Did you have anything else in your mind

20  when you were referring to the "simple and ho-hum"?

21      A.    Not that I remember.

22            MR. RANDALL:   When you say something else

23      in mind, counsel, do you mean other than she's

24      testified to?

25  BY MR. THOMAS:

Page 90

1            you know, we may have to take the transcript to

2            the judge before we have our next deposition if

3            this continues.

4                    I will ask a new question.

5                    MR. RANDALL:  Well, fine.

6    BY MR. THOMAS:

7            Q.    Did you tell Professor Bhide that the PC

8    prototype had been developed relatively quickly?

9            A.    I can't remember if I told him that.

10           Q.    Okay.  Drop down to the next paragraph, it

11   reads, "In accordance with its plan, in 1989, HPR

12   delivered a PC prototype to Caterpillar on

13   January 2.  It covered, Marcia said, just the

14   surgical section but it was enough to call it a

15   product and it was all Caterpillar wanted at the

16   time."  So it is true that on January 2, 1989 you

17   delivered a PC product for the surgical section to

18   Caterpillar?

19           A.    Yes.

20           Q.    Below that is what appears to be a quote

21   from you.  "Rule 101 in software development is you

22   never sell the prototype.  But we were running out

23   of money, because William Ryker, who's brilliant,

24   decided he wanted to be vice-president of software

25   development.  He went to the BU bookstore, bought a

1    book on expert systems, and decided how to build the

2    system."  Do you see that?

3         A.   Yes.

4         Q.   Is it accurate that William Ryker was the

5    person who decided how to build the system?

6         A.   No, not really.  And William Ryker doesn't

7    really exist.  That's a fake name.

8         Q.   It's a fake name?

9         A.   To protect the innocent.

10        Q.   Okay.  Is there a real person who you were

11   using the name William Ryker for?

12        A.   Yes.

13        Q.   And who is that person?

14        A.   Don Holloway.

15        Q.   So was it -- did Don Holloway go to the BU

16   bookstore, buy a book on expert systems and decide

17   how to build the system?

18        A.   Don Holloway went to the BU bookstore, he

19   bought a book on expert systems and he -- and he

20   thought we could use expert system technology to

21   build the mainframe version.

22        Q.   So you're referring here to the mainframe

23   system as opposed to the PC version?

24        A.   Yes.

25        Q.   And was the book that he bought at the BU

Page 92

1    bookstore, as far as you know, used in any way in

2    creating the mainframe version?

3        A.   I don't know.

4        Q.   The quote goes on to say, "And he's been

5    giving much of the money we got from Caterpillar

6    over to two computer consultants who aren't building

7    anything useful.  They live in Iowa so that they can

8    meditate with the Maharishi Yogi there."

9        A.   Sad but true.

10       Q.   Did these individuals living in Iowa

11   assist with the mainframe version?

12       A.   Yes.

13       Q.   Did they do anything on the PC version?

14       A.   No.

15       Q.   The PC version had already been finished

16   before they were retained?

17       A.   Finished.

18       Q.   Delivered to Caterpillar, the three

19   chunks?

20       A.   Yes.

21       Q.   Turn over, please, to the last page of

22   Exhibit 10.  The last paragraph, I believe, is a

23   quote attributed to you.  It reads, "It actually is

24   a very simple program.  It only has 6,000 lines of

25   code.  Quite a number of times big companies say, I

# EXHIBIT 7

AO 88 (Rev. 11/94) Subpoena in a Civil C---

## Issued by the
# UNITED STATES DISTRICT COURT

_____                **DISTRICT OF** <u>Massachusetts</u>  _____

McKesson Information Solutions, LLC

### SUBPOENA IN A CIVIL CASE

V.

The TriZetto Group, Inc.

