IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| MCKESSON INFORMATION SOLUTIONS LLC, | | |
| | Plaintiff, | |
| v. | | Civil Action No. 04-1258-SLR |
| THE TRIZETTO GROUP, INC. | | |
| | Defendant. | |

**OPENING BRIEF IN SUPPORT OF THE TRIZETTO GROUP INC.'S
MOTION FOR SUMMARY JUDGMENT OF NON-INFRINGEMENT**

MORRIS, NICHOLS, ARSHT & TUNNELL
Jack B. Blumenfeld (No. 1014)
Rodger D. Smith, II (No. 3778)
1201 N. Market Street
Wilmington, Delaware 19899
(302) 658-9200

Attorneys for Defendant The TriZetto Group, Inc.

Of Counsel:

GIBSON, DUNN & CRUTCHER LLP
Jeffrey T. Thomas
David Segal
Michael A. Sitzman
Daniel P. Muino
Jamboree Center, 4 Park Plaza
Irvine, CA  92614

December 15, 2005

# TABLE OF CONTENTS

Page

I.   NATURE AND STAGE OF THE PROCEEDING .............................................................. 1

II.  SUMMARY OF ARGUMENT ............................................................................................. 1

III. STATEMENT OF FACTS .................................................................................................... 3

    A.   The '164 Patent ........................................................................................................... 3

        1.   Background of the Technology ...................................................................... 3

        2.   Patent Claims ................................................................................................. 4

    B.   The TriZetto Products ................................................................................................. 5

IV.  ARGUMENT .......................................................................................................................... 5

    A.   SUMMARY JUDGMENT STANDARD ..................................................................... 5

        1.   The *Celotex* Standard Applies To Patent Cases ............................................ 5

        2.   McKesson Has The Burden Of Proving Infringement .................................. 6

    B.   MCKESSON  CANNOT PROVE INFRINGEMENT BECAUSE IT HAS
        FAILED TO PERFORM THE REQUIRED STRUCTURE-TO-STRUCTURE
        COMPARISON ............................................................................................................ 7

        1.   Proving Infringement Of A Means-Plus-Function Element Requires A
            Structure-To-Structure Comparison .............................................................. 7

        2.   The Corresponding Structure For A Computer-Implemented Means-Plus-
            Function Element Is The Disclosed Algorithm, Not Merely "Software".. 9

        3.   McKesson Has Failed To Identify Corresponding Structure That Is Clearly
            Linked To Each Means-Plus-Function Element .................................... 13

        4.   McKesson's Experts Have Failed To Perform A Structure-To-Structure
            Comparison ............................................................................................ 15

    C.   THE TRIZETTO PRODUCTS DO NOT INFRINGE THE CLAIMS OF THE
        '164 PATENT ............................................................................................................ 23

        1.   The TriZetto Products Do Not Contain A "Predetermined Database".... 24

        2.   The TriZetto Products Do Not Ascertain Whether Submitted Medical
            Claims Contain A Plurality Of Medical Service Codes .......................... 26

3.      McKesson Cannot Prove Infringement Under The Doctrine Of
        Equivalents..................................................................................... 27

V.   CONCLUSION............................................................................................. 28

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Altiris, Inc. v. Symantec Corp.*,
   318 F.3d 1363 (Fed. Cir. 2003).........................................................................10

*Barmag Barmer and Maschinensabrik AG v. Murata Mach Limited*,
   731 F.2d 831 (Fed. Cir. 1984)..............................................................................5

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986) ..............................................................................................5

*CytoLogix Corp. v. Ventana Med. Sys., Inc.*,
   76 U.S.P.Q.2d 1592 (Fed. Cir. 2005)................................................................8, 9

*Harris Corp. v. Ericsson Inc.*,
   417 F.3d 1241 (Fed. Cir. 2005)........................................................................9, 11

*Intellicall, Inc. v. Phonometrics, Inc.*,
   952 F.2d 1384 (Fed. Cir. 1992)........................................................................5, 6

*Johnson v. IVAC Corp.*,
   885 F.2d 1574 (Fed. Cir. 1989)......................................................................15, 23

*Mas-Hamilton Group v. LaGard, Inc.*,
   156 F.3d 1206 (Fed. Cir. 1998)...................................................................7, 8, 21

*Medical Instrumentation & Diagnostics Corp. v. Elekta AB*,
   344 F.3d 1205 (Fed. Cir. 2003)...........................................................7, 8, 11, 12

*O.I. Corp. v. Tekmar Co.*,
   115 F.3d 1576 (Fed. Cir. 1997)............................................................................7

*Pennwalt Corp. v. Durand-Wayland, Inc.*,
   833 F.2d 931 (Fed. Cir. 1987).............................................................8, 12, 15, 23

*SmithKline Diagnostics, Inc. v. Helena Labs. Corp.*,
   859 F.2d 878 (Fed. Cir. 1988)..............................................................................6

*TechSearch, L.L.C. v. Intel Corp.*,
   286 F.3d 1360 (Fed. Cir. 2002).........................................................................6, 8

*Under Sea Indus., Inc. v. Dacor Corp.*,
   833 F.2d 1551 (Fed. Cir. 1987)............................................................................6

*WMS Gaming Inc. v. Int'l Game Tech.*,
   184 F.3d 1339 (Fed. Cir. 1999)...........................................................................10

**Statutes**

35 U.S.C. § 112(6) ....................................................................................................7

## I.    NATURE AND STAGE OF THE PROCEEDING

On September 13, 2004, plaintiff McKesson Information Solutions, LLC ("McKesson") filed this suit against The TriZetto Group, Inc. ("TriZetto") alleging infringement of U.S. Patent No. 5,253,164 ("the '164 patent").  On October 1, 2004, McKesson amended its Complaint.  On November 1, 2004, TriZetto answered and filed a counterclaim seeking a declaratory judgment of invalidity, unenforceability, and non-infringement.

McKesson alleges that three of TriZetto's products (Facets, ClaimFacts and QicLink) infringe fifteen claims of the '164 patent (Claims 1-6 and 8-16).  Fact and expert discovery have been completed.  The Court has bifurcated the issue of invalidity and stayed motion practice and trial on that issue.  On the issues of infringement, damages and equitable defenses, motion practice is proceeding and scheduled for hearing on February 16, 2006, at which time the Court is also scheduled to consider any issues of claim construction.  Trial on the issues of infringement, damages and equitable defenses is set for April 17, 2006.  This is TriZetto's opening brief in support of its motion for summary judgment of non-infringement.

## II.    SUMMARY OF ARGUMENT

McKesson alleges that three TriZetto software products infringe Claims 1-6 and 8-16 of the '164 patent.[1]  As demonstrated herein, TriZetto should be granted summary judgment of non-infringement for two reasons:  First, McKesson cannot prove that the accused TriZetto products meet the means-plus-function elements of the '164 patent, because McKesson and its experts have failed to undertake the required structure-to-structure comparison.  Second, the accused TriZetto products do not contain or perform several elements of the asserted claims.

