IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| MCKESSON INFORMATION SOLUTIONS LLC, | |
| Plaintiff, | |
| v. | Civil Action No. 04-1258-SLR |
| THE TRIZETTO GROUP, INC. | |
| Defendant. | |

**THE TRIZETTO GROUP, INC.'S**
**<u>OPENING CLAIM CONSTRUCTION BRIEF</u>**

MORRIS, NICHOLS, ARSHT & TUNNELL
Jack B. Blumenfeld (No. 1014)
Rodger D. Smith, II (No. 3778)
1201 N. Market Street
Wilmington, Delaware 19899
(302) 658-9200

Attorneys for Defendant The TriZetto Group, Inc.

Of Counsel:

GIBSON, DUNN & CRUTCHER LLP
Jeffrey T. Thomas
David Segal
Michael A. Sitzman
Jamboree Center, 4 Park Plaza
Irvine, CA 92614

December 15, 2005

# TABLE OF CONTENTS

Page

I. NATURE AND STAGE OF THE PROCEEDING ................................................................... 1

II. SUMMARY OF ARGUMENT ......................................................................................... 1

III. STATEMENT OF FACTS ............................................................................................ 3

    A.    The '164 Patent............................................................................................. 3

        1.    Background of the Technology.................................................... 4

        2.    The Patent Claims ..................................................................... 5

    B.    The TriZetto Products ................................................................................. 6

IV. THE APPLICABLE LEGAL STANDARD ...................................................................... 6

    A.    General Principles Of Claim Construction ................................................. 6

    B.    Construction Of Means-Plus-Function Claim Elements............................. 7

V. ARGUMENT ................................................................................................................ 9

    A.    McKesson's Proposed Claim Constructions Fail To Identify Adequate Structure To Support The Means-Plus-Function Or Step-Plus-Function Elements In The Asserted Claims. ........................................................................................ 9

        1.    Each Of The Claims Asserted Contains At Least One Means-Plus Function Element. ................................................................. 9

        2.    Claims 1, 2, And 16 Are In Step-Plus-Function Form. ........... 10

    B.    "Means For Operating On A Predetermined Database Containing Medical Service Codes And A Set Of Relationships Among The Medical Service Codes" (Claims 1-6, 8-16).............................................................................. 11

        1.    "A Predetermined Database" ................................................... 12

        2.    "Medical Service Code"........................................................... 15

        3.    "A Set Of Relationships Among The Medical Service Codes Defining Whether Selected Ones Of The Medical Service Codes Are Valid When Input With Other Selected Ones Of The Medical Service Codes".......... 16

C.    "Ascertaining Whether The At Least One Claim Contains A Plurality Of Medical Service Codes" (Claims 2-6, 8-12, And 14-16) ................................................. 17

D.    The "Determining" Steps Of The '164 Patent ...................................... 19

　　1.    Checking For The Presence Of A Medical Service Code In The Predetermined Database (Claims 1(b), 13(c)) ............................. 19

　　2.    Comparison Of Single Codes (Claims 3(d), 15(d), 16(c)) ..................... 21

　　3.    Comparison Of One Code On The Claim With Another Code On The Claim ..................................................................................... 23

E.    The "Authorizing" And "Rejecting" Steps Of The '164 Patent ......................... 30

　　1.    "Authorizing" And "Rejecting" Medical Service *Codes* ........................ 30

　　2.    "Authorizing" And "Rejecting" The Medical *Claim* ............................ 33

F.    The Dependent Claims Of The '164 Patent ........................................ 35

VI. CONCLUSION .............................................................................. 36

## TABLE OF AUTHORITIES

Page

**Cases**

*Altiris, Inc. v. Symantec Corp.*, 318 F.3d 1363 (Fed. Cir. 2003) ...................................................8

*B. Braun Med., Inc. v. Abbott Labs.*, 124 F.3d 1419 (Fed. Cir. 1997).............................. passim

*Budde v. Harley Davidson, Inc.*, 250 F.3d 1369 (Fed. Cir. 2001) .................................................3

*Cardiac Pacemakers, Inc. v. St. Jude Med., Inc.*, 296 F.3d 1106 (Fed. Cir. 2002) ....9, 20, 26, 35

*Cross Med. Prods., Inc. v. Medtronic Sofamor Danek, Inc.*, 424 F.3d 1293 (Fed. Cir. 2005) .................................................................................................................7

*Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 535 U.S. 722 (2002) .........................26

*Harris Corp. v. Ericsson, Inc.*, 417 F.3d 1241 (Fed. Cir. 2005).....................................9, 10, 12

*Laitram Corp. v. Rexnord, Inc.*, 939 F.2d 1533 (Fed. Cir. 1991) .................................................8

*Markman v. Westview Instruments, Inc.*, 52 F.3d 967 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996)........................................................................................................6

*Med. Instrumentation & Diagnostics Corp. v. Elekta AB*, 344 F.3d 1205 (Fed. Cir. 2003) ...................................................................................................................... passim

*O.I. Corp. v. Tekmar Co.*, 115 F.3d 1576 (Fed. Cir. 1997) .........................................................8

*Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) ................................................... passim

*Reiffin v. Microsoft Corp.*, 214 F.3d 1342 (Fed. Cir. 2000) ......................................................26

*Seal-Flex, Inc. v. Athletic Track & Court Constr.*, 172 F.3d 836 (Fed. Cir. 1999) ..........8, 10, 11

*Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576 (Fed. Cir. 1996) .........................................7

*Voice Technologies Group, Inc. v. VMC Sys., Inc.*, 164 F.3d 605 (Fed. Cir. 1999)....................7

**Statutes**

35 U.S.C. § 112.................................................................................................................... passim

## I.    NATURE AND STAGE OF THE PROCEEDING

On September 13, 2004, plaintiff McKesson Information Solutions, LLC ("McKesson") filed this suit alleging infringement of U.S. Patent No. 5,253,164 (the "'164 patent") against The TriZetto Group, Inc. ("TriZetto").[1]  On October 1, 2004, McKesson amended its Complaint.  On November 1, 2004, TriZetto answered and filed a counterclaim seeking a declaratory judgment of invalidity, unenforceability, and non-infringement.

McKesson alleges that three of TriZetto's products (Facets, ClaimFacts and QicLink) infringe fifteen claims of the '164 patent (Claims 1-6 and 8-16).  Fact and expert discovery have been completed.  The Court has bifurcated the issue of invalidity and stayed motion practice and trial on that issue.  On the issues of infringement, damages and equitable defenses, motion practice is proceeding and scheduled for hearing on February 16, 2006, at which time the Court is also scheduled to consider any issues of claim construction.  Trial on the issues of infringement, damages and equitable defenses is set for April 17, 2006.  This is TriZetto's opening claim construction brief.

## II.    SUMMARY OF ARGUMENT

The parties have lodged a Joint Statement of Disputed Claim Terms and Proposed Constructions, setting forth each party's proposed constructions side-by-side.[2]  (D.I. 148).  As a preliminary matter, McKesson has asserted fifteen claims of the '164 patent against TriZetto.  Each of those claims contain multiple, repetitive claim elements.  All of the claims contain means-plus-function claim elements, requiring a two-step analysis for claim construction.

---

[1]    The '164 patent is attached to TriZetto's Appendix of Exhibits in Support of Its Opening Claim Construction Brief at Exhibit A.  All citations to the '164 patent shall refer to Exhibit A.

[2]    Attached as Exhibit A to the Joint Statement is a claim by claim comparison chart containing each party's proposed constructions.  That chart is reproduced in TriZetto's Appendix of Exhibits in Support of Its Opening Claim Construction brief as Exhibit B.

In this brief, TriZetto has attempted to group similar claim elements together, addressing each in the following order. *First*, in Section V.B., TriZetto discusses the "means for operating on a predetermined database. . .", which is contained in every independent claim of the '164 patent. *Second*, in Section V.C., TriZetto discusses the claim element "ascertaining whether the at least one claim contains a plurality of medical service codes." *See* Ex. A ('164 patent), Claims 2-6, 8-12, and 14-16. *Third*, in Section V.D., TriZetto discusses each of the "determining" steps of the '164 patent. *See id.*, Claims 1 and 13 ("determining whether any medical service code contained in the medical claim exists within the predetermined database"); Claims 3, 15, and 16 ("determining whether one of the medical service codes in the plurality of medical service codes. . ."); Claims 2, 10, 12, and 14 ("determining whether one of the medical service codes in the at least one claim is mutually exclusive due to non-medical criteria. . ."). *Fourth*, in Section V.E., TriZetto presents it proposed construction for the "authorizing" and "rejecting" steps of the '164 patent contained in Claims 2-3, 10, 12, and 14. And finally, in Section V.F., TriZetto briefly discusses claim construction of the claim elements contained in dependent claims of the '164 patent. *See id.*, Claims 4-6, 8-9, and 11.

