IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| MCKESSON INFORMATION SOLUTIONS, LLC, | ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | C.A. No. 04-1258 (SLR) |
| THE TRIZETTO GROUP, INC., | ) ) ) | |
| Defendant. | ) ) ) ) | |

## PLAINTIFF MCKESSON INFORMATION SOLUTIONS LLC'S
## OPENING CLAIM CONSTRUCTION BRIEF

Thomas J. Allingham II (#0476)
Michael A. Barlow (#3928)
SKADDEN, ARPS, SLATE,
    MEAGHER & FLOM LLP
One Rodney Square
P.O. Box 636
Wilmington, Delaware 19899
(302) 651-3000

OF COUNSEL:
Jeffrey G. Randall
David W. Hansen
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
525 University Avenue, Suite 1100
Palo Alto, California 94301
(650) 470-4500

Attorneys for Plaintiff
McKesson Information Solutions LLC

DATED: December 15, 2005

**TABLE OF CONTENTS**

Page

I.  INTRODUCTION ..................................................................................................1

II.  TRIZETTO'S UNTIMELY DISCLOSURE OF ITS CONSTRUCTIONS ONE WEEK
BEFORE CLAIM CONSTRUCTION BRIEFING...........................................................1

III.  BACKGROUND OF THE '164 PATENT ...................................................................1

IV.  LEGAL BACKGROUND FOR CLAIM CONSTRUCTION...............................................3

    A.  General Principles.....................................................................................3

    B.  "Step-Plus-Function" Elements Under 35 U.S.C. § 112,
        Paragraph 6. ..........................................................................................5

V.  CONSTRUCTION OF DISPUTED TERMS ...................................................................6

    A.  Medical Service Code(s)............................................................................6

    B.  A Predetermined Database ... Containing Medical Service Codes
        And A Set Of Relationships Among The Medical Service Codes ..............7

        1.  The Express Language Should Take Its Ordinary and
            Accustomed Meaning; No Construction Is Needed........................7

        2.  TriZetto's Construction Improperly Limits the Ordinary
            Meaning of "a predetermined database.".........................................7

        3.  The Phrase "containing medical service codes and a set of
            relationships among the medical service codes" Should Be
            Accorded Its Ordinary Meaning. ....................................................8

    C.  "Valid Or Invalid"....................................................................................8

        1.  The Express Functional Language Should Take Its
            Ordinary and Accustomed Meaning. ..............................................9

        2.  The Specification Supports McKesson's Construction. ..................9

        3.  TriZetto's Construction Is Inconsistent with Its Proposed
            Construction of the Term "valid" Elsewhere in the Claims. .........10

    D.  "Non-Medical Criteria" ..........................................................................11

    E.  "Medically Determined Relationships" ....................................................11

F.    "A Set Of Relationships Among The Medical Service Codes Defining Whether Selected Ones Of The Medical Service Codes Are Valid When Input With Other Selected Ones Of The Medical Service Codes"...........................................................................12

VI.    ALLEGED STEP-PLUS-FUNCTION ELEMENTS .............................................12

VII.    CONSTRUCTION OF MEANS-PLUS-FUNCTION ELEMENTS.........................13

A.    Legal Standards for Construing Means-Plus-Function Elements..............13

B.    Analysis of Disputes Concerning the Means-Plus-Function Elements..................................................................................................14

1.    Summary of the Parties' Disputes Concerning Means-Plus-Function Elements. ........................................................................14

2.    McKesson's Proposed Constructions Are Proper and Supported by Adequate Disclosure in the Specification, whereas TriZetto Improperly Seeks to Limit the Invention to Specific Portions of Software Code..........................................15

a.    The Patent Discloses More than Sufficient Structure for Elements Referencing the Predetermined Database...........................................................................16

b.    McKesson's Proposed Claim Constructions Fully Comply with the Court's Memorandum Order..................17

c.    TriZetto's Consistent Attempt to Limit the Means-Plus-Function Elements to Specific Lines of Software Code Is Improper.................................................18

3.    Proper Construction of the Means-Plus-Function Elements..........19

a.    Disputed Term: "means for operating on a predetermined database."...................................................20

b.    Disputed Term: "means for receiving at least one claim.".................................................................................21

c.    Disputed Term: "means for ascertaining whether the at least one claim contains a plurality of medical service codes." ...................................................................23

(1)    The Express Functional Language Should Take Its Ordinary and Accustomed Meaning; No Construction Is Needed.....................................23

ii

       (2)     The Corresponding Structure Comprises Software Capable of Ascertaining whether the at Least One Claim Contains a Plurality of Medical Service Codes, as well as Its Equivalents..........................................................25

d.     Disputed Term: "means for determining whether one of the medical service codes in the at least one claim is [criterion]."..........................................................26

       (1)     The Functional Language of the "Determining ..." Elements Should Take Its Ordinary and Accustomed Meaning. .....................26

       (2)     The Corresponding Structure Comprises Software Capable of Interacting with the Database to Determine whether One of the Medical Service Codes in the at least One Claim Is [criterion], as well as Its Equivalents..........................................................28

e.     Disputed Terms: "means for authorizing {rejecting} medical service codes which [meet {fail} criterion] in response to the means for determining." .......................33

       (1)     The Functional Language of the "Authorizing ..." and "Rejecting ..." Elements Should Take Its Ordinary and Accustomed Meaning. ...........................................33

       (2)     The Corresponding Structure Comprises Software Capable of Authorizing {Rejecting} Medical Service Codes which [Meet {Fail} Criterion] in Response to the Means for Determining, as well as Its Equivalents.................35

f.     Disputed Term: "means for revising the at least one claim to: delete invalid medical service codes (claim 4) / not include a rejected medical service code (claim 11)"................................................37

g.     Disputed Term: "means for informing a user: why the at least one claim was revised (claim 5) / that a medical service code is not contained in the predetermined database (claim 13)" ...................38

h.    Disputed Term: "means for requesting further information from a user regarding the at least one claim" ...............................................................39

VIII.    CONCLUSION.............................................................................................40

# TABLE OF AUTHORITIES

<u>Page(s)</u>

**CASES**

*ACTV, Inc. v. Walt Disney Co.*,
346 F.3d 1082 (Fed. Cir. 2003) ................................................................. 3, 8, 24

*Advanced Med. Optics, Inc. v. Alcon Inc.*,
361 F. Supp. 2d 370 (D. Del. 2005) ............................................................... 5, 12

*Atofina v. Great Lakes Chem. Corp.*,
2005 U.S. Dist. LEXIS 7365 (D. Del. March 16, 2005) ........................................... 4

*Budde v. Harley Davidson, Inc.*,
250 F.3d 1369 (Fed. Cir. 2001) ........................................................ 13, 14, 18, 30

*CCS Fitness, Inc. v. Brunswick Corp.*,
288 F.3d 1359 (Fed. Cir. 2002) .................................................................... 13

*Desper Prods. v. Qsound Lab.*,
157 F.3d 1325 (Fed. Cir. 1998) ..................................................................... 3

*Fonar Corp. v. General Electric Co.*,
107 F.3d 1543 (Fed. Cir. 1997) ............................................................ 15, 19, 21

*Gemstar-TV Guide Int'l, Inc. v. Int'l Trade Comm'n*,
383 F.3d 1352 (Fed. Cir. 2004) ................................................................. 4, 13

*Harris Corp. v. Ericsson, Inc.*,
417 F.3d 1241 (Fed. Cir. 2005) .................................................................... 13

*Intel Corp. v. VIA Technologies, Inc.*,
319 F.3d. 1357 (Fed. Cir. 2003) ................................................................... 13

*Invitrogen Corp. v. Biocrest Mfg., L.P.*,
424 F.3d 1374 (Fed. Cir. 2005) .................................................................... 11

*Johnson Worldwide Assocs., Inc. v. Zebco Corp.*,
175 F.3d 985 (Fed. Cir. 1999) ...................................................................... 3

*Liebel-Flarsheim Co. v. Medrad, Inc.*,
358 F.3d 898 (Fed. Cir. 2004) .................................................................... 7, 8

*Markman v. Westview Instruments, Inc.*,
52 F.3d 967 (Fed. Cir. 1995) ....................................................................... 3

*Markman v. Westview Instruments, Inc.*,
517 U.S. 370 (1996) ............................................................................... 19

*Masco Corp. v. United States*,
303 F.3d 1316 (Fed. Cir. 2002) ................................................................. 5, 12

*Medical Instrumentation and Diagnostic Corp. v. Elekta AB*,
344 F.3d 1205 (Fed. Cir. 2003) ............................................................... passim

*Northern Telecom Ltd. v. Samsung Elecs. Co.,*
 215 F.3d 1281 (Fed. Cir. 2000) ................................................................................. 4

*NTP, Inc. v. Research in Motion, Ltd.,*
 418 F.3d 1282 (Fed. Cir. 2005) ................................................................................. 4

*O.I. Corp. v. Tekmar Co.,*
 115 F.3d 1576 (Fed. Cir. 1997) ................................................................................. 5

*Pfizer, Inc. v. Teva Pharms. USA, Inc.,*
 2005 U.S. App. LEXIS 25123 (Fed. Cir. Nov. 22, 2005) ......................................... 8

*Phillips v. AWH Corp.,*
 415 F.3d 1303 (Fed. Cir. 2005) ....................................................................... *passim*

*Rexnard Corp. v. Laitram Corp.,*
 274 F.3d 1336 (Fed. Cir. 2001) ................................................................................. 9

*Tex. Digital Sys. v. Telegenix, Inc.,*
 308 F.3d 1193 (Fed. Cir. 2002) ................................................................................. 3

*WMS Gaming, Inc. v. Int'l Game Tech.,*
 184 F.3d 1339 (Fed. Cir. 1999) ............................................................................... 13

**STATUTES**

35 U.S.C. § 112 ................................................................................................... 5, 13

## I.    INTRODUCTION

Plaintiff, McKesson Information Solutions, LLC ("McKesson"), asserts infringement by The TriZetto Group, Inc. ("TriZetto") of claims 1-6 and 8-16 of United States Patent No. 5,253,164 (the "'164 patent")[1]. Pursuant to the Court's Scheduling Order [D.I. 28], the parties have met and conferred regarding claim construction issues. The Joint Claim Construction Statement filed today by the parties identifies the disputed terms.

## II.   TRIZETTO'S UNTIMELY DISCLOSURE OF ITS CONSTRUCTIONS ONE WEEK BEFORE CLAIM CONSTRUCTION BRIEFING

Although the Court's Scheduling Order called for the parties to exchange proposed claim constructions in July 2005, TriZetto did not provide McKesson with the bulk of its constructions until December 9, 2005 -- less than one week before the present briefing was due.[2] For months preceding its last-minute disclosure, TriZetto contended the functional language of many means-plus-function elements did not require construction and offered no construction for *any* of the corresponding structures for these elements. Barlow Decl., Exh. 2. Rather than narrow the issues for the Court to resolve, TriZetto placed *five additional* functional elements in dispute, modified its construction for *fourteen* other claimed functions, and for the first time identified corresponding structure for a host of elements that it had maintained for months was not disclosed. Barlow Decl., Exh. 3. TriZetto's refusal to disclose its proposed constructions until the eve of the present briefing is inexcusable, particularly given that TriZetto has been investigating the '164 patent for nearly a decade. Accordingly, McKesson respectfully requests that the Court preclude TriZetto from relying upon any construction not included in its October 11, 2005 claim construction statement.

## III.  BACKGROUND OF THE '164 PATENT

The '164 patent describes the use of computer systems and computer implemented methods for analyzing and detecting errors or other problems with medical claims. A medical

---

[1]     Declaration of Michael A. Barlow supporting McKesson's Opening Claim Construction Brief ("Barlow Decl.") Exh. 1.

