# EXHIBIT 5

LEXSEE 2005 U.S. DIST. LEXIS 7365

**ATOFINA, Plaintiff, v. GREAT LAKES CHEMICAL CORPORATION, Defendant.**

**Civ. No. 02–1250–SLR**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

*2005 U.S. Dist. LEXIS 7365*

**March 16, 2005, Decided**

**PRIOR HISTORY:** *Atofina v. Great Lakes Chem. Corp., 2005 U.S. Dist. LEXIS 7347 (D. Del., Feb. 23, 2005)*

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff patentee sued defendant company alleging patent infringement. The court conducted a bench trial on the issues of infringement, validity, and enforceability.

**OVERVIEW:** The patent covered the catalytic gas-phase fluorination of methylene chloride with hydrogen flouride in the presence of oxygen and a bulk or supported chromium catalyst to make difluoromethane. The court concluded that there was no literal infringement. The company's catalyst did not meet the "bulk or supported catalyst" limitation of the asserted claims in the patent. The company did not have a fluorination process in which chromium was the only catalytically active material. The court found patent claims 1, 2, 6, 7, 9, and 10 were invalid; the claims were anticipated by a Japanese patent, which was not submitted to the United States Patent and Trademark Office (PTO). Finally, the patent was invalid for inequitable conduct regarding disclosure and misrepresentation of the Japanese patent. The fully translated version of the Japanese patent was highly material to the claims of the patent at issue; it disclosed every claim of the patent at issue, except the weight content limitation of claim 5. Based on the patentee's possession and knowledge of the full translation, its failure to disclose, and repeated mischaracterization of the document, the patentee intended to deceive the PTO.

**OUTCOME:** The patent was not literally infringed; various claims were invalid for anticipation. Claim 5 was not obvious. The patent was not invalid for lack of enablement or failure to disclose the best mode. However, the patent was invalid for inequitable conduct.

**LexisNexis(R) Headnotes**

*Patent Law > Infringement Actions > Claim Interpretation > Fact & Law Issues*
[HN1] Patent claim construction is question of law.

*Patent Law > Infringement Actions > Claim Interpretation > Aids*
*Patent Law > Infringement Actions > Claim Interpretation > Scope*
[HN2] In interpreting patent claims, a court should begin with the intrinsic evidence of record (i.e., the patent itself, including the claims, the specification, and the prosecution history). Such intrinsic evidence is the most significant source of the legally operative meaning of disputed claim language.

*Patent Law > Infringement Actions > Claim Interpretation > Aids*
*Patent Law > Infringement Actions > Claim Interpretation > Scope*
[HN3] In the context of patent claim construction, first, a court should look to words of the claims themselves to define the scope of the patented invention. There is a heavy presumption that the claim terms carry their ordinary and customary meanings as would be understood by one of ordinary skill in the art. In other words, the court must determine how a person of experience in the field of the invention, upon reading the patent documents, would understand the words used to define the invention. Dictionaries and scientific treatises may help to supply the pertinent context and usage for claim construction.

*Patent Law > Infringement Actions > Claim Interpretation > Aids*
*Patent Law > Infringement Actions > Claim Interpretation > Scope*
[HN4] In the context of patent claim construction, second, because a patentee may choose to be his own lexicographer and use a term in a manner either more or less expansive than its general usage in the relevant art, the court should review the specification to determine whether an inventor has used any term in a manner other than its or-

2005 U.S. Dist. LEXIS 7365, *

dinary meaning. The specification may act as a dictionary when it either expressly defines terms used in the claims or when it defines terms by implication.

*Patent Law > Infringement Actions > Claim Interpretation > Aids*
*Patent Law > Infringement Actions > Claim Interpretation > Scope*
[HN5] In the context of patent claim construction, third, a court may consider the prosecution history of a patent, if in evidence. The prosecution history limits the interpretation of claim terms so as to exclude any interpretation that was disclaimed during prosecution. That is, a court must look to the prosecution history to determine if the patentee has limited the scope of the claims by disclaiming a particular interpretation during prosecution.

*Patent Law > Infringement Actions > Claim Interpretation > Aids*
*Patent Law > Infringement Actions > Claim Interpretation > Scope*
[HN6] If the meaning of patent claim term is not clear from the intrinsic evidence, then a court may consult extrinsic evidence, such as expert testimony, in construing claim terms as they would be understood in the relevant art.

*Patent Law > Infringement Actions > Claim Interpretation > Aids*
*Patent Law > Infringement Actions > Claim Interpretation > Scope*
[HN7] When construing patent claims, courts must take great care to avoid importing unnecessary limitations into the claims from the specification. If the court once begins to include elements not mentioned in the claim in order to limit such claim the court should never know where to stop. Nevertheless, a court should look to the specification to determine whether it refers to a limitation only as a part of less than all possible embodiments or whether it suggests that the very character of the invention requires that the limitation be a part of every embodiment. It is impermissible to read the one and only disclosed embodiment into a claim without other indicia that the patentee so intended to limit the invention. On the other hand, where the specification makes clear at various points that the claimed invention is narrower than the claim language might imply, it is entirely permissible and proper to limit the claims.

*Patent Law > Infringement Actions > Infringing Acts > General Overview*
[HN8] A patent is infringed when a person without authority makes, uses or sells any patented invention, within the United States during the term of the patent. *35 U.S.C.S.*

*§ 271(a).*

*Patent Law > Infringement Actions > Claim Interpretation > Fact & Law Issues*
*Patent Law > Infringement Actions > General Overview*
*Patent Law > Infringement Actions > Infringing Acts > General Overview*
[HN9] A court should employ a two-step analysis in making a patent infringement determination. First, the court must construe the asserted claims to ascertain their meaning and scope. Claim construction is a question of law subject to de novo review. Second, the trier of fact must compare the properly construed claims with the accused infringing product. This step is a question of fact. Literal infringement occurs where each limitation of at least one claim of the patent is found exactly in the alleged infringer's product.

*Patent Law > Infringement Actions > Burdens of Proof*
[HN10] The patent owner has the burden of proving infringement and must meet its burden by a preponderance of the evidence.

*Patent Law > Anticipation & Novelty > General Overview*
[HN11] See *35 U.S.C.S. § 102*(b).

*Patent Law > Anticipation & Novelty > Elements*
[HN12] In the context of *35 U.S.C.S. § 102*(b), there must be no difference between a claimed invention and the referenced disclosure, as viewed by a person of ordinary skill in the field of the invention.

*Patent Law > Anticipation & Novelty > General Overview*
[HN13] In determining whether a patented invention is explicitly anticipated, the claims are read in the context of the patent specification in which they arise and in which the invention is described. The prosecution history and the prior art may be consulted if needed to impart clarity or to avoid ambiguity in ascertaining whether the invention is novel or was previously known in the art. The prior art need not be ipsissimis verbis (i.e., use identical words as those recited in the claims) to be anticipating.

*Patent Law > Anticipation & Novelty > Description in Patents*
*Patent Law > Anticipation & Novelty > Description in Publications*
[HN14] A prior art reference may anticipate without explicitly disclosing a feature of the claimed invention if that missing characteristic is inherently present in the single anticipating reference. An inherent limitation is one that is necessarily present and not one that may be established

2005 U.S. Dist. LEXIS 7365, *

by probabilities or possibilities. That is, the mere fact that a certain thing may result from a given set of circumstances is not sufficient. Inherency operates to anticipate entire inventions as well as single limitations within an invention. Moreover, recognition of an inherent limitation by a person of ordinary skill in the art before the critical date is not required to establish inherent anticipation.

### Patent Law > Anticipation & Novelty > General Overview

[HN15] An anticipation inquiry involves two steps. First, the court must construe the claims of the patent in suit as a matter of law. Second, the finder of fact must compare the construed claims against the prior art. A finding of anticipation will invalidate the patent.

### Patent Law > Anticipation & Novelty > Elements

[HN16] When, as by a recitation of ranges or otherwise, a claim covers several compositions, the claim is anticipated if one of them is in the prior art.

### Patent Law > Claims & Specifications > Claim Language > Preambles

[HN17] No litmus test defines when a preamble limits claim scope. Whether to treat a preamble as a limitation is a determination resolved only on review of the entirety of the patent to gain an understanding of what the inventors actually invented and intended to encompass by the claim. In general, a preamble limits the claimed invention if it recites essential structure or steps, or if it is necessary to give life, meaning, and vitality to the claim. Clear reliance on the preamble during prosecution to distinguish the claimed invention from the prior art may indicate that the preamble is a claim limitation because the preamble is used to define the claimed invention.

### Patent Law > Nonobviousness > General Overview

[HN18] See 35 U.S.C.S. § 103.

### Patent Law > Nonobviousness > Elements & Tests > Claimed Invention as a Whole

### Patent Law > Nonobviousness > Elements & Tests > Ordinary Skill Standard

### Patent Law > Nonobviousness > Elements & Tests > Prior Art

### Patent Law > Nonobviousness > Elements & Tests > Secondary Considerations

[HN19] The question of obviousness turns on four factual inquiries: (1) the scope and content of the prior art; (2) the level of ordinary skill in the art; (3) the differences between the claimed invention and the prior art; and (4) any objective indicators of nonobviousness, more commonly termed secondary considerations. The existence of each limitation of a claim in the prior art does not, by

itself, demonstrate obviousness. Instead, there must be a reason, suggestion, or motivation in the prior art that would lead one of ordinary skill in the art to combine the references, and that would also suggest a reasonable likelihood of success. Such a suggestion or motivation may come from the references themselves, from knowledge by those skilled in the art that certain references are of special interest in a field, or even from the nature of the problem to be solved.

### Patent Law > Nonobviousness > Evidence & Procedure > Prima Facie Obviousness

[HN20] To rebut a prima facie case of obviousness, objective evidence of nonobviousness may be used. This objective evidence includes: (1) a long–felt and unmet need in the art for the invention; (2) failure of others to achieve the results of the invention; (3) commercial success of the invention; (4) copying of the invention by others in the field; (5) whether the invention was contrary to accepted wisdom of the prior art; (6) expression of disbelief or skepticism by those skilled in the art upon learning of the invention; (7) unexpected results; (8) praise of the invention by those in the field; and (9) independent invention by others. The objective evidence of nonobviousness should when present always be considered as an integral part of the analysis.

### Patent Law > Claims & Specifications > Enablement Requirement > Standards & Tests

[HN21] The statutory basis for the enablement requirement is found in 35 U.S.C.S. § 112, para. 1.

### Patent Law > Claims & Specifications > Enablement Requirement > Standards & Tests

[HN22] See 35 U.S.C.S. § 112, para. 1.

### Patent Law > Claims & Specifications > Enablement Requirement > Standards & Tests

[HN23] Patent protection is granted in return for an enabling disclosure of an invention, not for vague intimations of general ideas that may or may not be workable. Tossing out the mere germ of an idea does not constitute enabling disclosure.

### Patent Law > Claims & Specifications > Enablement Requirement > Standards & Tests

[HN24] To satisfy the enablement requirement, a specification must teach those skilled in the art how to make and to use the full scope of the claimed invention without undue experimentation. While every aspect of a generic claim certainly need not have been carried out by the inventor, or exemplified in the specification, reasonable detail must be provided in order to enable members of the public to understand and carry out the invention. The

specification need not teach what is well known in the art.

*Patent Law > Claims & Specifications > Enablement Requirement > General Overview*
[HN25] Enablement is determined as of the filing date of a patent application.

*Patent Law > Claims & Specifications > Enablement Requirement > Standards & Tests*
[HN26] Some experimentation may be necessary in order to practice a claimed invention; the amount of experimentation, however, must not be unduly extensive. The test for whether undue experimentation would have been required is not merely quantitative, since a considerable amount of experimentation is permissible, if it is merely routine, or if the specification in question provides a reasonable amount of guidance with respect to the direction in which the experimentation should proceed to enable the determination of how to practice a desired embodiment of the invention claimed.

*Patent Law > Claims & Specifications > Enablement Requirement > Standards & Tests*
[HN27] A court may consider several factors in determining whether undue experimentation is required to practice a claimed invention, including: (1) the quantity of experimentation necessary; (2) the amount of direction or guidance disclosed in the patent; (3) the presence or absence of working examples in the patent; (4) the nature of the invention; (5) the state of the prior art; (6) the relative skill of those in the art; (7) the predictability of the art; and (8) the breadth of the claims. These factors are sometimes referred to as the "Wands factors." A court need not consider every one of the Wands factors in its analysis. Rather, a court is only required to consider those factors relevant to the facts of the case.

*Patent Law > Claims & Specifications > Enablement Requirement > General Overview*
[HN28] The enablement requirement is a question of law based on underlying factual inquiries.

*Patent Law > Claims & Specifications > Enablement Requirement > Common Principles & Prior Art*
[HN29] A specification need not disclose what is well known in the art. This means that the omission of minor details does not cause a specification to fail to meet the enablement requirement. It is the specification, not the knowledge of one skilled in the art, that must supply the novel aspects of an invention in order to constitute adequate enablement.

*Patent Law > Claims & Specifications > Best Mode > Adequate Disclosure*

*Patent Law > Claims & Specifications > Best Mode > Adequate Disclosure*
[HN30] See *35 U.S.C.S. § 112, para. 1.*

*Patent Law > Claims & Specifications > Best Mode > Adequate Disclosure*
*Patent Law > Claims & Specifications > Best Mode > Time Limitations*
[HN31] The best mode requirement of *35 U.S.C.S. § 112* requires an inventor to disclose the best mode contemplated by him, as of the time he executes the application, of carrying out the invention. The existence of a best mode is a purely subjective matter depending upon what the inventor actually believed at the time the application was filed. Because of this subjectivity, § 112 demands actual disclosure, regardless of whether practicing that mode would be within the knowledge of one of ordinary skill in the art. Nevertheless, the extent of this actual disclosure is limited to the invention as defined by the claims.

*Patent Law > Claims & Specifications > Best Mode > Adequate Disclosure*
[HN32] In determining whether an inventor has disclosed the best mode, the United States Court of Appeals for the Federal Circuit has adopted a two-step inquiry. First, the invention must be defined by construing the claims. Definition of the invention is a legal exercise, wherein the ordinary principles of claim construction apply. Such definition is a crucial predicate to the factual portions of the best mode inquiry because it ensures that the finder of fact looks only for preferences pertaining to carrying out the claimed invention. Once the claim analysis is complete, the finder of fact may proceed to the second step and apply the classic two-prong test. That is, the fact-finder must determine whether, at the time of filing the application, the inventor possessed a best mode for practicing the claimed invention. If the inventor subjectively contemplated a best mode, then the fact-finder must evaluate whether the inventor's disclosure is objectively adequate to enable one of ordinary skill in the art to practice the best mode of the claimed invention.

*Patent Law > Claims & Specifications > Best Mode > Adequate Disclosure*
[HN33] If the best mode for carrying out a claimed invention involves novel subject matter, then an inventor must disclose a method for obtaining that subject matter even if it is unclaimed. In other words, when the subject matter is unclaimed, but both novel and essential for carrying out the best mode of the claimed invention, disclosure is required. With regard to unclaimed subject matter unrelated to the properties of the claimed invention, an inventor need not disclose a mode for obtaining it.

*Patent Law > Inequitable Conduct > Effect, Materiality & Scienter > Duties*

2005 U.S. Dist. LEXIS 7365, *

[HN34] Applicants for patents and their legal representatives have a duty of candor, good faith, and honesty in their dealings with the United States Patent and Trademark Office (PTO). *37 C.F.R. § 1.56(a)*. This duty is predicated on the fact that a patent is an exception to the general rule against monopolies and to the right of access to a free and open market. The duty of candor, good faith, and honesty includes the duty to submit truthful information and the duty to disclose to the PTO information known to patent applicants or their attorneys which is material to the examination of a patent application.

*Patent Law > Inequitable Conduct > Effect, Materiality & Scienter > Duties*
*Patent Law > Inequitable Conduct > General Overview*
[HN35] If it is established that a patent applicant engaged in inequitable conduct with respect to one claim, then the entire patent application is rendered unenforceable. Additionally, a breach of the duty of candor early in the prosecution may render unenforceable all claims which eventually issue from the same or a related application.

*Patent Law > Inequitable Conduct > Effect, Materiality & Scienter > Fact & Law Issues*
[HN36] A finding of inequitable conduct is an equitable determination and, therefore, is committed to the discretion of the trial court.

*Patent Law > Inequitable Conduct > Burdens of Proof*
[HN37] In order to establish unenforceability based on inequitable conduct, a defendant must establish by clear and convincing evidence that: (1) the omitted or false information was material to patentability of the invention; (2) the applicant had knowledge of the existence and materiality of the information; and (3) the applicant intended to deceive the United States Patent and Trademark Office.

*Patent Law > Inequitable Conduct > Effect, Materiality & Scienter > Elements*
[HN38] A determination of inequitable conduct entails a two step analysis. First, the court must determine whether the withheld information meets a threshold level of materiality. A reference is considered material if there is a substantial likelihood that a reasonable examiner would consider it important in deciding whether to allow the application to issue as a patent. A reference, however, does not have to render the claimed invention unpatentable or invalid to be material.

*Patent Law > Inequitable Conduct > Effect, Materiality & Scienter > Elements*
[HN39] In the context of a determination of inequitable conduct, after determining that the applicant withheld material information, the court must then decide whether

the applicant acted with the requisite level of intent to mislead the United States Patent and Trademark Office (PTO). Intent to deceive cannot be inferred solely from the fact that information was not disclosed; there must be a factual basis for finding a deceptive intent. That is, the involved conduct, viewed in light of all the evidence, including evidence indicative of good faith, must indicate sufficient culpability to require a finding of intent to deceive. A "smoking gun" is not required in order to establish an intent to deceive. An inference of intent, nevertheless, is warranted where a patent applicant knew or should have known that the withheld information would be material to the PTO's consideration of the patent application.

*Patent Law > Inequitable Conduct > Effect, Materiality & Scienter > Elements*
*Patent Law > Inequitable Conduct > Effect, Materiality & Scienter > Fact & Law Issues*
[HN40] In the context of a determination of inequitable conduct, once materiality and intent to deceive have been established, the trial court must weigh them to determine whether the balance tips in favor of a conclusion of inequitable conduct. The showing of intent can be proportionally less when balanced against high materiality. In contrast, the showing of intent must be proportionally greater when balanced against low materiality.

*Patent Law > Inequitable Conduct > Burdens of Proof*
*Patent Law > Infringement Actions > Defenses > Patent Invalidity > Validity Presumption*
[HN41] Because a patent is presumed valid under *35 U.S.C.S. § 282*, inequitable conduct requires proof by clear and convincing evidence.

*Patent Law > Inequitable Conduct > Effect, Materiality & Scienter > Duties*
[HN42] The duty of candor does not require that a patent applicant translate every foreign reference, but only that the applicant refrain from submitting partial translations and concise explanations that it knows will misdirect the examiner's attention from the reference's relevant teaching.

COUNSEL: [*1]  For Plaintiff: Paul E. Crawford, Esquire of Connolly Bove Lodge & Hutz, Wilmington, DE. Thomas G. Rowan, Esquire, Daniel L. Malone, Esquire, Eric C. Stops, Esquire, Gasper S. LaRosa, Esquire of Jones Day, New York, New York.

For Defendant: Frederick L. Cottreil, III, Esquire of Richards Layton & Finger, Wilmington, DE. Richard D. Harris, Esquire, James K. Cleland, Esquire of Greenberg & Traurig, Chicago, IL.

**JUDGES:** ROBINSON, Chief Judge.

**OPINIONBY:** Sue L. Robinson

**OPINION:**

### REDACTED OPINION

Dated: March 16, 2005
Wilmington, Delaware

**ROBINSON, Chief Judge**

## I. INTRODUCTION

On July 1, 2002 plaintiff Atofina filed suit against defendant Great Lakes Chemical Corporation, alleging infringement of *U.S. Patent No. 5,900,514* ("the '514 patent"). The '514 patent claims a process of manufacturing a refrigerant called difluoromethane. The court conducted a bench trial in January 2004 on the issues of infringement, validity, and enforceability. n1 The following constitutes the court's findings of fact and conclusions of law pursuant to *Fed. R. Civ. P. 52(a)*.

n1 The parties entered a stipulation regarding damages. Consequently, the amount of money damages was not tried.

[*2]

## II. FINDINGS OF FACT

### A. Parties and Background

1. Plaintiff Atofina is a company organized under the laws of France, having a place of business at 4-8 Cours Michelet, 92 800 Puteaux, R.C.S. Nanterre B 319 632 790, France. (D.I. 84, ex. 1)

2. Defendant Great Lakes Chemical Corporation is a Delaware corporation with its principal place of business in West Lafayette, Indiana. (Id.; D.I. 33)

3. For many years chlorofluorocarbons ("CFCs") n2 were commonly used as refrigerants. (D.I. 103 at 82) However, in the 1980s it was discovered that the chlorine portion of CFCs was harmful to the ozone layer. (Id. at 83) As a result, many countries joined the Montreal Protocol on Substances that Deplete the Ozone Layer ("the Montreal Protocol"), an agreement which phased out the use of ozone depleting substances such as CFCs. (Id.)

n2 CFCs are molecules which consist of chlorine, fluorine and carbon. (D.I. 103 at 82-83; D.I.

104 at 401).

