IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| MCKESSON INFORMATION SOLUTIONS LLC, | ) ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 04-1258 (SLR) |
| | ) | |
| THE TRIZETTO GROUP, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**THE TRIZETTO GROUP INC.'S OPENING BRIEF IN SUPPORT OF ITS MOTION TO
EXCLUDE THE EXPERT TESTIMONY OF MICHAEL J. WAGNER**

MORRIS, NICHOLS, ARSHT & TUNNELL
Jack B. Blumenfeld (#1014)
Rodger D. Smith II (#3778)
1201 North Market Street
P.O. Box 1347
Wilmington, Delaware 19899-1347
(302) 658-9200
  Attorneys for Defendant
  The TriZetto Group, Inc.

OF COUNSEL:

Jeffrey T. Thomas
David A. Segal
Michael A. Sitzman
GIBSON, DUNN & CRUTCHER LLP
Jamboree Center, 4 Park Plaza
Irvine, California 92614-8557
(949) 451-3800

December 20, 2005

## TABLE OF CONTENTS

Page

I.    NATURE AND STAGE OF PROCEEDINGS ..................................................................1

II.   SUMMARY OF ARGUMENT ..................................................................1

III.  STATEMENT OF FACTS ..................................................................3

      A.    Background ..................................................................3

      B.    The Expert Reports ..................................................................5

            1.    Wagner's Lost Profits Methodology..................................................................5

            2.    Wagner's Reasonable Royalty Methodology ..................................................6

IV.   ARGUMENT ..................................................................7

      A.    Basic Legal Standards Governing Admissibility Of Expert Testimony .................7

      B.    Expert Opinion Testimony Based On Assumptions Not Supported By
            The Facts Is Inadmissible As A Matter Of Law..........................................................8

      C.    Wagner's Lost Profits Analysis Is Based On Assumptions Not
            Supported By The Facts ..................................................................9

            1.    Wagner Erroneously Assumes That There Were No Non-
                  Infringing Alternatives Available To TriZetto At The Time Of
                  Infringement..................................................................11

            2.    Wagner Erroneously Assumes That, But For TriZetto's
                  Alleged Infringement, McKesson Would Have Made Sales To
                  Virtually *All* Of TriZetto's Customers......................................................16

            3.    Wagner's Testimony On Lost Profits Should Be Excluded ......................18

      D.    Wagner's Reasonable Royalty Analysis Is Also Based On
            Unsupportable Assumptions ..................................................................19

            1.    Wagner's Reasonable Royalty Analysis Is Based On The Same
                  Erroneous Assumptions As His Lost Profits Analysis.............................20

            2.    Wagner's Erroneous Use of The "Book of Wisdom" Renders
                  His Entire Reasonable Royalty Analysis Unreliable.................................20

ii.

## TABLE OF CONTENTS (cont'd)

Page

3. Wagner's Royalty Base — Virtually All of TriZetto's Revenue — Is Based on an Erroneous View of the Law ..........................................25

4. Wagner's Testimony On Reasonable Royalties Should Be Excluded ...................................................................................................28

V. CONCLUSION ...............................................................................................29

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*Advanced Med. Optics, Inc. v. Alcon, Inc.,*
  2005 U.S. Dist. LEXIS 5803 (D. Del. Apr. 7, 2005) ........................................................14, 25

*Alpex Computer Corp. v. Nintendo Co.,*
  34 U.S.P.Q.2d 1167 (S.D.N.Y. 1994)..................................................................................20

*Augustine Med., Inc. v. Mallinckrodt, Inc.,*
  Civ. A. No. 01-387-SLR, 2003 WL 1873836 (D. Del. Apr. 9, 2003) ....................................8, 9

*Barrel of Fun, Inc. v. State Farm Fire & Cas. Co.,*
  739 F.2d 1028 (5th Cir. 1984) ...............................................................................................8

*Benjamin v. Peter's Farm Condo. Owners Ass'n,*
  820 F.2d 640 (3d Cir. 1987).................................................................................................8

*BIC Leisure Products v. Windsurfing Int'l,*
  1 F.3d 1214 (Fed. Cir. 1993).................................................................................................9

*Carborundum Co. v. Molten Metal Equip. Innovations, Inc.,*
  72 F.3d 872 (Fed. Cir. 1995)...............................................................................................24

*Creative Dimensions in Mgmt., Inc. v. Thomas Group, Inc.,*
  1999 U.S. Dist. LEXIS 5623 (E.D. Pa. Apr. 16, 1999) .........................................................26

*Daubert v. Merrell Dow Pharms.,*
  509 U.S. 579 (1993).....................................................................................................2, 7, 8

*DSU Med. Corp. v. JMS Co.,*
  296 F. Supp. 2d 1140 (N.D. Cal. 2003) .....................................................................7, 18, 26

*Elcock v. Kmart Corp.,*
  233 F.3d 734 (3d Cir. 2000)..................................................................................................8

*Gen. Elec. Co. v. Joiner,*
  522 U.S. 136 (1997).................................................................................................8, 14, 15

*Georgia-Pacific Corp. v. United States Plywood Corp.,*
  318 F. Supp. 1116 (S.D.N.Y. 1970).............................................................................6, 19, 21

*Grain Processing Corp. v. American Maize-Products,*
  185 F.3d 1341 (Fed. Cir. 1999)........................................................................................10, 11

*Kearns v. Chrysler Corp.,*
  32 F.3d 941 (Fed. Cir. 1995).................................................................................................9

## TABLE OF AUTHORITIES (cont'd)

*King Instrument Corp. v. Otari Corp.,*
767 F.2d 853 (Fed. Cir. 1985)...................................................................................24

*Kumho Tire Co. v. Carmichael*,
526 U.S. 137 (1999)....................................................................................................18

*KW Plastics v. United States Can Co.*,
131 F. Supp. 2d 1289 (M.D. Ala. 2001) ....................................................................18

*Litton Systems Inc. v. Honeywell, Inc.*,
87 F.3d 1559 (Fed. Cir. 1996)....................................................................................16

*Main St. Mort., Inc. v. Main St. Bancorp, Inc.*,
158 F. Supp. 2d 510 (E.D. Pa. 2001) ........................................................................18

*Micro Chem., Inc. v. Lextron, Inc.*,
317 F.3d 1387 (Fed. Cir. 2003)....................................................................................7

*Minco Inc. v. Combustion Eng'g, Inc.*,
95 F.3d 1109 (Fed. Cir. 1996)....................................................................................19

*Odetics, Inc. v. Storage Tech. Corp.*,
185 F.3d 1259 (Fed. Cir. 1999)..................................................................................20

*Panduit v. Stahlin Bros. Fibre Works, Inc.*,
575 F.2d 1152 (1978)....................................................................................................5

*Pugliano v. United States*,
315 F. Supp. 2d 197 (D. Conn. 2004).........................................................................7

*Quinones-Pacheco v. American Airlines, Inc.*,
979 F.2d 16 (1st Cir. 1992)...........................................................................................8

*Riles v Shell Exploration & Prod.*,
298 F.3d 1302 (Fed. Cir. 2002)..................................................................................21

*Rite-Hite Corp. v. Kelley Co.*,
56 F.3d 1538 (Fed. Cir. 1995)....................................................................................24

*Schiller & Schmidt, Inc. v. Nordisco Corp.*,
969 F.2d 410 (7th Cir. 1992) ......................................................................................27

*Sinclair Refining Co. v. Jenkins Petroleum Co.*,
289 U.S. 689 (1933)..............................................................................................20, 22

*State Indus., Inc. v. Mor-Flo Indus., Inc.*,
883 F.2d 1573 (Fed. Cir. 1989)..................................................................................16

*TWN Mfg. Co. v. Dura Corp.*,
789 F.2d 895 (Fed. Cir. 1986)....................................................................................24

*Unisplay, S.A. v. American Elec. Sign Co.*,
69 F.3d 512 (Fed. Cir. 1995)......................................................................................19

v.

