# EXHIBIT A

## Page 1

1  UNITED STATES DISTRICT COURT

2  DISTRICT OF DELAWARE

3

4  McKESSON INFORMATION SOLUTIONS, LLC,

5        Plaintiff

6  v.                        CA NO. 04-1258 (SLR)

7  THE TRIZETTO GROUP, INC.,

8        Defendant

9

10

11

---

12            VOLUME 1

13      VIDEOTAPED DEPOSITION OF RANDALL

14  DAVIS, Ph.D., a witness called on behalf of

15  the Plaintiff, pursuant to the Federal Rules

16  of Civil Procedure, before Jessica L.

17  Williamson, Registered Merit Reporter,

18  Certified Realtime Reporter and Notary

19  Public in and for the Commonwealth of

20  Massachusetts, at the Offices of Skadden,

21  Arps, Slate, Meagher & Flom LLP, One Beacon

22  Street, Boston, Massachusetts, on Wednesday,

23  November 30, 2005, commencing at 9:27 a.m.

24  JOB NO. 41297

25

Page 1

## Page 3

1              INDEX

2  DEPONENT                    PAGE

3  RANDALL DAVIS, Ph.D.

4  Examination By Mr. Randall      5, 310

5  Examination By Mr. Segal        297

6

7          EXHIBITS

8  NO.                        PAGE

9  1  Copy of '164 patent        11

10 2  Expert Report dated October     22
          24, 2005

11

   3  Expert Report dated November    22
12    14, 2005

13 4  Article entitled "Enhancing     28
      Accuracy and Timeliness is
14    Integral to the Claims
      Adjudication Process"

15
   5  Document relating to AMS       141
16    entitled "Setting a New
      Standard"

17
   6  Document bearing Bates stamp   142
18    Nos. RD000314 - 324

19 7  Document entitled "AMS June    142
      1986 HDI-Proprietary"

20
   8  One-page document bearing      142
21    Bates stamp No. RD000420

22

23

24

25

Page 3

## Page 2

1  A P P E A R A N C E S

2

3  SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

4    (By Jeff Randall, Esq.)

5    525 University Avenue

6    Palo Alto, California  94301

7    (650) 470-4500

8    jrandall@skadden.com

9    Counsel for the Plaintiff

10

11 GIBSON, DUNN & CRUTCHER LLP

12   (By David A. Segal, Esq.)

13   4 Park Plaza

14   Irvine, California  92614-8557

15   (949) 451-3973

16   dsegal@gibsondunn.com

17   Counsel for the Defendant

18

19 ALSO PRESENT:

20

21   George Dobrentey, Videographer

22

23

24

25

Page 2

## Page 4

09:10:46  1          P R O C E E D I N G S

09:27:22  2          THE VIDEOGRAPHER: Good morning.

09:27:33  3  We are recording and are now on the record.

09:27:35  4  Today's date is November the 30th, 2005, and

09:27:38  5  the time is 9:27 a.m. My name is George

09:27:42  6  Dobrentey. I'm a legal videographer for G &

09:27:46  7  M Court Reporters, Ltd. Our business

09:27:46  8  address is 42 Chauncy Street, Suite 1A,

09:27:50  9  Boston, Massachusetts 02111.

09:27:51 10          This is the deposition of Randall

09:27:55 11  Davis in the matter of McKesson Information

09:28:00 12  Solutions vs. TriZetto Group in the United

09:28:04 13  States District Court in the District of

09:28:06 14  Delaware, Civil Action No. 04-1258 (SLR).

09:28:11 15          This deposition is being taken at One

09:28:15 16  Beacon Street in Boston, Massachusetts on

09:28:17 17  behalf of the plaintiff. The court reporter

09:28:18 18  is Jessica Williamson. The counsel will

09:28:19 19  state their appearances, and the court

09:28:21 20  reporter will administer the oath.

09:28:22 21          MR. RANDALL: Jeff Randall

09:28:24 22  representing plaintiff, McKesson.

09:28:26 23          MR. SEGAL: David Segal on behalf

09:28:27 24  of the TriZetto Corp.

         25

Page 4

1 (Pages 1 to 4)

RANDALL DAVIS, Ph.D.,
a witness called on behalf of the Plaintiff,
having first been duly sworn, was deposed
and testifies as follows:

DIRECT EXAMINATION

09:28:39 BY MR. RANDALL:

09:28:39 Q. Mr. Davis, have you ever had your deposition
09:28:45 taken before?
09:28:45 A. Yes.
09:28:46 Q. How many times?
09:28:47 A. Somewhere between six and ten, I would
09:28:52 guess.
09:28:52 Q. And in each of those occasions was the
09:28:57 deposition taken in conjunction with your
09:28:59 work as an expert on a piece of litigation?
09:29:02 A. Yes.
09:29:02 Q. Approximately how many times have you been
09:29:07 retained by a law firm to assist them in
09:29:13 litigation as an expert?
09:29:17 A. Specifically as an expert I would guess a
09:29:23 dozen to two dozen over the course of
09:29:28 about -- what is it now? -- 16 years.
09:29:33 Q. When you say "as an expert," what do you

Page 5

09:29:37 mean by that?
09:29:37 A. I understand there's a distinction between
09:29:40 being a consultant to a law firm and being
09:29:42 designated as an expert in the case.
09:29:44 Q. How many times have you been hired by a law
09:29:49 firm to act as a consultant to assist them
09:29:52 in either existing or potential litigation?
09:29:56 A. In distinction from the number I just gave
09:30:01 you, I would say there's probably about
09:30:02 another ten or so instances of being a
09:30:07 consultant, without, to my knowledge, being
09:30:08 designated as an expert.
09:30:10 Q. Are you currently employed?
09:30:13 A. Yes.
09:30:13 Q. And how are you currently employed?
09:30:16 A. Professor of computer science at MIT.
09:30:19 Q. How long have you been so employed?
09:30:21 A. I was hired there in 1978.
09:30:23 Q. When did you first become involved in this
09:30:31 case?
09:30:31 A. I believe I was contacted very near the end
09:30:35 of August 2005. Actually, come to think of
09:30:43 it, I believe I was contacted earlier in
09:30:46 2005, perhaps sometime in late spring or
09:30:51 thereabouts, and said I didn't have the time

Page 6

09:30:54 to be involved, and I was contacted again in
09:30:56 August and that began my real involvement in
09:30:59 the case.
09:31:00 Q. Who contacted you in the spring?
09:31:07 A. I believe it was Mr. Segal.
09:31:08 Q. Were you engaged at that time in this case?
09:31:14 A. No.
09:31:15 Q. Did you do any work whatsoever in connection
09:31:18 with this case prior to September of this
09:31:24 year?
09:31:24 A. No.
09:31:24 Q. When were you first engaged -- strike that.
09:31:29 You were engaged as an expert by the
09:31:32 law firm of Gibson, Dunn & Crutcher to work
09:31:34 on this case, correct?
09:31:35 A. Yes.
09:31:36 Q. And you were so engaged in early September
09:31:39 of this year, 2006; is that right -- 2005?
09:31:42 A. Correct.
09:31:47 Q. And prior to that time you had never read
09:31:49 the patent that is at issue in this
09:31:51 litigation, correct?
09:31:52 A. Correct.
09:31:52 Q. You were never aware of it, right?
09:31:54 A. No, I don't believe I was aware of it.

Page 7

09:31:57 Q. Approximately how much time to date have you
09:32:12 spent in connection with your work on this
09:32:15 case for Gibson, Dunn & Crutcher?
09:32:17 A. I always forget to look that up. They
09:32:25 always ask, so let me give you my best
09:32:27 estimate. I forget to do the numbers. I
09:32:33 would guess to date it's on the order of 80
09:32:36 hours, but I would actually have to look at
09:32:38 the records to see.
09:32:38 Q. And are you charging your normal -- strike
09:32:43 that.
09:32:44 What are you charging TriZetto's
09:32:47 lawyers to assist them in litigation per
09:32:51 hour?
09:32:51 A. It's either 650 or 700. I forget, to be
09:32:56 honest, as I sit here. I'm sure it's in the
09:32:59 report.
09:33:05 Q. You're not sure?
09:33:05 A. My rate has changed recently, and I don't
09:33:08 remember whether they got the early rate or
09:33:09 the late rate, to be perfectly honest.
09:33:11 Q. Your current rate is $700 per hour for
09:33:15 assisting law firms in litigation; is that
09:33:19 right?
09:33:19 A. That is correct.

Page 8

2 (Pages 5 to 8)

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
877.955.3855

10:02:07 1     was before the examiner.
10:02:07 2 A. That's what I read a moment ago, but it's,
10:02:10 3     for example --
10:02:11 4 Q. You read it rather fast, and you said that
10:02:14 5     it's in each claim. So I want to identify
10:02:15 6     exactly what language you're talking about?
10:02:17 7 A. Certainly. For example, in Claim 3, the
10:02:21 8     first element starting, "a predetermined
10:02:26 9     database stored," et cetera.
10:02:30 10 Q. So that would be at the patent Claim 3,
10:02:33 11     Column 117, Lines 45 through 51 --
10:02:36 12 A. Yes.
10:02:36 13 Q. -- is that correct?
10:02:37 14 A. Yes.
10:02:37 15 Q. So you believe that the prior art that was
10:02:43 16     before the examiner disclosed that element
10:02:49 17     and that the collection of prior art that
10:02:52 18     was before the examiner did not disclose any
10:02:54 19     of the other elements in the claims; is that
10:03:00 20     right?
10:03:00 21 A. I believe so.
10:03:01 22 Q. Which reference or references do you believe
10:03:07 23     was before the examiner disclosed that
10:03:11 24     specific element?
10:03:14 25 A. The reference on the cover page of the

Page 25

10:03:18 1     patent. It's the second listing under
10:03:23 2     "Other Publications." Its title starts
10:03:26 3     "Enhancing Accuracy and Timeliness."
10:03:28 4 Q. And where in your report do you address that
10:03:43 5     issue?
10:03:44 6 A. Page 28 and 29.
10:03:56 7 Q. Are there any other references that were
10:03:57 8     before the Patent Office that you believe
10:04:00 9     disclose the element of Claim 3 that you've
10:04:15 10     previously identified?
10:04:16 11 A. No.
10:04:17 12 Q. So is it your opinion, sir, that other than
10:04:30 13     the element in Claim 3 that you identified,
10:04:35 14     Column 117, Lines 45 through 51, and its
10:04:39 15     corresponding element that appears in other
10:04:40 16     claims, other than that -- those elements,
10:04:45 17     the collective prior art before the examiner
10:04:47 18     did not disclose any of the other elements
10:04:49 19     of the claims; is that right?
10:04:53 20 A. Correct.
10:04:53 21 Q. Is it your opinion that the article entitled
10:06:04 22     "Enhancing Accuracy and Timeliness is
10:06:07 23     Integral to the Claims Adjudication Process"
10:06:11 24     from the Employee Benefit Plan Review dated
10:06:14 25     December 1985, Pages 10 through 12, is the

Page 26

10:06:24 1     portion of the article that you believe
10:06:27 2     discloses the element of Claim 3 and its
10:06:31 3     corresponding elements from other claims
10:06:34 4     that you've mentioned?
10:06:35 5 A. I believe so. There was just a part of the
10:06:38 6     way you phrased that that I was a little
10:06:40 7     confused by. The reference to Page 10 to
10:06:43 8     12, that is the entire article, isn't it?
10:06:46 9 Q. All right. But is that what you're talking
10:06:48 10     about?
10:06:48 11 A. Yes, that is the article I'm talking about.
10:06:49 12 Q. And specifically the language that you're
10:06:52 13     relying on is the language that's in your
10:06:55 14     report at Page 28; is that right?
10:06:57 15 A. I'm relying on the entire article, but I
10:07:01 16     cited that particular language as being
10:07:02 17     particularly relevant.
10:07:50 18     (Pause.)
10:08:17 19     MR. RANDALL: We'll mark for
10:08:18 20     identification as Exhibit 4 the article
10:08:29 21     entitled "Enhancing Accuracy and Timeliness
10:08:32 22     is Integral to the Claims Adjudication
10:08:34 23     Process."
10:08:34 24
10:08:41 25

Page 27

10:08:28 1     (Exhibit No. 4, Article entitled
10:08:29 2     "Enhancing Accuracy and Timeliness is
10:08:32 3     Integral to the Claims Adjudication
10:09:28 4     Process," marked for identification.)
10:09:28 5 Q. I see that the exhibit's been put before
10:09:30 6     you, sir. Can you please point out
10:09:35 7     specifically where you believe that this
10:09:39 8     article discloses the element of Claim 3 at
10:09:44 9     Column 117, Lines 45 through 51?
10:09:54 10 A. Yes. Just one moment.
10:10:00 11     (Witness reviews document.)
10:11:18 12 A. Okay. There's language on Page 10 under the
10:11:26 13     heading "Eligibility Data" which starts with
10:11:32 14     "Ms. Welsh suggested that" -- excuse me, do
10:11:35 15     you want me to read this into the record or
10:11:37 16     just point you to it? How would you like me
10:11:39 17     to do it?
10:11:40 18 Q. I would like you to read specifically into
10:11:42 19     the record what you are relying on for your
10:11:44 20     opinion that somewhere in this article there
10:11:47 21     is language that discloses the element from
10:11:52 22     Claim 3 that we've identified.
10:11:54 23 A. Okay. First of all, I'm relying on the
10:11:57 24     entire article, but I can pick out specific
10:12:00 25     language that I think is most relevant. The

Page 28

7 (Pages 25 to 28)

**SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES**
**877.955.3855**

| | | |
|---|---|---|
| 10:12:02 | 1 | language, I don't think we can take the |
| 10:12:04 | 2 | language out of the context of the article |
| 10:12:06 | 3 | because it wouldn't necessarily make sense. |
| 10:12:08 | 4 | So I will start reading on Page 10, "Ms. |
| 10:12:11 | 5 | Welsh suggested that when data on age, sex, |
| 10:12:14 | 6 | effective dates, and cancellation date are |
| 10:12:16 | 7 | entered into the computer system, certain |
| 10:12:18 | 8 | red flags can be built into the system to |
| 10:12:21 | 9 | warn that the covered individual is near or |
| 10:12:23 | 10 | past eligibility status. |
| 10:12:25 | 11 | "Age edits will alert claims adjusters |
| 10:12:28 | 12 | to those participants who are over age 65 |
| 10:12:30 | 13 | and eligible for Medicare, and will identify |
| 10:12:33 | 14 | students age 19 to 23 or whatever |
| 10:12:36 | 15 | limitations might be under the plan." |
| 10:12:39 | 16 | That's one piece of the specific language |
| 10:12:41 | 17 | that I find particularly relevant. |
| 10:12:44 | 18 | Now I'm going to go to Page 12. Near |
| 10:12:47 | 19 | the top left, "For example, if the average |
| 10:12:50 | 20 | hospital length of stay for a given |
| 10:12:52 | 21 | procedure is two days and you receive a bill |
| 10:12:55 | 22 | for five days, the health profile will edit |
| 10:12:57 | 23 | the discrepancy or red flag the claim for |
| 10:13:00 | 24 | further investigation or concurrent review. |
| 10:13:03 | 25 | It will identify X-ray and lab work that is |

