# EXHIBIT B

# REBUTTAL REPORT OF RANDALL DAVIS

*McKesson Information Solutions LLC v. The TriZetto Group, Inc*

November 14, 2005

RCV'D SASMF LLP

2005 NOV 15 AM 11: 03

# I. INTRODUCTION

## I.A.    Qualifications.

My credentials are set forth in my expert report of October 24, 2005, which is incorporated by reference.

## I.B.    List of Publications Authored.

A complete list of the publications that I have authored or co-authored, including both technical papers and papers in the area of intellectual property, is set forth in my expert report of October 24, 2005.

## I.C.    Previous Testimony.

A complete list of the civil actions in which I have served as a consulting/testimonial expert is set forth in my expert report of October 24, 2005.

## I.D.    Expected Testimony.

I expect to testify concerning a number of technical issues related to U.S. Patent No. 5,253,164, including the allegation of infringement made by McKesson Information Solutions. I also expect to testify concerning the state of the art during the relevant time periods for the '164 patent, as well as expert systems, medical expert systems, and any other related technical matters. I also expect to testify concerning the Johnson and Musen reports; my opinions with respect to these reports are set forth more fully below.

There may be other issues or matters about which I may be asked to provide testimony depending upon discovery and events between now and trial, or upon testimony and/or exhibits introduced by McKesson Information Solutions during their case-in-chief, or upon or as a result of direct or cross-examination at trial or by the introduction of related exhibits.

## II. BACKGROUND

As background for the opinions I set out in this report, I have been provided an understanding of the current principles of U.S. patent law regarding interpretation and infringement of patent claims. I understand that determining infringement of a claim involves first construing the claim to determine its meaning, then comparing the claim to the accused product. I understand that the proper interpretation of the '164 claims will be determined by the Court.

I have been informed that means-plus-function and step-plus-function elements are construed by identifying the claimed function and then determining the corresponding structure or acts described in the patent specification in support of that function. I understand that means-plus-function or step-plus-function claim elements may be interpreted to include the structure or acts described in the patent's specification as performing that function, and that structure's or act's equivalents.

I understand that determining infringement of a claim requires evaluating whether the allegedly infringing product includes every element of the claim, and, for claims phrased in means-plus-function or step-plus-function language in particular, also requires that (a) the accused infringing product must have identical function to that disclosed in the patent and (b) the accused infringing product must be otherwise insubstantially different with respect to the structure or acts disclosed in the patent for accomplishing the function in question. Such a determination, naturally, requires examining both function and structure or acts in the patent and in the allegedly infringing product.

I understand that a claim's language should be interpreted from the perspective of an individual skilled in the art of the invention at the time the application for the patent was filed,

and that a claim's language should be given its ordinary and customary meaning as would have been understood by one skilled in the art in view of the patent as a whole, unless the patent or prosecution history clearly assign a special meaning to a particular term.

## III. SUMMARY OF OPINIONS

I find the reports by Dr. Johnson and Dr. Musen to be lacking in any substantive support for claims of infringement. Dr. Johnson's report appears to use the wrong standard when comparing function, never discusses what structure or acts corresponds to the function of means-plus-function or step-plus-function claims, and indeed never even mentions the '164 claims. The report instead focuses on an algorithm that she claims to be specified in the patent and makes a number of plainly incorrect claims about the algorithm and its appearance in the TriZetto products.

While Dr. Musen's report deals explicitly with the claims, he, too, never describes any structure or acts corresponding to the function in means-plus-function or step-plus-function elements, never describes any structure or acts in the accused products that corresponds to the function of means-plus-function or step-plus-function elements, and the deposition excerpts and product descriptions he cites to support his allegations that the TriZetto products include all the claim elements are in many cases plainly irrelevant to the claim element in question.

The TriZetto products also differ in significant ways in structure and behavior from the system described in the '164 patent, differences with material impact on questions of infringement of the '164 claims:

- The TriZetto products never "ascertain whether the at least one claim contains a plurality of medical service codes";
- The TriZetto products never delete medical service codes from claims;

- The TriZetto products never "request additional information from a user";

- The TriZetto products do not have "a predetermined database";

- The architecture of the TriZetto systems is different from that of the '164 patent;

- The processing done by the TriZetto products is different from that specified in the '164 patent;

- The TriZetto products do not have the same set of relations as implied by the '164 patent;

- The TriZetto products never authorize claims "in response to the determining step."

## IV. ANALYSIS OF THE JOHNSON REPORT

For a variety of reasons, Dr. Johnson's report fails to provide any substantive arguments concerning infringement. First, her report claims that "all three TriZetto products have similar functionality to that described in the patent" [Johnson at 5]. This may well be so, but as I understand it the infringement standard for means-plus-function elements or step-plus-function elements is identicality of function, and observations about similarity do not support allegations of infringement. In addition, if Dr. Johnson, as McKesson's own expert, finds only "similar functionality," that is informative indeed.

Second, despite the need to analyze infringement by demonstrating that every element of a claim is present, Dr. Johnson never even cites the actual '164 claims in her report and never evaluates whether the allegedly infringing products include every element of a claim. As I understand it, this means there is no substantive argument concerning infringement in her report.

The third problem with her report is that it seems to be wholly directed toward "The algorithm described and disclosed in the figures, text, and appendices of the '164 patent"

[Johnson at 5]. This algorithm appears to be an object of her own creation: The '164 patent does not describe and disclose an algorithm. Careful reading of the "figures, text, and appendices of the '164 patent" makes it clear that the patent specifies 16 claims, that many of the claims employ means-plus-function or step-plus-function language, and that 9 of the claims are independent. The 9 independent claims embody individual functions, not a single algorithm, and certainly not the algorithm created by Dr. Johnson.

Dr. Johnson's attempt to find an algorithm in the patent is doomed by the fact that the computations described in the figures, text, and appendices are mutually inconsistent in a variety of ways, some minor and some significant.[1] Hence even if it made sense to construct "an algorithm" from the patent text, it would prove impossible with the '164 patent, as you would have to decide (on what grounds?) whether to take the figures, the text, or the appendices (notably the code) as the structure. In addition, there is no clear linkage in the specification between the language of the specific claim functions and an identifiable structure or act.

