# EXHIBIT C

**EXPERT REPORT OF RANDALL DAVIS**

*McKesson Information Solutions LLC v. The Trizetto Group, Inc*

October 24, 2005

## I. INTRODUCTION

My name is Randall Davis. I am a Professor of Computer Science at the Massachusetts Institute of Technology. Exhibit A contains a resume providing details of my technical background and experience. I received my undergraduate degree from Dartmouth, graduating summa cum laude, Phi Beta Kappa in 1970, and a Ph.D. from Stanford University in artificial intelligence in 1976.

While at Stanford I was a member of the Heuristic Programming Project, the research group that invented expert systems and produced the first such programs, including DENDRAL, a program for chemistry, and MYCIN, the first medical expert system. My PhD thesis work specified some of the foundational concepts in expert systems, including the notions of explanation and knowledge acquisition.

I came to MIT in 1978, served for five years as Associate Director of the MIT Artificial Intelligence Laboratory, and currently serve as a Research Director in the newly formed 850-person MIT Computer Science and Artificial Intelligence Laboratory.

I have published some 55 articles on issues related to artificial intelligence and have served on several editorial boards, including *Artificial Intelligence, AI in Engineering,* and the MIT Press series in AI. I am a co-author of *Knowledge-Based Systems in AI.*

In recognition of my research in artificial intelligence, I was selected in 1984 as one of America's top 100 scientists under the age of 40 by *Science Digest.* In 1986 I received the *AI Award* from the Boston Computer Society for contributions to the field. In 1990 I was named a Founding Fellow of the American Association for AI and in 1995 was elected to a two-year term as President of the Association. In 2003 I received MIT's Frank E. Perkins Award for graduate advising. From 1995–1998 I served on the Scientific Advisory Board of the U. S. Air Force.

In addition to my work with artificial intelligence, I have also been active in the area of intellectual property and software. Among other things, I have served as a member of the Advisory Board to the US Congressional Office of Technology Assessment study on software and intellectual property, published in 1992 as *Finding a Balance: Computer Software, Intellectual Property, and the Challenge of Technological Change.* I have published a number of articles on the topic, including co-authoring an article in the *Columbia Law Review* in 1994 entitled "A Manifest Concerning Legal Protection of Computer Programs" and an article in the *Software Law Journal* in 1992 entitled "The Nature of Software and its Consequences for Establishing and Evaluating Similarity."

From 1998-2000 I served as the chairman of the National Academy of Sciences study on intellectual property rights and the emerging information infrastructure entitled *The Digital Dilemma: Intellectual Property in the Information Age,* published by the National Academy Press in February, 2000.

I have been retained as an expert in over thirty cases dealing with misappropriation of intellectual property, such as the allegations raised in this case. I have been retained by plaintiffs who have asked me to investigate violations of intellectual property, by defendants who have asked me to investigate allegations made against them, and by both sides to serve as the sole arbiter of a binding arbitration. A list of cases in which I have been involved is attached as Exhibit B.

In 1990 I served as expert to the Court (Eastern District of NY) in *Computer Associates v. Altai*, a software copyright infringement case whose decision was upheld by the Appeals Court for the 2nd Circuit in June 1992, resulting in the articulation of the abstraction, filtration, comparison test for software. In the early 1990's I was retained by the Department of Justice for

its investigation of the INSLAW matter. In 1992 (and later in 1995) my task in that engagement was to investigate alleged copyright theft and subsequent cover-up by the Federal Bureau of Investigation, the National Security Agency, the Drug Enforcement Agency, the United States Customs Service, and the Defense Intelligence Agency.

## II. OPINION

I was retained by The TriZetto Group, Inc. ("TriZetto") on September 19, 2005 and have been asked to perform a detailed analysis of the 5,253,164 patent ("the '164 patent") and any available prior art.

The opinions I report here are based on the documents I have reviewed (a full list is given in Exhibit C), and on my knowledge, background, and experience in the field of computer science and artificial intelligence.

Based on the prior art cited and discussed in detail below, it is my firm opinion that each and every asserted claim in the '164 patent would have been anticipated by the relevant prior art and obvious at the time of invention to a person having ordinary skill in the art.[1]

## III. THE '164 PATENT: OVERVIEW

The '164 patent has an effective filing date of September 30, 1988. Accordingly, the critical prior art date for purposes of patent invalidity under 35 U.S.C. § 102(b) is September 30, 1987. The '164 patent recites an application of expert systems technology to the processing of medical claims expressed in terms of medical service codes. For the purposes of this case an expert system can be thought of simply as a specific style of computer program: Expert systems are programs designed to do one specific task (in this case reviewing medical claims), using

---

[1] I take a person of ordinary skill in the art to be someone with an undergraduate degree in Computer Science with at least one course in artificial intelligence, and at least one year of experience in building expert systems.

(typically) a set of rules that specify the knowledge necessary to do that task, and having that set of rules represented in the system in a way that is distinct from the code that examines the rules and applies them to the task. It is this focus on task-specific knowledge (the rules) and their representation distinct from the code that characterizes expert systems as a specific class of computer program.

The '164 patent contains both method (1, 2, and 16) and apparatus claims (3-15). I begin by considering the method claims. In each case the analysis below focuses on selected language in the claim.

### III.A. Method Claims

*III.A.1.    Claim 1*

I take the "predetermined database...containing medical service codes" recited in claim 1 to be a fixed set of service codes containing every code known to be valid at the time the program is run. The remainder of the claim then recites a straightforward check of each code in a claim to determine whether it is not present in the predetermined database, and informing the user if a code is not contained in the database. Although the claim also includes "relationships among the medical service codes" in the predetermined database, it does not appear that these relationships are utilized to perform the code-checking function described in the claim.

Checking the validity of input data by comparing it against a list of known good values is one of the most fundamental techniques taught in every introductory programming course. It is one way of dealing with a phenomenon that has been recognized since at least the 1960's-era of computing: "Garbage in, garbage out." In other words, if your input data is not good, the results will not be good either; hence the first step always is to check the input to be sure it is good, and reject it otherwise.

This claim appears to recite nothing more than this time-honored aphorism, which is known to be universally applicable to every computer program, including those further specified by the claim elements of a database of medical service codes and a set of relationships.

### III.A.2.    Claim 2

Claim two recites the means for "determining whether one of the medical service codes in the at least one claim is mutually exclusive due to non-medical criteria with any other medical service code in the at least one claim." The term "non-medical criteria" is not to my understanding a term of art, nor does it appear anywhere in the patent other than the claims.

Appendix B of the patent gives 12 generic categories of "if/then" rules that are applied to multiple codes; Appendix A offers 9 concrete examples of these rules (two examples illustrate two categories of rules each, one category of rule – R4 – has no example). None of these rules relies on anything that may sensibly be termed "non-medical criteria."

Example 1 of Appendix A shows an "Example of 'E1/E2' Rule;" this is clearly a medical criterion for exclusion as it depends on knowing about appropriate uses of local anesthesia. Example 2 relies on a medical criterion involving understanding gynecological procedures. Example 3 relies on a medical criterion involving understanding what a cystoscopy is. Example 4 relies on a medical criterion involving understanding heart catheterization procedures. Example 5 relies on a medical criterion involving understanding the laparoscopy procedure. Example 6 relies on a medical criterion involving understanding the possible complications of a coronary artery bypass procedure. (Examples 7 – 15 involve rules applied to each code individually and hence are not relevant to this claim, which is limited to "determining whether one of the medical service codes in the at least one claim is mutually exclusive due to non-medical criteria with any other medical service code in the at least one claim.") Example 16 relies on a medical criterion involving understanding the steps involved in repairing a stomach lesion. Example 17 relies on a

medical criterion involving understanding electrocardiograms and their interpretation. Finally, Example 18 relies on a medical criterion involving an understanding of heart catheterization procedures.

As the patent text provides no guidance, I turn to ordinary language. The Oxford English Dictionary has no entry for *non-medical*, except under the generic definition of the prefix *non-*. For *medical* it suggests, among several definitions, the first of which is "Of, relating to, or designating the science or practice of medicine in general, or its practitioners." So presumably a non-medical criteria would be something not relating to the science or practice of medicine.

One possibility is the sort of check found in other medical service code review programs, which check such things as patient gender against gender-specific procedures (e.g., hysterectomy). But this is not covered by claim 2, as it calls specifically for "determining whether *one of the medical service codes* in the at least one claim is mutually exclusive due to non-medical criteria *with any other medical service code* in the at least one claim." That is, it specifies mutual exclusion between medical service codes, not exclusion of a medical service code based on information about the patient.

As the term "non-medical criteria" is not a term of art, and as the claim specifies exclusion between non-medical service codes, claim 2 cannot in my opinion, be sensibly interpreted based on the record available. I reserve the right to supplement my opinion if and at such time as the Court determines the proper construction of claim 2.

*III.A.3.     Claim 16*

Claim 16 appears to be quite general, specifying "a set of relationships among the medical service codes defining whether selected ones of the medical service codes are valid when received with other selected ones of the medical service codes" and a method involving "determining whether one of the medical service codes in the plurality of medical service codes

is valid or invalid by interacting with the database and the set of relationships contained in the database" It does not further specify the form in which those relationships are embodied or on what grounds a code might be considered valid in the context of another code. I interpret the claim with reference to the body of the patent, which indicates that the "set of relationships" is in fact a set of rules of the form shown in Appendix B, and that the grounds on which a code might be considered valid or invalid include appearing (or not) in the database of all known good codes, and appearing (or not) in one of actual the rules whose general form is shown in Appendix B.

I note also that where claims 1-14 recite the authorizing or rejecting of specific medical procedure *codes*, claim 16 refers to the authorization or rejection of the *claim* in which the medical procedure codes are found.

### III.B.  Apparatus Claims

*III.B.1.*     *Claim 3*

Claim 3 is parallel to claim 16, recited in apparatus form, and focused on acceptance and rejection of medical service codes (rather than claims).

*III.B.2.*     *Claims 4-9*

Claims 4 through 9 are dependent on claim 3, and specify further:

claim 4: means for revising a claim to delete an invalid medical service code

claim 5: means for informing why a claim was revised

claim 6: that the database may contain medical service codes described by CPT codes

claim 7: that the database may contain medical service codes described by CRVS codes[2]

claim 8: means for requesting further information from the user

---

[2] I understand this is the only claim not being asserted by McKesson in this litigation.

claim 9: that the relationships among the medical service codes include medically

   determined relationships.

   I take the phrase "medically determined relationships" in claim 9 to be any relation

among medical service codes that could have been written only by someone with knowledge of

medicine, in keeping with the analysis above of claim 2.

*III.B.3.*      *Claims 10-11*

   Claim 10 recites a general means for "determining whether one of the medical service

codes in the at least one claim is included in any other medical service code in the at least one

claim." Example 3 in the body of the patent appears to be one example of such inclusion.

   Claim 11 is dependent on 10 and further specifies a means for revising a claim to not

include a rejected medical service code.

*III.B.4.*      *Claim 12*

   Claim 12 recites a means for determining whether one medical service code is "medically

exclusive with any other medical service code," and the means for rejecting such codes. I take

this to refer to Examples 1, 17, and 18 in Appendix A, as these are the only rules that act on

multiple codes to *exclude* (i.e., reject) a code (rather than, for example, *replacing* it with another

code).

   It is unclear how "determining whether one of the medical service codes . . . is medically

exclusive with any other medical service code" differs from the determining element of certain

other claims, particularly Claims 3 and 16 ("determining whether one of the medical service

codes . . . is valid or invalid") and Claim 9 ("relationships among the medical service codes

include medically determined relationships"). These claims appear to significantly overlap in

their functionality.

*III.B.5.*        *Claim 13*

Claim 13 is the apparatus version of claim 1.

*III.B.6.*        *Claim 14*

Claim 14 is the apparatus version of claim 2.

*III.B.7.*        *Claim 15*

Claim 15 is the apparatus version of claim 16, and like claim 15 recites rejecting claims

rather than service codes.


## IV. PRIOR ART

I consider next a number of prior art publications and systems and point out their

relevance to various aspects of the '164 patent, starting with references relevant to expert systems

in general, then turning to those relevant to processing medical claims.[3]

### IV.A.  Expert Systems Prior Art

*IV.A.1.*        *Davis77: Davis, Buchanan, Shortliffe, Production Rules as a Representation for a*
            *Knowledge-Based Consultant Program,* Artificial Intelligence, 8:15-45, 1977.[4]

This paper, which I published in 1977, was one of the first expositions of the fundamental

concept and architecture for expert systems. It established several basic concepts, including the

basic architecture (Fig 3 from the paper, reproduced below), the use of simple if/then rules as a

way of capturing non-trivial expertise in a domain (Section 3.2 of the paper), the ability to revise

the rules in the knowledge base (Section 6.3 of the paper), and the concept and mechanism for

having the program explain its results (Section 6.2 of the paper).

---

[3] In the course of preparing this report, I considered prior art references from among a large collection of
publications related to the subject matter of the '164 patent. *See* Exhibit C. I also considered textbooks and articles
known to me from my experience in the expert system field and materials uncovered through my own investigation.
[4] For ease of reference later, cited references are given a label composed of the first author's last name and (for
papers) the year of publication appended.

The architecture in Davis Fig 3 specifies the fundamental components of an expert system; the components in Fig 1 of '164 correspond closely. The consultation program of Fig 3 provided the functionality of what the '164 patent calls the user interface and knowledge base interpreter (#2 and #5 in Fig 1 of '164), the knowledge base is labeled identically in both figures, while the task of knowledge acquisition program of Fig 3 is to update and refine the knowledge base, a functionality provided by the history database, #7 in '164 Fig 1.



Fig. 3. The six components of the system: four programs, the knowledge base, and the patient data base. All of the system's knowledge of infectious disease is contained within the knowledge base. Data about a specific patient collected during a consultation is stored in the patient data base. Arrows indicate the direction of information flow.

*Artificial Intelligence* 8 (1977), 15-45

**Fig 3 from Davis 1977.**

The explanation program in Fig 3 above reads directly on claim 5 of '164.

*IV.A.2.*     *vanMelle79: van Melle, W. A domain-independent production rule system for consultation programs, in* Proc. IJCAI-79, 923-925, Tokyo, August, 1979.

This paper presented a report on what became van Melle's 1980 PhD thesis (Stanford University Computer Science Department). It offered the first concrete demonstration of the idea that expert systems could be built by starting with a "shell," i.e., a system with all of the

components shown in Davis Fig 3 except the knowledge base. The task of building an expert system then became a far simpler one of creating a knowledge base and "plugging it in" to the shell. This was the genesis of the expert system shell business; by 1986 shells were used widely enough to account for a market estimated at $63 million a year.[5]

IV.A.3.    *McDermott82: McDermott, R1: A Rule-Based Configurer of Computer Systems,* Artificial Intelligence, **19**:39-88, 1982.

This paper reported on a very successful and widely known rule-based expert system that had been extensively used in a commercial setting at Digital Equipment Corporation.[6] The job of this program was to analyze orders being placed for Digital's VAX-11/780 computer systems. These computers were among the first to be highly configurable, i.e., there were a great many user-selectable options (as used to be the case for automobiles). The problem was that there were also numerous interrelations among the options and these interrelations had to be checked in order to ensure that a system built to that specification would actually work. R1 automated this task, doing it considerably faster and eventually more accurately than the human experts who checked orders.

