# EXHIBIT C

1              UNITED STATES DISTRICT COURT

2            FOR THE DISTRICT OF DELAWARE

3

4

        MCKESSON INFORMATION        )

5        SOLUTIONS,              )

                          )

6              Plaintiff,      )

                          )

7        vs.                  ) No. 04-1258 SLR

                          )

8        THE TRIZETTO GROUP,       )

                          )

9              Defendant.       )

10

11

12

                    DEPOSITION OF

13

                  DAVID A. WILSON, Ph.D.

14

                  PALO ALTO, CALIFORNIA

15

              Wednesday, November 23, 2005

16

17

18

19

20

21

22

23

24        REPORTED BY:  JANE H. STULLER, CSR NO. 7223

25        (211471)

1        MR. SHEK:  Objection, vague and ambiguous.

2        THE WITNESS:  -- when I showed that the

3    interact database has fields for ACODE, BCODE and

4    CCODE in any case -- for example, as I enter

5    specific data into the database, I will then be

6    entering specific relationships between a specific

7    ACODE and a specific BCODE and a specific CCODE.

8    BY MR. SITZMAN:

9        Q.  Gotcha.  As you are entering the actual

10   hard data?

11       A.  Right.

12       Q.  Okay.  I gotcha.  And that will be the

13   medical service codes and the set of relationships

14   among them?

15       A.  Yes.

16       Q.  Okay.  And again, sorry to be repetitive.

17   But there is nothing in the '164 patent, in the

18   specification or in the claims, that specifies,

19   other than the examples, I think, that are in

20   Appendix A, that specifies what the codes and the

21   relationships of the codes are?

22       A.  There is nothing in the claims that

23   specifies a specific relationship between specific

24   codes.

25       Q.  Okay.  And there is nothing in the

1    that's a medical procedure.  Removing a disk drive

2    is not a medical procedure.

3        Q.  Okay.  What is the -- what if I told you

4    the dentistry, the world of dentistry has its own

5    set of codes.  They are not CPT codes.

6        A.  Yes, I know it does.

7        Q.  Okay.  Why is it that you believe that that

8    coding system is -- is embedded in and embodied in

9    the 165 patent, whereas other coding systems are

10   not?

11       MR. SHEK:  Objection, vague and ambiguous.

12       THE WITNESS:  Well, I have stated I believe

13   that medical procedure codes would cover dental

14   procedure codes or surgical procedure codes or

15   diagnostic or radiological procedure codes, such as

16   getting an x-ray or an echocardiog -- cardiogram.

17   But no one would consider removing a disk drive to

18   be a medical procedure.  So configuring computer

19   systems is not covered by these claims.

20   BY MR. SITZMAN:

21       Q.  But you aren't making an arbitrary

22   distinction in terms of where you are classifying

23   you coding system?  Isn't there a coding system, as

24   described in R1, that deals with how to build a

25   computer?  And isn't there a coding system in how to

278

# EXHIBIT D

# REDACTED

# EXHIBIT E

11/22/2005 Musen, Mark

1          IN THE UNITED STATES DISTRICT COURT

2            FOR THE DISTRICT OF DELAWARE

3

4      MCKESSON INFORMATION          )

       SOLUTIONS, LLC,            )

5                       )

              PLAINTIFF,    )

6      vs.                ) Case No. 04-1258-SLR

                        )

7      THE TRIZETTO GROUP, INC.,    )

                        )

8              DEFENDANT.    )

       _____)

9

10

11

12

13

14        VIDEO DEPOSITION OF MARK MUSEN, M.D., PH.D.

15        Held at Skadden, Arps, Slate, Meagher & Flom

16            525 University Avenue, 11th Floor

17                Palo Alto, California

18          Tuesday, November 22, 2005, 9:11 a.m.

19

20

21

22

23

24      REPORTED BY:  CHRIS DE GEORGE, CSR. NO. 7069

25

1

1        Q.  But when you said that there was -- they were

2    appended to the -- to the report, was that the table

3    that you were thinking of?

