IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

MCKESSON INFORMATION SOLUTIONS
LLC,

              Plaintiff,

      v.

THE TRIZETTO GROUP, INC.

              Defendant.

Civil Action No. 04-1258-SLR

**REDACTED PUBLIC VERSION**

---

**OPENING BRIEF IN SUPPORT OF THE TRIZETTO GROUP INC.'S
MOTION FOR PARTIAL SUMMARY JUDGMENT OF LACHES**

MORRIS, NICHOLS, ARSHT & TUNNELL
Jack B. Blumenfeld (No. 1014)
Rodger D. Smith, II (No. 3778)
1201 N. Market Street
Wilmington, Delaware 19899
(302) 658-9200

Attorneys for Defendant The TriZetto Group, Inc.

Of Counsel:

GIBSON, DUNN & CRUTCHER LLP
Jeffrey T. Thomas
David Segal
Michael A. Sitzman
Jamboree Center, 4 Park Plaza
Irvine, CA 92614

Confidential Version Filed: December 15, 2005

Redacted Version Filed: December 21, 2005

## TABLE OF CONTENTS

|  |  | Page |
|---|---|---|
| TABLE OF CITATIONS | | iii |
| I. | NATURE AND STAGE OF THE PROCEEDING | 1 |
| II. | SUMMARY OF ARGUMENT | 1 |
| III. | STATEMENT OF FACTS | 2 |
| | A. AS EARLY AS 1988, MCKESSON AND ITS PREDECESSORS RECOGNIZED TRIZETTO'S PREDECESSORS AS COMPETITORS IN THE CLAIMS PROCESSING FIELD. | 2 |
| | B. AFTER THE PATENT ISSUED, MCKESSON'S PREDECESSORS TOOK NO ACTION TO ASSERT THE '164 PATENT AGAINST ERISCO OR RIMS. | 4 |
| | C. THERE WAS STILL NO ACTION TAKEN TO ASSERT OR ENFORCE THE '164 PATENT WHEN TRIZETTO ACQUIRED ERISCO AND RIMS. | 5 |
| IV. | ARGUMENT | 6 |
| | A. THE STANDARD FOR SUMMARY JUDGMENT | 6 |
| | B. THE DOCTRINE OF LACHES | 7 |
| | C. BECAUSE MCKESSON DELAYED IN FILING SUIT FOR NEARLY 11 YEARS, THE *AUKERMAN* PRESUMPTION CLEARLY APPLIES. | 8 |
| | D. MCKESSON CANNOT REBUT THE PRESUMPTION OF LACHES. | 9 |
| | 1. McKesson Delayed Filing Suit For An Inexcusable And Unreasonable Length Of Time. | 9 |
| | 2. No Excuses Apply To Justify The Delay. | 11 |
| | a. Other Litigation. | 11 |
| | b. Business Negotiations. | 12 |
| | 3. TriZetto Has Suffered Material Prejudice As A Result Of McKesson's Delay In Filing Suit. | 14 |

TABLE OF CONTENTS (continued)

Page

a.     Economic Prejudice.                          14

b.     Evidentiary Prejudice.                       17

V.     CONCLUSION                                   22

## TABLE OF CITATIONS

Page(s)

Cases

*A.C. Aukerman Co. v. R.L. Chaides Constr. Co.,*
    960 F.2d 1020 (Fed. Cir. 1992)        passim

*ABB Robotics, Inc. v. GMFanuc Robotics Corp.,*
    828 F. Supp. 1386 (E.D. Wis. 1993)        15

*Adelberg Labs., Inc. v. Miles, Inc.,*
    921 F.2d 1267 (Fed. Cir. 1990)        11, 15

*AptarGroup, Inc. v. Summit Packaging Sys.,*
    1996 U.S. Dist. LEXIS 3026 (D. Ill. 1996)        15

*Barmag Barmer and Maschinensabrik AG v. Murata Mach Limited,*
    731 F.2d 831 (Fed. Cir. 1984)        6

*Celotex Corp. v. Catrett,*
    477 U.S. 317 (1988)        6

*Continental Coatings Corp. v. Metco, Inc.,*
    464 F.2d 1375 (7th Cir. 1972)        13

*Eastman Kodak Co. v. The Goodyear Tire & Rubber Co.,*
    114 F.3d 1547 (Fed. Cir. 1997)        7

*General Electric Co. v. Sciaky Brothers,*
    304 F.2d 724 (6th Cir. 1962)        13

*Genzyme Corp. v. Atrium Med. Corp.,*
    2003 U.S. Dist. LEXIS 12784, *10 (D. Del. 2003)        14

*Giese v. Pierce Chem. Co.,*
    29 F. Supp. 2d 33 (D. Mass. 1998)        12, 13, 14

*Gifford v. Travelers Protective Ass'n,*
    153 F.2d 209 (9th Cir. 1946)        6, 9

*GMIS v. HPR, Inc.,*
    Civil Action 94-CV-0576 (E.D. Pa.)        4

*Hall v. Aqua Queen Mfg., Inc.,*
    93 F.3d 1548 (Fed. Cir. 1996)        12

*Hemstreet v. Computer Entry Sys. Corp.*,
   972 F.2d 1290 (Fed. Cir. 1992)                                              15

*Herman Miller, Inc. v. Palazzetti Imps. & Exps., Inc.*,
   270 F.3d 298 (6th Cir. 2001)                                               16

*Intellicall, Inc. v. Phonometrics, Inc.*,
   952 F.2d 1384 (Fed. Cir. 1992)                                              6

*Lane & Bodley Co. v. Locke*,
   150 U.S. 193 (1893)                                                        13

*R2 Med. Sys. v. Katecho, Inc.*,
   931 F. Supp. 1297 (N.D. Ill. 1996)                                          9

*Vaupel Testilmaschinen KG v. Meccanica Euro Italia S.P.A.*,
   944 F.2d 870 (Fed. Cir. 1991)                                              11

*Wanless Int'l Inc. v. General Electric Co.*,
   148 F.3d 1334 (Fed. Cir. 1998)                                     7, 8, 9, 17

