# EXHIBIT 16

# REDACTED

# EXHIBIT 17

REDACTED

# EXHIBIT 18

# REDACTED

# EXHIBIT 19

Boston Business Journal



February 5-8, 1994

# HPR's healthy settlement
## Dispute concluded over CodeReview

by JOHN S. MCCRIGHT
JOURNAL STAFF

Boston-based Health Payment Review Inc. and Malvern, Pa.-based GMIS Inc. both said they were pleased with the settlement of a patent dispute last week, but HPR seems to be the only one smiling.

The two makers of health care cost containment software were set to go to court Jan. 23 over a patent awarded in 1993 for HPR's CodeReview product. But, the long-simmering dispute was resolved hours before the court appearance.

Neither side would discuss terms of the agreement, but GMIS immediately issued a release saying the deal would result in a one-time charge to its earnings in the fourth quarter of 1994 and would "significantly" affect its 1994 profits. It also said the agreement would not affect future profits.

Do you smell a big payout to HPR?

Eight-year-old HPR is scheduled to have two new products ready for release in the spring. One will identify doctors who are out of the norm on cost or amount of treatment rendered and another will produce reports on quality of care based on an industry standard called the Health Plan Employer Data Information Set. Company revenue will approach $20 million for the year ending June 30.

Resolving the patent dispute removed one more hurdle in the way of a potential HPR initial public offering, said CFO Brian Cahill. Depending on the IPO market, the company could go public as early as the fall. But, the offering is more likely to happen within the next 24 months, Cahill said.

MCK 036458

04-CV-1258-SLR (D.Del.)

# EXHIBIT 20

# REDACTED

# EXHIBIT 21

REDACTED

# EXHIBIT 22

REDACTED

# EXHIBIT 23

1          UNITED STATES DISTRICT COURT

2          FOR THE DISTRICT OF DELAWARE

3

4

5    -----------------------------x

6    MC KESSON INFORMATION SYSTEMS, :

7         Plaintiff,        :   Case No.

8         vs.               :   04-1258 SLR

9    THE TRIZETTO GROUP,          :

10        Defendant.        :

11   -----------------------------x

12

13

14   VIDEOTAPED DEPOSITION OF GEORGE A. GOLDBERG

15

16

17             Washington, D.C.

18             Tuesday, September 13, 2005

19

20

21

22

23

24   REPORTED BY:

25     CARMEN SMITH

1       MR. SHEK:  Objection as to form; vague and

2   ambiguous.

3       THE WITNESS:  I don't recall any such

4   table in Advanced MedLogic.

5       BY MR. SEGAL:

6    Q   You don't recall one way or the other

7   whether or not there was a table that had more than

8   one procedure code in a sort of line of the table?

9       MR. SHEK:  Objection as to form; vague and

10   ambiguous.

11       THE WITNESS:  We had never conceived of

12   it, but of course, I don't remember the table --

13   such a table either way.  But we had never conceived

14   of the idea.

15       BY MR. SEGAL:

16    Q   So you don't know if, in fact, there was a

17   table?  You just have no recollection of whether or

18   not there was one or wasn't one; is that correct?

19    A   I believe there was none.  If I remember

20   it with certainty, thinking back 20 years, there's

21   very little I remember with certainty, except names

22   of people and meals I've eaten.

23       (Laughter.)

24    Q   Hopefully, this deposition won't knock it

25   down to the meals you've eaten, but I appreciate you

9/13/2005  Goldberg, George

1       Q    At any point in time, did you have any

2    documents concerning the CodeReview product?

3       A    Yes.

4       Q    When is the last time you think you had

5    those documents?

6       A    About a year after the previous -- the one

7    previous time I was subpoenaed and did whatever I

8    did.

9       Q    So whenever -- if we can at some point

10   figure out when that was.  Mid-1990s I think you

11   indicated?

12      A    That was my rough estimate.  Of course,

13   you know precisely when it was, but I don't.

14      Q    Okay.  And at that point, you had

15   additional documents concerning the CodeReview

16   product that you don't currently have today?

17      A    Right.

18      Q    Okay.  Did you have -- did you also have

19   additional documents concerning HPR at the time in

20   the mid-1990s that you don't have today?

21      A    Oh, I'm sorry, I was not distinguishing

22   them.  The answer is probably, yes, I had all the

23   documents concerned with HPR, Caterpillar,

24   CodeReview, patent -- '164 patent.  I don't know

25   precisely what I had, but I had a bunch that dealt

1    with those subjects.

