# EXHIBIT 16

# MCKESSON CORP

## FORM 10-K405
(Annual Report (Regulation S-K, item 405))

## Filed 7/14/1999 For Period Ending 3/31/1999

| | |
|---|---|
| Address | ONE POST ST MCKESSON PLAZA |
| | SAN FRANCISCO, California 94104 |
| Telephone | 415-983-8300 |
| CIK | 0000927653 |
| Industry | Personal & Household Prods. |
| Sector | Consumer/Non-Cyclical |
| Fiscal Year | 03/31 |

Generated by EDGAR Online Pro
http://pro.edgar-online.com



Contact EDGAR Online
Customer Service: 203-852-5666
Corporate Sales: 212-457-8200

# SECURITIES AND EXCHANGE COMMISSION
## Washington, D.C. 20549

# FORM 10-K

**[X] ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the fiscal year ended March 31, 1999

OR

**[_] TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

*Commission File Number 1-13252*

# McKESSON HBOC, INC.

A Delaware Corporation

**I.R.S. Employer Identification Number 94-3207296**

McKessonHBOC Plaza,
One Post Street,
San Francisco, CA 94104

**Telephone--Area Code (415) 983-8300**

**Securities registered pursuant to Section 12(b) of the Act:**

| (Title of Each Class) | (Name of Each Exchange on Which Registered) |
|---|---|
| Common Stock, $.01 par value | New York Stock Exchange Pacific Exchange, Inc. |
| Preferred Stock Purchase Rights | New York Stock Exchange Pacific Exchange, Inc. |

**Securities registered pursuant to Section 12 (g) of the Act: None.**

Indicate by check mark whether the Registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the Registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes [X] No

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of Registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. [X]

Aggregate market value of voting stock held by nonaffiliates of the Registrant at June 30, 1999: $8,335,183,427

Number of shares of common stock outstanding at June 30, 1999: 281,277,000

## Documents Incorporated By Reference

Portions of the Registrant's Proxy Statement for its Annual Meeting of Stockholders to be held on August 25, 1999 are incorporated by reference into Part III of this report.

# TABLE OF CONTENTS

Item                                                                    Page
----                                                                    ----

### PART I

1.  Business........................................................    3

2.  Properties......................................................   11

3.  Legal Proceedings...............................................   11

4.  Submission of Matters to a Vote of Security Holders.............   15

    Executive Officers of the Registrant...........................   16

### PART II

5.  Market for the Registrant's Common Stock and Related Stockholder
    Matters........................................................   17

6.  Selected Financial Data.........................................   17

7.  Management's Discussion and Analysis of Financial Condition and
    Results of Operations..........................................   17

7A. Quantitative and Qualitative Disclosures About Market Risk......   17

8.  Financial Statements and Supplementary Data.....................   17

9.  Changes in and Disagreements with Accountants on Accounting and
    Financial Disclosure...........................................   17

### PART III

10. Directors and Executive Officers of the Registrant..............   18

11. Executive Compensation..........................................   18

12. Security Ownership of Certain Beneficial Owners and Management...   18

13. Certain Relationships and Related Transactions..................   18

### PART IV

14. Exhibits, Financial Statement Schedule, and Reports on Form 8-K...  18

    Signatures.....................................................

2

As a result of the restatement of previously reported amounts for HBOC, revised consolidated financial information for the Company is as follows (in millions, except per share amounts):

| | Three months ended March 31, | | Year ended March 31, | |
|---|---|---|---|---|
| | 1999 | 1998 | 1999 | 1998 |
| Preliminarily reported consolidated net income (loss)................................................. | $(60.4) | $96.8 | $237.1 | $330.4 |
| Revised consolidated net income (loss)........... | (61.2) | 81.7 | 84.9 | 304.6 |
| Preliminarily reported consolidated net income (loss) per diluted share........................ | (0.22) | 0.35 | 0.84 | 1.19 |
| Revised consolidated net income (loss) per diluted share........................................... | (0.22) | 0.29 | 0.31 | 1.10 |

The impact of these restatements resulted in net reductions, from previously reported amounts, in the Health Care Information Technology segment as follows (in millions):

| | Three months ended March 31, | | Year ended March 31, | |
|---|---|---|---|---|
| | 1999 | 1998 | 1999 | 1998 |
| Health Care Information Technology | | | | |
| Preliminarily reported revenues.......... | $ 431.9 | $393.1 | $1,783.9 | $1,477.3 |
| Revised revenues........................ | 402.6 | 376.8 | 1,538.1 | 1,429.2 |
| Preliminarily reported operating profit (loss)................................... | (102.1) | 99.4 | 221.8 | 269.3 |
| Revised operating profit (loss) .......... | (105.5) | 74.3 | (31.6) | 227.0 |

See Financial Note 3 to the consolidated financial statements, "Restatement," appearing on pages F-40 to F-48 to this Annual Report on Form 10-K.

### Class Action Litigation and Government Investigations

A description of certain class action and other litigation arising subsequent to the Company's announcements discussed above are described in Item 3, "Legal Proceedings" on pages 11 to 15 of this Annual Report on Form 10-K. The United States Attorney's Office for the Northern District of California and the San Francisco District Office of the United States Securities and Exchange Commission ("SEC") have also commenced investigations in connection with the matters relating to the restatement of previously reported amounts for HBOC described above. The SEC has advised the Company that its inquiry should not be construed as an indication by the SEC or its staff that any violations of law have occurred.

### Management Changes

On June 21, 1999, the Company announced that its Board of Directors had appointed new executive management for the Company. John H. Hammergren and David L. Mahoney were appointed Co-Presidents and Co-Chief Executive Officers of the Company effective July 15, 1999 and Heidi E. Yodowitz, Senior Vice President and Controller, was appointed Acting Chief Financial Officer of the Company. The Company also announced the resignations of Mark A. Pulido, previously President and Chief Executive Officer, and Richard H. Hawkins, previously Executive Vice President and Chief Financial Officer, effective July 15, 1999.

Additionally, the Company announced the removal of Charles W. McCall as Chairman of the Board of Directors and his dismissal as an employee of the Company. Alan Seelenfreund, a former Chairman and Chief Executive Officer of McKesson, was appointed Chairman of the Board.

The Company also announced the dismissal of several executives of its Health Care Information Technology segment including its former president and chief executive officer. The Company appointed Graham O. King as the president of that segment.

(c) Narrative Description of Business

(1) Description of Segments of Business

The Company is organized under three operating segments, Health Care Supply Management, Health Care Information Technology and Water Products. Within the United States and Canada, the Health Care Supply Management segment is a leading wholesale distributor of ethical and proprietary drugs, medical-surgical supplies and health and beauty care products principally to chain and independent drug stores, hospitals, alternate care sites, food stores and mass merchandisers. The Health Care Information Technology segment delivers enterprise-wide patient care, clinical, financial, managed care, payor and strategic management software solutions, as well as networking technologies, electronic commerce, outsourcing and other services to health care organizations throughout the United States and certain foreign countries. The Water Products segment is engaged in the processing and sale of bottled drinking water to homes and businesses and packaged water through retail stores.

The Company generated annual sales of $30.4 billion, $22.4 billion, and $16.9 billion in fiscal years 1999, 1998, and 1997, respectively: approximately $28.4 billion, 94%; $20.6 billion, 92%; and $15.4 billion, 91%; respectively, in the Health Care Supply Management segment: approximately $1.5 billion, 5%; $1.4 billion, 6%; and $1.1 billion, 7%; respectively, in the Health Care Information Technology segment: and approximately $0.4 billion, 1%; $0.3 billion, 2%; and $0.3 billion, 2%; respectively, in the Water Products segment.

**Health Care Supply Management**

### Products and Markets

Through its Health Care Supply Management segment, McKessonHBOC is a leading distributor of ethical and proprietary drugs, medical-surgical supplies and health and beauty care products in North America. The Company's Health Care Supply Management segment consists of its core U.S. pharmaceutical distribution business, its medical-surgical distribution and services business, its automated pharmacy systems and services, its sales, marketing and other support services to pharmaceutical manufacturers and includes the Company's international operations in Canada and Mexico (collectively, the "Supply Management Business").

Through its Pharmaceutical Group, the Supply Management Business provides domestic distribution of pharmaceuticals and health and beauty care products to independent and chain pharmacies, hospitals, alternate site health care facilities, food stores and mass merchandisers in all 50 states. The Medical Group offers a full range of medical-surgical supplies, equipment, pharmacy management services, logistics and management information support to hospitals, physicians' offices, long-term care, and homecare providers. Through the Automation Group, the Company manufactures and markets automated pharmacy systems and services to hospitals and retail pharmacies.

The Pharmaceutical Group supplies pharmaceuticals and health care related products to three primary customer segments: retail chains (pharmacies, food stores, and mass merchandisers), retail independent pharmacies and institutional providers (including hospitals, alternate-site providers, and integrated health networks). These three customer categories represented approximately 38.5%, 28.7%, and 32.8%, respectively, of the Pharmaceutical Distribution Group's revenues in fiscal 1999. Operating under the tradenames Economost(TM) and Econolink(TM) and a number of related service marks, the Company promotes electronic order entry systems and a wide range of computerized merchandising and asset management services for pharmaceutical retailers and health care institutions. The Company has developed advanced marketing programs and information services directed at retail pharmacies. These initiatives include the Valu-Rite(TM), Valu-Rite/ CaremaxSM and HealthMart (TM) retail networks, the Omnilink(TM) centralized pharmacy technology platform, which offers retail network members connectivity with managed care organizations while promoting compliance with managed care plans. The Company's nationwide network of distribution centers utilizes the Acumax(R) Plus warehouse management system which provides real-time inventory statistics and tracks products from the receiving dock to shipping through scanned bar code information and radio frequency signals with accuracy levels above 99% to help ensure that the right product arrives at the right time and place for both the Company's customer and their patients. The Company believes that its financial strength, purchasing leverage, affiliation

6

# EXHIBIT 17

# IMS Health, Internet Portal TriZetto Combining In $8.1 Billion Stock Swap
## Wednesday, March 29, 2000 04:13 AM ET

NEW YORK -(Dow Jones)- IMS Health Inc. agreed to be acquired by TriZetto Group Inc., a California-based Internet health-care company, for around $8.1 billion in stock, forming a combination that will be world leader in health-care information services to the business marketplace.

The companies characterized the deal as a merger, but The Wall Street Journal reported earlier Wednesday that Westport, Conn., based IMS, a leading provider of information services to the pharmaceuticals and health-care industries, effectively is acquiring Newport Beach-based TriZetto since IMS shareholders will wind up controlling about 85% of the combined company.

