# EXHIBIT F

**Exhibit F**

| THE MEDICAL SERVICE CODES IN THE ACCUSED PRODUCTS INCLUDE CPT CODES AS CLAIMED IN CLAIM 6 |
|---|
| |

Deposition of Karen Lampe, TriZetto's 30(b)(6) Designee on ClaimFacts (9/14/05):

Q.    Could you read claim 6? Claim 6 includes all of the components of claim 3 and the added limitation in claim 6.

A.    Yes.

Q.    So is it your understanding that TriZetto's ClaimFacts product includes all the components of claim 3 and claim 6?

A.    Yes.

[73:24-74:6]

Deposition of ClaimFacts customer Harrington Benefits -- Patricia Keplinger 30(b)(6) designee (9/12/05):

Q.    Would you turn to claim 6, please. Is there anything within claim 6 that's not included within ClaimFacts with ClinicaLogic?

A.    No.

[120:3-7]

Deposition of Facets customer Providence Health Plan – Carolyn Drini 30(b)(6) designee (09/12/05):

Q.    Could you read claim 6? And claim 6 is --includes all of the elements of claim 3 plus an additional limitation as described in claim 6. Could you read claim 6. And my question is, based on your understanding, does Facets include the components of claim 6?

MS. DRINI:  Yes.

[72:14-21]

Deposition of John Danza, TriZetto's 30(b)(6) Designee on QicLink (9/12/05):

Q.    Turning to claim 6, is there any element within claim 6 that's not practiced by the QicLink product?

A.    No.

[101:4-7]

1

Deposition of QicLink customer Key Benefit Administrators - Clifton Jones 30(b)(6) designee (9/23/05):

Q.     With respect to claim 6, claim 6 includes all of the components from claim 3 and the added component of claim 6. And so the question is, does QuicLink with ClinicaLogic contain all of the components described in claim 3 and claim 6?

A.     Yes.

[31:13-18]

2

# EXHIBIT G

**Exhibit G**

| THE ACCUSED PRODUCTS INCLUDE ALL OF THE ELEMENTS OF CLAIM 15 |
|---|
| Deposition of Facets customer Providence Health Plan -- Carolyn Drini 30(b)(6) designee (09/12/05): |

      Q.     Okay.  Could you read claim 15.  And I'll ask you the same question:  Does the Facets system, based on your understanding, include the components described in claim 15?

    ***

MS. DRINI:    I would say yes.

[77:6-14]

Deposition of Karen Lampe, TriZetto's 30(b)(6) Designee on ClaimFacts (9/14/05):

      Q.     Does ClaimFacts contain the components described in claim 15?

      A.     Yes.

[78:13-15]

Deposition of ClaimFacts customer Harrington Benefits – Patricia Keplinger 30(b)(6) designee (9/12/05):

      Q.     So every element described in Claim 15 of the '164 patent is included within ClaimFacts with ClinicaLogic as received from TriZetto?

      A.     Yes.

[133:13-17]

1

<u>Deposition of QicLink customer Key Benefit Administrators - Clifton Jones 30(b)(6) designee
(9/23/05)</u>:

    Q.    Does QuicLink with ClinicaLogic include the components described in
claim 15?

    A.    Yes.

[32:25; 33:1-2]

---

**THE ACCUSED PRODUCTS INCLUDE ALL OF THE ELEMENTS OF CLAIM 16**

Deposition of Karen Lampe, TriZetto's 30(b)(6) Designee on ClaimFacts (9/14/05):

    Q.    Does ClaimFacts include—does ClaimFacts perform the steps described
in claim 16?

    A.    Yes.

[79:11-14]

Deposition of ClaimFacts customer Harrington Benefits – Patricia Keplinger 30(b)(6) designee
(9/12/05):

    Q.    So every element described in Claim 16 of the '164 patent is present in
ClaimFacts with ClinicaLogic as that product is received from TriZetto?

    A.    Yes.

[134:20-24]

<u>Deposition of Facets customer Providence Health Plan – Carolyn Drini 30(b)(6) designee
(09/12/05)</u>:

    Q.    Could you read claim 16, and I'll ask you based on your understanding, does the
Facets system operate pursuant to the steps described in claim 16?

        ***

MS. DRINI:    Based on my understanding, I would say yes.

[77:16-21]



Deposition of QicLink customer Key Benefit Administrators - Clifton Jones 30(b)(6) designee (9/23/05):

      Q.     Does QuicLink with ClinicaLogic perform the steps described in claim 16?
      A.     Yes.
[33:3-5]

3

# EXHIBIT H

**Exhibit H**

| '164 PATENT, CLAIM 3 | TESTIMONY OF TRIZETTO'S EXPERT RANDALL DAVIS, PhD, NOVEMBER 30, 2005. |
|---|---|
| 3. A computer system including a central processing unit and associated memory for processing input claims containing at least one medical service code, comprising: | Q. Let me start with Claim 3. At the start of Claim 3 it says, "A computer system including a central processing unit and associated memory for processing input claims containing at least one medical service code comprising." Do you see that? ... Each of the three accused systems has that, right?<br>A. Each of the three systems has that. |
| a predetermined database stored in the associated memory, the database containing medical service codes and a set of relationships among the medical service codes defining whether selected ones of the medical service codes are valid when received with other selected ones of the medical service codes; | A. My understanding of "predetermined" as it is in the patent is that it is given to you by a vendor and is not changed by the user.<br>---<br>A. ... I understand the term "predetermined" in the context of that patent to mean established by the vendor and not modifiable by the user. ....<br>---<br>Q. Okay. So each of the three systems includes the component that's listed as the element which starts with "a predetermined database stored in associated memory," ending with "one of the medical service codes" if you were to remove the term which we disagree on "predetermined," correct?<br>A. Correct. |
| means for receiving at least one claim; | Q. And each of the three accused systems satisfies the next element, "means for receiving at least one claim," correct?<br>A. It would need to. |
| means for ascertaining whether the at least one claim contains a plurality of medical service codes; | Q. And it's not a never-ending loop, right? At some point the system knows that it has processed each of the medical service codes in the claim, right?<br>A. Because the -- in effect, the line number of the code it's looking at has reached the maximum line number.<br>Q. So does the system determine how many medical service codes are contained within a given medical claim and then serially process each of those medical service codes contained in the claim?<br>A. That's the first of those. At some point it determines how many they are -- there are. ... So it knows how many it has to do. ... |
| means for determining whether one of the medical service codes in the plurality of medical service codes is valid or invalid by interacting with the database and the set of | Q. Do all of the three accused infringing systems satisfy the next element in Claim 3, means for determining whether one of the medical service codes in a plurality of medical service codes is valid or invalid by interacting with the database in a set of relationships contained in database?<br>A. Yes, they can do that. |

| '161 Patent: Claim 3 | Testimony of TriZetto's Expert Randall Davis, PhD, November 30, 2005 |
|---|---|
| relationships contained in the database; | |
| means for authorizing medical service codes which are valid in response to the means for determining; and | Q.   And do each of the three accused systems satisfy the next element, the means for authorizing an element?<br>A.   Yes. |
| means for rejecting medical service codes which are invalid in response to the means for determining. | Q.   And do each of the three accused infringing systems satisfy the last element, the means for injecting medical service codes?<br>A.   Yes. |

2

# EXHIBIT I

LEXSEE 2005 U.S. APP. LEXIS 25123

**PFIZER, INC. and WARNER-LAMBERT COMPANY, LLC, Plaintiffs-Appellees, v. TEVA PHARMACEUTICALS USA, INC., Defendant-Appellant, and RANBAXY PHARMACEUTICALS, INC. and RANBAXY LABORATORIES LIMITED, Defendants-Appellants.**

**05-1331**

**UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT**

*2005 U.S. App. LEXIS 25123*

**November 22, 2005, Decided**

**PRIOR HISTORY:** [*1] Appealed from: United States District Court for the District of New Jersey. Senior Judge Dickinson R. Debevoise.

*Pfizer, Inc. v. Teva Pharms. USA, Inc., 2005 U.S. Dist. LEXIS 29050 (D.N.J., Mar. 31, 2005)*

**DISPOSITION:** AFFIRMED.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff patentees sued defendant drug manufacturers, alleging infringement of its patent for pharmaceutical compositions used to treat hypertension. The United States District Court for the District of New Jersey granted the patentees' motion for a preliminary injunction. The drug manufacturers appealed.

**OVERVIEW:** Based on the preliminary record, the district court properly found that the patentees were likely to succeed on the merits as it properly construed the term saccharides based on the claim language and extrinsic evidence. Under that construction, the accused products were likely to literally infringe two patent claims. The alternative holding that even if the term saccharides included sugars but not polysaccharides the manufacturers were likely to have infringed the two claims under the doctrine of equivalents was proper as neither the disclosure-dedication rule nor the all limitations rule precluded the doctrine's application. The district court did not abuse its discretion in assuming irreparable harm as the patentees had made a strong showing of likely infringement. The manufacturers had not rebutted the presumption as it was clear that neither party anticipated voluntarily ceasing the sale of products covered by the patent and there was no evidence that the patentees intended to engage in non-exclusive licensing. The district court did not abuse its discretion in finding that the harm to the patentees out-weighed the harm to the manufacturers or in assessing the public interest.

**OUTCOME:** The order granting the preliminary injunction was affirmed.

**LexisNexis(R) Headnotes**

*Patent Law > Remedies > Equitable Relief > Injunctions*
[HN1] Courts have the power to grant injunctions to prevent the violation of patent rights. 35 U.S.C.S. § 283. In considering whether to grant a preliminary injunction, a court must consider whether the patent owner has shown: (1) a reasonable likelihood of success on the merits; (2) the prospect of irreparable harm to the patent owner in the absence of the injunction; (3) that this harm would exceed harm to the alleged infringer when subject to the injunction; and (4) that granting the injunction is in the public interest.

*Patent Law > Jurisdiction & Review > Standards of Review > Abuse of Discretion*
*Patent Law > Remedies > Equitable Relief > Injunctions*
[HN2] The United States Court of Appeals for the Federal Circuit reviews the grant of a preliminary injunction in patent cases for abuse of discretion. To overturn the grant of a preliminary injunction, the appellate court must find that the district court made a clear error of judgment in weighing the relevant factors or based its exercise of discretion on an error of law or on clearly erroneous factual findings.

*Patent Law > Infringement Actions > Burdens of Proof*
[HN3] To win on its claim of patent infringement, a plaintiff must present proof that the defendant infringed a valid and enforceable patent.

*Patent Law > Infringement Actions > General Overview*

[HN4] Determining the likelihood of patent infringement requires two steps, first claim construction and second a comparison of the properly construed claims to the accused product.

*Patent Law > Infringement Actions > Claim Interpretation > General Overview*
*Patent Law > Jurisdiction & Review > Standards of Review > De Novo Review*
[HN5] Patent claim construction is a question of law reviewed de novo.

*Patent Law > Infringement Actions > Claim Interpretation > General Overview*
[HN6] When interpreting claims, the United States Court of Appeals for the Federal Circuit inquires into how a person of ordinary skill in the art would have understood claim terms at the time of the invention. The inquiry into how a person of ordinary skill in the art understands a claim term provides an objective baseline from which to begin claim interpretation. Importantly, the person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification.

*Patent Law > Infringement Actions > Claim Interpretation > Aids*
[HN7] The claims themselves provide substantial guidance as to the meaning of particular patent claim terms.

*Patent Law > Infringement Actions > Claim Interpretation > General Overview*
[HN8] The person of ordinary skill in the art is deemed to have read the patent claim term in the context of the entire patent. It is necessary to consider the specification as a whole, and to read all portions of the written description, if possible, in a manner that renders the patent internally consistent.

*Patent Law > Infringement Actions > Claim Interpretation > Construction Preferences*
[HN9] In the context of a patent infringement case, a claim construction that excludes a preferred embodiment is rarely, if ever, correct.

*Patent Law > Infringement Actions > Claim Interpretation > Aids*
[HN10] As the United States Court of Appeals for the Federal Circuit holds, judges may rely on dictionary definitions when construing claim terms, so long as the dictionary definition does not contradict any definition found in or ascertained by a reading of the patent documents.

*Patent Law > Infringement Actions > Claim Interpretation > General Overview*
[HN11] The ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application.

*Civil Procedure > Entry of Judgments > Consent Decrees*
[HN12] The scope of a consent decree must be discerned within its four corners and the conditions upon which a party has consented to waive its right to litigate particular issues must be respected.

*Patent Law > Infringement Actions > Claim Interpretation > General Overview*
[HN13] While the United States Court of Appeals for the Federal Circuit acknowledges the maxim that claims should be construed to preserve their validity, it has not applied that principle broadly, and it certainly does not endorse a regime in which validity analysis is a regular component of claim construction. Instead, the court limits the maxim to cases in which the court concludes, after applying all the available tools of claim construction, that the claim is still ambiguous. In such cases, the court looks to whether it is reasonable to infer that the United States Patent and Trademark Office would not have issued an invalid patent, and that the ambiguity in the claim language should therefore be resolved in a manner that would preserve the patent's validity.

*Patent Law > Infringement Actions > Burdens of Proof*
[HN14] To prove infringement, a patentee must show that an accused product or method meets every claim limitation either literally or under the doctrine of equivalents.

*Patent Law > Infringement Actions > Burdens of Proof*
*Patent Law > Remedies > Equitable Relief > Injunctions*
[HN15] It is particularly appropriate at the preliminary injunction stage not to set a hard and fast rule that patent infringement can only be shown through quantitative testing of an accused product.

*Patent Law > Infringement Actions > Claim Interpretation > General Overview*
[HN16] District courts may engage in rolling claim construction, in which the court revisits and alters its interpretation of the claim terms as its understanding of the technology evolves. Indeed, a conclusion of law such as claim construction is subject to change upon the development of the record after a district court's decision on a motion for preliminary injunction.

2005 U.S. App. LEXIS 25123, *1

*Patent Law > Jurisdiction & Review > Standards of Review > De Novo Review*

[HN17] In the context of a patent infringement action, application of the disclosure–dedication rule is a question of law subject to de novo review.

*Patent Law > Claims & Specifications > General Overview*

[HN18] The United States Court of Appeals for the Federal Circuit holds that if one of ordinary skill in the art can understand the unclaimed disclosed teaching upon reading the written description, the alternative matter disclosed has been dedicated to the public. This disclosure–dedication rule does not mean that any generic reference in a written specification necessarily dedicates all members of that particular genus to the public. The disclosure must be of such specificity that one of ordinary skill in the art could identify the subject matter that had been disclosed and not claimed.

*Patent Law > Claims & Specifications > General Overview*
*Patent Law > Jurisdiction & Review > Standards of Review > De Novo Review*

[HN19] Like the disclosure–dedication rule, application of the all limitations rule is a question of law subject to de novo review.

*Patent Law > Infringement Actions > Doctrine of Equivalents > Limits on Equivalence*

[HN20] The all limitations rule provides that the doctrine of equivalents does not apply if applying the doctrine would vitiate an entire claim limitation. The United States Court of Appeals for the Federal Circuit explains that there is no set formula for determining whether a finding of equivalence would vitiate a claim limitation, and thereby violate the all limitations rule. Rather, courts must consider the totality of the circumstances of each case and determine whether the alleged equivalent can be fairly characterized as an insubstantial change from the claimed subject matter without rendering the pertinent limitation meaningless.

*Patent Law > Remedies > Equitable Relief > Injunctions*

[HN21] The United States Court of Appeals for the Federal Circuit consistently holds that a district court should presume that a patent owner will be irreparably harmed when a patent owner establishes a strong showing of likely infringement of a valid and enforceable patent.

*Patent Law > Remedies > Equitable Relief > Injunctions*

[HN22] The United States Court of Appeals for the Federal Circuit explains that because the very nature of a patent provides the right to exclude, infringement of

a valid patent inherently causes irreparable harm in the absence of exceptions such as a finding that future infringement is no longer likely, that the patentee is willing to forgo its right to exclude by licensing the patent, or that the patentee had delayed in bringing suit. And when the presumption of irreparable harm attaches, the burden is on the likely infringer to produce evidence sufficient to establish that the patent owner would not be irreparably harmed by an erroneous denial of a preliminary injunction.

*Patent Law > Remedies > Equitable Relief > Injunctions*

[HN23] For purposes of determining whether to issue a preliminary injunction, the fact that other infringers may be in the marketplace does not negate irreparable harm. A patentee does not have to sue all infringers at once. Picking off one infringer at a time is not inconsistent with being irreparably harmed. Neither is first targeting infringers whose sales dwarf the sales of other infringers.

*Patent Law > Remedies > Equitable Relief > Injunctions*

[HN24] Evidence that a patent owner unduly delays in bringing suit against an alleged infringer negates the idea of irreparability.

*Patent Law > Remedies > Equitable Relief > Injunctions*

[HN25] Simply put, for purposes of a preliminary injunction, an alleged infringer's loss of market share and customer relationships, without more, does not rise to the level necessary to overcome the loss of exclusivity experienced by a patent owner due to infringing conduct.

*Patent Law > Remedies > Equitable Relief > Injunctions*

[HN26] In the context of determining whether to issue a preliminary injunction, selling a lower priced product does not justify infringing a patent.

COUNSEL: Joseph M. O'Malley, Jr., Fitzpatrick, Cella, Harper & Scinto, of New York, New York, argued for plaintiffs-appellees. With him on the brief were Bruce M. Wexler, Christopher L. Limpus, and John C. Heuton. Of counsel was Herbert W. Rea.

William R. Zimmerman, Knobbe, Martens, Olson & Bear, LLP, of Irvine, California, argued for defendants-appellants. With him on the brief for Ranbaxy Pharmaceuticals, Inc. were Darrell L. Olson, James F. Lesniak, Craig S. Summers, Payson J. LeMeilleur, and Christy G. Lea. Of counsel on the brief were David M. Hashmall and Dominique T. Hussey, Goodwin Procter LLP, of New York, New York, for Teva Pharmaceuticals USA, Inc.

JUDGES: Before NEWMAN, RADER, and PROST,

2005 U.S. App. LEXIS 25123, *1

Circuit Judges.

**OPINIONBY: PROST**

**OPINION: PROST, Circuit Judge.**

Teva Pharmaceuticals USA, Inc. ("Teva") along with Ranbaxy Pharmaceuticals, Inc. and Ranbaxy Laboratories Limited (collectively, "Ranbaxy") appeal from the order of the United States District Court for the District of New Jersey granting a motion for a preliminary injunction filed by Pfizer, Inc. ("Pfizer") [*2] and Warner-Lambert Company, L.L.C. ("Warner-Lambert") to prevent Teva and Ranbaxy from infringing *United States Patent No. 4,743,450* ("the '450 patent"). *Pfizer, Inc. v. Teva Pharms. USA, Inc.,* 2005 U.S. Dist. LEXIS 29050, No. 05-CV-620 (D.N.J. Mar. 31, 2005) ("Preliminary Injunction Order"); *Pfizer, Inc. v. Teva Pharms. USA, Inc., 2005 U.S. Dist. LEXIS 29050, No. 05-CV-620 (D.N.J. Mar. 29, 2005)* ("Bench Decision"). At this preliminary stage in the proceedings, we neither find error in the district court's claim construction, nor do we conclude that the district court abused its discretion in determining that infringement is likely and that the harm and public interest favors enjoining Teva and Ranbaxy. We therefore affirm the grant of the preliminary injunction.

BACKGROUND

I.

The *'450 patent* relates to pharmaceutical compositions containing angiotensin converting enzyme ("ACE") inhibitors such as quinapril and their methods of manufacture. Quinapril and other ACE inhibitors can be used to treat hypertension, commonly known as high blood pressure. According to the *'450 patent,* however, many ACE inhibitors including quinapril are susceptible to degradation due to cyclization, hydrolysis, and oxidation. Cyclization occurs [*3] when one part of an ACE inhibitor compound reacts with a different part of the same compound to form a degraded, inactive "cyclized" compound. Hydrolysis and oxidation involve reactions with water and oxygen, respectively. Hydrolysis results in a degraded compound, and oxidation causes discoloration.

