# EXHIBIT O

## Page 1

```
 1      IN THE UNITED STATES DISTRICT COURT
            SOUTHERN DISTRICT OF OHIO
 2              EASTERN DIVISION
 3
 4   McKESSON INFORMATION
     SOLUTIONS, LLC.,
 5
            Plaintiff,
 6
        vs.           Civil Action No.
 7                      04-1258SLR
     THE TRIZETTO GROUP,
 8   INC.,
 9          Defendant.
10
11
12
13
14   DEPOSITION OF PATRICIA KEPLINGER
15       Taken at the offices of
              Westin Hotel
16        310 South High Street
          Columbus, Ohio 43215
17
18    on September 14, 2005, at 9:04 a.m.
19   Reported by: Angela R. Starbuck, RPR/CRR
20
21
22
23   JOB NO. 38563
24
25
```

## Page 2

```
 1   APPEARANCES:
 2     Mr. Michael Hendershot
       SKADDEN, ARPS, SLATE, MEAGHER
 3       & FLOW, LLP
       525 University Avenue
 4     Palo Alto, CA 94301
       (650) 470-4500
 5
          on behalf of the Plaintiff.
 6
 7     Mr. J. Scot Kennedy
       GIBSON, DUNN & CRUTCHER, LLP
 8     4 Park Plaza
       Irvine, CA 92614-8557
 9     (949) 451-3805
10        on behalf of the Defendant.
11
12     Mr. Brian M. Garvine
       266 North Fourth Street, Suite 100
13     Columbus, Ohio 43215-2511
       (614) 716-0500
14
          on behalf of the Witness.
15
16
17
18
19
     ALSO PRESENT:
20
       Mr. Joe Smith, Videographer
21
            --0--
22
23
24
25
```

## Page 3

```
 1              STIPULATIONS
 2        It is stipulated by and among
 3   counsel for the respective parties that the
 4   deposition of PATRICIA KEPLINGER, the
 5   Witness herein, called by the Plaintiff,
 6   under the applicable Rules of Federal Civil
 7   Court Procedure, may be taken at this time
 8   by the notary pursuant to notice; that said
 9   deposition may be reduced to writing in
10   stenotopy by the notary, whose notes
11   thereafter may be transcribed out of the
12   presence of the witness; and that the proof
13   of the official character and qualification
14   of the notary is waived; that the reading
15   and signature of the said witness to the
16   transcript of the deposition are expressly
17   waived by counsel and the witness; said
18   deposition to have the same force and effect
19   as though signed by the said witness.
20            --0--
21
22
23
24
25
```