CASE NUMBER:[1]  94-1257-SLR
Pending in D. Del

TO:  Peter Corless of Edward & Angell, LLP
     101 Federal St.
     Boston, MA 02110

☐  YOU ARE COMMANDED to appear in the United States District Court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
|  |  |
|  | DATE AND TIME |
|  |  |

☐  YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

| PLACE OF DEPOSITION | DATE AND TIME |
|---|---|
|  |  |

☒  YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects):
See Attached Schedule of Documents

| PLACE | DATE AND TIME |
|---|---|
| Beacon Hill Research | January 24, 2005 |
| 6 Beacon St., Suite 825 | 9:00 AM |
| <u>Boston, MA 02108</u> |  |

☐  YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|
|  |  |

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. Federal Rules of Civil Procedure, 30(b) (6).

| ISSUING OFFICER SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) | DATE |
|---|---|
| _signature_ | 12/20/04 |

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER
Matthew C. Lapple of Paul Hastings Janofsky & Walker, LLP   (Def. Atty.)
695 Town Center Dr., 17th Floor, Costa Mesa, CA 92626   (714) 668-6200

(See Rule 45, Federal Rules of Civil Procedure, Parts C & D on Reverse)

1  If action is pending in district other than district of issuance, state district under case number.

AO-88

AO 88 (Rev. 11/94) Subpoena in a Civil Case

## PROOF OF SERVICE

| | DATE | PLACE | |
|---|---|---|---|
| SERVED | | | |

| SERVED ON (PRINT NAME) | MANNER OF SERVICE |
|---|---|

| SERVED BY (PRINT NAME) | TITLE |
|---|---|

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on _____
DATE

_____
SIGNATURE OF SERVER

_____
ADDRESS OF SERVER

Rule 45, Federal Rules of Civil Procedure, Parts C & D:

(c) PROTECTION OF PERSONS SUBJECT TO SUBPOENAS.

(1) A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction, which may include, but is not limited to, lost earnings and reasonable attorney's fee.

(2) (A) A person commanded to produce and permit inspection and copying of designated books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.

(B) Subject to paragraph (d)(2) of this rule, a person commanded to produce and permit inspection and copying may, within 14 days after service of the subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to inspection or copying of any or all of the designated materials or of the premises. If objection is made, the party serving the subpoena shall not be entitled to inspect and copy materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production. Such an order to compel production shall protect any person who is not a party or an officer of a party from significant expense resulting ¬ the inspection and copying commanded.

) (A) On timely motion, the court by which a subpoena was .d shall quash or modify the subpoena if it

(i) fails to allow reasonable time for compliance;
(ii) requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides, is employed or regularly transacts business in

person, except that, subject to the provisions of clause (c)(3)(B)(iii) of this rule, such a person may in order to attend trial be commanded to travel from any such place within the state in which the trial is held, or
(iii) requires disclosure of privileged or other protected matter and no exception or waiver applies, or
(iv) subjects a person to undue burden.

(B) If a subpoena
(i) requires disclosure of a trade secret or other confidential research, development, or commercial information, or
(ii) requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or
(iii) requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial, the court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena, or if the party in whose behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

(d) DUTIES IN RESPONDING TO SUBPOENA.

(1) A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.

(2) When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim.



**Paul, Hastings, Janofsky & Walker LLP**
Seventeenth Floor • 695 Town Center Drive • Costa Mesa, CA 92626•1924
telephone 714 668 6200 • facsimile 714 979 1921 • www.paulhastings.com

## FACSIMILE TRANSMISSION

| to: | company/office: | facsimile: | telephone: |
|---|---|---|---|
| Michael C. Hendershot | Skadden, Arps | (888) 329-7976 | |
| Allan Soobert | Skadden, Arps | 202-393-5760 | |
| Thomas Allingham | Skadden, Arps | 302-651-3001 | |
| Jeff Randall | Skadden, Arps | 650-470-4570 | |

| from: | facsimile: | telephone: | initials: |
|---|---|---|---|
| Matthew C. Lapple | (714) 979-1921 | (714) 668-6234 | MCL3 |

| client name: | TriZetto | client matter number: | 36473.00019 |
|---|---|---|---|
| date: | January 4, 2005 | pages (with cover): | 9 |

comments:

**SASM&F**

**JAN 0 4 2005**

**RECEIVED**

**If you do not receive all pages, please call immediately Facsimile Center: (714) 668-6515**

This message is intended only for the use of the individual or entity to which it is addressed, and may contain information that is privileged, confidential and exempt from disclosure under applicable law. If the reader of this message is not the intended recipient, or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone, and return the original message to us at the above address via the U.S. Postal Service. Thank you..