It is McKesson's burden to prove that the accused TriZetto products contain every element of the asserted claims, including the means-plus-function elements.  Each asserted claim

---

[1]    A copy of the '164 patent is attached as Exhibit A to the Appendix filed in support of this motion.  All exhibits to the Appendix are cited herein as "App. Exh."

of the '164 patent contains at least one element written in means-plus-function form, pursuant to 35 U.S.C. § 112(6). Means-plus-function elements are subject to a four-step infringement analysis. The patentee must:

    (1)    Identify the claimed function of the element;

    (2)    Identify the corresponding structure in the patent specification that performs the claimed function;

    (3)    Perform a function-to-function comparison to determine if the accused products have the identical function as the claim element; and

    (4)    Perform a structure-to-structure comparison to determine if the accused products have identical or equivalent structure that corresponds to the claim element.

McKesson cannot prove that the accused TriZetto products infringe the means-plus-function elements of the '164 patent, because it has not and cannot perform the required structure-to-structure comparison in step 4 above. McKesson's infringement experts, Dr. Mark Musen and Dr. Margaret Johnson, have not attempted to undertake a structural comparison. In their reports, Dr. Musen and Dr. Johnson fail to even identify corresponding structure for the means-plus-function elements, let alone compare the corresponding structure to the accused products. Instead, they declare that the corresponding structure is simply "software" and conclude that the accused products infringe because they too use "software" to perform their functions. This analysis is completely deficient as a matter of law.

The corresponding structure for a computer-implemented means-plus-function element is not merely "software," in some generic sense, but rather the *specific algorithm* disclosed in the patent for performing the associated function. Federal Circuit cases instruct that this algorithm must be identified and compared to the structure of the accused products in order to prove infringement. The failure of McKesson and its experts to perform this structural comparison dooms McKesson's infringement case and entitles TriZetto to summary judgment of non-infringement.

Additionally, McKesson is unable to establish infringement because the accused TriZetto products do not include at least two elements of the asserted claims. First, the products do not contain a "predetermined database" – i.e., a database that cannot be modified by the end user — as required by all of the asserted claims. Second, the products do not ascertain whether submitted medical claims contain a plurality of codes before applying multiple-code edits, as required by Claims 2-6, 8-12, and 14-16. The absence of these elements from the accused products precludes a finding of literal infringement. Furthermore, McKesson cannot rely on the doctrine of equivalents, because its experts have not undertaken any such analysis. Accordingly, summary judgment of non-infringement should be granted in TriZetto's favor.

## III. STATEMENT OF FACTS

### A. The '164 Patent

The '164 patent claims an expert computer system for processing medical claims containing medical service codes. '164 patent, Abstract. The patent was issued on October 12, 1993, to HPR, Inc., and is now owned by McKesson.

#### 1. Background of the Technology

The technology described in the '164 patent pertains to physician billing. Physicians receive payment for their medical services by submitting bills (known as "medical claims") to insurance companies, health maintenance organizations (HMOs), preferred provider organizations (PPOs), and other health benefit providers. *See* '164 patent, Cols. 1-2. The physician will list on a medical claim certain "medical service codes" which indicate the particular services or procedures performed for that patient. The medical service codes most commonly used are the CPT codes ("Current Procedural Terminology"), developed by the American Medical Association. *Id.*, Cols. 2:21-23. The CPT code set contains numerous codes reflecting a wide range of medical services and procedures (e.g., "exploration of the abdomen," "partial colectomy"). *Id.*, Col. 3:38-68. At the time the patent was issued, the CPT code set was in its fourth edition, and the codes were referred to as "CPT-4" codes.

3

From time to time, some physicians submit medical claims with improper code combinations, either "assigning a higher paying code than a procedure merits, or [] unpackaging services that were intended to be bundled into a single code." *Id.*, Col. 2:8-14. In some instances, these code combinations are merely an inadvertent error. In other cases, the physician deliberately submits the code combination in order to secure greater reimbursement for his or her services. *Id.*

In response to these coding problems, manual techniques were created to allow medical claim reviewers to catch and correct the coding errors in submitted medical claims. *Id.*, Col. 3:25-29. One such manual code-checking technique was developed into a computer system, called CodeReview, by HPR, Inc., the assignee of the '164 patent. *Id.*, Col. 3:17-29. CodeReview is the basis for the purported invention of the '164 patent.

### 2.    Patent Claims

The apparatus and method described in the '164 patent is a computer system for checking and editing the medical service codes on medical claims submitted by physicians. In the industry, the process of checking and editing medical service codes on a claim is typically called "clinical editing." Declaration of Craig Luftig ("Luftig Decl."), filed herewith, ¶ 3.

The asserted claims (Claims 1-6 and 8-16) utilize "a predetermined database containing medical service codes and a set of relationships among the medical service codes" to check and edit the medical service codes on the claim. The "relationships among the medical service codes" define whether or not particular combinations of codes submitted together on the same claim are appropriate. '164 patent, Claims 1-6, 8-16. In the industry, such relationships among medical codes are called "clinical criteria." Luftig Decl., ¶ 3.

Independent claims 1, 3, 13, 15 and 16 describe receiving a medical claim and determining if the medical service codes listed on that claim are "valid" – i.e., whether the codes are actual CPT-4 codes found in the predetermined database. If the codes are not valid, the user is informed of that fact or the codes are simply rejected for payment.

Independent claims 2, 10, 12 and 14 describe receiving a medical claim and ascertaining whether the claim contains more than one code. If more than one code is present, the relationships in the predetermined database are used to decide if a particular code is appropriate in combination with the other codes on the claim. Those codes found to be appropriate are authorized for payment and codes found to be inappropriate are rejected.

## B.    The TriZetto Products

McKesson accuses three TriZetto software products of infringing the '164 patent: Facets, ClaimFacts and QicLink (the "TriZetto Products"). Each of these products perform a wide range of claims adjudication functions, only one of which is clinical editing (i.e., checking and editing medical codes). Luftig Decl, ¶ 2; Declaration of Karen Lampe ("Lampe Decl."), filed herewith, ¶ 2; Declaration of John Danza ("Danza Decl."), filed herewith, ¶ 2.

## IV.    ARGUMENT

## A.    SUMMARY JUDGMENT STANDARD

### 1.    The *Celotex* Standard Applies To Patent Cases

The Supreme Court's decision in *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986), requires the party bearing the burden of proof at trial to come forward with facts showing that there is a genuine issue of material fact for trial. *Id.* at 321-322. As the Supreme Court held in *Celotex*, "the plain language of Rule 56(c) mandates the entry of summary judgment . . . against the party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322. This standard has been adopted in patent cases as well. *See e.g., Intellicall, Inc. v. Phonometrics, Inc.*, 952 F.2d 1384, 1389 (Fed. Cir. 1992) (affirming summary judgment of non-infringement because of patent owner's failure of proof); *Barmag Barmer and Maschinensabrik AG v. Murata Mach Limited*, 731 F.2d 831, 835 (Fed. Cir. 1984) (summary judgment is appropriate in a patent case as in any other).

### 2.       McKesson Has The Burden Of Proving Infringement

The burden of proving infringement of a patent rests with the patent holder. *SmithKline Diagnostics, Inc. v. Helena Labs. Corp.*, 859 F.2d 878, 889 (Fed. Cir. 1988); *Intellicall*, 952 F.2d at 1389. There is no burden upon an accused infringer to prove non-infringement. *Under Sea Indus., Inc. v. Dacor Corp.*, 833 F.2d 1551, 1557 (Fed. Cir. 1987) ("[t]he district court erred to the extent it apparently placed the burden on [the accused infringer] of showing non-infringement").