While each of TriZetto's disputes with McKesson's proposed claim construction are discussed in greater detail below, TriZetto notes that each of the disputes arises from one of the following reoccurring deficiencies in McKesson's proposed constructions:

(1)    Each of the asserted claims of the '164 patent contain at least one means-plus-function element and three of the asserted claims are drafted in step-plus-function form. As a matter of law, McKesson must provide a construction for *both* the function and the corresponding *structure* supporting that function in the claims. However, in its proposed claim construction, McKesson provides absolutely no construction for the *function* of these claim elements, and glosses over the legal requirement to specifically identify the corresponding *structure*. In most instances, McKesson refers generally to the specification, including the lengthy appendices of the patent and asserts, contrary to case law, that "one skilled in the art" would be able to provide his or her own structure to support the means-plus-function claim

2

elements. McKesson's construction for these claim elements is improper and inadequate as a matter of law.[3]

(2)    McKesson also asserts that more than ten different claim elements should be interpreted to have their "ordinary meaning" and McKesson offers no interpretation of these elements. Despite this, McKesson's own experts have proffered conflicting testimony regarding their definitions of the meaning of these terms, owing to the fact that these terms are anything but "ordinary." McKesson attempts to circumvent the established Federal Circuit case law to shield itself from having to interpret these claim elements.

(3)    In several instances, McKesson's proposed constructions flatly contradict the specification (*e.g.*, "valid or invalid") or the ordinary meaning of the claim term (*e.g.*, "whether"). Such proposed definitions run contrary to the fundamental concept that patent claims are intended to put others on notice as to the scope of the claimed invention. McKesson's proposed constructions serve merely to obfuscate a fundamental problem with the '164 patent claims: namely, that many of the claim terms are indefinite or lack supporting structure.

For all of the reasons set forth herein, TriZetto respectfully requests that this Court adopt its proposed claim constructions.

## III.    STATEMENT OF FACTS

### A.    The '164 Patent

The '164 patent discloses an expert computer system for processing medical claims containing medical service codes. Ex. A (Abstract). The original application that led to the '164 patent was filed September 30, 1988. After two continuation applications were filed in response

---

[3]    McKesson's failure to provide or identify structure in the '164 patent that supports the means-plus-function claim elements renders the claims invalid as indefinite under 35 U.S.C. § 112, ¶ 2. *See, e.g., Budde v. Harley-Davidson, Inc.*, 250 F.3d 1369 (Fed. Cir. 2001); *see also* Section V.A., *infra*. Because the Court has bifurcated and stayed the issues of invalidity, TriZetto reserves its right to present the Court its invalidity arguments in connection with the means-plus-function claim elements.

to final rejections, the '164 patent ultimately issued on October 12, 1993, to HPR, Inc. The patent is now owned by McKesson.

### 1.    Background of the Technology

The technology described in the '164 patent pertains to physician billing. Physicians receive payment for their medical services by submitting bills (known as "medical claims") to insurance companies, health maintenance organizations (HMOs), preferred provider organizations (PPOs), and other health benefit providers. *See* Ex. A, cols. 1-2. The physician will list on a medical claim certain "medical service codes" which indicate the particular services or procedures performed for that patient. The medical service codes most commonly used are the CPT codes ("Current Procedural Terminology"), developed by the American Medical Association in 1966. *See id.*, col. 2, ll. 21-23. The CPT code set contains numerous codes reflecting a wide range of medical services and procedures (e.g., "exploration of the abdomen," "partial colectomy"). *Id.*, col. 3, ll. 38-68. At the time the patent was issued, the CPT code set was in its fourth edition, and the codes were referred to as "CPT-4" codes.

From time to time, some physicians submit medical claims with improper code combinations, either "assigning a higher paying code than a procedure merits, or [] unpackaging services that were intended to be bundled into a single code." *Id.*, col. 2, ll. 8-14. In some instances, these code combinations are merely an inadvertent error. In other cases, the physician deliberately submits the code combination in order to secure greater reimbursement for his or her services. *Id.*

In response to these coding problems, manual techniques existed to allow medical claim reviewers to identify and correct the coding errors in submitted medical claims. *Id.*, col. 3, ll. 25-29. One such manual code-checking technique was developed into a computer system, called CodeReview, by HPR, Inc., the assignee of the '164 patent. *Id.*, col. 3, ll. 17-29. CodeReview is the basis for the purported invention of the '164 patent.

2.      **The Patent Claims**

The apparatus and methods claimed in the '164 patent relate to a computer system for checking and editing the medical service codes on medical claims submitted by physicians. In the medical claims handling industry, the process of checking and editing medical service codes on a medical claim is typically called "clinical editing."

The asserted patent claims (Claims 1-6 and 8-16) utilize "a predetermined database containing medical service codes and a set of relationships among the medical service codes" to validate and edit the medical service codes submitted on a medical claim. The "relationships among the medical service codes" define whether or not particular combinations of codes submitted together on the same medical claim are appropriate. Ex. A (Claims 1-6, 8-16). In the industry, such relationships among medical codes are called "clinical criteria."

Independent claims 1, 3, 13, 15 and 16 describe receiving a medical claim and generally determining if, with respect to claims 3, 15, and 16, the medical service codes listed on that claim are "valid" – i.e., whether the codes are actual CPT-4 codes found in the predetermined database – or, with respect to all of the claims, invalid – i.e., whether the code is not in the predetermined database. Claims 1 and 13 inform the user if the code is not in the database, and claims 3, 15, and 16, authorize and reject codes or medical claims based on whether the codes are present in the predetermined database.

Independent claims 2, 10, 12 and 14 describe an apparatus or method for receiving a medical claim and ascertaining whether the claim contains more than one code.[4] If more than one code is present, the relationships in the predetermined database are used to decide if a particular code is appropriate, based on a specified type of relationship of codes, in combination with the other codes on the medical claim. Those codes found to be appropriate are authorized for payment and those codes found to be inappropriate are rejected.

---

[4]    Claims 3, 15, and 16 also include the step of ascertaining whether the claim contains a plurality of codes.

5

Dependent claims 4-6 and 8-9 are dependent on claim 3 while dependent claim 11 is dependent on claim 10. Claims 4, 5, and 11 provide for further revisions of the medical claims submitted. Claim 8 claims a means for requesting further information from an end user. Claims 6 specifies that the medical service codes used are the CPT codes whereas Claim 9 describes the relationships among the medical service codes as "medically determined."

## B.     The TriZetto Products

McKesson accuses three TriZetto software products of infringing the '164 patent: Facets, ClaimFacts and QicLink (the "TriZetto Products"). Each of these products perform a wide range of claims adjudication functions, only one of which is clinical editing (i.e., checking and editing medical codes).

## IV.     THE APPLICABLE LEGAL STANDARD

## A.     General Principles Of Claim Construction

The Federal Circuit's *en banc* decision in *Phillips v. AWH Corporation* is the most current and authoritative guidance concerning claim construction. *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005). In *Phillips*, the Federal Circuit reconfirmed that the claims, specification, and prosecution history are the principal sources for claim construction. *Id.* at 1311-26. *See also Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979-81 (Fed. Cir. 1995) (en banc), *aff'd* 517 U.S. 370 (1996).

*Phillips* confirmed the "bedrock principle" that "the claims of a patent define the invention to which the patentee is entitled the right to exclude." *Id.* at 1312 (citation omitted). The words of the claim are generally given the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application. *Id.* at 1312-13.

The claims do not stand alone, however, but are part of a fully integrated written instrument, and must be read in view of the specification, of which they are a part. *Id.* at 1315. The *Phillips* court reiterated the holding in *Vitronics* that "the specification is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to

the meaning of a disputed term."  *Id.*, *citing Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996).

*Phillips* also confirms that "extrinsic evidence in the form of expert testimony can be useful to a court for a variety of purposes, such as to provide background on the technology at issue, to explain how an invention works, to ensure that the court's understanding of the technical aspects of the patent is consistent with that of a person of skill in the art, or to establish that a particular term in the patent or the prior art has a particular meaning in the pertinent field." *Phillips*, 415 F.3d at 1318.

*Phillips* further confirms that the Court may consider inventor testimony in construing the claims.  *Id.* at 1317; *see also Voice Technologies Group, Inc. v. VMC Sys., Inc.*, 164 F.3d 605, 615 (Fed. Cir. 1999) (finding that inventor testimony may provide background information, including explaining problems and solutions at the time the invention was made:  "An inventor is a competent witness to explain the invention and what was intended to be conveyed by the specification and covered by the claims.").

Finally, dictionary definitions are appropriate "in understanding the commonly understood meaning of words," (*Phillips*, 415 F.3d at 1322), as long as the dictionary definitions do not "contradict any definition found in or ascertained by a reading of the patent documents." *Cross Med. Prods., Inc. v. Medtronic Sofamor Danek, Inc.*, 424 F.3d 1293, 1305 (Fed. Cir. 2005) (internal citations omitted).

## B.    Construction Of Means-Plus-Function Claim Elements

In this suit, the parties agree that each of the asserted claims of the '164 patent contains at least one means-plus-function element.  Additionally, TriZetto believes that claims 1, 2, and 16 contain claims in step-plus-function form.  Elements written in means-plus-function or step-plus-function form are explicitly permitted under 35 U.S.C. § 112, ¶ 6, which states:

> An element in a claim for a combination may be expressed as a *means* or *step* for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding *structure*, material, or *acts* described in the specification and equivalents thereof.