[2]     *Compare* Barlow Decl. Exh. 2 (TriZetto's Proposed Claim Construction chart of December 9, 2005) *with id.*, Exh. 3 (TriZetto's Supplemental Proposed Claim Construction of October 11, 2005). McKesson did not change its proposed constructions between October 11 and December 9, 2005.

claim is analogous to a bill requesting payment for medical services submitted by a service provider (*e.g.*, a physician) to the organization responsible for a patient's medical expenses (*e.g.*, an insurance company). A claim includes one or more codes, each representing a particular medical service for which payment is sought. Typically, each medical service code is associated with a previously negotiated fee to be paid for the service it represents. Thus, the medical service codes on a claim determine the amount to be paid to a service provider for a claim.

The '164 patent describes the use of a computer system to analyze the medical service codes submitted on a claim to detect and correct errors or problems that may result in an inappropriate amount being paid. For example, the '164 patent addresses the submission of what are commonly referred to as "unbundled" medical service codes. Unbundling involves the submission of medical service codes corresponding to each individual component of an overall service instead of, or in addition to, the single comprehensive code for that service. Unbundling often results in a higher bill than if the claim appropriately included only the comprehensive code.

To address unbundling and other coding problems, the '164 patent describes the use of a knowledge-based computer system with a database of medical service codes and relationships among those codes that define whether it is appropriate to pay the fee associated with a medical service code in conjunction with the other medical service codes submitted on the claim. The system described and claimed in the '164 patent provides the ability to consistently catch and process inappropriately coded claims that might otherwise go undetected and result in overcharging for medical services.

Claims 1-6 and 8-15 of the '164 patent each describe a computer system or method performed in a computer system for receiving and processing medical claims, each having one or more medical service codes, such as CPT codes. The computer system in each claim includes a database of medical service codes and relationships among those codes defining whether a particular medical service code is valid for payment when submitted with the other medical service codes on a received claim. Each '164 patent claim describes a particular check to be performed by a computer system on the medical service codes included in a claim. These checks include determining whether a medical service code in a claim is: not present in the database (claims 1 and 13); valid or invalid for payment (claims 3-9, 15, 16); exclusive with other medical

service codes on the claim due to medical criteria (claim 12) or non-medical criteria (claims 2 and 14); or included in any other medical service code on the claim (claims 10, 11). Based on these determinations, the computer system in each of the '164 patent claims may inform a user of the system's determination, request additional information, revise the claim, and/or authorize medical service codes that pass the check and reject those that do not.

## IV.    LEGAL BACKGROUND FOR CLAIM CONSTRUCTION

### A.    General Principles

"It is a bedrock principle of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (*en banc*) (internal quotations omitted). Claim construction is a question of law for the court. *See Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (*en banc*), *aff'd.*, 517 U.S. 370 (1996). [T]he words of a claim are generally given their ordinary and customary meaning. *Phillips*, 415 F.3d at 1312.

The "court must presume that the terms in the claim mean what they say, and, unless otherwise compelled, give full effect to the ordinary and accustomed meaning of claim terms." *Johnson Worldwide Assocs., Inc. v. Zebco Corp.*, 175 F.3d 985, 989 (Fed. Cir. 1999); *see also Tex. Digital Sys. v. Telegenix, Inc.*, 308 F.3d 1193, 1202 (Fed. Cir. 2002) (there is a "heavy presumption" that the claims "mean what they say" and possess the "full range" of their ordinary meaning); *Markman*, 52 F.3d at 986. Accordingly, if the patentee has chosen to use claim terms having broad meaning, the court must construe them as to give "full effect" to their breadth, absent any clear indication that the patentee did not intend the words to be interpreted broadly. *Johnson Worldwide*, 175 F.3d at 989 ("General descriptive terms will ordinarily be given their full meaning; modifiers will not be added to broad terms standing alone.").

The Federal Circuit has consistently affirmed that "[c]ommon words, unless the context suggests otherwise, should be interpreted according to their ordinary meaning." *Desper Prods. v. Qsound Lab.*, 157 F.3d 1325, 1336 (Fed. Cir. 1998) (citation omitted). The "context of the surrounding words of the claim . . . must be considered in determining the ordinary and customary meaning of [the claim's] terms." *ACTV, Inc. v. Walt Disney Co.*, 346 F.3d 1082, 1088 (Fed. Cir. 2003); *see also Phillips*, 415 F.3d at 1314. Where the ordinary meaning of a claim

3

term is readily apparent to lay judges, a court may apply the "widely accepted meaning of commonly understood words," using general purpose dictionaries. *Phillips*, 415 F.3d at 1314.

The presumption that terms should be given their ordinary meaning is only rebutted if the patentee "has disavowed or disclaimed [this] scope of coverage, by using words or expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope." *Gemstar-TV Guide Int'l, Inc. v. Int'l Trade Comm'n*, 383 F.3d 1352, 1364 (Fed. Cir. 2004) (citation omitted).

> Generally, "a party wishing to use statements in the written description to confine or otherwise affect a patent's scope must, at the very least, point to a term or terms in the claim with which to draw in those statements. Without any claim term that is susceptible of clarification by the written description, there is no legitimate way to narrow the property right." In other words, "there must be a textual reference in the actual language of the claim with which to associate a proffered claim construction."

*NTP, Inc. v. Research in Motion, Ltd.*, 418 F.3d 1282, 1310 (Fed. Cir. 2005) (citations omitted).

Although claims must be read in light of the specification, limitations from the specification may not be read into the claims. *See Phillips*, 415 F.3d at 1323. As this Court held in *Atofina v. Great Lakes Chem. Corp.*, 2005 U.S. Dist. LEXIS 7365 (D. Del. March 16, 2005):

> When construing the claims, courts must take great care to avoid importing unnecessary limitations into the claims from the specification. "If we once begin to include elements not mentioned in the claim in order to limit such claim ... we should never know where to stop." Nevertheless, a court should look to the specification to determine whether it refers to a limitation only as a part of less than all possible embodiments or whether it suggests that the very character of the invention requires that the limitation be a part of every embodiment. It is impermissible to read the one and only disclosed embodiment into a claim without other indicia that the patentee so intended to limit the invention. On the other hand, where the specification makes clear at various points that the claimed invention is narrower than the claim language might imply, it is entirely permissible and proper to limit the claims.

*Id.* at *33-34 (citations omitted). The Federal Circuit has cautioned that the danger of improperly limiting the claims is particularly high when the purported limitation is based upon a term not appearing in the claim. *See, e.g., Northern Telecom Ltd. v. Samsung Elecs. Co.*, 215 F.3d 1281, 1290 (Fed. Cir. 2000) (refusing to read "layer" into term "aluminum and aluminum oxide," noting that "[t]his court has repeatedly and clearly held that it will not read unstated limitations into claim language.").

**B.    "Step-Plus-Function" Elements Under 35 U.S.C. § 112, Paragraph 6.**

Section 112, paragraph 6 of the Patent Act also "provides that an element in a combination method or process claim may be recited as a step for performing a specified function without the recital of acts in support of the function."[3] *O.I. Corp. v. Tekmar Co.*, 115 F.3d 1576, 1583 (Fed. Cir. 1997); *see also* 35 U.S.C. § 112, ¶ 6.   However, if "a method claim does not contain the term 'steps for,' a limitation of that claim cannot be construed as a step-plus-function limitation without a showing that the limitation contains no act." *Masco Corp. v. United States*, 303 F.3d 1316, 1327 (Fed. Cir. 2002) (application of §112, ¶6 to claims including a "steps of" preamble "would render the scope of coverage of these method claims uncertain and disrupt patentees' settled expectations regarding the scope of their claims."); *see also Advanced Med. Optics, Inc. v. Alcon Inc.*, 361 F. Supp. 2d 370, 398 (D. Del. 2005) ("Because the words 'step for' do not appear in the claim element, the presumption that the element is not in step-plus-function format applies.").

As the Federal Circuit explained in *O.I. Corp.*, a claim element also does not transform into a "step-plus-function" element merely because it includes a word ending in "ing."  115 F.3d at 1583 ("constru[ing] every process claim containing steps described by an 'ing' verb, such as passing, heating, reacting, transferring, etc. into a step-plus-function limitation … would be limiting process claims in a manner never intended by Congress").  The Federal Circuit also rejected the argument that elements of method claims drafted in language that parallels "means for" elements of the apparatus claims of a patent should be interpreted as step-plus-function elements.  *Id.* at 1583-84 ("Interpretation of claims would be confusing indeed if claims that are not means- or step-plus-function claims were to be interpreted as if they were, only because they use language similar to that used in other claims that are subject to this provision.").  Given the strict limitations on invoking "step-plus-function" claiming under §112, ¶6, it is not surprising that we are not aware of any Federal Circuit opinion holding that a claim was drafted in "step-plus-function" absent express "step-for" language.

---

[3]        Section 112(6) also governs "*means*-plus-function" elements.  The law relating to means-plus-functions is discussed in Section IV below, which construes the disputed means-plus-function elements.

## V.    CONSTRUCTION OF DISPUTED TERMS

### A.    Medical Service Code(s)

The term "medical service code(s)" is used in every asserted claim of the '164 patent.  As explained above in the background of the patent, the '164 patent describes the use of a computer system to analyze the medical service codes submitted on a claim to detect and correct errors or problems that may result in an inappropriate amount being paid.

Based on the claim terms themselves, as well as the intrinsic record, this term should be given its ordinary and customary meaning, which is "a code representing a particular medical service or procedure, *e.g.,* CPT-4 codes, CRVS codes, and similar medical service or procedure codes."  The claim language and specification support the ordinary meaning proposed by McKesson. *See, e.g.,* '164 Col. 2, ll. 17-24 (referencing exemplary CPT-4 and CRVS coding methods); '164 Col. 3, ll. 38-42 ("the present invention utilizes the CPT-4 codes ... although other coding methods for classification of medical procedures such as the CRVS discussed above may be utilized as well "); '164 Col. 3, ll. 47-50.

The parties' main dispute is whether the word "code" means "code" or should be construed to mean "code, description, or other indicator" as TriZetto proposes.[4]  In addition to appending extraneous terms, TriZetto's construction is in direct conflict with the intrinsic record.  In the specification, the patent drafters specifically used the words "code" and "description" to refer to different things. *See, e.g.,* '164 Col. 10, lines 17-50 (describing correlating a description to a code before it can be processed); '164 Col. 4, ll. 51-56 (user may enter "a description ... *or* the codes") (emphasis added); '164 Col. 5, ll. 15-17 (discussing whether a "code and description do not match").  Since the patentee clearly differentiated "descriptions" and "codes," the Court should reject TriZetto's proposed construction.

Finally, there is no support in the intrinsic record for changing the ordinary meaning of the word code to include "other indicators" as TriZetto suggests.  Morever, TriZetto's vague would make the precise term "code" ambiguous.

---

[4]    All references to TriZetto's construction refer to the construction proposed by TriZetto on December 13, 2005 as stated in Barlow Decl. Exh. 4.

Therefore, the Court should adopt the ordinary and customary construction of "medical service code(s)": "a code representing a particular medical service or procedure, *e.g.,* CPT-4 codes, CRVS codes, and similar medical service or procedure codes."

**B.    A Predetermined Database ... Containing Medical Service Codes And A Set Of Relationships Among The Medical Service Codes**

The phrase "a predetermined database... containing medical service codes and a set of relationships among the medical service codes," occurs in every asserted claim of the '164 patent.