4. In light of the Montreal Protocol and the impending phase [*3] out of CFCs, refrigerant manufacturers began to look for alternatives to CFCs. (Id.) Difluoromethane provided just such an alternative. (Id.) Difluoromethane is a refrigerant containing one carbon atom attached to two hydrogen atoms and two flourine atoms ("CH[2]F[2]"). (Id. at 82-83) The absence of chlorine from difluoromethane's chemical structure means it does not pose the same threat to the ozone layer as CFCs. (Id. at 83)

### B. Prior Art

5. The parent of the '514 patent was a French patent application filed by plaintiff on June 27, 1995. The application for the '514 patent was filed in the United States on June 14, 1996, claiming priority from the previously filed French counterpart application. (D.I. 107 at 981)

6. JP 51-82206 is a Japanese patent application filed on January 16, 1975, and published on July 19, 1976. JP 51-82206 discloses a process for maintaining the activity of a catalyst in a gas-phase catalytic fluorination reaction with hydrogen fluoride. (D.I. 108 at 1266, 1271-72; DX 593) n3 One of the seven preferred starting materials in JP 51-82206 is methylene chloride, the same starting material specified in the '514 patent. (DX 593 at 5) [*4] JP 51-82206 discloses a temperature range of 100 to 500 [degree]C, with 150 to 350 [degree]C preferred (id. at 1, 4, 6), operates in a pressure range of 0.1 to 10 atm (id. at 6), and uses a chromium oxide catalyst (id. at 4, see also id. at 1-3). JP 51-82206 specifies that the chromium catalyst can either be "pure" chromium oxide or mainly chromium oxide. (D.I. 108 at 1272) According to JP 51-82206, oxygen is fed with the reactants in a ratio of 0.001% to 1% of the starting organic material to lengthen catalyst life. (D.I. 109 at 1341, 1343; DX 593 at 1, 4-5) The contact times employed in the examples of JP 51-82206 are 3.0 and 4.1 seconds. (D.I. 108 at 1276-77; DX 593 at 6-8)

n3 "DX  " refers to exhibits submitted by the defendant at trial. For example, DX 509 would be defense exhibit number 509.

7. The Derwent n4 abstract for JP 51-82206 states in full the following:

The [preparation] of freons by fluorinating a halogenated 1-3C hydrocarbon [containing] a chlorine or [*5] bromine atom (e.g., CCl[4], CHCl[3], CH[2]Cl[2], CCl[3]F, etc.) with hydrogen fluoride in the presence of a fluorinating catalyst mainly comprising

2005 U.S. Dist. LEXIS 7365, *5

trivalent chromium oxide, is carried out at 100-500 degrees C under a pressure of 0.1–10 atmospheres (absolute pressure), while adding 0.001–1.0 mole-% oxygen (based on the halogenated hydrocarbon) to the starting gaseous materials. The fluorination can be conducted continuously for several hundreds of hours without bringing about substantial decrease in catalytic activity.

(DX 579 at AT000184) The abstract does not indicate that the full JP 51-82206 application contemplates a chromium catalyst comprising "pure" chromium. (Id. at AT000184; DX 850; D.I. 108 at 1299) The abstract also does not include any of the examples of the full JP 51-82206 document and, therefore, does not disclose the contact times which clearly are derived from those examples. (DX 579 at AT000184; DX 593 at AT005278; DX 850; D.I. 108 at 1296-97)

n4 Derwent is "the world's leading patent and scientific information provider." "Thomson Derwent: About Us", at http://thomsonderwent.com/aboutu/ (February 14, 2005). Derwent "make[s] global patent information easily accessible by writing concise abstracts that clearly highlight the nature of the invention, then publishes these in a single, English-language database that can be searched precisely for specific technologies." Id.

[*6]

8. U.S. Patent No. 3,644,545 ("Buckman") discloses the gas-phase catalytic fluorination of a halocarbon (e.g., methylene chloride) with hydrogen fluoride in the presence of an alkali metal fluoride such as potassium fluoride at 150 to 350 [degree]C. (DX 575, col. 1 at ll. 54-59, col. 2 at ll. 50-52) The preferred catalyst is chromium, particularly chromium oxide. (DX 575, col. 2 at ll. 50-52) The alkali metal fluoride can either be mixed into the catalyst bed, or incorporated with the catalyst particles. (DX 575, col. 2 at l. 55, col. 2 at ll. 61-64; D.I. 108 at 1149-51) Buckman discloses a contact time of 10 seconds. (DX 575, col. 3 at ll. 67-68)

9. U.S. Patent No. 3,325,612 ("Anello") discloses the gas-phase catalytic fluorination of halogenated hydrocarbons having one to three carbon atoms, including methylene chloride, using a bulk or supported chromium catalyst. (DX 628, col. 1 at ll. 54-59, col. 2 at ll. 36-43) In the preferred form of the supported catalyst, the chromium oxide comprises 2 to 45% by weight of the catalyst. (DX 628, col. 2 at 47-52)

10. EP 629440 A1 ("Tsuji") describes a fluorination catalyst for a gas-phase catalytic [*7] fluorination of halogenated hydrocarbons to produce hydrofluorocarbons, particularly difluoromethane, at a temperature of 200 to 400 [degree]C. (DX 626, col. 2 at ll. 5-12, col. 6 at ll. 13-16) Tsuji discloses the use of a supported chromium-based catalyst having 10.5 wt% chromium. (D.I. 108 at 1285; D.I. 109 at 1372)

11. EP 554 165 A1 ("Galland") discloses a gas-phase catalytic fluorination of chlorotrifluoroethane ($C[2]H[2]ClF[3]$) with hydrogen fluoride to obtain tetrafluoroethane ($C[2]H[2]F[4]$) at a temperature of 300 to 450 [degree]C, preferably between 330 and 400 [degree]C, in the presence of a bulk supported chromium catalyst. (DX 627 at 4-5) The reaction is carried out in the presence of 0.1 to 5 mole% oxygen based upon the starting material to improve the lifetime of the catalyst, with a contact time of between 0.1 to 60 seconds, preferably from 3 to 30 seconds. (D.I. 108 at 1288) The chromium catalyst may contain solely chromium or other components, and the chromium content of the disclosed supported chromium catalyst is less than 20%, and preferably between 4 and 10%. (D.I. 108 at 1287-88, 1384)

## C. The '514 Patent

12. In 1994, plaintiff [*8] directed Dr. Benoit Requime along with Dr. Eric Lacroix and Dr. Andre Lantz to begin the development of a new process for the manufacture of difluoromethane. (Id. at 81-83)

13. Drs. Requime, Lacroix, and Lantz are the only named inventors on the '514 patent. (Id. at 78-81, DX 509) All three named inventors assigned their interest in the '514 patent to Elf Atochem. (D.I. 103 at 78-79, 135; PX 2) n5 Elf Atochem subsequently became Atofina, the plaintiff in this case. (D.I. 103 at 79-80, 172-173) Plaintiff owns the '514 patent.

n5 "PX  " refers to exhibits submitted by the plaintiff at trial. For example, PX 1 would be plaintiff's exhibit number 1.

14. The '514 patent covers the catalytic gas-phase fluorination of methylene chloride with hydrogen flouride in the presence of oxygen and a bulk or supported chromium catalyst to make difluoromethane. (Id. at 84; D.I. 104 at 400-01; D.I. 105 at 425, 427-28; DX 509; PX 1) In the processes claimed in the '514 patent, the chlorines in methylene chloride [*9] ("$CH[2]Cl[2]$") are replaced with fluorines from anhydrous hydrofluoric acid ("HF") to yield difluoromethane "$CH[2]F[2]$"). (D.I. 104 at 406-07; DX 509; PX 1) The '514 patent also requires that oxygen and methylene chloride are fed to a reactor in a ratio

2005 U.S. Dist. LEXIS 7365, *9

of 0.1 to 5.0 moles of oxygen per 100 moles of methylene chloride. (D.I. 103 at 85; D.I. 105 at 425; DX 509; PX 1) The processes claimed in the '514 patent are carried out at a temperature between 330 and 450 [degree]C. (D.I. 103 at 84–85; D.I. 105 at 426–427; DX 509)

15. Plaintiff alleges that defendant has infringed claims 1, 2, 5, 6, 7, 9, and 10 of the '514 patent. (D.I. 103 at 32)

16. Independent claim 1 provides:

> Process for the manufacture of difluoromethane consisting essentially of gas-phase catalytic fluorination of methylene chloride with anhydrous hydrofluoric acids in the presence of 0.1 to 5 moles of oxygen per 100 moles of methylene chloride, at a temperature of between 330 and 450 [degree]C[] and with a bulk or supported chromium catalyst.

('514 patent, col. 7 at ll. 20–25)

17. Claim 2 states:

> Process according to claim 1, wherein the $O[2]/CH[2]Cl[2]$ molar ratio is between [*10] 0.5% and 3%.

('514 patent, col. 7 at ll. 26–27)

18. Claim 5 covers:

> Process according to claim 1 wherein a supported chromium catalyst is employed, the weight content of chromium being less than 20%.

('514 patent, col. 8 at ll. 3–5)

19. Claim 6 provides:

> Process according to claim 1 wherein the gas[-]phase mixture of methylene chloride, anhydrous hydrogen fluoride and oxygen is in contact with the catalyst for a time between 0.01 and 10 seconds.

('514 patent, col. 8 at ll. 5–9)

20. Claim 7 covers:

> Process according to claim 1 wherein the process is carried out at a pressure of between 1 and 20 bars absolute.

('514 patent, col. 8 at ll. 10–11)

21. Independent claim 9 provides:

> Process for the manufacture of difluoromethane consisting of gas-phase catalytic fluorination of methylene chloride with anhydrous hydrofluoric acids in the presence of 0.1 to 5 moles of oxygen per 100 moles of methylene chloride, at a temperature of between 330 and 450 [degree]C[] and with a bulk or supported chromium catalyst.

('514 patent, col. 8 at ll. 14–19)

22. Independent claim 10 states:

> Process for the manufacture [*11] of difluoromethane consisting essentially of gas-phase catalytic fluorination of methylene chloride with anhydrous hydrofluoric acids in the presence of 0.1 to 5 moles of oxygen per 100 moles of methylene chloride, at a temperature of between 330 and 450 [degree]C and with a bulk or supported chromium catalyst, the gas[-]phase mixture of methylene chloride, anhydrous hydrogen fluoride and oxygen is in contact with the catalyst for a time between 0.01 and 10 seconds.

('514 patent, col. 7 at ll. 20–28)

23. The '514 specification teaches that the prior art dealt with certain problems arising from the manufacture of difluoromethane by using a composite catalyst that contains two active catalysts: nickel and chromium. According to the specification:

> To overcome this disadvantage it has been proposed [in the prior art] to employ some chromium-based mixed catalysts which make it possible to restrict the Deacon reaction. n6 Thus, patent EP 546 883 shows that, in the case of bulk catalyst [sic], the addition of a metal such as nickel allows the oxidation of HCl to be partially inhibited.

2005 U.S. Dist. LEXIS 7365, *11

A similar phenomenon is observed on Ni–Cr/AlF mixed catalysts

. . . .

('514 [*12] patent, col. 2 at ll. 17–24) (footnote added)

n6 The Deacon reaction is a significant problem in the manufacture of difluoromethane. The reaction creates unwanted side products and causes the degradation of catalysts. (D.I. 105 at 434–35) Consequently, the Deacon reaction is something that difluoromethane manufacturers want to avoid. (Id. at 434)

24. The '514 specification states that the prior art used additives to address certain problems:

Recently, after having shown that in the case of the reaction of fluorination of methylene chloride in the presence of oxygen the chromium catalysts were not very selective (formation of F22 and of halogenated ethane derivatives), patent JP 5-339179 has also claimed the use of catalysts devoid of chromium, which are specific to the synthesis of F32. These catalysts, such as CoCl[2]/AlF[3] or NiCl[2]/AlF[3], are highly selective and their stability is increased by additives chosen from the rare earths (La, Ce) or alkaline-earth elements (Mg, Ca, Se).

[*13]

('514 patent, col. 2 at ll. 31–40)

25. According to the '514 specification, the claimed catalyst has comparatively better stability and selectivity compared to the mixed metal catalyst prior art:

In trials of fluorination of methylene chloride, with a shorter contact time, aimed at increasing the space time yield of F32, we have been surprised to find that, in contrast to what the abovementioned patents lead one to expect, usual fluorination catalysts such as Ni/AlF[3] or Ni-Cr/AlF[3] are not stable, even in the presence of oxygen.

On the other hand, it has now been found that there is a temperature range in which a catalyst based on pure chromium (without the addition of another metal oxide) can produce, in the presence of oxygen, with an excellent stability, [difluoromethane] by gas-phase fluorination of methylene chloride, without any significant loss of selectivity.

('514 patent, col. 2 at ll. 48–59)

26. The '514 specification states that the superior performance of the claimed pure chromium catalyst made use of additives unnecessary and pointed to this feature as an advantage of the '514 process:

It is therefore unnecessary to employ special [*14] additives in order to increase its selectivity; the elimination of the additives employed in the mixed catalysts enables the manufacture of the catalyst to be simplified and thereby its cost to be reduced.

('514 patent, col. 3 at ll. 10–14)

27. The '514 specification states that "Comparative Examples 2 and 3 show that it is necessary to have a catalyst containing solely chromium . . . ." ('514 patent, col. 7 at ll. 7–8)

28. In response to a rejection by the United States Patent and Trademark Office ("USPTO") dated December 30, 1997, the '514 applicants attempted to distinguish their claims from the prior art by reiterating that the '514 application process uses a catalyst for which "it is therefore unnecessary to employ special additives to increase its selectivity; the elimination of additives employed in the mixed catalysts enables the manufacture of the catalyst to be simplified and thereby its cost to be reduced." (DX 579 at AT000172)

29. The '514 applicants also argued that the USPTO's December 30th rejection "ignored the criticality of utilizing a chromium catalyst alone, as opposed to other types of chromium-based catalysts such as that taught in comparative examples [*15] 2 and 3." (Id. at AT000179; D.I. 108 at 1148)

30. The applicants further sought to distinguish Buckman based on the claimed "bulk or supported chromium catalyst" limitation. Buckman calls for the gas-phase catalytic fluorination of a halocarbon, such as methylene chloride, with hydrogen fluoride in the presence of an alkali metal fluoride, specifying that the alkali metal fluoride can be either mixed into the catalyst bed or incorporated with the catalyst. (D.I. 108 at 1149-51; DX 579 at AT000179) The '514 applicants argued that "the present claims exclude the utilization of an alkali metal

fluoride noted in column 1, line 59 of Buckman[.]" (DX 579 at AT000179)

31. In the prosecution history of the '514 patent, the applicants also attempted to distinguish the Tsuji prior art reference by stating:

> Applicants point out that the claims recited the phrase 'consisting essentially of' which would exclude the utilization of a combination catalyst, such as that taught by Tsjui [sic] ... Rather applicants' disclosure in comparative examples 2 and 3 indicate the criticality of using chromium catalysts alone rather than in combination with other metal components. [*16]

(D.I. 108 at 1152–53; DX 579 at AT000180)

32. On February 25, 1998 the USPTO again rejected the '514 patent claims as being unpatentable, this time issuing a final rejection. (DX 573 at AT003130–AT003136)

33. The '514 applicants filed a further Amendment and Communication dated February 25, 1998. (DX 573 at AT00204) In this Amendment, the applicants again defined their claimed bulk or supported catalyst, "as defined on page 5, lines 13–14 [of the '514 patent], pure chromium means without the addition of another metal oxide[.]" (DX 579 at AT000207)

34. In that same Amendment, the '514 applicants distinguished the prior art. The '514 applicants argued that "the elimination of additives employed in the mixed catalysts enables the manufacture of the catalyst to be simplified and thereby its cost to be reduced." (DX 579 at AT00208) The '514 applicants emphasized "the criticality of utilizing a chromium catalyst alone, as opposed to other types of chromium-based catalysts such as that taught in comparative examples 2 and 3." (DX 579 at AT00216; D.I. 108 at 1148) The '514 applicants reiterated that "the claims recite[] the phrase 'consisting essentially of' which would exclude [*17] the utilization of a combination catalyst, such as that taught by Tsjui [sic] . . . . Rather applicants' disclosure in comparative examples 2 and 3 indicate the criticality of using chromium catalysts alone rather than in combination with other metal components." (DX 579 at AT000217; D.I. 108 at 1152) Finally, the '514 applicants argued "contrary to what might be expected from the prior art, the present invention makes it possible to employ a catalyst based solely on chromium to carry out this fluorination reaction." (DX 579 at AT00208)

35. The '514 applicants again distinguished Buckman, arguing "the present claims exclude the utilization of

an alkali metal fluoride noted in column 1, line 59 of Buckman[.]" (Id. at AT000216)

36. During prosecution of the '514 patent, the applicants characterized the examples of JP 51-82206 as "referring only to the fluorination of perhalogenated saturated materials (CCl[4] and C[2]Cl[3]F[3]). It is known, however, that the reactivity of perhalogenated molecules is very different from that of the hydrogenated materials." (Id. at AT00175, AT00212) (emphasis in original) The applicants also stated, "[a] [*18] person skilled in the art, who is looking for a means of fluorinating a specific H containing halocarbon (CH[2]Cl[2]) with a good selectivity, is therefore not prompted to consider the teachings of Buckman and JP 51-82206." (Id. at AT000178, AT000215) (emphasis in original) In the full translation of JP 51-82206, methylene chloride, a starting material for the '514 patent process and an H containing halocarbon, is listed as a preferred starting material, one of three other preferred starting materials (out of seven total) which are not perhalogenated. (DX 593 at 5)

37. The '514 applicants further told the USPTO that JP 51-82206 discloses a catalyst containing "chiefly chromium oxide," but did not mention that JP 51-82206 also discloses a catalyst of pure chromium. (D.I. 109 at 1539–41; DX 597 at AT000175, AT000212) The full English translation of JP 51-82206 discloses the use of a "pure chromium" catalyst. (DX 593 at 4; D.I. 108 at 1299)

38. In arguing for allowance of claims 6, 8, and 10 containing contact time limitations, the '514 applicants stated, "these specific process conditions effect a contact time of 10 seconds or less . . . . The short contact time is not [*19] taught in the applied references. Contact time[s] indicated in the references are substantially in excess of this." (DX 579 at AT000171; DX 848; D.I. 108 at 1306) The "applied references" were Buckman, the JP 51-82206 abstract, and U.S. Patent No. 5,523,500 ("Cheminal"). Buckman discloses a residence or contact time of 10 seconds for manufacturing difluoromethane in a gas-phase catalytic fluorination process. (D.I. 108 at 1306–07; DX 575, ex. 1) JP 51-82206 has contact times of 3.1 and 4.0 seconds, calculated from reaction data provided in the experimental examples. (D.I. 108 at 1307; DX 593 at 6–8) Cheminal discloses a range of contact times of 3 to 100 seconds, and preferably less than 30 seconds. (Id. at 1307; DX 609)

39. On two separate occasions the '514 patent applicants argued, "these [prior art] references, taken all together, do not prompt one skilled in the art to chose a restricted temperature range of 330–450 [degree]C as claimed in our process. They rather teach away from this range toward lower temperatures." (DX 579 at AT000178,

214–215) The applicable references were Buckman, the JP 51–82206 abstract, and Cheminal. Buckman discloses a [*20] temperature range of 150 to 350 [degree]C for a gas-phase catalytic fluorination reaction of methylene chloride with hydrogen fluoride to produce difluoromethane. (DX 575; D.I. 108 at 1310) JP 51–82206 discloses a temperature range of 100 to 500 [degree]C for a gas-phase catalytic fluorination reaction with hydrogen fluoride in the presence of oxygen with a preferred range of 150 to 350 [degree]C. (DX 593 at 1, 4, 6; D.I. 108 at 1310) Cheminal discloses a temperature range for a gas-phase catalytic fluorination reaction of 300 to 500 [degree]C. (DX 609; D.I. 108 at 1310)

### D. The European Application

40. The European counterpart to the '514 patent was copending with the '514 application during the entirety of the '514 prosecution, and was eventually allowed as a European patent approximately six years later in 2002. (DX 605)

41. On October 11, 1996, the European Patent Office ("EPO") issued a search report relative to the EPO counterpart application. (Id. at AT005337) The EPO search report cited a Derwent abstract of JP 51–82206. (Id.; D.I. 107 at 1071–75)

42. On May 12, 1999, the EPO rejected all of the claims of the EPO counterpart application n7 in light [*21] of JP 51–82206 for lack of novelty. (D.I. 107 at 1082–84) Additionally, the EPO demanded a full translation of JP 51–82206. (D.I. 107 at 1086–89)

> n7 The claims of the EPO counterpart application mirrored those of the issued '514 patent.

43. After receiving the full translation, the EPO maintained its rejection, again citing a lack of novelty in view of JP 51–82206. (Id. at 1093–94; DX 605) The EPO noted that methylene chloride is listed as one of seven preferred starting materials in JP 51–82206 and one of skill in the art would obtain difluoromethane from methylene chloride in light of the full disclosure of JP 51–82206. (DX 605 at AT005348–50)

44. Plaintiff amended its claims on June 2, 2000, requiring a molar ratio of hydrogen fluoride to methylene chloride between 1.5 and 10, preferably between 2 and 5. (Id. at 5338–41; D.I. 107 at 1098–99) Plaintiff also amended the EPO specification itself by adding examples to demonstrate a surprising effect of the newly claimed molar ratio. (DX 605 at [*22] AT005330–31; D.I. 107 at 1099–1100, 1105–07) Ultimately, the EPO allowed the application in view of the amendments to both the claims and the specification.