TABLE OF AUTHORITIES (cont'd)

*Viterbo v. Dow Chemical Co.*,
    826 F.2d 420 (5th Cir. 1987) ................................................................................................8

*Western Elec. Co. v. Stewart-Warner Corp.*,
    631 F.2d 333 (1980)................................................................................................................25

**Rules**

Fed. R. Evid. 702 .................................................................................................................7, 8

## I.      NATURE AND STAGE OF PROCEEDINGS

On September 13, 2004, plaintiff McKesson Information Solutions, LLC ("McKesson") filed this suit alleging infringement of U.S. Patent No. 5,253,164 (the "'164 patent") against The TriZetto Group, Inc. ("TriZetto").  On October 1, 2004, McKesson amended its Complaint.  On November 1, 2004, TriZetto answered and filed a counterclaim seeking a declaratory judgment of invalidity, unenforceability, and non-infringement.

McKesson alleges that three of TriZetto's products (Facets, ClaimFacts and QicLink) infringe fifteen claims of the '164 patent (Claims 1-6 and 8-16).  Fact and expert discovery have been completed.  The Court has bifurcated and stayed motion practice and trial on the invalidity issue.  Motion practice is proceeding on the infringement issue, damages and equitable defenses.  The Court has scheduled a hearing for February 16, 2006, to consider summary judgment motions and issues of claim construction.   Trial on the issues of infringement, damages and equitable defenses is set for April 17, 2006.

## II.      SUMMARY OF ARGUMENT

Pursuant to Rules 104(a), 401, 403, and 703 of the Federal Rules of Evidence, TriZetto moves to exclude the testimony of Michael J. Wagner ("Wagner"), an expert designated by McKesson on the subject of patent damages.

Wagner intends to offer the following opinions:  (1) McKesson lost profits from lost sales of its ClaimCheck and CodeReview products and lost convoyed sales totaling $91,034,823 from September 13, 1998, through April 28, 2006, due to TriZetto's infringement of the '164 patent; (2) if lost profits are not awarded, the royalty rate that is adequate to compensate McKesson for TriZetto's alleged infringement of the '164 patent is 9%; (3) the royalty base to which the royalty rate should be applied (assuming lost profits are not awarded) is $690,116,584,

which represents virtually all of TriZetto's revenue from sales of all of its products and services regardless of whether the sales are attributable to the accused products; (4) the resulting royalty amount due McKesson from September 13, 1998, through April 28, 2006 (assuming lost profits are not awarded) is $61,668,332 before prejudgment interest.

Under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and its progeny, the methodology Wagner employs and the conclusions he reaches are inadmissible because they are speculative and unreliable, do not fit the facts and circumstances of this case, and are inconsistent with damage measures required by law.

First, Wagner's lost profits analysis is based on assumptions not supported by the facts of this case. Wagner makes two critical but ultimately unsupportable assumptions that form the basis of his lost profits calculations. First, Wagner erroneously assumes that there were no non-infringing alternatives available to TriZetto at the time of infringement. Second, he erroneously assumes that, but-for TriZetto's alleged infringement, McKesson would have made sales to virtually *all* of TriZetto's customers. Wagner makes these assumptions baldly without any facts or data to support them, and there are cavernous analytical gaps between the actual facts and the conclusions Wagner reaches. Without these assumptions, Wagner's entire lost profits analysis becomes nothing more than a house of cards poised to fall.

Second, Wagner's reasonable royalty analysis is also based on unsupportable assumptions and misapplication of legal principles. In formulating his reasonable royalty analysis, Wagner relies on the same faulty assumptions that infect his lost profit calculations. In addition, Wagner makes incorrect assumptions about what the law is (or in his view should be) with regard to the entire market value rule and the "book of wisdom." By distorting these legal principles to bridge the analytical gap between the facts and his conclusions, Wagner creates a

reasonable royalty analysis that is wholly unreliable.  In the end, Wagner's reasonable royalty analysis is based solely on his own subjective interpretation of the law, which is in conflict with federal court precedent.  As such, the methodologies upon which he bases his reasonable royalty calculations are fundamentally flawed.

### III.    STATEMENT OF FACTS

#### A.    Background

The '164 patent issued on October 12, 1993, to McKesson's predecessor Health Payment Review, Inc. ("HPR").  The patent purportedly covers computer software for reviewing claims for payment submitted by medical care providers to health care insurance companies.  The patent describes software used to determine whether the "procedure codes" (codes used to designate what medical treatment was performed) on claims for payment are accurate.  This type of software is called clinical editing software.

Starting in 1986, HPR developed a clinical editing program called CodeReview and introduced it in 1988.  Around the same time, several other companies began offering clinical editing software, including TriZetto's predecessor, Erisco Managed Care Technologies, Inc. ("Erisco").  Since 1980, Erisco had been selling a multi-program software system called ClaimFacts, which provided a comprehensive medical claims processing solution.  The entire claims processing process entails many steps between the initial receipt of a claim and the ultimate payment of the claim, as well as the recordkeeping that must be done.  Clinical editing is only one small part of the process.  In 1989, Erisco added a clinical editing component to its ClaimFacts system.

Also in 1989, GMIS, Inc. developed its clinical editing program and began marketing it as ClaimCheck.  In addition, during this time period, a company named HealthChex

began offering a clinical editing program.  A company named Resource Information Management Systems, Inc. ("RIMS") offered that HealthChex program to its claims processing customers pursuant to an agreement between RIMS and HealthChex.  Still other companies (e.g., a company named VHS) also entered the market.

In 1996, HBO & Company ("HBOC") acquired GMIS, and then in 1997, HBOC acquired HPR and the rights to the '164 patent.  In 1999, McKesson acquired HBOC and the rights to the '164 patent as well as the right to sell both ClaimCheck (GMIS' program) and CodeReview (the HPR program).  One year later, in 2000, TriZetto acquired both Erisco and RIMS.  Through these acquisitions TriZetto acquired the rights to both Erisco's clinical editing software and RIMS' license to sell the HealthChex program.  (By the time of TriZetto's acquisition of RIMS, however, the HealthChex program had changed hands and was owned by a company named Solucient.)  Currently, TriZetto offers three comprehensive claims processing software systems called QicLink, ClaimFacts and Facets.  These software systems often include clinical editing software.

McKesson currently markets at least two clinical editing programs, ClaimCheck and CodeReview.  Unlike TriZetto, however, McKesson does not sell full claims processing systems.  Instead, it sells only the clinical editing piece, and so its customers must acquire all the other pieces from another vendor or develop those pieces on their own.