Page 29

| | | |
|---|---|---|
| 10:13:05 | 1 | not consistent with the diagnosis, which is |
| 10:13:07 | 2 | an indication of preventive maint" -- sorry, |
| 10:13:12 | 3 | "preventative medicine, or defensive |
| 10:13:14 | 4 | medicine, or financing a Rolls Royce. It |
| 10:13:17 | 5 | can edit ancillary charges, follow-up visits |
| 10:13:22 | 6 | that should be included in the surgical fee, |
| 10:13:23 | 7 | and so on." |
| 10:13:26 | 8 | And then skipping to the next |
| 10:13:28 | 9 | paragraph, "If you're able to share the |
| 10:13:30 | 10 | data, find out the coding system common to |
| 10:13:32 | 11 | the database. If procedural, is it RVS |
| 10:13:37 | 12 | (relative value study) or CPT (current |
| 10:13:41 | 13 | procedural terminology); if diagnostic, is |
| 10:13:46 | 14 | it ICD (international classification of |
| 10:13:49 | 15 | diseases) or DRG (diagnostic related group)? |
| 10:13:54 | 16 | Codes are for access, for comparing and for |
| 10:13:56 | 17 | profiling." |
| 10:14:04 | 18 | Those are the specific -- as I say, |
| 10:14:07 | 19 | I'm relying on the article as a whole, but |
| 10:14:09 | 20 | those pieces of the language that seem to me |
| 10:14:16 | 21 | to be most relevant to your question. |
| 10:14:18 | 22 | Q.  Where specifically in the portions of this |
| 10:14:23 | 23 | article that you just identified do you |
| 10:14:26 | 24 | believe it discloses a predetermined |
| 10:14:30 | 25 | database containing medical service codes |

Page 30

| | | |
|---|---|---|
| 10:14:34 | 1 | and a set of relationships among the medical |
| 10:14:38 | 2 | service codes? |
| 10:14:42 | 3 | A.  In the language I just read. |
| 10:14:48 | 4 | Q.  Where is the set of relationships among the |
| 10:14:51 | 5 | medical service codes disclosed? |
| 10:14:55 | 6 | A.  In taking it in order, though not |
| 10:15:06 | 7 | necessarily in order of importance, in |
| 10:15:08 | 8 | phrases like "or whatever limitations might |
| 10:15:10 | 9 | be under the plan," further on, "identifying |
| 10:15:15 | 10 | X-ray and lab work not consistent with the |
| 10:15:17 | 11 | diagnosis, defensive medicine, ancillary |
| 10:15:21 | 12 | charges," references to CPT codes. |
| 10:15:48 | 13 | Q.  Is that it? |
| 10:15:48 | 14 | A.  Those are the most relevant pieces of the |
| 10:15:53 | 15 | text that I just read. |
| 10:15:54 | 16 | Q.  I'm not asking for the relevant portion. |
| 10:15:56 | 17 | I'm asking for what specific portions of |
| 10:15:58 | 18 | this article did you rely on for your |
| 10:16:01 | 19 | opinion that this element of Claim 3 was |
| 10:16:05 | 20 | disclosed by this article? |
| 10:16:07 | 21 | MR. SEGAL:  Asked and answered. |
| 10:16:07 | 22 | Q.  And you've identified a series of excerpts |
| 10:16:11 | 23 | from this article, and then I asked you a |
| 10:16:15 | 24 | more specific question, which was, where |
| 10:16:18 | 25 | specifically in the excerpts that you |

Page 31

| | | |
|---|---|---|
| 10:16:20 | 1 | identified is the disclosure, in your |
| 10:16:22 | 2 | opinion, of a predetermined database |
| 10:16:27 | 3 | containing medical service codes and a set |
| 10:16:29 | 4 | of relationships among medical service |
| 10:16:32 | 5 | codes? |
| 10:16:33 | 6 | MR. SEGAL:  Asked and -- |
| 10:16:35 | 7 | Q.  And you answered by providing some examples. |
| 10:16:38 | 8 | Is that it? |
| 10:16:39 | 9 | MR. SEGAL:  Object -- |
| 10:16:40 | 10 | Q.  Are you completed with your answer? |
| 10:16:41 | 11 | MR. SEGAL:  Objection, misstates |
| 10:16:43 | 12 | his testimony. |
| 10:16:51 | 13 | A.  You have to forgive me.  I've lost track of |
| 10:16:53 | 14 | the original question.  If you give it to me |
| 10:16:55 | 15 | again, I will try and hit it head on. |
| 10:16:58 | 16 | Q.  Specifically where in this article that was |
| 10:17:03 | 17 | before the Patent Office -- strike that. |
| 10:17:07 | 18 | What language in the article that was |
| 10:17:09 | 19 | before the Patent Office entitled "Enhancing |
| 10:17:13 | 20 | the Accuracy and Timeliness is Integral to |
| 10:17:16 | 21 | the Claims Adjudication Process" do you rely |
| 10:17:21 | 22 | on for your opinion that it discloses the |
| 10:17:28 | 23 | predetermined database "containing medical |
| 10:17:30 | 24 | service codes and a set of relationships |
| 10:17:32 | 25 | among the medical service codes defining |

Page 32

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
877.955.3855

Page 33

```
10:17:35  1    whether selected ones of the medical service
10:17:37  2    codes are valid when received with other
10:17:41  3    selected ones of the medical service codes"?
10:17:44  4    And I'm reading that claim element from
10:17:46  5    Claim 3.
10:17:47  6  A.  Yes, one moment, please.  The excerpts that
10:18:01  7    I read into the record a moment ago are the
10:18:03  8    language that I'm relying on in the context
10:18:05  9    of the rest of the article.
10:18:13 10  Q.  So just to be clear, you have now identified
10:18:20 11    the portion of this article that was before
10:18:24 12    the Patent Office, namely Exhibit 4, that
10:18:30 13    you believe discloses the element of Claim 3
10:18:36 14    at Column 117, Lines 45 through 51, correct?
10:18:40 15    MR. SEGAL:  Objection, misstates
10:18:41 16    his testimony.
10:18:41 17  A.  I believe that that language in the context
10:18:44 18    of the rest of the article discloses that.
10:18:55 19  Q.  Does TriZetto -- strike that.
10:18:59 20    Do the systems that McKesson has
10:19:06 21    accused TriZetto of infringing also practice
10:19:10 22    that same element of Claim 3?
10:19:14 23  A.  My opinion is no.
10:19:24 24  Q.  Why not?
10:19:25 25  A.  As best I can undetermine -- I can
```

Page 34

```
10:19:32  1    understand, determine -- let me start again,
10:19:35  2    please.
10:19:35  3    As best I can understand the term
10:19:38  4    "predetermined database," the TriZetto
10:19:41  5    system does not have a predetermined
10:19:43  6    database.
10:19:43  7  Q.  Is that the only reason, in your opinion,
10:19:50  8    that the TriZetto systems do not practice
10:19:55  9    that element of Claim 3 and the
10:19:58 10    corresponding elements in other claims?
10:19:59 11    MR. SEGAL:  Objection, vague and
10:20:01 12    ambiguous.
10:20:01 13  A.  As I sit here, that's the only one I recall.
10:20:15 14    I cannot at this moment cite for you another
10:20:19 15    reason.
10:20:20 16  Q.  And what definition of "predetermined
10:20:30 17    database" did you use in reaching that
10:20:33 18    opinion?
10:20:37 19  A.  The notion that the database is fixed, not
10:20:44 20    changed by the user.
10:20:45 21  Q.  But where in this article that you've
10:21:12 22    identified that we've marked as Exhibit 4
10:21:15 23    does it say, No. 1, that there's a database,
10:21:19 24    but, No. 2, that this database is fixed and
10:21:24 25    cannot be changed?
```

Page 35

```
10:21:36  1    (Witness reviews document.)
10:21:40  2    MR. SEGAL:  Objection, compound.
10:21:45  3  Q.  Let me rephrase the question.  Where in
10:21:47  4    this -- strike that.
10:21:49  5    Where in Exhibit 4, if at all, is
10:21:53  6    there language which you believe discloses a
10:22:04  7    database that is fixed and cannot be
10:22:23  8    changed?
10:22:23  9    (Witness reviews document.)
10:23:33 10  A.  I don't see specific language using the term
10:23:36 11    "predetermined database."  It was my
10:23:38 12    impression in reading this over that that's
10:23:40 13    what they had in mind, but I cannot point
10:23:42 14    you to a specific piece of language in here.
10:23:47 15  Q.  Does that change your opinion in any way
10:23:49 16    that this article, Exhibit 4, and
10:23:53 17    specifically the language that you've
10:23:55 18    previously identified, discloses the element
10:23:59 19    of Claim 3 and its corresponding elements in
10:24:02 20    other claims that appears at Column 117,
10:24:09 21    Lines 45 to 51?
10:24:10 22  A.  No.
10:24:15 23  Q.  Well, how is it, sir, that you can opine
10:24:20 24    that Exhibit 4 discloses a predetermined
10:24:25 25    database which you have indicated is fixed
```

Page 36

```
10:24:29  1    and cannot be changed when that language
10:24:31  2    does not appear anywhere in the article?
10:24:34  3    MR. SEGAL:  Objection, misstates
10:24:35  4    his testimony.
10:24:35  5  A.  Well, all right.  Language, it does not
10:24:55  6    use -- let me admit it does not use the term
10:24:58  7    "predetermined database," okay?  But there
10:25:01  8    is language such as, as I read before,
10:25:07  9    "certain red flags can be built into the
10:25:11 10    system," okay, which suggests that these are
10:25:13 11    things that are built into the system, and
10:25:15 12    in terms of describing a computer system,
10:25:19 13    the notion of built-in generally implies not
10:25:24 14    user-modifiable.  So it's language like that
10:25:29 15    that I was keying off of.
10:25:33 16  Q.  Well, that suggests, does it not, sir, that
10:25:37 17    the -- whatever database that may exist in
10:25:39 18    this article can be changed because it says
10:25:41 19    that red flags can be built into the system?
10:25:48 20    Doesn't that suggest that it's modifiable?
10:25:50 21  A.  No.  It suggests that who builds the system
10:25:52 22    can make the decision.  It doesn't suggest
10:25:54 23    that a user can change it.  There's an
10:25:58 24    important difference there.
10:26:01 25  Q.  Where does it suggest that the entity that
```

9 (Pages 33 to 36)

10:26:02  1   builds the system as opposed to the user can
10:26:07  2   identify which flags ought to be built into
10:26:10  3   the system?
10:26:10  4  A.  I as a -- relying on my background in
10:26:21  5   computer science, I take the term "built-in"
10:26:24  6   to mean built into the system by the system
10:26:29  7   designers and constructors.
10:26:42  8  Q.  Do you see on Page 10, bottom of the column,
10:26:59  9   moving on to the second column where it says
10:27:01 10   "age edits will alert claims adjusters to,"
10:27:07 11   then skipping down a couple lines, "whatever
10:27:10 12   limitations might be under the plan."
10:27:11 13      Do you see that?
10:27:12 14  A.  I do.
10:27:12 15  Q.  Doesn't that suggest to you that this system
10:27:16 16   can be modified by limitations that might be
10:27:20 17   under the plan?
10:27:20 18  A.  No, not by the end user. The question is
10:27:25 19   not whether a system can be changed under
10:27:28 20   any circumstances at all. The question, as
10:27:32 21   I understand it -- sorry. Let me rephrase
10:27:35 22   that.
10:27:35 23      As I'm using the term "predetermined
10:27:39 24   database," I mean not changeable by the end
10:27:42 25   user. And that language does not suggest to

Page 37

10:27:44  1   me the notion of changeable by the end user.
10:27:52  2  Q.  Have you considered whether the
10:27:53  3   predetermined database means a database that
10:27:56  4   is predetermined prior to the processing of
10:28:02  5   a particular claim?
10:28:07  6  A.  I need to understand what you mean by
10:28:10  7   "predetermined prior to the processing of a
10:28:13  8   particular claim." As opposed -- and it
10:28:14  9   would help me to understand if you could
10:28:16 10   explain, as opposed to -- no, let me -- hang
10:28:21 11   on a second.
10:28:24 12      If you're saying there's a sense of
10:28:26 13   "predetermined" meaning prior to the
10:28:27 14   processing of a claim, then I need to
10:28:29 15   understand what would change after the
10:28:31 16   processing of a claim. That would help me
10:28:33 17   to understand how you're using the term
10:28:35 18   "predetermined" in that context.
10:28:37 19  Q.  Well, would you agree that the databases
10:28:42 20   that are included within the TriZetto
10:28:46 21   systems are predetermined prior to the input
10:29:00 22   of a particular claim?
10:29:01 23      MR. SEGAL: Objection, vague and
10:29:02 24   ambiguous.
10:29:02 25  A.  I'm trying to figure out how to describe

Page 38

10:29:19  1   this. There is a technically almost
10:29:22  2   nonsensical sense in which that can be true;
10:29:26  3   that is, if what you're suggesting is that
10:29:30  4   between the time -- sorry. Let me rephrase
10:29:38  5   that.
10:29:39  6      Could you use your phrase again about
10:29:44  7   "predetermined before data entry." That's
10:29:46  8   what I was tripping over. If you could say
10:29:50  9   that again, I'll be able to respond.
10:29:53 10  Q.  The question was, would you agree that the
10:29:56 11   databases that are included within the
10:29:57 12   TriZetto systems are predetermined prior to
10:30:00 13   the input of a particular claim?
10:30:02 14  A.  No, because they are changed by the user
10:30:11 15   upon installation. The user has to modify
10:30:14 16   the database as it comes from the vendor in
10:30:18 17   the very process of installation, so they're
10:30:20 18   not predetermined before the claims are
10:30:23 19   entered. They're changed before the claims
10:30:25 20   are entered.
10:30:30 21  Q.  Well, let me walk you through a typical
10:30:32 22   scenario, see if you agree. Is a typical
10:30:36 23   scenario that -- strike that.
10:30:38 24      TriZetto itself maintains and operates
10:30:44 25   accused infringing systems for the benefit

Page 39

10:30:47  1   of its customers, correct?
10:30:51  2  A.  I don't know about -- sorry, yes.
10:30:56  3  Q.  And it also sells and assists in the
10:30:58  4   training and installation of systems at
10:31:00  5   customer sites that have been accused of
10:31:02  6   infringement, correct?
10:31:03  7  A.  I understand that to be true.
10:31:09  8  Q.  And so, for instance, while we're sitting
10:31:13  9   here today, there are accused infringing
10:31:17 10   systems that are being operated by TriZetto
10:31:19 11   on behalf of some of its customers, correct?
10:31:22 12  A.  That's my understanding.
10:31:24 13  Q.  And while we're sitting here today, as those
10:31:29 14   claims are being input into those accused
10:31:32 15   infringing systems, the databases are
10:31:36 16   predetermined, correct?
10:31:37 17  A.  Not necessary -- I'm sorry, are you
10:31:39 18   finished?
10:31:39 19  Q.  Yeah.
10:31:39 20  A.  Not necessarily. There's a trivial sense in
10:31:45 21   which what you're saying is true; that is,
10:31:48 22   there are certainly intervals of time during
10:31:50 23   which that database is not changing. It's
10:31:52 24   certainly not changing every instant of
10:31:54 25   every moment, okay? Sure, that's true. But

Page 40

10 (Pages 37 to 40)

**SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES**
**877.955.3855**

03:26:00 1    BY MR. RANDALL:
03:26:01 2 Q. In rendering your opinions regarding the
03:26:09 3   validity of the patent, Mr. Davis, did you
03:26:12 4   review any source code for prior art?
03:26:28 5 A. I'm just going to check and see, so I can
03:26:32 6   make sure I give you an accurate answer.
03:26:43 7      MR. SEGAL: Here is part of your
03:26:44 8   report here (indicating).
03:26:45 9 A. Excuse me one minute while I get sorted out.
03:26:49 10      THE WITNESS: Thank you.
03:27:32 11   (Witness reviews document.)
03:27:33 12 A. Yes.
03:27:34 13 Q. Source code for what system?
03:27:36 14 A. The source code for the system cited on Page
03:27:49 15   9, the paper described in Davis, Buchanan
03:27:53 16   and Shortliffe. Since I built a reasonable
03:27:56 17   amount of that system, I knew about the
03:27:59 18   source code that was in there. Yes, and
03:28:09 19   then Page 11, the McDermott reference, some
03:28:13 20   of the source code is published in the
03:28:16 21   article that's cited there.
03:28:30 22 Q. Did you find it necessary to review the code
03:28:34 23   for at least those two references in order
03:28:37 24   to support your validity opinions?
03:28:52 25   (Witness reviews document.)