The analysis becomes even more problematic when we consider that Dr. Johnson does in fact not actually specify an algorithm. As she states "The algorithm described and disclosed in the figures, text and appendices of the '164 patent *includes the following processing:*" [Johnson report at 5, emphasis added]. I take this to mean that "the algorithm" (should there be one somewhere in the patent) might in fact include other processing, and that the list on page 5 is to be read as an explicitly incomplete specification of "the algorithm." This must be so, as the '164 patent also describes, among other things, processing capable of "informing a user that a medical service code is not contained in the predetermined database" (claim 1), and this is nowhere mentioned in Dr. Johnson's description of "the algorithm." The specification of "the algorithm" is thus demonstrably incomplete. Because she never actually specifies "the algorithm described

in the patent," we can make no technical sense of subsequent allegations by Dr. Johnson of the form of "The processing described above includes the algorithm described in the patent" [Johnson at 9] or "The algorithm described in the patent is also included in QicLink 3.20.30.04" [Johnson at 11], or "The algorithm of the '164 patent is also evident in the Facets Claims Processing User Guide and Supplement 2-3 – 2-4" [Johnson at 11].

The fourth reason why Dr. Johnson's report fails to provide any substantive arguments concerning infringement is that, where she does deal with the claims, the language she uses appears to be an informal and broader restatement of some elements of some of the claims, though the specific claims are never identified. As one example of the disconnect between her language and the claim language, in her report on page 5 she describes the algorithm as operating "…in a computer system which includes database(s)…" indicating the possibility of multiple databases, when in fact the claim language specifies only one database.

Consider the examples in the table below, showing Dr. Johnson's language and the actual claim language of the '164 patent. Notice in particular how much broader Dr. Johnson's casual restatement of claim elements is than the actual claim language. (The italicized text in the right-hand column indicates the likely corresponding claim elements that Dr. Johnson is apparently restating; the match is approximate as Dr. Johnson's restatements often contain parts of multiple claim elements and thus their intended referent cannot be understood with any certainty.)

| Language from the Johnson Report at 11 [emphases added] | Claim Language from '164 Patent |
| --- | --- |
| Facets v. 4.21 has *a mechanism for validating medical procedure codes*. | 1. In a computer system having means for operating on *a predetermined database containing medical service codes* and a set of relationships among the medical service codes defining whether selected ones of the medical service codes are valid when input with other selected ones of the medical service codes, a |

---

[1] See the discussion below for a description of the inconsistencies.

| | method for processing input claims containing at least one medical service code, comprising the steps of:<br>receiving at least one claim;<br>*determining whether any medical service code contained in the at least one claim is not present in the predetermined database*; and informing a user that a medical service code is not contained in the predetermined database. |
|---|---|
| In Facets v. 4.21, *there is a database* with medical procedure codes and relationships between medical procedure codes that define whether certain medical procedure codes are valid when received with other medical procedure codes. | 1. In a computer system having means for operating on *a predetermined database* containing medical service codes and a set of relationships among the medical service codes defining whether selected ones of the medical service codes are valid when input with other selected ones of the medical service codes, a method for processing input claims containing at least one medical service code, comprising the steps of:<br>receiving at least one claim;<br>determining whether any medical service code contained in the at least one claim is not present in the predetermined database; and informing a user that a medical service code is not contained in the predetermined database. |
| Facets v. 4.21 has processing that *accesses the database to determine* if a particular medical procedure code is valid or invalid given the information retrieved from the database. | 3. A computer system including a central processing unit and associated memory for processing input claims containing at least one medical service code, comprising:<br>a predetermined database stored in the associated memory, the database containing medical service codes and a set of relationships among the medical service codes defining whether selected ones of the medical service codes are valid when received with other selected ones of the medical service codes;<br>means for receiving at least one claim;<br>means for ascertaining whether the at least one claim contains a plurality of medical service codes;<br>*means for determining whether one of the medical service codes in the plurality of medical service codes is valid or invalid by interacting with the database and the set of relationships contained in the database*;<br>means for authorizing medical service codes |

| | which are valid in response to the means for determining; and<br>means for rejecting medical service codes which are invalid in response to the means for determining. |
|---|---|
| Finally, Facets v. 4.21 has a mechanism for informing the user about the clinical edits that it has performed which result in authorizations or rejections. | 1. In a computer system having means for operating on a predetermined database containing medical service codes and a set of relationships among the medical service codes defining whether selected ones of the medical service codes are valid when input with other selected ones of the medical service codes, a method for processing input claims containing at least one medical service code, comprising the steps of:<br>receiving at least one claim;<br>determining whether any medical service code contained in the at least one claim is not present in the predetermined database; and<br>*informing a user that a medical service code is not contained in the predetermined database.*<br><br>[or perhaps claim 5:]<br><br>5. The apparatus of claim 4, further comprising *means for informing a user why the at least one claim was revised.* |

It is as a consequence unsurprising that Dr. Johnson finds overlap between the TriZetto systems and her broadened restatement of the '164 claims, but as these are not in fact the '164 claims, the overlap has no impact on the question of infringement.

The fifth problem with her report arises from arguments that are in many instances vague and conclusory statements whose basis is unclear. Consider the allegation that "The algorithm described in the patent is also included in the QicLink 3.20.30.04 system written in COBOL. See, for example, c5xpeab0.ex, ca2670.prg, c5xccef.ex, clgcer.fd, c5xwea10.ws, c5xccc.prg, clexed.ws from CD TRAN-100 entitled 'ClinicaLogic+Source'." [Johnson at 11] The files named in the second sentence contain total of 17,625 lines, and presumably Dr. Johnson is

claiming that some of those 17,625 line contain the (as yet not clearly specified) algorithm. We are never told which lines, or even which sections of the files she might have in mind. So an underspecified algorithm is to be found somewhere in 17,625 lines of code.

Another vague and conclusory allegation is found in Dr. Johnson's allegation (noted above and reprinted below) concerning Facets documentation:

The algorithm of the '164 patent is also evident in the Facets Claims Processing User Guide and Supplement 2-3 – 2-4:

## Facets Claim Flow

The following steps describe the routine Facets follows when adjudicating a claim. Refer to Chapter 6, *Claims Adjudication Routine*, for detailed descriptions of each step.