For our purposes here the important elements are the explicit use of a set of relationships, captured as rules, that (among other things) specify tests for whether the objects being analyzed (the options in the order) were compatible, and in the event of conflicts, the system would modify the order so as to resolve the conflict. Consider these excerpts from the paper:

> [Someone checking an order] must have rules that enable him to associate components to form partial configurations and to associate partial configurations to form a functionally acceptable system configuration. These rules must indicate what

---

[5] Artificial Intelligence Market Set To Boom Worldwide, *Software Markets*, 5/23/1986, available from Lexis/Nexis.
[6] The R1 system was well-known in the expert system community during the 1980s and was widely cited in expert system patents and literature. For example, the Bennett patent, another prior art reference discussed herein, cites to the R1 paper as prior art. I knew Mr. McDermott and others who worked on R1 at the time they were developing the system and was personally familiar with their work.

components can (or must) be associated and what constraints must be satisfied in order for these associations to be acceptable; I will call this knowledge *constraint knowledge.*

[McDermott 1982 at 41; emphasis in original]

...all of the domain specific that R1 requires to do the task – including domain-specific control knowledge – is contained in productions. Each of R1's productions (rules) embodies a piece of constraint knowledge.

[McDermott 1982 at 45]

[Describing the processing of an order:] It next determines whether all of the components on the order have compatible voltage and frequency requirements, and if not, substitutes components of the appropriate voltage and frequency.

[McDermott 1982 at 50]

The first of these makes it clear that R1 had a set of relationships among the components that it examined, just as '164 has its relationships among medical service codes. Hence this reference reads on all claims of '164 involving a set of relations. The second paragraph above makes it clear R1 captured that knowledge in a set of rules, just as '164 does. The third makes it clear that R1 had rules about and an ability to deal with components that were mutually exclusive; it detected such exclusion and then rejected such components based on its rules, just as '164 deals with mutually exclusive medical service codes. This reads directly on claims 2, 3, 10, 12, and 16 of '164).

The system and technology described in the R1 paper is in my opinion clear prior art to the '164 patent. After R1 the general notion of "order checking" became a widespread application of expert systems technology; among others NCR and Motorola initiated major efforts to build such systems for their product lines in 1984 and 1985.

The R1 paper so directly reads on claim 3 in particular that simply by substituting "computer order" for "claim," and "computer component" for "medical service code," claim 3 would read as a remarkably accurate description of R1:

A computer system including a central processing unit and associated memory for processing input *computer orders* containing at least one *computer component*, comprising:

> a predetermined database stored in the associated memory, the database containing *computer components* and a set of relationships among the *computer components* defining whether selected ones of the *computer components* are valid when received with other selected ones of the *computer components*;

> means for receiving at least one *computer order*;

> means for ascertaining whether the at least one *computer order* contains a plurality of *computer components*;

> means for determining whether one of the *computer components* in the plurality of *computer components* is valid or invalid by interacting with the database and the set of relationships contained in the database;

> means for authorizing *computer components* which are valid in response to the means for determining; and

> means for rejecting *computer components* which are invalid in response to the means for determining.

*IV.A.4.*     *Bennett Patent: 4,591,983 (filed June, 1984)*

The patent describes a particular architecture for an expert system (or knowledge system, a virtually synonymous term), one particularly well suited to describing "things" that can naturally be described in terms of a hierarchy of related components. I say "things" because, while (like R1) the patent uses computer systems as the motivating example, the concept is more general and encompasses other things describable hierarchically, including both tangible things (e.g., cars) and intangible things (e.g., the coverage of an insurance policy). It is for this reason that the patent claims are phrased in terms of "objects" and "assemblies." Like R1, the system described here checks the consistency of the components and if a conflict is detected, either modifies the order or warns the user of the conflict.

Several extracts from the body of the patent make clear its use of these concepts:

> In accordance with a preferred embodiment of the invention, a knowledge-based configuration system has separate portions encoding a configuration checking strategy, a description of hierarchical functions of the product to be configured, a catalog of the parts and components which implement those functions, assembly constraints that

check whether a given set of components will successfully implement their respective hierarchical functions. The configuration system applies the assembly constraints during configuration checking and if necessary, warns the user or modifies the given set of components to insure compliance with the assembly constraints.

Col 4, lines 4-16

Once the order is received by the knowledge system 10, the parts in the order are checked for consistency by applying the constraints in the knowledge base (Appendix IV (D))

Col 11, lines 26-29

The constraints also specify the particular action that should be taken in response to whether the conditions are satisfied when the constraints are applied. For the MINI-1000 minicomputer, the order must include at least one RAM-1000 random access memory board, at least one ROM-1000 read only memory board, at least one TERMINAL-1000 computer terminal, and at least one IF-1000 interface board. The action to take when any of these parts is found to be missing is to add one of the respective missing parts, since these parts are essential to the operation of the minicomputer.

Col 11 lines 31-41

If the number of RAM-1000 cards plus the number of ROM-1000 cards exceeds seven, the user must be told that he has ordered too many memory cards. This kind of constraint is called a warning constraint in contrast to the previous modification constraints which require the working configuration of parts to be changed.

Col 11, lines 55-61

For constraints that modify the contents of the current bin, the system provides a special form for specifying a list of parts to add to, delete from, or replace the contents of a bin

Col 23, lines 62-65

As the quotes make clear, the Bennett patent describes a system that:

1. reviews the configuration of something (as '164 does)

2. uses a database of components that can be part of a configuration (cf. the medical
   service codes in the database in '164)

3. uses a set of rules that specify relationships among the components (as in '164)

4. is capable of adding or removing components from the configuration (as in claims
   4 and 11 of '164)

5. is capable of warning the user when a necessary relationship among the
   components is not satisfied (as in claims 1 and 13 of '164).

*IV.A.5.*      *Hardy Patent: 4,803,641 ( effective date June 6, 1984) (cited during patent prosecution)*

This patent describes some of the basic technology for an expert system building tool, i.e., a program whose task is to aid in building an expert system. A physician, for example, might use this tool to allow him/her to construct an expert system to diagnose a class of diseases, without having to learn to be a programmer.

For our purposes here the central element of interest appears in Figs 9-12 of the patent, described at Col 10, line 18-33. This is the format of an IF/THEN rule of the sort widely used in expert systems, and detailed earlier in Section 3.2 of the Davis 1977 reference discussed above. Both of these references demonstrate that both the structure and function of IF/THEN rules in expert systems had been well established long before the '164 patent.

*IV.A.6.*      *Gallant Patent: 4,730,259 (filed Mar 1, 1985)*

The Gallant patent describes an expert system in which the inference engine is controlled by a matrix of learning coefficients (i.e., a set of numbers) that can be learned from examples. The intent here is to ease the task of constructing an expert system, because:

> In the prior art, rules are generally constructed for an expert system by either having a human expert provide the rules in a form suitable for the rule base or by having another person generally known as a knowledge engineer convert the information from an expert into appropriate rules. It is often the case that a human expert in a particular area has difficulty formulating his or her knowledge as a set of rules. The process of generating and perfecting a set of rules has been universally recognized as the most time consuming, difficult, and expensive process involved in building an expert system. It is frequently difficult to reduce expertise to a set of rules.

> Various approaches have been tried to ameliorate the problem of generating rules for a expert system. One approach is to create a "user friendly" interface to ease the human task of adding new rules as described in Buchanan, B. and Shortliffe, Rule-Based Expert Systems, Addison Wesley, 1984, Chapter 9.

Col 1, line 63 -- Col 2, line 10.

Chapter 9 of Buchanan and Shortliffe is an abbreviated version of an article I wrote, it explains the traditional process of knowledge acquisition as "interactive transfer of expertise," essentially the relationship between a mentor and student.

Both of these references (i.e., the patent and the Davis article it cites) establish that the task of building expert systems was widely understood by the early 1980's as one of as collecting knowledge from human experts.

*IV.A.7.*    *Dormond Patent: 4,839,822 ( filed Aug 13, 1987)*

This patent covers an expert system that provides suggestions for treatment for physical trauma (e.g., broken bones). For our purposes here the most relevant element is the patent's recitation of the standard architecture for expert systems:

> The expert system in accordance with the present invention provides the user with one or more suggested treatments for a patient with physical trauma. The system includes a computing device having a memory, a plurality of databases in the memory, an application program and an inference engine program.
>
> Col 2, lines 57-60

While the terms of art have changed slightly over the years, the "consultation program" mentioned in Davis 1977 (above), the "knowledge interpreter" in the '164 patent, and the "inference engine" mentioned in '822 all refer to the same thing: the core component of an expert system that uses the knowledge in the knowledge base, applying it to the example at hand. The term "inference engine" has come to be the dominant term and is now the standard way to refer to this component.

Given that understanding, this patent, like Davis 1977 cited above, indicates that the basic architecture of an expert system was well established in the years before the '164 patent.

**IV.B.    Medical Claims Processing Prior Art**

*IV.B.1.*          *Egdahl87: Egdahl, Hertenstein, An Access-oriented Negotiated Fee Schedule: The*
                   *Caterpillar Experience, Annals of Surgery,* **206**:349-357, *Sept 1987 (also presented*
                   *at meeting of the American Surgical Assn, Palm Beach, Fl, 21-23 April 1987)*[7]

This paper, co-authored by one of the inventors of the '164 patent, Dr. Hertenstein,

describes in detail the system used by Caterpillar Corp. to reimburse surgeons.[8]  The article

describes the background and motivation for the approach Caterpillar uses, the details of the

process, the savings it produces, and the larger policy issues surrounding the impact such a

system can have on both patients and the willingness of surgeons to participate.

For our purposes the important thing is the discussion in the section entitled "Continual

audit and recoding of physician bills." This section lays out in detail the process used by

Caterpillar in auditing claims and possibly revising the medical service codes they contain.

While the system described in this article is a manual system, the article discloses almost every

important element found in the '164 claims.

Consider the following excepts (pages 349, 351-352):

> CAT claims processors subject each incoming physician bill to a coding analysis of
> CPT-4 codes as a first step, and recode claims where irregularities are found. Obvious
> simple coding errors are corrected first.

This reads directly on claims 1 and 13, as the most obvious simple coding error is to use a

medical service code not found in the database. "Recoding" implies that codes were changed,

---

[7] It is my understanding that the Egdahl87 and AMS references (described below) were in the possession of the
patentee at the time the patent was filed. It is my expert opinion that these references are highly material to the
subject matter of the patent. I have been informed that such material references should have been disclosed by the
patentee in connection with the patent application.
[8] In his deposition in this case, Dr. Hertenstein testified regarding Egdahl87 and confirmed that the components of
his manual process are discussed in the article. Hertenstein Deposition, pp. 45, 51-52. Dr. Hertenstein also
confirmed that the tables in the article show CPT-4 codes which had been rejected due to unbundling or upcoding
errors. Hertenstein Deposition, pp. 58-59.

meaning some could be added while others were deleted; hence this reads on claims 4 and 11 of '164.

> ...the patient is informed of CAT's review decision.

This reads directly on claims 1, 5, and 13, insofar as those claims deal with informing a user of the system's changes to the claim.

> ...operative reports are requested for most surgical claims and follow-up calls to provider offices for clarifying information are common.

This reads directly on claim 8, "means for requesting further information from a user regarding the at least one claim."

> Individuals with clinical knowledge and judgment then compare the provider's description of services with submitted codes...

This reads on all claims containing the phrase "a set of relationships among the medical service codes defining whether selected ones of the medical service codes are valid when received with other selected ones of the medical service codes," as this is precisely what is supplied by the "clinical knowledge and judgment" possessed by those individuals. It also reads on claims 9 and 12 of '164, as the "clinical knowledge and judgment" is of course medical information concerning the relationship among codes.

> CPT-4 codes are recoded for greater accuracy, when indicated, surgical services that have been incorrectly bundled are rebundled, and the appropriateness of surgical assistance charges is reviewed

This reads on claims containing the phrase "determining whether one of the medical service codes in the plurality of medical service codes is valid or invalid by interacting with the database and the set of relationships contained in the database," (namely claims 3, 15, and 16), as is exactly the action carried out by the CAT personnel doing the recoding. This excerpt also

reads on claims containing more specific versions of the same phrase, including: claim 2, "determining whether one of the medical service codes in the at least one claim is mutually exclusive due to non-medical criteria;" claim 10, "determining whether one of the medical service codes in the at least one claim is included in any other medical service code;" claim 12, "determining whether one of the medical service codes in the at least one claim is medically exclusive with any other medical service code;" and claim 14, "determining whether one of the medical service codes in the at least one claim is mutually exclusive due to non-medical criteria." Finally, the explicit mention of CPT-4 codes reads on claim 6 of '164.

The article then goes on to supply several concrete examples of the process, showing how recoding can be done effectively by using clinical knowledge and judgment in the form of knowledge about relations between medical service codes:

> In Table 4, the appropriate payment is $1000 for code 38100. The patient was hospitalized for an elective splenectomy. The CAT reviewer would disallow codes and charges for all except the splenectomy: a charge for laparaotomy and incidental appendectomy is warranted only if done as a separate procedure and preoperative check and postoperative care are conventionally part of the global surgery fee.

> Under most conditions, one surgeon can perform a brea[s]t biopsy. The operative report indicates no unusual circumstances. The assistant surgeon is not reimbursed, and the patient is informed of CAT's review decision.

> In Table 6 ... The procedure was actually a simply wart removal. The operative report described a 0.25 inch plantar wart on one foot. Excision combined with the use of the laser constitutes excessive treatment for this common condition. Wart removal is most accurately coded as 17100 ("destruction by any method of benign skin lesion").

Finally, the paper offers examples of rules used by CAT personnel to limit the payment amounts for various procedures, illustrating exactly the sort of rules shown in Example 16, Appendix A of the patent, an example of a type L1 rule:

> Once the claim reviewer is satisfied that enough information is available to code the bill consistent with CAT procedures, recoding is finalized, and the correct codes are compared with established regional fee schedules.

A charge of $1000 for the splenectomy is in line with the regional fee schedule and is the amount ultimately approved.

CAT knows that four local experienced, board-certified cardiac surgeons will carry out a three-vessel coronary artery bypass for $5000, assuring that access can be achieved for that fee (Table 7).

In Table 5, the appropriate payment is $750 to the primary surgeon for code 19121 (excision biopsy, breast, bilateral).

There is no question that virtually all of the fundamental elements in the patent are revealed in this paper. While the Caterpillar system described is manual, it contains the core of the matter covered in the patent, for the entirely plausible reason that it was written by one of the inventors, describing the very system that they automated.

In addition, given the state of the art of expert systems in the mid-1980's -- namely a well-known and routine technology -- the paper provides all it would take for someone with routine skill to have created the system described in the patent.