4        A.  Well, you ask- -- you asked me how I construed

5    the claims.

6        Q.  Yes.

7        A.  Not how others had, and I construed them in --

8    in the terms that are defined in Tabs 3, 4, and -- 2, 3,

9    and 4.

10       Q.  Okay.  Okay.

11       A.  Which have remark- -- a remarkable

12   correspondence to the McKesson construction.

13       Q.  Okay.  So in -- well, let's -- for instance,

14   let's just flip open, then, to Tab 2 --

15       A.  Sure.

16       Q.  -- 'cause I know I'll need a little help.

17           Just kind of jumping in, so on the first page

18   of Tab 2, there's an item that says Claim 1.

19       A.  Yeah.

20       Q.  And Claim 1 is, I think, recited or the

21   preamble is recited there in that first column.  So when

22   you got to the word, for instance, "Predetermined

23   database," did you construe that phrase or term?

24       A.  I construed it to have its ordinary meaning.

25       Q.  Okay.  And what meaning is it that you ascribe

1    to that?

2        A.  I ascribed the database to be a database which

3    is a conceptual structure that stores data where the

4    data, prior to run time, had been fixed.

5        Q.  All right.  So given that interpretation or

6    construction, have you -- have -- did you put that down,

7    that definition you just gave me, anywhere in your

8    report or the tabs that we're looking at?

9        A.  No.  As I said, I -- I considered that

10   construction is defined operationally in terms of the

11   evidence provided.  Ultimately, the court construes the

12   claims, but my belief is that predetermined database

13   takes on its ordinary meaning.

14       Q.  Okay.  Okay.  When you say "operationally,"

15   are you making a distinction between operationally and

16   functionally?

17       A.   That sounds like a legal question.

18   Operationally, I'm using the term in the vernacular

19   meaning that the -- the testimony and the references to

20   the TriZetto literature that supports the claim-

21   infringement documentation assumes that there -- there

22   are definitions of those terms that are consistent with

23   the testimony provided and by the quotes from the

24   product literature.

25       Q.  I don't want to mischaracterize, so let me

11/22/2005 Musen, Mark

1    Q.   Okay.  And that Mr. Margolis knew what that

2    meaning was?

3    A.   That is correct.

4    Q.   And the same thing with Anthony Bellomo and

5    then the rest of the people here, right?

6    A.   That's correct.

7    Q.   Including the customer -- I think there's two

8    customers cited here.  One is Providence Health Plan and

9    the other is Blue Cross Blue Shield.

10    A.   Correct.

11    Q.   Okay.

12    A.   If I can clarify my question [sic],

13    predetermined database is not a term that you would

14    ordinarily see in the computer science literature.

15    That's an -- the adjective is odd, and so it would be

16    unusual to assume that that would have a special meaning

17    with respect to --

18        THE REPORTER:  "With respect to" what?

19        THE WITNESS:  People skilled in computer

20    science.

21    BY MR. SITZMAN:

22    Q.   Assuming -- I think what you said was it's not

23    a word that normally appears.

24    A.   It -- that is correct, that the database

25    literature would not typically make a distinction

40

1    between a predetermined database and some other kind of

2    database, that -- so that I would not -- I would not

3    view that term as having special meaning in -- in

4    computer science jargon.

5         MR. HENDERSHOT:  Do you mind if we go off the

6    record for just a minute?

7         MR. SITZMAN:  Yeah.

8         MR. HENDERSHOT:  You don't mind?

9         MR. SITZMAN:  You don't have to stop the

10   video.  It can take a while to get on.

11        (Discussion off the record.)

12        MR. SITZMAN:  Back on the record.

13   Q.   The predetermined database.  So I think what

14   you're saying is, is that in the literature in the

15   computer science world, there wouldn't be a distinction

16   between predetermined database and database.