*Watkins v. Northwestern Ohio Tractor Pullers Ass'n.*,
   630 F.2d 1155 (6th Cir. 1980)                                              12

<u>Statutes</u>

11-56 Moore's Federal Practice - Civil § 56App.200                             6

<u>Other Authorities</u>

6 Donald S. Chisum, *Chisum on Patents* § 19.05[2][a][i] (2005)                 7

## I.    NATURE AND STAGE OF THE PROCEEDING

On September 13, 2004, plaintiff McKesson Information Solutions, LLC ("McKesson") filed this suit alleging infringement of U.S. Patent No. 5,253,164 (the "'164 patent") against The TriZetto Group, Inc. ("TriZetto"). On October 1, 2004, McKesson amended its Complaint. On November 1, 2004, TriZetto answered and filed a counterclaim seeking a declaratory judgment of invalidity, unenforceability, and non-infringement.

McKesson alleges that three of TriZetto's products (Facets, ClaimFacts and QicLink) infringe fifteen claims of the '164 patent (Claims 1-6 and 8-16). Fact and expert discovery have been completed. The Court has bifurcated the issue of invalidity and stayed motion practice and trial on that issue. On the issues of infringement, damages and equitable defenses, motion practice is proceeding and scheduled for hearing on February 16, 2006, at which time the Court is also scheduled to consider any issues of claim construction. Trial on the issues of infringement, damages and equitable defenses is set for April 17, 2006.

## II.    SUMMARY OF ARGUMENT

For fifteen years prior to filing this action, McKesson and its predecessors have known about the software programs sold by TriZetto and its predecessors that McKesson now contends infringe the patent at issue here. That patent issued in October 1993, and yet McKesson waited nearly eleven years to initiate this action against TriZetto. As a matter of law, McKesson's unexcused delay in pursuing its claims for patent infringement results in a presumption that the doctrine of laches applies. Because this long delay by McKesson will clearly cause significant prejudice to TriZetto if McKesson is allowed to recover damages for the period prior to the filing of the complaint here, McKesson cannot rebut this presumption, and summary judgment should be entered accordingly.

### III.    STATEMENT OF FACTS

**A.    AS EARLY AS 1988, MCKESSON AND ITS PREDECESSORS RECOGNIZED TRIZETTO'S PREDECESSORS AS COMPETITORS IN THE CLAIMS PROCESSING FIELD.**

The grandparent patent application that resulted in U.S. Patent Number 5,253,164 ("the '164 patent") was filed on September 30, 1988, by McKesson's predecessor Health Payment Review, Inc. ("HPR"). *See* Ex. 1 ['164 Patent] at 1. After five years of examination, the '164 patent finally issued on October 12, 1993. *See id.* The patent is directed to computer software for reviewing claims for payment submitted by medical care providers to health care insurance companies. Specifically, the patent describes software used to determine whether the "procedure codes" (codes used to designate what medical treatment was performed) on claims for payment are accurate. This type of software is called clinical editing software.

Beginning in 1986, HPR developed a clinical editing program called CodeReview, which it introduced in 1988. During the five-year period while the HPR patent applications were pending, HPR was aware of several companies marketing competing products. One of those companies was Erisco Managed Care Technologies, Inc. ("Erisco"), a predecessor-in-interest to TriZetto. Erisco was selling its ClaimFacts product, which was a complete medical claims processing solution involving many different programs. In 1989, Erisco added a clinical editing component as part of its ClaimFacts suite of products.

HPR knew of, and tracked, Erisco's development and marketing of the clinical editing module of the ClaimFacts system.

. *See* Ex. 2 [Holloway Dep. Tr., Ex. 106] at 234

*and* Ex. 3 [HPR Business Plan] at MCK 117521; *see also* Ex. 4 [Hertenstein Dep. Tr., Ex. 135] at 135. Additionally,



HPR's chief executive officer, Marcia Radosevich, testified that

*See* Ex. 5

[Radosevich Dep. Tr.] at 191

*see also id.* [Radosevich Dep. Tr., Plaintiff's Ex. 5] at 255 *and* Ex. 6 at MCK 117578 (Letter from M. Radosevich to F. Glover, the Director of Health Information at Erisco, dated January 24, 1989,                ). When Erisco decided not to license the clinical editing software from HPR in 1989,

*See* Ex. 5 [Radosevich Dep. Tr.] at 189, 192.

HPR also knew that Resource Information Management Systems, Inc. ("RIMS"), another company that was later acquired by Erisco, offered a competing medical claims processing system.[1] In 1989, HPR offered to incorporate its clinical editing product into RIMS' claims processing product.

*See* Exs. 7, 8. As with Erisco, RIMS also decided not to license HPR's clinical editing software, and instead began offering clinical editing software provided by one of HPR's competitors. Notwithstanding HPR's interactions with both RIMS and Erisco in 1989, and HPR's knowledge of their competing products, HPR failed to assert the '164 patent against either company when the patent issued in 1993, or for eleven years thereafter.

---

[1]    The clinical editing programs accused of infringement here are the programs TriZetto acquired when it purchased Erisco and RIMS in 2000.

**B.   AFTER   THE   PATENT   ISSUED,   MCKESSON'S PREDECESSORS TOOK NO ACTION TO ASSERT THE '164 PATENT AGAINST ERISCO OR RIMS.**

On January 24, 1994, HPR issued a press release publicizing the issuance of the '164 patent.  *See* Ex. 9.  HPR's chief executive officer, Marcia Radosevich, was interviewed by the *New York Times* and quoted as saying, "We do intend to enforce our patent rights."  *See* Ex. 10.  And HPR did.