2         Q    And after the -- you provided those cases

3    in the other litigation in which documents were

4    subpoenaed, what -- did you keep copies of the

5    documents?

6         A    Would you rephrase that question, please?

7         Q    Sure.  You indicated at some point in

8    connection with another litigation, you received a

9    subpoena for documents largely covering HPR, the

10   patent, CodeReview.

11        A    Right, and I provided everything I had at

12   that time.  I provided copies of everything I had at

13   that time.

14        Q    And you maintained the originals?

15        A    Right.  They may not have been the

16   originals, but they were my originals.

17        Q    Your originals.  And then when did you

18   dispose of your originals?

19        A    Approximately one year after I heard that

20   litigation was over, because I think one of the

21   companies had actually bought the other company, and

22   that certainly ended the litigation.  So a year went

23   by, and I thought, well, that's over, never have to

24   worry about that again.  So I thought.

25        Q    We will put Exhibit 5 -- actually, hold on

1    patent application, in my understanding.

2        Q    Okay.  Well, let's first do this.  Did you

3    ever review a completed application before it was

4    filed?

5        A    I don't remember.

6        Q    Did you ever review any comments from the

7    Patent Office that may have come back during the

8    prosecution of the patent?

9        A    I don't remember, and I strongly doubt it,

10    because I don't remember any comments coming back

11    from the Patent Office, though perhaps they did

12    after I left HPR.  But I don't -- the bottom line is

13    I don't remember.

14        Q    And when did you learn that the patent had

15    been issued?

16        A    That I definitely do not remember.

17        Q    Okay.  You were going to tell me what you

18    believed your input to be to the application, and

19    you were thumbing through Exhibit A to Exhibit 5 to

20    do that.

21        A    No, I wanted to see if there was something

22    I recognized here as clearly some input so I could

23    just answer your question in a yes or a no.  As soon

24    as I found something that clearly I had an input

25    into, then I could answer yes, I had a role in this

1     I HEREBY CERTIFY that I have read this

2   transcript of my deposition and that this transcript

3   accurately states the testimony given by me, with

4   the changes or corrections, if any, as noted.

5

6

7        x _George A. Goldberg_____

8               10/18/2005

9

10

11  Subscribed and sworn to before me this     day of

12           , 20

13

14

15

16      X

17      Notary Public

18

19

20

21  My commission expires:

22

23

24

25

254

GEORGE A. GOLDBERG

BARKLEY
Court Reporters

1          I HEREBY CERTIFY that I have read this transcript

2    of my deposition and that this transcript accurately states

3    the testimony given by me, with the changes or corrections,

4    if any, as noted.

5

6

7

8    x _George A. Goldberg_____

9          10/18/2005

10

11   Subscribed and sworn to before me this        day of

12                    20  .

13

14

15

16   _____

17

18   Notary Public

19

20   My commission expires:

21

22

23

24

25

                              392

GEORGE A. GOLDBERG, M.D. - VOLUME II

BARKLEY
Court Reporters

# EXHIBIT 24

# REDACTED

# EXHIBIT 25



**UNITED STATES DEPARTMENT OF COMMERCE**
**Patent and Trademark Office**
Address : COMMISSIONER OF PATENTS AND TRADEMARKS
Washington, D.C. 20231

| SERIAL NUMBER | FILING DATE | FIRST NAMED INVENTOR | | ATTORNEY DOCKET NO. |
|---|---|---|---|---|
| 07/648,314 | 01/29/91 | HOLLOWAY | D | H0433/7002 |

|  | EXAMINER |
|---|---|
|  | HAYES,G |

A. JASON MIRABITO
600 ATLANTIC AVENUE
BOSTON, MASSACHUSETTS   02210

| ART UNIT | PAPER NUMBER |
|---|---|
| 2311 | 22 |

DATE MAILED:04/08/92

This is a communication from the examiner in charge of your application.
COMMISSIONER OF PATENTS AND TRADEMARKS

☑ This application has been examined    ☑ Responsive to communication filed on _1-29-91_    ☐ This action is made final.

A shortened statutory period for response to this action is set to expire ___3___ month(s), _____ days from the date of this letter.
Failure to respond within the period for response will cause the application to become abandoned.    35 U.S.C. 133

**Part I    THE FOLLOWING ATTACHMENT(S) ARE PART OF THIS ACTION:**

1. ☐ Notice of References Cited by Examiner, PTO-892.
2. ☐ Notice re Patent Drawing, PTO-948.
3. ☐ Notice of Art Cited by Applicant, PTO-1449.
4. ☐ Notice of Informal Patent Application, Form PTO-152.
5. ☐ Information on How to Effect Drawing Changes, PTO-1474.
6. ☐ _____

**Part II    SUMMARY OF ACTION**

1. ☑ Claims ____7 - 32_____ are pending in the application.