IMS shareholders will receive 0.4655 share of TriZetto (TZIX, news, msgs) for each IMS share (RX, news, msgs). Based on the $58.063 price for TriZetto shares at 4 p.m. EST on the Nasdaq Stock Market Tuesday, the deal values IMS at $27.03 a share, a 25% premium to its late New York Stock Exchange price of $21.625.
IMS said TriZetto is the "legal acquirer" under terms of the deal, which will be accounted for as a purchase and is expected to be tax-free to shareholders.
The combined company, called TriZetto Group Inc., will issue shares of tracking stocks to "unbundle" Internet and non-Internet assets, partially in response to confusion over how to value Internet and non-Internet companies, the Journal said.
The newspaper reported that by making Internet health-care company TriZetto the acquirer, the huge amount of goodwill created will be booked on the Internet company, where there are no earnings and the stock trades largely on revenue. Goodwill must be deducted from reported earnings.

After the deal closes, the merged company plans to issue three securities to all investors. IMS Health, representing the core IMS pharmaceutical market-research and sales-management businesses, will be issued as a tracking stock. TriZetto, the application-services provider and Internet portal business, will be combined with Erisco, a provider of technology services. And a new security representing the company's pharmaceutical-relationship management business, Strategic Technologies, will be structured as a tax-free spinoff.

The transaction is expected to close in the third quarter, subject to regulatory approvals, approval by both companies' shareholders and customary closing conditions. Shareholders representing a majority of TriZetto shares have already agreed to approve the deal.

The boards of both companies approved the agreement, which will create a company with pro forma market capitalization of about $10 billion.

MCK 140904

Confidential Information Subject to D. Del. LR 26.2 - HIGHLY CONFIDENTIAL          04-CV-1258-SLR (D.Del.)

IMS Chairman Robert E. Weissman will be chairman of the combined company, while IMS Chief Executive Victoria R. Fash will be CEO of the combined company. TriZetto's chairman and chief executive, Jeffrey H. Margolis, will be vice chairman and president. The board will consist of those three executives and six independent directors, three designated by each company.
Goldman Sachs Group Inc. served as financial adviser to IMS; Warburg Dillon Read had the same role for TriZetto.

Fash said the companies' strategy is to combine high growth with financial sustainability, with "TriZetto technology as the eBusiness engine, driving IMS digital assets linked by the HealthWeb global portal."
TriZetto, formed in 1997, is a highly regarded applications-service provider and health-care business portal. Its HealthWeb portal is a business-to-business portal for health-care administrators. The company went public last October and its shares have soared 545% since the IPO. TriZetto, much like American Online Inc. (AOL, news, msgs), Qwest Communications International Inc. (Q, news, msgs) and Global Crossing Ltd. (GBLX, news, msgs), is using its heady share valuation as currency to acquire traditional concerns and businesses, the Journal noted. TriZetto posted a loss of 85 cents a share, or $7.9 million, in 1999, including charges. Revenue was $32.9 million. IMS, which has been in the health-care-information business for more than 40 years, posted 1999 income from continuing operations of 78 cents a share, or $250.4 million, on revenue of $1.4 billion.
IMS is the leading provider of prescription-drug research and analysis but faces the challenge of migrating its business onto the Internet. It processes $165 billion of transaction records a month, and its data base includes 99% of all prescription drugs filled. It had 1999 revenue of $1.4 billion. In 1998, it was spun out of Cognizant Corp., which in turn was spun out of Dun & Bradstreet Corp.

MCK 140905

# EXHIBIT 18
# IS REDACTED IN ITS ENTIRETY

**EXHIBIT 19
IS REDACTED IN ITS ENTIRETY**

**EXHIBIT 20
IS REDACTED IN ITS ENTIRETY**

**EXHIBIT 21**
**IS REDACTED IN ITS ENTIRETY**

# EXHIBIT 22

LEXSEE 2003 U.S. DIST. LEXIS 12784

**GENZYME CORPORATION, Plaintiff, v. ATRIUM MEDICAL CORPORATION, Defendant.**

**Civil Action No. 00-958-MPT**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

*2003 U.S. Dist. LEXIS 12784*

**July 22, 2003, Decided**

**SUBSEQUENT HISTORY:** Motion for new trial denied by, Motion granted by, Motion denied by, Injunction denied by *Genzyme Corp. v. Atrium Med. Corp., 2004 U.S. Dist. LEXIS 10984* (D. Del., Apr. 22, 2004)

**PRIOR HISTORY:** *Genzyme Corp. v. Atrium Med. Corp., 212 F. Supp. 2d 292, 2002 U.S. Dist. LEXIS 13878* (D. Del., 2002)

**DISPOSITION:** [*1] Defendant's motion on the defense of laches was denied.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff patent holder sued defendant company alleging patent infringement. A jury found that the company did not infringe any claims in the patents-in-suit and that all patents-in-suit were invalid. Before the court was defendant's motion on the defense of laches, which was filed during the trial and which the court reserved a decision on until after post trial briefing was complete.

**OVERVIEW:** The patent infringement case dealt with a dispute over designs for pulmonary drainage devices. The company asserted that the patent holder's four and a half year delay in filing claims of infringement on the patent was unreasonable since the patent holder had notice of the potential infringement and failed to notify the company of its intention to file suit. The court found that the patent holder's four and a half year delay was within the range set forth in the majority of cases. Its conduct was consistent with the "borrowed" statutory guideline set forth under *35 U.S.C.S. 282*, and the principles set forth under equitable estoppel, and was not unreasonable based on lack of notice. The patent holder had several valid reasons for its delay, such as a change in management and the issue of monetary ripeness. The company did not suffer economic prejudice during the four and a half years that the patent holder waited to file this action for infringement. Neither party legitimately complained during the pretrial conference nor in their pretrial motions that they were unable to obtain necessary information due to delay to prepare their case.

**OUTCOME:** The company's motion on the defense of laches was denied.

**LexisNexis(R) Headnotes**

*Patent Law > Infringement Actions > Defenses > Estoppel & Laches > Excuse*
*Patent Law > Infringement Actions > Defenses > Estoppel & Laches > Elements*
[HN1] Under patent law, the law on laches is rooted in the equitable principle that courts will not assist one who has "slept on his rights." In the interest of fairness and equity, those who are granted a monopoly under the patent system have an obligation to enforce their rights in a timely manner. Laches protects a potential infringer from unfair damage claims resulting from the intentional or neglectful delay of a patent holder to file suit. Two elements underlie this defense: (a) the patentee's delay in bringing suit was unreasonable and inexcusable, and (b) the alleged infringer suffered material prejudice attributable to the delay.

*Patent Law > Infringement Actions > Defenses > Estoppel & Laches > Elements*
*Patent Law > Infringement Actions > Burdens of Proof*
*Patent Law > Remedies > Damages > Time Limitations*
[HN2] Under patent law, laches, as defined under *35 U.S.C.S. 282* is an equitable defense to a claim for patent infringement. This provision in the Patent Act bars recovery of damages for any infringement committed more than six years prior to the filing of the complaint or a

2003 U.S. Dist. LEXIS 12784, *

counterclaim for infringement. Courts have almost unanimously "borrowed" this six year time provision in order to protect a potential infringer from damages due to either the intentional or negligent delay of a patent holder in bringing suit. This period can be described as the "reasonable" period required to create a presumption of laches. It begins when the patentee knew or should have known of the alleged infringer's activity. The presumption of six years represents an equitable balancing of the interests of the parties. It also represents the point at which the burden of proof shifts from the defendant to the plaintiff. A six-year delay requires the patentee to rebut the presumption of laches. But where the delay is less than six years, no presumption operates, and an accused infringer relying on laches must demonstrate the existence of both elements, namely, inexcusable delay and resulting prejudice.

*Patent Law > Infringement Actions > Defenses > Estoppel & Laches > Elements*
*Patent Law > Infringement Actions > Defenses > Estoppel & Laches > Excuse*
*Patent Law > Remedies > Damages > Time Limitations*
[HN3] With regard to laches under patent law, the degree of infringement may be relevant to the issue of when the period of delay begins. A delay of less than six years in bringing an infringement action has been excused where the infringer's actions are not commercially significant. Patent owners are not expected to incur considerable expense to silence commercially insignificant infringers. Finally, the court will consider these factors, the evidence, and other relevant circumstances to determine whether equity should intercede to bar pre-filing damages. Laches is not established by undue delay and prejudice. These factors merely lay the foundation for the trial court's exercise of discretion. Ultimately, it is within the court's prerogative, based on its evaluation of all relevant evidence, to determine whether a delay of fewer than six years is unreasonable or inexcusable.

*Patent Law > Inequitable Conduct > General Overview*
*Patent Law > Infringement Actions > Defenses > Estoppel & Laches > General Overview*
[HN4] Under patent law, in order to satisfy the second element of laches, a defendant must prove that he suffered material prejudice attributable to the delay. Material prejudice is defined to be either economic or evidentiary prejudice. Economic prejudice requires a change in the economic position of a defendant as a result of delay, while evidentiary prejudice arises when a defendant is impeded from presenting a full and fair defense on the merits.

*Patent Law > Remedies > Collateral Assessments > Increased Damages*
*Patent Law > Infringement Actions > Defenses > Estoppel & Laches > Elements*
*Copyright Law > Civil Infringement Actions > Remedies > Damages > Infringer Profits*
[HN5] With regard to laches under patent law, to establish economic prejudice, a change in the economic position of the alleged infringer during the period of delay must have occurred. The change must be because of and as a result of the delay, not simply a business decision to capitalize on a market opportunity. Therefore, economic prejudice is shown by evidence of either loss of investment expenditures or damages from increasing sales which might have been prevented by the institution of an earlier suit. Damages or monetary losses must be "because of and as a result of" the delay. In order for this required nexus to exist, the defendant must have had reason to believe that the patentee did not intend to file suit for infringement. A three-year wait to file suit after an infringer achieved profitability is not unreasonable.

*Patent Law > Infringement Actions > Defenses > Estoppel & Laches > Elements*
*Patent Law > Inequitable Conduct > General Overview*
[HN6] With regard to laches under patent law, evidentiary prejudice arises where the defendant's inability to present a full and fair defense on the merits due to the loss of records, the death of a witness, or the unreliability of memories of long past events undermines the court's ability to judge facts. When a party has met its burden of production, "the presumption evaporates" with respect to evidentiary prejudice. Thus, for laches, the length of delay, the seriousness of the prejudice or harm suffered, the justification for the delay, and the defendant's conduct or culpability must be weighed to determine whether the patentee dealt unfairly with the alleged infringer by not promptly bringing suit. In sum, a court must weigh all pertinent facts and equities in making a decision on the laches defense.