The *'450 patent* discloses minimizing cyclization, hydrolysis, and discoloration by using formulations containing a metal-containing stabilizer and a saccharide. According to the *'450 patent,* the metal-containing stabilizer prevents both cyclization and discoloration, while the saccharide prevents hydrolysis. A contemporaneous report, summarizing the research by the inventors eventually named on the *'450 patent,* describes how the inventors came to these conclusions. The report explains that the inventors initially attempted to prevent quinapril drug

formulations from decomposing due to cyclization and discoloration. The inventors first suspected that moisture caused these problems, and so developed a dry formulation. They chose excipients known to have low moisture content, employing anhydrous lactose as a "filler" and microcrystalline cellulose as a "dry binder." The formulation continued [*4] to degrade, however. Eventually the inventors discovered that the two problems, cyclization and discoloration, could be prevented by including magnesium carbonate in the formulations. Use of magnesium carbonate, however, resulted in a new, third problem: hydrolysis. To reduce hydrolysis successfully, the inventors added various proportions of an "inert diluent," lactose. The resulting composition thus eliminated all three problems: cyclization, discoloration, and hydrolysis. Warner-Lambert, which owns the *'450 patent,* now markets the resulting quinapril formulation as Accupril(R). n1

n1 For more background on the development of ACE inhibitors, including Accupril(R), see *Warner-Lambert Co. v. Teva Pharmaceuticals USA, Inc.,* 418 F.3d 1326, 1330-33 (Fed. Cir. 2005).

This appeal involves the *'450 patent's* independent claims 1 and 16. Claim 1 is a composition claim:

A pharmaceutical composition which contains:
(a) a drug component which comprises a suitable amount of an ACE inhibitor which is susceptible to cyclization, hydrolysis, and discoloration,
(b) a suitable amount of an alkali or alkaline earth metal carbonate to inhibit cyclization [*5] and discoloration, and
(c) a suitable amount of a saccharide to inhibit hydrolysis.

*'450 patent,* col. 5, l. 52 – col. 6, l. 2. Claim 16 is a process claim:

A process for stabilizing an ACE inhibitor drug against cyclization which comprises the step of contacting the drug with:
(a) a suitable amount of an alkali or alkaline earth-metal carbonate and,
(b) one or more saccharides.

Id. at col. 6, ll. 54-63.

II.

A.

On January 15, 1999, Teva sought approval from the Food and Drug Administration ("FDA") to market a generic version of Accupril(R) by filing an Abbreviated New Drug Application ("ANDA") pursuant to the Hatch-Waxman Amendments to the Federal Food, Drug and Cosmetic Act. n2 Because Teva was the first company to file an ANDA for the generic version of Accupril(R), Teva was entitled to a 180-day generic market exclusivity period pursuant to 21 U.S.C. § 355(j)(5)(B)(iv). As this court recently explained:

> The 180-day exclusivity period typically begins on the date of the first commercial marketing of the drug by the first applicant. 21 U.S.C. § 355(j)(5)(B)(iv). The original Hatch-Waxman [*6] Amendments provided that the commencement of the 180-day exclusivity period could also be triggered by "the date of a decision of a court . . . holding the patent which is the subject of the certification to be invalid or not infringed." Id.

*Teva Pharms. USA, Inc. v. Pfizer, Inc.,* 395 F.3d 1324, 1328 (Fed. Cir. 2005). n3 Along with the ANDA, Teva simultaneously filed a paragraph IV certification pursuant to the requirements of 21 U.S.C. § 355(j)(2)(A)(vii)(IV), asserting that the '450 patent is invalid under 35 U.S.C. §§ 102 and 103.

> n2 The Hatch-Waxman Amendments were enacted as a part of the Drug Price Competition and Patent Term Restoration Act of 1984, Pub. L. No. 98-417, codified at 21 U.S.C. §§ 355 and 360cc, and 35 U.S.C. §§ 156, 271, 282. *Syntax (U.S.A.) L.L.C. v. Apotex, Inc.,* 407 F.3d 1371, 1376 n.5 (Fed. Cir. 2005).

> n3 While in 2003 Congress amended the provisions relating to the 180-day exclusivity period, the new provisions do not apply to Teva's ANDA because it was filed before December 8, 2003. See Medicare Prescription Drug, Improvement, and Modernization Act of 2003, Pub. L. No. 108-173, § 1102(b), 117 Stat. 2066, 2460.

[*7]

On March 2, 1999, Warner-Lambert responded by suing Teva in the District of New Jersey for infringement of the '450 patent under 35 U.S.C. § 271(e)(2)(A). During the course of those proceedings, Teva and Warner-Lambert initially presented diverging claim construction arguments to the district court. In particular, with respect

to the claim terms "saccharide" and "saccharides," Teva advocated a construction that would encompass carbohydrates, including polysaccharides and sugars, as well as compounds derived from carbohydrates. For its part, Warner-Lambert simply argued that a "saccharide" is a sugar. n4 Later, however, Teva and Warner-Lambert stipulated to the following claim construction:

> The word "saccharide" in Claims 1 and 16 of the '450 patent means "a sugar, and specifically includes only lower molecular weight carbohydrates, specifically, mono- and diaccharides and their simple derivatives, including such substances as lactose, sucrose, mannitol and sorbitol."

The district court entered this stipulation in an order dated May 7, 2002. The ultimate resolution of that separate case is not at issue in this appeal. n5.

> n4 In the previous case, Teva and Warner-Lambert disputed the validity of the '450 patent. In the present appeal, the parties only dispute the infringement of the '450 patent. This distinction may explain what will soon become apparent: in this case Teva and Warner-Lambert have each embraced the other's construction of "saccharides" advocated in the previous case.

[*8]

> n5 The district court eventually granted summary judgment against Teva, finding the '450 patent not invalid for lack of enablement and infringed. After a bench trial, the district court also found the '450 patent not unenforceable due to inequitable conduct. This court recently affirmed the finding of no unenforceability for inequitable conduct, but reversed and remanded the case to the district court on the issues of enablement and infringement because the court identified genuine issues of material fact precluding summary judgment. See *Warner-Lambert,* 418 F.3d at 1348. The court did not, however, have occasion to address the issues presented to it in this appeal.

**B.**

On December 27, 2002, in what would eventually lead to the instant action, Ranbaxy sought FDA approval to market its own generic version of Accupril(R) by filing its own ANDA and certifying that its product would not

infringe the '450 patent, Ranbaxy sent Warner-Lambert a paragraph IV certification letter on April 7, 2003, explaining why Ranbaxy believed its product would not infringe the '450 patent. Ranbaxy's letter indicated that it had adopted and relied upon the construction of "saccharide" [*9] Warner-Lambert had previously stipulated to in its case against Teva. Warner-Lambert did not respond to Ranbaxy's letter or sue Ranbaxy within forty-five days of receiving the letter, which would have triggered a thirty-month stay of approval of Ranbaxy's ANDA. See 21 U.S.C. § 355(j)(5)(B)(iii) (2000).

Ranbaxy eventually approached Teva to solicit Teva's assistance in marketing Ranbaxy's product, and on August 26, 2004, the two entered into a Distribution and Supply Agreement. Later, on December 15, 2004, Teva relinquished its potential 180-day generic market exclusivity period, resulting in final FDA approval of Ranbaxy's ANDA. The next day, Teva began marketing Ranbaxy's product.

In response, Pfizer, the corporate parent of Warner-Lambert, and Warner-Lambert (hereinafter, collectively "Warner-Lambert") sued Ranbaxy and Teva (hereinafter, collectively "Ranbaxy") on January 28, 2005 for infringement of the '450 patent. Shortly thereafter, Warner-Lambert filed a motion for a preliminary injunction. The district court granted the motion on March 29, 2005, and issued a detailed explanation of the reasons for granting the motion on March 31, 2005. See Bench [*10] Decision; Preliminary Injunction Order.

The court construed "saccharide," as the term is used in claim 1, and "saccharides," as the term is used in claim 16, to include "mono-, di-, tri-, and polysaccharides." In doing so, the court simultaneously rejected both the stipulated construction previously entered in the separate case and Ranbaxy's proposed construction of "sugars, including the lower molecular carbohydrates, specifically mono- and disaccharides." The court found that Warner-Lambert is likely to prove that Ranbaxy's product literally infringes claims 1 and 16 under its construction given that the accused product includes microcrystalline cellulose, a polysaccharide. Because the court rejected Ranbaxy's contention that claim 16 requires Warner-Lambert to show that microcrystalline cellulose inhibits hydrolysis, it concluded that there could be little question that the Ranbaxy formulation literally infringes claim 16. The court noted that, in contrast, claim 1 does require the claimed "saccharide" to inhibit hydrolysis, but credited expert testimony presented by Warner-Lambert as providing a persuasive opinion that microcrystalline cellulose does in fact inhibit hydrolysis. [*11] The court went on to determine that even if "saccharides" were construed to mean "sugars," Warner-Lambert would likely be able to prove infringement of both claims 1 and 16 under the doctrine of equivalents.

After concluding that Warner-Lambert is likely to prove infringement of valid and enforceable claims, n6 the court proceeded to address remaining issues necessary for injunctive relief. It found that Warner-Lambert would suffer irreparable harm due to infringement of the '450 patent. Next, it found that the harm suffered by Ranbaxy in being subject to the injunction would not outweigh the harm Warner-Lambert would suffer in the absence of the injunction. Finally, it determined that granting the injunction was in the public interest since the injunction would further public policy inherent in the patent laws.

        n6 The court did not explain the basis for its holding that the claims of the '450 patent are likely valid and enforceable, but Ranbaxy has not appealed the court's decision on these issues.

The court denied Ranbaxy's motion for a stay of the preliminary injunction. On March 31, 2005, after Warner-Lambert posted a $200,000,000 bond, the preliminary injunction [*12] went into effect. Ranbaxy timely appeals the grant of the preliminary injunction. We have jurisdiction to consider the appeal under 28 U.S.C. § 1292(c)(1).

## DISCUSSION

[HN1] Courts have the power to grant injunctions to prevent the violation of patent rights. See 35 U.S.C. § 283 (2000). In considering whether to grant a preliminary injunction, a court must consider whether the patent owner has shown: (1) a reasonable likelihood of success on the merits; (2) the prospect of irreparable harm to the patent owner in the absence of the injunction; (3) that this harm would exceed harm to the alleged infringer when subject to the injunction; and (4) that granting the injunction is in the public interest. Jeneric/Pentron, Inc. v. Dillon Co., 205 F.3d 1377, 1380 (Fed. Cir. 2000); Nutrition 21 v. United States, 930 F.2d 867, 869 (Fed. Cir. 1991).

[HN2] We review the grant of a preliminary injunction for abuse of discretion. Novo Nordisk of N. Am., Inc. v. Genentech, Inc., 77 F.3d 1364, 1367 (Fed. Cir. 1996). To overturn the grant of a preliminary injunction, we must find that the district court made [*13] a clear error of judgment in weighing the relevant factors or based its exercise of discretion on an error of law or on clearly erroneous factual findings. Id.

    I.

Ranbaxy first challenges the district court's conclusion that Warner-Lambert is likely to succeed on the merits. [HN3] To win on its claim of patent infringe-

ment, Warner-Lambert must present proof that Ranbaxy infringed a valid and enforceable patent. *Nutrition 21, 930 F.2d at 869*. Ranbaxy does not appeal the district court's conclusion that the '450 patent is likely valid and enforceable, but instead the district court's finding that infringement is likely. [HN4] Determining the likelihood of infringement requires two steps, first claim construction and second a comparison of the properly construed claims to the accused product. See *Jeneric/Pentron, 205 F.3d at 1380*.

A.

We begin with [HN5] claim construction, a question of law reviewed de novo. *Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1454-56 (Fed. Cir. 1998) (en banc). [HN6] When interpreting claims, we inquire into how a person of ordinary skill in the art would have understood claim terms at the time of the invention. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005) [*14] (en banc). "The inquiry into how a person of ordinary skill in the art understands a claim term provides an objective baseline from which to begin claim interpretation." Id. "Importantly, the person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." Id.

Ranbaxy contests the district court's construction of "saccharide" and "saccharides" as those terms are used in independent claims 1 and 16. According to Ranbaxy, the district court should have construed "saccharides" to mean "sugars." In Ranbaxy's view "sugars" would include polysaccharides with up to ten monosaccharide units but would not include polysaccharides, such as microcrystalline cellulose, with more than ten monosaccharide units.

The claim language itself does not support Ranbaxy's proposed construction. [HN7] "The claims themselves provide substantial guidance as to the meaning of particular claim terms." *Id. at 1314*. Claim 1 includes "a suitable amount of a saccharide to inhibit hydrolysis," and claim 16 includes "one or more saccharides. [*15] " It is important to note that the claims do not include the terms "sugar" or "sugars." Neither do the claims distinguish between polysaccharides having ten or less monosaccharide units and polysaccharides having more than ten monosaccharide units.

Ranbaxy argues, however, that the district court erred by not adopting an explicit, narrow definition of "saccharides" set forth in the '450 patent. It points to the following language in the '450 patent: "saccharides (i.e., sugars)." '450 patent, col. 1, ll. 61 – 62. This language is located

in a part of the '450 patent discussing what the "invention deals with." Id. at col. 1, l. 44.

This court has previously construed a disputed claim term by referencing use of "i.e." in a patent specification. See *Abbott Labs. v. Novopharm Ltd.*, 323 F.3d 1324, 1327, 1330 (Fed. Cir. 2003). In that case, however, the court did not identify any support in the intrinsic evidence for a construction of the disputed claim term other than the construction linked to "i.e." *Id. at 1330*. Indeed, the problem with Ranbaxy's argument is that it ignores the fact that [HN8] the person of ordinary skill in the art is deemed to have read [*16] the claim term in the context of the entire patent. *Phillips, 415 F.3d at 1313*. See also *SanDisk Corp. v. Memorex Prods., Inc.*, 415 F.3d 1278, 1285 (Fed. Cir. 2005) ("The court must always read the claims in view of the full specification." (emphasis added)). "It is necessary to consider the specification as a whole, and to read all portions of the written description, if possible, in a manner that renders the patent internally consistent." *Budde v. Harley-Davidson, Inc.*, 250 F.3d 1369, 1379-80 (Fed. Cir. 2001).

Notably, the '450 patent includes the following discussion in a section entitled "SACCHARIDES":

The saccharide components to be used in the pharmaceutical products and methods of the invention are substances which are compatible with the alkali or alkaline earth metal-containing stabilizers. Generally, they are substances which do not contain groups which could significantly interfere with the function of either the metal-containing component or the drug component. Mannitol, lactose, and other sugars are preferred. Mixtures are operable.

'450 patent, col. 3, ll. 46-55. By using the label "SACCHARIDES," the [*17] patentee clearly intended for this section to address the meaning of the same term.

As a preliminary matter, the first two sentences of this section indicate that a broad construction of "saccharides" may be appropriate. The first sentence explains that "saccharides" are "substances which are compatible with the alkali or alkaline earth metal-containing stabilizers." Id. at col. 3, ll. 49-50. The second explains that "saccharides" are "substances which do not contain groups which could significantly interfere with the function of either the metal-containing component or the drug component." Id. at col. 3, ll. 51-54. Particularly when compared to the parallel section labeled "EXCIPIENTS," it is clear that these sentences do not affirmatively define what "saccharides"

analysis. First, evidence that "saccharides" is sometimes used to refer to "carbohydrates" does support the conclusion that the '450 patent in particular may be understood to have used "saccharides" to mean "carbohydrates." Thus, reliance on this disclosure to support the district court's construction is not improper. Second, understanding the historical origin of the term "saccharides" does not exactly answer the question of how one of ordinary skill in the art would interpret the term on the filing date of the '450 patent. [HN11] "The ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application. [*23] " Phillips, 415 F.3d at 1313. We therefore do not fault the district court for not considering the historical origin of "saccharides" to be dispositive of the term's meaning to those skilled in the art.

To support its proposed construction, Ranbaxy also points us to the construction of "saccharides" previously agreed upon by two of the parties to this case in separate litigation:

> The word "saccharide" in Claims 1 and 16 of the '450 patent means "a sugar, and specifically includes only lower weight carbohydrates, specifically, mono–and disaccharides and their simple derivatives, including such substances as lactose, sucrose, mannitol and sorbitol."

Ranbaxy asks us to adopt this construction in this appeal.

Ranbaxy has not identified any legal doctrines that would compel us to adopt the stipulated construction. And to the extent Ranbaxy's argument addresses issue preclusion, we conclude that issue preclusion does not apply in this case. The district court noted that the stipulation presented to the court in the earlier litigation specifically stated that it was for the purposes of that litigation only. Bench Decision, slip op. at 13. Because [*24] Ranbaxy does not dispute this finding, issue preclusion cannot apply to this case. [HN12] "The scope of a consent decree must be discerned within its four corners" and the conditions upon which a party has consented to waive its right to litigate particular issues "must be respected." United States v. Armour & Co., 402 U.S. 673, 682, 91 S. Ct. 1752, 29 L. Ed. 2d 256 (1971). See also In re Graham, 973 F.2d 1089, 1097 (3rd Cir. 1992) (noting that the Third Circuit defers to the intent of parties concerning the preclusive effect of agreed facts or claims in consent decrees and stipulations). While we do not fault Ranbaxy to the extent it may have adopted or relied upon the stipulated con-

struction of "saccharide," that stipulation does not define the scope of the invention claimed in the '450 patent for purposes of this case.

Ranbaxy additionally contends that the district court's claim construction would render the claims invalid for lack of enablement under 35 U.S.C. § 112, P1. In Phillips, this court stated:

> [HN13] While we have acknowledged the maxim that claims should be construed to preserve their validity, we have not applied that principle broadly, [*25] and we have certainly not endorsed a regime in which validity analysis is a regular component of claim construction. Instead, we have limited the maxim to cases in which the court concludes, after applying all the available tools of claim construction, that the claim is still ambiguous. In such cases, we have looked to whether it is reasonable to infer that the PTO would not have issued an invalid patent, and that the ambiguity in the claim language should therefore be resolved in a manner that would preserve the patent's validity.

415 F.3d at 1327 (citations and quotation marks omitted). Both Ranbaxy and Warner–Lambert were able to find at least some extrinsic evidence supporting their proposed constructions of "saccharides." Nevertheless, Ranbaxy has not presented sufficient evidence for us reasonably to infer that, unless "saccharides" means "sugars" or at least does not encompass polysaccharides, claim 1 and 16 would have been considered by the Patent and Trademark Office ("PTO") to be invalid. We therefore decline to apply the maxim in this case.

For the reasons discussed, we conclude that the district court did not err in construing "saccharides" to include: [*26] polysaccharides.

B.

We next consider whether the district court clearly erred in its comparison of the properly construed claims to the accused products and methods. [HN14] To prove infringement, a patentee must show that an accused product or method meets every claim limitation either literally or under the doctrine of equivalents. See Dynacore Holdings Corp. v. U.S. Philips Corp., 363 F.3d 1263, 1273 (Fed. Cir. 2004).

1.

The district court did not clearly err in determining that Warner–Lambert is likely to prevail in its charge that Ranbaxy literally infringes claim 16. Ranbaxy conceded

in the preliminary injunction hearing that its formulation "absolutely" literally infringes claim 16 if "saccharides" is construed to include polysaccharides. Given that concession and the fact that we have construed "saccharides" to include polysaccharides, we cannot help but conclude that the district court was on solid ground in finding that it is likely that Ranbaxy literally infringes claim 16.

The district court also did not clearly err in determining that Warner-Lambert is likely to prevail in its charge that Ranbaxy literally infringes claim 1. In contrast to claim 16, claim [*27] 1 specifically requires that a saccharide "inhibit hydrolysis." In finding that the microcrystalline cellulose in Ranbaxy's formulation likely inhibits hydrolysis, the district court credited the testimony of one of Warner-Lambert's experts, Dr. Brenner, stating:

> Significantly, Ranbaxy has offered no evidence countering Dr. Brenner's opinions concerning the manner in which hydrolysis is inhibited in its formulations. This is information peculiarly within Ranbaxy's possession. Hydrolysis must be inhibited in its formulation; otherwise it could not have submitted its ANDA to the FDA. Dr. Brenner gives a persuasive opinion that it is the saccharide microcrystalline cellulose that has this effect. Ranbaxy offers nothing but speculation to counter his opinion.

Bench Decision, slip op. at 19.

Ranbaxy's challenges to the district court's finding are easily rejected. Ranbaxy first points out that Dr. Brenner did not test Ranbaxy's product but instead relied upon tests conducted during previous cases involving two different products. But [HN15] it is particularly appropriate at the preliminary injunction stage not to set a hard and fast rule that infringement can only be shown through [*28] quantitative testing of an accused product. Cf. *Water Techs. Corp. v. Calco, Ltd.,* 850 F.2d 660, 667 *(Fed. Cir. 1988)* (refusing to overturn a finding of infringement based on the lack of quantitative testing to determine the exact composition of the accused product). Ranbaxy also contends that the district court improperly shifted to Ranbaxy the burden of showing that microcrystalline cellulose does not inhibit hydrolysis. The district court, however, did no such thing. The district court weighed the evidence submitted by the parties. In doing so, the court was at least entitled, and probably even required, to consider the lack of evidence submitted by Ranbaxy.

2.