## Page 4

```
 1        INDEX OF EXAMINATION
                PAGE
 2
     BY MR. HENDERSHOT:              6
 3   BY MR. KENNEDY:               155
     BY MR. HENDERSHOT:            164
 4   BY MR. KENNEDY:               169
 5
 6
 7        INDEX OF EXHIBITS
 8   EXHIBIT     DESCRIPTION       PAGE
 9    1    Letter with subpoena and    11
          deposition notice
10
      2   Copy of United States      104
11        Patent Number 5,253,164
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 5**

INDEX OF OBJECTIONS

| | PAGE | LINE |
|---|---|---|
| Objection by Mr. Kennedy | 24 | 12 |
| Objection by Mr. Kennedy | 25 | 15 |
| Objection by Mr. Kennedy | 31 | 24 |
| Objection by Mr. Kennedy | 32 | 10 |
| Objection by Mr. Kennedy | 35 | 20 |
| Objection by Mr. Kennedy | 37 | 24 |
| Objection by Mr. Kennedy | 38 | 15 |
| Objection by Mr. Kennedy | 43 | 7 |
| Objection by Mr. Kennedy | 44 | 16 |
| Objection by Mr. Kennedy | 45 | 6 |
| Objection by Mr. Kennedy | 46 | 20 |
| Objection by Mr. Kennedy | 56 | 19 |
| Objection by Mr. Kennedy | 57 | 19 |
| Objection by Mr. Kennedy | 58 | 9 |
| Objection by Mr. Kennedy | 59 | 15 |
| Objection by Mr. Kennedy | 61 | 22 |
| Objection by Mr. Kennedy | 65 | 20 |
| Objection by Mr. Kennedy | 68 | 18 |
| Objection by Mr. Kennedy | 69 | 3 |
| Objection by Mr. Kennedy | 71 | 12 |
| Objection by Mr. Kennedy | 72 | 12 |
| Objection by Mr. Kennedy | 76 | 11 |
| Objection by Mr. Kennedy | 82 | 19 |
| Objection by Mr. Kennedy | 86 | 24 |
| Objection by Mr. Kennedy | 107 | 6 |
| Objection by Mr. Kennedy | 108 | 8 |
| Objection by Mr. Kennedy | 140 | 16 |
| Objection by Mr. Kennedy | 141 | 10 |
| Objection by Mr. Hendershot | 157 | 11 |
| Objection by Mr. Hendershot | 157 | 19 |
| Objection by Mr. Hendershot | 160 | 12 |
| Objection by Mr. Hendershot | 160 | 24 |
| Objection by Mr. Hendershot | 163 | 5 |

**Page 6**

08:50 1 MR. HENDERSHOT: Michael Hendershot
09:04 2 of Skadden, Arps, in Palo Alto, for the
09:04 3 Plaintiff, McKesson Information Solutions.
09:04 4 MR. KENNEDY: Scott Kennedy of
09:04 5 Gibson, Dunn & Crutcher, in Irvine, for the
09:04 6 Defendant, the TriZetto Group.
09:04 7 MR. GARVINE: I actually don't have
09:04 8 a microphone on. Can you --
09:04 9 THE VIDEOGRAPHER: I'll still pick
09:04 10 you up.
09:04 11 MR. GARVINE: Can you? Okay.
09:04 12 Brian Garvine from Onda, LaBuhn &
09:04 13 Rankin for Harrington Benefits.
09:04 14 PATRICIA KEPLINGER
09:04 15 being first duly sworn, as hereinafter certified,
09:04 16 deposes and says as follows:
09:04 17 EXAMINATION
09:04 18 BY MR. HENDERSHOT:
09:04 19 Q. Good morning, Mrs. Keplinger. How
09:04 20 are you?
09:04 21 A. Fine.
09:04 22 Q. Is it Keplinger or Keplinger?
09:05 23 A. Either one.
09:05 24 Q. Okay. We'll go with Keplinger.
09:05 25 A. That's fine.

**Page 7**

09:05 1 Q. Do you understand what the
09:05 2 procedures of the deposition today will be
09:05 3 generally?
09:05 4 A. Yes.
09:05 5 Q. Have you been deposed before?
09:05 6 A. No.
09:05 7 Q. And you understand that even though
09:05 8 this is a somewhat informal setting, the
09:05 9 oath you just took has the same effect that
09:05 10 it would if you took it in the court of law?
09:05 11 A. Yes, I do.
09:05 12 Q. Is there any reason at all you feel
09:05 13 you cannot testify fully and accurately
09:05 14 today?
09:05 15 A. No.
09:05 16 Q. Could you briefly describe your
09:05 17 formal education since high school.
09:05 18 A. After graduating from high school, I
09:05 19 did have a couple years at Illinois Central
09:05 20 College, where I took classes in -- towards
09:05 21 a programming degree. After that, no more
09:05 22 formal education.
09:05 23 Q. Okay. And what years would those
09:05 24 have been at Illinois Central College,
09:05 25 roughly?

**Page 8**

09:05 1 A. I graduated high school in '70.
09:06 2 Q. Okay.
09:06 3 A. And I did not attend Illinois
09:06 4 Central right after high school, so probably
09:06 5 around 1980, or so. And that's -- that's
09:06 6 approximate.
09:06 7 Q. So prior to 1985?
09:06 8 A. I believe so.
09:06 9 Q. Okay. And are you currently an
09:06 10 employee at Harrington?
09:06 11 A. That is correct.
09:06 12 Q. And does Harrington have a full
09:06 13 formal corporate title?
09:06 14 A. Harrington Benefits Administration.
09:06 15 Q. Is it okay if I just refer to it as
09:06 16 Harrington today?
09:06 17 A. Yes.
09:06 18 Q. Okay.
09:06 19 A. Actually, it's Harrington Benefits
09:06 20 Systems, sorry.
09:06 21 Q. And do you have a title at
09:06 22 Harrington?
09:06 23 A. I'm vice-president of corporate IT
09:06 24 strategy.
09:06 25 Q. And what are your responsibilities

Page 49

| | | |
|---|---|---|
| 09:49 | 1 | Q. But Harrington was using ClaimFacts |
| 09:49 | 2 | when you started work there? |
| 09:49 | 3 | A. Right. |
| 09:49 | 4 | Q. And you've used ClaimFacts while at |
| 09:49 | 5 | Harrington? |
| 09:49 | 6 | A. Yes. |
| 09:49 | 7 | Q. How did you learn how to use |
| 09:49 | 8 | ClaimFacts while at Harrington? |
| 09:49 | 9 | A. At Borden, |
| 09:49 | 10 | Q. Okay. Does TriZetto provide any |
| 09:49 | 11 | documentation in support of its product; its |
| 09:49 | 12 | product being the ClaimFacts product. |
| 09:49 | 13 | A. Yes, there are various user manuals |
| 09:49 | 14 | that are available. |
| 09:49 | 15 | Q. And those user manuals regarding the |
| 09:49 | 16 | ClaimFacts product are provided to |
| 09:49 | 17 | Harrington? |
| 09:49 | 18 | A. Yes. |
| 09:49 | 19 | Q. Is there a standard level of |
| 09:49 | 20 | frequency with which Harrington receives the |
| 09:49 | 21 | manuals from TriZetto? |
| 09:49 | 22 | A. There are -- there's not a standard |
| 09:49 | 23 | frequency. |
| 09:49 | 24 | Q. With respect to the ClinicaLogic |
| 09:49 | 25 | module, are there updates to that product |

Page 50

| | | |
|---|---|---|
| 09:50 | 1 | annually? |
| 09:50 | 2 | A. There are updates to the code -- |
| 09:50 | 3 | code edits on an annual basis, yes. |
| 09:50 | 4 | Q. And when you say the code edits that |
| 09:50 | 5 | are updated by TriZetto in their |
| 09:50 | 6 | ClinicaLogic product, could you give me a |
| 09:50 | 7 | brief description of what you understand |
| 09:50 | 8 | those to be. |
| 09:50 | 9 | A. Yes. New codes that are added, |
| 09:50 | 10 | deleted codes, changes in the way codes |
| 09:50 | 11 | are -- are used within the industry are |
| 09:50 | 12 | captured there, and all of the different |
| 09:50 | 13 | editing criteria that goes with those. So |
| 09:50 | 14 | any changes in the rules that are currently |
| 09:50 | 15 | in place for one year to another that may |
| 09:50 | 16 | change. |
| 09:50 | 17 | Q. And TriZetto does that for |
| 09:50 | 18 | Harrington? |
| 09:50 | 19 | A. Yes. |
| 09:51 | 20 | Q. Has TriZetto ever suggested to |
| 09:51 | 21 | Harrington that the clinical editing |
| 09:51 | 22 | function of its ClaimFacts product should |
| 09:51 | 23 | not be used? |
| 09:51 | 24 | A. Not that I'm aware of. |
| 09:51 | 25 | Q. And correct me if I'm wrong, but you |

Page 51

| | | |
|---|---|---|
| 09:51 | 1 | testified earlier that if Harrington didn't |
| 09:51 | 2 | use some clinical editing protocols or logic |
| 09:51 | 3 | on the claims it was processing, its |
| 09:51 | 4 | customers might have an issue with that? |
| 09:51 | 5 | A. Since we currently have one in place |
| 09:51 | 6 | today, if we were to try to remove something |
| 09:51 | 7 | and not put something else in its place, I |
| 09:51 | 8 | would say, yes, they would -- they would |
| 09:51 | 9 | question why we would do that. |
| 09:51 | 10 | Q. Outside of the individualized |
| 09:51 | 11 | circumstances you described where a customer |
| 09:51 | 12 | may -- may request that there's not clinical |
| 09:51 | 13 | editing, is the application of clinical |
| 09:51 | 14 | editing logic to medical claims standard in |
| 09:51 | 15 | the industry? |
| 09:51 | 16 | A. I don't know within the industry. |
| 09:52 | 17 | With the individuals I've talked to, most |
| 09:52 | 18 | companies do have some sort of editing |
| 09:52 | 19 | process in place for medical claims. |
| 09:52 | 20 | Q. Does TriZetto maintain its -- its |
| 09:52 | 21 | ClaimFacts product for Harrington beyond the |
| 09:52 | 22 | updates to the ClinicaLogic database? |
| 09:52 | 23 | A. Yes. |
| 09:52 | 24 | Q. And ClaimFacts is software, I take |
| 09:52 | 25 | it? |

Page 52

| | | |
|---|---|---|
| 09:52 | 1 | A. Uh-huh. |
| 09:52 | 2 | Q. What sort of hardware does |
| 09:52 | 3 | Harrington run ClaimFacts on? |
| 09:52 | 4 | A. It runs on a mainframe. |
| 09:53 | 5 | Q. Do you know the brand of the |
| 09:53 | 6 | mainframe or any -- |
| 09:53 | 7 | A. No. It's IBM. |
| 09:53 | 8 | Q. Okay. So as software, ClaimFacts |
| 09:53 | 9 | requires some sort of computer to operate? |
| 09:53 | 10 | A. Correct. |
| 09:53 | 11 | Q. And Harrington does indeed use a |
| 09:53 | 12 | computer to operate -- |
| 09:53 | 13 | A. Yes. |
| 09:53 | 14 | Q. -- ClaimFacts? |
| 09:53 | 15 | And the computer it uses, I assume, |
| 09:53 | 16 | includes some sort of processing unit and |
| 09:53 | 17 | storage and memory? |
| 09:53 | 18 | A. Uh-huh. |
| 09:53 | 19 | Q. Maybe we can take a step back and |
| 09:53 | 20 | walk through sort of how Harrington uses the |
| 09:53 | 21 | Clinica -- ClaimFacts and ClinicaLogic to |
| 09:53 | 22 | process the claims. |
| 09:53 | 23 | So a claim is input into the -- the |
| 09:54 | 24 | ClaimFacts software -- |
| 09:54 | 25 | A. Uh-huh. |

13 (Pages 49 to 52)

Page 53

09:54 1    Q. -- and that claims for medical
09:54 2    payment, correct?
09:54 3    A. Right.
09:54 4    Q. Strike that. That was actually a
09:54 5    bad question. I apologize.
09:54 6        In Harrington's use of ClaimFacts,
09:54 7    medical claims for payment are input into
09:54 8    the ClaimFacts system; is that correct?
09:54 9    A. Yes.
09:54 10   Q. So those claims that the ClaimFacts
09:54 11   system receives are processed for payment by
09:54 12   the ClaimFacts system at Harrington,
09:54 13   correct?
09:54 14   A. Yes.
09:54 15   Q. And the means by which the
09:54 16   ClaimFacts system used by Harrington
09:54 17   processes those claims for medical -- strike
09:54 18   that.
09:54 19       And the means by which the
09:54 20   ClaimFacts system used by Harrington to
09:54 21   process those medical claims for payment is
09:54 22   the ClaimFacts software?
09:54 23   A. Yes.
09:55 24   Q. And that software is interaction
09:55 25   with various databases included on a

Page 54

09:55 1    mainframe?
09:55 2    A. We have -- yes, it's on the
09:55 3    mainframe and the claims are also on the
09:55 4    mainframe and included as part of the
09:55 5    ClaimFacts system hits that software.
09:55 6    Q. So there's a database stored
09:55 7    somewhere within the computer system that
09:55 8    Harrington uses to operate ClaimFacts?
09:55 9    A. Yes.
09:55 10   Q. And the claims that ClaimFacts
09:55 11   receives when used at Harrington for
09:55 12   processing, those may include one or more
09:55 13   medical service codes?
09:55 14   A. Yes.
09:56 15   Q. So the ClaimFacts system, as used by
09:56 16   Harrington, has some means of ascertaining
09:56 17   whether or not a claim being processed has
09:56 18   more than one medical service code?
09:56 19       MR. KENNEDY: Objection; vague and
09:56 20   ambiguous.
09:56 21   BY MR. HENDERSHOT:
09:56 22   Q. You can answer.
09:56 23   A. That sounds like your last question.
09:56 24   Q. Well, the ClaimFacts system used by
09:56 25   Harrington can process claims with multiple

Page 55

09:56 1    medical service codes, right?
09:56 2    A. That is correct.
09:56 3    Q. So I would assume that the
09:56 4    ClaimFacts system used by Harrington has
09:56 5    some ability to ascertain the number of
09:56 6    medical service codes on a claim throughout
09:56 7    the processing --
09:56 8    A. It -- it can identify how many lines
09:56 9    or how many services are there, yes.
09:56 10   Q. And that would be done by the -- the
09:56 11   ClaimFacts software?
09:56 12   A. Yes.
09:56 13   Q. And the ClaimFacts software, I would
09:56 14   assume, determines -- has a means for
09:56 15   determining the number of codes or lines on
09:56 16   a claim because that's necessary to some
09:57 17   processing within the system?
09:57 18       MR. KENNEDY: Objection; vague and
09:57 19   ambiguous.
09:57 20   A. It understands how many lines are on
09:57 21   the claim, yes.
09:57 22   Q. Okay. And Harrington also uses
09:57 23   the -- strike that.
09:57 24       Does the ClaimFacts system, as used
09:57 25   by Harrington, include a database of medical

Page 56

09:57 1    service codes?
09:57 2    A. Yes.
09:57 3    Q. And to perform the clinical editing,
09:57 4    I assume there's some sort of database of
09:57 5    relationships among those medical service
09:58 6    codes as well?
09:58 7        MR. KENNEDY: Objection; vague and
09:58 8    ambiguous.
09:58 9        MR. HENDERSHOT: As to what term?
09:58 10       MR. KENNEDY: Relationships.
09:58 11   BY MR. HENDERSHOT:
09:58 12   Q. You can answer the question.
09:58 13   A. I'm not sure I understand your
09:58 14   question.
09:58 15   Q. Well, there are rules and edits set
09:58 16   up in the -- in the ClaimFacts database, are
09:58 17   there not?
09:58 18   A. In relationship to multiple codes
09:58 19   and how each code should be used?
09:58 20   Q. In relation to whether or not a
09:58 21   given code, when billed with another code,
09:58 22   is valid, if that's an acceptable way to
09:58 23   bill it.
09:58 24   A. That would be within the
09:58 25   ClinicaLogic product, yes.

14 (Pages 53 to 56)

Page 57

09:58 1     Q. And that's included within
09:58 2 ClaimFacts?
09:58 3     A. Within ClaimFacts.
09:58 4     Q. So the ClinicaLogic -- Clinica --
09:58 5 strike that.
09:58 6     ClinicaLogic within ClaimFacts
09:58 7 includes a database of medical service codes
09:58 8 and some relationships among those medical
09:58 9 service codes that define whether or not
09:58 10 those codes are valid or invalid when
09:58 11 bundled together?
09:58 12     MR. KENNEDY: Objection; leading and
09:58 13 compound.
09:58 14     A. I believe that -- how I understand
09:58 15 your question is, yes, there are -- there
09:58 16 are standards set within the ClinicaLogic
09:58 17 software piece of ClaimCheck -- ClaimFacts
09:59 18 that -- that do state whether or not two
09:59 19 codes could be billed together, things along
09:59 20 that nature.
09:59 21     Q. And the contents of that database
09:59 22 are predetermined by TriZetto before they
09:59 23 ship the product to Harrington?
09:59 24     A. Yes.
09:59 25     Q. So just so I'm clear, Harrington

Page 58

09:59 1 uses ClaimFacts, which includes ClinicaLogic
09:59 2 as a module, and ClinicaLogic includes a
09:59 3 database of medical service codes and
09:59 4 relationships among those medical service
09:59 5 codes that determine whether or not those
09:59 6 codes are valid or invalid when received on
09:59 7 a claim together?
09:59 8     A. I'm not sure database is the right
09:59 9 term, but ClinicaLogic is the set of rules
09:59 10 that tie all of those coding variances
10:00 11 together, you know, whether or not this is
10:00 12 industry standard to bill code A and code B
10:00 13 together.
10:00 14     Q. So assuming that the industry
10:00 15 standard is to not bill code A and code B
10:00 16 together --
10:00 17     A. Uh-huh.
10:00 18     Q. -- if ClaimFacts, as used by
10:00 19 Harrington with ClinicaLogic, receives
10:00 20 code A and code B together, ClaimFacts would
10:00 21 likely -- strike that.
10:00 22     Assuming that it's industry standard
10:00 23 to not include code A and code B together on
10:00 24 the same claim, and ClaimFacts with
10:00 25 ClinicaLogic, as used by Harrington,

Page 59

10:00 1 receives a claim with code A and code B --
10:00 2     A. Uh-huh.
10:00 3     Q. -- the ClaimFacts system has some
10:00 4 means to determine that code A should not be
10:00 5 billed with code B?
10:00 6     A. That's correct.
10:00 7     Q. So if -- are you familiar with the
10:00 8 term "unbundling"?
10:00 9     A. Yes.
10:00 10     Q. So if code A is included within
10:01 11 code B on an unbundled claim, ClaimFacts, as
10:01 12 used by Harrington, has the ability to
10:01 13 determine that code A is included with --
10:01 14 within code B and reject code A and approve
10:01 15 code B for payment?
10:01 16     A. That is correct.
10:01 17     MR. KENNEDY: Objection; leading.
10:01 18 I'm sorry, I didn't mean to step on
10:01 19 your answer.
10:01 20     THE WITNESS: No, that's okay.
10:01 21     MR. HENDERSHOT: Did you get her
10:01 22 answer?
10:01 23     COURT REPORTER: Uh-huh.
10:01 24 BY MR. HENDERSHOT:
10:01 25     Q. I used the term unbundling. I

Page 60

10:01 1 probably should lay some foundation for
10:01 2 that.
10:01 3     You understand the term
10:01 4 "unbundling"?
10:01 5     A. Yes.
10:01 6     Q. Could you explain your understanding
10:01 7 of what unbundling is.
10:01 8     A. When a provider bills multiple codes
10:01 9 when they could have one code represent all
10:01 10 of them.
10:01 11     Q. So there's -- unbundling is a case
10:01 12 where there's one comprehensive code that
10:01 13 may cover an entire service that may have
10:01 14 certain subparts and the subparts are billed
10:01 15 as independent codes?
10:02 16     A. Yes.
10:02 17     Q. And ClaimFacts, as used by
10:02 18 Harrington, has the ability to detect
10:02 19 unbundling?
10:02 20     A. Through the ClinicaLogic module.
10:02 21     Q. So ClaimFacts with ClinicaLogic, as
10:02 22 used by Harrington, has a means for
10:02 23 determining whether a code is included
10:02 24 within another code and should not be billed
10:02 25 separately?

15 (Pages 57 to 60)

Page 61

| | |
|---|---|
| 10:02 | 1 |
| 10:02 | 2 |
| 10:02 | 3 |
| 10:02 | 4 |
| 10:02 | 5 |
| 10:02 | 6 |
| 10:02 | 7 |
| 10:02 | 8 |
| 10:02 | 9 |
| 10:02 | 10 |
| 10:03 | 11 |
| 10:03 | 12 |
| 10:03 | 13 |
| 10:03 | 14 |
| 10:03 | 15 |
| 10:03 | 16 |
| 10:03 | 17 |
| 10:03 | 18 |
| 10:03 | 19 |
| 10:03 | 20 |
| 10:03 | 21 |
| 10:03 | 22 |
| 10:03 | 23 |
| 10:03 | 24 |
| 10:03 | 25 |

A. Correct.
Q. And the means for determining whether or not a code is included within another code -- strike that.
And the means by which ClaimFacts with ClinicaLogic, as used by Harrington, determines whether or not a code is included within another code on a given claim is the ClaimFacts software as provided by TriZetto?
A. Yes.
Q. And I believe you had discussed earlier a deleted code or an outdated code in the updates that TriZetto provides; is that correct?
A. Correct.
Q. So there -- and these CPT codes, I assume those are updated annually?
A. Yes.
Q. So in the CPT medical service codes in any given year, some codes may be changed to another code or deleted; is that correct?
A. That is correct.
Q. So does the ClaimFacts system, as used by Harrington, have some ability to detect that?

Page 62

A. Yes.
Q. So -- I'll make that a little bit more clear.
Does the ClaimFacts system with ClinicaLogic, as used by Harrington, include an ability to determine whether a code submitted on a claim is contained within the ClinicaLogic database or is not?
A. If it is billed inappropriately, yes.
Q. You say if it is billed inappropriately?
A. The code may be in there multiple times, but the use on a particular claim may not receive an edit as -- as received back from ClinicaLogic.
Q. Okay. If a code was deleted, say in 2003, from the CPT manual --
A. Uh-huh.
Q. -- and ClinicaLogic -- strike that.
If a code was deleted in 2003 and Harrington, using ClaimFacts with ClinicaLogic, received a claim in 2005 that included that deleted code, would ClaimFacts have a means for determining that that code

Page 63

was not, in fact, in its database?
A. We would receive an edit back stating that that was an outdated code as -- as it was identified in the ClinicaLogic product.
Q. So if there was some replacement code for that deleted code, ClinicaLogic would replace it with that updated code and tell you why it did it?
A. Yes.
MR. KENNEDY: Objection; misstates prior testimony.
MR. HENDERSHOT: Could you read my question back again, please, so we have a clean record on it.
(Record read as requested.)
BY MR. HENDERSHOT:
Q. Did anywhere in that question did I misstate your testimony, to your knowledge?
A. No.
Q. Okay. Thank you.
And the means by which ClaimFacts with ClinicaLogic, as used by Harrington, will determine whether or not a code is not in its database and inform the user that

Page 64

that code is not in its database is the ClinicaLogic software, the ClaimFacts software?
A. I think when you say not in its database, that's -- that's not necessarily a good representation. What it's looking for is a code that's there within its database, if you will, that is tied to an incorrect billing process of some sort. If the code is not there, it's not going to give you an edit.
Q. I'm talking about the deleted codes.
A. If -- if it is a -- if you have a deleted code and we are billed after the fact that is no longer a valid code, we will receive an edit that says it's an invalid or outdated code.
Q. Let's focus on the positive for a moment. If a claim received by Harrington -- strike that.
If a claim received by ClaimFacts using ClinicaLogic at Harrington includes codes that are all billed correctly, and all those codes pass all the tests within ClinicaLogic, does ClaimFacts authorize

16 (Pages 61 to 64)

Page 65

| | | |
|---|---|---|
| 10:07 | 1 | payment for those codes? |
| 10:07 | 2 | A. Yes, and will go ahead and process |
| 10:07 | 3 | the claim. |
| 10:07 | 4 | Q. And moving to a less positive |
| 10:07 | 5 | scenario, if ClaimFacts using |
| 10:07 | 6 | ClinicaLogic -- strike that. |
| 10:07 | 7 | If -- if ClaimFacts with |
| 10:07 | 8 | ClinicaLogic, as used at Harrington, |
| 10:07 | 9 | receives a claim that includes some codes |
| 10:07 | 10 | that don't pass the various tests within |
| 10:07 | 11 | ClinicaLogic, ClinicaLogic will revise that |
| 10:07 | 12 | claim? |
| 10:07 | 13 | A. It could. |
| 10:07 | 14 | Q. In what situations would it? |
| 10:07 | 15 | A. There are sets of rules or flags |
| 10:07 | 16 | that are set within the system that are |
| 10:07 | 17 | normally set at the client level, depending |
| 10:07 | 18 | on how they want their edits to hit, whether |
| 10:07 | 19 | it is to automatically rebundle in those |
| 10:07 | 20 | situations or automatically replace an |
| 10:08 | 21 | outdated code, if one is available, or to |
| 10:08 | 22 | just give a warning. But if those flags are |
| 10:08 | 23 | all set to automatically happen, it will |
| 10:08 | 24 | automatically happen. |
| 10:08 | 25 | Q. So the ClaimFacts -- strike that. |

Page 66

| | | |
|---|---|---|
| 10:08 | 1 | So the ClaimFacts software with |
| 10:08 | 2 | ClinicaLogic, as used at Harrington, has |
| 10:08 | 3 | some means to automatically revise claims to |
| 10:08 | 4 | reject invalid codes and approve valid |
| 10:08 | 5 | codes? |
| 10:08 | 6 | MR. KENNEDY: Objection; leading. |
| 10:08 | 7 | A. It has the ability to reject invalid |
| 10:08 | 8 | codes, rebundle automatically. |
| 10:08 | 9 | Q. And approve valid codes? |
| 10:08 | 10 | A. And approve valid codes. |
| 10:08 | 11 | Q. And the means by which ClaimFacts |
| 10:08 | 12 | using ClinicaLogic at Harrington would |
| 10:08 | 13 | authorize valid codes or reject invalid |
| 10:09 | 14 | codes would be the ClaimFacts software? |
| 10:09 | 15 | MR. KENNEDY: Objection; leading. |
| 10:09 | 16 | A. Yeah, I don't... |
| 10:09 | 17 | Q. We had just established, correct me |
| 10:09 | 18 | if I'm wrong, that ClaimFacts using |
| 10:09 | 19 | ClinicaLogic, at Harrington, has some means |
| 10:09 | 20 | for automatically revising a claim to reject |
| 10:09 | 21 | invalid codes that don't pass the test in |
| 10:09 | 22 | the database -- |
| 10:09 | 23 | A. Correct. |
| 10:09 | 24 | Q. -- and approve valid codes that do |
| 10:09 | 25 | pass the test in the database -- |

Page 67

| | | |
|---|---|---|
| 10:09 | 1 | A. Correct. |
| 10:09 | 2 | Q. -- or approve those codes as revised |
| 10:09 | 3 | by the database? |
| 10:09 | 4 | A. Correct. |
| 10:09 | 5 | Q. Is the means by which all that |
| 10:09 | 6 | occurs this software within ClaimFacts? |
| 10:09 | 7 | A. Yes, it is. |
| 10:10 | 8 | Q. And the purpose for -- strike that. |
| 10:10 | 9 | Is the automatic revision and |
| 10:10 | 10 | approval and rejection of codes within |
| 10:10 | 11 | claims by ClaimFacts with ClinicaLogic, as |
| 10:10 | 12 | used at Harrington, intended to ensure that |
| 10:10 | 13 | claims are billed appropriately? |
| 10:10 | 14 | A. They are intended to be used to make |
| 10:10 | 15 | sure that payment as a result of the codes |
| 10:11 | 16 | that are billed is -- is paid correctly. We |
| 10:11 | 17 | can't -- we can't guarantee the billing. |
| 10:11 | 18 | It's the result of the billing. |
| 10:11 | 19 | Q. Okay. Okay. So the clinical edits |
| 10:11 | 20 | applied by ClaimFacts using ClinicaLogic, at |
| 10:11 | 21 | Harrington, are intended to ensure that the |
| 10:11 | 22 | payment that goes out is correct and |
| 10:11 | 23 | accurate and determined by an appropriate |
| 10:11 | 24 | coding of the services? |
| 10:11 | 25 | A. That's correct. |

Page 68

| | | |
|---|---|---|
| 10:11 | 1 | Q. And the automatic revisions of the |
| 10:11 | 2 | claim -- strike that. |
| 10:11 | 3 | And the rules that may trigger the |
| 10:11 | 4 | automatic revisions of claims within |
| 10:11 | 5 | ClaimFacts using ClinicaLogic, as used at |
| 10:11 | 6 | Harrington, are there a number of criteria |
| 10:11 | 7 | for those? |
| 10:11 | 8 | A. Can you ask that again? I'm sorry. |
| 10:11 | 9 | Q. Yeah, strike that. |
| 10:12 | 10 | Does ClaimFacts with ClinicaLogic, |
| 10:12 | 11 | as used by Harrington, include a means to |
| 10:12 | 12 | determine if codes received on a claim |
| 10:12 | 13 | cannot be performed from a medical |
| 10:12 | 14 | standpoint within one visit? |
| 10:12 | 15 | A. Yes. |
| 10:12 | 16 | Q. And if ClaimFacts with ClinicaLogic, |
| 10:12 | 17 | as used at Harrington, determines that two |
| 10:12 | 18 | codes within a claim represents services |
| 10:12 | 19 | that can not be medically performed during a |
| 10:12 | 20 | single visit, ClaimFacts has some means to |
| 10:12 | 21 | revise that claim to correct those codes? |
| 10:12 | 22 | MR. KENNEDY: Objection; leading. |
| 10:12 | 23 | BY MR. HENDERSHOT: |
| 10:12 | 24 | Q. Is that correct? |
| 10:12 | 25 | A. I don't know that that is correct. |

17 (Pages 65 to 68)

Page 69

| | | |
|---|---|---|
| 10:12 | 1 | I don't know how detailed the ClinicalLogic |
| 10:12 | 2 | module is in that relationship. |
| 10:12 | 3 | Q. So ClinicalLogic might not detect if |
| 10:12 | 4 | I submitted two codes for amputation of the |
| 10:13 | 5 | right leg with the same patient? |
| 10:13 | 6 | A. It would -- it would detect that. |
| 10:13 | 7 | Q. Okay. That's good. |
| 10:13 | 8 | A. Yes. |
| 10:13 | 9 | Q. So ClaimFacts with ClinicalLogic has |
| 10:13 | 10 | some determin -- strike that. |
| 10:13 | 11 | ClaimFacts with ClinicalLogic, as |
| 10:13 | 12 | used at Harrington, has some ability to |
| 10:13 | 13 | determine if two codes received on a single |
| 10:13 | 14 | claim are medically exclusive; is that |
| 10:13 | 15 | correct? |
| 10:13 | 16 | A. Yes. |
| 10:13 | 17 | Q. And ClaimFacts with ClinicalLogic, as |
| 10:13 | 18 | used at Harrington, includes some means for |
| 10:13 | 19 | revising the claim to correct the medically |
| 10:13 | 20 | exclusive codes; is that correct? |
| 10:13 | 21 | MR. KENNEDY: Objection; leading. |
| 10:13 | 22 | A. That is correct. |
| 10:13 | 23 | MR. HENDERSHOT: Counsel, this isn't |
| 10:13 | 24 | my witness. I'm not sure why you're stating |
| 10:13 | 25 | these leading objections. I've let them |

Page 70

| | | |
|---|---|---|
| 10:13 | 1 | slide for a long -- |
| 10:13 | 2 | MR. KENNEDY: Well, she's not |
| 10:13 | 3 | necessarily hostile. I mean, she -- she's |
| 10:13 | 4 | going to -- you know, she's going to answer |
| 10:13 | 5 | how she answers. But -- go ahead. I'm |
| 10:13 | 6 | not -- I don't -- I don't want to interfere |
| 10:13 | 7 | with your examination, I just have to state |
| 10:13 | 8 | the objections. |
| 10:14 | 9 | BY MR. HENDERSHOT: |
| 10:14 | 10 | Q. Just so the record's clear, you're |
| 10:14 | 11 | appearing here today pursuant to a subpoena |
| 10:14 | 12 | issued by McKesson Information Solutions; is |
| 10:14 | 13 | that correct? |
| 10:14 | 14 | A. Yes. |
| 10:14 | 15 | Q. Has anyone from McKesson Information |
| 10:14 | 16 | Solutions spoke to you about the subject of |
| 10:14 | 17 | your testimony for today? |
| 10:14 | 18 | A. No. |
| 10:14 | 19 | Q. Have you ever met with me before |
| 10:14 | 20 | today? |
| 10:14 | 21 | A. No. |
| 10:14 | 22 | Q. So you and I have never discussed |
| 10:14 | 23 | the subject of your testimony before today? |
| 10:14 | 24 | A. No. |
| 10:14 | 25 | Q. So we've discussed ClaimFacts with |

Page 71

| | | |
|---|---|---|
| 10:14 | 1 | ClinicalLogic's ability to -- strike that. |
| 10:14 | 2 | So we've discussed ClaimFacts with |
| 10:14 | 3 | ClinicalLogic, as used at Harrington, and its |
| 10:14 | 4 | ability to detect and correct codes that are |
| 10:14 | 5 | medically exclusive with an individual |
| 10:14 | 6 | claim; is that correct? |
| 10:14 | 7 | A. Yes. |
| 10:14 | 8 | Q. So I would assume that there are |
| 10:14 | 9 | other circumstances where -- strike that. |
| 10:14 | 10 | Are there other circumstances in |
| 10:14 | 11 | which ClaimFacts with ClinicalLogic, as used |
| 10:15 | 12 | at Harrington, would detect two codes that |
| 10:15 | 13 | represent services that could be performed |
| 10:15 | 14 | together, from a medical standpoint, in a |
| 10:15 | 15 | single visit but nonetheless should be -- |
| 10:15 | 16 | should not be billed separately? |
| 10:15 | 17 | A. Yes. |
| 10:15 | 18 | Q. Could you give me an example of such |
| 10:15 | 19 | a situation, just so I -- because you've got |
| 10:15 | 20 | a little more experience in the industry |
| 10:15 | 21 | than I do, obviously. |
| 10:15 | 22 | A. Well, a surgery where there is a |
| 10:15 | 23 | charge for the actual incision as well as |
| 10:15 | 24 | the surgery itself, you have to do the |
| 10:15 | 25 | incision before you can actually do the |

Page 72

| | | |
|---|---|---|
| 10:15 | 1 | surgery. |
| 10:15 | 2 | Q. Okay. So you -- you have to do an |
| 10:15 | 3 | incision with a surgery? |
| 10:15 | 4 | A. Correct. And although they have |
| 10:15 | 5 | separate codes that could be billed, it is |
| 10:15 | 6 | more appropriate to bill the surgery itself |
| 10:15 | 7 | and not the surgery and the incision |
| 10:15 | 8 | separately. |
| 10:15 | 9 | Q. So in that example within ClaimFacts |
| 10:15 | 10 | with ClinicalLogic, as used at Harrington, |
| 10:15 | 11 | the ClaimFacts software would correct -- |
| 10:16 | 12 | strike that. |
| 10:16 | 13 | So in that situation you just |
| 10:16 | 14 | discussed, where a code for an incision and |
| 10:16 | 15 | a code for a surgery are submitted on the |
| 10:16 | 16 | same claim, despite the fact that those two |
| 10:16 | 17 | codes are not medically exclusive, |
| 10:16 | 18 | ClaimFacts with ClinicalLogic, as used at |
| 10:16 | 19 | Harrington, would nonetheless detect that |
| 10:16 | 20 | the code for the incision and the code for |
| 10:16 | 21 | the surgery are mutually exclusive from a |
| 10:16 | 22 | billing standpoint for some other criteria; |
| 10:16 | 23 | is that correct? |
| 10:16 | 24 | A. I believe there could be situations |
| 10:16 | 25 | where both codes could be billed separately |

18 (Pages 69 to 72)

Page 73

10:16 1 and appropriately.
10:16 2     Q. But there are some circumstances
10:16 3 where they could not; is that correct?
10:16 4     A. That is correct.
10:16 5     Q. So assuming it's a circumstance
10:16 6 where the incision and the surgery should
10:16 7 not be billed separately --
10:16 8     A. Uh-huh.
10:16 9     Q. -- would ClaimFacts with
10:16 10 ClinicalLogic, as used at Harrington, detect
10:17 11 that the code for the incision and the code
10:17 12 for the surgery were submitted on the same
10:17 13 claim, and although they are not medically
10:17 14 exclusive, should nonetheless not be paid
10:17 15 together?
10:17 16     MR. KENNEDY: Objection; compound.
10:17 17 BY MR. HENDERSHOT:
10:17 18     Q. Do you understand the question?
10:17 19     A. I do understand the question and the
10:17 20 answer is, yes, it would detect that those
10:17 21 two codes should not be billed on the same
10:17 22 claim.
10:17 23     Q. So in some circumstances, even
10:17 24 though codes may not be medically exclusive,
10:17 25 the ClaimFacts system with ClinicalLogic, as

Page 74

10:17 1 used at Harrington, include some ability to
10:17 2 detect and automatically correct codes that
10:17 3 are exclusive for some nonmedical reason; is
10:17 4 that correct?
10:17 5     A. I'm not sure I understand your
10:17 6 question. I'm sorry.
10:17 7     Q. Is there some part of it that you
10:17 8 don't understand or --
10:17 9     A. Well --
10:17 10     Q. Let me try to rephrase it.
10:17 11     A. Yeah, please.
10:17 12     Q. See if we can work through it.
10:17 13     MR. KENNEDY: If it would make it
10:17 14 easier, we can stipulate that when you refer
10:17 15 to ClaimFacts with ClinicalLogic, we're
10:18 16 referring to as used at Harrington, and that
10:18 17 way you wouldn't have to --
10:18 18     MR. HENDERSHOT: Okay. That would
10:18 19 be great, if you don't mind.
10:18 20     Is that okay with you?
10:18 21     THE WITNESS: That's okay.
10:18 22     MR. HENDERSHOT: At this rate, it
10:18 23 may shave a few minutes off the deposition.
10:18 24 BY MR. HENDERSHOT:
10:18 25     Q. So ClaimFacts, as used at

Page 75

10:18 1 Harrington -- strike that.
10:18 2     So ClaimFacts with ClinicalLogic has
10:18 3 the ability to detect whether or not certain
10:18 4 codes should be billed together on the same
10:18 5 claim; is that correct?
10:18 6     A. Yes.
10:18 7     Q. And included among those sets of
10:18 8 codes that ClaimFacts with ClinicalLogic will
10:18 9 detect should not be billed together are
10:18 10 some codes that are medically exclusive; you
10:18 11 cannot perform code A with code B in the
10:18 12 same visit. Is that right?
10:18 13     A. I don't know that I can answer that.
10:18 14     Q. Okay. Well, we discussed earlier --
10:19 15 I used an oversimplified example, perhaps,
10:19 16 but if someone submitted two codes on the
10:19 17 same claim for amputation of the right
10:19 18 leg --
10:19 19     A. Uh-huh.
10:19 20     Q. -- that's a process, as I would
10:19 21 understand it, is medically impossible.
10:19 22     ClaimFacts with ClinicalLogic would
10:19 23 detect that, is that correct, as used at
10:19 24 Harrington?
10:19 25     A. I -- I don't know that for sure.

Page 76

10:19 1 I'm -- I'm thinking back that we may
10:19 2 actually get a different type of edit that's
10:19 3 not included in ClinicalLogic that would be
10:19 4 a -- a potential duplicate. And -- and
10:19 5 that's not part of the ClinicalLogic module.
10:19 6 And that may take precedence before it even
10:19 7 gets to ClinicalLogic.
10:19 8     Q. Okay. So there's --
10:19 9     A. But there's an edit that comes about
10:19 10 as -- as a result of ClaimFacts that would
10:19 11 identify that as potentially being an
10:19 12 incorrect bill.
10:19 13     Q. So the ClaimFacts core functionality
10:20 14 outside of the clinical -- the clinical
10:20 15 editing module in ClinicalLogic --
10:20 16     A. Right.
10:20 17     Q. -- includes some ability to detect,
10:20 18 at least in some circumstances, duplicate
10:20 19 codes?
10:20 20     A. That is correct.
10:20 21     Q. So the -- the ClaimFacts core
10:20 22 software includes some ability to examine
10:20 23 the codes that are included on a claim?
10:20 24     A. Yes.
10:20 25     Q. And in the circumstance where the

19 (Pages 73 to 76)

**Page 77**

10:20 1  ClaimFacts system would catch a duplicate
10:20 2  code, do you know if the ClaimFacts system
10:20 3  has some capability of correcting that
10:20 4  duplicate code?
10:20 5      A. There is the ability to
10:20 6  automatically deny it as a duplicate or to
10:20 7  warn.
10:20 8      Q. So the ClaimFacts software, outside
10:20 9  of ClinicalLogic, includes a means for
10:20 10  detecting the codes included on a claim and,
10:20 11  in some cases, rejecting certain codes that
10:20 12  are included on that claim for some
10:20 13  criteria?
10:20 14      A. Yes.
10:20 15      Q. And approving the other codes?
10:20 16      A. Yes.
10:21 17      Q. So getting back to your unbundling
10:21 18  example, there -- if a claim is submitted
10:21 19  with a code for an incision and a code for
10:21 20  the more comprehensive surgery --
10:21 21      A. Uh-huh.
10:21 22      Q. -- and it's understood that those
10:21 23  two codes should not be billed together,
10:21 24  Claim -- strike that.
10:21 25      ClaimFacts with ClinicalLogic

**Page 78**

10:21 1  includes the ability to detect and correct
10:21 2  unbundling; is that correct?
10:21 3      A. Correct.
10:21 4      Q. And by unbundling, I -- I mean, as
10:21 5  we discussed, the submission of one
10:21 6  comprehensive code and some other codes that
10:21 7  are included within that code on the same
10:21 8  claim. Is that consistent with your
10:21 9  understanding?
10:22 10      A. Yes.
10:22 11      Q. And ClaimFacts with ClinicalLogic has
10:22 12  the ability to detect and correct that
10:22 13  circumstance?
10:22 14      A. Yes.
10:22 15      Q. And in a situation where there is
10:22 16  unbundling, as I understand it, and correct
10:22 17  me if I'm wrong, the services represented by
10:22 18  the codes aren't necessarily exclusive from
10:22 19  a medical, practical standpoint, they could
10:22 20  be performed together, just they should not
10:22 21  be billed together; is that right?
10:22 22      A. Right.
10:22 23      Q. So ClaimFacts with ClinicalLogic has
10:22 24  some ability to detect codes that are, from
10:22 25  a billing standpoint, mutually exclusive; is

**Page 79**

10:22 1  that correct?
10:22 2      A. From a billing standpoint, yes.
10:22 3      Q. From a billing standpoint, not a
10:22 4  medical standpoint, right?
10:22 5      A. Right.
10:22 6      Q. But it also includes the capability
10:22 7  to correct -- detect and correct codes that
10:23 8  shouldn't be submitted together from a
10:23 9  medical standpoint; is that correct?  Are
10:23 10  there some rules in the database?
10:23 11      A. Yes.
10:23 12      Q. And the means by which ClaimFacts
10:23 13  with ClinicalLogic makes these determinations
10:23 14  that a code is mutually exclusive due to
10:23 15  some nonmedical criteria or exclusive due to
10:23 16  some medical criteria are the -- is the
10:23 17  ClaimFacts software; is that correct?
10:23 18      MR. KENNEDY: Objection; leading.
10:23 19  BY MR. HENDERSHOT:
10:23 20      Q. You can answer.
10:23 21      A. I will need you to restate that.
10:23 22      Q. Okay. And the means by which -- is
10:23 23  it true that the means by which the
10:23 24  ClaimFacts with ClinicalLogic system detects
10:23 25  and corrects codes that should not be billed

**Page 80**

10:23 1  together for medical reasons is the
10:23 2  ClaimFacts software? Strike that.
10:24 3      Is it the software within ClaimFacts
10:24 4  and ClinicalLogic that detects codes that
10:24 5  should not be billed together for medical
10:24 6  reasons?
10:24 7      A. Yes.
10:24 8      Q. So it's the software within
10:24 9  ClaimFacts and ClinicalLogic that detects and
10:24 10  determines whether or not codes submitted on
10:24 11  a claim are medically exclusive?
10:24 12      A. Yes.
10:24 13      Q. And it's also the software within
10:24 14  ClaimFacts and ClinicalLogic that detects and
10:24 15  determines whether or not codes, for
10:24 16  instance in unbundling edit, are mutually
10:24 17  exclusive due to some nonmedical criteria,
10:24 18  such as a billing criteria?
10:24 19      A. Yes, in -- in the case that we
10:24 20  talked about earlier, surgery cannot be
10:24 21  performed without first making an incision.
10:24 22  So in that instance, it would be a billing
10:24 23  issue, where it was billed incorrectly and
10:24 24  the system would catch that.
10:24 25      Q. Not a medical issue?

20 (Pages 77 to 80)

A. Not a medical issue.
Q. Because a surgery without an incision may actually be a medical issue?
A. Yes.
Q. Okay.
A. Yeah.
Q. And if -- strike that.
If ClaimFacts with ClinicaLogic determines that certain codes in a claim are invalid, ClaimFacts with ClinicaLogic includes the capability to revise that claim to correct the coding error?
A. Yes.
Q. And when ClaimFacts with ClinicaLogic revises a claim to reject invalid codes, does ClaimFacts with ClinicaLogic provide it -- strike that. That's too many ClaimFacts and ClinicaLogics.
When ClaimFacts with ClinicaLogic detects an invalid code and revises the code to rejects that -- strike that.
When ClaimFacts with ClinicaLogic detects an invalid code on a claim and revises the claim to correct that code, does

the system provide some explanation to the user as to why that revision took place?
A. Yes, it does.
Q. And the means by which that explanation is given is the software, some interface, I assume?
A. Yes.
MR. GARVINE: Would this be a good time for a break, Mike, or are you on the stretch run or --
MR. HENDERSHOT: Let's take a break now and I'll see whatever -- I think we're -- we're moving along. Let's take a break now and see --
MR. GARVINE: Yeah, no, that's fine. Because I -- would you like to take five?
THE WITNESS: Yeah.
MR. GARVINE: Okay.
(Recess taken.)
BY MR. HENDERSHOT:
Q. Ms. Keplinger, we discussed a number of functions performed by ClinicaLogic with ClaimFacts before we went off the record. All of the functionality that we've discussed today with respect to ClaimFacts

with ClinicaLogic is present within the product when you receive it from TriZetto; is that correct?
A. Yes.
Q. And just to make sure I'm clear, and included within that functionality is the ability to revise claims so that they don't include a rejected medical service code?
A. Yes.
Q. And the means by which that is done within ClaimFacts with ClinicaLogic is the software?
A. Yes.
Q. And ClaimFacts with ClinicaLogic, as received from TriZetto, also includes the capability to delete an invalid code from a medical service -- from a claim for medical services?
MR. KENNEDY: Objection; vague and ambiguous.
A. It has the ability to edit for deleted codes and then take the action that we have established, which is part of the rules.
Q. So if ClaimFacts with ClinicaLogic

receives a claim with a code that should not be paid, an invalid code, it will -- based on some rules or relationships with other codes in the claim, the system will delete that code from those codes that are going to be paid; is that correct?
A. It can.
Q. Okay. Under what circumstances would it?
A. It could delete it or roll it up and include it in another line if that was a more inclusive or a more comprehensive code.
Q. So ClaimFacts with ClinicaLogic includes the ability to delete an invalid code or roll it -- roll it into another code on another line?
A. It has the ability to -- to include a message that says deny a particular line because it is a deleted code.
Q. Okay.
A. Or to include it as part of another more all-inclusive code, if that's appropriate.
Q. But if a code on a claim should not be paid per the rules set up in

Page 85

10:40  1  ClinicaLogic, the ClaimFacts system will
10:40  2  delete that code from the codes that are
10:41  3  listed as paid?
10:41  4      A. Chances are -- if it is not included
10:41  5  in the other code or codes that are on that
10:41  6  particular claim, it will leave that code,
10:41  7  the line there, and will deny payment for
10:41  8  that code.
10:41  9      Q. So if a code doesn't pass the test
10:41 10  within ClinicaLogic, that code won't be
10:41 11  paid, obviously; is that correct?
10:41 12      A. That is correct.
10:41 13      Q. And in the circumstance where there
10:41 14  is an unbundling and a code is received on a
10:41 15  claim that is included within another code
10:42 16  that's received on a claim, how would
10:42 17  ClaimFacts with ClinicaLogic process that
10:42 18  and what sort of output would the user
10:42 19  receive?
10:42 20      A. In that example, we'll have a claim
10:42 21  with two line items. One line item is it
10:42 22  should have been billed with a more
10:42 23  comprehensive code. It would roll both up
10:42 24  into one line item and would also give us an
10:42 25  edit that indicated how it handled that. It

Page 86

10:42  1  would also take all the charges and roll it
10:42  2  up on the same line as well.
10:42  3      Q. So the -- the output to the user --
10:42  4      A. Would show one line.
10:42  5      Q. With the comprehensive code?
10:42  6      A. That is correct.
10:42  7      Q. And an explanation as to why --
10:42  8      A. That is correct.
10:42  9      Q. -- that code's there?
10:42 10      A. Right.
10:42 11      Q. But it would not include the invalid
10:42 12  codes that were submitted on the claim?
10:42 13      A. No.
10:43 14      Q. Are some of the -- strike that.
10:43 15          To your knowledge, are some of the
10:43 16  rules set up in the ClinicaLogic database
10:43 17  developed by physicians or a group of
10:43 18  physicians?
10:43 19      A. Yes.
10:43 20      Q. Why is that important to the --
10:43 21  strike that.
10:43 22          Is that an important fact in a claim
10:43 23  editing system?
10:43 24      A. Yes, you want it clinically sound.
10:43 25      Q. So you want to make sure that the --

Page 87

10:43  1  strike that.
10:43  2          So it's important that the
10:43  3  relationships between the medical service
10:43  4  codes and the -- in the claim editing logic
10:43  5  be clinically sound; is that correct?
10:43  6      A. Yes.
10:43  7      Q. And it's -- strike that.
10:43  8          And it is important that -- strike
10:43  9  that.
10:43 10          Are some of those relationships then
10:43 11  medically determined relationships? And the
10:43 12  relationships I'm referring to being the
10:43 13  relationships between the medical service
10:44 14  codes that determine whether or not they're
10:44 15  valid or invalid when received.
10:44 16      A. Yes.
10:44 17      Q. Are you aware of any use for the
10:44 18  relationships among the medical service
10:44 19  codes in the ClinicaLogic database other
10:44 20  than determining whether a code is valid
10:44 21  when received on a claim?
10:44 22      A. I'm --
10:44 23      Q. Is ClinicaLogic used for anything
10:44 24  other than processing claims for payment at
10:44 25  Harrington?

Page 88

10:44  1      A. I'm not sure what other -- other
10:44  2  reason that would be.
10:44  3      Q. Why is that?
10:44  4      A. The purpose of ClinicaLogic is to
10:44  5  look at the claims as submitted and compare
10:45  6  the codes there to make sure that they
10:45  7  are -- they're being billed correctly.
10:45  8      Q. Okay. So ClinicaLogic exists to
10:45  9  perform clinical editing?
10:45 10      A. That is its -- yes.
10:45 11      Q. Now, you had discussed earlier a
10:45 12  small number of customers that Harrington
10:45 13  has for which clinical editing is not
10:45 14  applied to their claims; is that correct?
10:45 15      A. No, I believe I said that there was
10:45 16  some situations such as with network claims
10:45 17  where a claim is submitted as billed by a
10:45 18  network physician or group where we do not
10:45 19  use ClinicaLogic on their claims, and that
10:45 20  is because they have their own clinical
10:45 21  editing process that they use as they -- as
10:45 22  they price claims within their system.
10:45 23      Q. Okay. So the -- the claims that
10:45 24  Harrington does not apply clinical editing
10:45 25  to have already been subjected to some

22 (Pages 85 to 88)

Page 105

11:03 1 of Claim 1, is the system that's at least in
11:03 2 part described in that paragraph consistent
11:03 3 with your understanding of the operations
11:03 4 and functionality of ClaimFacts?
11:03 5 A. Yes.
11:03 6 Q. So there's nothing in that first
11:03 7 paragraph of Claim 1, of the '164 patent,
11:03 8 that you see that is -- that is not present
11:03 9 in ClaimFacts with ClinicalLogic?
11:03 10 A. Well, after the quick --
11:04 11 Q. Yeah.
11:04 12 A. -- review, no, nothing at this
11:04 13 point.
11:04 14 Q. Well, ClinicalLogic -- we discussed
11:04 15 earlier, ClinicalLogic uses a computer
11:04 16 system, correct?
11:04 17 A. That is correct.
11:04 18 Q. And that computer system includes a
11:04 19 means for operating on a predetermined
11:04 20 database?
11:04 21 A. Yes.
11:04 22 Q. And that predetermined database
11:04 23 contains medical service codes and a set of
11:04 24 relationships among the medical service
11:04 25 codes; is that correct?

Page 106

11:04 1 A. Yes.
11:04 2 Q. And those relationships among the
11:04 3 medical service codes within the
11:04 4 ClinicalLogic database in ClaimFacts define
11:04 5 whether medical service codes are valid when
11:04 6 input with other medical service codes on a
11:04 7 claim, correct?
11:04 8 A. Correct.
11:04 9 Q. And the ClaimFacts system includes a
11:04 10 method for processing input claims
11:04 11 containing at least one medical service
11:04 12 code, correct?
11:04 13 A. Yes.
11:04 14 Q. And did I cover all the text in
11:04 15 Paragraph 1 of Claim 1 there?
11:04 16 A. Yes, I believe so.
11:04 17 Q. Okay. So everything, as you read it
11:05 18 here, as we've discussed, included from the
11:05 19 first paragraph of Claim 1 is present in the
11:05 20 ClaimFacts system with ClinicalLogic?
11:05 21 A. Yes.
11:05 22 Q. If you could move to the next line,
11:05 23 beginning with the word "receiving."
11:05 24 A. Uh-huh.
11:05 25 Q. Have you read that?

Page 107

11:05 1 A. Yes.
11:05 2 Q. Do you understand the term
11:05 3 "receiving at least one claim"?
11:05 4 A. I'm assuming that it means one -- at
11:05 5 least one service is present on the claim.
11:05 6 Q. Okay. Does the ClaimFacts system
11:05 7 with ClinicalLogic include the ability to
11:05 8 process multiple claims?
11:05 9 A. Yes.
11:05 10 Q. So ClaimFacts, as you understand it,
11:05 11 includes the ability to receive one claim or
11:05 12 more claims?
11:05 13 A. Yes.
11:05 14 Q. So ClaimFacts with ClinicalLogic
11:05 15 includes the ability to receive at least one
11:05 16 claim as recited here?
11:05 17 A. Yes.
11:05 18 Q. If you could move on to the next
11:05 19 line, it says, "determining whether any
11:05 20 medical service code," do you see that?
11:06 21 A. Yes.
11:06 22 Q. Could you read that to yourself for
11:06 23 me, please.
11:06 24 (Pause in proceedings.)
11:06 25 THE WITNESS: Okay.

Page 108

11:06 1 BY MR. HENDERSHOT:
11:06 2 Q. And at the end of that sentence or
11:06 3 that -- those three lines, it says -- it
11:06 4 references a predetermined database.
11:06 5 A. Uh-huh.
11:06 6 Q. We discussed earlier that there's a
11:06 7 predetermined database of medical service
11:06 8 codes and relationships in ClinicalLogic,
11:06 9 correct?
11:06 10 A. Right.
11:06 11 Q. Is that the data -- strike that.
11:06 12 So -- strike that.
11:06 13 Is it your understanding that
11:06 14 ClinicalLogic includes the ability to
11:06 15 determine whether any medical service code
11:06 16 contained in the at least one claim is not
11:06 17 present in the predetermined database?
11:06 18 A. Yes.
11:06 19 Q. So there's nothing thus far in
11:06 20 Claim 1 that we've discussed that is not
11:06 21 present in ClaimFacts, to your
11:06 22 understanding?
11:06 23 A. Correct.
11:06 24 Q. If you would turn to the last two
11:07 25 lines of Claim 1, beginning with the term --

27 (Pages 105 to 108)

**Page 109**

11:07 1 the words, "informing a user." Do you see
11:07 2 that?
11:07 3    A. Yes.
11:07 4    Q. Could you read those lines to
11:07 5 yourself for me, please.
11:07 6    A. Yes.
11:07 7    Q. Is there anything in those last two
11:07 8 lines that begin with "informing a user" in
11:07 9 Claim 1 that is not present, to your
11:07 10 knowledge, in the ClaimFacts system?
11:07 11    A. No.
11:07 12    Q. And you've used the ClaimFacts
11:07 13 system for over 11 years?
11:07 14    A. Yes.
11:07 15    Q. And you're being offered today as
11:07 16 the person most knowledgeable regarding
11:07 17 Harrington's use of ClaimFacts; is that
11:07 18 correct?
11:07 19    A. Yes.
11:07 20    Q. So as the person most knowledgeable
11:07 21 regarding Harrington's use of ClaimFacts and
11:07 22 a person who's used ClaimFacts for over 11
11:07 23 years, is there anything in the text of
11:07 24 Claim 1 that we've just been through that is
11:07 25 not present in the ClaimFacts product?

**Page 110**

11:07 1    A. Not that I can think of today.
11:07 2    Q. Okay. If you could turn to
11:07 3 Paragraph 2 or Claim 2.
11:07 4    MR. KENNEDY: Just to clarify, my
11:07 5 earlier objections are going to apply to
11:07 6 each and every claim that we go through.
11:08 7    MR. HENDERSHOT: Yeah, that's what I
11:08 8 assumed.
11:08 9    MR. KENNEDY: Okay.
11:08 10 BY MR. HENDERSHOT:
11:08 11    Q. If you could read the first
11:08 12 paragraph of Claim 2 for me.
11:08 13    Some of the text is similar to other
11:08 14 paragraphs, but if you could just go ahead
11:08 15 and read through each one for me, beginning
11:08 16 with the first paragraph now.
11:09 17    (Pause in proceedings.)
11:09 18    THE WITNESS: Okay.
11:09 19 BY MR. HENDERSHOT:
11:09 20    Q. Having read the first paragraph of
11:09 21 Claim 2 of the '164 patent, do you see any
11:09 22 elements described in that paragraph that is
11:09 23 not present in ClaimFacts, to your
11:09 24 understanding?
11:09 25    A. No.

**Page 111**

11:09 1    Q. If you could move on to the next
11:09 2 line, beginning with "receiving," within
11:09 3 Claim 2. Have you read that?
11:09 4    A. Yes.
11:09 5    Q. Do you understand ClaimFacts to
11:09 6 include the ability to receive at least one
11:09 7 claim --
11:09 8    A. Yes.
11:09 9    Q. -- as recited here in Claim 2?
11:09 10    A. Yes.
11:09 11    Q. If you turn to the -- move on to the
11:09 12 next two lines, which begin with
11:09 13 "ascertaining."
11:09 14    A. Uh-huh.
11:09 15    Q. Have you read those lines?
11:09 16    A. Yes.
11:09 17    Q. Is it your understanding that
11:09 18 ClaimFacts includes the ability to ascertain
11:09 19 whether the at least one claim contains a
11:09 20 plurality of medical service codes?
11:10 21    A. Yes.
11:10 22    Q. If you move on to the next
11:10 23 subparagraph beginning with "determining."
11:10 24    Let me know when you've read that.
11:10 25    (Pause in proceedings.)

**Page 112**

11:10 1    THE WITNESS: All right.
11:10 2 BY MR. HENDERSHOT:
11:10 3    Q. Is there anything described in that
11:10 4 subparagraph of Claim 2 of the '164 patent
11:10 5 that is not present in the ClaimFacts
11:10 6 system?
11:10 7    A. Not to my knowledge.
11:10 8    Q. Move on to the next subparagraph
11:10 9 beginning with "authorizing."
11:10 10    Let me know when you've read that.
11:10 11    (Pause in proceedings.)
11:10 12    THE WITNESS: Okay.
11:10 13 BY MR. HENDERSHOT:
11:10 14    Q. Do you see anything in that
11:10 15 paragraph of Claim 2 that is not present in
11:10 16 the ClaimFacts system?
11:10 17    A. No.
11:11 18    Q. If you could move on to the final
11:11 19 subparagraph of Claim 2 for me.
11:11 20    Let me know when you've read it.
11:11 21    (Pause in proceedings.)
11:11 22    THE WITNESS: All right.
11:11 23 BY MR. HENDERSHOT:
11:11 24    Q. Is everything described in that
11:11 25 subparagraph included within the ClaimFacts

Page 113

11:11  1  system as you understand it?
11:11  2      A. Yes.
11:11  3      Q. So every element described in
11:11  4  Claim 2 that you've just read is included
11:11  5  with claim -- strike that.
11:11  6      So every element of Claim 2 that you
11:11  7  just read of the '164 patent is included
11:11  8  within the ClaimFacts system?
11:11  9      A. With ClaimCheck -- Claim --
11:11 10  ClinicaLogic.
11:11 11      Q. Okay. So every element of Claim 2
11:11 12  of the '164 patent that you just read is
11:11 13  included within TriZetto's ClaimFacts
11:11 14  product with ClinicaLogic?
11:11 15      A. Yes.
11:12 16      Q. If you would turn to Claim 3. Read
11:12 17  the first paragraph beginning "a computer
11:12 18  system."
11:12 19      (Pause in proceedings.)
11:12 20      THE WITNESS: All right.
11:12 21  BY MR. HENDERSHOT:
11:12 22      Q. Is every element described in that
11:12 23  first paragraph of Claim 3 of the '164
11:12 24  patent present in the ClaimFacts system?
11:12 25      A. Yes.

Page 114

11:12  1      Q. If you could turn to the next
11:12  2  subparagraph of Claim 3.
11:12  3      (Pause in proceedings.)
11:12  4      THE WITNESS: Okay.
11:12  5  BY MR. HENDERSHOT:
11:12  6      Q. Is every element in that
11:12  7  subparagraph of Claim 3 of the '164 patent
11:12  8  included within the ClaimFacts system with
11:12  9  ClinicaLogic?
11:12 10      A. Yes.
11:12 11      Q. Got a short one now. If you'd turn
11:12 12  to the next line, "means for receiving."
11:12 13      A. Uh-huh.
11:12 14      Q. Do you understand ClaimFacts
11:13 15  including a means for receiving at least one
11:13 16  claim as recited here in Claim 3 of the '164
11:13 17  patent?
11:13 18      A. Yes.
11:13 19      Q. Read the next two lines, beginning
11:13 20  with "means for ascertaining."
11:13 21      A. Okay.
11:13 22      Q. Do you understand ClinicaLogic with
11:13 23  ClaimFacts -- strike that.
11:13 24      Do you understand ClaimFacts with
11:13 25  ClinicaLogic to include a means for

Page 115

11:13  1  ascertaining whether the at least one claim
11:13  2  contains a plurality of medical service
11:13  3  codes?
11:13  4      A. Yes.
11:13  5      Q. If you could turn to the next
11:13  6  subparagraph, beginning with "means for
11:13  7  determining."
11:13  8      (Pause in proceedings.)
11:13  9      THE WITNESS: Okay.
11:13 10  BY MR. HENDERSHOT:
11:13 11      Q. Is every element here in this
11:13 12  subparagraph, beginning with "means for
11:13 13  determining," of Claim 3 of the '164 patent
11:13 14  included within ClaimFacts with
11:13 15  ClinicaLogic?
11:13 16      A. Yes.
11:13 17      Q. Would you turn to the next
11:13 18  subparagraph, which is -- begins with "means
11:13 19  for authorizing."
11:14 20      A. All right.
11:14 21      Q. Is everything described in that
11:14 22  subparagraph of Claim 3 of the '164 patent
11:14 23  included within ClaimFacts with
11:14 24  ClinicaLogic?
11:14 25      A. Yes.

Page 116

11:14  1      Q. If you could turn to the last
11:14  2  subparagraph, Claim 3, beginning with "means
11:14  3  for rejecting."
11:14  4      A. Uh-huh.
11:14  5      Q. Is everything included within that
11:14  6  subparagraph of Claim 3 of the '164 patent
11:14  7  included within the ClaimFacts system with
11:14  8  ClinicaLogic?
11:14  9      A. Yes.
11:14 10      Q. So every element described here in
11:14 11  Claim 3 of the '164 patent is included
11:14 12  within the ClaimFacts system with
11:14 13  ClinicaLogic?
11:14 14      A. Yes.
11:14 15      Q. And it's included within the
11:14 16  claim -- strike that.
11:14 17      And every element of Claim 3
11:14 18  described here in the '164 patent is
11:14 19  included within ClaimFacts with ClinicaLogic
11:14 20  as you received it from TriZetto?
11:14 21      A. Yes.
11:14 22      Q. And that last question, is -- do
11:14 23  you -- is the answer also yes for Claims 2
11:14 24  and 1 that we've been through?
11:14 25      A. Yes.

29 (Pages 113 to 116)

Page 117

| | | |
|---|---|---|
| 11:14 | 1 | THE VIDEOGRAPHER: Excuse me. We |
| 11:15 | 2 | need to change the tapes real quick. We're |
| 11:15 | 3 | off the record. |
| 11:15 | 4 | (Pause in proceedings.) |
| 11:20 | 5 | BY MR. HENDERSHOT: |
| 11:20 | 6 | Q. Ms. Keplinger, before we went off |
| 11:20 | 7 | the record, I believe we discussed the |
| 11:20 | 8 | elements of Claims 1, 2, and 3 of the '164 |
| 11:20 | 9 | patent; is that correct? |
| 11:20 | 10 | A. Correct. |
| 11:20 | 11 | Q. And with respect to Claim 1 of the |
| 11:20 | 12 | '164 patent, you had identified no steps in |
| 11:20 | 13 | the method recited in Claim 1 that are not |
| 11:20 | 14 | performed by ClaimFacts with ClinicaLogic; |
| 11:20 | 15 | is that correct? |
| 11:20 | 16 | A. Correct. |
| 11:20 | 17 | Q. So everything disclosed in Claim 1 |
| 11:20 | 18 | of the '164 patent is performed by |
| 11:20 | 19 | ClaimFacts with ClinicaLogic? |
| 11:20 | 20 | A. Yes. |
| 11:20 | 21 | Q. And with respect to Claim 2, every |
| 11:20 | 22 | step disclosed in the method of Claim 2 of |
| 11:20 | 23 | the '164 patent is performed by ClinicaLogic |
| 11:20 | 24 | with -- strike that. |
| 11:20 | 25 | With respect to Claim 2 of the '164 |

Page 118

| | | |
|---|---|---|
| 11:20 | 1 | patent, every step of the method recited in |
| 11:20 | 2 | Claim 2 is performed by ClaimFacts with |
| 11:20 | 3 | ClinicaLogic; is that correct? |
| 11:20 | 4 | A. Correct. |
| 11:20 | 5 | Q. With respect to Claim 3, every |
| 11:21 | 6 | element of Claim 3 as described here in the |
| 11:21 | 7 | '164 patent is present in the ClaimFacts |
| 11:21 | 8 | system with ClinicaLogic; is that correct? |
| 11:21 | 9 | A. Correct. |
| 11:21 | 10 | Q. If I could turn your attention to |
| 11:21 | 11 | Claim 4, which is at the bottom of Column |
| 11:21 | 12 | 117. |
| 11:21 | 13 | A. Uh-huh. |
| 11:21 | 14 | Q. Claim 4 begins with the language |
| 11:21 | 15 | saying, "the apparatus of Claim 3." |
| 11:21 | 16 | I'll represent to you that that |
| 11:21 | 17 | means the elements of Claim 3 are |
| 11:21 | 18 | incorporated by reference in Claim 4. |
| 11:21 | 19 | A. All right. |
| 11:21 | 20 | Q. Given that we've discussed that all |
| 11:21 | 21 | the elements of Claim 3 of the '164 patent |
| 11:21 | 22 | are present in ClaimFacts with ClinicaLogic, |
| 11:21 | 23 | I assume that that would hold true for that |
| 11:21 | 24 | part of Claim 4, as well? |
| 11:21 | 25 | A. That is correct. |

Page 119

| | | |
|---|---|---|
| 11:21 | 1 | Q. Could you read the remainder of |
| 11:21 | 2 | Claim 4 for me. |
| 11:21 | 3 | (Pause in proceedings.) |
| 11:21 | 4 | THE WITNESS: Okay. |
| 11:21 | 5 | BY MR. HENDERSHOT: |
| 11:21 | 6 | Q. Is there anything described in |
| 11:21 | 7 | Claim 4 that is not performed by Clinic -- |
| 11:21 | 8 | ClaimFacts with ClinicaLogic? |
| 11:21 | 9 | A. No. |
| 11:21 | 10 | Q. So everything described in Claim 4, |
| 11:21 | 11 | including the elements referenced by |
| 11:22 | 12 | Claim 3, are present in ClaimFacts with |
| 11:22 | 13 | ClinicaLogic? |
| 11:22 | 14 | A. Yes. |
| 11:22 | 15 | Q. I'll direct your attention to |
| 11:22 | 16 | Claim 5 at the top of Column 118. Claim 5 |
| 11:22 | 17 | again incorporates the elements of 4 and 3. |
| 11:22 | 18 | Could you read the remainder of |
| 11:22 | 19 | Claim 5 for me, please. |
| 11:22 | 20 | (Pause in proceedings.) |
| 11:22 | 21 | THE WITNESS: Okay. |
| 11:22 | 22 | BY MR. HENDERSHOT: |
| 11:22 | 23 | Q. Does Claim 5 -- strike that. |
| 11:22 | 24 | Is there anything described in |
| 11:22 | 25 | Claim 5 of the '164 patent that is not |

Page 120

| | | |
|---|---|---|
| 11:22 | 1 | present in ClaimFacts with ClinicaLogic? |
| 11:22 | 2 | A. No. |
| 11:22 | 3 | Q. Would you turn to Claim 6, please. |
| 11:22 | 4 | Is there anything within Claim 6 |
| 11:22 | 5 | that's not included within ClaimFacts with |
| 11:22 | 6 | ClinicaLogic? |
| 11:22 | 7 | A. No. |
| 11:23 | 8 | Q. Are you familiar with CRVS codes, |
| 11:23 | 9 | Ms. Keplinger? |
| 11:23 | 10 | A. Not to any degree of detail. |
| 11:23 | 11 | Q. Do you know if any CRVS codes are |
| 11:23 | 12 | included within ClaimFacts and ClinicaLogic? |
| 11:23 | 13 | A. Not to my knowledge. |
| 11:23 | 14 | Q. Okay. If you could turn to Claim 8 |
| 11:23 | 15 | in Column 118. |
| 11:23 | 16 | (Pause in proceedings.) |
| 11:23 | 17 | THE WITNESS: Okay. |
| 11:23 | 18 | BY MR. HENDERSHOT: |
| 11:23 | 19 | Q. Is there any element in Claim 8 that |
| 11:23 | 20 | is not -- strike that. |
| 11:23 | 21 | Is everything described in Claim 8 |
| 11:23 | 22 | included within ClaimFacts with |
| 11:23 | 23 | ClinicaLogic? |
| 11:23 | 24 | A. Yes. |
| 11:23 | 25 | Q. Turn to Claim 9. |

30 (Pages 117 to 120)

Page 129

11:31 1    subparagraph beginning with, "A
11:31 2    predetermined database."
11:31 3        A. Okay.
11:31 4        Q. Is there anything within that
11:31 5    subparagraph of Claim 13 that is not present
11:32 6    within ClaimFacts with ClinicaLogic?
11:32 7        A. No.
11:32 8        Q. Could you read the next line of
11:32 9    Claim 13 beginning with, "Means for
11:32 10   receiving."
11:32 11       A. Okay.
11:32 12       Q. Is there anything present in that
11:32 13   line -- strike that.
11:32 14       Is everything described in that line
11:32 15   of Claim 13 present in ClaimFacts with
11:32 16   ClinicaLogic?
11:32 17       A. Yes.
11:32 18       Q. Would you read the next subparagraph
11:32 19   beginning with, "Means for determining."
11:32 20       A. Okay.
11:32 21       Q. Is there anything described in that
11:32 22   subparagraph of Claim 13 that's not present
11:32 23   in ClaimFacts with ClinicaLogic?
11:32 24       A. No.
11:32 25       Q. And what do you have as the next

Page 130

11:32 1    subparagraph?
11:32 2        A. "Means for informing."
11:32 3        Q. Could you read that subparagraph for
11:32 4    me.
11:32 5        A. Okay.
11:32 6        Q. Is there anything described in that
11:32 7    subparagraph of Claim 13 that's not present
11:32 8    in ClaimFacts with ClinicaLogic?
11:32 9        A. No.
11:33 10       Q. So everything recited in Claim 13 of
11:33 11   the '164 patent is present within ClaimFacts
11:33 12   with ClinicaLogic as Harrington receives
11:33 13   that from TriZetto?
11:33 14       A. Yes.
11:33 15       Q. Could you read the first
11:33 16   subparagraph of Claim 14, please.
11:33 17       A. Okay.
11:33 18       Q. Is there anything included within
11:33 19   that subparagraph that's not present in
11:33 20   ClaimFacts with ClinicaLogic?
11:33 21       A. No.
11:33 22       Q. Would you read the next subparagraph
11:33 23   beginning, "A predetermined database."
11:33 24       A. Okay.
11:33 25       Q. Is there anything present in that

Page 131

11:33 1    subparagraph of Claim 14 that's not present
11:33 2    in ClaimFacts?
11:33 3        A. No.
11:33 4        Q. Does the same hold true for the next
11:33 5    line?
11:33 6        A. Yes.
11:33 7        Q. The next subparagraph?
11:33 8        A. Yes.
11:33 9        Q. Everything described in the next
11:33 10   subparagraph beginning with, "Means for
11:33 11   determining," present in ClaimFacts?
11:33 12       A. Yes.
11:34 13       Q. Then with respect to the next
11:34 14   subparagraph that begins, "Means for
11:34 15   authorizing," is everything described in
11:34 16   that subparagraph present in ClaimFacts with
11:34 17   ClinicaLogic?
11:34 18       A. Yes.
11:34 19       Q. Then if you could read the last
11:34 20   paragraph of Claim 14 for me. Let me know
11:34 21   when you've read it.
11:34 22       A. Okay.
11:34 23       Q. Is there anything described in that
11:34 24   subparagraph of Claim 14 that's not present
11:34 25   in ClaimFacts with -- with ClinicaLogic?

Page 132

11:34 1        A. No.
11:34 2        Q. That's a no?
11:34 3        A. That's a no.
11:34 4        Q. So everything described in Claim 14
11:34 5    of the 164 patent is included within
11:34 6    ClaimFacts with ClinicaLogic as that product
11:34 7    is received from TriZetto?
11:34 8        A. Correct.
11:34 9        Q. Would you turn to Claim 15 for me,
11:34 10   please. Read the first subparagraph.
11:34 11       A. Okay.
11:34 12       Q. Is everything described in the first
11:35 13   subparagraph of Claim 15 present in
11:35 14   ClaimFacts with ClinicaLogic?
11:35 15       A. Yes.
11:35 16       Q. Does the same hold true for the next
11:35 17   subparagraph beginning with, "A
11:35 18   predetermined database"?
11:35 19       A. Yes.
11:35 20       Q. Does the same hold true for the next
11:35 21   line beginning, "Means for receiving"?
11:35 22       A. Yes.
11:35 23       Q. Does the same hold true for the next
11:35 24   two lines beginning with, "Means for
11:35 25   ascertaining"?

33 (Pages 129 to 132)

## Page 133

11:35 1    A. Yes.
11:35 2    Q. Does the same hold true for the next
11:35 3  subparagraph, "Means for determining"?
11:35 4    A. Yes.
11:35 5    Q. Does the same hold true for the next
11:35 6  subparagraph beginning, "Means for
11:35 7  authorizing"?
11:35 8    A. Yes.
11:35 9    Q. And does the same hold true for the
11:35 10  next subparagraph beginning, "Means for
11:35 11  rejecting"?
11:35 12    A. Yes.
11:35 13    Q. So every element described in
11:35 14  Claim 15 of the '164 patent is included
11:35 15  within ClaimFacts with ClinicaLogic as
11:35 16  received from TriZetto?
11:35 17    A. Yes.
11:35 18    Q. Could you turn to Claim 16 and read
11:35 19  the first subparagraph to yourself, please.
11:36 20      (Pause in proceedings.)
11:36 21    THE WITNESS: Okay.
11:36 22  BY MR. HENDERSHOT:
11:36 23    Q. Is everything described in the first
11:36 24  subparagraph of Claim 16 included within --
11:36 25  with -- strike that.

## Page 134

11:36 1    Is everything described in the first
11:36 2  subparagraph of Claim 16 included within
11:36 3  ClaimFacts with ClinicaLogic?
11:36 4    A. Yes.
11:36 5    Q. Does the same hold true for the next
11:36 6  line, beginning with receiving?
11:36 7    A. Yes.
11:36 8    Q. Does the same hold true for the next
11:36 9  line beginning with, "Ascertaining"?
11:36 10    A. Yes.
11:36 11    Q. Does the same hold true for the next
11:36 12  line beginning with, "Determining"?
11:36 13    A. Yes.
11:36 14    Q. Does the same hold true with the
11:36 15  next line beginning with, "Authorizing"?
11:36 16    A. Yes.
11:36 17    Q. And does the same hold true with the
11:36 18  next line with respect to "Rejecting"?
11:36 19    A. Yes.
11:36 20    Q. So every element described in
11:36 21  Claim 16 of the '164 patent is present in
11:37 22  ClaimFacts with ClinicaLogic as that product
11:37 23  is received from TriZetto?
11:37 24    A. Yes.
11:37 25    Q. So to make sure I've got everything

## Page 135

11:37 1  straight, it is your testimony that every
11:37 2  element of Claims 1, 2, 3, 4, 5, 6, 8, 9,
11:37 3  10, 11, 12, 13, 14, 15, and 16, of the '164
11:37 4  patent is either present in or practiced by
11:37 5  ClaimFacts with ClinicaLogic as that product
11:37 6  is received from TriZetto?
11:37 7    MR. KENNEDY: Objection; asked and
11:37 8  answered.
11:37 9  BY MR. HENDERSHOT:
11:37 10    Q. You can answer.
11:37 11    A. Yes.
11:38 12    Q. So the only claim within the '164
11:38 13  patent that we've discussed here today where
11:38 14  every limitation -- strike that.
11:38 15      So the only claim within the '164
11:38 16  patent, which are the numbered paragraphs at
11:38 17  the back of Exhibit 2, where every element
11:38 18  is not present within ClaimFacts with
11:38 19  ClinicaLogic is Claim 7 with respect to the
11:38 20  CRVS codes?
11:38 21    A. Yes.
11:38 22    Q. Every other element of every other
11:38 23  claim described here in the '164 patent is
11:38 24  present in ClaimFacts and ClinicaLogic?
11:38 25    MR. KENNEDY: Same objection. Asked

## Page 136

11:38 1  and answered.
11:38 2    A. Yes.
11:38 3    Q. Okay. Direct your attention to
11:38 4  Claim 3. The third subparagraph begins
11:38 5  with, "Means for receiving at least one
11:38 6  claim"?
11:38 7    A. Uh-huh.
11:38 8    Q. What is the means for receiving a
11:38 9  claim when using ClinicaLogic -- strike
11:39 10  that.
11:39 11      What is the means for receiving at
11:39 12  least one claim in ClaimFacts with
11:39 13  ClinicaLogic?
11:39 14    A. Same as it would be without it. I
11:39 15  mean, either a claim can be entered manually
11:39 16  or it can be entered electronically into the
11:39 17  system.
11:39 18    Q. And in either event, it's an
11:39 19  interface with a computer system --
11:39 20    A. Yes.
11:39 21    Q. -- where the claim is input?
11:39 22    A. That's correct.
11:39 23    Q. And with respect to the next
11:39 24  subparagraph, it says, "Means for
11:39 25  ascertaining whether the at least one claim

34 (Pages 133 to 136)

# EXHIBIT P

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE


MCKESSON INFORMATION          )
SOLUTIONS LLC,                )
                             )
          Plaintiff,          )
                             )
     -v-                      ) CIVIL ACTION NO.
                             ) 04-1258-SLR
THE TRIZETTO GROUP, INC.,     )
                             )
          Defendant.          )


          The videotaped 30(B)(6)deposition upon oral
examination of Key Benefits Administrators,
represented by  CLIFTON L. JONES, a witness produced
and sworn before me, Elizabeth T. Lindner, RPR, Notary
Public in and for the County of Hendricks, State of
Indiana, taken on behalf of the Plaintiff at the
Westin Hotel, 50 South Capitol Boulevard,
Indianapolis, Indiana, on September 23, 2005, at
9:07 a.m., pursuant to the Federal Rules of Civil
Procedure.

          STEWART RICHARDSON & ASSOCIATES
          Registered Professional Reporters
               One Indiana Square
                  Suite 2425
              Indianapolis, IN  46204
                 (317)237-3773

**Page 2**