OC/365668.1

AO 88 (Rev. 11/94) Subpoena in a Civil Case

---

## PROOF OF SERVICE

| | DATE | PLACE |
|---|---|---|
| SERVED | 12/28/04 | Edward & Angell, LLP<br>101 Federal St.  Boston, MA |

SERVED  Peter Corless

| SERVED ON (PRINT NAME) | MANNER OF SERVICE |
|---|---|
| Peter Corless | In Hand |

| SERVED BY (PRINT NAME) | TITLE |
|---|---|
| George Hebert.... | Process Server |

---

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on  12/28/04
              DATE

SIGNATURE OF SERVER

6 Beacon St. #825    Boston, MA
ADDRESS OF SERVER

---

Rule 45, Federal Rules of Civil Procedure, Parts C & D:

(c) PROTECTION OF PERSONS SUBJECT TO SUBPOENAS.

(1) A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction, which may include, but is not limited to, lost earnings and reasonable attorney's fee.

(2) (A) A person commanded to produce and permit inspection and copying of designated books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.

(B) Subject to paragraph (d)(2) of this rule, a person commanded to produce and permit inspection and copying may, within 14 days after service of the subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to inspection or copying of any or all of the designated materials or of the premises. If objection is made, the party serving the subpoena shall not be entitled to inspect and copy materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production. Such an order to compel production shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection and copying commanded.

(3) (A) On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it

(i) fails to allow reasonable time for compliance;

(ii) requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides, is employed or regularly transacts business in

person, except that, subject to the provisions of clause (c)(3)(B)(iii) of this rule, such a person may in order to attend trial be commanded to travel from any such place within the state in which the trial is held, or

(iii) requires disclosure of privileged or other protected matter and no exception or waiver applies, or

(iv) subjects a person to undue burden.

(B) If a subpoena

(i) requires disclosure of a trade secret or other confidential research, development, or commercial information, or

(ii) requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or

(iii) requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial, the court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena, or, if the party in whose behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

(d) DUTIES IN RESPONDING TO SUBPOENA.

(1) A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.

(2) When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim.

**PROOF OF SERVICE**

STATE OF CALIFORNIA                    } ss:

CITY AND COUNTY OF ORANGE              }

I am employed in the City and County of Orange, State of California. I am over the age of 18, and not a party to the within action. My business address is 695 Town Center Drive, Seventeenth Floor, Costa Mesa, California 92626-1924.

On January 4, 2005, I served the foregoing document(s) described as:

PROOFS OF SERVICE TO SUSAN HAMILTON, RICHARD EGDAHL, JAIFFA (SADIA) JIMINIAN, CT CORPORATION SYSTEM, JASON HONEYMAN, PETER CORLESS, AND AMIR BHIDE

on the interested parties by placing thereof in a sealed envelope(s) addressed as follows:

Jeffrey G. Randall
David W. Hansen
Michael Hendershot
Skadden, Arps, Slate, Meagher &
Flom LLP
525 University Ave., Suite 1100
Palo Alto, CA 94301
*Also served via facsimile

Allan Soobert
Skadden, Arps, Slate, Meagher &
Flom LLP
1440 New York Ave., N.W.
Washington, D.C. 20005
*Also served via facsimile

Thomas J. Allingham II
Skadden, Arps, Slate, Meagher &
Flom LLP
One Rodney Square
P.O. Box 636
Wilmington, DE 19899
*Also served via facsimile

Jeff Randall
Skadden, Arps, Slate, Meagher &
Flom LLP
525 University Avenue
Palo Alto, CA 94301-1908
*Also served via facsimile

[X]  **VIA U.S. MAIL:**
I am readily familiar with the firm's practice of collection and processing of correspondence for mailing. Under that practice such sealed envelope(s) would be deposited with the U.S. postal service on January 4, 2005 with postage thereon fully prepaid, at Costa Mesa, California.