An infringement analysis involves two steps: "1) claim construction; and 2) application of the properly construed claim to the accused product." *TechSearch, L.L.C. v. Intel Corp.*, 286 F.3d 1360, 1369 (Fed. Cir. 2002).

TriZetto offers its construction of the patent claims in the Joint Statement of Disputed Claim Terms and Proposed Constructions ("Joint Stmt.") submitted by the parties. TriZetto also discusses specific issues of claim construction in TriZetto's Opening Claim Construction Brief ("TriZetto's Claim Constr. Br."), filed concurrently herewith.

In this case, however, McKesson has failed to meet its burden on infringement regardless of the outcome of the claim construction. The Court has already found that *some* structure (beyond merely "software") must be identified and linked to the specific claims. D.I. 99, Order of September 20, 2005 ("Sept. 20, 2005 Order"), p. 2. This structure must be compared to the TriZetto Products to determine infringement. McKesson has failed to do so in its proffered claim construction, through expert testimony, or as part of its infringement proof.

**B.    MCKESSON CANNOT PROVE INFRINGEMENT BECAUSE IT HAS FAILED TO PERFORM THE REQUIRED STRUCTURE-TO-STRUCTURE COMPARISON**

    **1.    Proving Infringement Of A Means-Plus-Function Element Requires A Structure-To-Structure Comparison**

Each of the asserted claims of the '164 patent contains at least one means-plus-function element.[2] Determining infringement of a means-plus-function element is a four-step process:

(1)    Identify the claimed function of the element;

(2)    Identify the corresponding structure in the patent specification that performs the function;

(3)    Perform a function-to-function comparison to see if the accused products have the identical function as the claim element; and

(4)    Perform a structure-to-structure comparison to see if the accused products have identical or equivalent structure that corresponds to the claim element.

*See Medical Instrumentation & Diagnostics Corp. v. Elekta AB ("MIDCO")*, 344 F.3d 1205, 1211 (Fed. Cir. 2003); *Mas-Hamilton Group v. LaGard, Inc.*, 156 F.3d 1206, 1211-12 (Fed. Cir. 1998).

Elements written in means-plus-function form are explicitly permitted by 35 U.S.C. § 112(6), which states:

An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof.

---

[2]    Independent claims 1, 2 and 16 contain the element "means for operating on a predetermined database." Independent claims 3, 10, 12, 13, 14 and 15, together with their associated dependent claims, contain multiple means-plus-function elements – e.g., "means for receiving," "means for ascertaining," "means for determining," "means for authorizing," and "means for rejecting." There is no dispute that these elements are written in means-plus-function form and are subject to the requirements of 35 U.S.C. § 112(6).

In exchange for the benefit of writing a claim element in the simplified means-plus-function form, the patentee is obliged to clearly link the claimed function to corresponding structure disclosed in the patent specification. *See MIDCO*, 344 F.3d at 1211 ("[t]he duty of a patentee to clearly link or associate structure with the claimed function is the quid pro quo for allowing the patentee to express the claim in terms of function under section 112, paragraph 6"); *O.I. Corp. v. Tekmar Co.*, 115 F.3d 1576, 1583 (Fed. Cir. 1997) ("the price that must be paid for use of that convenience is limitation of the claim to the means specified in the written description and equivalents thereof").

As with any infringement analysis, the four-step process for determining infringement of a means-plus-function element includes both "1) claim construction; and 2) application of the properly construed claim to the accused product." *TechSearch*, 286 F.3d at 1369. The first two steps involve construction of the means-plus-function element:

(1)     "The first step . . . is to identify the particular claimed function."

(2)     "The second step in the analysis is to look to the specification and identify the corresponding structure for that function."

*MIDCO*, 344 F.3d at 1210. The third and fourth steps involve comparing the accused products to the construed claim element:

(3)     A function-to-function comparison: "[D]etermine whether the accused device performs an identical function to the one recited in the means-plus-function clause."

(4)     A structure-to-structure comparison: "[D]etermine whether the accused device utilizes the same structure or materials as described in the specification, or their equivalents."

*Mas-Hamilton*, 156 F.3d at 1211-12; *see also Pennwalt Corp. v. Durand-Wayland, Inc.*, 833 F.2d 931, 934 (Fed. Cir. 1987) ("the court must compare the accused structure *with the disclosed structure*, and must find equivalent *structure* as well as *identity* of claimed *function* for the structure") (emphasis in original). In other words, infringement cannot be shown without proof

that the structure in the accused product is equivalent to the structures from the patent specification that correspond with the functions described in the claims.

The Federal Circuit has recently reiterated this requirement. In *CytoLogix Corp. v. Ventana Med. Sys., Inc.*, 76 U.S.P.Q.2d 1592 (Fed. Cir. 2005), the Court reversed a finding of infringement due to the lack of a structure-to-structure analysis, and explained as follows:

> Ventana argues that CytoLogix failed to present substantial evidence of infringement of claim 13 of the '693 patent because it did not conduct a structural analysis of means-plus-function limitations in that claim. The "temperature controller" limitation of claim 13 is a means-plus-function limitation as defined by 35 U.S.C. § 112, ¶ 6. Infringement of a means-plus-function limitation "requires that the relevant structure in the accused device . . . be identical or equivalent to the corresponding structure in the specification." *Odetics, Inc. v. Storage Tech. Corp.*, 185 F.3d 1259, 1267, 51 U.S.P.Q.2d 1225 (Fed. Cir. 1999). To establish infringement under § 112, ¶ 6, it is insufficient for the patent holder to present testimony "based only on a functional, not a structural, analysis." *Alpex Computer Corp. v. Nintendo Co.*, 102 F.3d 1214, 1222, 40 U.S.P.Q.2d 1667 (Fed. Cir. 1996). Here, CytoLogix failed to identify the structure in the specification that is the "temperature controller means" and compare it to the structure of the accused device. Accordingly, because CytoLogix failed to present substantial evidence of infringement of claim 13 of the '693 patent, the jury verdict of infringement of claim 13 must be reversed.

76 U.S.P.Q.2d at 1600.

## 2. The Corresponding Structure For A Computer-Implemented Means-Plus-Function Element Is The Disclosed Algorithm, Not Merely "Software"

The corresponding structure for a means-plus-function element in a software patent is not merely "software" in some generic, unspecified sense, as McKesson contends. Defining the structure in that manner would completely evade the requirements of 35 U.S.C. § 112(6), which commands that specific structure be clearly linked to the element as a *quid pro quo* for drafting the element in the simplified means-plus-function form. Federal Circuit precedent instructs that the corresponding structure for "[a] computer-implemented means-plus-function term . . . is the algorithm" disclosed in the patent specification. *Harris Corp. v. Ericsson Inc.*, 417 F.3d 1241, 1253 (Fed. Cir. 2005). Simply invoking the word "software" is not enough – the particular algorithm in the specification that performs the claimed function must be identified. This requirement is spelled out in this Court's September 20, 2005 Order. As the Court stated in that

Order, the Federal Circuit has held a "computer-implemented means-plus-function term is limited to the corresponding structure disclosed in the specification and equivalents thereof, *and the corresponding structure is the algorithm*." D.I. 99 (emphasis added).