35 U.S.C. § 112, ¶ 6 (emphasis added).

In an apparatus claim, "[w]here a claim uses the term 'means' to describe a limitation, we presume that the inventor used the term advisedly to invoke the statutory means-plus-function clauses." *Altiris, Inc. v. Symantec Corp.*, 318 F.3d 1363, 1375 (Fed. Cir. 2003) (internal quotations and citations omitted). This presumption may be overcome where the claim, in addition to the functional language, recites structure sufficient to perform the claimed function in its entirety. *Id*. The recitation of some structure, however, in a means-plus-function element does not preclude the applicability of Section 112, ¶ 6. *See Laitram Corp. v. Rexnord, Inc.*, 939 F.2d 1533, 1536 (Fed. Cir. 1991) (noting that Section 112, ¶ 6 applies where the structure recited in the claim serves only to further specify the function of that means).

Similarly, in *O.I. Corp. v. Tekmar Co.*, 115 F.3d 1576 (Fed. Cir. 1997), the Federal Circuit noted that Section 112, ¶ 6 provides that an element in a method claim "may be recited as a step for performing a specified function without the recital of acts in support of the function." *Id*. at 1583. The term "steps" refers to the elements of a process or method while the term "acts" refers to the implementation of such steps. *Id*. at 1582-83. As with apparatus claims, Judge Rader noted in *Seal-Flex* that only the language "step for" and not "step" alone or "step of" invokes a presumption that Section 112, ¶ 6 applies. *Seal-Flex, Inc. v. Athletic Track & Court Constr.*, 172 F.3d 836, 850 (Fed. Cir. 1999) (Rader, J., concurring). Even where the claim does not use "step for," however, Section 112, ¶ 6 may apply if the claim merely claims the underlying function without recitation of the acts necessary for performing that function. *Id*. Here, the applicability of Section 112, ¶ 6 to the method claims is supported by the fact that the same admittedly purely functional language is used to describe the steps of the method as used in the means-for elements of the apparatus claims.

Construction of a means-plus-function or step-plus-function claim involves two steps. First, the court must identify the claimed function. *Med. Instrumentation & Diagnostics Corp. v. Elekta AB*, 344 F.3d 1205, 1210 (Fed. Cir. 2003). Second, the court must determine what structure, if any, disclosed in the specification corresponds to the claimed function. *Id. See also*

*Cardiac Pacemakers, Inc. v. St. Jude Med., Inc.*, 296 F.3d 1106, 1119 (Fed. Cir. 2002) (stating that "corresponding structure must include all structure that actually performs the recited function."); *B. Braun Med., Inc. v. Abbott Labs.*, 124 F.3d 1419, 1424 (Fed. Cir. 1997) (noting that a disclosed structure is corresponding "only if the specification or the prosecution history clearly links or associates that structure to the function recited in the claim."). Simply invoking the word "software" is not enough – the specific algorithm in the specification must be identified. *Harris Corp. v. Ericsson, Inc.*, 417 F.3d 1241, 1253 (Fed. Cir. 2005) ("A computer-implemented means-plus-function term is limited to the corresponding structure disclosed in the specification and equivalents thereof, and the corresponding structure is the algorithm.").

## V.    ARGUMENT

### A.    McKesson's Proposed Claim Constructions Fail To Identify Adequate Structure To Support The Means-Plus-Function Or Step-Plus-Function Elements In The Asserted Claims.

#### 1.    Each Of The Claims Asserted Contains At Least One Means-Plus Function Element.

The parties agree that each of Claims 1-6 and 8-16 contain at least one claim element phrased in the "means for" format that invokes the presumption that Section 112, ¶ 6 applies.[5] *See Altiris, Inc.*, 318 F.3d at 1375. Accordingly, a proper claim construction will (1) identify the claimed function; and (2) determine what structure in the specification corresponds to the claimed function. *Med. Instrumentation & Diagnostics Corp.*, 344 F.3d at 1210.

McKesson's proposed construction completely ignores the first step by failing to identify, define, or explain the functional language found in the claims. As the second step, McKesson generally asserts that the corresponding structure for each "means for" claim element comprises

---

[5]    The independent method claims (Claims 1, 2, and 16) each contain the element "means for operating on a predetermined database." The independent apparatus claims 3, 10, 12, 13, 14, and 15, together with their associated dependent claims, each contain multiple means-plus-function elements. McKesson does not dispute that all of these claim elements are written in means-plus-function form and are subject to the requirements of 35 U.S.C. § 112, ¶ 6.

entire appendices, figures and sections of the specification without identifying the location of *any* specific algorithm, code, subroutine or other software structure that performs the functions described in the claim as required by Federal Circuit precedent. *See generally* Ex. B; *see also Harris Corp.*, 417 F.3d at 1253. McKesson further contends that although there is nothing in the specification linking any structure with the function claimed in the patent claims, it insists that "one of skill in the art" could identify the supporting structure. But, the Federal Circuit has emphasized "[i]t is not proper to look to the knowledge of one skilled in the art apart from and unconnected to the disclosure of the patent." *Med. Instrumentation & Diagnostics Corp.*, 344 F.3d at 1212. This assertion simply does not satisfy the structure requirement for claim construction. McKesson has therefore failed to proffer sufficient identification of structure in its claim construction to satisfy the requirements of Section 112, ¶ 6.

## 2.      Claims 1, 2, And 16 Are In Step-Plus-Function Form.

Similarly, McKesson has failed to provide any proposed structure for Claims 1, 2, and 16, which also invoke Section 112, ¶ 6. Claims 1, 2, and 16 are method claims claiming "a method for processing input claims. . .comprising the steps of: . . . ." For each of these associated functional elements, McKesson merely states that the ordinary meaning applies and no construction is required. *See* Ex. B (Claims 1(a)-(c), 2, 16(a)-(c)).

McKesson ignores, however, that these claims recite functions without any corresponding acts in the claim to perform that function. While these claims are written in "step of" rather than "step for" form, Section 112, ¶ 6 still applies. *Seal-Flex, Inc.,* 172 F.3d at 850 (Rader, J., concurring). In this case, the relevant functions, such as: "receiving at least one claim," "determining whether any medical service code contained in the at least one claim is not present in the predetermined database," and "informing a user that a medical service code is not contained in the predetermined database," are presented in Claim 1 without any identification of the applicable supporting act of performing each of these functions. *See* Ex. A, Claim 1. Similarly, Claim 2 and Claim 16 refer to similar "step" functions, without providing any supporting act. *See* Ex. A, Claims 2 and 16 (containing elements similar to those in Claim 1 as

well as additional "ascertaining," "authorizing," and "rejecting" claim elements). Each of these claims recites a function without setting forth a corresponding act; i.e., there is no explanation in the claim itself of *how* the computer system performs this function. Furthermore, these same purely functional claim elements are used, *without change*, in the means-plus function claims. Accordingly, Section 112, ¶ 6 applies to these claim elements. *See Seal-Flex, Inc.,* 172 F.3d at 850 (Rader, J., concurring) ("[I]f an examination of the claim element reveals that it recites only the underlying function, § 112, ¶ 6 nonetheless applies.").

Because each of these claims invokes the statutory requirements associated with step-plus-function claims, a proper construction requires identification of the corresponding act specifically linked in the specification. Because McKesson has failed to provide any supporting act for these claim elements, the claims cannot be construed and are otherwise indefinite. *See supra*, fn.3.

**B.    "Means For Operating On A Predetermined Database Containing Medical Service Codes And A Set Of Relationships Among The Medical Service Codes" (Claims 1-6, 8-16)**

The language, "means for operating on a predetermined database containing medical service codes and a set of relationships among the medical service codes," or other similar language is contained in each of the claims asserted in the patent. Despite this claim element's prominence, McKesson has failed to provide any structure to support the function identified in this element. Instead, McKesson refers generally to structure that:

> comprises data processing capabilities, memory, and software capable of managing a database, as well as their equivalents. *See, e.g.,* Fig. 1; col. 4, ll. 33-42. It is disclosed or otherwise inferred that one skilled in the art would know what specific software/algorithm(s) could be used perform the claimed function in accordance with this claim. *See, e.g.,* Fig. 1; col. 33-42; col. 10, ll. 51-64; App. D.

*See generally* Ex. B.

While TriZetto agrees that what little structure disclosed in the specification is located at Fig. 1, col. 4, ll. 33-42, and Appendix D, this is simply not enough structure to support the function of the claim. As previously stated, blanket referrals to "software," without identification

of the specific algorithm to carry out the claimed function, do not satisfy a patentee's obligations under Section 112, ¶ 6.  *See Harris Corp.*, 417 F.3d at 1253.  McKesson's failure in this regard is understandable given that there is no disclosure in the patent specification concerning the "predetermined database" that is referred to in this claim element.  Indeed, McKesson's own expert has testified that the predetermined database claimed in this element is not disclosed in the patent specification.  *See* Ex. C [Wilson Dep.], 213:16-25 (stating "[t]here is nothing in the claims that specifies a specific relationship between specific codes.").  Likewise, the inventors have all admitted that the database referred to in this claim element is not disclosed in the patent specification.  Ex. D [Hertenstein Dep.], 194:3-13.  Still further, there is nothing in the specification that links any structure to this means-plus-function claim element.  Without structure or any proper linking, this claim term cannot be construed as McKesson suggests, and it is otherwise indefinite.

Apart from the means-plus-function analysis, there is dispute concerning the proper construction of the constituent terms.