**1.    The Express Language Should Take Its Ordinary and Accustomed Meaning; No Construction Is Needed.**

McKesson contends that "a predetermined database ... containing medical service codes and a set of relationships among the medical service codes," should be given its ordinary and accustomed meaning. The claims of the '164 patent concern the use of a database containing relationships among medical service codes for processing medical claims to detect potential coding errors. Application of such relationships to the codes on a claim logically requires that those relationships be determined in the database before a claim is received for processing. Thus, the ordinary meaning of "predetermined" is clear from the context of each claim.

TriZetto, however, urges the Court to adopt a very limited and unusual construction of "a predetermined database" that would inappropriately import multiple limitations into this claim language. As discussed below, TriZetto's construction is not supported by, and is contrary to, the intrinsic record. Nothing in the intrinsic record supports a deviation from the fundamental rule that claim terms are "generally given their ordinary and customary meaning." *Phillips*, 415 F.3d at 1312-13 (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)).

**2.    TriZetto's Construction Improperly Limits the Ordinary Meaning of "a predetermined database."**

In an apparent effort to manufacture a potential noninfringement argument, TriZetto's construction shoehorns a host of limitations into "predetermined database": "a database [1] containing a single computer readable table [2] that is designed to be modified or updated [3] only by the system designer or vendor, and [4] that is not designed to be modifiable by the end user." Such a construction is patently improper: "the claims of the patent will not be read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope using 'words or expressions of manifest exclusion or restriction.'" *Liebel-Flarsheim Co. v. Medrad,*

7

*Inc.*, 358 F.3d 898, 906 (Fed. Cir. 2004) (quoting *Teleflex, Inc v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1327 (Fed. Cir. 2002)); *see also ACTV*, 346 F.3d at 1091 (if the written description "does not expressly limit the claim term and otherwise supports a broader interpretation," that term must be given "its full breadth of ordinary meaning as understood by persons skilled in the art."). Here the patentee has not demonstrated any intention to limit "predetermined database" to a single computer readable table -- a phrase found nowhere in the '164 patent or prosecution history -- or to a database that is not modifiable by the end user.

It is a canon of claim construction that "[a] claim construction that excludes a preferred embodiment ... is 'rarely, if ever, correct.'" *Pfizer, Inc. v. Teva Pharms. USA, Inc.*, 2005 U.S. App. LEXIS 25123 at *18 (Fed. Cir. Nov. 22, 2005) (quoting *SanDisk Corp. v. Memorex Prods., Inc.*, 415 F.3d 1278, 1285 (Fed. Cir. 2005)). TriZetto's proposed construction excludes the preferred embodiment described in the '164 patent, which emphasizes that the database should be modified based on the user's experience. *See, e.g.,* '164 Col. 3, ll. 32-37; '164 Col. 4, ll. 64- '164 Col. 5, l. 3; '164 Col. 10, ll. 3-7, 55-60. The cited excerpts describe modifying the database to refine the rules and relationships contained therein, and none of them either prohibits the end user from performing the modification or restricts such capability to a vendor or system designer.

TriZetto's construction would permit anyone to intentionally copy every detail of the invention described in the '164 patent but avoid infringement by, for example, arbitrarily partitioning the database into more than one table or tasking any individual other than the "system designer or vendor" with updating the database. Such a result is particularly inappropriate where, as here, the limitations TriZetto seeks to introduce contradict the preferred embodiment.

> 3.  **The Phrase "containing medical service codes and a set of relationships among the medical service codes" Should Be Accorded Its Ordinary Meaning.**

TriZetto's construction of this phrase changes the explicit and commonly understandable term "containing" to "including both." The jury should have no problem understanding the word "containing," and there is no support in the intrinsic record for TriZetto's suggested change.

C.    **"Valid Or Invalid"**

In the context of the patent as a whole, the only reasonable interpretation of "valid or invalid" in claims 3, 15, and 16 is "appropriate or inappropriate for payment."

1.    **The Express Functional Language Should Take Its Ordinary and Accustomed Meaning.**

To properly construe this term, it is important to understand the term in the context of claims in which it is found. *See Phillips*, 415 F.3d at 1314. The particular element of the claims in which this term is found is as follows:

> [means for][5] determining whether one of the medical service codes in the plurality of medical service codes is <u>valid or invalid</u> by interacting with the database and the set of relationships contained in the database;

The determination of whether a code is "valid or invalid" is performed by interacting with both the database *and* the set of relationships contained in the database. The relationships contained in the database determine if a particular code should be paid. Thus the surrounding claim language supports McKesson's construction that "valid" means appropriate for payment and "invalid" means inappropriate for payment.

Indeed, the claims describes the relationships in the database as:

> a set of relationships among the medical service codes defining whether selected ones of the medical service codes are <u>valid</u> when input with other selected ones of the medical service codes.

This same phrase appears in every claim of the '164 patent. TriZetto agrees that "valid," when appearing in that phrase, means "appropriate for payment" in every claim -- including claims 3, 15, and 16. Given this uncontested meaning of "valid" in connection with the "relationships" of each claim, determining whether a code is "valid or invalid" by interacting with those relationships may only be construed as determining whether a code is appropriate or inappropriate for payment. *See Phillips*, 415 F.3d at 1314 ("claim terms are normally used consistently throughout the patent."); *see also Rexnard Corp. v. Laitram Corp.*, 274 F.3d 1336, 1342 (Fed. Cir. 2001) ("[A] claim term should be construed consistently with its appearance . . . in other claims of the same patent.").

2.    **The Specification Supports McKesson's Construction.**

The specification "is always highly relevant to the claim construction analysis." *Phillips*, 415 F.3d at 1314. The specification of the '164 patent describes the use of a computer system to

---

[5]    The "means for" language only appears in claim 15.

9

analyze the medical service codes submitted on a claim to detect and correct errors or problems that may result in an inappropriate amount being paid. In particular, the following section of the specification clearly supports McKesson's construction:

> At this point the user 3 has either confirmed that the <u>code(s) for which payment is requested are valid</u> or have been modified to become valid or have been pended so that more information may be obtained by the user 3 from the physician or his or her billing entity to aid in processing the claims.

'164 Col. 10, ll. 10-16 (emphasis added). In the context of the patent as a whole, it is clear that the term "valid or invalid" in claims 3, 15 and 16 means appropriate or inappropriate for payment.

### 3.    TriZetto's Construction Is Inconsistent with Its Proposed Construction of the Term "valid" Elsewhere in the Claims.

TriZetto's construction of "valid" as meaning "that the code exists in the database" violates a basic principle of claim construction: "claim terms are normally used consistently throughout the patent." *Phillips*, 415 F.3d at 1314. Contrary to its construction of "valid" when it appears in the phrase "valid or invalid," TriZetto agrees the term "valid" means "appropriate for payment" when it appears in the phrase "a set of relationships among the medical service codes defining whether selected ones of the medical service codes are <u>valid</u> when input with other selected ones of the medical service codes." The latter phrase occurs in every asserted claim of the patent -- including claims 3, 15, and 16. Thus, not only does TriZetto construe the term "valid" differently across claims, it construes it differently when it appears *within a single claim*, claim 3.

Moreover, TriZetto seeks to import a limitation that the inventors claimed expressly in other elements when they intended the elements to be so limited. *See, e.g.*, claim 1 ("determining whether any medical service code contained in the at least one claim is *not present in the predetermined database*") (emphasis added); and claim 13 (same). Thus, introducing the limitation into claims that do not expressly require it is inappropriate.

Because McKesson's construction is consistent with the claim context, the specification, and TriZetto's own construction of the term "valid" in other claim elements, the Court should construe "valid or invalid" to mean "appropriate or inappropriate for payment."

10

### D. "Non-Medical Criteria"

This term occurs in claims 2 and 14 in the context of whether a code is "mutually exclusive" with another code due to "non-medical criteria." The ordinary and customary meaning of the term is readily apparent and does not require further construction. *See Phillips*, 415 F.3d at 1314 ("the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words.") (citing *Brown v. 3M*, 265 F.3d 1349, 1352 (Fed. Cir. 2001)).

Notably, while TriZetto contends that the term "non-medical criteria" is "indefinite," TriZetto makes no such contention concerning the term "medically exclusive," nor does it propose any construction for "medically exclusive." Despite TriZetto's implicit agreement that "exclusiv[ity]" due to "medical" criteria is clear on its face, TriZetto essentially contends that exclusivity due to "non-medical criteria" is so "insolubly ambiguous" that attempting to construe it would be "futile." *See Invitrogen Corp. v. Biocrest Mfg., L.P.*, 424 F.3d 1374, 1383 (Fed. Cir. 2005) (stating the standard for indefiniteness). If jurors can, as TriZetto agrees, understand whether or not an exclusionary criterion is "medical," they necessarily can understand whether such a criterion is "non-medical."

### E. "Medically Determined Relationships"

This phrase occurs in claim 9 in the following context: "the relationships among the medical service codes include medically determined relationships." Nothing in the intrinsic evidence attaches any special meaning to this language, the ordinary and customary meaning of which is readily apparent and should be read to the jury without further construction. *See Phillips*, 415 F.3d at 1314.

Nonetheless, TriZetto contends this plain language is too indefinite to construe. Once again TriZetto's argument flies in the face of a number of claim elements TriZetto was able to construe or apparently does not believe require construction at all. For example, TriZetto does not assert that the determining whether codes are "medically exclusive" requires any particular construction but asserts that "medically determined relationships" among such codes somehow defies construction.

11

F.    **"A Set Of Relationships Among The Medical Service Codes Defining Whether Selected Ones Of The Medical Service Codes Are Valid When Input With Other Selected Ones Of The Medical Service Codes"**

This language appears in each claim of the '164 patent. The parties agree that "valid" should be construed to mean "appropriate for payment." McKesson proposes that the ordinary and customary meaning of this claim element should apply, as nothing in the intrinsic evidence attributes any special definition to its terms. Thus, it should be construed to mean a "set of relationships among the medical service codes defining whether one or more medical service codes are appropriate for payment when input with one or more different medical service codes."

TriZetto largely appears to agree with this interpretation, but would read the term "other selected ones of the medical service codes" out of this element. TriZetto's construction is contrary to the plain language of the claim, which makes clear that the claimed relationships define whether "selected medical service codes are valid when input with *other* selected ones of the medical service codes." In addition, TriZetto substitutes the word "specifying" for the claim term "defining." Nothing in the language of the claim or the intrinsic evidence as a whole dictates that "defining" -- a term the jury can clearly understand -- requires any such construction.

VI.    **ALLEGED STEP-PLUS-FUNCTION ELEMENTS**

TriZetto claims that every element of every method claim in the '164 patent, claims 1, 2, and 16, is in "step-plus-function" format -- the rarest of exceptions in patent claiming. Where, as here, "the words 'step for' do not appear in the claim element, the presumption that the element is not in step-plus-function format applies." *Advanced Med. Optics*, 361 F. Supp. 2d at 398; *see also Masco Corp.*, 303 F.3d at 1327 (application of §112, ¶6 to claims including a "steps of" preamble "would render the scope of coverage of these method claims uncertain and disrupt patentees' settled expectations regarding the scope of their claims."). Given the strong presumption against step-plus-function construction the Federal Circuit does not appear to have allowed such treatment without the express inclusion of "step for" in a claim. Nonetheless, TriZetto asks the Court to construe not one, but every claimed process step under section 112, paragraph 6. Nothing in the '164 patent claims -- none of which recited a "step for" any function -- supports TriZetto's unprecedented construction.

12

**VII.    CONSTRUCTION OF MEANS-PLUS-FUNCTION ELEMENTS**

    **A.    Legal Standards for Construing Means-Plus-Function Elements.**

"A claim limitation that employs "the word 'means' will invoke a rebuttable presumption

that §112, ¶6 applies." *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1369 (Fed. Cir.