### E. Defendant's Process

45. Defendant manufactures difluoromethane by a gas-phase fluorination of methylene chloride with hydrogen fluoride, utilizing a catalyst which contains chromium. (D.I. 104 at 308–09; D.I. 106 at 719–20) Agent X n8 significantly enhances the selectivity of defendant's fluorination reactions, as well as the catalyst life. (D.I. 104 at 301, 354–56) Defendant feeds oxygen at a level of about 1.1 to 1.2 moles of oxygen per 100 moles of methylene chloride. (Id. at 310; D.I. 105 at 425–26, 455) The reactants in defendant's process are in contact with the catalyst for a time of approximately 10 seconds. (D.I. 105 at 460) Defendant's reaction is carried out at a pressure of between 5.5 and 7.6 bars absolute. (Id. at 461–62) Defendant's process was originally carried out at a temperature of approximately 310 [degree]C. (D.I. 104 at 326–27) In October 1999 defendant upgraded its reactor temperature control system, enabling it to manufacture difluoromethane at upwards of 343 [degree]C. (D.I. 106 [*23] at 749–53, 836–38) Once defendant's system was upgraded the reaction was capable of being conducted at 335 [degree]C. (D.I. 104 at 326; D.I. 106 at 753–55, 800) The temperature of defendant's fluorination reaction came within the claimed temperature range of the '514 patent sometime between June 18 and July 27, 2001. (D.I. 103 at 374)

> n8 By stipulation of the parties, the designation "Agent X" is used throughout to refer to a component of defendant's proprietary catalyst formulation that is subject to a Protective Order. Likewise, "Compound X" and "Compound Y" are used to refer to certain compounds containing Agent X.

46. On one occasion defendant depleted its supply of Agent X and was forced to prepare a batch of Agent X-free catalyst for use in its fluorination reaction to produce a hydrofluorocarbon similar to difluoromethane. (Id. at 358; D.I. 106 at 737–038) Catalyst life was shortened and reaction yield was reduced four-fold. (D.I. 104 at 358; D.I. 106 at 744–45)

47. Defendant has compared the performance [*24] of its catalyst to various pure chromium catalysts that have been offered to it by commercial catalyst manufacturers. (D.I. 106 at 721–23) In March 1999, defendant tested its Agent-X containing catalyst against a pure chromium catalyst in the manufacture of difluoromethane and found that its catalyst provided substantially better selectivity, greater consistency, and fewer undesired byproducts. (D.I. 106 at 723–27, 787; DX 538) In February 2001, defendant compared its catalyst against pure chromium catalysts from another vendor and determined that the ven-

dor catalyst performance did not even justify full-scale testing of the vendor catalyst. (D.I. 106 at 728–29) In November 2002 and September 2003, two further vendor comparisons were performed, comparing defendant's catalyst to another vendor's pure chromium catalyst. The pure chromium catalyst exhibited a lower catalyst life than that of defendant's catalyst. (D.I. 106 at 729–30)

48. In the absence of chromium, defendant's fluorination process would not work. (D.I. 105 at 452–53, 560–61 D.I. 108 at 1206; D.I. 109 at 1518–19)

### F. Willful Infringement

49. Dr. Mark Robin worked for defendant as a research chemist from 1988 until [*25] 2000. (D.I. 104 at 220–25) Between 1994 and 2000, Dr. Robin spent nearly all of his time identifying commercial applications for flame retardant products unrelated to difluoromethane. (Id. at 221) In March of 2000, Dr. Robin was asked to review relevant patent literature in connection with defendant's development of a liquid-phase process for the manufacture of difluoromethane. (Id. at 221) The '514 patent was one of many patents that came up in Dr. Robin's patent search; however, it was not identified as an issue for a liquid-phase process for difluoromethane. (Id. at 328, 332–33)

50. In May or June of 2001, a representative of plaintiff informed defendant's general manager of fluorine at an industry conference that, if defendant was producing difluoromethane, defendant had to be infringing at least one of plaintiff's patents. (Id. at 327; D.I. 105 at 612–13)

51. Days after plaintiff's accusation, defendant launched a focused search of plaintiff's patent portfolio. (D.I. 105 at 613–14) Dr. Stephan Brandstadter was given the responsibility of locating plaintiff's patents related to the manufacture of difluoromethane. (D.I. 103 at 195–98) Dr. Brandstadter identified [*26] several of plaintiff's patents relating to the manufacture of difluoromethane, including the '514 patent. (D.I. 104 at 371; D.I. 105 at 615–16) Dr. Gregory Leman, defendant's business director for specialty fluorine products, ordered an internal investigation into the '514 patent. (D.I. 104 at 371; D.I. 105 at 596; D.I. 106 at 661)

52. By June 19, 2001, defendant had identified the JP 51-82206 prior art and noted that it was merely practicing that prior art. (D.I. 105 at 623)

53. On July 11, 2001, defendant's outside patent counsel completed a New Project Trigger Form in response to defendant's request that a careful examination be performed towards ensuring that defendant did not infringe the '514 patent. (D.I. 104 at 341–42)

54. By July 18, 2001, Dr. Brandstadter and defen-

dant's internal fluorine team concluded defendant did not infringe the '514 patent. (D.I. 103 at 206–07)

55. Within 90 days of defendant's contacting its outside patent counsel, the outside patent counsel informed defendant that its process for manufacturing difluoromethane could not infringe the '514 patent. (D.I. 105 at 616; D.I. 106 at 758–59)

56. On October 19, 2001, Robert Hyta of defendant's outside counsel [*27] wrote an email to Dr. Leman ("the Hyta email"). (D.I. 104 at 375) In the Hyta email, Mr. Hyta asked Dr. Leman to verify that the email set forth a correct description of defendant's process, including its catalyst. (Id. at 375) The Hyta email stated that the supporting catalyst was made from a mixture of chromium oxide (CrO[3]) and Compound Y. (Id. at 375) Dr. Leman, testifying as defendant's Rule 30(b) (6) designee, indicated that Mr. Hyta's statement that defendant's catalyst was made from chromium oxide and Compound Y was wrong. (Id. at 376) According to Dr. Leman, defendant's catalyst was actually made from chromium oxide and Compound X. (Id.)

57. In April 2002, plaintiff sent a letter to defendant identifying five patents which plaintiff believed defendant infringed. Defendant responded to plaintiff within days, attempting to demonstrate defendant's non-infringement. (D.I. 106 at 759–60) Defendant also sought a written opinion of outside counsel as to whether its process for manufacturing difluoromethane infringed any of the five patents identified by plaintiff. (D.I. 105 at 616–17)

58. On June 18, 2002, defendant received a formal opinion report from its patent [*28] counsel indicating that it did not infringe the '514 patent. (D.I. 106 at 765–67)

### G. Inequitable Conduct

59. Drs. Benoit Requieme, Amberieux LaCroix, and Andre Lantz are research scientists for plaintiff and the named inventors of the '514 patent. (D.I. 103 at 77)

60. Drs. Requieme and LaCroix both had knowledge of, possessed, and read a copy of an English language translation of JP 51-82206 during their work on the difluoromethane project and before filing the '514 patent application. (D.I. 103 at 101–102, 147; D.I. 107 at 917–18) The translation of JP 51-82206 had been in the patent archives of plaintiff's research center since 1988. (D.I. 103 at 147–48; D.I. 107 at 916) Pursuant to his normal practice, Dr. Requieme would have provided a copy of the full English translation of JP 51-82206 to plaintiff's in-house patent attorney, Mr. Leboulanger, in preparation for filing the underlying French priority application. (D.I. 103 at 158–59) Partway through the prosecution

of the '514 patent, in September of 1997, Pierre Granet took over responsibility for prosecution of the '514 patent. (D.I. 107 at 1051-52, 1058) Mr. Granet admitted that he had the full English translation of [*29] JP 51-82206 in his files, which were transferred to Mr. Granet from Mr. Leboulanger. (Id. at 1063, 1065)

61. The '514 patent was prosecuted before the USPTO by plaintiff's U.S. patent counsel, Frederick Calvetti. (Id. at 981) None of the named inventors of the '514 patent sent a translation of JP 51-82206 to Mr. Calvetti or made any communications to Mr. Calvetti regarding prosecution of the '514 patent. (Id. at 926, 930-31) Instead, during the prosecution of the '514 patent, Mr. Calvetti communicated with Mr. Leboulanger. (Id. at 997) Mr. Calvetti never received a copy of the full English translation of JP 51-82206, nor was the translation ever submitted to the USPTO by plaintiff. (Id. at 1027-28) Had Mr. Calvetti been provided with a copy of the English language translation of JP 51-82206, he would have provided that document to the USPTO. (Id. at 1027-28) Mr. Calvetti filed Information Disclosure Statements (IDS) with the USPTO which included a copy of JP 51-82206 in Japanese and a Derwent abstract of JP 51-82206. (Id. at 1031, 1042)

## III. CONCLUSIONS OF LAW

### A. Claim Construction

1. The parties only dispute the construction of one limitation [*30] in the '514 patent: bulk and supported chromium catalyst. (D.I. 112 at 14; D.I. 114 at 13) Plaintiff construes the limitation to cover a catalyst that uses chromium as the only catalytically active metal, but which may also contain non-catalytically active components or additives. (D.I. 73 at 2) Under plaintiff's construction, a "bulk or supported chromium catalyst" would not function in the absence of chromium. (D.I. 105 at 430-32; D.I. 112 at 15) In other words, although a "bulk or supported chromium catalyst" could contain additives, none of these additives could catalyze the reaction by themselves. (Id.) Plaintiff cites evidence that defendant's catalyst would not function in the absence of chromium. (Id.) Plaintiff also cites evidence that Agent X by itself would not catalyze the reaction for making difluoromethane. (Id.) Defendant construes "bulk and supported chromium catalyst" to cover a substance that lowers the activation energy of a chemical reaction, without itself being consumed, which only contains chromium without the addition of other metal components such as metal oxides or alkali metal fluorides or non-inert additives. (D.I. 73 at 2) In support of its [*31] construction, defendant cites several references from the '514 specification and from the '514 prosecution history where plaintiff stated that its invention does not include metal oxides or

alkali metal fluorides. (D.I. 115 at 9-10, 12-14)

2. [HN1] Claim construction is question of law. *Markman v. Westview Instruments, Inc., 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc)*.

3. [HN2] In interpreting the claims, a court should begin with the intrinsic evidence of record (i.e., the patent itself, including the claims, the specification, and the prosecution history). *Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582 (Fed. Cir. 1996)*. "Such intrinsic evidence is the most significant source of the legally operative meaning of disputed claim language." Id.

4. [HN3] First, a court should look to words of the claims themselves to define the scope of the patented invention. Id. There is a heavy presumption that the claim terms carry their ordinary and customary meanings as would be understood by one of ordinary skill in the art. *Markman, 52 F.3d at 986*. In other words, the court must determine how a person of experience in the field of the invention, [*32] upon reading the patent documents, would understand the words used to define the invention. *Toro Co. v. White Consol. Indus., Inc., 199 F.3d 1295, 1299 (Fed. Cir. 1999)*. Dictionaries and scientific treatises may help to supply the pertinent context and usage for claim construction. *Tex. Digital Sys. v. Telegenix, Inc., 308 F.3d 1193, 1201, 1202 (Fed. Cir. 2002)*.

5. [HN4] Second, because a patentee may choose to be his own lexicographer and use a term in a manner either more or less expansive than its general usage in the relevant art, the court also should review the specification to determine whether an inventor has used any term in a manner other than its ordinary meaning. *Vitronics, 90 F.3d at 1582*. The specification may act as a dictionary when it either expressly defines terms used in the claims or when it defines terms by implication. Id.

6. [HN5] Third, a court may consider the prosecution history of a patent, if in evidence. Id. "The prosecution history limits the interpretation of claim terms so as to exclude any interpretation that was disclaimed during prosecution." Id. (quoting *Southwall Tech., Inc. v. Cardinal IG Co., 54 F.3d 1570, 1576 (Fed. Cir. 1995)*). [*33] That is, a court must look to the prosecution history to determine if the patentee has limited the scope of the claims by disclaiming a particular interpretation during prosecution. *Biodex Corp. v. Loredan Biomed, Inc., 946 F.2d 850, 862 (Fed. Cir. 1991)*.

7. Additionally, [HN6] if the meaning of a term is not clear from the intrinsic evidence, then a court may consult extrinsic evidence, such as expert testimony, in construing claim terms as they would be understood in the relevant art. *Markman, 52 F.3d at 980-81*.

Case 1:04-cv-01258-SLR    Document 171-6    Filed 12/16/2005    Page 15 of 43

Page 14
2005 U.S. Dist. LEXIS 7365, *33

8. [HN7] When construing the claims, courts must take great care to avoid importing unnecessary limitations into the claims from the specification. *Amgen Inc. v. Hoechst Marion Roussel, Inc., 314 F.3d 1313, 1325 (Fed. Cir. 2003).* "If we once begin to include elements not mentioned in the claim in order to limit such claim . . . we should never know where to stop." *Johnson Worldwide Assocs., Inc. v. Zebco Corp., 175 F.3d 985, 990 (Fed. Cir. 1999) (quoting McCarty v. Lehigh Val. R.R., 160 U.S. 110, 116, 40 L. Ed. 358, 16 S. Ct. 240, 1895 Dec. Comm'r Pat. 721 (1895)).* Nevertheless, a court should look to the specification to determine whether it refers to a [*34] limitation only as a part of less than all possible embodiments or whether it suggests that the very character of the invention requires that the limitation be a part of every embodiment. It is impermissible to read the one and only disclosed embodiment into a claim without other indicia that the patentee so intended to limit the invention. *Teleflex, Inc. v. Ficosa N. Am. Corp., 299 F.3d 1313, 1327 (Fed. Cir. 2002).* On the other hand, where the specification makes clear at various points that the claimed invention is narrower than the claim language might imply, it is entirely permissible and proper to limit the claims. *SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc., 242 F.3d 1337, 1345 (Fed. Cir. 2001).*

9. The court construes **"chromium catalyst"** n9 to mean a substance that alters the velocity of a chemical reaction without itself being consumed, where the only catalytically active material is chromium without the addition of metal oxides, alkali metal fluorides, or non-inert additives. A substance is catalytically active if it contributes to the catalysis of a reaction. Being catalytically active does not require a substance to [*35] catalyze a reaction on its own. n10

n9 The language of independent claims 1, 9 and 10 of the '514 patent include as a limitation a "bulk or supported chromium catalyst." ('514 patent, col. 7 at l. 25, col. 8 at ll. 19, 25) Furthermore, the parties purport to construe this "bulk or supported chromium catalyst" limitation. (D.I. 112 at 8-9; D.I. 114 at 14) However, the parties did not provide arguments related to construction of "bulk or supported." Furthermore, the court did not find an ordinary meaning of "bulk or supported" in the context of catalysts. As far as the court can tell, a supported chromium catalyst is "a composition in which the chromium catalyst is prepared by depositing it on a support – on the surface of the support [,] and the catalyst is chromium." (D.I. 103 at 92) "A bulk chromium catalyst is one in which the catalyst is also a chromium catalyst, but this time it is prepared without a support." (Id. at 93) The parties' claim

construction and infringement arguments center on construction of "chromium catalyst" and have nothing to do with whether defendant's catalyst was bulk or supported. Consequently, the court will disregard this portion of the limitation and focus its analysis on construction of "chromium catalyst."

[*36]

n10 Plaintiff defines "chromium catalyst" as a catalyst where chromium is the only catalytically active metal in the claimed fluorination reaction. (D.I. 112 at 9) Plaintiff further claims that catalytically active means capable of carrying out the claimed fluorination reaction. (D.I. 105 at 430-432; D.I. 113 at 8) Thus, under plaintiff's construction, a chromium catalyst would not function without the presence of chromium and could not be carried out by another element. Plaintiff's construction would arguably cover defendant's catalyst since: (1) defendant's catalyst would not function in the absence of chromium; and (2) although Agent X plays some role in defendant's catalyst, Agent X could not carry out the catalysis on its own. (D.I. 105 at 452-53, 560-61; D.I. 108 at 1206; D.I. 109 at 1518-19) While the court agrees with plaintiff's construction of "chromium catalyst" as a catalyst in which chromium is the only catalytically active material, it rejects plaintiff's attempt to expand "catalytically active" to cover substances capable of carrying out the fluorination reaction by themselves.

Plaintiff begins its construction argument with what it claims is the ordinary meaning of chromium catalyst. However, plaintiff's sole evidence regarding the ordinary meaning of chromium catalyst comes in the form of Dr. Dolbier's testimony:

Q: Could you explain what the term chromium catalyst would mean, the ordinary meaning of that term would be to a person of ordinary skill in the art in your opinion?

A: What this means is that the active catalyst in this reaction is chromium and only chromium.

(D.I. 105 at 430-31) This testimony does not indicate that "catalytically active" means capable of catalyzing a reaction on its own.

Plaintiff cites several statements in the specification and prosecution history which it claims

establish that the '514 patent defined chromium catalyst to mean that only chromium is capable of catalyzing the claimed fluorination process. (D.I. 113 at 9–12) First, the '514 specification identifies the prior art "chromium-based mixed catalysts" such as "Ni-Cr/AlF[3] mixed catalysts." ('514 patent, col. 2 at ll. 17–41) Plaintiff claims that this establishes that the prior art had "two active catalysts (as opposed to the claimed 'chromium catalyst')." (D.I. 112 at 10) However, this statement says nothing about whether each of the metals in the mixed metal catalyst was capable of carrying out the reaction. At most, this statement in the specification shows that the prior art had two separate metals which contributed to the catalysis. Plaintiff also points to a specification reference which states that "usual fluorination catalysts such as . . . Ni-Cr/AlF[3] are not stable . . . ." ('514 patent, col. 2 at ll. 51–53) Once again, this reference says nothing about both nickel and chromium being capable of carrying out the catalyzed reaction on their own. It merely shows that the prior art contained both nickel and chromium and that both of these metals contributed to the catalysis. In the prosecution history, the '514 applicants stated, "comparative examples 2 and 3 show that the use of supported catalysts (Ni/AlF[3] and Ni-Cr/AlF[3] does not make it possible to obtain the lifetime obtained on [sic] catalysts according to the invention." (PX 4 at AT000173) Like the specification references, this statement also does not indicate that the prior art contained two metals, each of which was capable of carrying out the reaction. Finally, in support of its claim construction argument, plaintiff points to arguments made before the USPTO distinguishing Cheminal from the '514 patent. The applicants for the '514 patent distinguished Cheminal by saying it "completely [taught] away from the applicants' claimed process, because it suggests to use a Cr-Ni based catalyst, where as [sic] the present catalyst is only chromium based." (PX 4 at AT000178) However, Cheminal does not indicate whether nickel is capable of catalyzing the reaction by itself. (D.I. 609)

None of the references or communications cited by plaintiff explicitly states that each metal in the prior art mixed metal catalysts could carry out the catalysis. Furthermore, plaintiff does not cite any evidence, other than the unsupported testimony of Dr. Dolbier (see D.I. 105 at 435–36), that these prior art references described catalysts in which each metal was capable of catalyzing the claimed reaction. Thus, plaintiff has failed to establish that the intrinsic evidence of record supports its definition of catalytically active (or chromium catalyst). Given that Cheminal does not disclose that both nickel and chromium are capable of catalyzing the reaction by themselves, plaintiff's construction of chromium catalyst could also encompass prior art. As a result, the court rejects plaintiff's construction of "bulk or supported chromium catalyst", and holds that catalytically active merely means contributing to the catalyzation of a reaction.

[*37]

10. The court begins by noting that the plain ordinary meaning of a catalyst is a "substance [] that accelerate[s] the rate of chemical reactions without [] being consumed during the reactions . . . ." n11 Van Nostrand's Scientific Encyclopedia 560 (8th ed. 1995). See also McGraw-Hill Concise Encyclopedia of Science & Technology 329 (3d ed. 1992) (defining "catalysis" as "the phenomenon in which a relatively small amount of foreign material called a catalyst augments the rate of a chemical reaction without itself being consumed."); McGraw-Hill Dictionary of Scientific and Technical Terms 307 (4th ed. 1989) (defining a catalyst as a "substance that alters the velocity of a chemical reaction and may be recovered essentially unaltered in form and amount at the end of the reaction."). A "chromium catalyst" would be a catalyst in which the only catalytically active material is chromium. Thus, a "chromium catalyst" would be a substance that alters the velocity of a chemical reaction without itself being consumed, where the only catalytically active material is chromium.