In 2001-03, McKesson and TriZetto attempted to negotiate an arrangement under which TriZetto would offer ClaimCheck to its claims processing customers.  The idea was that TriZetto's customers would have the option to purchase ClaimCheck if they wanted to have it in addition to TriZetto's own clinical editing program.  A final agreement, however, was never reached.  In 2004, McKesson accused TriZetto of infringement based on the allegation that the

QicLink, ClaimFacts and Facets systems include a clinical editing component.  McKesson asserts that the first infringing sales began in October 1993 by Erisco and RIMS, and continued after TriZetto acquired those companies and the corresponding rights to their clinical editing products.

### B.     The Expert Reports

McKesson submitted its expert report on damages (the "Wagner Report") on October 24, 2005.[1]  In response, TriZetto's expert, Dr. Jesse David, submitted his rebuttal report (the "David Report") on November 17, 2005.[2]  Wagner was deposed on November 21, 2005.[3]

### 1.     Wagner's Lost Profits Methodology

Wagner's first damages measure is based on sales he claims McKesson lost due to TriZetto's alleged infringement of the '164 patent.  Wagner Report, Exh. A at 4-16.  Wagner uses the four-factor test provided by *Panduit v. Stahlin Bros. Fiber Works, Inc.*, 575 F.2d 1152 (6th Cir. 1978).  *Panduit* requires the patent owner to show all of the following to recover lost profits: (1) demand for the patented product; (2) absence of non-infringing alternatives; (3) manufacturing and marketing capability to exploit the demand; and (4) the amount of lost profits.  In applying the *Panduit* factors, however, Wagner makes several unsupportable assumptions, and as a result there is a large analytical gap between the data and facts he relies upon and his conclusions.

The basic assumption Wagner makes for his lost profits analysis is that 100% of TriZetto's customers would have purchased McKesson's clinical editing software if TriZetto did

---

[1]     A true and correct copy of the Wagner Report is Exhibit A in the Appendix that has been filed concurrently herewith.

[2]     A true and correct copy of the David Report is Exhibit B in the Appendix that has been filed concurrently herewith.

[3]     The pertinent pages of the transcript and exhibits from Wagner's November 21, 2005 deposition are Exhibit C in the Appendix that has been filed concurrently herewith.

not offer such software.  As discussed below, he makes that assumption by essentially ignoring the non-infringing alternatives, and, based on scant evidence of marginal relevance, concluding that TriZetto would have voluntarily chosen to offer its customers only the McKesson software. As a result, that assumption cannot be squared with the requirements of *Panduit* and its progeny.

### 2.     Wagner's Reasonable Royalty Methodology

In the event that lost profits are not awarded, Wagner has included a damages calculation based on the reasonable royalty he claims McKesson and TriZetto would have agreed to through a hypothetical negotiation.  Wagner Report, Exh. A at 17-20.  Wagner determines that a reasonable royalty rate is 9 percent.  *Id.* at 16.  To reach this royalty rate, Wagner utilized the accepted *Georgia-Pacific* factors.  *Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116 (S.D.N.Y. 1970).  Wagner then proceeds to apply that royalty rate to *all of TriZetto's revenue.  Id.*  Wagner does not establish why the royalty base includes revenue that is unrelated to TriZetto's clinical editing software.  Instead, he bases this on an incorrect interpretation of the entire market value rule.  Wagner Report, Exh. A at 28.

In establishing his royalty rate, Wagner attempts to recreate a hypothetical negotiation between McKesson and TriZetto on the day the '164 patent issued – or in other words, the day the alleged infringement began.  That is correct.  At that time, October 1993, however, neither TriZetto nor McKesson were on the scene.  McKesson had no interest in the '164 patent, and neither McKesson nor TriZetto was offering clinical editing software.  It is undisputed that had a negotiation occurred at that time the parties would have been HPR and Erisco.  Nevertheless, Wagner assumes the parties to the negotiation would have been McKesson and TriZetto.  He further assumes the landscape (including which companies merged, respective market shares, etc.) at the time of the negotiation looked like it does today rather than how it

actually looked in 1993.  To create this fiction, Wagner again assumes an incorrect interpretation of a legal doctrine, this time the "book of wisdom."  He admits that he has found no cases supporting his theory on the book of wisdom; instead, he bases his approach on what he thinks the law should be.  Wagner Depo., Exh. C at 153:11-21.

## IV.     ARGUMENT

### A.     Basic Legal Standards Governing Admissibility of Expert Testimony

The landmark case of *Daubert v. Merrell Dow Pharmaceuticals,* 509 U.S. 579 (1993), established the analytical framework for determining the admissibility of expert testimony under Federal Rule of Evidence 702.  *Micro Chem., Inc. v. Lextron, Inc.*, 317 F.3d 1387, 1391 (Fed. Cir. 2003).  Under *Daubert,* the court acts as a "gatekeeper" to ensure that expert testimony "both rests on a reliable foundation and is relevant to the task at hand."  509 U.S. at 597.  This analysis applies to all aspects of an expert's testimony: the methodology, the facts underlying the expert's opinion, and the analytical link between the facts and the conclusion. *Pugliano v. United States*, 315 F. Supp. 2d 197, 199 (D. Conn. 2004).  Expert testimony that is irrelevant or does not result from the application of reliable methodologies or theories to the facts of the case should be excluded.  *DSU Med. Corp. v. JMS Co.*, 296 F. Supp. 2d 1140 (N.D. Cal. 2003).

Federal Rule of Evidence 702 was amended in 2000 to reflect *Daubert* and its progeny.  Under Rule 702, expert testimony is admissible only if it "will assist the trier of fact to understand the evidence or to determine a fact in issue."  Fed. R. Evid. 702.  Furthermore, an expert may testify only if:  (1) the testimony is based upon sufficient facts or data; (2) the testimony is the product of reliable principles and methods; and (3) the witness has applied the principles and methods reliably to the facts of the case.  *Id.*

In deciding whether an expert's analysis is reliable, "the court must undertake a rigorous examination of the data on which the expert relies, the method by which he draws his opinions from such studies and data, and the application of the data and methods to the case at hand." *Pugliano*, 315 F. Supp. 2d at 199. The proponent of the testimony must present enough evidence to demonstrate the validity of the research supporting the conclusions so that the court can determine whether the testimony is well-founded. *Id.* The court may inquire into the reliability and foundation of any expert opinion to determine admissibility. *Viterbo v. Dow Chemical Co.*, 826 F.2d 420, 422 (5th Cir. 1987). The Court's goal should be to determine the reliability of an expert opinion through a preliminary assessment of the data and methodologies underlying the opinion. *Daubert*, 509 U.S. at 592-93. Courts should exclude opinion evidence that is connected to existing data only by the expert's unsupportable assertions. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 147 (1997).

**B.     Expert Opinion Testimony Based On Assumptions Not Supported By The Facts Is Inadmissible As A Matter Of Law**

Expert testimony should be excluded as a matter of law if it is not based upon sufficient facts and data. Fed. R. Evid. 702. Expert testimony that is based on false assumptions and fictional or random data is inadmissible. *Elcock v. Kmart Corp.*, 233 F.3d 734, 756 n.13 (3d Cir. 2000). In other words, where a party proffers expert testimony that is based on erroneous assumptions, "[a] court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec.*, 522 U.S. at 146. Such testimony should be held inadmissible because it provides no assistance to the trier of fact in arriving at an intelligent and sound verdict as required by Rule 702. *Tuman*, 935 F. Supp. at 1385. Furthermore, such testimony may be more prejudicial than probative and thus inadmissible pursuant to Rule 403.