Page 193

03:29:04 1 A. As to the Davis reference on Page 9, no.
03:29:10 2   The issues that I cite with respect to that
03:29:14 3   system are accessible without having to have
03:29:18 4   reviewed the source code. I happen to have
03:29:20 5   known the source code, but what I cite
03:29:23 6   didn't require going to the source code.
03:29:34 7      And with respect to McDermott in R-1,
03:29:38 8   I would say it was useful -- what was the
03:29:41 9   word you used? Was it what?
03:29:48 10 Q. Did you find it necessary --
03:29:50 11 A. Necessary.
03:29:51 12 Q. -- to review the code for at least those two
03:29:53 13   references in order to support the validity
03:29:55 14   opinions?
03:29:56 15 A. I guess I'm having a little trouble deciding
03:30:03 16   whether it was necessary or not in the case
03:30:04 17   of R-1. It was certainly a useful and
03:30:07 18   helpful thing to do to have reviewed the
03:30:10 19   code in that case.
03:30:11 20 Q. Did you find it unnecessary to review any
03:30:12 21   source code with respect to any of the other
03:30:14 22   systems or references which you opined on in
03:30:17 23   your October report?
03:30:19 24 A. The aspects of those other systems that I
03:30:26 25   opined on were accessible from documents

Page 194

03:30:31 1   other than the source code. So I guess I'm
03:30:36 2   answering two questions at once. I did not
03:30:39 3   find it necessary for the other systems
03:30:43 4   because the things I was opining on about
03:30:45 5   those systems did not require me to read the
03:30:48 6   source code.
03:30:53 7 Q. And specifically you were opining on the
03:30:57 8   prior art references and systems, the
03:31:07 9   satisfaction of -- strike that.
03:31:09 10      Specifically you were opining on the
03:31:20 11   disclosure of each and every element of each
03:31:24 12   and every asserted claim in the prior art,
03:31:29 13   correct?
03:31:32 14 A. I'm sorry, could you just say that again? I
03:31:35 15   missed it.
03:31:36 16 Q. You opined in your October report that the
03:31:38 17   asserted claims were invalid, right?
03:31:41 18 A. Correct.
03:31:41 19 Q. And you based your opinions on prior art
03:31:45 20   listed in your report, correct?
03:31:47 21 A. Plus a knowledge of one versed in the art as
03:31:51 22   of the time.
03:31:53 23 Q. Correct?
03:31:54 24 A. Correct.
03:31:54 25 Q. And you found it unnecessary in determining

Page 195

03:32:00 1   that the collection of prior art that you
03:32:04 2   described in your report disclosed each and
03:32:09 3   every element of the asserted claims to
03:32:14 4   review the source code, right, for any one
03:32:17 5   of those systems or references?
03:32:19 6      MR. SEGAL: Objection, vague.
03:32:19 7 A. The information that was available about
03:32:32 8   those systems plus my knowledge of the field
03:32:36 9   at the time was enough to make me believe
03:32:38 10   that they were invalid, without in every
03:32:43 11   case having to read source code.
03:32:49 12 Q. Well, didn't you say that it was unnecessary
03:33:00 13   for you to review the code with respect to
03:33:02 14   your own article for the opinions that you
03:33:05 15   reached on your 77 article, right?
03:33:08 16 A. I said that the opinions I gave regarding
03:33:13 17   the system described in that article do not
03:33:16 18   happen to depend on the details of the
03:33:17 19   source code.
03:33:18 20 Q. And nor do your opinions regarding the
03:33:22 21   McDermott reference, correct?
03:33:24 22 A. No. I said it was -- well, if the standard
03:33:29 23   is absolutely necessary, I would actually
03:33:33 24   have to go back and double-check the article
03:33:34 25   to decide whether it was absolutely

Page 196

49 (Pages 193 to 196)

| | |
|---|---|
| 03:33:37 1 | necessary. I know it was certainly useful. |
| 03:33:39 2 | Q. All right. Other than this McDermott |
| 03:33:42 3 | reference, you did not find it necessary to |
| 03:33:45 4 | review any source code for any of the other |
| 03:33:49 5 | prior art references or systems that you -- |
| 03:33:52 6 | that form the basis for your validity |
| 03:33:54 7 | opinions, correct? |
| 03:33:55 8 | A. Yes, that's correct. Part of the things I |
| 03:34:02 9 | opined about concerning those previous |
| 03:34:03 10 | systems were based on information and |
| 03:34:08 11 | descriptions of the systems as opposed to |
| 03:34:10 12 | information gleaned from reading the source |
| 03:34:12 13 | code. |
| 03:34:18 14 | Q. And you were able to reach the conclusion |
| 03:34:19 15 | and opinions that you reached, namely that |
| 03:34:24 16 | the prior art practiced all of the elements |
| 03:34:26 17 | of all of the asserted claims, without the |
| 03:34:29 18 | necessity of ever looking at any source code |
| 03:34:34 19 | for those references or systems other than |
| 03:34:36 20 | this McDermott reference, correct? |
| 03:34:38 21 | MR. SEGAL: Objection, vague and |
| 03:34:41 22 | ambiguous, mischaracterizes the testimony. |
| 03:34:43 23 | A. I think it's necessary to be explicit and |
| 03:34:48 24 | say that the prior art, along with knowledge |
| 03:34:55 25 | of practice at that point in time, renders |

Page 197

| | |
|---|---|
| 03:34:59 1 | these things obvious. It wasn't just the |
| 03:35:01 2 | articles themselves. And you keep saying |
| 03:35:03 3 | just the articles. And I want to be clear |
| 03:35:06 4 | that it's those articles in the context of |
| 03:35:08 5 | experience in the art as of that point in |
| 03:35:11 6 | time which rendered them obvious. |
| 03:35:15 7 | Q. And you were able to reach those conclusions |
| 03:35:18 8 | without the necessity of reviewing any |
| 03:35:24 9 | source code with respect to the prior art |
| 03:35:27 10 | referenced in your reports, right, other |
| 03:35:30 11 | than this McDermott reference? |
| 03:35:31 12 | MR. SEGAL: Objection, vague. |
| 03:35:32 13 | A. Other than the McDermott reference. |
| 03:35:37 14 | Q. The answer's yes? |
| 03:35:38 15 | A. Yes. |
| 03:35:38 16 | Q. So just to be clear, you were able to, based |
| 03:35:46 17 | on someone that you considered to be of |
| 03:35:50 18 | ordinary skill in the art at the relevant |
| 03:35:54 19 | time, look at just the references and the |
| 03:35:56 20 | materials cited in your report and conclude |
| 03:35:59 21 | that they disclosed all the elements of the |
| 03:36:05 22 | asserted claims without ever having to look |
| 03:36:08 23 | at the source code, correct? |
| 03:36:09 24 | MR. SEGAL: Objection, |
| 03:36:10 25 | mischaracterizes the record, vague. |

Page 198

| | |
|---|---|
| 03:36:12 1 | A. I'm sorry, I'm losing it. If you could just |
| 03:36:23 2 | read that back. |
| 03:36:23 3 | Q. I'll rephrase it. |
| 03:36:24 4 | A. Okay. Sorry. |
| 03:36:26 5 | Q. The basis for your opinions that the |
| 03:36:29 6 | asserted claims are invalid -- strike that. |
| 03:36:34 7 | It was not necessary for the basis of |
| 03:36:39 8 | your opinions that each and every asserted |
| 03:36:44 9 | claim was invalid for you to review the |
| 03:36:49 10 | source code for the references and systems |
| 03:36:52 11 | that you relied upon in your report, |
| 03:36:54 12 | correct? |
| 03:36:54 13 | MR. SEGAL: Vague. |
| 03:36:55 14 | A. It was not necessary for me to review the |
| 03:36:57 15 | source code of every system described in the |
| 03:37:00 16 | report in order to arrive at the opinions I |
| 03:37:02 17 | arrived at. |
| 03:37:03 18 | Q. And, in fact, it wasn't necessary for you to |
| 03:37:05 19 | review any source code for any system, aside |
| 03:37:08 20 | from the source code, perhaps, that was |
| 03:37:10 21 | referenced in the McDermott article, |
| 03:37:13 22 | correct? |
| 03:37:13 23 | A. There was enough material in the articles |
| 03:37:16 24 | and in my knowledge of the prior art. |
| 03:37:20 25 | Q. Without the necessity of having to rely on a |

Page 199

| | |
|---|---|
| 03:37:22 1 | review of the source code, correct? |
| 03:37:24 2 | A. For most of them, except for McDermott. |
| 03:37:27 3 | Q. Is it your opinion, sir, that any individual |
| 03:37:43 4 | reference or system anticipates any one |
| 03:37:49 5 | claim of the -- strike that. |
| 03:37:53 6 | Is it your opinion that any one |
| 03:37:55 7 | reference or system anticipates all asserted |
| 03:38:00 8 | claims of the '164 patent? |
| 03:38:04 9 | A. As I understand the term "anticipates," the |
| 03:38:07 10 | answer is no. |
| 03:38:08 11 | Q. Is it your opinion that any one reference or |
| 03:38:13 12 | system anticipates any claim of the '164 |
| 03:38:19 13 | patent? |
| 03:38:24 14 | (Witness reviews document.) |
| 03:38:24 15 | A. Okay. So the question is, again, is there |
| 03:39:05 16 | any one reference that anticipates any claim |
| 03:39:09 17 | of the '164 patent? Do I have it right? |
| 03:39:13 18 | Q. Reference or system, yes. |
| 03:39:15 19 | A. No. |
| 03:39:19 20 | Q. So it's your opinion, sir, that you have not |
| 03:39:24 21 | found any one reference or any one system |
| 03:39:29 22 | that you believe anticipates any asserted |
| 03:39:32 23 | claim of the '164 patent, correct? |
| 03:39:36 24 | A. I guess I would want to -- as I sit here, I |
| 03:39:49 25 | would want to give a little more thought -- |

Page 200

50 (Pages 197 to 200)

03:39:51  1    I'd just go back and do more examination of
03:39:53  2    the AMS system with respect to Claims 1 and
03:39:56  3    13 in particular, but at this moment I'm not
03:39:58  4    prepared to answer that -- to anticipate how
03:40:03  5    that query would come out. So I would have
03:40:05  6    to say for the moment I have not found a
03:40:06  7    system which anticipates any one claim --
03:40:10  8  Q.  Or --
03:40:11  9  A.    -- any one system or -- any one reference or
03:40:13 10    system which anticipates any claim.
03:40:21 11  Q.  So to the extent that your report suggests
03:40:24 12    otherwise, your report is inaccurate,
03:40:26 13    correct?
03:40:26 14  A.  There is at least one place in the report
03:40:28 15    that uses the language "anticipate" that on
03:40:31 16    reflection should not have.
03:40:35 17  Q.  Well, to the extent anywhere in your report
03:40:39 18    it suggests that any claim is anticipated by
03:40:43 19    a reference or a system it's inaccurate,
03:40:45 20    correct?
03:40:45 21  A.  It should not have used the term
03:40:48 22    "anticipate."
03:40:48 23  Q.  So, sir, you do not intend to express an
03:41:04 24    opinion and testify about today that any one
03:41:10 25    system or one reference anticipates any

Page 201

03:41:15  1    claim in the '164 patent, correct?
03:41:17  2  A.  That's correct.
03:41:17  3  Q.  Is there any combination of systems or
03:41:33  4    references that you believe anticipates --
03:41:37  5    strike that -- that you believe renders
03:41:40  6    obvious all of the claims of the one six --
03:41:44  7    of the asserted '164 patent? Strike that.
03:41:48  8    Let me rephrase it.
03:41:51  9      Is there any combination of systems or
03:41:53 10    references that you believe renders obvious
03:41:56 11    all of the asserted claims of the '164
03:41:59 12    patent?
03:42:00 13  A.  Yes.
03:42:00 14  Q.  And what is the combination that you are
03:42:09 15    relying on?
03:42:10 16  A.  It's on Page 34 of my report.
03:42:19 17  Q.  And specifically what is the combination
03:42:21 18    that you're referring to when you answered
03:42:23 19    my question that there is a combination of
03:42:26 20    references and/or systems that render all of
03:42:30 21    the asserted claims of the '164 patent
03:42:35 22    obvious?
03:42:35 23  A.  They are, first of all, the union of all of
03:42:38 24    the references the system cited here; that
03:42:44 25    is, take all of these and eliminate