1. A claim is entered into Facets.
2. Facets will perform some basic input editing on the claim (is the subscriber ID valid? is the subscriber in a group?). If errors are found here, these errors must be resolved before the claim can continue to process.
3. Once Facets finishes the basic input editing, eligibility is checked. The group must have a valid class/plan record and the member must have an eligibility row.
   - If the member is found to be ineligible, Facets will deny the claim and will not go through any additional processing unless eligibility is overridden.
   - If eligibility is not found for a member, an error message will be received and the claim will not continue to process.
   - If the eligibility check results in a warning message, the claim will continue through the process flow. However, the warning message will appear on the claim.
4. Once Facets has completed the eligibility check and found the appropriate plan/product for the member, Facets performs provider/network edits.
   - If an error message occurs, provider set-up is incorrect and Facets will discontinue processing.
   - Any warning messages discovered at this level (such as provider is out of network) appear on the claim, but the process will continue.
5. If a provider agreement is found, Facets will obtain the Service Definition (AGSE) for each line from the agreement. If a provider does not have an agreement, the Service Definition (SEDF) will be obtained from the product's SEDF record. The Service Definition will state which services have referral and/or authorization requirements.
6. Facets will then perform a duplicate check for each claim line. If an exact duplicate is discovered, then the claim will disallow and further processing will not be checked. If the claim is not an exact duplicate, Facets will continue the claim flow process.
7. Facets will then perform the managed care edits, checking for referrals and pre-authorization requirements and looking for a match. (Refer to Chapter 12 for more information on the Claim/UM matching routine.)
8. Facets then performs the clinical editing edits, disallowing and warning where appropriate. If a line is disallowed due to a clinical edit, the line will not continue through the claim flow process.

[Johnson at 11, citing Facets Claims Processing User Guide]

Note first that the Facets User Guide describes a 12-step process; Dr. Johnson reproduces only the first 8 steps. Consider also that of the 8 steps she does list, 6 deal with elements that are

not in the '164 patent, namely steps 2-7. Step 1 of the process does indeed acknowledge that claims must be entered into Facets, so Facets can be said to have the claim element of "receiving at least one claim," but then it would be difficult to imagine any claims processing system that did not have this element. While step 8 does mention the term "clinical editing," the description is so abstract and brief as to make it unclear how Dr. Johnson arrives at her claim "the algorithm of the '164 patent is also evident in the Facets Claims Processing User Guide and Supplement 2-3 – 2-4." But perhaps most important, the allegation is simply wrong: Nowhere in the 8 steps above (or indeed in the 12 that are actually contained in the Facets User Guide) is there any mention of "Processing to determine if more than one medical procedure code has been entered," which is step 5 in her listing of "the algorithm" [Johnson report at 5]. Hence the section of the User Guide she cites does not in fact contain one of the steps she herself recites as a part of the algorithm.

Sixth, while she offers a number of vague and conclusory statements regarding similarity of function, nowhere in her report does she identify the structure or acts in the '164 patent that correspond to the function being discussed in the means-plus-function or step-plus-function elements, and, not surprisingly, there is no comparison of the (unidentified) structure of the system described in the '164 patent with those of the TriZetto products, in order to argue that they are insubstantially different. As I understand it such an analysis is essential to analyzing infringement, and its absence is significant.

Finally, Dr. Johnson's report focuses almost solely around one example, a code rebundling. Yet as I explain below, rebundling is not within the scope of the '164 claims as they would be interpreted by one skilled in the art. As a consequence Dr. Johnson's report is almost

wholly devoted to an example that is not in fact relevant to allegations of infringement of the '164 patent.

As a consequence it is difficult find anything in Dr. Johnson's report that is directed toward the analysis of the claims of the '164 patent and their alleged infringement by the TriZetto products.

## V. ANALYSIS OF THE MUSEN REPORT

Dr. Musen's report is also problematic for several reasons. He explicitly acknowledges that analyzing infringement for means plus function claims requires identicality of function and insubstantial difference with respect to the structure disclosed in the patent for accomplishing that function in question. Yet there is virtually no analysis of structure in the report. We find the single, very general allegation that:

> Regarding the various "means for" elements in the claims, the '164 patent discloses software or a combination of software and hardware as the structure that performs the functions corresponding to those elements. Indeed, in a computer system or computer implemented method, each function associated with the "means for" elements must necessarily be performed by software and related hardware.

[Musen at 8]

This is a remarkable pair of statements. The second sentence is of course a tautology – if you claim that a computer system carries out a function, you are of course saying that it is the computer hardware and/or software that carries out the function. What else is there?

The first sentence in the quote above alleges that the patent discloses the relevant structure, but this is the last we hear of the matter throughout the remainder of Dr. Musen's report. He never actually indicates *what* structure or acts are disclosed by the patent, which elements of that structure or acts correspond to the various "means for" elements, what the

structure or acts are of the allegedly infringing products, or what elements of those structures or acts correspond to the various claim elements.

If all that needs to be said to analyze infringement allegations in the case of a computer system or a computer-implemented method is that the structure is (somewhere) in the "software or a combination of the software and hardware," without further specification, analysis, or comparison, then *any* system with identical function infringes, no matter what its structure. The implication of Dr. Musen's approach is that the standard for infringement has lost half its criteria and become identicality of function alone.

Nor is Dr. Musen's discussion of the patent claims any more precise on this dimension. We find the same conclusory sentence repeated 15 times: "Finally, the structure of the computer system disclosed in the '164 patent for performing the function of each 'means for' element of this claim is included in, or is equivalent to, the structure of each product."

The report contains no specification of the structure that correspond to claim elements in the '164 patent, nor any identification of structure in any TriZetto product. Unsurprisingly, there is no comparison of structures; there is only the unsupported conclusory statement that the (as yet unspecified) structures are equivalent. As we have not been told what "they" are, it is odd to find the claim that "they" are identical, and of course impossible to evaluate the claim.

There is thus no discussion in the Musen report as to what specifically is being referred to by "the structure of the computer system ... for performing the function" in question. All we know from Dr. Musen's report is that it is *somewhere* in the "software or combination of software and hardware."

This level of argument is faulty technically as well, because, as Dr. Musen surely knows, it is a trivial matter to create two computer systems that have identical functions, yet use vastly

different structures to achieve those functions. With computer systems, "structure" concerns, among other things, the organization of data, of files, and of behavior (i.e., how the behavior of the system is decomposed into the smaller-sized components of which every non-trivial computer program is composed).[2] The organization of data, files and behavior is frequently influenced heavily by the language in which it was written. Each computer language makes some structures and behaviors easier to implement and others more difficult. Naturally, programs written in any particular language tend to be structured around those things that are easily created using that language. As a result, two programs to do the identical function, but written in different languages, are very likely to have structures that differ in substantial ways.