*IV.B.2.      AMS: Advanced Medlogic Systems, from The Health Data Institute*

AMS, as it was known, was developed by The Health Data Institute ("HDI"), then of Lexington, MA in the early 1980's, and by 1986 was being marketed and sold to insurance companies to enhance their claims processing systems. One of the inventors of the '164 patent, Dr. George Goldberg ("Goldberg"), testified at his deposition in this case that he had worked with AMS while employed by HDI in 1985 and 1986. Goldberg Deposition, pp. 51-52, 62-63. He described AMS as "a series of computerized tables, lookup tables, that received, processed and paid claims." Goldberg Deposition, p. 51-52. Dr. Goldberg stated that the tables reported discrepancies such as "age/procedure discrepancies, age/diagnosis discrepancies, sex/procedure discrepancies, sex/diagnosis discrepancies." *Id.*, pp. 63-65. Dr. Goldberg also stated that AMS was a "system . . . for looking for the occurrence of certain codes or code combinations" (*Id.*, p.

265), but observed that the "tables could have been modified to have two procedure codes and a lookup table that would indicate some unbundling." *Id.*, p. 389.

A marketing pamphlet describing AMS, entitled "Setting a New Standard," contains the following relevant descriptions of the AMS system:[9]

> Beginning at the individual claim level, AMS organizes and evaluates provider claims, *first checking for the validity of values* and then *cross-checking for consistency of information and accuracy* of data items.
>
> An AMS accuracy edit at the individual claim level, for example, flags a claim with a rare combination of procedure and age -- such as a coronary artery bypass performed on a 12-year-old – and investigates it for possible coding errors.
>
> At subsequent levels, AMS merges hospital and physician claims for both in patient and outpatient procedures related to an illness.
>
> If, for example, the hospital's diagnoses are pneumonia and diabetes and the physician's diagnosis is a stroke, *AMS automatically flags the claim for further review* to determine which diagnoses are correct.
>
> ... *AMS reviews the case automatically and a payment decision is made based on clinical data and medically accepted standards* of care.
>
> *AMS also merges and evaluates ambulatory care claims for volume and appropriateness of services.* A patient with gall gladder disease, for example, who has had a complete set of X-rays prior to elective hospitalization for gall bladder surgery does not need to have them performed again upon admission.
>
> *If AMS flags a claim, a number of review methods can be used to resolve and eventually adjudicate the claim.*
>
> *An AMS accuracy edit under review may require a telephone query to the appropriate physician or hospital, for example.*
>
> [emphases added]

As these quotes make clear, the AMS system:

- checked the validity of the codes entered: "checking for the validity of values" (cf.

    '164 claims 1 and 13)

---

[9] HDI was acquired by Caremark in 1985, then in mid-1987 Caremark was in turn acquired by Baxter, Inc. While the pamplet is not dated, the last page describes HDI as "a Caremark company," indicating it was written in and describes AMS as of the 1985 to mid-1987 time period. I obtained this pamphlet and the other AMS documents referenced herein through my own investigative efforts undertaken while preparing this report. I understand that additional AMS documents have been produced in this litigation. *See* MCK 047505-047606, MCK 047608-047619.

- had a set of relationships among the codes it examined that defined whether one of the codes was valid when input with other codes: "cross-checking for consistency of information" (cf. '164 claim 3 and all others relying on a set of relationships)

- automatically reviews the claim and applies knowledge about medical relations among the codes: "AMS reviews the case automatically and a payment decision is made based on clinical data and medically accepted standards," "AMS also… evaluates ambulatory care claims for volume and appropriateness of services." (cf. all '164 claims involving medically determined relations)

- can request additional information from the user: "An AMS accuracy edit under review may require a telephone query" (cf. '164 claim 8).

An extract from a June 1986 HDI document describes in detail the claim editing rules that were the heart of AMS's expertise. The page labeled 1 in the document shows the basic rule for validating the accuracy of data; note that the system "Checks individual data elements and compares each with a list of acceptable single numbers, letters, and/or ranges. Values outside these ranges are not acceptable," and "For each variable listed, a specified set of acceptable values is provided" (cf. '164 claims 1 and 13).

The pages labeled 6-7 in the document shows an editing rule that (a) deals with multiple medical procedure codes in a claim ("there must be at least two procedures on the claim to perform this edit"), and (b) uses a set of relationships among the medical procedure codes to accept or reject the claim (cf. '164 claims 15 and 16).

The page labeled 8 in the document shows another example of a set of relationships among medical procedure codes being used to accept or reject a claim, in this case relying on

medical knowledge about the relation between surgical procedures and diagnoses (cf. '164 claims 9 and 12).

The page labeled 12 in the document shows an editing rule for comparing the diagnosis and the patient's age, showing the use of a rule of the sort classified in the '164 patent as an EA or Q7 rule. The page labeled 13 in the document shows an editing rule that compares procedures and patient age, almost an exact match to the EA and Q7 classes of rules in the '164 patent.

Pages labeled 14 and 15 in the document show AMS checked for medical relations between procedures (or diagnoses) and patient age. To the extent the claim 2 of '164 is regarded as dealing with patient age (as a "non-medical" criterion), this shows a prior system using that concept.

Pages labeled 17 and 18 in the document show AMS checked the procedure and diagnosis against place of service, a rule almost identical to the EP and Q5 classes of rules shown in Appendix B of '164.

Additional examples in the document show AMS used medical knowledge to check length of stay (pages labeled 20-27).

Pages labeled 28-30 show AMS used medical knowledge to check charges to ensure that they were within the expected range, an example of what the '164 patent calls an L1 or a Q3 rule.

Page 31 of the document explicitly mentions the use of CPT codes "(Only CPT-4 procedure codes will be edited"), (cf. '164 claim 6).

Page 32 shows yet another use of medically determined relationships among procedure codes being used to authorize or reject a claim, in this case "procedures and tests which should only occur once in a claim" (cf. '164 claim 3 and others referring to "a set of relationships").

Finally, page 33 shows the AMS system could accept or reject part of a claim based on its medical knowledge about the number of practitioners necessary for uncomplicated procedures, yet another example of medically determined relationships among procedure codes.

A letter from a Senior Scientist at HDI, written May 28, 1987, following up on a marketing call to the Health Claims Division of State Farm Insurance demonstrates that the AMS system was being actively marketed and sold in mid-1987, and that both the marketing pamphlet and an AMS Product Overview, dated May 1986, were openly distributed ("Please feel free to share this information with anyone in your organization who might be interested in them.")

The documents from HDI describing the AMS system provide what I believe to be compelling evidence of prior art that anticipates or renders obvious many of the claims of the '164 patent.

IV.B.3.    *Doyle Patent: 5,070,452 (effective date June 30, 1987)*
           *Mohlenbrock Patent: 5,018,067 (filed Feb 16, 1984)*

These two patents describe systems that deal with medical codes and offer some basic ability to accept or reject those codes. For our purposes here the important part of the Doyle patent is its description of a system that allows the physician to enter both diagnosis codes and procedure codes, which it then checks in some basic ways, illustrating the general concept of checking both claims and medical codes:

> Block 95 indicates that the physician enters a code identifying the diagnosis (sprained wrist). Block 97 indicates that the physician enters up to ten "procedure codes", which refer to the treatments for a sprained wrist selected by the physician. Blocks 101 and 104 indicate that the diagnosis and procedure codes are now transmitted via a local telephone call to the administration computer 3. Block 106 indicates that a check is made to verify that the codes received are actually existing, and not fictitious, codes. Block 109 indicates that the administration computer searches the data base for plan ABC and calculates the reimbursement specified by the employer for each treatment. Block 112 indicates that these reimbursements are under the employer's control, and will be discussed later in more detail.

Col 5, lines 42-58

The sentence "Block 106 indicates that a check is made to verify that the codes received are actually existing, and not fictitious, codes" reads directly on claims 1 and 13 of '164 ("determining whether any medical service code contained in the at least one claim is not present in the predetermined database").

The sentence "Block 109 indicates that the administration computer searches the data base for plan ABC and calculates the reimbursement specified by the employer for each treatment" illustrates the idea of a system that knows the appropriate level of reimbursement, as illustrated in Example 16 of Appendix A of the '164 patent.

The Mohlenbrock patent describes a system that aids a doctor in selecting an appropriate diagnostic related group (DRG), a form of encoding that aggregates the more than 10,000 ICD (International Classification of Diseases) codes into several hundred codes that describe patients with similar diagnoses and similar hospital resource usage. For our purposes the important part of the patent is its description of rejecting DRGs that are inappropriate, and the notion that claims editing can be automated. The first of these is found at Col 10 Line 60 – Col 11, line 2:

> ...the processing steps 47-65 of FIG. 2 examine the list of related DRGs that are in the DRG database record for the current Working DRG. Those related DRGs that cannot fit this patient because the sex or age do not match are eliminated. Also, any DRGs with the same Content Code as the working DRG are eliminated since only one DRG of a doublet or triplet can be relevant.

This reads on claims in '164 that recite the notion of "a set of relationships among the medical service codes defining whether selected ones of the medical service codes are valid when input with other selected ones of the medical service codes."

The second is found at Col 12, lines 37-66:

> Once discharged, the patient chart and the physician determined DRG number are sent to the medical records clerical department of the hospital where ICD-9 codes are

identified for all the diagnoses and procedures in accordance with usual techniques. But the medical records clerk now has the physician determined DRG with which to compare. Additionally, form A1 will alert the medical records clerk to additional C.C.s that may be relevant. Further, if the DRG text in the DRG database is expanded, the medical records clerk has the text of the Working DRG as an aid.

In fact, this comparison can be automated, as shown in FIG. 5 wherein a comparator 91 receives as one input 93 the DRG number determined by the physician in accordance with the procedure of FIG. 4 using the computer system of this invention. The second input 95 is a DRG number determined by running a prior art Grouper program 97 which operates from a plurality of ICD-9 code numbers identified by the medical records clerk. A system can even be used that would respond directly to each ICD-9 code inputted to it by the medical records clerk and indicate at the output of the comparator 91 when enough ICD-9 codes have been entered so that the DRG that is calculated by the Grouper program is the same as that determined by the attending physician.

This provides background indicating that the notion of automating the claims editing process was a part of the prior art as of 1984.

IV.B.4.    *Bernier86: Bernier, Clinical Evaluation: The Next Step in Claims Processing,* Best's Review Life/Health Insurance Edition, *April 1986, pp 106-127*

This article lays out a plan for clinical evaluation of claims and anticipates several central elements in the '164 patent. It begins by describing the overall organization of a system to manage hospitalization:

An automated system designed to monitor and manage a hospitalization encounter with the goal of controlling costs would be divide into three stages: automated pre-certification, concurrent utilization review and automated claims editing.

We are of course interested here in the automated claims editing component:

The final module, automated claims editing, would audit the claim prior to payment to assure that clinical, resource utilization and financial components are within bounds and reasonable. Clinical edits evaluate the interrelationships among age, sex, principal and secondary diagnoses and procedures.

This reads on the '164 claims using the phrase "a set of relationships among the medical service codes defining whether selected ones of the medical service codes are valid when input with other selected ones of the medical service codes."

The article goes on to say

Thus, clinical editing would identify clinical inconsistencies in a claim and cause removal from the claims adjudication process prior to payment.

This reads on the claims of '164 involving any form of inconsistency among the medical service codes (patent claims 2, 10, 12, 14, 15, and 16), as well as those indicating rejection of medical service codes (patent claims 2, 3, 4, 10, 14) or medical claims (patent claims 15 and 16).

The article makes the case that clinical editing is a crucial function, highlighting the value of creating such a system:

The clinical-editing function is critical because the determination of appropriate comparative norms will be based on the clinical information. ... Further, ... clinical editing is essential in order to determine the appropriate DRG assignment.

The article also suggests that clinical editing is already being done, in 1986:

Sophisticated clinical editing systems exist which identify problems such as:
- Conflicts between a patient's age and sex and their diagnosis or procedures
- Procedures performed which are not justified by the patient's diagnosis
- Noncovered procedures
- Diagnosis indicating surgery, in which no surgery was performed
- Clinically unreasonable length of stay.

The article also points out that

The system optionally could produce an initial DRG, length-of-stay limitations, reasonable charge limits for room, board and ancillary charges that are specific to that hospital... Based upon the results of this analysis, a reviewer could approve or deny the admission or request additional information.

This reads on claim 8 of '164, the means for requesting additional information from the user. Finally, the article indicates that

> The automated system described here could exist as an integrated system, or each module could be utilized separately. It could run on microcomputers in individual claims offices or be integrated into an existing claims-payment system on a large mainframe computer. Sufficient technological alternatives exist today to accommodate the needs of organizations of any size.

This makes it clear that the functionality for claims editing that the functionality for claims editing outlined earlier in the article could easily be built as a standalone system, as suggested in '164.

### IV.B.5.    *Numerous Brief Articles Dealing with Claims Editing*

Eight short articles from trade publications are briefly relevant to the analysis of the '164 claims. I lump them together for the sake of simplicity and extract from each just the relevant quote(s).

Anon85: ____, Enhancing Accuracy and Timeliness is Integral to the Claims Adjudication Process, *Employee Benefit Plan Review*, Dec 1985, pp 10-12.

This article describes the process of clinical editing, giving several examples:

> ...when data on age, sex, effective dates, and cancellation date are entered into the computer system certain red flags can be built into the system to warn that a covered individual is near or past eligibility status.

> Age edits will alert claims adjusters to those participants who are over age 65 and eligible for Medicare, and will identify students age 19 to 23 or whatever limitations might be under the plan.

> It will identify X-ray and lab work that is not consistent with the diagnosis, which is an indication of preventative medicine, or defensive medicine, or financing a Rolls Royce.

To the extent that '164 claim 2 is interpreted to mean taking into account such things as age, gender, etc. (which I have argued against above), this reference demonstrates that such

accounting of age, etc., was an established concept in the prior art in 1985. The example above concerning X-rays and lab work also indicates that the concept of "a set of relationships among the medical service codes defining whether selected ones of the medical service codes are valid when received with other selected ones of the medical service codes" is also present in this article. The article also mentions a variety of different coding systems, including CPT, RVS, ICD, and DRG, demonstrating that dealing with all of these codes was anticipated in 1985.

Snyder87: Snyder, The leading edge of expert systems, Software Review, **12**:22-30, Autumn 1987.

This article reviews applications of expert systems in the insurance industry, notably mentioning the ExClaim system by Policy Management Systems Corporation, which

> ...completely automates the health claims adjudication process.
>
> The claims examiner prompts ExClaim by entering basic claim information, such as the claimant's name and address, dates of service, amounts of charges, provider information, diagnoses, procedures performed, and category of service (office visits, inpatient or outpatient surgery, etc.). Based on all that data, ExClaim then determines the resultant payment or final reconciliation of the claim...
>
> The system contains an underlying base of knowledge regarding how to operate in the claims industry.

The article thus indicates that there was another system similar to that described in '164 already in use no later than Autumn 1987.

Stachura87: Stachura, Software reference guide: DRG assignment, J American Medical Record Assn, **58**:33-40, January 1987.

This article provides a brief list of systems that fall in the general category of DRG assignment software. Examples with particular relevance to '164 include:

> PQDM contains a DRG grouper and is design to provide complete and accurate information for coding and grouping purposes. The system promotes coding accuracy by *detecting selection errors, determining the potential for more specific codes,*

*prompting for additional clinical data*, and presenting legitimate reporting options. *As many as 600 edit checks per case are conducted* to ensure that codes conform to coding principles, UHDDS definitions, Medicare edit checks, and clinical concepts.