17   A.   That's correct.  I would -- I would not see

18   that as a -- as a buzzword.

19   Q.   Okay.  And -- okay.  However, the drafters of

20   the patent use the phrase "predetermined database" and I

21   guess the question I have for you is do you think, based

22   on your expertise, that predetermined database should be

23   given some special meaning, then?

24   A.   I --

25        THE REPORTER:  Did or didn't?

1          I -- I infer that by non-medical criteria, the

2     emphasis here is on criteria that are not a function of

3     patient care or the procedure being performed as much as

4     the mechanics of billing or of claim -- claims

5     processing.

6          Q.   Well, can -- can you give me an example of

7     what you mean by non-medical criteria, then, in that

8     context?

9          A.   Okay.  The -- one of the classic examples

10     would be the surgeon who charges for the operation and

11     then also charges for the instruments of the operation

12     or for cleaning the instruments of the operation or for

13     the tray used to perform the procedure.

14          There was a time, perhaps, when it was

15     appropriate to bill separately for those non-medical

16     components of performing the procedure.  Now those

17     codes, kinds of codes, usually are -- are disallowed.

18          Q.   Okay.  And are you aware of the existence of

19     codes that are associated with the non-medical criteria

20     that you're talking about?

21          A.   As I just said, there are CPT codes for

22     procedure trays or for instruments or for setups, and

23     those are -- those are appropriate ser- -- service

24     codes.  Whether they're allowable for reimbursement is

25     another question.

11/22/2005 Masen, Mark

1       Q.   And you're personally aware of these

2   procedural codes that you're -- that you're referring

3   to?

4       A.   Absolutely.  When I was a medical resident, we

5   were all instructed to make sure that we kept little

6   stickers on the procedure trays because those would be

7   billed for separately.  That was a while back.

8       Q.   Okay.  How -- how is, looking at this one --

9   at this one cell, this -- this one step --

10      A.   Sure.

11      Q.   -- how is it, then -- can you give me an

12  explanation or an example of how one code, then, is

13  mutually exclusive with another code based on

14  non-medical criteria?

15      A.   Well, as I just said, if you're billing

16  someone for a lumbar puncture and you're billing someone

17  for a lumbar puncture tray, then those would be mutually

18  exclusive.  You couldn't bill for both of those.

19      Q.   And why couldn't you?

20      A.   You could -- you could bill for them.  Would

21  they be allowed?  That's the question.  And they would

22  not be allowed because, presumably, the cost of

23  performing the procedure is tied in with the cost of the

24  supplies used to do the procedure, and so many payers

25  would argue that their reimbursement for the procedure

1    the at least one claim is mutually exclusive due to

2    non-medical criteria with any other medical service code

3    in the at least one claim."

4        A.   Okay.

5        Q.   So someone reading that, how do they know, I

6    think what you're telling me is that it's up to the

7    database programmer, but somebody reading this claim

8    needs to understand the scope of the patent claim.  What

9    is it that tells me what the non-medical criteria is?

10       MR. HENDERSHOT:  You mean outside of the

11   ordinary meaning he identified earlier?

12       MR. SITZMAN:  Well, and -- and if that's what

13   he wants to tell me, that non-medical criteria has

14   ordinary meaning and that was the ordinary meaning that

15   he gave it, that's fine.

16       Q.   But I need to either know whether or not

17   that's your interpretation of ordinary meaning or if

18   it's in the patent somewhere.

19       A.   Well, my -- my testimony was that it's not

20   essential for the database implementer to make that

21   distinction between medical and non-medical because the

22   framework provided by the patent is sufficiently general

23   that it will apply to criteria of both kinds.

24       Q.   "Both kinds" being?

25       A.   Medical and non-medical.  That the data --

1    non-medical.

2         MR. HENDERSHOT:  Objection.  Misstates his

3    testimony as to -- and it's vague and ambiguous as to

4    from a functional perspective.