In a declaratory action brought in the Eastern District of Pennsylvania by one of HPR's competitors (GMIS, Inc.), HPR counterclaimed for infringement of the '164 patent.  *GMIS v. HPR, Inc.*, Civil Action 94-CV-0576 (E.D. Pa.).  During discovery, several employees of HPR testified that ███████████████████████████████████████████████████████████ ███████████████████  *See* Ex. 11 [Deposition of Michael J. Stare in *GMIS* litigation, August 17, 1994] at 37 ████████████████████████████████████████████  *see also* Ex. 12 [Radosevich Dep. in *GMIS* litigation, November 29, 1994] at 11 ████████████████  In January 1995, GMIS settled the lawsuit and paid HPR ██████████████████████  *See* Ex. 13 [GMIS-HPR Settlement Agreement] at MCK 002431-440.  Yet, neither HPR nor any of its successors (including McKesson) took any legal action against TriZetto or its predecessors until September 2004.

A year after the settlement, a company named HBO & Company ("HBOC") acquired GMIS, and then in 1997, HBOC acquired HPR and the rights to the '164 patent.  HBOC employees continued to analyze and track both Erisco's and RIMS' product offerings, but took no action to enforce or assert the '164 patent against them.  Carolyn Wukitch, McKesson's current Senior Vice-President and General Manager of McKesson's Code Auditing and Compliance Division, testified that ███████████████████████████████████████████████████ ██████████████████████  Ex. 14 [Wukitch Dep. Tr.] at 95-96.  Similarly, Wukitch testified that ███████████████████████████████  *Id.* at 94.  After HBOC acquired GMIS and HPR, Wukitch was aware that ████████████████████  and

knew that ███████████████████████████████ Despite this surveillance, HBOC did not take any legal action or otherwise assert the '164 patent against Erisco or RIMS.

HBOC, however, became increasingly concerned about Erisco's newly-developed Facets claims processing system and the clinical editing capabilities thereof. ███████████████████████████████████████████████████

*See* Ex. 15 [Cesarz Dep. Tr.] at 83, 85 ███████████████████████████████████████████████

*and* Ex. 14 [Wukitch Dep. Tr.] at 96 ████████████████████████████████████████████████████

*see also* Ex. 15 [Cesarz Dep. Tr., Ex. MC2] at 82 *and* Ex. 16 at MCK 020496.  HBOC also approached Erisco ████████████████████████████████████████████████

– during this time period.  *See* Ex. 14 [Wukitch Dep. Tr.] at 70, 97.  However, ████████████████████████████████

*Id.* at 70. ██████████████████████████████████████████

*Id.* at 73.

**C.    THERE WAS STILL NO ACTION TAKEN TO ASSERT OR ENFORCE THE '164 PATENT WHEN TRIZETTO ACQUIRED ERISCO AND RIMS.**

In January 1999, McKesson acquired HBOC and the rights to the '164 patent.  A year later, TriZetto acquired both Erisco and RIMS.  After these acquisitions, TriZetto entered into discussions with McKesson regarding a potential marketing agreement under which TriZetto customers would be given a choice between the clinical editing programs offered by TriZetto and McKesson.  Internal McKesson documents and testimony from McKesson's employees indicate that █████████████████████████████████████████████ Ex. 15 [Cesarz Dep. Tr.] at 206-207; 232; *see also* Ex. 17 at MCK 021191-193 ████████████████████████████████████

████████████████████████████  In fact, the '164 patent was not introduced into the negotiations over the interface until 2002, ████████████████████████████████████████

See Ex. 14 [Wukitch Dep. Tr.] at 162; see also Ex. 15 [Cesarz Dep. Tr.] at 148-149 and Ex. 18 at MCK 030281.[2]  It would take McKesson two more years to file this action on September 13, 2004.

## IV.    ARGUMENT

### A.    THE STANDARD FOR SUMMARY JUDGMENT

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith" where there is "no genuine issue as to any material fact" and "the moving party is entitled to a judgment as a matter of law."  A defendant moving for summary judgment may establish that he is entitled to judgment as a matter of law by demonstrating that there is no genuine issue of material fact with regard to an affirmative defense.  *See Gifford v. Travelers Protective Ass'n*, 153 F.2d 209, 211 (9th Cir. 1946); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1988); 11-56 Moore's Federal Practice - Civil § 56App.200 [8] ("The basic principles that govern the grant or denial of summary judgment in other situations apply, of course, to the granting or denial of summary judgment on the basis of an affirmative defense.").  This standard has been adopted in patent cases as it has in other civil cases.  *Barmag Barmer and Maschinensabrik AG v. Murata Mach Limited*, 731 F.2d 831, 835 (Fed. Cir. 1984) ("[S]ummary judgment is as appropriate in a patent case as in any other.");  *see also Intellicall, Inc. v. Phonometrics, Inc.*, 952 F.2d 1384, 1387-88 (Fed. Cir. 1992) (summary judgment properly granted in patent case).  The affirmative defense of laches is an appropriate basis for summary judgment.  *Gifford*, 153 F.2d at 211.

---

[2]    In 2001, McKesson sent TriZetto a copy of the patent, but did not assert infringement; the patent did not become an issue in the negotiations until 2002.

## B.    THE DOCTRINE OF LACHES

"Laches is cognizable under 35 U.S.C. § 282 as an equitable defense to a claim for patent infringement." *A.C. Aukerman Co. v. R.L. Chaides Constr. Co.*, 960 F.2d 1020, 1028, 1032 (Fed. Cir. 1992) (*en banc*) (hereinafter "*Aukerman*").  When an alleged infringer establishes laches, the patentee may not recover damages for infringement occurring prior to the filing of the lawsuit. *Id.* at 1041.  To establish laches, an alleged infringer must show that (1) the patentee delayed filing suit for an unreasonable and inexcusable length of time from the time the patentee knew or reasonably should have known of its claim against the alleged infringer, and (2) the delay operated to the prejudice or injury of the alleged infringer. *Wanlass Int'l Inc. v. General Electric Co.*, 148 F.3d 1334, 1337 (Fed. Cir. 1998); *see also Aukerman*, 960 F.2d at 1032.

A presumption of unreasonable delay and prejudice arises when a patent holder fails to bring suit within six years after the holder knew or should have known of the potential infringement. *Aukerman*, 960 F.2d at 1037; *see also* 6 Donald S. Chisum, *Chisum on Patents* § 19.05[2][a][i] (2005) ("The delay is measured from the time the patent owner knew or, in the exercise of due diligence, should have known of the defendant's allegedly infringing activity.").  When the presumption applies, unreasonable delay and prejudice "must be inferred, absent rebuttal evidence." *Aukerman*, 960 F.2d at 1037.