   Of the above, claims _____ are withdrawn from consideration.

2. ☑ Claims _____1 - 6_____ have been cancelled.

3. ☑ Claims _____17 - 32_____ are allowed.

4. ☑ Claims _____7 - 16_____ are rejected.

5. ☐ Claims _____ are objected to.

6. ☐ Claims _____ are subject to restriction or election requirement.

7. ☐ This application has been filed with informal drawings under 37 C.F.R. 1.85 which are acceptable for examination purposes.

8. ☐ Formal drawings are required in response to this Office action.

9. ☐ The corrected or substitute drawings have been received on _____ . Under 37 C.F.R. 1.84 these drawings
   are ☐ acceptable. ☐ not acceptable (see explanation or Notice re Patent Drawing, PTO-948).

10. ☐ The proposed additional or substitute sheet(s) of drawings, filed on _____ has (have) been ☐ approved by the
    examiner. ☐ disapproved by the examiner (see explanation).

11. ☐ The proposed drawing correction, filed on _____ has been ☐ approved. ☐ disapproved (see explanation).

12. ☐ Acknowledgment is made of the claim for priority under U.S.C. 119. The certified copy has ☐ been received ☐ not been received
    ☐ been filed in parent application, serial no. _____ ; filed on _____ .

13. ☐ Since this application appears to be in condition for allowance except for formal matters, prosecution as to the merits is closed in
    accordance with the practice under Ex parte Quayle, 1935 C.D. 11; 453 O.G. 213.

14. ☐ Other

**MCK 000331**

**EXAMINER'S ACTION**

Serial No. 07/648,314                                    -2-
Art Unit   2311

1.   The title of the invention is not descriptive.  A new title is required that is clearly indicative of the invention to which the claims are directed.

2.   The following is a quotation of the appropriate paragraphs of 35 U.S.C. § 102 that form the basis for the rejections under this section made in this Office action:

     A person shall be entitled to a patent unless --
     (b) the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of application for patent in the United States.

     As discussed in the previous Office Action, Weitzel et al. is directed to an expert computer system for processing medical claims.   Use of the system involves receipt of the claim; determination of whether or not the claim makes use of medical service codes; authorization of valid claims and rejection of the invalid codes.

3.   The following is a quotation of 35 U.S.C. § 103 which forms the basis for all obviousness rejections set forth in this Office action:

     A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains.  Patentability shall not be negatived by the manner in which the invention was made.

     Subject matter developed by another person, which qualifies as prior art only under subsection (f) or (g) of section 102 of this title, shall not preclude patentability under this section where the subject matter and the claimed invention were, at the time the invention was made, owned by the same person or subject to an obligation of assignment to the same person.

MCK 000332

Serial No. 07/648,314                          -3-
Art Unit    2311

Claims 7-8 are rejected under 35 U.S.C. § 103 as being unpatentable over Software Packages.

Software packages introduced a software system comprising Levels I and II which includes means for checking medical claims and prepares a report which explains reduced and disallowed charges. While no explicit details are provided in the article, the Examiner asserts that in order to check the claims, means for receiving the claim, to determine whether ICD-9 diagnostic codes are present and rejection or authorization of claims in the prepared report must be present. Claim 7 is rejected.

The Examiner respectfully asserts that motivation for Software Packages to update its system by elimination of defunct codes would be to provide a product on which their customers could depend. Claim 8 is rejected.

The Examiner respectfully asserts that the report of Level II would inform the user of any changes made. Claim 9 is rejected.

Use of existing service codes would be a design choice. Claims 10-11 are rejected.

In order to examine medical claims, Level II would have to have input of data regarding the claim. Claim 12 is rejected.

The IDC-9 codes represent medically determined relationships. Claim 13 is rejected.

Claims 14-16 are apparatus claims corresponding to method claims 7-8 and are rejected on the same basis.

MCK 000333

Serial No. 07/648,314                          -4-
Art Unit  2311

4.                    -RESPONSE TO REMARKS-

    Applicant traverses use of Weitzel as a reference by asserting
that the reference is non-enabling.  The Examiner respectfully
asserts that the reference is evidence that a system for performing
the disclosed function was available to the public prior to
Applicant's filing date and is thus valid prior art.