*Patent Law > Remedies > Damages > Time Limitations*
*Patent Law > Infringement Actions > Defenses > Estoppel & Laches > Elements*
[HN7] With regard to laches under patent law, in the majority of cases, while a patent holder is under an obligation to bring suit in a timely manner, a six year wait is reasonable. In contrast, where a patent holder is found to have clearly mislead an infringer and its reliance ultimately led to material prejudice, the courts have applied equitable estoppel and ruled that a time period of less than six years is unreasonable.

*Patent Law > Infringement Actions > Defenses > Estoppel & Laches > Excuse*
*Patent Law > Infringement Actions > Defenses > Estoppel & Laches > Elements*
*Patent Law > Ownership > General Overview*
[HN8] With regard to laches under patent law, while providing notice to an infringer may be the typical start to licensing negotiations, it is not required to excuse delay associated with initiating an infringement suit. In fact, it would be illogical for companies in a highly competitive market to provide this information in advance, particularly in the absence of any intent to license intellectual property.

*Patent Law > Infringement Actions > Defenses > Estoppel & Laches > General Overview*
[HN9] With regard to laches, while a patent holder has an obligation to enforce its rights in a timely manner, applying this concept in equity should only bar a plaintiff whose institution of the action was inexcusably delayed.

*Patent Law > Infringement Actions > Defenses > Estoppel & Laches > Excuse*
*Patent Law > Infringement Actions > Defenses > Estoppel & Laches > Elements*
*Patent Law > Remedies > Collateral Assessments > Costs*
[HN10] With regard to laches under patent law, delay to minimize litigation costs and to combine litigation against one potential infringer is appropriate. Also "ripeness" is a reasonable excuse for delay. Patent owners are not expected to incur such large costs to silence commercially insignificant infringers. Waiting until litigation makes clear economic sense is reasonable.

*Patent Law > Inequitable Conduct > General Overview*
*Patent Law > Remedies > Collateral Assessments > Increased Damages*
*Patent Law > Infringement Actions > General Overview*
[HN11] With regard to laches under patent law, economic prejudice is shown by evidence of either loss of investment expenditures or damages (from increasing sales) which might have been prevented by an earlier suit.

*Patent Law > Infringement Actions > Defenses > Estoppel & Laches > Elements*
*Patent Law > Infringement Actions > Infringing Acts > Intent & Knowledge*

[HN12] With regard to laches under patent law, the law protects the potential infringer from economic hardships due to intentional or negligent delay by the patent holder who neither informs of infringement nor files suit. The underlying reasoning behind this element is to protect an infringer, who is ignorant of his potential infringement.

*Patent Law > Infringement Actions > Defenses > Estoppel & Laches > General Overview*
[HN13] With regard to laches under patent law, equity notwithstanding, applying significantly different standards to small and large corporations is not reasonable in determining when the obligation to file suit exists. In addition, courts hold that an individual plaintiff can reasonably delay bringing suit until he can determine that the possible infringement made litigation "monetarily ripe." In contrast, courts have not found delay in excess of six years to be reasonable, where there was insufficient evidence to support the argument of lack of "ripeness."

*Patent Law > Infringement Actions > Defenses > Estoppel & Laches > General Overview*
[HN14] With regard to laches under patent law, a witness's failure to remember specific past events is not, in and of itself, indicative of evidentiary prejudice. While it is difficult to determine what allegedly "missing" information would impact a jury's decision, juries are expected to weigh a witness's inability to remember, along with the other information presented, to determine the facts.

**COUNSEL:** William J. Wade, Esquire, Richards, Layton & Finger, Wilmington, Delaware.

Of Counsel: Donald R. Dunner, Esquire, Richard L. Stroup, Esquire, Robert L. Burns, Esquire, and Adam Avrunin, Esquire, Finnegan, Henderson, Farabow, Garrett & Dunner, Washington, D.C.; counsel for plaintiff Genzyme Corporation.

Josy W. Ingersoll, Esquire, John W. Shaw, Esquire, and Christian Douglas Wright, Young Conaway Stargatt & Taylor, Wilmington, Delaware.

Of Counsel: William Lee, Esquire, Merriann M. Panarella, Esquire, and Wayne Stoner, Esquire, Hale and Dorr, L.L.P., Boston, MA.

**JUDGES:** Thynge, Magistrate Judge.

**OPINIONBY:** Thynge

**OPINION:**

### MEMORANDUM OPINION

Wilmington, Delaware

**Thynge, Magistrate Judge**

## I. INTRODUCTION

In July 2002, this court issued a claim construction opinion after a *Markman* hearing n1 held in May 2002. In November 2002, a trial was held on the patent infringement dispute between Genzyme and Atrium over designs for pulmonary drainage devices. Genzyme sued for damages for the marketing and sale of Atrium's "OASIS" and "EXPRESS" devices, which allegedly infringed Genzyme's "Elliot patents" [*2] (U.S. Patent Nos. 4,544,370; 4,715,856; 4,747,844 and 4,822,346 ) and its "D'Antonio patent" (U.S. Patent No. 4,899,531). Both parties reserved the right at the close of evidence to have the court make a determination of certain issues of law and fact after the jury verdict. After an eight day trial, the jury found that Atrium did not infringe any claims of the patents-in-suit and that all patents-in-suit were invalid.

---

n1 *Markman v. Westview Instruments, Inc., 52 F.3d 967, 970-71 (Fed. Cir. 1995).* For a more complete review of the asserted claims of the D'Antonio and Elliot patents, see the court's claim construction opinion, *Genzyme v. Atrium, 212 F. Supp.2d 292 (D. Del. 2002).* The description of the claims in this opinion cover only those claim limitations that are germane to the current motion addressed by the court.

---

Presently before the court are post trial motions for a new trial on the defense of laches, for judgement as a matter of law on validity and infringement of both [*3] the Elliot and D'Antonio patents and an award for damages. D.I. 284. This opinion is directed only to Atrium's laches motion. D.I. 282.

## II. BACKGROUND

### A. The Chronology of Events

Knowledge of Competitive Devices and Product Introduction

In 1989, Deknatel released the "first" pulmonary drainage device using a dry suction regulator based on the technology outlined in the '531 D'Antonio patent. D.I. 269 at 576. This patent application was filed in August 1986, and issued in December 1989. In September 1991, Atrium began development of its OASIS chest drainage device with knowledge of the D'Antonio patent. D.I. 272 at 1940 - 1942. During the research and development phase,

Atrium sought the opinions of two law firms with regard to potential infringement of the patent. D.I. 272 at 1956 - 1957. In the Spring of 1996, Atrium released the OASIS device and in May 1996, Deknatel approved a competitive testing protocol which specified Atrium's new OASIS device. Deknatel obtained an OASIS device and analyzed it. D.I. 269 at 512 - 513. Thereafter, a recommendation was made to Deknatel management concerning the review of the OASIS device and the D'Antonio patent. D.I. 269 at [*4] 516.

In the same year, Genzyme acquired Deknatel and the patents-in-suit. n2 Shortly after this acquisition, Genzyme introduced its SAHARA device, incorporating technology from the Elliot patents, which it believed would render the OASIS device obsolete. D.I. 269 at 518. In the Fall of 1997, after a corporate reorganization, a new manager joined Genzyme's R&D and in 1998, that manager was advised that Atrium's OASIS product infringed. At that time, Genzyme started to "think seriously" about infringement. D.I. 268 at 336 - 337 and 381. Through information from an industry research report, Genzyme concluded that OASIS sales of 67 thousand units in 1997 accounted for nearly $ 900,000 in lost profits. During 1998, OASIS sales nearly doubled to approximately 130 thousand units. As a result, Genzyme announced in a 1999 report to shareholders that Atrium was a competitor who hurt performance and sales. D.I. 271 at 1573 - 1574. In 2000, Atrium introduced the EXPRESS device which Genzyme viewed as "knock-off" of its SAHARA device and infringed the Elliot patents. D.I. 268 at 400. After losing over $ 2 million in profits to OASIS sales (170,000 units) in 1999, and the prospect of new competition [*5] from the EXPRESS product, Genzyme determined that no other alternative existed and filed suit. D.I. 268 at 336.

---

n2 The acquisition included the Elliot patents, as well. The '370 patent was filed in May 1982 and issued in October 1985. The '856 patent was filed in August 1985 and issued in December 1987. The '844 patent was filed in September 1986 and issued in May 1988. The '346 patent was filed in April 1988 and issued in April 1989.

---

In November 2000, Genzyme filed this action against Atrium alleging that its OASIS and EXPRESS products infringed the D'Antonio and Elliot patents. During trial, Atrium moved, pursuant to *Fed. R. Civ. P. 52 and 58,* for judgement in its favor on sales of its OASIS product prior to November 14, 2000, relying on the equitable doctrine of laches. The court reserved decision until after post trial briefing was completed.

### B. The Technology

2003 U.S. Dist. LEXIS 12784, *

### The Elliot Patents

Chest drainage devices remove fluid and air from a patient's chest cavity through the use of vacuum suction. Body [*6] fluids are drained through a tube into a collection chamber within the device. Because of the negative pressure exerted on the device when a patient inhales, proper operation requires the use of one-way "valves" to prevent the reverse flow of collected fluids. Prior art devices used a water column to act as a one-way valve or "water seal" to prevent reverse flow. The Elliot patents disclose a "waterless" (or "dry") device that replaces water seals with a mechanical one- way valve. The patents further disclose a number of pressure relief and control valves to allow for accurate pressure regulation and reverse flow protection.

### The D'Antonio Patent

Chest drainage devices that used water columns as one way valves to prevent the flow of fluid back into the patient also act to regulate the suction applied to the patient by preferentially allowing air from the atmosphere into the suction and collection chambers. Medical personnel would regulate the suction by varying the amount of water in U-shaped tubes within the device. Instead of employing a water-based control mechanism, the D'Antonio patent utilizes mechanical valves that "self-adjust" to regulate the pressure in the suction chamber. [*7] This is accomplished, in part, by a gas port closing member positioned between the vacuum and collection chambers within the device.