Because we have held that the district court did not err in construing "saccharides" to include polysaccha-

rides or abuse its discretion in concluding that literal infringement is likely, we need not respond to Ranbaxy's contention that the district court erred in its application of the doctrine of equivalents. We recognize, however, that the district court's claim construction, as well as our claim construction, is based on a record developed at the preliminary injunction stage of this case. We also recognize [*29] that [HN16] "district courts may engage in rolling claim construction, in which the court revisits and alters its interpretation of the claim terms as its understanding of the technology evolves." *Jack Guttman, Inc. v. Kopykake Enters., Inc.,* 302 F.3d 1352, 1361 *(Fed. Cir. 2002).* Indeed, a conclusion of law such as claim construction is subject to change upon the development of the record after a district court's decision on a motion for preliminary injunction. Id. (citing *Purdue Pharma L.P. v. Boehringer Ingelheim GmbH,* 237 F.3d 1359, 1363 *(Fed. Cir. 2001)).* Thus, we find it prudent to address Ranbaxy's contention that the district court wrongly concluded that infringement under the doctrine of equivalents is likely.

The district court did not clearly err in holding in the alternative that, even if "saccharides" were construed to include sugars but not polysaccharides, Ranbaxy likely infringes claims 1 and 16 under the doctrine of equivalents. Ranbaxy argues that the district court erred in its analysis of claim 16 by not assigning any function to "saccharides" for purposes of equivalency. It argues that the court should have assigned to "saccharides" [*30] the function of inhibiting hydrolysis. Thus, in Ranbaxy's view the district court clearly erred in its analysis of both claim 1 and claim 16 because the evidence does not show that it is likely that microcrystalline cellulose inhibits hydrolysis. As discussed above with regard to literal infringement of claim 1, however, the district court did not clearly err in finding to the contrary. It was perfectly appropriate for the district court to credit the testimony of Warner-Lambert's expert, Dr. Brenner, explaining that microcrystalline cellulose does in fact inhibit hydrolysis.

Ranbaxy also contends that as a matter of law microcrystalline cellulose cannot be an equivalent of a "saccharide" because the patentee dedicated microcrystalline cellulose to the public by disclosing but not claiming its use in the '450 patent. One alleged disclosure is a listing of "modified cellulose derivatives" as an example of a "disintegrating agent." '450 patent, col. 4, ll. 3-7. Another is Example C in the '450 patent, which discloses a prior art composition containing microcrystalline cellulose. Id. at col. 5, ll. 15-30. The district court concluded that the patentee did not dedicate use of microcrystalline [*31] cellulose to the public because "only those compounds or articles that are clearly identified as alternatives to what is actually claimed are subject to the bar" against recapturing disclaimed subject matter using

the doctrine of equivalents. Bench Decision, slip op. at 24. According to Ranbaxy, however, our precedent is not so restrictive. Ranbaxy argues we have not required that the patent expressly disclose the subject matter left unclaimed as an alternative to the claim limitation at issue. [HN17] Application of the disclosure-dedication rule is a question of law subject to de novo review. See *Toro Co. v. White Consol. Indus., Inc.*, 383 F.3d 1326, 1331 (Fed. Cir. 2004).

Ranbaxy is correct to the extent it points that out that our precedent addressing the disclosure-dedication rule appears to deal only with patents in which subject matter is disclosed as an alternative to the relevant claim limitation. See, e.g., *Johnson & Johnston Assocs. Inc. v. R.E. Serv. Co.*, 285 F.3d 1046 (Fed. Cir. 2002) (en banc); *PSC Computer Prods., Inc. v. Foxconn Int'l, Inc.*, 355 F.3d 1353 (Fed. Cir. 2004); *Toro*, 383 F.3d at 1326. For example, [*32] in *PSC Computer Products* this court answered the question of how specific a disclosure in a written description must be to dedicate matter to the public:

> [HN18] We hold that if one of ordinary skill in the art can understand the unclaimed disclosed teaching upon reading the written description, the alternative matter disclosed has been dedicated to the public. This "disclosure-dedication" rule does not mean that any generic reference in a written specification necessarily dedicates all members of that particular genus to the public. The disclosure must be of such specificity that one of ordinary skill in the art could identify the subject matter that had been disclosed and not claimed.

*355 F.3d at 1360.* This court found that the generic disclosure of a class of unclaimed alternatives, "other resilient materials," does not necessarily dedicate all members of that class to the public. On the other hand, the court did find specifically disclosed but unclaimed alternatives, "molded plastic parts," to have been dedicated to the public when only metal parts were claimed. Id. The court reasoned that "[a] reader of ordinary skill in the art could reasonably [*33] conclude from . . . language in the written description that plastic clip parts could be substituted for metal clip parts." Id.

This case presents a slightly different scenario: generic and specific disclosures of subject matter, but subject matter that is not specifically identified as being an alternative to a claim limitation. Nevertheless, in *PSC Computer Products* the driving force behind the court's holding was the public notice function of patents. Id. And

in our view, the public notice function of patents suggests that before unclaimed subject matter is deemed to have been dedicated to the public, that unclaimed subject matter must have been identified by the patentee as an alternative to a claim limitation.

In this case, even if "saccharides" we re construed to mean "sugars," Ranbaxy has not pointed to parts of the '450 patent where the inventors identify microcrystalline cellulose as an unclaimed alternative that would function as a "saccharide" preventing hydrolysis. As the district court found, modified cellulose derivatives are only discussed as examples of a "disintegrating agent," one of various "optional excipients." '450 patent, col. 3, l. 60 – col. 4, [*34] l. 10. Furthermore, while Example C identifies microcrystalline cellulose as an ingredient in a particular formulation, we are not convinced that one of ordinary skill in the art would come to the conclusion that the inventors have identified microcrystalline cellulose in that formulation as an alternative to a "saccharide" that prevents hydrolysis. The '450 patent states that Example C discloses a "standard," prior art formulation "without the addition of a stabilizer of the present invention." Id. at col. 5, ll. 14-17. Indeed, the ingredient list does not include magnesium carbonate, and the '450 patent does not contend that Example C prevents cyclization. See id. at col. 5, ll. 20-28, 46-55. Instead, Example C appears to correspond to the first, unsuccessful formulation devised by the inventors in an attempt to prevent cyclization: the ingredient list includes both anhydrous lactose and microcrystalline cellulose. Id. at col. 5, ll. 20-23. As discussed above, not until magnesium carbonate was introduced into formulations did hydrolysis become a major problem. Thus, a saccharide was not needed to prevent hydrolysis in Example C. In short, Example C does not appear to [*35] relate to the claimed invention. For these reasons, we hold that the patentee did not dedicate to the public the use of microcrystalline cellulose as a "saccharide" to prevent hydrolysis.

Ranbaxy next contends that the all limitations rule precludes application of the doctrine of equivalents. Ranbaxy argues that Warner-Lambert cannot now assert that microcrystalline cellulose is an equivalent to the claimed "saccharide" because to do so would impermissibly vitiate the "saccharide" and "saccharides" limitations. [HN19] Like the disclosure-dedication rule, application of the all limitations rule is a question of law subject to de novo review. See *Seachange Int'l, Inc. v. C-COR Inc.*, 413 F.3d 1361, 1378 (Fed. Cir. 2005).

[HN20] The all limitations rule "provides that the doctrine of equivalents does not apply if applying the doctrine would vitiate an entire claim limitation." *Asyst Techs., Inc. v. Emtrak, Inc.*, 402 F.3d 1188, 1195 (Fed. Cir. 2005). We

have explained:

> There is no set formula for determining whether a finding of equivalence would vitiate a claim limitation, and thereby violate the all limitations rule. Rather, courts must consider the totality [*36] of the circumstances of each case and determine whether the alleged equivalent can be fairly characterized as an insubstantial change from the claimed subject matter without rendering the pertinent limitation meaningless.

*Freedman Seating Co. v. Am. Seating Co., 420 F.3d 1350, 1359 (Fed. Cir. 2005).*

Based on the totality of the circumstances, even if "saccharides" were construed to mean "sugars," we conclude that microcrystalline cellulose can be fairly characterized as an insubstantial change from the claimed subject matter without rendering the "saccharide" limitations meaningless. As discussed above, the district court pointed to evidence that microcrystalline cellulose, like sugars, performs the function of inhibiting hydrolysis. Moreover, microcrystalline cellulose, a polysaccharide, is a substance having many monosaccharide units, which are the building blocks of sugars. These similarities convince us that microcrystalline cellulose can be fairly characterized as an insubstantial change when compared to "sugars." Moreover, such a characterization would not render the claim limitations meaningless. Thus, the all limitations rule does not preclude application [*37] of the doctrine of equivalents in this case.

For the reasons discussed, we conclude that the district court did not clearly err in its comparison of the claims to the accused products and methods based on the preliminary record.

II.

Ranbaxy maintains that the district court clearly erred in its consideration of the prospect of irreparable harm to the patent owner in the absence of the injunction. The district court presumed irreparable harm based on its finding that Warner-Lambert is likely to succeed on the merits, citing *Purdue Pharma L.P., 237 F.3d at 1363.* The court also analyzed the potential for harm to Warner-Lambert and found that Ranbaxy's sales of its generic product would cause substantial harm to Warner-Lambert and loss of the statutory right to exclude Ranbaxy for the remaining life of the '450 patent, which expires in August 2007. The court also noted that Warner-Lambert has fought Teva vigorously to protect its rights under the '450 patent.

According to Ranbaxy, the court should not have presumed irreparable harm because Ranbaxy's product does not infringe any claim of the '450 patent. Ranbaxy cites *Reebok International Ltd. v. J. Baker, Inc., 32 F.3d 1552, 1558-59 (Fed. Cir. 1994),* [*38] and *Illinois Tool Works, Inc. v. Grip-Pak, Inc., 906 F.2d 679, 683 (Fed. Cir. 1990),* for the proposition that the loss of the statutory right to exclude alone does not constitute irreparable harm. Ranbaxy further argues that the district court failed to consider evidence that Warner-Lambert does not currently enjoy market exclusivity. For example, Ranbaxy points out that various competitors have begun selling competing generic products. Ranbaxy also argues that Warner-Lambert's grant of a license under the '450 patent shows that any injury suffered by Warner-Lambert would be compensable in monetary damages. Ranbaxy additionally claims that Warner-Lambert should not be excused for its decision not to bring suit within forty-five days of receiving Ranbaxy's paragraph IV certification letter dated April 7, 2003, which would have triggered the thirty-month stay of FDA approval of Ranbaxy's ANDA, see *21 U.S.C. § 355(j)(5)(B) (2000); 35 U.S.C. § 271(e)(2)(A) (2000).*

Warner-Lambert responds by pointing to evidence that shows that sales of Ranbaxy's product dwarf the sales of other competitors' generic products. And while [*39] Warner-Lambert admits that it has granted a license to the '450 patent, it clarifies that the license is exclusive and limited to moexipril products and not quinapril products such as Accupril(R) Warner-Lambert further explains that it did not sue Ranbaxy within forty-five days of receiving Ranbaxy's paragraph IV certification letter because Teva, as the first ANDA filer, had a potential 180-day exclusivity period, which precluded FDA approval of any later ANDA.

The district court did not abuse its discretion by presuming irreparable harm. [HN21] We have consistently held that a district court should presume that a patent owner will be irreparably harmed when, as here, a patent owner establishes a strong showing of likely infringement of a valid and enforceable patent. See, e.g., *Jack Guttman, Inc., 302 F.3d at 1356; Purdue Pharma, 237 F.3d at 1363; Datascope Corp. v. Kontron Inc., 786 F.2d 398, 400 (Fed. Cir. 1986).*

The district court also did not abuse its discretion in finding that Ranbaxy failed to rebut the presumption of irreparable harm. In *Polymer Technologies, Inc. v. Bridwell,* [HN22] this court explained that because the very nature [*40] of a patent provides the right to exclude, infringement of a valid patent inherently causes irreparable harm in the absence of exceptions such as a finding that future infringement is no longer likely, that the patentee is willing to forgo its right to exclude by

licensing the patent, or that the patentee had delayed in bringing suit, *103 F.3d 970, 975 (Fed. Cir. 1996)*. And when the presumption of irreparable harm attaches, the burden is on the likely infringer to produce evidence sufficient to establish that the patent owner would not be irreparably harmed by an erroneous denial of a preliminary injunction. *Id. at 974.* The court explained that in *Reebok* "the presumption of irreparable harm was rebutted by evidence that neither the patentee nor the alleged infringer would be continuing to manufacture or sell the devices covered by the patent (except for a small amount of residual stock)." *Id. at 975.* The court also explained that in *Illinois Tool Works* "we held that potential lost sales alone could not demonstrate 'manifest irreparable harm' in light of other evidence that the movant had granted a non-exclusive license to a non-party. [*41] " *Id.* In contrast to those cases, here, it is clear that neither party anticipates voluntarily ceasing the sale of products covered by the '450 patent, and there is no evidence that Warner-Lambert intends to engage in non-exclusive licensing of its rights under the '450 patent.

While Warner-Lambert admits that two competitors remain in the marketplace, [HN23] "the fact that other infringers may be in the marketplace does not negate irreparable harm. A patentee does not have to sue all infringers at once. Picking off one infringer at a time is not inconsistent with being irreparably harmed." Id. Neither is first targeting infringers whose sales dwarf the sales of other infringers.

The fact that Warner-Lambert has granted a narrow, exclusive license under the '450 patent also does not require that the district court find that any harm would not be irreparable. The grant of such a license is simply not a sufficient basis to overturn the district court's conclusion that Warner-Lambert did not engage in a pattern of licensing destroying market exclusivity. See *id. at 974* (noting that engagement in a pattern of granting licenses under a patent evidences the reasonableness [*42] of the ability to recompense invasion of patent rights using a royalty rather than an injunction).

The district court also did not abuse its discretion by not faulting Warner-Lambert for its decision not to bring suit within forty-five days of receiving Ranbaxy's paragraph IV certification letter. Ranbaxy is correct to point out that [HN24] evidence that a patent owner unduly delays in bringing suit against an alleged infringer negates the idea of irreparability. See *id.* And Ranbaxy is also correct that the relevant statutory provisions would have triggered the thirty-month stay of FDA approval of Ranbaxy's ANDA had Warner-Lambert sued. But there is no requirement that a patent owner take advantage of the statutory carrot of a thirty-month stay, and certainly no statutory

stick for choosing not to. Moreover, Teva, as the first party to file an ANDA, held exclusive generic rights. There was therefore no immediate need for Warner-Lambert to sue Ranbaxy. And the fact that Warner-Lambert filed suit against Ranbaxy within two months of the launch of Ranbaxy's quinapril formulation supports the district court's rejection of the idea that Warner-Lambert unduly delayed in bringing suit against [*43] Ranbaxy. Thus, the district court did not clearly err or otherwise abuse its discretion in determining that Ranbaxy did not meet its burden of rebutting the presumption of irreparable harm.

For the reasons discussed, we conclude that the district court did not abuse its discretion in its analysis of the harm to Warner-Lambert.

III.

Ranbaxy next challenges the district court's conclusion that the harm to Warner-Lambert in the absence of an injunction would exceed the harm to Ranbaxy when Ranbaxy is subject to the injunction. The district court held that the fact that Ranbaxy "built up its manufacturing facility in India and prepared to market [its] product was simply a risk it took with eyes open to the consequences." Bench Decision, slip op. at 26. Ranbaxy responds by arguing that, in contrast to Warner-Lambert, it is facing real and immediate irreparable harm since the preliminary injunction has forced it to remove its product from the market, thereby causing Ranbaxy to lose market share and customer relationships.

The district court did not abuse its discretion in finding that the harm favors enjoining Ranbaxy. [HN25] Simply put, an alleged infringer's loss of market share and [*44] customer relationships, without more, does not rise to the level necessary to overcome the loss of exclusivity experienced by a patent owner due to infringing conduct.

IV.

Ranbaxy finally argues that the district court erred in assessing the public interest. Ranbaxy contends that the public interest favors denying the preliminary injunction because the statutory framework under which Ranbaxy filed its ANDA makes low cost generic drugs available to the public through increased competition. The district court rejected Ranbaxy's argument by pointing out that a preliminary injunction that enforces a valid patent against an infringer "does no more than further public policy inherent in the patent laws designed to encourage useful inventions by rewarding the inventor with a limited period of market exclusivity." Id.

The district court did not abuse its discretion in rejecting Ranbaxy's argument. [HN26] "Selling a lower priced product does not justify infringing a patent." *Payless*

*Shoesource, Inc. v. Reebok Int'l Ltd., 998 F.2d 985, 991 (Fed. Cir. 1993).* And while the statutory framework under which Ranbaxy filed its ANDA does seek to make low cost generic drugs available [*45] to the public, it does not do so by entirely eliminating the exclusionary rights conveyed by pharmaceutical patents. Nor does the statutory framework encourage or excuse infringement of valid pharmaceutical patents.

## CONCLUSION

We affirm the grant of the preliminary injunction.

Based on the preliminary record, the district court's claim construction was not erroneous; the district court did not abuse its discretion when it determined that Ranbaxy likely infringes the '450 patent either literally or under the doctrine of equivalents; and the district court did not abuse its discretion when it found that the harm and public interest favors enjoining Ranbaxy.

## COSTS

Each party shall bear its own costs.

## AFFIRMED

# EXHIBIT J

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
877.955.3855

**SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES**
**877.955.3855**

28 (Pages 109 to 112)



# EXHIBIT K

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
877.955.3855

2 (Pages 5 to 8)

26 (Pages 101 to 104)

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
877.955.3855

28 (Pages 109 to 112)





SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
877.955.3855

# EXHIBIT L

**SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES**
**877.955.3855**

54 (Pages 153 to 156)

# EXHIBIT M

**Page 1**

```
 1      IN THE UNITED STATES DISTRICT COURT
 2        FOR THE DISTRICT OF DELAWARE
 3
 4   McKESSON INFORMATION
     SOLUTIONS, LLC,
 5                 Civil Action
         Plaintiff,    No. 04-1258-SLR
 6
     vs.
 7
     THE TRIZETTO GROUP, INC.,
 8
         Defendant.
 9
10
11
12
13   The videotaped deposition of JOHN PETER
14   DANZA, called by the Plaintiff for examination,
15   pursuant to Notice, and pursuant to the Rules of
16   Civil Procedure for the United States District
17   Courts, taken before Sandra L. Rocca, CSR and
18   Notary Public in and for the County of DuPage, and
19   State of Illinois, at 333 West Wacker Drive,
20   Chicago, Illinois, on the 12th day of September,
21   2005, at the hour of 9:45 a.m.
22
23   JOB NO. 38561
24
```

**Page 2**

```
 1   APPEARANCES:
 2
     SKADDEN, ARPS, SLATE, MEAGHER &
 3   FLOM, LLP
     By: MR. MICHAEL HENDERSHOT
 4   525 University Avenue
     Palo Alto, CA 94301
 5   (650)470-4500/Fax: (650)470-4570
     mhenders@skadden.com
 6
 7      appeared on behalf of the
        Plaintiff;
 8
 9
     GIBSON, DUNN & CRUTCHER
10   By: MR. DANIEL P. MUINO
     4 Park Plaza, Suite 1400
11   Irvine, CA  92614-8557
     (415)393-8233/Fax: (949)475-4670
12   dmuino@gibsondunn.com
13      appeared on behalf of the
        Defendant.
14
15
     Also Present:
16
        Ben Stanson, Videographer
17
18
19
20
21
22
23
24
```

**Page 3**

```
 1                INDEX
     WITNESS              PAGE
 2
     JOHN PETER DANZA
 3
     EXAMINED BY
 4
         Mr. Hendershot       5
 5       Mr. Muino           111
         Mr. Hendershot (Recross)  115
 6
 7
              EXHIBITS
 8   NUMBER            MARKED FOR ID
 9   Danza Deposition Exhibit
10      No. 1           3
        No. 2           22
11      Nos. 3 through 6      43
        No. 7           67
12      No. 8           82
13      No. 9           89
        No. 10         109
14
15
16
17
18
19
20
21
22
23
24
```