```
 1        APPEARANCES
 2
 3   FOR THE PLAINTIFF:
 4      Jeffrey G. Randall, Esq.
        SKADDEN ARPS SLATE MEAGHER & FLOM LLP
 5      525 University Avenue
        Suite 1100
 6      Palo Alto, CA 94301
 7
     FOR THE DEFENDANT:
 8
        Daniel P. Muino, Esq.
 9      GIBSON DUNN & CRUTCHER LLP
        One Montgomery Street
10      San Francisco, CA 94104
11
     FOR THE WITNESS:
12
        Wallace T. Gray, Esq.
13      KEY BENEFIT ADMINISTRATORS, INC.
        8330 Allison Pointe Trail
14      Indianapolis, IN 46250
15
     ALSO PRESENT: Pete Zinkan, videographer
16      Maria Collier
17
18
19
20
21
22
23
24
25
```

**Page 3**

```
 1        INDEX OF EXAMINATION
 2                              PAGE
 3   DIRECT EXAMINATION
 4      Questions By Mr. Randall:        5
 5   CROSS-EXAMINATION
 6      Questions By Mr. Muino:         66
 7   REDIRECT EXAMINATION
 8      Questions By Mr. Randall:       69
 9
        INDEX OF PLAINTIFF'S EXHIBITS
10
     NUM.     DESCRIPTION          PAGE
11
     Exhibit 1   Subpoena issued to Key Benefit   4
12               Administrators, Inc.
13   Exhibit 2   Volume I - A, B(1-46)       13
                 Documents produced by KBA
14
     Exhibit 3   Volume II - B(47-60), C, D(1-53)  13
15               Documents produced by KBA
16   Exhibit 4   Volume III - E(1-25), F(1-56)   13
                 Documents produced by KBA
17
     Exhibit 5   Volume IV - G, H, I, J, K,     14
18               L(1-6), M, N(1-31)
19   Exhibit 6   Volume V - O(1-52), P(1-22)    14
20   Exhibit 7   United State Patent Number:    28
                 5,253,164
21
22
23
24
25
```

**Page 4**

```
 1        (Plaintiff's Exhibit 1 was marked for
 2   identification.)
 3        THE VIDEOGRAPHER:  Here begins the videotaped
 4   deposition of Clifton Jones taken by the plaintiff
 5   on Friday September the 23, 2005. We're going on
 6   the record at 9:07 a.m.
 7        This deposition is being held at the Westin
 8   Hotel in the third floor boardroom, Indianapolis,
 9   Indiana.
10        This case is pending in the United States
11   District Court, the District of Delaware, Cause No.
12   04-1258-SLR. This is McKesson Information
13   Solutions, LLC, versus TriZetto Group, Inc.
14        My name is Pete Zinkan with Stewart Richardson
15   and Associates located at One Indiana Square,
16   Indianapolis, Indiana, and I'm the video
17   specialist. The court reporter today is Liz
18   Lindner, also from Stewart Richardson.
19        The attorneys present may state their
20   appearance for the record, and the reporter will
21   issue the oath.
22        MR. RANDALL:  Jeff Randall with Skadden Arps
23   representing the plaintiff.
24        MR. MUINO:  Daniel Muino of Gibson Dunn &
25   Crutcher representing defendant, The TriZetto
```

**Page 5**