I declare under penalty of perjury under the laws of the United States that the above is true and correct.

Executed on January 4, 2005, at Costa Mesa, California.

_____
                              Laina Anderson

SUBPOENA IN A CIVIL CASE

OC/364779.1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

MCKESSON INFORMATION SOLUTIONS, )
LLC                                                         )
                                                                 )
                        Plaintiff,                        )
                                                                 )
            v.                                               )  C.A. No. 04-1258 (SLR)
                                                                 )
THE TRIZETTO GROUP, INC.             )
                                                                 )  CERTIFICATE OF SERVICE
                        Defendant.                     )
                                                                 )
_____ )

STATE OF CALIFORNIA                           )
                                                              ) ss:
CITY AND COUNTY OF SAN DIEGO    )

      I am employed in the City and County of San Diego, State of California. I am over the age of 18, and not a party to the within action. My business address is 3579 Valley Centre Drive, San Diego, California 92130.

      On January 3, 2005, I served the foregoing documents described as:

**SUBPOENA IN A CIVIL CASE TO ROBERT D. HERTENSTEIN, M.D.**

**SUBPOENA IN A CIVIL CASE TO CATERPILLAR, INC.**

**SUBPOENA IN A CIVIL CASE TO HARVARD BUSINESS SCHOOL**

**SUBPOENA IN A CIVIL CASE TO BOSTON UNIVERSITY HEALTH POLICY INSTITUTE**

**SUBPOENA IN A CIVIL CASE TO RICHARD H. EGDAHL, M..D.**

**SUBPOENA IN A CIVIL CASE TO KELLI A. DUGAN, M.D.**

**SUBPOENA IN A CIVIL CASE TO AMAR BHIDÉ**

**SUBPOENA IN A CIVIL CASE TO JASON M. HONEYMAN**

**SUBPOENA IN A CIVIL CASE TO PETER CORLESS**

on the interested parties by placing thereof in a sealed envelope(s) addressed as follows:

SAN/105968.1

Jeffrey G. Randall
David W. Hansen
Michael Hendershot
Skadden, Arps, Slate, Meagher &
Flom LLP
525 University Ave., Suite 1100
Palo Alto, CA 94301

 **VIA OVERNIGHT MAIL:**

VIA United Parcel Service: By delivering such document(s) to an overnight mail service or an authorized courier in a sealed envelope or package designated by the express service courier addressed to the person(s) on whom it is to be served.

 **VIA U.S. MAIL:**

I am readily familiar with the firm's practice of collection and processing of correspondence for mailing. Under that practice such sealed envelope(s) would be deposited with the U.S. postal service on January 3, 2005 with postage thereon fully prepaid, at Costa Mesa, California.

I declare under penalty of perjury under the laws of the United States that the above is true and correct.

Executed on January 3, 2005, California.

Patricia D. Hoekman

# PETER CORLESS

## SCHEDULE OF REQUESTED DOCUMENTS

### DEFINITIONS

As used in this request, the terms set forth below are defined as follows:

1.  *Communication:*  The term "COMMUNICATION" means all forms of information transfer whereby information of any nature was recorded, transmitted, or transferred by any means, including orally, in writing, telephonically, by facsimile transmission, by electronic or magnetic transfer of computer files, by electronic or magnetic storage of computer files, by electronic mail, by voicemail or answering machine, or otherwise.

2.  *Concerning:*  The term "CONCERNING" means relating to, referring to, describing, evidencing, or supporting or rebutting the issue or argument described.