It is not enough to say the structure is "any software" merely because it is obvious from the claims themselves that software would be used. That would eviscerate the *quid pro quo* requirement of Section 112(6), as it would allow a patentee to claim *all* potential software solutions to a problem by writing means-plus-function claims that say "software that performs the function of addressing the following problem: . . . ." That is why the Federal Circuit has held that such claims are limited to the algorithm(s) that the specification both identifies and specifically links to each function stated in the claims.

The first Federal Circuit case to squarely consider the issue of software structure was *WMS Gaming Inc. v. Int'l Game Tech.*, 184 F.3d 1339 (Fed. Cir. 1999). In that case, the court reviewed several computer-implemented means-plus-function elements, including the element "means for assigning a plurality of numbers representing said angular positions of said reel . . . ." *Id*. at 1346. The District Court had construed the corresponding structure broadly to be "an algorithm executed by a computer." *Id*. at 1348. The Federal Circuit found that the district court "erred by failing to limit the claim to the algorithm disclosed in the specification." *Id*. The appropriate structure was not simply any "algorithm" for carrying out the claimed function, but the specific algorithm disclosed in the patent. *Id.* ("[t]he structure of a microprocessor programmed to carry out an algorithm is limited by the disclosed algorithm"). The court held that the correct structure was a specific algorithm expressly disclosed in the patent specification. *Id*. at 1349.

The Federal Circuit again addressed the issue of software structure in *Altiris, Inc. v. Symantec Corp.,* 318 F.3d 1363 (Fed. Cir. 2003). In that case, the court examined the means-plus-function element "means of booting said digital computer." *Id*. at 1375. The element itself actually provided some definition for "means of booting": "said means of booting including a first set of commands . . . and a second set of commands . . . ." *Id*. The patentee argued that the

"commands" were software for booting the computer and insisted that such invocation of "software" was sufficient structure. The court rejected patentee's argument:

> [M]erely pointing out that the relevant structure is software rather than hardware is insufficient. As stated above, because "commands" (i.e., software) is so broad as to give little indication of the particular structure used here and is described only functionally, one must still look to the specification for an adequate understanding of the structure of that software.

*Id*. at 1376. Accordingly, the court required that specific corresponding structure from the patent specification be identified to support the means-plus-function elements.

In *Harris Corp. v. Ericsson Inc.*, 417 F.3d 1241 (Fed. Cir. 2005), the Federal Circuit again addressed the software structure issue. The court began by acknowledging "the rule of *WMS Gaming*, which established that the corresponding structure for a [means-plus-function] claim for a computer-implemented function is the algorithm disclosed in the specification." *Id*. at 1249. The patentee argued that *WMS Gaming* did not limit computer-implemented means-plus-function elements to only the "disclosed algorithm." *Id*. at 1253. The *Harris* court rejected this notion, confirming that "*WMS Gaming* restricts computer-implemented means-plus-function terms to the algorithm disclosed in the specification." *Id*. The Court proceeded to examine the means-plus-function element at issue, finding the corresponding structure in a specific algorithm in the patent specification. *Id*. at 1254.

McKesson seeks to avoid the structure requirement by stating that "one skilled in the art would know what specific software/algorithm(s) could be used to perform the claimed function." Joint Stmt., Exh. A at 1. To support this proposition, McKesson relies on a few general sentences in the '164 specification indicating that the patent's functionality could be carried out by a "suitable computer system," such as "the well-known IBM 'personal computer' containing sufficient data processing capabilities and memory and suitable commercially available database management software programs to perform the desired functions." '164 patent, Col. 4:33-40. But that cannot satisfy the structure requirement, absent some actual structure in the patent that is clearly linked to each function.

The Federal Circuit addressed this issue in *MIDCO*, 344 F.3d 1205.  In that case, the court was looking for software structure to support a "means" for performing a "digital-to-digital conversion."  *Id*. at 1211-12.  The district court found the structure requirement satisfied, because "techniques for performing those conversions were known to those of skill in the art at the time the application was filed."  *Id*. at 1211.  The Federal Circuit rejected that approach to establishing structure:  "It is important to determine whether one of skill in the art would understand the specification itself to disclose the structure, not simply whether that person would be capable of implementing that structure."  *Id*. at 1212 (*citing Atmel Corp. v. Info. Storage Devices, Inc.*, 198 F.3d 1374, 1382 (Fed. Cir. 1999) ("Fulfillment of the § 112, P6 trade-off cannot be satisfied when there is a total omission of structure.  There must be structure in the specification.")).  The court concluded that the structure requirement was not met unless there was some actual software structure revealed in the patent specification.  *Id*. ("it is not proper to look to the knowledge of one skilled in the art apart from and unconnected to the disclosure of the patent").

The patentee in *MIDCO* also argued, as McKesson does here, that the corresponding structure was provided by a general statement in the specification indicating that software for performing the patented functions was "either commercially available or within the skill of practitioners in the programming arts."  *Id*. at 1217.  The patentee insisted that this statement was sufficient to establish "software," in a generic sense, as the corresponding structure.  The *MIDCO* court disagreed, observing that "the references to commercially available software or software known in the art" were not clearly linked to any particular functions.  *Id*.  The court explained:

> Although the specification refers to the use of software programs that 'are either commercially available or within the skill of practitioners in the programming arts,' . . . this statement in no way links software to the function [in question]. . . . There must be something in the disclosure to indicate to the public that the patentee intends for a particular structure to correspond to a claimed function.

*Id*. at 1217-18.

### 3. McKesson Has Failed To Identify Corresponding Structure That Is Clearly Linked To Each Means-Plus-Function Element

McKesson and its experts have not identified structure from the specification that is clearly linked to each means-plus-function element. By characterizing the structure as simply "software" of any kind, McKesson is attempting to capture every conceivable structure for carrying out the functions, something the law does not permit. *Pennwalt*, 833 F.2d at 934 ("section 112, paragraph 6, rules out the possibility that any and every means which performs the function specified in the claim literally satisfies that limitation"). For example, the element "means for receiving at least one claim," found in Claims 3-15, can have a number of conceivable structures. A medical claim could be "received" by having a person type the claim information into the system. It could also be "received" electronically, transmitted from a physician's office. Perhaps the medical claim could be scanned into the system. Each of these techniques would involve different software and hardware structures. Yet, McKesson's construction would cover all of these techniques and more, without ever identifying the structures in the patent. This approach violates the fundamental principle that a means-plus-function element is limited by the corresponding structure disclosed in the patent.[3]

McKesson's use of the generic term "software" as the only definition of the required structure also fails to take into account the database element found in all the claims. All of the claims refer to "means for operating on a predetermined database," "means for . . . interacting

---

[3] Additionally, if the invention of the '164 patent is construed to be "any software" for carrying out the claimed functions and "one skilled in the art would know what specific software/algorithm(s) could be used to perform the claimed function," then the invention was clearly known more than one year before the patent was filed on September 30, 1988. For example, at a Pew Foundation conference in April 1986, the concept of using "software" to receive and edit medical codes on medical claims was presented. *See* Deposition of Mark Musen ("Musen Depo."), 173:2-176:4 (App. Exh. H). Additionally, the use of "software" to perform the patented functions was clearly revealed in several proposals and letters from HPR (the patent assignee) to Aetna in 1987. If the invention is simply "software" for performing the patented functions, then the patent is invalid as anticipated by the Pew conference presentation and the Aetna proposals and letters.

with the database," or other "means" elements that require interaction with the "predetermined database." The database is an element of every claim and is an essential part of the functionality described in each claim. Thus, in determining what structure from the specification, if any, satisfies the requirements of Section 112(6), the database must be accounted for in some way. Obviously, the word "software" does not do so as the database is distinct from the software code that is used to access it. The purported invention of the patent includes two pieces—the database and the software code—and yet McKesson completely ignores one of the pieces in its infringement analysis.