### 1.     "A Predetermined Database"

McKesson asserts that the term "predetermined database" should have its ordinary meaning.  *See generally* Ex. B (Claims 1(preamble), 2(preamble), 3(a), 10(a), 12(a), 13(a), 14(a), 15(a), 16(a)).  McKesson's experts admit, however, that the term does not appear generally in the relevant field.  *See* Ex. E [Musen Dep.], 40:12-20 ("[P]redetermined database is not a term that you would ordinarily see in the computer science literature.  That's an -- the adjective is odd, and so it would be unusual to assume that that would have a special meaning with respect to. . .people skilled in computer science."); *see also* Ex. F [Johnson Dep.], 106:17-20 ("It is not a term that is found" in the art.).  Equally troublesome, McKesson's experts cannot agree on a definition of "predetermined database."  Dr. Musen refers to the predetermined database one in which the *data* is a fixed *before the software is run*.  Ex. E [Musen Dep.], 37:21-38:421  ("I ascribed the database to be a database which is a conceptual structure that stores data where the data, prior to run time, had been fixed.").  Dr. Johnson, on the other hand, describes the

predetermined database as a database in which the *structure* of the table – that is, the columns and rows – are fixed while the *software is running*. Ex. F [Johnson Dep.], 100:20-101:6 ("It's a database that consists of tables where the structures of those tables are defined and cannot be modified while the system is running.").  These examples of expert testimony demonstrate that although McKesson asserts that this term should be given its "ordinary meaning," not even McKesson's experts have a unified understanding of what the phrase means.  Further, by trying to avoid the need for construction, McKesson seeks to ignore the meaning and use of the word "predetermined."

TriZetto believes that the word "predetermined" must modify the word "database." Because "the database literature would not typically make a distinction between a predetermined database and some other kind of database," (Ex. E [Musen Dep.], 40:24-41:4), the addition of the word "predetermined" before "database" must provide some insight into the way the term was intended at the time the claims were drafted.  Consequently, TriZetto proposes the following construction of "a predetermined database":

> A database containing a single computer readable table that is designed to be modified or updated only by the system designer or vendor, and that is not designed to be modifiable by the end user.

*See, e.g.*, Ex. B (Claim 1(preamble)).

TriZetto's construction is supported by the patent specification.  As re-affirmed in *Phillips*, the claims, specification, and prosecution history are the principal sources for claim construction.  *See Phillips*, 415 F.3d at 1311-26.  Here, the claims themselves use the term "predetermined database" in every single claim.  *See generally* Ex. A.  By inference, therefore, the word "predetermined" was used in an intentional manner to modify the "database."  The patent specification itself refers to decision-making rules rather than any user-modifiable rules or any other construction suggesting that user modification has been contemplated.  *Id.*, col. 3, ll. 30-32 ("The present invention uses a set of decision-making rules coupled to a knowledge base of facts and observations to assist the medical claims processor.").  In fact, nowhere in the patent, the specification, flowcharts, or the appendices providing the code for the patent, is there any

13

code or other mechanism that allows the end user to *view* or *modify* the rules database. *See generally id*.

Furthermore, the specification refers consistently to the "predetermined database" as a database of rules developed by experts specifically for the program. *See id*., col. 3, ll. 42-45 ("The knowledge base interpreter is a part of the CodeReview program and contains an association of the CPT-4 codes with the knowledge base of *expert-derived* decisions or rules."); *id*., col. 5, ll. 67-68 ("In order to accomplish this, a set of rules *developed for use of this program* is now invoked."); *and id*., col. 5, l. 68 – col. 6, l. 4 ("These rules were derived using the CPT-4 classification system, and from various medical procedures which were examined, classified, and possible combinations of procedures assessed by *expert medical specialists*."). These references to the database as a compilation of the results of work by experts implies that there is a needed set of specific relationships that was not intended to be modified by the user. This is further reinforced by the fact that the "predetermined database" also contains both "medical service codes and a set of relationships among the medical service codes" in every claim. *Id*., Claims 1-16. As a result, the predetermined database is clearly intended as a repository for expert-derived knowledge. This follows logically from the statements in the specification of the '164 patent that the user is a layman, and that the patented invention is designed to deliver such expert technology to the user. *See id*., col. 2, ll. 61-64 ("It is impractical for each of the operators to have a trained medical physician or technician to sit by the operator and decide whether a particular claim should be paid or not."). Accordingly, the emphasis on the expert knowledge as opposed to the user's knowledge demonstrates the need for a database containing a table designed to be modified only by the system designer or vendor, and not modifiable by the end user.

Likewise, the HISTORY database disclosed in the specification supports TriZetto's proposed construction. In the patent, HISTORY is explained as a database used to update or modify the rules database. *Id*., col. 10, ll. 3-8. However, the code and the specification provides no way for a user to view or modify the history database. *See generally id*. Furthermore, the

14

specification provides that the HISTORY database is used to change the "knowledge base interpreter" – that database is the program and the rules database.  *See id.*, Fig. 1.  It is certainly not common for a user to modify the very core of the program that a user is given.

TriZetto's expert testimony elaborates on why the "predetermined database" must refer to a database which cannot be modified by the end user.  Dr. Davis states, "My understanding of 'predetermined' as it is in the patent is that it is given to you by a vendor and is not changed by the user, not never changed, that's not what I said, but not end-user-modifiable."  Ex. G [Davis Dep.], 42:21-25.

Therefore, TriZetto's proposed claim construction asserting that the predetermined database contains a single computer-readable table that is designed to be modified or updated only by the system designed or vendor, and that is not designed to be modifiable by the end user, is supported by the specification, and should be adopted by this Court.

### 2.     "Medical Service Code"

McKesson suggests that the term "medical service code" should be construed to mean a code representing a particular medical service or procedure, *e.g.,* CPT-4 codes, CRVS codes, and similar medical service or procedure codes.  TriZetto proffers the following construction:  "A code, description, or other indicator that is used to denote a medical service, treatment, or procedure."  *See, e.g.,* Ex. B (Claim 1(preamble)).

McKesson's circular construction is unhelpful.  McKesson defines the term "medical service codes" to mean "similar *medical service or procedure* codes."  This proposed construction provides little added meaning and fails to properly reflect the scope of the term contemplated in the patent.  In the specification, the patent generally refers to use of a wide array of classification systems.  Ex. A, col. 4, ll. 23-26 ("The ALLCODE database preferably uses the CPT-4 classification system, but *other classification systems are intended to be within the scope of the present invention.*"); *and id.*, col. 10, ll. 48-50 ("Of course, the process described with reference to program 10 may be performed with databases *other than the CPT-4 example given.*").  Similarly, McKesson's expert testimony supports the proposition that "medical service

code" can refer to any code, description, or other indicator that is used to denote a medical service, treatment, or procedure. *See* Ex. C [Wilson Dep.], 278:12-19 ("I believe that medical procedure codes would cover dental procedure codes or surgical procedure codes or diagnostic or radiological procedure codes."). As a result, TriZetto's proposed claim construction is reasonable and even supported by McKesson's expert testimony.

> ### 3. "A Set Of Relationships Among The Medical Service Codes Defining Whether Selected Ones Of The Medical Service Codes Are Valid When Input With Other Selected Ones Of The Medical Service Codes"

With respect to this claim element, McKesson has proposed the following construction: "A set of relationships among the medical service codes defining whether one or more medical service codes are appropriate for payment when input with one or more different medical service codes." TriZetto, on the other hand, has construed the term to mean "a set of relationships specifying that if two or more particular medical service codes are input together as part of the same claim, then one or more of the input medical service codes are appropriate for payment." *See e.g.*, Ex. B (Claim 1(preamble)).

At this point, it is unclear whether there is any real disagreement on the proposed claim construction. TriZetto believes that its proposed construction reads directly on the claim and is supported by the ordinary meaning of the claim terms. Furthermore, TriZetto's proposed claim construction strives to present a clearer definition of the claim element by explaining that the medical codes here are inputted on the same claim element. Primarily, TriZetto's proposed claim construction attempts to clarify logic of the step by placing it in an "if-then" format as used by computer programs to express the application of logic rules. By doing so, TriZetto's proposed claim construction clarifies that *if* there are two or more codes input into the predetermined database as part of the same claim, *then* the relationships in the database dictate that one or more of the resulting codes will be deemed appropriate for payment.

C.    **"Ascertaining Whether The At Least One Claim Contains A Plurality Of Medical Service Codes" (Claims 2-6, 8-12, And 14-16)**

As described in Section IV.B., *supra*, rather than put forward any specific construction or structure regarding the "ascertaining" step of the asserted claims, McKesson asserts that this element should be given its ordinary meaning and points to whole sections of the specification, including Figures 2 and 3 in their entirety and Appendix D, as the material from which one of ordinary skill presumably could discern the applicable structure. *See generally* Ex. B (Claims 2(b), 3(c), 10(c), 12(c), 14(c), 15(c), 16(b)). As an initial matter, McKesson's failure to identify specific structure linked with the means-for and steps-for claim elements demonstrates that these functional claims cannot be supported by corresponding structure in the specification. Referring generally to portions of the specification is simply not enough. *See B. Braun Med. Inc.*, 124 F.3d at 1424 (holding that structure in the specification must be clearly linked or associated with that structure to the function in the claim).