2002). Section 112, paragraph 6 of the Patent Act states:

> An element in a claim for a combination may be expressed as a means or step for
> performing a specified function without the recital of structure, material, or acts
> in support thereof, and such claim shall be construed to cover the corresponding
> structure, material, or acts described in the specification and equivalents thereof.

35 U.S.C. §112, ¶6 ("section 112(6)"). "In construing a means-plus-function claim limitation, the

recited function within that limitation must first be identified. [Citation omitted.] 'Then, the

written description must be examined to determine the structure that corresponds to and performs

that function.'" *Gemstar-TV Guide*, 383 F.3d at 1361 (quoting *ACTV*, 346 F.3d at 1087). "The

specification must be read as a whole to determine the structure capable of performing the

claimed function." *Budde v. Harley Davidson, Inc.*, 250 F.3d 1369, 1379 (Fed. Cir. 2001).

    Although the corresponding structure must be "clearly link[ed] or associate[d] ... with the

claimed function" (*Medical Instrumentation and Diagnostic Corp. v. Elekta AB*, 344 F.3d 1205,

1211 (Fed. Cir. 2003)), a the Court must consider both "the level of skill in the art" and "the

requirement that a lack of corresponding structure be proven by clear and convincing evidence."

*Budde*, 250 F.3d at 1380-81 (reasoning that finding a lack of corresponding structure would

invalidate the claim and therefore requires clear and convincing evidence); *see also Intel Corp. v.*

*VIA Technologies, Inc.*, 319 F.3d. 1357, 1365-66 (Fed. Cir. 2003).

    "In a means-plus-function claim in which the disclosed structure is a computer, or

microprocessor, programmed to carry out an algorithm, the disclosed structure is not the general

purpose computer, but rather the special purpose computer programmed to perform the disclosed

algorithm." *WMS Gaming, Inc. v. Int'l Game Tech.*, 184 F.3d 1339, 1349 (Fed. Cir. 1999). "A

computer-implemented means-plus-function term is limited to the corresponding structure

disclosed in the specification and equivalents thereof, and the corresponding structure is the

algorithm." *Harris Corp. v. Ericsson, Inc.*, 417 F.3d 1241, 1253 (Fed. Cir. 2005).

    As the Court has noted in its September 22, 2005 Memorandum Order, the corresponding

algorithm may be either:  (1) expressly disclosed in the specification; or (2) "disclosed (or

otherwise inferred) … [as being] known to those of skill in the art." Memorandum Order, ¶1. [D.I. 99]  Indeed, the Federal Circuit has "been generous in finding something to be a corresponding structure when the specification contain[s] a generic reference to structure that would be known to those in the art and that structure was clearly associated with performance of the claimed function." *Medical Instrumentation and Diag. Corp.*, 344 F.3d at 1213-14 (citing various cases in which adequate structure was found).

Two cases discussed by the Federal Circuit in *Medical Instrumentation* illustrate the standard for generically disclosing corresponding structure known to those of skill in the art. In that case, the Federal Circuit summarized the *Intel Corp.* decision as follows:

> For example, we found that the "core logic" modified to perform a particular program was adequate corresponding structure for a claimed function although the specification did not disclose internal circuitry of the core logic to show exactly how it must be modified. The core logic was described as structure in the specification, and the specification explained that it was the adapted core logic that was capable of performing the functions recited in the claim. *There was no need for a disclosure of specific circuitry in that case, just as here there would be no need for a disclosure of the specific program code if software were linked to the converting function and one skilled in the art would know the kind of program to use.*

*Medical Instrumentation*, 344 F.3d at 1213-1214 (emphasis added; citation omitted). Thus, so long as "software" is linked to the claimed function and known to one of skill in the art, it is unnecessary to disclose specific program code. As discussed further below in section VI.B.2.c., it would be inappropriate to limit the corresponding structure to the specific code.

Similarly, the Federal Circuit cited *Budde* as "yet another example of this line of cases." *Medical Instrumentation*, 344 F.3d at 1214.  In *Budde*, the court held that a generic "vacuum sensor," described in the specification as "commercially available," would be understood by a person skilled in the art as disclosing structure capable of performing the claimed function despite the absence of any detailed description of the vacuum sensor.  250 F.3d at 1382.  Thus, if a structure corresponding to a claimed function is "commercially available" and therefore known to those of skill in the art, it need not be described in detail.

**B.    Analysis of Disputes Concerning the Means-Plus-Function Elements.**

**1.    Summary of the Parties' Disputes Concerning Means-Plus-Function Elements.**

Generally, the parties' positions concerning the various "means-plus-function" elements of the asserted claims follow a recurring pattern. The parties agree that terms beginning with "means for ..." language are stated in means-plus-function format and must therefore be construed under section 112(6). With respect to many means-plus-function elements, McKesson contends that the straightforward functional language should take its ordinary meaning and need not be construed. TriZetto, by contrast, unabashedly redrafts the claim language, changing the meaning of express claim terms and adding new limitations that find no support in the claims.

With respect to the corresponding structures found in the specification and their equivalents, the parties disagree both as to the adequacy of the disclosed structures and their meanings. McKesson points to specific excerpts from the patent's specification that disclose structure corresponding to the claimed functions, including commercially available database management software known to those skilled in the art that interacts with the database to implement the rules-based algorithms of the invention.

Rather than offering any explicit construction for the corresponding structures to guide the jury, TriZetto typically cites to specific lines of software code attached by the inventors as Appendix D to the patent. As discussed below, however, it is improper to limit the means-plus-function elements to specific lines of code. *See Fonar Corp. v. General Electric Co.*, 107 F.3d 1543, 1549 (Fed. Cir. 1997); *see also Medical Instrumentation*, 344 F.3d at 1214. Moreover, TriZetto ignores the well known software for interacting with the database to implement the rules-based algorithms disclosed throughout the specification in association with the claimed functions.

As discussed below, McKesson's proposed constructions must prevail. The functional language speaks for itself in terms any lay juror can understand, and the corresponding software structure is clearly disclosed in the specification.

   2.    **McKesson's Proposed Constructions Are Proper and Supported by Adequate Disclosure in the Specification, whereas TriZetto Improperly Seeks to Limit the Invention to Specific Portions of Software Code.**

As an initial matter, TriZetto's proposed "claim constructions" raise several, recurring arguments in connection with many of the disputed claim elements. For the sake of efficiency, we address these arguments at the outset. The issues raised by TriZetto's arguments include:

- whether a means-plus-function element "lacks complete supporting structure because the predetermined database is not disclosed in the specification";

- whether McKesson's proposed constructions complied with the Court's Memorandum Order dated September 22, 2005, relating to the construction of means-plus-function elements; and

- whether it is proper to limit the corresponding structure for a claimed function to a portion of the specific software code disclosed by the inventors in Appendix D of the patent.

### a.    The Patent Discloses More than Sufficient Structure for Elements Referencing the Predetermined Database.

TriZetto argues that many means-plus-function elements "lack[] complete supporting structure because the predetermined database is not disclosed in the specification" in connection with three categories of claim elements: (1) "means for operating on a predetermined database" {claim 1 preamble, claim 16 preamble}; (2) "means for determining whether ... medical service codes [meet or fail a specified criterion with specific reference to the "predetermined database"] {claim elements 3(d), 13(c), 15(d)}; and (3) "means for determining whether one of the medical service codes [meet or fail a specified criterion *without* referencing the "predetermined database"] {claim elements 10(d), 12(d), 14(d)}.

With regard to the first category of claim elements ("means for *operating on* a predetermined database"), TriZetto's argument fails on at least two grounds. First, the specific content of the predetermined database is irrelevant. The computer system disclosed in the patent, which "contain[s] sufficient data processing capabilities and memory and suitable commercially available database management software programs"[6] is capable of "operating on" a database regardless of its specific contents. Second, even if the specific database contents were relevant to the "operating on ..." function, the specification is replete with descriptions of the predetermined database(s) of the claimed invention. *See, e.g.,* '164 Figs. 1, 2; *id.* '164 Col. 3, ll. 30-35 ("The present invention uses a set of decision-making rules coupled to a knowledge base of facts and observations to assist the medical claims processor. There is included a knowledge base and a knowledge base interpreter which applies the knowledge base using the rules specified in the knowledge base interpreter"); '164 Col. 4, ll. 51-64 (further discussion of the rules-based

---

[6]    *See* '164 patent, Col. 4, ll. 33-40.

"knowledge base interpreter" and the "knowledge base"); '164 Col. 5, l. 67 – Col. 7, l. 28 (specific discussion of rules applied in interaction with, *e.g.*, "INTERACT," "ALLCODE" and "PROCESS" databases).

The same conclusion applies to the elements in the second category ("means for determining whether ... medical service codes [meet or fail a specified criterion with specific reference to the 'predetermined database']"). As discussed above, the patent describes a set of rules that evaluate the claimed criteria by interacting with the predetermined database. "Commercially available database management software" is known to those skilled in the art as capable of interacting with the database. Moreover, the specific disclosure of the database(s) and rules contained therein directly correspond to the claimed "determining" functions, as discussed further below.

Finally, the third category of claim elements ("means for determining whether one of the medical service codes [meet or fail a specified criterion *without* referencing the 'predetermined database']" do not even *mention* the "predetermined database," so TriZetto's argument is nonsensical. Even if the limitation were improperly read into the claims, the argument would be defeated by the fact that the "predetermined database" is more than adequately disclosed.

### b.  McKesson's Proposed Claim Constructions Fully Comply with the Court's Memorandum Order.

Under paragraph 1 of the Memorandum Order, McKesson must identify:

[a] "those portions of the specification that disclose the correspondence between the software (the structure) and the function disclosed by each claim limitation"; and

[b] "the specific algorithm disclosed in the specification, or where it is disclosed (or otherwise inferred) that the algorithm/software is known to those of skill in the art."

(Emphasis added.)  In connection with each disputed means-plus-function element discussed further below, McKesson's proposed construction specifically identifies the portions of the specification that disclose a correspondence between the software or other structure and the claimed function.  In addition, McKesson's constructions identify either the algorithm(s) disclosed in the specification or where it is disclosed or inferred that the algorithm or software corresponding to the claimed function is known to those of skill in the art.

17

Generally, many of the inventions' claimed functions are accomplished by interacting with the database. As a result, the corresponding structure is found in the computer system's "database management software," which is expressly described as both " perform[ing] the desired functions" and "commercially available" -- *i.e.*, known to those of skill in the art (*see Budde*, 250 F.3d at 1382). '164 Col. 4, ll. 33-42. Additional portions of the specification further disclose or infer the algorithms and other structures corresponding to the claimed functions:[7]

- Figure 1 (featuring, *e.g.*, computer system 2, discussed above);

- Figures 2 and 4 (showing "a flowchart of the overall operation of the programmed computer of the present invention" and "a flowchart of the operation of the programmed computer for" claims containing multiple medical service codes, respectively);

- Column 10, lines 51-64 (summarizing a preferred embodiment and noting that "variations and modifications will occur to those skilled in the art" and "are intended to fall within the scope of the appended claims");

- Appendix B (definitions of the rules-based algorithms corresponding to the claimed functions of the invention); and

- Appendix A (containing a series of examples illustrating the rules-based algorithms); and

- Appendices C and D (containing the specific, albeit non-limiting, disclosure of specific software code to further illustrate the inventors' best mode).

As discussed further in connection with each disputed claim element below, these disclosures are more than sufficient to show that the hardware and software structures corresponding to the claimed functions are disclosed or otherwise known to those of skill in the art.

### c. TriZetto's Consistent Attempt to Limit the Means-Plus-Function Elements to Specific Lines of Software Code Is Improper.