> n11 Plaintiff and defendant both agree with this plain ordinary meaning of catalyst. Dr. Dolbier, an expert for plaintiff, testified that "[a] catalyst is a material which when added to a reaction . . . will enhance the rate of the reaction by providing an alternative lower barrier pathway or mechanism for the reaction." (D.I. 105 at 428) Defendant states in its post trial brief that "to one of ordinary skill in the art, the ordinary meaning of the term 'catalyst' means 'a species that lowers the activation energy of a chemical reaction without itself being consumed.'" (D.I. 114 at 14)

[*38]

11. However, the applicants for the '514 patent made several disclaimers of claim scope in the specification and the prosecution history of the '514 patent. First, the '514 specification states that "it has now been found that there is a temperature range in which a catalyst based on pure chromium (without the addition of another metal oxide) can produce, in the presence of oxygen . . . [di-

fluoromethane] by gas-phase fluorination . . . ." ('514 patent, col. 2 at ll. 54-58) The '514 applicants also stated to the USPTO that "as defined on page 5, lines 13-14 [of the '514 patent], pure chromium means without the addition of another metal oxide." (DX 579 at AT00207) The '514 applicants indicated to the USPTO that "the present claims exclude the utilization of an alkali metal fluoride noted in column 1, line 59 of Buckman[.]" (D.I. 579 at AT000179, AT000216) The applicants for the '514 patent state in the specification and in the prosecution history that, "it is therefore unnecessary to employ special additives to increase its selectivity; the elimination of additives employed in the mixed catalysts enables the manufacture of the catalyst to be simplified and thereby its cost to [*39] be reduced." n12 ('514 patent, col. 3, ll. 10-14; DX 579 at AT000172, AT000208) These statements constitute a clear disavowal of metal oxides, metal fluorides, and non-inert additives from the '514 patent's "bulk or supported chromium catalyst." As a result, the ordinary meaning of chromium catalyst must be construed to cover a substance that alters the velocity of a chemical reaction without itself being consumed, where the only catalytically active material is chromium without the addition of metal oxides, alkali metal fluorides, or non-inert additives.

n12 Plaintiff argues in its post trial motion that this quote's description of additives as "unnecessary" simply means that additives are not needed, but does not mean they are prohibited. (D.I. 112 at 11) In this quote the '514 applicants were distinguishing the '514 patent from the prior art and pointing out a benefit of the invention, namely, that it was cheaper and easier to make. While "unnecessary" can be contorted to mean not prohibited, it is clear in the context of this quote that the '514 applicants did not intend their invention to include special additives.

[*40]

**B. Literal Infringement n13**

n13 Plaintiff does not make any arguments regarding the doctrine of equivalents. Therefore, the court will not consider whether defendant infringes under this doctrine.

12. Plaintiff claims that defendant's difluoromethane process meets all the limitations, most notably the bulk or supported chromium catalyst limitation, of claims 1, 2, 5, 6, 7, 9, and 10 of the '514 patent. Defendant argues that the Agent X in its catalyst is either an excluded metal component or is a catalytically active additive and, therefore, does not satisfy the bulk or supported chromium

catalyst limitation. (D.I. 114 at 21)

13. [HN8] A patent is infringed when a person "without authority makes, uses or sells any patented invention, within the United States . . . during the term of the patent." 35 U.S.C. § 271(a).

14. [HN9] A court should employ a two-step analysis in making an infringement determination. *Markman, 52 F.3d at 976.* First, the court must construe the asserted [*41] claims to ascertain their meaning and scope. *Id.* Claim construction is a question of law subject to de novo review. See *Cybor Corp. v. FAS Techs., 138 F.3d 1448, 1454 (Fed. Cir. 1998).* Second, the trier of fact must compare the properly construed claims with the accused infringing product. *Markman, 52 F.3d at 976.* This step is a question of fact. See *Bai v. L & L Wings, Inc., 160 F.3d 1350, 1353 (Fed. Cir. 1998).* Literal infringement occurs where each limitation of at least one claim of the patent is found exactly in the alleged infringer's product. *Panduit Corp. v. Dennison Mfg. Co., 836 F.2d 1329, 1330 n. 1 (Fed. Cir. 1987).*

15. [HN10] The patent owner has the burden of proving infringement and must meet its burden by a preponderance of the evidence. *SmithKline Diagnostics, Inc. v. Helena Lab. Corp., 859 F.2d 878, 889 (Fed. Cir. 1988)* (citations omitted).

16. The court finds that defendant's catalyst does not meet the "bulk or supported catalyst" limitation of the asserted claims in the '514 patent. Defendant's catalyst contains Agent X. (DX 125; DX 126) Furthermore, defendant produced evidence that [*42] the Agent X in its catalyst is catalytically active. Defendant found substantially decreased catalyst performance when it attempted to run a fluorination process with a catalyst lacking Agent X. (D.I. 104 at 358, D.I. 106 at 737-38, 744-45) Furthermore, when defendant tested its catalyst against a variety of commercial third-party "pure" chromium catalysts, its Agent X-chromium catalyst substantially outperformed each pure chromium catalyst tested. (D.I. 106 at 721-23) Dr. Jeffrey Webb, an expert for defendant, testified that he tested defendant's catalyst and verified that Agent X was present in defendant's catalyst and was catalytically active. (D.I. 108 at 1173-88; DX 841, 811, 812, 813, 814, 815, 816, 129) Finally, Dr. Webb and Dr. William Gumprecht testified that several articles and printed publications indicate that Agent X plays a catalytically active role in defendant's catalyst. (D.I. 108 at 1210-11, 1255, 1257-58; PX 564, 565, 566, 567) In sum, Agent X, together with chromium, serves as a catalyst in defendant's fluorination process. n14 Thus, defendant does not have a fluorination process in which chromium is the only catalytically active material; defendant's process does [*43] not satisfy the "bulk or supported chromium catalyst"

limitation. n15

n14 Even if Agent X were not a catalyst, at the very least it is a non-inert additive. The '514 applicants disclaimed use of non-inert additives. ('514 patent, col. 3, ll. 10-14; DX 579 at AT000172, AT000208) Consequently, even if Agent X does not rise to the level of being classified as a catalyst, its presence still puts defendant's process outside the scope of the '514 patent.

n15 Plaintiff's arguments that defendant literally infringes the '514 patent are unavailing. (D.I. 112 at 15-21) First, plaintiff points to the testimony of Drs. Dolbier and Webb as evidence that chromium is the only catalytically active metal in defendant's catalyst. However, this argument relies on plaintiff's construction of chromium catalyst and catalytically active. Since the court has not adopted plaintiff's construction, this argument is moot. Next, plaintiff refers to several internal communications of defendant which failed to mention Agent X as a component of defendant's catalyst. (D.I. 103 at 183-84, 187-88, 201; D.I. 104 at 328, 333; D.I. 106 at 786, 804-07, 811-12; D.I. 108 at 1214-18) The fact that defendant did not acknowledge in these documents the significance of the role Agent X played in its catalytic reaction does not detract from the credible evidence of record demonstrating that measurable amounts of Agent X are present in the catalyst and that Agent X does play an active role in the catalytic reaction. Finally, plaintiff argues that defendant's catalyst is not outside the scope of the '514 patent because it only possesses de minimus levels of Agent X. The amount of material used has no relevance in determining whether a material is a catalyst. Van Nostrand's Scientific Encyclopedia 560 (8th ed. 1995) (noting that early scientists found that "minute amounts of foreign substances[, catalysts,] were able to greatly affect the course of chemical reactions . . . ."). Furthermore, the Synetix report found Agent X oxide to be the third most abundant component in defendant's catalyst. (PX 126) As a result, the court rejects plaintiff's arguments regarding literal infringement.

[*44]

17. Furthermore, the '514 applicants clearly disclaimed metal oxides other than chromium oxide from the scope of the '514 patent. ('514 patent, col. 2 at ll. 54-58; DX 579 at AT000207) Both the Johnson Matthey report and the Synetix report demonstrated that defendant's catalysts contained several metal oxides including Agent

X oxide. (PX 125 at 4; PX 126 at 3) As a result, defendant's catalyst once again falls outside the scope of the "bulk or supported chromium catalyst."

18. Because defendant's catalyst does not infringe the '514 patent, the court will not address plaintiff's claims of willful infringement.

### C. Invalidity

#### 1. Anticipation

19. Defendant argues that claims 1, 2, 6, 7, 9, and 10 of the '514 patent lack novelty in light of the fully translated version of JP 51-82206 which was not submitted to the USPTO. (D.I. 114 at 25)

20. Under 35 U.S.C. § 102(b), [HN11] "[a] person shall be entitled to a patent unless the invention was patented or described in a printed publication in this or a foreign country . . . more than one year prior to the date of the application for patent in the United States." The Federal Circuit has stated that [HN12] "there [*45] must be no difference between the claimed invention and the referenced disclosure, as viewed by a person of ordinary skill in the field of the invention." Scripps Clinic & Research Foundation v. Genentech, Inc., 927 F.2d 1565 at 1576. [HN13] In determining whether a patented invention is explicitly anticipated, the claims are read in the context of the patent specification in which they arise and in which the invention is described. Glaverbel Societe Anonyme v. Northlake Mktg. & Supply, Inc., 45 F.3d 1550, 1554 (Fed. Cir. 1995). The prosecution history and the prior art may be consulted if needed to impart clarity or to avoid ambiguity in ascertaining whether the invention is novel or was previously known in the art. Id. The prior art need not be ipsissimis verbis (i.e., use identical words as those recited in the claims) to be anticipating. Structural Rubber Prods. Co. v. Park Rubber Co., 749 F.2d 707, 716 (Fed. Cir. 1984).

21. [HN14] A prior art reference also may anticipate without explicitly disclosing a feature of the claimed invention if that missing characteristic is inherently present in the single anticipating reference. Continental Can Co. v. Monsanto Co., 948 F.2d 1264, 1268 (Fed. Cir. 1991). [*46] The Federal Circuit has explained that an inherent limitation is one that is necessarily present and not one that may be established by probabilities or possibilities. Id. That is, "the mere fact that a certain thing may result from a given set of circumstances is not sufficient." Id. The Federal Circuit also has observed that "inherency operates to anticipate entire inventions as well as single limitations within an invention." Schering Corp. v. Geneva Pharms. Inc., 339 F.3d 1373, 1380 (Fed. Cir. 2003). Moreover, recognition of an inherent limitation by a person of ordinary skill in the art before the critical date is not required

to establish inherent anticipation. *Id. at 1377.*

22. [HN15] An anticipation inquiry involves two steps. First, the court must construe the claims of the patent in suit as a matter of law. *Key Pharms. v. Hercon Lab. Corp., 161 F.3d 709, 714 (Fed. Cir. 1998).* Second, the finder of fact must compare the construed claims against the prior art. *Id.* A finding of anticipation will invalidate the patent. *Applied Med. Res. Corp. v. U.S. Surgical Corp., 147 F.3d 1374, 1378 (Fed. Cir. 1998).* [*47]

23. Claim 1 discloses the following limitations: (1) gas-phase fluorination; (2) of methylene chloride; (3) with anhydrous hydrofluoric acid; (4) in the presence of 0.1 to 5 moles of oxygen per 100 moles of methylene chloride; (5) at a temperature of between 330 and 450 [degree]C; and (6) with a bulk or supported chromium catalyst. n16 ('514 patent, col. 7 at l. 21 - col. 8 at ll. 28) JP 51-82206 discloses: (1) gas-phase catalytic fluorination (DX 593 at 1, 2, 4); (2) of halogenated hydrocarbons, specifically methylene chloride (id. at 1-5); (3) with anhydrous hydrofluoric acids (id. at 1, 3); (4) with oxygen, which is fed into the reaction at a ratio of 0.001 to 1 molar percent of the starting halogenated hydrocarbon (i.e., methylene chloride) (id. at 1, 4-5); (5) at a temperature of between 100 and 500 [degree]C (id. at 1, 4, 6); and (6) with a pure chromium catalyst (id. at 4; see also id. at 1-3). JP 51-82206 explicitly discloses the first two limitations of claim 1 of the '514 patent (i.e., gas-phase catalytic fluorination and methylene chloride). At least a portion of the '514 patent's limitation of 0.1 to 5 moles of oxygen per 100 moles of methylene [*48] chloride is within JP 51-82206's range of 0.001 to 1 molar percent of oxygen based on methylene chloride. n17 [HN16] "When, as by a recitation of ranges or otherwise, a claim covers several compositions, the claim is 'anticipated' if one of them is in the prior art." *Titanium Metals Corp. v. Banner, 778 F.2d 775, 782 (Fed. Cir. 1985)* (emphasis in original). Thus, JP 51-82206 discloses this limitation of claim 1 of the '514 patent. Similarly, the '514 patent's limitation of 330 to 450 [degree]C is entirely within JP 51-82206's temperature range of 100 and 500 [degree]C. Consequently, this limitation of claim 1 is also disclosed by JP 51-82206. The court's construction of "bulk or supported chromium catalyst" is a substance that alters the velocity of a chemical reaction without itself being consumed, where the only catalytically active material is chromium without the addition of metal oxides, alkali metal fluorides, or non-inert additives. Since JP 51-82206's catalyst is pure chromium, chromium must be the only catalytically active material in the catalyst and the catalyst must be a bulk or supported chromium catalyst for purposes of the '514 patent. JP 51-82206 does [*49] not mention the addition of metal oxides, alkali metal fluorides, or non-inert additives. JP 51-82206 discloses all the limitations of claim 1 of the '514 patent.

n16 Plaintiff argues that difluoromethane is a limitation of claim 1 of the '514 patent. The statement "process for the manufacture of difluoromethane" is the only mention of difluoromethane in claim 1. However, this statement is in the preamble of claim 1. The Federal Circuit has held that

> [HN17] no litmus test defines when a preamble limits claim scope. Whether to treat a preamble as a limitation is a determination "resolved only on review of the entirety of the patent to gain an understanding of what the inventors actually invented and intended to encompass by the claim."
>
> In general, a preamble limits the claimed invention if it recites essential structure or steps, or if it is "necessary to give life, meaning, and vitality" to the claim. Clear reliance on the preamble during prosecution to distinguish the claimed invention from the prior art may indicate that the preamble is a claim limitation because the preamble is used to define the claimed invention.

*In re Cruciferous Sprout Litig., 301 F.3d 1343, 1347 (Fed. Cir. 2002)* (citations omitted). The preamble of claim 1 does not recite essential structure or steps. Furthermore, claim 1's preamble does not give life, meaning, or vitality to the claim. Rather, the preamble of claim 1 provides a descriptive name to the set of limitations in the body of the claim. Plaintiff also fails to identify any language in the prosecution history where the applicants for the '514 patent relied on the preamble to distinguish the claimed invention from the prior art. Consequently, this court concludes that the preamble of claim 1 does not create a limitation for claim 1.

However, even if the preamble of claim 1 did create a limitation, the fact that JP 51-82206 does not explicitly mention difluoromethane does not mean the process described in JP 51-82206 does not produce difluoromethane. JP 51-82206 identified methylene chloride, the starting material in the '514 patent, as one of its starting materials. JP 51-82206 then performed the same steps as the '514 patent, under the same conditions as the '514 patent. Because JP 51-82206 uses the same

starting material, steps, and conditions as the '514 patent, it must also produce at least some difluoromethane. Furthermore, plaintiff's argument that there is no conversion of methylene chloride to difluoromethane at certain conditions described in JP 51-82206, does not change the court's finding that JP 51-82206 produces at least some difluoromethane. The '514 patent says nothing about the efficiency or consistency of difluoromethane production. That JP 51-82206 produces any difluoromethane under the limitations of claim 1, is sufficient to invalidate claim 1.

[*50]

n17 0.001 to 1.0 molar percent of oxygen based on the starting halogenated hydrocarbon (i.e., methylene chloride) is the equivalent of 0.001 to 1 mole of oxygen per 100 moles of methylene chloride. (D.I. 113 at 33)

24. Claim 2 depends from claim 1 of the '514 patent and, therefore, includes all the limitations of claim 1 plus the additional limitation that the oxygen to methylene chloride molar ratio is between 0.5% and 3%. ('514 patent, col. 7 at 11. 26-27) JP 51-82206 discloses all the limitations of claim 1. At least a portion of claim 2's additional limitation is also within JP 51-82206's range of 0.001 to 1.0 molar percent of oxygen based on methylene chloride. JP 51-82206's disclosure of part of the range covered in claim 2 means that JP 51-82206 disclosed this limitation. *Titanium Metals, 778 F.2d at 782.* JP 51-82206 discloses all the limitations of claim 2, and anticipates this claim.

25. Claim 6 also depends from claim 1 of the '514 patent and, therefore, includes all the limitations of claim 1 plus the additional limitation that the mixture of methylene chloride, anhydrous [*51] hydrogen fluoride and oxygen is in contact with the catalyst for a time between 0.01 and 10 seconds. ('514 patent, col. 8 at 11. 8-9) Although JP 51-82206 does not explicitly mention contact times, these contact times can be calculated based on the information provided in the examples of JP 51-82206. n18 (D.I. 108 at 1276-77) ) According to Dr. Gumprecht, examples 1 and 2 of JP 51-82206 have contact times of 3.0 and 4.1 seconds, which are within the range covered by claim 6. (Id.) JP 51-82206 discloses all the limitations of claim 6 and, therefore, anticipates this claim.

n18 Defendant cites the following testimony in support of its argument that contact times may be calculated from the information provided in the examples of JP 51-82206:

Q: Let's go to Claim 6. Did you find either inherently or expressly language corresponding to that claim element
A: Yes.
Q: What about —
A: That's inherently because we have to calculate it from the examples.
Q: You mean the actual seconds of contact time you have to arrive at differently than actually seeing the number on the page?
A: The numbers are not specifically there, but the parameters are there for making the calculation.

(D.I. 108 at 1276-77) Plaintiff argues that the contact time cannot be calculated from the information disclosed in the JP 51-82206 examples. (D.I. 113 at 35) However, the testimony cited by plaintiff does not establish this argument. First, plaintiff cites the following from the cross-examination of Dr. William Gumprecht:

Q: My question is this: Where in [JP 51-82206] is there a disclosure of a gas-phase mixture of methylene chloride, anhydrous hydrogen fluoride and oxygen in contact with the catalyst for a time between .01 and 10 seconds?
A: There is no disclosure of the fluorination of methylene chloride, it's listed as a preferred raw material, and therefore it's part of the disclosure of the reference.

(D.I. 108 at 1331) However, the rest of Dr. Gumprecht's response to this question indicates that contact times could be determined based on the information provided in the examples. According to Dr. Gumprecht:

[The] feed rates for raw materials and catalyst volume, temperature combined, it doesn't really make a difference [for] one of ordinary skill in the art . . . . You can determine [contact time] for any organic feed rate if you know the number of moles per hour of the organic and then moles of [hydroflouric acid].

(D.I. 108 at 1331-1332) The remaining testimony cited by plaintiff indicates, not that contact times cannot be calculated, based on the information pro-

vided, but that it is inappropriate to use the contact times from these examples because the examples do not produce difluoromethane; a reaction producing difluoromethane would require different conditions (e.g., temperature, reactants) from those presented in the examples. (D.I. 109 at 1481-82, 1530) Thus, plaintiff does not provide any testimony or evidence that contact time cannot be calculated from the examples. Plaintiff's argument that the contact times calculated from the examples of JP 51-82206 should not be considered because different reaction parameters would be required to produce difluoromethane are from two reasons. First, plaintiff does not dispute that none of the parameters it claims would have to change in order to produce difluoromethane (e.g., temperature, reactants) have anything to do with calculating contact time. As Dr. Gumprecht indicated, contact time can be calculated from the number of moles per hour of the organic (e.g., methylene chloride) and the moles of hydroflouric acid used. Second, JP 51-82206 discloses a wide range of starting materials, temperatures, and oxygen to starting material ratios. If methylene chloride were substituted into the examples of JP 51-82206, the reaction parameters could change in such a way that difluoromethane could be produced and still be within JP 51-82206's disclosure. Regardless of plaintiff's argument regarding the applicability of JP 51-82206's examples to the '514 patent, the fact still remains plaintiff has not refuted that JP 51-82206 discloses contact times of between 0.1 and 10 seconds.

[*52]

26. Claim 7 also depends from claim 1 of the '514 patent and, therefore, includes all the limitations of claim 1 plus the additional limitation that the process of claim 1 must be carried out at a pressure between 1 and 20 bars absolute. ('514 patent, col. 8 at ll. 8-9) JP 51-82206 discloses a fluorination reaction carried out at a pressure of 0.1 to 10 atm absolute pressure. (DX 593 at 6) This corresponds to a reaction pressure range of 0.8 to 4.0 bars absolute. (D.I. 114 at 28) JP 51-82206 discloses all the limitations of claim 7 and anticipates this claim.

27. Claim 9 has the same limitations as claim 1. n19 ('514 patent, col. 8 at ll. 14-19) JP 51-82206 anticipates claim 9.

    n19 The only difference between claim 1 and claim 9 is in the transitional term used. Claim 1 uses the transitional term "consisting essentially of", while claim 9 uses the transitional term "consisting of". ('514 patent, col. 7 at ll. 21-22, col. 8 at ll. 14-15)

28. Claim 10 has the same limitations as claim 1 with the additional limitation [*53] that the mixture of methylene chloride, anhydrous hydrogen fluoride and oxygen is in contact with the catalyst for a time between 0.01 and 10 seconds. ('514 patent, col. 8 at ll. 26-28) The contact times employed in the examples of JP 51-82206 are 3.0 and 4.1 seconds. (D.I. 108 at 1276-77; DX 593 at 6-8) JP 51-82206 discloses all the limitations of claim 10.

29. Plaintiff argues that JP 51-82206 does not enable claims 1, 2, 6, 7, 9, or 10 of the '514 patent. (D.I. 112 at 30) Plaintiff's argument is that JP 51-2206 "does not direct one towards the narrow process parameters of the '514 patent claims, and a person of ordinary skill in the art would not obtain those parameters without undue experimentation." (Id. at 31) According to plaintiff, "the narrow process parameters of the '514 patent were necessary to overcome a reaction known as the Deacon Reaction." (Id.)

30. The '514 specification mentions the Deacon reaction six separate times. ('514 patent, col. 2 at ll. 9, 13, 19, 61, 67, col. 5 at l. 55) The first three references are in the "Background of the Invention" section and describe how the prior art dealt with the Deacon reaction. The next two references indicate that the [*54] claimed '514 patent processes did not produce the Deacon reaction. The final reference to the Deacon reaction is in the discussion of Example 1, and indicates that the Deacon reaction did not occur. None of the claims in the '514 patent mention the Deacon reaction. ('514 patent, col. 7 at l. 21 – col. 8 at l. 28) Furthermore, plaintiff has not presented any claim construction argument that the Deacon reaction should be incorporated into any claim language. Consequently, information related to avoiding the Deacon reaction is completely irrelevant to determining whether the claims of the '514 patent are anticipated.