*Barrel of Fun, Inc. v. State Farm Fire & Cas. Co.*, 739 F.2d 1028, 1035 (5th Cir. 1984); *Elcock*, 233 F.3d at 756 n.13.

In *Quinones-Pacheco v. American Airlines, Inc.*, 979 F.2d 1 (1st Cir. 1992), the court held that expert opinion testimony based on assumptions not supported by the factual record is inadmissible. The court in *Benjamin v. Peter's Farm Condominium Owners Assoc.*, 820 F.2d 640 (3d Cir. 1987), held that expert opinions based on assumptions that lack sufficient factual predicates are nothing more than "castles made of sand." The court in *Augustine Med., Inc. v. Mallinckrodt, Inc.*, Civ. A. No. 01-387-SLR, 2003 WL 1873836 (D. Del. Apr. 9, 2003), held that an expert who "[i]nstead of facts, stacks assumption upon assumption to come to his conclusion, should be precluded from testifying."

### C.    Wagner's Lost Profits Analysis Is Based On Assumptions Not Supported By The Facts

Courts will award lost profits for patent infringement if the patentee can realistically demonstrate that, "but-for" the infringement, it would have made the sales that were actually made by the infringer. *Kearns v. Chrysler Corp.*, 32 F.3d 941, 952 (Fed. Cir. 1995); *BIC Leisure Products v. Windsurfing Int'l*, 1 F.3d 1214, 1218 (Fed. Cir. 1993) (holding that a patent owner must prove a causal relation between the infringement and its loss of profits). An award of lost profits may not be speculative. *Kearns*, 32 F.3d at 952. Rather, it must be shown with reasonable probability that, absent the infringement, the patentee would have made the infringer's sales. *Id.* The accepted mechanism for demonstrating causation is the standard set forth in *Panduit v. Stahlin Brothers Fibre Works, Inc.*, 575 F.2d 1152 (1978). Under *Panduit*, the patentee must show that: (1) the patented product was in demand; (2) no acceptable non-infringing substitute was available; (3) the patentee or its licensee possessed the manufacturing

and marketing capability to exploit the demand; and (4) the amount of profit the patentee would have made. *Id.* at 1156.

In his report, Wagner applies the *Panduit* methodology to his lost profits analysis. Wagner Report, Exh. A at 4. As discussed below, however, he bases his opinions on unreasonable assumptions not supported by the facts of this case, and he fails to account for a factor — non-infringing alternatives — that the law requires be considered. As a result, Wagner's lost profits calculation is nothing more than an unstable house of cards.

Wagner's lost profits approach is an odd one because he does not opine that TriZetto's sales would have been any less if it had not infringed. Normally, of course, a lost profits calculation is based on the defendant's sales that are attributable to the infringement and the percentage of those sales that would have gone to the plaintiff but for the infringement. Here, however, Wagner admits that he has made no attempt to determine if Erisco's or TriZetto's sales or revenues would have been any different had it not offered clinical editing software to its customers. Wagner Depo., Exh. C at 137:22-138:13. Instead, he assumes that in his but-for world, TriZetto and its predecessors would have voluntarily entered into an agreement with McKesson to offer their customers *only* the McKesson clinical editing software (ClaimCheck), and *all* of those customers would have purchased that software in addition to TriZetto's claims processing systems. He admits that neither McKesson nor any of its predecessors would have entered TriZetto's primary market (claims processing systems) even if the alleged infringement had never occurred. Wagner Depo., Exh. C at 151:25-152:4. He further assumes TriZetto and its predecessors would have created interface software that would allow ClaimCheck to work with their larger claims processing systems.

There are two fundamental problems with Wagner's approach. First, his assumption that TriZetto and its predecessors would have offered their customers only the McKesson software -- i.e., there were no other alternatives -- is based on nothing more than speculation and does not comport with the analysis the law requires. Second, he provides no fact-based analysis to support his conclusion that all the TriZetto customers would have chosen to buy the McKesson software. These are basic flaws that render the analysis improper as a matter of law, not merely weaknesses that go to the weight of Wagner's opinion

    1.    **Wagner Erroneously Assumes That There Were No Non-Infringing Alternatives Available to TriZetto At The Time Of Infringement**

Courts have held that in order to claim lost profits for patent infringement, the patent owner must fairly and accurately reconstruct the but-for marketplace. In the seminal case of *Grain Processing Corp. v. American Maize-Products*, 185 F.3d 1341, 1351 (Fed. Cir. 1999), the court held that this reconstruction *must* take into account alternative actions that the alleged infringer foreseeably could have taken. The court stated that "[t]he competitor in the 'but-for' marketplace is hardly likely to surrender its complete market share when faced with a patent, if it can compete in some other lawful manner." *Id.* The court cautioned that in order to "prevent the hypothetical from lapsing into pure speculation," sound economic proof of the nature of the market without the alleged infringement is required. *Id.* at 1350.

Here, given Wagner's odd approach of assuming a joint venture of sorts between TriZetto and McKesson, the law requires a reasonably careful analysis of what alternatives other than partnering with McKesson would have been available to TriZetto. In his report, Wagner admits that while he is aware that other clinical editing products were on the market at the relevant time, he was asked by McKesson to assume that all these products infringe the '164

patent.  Wagner Report, Exh. A at 6 ("I have been asked to assume that these products also infringe the '164 patent.").  Based on this assumption, Wagner makes the critical assumption that, in the but-for world, TriZetto and its predecessors would have had no choice but to refer customers to McKesson.  *Id.*  Furthermore, Wagner states that even if the alternatives available at the time of infringement did not infringe the '164 patent, TriZetto would not have developed an interface between its claims processing system and any clinical editing software product other than ClaimCheck.  *Id.*  As demonstrated below, however, both of these assumptions are made without factual support and do not satisfy the analysis the law requires.

Wagner himself admits the fundamentally unsupportable nature of his assumption that there were no non-infringing alternatives.  At his deposition, Wagner confessed that the only reason he assumed that there were no non-infringing alternatives available to TriZetto or its predecessors was because McKesson told him to do so:

> Q:     In your hypothetical but-for world, sometime prior to September 13, 1998, Erisco does partner, joint venture deal, with McKesson or one of its predecessors, right?
>
> A:     Yes.
>
> Q:     And it is your opinion that it would have done a deal with McKesson because it had few, if any, other alternatives?
>
> A:     Correct.  My understanding is that these are – this is a foundational patent, No. 1, that unless you do have a license to it, you don't have a non-infringing alternative if you want to be in this business.  *That's the assumption I have been asked to make.*  And because of that, there are limited, if any options . . . .

Wagner Depo., Exh. C at 101:12-21.