Page 202

03:42:46  1    duplicates, but include all of them here.
03:42:50  2    And I would have to double-check, there's
03:42:53  3    also -- let me just double-check the
03:42:55  4    reference to the combinations. We may have
03:42:57  5    to include a couple of the references on
03:42:59  6    Page 37. Let me just double-check.
03:43:10  7      We would have to include Snyder on
03:43:12  8    Page 37. We would have to include the
03:43:25  9    Mohlenbach -- Mohlenbrock patent, the
03:43:30 10    Gibbons citation on Page 38, the Miller
03:43:34 11    citation on Page 38. Is that it? I guess
03:43:45 12    we need the Gallant patent also, cited on
03:43:48 13    Page 39.
03:43:52 14  Q.  Is that it?
03:43:53 15  A.  I believe so.
03:43:53 16  Q.  All right. Is there any one combination of
03:44:06 17    prior art references or systems that you
03:44:09 18    believe invalidates all of the asserted '164
03:44:12 19    claims based on obviousness?
03:44:21 20  A.  I'm afraid you need to clarify that question
03:44:24 21    a little bit more. Base on obvious --
03:44:25 22    you're putting the emphasis on "obviousness"
03:44:30 23    as opposed to?
03:44:31 24  Q.  As opposed to "anticipation."
03:44:34 25  A.  Ah, okay. I believe the combination that

Page 203

03:44:35  1    we've just talked about renders obvious. Or
03:44:41  2    did I misunderstand your question?
03:44:43  3  Q.  Well, no, maybe not. You mentioned in
03:44:48  4    addition to the references that are in the
03:44:51  5    chart on Page 34 of your October report, you
03:44:54  6    also added Snyder, Mohlenbrock, Gibbons,
03:45:00  7    Miller, Gallant, correct?
03:45:01  8  A.  Yeah, references from a little later in the
03:45:03  9    report.
03:45:03 10  Q.  Okay. So that's five references, correct?
03:45:06 11  A.  Yes.
03:45:07 12  Q.  And what I'm getting at is, what is the
03:45:13 13    combination of references that you believe
03:45:17 14    render obvious all of the '164 claims? How
03:45:22 15    many references are there in that
03:45:23 16    combination that you're relying on?
03:45:25 17  A.  If I understand the question, it's the count
03:45:32 18    of all of the unique references in the table
03:45:36 19    on 34 and the five additional ones I gave
03:45:39 20    you. But perhaps I'm not understanding the
03:45:43 21    question.
03:46:22 22      (Pause.)
03:46:34 23  Q.  How many is that in your combination? I
03:46:37 24    view --
03:46:38 25  A.  I would have to count up. I'll do that, if

Page 204

51 (Pages 201 to 204)

03:46:40 1    you like. Do you want to do that? I'm
03:46:50 2    happy to do that. I'm not sure what the
03:46:52 3    question is at this point.
03:46:52 4  Q.  Is it your opinion that -- is it your
03:46:53 5    opinion that all of the references
03:46:56 6    identified on Page 34 in the table, along
03:47:01 7    with the five references, Snyder,
03:47:06 8    Mohlenbrock, Gibbons, Miller and Gallant,
03:47:11 9    collectively as a combination render obvious
03:47:18 10    all of the asserted claims in '164?
03:47:22 11  A.  Yes. Some of the -- as shown on the table
03:47:25 12    on Page 34, some of these deal with one
03:47:27 13    claim, some deal with another, and the
03:47:29 14    additional five deal with combining
03:47:38 15    automating a manual system, and in the
03:47:40 16    aggregate I believe they render obvious.
03:47:45 17  Q.  And what is your understanding of the term
03:47:51 18    "render a claim obvious"?
03:47:57 19  A.  I don't recall the precise language, but I
03:47:59 20    understand it to be obvious to someone
03:48:03 21    versed in the art at that point in time, at
03:48:06 22    the time the invention was made. And I
03:48:08 23    think I've given a definition earlier in my
03:48:11 24    report for the kind of background someone
03:48:17 25    would have for me to call them first in this

Page 205

03:48:19 1    art.
03:48:20 2  Q.  And what is your opinion with respect to
03:48:23 3    what type of hypothetical person would be of
03:48:28 4    ordinary skill in the art as it pertains to
03:48:32 5    the '164 patent?
03:48:52 6  A.  On Page 3 I say I take a person of the
03:48:54 7    ordinary skill in the art to be someone with
03:48:55 8    an undergraduate degree in computer science
03:48:58 9    with at least one course in artificial
03:49:01 10    intelligence and at least one year of
03:49:02 11    experience in building expert systems. One
03:49:05 12    of the McKesson experts had suggested that
03:49:07 13    someone of ordinary skill also to be
03:49:11 14    familiar with the task domain of claims
03:49:15 15    editing.
03:49:17 16        I guess I would be willing to accept
03:49:19 17    that as an additional criterion, but I'm not
03:49:22 18    sure that that's necessary. Because I think
03:49:24 19    that someone with this background and skill
03:49:25 20    would be able to learn the task domain in a
03:49:29 21    perfectly reasonable amount of time.
03:49:33 22  Q.  I'm actually asking just for your opinion of
03:49:35 23    someone of ordinary skill in the art as it
03:49:37 24    pertains to the '164, and is that
03:49:43 25    articulated at Page 3, Footnote 1?

Page 206

03:49:46 1  A.  Yes.
03:49:47 2  Q.  All right. So it's your opinion that one of
03:49:52 3    ordinary skill in the art as it pertains to
03:49:53 4    the '164 patent need not have any experience
03:49:57 5    whatsoever with respect to medical service
03:50:04 6    codes, for instance?
03:50:05 7  A.  Well, maybe I'm mixing two things in
03:50:17 8    together, so let me describe what I have in
03:50:18 9    mind. No, I think I'm not. The footnote on
03:50:39 10    Page 3 describes what I believe to be
03:50:41 11    someone of ordinary skill in the art at this
03:50:44 12    point in time. And to address the question
03:50:45 13    of would they need experience in claims
03:50:49 14    editing, one of the classic characteristics
03:50:52 15    of someone with a year of experience in
03:50:55 16    building expert systems is that they have
03:50:58 17    learned to -- learn how other people think
03:51:03 18    about a task, to come to understand the
03:51:06 19    nature of the task and to work with the
03:51:09 20    experts who really do understand the task.
03:51:11 21        So the task of the guy who's described
03:51:15 22    at the bottom of Page 3 is to learn from
03:51:19 23    people like Dr. Hertenstein or his
03:51:23 24    equivalent, who has the expertise about
03:51:25 25    medical claims processing. The person of

Page 207

03:51:29 1    ordinary skill is the one I take to be
03:51:30 2    someone who's going to build this system.
03:51:34 3    He would need someone like Dr. Hertenstein
03:51:37 4    to explain the knowledge that goes into the
03:51:38 5    system, but this is the skill it would take
03:51:40 6    to build the system.
03:51:41 7  Q.  So is it your opinion that someone of
03:51:44 8    ordinary skill in the art as it pertains to
03:51:45 9    the '164 patent is someone that could build
03:51:57 10    the invention of the '164 patent?
03:52:01 11  A.  As long they -- as I've defined it down on
03:52:04 12    the bottom of Page 3, it depends on the
03:52:07 13    notion that they have available to them
03:52:10 14    someone like Dr. Hertenstein. I do not
03:52:11 15    presume --
03:52:11 16  Q.  The inventor?
03:52:11 17  A.  The inventor. In particular, the -- no,
03:52:15 18    it's not the inventor. I said carefully
03:52:17 19    "someone like Dr. Hertenstein," someone who
03:52:19 20    understands the task of medical claims
03:52:21 21    processing.
03:52:23 22  Q.  All right. So is that a component of the
03:52:27 23    knowledge set that someone of ordinary skill
03:52:30 24    in the art must possess as it pertains to
03:52:34 25    the '164 patent?

Page 208

52 (Pages 205 to 208)

Page 209

```
03:52:36  1   A.  It's something they would very quickly come
03:52:38  2       to have as a consequence of trying to build
03:52:40  3       a system like this by talking to someone who
03:52:42  4       understood the claims processing process.
03:52:44  5   Q.  Would your person of ordinary skill in the
03:52:48  6       art as it pertains to the '164 patent,
03:52:55  7       without any knowledge of the -- strike that.
03:52:58  8           Would your hypothetical person of one
03:53:01  9       of ordinary skill in the art as it pertains
03:53:03 10       to the '164 patent understand the problems
03:53:08 11       associated with fraudulent medical claims
03:53:13 12       and the examination of medical service
03:53:15 13       codes?
03:53:16 14   A.  Not until they had talked to someone who did
03:53:19 15       understand the task, but the skill of
03:53:22 16       someone who has been building expert
03:53:24 17       systems -- I suggest it at the bottom of
03:53:28 18       Page 3 -- is in fact what we -- I teach a
03:53:29 19       course on this, and one of the things that
03:53:31 20       we teach people is how to go and talk to
03:53:33 21       someone who knows how to do something
03:53:35 22       interesting, important and valuable and in
03:53:38 23       effect debrief them, get them to tell you
03:53:40 24       how to think about the problem, how to solve
03:53:42 25       the problem in such a way that you, the
```

Page 210

```
03:53:45  1       person versed in artificial intelligence,
03:53:48  2       can cast that as a computer program.
03:53:50  3           So it's not that a person like this
03:53:52  4       could have built the system all by
03:53:55  5       themselves in a locked room. It's that with
03:53:58  6       appropriate access to someone who
03:54:00  7       understands the task domain, they could have
03:54:03  8       done it. Or if you don't want to have a
03:54:07  9       scenario like this, then we have to say it's
03:54:11 10       also someone who understands medical claims
03:54:13 11       processing. But the reason I divided it up
03:54:15 12       is because this is standard practice for
03:54:17 13       someone who is experienced in the technology
03:54:19 14       but not experienced in the task domain to
03:54:22 15       get the knowledge from the person who is
03:54:23 16       experienced in the task domain.
03:54:24 17   Q.  Well, would your person of ordinary skill in
03:54:27 18       the art who does not have knowledge of
03:54:29 19       claims processing understand, without access
03:54:34 20       to that knowledge, the problems confronted
03:54:41 21       with fraudulent medical claims caused by the
03:54:47 22       examination of medical service codes?
03:54:48 23   A.  Virtually by definition of your question, if
03:54:53 24       they don't have the knowledge, then they
03:54:56 25       won't understand it. So if someone versed
```

Page 211

```
03:55:00  1       in the art is, in your scenario, unlike
03:55:03  2       mine, not going to be able to talk to
03:55:06  3       someone who does understand the problem,
03:55:08  4       then I'll have to amend this definition and
03:55:10  5       say it's these things, plus a basic
03:55:13  6       understanding of medical claims processing.
03:55:16  7       I'm willing to take that modification, if
03:55:19  8       we're going to do it according to your
03:55:22  9       scenario.
03:55:23 10   Q.  Well, I'm trying to find about -- I'm trying
03:55:26 11       to determine what person of ordinary skill
03:55:30 12       in the art you used in determining that that
03:55:34 13       person would find these claims obvious. And
03:55:41 14       the person that you used was someone without
03:55:43 15       any knowledge of medical claims processing,
03:55:46 16       right?
03:55:47 17   A.  But with access to someone with medical
03:55:49 18       claims processing knowledge. And if we
03:55:52 19       don't want to structure it that way, then,
03:55:55 20       as I said, I'll need to amend this
03:55:57 21       definition and say it's someone who has
03:55:59 22       these properties plus knowledge of medical
03:56:01 23       claims processing.
03:56:06 24   Q.  But you did not have any knowledge of
03:56:07 25       medical claims processing at the relevant
```

Page 212

```
03:56:09  1       time, correct?
03:56:12  2   A.  "Relevant time" being the 1987 time period?
03:56:16  3   Q.  Yes. Yeah.
03:56:17  4   A.  Actually, I did.
03:56:22  5   Q.  So do you believe that you were one of
03:56:24  6       ordinary skill in the art as of September of
03:56:40  7       '88 as it pertains to the '164 patent?
03:56:42  8   A.  Insofar as someone in order -- insofar as
03:56:46  9       someone being of ordinary skill in the art
03:56:50 10       capable of building the system without
03:56:52 11       reference to a domain expert, yes, I believe
03:56:56 12       I would have been such a person at that
03:56:57 13       point in time.
03:56:59 14   Q.  Is it your opinion that someone of ordinary
03:57:01 15       skill in the art looking at the '164 patent
03:57:03 16       at the time it was filed could have built
03:57:06 17       without undue experimentation the inventions
03:57:09 18       of the '164 patent?
03:57:10 19   A.  As I understand what the inventions of the
03:57:16 20       '164 patent are, yes, I believe so.
03:57:18 21   Q.  And you believe that you as someone of
03:57:21 22       ordinary skill in the art at that time could
03:57:23 23       have built it without any -- could have
03:57:25 24       built the inventions without any undue
03:57:27 25       experimentation?
```

53 (Pages 209 to 212)

03:57:27 1 A. Yes.

03:57:28 2 Q. And anyone else of ordinary skill in the art
03:57:30 3    could have read the patent at the time it
03:57:35 4    was filed and built the inventions of the
03:57:38 5    '164 patent without undue experimentation,
03:57:39 6    correct?

03:57:40 7        MR. SEGAL: Objection, vague.

03:57:42 8 A. I believe so.

03:57:43 9 Q. And you're using in that definition of
03:57:49 10    someone of ordinary skill in the art someone
03:57:51 11    that need not have knowledge of medical
03:57:55 12    claims processing, correct?

03:57:57 13 A. No. I tried to explain the scenario under
03:58:01 14    which I was not presuming medical claims
03:58:04 15    processing knowledge. You -- I took your
03:58:08 16    question to be one of -- if someone versed
03:58:15 17    in the art is going to have to do it without
03:58:17 18    access to the ability to talk to an expert,
03:58:19 19    then I was willing to add knowledge of
03:58:22 20    medical claims processing to the
03:58:24 21    requirement. And that's fine. So I have
03:58:25 22    added that, and that's the context in which
03:58:27 23    I was answering your question.

03:59:13 24 Q. Would your hypothetical person of ordinary
03:59:16 25    skill in the art as it pertains to the '164

Page 213

03:59:19 1    patent have understood the problems that
03:59:22 2    confronted the industry at that time with
03:59:24 3    respect to fraudulent medical claims caused
03:59:29 4    by medical service codes?

03:59:32 5 A. I believe so, yes.

03:59:45 6 Q. And what specifically was the problem the
03:59:48 7    industry was facing in September of '88 with
03:59:53 8    respect to fraudulent medical claims that
04:00:03 9    were being submitted with medical service
04:00:04 10    codes?

04:00:05 11 A. My understanding is that --

04:00:08 12 Q. Go ahead.

04:00:09 13 A. My understanding is that there was more than
04:00:10 14    one problem. At least one of them was what
04:00:13 15    was called unbundling, another one upcoding.
04:00:16 16    There were a variety of ways in which
04:00:18 17    physicians were either inadvertently or
04:00:21 18    purposely gaming the system to code
04:00:25 19    procedures in a way that generated more
04:00:26 20    revenue than was believed to be appropriate.

04:00:30 21 Q. And in September of 1988 one of ordinary
04:00:35 22    skill in the art as it pertains to the '164
04:00:37 23    patent would have understood at that time
04:00:39 24    that there was a problem with fraudulent
04:00:44 25    medical claims; specifically one of the

Page 214

04:00:46 1    problems was unbundling of codes and
04:00:50 2    upcoding, correct?