The '164 patent describes a computer system created in the late 1980's in a language called Clipper. The claims editing capabilities of ClaimFacts (and later QicLink) were first created in the late 1980's using Cobol, while Facets was developed in very different structure and architecture (called client/server) in the early 1990's using a language called C++. The computer languages Cobol and C++ are both very different from Clipper (and from each other), in the sense that they make different behaviors and structures easier (or harder) to create. Anyone knowing that the '164 patent referred to a system designed in the late 1980's and written in Clipper, while the TriZetto products were written either at different times, or using different languages, or both, would start by presuming that they were structured differently, if for no other reason than that, even if one explicitly wanted to, it is often difficult as a technical programming matter to create insubstantially different structure using two different computer languages.

---

[2] See, for example, *Computer Associates v. Altai*, 775 F. Supp. 544 (E.D.N.Y. 1991) and 982 F. 2d 693 (2d. Cir. 1992), which, although it concerned software copyright, discusses the notion of structure in computer programs. See also Davis, The nature of software and its consequences for establishing and evaluating similarity, *Software Law Journal*, V:299–330, April 1992, which while also directed at copyright discusses software structure in more detail.

Hence rather than the blithe conclusory statements that we see in Dr. Musen's report, to support the allegations of infringement, we need a clear specification of the relevant structure in the '164 patent, a clear specification of the relevant structure in each of the TriZetto products, and a straightforward comparison of the two structures so that claims of equivalence can be evaluated. In the absence of all this it is difficult to find anything of significance in Dr. Musen's report that supports his infringement conclusions.

Dr. Musen's report is also remarkable for the evidence it offers in support of the allegation that the TriZetto products contain each claim element. In several instances the deposition transcript extracts cited are plainly irrelevant to the claim. Consider this example, from Dr. Musen's Exhibit 2, discussing the claim element from claim 2 that specifies "ascertaining whether the at least one claim contains a plurality of medical service codes":

Deposition of TriZetto's executive vice president Anthony Bellomo (09/16/05):
    Q. The Facets system operates to *receive claims that contain one or more medical service codes*, correct?
    A. Yes.
    [103:19-22]
    Q. Does the Facets system operate with *a database containing medical service codes* that include CPT codes?
    A. Yes.
    [110:21-24]
    Q. Does the database that operates with Facets *contain a set of relationships among medical service codes* that are based on medical factors?
    A. Yes.
    [113:1-4]

Deposition of Craig Luftig, TriZetto's 30(b)(6) Designee on Facets (9/09/05):
    Q. And the database that Facets operates with has, *contains medical service codes*, correct?
    A. Can you explain what you mean by "medical service codes."
    Q. CPT codes.
    A. Yes, that's correct.
    [67:15-20]
    Q. So the system is capable of *accepting a claim with multiple service codes*, correct?
    A. Correct.

[71:18-20]
Q.    Are some, at least some of the medical service codes—and I'm talking about HCPCS and CPT4 codes—are at least some of the preset relationships in Facets among those codes *based on medically determined relationships*?
A.    All of them are.[3]
[99:16-21]

Deposition of TriZetto Employee Tara Smith (09/14/05):
Q.    So is it your understanding that when your claims are submitted to Facets that they are received by Facets with one or more medical service codes? ...
Q.    Procedure codes, I'm sorry.
A.    Yes.
Q.    Procedure codes associated with the claim
A.    Yes.
[91:23-92:2,4-8]

Q.    Through source code or through code that's written that *instructs the computer to recognize a claim and to process that claim in accordance with whatever rules are set forth in the program*?
A.    Yes.
[131:1-6]

Deposition of Facets customer Blue Cross Blue Shield of Tennessee - John Blake 30(b)(6) designee (09/22/05):
Q.    *And the database include CPT codes?* ...
THE WITNESS: Yes it would include CPT codes.

[Musen Report, Exhibit 2 at 10-11, emphases added]

None of the questions in the testimony cited above are directed to the claim element whose presence in TriZetto products Dr. Musen alleges they establish.  Most of the highlighted examples illustrate questions that are simply and plainly irrelevant.  The claim element concerns "ascertaining whether the at least one claim contains a plurality of medical service codes."  How are questions about the *database* in Facets relevant to the question of whether the system ascertains whether a claim contains a plurality of medical service codes? [Bellomo Dep. questions at lines 110, 113; Luftig Dep questions at 67, 99; Blake Dep question at 100].  They

---

[3] This would suggest that the TriZetto products do not infringe claim 2, which is concerned with non-medical criteria.

are not. The question in the Smith deposition at 131 concerns TriZetto source code "recognizing" a claim (whatever that means) and processing it "in accordance with whatever rules are set forth in the program." This has no evident probative value in establishing the presence in TriZetto products of "ascertaining whether the at least one claim contains a plurality of medical service codes."

The remaining deposition questions in this section of Dr. Musen's report sound vaguely like the claim element in question, but are in fact substantively different. Consider the question at Bellomo Dep 103: "The Facets system operates to receive claims that contain one or more medical service codes, correct?" Indeed it *receives* claims that contain one or more medical service codes, but this does *not* mean that it ascertains whether the claim contains a plurality of medical service codes. It may both receive and process the claim without ever examining the number of codes the claim contains. Consider next the Luftig Dep at 71: "So the system is capable of accepting a claim with multiple service codes, correct?" Well, yes, but this too has no probative value in determining whether the system ascertains whether the claim contains a plurality of codes. It may well *accept* the claim without counting the service codes. Consider the Smith question at 91: "So is it your understanding that when claims are submitted to Facets that they are received by Facets with one or more medical service codes?" Well yes, again, but claims may well be *received* with one or more codes, without Facets ever explicitly ascertaining whether the claim contains a plurality of codes. Citing these questions as support for a carefully and precisely phrased claim borders on playing word games in a circumstance where precise language use is of the essence.

The remainder of the allegedly supporting evidence cited in this section of Dr. Musen's report concerns the ability of two of TriZetto products to handle unbundling. This, too, has no

probative value on the question at hand.  Despite what the method in the '164 patent seems to imply, there is no need to explicitly count the number of codes in a claim in order to handle unbundling, or in order to handle any other edit that involves multiple medical service codes. I address this issue in more technical detail below, in discussing the structure and function of the TriZetto products.