P. 34 (emphasis added). The emphasized text above indicates that this system appears to have had the ability to check for codes not in the set of approved codes (cf. claims 1 and 13 of '164); replace one code with another based on a set of relationships among the codes, in this case a relation of generality/specificity (cf. claim 3 of '164); asking for additional data (cf. claim 8 of '164). The reference to 600 edits also makes it clear that this was a substantial system, even in January, 1987.

A second relevant system in the list is Clinical Data Editor by Honeywell Information Systems: "The Clinical Data Editor system evaluates the consistency of coded data via more than 25 code edits and assigns DRGs based on edited data." P. 37. This illustrates another system capable of editing medical codes that was operational in prior to January 1987. While the description is brief, the claim that the system "evaluates the consistency of coded data via more than 25 code edits" reads on claims 1, 3, 8, and 13.

Huertas88: Huertas-Cortocarrero, Concurrent clinical review: Using microcomputer-based DRG software, Health Policy, 9:211-217, 1988. (Also presented at the October 1987 EHPF-WHO Meeting in Brussels.)

The relevant portions of this paper describe the Clinical Review System (CRS), pointing out that it had the following properties:

An on-line DRG Grouper *calculates DRG assignments from the ICD9-CM codes.*
*CRS points out when a non-specific code must be replaced by an ICD-9-CM code of greater specificity, and when the presence of a complication/co-morbidity code affects the DRG.*
The system can help improve the accuracy and completeness of medical records. *Problems with clinical data (e.g., diagnoses inconsistent with sex) and DRG assignment*

*(e.g., manifestation code listed as principal diagnosis) are found by the CRS clinical data editor.*

[emphasis added]

The text emphasized above makes it clear that:

- CRS worked on and manipulated medical codes,

- CRS had a set of relationships among medical codes that it used to replace codes that were too general with codes that were more specific (cf. '164 claim 3 and others)

- that it had a set of relationships among medical codes that it used to recognize complications that affected the choice of DRG code (cf. '164 claim 3 and others)

- that it could recognize codes inconsistent with patient data (cf. '164 claims 2 and 14, assuming "non-medical" refers to issues such as patient gender, age, etc.) and

- that it could recognize codes that were medically exclusive with other codes (cf. '164 claim 12)

Nathanson85: Nathanson, Experts: More research needed to set value of code programs, Modern Healthcare, **15**:98-102, June 21, 1985

This article discusses a number of coding programs. Relevant observations include:

Code editor software *checks codes to ensure they're appropriate for Medicare reimbursement, detecting diagnoses that aren't specific and finding procedures and diagnoses that don't match* and would be rejected by Medicare.

[emphasis added]

The highlighted text makes it clear that when this article was written in 1985 there already existed programs doing medical code editing, checking code validity (cf. '164 claims 1 and 13), checking code specificity (cf. '164 claim 3 and others), and detecting codes that were mutually exclusive (cf. '164 claim 12).

Gonnella84: Gonnella, Staging of Disease, A Case-Mix Measurement, JAMA, **251**:637-644,
February 3, 1984.

This article provides an overview of a research effort aimed at "staging" diseases, i.e.,
categorizing the severity of a disease. For our purposes the interesting information concerns their
software:

> A computer software system has been developed to employ staging on large-scale
> databases. An individual patient record from a computerized discharge abstract file is
> read by the program and systematically searched for the principal and associated
> diagnoses. ... the software *will overrule the principal diagnosis* listed *if it is a*
> *complication or manifestation of a secondary diagnosis, according to the medical*
> *criteria.* For example, neuropathy is considered a manifestation of diabetes mellitus by
> the software when both conditions are listed on a discharge abstract, regardless of the
> order in which they appear.
>
> > [emphasis added]

The emphasized text shows that this program had and used a sizable body of knowledge
about the medical relationship between medical conditions (cf. '164 claims 9 and 12).


Dornfest84: Dorenfest, Computers can figure out DRGs, if you can figure out computer market,
Modern Healthcare,**14**:130-136, February 15, 1984.

This brief article provides a snapshot of the confusing state of the medical software
market in early 1984 as the effects of changes in Medicare regulations was being felt. For our
purposes the important point appears in this text:

> But even using Code Finder, a hospital isn't assured of the *consistency of clinical data*
> and the resulting diagnosis. For this purpose *a hospital can acquire the Clinical Data*
> *Editor* marketed by Health Systems International. *This product identifies erroneous or*
> *missing diagnosis and procedure codes.*
>
> > [emphasis added]

The highlighted text above makes it clear that as of February 1984 when this article was
written, there already existed a program capable of detecting erroneous procedure codes (cf. '164
claims 1 and 13.

RANDALL DAVIS                    *McKesson v Trizetto*                                    32

Carter, End of PIP will prompt hospitals to try software to speed billing, Modern Healthcare, **17**:
62-68, Feb 13, 1987.

This brief trade article describes yet another system, operational in early 1987, capable of

modifying medical codes by relying on knowledge about the relationships among the medical

codes:

> ...ENSEMBLE lets hospitals collect information for billing while the patient is in the
> hospital receiving treatment... The software keeps track of the patient's DRG
> throughout his stay and *alerts the hospital if his case should be classified under another*
> *DRG.*
>
> [emphasis added]

While somewhat general, the emphasized text indicates the existence of a system in early

1987 that, like the '164 patent, examined medical records and reasoned about codes.

## V. CLAIM CHART

The chart below summarizes the discussion above of prior art.

| Asserted Claims of the '164 patent | Relevant Prior Art Reference |
| --- | --- |
| 1 | Bennett patent, Egdahl, AMS Brochure, AMS rules, Doyle patent, Stachura84, Nathanson85, Dornfest84 |
| 2 | Egdahl87, McDermott82, AMS rules, Bernier86, Anon85, Huerta88 |
| 3 | McDermott82, Bennett patent, Egdahl87, AMS brochure, Bernier86, Stachura84, Huertas88, Nathanson85 |
| 4 | Bennett patent, Egdahl87, Bernier86 |
| 5 | Davis77, Egdahl87 |
| 6 | Egdahl87, AMS rules, Anon85 |
| 8 | Egdahl87, AMS brochure, Bernier86, Stachura84 |
| 9 | Egdahl87, AMS rules, Hertas88, Gonella84 |
| 10 | Egdahl87, AMS rules, Bernier86, Huertas88, Nathanson85, McDermott82 |
| 11 | McDermott82, Bennett patent, Egdahl87 |
| 12 | Egdahl87, AMS rules, Bernier86, Huertas88, Nathanson85, Gonella84 |
| 13 | Egdahl87, AMS brochure, AMS rules, Doyle patent, Stachura84, Bennett patent, Nathanson85, Dornfest84 |
| 14 | McDermott82, Egdahl87, Bernier86, Huertas88 |
| 15 | Egdahl87, AMS rules, Bernier86 |
| 16 | Egdahl87, AMS rules, Bernier86 |

## VI. THE STATE OF THE ART OF EXPERT SYSTEMS CIRCA 1986.

As my CV suggests, I have been involved in the field of expert systems in general and expert systems applications in medicine roughly from the time that work first began in the mid 1970's. My PhD thesis and subsequent publications helped to establish some of the fundamental properties of expert systems, and over the years since I have been involved creating systems in a variety of areas, including medicine, geology, financial planning, and others. For the decade from 1980 to 1990 I routinely consulted to variety of commercial companies in their efforts to

build expert systems, giving lectures that taught them about the technology and aiding in system construction.

Based on this extensive background and participation in the field from the earliest days I can offer a number of opinions with considerable confidence. First, by the mid 1980's expert systems technology was well understood and widely used: A 1985 paper by Buchanan (Buchanan85) lists 46 commercial applications of expert systems in a variety fields and more than 350 research papers from the field, without including articles in the popular press or trade magazines. While a plethora of research papers may not by itself establish that a field is well understood, the abundant commercial application of the technology establishes clearly that it was well understood and that its application was routine.

Second, as dates in the references in Buchanan85 imply, medical applications of expert systems were among the very first. Hence the notion of applying expert systems to problems in medicine was a routine notion by the early 1980's. A paper I wrote in 1986 (Davis86), describing the variety of fields to which the technology has been applied indicates "Medicine has been a rich source of examples and challenging problems for these systems." A 1984 book by Clancey and Shortliffe (Clancey84) , entitled *Readings In Medical Artificial Intelligence: The First Decade,* provides additional evidence of the early (from 1974 onward) and important role of medical applications as a domain and provides 20 papers describing computerized medical systems.

Third, some of the medical applications that had been built by 1986 were considerably more difficult technologically than medical claims processing. Programs like Mycin and Internist (see Clancey84, chapters 5 and 8) aimed at doing medical diagnosis, a task that was not nearly as well understood as medical claims processing. Building systems like Mycin and Internist

required basic research into understanding how doctors reasoned and how (and perhaps whether) a computer could be made to reason similarly.

Fourth, after the creation of R1 (McDermott82), the notion of configuration checking was understood to be an important, tractable task, as evidenced by the number of commercial companies that built systems variously termed configuration checking or order checking. It was also understood to be a broadly applicable task, as illustrated by the interest in it by companies as diverse as NCR (computers) and AIG (insurance) (Buchanan85). Indeed, as noted above, R1 as a system maps so well into the subject matter of '164 that with the slightest of word substitutions, one of the claims of '164 becomes an accurate description of R1.

Fifth, in terms of methodology, it was routine practice to find a task that people knew how to do and build an expert system to automate that task.[10] This was so routine a methodology that I came to call it "intellectual cloning" in the numerous talks I gave to consulting clients in the early 1980's describing expert systems. The idea was to ensure that the task of building the system involved only the (smaller) technical challenge of creating the knowledge base, not the (sometimes) major challenge of trying to understand a process no one yet understood (e.g., how physicians manage to diagnose an illness).

Sixth, the references cited earlier, notably Egdahl87 and Bernier86, make it abundantly clear that claims processing and editing was one of those tasks that was in fact well understood, as indeed it would have to have been in order to put to work the staff tasked with reading, evaluating, and revising claims.

Seventh, as a consequence of the routine character of expert system applications, the well-understood nature of claims processing and editing, and the standard methodology of the

time, combining claims editing of the kind disclosed in Egdahl87 and expert systems technology would have been obvious to anyone having ordinary skill in the art at the time. Automation of a well-described manual claims editing process, such as the one disclosed in Egdahl87, would have been obvious to a person skilled in the art.

Eighth, even absent the methodology, several references suggest combining the clinical editing process with computing in general and expert systems in particular:

| | |
|---|---|
| Snyder, C., *From research to reality: the leading edge of expert systems*, Insurance Software Review, **12**, Autm., 1987, 22-4, 26-7, 30 | States the benefits of automation: "ExClaim increases productivity in a number of areas. One of these is volume. . . Another benefit is a reduction in errors and an increase in consistency among examiners, due to the fact that the system makes the same decisions the same way every time. Further . . . 'the need for high-level examiners should be reduced and an examiner with less experience should be able to do a higher volume and quality of work than before.' Finally, productivity gains are achieved through the product's PC orientation." P. 26-27.<br><br>Describes impact of workstation environment on future of insurance data processing: "The workstation environment [of PALLM, Inc.] . . . will instead address the administration that currently takes place at the desks of clerks and managers. It will serve to gather intelligence, guide the user through company procedures, and make routine decisions automatically. . . When PALLM's workstation environment evolves from research to reality, its impact on insurance data processing is expected to be dramatic." P. 30. |
| Egdahl, M.D. and Hertenstein, M.D., *An Access-oriented Negotiated Fee Schedule: The Caterpillar Experience*, Ann Surg., 206(3), pp. 349-57 (Sept. | "[The CAT process] can also be used (after eligibility is certified and benefits are coordinated) by claims processing systems." P. |

[10] For example: "A refrain that occurs over and over in the current literature on building commercial knowledge-based systems is to select a problem and a design that can be solved using available technology. . ." Weitzel, J.R., et al., *A Company / University Joint Venture to build a knowledge-based system,* MIS Quarterly, 12:23-24, Mar1988.

| 1987). | 353. |
|---|---|
| U.S. Pat. No. 4,667,292 (Mohlenbrock patent) | "One technique for increasing the likelihood of accuracy and cost-effectiveness in working with the new Medicare DRGs is to incorporate it into a computer system." Col. 3, lines 42-45.<br><br>Suggests automated comparison of two DRG numbers from different sources: "In fact, this comparison can be automated, as shown in FIG. 5 wherein a comparator 91 receives as one input 93 the DRG number determined by the physician in accordance with the procedure of FIG. 4 using the computer system of this invention. The second input 95 is a DRG number determined by running a prior art Grouper program 97 which operates from a plurality of ICD-9 code numbers identified by the medical records clerk. A system can even be used that would respond directly to each ICD-9 code inputted to it by the medical records clerk and indicate at the output of the comparator 91 when enough ICD-9 codes have been entered so that the DRG that is calculated by the Grouper program is the same as that determined by the attending physician." Col. 12, lines 48-62. |
| Gibbons PS, Pishotta FT, Stepto RC, *A system for reporting gynecologic procedures. A linguistic-logical approach,* Journal of Reproductive Medicine, March 1983, Vol. 28 (3), pp. 201-5 | Suggests potential for accuracy in automated system in encoding and reporting: "The automated system for encoding gynecologic procedures developed at Chicago Lying-In Hospital represents a step in the direction of 'softening' and yet controlling entry of technical medical information by standard input personnel. The use of a logical-linguistic network, allowing each procedure to be characterized in a number of ways, offers great flexibility to local managers as well as the potential for accuracy in procedure encoding and reporting." P. 205. |
| Miller KM, Wisnicki HJ, Buchman JP, Riley MJ, Repka MX, Taylor HR, Guyton DL, *The Wilmer Information System. A classification and retrieval system for information on diagnosis and* | Suggests future development of interactive error checking software: "Maryland Medicare and Blue Cross/Blue Shield implemented policy changes in July 1986 to automate and expedite the processing of claims. The most noteworthy |

| | |
|---|---|
| *therapy in ophthalmology,* Ophthalmology, March 1988, Vol. 95 (3), pp. 403-9 | requirement was that all submitted claims would have to include an ICD-9 code before being processed . . . Interactive error checking software, similar to that used for direct entry, also will be developed.  Until then, a data entry operator receives one copy of the customized coding sheet and enters the data manually."  P. 408.<br><br>Discusses importance of coding scheme: "[T]he trend in future years is likely to be in the direction of consolidation.  This trend will permit a greater pooling of resources at the hardware/software level, and provide better access to information for all those involved in patient care.  The key to the success or failure of any medical information system is its coding scheme."  P. 409 |
| U.S. Pat. No. 4,730,259 (Gallant patent) | Suggests the need for human experts in prior art:  "In the prior art, rules are generally constructed for an expert system by either having a human expert provide the rules in a form suitable for the rule base or by having another person generally known as a knowledge engineer convert the information from an expert into appropriate rules.  It is often the case that a human expert in a particular area has difficulty formatting his or her knowledge as a set of rules.  The process of generating and perfecting a set of rules has been universally recognized as the most time consuming, difficult, and expensive process involved in building an expert system.  It is frequently difficult to reduce expertise to a set of rules."  Col. 1, line 63 – Col. 2, line 6. |

Ninth, once the general idea has been suggested, Bernier86 and Egdahl87 between them

offer almost a roadmap for implementing such a system.  Bernier86 lays out the ideas in general,

explaining what such a system should do and why, while Egdahl87 describes the types of claim editing rules used in the '164 patent.[11]

Tenth, the software written to implement the patented invention (a portion of which is disclosed in Appendix D of the '164 patent) was not, in itself, novel. Ms. Kelli Dugan, one of the inventors of the '164 patent, testified that two programs were used to create the patented product: a programming language called Clipper and a database program called dBase III. Dugan Deposition, pp. 71, 76. Both of these were well-known, commercially available software programs and would have been obvious choices for creating an automated claims editing system. On my initial review of the software in Appendix D of the patent, it appears to be a straightforward implementation of an expert system.