5         THE WITNESS:  From a computational

6    perspective, it doesn't make a difference.

7    BY MR. SITZMAN:

8         Q.   And explain to me from the computational

9    perspective.  What do you mean when you say from a

10   computational -- from a -- well, why don't you explain

11   computational?

12        A.   [Simultaneously] Okay.  That the database that

13   the McKesson product provides allows one to specify

14   relationships among claims that could be classified in a

15   variety of ways, including medical and non-medical.  And

16   so in terms of the processing that's necessary to

17   determine whether claims need to be excluded or edited

18   or whatever, the computations are the same.

19        Now, obviously, when you say functional, that

20   has a legal implication, and whether one wants to

21   include non-medical or medical claims in a particular

22   system as implemented at the site of a particular payer

23   is a matter of the policies of the organization that

24   purchases a system and how it wants claims to be

25   adjusted.  So that -- that's -- those are -- those are

1   codes or a combination of the codes that defines

2   relationship as being medical or non-medical.  In some

3   sense that's a -- an issue that reflects the policy of

4   the organization that's implementing the database, so

5   it's not something that is an inherent component of the

6   codes as much as the organization that implements the

7   database and decides how to structure it.

8   BY MR. SITZMAN:

9       Q.  It's a -- I'm sorry.

10      A.  Oh, go ahead.

11      Q.  I didn't want to interrupt you, and I did.

12      A.  I think the -- the more generic question is if

13  two people were to sit down and create any kind of a

14  database of any large scale, would they make exactly the

15  same design decision, the answer's of course not.

16      Q.  And -- and I'm not talking about design.  I'm

17  just talking about lumping at this point in time, really

18  just categorizing between medical and non-medical --

19      A.  Right.

20      Q.  And those -- those, I'm sorry, that are

21  mutually exclusive due to non-medical criteria.

22      A.  See, in my mind it -- it's pretty

23  straightforward, that if I'm dealing with combinations

24  of codes that relate to the medical procedure.  The

25  example, of course, here is cholecystectomy --

1    patient, it could be -- it could just be data that is

2    submitted in the claim.  It's -- it's -- I'm just

3    throwing that in as a variable.

4        Q.   Much like you were telling me about, you know,

5    about the -- the laceration --

6        A.   Right.

7        Q.   -- hypothetical and the -- and the lumbar

8    situation.  Is the fact that the patient is a male, is

9    that a non-medical criteria upon which the hysterectomy

10   becomes a mutually exclusive code?

11       A.   And the answer is that I would -- I would view

12   that in my construction as being medical.  We don't

13   want -- really want to get into this necessarily, but

14   obviously there can be situations where a patient is

15   phenotypically male but has a uterus, in which case a

16   hysterectomy might be an appropriate procedure or that

17   might represent a billing error, in which case that

18   needs to be flagged.  But I would -- my initial

19   construction would be that that would be a medical

20   criteria that needs to be evaluated.

21       Q.   But you would consider the male gender a

22   non-medical criteria -- no, a medical criteria?

23       A.   Yeah.  Yeah.

24       Q.   Sorry.  I didn't want to mis- -- misstate you.

25       A.   'Cause it's not an artifact of billing or a

11/22/2005  Musen, Mark

1    necessarily specify what to do about what -- what to do

2    about the infringing situation when it's detected.

3    BY MR. SITZMAN:

4        Q.   Okay.  Let me break down a couple things that

5    you said.  First of all, the -- the non-medical

6    criteria, what is the actual criterion that you were

7    just applying that makes, as we've said, CT scan with

8    contrast, CT scan without contrast, what makes those

9    either mutually exclusive, or what is the non-medical

10   criterion that's applied?

11       A.   To state it informally, it would be that the

12   patient is undergoing a single procedure in one sitting

13   that happens to have two components where the, in this

14   case, the payer has determined that those components

15   need to be considered as a unit and, therefore, not paid

16   separately.