The Federal Circuit has identified that "the period of delay begins at the time the patentee has actual or constructive knowledge of the defendant's potentially infringing activities." *Wanlass Int'l Inc.*, 148 F.3d at 1337.[3]  Courts have found that the patentee has constructive knowledge where a defendant conducts pervasive, open and notorious activities that

---

[3]    This brief refers to McKesson's delay in filing suit to include the actions of its predecessors HBOC and HPR.  For the purposes of calculating the period of delay in evaluating a laches defense, if there is a transfer of the patent, the actions of the transferor are imputed to the transferee. *Eastman Kodak Co. v. The Goodyear Tire & Rubber Co.*, 114 F.3d 1547, 1559 (Fed. Cir. 1997) (noting that a patentee cannot avoid the consequences of his laches by transferring the patent).

a reasonable patentee would suspect were infringing. *Id.* at 1338 (noting that this includes actual knowledge of "sales, marketing, publication, or public use of a product similar to or embodying technology similar to the patented invention, or published descriptions of the defendant's potentially infringing activities"). Constructive knowledge may also be imputed to the patentee where the defendant's sales and marketing activities or public uses of allegedly infringing technology "are sufficiently prevalent in the inventor's field of endeavor." *Id.*

## C.   BECAUSE MCKESSON DELAYED IN FILING SUIT FOR NEARLY 11 YEARS, THE *AUKERMAN* PRESUMPTION CLEARLY APPLIES.

The period of laches does not begin prior to the issuance of the patent, or in this instance, October 12, 1993. *Aukerman*, 960 F.2d at 1032. Here, however, the undisputed evidence demonstrates that McKesson knew about TriZetto or its predecessor's allegedly infringing activities and products since 1989. From its initial business plan to the early meetings between Ms. Radosevich and Erisco, McKesson has had actual knowledge of TriZetto's allegedly infringing activities for 4 years before the issuance of the patent (and 15 years before commencing this action). *See* Ex. 2 [Holloway Dep. Tr., Ex. 106] at 234 *and* Ex. 3 [HPR Business Plan]; Ex. 5 [Radosevich Dep. Tr.] at 189-192. Furthermore, TriZetto's sales activities were open and notorious and specifically known, understood and were being tracked by McKesson. *See* Ex. 15 [Cesarz Dep. Tr.] at 83, 85 *and* Ex. 14 [Wukitch Dep. Tr.] at 96. Given McKesson's actual knowledge of TriZetto's activities before the issuance of the '164 patent, the period of laches began once the patent issued on October 12, 1993.

From the time the '164 patent issued to the date the complaint was filed on September 13, 2004, McKesson and its predecessors consciously refrained from asserting the '164 patent against TriZetto. Because McKesson delayed not only six, but *nearly eleven years*

before filing suit against TriZetto, the *Aukerman* presumption of laches applies, creating a prima facie defense of laches.[4]

## D.    MCKESSON CANNOT REBUT THE PRESUMPTION OF LACHES.

The presumption of laches establishes that (1) the patentee delayed filing suit for an unreasonable and inexcusable length of time from when the patentee knew or reasonably should have known of its claim against the alleged infringer, and (2) the delay operated to the prejudice or injury of the alleged infringer. *Aukerman*, 960 F.2d at 1037. As a result, the burden of proof shifts to the patentee to proffer evidence that the delay was either not unreasonable or that the alleged infringer was not prejudiced. *Id.* Absent a preponderance of evidence to rebut these presumptions, laches is established as a matter of law. *See Gifford*, 153 F.2d at 211. As discussed below, McKesson simply cannot produce any such evidence to rebut either presumption.

### 1.    McKesson Delayed Filing Suit For An Inexcusable And Unreasonable Length Of Time.

The first element of the laches defense is that the patent owner delayed filing suit for an unreasonable and inexcusable period of time. *Wanlass v. General Elec. Co.*, 148 F.3d 1334, 1337 (Fed. Cir. 1998). As discussed above, McKesson knew of and recognized TriZetto's predecessors as competitors in the claims processing field as early as 1988. HPR knew about Erisco's entrance into the clinical editing market. *See* Ex. 5 [Radosevich Dep. Tr.] at 191

Ex. 2 [Holloway Dep. Tr., Ex. 106] at 234 *and* Ex. 3 [HPR Business Plan] at MCK

---

[4]    TriZetto may rely on McKesson's dilatory conduct with respect to TriZetto's predecessors-in-interest, RIMS and Erisco. "A defendant that is the transferee of an entire business or its assets may rely upon the patentee's delay in suing the transferor." *R2 Med. Sys. v. Katecho, Inc.*, 931 F. Supp. 1297, 1412 (N.D. Ill. 1996).

117521 ████████████████████████████████████ HPR also knew that
████████████████████ *See Exs. 7, 8* ████████████████████
█████████████████████████ Because HPR had actual knowledge of RIMS' and Erisco's activities
as competitors in the field of clinical editing, *see* Section III. B, *supra*, HPR had actual, or at
least constructive knowledge of RIMS' and Erisco's allegedly infringing activities even before
the '164 patent issued in 1993.

After the '164 patent issued, McKesson also recognized TriZetto's predecessors as
potential infringers, ██████████████████████████████████████████
(*see* Ex. 16), and █████████████████████████████████████████
*See* Ex. 14 [Wukitch Dep. Tr.] at 70. During the *GMIS* litigation, the CEO and an account
executive at HPR both testified that ████████████████████████████
████████████████████ *See* Ex. 11 [Deposition of Michael J. Stare in *GMIS* litigation,
August 17, 1994] at 37 ██████████████████████████ *see also*
Ex. 12 [Radosevich Dep. in *GMIS* litigation, November 29, 1994] at 11 █████████
████████████ Nevertheless, McKesson took no action against TriZetto's predecessors to
enforce the '164 patent.[5] *See* Ex. 14 [Wukitch Dep. Tr.] at 70, 73. Instead, McKesson continued
to sit on its patent rights until filing the complaint in 2004. This 11-year delay was both
unreasonable and inexcusable.