5.  Any inquiry concerning this communication or earlier
communications from the examiner should be directed to Gail Hayes
whose telephone number is (703) 308-1670.

    Any inquiry of a general nature or relating to the status of
this application should be directed to the Group receptionist whose
telephone number is (703) 0754.


                                        Gail Hayes
                                    GAIL O. HAYES
                                    PATENT EXAMINER
                                      GROUP 230

g.o.h.
April 8, 1992


MCK 000334

# EXHIBIT 26

# Cost Containment—
# The Caterpillar Experience

Ronald Hurst

One of the challenges and new realities on the health care horizon is the growing concern, awareness, and involvement of American industry, as exemplified by what is taking place within my own company, Caterpillar Tractor of Peoria, Illinois. Taken altogether we are administering benefits for more than 200,000 people in the United States—70,000 employees, another 120,000 dependents, and 15,000 retirees and survivors. We are concerned about the cost of these benefits.

Last year in Illinois, where we have the pleasure of being the largest private employer, $350,000,000 in hospital charges was shifted from public payors to private payors. As a largely self-insured, self-administered payor, we are concerned about this trend. However, since part of the problem is a management problem, we at Caterpillar have asked how we can better manage health care payments. That information is what I will share in some detail in this article.

## Caterpillar

First, let me provide a bit of background about Caterpillar Tractor. In 1981 our sales were just over $9 billion, half of which was in foreign countries, where we are one of the major exporters from the U.S. We had a profit of $579 million in 1981. Last year our health benefit payments amounted to just over $150 million. Of that amount, half went to hospitals. Our number one competitor is not General Motors, Allis Chalmers, or International Harvester but a Japanese company named Komatsu. Part

Mr. Hurst is manager of health care planning with Caterpillar Tractor Company in Peoria, Illinois. His paper was originally presented at the 1982 NAPPH annual meeting in Scottsdale, Arizona.

of our management plan is to make sure that Komatsu never becomes as familiar to you as Datsun, Toyota, or Sony.

The reason Caterpillar is as involved as it is in health care is that we have a big stake invested financially. As I noted, last year we paid $150 million for health care, exclusive of workers' compensation payments, taxes for Medicare and Medicaid, disability payments, and death and survivor payments; so we are talking about a sizable sum.

Another principle behind our management approach to health care: We do not blame the doctors or dentists; we do not blame the hospitals. We do not blame labor or government. Industry helped to create the problem by agreeing in its union negotiations on comprehensive first dollar coverage. What we have is a system that is reacting rationally to what amounts to almost a blank check. We in industry need to do something about this situation. The buck has to stop with industry and with labor. It has to stop with doctors, hospitals, and dentists. All of us who helped create the problem need to come together to address it. And we must do so without reducing the quality of health care.

Our management approach, then, has two main aspects: what we are doing inside the company and what we are doing outside. I will describe what we are doing inside first because that is the first area we have to straighten out—clearly a management problem.

## The Inside Approach

My job was created three years ago to coordinate all aspects of health care delivery because we found that we had a number of departments working on their own: data processing, labor relations, communications, medical, and compensation. My job was to bring them together to assure that we are all "singing from the same hymn book,"

102

Supplied by the British Library - "The world's knowledge" www.bl.uk

if you will. To bring about such a unified approach, top level support from the chairman of the board and the president is necessary. Fortunately, I have had this backing within Caterpillar.

Although Caterpillar has been largely self-insured and self-administered for many years, the company has made some new efforts to improve its ability to monitor costs. For example, we have improved our ability to collect and analyze data. We now are able to identify a specific physician whose costs are severely out of line or whose practice patterns do not conform to the norm or identify a hospital that charges excessive amounts for given procedures. We do not simply take such reports and put them aside. We sit down with the doctors, the hospitals, the boards, the administrators, and the dentists. We have 85 people monitoring and processing claims. We are training them so that they are better aware of what they are doing, and we are involving professionals in the claims process. We have hired a physician and a dentist to help improve the medical knowledge of our claims processors and to be involved in their training.

In the area of disability absence control, we have organized programs at all of our major facilities to make sure our plant physicians are talking with the admitting or attending physicians about whether or not each employee may return to work. This activity has a high return not just in terms of dollars but in terms of humanity. We have found that malingering has not been as much of a problem as our own structure and requirements for return to work on the part of employees who are on disability absence. So this area is something we had to clean up within our own house.