### III. Laches

[HN1] The law on laches is rooted in the equitable principle that courts will not assist one who has "slept on his rights." *Jarrow Formulas, Inc. v. Nutrition Now, Inc.* 304 F.3d 829, 835 (9th Cir. 2002). In the interest of fairness and equity, those who are granted a monopoly under the patent system have an obligation to enforce their rights in a timely manner. *Advanced Hydraulics, Inc. v. Eaton Corp., 415 F. Supp. 283, 286 (N.D. Ill. 1976).* Laches protects a potential infringer from unfair damage claims resulting from the intentional or neglectful delay of a patent holder to file suit. Two elements underlie this defense: (a) the patentee's delay in bringing suit was unreasonable and inexcusable, and (b) the alleged infringer suffered material prejudice attributable to the delay. *Bayer AG v. Sony Electronics, Inc., 229 F. Supp.2d 332, 366 (D. Del. 2002).*

### Delay in Bringing Suit

[HN2] Laches, as defined under 35 U.S.C.     282 (1988), is an equitable defense to a [*8] claim for patent infringement. This provision in the *Patent Act* bars recovery of damages for any infringement committed more than six years prior to the filing of the complaint or a counterclaim for infringement. Courts have almost unanimously "borrowed" this six year time provision in order to protect a potential infringer from damages due to either the intentional or negligent delay of a patent holder in bringing suit. This period can be described as the "reasonable" period required to create a presumption of laches. It begins when the patentee knew or should have known of the alleged infringer's activity. The presumption of six years "represents an equitable balancing of the interests of the parties." *A.C. Aukerman Co. v. R.L. Chaides Constr. Co., 960 F.2d 1020, 1035 (Fed. Cir. 1992).* It also represents the point at which the burden of proof shifts from the defendant to the plaintiff. A six-year delay requires the patentee to rebut the presumption of laches. But where the delay is less than six years, no presumption operates, and an accused infringer relying on laches must demonstrate the existence of both elements, namely, unreasonable delay and resulting prejudice. [*9] *Id. at 1034-1037.*

[HN3] The degree of infringement may be relevant to the issue of when the period of delay begins. See, *Lever Bros. v. Procter & Gamble Distributing Co., 668 F. Supp. 924 (D. N.J. 1987).* A delay of less than 6 years in bringing an infringement action has been excused where the infringer's actions are not commercially significant. *Illinois Tool Works Inc. v. Grip-Pak, Inc., 725 F. Supp. 951, 953 (N.D. Ill. 1989).* In *ITW,* the patentee waited 5 years to determine whether it would be economically prudent to initiate an action against Grip-Pak, an infringer. The court determined that patent owners are not expected to incur considerable expense to silence commercially insignificant infringers. In a similar finding, the court in *Mead Digital Systems, Inc. v. A.B. Dick Co., 521 F. Supp. 164, 183 (S.D. Ohio 1981)* found that a 3 year wait to file suit *after* the infringer reached *profitability* was not unreasonable.

Finally, the court will consider these factors, the evidence, and other relevant circumstances to determine whether equity should intercede to bar pre-filing damages. "Laches is not *established* [*10] by undue delay and prejudice. These factors merely lay the foundation for the trial court's exercise of discretion." *Aukerman, 960 F.2d at 1036.* Ultimately, it is within the court's prerogative, based on its evaluation of all relevant evidence, to determine whether a delay of fewer than 6 years is unreasonable or inexcusable.

### Material Prejudice

[HN4] In order to satisfy the second element of laches, a defendant must prove that he suffered material prejudice attributable to the delay. Material prejudice is defined to be either economic or evidentiary prejudice. See *Pappan Enterprises, Inc. v. Hardee's Food Systems,*

*Inc., 143 F.3d 800, 804 (3rd Cir. 1998).* Economic prejudice requires a change in the economic position of a defendant as a result of delay, while evidentiary prejudice arises when a defendant is impeded from presenting a full and fair defense on the merits. See *Bayer, 229 F. Supp.2d at 366.*

### Economic Prejudice

[HN5] To establish economic prejudice, a change in the economic position of the alleged infringer during the period of delay must have occurred. See *Aukerman, 960 F.2d at 1033.* "The change must be [*11] *because of and as a result of* the delay, not simply a business decision to capitalize on a market opportunity." *Hemstreet v. Computer Entry Systems Corp., 972 F.2d 1290, 1294 (Fed. Cir. 1992)* (emphasis added). Therefore, economic prejudice is shown by evidence of either loss of investment expenditures or damages from increasing sales which might have been prevented by the institution of an earlier suit. *Aukerman* and *Hemstreet* make it clear that damages or monetary losses must be, "because of and as a result of" the delay. In order for this required nexus to exist, the defendant must have had reason to believe that the patentee did not intend to file suit for infringement. *ABB Robotics, Inc. v. GM Fanuc Robotics Corp., 828 F. Supp. 1386, 1395 (E.D. WI. 1993).* See also, *Mead Digital Systems, Inc. v. A.B. Dick Co., 723 F.2d 455 (6th Cir. 1983)* (a three-year wait to file suit after an infringer achieved profitability is not unreasonable); *E.I. du Pont de Nemours & Co. v. Polaroid Graphics Imaging, Inc., 706 F. Supp. 1135 (D. Del. 1989)* (where the court found that it was not unreasonable for Dupont to notify [*12] Polaroid of infringement until it was economically worthwhile to file suit).

### Evidentiary Prejudice

[HN6] Evidentiary prejudice arises where the "defendant's inability to present a full and fair defense on the merits due to the loss of records, the death of a witness, or the unreliability of memories of long past events ..." undermines the court's ability to judge facts. *Aukerman, 960 F.2d at 1033.* When a party has met its burden of production, "the presumption evaporates" with respect to evidentiary prejudice. *Id.* Thus, for laches, the length of delay, the seriousness of the prejudice or harm suffered, the justification for the delay, and the defendant's conduct or culpability must be weighed to determine whether the patentee dealt unfairly with the alleged infringer by not promptly bringing suit. In sum, a court must weigh all pertinent facts and equities in making a decision on the laches defense.

### IV. DISCUSSION

### Parties Positions

### Unreasonable Delay

Atrium claims that Genzyme's 4 1/2 year delay in filing claims of infringement on the D'Antonio patent is unreasonable since Genzyme had notice of the potential infringement in 1996 and failed to [*13] notify Atrium of its intention to file suit. Atrium further argues that there is direct evidence of Genzyme's intention to file suit, as evidenced by the relevant documents unearthed during discovery. Atrium implies in its argument that Genzyme has an affirmative duty to inform, and that its failure to do so was unreasonable. Atrium sites *Odetics Inc. v. Storage Tech. Corp., 919 F. Supp. 911 (E.D. Va. 1996)* as a case where the court found that 3 year delay was unreasonable. Atrium further relies on *Bott v. Four Star Corp., 807 F.2d 1567 (Fed. Cir. 1986)* (defining constructive notice) and *Galliher v. Cadwell, 145 U.S. 368, 36 L. Ed. 738, 12 S. Ct. 873 (1862)* (determining that reasonableness depends on the circumstances) and several other cases where a delay shorter than six years was found to be unreasonable.

Alternately, Genzyme asserts that, as pronounced by the Federal Circuit, delays of less than 6 years are not unreasonable. In support of its position, Genzyme relies on *Meyers v Asics Corp., 974 F.2d 1304 (Fed. Cir. 1992)* (where a 5 1/2 year delay was not unreasonable), *Gasser Chair Co. v. Infanti Chair Manufacturing Corp., 60 F.3d 770 (Fed. Cir. 1995)* [*14] and *Hall v. Aqua Queen Manufacturing Inc., 93 F.3d 1548 (Fed. Cir. 1996)* (delays of 5 or more years were not unreasonable). According to Genzyme, Atrium has an affirmative obligation to prove that a 4 1/2 year delay is unreasonable and has failed to do so. Genzyme "blends" these arguments with the principles of equitable estoppel to support its position that a delay of less than 6 years is unreasonable only when a patent holder misleads a potential infringer into believing that it is "safe from suit."

Genzyme's delay in bringing suit was not unreasonable. In contrast to *Bott* and *Odetics,* actual or constructive notice of potential infringement and the delay in bringing suit is not in dispute. At issue, here, is whether the 6 year guideline set forth in previous opinions is reasonable under the circumstances. See *Aukerman, 960 F.2d at 1033.* [HN7] In the majority of cases, while a patent holder is under an obligation to bring suit in a timely manner, a 6 year wait is reasonable. In contrast, where a patent holder was found to have clearly mislead an infringer and its reliance ultimately led to material prejudice, the courts have applied equitable estoppel [*15] and ruled that a time period of less than 6 years was unreasonable. See *Wafer Shave, Inc. v. Gillette Co., 857 F. Supp. 112 (D. Mass. 1993)* and *Digital Sys. Int'l v. Davox Corp., 1993 U.S. Dist. LEXIS 20443, 1993 WL 664647 (W.D. Wash. July 1, 1993).* Although equitable estoppel has not been directly raised, its application has been cited in defense of laches claims and should be considered herein. See

2003 U.S. Dist. LEXIS 12784, *

*Odetics, 919 F. Supp. at 923* (where intentional delay caused evidentiary prejudice).

[HN8] While providing notice to an infringer may be the typical start to licensing negotiations, it is not required to excuse delay associated with initiating an infringement suit. *Odetics, 919 F. Supp. at 921*. This court is unable to find an authoritative or reasonably persuasive source which would require the conclusion that Genzyme was under an affirmative duty to disclose future plans to file suit. n3 In fact, it would be illogical for companies in a highly competitive market to provide this information in advance, particularly in the absence of any intent to license intellectual property.

> n3 Nothing cited by Atrium is authoritative for this proposition.

[*16]

In conclusion, Genzyme's 4 1/2 year delay in bringing suit is within the range set forth in the majority of cases. Its conduct is consistent with the "borrowed" statutory guideline set forth under *35 U.S.C.* 282, and the principles set forth under equitable estoppel, and is not unreasonable based on lack of notice.

**Inexcusable Delay**

[HN9] While the court agrees that a patent holder has an obligation to enforce its rights in a timely manner, applying this concept in equity should only bar a plaintiff whose "institution of the action was inexcusably delayed." *Advanced Hydraulics, Inc. v. Eaton Corp., 415 F. Supp. 283, 286 (N.D. Ill. 1976)*.

Atrium argues that no reasonable excuse for the 4 1/2 year delay has been offered by Genzyme, particularly since it did not lack the necessary financial resources to pursue a claim, was not preoccupied with other litigation, nor involved in licensing negotiations. Genzyme's excuse that litigation is a "painful and crude alternative" is a *non sequitur* since it enthusiastically pursued litigation four years later. Further, delaying litigation until Atrium's EXPRESS product was introduced does not make [*17] sense since it only constitutes a small portion of the revenues lost compared to the losses incurred due to the OASIS product.