**Page 4**

```
09:45:45  1      VIDEOGRAPHER: Good morning. Here begins
09:48:51  2   videotape Number 1 of the deposition of John P.
09:48:53  3   Danza in the matter of McKesson Information
09:48:57  4   Systems, LLC, versus The TriZetto Group,
09:49:01  5   Incorporated. This case is in the U.S. District
09:49:04  6   Court for the District of Delaware. The case
09:49:07  7   number is 04-1258-SLR. Today's date is September
09:49:14  8   12th, 2005. The time is 9:49 a.m. as indicated on
09:49:20  9   the video screen.
09:49:22 10      This deposition is taking place at 333
09:49:26 11   West Wacker Drive in Chicago, Illinois and is being
09:49:30 12   taken on behalf of the Plaintiffs. The
09:49:32 13   videographer is Ben Stanson employed by Sarnoff
09:49:36 14   Court Reporters and Legal Technologies. Would
09:49:39 15   counsel please identify themselves and state whom
09:49:42 16   you represent?
09:49:43 17      MR. HENDERSHOT: Michael Hendershot of
09:49:45 18   Skadden, Arps, Slate, Meagher & Flom in Palo Alto
09:49:49 19   representing the Plaintiff, McKesson Information
09:49:51 20   Solutions.
09:49:52 21      MR. MUINO: Daniel Muino of Gibson, Dunn
09:49:55 22   & Crutcher for Defendant The TriZetto Group and the
09:49:56 23   witness John Danza.
09:49:58 24      VIDEOGRAPHER: Thank you. The court
```

1 (Pages 1 to 4)

Page 5

```
09:50:00  1   reporter today is Sandi Rocca with Sarnoff Court
09:50:03  2   Reporters of San Francisco, California. Will you
09:50:07  3   please swear in the witness?
09:50:14  4        JOHN PETER DANZA,
09:50:14  5   having been first duly sworn, was examined and
09:50:14  6   testified as follows:
09:50:16  7        EXAMINATION
09:50:16  8   BY MR. HENDERSHOT:
09:50:16  9        Q.  Morning, Mr. Danza.
09:50:17 10        A.  Morning.
09:50:18 11        Q.  Do you understand generally what the
09:50:19 12   procedures of this deposition will be today?
09:50:22 13        A.  Yes, I believe so.
09:50:22 14        Q.  Have you been deposed before?
09:50:24 15        A.  I have.
09:50:24 16        Q.  How many times?
09:50:25 17        A.  Twice.
09:50:26 18        Q.  And in connection with what matters?
09:50:27 19        A.  Once involving a personal -- a personal
09:50:31 20   lawsuit and once involving an action involving
09:50:34 21   TriZetto.
09:50:35 22        Q.  And the action involving TriZetto, what
09:50:38 23   was the subject matter of that action?
09:50:40 24        A.  That was a contract dispute between
```

Page 6

```
09:50:42  1   TriZetto and one of its clients.
09:50:44  2        Q.  What was that contract dispute relating
09:50:46  3   to specifically?
09:50:46  4        A.  It was relating to specific items that
09:50:48  5   the plaintiff had indicated that were -- situations
09:50:53  6   that were or statements that were made during the
09:50:55  7   sales cycle that they felt that were not true once
09:50:58  8   they became a client.
09:50:59  9        Q.  And statements regarding what, that the
09:51:02 10   customer felt was untrue?
09:51:03 11        A.  That they felt that TriZetto had made
09:51:07 12   some positions that the software did certain
09:51:10 13   functionality that they felt that it didn't once
09:51:13 14   they actually got the software and were using it.
09:51:15 15        Q.  And what sort of functionality is that?
09:51:19 16        A.  It involved the building of benefit
09:51:21 17   plans.
09:51:21 18        Q.  And specifically within that general area
09:51:24 19   of building benefit plans, what was the specific
09:51:26 20   area of functionality that they thought the product
09:51:29 21   did not deliver?
09:51:30 22        A.  They felt that it delivered the ability
09:51:33 23   to have multiple plans attached to a given employee
09:51:42 24   and that product -- the product does not do that
```

Page 7

```
09:51:46  1   and, in fact, has one plan per employee.
09:51:48  2        Q.  Okay. What was the name of the customer
09:51:50  3   in that action?
09:51:50  4        A.  It was Associated Third Party
09:51:55  5   Administrators.
09:51:56  6        Q.  Okay. So backtrack here a little bit.
09:52:00  7   You understand the oath you took earlier in this
09:52:02  8   deposition attaches as if it were taken in a court
09:52:05  9   of law and the penalty of perjury attaches to it?
09:52:08 10        A.  Yes.
09:52:08 11        Q.  Is there any reason sitting here today
09:52:11 12   you don't think you can testify fully and
09:52:13 13   accurately?
09:52:13 14        A.  No reason.
09:52:14 15        Q.  Can you be describe your formal education
09:52:16 16   following high school?
09:52:17 17        A.  Sure. Post-high school I have a degree
09:52:20 18   from Elmhurst College. It's a Bachelor of Arts I
09:52:26 19   believe it is, Bachelor of Arts or Bachelor of
09:52:28 20   Science, one or the other, in business
09:52:30 21   administration and economics.
09:52:32 22        Q.  What year did you receive that degree?
09:52:33 23        A.  1990.
09:52:35 24        Q.  And how long have you been employed by
```

Page 8

```
09:52:38  1   TriZetto?
09:52:38  2        A.  I've been employed by TriZetto actually
09:52:41  3   -- one of the TriZetto purchased companies since
09:52:43  4   1993.
09:52:44  5        Q.  And what did you do from 1990 to 1993
09:52:47  6   specifically in terms of your employment?
09:52:49  7        A.  Oh, I was working for United Insurance
09:52:52  8   Company of America.
09:52:52  9        Q.  And what did you do for United Insurance
09:52:55 10   Company of America from 1990 to 1993?
09:52:56 11        A.  I was a systems manager, so managed some
09:53:00 12   of the administration systems.
09:53:02 13        Q.  When you say administration systems, did
09:53:04 14   those administration systems involve editing of
09:53:09 15   claims or processing medical claims?
09:53:11 16        A.  One of the systems was our claims system,
09:53:13 17   and the other a policy management system.
09:53:15 18        Q.  What claims system did you use?
09:53:16 19        A.  We used two different systems, one was an
09:53:18 20   in-house written system, the other one was a -- was
09:53:21 21   a vendor system that was purchased or licensed from
09:53:25 22   a company called Cybertech.
09:53:27 23        Q.  Okay. Do you have a title at TriZetto?
09:53:33 24        A.  Yes.
```

2 (Pages 5 to 8)

Page 41

```
10:29:51  1        So unbundling includes a circumstance
10:29:54  2    where you have a series of procedures represented
10:29:56  3    by medical service codes where it may be possible
10:30:00  4    medically to perform all of those procedures, but
10:30:03  5    they should be billed as a single code and those
10:30:06  6    submitted codes are rebundled into a single code
10:30:09  7    for payment?
10:30:11  8        A.  Yes, that's correct.
10:30:11  9        Q.  And QicLink has the ability to correct
10:30:28 10    such unbundling as I described?
10:30:30 11        A.  Through the use of one of the clinical
10:30:33 12    editing packages, yes.
10:30:34 13        Q.  Does QicLink with one of the clinical
10:30:44 14    editing packages determine whether or not a medical
10:30:47 15    service code submitted on that claim is included
10:30:50 16    within its database of medical service codes and
10:30:54 17    relationships?
10:30:54 18        A.  Restate that for me, please.
10:30:56 19        Q.  If a -- could you read that back?
10:31:12 20        (Record read as requested.)
10:31:14 21        THE WITNESS:  Yes.
10:31:15 22    BY MR. HENDERSHOT:
10:31:18 23        Q.  Does it inform the user that the -- one
10:31:20 24    of the medical service -- strike that.
```

Page 42

```
10:31:22  1        Does QicLink inform the user that one of
10:31:25  2    the medical service codes submitted on the claim is
10:31:28  3    not included within QicLink's database?
10:31:30  4        A.  Yes, yes.
10:31:34  5        Q.  So in the unbundling circumstance that we
10:31:54  6    use discussed earlier, does QicLink include the
10:31:59  7    capability of correcting the submission of multiple
10:32:02  8    medical service codes that should be submitted as
10:32:05  9    one medical service code and approve payment only
10:32:07 10    for the one medical service code?
10:32:10 11        A.  Again through the clinical editing
10:32:13 12    ancillary modules, yes.
10:32:14 13        Q.  So it approves payment for the one
10:32:17 14    medical service code that's valid and rejects it
10:32:19 15    for the invalid medical service codes, it being
10:32:22 16    QicLink?
10:32:22 17        A.  Yes, it can.
10:32:23 18        Q.  In so doing it revises the claim --
10:32:37 19    strike that.
10:32:37 20        In correcting unbundling or the receipt
10:32:39 21    of invalid medical service codes, does QicLink
10:32:43 22    revise the claim to only authorize payment for the
10:32:45 23    codes it determines to be valid and reject payment
10:32:48 24    for those it determines to be invalid?
```

Page 43

```
10:32:50  1        A.  Yes, that's correct.  That's correct.
10:32:52  2        And in that question and the previous question, I'm
10:32:55  3    kind of using -- I'm assuming you're using QicLink
10:32:57  4    in a generic term here meaning QicLink along with
10:33:01  5    the clinical editing ancillary modules, is that
10:33:04  6    accurate?
10:33:04  7        Q.  Yes, Auto Audit or ClinicalLogic?
10:33:07  8        A.  Okay.  Thanks.
10:33:07  9        Q.  And all your answers are true with
10:33:10 10    respect to ClinicalLogic or Auto Audit?
10:33:12 11        A.  That's correct.  That's correct.
10:33:17 12        MR. HENDERSHOT:  Mind if we take a
10:33:18 13    10-minute break?
10:33:19 14        THE WITNESS:  That would be great.
10:33:20 15        VIDEOGRAPHER:  We are off the record at
10:33:22 16    10:33 a.m.
10:33:24 17        (Short recess.)
10:41:10 18        VIDEOGRAPHER:  We are back on the record
10:41:45 19    at 10:41 a.m.
10:41:45 20        (Documents marked as Danza Deposition
10:41:45 21    Exhibit Nos. 3 through 6 for
10:41:47 22    identification.)
10:41:47 23    BY MR. HENDERSHOT:
10:41:48 24        Q.  Mr. Danza, does TriZetto in the ordinary
```

Page 44

```
10:41:51  1    course of its business prepare product
10:41:55  2    announcements?
10:41:55  3        A.  Yes.
10:41:55  4        Q.  I'd like to hand you what I've marked as
10:42:00  5    -- what's been marked as Danza Exhibit 3, which is
10:42:03  6    labeled "QicLink Product Suite, Product
10:42:05  7    Announcement."  Take a moment to review that.
10:42:32  8        A.  Okay, sure.
10:42:32  9        Q.  Do you recognize what's been marked as
10:42:35 10    Exhibit 3?
10:42:35 11        A.  Yes, I do.
10:42:36 12        Q.  What do you recognize it as?
10:42:37 13        A.  It's a product announcement that my
10:42:41 14    department issued about the availability of
10:42:46 15    ClinicalLogic.
10:42:47 16        Q.  And that's a product announcement that
10:42:49 17    issued from your group?
10:42:50 18        A.  Yes, it is.
10:42:50 19        Q.  So you've got no reason to believe that
10:42:55 20    it doesn't -- strike that.
10:42:56 21        So you have no reason to believe what's
10:42:57 22    been described as Exhibit 3 wasn't prepared in the
10:43:00 23    ordinary course of TriZetto's business?
10:43:02 24        A.  Yes, that's correct.  I'm sorry.  I don't
```

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
877.955.3855

Page 45

10:43:05 1   have any reason to believe that. Is that correct?
10:43:08 2     Q. I think you've got it. I'll try to clean
10:43:10 3   it up. Do you have any reason to believe that the
10:43:13 4   document that's been marked as Exhibit 3 was not
10:43:18 5   prepared in the ordinary course of TriZetto's
10:43:20 6   business?
10:43:20 7     A. I have no reason to believe that.
10:43:21 8     Q. And do you have any reason to believe
10:43:24 9   that the document marked as Exhibit 3 does not
10:43:26 10   accurately describe the operations of QicLink, at
10:43:29 11   least as of the date of the document?
10:43:30 12     A. No, I believe it's accurate.
10:43:32 13     Q. You can set that one aside. Let's try to
10:43:37 14   go through a few of these pretty quickly if you
10:43:39 15   don't mind.
10:43:40 16     I'm going to hand you what's been marked
10:43:42 17   as Danza Exhibit 4. It's another document marked
10:43:45 18   "QicLink Product Suite Product Announcement" dated
10:43:48 19   May 8th, 2003.
10:44:03 20     A. Okay.
10:44:04 21     Q. You've had a chance to review what's been
10:44:06 22   marked as Exhibit 4?
10:44:07 23     A. I have.
10:44:07 24     Q. Do you recognize what's been marked as

Page 46

10:44:09 1   Exhibit 4?
10:44:09 2     A. Yes.
10:44:10 3     Q. What do you recognize it as?
10:44:12 4     A. It is the general availability
10:44:15 5   announcement that my department issued to clients.
10:44:19 6     Q. So like Exhibit 3, the document that's
10:44:22 7   been marked as Exhibit 4 was prepared in the
10:44:25 8   ordinary course of TriZetto's business?
10:44:26 9     A. Yes, that's correct.
10:44:28 10     Q. Like the document marked as Exhibit 3,
10:44:30 11   you have no reason to believe the document marked
10:44:32 12   as Exhibit 4 doesn't accurately describe -- strike
10:44:32 13   that.
10:44:33 14     Like the document marked as Exhibit 3, do
10:44:36 15   you have any reason to believe -- strike that.
10:44:39 16     Do you have any reason to believe that
10:44:40 17   the document marked Danza Exhibit 4 does not
10:44:43 18   accurately describe the operations of the
10:44:46 19   ClinicalLogic product or the QicLink product?
10:44:48 20     A. I have no reason to believe that.
10:44:57 21     Q. Thank you.
10:44:57 22     A. Sure.
10:44:57 23     Q. I'm going to hand you what's been marked
10:44:57 24   as Danza Exhibit 5 which is another document marked

Page 47

10:45:03 1   "QicLink Product Suite, Product Announcement" dated
10:45:06 2   June 18th, 2002.
10:45:13 3     A. Okay.
10:45:13 4     Q. Do you recognize what's been marked as
10:45:19 5   Exhibit 5?
10:45:19 6     A. Yes, I do.
10:45:21 7     Q. What do you recognize it as?
10:45:24 8     A. It is a product announcement describing
10:45:27 9   -- again issued by my department concerning
10:45:32 10   ClinicalLogic.
10:45:33 11     Q. Like Exhibits 3 and 4, was Danza
10:45:36 12   Exhibit 5 prepared in the ordinary course of
10:45:38 13   TriZetto's business?
10:45:39 14     A. Yes.
10:45:40 15     Q. Like Exhibits 3 and 4, you don't have any
10:45:48 16   reason to believe that Danza Exhibit 5 does not
10:45:50 17   accurately describe the operations of ClinicalLogic
10:45:53 18   or QicLink?
10:45:54 19     A. No, I believe it's accurate.
10:45:56 20     Q. This one's a little thicker. I hand you
10:46:07 21   what's been marked as Danza Exhibit 6. I'm not
10:46:14 22   going to ask you to read it.
10:46:16 23     A. Thank you.
10:46:17 24     Q. But could you flip through it and at

Page 48

10:46:19 1   least comfort yourself with what you think the
10:46:21 2   document is?
10:46:33 3     A. Okay.
10:46:34 4     Q. Do you recognize what's been marked as
10:46:39 5   Danza Exhibit 6?
10:46:40 6     A. Yes, I do.
10:46:41 7     Q. What do you recognize that document as?
10:46:42 8     A. This is our user documentation for the
10:46:46 9   ClinicalLogic -- ClinicalLogic module.
10:46:50 10     Q. Just to ensure that you have a full copy
10:46:53 11   of Exhibit 6, what is the first page listed on the
10:46:56 12   bottom right, the number there TRZ?
10:46:59 13     A. The TRZ154730.
10:47:02 14     Q. And if you could flip to the last page,
10:47:04 15   please, Mr. Danza?
10:47:05 16     A. TRZ154905.
10:47:11 17     Q. I'd like to direct you to a page within
10:47:14 18   Danza Exhibit 6 -- actually, before we do that,
10:47:16 19   strike that.
10:47:20 20     Is the user guide that's been marked as
10:47:22 21   Danza Exhibit 6 a document that's prepared in the
10:47:24 22   ordinary course of TriZetto's business?
10:47:26 23     A. Yes.
10:47:27 24     Q. Do you have any reason -- strike that.

12 (Pages 45 to 48)

Page 57

| | | |
|---|---|---|
| 10:57:41 | 1 | QicLink gives you the ability for the client to set |
| 10:57:44 | 2 | up those rules. It has the logic capability within |
| 10:57:47 | 3 | it. So they just do what's appropriate for their |
| 10:57:49 | 4 | business. |
| 10:57:50 | 5 | Q. So it provides a means to perform those |
| 10:57:52 | 6 | edits within -- strike that. |
| 10:57:54 | 7 | So QicLink's core functionality provides |
| 10:57:56 | 8 | a means to perform those sort of edits that you |
| 10:57:59 | 9 | just described? |
| 10:58:00 | 10 | A. Yes, that's correct. |
| 10:58:01 | 11 | Q. When you say the client needs to go |
| 10:58:03 | 12 | through, I assume they put boxes or could you |
| 10:58:06 | 13 | describe the process that you just alluded to |
| 10:58:08 | 14 | there? |
| 10:58:08 | 15 | A. Yes, they can -- we have a separate |
| 10:58:11 | 16 | product -- let me describe this without getting way |
| 10:58:16 | 17 | too complicated. |
| 10:58:17 | 18 | Q. Let me try to break it down. With |
| 10:58:20 | 19 | respect to the QicLink core functionality and the |
| 10:58:22 | 20 | edits that you described regarding the medical |
| 10:58:23 | 21 | service codes, within QicLink's core functionality, |
| 10:58:27 | 22 | is there a step that the customer goes through to |
| 10:58:31 | 23 | activate these edits that are there in QicLink? |
| 10:58:32 | 24 | A. There is, yes. They can either start |

Page 58

| | | |
|---|---|---|
| 10:58:35 | 1 | with a blank table and create those categorizations |
| 10:58:41 | 2 | themselves that put those rules into the system or |
| 10:58:46 | 3 | they can license a separate product we have that's |
| 10:58:49 | 4 | called claim rules that actually has a baseline |
| 10:58:52 | 5 | starting point that says certain procedures are |
| 10:58:55 | 6 | typically, you know, cosmetic and so they can start |
| 10:59:00 | 7 | with that baseline and then choose to tweak it |
| 10:59:04 | 8 | after that. |
| 10:59:04 | 9 | Q. Okay. Now, are there default settings |
| 10:59:07 | 10 | for that within the QicLink core functionality? |
| 10:59:09 | 11 | A. Yes, yes, in the claim rules. Again |
| 10:59:11 | 12 | that's a separate licensed product that we have. |
| 10:59:14 | 13 | Q. Okay. Just to make sure I've got |
| 10:59:26 | 14 | everything straight and we've got a clean record, |
| 10:59:29 | 15 | let's try to backtrack a little bit if that's all |
| 10:59:31 | 16 | right with you? |
| 10:59:31 | 17 | A. That's fine. |
| 10:59:33 | 18 | Q. So the QicLink product itself is a |
| 10:59:36 | 19 | software product that receives and processes |
| 10:59:39 | 20 | medical claims? |
| 10:59:40 | 21 | A. Yes, that's correct. |
| 10:59:40 | 22 | Q. And to implement that product you require |
| 10:59:45 | 23 | a -- because it's software, you require a computer |
| 10:59:48 | 24 | system of some sort? |

Page 59

| | | |
|---|---|---|
| 10:59:48 | 1 | A. Yes, that's correct. |
| 10:59:49 | 2 | Q. So to -- strike that. |
| 10:59:53 | 3 | So to operate QicLink, the QicLink |
| 10:59:56 | 4 | software, it requires a computer system with some |
| 10:59:59 | 5 | sort of CPU and storage space or memory? |
| 11:00:01 | 6 | A. Yes. |
| 11:00:02 | 7 | Q. And TriZetto makes available to customers |
| 11:00:10 | 8 | additional modules for which the customers pay that |
| 11:00:14 | 9 | are capable of performing clinical editing such as |
| 11:00:18 | 10 | the detection of unbundling of codes on a medical |
| 11:00:21 | 11 | claim? |
| 11:00:21 | 12 | A. Yes, that's correct. |
| 11:00:22 | 13 | Q. So to do so, I assume that the claims |
| 11:00:28 | 14 | that QicLink receives include one or more medical |
| 11:00:34 | 15 | service codes representing the services for which |
| 11:00:37 | 16 | payment's being sought? |
| 11:00:38 | 17 | A. Yes, that's correct. |
| 11:00:39 | 18 | Q. And included within QicLink's |
| 11:00:43 | 19 | ClinicaLogic or Auto Audit clinical editing modules |
| 11:00:47 | 20 | are a set of medical service codes and |
| 11:00:49 | 21 | relationships among those medical service codes |
| 11:00:51 | 22 | that define whether or not certain codes, be it for |
| 11:00:55 | 23 | example an unbundled code, is valid or invalid? |
| 11:00:59 | 24 | A. Yes, that's correct. |