```
 1   Group.
 2        MR. GRAY:  Wallace T. Gray, general counsel,
 3   Key Benefit Administrators as counsel for deponent.
 4          CLIFTON L. JONES
 5   having been first duly sworn to tell the truth, the
 6   whole truth, and nothing but the truth took the stand
 7   and testified as follows:
 8   DIRECT EXAMINATION
 9   BY MR. RANDALL:
10   Q  Could you please state your full name for the
11      record, please.
12   A  Clifton Lee Jones.
13   Q  How are you employed, Mr. Jones?
14   A  How am I employed?
15   Q  By whom.
16   A  Key Benefit Administrators.
17   Q  In what capacity?
18   A  I am the Vice President of Information Technology.
19   Q  How long have you held that position?
20   A  I have been with Key Benefit Administrators for
21      over six years.
22   Q  Can you briefly describe and summarize your post
23      high school education.
24   A  Purdue University, 1971, computer technology.
25   Q  Is that when you received your degree?
```

**Page 14**

1      MR. RANDALL: I'll mark as Exhibit 5, Volume
2   IV containing tabs G, H, I, J, K, L1 through 6, M,
3   and N1 through 31 bearing Bates stamp ranges Key
4   01484 through Key 01793.
5      (Plaintiff's Exhibit 5 was marked for
6   identification.)
7      MR. RANDALL: I'll mark as Exhibit 6, Volume V
8   containing tabs O1 through 52 and P1 through 22
9   bearing Bates stamp ranges Key 01974 through
10   Key 01980.
11      (Plaintiff's Exhibit 6 was marked for
12   identification.)
13  Q  And, Mr. Jones, the question to you is, are the
14   documents I have marked as Exhibits 2 through 6
15   true and correct copies of the documents that KBA
16   produced to us in response to the subpoena, and
17   they are Bates stamped Key 1 through Key 1980,
18      MR. GRAY: May I, Counsel?
19      MR. RANDALL: Sure.
20      MR. GRAY: Mr. Jones did not do the copying.
21   The copying was done by an outside firm that was
22   hired by your firm. He was not part of that
23   process. I doubt that he could certify that those
24   are complete and exact based on what your firm did.
25   All we did was produce everything we had. And the

**Page 15**

1   copies, they are what they are. I don't want him
2   to make a false statement --
3      MR. RANDALL: I understand.
4      MR. GRAY: -- that he's unable to make.
5  Q  Let me phrase it this way: To the best of your
6   knowledge, are the documents Bates stamped Key 1
7   through Key 1980 that are contained in Exhibits 2
8   through 6 true and correct copies of KBA documents
9   that were kept in ordinary course of its business
10   and produced as such to us?
11  A  Yes, I believe so. Yes, without going through all
12   of these.
13      MR. GRAY: Okay. Thank you.
14  A  Okay. Is that fine?
15  Q  Yes. Does Key Benefits have any system in place to
16   automatically adjudicate medical claims by applying
17   clinical edits to medical service codes?
18  A  As KBA, we have an auto adjudication module
19   licensed through TriZetto.
20  Q  What's that called?
21  A  Auto Adjudication. But the second part of that
22   question, though, when you talked about clinical
23   edits, that's not included within that module
24   though.
25  Q  Does KBA use TriZetto's QuicLink?

**Page 16**

1  A  Yes, sir.
2  Q  And does it also use TriZetto's ClinicaLogic that
3   is embedded in QuicLink?
4  A  Yes.
5  Q  What does KBA use QuicLink along with the
6   integrated ClinicaLogic capability for?
7  A  ClinicaLogic sets in front of auto adjudication.
8   So as claims are coming through the system, whether
9   their electronic or data entered, let's say,
10   directly into it, ClinicaLogic rules are applied
11   then and either throw up warnings or deny things
12   based on procedure codes and diagnosis codes as far
13   as common practices.
14  Q  And so for instance, ClinicaLogic automatically
15   checks medical service codes within a claim to
16   determine, for instance, if those medical service
17   codes were improperly unbundled?
18  A  Yes.
19  Q  And ClinicaLogic then corrects that issue by
20   removing the improperly unbundled medical service
21   codes and inserting the appropriate comprehensive
22   medical service code for that procedure; correct?
23  A  Yes.
24  Q  Did KBA use a different system for that
25   functionality before using QuicLink with

**Page 17**

1   ClinicaLogic?
2  A  KBA was -- had license for another product that
3   performed that function, non-integrated, outside of
4   the QuicLink environment.
5  Q  And what product was that?
6  A  That was AutoAudit.
7  Q  How long did KBA use AutoAudit?
8  A  I can't recall, because that was purchased prior to
9   me coming to KBA.
10  Q  You were there at KBA when KBA made the change from
11   AutoAudit to QuicLink with ClinicaLogic; correct?
12  A  Yes.
13  Q  Change was made in 2002; is that right?
14  A  2003.
15  Q  When was the decision made to make the change?
16  A  Late 2002.
17  Q  Why was the decision made at KBA to make the change
18   from AutoAudit to QuicLink with ClinicaLogic?
19  A  Why was it?
20  Q  Yes.
21  A  Our goal was to increase our auto adjudication
22   claims, okay? And to do that you really need a
23   piece of software sitting in front of that that's
24   doing the clinical edits, which that's what
25   ClinicaLogic does. It is fully integrated into the

**Page 18**

1  QuicLink application on that same platform versus
2  an outside platform like AutoAudit was. So that's
3  why our goal was to increase auto adjudication.
4  That was a piece of software that would help us get
5  there.
6  Q  Why was it important to increase auto adjudication
7  of medical claims?
8  A  Cost savings efficiencies for the corporation
9  versus having a human being to pay that claim,
10  process and adjudicate it.
11  Q  Did, to your knowledge, KBA ever consider instead
12  of moving from AutoAudit to QuicLink with
13  ClinicaLogic, did KBA ever consider reviewing
14  medical claims for clinical edits manually?
15  A  Can you restate that, please. Sorry.
16  Q  Sure. Instead of using and moving to QuicLink with
17  ClinicaLogic, did KBA consider simply reviewing the
18  100 plus thousand medical claims a year to perform
19  clinical edits on medical service codes manually?
20  A  I really -- I can't answer that question. I mean,
21  I can suppose or whatever, but I really can't
22  answer that accurately.
23  Q  What benefits, if any, does an automated system for
24  performing clinical edits on medical service codes
25  with any claim provide KBA?

**Page 19**

1  A  What benefits?
2  Q  Yes.
3  A  That would be in labor versus --
4  Q  What would be what?
5  A  It would be a reduction in labor costs, let's say.
6  If you're running a claim through an automated
7  process such as ClinicaLogic versus somebody
8  looking at it as they're presented to them a claim
9  to adjudicate it and those type of things.
10  Q  Does it increase reliability?
11  A  What do you mean by reliability?
12  Q  Is the system more reliable than having multiple
13  human being utilizing their subjective views and
14  sometimes mistaken views on analyzing claims?
15  A  Yes, you would believe it would be.
16  Q  And is it also more consistent and predictable to
17  do it automatically?
18  A  Yes.
19  Q  And is that a benefit to KBA?
20  A  Yes.
21  Q  Approximately what is the percentage savings that
22  KBA receives from passing its claims through
23  QuicLink's ClinicaLogic in order to catch
24  irregularities?
25  A  I don't have that information.

**Page 20**

1  Q  What's your best estimate? 10 percent?
2  A  I don't believe I can fairly make a guess at that.
3  Q  It does save money from the amount of the claims
4  input to the amount of the claims paid, does it
5  not, sir?
6  A  That's correct, yes, sir.
7  Q  And is that percentage savings above 5 percent?
8  A  I cannot accurately state that it is or is not.
9  Q  It saves --
10  A  I am not a user of that report savings or whatever.
11  Q  QuicLink does generate specifically a savings
12  report indicating what claims have been input into
13  the system. And based on clinical editing
14  performed on those claims, what was paid and the
15  resulting savings; correct?
16  A  Yes.
17  Q  And it does that because KBA, and presumably other
18  customers, want to know exactly what they saved by
19  using ClinicaLogic; correct?
20  A  Yes, I guess so. Saved is a -- I'm not sure that's
21  an appropriate word but whatever. That's okay.
22  Q  Well, the alternative is to simply pay the claims
23  when they come in; correct?
24  A  That's right.
25  Q  By running the claims through ClinicaLogic, there

**Page 21**

1  is a savings that is received from either -- as an
2  alternative to paying the claims; correct?
3  A  That's correct, yes, sir.
4  Q  And that savings is millions of dollars a year;
5  correct?
6  A  It could potentially be, yes.
7  Q  And it is, in fact, for KBA; correct?
8  A  I cannot answer that, no.
9  Q  So your best estimate it is in the millions,
10  though; correct?
11  A  You know, I cannot answer that, no. I mean...
12  Q  I want to ask you some questions about how QuicLink
13  with ClinicaLogic operates, okay?
14  A  Okay.
15  Q  It operates with a computer system; right?
16  A  That's correct. Yes. Yes.
17  Q  And it has a predetermined database containing
18  medical service codes; correct?
19  A  Yes.
20  Q  And the database has a set of relationships among
21  the medical service codes; correct?
22  A  Yes.
23  Q  And the set of relationships among the medical
24  service codes in the predetermined database defines
25  whether selected medical service codes are valid

## Page 22

1    when input with other medical service codes;
2    correct?
3    A Yes.
4    Q And I'm going to ask you some questions about
5    actual operating systems as well, QuicLink with
6    ClinicaLogic. Does it allow for processing claims
7    containing at least one medical service code? Can
8    you process a claim using QuicLink and ClinicaLogic
9    that contains one medical service code?
10   A I don't believe I can accurately answer that
11   question. I believe it would, though. Yes. You
12   have a claim with one service code on it?
13   Q Yes.
14   A One procedure code?
15   Q Yes.
16   A Yes.
17   Q There's no question about that; right?
18   A Yeah.
19   Q Some of these may be very elementary questions, but
20   I have to ask them anyway, all right?
21   A Okay. Yes, sir.
22   Q It doesn't have to be difficult. I have to ask
23   some of these foundational questions, all right?
24   A Okay.
25   Q So QuicLink with ClinicaLogic can receive at least

## Page 23

1    one claim with a medical service code; correct?
2    A Yes.
3    Q And it determines whether a medical service code
4    contained in the claim is not present in the
5    predetermined database; correct?
6    A Yes.
7    Q And it informs the user that a medical service code
8    is not contained in the predetermined database;
9    correct?
10   A Yes.
11   Q QuicLink with ClinicaLogic also ascertains whether
12   a claim contains a number of medical service codes;
13   correct?
14   A Yes.
15   Q QuicLink with ClinicaLogic also determines whether
16   one of the medical service codes in a claim is
17   mutually exclusive due to non-medical criteria with
18   another medical service code; correct?
19       MR. MUINO: Objection, vague and ambiguous as
20   to mutually exclusive and non-medical criteria.
21       MR. GRAY: You can answer the question.
22   A I'm sorry. Yes.
23   Q Okay. Yes?
24   A Yes.
25   Q QuicLink with ClinicaLogic authorizes medical

## Page 24

1    service codes which are not mutually exclusive due
2    to non-medical criteria; correct?
3        MR. MUINO: Objection. Same objections.
4    A Yes.
5    Q QuicLink with ClinicaLogic will reject medical
6    service codes in a claim that are mutually
7    exclusive due to non-medical criteria with other
8    medical service codes in the claim; correct?
9        MR. MUINO: Same objections.
10   A Yes.
11   Q QuicLink with ClinicaLogic contains an ability for
12   determining whether one medical service code among
13   several in a claim is valid or invalid by
14   interacting with the database and the set of
15   relationships contained in the database; correct?
16   A Yes.
17   Q QuicLink where ClinicaLogic contains the ability
18   for authorizing medical service codes which are
19   valid in response to interacting with the database
20   and the set of relationships contained therein;
21   correct?
22   A Yes.
23   Q QuicLink with ClinicaLogic will revise a claim to
24   delete what it has determined to be an invalid
25   medical service code; correct?

## Page 25

1    A Yes, I believe so.
2    Q QuicLink with ClinicaLogic automatically
3    adjudicates claims that contain CPT medical codes,
4    correct, CPT-4 medical codes?
5    A Can you rephrase that question.
6    Q Sure. The claims that are automatically
7    adjudicated and -- strike that.
8        The claims that QuicLink with ClinicaLogic
9    applies clinical editing to contain CPT codes;
10   correct?
11   A That's correct. Yes.
12   Q The predetermined database that operates in
13   conjunction with QuicLink and ClinicaLogic
14   contains, among other things, relationships among
15   medical service codes including medically
16   determined relationships; correct?
17   A Yes.
18   Q QuicLink with ClinicaLogic has an ability to
19   determine whether one of the medical service codes
20   in a claim is included in any other medical service
21   code within the claim; correct?
22   A Yes.
23   Q ClinicaLogic -- strike that.
24   Q QuicLink with ClinicaLogic contains the
25   ability for authorizing medical service codes which

**Page 26**

1    are not contained in any other medical service code
2    and the ability for rejecting medical service codes
3    which are contained in other medical service codes;
4    correct?
5    A  Yes.
6    Q  QuicLink with ClinicaLogic contains the ability to
7    revise a claim so that it does not include a
8    rejected medical service code; correct?
9    A  Please restate that.
10   Q  Sure.  Does QuicLink with ClinicaLogic have the
11   ability to revise a claim to exclude a rejected
12   medical service code?
13   A  Yes.
14   Q  Does QuicLink with ClinicaLogic -- does the system
15   include -- strike that.  Is the system comprised
16   of, including other things, a computer system with
17   one or more central processing units and associated
18   memory for processing input claims?
19   A  Restate that again for me, please.
20   Q  Sure.  Does the QuicLink with ClinicaLogic system
21   include one or more central processing units -- let
22   me state it another way.  Does it include one or
23   more microprocessors and associated memory for
24   processing input claims?
25   A  If I understand the question, I'd say no.

**Page 27**

1    ClinicaLogic and QuicLink is a piece of software.
2    You've thrown in hardware with me now, too, which
3    those are mutually exclusive, okay?
4    Q  There are no uses that you can think of other than
5    perhaps as a coaster on the table, that the
6    software can be utilized for other than in
7    connection with the computer system that includes
8    central processing unit and associated memory; is
9    that correct?
10   A  Yes, that is correct.
11   Q  It is the clinical -- strike that.
12       The QuicLink product with ClinicaLogic is, to
13   your knowledge, marketed by TriZetto, promoted by
14   TriZetto, sold by TriZetto and used by customers
15   such as KBA with a computer system that has central
16   processing unit and associated memory for
17   processing input claims; correct?
18   A  Yes.
19   Q  QuicLink with ClinicaLogic contains the ability to
20   determine whether one medical service code in a
21   claim is medically exclusive with another medical
22   service code in the claim; correct?
23       MR. MUINO:  Objection vague and ambiguous as
24   to medically exclusive.
25   A  Yes.

**Page 28**

1    Q  The system also contains the ability to authorize
2    medical service codes which are not medically
3    exclusive with other medical service codes
4    contained in the claim; correct?
5        MR. MUINO:  Same objection.
6    A  Yes.
7    Q  And QuicLink with ClinicaLogic contains the ability
8    to reject medical service codes which are medically
9    exclusive with other medical service codes in the
10   claim; correct?
11       MR. MUINO:  Same objection.
12   A  Yes.
13       MR. RANDALL:  I'll mark for identification as
14   Exhibit 7 McKesson's '164 patent.
15       (Plaintiff's Exhibit 7 was marked for
16   identification.)
17   Q  Mr. Jones, I have shown you McKesson's '164 patent,
18   and specifically what I'd like to direct your
19   attention to is the last two pages of the document,
20   the upper left-hand column it is labeled 117.
21   That's column 117.  And right below that says what
22   is claimed.  And then there are a series of
23   numbers, on this page 1 through 12 and on the next
24   page through 16.  Do you see that?
25   A  (Witness nodded head affirmatively.)

**Page 29**

1    Q  Is that a yes?
2    A  Yes.  I mean, I have a column 117 and column 118
3    and column 119 and a column 120.  Yes.
4    Q  Okay.  What is contained in those columns is
5    numbered paragraphs.  Do you see that?
6    A  Yes.
7    Q  I'm going to ask you a series of questions about
8    each of those numbered paragraphs.  All right?
9    A  Okay.
10   Q  With respect to -- and each of those numbered
11   paragraphs by the way, sir, are claims, patent
12   claims, all right?  And so if I ask you about
13   claim 1, I'm referring to everything that is
14   contained and described after paragraph 1 and
15   excluding paragraph 2, all right?
16   A  Okay.
17   Q  So could you please read claim 1 to yourself and
18   the question that I have for you is, does QuicLink
19   with ClinicaLogic operate to perform the steps
20   described in claim 1?
21       MR. MUINO:  I have to object to this line of
22   questioning on the grounds that it calls for
23   speculation, calls for expert opinion, and it calls
24   for legal conclusion.  As before, Mr. Randall, if I
25   could get a standing objection as to this line of

**Page 30**

1  questioning.
2    MR. RANDALL:  You can.
3    MR. MUINO:  Great.
4  A  Okay.  What is the question?
5  Q  Question is, does QuicLink with ClinicaLogic
6    operate to perform the steps described in claim 1?
7    Is that a yes?
8  A  As I understand it, it does, yes.
9  Q  Okay.
10  A  Okay.
11  Q  And I am asking you these questions based on your
12    understanding and your knowledge of the product and
13    your experience.
14  A  Okay.
15  Q  Can you read claim 2, and I'd like to ask you the
16    exact same question.  Does QuicLink with
17    ClinicaLogic perform steps described in claim 2?
18  A  Yes.
19  Q  With respect to claim 3, the question is just
20    slightly different.  Does QuicLink with
21    ClinicaLogic contain the components described in
22    claim 3?
23  A  Yes.
24  Q  With respect to claim 4, claim 4 contains all of
25    the elements of claim 3 with the added limitation

**Page 31**

1    described there.  So the question is, does QuicLink
2    with ClinicaLogic contain all of the components of
3    claim 3, which you just indicated it does, and the
4    added component of claim 4?
5  A  Yes.
6  Q  With respect to claim 5, claim 5 includes all of
7    the elements of claim 3 and claim 4 with the added
8    component of claim 5.  And so the question is, does
9    QuicLink with ClinicaLogic contain the components
10    of claims 3 and 4 which you've already said yes to,
11    and 5?
12  A  Yes.  To the best of my knowledge, yes.
13  Q  With respect to claim 6, claim 6 includes all of
14    the components from claim 3 and the added component
15    of claim 6.  And so the question is, does QuicLink
16    with ClinicaLogic contain all of the components
17    described in claim 3 and claim 6?
18  A  Yes.
19  Q  Claim 7 is very similar.  It contains all of the
20    elements of claim 3 -- I'm sorry.  I'll move to
21    claim 8.  Claim 8 contains all of the elements of
22    claim 3 and the added component of claim 8.  And
23    the question is, does QuicLink with ClinicaLogic
24    include all of the components of claim 3 and
25    claim 8?

**Page 32**

1  A  Yes.
2  Q  With respect to claim 9, claim 9 contains all of
3    the components of claim 3 and the component
4    described in claim 9.  Does QuicLink with
5    ClinicaLogic include all of the components of
6    claim 3 and claim 9?
7  A  Yes.
8  Q  Does QuicLink with ClinicaLogic include the
9    components described in claim 10?
10  A  Yes.
11  Q  Does QuicLink with ClinicaLogic contain all of the
12    components with claim 10 and claim 11?
13  A  Yes.
14  Q  Does QuicLink with ClinicaLogic contain all of the
15    components described in claim 12?
16  A  Yes.
17  Q  Does QuicLink -- turning the page to column 19, the
18    last page of the patent -- does QuicLink with
19    ClinicaLogic contain the components described in
20    claim 13?
21  A  Yes.
22  Q  Does QuicLink with ClinicaLogic contain the
23    components contained in claim 14?
24  A  Yes.
25  Q  Does QuicLink with ClinicaLogic include the

**Page 33**

1    components described in claim 15?
2  A  Yes.
3  Q  Does QuicLink with ClinicaLogic perform the steps
4    described in claim 16?
5  A  Yes.
6  Q  Going back to claim 3 for a minute.  The -- about
7    halfway through claim there's a statement that
8    says, "Means for receiving at least one claim."  Do
9    you see that?
10  A  Yes.
11  Q  Does QuicLink with ClinicaLogic receive claims that
12    are either input manually or electronically through
13    batch processing?
14  A  Yes.
15  Q  It does it both ways; right?
16  A  Yes, sir.
17  Q  Does QuicLink with ClinicaLogic ascertain -- moving
18    down to the next item -- ascertain whether at least
19    one claim contains the plurality of medical service
20    codes through software?  Is that how it does that?
21  A  Yes.
22  Q  And the next step, means for determining whether
23    one of the medical service codes in the plurality
24    of medical service codes is valid or invalid by
25    interacting with the database and set of services

**Page 34**

1 contained in the database. Do you see that?
2 A Yes.
3 Q How does QuicLink with ClinicaLogic perform that
4 function? Through software?
5 A Through software just as it states here it's a
6 database of rules.
7 Q And the last two elements, means for authorizing
8 medical service codes, means for rejecting
9 medical service codes, are the means that QuicLink and
10 ClinicaLogic utilize to perform those functions
11 also the software and the product in conjunction
12 with the database?
13 A Yes.
14 Q And the database -- strike that. The predetermined
15 database that is utilized by QuicLink with
16 ClinicaLogic contains a set of high level rules or
17 edits; correct?
18 A That's correct.
19 Q And within each of those high level rules or edits,
20 there is populated a -- thousands of sets of
21 relationships among medical codes; correct?
22 A Yes.
23 Q Was there anything about those questions I just
24 asked you about the claims that you didn't
25 understand?

**Page 35**

1 A No, sir.
2 Q Is there anything about the questions that I asked
3 you about the claims that you were incompetent
4 based on a lack of education or a lack of
5 experience in answering my questions?
6 A No, sir.
7 Q Was the clinical editing criteria in ClinicaLogic a
8 reason for purchasing both it and QuicLink? Strike
9 that.
10 Was one of the reasons that KBA purchased
11 ClinicaLogic the clinical editing criteria used in
12 ClinicaLogic?
13 A Again, our goal was to improve auto adjudication
14 rates. ClinicaLogic fits in closely knit with
15 QuicLink, okay? So it's a part of that process,
16 that flow. That makes that product viable for us
17 in our environment.
18 Q To your knowledge, would KBA utilize a claims
19 processing system that did not include the
20 capability to automatically provide clinical edits
21 to medical service codes?
22 A Can you re-ask that question, please.
23 Q Sure. You've said a couple times that KBA's goal
24 was to improve auto adjudication of claims; right?
25 A Yes.

**Page 36**

1 Q By the word auto you mean automatic; right?
2 A Automatic, yes.
3 Q Improve the rates in doing that; correct?
4 A Yes.
5 Q Also improve the accuracy, reliability, and
6 predictability; correct?
7 A Yes.
8 Q Given that goal, would KBA consider utilizing the
9 claims processing system that did not have the
10 capability to automatically provide clinical edits
11 to medical service codes?
12 A In my opinion they would not, okay?
13 Q Did TriZetto market to KBA its ClinicaLogic with
14 QuicLink as a comprehensive solution to providing
15 automatic clinical editing to medical service
16 codes?
17 A Yes, I believe so.
18 Q Did TriZetto train KBA employees on how to use
19 QuicLink with ClinicaLogic?
20 A Yes.
21 Q Did TriZetto assist in the implementation at KBA of
22 QuicLink with ClinicaLogic?
23 A Yes.
24 Q Did TriZetto provide on-going maintenance to KBA
25 regarding the operation of QuicLink with

**Page 37**

1 ClinicaLogic?
2 A Yes, they do.
3 Q Did and does TriZetto provide technical support to
4 KBA regarding the operation of QuicLink with
5 ClinicaLogic?
6 A Yes.
7 Q Did TriZetto make recommendations to KBA regarding
8 how to set up the application of their various
9 edits in ClinicaLogic?
10 A That I cannot answer.
11 Q Did, in fact, the use by KBA of QuicLink with
12 ClinicaLogic improve the rate of automatic
13 adjudication of claims at KBA?
14 A I can't answer that for sure.
15 Q Was one of the reasons that KBA purchased
16 ClinicaLogic with QuicLink from TriZetto that it
17 would provide cost savings to KBA?
18 A Not the primary goal, no. One of them you said.
19 Q Was that one of the factors?
20 A One of them. I would say one of them, yes.
21 Q To your knowledge, has KBA had any communications
22 with TriZetto regarding McKesson's '164 patent or
23 the lawsuit?
24 A I have no knowledge of that.
25     MR. RANDALL: Why don't we take a couple

0 (Pages 34 to 37)

EXHIBIT Q

Page 1

1      UNITED STATES DISTRICT COURT
2      FOR THE DISTRICT OF DELAWARE
3
4   McKESSON INFORMATION SOLUTIONS LLC.
5            Plaintiff,
6        -against-        Civil Action No.
                          04-1258-SLR
7   THE TRIZETTO GROUP, INC.,
8            Defendant.
9
10
11
12
13
14      VIDEOTAPED DEPOSITION OF KAREN LAMPE
15          New York, New York
16        Wednesday, September 14, 2005
17
18
19
20
21   Reported by:
     CATHI IRISH
22   RPR/CLVS
23   JOB NO. 38481
24
25

Page 2

1
2
3
4              September 14, 2005
5                 12:04 p.m.
6
7
8        Videotaped deposition of KAREN LAMPE,
9   held at Skadden, Arps, Slate, Meagher & Flom
10  LLP, 4 Times Square, 38th Floor, New York,
11  New York, pursuant to Notice, before Cathi
12  Irish, a Registered Professional Reporter and
13  Notary Public of the State of New York.
14
15
16
17
18
19
20
21
22
23
24
25

Page 3

1
2
3
4   APPEARANCES:
5
6   SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
7   Attorneys for Plaintiff
8       525 University Avenue
9       Palo Alto, California 94301
10      (650) 470-4500
11  BY:  JEFF RANDALL, ESQ.
12      E-mail: jrandall@skadden.com
13
14  GIBSON, DUNN & CRUTCHER LLP
15  Attorneys for Defendant
16      One Montgomery Street
17      San Francisco, California 94104-4505
18      (415) 393-8233
19  BY:  DANIEL P. MUINO, ESQ.
20      E-mail: dmuino@gibsondunn.com
21
22  ALSO PRESENT:
23      Jeffrey Suazo, videographer
24
25

Page 4

12:03  1       THE VIDEOGRAPHER:  This is tape number
12:04  2   1 of the videotaped deposition of Karen Lampe
12:04  3   in the matter McKesson Information Solutions
12:04  4   LLC, plaintiff, versus The TriZetto Group,
12:04  5   Inc., defendant in the United States District
12:04  6   Court for the District of Delaware, Civil
12:04  7   Action Number 04-1258-SLR.
12:04  8       This deposition is being held at
12:04  9   Skadden, Arps, Slate, Meagher & Flom LLP, 4
12:04  10  Times Square, 38th Floor, New York, New York,
12:04  11  10036 on September 14, 2005 at approximately
12:04  12  12:04 p.m.  My name is Jeffrey Suazo from the
12:04  13  firm of Global Deposition Services, Inc. and I
12:04  14  am the legal video specialist.  The court
12:04  15  reporter is Cathi Irish in association with
12:04  16  Global Deposition Services, Inc.
12:04  17      Would Counsel please introduce
12:05  18  themselves?
12:05  19      MR. RANDALL:  Jeff Randall with
12:05  20  Skadden, Arps representing plaintiff McKesson.
12:05  21      MR. MUINO:  Daniel Muino with Gibson,
12:05  22  Dunn & Crutcher for defendant The TriZetto
12:05  23  Group and witness Karen Lampe.
12:05  24      THE VIDEOGRAPHER:  Will the court
12:05  25  reporter please swear in the witness?

1 (Pages 1 to 4)

Page 5

12:05 1  K A R E N   L A M P E,   called as a
12:05 2    witness, having been duly sworn by a Notary
12:05 3    Public, was examined and testified as follows:
12:05 4  EXAMINATION BY
12:05 5  MR. RANDALL:
12:05 6    Q.  Will you please state your full name
12:05 7  for the record, please?
12:05 8    A.  Karen Helen Lampe.
12:05 9    Q.  Ms. Lampe, how are you employed?
12:05 10    A.  I'm employed by The TriZetto Group.
12:05 11    Q.  How long have you been so employed?
12:05 12    A.  Seven years, just over seven years.
12:05 13    Q.  Prior to that --
12:05 14    A.  Prior to that --
12:05 15    Q.  -- who did you work for?
12:05 16    A.  -- I worked for the Chubb Life -- Chubb
12:05 17  Life America subsidiary of Chubb & Son.
12:05 18    Q.  So you worked at TriZetto or its
12:06 19  predecessor, Erisco, from 1998 on?
12:06 20    A.  Right, Yes.
12:06 21    Q.  And what were the years that you worked
12:06 22  at Chubb?
12:06 23    A.  1987 to 1998.
12:06 24    Q.  Could you briefly summarize your post
12:06 25  high school education?

Page 6

12:06 1    A.  I spent a little less than a year at
12:06 2  college. Since joining the insurance industry,
12:06 3  which I did after that, I've received insurance
12:06 4  designations from LOMA, which is the Life Office
12:06 5  Management -- LOMA, L-O-M-A -- Life Office
12:06 6  Management Association, AHIMA, which is the
12:06 7  American Health Information Management
12:06 8  Association, and HIA, which is the Health
12:07 9  Information Association.
12:07 10    Q.  What year did you attend college?
12:07 11    A.  1975.
12:07 12    Q.  I take it you did not get a degree?
12:07 13    A.  No.
12:07 14    Q.  You attended for a year?
12:07 15    A.  Yes. No, well, less than a year.
12:07 16    Q.  All right. After that, what did you do
12:07 17  for work?
12:07 18    A.  I went to work as -- at Kmart, and then
12:07 19  from there about a year and a half there,
12:07 20  and then went to work for Prudential, which is
12:07 21  where I started my insurance career.
12:07 22    Q.  Did you start approximately 1978 at
12:07 23  Prudential?
12:07 24    A.  Yeah, that would be right. Yeah, I
12:07 25  think so.  .

Page 7

12:07 1    Q.  What did you do beginning in
12:07 2  approximately 1978 for Prudential?
12:07 3    A.  I worked as a claims examiner.
12:07 4    Q.  What did that entail?
12:07 5    A.  Receiving claims in from insured
12:08 6  persons. I happened to work for the American
12:08 7  Airlines division, so we only dealt with employees
12:08 8  of American Airlines. They would send in
12:08 9  healthcare claims. I would review them, input
12:08 10  them into the computer system that pretty much
12:08 11  said what benefits they got. Claims that were
12:08 12  more complicated I would be responsible for
12:08 13  referring to the proper person for review. And
12:08 14  that's pretty much what I did there. I worked
12:08 15  there for about a year and a half.
12:08 16    Q.  What would make a claim at that time
12:08 17  complicated so that you would refer it to someone
12:08 18  else?
12:08 19    A.  More than one surgery. Maybe home
12:08 20  healthcare that we didn't see a lot or, you know,
12:08 21  in-home nursing, review that for appropriateness
12:09 22  and whether or not it was eligible under the plan.
12:09 23    Q.  And what were you specifically looking
12:09 24  for in order to approve or disallow a claim at
12:09 25  that time for Prudential?

Page 8

12:09 1    A.  Eligibility under the plan, which was
12:09 2  most of the time determined by the computer
12:09 3  processing system for effective date, termination
12:09 4  date, age requirements, if they were a child and a
12:09 5  student. Oh, gosh --
12:09 6    Q.  Did you look for irregularities in
12:09 7  medical service, for instance?
12:09 8    A.  Well, at that time I wasn't experienced
12:09 9  enough to really do that. If you noticed
12:09 10  something, by all means you needed to bring that
12:09 11  to somebody's attention. But no, that wasn't
12:09 12  something that I was specifically required to do.
12:09 13    Q.  Okay. Approximately how many claims
12:09 14  did you review a day at that time in 1978 for
12:10 15  Prudential?
12:10 16    A.  Oh, I — I don't remember. I don't
12:10 17  remember what the production requirements were
12:10 18  back then.
12:10 19    Q.  Less than 30?
12:10 20    A.  I doubt it. Probably more than that.
12:10 21    Q.  Less than 50?
12:10 22    A.  Yeah, I'd have to say that, somewhere
12:10 23  around there.
12:10 24    Q.  What did you do after you were the
12:10 25  claims examiner for Prudential for a year and a

2 (Pages 5 to 8)

Page 57

| | |
|---|---|
| 01:43 1 | that I won't be able to examine any witness on |
| 01:43 2 | anything pre-1998, given that your designee |
| 01:43 3 | can't testify about that. |
| 01:43 4 | MR. MUINO: Well, sure you will. You |
| 01:43 5 | can examine Mr. Luftig on that subject. I've |
| 01:43 6 | said that several times. I'm not going to |
| 01:43 7 | object to you asking any questions about |
| 01:43 8 | ClaimFacts. They were cross-designated on |
| 01:43 9 | each of these topics. |
| 01:43 10 | MR. RANDALL: When is Mr. Luftig |
| 01:43 11 | available, by the way, for his 30(b)(6)? |
| 01:43 12 | MR. MUINO: I have no idea. We're |
| 01:43 13 | working on it, though. |
| 01:44 14 | MR. RANDALL: I've marked for |
| 01:44 15 | identification as Exhibit 2 the McKesson |
| 01:44 16 | patent. |
| 01:44 17 | (Lampe Exhibit 2, United States patent |
| 01:44 18 | 5,253,164, marked for identification, as of |
| 01:45 19 | this date.) |
| 01:45 20 | BY MR. RANDALL: |
| 01:45 21 | Q. Ms. Lampe, I'm going to ask you a few |
| 01:45 22 | questions about how ClaimFacts operates. |
| 01:45 23 | Does ClaimFacts operate with a |
| 01:45 24 | database? |
| 01:45 25 | A. I don't know. No, I don't -- |

Page 58

| | |
|---|---|
| 01:45 1 | programming lingo, I'm not sure. It's written in |
| 01:45 2 | Cobalt. |
| 01:45 3 | Q. Doesn't ClaimFacts utilize a database |
| 01:45 4 | that has a predetermined set of relationships |
| 01:45 5 | between medical service codes? |
| 01:45 6 | A. Oh, ClinicaLogic, yes, there are |
| 01:45 7 | records set up that are -- where our criteria |
| 01:45 8 | lives. So I don't know that it would be |
| 01:45 9 | classified as a database because it's not |
| 01:45 10 | separate; it's incorporated into the system. But |
| 01:45 11 | yes, there are separate records for the |
| 01:46 12 | ClinicaLogic function. |
| 01:46 13 | Q. So we get this, I want to get my |
| 01:46 14 | terminology correct. ClaimFacts is a system that |
| 01:46 15 | has integrated into it ClinicaLogic, and this |
| 01:46 16 | database has a predetermined set of relationships |
| 01:46 17 | between medical service codes; is that right? |
| 01:46 18 | A. Yes, I would say that's correct. |
| 01:46 19 | Q. And ClaimFacts operates to utilize |
| 01:46 20 | these predetermined set of relationships between |
| 01:46 21 | medical service codes to determine if one or more |
| 01:46 22 | medical codes in a claim is valid or invalid, |
| 01:46 23 | correct? |
| 01:46 24 | A. Yes. |
| 01:46 25 | Q. And the predetermined set of |

Page 59

| | |
|---|---|
| 01:47 1 | relationships between medical service codes in |
| 01:47 2 | ClaimFacts is based in part on medical reasons or |
| 01:47 3 | medical considerations, correct? |
| 01:47 4 | A. Correct. |
| 01:47 5 | Q. Does ClaimFacts also operate to |
| 01:47 6 | invalidate one or more medical service codes based |
| 01:47 7 | on non-medical reasons? |
| 01:47 8 | MR. MUINO: Objection, vague and |
| 01:47 9 | ambiguous as to -- |
| 01:47 10 | BY MR. RANDALL: |
| 01:47 11 | Q. Do you know what I mean by non-medical |
| 01:47 12 | reasons? |
| 01:47 13 | A. No. |
| 01:47 14 | Q. So for instance, if the medical |
| 01:47 15 | procedure were a cosmetic procedure, if the |
| 01:47 16 | medical procedure exceeded a preset cost for that |
| 01:47 17 | medical procedure, things like that. |
| 01:47 18 | A. Okay. The preset cost is handled |
| 01:47 19 | outside of ClinicaLogic. ClinicaLogic doesn't |
| 01:48 20 | have -- have -- doesn't include usual customary |
| 01:48 21 | fees. Cosmetic, experimental, or investigative |
| 01:48 22 | age parameters, gender parameters, inpatient |
| 01:48 23 | versus outpatient designations for the site of the |
| 01:48 24 | services, those types of things, yes, it does have |
| 01:48 25 | those. |

Page 60

| | |
|---|---|
| 01:48 1 | Q. So, for instance, ClaimFacts does |
| 01:48 2 | operate to invalidate some medical service codes |
| 01:48 3 | based on non-medical reasons as I explained it, |
| 01:48 4 | correct? |
| 01:48 5 | A. Yes. |
| 01:48 6 | Q. The vast majority, however, are based |
| 01:48 7 | on medical reasons, correct? |
| 01:48 8 | A. I would have to say that's correct. |
| 01:48 9 | Q. I'm going to ask you to look at the |
| 01:49 10 | McKesson patent. I've marked it as Exhibit 2. |
| 01:49 11 | Can you look at the second to last page? |
| 01:49 12 | I'm sorry. I'll just give you a copy. |
| 01:49 13 | A. Thank you. |
| 01:49 14 | Q. The second to last page contains a list |
| 01:49 15 | of numbered paragraphs or claims. These are each |
| 01:49 16 | claim numbers. Do you see that? |
| 01:49 17 | A. Uh-huh, yes. |
| 01:49 18 | Q. And on this page and on the next page |
| 01:49 19 | it shows claims 1 through 16. Do you see that? |
| 01:49 20 | A. 1 through 16? |
| 01:49 21 | Q. Paragraphs 1 through 16 or claims 1 |
| 01:50 22 | through 16 on the two pages -- the last two pages |
| 01:50 23 | of the patent. |
| 01:50 24 | A. Oh, oh, yes. |
| 01:50 25 | Q. So I want to direct your attention to |

15 (Pages 57 to 60)

Page 61

01:50  1   claim 1 and that's at the top of column 117. Do
01:50  2   you see that?
01:50  3       A.   Yes.
01:50  4       Q.   Can you read just that claim which is
01:50  5   just paragraph 1 there? And I want to ask you if
01:50  6   ClaimFacts performs the steps described in claim
01:50 ·7   1.
01:50  8       A.   Okay.
01:50  9       MR. MUINO: While she's reading,
01:50 10   Counsel, can I put a standing objection on the
01:50 11   record to this line of questions?
01:50 12       MR. RANDALL: What's your standing
01:50 13   objection?
01:50 14       MR. MUINO: The objection is first, it
01:50 15   calls for a legal conclusion, it calls for
01:50 16   speculation, it calls for expert opinion.
01:50 17   Those are the objections. If I could get a
01:50 18   standing objection to this line of questions.
01:50 19       MR. RANDALL: Yes, you can.
01:51 20       THE WITNESS: Okay.    .   .
01:51 21   BY MR. RANDALL:
01:51 22       Q.   The question, Ms. Lampe, is: Does
01:51 23   ClaimFacts perform the steps described in claim 1
01:51 24   of the McKesson patent?
01:51 25       A.   It performs -- it performs -- yes, it

Page 62

01:52  1   performs them. I don't know if it performs them
01:52  2   in the same order.
01:52  3       Q.   That's fine.
01:52  4       A.   But -- but we -- I guess this is how we
01:52  5   describe it. It's not the way I would describe
01:52  6   it.
01:52  7       Q.   I understand. But nonetheless, this
01:52  8   does -- strike that.
01:52  9       ClaimFacts does operate to perform the
01:52 10   steps in claim 1, correct?
01:52 11       A.   Yes.
01:52 12       Q.   Can you look at claim 2? I'm going ask
01:52 13   you the same question.
01:53 14       A.   Okay.
01:53 15       Q.   Does ClaimFacts perform the steps
01:53 16   described in claim 2 of the McKesson patent?
01:53 17       A.   I think we need to break it down
01:53 18   because there's some that I'm not sure.
01:53 19       Q.   What's the first uncertainty that you
01:53 20   have?
01:53 21       A.   Let's see. Ascertaining whether at
01:53 22   least one claim contained the plurality of medical
01:54 23   service codes.
01:54 24       Q.   More than one.
01:54 25       A.   Just more than one?

Page 63

01:54  1       Q.   Yes. So that element.
01:54  2       A.   Yes, yes.
01:54  3       Q.   With that clarification, does
01:54  4   TriZetto's ClaimFacts perform the steps described
01:54  5   in claim 2 of the McKesson patent?
01:54  6       A.   The next one?
01:54  7       Q.   Yes.
01:54  8       A.   Determining whether one of the medical
01:54  9   service codes and at least one claim is mutually
01:54 10   exclusive due to non-medical criteria and with any
01:54 11   other medical service code in least one claim?
01:54 12   That's not the terminology I would use in the
01:54 13   ClinicalLogic world, so I'm not sure what they're
01:54 14   meaning by mutually exclusive.
01:54 15       Q.   Well, for instance, is a medical
01:54 16   service code for a particular procedure on a
01:54 17   particular day that was performed both within the
01:55 18   hospital and outside the hospital, that would be
01:55 19   mutually exclusive based on the non-medical
01:55 20   reason, correct?
01:55 21       I'm asking you: Is there any instance
01:55 22   at all within ClaimFacts where ClaimFacts will
01:55 23   determine that one medical service code is invalid
01:55 24   because it's mutually exclusive for some reason
01:55 25   with another medical service code, for some reason

Page 64

01:55  1   other than medical reasons?
01:55  2       A.   I'm not sure. I'm not sure I can
01:55  3   answer that. One code against another code for
01:55  4   non-medical reasons. The edits that I can recall,
01:55  5   and I work with them a lot, when you're talking
01:56  6   about a code to code relationship, a procedure
01:56  7   code to procedure code relationship, I think it's
01:56  8   all based on medical or CPT guidelines, NCCI
01:56  9   edits.
01:56 10       I can't think of one that does it based
01:56 11   on gender or age or any of the other non-medical
01:56 12   ones. I mean, an age or a gender edit would go
01:56 13   against a specific code, but I don't know that one
01:56 14   code would edit against the other one because of
01:56 15   that.
01:56 16       The system does not -- well, I don't
01:56 17   know that you would even input a claim that had
01:56 18   procedure on one day inpatient and procedure on
01:56 19   the same date outpatient. That would be an input
01:56 20   error. And it would be that line that would come
01:57 21   up as an edit, not the codes against each other.
01:57 22       Q.   What types of checks does ClaimFacts
01:57 23   conduct on medical service codes that are
01:57 24   non-medical in nature?
01:57 25       A.   Okay, it checks for if the code has

16 (Pages 61 to 64)

Page 73

02:10 1    service codes that it determines to be invalid
02:10 2    for, among other reasons, the fact that the
02:10 3    medical service code is no longer valid and has
02:10 4    been replaced with another one, correct?
02:10 5    A.   Correct.
02:10 6    Q.   So -- and I don't have to go -- I'm not
02:10 7    going to go through all the different instances in
02:10 8    which this is done.  That's just simply one,
02:10 9    correct?
02:10 10    A.   Okay.
02:10 11    Q.   With that in mind, would you agree that
02:10 12    the TriZetto ClaimFacts system contains all of the
02:10 13    elements described in both claim 3 and claim 4?
02:10 14    A.   Yes.
02:10 15    Q.   Could you read claim 5?  And claim 5 is
02:10 16    a claim that includes the apparatus or the system
02:10 17    of claim 4.  It just has one further limitation.
02:11 18    A.   Yeah, there's a display that tells the
02:11 19    examiner what happened with the claim and why.
02:11 20    Q.   So would you agree that TriZetto's
02:11 21    ClaimFacts includes the components described in
02:11 22    claims 3, 4 and 5?
02:11 23    A.   Yes.
02:11 24    Q.   Could you read claim 6?  Claim 6
02:11 25    includes all of the components of claim 3 and the

Page 74

02:11 1    added limitation in claim 6.
02:11 2    A.   Yes.
02:11 3    Q.   So is it your understanding that
02:11 4    TriZetto's ClaimFacts product includes all the
02:11 5    components of claim 3 and claim 6?
02:11 6    A.   Yes.
02:11 7    Q.   Do you know what the CRV codes are in
02:12 8    claim 7?
02:12 9    A.   I believe they are customary and
02:12 10    reasonable value codes, or pricing codes.  Is that
02:12 11    correct?  Relative value system.  It's California
02:12 12    relative value system which is no longer used,
02:12 13    actually.
02:12 14    Q.   Does ClaimFacts use that?
02:12 15    A.   No.  Well, ClinicaLogic doesn't use it.
02:12 16    ClaimFacts has its pricing separate from
02:12 17    ClinicaLogic.
02:12 18    Q.   So does ClaimFacts include all of the
02:12 19    components of claim 3 and claim 7?
02:12 20    A.   No.
02:12 21    Q.   Because it doesn't utilize CRV codes?
02:12 22    A.   Correct.
02:12 23    Q.   Could you read claim 8?  Claim 8
02:12 24    includes all the components of claim 3 and the
02:12 25    added limitation from claim 8.

Page 75

02:12 1    A.   Yes.
02:13 2    Q.   So is it your understanding that
02:13 3    ClaimFacts includes all of the components of
02:13 4    claims 3 and 8?
02:13 5    A.   Yes.
02:13 6    Q.   Claim 9 also includes all the
02:13 7    components of claim 3.  Could you read that and
02:13 8    tell me if ClaimFacts includes all of the
02:13 9    components of claims 3 and 9?
02:13 10    A.   Yes.
02:13 11    Q.   ClaimFacts does include all the
02:13 12    components of claims 3 and 9?
02:13 13    A.   Yes.
02:13 14    Q.   Could you read claim 10?  Claim 10 is
02:13 15    an independent claim, meaning it's just -- if you
02:13 16    could just read all of claim 10.  And I'm going to
02:13 17    ask you if ClaimFacts includes the components
02:13 18    listed in claim 10.
02:14 19    A.   Okay.
02:15 20    Q.   Does ClaimFacts contain all of the
02:15 21    components described in claim 10?
02:15 22    A.   Yes.
02:15 23    Q.   Can you read claim 11?  Claim 11
02:15 24    includes all the components from claim 10 plus the
02:15 25    added limitation in claim 11.

Page 76

02:15 1    A.   I'm not sure.  I need an explanation on
02:15 2    that.  Seems simple enough, but...
02:15 3    Q.   For instance, when we just discussed
02:15 4    this example, when ClaimFacts determines that a
02:15 5    medical service code is no longer valid or has
02:16 6    been deleted, and it has been substituted with a
02:16 7    new medical service code, ClaimFacts will reject
02:16 8    the deleted or invalid code and actually replace
02:16 9    it with the updated code, correct?
02:16 10    A.   Correct.
02:16 11    Q.   All right.  So with that clarification
02:16 12    in mind and that example in mind, does ClaimFacts
02:16 13    include all the components of claims 11 and 10?
02:16 14    A.   Yes.
02:16 15    Q.   Would you read claim 12, and I'll ask
02:16 16    you if ClaimFacts contains the components
02:16 17    described in claim 12.
02:17 18    A.   Okay.
02:17 19    Q.   Does ClaimFacts contain all the
02:17 20    components described in claim 12?
02:17 21    A.   Yes.
02:17 22    Q.   Can you read claim 13 and I'll ask you
02:17 23    the same question:  Does ClaimFacts contain all
02:18 24    the components described in claim 13?
02:18 25    A.   Okay.

19 (Pages 73 to 76)

Page 77

02:18 1    Q.  Does ClaimFacts contain all of the
02:18 2    components described in claim 13?
02:18 3    A.  Yes.
02:18 4    Q.  Can you read claim 14 and I'll ask you
02:19 5    the same question: Does ClaimFacts contain all of
02:19 6    the components described in claim 14?
02:20 7    A.  This is very similar to another one, to
02:20 8    one of the other ones where it's talking about
02:20 9    mutually exclusive based on non-medical reasons.
02:20 10   Okay.
02:20 11   Q.  So does -- does, based on your
02:20 12   understanding, ClaimFacts include all of the
02:20 13   components described in claim 14?.
02:20 14   A.  Yes.
02:20 15   Q.  Could you read claim 15 and I'll ask:
02:20 16   Does ClaimFacts include all of the components of
02:20 17   claim --
02:20 18       MR. RANDALL: I'm sorry. We have to
02:20 19   stop to change the tape and then we'll come
02:20 20   back on the record, all right?
02:20 21       THE VIDEOGRAPHER: The time is now 2:20
02:20 22   p.m. and this ends tape number 2 of the
02:20 23   videotaped deposition of Karen Lampe.
02:21 24       (Discussion off the record.)
02:21 25       THE VIDEOGRAPHER: The time is now 2:22

Page 78

02:22 1    p.m. and this begins tape number 3 of the
02:22 2    videotaped deposition of Karen Lampe.
02:22 3    BY MR. RANDALL:
02:22 4    Q.  Ms. Lampe, can you read claim 15 and
02:22 5    I'll ask you whether ClaimFacts includes all of
02:22 6    the components of claim 15.
02:22 7       MR. MUINO: Counsel, just to clarify, I
02:22 8    still have a standing objection.
02:22 9       MR. RANDALL: The objection you stated,
02:22 10   yes.
02:23 11      THE WITNESS: Okay.
02:23 12   BY MR. RANDALL:
02:23 13   Q.  Does ClaimFacts contain the components
02:23 14   described in claim 15?
02:23 15   A.  Yes.
02:23 16   Q.  I'll ask you the same question, or a
02:23 17   similar question with respect to claim 16. Does
02:23 18   ClaimFacts perform the steps described in claim
02:23 19   16?
02:23 20   A.  I don't see the difference between 15
02:24 21   and 16.
02:24 22   Q.  Well, one difference is that one is an
02:24 23   apparatus claim or system and the other one is a
02:24 24   method of steps that are performed, so I
02:24 25   understand why you can see a great similarity in

Page 79

02:24 1    those two. But one is the physical apparatus and
02:24 2    one is a method of steps being performed. And
02:24 3    that's why in asking the question I asked, do you
02:24 4    understand ClaimFacts to perform the steps
02:25 5    described in claim 16?
02:25 6    A.  Oh, you asked the question differently.
02:25 7    Q.  Yes.
02:25 8    A.  Now I have to reread it.
02:25 9    Q.  Okay.
02:25 10   A.  Okay.
02:25 11   Q.  Does ClaimFacts include -- does
02:25 12   ClaimFacts perform the steps described in claim
02:25 13   16?
02:25 14   A.  Yes.
02:26 15   Q.  You've just gone through all 16 claims
02:26 16   and you've noticed, I'm sure, that many, if not
02:26 17   all of them -- strike that.
02:26 18       We've just gone through all 16 claims
02:26 19   in the McKesson patent. And many of the claims
02:26 20   have language that says, for instance, "means for
02:26 21   ascertaining", "means for determining", "means for
02:26 22   authorizing" and "means for rejecting".
02:26 23       Do you recall that?
02:26 24   A.  Yes.
02:26 25   Q.  And those elements, means for

Page 80

02:26 1    ascertaining, determining, authorizing and
02:26 2    rejecting are related to the predetermined
02:26 3    relationships of the medical service codes in the
02:26 4    database, correct?
02:26 5    A.  Yes.
02:26 6    Q.  And did you -- do you understand
02:26 7    ClaimFacts to utilize software as the means for
02:27 8    ascertaining and determining these relationships?
02:27 9    A.  Yes. .
02:27 10   Q.  And do you understand ClaimFacts as
02:27 11   utilizing software for -- as the means for
02:27 12   authorizing and rejecting these medical service
02:27 13   codes based on the preset or predetermined
02:27 14   relationships in the database?
02:27 15   A.  Yes. Can I clarify something else?
02:27 16   Q.  Absolutely.
02:27 17   A.  We're referring to this as ClaimFacts,
02:27 18   but in truth ClaimFacts, if we really get down to
02:27 19   it, doesn't do these things. ClinicaLogic does.
02:27 20   Because you can operate and process claims on
02:27 21   ClaimFacts without having ClinicaLogic turned on
02:27 22   or even loaded into the system.
02:27 23   Q.  Your answers are all correct and
02:27 24   accurate if, for.example, ClinicaLogic is included
02:27 25   within the integrated system of ClaimFacts,

20 (Pages 77 to 80)

# EXHIBIT R

HIGHLY CONFIDENTIAL





2 (Pages 5 to 8)

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
877.955.3855

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
877.955.3855



SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
877.955.3855

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
877.955.3855

# EXHIBIT S



1 (Pages 1 to 4)











SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
877.955.3855



46 (Pages 157 to 160)

# EXHIBIT T

Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
 2                 FOR THE DISTRICT OF DELAWARE
 3
 4   McKESSON INFORMATION SOLUTIONS, LLC,
 5            Plaintiff,
 6        vs.            Case No. 04-1258-SLR
 7   THE TRIZETTO GROUP, INC.,
 8            Defendant.
 9
10
11
12         _____
13
14       VIDEOTAPED 30(b)(6) DEPOSITION OF KIRSTEN C. KEMP
15                   Seattle, Washington
16                  Monday, October 10, 2005
17
18
19
20
21   Reported by:
     Tia B. Reidt
22   CSR No. 2798
23   Job No. 39348
24
25
```