3.  *Document:*  The term "DOCUMENT" includes the plural as well as the singular, and is synonymous with the terms "writing" and "recording" as defined in Rule 1001 of the Federal Rules of Evidence, and is intended to include without limitation any handwritings, typewritings, printings, photostats, photocopies, drawings, drafts, charts, photographs, e-mail, tape recordings, filming and every other form of recording upon any tangible thing, any form of communication or representation including letters, words, numbers, symbols, pictures, sounds, or combinations thereof, any stored information or databases, whether maintained on paper, magnetic or electronic media, floppy disks, CD-ROMs, hard drives, zip drives, tapes or on other computer storage, or any other manner including the originals, or if the originals are unavailable, the duplicates of said DOCUMENTS, from which information can be obtained or translated.

4.  *You/Your:*  The terms "YOU" and "YOUR" refer to non-party Peter Corless and any other PERSON acting on his behalf.

OC/364894.1

5.     The term "CATERPILLAR" refers to non-party Caterpillar, Inc. and include its employees, agents, representatives, consultants, experts, investigators, accountants, attorneys, and advisors, and any other PERSON acting on its behalf, including subsidiary and affiliated corporations.

6.     The present tense includes the past and future tenses. The singular includes the plural, and the plural includes the singular. "All" means "any and all"; "any" means "any and all", "Including" means "including but not limited to." "And" and "or" encompass both "and" and "or". Words in the masculine, feminine or neuter form shall include each of the other genders.

7.     If the requested documents are maintained in a file, the file folder is included in the request for production of those documents.

8.     As used herein, the term "MCKESSON" refers to McKesson Information Solutions, LLC, its officers, directors, employees, attorneys, agents, consultants, and any individual, subsidiary, parent, or affiliated entity, including predecessors, successors, and assigns, through which they act or have acted with respect to the subject matter inquired of herein.

9.     As used herein, the term "HPR" refers to Health Payment Review, Inc., its officers, directors, employees, attorneys, agents, consultants, and any individual, subsidiary, parent, or affiliated entity, including predecessors, successors, and assigns, through which they act or have acted with respect to the subject matter inquired of herein.

10.     "The '164 patent" shall mean U.S. Patent No. 5,253,164 issued October 12, 1993 to Holloway et al., and attached hereto as Exhibit "A."

11.     The terms "AND" and "OR" shall be construed conjunctively and disjunctively so as to acquire the broadest meaning possible.

## INSTRUCTIONS

1.     If, in responding to this Request for Production, you encounter any

OC/364894.1

ambiguities when construing a request or definition, the response shall set forth the matter deemed ambiguous and the construction used in responding.

2.    Whenever in this Request you are asked to identify or produce a document which is deemed by you to be properly withheld from production for inspection or copying:

A.    If you are withholding the document under claim of privilege (including, but not limited to, the work product doctrine), please provide the information set forth in Fed. R. Civ. P.26 (b)(5), including the type of document, the general subject matter of the document, the date of the document, and such other information as is sufficient to identify the document, including, where appropriate, the author, addressee, custodian, and any other recipient of the document, and where not apparent, the relationship of the author, addressee, custodian, and any other recipient to each other, in a manner that, without revealing the information claimed to be protected, will enable this party to assess the applicability of the privilege or protection claimed by you;

B.    If you are withholding the document for any reason other than an objection that it is beyond the scope of discovery or that a request is unduly burdensome, identify as to each document and, in addition to the information requested in ¶2.A, above, please state the reason for withholding the document.

3.    When a document contains both privileged and non-privileged material, the non-privileged material should be disclosed to the fullest extent possible without thereby disclosing the privileged material. If a privilege is asserted with regard to part of the material contained in a document, please clearly indicate the portions as to which the privilege is claimed. When a document has been redacted or altered in any fashion, identify as to each document the reason for the redaction or alteration, the date of the redaction or alteration, and the person performing the redaction or alteration. Any redaction must be clearly visible on the redacted document.

4.    If production of any requested document(s) is objected to on the grounds

- 3 -

that production is unduly burdensome, describe the burden or expense of the proposed discovery.