The precise structure of the "predetermined database" is never disclosed in the patent. The database is said to contain medical codes, relationships among the codes, and the rules described in Appendix B of the patent. Yet, there is little disclosure as to how these components are organized and arranged in the database, nor any disclosure of the actual database contents. For this reason, the "means for determining" steps of the patent claims, each of which relies on the predetermined database, are unclear and unsupported by any structure. For example, Claim 3 includes a "means for determining whether one of the medical service codes . . . is valid or invalid by interacting with the database and the set of relationships contained in the database." But the patent never explains how the system "interacts with the database" to determine if a code is "valid or invalid." Does it find the code in a table of medical service codes? Does it search through records containing medical service codes? How do the rules and relationships fit into the database? Without supporting structure for the function of "interacting with the database," none of this is ever explained.

To the extent the specification provides *any* structure for the database, it is found in Appendices B and C. In its claim construction for some of the claims, McKesson references these Appendices. However, as with all the other structural references in McKesson's claim construction, McKesson's experts made no effort whatsoever to compare the database descriptions in those Appendices to the databases of the accused TriZetto Products.

14

As discussed above, McKesson is attempting to avoid a structure-to-structure analysis by arguing that it would be obvious that many kinds of commercially-available software could be used to accomplish the functions described in the claims. This cannot excuse McKesson's failure to consider the structure of the database, which McKesson presumably believes was not obvious or commercially-available. McKesson has provided no explanation for the failure of its experts to consider whether the structures of the TriZetto databases are equivalent to any database structure found in the patent.

### 4. McKesson's Experts Have Failed To Perform A Structure-To-Structure Comparison

McKesson cannot prove that the TriZetto Products meet the means-plus-function elements of the '164 patent, because its experts have failed to undertake the required structure-to-structure comparison. In their reports, McKesson experts Dr. Mark Musen and Dr. Margaret Johnson do not identify *any* structure from the patent specification corresponding to the various means-plus-function elements. Without corresponding structure, they are unable to, and do not, perform the required structure-to-structure comparison. Instead, they define the corresponding structure as simply "software," and dispose of the structural issue by noting that the TriZetto Products also use "software" to perform their functions. This is insufficient, as a matter of law.

A structure-to-structure comparison is part of McKesson's burden of proof on the infringement issue and is indispensable to McKesson's case. As the Federal Circuit stated in *Pennwalt*, "it is part of the ultimate burden of proof of the patent owner to establish, with respect to a claim limitation in means-plus-function form, that the structure in the accused device which performs that function is the same as or an equivalent of the structure disclosed in the specification." *Pennwalt*, 833 F.2d at 934. The failure of McKesson and its experts to perform a structure-to-structure comparison is a failure of proof requiring summary judgment of non-infringement. *Johnson v. IVAC Corp.*, 885 F.2d 1574, 1578 (Fed. Cir. 1989) ("[an] accused infringer . . . is entitled to summary judgment, on the ground of non-infringement, by pointing

out that the patentee failed to put forth evidence to support a finding that a limitation of the asserted claim was met by the structure in the accused devices").

### a.    Expert Report of Dr. Mark Musen

McKesson expert Dr. Mark Musen submitted a report on October 21, 2005, opining that the TriZetto Products infringe claims 1-6 and 8-16 of the '164 patent.  *See* Expert Report of Mark A. Musen, M.D., Ph.D., dated October 21, 2005 ("Musen Report"), p. 9, ¶ 30 (App. Exh. B).

Dr. Musen's expert report is devoid of any structural analysis.  Nowhere in his report does Dr. Musen identify corresponding structure for the means-plus-function elements in the '164 patent.  Even with respect to the TriZetto Products, Dr. Musen's report identifies little, if any, structure.  For instance, Dr. Musen acknowledged that he had not reviewed the TriZetto Products' source code and did not include any discussion of the code in his report.  Musen Depo., 30:4-9 (App. Exh. H).  Most importantly, as Dr. Musen admitted, his report does not contain a structure-to-structure comparison matching the patent structure to the TriZetto Products.  *Id.* at 323:21-324:16.

Dr. Musen's opinion on the subject of corresponding structure is relegated to two sentences in his report:

> Regarding the various 'means for' elements in the claims, the '164 patent discloses software or a combination of software and hardware as the structure that performs the functions corresponding to these elements.  Indeed, in a computer system or computer implemented method, each function associated with the 'means for' elements must necessarily be performed by software or software and related hardware.

Musen Report, p. 8 (App. Exh. B).  In preparing his report, Dr. Musen assumed that invoking "software" and "hardware" was sufficient to supply structure for the means-plus-function elements.  He confirmed this understanding at his deposition:

> Q.    Since you haven't seen or looked at the TriZetto source code or the TriZetto products . . . I'm assuming, then, that you don't know that the TriZetto products have the same structure or similar structure to what is described in the patent?

> A.    I know they're software systems.  If the requisite definition of structure is – is simply software, then the TriZetto products must embody the principles of the patent in software as their structure.

Musen Depo., 109:1-9 (App. Exh. H).  Accordingly, he made no effort in his report to identify corresponding structure from the patent, never once citing to the patent specification, figures or appendices.  Nor did he attempt to find structure in the TriZetto Products.  *Id.*, 302:5-14.

When he was asked whether "any software program" that carries out the functions of the claims would infringe, Dr. Musen stated that he made that assumption based on this Court's September 20, 2005 Order.  *Id.* at 302:16-20 ("Q.  [A]ny software program that performs those functions, according to your analysis, would infringe that claim limitation?  A.  That's my understanding of the court memo.").  Of course, that is not what the Court said.  Based on this assumption, Dr. Musen believed that he did not need to consider the structure of the TriZetto Products beyond the fact that they are "software."  *Id.*, 302:5-14 ("I do not believe it was necessary to go to a lower level of granularity to ascertain those specific components . . . [b]ecause if the function needed to be reproduced and the testimony and the . . . product literature suggests that it was *and the structure was clearly software*, then my job was done") (emphasis added).

The entirety of Dr. Musen's infringement analysis is a series of fifteen conclusory paragraphs (one for each asserted claim) stating that the TriZetto Products perform the functions of each patent claim.  Musen Report, pp. 10-16 (App. Exh. B).  In each paragraph, Dr. Musen recites the functional language of the claim and states that the TriZetto Products include "software" and/or "hardware" for performing that function.  For example:

> Para. 32:  "Each product includes software and data processing capabilities for operating on a database. . ."