Moreover, McKesson is attempting to avoid the Court's construction of this element by using "ordinary meaning" to distort the meaning of this claim element. As noted previously, McKesson's experts proffer a definition that outright *contradicts* any supposed ordinary meaning in this claim element. McKesson's experts improperly construe this claim element to refer simply to a "count" of the number of codes that has no impact on subsequent steps. *See* Ex. E [Musen Dep.], 113:6-11, 113:23-114:5 (stating that merely "numbering codes" meets the "ascertaining whether" element); *see also* Ex. F [Johnson Dep.], 96:1-6 ("Q.    Okay. Now, with respect to step three, 'Processing to determine' -- this is of the algorithm [that Dr. Johnson previously testified corresponded to the "ascertaining" element] now – 'if more than one medical procedure code has been entered,' do you read that to mean that the computer is counting the number of procedure codes on the claim? A.    Could be. That's a possible implementation.").

TriZetto submits that the "ascertaining" element of the applicable claims refers to the step of the claimed method (or the apparatus performing the disclosed method) that "[i]dentif[ies] if the claim contains more than one medical service code in order to determine whether multiple code edits should be checked." *See, e.g.,* Ex. B (Claim 2(b)). The fact that the "ascertaining"

17

step makes a yes/no determination, as opposed to simply counting the codes on the claim, is fully supported by the claim language itself and the patent specification. The element specifically ascertains "whether" a claim contains a plurality of codes. *See, e.g.,* Ex. A, Claim 2(a). The term "whether" has no special meaning in the '164 patent and generally refers to a question involving alternatives or "a choice between alternatives" – that is, this element determines whether the claim has more than one code on it or not, *see* Ex. H [Webster's Third New Int'l Dictionary (Merriam-Webster 1986)] at 2603, and takes appropriate action if the system "ascertains" that there is more than one code on the claim.

Correspondingly, the "flowchart of the overall operation of *the* programmed computer of *the* [claimed] invention" (*see* Ex. A, col. 4, ll. 5-6 (Brief Description of the Drawings, Fig. 2)), has only one element that "ascertains" "whether" the claim has more than one code and, only if there are a plurality of codes, is multiple code processing performed. *See id.*, Fig. 2, box 2; *see also id.* box 21 ("Multiple Prg." executed if "yes", *.i.e.,* "number of codes > 1"); *id.* box 31 (other processing that occurs if "no"). In fact, like the claims themselves, the element that precedes the ascertaining step is the receipt or entry of the claim to be processed. *See id.*, Fig. 2, box 7 (Entry Prg.). Moreover, the specification expressly distinguishes between counting



the number of codes, which is stored as part of the entry program, and "ascertaining" whether there is a plurality of codes prior to performing multiple code checking (Multiple Prg.). *See id.*, Fig. 3, box 18 ("Count No of Codes"); col. 4, l. 7 (Figure 3 is the flowchart of the entry program); Fig. 2, boxes, 7, 20; col. 5, ll. 45-56 (distinguishing the entry program step of counting codes with determining if the number of codes was greater than one).

Finally, because all of the ascertaining elements are drafted in means-plus or steps-plus-function, the structure of the element must be identified. *See*, *supra*, Section IV.B; *see also Med. Instrumentation & Diagnostics Corp.*, 344 F.3d at 1210. In the '164 patent, the specific

algorithm that is identified as "ascertaining whether the at least one claim contains a plurality of medical service codes" is Figure 2, box 20 and the three lines from Appendix D at column 59 that check if the "code-count > 1." *See* Ex. A, Fig. 2, box 20; Fig. 4, box 23'; 25', 27, 27', col. 5, l. 53 ("if the number of codes determined was more than one, then the MULTIPLE PROGRAM is run"); col. 59 ("if code-count >1[¶]  DO MULTIPLE.prg[¶]  end if").  Thus, the structure that does appear in the patent supports TriZetto's construction of the "ascertaining" elements.

**D.     The "Determining" Steps Of The '164 Patent**

**1.     Checking For The Presence Of A Medical Service Code In The Predetermined Database (Claims 1(b), 13(c))**

The object of claims 1 and 13 is to "determin[e] whether any medical service code" contained in the medical claim exists within the "predetermined database."  In contrast with all the other claims of the '164 patent, Claims 1 and 13 do not require that a "plurality of medical service codes" be "ascertained" on the medical claim before processing. *Compare* Claims 1 and 13 *with* Claims 2(b), 3(c), 10(c), 12(c).  Although Claim 1 is drafted as a method claim and Claim 13 as an apparatus claim, both claims perform the same validation function to "determin[e] whether any medical service code contained in the at least one claim is not present in the predetermined database."  Because the determining elements of both claims are identical and both perform the same function, TriZetto respectfully submits that proper construction of these elements must be made under Section 112, ¶ 6.

McKesson has not proffered any specific construction regarding the "determining" steps of Claims 1 and 13.  Instead, McKesson suggests that they be given their "ordinary meaning," and that "no construction [is] required." *See e.g.,* Ex. B (Claim 1(b)).  As described in Claims 1 and 13, the function of the determining element is to perform a check to verify that the medical service codes that are input on the medical claim are present in the predetermined database.  The function of the determining means is to validate the medical service code in the predetermined database to see whether that code exists.  TriZetto expects that there should be no disagreement

between the parties on this function, especially in light of McKesson's failure to proffer any other explanation of this claim element.

Because the determining element is written in means-plus-function and steps-plus-function language, proper construction requires that the specific structure that corresponds with the foregoing function be identified. *See Cardiac Pacemakers, Inc.*, 296 F.3d at 1119. As to Claim 1(b), McKesson fails to identify any corresponding structure for this step-plus-function element. *See* Ex. B (Claim 1(b)). As to Claim 13(c), McKesson identifies the structure corresponding to this functional language as simply "software," capable of carrying out the function described, and then cites generally to broad sections of the patent specification. *See* Ex. B (Claim 13(c)). Nowhere in McKesson's construction or in the patent specification is there any linking language that identifies specific structure that corresponds to the determining function in these claims. A corresponding structure must be clearly linked to the claimed function. *B. Braun Med., Inc. v. Abbott Labs.*, 124 F.3d 1419, 1424-25 (Fed. Cir. 1997). Instead, McKesson merely cites to the general figures depicting the flowchart for the overall operation of the programmed computer (Fig. 2) and the flowchart of the entry program of the programmed computer (Fig. 3). Additionally, McKesson cites to all of Appendix C and Appendix D. Neither of these cites provides any specific identity of the structure corresponding to the determining elements described in Claims 1 and 13. McKesson's failure to identify structure, therefore, supports a finding that there is no linked structure.

Notwithstanding, the only portion of the specification that appears to discuss the function of the "determining" element is the detailed description of the "ALLCODE database," where "it is determined whether the code entry is valid or invalid by reference to the ALLCODE database 11." Ex. A, col. 5, ll. 4-15. The patent specification provides computer code for an ENTRY.PRG (*see id.*, col. 59, ll. 50 – col. 65, ll. 15) as well as computer code which returns the claim to the main program. *See id.*, col. 65, ll. 17 – col. 67, ll. 63. The GET CODE procedure listed in Appendix D clearly shows the selection of the ALLCODE database. *See id.*, col. 65, ll. 47.

The problem presented is that the ALLCODE database is *not* a "predetermined database containing medical service codes and a set of relationships among the medical service codes," as required by the claims. The only database described in the patent specification containing a set of relationships is the INTERACT database. But the INTERACT database does not perform the validation function described in the claims. Ironically, McKesson's reliance on the ALLCODE database supports and actually strengthens TriZetto's interpretation that the only structure capable of performing this function, if any, is the ALLCODE database and related software that checks to see if an entered medical service code is in that database, and not the predetermined INTERACT database which contains the set of relationships amongst the codes.

### 2.    Comparison Of Single Codes (Claims 3(d), 15(d), 16(c))

As it has done with all of the means-plus-function claim elements, McKesson does not propose any construction of the function described by the "determining" element of Claims 3, 15 and 16. Looking at the plain language of the claim, TriZetto has interpreted these determining elements as "making a determination that one of the medical service codes entered on the claim is 'valid or invalid' based on the database and set of relationships contained in the database." *See* Ex. B (Claims 3(d), 15(d), 16(c)). Under *Phillips*, the Court should accept this construction because it is immediately apparent from the language of the claim itself that the foregoing construction accurately describes the function of the determining elements: namely, that the elements determine whether one of the medical service codes is valid or invalid by interacting with the database. In shorthand form, these elements provide a validity check, looking at a single medical service code and determining if it is valid or invalid by interacting with the predetermined database and the set of relationships contained therein. Whether it is written in means-plus-function language as in Claims 3 and 15 or step-plus-function language as it is in Claim 16, each of these determining elements performs the same validity check on a single medical service code. Having identified and properly construed the function of the determining elements, the next step in the analysis is to identify the corresponding structure.

Once again, McKesson has failed to identify the specific structure corresponding to the means-plus and step-plus function elements of Claims 3, 15 and 16. Moreover, there is nothing in the specification that TriZetto has located that specifically links the functionality described above with any specific structure in the specification. In McKesson's proposed construction, McKesson simply cites to the general figures of the specification depicting the flowchart for the general operation of the entire programmed computer (Fig. 2), the flowchart of the entire operation of multiple entries of the programmed computer (Fig. 4), and the chart of the categories of rules of the programmed computer (Fig. 6). By citing generally to all of these portions of the specification (including the entirety of Appendices A through D), McKesson demonstrates that there is no specific structure identified with the determining functionality of Claims 3, 15 and 16. The only thing close to structure that TriZetto has been able to locate in the specification is the ALLCODE database. However, as described above (*supra*, Section IV.D.1), the ALLCODE database is not the "predetermined" database that contains the relationships among the codes. That appears to be the INTERACT database, but the database does not function in accordance with the validation function described in the claims. Thus, there is no structure described in the patent for performing the validity check that is described in the determining elements of Claims 3, 15 and 16.