With respect to many means-plus-function elements, TriZetto cites portions of Appendix D -- the inventors' specific software code in existence at the time the patent was filed -- as the corresponding structure. By citing the code, TriZetto appears poised to argue that the

---

[7]     The portions of the specification cited here are non-exclusive. McKesson cites further excerpts of the specification in connection with specific claim elements, as discussed further below in the connection with the different elements.

means-plus-function elements should be limited to the inventors' specific lines of software code, or their equivalents. Such a narrow construction would be improper.

Where, as here, the specific software code need not have been disclosed at all, the claim elements should not be limited to the code. Appendix D was attached unnecessarily in an era when it was believed specific software code might be necessary to comply with the "best mode" requirements of section 112. The law that has developed since the patent's filing now clarifies that attaching specific software code is unnecessary, because those skilled in the art are deemed capable of finding or developing specific code to implement the general algorithm.

> As a general rule, where software constitutes part of a best mode of carrying out an invention, description of such a best mode is satisfied by a disclosure of the functions of the software. This is because, normally, writing code for such software is within the skill of the art, not requiring undue experimentation, once its functions have been disclosed.... Thus, flow charts or source code listings are not a requirement for adequately disclosing the functions of software.

*Fonar Corp.*, 107 F.3d at 1549; *see also Medical Instrumentation*, 344 F.3d at 1214 (with regard to means-plus-function elements, "there would be no need for a disclosure of the specific program code if software were linked to the ... function and one skilled in the art would know the kind of program to use"). As noted above and in connection with the specific elements below, the patent includes disclosures of the computer system, software known to those skilled in the art, and detailed discussions of the rules-based algorithms corresponding to the claimed inventions. These disclosures provide more than adequate support for the structures corresponding to the claimed functions.

Finally, merely directing the jury to a portion of highly technical software code written in an obscure programming language would do nothing to assist the jurors in applying the construed claims to TriZetto's infringing products. Indeed, adopting such a "construction" would abdicate the role of the Court to the jury in violation of *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 388-89 (1996).

Thus, any attempt to limit the corresponding structures to specific lines of code must fail.

### 3.    Proper Construction of the Means-Plus-Function Elements.[8]

---

[8]    A number of the elements of the method claims include the same language contained in the elements discussed herein and arguments related to the construction of those elements is identical to the arguments expressed in this section for the overlapping claim language.

19

Although McKesson has asserted nine independent claims based on the extent of TriZetto's infringement, many of the independent claims share similar or identical language and organization -- particularly concerning the means-plus-function elements at issue. Thus, many of the parties' disputes concerning the means-plus-function elements may be resolved by reference to the common language found in the claims and supporting disclosures in the specification. To facilitate analysis of these common, recurring elements, a table attached to this brief as Appendix 1 illustrates the similarities in the means-plus-function elements of the asserted independent claims.

The sections below address each of the unique, disputed means-plus-function elements.

**a.    Disputed Term: "means for operating on a predetermined database."**

This term, "means for operating on a predetermined database," appears in asserted claims 1, 2 and 16. As an initial matter, aside from a dispute over the meaning of "predetermined database" and the ensuing claim language (discussed above), the parties agree no special construction is necessary for the claimed function: "operating on a predetermined database." Thus, subject to the Court's construction of "predetermined database ...," the functional language should take its ordinary and accustomed meaning.

The only dispute appearing from the parties' proposed claim construction disclosures concerns the structure corresponding to "operating on a predetermined database." McKesson proposes the structure be properly construed to comprise "data processing capabilities, memory, and software capable of managing a database, as well as their equivalents." That structure is expressly described in the specification of the '164 patent:

> The computer system 2 may be any type of suitable computer system which can interact with the program of the present invention. One such suitable computer system is the well-known IBM "personal computer" *containing sufficient data processing capabilities and memory and suitable commercially available database management software programs to perform the desired functions.* Other suitable computer systems exist and are intended to come within the scope of the present invention.

'164 Col. 4, ll. 33-42 (emphasis added); *see also id.*, Figure 1 (picturing the computer system as item 2). The reference to a computer system having "commercially available *database management software*" in conjunction with data processing capabilities and memory clearly links

the cited structure directly to the claimed function, "operating on a predetermined *database*." (Emphasis added.) *See Medical Instrumentation*, 344 F.3d at 1218.

TriZetto purports to "***agree[]*** with McKesson that the structure for the 'means for operating ...' disclosed in the specification is Fig. 1; Col. 4, ll. 33-42; App. D." TriZetto's purported agreement is illusory, however, as TriZetto does not expressly approve the construction proposed by McKesson:  the corresponding structure for the "means for operating on a predetermined database" comprises "data processing capabilities, memory, and software capable of managing a database, as well as their equivalents."

Moreover, TriZetto cites Appendix D (a copy of the inventors' specific software code available at the time of filing) out of context in an apparent attempt to unduly narrow the corresponding structure.  As discussed above, only the first two excerpts cited by TriZetto (Figure 1 and column 4, lines 33-42) disclose the proper structure corresponding to the claimed function.  McKesson cited two, additional excerpts (column 10, lines 51-64 and Appendix D) solely in support of the fact that "one skilled in the art would know what specific software/algorithm(s) could be used to perform the claimed function in accordance with this claim."  Column 10, lines 51-64 summarize a preferred embodiment and expressly state that "variations and modifications will occur to those skilled in the art.  Such variations and modifications are intended to fall within the scope of the appended claims."  This statement belies any argument that the supporting structure should be limited to the inventors' particular software code.  In addition, it would be improper to limit the invention to the specific source code, as discussed above.  *See Fonar Corp*, 107 F.3d at 1549; *Medical Instrumentation*, 344 F.3d at 1214.

In sum, McKesson has offered the only proper construction for the structure corresponding to the means for operating on a predetermined database:  "The structure ... comprises data processing capabilities, memory, and software capable of managing a database, as well as their equivalents."

<b>b.    Disputed Term: "means for receiving at least one claim."</b>

This claim term appears in asserted claims 3, 10, 12, 13, 14 and 15, all of which describe inventions relating to "computer system[s]."  Here again, the parties agree that the functional

21

language need not be construed. Thus, "receiving at least one claim" should take its ordinary and accustomed meaning.

The dispute concerns the structure corresponding to the "means for receiving at least one claim." In other words, what structure does the "computer system" of the invention employ to receive the data representing at least one claim? Since it is well understood that computer systems have hardware and software capable of receiving input data, it borders on the absurd that this element is disputed at all. What is conventional or well known to one of ordinary skill in the art need not be disclosed in detail. *See, e.g., Medical Instrumentation*, 344 F.3d at 1214. Nonetheless, TriZetto disputes McKesson's proper construction: "The structure corresponding to this means comprises hardware and software capable of receiving the at least one claim by the computer system, as well as equivalents."

The specification of the '164 patent fully supports McKesson's construction. As noted above, the specification discloses a "computer system 2," which "may be any type of suitable computer system which can interact with the program of the present invention." '164 Col. 4, ll. 33-35. The disclosure then describes a specific, nonexclusive example of such a computer system: a computer system "containing sufficient data processing capabilities and memory and suitable commercially available database management software programs to perform the desired functions." '164 Col. 4, ll. 35-40. That disclosure alone is sufficient to support McKesson's proposed construction -- a computer system with "sufficient data processing capabilities and memory," includes hardware and software capable of receiving data to be processed -- regardless of whether the data represents "at least one claim."

In addition, a discussion of "receiv[ing]" the "[c]laims to be processed" "into the computer system 2" immediately precedes the description of the computer system. '164 Col. 4, ll. 25-28. Thus, there is a clear link between the function of "receiving the claims to be processed" and the computer system having hardware and software capable of receiving the at least one claim. *See Medical Instrumentation*, 344 F.3d at 1218.

Finally, the disclosure specifically references "suitable commercially available database management software programs *to perform the desired functions*." (Emphasis added.) Thus, to the extent the "receiving" function were construed to mean receiving a claim into an environment

where it can interact with the database(s) of the invention, the specification references software known to those skilled in the art that would accomplish the function.

TriZetto, by contrast, declines to propose an express construction for the structure corresponding to the means for receiving element; instead, TriZetto narrowly cites to the inventors' specific software code for data entry: "Fig. 2, box 7; col. 59 (entry.prg)." Box 7 of Figure 2 simply reads "ENTRY PRG.," and column 59 of the patent is part of the inventors' specific software code, attached as Appendix D, which includes the beginning of the "ENTRY.PRG" code. As discussed above, however, TriZetto's attempt to limit the structure to specific lines of software code must fail.

Moreover, unlike the excerpts cited by McKesson in support of its proposed construction, none of the excerpts cited by TriZetto even *mention* the function of "receiving." *Compare* '164 at Col. 4, ll. 25-28 ("Claims to be processed 1 are received ... into the computer system 2") *with* Fig. 2, box 7; Col. 59 (simply referencing "ENTRY.PRG"). TriZetto omits any discussion whatsoever of the computer system 2, which the specification directly links to the "receiving" function, or its well known hardware and software capable of receiving data.

In sum, McKesson's proposed construction should prevail over TriZetto's proposal on several grounds, including: (1) McKesson's proposal is based upon specification excerpts clearly linked to the function of "receiving" at least one "claim[] to be processed," while TriZetto's is not; (2) McKesson's proposal properly links the structure to both the hardware and software necessary to accomplish the function, while TriZetto's does not; and (3) TriZetto's proposal improperly narrows the corresponding structure to the specific software code written by the inventors nearly two decades ago, while McKesson's does not.

### c.  Disputed Term: "means for ascertaining whether the at least one claim contains a plurality of medical service codes."

For this element, we must address disputes as to both the functional language and the corresponding structure.

#### (1)  *The Express Functional Language Should Take Its Ordinary and Accustomed Meaning; No Construction Is Needed.*

Concerning the functional language, McKesson contends that "ascertaining whether the at least one claim contains a plurality of medical service codes" should take its ordinary and

accustomed language. Any jury should be able to understand what it means to ascertain whether a claim contains a plurality of codes.

TriZetto, by contrast, proposes a construction that would introduce limitations not found in the claim language: "Identifying if the claim contains more than one medical service codes in order to determine whether multiple code edits should be checked." First, TriZetto substitutes "identifying" for "ascertaining." In fact, the two terms have different meanings. "Ascertain" means "to find out or learn with certainty." Barlow Decl. Exh. 7 at 67 (MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY (10th ed., 1996)). "Identify" means "to cause to be or become identical" or "to establish the identity of." *Id.* at 575. In the context of the claim language, "ascertain" makes sense (*i.e.*, "[finding out or learning with certainty] whether the ... claim contains a plurality of medical service codes"), whereas "identify" does not (*i.e.*, "[causing to be or becoming identical or establishing the identity of] whether the ... claim contains a plurality of medical service codes"). It simply makes no sense to change a claim term from its informative, original language to something incomprehensible.

Second, TriZetto imports a wholly new limitation that has no basis in the claim language: "in order to determine whether multiple code edits should be checked." Even if TriZetto's unclaimed limitation found support in the specification, it would be improper to import it into the claims. Reading the "ascertaining" function in the context of the other claim elements further demonstrates the impropriety of importing the new limitation. *See ACTV, Inc.*, 346 F.3d at 1088 (The "context of the surrounding words of the claim ... must be considered in determining the ordinary and customary meaning of [the claim's] terms"). When the inventors intended to create a causal relationship between claimed functions, they stated it expressly. *See, e.g.*, '164 Col. 117, ll. 60-64 (in claim 3, both the "means for authorizing ..." and the "means for rejecting ..." are expressly "in response to the means for determining," but "means for ascertaining ..." is not). Here, in essence, TriZetto seeks to create an *unclaimed* causal relationship between the "means for ascertaining ..." and the "means for determining ..." by introducing the language "in order to determine whether multiple code edits should be checked."