31. Furthermore, JP 51 82206's failure to direct one towards the narrow process parameters of the '514 patent claims is also irrelevant to an anticipation inquiry. In Titanium Metals Corp. v. Banner, the applicants for a patent claimed "[a] titanium base alloy consisting essentially by weight of about 0.6% to 0.9% nickel, 0.2% to 0.4% molybdenum, up to 0.2% maximum iron, balance titanium . . . ." 778 F.2d 775, 776 (Fed. Cir. 1985). A Russian prior art reference disclosed a titanium base alloy that had 0.25% molybdenum, 0.75% nickel and the balance titanium. [*55] Id. at 776. The applicants attempted to distinguish their invention from the Russian prior art on the basis that they had discovered "range limits of the [nickel] and [molybdenum] content, outside of which [corrosion] resistance diminishes . . . ." Id. at 781. In other words, the applicants' contribution to the art was

2005 U.S. Dist. LEXIS 7365, *55

disclosure of specific ranges, outside of which negative results occurred. The Federal Circuit rejected this argument and found the patent application to be anticipated by the Russian prior art reference. Like *Titanium Metals*, the plaintiff attempts to argue that its patent is novel on the basis that it discovered specific parameters to avoid an undesirable result. (D.I. 112 at 31) Just as in *Titanium Metals*, this argument fails.

**2. Obviousness**

32. Defendant argues that claim 5 of the '514 patent is invalid for obviousness in view of JP 51–82206 and any of the Galland, Tsuji, or Anello references. (D.I. 114 at 29–30)

33. In pertinent part, *35 U.S.C. § 103* provides that

> [HN18] a patent may not be obtained . . . if the differences between the subject matter sought to be patented [*56] and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains.

34. [HN19] The question of obviousness turns on four factual inquiries: (1) the scope and content of the prior art; (2) the level of ordinary skill in the art; (3) the differences between the claimed invention and the prior art; and (4) any objective indicators of nonobviousness, more commonly termed secondary considerations. *Graham v. John Deere Co., 383 U.S. 1, 17–18, 15 L. Ed. 2d 545, 86 S. Ct. 684 (1966); B.F. Goodrich Co. v. Aircraft Braking Sys. Corp., 72 F.3d 1577, 1582 (Fed. Cir. 1996)*. The existence of each limitation of a claim in the prior art does not, by itself, demonstrate obviousness. Instead, there must be a "reason, suggestion, or motivation in the prior art that would lead one of ordinary skill in the art to combine the references, and that would also suggest a reasonable likelihood of success." *Smiths Indus. Med. Sys., Inc. v. Vital Signs, Inc., 183 F.3d 1347, 1353 (Fed. Cir. 1999).* "Such a suggestion or motivation may come from the references themselves, [*57] from knowledge by those skilled in the art that certain references are of special interest in a field, or even from the nature of the problem to be solved." *Id. at 1356.*

35. [HN20] To rebut a prima facie case of obviousness, objective evidence of nonobviousness may be used. *Tec Air, Inc. v. Denso Mfg. Mich, Inc., 192 F.3d 1353, 1360 (Fed. Cir. 1999).* This objective evidence includes: (1) a long-felt and unmet need in the art for the invention; (2) failure of others to achieve the results of the invention; (3) commercial success of the invention; (4) copying of

the invention by others in the field; (5) whether the invention was contrary to accepted wisdom of the prior art; (6) expression of disbelief or skepticism by those skilled in the art upon learning of the invention; (7) unexpected results; (8) praise of the invention by those in the field; and (9) independent invention by others. *Graham, 383 U.S. at 17–19.* "The objective evidence of nonobviousness . . . should when present always be considered as an integral part of the analysis." *Demaco Corp. v. F. Von Langsdorff Licensing Ltd., 851 F.2d 1387, 1393 (Fed. Cir. 1988)* [*58] (quoting *W.L. Gore & Assoc. Inc. v. Garlock, Inc., 721 F.2d 1540, 1555 (Fed. Cir. 1983)).*

36. A person of ordinary skill in the art of the '514 patent would have a Bachelor's Degree and either a Master's Degree or Ph.D. in chemistry or chemical engineering, as well as at least five years of practical experience in gas-phase catalytic fluorination. (D.I. 108 at 1133–34, 1249)

37. Claim 5 has all the limitations of claim 1 with the additional limitation that the supported chromium catalyst has a weight content of chromium being less than 20%. JP 51–82206 presents all the limitations of claim 1. "While JP 51–82206 permits the use of a supported catalyst, it does not expressly suggest the use of a chromium weight percent below 20%." (D.I. 114 at 30) Defendant argues that each of Galland, Tsuji, and Anello disclose a chromium catalyst which has a chromium weight percent below 20%. (D.I. 114 at 30–31) However, defendant fails to present any evidence of a motivation to combine JP 51–82206 with any of the Galland, Tsuji, or Anello references. n20 Without this motivation to combine, defendant's obviousness argument fails.

> n20 Defendant states that "the prior art is replete with chromium catalysts in analogous gas-phase catalytic fluorination reactions having a weight of chromium less than 20%." (D.I. 114 at 33) While this may be true, defendant does not suggest that chromium catalysts having a weight of chromium less than 20% were so widespread that such a feature would be implicitly suggested by JP 51–82206. See, e.g., *SIBIA Neurosciences, Inc. v. Cadus Pharm. Corp., 225 F.3d 1349, 1356 (Fed. Cir. 2000).* Defendant also states that
>
> > Tsuji, Galland, and Anello disclose the use of a supported catalyst responding to the limitation of claim 5, in fluorination reactions that are closely related to those described in JP 51–82206. Thus, the nature of the problem — developing an effective fluorination pro-

cess to produce difluoromethane — would suggest to a person considering JP-82206 to also look to the Tsuji, Galland, or Anello references.

(D.I. 114 at 33) Although Tsuji, Galland, and Anello do disclose a catalyst having less than 20% of its weight coming from chromium and this catalyst is used in fluorination reactions, this only proves that Tsuji, Galland, and Anello were in the same field of invention as JP 51-82206 and the '514 patent. Obviousness requires more than showing that prior art was in the same field of invention. *In re Bigio, 381 F.3d 1320, 1325 (Fed. Cir. 2004).* Nothing about the nature of the problem of developing an effective fluorination process to produce difluoromethane would suggest looking to these three references. Defendant also argues that reduction of chromium content would reduce the cost of a catalyst, thereby creating a motivation to combine JP 51-82206 with Tsuji, Galland, and Anello. However, difluoromethane manufacturers' desire to limit costs does not necessarily mean that they would look to these three prior art references to reduce the cost. There are undoubtedly several ways to reduce catalyst costs. Defendant fails to point to any prior art reference suggesting that chromium reduction is a way to make the JP 51-82206 catalyst more profitable. Defendant also points to the '514 inventors' practice of studying existing processes before developing their own process as motivation to combine JP 51-82206 with Tsuji, Galland, and Anello. (D.I. 114 at 33) This evidence does not create a motivation to combine the specific references cited by plaintiff. Finally, defendant argues that Dr. Dolbier was not one of skill in the relevant art and, therefore, did not have a valid opinion on the obviousness of the '514 patent. Regardless of Dr. Dolbier's skill level, defendant still has not identified a motivation to combine the references. As a result, defendant's obviousness argument is rejected.

[*59]

### 3. Enablement

38. Defendant argues that the '514 patent fails to enable preparation of the claimed bulk catalyst. (D.I. 114 at 35) According to defendant, "without specifying the process by which a chromium catalyst is prepared, the performance of the catalyst is highly unpredictable." (Id.) Defendant claims that one of ordinary skill in the art would have to begin by selecting from numerous starting

compounds and countless variations on catalyst preparation technique in hopes of "stumbling" upon a catalyst providing the results of the '514 patent. (Id.)

39. [HN21] The statutory basis for the enablement requirement is found in 35 U.S.C. § 112, paragraph 1, which provides in relevant part:

> [HN22] The specification shall contain a written description of the invention and of the manner and process of making and using it, in such full, clear, concise and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same.

40. The Federal Circuit has explained that [HN23] "patent protection is granted in return for an enabling disclosure of an invention, not for vague intimations of general [*60] ideas that may or may not be workable . . . . Tossing out the mere germ of an idea does not constitute enabling disclosure." *Genentech, Inc. v. Novo Nordisk A/S, 108 F.3d 1361, 1366 (Fed. Cir. 1997).*

41. [HN24] To satisfy the enablement requirement, a specification must teach those skilled in the art how to make and to use the full scope of the claimed invention without undue experimentation. *Genentech, 108 F.3d at 1365.* "While every aspect of a generic claim certainly need not have been carried out by the inventor, or exemplified in the specification, reasonable detail must be provided in order to enable members of the public to understand and carry out the invention." *Id. at 1366.* The specification need not teach what is well known in the art. *Hybritech v. Monoclonal Antibodies, Inc., 802 F.2d 1367, 1384 (Fed. Cir. 1986).*

42. [HN25] Enablement is determined as of the filing date of the patent application. *In re Brana, 51 F.3d 1560, 1567 n. 19 (Fed. Cir. 1995).*

43. [HN26] Some experimentation may be necessary in order to practice a claimed invention; the amount of experimentation, however, "must not be unduly extensive. [*61] " *Id. at 1567.*

44. As summarized by the Federal Circuit:

> The test [for whether undue experimentation would have been required] is not merely quantitative, since a considerable amount of experimentation is permissible, if it is merely routine, or if the specification in question provides a reasonable amount of guidance with respect to the direction in which the experimentation should proceed to enable the

determination of how to practice a desired embodiment of the invention claimed.

*PPG Indus. Inc. v. Guardian Indus. Corp., 75 F.3d 1558, 1564 (Fed. Cir. 1996) (quoting Ex parte Jackson, 217 U.S.P.Q. 804, 807 (1982)).*

45. [HN27] A court may consider several factors in determining whether undue experimentation is required to practice a claimed invention, including: (1) the quantity of experimentation necessary; (2) the amount of direction or guidance disclosed in the patent; (3) the presence or absence of working examples in the patent; (4) the nature of the invention; (5) the state of the prior art; (6) the relative skill of those in the art; (7) the predictability of the art; and (8) the breadth of the claims. *In re Wands, 858 F.2d 731, 737 (Fed. Cir. 1988).* [*62] These factors are sometimes referred to as the "Wands factors." A court need not consider every one of the Wands factors in its analysis. Rather, a court is only required to consider those factors relevant to the facts of the case. See *Amgen, Inc. v. Chugai Pharm. Co., Ltd., 927 F.2d 1200, 1213 (Fed. Cir. 1991).*

46. [HN28] The enablement requirement is a question of law based on underlying factual inquiries. *Wands, 858 F.2d at 737.*

47. Defendant has not provided clear and convincing evidence that the '514 patent does not enable a person of ordinary skill to practice the claimed inventions. Dr. Gumprecht testified that chromium catalysts are unpredictable depending on the catalyst's preparation, and that patents dealing with chromium catalysts typically describe the catalyst in great detail in the specification and the examples. (D.I. 108 at 1291–93, 1318) Defendant also presented *U.S. Patent No. 3,258,500* which, according to Dr. Gumprecht, "states that the selection of [a] catalyst is very important in the results [obtained] in fluorinating various chlorocarbons." (D.I. 108 at 1293; DX 614) However, plaintiff countered this testimony and evidence [*63] with Dr. Dolbier's testimony that a person of ordinary skill in the art would know how to make the '514 catalyst and also would know where to purchase such a catalyst. (D.I. 109 at 1517–18) Furthermore, defendant provides no evidence concerning the amount of experimentation necessary to practice the claimed invention. Given the conflicting testimony and lack of information regarding the amount of experimentation required, the court finds that defendant did not provide clear and convincing evidence that the '514 patent does not enable a person of ordinary skill to practice the claimed invention. n21

n21 [HN29] "[A] specification need not dis-

close what is well known in the art. . . . [This] means that the omission of minor details does not cause a specification to fail to meet the enablement requirement. . . . It is the specification, not the knowledge of one skilled in the art, that must supply the novel aspects of an invention in order to constitute adequate enablement." *Genentech, Inc. v. Novo Nordisk A/S, 108 F.3d 1361, 1366 (Fed. Cir. 1997).* The '514 patent claims a novel process for manufacturing difluoromethane. It does not claim that the bulk or supported catalyst used by the invention is novel. Nor does the '514 patent claim a novel process for creating the bulk or supported catalyst. This already existed in the prior art cited by defendant. As a result, the '514 patent need not provide a detailed description of the bulk or supported catalyst or how to make the catalyst used by the '514 claims.

[*64]

### 4. Best Mode

48. Defendant argues that plaintiff failed to disclose its best mode of practicing the '514 patent because plaintiff knew that crushing its catalyst prior to use in the reaction enhanced the catalyst's performance and, yet, plaintiff never disclosed use of a crushed catalyst in the '514 patent's specification. (D.I. 114 at 36)

49. The best mode requirement of *35 U.S.C. § 112*, P 1, states:

[HN30] The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, **and shall set forth the best mode contemplated by the inventor of carrying out his invention.**

*35 U.S.C. § 112 (2002)* (emphasis added).

50. "The purpose of the best mode requirement is to ensure that the public, in exchange for the rights given the inventor under the patent laws, obtains from the inventor a full disclosure of the preferred embodiment of the invention." *Dana Corp. v. IPC Ltd. P'ship, 860 F.2d 415, 418 (Fed. Cir. 1988).* [*65] Consequently, [HN31] the best mode requirement of *§ 112* "requires an inventor to disclose the best mode contemplated by him, as of the time he executes the application, of carrying out the invention." *Bayer AG & Bayer Corp. v. Schein Pharms., Inc.,*

*301 F.3d 1306, 1314 (Fed. Cir. 2002)* (citation omitted). "The existence of a best mode is a purely subjective matter depending upon what the inventor actually believed at the time the application was filed." *Id.* Because of this subjectivity, § *112* demands actual disclosure, regardless of whether practicing that mode would be within the knowledge of one of ordinary skill in the art. *Id.* Nevertheless, the extent of this actual disclosure is limited to the invention as defined by the claims. *Id. at 1315.*

51. [HN32] In determining whether an inventor has disclosed the best mode, the Federal Circuit has adopted a two-step inquiry. First, the invention must be defined by construing the claims. *Id. at 1320* (citing *Northern Telecom Ltd. v. Samsung Elecs. Co., 215 F.3d 1281, 1286-87 (Fed. Cir. 2000)).* The Federal Circuit has noted that "definition of the invention 'is a legal exercise, [*66] wherein the ordinary principles of claim construction apply.'" *Id.* It has also commented that such definition "is a crucial predicate to the factual portions of the best mode inquiry because it ensures that the finder of fact looks only for preferences pertaining to carrying out the claimed invention." *Id.*

52. Once the claim analysis is complete, the finder of fact may proceed to the second step and apply the classic two-prong test. That is, the fact-finder must determine whether, at the time of filing the application, the inventor possessed a best mode for practicing the claimed invention. *Id. at 1320.* If the inventor subjectively contemplated a best mode, then the fact-finder must evaluate whether the inventor's disclosure is objectively adequate to enable one of ordinary skill in the art to practice the best mode of the claimed invention. *Id.*

53. The Federal Circuit further has delineated that [HN33] "if the best mode for carrying out the claimed invention involves novel subject matter, then an inventor must disclose a method for obtaining that subject matter even if it is unclaimed." *Id. at 1322* (quoting *Eli Lilly & Co. v. Barr Labs., Inc., 251 F.3d 955, 965 (Fed. Cir. 2001)).* [*67] In other words, when the subject matter is unclaimed, but both novel and essential for carrying out the best mode of the claimed invention, disclosure is required. *Id.* With regard to unclaimed subject matter unrelated to the properties of the claimed invention, the Federal Circuit has acknowledged that an inventor need not disclose a mode for obtaining it. *Id.* (citing *Eli Lilly, 251 F.3d at 963)*

54. As evidence of plaintiff's failure to disclose the best mode, defendant pointed to an English translation of plaintiff's research documentation which, defendant claimed, indicated that the bulk chromium catalyst was crushed prior to use in the reaction. (DX 710 at AT003347; D.I. 103 at 143-44; D.I. 108 at 1294-95) However, plaintiff contested this translation, claiming that a more accurate translation would have used the word "chop" instead of "crush." (D.I. 103 at 144) Furthermore, plaintiff pointed to an appendix in the same research document which indicated that the catalyst was cut into four pieces. (DX 710 at AT003413; D.I. 103 at 144-45) Based on this conflicting evidence, defendant has not produced clear and convincing evidence that plaintiff failed to disclose [*68] its best mode with respect to preparing the '*514* catalyst.

**D. Inequitable Conduct**

55. Defendant alleges that "the '*514* patent is unenforceable because the applicants intentionally withheld the full English language translation of the JP 51-82206 prior art during prosecution of the application before the USPTO, while making repeated misrepresentations to the USPTO in attempting to distinguish the '*514* patent claims over the prior art." (D.I. 114 at 37)

56. [HN34] Applicants for patents and their legal representatives have a duty of candor, good faith, and honesty in their dealings with the PTO. *Molins PLC v. Textron, Inc., 48 F.3d 1172, 1178 (Fed. Cir. 1995); 37 C.F.R. § 1.56(a).* This duty is predicated on the fact that "a patent is an exception to the general rule against monopolies and to the right of access to a free and open market." *Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co., 324 U.S. 806, 816, 89 L. Ed. 1381, 65 S. Ct. 993, 1945 Dec. Comm'r Pat. 582 (1945).* The duty of candor, good faith, and honesty includes the duty to submit truthful information and the duty to disclose to the USPTO information known to patent applicants or their attorneys which is material to [*69] the examination of a patent application. *Elk Corp. of Dallas v. GAF Bldg. Materials Corp., 168 F.3d 28, 30 (Fed. Cir. 1999).* A breach of this duty constitutes inequitable conduct. *Molins, 48 F.3d at 1178.*

57. [HN35] If it is established that a patent applicant engaged in inequitable conduct with respect to one claim, then the entire patent application is rendered unenforceable. *Kingsdown Med. Consultants v. Hollister Inc., 863 F.2d 867, 877 (Fed. Cir. 1988).* Additionally, "[a] breach of the duty of candor early in the prosecution may render unenforceable all claims which eventually issue from the same or a related application." *Fox Indus., Inc. v. Structural Pres. Sys., Inc., 922 F.2d 801, 803-04 (Fed. Cir. 1991).*

58. [HN36] A finding of inequitable conduct is "an equitable determination" and, therefore, "is committed to the discretion of the trial court." *Monon Corp. v. Stoughton Trailers, Inc., 239 F.3d 1253, 1261 (Fed. Cir. 2001).*

59. [HN37] In order to establish unenforceability based on inequitable conduct, a defendant must establish

by clear and convincing evidence that: (1) the omitted or false information [*70] was material to patentability of the invention; (2) the applicant had knowledge of the existence and materiality of the information; and (3) the applicant intended to deceive the USPTO. *Molins, 48 F.3d at 1178.*

60. [HN38] A determination of inequitable conduct entails a two step analysis. First, the court must determine whether the withheld information meets a threshold level of materiality. A reference is considered material if there is a substantial likelihood that a reasonable examiner would consider it important in deciding whether to allow the application to issue as a patent. *Allied Colloids, Inc. v. American Cyanamid Co., 64 F.3d 1570, 1578 (Fed. Cir. 1995)* (citations omitted); see also *37 C.F.R. 1.56(b)(2)* ("Information is material to patentability when it . . . establishes . . . a prima facie case of unpatentability of a claim; or . . . refutes, or is inconsistent with, a position the applicant takes in opposing an argument of unpatentability relied on by the office, or asserting an argument of patentability."). A reference, however, does not have to render the claimed invention unpatentable or invalid to be material. [*71] See *Merck v. Danbury Pharmacal, 873 F.2d 1418 (Fed. Cir. 1989).*

61. [HN39] After determining that the applicant withheld material information, the court must then decide whether the applicant acted with the requisite level of intent to mislead the PTO. See *Baxter Int'l, Inc. V. McGaw Inc., 149 F.3d 1321, 1327 (Fed. Cir. 1998).* "Intent to deceive cannot be inferred solely from the fact that information was not disclosed; there must be a factual basis for finding a deceptive intent." *Hebert v. Lisle Corp., 99 F.3d 1109, 1116 (Fed. Cir. 1996).* That is, "the involved conduct, viewed in light of all the evidence, including evidence indicative of good faith, must indicate sufficient culpability to require a finding of intent to deceive." *Kingsdown, 863 F.2d at 876.* A "smoking gun" is not required in order to establish an intent to deceive. See *Merck, 873 F.2d at 1422.* An inference of intent, nevertheless, is warranted where a patent applicant knew or should have known that the withheld information would be material to the PTO's consideration of the patent application. *Critikon, Inc. v. Becton Dickinson Vascular Access, Inc., 120 F.3d 1253, 1256 (Fed. Cir. 1997).* [*72]

62. [HN40] Once materiality and intent to deceive have been established, the trial court must weigh them to determine whether the balance tips in favor of a conclusion of inequitable conduct. *N.V. Akzo v. E.I. DuPont de Nemours, 810 F.2d 1148, 1153 (Fed. Cir. 1988).* The showing of intent can be proportionally less when balanced against high materiality. Id. In contrast, the showing of intent must be proportionally greater when balanced against low materiality. Id.