The problem with this assumption is that it is undisputed that several licenses to the '164 patent had been granted prior to the date by which Wagner says the TriZetto-McKesson joint venture would have been formed (September 1998).  For example, in 1994, Value Health

Services, Inc. (VHS) entered into a license agreement involving the '164 patent with HPR. Wagner Depo., Exh. C at 97:10-21; 99:3-100:21; 101:25-102:4; Exh. 15. *See also* David Report, Exh. B at 13-14. Through this license, VHS could have sold TriZetto/Erisco/RIMS the right to offer VHS' clinical editing software to their customers. In his deposition, Wagner admits that this license agreement was a non-infringing opportunity available to TriZetto and its predecessors. Wagner Depo., Exh. C at 101:25, 102:1-4. Furthermore, in 1995, GMIS and HPR entered into a settlement agreement that granted GMIS a license to sell the '164 patent. David Report, Exh. B at 13-15. Thus, TriZetto/Erisco/RIMS could have also gone to GMIS for a non-infringing alternative. Additionally, in 1997, a company named Medicode, Inc. and HPR entered into a cross-license agreement that allowed Medicode to practice the '164 patent. *Id.* at 15-16. Under this license, Medicode as well could have provided TriZetto/Erisco/RIMS with a non-infringing alternative to the '164 patent during the damages period. Wagner Depo., Exh. C at 104:23-106:1; Exh. 17. Despite the existence of these non-infringing alternatives, Wagner proceeded with his analysis of lost profit damages as if each of these clinical editing software products also infringed the '164 patent.

The GMIS option that was available is particularly important. Wagner claims that TriZetto and its predecessors, as well as all their customers, would have done business only with McKesson because the McKesson product, ClaimCheck, is so much better than any other clinical editing software. The problem with this approach is that ClaimCheck belonged to GMIS, and during the time when Wagner claims TriZetto and its predecessors would have partnered with a clinical editing software vendor, GMIS had a license to the patent so that it could sell ClaimCheck to others, including TriZetto. Thus, the very product that Wagner claims TriZetto would have selected in his but-for world, ClaimCheck, was available from a third party and so

was a non-infringing alternative. Wagner Depo., Exh. C at 65:12-25; 67:1-20; Exh. 6. (While it is true that McKesson later acquired the rights to ClaimCheck, Wagner has admitted that GMIS, as an independent company, would have realized all the value of a joint venture with TriZetto through a higher purchase price that would have been paid when GMIS was acquired. Wagner Depo., Exh. C at 68:2-11; 215:16-216:12.)

Another option was the software originally offered by HealthChex, AutoAudit, which was later offered by Solucient. RIMS and TriZetto have had the right to offer that software to their customers since 1992, and have in fact done so right up until today. Wagner Depo., Exh. C at 93:25-94:2; 169:5-12. Before this litigation was filed, McKesson granted a license to the '164 patent to Solucient, which covers both past and future use of the '164 patent. Wagner Depo., Exh. C at 87:17-88:10; 94:18-95:6; Exh. 13. Thus, another non-infringing alternative alternative would be to do exactly what TriZetto has actually done and offer its customers the Solucient software. In his report, Wagner hedges on whether Solucient's license allows it to sell its software to TriZetto for resale to TriZetto's customers, but at his deposition he admitted it does. Wagner Depo., Exh. C at 87:17-88:10; 91:20-93:24.

In the lost profits section of his report, Wagner does not even discuss these various license agreements, which he admits made the licensees alternative sources of clinical editing software for TriZetto and its predecessors. The only license agreement he mentions is the one entered into by McKesson and Solucient at least four years after he says TriZetto would have selected its clinical editing partner. As discussed above, that agreement does create another option, but what is important is that he does not consider the other license agreements; he just assumes them away, apparently based on what he was told to do by McKesson's counsel. Thus, he did not do the analysis required by *Grain Processing* and its progeny.

15.

Federal courts have held that expert opinion testimony is fundamentally unsupported when the expert relies almost exclusively on information from one source who was clearly biased. *Advanced Med. Optics, Inc. v. Alcon, Inc.*, 2005 U.S. Dist. LEXIS 5803 (D. Del. Apr. 7, 2005). In this case, Wagner has assumed that there were no non-infringing alternatives based solely on what McKesson — a biased party to this litigation — has told him. As a result, Wagner's assumption that there were no non-infringing alternatives is without factual support and should be held inadmissible.

The only element of Wagner's work that even approaches an analysis of these undisputed non-infringing alternatives is yet another assumption that, even if these non-infringing alternatives were available in the but-for world, TriZetto would not have worked with any third party clinical editing vendor other than McKesson. Wagner Report, Exh. A at 7. Wagner bases this assumption on the following feeble facts: (1) prior to TriZetto's acquisition of Erisco, TriZetto was a licensed reseller of ClaimCheck; (2) TriZetto has not, to date, actually developed an interface between its claim processing systems and any of the third party clinical editing programs other than ClaimCheck; and (3) the deposition testimony of a TriZetto executive that it would be TriZetto's "preference" to interface its claims processing systems with ClaimCheck. *Id.* at 5, 7. Once again, however, these facts leave too large an analytical gap to be accepted as reliable under the *Daubert* standard. *Gen. Elec.*, 522 U.S. at 146. Wagner is relying on TriZetto actions that are irrelevant because during the period of time that Wagner says is relevant (the years leading up to September 1998), the company that would have selected the clinical editing partner was Erisco, not TriZetto. Wagner has admitted this, and has admitted Erisco never did business with McKesson or its predecessors or otherwise indicated any "preference" for McKesson or ClaimCheck. Wagner Depo., Exh. C at 58:3-19. Thus, the

TriZetto actions Wagner relies on are not indicative of what the parties would have done but-for the alleged infringement.

Furthermore, as discussed above, during the relevant period, McKesson did not own any rights to ClaimCheck.  Thus, ClaimCheck itself was a non-infringing alternative to the '164 patent.  If during the period between January 1995 and November 1997 TriZetto had licensed and built an interface to ClaimCheck, McKesson would not have benefited.  Finally, the fact that, to date, TriZetto has not created an interface for any third party's software other than McKesson's simply indicates that TriZetto is waiting until this litigation is completed to determine if such steps are necessary.

There is simply not enough factual support for Wagner's assumption that, despite non-infringing alternatives being available, TriZetto would have dealt only with McKesson.  The law does not allow clear non-infringing alternatives to be ignored based on a snippet or two of evidence that is at best of marginal relevance to the issue of what the accused infringer would have done at the relevant time.  Wagner's assumption that there were no non-infringing alternatives leaves too great an analytical gap between the facts available and his conclusion. *Gen. Elec.*, 522 U.S. at 146.  As such, Wagner's testimony on this subject should be held inadmissible.

**2.     Wagner Erroneously Assumes That, But For TriZetto's Alleged Infringement, McKesson Would Have Made Sales To Virtually *All* Of TriZetto' Customers**

Wagner opines that but for TriZetto's alleged infringement, McKesson would have sold its software to virtually *all* of TriZetto's customers.  Wagner Report, Exh. A at 12-16 and Schedules 1.1, 1.3 and 12.1.  He has, however, done no analysis whatsoever to determine what TriZetto's customers would have done if the TriZetto claims processing system had not included

a clinical editing program.  Instead, he just assumes that TriZetto would have given its customers no alternative other than McKesson and they all would have gone along with that regardless of the cost.