04:00:51 3 A. Yes. To my understanding, yes.

04:00:54 4 Q. And would you agree that at the time of
04:01:01 5    the -- at the time the '164 patent was
04:01:05 6    filed, that the standard industry practice
04:01:11 7    was to attempt to detect the problems
04:01:20 8    associated with unbundling and upcoding
04:01:24 9    manually?

04:01:25 10        MR. SEGAL: Objection, vague and
04:01:26 11    ambiguous, lacks foundation.

04:01:31 12        THE WITNESS: I'm sorry, was -- I
04:01:33 13    just missed it. The beginning of the
04:01:35 14    question, could we read it back, please.

04:01:36 15        (Record read.)

04:01:52 16 A. I don't know if I can speak with great
04:01:54 17    authority about the standard industry
04:01:56 18    practice, but I do understand that some
04:02:00 19    amount of practice going on was manual,
04:02:03 20    namely the Caterpillar system was a manual
04:02:07 21    system first.

04:02:11 22 Q. Well, you believe you were one of ordinary
04:02:13 23    skill in the art at that time, correct?

04:02:14 24 A. Yes.

04:02:15 25 Q. And did you understand that the common

Page 215

04:02:17 1    practice -- industry practice at the time
04:02:19 2    was to attempt to manually detect and
04:02:23 3    resolve unbundling and upcoding medical
04:02:27 4    service code errors?

04:02:29 5        MR. SEGAL: Lacks foundation.

04:02:30 6 A. Yeah, I believe so, but it's actually a
04:02:33 7    little hard to put my mind back to that
04:02:36 8    period, especially given everything I've
04:02:38 9    read in the past three months.

04:02:45 10 Q. That is what at least the -- and the
04:02:49 11    inventors disclosed in the body of the
04:02:55 12    patent, correct?

04:02:56 13 A. Yes.

04:02:56 14 Q. That the common industry practice --

04:02:58 15 A. Yes.

04:02:59 16 Q. -- at the time this patent was filed was to
04:03:05 17    manually attempt to detect and resolve
04:03:11 18    unbundling and upcoding clinical editing
04:03:15 19    errors, correct?

04:03:16 20 A. Correct.

04:03:17 21 Q. I would like to direct your attention to
04:03:55 22    Page 34 of your report, your October report.

04:04:12 23 A. Yes, sir.

04:04:12 24 Q. And do you believe that each of the
04:04:21 25    references that are listed in the table on

Page 216

54 (Pages 213 to 216)

**SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES**
**877.955.3855**

04:38:15 1   understanding the question. Is there some
04:38:17 2   way to rephrase it?
04:38:18 3 Q. Yes, certainly. In forming your opinions in
04:38:20 4   this case, you read the patent, correct?
04:38:21 5 A. Yes.
04:38:21 6 Q. You read the file history, correct?
04:38:23 7 A. Yes.
04:38:24 8 Q. And then you read the claims, correct?
04:38:26 9 A. Correct.
04:38:26 10 Q. And you determined in your mind what each
04:38:28 11   claim meant, correct?
04:38:30 12 A. Correct.
04:38:30 13 Q. And did you determine that, at least for
04:38:38 14   infringement purposes, that the meaning of
04:38:39 15   the claims were slightly different than the
04:38:42 16   meaning of the claims that you applied to
04:38:46 17   your validity opinions?
04:38:50 18      MR. SEGAL: Vague.
04:38:50 19 A. All I can say is it doesn't ring a bell.
04:39:01 20   Maybe I'm -- I'm sorry, but maybe I still
04:39:03 21   don't understand what you're getting at.
04:39:05 22   Can you give me an example of the
04:39:06 23   difference? And maybe then it'll be easy
04:39:09 24   for me to answer the question.
04:39:11 25 Q. Did you apply a narrower claim scope or

         Page 241

04:39:24 1   broader claim scope or the same claim scope
04:39:27 2   to your opinions regarding validity and
04:39:31 3   infringement?
04:39:39 4      MR. SEGAL: Objection, compound,
04:39:40 5   vague.
04:39:41 6 A. I'm sorry, I guess, as I sit here, I don't
04:40:01 7   know the answer to that question, whether I
04:40:02 8   specifically tried to make it narrower or
04:40:05 9   broader or the same.
04:40:06 10 Q. Looking at, for instance, Claim 3.
04:40:30 11 A. Uh-huh.
04:40:31 12 Q. One of the elements indicates "means for
04:40:34 13   receiving at least one claim." Do you see
04:40:36 14   that?
04:40:36 15 A. Yes, uh-huh.
04:40:38 16 Q. What were the means for receiving at least
04:40:41 17   one claim as disclosed in the '164 patent,
04:40:46 18   or what did you -- yeah, go ahead. Let me
04:40:52 19   rephrase the question.
04:40:52 20      MR. SEGAL: If you're going
04:40:53 21 Q. In performing your opinions --
04:40:55 22      MR. SEGAL: -- to a new area, it
04:40:58 23   would be nice to get a break since we've
04:41:01 24   been going for an hour and 15 minutes, so...
04:41:04 25 Q. In forming your opinions -- it says right on

         Page 242

04:41:04 1   the top of the question. In forming your
04:41:05 2   opinions in this case, what did you construe
04:41:08 3   that element to mean where it says "means
04:41:10 4   for receiving at least one claim"?
04:41:12 5 A. I tried to go back into the specification
04:41:19 6   for the patent, looking at the figures, the
04:41:21 7   body, the software and so forth, and
04:41:25 8   determine what structure corresponded to
04:41:27 9   those means.
04:41:27 10 Q. And what structure did correspond to that
04:41:30 11   means?
04:41:30 12 A. Well, it wasn't always clear in a number of
04:41:33 13   these cases. I think in this case it's a
04:41:35 14   little -- in this instance it's a little bit
04:41:37 15   clearer. The Figure 2, the entry program,
04:41:42 16   No. 7, would be the means for receiving a
04:41:45 17   claim.
04:41:54 18 Q. Figure 2 --
04:41:54 19 A. -- No. 7 or more generally Figure 1, No. 1,
04:41:57 20   the user interface.
04:42:00 21 Q. And that's true for each claim that has
04:42:02 22   "means for receiving at least one claim,"
04:42:04 23   correct?
04:42:05 24 A. Yes.
04:42:05 25 Q. And the next element says, "means for

         Page 243

04:42:08 1   ascertaining whether at least one claim
04:42:11 2   contains a plurality of medical service
04:42:14 3   codes."
04:42:14 4 A. Yes.
04:42:15 5 Q. What did you construe that to mean?
04:42:18 6 A. That's in several places, and I mention this
04:42:24 7   in the report. I think that's in the
04:42:28 8   infringement report. It's in Figure 4 at,
04:42:35 9   among other places, 23 prime, 25 prime, it
04:42:39 10   is also in the text of the patent, and it's
04:42:44 11   also in the code. One specific example
04:42:54 12   is...
04:43:50 13     (Witness reviews document.)
04:43:50 14 A. Let me find it. I'm looking for it again.
04:43:53 15   It's just easier to look in the report and
04:43:55 16   see where I cited it.
04:43:57 17     (Witness reviews document.)
04:44:44 18 A. Yes. Okay, fine. I'm sorry. It also shows
04:44:47 19   up in Column 59 at Line 7 and Line 21.
04:44:53 20 Q. All right. The means for ascertaining and
04:44:58 21   the means for determining, and the next
04:45:00 22   element, means for authorizing --
04:45:03 23 A. Uh-huh.
04:45:03 24 Q. -- the next element, means for rejecting --
04:45:06 25 A. Uh-huh.

         Page 244

         61 (Pages 241 to 244)

04:45:06 1 Q. -- those means are software; is that
04:45:11 2 correct?
04:45:11 3     MR. SEGAL: Objection, vague.
04:45:21 4 A. Well, at some very abstract level they are
04:45:23 5 in the software, but I wouldn't just say
04:45:25 6 they are software. It's like saying this
04:45:27 7 whole thing's a computer program. It
04:45:29 8 doesn't tell you where or what in that
04:45:31 9 software is the actual means for doing that.
04:45:33 10 I wouldn't call the means for this software
04:45:37 11 any more than I would call the means for
04:45:39 12 ascertaining whether the claim contains a
04:45:42 13 plurality of medical service codes software.
04:45:44 14     There is an easily distinguishable
04:45:46 15 element in the flow charts. There's an
04:45:50 16 easily distinguishable element in the
04:45:53 17 software and the code listing that is the
04:45:56 18 means for ascertaining whether at least one
04:45:59 19 claim contains a plurality of codes. So I
04:46:02 20 wouldn't give an answer that says software
04:46:04 21 generally. I would say it's this piece of
04:46:06 22 the software or another piece.
04:46:12 23     MR. RANDALL: If you need to take
04:46:13 24 that break, we need to change the tape. I'm
04:46:16 25 perfectly willing to continue on with the

Page 245

04:46:16 1 examination --
04:46:16 2     MR. SEGAL: Given the hour --
04:46:18 3     MR. RANDALL: -- taking a break.
04:46:18 4     MR. SEGAL: I think given the hour,
04:46:19 5 we need to have everyone just get up and
04:46:22 6 take a break.
04:46:22 7     MR. RANDALL: All right. That's
04:46:23 8 fine. We can change the tape at the same
04:46:25 9 time.
04:46:28 10     THE VIDEOGRAPHER: The time is
04:46:33 11 4:46. This is the end of Tape 5, and we are
04:46:33 12 going off the record.
04:46:35 13     (Recess taken.)
04:57:29 14     THE VIDEOGRAPHER: The time is
04:57:34 15 4:57. This is the beginning of Tape 6, and
04:57:36 16 we are back on the record.
04:57:37 17 BY MR. RANDALL:
04:57:38 18 Q. Mr. Davis, in forming your opinions in your
04:57:42 19 reports, did you analyze the commercial
04:57:48 20 success of the inventions?
04:57:52 21 A. No, I didn't.
04:57:54 22 Q. So is it fair to say, then, that you did not
04:58:02 23 apply either positively or negatively any
04:58:07 24 issue regarding commercial success in
04:58:11 25 forming your opinions in this case?

Page 246

04:58:13 1 A. No.
04:58:15 2 Q. That's correct, isn't it?
04:58:16 3 A. I'm sorry, say it again. I'll give you --
04:58:21 4 Q. That's a correct statement?
04:58:22 5 A. That's a correct statement, yes. I was
04:58:25 6 trying to agree with you.
04:58:26 7 Q. And you are not prepared -- strike that.
04:58:27 8     You did not opine in your report and
04:58:30 9 you are not prepared today to talk about the
04:58:34 10 effect, if anything, of the commercial
04:58:38 11 success of the inventions on your opinions,
04:58:40 12 correct?
04:58:40 13 A. Correct.
04:58:41 14 Q. You also did not analyze the long-felt need
04:58:50 15 for the inventions in your report, correct?
04:58:55 16 A. No, it -- sorry. It was not in the report.
04:59:05 17 I have read what some of the other reports
04:59:07 18 had to say about that, and -- let me just
04:59:14 19 leave it at that.
04:59:14 20 Q. All right. So you neither expressed an
04:59:20 21 opinion in your report regarding the long-
04:59:22 22 felt need that -- for the inventions nor are
04:59:25 23 you prepared to testify regarding an opinion
04:59:29 24 today on the long-felt need of the
04:59:32 25 inventions, correct?

Page 247

04:59:33 1 A. Well, the only opinion I do have on that
04:59:37 2 today is that there seemed to be a kind of
04:59:47 3 contradiction in taking the position, both
04:59:51 4 that there was a long-felt need and people
04:59:53 5 didn't think it could be done. It's not a
04:59:56 6 direct head-to-head contradiction, but it
04:59:59 7 seems a curious position taken by some of
05:00:02 8 the other experts -- I should say in at
05:00:05 9 least one of the McKesson reports that there
05:00:09 10 was both a long-felt need and a belief that
05:00:11 11 you couldn't do this. It's a little hard to
05:00:15 12 reconcile those two.
05:00:22 13 Q. That -- let me focus on a few things. You
05:00:24 14 did not in your report express any opinion
05:00:27 15 regarding the long-felt need of the
05:00:29 16 inventions, correct?
05:00:30 17 A. Correct.
05:00:30 18 Q. And you didn't intend to do so, correct?
05:00:32 19 A. I think the answer is correct.
05:00:38 20 Q. All right. And you are not prepared today
05:00:42 21 to either provide an opinion or testify
05:00:50 22 regarding the long-felt need of the
05:00:53 23 inventions other than what you've just
05:00:57 24 mentioned; is that right?
05:00:58 25 A. That's correct.

Page 248

**SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES**
877.955.3855

05:12:56 1    claims which you believe the inventors
05:13:02 2    expressly provided a special meaning for as
05:13:08 3    opposed to the ordinary meaning of the term?
05:13:12 4        MR. SEGAL: Objection, vague and
05:13:17 5    ambiguous. Also object to the extent it
05:13:19 6    mischaracterizes the legal standard.
05:13:52 7 A.  The only term that I -- that jumps out at me
05:13:55 8    at the moment is the use of the term "non"
05:14:00 9    -- use of the phrase "nonmedical criteria"
05:14:02 10   in, for example, Claim No. 14. And it's not
05:14:05 11   that I have evidence that they attached a
05:14:07 12   special meaning to that which is clear, it's
05:14:11 13   that it's difficult to determine what
05:14:14 14   meaning they could have attached to it.
05:14:18 15      So one possibility is they had a
05:14:19 16   special meaning in mind, but I don't know
05:14:21 17   what that special meaning is.
05:14:23 18 Q.  Well, the question was, is there any term
05:14:30 19   used in any of the claims which you believe
05:14:33 20   the inventors provided a special definition
05:14:40 21   for as opposed to the ordinary meaning?
05:14:42 22 A.  They did not --
05:14:43 23      MR. SEGAL: Objection -- same
05:14:45 24   objections.
05:14:45 25 A.  They did not provide a special meaning for

Page 257

05:14:48 1    "nonmedical" in the terms, so I suppose the
05:14:51 2    answer to your question is no, they did not
05:14:53 3    provide a special meaning, that I can find.
05:15:00 4 Q.  In rendering your opinions regarding
05:15:03 5    infringement in this case, did you observe
05:15:08 6    the operation of the accused infringing
05:15:13 7    TriZetto systems?
05:15:14 8 A.  Yes.
05:15:15 9 Q.  Each of the three accused systems?
05:15:17 10 A.  Yes.
05:15:17 11 Q.  Do you realize that -- strike that.
05:15:22 12      Did you understand that McKesson is
05:15:25 13   accusing the entire system, each of the
05:15:28 14   entire systems of infringing and not just a
05:15:31 15   component thereof?
05:15:32 16 A.  Yes.
05:15:32 17 Q.  Where did you observe the operation of the
05:15:39 18   accused infringing systems?
05:15:41 19 A.  From my office at MIT we rigged up an
05:15:45 20   on-line conferencing system, and I was given
05:15:47 21   a demo of each system in turn. The system
05:15:51 22   was at its remote site. I was able to see
05:15:54 23   on my screen exactly what was on the screen
05:15:57 24   of the person running the system.
05:15:58 25 Q.  And so you were on a conference call; is