As a result, all of the evidence Dr. Musen cites for the presence in the Facets system of the claim "ascertaining whether the at least one claim contains a plurality of medical service codes" is simply faulty.  Some of the questions are irrelevant and the remainder are misstatements of the substance of the claim element, while the reference to the ability of Facets to handle unbundling is, as a technical matter, no demonstration that the system needs to ascertain whether there is a plurality of codes in the claim.

A similarly irrelevant body of evidence is given in support of the next element of claim 2: "determining whether one of the medical service codes in the at least one claim is mutually exclusive due to non-medical criteria with any other medical service code in the at least one claim."  Consider the deposition transcript excerpts cited by Dr. Musen:

Deposition of Craig Luftig - TriZetto's 30(b)(6) designee on Facets (09/09/05):
    Q.    And does the Facets system determine, at least in some instances, whether at least one of the medical service codes is mutually exclusive with another medical service code in that claim due to nonmedical reasons, for instance?
       ***
    Q.    Perhaps, for instance, some reason that does not pertain to reasons like, for instance, that the policies don't cover, you know, certain limits or certain procedures. Any arbitrary criterion that doesn't have to do with medical issues, and when I say "arbitrary," obviously it's a reasonable, some criterion that is not based on, you know, medical issues.
    A.    Customers can configure their system to do that if they wish, but none of it is preset in the system.
    Q.    So the system does not contain any criteria whatsoever for rejecting claims that is based on something other than medical reasons?

A.    Customers configure the system to deny or approve claims based on their own contractual business models. We don't provide that to them. We provide them with the software that allows them to set up those rules.

Q.    I'm asking you, with respect to the product that you ship, Facets, along with the database, are there any criteria included in the product that will reject claims based on nonmedical reasons?

A.    Not until the customer configures it.

Q.    And does TriZetto assist the customer in doing that?

A.    We'll teach the customer how to do it. We don't tell them what to do.

Q.    Right. Is that one of the features that TriZetto markets to customers, the flexibility of the program?

A.    Yes.

[71:21-25; 721-25; 73:1-3]

Facets Clinical Editing Overview: "Cosmetic Procedure Edit: Identifies surgical procedures primarily used to improve appearance. System Response: A warning message will display on the processing screen. (TRZ471559)

[Musen Exhibit 2, at 11-12]

The remarkable thing about this text is that it is wholly irrelevant to the claim element in question. The claim language is quite specific: "determining whether *one of the medical service codes* in the at least one claim *is mutually exclusive* due to non-medical criteria *with any other medical service code* in the at least one claim." The claim language makes it unmistakably clear that the mutual exclusivity is between medical service codes and the claim is thus limited to relations between codes.

*None* of the evidence cited in this section of Dr. Musen's report concerns relations between medical service codes. Mr. Luftig is being asked whether there are relations between *insurance policy terms* and *medical service codes* ("the policies don't cover, you know, certain limits or certain procedures"). This is manifestly not the same thing. Mr. Luftig is also asked whether there are "any criteria included in the product that will reject claims based on nonmedical reasons," but this, too, is manifestly not the same thing as mutual exclusion between two medical service codes.

The citation to the Facets Clinical Editing Overview is equally irrelevant. Cosmetic procedures may well be denied payment in the Facets system, but this is clearly not a mutual exclusion between medical service codes. Coverage will be denied for a cosmetic procedure even if it is the *only code* on the claim, hence there cannot be any mutual exclusion, as there is no other code for it to be mutually exclusive with.

Note also that, as I understand it from the deposition transcripts, with the exception of Mr. Luftig, the witnesses cited in Dr. Musen's report did not have a chance ahead of time to study the patent, nor were they legally sophisticated and knowledgeable in how to read patent claims, nor necessarily people skilled in the art covered by the patent. Given also that the Court has yet to rule on the question of claim construction, the witnesses were employing a layman's interpretation of the language used both in the patent, and in the alleged explanation of the patent terms supplied by the opposing counsel.

Nor is it clear that the various witnesses were even working from a shared understanding of the terms in the claims. Indeed, the inventors themselves appear to be uncertain about the meaning of some of the important terms in the claims. In his deposition, Dr. Hertenstein indicates:

> Q. But would the two claims, excuse me, the
> two codes, be mutually exclusive because of the
> non-medical criterion?
> A. I don't know what mutually exclusive
> means. Okay?
>
> [Hertenstein Dep, at 200, lines 19-23]

Dr. Goldberg has similar problems with the terms:

> Q. Your understanding that prior to 1987, after
> receiving a claim, ascertaining whether a claim contained a
> plurality of medical service codes, and making a
> determination as to whither one of the medical service codes
> in the at least one claim was mutually exclusive due to

nonmedical criteria with any other medical service code,
that the individual at Caterpillar would then authorize medical
service codes which were not mutually exclusive due
to nonmedical criteria?

Mr. Shek: Object as to form.

A. It is a complicated question, all right?
In this document, I, "little old me" in quotation
marks, merely an M.D., do not know what authorizing means,
and I do not know what nonmedical criteria mean fully. I
can guess, but I don't know.

[Goldberg Dep. at 304-305]

The overall consequence of these deficiencies is that Dr. Musen's report does not provide

any substantive support for the allegations of infringement by the TriZetto products.

## VI. FACTORS RELEVANT TO AN INFRINGEMENT ANALYSIS

This section explores a number of elements of the function and structure of the TriZetto

products, pointing out significant differences relevant to the '164 claims.

### VI.A.  Foundation: Observations on the '164 Patent

As foundation for the discussion that follows, I make a number of observations about the

'164 patent that will assist in analyzing allegations of infringement.

*VI.A.1.    The '164 Claims, Rules and Examples*

Examination of the '164 claims makes it clear that all claims other than 1 and 13 concern

edits based on relations between medical service codes.  Hence the only rules and examples in

the patent that are relevant to the claims, and therefore relevant to the allegations of

infringement, are rules and examples based on relations between multiple medical service codes.

This means that all of the rules in the BYITSELF database (the file byitself.dbf), namely rules

Q1 through Q9 in Appendix B do not appear to be relevant to the claims and allegations of

infringement, and also means that the corresponding examples (7-15) in Appendix A are likewise irrelevant.

Examination of the claims also makes it clear that while they specify authorizing, rejecting, and/or deleting of medical service codes, there is no claim in the '164 patent *adding* to a medical claim a medical service code that was not entered by the user (i.e., designated by the user in step 22 of Fig. 4 of the patent). The patent *specification* describes replacing codes using the "R" rules (col. 7, line 18), and replacement can be seen as deletion followed by addition. But the claims do not mention either the addition of or the replacement of codes.