Eleventh, as of 1986 there was at least one other system in commercial use doing what appears to be the identical task, namely the AMS system from HDI cited earlier. The description in the brochure ("Beginning at the individual claim level, AMS organizes the evaluates provider claims, first checking for the validity of values and then cross-checking for consistency of information and accuracy of data items. ... AMS uses medical protocols to clinically identify inconsistent claims...") and the detailed claims editing rules contained in the June 1986 document indicate that AMS did what the '164 patent describes.

---

[11] It should be noted that the full set of specific claim editing rules that is supposed to reside in the predetermined database is never disclosed anywhere in the '164 patent. The patent discloses only some general types of claim editing rules, supported by a few examples. Much of the same information is found in Egdahl87.

## VII.    THE INVENTOR TESTIMONY SUPPORTS MY CONCLUSIONS

The testimony of the named inventors of the '164 patent supports the conclusions in this report. During their depositions, the inventors Donald Holloway ("Holloway"), Robert Hertenstein ("Hertenstein"), George Goldberg ("Goldberg") and Kelli Dugan ("Dugan") each testified as follows:[12]

Novelty

The inventors testified that many aspects of the patented system were covered by the manual process used by Dr. Hertenstein. Dr. Hertenstein himself testified that his manual process covered all the steps of Claims 1, 2, 3 and 10. *See* Hertenstein Deposition, pp. 195-198, 199-204, 205-207, 208.[13] Hertenstein also testified that the "claims in this patent generally describe using a computer and a database to do what [I] did manually at Caterpillar." Hertenstein Deposition, pp. 209-210.

In discussing whether the claims reflected Hertenstein's manual process, Holloway also testified that the "determining" steps of Claims 1, 2, 3 and 10 were all a part of Hertenstein's manual process. *See* Holloway Deposition, pp. 268-270. Holloway further testified that Hertenstein's manual process covered all the steps in Claim 10, and that these steps were not novel because they were part of Hertenstein's manual process. Holloway Deposition, pp. 276-277, 279-281.

[12] Depending on how the Court construes the patent claims, there may be issues as to whether each of the named inventors actually contributed to at least one patent claim. I reserve the right to supplement my report should inventorship become an issue in view of the Court's claim construction.
[13] Goldberg also testified that the steps described in Claims 2 and 3 were covered by Hertenstein's manual process. Goldberg Deposition, pp. 300-303, 311-313. Dugan further testified that Claim 1 covered the function of Autocoder. Dugan Deposition, pp. 90-91.

Goldberg stated in a letter to an Aetna employee that "anybody can go through the coding book [CPT-4 Manual] and identify a large number of decision rules."[14] Goldberg Deposition, p. 230.

### Knowledge by Others of System and Functionality

Several other companies and persons were aware of Hertenstein's system for processing claims.[15] Holloway testified that the concepts of unbundling code checks and incorrect code checks were presented to others at a Pew conference in mid-1986. See Holloway Deposition, p. 76. Holloway also testified that as early as March of 1986, the idea of creating software to catch CPT-4 coding errors had been discussed. See id, at p. 62.

Aetna was another company that knew about the system. Hertenstein testified that "we had a meeting with Aetna later in 1987 where we had a prototype of what we were developing and showed it to them. . ." Hertenstein Deposition, p. 102; see also, Holloway Deposition, pp. 28-30.[16] Hertenstein also testified that Armco knew about the system, based upon HPI's proposal to Armco in March of 1987 and Armco's acceptance of that proposal.[17] See Hertenstein Deposition, p. 150, and Exhibit No. 139 to Hertenstein Deposition, Volume I.[18]

---

[14] Goldberg also agreed that as of January 1988, there were "many self-evident, logical examples of procedure codes that could be identified by going through the coding book." Goldberg Deposition, p. 231.

[15] Hertenstein also testified that he gave talks or presentations describing unbundling or other coding errors during the 1985-1987 time period. Hertenstein Deposition, p. 43.

[16] Hertenstein also testified that in July of 1987, HPI was talking to Aetna about creating software that would essentially replicate Hertenstein's manual claims processing system. Hertenstein Deposition, p. 104.

[17] Another company that knew about Hertenstein's manual system was Blue Cross Blue Shield of Michigan ("BCBS-MI"). Hertenstein further discussed the work done for BCBS-MI in analyzing their claims, and his interaction with Wally Maher, benefits manager for Chrysler and BCBS in Detroit. Hertenstein Deposition, pp. 142-143; see also, Holloway Deposition, pp. 28-30.

[18] See also, Holloway Deposition, p. 307, discussing proposals to Armco and Weyerhauser.

## VIII.  CONCLUSION

As a consequence of all of the above, it is my firm opinion that each and every claim in the '164 patent would have been anticipated by the prior art cited herein and obvious at the time to a personal having ordinary skill in the art.

I reserve the right to modify or supplement my views stated herein in the event any information is brought to my attention relating to this matter of which I am not currently aware.


Randall Davis

October 2005

**EXHIBITS**

Exhibit A: Davis Resume

Exhibit B: List of prior cases and publications

Exhibit C: Materials Examined

## EXHIBIT A

### RANDALL DAVIS RESUME

Randall Davis received his undergraduate degree from Dartmouth, graduating summa cum laude, Phi Beta Kappa in 1970, and received a PhD from Stanford in artificial intelligence in 1976.

In 1978 he joined the faculty of the Electrical Engineering and Computer Science Department at MIT, where from 1979-1981 he held an Esther and Harold Edgerton Endowed Chair. He later served for 5 years as Associate Director of the Artificial Intelligence Laboratory. He is currently a Full Professor in the Department, and a Research Director of CSAIL, the newly-formed Computer Science and Artificial Intelligence Laboratory that resulted from the merger of the AI Lab and the Lab for Computer Science. He and his research group are developing advanced tools that permit natural multi-modal interaction with computers by creating software that understands users as they sketch, gesture, and talk.

Dr. Davis has been one of the seminal contributors to the field of knowledge-based systems, publishing some 50 articles and playing a central role in the development of several systems. He serves on several editorial boards, including Artificial Intelligence, AI in Engineering, and the MIT Press series in AI. He is the co-author of Knowledge-Based Systems in AI, and was selected in 1984 as one of America's top 100 scientists under the age of 40 by Science Digest. In 1986 he received the AI Award from the Boston Computer Society for his contributions to the field. In 1990 he was named a Founding Fellow of the American Association for AI and in 1995 was elected to a two-year term as President of the Association. In 2003 he received MIT's Frank E. Perkins Award for graduate advising. From 1995–1998 he served on the Scientific Advisory Board of the U. S. Air Force.

Dr. Davis has been a consultant to several major organizations, including Digital Equipment Corp, IBM, Aetna, and Schlumberger, and has been involved in the founding of three software companies.

Dr. Davis has also been active in the area of intellectual property and software. In 1990 he served as expert to the Court in Computer Associates v. Altai, (775 F. Supp. 544 (E.D.N.Y. 1991); 982 F 2d 693) a case that produced the abstraction, filtration, comparison test for software copyright. He served on the panel run by the Computer Science and Telecommunications Board (CSTB) of the National Academy of Science in 1991 that resulted in Intellectual Property Issues in Software, and served as a member of the Advisory Board to the US Congressional Office of Technology Assessment study on software and intellectual property that was published in 1992 as Finding a Balance: Computer Software, Intellectual Property, and the Challenge of Technological Change. A 1994 paper in the Columbia Law Review analyzed the difficulties in applying intellectual property law to software and proposed a number of remedies.

He has served as an expert in a variety of cases involving software, including the investigation by the Department of Justice of the Inslaw matter (40 Fed. Cl. 843; 1998 U.S. Claims), where he investigated allegations of copyright theft and cover-up by the Federal Bureau of Investigation, the National Security Agency, the Drug Enforcement Agency, the United States Customs Service, and the Defense Intelligence Agency.

From 1998-2000 he served as the chairman of the National Academy of Sciences study on intellectual property rights and the information infrastructure entitled The Digital Dilemma: Intellectual Property in the Information Age, published by the National Academy Press in February, 2000.

Dr. Davis has appeared on *The Macneil/Lehrer Report* and *Innovations* (WNET, NY), and played a major role in *This Computer Thing*, a pilot for an educational series (WGBH, Boston) about personal computers. He has been quoted in articles in *The New York Times, The Wall Street Journal, Business Week, The Economist, The Boston Globe, High Technology*, and *Psychology Today*. Interviews have appeared in *Computerworld* and on National Public Radio's *All Things Considered*.

# EXHIBIT B

## RANDALL DAVIS: CASES, IP PUBLICATIONS, AND TECHNICAL

## PUBLICATIONS

*Computer Associates v. Altai*, CV 89-011 EDNY
775 F. Supp. 544 (E.D.N.Y. 1991); 982 F 2d 693
Rule 706 expert to the court (testified)
copyright concerning IBM operating systems software.
Case appealed; appeal court decision create the Abstraction, Filtration, Comparison test.

*Daly et. al v. IECA et al.*, 90 CIV 0588 NY
consultant to plaintiff; settled
copyright concerning proxy vote counting software

*Quotron v. ADP*, 91 CIV 6526, NY
consultant to defendant, settled
software copyright concerning brokerage office software

*Goal Systems v. J. W. Bennett Co.*, C2-90-681 SD Ohio
consultant to plaintiff (deposed); settled
copyright involving mainframe job scheduling software

*Gates Rubber, Inc., v. Bando American, Inc.*, 92-S-136 CO
expert for plaintiff (deposed, testified)
copyright and trade secret involving industrial belt design software

US Department of Justice investigation, 1994
consultant to the DOJ on its re-investigation of the INSLAW matter
investigated alleged copyright theft and cover-up by the FBI

*International Business Machines Corporation vs. Fujitsu Limited*
American Arb. Assoc. Case No. 13T-117-0636-85
consultant to plaintiff
copyright concerning IBM operating systems

*Logica North America v. Intelsat*, AAA Case No. 16 117 00084 92M
expert for plaintiff (testified)
breach of contract involving satellite communications scheduling software

*American Airlines, Inc. v. ICOT Corporation*, CA-4-91-305-A; Dallas TX
consultant to plaintiff
copyright involving terminal control software

Davis Exhibit B　　　　　　　　　　　　　　　　　　　　　　　　B–1

*Unix Systems Laboratories, Inc., v. Berkeley Systems Design, Inc.,* Civ. 92-1667, CA
consultant to defendant
copyright of Unix operating system software


*Bitstream, Inc., et al. v. SWFTE Int'l Ltd*, CV93-11068H, Boston MA
consultant to plaintiff
copyright concerning computerized type face software

*Data General Corp. v. Grumman Data Systems Corp.*, Civ 93-40087-GN, NY
consultant to defendant
copyright concerning hardware diagnostic software

*Systems Engineering Associates v. IMED Corp*, CV91 3583, AL
consultant to defendant
copyright involving medical instrumentation software

*Lotus v. Borland,* 90-11662K Boston, MA
consultant to defendant
copyright concerning the Key Reader capability in Quattro

*Mitek Holdings, Inc. v. Arce Engineering,* 91-2629 SD FL
expert for plaintiff (deposed, testified)
copyright concerning architectural and structural design software

*Mitek Holdings, Inc v. Merlyn Industries, Inc.*, 91-2631 Dallas, TX
consultant to plaintiff; settled
copyright concerning architectural and structural design software

*Fonar Corp v. Deccaid, et al.*, CV 91-3805, NY
consultant to defendant (deposed)
copyright concerning medical instrumentation software

*Star Technology, Inc v. Tultex Corporation, et al.*, 3-91-CV-1067-X, Dallas, TX
consultant to defendant (deposed)
copyright concerning factory automation software

Re-examination of Compton's New Media Patent 5,241,671
consultant to patent holder
patent concerning multimedia presentation

*Florida Software Services Inc., v Citicorp Information Resources Inc, et al.*,
Seminole County, FL, 91-893-CA-16-K
consultant for defendant; settled
trade secret and copyright concerning retail banking software


Davis Exhibit B

*Quarterdeck Office Systems, Inc. v. Weinstein et al.,* CD of CA, 95-1564 LGB
consultant to defendant; settled
copyright and trade secret regarding Internet navigation software


*E. S. Cadd, Inc., v. Greiner, Inc.,* Middle District of FL, 94-1829-CIV-T-24C
consultant to defendant
copyright of engineering software for air traffic control

*Trilogy Development Group v. Teknowledge Corp,* CA
consultant to defendant, settled
software patent concerning configuration software

*Sitrick v. Nintendo of America,* Inc, N D Illinois 94 C5515
consultant to defendant (deposed); settled
software patent concerning game software

*INSLAW Inc., v. The United States of America,* Court of Federal Claims 95-338X
expert for the defendant (deposed, testified)
copyright concerning database software
investigated alleged copyright theft by the FBI, National Security Agency, Drug
Enforcement Agency, US Customs Service, and the Defense Intelligence Agency.

*Cadence Design Systems, Inc., v. Avanti! Inc,* C 95-20828 RMW, CA
expert for plaintiff (deposed, filed under seal); case settled in 2002 for $265 million
software copyright concerning computer aided design software

*Automated Tracking Systems v. Great American Insurance Company*
American Arbitration Association Case 53 195 00090 95
consultant to plaintiff
software copyright concerning database software

*MicroStar v. Formgen Inc, et al.,* 96-3435h(CM), SD of CA
consultant to defendant; appeal affirmed defendant
software copyright concerning game software

*Computer Aid v Hewlett Packard Company*
consultant to defendant; deposed
software copyright and trade secret regarding network analysis software

*Commonwealth of MA v. Ellis*
consultant to defendant; testified in evidentiary hearing
criminal case; issues involving electronic search and seizure

*Boron LePore & Associates Inc., v. DigiNet LLC, Miller, Freed, Crooks, Wood and Lilley*
Sole arbitrator in binding arbitration.