17            It's non-medical because it's -- it's a

18   function of how the payer has decided to manage

19   reimbursement.  It has nothing to do with the state of

20   the patient.  The patient is not even informed,

21   necessarily, of what -- of how the procedure is billed.

22       Q.   Okay.  So let's walk through the steps.  This

23   is a -- this is one of the method claims -- of how this

24   would work, the steps of -- first step, receiving at

25   least one claim.  So the claim that we're talking about

86

1          MR. HENDERSHOT:  Objection.  Vague and

2    ambiguous as to what a natural assumption.

3          THE WITNESS:  Well, I think I can be more

4    specific.  I've seen screen dumps of TriZetto products

5    where you see the codes and you see them numbered.

6    Obviously, the computers are very good at counting, and

7    so my assumption is that if the -- if the codes are

8    counted in the display and if the computer is

9    determining whether it's appropriate to be applying an

10   algorithm to check for relationships among more than one

11   code, it knows whether there is more than one code.

12   BY MR. SITZMAN:

13      Q.  You say that it -- it knows that there's more

14   than one code, meaning ---

15      A.  I'm anthropomorphizing the computer.

16      Q.  But you don't -- you don't know whether or not

17   the computer is actually making that determination as an

18   actual step.  What you're doing is you're assuming that

19   it must know because it numbers the codes.

20      A.  I know --

21          MR. HENDERSHOT:  Objection.  Misstates his

22   testimony.

23          THE WITNESS:  I'll restate it two ways.  It

24   knows how many codes there are because it numbers them,

25   but also it would be impossible to write any software

113

1    program that had to determine whether it was appropriate

2    to be comparing more than one datum without first

3    checking to see whether there was more than one datum.

4    That's a function of computer programming, not of any

5    particular product.

6    BY MR. SITZMAN:

7        Q.   And -- and just -- just to reiterate, you've

8    not seen or reviewed the TriZetto code or the TriZetto

9    programs.

10       A.   That is correct.

11       Q.   Okay.

12       A.   I only see the screen dumps.

13       Q.   And the product literature.

14       A.   And the product literature, yes, which that

15   contains --

16           MR. HENDERSHOT:  And the deposition

17   transcripts of the people that know about the

18   products --

19           THE WITNESS:  Right.

20           MR. HENDERSHOT:  -- the sake of completeness.

21           THE WITNESS:  Thank you.

22   BY MR. SITZMAN:

23       Q.   Okay.  I want to look at -- try -- try to do

24   this, if I can, before lunch, but we may have to break

25   earlier.

1    include a discussion of whether or not the allegedly

2    infringing products determines whether the codes are

3    medically exclusive with any other medical service code.

4    Is -- is that implied somewhere in -- in paragraph 42?

5        A.   Well, it -- it's implied in paragraph 42, and

6    I think when you go to the supporting information in --

7    in the appendices, it's clear that that's the case.

8        Q.   All right.  What -- give me -- can you give me

9    an example of -- of codes that are medically exclusive

10   of one another when they're submitted?

11       A.   Well, that would be analogous to the medical

12   criteria that could lead codes to be mutually exclusive.

13   It would be impossible to do two separate procedures in

14   certain circumstances.  Let me just see if I can come up

15   with an example.

16            You wouldn't be able to perform an amputation

17   on a patient who -- you wouldn't be able to perform the

18   same amputation twice, for example.

19       Q.   Okay.

20       A.   That would be medically exclusive.

21       Q.   Okay.  Now, would you need historical

22   information or are you thinking sort of two claims

23   coming in for amputation of the same leg --

24            THE REPORTER:  "Amputation of the same leg" is

25   what I got.