The recent competition between McKesson and TriZetto, which presumably
caused McKesson to file this action, is of the same type that has existed between their
predecessors since 1989. As McKesson's own damages expert has testified in this action, █

---

[5]     Ironically, HPR received a settlement from GMIS in January 1995 in the *GMIS* litigation
that was characterized by the business community as "healthy." *See* Ex. 19. If anything,
the result of the *GMIS* litigation should have *heightened* HPR's interest in enforcing its
patent rights against the many other third party clinical editing software developers in the
market at the time.

███████████████████████████████████████████

*See* Ex. 21 [Wagner Dep. Tr.] at 43-45.  McKesson's damages expert also

testified that ████████████████████████████████████

████████████████████████████████████     *Id.* at 27-29.

McKesson cannot show that circumstances have somehow changed so as to justify the 11-year delay in the commencement of this litigation.

## 2.     No Excuses Apply To Justify The Delay.

*Aukerman* recognized several excuses, including other litigation, negotiations with the accused, poverty and illness, wartime conditions, extent of infringement, and dispute over ownership of patent, which can potentially justify a delay in filing an infringement action. *Aukerman*, 960 F.2d at 1033.  There are no facts here, however, to support any of those excuses. McKesson may contend that "other litigation" with others and "business negotiations" with the accused should apply.  But, as discussed below, neither of these excuses withstands scrutiny here, and neither excuse overcomes the nearly 11-year delay in filing.

### a.     Other Litigation.

HPR's early litigation with GMIS cannot justify McKesson's delay in asserting its patent rights against TriZetto.  This excuse is designed to apply where a patentee reasonably defers suit against an infringer until conclusion of an action against another infringer.  *Vaupel Testilmaschinen KG v. Meccanica Euro Italia S.P.A.*, 944 F.2d 870, 877 (Fed. Cir. 1991).  For other litigation to excuse a delay in bringing suit, there must be adequate notice of the proceedings to the accused infringer, and the notice must also inform the alleged infringer of the patentee's intention to enforce its patent upon completion of that proceeding.  *Vaupel*, 944 F.2d at 877; *see also Adelberg Labs., Inc. v. Miles, Inc.*, 921 F.2d 1267, 1272 (Fed. Cir. 1990) (affirming summary judgment on laches and stating patentee's obligation to communicate to an

accused infringer whom it has contacted and failed to sue because of other litigation that it was not acquiescing in the infringement); *Hall v. Aqua Queen Mfg., Inc.*, 93 F.3d 1548, 1554 (Fed. Cir. 1996) (finding that patentee could not rely upon other litigation as excuse for delay because patentee had not informed alleged infringer of intent to sue after conclusion of other suit).

Here, although Erisco heard about the *HPR v. GMIS* case, and wondered whether HPR would assert the '164 patent against other companies (including Erisco), it is undisputed that HPR did not inform Erisco of any intent to enforce the '164 patent upon conclusion of the *GMIS* litigation, despite HPR's earlier contact with Erisco. Ms. Radosevich, the CEO of HPR, testified that ██████████████████████████████          *See* Ex. 5 [Radosevich Dep. Tr.] at 191. Ms. Radosevich also ████████████████

████████████████████          *See* Ex. 5 [Radosevich Dep. Tr., Plaintiff's Ex. 5] at 255 *and* Ex. 6. Because there was clearly prior contact between HPR and Erisco, HPR should have given notice to Erisco of its intent to sue after the *GMIS* case concluded if it intended to use the *GMIS* litigation as an excuse. *See Aukerman*, 960 F.2d at 1039 (where there is prior contact between the patentee and the accused infringer, the overall equities require that the patentee give appropriate notice to the alleged infringer); *Watkins v. Northwestern Ohio Tractor Pullers Ass'n.*, 630 F.2d 1155, 1163 (6th Cir. 1980) (because another infringer was being sued, and defendant was not, *and* defendant had not been advised that it would be sued, the court held that defendant was entitled to infer that the patentee did not intend to sue it). Because no such notice was given, the *GMIS* litigation does not excuse McKesson's delay in filing suit.

**b.    Business Negotiations.**

McKesson's negotiations with TriZetto to enter into a joint marketing agreement and integrate its software products with TriZetto's also cannot excuse McKesson's delay. Although genuine *continuous and bilateral* negotiations to license or settle *the patent dispute* may constitute an excuse for delay in filing suit, the primary rationale behind the negotiations excuse is to allow a patentee to resolve a patent dispute without resort to litigation. *See Giese v.*

*Pierce Chem. Co.*, 29 F. Supp. 2d 33, 40 (D. Mass. 1998) (citing *General Electric Co. v. Sciaky Brothers*, 304 F.2d 724, 727 (6th Cir. 1962); *Continental Coatings Corp. v. Metco, Inc.*, 464 F.2d 1375, 1377-78 (7th Cir. 1972)); *see also Aukerman*, 960 F.2d at 1033. Thus, negotiations aimed at creating a joint marketing agreement, such as those between McKesson and TriZetto beginning in 2001, do not qualify or constitute the type of "bilateral negotiations to settle or license the patent" that would justify a delay in bringing suit. *See Giese*, 29 F. Supp. 2d at 40. Indeed, McKesson has admitted that the patent was never even discussed as part of the negotiations until 2002.