In attempting to coordinate benefits, we have an aggressive program to make sure that we pay only if we are responsible for the bill. If another insurance company should be taking care of the bill, we make sure that it does. We have found that we have had to make clear specifications in the area of what we consider usual and customary fees for services.

Although I am not a data processing professional, I had to become involved in data processing because that is where our claims are processed and paid. As you get into this area, if you do, what you need to remember is that a

"Another area we have tried to enhance is communications with employees. If we do not tell the employees that we have a...benefit, how are they supposed to know?"

"Externally, we have entered into a contract with a professional standards review organization (PSRO) in central Illinois which has had a return on our investment of no less than $10 for every $1 we have put into it."

computer is a tool—and that is all it is. That is all computer programs are too; they are tools by which to accomplish a specific objective and should be used to their best advantage toward that end.

## Benefit Plans

Another project we are undertaking inside Caterpillar is to look at our benefit plans. We often negotiated benefits that forced employees and employers into the highest cost option because we did not pay for certain benefits such as outpatient care. We are looking at the cost-effectiveness of the benefits we offer. Among the options we have added are home health care that is under the direction of a licensed physician and performed by a registered nurse and reimbursement for certain ambulatory services. We have not come up with a program for second surgical opinions because our research indicates that it probably costs as much as it benefits, both in health and dollars. We are taking a close look at hospices because we are seeing more evidence that they are both humane and cost-effective. As for dental reviews, we have found more abuse in dental payments than in any other single category, so we have an aggressive multi-faceted program related to dental payments.

Caterpillar now offers 15 health maintenance organizations (HMOs), and we have had an aggressive chemical dependency and alcohol abuse or drug abuse program since before World War II. We have found very high cost-effectiveness from these programs in addition to the humanity of keeping an employee well so that he can get the job done. Obviously, this approach is better for the employee and the family, and it is certainly better for the job being done at work.

Another area we have tried to enhance is communications with employees. If we do not tell the employees that we have a home health care benefit, how are they supposed to know? If we do not tell them that we have an ambulatory benefit so they do not have to be hospitalized to be reimbursed for a given procedure, they may not use the benefit. Half of the time the physician is in a position of knowing more about a given benefit than the employee is,

Supplied by the British Library - "The world's knowledge" www.bl.uk

> "In terms of our psychiatric confinements in particular,...13 percent of our patient days are psychiatric, four percent of our admissions are psychiatric, and the average length of stay for the psychiatric confinement is about three times the average length of stay for other illnesses."

and that is not as it should be. So we have extended our communications extensively, even getting into the area of life styles. The most obvious message that we are spreading is that the way to avoid health care costs is to stay healthy. However, we have not yet been able to define a return on investment from exhaustive programs of the physical fitness or health club type. We are not sure that corporations need to become involved in a major way in this area, but that may depend on where the company is located. What has worked for us may not apply to other employers such as Kimberly-Clark in Wisconsin, for example: In that area of the country, if the company does not do it, it simply does not get done. Kimberly-Clark has spent about $6 million on a gymnasium, a track, and other facilities for its employees. For them, it is a suitable program; however, for us at this point, in our major location, it is not necessary.

## On the Outside

These are just some of the strategies Caterpillar is using internally. Externally, we have entered into a contract with a professional standards review organization (PSRO) in central Illinois which has had a return on our investment of no less than $10 for every $1 we have put into it. We have been so persuaded that we have extended the hospital review to nursing homes and to two of our other production sites at which we have about 6,000 employees each. I think there will come a time when physicians are going to seriously regret having abandoned the PSRO program, which is already in place, operated by doctors, and can be run cost effectively. The physician's message has not been communicated where PSROs have been effective. Doctors seem to be abandoning physician control of the medical cost issue and turning it over to theoreticians and bureaucrats. Where we have contracts we will fund them because our return has been so remarkable. Let me give you the details.

Between 1977, the last full year before Caterpillar contracted with a PSRO, and 1980, our admissions rate per 1,000 covered persons per year declined from 156 to 140. Our patient days per thousand covered persons per

year, excluding Medicare, went down from 1,000 to 830. The average length of stay went down from 6.4 to 5.8 days, so we have had significant reductions. We can point to no other variable that specifically would have caused those savings other than the PSRO review. Return on investment has been high for us.

According to our PSRO representative, one of the reasons Caterpillar's return on investment has been so high is that we firmly requested what we wanted, made comparisons with our data, and really worked with the PSRO to get a good program. Now six other major employers in central Illinois also have private review contracts.