Contrary to Atrium's position, Genzyme presents several valid reasons for its delay. According to the testimony, Genzyme underwent a change in management during the relevant time period. As a result, litigation remained a low priority until the "dust settled." [HN10] Delay to minimize litigation costs and to combine litigation against one potential infringer is appropriate. Similarly, in *ITW*, the court found "ripeness" to be a reasonable

excuse for delay. "Patent owners are not expected to incur such large costs to silence commercially insignificant infringers." *Id.* at 953. While a court cannot precisely define when a sum or percentage of sales reaches "commercial significance" in every circumstance, based on the evidence, Genzyme initiated suit when it was compelled to do so by weighing the cost of litigation with the risk of potential losses by the introduction of Atrium's EXPRESS product. Waiting until litigation makes clear economic sense is reasonable. Interestingly, Atrium supports this conclusion by its argument that large, publically-held corporations [*18] move more slowly in the decision-making process than smaller, privately-held companies.

**Material Prejudice**

Economic Prejudice

Atrium claims that, while Genzyme delayed, there was 30 fold increase in sales of its OASIS product, that Genzyme knew of this increase, and as a result, intentionally procrastinated to cause greater economic harm to Atrium. The thrust of this argument is that Genzyme "laid in wait" for damages to build, while providing no notice to Atrium of its intention to file suit. *Raber v. Pittway Corp., 1994 U.S. Dist. LEXIS 9646, 1994 WL 374542* (N.D. Cal. July 11, 1994). Further, since Genzyme had market share information (IMS data), it had knowledge of Atrium's product sales, and acted upon that knowledge by deferring suit. In support of this argument, Atrium relies on the *Aptargroup, Manus* and *Digital Systems* n4 cases where sales and damages increased during the time when a patent holder might have filed suit. In those cases, the *potential* for damages during the period of delay was enough to support a finding of laches. *Actual* damages were not required. n5

> n4 *Aptargroup Inc. v. Summit Packing Sys., Inc., 1996 U.S. Dist. LEXIS 3026, 1996 WL 114781* (N.D. Ill. March 14, 1996); *Manus v. Playworld Systems, Inc., 893 F. Supp. 8 (E.D. Pa. 1995); Digital Sys. Int'l, Inc. v. Davox Co., 1993 U.S. Dist. LEXIS 20443, 1993 WL 664647* (W.D. Wash. July 1, 1993).

[*19]

> n5 *Aptargroup, 1996 U.S. Dist. LEXIS 3026, 1996 WL 114781 at \*9; Manus, 893 F. Supp. at 10; Digital, 1993 U.S. Dist. LEXIS 20443, 1993 WL 664647 at \*3-\*4*.

Case 1:04-cv-01258-SLR    Document 190-4    Filed 12/22/2005    Page 23 of 35

Page 8
2003 U.S. Dist. LEXIS 12784, *

Genzyme argues that there is no reason to believe that Atrium would have changed its conduct as a result of being notified of potential infringement. [HN11] Economic prejudice is shown by evidence of either loss of investment expenditures or damages (from increasing sales) which might have been prevented by an earlier suit. As a result, to prove economic prejudice necessarily requires Atrium to produce facts that, for example, show expenditures made in reliance upon Genzyme's inaction. Genzyme points out that Atrium continued selling the OASIS device and developed new devices based on its original design *after* this action was filed. In addition, the testimony establishes that Atrium believes that it is not infringing the D'Antonio patent. Further, mere proof of investment in research and development and increased sales, in and of themselves, are not evidence of economic prejudice. Genzyme also contends that Atrium fails to provide a "causal nexus," [*20] the connection between the patent holder's actions and the change in the economic position of the alleged infringing party, during the period of the delay. Thus, Atrium's knowledge of its potential infringement and its continued infringement after suit reinforces Genzyme's position.

Atrium did not suffer economic prejudice during the 4 1/2 years that Genzyme waited to file this action for infringement. To demonstrate the impact of delay on its unit sales, Atrium compares the sales of its OASIS product (30 fold increase over 4 1/2 years) to the *Raber* and *ABB* cases, which, respectively, involved a six- and three-fold increase. In *Raber*, the delay of 11 years in filing suit was clearly beyond the six year limit for a presumption of laches. In that case, there was both intentional delay and acquiescence on the part of the patent holder, which created a presumption of laches by shifting the burden of proof and by raising an assumption of material prejudice. In *ABB*, the defendant's (Fanuc) sales tripled over 5 years. However, the court found evidence that if Fanuc had knowledge of ABB's intentions to file suit, it would have modified its conduct. *Id.* at 1397. In addition, [*21] there was evidence that ABB led Fanuc to believe that it would license the technology, but then delayed doing so. ABB failed to offer evidence to rebut the presumption of economic prejudice, and the court found the defense of laches to be valid.

There is no similar delay in this case, and therefore, no shift in the burden of proof nor assumption of material prejudice. In contrast, Atrium has failed to offer any evidence to suggest that it considered altering its business strategies or operations as a result of Genzyme's action or inaction. Further, Genzyme did not induce Atrium into believing that a license was imminent, only to delay and then file suit 4 1/2 years later.

[HN12] The law protects the potential infringer from economic hardships due to intentional or negligent delay by the patent holder who neither informs of infringement nor files suit. The underlying reasoning behind this element is to protect an infringer, who is ignorant of his potential infringement. Here, Atrium had reason to believe that it would be sued by Genzyme for infringement as shown by the evidence at trial. n6

n6 Atrium admitted to reviewing the D'Antonio patent and Genzyme's Pleur-Evac A-6000 device. D.I. 272 at 1937 - 1943. Atrium sought the opinion of two law firms on potential infringement. D.I. 272 at 2085 - 2091.

[*22]

Moreover, although Atrium's sales significantly increased during the 4 1/2 year period, exponential growth in product sales are a normal consequence of new product introduction. Between 1998 and 1999, when Genzyme focused on the impact of OASIS sales, the growth in those sales was far less than the thirty-fold increase that Atrium contends. A more accurate number is approximately a thirty *percent*, or roughly one-third, increase. Further, the testimony reveals that Genzyme did evaluate sales of the OASIS product and their effect and filed suit when it made economic sense. Efficiency and economy resulted in combining the claims for infringement on both the D'Antonio and Elliot patents.

Despite Atrium's contention that a large, financially successful corporation should be less concerned about the economic impact of litigation and, therefore, should not delay filing a claim, it does not make economic sense for a company to hastily rush into litigation over losses to a competitor which are less than 1.2% of its overall revenues. n7 [HN13] Equity notwithstanding, applying significantly different standards to small and large corporations is not reasonable in determining when the obligation [*23] to file suit exists. In addition, courts have held that an individual plaintiff could reasonably delay bringing suit until he could determine that the possible infringement made litigation "monetarily ripe." *Tripp v. U.S., 186 Ct. Cl. 872, 406 F.2d 1066, 1071 (Ct. Cl. 1969)* (where plaintiff waited 5 years after advising the United States government of infringement). In contrast, courts have not found delay in excess of six years to be reasonable, where there was insufficient evidence to support the argument of lack of "ripeness." See *Cooper v. North American Philips Corp., 1989 U.S. Dist. LEXIS 14104, 1989 WL 205666 (D. Alaska 1989)* and *Jensen v. Western Irr. and Mfg., Inc., 650 F.2d 165, 168 (9th Cir. 1980).* In conclusion, there is ample evidence that Genzyme waited for the matter to be economically justified prior to filing suit. Moreover, the delay here was less than the prescribed 6-year period.

n7 In 1998, Genzyme's annual revenues were approximately $ 560 million, while Atrium's OASIS sales were approximately $ 6.3 million.

[*24]

Evidentiary Prejudice

Atrium claims that the jury made its decision under several evidentiary handicaps that prevented a full and fair presentation of its defense on the merits. The basis for this claim is that several important witnesses were unavailable or failed to remember key events that would have "further debunked" Genzyme's copying allegations and its arguments regarding the scope of the claims of the patents-in-suit. Atrium asserts that the advanced age and ill health of one of its key witnesses prevented him from appearing in court, and required his video-taped deposition be taken. Therefore, the delay caused a prejudicial evidentiary presentation to the jury.

Genzyme responds that video-taped depositions are not prejudicial, and that Atrium could have subpoenaed witnesses that they claimed were unavailable. Citing *Aukerman*, Genzyme further asserts that Atrium must demonstrate how unavailable evidence was important to its defense. *Id.* at 1034. Since Atrium has failed to meet this requirement, it has not established evidentiary prejudice.

This court finds that 4 1/2 year delay in filing suit did not substantially contribute to evidentiary prejudice against [*25] Atrium. [HN14] A witness's failure to remember specific past events is not, in and of itself, indicative of evidentiary prejudice. Here, no evidence has been presented suggesting that, due to delay, either the destruction of records or incapacity of witnesses vital to Atrium should compel this court to find such prejudice. Records disclosed during discovery adequately support the positions of both parties. While it is difficult to determine what allegedly "missing" information would impact a jury's decision, juries are expected to weigh a witness's inability to remember, along with the other information presented, to determine the facts. Further, neither party in this action legitimately complained during the pretrial conference nor in their pretrial motions that they were unable to obtain necessary information due to delay to prepare their case.

Further, the burden of proof falls on Atrium to clearly establish how unavailable evidence would be important to its defense. Atrium has failed to demonstrate to the court that the delay prevented it from presenting a full and fair defense on the merits.

**V. Conclusion**

In conclusion, based on the above analysis, Genzyme's delay in bringing [*26] suit was not unreasonable or inexcusable, and thus Atrium suffered no material prejudice attributable to the delay. As a result, Atrium's motion on the defense of laches (D.I. 282) is DENIED.

**EXHIBIT 23
IS REDACTED IN ITS ENTIRETY**

# EXHIBIT 24

Westlaw.

Not Reported in F.Supp.2d                                                 Page 1
Not Reported in F.Supp.2d, 2004 WL 1770290 (D.Del.)
**(Cite as: 2004 WL 1770290 (D.Del.))**

**H**

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
D. Delaware.
SYMBOL TECHNOLOGIES, INCORPORATED,
Plaintiff,
v.
PROXIM INCORPORATED, Defendant.
**No. Civ. 01-801-SLR.**

July 28, 2004.