Page 60

| | | |
|---|---|---|
| 11:01:00 | 1 | Q. And the ClinicaLogic database within |
| 11:01:05 | 2 | QicLink also will detect if a medical service code |
| 11:01:09 | 3 | on a received claim is outdated or not within the |
| 11:01:12 | 4 | ClinicaLogic database, is that correct? |
| 11:01:14 | 5 | A. Yes, that's correct. |
| 11:01:15 | 6 | Q. It will inform the user with some remark |
| 11:01:18 | 7 | code that one of the medical service codes on the |
| 11:01:21 | 8 | claim is not included within the database? |
| 11:01:23 | 9 | A. Yes, that's correct. |
| 11:01:24 | 10 | Q. For example, within the QicLink subset |
| 11:01:35 | 11 | edit that we discussed in connection with |
| 11:01:39 | 12 | Exhibit 6, if code A is determined by QicLink to be |
| 11:01:44 | 13 | included within code B and both code A and code B |
| 11:01:48 | 14 | are submitted on the same medical claim, QicLink |
| 11:01:51 | 15 | with the ClinicaLogic or Auto Audit module will |
| 11:01:55 | 16 | reject code A and pay or approve code B within -- |
| 11:02:01 | 17 | which is the code that A's included within? |
| 11:02:03 | 18 | A. Yes. |
| 11:02:04 | 19 | Q. Let me try to make that a little clearer. |
| 11:02:10 | 20 | That was my fault. So QicLink, including the |
| 11:02:16 | 21 | ClinicaLogic or Auto Audit database, has the |
| 11:02:22 | 22 | capability of determining whether or not a medical |
| 11:02:22 | 23 | service code included on a claim is included within |
| 11:02:25 | 24 | another medical service code by consulting its |

15 (Pages 57 to 60)

Page 61

```
11:02:27  1   database of medical service codes and
11:02:29  2   relationships?
11:02:30  3        A.  Yes, that's correct.
11:02:31  4        Q.  Does QicLink's -- strike that.
11:02:51  5        Does QicLink with ClinicalLogic or Auto
11:02:56  6   Audit revise claims to delete a code, for example,
11:03:00  7   in the subset example we just spoke about, say code
11:03:05  8   A if it's included within code B, does it revise
11:03:08  9   the claims to delete code A and just pay code B?
11:03:10 10        A.  It doesn't revise the claim. It
11:03:11 11   physically doesn't remove that line. It just
11:03:13 12   accounts for it and with no payment and then pays
11:03:17 13   the correct line.
11:03:19 14        Q.  So the invalid codes are removed from
11:03:21 15   payment in terms of the claim that's returned to
11:03:25 16   the customer?
11:03:25 17        A.  There's no payment associated with them,
11:03:28 18   but the line is still physically there because we
11:03:31 19   got it to begin with so we want to account for it
11:03:34 20   along the way.
11:03:34 21        Q.  So people don't think it's lost or
11:03:37 22   something?
11:03:37 23        A.  Right, exactly.
11:03:39 24        Q.  But it's not included within the list of
```

Page 62

```
11:03:41  1   codes for which payment's being made or what's
11:03:44  2   being approved?
11:03:45  3        A.  That's correct.
11:03:46  4        Q.  When QicLink revises a claim to reject
11:03:58  5   payment for some medical service codes that are
11:03:59  6   received and approve payment for other medical
11:04:02  7   service codes that are received, does it provide an
11:04:04  8   explanation to the user as to why that revision was
11:04:08  9   made?
11:04:08 10        A.  To the user or to the -- ultimately to
11:04:14 11   the -- by user, do you mean the user of the
11:04:17 12   software or do you mean the person who ultimately
11:04:20 13   receives that explanation of benefits?
11:04:22 14        Q.  Let's start with the user of the
11:04:23 15   software.
11:04:23 16        A.  The user of the software, yes, if they
11:04:26 17   set the system to be advised of that as opposed to
11:04:31 18   automatically just applying the rule, then yes, we
11:04:35 19   will advise them that there is a situation and it
11:04:39 20   essentially then -- it's not fully automated, but
11:04:42 21   it tells them.
11:04:43 22        Q.  So in a situation where a customer hasn't
11:04:45 23   set QicLink up to advise them and not apply the
11:04:48 24   rule, when QicLink -- does QicLink automatically
```

Page 63

```
11:04:53  1   apply the rule and revise the claim?
11:04:55  2        A.  It can, yes.
11:04:56  3        Q.  Is that the default setting for
11:04:58  4   ClinicalLogic when it's shipped, say for --
11:05:01  5        A.  No, we -- I'm sorry, go ahead.
11:05:02  6        Q.  Say for the subset edit?
11:05:04  7        A.  Best of my knowledge, no, it's not. We
11:05:07  8   want the client to set what they feel should be
11:05:10  9   automated and what their people should look at.
11:05:12 10        Q.  So are any -- strike that.
11:05:14 11        Are any of the edits included within
11:05:17 12   ClinicalLogic when they ship to the customer set as
11:05:20 13   a default to automatically correct codes?
11:05:23 14        A.  They are -- there's a little difference
11:05:27 15   between correcting the code and notifying the user
11:05:29 16   that we've done it. Because it can correct the
11:05:34 17   code but still stop the claim and notify the claim
11:05:38 18   processor that a correction is going to be made.
11:05:43 19   And that's a different setting than saying go ahead
11:05:47 20   and correct the code and then don't advise the
11:05:50 21   processor and just automate the claim through the
11:05:54 22   system. And that's a work flow decision that the
11:05:57 23   client needs to make as to whether or not they want
11:05:59 24   human eyes to look at it before the claim goes out.
```

Page 64

```
11:06:01  1        Q.  But QicLink with ClinicalLogic or Auto
11:06:08  2   Audit does provide a means to automatically
11:06:10  3   determine whether a code on the claim is invalid or
11:06:16  4   valid based on other codes received on the claim
11:06:19  5   and revise the claim without human intervention?
11:06:21  6        A.  Yes, that's correct.
11:06:22  7        Q.  And the relationships within
11:06:28  8   ClinicalLogic's database, are some of those based on
11:06:31  9   medical criteria or --
11:06:33 10        A.  I believe so, yes.
11:06:34 11        Q.  Whereas based on -- strike that.
11:06:40 12        So some of the relationships within the
11:06:43 13   predetermined database in the ClinicalLogic module
11:06:47 14   of QicLink are based on medical criteria?
11:06:50 15        A.  That's my understanding, yes.
11:06:51 16        Q.  And based on your description of some of
11:06:54 17   the edits earlier, I assume that some of the edits
11:06:57 18   included within the predetermined database of
11:06:59 19   ClinicalLogic are based on billing reasons or
11:07:03 20   nonmedical reasons?
11:07:04 21        A.  I think ultimately, and again I'm not an
11:07:08 22   expert on this because, you know, because the rules
11:07:10 23   do come ultimately through -- from Deloitte &
11:07:15 24   Touche, that I think there's ultimately medical
```

16 (Pages 61 to 64)

Page 65

11:07:17 1    reasons even for the billing -- even for the
11:07:20 2    billing rules.
11:07:20 3       Q. But there are some relationships within
11:07:28 4    the database of ClinicalLogic where it is medically
11:07:31 5    possible to perform code A and -- the services
11:07:34 6    represented by code A and code B, yet code A and
11:07:37 7    code B should not be paid on the same claim, is
11:07:40 8    that right?
11:07:40 9       A. Yes, that's correct.
11:07:42 10      Q. So they're not medically exclusive, but
11:07:46 11   they should be billed as a single code in that
11:07:49 12   example?
11:07:50 13      A. In that example you gave, yes, that's
11:07:52 14   correct. I think there are rules.
11:07:54 15      Q. I guess also I would assume that the
11:07:57 16   ClinicalLogic database within QicLink would catch
11:08:01 17   claims where multiple medical service codes are
11:08:04 18   submitted and it is medically impossible to perform
11:08:07 19   the submitted codes, like amputating the same leg
11:08:11 20   twice?
11:08:13 21      A. Right, I believe ClinicalLogic and both
11:08:16 22   Auto Audit, yeah, have those as well.
11:08:17 23      Q. It's a good thing to include. If you
11:08:20 24   have it, use it. Does TriZetto update the

Page 66

11:08:33 1    ClinicalLogic database from time to time?
11:08:35 2       A. Yes, it does.
11:08:37 3       Q. Is that typically on an annual basis when
11:08:39 4    the CPT-4 codes are updated?
11:08:41 5       A. Yes, it is done annually.
11:08:42 6       Q. Are there any other -- strike that.
11:08:46 7          Does TriZetto update the database at any
11:08:50 8    other period other than annually, that being the
11:08:53 9    ClinicalLogic database?
11:08:53 10      A. Not typically, no.
11:08:55 11      Q. And the database of ClinicalLogic within
11:09:01 12   QicLink when it ships to a customer and the
11:09:04 13   database being the medical service codes and the
11:09:07 14   relationships among those are predetermined before
11:09:10 15   the product is shipped to the customer, is that
11:09:12 16   right?
11:09:12 17      A. Yes, that's right.
11:09:13 18      Q. Why is it important that the database be
11:09:15 19   fixed?
11:09:16 20      A. Well, I'm not sure that the database is
11:09:19 21   truly fixed. What it is that those rules are
11:09:21 22   set up ahead of time because that's essentially
11:09:24 23   what the client is paying for is a -- is rules
11:09:29 24   determined by a medical Board so that they have

Page 67

11:09:33 1    some backing.
11:09:35 2       Q. So they can have some consistency amongst
11:09:38 3    the editing amongst their claims?
11:09:40 4       A. I'm not -- I'm sure consistency -- I'm
11:09:45 5    sure consistency does work its way into it. It's
11:09:48 6    primarily because you need medical staff to
11:09:52 7    actually have determined that. They don't want
11:09:55 8    somebody like you or me -- they want to know
11:09:58 9    somebody with a medical background has done it.
11:10:00 10      Q. Because a doctor may come back and
11:10:03 11   contest the thing, say hey, this really is right,
11:10:05 12   you don't know what you're talking about?
11:10:08 13      A. Exactly.
11:10:08 14      Q. I'd like to mark as the next exhibit in
11:10:31 15   sequence United States Patent No. 5,253,164 issued
11:10:41 16   to Holloway, et al.
11:10:53 17         (Document marked as Danza Exhibit No. 7
11:10:57 18   for identification.)
11:10:57 19   BY MR. HENDERSHOT:
11:10:58 20      Q. Have you seen this document before,
11:11:00 21   Mr. Danza?
11:11:00 22      A. No, I haven't.
11:11:01 23      Q. Have you ever seen a patent before,
11:11:06 24   Mr. Danza?

Page 68

11:11:06 1       A. I have seen patents before.
11:11:08 2       Q. Are you a named inventor on any patents?
11:11:11 3       A. I am.
11:11:11 4       Q. How many patents?
11:11:13 5       A. One.
11:11:13 6       Q. What's the subject matter of the patent?
11:11:16 7       A. It is a -- it is a processing rule set
11:11:21 8    for doing consumer directed health care.
11:11:26 9       Q. Do you recall roughly when you filed for
11:11:28 10   that patent or if you know the specific date?
11:11:30 11      A. Sometime earlier this year.
11:11:32 12      Q. Earlier this year?
11:11:33 13      A. Uh-huh.
11:11:34 14      Q. Could you describe in a little greater
11:11:36 15   detail what your patent relates to?
11:11:38 16      A. It's a set of rules and processes for
11:11:43 17   linking different companies together to do an
11:11:47 18   automated claim process for consumer directed
11:11:52 19   health care.
11:11:53 20      Q. Do you know the number of it by any
11:11:56 21   chance?
11:11:56 22      A. I don't. I don't know if they have it
11:12:00 23   yet or not.
11:12:01 24      Q. So you filed for it?

17 (Pages 65 to 68)

Page 69

11:12:02  1    A. We filed for it.
11:12:03  2    Q. So you filed -- and this is as an
11:12:09  3    employee of TriZetto?
11:12:10  4    A. Yes, that's correct.
11:12:10  5    Q. So as an employee of TriZetto earlier
11:12:13  6    this year you filed an application for a United
11:12:16  7    States patent for a system of applying rules and
11:12:21  8    processing consumer health care or health care
11:12:24  9    claims? I just want to make sure I follow exactly
11:12:27 10    what it is.
11:12:27 11    A. Sure. It's a set of rules and process
11:12:31 12    flows that would allow a claim payor to work with a
11:12:38 13    bank and actually a debit card vendor to bring
11:12:44 14    disparate accounts together into a consolidated
11:12:46 15    claim payment. And actually, we did -- myself and
11:12:53 16    the other named person did some charts and somebody
11:12:57 17    else did all the legalese.
11:13:00 18    Q. Well, are you familiar with what a claim
11:13:03 19    is in a patent? Did they discuss that with you? I
11:13:07 20    don't want you to reveal any privileged
11:13:09 21    communications between you and your patent
11:13:11 22    attorneys.
11:13:11 23    A. No, we never discussed it.
11:13:13 24    Q. Could you flip to the second to last page

Page 70

11:13:15  1    of what's been marked as Exhibit 7? It's got a
11:13:17  2    number on the left of 117 on the top.
11:13:20  3    A. I can. I have to tell you, I haven't
11:13:22  4    looked at this document on purpose.
11:13:25  5    Q. Why haven't you looked at it?
11:13:27  6    A. Because you know what, you know, I wasn't
11:13:30  7    involved with it, I'm not an attorney, so I didn't
11:13:32  8    want to get involved with actually reviewing this
11:13:35  9    for content or evaluation or any of that nature.
11:13:39 10    Q. So you've intentionally not reviewed the
11:13:42 11    patent-in-suit before today?
11:13:43 12    A. That's correct.
11:13:44 13    Q. Was that at the direction of counsel?
11:13:45 14    A. No. I just made that up on my own.
11:13:48 15    Q. And no attorneys for TriZetto asked you
11:13:53 16    to review the patent?
11:13:54 17    A. That's correct.
11:13:55 18    Q. But you are the person most knowledgeable
11:14:00 19    regarding the -- strike that.
11:14:01 20        But you are the person most knowledgeable
11:14:03 21    within TriZetto of the functionality of QicLink and
11:14:09 22    ClinicaLogic within QicLink, right?
11:14:10 23    A. Yes, that's correct.
11:14:11 24    Q. So why don't we try to take advantage of

Page 71

11:14:13  1    that knowledge and see what you think about some of
11:14:16  2    the stuff in here.
11:14:16  3    A. Okay.
11:14:16  4    Q. Flip to the last page, second to last.
11:14:20  5    A. Second to last, is that the one that says
11:14:22  6    117 and 118 on top?
11:14:24  7    Q. Yes. So if we just start with the
11:14:26  8    paragraph numbered 1, could you read that first
11:14:30  9    paragraph? You can read it to yourself.
11:14:39 10    A. Okay.
11:15:20 11    Q. Have you finished reading paragraph 1,
11:15:23 12    Mr. Danza?
11:15:24 13    A. Yes.
11:15:24 14    Q. We discussed earlier that QicLink
11:15:31 15    operates on a computer system, correct?
11:15:33 16    A. Uh-huh, that's correct.
11:15:34 17    Q. And QicLink includes a means for
11:15:37 18    operating on a -- and QicLink -- strike that.
11:15:40 19        And QicLink with the ClinicaLogic or Auto
11:15:43 20    Audit module has a means for operating on a
11:15:45 21    predetermined database containing medical service
11:15:48 22    codes, correct?
11:15:48 23        MR. MUINO: I have to interpose an
11:15:49 24    objection at this point. This line of questioning

Page 72

11:15:51  1    with respect to the claims is objectionable for the
11:15:55  2    following reasons: I think, first of all, it calls
11:15:58  3    for a legal conclusion and he's not a patent
11:16:01  4    lawyer. It calls for speculation. He hasn't had a
11:16:03  5    chance to actually review the entire patent. It
11:16:06  6    also calls for an expert opinion and he hasn't been
11:16:10  7    designated as an expert. For these reasons, I
11:16:11  8    believe it's objectionable. If you're going to go
11:16:12  9    on with this, if I can get a standing objection, so
11:16:14 10    I don't have to object each time.
11:16:16 11        MR. HENDERSHOT: That's fine with me.
11:16:18 12        MR. MUINO: Is that okay?
11:16:19 13    BY MR. HENDERSHOT:
11:16:20 14    Q. Mr. Danza, in reviewing paragraph 1 was
11:16:23 15    there any word that jumped out at you where you
11:16:26 16    thought I just don't know what that means?
11:16:28 17    A. Actually I have to tell you and I'm not
11:16:31 18    being smart-alecky about this, but given the lack
11:16:34 19    of punctuation, I don't know what the hell this
11:16:36 20    paragraph is saying to be quite honest.
11:16:39 21    Q. I'll tell you what. I'm going to walk
11:16:41 22    through some questions and if you don't understand
11:16:42 23    anything in my questions, feel free to stop me and
11:16:46 24    you should do that throughout the remainder -- the

18 (Pages 69 to 72)

Page 97

11:54:35  1    A. Yeah, I have.
11:54:36  2    Q. Did you see any element in this first
11:54:38  3  subparagraph of Claim 2 that is not present within
11:54:42  4  QicLink?
11:54:47  5    A. I'm sorry. I'm just trying to break this
11:54:54  6  down to kind of make it make sense. Yes, I think
11:54:58  7  up through the first comma, that would be -- yes,
11:55:04  8  that would be present.
11:55:06  9    Q. And that's up to a method for processing
11:55:09 10  input claims, is that correct?
11:55:11 11    A. Yes, up to but not including that part.
11:55:13 12  That's as far as I went.
11:55:15 13    Q. Then moving forward from there.
11:55:33 14    A. Okay. I've read through the rest of it.
11:55:54 15    Q. Do you see any element within Claim 2 as
11:55:56 16  you've read it now that's not present within
11:55:57 17  QicLink?
11:55:58 18    A. No.
11:56:02 19    Q. Okay. So I'm going to try to save you
11:56:07 20  some reading now. I'll try to direct your
11:56:09 21  attention to specific paragraphs and try to save
11:56:12 22  some time.
11:56:12 23    A. Thank you.
11:56:13 24    Q. If you could look at -- these are called

Page 98

11:56:19  1  claims, Claim 3 underneath column 117 of the '164
11:56:24  2  patent.
11:56:25  3    A. So is that the item numbered three?
11:56:28  4    Q. Yes.
11:56:29  5    A. Okay.
11:56:29  6    Q. So in the fourth indented paragraph of
11:56:32  7  Claim 3, there is discussed a means for determining
11:56:37  8  whether one of the medical service codes, do you
11:56:39  9  see that subparagraph?
11:56:40 10    A. I do.
11:56:40 11    Q. Could you read that for me? Not for the
11:56:43 12  record, just to yourself, please.
11:56:44 13    A. Okay. If you don't mind, I'm going to
11:56:47 14  read the entry into it as well.
11:56:48 15    Q. Okay.
11:57:10 16    A. Okay.
11:57:10 17    Q. Do you see anything within that fourth
11:57:14 18  indented paragraph of Claim 3 starting with means
11:57:16 19  for determining that's not present within QicLink?
11:57:19 20    A. No, I don't.
11:57:21 21    Q. If you would look at Claim 4 or the item
11:57:30 22  numbered four underneath column 117 of the '164
11:57:34 23  patent?
11:57:35 24    A. Okay.

Page 99

11:57:35  1    Q. Could you read that?
11:57:36  2    A. Okay, sorry.
11:57:52  3    Q. Do you see anything --
11:57:53  4    A. It took so long to read that sentence.
11:57:55  5    Q. I want to make sure your answers are
11:57:57  6  accurate. So I appreciate it.
11:58:00  7    A. Okay, go ahead.
11:58:00  8    Q. Do you see anything within Claim 4 that
11:58:03  9  you've just read of the '164 patent that is not
11:58:06 10  included with TriZetto's QicLink product?
11:58:09 11    A. Given that it relates to the entirety of
11:58:14 12  Number 3 before there and I've only kind of looked
11:58:18 13  through the one indentation, I would say no, that
11:58:21 14  would --
11:58:21 15    Q. Subject to that caveat.
11:58:22 16    A. That's correct. So I would say --
11:58:28 17    Q. Would you turn to Number 5 on the top of
11:58:30 18  column 118 of the '164 patent, please?
11:58:33 19    A. Okay.
11:58:34 20    Q. Is there anything within Claim 5 of the
11:58:38 21  '164 patent at the top of column 118 that is not
11:58:41 22  practiced by the QicLink product?
11:58:43 23    A. No.
11:58:43 24    Q. Would you turn to Number 6?