Page 2

```
 1              IN THE UNITED STATES DISTRICT COURT
 2                 FOR THE DISTRICT OF DELAWARE
 3
 4   McKESSON INFORMATION SOLUTIONS, LLC,
 5            Plaintiff,
 6        vs.            Case No. 04-1258-SLR
 7   THE TRIZETTO GROUP, INC.,
 8            Defendant.
 9
10
11
12         _____
13
14
15   BE IT REMEMBERED THAT, pursuant to the Washington Rules of
16   Civil Procedure, the deposition of KIRSTEN C. KEMP, was
17   taken before Tia B. Reidt, #2798, a Certified Shorthand
18   Reporter, and a Notary Public for the State of Washington,
19   on October 10, 2005, commencing at the hour of 10:26 a.m.,
20   the proceedings being reported at Lane, Powell, Spears,
21   Lubersky, LLP, 1420 5th Avenue, Suite 4100, Seattle,
22   Washington.
23
24
25
```

Page 3

```
 1   APPEARANCES
 2      Appearing on behalf of the Plaintiff:
     SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP
 3   BY: JEFFREY RANDALL
        Attorney at Law
 4      525 University Avenue, Suite 1100
        Palo Alto, CA 94301
 5      (650) 470-4500
        (650) 470-4570 Fax
 6      Jrandall@skadden.com
 7
        Appearing on behalf of the Defendant:
 8   GIBSON, DUNN & CRUTCHER, LLP
     BY: T. KEVIN ROOSEVELT
 9      Attorney at Law
        4 Park Plaza
10      Irvine, CA 92614
        (949) 451-3932
11      (949) 475-4744 Fax
        Kroosevelt@gibsondunn.com
12
13      Appearing on behalf of the Witness Premera Blue Cross
     PREMERA BLUE CROSS
14   BY: JANET E. McKINNON
        Attorney at Law
15      7001 220th St. SW. MS 316
        PO Box 327
16      Mountlake Terrace, WA 98043
        (425) 918-5785
17      (425) 918-5787 Fax
        Janet.mckinnon@premera.com
18
19   ALSO PRESENT:
        Casey Muldoon
20      Videographer,
        Naegeli Reporting Corporation
21
22
23
24
25
```

Page 4

| | EXHIBIT | | PAGE |
|---|---|---|---|
| | NUMBER | DESCRIPTION | NUMBER |
| 4 | 1 | 1-page letter from Khoi D. | 12 |
| 5 | | Nguyen to Premera Blue Cross | |
| 6 | | dated 8/26/05 and a 5-page Subpoena. | |
| 8 | 2 | 66-page Facets License Agreement. | 15 |
| 10 | 3 | 66-page United States Patent | 31 |
| 11 | | Number 5,253,164. | |
| 13 | 4 | 277-page Facets Extended | 41 |
| 14 | | Enterprise Claims Processing | |
| 15 | | User Guide and Supplement. | |
| 17 | 5 | 2-page ClinicaLogic Physician | 59 |
| 18 | | Claim Screening System brochure. | |

1 (Pages 1 to 4)

Page 5

| | |
|---|---|
| 1 | Seattle, Washington; Monday, October 10, 2005 |
| 2 | 10:26 a.m. |
| 3 | |
| 10:26:38 4 | THE VIDEOGRAPHER: We are on the record. This |
| 10:26:38 5 | is a statement for a video deposition. I'm the |
| 10:26:46 6 | videographer, and my name is Casey Muldoon. This |
| 10:26:48 7 | videotaped deposition has been noticed by attorney Jeffrey |
| 10:26:53 8 | Randall and is being held on October 10th, 2005 at |
| 10:27:00 9 | 10:27 a.m. The location is Lane, Powell, 1420 Fifth |
| 10:27:02 10 | Avenue, Suite 4100, Seattle, Washington. |
| 10:27:05 11 | The case caption is McKesson Information |
| 10:27:11 12 | Solutions, LLC, versus the TriZetto Group, Incorporated in |
| 10:27:12 13 | the United States District Court for the district of |
| 10:27:23 14 | Delaware, Case No. 04-1258-SLR. This is a 30(b)(6) |
| 10:27:26 15 | deposition of Premera Blue Cross with Kirsten Kemp as the |
| 10:27:28 16 | designated witness. |
| 10:27:30 17 | Would counsel please identify yourselves |
| 10:27:31 18 | and state whom you represent. |
| 10:27:34 19 | MR. RANDALL: Jeff Randall with Skadden, Arps, |
| 10:27:37 20 | representing the plaintiff McKesson. |
| 10:27:39 21 | MS. McKINNON: Janet McKinnon, assistant general |
| 10:27:42 22 | counsel for Premera Blue Cross. |
| 10:27:47 23 | MR. ROOSEVELT: Kevin Roosevelt from Gibson, |
| 24 | Dunn & Crutcher on behalf of TriZetto. |
| 10:27:48 25 | THE VIDEOGRAPHER: The deposition is being taken |

Page 6

| | |
|---|---|
| 10:27:59 1 | before Tia Reidt, court reporter, who will now swear in |
| 10:27:59 2 | the witness. |
| 10:27:59 3 | KIRSTEN C. KEMP, having been first duly sworn, |
| 10:27:59 4 | was examined and testified as follows: |
| 10:27:59 5 | |
| 10:27:59 6 | EXAMINATION |
| 10:27:59 7 | BY MR. RANDALL: |
| 10:27:59 8 | |
| 10:28:02 9 | Q.   Can you please state your full name the |
| 10:28:03 10 | record, please? |
| 10:28:06 11 | A.   Kirsten Kemp, C. Kemp. |
| 10:28:10 12 | Q.   How are you employed? |
| 10:28:12 13 | A.   I'm employed by Premera Blue Cross. |
| 10:28:14 14 | Q.   Here in Seattle? |
| 10:28:16 15 | A.   Yes. Mountlake Terrace. |
| 10:28:20 16 | Q.   And what's your position at Premera Blue |
| 10:28:20 17 | Cross? |
| 10:28:21 18 | A.   I'm vice president of operations. |
| 10:28:24 19 | Q.   And what do your responsibilities include? |
| 10:28:27 20 | A.   My responsibilities include claims |
| 10:28:34 21 | adjudication, Facets configuration, acceptance integration |
| 10:28:42 22 | testing, and various other supporting applications. |
| 10:28:44 23 | Q.   How long have you been vice president of |
| 24 | operations at Premera? |
| 10:28:50 25 | A.   Approximately two years. |

Page 7

| | |
|---|---|
| 10:28:53 1 | Q.   So have you had the responsibilities that you |
| 10:28:56 2 | just described for the last two years? |
| 10:28:59 3 | A.   With the exception of claims, yes. |
| 10:29:03 4 | Q.   Can you summarize your educational background |
| 10:29:07 5 | after high school, just giving me any institutions you may |
| 10:29:11 6 | have attended and when you attended them and what degrees, |
| 10:29:12 7 | if any, you received? |
| 10:29:15 8 | A.   I have actually attended no college. |
| 10:29:20 9 | Q.   Okay. Can you summarize your work experience |
| 10:29:23 10 | following high school? |
| 10:29:28 11 | A.   I've been employed at Premera since 1979; |
| 10:29:32 12 | have been a claims processor, an acceptance test |
| 10:29:38 13 | specialist, a supervisor, manager, and then director and |
| 10:29:45 14 | vice president. |
| 10:29:47 15 | Q.   When were you appointed vice president? |
| 10:29:49 16 | A.   Two years ago, August. |
| 10:29:52 17 | Q.   Okay. And prior to that, what was your |
| 10:29:52 18 | title? |
| 10:29:58 19 | A.   Director of implementation systems. |
| 10:30:01 20 | Q.   For processing medical claims? |
| 10:30:09 21 | A.   No. I actually had accountability for |
| 10:30:12 22 | configuration testing and e-business. |
| 10:30:18 23 | Q.   Does Premera currently use TriZetto's Facets |
| 24 | Systems' system that includes its clinical editing |
| 25 | functionality? |

Page 8

| | |
|---|---|
| 1 | A.   Yes, we do. |
| 2 | THE COURT REPORTER: Can we pause for just a |
| 3 | second? |
| 4 | MR. RANDALL: Sure. |
| 5 | THE COURT REPORTER: Can we go off the record? |
| 10:31:06 6 | THE VIDEOGRAPHER: The time is 10:31 a.m. Going |
| 10:31:06 7 | off the record. |
| 10:31:08 8 | (Pause in the proceedings.) |
| 10:31:08 9 | THE VIDEOGRAPHER: Back on the record. The time |
| 10:31:11 10 | is 10:31 a.m. |
| 10:31:11 11 | BY MR. RANDALL: |
| 10:31:17 12 | Q.   When did Premera first start using Facets |
| 10:31:18 13 | with its clinical editing functionality? |
| 10:31:26 14 | A.   Our go-live date was June 2002. |
| 10:31:32 15 | Q.   Did that Facets System replace another system |
| 10:31:37 16 | that was being used at Premera? |
| 10:31:41 17 | A.   The Premera approach to implementing Facets |
| 10:31:43 18 | has been on a sell-over with the intent of replacing our |
| 10:31:52 19 | seven different systems. |
| 10:31:57 20 | Q.   Prior to beginning use of Facets in |
| 10:32:01 21 | June 2002, did Premera have any system that provided |
| 10:32:08 22 | automatic claim editing functionality, or automated? |
| 10:32:17 23 | A.   Yeah. We had seven. |
| 24 | Q.   Did any of those seven provide automated |
| 10:32:22 25 | clinical editing of medical service codes to detect, for |

2 (Pages 5 to 8)

Page 25

11:02:07 1    A.    Yes.