## REQUESTS

### REQUEST FOR PRODUCTION NO. 1:

All documents concerning the formation of HPR.

### REQUEST FOR PRODUCTION NO. 2:

All documents concerning any agreement between YOU and HPR.

### REQUEST FOR PRODUCTION NO. 3:

All documents concerning HPR's "CodeReview" product.

### REQUEST FOR PRODUCTION NO. 4:

All documents and things concerning the conception, research and development or reduction to practice of HPR's "CodeReview" product.

### REQUEST FOR PRODUCTION NO. 5:

All documents and things concerning the '164 patent.

### REQUEST FOR PRODUCTION NO. 6:

All documents and things concerning the conception, research and development, or reduction to practice of the subject matter disclosed or claimed in the '164 patent.

### REQUEST FOR PRODUCTION NO. 7:

All documents and things concerning the preparation, filing, or prosecution of the application for the '164 patent, or related applications.

OC/364894.1



**REQUEST FOR PRODUCTION NO. 8:**

All documents concerning the article "An Access-oriented Negotiated Fee Schedule: The Caterpillar Experience" attached hereto as Exhibit B.

**REQUEST FOR PRODUCTION NO. 9:**

All documents concerning any public disclosure by Robert D. Hertenstein regarding the review of health care claims before September 30, 1987.

**REQUEST FOR PRODUCTION NO. 10:**

All documents concerning HPR's relationship with Boston University, the Boston University Medical Center, or the Boston University Health Policy Institute.

**REQUEST FOR PRODUCTION NO. 11:**

Documents sufficient to show your relationship with Boston University, the Boston University Medical Center, or the Boston University Health Policy Institute between 1986 and 1994.

**REQUEST FOR PRODUCTION NO. 12:**

All documents and things concerning any investigation, testing, evaluation, analysis, or opinion regarding the patentability of any subject matter disclosed in the '164 patent.

**REQUEST FOR PRODUCTION NO. 13:**

All documents and things concerning the ownership, chain of title, assignment, or licensing of the '164 patent.

OC/364894.1

**REQUEST FOR PRODUCTION NO. 14:**

All documents and things created prior to September 30, 1988 concerning any product or method that embodies, uses, or practices any of the subject matter disclosed in the '164 patent.

**REQUEST FOR PRODUCTION NO. 15:**

All documents and things used or referred to in the conception, development, or reduction to practice of the subject matter disclosed in the '164 patent, including but not limited to books, treatises, articles, computer programs, reference materials, or databases.

**REQUEST FOR PRODUCTION NO. 16:**

All prior art to the '164 Patent.

**REQUEST FOR PRODUCTION NO. 17:**

All documents concerning or evidencing the disclosure or failure to disclose prior art to the Patent Office by YOU or the named inventors of the '164 patent during the prosecution of the '164 Patent.

**REQUEST FOR PRODUCTION NO. 18:**

All documents concerning the lawsuit captioned <u>GMIS, INC. v. HEALTH PAYMENT REVIEW, INC.</u>, filed in the U.S. District Court for the Eastern District of Pennsylvania, Civil Action Number 94-576.

**REQUEST FOR PRODUCTION NO. 19:**

All documents concerning any participation by anyone other than the named inventors in the conception or reduction to practice of any subject matter disclosed in the '164 Patent.

- 6 -

OC/364894.1

**REQUEST FOR PRODUCTION NO. 20:**

All documents concerning Marcia Radosevich, William Ryker, or Richard Egdahl.


**REQUEST FOR PRODUCTION NO. 21:**

Documents sufficient to identify the current addresses and phone numbers of Marcia Radosevich and William Ryker.


**REQUEST FOR PRODUCTION NO. 22:**

Documents sufficient to identify the current address and phone number of each of the named inventors of the '164 patent.


**REQUEST FOR PRODUCTION NO. 23:**

The source code, object code, knowledge base and knowledge base interpreter for HPR's "CodeReview" software.

OC/364894.1