> Para. 34:  "Each product includes hardware and software that receives medical claims to be processed."

> Para. 35:  "[E]ach product includes software that revises medical claims to delete medical service codes that are determined to be inappropriate for payment."

*Id.*, pp. 10-12. Based on this purely *functional* comparison, Dr. Musen concludes that the TriZetto Products infringe the patent claims. *Id.*, 10-16.

At the end of each paragraph on pages 10-16, Dr. Musen says "the structure of the computer system disclosed in the '164 patent for performing the function of each 'means for' element of this claim is included in, or is equivalent to, the structure of each product." *Id.*, 10-16. However, he identifies *absolutely no corresponding structure* from the patent specification and performs no structure-to-structure comparison to support this bald assertion.

Dr. Musen attaches three claim charts to his report, one for each of the TriZetto Products. Musen Report, Exhs. 2-4 (App. Exhs. D-F). The charts compare the patent claims to two sources of information concerning the TriZetto Products: (1) deposition testimony given by TriZetto employees and customers, and (2) excerpts from product documents. *Id.* These charts do not carry out the required structural comparison.

The claim column of the charts simply recite the language of the patent claims, without identifying corresponding structure for the means-plus-function elements. Even with respect to the TriZetto Products, the charts provide virtually no structural information. Instead, they contain witness testimony and document excerpts concerning the *function* of the accused products, but not the underlying structure. *Id.*[4] Hence, these claim charts do not reveal a structure-to-structure comparison.

Dr. Musen's report also attaches the parties' preliminary Proposed Claim Construction statement from October 11, 2005, but does not reference any of the definitions or specification

---

[4]     TriZetto objects to the admission of the witness testimony cited in Dr. Musen's charts to support a finding of infringement, even as to function, as the witnesses were in no position to interpret and apply the patent claims at their depositions. Most of the witnesses (non-lawyer employees of TriZetto and its customers) had never read the patent specification and had no opportunity to do so at their deposition; many had never read the claims prior to their deposition; and they did not have the Court's claim construction ruling, so they were simply using their own layperson's understanding of the functional claim terms.

sections cited in that statement. Musen Report, Exh. 5 (App. Exh. G). The October 11, 2005 statement includes McKesson's proffered structure in support of the means-plus-function elements, in which McKesson cites broadly to the appendices, figures and some specification sections. TriZetto believes that McKesson's construction is deficient for failing to identify and link specific structure to each of the means-plus-function elements. In any event, one would think that McKesson's infringement expert would consider the structure that McKesson itself has identified, but he did not do so. Dr. Musen does not discuss in his report any of the structure that McKesson put forward. Indeed, the structure McKesson identified in the October 11, 2005 statement has never been compared to the TriZetto Products by anyone, as required to prove infringement.

### b.    Expert Report of Dr. Margaret Johnson

McKesson expert Dr. Margaret Johnson also submitted a report on October 21, 2005, ostensibly addressing the subject of patent infringement. *See* Expert Report of Dr. Margaret L. Johnson, Ph.D., dated October 21, 2005 ("Johnson Report") (App. Exh. I).

Dr. Johnson does not carry out the required structure-to-structure comparison in her report. In fact, Dr. Johnson does not perform a traditional infringement analysis at all. She does not actually compare the patent claims directly to the accused products, as required for a proper infringement analysis. Deposition of Margaret Johnson ("Johnson Depo."), at 70:4-17 ("Q. [T]here isn't a claim-to-product comparison specifically anywhere in your report, is there? A. No.") (App. Exh. J).

Instead, Dr. Johnson created a five-part "algorithm" that she believed encompassed all the functionality of the patent claims. Johnson Report, p. 5 (App. Exh. I); Johnson Depo., 30:5-14 (App. Exh. J). She then compared her own algorithm to the accused products. Johnson Depo., 30:21-31:1, 39:21-25 ("I used that algorithm to guide my search through the TriZetto products to see whether or not that algorithm was present. And what is in my report are the places where I found that algorithm in the TriZetto products."). In other words, she wrote a

single algorithm that she claims represents the patent in its entirety, including an aggregation of all 15 asserted claims, and then compared only her algorithm to the TriZetto Products.

Dr. Johnson's "algorithm" is a creature of her own creation, which she admits is different in some respect from each of the claims in the patent. Dr. Johnson admitted that none of the patent claims perform her entire algorithm. *Id.*, 34:9-18. Moreover, her algorithm omits some functionality contained in the claims. Dr. Johnson frankly admits that she did not consider the specific functions found in the claims when she looked at the accused products; instead, she considered her more general algorithm. *Id.*, 57:1-14. For example, Dr. Johnson did not include the specific function of determining whether two medical service codes are "mutually exclusive due to non-medical criteria," found in Claims 2 and 14, in her algorithm. *Id.*, 56:13-57:23, 65:13-66:2. Nor did she consider the function of determining whether medical service codes are "medically exclusive," found in Claim 12. *Id.*, 62:16-63:4, 109:21-110:2. The same is true for the functions of authorizing and rejecting medical *claims*, as distinct from codes, found in Claims 15 and 16. *Id.*, 66:20-67:14. Indeed, Dr. Johnson did not even venture to interpret some of the claim terms, as would be necessary to analyze those functions (e.g. "mutually exclusive due to non-medical criteria" and "medically exclusive"). *Id.*, 107:13-23, 109:21-110:2.

Although McKesson now contends that nothing from the specification should limit the claim construction, Dr. Johnson admits that her algorithm is not based on the claims alone. She testified as follows:

> Q.    First, can you explain to me what exactly you mean by "algorithm" as it's used in this section here?
>
> A.    It is a high-level description of the processing.
>
> * * *
>
> A.    I defined the algorithm by analyzing the patent, all different parts of the patent.
>
> * * *
>
> Q.    The algorithm here, was that drawn from these patent claims?
>
> A.    In part.

Q.    In part.  Okay.  And then also from other parts of the patent as well?

A.    Yes.

* * *

Q.    So this is designed to capture pretty much all of the functionality that's set out in the patent claims?

A.    In the patent claims and the descriptions elsewhere.

* * *

Q.    . . . [C]an you tell me if the algorithm pertains to any patent claim in particular?  Is there any one patent claim that it pertains to?

A.    The process I went through in defining this algorithm was to read through the claims, read through the entire patent and come up with a representation that describes the processing that is described here.  So there isn't any one particular claim that I would map to this.  It really was derived from the entire — the entire document.

*Id.*, 28:8-10, 29:15-16, 29:24-30:4, 30:12-14, 31:4-12.  Obviously, this is contrary to black-letter patent law that an infringement analysis must compare each element of the asserted claims to the accused product.

Dr. Johnson's odd attempt to determine patent infringement through an incomplete and vaguely-worded algorithm, with no direct connection to the patent claims, renders her report useless for establishing patent infringement, even as to functionality.