### a.    "Valid or Invalid" (Claims 3(d), 15(d), 16(c))

McKesson has offered a definition for the phrase "valid or invalid" that is directly contradicted by the plain language of the specification, which clearly states:

> By valid is meant that there is a code or codes for the treatment given a patient. *It does not mean that the entry or entries are valid for payment.*

Ex. A, col. 5, ll. 20-23 (emphasis added). McKesson's proffered definition that "valid or invalid," should be construed to mean "appropriate or inappropriate for payment," is completely improper in light of the patent specification.

TriZetto has offered a definition based on the ordinary meaning of the claim language and which is consistent with the patent specification and the claim language itself. *See Phillips*,

at 1312, 1315. TriZetto submits that the term "valid" means that the medical code exists in the database and the term "invalid" means that the medical code does not exists in the database. *See* Ex. B (Claims 3(d), 15(d), 16(c)). This proposed definition is specifically supported by the language cited above, as well as other portions of the specification. *See, e.g.*, *id.*, col. 5, ll. 13-14 ("[I]n Step 9 it is determined whether the code entry is *valid or invalid* by reference to the ALLCODE database 11."); *and id.*, col. 5, ll. 15-20 ("If an incorrect code (meaning here that there is no such alpha/numeric code or the code and description do not match) entry or entries are given or if no code entry is given at all, in step 9 the valid code entry or entries are specified by the process of the LOOKUP PROGRAM 10.")

Under *Phillips*, the specification is "always highly relevant to the claim construction analysis" and "usually . . . is dispositive; it is the single best guide to the meaning of a disputed term." *Phillips*, 415 F.3d at 1315. The reference to the ALLCODE database in the specification is a simple check to see whether the medical code entry or entries exists. As defined in Appendix C, "ALLCODE is the file which contains *every* code." Ex. A, col. 51 & 52 (emphasis added). Again, the specification of the patent expressly states that "by valid is meant that there is a code or codes for the treatment given a patient." *Id.* at ll. 20-22. Thus, TriZetto's submits that the phrase "valid or invalid" as used in the claims should be interpreted such that "valid" means that the code exists in the database and the term "invalid" means that the code does not exist in the database.

### 3. Comparison Of One Code On The Claim With Another Code On The Claim

Claims 2, 10, 12 and 14 all include a "determining" step that determines whether one code on the medical claim is related to another code on the same medical claim. According to the specific claim elements, making a determination is made based on the codes being "mutually exclusive due to non-medical criteria," being "included in" another medical code, or being "medically exclusive" with another medical code. Ex. A, Claims 2(c) ("mutually exclusive due to non-medical criteria"); 10(d), 12(d), 14(d), ("included in"); and 12(e) ("medically exclusive").

23

As an initial matter, TriZetto submits that each of these claim elements should be construed to make clear that the claimed computer system or method is making a determination based on a relationship (whether it be "non-medical" criteria, "medically exclusive," or "included in") between one code on the at least one claim with another code on the at least one claim.[6]  A problem, however, arises in construing the type and details of these relationships and in identifying the required structure corresponding to this functional element.

Once again, there is no structure in the patent specification that corresponds to the specific "non-medical," "medical," or "included" determining means or steps identified in the claims.  In fact, nowhere in the specification is the structure that applies to make the different determinations disclosed.  Moreover, the system and method described in the specification relies on expert rules contained in the predetermined database, and that database is not disclosed in the specification.

Additionally, it is not possible to fully construe the function of Claims 2, 12 and 14 because the patent does not define the terms "mutually exclusive due to non-medical criteria," or "medically exclusive," nor are these terms generally known to one of ordinary skill in the art.

### a.     There Is Insufficient Structure Linked To The Specific "Determining" Claim Elements.

The step-plus-function element of Claim 2(c) and the means-plus-function elements of Claims 10(d), 12(d) and 14(d) each lack complete supporting structure because nowhere does the '164 patent specification identify a "determining" structure specifically based on the relationship of the codes being "mutually exclusive due to non-medical criteria," "included in" another code, or "medically exclusive."  *See, e.g., B. Braun Med.*, 124 F.3d at 1424 (noting that a disclosed

---

[6]     McKesson suggests that these terms should be given their "ordinary meaning" without providing any insight as to what that means.  *See, e.g.*, Ex. B (Claims 2(c)).  Regardless of what "ordinary meaning" McKesson believes applies, it is clear that the claim language cannot be construed to allow determinations to be made based on a relationship of codes that are *not* on the claim.  Such a construction would be improper.

structure is corresponding "only if the specification . . . clearly links or associates that structure to the function recited in the claim").  Rather, the specification discloses the utility of having an entire expert system that applies appropriate judgment to incoming claims to authorize only the codes that are appropriate for payment as a whole.  *See, e.g.,* Ex. A, col. 3, ll. 6-14; col. 4, ll. 51-70 (describing application of entire system in determining that codes for which payment is proper);

The patent specification also does not indicate which subset of the "rules" is used to identify the specific subset of relationships identified in the determining step of claims 2, 10, 12, and 14.  In fact, the patent specification refers to the need to use several different databases (ALLCODES.dbf,  SUPERSEDED.dbf,  and  BYITSELF.dbf),  in  addition  to  the  one "predetermined database" with code relationships (INTERACT.dbf) specified in the claims, to make a "determination" for appropriate claims adjudication.  *See, e.g., id.*, Fig. 3, boxes 11-12; Fig. 4, box 4.  To this end, both before and after code checking for multiple code edits is performed (assuming the claim has more than one code), the specification makes clear that the disclosed system and method also perform additional code checks using the different databases. *See, e.g., id.*, Fig. 3, box 9 (validation); Fig. 2, box 31 (single code edits performed after box 21, multiple code edits).  Nowhere does the specification reveal that codes can or should be authorized (or entire claims approved as in claims 15 and 16) only after running the undefined subset of rules or the determining structure.  *See, e.g., id.*, col. 6, ll. 13-16 ("Therefore, for both single and multiple code entries, a set of rules applicable to CPT-4 codes singley [sic] and in combination are used to evaluate the appropriateness for payment.").

In addition, the patent specification says that the "determination" of appropriate codes is based on the detailed rules in the predetermined database.  *See, e.g., id.*, col. 4, ll. 56-64 (the interpreter (program), using rules of the present invention interacts with the knowledge base (containing the various databases) of the present invention); col. 5, l. 59 – col. 6, l. 27 (to accomplish determination of appropriateness of multiple codes, the codes on the medical claim in the PROCESS database "are examined first by looking up from the INTERACT database [the

only database containing relationships of codes identified in the specification] any references to those specific multiple codes").  The patent, however, never discloses the specific rules for the predetermined (INTERACT) database and, as such, the determining step and means of these claims lack proper written description.  *See* 35 U.S.C. § 112; *see, e.g., Reiffin v. Microsoft Corp.*, 214 F.3d 1342, 1345-46 (Fed. Cir. 2000)  (the inventor must describe in the specification the invention covered by the claims) *and see generally Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 535 U.S. 722, 736 (2002)  ("[W]hat is claimed by the patent application must be the same as what is disclosed in the specification.").

With respect to the determining means elements, McKesson has identified large portions of the specification from which it contends a person of ordinary skill could identify the appropriate structure.  *See, e.g.,* Ex. B (Claim 10(d)).  As previously discussed, the specification must specifically link the claim element with the supporting structure.  *Cardiac Pacemakers, Inc.*, 296 F.3d at 1119.  In doing so, the patentee must expressly point to portions of the specification that demonstrate that one of ordinary skill in the art would understand the identified supporting structure.  *Med. Instrumentation and Diagnostics Corp.*, 344 F. 3d at 1212 (holding that "software routines for converting digital-to-digital known to those of skill in the art" were not "corresponding" structure because nothing in the disclosure would allow one of those of ordinary skill in the art to understand that the disclosure encompasses such software).  Simply pointing to one of skill in the art to figure out what structure is necessary is not enough and as such, it is inappropriate for McKesson to rely on one of ordinary skill to figure out the appropriate structure.  Nowhere in the lengthy citations identified by McKesson does the specification ever link (or even mention) determining means for codes that are "mutually exclusive due to non-medical criteria" or any of the other specific relationships mentioned in the claims with the disclosed structure.  *See* Ex. A, Figs. 2, 4, & 6; Apps. A, B, C, & D; col. 5, l. 53 – col. 7, l. 60.

Nevertheless, while preserving its indefiniteness objection, because McKesson's citations essentially encompass all of the "determining" algorithms and logic set forth in the patent for the

disclosed system and method, and McKesson has not attempted to prove that TriZetto's programs are equivalent to that structure, TriZetto is willing to accept the structure identified in McKesson's listing (Ex. A, Figs. 2, 4, & 6; Apps. A, B, C, & D; col. 5, l. 53 – col. 7, l. 60) as including structure for the "determining" means or step of the disclosed system and method.[7]

Alternatively, because each of these determining elements apply to multiple code edits using the predetermined database with multiple code edits, TriZetto has identified the specific portions from the specification that appear to be most relevant to multiple code checking.  *See* Ex. B (Claims 2(c), 10(d), 12(d), 14(d)).