In sum, TriZetto's attempt to redraft the "ascertaining ..." function should be rejected. The functional language should take its ordinary and accustomed meaning, and no construction is necessary.

> (2)    *The Corresponding Structure Comprises Software Capable of Ascertaining whether the at Least One Claim Contains a Plurality of Medical Service Codes, as well as Its Equivalents.*

The parties also dispute the structure corresponding to the "means for ascertaining whether the at least one claim contains a plurality of medical service codes." McKesson contends that one of ordinary skill in the art would understand the corresponding structure is software capable of performing the function. More specifically, McKesson cites specification excerpts describing software that determines the number of medical service codes in a given claim. *See, e.g.,* '164 Col. 5, ll. 45-47 ("In step 18, the number of codes resulting from the foregoing steps is counted and stored"); '164 Col. 5, ll. 52-53 ("It will be recalled that in step 18 the number of codes was determined and stored"). Thus, the structure corresponding to the claimed function is software capable of ascertaining whether the at least one claim contains a plurality of medical service codes -- *i.e.*, software capable of determining the number of codes.

Here again, TriZetto declines to state an express construction, choosing instead to cite a string of specification excerpts. *See, e.g.,* '164 Col. 5, l. 53 ("if the number of codes determined was more than one, then the MULTIPLE PROGRAM is run"); '164 Col. 59 ("if code-count >1[¶] DO MULTIPLE.prg[¶] end if"). Based on those excerpts, it appears the principle dispute is whether the corresponding software structure need only determine the number of codes (as McKesson contends) or must also determine whether the number of codes is greater than 1 in order to run the "MULTIPLE PROGRAM" (as TriZetto apparently contends).

The dispute is easily resolved, as it directly relates to TriZetto's improper importation of unclaimed limitations into the claimed function. Only by introducing the improper functional limitation, "in order to determine whether multiple code edits should be checked," can TriZetto logically argue that the corresponding structure includes software that runs the "MULTIPLE PROGRAM" only "if the number of codes determined was more than one." *See* '164 Col. 5, l. 53. Thus, TriZetto's construction of the corresponding structure fails for the same reason as its construction of the functional language. It is improper to import the unclaimed limitation into the

25

express functional language and equally improper to construe corresponding structure based on a nonexistent functional limitation.

### d. Disputed Term: "means for determining whether one of the medical service codes in the at least one claim is [criterion]."

#### (1) *The Functional Language of the "Determining ..." Elements Should Take Its Ordinary and Accustomed Meaning.*

McKesson contends that "determining whether one of the medical service codes in the at least one claim is [criterion]" should take its ordinary and accustomed meaning to those skilled in the art. (*See* "means for determining ..." in element [d] of Appendix 1 to this brief for the specific [criterion] in each claim.)    TriZetto, by contrast, offers special definitions for each of the "determining ..." functions.  *See* Appendix 2 attached to this brief (table summarizing TriZetto's constructions for the "determining ..." function).

Some of TriZetto's inappropriate modifications to the express claim language appear throughout its proposed constructions of the "determining" functions.  In claims 3, 10, 12, 14 and 15, for example, TriZetto replaces "determining" with "making a determination."  Even if TriZetto does not intend to alter the meaning of the claim language, the change is unnecessary. Any jury that understood what it means to "mak[e] a determination" would also understand what it means to "determin[e]."  TriZetto also consistently changes "one of the medical service codes *in* the ... claim" (express claim language, emphasis added) to "one of the medical service codes *entered on* the claim" (TriZetto's proposed constructions for all "determining" functions, emphasis added).  Here, TriZetto apparently seeks to limit the "determining" functions to medical service codes that have been manually "entered on the claim."    However, neither the "determining" elements nor any other element of the asserted claims requires that codes be "entered," manually or otherwise.  The claims simply require "receiving at least one claim," as discussed above.

Concerning claims 3 and 15, TriZetto further seeks to replace the express claim language, "*by interacting with* the database ... ," with "*based on* the database ...."  TriZetto's strategic reason for the change is unclear, but its effect is transparently improper.  "Interacting with" the database has a different meaning than "based on" the database.  "Interact" means "to act upon one another." Barlow Decl. Exh. 7 at 609 (MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY).  When

26

"base" is used as a verb followed by "on" or "upon," by contrast, it means "to find a base or basis for." *Id.* at 94. According to the express language of the claim, the "means for determining" need only "interact[] with the database ...." -- *i.e.*, the means and the database must "act upon one another." Under TriZetto's modification, apparently, the claim would require "find[ing] a base or basis for" the "means for determining" in the database. Where, as here, the meaning ascribed by TriZetto conflicts with the plain meaning of the claim language, it must be rejected.

Concerning claims 10, 12 and 14, TriZetto similarly introduces a number of additional limitations that find no express or implied support in the claim language. Specifically, TriZetto adds the following limitations into the claim language:

- "based on the relationship among two {or more} of the medical service codes entered on the claim, such relationship based on [TriZetto's statement of the claimed criterion]"; and

- "that one of the input medical service codes is inappropriate for payment due to [TriZetto's statement of the claimed criterion]."

Neither of these limitations is proper.

First, TriZetto's attempt to "base[]" the "determining" functions in claims 10, 12 and 14 on "the relationship among ... medical service codes entered on the claim" is belied by the claim language itself. No such language is present in the "determining" elements of claims 10, 12 or 14. Moreover, when the inventors sought to relate the "determining" step of other claims to the "set of relationships contained in the database," they did so expressly. *See, e.g.*, claims 3 and 15. Where, as here, the context of the claims shows that the inventors intentionally omitted any reference to the "relationship among ... the medical service codes" from claims 10, 12 and 14, it would be improper to redraft the claim language to include it.

Second, TriZetto attempts to redraft the claim language as determining whether a medical service code "is inappropriate for payment" due to the claimed criterion. It is true that an ultimate object of the invention described in the patent is to determine which of the medical service codes are valid for payment and which, if any, are invalid for payment. *See, e.g.*, '164 Col. 3, ll. 11-21; Col. 10, ll. 8-16. It would be error, however, to introduce "appropriate[ness] for payment" into the "determining" steps of claims 10, 12 and 14. Each of these claims includes a means for determining simply whether a particular criterion is or is not met by a particular medical service

code (*i.e.*, whether the code is "included in" another code, "medically exclusive with" another code, or "mutually exclusive due to non-medical criteria" with another code). The system described in the patent may, however, iteratively apply more than one criteria, whether to the same code or to other codes in the claim. Only if just one criterion were applicable would the determination of that single criterion lead to a conclusion that the code is valid or invalid for payment. *See* '164 Col. 10, ll. 8-16. Nothing in claims 10, 12 or 14 requires or suggests that the specific, claimed criterion must be the only one applied. Thus, application of a single criterion to a single code does not necessarily determine whether the code is appropriate or inappropriate for payment, and TriZetto's attempt to introduce the limitation must fail.

Finally, TriZetto's construction of the "determining" step in claim 13 attempts to rewrite the claim element in its entirety. In doing so, TriZetto introduces a flood of new limitations, none of which is proper. Specifically, TriZetto:

- replaces "determining whether" with "performing a check to verify that" (a construction that is not even consistent with its own interpretation of "determining" in the other claims);

- replaces "any medical service code contained in the at least one claim" with "the medical service codes *input by the user*" (another apparent attempt to limit the invention to manual data entry);

- replaces "*is not* present in the predetermined database" with "*are* present in the predetermined database" (directly contradicting the claimed criterion); and

- inserts an additional requirement that the database must "contain[] codes and relationships" (an unnecessary addition in view of element 13(a)).

In sum, each of TriZetto's proposed constructions unnecessarily and improperly alters the plain meaning of the "determining" functions. Particularly where, as here, the claim language speaks for itself in terms a lay jury can understand, the express functional language should take its ordinary and accustomed meaning.

> (2)    *The Corresponding Structure Comprises Software Capable of Interacting with the Database to Determine whether One of the Medical Service Codes in the at least One Claim Is [criterion], as well as Its Equivalents.*

| McKesson's Proposed Construction |
| --- |
| Corresponding Structure: The structure corresponding to each of the "means for determining whether one of the medical service codes in the at least one claim is [criterion]" elements |

28

| McKesson's Proposed Construction |
|---|
| comprises: "software capable of interacting with the database to determine whether one of the medical service codes in the at least one claim is [criterion], as well as its equivalents."[9] <br><br> • For elements 3(d) and 15(d), the [criterion] is "valid or invalid"; <br><br> • For element 10(d), the [criterion] is "included in any other service code in the at least one claim"; <br><br> • For element 12(d), the [criterion] is "medically exclusive with any other medical service code in the at least one claim"; <br><br> • For element 13(c), the [criterion] is "not present in the database"; and <br><br> • For element 14(d), the [criterion] is "mutually exclusive due to non-medical criteria with any other medical service code in the at least one claim." <br><br> *See* Figs. 2, 4 & 6; App. A; App. B; App. C; App. D; Col. 5, l. 53 – Col. 7, l. 60. It is disclosed or otherwise inferred that one skilled in the art would know what specific software/algorithm(s) could be used to perform the claimed function in accordance with this claim. *See* Figs. 2, 4 & 6; App. A; App. B; App. C; App. D; Col. 5, l. 53 – Col. 7, l. 60; Col. 10, ll. 51-64. |

Because most of the "means for authorizing ..." and "means for rejecting ..." elements are expressly "in response to the means for determining,"[10] it is helpful to discuss the disclosures for the three elements together before turning specifically to the "means for determining ...."

As summarized in Appendix 1 attached hereto, the three final means elements of claims 3, 10, 12 and 14 read as follows (subject to the minor variations discussed in the second column of Appendix 1 to this brief):

[d] "means for determining whether one of the medical service codes in the at least one claim is [criterion]";

[e] "means for authorizing medical service codes which [meet criterion] in response to the means for determining"; and

[f] "means for rejecting medical service codes which [fail criterion] in response to the means for determining."

---

[9]      This construction applies exactly to elements 10(d), 12(d) and 14(d). For elements 3(d) and 15(d), it varies insignificantly due to the slightly different functional language of the claim elements: "The structure corresponding to the "means for determining ..." elements 3(d) and 15(d) comprises: "software capable of interacting with the database and the set of relationships contained therein to determine whether one of the medical service codes in the ~~at least one claim~~ plurality of medical service codes is [criterion], as well as its equivalents.

[10]      Specifically, claims 3, 12, 14 and 15 include "in response to the means for determining" in both the "means for authorizing ..." and "means for rejecting ..." elements, but claim 10 does not. Claim 13 does not include either a "means for authorizing ..." or a "means for rejecting ...." and will, therefore, be discussed separately below.

Broadly, therefore, the three elements together address means for applying given criteria to medical service codes in a claim for medical services. Codes which meet a given criterion are authorized, and codes that fail the given criterion are rejected.

To identify the corresponding structure for the "determining" functions, we begin by considering the relevant disclosure as a whole. *See, e.g., Budde*, 250 F.3d at 1379. At the heart of the invention is a "set of rules developed for use of th[e] program" used to address claims containing multiple medical service codes. *See* '164 Col. 5, l. 67 – Col. 6, l. 7. The rules applicable to claims containing multiple codes fall into three major categories: (1) "E" rules (*e.g.,* "E1," "E2," "EP," "EA")[11]; (2) "R" rules (*e.g.,* "R1," "R2," ... "RN")[12]; (3) and certain of the "Q" rules (*e.g.,* "QM," "QS," "QB").[13] Generally, "E" rules are used to determine whether exclusion criteria are met and "exclude" (*i.e.,* reject) one or more codes and retain (*i.e.,* authorize) one or more other codes when the codes appear together in a claim. *See, e.g., id.,* App. B (description of "E" rules in cols. 47-50). "R" rules are used to determine whether replacement criteria are met and "replace" one or more codes (*i.e.,* the rejected codes) in the claim with one or more different codes (*i.e.,* the authorized codes). *See id.,* App. B (description of "R" rules in cols. 47-48). "QM," "QS" and "QB" rules identify when a "question" arises concerning a combination of codes appearing together in a claim. *See id.,* App. B (description of "QM," "QS" and "QB" rules in cols. 49-50). Therefore, one of ordinary skill in the art would recognize that the structures that contain and implement the rules-based algorithms of the invention are the structures corresponding to the "determining" functions.