63. [HN41] Because a patent is presumed valid under *35 U.S.C. § 282,* inequitable conduct requires proof by clear and convincing evidence. *Manville Sales Corp. v. Paramount Sys., Inc., 917 F.2d 544, 551 (Fed. Cir. 1990).*

**1. Materiality**

64. The fully translated version of JP 51-82206 is highly material to the claims of the '514 patent because it discloses all the limitations of claims 1, 2, 6, 7, 9, and 10. Not only does JP 51-82206 disclose all of the above limitations, it discloses every claim limitation of the '514 patent except for the weight content limitation of claim 5. There is more than a substantial likelihood that a reasonable examiner would have considered [*73] this information important in deciding whether to allow the '514 application to issue as a patent.

**2. Intent**

65. Plaintiff had a full-length English translation of JP 51-82206 at least as early as June 16, 1988. (D.I. 103 at 147-48; DX 593) Drs. Requieme and Lacroix, two of the three named inventors of the '514 patent, testified that they read the full-length English translation of JP 51-82206 before coming up with the process patented by the '514 patent. (D.I. 103 at 147; D.I. 107 at 917) Furthermore, the '514 patent specification includes a description of JP 51-82206. ('514 patent, col. 1 at 11. 44-63) This description contains information not disclosed in the Derwent abstract submitted to the USPTO by the '514 applicants.

66. Plaintiff's in-house patent attorney at the time of its application for the '514 patent was Mr. Leboulanger. Partway through the prosecution of the '514 patent, in September of 1997, Pierre Granet took over responsibility for prosecution of the '514 patent. (D.I. 107 at 1051-52, 1058) Mr. Granet admitted that he had the full English translation of JP 51-82206 in his files, which were transferred to him from Mr. Leboulanger. (Id. at 1063, 1065) [*74] Frederick Calvetti, plaintiff's U.S. patent counsel, never received a copy of the full English translation of JP 51-82206, nor was the translation ever submitted to the USPTO by plaintiff. (D.I. 107 at 1027-28) Mr. Calvetti filed Information Disclosure Statements (IDS) with the USPTO which included a copy of JP 51-82206 in Japanese and a Derwent abstract of JP 51-82206. (Id. at 1031, 1042) The Derwent abstract of JP 51-82206 did not indicate that JP 51-82206 disclosed use of a pure chromium catalyst and had examples using contact times of 3.0 and 4.1 seconds.

66. Plaintiff also made several misrepresentations to the USPTO regarding JP 51-82206. The '514 applicants stated that JP 51-82206 discloses a catalyst containing

"chiefly chromium oxide and optionally other metal oxides." (DX 579 at AT000175, AT000212) Characterizing JP 51-82206's catalyst as containing "chiefly" chromium oxide meant that JP 51-82206's catalyst contained other components. The applicants failed to mention that JP 51-82206 discloses a catalyst of pure chromium oxide. This misrepresentation is particularly important because the '514 applicants repeatedly represented to the USPTO that the key difference between [*75] the '514 patent and the prior art was the '514 patent process's use of a pure chromium catalyst. (DX 579 at AT000179, AT000180, AT000207, AT000216) Furthermore, the specification of the '514 patent repeatedly states that the claimed chromium catalyst is pure chromium. ('514 patent, col. 2 at ll. 54-59; col. 7 at ll. 7-12) Failure to identify JP 51-82206 as prior art disclosing use of a pure chromium catalyst allowed the '514 applicants to continue to make this argument.

67. The '514 applicants also mischaracterized JP 51-82206 with respect to the scope of the reference and the contact times used in the reference. According to the '514 applicants, "[a] person skilled in the art, who is looking for a means of fluorinating **a specific H containing halocarbon (CH[2]Cl[2])** with good selectivity, is therefore not prompted to consider the teachings of . . . JP 51-82206." (DX 579 at AT000178, AT000215) (emphasis in original) However, in the full translation of JP 51-82206, methylene chloride, an H containing halocarbon, is listed as a preferred starting material. (DX 593 at 5) The applicants also stated that "these specific process conditions effect a contact time of 10 seconds [*76] or less ... The short contact time is not taught in the applied references. Contact time indicated in the references are substantially in excess of this." (DX 579 at AT000171) JP 51-82206 discloses contact times of 3.1 and 4.0 seconds, calculated from the reaction data provided in the experimental examples. (DX 593 at 6-8)

68. Based on plaintiff's possession and knowledge of the full translation of JP 51-82206, its failure to disclose this document to the USPTO and its repeated mischaracterization of this document, the court concludes that plaintiff had the intent to deceive the USPTO.

69. In Semiconductor Energy Lab. Co. v. Samsung Elecs. Co., the Federal Circuit found inequitable conduct under conditions similar to those of the present case. 204 F.3d 1368 (Fed. Cir. 2001). In that case, Semiconductor Energy Laboratory ("SEL") accused Samsung of infringing its U.S. Patent No. 5,543,636 ("the '636 patent"). Id. at 1371. The '636 patent's IDS included a Japanese Laid-Open Application No. 56-135968 assigned to Canon K.K. ("the Canon reference"). Id. In addition, "SEL submitted the entire 29-page Canon reference in its original

Japanese, a concise [*77] explanation of its relevance, and an existing one-page partial English translation from a prior unrelated patent." Id. at 1371-72. Similarly, plaintiff at bar submitted JP 51-82206 in its original Japanese, an explanation of its relevance in the '514 patent specification, and the Derwent one-page partial English translation of JP 51-82206. In Semiconductor Energy, the district court found that the Canon reference was material since it established a prima facie case of unpatentability in combination with other information. Id. at 1374. In the present matter, the court has found that JP 51-82206 is material because it anticipates all the limitations of claims 1, 2, 6, 7, 9, and 10 of the '514 patent. The district court in Semiconductor Energy found an intent to deceive because the '636 patent inventor "knew that the Canon reference disclosed the important admonition to avoid impurities and that the preexisting, one-page partial translation did not discuss this teaching." Id. at 1376. Similarly, this court has found an intent to deceive because the '514 applicants knew or should have known that JP 51-82206 disclosed the important [*78] feature of a pure chromium catalyst and that the one-page partial translation did not discuss this teaching. In Semiconductor Energy, the Federal Circuit affirmed the district court's findings regarding materiality and intent and its ultimate conclusion that the '636 patent was unenforceable because the applicants for the '636 patent engaged in inequitable conduct. n22 Id. at 1374, 1376, 1378.

   n22 In Semiconductor Energy, SEL also argued that "because it submitted the entire untranslated Canon reference to the PTO, it [could not] be deemed to have withheld the reference from the examiner." Id. at 1377. The Federal Circuit rejected this argument. According to the Court, [HN42] "the duty of candor does not require that the applicant translate every foreign reference, but only that the applicant refrain from submitting partial translations and concise explanations that it knows will misdirect the examiner's attention from the reference's relevant teaching. Here, the desirability of the examiner securing a full translation was masked by the affirmatively misleading concise statement and one-page translation." Id. at 1378. This court finds that, as in Semiconductor Energy, the '514 applicants' disclosure of the Derwent translation, together with its mischaracterization of JP 51-82206, masked the need for the USPTO to secure a full translation. Thus, disclosure of the full-length, untranslated JP 51-82206 was insufficient to refute defendant's claim of inequitable conduct.

[*79]

2005 U.S. Dist. LEXIS 7365, *79

### 3. Balancing Materiality and Intent

70. JP 51-82206 is highly material to the claims of the '514 patent. Based on plaintiff's knowledge of JP 51-82206, its withholding of the full translation of this reference, and its misrepresentation of critical features of the full translation, the court concludes that the '514 applicants intended to deceive the USPTO. As a result, the '514 patent is unenforceable based upon JP 51-82206.

## IV. CONCLUSION

For the reasons set forth above, the court finds the following: (1) the '514 patent is not literally infringed by defendant's accused process; (2) claims 1, 2, 6, 7, 9, and 10 '514 patent are invalid because they are anticipated by JP 51-82206; (3) claim 5 of the '514 patent is not obvious because there is no motivation to combine JP 51-82206 with Galland, Tsuji, or Anello; (4) the '514 patent is not invalid for lack of enablement or failure to disclose the best mode; (5) the '514 patent is invalid for inequitable conduct regarding the '514 applicants' disclosure and misrepresentation of JP 51-82206. An [*80] appropriate order shall issue.

Judge: Sue L. Robinson

3-16-05

# EXHIBIT 6

LEXSEE 2005 U.S. APP. LEXIS 25123

**PFIZER, INC. and WARNER-LAMBERT COMPANY, LLC, Plaintiffs-Appellees, v. TEVA PHARMACEUTICALS USA, INC., Defendant-Appellant, and RANBAXY PHARMACEUTICALS, INC. and RANBAXY LABORATORIES LIMITED, Defendants-Appellants.**

05-1331

UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

*2005 U.S. App. LEXIS 25123*

November 22, 2005, Decided

**PRIOR HISTORY:** [*1] Appealed from: United States District Court for the District of New Jersey. Senior Judge Dickinson R. Debevoise.

*Pfizer, Inc. v. Teva Pharms. USA, Inc., 2005 U.S. Dist. LEXIS 29050 (D.N.J., Mar. 31, 2005)*

**DISPOSITION:** AFFIRMED.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff patentees sued defendant drug manufacturers, alleging infringement of its patent for pharmaceutical compositions used to treat hypertension. The United States District Court for the District of New Jersey granted the patentees' motion for a preliminary injunction. The drug manufacturers appealed.

**OVERVIEW:** Based on the preliminary record, the district court properly found that the patentees were likely to succeed on the merits as it properly construed the term saccharides based on the claim language and extrinsic evidence. Under that construction, the accused products were likely to literally infringe two patent claims. The alternative holding that even if the term saccharides included sugars but not polysaccharides the manufacturers were likely to have infringed the two claims under the doctrine of equivalents was proper as neither the disclosure-dedication rule nor the all limitations rule precluded the doctrine's application. The district court did not abuse its discretion in assuming irreparable harm as the patentees had made a strong showing of likely infringement. The manufacturers had not rebutted the presumption as it was clear that neither party anticipated voluntarily ceasing the sale of products covered by the patent and there was no evidence that the patentees intended to engage in non-exclusive licensing. The district court did not abuse its discretion in finding that the harm to the patentees outweighed the harm to the manufacturers or in assessing the public interest.

**OUTCOME:** The order granting the preliminary injunction was affirmed.

**LexisNexis(R) Headnotes**

*Patent Law > Remedies > Equitable Relief > Injunctions*
[HN1] Courts have the power to grant injunctions to prevent the violation of patent rights. 35 U.S.C.S. § 283. In considering whether to grant a preliminary injunction, a court must consider whether the patent owner has shown: (1) a reasonable likelihood of success on the merits; (2) the prospect of irreparable harm to the patent owner in the absence of the injunction; (3) that this harm would exceed harm to the alleged infringer when subject to the injunction; and (4) that granting the injunction is in the public interest.

*Patent Law > Jurisdiction & Review > Standards of Review > Abuse of Discretion*
*Patent Law > Remedies > Equitable Relief > Injunctions*
[HN2] The United States Court of Appeals for the Federal Circuit reviews the grant of a preliminary injunction in patent cases for abuse of discretion. To overturn the grant of a preliminary injunction, the appellate court must find that the district court made a clear error of judgment in weighing the relevant factors or based its exercise of discretion on an error of law or on clearly erroneous factual findings.

*Patent Law > Infringement Actions > Burdens of Proof*
[HN3] To win on its claim of patent infringement, a plaintiff must present proof that the defendant infringed a valid and enforceable patent.

*Patent Law > Infringement Actions > General Overview*

[HN4] Determining the likelihood of patent infringement requires two steps, first claim construction and second a comparison of the properly construed claims to the accused product.

*Patent Law > Infringement Actions > Claim Interpretation > General Overview*
*Patent Law > Jurisdiction & Review > Standards of Review > De Novo Review*
[HN5] Patent claim construction is a question of law reviewed de novo.

*Patent Law > Infringement Actions > Claim Interpretation > General Overview*
[HN6] When interpreting claims, the United States Court of Appeals for the Federal Circuit inquires into how a person of ordinary skill in the art would have understood claim terms at the time of the invention. The inquiry into how a person of ordinary skill in the art understands a claim term provides an objective baseline from which to begin claim interpretation. Importantly, the person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification.

*Patent Law > Infringement Actions > Claim Interpretation > Aids*
[HN7] The claims themselves provide substantial guidance as to the meaning of particular patent claim terms.

*Patent Law > Infringement Actions > Claim Interpretation > General Overview*
[HN8] The person of ordinary skill in the art is deemed to have read the patent claim term in the context of the entire patent. It is necessary to consider the specification as a whole, and to read all portions of the written description, if possible, in a manner that renders the patent internally consistent.

*Patent Law > Infringement Actions > Claim Interpretation > Construction Preferences*
[HN9] In the context of a patent infringement case, a claim construction that excludes a preferred embodiment is rarely, if ever, correct.

*Patent Law > Infringement Actions > Claim Interpretation > Aids*
[HN10] As the United States Court of Appeals for the Federal Circuit holds, judges may rely on dictionary definitions when construing claim terms, so long as the dictionary definition does not contradict any definition found in or ascertained by a reading of the patent documents.

*Patent Law > Infringement Actions > Claim Interpretation > General Overview*
[HN11] The ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application.

*Civil Procedure > Entry of Judgments > Consent Decrees*
[HN12] The scope of a consent decree must be discerned within its four corners and the conditions upon which a party has consented to waive its right to litigate particular issues must be respected.

*Patent Law > Infringement Actions > Claim Interpretation > General Overview*
[HN13] While the United States Court of Appeals for the Federal Circuit acknowledges the maxim that claims should be construed to preserve their validity, it has not applied that principle broadly, and it certainly does not endorse a regime in which validity analysis is a regular component of claim construction. Instead, the court limits the maxim to cases in which the court concludes, after applying all the available tools of claim construction, that the claim is still ambiguous. In such cases, the court looks to whether it is reasonable to infer that the United States Patent and Trademark Office would not have issued an invalid patent, and that the ambiguity in the claim language should therefore be resolved in a manner that would preserve the patent's validity.

*Patent Law > Infringement Actions > Burdens of Proof*
[HN14] To prove infringement, a patentee must show that an accused product or method meets every claim limitation either literally or under the doctrine of equivalents.

*Patent Law > Infringement Actions > Burdens of Proof*
*Patent Law > Remedies > Equitable Relief > Injunctions*
[HN15] It is particularly appropriate at the preliminary injunction stage not to set a hard and fast rule that patent infringement can only be shown through quantitative testing of an accused product.

*Patent Law > Infringement Actions > Claim Interpretation > General Overview*
[HN16] District courts may engage in rolling claim construction, in which the court revisits and alters its interpretation of the claim terms as its understanding of the technology evolves. Indeed, a conclusion of law such as claim construction is subject to change upon the development of the record after a district court's decision on a motion for preliminary injunction.

2005 U.S. App. LEXIS 25123, *1

*Patent Law > Jurisdiction & Review > Standards of Review > De Novo Review*
[HN17] In the context of a patent infringement action, application of the disclosure–dedication rule is a question of law subject to de novo review.

*Patent Law > Claims & Specifications > General Overview*
[HN18] The United States Court of Appeals for the Federal Circuit holds that if one of ordinary skill in the art can understand the unclaimed disclosed teaching upon reading the written description, the alternative matter disclosed has been dedicated to the public. This disclosure–dedication rule does not mean that any generic reference in a written specification necessarily dedicates all members of that particular genus to the public. The disclosure must be of such specificity that one of ordinary skill in the art could identify the subject matter that had been disclosed and not claimed.

*Patent Law > Claims & Specifications > General Overview*
*Patent Law > Jurisdiction & Review > Standards of Review > De Novo Review*
[HN19] Like the disclosure–dedication rule, application of the all limitations rule is a question of law subject to de novo review.

*Patent Law > Infringement Actions > Doctrine of Equivalents > Limits on Equivalence*
[HN20] The all limitations rule provides that the doctrine of equivalents does not apply if applying the doctrine would vitiate an entire claim limitation. The United States Court of Appeals for the Federal Circuit explains that there is no set formula for determining whether a finding of equivalence would vitiate a claim limitation, and thereby violate the all limitations rule. Rather, courts must consider the totality of the circumstances of each case and determine whether the alleged equivalent can be fairly characterized as an insubstantial change from the claimed subject matter without rendering the pertinent limitation meaningless.

*Patent Law > Remedies > Equitable Relief > Injunctions*
[HN21] The United States Court of Appeals for the Federal Circuit consistently holds that a district court should presume that a patent owner will be irreparably harmed when a patent owner establishes a strong showing of likely infringement of a valid and enforceable patent.

*Patent Law > Remedies > Equitable Relief > Injunctions*
[HN22] The United States Court of Appeals for the Federal Circuit explains that because the very nature of a patent provides the right to exclude, infringement of

a valid patent inherently causes irreparable harm in the absence of exceptions such as a finding that future infringement is no longer likely, that the patentee is willing to forgo its right to exclude by licensing the patent, or that the patentee had delayed in bringing suit. And when the presumption of irreparable harm attaches, the burden is on the likely infringer to produce evidence sufficient to establish that the patent owner would not be irreparably harmed by an erroneous denial of a preliminary injunction.

*Patent Law > Remedies > Equitable Relief > Injunctions*
[HN23] For purposes of determining whether to issue a preliminary injunction, the fact that other infringers may be in the marketplace does not negate irreparable harm. A patentee does not have to sue all infringers at once. Picking off one infringer at a time is not inconsistent with being irreparably harmed. Neither is first targeting infringers whose sales dwarf the sales of other infringers.

*Patent Law > Remedies > Equitable Relief > Injunctions*
[HN24] Evidence that a patent owner unduly delays in bringing suit against an alleged infringer negates the idea of irreparability.

*Patent Law > Remedies > Equitable Relief > Injunctions*
[HN25] Simply put, for purposes of a preliminary injunction, an alleged infringer's loss of market share and customer relationships, without more, does not rise to the level necessary to overcome the loss of exclusivity experienced by a patent owner due to infringing conduct.

*Patent Law > Remedies > Equitable Relief > Injunctions*
[HN26] In the context of determining whether to issue a preliminary injunction, selling a lower priced product does not justify infringing a patent.

COUNSEL: Joseph M. O'Malley, Jr., Fitzpatrick, Cella, Harper & Scinto, of New York, New York, argued for plaintiffs-appellees. With him on the brief were Bruce M. Wexler, Christopher L. Limpus, and John C. Heuton. Of counsel was Herbert W. Rea.

William R. Zimmerman, Knobbe, Martens, Olson & Bear, LLP, of Irvine, California, argued for defendants-appellants. With him on the brief for Ranbaxy Pharmaceuticals, Inc. were Darrell L. Olson, James F. Lesniak, Craig S. Summers, Payson J. LeMeilleur, and Christy G. Lea. Of counsel on the brief were David M. Hashmall and Dominique T. Hussey, Goodwin Procter LLP, of New York, New York, for Teva Pharmaceuticals USA, Inc.

JUDGES: Before NEWMAN, RADER, and PROST,

Circuit Judges.

OPINIONBY: PROST

OPINION: PROST, Circuit Judge.

Teva Pharmaceuticals USA, Inc. ("Teva") along with Ranbaxy Pharmaceuticals, Inc. and Ranbaxy Laboratories Limited (collectively, "Ranbaxy") appeal from the order of the United States District Court for the District of New Jersey granting a motion for a preliminary injunction filed by Pfizer, Inc. ("Pfizer") [*2] and Warner–Lambert Company, L.L.C. ("Warner–Lambert") to prevent Teva and Ranbaxy from infringing *United States Patent No. 4,743,450* ("the *'450 patent*"). *Pfizer, Inc. v. Teva Pharms. USA, Inc.*, 2005 U.S. Dist. LEXIS 29050, No. 05-CV-620 (D.N.J. Mar. 31, 2005) ("Preliminary Injunction Order"); *Pfizer, Inc. v. Teva Pharms. USA, Inc., 2005 U.S. Dist. LEXIS 29050, No. 05-CV-620 (D.N.J. Mar. 29, 2005)* ("Bench Decision"): At this preliminary stage in the proceedings, we neither find error in the district court's claim construction, nor do we conclude that the district court abused its discretion in determining that infringement is likely and that the harm and public interest favors enjoining Teva and Ranbaxy. We therefore affirm the grant of the preliminary injunction.

BACKGROUND

I.

The *'450 patent* relates to pharmaceutical compositions containing angiotensin converting enzyme ("ACE") inhibitors such as quinapril and their methods of manufacture. Quinapril and other ACE inhibitors can be used to treat hypertension, commonly known as high blood pressure. According to the *'450 patent*, however, many ACE inhibitors including quinapril are susceptible to degradation due to cyclization, hydrolysis, and oxidation. Cyclization occurs [*3] when one part of an ACE inhibitor compound reacts with a different part of the same compound to form a degraded, inactive "cyclized" compound. Hydrolysis and oxidation involve reactions with water and oxygen, respectively. Hydrolysis results in a degraded compound, and oxidation causes discoloration.