As discussed above, there have always been several vendors of clinical editing software from which customers can choose.  Wagner has admitted that TriZetto could have accommodated customers who opted to purchase the software from one of these other vendors. Wagner Depo., Exh. C at 53:25-55:6.  Nevertheless, Wagner assumes, without further analysis, that TriZetto would have successfully forced all its customers to use only McKesson's software. Normally, of course, where the patentee has competition, a proper damages analysis would consider the market shares of the various companies.  *See*, *e.g.*, *State Indus., Inc. v. Mor-Flo Indus., Inc.*, 883 F.2d 1573 (Fed. Cir. 1989).  Wagner, however, does not know what McKesson's market share is, nor did he factor any market shares into his analysis; he just awarded 100% of TriZetto's customers to McKesson.  Wagner Depo., Exh. C at 218:3-219:4.[4]

It is reasonable to predict that at least some of those customers may have opted for a less expensive alternative – even if it would have been inferior to McKesson's products.  Courts have held that assumptions to the contrary amount to pure speculation.  For example, in *Litton Systems Inc. v. Honeywell, Inc.*, 87 F.3d 1559, 1576-77 (Fed. Cir. 1996), the court overturned a jury verdict awarding lost profits because the only evidentiary support for the award was speculative and unrealistic expert assertions.  The court held that there was no sound economic evidence that customers would not be willing to buy a less reliable alternative if it would cost

----

[4]    Confronted with no clinical editing software in their TriZetto system, some of those customers would have opted to forego the additional expense of ClaimCheck and CodeReview.  In fact, many customers purchase TriZetto's claims processing software suite without the claims editing component or, if they inadvertently receive it in the bundle, have no use for it.  David Report, Exh. B at 8.

them less money.  Without some accurate assessment of the elasticity of demand, the court held

the expert's assumptions were too speculative.  *Id.*  At his deposition, Wagner admitted that he

had not considered price elasticity or the possibility that, in the but-for world, some of TriZetto's

customers would not have been willing to pay more for McKesson's clinical editing module.

Wagner Depo., Exh. C at 61, 115.

Wagner's conclusion that 100% of TriZetto's customers would have become

McKesson customers is also based on the assumption that *all* of TriZetto's customers require a

clinical editing module.  Wagner Report, Exh. A at 5.  This assumption is not supported by the

facts of this case.  In fact, many of TriZetto's customers do not use clinical editing software.  For

example, TriZetto's clinical editing module does not apply to dental, behavioral health, or

physical therapy claims.  David Report, Exh. B at 9-10.  Thus, customers who work exclusively

in those areas would not need the clinical editing component.  Furthermore, TriZetto's clinical

editing module does not cover healthcare markets outside the United States.  *Id.*  Thus, TriZetto's

international customers who otherwise use TriZetto's software for billing, enrollment and

utilization management would have no use for a clinical editing module.  *Id.*

### 3.     Wagner's Testimony On Lost Profits Should Be Excluded

In the end, all Wagner did was some arithmetic.  He concluded, based only on

what he was told to assume and some marginally relevant anecdotal evidence, that 100% of

TriZetto's customers would have purchased only the McKesson software.  He then took what

McKesson told him are its current prices, and did a calculation to determine how much those

customers would have paid at those prices.  He did not do any of the analyses the law requires

(e.g., an analysis of non-infringing alternatives or a market share analysis), and yet if he is

allowed to testify, the jury will be told that his damages numbers represent the result of an

"expert" analysis.   This is precisely the type of case where the court should exercise its gatekeeping function to exclude Wagner's testimony.

In evaluating the admissibility of expert testimony, the court's ultimate goal is "to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *KW Plastics v. United States Can Co.*, 131 F. Supp. 2d 1289, 1292 (M.D. Ala. 2001), *quoting Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999).  Wagner's proposed expert testimony on the subject of lost profits damages fails to meet this standard.   By basing his opinions on unsupportable assumptions and faulty methodology, Wagner has left too many analytical gaps between the facts of this case and his conclusions – gaps he simply cannot fill.   Because his opinions are not founded on proper independent investigation and are riddled with improper legal methodology, Wagner's entire lost profits analysis becomes exposed for what it really is – a castle made of sand.   "Nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *DSU Med. Corp.*, 296 F. Supp. 2d at 1147.  Such testimony fails to meet the standards set by *Daubert* and Rule 702 and will not help the jury better understand the evidence or to determine a fact in issue.  Wagner's testimony on lost profits damages should be excluded.

**D.    Wagner's Reasonable Royalty Analysis Is Also Based On Unsupportable Assumptions**

Wagner's reasonable royalty analysis is similarly flawed.    Expert opinion testimony must be based on "good grounds" in order to be reliable and admissible. *Main St. Mort., Inc. v.* Main *St. Bancorp, Inc.*, 158 F. Supp. 2d 510, 514 (E.D. Pa. 2001).  To determine if

good grounds exist, the court must examine the expert's conclusions to see whether they could reliably flow from the facts the expert knew and the methodology used. *Id.* As mentioned above, a sound methodology is one that is based on accepted legal principles. *DSU Med. Corp.*, 296 F. Supp. 2d at 1148. Throughout his reasonable royalty analysis, Wagner not only relies on the same faulty assumptions as he did in formulating his opinion on lost profits, but continues to misapply the law. As a result, his testimony on reasonable royalty damages should also be held inadmissible.

> **1.     Wagner's Reasonable Royalty Analysis Is Based On The Same Erroneous Assumptions As His Lost Profit Analysis**

In calculating damages based on the reasonable royalty approach, Wagner bases his conclusions on the same erroneous assumptions that he relied upon in formulating his lost profits damages number. For example, Wagner still erroneously assumes that there were no non-infringing alternatives available to TriZetto during the damages period, and artificially inflates the demand for McKesson's clinical editing software. As a result, his reasonable royalty conclusions are wholly unreliable.

> **2.     Wagner's Erroneous Use Of The "Book of Wisdom" Renders His Entire Reasonable Royalty Analysis Unreliable**

To determine reasonable royalty damages, the courts indulge in the legal fiction of a hypothetical licensing negotiation. *Minco Inc. v. Combustion Eng'g, Inc.*, 95 F.3d 1109, 1119 (Fed. Cir. 1996). The reasonable royalty is based on the rate a willing patent owner and willing licensee would have decided upon had they negotiated the license on the date the infringement began. *Unisplay, S.A. v. American Elec. Sign Co.*, 69 F.3d 512, 518 (Fed. Cir. 1995). To determine the outcome of this fictional negotiation, the courts consider many factors. The seminal case of *Georgia-Pacific Corp. v. United States Plywood Corp.* provides an extensive list

of such elements – all of which have been analyzed by both experts in this case.  318 F. Supp. at

1116; Wagner Report, Exh. A at 21-40; David Report, Exh. B at 33-51.

In his report, Wagner admits the date of the hypothetical negotiation should be

October 1993 – the date that the '164 patent issued.  Wagner Report, Exh. A at 19.  Nevertheless,

his analysis once again deviates from the proper approach by using the "book of wisdom" to

change the very parties to the hypothetical negotiation.  *Id*. at 17.  Under the book of wisdom

approach, courts admit some evidence of events subsequent to the date of the hypothetical

negotiation as a basis for inferring what the pre-infringement negotiated royalty value would

have been.  *Sinclair Refining Co. v. Jenkins Petroleum Co.,* 289 U.S. 689 (1933).  Through a

distorted use of the book of wisdom, Wagner assumes that the parties to the hypothetical

negotiation would have been TriZetto and McKesson.  Wagner Report, Exh. A at 17-19.  On the

date of the hypothetical negotiation, however, neither of these parties had any legal interest in the

patented technology.  The book of wisdom approach cannot be stretched that far.  While the

courts are somewhat flexible regarding evidence of subsequent events, courts must still anchor

their analyses to the facts at the time of infringement.  *Alpex Computer Corp. v. Nintendo Co.*, 34

U.S.P.Q.2d 1167, 1199 (S.D.N.Y. 1994).  As such, the proper parties to the hypothetical

negotiation in this case are HPR and Erisco.