Page 258

05:16:01 1    that correct?
05:16:01 2 A.  I was on a conference call with an on-line
05:16:05 3    conferencing system allowing me to see the
05:16:07 4    system in use.
05:16:07 5 Q.  When you say "on-line conferencing system,"
05:16:11 6    was that a video conference?
05:16:12 7 A.  No. It runs off of a computer.
05:16:16 8 Q.  All right. So you were able -- there was a
05:16:16 9    live demonstration of processing medical
05:16:26 10   claims by TriZetto, and you were able to tie
05:16:29 11   your computer in to observe that; is that
05:16:32 12   right?
05:16:32 13 A.  That's correct.
05:16:33 14      MR. SEGAL: Vague and ambiguous.
05:16:34 15 A.  But that --
05:16:35 16 Q.  And -- go ahead.
05:16:36 17 A.  Just so it's clear, in effect, whatever
05:16:42 18   showed up on -- not in effect, whatever
05:16:44 19   showed up on the screen of the person who
05:16:46 20   was running the system on their actual
05:16:47 21   computer showed up in a window on my
05:16:50 22   computer.
05:16:51 23 Q.  And were you able to direct that -- strike
05:16:55 24   that.
05:16:56 25      Who was the person at TriZetto that

Page 259

05:16:58 1    set that up for TriZetto's counsel?
05:17:01 2 A.  I believe TriZetto's counsel organized it,
05:17:04 3    but there were probably six people in on the
05:17:07 4    conference call, counsel and then TriZetto
05:17:11 5    personnel at various sites demonstrating the
05:17:13 6    system.
05:17:17 7 Q.  That demonstration, however, was wholly
05:17:18 8    unnecessary to your opinions in this case,
05:17:22 9    correct?
05:17:22 10 A.  No.
05:17:27 11 Q.  Can you explain that?
05:17:28 12 A.  In the rebuttal report, for example, there
05:17:34 13   are at least two figures giving screen shots
05:17:37 14   of one of the systems in operation, and so
05:17:42 15   it was useful to see the systems in order to
05:17:47 16   provide those screen shots, give examples.
05:17:53 17   It was also useful to be able to see the
05:17:55 18   system and ask questions and see the details
05:17:58 19   of issues that were being described to me
05:18:01 20   about how the system worked, but then to
05:18:03 21   actually see it was helpful as well. It
05:18:05 22   grounded things and helped me make sure that
05:18:08 23   I understood them.
05:18:09 24 Q.  How long did the demonstration last?
05:18:10 25 A.  It was about an hour all together, I would

Page 260

65 (Pages 257 to 260)

**SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES**
**877.955.3855**

05:18:18  1   say.

05:18:18  2   Q.   How many weeks did -- did you ask for this
05:18:20  3        demonstration?

05:18:21  4   A.   I actually don't remember whether I asked or
05:18:27  5        counsel volunteered.

05:18:27  6   Q.   When did it happen?

05:18:29  7   A.   Well, I know for sure it happened before the
05:18:46  8        second report, before the November 14th
05:18:48  9        report, because I was able to use screen
05:18:52 10        shots from -- not from the demo, but from
05:18:54 11        one of those systems in my report. Whether
05:19:00 12        it occurred before the first report or not I
05:19:03 13        do not recall.

05:19:03 14   Q.   Before the demonstration were you able to
05:19:09 15        suggest types of claims to process through
05:19:12 16        the system?

05:19:13 17   A.   They had an example ready to go, but I was
05:19:16 18        able to suggest changes and variations to
05:19:19 19        explore it to my satisfaction.

05:19:23 20   Q.   And so did either you or someone else
05:19:31 21        arrange for a series of different types of
05:19:33 22        claims? And when I say that, I mean claims
05:19:35 23        that included different types of medical
05:19:38 24        service codes to be processed by the accused
05:19:42 25        infringing systems.

Page 261

05:19:43  1   A.   A small set of them, not -- I mean, there's
05:19:46  2        a lot of power to all of these systems,
05:19:48  3        including McKesson, so it was hardly an
05:19:50  4        exhaustive exploration.

05:19:51  5   Q.   Right. You or someone else directed a few
05:19:55  6        representative examples to be --

05:19:57  7   A.   A few representative examples would be a
05:19:59  8        good description.

05:20:01  9   Q.   All right. -- to be run through the system,
05:20:05 10        right?

05:20:05 11   A.   Yes.

05:20:08 12   Q.   And how did you -- how did you get the
05:20:09 13        screen shots? Did TriZetto print them out
05:20:11 14        and give them to you, or were you able to
05:20:14 15        print them out off your screen?

05:20:15 16   A.   The screen shots that are in the report, I
05:20:17 17        asked one of the TriZetto personnel to do
05:20:20 18        those for me because I wanted an example of
05:20:23 19        a specific capability of the system. So I
05:20:26 20        said, "Please do an example with this
05:20:28 21        characteristic that displays this kind of
05:20:30 22        capability and send me the screen shots that
05:20:32 23        document it."

05:20:32 24   Q.   You are --

05:20:34 25   A.   So this was subsequent to the demo.

Page 262

05:20:40  1   Q.   What special computer equipment did you have
05:20:42  2        that enabled you to tie in to this system?

05:20:47  3   A.   The really amazing part of this, the answer
05:20:50  4        was really nothing. It turns out there's
05:20:53  5        something called NetMeeting that's part of
05:20:55  6        Windows XP. The truly astounding part was
05:20:59  7        we had six or eight people around the
05:21:00  8        country looking at each other's -- sorry,
05:21:02  9        not each other's, all looking at the same
05:21:05 10        computer window while on a conference call,
05:21:07 11        and it worked. But the most amazing part
05:21:10 12        was it all just worked.

05:21:11 13   Q.   Without a glitch?

05:21:12 14   A.   Without a glitch. That was the true -- I
05:21:14 15        was flabbergasted and pleased to learn that
05:21:17 16        this actually worked. It's enormously
05:21:22 17        convenient, but it's a built-in piece of
05:21:25 18        Windows XP.

05:21:27 19   Q.   What is your understanding as to, you know,
05:21:30 20        how many weeks or months it took to set up
05:21:31 21        this demonstration?

05:21:32 22   A.   Oh, I don't expect it took more than a call
05:21:35 23        or two, because doing the demos seemed to be
05:21:43 24        a very easy thing to do. We had previously
05:21:46 25        made use of NetMeeting, so people knew how

Page 263

05:21:52  1        to do that, and the program just works. I
05:21:54  2        suspect as usual the most time-consuming
05:21:57  3        thing was finding a time for the conference
05:21:59  4        call when all the people could get together.

05:22:01  5   Q.   Was there any concerns expressed
05:22:03  6        regarding -- strike that.

05:22:07  7            Where did you get the medical claims
05:22:08  8        that you ran through the system?

05:22:10  9   A.   I didn't request specific medical claims and
05:22:14 10        codes so much as categories, a claim of this
05:22:20 11        sort or that sort.

05:22:20 12   Q.   For instance, what?

05:22:21 13   A.   On rebundling or disallowing for inclusion,
05:22:26 14        something like that. It was that level of
05:22:29 15        specificity.

05:22:33 16   Q.   All right. So you ran -- you asked for
05:22:36 17        claims to be run through the system that,
05:22:39 18        for instance, demonstrated unbundling of
05:22:43 19        codes, right?

05:22:44 20            MR. SEGAL: Vague and ambiguous.

05:22:44 21   A.   I'm sorry, I guess the term is "rebundling."

05:22:47 22   Q.   Rebundling of codes.

05:22:48 23            MR. SEGAL: Vague and ambiguous.

05:22:49 24   Q.   Yes.

05:22:49 25   A.   I think I may have requested something like

Page 264

66 (Pages 261 to 264)

05:22:54 1  that, yes. I don't recall the exact
05:22:55 2  request, but the point is I didn't attempt
05:22:56 3  to make up a specific set of CPT codes and
05:23:01 4  say run these.
05:23:04 5  Q.  Right. Instead, you simply asked TriZetto
05:23:06 6  to run an example of a claim that needed to
05:23:15 7  be rebundled, correct?
05:23:17 8  A.  For an example, yes. As an example.
05:23:19 9  Q.  And other examples from the claims in the
05:23:26 10  patent, correct?
05:23:27 11      MR. SEGAL: Objection, vague.
05:23:28 12  A.  I don't know if I was specifically looking
05:23:31 13  for claims from the patent. I suspect we
05:23:35 14  probably covered such, but I don't -- I
05:23:37 15  wasn't thinking in those particular terms.
05:23:39 16  Q.  Where were the actual systems being
05:23:42 17  operated? Was that done at TriZetto's
05:23:44 18  facilities in --
05:23:45 19  A.  Yes.
05:23:45 20  Q.  -- Southern California --
05:23:46 21  A.  Well, one was in --
05:23:48 22  Q.  -- or New Jersey?
05:23:50 23  A.  One was in New Jersey. I know for sure one
05:23:56 24  was in New Jersey. I'm not sure where the
05:23:58 25  others were. Again, the amazing part was it

Page 265

05:24:00 1  just worked.
05:24:01 2  Q.  Right. So you were able to observe within
05:24:04 3  an hour the operation of all three of the
05:24:06 4  accused infringing systems, run
05:24:08 5  representative claims through the system and
05:24:10 6  watch the exact screen displays come up that
05:24:14 7  actually are displayed when the three
05:24:18 8  accused infringing systems are operating,
05:24:20 9  right?
05:24:20 10      MR. SEGAL: Vague and ambiguous.
05:24:21 11  A.  For a small set of claims, yes.
05:24:23 12  Q.  And was it your understanding that these
05:24:25 13  were actual claims that were being
05:24:27 14  processed?
05:24:27 15  A.  In the sense that they came off of
05:24:29 16  somebody's medical record?
05:24:30 17  Q.  Yeah.
05:24:31 18  A.  No, I didn't understand that. It didn't
05:24:33 19  seem --
05:24:33 20  Q.  You didn't know one way or the other?
05:24:35 21  A.  It didn't seem material -- I'm sorry, it
05:24:38 22  didn't seem relevant to the demonstration I
05:24:43 23  had.
05:24:43 24  Q.  And so you asked for certain screen shots,
05:24:50 25  and those were provided to you later; is

Page 266

05:24:53 1  that right?
05:24:53 2  A.  Subsequently. Just to be clear, I'm not
05:24:56 3  sure it matters, but we did the demos, and I
05:24:59 4  was able to see each of -- the system
05:25:00 5  operation firsthand. Subsequently, in
05:25:03 6  writing the second of my reports it was
05:25:07 7  clear to me that it would be useful to have
05:25:08 8  screen shots to illustrate certain points I
05:25:10 9  was making. So I subsequently asked someone
05:25:13 10  else to run some additional examples and
05:25:14 11  send me the screen shots.
05:25:20 12  Q.  And how long did you have to wait for those
05:25:22 13  screen shots to arrive after you asked for
05:25:24 14  them?
05:25:25 15  A.  Oh, somewhere between a couple of hours and
05:25:27 16  the next day. It wasn't a time-consuming
05:25:30 17  thing.
05:25:31 18  Q.  All right. Let me direct your attention to
05:25:34 19  your November report. Strike that.
05:25:41 20      No, I'll direct your attention to the
05:25:42 21  November report, specifically Exhibit B, the
05:25:48 22  TriZetto flow charts.
05:25:50 23  A.  Yes.
05:25:51 24  Q.  Are these -- do these pages, B-2 through 6,
05:26:09 25  represent all of the TriZetto flow charts

Page 267

05:26:13 1  that you were provided?
05:26:17 2  A.  They are all the TriZetto flow charts that I
05:26:20 3  was provided, yes.
05:26:21 4  Q.  Did you ask for any more?
05:26:23 5  A.  No. I asked for the flow charts that
05:26:26 6  describe the claims processing.
05:26:28 7  Q.  When did you ask for that?
05:26:29 8  A.  I'm sorry, I said that badly. Claims
05:26:32 9  editing process was what I was focusing in
05:26:34 10  on.
05:26:35 11  Q.  When did you ask for that?
05:26:37 12  A.  I'm sorry, I just don't keep track of these
05:26:47 13  things. It all runs together. I had these
05:26:50 14  for some time before I wrote the report, so
05:26:53 15  it was least a couple of weeks before I
05:26:55 16  wrote the report, I would guess.
05:26:58 17  Q.  And weren't you provided this material
05:27:03 18  sometime in September?
05:27:05 19  A.  This? I don't believe so. I could be
05:27:09 20  wrong, but I don't believe so. At least I
05:27:11 21  made no reference to it earlier than getting
05:27:15 22  ready for the second report.
05:27:17 23  Q.  What led you to ask for these flow charts?
05:27:20 24  A.  Part of comparing the TriZetto system to the
05:27:27 25  McKesson system. Since there was flow

Page 268

67 (Pages 265 to 268)

| | | |
|---|---|---|
| 05:27:29 | 1 | charts for the McKesson system in the |
| 05:27:32 | 2 | patent, it made sense to have flow charts |
| 05:27:34 | 3 | for the TriZetto system to see if there |
| 05:27:38 | 4 | were, in fact, structural differences. |
| 05:27:42 | 5 | Q.  You said it made sense to have these flow |
| 05:27:45 | 6 | charts, but it certainly wasn't necessary to |
| 05:27:47 | 7 | your opinions, correct? |
| 05:27:48 | 8 | A.  I believe it was necessary to some of the |
| 05:27:51 | 9 | opinions, the opinions that I have about |
| 05:27:54 | 10 | structure of the flow charts, the structure |
| 05:27:57 | 11 | of the system. |
| 05:28:01 | 12 | Q.  Well, your conclusion that TriZetto does not |
| 05:28:05 | 13 | infringe any of the asserted claims would |
| 05:28:08 | 14 | not have changed in any way if you did not |
| 05:28:11 | 15 | have access to the live demonstration of the |
| 05:28:16 | 16 | three accused systems not -- nor to these |
| 05:28:22 | 17 | flow charts, correct? |
| 05:28:29 | 18 | A.  It's a difficult question to answer on the |
| 05:28:32 | 19 | spot.  I would have to go back and look at |
| 05:28:33 | 20 | the opinions and see whether they depend in |
| 05:28:35 | 21 | some crucial way on the flow chart or the |
| 05:28:37 | 22 | demos. |
| 05:28:38 | 23 | Q.  All right.  Fair enough.  You don't know |
| 05:28:39 | 24 | whether they were necessary, but you |
| 05:28:41 | 25 | certainly found them useful; is that right? |