One consequence of this is that much of Dr. Johnson's report is irrelevant; she has focused on a rebundling example, and rebundling by its nature requires replacing one code with another (or deleting one code and adding another). As I read the '164 claims, such a function is not covered.

A second consequence is that rebundling, or any other clinical editing that involves adding codes not designated by the user during data input, is outside the scope of the patent, and hence not a relevant function to consider when examining allegations of infringement.

*VI.A.2.    The '164 Predetermined Database*

Claims 1 and 13 of the patent refer to "a predetermined database," presumably distinguishing the claim from one that recited simply "a database," and from a claim that recited multiple databases. There should thus be in the '164 patent some corresponding structure, i.e., a single, predetermined database. As I read the patent, there is no such structure to be found. In particular, there is no single, predetermined structure that contains both all the "medical service codes and a set of relationships among the medical service codes…" Instead the specification

recites two structures, `ALLCODES` and `INTERACT`, making it difficult to determine the referent of that claim element.

### VI.A.3.   The Text, Figures, Code and Claims in '164 are Mutually Inconsistent

Attempts to determine the structure specified in the patent that corresponds to the function described in means-plus-function and step-plus-function claims is made difficult by the numerous inconsistencies that are evident when comparing the text, figures, code, and claims of the '164 patent.

As one example, the claims refer to "a predetermined database," yet the '164 text, flowchart, and code all make it clear there are at least 5 separate databases, named `interact`, `byitself`, `allcodes`, `superseded`, and `dupes`. Figs 2 and 3, and the text in the Descriptions of Preferred Embodiment make it clear these are individual databases (e.g., at col 5, line 13: "...in step 9 it is determined whether the code entry is valid or invalid by reference to the ALLCODE database", at line 26: "The computer programmed in accordance with the present invention then looks up in the SUPERSEDE database file to determine...", and so on for the other databases). Figures 2 and 3 of the patent are consistent with this, showing 5 separate databases. The code in Appendices C and D is consistent with this, making reference to multiple distinct databases. The claims alone refer to "a predetermined database," everything else in the patent indicates there are multiple databases.

Another inconsistency appears in examining Appendices A and B, and comparing them against the code in Appendices C and D. Appendix B lists 21 categories of rules, indicating that they reside in the INTERACT database or the BYITSELF database and that the system uses these rules to process claims. The listing in Appendix C never mentions rules of type EA and

EP, but as this appears to be documentation rather than code, the omission is interesting but not compelling.

Somewhat more important, an examination of the code in Appendix D makes clear that several categories of rules are apparently never used by the program. At line 8 of column 59, the code calls MULTIPLE.prg, commenting that this will invoke the "exclude, replacement, & QM rules." The code for MULTIPLE.prg appears to begin at column 73 (the listing is somewhat unclear); this in turn calls procedures named `exclude`, `replace`, `rls`, and `query`. These in turn run the rules of types E1 and E2 (`exclude`), R2 (`replace`), R1 (`rls`), and QM, QS, QB (`query`). There appears to be no place in the code where rules of type R3 or R4 are used. There appears to be no place in the code where rules of type EA and EP are used.[4]

After MULTIPLE.prg, the main program calls RULES.PRG; this in turn invokes rules of type Q1 and Q3-Q9. Note that rules of type Q2 are never executed by the program. A place has been left in the code for rules of type Q2 (column 85, line 33), but there is no code there that does anything. This is inconsistent with the text of the patent, which discusses Q2 rules (col. 8, line 63), inconsistent with the listing of the Q2 rule type in Appendix B, and inconsistent with the example of its use in Example 8 of Appendix A.

All of these inconsistencies in the patent complicate any attempts to determine what structure or acts correspond to the function of the means-plus-function or the step-plus-function claim elements.

---

[4] The listing is unclear in places and as it exists only in hardcopy, it is not searchable with the certainty that is possible with electronic listings of code. Hence my phrasing here specifies what "appears" to be true. I believe these statements to be true, of course, but cannot be as certain as with code in electronic form.

## VI.B.  Differences in the TriZetto Products vs. the '164 System

### VI.B.1.  The TriZetto Products Never "ascertain whether the at least one claim contains a plurality of medical service codes"

In the '164 patent, claims 2, 3 (along with dependent claims 4, 5, 6, 8, 9), 10 (along with dependent claim 11), 12, 14, 15, and 16 all contain as a claim element "ascertaining whether the at least one claim contains a plurality of medical service codes." Figures 2 and 3 in the patent are consistent with this (see step 18 in Fig 3, step 23' in Fig 4)), as is the text ("In step 18, the number of codes resulting from the foregoing steps is counted and stored," col 5, lines 45-47; and "In step 20, if the number of codes determined was more than one, then the MULTIPLE PROGRAM is run in step 21..." col 5, lines 53-55), as is the code in Appendix D (e.g., col 59, at lines 7 and 21, the code checks to see whether the claim contains a plurality of codes).

None of the TriZetto products do this. The simplest way to illustrate this is to note that if a claim is received with only a single medical service code, the TriZetto products still put it through *all* of the clinical editing processes, even those that deal with relationships between service codes.

This behavior is in fact purposeful and useful: the TriZetto products, unlike the computer system and method described in '164, examine more than just the current claim when doing editing. They consider the patient's history of claims as well. This enables them to check for relationships such as subset, secondary, and redundant, not only among multiple codes in a single claim, but across claims.

Figures 1 and 2 show an example from the Facets system. In Figure 1 the user has entered a claim with a single medical service code. In Figure 2 the clinical editing process has determined that the medical service code in Figure 1 is a secondary procedure in the context of a previous claim in the patient's claim history. Thus the TriZetto products (all of which behave

identically in this regard), never ascertain whether there is a plurality of medical service codes in the claim.



Figure 1: Entering a claim with a single medical procedure code.



**Figure 2:** The *single medical procedure code* of Fig. 1 has compared to a claim in the patient's claim history.

More generally, in all of the TriZetto products, all of the clinical editing procedures that are normally understood to involve *relations* among medical service codes are run on claims even if they contain just a *single* service code. And as noted, this is purposeful behavior, resulting in a useful function carried out by the system. As a consequence, not only do the TriZetto products *not* ascertain "whether the at least one claim contains a plurality of medical service codes," they expressly *avoid* doing this because it enables them to perform a more sophisticated and effective form of editing. The products treat claims uniformly, i.e., processing all claims with the same procedures, whether they contain one service code or many.