Davis Exhibit B

B–3

Trade secret regarding meeting planning software

*Computer Sciences Corp et al. v Policy Management Systems Corp et al.*
Expert witness for defendant; testified in arbitration hearing
Trade secret concerning software for analysis of bodily injury insurance claims

Excelergy Corporation v. OPG EBT Holdco Inc., and EBT Express
consultant to plaintiff
copyright and reverse engineering of software for the electric power industry
settled

*IMS Health, Inc. v. Vality Technology, Inc.*
consultant to plaintiff; deposed; case settled
copyright and trade secret regarding database cleaning software

GUS v Boaz et al., *Case No. H-01-1674*
consultant to defendant
copyright regarding freight forwarding software

Norwest Corporation v. IRS Commissioner
expert witness for IRS, testified
research and experimentation tax credit for software

*LinkCo v. Fujitsu*, 00 Civ 7242 (SAS)
expert witness for defendant, deposed, testified at trial
trade secret issues in investor relations/corporate disclosure software

*Florida Power and Light v IRS Commissioner*, Docket No. 5271-96
consultant to IRS; case settled
research and experimentation tax credit for software

*Amadeus Global Travel v. Orbitz, LLC et al.*, C.A. No. 02-1542-SLR
consultant to defendant; case settled
software for the travel industry

*J. D. Edwards World Solutions Company, et al., v. Mayer Electric Supply Company*
AAA Case 30-181-0018403
consultant to plaintiff; testified at arbitration
supply chain management software

*Nastel Technologies, Inc., v. BMC Software, Inc.*, AAA Case 70-117-00306-01
consultant to plaintiff; deposed, testified at arbitration
copyright regarding middleware

*The SCO Group, Inc, v. International Business Machines*, 2:03CV0294 DAK (Utah)
expert for defendant; ongoing

Davis Exhibit B                                                                    B–4

copyright regarding operating systems

## Intellectual Property Publications

Davis R, The Digital Dilemma, *Communications of the ACM*, February, 2001, pp.77-83. Overview of the report cited below.

Davis R, et al, *The Digital Dilemma: Intellectual Property in the Information Age*, National Academy Press, Washington DC, 2000.
A 340-page report and study prepared for the National Academy of Science's Computer Science and Telecommunications Board. I served as chair of the committee that produced the report.

Samuelson P, Davis R, Kapor M, Reichman J, A Manifesto Concerning the Legal Protection of Computer Programs, *Columbia Law Review*, Vol 94, December 1994, pp.1401-1524.

Davis R, The nature of software and its consequences for establishing and evaluating similarity, *Software Law Journal*, V:299-330, April 1992.

Davis R, Viewing Intellectual Property as Design, *Chemical Design Automation News*, Vol. 6, Number 6 (Part I) and Vol. 6, Number 7 (Part II), June 1991.

Davis R, Intellectual Property and Software: The Assumptions are Broken, *Proceedings of the World Intellectual Property Organization Worldwide Symposium on the Intellectual Property Aspects of AI*, pp.101-119, March 1991, Stanford, CA

**Technical Publications**

### 1. Books

Davis R, and Lenat D B, *Knowledge-based Systems in Artificial Intelligence,* McGraw-Hill, 1982.
  English reprint in Taiwan, 1984.
  Japanese language edition, 1992.

Davis R, et al., *The Digital Dilemma: Intellectual Property in the Information Age,* National
  Academy Press, 2000.

### 2. Papers in Refereed Journals

1.  King A, and Davis R, The Curious Bands of Talbot, Amer J *Physics* **139**:1195-1198, Oct
    1971.
    This paper reported work done as a senior thesis while an undergraduate at Dartmouth.

2.  Shortliffe E H, Davis R, Axline S, Buchanan B G, and Cohen S, "Computer-Based
    Consultations in Clinical Therapeutics: Explanation and Rule Acquisition Capabilities of the
    MYCIN System," *Comp and Biomed Research*, **18**:303-320, August 1975.
    **Reprinted in:**
    *Cognitive Science,* Sheehy and Chapman (eds.), Edward Elgar Publishing Ltd, 1994.

3.  Wraith S, Aikins J, Buchanan B, Clancey W, Davis R, Fagan L, Hannigan W, Scott A,
    Shortliffe E, vanMelle W, Yu V, Axline S, and Cohen S.,"Computerized Consultation
    System for Selection of Antimicrobial Therapy," *American Journal of Hospital Pharmacy,*
    **33**:1304-1308, December 1976.

4.  Scott A C, Clancey W, Davis R, and Shortliffe, E H, Explanation "Capabilities of Rule-Based
    Consultation Systems" *Am Jnl of Computational Linguistics*, Microfiche 62, 1977.
    **Reprinted in:**
    *Rule-Based Expert Systems*, Shortliffe & Buchanan(eds.), Addison Wesley, 1984.

5.  Davis R, Buchanan B G, and Shortliffe E H, "Production Rules as a Representation in a
    Knowledge-based Consultation System," Artificial Intelligence, **8**:15-45, February 1977.
    **Reprinted in:**
    *Context-Directed Pattern Recognition and Machine Intelligence Techniques,*Pao & Ernst,
    eds., IEEE Press, 1982.
    *Readings in Medical AI,* Clancey & Shortliffe (eds.), Addison Wesley, 1984.*Readings in
    Knowledge Representation,* Brachman & Levesque, eds., 1985.
    *Computer-Assisted Medical Decision Making,* (Vol 2), Reggia & Tuhrim (eds.), Springer-
    Verlag, 1985.

6.  Yu V, Shortliffe S, Wraith S, Davis R, Scott A, Buchanan B, Axline S, and Cohen S,
    "Evaluating the Performance of a Computer-Based Consultant," *Computer Programs in
    Biomedicine,* **9**:95-102, 1979.

7.  Davis R, "Interactive Transfer of Expertise: Acquisition of New Inference Rules," *Artificial
    Intelligence,* **12**:121-157, 1979.

Davis Exhibit B                                                                              B–7

**Reprinted in:**
*Readings in Artificial Intelligence,* Webber & Nilsson, eds., Tioga Press. *Rule-Based Expert Systems* Shortliffe & Buchanan (eds.), Addison Wesley, 1984.

8. Davis R, "Meta-rules: Reasoning about Control," *Artificial Intelligence,* **15**:179-222, 1980.
   **Reprinted in:**
   *Comtex Scientific Database,* four different subject-based collections.

9. Davis R, "Content-reference: Reasoning about Rules," *Artificial Intelligence,* **15**:223-240, 1980.

10. Smith R G, Davis R, "Frameworks for Cooperation in Distributed Problem-Solving," IEEE Transactions on SMC, pp. 61-70, January 1981.
    **Reprinted in:**
    *Readings in Distributed AI,* Bond & Gasser (eds.), Morgan Kaufman Pub.

11. Davis R, Smith R G, "Negotiation as a Metaphor for Distributed Problem-Solving *Artificial Intelligence,* **20**:63-109, 1983
    **Reprinted in:**
    *Readings in Distributed AI,* Bond & Gasser (eds.), Morgan Kaufman Pub.

12. Davis R, "Reasoning from First Principles in Electronic Troubleshooting," *Intl Jnl Man-Machine Studies,* **19**:403-423, 1983.
    **Reprinted in:**
    Developments in Expert Systems, Coomb (ed.), Academic Press, 1984.

13. Davis R, Shrobe H E, "Representing Structure and Behavior of Digital Hardware," *IEEE Computer,* Special Issue on Knowledge Representation, pp. 75-82, Oct 1983.

14. Davis R, "Diagnostic Reasoning Based on Structure and Behavior," *Artificial Intelligence,* 24:347-410, December 1984.
    **Reprinted in:**
    *Qualitative Reasoning About Physical Systems,* Bobrow (ed.), North Holland, 1984.*Tutorial:* VLSI Testing &Validation Techniques, Reghbati (ed.), IEEE Computer Society Press, 1985.*Building Blocks of AI,* Feigenbaum (ed.), Addison Wesley, to appear.

14. Davis R, "Knowledge-Based Systems," Science," **231**:957-963, 28 February 1986.

15. Davis R (ed.), "Expert Systems: How Far Can They Go," *AI Magazine,* Part I—**10**:1, Spring 1989, pp61--68; Part II—**10**:2, Summer 1989, pp. 365–78.

16. Buchanan B, Bobrow D, Davis R, McDermott J, Shortliffe E, Knowledge-based systems, *Advances in Computer Science 1989,* J. Traub (eb.), volume 4, pp. 395–416, Annual Reviews Inc., Palo Alto, CA.

17. Davis R, "A Tale of Two Knowledge Servers," *AI Magazine,*12:3, Fall 1991, pp. 118-120.
    **Reprinted in:**
    *Nikkei AI,* 1991 (Japanese translation)

18. Davis R, Shrobe H, Szolovits P, "What is a Knowledge Representation," *AI Magazine,* 14, #1, Spring 1993, pp. 17–33.

20. Davis R, "Retrospective on `Diagnostic reasoning based on structure and behavior," *Artificial Intelligence,* 59(1993)139–157.

21. Davis R, Buchanan B, Shortliffe E, "Retrospective on 'Production rules as a representation for a knowledge-based consultation program'," *Artificial Intelligence,* 59(1993)181–189.

22. Trice A, Davis R, Heuristics for reconciling independent knowledge bases, *Information Systems Research,* Vol 4, #3, pp. 262–288, September 1993.

23. Stahovich T, Davis R, Shrobe H, Generating multiple new designs from a sketch, *Artificial Intelligence* (104)1-2 (1998) pp. 211-264.

24. Stahovich T, Davis R, Shrobe H, Qualitative Rigid Body Mechanics, *Artificial Intelligence* (119) 2000 pp. 19-60

### 3. Proceedings of Refereed Conferences

1. Davis R, "Knowledge Acquisition in Rule-Based Systems: Knowledge about Representations as a Basis for System Construction and Maintenance," Proceedings of Workshop on Pattern-directed Inference Systems, published as *Pattern Directed Inference Systems,* Waterman & Hayes-Roth (Eds), Academic Press, 1978, pp. 99-134.
   **Reprinted in:**
   Context-Directed Pattern Recognition and Machine Intelligence Techniques, Pao & Ernst, (eds.) IEEE Press., 1982.

2. Davis R, "Interactive Transfer of Expertise: Acquisition of New Inference Rules," *Proc 5th IJCAI,* pp. 321-328, August 1977.

3. Davis R, Buchanan B G, "Meta-level Knowledge: Overview and Applications," *Proc 5th IJCAI,* pp. 920-928, August 1977.
   **Reprinted in:**
   *Rule-Based Expert Systems,* Shortliffe & Buchanan (eds.), Addison Wesley, 1984.*Readings in Knowledge Representation,* Brachman & Levesque, (eds.), 1985.

4. Davis R, "Generalized Procedure Calling and Content-Directed Invocation,"*Proceedings of Symposium on Artificial Intelligence and Programming Languages,* SIGART--SIGPLAN combined issue, pp. 45-54, August 1977.
   **Reprinted in:**
   *Comtex Scientific Database*

5. Davis R, "A Decision Support System for Medical Diagnosis and Therapy Selection," *Proc of Conf on Decision Support Systems,* appearing as Data Base (SIGBDP Newsletter), **8**:58-72, Winter 1977.
   **Reprinted in:**
   *Comtex Scientific Database*

6. Buchanan B G, Davis R, Yu V, Cohen S N, "Rule-Based Medical Decision Making by Computer," *Proc MEDINFO,* 1977.

Davis Exhibit B

7.  Smith R G, Davis R, "Distributed Problem Solving: The Contract Net Approach," Proc of the 2nd Nat'l Conf of the Canadian Soc for Computatnl Studies of Intelligence, pp. 278-287, July 1978.

8.  Smith R G, Davis R, "Cooperation in Distributed Problem Solving," *Proc of the IEEE Int'l Conf on Cybernetics and Society,* pp. 366-371, October 1979.

9.  Davis R, "Dealing with Uncertainty Chairman's abstract for invited panel," *Proc 6th IJCAI,* pp. 1101-1102, August 1979.

10.  Davis R, Austin H, Carlbom I, Frawley B, Prucknik P, Sneiderman R, Gilreath J A, "The Dipmeter Advisor: Intepretation of Geological Signals," *Proc 7th IJCAI,*    Vancouver, Canada, pp. 846-849, 1981.

11.  Davis R, Shrobe H, Hamscher W, Wieckert K, Shirley M, Polit S, "Diagnosis Based on Structure and Function," *Proc AAAI-82,* Pittsburgh, PA, pp. 137-142, August 1982.
     **Reprinted in:**
     *Artificial Intelligence in Maintenance,* J. Richardson (ed.), Noyes Publications, Park Ridge, NJ, 1985.

12.  Dove W, Meyers C, Oppenheim A, Davis R, Kopec G, "Knowledge Based Pitch Detection," *Proc ICASSP-83,* pp. 1348-1351, April 1983.

13.  Simmons R, Davis R, "Representing and Reasoning about Change," *Proc. ACM SIGART Conference on Motion: Representation and Perception,* Toronto, April 1983.

14.  Shirley M, Davis R, "Generating Distinguishing Tests from Hierarchical Models and Symptom Information," *Proc. IEEE Int'l Conf on Computer Design,* Oct 1983.

15.  Davis R, "Diagnosis via Causal Reasoning: Paths of Interaction and the Locality Principle," Proc AAAI-83, pp. 88-94. August 1983. Nominated as Best Paper of the conference.
     **Reprinted in:**
     *Artificial Intelligence in Maintenance,* J. Richardson (ed.), Noyes Publications, Park Ridge, NJ, 1985. Qualitative Reasoning About Physical Systems, Weld and deKleer (eds.), Morgan Kaufman, San Mateo, CA, 1990.

16.  Hamscher W, Davis R, "Diagnosing Circuits with State: An Inherently Underconstrained Problem," Proc AAAI-84, pp. 142-147, August 1984.

17.  Davis R, "Expert Systems: What To Do Until the Theory Arrives," *Proc IJCAI-85,* pp. 1306-1307, August 1985.

18.  Davis R, "Robustness and Transparency in Intelligent Systems in National Academy of Sciences report:," *Human Factors in Automated and Robotic Space Systems,* pp. 211-233, February, 1987.
     **Reprinted in:**
     *Proceedings of Third Australian Conference on Applications of Expert Systems,* pp. 143-164, New South Wales Institute of Technology, Sydney, Australia, May 1987.

19. Shirley M H, Wu P, Davis R, Robinson G, "A Synergistic Combination of Test IEEE Generation and Design for Testability," *Proceedings 1987 International Test Conference,* Computer Society Press, September 1987, pp. 701-711.

20. Simmons R G , Davis R, "Generate, Test, and Debug: Combining Associational Rules and Causal Models in," Proc IJCAI--87, Morgan Kaufman Pub, August 1987, pp. 1071-1078.

21. vanBaalen J and Davis R, "Overview of an approach to representation design," *Proc AAAI-88,* August 1988, pp. 392-397.

22. Davis R, Form and Content in Model-Based Reasoning, Proceedings IJCAI-89 Workshop on Model-Based Reasoning, August 1989.

23. Davis R, Viewing Intellectual Property as Design, *Chemical Design Automation News,* Vol. 6, Number 6 (Part I) and Vol. 6, Number 7 (Part II), June 1991.

24. Trice, A, and Davis, R, "Consensus Knowledge Acquisition," *Proc 6th Banff Knowledge Acquisition for Knowledge-Based Systems Workshop,* pp. 33.1-33.20. (Available through SRDG Publications, Dept. of Computer Science, University of Calgary, Calgary, Alberta, Canada, T2N 1N4)

26. Davis R, Resnick P, "Multiple dimensions of generalization in model-based troubleshooting," *Proc AAAI-93,* July 1993, pp. 160--166.