# EXHIBIT F

REDACTED

# EXHIBIT G

1              UNITED STATES DISTRICT COURT

2                 DISTRICT OF DELAWARE

3

4      McKESSON INFORMATION SOLUTIONS, LLC,

5              Plaintiff

6      v.              CA NO. 04-1258 (SLR)

7      THE TRIZETTO GROUP, INC.,

8              Defendant

9

10

11

————————————————————————

12              VOLUME 1

13        VIDEOTAPED DEPOSITION OF RANDALL

14     DAVIS, Ph.D., a witness called on behalf of

15     the Plaintiff, pursuant to the Federal Rules

16     of Civil Procedure, before Jessica L.

17     Williamson, Registered Merit Reporter,

18     Certified Realtime Reporter and Notary

19     Public in and for the Commonwealth of

20     Massachusetts, at the Offices of Skadden,

21     Arps, Slate, Meagher & Flom LLP, One Beacon

22     Street, Boston, Massachusetts, on Wednesday,

23     November 30, 2005, commencing at 9:27 a.m.

24     JOB NO. 41297

25

1    A.  No.

2    Q.  Why not?

3    A.  Because the database in the TriZetto system,

4        as I understand it, is modifiable by the end

5        user during routine uses of the system.

6        That modification may not occur in the midst

7        of a claim processing on -- just to be

8        specific, they may not change it Tuesday --

9        what's today? -- Wednesday morning at 10:00

10       a.m. while they're processing claims, but to

11       take your question, between the time the

12       system was installed and configured and the

13       time a claim is processed months or years

14       later, the database can have changed.

15       That's my understanding of the system.  So

16       it is not predetermined in the sense you

17       just asked.

18   Q.  So is it your understanding of

19       "predetermined database" that that means the

20       database can never be changed?

21   A.  My understanding of "predetermined" as it is

22       in the patent is that it is given to you by

23       a vendor and is not changed by the user, not

24       never changed, that's not what I said, but

25       not end-user-modifiable.  That's my

# EXHIBIT H

# Webster's
# Third
# New International
# Dictionary

## OF THE ENGLISH LANGUAGE

## UNABRIDGED

### A Merriam-Webster
#### REG. U.S. PAT. OFF.

*Utilizing all the experience and resources of more than
one hundred years of Merriam-Webster® dictionaries*

EDITOR IN CHIEF

**PHILIP BABCOCK GOVE, Ph.D.**

AND

THE MERRIAM-WEBSTER

EDITORIAL STAFF



MERRIAM-WEBSTER INC., *Publishers*

SPRINGFIELD, MASSACHUSETTS, U.S.A.



### A GENUINE MERRIAM-WEBSTER

The name *Webster* alone is no guarantee of excellence. It is used by a number of publishers and may serve mainly to mislead an unwary buyer.

*A Merriam-Webster®* is the registered trademark you should look for when you consider the purchase of dictionaries or other fine reference books. It carries the reputation of a company that has been publishing since 1831 and is your assurance of quality and authority.

COPYRIGHT © 1986 BY MERRIAM-WEBSTER INC.

PHILIPPINES COPYRIGHT 1986 BY MERRIAM-WEBSTER INC.

WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY
PRINCIPAL COPYRIGHT 1961

Library of Congress Cataloging in Publication Data
Main entry under title:

Webster's third new international dictionary of
the English language, unabridged.

Includes index.
1. English language—Dictionaries. I. Gove,
Philip Babcock, 1902–1972. II. Merriam-Webster Inc.
PE1625.W36      1986      423      85-31018
ISBN 0-87779-201-1 (blue Sturdite)
ISBN 0-87779-206-2 (imperial buckram)

*All rights reserved. No part of this work covered by the copyrights hereon may be reproduced or copied in any form or by any means—graphic, electronic, or mechanical, including photocopying, recording, taping, or information storage and retrieval systems—without written permission of the publisher.*