In fact, McKesson's only proffered explanation, in numerous depositions, for failing to assert its patent rights earlier, is that ████████████████████████████████ ████████████████████████████████████████ Ex. 15 [Cesarz Dep. Tr.] at 148 ████████████ *see also* Ex. 17 at MCK 021191-193 ████████ (noting that ██████████████████ ████ ). Indeed, the '164 patent was not introduced into the negotiations until McKesson ████████████ in its negotiations over the marketing agreement with TriZetto. Ms. Wukitch noted that ████ Ex. 14 [Wukitch Dep. Tr.] at 185. The desire to maintain "amicable relations" with the defendant, or otherwise maintain good business relations between parties, however, *does not* serve to justify a patentee's laches. *Lane & Bodley Co. v. Locke*, 150 U.S. 193, 200-201 (1893) (noting that such behavior is entitled to less favorable consideration by a court of equity than mere inaction). McKesson only introduced the patent into the joint marketing negotiations ████████ ██ *See* Ex. 14 [Wukitch Dep. Tr.] at 162; *see also* Ex. 15 [Cesarz Dep. Tr.] at 148-149; Ex. 18; Ex. 14 [Wukitch Dep., Ex. 76] at 184 *and* Ex. 20 ████████████████████████ Thus, in the absence of "continuous and bilateral"

negotiations to resolve the patent dispute, there is no "business negotiation" excuse for McKesson's delay in filing suit. *See Giese*, 29 F. Supp. 2d at 40.

The overwhelming evidence demonstrates that McKesson *intentionally* sat on its rights for more than ten years before filing suit. McKesson does not have any legally cognizable excuse for its inordinate delay. Even if the Court were to give McKesson the benefit of both of the excuses examined above, the period in which McKesson delayed still lasted for more than seven years (*i.e.*, from the time of settlement of the *GMIS* litigation in 1995 to the first discussions of the '164 patent in 2002). Thus, under any analysis, these excuses cannot be used to rebut the heavy presumption of laches that applies in this case.

    **3.**    **TriZetto Has Suffered Material Prejudice As A Result Of McKesson's Delay In Filing Suit.**

The second major element of the laches defense is that the alleged infringer "suffered material prejudice attributable to the" patentee's delay in filing suit. *Genzyme Corp. v. Atrium Med. Corp.*, 2003 U.S. Dist. LEXIS 12784, *10 (D. Del. 2003). "Material prejudice is defined to be either economic or evidentiary prejudice." *Id.* "Economic prejudice requires a change in the economic position of a defendant as a result of the delay, while evidentiary prejudice arises when a defendant is impeded from presenting a full and fair defense on the merits." *Id.* The six-year presumption, discussed above, applies to material prejudice. *Aukerman*, 960 F.2d at 1035. McKesson also cannot meet its burden to prove that TriZetto will suffer no prejudice as a result of its delay in filing suit. *Id.*

    **a.**    **Economic Prejudice.**

"Economic prejudice may arise where a defendant and possibly others will suffer the loss of monetary investments or incur damages which likely would have been prevented by earlier suit." *Aukerman*, 960 F.2d at 1033. For example, if the economic position of the alleged infringer changes during the period of delay, economic prejudice exists. *See id.* "[T]he key is whether there is a nexus between the delay and the infringer's decision to expand the infringing

activity." *ABB Robotics, Inc. v. GMFanuc Robotics Corp.*, 828 F. Supp. 1386, 1395 (E.D. Wis. 1993) (finding economic prejudice and granting defendant's motion for summary judgment on laches). Economic prejudice can be shown by evidence of either loss of investment expenditures or damages (from increasing sales) which might have been prevented by an earlier suit. *Id.* at 1396. Such losses or damages must be "because of and as a result of" the patentee's delay. *Aukerman*, 960 F.2d at 1033 *and Hemstreet v. Computer Entry Sys. Corp.*, 972 F.2d 1290, 1294 (Fed. Cir. 1992).

TriZetto changed its economic position as a result of the patentee's delay in filing suit. During the 11 years between 1993 and 2004, TriZetto and its predecessors spent millions of dollars in the research, development, and marketing of its clinical editing software and subsequent upgrades. Bellomo Decl. at ¶ 6, 9. TriZetto would have developed or marketed its product differently if it had timely notice of purported infringement. *Id.* at ¶ 8. TriZetto also may have chosen to partner with or acquire a software provider that had a license to the '164 patent. *Id.* Also, TriZetto might not have developed its annual updates or regular upgrades to the allegedly infringing product. *Id.* at ¶ 9. Thus, McKesson's failure to timely pursue its claims of infringement caused TriZetto to suffer significant economic prejudice. *See Adelberg Laboratories, Inc. v. Miles, Inc.*, 921 F.2d 1267, 1272 (Fed. Cir. 1990) (Adelberg failed to rebut the presumption of material prejudice to Cutter as Cutter expended capital to expand its business and build up its clamp business, while it had no reason to believe that Adelberg was going to sue for patent infringement. This activity could have been costly to Cutter if Adelberg had successfully sued and recovered lost profits or increased damages to compensate for the infringement.); *AptarGroup, Inc. v. Summit Packaging Sys.*, 1996 U.S. Dist. LEXIS 3026 (D. Ill. 1996) (economic prejudice is demonstrated, because "while sales and thus potential damages increased, AptarGroup could have switched to another design if it had been previously determined that the Taperseal infringed the '236 patent.").

The discussion in McKesson's own damages report of the change in circumstances over time further demonstrates how McKesson's inaction has caused economic

prejudice to Erisco. McKesson is seeking over $90 million in lost profits damages, which it claims were suffered during the period since September 1998 (*i.e.*, during a period that began five years after the infringement allegedly began). ████████████████████

████████████████████████████████████ Ex. 21 [Wagner Dep. Tr.] at 73-74, 101, 118, 122-23. McKesson's lost profits damage claim is based ████████████████████████████ ██████████████ *Id.* at 97-98, 203, 212-13. McKesson simply could not have sought damages of this magnitude had litigation been commenced within six years of the first alleged infringement. *See Herman Miller, Inc. v. Palazzetti Imps. & Exps., Inc.*, 270 F.3d 298, 322 (6th Cir. 2001) (Palazzetti suffered prejudice because of Herman Miller's delay since Palazzetti's potential liability for damages increased).