In terms of psychiatric confinements in particular, I can share with you that 13 percent of our patient days are psychiatric, four percent of our admissions are psychiatric, and the average length of stay for the psychiatric confinement is about three times the average length of stay for other illnesses. Our data on these factors are very concrete since we have been largely self-insured, self-administered for so long.

Our psychiatric admission criteria were developed by a group of local psychiatrists who are involved in the PSRO program. The criteria deal with clinical and laboratory findings, appropriateness of medication, need for hospitalization, discharge criteria, and a number of other treatment factors.

What problems have we had with psychiatric confinements in our PSRO program? We now have had the program for four years, so the problems no longer exist for us in any magnitude. In the beginning, however, we had to deal with the issues of subjectivity and confidentiality of records.

Caterpillar also has 15 contracts with health maintenance organizations. We are involved in about half a dozen business coalitions on health care costs, and we have begun talking to the medical community more than we did in the past—making presentations to medical society boards, sitting down with individual physicians, encouraging regular dialogue rather than just calling infrequently to discuss a claim or a single patient. We need to know more about the problems of the providers, just as the providers need to know more about the problems of the payors, so we are enhancing the dialogue.

## Conclusion

There is an old saying in the field of management that managers are supposed to make something happen. But the question is a complex one, and I hope I have not oversimplified it. The issue is terribly difficult, volatile, and sensitive; and there is no silver bullet. Nonetheless, we at Caterpillar are trying to make cost containment happen ■

104

Supplied by the British Library - "The world's knowledge" www.bl.uk

# EXHIBIT 27

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

McKESSON INFORMATION

SOLUTIONS, LLC,

CIVIL ACTION NO. 04-1258 SLR

Plaintiff,

vs.

THE TRIZETTO GROUP, INC.,

Defendant.

_____/

VIDEOTAPED

DEPOSITION OF:          RONALD A. HURST

TAKEN:          Pursuant to Notice

Instance of Defendant

DATE:          September 21, 2005

TIME:          Commencing at 9:09 a.m.

PLACE:          Wyngate Inn

17301 Dona Michelle Drive

Tampa, Florida

BEFORE:          TONYA H. MAGEE

Court Reporter and

Notary Public, State

of Florida at Large

VIDEOGRAPHER:          RICK SPECTOR

1     A.   Yes, I did.

2     Q.   Okay.  And I think he said that he was

3     otherwise gonna be here with you today.

4     A.   He called Monday and said that he had to go to

5     Chicago.

6     Q.   Okay.  All right.  Did he tell you not to

7     proceed with the deposition or anything?

8     A.   No, no.

9     Q.   Okay.

10    A.   I've actually gotten two subpoenas.  The first

11    one was to provide documents.  And I called Caterpillar

12    and I said, what is this?  You know, I wasn't employed

13    by Caterpillar at the time it was written.  And I said,

14    what are they talking about?  I left Caterpillar in

15    1985.  That's 20 years ago.  And I've moved several

16    times since then and I have no documents.

17       So Andy sent a letter to whoever sent that

18    subpoena saying, he has no documents.  And I thought

19    that was the end of it.  Then three months later or

20    thereabouts, I get another subpoena saying, well, even

21    if you don't have any documents, we want you to give a

22    deposition.  So that's the conversation I had with Andy,

23    what do I do.

24    Q.   Thank you.  Thank you very much.  That's

25    helpful.  The -- and you did a great job, by the way,

# EXHIBIT 28

1          IN THE UNITED STATES DISTRICT COURT

2            FOR THE DISTRICT OF DELAWARE

3                    - - -

4     McKESSON INFORMATION          :

      SOLUTIONS, LLC,            :

5                        : Civil Action

         Plaintiff,        : No. 04-1258 SLR

6                    :

         vs.          :

7                    :

      THE TRIZETTO GROUP, INC.,    :

8                    :

         Defendant.          :

9

10

11              - - -

12

13          Videotaped deposition of KAREN

14     BELL, taken pursuant to notice before Gail Inghram

15     Verbano, CSR, RMR, in the law offices of Morris,

16     Nichols, Arsht & Tunnell, 1201 North Market Street,

17     Wilmington, Delaware, on Friday, September 16, 2005,

18     beginning at approximately 9:25 a.m., there being

19     present:

20

21

22

23

24

25

9/16/2005 Bell, Karen

1        Can I clarify that?  I do know        12:23:47

2    another person.  At that time, it was Will Lee.        12:23:48

3    BY MR. SITZMAN:                        12:23:52

4        Q    And what time -- what time frame are you  12:23:53

5    thinking of?  You said "at that time."        12:23:56

6        A    When Will was employed with McKesson.    12:23:58

7        Q    Because he's no longer there; right?    12:24:01

8        A    That is correct.  The exact time frame,    12:24:03

9    I don't know, but I know that he was on that team.    12:24:06

10        Q    Do you know when the patent team was    12:24:11

11    formed?                        12:24:12

12        A    I do not, huh-uh.            12:24:13

13        Q    Did you take part in any meetings        12:24:33

14    regarding decisions as to which customers -- strike  12:24:41

15    that.                        12:24:44

16            Did you take part in any        12:24:45

17    discussions in which various vendors were identified  12:24:46

18    that would be sent letters warning them of the        12:24:53

19    patent and the reach of the patent that McKesson    12:24:58

20    owned?                        12:25:00

21        A    No.                    12:25:01

22        Q    I had the court reporter mark as KB9 a    12:25:13

23    string of emails that's marked MCK21457 to 477.    12:25:17

24        A    Yes.                    12:25:30

25        Q    And I'm going to ask you to take a look  12:25:30

111

C E R T I F I C A T I O N

I hereby certify that I have read
the foregoing transcript of my deposition testimony,
and that my answers to the questions propounded,
with the attached corrections or changes, if any,
are true and correct.

------------------------------------
KAREN BELL

133

KAREN BELL

BARKLEY
Court Reporters

# EXHIBIT 29

# REDACTED

# EXHIBIT 30

1              UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF DELAWARE

3

4     McKESSON INFORMATION SOLUTIONS LLC,

5              Plaintiff,

6        vs.          Civil Action No.

                      04-1258-SLR

7     THE TRIZETTO GROUP, INC.,

8              Defendant.

9

10

11

                    _____

12

13              Videotaped deposition of ANTHONY

14         BENJAMIN BELLOMO held at the offices of Skadden

15         Arps Slate Meagher & Flom, Four Times Square,

16         New York, New York, on Friday, September 16,

17         2005, commencing at 9:00 a.m., before David

18         Sanders, Legal Video Specialist, and James W.

19         Johnson, Registered Professional Reporter and

20         a Notary Public of the State of New York.

21

22

23         JOB No. 38485

24

25

1    discussions and obtain manuals and materials

2    regarding HPR's CodeReview product in order to

3    develop Erisco's functionality?

4         A.    Not to my knowledge.  I remember having

5    conversations with one or more external parties

6    that had code review systems.  I absolutely

7    remember speaking with Tom Owens at GMIS on one and

8    possibly two occasions, visiting their, their

9    company in Pennsylvania, wherever they were.

10        We may have had discussions with HPR.  I

11   know I met Marcia once.  I don't remember if it was

12   in this context or later on a few years later.

13        We very well could have had discussions

14   with her about this product and potentially

15   incorporating it; I don't recall, but I certainly

16   recall having discussions with Tom Owens of GMIS

17   and evaluating whether or not we would be better

18   off taking their application and essentially

19   partnering with them as an alternative to building

20   it ourselves, so we evaluated that.

21        We also evaluated the potential sources

22   of the database as to, if we chose to build it

23   ourselves, what would be the ways that we can get a

24   database that contained the necessary rules in it

25   for us to do the logic, so those were the things

1   product prior to the development of Erisco's own

2   code review product in the spring of 1989?

3       A.   I don't recall.  I remember

4   conversations with them.  I don't remember any

5   material.  I don't remember seeing this material.

6   I don't know what was sent in this.

7           This could have been a brochure.  It

8   could have been a, you know, a one-page

9   description.  I do not know what was here.

10  Generally speaking, if a company sends out material

11  to another company without a nondisclosure, they're

12  okay with it being out there.  I don't know what

13  this is.

14      Q.   How did Erisco use the oral and written

15  information that it received from HPR in late 1988

16  and early 1989 regarding HPR's code review product

17  in connection with the subsequent development at

18  Erisco of its code review product?

19          MR. THOMAS:  Objection, assumes facts

20      not in evidence.

21      A.   The material looks like it was received

22  in '89, right?

23      Q.   January of '89.

24      A.   So you said '88, '89.

25      Q.   I said oral and written, and it

1    upon their patent.

2        Q.    And when you say you don't recall

3    receiving notification, you don't recall receiving

4    any notification, whether it was written or oral,

5    from HPR that Erisco infringed the '164 patent,

6    correct?