Andre G. Bouchard, and Karen L. Pascale, of Bouchard, Margules & Friedlander, Wilmington, Delaware, for Plaintiff, Eric J. Lobenfeld, Ira J. Schaefer, Jonathan M. Sobel, and Ernest Yakob, of Hogan & Hartson L.L.P., New York, New York, of counsel.

Richard L. Horwitz, David E. Moore, of Potter, Anderson & Corroon, LLP, Wilmington, Delaware, for Defendant, Harry J. Roper, George S. Bosey, Raymond N. Nimrod, Aaron A. Barlow, and Timothy J. Barron, of Roper & Quigg, Chicago, Illinois, of counsel.

OPINION

ROBINSON, Chief J.

**I. INTRODUCTION**

*1 On December 4, 2001, plaintiff Symbol Technologies, Incorporated ("Symbol") filed this action against defendant Proxim, Incorporated ("Proxim") alleging infringement of four U.S. Patents owned by plaintiff. [FN1] (D.I.1) On December 18, 2001, Proxim answered the complaint and asserted, *inter alia*, a counterclaim of infringement of one of its own patents. [FN2] (D.I.6) Plaintiff subsequently dismissed the '803 patent from its case.

FN1. U.S. Patent Nos. 5,029,183 ("the '183 patent"), 5,103,461 ("the '461 patent"), 5,479,441 ("the '441 patent") and 5,668,803 (the '803 patent") (collectively the "Tymes patents").

FN2. U.S. Patent No. 5,231,634 ("the '634 patent").

A jury trial was held from September 8 through September 12, 2003. The jury rendered a verdict in Symbol's favor, finding that Proxim's OpenAir and 802.11 products infringe the '183 and '441 patents. Both of these patents relate to a power saving feature in wireless local area network ("WLAN") communications protocols. The jury awarded a six percent royalty on sales of Proxim's OpenAir and 802.11 products.

On November 24, 2003, the court conducted a one day bench trial to hear evidence on Proxim's defenses of laches and equitable estoppel. Proxim asserts the defense of laches only with respect to its OpenAir products and equitable estoppel only with respect to its 802.11 products. For the reasons stated below, the court finds that Proxim has failed to prove by a preponderance of the evidence its defenses of laches and equitable estoppel; these are the court's findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52.

**II. FINDINGS OF FACT**

A. Background

1. Symbol is a Delaware corporation with corporate headquarters in Holtzville, New York. (D.I.273) Proxim is a Delaware corporation with corporate headquarters in Sunnyvale, California.

2. Symbols owns the Tymes patents at issue in this action. The '183 patent was issued on June 29, 1991; the '441 patent issued on December 26, 1995. (PTX 1; PTX 2) The application for the '183 patent is the parent of the application for the '441 patent. (PTX 1; PTX 2; PTX 5, PTX 6 at SBLP 165776) Symbol filed a terminal disclaimer of the '441 patent, disclaiming any rights therein beyond the expiration of the '183 patent. (PTX 2; PTX 6 at SBLP 165977-79)

3. The claims of the '183 and '441 patents are directed to methods and systems of transferring data packets between remote units and base stations. (PTX 1; PTX 2) Claim 1 of the '183 patent, a representative claim of the patents at issue, claims:
  A method of transmitting data packets from one of a

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 1770290 (D.Del.)
**(Cite as: 2004 WL 1770290 (D.Del.))**

Page 2

plurality of remote terminal units to a base station, comprising the steps of: (a) transmitting a data packet from said one unit to said base station during a first time period selected by the unit; (b) receiving at said one unit from said base station an acknowledge signal during a second period occurring only a fixed time delay after said first time period, said second time period being the same for at least some of said units.
(PTX 1, col. 23, 11. 42-52)

4. The jury found that Proxim's OpenAir products and 802.11 products infringe the Tymes patents. (D.I.294)

**B. Laches**

*2 5. Proxim contends that it is entitled to the defense of laches with respect to its OpenAir products because Symbol had either actual or constructive knowledge as early as 1993-94 that the OpenAir products infringed Symbol's patents. Proxim contends that it sustained both economic and evidentiary prejudice as a result of Symbol's unreasonable delay in bringing suit. (D.I. 340 at 5-6)

6. Symbol first filed its claims for patent infringement against Proxim on May 1, 2001 in the form of a counterclaim in *Proxim Inc. v. 3COM Corp., et al.*, No. 01-155-SLR. (D.I. 273 at 1). The counterclaims did not identify the OpenAir products as the subject of Symbol's infringement allegations. Symbol first accused Proxim's OpenAir products of infringement on December 24, 2002, when it served its expert report concerning infringement. (D.I. 328 at 260-61)

7. The OpenAir products were sold under the RangeLAN2 name. (D.I. 328 at 85- 86) The accused OpenAir products included PC cards and access points. (*Id.* at 24, 27, 86) Proxim began selling the OpenAir product line in 1994.

8. The OpenAir products utilized a proprietary protocol developed by Proxim and known only to members of an industry organization, the Wirless LAN Interoperabilty Forum ("WLIF"). [FN3] (D.I. 311 at 350-51; D.I. 328 at 17, 244-45) Proxim vigorously guards the confidentiality of its OpenAir source code.

> FN3. "Protocol" refers to the rules under which a product operates. A protocol specification is a document detailing the "rules" of the protocol. (D.I. 328 at 244) "Source code" is the computer language through which the protocol is implemented.

(*Id.* at 7-11; D.I. 311 at 383-84)

9. Symbol's infringement expert testified that he performed his infringement analysis for the OpenAir products using both the OpenAir protocol description and the OpenAir source code. (D.I. 311 at 354-55, 375-83) The infringement expert testified that, to determine direct infringement, both the protocol and source code were required. (*Id.* at 386)

10. The OpenAir protocol and source code were proprietary to Proxim. In order for Symbol lawfully to obtain the source coude, it would have had to join Proxim's WLIF organization. (D.I. 328 at 244) Symbol did not join the WLIF as the WLIF promoted a wireless standard, OpenAir, that directly competed with the 802.11 standard endorsed by Symbol. (*Id.* at 245)

11. As Proxim was a direct competitor of Symbol, Symbol was aware of Proxim's product lines and product features. (D.I. 328 at 22-27) Through publicly available information, Symbol became aware that Proxim's OpenAir PC cards had advanced power management features. (*Id.* at 27; DTX 1158; DTX 7153)

12. In April 1995, Proxim made a direct sale of an accused OpenAir PC card to Symbol. (D.I. 328 at 32, 86, 98-101) The PC card was sold to Symbol so that Symbol could determine whether the OpenAir product could be installed in a Symbol hand-held device for use in a customer network. (*Id.* at 96-98) In the fall of 1996, Symbol tested both a Proxim PC card and access point with a spectrum analyzer, which measured the amount of information that a laptop computer sends to an access point through the PC card. (D.I. 328 at 33; DTX 1160)

13. In September 1996, senior management at Symbol received an internal memorandum discussing Proxim's OpenAir products which were competitive with Symbol (the "September 1996 memoranda"). (D.I. 328 at 34-38; DTX 1036) It compared the features and functions of Symbol's products with that of Proxim's. Included in the September 1996 memorandum was a discussion concerning Proxim's power management function. (D.I. 328 at 40; DTX 1036) It also showed test results indicating that Proxim's products transferred significantly more files per second when the power management feature was activated. Overall, the September 1996 memorandum reported that the OpenAir products had a competitive advantage over Symbol's own products.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 1770290 (D.Del.)
(Cite as: 2004 WL 1770290 (D.Del.))

\*3 14. The September 1996 memoranda explained that Proxim's products utilized a request-to-send and clear-to-send protocol ("RTS-CTS"). (DTX 1036) RTS-CTS was the basis of Symbol's infringement expert's testimony that Proxim's products infringed the '183 and '441 patents.

15. Between 1994 and 2000, Proxim advertised and promoted its OpenAir product lines. (D.I. 328 at 108-09) In that time period, Proxim spent approximately $250,000 in advertising for its OpenAir products. (*Id.* at 108-09)

16. Proxim contends that it was substantially prejudiced by having invested several million dollars in its OpenAir products between 1994 and 2001, that it lost the opportunity to re-engineer its products to avoid infringement, and that it lost the opportunity to negotiate a licensing agreement. Proxim also contends that it sustained evidentiary prejudice which prevented it from raising defenses on the basis of inventorship, invalidity and inequitable conduct.

17. Conclusions of Law. It is well established that laches is a defense to a patent infringement suit. *See Lane & Bodley Co. v. Locke*, 150 U.S. 193 (1893); *Wollensak v. Reiher*, 115 U.S. 96 (1885); *Mahn v. Harwood*, 112 U.S. 354 (1884); *A.C. Aukerman Co. v. R.L. Chaides Const. Co.* 960 F.2d 1020, 1028 (Fed.Cir.1992). "In a legal context, laches may be defined as the neglect or delay in bringing suit to remedy an alleged wrong, which taken together with lapse of time and other circumstances, causes prejudice to the adverse party and operates as an equitable bar." *A.C. Aukerman Co.*, 960 F.2d at 1028-29.

18. To prevail on its equitable defense of laches, Proxim must prove by a preponderance of the evidence that: (1) Symbol delayed filing suit for an unreasonable and inexcusable period from the time that Symbol knew or should have known of its infringement claim against Proxim; and (2) Symbol's delay operated to Symbol's prejudice or injury. *Id.* at 1032.

19. The first prong of a laches defense requires proof that the patent holder had either actual or constructive knowledge of infringing activity. *See Johnston v. Standard Min. Co.*, 148 U.S. 360, 370 (1893); *Eastman Kodak Co. v. Goodyear Tire & Rubber Co.*, 114 F.3d 1547, 1559 (Fed.Cir.1997). Constructive knowledge imposes upon patent holders the duty to police their rights. *See Wanless v. Fedders Corp.*, 145 F.3d 1461, 1464-67 (Fed.Cir.1998); *Wanless v.*

*General Electric Co.*, 148 F.3d 1334, 1338 (Fed.Cir.1998). Under the constructive knowledge theory, a patentee is charged with "such knowledge as he might have obtained upon inquiry, provided the facts already known by him were such as to put upon a man of ordinary intelligence the duty of inquiry." *Johnston*, 148 U.S. at 370.

20. A patentee's duty to inquire is subject to a standard of reasonableness. As such, the extent to which a reasonable method of detection of infringement is available to the patentee is relevant. *See Wanless v. General Elec.*, 148 F.3d at 1340 (holding that the "frequency with which [infringement] investigations should ... occur[ ] is a function of their cost and difficulty."); *Wanless v. Fedders Corp.*, 145 F.3d at 1464-67 (finding that a finding of laches was not appropriate on summary judgment where record did not demonstrate that a testing of all possible infringing products was feasible and affordable). Circumstances which give rise to a duty to inquire must be "pervasive, open, and notorious" and include "sales, marketing, publication or public use of a product similar to or embodying technology similar to the patented invention, or published descriptions of the defendant's potentially infringing activities." *Wanless v. General Elec.*, 148 F.3d at 1339.