Page 100

11:58:48  1    A. Okay.
11:58:48  2    Q. Is there anything -- is there any element
11:58:52  3  of Claim Number 6 of the '164 patent that is not
11:58:56  4  included within the QicLink product?
11:58:57  5    A. Again, given that it refers to the
11:59:03  6  entirety of Number 3 that I haven't looked through
11:59:06  7  the entirety of, no. I would say no.
11:59:09  8    Q. Why don't you look through the entirety
11:59:15  9  of three real quickly? As quickly as you feel you
11:59:26 10  can. There's no goal to meet.
11:59:56 11    A. Okay, thanks.
11:59:57 12    Q. Thank you. Having reviewed Claim 3 of
12:00:02 13  the '164 patent, are there any elements within
12:00:06 14  Claim 3 that are not practiced by the QicLink
12:00:08 15  product?
12:00:09 16    A. No, there isn't.
12:00:10 17    Q. So given that there are no elements
12:00:15 18  within Claim 3 of the '164 patent that are not
12:00:20 19  practiced by the QicLink product, turning to
12:00:22 20  Claim 4 which includes all those limitations, is
12:00:24 21  there any element within Claim 4 that is not
12:00:26 22  practiced by the QicLink product?
12:00:28 23    A. No.
12:00:28 24    Q. Turning to Claim 5, is there any element

25 (Pages 97 to 100)

**Page 101**

12:00:32 1  within Claim 5 that is not practiced by the QicLink

12:00:35 2  product?

12:00:35 3      A. No.

12:00:36 4      Q. Turning to Claim 6, is there any element

12:00:39 5  within Claim 6 that's not practiced by the QicLink

12:00:42 6  product?

12:00:42 7      A. No.

12:00:42 8      Q. Turning to Claim 8, if you could read

12:00:50 9  that for me.

12:01:00 10     A. Okay.

12:01:01 11     Q. Are there any elements of Claim 8 that

12:01:03 12  are not practiced by the QicLink product?

12:01:05 13     A. No.

12:01:06 14     Q. Actually let me rephrase that if you

12:01:11 15  don't mind. Are there any elements within Claim 8

12:01:14 16  that are not included within the QicLink product?

12:01:18 17     A. No.

12:01:18 18     Q. Would you turn to Claim 9, please?

12:01:23 19     A. Okay. Okay.

12:01:32 20     Q. Are there any elements within Claim 9

12:01:34 21  that are not included within the QicLink product?

12:01:36 22     A. No. And again if I may, for just a

12:01:39 23  minute, you're referencing QicLink and I'm

12:01:43 24  answering based on ClinicaLogic.

**Page 102**

12:01:45 1      Q. Yes, with respect to all of my questions

12:01:47 2  about these claims, I'm discussing QicLink

12:01:52 3  including ClinicaLogic and/or Auto Audit?

12:01:56 4      A. Right. I just wanted to be clear. Okay,

12:01:59 5  great. Thanks.

12:01:59 6      Q. Just so the record's clear, because I

12:02:03 7  struck the last one, all of these questions about

12:02:05 8  the claims of the '164 patent are directed at

12:02:07 9  QicLink including either the Auto Audit or the

12:02:09 10  ClinicaLogic clinical editing modules?

12:02:11 11     A. Understand. Thank you.

12:02:14 12     Q. So none of your answers would change

12:02:16 13  given that caveat?

12:02:17 14     A. That's correct.

12:02:18 15     Q. And that was an assumption you were

12:02:19 16  making in answering all those questions?

12:02:22 17     A. That's correct.

12:02:22 18     Q. I was as well. Can we take a two-minute

12:02:50 19  break and I'll see if I can wrap it up with a few

12:02:52 20  questions.

12:02:53 21     MR. MUINO: Sure.

12:02:54 22     VIDEOGRAPHER: We are off the record at

12:02:57 23  12:03 p.m. with the end of tape Number 1.

12:03:02 24     (Short recess.)

**Page 103**

12:13:18 1      VIDEOGRAPHER: We are back on the record

12:13:38 2  at 12:13 p.m. with the beginning of tape Number 2.

12:13:41 3  BY MR. HENDERSHOT:

12:13:43 4      Q. So, Mr. Danza, before we went off the

12:13:44 5  record we were discussing the claims of the '164

12:13:47 6  patent which has been marked as Exhibit 7. And

12:13:50 7  correct me if I'm wrong, but we had gone through

12:13:52 8  Claims 1, 2, 3, 4, 5, 6, 8 and 9 and you had not

12:14:03 9  identified any element recited in those claims that

12:14:08 10  was not present in the QicLink product, is that

12:14:10 11  correct?

12:14:10 12     A. That's correct.

12:14:11 13     MR. MUINO: Let me just state that I

12:14:13 14  still have my standing objection to this line of

12:14:15 15  questioning.

12:14:15 16     MR. HENDERSHOT: Understood.

12:14:16 17     Q. So if I could direct your attention to

12:14:19 18  the last subparagraph of Claim 10, beginning with

12:14:26 19  "means for determining," do you see that;

12:14:30 20  Mr. Danza?

12:14:30 21     A. I do.

12:14:30 22     Q. Could you review that for me?

12:14:41 23     A. I'm just reading the top of 10 if that's

12:14:44 24  okay.

**Page 104**

12:14:44 1      Q. Okay.

12:14:45 2      A. Just because since that sub is kind of a

12:14:48 3  continuation I guess of that sentence. Okay.

12:15:00 4      Q. So have you read all of Claim 10?

12:15:03 5      A. I didn't read all of 10. I just read the

12:15:06 6  opening of 10 and then the last indented. That's

12:15:10 7  what you indicated for me.

12:15:11 8      Q. The third from the last?

12:15:12 9      A. The third from the last. I'm sorry.

12:15:14 10     Q. That's all right.

12:15:23 11     A. Okay, yes, I've got it.

12:15:24 12     Q. So is there any element described in the

12:15:27 13  third from the last subparagraph of Claim 10 of the

12:15:31 14  '164 patent that's not present in the QicLink

12:15:33 15  product?

12:15:33 16     A. No.

12:15:33 17     Q. Did you identify anything else in the

12:15:38 18  sections of Claim 10 that you read that's not

12:15:40 19  present in the QicLink product?

12:15:41 20     A. No, I'd only read the one at the very

12:15:44 21  bottom.

12:15:45 22     Q. Okay.

12:15:49 23     A. And that would be included as well.

12:15:52 24     Q. Then if you could look at Claim 11 for

**SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES**
**877.955.3855**

# EXHIBIT N

## Page 1

```
 1              UNITED STATES DISTRICT COURT
 2                  DISTRICT OF DELAWARE
 3
 4  McKESSON INFORMATION SOLUTIONS, LLC,
 5        Plaintiff
 6  v.              CA NO. 04-1258 (SLR)
 7  THE TRIZETTO GROUP, INC.,
 8        Defendant
 9
10
11
12              VOLUME 1
13      VIDEOTAPED DEPOSITION OF RANDALL
14  DAVIS, Ph.D., a witness called on behalf of
15  the Plaintiff, pursuant to the Federal Rules
16  of Civil Procedure, before Jessica L.
17  Williamson, Registered Merit Reporter,
18  Certified Realtime Reporter and Notary
19  Public in and for the Commonwealth of
20  Massachusetts, at the Offices of Skadden,
21  Arps, Slate, Meagher & Flom LLP, One Beacon
22  Street, Boston, Massachusetts, on Wednesday,
23  November 30, 2005, commencing at 9:27 a.m.
24  JOB NO. 41297
25
```
Page 1

## Page 2

```
 1  A P P E A R A N C E S
 2
 3  SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
 4    (By Jeff Randall, Esq.)
 5    525 University Avenue
 6    Palo Alto, California 94301
 7    (650) 470-4500
 8    jrandall@skadden.com
 9    Counsel for the Plaintiff
10
11  GIBSON, DUNN & CRUTCHER LLP
12    (By David A. Segal, Esq.)
13    4 Park Plaza
14    Irvine, California 92614-8557
15    (949) 451-3973
16    dsegal@gibsondunn.com
17    Counsel for the Defendant
18
19  ALSO PRESENT:
20
21  George Dobrentey, Videographer
22
23
24
25
```
Page 2

## Page 3

```
              I N D E X
 1
 2  DEPONENT                      PAGE
 3  RANDALL DAVIS, Ph.D.
 4  Examination By Mr. Randall       5, 310
 5  Examination By Mr. Segal         297
 6
 7        E X H I B I T S
 8  NO.                           PAGE
 9  1 Copy of '164 patent          11
10  2 Expert Report dated October   22
11    24, 2005
12
13  3 Expert Report dated November  22
      14, 2005
14  4 Article entitled "Enhancing   28
      Accuracy and Timeliness is
15    Integral to the Claims
      Adjudication Process"
16
17  5 Document relating to AMS      141
      entitled "Setting a New
18    Standard"
19  6 Document bearing Bates stamp  142
      Nos. RD000314 - 324
20  7 Document entitled "AMS June   142
      1986 HDI-Proprietary"
21
22  8 One-page document bearing     142
      Bates stamp No. RD000420
23
24
25
```
Page 3

## Page 4

```
 1              P R O C E E D I N G S
09:10:46  1
09:27:22  2        THE VIDEOGRAPHER:  Good morning.
09:27:33  3   We are recording and are now on the record.
09:27:35  4   Today's date is November the 30th, 2005, and
09:27:38  5   the time is 9:27 a.m.  My name is George
09:27:42  6   Dobrentey.  I'm a legal videographer for G &
09:27:46  7   M Court Reporters, Ltd.  Our business
09:27:46  8   address is 42 Chauncy Street, Suite 1A,
09:27:50  9   Boston, Massachusetts 02111.
09:27:51 10        This is the deposition of Randall
09:27:55 11   Davis in the matter of McKesson Information
09:28:00 12   Solutions vs. TriZetto Group in the United
09:28:04 13   States District Court in the District of
09:28:06 14   Delaware, Civil Action No. 04-1258 (SLR).
09:28:11 15        This deposition is being taken at One
09:28:15 16   Beacon Street in Boston, Massachusetts on
09:28:17 17   behalf of the plaintiff.  The court reporter
09:28:18 18   is Jessica Williamson.  The counsel will
09:28:19 19   state their appearances, and the court
09:28:21 20   reporter will administer the oath.
09:28:22 21        MR. RANDALL:  Jeff Randall
09:28:24 22   representing plaintiff, McKesson.
09:28:26 23        MR. SEGAL:  David Segal on behalf
09:28:27 24   of the TriZetto Corp.
         25
```
Page 4

|  |  |
|---|---|
| 1 | RANDALL DAVIS, Ph.D., |
| 2 | a witness called on behalf of the Plaintiff, |
| 3 | having first been duly sworn, was deposed |
| 4 | and testifies as follows: |
| 5 | |
| 6 | DIRECT EXAMINATION |
| 7 | |

09:28:39 8    BY MR. RANDALL:
09:28:39 9    Q.   Mr. Davis, have you ever had your deposition
09:28:45 10        taken before?
09:28:45 11   A.   Yes.
09:28:46 12   Q.   How many times?
09:28:47 13   A.   Somewhere between six and ten, I would
09:28:52 14        guess.
09:28:52 15   Q.   And in each of those occasions was the
09:28:57 16        deposition taken in conjunction with your
09:28:59 17        work as an expert on a piece of litigation?
09:29:02 18   A.   Yes.
09:29:02 19   Q.   Approximately how many times have you been
09:29:07 20        retained by a law firm to assist them in
09:29:15 21        litigation as an expert?
09:29:17 22   A.   Specifically as an expert I would guess a
09:29:23 23        dozen to two dozen over the course of
09:29:28 24        about -- what is it now? -- 16 years.
09:29:33 25   Q.   When you say "as an expert," what do you

Page 5

09:30:54 1    to be involved, and I was contacted again in
09:30:56 2    August and that began my real involvement in
09:30:59 3    the case.
09:31:00 4    Q.   Who contacted you in the spring?
09:31:07 5    A.   I believe it was Mr. Segal.
09:31:14 6    Q.   Were you engaged at that time in this case?
09:31:14 7    A.   No.
09:31:15 8    Q.   Did you do any work whatsoever in connection
09:31:18 9         with this case prior to September of this
09:31:24 10        year?
09:31:24 11   A.   No.
09:31:24 12   Q.   When were you first engaged -- strike that.
09:31:29 13        You were engaged as an expert by the
09:31:32 14        law firm of Gibson, Dunn & Crutcher to work
09:31:34 15        on this case, correct?
09:31:35 16   A.   Correct.
09:31:36 17   Q.   And you were so engaged in early September
09:31:39 18        of this year, 2006; is that right -- 2005?
09:31:42 19   A.   Correct.
09:31:47 20   Q.   And prior to that time you had never read
09:31:49 21        the patent that is at issue in this
09:31:51 22        litigation, correct?
09:31:52 23   A.   Correct.
09:31:52 24   Q.   You were never aware of it, right?
09:31:54 25   A.   No, I don't believe I was aware of it.

Page 7

09:29:37 1    mean by that?
09:29:37 2    A.   I understand there's a distinction between
09:29:40 3         being a consultant to a law firm and being
09:29:42 4         designated as an expert in the case.
09:29:44 5    Q.   How many times have you been hired by a law
09:29:49 6         firm to act as a consultant to assist them
09:29:52 7         in either existing or potential litigation?
09:29:56 8    A.   In distinction from the number I just gave
09:30:01 9         you, I would say there's probably about
09:30:02 10        another ten or so instances of being a
09:30:07 11        consultant, without, to my knowledge, being
09:30:08 12        designated as an expert.
09:30:10 13   Q.   Are you currently employed?
09:30:13 14   A.   Yes.
09:30:13 15   Q.   And how are you currently employed?
09:30:16 16   A.   Professor of computer science at MIT.
09:30:19 17   Q.   How long have you been so employed?
09:30:21 18   A.   I was hired there in 1978.
09:30:23 19   Q.   When did you first become involved in this
09:30:31 20        case?
09:30:31 21   A.   I believe I was contacted very near the end
09:30:35 22        of August 2005. Actually, come to think of
09:30:43 23        it, I believe I was contacted earlier in
09:30:46 24        2005, perhaps sometime in late spring or
09:30:51 25        thereabouts, and said I didn't have the time

Page 6

09:31:57 1    Q.   Approximately how much time to date have you
09:32:12 2         spent in connection with your work on this
09:32:15 3         case for Gibson, Dunn & Crutcher?
09:32:17 4    A.   I always forget to look that up. They
09:32:25 5         always ask, so let me give you my best
09:32:27 6         estimate. I forget to do the numbers. I
09:32:33 7         would guess to date it's on the order of 80
09:32:36 8         hours, but I would actually have to look at
09:32:38 9         the records to see.
09:32:38 10   Q.   And are you charging your normal -- strike
09:32:43 11        that.
09:32:44 12        What are you charging TriZetto's
09:32:47 13        lawyers to assist them in litigation per
09:32:51 14        hour?
09:32:51 15   A.   It's either 650 or 700. I forget, to be
09:32:56 16        honest, as I sit here. I'm sure it's in the
09:32:59 17        report.
09:33:05 18   Q.   You're not sure?
09:33:05 19   A.   My rate has changed recently, and I don't
09:33:08 20        remember whether they got the early rate or
09:33:09 21        the late rate, to be perfectly honest.
09:33:11 22   Q.   Your current rate is $700 per hour for
09:33:15 23        assisting law firms in litigation; is that
09:33:19 24        right?
09:33:19 25   A.   That is correct.

Page 8

: (Pages 5 to 8)

| | | |
|---|---|---|
| 10:32:00 | 1 | I don't take "predetermined" to mean there |
| 10:32:05 | 2 | is some number of hours, minutes or seconds |
| 10:32:08 | 3 | during which this database has not been |
| 10:32:11 | 4 | changed. I take "predetermined" to mean |
| 10:32:14 | 5 | there is a time when -- at which one is |
| 10:32:18 | 6 | given the database, and it does not change |
| 10:32:20 | 7 | after that. The database doesn't change |
| 10:32:22 | 8 | during processing, either. That doesn't |
| 10:32:24 | 9 | make it a predetermined database, as I am |
| 10:32:27 | 10 | understanding the term. |
| 10:32:36 | 11 | Q. Well, let me give you -- strike that. |
| 10:32:37 | 12 | Let me say, for instance, a customer |
| 10:32:45 | 13 | that -- strike that. |
| 10:32:45 | 14 | With respect to these accused |
| 10:32:52 | 15 | infringing systems that are being operated |
| 10:32:54 | 16 | by TriZetto, those systems, once TriZetto |
| 10:33:02 | 17 | and the customer establish what |
| 10:33:13 | 18 | configuration will apply to the system, |
| 10:33:16 | 19 | after that's done, assuming that no other |
| 10:33:18 | 20 | changes are made and assuming that the |
| 10:33:23 | 21 | system processes claims every day and every |
| 10:33:26 | 22 | week and every month and every year, you |
| 10:33:29 | 23 | would agree that once it's been configured, |
| 10:33:32 | 24 | that the databases are predetermined |
| 10:33:34 | 25 | pursuant to the claims, correct? |

Page 41

| | | |
|---|---|---|
| 10:33:36 | 1 | A. No. |
| 10:33:36 | 2 | Q. Why not? |
| 10:33:37 | 3 | A. Because the database in the TriZetto system, |
| 10:33:41 | 4 | as I understand it, is modifiable by the end |
| 10:33:43 | 5 | user during routine uses of the system. |
| 10:33:47 | 6 | That modification may not occur in the midst |
| 10:33:51 | 7 | of a claim processing on -- just to be |
| 10:33:54 | 8 | specific, they may not change it Tuesday -- |
| 10:33:57 | 9 | what's today? -- Wednesday morning at 10:00 |
| 10:34:00 | 10 | a.m. while they're processing claims, but to |
| 10:34:04 | 11 | take your question, between the time the |
| 10:34:06 | 12 | system was installed and configured and the |
| 10:34:09 | 13 | time a claim is processed months or years |
| 10:34:11 | 14 | later, the database can have changed. |
| 10:34:13 | 15 | That's my understanding of the system. So |
| 10:34:15 | 16 | it is not predetermined in the sense you |
| 10:34:16 | 17 | just asked. |
| 10:34:17 | 18 | Q. So is it your understanding of |
| 10:34:20 | 19 | "predetermined database" that that means the |
| 10:34:22 | 20 | database can never be changed? |
| 10:34:23 | 21 | A. My understanding of "predetermined" as it is |
| 10:34:33 | 22 | in the patent, is that it is given to you by |
| 10:34:36 | 23 | a vendor and is not changed by the user, not |
| 10:34:42 | 24 | never changed, that's not what I said, but |
| 10:34:44 | 25 | not end-user-modifiable. That's my |

Page 42

| | | |
|---|---|---|
| 10:34:49 | 1 | understanding of "predetermined" in the |
| 10:34:51 | 2 | context of this patent. |
| 10:35:15 | 3 | Q. So is it your opinion that because |
| 10:35:17 | 4 | TriZetto's infringing systems can be |
| 10:35:19 | 5 | configured during installation by TriZetto |
| 10:35:23 | 6 | and the customer, that because of that fact |
| 10:35:28 | 7 | it does not satisfy the predetermined |
| 10:35:31 | 8 | database requirement in the claims? |
| 10:35:33 | 9 | A. No. |
| 10:35:33 | 10 | MR. SEGAL: Objection, vague. |
| 10:35:34 | 11 | A. I'm sorry. My answer is no. |
| 10:35:42 | 12 | Q. Would you agree, for instance, that for any |
| 10:35:46 | 13 | given system that is installed and |
| 10:35:49 | 14 | configured by TriZetto and the customer and |
| 10:35:54 | 15 | then subsequently is not modified for weeks, |
| 10:35:59 | 16 | months and years, would you agree that that |
| 10:36:04 | 17 | system is operating with a predetermined |
| 10:36:09 | 18 | database as required by the claims after |
| 10:36:11 | 19 | it's configured and installed by TriZetto |
| 10:36:13 | 20 | and the customer? |
| 10:36:14 | 21 | MR. SEGAL: Objection, asked and |
| 10:36:15 | 22 | answered. |
| 10:36:15 | 23 | A. No. |
| 10:36:15 | 24 | Q. Why not? |
| 10:36:16 | 25 | A. First of all, as I understand your question, |