11:02:10 2    Q.    One of the performance goals also listed in

11:02:15 3    Roman numeral II -- strike that.

11:02:19 4          Roman numeral II also includes performance

11:02:24 5    goals associated with the use by Premera of Facets,

11:02:24 6    correct?

11:02:25 7    A.    Yes.

11:02:30 8    Q.    And the agreement states under "Application

11:02:35 9    goals for client's productions operations," "The following

11:02:38 10   goals relate to the application transaction mix processing

11:02:45 11   up to 1.7 million members using the Facets System with the

11:02:49 12   exception of the initial startup of Facets' application or

11:02:49 13   system."

11:02:50 14         Do you see that?

11:02:50 15   A.    Yes.

11:02:53 16   Q.    And the first application goal listed states

11:02:58 17   "90 percent of clients' transactions response time on the

11:03:03 18   local area network not to exceed one second, and

11:03:08 19   95 percent of the transactions must not exceed two seconds

11:03:10 20   measured at the database."

11:03:10 21         Do you see that?

11:03:11 22   A.    Yes.

11:03:15 23   Q.    Do you understand that TriZetto was

      24   representing to Premera that at a volume of 1.7 members

11:03:31 25   using the Facets System, that 90 percent of Premera's

Page 26

11:33:35 1    medical claims processed through the system would take

11:03:41 2    less than one second and that 95 percent of the medical

11:03:46 3    claims processed through the Facets System would take less

11:03:48 4    than two seconds?

11:03:51 5          MR. ROOSEVELT:  Objection as to form.  Misstates

11:03:53 6    the document.

11:03:59 7          THE WITNESS:  I don't -- this gets into an area

11:04:05 8    that I don't have a lot of knowledge about -- around, so

11:04:06 9    I'm not -- I'm not sure.

11:04:08 10   BY MR. RANDALL:

11:04:10 11   Q.    Well, let me restate the question.  Did you

11:04:14 12   understand that one of the performance goals that TriZetto

11:04:23 13   was agreeing to was that at a volume of 1.7 members using

11:04:28 14   the Facets System, that it would strive to achieve that

11:04:33 15   90 percent of the medical claims processed through the

11:04:37 16   Facets System would take less than one second to process?

11:04:42 17   A.    At the time of this document, yes, that is an

11:04:44 18   expectation that we had.

11:04:47 19   Q.    Okay.  And it's an expectation that was

11:04:51 20   expressed in writing and agreed to by TriZetto, correct?

11:05:02 21   A.    Yes.

11:05:04 22   Q.    I'd like to direct your attention to

11:05:18 23   Schedule 1, which appears at Bates Stamp No. 827813.

      24   (Witness complies.)

11:05:25 25   Q.    This is a nondisclosure agreement, and the

Page 27

11:05:32 1    first sentence states "Erisco Managed Care Technologies.

11:05:36 2    Inc. (Erisco), is the sole owner and licensor of System

11:05:41 3    software programs and documentation comprising the Facets

11:05:46 4    System, which is considered by Erisco to be secret and

11:05:48 5    valuable property information."  (As read.)

11:05:49 6 .        Do you see that?

11:05:53 7          MR. ROOSEVELT:  "Proprietary."

11:05:55 8          MR. RANDALL:  Yeah, okay.

11:05:55 9    BY MR. RANDALL:

11:05:56 10   Q.    Do you see that?

11:05:56 11   A.    Yes.

11:06:08 12   Q.    Did Premera understand that TriZetto

11:06:16 13   represented to it that its system software programs and

11:06:20 14   documentation comprising the Facets System was considered

11:06:26 15   by TriZetto to be secret and valuable proprietary

11:06:27 16   information?

11:06:29 17         MR. ROOSEVELT:  Objection as to form.

11:06:29 18   BY MR. RANDALL:

11:06:34 19   Q.    You can answer the question.

11:06:35 20         MS. McKINNON:  You can answer if you know.

11:06:38 21         THE WITNESS:  I believe we did.

11:07:24 22   BY MR. RANDALL:

11:07:31 23   Q.    Okay.  Does Premera use TriZetto's Facets

      24   System to identify unbundled procedures?

11:07:38 25   A.    Yes, we do.

Page 28

11:07:42 1          MR. ROOSEVELT:  Objection.  Vague and ambiguous;

11:07:44 2    calls for a legal conclusion.

11:07:44 3    BY MR. RANDALL:

11:07:47 4    Q.    When I say "unbundled procedures," do you

11:07:51 5    understand that to mean that when, for instance, a medical

11:07:55 6    claim is processed by the Facets System, the Facets System

11:08:01 7    is capable of identifying one or more medical service

11:08:07 8    codes that should be, according to the system, included

11:08:11 9    within another medical service code contained in the same

11:08:12 10   claim?

11:08:17 11         MR. ROOSEVELT:  Objection.  Vague and ambiguous;

11:08:18 12   calls for a legal conclusion.

11:08:19 13   BY MR. RANDALL:  .

11:08:20 14   Q.    You can answer the question.

11:08:20 15   A.    Yes.

11:08:26 16   Q.    Okay.  Does Premera use TriZetto's Facets

11:08:33 17   System to identify CPT surgical coding errors?

11:08:35 18   A.    Yes.

11:08:43 19   Q.    Does Premera use TriZetto's Facets System to

11:08:50 20   identify invalid relationships between medical service to

11:08:52 21   codes contained in a claim?

11:08:56 22         MR. ROOSEVELT:  Same objections.

11:09:01 23         THE WITNESS:  Can you clarify that, please?

      24   BY MR. RANDALL:

11:09:09 25   Q.    Sure.  Do you understand the Facets System to

7 (Pages 25 to 28)

Page 29

11:09:16  1    contain a preset list of medical service codes and
11:09:20  2    relationships among those medical service codes?
11:09:27  3         MR. ROOSEVELT: Same objection.
11:09:30  4         THE WITNESS: Facets includes a list of codes,
11:09:33  5    but then Premera comes along and decides what we're going
11:09:41  6    to do with those codes in our configuration.
11:09:41  7    BY MR. RANDALL:
11:09:45  8         Q.   I'm not asking about what action Premera
11:09:50  9    chooses to take when a particular relationship or
11:09:55 10    irregularity has been detected. I'm just asking, does
11:10:01 11    Premera understand that Facets has a predetermined set of
11:10:04 12    relationships among medical service codes within a system?
11:10:06 13         MR. ROOSEVELT: Same objections.
11:10:12 14         THE WITNESS: Yes.
11:10:12 15    BY MR. RANDALL:
11:10:19 16         Q.   And the Facets System operates to detect
11:10:24 17    irregularities in the relationships among medical service
11:10:26 18    codes within a particular claim, correct?
11:10:30 19         MR. ROOSEVELT: Same objections.
11:10:39 20         THE WITNESS: Yes, if you configure it that way.
11:10:42 21         MR. RANDALL: Counsel, when you say "same
11:10:43 22    objections," I don't know what you mean.
11:10:45 23         MR. ROOSEVELT: I have the same objections that
· 24    I made; that the question calls for a legal conclusion and
11:10:58 25    that it's vague and ambiguous.

Page 30

11:11:11  1    BY MR. RANDALL:
11:11:18  2         Q.   Does the Facets System operate to disallow
11:11:26  3    medical service codes that are contained within a medical
11:11:33  4    claim based on determining an irregularity between the
11:11:36  5    presence of that particular medical service code and other
11:11:40  6    medical service codes within the claim?
11:11:42  7         MR. ROOSEVELT: Same objections.
11:12:00  8         THE WITNESS: Yes.
11:12:04  9         MR. RANDALL: I'll mark for identification as
11:12:31 10    Exhibit 3, the McKesson -164 patent.
11:12:35 11         (Whereupon, a 66-page United States Patent
11:12:35 12    Number 5,253,164 was marked Exhibit-3 for identification.)
11:12:35 13    BY MR. RANDALL:
11:12:38 14         Q.   Ms. Kemp, I'd like to direct your attention
11:12:45 15    to the second-to-the-last page of this document.
11:12:49 16         A.   (Witness complies.)
11:12:53 17         Q.   The upper left-hand column is labeled 117,
11:12:56 18    and that's the column number. And then below that there
11:13:02 19    are, on this page and the next page, a set of numbered
11:13:07 20    paragraphs or claims numbered 1 through 16.
11:13:08 21         Do you see that?
11:13:10 22         A.   Yes.
11:13:14 23         Q.   I'd like you to take a look at what is
24    described as Claim No. 1, so that would be the first
11:13:27 25    column, 117, and I'm going to ask you to read that.

Page 31

11:13:33  1         And the question is: Does the Facets
11:13:40  2    System perform the steps described in Claim 1?
11:13:42  3         MR. ROOSEVELT: And I'll just object on the
11:13:45  4    grounds that it calls for a legal conclusion, calls for
11:13:49  5    expert testimony, and is vague and ambiguous and calls for
11:13:53  6    speculation. And if we can just have a standing objection
11:13:56  7    as we go through these; is that okay, Counsel?
11:14:11  8         MR. RANDALL: That's fine.
11:14:13  9         THE WITNESS: What was your question again?
11:14:14 10    I've read this.
11:14:14 11    BY MR. RANDALL:
11:14:18 12         Q.   Does the Facets System operate to perform the
11:14:22 13    steps described in Claim 1?
11:14:26 14         A.   (Witness peruses document.)
11:14:26 15         Yes.
11:14:30 16         Q.   I'd like you to look at Claim 2, and I have
11:14:33 17    the same question, which is: Does the Facets System
11:14:44 18    operate to perform the steps described in Claim 2?
11:15:09 19         A.   (Witness peruses document.)
11:15:09 20         Yes.
11:15:14 21         Q.   With respect to Claim 3, it's slightly
11:15:17 22    different. It is an apparatus claim, so I'm going to
11:15:18 23    change the question slightly.
24         And the question is: With respect to
11:15:25 25    Claim 3, does the Facets System include the components

Page 32

11:16:15  1    described in Claim 3?
11:16:16  2         A.   (Witness peruses document.)
11:16:18  3         Yes.
11:16:23  4         Q.   With respect to Claim 4, Claim 4 is also an
11:16:28  5    apparatus claim, and it adds an additional limitation to
11:16:30  6    the components from Claim 3.
11:16:37  7         So the question is: Does the Facets System
11:16:41  8    include the components of both Claim 3 and the added
11:16:57  9    component identified in Claim 4?
11:16:59 10         A.   (Witness peruses document.)
11:17:08 11         I don't believe so, not the "delete" part.
11:17:21 12         Q.   Does -- does the Facets System include the
11:17:29 13    components of Claim 3 and the added component of a means
11:17:38 14    or mechanism for revising at least one claim to
11:17:47 15    discontinue further processing of an invalid medical
11:17:52 16    service code?
11:17:53 17         A.   (Witness peruses document.)
11:17:53 18         Yes.
11:18:01 19         Q.   Can you read Claim 5? And the question is:
11:18:09 20    Does the Facets System include the components of Claim 3
11:18:17 21    and Claim 4 and the added component described in Claim 5
11:18:23 22    with the understanding that, at least with respect to the
11:18:27 23    word "delete," you should use -- you should apply the
24    understanding that it means discontinuing any further
11:18:38 25    processing of an invalid medical service code?

8 (Pages 29 to 32)

# EXHIBIT U

Page 1

1   IN THE UNITED STATES DISTRICT COURT
2       FOR THE DISTRICT OF DELAWARE
3
4   McKESSON INFORMATION SOLUTIONS, LLC,
5       Plaintiff,
6   vs.            Case No. 04-1258-SLR
7   THE TRIZETTO GROUP, INC.,
8       Defendant.
9
10
11
_____
12
13      VIDEOTAPE DEPOSITIONS OF
14   TRACY PIERSON AND CAROLYN DRINI
15   TAKEN ON BEHALF OF PLAINTIFF
16   MONDAY, SEPTEMBER 12, 2005
17   BE IT REMEMBERED THAT, pursuant to the Federal Rules
18   of Civil Procedure, the videotape depositions of
19   TRACY PIERSON and CAROLYN DRINI were taken before
20   Laurie A. Volker, Registered Professional Reporter,
21   on September 12, 2005, commencing at the hour of 1:16
22   p.m., the proceedings being reported at 750 SW Alder
23   Street, Portland, Oregon.
24   JOB NO. 38520
25

Page 2

1   APPEARANCES
2
3   JEFFREY RANDALL, ESQUIRE
4   Skadden, Arps, Slate, Meagher & Flom, LLP
5   525 University Avenue, Suite 1100
6   Palo Alto, California 94301
7   650.470.4500
8   Appearing on behalf of Plaintiff
9
10  J. SCOT KENNEDY, ESQUIRE
11  Gibson, Dunn & Crutcher, LLP
12  4 Park Plaza
13  Irvine, California 92614-8557
14  949.451.3805
15  Appearing on behalf of Defendant
16
17  SEAN T. WATERS, ESQUIRE
18  Marrang Long Gary Rudnick, PC
19  100 SW Fifth Avenue, Suite 1650
20  Portland, Oregon 97204
21  503.242.0000
22  Appearing on behalf of the Deponents
23
24  Also present: Travis Shields, Videographer
25

Page 3

1       EXHIBIT INDEX
2   No.   Description          Page/Line
3   1 A letter dated August 26th, 2005,    7/8
4      with a subpoena attached.
5   2 A systems license agreement      12/23
6      bearing Bates stamp numbers
7      TriZetto 827355-634705.
8   3 The original response to        22/12
9      Providence Health Plan's request
10     for information dated 10-11-2000.
11  4 The McKesson Patent No. '164      67/17
12  5 A document authored by Ms. Drini    83/2
13     and last modified on 9-16-02.
14  6 A document entitled, "Comparative   92/16
15     Analysis, McKesson HBOC ClaimCheck
16     and Facets Clinical Editor."
17  7 A 5-page document entitled,        97/18
18     "Providence Health Plan Facets
19     clinical editing TriZetto Response
20     to Identified Issues."
21  8 A document entitled, "Facets Extended  104/11
22     Enterprise claims Processing User
23     Guide and Supplement."
24  9 A 5-page document entitled, "Platform  111/5
25     System Selection."

Page 4

1   PORTLAND, OREGON;
2   SEPTEMBER 12, 2005
3   1:16 P.M.
4      (Witness key: A1, Ms. Pierson; A2, Ms. Drini)
13:16:55  5
13:17:00  6      THE VIDEOGRAPHER: We are on the record.
13:17:00  7   This is a statement for a video deposition. I'm the
13:17:03  8   videographer. My name is Travis Shields.
13:17:05  9      This videotaped deposition is being noticed
13:17:08 10   by Attorney Jeffrey Randall and is being held on
13:17:16 11   September 12th, 2005, at 1:19 p.m. The location is
13:17:16 12   750 Southwest Alder Street, Portland, Oregon. Case
13:17:19 13   caption is McKesson Information Solutions, LLC, vs.
13:17:24 14   The TriZetto Group, Inc., U.S. District Court for the
13:17:28 15   District of Delaware, Case No. 04-1258-SLR.
         16      The deponents are Carolyn Drini and Tracy
13:17:33 17   Pierson.
13:17:38 18      Would counsel and all present please
13:17:38 19   identify yourselves and state whom you represent.
13:17:40 20      MR. RANDALL: Jeff Randall with Skadden
13:17:42 21   Arps representing Plaintiff McKesson.
13:17:44 22      MR. KENNEDY: Scot Kennedy with Gibson,
13:17:46 23   Dunn & Crutcher representing the Defendant, The
13:17:48 24   TriZetto Group.
         25      MR. WATERS: Sean Waters from Marrang Long

1 (Pages 1 to 4)

Page 5

13:17:51 1  Gary Rudnick representing the deponents.
13:17:53 2         THE VIDEOGRAPHER: This deposition is being
13:17:55 3  taken before Laurie Volker, court reporter, who will
        4  now swear in the witnesses.
        5         THE REPORTER: Could you raise your right
        6  hands, please.
        7         You do solemnly swear that the testimony
        8  you are about to give will be the truth, the whole
13:18:05 9  truth, and nothing but the truth, so help you God?
13:18:06 10        MS. DRINI: Yes.
13:18:11 11        MS. PIERSON: Yes.
13:18:11 12        MR. WATERS: Before we begin, I just want
13:18:13 13 to make a quick objection to the use of the --
13:18:18 14 videotaping the deposition. The deposition wasn't
13:18:18 15 noticed that way, and in fact we were not even served
13:18:21 16 with a copy of the notice of the deposition in this
13:18:21 17 case.
13:18:23 18        The deposition can proceed.
13:18:25 19        MR. RANDALL: Do you feel like you're being
13:18:28 20 prejudiced in any way in terms of the witnesses'
13:18:31 21 preparation or any other issue? If there is, if
13:18:35 22 there is some concrete issue with respect to
13:18:37 23 videotaping the witnesses, I'd like to address it and
13:18:39 24 take care of it, but if there's just an objection
        25 that it wasn't noticed, and there's no other

Page 6

13:18:43 1  prejudice or anything else to you or your client,
13:18:46 2  then I'll just proceed, if that's all right with you.
13:18:48 3         MR. WATERS: Well, I just state my
13:18:49 4  objection.
13:18:54 5         MR. RANDALL: All right.
13:18:54 6         MR. KENNEDY: Mr. Randall, before we begin,
13:18:56 7  I'd just ask that you reserve enough time for us to
13:18:58 8  examine the witnesses at the conclusion of your
13:18:58 9  questions.
13:19:00 10        MR. RANDALL: How much time do you need?
13:19:02 11        MR. KENNEDY: Not much. I think probably
13:19:04 12 45 minutes would be sufficient. More than
13:19:05 13 sufficient.
13:19:06 14        MR. RANDALL: We'll see. We'll see if I
13:19:07 15 can do that.
        16        MR. KENNEDY: All right. Thank you.
        17 TRACY PIERSON and CAROLYN DRINI,
        18 having been first duly sworn, were examined
13:19:10 19 and testified as follows:
        20 EXAMINATION
13:19:10 21 BY MR. RANDALL:
13:19:14 22        Q. We have two designees, as I understand it,
13:19:21 23 to testify regarding the topics of the deposition.
13:19:21 24        Could you each state your name for the
        25 record, please.

Page 7

        1         A2. Carolyn Drini.
13:19:25 2
13:19:32 3         A1. And I'm Tracy Pierson.
13:19:35 4         MR. RANDALL: I'll mark for identification
13:19:46 5  as Providence Exhibit 1 a letter dated August 26th
13:19:52 6  with a subpoena attached and a list of topics for the
        7  deposition as well.
        8         (Whereupon Exhibit-1, a letter dated
13:20:06 9  August 26th, 2005, with a subpoena attached, was
        10 marked for identification.)
13:20:08 11 BY MR. RANDALL:
13:20:13 12        Q. Let me show you both the deposition notice,
13:20:17 13 and specifically, I'd ask that you turn --
13:20:19 14        MR. WATERS: Counsel, do you have an extra
13:20:20 15 copy of that?
        16        MR. RANDALL: I don't. I'm sorry.
13:20:40 17        MR. WATERS: Can I take a quick look at
        18 that?
13:20:40 19 BY MR. RANDALL:
13:20:44 20        Q. This is the deposition notice to Providence
13:20:47 21 Health Plan. Specifically, I'd like you to take a
13:20:55 22 look at, if you would, the last two pages,
13:20:57 23 second-to-the-last page, in the middle of the page,
13:21:02 24 it says, "Topics," and then there are six paragraphs.
        25        Do you see that?

Page 8

13:21:07 1         A1. Uh-huh.
13:21:08 2         Q. Is that a "yes"?
13:21:08 3         A2. Yes.
13:21:10 4         A1. Yes. Sorry, yes.
13:21:13 5         Q. Okay. Could you each take a look at those
13:21:15 6  topics, and then I'm going to ask you a question
13:21:18 7  about them; namely, do you understand that you are
13:21:23 8  both collectively being asked to testify on behalf of
13:21:26 9  Providence Health Plan as to the topics identified as
13:21:39 10 topics 1 through 6 of the Providence deposition
13:21:52 11 notice?
13:21:54 12        A2. Yes.
13:21:55 13        A1. Yes.
13:21:58 14        Q. Did either of you do any preparation for
        15 this deposition, such as meeting with counsel for
13:22:04 16 TriZetto?
13:22:04 17        A2. No.
13:22:06 18        A1. No.
13:22:10 19        Q. Are you both prepared to testify about
13:22:21 20 topics 1 through 6 on behalf of Providence Health
13:22:21 21 Plan?
13:22:21 22        A1. Yes.
13:22:22 23        A2. Yes.
13:22:26 24        Q. Let's start with you, Ms. Pierson. How
        25 long have you been employed by Providence Health

2 (Pages 5 to 8)

**Page 57**

14:41:17  1    operate to delete invalid medical service codes
14:41:19  2    within a claim?
14:41:21  3        MR. KENNEDY: Objection. Vague.
14:41:29  4    A2. I don't believe it deletes a code. I
14:41:31  5    believe it will determine whether it's valid or not
14:41:35  6    and send a message back on the claim saying it's
14:41:40  7    invalid.
14:41:53  8        Q.  Do you understand Facets to operate to
14:41:56  9    eliminate from further consideration a medical
14:41:59 10    service code within a claim that's been determined by
14:42:01 11    Facets to be invalid?
14:42:02 12        MR. KENNEDY: Objection. Vague and
14:42:03 13    ambiguous.
14:42:05 14    A2. Yeah. I don't understand your question.
         15    Could you break it down?
14:42:07 16    BY MR. RANDALL:
14:42:10 17        Q.  Sure. Let's say, for instance, you submit
14:42:16 18    a claim to Facets, and it contains two medical
14:42:16 19    service codes, one of which is determined by Facets
14:42:18 20    to be valid, and the other is determined by Facets to
14:42:20 21    be invalid.
14:42:23 22        Do you understand in that situation that
14:42:28 23    Facets would eliminate from further consideration the
14:42:29 24    invalid code?
         25        MR. KENNEDY: Objection. Same objection.

**Page 58**

14:42:36  1    A2. I'm not sure what you mean by, "eliminate
14:42:36  2    from further consideration."
14:42:40  3        An invalid code, from my understanding, is
14:42:46  4    a code that is no longer considered valid by the
14:42:50  5    bodies that publish them, so if it's a CPT code
14:42:54  6    that's been retired, it's no longer valid. And so
14:42:57  7    the system does adjudicate, and we do monitor that.
14:43:00  8    The Facets system does do that so it's no longer
         9    valid for the purposes of processing and payment.
14:43:07 10    BY MR. RANDALL:
14:43:12 11        Q.  Let me ask you another example. Say, for
14:43:16 12    instance, a -- well, let me back up a minute.
14:43:16 13        Do you understand that the Facets system
14:43:21 14    has -- applies a set of rules or criteria in a
14:43:24 15    certain order?
14:43:28 16    A2. I believe there's a hierarchy. I don't
14:43:30 17    personally know what that order is.
14:43:32 18        Q.  All right. And, for example, if the claim
14:43:35 19    was submitted to the Facets system with three medical
14:43:40 20    service codes, and after, let's say, the first rule
14:43:49 21    is applied, it is determined that one of the medical
14:43:53 22    service codes was unbundled -- do you understand what
14:43:53 23    that means?
14:43:54 24    A2. Yes.
         25        Q.  Okay. That it should have been included

**Page 59**

14:43:59  1    within another medical service code in the same
14:44:01  2    claim?
14:44:02  3    A2. Right.
14:44:05  4        Q.  With respect to that unbundled medical
14:44:09  5    service code, do you understand that Facets would
14:44:18  6    eliminate that medical service code from further
14:44:19  7    consideration among the subsequent rules?
         8    A2. I believe it does.
14:44:22  9        Q.  Okay.
14:44:31 10        So, for instance, do you understand the
14:44:32 11    Facets system, when it is following its sequence of
14:44:35 12    rules to apply, that when it determines that a
14:44:37 13    particular medical service code is invalid for
14:44:40 14    payment, that they will eliminate that from further
14:44:42 15    consideration by the subsequent rules?
14:44:43 16        MR. KENNEDY: Objection. Vague and
14:44:44 17    ambiguous.
14:44:47 18    A2. I will -- I can't say because I really
14:44:50 19    don't know the hierarchy that it follows. I do think
14:44:54 20    that it's one of the rules that does disallow it,
14:44:59 21    that that does prevent it from moving on down through
         22    the system, but I can't say absolutely.
14:45:01 23    BY MR. RANDALL:
14:45:03 24        Q.  All right. But that's your best
         25    understanding?

**Page 60**

14:45:07  1    A2. That's my best understanding.
14:45:07  2        Q.  All right.
14:45:11  3        Ms. Pierson, do you have any better
14:45:12  4    understanding than that?
         5    A1. I don't.
14:46:15  6        Q.  Okay.
14:46:21  7        With respect to unbundling of medical
14:46:26  8    service codes, can you tell me what your
14:46:27  9    understanding of that terminology is?
14:46:31 10    A2. As you previously stated, it's generally a
14:46:35 11    service that is considered a component of another
14:46:40 12    service that's being billed on the same claim.
14:46:46 13        Q.  Do you understand Facets to operate to --
14:46:54 14    at least with respect to unbundling, to determine
14:46:59 15    when a medical service code should have been included
14:47:02 16    within another medical service code that is included
14:47:06 17    in the claim and therefore should be rejected?
14:47:08 18        MR. KENNEDY: Objection. Vague.
14:47:10 19    A2. If I understand what you're saying, it
14:47:14 20    sounds like you're saying the same thing. It's a
         21    rebundled service, and, yes, it does deny it.
14:47:19 22    BY MR. RANDALL:
14:47:22 23        Q.  Okay. With respect to the unbundled
14:47:27 24    criteria, do you understand that the Facets system
         25    operates to determine whether a particular medical

15 (Pages 57 to 60)

Page 61

```
14:47:34  1    service code should be subsumed within other medical
14:47:38  2    service codes and therefore disallowed?
14:47:41  3        A2. Meaning they are a component of the other
14:47:41  4    code --
14:47:43  5        Q. Yes.
14:47:45  6        A2. -- and therefore would be bundled?
14:47:46  7        Q. Yes.
14:47:46  8        A. Yes.
14:47:50  9        Q. And do you also understand Facets to
14:47:53 10    operate in the alternative, which is to determine
14:47:58 11    whether a particular medical service code should be
14:48:00 12    included within other medical service codes in the
14:48:04 13    claim, and if not, at least it passes that test?
14:48:05 14        A2. Right.
14:48:07 15        MR. KENNEDY: Objection. Vague and
14:48:09 16    compound.
14:48:12 17        MR. RANDALL: What was compound about it?
14:48:14 18        MR. KENNEDY: You said -- you gave two
14:48:17 19    functions of the -- that were performed in editing
14:48:22 20    the claim.
14:48:22 21        MR. RANDALL: All right. I'll break it
14:48:22 22    down.
         23        MR. KENNEDY: All right.
14:48:22 24    BY MR. RANDALL:
         25        Q. I'll break it down.
```

Page 62

```
14:48:26  1        Do you understand Facets to operate to
14:48:29  2    determine whether or not a particular medical service
14:48:34  3    code within a claim should have been included within
14:48:38  4    another medical service code within the same claim?
14:48:40  5        A2. For the most part, yes.
14:48:43  6        Q. And do you understand Facets to operate,
14:48:48  7    for instance, in a manner in which a medical service
14:48:53  8    code is determined by Facets not to be included
14:48:56  9    within other medical service codes within the claim;
14:49:01 10    that the Facets system would then pass that medical
14:49:03 11    service code on to the next test or rule?
14:49:06 12        A2. That's correct. .
14:49:07 13        Q. And if, for example, that a medical service
14:49:11 14    code were determined by Facets to be properly
14:49:14 15    included within another medical service code within
14:49:20 16    the same claim, then is it your understanding Facets
14:49:21 17    would operate to disallow that particular medical
14:49:24 18    service code?
14:49:29 19        A2. That to me is, again, a bundled service.
14:49:33 20    It's bundling it to another code.
14:49:36 21        The question of whether it's disallowed or
14:49:41 22    not is a configuration question, I believe. But it
14:49:44 23    can and does do that. It will disallow if we set it
14:49:49 24    to disallow.
         25        Q. Ms. Pierson, does the Facets system include
```

Page 63

```
14:50:06  1    a central processing unit and memory, an associated
14:50:10  2    memory for processing claims?
14:50:13  3        A1. I don't know, actually, if that's part of
14:50:18  4    the Facets system or the server and the hardware that
14:50:18  5    it's on.
14:50:21  6        Q. Have you ever heard of or seen --
14:50:24  7        A1. Well, I know what a CP --
14:50:27  8        Q. -- or discussed the Facets system operating
14:50:28  9    without any hardware?
14:50:32 10        A1. Well, obviously, it wouldn't operate
14:50:35 11    without any hardware, but you asked if it contains
14:50:36 12    that.
14:50:42 13        Q. You do understand Facets as requiring a
14:50:45 14    central processing unit and memory in order to have
14:50:48 15    any use at all; right?
         16        A1. Absolutely.
14:51:09 17        Q. Okay.
14:51:13 18        Ms. Drini, do you understand Facets to
14:51:17 19    operate as providing a means for ascertaining whether
14:51:36 20    at least medical service codes in one claim are
14:51:38 21    mutually exclusive with medical service codes in the
14:51:39 22    same claim?
14:51:41 23        MR. KENNEDY: Objection. Vague.
         24        A2. Yes.
         25    BY MR. RANDALL:
```