Dr. Johnson's report is no better on the subject of structure.  Her analysis was limited to locating the patent functionality in the TriZetto Products:

I reviewed the '164 patent and compared the *functionality* described, to the Facets v. 4.21 source code, QicLink Version 3.20.30.04 source code and ClaimFacts source code.  As discussed in detail below, all three TriZetto products *have similar functionality* to that described in the patent.

Johnson Report, p. 5 (App. Exh. I) (emphasis added).[5]  She does not specifically identify *any* structure from the '164 patent, other than a single reference to Appendix D:  "Appendix D of the

---

[5]    It should be noted that Dr. Johnson uses the wrong literal infringement standard, even with respect to the functional comparison.  Her conclusion that the TriZetto Products "have *similar functionality* to that described in the patent" is not enough.  The

[Footnote continued on next page]

'164 patent contains an implementation of the preferred embodiment, including the algorithm discussed above, written in a programming language called Clipper."  Johnson Depo., p. 13 (App. Exh. J).  She makes no effort to identify specific supporting structure in Appendix D and does not compare the structures disclosed in Appendix D, if any, to the structures of the TriZetto Products.

On the subject of means-plus-function elements, Dr. Johnson testified:  "[W]here we have a 'means for' type of language in the claim, there's a function defined in those – in the claim language, and the structure associated with those is *software*."  *Id*., 35:12-36:7 (emphasis added).  Beyond simply invoking "software" in a general sense, Dr. Johnson did not identify any supporting structure for the means-plus-function elements.  *See, e.g., id*., 47:20-48:9 ("Q. [D]id you identify any structure from the specification that supports that function?  A. Software.  Q. Just software generally?  A. Yes.").  In her report, she disposes of the structure issue in one sentence:  "It is my opinion that anyone with ordinary skill in the art could implement the functionality described in the patent in a number of different programming languages."  Johnson

---

[Footnote continued from previous page]
> functionality must be *identical* in order to infringe.  *Mas-Hamilton*, 156 F.3d at 1211-12 ("the accused device [must] perform an identical function to the one recited").

[7]  Dr. Johnson's testimony suggests that the patent specification may not actually disclose specific structure supporting the means-plus-function elements.  Dr. Johnson characterized the specification as follows:  "All that's defined in the specification is that the software is supported by commercially-available database management systems, and there is really no other limitation on what the software must do.  There's no description of constructs or specific algorithms that the software must perform in order to do the functions specified in the claims."  Johnson Depo., 36:8-25 (App. Exh. J).  She also stated:  "What I did in my report was, as I mentioned earlier, went through the patent and analyzed the claims and all parts of the patent to define this algorithm.  And the reason why I focused on defining an algorithm was because the structure that was defined in the patent was so general that an algorithm was easier for me to hold in my head as I analyzed the source code."  *Id*., 39:14-20.  This might explain why McKesson and its experts have declined to identify specific structure – such structure does not exist in the patent for all means-plus-function elements, rendering those claims invalid.  *Budde v. Harley-Davidson, Inc.*, 250 F.3d 1369 (Fed. Cir. 2001).

Report, p. 13-14 (App. Exh. I).  Hence, it is clear that Dr. Johnson does not identify specific corresponding structure from the '164 patent and does not attempt the required structure-to-structure comparison.[7]

* * *

To prove infringement of a means-plus-function element, the corresponding structure from the patent specification must be compared to the structure from the accused products. McKesson and its experts have failed to perform this structure-to-structure comparison. Although McKesson has identified some alleged structure from the patent (presented in the Joint Claim Construction Statement), McKesson's experts did not compare this structure to the TriZetto Products.  Hence, McKesson has no expert testimony and no evidence to support its infringement case and cannot prove infringement.  TriZetto respectfully requests that the Court grant summary judgment of non-infringement.  *Johnson*, 885 F.2d at 1578 ("[an] accused infringer . . . is entitled to summary judgment, on the ground of non-infringement, by pointing out that the patentee failed to put forth evidence to support a finding that a limitation of the asserted claim was met by the structure in the accused devices").[8]

## C.    THE TRIZETTO PRODUCTS DO NOT INFRINGE THE CLAIMS OF THE '164 PATENT

In order to prove infringement, McKesson must demonstrate that every element (or its equivalent) of each asserted claim is present in the TriZetto Products.  *Pennwalt*, 833 F.2d at 934 ("[i]t is . . . well-settled that each element of a claim is material and essential and that in order for

---

[8]    McKesson would not have succeeded in showing equivalency of structure between the patent and the TriZetto Products, even if it had tried.  As explained by TriZetto expert Dr. Randall Davis, the architecture of the TriZetto Products is different from that of the '164 patent.  *See* Rebuttal Report of Randall Davis, dated November 14, 2005 ("Davis Report"), p. 30 (App. Exh. K).  While the patented invention is a rule-based expert system (applying rules from a database), the TriZetto Products are traditional procedural programs (performing multi-step operations on complex record structures).  *Id.*  The different architectures utilize different techniques for performing clinical editing functions.

a court to find infringement, the plaintiff must show the presence of every element or its substantial equivalent in the accused device"). Thus, separate and apart from the requirement that it match the relevant structure from the specification with the structure of the TriZetto Products, McKesson must show that the functions described in the claims themselves are found in the TriZetto Products. McKesson cannot do so because the TriZetto Products do not contain or perform at least two elements of those claims (based on TriZetto's construction of those elements as stated in the Joint Claim Construction Statement):

1. The TriZetto Products do not contain a "predetermined database" – i.e., a database that cannot be modified by the end user – as required by all of the asserted claims.

2. The TriZetto Products do not ascertain whether submitted medical claims contain a plurality of codes in order to proceed with the multiple-code edits, as required by Claims 2-6, 8-12 and 14-16.

Nor can McKesson prove infringement under the doctrine of equivalents, because McKesson's experts have not offered an equivalents analysis. Consequently, the Court should grant summary judgment of non-infringement for these additional reasons.[9]

### 1. The TriZetto Products Do Not Contain A "Predetermined Database"

Each of the asserted claims of the '164 patent contains the following feature:

[A] predetermined database containing medical service codes and a set of relationships among the medical service codes defining whether selected ones of the medical service codes are valid when input with other selected ones of the medical service codes.

'164 patent, Claims 1-6, 8-16. As discussed in TriZetto's claim construction brief, the term "predetermined database" is not a term used or known by those skilled in the art of expert

---

[9] TriZetto has identified other grounds for non-infringement, including the fact that the TriZetto Products do not perform "authorizing" and "rejecting" of codes and claims as recited in the patent. TriZetto reserves these additional non-infringement arguments, if necessary, for trial.

computer systems. TriZetto's Claim Constr. Br., Section V.B.1. The term is not expressly defined or explained anywhere in the patent. Accordingly, the term must be defined by this Court, with particular attention paid to the word "predetermined." TriZetto offers the following definition for "predetermined database":

> A database containing a single computer-readable table that is designed to be modified or updated only by the system designer or vendor, and that is not designed to be modifiable by the end user.

Joint Stmt., Exh. A at 2.