**b.    The Determining Elements Of Claims 2, 12 And 14 Also Include Additional Terms That Are Indefinite.**

The determining steps of claims 2, 12, and 14 each use a term that is undefined in the patent and which is not understandable to a person of ordinary skill in the art.  Specifically, both claims 2 and 14 refers to codes being mutually exclusive due to "non-medical criteria" and claim 12 refer to codes being "medically exclusive."  However, nowhere in the specification is either phrase defined or even discussed.  Because the patent law requires that the claims clearly define the scope of the claimed invention, the inability to define these phrases renders these claims invalid.  *See, e.g., Phillips*, 415 F.3d at 1312.

**(i)    "Non-Medical Criteria"**

To avoid acknowledging the indefiniteness of claims 2 and 14, McKesson simply proposes that the term non-medical criteria be given its "ordinary meaning."  *See* Ex. B. (Claims 2(c), 14(d)).  However, this term is not defined in any dictionary or in the patent specification

---

[7]    McKesson also includes col. 10, ll. 51-64 of the '164 Patent in its recitation of structure. This section of the specification merely generally notes that other variations of the preferred embodiment are intended to be encompassed by the claims.  As the Federal Circuit made clear in *Medical Instrumentation*, such general references to other variations that are not expressly linked to a specific claim element do not constitute proper structure of a means-plus or steps-plus function element.  *See* 344 F.3d at 1216-1217.

itself.  And, as the depositions in this case reveal, this phrase does not have any "ordinary meaning."

First, each of the inventors of the patent admitted that they did not understand the meaning of "non-medical" criteria in the patent claims.  *See, e.g.,* Ex. I [Dugan Dep.], 93:17-24 ("I guess that's where I'm being *tripped up*, nonmedical criteria.  It's -- I -- they don't – my understanding is that -- for instance, this is an example.  Yes, that they -- that Bob and/or Peggy, would look at certain claims that had more than one code, and perhaps they would deny any payment on a particular code because of its relation to the other one, or more, that appeared on that same claim." (emphasis added)); Ex. J [Goldberg Dep.], 305:4-7 (". . . "little old me" in quotation marks, merely an M.D., do not know what authorizing means, and I do not know what nonmedical criteria mean fully.  I can guess, but I don't know."); Ex. D [Hertenstein Dep.], 199:12-200:3 ("Q.  First of all, sir, do you know what is meant here by non-medical criteria?  A. That's a *confusing term*." (emphasis added)).

When pressed to give their best understanding of the term, the inventors were reduced to offering different possibilities for the phrase's meaning, *see, e.g.,* Ex. J [Goldberg Dep.], 305:19-306:11 (offering that perhaps the term means "coding criteria" as set forth by the American Medical Association in the CPT book); Ex. D [Hertenstein Dep.], 204:12-205:15 (suggesting gender or place of service as the non-medical criteria),[8] or offering explanations about a single code and some "non-medical" criteria, as opposed to a non-medical criteria rendering one code

---

[8]     The patent, however, does not disclose any coding examples where gender is used as a criteria for authorizing or rejecting claims.  Ex. A, App. B.  In any event, one could credibly assert that the knowledge that a procedure is inappropriate because of the patient's gender is based on medical criteria or knowledge about the human anatomy, even if that criteria or knowledge is generally known outside the medical profession.

mutually exclusive with another code. *See, e.g., id.* [Hertenstein Dep.], 199:17-200:3 (suggesting a plan may not pay for a breast augmentation as a non-medical criteria).[9]

Second, even McKesson's experts admit that they did not have a clear understanding of the phrase "non-medical criteria." For example, Dr. Johnson testified that she did not even venture to come up with an interpretation of this phrase as part of her analysis. *See* Ex. F [Johnson Dep.], 57:15-23; 107:8-16. Dr. Musen, McKesson's other infringement expert, offered several possible explanations for non-medical criteria, including that when a procedure and equipment code appeared together, the equipment may be "mutually exclusive" (even though, under both parties' proposed constructions "equipment codes" are not medical service codes) (*see* Ex. E [Musen Dep.], 43:6-44:18); that non-medical "has nothing to do with the state of the patient" (contrary to Dr. Hertenstein's explanation that gender was an example of non-medical criteria), but rather is based on "how the payer has decided to manage reimbursement (*id.* at 86:5-21; *see also id.* at 61:8-12 (opining that gender is a medical, not non-medical, criteria). Finally, Dr. Musen admitted there was no computational difference between medical and non-medical criteria and that non-medical criteria "is not something that is an inherent component of the codes as much as the organization that implements the database and decides how to structure it." *Id.* [Musen Dep.], 56:12-18, and 58:5-7; *see also id.* 52:19-23 ("[I]t's not essential for the database implementer to make that distinction between medical and non-medical because the framework provided by the patent is sufficiently general that it will apply to criteria of both kinds"). In other words, Dr. Musen essentially admits that the scope of claims 2 and 14 is not defined by the claim language itself.

Accordingly, based on the claim language, the specification and the deposition testimony, TriZetto respectfully submits that the term "non-medical criteria" is indefinite and incapable of proper construction.

---

[9] Specifically, the fact that a plan does not cover a specific procedure has nothing to do with whether there are also other procedures identified on the claim.

(ii)    **"Medically Exclusive."**

As with "non-medical criteria," TriZetto submits that the phrase "medically exclusive" appears nowhere in the '164 patent specification and is indefinite as used in Claim 12. The term "medically exclusive" is not defined anywhere in the patent or in any dictionary that was in use at the time of the initial application. McKesson's expert Dr. Johnson did not even attempt to define this term. Ex. F [Johnson Dep.], 109:21 – 110:2. And, Dr. Musen only interpreted the phrase "medically exclusive" in terms of the phrase "mutually exclusive due to non-medical criteria." Ex. E [Musen Dep.], 131:8-15 ("Q. All right. What -- give me -- can you give me an example of -- of codes that are medically exclusive of one another when they're submitted? A. Well, that would be analogous to the medical criteria that could lead codes to be mutually exclusive."). In other words, Dr. Musen uses the vague and indefinite phrase "non-medical criteria" and opines that "medically exclusive" covers whatever was not mutually exclusive due to non-medical criteria. Such circular logic should not be permitted to transform the undefined, indefinite phrase "medically-exclusive" into a phrase capable of construction in order to properly delineate the scope of claim 12 of the '164 patent.

Accordingly, TriZetto respectfully submits that the term "medically exclusive" is indefinite and incapable of proper construction.

## E.    The "Authorizing" And "Rejecting" Steps Of The '164 Patent

### 1.    "Authorizing" And "Rejecting" Medical Service *Codes*

For the numerous "authorizing" and "rejecting" steps (Claims 2(d), 2(e), 3(e), 3(f), 10(e), 10(f), 12(e), 12(f), 14(e) and 14(f)) which relate to *codes*, McKesson offers neither a construction of the applicable function nor identification of the corresponding structure (Claims 2(d), 2(e)). Indeed, for the majority of these claim terms, McKesson simply fails to identify any structure corresponding to the claim limitations as required by that Section 112, ¶ 6 and the Court's September 20, 2005 Order (Claims 3(e), 3(f), 10(e), 10(f), 12(e), 12(f), 14(e) and 14(f)). (D.I. 99.) In this latter set of claims, McKesson's approach was to repeat the language of the claim, without explaining function or structure. For example, in claim 3(e), "means for authorizing

medical service codes which are valid in response to the means for determining," McKesson offers only:  "The structure corresponding to this means comprises software capable of authorizing medical service codes which are valid in response to the means for determining, as well as its equivalents."  Ex. B (Claim 3(e)).  Similarly, in claim 3(f), "means for rejecting medical service codes which are invalid in response to the means for determining," McKesson offers only: "The structure corresponding to this means comprises software capable of rejecting medical service codes which are invalid in response to the means for determining, as well as its equivalents."  Ex. B (Claim 3(f)).

McKesson would have the Court believe that it can sufficiently identify structure in this set of claims by simply inserting the word "software" and stating that "[i]t is disclosed or otherwise inferred that one skilled in the art would know what specific software/algorithm(s) could be used to perform the claimed function in accordance with this claim."  *See generally* Ex. B.  This is not enough – the specific algorithm for carrying out the claimed function must be identified.

In support of its meaningless proposed construction, McKesson cites very broadly to general portions of the specification:  the high level figure of the invention (Fig. 1), the flowchart for the overall operation of the programmed computer (Fig. 2), and the flowchart for the operation of multiple entries (Fig. 4).  McKesson also cites generally to all of the Appendices A through D, and further cites to broad statements regarding the overall manner in which the system works.  But these citations and references offer no explanation regarding the structure of the corresponding claim limitation, and they do not contain any language linking the disclosure to the claim limitation.  *See B. Braun Med.*, 124 F.3d at 1253 (structure is corresponding only if

the specification "clearly links or associates that structure to the function recited in the claim.").[10]

For each of these claims in which McKesson offers no interpretation of the claimed function and only a meaningless broad brush of general cites for corresponding structure, TriZetto proposes a construction of the functions described in each "authorizing" and "rejecting" element.  For example, for claim 3(e), "means for authorizing medical service codes which are valid in response to the means for determining," TriZetto proposes:  "Displaying on a computer monitor or otherwise communicating to a user that one or more medical service codes input by the user as part of a claim should be authorized for payment, because such codes on the claim were determined in the 'determining' step to be 'valid.'"  *See* Ex. B (Claim 3(e)).  Similarly, for claim 3(f), TriZetto proposes: "Displaying on a computer monitor or otherwise communicating to a user that one or more medical service codes input by the user as part of a claim should not be authorized for payment, because such codes on the claim were determined in the 'determining' step to be 'invalid.'"  *See* Ex. B (Claim 3(f)).