The rules are implemented in a portion of the inventions' software, which interacts with the predetermined database of the invention. *See, e.g., id.* Figs. 1, 2; '164 Col. 3, ll. 30-35 ("The present invention uses a set of decision-making rules coupled to a knowledge base of facts and observations to assist the medical claims processor. There is included a knowledge base and a

---

[11]    *See* '164 Col. 6, l. 26 – Col. 7, l. 10; *id.* Fig. 6; *id.* App. B (description "E" rules in cols. 47-50); App. A (Examples 1, 17, 18).

[12]    *See* '164 Col. 7, ll. 16-60; *id.* Fig. 6; *id.* App. B (description of "R" rules in cols. 47-48); *id.* App. A (Examples 2, 3, 4).

[13]    *See* '164 Col. 7, l. 61 – Col. 8, l. 28; *id.* Fig. 6; *id.,* App. B (description of "QM," "QS" and "QB" rules in cols. 49-50); App. A (Examples 5, 6). Rules "Q1" through "Q9" are not applicable to multiple-code claims. *See, e.g., id.* App. B, cols. 49-52.

knowledge base interpreter which applies the knowledge base using the rules specified in the knowledge base interpreter"); '164 Col. 4, ll. 51-64 (further discussion of the rules-based "knowledge base interpreter" software interacting with the "knowledge base"); '164 Col. 5, l. 67 – Col. 7, l. 28 (specific discussion of rules applied in interaction with, *e.g.*, "INTERACT," "ALLCODE" and "PROCESS" database). Thus, McKesson properly construes the structure corresponding to the "determining ..." elements as "software capable of interacting with the database to determine whether one of the medical service codes ... is [criterion]."

The many, specific disclosures and examples of the rules-based algorithms further illustrate the link between the "determining" functions and the software capable of interacting with the database to determine whether medical service codes meet the claimed criteria. For example, the specification discloses a hypothetical claim containing a plurality of medical service codes, *e.g.*, "ACODE" and code(s) in the range of "BCODE" to "CCODE." *See, e.g.*, '164 Col. 6, ll. 26-68. The software "first examine[s]" the codes "by looking up from INTERACT database 24 any references to those specific multiple codes ... to which will be applied one or more of the rules shown in summary form in FIG. 6 and more fully detailed in Appendix B." '164 Col. 6, ll. 19-26. In other words, the software "interacts" with the database to determine whether any of the rules detailed in the invention are applicable. In the "E" rules, for example, the software interacts with the database to determine whether one code (*e.g.*, "ACODE") appears with one or more other codes (*e.g.*, "codes in the range of BCODE to CCODE"). '164 Col. 6, ll. 30-33, 37-39. If so, rule "E1" "eliminate[s]" (*i.e.*, rejects) ACODE and "retain[s]" (*i.e.*, authorizes) the code(s) appearing in the range of BCODE to CCODE for further processing and possible approval for payment. '164 Col. 6, ll. 30-37. Conversely, rule "E2" retains (*i.e.*, authorizes) ACODE and eliminates (*i.e.*, rejects) the code(s) appearing in the range of BCODE to CCODE. '164 Col. 6, ll. 37-40.

The "R" rules, which "generally replace the codes presented ... with other codes not designated," similarly begin by interacting with the database to determine whether it contains references to codes subject to replacement. *See* '164 Col. 6, ll. 19-26, '164 Col. 7, ll. 18-20, 40-42. Different "R" rules are disclosed to replace any number of codes (*i.e.*, the rejected codes) with a different code (*i.e.*, the authorized code). '164 Col. 7, ll. 26-31.

31

The specific rules and examples disclosed in the detailed description of the invention and Appendices A and B further confirm that the structure implementing the "E" and "R" rules corresponds to each of the "determining ..." functions. Concerning element 10(d), for example, the disclosure provides a detailed example of an instance in which a code is "included in" another code and therefore rejected according to the specified rules (*e.g.*, the "E" rules). *See* '164 Col. 3, ll. 43-66. Concerning element 12(d), Example 1 of Appendix A provides an illustration of a code that is "medically exclusive with [another] medical service code in the ... claim." Specifically, a medical service code corresponding to "injection for nerve block" is "excluded" through the application of the "E" rules "because [it] is inappropriate to use for local anesthesia." An example corresponding to element 14(d) similarly appears in Example 17 of Appendix A. By application of rule "EP," medical service code(s) corresponding to an electrocardiogram are either excluded or replaced depending on the "place of service" -- a "non-medical criterion."

More broadly, the claimed [criterion] in elements 3(d) and 15(d) is whether a medical service code is "valid or invalid" for payment. *See, e.g.*, '164 Col. 10, ll. 11-13 ("the code(s) for which payment is requested are valid or have been modified to become valid"). Because determining whether a claim as a whole is valid or invalid for payment may involve the application of multiple criteria to multiple codes, application of the criteria in these claims is illustrated by any of the "E" and "R" rules, alone or in combination, and their specific examples as discussed above.

Finally, the [criterion] claimed in element 13(d) is whether a code is "not present in the database." Here again, the specification provides a detailed description of software capable of interacting with the database to accomplish the claimed function. One example of such software is the "LOOKUP PROGRAM," which interacts with the "ALLCODE database" to determine whether a code in a claim is present in the database. *See, e.g.*, '164 Col. 5, ll. 8-26. The "ALLCODE" database essentially acts as an index of the medical service codes the system is capable of processing. *See* '164 Col. 5, ll. 23-26. As such, if a code is "not present in" the ALLCODE database, it cannot be present in the predetermined database. Another example is a portion of the "MULTIPLE PROGRAM" software, which interacts directly with the predetermined "INTERACT database" to "look[] up ... any references to ... specific multiple

32

codes ... to which will be applied one or more of the rules" described in the rules-based system of the invention. '164 Col. 6, ll. 19-26.

In sum, the structure corresponding to the "determining ..." steps is "software capable of interacting with the database to determine whether one of the medical service codes in the at least one claim is [criterion]."[14] The detailed disclosure and supporting Appendices provide more than ample disclosures to describe the corresponding structure and link it to the claimed functions.

<b>e.    Disputed Terms: "means for authorizing {rejecting} medical service codes which [meet {fail} criterion] in response to the means for determining."[15]</b>

(1)    <i>The Functional Language of the "Authorizing ..." and "Rejecting ..." Elements Should Take Its Ordinary and Accustomed Meaning.</i>

The parties' disputes concerning the "authorizing ..." and "rejecting ..." functions follow the familiar pattern. McKesson contends the functions should take their ordinary and accustomed meaning and simply be read to the jury. TriZetto disagrees and offers special constructions for each of the functions, as illustrated in Appendix 3 attached hereto.[16]

As with the previous elements, the TriZetto seeks to introduce a raft of limitations into the express language of claim elements 3(e) & (f), 10(e) & (f), 12(e) & (f) and 14(e) & (f). Specifically, TriZetto:

- replaces the claim language "authorizing {rejecting} medical service codes" with "[d]isplaying on a computer monitor or otherwise communicating to a user that one or more medical service codes input by the user as part of a claim should {not} be authorized for payment"; and

---

[14]    As noted above, this construction applies exactly to elements 10(d), 12(d) and 14(d). For elements 3(d) and 15(d), it varies insignificantly due to the slightly different functional language of the claim elements:   "The structure corresponding to the "means for determining ..." elements 3(d) and 15(d) comprises: "software capable of interacting with the database ~~and the set of relationships contained therein~~ to determine whether one of the medical service codes in the ~~at least one claim~~ plurality of medical service codes is [criterion], as well as its equivalents.

[15]    TriZetto has proposed similar constructions for the similar language that appears in method claims 2, 16, these constructions should be rejected for the reasons discussed herein.

[16]    Because the "rejecting ..." functions are simply the converse of the "authorizing ..." functions and present similar issues, they are addressed together both in Appendix 3 to this brief and the following analysis. Where the language of the claims and TriZetto's proposed constructions for the "rejecting" elements vary from the "authorizing" elements, those variations are indicated by brackets "{}."

33

- replaces the claim language "which [meet criterion] in response to the means for determining"[17] with "because such codes on the claim were not {were} determined in the 'determining' step to be" --

  o "inappropriate for payment because they were not {were} 'included in' another code on the claim" (elements 10(e), (f));

  o "inappropriate for payment due to the 'medically exclusive' relationship" (element 12(e), (f)); or

  o "inappropriate for payment due to the 'non-medical criteria'" (element 14(e), (f)).

  o (In claim 3, TriZetto exercises at least some restraint, construing the language instead as "because such codes on the claim were determined in the 'determining' step to be 'valid.'")

At the outset, TriZetto takes the simple terms "authorizing {rejecting} medical service codes" and adds at least *six* distinctly different or new limitations: "[1] *displaying on a computer monitor or* [2] *otherwise communicating to a user that* [3] *one or more* medical service codes [4] *input by the user as part of a claim* [5] *should {not} be* authorized [6] *for payment.*" Clearly, this is an egregious violation of the prohibition against introducing new limitations into the express claim language. In addition, TriZetto's construction disrespects the express distinctions drawn among claim elements in different claims. *See Phillips*, 415 F.3d at 1314-15 ("[o]ther claims ... can also be valuable sources of enlightenment as to the meaning of a claim term"; "[d]ifferences among claims can also be a useful guide in understanding the meaning of particular claim terms") When the inventors intended to require "informing a user" (*e.g.*, displaying or otherwise communicating to a user), they claimed it expressly. *See* claims 1, 5[18] and 13. Claims 3, 10, 12 and 14, by contrast, include no such limitations.

TriZetto also attempts to limit the "authorizing..." and "rejecting..." functions to medical service codes that have been manually "input by the user" However, neither the "authorizing..."

---

[17]    Note, however, that claim element 10(e) does not require "in response to the means for determining."

[18]    Indeed, claims 3, 4 and 5 illustrate that the "authorizing" and "rejecting" functions are far removed from "informing a user" via a display or other communication.    Claim 3 includes the "means for authorizing .... codes which are valid" and "means for rejecting ... codes which are invalid."    Claim 4, which depends from claim 3, adds a "means for revising the ... claim to delete invalid ... codes."    Finally, claim 5 depends from Claim 4 and adds a "means for informing a user why the ... claim was revised."    In claim 5, therefore, "informing a user" cannot logically occur until *after* the codes are authorized or rejected and *after* the claim is revised to delete invalid codes.

nor "rejecting…" elements are limited to those medical service codes that have been input by the user. The claims simply require "authorizing {rejecting} medical service codes."

TriZetto's proposed constructions for the remainder of the claim language, although not quite as fanciful, nonetheless introduce terms and relationships not required by the claims. For example, while it is true that claim elements 3(e) & (f), 12(e) & (f) and 14(e) & (f) expressly require "authorizing {rejecting} … in response to the *means for determining*," TriZetto seeks to modify the claimed relationship by substituting "because such codes on the claim were not {were} determined in the 'determining' step to be …." In essence, TriZetto attempts to replace a claimed relationship between "authorizing" or "rejecting" and a *structural* "means for determining" element with a narrowly drawn relationship to a nonexistent *method* "step." Moreover, TriZetto reads its unclaimed "'determining' step" relationship into elements 10(e) & (f) as well, in which neither "authorizing …" nor "rejecting …" is required to be "in response to the means for determining."