The *'450 patent* discloses minimizing cyclization, hydrolysis, and discoloration by using formulations containing a metal–containing stabilizer and a saccharide. According to the *'450 patent*, the metal–containing stabilizer prevents both cyclization and discoloration, while the saccharide prevents hydrolysis. A contemporaneous report, summarizing the research by the inventors eventually named of the *'450 patent*, describes how the inventors came to these conclusions. The report explains that the inventors initially attempted to prevent quinapril drug

formulations from decomposing due to cyclization and discoloration. The inventors first suspected that moisture caused these problems and so developed a dry formulation. They chose excipients known to have low moisture content, employing anhydrous lactose as a "filler" and microcrystalline cellulose as a "dry binder." The formulation continued [*4] to degrade, however. Eventually the inventors discovered that the two problems, cyclization and discoloration, could be prevented by including magnesium carbonate in the formulations. Use of magnesium carbonate, however, resulted in a new, third problem: hydrolysis. To reduce hydrolysis successfully, the inventors added various proportions of an "inert diluent," lactose. The resulting composition thus eliminated all three problems: cyclization, discoloration, and hydrolysis. Warner–Lambert, which owns the *'450 patent*, now markets the resulting quinapril formulation as Accupril(R). n1

> n1 For more background on the development of ACE inhibitors, including Accupril(R), see *Warner–Lambert Co. v. Teva Pharmaceuticals USA, Inc., 418 F.3d 1326, 1330-33 (Fed. Cir. 2005).*

This appeal involves the *'450 patent's* independent claims 1 and 16. Claim 1 is a composition claim:

> A pharmaceutical composition which contains:
> (a) a drug component which comprises a suitable amount of an ACE inhibitor which is susceptible to cyclization, hydrolysis, and discoloration,
> (b) a suitable amount of an alkali or alkaline earth metal carbonate to inhibit cyclization [*5] and discoloration, and
> (c) a suitable amount of a saccharide to inhibit hydrolysis.

*'450 patent*, col. 5, l. 52 - col. 6, l. 2. Claim 16 is a process claim:

> A process for stabilizing an ACE inhibitor drug against cyclization which comprises the step of contacting the drug with:
> (a) a suitable amount of an alkali or alkaline earth-metal carbonate and,
> (b) one or more saccharides.

Id. at col. 6, ll. 54-63.

II.

A.

On January 15, 1999, Teva sought approval from the Food and Drug Administration ("FDA") to market a generic version of Accupril(R) by filing an Abbreviated New Drug Application ("ANDA") pursuant to the Hatch-Waxman Amendments to the Federal Food, Drug and Cosmetic Act. n2 Because Teva was the first company to file an ANDA for the generic version of Accupril(R), Teva was entitled to a 180-day generic market exclusivity period pursuant to *21 U.S.C. § 355(j)(5)(B)(iv)*. As this court recently explained:

> The 180-day exclusivity period typically begins on the date of the first commercial marketing of the drug by the first applicant. *21 U.S.C. § 355(j)(5)(B)(iv)*. The original Hatch-Waxman [*6] Amendments provided that the commencement of the 180-day exclusivity period could also be triggered by "the date of a decision of a court . . . holding the patent which is the subject of the certification to be invalid or not infringed." Id.

*Teva Pharms. USA, Inc. v. Pfizer, Inc., 395 F.3d 1324, 1328 (Fed. Cir. 2005)*. n3 Along with the ANDA, Teva simultaneously filed a paragraph IV certification pursuant to the requirements of *21 U.S.C. § 355(j)(2)(A)(vii)(IV)*, asserting that the *'450 patent* is invalid under *35 U.S.C. §§ 102* and *103*.

n2 The Hatch-Waxman Amendments were enacted as a part of the Drug Price Competition and Patent Term Restoration Act of 1984, Pub. L. No. 98-417, codified at *21 U.S.C. §§ 355* and *360cc*, and *35 U.S.C. §§ 156, 271, 282. Syntex (U.S.A.) L.L.C. v. Apotex, Inc., 407 F.3d 1371, 1376 n.5 (Fed. Cir. 2005)*.

n3 While in 2003 Congress amended the provisions relating to the 180-day exclusivity period, the new provisions do not apply to Teva's ANDA because it was filed before December 8, 2003. See Medicare Prescription Drug, Improvement, and Modernization Act of 2003, Pub. L. No. 108-173, § 1102(b), 117 Stat. 2066, 2460.

[*7]

On March 2, 1999, Warner-Lambert responded by suing Teva in the District of New Jersey for infringement of the *'450 patent* under *35 U.S.C. § 271(e)(2)(A)*. During the course of those proceedings, Teva and Warner-Lambert initially presented diverging claim construction arguments to the district court. In particular, with respect to the claim terms "saccharide" and "saccharides," Teva advocated a construction that would encompass carbohydrates, including polysaccharides and sugars, as well as compounds derived from carbohydrates. For its part, Warner-Lambert simply argued that a "saccharide" is a sugar. n4 Later, however, Teva and Warner-Lambert stipulated to the following claim construction:

> The word "saccharide" in Claims 1 and 16 of the *'450 patent* means "a sugar, and specifically includes only lower molecular weight carbohydrates, specifically, mono- and disaccharides and their simple derivatives, including such substances as lactose, sucrose, mannitol and sorbitol."

The district court entered this stipulation in an order dated May 7, 2002. The ultimate resolution of that separate case is not at issue in this appeal. n5

n4 In the previous case, Teva and Warner-Lambert disputed the validity of the *'450 patent*. In the present appeal, the parties only dispute the infringement of the *'450 patent*. This distinction may explain what will soon become apparent: in this case Teva and Warner-Lambert have each embraced the other's construction of "saccharides" advocated in the previous case.

[*8]

n5 The district court eventually granted summary judgment against Teva, finding the *'450 patent* not invalid for lack of enablement and infringed. After a bench trial, the district court also found the *'450 patent* not unenforceable due to inequitable conduct. This court recently affirmed the finding of no unenforceability for inequitable conduct, but reversed and remanded the case to the district court on the issues of enablement and infringement because the court identified genuine issues of material fact precluding summary judgment. See *Warner-Lambert, 418 F.3d at 1348*. The court did not, however, have occasion to address the issues presented to it in this appeal.

**B.**

On December 27, 2002, in what would eventually lead to the instant action, Ranbaxy sought FDA approval to market its own generic version of Accupril(R) by filing its own ANDA and certifying that its product would not

infringe the '450 patent. Ranbaxy sent Warner–Lambert a paragraph IV certification letter on April 7, 2003, explaining why Ranbaxy believed its product would not infringe the '450 patent. Ranbaxy's letter indicated that it had adopted and relied upon the construction of "saccharide" [*9] Warner–Lambert had previously stipulated to in its case against Teva. Warner–Lambert did not respond to Ranbaxy's letter or sue Ranbaxy within forty–five days of receiving the letter, which would have triggered a thirty–month stay of approval of Ranbaxy's ANDA. See 21 U.S.C. § 355(j)(5)(B)(iii) (2000).

Ranbaxy eventually approached Teva to solicit Teva's assistance in marketing Ranbaxy's product, and on August 26, 2004, the two entered into a Distribution and Supply Agreement. Later, on December 15, 2004, Teva relinquished its potential 180-day generic market exclusivity period, resulting in final FDA approval of Ranbaxy's ANDA. The next day, Teva began marketing Ranbaxy's product.

In response, Pfizer, the corporate parent of Warner–Lambert, and Warner–Lambert (hereinafter, collectively "Warner–Lambert") sued Ranbaxy and Teva (hereinafter, collectively "Ranbaxy") on January 28, 2005 for infringement of the '450 patent. Shortly thereafter, Warner–Lambert filed a motion for a preliminary injunction. The district court granted the motion on March 29, 2005, and issued a detailed explanation of the reasons for granting the motion on March 31, 2005. See Bench [*10] Decision; Preliminary Injunction Order.

The court construed "saccharide," as the term is used in claim 1, and "saccharides," as the term is used in claim 16, to include "mono-, di-, tri-, and polysaccharides." In doing so, the court simultaneously rejected both the stipulated construction previously entered in the separate case and Ranbaxy's proposed construction of "sugars, including the lower molecular carbohydrates, specifically mono-and disaccharides." The court found that Warner–Lambert is likely to prove that Ranbaxy's product literally infringes claims 1 and 16 under its construction given that the accused product includes microcrystalline cellulose, a polysaccharide. Because the court rejected Ranbaxy's contention that claim 16 requires Warner–Lambert to show that microcrystalline cellulose inhibits hydrolysis, it concluded that there could be little question that the Ranbaxy formulation literally infringes claim 16. The court noted that, in contrast, claim 1 does require the claimed "saccharide" to inhibit hydrolysis, but credited expert testimony presented by Warner–Lambert as providing a persuasive opinion that microcrystalline cellulose does in fact inhibit hydrolysis. [*11] The court went on to determine that even if "saccharides" were construed to mean "sugars," Warner–Lambert would likely

be able to prove infringement of both claims 1 and 16 under the doctrine of equivalents.

After concluding that Warner–Lambert is likely to prove infringement of valid and enforceable claims, n6 the court proceeded to address remaining issues necessary for injunctive relief. It found that Warner–Lambert would suffer irreparable harm due to infringement of the '450 patent. Next, it found that the harm suffered by Ranbaxy in being subject to the injunction would not outweigh the harm Warner–Lambert would suffer in the absence of the injunction. Finally, it determined that granting the injunction was in the public interest since the injunction would further public policy inherent in the patent laws.

n6 The court did not explain the basis for its holding that the claims of the '450 patent are likely valid and enforceable, but Ranbaxy has not appealed the court's decision on these issues.

The court denied Ranbaxy's motion for a stay of the preliminary injunction. On March 31, 2005, after Warner–Lambert posted a $200,000,000 bond, the preliminary injunction [*12] went into effect. Ranbaxy timely appeals the grant of the preliminary injunction. We have jurisdiction to consider the appeal under 28 U.S.C. § 1292(c)(1).

## DISCUSSION

[HN1] Courts have the power to grant injunctions to prevent the violation of patent rights. See 35 U.S.C. § 283 (2000). In considering whether to grant a preliminary injunction, a court must consider whether the patent owner has shown: (1) a reasonable likelihood of success on the merits; (2) the prospect of irreparable harm to the patent owner in the absence of the injunction; (3) that this harm would exceed harm to the alleged infringer when subject to the injunction; and (4) that granting the injunction is in the public interest. Jeneric/Pentron, Inc. v. Dillon Co., 205 F.3d 1377, 1380 (Fed. Cir. 2000); Nutrition 21 v. United States, 930 F.2d 867, 869 (Fed. Cir. 1991).

[HN2] We review the grant of a preliminary injunction for abuse of discretion. Novo Nordisk of N. Am., Inc. v. Genentech, Inc., 77 F.3d 1364, 1367 (Fed. Cir. 1996). To overturn the grant of a preliminary injunction, we must find that the district court made [*13] a clear error of judgment in weighing the relevant factors or based its exercise of discretion on an error of law or on clearly erroneous factual findings. Id.

I.

Ranbaxy first challenges the district court's conclusion that Warner–Lambert is likely to succeed on the merits. [HN3] To win on its claim of patent infringe-

ment, Warner-Lambert must present proof that Ranbaxy infringed a valid and enforceable patent. *Nutrition 21, 930 F.2d at 869.* Ranbaxy does not appeal the district court's conclusion that the *'450 patent* is likely valid and enforceable, but instead the district court's finding that infringement is likely. [HN4] Determining the likelihood of infringement requires two steps, first claim construction and second a comparison of the properly construed claims to the accused product. See *Jeneric/Pentron, 205 F.3d at 1380.*

A.

We begin with [HN5] claim construction, a question of law reviewed de novo. *Cybor Corp. v. FAS Techs., Inc., 138 F.3d 1448, 1454–56 (Fed. Cir. 1998)* (en banc). [HN6] When interpreting claims, we inquire into how a person of ordinary skill in the art would have understood claim terms at the time of the invention. *Phillips v. AWH Corp., 415 F.3d 1303, 1313 (Fed. Cir. 2005)* [*14] (en banc). "The inquiry into how a person of ordinary skill in the art understands a claim term provides an objective baseline from which to begin claim interpretation." Id. "Importantly, the person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." Id.

Ranbaxy contests the district court's construction of "saccharide" and "saccharides" as those terms are used in independent claims 1 and 16. According to Ranbaxy, the district court should have construed "saccharides" to mean "sugars." In Ranbaxy's view "sugars" would include polysaccharides with up to ten monosaccharide units but would not include polysaccharides, such as microcrystalline cellulose, with more than ten monosaccharide units.

The claim language itself does not support Ranbaxy's proposed construction. [HN7] "The claims themselves provide substantial guidance as to the meaning of particular claim terms." *Id. at 1314.* Claim 1 includes "a suitable amount of a saccharide to inhibit hydrolysis," and claim 16 includes "one or more saccharides. [*15] " It is important to note that the claims do not include the terms "sugar" or "sugars." Neither do the claims distinguish between polysaccharides having ten or less monosaccharide units and polysaccharides having more than ten monosaccharide units.

Ranbaxy argues, however, that the district court erred by not adopting an explicit, narrow definition of "saccharides" set forth in the *'450 patent.* It points to the following language in the *'450 patent:* "saccharides (i.e., sugars)." *'450 patent,* col. 1, ll. 61 – 62. This language is located

in a part of the *'450 patent* discussing what the "invention deals with." Id. at col. 1, l. 44.

This court has previously construed a disputed claim term by referencing use of "i.e." in a patent specification. See *Abbott Labs. v. Novopharm Ltd., 323 F.3d 1324, 1327, 1330 (Fed. Cir. 2003).* In that case, however, the court did not identify any support in the intrinsic evidence for a construction of the disputed claim term other than the construction linked to "i.e." *Id. at 1330.* Indeed, the problem with Ranbaxy's argument is that it ignores the fact that [HN8] the person of ordinary skill in the art is deemed to have read [*16] the claim term in the context of the entire patent. *Phillips, 415 F.3d at 1313.* See also *SanDisk Corp. v. Memorex Prods., Inc., 415 F.3d 1278, 1285 (Fed. Cir. 2005)* ("The court must always read the claims in view of the full specification." (emphasis added)). "It is necessary to consider the specification as a whole, and to read all portions of the written description, if possible, in a manner that renders the patent internally consistent." *Budde v. Harley-Davidson, Inc., 250 F.3d 1369, 1379–80 (Fed. Cir. 2001).*

Notably, the *'450 patent* includes the following discussion in a section entitled "SACCHARIDES":

> The saccharide components to be used in the pharmaceutical products and methods of the invention are substances which are compatible with the alkali or alkaline earth metal-containing stabilizers. Generally, they are substances which do not contain groups which could significantly interfere with the function of either the metal-containing component or the drug component. Mannitol, lactose, and other sugars are preferred. Mixtures are operable.

*'450 patent,* col. 3, ll. 46–55. By using the label "SACCHARIDES," the [*17] patentee clearly intended for this section to address the meaning of the same term.

As a preliminary matter, the first two sentences of this section indicate that a broad construction of "saccharides" may be appropriate. The first sentence explains that "saccharides" are "substances which are compatible with the alkali or alkaline earth metal-containing stabilizers." Id. at col. 3, ll. 49–50. The second explains that "saccharides" are "substances which do not contain groups which could significantly interfere with the function of either the metal-containing component or the drug component." Id. at col. 3, ll. 51–54. Particularly when compared to the parallel section labeled "EXCIPIENTS," it is clear that these sentences do not affirmatively define what "saccharides"

2005 U.S. App. LEXIS 25123, *17

are, but instead negatively define what "saccharides" are not. The section addressing "excipients" similarly states that excipients are "substances which must be compatible with the alkali or alkaline earth metal-containing stabilizers so that it [sic] does not interfere with its [sic] function in the composition." Id. at col. 3, ll. 60-65. Properly understood, then, these sections do not define the exact [*18] meaning of "saccharides" and "excipients." Nevertheless, by only indicating what substances should not be considered "saccharides" or "excipients," the patentee has left open a vast array of substances that may be considered to be "saccharides" and "excipients."

Moreover, the section labeled "SACCHARIDES" indicates that the term "saccharides" should not be limited to sugars. The third sentence in this section states that "Mannitol, lactose, and other sugars are preferred." Id. at col. 3, l. 54. Since mannitol is a sugar derivative and not a sugar, were we to accept Ranbaxy's proposed construction of "sugars," we would exclude mannitol from the scope of the '450 patent's use of "saccharides." This would be improper. [HN9] "A claim construction that excludes a preferred embodiment . . . is 'rarely, if ever, correct.'" SanDisk Corp., 415 F.3d at 1285 (quoting Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1583 (Fed. Cir. 1996)).

Ranbaxy admits that mannitol is not a sugar. It nevertheless argues that the patentee labeled mannitol as a sugar, and that we should respect the patentees' decision to do so. Thus, according to Ranbaxy, "Mannitol, lactose, [*19] and other sugars are preferred" is, for the purpose of the patent, a list of like ingredients, "sugars."

We are not convinced that one of ordinary skill in the art would understand the patentee to have classified mannitol as a sugar in this sentence. As the district court found and Ranbaxy does not dispute on appeal, mannitol is not actually a sugar. On the other hand, lactose is a sugar. The reference to "other sugars" therefore appears to relate to the disclosure of lactose only. In short, the reference to "other sugars" does not mean that mannitol is a sugar or should be considered to be a sugar for purposes of the '450 patent.

Even if we concluded that Ranbaxy's reading of "Mannitol, lactose, and other sugars are preferred" is correct and that mannitol, a sugar derivative, should be considered to be a sugar for the purpose of the '450 patent, this sentence would only identify sugars as being preferred embodiments of "saccharides." We hesitate to adopt a construction of "saccharides" that would be limited to disclosed preferred embodiments. See Playtex Prods., Inc. v. Procter & Gamble Co., 400 F.3d 901, 907-08 (Fed. Cir. 2005). Indeed, identifying sugars as preferred [*20] saccharides seems to indicate that there is a broader, albeit less preferred class of substances that are still "saccharides."

Extrinsic evidence in the form of technical dictionaries, treatises, and expert testimony supports the conclusion drawn from the '450 patent that one of skill in the art would understand "saccharides" to encompass more than sugars. The district court reviewed the extrinsic evidence presented by the parties and concluded that one of skill in the art would understand "saccharides" to include polysaccharides. Ranbaxy, however, points to specific examples of references and testimony that allegedly support its view that "saccharides" means sugars.

Based on our review of the preliminary record, we do not disagree with the district court's conclusion that a person of ordinary skill in the art would understand "saccharides" to encompass polysaccharides. The district court weighed the disclosures of the competing references and testimony and concluded that the "general view" is that the saccharides include polysaccharides. Contrary to Ranbaxy's assertions, the district court did not err by referencing dictionary definitions of "saccharides." [HN10] As this court has held, judges [*21] may "'rely on dictionary definitions when construing claim terms, so long as the dictionary definition does not contradict any definition found in or ascertained by a reading of the patent documents.'" Phillips, 415 F.3d at 1322-23 (quoting Vitronics, 90 F.3d at 1584 n.6). And as discussed above, when read in the context of the entire '450 patent, the reference to "saccharides (i.e., sugars)" does not constitute a definition of "saccharides."

Furthermore, the district court's conclusion that the "general view" is that the group of substances called saccharides includes polysaccharides appears to be well supported. As Warner-Lambert notes, many of the references cited by Ranbaxy do not actually address the scope of the term "saccharides." Rather, they clarify that sugars and polysaccharides are both subclasses of the larger class of substances called carbohydrates. For example, one reference submitted by Ranbaxy states that "carbohydrates" include both sugars and polysaccharides. As the district court noted, however, even that reference stated that "the carbohydrates are sometimes referred to as the saccharides." Edward Staunton West et al., Textbook [*22] of Biochemistry 174 (MacMillan 4th ed. 1966) (1951).

Ranbaxy faults the district court for relying on this text in view of its use of the word "sometimes." Ranbaxy also alleges that to reach its conclusion the district court was forced to ignore the next sentence in the reference, which explains that "'saccharide' comes from the Greek word sakcharon, meaning sugar." Id.

We do not believe that the district court erred in its

analysis. First, evidence that "saccharides" is sometimes used to refer to "carbohydrates" does support the conclusion that the '450 patent in particular may be understood to have used "saccharides" to mean "carbohydrates." Thus, reliance on this disclosure to support the district court's construction is not improper. Second, understanding the historical origin of the term "saccharides" does not exactly answer the question of how one of ordinary skill in the art would interpret the term on the filing date of the '450 patent. [HN11] "The ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application. [*23] " Phillips, 415 F.3d at 1313. We therefore do not fault the district court for not considering the historical origin of "saccharides" to be dispositive of the term's meaning to those skilled in the art.

To support its proposed construction, Ranbaxy also points us to the construction of "saccharides" previously agreed upon by two of the parties to this case in separate litigation:

> The word "saccharide" in Claims 1 and 16 of the '450 patent means "a sugar, and specifically includes only lower weight carbohydrates, specifically, mono-and disaccharides and their simple derivatives, including such substances as lactose, sucrose, mannitol and sorbitol."

Ranbaxy asks us to adopt this construction in this appeal.

Ranbaxy has not identified any legal doctrines that would compel us to adopt the stipulated construction. And to the extent Ranbaxy's argument addresses issue preclusion, we conclude that issue preclusion does not apply in this case. The district court noted that the stipulation presented to the court in the earlier litigation specifically stated that it was for the purposes of that litigation only, Bench Decision, slip op. at 13. Because [*24] Ranbaxy does not dispute this finding, issue preclusion cannot apply to this case. [HN12] "The scope of a consent decree must be discerned within its four corners" and the conditions upon which a party has consented to waive its right to litigate particular issues "must be respected." United States v. Armour & Co., 402 U.S. 673, 682, 91 S. Ct. 1752, 29 L. Ed. 2d 256 (1971). See also In re Graham, 973 F.2d 1089, 1097 (3rd Cir. 1992) (noting that the Third Circuit defers to the intent of parties concerning the preclusive effect of agreed facts or claims in consent decrees and stipulations). While we do not fault Ranbaxy to the extent it may have adopted or relied upon the stipulated con-

struction of "saccharide," that stipulation does not define the scope of the invention claimed in the '450 patent for purposes of this case.