In 1993, McKesson did not own the '164 patent, and it would be at least several

more years before either McKesson or TriZetto began offering clinical editing software.  In 1993,

HPR owned the patent and Erisco was selling the product that is now accused of infringement.

Thus, Wagner assumes that the parties to the hypothetical negotiation are two companies that did

not become direct competitors until TriZetto acquired Erisco in 2000 – nearly seven years after

infringement began in 1993.  David Report, Exh. B at 22 n.66.

Courts have not been willing to so fundamentally change the facts as they existed on the date of first infringement in recreating the hypothetical negotiation. For example, in *Odetics, Inc. v. Storage Technology Corp.*, 185 F.3d 1259, 1276 (Fed. Cir. 1999), the court upheld the exclusion of two license agreements that the patentee granted four and five years after the infringement began because, in the district court's view, these had occurred far too late and after the financial landscape had dramatically changed. The court stated that "[t]he district court correctly understood that 'the hypothetical negotiation [required in a reasonable royalty analysis] requires the court to envision the terms of a licensing agreement reached between the patentee and the infringer *at the time infringement began*.'" *Id.* at 1276 (emphasis added), *quoting Rite-Hite*, 56 F.3d at 1554. The court went on to state that, while not all post-infringement evidence should be excluded, it was within its discretion to exclude it if prejudicial or irrelevant. *Odetics, Inc.* 185 F.3d at 1276-77. Likewise, in *Riles v Shell Exploration & Production*, 298 F.3d 1302, 1313 (Fed. Cir. 2002), the court held that "[a] reasonable royalty determination for purposes of making a damages evaluation must relate to the time infringement occurred, and not be an after-the-fact assessment."

By changing the parties at the bargaining table, Wagner is able to skew the *Georgia-Pacific* factors in favor of a higher royalty rate. For instance, one of the *Georgia-Pacific* factors looks to the licensor's established policy and marketing program to maintain its patent monopoly by not licensing others to use the invention or by granting licenses under special conditions designed to preserve the monopoly. 318 F. Supp. at 1120. Wagner asserts that because McKesson has an established policy or marketing program to maintain a patent monopoly by not licensing the '164 patent to major competitors, this factor has an upward impact on the negotiated royalty. Wagner Report, Exh. A at 26-27. To the contrary, however, HPR –

the patent owner at the time infringement began in 1993 – in fact licensed several competitors for modest compensation. David Report, Exh. B at 37. Wagner has admitted that the analysis would be different if the assumed negotiators are Erisco and HPR, and the royalty likely would have been lower. Wagner Depo., Exh. C at 157:13-159:16. By putting McKesson at the hypothetical bargaining table rather than HPR, Wagner is able to improve the patentee's bargaining position because it appears as if McKesson would have driven a harder bargain to preserve its more secure monopoly. This ultimately results in a higher royalty rate in favor of McKesson – a royalty rate HPR would not have been able to achieve.

Fundamental shifts in who has the advantage in the hypothetical negotiation based on subsequent events is not the intended effect of the book of wisdom approach. As the Supreme Court has stated, "the use of the book of wisdom does not charge the offender with elements of value non-existent at the time of his offense. *It is to bring out and expose to light the elements of value that were there from the beginning*." *Sinclair Refining Co.*, 289 U.S. at 689 (emphasis added).

Although there is some disagreement among courts as to what evidence of subsequent events is admissible, one thing is certain: no court has ever held that the book of wisdom may be used to change the very parties to the hypothetical negotiation. When Wagner was asked about the legal propriety of using the book of wisdom to change the parties to the hypothetical negotiation, the following exchange took place:

> Q:   Are you aware of any case holding that it's appropriate to assume the actual parties to the hypothetical negotiation were parties that were neither the patentee nor the accused infringer as of the date of the negotiation?

> A:   No. *And believe me, I have looked.* I think this is an area we need guidance from either the Federal Circuit or the

Supreme Court of the United States, because it is a question that comes up often in cases that I deal with, *and there is absolutely zero case law on this topic*.

Wagner Depo., Exh. C at 153:11-19 (emphasis added).

Thus, it is clear that there is no precedent condoning Wagner's application of the book of wisdom.  Yet, as if *he* were the Federal Circuit or the Supreme Court, Wagner doesn't let that stop him.  He still insists on applying the book of wisdom as he sees fit, even though his own research revealed no support for his position.

In reality, Wagner has not applied the book of wisdom at all.  He has changed the date of the hypothetical negotiation.  Although he pays lip service to the fact that the date of the negotiation must be in 1993, he then assumes that the parties to the negotiation were companies that came onto the scene years later, and he assumes that in 1993 they had the relationship that they have today.  He further assumes that they knew and used all of the information available today, including perfect knowledge of the mergers that have occurred and changes in the market, during the negotiation. Thus, Wagner's negotiation actually occurred this year, not eleven years ago.  Since the law is quite clear that the negotiation must be set as of the date of the first infringement, Wagner's approach is just fundamentally wrong.

In addition, there appears to be strong policy reasons for requiring courts to limit the admission of evidence relating to events that occur after the date of hypothetical negotiation. If the courts were to allow an expert to do as Wagner has done, and change the very parties at the bargaining table, then patentees could attempt to increase reasonable royalty damages based on infringement by delaying litigation.  As they delay, the patentee could seek out a larger, more established company to acquire the rights to their patent.  As a selling point, the patentee could tout the ability of the buyer to increase its damages in litigation through the acquisition.

Allowing the buyer to step into the shoes of its predecessor at the hypothetical negotiation could create a perverse incentive for large companies to shop for smaller patentees with the most lucrative causes of action. This would serve to artificially punish would-be infringers and could exponentially increase frivolous litigation. And that is exactly what is happening here. McKesson and its predecessors waited eleven years from when the alleged infringement began to file this action. During that time, the landscape changed dramatically. Wagner and McKesson are now claiming McKesson should be rewarded for that delay by receiving more damages than would have been possible had the action been timely filed.

### 3. Wagner's Royalty Base — Virtually All Of TriZetto's Revenue — Is Based on an Erroneous View of the Law

Rather than applying his 9% royalty to the portion of TriZetto's revenue that is attributable to its sales of clinical editing software — i.e., attributable to the alleged infringement — Wagner applies it to virtually all of TriZetto's revenues. Thus, he includes in the royalty base revenues from products and services TriZetto sells that are unrelated to the fact that one of the many programs TriZetto has sold to some of its customers has been a clinical editing program. He purports to justify this not based on any economic analysis but on his own version of the legal doctrine called the entire market value rule. Once again, he gets the law wrong, and then uses that misinterpretation as the basis for his conclusions.

Under the entire market value rule, patentees may claim damages for unpatented products sold alongside the patented invention[5] if three strict standards are met: (1) the patented feature must form the basis for customer demand for the entire product sold; (2) the patentee

---

[5]    Such sales are termed "convoyed sales." *Carborundum Co. v. Molten Metal Equip. Innovations, Inc.*, 72 F.3d 872, 882 n.8 (Fed. Cir. 1995).

must reasonably anticipate the sale of the unpatented parts along with the patented component;

and (3) the patented and the unpatented inventions must be functionally related. *TWN Mfg. Co.

v. Dura Corp.*, 789 F.2d 895, 901 (Fed. Cir. 1986); *King Instrument Corp. v. Otari Corp.,* 767 F.