Page 269

| | | |
|---|---|---|
| 05:28:43 | 1 | A.  I at least found them useful, yes. |
| 05:28:46 | 2 | Q.  No doubt about that, right? |
| 05:28:47 | 3 | A.  And the -- let me leave it at that.  Found |
| 05:28:54 | 4 | them useful. |
| 05:28:55 | 5 | Q.  And you, in fact, asked for both of them, |
| 05:28:57 | 6 | right, the live demonstration and the flow |
| 05:28:59 | 7 | charts, right? |
| 05:28:59 | 8 | A.  Yes. |
| 05:29:00 | 9 | Q.  And is it your understanding that these flow |
| 05:29:05 | 10 | charts as represented by Exhibit B exist |
| 05:29:09 | 11 | with respect to the entire claims processing |
| 05:29:12 | 12 | systems, the accused systems? |
| 05:29:15 | 13 | A.  No, I don't know that.  I would not be |
| 05:29:17 | 14 | surprised if it were true, but I don't know |
| 05:29:18 | 15 | that for a fact because I did not -- |
| 05:29:20 | 16 | Q.  Well, you were -- I'm sorry. |
| 05:29:21 | 17 | A.  -- because I did not ask for the flow chart |
| 05:29:24 | 18 | for the entire system. |
| 05:29:25 | 19 | Q.  In your expert opinion, though, you expect |
| 05:29:27 | 20 | that they would have flow charts for the |
| 05:29:31 | 21 | operation of the entire system, right? |
| 05:29:32 | 22 | MR. SEGAL:  Lacks foundation, not |
| 05:29:34 | 23 | an opinion relevant to the case and calls |
| 05:29:37 | 24 | for speculation. |
| 05:29:37 | 25 | Q.  You can answer the question. |

Page 270

| | | |
|---|---|---|
| 05:29:39 | 1 | A.  In my experience, things like this get |
| 05:29:42 | 2 | written up because somebody needs them, not |
| 05:29:45 | 3 | because it's a routine thing to do.  People |
| 05:29:47 | 4 | are usually too busy writing and maintaining |
| 05:29:51 | 5 | code to write nice neat flow charts.  So I |
| 05:29:58 | 6 | don't have a strong feeling one way or the |
| 05:30:00 | 7 | other.  It would not surprise me if the |
| 05:30:02 | 8 | other flow charts did not exist.  I guess I |
| 05:30:05 | 9 | would be slightly surprised if somebody had |
| 05:30:07 | 10 | gone to the trouble to build flow charts for |
| 05:30:09 | 11 | all of the rest of the system in the careful |
| 05:30:12 | 12 | fashion that these were built. |
| 05:30:13 | 13 | Q.  Didn't you ask for flow charts for the |
| 05:30:15 | 14 | entire system? |
| 05:30:19 | 15 | A.  No, I was looking to compare the claims |
| 05:30:21 | 16 | editing process here. |
| 05:30:22 | 17 | Q.  ClinicaLogic? |
| 05:30:24 | 18 | A.  Well, ClinicaLogic is one of the names |
| 05:30:27 | 19 | that's used to describe that code, yes. |
| 05:30:29 | 20 | This happens to be -- this happens to be for |
| 05:30:36 | 21 | the Facets system, but it's my understanding |
| 05:30:39 | 22 | that it's the same. |
| 05:30:40 | 23 | Q.  It's your understanding that the same flow |
| 05:30:42 | 24 | chart applies to each of the three accused |
| 05:30:44 | 25 | systems? |

Page 271

| | | |
|---|---|---|
| 05:30:45 | 1 | A.  At least in a general level of detail.  What |
| 05:30:52 | 2 | I'm continuing to work on is whether this is |
| 05:30:53 | 3 | an accurate representation of the COBOL |
| 05:30:56 | 4 | code.  I know it to be an accurate |
| 05:30:57 | 5 | representation of the C++ code. |
| 05:30:59 | 6 | Q.  You in forming your opinions regarding the |
| 05:31:04 | 7 | infringement of the three systems, did you |
| 05:31:10 | 8 | ask for documentation regarding the |
| 05:31:12 | 9 | operation of the entire system, each of the |
| 05:31:16 | 10 | three systems? |
| 05:31:16 | 11 | MR. SEGAL:  Vague and ambiguous. |
| 05:31:18 | 12 | A.  I received documentation that I believe |
| 05:31:26 | 13 | covers the -- I believe covers more than |
| 05:31:30 | 14 | just the claim editing, but I'm not |
| 05:31:34 | 15 | positive.  I would have to go back and look |
| 05:31:35 | 16 | at the documents.  I received a number of |
| 05:31:37 | 17 | paper docu -- paper's not the right term |
| 05:31:43 | 18 | anymore -- number of manuals; that is, I'm |
| 05:31:45 | 19 | trying to distinguish source code.  I |
| 05:31:47 | 20 | received a number of manuals describing each |
| 05:31:49 | 21 | of the systems.  And as I sit here, I don't |
| 05:31:52 | 22 | remember whether those manuals -- and I know |
| 05:31:54 | 23 | they at least covered claims editing.  I |
| 05:31:56 | 24 | don't remember if they covered more. |
| 05:31:59 | 25 | Q.  Did you ever receive all of the source code |

Page 272

68 (Pages 269 to 272)

05:32:02 1    for the accused -- for the three accused
05:32:05 2    infringing systems?
05:32:06 3  A.  I believe I have all of the source code for
05:32:10 4    the Facets system. I believe I have the
05:32:19 5    clinical editing code for the ClinicalLogic.
05:32:25 6    I believe I have all the code for QikLink,
05:32:27 7    but that's also something that I'm still
05:32:29 8    working to make sure of. There was some
05:32:35 9    confusion.
05:32:36 10  Q.  Have you analyzed the code for the entire
05:32:38 11    system -- three systems that are accused of
05:32:40 12    infringement?
05:32:41 13  A.  No.
05:32:41 14        MR. SEGAL: Objection, vague and
05:32:42 15    ambiguous.
05:32:42 16  A.  No, I have not analyzed all of the code for
05:32:44 17    all three systems.
05:32:45 18  Q.  Why not?
05:32:48 19  A.  Well, among other reasons, it would be a job
05:32:55 20    that probably would have taken the better
05:33:00 21    part of, oh, I don't know, six months or a
05:33:05 22    year's worth of full-time work. There's a
05:33:08 23    lot of code there. It would have been an
05:33:10 24    overwhelming task to analyze all of the code
05:33:12 25    for all of the systems.

Page 273

---

05:33:17 1  Q.  In your opinion, was it necessary for you to
05:33:19 2    review the source code to determine whether
05:33:23 3    or not any of the three accused systems
05:33:25 4    infringed the McKesson patent?
05:33:27 5  A.  Yeah, it was.
05:33:48 6  Q.  In your expert opinion, was it necessary for
05:33:50 7    you to review the flow charts that are
05:33:54 8    attached as Exhibit B to your November
05:33:56 9    report that you understand applies equally
05:33:59 10    to all three infringing systems in order to
05:34:02 11    determine whether or not the TriZetto
05:34:03 12    systems infringed the claims of the patent?
05:34:05 13  A.  I think we talked about this and came to the
05:34:08 14    agreement that it was -- no, wait. I have
05:34:14 15    to be careful, because you mentioned a
05:34:16 16    couple things before. Yeah, the flow charts
05:34:24 17    were necessary in order to have something to
05:34:25 18    compare against the flow charts in the
05:34:27 19    patent.
05:34:27 20  Q.  Isn't it true that one can determine whether
05:34:36 21    or not TriZetto infringes the -- any claim
05:34:41 22    of the patent by simply reviewing a
05:34:44 23    marketing brochure for any one of the three
05:34:48 24    accused systems?
05:34:49 25  A.  Not to my understanding, no.

Page 274

---

05:34:50 1  Q.  Why not?
05:34:51 2  A.  I don't believe you can determine, for
05:34:52 3    example, whether the system ascertains
05:34:55 4    whether a claim contains a plurality -- it's
05:35:01 5    getting late -- a plurality of service codes
05:35:04 6    by looking at the marketing brochure.
05:35:08 7        MR. SEGAL: Just for the record,
05:35:09 8    counsel, I am going to have some questions
05:35:11 9    for the witness, and to the extent you use
05:35:13 10    your full seven hours you will not have time
05:35:14 11    to redirect. You've had a full day with
05:35:20 12    this witness where you've had more than
05:35:21 13    ample time to cover whatever ground you
05:35:23 14    needed to and to leave time for redirect. This
05:35:27 15    is a one-day, seven-hour deposition, so if
05:35:32 16    you want to reserve time, you might want to
05:35:34 17    consider that.
05:35:44 18  Q.  Sir, what documentation regarding the
05:35:47 19    accused systems did you find necessary to
05:35:52 20    review and analyze in order to determine
05:35:55 21    whether or not TriZetto infringed the
05:35:59 22    patent, any claim of the patent?
05:36:32 23  A.  Okay. That's a difficult question at this
05:36:33 24    point because I did not attempt to -- in
05:36:35 25    looking through -- I'm looking at the list

Page 275

---

05:36:37 1    of materials explored in my November 14th
05:36:41 2    report on Page A-2, and I have not
05:36:44 3    previously tried to sort out which materials
05:36:49 4    were necessary and which materials were
05:36:53 5    merely useful. So it's not a question I can
05:36:55 6    answer on the spot, because there's a large
05:36:58 7    body of material here, and so I can't tell
05:37:00 8    you off the top of my head which were
05:37:02 9    necessary versus simply useful.
05:37:04 10  Q.  In determining the meaning of each of the
05:37:08 11    asserted claims, did you attempt to
05:37:11 12    determine a range of equivalence to those
05:37:17 13    claims?
05:37:17 14  A.  I considered that, yes.
05:37:21 15  Q.  And did you in fact determine what range of
05:37:31 16    equivalence would apply to each of the
05:37:33 17    asserted claims?
05:37:35 18        MR. SEGAL: Objection, vague.
05:37:36 19  A.  I don't think I wrote down and recorded a
05:37:45 20    range for each of the claims. What I was
05:37:47 21    doing was looking at the claims and looking
05:37:50 22    for identicality (sic) of function and then
05:37:58 23    equivalence of structure as best I could
05:38:00 24    determine it.
05:38:01 25  Q.  And so are you prepared to testify today

Page 276

69 (Pages 273 to 276)

05:38:11 1   about the range of equivalence for each of
05:38:13 2   the given asserted claims?
05:38:18 3        MR. SEGAL: Vague and ambiguous.
05:38:18 4   A. No, I don't think I have a pre-established
05:38:22 5   range of equivalence all figured out for
05:38:24 6   each of the claims.
05:38:25 7   Q. Let me direct your attention to Claim 1.
05:38:32 8   Well, strike that.
05:38:32 9        Let me direct your attention to Claim
05:38:35 10  3. Do you see the element that we referred
05:38:39 11  to earlier in the deposition as the
05:38:46 12  predetermined database element that starts
05:38:47 13  with "a predetermined database stored in the
05:38:50 14  associated memory," ends with "one of the
05:38:53 15  medical service codes." Do you see that?
05:38:56 16  A. I do.
05:38:56 17  Q. And that's the predetermined database
05:38:58 18  element that we discussed at length earlier
05:39:02 19  today, correct?
05:39:02 20  A. Correct.
05:39:03 21  Q. I want to ask you some questions about that.
05:39:08 22  Now, does each of the three
05:39:11 23  TriZetto accused systems have a database
05:39:17 24  stored in associated memory?
05:39:19 25  A. Yes, I believe it has a database. Each of

05:39:31 1   them has a database.
05:39:31 2   Q. Stored in the associated memory, right?
05:39:33 3   A. Let me just make sure I understand the term
05:39:38 4   "associated memory."
05:39:39 5   Q. Well, let me back up. I'll ask a different
05:39:41 6   question.
05:39:41 7   A. No, that's all right. Yes, stored in the
05:39:43 8   associated memory is correct.
05:39:44 9   Q. Let me start with Claim 3. At the start of
05:39:50 10  Claim 3 it says, "A computer system,
05:39:52 11  including a central processing unit and
05:39:54 12  associated memory for processing input
05:39:56 13  claims containing at least one medical
05:39:58 14  service code comprising." Do you see that?
05:40:03 15  A. Yes.
05:40:03 16  Q. Each of the three accused systems has that,
05:40:05 17  right?
05:40:06 18  A. Each of the three systems has that.
05:40:11 19  Q. They satisfy that element, correct?
05:40:12 20  A. I believe so.
05:40:13 21  Q. Okay. And directing your attention to the
05:40:19 22  next element, each of the three accused
05:40:22 23  systems has a database stored in the
05:40:27 24  associated memory, correct?
05:40:28 25       MR. SEGAL: Objection to the extent

05:40:29 1   it misstates the element.
05:40:30 2   A. As long as we are explicit about leaving out
05:40:33 3   the adjective "predetermined." You're
05:40:39 4   reading a database, not a predetermined
05:40:40 5   database, correct?
05:40:41 6   Q. We have a disagreement on the construction
05:40:43 7   of "predetermined," you realize that, right?
05:40:45 8   A. I understand. All I'm trying to establish
05:40:49 9   is that we're leaving out that word in the
05:40:51 10  phrase you're reading to me.
05:40:52 11  Q. That's correct.
05:40:52 12  A. Okay.
05:40:53 13  Q. So each of the three accused systems
05:40:56 14  contains a database, at least a database
05:41:00 15  stored in the associated memory, correct?
05:41:01 16  A. Correct.
05:41:04 17  Q. The database contains medical service codes,
05:41:06 18  correct?
05:41:06 19  A. Correct.
05:41:10 20  Q. And a set of relationships among the medical
05:41:13 21  service codes, correct?
05:41:16 22  A. Well, we need to read the rest of this.
05:41:18 23  Just a moment.
05:41:19 24       (Witness reviews document.)
05:41:50 25  A. Yes. I wanted to think about that one

05:41:52 1   carefully.
05:41:58 2   Q. And each of the three accused systems -- let
05:42:04 3   me just put it this way to save some time:
05:42:08 4   Each of the three accused systems satisfied
05:42:14 5   for practice -- strike that.
05:42:20 6        Claim 3 is an apparatus claim. Do you
05:42:23 7   understand that?
05:42:23 8   A. I do.
05:42:24 9   Q. Okay. So each of the three systems includes
05:42:27 10  the component that's listed as the element
05:42:33 11  which starts with "a predetermined database
05:42:36 12  stored in associated memory," ending with
05:42:40 13  "one of the medical service codes" if you
05:42:43 14  were to remove the term which we disagree
05:42:44 15  on, "predetermined," correct?
05:42:47 16  A. Correct.
05:42:47 17  Q. All right. And each of the three systems --
05:42:52 18  so therefore each of the three accused
05:42:54 19  systems satisfies the first two elements of
05:42:56 20  Claim 3 as long as we remove the term
05:43:03 21  "predetermined," correct?
05:43:04 22  A. As long as we modify the first element, then
05:43:07 23  we're okay --
05:43:07 24  Q. Okay.
05:43:08 25  A. -- so far.