This also has a consequence for the claim elements that use the phrase "any other medical service codes *contained in the at least one claim*" (namely, claims 2, 10, 12, and 14). The

TriZetto products are not limited to considering relationships among service codes in "the at least one claim," but instead can consider relationships between a medical service code in a newly received claim and any other medical service code *contained in any claim in the patient's history.*

In the Facets system the relevant code carrying out this behavior can be found generally in the CD designated CD-TRZN-018, more specifically in the directory /dev/cmc/src/cmp, and most specifically in the files named 002100012485_cmcapce0.CPP and 002100012391_cmcaclce.CPP. One important line of code that appears in the same general form in many places, and functions identically in most of those places, has in fact been cited by Dr. Johnson [Johnson, p. 20]:

```
for(lnIdx = 0;lnIdx < ppcFmtEditArray->GetSize();lnIdx++)
```

As Dr. Johnson indicates, this line of code causes the system to "go through [the] array of data containing claim information." Of particular significance in this case is the fact that it does so even if the array of data contains exactly one item, i.e., one medical service code. Hence this element of structure in the Facets system is one concrete illustration that the system does not ascertain whether the claim contains a plurality of medical service codes; it runs all the same clinical edits no matter whether the claim has a single medical service code or a plurality.

*VI.B.2.    The TriZetto Products Never Delete Medical Service Codes from Claims*

Claim 4 of the '164 patent describes "revising the at least one claim to *delete* invalid medical service codes," while claim 11 specifies "means for revising the at least one claim *to not include* a rejected medical service code." The TriZetto products never delete a medical service code. Codes that are rejected for further processing (e.g., edited as redundant, rebundled, or other edits) are never deleted; they are simply marked as rejected. As Figs 3 and 4 indicate, even

after the system has indicated a medical service code on a claim as rejected, the user can still

refer to that line item (e.g., to see why it was rejected). This also provides an audit trail for use

later. Hence codes are never deleted in the TriZetto products, for a good reason.



Figure 3: Codes 64450 and 10120 entered; 64450 disallowed. Information about 10120 is displayed.



**Figure 4: Even though 64450 has been disallowed, it had not been deleted from the claim, and information about it can still be viewed (in the middle box).**

*VI.B.3.    The TriZetto Products Never "request additional information from a user"*

Claim 8 of the '164 patent specifies "means for requesting further information from a user regarding the at least one claim," and illustrate this with Examples 17 (rule EP) and 18 (rule EA) in Appendix A. The TriZetto products never do this. This results from a basic difference in the structure of TriZetto products as compared to the system described in '164. Where the system described in '164 is a stand-alone designed to do medical claims analysis, the TriZetto products are integrated systems handling the entire process of managed care administration. As such they *already have* information about the patient's age and about place of service, and never need to request it from the user. There is thus no function or structure in the TriZetto products

that corresponds to the element "means for requesting further information from a user regarding the at least one claim" as in '164 claim 8.

### VI.B.4.    The Architecture Of The TriZetto Systems Is Different From That Of The '164 Patent

The system in the '164 patent is structured much like a traditional rule-based expert system, in at least one of the definitional structural elements of such a system: having the set of rules in the system represented in a way that is distinct from the code that examines the rules and applies them to the task. In the '164 patent this structural element is found in the structure of the databases INTERACT.dbf and BYITSELF.dbf, and the structure of the code (notably col. 59, lines 4 through 50). The databases represent the rules in a way that is distinct from the code that examines them (col 59, lines 4-50), and the code cycles through each rule in turn, using an approach found in many rule-based systems. This is just what one would expect it a patent describing "An expert computer system for processing medical claims."

The TriZetto products, by contrast, are structured as traditional procedural programs. That is, they operate by performing complex, multi-step operations on complex record structures. The rebundling example cited by Dr. Johnson is one good instance. It involves loops within loops, examining multiple different kinds of pointers, and, among other things, searching multiple possible rebundlings for the largest such rebundling. Trying to re-cast that process into a set of rules of the sort given in the '164 patent, would not only be extremely difficult, awkward, and would produce a system that was intolerably slow, it would also make clear why some things are better expressed as traditional procedure programs rather than rule-based systems. The approaches, architectures, and mindsets of the two system are different in these important structural elements.

*VI.B.5.    The Processing Done by the TriZetto Products Is Different from that Specified in the '164 Patent*

Figures 1-7 of the '164 patent provide a flowchart specifying the processing done by the system the patent describes. Exhibit B shows flowcharts for the TriZetto products at a roughly comparable level of detail. A comparison of the two illustrates a number of interesting differences:

One thing obvious from even at the most abstract level is the difference in scope of the two systems. Where the '164 system is focused on clinical editing, the TriZetto products do the entire scope of claims adjudication, starting with basic data validation, eligibility verification, provider verification, and so forth, eventually coming to clinical editing, then continuing on to medical utilization analysis, pricing, and payment.

Even focusing in on the clinical editing component of the TriZetto system, additional differences are apparent. As one structural difference, unlike the '164 system, data validation is not part of clinical editing, it is in fact done considerably earlier in the overall process.

The information used by the two systems also differs: where the '164 system examines only the current claims, the TriZetto systems make use of both a current and prior claims database (Appendix B, Fig. 1.6).

Figs. 1.6, 1.6.1, and 1.6.2 also make clear that the clinical editing processes are organized by the kind of clinical edit they perform, not, as in the '164, according to the form of the rule. Fig. 4 of '164 shows that the rules are applied by types. For example, the RN-R2 rules are applied in step 25. But the "R" rules include any rule that specifies replacing one code (or set of codes) with another, no matter what the underlying medical reason. In the TriZetto products, by contrast, edits are applied for new patient codes, unilateral codes, and unbundled codes, in that

order. The process employed by the TriZetto products thus has a level of organization and order to it that is missing from the '164 system.

Note also that the TriZetto products check all claims against the diagnosis (box 1.6.4 in Fig 1.6). This is a relation between a medical service code and a diagnosis, which is not part of what the '164 patent claims. While the patent lists a rule Q8, which mentions diagnosis, it is unclear what rules of Q8 actually do, or say, as the only example we are given (Example 14 in Appendix A) indicates a question about the kind of provider, and edits the service code on that basis, not on the basis of the diagnosis.