27. Stahovich T, Davis R, Shrobe H, "Turning skeches into working geometry," Seventh International ASME Conference on Design Theory and Methodology, DE- Vol 93, 1995, pp. 603--610.

28. Stahovich T, Davis R, Shrobe H, Generating multiple designs from a single sketch, *Proc AAAI-96*

29. Christine Alvarado and Randall Davis. Preserving the Freedom of Sketching to Create a Natural Computer-Based Sketch Tool. In Human Computer Interaction International Proceedings. 2001.

30. Christine Alvarado and Randall Davis. Resolving Ambiguities to Create a Natural Sketch Based Interface. In Proceedings. of IJCAI-2001. August 2001.

31. Mark Foltz and Randall Davis. Query By Attention: Visually Searchable Information Maps. In Proceedings of Fifth International Conference on Information Visualization (InfoVis 2001). 2001.

32. Michael Oltmans and Randall Davis. Naturally Conveyed Explanations of Device Behavior. In Workshop on Perceptive User Interfaces. 2001.

33. Tevfik Metin Sezgin, Thomas Stahovich, and Randall Davis. Sketch Based Interfaces: Early Processing for Sketch Understanding. Workshop on Perceptive User Interfaces, Orlando FL. 2001.

34. Tracy Hammond and Randall Davis. Tahuti: A Geometrical Sketch Recognition System for UML Class Diagrams. AAAI Spring Symposium on Sketch Understanding, pp.59-68. Stanford, California, March 25-27 2002.

35. Christine Alvarado, Michael Oltmans, and Randall Davis. A Framework for Multi-Domain Sketch Recognition. AAAI Spring Symposium on Sketch Understanding, pp.1-8. Stanford, California, March 25-27 2002.

36. Randall Davis. Sketch Understanding in Design: Overview of Work at the MIT AI Lab. Sketch Understanding, Papers from the 2002 AAAI Spring Symposium, pp.24-31. Stanford, California, March 25-27 2002.

37. Tracy Hammond, Krzysztof Gajos, Randall Davis, and Howard Shrobe. An Agent-Based System For Capturing and Indexing Software Design Meetings. In Proceedings of International Workshop on Agents In Design, WAID'02. 2002.

38. Jacob Eisenstein and Randall Davis. Natural Gesture in Descriptive Monologues. In Supplementary Proceedings of the ACM Symposium on User Interface Software and Techology (UIST'03), pp.69-70. New York, New York, November 2-5 2003.

39. Tracy Hammond and Randall Davis. LADDER: A Language to Describe Drawing, Display, and Editing in Sketch Recognition. Proceedings of the 2003 Internaltional Joint Conference on Artificial Intelligence (IJCAI). Acapulco, Mexico, 2003

40. Jacob Eisenstein and Randall Davis. Visual and Linguistic Information in Gesture Classification. In International Conference on Multimodal Interfaces (ICMI'04), pp.113-120. New York, New York, October 14-15 2004.

41. Tracy Hammond and Randall Davis. Automatically Transforming Symbolic Shape Descriptions for Use in Sketch Recognition. Proceedings of the Nineteenth National Conference on Artificial Intelligence (AAAI-04). San Jose, CA, 2004.

42. Tracy Hammond and Randall Davis. Shady: A Shape Description Debugger for Use in Sketch Recognition. AAAI Fall Symposium on Making Pen-Based Interaction Intelligent and Natural. 2004.

43. Michael Oltmans, Christine Alvarado, and Randall Davis. ETCHA Sketches: Lessons Learned from Collecting Sketch Data. In Making Pen-Based Interaction Intelligent and Natural. 2004.

44. Tevfik Metin Sezgin and Randall Davis. Handling Overtraced Strokes in Hand-Drawn Sketches. In Making Pen-Based Interaction Intelligent and Natural. 2004.

45. Tevfik Metin Sezgin and Randall Davis. Scale-space Based Feature Point Detection for Digital Ink. In Making Pen-Based Interaction Intelligent and Natural. 2004.

46. Olya Veselova and Randall Davis. Perceptually Based Learning of Shape Descriptions. Proceedings of the Nineteenth National Conference on Artificial Intelligence (AAAI-04). San Jose, CA, 2004.

Davis Exhibit B

47. Christine Alvarado and Randall Davis. SketchREAD: A Multi-Domain Sketch Recognition Engine. In Proceedings of UIST 2004. 2004.

48. Sonya Cates and Randall Davis. New Approach to Early Sketch Processing. In Making Pen-Based Interaction Intelligent and Natural, pp.29-34. Menlo Park, California, October 21-24 2004.

49. Aaron Adler, Jacob Eisenstein, Michael Oltmans, Lisa Guttentag, and Randall Davis. Building the Design Studio of the Future. In Making Pen-Based Interaction Intelligent and Natural, pp.1-7. Menlo Park, California, October 21-24 2004.

50. Aaron Adler and Randall Davis. Speech and Sketching for Multimodal Design. In Proceedings of the 9th International Conference on Intelligent User Interfaces, pp.214--216. 2004.

51. Christine Alvarado and Randall Davis. Dynamically Constructed Bayes Nets for Multi-Domain Sketch Understanding. In Proceedings of IJCAI-05. 2005.

52. Tevfik Metin Sezgin and Randall Davis. HMM-Based Efficient Sketch Recognition. In Proceedings of the International Conference on Intelligent User Interfaces (IUI'05), pp.www. New York, New York, January 9-12 2005.

Davis Exhibit B

**EXHIBIT C**

**MATERIALS EXAMINED**

In addition to the documents explicitly cited in the body of the report, I also examined:

- The '164 patent application and other information contained in the file history.

- *Proceedings of the Innovative Applications of AI* for several years.

- Buchanan and Shortliffe, *Rule-Based Expert Systems*, Addison-Wesley, 1984.

- Clancey and Shortliffe, *Readings in Medical Artificial Intelligence: The First Decade*, Addison-Wesley, 1984.

- Davis R, Knowledge-Based Systems, *Science, 231:*957-963, Feb 28, 1986.

- Documents detailing Advanced Medlogic Systems from The Health Data Institute, including (1) a marketing pamphlet, entitled "Setting a New Standard," (2) an extract from a June 1986 HDI document, entitled "Claim Level Edits," (3) a letter from a Senior Scientist at HDI, written May 28, 1987, following up on a marketing call to the Health Claims Division of State Farm Insurance, and (4) an AMS Product Overview, dated May 1986.

I considered prior art references known to me from my experience in the expert system field and prior art references uncovered through my own investigation. These references are cited in the body of the report.

I also considered prior art references from among a large collection of publications related to the subject matter of the '164 patent, which collection is listed below:

| Author, Title & Source |
|---|
| Marva J. Crouff, *Automating Claims Processing, Insurance Software Review*, Autumn 1988, pp. 52, 54. |
| *Enhancing Accuracy and Timeliness is Integral to the Claims Adjudication Process*, Employee. Benefit Plan Review, Anonymous, Dec. 1985, pp. 10-12. |
| Healthstar, Health Benefits Management System, Product Description, v. 1.024 (Insurance Software Packages, Inc.). |
| *System validates medical fee schedules*, Best Review: Life/Health, June 1987, 92 [Insurance Software Packages, Inc. Medical C Schedule and Audit System]. |
| *Expert System identifies miscoded health claims*, Bests Review: Life/Health, November 1990, 60. |
| *Claims editing software runs coding rule checks*, Bests Review: Life/Health, November 1990, 62. |

| Author, Title & Source |
| --- |
| Woolsey, C., *Employer spots inflated medical bills*, Business Insurance, June 25, 1990, 3. |
| Weitzel, J.R., et al., *A Company / University Joint Venture to build a knowledge-based system*, MIS Quarterly, Vol. 12, No. 1, March 1988, 23-34 |
| Leary, E., *SSA applies expertise to develop expert systems (Spotlight on AI-expert systems, Social Security Administration)*, Government Computer News, Vol. 6, No. 17, August 28, 1987, 49(3). |
| Beard, P., *Blue Cross develops insurance claim ES*, AIWeek, Vol. 6, No. 7, April 1, 1989, 3. |
| Sullivan-Trainor, M., *Catching new clients*, Computerworld, Vol. 21, No. 50, December 14, 1987, 95, 99. |
| Snyeder, C., *From research to reality: the leading edge of expert systems*, Insurance Software Review, Vol. 12, No. 3, Autumn 1987, 22-4, 26-7, 30 |
| Christensen, J., *Insuring*, High Technology Business, Vol. 8, No. 10, October 1988, 47-8. |
| *Expert Systems In the Insurance Industry: 1987 Survey Report Update*, Coopers and Lybrand, 1987. |
| Pallatto, J., *Expert system cures the blues (Blue Cross develops insurance claims analysis system NERSys)*, PC Week, Vol. 5, No. 50, December 12, 1988, 35, 44. |
| Gladwell, Malcolm, *Computer Firm Finds the Link for Health Care*, Washington Business, December 5, 1988, 5-6. |
| Kerschberg, L. "A Proposal for the Development of an Expert System for Medical Claims Processing: MEDCLAIM," Institute of Information Management, Technology and Policy, College of Business Administration, University of South Carolina, Columbia, SC, (July 1985). |
| Weitzel, J.R. and Kerschberg, L., "Developing Knowledge- Based Systems: Reorganizing the System Development Life Cycle," working paper, University of South Carolina, Columbia, SC and George Mason University, Fairfax, VA (December 1986). Final Publication, April 1989 in Communications of the ACM, Vol. 32, No. 4. |
| Ronald Hurst, *Cost Containment - The Caterpillar Experience*, The Psychiatric Hospital, Vol. 13, No. 3 (1982). |
| Egdahl, M.D. and Hertenstein, M.D., *An Access-oriented Negotiated Fee Schedule: The Caterpillar Experience*, Ann Surg., 206(3), pp. 349-57 (Sept. 1987). |
| Bauer JW, Cassidy TG, DeBord JR, Hart RD, Lee RH, Maher JE, Montgomery CE, Neufeld GK, Rivan RJ, Soderstrom CW, et al., Related Articles, *An access-oriented negotiated fee schedule: the Caterpillar experience*, Ann Surg., 208(5), pp. 667-8 (Nov. 1988). |
| Waterman, Donald A. (The Rand Corporation), *A Guide to Expert Systems*, Addison Wesley Publishing, Inc. (1985). |
| McDermott, John, *Artificial Intelligence Applications for Business: Building Expert Systems*, Proceedings of the NYU Symposium (May 1983). |

Davis Exhibit C

C-2

| Author, Title & Source |
| --- |
| Gerson, Elihu and Star, Susan Leigh, *Analyzing Due Process in the Workplace*, ACM Transactions on Office Information systems, Vol. 4, No. 3 (July 1986). |
| Hayes-Roth, Frederick, *et. al., Building Expert Systems: An Overview of Expert Systems*, Addison-Wesley Publishing, Inc. (1985). |
| Taylor, Edward, *Developing A Knowledge Engineering Capability in the TRW Defense Systems Group*, The AI Magazine (Summer 1985). |
| Bobrow, Daniel, *et. al., Expert Systems: Perils and Promise*, Computing Practices, Communications of the ACM, Vol. 29, No. 9 (Sept. 1986). |
| Bhide, Amar and Mohan, Brian, *Marcia Radosevich and Health Payment Review: 1989(A)*, Harvard Business School, 9-394-204 (Feb. 1999). |
| Genesereth, Michael, Ginsberg, Matthew, *Logic Programming*, Communications of the ACM, Vol. 28, No. 9 (Sept. 1985). |
| Yasdi, Ramin, *Modeling Database Based Expert Systems at the Conceptual Level*, Proceedings of the 1985 ACM Computer Science Conference (March 1985). |
| Freudenheim, Milt, *Insurers vs. Doctors: A Software Battleground*, New York Times (Nov. 15, 1989). |
| Riordan, Teresa, Patents: *A software-technology infringement case against Microsoft goes to trial in Federal Court*, New York Times (Jan. 24, 1994). |
| Colmerauer, Alain, *Prolog in 10 Figures*, Communications of the ACM, Vol. 28, No. 12 (Dec. 1985). |
| Hayes-Roth, Frederick, *Rule-Based Systems*, Communications of the ACM, Vol. 28, No. 9 (Sept. 1985). |
| Weitzel, J.R. and Kerschberg, L. *A System Development Methodology for Knowledge Based Systems*, IEEE Transactions on Systems, Man and Cybernetics, Vol. 19, No. 3 (May/June 1989). |
| Winston,, Patrick H., Prendergast, Karen A., *The AI Business: The Commercial Uses of Artificial Intelligence*, The MIT Press (1984). |
| Mack, Barbara, *A Prescription for Cutting Corporate Health Expenses*, Wall Street Journal (Jul. 18, 1983). |
| U.S. Pat. No. 4,591,983 (Bennett patent) |
| U.S. Pat. No. 4,667,292 (Mohlenbrock patent) |
| U.S. Pat. No. 5,018,067 (Mohlenbrock 2 patent) |
| U.S. Pat. No. 5,070,452 (Doyle patent) |
| U.S. Pat. No. 4,858,121 (Barber patent) |
| U.S. Pat. No. 4,658,370 (Erman patent) |
| U.S. Pat. No. 4,803,641 (Hardy patent) |

Davis Exhibit C

C-3

| Author, Title & Source |
| --- |
| Turner JM, *DRG compliance measurement in the future*, Software in Healthcare, August-September 1985, Vol. 3 (4), p. 48. |
| Mohlenbrock WC, *Getting the most out of DRG 's*, Group Practice Journal, September October 1985, Vol. 34 (5), pp. 27-32. |
| Gibbons PS, Pishotta FT, Stepto RC, *A system for reporting gynecologic procedures. A linguistic-logical approach*, Journal of Reproductive Medicine, March 1983, Vol. 28 (3), pp. 201-5 |
| Studney DR, Hakstian AR, *Effect of a computerized ambulatory medical record system on the validity of claims data*, Medical Care, April 1983, Vol. 21 (4), pp. 463-7. |
| Poulson GP, *Detailed costing system nets efficiency*, savings, Hospitals, October 1, 1984, Vol. 58 (19), pp. 106-8, 111. |
| *Medical coding*, Medical Record and Health Care Information Journal, February 1988, Vol. 29 (1), pp. 20-2. |
| Johnson KF, *Integrated system brings hospital data together*, Health Progress, October 1987, Vol. 68 (8), pp. 46-9, 82. |
| Tauber J, Lahav M, *Simplified diagnostic coding sheet for computerized data storage and analysis in ophthalmology*, Ophthalmic Surgery, November 1987, Vol. 18 (11), pp. 846-9 |
| Miller KM, Wisnicki HJ, Buchman JP. Riley MJ, Repka MX, Taylor HR, Guyton DL, *The Wilmer Information System. A classification and retrieval system for information on diagnosis and therapy in ophthalmology*, Ophthalmology, March 1988, Vol. 95 (3), pp. 403-9 |
| Carter K, *PCs can tap databanks for costs*, Modern Healthcare, June 20 1986, Vol. 16 (13), p. 52. |
| Ohnsson J, *GMIS (Gabrieli Medication Information Systems) software flags inappropriate billings, medical procedures*, Contract Healthcare, May 1988, pp. 28-9. |
| Cimino JJ, *Review paper: coding systems in health care*, Methods of Information in Medicine, December 1996, Vol. 35 (4-5), pp. 273-84. |
| Gabrieli ER, Speth DJ, Casiraghi E, *Knowledge bases*, Journal of Clinical Computing, 1985, Vol. 13 (5), pp. 150-4. |
| Gabrieli ER, Saumby JA, *Computer-based coding of medical data*, Topics in Health Record Management, March 1982, Vol. 2 (3), pp. 51-9. |
| Ely RM, *Savings through claims audits*, Topics in Health Care Financing, Summer 1986, Vol. 12 (4), pp. 61-7. |
| U.S. Pat. No. 4,347,568 (Giguere patent) |
| U.S. Pat. No. 4,491,725 (Pritchard patent) |
| U.S. Pat. No. 4,730,259 (Gallant patent) |
| U.S. Pat. No. 4,839,822 (Dormond patent) |
| U.S. Pat. No. 4,937,743 (Rassman patent) |