MADE IN THE UNITED STATES OF AMERICA
4344AG/KP9190

# EXHIBIT I

1              IN THE UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF DELAWARE

3              CIVIL ACTION NO. 04-1258 SLR

4

5         ----------------------X

6    MCKESSON INFORMATION        :

7    SOLUTIONS, LLC,           :

8         Plaintiff,      :

9    vs.              :

10   THE TRIZETTO GROUP, INC., :

11        Defendant.      :

12        ----------------------X

13

14              Durham, North Carolina

15              Friday, September 23, 2005

16

17        VIDEOTAPE DEPOSITION OF KELLI A. DUGAN,

18   a witness herein, called for examination by counsel

19   for the Defendant, in the above-entitled matter,

20   pursuant to notice, the witness being duly sworn by

21   DARLENE M. BRYANT, Registered Professional Reporter

22   and Notary Public in and for the State of North

23   Carolina, taken at the offices of Interactive World,

24   1000 Park Forty Plaza, Suite 300, Durham, North

25   Carolina, at 8:06 a.m., September 23, 2005, and the

1

9/23/2005  Dugan, Kelii

1      Q.  All right.  Well, let's just walk through this

2    real quickly.

3      A.  Okay.

4      Q.  Is it your belief and understanding that they

5    would receive a medical claim?

6      A.  Yes.

7      Q.  Was it your belief and understanding that one

8    of the -- one of the things that they were to do is to

9    find out if there were more than one service -- CPT-4

10   code on that claim?

11     A.  Yes.

12     Q.  Okay.  Was it your knowledge and understanding

13   that they would also look at those codes when there

14   were more than one, to determine whether or not those

15   codes were mutually exclusive due to some nonmedical

16   criteria?

17     A.  I guess that's where I'm being tripped up,

18   nonmedical criteria.  It's -- I -- they don't -- my

19   understanding is that -- for instance, this is an

20   example.  Yes, that they -- that Bob and/or Peggy,

21   would look at certain claims that had more than one

22   code, and perhaps they would deny any payment on a

23   particular code because of its relation to the other

24   one, or more, that appeared on that same claim.

25     Q.  Okay.  And then they would -- based on your

93

# EXHIBIT J

9/13/2005 Goldberg, George

1        UNITED STATES DISTRICT COURT

2        FOR THE DISTRICT OF DELAWARE

3

4

5    ------------------------------x

6    MC KESSON INFORMATION SYSTEMS, :

7        Plaintiff,        :   Case No.

8        vs.              :   04-1258 SLR

9    THE TRIZETTO GROUP,        :

10        Defendant.        :

11    ------------------------------x

12

13

14    VIDEOTAPED DEPOSITION OF GEORGE A. GOLDBERG

15

16

17            Washington, D.C.

18            Tuesday, September 13, 2005

19

20

21

22

23

24    REPORTED BY:

25    CARMEN SMITH

1

1              IN THE UNITED STATES DISTRICT COURT

2                    for the District of Delaware

3

4         - - - - - - - - - - - - - - - - - - x

5                                :

6    McKESSON INFORMATION SYSTEMS,       :

7                                :

8         Plaintiffs,          :

9                                : Case No.

10    v.                    : 04-1258 SLR

11                                :

12    THE TRIZETTO GROUP,           :

13                                :

14         Defendant.          :

15                                :

16         - - - - - - - - - - - - - - - - - - x

17                    Washington, D.C.

18                    Volume II

19                    September 28, 2005

20

21

22

23    REPORTED BY:

24         DANIEL W. HAWKINS

25

257

1          Video Deposition of

2

3                GEORGE A. GOLDBERG, M.D.

4

5          called for examination pursuant to notice of deposition, at

6          the law offices of Gibson, Dunn & Crutcher, 1050 Connecticut

7          Avenue, Northwest, 2nd Floor, Conference Room 3B,

8          Washington, D.C., beginning at 9:21 a.m., before DANIEL W.

9          HAWKINS, a Notary Public within and for the District of

10         Columbia, when were present on behalf of the respective

11         parties:

12

13                BERNARD SHEK, ESQ.

14                Skadden, Arps, Slate, Meagher & Flom LLP

15                528 University Avenue, Suite 1100

16                Palo Alto, California 94301

17                Phone  650.470.4500

18                Fax 650.470.4570

19                E-mail bshek@skadden.com

20                On behalf of Plaintiff and Witness

21

22

23

24

25

1          MR. SHEK:  Object as to form.

2          THE WITNESS:  It is a complicated question, all

3    right?