Moreover, McKesson's damages expert, Michael Wagner testified that ████████ ██████████████████████████████████████ ████████████████████████ Ex. 21 [Wagner Dep. Tr.] at 158-59. In fact, his basic approach to calculating the damages would have been different. This is because Mr. Wagner bases these damages on ███████████████████████ ██████████████████████████ *Id.* at 73-74, 101, 118, 122-23. The damages are ████████████████ ████████████████████ *See id.* Had an action been filed within six years of the issuance of the patent, this approach would have been impossible because, for example, TriZetto was not even selling clinical editing software at that time. Had McKesson filed suit earlier, many events over the years (such as several corporate acquisitions and changes in the market) could not have been used to enhance the damages being sought. *See id.*

Finally, TriZetto would have structured its purchase of Erisco in October 2000 differently had a patent infringement suit been threatened or initiated by McKesson. If HPR or HBOC had sued Erisco or threatened it with infringement litigation, TriZetto may: (a) not have

purchased Erisco; (b) required certain indemnity in the purchase transaction; and/or (c) demanded a large hold-back of funds in the transaction to cover litigation.  *See* Ex. 22 [Margolis Dep. Tr.] at 88 ███████████████████████████████████████████████ ███████████████████████████████████████████████████████ TriZetto proceeded with the acquisition at the price it did and without indemnity or a hold-back, because it never occurred to anyone involved at the time that a seven-year-old patent would be asserted against a product that had been on the market for over ten years.  In fact, McKesson's expert, Mr. Wagner, testified that █████████████████████████████████████████████████ ███████████████████████████████████████████████ Ex. 21 [Wagner Dep. Tr.] at 47-49.  Thus, McKesson caused TriZetto substantial economic prejudice by failing to assert the patent in a timely manner.

### b.  Evidentiary Prejudice.

McKesson's long delay before filing suit has also caused evidentiary prejudice to TriZetto.  Evidentiary prejudice "may arise by reason of a defendant's inability to present a full and fair defense on the merits due to the loss of records, the death of a witness, or the unreliability of memories of long past events, thereby undermining the court's ability to judge the facts."  *Aukerman*, 960 F.2d at 1033; *see also Wanlass Int'l Inc.*, 148 F.3d at 1340 (finding evidentiary prejudice where there was a presumption of laches and where the defendant's policy was to destroy internal documents after six years, key witnesses were deceased or unavailable or had fading memories, and the defendant no longer kept models of some of the accused products).  In this case, key internal documents of both McKesson and TriZetto have been lost or destroyed, and key witnesses are deceased, unavailable, or have fading memories.  *See Wanlass Int'l Inc.*, 148 F.3d at 1340.

As shown by the deposition testimony of the key inventors, information that may have assisted TriZetto in preparing a defense has been lost or destroyed.  For example, Dr.

Goldberg, a key inventor, maintained his originals of "all the documents concerned with HPR, Caterpillar, CodeReview [and the] '164 patent," and provided them pursuant to the subpoena in the *GMIS* litigation. Ex. 23 [Goldberg Dep. Tr.] at 140. About one year after that case settled, Dr. Goldberg "dispose[d] of" his originals. *Id.* at 141 ("Approximately one year after I heard that litigation was over, because I think one of the companies had actually bought the other company, and that certainly ended the litigation. So a year went by and I thought, well, that's over, never have to worry about that again.").

   Similarly, Dr. Egdahl, Director of Boston University's Health Policy Institute and Chairman of the Board of Directors of HPR in 1988, testified that ███████████████

███████████████████ Ex. 24 [Egdahl Dep. Tr.] at 171. Ms. Radosevich, the former CEO of HPR, testified that ███████████████

███████████ Ex. 5 [Radosevich Dep. Tr.] at 15-16. McKesson's expert, Mr. Wagner, testified that ███████

███████ [6] Ex. 21 [Wagner Dep. Tr.] at 152. However, documents evidencing these circumstances dating from 1993 were not available for his review ███████████

███████████ *Id.* at 29-30. Mr. Wagner testified that his damages are

*See id.*

   This problem is exacerbated by two factors. First, although the patent did not issue until 1993, the inventors did the relevant work starting in 1986, almost 20 years ago. Second, all the relevant companies have been acquired at least once and the patent itself has

---

[6]    Mr. Wagner presumes ██████████████████
██████ Ex. 21 [Wagner Dep. Tr.] at 29, 153.

changed hands twice. There is simply no way to reconstruct the evidence that would have been available had litigation been filed within a reasonable period of time.

Evidence of the prejudice caused by the delay is apparent from the testimony of the inventors, who were also unable to remember many key events. Dr. Hertenstein was unable to remember ████████████████████████████████████████████████ See Ex. 4 [Hertenstein Dep. Tr.] at 138-139. He could not remember ███████████████████████████████████████████ (id. at 41), ████████████████ Id. at 179, 188;[7] see also Ex. 23 [Goldberg Dep. Tr.] at 153 ("[T]he bottom line is I don't remember."). Dr. Goldberg also could not remember key technical facts. Id. at 69 (on whether there was a table with more than one procedure code on it: "I believe there was none. If I remember it with certainty, thinking back 20 years, there's very little I remember with certainty, except names of people and meals I've eaten.").

The unexcused delay also prejudiced TriZetto with regard to discovery of evidence from third party witnesses. TriZetto's subpoenas to third parties who were developing clinical editing software systems in the late 1980s were wholly ineffective. See, e.g., D.I. 51 [Ventiv Health, Inc.] and D.I. 59 [Daniel Mgmt. Center, Moore School of Business]. Many of the subpoena recipients responded that they did not retain or have any documents from those projects or that time frame. Still other subpoena recipients were believed to have invalidating prior art. Specifically, Pharmacy Management Services, Inc., which had acquired Insurance Software Packages, Inc., a company identified by the '164 patent examiner, appeared to have a prior art system that rendered many of HPR's pending patent claims "unpatentable." See Ex. 25 [PTO patent prosecution rejection] at MCK 000331-334. Thirteen years later, when TriZetto

---

[7]    On whether Dr. Hertenstein remembered ███████████████████████████████████ Ex. 4 [Hertenstein Dep. Tr.] at 85-86.

attempted to subpoena documents from Pharmacy Management Services, Inc., no responsive documents were produced. TriZetto also tried to subpoena documents from Ronald Hurst, the former manager of health care planning at Caterpillar, Inc. Prior to Robert Hertenstein (one of the chief inventors of the '164 patent) joining Caterpillar, Mr. Hurst was publishing articles on cost containment efforts in the medical claims handling field. Ex. 27 [Hurst article: *Cost Containment*] at 102-104. In response to TriZetto's subpoena, Mr. Hurst responded that he had no documents. As he explained at his subsequent deposition, "I left Caterpillar in 1985. That's 20 years ago. And I've moved several times since then and I have no documents."[8] Ex. 28 [Hurst Dep. Tr.] at 10.