7        A.    In the discussion in '97 the patent was

8    referred to, but it was not a notification verbally

9    that we were infringing upon it.  It was possibly,

10    you know, discussed, but put aside, and I don't

11    remember what was said.

12        I don't remember if it was, you know,

13    you guys are infringing but we're not going to go

14    there, or if it was I understand you have a

15    competing product, so let's not talk about that,

16    let's talk about this.

17        It was a generally friendly meeting

18    where we were trying to develop a business

19    relationship, so in all likelihood it was, it

20    started off with a threat about you're infringing

21    upon us, but I couldn't tell you I, you know,

22    remember that explicitly.  My notes don't indicate

23    it.

24        Q.    Can you recall -- and if you can I want

25    to talk about it -- can you recall any instance in

**Page 209**

I, ANTHONY BENJAMIN BELLOMO, do hereby declare under penalty of perjury that I have read the foregoing transcript; that I have made any corrections as appear noted, in ink, initialed by me, or attached hereto; that my testimony as contained herein, as corrected, is true and correct.

EXECUTED this _14_ day of _November_ 20_05_, at _Union_, _NJ_, _____
(City)        (State)

_____
ANTHONY BENJAMIN BELLOMO

---

**Page 210**

## C E R T I F I C A T E

STATE OF NEW YORK )
                  ) Ss
COUNTY OF NEW YORK )

I, JAMES W. JOHNSON, a Registered Professional Reporter and Notary Public within and for the State of New York, do hereby certify:

That ANTHONY BENJAMIN BELLOMO, the witness whose deposition is hereinbefore set forth, was duly sworn by me and that such deposition is a true record of the testimony given by such witness.

I further certify that I am not related to any of the parties to this action by blood or marriage and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF I have hereunto set my hand this 25th day of September 2005.

_____
JAMES W. JOHNSON
Registration #01J05000925
Commission Expires 9/4/2006

---

**Page 211**

------------I N D E X------------

WITNESS        EXAMINATION BY        PAGE
Anthony Bellomo        Mr. Randall        5

------------MOTIONS------------
PAGES  50, 81, 103

------------EXHIBITS------------
BELLOMO                                    PAGE
1    E-Mail, TRZ 637190-191              42
2    E-Mail, TRZ 207303                  47
3    E-Mail, TRZ 358484                  52
4    E-Mail, TRZ 687691-7692             57
5    Letter, Aug 20, 1998, MCK034337-338  59

---

**Page 212**

------------EXHIBITS------------
BELLOMO                                    PAGE
6    E-Mail, TRZ 295420-5421             62
7    US Patent Number 5,253,164          84
8    Provider Perspective               119
9    Letter, Jan 24, 1989, MCK117578    151
10   Letter, Jun 29, 1989, TRZ 837458   165
11   Letter, Jun 13, 1989, TRZ 837024-25  169
12   Letter, Jul 3, 1989, TRZ 837026-047  170
13   TriZetto Group Web Page Printout   182
14   Notice of 30(b)(6) Deposition      183
15   Notice of 30(b)(6) Deposition      194
16   Letter, Aug 30, 2005               188

53 (Pages 209 to 212)

<u>CERTIFICATE OF SERVICE</u>

I, Rodger D. Smith II, hereby certify that on December 21, 2005, I caused to be electronically filed redacted The TriZetto Group, Inc.'s Appendix of Exhibits in Support of its Motion for Partial Summary Judgment of Laches with the Clerk of the Court using CM/ECF, which will send notification of such filing(s) to the following:

> Thomas J. Allingham, II
> Skadden, Arps, Slate, Meagher & Flom LLP

I also certify that copies were caused to be served on December 21, 2005, upon the following in the manner indicated:

> <u>BY HAND</u>
>
> Thomas J. Allingham, II
> Skadden, Arps, Slate, Meagher & Flom LLP
> One Rodney Square
> P.O. Box 636
> Wilmington, DE  19899
>
> <u>BY FEDERAL EXPRESS</u>
>
> Jeffrey G. Randall
> Skadden, Arps, Slate, Meagher & Flom LLP
> 525 University Avenue
> Suite 1100
> Palo Alto, CA  94301

> /s/    Rodger D. Smith II (#3778)
> Morris, Nichols, Arsht & Tunnell
> 1201 N. Market Street
> P.O. Box 1347
> Wilmington, DE  19899
> (302) 658-9200
> rsmith@mnat.com