\*4 21. The defense of laches focuses on the conduct of the patentee, not the infringer. Nevertheless, the infringer's activities are relevant to whether the patentee's conduct is reasonable, including the infringer's efforts to maintain the secrecy of its processes and its denials of infringement. *See Eastman Kodak Co.*, 114 F.3d at 1559. An infringer cannot cloak its activities in secrecy and simultaneously accuse the patent holder of failing to adequately protect its rights. *See, e.g., Fromson v. Western Litho Plate and Supply Co.*, 670 F.Supp. 861, 868-69 (E.D.Mo.1987), *rev'd on other grounds by* 853 F.2d 1568 (Fed.Cir.1988).

22. After determining the point in time at which a patentee had knowledge, actual or constructive, of the infringing activities, the court must then determine whether the delay in bringing suit is unreasonable or inexcusable. *See A.C. Auckerman*, 960 F.2d at 1032. If the delay in filing suit is more than six years, a presumption arises that the delay is unreasonable. *See id.* at 1035.

23. Absence of Requisite Knowledge. Proxim produced no evidence that demonstrates Symbol had actual knowledge of Symbol's infringing activities. Instead, Proxim's laches defense rests upon whether

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 1770290 (D.Del.)
(Cite as: 2004 WL 1770290 (D.Del.))

there were sufficient facts in Symbol's possession to place Symbol on notice of potentially infringing activities and from which a duty to inquire would arise. The court concludes that under these circumstances, the publicly available facts did not give rise to a duty to inquire.

24. In *Wanlass v. General Elec.*, the Federal Circuit articulated a duty to inquire that will arise when sufficient facts are available to put the patentee on notice of infringement. 148 F.3d at 1339. A principal justification for this duty is that the burden is less costly on patentees to police their rights than it would be to impose a burden upon potential infringers to review all patent art for potential infringement. *Id.*

25. It is not the case, however, that all inventions, and the activities which may infringe them, are so readily susceptible to low cost detection. *See Wanlass v. Fedders*, 145 F.3d at 1467. The case at bar highlights this tension. Symbol did have knowledge of Proxim's power save feature. If Symbol's patent were so broad that any power saving function in a wireless device might infringe, this certainly may impose a duty upon Symbol to inquire further. Symbol's patent, however, is not of such breadth.

26. Under different circumstances, Symbol may have had a duty to investigate. For example, if evidence indicated that Symbol actually suspected Proxim's OpenAir products of infringement at a time prior to when it filed suit, but did nothing, laches might attach. Or if Proxim's proprietary source code was reasonably and lawfully available to Symbol, its duty may have been different. Under the facts at bar, however, the court finds that Proxim has not established that Symbol had sufficient knowledge to put it on notice of Proxim's infringing activities.

**\*5** 27. Absence of Requisite Prejudice. Even if the court were to find that Symbol had knowledge, constructive or otherwise, of Proxim's infringing activities, Proxim has still failed to prove the requisite prejudice. "Evidentiary, or 'defense' prejudice, may arise by reason of a defendant's inability to present a full and fair defense on the merits due to the loss of records, the death of a witness, or the unreliability of memories of long past events, thereby undermining the court's ability to judge the facts." *A.C. Auckerman*, 960 F.2d at 1033. In *Wanlass v. General Elec.*, the Federal Circuit found evidentiary prejudice where the defendant had a policy of destroying internal documents after six years, key witnesses were deceased or unavailable, and the defendant no longer had models of some of the accused products. 148 F.3d

at 1340.

28. Proxim contends that it suffered evidentiary prejudice stemming from Symbol's delay in that two witnesses were unable to recall certain facts during depositions and that a certain document was not produced by Symbol during discovery. This, according to Proxim, prejudiced its ability to assert defenses pertaining to inventorship and inequitable conduct.

29. Proxim's inventorship defense supposedly relates to whether John Kramer was a co-inventor of the '441 patent. Initially, Kramer was named as a co-inventor, something which Symbol contends was mistaken and undiscovered until this litigation. (PTX 2) Symbol, pursuant to 35 U.S.C. § 256, applied for and obtained a correction from the PTO based upon certifications by both Tymes and Kramer asserting that the original application was in error in that respect. (D.I. 311 at 268-73; PTX 151; PTX 331) At trial, Tymes testified that he was the sole inventor of the '441 patent. (D.I. 311 at 268)

30. Proxim did not raise inventorship at trial as a defense and did not question Tymes on the issue of inventorship in its cross-examination of him. As Kramer has disclaimed any inventorship in the patents at issue and Proxim has no evidence otherwise to counter such a claim, it eludes the court as to how Proxim was in fact prejudiced. Where, as here, a deposed witness has indicated that he does not have a recollection of a particular fact, the lapse in memory is susceptible to more than one reasonable inference; in the absence of other evidence to support defendant's contention, its alleged evidentiary prejudice is no more likely than not.

31. The second basis for evidentiary prejudice was Symbol's failure to produce a certain document, or perhaps a group of related documents, created by Tymes in preparation for the patent applications. During his deposition, Tymes described preparing a memorandum which explained format and procedures pertaining to his invention but could not recall specifics about these documents or their present location. (D.I. 328 at 314-15) Like the absence of memory by a witness, the absence of a document that was once known to exist, without more, does not give rise to an inference of evidentiary prejudice. Proxim offered no evidence to suggest that such a document likely contained material that would have aided its invalidity defense of inventorship. [FN4] Therefore, the court finds that Proxim has not demonstrated that it sustained evidentiary prejudice to support its defense

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 1770290 (D.Del.)
(Cite as: 2004 WL 1770290 (D.Del.))

of laches.

FN4. Proxim also, in conclusory fashion, suggests that this unavailable evidence might have aided it in a defense of inequitable conduct. (D.I. 340 at 65) Of course, conclusory assertions of evidentiary prejudice cannot form the basis of a laches defense. See Meyers v. Asics Corp., 974 F.2d 1304, 1307 (Fed.Cir.1992). Moreover, in the case of inequitable conduct where the law requires proof by clear and convincing evidence, the absence of any evidence of deceit or fraud undermines Proxim's claims of prejudice.

*6 32. Economic prejudice results where the infringer "will suffer the loss of monetary investments or incur damages which likely would have been prevented by earlier suit." A.C. Auckerman, 960 F.2d at 1033. There must be a nexus between the patentee's delay and the infringer's injury. See Gasser Chair Co., Inc. v. Infanti Chair Mfg. Corp., 60 F.3d 770, 774 (Fed.Cir.1995). Simply that the infringer expended capital in pursuit of its infringing activities does not support a finding of a causal connection. See Hemstreet v. Computer Entry Systems Corp., 972 F.2d 1290, 1294 (Fed.Cir.1992) ("It is not enough that the alleged infringer changed his position--i.e., invested in production of the allegedly infringing device. The change must be because of and as a result of the delay, not simply a business decision to capitalize on a market opportunity.").

33. Proxim has insufficiently demonstrated the existence of actual prejudice that is causally linked to Symbol's delay. The economic prejudice Proxim relies upon is of the ordinary kind that any infringer would incur, namely, the loss of the opportunity to engage in noninfringing economic activities. While in some cases, a patentee's conduct may justify laches in such circumstances, it does not here. For example, had Proxim proven actual knowledge by Symbol of Proxim's infringing activity, such economic losses might constitute actual prejudice. Dwight & Lloyd Sintering Co. v. Greenawalt, 27 F.2d 823, 827 (2d Cir.1928) ("[T]here is abundant authority to deny an accounting where the patentee has let the infringer slowly build up a large business without protest.").

34. Proxim's allegation of nexus also fails to the extent it relies upon its post hoc awareness of the scope and validity of the Tymes patents. Proxim contends that had it known its products infringed valid patents held by Symbol, it would have designed

around them or diverted its investments to noninfringing technologies. (D.I. 347 at 52) This argument is on four corners with that rejected by the Federal Circuit in State Contracting & Engineering Corp. v. Condotte America, Inc. 346 F.3d 1057 (Fed.Cir.2003). In that case, the infringer argued that had it received earlier notice of the patent at issue in that case, it would have designed around the patent and would not have included the patented invention in its project bids. Id. at 1066. The Federal Circuit rejected this argument as lacking the requisite nexus between the delay and the injury. [FN5] Id. at 1067. In particular, the Federal Circuit noted that the infringer failed to prove that it would have changed its design. Id. Similarly, in Gasser Chair, the Federal Circuit found that an infringer's belief that the patent was invalid undercut its argument that it would have engaged in a different course of conduct. Gasser Chair Co., Inc. v. Infanti Chair Mfg. Corp., 60 F.3d 770, 775 (Fed.Cir.1995).

FN5. The Federal Circuit also found that the alleged prejudice was inadequate to serve as a basis for laches, as it was the kind of loss attributable to ordinary liability for infringement. Id. at 1067.

35. In the case at bar, Proxim has not demonstrated that the prejudice it allegedly sustained has a nexus to Symbol's delay. Consequently, the court finds that Proxim has failed to prove the required elements of laches by a preponderance of the evidence.

C. Equitable Estoppel

*7 36. Proxim contends that Symbol, by not informing the IEEE of the existence of the Tymes patents and their applicability to the 802.11 standard, misled Proxim into believing that Symbol held no patents relating to the 802.11 standard.

37. Proxim first began selling the infringing 802.11 product line in 1998. (D.I. 312 at 675) Proxim's 802.11 products were sold under various names, including RangeLAN802, Skyline, Harmony and Orinoco.