Page 43

| | | |
|---|---|---|
| 10:36:22 | 1 | you're basically saying if we go past the |
| 10:36:27 | 2 | time that any changes are made and then |
| 10:36:28 | 3 | hypothesize that no changes are made, would |
| 10:36:32 | 4 | you say that any changes have been made in |
| 10:36:34 | 5 | that database? So the question's veritably |
| 10:36:39 | 6 | tautological. If you say we're only going |
| 10:36:41 | 7 | to consider the interval during which the |
| 10:36:43 | 8 | database is not changing, has it not |
| 10:36:45 | 9 | changed? Answer, yes, it has not changed. |
| 10:36:48 | 10 | I understand "predetermined" in the |
| 10:36:51 | 11 | context of this patent to mean not |
| 10:36:54 | 12 | changeable by the user. So the second |
| 10:36:58 | 13 | element of my disagreeing with your question |
| 10:37:05 | 14 | is that the TriZetto system, as I understand |
| 10:37:08 | 15 | it, is, in fact, changeable by the user -- |
| 10:37:11 | 16 | the database in the TriZetto system is, in |
| 10:37:14 | 17 | fact, changeable by the user even after the |
| 10:37:17 | 18 | configuration, the initial installation |
| 10:37:20 | 19 | configuration, which by itself would be |
| 10:37:22 | 20 | enough to give us the distinction with |
| 10:37:24 | 21 | "predetermined," as I understand it in the |
| 10:37:26 | 22 | context of this patent, but even after that |
| 10:37:29 | 23 | point the user can modify the database, as I |
| 10:37:32 | 24 | understand it. |
| 10:37:35 | 25 | If you asked me to look at the |

Page 44

11 (Pages 41 to 44)

| | |
|---|---|
| 10:37:36 1 | interval in between changes and ask me if |
| 10:37:38 2 | there are changes there, by definition there |
| 10:37:40 3 | are no changes there, but that's not |
| 10:37:42 4 | interesting as I understand -- as I am |
| 10:37:43 5 | understanding the determine |
| 10:37:45 6 | "predetermined" -- as I am understanding the |
| 10:37:49 7 | term "predetermined." |
| 10:37:53 8 | Q.  Well, you continue to say that the system -- |
| 10:37:57 9 | in my example the system is installed and |
| 10:38:00 10 | configured by TriZetto, along with the |
| 10:38:02 11 | customer, and then after that there are no |
| 10:38:04 12 | changes to the configuration of the system, |
| 10:38:08 13 | and there are millions of claims that are |
| 10:38:10 14 | processed over weeks and months and years in |
| 10:38:14 15 | that system.  Isn't that system operating |
| 10:38:16 16 | with a predetermined database pursuant to |
| 10:38:20 17 | the claims after installation and |
| 10:38:23 18 | configuration? |
| 10:38:25 19 | A.  As I understand the term "predetermined" in |
| 10:38:27 20 | the use of the patent, the answer to that |
| 10:38:29 21 | question is no. |
| 10:38:37 22 | Q.  Why not? |
| 10:38:38 23 | A.  It seems to me we're asking the same |
| 10:38:40 24 | question, so I will have to give you the |
| 10:38:41 25 | same answer, which I am delighted to do.  I |

Page 45

| | |
|---|---|
| 10:38:44 1 | understand the term "predetermined" in the |
| 10:38:46 2 | context of that patent to mean established |
| 10:38:48 3 | by the vendor and not modifiable by the |
| 10:38:51 4 | user.  Whether or not the user does a |
| 10:38:56 5 | modification does not change the fact that |
| 10:39:01 6 | the system is designed to be modified by the |
| 10:39:04 7 | user or not. |
| 10:39:07 8 | It is my understanding that the |
| 10:39:08 9 | TriZetto system is -- I should be more |
| 10:39:11 10 | careful.  It is my understanding that the |
| 10:39:13 11 | database of the TriZetto system is designed |
| 10:39:14 12 | to be so modifiable, and I do not understand |
| 10:39:17 13 | that to be what the patent means by |
| 10:39:20 14 | "predetermined." |
| 10:39:25 15 | Q.  And in the article -- strike that. |
| 10:39:30 16 | Is that a firm opinion, sir -- |
| 10:39:33 17 | MR. SEGAL:  Objection, vague and -- |
| 10:39:36 18 | Q.  -- that you just articulated? |
| 10:39:39 19 | A.  I'm afraid you'll have to give me the |
| 10:39:41 20 | criteria for "firm." |
| 10:39:42 21 | Q.  Well, you've thought about that, you've |
| 10:39:44 22 | analyzed it, you're confident that -- in |
| 10:39:48 23 | your opinion, right?  Is there something |
| 10:39:50 24 | that you're missing?  Is there any more |
| 10:39:52 25 | information that I can give you? |

Page 46

| | |
|---|---|
| 10:39:53 1 | A.  More information about what? |
| 10:39:54 2 | Q.  Are you confident in your position, sir, yes |
| 10:39:59 3 | or no -- |
| 10:39:59 4 | MR. SEGAL:  Objection -- |
| 10:40:00 5 | Q.  -- in answering my previous question? |
| 10:40:01 6 | MR. SEGAL:  Objection, |
| 10:40:02 7 | argumentative, vague. |
| 10:40:11 8 | A.  As I sit here, I cannot think of a reason |
| 10:40:13 9 | why I'm not confident in that answer that I |
| 10:40:16 10 | gave you. |
| 10:40:16 11 | Q.  And are you equally confident that the |
| 10:40:20 12 | article that's been marked as Exhibit 4 |
| 10:40:23 13 | discloses a predetermined database pursuant |
| 10:40:29 14 | to the definition that you've used, which is |
| 10:40:31 15 | cannot be modified by the user? |
| 10:40:33 16 | A.  There is language in the article which |
| 10:40:41 17 | suggests that, yes, and in particular |
| 10:40:43 18 | language I cited earlier about built-in. |
| 10:40:46 19 | Q.  Well, are you equally confident that this |
| 10:40:48 20 | article -- you know, on one hand you've |
| 10:40:51 21 | testified that TriZetto's systems absolutely |
| 10:40:54 22 | do not disclose a predetermined database |
| 10:40:57 23 | because they can be hypothetically |
| 10:41:01 24 | modifiable by the user, and in contrast to |
| 10:41:07 25 | that it's your opinion -- correct me if I'm |

Page 47

| | |
|---|---|
| 10:41:09 1 | wrong -- that Exhibit 4 discloses a system |
| 10:41:15 2 | that is a predetermined database and cannot |
| 10:41:19 3 | be modified by the user; is that right? |
| 10:41:21 4 | MR. SEGAL:  Objection, vague, |
| 10:41:23 5 | argumentative. |
| 10:41:25 6 | A.  Let me double-check. |
| 10:41:53 7 | (Witness reviews document.) |
| 10:41:53 8 | A.  The article is a little bit ambiguous in |
| 10:41:55 9 | that respect.  The language that I cited to |
| 10:41:58 10 | you about built-in suggests predetermined |
| 10:42:00 11 | and it seems to me discloses the notion of a |
| 10:42:02 12 | predetermined database.  There's also |
| 10:42:04 13 | language in the article that discloses the |
| 10:42:08 14 | possibility of a non-predetermined database, |
| 10:42:11 15 | but they are both disclosed in there. |
| 10:42:13 16 | Q.  Well, does this -- is there anything in this |
| 10:42:16 17 | article, Exhibit 4, that clearly convinces |
| 10:42:18 18 | you that it is disclosing a predetermined |
| 10:42:24 19 | database that cannot be changed under any |
| 10:42:26 20 | circumstances by the user? |
| 10:42:28 21 | A.  The language "built-in" suggests that, what |
| 10:42:33 22 | you just said. |
| 10:42:34 23 | Q.  And it clearly convinces you; is that right? |
| 10:42:36 24 | MR. SEGAL:  Objection, misstates |
| 10:42:38 25 | his testimony, argumentative. |

Page 48

12 (Pages 45 to 48)

05:32:02 1     for the accused -- for the three accused
05:32:05 2     infringing systems?
05:32:06 3  A.  I believe I have all of the source code for
05:32:10 4     the Facets system. I believe I have the
05:32:19 5     clinical editing code for the ClinicalLogic.
05:32:25 6     I believe I have all the code for QikLink,
05:32:27 7     but that's also something that I'm still
05:32:29 8     working to make sure of. There was some
05:32:35 9     confusion.
05:32:36 10  Q.  Have you analyzed the code for the entire
05:32:38 11     system -- three systems that are accused of
05:32:40 12     infringement?
05:32:41 13  A.  No.
05:32:41 14          MR. SEGAL: Objection, vague and
05:32:42 15     ambiguous.
05:32:42 16  A.  No, I have not analyzed all of the code for
05:32:44 17     all three systems.
05:32:45 18  Q.  Why not?
05:32:48 19  A.  Well, among other reasons, it would be a job
05:32:55 20     that probably would have taken the better
05:33:00 21     part of, oh, I don't know, six months or a
05:33:05 22     year's worth of full-time work. There's a
05:33:08 23     lot of code there. It would have been an
05:33:10 24     overwhelming task to analyze all of the code
05:33:12 25     for all of the systems.

Page 273

05:33:17 1  Q.  In your opinion, was it necessary for you to
05:33:19 2     review the source code to determine whether
05:33:23 3     or not any of the three accused systems
05:33:25 4     infringed the McKesson patent?
05:33:27 5  A.  Yeah, it was.
05:33:48 6  Q.  In your expert opinion, was it necessary for
05:33:50 7     you to review the flow charts that are
05:33:54 8     attached as Exhibit B to your November
05:33:56 9     report that you understand applies equally
05:33:59 10     to all three infringing systems in order to
05:34:02 11     determine whether or not the TriZetto
05:34:03 12     systems infringed the claims of the patent?
05:34:05 13  A.  I think we talked about this and came to the
05:34:08 14     agreement that it was -- no, wait. I have
05:34:14 15     to be careful, because you mentioned a
05:34:16 16     couple things before. Yeah, the flow charts
05:34:24 17     were necessary in order to have something to
05:34:25 18     compare against the flow charts in the
05:34:27 19     patent.
05:34:27 20  Q.  Isn't it true that one can determine whether
05:34:36 21     or not TriZetto infringes the -- any claim
05:34:41 22     of the patent by simply reviewing a
05:34:44 23     marketing brochure for any one of the three
05:34:48 24     accused systems?
05:34:49 25  A.  Not to my understanding, no.

Page 274

05:34:50 1  Q.  Why not?
05:34:51 2  A.  I don't believe you can determine, for
05:34:52 3     example, whether the system ascertains
05:34:55 4     whether a claim contains a plurality -- it's
05:35:01 5     getting late -- a plurality of service codes
05:35:04 6     by looking at the marketing brochure.
05:35:08 7          MR. SEGAL: Just for the record,
05:35:09 8     counsel, I am going to have some questions
05:35:11 9     for the witness, and to the extent you use
05:35:13 10     your full seven hours you will not have time
05:35:14 11     to redirect. You've had a full day with
05:35:20 12     this witness where you've had more than
05:35:21 13     ample time to cover whatever ground you
05:35:23 14     needed and to leave time for redirect. This
05:35:27 15     is a one-day, seven-hour deposition, so if
05:35:32 16     you want to reserve time, you might want to
05:35:34 17     consider that.
05:35:44 18  Q.  Sir, what documentation regarding the
05:35:47 19     accused systems did you find necessary to
05:35:52 20     review and analyze in order to determine
05:35:55 21     whether or not TriZetto infringed the
05:35:59 22     patent, any claim of the patent?
05:36:32 23  A.  Okay. That's a difficult question at this
05:36:33 24     point because I did not attempt to -- in
05:36:35 25     looking through -- I'm looking at the list

Page 275

05:36:37 1     of materials explored in my November 14th
05:36:41 2     report on Page A-2, and I have not
05:36:44 3     previously tried to sort out which materials
05:36:49 4     were necessary and which materials were
05:36:53 5     merely useful. So it's not a question I can
05:36:55 6     answer on the spot, because there's a large
05:36:58 7     body of material here, and so I can't tell
05:37:00 8     you off the top of my head which were
05:37:02 9     necessary versus simply useful.
05:37:04 10  Q.  In determining the meaning of each of the
05:37:08 11     asserted claims, did you attempt to
05:37:11 12     determine a range of equivalence to those
05:37:17 13     claims?
05:37:17 14  A.  I considered that, yes.
05:37:21 15  Q.  And did you in fact determine what range of
05:37:31 16     equivalence would apply to each of the
05:37:33 17     asserted claims?
05:37:35 18          MR. SEGAL: Objection, vague.
05:37:36 19  A.  I don't think I wrote down and recorded a
05:37:45 20     range for each of the claims. What I was
05:37:47 21     doing was looking at the claims and looking
05:37:50 22     for identicality (sic) of function and then
05:37:58 23     equivalence of structure as best I could
05:38:00 24     determine it.
05:38:01 25  Q.  And so are you prepared to testify today

Page 276

69 (Pages 273 to 276)

| | |
|---|---|
| 05:38:11 1 | about the range of equivalence for each of |
| 05:38:13 2 | the given asserted claims? |
| 05:38:18 3 | MR. SEGAL: Vague and ambiguous. |
| 05:38:18 4 | A. No, I don't think I have a pre-established |
| 05:38:22 5 | range of equivalence all figured out for |
| 05:38:24 6 | each of the claims. |
| 05:38:25 7 | Q. Let me direct your attention to Claim 1. |
| 05:38:32 8 | Well, strike that. |
| 05:38:32 9 | Let me direct your attention to Claim |
| 05:38:35 10 | 3. Do you see the element that we referred |
| 05:38:39 11 | to earlier in the deposition as the |
| 05:38:46 12 | predetermined database element that starts |
| 05:38:47 13 | with "a predetermined database stored in the |
| 05:38:50 14 | associated memory," ends with "one of the |
| 05:38:53 15 | medical service codes." Do you see that? |
| 05:38:56 16 | A. I do. |
| 05:38:56 17 | Q. And that's the predetermined database |
| 05:38:58 18 | element that we discussed at length earlier |
| 05:39:02 19 | today, correct? |
| 05:39:02 20 | A. Correct. |
| 05:39:03 21 | Q. I want to ask you some questions about that. |
| 05:39:08 22 | Now, does the -- does each of the three |
| 05:39:11 23 | TriZetto accused systems have a database |
| 05:39:17 24 | stored in associated memory? |
| 05:39:19 25 | A. Yes, I believe it has a database. Each of |

Page 277

| | |
|---|---|
| 05:39:31 1 | them has a database. |
| 05:39:31 2 | Q. Stored in the associated memory, right? |
| 05:39:33 3 | A. Let me just make sure I understand the term |
| 05:39:38 4 | "associated memory." |
| 05:39:39 5 | Q. Well, let me back up. I'll ask a different |
| 05:39:41 6 | question. |
| 05:39:41 7 | A. No, that's all right. Yes, stored in the |
| 05:39:43 8 | associated memory is correct. |
| 05:39:44 9 | Q. Let me start with Claim 3. At the start of |
| 05:39:50 10 | Claim 3 it says, "A computer system, |
| 05:39:52 11 | including a central processing unit and |
| 05:39:54 12 | associated memory for processing input |
| 05:39:56 13 | claims containing at least one medical |
| 05:39:58 14 | service code comprising." Do you see that? |
| 05:40:03 15 | A. Yes. |
| 05:40:03 16 | Q. Each of the three accused systems has that, |
| 05:40:05 17 | right? |
| 05:40:06 18 | A. Each of the three systems has that. |
| 05:40:11 19 | Q. They satisfy that element, correct? |
| 05:40:12 20 | A. I believe so. |
| 05:40:13 21 | Q. Okay. And directing your attention to the |
| 05:40:19 22 | next element, each of the three accused |
| 05:40:22 23 | systems has a database stored in the |
| 05:40:27 24 | associated memory, correct? |
| 05:40:28 25 | MR. SEGAL: Objection to the extent |

Page 278

| | |
|---|---|
| 05:40:29 1 | it misstates the element. |
| 05:40:30 2 | A. As long as we are explicit about leaving out |
| 05:40:33 3 | the adjective "predetermined." You're |
| 05:40:39 4 | reading a database, not a predetermined |
| 05:40:40 5 | database, correct? |
| 05:40:41 6 | Q. We have a disagreement on the construction |
| 05:40:43 7 | of "predetermined," you realize that, right? |
| 05:40:45 8 | A. I understand. All I'm trying to establish |
| 05:40:48 9 | is that we're leaving out that word in the |
| 05:40:51 10 | phrase you're reading to me. |
| 05:40:52 11 | Q. That's correct. |
| 05:40:52 12 | A. Okay. |
| 05:40:53 13 | Q. So each of the three accused systems |
| 05:40:56 14 | contains a database, at least a database |
| 05:41:00 15 | stored in the associated memory, correct? |
| 05:41:01 16 | A. Correct. |
| 05:41:04 17 | Q. The database contains medical service codes, |
| 05:41:06 18 | correct? |
| 05:41:06 19 | A. Correct. |
| 05:41:10 20 | Q. And a set of relationships among the medical |
| 05:41:13 21 | service codes, correct? |
| 05:41:16 22 | A. Well, we need to read the rest of this. |
| 05:41:18 23 | Just a moment. |
| 05:41:19 24 | (Witness reviews document.) |
| 05:41:50 25 | A. Yes. I wanted to think about that one |

Page 279

| | |
|---|---|
| 05:41:52 1 | carefully. |
| 05:41:58 2 | Q. And each of the three accused systems -- let |
| 05:42:04 3 | me just put it this way to save some time: |
| 05:42:08 4 | Each of the three accused systems satisfied |
| 05:42:14 5 | for practice -- strike that. |
| 05:42:20 6 | Claim 3 is an apparatus claim. Do you |
| 05:42:23 7 | understand that? |
| 05:42:23 8 | A. I do. |
| 05:42:24 9 | Q. Okay. So each of the three systems includes |
| 05:42:27 10 | the component that's listed as the element |
| 05:42:33 11 | which starts with "a predetermined database |
| 05:42:36 12 | stored in associated memory," ending with |
| 05:42:40 13 | "one of the medical service codes" if you |
| 05:42:43 14 | were to remove the term which we disagree |
| 05:42:44 15 | on, "predetermined," correct? |
| 05:42:47 16 | A. Correct. |
| 05:42:47 17 | Q. All right. And each of the three systems -- |
| 05:42:52 18 | so therefore each of the three accused |
| 05:42:54 19 | systems satisfies the first two elements of |
| 05:42:56 20 | Claim 3 as long as we remove the term |
| 05:43:03 21 | "predetermined," correct? |
| 05:43:04 22 | A. As long as we modify the first element, then |
| 05:43:07 23 | we're okay -- |
| 05:43:07 24 | Q. Okay. |
| 05:43:08 25 | A. -- so far. |

Page 280

70 (Pages 277 to 280)

05:43:09 1    Q.  Well, I'm talking about just removing the
05:43:12 2        word "predetermined."
05:43:13 3    A.  Yes, that's what I mean by "modify,"
05:43:14 4        removing that word.
05:43:15 5    Q.  And each of the three accused systems
05:43:17 6        satisfies the next element, "means for
05:43:19 7        receiving at least one claim," correct?
05:43:20 8    A.  It would need to.
05:43:22 9    Q.  And also satisfies the next element, "means
05:43:25 10       for ascertaining whether the at least one
05:43:27 11       claim contains a plurality of medical
05:43:29 12       service codes," correct?
05:43:30 13   A.  No.
05:43:38 14   Q.  There are -- the TriZetto system accepts
05:43:43 15       medical claims that contain more than one
05:43:47 16       medical service code, correct?
05:43:49 17   A.  Yes, but it never ascertains whether there
05:43:52 18       is a plurality of claims -- of codes on the
05:43:56 19       claim.  Accepting such a claim is one
05:44:00 20       action.  Examining it to ascertain whether
05:44:02 21       there is a plurality of medical service
05:44:03 22       codes on the claim is something quite
05:44:06 23       different.  And that's what the claim says.
05:44:08 24       So, no, the system doesn't do that.
05:44:17 25   Q.  Does the system process more than one --

                                                    Page 281

05:44:28 1        does the system process a plurality of
05:44:32 2        medical service codes contained in a claim?
05:44:34 3    A.  The system will process all of the medical
05:44:38 4        service codes contained in a claim,
05:44:40 5        independent of whether there is just one
05:44:43 6        claim -- one code on the claim or whether
05:44:45 7        there's five codes or four.  No matter what
05:44:49 8        the number is, it will process all of the
05:44:52 9        codes on the claim.
05:44:56 10   Q.  Simultaneously?
05:44:58 11       MR. SEGAL:  Objection, vague and
05:44:59 12       ambiguous.
05:44:59 13   A.  In sequence.
05:45:00 14   Q.  Excuse me?
05:45:00 15   A.  In sequence.
05:45:01 16   Q.  So it processes one medical service code
05:45:03 17       contained in a claim, correct?
05:45:04 18   A.  No.  If we're going to get down to this
05:45:08 19       level of detail, then we have to talk about
05:45:11 20       how the code actually works, and it's
05:45:14 21       somewhat more complicated than that.  Let me
05:45:17 22       suggest, however, that the relevant question
05:45:19 23       here is, do the systems have a means for
05:45:22 24       ascertaining whether the at least one claim
05:45:25 25       contains a plurality of medical service

                                                    Page 282

05:45:27 1        codes.  I have examined the systems in quite
05:45:29 2        some detail, and I am prepared to opine with
05:45:33 3        great confidence, or whatever the term was
05:45:36 4        you used earlier, that none of these systems
05:45:39 5        ascertain whether there's a plurality of
05:45:42 6        medical service codes.  They never make a
05:45:45 7        decision based on whether there is one or
05:45:48 8        more than one.
05:45:49 9    Q.  Do they make a decision whether or not a
05:45:54 10       medical service code contained in a claim
05:45:58 11       has been processed or examined?
05:46:02 12       MR. SEGAL:  Objection, vague.
05:46:03 13   A.  I need to know what you mean by "processed
05:46:06 14       or examined."
05:46:07 15   Q.  Well, let's say, for instance, a medical
05:46:09 16       claim is submitted to the three accused
05:46:12 17       systems and it contains two medical service
05:46:15 18       codes, all right?  There is processing that
05:46:18 19       is performed by the system with respect to
05:46:21 20       Medical Service Code A, for instance,
05:46:24 21       correct?
05:46:27 22   A.  (No verbal response.)
05:46:28 23   Q.  Yes?
05:46:28 24   A.  Well, let me say yes provisionally.  Let me
05:46:33 25       see where you're going with this.