Page 64

```
14:52:01  1        Q. Do you understand the Facets system to
14:52:04  2    provide a means for authorizing medical service codes
14:52:09  3    which are not mutually exclusive with other medical
14:52:12  4    service codes in a claim?
14:52:13  5        MR. KENNEDY: Objection. Vague and
14:52:15  6    ambiguous.
14:52:21  7        A2. I am not sure as far as the authorization,
         8    if you're referring to preauthorization, or not.
14:52:25  9    BY MR. RANDALL:
14:52:26 10        Q. Any authorization.
14:52:28 11        A2. Any authorization.
14:52:33 12        Q. Yeah.
14:52:33 13        A2. I really don't know.
14:52:34 14        Q. Well, does the Facets system ever allow for
14:52:35 15    the payment of a claim?
14:52:36 16        A2. Yes.
14:52:37 17        Q. All right.
14:52:44 18        Does the Facets system, at least on -- does
14:52:51 19    the Facets system provide a means for authorizing for
14:52:54 20    payment medical service codes which are not
14:52:57 21    mutually -- which are not medically exclusive with
14:53:00 22    other medical service codes within a claim?
14:53:00 23        A2. Yes.
14:53:03 24        Q. All right.
         25        And does Facets provide a means for
```

16 (Pages 61 to 64)

**Page 65**

| | | |
|---|---|---|
| 14:53:12 | 1 | rejecting for payment medical service codes which are |
| 14:53:15 | 2 | medically exclusive with other medical service codes |
| 14:53:17 | 3 | contained in the claim? |
| 14:53:47 | 4 | A2. Yes. |
| 14:53:51 | 5 | Q. Does Facets operate -- strike that. |
| 14:53:54 | 6 | Does Facets provide a means for determining |
| 14:54:03 | 7 | whether a medical service code is present in the |
| 14:54:05 | 8 | database? |
| 14:54:10 | 9 | MR. KENNEDY: Objection. Vague and |
| 14:54:10 | 10 | ambiguous. |
| 14:54:11 | 11 | A2. If -- I'm sorry. If it's present in a |
| 14:54:14 | 12 | database and it comes in on a claim? |
| 14:54:14 | 13 | BY MR. RANDALL: |
| 14:54:16 | 14 | Q. Correct. |
| 14:54:19 | 15 | A2. And your question is? |
| 14:54:22 | 16 | Q. Does Facets provide a means to determine, |
| 14:54:26 | 17 | if, for example, a particular medical service code is |
| 14:54:31 | 18 | present within the database of medical service codes? |
| 14:54:32 | 19 | Is it there? |
| 14:54:35 | 20 | A2. I'm not -- I don't fully understand what |
| 14:54:40 | 21 | you mean by "a means to identify if it's in there." |
| 14:54:45 | 22 | Q. Does it make that check? Does it check to |
| 14:54:48 | 23 | see if it even recognizes the medical service code? |
| 14:54:54 | 24 | A2. If it -- if that's part of the editing |
| | 25 | system and that hierarchy, it will flow through. And |

**Page 66**

| | | |
|---|---|---|
| 14:55:00 | 1 | if it is added in the database, then, yes, it would. |
| 14:55:06 | 2 | Q. All right. The question is: Does Facets |
| 14:55:06 | 3 | determine whether or not a medical service code that |
| 14:55:16 | 4 | is present in a claim actually is present in the |
| 14:55:16 | 5 | database? |
| 14:55:21 | 6 | A2. It would check the database as the claim |
| 14:55:23 | 7 | goes through the process, yes. |
| 14:55:25 | 8 | Q. And determine whether that medical service |
| 14:55:31 | 9 | code is present in the database; correct? |
| 14:55:35 | 10 | A2. It's more the way you're phrasing it, but |
| 14:55:39 | 11 | if it's in the database, yes, it would -- the |
| 14:55:42 | 12 | processing action would move it through. If it's |
| 14:55:53 | 13 | not, I would think it would be silent. |
| 14:55:58 | 14 | Q. Well, isn't one of the rules for tests that |
| 14:56:02 | 15 | are applied to medical service codes within a claim |
| 14:56:06 | 16 | whether or not that medical service code exists in |
| 14:56:11 | 17 | the database? |
| 14:56:11 | 18 | Ms. Pierson, if you can answer it, go |
| 14:56:11 | 19 | ahead. |
| 14:56:13 | 20 | A1. Yes. If -- any time a claim is submitted |
| 14:56:18 | 21 | and any code that is on that claim doesn't exist in |
| 14:56:21 | 22 | the database, an error would come up, and the claim |
| | 23 | would not adjudicate in the system. |
| 14:56:56 | 24 | Q. Okay. |
| | 25 | Ms. Pierson, in -- at any time during |

**Page 67**

| | | |
|---|---|---|
| 14:57:06 | 1 | either the purchase process and decision-making or |
| 14:57:14 | 2 | the use of Facets, did TriZetto ever communicate to |
| 14:57:18 | 3 | Providence that the product might infringe on |
| 14:57:21 | 4 | McKesson's patent? |
| 14:57:21 | 5 | A1. No. |
| 14:57:28 | 6 | Q. Are you aware of any discussions whatsoever |
| 14:57:28 | 7 | between anyone on behalf of TriZetto and anyone at |
| 14:57:34 | 8 | Providence regarding whether the Facets system |
| 14:57:36 | 9 | infringes McKesson's patent? |
| 14:57:40 | 10 | A1. No. |
| 14:57:44 | 11 | Q. Do you understand that Providence is fully |
| 14:57:50 | 12 | indemnified by TriZetto in case it does infringe? |
| 14:57:53 | 13 | A1. No, but that's good. Sorry. |
| 14:58:10 | 14 | MR. WATERS: That's okay. |
| 14:58:14 | 15 | MR. RANDALL: I'll mark as Providence |
| | 16 | Exhibit 4 the McKesson Patent No. '164. |
| 14:58:55 | 17 | (Whereupon Exhibit-4, the McKesson Patent |
| | 18 | No. '164, was marked for identification.) |
| 14:58:55 | 19 | BY MR. RANDALL: |
| 14:59:00 | 20 | Q. Let me show you the patent I've marked as |
| 14:59:04 | 21 | Exhibit 4, and I just want to use this as a reference |
| 14:59:08 | 22 | in asking you a series of questions. Probably to |
| 14:59:09 | 23 | you, Ms. Drini. |
| 14:59:15 | 24 | Can you turn to the second-to-the-last |
| | 25 | page. I don't mean to exclude you, Ms. Pierson -- |

**Page 68**

| | | |
|---|---|---|
| 14:59:22 | 1 | A1. That's okay. |
| 14:59:27 | 2 | Q. But if you want to jump in and answer, feel |
| 14:59:28 | 3 | free. |
| 14:59:32 | 4 | And the first paragraph is paragraph 1. Do |
| 14:59:32 | 5 | you see that? |
| 14:59:33 | 6 | A2. Yes. |
| 14:59:36 | 7 | Q. That's actually a claim. I might call it a |
| 14:59:38 | 8 | claim, but that's Claim No. 1. |
| 14:59:43 | 9 | Could you just read through that claim, and |
| 14:59:46 | 10 | I'm going to ask you if, based on your understanding, |
| 15:00:01 | 11 | the Facets system performs or operates pursuant to |
| 15:00:05 | 12 | what's described there? |
| 15:00:07 | 13 | MR. KENNEDY: I would object to this as |
| 15:00:10 | 14 | calling for a legal conclusion. |
| 15:00:11 | 15 | MR. WATERS: And I'm going to object to |
| 15:00:16 | 16 | this that I think it's calling for an expert |
| | 17 | conclusion. |
| 15:00:16 | 18 | BY MR. RANDALL: |
| 15:00:18 | 19 | Q. Ms. Drini, I want this to be perfectly |
| 15:00:25 | 20 | clear, I'm asking for your understanding as to how |
| 15:00:25 | 21 | Facets operates. That's all. |
| 15:00:45 | 22 | A2. Okay. |
| 15:00:45 | 23 | (Pause in the proceedings.) |
| 15:00:51 | 24 | A2. It appears that it would. |
| | 25 | Q. Okay. Based on your understanding, the |

17 (Pages 65 to 68)

Page 69

15:00:57  1  Facets system does operate pursuant to the steps
15:01:01  2  identified in Claim 1?
15:01:03  3      A2. I would say yes.
15:01:07  4      Q.  I'd like you to look at Claim 2, and I'm
15:01:12  5  going to ask you the same question about Claim 2.
15:01:57  6          MR. KENNEDY:  Same objection.
         7          (Pause in the proceedings.)
15:01:58  8  BY MR. RANDALL:
15:02:00  9      Q.  Does the Facets system, based on your
15:02:04 10  understanding, Ms. Drini, operate pursuant to the
15:02:07 11  steps described in Claim 2?
15:02:12 12      A2. Based on my understanding, yes.
15:02:14 13      Q.  Could you read Claim 3, and I have the same
15:02:14 14  question.
15:02:55 15          MR. KENNEDY:  Same objection.
        16          (Pause in the proceedings.)
15:02:55 17  BY MR. RANDALL:
15:03:01 18      Q.  Based on your understanding, Ms. Drini,
15:03:03 19  does the Facets system comprise the components
15:03:05 20  described in Claim 3?
15:03:06 21          MR. KENNEDY:  Objection as calling for a
15:03:09 22  legal conclusion.
        23      A2. Based on my understanding, I would say yes.
15:03:19 24  BY MR. RANDALL:
        25      Q.  Could you read Claim 4?  And I have the

Page 70

15:03:28  1  same question.
15:03:31  2      Claim 4, by the way, is the same as Claim
15:03:37  3  3, just with a slight modification.
15:03:44  4          MR. KENNEDY:  Same objection.
15:03:47  5      A2. I would have to qualify it and say I don't
15:03:49  6  believe it deletes invalid medical service codes.
15:03:50  7  BY MR. RANDALL:
15:03:51  8      Q.  All right.  With respect --
         9      A2. It would --
        10      Q.  I'm sorry?
        11      A2. It would identify them.
15:03:56 12      Q.  Okay.
15:03:56 13      With respect to Claim 4, is it your
15:04:01 14  understanding that the Facets system is comprised of
15:04:08 15  all of the components of Claim 3 and the added
15:04:12 16  modification of Claim 4, given that instead of
15:04:17 17  deleting the claim, it eliminates it from further
15:04:20 18  consideration for payment?
15:04:24 19          MR. KENNEDY:  Same objection.
15:04:28 20      A2. I would say probably yes, but there are so
15:04:32 21  many variations in how a claim is processed and all
15:04:35 22  of the codes are adjudicated, that it's difficult to
        23  be absolute on my answer.
15:04:37 24  BY MR. RANDALL:
        25      Q.  Okay.

Page 71

15:05:16  1      Is it your understanding that the Facets
15:05:25  2  system operates to eliminate from further
15:05:30  3  consideration of subsequent rules a medical code that
15:05:33  4  Facets determines is invalid?
15:05:36  5          MR. KENNEDY:  Objection.  Vague and
15:05:42  6  ambiguous.
15:05:43  7      A2. Could you say that again?
         8          MR. RANDALL:  Could you read that back.
15:05:58  9          (Whereupon the requested question was read
15:05:58 10  back.)
        11      A2. I believe it does.
15:06:15 12  BY MR. RANDALL:
15:06:21 13      Q.  With that understanding regarding what the
15:06:24 14  term "deicte" means in Claim 4, is it your
15:06:33 15  understanding that the Facets system comprises the
15:06:38 16  components identified in Claims 3 and 4?
15:06:39 17      A2. I believe so.
15:06:44 18      Q.  With that understanding with respect to the
15:06:48 19  word "delete," could you also read Claim 5, and I
15:07:02 20  have the same question.
15:07:02 21          (Pause in the proceedings.)
15:07:06 22      A2. If I understand what it's saying, I would
15:07:11 23  say yes, it does inform the user why the claim is
15:07:14 24  being adjudicated in the manner it is.
        25      Q.  Okay.  Why, for instance, an invalid

Page 72

15:07:29  1  medical service code is being eliminated from further
15:07:29  2  consideration?
15:07:30  3      A2. Yes.
15:07:33  4      Q.  So with that understanding, do you -- is it
         5  your understanding that the Facets system operates --
15:07:37  6  strike that.
15:07:41  7      The Facets system comprises the components
15:07:45  8  identified in Claims 3, 4, and 5?
15:07:46  9          MR. KENNEDY:  Objection.  Compound and
        10  calls for a legal conclusion.
15:07:48 11  BY MR. RANDALL:
15:07:50 12      Q.  You can answer the question.
15:07:54 13      A2. I believe so.
15:08:03 14      Q.  Could you read Claim 6?  And Claim 6 is --
15:08:08 15  includes all of the elements of Claim 3 plus an
15:08:12 16  additional limitation as described in Claim 6.  Could
15:08:16 17  you read Claim 6.
15:08:19 18      And my question is, based on your
15:08:25 19  understanding, does Facets include the components of
15:08:26 20  Claim 6?
15:08:30 21      A2. Yes.
15:08:39 22      Q.  Do you know what CRVS codes are?
15:08:39 23      A2. I believe it stands for California Relative
15:08:40 24  Value System.
        25      Q.  Correct.

18 (Pages 69 to 72)

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
877.955.3855

**Page 73**

15:08:46  1    Does the Facets system include those codes?

15:08:59  2    A2. I don't believe that's a coding system, so

15:09:00  3    no.

15:09:03  4    Q. Could you read Claim 8? And Claim 8

15:09:11  5    includes all of the components of Claim 3 plus the

15:09:11  6    added information in Claim 8.

15:09:16  7    And the question is: Does the Facets

15:09:16  8    system, based on your understanding, include the

15:09:16  9    components of Claim 8?

15:09:18 10    MR. KENNEDY: Objection as calling for a

15:09:29 11    legal conclusion.

15:09:30 12    (Pause in the proceedings.)

15:09:34 13    A2. I believe that would be part of the method

15:09:42 14    of informing the user of the status of that

15:09:48 15    particular service code, but I don't know

15:09:49 16    specifically, no.

15:09:49 17. BY MR. RANDALL:

15:09:54 18    Q. Does the Facets system, on occasion,

15:10:10 19    request additional information regarding a medical

15:10:14 20    service code that has been determined to be invalid?

15:10:15 21    A. Say that again.

15:10:19 22    Q. Yes.

        23    MR. RANDALL: Can you read it back, please.

15:10:30 24    (Whereupon the requested question was read

        25    back.)

**Page 74**

        1    A2. Not to my knowledge.

15:10:39  2. BY MR. RANDALL:

15:10:42  3    Q. Ms. Pierson, can you answer that?

15:10:45  4    A1. Can you repeat the question? I'm sorry.

        5    Q. Sure.

15:10:55  6    (Whereupon the requested question was read

15:11:00  7    back.)

        8    A1. I don't know.

15:11:12  9 BY MR. RANDALL:

15:11:18 10    Q. Could you read Claim 9, Ms. Drini. And

15:11:22 11    Claim 9 includes all of the components of Claim 3

15:11:28 12    plus the added limitation described in Claim 9.

15:11:30 13    And the question is: Does the Facets

15:11:34 14    system, as you understand it, include the components

15:11:36 15    required by Claim 9?

15:11:41 16    MR. KENNEDY: Objection. Calls for a legal

15:11:47 17    conclusion.

15:11:47 18    (Pause in the proceedings.)

        19    A2. I would say yes.

15:11:50 20 BY MR. RANDALL:

15:11:59 21    Q. Could you read Claim 10. And I'm going to

15:12:05 22    ask you the same question which is: Does the Facets

15:12:09 23    system, based on your understanding, include the

15:12:19 24    components described in Claim 10?

        25    MR. KENNEDY: Same objection.

**Page 75**

15:12:40  1    (Pause in the proceedings.)

        2    A2. In my opinion, I would say yes.

15:12:44  3 BY MR. RANDALL:

15:12:51  4    Q. And could you read Claim 11. And again,

15:12:51  5    Claim 11 includes all of the same components of

15:12:55  6    Claim 10 with the further component identified in

15:12:55  7    Claim 11.

15:12:58  8    And the question is: Based on your

15:13:03  9    understanding, does the Facets system include the

15:13:08 10    components described in Claim 11?

15:13:12 11    MR. KENNEDY: Same objection.

15:13:23 12    (Pause in the proceedings.)

        13    A2. I would say it does.

15:13:26 14 BY MR. RANDALL:

15:13:36 15    Q. Could you read Claim 12. And I'll ask you,

15:13:40 16    based on your understanding, does the Facets system

15:13:45 17    include the components described in Claim 12?

15:13:47 18    MR. KENNEDY: Same objection.

15:14:14 19    (Pause in the proceedings.)

15:14:19 20    A2. I believe it does.

15:14:21 21    MR. RANDALL: We have to take a break in

15:14:24 22    order to change the videotape. It's going to be just

15:14:31 23    a couple minutes, and then we'll go back on the

15:14:31 24    record, and I'll go for another five or ten minutes,

        25    and then we can take an afternoon break, if that

**Page 76**

15:14:34  1    would be okay with everybody.

15:14:36  2    THE VIDEOGRAPHER: This concludes Tape

15:16:24  3    No. 1. We're off the record at 3:16 p.m.

15:16:24  4    (Whereupon a break was taken.)

15:16:26  5    THE VIDEOGRAPHER: This begins Tape No. 2.

        6    We're back on the record at 3:18 p.m.

15:16:31  7 BY MR. RANDALL:

15:16:35  8    Q. Ms. Drini, could you read Claim 13 of the

15:16:37  9    McKesson patent, and I'll ask you the same question,

15:16:40 10    which is: Based on your understanding, does the

15:16:44 11    Facets system include the components described in

15:16:49 12    Claim 13?

15:16:49 13    MR. KENNEDY: Object again as calling for a

15:16:54 14    legal conclusion.

15:17:02 15    (Pause in the proceedings.)

        16    A2. I believe it does.

15:17:05 17 BY MR. RANDALL:

15:17:10 18    Q. Could you read Claim 14, and I'll ask you

15:17:11 19    the same question.

15:17:13 20    Does the Facets system, based on your

15:17:18 21    understanding, include the components described in

15:17:19 22    Claim 14?

15:17:21 23    MR. KENNEDY: Same objection.

15:17:46 24    (Pause in the proceedings.)

        25    A2. I would have to say based on your previous

19 (Pages 73 to 76)

Page 77

```
15:18:00   1    definition of nonmedical, I could say yes.
           2    BY MR. RANDALL:
15:18:03   3       Q.  Okay.  You say you could say yes.  You mean
15:18:05   4    you would say yes?
           5       A2.  I would say yes.
15:18:07   6       Q.  Okay.
15:18:14   7          Could you read Claim 15.  And I'll ask you
15:18:20   8    the same question.
15:18:20   9          Does the Facets system, based on your
15:18:23  10    understanding, include the components described in
15:18:24  11    Claim 15?
15:18:26  12          MR. KENNEDY:  Same objection.
15:18:40  13          (Pause in the proceedings.)
          14       A2.  I would say yes.
15:18:43  15    BY MR. RANDALL:
15:18:48  16       Q.  Could you read Claim 16.  And I'll ask you,
15:18:55  17    based on your understanding, does the Facets system
15:19:03  18    operate pursuant to the steps described in Claim 16?
15:19:05  19          MR. KENNEDY:  Same objection.
15:19:19  20          (Pause in the proceedings.)
15:19:23  21       A2.  Based on my understanding, I would say yes.
15:19:24  22          MR. RANDALL:  Okay.  Why don't we take a short
15:19:28  23    afternoon break now.  Maybe ten minutes, if that's
15:19:31  24    all right with everybody.
          25       A1.  Sure.
```

Page 78

```
15:19:33   1       A2.  All right with me.
15:19:34   2          THE VIDEOGRAPHER:  Off the record at
15:40:23   3    3:21 p.m.
15:40:26   4          (Whereupon a break was taken.)
15:40:28   5          THE VIDEOGRAPHER:  We're back on the record
           6    at 3:42 p.m.
15:40:31   7    BY MR. RANDALL:
15:40:34   8       Q.  Ms. Pierson, have you understood all the
15:40:38   9    questions that at least I've asked you during this
15:40:39  10    deposition?
15:40:42  11          MR. WATERS:  I object.  That's overbroad.
15:40:43  12       A1.  I think so.
15:40:43  13    BY MR. RANDALL:
15:40:45  14       Q.  Have you understood them?
15:40:47  15       A1.  I've asked for clarification when I
15:40:48  16    haven't, so yes.
15:40:50  17       Q.  Are you comfortable with your testimony?
15:40:51  18       A1.  Yes.
15:40:53  19       Q.  Ms. Drini, have you understood all of my
15:40:53  20    questions this afternoon?
15:40:55  21       A2.  To the best of my ability.
15:40:57  22       Q.  Okay.  Are you comfortable with your
15:40:57  23    testimony?
15:40:59  24       A2.  I think so.
          25       Q.  And with respect to the videotape, do
```

Page 79

```
15:41:07   1    either of you two women have any issues with the fact
15:41:08   2    that we videotaped this?
15:41:10   3          MR. WATERS:  I'm going to -- I've already
15:41:12   4    stated my objection for the record, and that's not an
15:41:14   5    appropriate question, and that's not likely to lead
15:41:20   6    to relevant evidence or anything discoverable, so I'm
           7    going to instruct them not to answer.
15:41:20   8    BY MR. RANDALL:
15:41:20   9       Q.  Is there anything about this proceeding
15:41:27  10    that has been in any way uncomfortable that would
15:41:30  11    lead you to change your testimony?
15:41:30  12       A1.  No.
15:41:30  13       A2.  No.
15:41:32  14          MR. RANDALL:  And, Counsel, the only reason
15:41:36  15    I'm asking is if there was some reason why these two
15:41:39  16    witnesses felt there was some issue with the
15:41:41  17    videotape, I wanted to address it.
15:41:43  18          MR. WATERS:  I understand.  I just wanted
15:41:45  19    to be clear that I made an objection for the record,
15:41:48  20    and it's not their position to decide whether or not
15:41:50  21    they're being videotaped or not.  And I understand
15:41:53  22    your question whether or not it's affected their
15:41:54  23    testimony, and if that's all the question is, I think
          24    you asked it, and that's fine.
          25    BY MR. RANDALL:
```

Page 80

```
15:41:58   1       Q.  It hasn't affected your testimony in any
15:42:00   2    way, has it?
15:42:00   3       A2.  No.
15:42:04   4       A1.  No.
15:42:05   5       Q.  Okay.
15:42:09   6          I don't want to get into the substance of
15:42:11   7    any communications you may have had with your
15:42:15   8    attorneys, but have either of you met with or had a
15:42:17   9    telephone conference with your attorney regarding
15:42:18  10    this deposition?
15:42:19  11       A1.  Yes.
15:42:20  12       A2.  Yes.
15:42:26  13       Q.  A meeting or telephone call, Ms. Pierson?
15:42:26  14       A1.  A meeting.
15:42:27  15       Q.  How long was the meeting?
15:42:29  16          MR. WATERS:  I'm going to object to the
15:42:32  17    length of time.  Whether we met or not is fine, but
15:42:33  18    how long we met, not only is it not irrelevant, I
15:42:35  19    don't think it's appropriate.
15:42:36  20          MR. RANDALL:  I'm not going to get into the
15:42:39  21    substance of the communication.  I just wanted the
15:42:41  22    factual information did you meet, how long did you
15:42:42  23    meet, and --
15:42:44  24          MR. WATERS:  Well, we met.  That's fine.
          25    That's all you need to know.  How long we met is
```

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
877.955.3855

# EXHIBIT V

Page 1

1    UNITED STATES DISTRICT COURT
2    FOR THE DISTRICT OF DELAWARE
3
4    McKESSON INFORMATION SOLUTIONS LLC,
5         Plaintiff,
6    -against-    Civil Action No.
                  04-1258-SLR
7    THE TRIZETTO GROUP, INC.,
8         Defendant.
9
10
11
12
13    Videotaped deposition of TARA SMITH held
14    at the offices of Skadden Arps Slate Meagher &
15    Flom, Four Times Square, New York, New York,
16    on Wednesday, September 14, 2005, commencing
17    at 10:22 a.m., before David Sanders, Legal
18    Video Specialist, and James W. Johnson,
19    Registered Professional Reporter and a Notary
20    Public of the State of New York.
21
22
23    JOB NO. 38479
24
25

Page 2

1    A P P E A R A N C E S :
2
3    SKADDEN ARPS SLATE MEAGHER & FLOM LLP
4    Attorneys for the Plaintiff
5         Four Times Square
6         New York, New York  10036-6522
7    BY:  CONSTANCE S. HUTTNER, ESQ.
8         (212) 735-3000, shuttner@skadden.com
9
10   GIBSON DUNN & CRUTCHER LLP
11   Attorneys for the Defendant
12        Four Park Plaza
13        Irvine, California 92614-8557
14   BY:  T. KEVIN ROOSEVELT, ESQ.
15        (949) 451-3932, kroosevelt@gibsondunn.com
16
17
18
19
20   ALSO PRESENT:
21        David Sanders, Legal Video Specialist
22
23
24
25

Page 3

1
2         IT IS HEREBY STIPULATED AND AGREED by
3    and between the attorneys for the respective
4    parties herein, that the filing and sealing of
5    the within deposition be waived.
6         IT IS FURTHER STIPULATED AND AGREED that
7    all objections, except as to the form of the
8    question, shall be reserved to the time of the
9    trial.
10        IT IS FURTHER STIPULATED AND AGREED that
11   the within deposition may be sworn to and
12   signed before any officer authorized to
13   administer an oath with the same force and
14   effect as if signed and sworn to before the
15   Court.
16             - oOo -
17
18
19
20
21
22
23
24
25

Page 4

10:17  1         THE VIDEOGRAPHER:  This is tape number
10:18  2    one of videotaped deposition of Tara Smith
10:18  3    taken by Constance Huttner in the matter of
10:18  4    McKesson Information Solutions versus The
10:18  5    TriZetto Group Inc. in the United States
10:19  6    District Court for the District of Delaware,
10:19  7    Number 04-12-58-SLR.
10:19  8         This deposition is being held in the
10:19  9    offices of Skadden Arps & Flom, Four Times
10:19  10   Square, New York, New York, on September 14th,
10:19  11   2005. The approximate time is 10:24 a.m. My
10:19  12   name is David Sanders, from the firm of Global
10:19  13   Deposition Services, and I am a legal video
10:19  14   specialist.
10:19  15        The court reporter is Jim Johnson, in
10:19  16   association with Global Deposition Services at
10:19  17   420 Lexington Avenue, New York, New York. For
10:19  18   the record will counsel please introduce
10:19  19   themselves.
10:19  20        MS. HUTTNER:  My name is Constance
10:19  21   Huttner. I represent the plaintiff, McKesson.
10:19  22        MR. ROOSEVELT:  Kevin Roosevelt from
10:19  23   Gibson Dunn & Crutcher on behalf of the
10:19  24   defendant, The TriZetto Group.
10:19  25        THE VIDEOGRAPHER:  Now will the court

1 (Pages 1 to 4)

**Page 5**

| | |
|---|---|
| 10:19 1 | reporter please swear in the witness. |
| 10:20 2 | TARA SMITH, called as a witness, |
| 10:20 3 | having been first duly sworn by a Notary |
| 10:20 4 | Public, was examined and testified under oath |
| 10:20 5 | as follows: |
| 10:20 6 | MS. HUTTNER: Before we begin I'll just |
| 10:20 7 | note that we're beginning later than we had |
| 10:20 8 | agreed upon pursuant to agreement because of |
| 10:20 9 | the traffic created by the UN situation here |
| 10:20 10 | in New York. |
| 10:20 11 | EXAMINATION BY MS. HUTTNER: |
| 10:20 12 | Q. So with that introduction let me |
| 10:20 13 | introduce myself again to you, Ms. Smith. My name |
| 10:20 14 | is Connie Huttner. I'm a partner here at Skadden |
| 10:20 15 | Arps. I represent McKesson, I'm one of the |
| 10:20 16 | lawyers representing McKesson, and I'm going to |
| 10:20 17 | take your deposition today. |
| 10:20 18 | A. Okay. |
| 10:20 19 | Q. For the record can you tell us what your |
| 10:20 20 | name is and where you live. |
| 10:20 21 | A. Tara D. Smith, and I live at 73 Spruce |
| 10:20 22 | Meadows Drive in Monroe Township, New Jersey. |
| 10:20 23 | Q. Are you employed? |
| 10:20 24 | A. Yes. |
| 10:20 25 | Q. Where do you work? |

**Page 6**

| | |
|---|---|
| 10:20 1 | A. TriZetto. |
| 10:20 2 | Q. How long have you worked for TriZetto? |
| 10:20 3 | A. Since -- for four years, four and a half |
| 10:20 4 | years. |
| 10:20 5 | Q. So you started in -- |
| 10:20 6 | A. December 18th, 2000. |
| 10:20 7 | Q. December 18th, 2000? |
| 10:20 8 | A. Yes. |
| 10:20 9 | MS. HUTTNER: What is today's date, by |
| 10:21 10 | the way? Tomorrow is my 25th anniversary here |
| 10:21 11 | at Skadden Arps. |
| 10:21 12 | Q. Can you tell me, just briefly trace for |
| 10:21 13 | me where you, would you tell me what your |
| 10:21 14 | educational background is since high school. |
| 10:21 15 | A. I actually went to CUNY. I actually |
| 10:21 16 | went to a few different colleges. I went to New |
| 10:21 17 | York City Technical. I went to Hunter College, as |
| 10:21 18 | well as York College, and I have an associate's in |
| 10:21 19 | marketing management, and -- do you want anything |
| 10:21 20 | else? Or -- |
| 10:21 21 | Q. You have an associate's degree from |
| 10:21 22 | which institution? |
| 10:21 23 | A. Oh, from New York City Technical. |
| 10:21 24 | Q. Do you have any other degrees? |
| 10:21 25 | A. I have a Chubb -- it's not a degree; |

**Page 7**

| | |
|---|---|
| 10:21 1 | it's a certificate for computer programming, |
| 10:21 2 | Chubb. |
| 10:21 3 | Q. C-H-U-B-B? |
| 10:21 4 | A. Mm hmm. |
| 10:21 5 | Q. As in the insurance company? |
| 10:22 6 | A. Right, but they also have a technical |
| 10:22 7 | school. |
| 10:22 8 | Q. Okay, and when did you receive that |
| 10:22 9 | degree? |
| 10:22 10 | A. In 2000. |
| 10:22 11 | Q. And is there any particular aspect of |
| 10:22 12 | computer programming that this certificate relates |
| 10:22 13 | to, or is it just general? |
| 10:22 14 | A. It's general, that I can remember. |
| 10:22 15 | Q. And the associate's degree that you have |
| 10:22 16 | from New York City Technical Institute you received |
| 10:22 17 | when? |
| 10:22 18 | A. I believe in '98. |
| 10:22 19 | Q. And where did you go to high school? |
| 10:22 20 | A. William E. Grady. |
| 10:22 21 | Q. I'm sorry? |
| 10:22 22 | A. William E. Grady in Brooklyn. |
| 10:22 23 | Q. I take it you are a native New Yorker -- |
| 10:22 24 | A. Yes. |
| 10:22 25 | Q. -- who has been exiled to New Jersey? |

**Page 8**

| | |
|---|---|
| 10:22 1 | A. Yes. Unwillingly. |
| 10:22 2 | Q. Is William Grady -- and I'll betray the |
| 10:22 3 | fact that I'm not a native New Yorker -- is William |
| 10:22 4 | Grady, is that a special, a magnet school of any |
| 10:22 5 | type? |
| 10:22 6 | A. It's a vocational, technical high |
| 10:23 7 | school. |
| 10:23 8 | Q. And did you focus on any particular |
| 10:23 9 | field when you were there? |
| 10:23 10 | A. Computers. |
| 10:23 11 | Q. And what languages, what language or |
| 10:23 12 | languages are you able to program in, computer |
| 10:23 13 | languages? |
| 10:23 14 | A. C++. Visual Basics. I learned COBOL, |
| 10:23 15 | but I refuse to do that. |
| 10:23 16 | Q. Why is that? |
| 10:23 17 | A. I hated it. |
| 10:23 18 | Q. Okay. COBOL is like modern FORTRAN, |
| 10:23 19 | right? |
| 10:23 20 | A. It's like, yeah, mainframe. Mostly C, |
| 10:23 21 | C++, COM (ph). |
| 10:23 22 | Q. Now, aside from your employment at |
| 10:23 23 | TriZetto, have you had other jobs since high |
| 10:23 24 | school? |
| 10:23 25 | A. Oh, yes. |

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
877.955.3855

**Page 81**

11:43  1      A.  I said because I had dealt with him at
11:43  2   both locations.
11:43  3      Q.  Okay, I understand that, but was he
11:43  4   assigned to those clients because both of them had
11:43  5   the desire to integrate Facets with ClaimCheck?
11:43  6      A.  I don't know.
11:43  7      Q.  To your knowledge?
11:43  8          You don't know if there's any connection
11:43  9   between --
11:43 10      A.  No.
11:43 11      Q.  -- the fact that he was assigned to
11:43 12   those clients and the fact that they both wanted
11:43 13   integration?
11:43 14      A.  No.
11:43 15      Q.  And you don't know if he was responsible
11:43 16   for John Muir?
11:43 17      A.  No.
11:43 18      Q.  Did you interface with anyone in
11:43 19   connection with your work on John Muir?
11:43 20      A.  Just on technical support.
11:43 21      Q.  Who would that be?
11:43 22      A.  The department within TriZetto.
11:43 23      Q.  And what, why were you interfacing --
11:43 24   what was the need to contact technical support in
11:43 25   connection with John Muir?