The TriZetto Products do not have a "predetermined database," as defined in this manner. As explained in the Declarations of Craig Luftig (TriZetto's person most knowledgeable ("PMK") concerning Facets), Karen Lampe (TriZetto's PMK concerning ClaimFacts), and John Danza (TriZetto's PMK concerning QicLink), the databases or files contained in Facets, ClaimFacts and QicLink are not "predetermined." They are not determined beforehand or predestined as the ordinary meaning of that term would suggest. Instead, they are variable, flexible databases or files, designed to allow customers to alter and customize the clinical criteria (i.e., relationships among medical service codes) as they see fit.

Each of the TriZetto Products has a structure for storing clinical criteria. Clinical criteria are associations between particular medical service codes, indicating whether those codes are appropriate when found together on the same medical claim or on separate claims for the same patient. Luftig Decl., ¶ 3. The Facets and ClaimFacts products each include a database that stores clinical criteria. Luftig Decl., ¶ 4; Lampe Decl., ¶ 4. Facets uses the Facets Clinical Editing database and ClaimFacts uses the ClinicaLogic database. *Id.* The QicLink product has no database, but instead utilizes an ISAM file to store clinical criteria. Danza Decl., ¶ 4. These are the only structures in the TriZetto Products that could conceivably qualify as "a predetermined database containing medical service codes and a set of relationships."

But they are not "predetermined." Each of the TriZetto Products includes an application that allows customers to alter and customize the clinical criteria contained in the database or file. Luftig Decl., ¶ 5; Lampe Decl., ¶ 5; Danza Decl., ¶ 5. The customer can activate or deactivate

any of the clinical criteria in the database or file.  *Id*.  The customer can also delete clinical criteria from the database or file and add new clinical criteria.  *Id*.  Finally, the customer can change the terms of a given clinical criteria in the database or file.  *Id*.

The patent does not disclose, describe or claim a database that functions anything like that contained in the TriZetto Products.  Unlike the patented invention, in which the clinical criteria (relationships) in the database are "predetermined" and unalterable by the customer, the databases in the TriZetto Products are flexible and dynamic.  For this reason, the TriZetto Products do not contain a "predetermined database," as required by each of the patent claims.

### 2.    The TriZetto Products Do Not Ascertain Whether Submitted Medical Claims Contain A Plurality Of Medical Service Codes

Claims 2-6, 8-12, and 14-16 of the '164 patent each contain the element of "ascertaining whether the at least one claim contains a plurality of medical service codes."  As illustrated in the patent specification, the outcome of this function will determine whether or not the patented system applies multiple-code edits (e.g., the edits described in the "determining" steps of Claims 2, 10, 12 and 14).  Specifically, if it is ascertained that the medical claim contains more than one medical service code, the multiple-code edits may be applied; if the medical claim does not contain more than one medical service code, the multiple-code edits will not be applied.  *See* TriZetto's Claim Constr. Br., Section V.C.  Consequently, TriZetto has defined the "ascertaining" step to mean "[i]dentifying if the claim contains more than one medical service code in order to determine whether multiple-code edits should be checked."  Joint Stmt., Exh. A at 8.

The TriZetto Products do not perform the "ascertaining" step of Claims 2-6, 8-12, and 14-16.  They do not ascertain whether the submitted medical claim has more than one medical code for the purpose of deciding whether or not to apply the multiple-code edits.  Luftig Decl., ¶ 6; Lampe Decl., ¶ 6; Danza Decl., ¶ 6.  Instead, the multiple-code edits are applied to every claim, *even if the claim contains just one code*.  *Id*.  The reason for this is that the TriZetto Products, in addition to examining the current claim, are capable of examining earlier claims

submitted for the same patient. *Id*. The TriZetto Products can consider medical codes on the current claim together with codes on an earlier claim and apply multiple-code edits as appropriate. *Id*.[10] The TriZetto Products have no need to ascertain whether the current claim contains more than one medical service code, since they will apply multiple-code edits to every claim in any event.

The TriZetto Products do not perform the "ascertaining" step of Claims 2-6, 8-12, and 14-16, and hence do not literally infringe those claims.

### 3.    McKesson Cannot Prove Infringement Under The Doctrine Of Equivalents

McKesson cannot prove infringement under the doctrine of equivalents, because its experts, Dr. Musen and Dr. Johnson, have not offered an equivalents analysis in their reports.

Dr. Musen's report is explicitly limited to addressing literal infringement:

> [T]his report addresses TriZetto's literal infringement of the '164 patent. . . . I reserve the right to supplement my analyses and opinions to address infringement under the doctrine of equivalents once the Court renders its claim construction rulings or as additional information comes to my attention.

Musen Report, p. 17, ¶ 48 (App. Exh. B). Dr. Musen confirmed at his deposition that he had not performed an infringement analysis under the doctrine of equivalents. Musen Depo., 186:1-8, 294:19-295:8 (App. Exh. H). Dr. Johnson's report says nothing whatsoever about the doctrine of equivalents and contains no equivalents analysis. *See* Johnson Report (App. Exh. I).

McKesson's experts were required to include all of their opinions in their infringement reports, including any doctrine of equivalents analysis. They are not entitled to reserve the equivalents analysis until some later time. Without expert testimony concerning infringement by equivalents, McKesson cannot prove infringement under the doctrine of equivalents. Consequently, summary judgment of non-infringement is warranted.

---

[10]    An illustration of this functionality is provided in the report of TriZetto expert Dr. Randall Davis. *See* Davis Report, pp. 24-26 (App. Exh. K).

## V.    CONCLUSION

For the reasons set forth herein, summary judgment of non-infringement should be granted to TriZetto.

MORRIS, NICHOLS, ARSHT & TUNNELL

*/s/  Jack B. Blumenfeld*

Jack B. Blumenfeld (# 1014)
Rodger D. Smith, II (# 3778)
1201 N. Market Street
Wilmington, Delaware 19899
(302) 658-9200

Attorneys for Defendant The TriZetto Group, Inc.

Of Counsel:

GIBSON, DUNN & CRUTCHER LLP
Jeffrey T. Thomas
David Segal
Michael A. Sitzman
Jamboree Center, 4 Park Plaza
Irvine, CA  92614

December 15, 2005

<u>CERTIFICATE OF SERVICE</u>

   I, Jack B. Blumenfeld, hereby certify that on December 15, 2005 I electronically

filed an Opening Brief in Support of the TriZetto Group, Inc.'s Motion for Summary Judgment

of Non-Infringement with the Clerk of the Court using CM/ECF, which will send notification of

such filing(s) to the following:

     Thomas J. Allingham, II
     Skadden, Arps, Slate, Meagher & Flom LLP

   I also certify that copies were caused to be served on December 15, 2005 upon the

following in the manner indicated:

     <u>BY HAND</u>
     Thomas J. Allingham, II
     Skadden, Arps, Slate, Meagher & Flom LLP
     One Rodney Square
     P.O. Box 636
     Wilmington, DE  19899

     <u>BY EMAIL</u>

     Jeffrey G. Randall
     Skadden, Arps, Slate, Meagher & Flom LLP
     525 University Avenue
     Suite 1100
     Palo Alto, CA  94301]

       /s/  Jack B. Blumenfeld (#1014)
       Morris, Nichols, Arsht & Tunnell
       1201 N. Market Street
       P.O. Box 1347
       Wilmington, DE  19899
       (302) 658-9200
       jblumenfeld@mnat.com