TriZetto submits that any action taken by the expert system in each "authorizing" and "rejecting" step is done in response to the "determining" step.  First, under *Phillips*, the bedrock principle of claim construction is that the "claims of the patent define the invention."  *Phillips*, 415 F.3d at 1312.  Here, every single "authorizing" and "rejecting" claim element contains claim language immediately following which states "in response to the means for determining" or "in response to the determining step."  Ex. A, Claims 2, 3, 10, 12, and 14.  Second, the plain meaning of the term clearly indicates that the "authorizing" and "rejecting " steps cannot stand alone:  they must be done in response to something.  Here, that something is the "determining" means or step.  The claims cannot be sensibly read without a connection to the determining step.

---

[10]     Curiously, McKesson references each of the Appendices A through D in its construction, but it does not cite to a single example from the patent which at least shows when the expert system "authorizes" or "rejects" a code.

Although the patent specification does not identify any structure for authorizing codes that are "valid," TriZetto believes that the structure in the patent most related to such function is found in Appendix A, Example 1, illustrating an example of an E1/E2 rule in a typical session with CodeReview. After the user enters the codes and the programmed computer runs through the flowchart for the multiple entries, the computer's response to the user is: "Assign the following code(s) for payment:  1.  10120 remove foreign body." Ex. A, col. 11, ll. 34-36.[11] This disclosure, however, is not in response to a determination that the code is "valid" as required by the claim. Equally so, the specification does not identify structure for rejecting codes which are determined to be "invalid." The messages contained in the Examples of Appendix A do not mention any possible structure for this "rejecting" step.[12] Nevertheless, TriZetto respectfully submits that the Court should adopt TriZetto's proposed construction of the "authorizing" and "rejecting" claim elements which act on the medical service codes.

### 2.    "Authorizing" And "Rejecting" The Medical *Claim*

The remaining "authorizing" and "rejecting" steps (Claims 15(e), 15(f), 16(d), and 16(e)) relate to the medical *claims* rather than the service *codes*. Claim 15(e) states "means for authorizing the at least one claim in response to the means for determining" and claim 15(f) states "means for rejecting the at least one claim in response to the means for determining." Ex. A, Claim 15. As with the other steps, McKesson again fails to identify corresponding structure through the same broad cites to general portions of the patent, including all of the Appendices in

---

[11]   Additional structure relating to "authorizing codes," although not for being "valid," can be found in Appendix D, which lists the code for recomm.prg for creating a NEW database. Ex. A, col. 99, l. 33 – col. 113, l. 22.

[12]   Even if Appendix A contained examples which rejected invalid codes, this would still fail to sufficiently explain what happens to the rejected code. The claims do not explain what happens. Only claim 4 ("means for revising the at least one claim to delete invalid medical service codes") and claim 11 ("means for revising the at least one claim to not include a rejected medical service code") contain any functional language addressing this issue. Ex. A, Claims 4, 11.

full.  *See* Ex. B.  McKesson further fails to link the function to any structure, and thus has failed to specifically identify structure corresponding to this claim limitation, as required by the Court's September 20, 2005 Order.  (D.I. 99.)

TriZetto submits that these "authorizing" and "rejecting" phrases are indefinite, because a person of ordinary skill in the art would not know how an entire medical claim is authorized in response to the determining step, which only determines whether a service code is valid or invalid.  McKesson's own expert Dr. Johnson testified that she did not even consider these "authorizing" and "rejecting" steps which operated on medical claims rather than service codes. *See* Ex. F [Johnson Dep.], 67:8-11 ("Again, I am not a medical claims processing expert, but my interpretation was that if the medical service codes were authorized to be valid together, then that was at least one of the steps involved in authorizing the claim.")

Furthermore, TriZetto submits that these claims are indefinite because of the impossible concept of both "authorizing" *and* "rejecting" the same medical claim in the method described in Claim 16.  If a medical claim is first authorized, how can it then be rejected in a subsequent step? By using the conjugative "and" in a method claim, the patentee has rendered the claim indefinite.

Notwithstanding the foregoing deficiencies, TriZetto proposes the following claim constructions: "Authorizing for payment the entire claim received from the user based on the determinations step of the "determining" step, and "Rejecting for payment the entire claim received from the user based on the determinations of the "determining" step.  Ex. B (Claims 15(e), 15(f), 16(d), 16(f)).  While this construction is consistent with the functionality described, the specification does not identify any structure for authorizing or rejecting a claim based on the clinical edits determined in the "determining" step.  In fact, the only authorization means appears to be the user, and not the system itself.  The specification clearly contemplates that the user, not the system, will take an action with respect to the information.  "When the knowledge base interpreter has recommended approval of payment of a particular type, the User 3 may then authorize payment to the provider of the processed claim or may forward that information via input into computer system 4."  Ex. A, col. 4, ll. 64-68.

Despite these ambiguities in the claim language, the one thing that is clear is that McKesson has failed to specifically identify or link corresponding structure, as required by statute (Section 112, ¶ 6), established case law (*see Cardiac Pacemakers*, 296 F.3d 1106, 1119 *and B. Braun Med.*, 124 F.3d 1419, 1424), and the Court's September 20, 2005 Order (D.I. 99). Thus, the Court should adopt TriZetto's proposed construction of the "authorizing" and "rejecting" claim elements which act on the "at least one claim[s]" themselves.

**F.    The Dependent Claims Of The '164 Patent**

For dependent Claims 4, 5, 6, 8, 9, and 11, TriZetto submits that the patent specification does not identify any structure corresponding to "means for revising the at least one claim to delete invalid medical codes" (Claim 4) or to "means for revising the at least one claim to not include a rejected medical service code."  (Claim 11).  The only description in the specification which could arguably identify some structure corresponding to these two dependent Claims 4 and 11 relates to the user manually revising the claim.  In other words, the specification does not identify any acts of the expert computer system itself which would "revise the claim" or "delete the code."  The specification instead clearly contemplates that the user, not the system, will take an action with respect to the information.    "When the knowledge base interpreter has recommended approval of payment of a particular type, the User 3 may then authorize payment to the provider of the processed claim or may forward that information via input into computer system 4."  Ex. A, col. 4, ll. 64-68.  Furthermore, the messages that appear to the user upon the system processing certain codes or claims demonstrate that the user does take action in response to the system.  *See id.*, Example 1, App. A (user presses Return key after Computer Response, and computer displays further information); Examples 12, 17 and 18 (user presses Return key in multiple instances in response to Computer Responses, and computer displays further information).  While this appears contrary to the entire thrust of the '164 patent, a human user is the only "structure" identified in the specification to carry out the claimed function.

Alternatively, TriZetto submits that the claim terms contained in dependent Claims 4 and 11 are indefinite.  McKesson's broad cites to structure (*see generally* Ex. B (Claims 4,5,6,8,11)),

similar to many of McKesson's other cites, fail to specifically identify structure corresponding to this functional claim limitation and TriZetto's independent review reveals no structure specifically linked.  Accordingly, because McKesson has failed to specifically identify structure associated with the relevant claims, the Court should accept TriZetto's proposed construction for the dependent claim terms.

## VI.     CONCLUSION

For the foregoing reasons, TriZetto respectfully requests that the Court adopt TriZetto's proposed constructions of the terms of the patent in suit as set forth herein and in the concurrently filed Joint Statement.

MORRIS, NICHOLS, ARSHT & TUNNELL

/s/ Jack B. Blumenfeld
Jack B. Blumenfeld (No. 1014)
Rodger D. Smith, II (No. 3778)
1201 N. Market Street
Wilmington, Delaware 19899
(302) 658-9200

Attorneys for Defendant The TriZetto Group, Inc.

Of Counsel:

GIBSON, DUNN & CRUTCHER LLP
Jeffrey T. Thomas
David Segal
Michael A. Sitzman
Jamboree Center, 4 Park Plaza
Irvine, CA  92614

CERTIFICATE OF SERVICE

I, Jack B. Blumenfeld, hereby certify that on December 15, 2005 I electronically

filed an Opening Brief in Support of the TriZetto Group, Inc.'s Motion for Summary Judgment

of Non-Infringement with the Clerk of the Court using CM/ECF, which will send notification of

such filing(s) to the following:

Thomas J. Allingham, II
Skadden, Arps, Slate, Meagher & Flom LLP

I also certify that copies were caused to be served on December 15, 2005 upon the

following in the manner indicated:

BY HAND

Thomas J. Allingham, II
Skadden, Arps, Slate, Meagher & Flom LLP
One Rodney Square
P.O. Box 636
Wilmington, DE  19899

BY EMAIL

Jeffrey G. Randall
Skadden, Arps, Slate, Meagher & Flom LLP
525 University Avenue
Suite 1100
Palo Alto, CA  94301]

/s/     Jack B. Blumenfeld (#1014)
Morris, Nichols, Arsht & Tunnell
1201 N. Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
jblumenfeld@mnat.com