Finally, the term "inappropriate for payment" does not appear in any of the "means for authorizing …" claim elements and does not belong there, as discussed above in connection with the "means for determining" elements.

To the extent TriZetto can advance any colorable arguments for its wholesale redrafting of the "means for authorizing …" and "means for rejecting …" elements, McKesson will address them on rebuttal.

> (2)  *The Corresponding Structure Comprises Software Capable of Authorizing {Rejecting} Medical Service Codes which [Meet {Fail} Criterion] in Response to the Means for Determining, as well as Its Equivalents.*

| McKesson's Proposed Construction |
|---|
| Corresponding Structure: The structure corresponding to each of the "means for authorizing {rejecting} medical service codes which [meet {fail} criterion] in response to the means for determining" elements comprises: "software capable of authorizing {rejecting} medical service codes which [meet {fail} criterion] in response to the means for determining, as well as its equivalents.[19] |

---

[19]    This language applies exactly to elements 10(d), 12(d) and 14(d). For elements 3(d) and 15(d), it varies insignificantly due to the slightly different functional language of the claim elements: "The structure corresponding to the "means for determining …" elements 3(d) and 15(d) comprises: "software capable of interacting with the database and the set of relationships contained therein to determine whether one of the

*(cont'd)*

| McKesson's Proposed Construction |
| --- |
| <ul><li>For elements 3(e) & (f), codes [meet {fail} criterion] if they "are valid" {"are invalid"}.</li><li>For elements 10(e) & (f), codes [meet {fail} criterion] if they "are not contained in any other medical service code." (Also, element 10(e) does not include the language, "in response to the means for determining.")</li><li>For elements 12(e) & (f), codes [meet {fail} criterion] if they "are not {are} medically exclusive with any other medical service codes contained in the at least one claim."</li><li>(This element is not present in claim 13.)</li><li>For elements 14(e) & (f), codes [meet {fail} criterion] if they "are not {are} mutually exclusive due to non-medical criteria with any other medical service codes contained in the at least one claim."</li><li>Elements 15(e) & (f) read: "means for authorizing {rejecting} the at least one claim in response to the means for determining." The corresponding structure comprises software capable of authorizing {rejecting} the at least one claim in response to the means for determining, as well as its equivalents.</li></ul> *See* Figs. 1, 2 & 4; App. A; App. B; App. C; App. D; Col. 4, ll. 42-47 & 56-68; Col. 6, ll. 30-40; Col. 10, ll. 8-16. It is disclosed or otherwise inferred that one skilled in the art would know what specific software/algorithm(s) could be used to perform the claimed function in accordance with this claim. *See* Figs. 1,2 & 4; App. A; App. B; App. C; App. D; Col. 4, ll. 42-47 & 56-68; Col. 6, ll. 30-40; Col. 10, ll. 8-16 & 51-64. |

As discussed above in connection with the "means for determining ..." elements, the patent describes a rules-based system, implemented in a portion of software which is capable of interacting with the database to determine whether certain criteria apply to medical service codes. *See* section VI.B.3.d., *supra*. As further discussed, the rules-based system includes "E" (exclusion) rules and "R" (replacement) rules. After it is determined whether the claimed criteria apply, the rules-based software either authorizes or rejects given code(s) from further processing. *See, e.g.,* '164 Col. 6, ll. 30-37 (rule "E1" "eliminate[s]" (*i.e.,* rejects) ACODE and "retain[s]" (*i.e.,* authorizes) the code(s) appearing in the range of BCODE to CCODE for further processing and possible approval for payment); Col. 6, ll. 37-40 (rule "E2" retains (*i.e.,* authorizes) ACODE and eliminates (*i.e.,* rejects) the code(s) appearing in the range of BCODE to CCODE); Col. 7, ll. 26-31 ("R" rules replace any number of codes (*i.e.,* the rejected code(s)) with a different code (*i.e.,* the authorized code)).

Notably, the disclosure specifically links the term "authorization" with the rules-based system discussed above:

_____
*(cont'd from previous page)*
medical service codes in the ~~at least one claim~~ plurality of medical service codes is [criterion], as well as its equivalents.

> Referring now to FIG. 4, this figure is the flowchart of MULTIPLE PROGRAM 21. In step 22, the multiple number of codes under consideration is read out from PROCESS database 17. Generally, in the next series of steps, *the program will examine the multiple codes presented to determine whether* payment or payment *authorization* for each of the stated codes is medically appropriate, or whether one or more of the codes is medically inappropriate, or whether one or all of the multiple codes should be replaced by other code(s).
>
> In order to accomplish this, *a set of rules* developed for use of this program is now invoked.

'164 Col. 5, ll. 59-66 (emphasis added). This association between "authorization" and the software implementing the rules is more than sufficient to link the claimed "authorizing" function to the corresponding structure: "software capable of authorizing medical service codes which [meet criterion] in response to the means for determining" as the structure corresponding to the claimed function. *See also* '164 Col. 3, ll. 38-64 (similarly linking the knowledge base interpreter software to "reject[ing]" codes that fail a specified criterion).

Finally, specific rules and examples illustrating how the rules accomplish each particular [criterion] in claims 3, 10, 12, 14 and 15 are discussed above in connection with the "means for determining ..." elements. Because it applies equally to the "means for authorizing ..." and "means for rejecting ..." elements, it need not be repeated here.

      **f.**    **Disputed Term: "means for revising the at least one claim to: delete invalid medical service codes (claim 4) / not include a rejected medical service code (claim 11)"**

Concerning the functional language of dependent claims 4 and 11 (which depend from claims 3 and 10, respectively), McKesson contends that "revising the at least one claim to delete invalid medical service codes" and "revising the at least one claim to not include a rejected medical service code" speaks for itself and should take its ordinary and accustomed meaning. TriZetto, as is its custom, proposes a construction that would introduce limitations not found in the language of claims 4 and 11. For example, TriZetto overlooks that claims 3, 4, 10 and 11 are directed to "computer systems" with claimed *structural components* and would read *method steps* into the "revising" function: "The apparatus of claim [3/10], where the *steps* of processing a claim further include ...." (Emphasis added.) None of the claims requires "steps" of processing. On the contrary, claims 4 and 11 only require a computer system with structure *capable of performing* the claimed functionality, so TriZetto's attempt to import the requirement of "steps of

processing a claim" is improper. TriZetto further proposes to read the term "claim" -- which it does not contend requires construction anywhere else in the asserted claims -- to mean "claim record" for purposes of these functions. As confirmed by TriZetto's treatment of the term "claim" throughout the asserted claims (including claim 5 which incorporates all elements of claim 4), nothing in the claim language supports importing a phrase that appears nowhere in the '164 patent.

Second, the parties also dispute the structure corresponding to the "means for revising whether the at least one claim ..." in claims 4 and 11. McKesson contends that the corresponding structure is software capable of performing the function. Indeed, excerpts from the specification disclose software as the structure that revises a claim to delete invalid codes or not include rejected codes. As described in detail above, the rules-based system of the invention generally applies one or more of the specified rules to reject or authorize medical service codes. When a claim is received, the software of the invention stores its code(s) in the "PROCESS DATABASE." See '164 Col. 4, ll. 43-47. In order to apply a particular rule to the code(s) in a claim, the software reads the codes from the PROCESS database. See '164 Col. 5, ll. 52-59; Col. 6, ll. 19-26. After each application of a rule (which, as discussed above, may authorize or reject given code(s) in the claim) the software revises the claim and re-stores it in the PROCESS database, absent any codes that have been rejected or deleted. See '164 Col. 7, ll. 11-12 (revised claim stored after application of "E" rules), Col. 7, ll. 43-44, 48-49 (revised claim stored after application of "R" rules), and Col. 9, ll. 58-61 (revised claim stored after application of "Q" rules). As discussed above in connection with the "determining..." element, these rules specifically implement each of the claimed "rejection" criteria, including whether a code is "invalid." In sum, the specification fully discloses "software capable of revising the at least one claim to: delete invalid medical service codes (claim 4) / not include a rejected medical service code (claim 11)" and links that software to the claimed functions.

g.    **Disputed Term: "means for informing a user: why the at least one claim was revised (claim 5) / that a medical service code is not contained in the predetermined database (claim 13)"**

Concerning the functional language of this element of claim 5, McKesson contends that "informing a user why the at least one claim was revised" speaks for itself and should take its

38

ordinary and accustomed meaning.[20]  TriZetto seems to agree that the claim language does not require special construction, but again attempts to improperly read method "steps of processing a claim" into this structural element.  Beyond this, TriZetto's construction largely restates the claim language but substitutes the term "deleted" from claim 4 for the term "revised" in this element of claim 5.  Because the meaning of the claim language is clear on its face, there is no reason to restate it with TriZetto's proposed modifications.

With respect to corresponding structure for the "means for informing a user..." in claims 5 and 13, as with any computer function that involves communicating with a user, one skilled in the art this function to require hardware and software.  The '164 patent makes clear that software is used to inform a user why a claim was revised and that a code is not in the predetermined database.  *See, e.g.,* '164 Col. 6, ll. 59-66 ("... the program is instructed to recommend elimination for 64450, with an explanation given ...").  The '164 patent further explains that a number of suitable hardware components would have been known to one skilled in the art to communicate this explanation to a user.  *See, e.g.,* '164 Col. 4, ll. 33-42.  Thus, the structure corresponding to these functions comprises hardware and software capable of informing a user why the at least one claim was revised.

### h.    Disputed Term: "means for requesting further information from a user regarding the at least one claim"

Concerning the functional language of this element of claim 8, McKesson contends that "requesting further information from a user regarding the at least one claim" speaks for itself and should take its ordinary and accustomed meaning and be read to the jury.  TriZetto does not dispute that "requesting information from the user" may be readily understood by a jury, but again improperly attempts to read method limitations regarding "claim processing" into this structural element.  In addition, TriZetto seeks to limit the function to requesting information "to allow further processing of the codes on the claim."  However, the claim language only describes the requested information as "regarding the at least one claim" and does not support TriZetto's

---

[20]    The proper construction of the language in claim 13 regarding a medical service code being contained in the predetermined database is discussed above in connection with the "means for determining ..." of claim 13.

39

attempt to import a required purpose for the request. Because the meaning of the claim language is clear on its face, there is no reason to restate it with TriZetto's proposed modifications.

With respect to the corresponding structure, as explained above in connection with the "means for informing" of claim 5, the '164 patent discloses that a number of suitable combinations of hardware and software may be used to communicate with a user, including to request additional information. Thus for the same reasons discussed above, the structure corresponding to this function is hardware and software capable of requesting further information from a user regarding the at least one claim.

## VIII.   CONCLUSION

For the foregoing reasons, McKesson respectfully requests that this Court adopt its proposed constructions for the disputed terms of the '164 patent.

By _____
Thomas J. Allingham II (#0476)
Michael A. Barlow (#3928)
SKADDEN, ARPS, SLATE,
   MEAGHER & FLOM LLP
One Rodney Square
P.O. Box 636
Wilmington, Delaware  19899
(302) 651-3000

Attorneys for Plaintiff McKesson
   Information Solutions LLC

OF COUNSEL:
Jeffery G. Randall
David W. Hansen
SKADDEN, ARPS, SLATE,
   MEAGHER & FLOM LLP
525 University Avenue, Suite 1100
Palo Alto, California 94301
(650) 470-4500

DATED:    December 15, 2005