Ranbaxy additionally contends that the district court's claim construction would render the claims invalid for lack of enablement under 35 U.S.C. § 112, P1. In Phillips, this court stated:

> [HN13] While we have acknowledged the maxim that claims should be construed to preserve their validity, we have not applied that principle broadly, [*25] and we have certainly not endorsed a regime in which validity analysis is a regular component of claim construction. Instead, we have limited the maxim to cases in which the court concludes, after applying all the available tools of claim construction, that the claim is still ambiguous. In such cases, we have looked to whether it is reasonable to infer that the PTO would not have issued an invalid patent, and that the ambiguity in the claim language should therefore be resolved in a manner that would preserve the patent's validity.

415 F.3d at 1327 (citations and quotation marks omitted). Both Ranbaxy and Warner-Lambert were able to find at least some extrinsic evidence supporting their proposed constructions of "saccharides." Nevertheless, Ranbaxy has not presented sufficient evidence for us reasonably to infer that, unless "saccharides" means "sugars" or at least does not encompass polysaccharides, claim 1 and 16 would have been considered by the Patent and Trademark Office ("PTO") to be invalid. We therefore decline to apply the maxim in this case.

For the reasons discussed, we conclude that the district court did not err in construing "saccharides" to include [*26] polysaccharides.

B.

We next consider whether the district court clearly erred in its comparison of the properly construed claims to the accused products and methods. [HN14] To prove infringement, a patentee must show that an accused product or method meets every claim limitation either literally or under the doctrine of equivalents. See Dynacore Holdings Corp. v. U.S. Philips Corp., 363 F.3d 1263, 1273 (Fed. Cir. 2004).

1.

The district court did not clearly err in determining that Warner-Lambert is likely to prevail in its charge that Ranbaxy literally infringes claim 16. Ranbaxy conceded

in the preliminary injunction hearing that its formulation "absolutely" literally infringes claim 16 if "saccharides" is construed to include polysaccharides. Given that concession and the fact that we have construed "saccharides" to include polysaccharides, we cannot help but conclude that the district court was on solid ground in finding that it is likely that Ranbaxy literally infringes claim 16.

The district court also did not clearly err in determining that Warner-Lambert is likely to prevail in its charge that Ranbaxy literally infringes claim 1. In contrast to claim 16, claim [*27] 1 specifically requires that a saccharide "inhibit hydrolysis." In finding that the microcrystalline cellulose in Ranbaxy's formulation likely inhibits hydrolysis, the district court credited the testimony of one of Warner-Lambert's experts, Dr. Brenner, stating:

> Significantly, Ranbaxy has offered no evidence countering Dr. Brenner's opinions concerning the manner in which hydrolysis is inhibited in its formulations. This is information peculiarly within Ranbaxy's possession. Hydrolysis must be inhibited in its formulation; otherwise it could not have submitted its ANDA to the FDA. Dr. Brenner gives a persuasive opinion that it is the saccharide microcrystalline cellulose that has this effect. Ranbaxy offers nothing but speculation to counter his opinion.

Bench Decision, slip op. at 19.

Ranbaxy's challenges to the district court's finding are easily rejected. Ranbaxy first points out that Dr. Brenner did not test Ranbaxy's product but instead relied upon tests conducted during previous cases involving two different products. But [HN15] it is particularly appropriate at the preliminary injunction stage not to set a hard and fast rule that infringement can only be shown through [*28] quantitative testing of an accused product. Cf. Water Techs. Corp. v. Calco, Ltd., 850 F.2d 660, 667 (Fed. Cir. 1988) (refusing to overturn a finding of infringement based on the lack of quantitative testing to determine the exact composition of the accused product). Ranbaxy also contends that the district court improperly shifted to Ranbaxy the burden of showing that microcrystalline cellulose does not inhibit hydrolysis. The district court, however, did no such thing. The district court weighed the evidence submitted by the parties. In doing so, the court was at least entitled, and probably even required, to consider the lack of evidence submitted by Ranbaxy.

2.

Because we have held that the district court did not err in construing "saccharides" to include polysaccha-

rides or abuse its discretion in concluding that literal infringement is likely, we need not respond to Ranbaxy's contention that the district court erred in its application of the doctrine of equivalents. We recognize, however, that the district court's claim construction, as well as our claim construction, is based on a record developed at the preliminary injunction stage of this case. We also recognize [*29] that [HN16] "district courts may engage in rolling claim construction, in which the court revisits and alters its interpretation of the claim terms as its understanding of the technology evolves." Jack Guttman, Inc. v. Kopykake Enters., Inc., 302 F.3d 1352, 1361 (Fed. Cir. 2002). Indeed, a conclusion of law such as claim construction is subject to change upon the development of the record after a district court's decision on a motion for preliminary injunction. Id. (citing Purdue Pharma L.P. v. Boehringer Ingelheim GmbH, 237 F.3d 1359, 1363 (Fed. Cir. 2001)). Thus, we find it prudent to address Ranbaxy's contention that the district court wrongly concluded that infringement under the doctrine of equivalents is likely.

The district court did not clearly err in holding in the alternative that, even if "saccharides" were construed to include sugars but not polysaccharides, Ranbaxy likely infringes claims 1 and 16 under the doctrine of equivalents. Ranbaxy argues that the district court erred in its analysis of claim 16 by not assigning any function to "saccharides" for purposes of equivalency. It argues that the court should have assigned to "saccharides" [*30] the function of inhibiting hydrolysis. Thus, in Ranbaxy's view the district court clearly erred in its analysis of both claim 1 and claim 16 because the evidence does not show that it is likely that microcrystalline cellulose inhibits hydrolysis. As discussed above with regard to literal infringement of claim 1, however, the district court did not clearly err in finding to the contrary. It was perfectly appropriate for the district court to credit the testimony of Warner-Lambert's expert, Dr. Brenner, explaining that microcrystalline cellulose does in fact inhibit hydrolysis.

Ranbaxy also contends that as a matter of law microcrystalline cellulose cannot be an equivalent of a "saccharide" because the patentee dedicated microcrystalline cellulose to the public by disclosing but not claiming its use in the '450 patent. One alleged disclosure is a listing of "modified cellulose derivatives" as an example of a "disintegrating agent." '450 patent, col. 4, ll. 3–7. Another is Example C in the '450 patent, which discloses a prior art composition containing microcrystalline cellulose. Id. at col. 5, ll. 15–30. The district court concluded that the patentee did not dedicate use of microcrystalline [*31] cellulose to the public because "only those compounds or articles that are clearly identified as alternatives to what is actually claimed are subject to the bar" against recapturing disclaimed subject matter using

the doctrine of equivalents. Bench Decision, slip op. at 24. According to Ranbaxy, however, our precedent is not so restrictive. Ranbaxy argues we have not required that the patent expressly disclose the subject matter left unclaimed as an alternative to the claim limitation at issue. [HN17] Application of the disclosure-dedication rule is a question of law subject to de novo review. See *Toro Co. v. White Consol. Indus., Inc.*, 383 F.3d 1326, 1331 (Fed. Cir. 2004).

Ranbaxy is correct to the extent it points out that our precedent addressing the disclosure-dedication rule appears to deal only with patents in which subject matter is disclosed as an alternative to the relevant claim limitation. See, e.g., *Johnson & Johnston Assocs. Inc. v. R.E. Serv. Co.*, 285 F.3d 1046 (Fed. Cir. 2002) (en banc); *PSC Computer Prods., Inc. v. Foxconn Int'l, Inc.*, 355 F.3d 1353 (Fed. Cir. 2004); *Toro*, 383 F.3d at 1326. For example, [*32] in PSC Computer Products this court answered the question of how specific a disclosure in a written description must be to dedicate matter to the public:

> [HN18] We hold that if one of ordinary skill in the art can understand the unclaimed disclosed teaching upon reading the written description, the alternative matter disclosed has been dedicated to the public. This "disclosure-dedication" rule does not mean that any generic reference in a written specification necessarily dedicates all members of that particular genus to the public. The disclosure must be of such specificity that one of ordinary skill in the art could identify the subject matter that had been disclosed and not claimed.

*355 F.3d at 1360*. This court found that the generic disclosure of a class of unclaimed alternatives, "other resilient materials," does not necessarily dedicate all members of that class to the public. On the other hand, the court did find specifically disclosed but unclaimed alternatives, "molded plastic parts," to have been dedicated to the public when only metal parts were claimed. Id. The claim reasoned that "[a] reader of ordinary skill in the art could reasonably [*33] conclude from . . . language in the written description that plastic clip parts could be substituted for metal clip parts." Id.

This case presents a slightly different scenario: generic and specific disclosures of subject matter, but subject matter that is not specifically identified as being an alternative to a claim limitation. Nevertheless, like in *PSC Computer Products* the driving force behind the court's holding was the public notice function of patents. Id. And

in our view, the public notice function of patents suggests that before unclaimed subject matter is deemed to have been dedicated to the public, that unclaimed subject matter must have been identified by the patentee as an alternative to a claim limitation.

In this case, even if "saccharides" we re construed to mean "sugars," Ranbaxy has not pointed to parts of the '450 patent where the inventors identify microcrystalline cellulose as an unclaimed alternative that would function as a "saccharide" preventing hydrolysis. As the district court found, modified cellulose derivatives are only discussed as examples of a "disintegrating agent," one of various "optional excipients." '450 patent, col. 3, l. 60 – col. 4, [*34] l. 10. Furthermore, while Example C identifies microcrystalline cellulose as an ingredient in a particular formulation, we are not convinced that one of ordinary skill in the art would come to the conclusion that the inventors have identified microcrystalline cellulose in that formulation as an alternative to a "saccharide" that prevents hydrolysis. The '450 patent states that Example C discloses a "standard," prior art formulation "without the addition of a stabilizer of the present invention." Id. at col. 5, ll. 14–17. Indeed, the ingredient list does not include magnesium carbonate, and the '450 patent does not contend that Example C prevents cyclization. See id. at col. 5, ll. 20–28, 46–55. Instead, Example C appears to correspond to the first, unsuccessful formulation devised by the inventors in an attempt to prevent cyclization: the ingredient list includes both anhydrous lactose and microcrystalline cellulose. Id. at col. 5, ll. 20–23. As discussed above, not until magnesium carbonate was introduced into formulations did hydrolysis become a major problem. Thus, a saccharide was not needed to prevent hydrolysis in Example C. In short, Example C does not appear to [*35] relate to the claimed invention. For these reasons, we hold that the patentee did not dedicate to the public the use of microcrystalline cellulose as a "saccharide" to prevent hydrolysis.

Ranbaxy next contends that the all limitations rule precludes application of the doctrine of equivalents. Ranbaxy argues that Warner-Lambert cannot now assert that microcrystalline cellulose is an equivalent to the claimed "saccharide" because to do so would impermissibly vitiate the "saccharide" and "saccharides" limitations. [HN19] Like the disclosure-dedication rule, application of the all limitations rule is a question of law subject to de novo review. See *Seachange Int'l, Inc. v. C-COR Inc.*, 413 F.3d 1361, 1378 (Fed. Cir. 2005).

[HN20] The all limitations rule "provides that the doctrine of equivalents does not apply if applying the doctrine would vitiate an entire claim limitation." *Asyst Techs., Inc. v. Emtrak, Inc.*, 402 F.3d 1188, 1195 (Fed. Cir. 2005). We

have explained:

> There is no set formula for determining whether a finding of equivalence would vitiate a claim limitation, and thereby violate the all limitations rule. Rather, courts must consider the totality [*36] of the circumstances of each case and determine whether the alleged equivalent can be fairly characterized as an insubstantial change from the claimed subject matter without rendering the pertinent limitation meaningless.

*Freedman Seating Co. v. Am. Seating Co., 420 F.3d 1350, 1359 (Fed. Cir. 2005).*

Based on the totality of the circumstances, even if "saccharides" were construed to mean "sugars," we conclude that microcrystalline cellulose can be fairly characterized as an insubstantial change from the claimed subject matter without rendering the "saccharide" limitations meaningless. As discussed above, the district court pointed to evidence that microcrystalline cellulose, like sugars, performs the function of inhibiting hydrolysis. Moreover, microcrystalline cellulose, a polysaccharide, is a substance having many monosaccharide units, which are the building blocks of sugars. These similarities convince us that microcrystalline cellulose can be fairly characterized as an insubstantial change when compared to "sugars." Moreover, such a characterization would not render the claim limitations meaningless. Thus, the all limitations rule does not preclude application [*37] of the doctrine of equivalents in this case.

For the reasons discussed, we conclude that the district court did not clearly err in its comparison of the claims to the accused products and methods based on the preliminary record.

II.

Ranbaxy maintains that the district court clearly erred in its consideration of the prospect of irreparable harm to the patent owner in the absence of the injunction. The district court presumed irreparable harm based on its finding that Warner-Lambert is likely to succeed on the merits, citing *Purdue Pharma L.P., 237 F.3d at 1363.* The court also analyzed the potential for harm to Warner-Lambert and found that Ranbaxy's sales of its generic product would cause substantial harm to Warner-Lambert and loss of the statutory right to exclude Ranbaxy for the remaining life of the '450 patent, which expires in August 2007. The court also noted that Warner-Lambert has fought Teva vigorously to protect its rights under the '450 patent.

According to Ranbaxy, the court should not have presumed irreparable harm because Ranbaxy's product does not infringe any claim of the '450 patent. Ranbaxy cites *Reebok International Ltd. v. J. Baker, Inc., 32 F.3d 1552, 1558-59 (Fed. Cir. 1994),* [*38] and *Illinois Tool Works, Inc. v. Grip-Pak, Inc., 906 F.2d 679, 683 (Fed. Cir. 1990),* for the proposition that the loss of the statutory right to exclude alone does not constitute irreparable harm. Ranbaxy further argues that the district court failed to consider evidence that Warner-Lambert does not currently enjoy market exclusivity. For example, Ranbaxy points out that various competitors have begun selling competing generic products. Ranbaxy also argues that Warner-Lambert's grant of a license under the '450 patent shows that any injury suffered by Warner-Lambert would be compensable in monetary damages. Ranbaxy additionally claims that Warner-Lambert should not be excused for its decision not to bring suit within forty-five days of receiving Ranbaxy's paragraph IV certification letter dated April 7, 2003, which would have triggered the thirty-month stay of FDA approval of Ranbaxy's ANDA, see *21 U.S.C. § 355(j)(5)(B) (2000); 35 U.S.C. § 271(e)(2)(A) (2000).*

Warner-Lambert responds by pointing to evidence that shows that sales of Ranbaxy's product dwarf the sales of other competitors' generic products. And while [*39] Warner-Lambert admits that it has granted a license to the '450 patent, it clarifies that the license is exclusive and limited to moexipril products and not quinapril products such as Accupril(R) Warner-Lambert further explains that it did not sue Ranbaxy within forty-five days of receiving Ranbaxy's paragraph IV certification letter because Teva, as the first ANDA filer, had a potential 180-day exclusivity period, which precluded FDA approval of any later ANDA.

The district court did not abuse its discretion by presuming irreparable harm. [HN21] We have consistently held that a district court should presume that a patent owner will be irreparably harmed when, as here, a patent owner establishes a strong showing of likely infringement of a valid and enforceable patent. See, e.g., *Jack Guttman, Inc., 302 F.3d at 1356; Purdue Pharma, 237 F.3d at 1363; Datascope Corp. v. Kontron Inc., 786 F.2d 398, 400 (Fed. Cir. 1986).*

The district court also did not abuse its discretion in finding that Ranbaxy failed to rebut the presumption of irreparable harm. In *Polymer Technologies, Inc. v. Bridwell,* [HN22] this court explained that because the very nature [*40] of a patent provides the right to exclude, infringement of a valid patent inherently causes irreparable harm in the absence of exceptions such as a finding that future infringement is no longer likely, that the patentee is willing to forgo its right to exclude by

licensing the patent, or that the patentee had delayed in bringing suit. *103 F.3d 970, 975 (Fed. Cir. 1996)*. And when the presumption of irreparable harm attaches, the burden is on the likely infringer to produce evidence sufficient to establish that the patent owner would not be irreparably harmed by an erroneous denial of a preliminary injunction. *Id. at 974*. The court explained that in Reebok "the presumption of irreparable harm was rebutted by evidence that neither the patentee nor the alleged infringer would be continuing to manufacture or sell the devices covered by the patent (except for a small amount of residual stock)." *Id. at 975*. The court also explained that in *Illinois Tool Works* "we held that potential lost sales alone could not demonstrate 'manifest irreparable harm' in light of other evidence that the movant had granted a non-exclusive license to a non-party. [*41] " Id. In contrast to those cases, it is clear that neither party anticipates voluntarily ceasing the sale of products covered by the '450 patent, and there is no evidence that Warner-Lambert intends to engage in non-exclusive licensing of its rights under the '450 patent.

While Warner-Lambert admits that two competitors remain in the marketplace, [HN23] "the fact that other infringers may be in the marketplace does not negate irreparable harm. A patentee does not have to sue all infringers at once. Picking off one infringer at a time is not inconsistent with being irreparably harmed." Id. Warner is first targeting infringers whose sales dwarf the sales of other infringers.

The fact that Warner-Lambert has granted a narrow, exclusive license under the '450 patent also does not require that the district court find that any harm would not be irreparable. The grant of such a license is simply not a sufficient basis to overturn the district court's conclusion that Warner-Lambert did not engage in a pattern of licensing destroying market exclusivity. See *id. at 974* (noting that engagement in a pattern of granting licenses under a patent evidences the reasonableness [*42] of the ability to recompense invasion of patent rights using a royalty rather than an injunction).

The district court also did not abuse its discretion by not faulting Warner-Lambert for its decision not to bring suit within forty-five days of receiving Ranbaxy's paragraph IV certification letter. Ranbaxy is correct to point out that [HN24] evidence that a patent owner unduly delays in bringing suit against an alleged infringer negates the idea of irreparability. See id. And Ranbaxy is also correct that the relevant statutory provisions would have triggered the thirty-month stay of FDA approval of Ranbaxy's ANDA had Warner-Lambert sued. But there is no requirement that a patent owner take advantage of the statutory carrot of a thirty-month stay, and certainly no statutory

stick for choosing not to. Moreover, Teva, as the first party to file an ANDA, held exclusive generic rights. There was therefore no immediate need for Warner-Lambert to sue Ranbaxy. And the fact that Warner-Lambert filed suit against Ranbaxy within two months of the launch of Ranbaxy's quinapril formulation supports the district court's rejection of the idea that Warner-Lambert unduly delayed in bringing suit against [*43] Ranbaxy. Thus, the district court did not clearly err or otherwise abuse its discretion in determining that Ranbaxy did not meet its burden of rebutting the presumption of irreparable harm.

For the reasons discussed, we conclude that the district court did not abuse its discretion in its analysis of the harm to Warner-Lambert.

III.

Ranbaxy next challenges the district court's conclusion that the harm to Warner-Lambert in the absence of an injunction would exceed the harm to Ranbaxy when Ranbaxy is subject to the injunction. The district court held that the fact that Ranbaxy "built up its manufacturing facility in India and prepared to market [its] product was simply a risk it took with eyes open to the consequences." Bench Decision, slip op. at 26. Ranbaxy responds by arguing that, in contrast to Warner-Lambert, it is facing real and immediate irreparable harm since the preliminary injunction has forced it to remove its product from the market, thereby causing Ranbaxy to lose market share and customer relationships.

The district court did not abuse its discretion in finding that the harm favors enjoining Ranbaxy. [HN25] Simply put, an alleged infringer's loss of market share and [*44] customer relationships, without more, does not rise to the level necessary to overcome the loss of exclusivity experienced by a patent owner due to infringing conduct.

IV.

Ranbaxy finally argues that the district court erred in assessing the public interest. Ranbaxy contends that the public interest favors denying the preliminary injunction because the statutory framework under which Ranbaxy filed its ANDA makes low cost generic drugs available to the public through increased competition. The district court rejected Ranbaxy's argument by pointing out that a preliminary injunction that enforces a valid patent against an infringer "does no more than further public policy inherent in the patent laws designed to encourage useful inventions by rewarding the inventor with a limited period of market exclusivity." Id.

The district court did not abuse its discretion in rejecting Ranbaxy's argument. [HN26] "Selling a lower priced product does not justify infringing a patent." *Payless*

2005 U.S. App. LEXIS 25123, *44

*Shoesource, Inc. v. Reebok Int'l Ltd., 998 F.2d 985, 991 (Fed. Cir. 1993)*. And while the statutory framework under which Ranbaxy filed its ANDA does seek to make low cost generic drugs available [*45] to the public, it does not do so by entirely eliminating the exclusionary rights conveyed by pharmaceutical patents. Nor does the statutory framework encourage or excuse infringement of valid pharmaceutical patents.

CONCLUSION

We affirm the grant of the preliminary injunction.

Based on the preliminary record, the district court's claim construction was not erroneous; the district court did not abuse its discretion when it determined that Ranbaxy likely infringes the *'450 patent* either literally or under the doctrine of equivalents; and the district court did not abuse its discretion when it found that the harm and public interest favors enjoining Ranbaxy.

COSTS

Each party shall bear its own costs.

AFFIRMED