2d 853 (Fed. Cir. 1985); *Rite-Hite Corp. v. Kelley Co.*, 56 F.3d 1538 (Fed. Cir. 1995).

In trying to establish that the technology covered by the '164 patent forms the

basis for customer demand of TriZetto's entire claims processing product line, Wagner once

again leaves too large an analytical gap between the facts of this case and his assertion.  For

example, the facts of this case show that clinical editing performs a very small role within the

overall claims processing system sold by TriZetto.  David Report, Exh. B at 7-10.  Furthermore,

as stated above, many customers do not purchase the clinical editing component, or if they do

receive it as part of a bundled software package, do not use it.  *Id.*  According to TriZetto's

product brochure, Facets performs nine broad and comprehensive functions among which

clinical editing is only a small subpart.  *Id.*  In addition, the opening screen of Facets indicates a

total of 24 "modules" that correspond to particular functions performed by the system.  Claims

editing is only a small component within one of these larger modules.  *Id.*

More importantly, Wagner has completed no analysis or independent research to

determine the importance of clinical editing to TriZetto's overall claims processing product line.

In his deposition, Wagner testified as follows:

> Q:     What analysis have you done to determine which of
> TriZetto's products and services would not be sold if TriZetto did
> not offer clinical editing?
>
> A:     It is my understanding – *I haven't done any
> analysis.  Because I have been told to assume* that if they did not
> have that functionality, that these are foundational patents to this
> whole area, that clients require this.

Wagner Depo., Exh. C at 135:24-25, 136:1-5 (emphasis added).  Moreover, Wagner admitted that he does not know if TriZetto's revenues would have been affected in any way if it had not offered clinical editing to its customers; he has not studied that issue.  Wagner Depo., Exh. C at 137:22-138:13.  How, then, can he possibly claim that the entire market value rule applies such that TriZetto should be liable for reasonable royalty damages based on all of its revenue?

In the end, Wagner admits that the only foundation he has for assuming that the entire market value rule applies to this case is that McKesson has told him to make that assumption.  As mentioned above, federal courts have held that expert opinion testimony is fundamentally unsupported when the expert relies almost exclusively on information from one source who is clearly biased.  *Advanced Med. Optics, Inc.*, 2005 U.S. Dist. LEXIS 5803.  Here, Wagner once again makes a critical assumption based on no independent study or analysis.  As such, his opinion on this subject is without sufficient facts or data to support it.

In addition to holding that the patented feature must form the basis for customer demand for the entire product sold, the Federal Circuit has held that a critical fact in applying the entire market value rule is that the infringing product derives substantially all, if not its entire, value from use of the patented component.  *Western Elec. Co. v. Stewart-Warner Corp.*, 631 F.2d 333, 341 (1980).  When asked about this legal principle at his deposition, the following exchange took place:

> Q:      In your opinion, in applying the entire market value rule, is it appropriate to ask whether the overall group of products being sold derive all, if not substantially all, if not their entire value, from the patented component?
>
> A:      I don't think it needs to be that strong.  You'd have to ask the Federal Circuit whether they are going to say it has to be that strong.  I think it is only necessary that a critical component of

the demand for the patent – for the product includes the patented feature.

Q:     Have you reached any conclusion as to whether all of TriZetto's products and services derive substantially all, if not their entire value, from clinical editing.

A:     *I can't say that I have done enough study that I could independently state that.*   I clearly think based on the marketing information that I have seen, that this is an important feature to their customers.

Wagner Depo., Exh. C at 147:23-25, 148:1-15.

Federal courts have held that "the opinion of an expert . . . must be based on *reliable methodology or analysis* and not on *subjective belief or unsupported speculation*.   An expert must have *good grounds* for his or her opinion." *Creative Dimensions in Mgmt., Inc. v. Thomas Group, Inc.*, 1999 U.S. Dist. LEXIS 5623 (E.D. Pa. Apr. 16, 1999) (emphasis added). Analyzing the expert's methodology requires the court to examine the legal grounds upon which the expert bases his opinion. *DSU Med. Corp.*, 296 F. Supp. 2d at 1148.   In turn, "[r]eliable methodology requires that the legal grounds used by an expert to calculate damages be legally acceptable." *Id.*   As demonstrated by Wagner's deposition testimony above, his methodology is based on his own subjective opinion regarding the entire market value rule, which is contrary to Federal Circuit precedent.   As a result, his methodology is not reliable and his testimony regarding the entire market value rule should be excluded.

**4.     Wagner's Testimony On Reasonable Royalties Should Be Excluded**

As with his lost profits analysis, Wagner's reasonable royalty calculations are devoid of factual support and are riddled with unreliable methodologies.   Indeed, his reasonable royalty analysis includes all of the infirmities that infect his lost profits analysis along with a host of other flaws that make it totally unreliable.   Through misapplication of the law and reliance on

29.

his own subjective application of legal precedent, Wagner has stepped over the line drawn by *Daubert* and Rule 702.  As one court has aptly observed, "people who want damages have to prove them, using methodologies that need not be intellectually sophisticated, but must not insult the intelligence."  *Schiller & Schmidt, Inc. v. Nordisco Corp.*, 969 F.2d 410, 415 (7th Cir. 1992). Wagner's opinions on reasonable royalties fail to meet this criteria.

## V.     CONCLUSION

For the foregoing reasons, TriZetto respectfully submits that Wagner's opinions and testimony should be excluded.

MORRIS, NICHOLS, ARSHT & TUNNELL

*/s/ Rodger D. Smith II (#3778)*
Jack B. Blumenfeld (#1014)
Rodger D. Smith II (#3778)
1201 North Market Street
P.O. Box 1347
Wilmington, Delaware 19899-1347
(302) 658-9200
  Attorneys for Defendant
  The TriZetto Group, Inc.

OF COUNSEL:

Jeffrey T. Thomas
David A. Segal
Michael A. Sitzman
GIBSON, DUNN & CRUTCHER LLP
Jamboree Center, 4 Park Plaza
Irvine, California 92614-8557
(949) 451-3800

December 20, 2005
498671

.

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on December 20, 2005, I caused to be electronically filed the **The TriZetto Group Inc.'s Opening Brief In Support Of Its Motion To Exclude The Expert Testimony Of Michael J. Wagner** with the Clerk of the Court using CM/ECF, which will send notification of such filing(s) to the following:

> Thomas J. Allingham, II
> Skadden, Arps, Slate, Meagher & Flom LLP

I also certify that copies were caused to be served on December 20, 2005, upon the following in the manner indicated:

### BY HAND

> Thomas J. Allingham, II
> Skadden, Arps, Slate, Meagher & Flom LLP
> One Rodney Square
> Wilmington, DE  19801

### BY EMAIL

> Jeffrey G. Randall
> Skadden, Arps, Slate, Meagher & Flom LLP
> 525 University Avenue
> Suite 1100
> Palo Alto, CA  94301

> */s/ Rodger D. Smith II (#3778)*
> Morris, Nichols, Arsht & Tunnell
> 1201 N. Market Street
> P.O. Box 1347
> Wilmington, DE  19899
> (302) 658-9200
> rsmith@mnat.com