70 (Pages 277 to 280)

| | |
|---|---|
| 06:10:00 1 reference; is that correct? | 06:12:02 1 A. No. |
| 06:10:00 2 A. At least in the chart on Page 34. | 06:12:02 2 Q. What was your intention about the individual |
| 06:10:03 3 Q. Okay. In the text of your report do you | 06:12:06 3 reference with respect to the conclusion you |
| 06:10:06 4 identify what parts of the claims you | 06:12:09 4 reached that the claims of the '164 patent |
| 06:10:10 5 believe are in each individual reference? | 06:12:11 5 are invalid for obviousness? |
| 06:10:11 6 MR. RANDALL: Objection, lacks -- | 06:12:14 6 MR. RANDALL: Objection, your |
| 06:10:11 7 A. For the most -- | 06:12:16 7 question's vague and ambiguous. |
| 06:10:13 8 MR. RANDALL: -- foundation. | 06:12:17 8 A. That the reference in the context of one |
| 06:10:13 9 A. Yes, for the most part I do. There may be | 06:12:22 9 skilled in the -- one of ordinary skill in |
| 06:10:16 10 places where I haven't done it at all, but | 06:12:25 10 the art would render the claim obvious. |
| 06:10:18 11 in most places I do. | 06:12:28 11 Q. So you weren't combining the reference with |
| 06:10:20 12 Q. Okay. Let's, for example, go to Page 17 of | 06:12:30 12 any other reference? You were taking the |
| 06:10:24 13 your report, which is -- actually, let me | 06:12:32 13 reference plus skill in the art? |
| 06:10:26 14 not use the Egdahl reference. Let me | 06:12:34 14 MR. RANDALL: Objection. Your |
| 06:10:28 15 withdraw my question. | 06:12:35 15 question is leading, and it's vague and |
| 06:10:37 16 Let's go to Page 20. It starts on the | 06:12:37 16 ambiguous as to what reference you're |
| 06:10:41 17 Advanced MedLogic System? | 06:12:38 17 referring to. |
| 06:10:41 18 A. Yes. | 06:12:39 18 Q. Okay. For each of the individual references |
| 06:10:42 19 Q. Can you identify what you attempted to do | 06:12:41 19 that are discussed starting at Page 9 of |
| 06:10:45 20 with respect to the Advanced MedLogic System | 06:12:49 20 your report and going through Page, at least |
| 06:10:49 21 and explaining how it applied to the patent | 06:12:59 21 28, actually further than that, what was |
| 06:10:51 22 claims? | 06:13:02 22 your intention -- what is your opinion about |
| 06:10:51 23 A. I went through particular text from the | 06:13:06 23 what one of ordinary skill in the art would |
| 06:10:56 24 various documents from Advanced MedLogic and | 06:13:10 24 need to combine with each of those |
| 06:11:00 25 attempted to align them with various claims | 06:13:11 25 individual references in order to invalidate |
| Page 305 | Page 307 |
| 06:11:04 1 and elements of claims. For -- | 06:13:14 1 the cited claim from the chart on Page 34? |
| 06:11:08 2 Q. Can you give us an example of where you | 06:13:17 2 MR. RANDALL: Objection. Your |
| 06:11:10 3 identify a claim element within the | 06:13:19 3 question is vague and ambiguous, and it's |
| 06:11:11 4 description of your report? | 06:13:22 4 compound. |
| 06:11:12 5 A. The top of Page 22, the first bullet, the | 06:13:27 5 A. In the -- |
| 06:11:17 6 parenthetical comment says, "compare '164 | 06:13:27 6 Q. Let me lay a foundation. We've looked at |
| 06:11:20 7 claim 3 and all others relying on a set of | 06:13:30 7 your chart on Page 34, and there is a number |
| 06:11:22 8 relationships," because that particular | 06:13:33 8 of references listed for different claims, |
| 06:11:24 9 piece of the text was relevant to the | 06:13:35 9 correct? |
| 06:11:26 10 element of the claim having to do with claim | 06:13:35 10 A. Correct. |
| 06:11:29 11 relationships. The second bullet similarly | 06:13:36 11 Q. And I believe your testimony was that that |
| 06:11:34 12 says compare to all claims involving | 06:13:37 12 meant that particular piece of prior art had |
| 06:11:36 13 medically determined relations. So this | 06:13:41 13 some relevance to the claim? |
| 06:11:38 14 particular piece of text was relevant to the | 06:13:43 14 A. Correct. |
| 06:11:40 15 element of claims concerning medically | 06:13:46 15 Q. What is your opinion as to what needed to be |
| 06:11:43 16 determined relationships. | 06:13:48 16 combined with each of the individual |
| 06:11:43 17 Q. In connection with the elements that you | 06:13:51 17 references on Chart 34 in order to render |
| 06:11:47 18 don't mention for each of the individual | 06:13:56 18 the claim obvious? |
| 06:11:49 19 pieces of prior art, was it your intention | 06:13:57 19 MR. RANDALL: Objection. The |
| 06:11:52 20 to rely on combination with some other piece | 06:13:58 20 question's compound. It's vague and |
| 06:11:56 21 of prior art to reach your conclusion of | 06:14:01 21 ambiguous, and it lacks foundation. |
| 06:11:58 22 obviousness? | 06:14:09 22 A. With respect to the Egdahl citation, that |
| 06:11:59 23 MR. RANDALL: Objection. Your | 06:14:11 23 requires one of the references in the chart |
| 06:11:59 24 question is vague and ambiguous and lacks | 06:14:14 24 that begins on Page 37. With respect to any |
| 06:12:01 25 foundation. | 06:14:18 25 of the other references, they are intended |
| Page 306 | Page 308 |

**SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES**
**877.955.3855**

| | | |
|---|---|---|
| 06:14:21 | 1 | to stand on their own in the context of one |
| 06:14:24 | 2 | of ordinary skill in the art. |
| 06:14:32 | 3 | Q.  In determining whether or not the TriZetto |
| 06:14:34 | 4 | systems infringed the '164 patent, what is |
| 06:14:37 | 5 | the first step that you did? |
| 06:14:40 | 6 | A.  Read the patent. |
| 06:14:46 | 7 | Q.  And did you make any attempt to construe the |
| 06:14:48 | 8 | claims of the patent? |
| 06:14:49 | 9 | A.  Oh, sorry.  Yes, in reading the patent, in |
| 06:14:54 | 10 | order to understand the claims, I had to |
| 06:14:56 | 11 | attempt to construe them. |
| 06:14:58 | 12 | Q.  To the extent you were able to construe the |
| 06:15:01 | 13 | claims for purposes of your infringement |
| 06:15:03 | 14 | position, did you use a different |
| 06:15:05 | 15 | construction for the purposes of your |
| 06:15:07 | 16 | invalidity report? |
| 06:15:08 | 17 | MR. RANDALL:  Objection, the |
| 06:15:09 | 18 | question lacks foundation. |
| 06:15:09 | 19 | A.  No.  I did not.  I tried to make -- I'll try |
| 06:15:15 | 20 | it in a form that makes sense of -- let me |
| 06:15:17 | 21 | use the standard term.  I tried to construe |
| 06:15:19 | 22 | the term -- the claims -- construe the terms |
| 06:15:21 | 23 | of the claim when I first went through the |
| 06:15:24 | 24 | patent and continued to use that |
| 06:15:28 | 25 | construction throughout my work. |

Page 309

| | | |
|---|---|---|
| 06:15:30 | 1 | Q.  And the first time you went through the |
| 06:15:32 | 2 | patent was for purposes of your invalidity |
| 06:15:35 | 3 | report? |
| 06:15:35 | 4 | A.  Yes. |
| 06:15:35 | 5 | Q.  And so you used a construction in performing |
| 06:15:39 | 6 | your invalidity report? |
| 06:15:40 | 7 | A.  Yes. |
| 06:15:41 | 8 | Q.  And did you make any modifications to your |
| 06:15:44 | 9 | construction when you set about to do your |
| 06:15:47 | 10 | infringement report? |
| 06:15:47 | 11 | A.  No.  No, I did not. |
| 06:15:48 | 12 | MR. SEGAL:  Okay.  I have nothing |
| 06:15:50 | 13 | further. |
| 06:15:50 | 14 | |
| 06:15:50 | 15 | REDIRECT EXAMINATION |
| 06:15:50 | 16 | |
| 06:15:50 | 17 | BY MR. RANDALL: |
| 06:15:51 | 18 | Q.  You were asked a question, Mr. Davis -- |
| 06:15:52 | 19 | MR. SEGAL:  I think we have a tape |
| 06:15:53 | 20 | change.  You might want to -- |
| 06:15:55 | 21 | THE VIDEOGRAPHER:  Two minutes. |
| 06:15:56 | 22 | MR. RANDALL:  I can ask you. |
| 06:15:58 | 23 | BY MR. RANDALL: |
| 06:15:58 | 24 | Q.  You were asked a question earlier about |
| 06:16:00 | 25 | whether you reviewed information regarding |

Page 310

| | | |
|---|---|---|
| 06:16:02 | 1 | the entire system of the three accused |
| 06:16:04 | 2 | infringing systems, correct?  Do you |
| 06:16:06 | 3 | remember that? |
| 06:16:06 | 4 | A.  Generally, yes. |
| 06:16:07 | 5 | Q.  Did you examine sufficiently all of the -- |
| 06:16:13 | 6 | the entirety of the three accused infringing |
| 06:16:20 | 7 | systems such that you can render an opinion |
| 06:16:23 | 8 | regarding the entire aspect of the |
| 06:16:25 | 9 | infringing systems? |
| 06:16:25 | 10 | MR. SEGAL:  Objection, vague and |
| 06:16:27 | 11 | ambiguous. |
| 06:16:27 | 12 | A.  I'm sorry, I really don't know what you mean |
| 06:16:30 | 13 | by "the entire aspect." |
| 06:16:31 | 14 | Q.  Do you have an opinion -- strike that. |
| 06:16:32 | 15 | Have you sufficiently reviewed |
| 06:16:34 | 16 | material regarding the operation of the |
| 06:16:36 | 17 | entire accused infringing systems in order |
| 06:16:38 | 18 | to render an opinion that aside from the |
| 06:16:46 | 19 | ClinicaLogic portions, that there is no |
| 06:16:50 | 20 | infringement elsewhere in the system? |
| 06:16:52 | 21 | MR. SEGAL:  Objection, vague and |
| 06:16:52 | 22 | ambiguous. |
| 06:16:52 | 23 | A.  I believe so.  I believe I have, and I |
| 06:16:54 | 24 | believe my opinion is unchanged with respect |
| 06:16:55 | 25 | to the rest of the system. |

Page 311

| | | |
|---|---|---|
| 06:16:57 | 1 | Q.  And what specifically did you review in |
| 06:16:59 | 2 | terms of the operation of the entire system |
| 06:17:01 | 3 | to reach that conclusion? |
| 06:17:02 | 4 | A.  There are manuals that I was given as part |
| 06:17:05 | 5 | of the documents from TriZetto that I |
| 06:17:06 | 6 | believe described the system. |
| 06:17:07 | 7 | Q.  But you didn't review any flow charts, any |
| 06:17:09 | 8 | source code or the actual operation of the |
| 06:17:13 | 9 | rest of the system -- |
| 06:17:13 | 10 | A.  I did not -- |
| 06:17:14 | 11 | Q.  -- correct? |
| 06:17:15 | 12 | A.  -- feel the need to do that because the |
| 06:17:17 | 13 | patent focuses on clinical editing, and the |
| 06:17:22 | 14 | detailed examination, in my opinion, needs |
| 06:17:24 | 15 | to be with respect to the clinical editing |
| 06:17:27 | 16 | stuff, which is -- of the accused systems, |
| 06:17:30 | 17 | which is why I focused more detailed |
| 06:17:32 | 18 | attention there. |
| 06:17:32 | 19 | Q.  All right.  So all you're relying on for |
| 06:17:34 | 20 | your determination that there is no |
| 06:17:36 | 21 | infringement elsewhere in the accused |
| 06:17:37 | 22 | systems is the manuals that you were |
| 06:17:39 | 23 | provided; is that right? |
| 06:17:40 | 24 | A.  The patent for the McKesson system and the |
| 06:17:42 | 25 | manuals and my understanding of the rest of |

Page 312

**SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES**
**877.955.3855**

| | | |
|---|---|---|
| 06:17:44 | 1 | the system. |
| 06:17:46 | 2 | Q. Well, that's based on the manuals, right? |
| 06:17:48 | 3 | A. Manuals. Okay, the manuals. |
| 06:17:50 | 4 | MR. RANDALL: All right. No |
| 06:17:51 | 5 | further questions, subject to my statement |
| 06:17:57 | 6 | earlier. |
| 06:17:58 | 7 | MR. SEGAL: We can go off the |
| 06:17:58 | 8 | videotape record, and we can... |
| 06:18:01 | 9 | THE VIDEOGRAPHER: The time is |
| 06:18:03 | 10 | 6:18. This is the end of Tape No. 6. The |
| 06:18:06 | 11 | deposition is adjourned, and we are off the |
| 06:18:08 | 12 | record. |
| 06:18:08 | 13 | (Whereupon the deposition was |
| | 14 | concluded at 6:18 p.m.) |
| | 15 | |
| | 16 | |
| | 17 | |
| | 18 | |
| | 19 | |
| | 20 | |
| | 21 | |
| | 22 | |
| | 23 | |
| | 24 | |
| | 25 | |

Page 313

1  United States District Court
2  District of Delaware
3      I, Jessica L. Williamson, Registered,
4  Merit Reporter, Certified Realtime Reporter
5  and Notary Public in and for the
6  Commonwealth of Massachusetts, do hereby
7  certify that RANDALL DAVIS, Ph.D., the
8  witness whose deposition is hereinbefore set
9  forth, was duly sworn by me and that such
10  deposition is a true record of the testimony
11  given by the witness.
12      I further certify that I am neither
13  related to or employed by any of the parties
14  in or counsel to this action, nor am I
15  financially interested in the outcome of
16  this action.
17      In witness whereof, I have hereunto set
18  my hand and seal this 6th day of December,
19  2005.
20
21
22
23      Jessica L. Williamson, RMR, RPR, CRR
24      Notary Public, CSR No. 138795
25      My commission expires: 12/18/2009

Page 315

1
2
3
4
5
6
7
8
9  I, RANDALL DAVIS, Ph.D., do hereby declare under
10  penalty of perjury that I have read the foregoing
11  transcript; that I have made any corrections as appear
12  noted, in ink, initialed by me, or attached hereto; that
13  my testimony as contained herein, as corrected, is true
14  and correct.
15      EXECUTED this _____ day of _____,
16  20____, at _____, _____,
              (City)            (State)
17
18
19
20      _____
              RANDALL DAVIS, Ph.D.
21
22
23
24
25

Page 314

79 (Pages 313 to 315)

**SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES**
**877.955.3855**