*VI.B.6.    The TriZetto Products Do Not Have "a predetermined database"*

All of the independent claims of '164 refer to "a predetermined database." The TriZetto products do not have a predetermined database. One illustration of this fact becomes manifest when the product is first installed: An essential part of the TriZetto product installation is the requirement that the end-user add a Clinical Edits Administrative Rules Record to the database:

> After you activate ClinicaLogic at the client level, you must add a ClinicalEdits Administrative Rules (EA) Record. The EA Record enables you to:
>
> 1. Define the criteria which a claim must meet to qualify for clinical editing.
>
> 2. Choose the edits you want to activate for anesthesia, laboratory, medical, radiology and surgical procedures, and determine whether they will display warning, disallow or, in some cases, error messages if they are invoked during claims processing. Warning and disallow messages display on the adjudication display; error messages, on the bottom of the CP Screen.
>
> [ClaimFacts ClincaLogic User Manual, Release 6.0, Implementation Procedures, at 5]

There are in fact 7 kinds of records the end-user must add to the database during installation. In addition to the Clinical Edits Administrative Rules Record, the end-user must also add to the database: a Service Maintenance Record, a Benefit Component Record, a ClaimFacts Clinical Edits Record, a ClaimFacts Anesthesia Procedure Edits Record, and a

Diagnosis Code Maintenance Record. Thus the database in the product is not predetermined; it must in fact be determined in part by the end-user, who must change the database (by adding records) simply to install it, before it can even be used.

A second manifestation of the lack of a predetermined database is the ability of the end-user to change the Clinical Edits Administrative Rules Record at any time. This might occur for example if the end-user's benefits plan changes it policies. At any point when this happens, and whenever it happens, the end-users can (and should) modify the product database.

### VI.B.7.   The TriZetto Products Do Not Have the Same Set of Relations as Implied by the '164 Patent

As I read claims 1 and 13, the "predetermined database" of the '164 patent claims must refer to the complete set of relations that enables the system to perform clinical editing. While this full set is never disclosed in the patent, the examples of Appendix A supply sufficient information to establish that the relations in the TriZetto products are different and the rule formats of Appendix B are sufficient to establish that the '164 system embodies different relations from those used in the TriZetto systems.

The examples of Appendix A have been run through the TriZetto products, with the following results:

- in one case (Example 1) they produce the same result;

- in 12 cases they produce different results because the systems embody different relations among codes;

- in 5 cases (Examples 8, 9, 10, 11, 12, 13) they produce different results because there is nothing in the TriZetto systems that corresponds to the rule being used by the '164 system.

With respect to Appendix B, as noted above, there is nothing in the Facets system corresponding to the relations expressed by '164 rules EA and EP, and no need for such rules or relations. In addition, where the '164 rules of type QM, QS, QB, indicate "there is a question about" a combination of codes, and the Q1-Q8 rules request specific information from the user, none of these behaviors is found in the TriZetto products. This is first of all because, as noted above, they are part of an integrated product that has already gathered such information (and hence does not have to ask for it), and second because the TriZetto products are designed to make decisions (e.g., accept, reject, warn), not to engage in further information gathering with the user.

To the extent that all the rules in Appendix B constitute the structure of the patent claims, the structure of the TriZetto claims editing is substantially different.

*VI.B.8.    The TriZetto Products Never Authorize Claims "In Response to the Determining Step"*

Claims 15 and 16 of '164 recite the "authorizing the at least one claim in response to the determining step" (or "in response to the means for determining"). As the flowcharts in Appendix B make clear, the TriZetto products never authorize claims in response to the determination of whether one of the medical service codes is valid. Clinical editing is only one part of a much larger process.

## VII. CONCLUSIONS

The reports by Dr. Johnson and Dr. Musen fail to provide any substantive support for McKesson's allegations of infringement. The substantial differences in the function and structure of the TriZetto products as compared to the system in the '164 patent, and in particular with respect to important elements of the '164 claims, render allegations of patent infringement of the '164 patent incorrect.

I reserve the right to modify or supplement my views stated herein in the event any information is brought to my attention relating to this matter of which I am not currently aware.


Randall Davis

14 November 2005

# EXHIBITS

Exhibit A: Materials Examined

Exhibit B: TriZetto Flowcharts

**EXHIBIT A: MATERIALS EXAMINED**

In addition to any documents explicitly cited in the body of the report, I also examined:

ClaimFacts Clinicalogic Manual 6.80 MVS.pdf
ClaimFacts Clinicalogic Manual 6.80 VSE.pdf
ClaimFacts Clinicalogic Systems Overview.pdf
ClaimFacts Clinicalogic User Manual 6.0.pdf
ClinicaLogic Overview.doc
ClinicaLogicUserGuide.pdf
Clinicalogic User Guide.pdf
ComparisonChartSFX4D89.pdf
Cutting Claim Costs.pdf
Facets Clinical Editing Overview.pdf
Facets Product Overview.pdf
Facets e2 Claims Processing User Guide.pdf
Facets e2 Medical Plan Resource Guide.pdf
FacetsExtendedClaimsProcessingUserGuide.pdf
Facts How to Rebundle.doc
M Plan Replacing Clinical Editing System.pdf
MCK002304-002309.pdf
MCK002310-002338.pdf
MCK002349-002354.pdf
MCK002355-002364.pdf
MCK004812-004814.pdf
MCK034224-034225.pdf
QicLink Operator Manual Volume I.pdf
Rules.doc
TRZ032139-032144.pdf
TRZ092350-092375.pdf
TRZ277699-277702.pdf
TRZ471553-471564.pdf
TrizettoDatabases.doc

**Depositions**
Dugan, Goldberg, Hertenstein, Holloway, Lampe, Luftig

**Reports from**
Hawley, Kerschberg, Musen, Johnson

**Source code**
ClinicaLogic source: Clinical320.20.34.050419src.tar (CD-TRZN-001)
Facets source code (CD-TRZN-018, CD-TRZN-019)
QicLink source (CD TRZ838453)

**I viewed live demonstrations of:** Facets, QicLink, ClaimFacts

Davis Exhibit A                                                    A–2

**EXHIBIT B: TriZetto Flowcharts**

i

**Figure 1.0  Claims Adjudication Processing**







Fig 1.8    Clinical Editing Processing



**Fig 1.5.1   Format Edits Processing**



Fig 1.6.2 Relational Edits Processing