Davis Exhibit C

C-5

| Author, Title & Source |
| --- |
| U.S. Pat. No. 4,975,840 (De Tore patent) |
| U.S. Pat. No. 4,991,091 (Allen patent) |
| Buchanan Bruce G., *Expert Systems*, Journal of Automated Reasoning, Vol. 1, No. 1, 1985, pp. 28-35. |
| Hao Kuo, *MEDCLAIM: An Expert Support System for Medical Claims Review*, Thesis Submitted in Department of Computer Science, University of South Carolina (1986). |
| Horn SD,. Horn RA., *The computerized severity index: a new tool for case-mix management*, J Med Syst, February 1986, Vol. 10 (10), pp. 73-78. |
| Cebrian, Gil et al, *APACHE II*, Intensive Care med., 1987, Vol. 13 (2), p. 143. |
| Robinson, ML, *Hospitals look to "severity of illness" indexes*, Healthspan, June 1986, Vol. 3 (6), pp. 19-22. |
| Nestler, WB et al, *Case-mix reimbursement and clinical management....*, Ind Health Care (Cambridge Ma), 1985, Vol. 2, pp. 117-130. |
| Bates, SW et al, *Case mix management systems*, Mich. Hosp., August 1984, Vol. 20 (8), pp. 24-29. |
| Zak, EJ et al; *Financial modeling: an administrative tool of the highest. ..*, Computers in Healthcare, June 1984, Vol. 5(6), pp. 24-26. |
| Huhn, C et al, *Evaluating the new case-mix systems: a systematic approach*, Hospitals, January 1984, Vo. 58 (2), pp. 92, 94, 96. |
| Lewis, J et al, *Development of a case mix information system*, Computers in Healthcare, February 1983, Vol. 4 (2), pp. 36-41 |
| Shaffer, VM, *Case mix analysis*, Osteopathic hospital leadership, September-October 1985, pp. 8-9. |
| Braithwaite, WR, *The effect of Medicare legislation on medical records system*, Software in Healthcare, August-September 1985, Vol. 3 (4), pp. 26-27. |
| Myers, TF et al, *A modification of the international classification of diseases for uniform...* , AM J Perinatol, July 1985, Vol. 2 (3), pp. 240-241. |
| Barnard, C., *How to select and implement case-mix (product-line analysis). ..*, Hosp. Forum, January – February, 1985 Vol. 28 (1), pp. 25-30. |
| Jones, R, *Case-mix and computers: there's a micro-mainframe connection. ..*, Computers in Healthcare, October 1984, Vol. 5 (10), pp. 36-39. |
| Jones, R., *Case-mix and computers: there's a micro-mainframe connection...* , Computers in Healthcare, August 1984, Vol. 5 (8), pp. 44-45. |
| Schumacher, DN, *A practical guide to reviewing case mix financial date*, The Hospital Medical Staff, August 1984, Vol. 13 (8), p. 170. |

Davis Exhibit C

C-6

| Author, Title & Source |
| --- |
| Jones, R., *Case-mix and computers. Part one: a look at computer delivery. ..*, Computers in Healthcare, June 1984, Vol. 5 (5), pp. 42-45. |
| Jaggar, FM et al, *A PPS essential: case-mix management systems*, Hospitals, May 1, 1984, Vol. 58 (9), pp. 71-76. |
| Dorenfest SI, *Computers can figure out DRGs, if you can figure out computer market*, Modern Healthcare, February 15, 1984, Vol. 14 (3), pp. 130, 134, 136 |
| Fedorowicz, J., *Will your computer meet your case-mix informational. ..*, Nurs Health Care, November 1983, Vol. 4 (9), pp. 493-497. |
| Fedorowicz, J., *Hospital information systems: are we ready for case mix applications*, Health Care Manage Rev., Fall 1983, Vol. 8 (4), pp. 33-41. |
| Gillette, PE., *Hospital information systems: computer must rack patient costs*, Modern Healthcare, September 1983, Vol. 13 (9), pp. 154, 156, 158. |
| Nathanson, M., *Hospital information systems: computers crank out DRG...* , Modern Healthcare, September 19833, Vol. 13, (9), pp. 160, 162, 164. |
| McLaughlin, DB et al., *Personal computers provide advantages and frustrations...* , Hospitals, July 1983, Vol. 57 (14), p. 94. |
| Barnard, C., *System strategies for case mix*, Computers in Healthcare, June 1983, Vol., 4 (6), pp. 28-32. |
| Mitchell WA., *An automated APACHE II scoring system*, Intensive care nursing, 1987, Vol. 3 (1), pp. 14-18. |
| Packer, CL., *Automation in the medical records department*, Hospitals, March 1, 1985, Vol. 59 (5), pp. 100, 102, 104. |
| Kramer, DJ., *Medicare billing goes electronic*, Software in Healthcare, February March 1986, Vol. 5 (1), pp. 31-32. |
| Gardner, E., *Coding changes delay reimbursement*, Modem Healthcare, December 4, 1987, Vol. 17 (25), p. 11. |
| King, M., *How can case mix work for long-term care providers*, Contemporary Longterm Care, November 1988, Vol. 11 (11), pp. 48, 50. |
| Couch, JB., *Assessing medical care on the basis of its value*, Physician executive, July August 1987, Vol. 13 (4), pp. 7-10. |
| Peterson, RN et al., *Congress to decide Medicare matters; final PPS rules. ..* , Health Law Vigil, September 20, 1985, Vol. 8 (19), pp. 6-8. |
| Terenzio J., *Preparing for the future today -product line management...* , Healthcare, Computing & communications, September 1985, Vol. 2 (9), pp. 56-58. |
| Sovie, MD et al., *Amalgam of nursing acuity*, DRGs and costs... , Nursing Management, March 1985, Vol. 16 (3), pp. 22-42. |

Davis Exhibit C

| Author, Title & Source |
| --- |
| Sleight, S. et al., *Addressing case mix management in the smaller hospital...*,  Computers in Healthcare, February 1985, Vol. 6 (2), pp. 22-24. |
| Nathanson, M., *Hospitals struggling to develop standards*, Modern Healthcare, September 1984, Vol. 14 (12), p. 140. |
| Llaurado, JG, *Computing disease severity: staging*, Int J Biomed Comput, July-August 1984, Vol. 15 (4), pp. 243-248. |
| Christensen, B., *"Staging" software measures severity of patient's illness*, Hospitals, May 1, 1984, Vol. 58 (9), pp. 45-46. |
| Dambro, MR et al., *An unsuccessful experience with computerized medical. ..*, Journal of Medical Education, August 1988, Vol. 63 (8), pp. 617-623. |
| Wheeler, JT, *Hospital's six-point program clears up financial picture*, Health Progress, July-August 1988, Vol. 69 (6), pp. 78-81 |
| DiMauro, ME, *Information systems for cost-effective management*, Topics in Health Care Financing, Winter 1987, Vol. 14 (2), pp. 28-34. |
| Dombi, WA, *Home care denials: computerization and Medicare home care appeals*, Caring: National Association for Home Care Magazine, June 1987, Vol. 6 (6), pp. 16, 19. |
| Crownover, KR, *Shrinking the demand of home care documentation*, Caring: National Association for Home Care Magazine, June 1987, Vol. 6 (6), pp. 20-22. |
| Sabin, P., *Hospital cost accounting and the new imperative*, Health Progress, May 1987, Vol. 68 (4), pp. 52-57. |
| Carter, K., *End of PIP will prompt hospitals to try software to speed billing*, Modern Healthcare, February 13, 1987, Vol. 17 (4), pp. 62, 64, 68 |
| Woodward, RS, *Teaching DRG reimbursement with VisiCalc.*, The Journal of Health Administration Education, Winter 1985, Vol. 3 (1), pp. 91-97. |
| Landais P. et al., *ARCANE. A new medical patient information system*, Medical Information=Medecine et informatique, April-June 1988, Vol. 13 (2), pp. 105-116. |
| Carter K., *New reimbursement for outpatient services will mean more...*, Modern Healthcare, August 28, 1987, Vol. 17 (18), p. 78. |
| None Listed, *Computerization in the medical record department at Pioneer Valley...*, J Am Med Rec Assoc, February 1985, Vol. 56 (2), pp. 42-43. |
| Gabrieli, ER, *Automated medical office records*, Journal of Medical Systems, February 1987, Vol. 11 (1), pp. 59-68. |
| Gabrieli, ER, et al., *Computerized discharge summaries: a new window...*, Journal of Clinical Computing, 1987, Vol. 16 (1-2), pp. 47-62. |
| Gabrieli, ER, et al., *Automated analysis of the discharge summary*, Journal of Clinical Computing, 1986, Vol. 15 (1), p. 128. |

Davis Exhibit C

| Author, Title & Source |
|---|
| Jap. Appl. No. 55-107352, entitled "Medical business system" (Yoshikuni App.) |
| U.S. Trademark No. 1,583,416 (ClaimCheck Mark) |
| U.S. Trademark No. 1,624,579 (CodeReview Mark) |
| U.S. Trademark No. 2,165,159 (Code Advisor Mark) |
| Stachura CT, *Software reference guide: case-mix management*, Journal of the American Medical Record Association [J Am Med Rec Assoc] February 1987, Vol. 58 (2), pp. 42-6. |
| Stachura CT, *Software reference guide: DRG assignment*, J Am Med Rec Assoc, January 1987, Vol. 58, (1), pp. 33-40 |
| Stachura CT, *Software reference guide: encoding*, J Am Med Rec Assoc, November 1986, Vol. 57 (11), pp. 25-8. |
| Wilkinson R, *Does your grouper 'over-maximize' reimbursement?*, Hospitals, October 20, 1986, Vol. 60 (20), p. 88. |
| Huertas-Cortocarrero D, Ruiz PP, Marmol JP, *Concurrent clinical review: using microcomputer-based DRG-software*, Health Policy 1988, Vol. 9 (2), pp, 211-7 |
| Nathanson M, *Medical records. Experts: more research needed to set value of code programs*, Modem Healthcare, June 21, 1985, Vol. 15 (13), pp. 98, 102. |
| Caterinicchio RP, *Implementing a DRG-driven acuity system for nurse staffing under prospective hospital payment*, Hospital Topics, May-June 1985, Vol. 63 (3), pp. 6-7, 13. |
| Jackson B, Jensen J, *Hospitals turn to new software, hardware to cope with DRG 's*, Modern Healthcare, September 1984, Vol. 14 (12), pp. 109-12. |
| Nathanson M, *New software helps hospitals watch costs, profit under DRG*, Modern Healthcare, September 1984, Vol. 14 (12), pp. 132, 136-8. |
| *DRG helper makes it easy for doctors to maximize reimbursement*, Hospital Forum, July-August 1984, Vol. 27 (4), pp. 62-3. |
| Burda D, *Health care market experiences grouper software explosion*, J Am Med Rec Assoc, May 1984, Vol. 55 (5), pp. 35-7. |
| *Health care executive's guidebook to automation in the 1980s: health care information systems and DRG's*, Hospital Forum, Jan-Feb 1984, Vol. 27 (1), pp. 23-30. |
| Gonnella JS, Hornbrook MC, Louis DZ, *Staging of disease. A case mix measurement*, Journal of the American Medical Association [JAMA], February 3, 1984, Vol. 251 (5), pp. 637 44 |
| Ray WJ, Johnstone J, *Using medical records to ensure fair DRG reimbursement*, Computer in Healthcare, December 1983, Vol. 4 (12), pp. 32-6, 40. |
| Heck S, Esmond T, *Financial modeling/case-mix analysis*, Computers in Healthcare, June 1983, Vol. 4 (6), pp. 50-1, 54. |
| Moliver M, *Computers and reimbursement*, Contemporary longterm care, April 1986, Vol. 9 (4), pp. 46-7. |

Davis Exhibit C

| Author, Title & Source |
|---|
| Gabrieli, ER, et al., *Standardization of medical informatics*, Journal of Clinical Computing, 1986, Vol. 14 (6), pp. 179-198. |
| Gabrieli, ER, et al., *A center for medical informatics; modern methods of information...*, Topics in Health Record Management, September 1985, Vol. 6 (1), pp. 12-15. |
| Gabrieli, ER, et al., *Cognitive processing for computerized new knowledge*, Journal of Clinical Computing, 1985, Vol. 13 (4), pp. 113-116. |
| Gabrieli, ER, et al., *Computer-based knowledge banks for clinical medicine*, Journal of Clinical Computing, 1983, Vol. 11 (5-6), pp. 195-200. |
| Gabrieli, ER, et al., *Computer-oriented coding of medical data*, Journal of Clinical Computing, 1981, Vol. 10 (1), pp. 1-18. |
| Gabrieli, ER, et al., *A proposal for a computer-based national medical information ....*, Journal of Clinical Computing, Vol. 10 (1), pp. 19-52. |
| Gabrieli, ER, et al., *Computer-oriented nomenclature, automated classification ....*, Journal of Clinical Computing, 1980, Vol. 9 (2), pp. 54-66. |
| Gabrieli, ER, *Medical information system, health records, and knowledge...* , Medical Instrumentation, July-August 1978, Vol. 12 (4), pp. 245-247. |
| Gabrieli, ER, *Computer-assisted assessment of patient care in the hospital*, Journal of Medical Systems. June 1988, Vol. 12 (3), pp. 135-146. |
| Bernier, RP, *Clinical evaluation: the next step in claims processing*, Best Rev Life Health Insur Ed, April 1986, Vol. 86 (12), pp. 106-110, 127 |
| Robinson, Michele L., *AHA voices concerns about HCFA's severity index*, Hospitals, October 5, 1988, p. 26. |
| Barnard, C., *Preparing for case-mix: the role of data processing*, Healthcare financial management: journal of the Healthcare Financial Management Association, June 1983, Vol. 37 (6), pp. 57-70. |
| McDermott, John, *R1: A Rule-Based Configurer of Computer Systems, Artificial Intelligence*, 1982, No. 19, pp. 39-88. |
| David Leinweber, *Knowledge-Based Systems for Financial Applications*, IEEE Expert, Fall 1988, pp. 18-31. |
| Fagan, Lawrence Marvin, *VM: Representing Time-Dependent Relations in a Medical Setting*, Ph.D Thesis Submitted at Stanford University (1980) |