4          In this document, I, "little old me" in quotation

5    marks, merely an M.D., do not know what authorizing means,

6    and I do not know what nonmedical criteria mean fully.  I

7    can guess, but I don't know.

8          BY MR. SEGAL:

9     Q    As one of the inventors on this patent, you don't

10    know what authorized or nonmedical criteria mean, as used in

11    this claim?

12    A    On September 28, 2005, I am not sure of what

13    these words meant to us or to me in 198--whatever, when this

14    patent was first -- I see it was approved in -- dated 1993.

15    It says filed 1991, after I had left the company.  I can

16    make very good guesses, but this is not my wording; I think

17    it was not my wording, and that many years later I am not

18    certain.

19    Q    What is your best understanding of what

20    'nonmedical criteria' refers to?

21    A    My best understanding is that nonmedical criteria

22    refers to coding criteria.  The rules of coding, as

23    enunciated by the owner of CPT procedure codes, the American

24    Medical Association, at any particular time.

25    Q    What do you mean by the coding criteria?

305

1    A    The American Medical Association's CPT procedure

2    book describes, in introductory sections; not only at the

3    beginning of the book but at the beginning of many

4    subsections, not only in many subsections, but also before

5    individual codes, how coding is supposed to be carried out,

6    how codes are supposed to be used; the comments are most

7    often general and especially in the 1980s, rarely specific.

8    And over the years, there have been, there has been an

9    evolution in that area.

10    But there are rules of coding that are printed in

11    AMA procedure books going back to the early years.

12    Q    Now are those rules of coding based on any

13    medical criteria?

14    MR. SHEK:  Object as to form.

15    THE WITNESS:  The rules of coding are not based

16    on medical criteria; some of the rules about when to use --

17    period.

18    BY MR. SEGAL:

19    Q    I'm going back to your explanation.  These

20    explanations, would they be based on things about medical

21    treatment?  Or would they be based on what's nonmedical

22    criteria, is my question.

23    A    That if you -- one example is that if you have a

24    code that is indented under another code, you should not be

25    using both those codes.  That is an example, but I am not

<u>CERTIFICATE OF SERVICE</u>

I, Rodger D. Smith II, hereby certify that on December 21, 2005, I caused to be electronically filed redacted The TriZetto Group, Inc.'s Appendix of Exhibits in Support of its Opening Claim Construction Brief with the Clerk of the Court using CM/ECF, which will send notification of such filing(s) to the following:

> Thomas J. Allingham, II
> Skadden, Arps, Slate, Meagher & Flom LLP

I also certify that copies were caused to be served on December 21, 2005, upon the following in the manner indicated:

> <u>BY HAND</u>
>
> Thomas J. Allingham, II
> Skadden, Arps, Slate, Meagher & Flom LLP
> One Rodney Square
> P.O. Box 636
> Wilmington, DE  19899
>
> <u>BY FEDERAL EXPRESS</u>
>
> Jeffrey G. Randall
> Skadden, Arps, Slate, Meagher & Flom LLP
> 525 University Avenue
> Suite 1100
> Palo Alto, CA  94301

> /s/     Rodger D. Smith II (#3778)
> Morris, Nichols, Arsht & Tunnell
> 1201 N. Market Street
> P.O. Box 1347
> Wilmington, DE  19899
> (302) 658-9200
> rsmith@mnat.com