Furthermore, some fact witnesses are no longer available. Some personnel involved in developing McKesson's patent strategy no longer work for McKesson. *See* Ex. 29 [Bell Dep. Tr.] at 111. Others involved with the diligence and decision-making regarding the acquisition of HPR by HBOC and the acquisition of HBOC by McKesson, and would be able to provide information about the value of the patent at the time of the acquisitions, are also no longer employed or available to testify. *See* Ex. 30 [Bowker Dep. Tr.] at 7. This lack of information has further hampered TriZetto's ability to obtain useful evidence in calculating McKesson's alleged damages.

Most of the witnesses can no longer remember many relevant facts, including dates, timing, meetings, proposals and other discussions. Ms. Radosevich was unable to remember ███████████████████████████████████████████ *See* Ex. 5 [Radosevich Dep. Tr.] at 63, 80-81. She was unable to recall (*id.* at 136), nor could she remember ████████████████████████████████

---

[8]    Based on Mr. Hurst's prior art articles and his position at Caterpillar, TriZetto allocated one of its fifteen depositions to Mr. Hurst, only to find out that he could recall very little about his early work and even less about Dr. Hertenstein's work at Caterpillar.

██████████ *Id.* at 164, 170.  At one point in her deposition, Ms. Radosevich declared, ████

████████████████  *Id.* at 186.[9]  Similarly, Tony Bellomo, the

president of Erisco, was unable to remember either when Erisco had discussions with HPR or

when he actually met Ms. Radosevich.  *See* Ex. 31 [Bellomo Dep. Tr.] at 129.  Nor was he able

to recall any details of discussion with HPR in spring 1989[10] or in 1997.[11]

Finally, the 11-year delay in filing suit here has prejudiced TriZetto because

McKesson can no longer find the original CodeReview clinical editing product, developed at the

time the patent application was filed.  Although this Court ordered McKesson to produce the

original CodeReview program to TriZetto, McKesson has admitted that it cannot do so because it

no longer exists.  *See* Transcript of Proceedings, June 13, 2005 at 37; *see also* Transcript of

Proceedings, August 2, 2005 at 29.  Because the preferred embodiment of the product, as

described in the '164 patent, would be useful in understanding the structure of the claims in the

---

[9]    *See also id.* at 124-25 (on whether Radosevich knew ████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████

[10]    On whether Bellomo recalled receiving notification from HPR and GMIS of their code
review products: "I don't recall.  I remember conversations with them.  I don't remember
any material.  I don't remember seeing this material.  I don't know what was sent in this."
Ex. 31 [Bellomo Dep. Tr.] at 156.

[11]    On whether Bellomo recalled receiving notification from HPR of infringement: "[In the
1997 discussion] the patent . . . was possibly, you know, discussed, but put aside, and I
don't remember what was said.  I don't remember if it was, you know, you guys are
infringing but we're not going to go there, or if it was I understand you have a competing
product, so let's not talk about that, let's talk about this . . . but I couldn't tell you I, you
know remember that explicitly."  Ex. 31 [Bellomo Dep. Tr.] at 199.

patent, and the understanding of those of skill in the art at the time the patent was filed, TriZetto has been prejudiced as a result of this loss.

## V.    **CONCLUSION**

McKesson delayed filing suit for an unreasonably long period, and that delay caused both economic and evidentiary prejudice to TriZetto. That prejudice will be greatly magnified if McKesson is allowed to seek the very large damages it now claims. McKesson's actions should preclude recovery for damages for any alleged infringement prior to the filing of the complaint. TriZetto respectfully requests that the Court enter summary judgment of laches.

MORRIS, NICHOLS, ARSHT & TUNNELL

*/s/ Jack B. Blumenfeld*

Jack B. Blumenfeld (#1014)
Rodger D. Smith, II (#3778)
1201 N. Market Street
Wilmington, Delaware 19899
(302) 658-9200

Attorneys for Defendant The TriZetto Group, Inc.

Of Counsel:

GIBSON, DUNN & CRUTCHER LLP
Jeffrey T. Thomas
David Segal
Michael A. Sitzman
Jamboree Center, 4 Park Plaza
Irvine, CA  92614

December 15, 2005

497968

## CERTIFICATE OF SERVICE

I, Rodger D. Smith II, hereby certify that on December 21, 2005, I caused to be electronically filed redacted Opening Brief in Support of The TriZetto Group Inc.'s Motion for Partial Summary Judgment of Laches with the Clerk of the Court using CM/ECF, which will send notification of such filing(s) to the following:

> Thomas J. Allingham, II
> Skadden, Arps, Slate, Meagher & Flom LLP

I also certify that copies were caused to be served on December 21, 2005, upon the following in the manner indicated:

### BY HAND

> Thomas J. Allingham, II
> Skadden, Arps, Slate, Meagher & Flom LLP
> One Rodney Square
> P.O. Box 636
> Wilmington, DE  19899

### BY FEDERAL EXPRESS

> Jeffrey G. Randall
> Skadden, Arps, Slate, Meagher & Flom LLP
> 525 University Avenue
> Suite 1100
> Palo Alto, CA  94301

> /s/     Rodger D. Smith II (#3778)
> Morris, Nichols, Arsht & Tunnell
> 1201 N. Market Street
> P.O. Box 1347
> Wilmington, DE  19899
> (302) 658-9200
> rsmith@mnat.com