38. The IEEE 802.11 standard is an industry standard drafted by the working group members of the 802.11 committee, of which Symbol and Proxim were both members. (D.I. 328 at 52)

39. The IEEE Standards Board Bylaws contemplate that IEEE standards may include the use of subject matter covered by known patents or pending patent

Page 6

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 1770290 (D.Del.)
**(Cite as: 2004 WL 1770290 (D.Del.))**

applications. (PTX 400) The Bylaws require that such patented subject matter may only be included if the patentee provides either: (1) a general disclaimer against assertion of any present or future patent rights against persons or entities practicing a patented invention in order to comply with the IEEE standard; or (2) a statement that a license will be made available "without compensation or under reasonable rates, with reasonable terms and conditions that are demonstrably free of any unfair discrimination." (PTX 400)

40. In September 1995, the chairperson of the 802.11 committee sent a letter to all committee members requesting that each member identify whether they held patents related to technology embodied in the draft agreement and whether they would be willing to "license their technology on a non-discriminatory basis and under fair and reasonable terms." (DTX 6166 at P511051) Attached to the chairperson's letter was a sample letter which provided blank spaces for the inclusion of U.S. Patent Numbers. (*Id.* at P511052)

41. In April 1996, Symbol responded to the chairperson's letter with a letter of assurance. (DTX 6166 at P511048) Symbol's letter did not identify any specific patents or patent applications. (*Id.*) Instead, the letter stated that in the event the 802.11 standard is adopted, Symbol would "be willing to negotiate a non-exclusive, worldwide license, under the relevant claims of such patent or patents, on a nondiscriminatory basis and on reasonable terms and conditions including its then current royalty rates." (*Id.*) Symbol's letter is consistent with submissions made by several other companies. In an August 1996 memorandum, the IEEE Standards Board chairperson provided a list as to which committee members had complied with this request for an assurance letter. Symbol, along with several other companies, was denoted as having an "IP statement available." (*Id.* at P511030)

42. In 1997, testing was performed at a laboratory at the University of New Hampshire to determine whether products offered by various 802.11 participants had interoperability. (D.I. 328 at 49-50, 197-198) This third-party testing confirmed that Proxim and Symbol's products were interoperable. (*Id.* At 51- 52)

*8 43. Conclusions of Law. Equitable estoppel is similar to laches but focuses on the reasonableness of the infringer's reliance rather than the unreasonableness of the patentee's delay. To obtain relief from enforcement of a patent under the doctrine of equitable estoppel, Proxim must prove three

elements by the preponderance of the evidence: (1) Symbol, through misleading conduct, led Proxim to reasonably infer that Symbol did not intend to enforce its patent; (2) Proxim relied on Symbol's misleading conduct; and (3) material prejudice resulted to Proxim. *See A.C. Auckerman Co.,* 960 F.2d at 1028.

44. Silence may give rise to the defense of equitable estoppel only when coupled with either affirmative conduct [FN6] or an affirmative obligation. [FN7] *Id.*

> FN6. For example, if a patentee threatened enforcement, but then delayed in bringing suit. *See Meyers,* 974 F.2d at 1308-09.

> FN7. For example, if a patentee and infringer had a relationship from which there exists an affirmative obligation to speak. *See A.C. Auckerman,* 960 F.2d at 1042.

45. Proxim contends that Symbol had a duty to disclose the existence of patents relevant to the IEEE standards development. Proxim relies upon the Federal Circuit's decision in *Rambus, Inc. v. Infineon Tech Corp.,* 318 F.3d 1081 (Fed.Cir.2003), to support the existence of a duty to disclose. Proxim's reliance is misplaced.

46. *Rambus* does not stand for a general duty of disclosure for participants in an industry standards organization. First, the portion of the *Rambus* opinion relied upon by Proxim addressed a state law claim of fraud, not equitable estoppel. *Rambus,* 318 F.3d at 1096. Second, the Federal Circuit focused substantially on the contractual duty of disclosure of the specific industry standards organization. *Id.* at 1097-1101. The contractual nature of this duty was further reinforced by court of appeal dicta admonishing open standards committees to adopt clearer policies relating to the disclosure of intellectual property by its members. *Id.* at 1102.

47. If Proxim sought to rely upon the existence of a contractual duty to disclose, it had the burden of proving the existence thereof and the scope thereto. Proxim, however, failed to provide evidence to support its claim that IEEE Standards Board members bore a duty to disclose their patent rights. Indeed, the evidence demonstrates that IEEE Standards Board members could either disclose their specific patents or pledge to license on a reasonable and nondiscriminatory basis, the latter being the course selected by Symbol and several other significant technology holders. Proxim produced no controlling agreement that expressed a duty to the contrary. Given

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 1770290 (D.Del.)
**(Cite as: 2004 WL 1770290 (D.Del.))**

the course of conduct of the IEEE members, the court finds that no such duty existed. In the absence of a duty to speak, Symbol's silence cannot constitute the basis for a charge of equitable estoppel as a matter of law. *A.C. Auckerman, 960 F.2d at 1042* ("[S]ilence alone will not create an estoppel unless there was a clear duty to speak.").

48. Proxim also contends that Symbol's silence following the interoperability testing between Proxim and Symbol constituted misleading conduct. Proxim, however, offered no evidence that the third-party interoperability testing affirmatively imposed the duty to speak upon any participating 802.11 vendor. In the absence of such a duty, Symbol's silence cannot be misleading as a matter of law. Moreover, Proxim has not shown any evidence of reliance that is connected to the interoperability testing. *Id. at 1043.*

**\*9** 49. Consequently, the court finds Proxim has failed to prove by a preponderance of the evidence its defense of equitable estoppel.

## IV. PREJUDGMENT INTEREST

Symbol filed a motion for an award of prejudgment interest and for a six percent royalty on future infringing sales by Proxim. (D.I.324) At the conclusion of the jury trial, the jury found by a preponderance of the evidence that Symbol was entitled to damages both for infringement by the 802.11 products and the OpenAir products. (D.I. 294 at 27) Question 28 asked the jury "[w]hat amount of damages in the form of a reasonable royalty do you find that Symbol has proven by a preponderance of the evidence it is entitled to receive from Proxim?" (*Id.* at 28) Following the question, two boxes were provided for the jury's response: (1) a box which contained a blank line after which the "% royalty rate" appeared; (2) a box which began with a dollar symbol after which a blank line was provided. (*Id.*) The jury indicated on the verdict form that a six percent royalty rate was awarded. (*Id.*) The jury drew a dash through the second box containing the dollar symbol.

Proxim contends that the jury's response to the second box indicates that it determined that no damages should be awarded Symbol. (D.I.346) This argument, however, cannot be reconciled with the verdict form, the jury's full response to question 28 nor Proxim's argument at trial. The verdict form supplied to the jury was agreed to by both parties. (D.I. 314 at 1073-74) Neither party requested that the jury be asked to make a special finding as to the royalty base. Both parties' experts used a royalty base based upon Proxim's

reported sales data for the accused products. (DTX 2008; DTX 2026; DTX 2018; DTX 2036; DTX 2041; D.I. 312 at 584-85; D.I. 313 at 958-59) Indeed, it was Proxim's argument, as proffered through its damages expert, that the proper royalty, if not zero, should be a lump sum. (D.I. 313 at 961) At no point during the trial did Proxim introduce evidence to contradict the royalty base figure. Consequently, the court finds that the undisputed evidence offered at trial supports the conclusion that the proper royalty base is $381,091,287, based upon defendant's reported sales figures for the products found to have infringed the Tymes patents. (DTX 2008; DTX 2011; DTX 2018; DTX 2026; DTX 2036; DTX 2041; D.I. 312 at 584) Consequently, based upon the jury's finding of a six percent royalty, Symbol is entitled to an award of damages in the amount of $22,865,477.

Symbol proposes an award of prejudgment interest based upon the average annual prime rate compounded annually. (D.I.324) The rate, if any, of prejudgment interest to be awarded is within the discretion of the court. See *Studiengesellschaft Kohle, m.b.H: v. Dart Industries, Inc.,* 862 F.2d 1564, 1580 (Fed.Cir.1988). A patent holder need not prove that it borrowed at the prime rate in order to be entitled to prejudgment interest on that basis. See *Uniroyal, Inc. V. Rudkin-Wiley Corp.,* 939 F.2d 1540, 1545 (Fed.Cir.1991). The determination of whether to award simple or compounded interest is within the discretion of the court. See *Rite-Hite Corp.,* 56 F.3d at 1555. "[I]t may be appropriate to limit prejudgment interest, or perhaps even deny it altogether, where the patent owner has been responsible for undue delay in prosecuting the lawsuit." *General Motors Corp. v. Devex Corp.,* 461 U.S. 648, 657 (1983). "Any justification for withholding the award ... must have some relationship to the award of prejudgment interest itself." *Crystal Semiconductor Corp. v. TriTech Microelectronics Intern., Inc.* 246 F.3d 1336, 1361 (Fed.Cir.2001).

**\*10** Mindful of its discretion, the court concludes that Symbol is entitled to simple interest based upon the United States Treasury Bill One Year Constant Rate for a period beginning in May 1995 and ending in July 2004. [FN8] Prejudgment interest, calculated consistent with Symbol's expert's methodology, shall be awarded in the amount of $3,052,192.

> FN8. The interest rates employed by the court are as follows: (1995) 5.96%; (1996) 5.52%; (1997) 5.63%; (1998) 5.05%; (1999) 5.08%; (2000) 6.11%; (2001) 3.49%; (2002) 2.00%; (2003) 1.24%; and (2004) 1 .29%.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 1770290 (D.Del.)
**(Cite as: 2004 WL 1770290 (D.Del.))**

*See* United States Federal Reserve, Selected Interest Rates(2004) *at* http://www.federalreserve.gov/releases/h15/data.htm.

## V. FUTURE ROYALTIES

Symbol contends that in lieu of a permanent injunction it should be awarded a six percent royalty on sales of infringing products by Proxim occurring after September 2003. (D.I.324) Symbol relies upon *Shatterproof Glass Corp. v. Libbey-Owens Ford Co.*, 758 F.2d 613, 616, 628 (Fed.Cir.1985), for its argument that it should receive a court imposed royalty on future sales. In *Shatterproof Glass,* however, the patentee sought a permanent injunction. The district court denied the injunction and instead ordered a compulsory license to be granted to the infringer. In the case at bar, Symbol has not sought a permanent injunction and Proxim has not sought a compulsory license. In the absence thereof, the court declines to consider whether a judicially determined royalty on future sales is appropriate relief in the present case.

## VI. CONCLUSION

For the reasons stated above, the court finds that Proxim has failed to establish by a preponderance of the evidence its equitable defenses of estoppel and laches. The court also finds that, consistent with the jury's award of a six percent royalty on the infringing products, Symbol is entitled to an award of damages in the amount $22,865,477 and interest in the amount of $3,052,192. An order shall issue.

Not Reported in F.Supp.2d, 2004 WL 1770290 (D.Del.)

**Motions, Pleadings and Filings (Back to top)**

• 1:01CV00801 (Docket) (Dec. 04, 2001)

END OF DOCUMENT

2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 25
## IS REDACTED IN ITS ENTIRETY