                                                    Page 283

05:46:35 1    Q.  And then there is a determination made at
05:46:37 2        some point that there is another medical
05:46:39 3        service code contained in that claim, namely
05:46:41 4        B, that needs to be examined or processed,
05:46:43 5        correct?
05:46:43 6        MR. SEGAL:  Objection, vague.
05:46:45 7    A.  No, that's not actually how it works.
05:46:48 8    Q.  How does the system know that there is
05:46:54 9        another medical service code to examine?
05:46:56 10   A.  Its process is to say for every service code
05:47:03 11       on the claim, parens, my words, no matter
05:47:08 12       how many there are, do the following set of
05:47:11 13       operations.  And it will do same thing if
05:47:14 14       there's one or if there's two or if there's
05:47:15 15       three or if there's four or if there's 10,
05:47:17 16       however many there are.
05:47:20 17       I take the term "ascertaining" whether
05:47:24 18       the claim contains a plurality to mean
05:47:26 19       asking a yes/no question.  Is there one or
05:47:31 20       more than one?  It's not just are there
05:47:34 21       more?  The question you were asking a moment
05:47:36 22       ago is, are there more claims on the code --
05:47:40 23       are there more codes on the claim, okay?
05:47:44 24       You can ask, are there more codes on
05:47:46 25       the claim as yet unprocessed?  That's not

                                                    Page 284

05:47:49  1    the same as asking, is there one or is there
05:47:51  2    more than one claim on the -- is there one
05:47:54  3    or is there more than one code on the entire
05:47:56  4    claim? That's what I take this element of
05:47:59  5    that Claim No. 3, to be. It seems to me
05:48:03  6    quite clear, and it also seems to me quite
05:48:05  7    apparent that the TriZetto systems do not do
05:48:07  8    that.
05:48:18  9  Q.  You would agree that the system -- that the
05:48:19 10    three accused systems do determine if there
05:48:21 11    are additional medical service codes within
05:48:23 12    a claim that need to be processed, correct?
05:48:25 13         MR. SEGAL: Objection, vague and
05:48:29 14    ambiguous.
05:48:29 15  A.  The question, have we processed all the
05:48:31 16    claims on this code?
05:48:31 17  Q.  Yes.
05:48:32 18  A.  Yes, but that's not the same as asking
05:48:34 19    whether there's a plurality.
05:48:37 20  Q.  And have you examined whether or not you
05:48:39 21    believe that is equivalent or not?
05:48:40 22  A.  Oh, I've considered whether it's equivalent,
05:48:42 23    and it is not.
05:48:43 24  Q.  Why?
05:48:43 25  A.  Because they are fundamentally different

Page 285

05:48:46  1    questions. The question of a plurality is a
05:48:51  2    yes/no question. The question of how many
05:48:54  3    is a number question. Those are different
05:48:55  4    questions. The question I ask about an
05:48:58  5    entire claim is, are there a plurality of
05:49:03  6    codes on it or not? It is a question about
05:49:06  7    an entire claim. Comes back with a yes/no
05:49:08  8    answer.
05:49:09  9         The question are there more
05:49:10 10    unprocessed codes on the claim is not about
05:49:12 11    an entire claim, it's about an action taking
05:49:15 12    place as I'm working through. The plurality
05:49:18 13    question is a predecessor question before
05:49:22 14    some part of the processing starts. That's
05:49:24 15    what's in the claim. That's what's in the
05:49:26 16    code. It makes a binary decision about the
05:49:29 17    entire claim and then does one thing if
05:49:32 18    there's only one claim. It does something
05:49:34 19    else if there's -- it does one thing if
05:49:36 20    there's only one code. It does something
05:49:38 21    else if there's more than one code. And
05:49:40 22    that's not how the TriZetto systems work,
05:49:43 23    and there is no equivalent in the TriZetto
05:49:45 24    systems. They work differently.
05:49:46 25  Q.  The TriZetto systems, all three of them,

Page 286

05:49:49  1    operate to simply determine whether there is
05:49:55  2    another medical service code contained in
05:49:57  3    the claim that needs to be processed; is
05:50:00  4    that right?
05:50:00  5         MR. SEGAL: Objection, vague and
05:50:01  6    ambiguous.
05:50:03  7  A.  That's not how I would characterize it.
05:50:04  8  Q.  Can you explain it, then? How does it work?
05:50:08  9    How does -- how do the three accused systems
05:50:11 10    determine if there is another medical
05:50:14 11    service code contained in the claim that
05:50:16 12    needs to be processed?
05:50:17 13         MR. SEGAL: Vague and ambiguous and
05:50:18 14    mischaracterizes the element.
05:50:28 15  A.  I'm trying to decide the level at which to
05:50:32 16    answer the question, whether to tell you
05:50:34 17    about how the code works in order to make it
05:50:36 18    clear.
05:50:36 19  Q.  Let me withdraw the question.
05:50:38 20  A.  Yeah.
05:50:38 21  Q.  All three of the TriZetto systems are
05:50:41 22    capable of and in fact do process a
05:50:46 23    plurality of medical service codes contained
05:50:51 24    within any given plan, correct?
05:50:55 25         MR. SEGAL: Objection, vague.

Page 287

05:50:55  1  A.  Yes, they do this and they do that without
05:50:57  2    ever making a decision about whether there
05:51:00  3    is one claim or more than one claim on the
05:51:01  4    code -- more than one code on the claim.
05:51:06  5  Q.  The three -- I just want you to answer my
05:51:08  6    question so we can get through this.
05:51:09  7         MR. SEGAL: Asked and answered.
05:51:10  8  Q.  All three of the accused TriZetto systems
05:51:14  9    operate to provide clinical editing to a
05:51:19 10    plurality of medical service codes contained
05:51:22 11    within a given claim, correct?
05:51:23 12         MR. SEGAL: Asked and answered.
05:51:24 13  A.  They do that, as well as --
05:51:28 14  Q.  Is that a yes or no?
05:51:29 15         MR. SEGAL: He can explain his
05:51:31 16    answer. He doesn't have to confine it to a
05:51:32 17    yes or no.
05:51:33 18         MR. RANDALL: Counsel, if you have
05:51:33 19    an objection, just make it. I'm just
05:51:35 20    asking --
05:51:36 21         MR. SEGAL: Well, you are
05:51:38 22    argumentative. You're fighting with him,
05:51:38 23    and then you get an incomplete description.
05:51:43 24  A.  Which is why I'm trying to augment it. They
05:51:46 25    will process a plurality of codes, and they

Page 288

2 (Pages 285 to 288)

| | |
|---|---|
| 05:51:48 1 | will process a single code on the claim. |
| 05:51:49 2 | And they do both of those in the same |
| 05:51:51 3 | fashion. There's no difference in how they |
| 05:51:53 4 | proceed on those. |
| 05:51:55 5 | Q. Okay. That's not my -- my question is |
| 05:51:58 6 | simply this: Do -- |
| 05:51:58 7 | A. Okay. So can I rephrase my answer perhaps |
| 05:52:01 8 | to, excuse me, address your question? |
| 05:52:02 9 | Q. I want the question and answer. |
| 05:52:03 10 | A. Certainly. |
| 05:52:04 11 | Q. All three of the accused TriZetto systems in |
| 05:52:08 12 | fact operate to apply clinical editing to a |
| 05:52:12 13 | plurality of medical service codes within a |
| 05:52:16 14 | given claim, correct? |
| 05:52:16 15 | MR. SEGAL: Vague and ambiguous, |
| 05:52:18 16 | incomplete description. |
| 05:52:18 17 | A. That is correct, but incomplete. |
| 05:52:24 18 | Q. Well, and the incomplete part is that they |
| 05:52:28 19 | are also capable of and in fact perform |
| 05:52:30 20 | clinical editing on one medical service code |
| 05:52:34 21 | contained in the claim, correct? |
| 05:52:35 22 | A. That's part of the incompleteness. Another |
| 05:52:37 23 | part of the incompleteness is they do both |
| 05:52:40 24 | of those indistinguishably where the |
| 05:52:44 25 | McKesson system explicitly distinguishes and |

Page 289

| | |
|---|---|
| 05:52:48 1 | does something different. In each case it's |
| 05:52:50 2 | in the code, it's in the flow charts, it's |
| 05:52:53 3 | in the text of the patent, and it's in the |
| 05:52:55 4 | claim. |
| 05:52:55 5 | Q. All right. You have an argument that you |
| 05:53:00 6 | want to advance regarding your position on |
| 05:53:03 7 | non-infringement, and I understand that. |
| 05:53:04 8 | There will be a time and place for that. |
| 05:53:06 9 | All I'm asking you is a simple yes or no |
| 05:53:08 10 | question, which is, is, do all three of the |
| 05:53:13 11 | TriZetto systems operate to apply clinical |
| 05:53:17 12 | editing to a plurality of medical service |
| 05:53:21 13 | codes contained in a given medical claim? |
| 05:53:25 14 | MR. SEGAL: Objection, vague. |
| 05:53:26 15 | A. As an incomplete description that is |
| 05:53:30 16 | accurate -- I'm sorry, that's an accurate |
| 05:53:32 17 | but incomplete description. |
| 05:53:36 18 | Q. And I'm not attempting to articulate or |
| 05:53:39 19 | characterize all the operations of the |
| 05:53:40 20 | system, I'm just asking, does it perform |
| 05:53:42 21 | that function? And the answer is yes? |
| 05:53:43 22 | A. It's part of what it does, it performs that |
| 05:53:46 23 | function. |
| 05:53:46 24 | Q. All right. That's fine. Do all three of |
| 05:53:49 25 | the TriZetto-accused infringing systems also |

Page 290

| | |
|---|---|
| 05:53:57 1 | operate to determine if a given medical |
| 05:54:03 2 | service code in a claim has been processed |
| 05:54:08 3 | or not? |
| 05:54:09 4 | MR. SEGAL: Objection, vague and |
| 05:54:11 5 | ambiguous. |
| 05:54:11 6 | A. No, I wouldn't -- I don't think I can use |
| 05:54:24 7 | that characterization. I mean, they work |
| 05:54:29 8 | their way through the claims -- work their |
| 05:54:32 9 | way through the -- I say it backwards every |
| 05:54:34 10 | time. They work their way through the codes |
| 05:54:37 11 | on the claim methodically -- I'm sorry, ask |
| 05:54:42 12 | your question again. I'm getting tired. |
| 05:54:44 13 | Please just restate it. |
| 05:54:45 14 | Q. When you said -- you just mentioned that |
| 05:54:50 15 | TriZetto's accused infringing systems |
| 05:54:56 16 | operate methodically or serially to process |
| 05:55:02 17 | individual medical service codes contained |
| 05:55:05 18 | within a claim, correct? |
| 05:55:06 19 | A. No. That's why I stopped. |
| 05:55:08 20 | Q. All right. |
| 05:55:09 21 | A. It's more complicated than that. |
| 05:55:12 22 | Q. Okay. Can you describe how the three |
| 05:55:15 23 | accused infringing systems operate to |
| 05:55:20 24 | determine if the system should apply |
| 05:55:24 25 | clinical editing to a medical service code |

Page 291

| | |
|---|---|
| 05:55:29 1 | contained in a claim that has not yet been |
| 05:55:31 2 | processed? |
| 05:55:32 3 | A. It has a set of edits that it attempts to |
| 05:55:36 4 | apply to each line of the claim uniformly, |
| 05:55:47 5 | no matter how many lines there are on the |
| 05:55:49 6 | claim. |
| 05:55:49 7 | Q. And it's not a never-ending loop, right? At |
| 05:55:53 8 | some point the system knows that it has |
| 05:55:55 9 | processed each of the medical service codes |
| 05:55:58 10 | in the claim, right? |
| 05:55:59 11 | A. Because the -- in effect, the line number of |
| 05:56:03 12 | the code it's looking at has reached the |
| 05:56:05 13 | maximum line number. |
| 05:56:06 14 | Q. So does the system determine how many |
| 05:56:14 15 | medical service codes are contained within a |
| 05:56:18 16 | given medical claim and then serially |
| 05:56:22 17 | process each of those medical service codes |
| 05:56:24 18 | contained in the claim? |
| 05:56:25 19 | A. That's the first of those. At some point it |
| 05:56:28 20 | determines how many they are -- there are. |
| 05:56:30 21 | Q. Yes. |
| 05:56:30 22 | A. So it knows how many it has to do. But it |
| 05:56:33 23 | doesn't do the second thing that you said. |
| 05:56:35 24 | Q. All right. How does -- once the system |
| 05:56:37 25 | determines how many medical service codes |

Page 292

73 (Pages 289 to 292)

| | | |
|---|---|---|
| 05:56:40 1 | are contained in the claim, what does it do, | |
| 05:56:43 2 | the system? | |
| 05:56:44 3 | MR. SEGAL: By the way, I note that | |
| 05:56:45 4 | counsel's at seven hours of testimony time. | |
| 05:56:47 5 | I'll allow him to finish his questioning, | |
| 05:56:49 6 | and then I have a couple of questions, but I | |
| 05:56:52 7 | believe he's out of time. And I advised him | |
| 05:56:53 8 | at the last break that I had some questions, | |
| 05:56:55 9 | and I advised him about a half hour ago on | |
| 05:56:59 10 | the record that I had questions. | |
| 05:57:00 11 | Ask the court reporter to read back | |
| 05:57:01 12 | the question because I probably -- | |
| 05:57:06 13 Q. | You can answer the question. | |
| 05:57:04 14 | MR. SEGAL: -- interrupted the | |
| 05:57:06 15 | flow. | |
| 05:57:06 16 A. | Actually, to make it accurate, if you don't | |
| 05:57:08 17 | mind, it would help to have it read back. | |
| 05:57:13 18 Q. | Once the three accused infringing systems | |
| 05:57:18 19 | determine how many medical service codes are | |
| 05:57:20 20 | contained in a given claim, what do the | |
| 05:57:25 21 | systems do next? | |
| 05:57:26 22 A. | Okay. The reason that is a little bit | |
| 05:57:33 23 | difficult to say easily is that that's -- | |
| 05:57:39 24 | the answer to the question is largely | |
| 05:57:42 25 | contained in my November 14th report at Page | |

Page 293

| | | |
|---|---|---|
| 05:57:48 1 | B-4. It's one of the flow charts, and the | |
| 05:57:53 2 | shortest answer to your question, the most | |
| 05:57:55 3 | compact answer is this is what happens, all | |
| 05:57:57 4 | of this, which is why it's hard to simply | |
| 05:58:00 5 | say what you said. Sorry. Let me say that | |
| 05:58:04 6 | again. That's why I can't simply agree with | |
| 05:58:06 7 | what you said because it's noticeably more | |
| 05:58:08 8 | complicated than that. | |
| 05:58:09 9 Q. | Do all of the three accused infringing | |
| 05:58:13 10 | systems satisfy the next element in Claim 3, | |
| 05:58:16 11 | means for determining whether one of the | |
| 05:58:17 12 | medical service codes in a plurality of | |
| 05:58:19 13 | medical service codes is valid or invalid by | |
| 05:58:22 14 | interacting with the database in a set of | |
| 05:58:27 15 | relationships contained in the database? | |
| 05:58:40 16 A. | Yes, they can do that. | |
| 05:58:41 17 Q. | And do each of the three accused systems | |
| 05:58:44 18 | satisfy the next element, the means for | |
| 05:58:46 19 | authorizing an element? | |
| 05:58:48 20 A. | Yes. | |
| 05:58:48 21 Q. | And do each of the three accused infringing | |
| 05:58:51 22 | systems satisfy the last element, the means | |
| 05:58:54 23 | for rejecting medical service codes? | |
| 05:58:56 24 A. | Yes. | |
| 05:58:57 25 Q. | All right. So with respect to Claim 3 -- | |

Page 294

| | | |
|---|---|---|
| 05:58:59 1 | MR. SEGAL: You're out of time, | |
| 05:59:00 2 | counsel. | |
| 05:59:00 3 | MR. RANDALL: I have one more | |
| 05:59:01 4 | question. | |
| 05:59:01 5 | MR. SEGAL: Okay. | |
| 05:59:02 6 Q. | With respect to Claim 3, would you agree | |
| 05:59:04 7 | that the only dispute regarding whether or | |
| 05:59:07 8 | not the three accused systems infringed that | |
| 05:59:11 9 | claim is the word "predetermined" and the | |
| 05:59:20 10 | element that states "means for ascertaining | |
| 05:59:23 11 | whether the at least one claim contains a | |
| 05:59:25 12 | plurality of medical service codes"? | |
| 05:59:28 13 A. | Those are the distinctions I would make at | |
| 05:59:30 14 | the moment, yes. | |
| 05:59:30 15 Q. | And those are the only ones? | |
| 05:59:31 16 A. | These are the only ones I know of right now, | |
| 05:59:34 17 | yes. | |
| 05:59:35 18 Q. | And so other than those two element -- . | |
| 05:59:37 19 | MR. SEGAL: You said one question, | |
| 05:59:39 20 | counsel. You're now on four. | |
| 05:59:40 21 Q. | Other than those two exceptions, you would | |
| 05:59:50 22 | agree that the three accused systems | |
| 05:59:55 23 | infringe Claim 3, correct? | |
| 05:59:56 24 A. | I wouldn't say they infringe Claim 3, | |
| 05:59:59 25 | because, as you've just said, they don't | |

Page 295

| | | |
|---|---|---|
| 06:00:02 1 | have elements of the claim, so I don't know | |
| 06:00:04 2 | what it would mean to infringe Claim 3 if | |
| 06:00:07 3 | we're taking elements of Claim 3 out of | |
| 06:00:09 4 | there. So may I say something more specific | |
| 06:00:11 5 | for the sake of time? You and I have gone | |
| 06:00:13 6 | through this list, and when looking at | |
| 06:00:15 7 | individual elements we have agreed or agreed | |
| 06:00:18 8 | to disagree about each of those individual | |
| 06:00:20 9 | elements. That's what I'm prepared to stand | |
| 06:00:22 10 | on. I won't offer an opinion on a claim | |
| 06:00:24 11 | that isn't what's in the patent. | |
| 06:00:27 12 Q. | The three systems include all of the | |
| 06:00:30 13 | components of Claim 3 except for the term | |
| 06:00:37 14 | "predetermined" and except for, in your | |
| 06:00:38 15 | opinion, the element that says "means for | |
| 06:00:41 16 | ascertaining whether the at least one claim | |
| 06:00:43 17 | contains a plurality of medical service | |
| 06:00:44 18 | codes," correct?. | |
| 06:00:45 19 A. | That, I will agree with. | |
| 06:00:47 20 | MR. RANDALL: Okay. Counsel? | |
| 06:00:48 21 | MR. SEGAL: Okay. | |
| 22 | | |
| 23 | | |
| 24 | | |
| 25 | | |

Page 296

74 (Pages 293 to 296)