**Page 82**

11:43  1      A.  They contacted technical support for
11:43  2   various issues.
11:43  3      Q.  John Muir contacted them?
11:43  4      A.  Yes, which is our, which is the standard
11:43  5   protocol.
11:43  6      Q.  Okay, they provide basically online
11:44  7   support or phone support to the client?
11:44  8      A.  Yes.
11:44  9      Q.  Do you recall any, any issues or
11:44 10   problems or defects that arose in connection with
11:44 11   the integration of ClaimCheck and Facets at the
11:44 12   Louisiana client?
11:44 13      A.  I know there was one. I don't recall
11:44 14   what it was, though.
11:44 15      Q.  Do you know when that integration took
11:44 16   place?
11:44 17      A.  No.
11:44 18      Q.  How about John Muir? Do you know when
11:44 19   that integration took place?
11:44 20      A.  No.
11:44 21      Q.  Do you recall any problems that arose in
11:44 22   connection with the integration of Facets and
11:44 23   ClaimCheck with John Muir?
11:44 24      A.  Yes. I know there was one. I don't
11:44 25   recall what it was, though.

**Page 83**

11:45  1      Q.  Why is it that you remember that there
11:45  2   was one?
11:45  3      A.  Because I remember having, dealing with
11:45  4   our technical support, but I deal with them on a
11:45  5   few different things, so --
11:45  6      Q.  Okay. What -- could you describe for me
11:45  7   how the interface that you developed worked.
11:45  8          MR. ROOSEVELT:  Objection, vague and
11:45  9   ambiguous.
11:45 10      Q.  Do you understand what I mean?
11:45 11      A.  No.
11:45 12      Q.  In other words, can you just describe
11:45 13   for me, was it, was it -- you mentioned that you
11:45 14   used XML?
11:45 15      A.  Yes.
11:45 16      Q.  Can you just describe for me from a
11:45 17   functional standpoint what the integration did.
11:45 18   That's what I'm trying to understand.
11:46 19          MR. ROOSEVELT:  I believe that's been
11:46 20   asked and answered.
11:46 21      Q.  And where it would slot into -- you said
11:46 22   it slotted into the Facets process after
11:46 23   eligibility was verified, correct?
11:46 24      A.  Mm hmm.
11:46 25      Q.  Can you describe for me the

**Page 84**

11:46  1   functionality after that.
11:46  2      A.  It would come into my, my integration
11:46  3   program, would break down the data. Facets is in
11:46  4   records. It would get converted into XML. After
11:46  5   it was in the expected format it would go
11:46  6   through -- we have an, it's a, kind of an exiting
11:46  7   manager, and it would go there and ClaimCheck.
11:46  8          The integration module would be called.
11:46  9   Then the data would be sent to the integration
11:46 10   module. The integration module would do whatever
11:47 11   it did with it and then send it to ClaimCheck, and
11:47 12   ClaimCheck would get the results and it would be
11:47 13   filtered back into my stuff, and then it would tell
11:47 14   me to delete lines or, you know, change units, what
11:47 15   have you, and error messages, warning messages.
11:47 16          It would tell me exactly what it wanted
11:47 17   to do with the claim and then come back into the
11:47 18   package.
11:47 19      Q.  What protocol did you use to communicate
11:47 20   with ClaimCheck? Was it TCPIP?
11:47 21      A.  No, it's our exiting manager. It uses
11:47 22   some -- I know it's Com -- some, Microsoft-
11:47 23   something. I don't know exactly.
11:47 24      Q.  It's not something that you wrote?
11:47 25      A.  No.

21 (Pages 81 to 84)

Page 85

11:47  1    Q. The code that you wrote, what was its —
11:47  2 was its primary function to translate into HML?
11:47  3    A. XML.
11:47  4    Q. XML, I'm sorry.
11:48  5    A. Yeah, translate it into XML and then,
11:48  6 when it came back, put it back into the Facets
11:48  7 format, making changes as necessary.
11:48  8    Q. To your knowledge, is the Facets program
11:48  9 intended to be used on a computer system, with a
11:48 10 CPU and associated memory?
11:48 11     MR. ROOSEVELT: Objection, vague and
11:48 12 ambiguous.
11:48 13    A. Yes.
11:48 14    Q. And is it your understanding that the
11:48 15 Facets software won't work unless you load it into
11:48 16 a computer system that has a CPU and associated
11:48 17 memory?
11:48 18     MR. ROOSEVELT: Same objection.
11:48 19    A. Yes.
11:49 20    Q. Do you have any knowledge or familiarity
11:49 21 with the hardware requirements for clients that
11:49 22 purchase software — I'm sorry — that purchase the
11:49 23 Facets software?
11:49 24    A. No.
11:49 25    Q. Do you know whether or not the claim

Page 86

11:49  1 editing function within Facets is capable of
11:50  2 identifying claims with unbundled procedures and
11:50  3 rebundling them?
11:50  4     MR. ROOSEVELT: Calls for speculation,
11:50  5 vague and ambiguous.
11:50  6     MS. HUTTNER: It doesn't call for
11:50  7 speculation. The question was "do you know,"
11:50  8 and if you continue with these kinds of
11:50  9 objections I'll raise a formal complaint with
11:50 10 the magistrate. These are not permissible
11:50 11 objections in the Third Circuit. I invite you
11:50 12 to research the law.
11:50 13     I'd be happy to give you a case, but if
11:50 14 you have a specific — I don't know what could
11:50 15 possibly be vague about the question. Would
11:50 16 you like to tell me? What's been vague or
11:50 17 ambiguous about it? Because I'd like to
11:50 18 correct it, because I don't want the witness
11:50 19 to be confused, or you either.
11:50 20     MR. ROOSEVELT: Well, the witness
11:50 21 testified that she doesn't know how the, that
11:50 22 function of Facets works.
11:50 23     MS. HUTTNER: Well, I didn't ask her how
11:50 24 that function of Facets worked. I asked her
11:50 25 "do you know" followed by a question, and if

Page 87

11:50  1 the answer is no the witness can say no, I do
11:50  2 not know, so unless you're planning on
11:50  3 testifying for the witness — what's ambiguous
11:50  4 about the question?
11:50  5     Is there anything ambiguous about it?
11:51  6 Can you tell me what it is so I can fix it.
11:51  7     MR. ROOSEVELT: At this point I don't
11:51  8 even recall the question.
11:51  9     MS. HUTTNER: Well, let me read it back
11:51 10 to you.
11:51 11    Q. Do you know whether or not the claim
11:51 12 editing function within Facets is capable of
11:51 13 identifying claims with unbundled procedures and
11:51 14 rebundling them?
11:51 15     MS. HUTTNER: Which part of that is
11:51 16 ambiguous?
11:51 17     MR. ROOSEVELT: Counsel, I'm just going
11:51 18 to assert objections.
11:51 19     MS. HUTTNER: Okay, if you assert
11:51 20 objections you have to tell me, since all
11:51 21 objections are reserved except as to form, to
11:51 22 the extent you are asserting a form objection
11:51 23 you are obligated to tell me what the
11:51 24 objection is so that I can fix the form.
11:51 25 That's the rule, and if you don't do that,

Page 88

11:51  1 then you waive the objection.
11:51  2     Do you understand that?
11:51  3     MR. ROOSEVELT: All right, I said that
11:51  4 the question was vague and ambiguous and calls
11:51  5 for speculation because the witness has given
11:51  6 previous testimony that indicates that she
11:51  7 would not know the answer to that question.
11:51  8     MS. HUTTNER: Okay, then she can say,
11:51  9 "No, I don't know," but my question to you —
11:51 10 and I'll repeat it again — is what is vague
11:51 11 and what is ambiguous about the question as
11:51 12 phrased? She may or may not know the answer
11:51 13 to the question.
11:51 14     My question is, as to form, what is
11:51 15 vague or ambiguous about the question I just
11:52 16 asked?
11:52 17     MR. ROOSEVELT: I'm not going to sit
11:52 18 here and be interrogated by you.
11:52 19     MS. HUTTNER: Okay, then don't make
11:52 20 objections that you can't explain, because
11:52 21 it's not a buzzword to say, "vague and
11:52 22 ambiguous," and if you can't explain the
11:52 23 objection or tell me what's wrong with the
11:52 24 form of the question, then I will assume that
11:52 25 you have pre-established some code with the

22 (Pages 85 to 88)

Page 89

11:52 1   witness where if you say, "vague and
11:52 2   ambiguous," it means don't answer the
11:52 3   question.
11:52 4       Okay? Because if you have a form
11:52 5   objection --
11:52 6       MR. ROOSEVELT: I've explained the
11:52 7   objection to you twice.
11:52 8       MS. HUTTNER: No, actually, you haven't
11:52 9   explained it even once.
11:52 10      MR. ROOSEVELT: And there's no
11:52 11  preestablished code that's been established.
11:52 12      MS. HUTTNER: Okay, well, I'm glad to
11:52 13  hear that, but, like I say, if you have a form
11:52 14  objection you are obligated to explain it so I
11:52 15  can fix the question.
11:52 16      MR. ROOSEVELT: And I've done that.
11:52 17      MS. HUTTNER: You haven't, but we'll
11:52 18  pursue that later. Okay, so I don't know
11:52 19  whether we ever got an answer to that
11:52 20  question, so let's ask it again.
11:52 21      Q.  Do you know whether or not the claim
11:52 22  editing function within Facets is capable of
11:52 23  identifying claims with unbundled procedures and
11:52 24  rebundling them?
11:52 25      MR. ROOSEVELT: Same objections.

Page 90

11:52 1       A.  I know that it has rebundled, but that's
11:53 2   just because of what I did in ClaimCheck.
11:53 3       Q.  Okay, well, regardless of how you know,
11:53 4   do you have an understanding of what's meant by
11:53 5   "unbundled procedures?"
11:53 6       A.  Yes.
11:53 7       Q.  What is that understanding?
11:53 8       A.  Where you'd have a procedure that, let's
11:53 9   say it's on three different lines using three
11:53 10  different procedure codes and it really should have
11:53 11  been one procedure code. Then it's unbundled and
11:53 12  it gets rebundled into that one particular
11:53 13  procedure code.
11:53 14      Q.  Okay, so that it gets paid under one
11:53 15  procedure code as opposed to multiple?
11:53 16      A.  Under one, right, as opposed to --
11:53 17  right. Right.
11:53 18      Q.  Do you know whether or not Facets has
11:53 19  the ability to receive claims with associated
11:53 20  medical service codes?
11:53 21      A.  I don't know. I don't know.
11:53 22      Q.  What -- I think you testified that, to
11:53 23  your understanding, Facets contains a claim
11:53 24  processing, claim editing feature; is that right?
11:53 25      A.  Yes.

Page 91

11:53 1       Q.  And in that connection is it your
11:53 2   understanding that claims are submitted into the
11:53 3   Facets system?
11:54 4       A.  Yes, they're submitted.
11:54 5       Q.  And is it your understanding that when
11:54 6   they are submitted they are submitted with an
11:54 7   associated service code?
11:54 8       A.  Yes.
11:54 9       Q.  And that on occasion there may be more
11:54 10  than one associated service code submitted with a
11:54 11  claim, is that also your understanding?
11:54 12      A.  No, it's not. I don't have --
11:54 13      Q.  Well, in the case of unbundled
11:54 14  procedures is it your understanding that --
11:54 15      A.  Are you talking about procedure codes?
11:54 16      Q.  Yes, procedure codes.
11:54 17      A.  Yes.
11:54 18      Q.  I'm sorry, what did I say, "service
11:54 19  codes?"
11:54 20      A.  "Service codes."
11:54 21      Q.  I meant procedure codes.
11:54 22      A.  Okay.
11:54 23      Q.  So let me rephrase the question.
11:54 24      So is it your understanding that when
11:54 25  claims are submitted to Facets that they are

Page 92

11:54 1   received by Facets with one or more medical service
11:54 2   codes?
11:54 3       A.  Procedure codes.
11:54 4       Q.  Procedure codes, I'm sorry.
11:54 5       A.  Yes.
11:54 6       Q.  Procedure codes associated with the
11:54 7   claim.
11:54 8       A.  Yes.
11:54 9       Q.  And is it your understanding that within
11:55 10  Facets there is a table or tables that contain a
11:55 11  set of rules that establish relationships between
11:55 12  medical procedure codes?
11:55 13      A.  I don't know of any tables.
11:55 14      Q.  Whether it's some table or not, is it
11:55 15  your understanding that Facets in some form
11:55 16  includes a set of rules that establish
11:55 17  relationships between medical procedure codes?
11:55 18      MR. ROOSEVELT: Vague and ambiguous,
11:55 19  calls for speculation.
11:55 20      A.  It, it would be an assumption, but -- so
11:55 21  I'd say no. I'm not aware of exactly how it does
11:55 22  any of its --
11:55 23      Q.  Okay. Do you know how Facets is able to
11:55 24  determine when procedure codes have been unbundled?
11:56 25      MR. ROOSEVELT: Assumes facts not in

23 (Pages 89 to 92)

Page 93

11:56 1 evidence.
11:56 2 MS. HUTTNER: What facts does it assume
11:56 3 not in evidence?
11:56 4 MR. ROOSEVELT: That that's what Facets
11:56 5 does.
11:56 6 MS. HUTTNER: She already testified
11:56 7 that's what it does.
11:56 8 A. Can you repeat the question. I'm sorry.
11:56 9 Q. My -- the question is, do you have any
11:56 10 understanding of how -- you testified earlier that
11:56 11 it's your understanding that when claims are
11:56 12 submitted into Facets with multiple medical
11:56 13 procedure codes which are basically an unbundling
11:56 14 of services that should be under one number instead
11:56 15 of multiple numbers that Facets has the ability to
11:56 16 detect that and to rebundle it under one service
11:56 17 code, correct?
11:56 18 A. Yes.
11:56 19 Q. Do you know how it performs that
11:56 20 function?
11:56 21 A. No.
11:56 22 Q. Do you know what rules it relies on to
11:56 23 decide whether or not something has been improperly
11:56 24 unbundled?
11:56 25 A. No.

Page 94

11:56 1 Q. Do you know if there are rules in that
11:56 2 regard within Facets?
11:56 3 A. Yes. I know, I'm sure there are.
11:57 4 Q. Okay. When you say -- can you tell me
11:57 5 what you understand in that regard.
11:57 6 A. It would go back to what I've done on
11:57 7 ClaimCheck, just to know --
11:57 8 Q. Well, how, whatever it goes back to, can
11:57 9 you tell me what your understanding is in that
11:57 10 regard.
11:57 11 A. I know that a few of the things that we
11:57 12 did with the ClaimCheck integration, we wanted it
11:57 13 to somewhat mimic what Facets did, so that's how I
11:57 14 know that, you know, we had situations where there
11:57 15 were multiple procedure codes and it went into one,
11:57 16 and, you know, how that related to Facets.
11:57 17 Q. Okay, so it was your understanding that
11:57 18 that's something that Facets did?
11:57 19 A. Right, because we weren't going to do
11:57 20 anything that went completely against the norm of
11:57 21 what Facets did, so --
11:57 22 Q. Okay, and is there any -- you had
11:57 23 mentioned age, I think, and sex, but is there any
11:57 24 other, do you have any other understanding of what
11:57 25 Facets did that you, in that regard that you tried

Page 95

11:57 1 to mimic in your --
11:57 2 A. No.
11:57 3 Q. -- in your integration module?
11:57 4 A. No.
11:57 5 Q. Okay. And I think I asked you this
11:58 6 before, and if I did I apologize, but do you have
11:58 7 any understanding of what database or databases are
11:58 8 associated with Facets?
11:58 9 MR. ROOSEVELT: Assumes facts not in
11:58 10 evidence.
11:58 11 A. I know we use Sybase, Oracle, Microsoft.
11:58 12 Q. Okay, do you have any understanding of
11:58 13 whether the Facets product as it's packaged and
11:58 14 sent to customers includes a database?
11:58 15 MR. ROOSEVELT: Asked and answered.
11:58 16 A. I don't know.
11:58 17 MS. HUTTNER: I'm going to just, I'm
11:58 18 going to say it again, and I'm going to give
11:58 19 you the opportunity to fix it.
11:58 20 If a special master for discovery were
11:58 21 assigned to this case right now I would be on
11:59 22 the phone with him or her, because it is
11:59 23 without question in Delaware, where they take
11:59 24 these things very seriously, improper to make
11:59 25 objections like "asked and answered,

Page 96

11:59 1 speculative, don't guess."
11:59 2 All of that is considered to be coaching
11:59 3 in Delaware, okay? So I would invite you to
11:59 4 read the case law in Delaware so that you
11:59 5 don't get yourself into trouble, because if
11:59 6 there were a magistrate appointed right now
11:59 7 I'd be on the phone with him or her, so
11:59 8 consider yourself lucky.
12:00 9 Q. Have you ever seen a user manual for
12:00 10 Facets?
12:00 11 A. I know there is one. I've never --
12:00 12 Q. I know there's one too, but have you
12:00 13 ever seen it? I don't have enough copies of them.
12:00 14 I just, I don't want to make you look at them if
12:00 15 you had nothing to do with them.
12:00 16 A. Online we have copies of them.
12:00 17 Q. Okay, and when you say "online," is that
12:00 18 within the intranet within the company?
12:00 19 A. Intranet, yes.
12:00 20 Q. Is it in a particular file or icon? Or
12:00 21 what do you click on to get to it?
12:00 22 A. I don't know. I think it's in "User
12:00 23 Manuals."
12:00 24 Q. That's a good place to put your user
12:00 25 manuals. What else, what other kinds of

24 (Pages 93 to 96)

**Page 129**

01:00 1    A. No.
01:00 2    Q. -- relating to medical claims
01:00 3 processing?
01:00 4    A. No.
01:00 5    Q. And no one ever suggested to you that,
01:00 6 or said to you, that there was any need to make
01:00 7 changes in Facets to address that patent; is that
01:00 8 right?
01:00 9    A. No.
01:00 10    Q. No, it's not right? Or --
01:01 11    A. No, no one ever said that.
01:01 12    Q. No one ever said that, okay. My fault.
01:01 13 Have you ever been deposed before?
01:01 14    A. No.
01:01 15    Q. Has it been a pleasant experience for
01:01 16 you?
01:01 17    A. No.
01:01 18    Q. I've tried to make it as pleasant as
01:01 19 possible.
01:01 20    A. That's fine.
01:01 21    Q. And we're almost done.
01:01 22    I want you to leave with good memories.
01:01 23    A. Good memories, okay.
01:01 24    Q. Well, as good as it can get, which isn't
01:01 25 that good.

**Page 130**

01:01 1    Have you ever heard of-- did I show
01:01 2 this to you already? No, I didn't. Let me show
01:01 3 you another document. It's "Facets ClinicalEditing
01:02 4 Guide." Did I show you this already?
01:02 5    A. I believe you did.
01:02 6    Q. Did I? There were -- there's a couple
01:02 7 of versions of it. That's why. This is the 2001
01:02 8 version of it.
01:02 9    I take it -- is it fair to say that
01:02 10 you've never seen any version of the Facets
01:02 11 ClinicalEditing guide?
01:02 12    A. No, I have not seen it.
01:02 13    Q. Thanks. Getting better, much better.
01:02 14    I think -- you testified earlier that,
01:02 15 to your understanding, Facets is capable of
01:02 16 receiving claims submitted by medical providers and
01:02 17 processing those claims for payment, correct?
01:02 18    A. Yes.
01:02 19    Q. What is your understanding of the
01:02 20 mechanism by which that is accomplished?
01:03 21    Or, stated another way, is it your
01:03 22 understanding that that, the ability to receive
01:03 23 claims by Facets, that Facets' ability to receive
01:03 24 claims is through software?
01:03 25    A. Yes.

**Page 131**

01:03 1    Q. Through source code or through code
01:03 2 that's written that instructs the computer to
01:03 3 recognize a claim and to process that claim in
01:03 4 accordance with whatever rules are set forth in the
01:03 5 program?
01:03 6    A. Yes.
01:03 7    Q. And is it also your understanding that
01:03 8 the processing of the claims, both in terms of
01:03 9 determining eligibility and in performing clinical
01:03 10 editing functions, is implemented by software?
01:03 11    A. Yes.
01:04 12    Q. And I think you told me that that
01:04 13 software operates on a computer system with a CPU
01:04 14 and associated memory, right?
01:04 15    A. Yes.
01:04 16    Q. Have you ever heard of a product called
01:04 17 "Code Advisor?"
01:04 18    A. No.
01:04 19    Q. Medical Fee Schedule, is that a product
01:04 20 you've ever heard of?
01:04 21    A. No.
01:04 22    Q. I'm sorry, Medical Fee Schedule and
01:04 23 Audit System?
01:04 24    A. No.
01:05 25    Q. Have you ever heard of a product called

**Page 132**

01:05 1 "AccuCode?"
01:05 2    A. No.
01:05 3    Q. How about a product called "Clinical
01:05 4 Data Editor?"
01:05 5    A. No.
01:05 6    Q. Have you ever heard of a product called
01:05 7 "Chart and Coder?"
01:05 8    A. No.
01:05 9    Q. Code Finder/Drug Finder, is that a
01:05 10 product that you've heard of?
01:05 11    A. No. Not that I can recall.
01:06 12    Q. Code Master Plus?
01:06 13    A. No.
01:06 14    Q. Discorp (ph) software?
01:06 15    A. No.
01:06 16    Q. X Claim?
01:06 17    A. No.
01:06 18    Q. Interactive DRG Grouper?
01:06 19    A. DRG Grouper, yes.
01:06 20    Q. What is your understanding of that
01:06 21 product?
01:06 22    A. I just know that we have something
01:06 23 having to do with DRG Grouper. I don't know what
01:06 24 it is.
01:06 25    Q. When you say, "We have something having

33 (Pages 129 to 132)

Page 133

01:06 1    to do with DRG Grouper," what do you have in mind?
01:06 2      A.  As far as in Facets, it's just something
01:06 3    that, DRG Grouper is part of it.
01:06 4      Q.  Do you think that DRG Grouper is
01:06 5    incorporated into Facets?  Is that what you're
01:06 6    saying?
01:06 7      A.  Or we use it somehow.
01:06 8      Q.  Do you know what it does?
01:06 9      A.  No. No. No.
01:07 10     Q.  Do you have any understanding of what
01:07 11   its function is within Facets?
01:07 12     A.  No. It's something to do with pricing,
01:07 13   but --
01:07 14     Q.  Pricing?
01:07 15     A.  Pricing, yes.
01:07 16     Q.  Have you ever heard of something called
01:07 17   "MedCheck?"
01:07 18     A.  I may have seen it, but I don't know
01:07 19   what it is.
01:07 20     Q.  MedClaim, is that familiar to you?
01:07 21     A.  That's probably one of the names of our
01:07 22   methods, but I'm sure that's not what you're
01:07 23   talking about.
01:07 24     Q.  Q Grouper, is that something that --
01:07 25     A.  No.

Page 134

01:07 1      Q.  -- you've heard of?
01:08 2          Do you know who Samuel Fager (ph) is?
01:08 3      A.  No.
01:08 4      Q.  Kevin Lucy (ph)?
01:08 5      A.  No.
01:08 6      Q.  Hunter Siemens (ph)?
01:08 7      A.  No.
01:08 8      Q.  Pete Gruber (ph)?
01:08 9      A.  No.
01:08 10     Q.  Bill Thomas (ph)?
01:08 11     A.  No.
01:08 12     Q.  Donald DeMeers (ph)?
01:08 13     A.  No.
01:08 14     Q.  John Blainey (ph)?
01:08 15     A.  No.
01:08 16     Q.  Lee Zausner (ph)?
01:09 17     A.  No.
01:09 18     Q.  Ken Uhler (ph)?
01:09 19     A.  No.
01:09 20     Q.  Philip Hawley?
01:09 21     A.  No.
01:09 22     Q.  Is everything you told me today
01:09 23   accurate, to the best of your knowledge?
01:09 24     A.  Yes.
01:09 25     Q.  Is there anything about your testimony

Page 135

01:09 1    that you want to change?
01:09 2      A.  No.
01:09 3      Q.  Did I ask you any questions you didn't
01:09 4    understand that weren't clarified?
01:09 5      A.  No.
01:10 6      Q.  Was there any external factor that was
01:10 7    affecting your testimony here today?
01:10 8      A.  No.
01:10 9      Q.  By the way, when STARs are identified,
01:10 10   are they entered into a system or a, some sort of a
01:11 11   tracking system?
01:11 12     A.  Yes.
01:11 13     Q.  What's the name of that system?
01:11 14     A.  STARs Application.
01:11 15     Q.  And is that on the intranet?  How do you
01:11 16   access that?
01:11 17     A.  Via the intranet.
01:11 18     Q.  Have you ever attended any meetings
01:11 19   relating to TriZetto's marketing strategy or
01:11 20   business strategy for Facets?
01:11 21     A.  Meaning, do you mean specifically for
01:11 22   marketing?  Or --
01:11 23     Q.  No, I mean have you ever just, have you
01:11 24   ever had any discussions in connection with your
01:11 25   job at TriZetto in which the competitive aspects,

Page 136

01:12 1    if you will, of Facets were discussed, such as what
01:12 2    products Facets competes with, how Facets might be
01:12 3    positioned to compete, what developments, you know,
01:12 4    what future development strategies might be
01:12 5    implemented?
01:12 6      A.  Yes. Yes.
01:12 7      Q.  You have?
01:12 8      A.  Mm hmm.
01:12 9      Q.  Okay.  Can you tell me what
01:12 10   conversations or meetings you've had in that
01:12 11   regard.
01:12 12     A.  Just basically kind of a, where, where
01:12 13   we stand now and, you know, how, how we're making
01:12 14   our financials and just kind of an overview, more
01:12 15   or less.
01:12 16     Q.  Can you tell me what kind of -- those
01:12 17   meetings were town-hall-type meetings?  Or what
01:12 18   was --
01:12 19     A.  Yes. Right, kind of like a town hall
01:12 20   type of meeting, right.
01:12 21     Q.  Where all the employees were invited?
01:12 22     A.  Yes.
01:12 23     Q.  And a presentation was made by whom?
01:12 24     A.  Usually department heads.
01:13 25     Q.  Is it an annual thing?  Or how often are

34 (Pages 133 to 136)