# EXHIBIT 1

# REDACTED
# IN ITS
# ENTIRETY

# EXHIBIT 2

# CONDENSED TRANSCRIPT & WORD INDEX

DEPOSITION OF MARK MUSEN, M.D., PH.D.

## MCKESSON VS. TRIZETTO GROUP

### NOVEMBER 22, 2005



(310) 207.8000    Los Angeles
(949) 955.0400    Orange County
(415) 433.5777    San Francisco

(916) 922.5777    Sacramento
(408) 885.0550    San Jose
(951) 686.0606    Inland Empire

(818) 702.0202    San Fernando Valley
(858) 455.5444    San Diego
(760) 322.2240    Palm Springs

09:15  1  on the same page, I'd appreciate it.
09:15  2      MR. SITZMAN: No, that's fine. Why don't I
09:15  3  ask the witness.
09:15  4      Q. Can you -- can you define for me, use through
09:15  5  your report that we're going to get through, what you
09:16  6  consider to be a knowledge-based expert system?
09:16  7      A. Okay. Good. A knowledge-based system
09:16  8  represents a software system that has explicit
09:16  9  representation of the knowledge that is used for the
09:16  10 decision-making process. That representation makes it
09:16  11 possible for the developer or an observer to look at the
09:16  12 implementation and understand the basis by which the
09:16  13 decision -- decisions are made. So in the case of the
09:16  14 '164 patent, the rules that appear in Appendix B would
09:16  15 represent that body of knowledge which is used to derive
09:16  16 the decision-making process.
09:16  17     Q. Returning now to that question that I posed,
09:16  18 can you think of an example now where a system, a
09:16  19 computerized system that is not a knowledge-based expert
09:16  20 system, would infringe the '164 patent?
09:16  21     A. Sure, because when we talk about
09:16  22 knowledge-based systems, we're primarily talking about a
09:17  23 means for implementing software which then gets
09:17  24 executed, and the -- the execution format of that system
09:17  25 might actually exist in a variety of -- of forms. Good

Page 9

09:17  1  example is the allusion that Randy Davis makes in his
09:17  2  testimony regarding EMYCIN, which was a rule-based shell
09:17  3  which was developed in the late '70s, which had as one
09:17  4  of its important features the ability to compile the
09:17  5  rules that one would enter into a traditional rule-based
09:17  6  system and generate conventional computer codes, would
09:17  7  execute faster. So we're talking really about a
09:17  8  knowledge-based system being a means for development
09:17  9  which would then be equivalent to a variety of
09:17  10 implementations which could execute at run time.
09:17  11     Q. You -- I'm trying to parse that out a little
09:18  12 bit.
09:18  13     A. Okay.
09:18  14     Q. Is EMYCIN -- would you consider EMYCIN, then,
09:18  15 a -- not a knowledge-based expert system?
09:18  16     A. EMYCIN was a shell for building
09:18  17 knowledge-based systems.
09:18  18     Q. You -- you've had a chance, and we're going to
09:18  19 get into a lot more detail here, talk about the TriZetto
09:18  20 products, the ones that are allegedly accused of
09:18  21 infringing, do you consider any of them to be expert,
09:18  22 knowledge-based expert systems?
09:18  23     A. The code in the TriZetto products represents
09:18  24 conventional computer software. I -- I don't, of
09:18  25 course, have any knowledge about how that code was

Page 10

09:19  1  developed. It's sometimes the case that developers will
09:19  2  use, say, a rule-based framework and build a more
09:19  3  traditional knowledge-based system as a prelude to
09:19  4  actually implementing something using more conventional
09:19  5  software techniques because they want to be able to
09:19  6  initially have the advantages of making the knowledge
09:19  7  more explicit so that they have more insight into the
09:19  8  rules that are going into the program. And then later
09:19  9  they may want to recast it in a form where it executes
09:19  10 more quickly and has certain performance advantages for
09:19  11 the product.
09:19  12     I don't know how the TriZetto products were
09:19  13 actually manufactured so that they may not use
09:19  14 knowledge-based system architecture in their embodiment
09:19  15 as they're sold, but they certainly have the
09:19  16 functionality that one would create using
09:19  17 knowledge-based systems technology.
09:19  18     Q. Okay. So let me see if I can parse that out.
09:19  19 You do not know whether or not the products, as sold,
09:20  20 the architecture of the archi- -- of the products that
09:20  21 are sold are, in fact, knowledge-based expert systems.
09:20  22     A. Let's -- let's -- let's back up a bit. I know
09:20  23 how they're currently implemented from my reading of the
09:20  24 documents and from Dr. Johnson's report. What I was
09:20  25 saying is I don't know how TriZetto and its predecessors

Page 11

09:20  1  actually implemented their software systems and whether
09:20  2  they went through an initial phase where the rules may
09:20  3  have been more explicit or whether they went directly to
09:20  4  procedural implementation. That's all proprietary
09:20  5  information that I would not have access to.
09:20  6      Q. Okay. I think what -- and I think, if I can
09:20  7  generalize, I think what you're distinguishing is the
09:20  8  development of the product and the product itself.
09:20  9      A. I think that's fair. I think in some sense
09:20  10 the terminology-based system is a little bit overloaded
09:20  11 because people in computer science traditionally refer
09:20  12 to that term when discussing how intelligent systems get
09:21  13 developed and how they're often initially implemented.
09:21  14 There's a problem, though, in that when -- when one
09:21  15 really cares about, of course, is what the system does,
09:21  16 and there are multiple ways in which software can be
09:21  17 used to build systems that act intelligently whether
09:21  18 they're actually implemented using rules or not.
09:21  19     Q. If they are implemented using a set of rules
09:21  20 derived from an expert, is it fair to characterize that
09:21  21 as an expert-based system or one that was developed
09:21  22 through an expert-based system?
09:21  23     A. It's -- it's -- it's fair. I mean, we're --
09:21  24 these are actually really tough words in the academic
09:21  25 community. The term "expert system," although very

Page 12

3 (Pages 9 to 12)

MARK MUSEN, M.D., PH.D.

| | | |
|---|---|---|
| 10:23 1 | patient, it could be -- it could just be data that is | |
| 10:23 2 | submitted in the claim. It's -- it's -- I'm just | |
| 10:23 3 | throwing that in as a variable. | |
| 10:23 4 | Q. Much like you were telling me about, you know, | |
| 10:23 5 | about the -- the laceration -- | |
| 10:23 6 | A. Right. | |
| 10:23 7 | Q. -- hypothetical and the -- and the lumbar | |
| 10:23 8 | situation. Is the fact that the patient is a male, is | |
| 10:23 9 | that a non-medical criteria upon which the hysterectomy | |
| 10:23 10 | becomes a mutually exclusive code? | |
| 10:23 11 | A. And the answer is that I would -- I would view | |
| 10:23 12 | that in my construction as being medical. We don't | |
| 10:23 13 | want -- really want to get into this necessarily, but | |
| 10:24 14 | obviously there can be situations where a patient is | |
| 10:24 15 | phenotypically male but has a uterus, in which case a | |
| 10:24 16 | hysterectomy might be an appropriate procedure or that | |
| 10:24 17 | might represent a billing error, in which case that | |
| 10:24 18 | needs to be flagged. But I would -- my initial | |
| 10:24 19 | construction would be that that would be a medical | |
| 10:24 20 | criteria that needs to be evaluated. | |
| 10:24 21 | Q. But you would consider the male gender as | |
| 10:24 22 | non-medical criteria -- no, a medical criteria? | |
| 10:24 23 | A. Yeah. Yeah. | |
| 10:24 24 | Q. Sorry. I didn't want to mis- -- misstate you, | |
| 10:24 25 | A. 'Cause it's not an artifact of billing or a | |

Page 61

| | |
|---|---|
| 10:24 1 | process. |
| 10:24 2 | Q. Okay. |
| 10:24 3 | MR. HENDERSHOT: If we're approaching a time |
| 10:24 4 | for a break, whenever's convenient for you, I'd |
| 10:24 5 | appreciate it. |
| 10:24 6 | MR. SITZMAN: That would be -- I think that |
| 10:24 7 | right now would be just great. |
| 10:24 8 | MR. HENDERSHOT: Okay. |
| 10:24 9 | THE VIDEOGRAPHER: We're going off the record, |
| 10:24 10 | the time is 10:24 a.m. |
| 10:24 11 | (Recess taken.) |
| 10:37 12 | THE VIDEOGRAPHER: Back on the record, the |
| 10:37 13 | time is 10:37 a.m. |
| 10:37 14 | BY MR. SITZMAN: |
| 10:37 15 | Q. So, Doctor, let -- let me turn to -- back to |
| 10:37 16 | your report -- |
| 10:37 17 | A. Okay. |
| 10:37 18 | Q. -- MM-1. I'm going to paragraph 26. You |
| 10:37 19 | discuss here the -- the database. Is -- is it your |
| 10:38 20 | understanding that the database consists of both med- -- |
| 10:38 21 | the medical service codes and the relationships among |
| 10:38 22 | the codes? |
| 10:38 23 | A. Yes. |
| 10:38 24 | Q. When you say "relationships among the |
| 10:38 25 | codes," are you referring to the rules, the Appendix B |

Page 62

| | |
|---|---|
| 10:38 1 | rules? |
| 10:38 2 | A. Yes, I am. |
| 10:38 3 | Q. Okay. So the database contains all the |
| 10:38 4 | medical service codes and the Appendix B rules. |
| 10:38 5 | A. That's correct. |
| 10:38 6 | Q. Okay. |
| 10:38 7 | A. Or actually, not -- the Appendix B rules |
| 10:38 8 | provide a template for the individual rules that relate |
| 10:38 9 | to specific medical service codes, so the -- the |
| 10:38 10 | framework for the relationships is provided by the |
| 10:38 11 | Appendix B rules, but the actual rules in the database |
| 10:38 12 | deal with code-to-code comparisons. |
| 10:38 13 | Q. Do the rules that we see in Appendix B appear |
| 10:38 14 | anywhere by themselves, or -- or are they, as you say, |
| 10:38 15 | they -- they provide the -- sorry. I didn't grab that |
| 10:39 16 | word that you used. |
| 10:39 17 | A. Template. |
| 10:39 18 | Q. The template. They provide the template for |
| 10:39 19 | the more specific rules that are in the database. |
| 10:39 20 | A. That's correct. |
| 10:39 21 | Q. But the Appendix B rules, then, don't appear |
| 10:39 22 | anywhere in the system. |
| 10:39 23 | A. They do in the schema for the database. So a |
| 10:39 24 | database is built with a schema that defines its |
| 10:39 25 | structure that gets populated with specific data, and so |

Page 63

| | |
|---|---|
| 10:39 1 | the database -- the table in the database that |
| 10:39 2 | enumerates the code is trivial 'cause it -- it has a |
| 10:39 3 | very simple structure. It's just that list. The part |
| 10:39 4 | of the database that contains the relationships among |
| 10:39 5 | those codes has more complicated schema, and that schema |
| 10:39 6 | is defined by the kinds of rules that are in the system. |
| 10:39 7 | Q. If I -- if I -- I'm trying to break it down |
| 10:39 8 | just a little bit more. If I understand you correctly, |
| 10:39 9 | once you set up the predetermined database, you, in the |
| 10:40 10 | process, have used the rules in the Appendix B rules by |
| 10:40 11 | creating that -- that predetermined database. |
| 10:40 12 | A. Yeah. |
| 10:40 13 | Q. And then, essentially, the Appendix B rules |
| 10:40 14 | sort of go away because they were just a template to |
| 10:40 15 | create the predetermined database. |
| 10:40 16 | A. They don't -- they don't go away because |
| 10:40 17 | they're, presumably, the foundation of what the system |
| 10:40 18 | does at run time to verify the constraints and to make |
| 10:40 19 | sure that the codes are appropriate. So there -- |
| 10:40 20 | there -- there's both a structural element which |
| 10:40 21 | corresponds to the database and a structural element |
| 10:40 22 | which consists of the algorithm that checks to make sure |
| 10:40 23 | there's -- that the appropriate relationships among |
| 10:40 24 | the -- the codes exist. |
| 10:40 25 | Q. Okay. And both of those structures exist in |

Page 64

16 (Pages 61 to 64)

MARK MUSEN, M.D., PH.D.

10:40 1 the predetermined database?

10:40 2 A. No.

10:40 3 Q. Oh.

10:40 4 A. The database is the database. It contains the

10:40 5 enumeration of codes and the enumeration of

10:41 6 relationships among those codes that are considered to

10:41 7 be violation of -- of the predefined constraints.

10:41 8 There -- it's impo-- I mean, the database by itself is

10:41 9 useless. There has to be some system that operates on

10:41 10 it. And in the case of the McKesson product, there is

10:41 11 software that operates on the database to determine that

10:41 12 those rules are fired in the appropriate way.

10:41 13 Q. Okay. Are there any rules, then, in the

10:41 14 software that operates on the predetermined database?

10:41 15 MR. HENDERSHOT: Objection. Vague and

10:41 16 ambiguous as to "rules." I just want to make sure we're

10:41 17 all on the same page what it means.

10:41 18 BY MR. SITZMAN:

10:41 19 Q. Are the Appendix B rules in the software that

10:41 20 operate in the predetermined database?

10:41 21 A. They are in terms of code that then uses the

10:41 22 data in the database to perform the appropriate

10:41 23 evaluation and edit procedures. I'm not trying to be

10:41 24 difficult, but there's a database component and a

10:42 25 procedural component, and they -- they both are

Page 65

10:42 1 important.

10:42 2 Q. Yeah. No, I -- I appreciate that, and I'm --

10:42 3 I'm just trying to -- so as not to be redundant but just

10:42 4 try to be as simple as I can, if I asked you, then,

10:42 5 where in the McKesson product would I find the Appendix

10:42 6 B rules, what would you tell me?

10:42 7 A. You would find them -- find them in two

10:42 8 places.

10:42 9 Q. Okay.

10:42 10 A. You would find it in the schema in the

10:42 11 database that defines how the constraints among codes

10:42 12 needs to be represented. You would find them in the

10:42 13 code that queries the database in processing a claim in

10:42 14 order to determine whether the constraints are violated.

10:42 15 Q. Okay. So that -- that was what was

10:42 16 throwing -- I'd find them in both places.

10:42 17 A. Yes.

10:42 18 Q. Can you also, sort of keying in on

10:43 19 paragraph 26 here, you talk about -- actually,

10:43 20 paragraph 25 talks about unbundling. Paragraph 26 talks

10:43 21 about how to address unbundling. Can -- can you

10:43 22 explain to me how unbundling works in the context of the

10:43 23 '164 patent? I'm sorry. Let me rephrase. How the '164

10:43 24 patent addresses the unbundling problem.

10:43 25 A. Okay. The patent defines a means by which

Page 66

10:43 1 codes that are mutually exclusive or inappropriate to be

10:43 2 reimbursed together are identified and appropriate

10:43 3 changes are made to either replace codes or remove

10:43 4 codes.

10:43 5 Q. Okay. Let -- let's work with an example, an

10:43 6 appendectomy. I think that may be one of the --

10:43 7 A. Okay.

10:43 8 Q. -- examples we've seen in either -- some of

10:44 9 the literature --

10:44 10 A. Yeah.

10:44 11 Q. -- in this case. And let's also work, if we

10:44 12 can, with the phraseology that's more close to home for

10:44 13 me, parent and child, where you've got sort of a

10:44 14 genealogical relationship. Let me see if I can explain

10:44 15 it to you --

10:44 16 A. Okay.

10:44 17 Q. -- so that we're on the same page.

10:44 18 If -- if you were to bill for an appendectomy

10:44 19 it would be one code, but the appendectomy also includes

10:44 20 a few other steps. It includes incision of the abdomen,

10:44 21 it includes exploration of the abdomen at times; it also

10:44 22 includes a biopsy; it includes examination of the

10:44 23 biopsy; it includes sutures and cleanup and post op, et.

10:44 24 cetera, all of those component parts.

10:44 25 A. Right.

Page 67

10:44 1 Q. Okay. I want to refer to those components as

10:44 2 children and refer to the appendectomy as the parent.

10:44 3 A. Okay.

10:44 4 Q. Okay? I think -- first of all, do you

10:45 5 understand where -- my phraseology?

10:45 6 A. Sure.

10:45 7 Q. Okay. And are you comfortable with that?

10:45 8 MR. HENDERSHOT: So the -- the children are

10:45 9 the --

10:45 10 THE REPORTER: "The children are the" what?

10:45 11 MR. HENDERSHOT: The children are the

10:45 12 substituent procedures and the parent is the more

10:45 13 comprehensive.

10:45 14 MR. SITZMAN: Exactly. The inclusive.

10:45 15 THE WITNESS: Yeah.

10:45 16 BY MR. SITZMAN:

10:45 17 Q. Okay. The -- and I think, as we've talked

10:45 18 about unbundling, as you've described in paragraphs 25

10:45 19 and 26, if you bill separately for the children --

10:45 20 A. Right.

10:45 21 Q. -- that is inappropriate, and -- and many

10:45 22 times, going back to the '164 patent, that typically

10:45 23 results in a higher, or for the doctor, the motivation

10:45 24 is a higher reimbursement if you bill for all the

10:45 25 children versus just billing for the parent.

Page 68

17 (Pages 65 to 68)

MARK MUSEN, M.D., PH.D.

11:43 1    THE WITNESS: I think we're doing okay.
11:43 2    MR. HENDERSHOT: Okay.
11:43 3    THE WITNESS: I think the algorithm is so tied
11:43 4    to the functions that are in the claims, that it's
11:43 5    obvious how to perform the appropriate checks on the
11:43 6    service codes in order to achieve the results.
11:43 7    BY MR. SITZMAN:
11:43 8    Q. So it's -- it's obvious to one who is skilled
11:43 9    in the art to create the algorithm, but the algorithm
11:43 10   itself is not disclosed.
11:43 11   MR. HENDERSHOT: Objection. Misstates his
11:43 12   testimony.
11:43 13   THE WITNESS: I think the algorithm is so well
11:43 14   defined by the function, that the leap between the
11:43 15   functional description and the algorithm is -- is -- is
11:43 16   insignificant.
11:43 17   MR. HENDERSHOT: Okay. I think it was also
11:43 18   asked, correct me if I'm wrong, is the algorithm
11:44 19   disclosed in the patent as well.
11:44 20   MR. SITZMAN: Okay.
11:44 21   MR. HENDERSHOT: I mean, were you?
11:44 22   MR. SITZMAN: Yeah. Well, and I guess I was,
11:44 23   but I think I can tie them all together.
11:44 24   THE WITNESS: Okay.
11:44 25   BY MR. SITZMAN:

Page 105

11:44 1    Q. I think what you're saying is, is that the
11:44 2    functional language is so explicit that you don't need
11:44 3    to have disclosure and -- and there is no disclosure of
11:44 4    the actual algorithm.
11:44 5    MR. HENDERSHOT: Objection. Misstates his
11:44 6    testimony. I don't think he said there was no
11:44 7    disclosure of the algorithm.
11:44 8    MR. SITZMAN: Sorry. Sorry. I'll take
11:44 9    that back. Let's break it down, then.
11:44 10   THE WITNESS: I'm saying that in -- in --
11:44 11   in -- in one perspective algorithms are functions, and
11:44 12   defining computationally the function in the claims
11:44 13   makes it obvious to someone skilled in the art how to
11:44 14   build software that could implement that algorithm.
11:44 15   BY MR. SITZMAN:
11:44 16   Q. Okay. Other than the functional language
11:44 17   that's set forth in the claim, is there anything else in
11:44 18   the patent that tells somebody who is skilled in the art
11:44 19   what algorithm or what software to use to carry that
11:45 20   function out?
11:45 21   A. The -- the patent specification itself leaves
11:45 22   that open and gives the embodiment that was available in
11:45 23   1988 as an example.
11:45 24   Q. And the embodiment is?
11:45 25   A. Is the dBase database with the associated

Page 106

11:45 1    Clipper code.
11:45 2    MR. HENDERSHOT: I may have a different
11:45 3    understanding of what an algorithm is. I'm sorry. I
11:45 4    just want to make sure -- are you saying that --
11:45 5    THE WITNESS: I -- I -- I -- I --
11:45 6    MR. SITZMAN: Go ahead, Michael.
11:45 7    MR. HENDERSHOT: No, that's fine. I -- I just
11:45 8    want to make sure we're all on the same page for
11:45 9    algorithm 'cause I think I'm on a different one
11:45 10   than one, or both, of you.
11:45 11   THE WITNESS: Maybe I can clarify my position
11:45 12   for both of you and you can help me here.
11:45 13   An algorithm is an abstraction; it's not a
11:45 14   piece of software necessarily. The algorithm gets
11:45 15   implemented by -- by -- by a piece of software. The
11:45 16   structure for providing the claims is software. That
11:45 17   software implements conceptually an algorithm which
11:46 18   flows directly from the functions described in the
11:46 19   claims.
11:46 20   BY MR. SITZMAN:
11:46 21   Q. So would you say, based on that discussion,
11:46 22   would you say, then, the algorithm is synonymous with
11:46 23   the function that's described in the claims?
11:46 24   A. No. We're getting into nuance of -- of
11:46 25   terminology here. I wouldn't say that the function is

Page 107

11:46 1    synonymous with the algorithm, but I would say that the
11:46 2    algorithmic steps necessary to achieve the functions
11:46 3    described are obvious to anyone who knows how to write
11:46 4    software. In fact, that's what Randy Davis said in his
11:46 5    original report.
11:47 6    Q. Okay. Is -- is that a true statement for all
11:47 7    of the means, all of the language that appears, means
11:47 8    for, throughout the patent claims?
11:47 9    A. That's my belief.
11:47 10   MR. HENDERSHOT: Is which part of that a true
11:47 11   statement, if you could just start take it -- just so
11:47 12   the record's clear.
11:47 13   THE WITNESS: Okay. It's my belief that for
11:47 14   each of the means for claims, the function that is
11:47 15   described is tied tightly to an algorithm that would be
11:47 16   obvious to implement in software once the -- the
11:47 17   functionality is described.
11:48 18   BY MR. SITZMAN:
11:48 19   Q. The functionality being described in the
11:48 20   claim --
11:48 21   A. Yes.
11:48 22   Q. -- itself?
11:48 23   A. Yes.
11:48 24   Q. Where in the TriZetto products is -- well,
11:48 25   strike that.

Page 108

27 (Pages 105 to 108)

MARK MUSEN, M.D., PH.D.

11:48 1    Since you haven't seen or looked at the
11:48 2 TriZetto source code or the TriZetto products, how --
11:48 3 well, I'm assuming, then, that you don't know that the
11:48 4 TriZetto products have the same structure or similar
11:48 5 structure to what is described in the patent.
11:48 6    A. I know they're software systems. If the
11:48 7 requisite definition of structure is -- is simply
11:48 8 software, then the TriZetto products must embody the
11:49 9 principles of the patent in software as their structure.
11:49 10    Q. If -- if that were true, then any software
11:49 11 program that carries out these functions, "these" being
11:49 12 the functions set forth in the claims, would infringe
11:49 13 the patent.
11:49 14    MR. HENDERSHOT: Assuming all other
11:49 15 limitations were met?
11:49 16    MR. SITZMAN: Assuming all other limitations
11:49 17 were met.
11:49 18    THE WITNESS: That's my understanding reading
11:49 19 the court order from, I guess, September 20th.
11:49 20    MR. SITZMAN: Let -- let me actually introduce
11:49 21 that, if you don't mind.
11:49 22    THE WITNESS: Okay.
11:49 23    (Defendant's Exhibit MM-5 was marked.)
11:49 24 BY MR. SITZMAN:
11:50 25    Q. I had the court reporter mark as the -- as

Page 109

11:50 1 MM-5 the Court's opinion for September 20, 2005, and I
11:50 2 believe the item that you're talking about is -- is at
11:50 3 paragraph 1 on pages 1 and 2.
11:50 4    A. Correct.
11:50 5    Q. And you reviewed this prior to producing your
11:50 6 report?
11:50 7    A. Correct.
11:50 8    Q. Okay. All right. Let me just go through
11:51 9 this.
11:51 10    On page 2 --
11:51 11    A. Okay.
11:51 12    Q. -- the Court says there midway through that
11:51 13 paragraph, it starts with the word "Therefore:
11:51 14    "Therefore, plaintiff must supplement
11:51 15    its" claims "construction by identifying
11:51 16    those portions of the specification that
11:51 17    disclose the correspondence between the
11:51 18    software and the function disclosed by
11:51 19    each claim limitation, as well as the
11:51 20    specific algorithm disclosed in the
11:51 21    specification, or where it is disclosed
11:51 22    (or otherwise" referred) "that the
11:51 23    algorithm/software is known to those
11:51 24    of skill in the art."
11:51 25    A. Right.

Page 110

11:52 1    Q. You have not separately identified portions of
11:52 2 the specification that disclose the correspondence
11:52 3 between general software and the function disclosed in
11:52 4 the "means for" language.
11:52 5    MR. HENDERSHOT: Can I have that question
11:52 6 back?
11:52 7    (Record read.)
11:52 8    MR. HENDERSHOT: I'm going to object to that
11:52 9 as misstating his testimony.
11:52 10    THE WITNESS: I believe the functions
11:52 11 described in the claims state implicitly what algorithms
11:52 12 are necessary in order to achieve the corresponding
11:52 13 functions.
11:53 14 BY MR. SITZMAN:
11:53 15    Q. And therefore, just to reiterate, any software
11:53 16 that carries out that function, the function set forth
11:53 17 in the claims, infringes the claims of the patent
11:53 18 regardless of how that software is structured or built
11:53 19 or et cetera, so long as it -- again, so long as it
11:53 20 performs that function.
11:53 21    A. That's my understanding.
11:53 22    Q. Okay. Let me draw your attention to, I think
11:53 23 it's paragraph 31 of your report, page 9. The last
11:54 24 sentence on page 9, it says: "Each product receives
11:54 25 medical claims and includes software for determining

Page 111

11:54 1 whether a claim contains more than one medical service
11:54 2 code..." Do you see that?
11:54 3    A. Yes.
11:54 4    Q. What -- what is that based on? And I -- I
11:54 5 should preface that, you may want to read the whole
11:54 6 context. It is talking about the three TriZetto
11:54 7 products.
11:54 8    A. That's correct. It's based on review of the
11:54 9 product literature and just knowledge of how computer
11:54 10 software operates.
11:54 11    Q. Can you identify for me where in the operation
11:55 12 of the TriZetto products that it -- that it makes this
11:55 13 determining step as to whether or not there's more than
11:55 14 one medical service code?
11:55 15    A. It would be impossible for TriZetto to be able
11:55 16 to look at relationships among claims without first
11:55 17 noting whether there are more than one claim.
11:55 18    MR. HENDERSHOT: You mean claims or codes?
11:55 19    THE WITNESS: Codes. I'm sorry.
11:55 20    MR. SITZMAN: Thank you.
11:55 21    Q. So it's -- is it fair to characterize that
11:55 22 that is a natural assumption that you've made based on
11:55 23 looking at the product literature and your knowledge of
11:55 24 software, that it -- it must do that just as a natural
11:55 25 function?

Page 112

28 (Pages 109 to 112)

MARK MUSEN, M.D., PH.D.

12:06  1    same is true for paragraph 43, which is Claim 13, it has
12:06  2    that same "each" statement, that each product includes
12:06  3    software and hardware that informs a user if any medical
12:06  4    service code submitted are not present in the product's
12:06  5    database. Again, same response?
12:07  6        A.  Yes. Same ambiguity, too.
12:07  7        Q.  And -- and same assumption, I assume.
12:07  8        A.  Yes.
12:07  9        Q.  The assumption made in that last response that
12:07 10    you made, that it could be any user at any point in the
12:07 11    chain.
12:07 12        A.  That's correct.
12:07 13        Q.  Okay.
12:07 14        MR. HENDERSHOT:  Is -- is that assumption
12:07 15    necessary to your opinion for --
12:07 16        THE WITNESS:  Yes.
12:07 17        MR. HENDERSHOT:  Okay.
12:07 18        THE WITNESS:  Because -- because the claims
12:07 19    in -- in the '164 patent are written very broadly.
12:07 20    BY MR. SITZMAN:
12:07 21        Q.  All right. Claim -- paragraph 33, Claim 2,
12:07 22    you -- you reach -- you have a conclusion there, "each
12:07 23    product determines whether a medical claim contains more
12:07 24    than one medical service code."
12:07 25        A.  Yes.

Page 121

12:07  1        Q.  I think we talked about this.
12:07  2        A.  We've been there before.
12:08  3        Q.  Yes. Again -- again, nothing additional to
12:08  4    add other than based on your reading of the product
12:08  5    literature and your assumption that that's how the
12:08  6    software works.
12:08  7        A.  And knowledge of computer programming.
12:08  8        Q.  Okay.
12:08  9        A.  Computer programs fail. They do not know how
12:08 10    many ... they have.
12:08 11        THE REPORTER:  Say that again, please, that
12:08 12    last part.
12:08 13        THE WITNESS:  Computer programs fail if they
12:08 14    do not know how many operands, o-p-e-r-a-n-d-s, they
12:08 15    have.
12:08 16        MR. HENDERSHOT:  And I'd like to object to the
12:08 17    charac- -- characterization of his opinion based on an
12:08 18    assumption as to how they work.
12:08 19        I think he's testified that he's reviewed
12:08 20    evidence that indicates how they operate, and that's
12:08 21    what he's based his opinion on.
12:08 22        MR. SITZMAN:  Well, I -- I was trying to avoid
12:08 23    having to go through all of it, but let's do that.
12:08 24        Q.  But it's not based on review of source code.
12:08 25        MR. HENDERSHOT:  Outside of the review of

Page 122

12:08  1    Dr. Johnson's report that he's talked about?
12:08  2        MR. SITZMAN:  Right.
12:08  3        THE WITNESS:  Right. It was based on
12:08  4    Dr. Johnson's report, the product literature, and the
12:08  5    depositions.
12:08  6    BY MR. SITZMAN:
12:08  7        Q.  Right. Okay. There are no depositions taken
12:08  8    of any of the software engineers that created the Tri --
12:08  9    TriZetto products, correct?
12:09 10        A.  I don't -- I don't recall.
12:09 11        Q.  Well, do you recall reading any?
12:09 12        A.  I -- I don't.
12:09 13        Q.  Let's go to paragraph 34, which is Claim 3.
12:09 14    Claim 3 uses a -- a term or a phrase valid or invalid in
12:10 15    the determ- -- determining step. Do you see that?
12:10 16        A.  Right.
12:10 17        Q.  What meaning did you ascribe to that phrase,
12:10 18    the valid or invalid?
12:10 19        A.  Right. I agree that that could be an -- an
12:10 20    ambiguous term. I read this -- this claim and, to me,
12:10 21    it means valid for payment.
12:10 22        Q.  And who sets the parameter on, based on your
12:10 23    understanding of the '164 patent, the parameter for
12:10 24    whether or not a -- a code is valid for payment?
12:10 25        A.  Always with everything in the -- the database

Page 123

12:10  1    implied by the patent, it's the customer who is
12:10  2    providing ultimate payment who decides what -- what the
12:10  3    policies are for reimbursement.
12:10  4        Q.  And there's nothing in the patent itself that
12:10  5    gives us any guidance as to what a provider might
12:10  6    consider as valid for payment or invalid.
12:10  7        A.  That's -- that -- that is the payer's
12:10  8    determination.
12:11  9        Q.  It's up to the payer to populate or make those
12:11 10    decisions?
12:11 11        A.  The payer may decide to reimburse for cosmetic
12:11 12    procedures or not. The payer may allow incidental
12:11 13    appendectomy or laparotomy; the payer may not.
12:11 14        Q.  So it's almost as if the use of the valid --
12:11 15        THE REPORTER:  Could you say it again? I lost
12:11 16    it already.
12:11 17    BY MR. SITZMAN:
12:11 18        Q.  It's almost as if the use of valid and invalid
12:11 19    or non-medical criteria, like we were talking about
12:11 20    earlier, are placeholders in the patent claims for the
12:11 21    provider to make decisions and decide what they want to
12:11 22    put in those criterion.
12:11 23        MR. HENDERSHOT:  Objection. Vague and
12:11 24    ambiguous as to placeholders, and I think it misstates
12:11 25    the contents of the patent.

Page 124

31 (Pages 121 to 124)

MARK MUSEN, M.D., PH.D.

12:11  1  THE WITNESS: "Placeholders" is -- is the
12:11  2  wrong term but -- and it's not the provider. It's the
12:11  3  payer, the customer. Whoever buys the McKesson or the
12:12  4  TriZetto product has policies regarding what is payable
12:12  5  and what is not, and the software defined by the patent
12:12  6  allows the customer to represent those policies and to
12:12  7  process claims.
12:12  8  BY MR. SITZMAN:
12:12  9  Q.  The software doesn't decide -- the software as
12:12 10  delivered --
12:12 11  A.  Right.
12:12 12  Q.  -- doesn't decide what's valid and invalid or
12:12 13  non-medical criteria.  It gives the customer the
12:12 14  opportunity to fill in those spots, if you will.
12:12 15  MR. HENDERSHOT: Objection.  Vague and
12:12 16  ambiguous as to "decide."  Do you mean it -- the
12:12 17  ultimate -- the TriZetto doesn't approve payment or
12:12 18  TriZetto doesn't provide a product with relationships
12:12 19  preset in it?
12:12 20  BY MR. SITZMAN:
12:12 21  Q.  The product that's delivered that falls within
12:12 22  the scope of the --
12:12 23  A.  Right.
12:12 24  Q.  -- the '164 patent, it's not preprogrammed or
12:12 25  it doesn't, according to your analysis, does not have

Page 125

12:12  1  within it, as delivered, the determination of valid and
12:13  2  invalid what goes into those buckets.  That's up to the
12:13  3  customer to decide.
12:13  4  A.  I see that outside of the range of the patent.
12:13  5  I think that's a -- a function of the company that
12:13  6  implements the software, how the company wants to market
12:13  7  the software, what customers it may anticipate, what
12:13  8  customers want to do; but that's outside of the claims
12:13  9  of the patent.
12:13 10  Q.  The -- the details are outside of the patent.
12:13 11  A.  Correct.  The framework is provided by the
12:13 12  patent.
12:13 13  Q.  Okay.  Got -- 'cause we clearly know that the
12:13 14  words are in the patent.
12:13 15  A.  Yes, yes.
12:13 16  Q.  Okay.
12:13 17  A.  But what is actually delivered to the customer
12:13 18  I don't know.  That's a -- a function of -- of -- of a
12:13 19  particular marketing situation.
12:13 20  Q.  Right.  Okay.
12:14 21  Let's skip down to paragraph 39, Claim 9.
12:14 22  There's a phrase there, it says "includes relationships
12:14 23  within a predetermined database that are medically
12:14 24  determined."
12:14 25  A.  Where?  Which paragraph are we on, again?

Page 126

12:14  1  Q.  Paragraph 39, which I think corresponds to
12:14  2  Claim 9.
12:14  3  A.  Right.
12:14  4  Q.  I think it's the last sentence:  As further
12:14  5  illustrated charge attached "each product includes
12:14  6  relationships within a predetermined database that are
12:14  7  medically determined."
12:14  8  What relationships are medically determined
12:15  9  for each of the allegedly infringing products?
12:15 10  A.  We're there back to discussion of what's
12:15 11  medical versus non-medical criteria, and certainly
12:15 12  TriZetto's product literature describes examples of
12:15 13  surgical procedures that are highly coupled that are
12:15 14  examples of medically determined relationships.
12:15 15  Q.  If the customer decides what is valid and
12:15 16  invalid and the customer decides the non-medical
12:15 17  criteria that it wants to apply and the customer decides
12:15 18  what's medically determined, how is it that the TriZetto
12:16 19  product contains a predetermined database with the
12:16 20  relationship among the service codes as described in the
12:16 21  '164 patent?
12:16 22  MR. HENDERSHOT: Objection.  Misstates his
12:16 23  testimony.
12:16 24  MR. SITZMAN: Well, I just -- I think it was
12:16 25  open-ended.  It was how.

Page 127

12:16  1  MR. HENDERSHOT: Okay.
12:16  2  THE WITNESS: But there -- there's some
12:16  3  assumption in there.
12:16  4  MR. HENDERSHOT: There's assumptions built in.
12:16  5  Mischaracterizes his testimony.
12:16  6  MR. SITZMAN: Okay.
12:16  7  MR. HENDERSHOT: I don't think he's made those
12:16  8  assumptions.
12:16  9  THE WITNESS: Yeah.
12:16 10  MR. SITZMAN: All right.
12:16 11  THE WITNESS: Well, why don't you give me a
12:16 12  simpler question to answer and we -- and then we can
12:16 13  build up, because I -- I'm not really sure where to
12:16 14  begin in terms of answering that one.
12:16 15  BY MR. SITZMAN:
12:16 16  Q.  I thought that was pretty simple.  Well, I can
12:16 17  break it down into pieces.
12:16 18  If the customer -- well, let's -- I guess
12:16 19  let's just return to the valid and invalid.  If -- if
12:16 20  the customer is to decide what is valid or invalid, for
12:16 21  instance, in Claim 3 --
12:16 22  A.  Okay.
12:16 23  Q.  -- how is it, then, that the TriZetto products
12:17 24  can be considered to have a predetermined database
12:17 25  stored in the associated memory, the database containing

Page 128

32 (Pages 125 to 128)

MARK MUSEN, M.D., PH.D.

| | |
|---|---|
| 05:02 1 | MR. HENDERSHOT: Great. Thank you. |
| 05:02 2 | THE VIDEOGRAPHER: Going off the record, the |
| 05:02 3 | time is 5:02 p.m. |
| 05:11 4 | (Recess taken.) |
| 05:11 5 | THE VIDEOGRAPHER: Back on the record, the |
| 05:11 6 | time is 5:11 p.m. |
| 05:11 7 | MR. SITZMAN: I don't think I have any more |
| 05:11 8 | questions at this point, but it sounds like your |
| 05:11 9 | counsel's going to ask you questions. |
| 05:11 10 | MR. HENDERSHOT: Yeah, just a few minutes' |
| 05:12 11 | worth. |
| 05:12 12 | MR. SITZMAN: Don't open a lot of doors if you |
| 05:12 13 | want him to leave. |
| 05:12 14 | MR. HENDERSHOT: Gotcha. I'm just -- |
| 05:12 15 | EXAMINATION |
| 05:12 16 | BY MR. HENDERSHOT: |
| 05:12 17 | Q. So, Dr. Musen, I just have a few questions. |
| 05:12 18 | We'll try to keep to the doors that are already ajar. |
| 05:12 19 | Dr. Musen, in your review of the claims of the |
| 05:12 20 | '164 patent, did you identify the word "comprising" in |
| 05:12 21 | any of the claims? |
| 05:12 22 | A. I think almost all of them use the word |
| 05:12 23 | "comprising." |
| 05:12 24 | Q. Do you have any understanding of what that |
| 05:12 25 | indicates under the patent laws? |

Page 277

| | |
|---|---|
| 05:12 1 | A. My understanding is that that word indicates |
| 05:12 2 | that the functions that follow represent a set of |
| 05:12 3 | components for defining the -- the functionality of the |
| 05:12 4 | claim, and that infringing artifacts would at least |
| 05:13 5 | include that functionality but have -- could have other |
| 05:13 6 | stuff. |
| 05:13 7 | Q. So is it your understanding that if an accused |
| 05:13 8 | device practices all of the elements of a claim that |
| 05:13 9 | says "comprising" but does a number of other activities, |
| 05:13 10 | it doesn't matter for purposes of infringement that it |
| 05:13 11 | does -- |
| 05:13 12 | THE REPORTER: I'm sorry. Can you start it |
| 05:13 13 | again? |
| 05:13 14 | MR. HENDERSHOT: Sorry. |
| 05:13 15 | Q. Do you have any understanding as to whether an |
| 05:13 16 | accused product's performance of activities, other than |
| 05:13 17 | those recited in a comprising claim, removes it from |
| 05:13 18 | infringement of that claim if it practices all of the |
| 05:13 19 | elements recited in the claim? |
| 05:13 20 | A. My understanding is that if the allegedly |
| 05:13 21 | infringing product practices the elements in the claim |
| 05:14 22 | and does other activities besides, that it still |
| 05:14 23 | infringes and the other activities are -- are |
| 05:14 24 | irrelevant. |
| 05:14 25 | Q. Okay. And it's your understanding that each |

Page 278

| | |
|---|---|
| 05:14 1 | claim of the '164 patent includes the term "comprising"? |
| 05:14 2 | A. That's correct. |
| 05:14 3 | Q. If you could flip back to Appendix B for me, |
| 05:14 4 | please, of the '164 patent which is marked as MM-3, |
| 05:14 5 | Mr. Sitzman had asked you a number of questions about |
| 05:14 6 | which -- which rules were -- from Appendix B were |
| 05:14 7 | described or recited or described to their full extent, |
| 05:14 8 | I believe, in the claims of the '164 patent. Do you |
| 05:14 9 | recall that? |
| 05:14 10 | A. Yes, I do. |
| 05:14 11 | Q. With respect to the R rules in Columns 47 and |
| 05:14 12 | 48 of Appendix B of MM-3, is there any way to implement |
| 05:14 13 | any of the R rules without infringing one of the claims |
| 05:14 14 | of the '164 patent? |
| 05:14 15 | A. No. But by definition, what's in the |
| 05:15 16 | left-hand side of those rules requires a processing |
| 05:15 17 | defined by the functionality of those claims. |
| 05:15 18 | Q. So while the claims of the '164 patent may not |
| 05:15 19 | describe all of the text corresponding to the R rules in |
| 05:15 20 | the '164 patent, they, nonetheless, cover an |
| 05:15 21 | implementation of the R rules. |
| 05:15 22 | A. Yes. |
| 05:15 23 | Q. If you could turn to Appendix A, I believe |
| 05:15 24 | that Example 17 Mr. Sitzman had spoken about, or you and |
| 05:15 25 | Mr. Sitzman had spoken about the EP rule. |

Page 279

| | |
|---|---|
| 05:15 1 | A. Yes. |
| 05:15 2 | Q. Actually, strike that. Could you -- strike |
| 05:15 3 | that. |
| 05:15 4 | If you flip to Appendix B again, because I |
| 05:15 5 | believe his question was actually directed to the |
| 05:15 6 | discussion of the EP rule in Appendix B, could you |
| 05:15 7 | describe for me what you understand the EP rule listed |
| 05:16 8 | on -- in Columns 49 and 50 to describe? |
| 05:16 9 | A. It states that if there's a code that appears |
| 05:16 10 | with another code in some range and there is a |
| 05:16 11 | particular place of service defined by yet another code, |
| 05:16 12 | then the initial code is excluded and the subsequent |
| 05:16 13 | codes are kept. It's an example of a non-medical |
| 05:16 14 | constraint. |
| 05:16 15 | Q. And I believe earlier you had testified, and |
| 05:16 16 | correct me if I'm wrong, that the place of service was |
| 05:16 17 | not something represented by a medical service code on a |
| 05:16 18 | claim. |
| 05:16 19 | A. It's not represented as a medical service |
| 05:16 20 | code, but it is a non-medical condition -- |
| 05:16 21 | Q. So is it your under- |
| 05:16 22 | A. -- with respect to the claims of the patent. |
| 05:16 23 | Q. Okay. |
| 05:16 24 | MR. SITZMAN: I'm sorry. Can I hear that last |
| 05:16 25 | response there? |

Page 280

70 (Pages 277 to 280)

MARK MUSEN, M.D., PH.D.

05:16  1      (Record read.)
05:16  2  BY MR. HENDERSHOT:
05:17  3      Q. So it's your opinion that -- strike that.
05:17  4          So you would -- just so I understand, the rule
05:17  5  described in EP of Appendix B of the '164 patent defines
05:17  6  a situation where two codes would be mutually exclusive
05:17  7  to one another in a claim based on a non-medical
05:17  8  criteria where the non-medical criteria is the place of
05:17  9  service?
05:17 10      A. Precisely.
05:17 11      Q. Okay. We have talked a few times today,
05:17 12  probably more than a few, if you would recall, about the
05:17 13  term "algorithm." Could you explain to me what one of
05:17 14  skill in the art would understand an algorithm to be?
05:17 15      A. An algorithm is an abstraction that provides a
05:17 16  procedure for performing some computation which may then
05:18 17  be implemented in software.
05:18 18      Q. So software is an implementation of an
05:18 19  algorithm which is a -- would be understood to be a
05:18 20  broader logical abstraction?
05:18 21      A. That's right, but one can choose --
05:18 22      THE REPORTER: I need that again.
05:18 23      THE WITNESS: One can choose a variety of
05:18 24  programming languages to implement the algorithm and the
05:18 25  algorithm is still preserved.

Page 281

05:18  1  BY MR. SITZMAN:
05:18  2      Q. So does the '164 patent disclose -- strike
05:18  3  that.
05:18  4          Does the '164 patent disclose the algorithm
05:18  5  for performing the various functions described in the
05:18  6  means for limitations of the claims?
05:18  7      A. Yes, it does.
05:18  8      Q. Speaking generally, where would that be found?
05:18  9      A. It exists in two places: in the flow charts
05:18 10  in the figures at the beginning of the patent which
05:19 11  provide for the sequence of indication of the rules; but
05:19 12  more to the point, in the claims of the patent where the
05:19 13  functionality described in each claim establishes a
05:19 14  procedure for validity for checking the necessary
05:19 15  constraints associated with that claim.
05:19 16      Q. So with respect to the determining limitations
05:19 17  of the claims, the means for determining --
05:19 18      A. As far as the claims are concerned, the
05:19 19  algorithm flows directly from the description of -- of
05:19 20  the functionality.
05:19 21      Q. And this -- is that algorithm for those
05:19 22  elements described in -- for at least some of those
05:19 23  elements described in Appendix B?
05:19 24      A. Absolutely.
05:19 25      Q. It's Appendix B of the '164 patent?

Page 282

05:19  1      A. Yes.
05:19  2      Q. If the structure corresponding to -- strike
05:19  3  that.
05:19  4          If the claims are construed, the claims of the
05:19  5  '164 patent are construed in such a way that the means
05:20  6  for elements are acquired to include the algorithm for
05:20  7  the functions for the -- are required to include the
05:20  8  algorithm described in the '164 patent as corresponding
05:20  9  with that function, would that affect your infringement
05:20 10  opinion?
05:20 11      A. You're saying if -- if they were construed to
05:20 12  require the algorithm as opposed to just generically
05:20 13  software?
05:20 14      Q. Yeah. If they were construed to require
05:20 15  software to implement the algorithm described in that
05:20 16  function.
05:20 17      A. The answer is yes. The algorithm is obvious
05:20 18  from looking at the function. Dr. Davis testified as
05:20 19  such.
05:20 20      Q. Okay. And the algo- -- the algorithms being
05:20 21  the algorithms that are describe in the '164 patent
05:20 22  specification?
05:20 23      A. Yes.
05:20 24      Q. In performing your infringement analysis with
05:20 25  respect to the '164 claims and the -- the accused

Page 283

05:20  1  products, there are -- there are a series of elements in
05:20  2  the patent -- in the patent, and we've talked about a
05:20  3  lot today, that are means for, "means for" elements, and
05:21  4  I believe Mr. Sitzman established or you two had
05:21  5  discussed that each one of those corresponds to -- had a
05:21  6  corresponding function in the claim. Is that correct?
05:21  7      A. Correct.
05:21  8      Q. For -- in reaching your conclusions that the
05:21  9  products infringe, did you interpret -- strike that.
05:21 10          Purely in terms of interpreting the claims in
05:21 11  reaching your -- your understanding of those, with
05:21 12  respect to the "means for" elements, did you identify
05:21 13  the function that corresponds to each element?
05:21 14      A. Yes.
05:21 15      Q. What did you do, then, with respect to the
05:21 16  '164 patent to identify what that claim meant?
05:21 17      A. It was important to identify what the
05:21 18  corresponding software structures were that could
05:21 19  implement that, that functionality.
05:22 20      Q. So for each means for elements in the '164
05:22 21  claims -- sorry. Strike that.
05:22 22          So for each, quote, means for, closed quote,
05:22 23  element in the '164 claims, you identified the function
05:22 24  recited for that means in the claims and identified the
05:22 25  structure described in the specification of the '164

Page 284

71 (Pages 281 to 284)

MARK MUSEN, M.D., PH.D.

05:22 1 patent for performing that patent?

05:22 2    A. Yes.

05:22 3    Q. And you had testified earlier, I believe, that

05:22 4 the '164 patent describes software --

05:22 5    A. Correct.

05:22 6    Q. -- generally as the -- as the structure for

05:22 7 performing many of the -- the claimed functions.

05:22 8    A. Correct.

05:22 9    Q. Was there any point in the specification that

05:22 10 you looked to that id-- -- that you saw that identified

05:22 11 that when you were performing your analysis?

05:22 12    A. Any point in specification?

05:22 13    Q. Strike that.

05:22 14    A. The description -- do you want me to answer

05:22 15 that or not?

05:22 16    Q. No. Strike the question.

05:22 17    A. Okay.

05:22 18    Q. Just directing your attention to Column 4 of

05:23 19 the patent --

05:23 20    A. Yeah.

05:23 21    Q. -- within the first paragraph, under the

05:23 22 "Description of the Preferred Embodiment," did you rely

05:23 23 on any of the statements in that section of the patent

05:23 24 in that general area in reaching your opinion that the

05:23 25 '164 patent describes software generally as the

05:23 1 structure for performing many of the function of the

05:23 2 claims?

05:23 3    A. Sure. The description of the preferred

05:23 4 embodiment describes the system as being implementable

05:23 5 on any suitable commercial computer system using

05:23 6 suitable commercial software, and we know that an

05:23 7 actual implementation provided was one that used dBase

05:23 8 and Clipper, which were widely available software tools

05:23 9 at the time.

05:23 10    Q. Is it your opinion that one of ordinary skill

05:24 11 in the art at the time of the invention, reading the

05:24 12 specification, would have understood the structure

05:24 13 disclosed for performing any of the -- the "means for"

05:24 14 function as being limited to any programming language or

05:24 15 given program?

05:24 16    A. No.

05:24 17    Q. If I could direct your attention to MM-5,

05:24 18 which I believe was the Court's order of September 20.

05:24 19    A. Okay.

05:24 20    Q. Did you review paragraph 1 in reaching your

05:24 21 opinion that the corresponding structure for at least

05:24 22 the means for determining elements was software?

05:24 23    A. Yes.

05:24 24    Q. The -- the order in paragraph 1 -- I'll just

05:24 25 go through a couple sentences for you. Hopefully, we

05:24 1 can get through this, get you on your way to the

05:25 2 airport.

05:25 3       MR. SITZMAN: Unlikely.

05:25 4       MR. HENDERSHOT: Okay.

05:25 5    Q. "In order for this language to pass muster

05:25 6 under Federal Circuit precedent, the specification must

05:25 7 disclose 'software' as the corresponding structure that

05:25 8 performs the specific function in a means-plus-function

05:25 9 claim limitation."

05:25 10       Did you understand the specification to make

05:25 11 such a disclosure?

05:25 12    A. Yes.

05:25 13    Q. Okay. And is that in part what you based your

05:25 14 opinion that the corresponding structure for the "means

05:25 15 for" functions was software or software and hardware?

05:25 16    A. Yes.

05:25 17    Q. And in assessing the infringement, did you

05:25 18 identify for each "means for" element of the '164 claims

05:25 19 the identical function in the accused products?

05:25 20    A. That's correct. That's the appendices in my

05:25 21 initial report.

05:25 22    Q. And having identified those functions, did you

05:25 23 identify, in forming your infringement opinion, whether

05:25 24 or not the structure was equivalent or identical to the

05:25 25 structure disclosed in the '164 patent?

05:26 1    A. They were necessarily equivalent because they

05:26 2 were implemented in software.

05:26 3    Q. Okay. Mr. Sitzman had noted earlier that you

05:26 4 didn't -- strike that.

05:26 5       You had testified earlier that you didn't

05:26 6 recall reviewing the deposition transcripts of any

05:26 7 software engineers from TriZetto; is that correct?

05:26 8    A. That's correct.

05:26 9    Q. Did you understand that TriZetto had

05:26 10 identified witnesses as -- strike that.

05:26 11       Did you review TriZetto deposition

05:26 12 transcripts?

05:26 13    A. Absolutely.

05:26 14    Q. Were some of those deposition transcripts

05:26 15 indicated as 30(b)(6) deposition transcripts? Do you

05:26 16 recall?

05:26 17    A. I, frankly, don't recall.

05:26 18    Q. Do you recall if any of the deposition

05:26 19 transcripts you reviewed of TriZetto witnesses were of

05:26 20 witnesses that TriZetto had identified as the

05:26 21 individuals most knowledgeable about their products?

05:26 22    A. That's correct.

05:26 23    Q. Okay.

05:26 24       THE REPORTER: I didn't hear the last part.

05:26 25       THE WITNESS: Certainly they seemed

05:31  1   questioned you about?

05:31  2       MR. HENDERSHOT: Objection. Misstates his

05:31  3   testimony, grossly.

05:31  4   BY MR. SITZMAN:

05:31  5       Q. Did you -- did you talk with him about these

05:31  6   areas that he's just asked you about?

05:31  7       A. We discussed some of them generally.

05:31  8       Q. Okay. Throughout the day during the breaks?

05:31  9       A. Occasionally.

05:31 10       Q. During this last break, you guys went

05:31 11   outside and you talked about coming back in and

05:31 12   questions he might ask you on the record?

05:31 13       A. Yes.

05:31 14       Q. And did he tell you that he was going to be

05:31 15   asking you these questions?

05:31 16       A. Not specific questions.

05:31 17       Q. But general concepts --

05:31 18       A. Yes.

05:31 19       Q. -- in general areas?

05:31 20       Did he tell you also what he wanted from you

05:31 21   in terms of your response in terms of the general areas?

05:31 22       A. No.

05:31 23       Q. Did he tell you generally what the issues were

05:31 24   that he needed to flesh out and correct for the record?

05:31 25       MR. HENDERSHOT: Objection. Assumes facts not

Page 293

05:31  1   in evidence.

05:31  2   BY MR. SITZMAN:

05:31  3       Q. You can go ahead and answer truthfully.

05:31  4       A. I'm not sure what you really mean by that.

05:32  5       Q. Well, did he tell you what we need -- what he

05:32  6   needed to correct, what he needed to fix on the record

05:32  7   for purposes of the deposition?

05:32  8       A. Not in those terms.

05:32  9       Q. Well, in what terms did he use? ·

05:32 10       A. That there were areas that he wanted to get

05:32 11   additional information to clarify.

05:32 12       Q. And did he tell you why he couldn't get them

05:32 13   later since he was -- you know, you are his witness and

05:32 14   why he wanted them now at this deposition?

05:32 15       A. I didn't -- I didn't pursue that question.

05:32 16       Q. You didn't ask him? Okay.

05:32 17       Let's work backwards through all the doors

05:32 18   that have now been reopened.

05:32 19       Paragraph 48 of your deposition -- of your

05:32 20   opening report, do you offer any opinion regarding the

05:32 21   doctrine of equivalence?

05:32 22       A. No.

05:32 23       Q. Do you -- have you reached any conclusions

05:32 24   about the doctrine of equivalence?

05:32 25       A. No.

Page 294

05:32  1       Q. Okay. Do you even know what that phrase

05:32  2   means?

05:32  3       A. Only in very general terms.

05:32  4       Q. Okay.

05:32  5       A. I'm not an attorney.

05:32  6       Q. Were you asked to do a doctrine of equivalence

05:33  7   infringement analysis at all?

05:33  8       A. Not in those terms.

05:33  9       Q. Okay. All right. Let's go through -- okay.

05:33 10   Let's turn to the patent, Claim 3, Column 117, and let's

05:33 11   start with the "means for receiving at least one claim."

05:33 12       What is the structure of the '164 patent that

05:33 13   accomplishes the function of receiving at least one

05:34 14   claim?

05:34 15       MR. HENDERSHOT: Objection. Asked and

05:34 16   answered.

05:34 17       MR. SITZMAN: Well, it was this morning. It's

05:34 18   been answered differently now, so go ahead.

05:34 19       MR. HENDERSHOT: It's answered consistently

05:34 20   numerous times.

05:34 21       MR. SITZMAN: Well, we'll -- we'll -- we'll

05:34 22   flesh it out on the record. Let's get it, hopefully,

05:34 23   for the last time.

05:34 24       Q. What's the structure that achieves the

05:34 25   function, "receiving at least one claim"?

Page 295

05:34  1       A. There is software that receives the data

05:34  2   contained in the claim.

05:34  3       Q. Okay. What software?

05:34  4       A. That can be embodied in a variety of ways.

05:34  5       Q. Okay. I want it specifically, in the '164

05:34  6   patent, exactly the software that is described in the

05:34  7   '164 patent that receives at least one claim.

05:34  8       A. Well, if you look at Figure 2 on -- on

05:35  9   Sheet 1 --

05:35 10       Q. Okay.

05:35 11       A. -- the area where it says -- the component of

05:35 12   the software called Entry Program is where the initial

05:35 13   information gets entered in -- in this particular flow

05:35 14   chart showing the processing steps.

05:35 15       Q. Okay. Is there anything in the patent that

05:35 16   describes what that actual program either looks like or

05:35 17   source code that describes that program?

05:35 18       A. It's -- no, but it's not necessary to describe

05:35 19   something of that level of detail for a function which

05:35 20   is so straightforward.

05:35 21       Q. Okay. Is there anything else in the entire

05:35 22   patent that provides the structure, quote -- for the

05:35 23   function "receiving at least one claim"?

05:35 24       A. I'm not aware of any.

05:35 25       Q. Okay. Is there a specific algorithm that is

Page 296

MARK MUSEN, M.D., PH.D.

05:36 1 disclosed anywhere in the patent that carries out the
05:36 2 function "receiving at least one claim"?
05:36 3    A. The algorithm is so trivial that it wouldn't
05:36 4 be described.
05:36 5    Q. Okay. It's trivial in your mind, but I need
05:36 6 an answer to my question. It is not described, I
05:36 7 assume.
05:36 8    MR. HENDERSHOT: Outside of the flow chart he
05:36 9 just pointed at?
05:36 10    MR. SITZMAN: Well, if he wants to tell me
05:36 11 that the flow chart shows the algorithm.
05:36 12    THE WITNESS: I think for one skilled in the
05:36 13 art, that's adequate.
05:36 14 BY MR. SITZMAN:
05:36 15    Q. The flow chart is the algorithm or shows it?
05:36 16    A. Right. That's right. As I said a minute ago,
05:36 17 algorithms are conceptual. They get implemented in
05:36 18 software, and the conceptual description is adequate.
05:36 19    Q. Okay. Let's take each of the TriZetto
05:36 20 products. Let's starts with Facets. What is the
05:36 21 structure in the Facets program, software program, that
05:37 22 is identical to or equivalent to the entry program
05:37 23 identified in Figure 2 of the '164 patent?
05:37 24    A. There is software that achieves that
05:37 25 functionality.

Page 297

05:37 1    Q. What software?
05:37 2    A. I would have to re-review Dr. Johnson's report
05:37 3 to tell you precisely.
05:37 4    Q. Well, let me give you a copy of Dr. Johnson's
05:37 5 report so you can tell me.
05:37 6    MM --
05:37 7    THE REPORTER: 9
05:37 8    (Defendant's Exhibit MM-9 was marked.)
05:38 9    THE WITNESS: I'm trying to be able to answer
05:38 10 your question as specifically as possible.
05:38 11 BY MR. SITZMAN:
05:39 12    Q. Well, how about this? There's nothing in your
05:39 13 report or reports that identify what the software is in
05:39 14 the Facets product that performs the function, quote,
05:39 15 "receiving at least one claim" --
05:39 16    MR. HENDERSHOT: Object.
05:39 17 BY MR. SITZMAN:
05:39 18    Q. Correct?
05:39 19    MR. HENDERSHOT: Objection. Misstates the
05:39 20 contents of his reports. Actually, strike the
05:39 21 objection. I'm sorry. I misinterpreted it.
05:39 22    THE WITNESS: That is correct. On the other
05:39 23 hand, it's -- it's inconceivable that there would not be
05:39 24 software that wouldn't have that functionality.
05:39 25 BY MR. SITZMAN:

Page 298

05:39 1    Q. Again, you're assuming that there is software
05:39 2 with that functionality and that assumption is not based
05:39 3 on a review of either the source code, the program, or
05:39 4 any actual interaction with the actual software.
05:39 5    A. We've -- we've certainly not had the
05:40 6 opportunity to interact with the actual software. The
05:40 7 manuals and the testimony regarding the products provide
05:40 8 that kind of information.
05:40 9    Q. But you haven't identified, nor can you
05:40 10 identify, the actual software or source code or section
05:40 11 of software that carries out that function in the
05:40 12 TriZetto product.
05:40 13    A. I cannot point to a particular piece of code.
05:40 14    Q. Well, or can you point to a particular program
05:40 15 or subroutine or anything of the TriZetto product that
05:40 16 performs that function?
05:40 17    A. I can't point to it but it has to be there
05:40 18 because otherwise the functionality wouldn't exist.
05:40 19    Q. Again, that's an assumption that you've made
05:40 20 looking at functionality and assuming it must be in the
05:40 21 software.
05:40 22    MR. HENDERSHOT: Objection. Misstates his
05:40 23 testimony.
05:40 24 BY MR. SITZMAN:
05:40 25    Q. Well, please correct me if I've got it wrong.

Page 299

05:40 1    MR. HENDERSHOT: I think he recited a number
05:40 2 of sources other than just the assumption just now.
05:40 3    THE WITNESS: As I said, it would be
05:41 4 inconceivable that that structure did not exist if the
05:41 5 functionality is present.
05:41 6 BY MR. SITZMAN:
05:41 7    Q. And you think the functionality is present
05:41 8 even though you haven't looked at the source code or the
05:41 9 program itself.
05:41 10    MR. HENDERSHOT: Objection. Asked and
05:41 11 answered a number of times.
05:41 12    THE WITNESS: I have reviewed the manuals and
05:41 13 I've reviewed the depositions of the TriZetto employees
05:41 14 who described the operations of the software.
05:41 15 BY MR. SITZMAN:
05:41 16    Q. Right. And that describes function but
05:41 17 doesn't describe structure.
05:41 18    MR. HENDERSHOT: Objection. Misstates his
05:41 19 testimony.
05:41 20 BY MR. SITZMAN:
05:41 21    Q. Does it describe structure? In anything
05:41 22 you've reviewed, is there anything that describes the
05:41 23 structure of the Facets product?
05:41 24    A. There necessarily has to be software to
05:41 25 receive the claim.

Page 300

MARK MUSEN, M.D., PH.D.

05:41 1  Q. Other than the disclosure of software, have
05:41 2  you reviewed anything that tells you what the structure
05:41 3  of the software is, what the code is, what the
05:41 4  subroutines are, what the processes are, how it
05:41 5  processes its claims so that you can identify that
05:41 6  portion of the Facets product that carries out that
05:42 7  function?
05:42 8      MR. HENDERSHOT: Objection. Compound, asked
05:42 9  and answered.
05:42 10      THE WITNESS: I have not delved down to a
05:42 11  lower level of granularity to dissect the -- the
05:42 12  component pieces that would allow me to answer that
05:42 13  question. I based my assessment on my understanding of
05:42 14  the necessary structure as dictated by the memorandum
05:42 15  of -- of September 20th. And if software is a
05:42 16  sufficient means for achieve-- -- achieving the necessary
05:42 17  functionality, I -- I deem that to be sufficient.
05:42 18  BY MR. SITZMAN:
05:42 19  Q. Is it fair to say that you stopped looking or
05:42 20  decided not to look beyond the product once you
05:42 21  concluded that it must be software-based, and since the
05:42 22  functionality was the same, you must conclude that it
05:42 23  must have the same structure or a similar structure?
05:42 24      MR. HENDERSHOT: Objection. Argumentative.
05:42 25      THE WITNESS: My approach seemed very

Page 301

05:42 1  reasonable to me.
05:43 2  BY MR. SITZMAN:
05:43 3  Q. I'm sorry. In my statement, was -- was there
05:43 4  anything wrong in what I had said?
05:43 5  A. It wasn't -- I do not believe it was necessary
05:43 6  to go to a lower level of granularity to ascertain those
05:43 7  specific components.
05:43 8  Q. Okay. And why did you not believe that?
05:43 9      MR. HENDERSHOT: Objection. Asked and
05:43 10  answered.
05:43 11      THE WITNESS: Because if the function needed
05:43 12  to be reproduced and the testimony and the -- and the
05:43 13  product literature suggests that it was and the
05:43 14  structure was clearly software, then my job was done.
05:43 15  BY MR. SITZMAN:
05:43 16  Q. Okay. And then the log- -- logical leap,
05:43 17  then, is any software program that performs those
05:43 18  functions, according to your analysis, would infringe
05:43 19  that claim limitation.
05:43 20  A. That's my understanding of the court memo.
05:43 21  Q. Okay. And that was the first sentence of
05:43 22  paragraph 1 that Mr. Hendershot read to you and not the
05:43 23  last two sentences of that -- of the memorandum.
05:43 24  A. I read the entire paragraph.
05:44 25  Q. Okay. The -- the part that says, on page 2,

Page 302

05:44 1  beginning with the word "therefore": "Therefore,
05:44 2  plaintiff must supplement its claim construction by
05:44 3  identifying those portions of the specification that
05:44 4  disclose the correspondence between the software ... and
05:44 5  the function disclosed by each claim limitation, as well
05:44 6  as the specific algorithm disclosed in the
05:44 7  specification, or where it is disclosed (or otherwise
05:44 8  inferred) that the algorithm/software is known to those
05:44 9  of skill in the art"?
05:44 10      MR. HENDERSHOT: I'm just going to note that
05:44 11  you missed the first where it says the correspondence
05:44 12  between the software, paren, "the structure," closed
05:44 13  paren.
05:44 14      MR. SITZMAN: Okay.
05:44 15  Q. You included that sentence in your analysis
05:44 16  that you didn't need to go beyond the fact that it was
05:44 17  embodied in software.
05:45 18  A. The algorithms that practice the claims in the
05:45 19  '164 patent directly flow from the functions that are
05:45 20  described in those claims. Dr. Davis said as much in --
05:45 21  in his initial report. The algorithms are
05:45 22  straightforward and are immediately inferable from the
05:45 23  functions.
05:45 24  Q. Well, since we're working on the -- the "means
05:45 25  for receiving at least one claim," what is the algorithm

Page 303

05:45 1  that is immediately inferable from that function?
05:45 2  A. That the data of the claim are input into the
05:45 3  computer and stored in some database or temporary
05:45 4  storage location.
05:45 5  Q. And how is that implemented in the '164
05:46 6  patent?
05:46 7  A. It's implemented in Clipper code.
05:46 8  Q. And how is it implemented in the Facet
05:46 9  software?
05:46 10  A. In -- in corresponding software.
05:46 11  Q. Do you know what the corresponding software
05:46 12  is?
05:46 13      MR. HENDERSHOT: Objection. Asked and
05:46 14  answered.
05:46 15  BY MR. SITZMAN:
05:46 16  Q. Do you know what the corresponding --
05:46 17  A. No. I have not --
05:46 18      THE REPORTER: I'm sorry?
05:46 19      THE WITNESS: I have not examined the source
05:46 20  code.
05:46 21  BY MR. SITZMAN:
05:46 22  Q. And when you said it's -- it's embodied in
05:46 23  Clipper code, you don't have any particular code in
05:46 24  mind. You're just basing that off of Appendix D which
05:46 25  has a por- -- a portion of the Clipper code used in this

Page 304

05:46  1   product.
05:46  2      A.  Correct.
05:46  3      Q.  Can you identify for me or have you identified
05:46  4   where in Appendix D the implementation of that algorithm
05:46  5   is located?
05:46  6      A.  For receiving the data?
05:46  7      Q.  Yes.
05:46  8      A.  No, I haven't -- I have not studied the code
05:46  9   well enough to be able to tell you.
05:47  10     Q.  You've told me, though, that the code is
05:47  11  incomplete.
05:47  12     A.  That's my understanding.
05:47  13     Q.  And there's certainly no disclosure in your
05:47  14  report as to where in the Clipper code we can find that
05:47  15  implementation.
05:47  16     A.  Right.  But, remember, we make a distinction
05:47  17  between algorithms as conceptual entities and
05:47  18  softwares -- software as a particular embodiment of that
05:47  19  algorithm.
05:47  20     Q.  Okay.  So I have function, algorithms flowing
05:47  21  directly from function and software which implements
05:47  22  that function, or implements that algorithm.
05:47  23     A.  Yes.
05:47  24     Q.  Okay.  And we're still working with the first
05:47  25  one, the "means for receiving at least one claim." I

05:47  1   think we're clear -- well, I -- I guess I'm still
05:48  2   unclear.  Is -- is it your testimony that the structure
05:48  3   is Figure 2, the flow chart entry program, or is it your
05:48  4   testimony that it's somewhere in Appendix D but you
05:48  5   haven't found it --
05:48  6      MR. HENDERSHOT:  Objection.
05:48  7   BY MR. SITZMAN:
05:48  8      Q.  -- or you haven't identified it?
05:48  9      MR. HENDERSHOT:  Sorry to speak over you.
05:48  10     Objection.  Misstates his testimony.  He's
05:48  11  pointed to something else in the patent before.
05:48  12     THE WITNESS:  Now I'm confused.  Structure for
05:48  13  what?
05:48  14  BY MR. SITZMAN:
05:48  15     Q.  The function of receiving at least one claim.
05:48  16     A.  The algorithm is implied by the box at --
05:48  17  called Entry Program in Figure 1.  That -- this flow
05:48  18  chart refers to an algorithm.  There's a particular
05:48  19  embodiment that's in the Clipper code in Appendix D.
05:48  20     Q.  But you haven't identified in your report or
05:49  21  today yet where in Appendix D the software is located.
05:49  22     A.  And the point is that someone who is skilled
05:49  23  in the art would have no difficulty implementing a
05:49  24  program that would read in data.
05:49  25     Q.  That would what?

05:49  1      A.  That would read in data.
05:49  2      Q.  Is it your understanding, either based on what
05:49  3   Counsel's told you or your reading of the Court's order,
05:49  4   that two computer programs that both carry out the same
05:50  5   function, regardless of their structure, are -- are
05:50  6   necessarily, if one's patented and the other one's not,
05:50  7   is necessarily an infringement just because they perform
05:50  8   the same function?
05:50  9      MR. HENDERSHOT:  Objection.  Your
05:50  10  hypothetical's incomplete and vague and ambiguous.
05:50  11  there's a claim recited, means plus function.
05:50  12     MR. SITZMAN:  All right.  I'll take that back.
05:50  13  Let's not do that.  I was trying to short-cut this but
05:50  14  let's -- we'll go through it the long way.
05:50  15     MR. HENDERSHOT:  If you're intending just to
05:50  16  keep him here long enough, would you mind if we took a break
05:50  17  and tried to arrange for a car to pick up his mother?
05:50  18     MR. SITZMAN:  Yeah, that would be fine if you
05:50  19  want to do that.  We've got two, three, four, five --
05:50  20     THE WITNESS:  Actually, I'm going to have to
05:50  21  leave -- I can probably leave as late as 6:20 and still
05:50  22  make it.  My mother is such that it would not be
05:50  23  appropriate to have a car pick her up.  She would not --
05:50  24     MR. HENDERSHOT:  Could we go off the record?
05:50  25     MR. SITZMAN:  Sure.

05:50  1      THE VIDEOGRAPHER:  Going off the record, the
05:50  2   time is 5:50 p.m.
05:51  3      (Recess taken.)
05:55  4      THE VIDEOGRAPHER:  Back on the record, the
05:55  5   time is 5:55 p.m.
05:55  6   BY MR. SITZMAN:
05:55  7      Q.  I think we've gone over the Facet software, so
05:55  8   let's switch to the QicLink TriZetto software.  What is
05:55  9   it in the -- what structure have you identified in the
05:55  10  QicLink TriZetto product that is either identical to or
05:55  11  equivalent to the software in -- described or disclosed
05:56  12  in the '164 patent that performs the function of
05:56  13  receiving at least one claim?
05:56  14     A.  Well, let me jump to the chase and say that
05:56  15  Dr. Johnson's analysis shows that all three TriZetto's
05:56  16  products operate with, essentially, the same algorithm,
05:56  17  and so the software would be equivalent in -- in all
05:56  18  three products.  Have I actually looked at specific
05:56  19  subroutines?  I've testified earlier I have not.
05:56  20     Q.  You've not looked at subroutines or source
05:56  21  code.
05:56  22     A.  That's correct.
05:56  23     Q.  Or the actual program itself.
05:56  24     A.  I don't have the program.
05:56  25     MR. HENDERSHOT:  Or working product, which

05:56 1 we've been asking for for months.
05:56 2 BY MR. SITZMAN:
05:56 3 Q. Okay. Now, is -- is it your testimony, then,
05:56 4 that Dr. Johnson has identified -- she has identified
05:57 5 the structure of each of the three TriZetto products for
05:57 6 each of the means for claims?
05:57 7 A. She has identified the functionality that's
05:57 8 embedded in the three products, and the -- to the degree
05:57 9 that the software implements the functionality of the
05:57 10 claims, yes.
05:57 11 Q. Okay. She has looked at functionality, and
05:57 12 you, based on the functionality, have assumed that the
05:57 13 software employed in Facets, QicLink, and ClainFacts
05:57 14 must necessarily be identical to or equivalent to the
05:57 15 software disclosed in the patent.
05:57 16 A. It's necessary --
05:57 17 MR. HENDERSHOT: Objection. Misstates his
05:57 18 testimony.
05:57 19 THE WITNESS: It's necessarily equivalent.
05:57 20 BY MR. SITZMAN:
05:57 21 Q. It's necessarily equivalent. Why is it
05:57 22 necessarily equivalent?
05:57 23 MR. HENDERSHOT: He said the structure is
05:57 24 software. I mean I just -- if we want to cut to the
05:57 25 chase.

Page 309

05:57 1 BY MR. SITZMAN:
05:57 2 Q. Well, we -- we -- I thought we were pretty
05:58 3 clear and closed on it this morning, so that's why
05:58 4 I'm -- I'm struggling through --
05:58 5 A. I don't think anything's changed. The
05:58 6 algorithms for performing the claims in the '164 patent
05:58 7 are straightforward. There is really a limited way in
05:58 8 which those algorithms could be implemented in software,
05:58 9 and variations in the design decisions would be
05:58 10 relevant.
05:58 11 THE REPORTER: Would be "relevant"?
05:58 12 THE WITNESS: Irrelevant.
05:58 13 BY MR. SITZMAN:
05:58 14 Q. And why would they be irrelevant?
05:58 15 A. Because, one, the structure that matters is
05:58 16 simply software and, two, in terms of the
05:58 17 capabilities of the system or qualities of the system or
05:58 18 its duplication of function, that would be -- precisely
05:58 19 how the software would be implemented would be
05:59 20 irrelevant 'cause there are infinite ways in which one
05:59 21 could program a system but the algorithms would be
05:59 22 relatively straightforward and the same.
05:59 23 Q. All right. Well, let's -- let's -- let's see
05:59 24 if we can cut to the chase. Okay? Let's get to the
05:59 25 bottom line. I don't mean to cut you off, and I thought

Page 310

05:59 1 it was much clearer this morning, but if we want to get
05:59 2 through this, let's see if we can --
05:59 3 A. Okay.
05:59 4 Q. -- come to either a stipulation or a
05:59 5 conclusion or a wrap-up.
05:59 6 I think what you're saying is the '164 patent,
05:59 7 the support, the structure that supports all of the
05:59 8 means-plus-function claim language is software in the
05:59 9 '164 patent, and it -- and the software performs the
05:59 10 function described in the claims, and the TriZetto
05:59 11 products, in your opinion, infringe because they perform
06:00 12 identical function?
06:00 13 A. Yes.
06:00 14 Q. And they're embodied in software so they must
06:00 15 necessarily have either identical software structure or
06:00 16 equivalent software structure. Is that too compound?
06:00 17 MR. HENDERSHOT: I think -- I think there's
06:00 18 one -- if -- if I can address one assumption in it.
06:00 19 MR. SITZMAN: Go ahead.
06:00 20 MR. HENDERSHOT: I thought his testimony was
06:00 21 that the patent identified software, generally
06:00 22 commercially available software, as the structure that
06:00 23 performed functions, and that's -- that's my
06:00 24 understanding. I'm not the witness. If --
06:00 25 MR. SITZMAN: Okay. Let's -- let's clean it

Page 311

06:00 1 up, 'cause I think if we could clean it up, then I think
06:00 2 we'll be okay.
06:00 3 THE WITNESS: That's -- that's correct.
06:00 4 MR. SITZMAN: Okay.
06:00 5 MR. HENDERSHOT: What's correct? Let's make
06:00 6 sure we're all on the same page.
06:00 7 THE WITNESS: Okay. That the claims in the
06:00 8 '164 patent describe functions that are implemented in
06:00 9 their -- in software to provide structure, that the
06:00 10 equivalent functionality exists in the TriZetto products
06:01 11 which are implemented in software.
06:01 12 BY MR. SITZMAN:
06:01 13 Q. Okay.
06:01 14 THE REPORTER: Say it again.
06:01 15 MR. HENDERSHOT: Subject to the Court's
06:01 16 ultimate construction of the claims.
06:01 17 MR. SITZMAN: I'm just going to consult.
06:01 18 THE VIDEOGRAPHER: Going off the record, the
06:01 19 time is 6:01 p.m.
06:01 20 (Recess taken.)
06:03 21 THE VIDEOGRAPHER: Back on the record, the
06:03 22 time is 6:03 p.m.
06:03 23 MR. SITZMAN: Okay. Anything to clarify on
06:03 24 your end? 'Cause I had two more on mine.
06:03 25 MR. HENDERSHOT: Why don't you go ahead and

Page 312

78 (Pages 309 to 312)

MARK MUSEN, M.D., PH.D.

06:03  1   we'll try to wrap it up.
06:03  2       MR. SITZMAN: Okay. And then I do want to go
06:03  3   through one more other subject, but this will speed this
06:03  4   along.
06:03  5       MR. HENDERSHOT: Okay.
06:03  6   BY MR. SITZMAN:
06:04  7       Q.  In addition to what we've just discussed and I
06:04  8   think gotten some clarity on, you've not identified any
06:04  9   specific software beyond commercial -- you know, the
06:04  10  generally commercially available software in the '164
06:04  11  patent that performs each of the various
06:04  12  means-plus-function functions.
06:04  13      A.  Well, in the '164 patent, the rules that we've
06:04  14  discussed in Appendix B implement all of the
06:04  15  functionality related to the claims.
06:04  16      Q.  But the rules are not specific software.
06:04  17      A.  Sure they are.  I mean, they're -- they're
06:04  18  data structures that are -- that are interpreted by the
06:04  19  rest of the software in the system.
06:04  20      Q.  Okay.  So -- okay.  All right.  Other than the
06:04  21  rules at Appendix B --
06:05  22      A.  Yeah.
06:05  23      Q.  -- and generally commercial software, have you
06:05  24  identified anything else in the '164 patent that
06:05  25  provides the structure to the functions described in the

Page 313

06:05  1   means for claims?
06:05  2       A.  Well, that -- that information is supplemented
06:05  3   by the flowcharts and the description of the -- the
06:05  4   software in the specification.
06:05  5       Q.  I'm sorry.  Say that last part again.  And
06:05  6   the?
06:05  7       A.  Description of the software in the
06:05  8   specification of the patent.
06:05  9       Q.  Appendix D?
06:05  10      A.  And also in --
06:05  11      MR. HENDERSHOT: Are you referring to the
06:05  12  prose?
06:05  13      THE WITNESS: I'm talking about the prose in
06:05  14  the specification, the --
06:05  15      THE REPORTER: Say it again.
06:05  16      THE WITNESS: The "Description of the
06:05  17  Preferred Embodiment" that begins in Column 4.
06:05  18  BY MR. SITZMAN:
06:06  19      Q.  Let me set that aside for a second.  Let's --
06:06  20  let's switch over to the TriZetto products.
06:06  21      A.  Okay.
06:06  22      Q.  You've not identified anything in the Tri- --
06:06  23  any specific software in the TriZetto products that
06:06  24  provide the structure for the function that -- that you
06:06  25  believe is identical in the claims.

Page 314

06:06  1       A.  Apart from the overall software, no, I've
06:06  2   not -- I understand that each of those systems is a
06:06  3   software system.  I have not gone down to the next level
06:06  4   of granularity.
06:06  5       Q.  For example, you just said, a second ago you
06:06  6   said when I asked you about the structure in the '164
06:06  7   patent, I said you hadn't identified anything other than
06:07  8   just generalized software.  You said, ah, but the rules.
06:07  9       A.  Okay.
06:07  10      Q.  On the TriZetto side, you haven't identified
06:07  11  any corollary rules.
06:07  12      MR. HENDERSHOT: Objection.  Misstates his
06:07  13  testimony or inconsistent with the -- the report and the
06:07  14  appendices.
06:07  15  BY MR. SITZMAN:
06:07  16      Q.  Have you identified any -- any rules like
06:07  17  you --
06:07  18      A.  My -- my understanding is that the TriZetto
06:07  19  products accomplished the same task by implementing the
06:07  20  software more procedurally than -- than in the
06:07  21  rule-based formulas described in the patent.
06:07  22      Q.  But do you know what structure it is that
06:07  23  carries out that function?
06:07  24      A.  There is software -- there necessarily is
06:07  25  software that carries out that function.  Do I -- can I

Page 315

06:07  1   point to lines of code?  No.
06:08  2       Q.  Let's leave that for a second.
06:08  3       Let -- let me turn your attention back to the
06:08  4   rules here.  In response to questions from
06:08  5   Mr. Hendershot about Rules R1 through R4, you've
06:08  6   responded that -- well, in -- in response to my ,
06:08  7   questions earlier this morning, you told me that none of
06:08  8   the rules, R1 through R4, are implemented in the claims
06:08  9   as they appear in their entirety here in Appendix B.
06:08  10      A.  That's correct.
06:08  11      Q.  In response to your questions from
06:08  12  Mr. Hendershot, you made this distinction between left
06:08  13  hand and right hand.
06:08  14      A.  I've been doing that all day.
06:08  15      Q.  Okay.  How -- how is it that you or where are
06:08  16  you making that distinction between left hand and right
06:08  17  hand, taking R1, for example?
06:09  18      A.  R1, the left-hand side of the rule is that if
06:09  19  ACODE appears with another code in the range of, and
06:09  20  including, BCODE to CCODE, that's the left-hand side.
06:09  21  And what follows --
06:09  22      THE REPORTER: "And what follows" -- from
06:09  23  there.
06:09  24      THE WITNESS: Delete ACODE, comma, keep BCODE
06:09  25  to CCODE, comma, and add DCODE is the right-hand side or

Page 316

79 (Pages 313 to 316)

MARK MUSEN, M.D., PH.D.

McKesson Information Solutions LLC v. The TriZetto Group, Inc.
District of Deleware Case No. 04-1258 SLR

Deposition of Mark Musen, M.D. PH.D
Date of Deposition: November 22, 2005

## TRANSCRIPT ERRATA

| PAGE: LINE(S) | CURRENT VERSION | CHANGE TO | REASON FOR CHANGE |
|---|---|---|---|
| 9:15 | derive | drive | mistranscription |
| 12:10 | terminology-based | term knowledge-based | mistranscription |
| 13:1 | disfavor | favor | mistranscription |
| 29:23 | function | functioning | mistranscription |
| 57:24 | making | making an | mistranscription |
| 58:1 | defines | defines a | mistranscription |
| 58:15 | decision | decisions | mistranscription |
| 65:7 | be violation | be in violation | mistranscription |
| 69:7 | database, say, are | database say are | inappropriate punctuation |
| 84:13 | A code CT code | A code is CT with contrast | mistranscription determined by context |
| 85:25 | bill | build | mistranscription |
| 95:15-20 | that although the Q1 through Q9 rules are not the result of claims in the patent. The description of the embodiment makes it obvious that to be effective, one has to apply those rules after the rules that are governed by the claims spotter (phonetic) first. | that, although the Q1 through Q9 rules are not the result of claims in the patent, the description of the embodiment makes it obvious that, to be effective, one has to apply those rules after the rules that are governed by the claims five first. | mistranscription, inappropriate punctuation |
| 108:14 | means for | "means for" | clarity |
| 113:6 | the computers | computers | mistranscription |

Deposition of Mark Musen, M.D. PH.D.

McKesson Information Solutions LLC v. The TriZetto Group, Inc.
District of Deleware Case No. 04-1258 SLR

Deposition of Mark Musen, M.D. PH.D
Date of Deposition: November 22, 2005

## TRANSCRIPT ERRATA

| PAGE: LINE(S) | CURRENT VERSION | CHANGE TO | REASON FOR CHANGE |
|---|---|---|---|
| 154:14 | End of one | "N of 1" | mistranscription of statistical jargon |
| 191:14 | saying | seeing | mistranscription |
| 203:12 | it was ever | there was ever | mistranscription |
| 204:20 | Instruments, | Instruments' | inappropriate punctuation |
| 216:6 | specification of the claims | the specification and the claims | mistranscription |
| 283: 17-19 | The answer is yes. The algorithm is obvious from looking at the function. Dr. Davis testified as such. | The answer is yes, it would not change my infringement opinion. The algorithm is obvious from looking at the function. Dr. Davis testified as such. | clarity |

Deposition of Mark Musen, M.D. PH.D.

# EXHIBIT 3

Page 1

1     IN THE UNITED STATES DISTRICT COURT
2      FOR THE DISTRICT OF DELAWARE
3
4  McKESSON INFORMATION SOLUTIONS,
    LLC,
5
        Plaintiff,
6
      vs.      No. 04-1258-SLR
7
  THE TRIZETTO GROUP, INC.,
8
        Defendant.
10
11
    _____
12
13
14  VIDEOTAPED DEPOSITION OF LARRY KERSCHBERG, PH.D.
15       Washington, D.C.
16     Monday, November 21, 2005
17        9:42 a.m.
18
19
20
21  Reported by:
    Karen Young
22
23  Job No. 41296
24
25

Page 2

1     IN THE UNITED STATES DISTRICT COURT
2      FOR THE DISTRICT OF DELAWARE
3
4  McKESSON INFORMATION SOLUTIONS,
    LLC,
5
        Plaintiff,
6
      vs.      No. 04-1258-SLR
7
  THE TRIZETTO GROUP, INC.,
8
        Defendant.
10
11
    _____
12
13    Videotaped Deposition of LARRY KERSCHBERG,
14  PH.D., held at the offices of:
15    GIBSON, DUNN & CRUTCHER LLP
16    1050 Connecticut Avenue, Northwest
17    Washington, D.C. 20036
18    (202) 955-8500
19
20
21    Pursuant to notice, before Karen Young,
22  Notary Public of the District of Columbia.
23
24
25

Page 3

1       A P P E A R A N C E S
2  ON BEHALF OF THE PLAINTIFF:
3    DAVID W. HANSEN, ESQUIRE
4    SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
5    525 University Avenue, Suite 1100
6    Palo Alto, California 94301
7    (650) 470-4500
8
9  ON BEHALF OF THE DEFENDANT:
10    DAVID A. SEGAL, ESQUIRE
11    GIBSON, DUNN & CRUTCHER LLP
12    4 Park Plaza, Suite 1700
13    Irvine, California 92614-8557
14    (949) 451-3800
15
16  ALSO PRESENT:
17    Antonio Tropeano, Videographer
18
19
20
21
22
23
24
25

Page 4

1       C O N T E N T S
2  EXAMINATION OF LARRY KERSCHBERG, PH.D.    PAGE
3    By Mr. Hansen .............................. 7
4    By Mr. Segal ............................ 216
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
877.955.3855

Page 177

```
15:49:05  1    Q.   An ICD-9 code.
15:49:07  2    A.   Right.
15:49:07  3    Q.   Okay.
15:49:08  4    A.   And there could be multiple ICD-9 codes
15:49:11  5  associated.  There's a principal diagnosis, surgical
15:49:17  6  procedure, secondary diagnosis, so all of those have
15:49:21  7  to be handled together.
15:49:23  8    Q.   Yes, and the relationships between the
15:49:24  9  various ICD-9 codes are coded in the database, you
15:49:29 10  would say that this code --
15:49:30 11    A.   Some of them are.  The temporal
15:49:32 12  relationships.
15:49:32 13    Q.   Temporal relationships between the codes, so
15:49:36 14  you would have a relationship between the --
15:49:38 15    A.   And the services.
15:49:39 16    Q.   Pardon?
15:49:39 17    A.   Codes and the services.
15:49:41 18    Q.   And the database in the MEDCLAIM system had
15:49:44 19  actual relationships between the ICD-9 codes
15:49:48 20  themselves?
15:49:50 21    A.   I believe in some cases yes.
15:49:52 22    Q.   And is that the case that you've just
15:49:54 23  illustrated for me?
15:49:55 24    A.   Not necessarily.  I'm not sure.
15:49:57 25    Q.   You're not sure.
```

Page 178

```
15:49:58  1    A.   Yeah, I'd have to look more closely at the
15:50:01  2  database.
15:50:02  3    Q.   And how would you do that?  How would I do
15:50:05  4  that?  I want to figure that out, right?  How do I do
15:50:07  5  that?
15:50:08  6    A.   Right.  I'd have to look for the code.  I
15:50:12  7  couldn't find the documentation, so --
15:50:16  8    Q.   But without doing that, you don't know.
15:50:20  9    A.   Right.
15:50:20 10    Q.   Okay.
15:50:27 11    A.   I reserve the right though if I do find it
15:50:30 12  that we could have an addendum to the testimony.
15:50:37 13    Q.   Not in my lifetime.
15:50:38 14    A.   Not in your lifetime, okay.
15:50:40 15    Q.   Not if I have anything to do with it.  It's
15:50:43 16  not the way the process works, but we don't have to
15:50:45 17  get into that now.  You can talk to your lawyer.
15:50:47 18    A.   Okay.
15:50:48 19    Q.   This is a deposition.
15:50:49 20    A.   Right.
15:50:49 21    Q.   All right.  Now, let me ask you, have you
15:50:51 22  ever heard of means plus function claiming?  You're
15:51:01 23  not a patent lawyer, right?
15:51:02 24    A.   No, but I've heard the expression but I
15:51:05 25  couldn't give you the definition.
```

Page 179

```
15:51:06  1    Q.   So let's go, for example, to page -- let's
15:51:12  2  pick one.  Page 19 --
15:51:14  3    A.   Yes.
15:51:15  4    Q.   -- of your report.  Sorry.  Exhibit 7.
15:51:22  5  Let's just start with element C, okay?  You see where
15:51:31  6  it says "Means for receiving"?
15:51:32  7    A.   Correct.
15:51:32  8    Q.   Do you have any idea -- how did you
15:51:34  9  interpret that?
15:51:37 10    A.   That somehow the invention would receive a
15:51:42 11  claim, some mechanism by which that claim would be
15:51:46 12  provided to the system.
15:51:52 13    Q.   Do you have any idea whether the term
15:51:53 14  "means" has any special meaning in patent law?
15:51:58 15    A.   It's a mechanism.  Is that -- means for
15:52:02 16  determining.  It's a way, a way of receiving.
15:52:05 17    Q.   But in terms of -- in terms of formulating
15:52:08 18  your definition of the claims for your report, you
15:52:12 19  were not providing any instruction as to how
15:52:15 20  means-type elements would be interpreted under patent
15:52:21 21  law?
15:52:27 22    A.   I think I was, but I don't remember the
15:52:29 23  exact definition.
15:52:31 24    Q.   Do you remember when that instruction came?
15:52:34 25    A.   I think when I was talking with Mr. Muino
```

Page 180

```
15:52:39  1  early on when we were talking about how to interpret
15:52:41  2  the claims, he did talk about means plus function, so
15:52:48  3  some of the claims are more like a computer system
15:52:54  4  that would be the apparatus, and this is more of a
15:52:55  5  specification.  It doesn't tell you how it's done.  It
15:52:58  6  just says this is a specification of the system, and
15:53:02  7  then it can have various embodiments, so to speak,
15:53:06  8  various ways to do it.  Like I could hand you a claim.
15:53:10  9  That might be a means of receiving the claim.  Is that
15:53:17 10  okay?  I mean --
15:53:18 11    Q.   It's okay with me.  I'm just trying to get
15:53:21 12  your testimony.  No, I mean that's all --
15:53:21 13    A.   That's the way --
15:53:23 14    Q.   -- I'm trying to do, is figure out what you
15:53:24 15  did, so --
15:53:24 16    A.   Right.
15:53:26 17    Q.   Did you for purposes of -- let's take the
15:53:30 18  next one, right, D, means for ascertaining whether the
15:53:34 19  at least one claim contains a plurality of medical
15:53:37 20  service codes.  Do you see that?
15:53:38 21    A.   Right.
15:53:39 22    Q.   Did you look at the patent to determine
15:53:41 23  whether any structure's disclosed for that means?
15:53:51 24    A.   No.
15:53:52 25    Q.   If you had, it would be set forth in your
```

45 (Pages 177 to 180)

Page 181

15:53:56  1  report I assume, right?
15:53:58  2      A.  Right. I couldn't find it.
15:53:59  3      Q.  Okay. Is that true for the next one also,
15:54:00  4  E, means for determining? Did you look at the patent
15:54:03  5  to determine whether there's any structure disclosed
15:54:05  6  for that?
15:54:13  7      A.  No, I didn't find it.
15:54:14  8      Q.  All right. So that --
15:54:15  9      A.  I mean, this is more a specification. I
15:54:21 10  didn't see enough of the invention to actually see it.
15:54:30 11  I mean --
15:54:34 12      Q.  Would that be true for all of the means for
15:54:39 13  elements?
15:55:00 14      A.  Let me ask -- this is a clarification. In
15:55:12 15  the description, there is an appendix with the source
15:55:17 16  code. Is that the preferred embodiment to look for
15:55:20 17  the means?
15:55:21 18      Q.  Would that matter to your opinion?
15:55:23 19      A.  No.
15:55:27 20      Q.  I'm not trying to be rude. It's just a
15:55:29 21  matter of for purposes -- all I'm trying to do is get
15:55:33 22  your testimony as to what you did and --
15:55:34 23      A.  Right, right.
15:55:35 24      Q.  It's a question of whether or not you were
15:55:37 25  -- whether or not it's right is a different issue.

Page 182

15:55:39  1      A.  Right.
15:55:39  2      Q.  Right, so --
15:55:40  3      A.  I mean, I looked for these. I tried to
15:55:41  4  understand obviously what they mean, and you can only
15:55:45  5  go up to a certain point because the database was not
15:55:51  6  explained or I couldn't really see what the database
15:55:56  7  organization would look like, so I think I had trouble
15:56:01  8  with that.
15:56:02  9      Q.  Did you get any assistance in terms of
15:56:04 10  interpreting the means elements from counsel at
15:56:08 11  TriZetto?
15:56:14 12      A.  No.
15:56:16 13      Q.  Do you know whether or not any of the other
15:56:18 14  experts did?
15:56:20 15      A.  I don't know.
15:56:24 16          MR. HANSEN: Let's mark -- what's our next
15:56:33 17  one? Ten? Let's mark this as 10.
        18              - - -
        19          (Deposition Exhibit Number 10 was marked for
        20  identification.)
        21              - - -
15:56:49 22  BY MR. HANSEN:
15:56:49 23      Q.  Dr. Kerschberg, I've given you a portion of
15:56:51 24  the rebuttal report of Randall Davis --
15:56:54 25      A.  Okay.

Page 183

15:56:54  1      Q.  -- because I don't want to go through the
15:56:55  2  whole report, but you -- I think you said that you've
15:56:57  3  seen Dr. Davis' rebuttal report in this case?
15:57:05  4          MR. SEGAL: I was going to object, misstates
15:57:07  5  his testimony.
15:57:07  6  BY MR. HANSEN:
15:57:07  7      Q.  I'm sorry. Have you seen -- do you know
15:57:10  8  that Dr. Davis has submitted a rebuttal report?
15:57:12  9      A.  No, I haven't. This is November 14th.
15:57:14 10      Q.  And you haven't seen this.
15:57:16 11      A.  No, I haven't.
15:57:17 12      Q.  Okay. Sorry.
15:57:18 13      A.  I saw the rebuttal reports for Dr. Musen and
15:57:21 14  Dr. Wilson, so I have not seen this. Shall I read it?
15:57:26 15      Q.  Well, what I'm focusing you in on is the
15:57:29 16  second paragraph of page 2, "I have been informed that
15:57:34 17  means plus function" -- do you see that?
15:57:36 18      A.  Right.
15:57:39 19      Q.  Can you just read it and tell me whether you
15:57:42 20  were similarly informed at any point?
15:57:45 21      A.  I've heard of -- okay, let me read it first.
15:57:48 22      Q.  Yes, please.
15:57:49 23      A.  Okay.
15:58:16 24      Q.  Were you instructed similarly?
15:58:18 25      A.  I heard the terminology "means plus

Page 184

15:58:23  1  function" in terms of some of the claims, but not how
15:58:28  2  to interpret that. A step plus function, this is the
15:58:32  3  first I've heard of that term.
15:58:35  4      Q.  Uh-huh. In connection with your report, did
15:58:39  5  you determine corresponding structure or acts
15:58:41  6  described in the patent specification for any of the
15:58:43  7  elements of the claims?
15:58:47  8      A.  As best I could, I read through the
15:58:50  9  specification. There are certain portions which talk
15:58:54 10  about the codes, and so I went through that aspect,
15:58:58 11  yes.
15:59:00 12      Q.  Talked about the codes? What do you mean?
15:59:03 13      A.  Like the A code, in the patent specification
15:59:07 14  showing the flow of the system, but some of the flow
15:59:13 15  charts were incomplete in that the arrows didn't go
15:59:18 16  anywhere. I mean, there was no way to actually follow
15:59:21 17  the logical flow in the flow charts.
15:59:23 18      Q.  In terms of the structure, did you consider
15:59:29 19  the rules, the meta-rules as you call them in Appendix
15:59:33 20  B of the '164 patent? Was that a structure that you
15:59:36 21  considered in connection with your claim construction,
15:59:41 22  or --
15:59:50 23      A.  The structure would be the embodiment of the
15:59:55 24  requirement? Is that what the structure really means?
15:59:58 25  I don't know.

46 (Pages 181 to 184)

# EXHIBIT 4

**Page 1**

1   IN THE UNITED STATES DISTRICT COURT
2       FOR THE DISTRICT OF DELAWARE
3
4   MCKESSON INFORMATION SOLUTIONS, LLC,
5           Plaintiff,
6       vs.            No. 04-1258-SLR
7   THE TRIZETTO GROUP, INC.,
8           Defendant.
9
10
11

12
13
14
15       DEPOSITION OF PHILIP M. HAWLEY, JR., M.D.
16           Los Angeles, California
17           Wednesday, November 30, 2005
18
19
20
21   Reported by:
     RENEE A. PACHECO, RPR
22   CSR NO. 11564
23   JOB NO. 41623
24
25

**Page 2**

1   IN THE UNITED STATES DISTRICT COURT
2       FOR THE DISTRICT OF DELAWARE
3
4   MCKESSON INFORMATION SOLUTIONS, LLC,
5           Plaintiff,
6       vs.            No. 04-1258-SLR
7   THE TRIZETTO GROUP, INC.,
8           Defendant.
9
10
11
12
13
14
15       Deposition of PHILIP M. HAWLEY, JR., M.D., taken on
16   behalf of Plaintiff, at 333 South Grand Avenue,
17   Los Angeles, California, beginning at 9:13 a.m. and
18   ending at 4:59 p.m. on Wednesday, November 30, 2005,
19   before RENEE A. PACHECO, RPR, Certified Shorthand
20   Reporter No. 11564.
21
22
23
24
25

**Page 3**

1   APPEARANCES:
2
3   For Plaintiff:
4       SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLC
        BY: MICHAEL HENDERSHOT
5       Attorney at Law
        525 University Avenue
6       Suite 1100
        Palo Alto, California 94301
7       (650) 470-4500
8   For Defendant and the Witness:
9       GIBSON, DUNN & CRUTCHER
        BY: THEODORE KEVIN ROOSEVELT
10      Attorney at Law
        333 South Grand Avenue
11      Los Angeles, California 90071-3197
        (213) 229-7000
12
    Videographer:
13
        MAX BUSHMAN
14
15
16
17
18
19
20
21
22
23
24
25

**Page 4**

1           INDEX
2   WITNESS            EXAMINATION
3   PHILIP M. HAWLEY, JR., M.D.
4
5
6   BY MR. HENDERSHOT          6
7   AFTERNOON SESSION          136
8
9       EXHIBITS
10  HAWLEY             PAGE
    1   Dr. Hawley's Report        47
11
    2   U.S. Patent No. 5,253,164      118
12
    3   Article by Richard Egdahl, M.D. and
13      Robert Hertenstein, M.D.      158
14
15
16      INFORMATION REQUESTED
17      NONE.
18
19
20
21      INSTRUCTION NOT TO ANSWER
22      NONE.
23
24
25

1 (Pages 1 to 4)

Page 201

1   A It would be both. That they're broader and as
2   in the case of the R Claims -- or the R Rules, for
3   example, and the L Rule, I didn't see a claim that --
4   that dealt with that.
03:43 5   Q So there -- there are rules described in the
6   specification appendixes that -- that aren't implemented
7   in the claims -- is that correct? -- in your opinion,
8   that aren't fully described in the claims.
9   A Not fully described in the claims, yes.
03:44 10   Q And the claims, the way they are phrased in your
11   opinion, are broader than an individual example, they may
12   encompass one or more examples or --
13   A Yes.
14   Q Sorry.
03:44 15   A That could be the case, yes.
16   Q For example, you'd said -- you'd spoken about
17   valid earlier, about how it could be one of those or a
18   combination of those rules set forth in the patent, in
19   your opinion?
03:44 20   A In the specification are you --
21   Q In the specification.
22   A Yes. Yes.
23   Q Let me try to generalize this, save us a little
24   time.
03:44 25   With respect to the -- with respect to your

Page 202

1   statement that the -- strike that.
2   I'm trying to phrase it in a way to avoid having
3   to go through it a bunch of times.
4   Given that the definition of comprising I'd
03:45 5   articulated you earlier struck you as somewhat far afield
6   from what you'd applied and understood, would it be a
7   fair statement that, if, under my definition of
8   comprising that I articulated, you might have to
9   reconsider your statement about whether the claims
03:45 10   correlate to audit detection -- or audit techniques
11   described in the specification and appendixes for those
12   claims where you don't think they do, under your
13   definition of comprising?
14   A Certainly by way of example of the R Rules
03:46 15   alone, yes. I'd have to reexamine my opinion.
16   Q Okay. Do me a favor and take a look at Claim 3
17   again.
18   Do you have the patent open?
19   A I do. I do.
03:46 20   Q Sorry. Didn't want to run off without you.
21   Do you see the second indented paragraph, which
22   is a single line, that says:
23   "Means for receiving at least one
24   claim"?
03:46 25   A Yes. I do.

Page 203

1   Q During your discussions with TriZetto's counsel,
2   in which you obtained the understanding of legal
3   principles that you applied in your opinions in your
4   report, did any of TriZetto's attorneys direct you to
03:47 5   construe that element in a way different from any other
6   element in the patent?
7   A I don't recall them calling out that phrase with
8   any special consideration.
9   Q Do you recall interpreting it under any
03:47 10   different protocol than you applied to any other element
11   to the patent, in formulating your opinion that's set
12   forth in your report?
13   A No.
14   Q Okay. How about means for ascertaining the
03:47 15   element underneath it; it would be the same answer?
16   A Same answer.
17   Q There are a number of means for limitations --
18   or strike that.
19   There are a number of elements that start with
03:47 20   the terms "means for" in the claims.
21   Do you see that?
22   A Yes, I do.
23   Q And would -- would the answers you just gave
24   that you weren't instructed to and did not apply any
03:47 25   special interpretation to those, apart from what you

Page 204

1   applied to all of the claims, hold true for all of the
2   means for limitations or elements?
3   A That -- that would be true.
4   Q And with respect to that interpretation that you
03:48 5   applied to -- to all of the elements, you just applied
6   your regular understanding of the English language?
7   A Yes. As well as the definition of terms
8   provided to me by the TriZetto attorneys.
9   Q And what terms would those be?
03:48 10   A Well, as I mentioned, they would -- they
11   clarified the term "apparatus."
12   Q Plurality?
13   A Plurality?
14   Q Was plurality one of them?
03:48 15   A I don't recall whether we discussed that term or
16   not, you know. I don't know whether they called out that
17   term.
18   Q Can I direct you to Page 9 of your report.
19   A Yes.
03:49 20   Q Keep the claims of the patent open as well, if
21   you don't mind.
22   A Okay. So you said Page 9?
23   Q Yes, sir. Actually, it would be Page 8. I
24   apologize.
03:49 25   A 8. Okay.

51 (Pages 201 to 204)

Page 205

1    Q   It's your discussion of the claims of the '164
2    patent.
3    A   Okay. Okay. I have it open.
4    Q   Do me a favor and review -- you don't need to
03:50  5    read it aloud again -- review your discussion of Claim 1.
6    (Document reviewed by the witness.)
7    THE WITNESS: Okay. I finished.
8    BY MR. HENDERSHOT:
9    Q   You had mentioned earlier that TriZetto's
03:50 10    attorneys told you to operate -- at least at some point,
11    I believe it was likely after your report, but correct me
12    if I'm wrong -- to operate under the assumption that the
13    claims -- it was McKesson's position that the claims
14    cover any software system implementing clinical auditing
03:51 15    or the -- the specific functions described here; is that
16    correct?
17    A   They did make that point. I'm not -- I believe
18    they mentioned that while -- during our discussions while
19    I was preparing this report. I don't think it was only
03:51 20    after the report that they mentioned it, but --
21    Q   Did they tell you to assume that interpretation
22    in reaching your opinions or did they just say, hey,
23    McKesson's saying this stuff over here?
24    A   I don't recall, while I was preparing the
03:51 25    report, that I was instructed one way or another.

Page 206

1    I believe -- I believe that I was not to --
2    to -- to make an assumption. I think that they mentioned
3    that that was a position, but I don't -- no, they didn't.
4    Q   Did you -- when you reviewed the claims, did you
03:52  5    see anything in the claims that you thought was
6    inconsistent with that position?
7    A   Inconsistent with?
8    Q   The -- the notion that the claims cover soft --
9    any software implementation of these functions.
03:52 10    A   I didn't see anything inconsistent or supporting
11    that fact. I just --
12    Q   Do you think they did?
13    A   Do they --
14    Q   Do you think they cover any software
03:52 15    implementation?
16    A   To me that's a legal question that I'm -- I'm
17    not -- you know, I'm not steeped in patent law. I mean
18    that seems to me a patent law question.
19    Q   Fair enough.
03:53 20    So just so I'm -- I'm clear, whether they cover
21    any software system is something that would require an
22    understanding of patent law that you don't have, in your
23    opinion?
24    A   I'm sorry. Repeat the question one more time.
03:53 25    Q   Whether the claims of the '164 patent cover any

Page 207

1    software system for implementing their functions is a
2    question that would -- the resolution of which would
3    require a knowledge of patent law you don't have.
4    Is that your opinion?
03:53  5    A   Repeat it one more time. I'm sorry. I'm
6    just -- I'm getting -- I'm growing tired here.
7    Q   I -- I think you had just said that you couldn't
8    determine -- or you weren't comfortable determining -- I
9    don't want to put words in your mouth.
03:53 10    You had issues determining whether or not the
11    claims cover any software implementation of these
12    functions, because it seemed like a patent law issue to
13    you.
14    A   Correct.
03:54 15    Q   But you are of the opinion that they would cover
16    some form of software implementation?
17    A   I am.
18    Q   Okay. Is there a -- is there a specific sort of
19    software you have in mind that these are limited to?
03:54 20    I'm just trying to sort of bridge the gap
21    between -- you're convinced that they cover some software
22    implementation of these functions, but you're not
23    comfortable saying they cover any software
24    implementation.
03:54 25    I'm just trying to see where you -- where you

Page 208

1    draw the line.
2    MR. ROOSEVELT: I think that misstates the
3    testimony.
4    THE WITNESS: What I'm saying is this could
03:54  5    describe -- it -- it describes generally the automation
6    of the claim auditing process using computers. That's
7    quite clear.
8    And beyond that it is not very descriptive. And
9    so it could encompass, you know, anything of any size or
03:55 10    description by virtue of its broad and general nature.
11    BY MR. HENDERSHOT:
12    Q   The claims as a whole or --
13    A   The claims -- the '164 claims.
14    Q   Okay. Turning back to Page 8 of your report.
03:55 15    A   Yes.
16    Q   You're discussing Claim 1.
17    You see that?
18    A   Yes.
19    Q   And it's Claim 1 of the '164 patent.
03:55 20    You state that:
21    "The term 'predetermined' is never
22    defined in the '164 patent."
23    Do you see that?
24    A   Yes, I do see that.
03:56 25    Q   You suggest that -- or you state, I'm sorry:

52 (Pages 205 to 208)

# EXHIBIT 5

**Page 1**

1  UNITED STATES DISTRICT COURT
2  DISTRICT OF DELAWARE
3
4  McKESSON INFORMATION SOLUTIONS, LLC,
5      Plaintiff
6  v.         CA NO. 04-1258 (SLR)
7  THE TRIZETTO GROUP, INC.,
8      Defendant
9
10
11
_____
12      VOLUME I
13  VIDEOTAPED DEPOSITION OF RANDALL
14  DAVIS, Ph.D., a witness called on behalf of
15  the Plaintiff, pursuant to the Federal Rules
16  of Civil Procedure, before Jessica L.
17  Williamson, Registered Merit Reporter,
18  Certified Realtime Reporter and Notary
19  Public in and for the Commonwealth of
20  Massachusetts, at the Offices of Skadden,
21  Arps, Slate, Meagher & Flom LLP, One Beacon
22  Street, Boston, Massachusetts, on Wednesday,
23  November 30, 2005, commencing at 9:27 a.m.
24  JOB NO. 41297
25

**Page 3**

1            I N D E X
2  DEPONENT              PAGE
3  RANDALL DAVIS, Ph.D.
4  Examination By Mr. Randall     5, 310
5  Examination By Mr. Segal       297
6
7            E X H I B I T S
8  NO.                  PAGE
9  1 Copy of '164 patent         11
10 2 Expert Report dated October  22
   24, 2005
11
   3 Expert Report dated November  22
12  14, 2005
13 4 Article entitled "Enhancing   28
   Accuracy and Timeliness is
14  Integral to the Claims
   Adjudication Process"
15
   5 Document relating to AMS     141
16  entitled "Setting a New
   Standard"
17
   6 Document bearing Bates stamp  142
18  Nos. RD000314 - 324
19 7 Document entitled "AMS June   142
   1986 HDI-Proprietary"
20
   8 One-page document bearing     142
21  Bates stamp No. RD000420
22
23
24
25

**Page 2**

1  A P P E A R A N C E S
2
3  SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
4   (By Jeff Randall, Esq.)
5   525 University Avenue
6   Palo Alto, California 94301
7   (650) 470-4500
8   jrandall@skadden.com
9   Counsel for the Plaintiff
10
11  GIBSON, DUNN & CRUTCHER LLP
12   (By David A. Segal, Esq.)
13   4 Park Plaza
14   Irvine, California 92614-8557
15   (949) 451-3973
16   dsegal@gibsondunn.com
17   Counsel for the Defendant
18
19  ALSO PRESENT:
20
21   George Dobrentey, Videographer
22
23
24
25

**Page 4**

09:10:46  1         P R O C E E D I N G S
09:27:22  2         THE VIDEOGRAPHER:  Good morning.
09:27:33  3  We are recording and are now on the record.
09:27:35  4  Today's date is November the 30th, 2005, and
09:27:38  5  the time is 9:27 a.m.  My name is George
09:27:42  6  Dobrentey.  I'm a legal videographer for G &
09:27:46  7  M Court Reporters, Ltd.  Our business
09:27:46  8  address is 42 Chauncy Street, Suite 1A,
09:27:50  9  Boston, Massachusetts 02111.
09:27:51 10         This is the deposition of Randall
09:27:55 11  Davis in the matter of McKesson Information
09:28:00 12  Solutions vs. TriZetto Group in the United
09:28:04 13  States District Court in the District of
09:28:06 14  Delaware, Civil Action No. 04-1258 (SLR).
09:28:11 15         This deposition is being taken at One
09:28:15 16  Beacon Street in Boston, Massachusetts on
09:28:17 17  behalf of the plaintiff.  The court reporter
09:28:18 18  is Jessica Williamson.  The counsel will
09:28:19 19  state their appearances, and the court
09:28:21 20  reporter will administer the oath.
09:28:22 21         MR. RANDALL:  Jeff Randall
09:28:24 22  representing plaintiff, McKesson.
09:28:26 23         MR. SEGAL:  David Segal on behalf
09:28:27 24  of the TriZetto Corp.
         25

05:18:18  1    say.
05:18:18  2  Q.  How many weeks did -- did you ask for this
05:18:20  3        demonstration?
05:18:21  4  A.  I actually don't remember whether I asked or
05:18:27  5        counsel volunteered.
05:18:27  6  Q.  When did it happen?
05:18:29  7  A.  Well, I know for sure it happened before the
05:18:46  8        second report, before the November 14th
05:18:48  9        report, because I was able to use screen
05:18:52 10        shots from -- not from the demo, but from
05:18:54 11        one of those systems in my report. Whether
05:19:00 12        it occurred before the first report or not I
05:19:03 13        do not recall.
05:19:03 14  Q.  Before the demonstration were you able to
05:19:09 15        suggest types of claims to process through
05:19:12 16        the system?
05:19:13 17  A.  They had an example ready to go, but I was
05:19:16 18        able to suggest changes and variations to
05:19:19 19        explore it to my satisfaction.
05:19:23 20  Q.  And so did either you or someone else
05:19:31 21        arrange for a series of different types of
05:19:33 22        claims? And when I say that, I mean claims
05:19:35 23        that included different types of medical
05:19:38 24        service codes to be processed by the accused
05:19:42 25        infringing systems.

Page 261

05:19:43  1  A.  A small set of them, not -- I mean, there's
05:19:46  2        a lot of power to all of these systems,
05:19:48  3        including McKesson, so it was hardly an
05:19:50  4        exhaustive exploration.
05:19:51  5  Q.  Right. You or someone else directed a few
05:19:55  6        representative examples to be --
05:19:57  7  A.  A few representative examples would be a
05:19:59  8        good description.
05:20:01  9  Q.  All right. -- to be run through the system,
05:20:05 10        right?
05:20:05 11  A.  Yes.
05:20:08 12  Q.  And how did you -- how did you get the
05:20:09 13        screen shots? Did TriZetto print them out
05:20:11 14        and give them to you, or were you able to
05:20:14 15        print them out off your screen?
05:20:15 16  A.  The screen shots that are in the report, I
05:20:17 17        asked one of the TriZetto personnel to do
05:20:20 18        those for me because I wanted an example of
05:20:23 19        a specific capability of the system. So I
05:20:26 20        said, "Please do an example with this
05:20:28 21        characteristic that displays this kind of
05:20:30 22        capability and send me the screen shots that
05:20:32 23        document it."
05:20:32 24  Q.  You are --
05:20:34 25  A.  So this was subsequent to the demo.

Page 262

05:20:40  1  Q.  What special computer equipment did you have
05:20:42  2        that enabled you to tie in to this system?
05:20:47  3  A.  The really amazing part of this, the answer
05:20:50  4        was really nothing. It turns out there's
05:20:53  5        something called NetMeeting that's part of
05:20:55  6        Windows XP. The truly astounding part was
05:20:59  7        we had six or eight people around the
05:21:00  8        country looking at each other's -- sorry,
05:21:02  9        not each other's, all looking at the same
05:21:05 10        computer window while on a conference call,
05:21:07 11        and it worked. But the most amazing part
05:21:10 12        was it all just worked.
05:21:11 13  Q.  Without a glitch?
05:21:12 14  A.  Without a glitch. That was the true -- I
05:21:14 15        was flabbergasted and pleased to learn that
05:21:17 16        this actually worked. It's enormously
05:21:22 17        convenient, but it's a built-in piece of
05:21:25 18        Windows XP.
05:21:27 19  Q.  What is your understanding as to, you know,
05:21:30 20        how many weeks or months it took to set up
05:21:31 21        this demonstration?
05:21:32 22  A.  Oh, I don't expect it took more than a call
05:21:35 23        or two, because doing the demos seemed to be
05:21:43 24        a very easy thing to do. We had previously
05:21:46 25        made use of NetMeeting, so people knew how

Page 263

05:21:52  1        to do that, and the program just works. I
05:21:54  2        suspect as usual the most time-consuming
05:21:57  3        thing was finding a time for the conference
05:21:59  4        call when all the people could get together.
05:22:01  5  Q.  Was there any concerns expressed
05:22:03  6        regarding -- strike that.
05:22:07  7        Where did you get the medical claims
05:22:08  8        that you ran through the system?
05:22:10  9  A.  I didn't request specific medical claims and
05:22:14 10        codes so much as categories, a claim of this
05:22:20 11        sort or of that sort.
05:22:20 12  Q.  For instance, what?
05:22:21 13  A.  On rebundling or disallowing for inclusion,
05:22:26 14        something like that. It was that level of
05:22:29 15        specificity.
05:22:33 16  Q.  All right. So you ran -- you asked for
05:22:36 17        claims to be run through the system that,
05:22:39 18        for instance, demonstrated unbundling of
05:22:43 19        codes, right?
05:22:44 20        MR. SEGAL: Vague and ambiguous.
05:22:44 21  A.  I'm sorry, I guess the term is "rebundling."
05:22:47 22  Q.  Rebundling of codes.
05:22:48 23        MR. SEGAL: Vague and ambiguous.
05:22:49 24  Q.  Yes.
05:22:49 25  A.  I think I may have requested something like

Page 264

66 (Pages 261 to 264)

05:38:11 1     about the range of equivalence for each of
05:38:13 2     the given asserted claims?
05:38:18 3         MR. SEGAL: Vague and ambiguous.
05:38:18 4 A.  No, I don't think I have a pre-established
05:38:22 5     range of equivalence all figured out for
05:38:24 6     each of the claims.
05:38:25 7 Q.  Let me direct your attention to Claim 1.
05:38:32 8     Well, strike that.
05:38:32 9         Let me direct your attention to Claim
05:38:35 10     3. Do you see the element that we referred
05:38:39 11     to earlier in the deposition as the
05:38:46 12     predetermined database element that starts
05:38:47 13     with "a predetermined database stored in the
05:38:50 14     associated memory," ends with "one of the
05:38:53 15     medical service codes." Do you see that?
05:38:56 16 A.  I do.
05:38:56 17 Q.  And that's the predetermined database
05:38:58 18     element that we discussed at length earlier
05:39:02 19     today, correct?
05:39:02 20 A.  Correct.
05:39:03 21 Q.  I want to ask you some questions about that.
05:39:08 22     Now, does the -- does each of the three
05:39:11 23     TriZetto accused systems have a database
05:39:17 24     stored in associated memory?
05:39:19 25 A.  Yes, I believe it has a database. Each of

Page 277

05:39:31 1     them has a database.
05:39:31 2 Q.  Stored in the associated memory, right?
05:39:33 3 A.  Let me just make sure I understand the term
05:39:38 4     "associated memory."
05:39:39 5 Q.  Well, let me back up. I'll ask a different
05:39:41 6     question.
05:39:41 7 A.  No, that's all right. Yes, stored in the
05:39:43 8     associated memory is correct.
05:39:44 9 Q.  Let me start with Claim 3. At the start of
05:39:50 10     Claim 3 it says, "A computer system,
05:39:52 11     including a central processing unit and
05:39:54 12     associated memory for processing input
05:39:56 13     claims containing at least one medical
05:39:58 14     service code comprising." Do you see that?
05:40:03 15 A.  Yes.
05:40:03 16 Q.  Each of the three accused systems has that,
05:40:05 17     right?
05:40:06 18 A.  Each of the three systems has that.
05:40:11 19 Q.  They satisfy that element, correct?
05:40:12 20 A.  I believe so.
05:40:13 21 Q.  Okay. And directing your attention to the
05:40:19 22     next element, each of the three accused
05:40:22 23     systems has a database stored in the
05:40:27 24     associated memory, correct?
05:40:28 25         MR. SEGAL: Objection to the extent

Page 278

05:40:29 1     it misstates the element.
05:40:30 2 A.  As long as we are explicit about leaving out
05:40:33 3     the adjective "predetermined." You're
05:40:39 4     reading a database, not a predetermined
05:40:40 5     database, correct?
05:40:41 6 Q.  We have a disagreement on the construction
05:40:43 7     of "predetermined," you realize that, right?
05:40:45 8 A.  I understand. All I'm trying to establish
05:40:49 9     is that we're leaving out that word in the
05:40:51 10     phrase you're reading to me.
05:40:52 11 Q.  That's correct.
05:40:52 12 A.  Okay.
05:40:53 13 Q.  So each of the three accused systems
05:40:56 14     contains a database, at least a database
05:41:00 15     stored in the associated memory, correct?
05:41:01 16 A.  Correct.
05:41:04 17 Q.  The database contains medical service codes,
05:41:06 18     correct?
05:41:06 19 A.  Correct.
05:41:10 20 Q.  And a set of relationships among the medical
05:41:13 21     service codes, correct?
05:41:16 22 A.  Well, we need to read the rest of this.
05:41:18 23     Just a moment.
05:41:19 24         (Witness reviews document.)
05:41:50 25 A.  Yes. I wanted to think about that one

Page 279

05:41:52 1     carefully.
05:41:58 2 Q.  And each of the three accused systems -- let
05:42:04 3     me just put it this way to save some time:
05:42:08 4     Each of the three accused systems satisfied
05:42:14 5     for practice -- strike that.
05:42:20 6     Claim 3 is an apparatus claim. Do you
05:42:23 7     understand that?
05:42:23 8 A.  I do.
05:42:24 9 Q.  Okay. So each of the three systems includes
05:42:27 10     the component that's listed as the element
05:42:33 11     which starts with "a predetermined database
05:42:36 12     stored in associated memory," ending with
05:42:40 13     "one of the medical service codes" if you
05:42:43 14     were to remove the term which we disagree
05:42:44 15     on, "predetermined," correct?
05:42:47 16 A.  Correct.
05:42:47 17 Q.  All right. And each of the three systems --
05:42:52 18     so therefore each of the three accused
05:42:54 19     systems satisfies the first two elements of
05:42:56 20     Claim 3 as long as we remove the term
05:43:03 21     "predetermined," correct?
05:43:04 22 A.  As long as we modify the first element, then
05:43:07 23     we're okay --
05:43:07 24 Q.  Okay.
05:43:08 25 A.  -- so far.

Page 280

70 (Pages 277 to 280)

05:43:09  1  Q.  Well, I'm talking about just removing the
05:43:12  2      word "predetermined."
05:43:13  3  A.  Yes, that's what I mean by "modify,"
05:43:14  4      removing that word.
05:43:15  5  Q.  And each of the three accused systems
05:43:17  6      satisfies the next element, "means for
05:43:19  7      receiving at least one claim," correct?
05:43:20  8  A.  It would need to.
05:43:22  9  Q.  And also satisfies the next element, "means
05:43:25 10      for ascertaining whether the at least one
05:43:27 11      claim contains a plurality of medical
05:43:29 12      service codes," correct?
05:43:30 13  A.  No.
05:43:38 14  Q.  There are -- the TriZetto system accepts
05:43:43 15      medical claims that contain more than one
05:43:47 16      medical service code, correct?
05:43:49 17  A.  Yes, but it never ascertains whether there
05:43:52 18      is a plurality of claims -- of codes on the
05:43:56 19      claim. Accepting such a claim is one
05:44:00 20      action. Examining it to ascertain whether
05:44:02 21      there is a plurality of medical service
05:44:03 22      codes on the claim is something quite
05:44:06 23      different. And that's what the claim says.
05:44:08 24      So, no, the system doesn't do that.
05:44:17 25  Q.  Does the system process more than one --

Page 281

05:44:28  1      does the system process a plurality of
05:44:32  2      medical service codes contained in a claim?
05:44:34  3  A.  The system will process all of the medical
05:44:38  4      service codes contained in a claim,
05:44:40  5      independent of whether there is just one
05:44:43  6      claim -- one code on the claim or whether
05:44:45  7      there's five codes or four. No matter what
05:44:49  8      the number is, it will process all of the
05:44:52  9      codes on the claim.
05:44:56 10  Q.  Simultaneously?
05:44:58 11      MR. SEGAL:  Objection, vague and
05:44:59 12      ambiguous.
05:44:59 13  A.  In sequence.
05:45:00 14  Q.  Excuse me?
05:45:00 15  A.  In sequence.
05:45:01 16  Q.  So it processes one medical service code
05:45:03 17      contained in a claim, correct?
05:45:04 18  A.  No. If we're going to get down to this
05:45:08 19      level of detail, then we have to talk about
05:45:11 20      how the code actually works, and it's
05:45:14 21      somewhat more complicated than that. Let me
05:45:17 22      suggest, however, that the relevant question
05:45:19 23      here is, do the systems have a means for
05:45:22 24      ascertaining whether the at least one claim
05:45:25 25      contains a plurality of medical service

Page 282

05:45:27  1      codes. I have examined the systems in quite
05:45:29  2      some detail, and I am prepared to opine with
05:45:33  3      great confidence, or whatever the term was
05:45:36  4      you used earlier, that none of these systems
05:45:39  5      ascertain whether there's a plurality of
05:45:42  6      medical service codes. They never make a
05:45:45  7      decision based on whether there is one or
05:45:48  8      more than one.
05:45:49  9  Q.  Do they make a decision whether or not a
05:45:54 10      medical service code contained in a claim
05:45:58 11      has been processed or examined?
05:46:02 12      MR. SEGAL:  Objection, vague.
05:46:03 13  A.  I need to know what you mean by "processed
05:46:06 14      or examined."
05:46:07 15  Q.  Well, let's say, for instance, a medical
05:46:09 16      claim is submitted to the three accused
05:46:12 17      systems and it contains two medical service
05:46:15 18      codes, all right? There is processing that
05:46:18 19      is performed by the system with respect to
05:46:21 20      Medical Service Code A, for instance,
05:46:24 21      correct?
05:46:27 22  A.  (No verbal response.)
05:46:28 23  Q.  Yes?
05:46:28 24  A.  Well, let me say yes provisionally. Let me
05:46:33 25      see where you're going with this.

Page 283

05:46:35  1  Q.  And then there is a determination made at
05:46:37  2      some point that there is another medical
05:46:39  3      service code contained in that claim, namely
05:46:41  4      B, that needs to be examined or processed,
05:46:43  5      correct?
05:46:43  6      MR. SEGAL:  Objection, vague.
05:46:45  7  A.  No, that's not actually how it works.
05:46:48  8  Q.  How does the system know that there is
05:46:54  9      another medical service code to examine?
05:46:56 10  A.  Its process is to say for every service code
05:47:03 11      on the claim, parens, my words, no matter
05:47:08 12      how many there are, do the following set of
05:47:11 13      operations. And it will do same thing if
05:47:14 14      there's one or if there's two or if there's
05:47:15 15      three or if there's four or if there's 10,
05:47:17 16      however many there are.
05:47:20 17      I take the term "ascertaining" whether
05:47:24 18      the claim contains a plurality to mean
05:47:26 19      asking a yes/no question. Is there one or
05:47:31 20      more than one? It's not just are there
05:47:34 21      more? The question you were asking a moment
05:47:36 22      ago is, are there more claims on the code --
05:47:40 23      are there more codes on the claim, okay?
05:47:44 24      You can ask, are there more codes on
05:47:46 25      the claim as yet unprocessed? That's not

Page 284

71 (Pages 281 to 284)

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
877.955.3855

| | | |
|---|---|---|
| 05:56:40 | 1 | are contained in the claim, what does it do, |
| 05:56:43 | 2 | the system? |
| 05:56:44 | 3 | MR. SEGAL: By the way, I note that |
| 05:56:45 | 4 | counsel's at seven hours of testimony time. |
| 05:56:47 | 5 | I'll allow him to finish his questioning, |
| 05:56:49 | 6 | and then I have a couple of questions, but I |
| 05:56:52 | 7 | believe he's out of time. And I advised him |
| 05:56:53 | 8 | at the last break that I had some questions, |
| 05:56:55 | 9 | and I advised him about a half hour ago on |
| 05:56:59 | 10 | the record that I had questions. |
| 05:57:00 | 11 | Ask the court reporter to read back |
| 05:57:01 | 12 | the question because I probably -- |
| 05:57:06 | 13 | Q. You can answer the question. |
| 05:57:04 | 14 | MR. SEGAL: -- interrupted the |
| 05:57:06 | 15 | flow. |
| 05:57:06 | 16 | A. Actually, to make it accurate, if you don't |
| 05:57:08 | 17 | mind, it would help to have it read back. |
| 05:57:13 | 18 | Q. Once the three accused infringing systems |
| 05:57:18 | 19 | determine how many medical service codes are |
| 05:57:20 | 20 | contained in a given claim, what do the |
| 05:57:25 | 21 | systems do next? |
| 05:57:26 | 22 | A. Okay. The reason that is a little bit |
| 05:57:33 | 23 | difficult to say easily is that that's -- |
| 05:57:39 | 24 | the answer to the question is largely |
| 05:57:42 | 25 | contained in my November 14th report at Page |

Page 293

| | | |
|---|---|---|
| 05:58:59 | 1 | MR. SEGAL: You're out of time, |
| 05:59:00 | 2 | counsel. |
| 05:59:00 | 3 | MR. RANDALL: I have one more |
| 05:59:01 | 4 | question. |
| 05:59:01 | 5 | MR. SEGAL: Okay. |
| 05:59:02 | 6 | Q. With respect to Claim 3, would you agree |
| 05:59:04 | 7 | that the only dispute regarding whether or |
| 05:59:07 | 8 | not the three accused systems infringed that |
| 05:59:11 | 9 | claim is the word "predetermined" and the |
| 05:59:20 | 10 | element that states "means for ascertaining |
| 05:59:23 | 11 | whether the at least one claim contains a |
| 05:59:25 | 12 | plurality of medical service codes"? |
| 05:59:28 | 13 | A. Those are the distinctions I would make at |
| 05:59:30 | 14 | the moment, yes. |
| 05:59:30 | 15 | Q. And those are the only ones? |
| 05:59:31 | 16 | A. These are the only ones I know of right now, |
| 05:59:34 | 17 | yes. |
| 05:59:35 | 18 | Q. And so other than those two element -- |
| 05:59:37 | 19 | MR. SEGAL: You said one question, |
| 05:59:39 | 20 | counsel. You're now on four. |
| 05:59:40 | 21 | Q. Other than those two exceptions, you would |
| 05:59:50 | 22 | agree that the three accused systems |
| 05:59:55 | 23 | infringe Claim 3, correct? |
| 05:59:56 | 24 | A. I wouldn't say they infringe Claim 3, |
| 05:59:59 | 25 | because, as you've just said, they don't |

Page 295

| | | |
|---|---|---|
| 05:57:48 | 1 | B-4. It's one of the flow charts, and the |
| 05:57:53 | 2 | shortest answer to your question, the most |
| 05:57:55 | 3 | compact answer is this is what happens, all |
| 05:57:57 | 4 | of this, which is why it's hard to simply |
| 05:58:00 | 5 | say what you said. Sorry. Let me say that |
| 05:58:04 | 6 | again. That's why I can't simply agree with |
| 05:58:06 | 7 | what you said because it's noticeably more |
| 05:58:08 | 8 | complicated than that. |
| 05:58:09 | 9 | Q. Do all of the three accused infringing |
| 05:58:13 | 10 | systems satisfy the next element in Claim 3, |
| 05:58:16 | 11 | means for determining whether one of the |
| 05:58:17 | 12 | medical service codes in a plurality of |
| 05:58:19 | 13 | medical service codes is valid or invalid by |
| 05:58:22 | 14 | interacting with the database in a set of |
| 05:58:27 | 15 | relationships contained in the database? |
| 05:58:40 | 16 | A. Yes, they can do that. |
| 05:58:41 | 17 | Q. And do each of the three accused systems |
| 05:58:44 | 18 | satisfy the next element, the means for |
| 05:58:46 | 19 | authorizing an element? |
| 05:58:48 | 20 | A. Yes. |
| 05:58:48 | 21 | Q. And do each of the three accused infringing |
| 05:58:51 | 22 | systems satisfy the last element, the means |
| 05:58:54 | 23 | for rejecting medical service codes? |
| 05:58:56 | 24 | A. Yes. |
| 05:58:57 | 25 | Q. All right. So with respect to Claim 3 -- |

Page 294

| | | |
|---|---|---|
| 06:00:02 | 1 | have elements of the claim, so I don't know |
| 06:00:04 | 2 | what it would mean to infringe Claim 3 if |
| 06:00:07 | 3 | we're taking elements of Claim 3 out of |
| 06:00:09 | 4 | there. So may I say something more specific |
| 06:00:11 | 5 | for the sake of time? You and I have gone |
| 06:00:13 | 6 | through this list, and when looking at |
| 06:00:15 | 7 | individual elements we have agreed or agreed |
| 06:00:18 | 8 | to disagree about each of those individual |
| 06:00:20 | 9 | elements. That's what I'm prepared to stand |
| 06:00:22 | 10 | on. I won't offer an opinion on a claim |
| 06:00:24 | 11 | that isn't what's in the patent. |
| 06:00:27 | 12 | Q. The three systems include all of the |
| 06:00:30 | 13 | components of Claim 3 except for the term |
| 06:00:37 | 14 | "predetermined" and except for, in your |
| 06:00:38 | 15 | opinion, the element that says "means for |
| 06:00:41 | 16 | ascertaining whether the at least one claim |
| 06:00:43 | 17 | contains a plurality of medical service |
| 06:00:44 | 18 | codes," correct? |
| 06:00:45 | 19 | A. That, I will agree with. |
| 06:00:47 | 20 | MR. RANDALL: Okay. Counsel? |
| 06:00:48 | 21 | MR. SEGAL: Okay. |
| | 22 | |
| | 23 | |
| | 24 | |
| | 25 | |

Page 296

74 (Pages 293 to 296)

CROSS EXAMINATION

BY MR. SEGAL:

06:00:52 Q. Just going to Claim 3, what is the structure
of the means for determining in that claim?

06:01:01 A. I'm sorry, where are we?

06:01:03 Q. Means -- in Claim 3 there is an element,
"means for determining whether one of the
medical service codes in the plurality of
medical service codes is valid or invalid by
interacting with the database and the set of
relationships contained in the database."
Do you see that?

06:01:17 A. Yes.

06:01:18 Q. And do you understand that there is some
structure associated with the means -- with
the function after the words "means for"?

06:01:25 A. Yes.

06:01:25 Q. Were you able to locate any structure in the
patent that ties to that function?

06:01:52 A. It's not clear. The closest thing I would
say is -- but it's definitely non-obvious,
as you've used that term. One moment.

06:02:17 MR. RANDALL: Counsel, while the
witness is looking for that, I am not

Page 297

06:02:19 waiving a request for additional time with
the witness, for a variety of reasons. I'm
not going to waste your time and the
witness's time describing all those, but we
either need to exclude large portions if not
the entire report or obtain significantly
more time with this witness.

06:02:41 MR. SEGAL: Well, we'll discuss
that, but I don't think that's appropriate.
I think you've had more than enough time to
analyze the witness on two reports. We did
all your witnesses, including those that had
two reports, within the allocated time, so.

06:02:52 MR. RANDALL: I understand.

06:02:52 MR. SEGAL: I think the fact that
you chose to spend your time on where you did was
your choice. His reports are in the record,
and you could have questioned him on any of
those parts. So that's our position.

06:03:01 MR. RANDALL: That's fine.

06:03:02 MR. SEGAL: I understand your
position, and that's fair enough.

06:03:03 MR. RANDALL: Fine.

06:03:05 A. The closest thing I could come to this would
be to isolate some part or attempt to

Page 298

isolate some part of the source code in the,
I guess it's Exhibit C.

06:03:16 Q. Okay. And were you able to do that and
determine, based on reading this
specification as one of ordinary skill in
the art, and determine what structure
applied to the function that determined
whether one of the medical service codes in
the plurality of medical service codes is
valid or invalid?

06:03:39 A. Yeah, there is structure in -- yes, there is
structure in the code that I would point to
as the structure that accomplishes that
means.

06:03:49 Q. And can you identify that for us?

06:03:50 A. It's actually in several places, but I can
pick out one of the places. For instance,
in Column 59 -- one, two, three, four, five,
six, seven, eight -- there's Line 8, which
is in fact a reference to a body of other
code that's going to be the structure that
is the means for determining, et cetera,
MULTIPLE.PRG.

06:04:46 Q. And did you determine whether or not the
structure of MULTIPLE.PRG incorporates any

Page 299

of the rules in Appendix B?

06:04:54 A. Let me just get there. I think you need to
explain "incorporates any of the structure,"

06:05:14 Q. Okay. Can you identify where MULTIPLE.PRG
is in the patent?

06:05:19 A. It is my belief, but I'm not positive, that
it starts at the top of Column 73.

06:05:26 Q. Is it identified as MULTIPLE.PRG in the
patent?

06:05:29 A. That's partly why I'm a little unclear.

06:05:34 MR. RANDALL: Counsel, I'm going to
object that this goes beyond the scope of my
examination. I don't recall asking him
specifically about this.

06:05:38 MR. SEGAL: You asked him about
this element of means for determining, and
I'm asking him about it, so I think it's
appropriate.

06:05:44 MR. RANDALL: I object.

06:05:45 MR. SEGAL: I understand that.

BY MR. SEGAL:

06:05:46 Q. Can you tell me whether or not the TriZetto
accused systems have identical structure to
the structure in what you think is
MULTIPLE.PRG?

Page 300

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
877.955.3855

# EXHIBIT 6

Westlaw.

Slip Copy
Slip Copy, 2005 WL 2179799 (S.D.Ala.)
(Cite as: Slip Copy)

Page 1

**C**

Only the Westlaw citation is currently available.
United States District Court,S.D. Alabama Southern
Division.
THE CINCINNATI INSURANCE CO., Plaintiff,
v.
Matthew Leach COCHRAN, et al., Defendants.
Civ.A. 99-0552-WS-C.

Sept. 2, 2005.

G. Randall Spear, John D. Richardson, Richardson, Spear, Spear & Hamby, P.C., Mobile, AL, for Plaintiff.
Matthew Leath Cochran, Mobile, AL, pro se.
Stephen M. Tunstall, William M. Moore, Mobile, AL, for Defendants.

ORDER

STEELE, J.

*1 This matter is before the Court on the plaintiff's motion in limine regarding certain of the defendants' expert witnesses. (Doc. 301). The defendants have responded, (Doc. 310), and the motion is ripe for resolution. After carefully considering the foregoing materials and other relevant materials in the file, the Court concludes that the motion is due to be granted in part and denied in part. [FN1]

> FN1. The defendants' multiple, unlabeled motions to strike the motion in limine, (Doc. 310 at 29, 33, 36, 39), are denied. The defendants' request for an award of fees and expenses, (id. at 41), is also denied.

BACKGROUND

On the night of November 11, 1998, a fire damaged the premises of defendant Foreign Auto Parts of Mobile, Inc. ("Foreign Auto Parts"). Defendant Cochran, the business owner, acknowledges that he was in the building when the fire began but denies that he set it. A succession of individuals investigated the fire, with several concluding or supporting the conclusion that it was the result of arson. The plaintiff, which insured the premises, declined to pay and filed this declaratory action. The defendants counterclaimed, inter alia, for breach of contract and bad faith.

The present motion seeks to exclude the testimony of six expert witnesses for the defendants. The primary ground is the defendants' asserted failure to satisfy the requirements of Federal Rule of Evidence 702, as amplified by Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and like cases. The motion includes additional, isolated challenges based on Rules 401, 402 and 403.

DISCUSSION

The requirements for the admission of expert testimony in light of Daubert are well known and need not be regurgitated at length herein. "Expert testimony may be admitted into evidence if: (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in Daubert; and (3) the testimony assists the trier of fact, through the application of scientific, technical or specialized expertise, to understand the evidence or to determine a fact in issue." City of Tuscaloosa v. Harcros Chemicals, Inc., 158 F.3d 548, 562 (11th Cir.1998)(footnote omitted). There are thus three discrete inquiries: qualifications, relevance, and reliability. [FN2] The burden of establishing these three requisites lies with the proponent. United States v. Frazier, 387 F.3d 1244, 1260 (11th Cir.2004)(en banc). [FN3]

> FN2. See Quiet Technology DC-8, Inc. v. Hurel-Dubois UK Ltd., 326 F.3d 1333, 1341 (11th Cir.2003)(although there is "some overlap" among these inquiries, they "are distinct concepts that courts and litigants must take care not to conflate").

> FN3. Expert testimony must also satisfy other applicable rules of evidence, including Rules 401, 402 and 403. Allison v. McGhan Medical Corp., 184 F.3d 1300, 1309 (11th Cir.1999).

An expert may be qualified "by knowledge, skill, experience, training, or education." Fed.R.Evid. 702. An expert is not necessarily unqualified simply because her experience does not precisely match the matter at hand. See Maiz v. Virani, 253 F.3d 641, 665 (11th Cir.2001)(an

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Slip Copy                                                                                                    Page 2
Slip Copy, 2005 WL 2179799 (S.D.Ala.)
(Cite as: Slip Copy)

economic expert was qualified even though he "ha[d] no real estate development experience and thus no basis to opine regarding how the pilfered funds would have been invested by the Plaintiffs"); *id. at 669* (expert knowledgeable concerning the practices of Mexican immigration authorities generally was qualified to testify even though he had no experience with Monterey officials in particular).

*2 To the requirement of Rule 401 that evidence possess a "tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable," Rule 702 adds that expert evidence must "assist the trier of fact to understand the evidence or to determine a fact in issue." The evidence must "concern matters that are beyond the understanding of the average lay person.... Proffered expert testimony generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments." *United States v. Frazier, 387 F.3d at 1262-63.* In addition, the expert evidence "must have a valid scientific connection to the disputed facts in the case." *Allison v. McGhan Medical Corp., 184 F.3d 1300, 1312* (11th Cir.1999). That is, there must be an adequate "fit" between the evidence and the case, which may be lacking, for example, when the expert attempts to extrapolate animal studies into the human sphere. *Rider v. Sandoz Pharmaceuticals Corp., 295 F.3d 1194, 1202* (11th Cir.2002).

The most heavily litigated component of the *Daubert* analysis, in this case as generally, is reliability. Expert testimony "must be 'scientific,' meaning grounded in the methods and procedures of science, and must constitute 'knowledge,' meaning more than subjective belief or unsupported assumptions." *McDowell v. Brown, 392 F.3d 1283, 1298* (11th Cir.2004). Rule 702 identifies three components of the reliability element: "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case."

*Daubert* identifies several non-exclusive factors that a court may consider as appropriate in gauging the reliability of the principles and methods utilized by the expert: (1) whether the methodology has been, or is amenable to, testing; (2) whether it has been subjected to peer review and/or publication; (3) the known and potential error rate of the methodology; and (4) whether it has been generally accepted in the relevant scientific community. *509 U.S. at 593-94.* "Notably, ... these factors do not exhaust the universe of considerations that may bear on the reliability of a given expert opinion, and a federal court should consider any additional factors that may advance its Rule 702 analysis." *Quiet Technology DC-8, Inc. v. Hurel-Dubois UK Ltd., 326 F.3d 1333, 1341* (11th Cir.2003). Among such factors, "[i]n evaluating the reliability of an expert's method, ... a district court may properly consider whether the expert's methodology has been contrived to reach a particular result." *Rink v. Cheminova, Inc., 400 F.3d 1286, 1293 n. 7* (11th Cir.2005).

Whatever factors are considered, the Court's focus should "be solely on principles and methodology, not the conclusions they generate." *Allison v. McGhan Medical Corp., 184 F.3d at 1312* (internal quotes omitted). It is therefore error to conflate admissibility with credibility, as by considering the relative weight of competing experts and their opinions. *Quiet Technology v. Hurel-Dubois, 326 F.3d at 1341.* Thus, for example, "a district court may not exclude an expert because it believes the expert lacks personal credibility because of prior bad acts or other prior instances of untruthfulness." *Rink v. Cheminova, 400 F.3d at 1293 n. 7.*

*3 With respect to the third reliability criterion of Rule 702, errors in an expert's application of a reliable method generally implicate credibility rather than reliability. *See Quiet Technology v. Hurel-Dubois, 326 F.3d at 1345-46* (using incorrect numbers in a reliable formula is not grounds for exclusion under *Daubert*).

Certain additional observations are worth making. "Presenting a summary of a proffered expert's testimony in the form of conclusory statements devoid of factual or analytical support is simply not enough [to carry the proponent's burden]." *Cook ex rel. Estate of Tessier v. Sheriff of Monroe County, 402 F.3d 1092, 1113* (11th Cir.2005). Similarly, "nothing in either *Daubert* or the

Westlaw.

Slip Copy
Slip Copy, 2005 WL 2179799 (S.D.Ala.)
(Cite as: Slip Copy)

Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the ipse dixit of the expert." *Id.* at 1111 (internal quotes omitted). An expert's unexplained assurance that her opinions rest on accepted principles fares no better. *McClain v. Metabolife International, Inc.*, 401 F.3d 1233, 1222 (11th Cir.2005).

Moreover, "[t]he *Daubert* requirement that the expert testify to scientific knowledge-conclusions supported by good grounds for every step in the analysis-means that *any* step that renders the analysis unreliable under the *Daubert* factors renders the expert's testimony inadmissible." *McClain v. Metabolife*, 401 F.3d at 1245 (emphasis in original)(internal quotes omitted); *accord Hudgens v. Bell Helicopters/Textron*, 328 F.3d 1329, 1344 (11th Cir.2003) ("[A]n expert's failure to explain the basis for an important inference mandates exclusion of his or her opinion."). [FN4]

> FN4. Having set forth these governing principles, the Court will not repeat them each time one becomes applicable to a particular expert or argument advanced by the parties.

Neither side has requested a hearing. A trial court's decision whether to hold such a hearing is committed to its sound discretion, *Cook v. Sheriff of Monroe County*, 402 F.3d at 1113, and absent a request the Court concludes that no hearing is required. *Cf. id. at 1108, 1114* (no abuse of discretion in failing to hold a hearing when not requested). Even when a hearing is requested, the court has discretion to deny the request, especially when the evidence is not a complicated one involving multiple expert witnesses. *E.g., United States v. Hansen*, 262 F.3d 1217, 1234 (11th Cir.2001). Although there are multiple expert witnesses in this case, their testimony is not-despite the best efforts of the parties to suggest otherwise-particularly complicated, especially compared with those cases involving dueling medical evidence as to which a hearing may be a fruitful exercise. *See id.* (trial court should grant a motion for hearing when the opponent presents conflicting medical literature and expert testimony).

A. Eleanor Posey.

Posey has been identified as an "electrical engineer [and] fire origin and cause expert." (Doc. 297 at 41). Within this rubric, the defendants intend to apprehend, in addition to the common reach of these terms, the subjects of "altering the fire scene/evidence, spoliation of evidence and the bad faith investigation of the alleged co-conspirators." (*Id.*). [FN5]

> FN5. The plaintiff objects on numerous grounds to Posey's opinion that Cochran's behavior was consistent with that of other fire victims. (Doc. 301 at 24). Because Posey has not been timely identified as an expert for this purpose, she may not offer expert testimony in this regard. At any rate, she is plainly unqualified to render any such opinions.

1. Qualifications.

*4 Posey has a bachelor's degree in engineering, with a major in electrical engineering. She completed 75% of the course work for a master's degree in electrical engineering. (Doc. 301, Exhibit A). The plaintiff's only objection is that Posey "has no work experience as a practicing engineer," (Doc. 301 at 9), but her C.V. reflects that she is a registered professional engineer, a designation which required at least four years of relevant work experience. (*Id.*, Exhibit A).

With respect to fire cause and origin, Posey has practiced forensic engineering with her father's firm for over 20 years. She has been certified in forensic engineering by the Council of Engineering Specialty Boards. She is certified by the National Association of Fire Investigators as a fire and explosion investigator and as a fire investigation instructor. She has authored articles on, and participated in many continuing education offerings on, such things as electrical fires and fire/arson investigation. Other qualifications appear in her C.V. (Doc. 301, Exhibit A).

The plaintiff raises two challenges to Posey's qualifications as an expert in fire cause and origin. First, that Posey has no "practical experience" in the field, such as firefighting or working as an investigator for an insurance company or government agency; and second, that Posey gained her relevant experience "as a professional witness." (Doc. 301 at 9). The plaintiff offers no authority for the proposition

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Slip Copy
Slip Copy, 2005 WL 2179799 (S.D.Ala.)
(Cite as: Slip Copy)

that a past life as a firefighter or investigator is a predicate for qualification as a cause and origin expert, and the very evidence it cites reflects that Posey has given deposition or trial testimony only eight times in the past four years. (*Id.*, Exhibit B).[FN6]

> FN6. The plaintiff ignores any earlier period, but the defendants represent that Posey has been asked to testify approximately 100 times over the past 30 years. (Doc. 310 at 11), or about three times a year.

In an apparent attack on Posey's qualifications, the plaintiff asserts that she "has been the subject of complaints made against her" with the International Association of Arson Investigators ("IAAI"). (Doc. 301 at 10). The plaintiff offers no details of these complaints, and the defendants have provided affidavits from the then-president of the IAAI and the investigator concluding there was nothing to substantiate a December 1989 grievance/complaint by one Roland Kennedy. (Doc. 150, Affidavits of David M. Smith, Edward C. Scott).[FN7]

> FN7. These affidavits were filed in April 2004. The plaintiff's inability to counter them over a year later is strongly persuasive that the defendants' version is correct.

As noted, Posey is expected to offer expert opinions concerning alteration/spoliation and bad faith investigation. The plaintiff does not challenge Posey's qualifications concerning the former and, as an expert in fire cause and origin with experience and training in fire and arson investigation, she presumably is qualified to testify as to appropriate steps for investigators in preserving the scene and evidence.

The plaintiff does challenge Posey's qualifications to offer expert testimony as to the alleged bad faith nature of the investigation. (Doc. 301 at 16). Again, however, Posey appears fully qualified to testify as to the components of a proper fire investigation and how the plaintiff's agents may have strayed from the ideal, and those deviations may indicate bad faith to the jury. Posey does not, however, possess any identified qualifications to testify as to the components of a proper insurance investigation or other

insurance practices. Thus, she may offer opinions only with respect to the actual investigation of the fire and its cause and origin, not other aspects of the plaintiff's acts and omissions.

*5 Nor has Posey been shown to possess qualifications as an expert to characterize the plaintiff's fire investigation as reflective of bad faith or spoliation. She may know what ought to be done in a fire investigation, but there is no indication that she has specialized knowledge as to whether a failure to do all that ought to be done is the result of bad faith or spoliation, both of which terms presuppose an understanding of the actor's mental state. Alternatively, and as discussed in Part A.2, any such opinion from Posey would concern a matter within the jury's understanding and therefore would not be relevant for purposes of Rule 702. Thus, Posey may not testify to the effect that the fire investigation of the plaintiff or any individual suggests bad faith or that the treatment of the scene or evidence suggests spoliation.

Posey apparently offers criticisms of plaintiff's expert Laurel Waters, who tested samples provided her by plaintiff's investigator Harold Deese.[FN8] As Posey has not been shown to possess any qualifications in the fields of gas chromatography and mass spectrometry, she may not offer testimony critical of Waters.[FN9]

> FN8. The plaintiff fails to provide record cites to these opinions. (Doc. 301 at 21).

> FN9. As discussed in the Court's order on the defendants' motion in limine, the only opinions Waters may offer concern her qualitative testing of the samples.

In summary, Posey is generally qualified to render expert opinions concerning electrical engineering and fire cause and origin, including her theory concerning the cause and origin of the instant fire. She is also qualified to offer expert opinions concerning the components of a proper fire investigation and any deviation therefrom in this case. However, she is not qualified to render expert opinions: (1) concerning proper insurance practices; (2) that the fire investigation of the plaintiff or any individual is indicative

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Slip Copy                                                                Page 5
Slip Copy, 2005 WL 2179799 (S.D.Ala.)
**(Cite as: Slip Copy)**

of bad faith or spoliation; or (3) the testing of samples by Waters or any other witness.

### 2. Relevance.

The plaintiff argues that Posey's opinion concerning the alleged bad faith and spoliation of the plaintiff and its representatives "does not meaningfully assist the jury." (Doc. 301 at 30-31). The Court agrees. Once Posey sets forth the components of a proper fire investigation and the plaintiff's deviations therefrom, the jury is as capable as she of drawing an inference of bad faith or spoliation, and her opinion would offer nothing more than what defense counsel can argue in closing.

### 3. Reliability.

The plaintiff offers up a jumbled mass of challenges to the reliability of Posey's opinions, which may be conveniently organized into four clusters: (1) bias; (2) unprofessional practices; (3) dismissal of conflicting evidence; and (4) unsupported opinions.

#### i. Bias.

The plaintiff notes Posey's statement that she "became aware of many aspects of the fire" some time before being retained as an expert (because she was married to James Posey, then a defense expert) and became "distressed ... at what appeared to [her] to be leading to an extremely troubling miscarriage of justice." (Doc. 301, Exhibit C at 5). The plaintiff objects that this comment reflects that Posey "formed opinions before becoming a retained expert" and did so based on "filtered information from her husband" rather than from her own investigation. (Doc. 301 at 11). The plaintiff concludes that Posey has a "predisposition to bias." (*Id.* at 15).

*6 As a threshold matter, the deposition excerpt cited by the plaintiff, (Doc. 301 at 11), reflects that Posey formed no opinions concerning cause and origin before being retained, but only concerning the quality of the plaintiff's investigation. (Doc. 301, Exhibit D at 230-31). Thus, her opinions concerning cause and origin are not implicated by the plaintiff's argument.

Nor has the plaintiff demonstrated bias with respect to Posey's opinions concerning the plaintiff's investigation. It would be strange indeed if experts were barred from forming tentative opinions based on partial information but instead were required to maintain an "empty head" until all available information had been reviewed. [FN10]

> FN10. Such a rule might well disqualify plaintiff's expert Emmanuel Cook, who admittedly did not perform a complete investigation before pronouncing the fire "suspicious." (Doc. 236, Exhibit F).

The plaintiff next argues that Posey's bias is reflected in the "limited amount of information she reviewed." (Doc. 301 at 12-14). While the plaintiff questions whether Posey reviewed a number of sworn and unsworn statements, the deposition pages it cites, as well as Posey's report, show that she did or probably did review most of them, even if her memory of having done so is sketchy. [FN11] The remaining statements at issue are those of Cochran to the police; of Cochran in his examination under oath; of Leonard Burroughs; and the affidavit of Emmanuel Cook. These alleged omissions may provide fodder for questioning the thoroughness of Posey's investigation, but they are not so widespread as to support disqualification of the witness. Indeed, the plaintiff has failed to show or even suggest that Posey was aware of these materials, and without such awareness she could hardly have ignored them out of bias. [FN12]

> FN11. This includes the statement and affidavit of Peter Preston; reports from the Mobile Fire Department, including that of Emanuel Cook; the trial testimony of Owen Posey and Harold Deese; and the affidavits of Messrs. Laney and Watkins. (Doc. 301, Exhibit D at 98, 182-84, 227-28, 303-05; *id.*, Exhibit C at 101-04).

> FN12. In a related and similarly unsuccessful vein, the plaintiff suggests that defense counsel intentionally withheld these documents from Posey in an effort to manipulate her opinions, so that Posey's report reflects counsel's bias if not her own. (Doc. 301 at 14, 26).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Slip Copy                                                                                      Page 6
Slip Copy, 2005 WL 2179799 (S.D.Ala.)
(Cite as: Slip Copy)

The plaintiff also argues that Posey's bias is shown by her verbatim incorporation of portions of her late husband's report within her own, and by her denial that she did so. (Doc. 301 at 10-11, 16). The plaintiff focuses on the sentence, "I found 11 circuit breakers 'tripped' on the electrical panel which was located too far from the area of the fire for the heat of the fire to explain why they were tripped," which language appears in both reports. (Id. at 15). The plaintiff emphasizes this sentence because, the plaintiff says, it shows that Posey was purporting to find something that her husband actually found. (Id.). However, in the deposition excerpt cited by the plaintiff, (id. at 11, 15), Posey explained that she did confirm from photographs the factual information found in the quoted sentence. (Id., Exhibit D at 208-09).

The Court has reviewed those portions of the two reports identified by the plaintiff and concurs that Posey incorporated verbatim entire paragraphs of her late husband's report totaling approximately 7 1/2 pages. FN13 The plaintiff, however, has failed to explain or support its position that Posey's practice demonstrates that she held no independent opinions but merely "parroted" her husband's. (Doc. 301 at 11). As a threshold matter, the textual portion of Posey's report consumes 104 pages, so that most of her report was not drawn verbatim from her husband's. Second, Posey offered the apparently benign explanation that, following her husband's unexpected death, she had a limited amount of time within which to complete her report due to court-imposed deadlines and that she used her husband's report as a guide and to ensure that she did not omit information and opinions she intended to include. Third, it is a commonplace that an expert may rely on the work of other experts in forming his opinions, Fed.R.Evid. 703, and "when an expert relies on the opinion of another, such reliance goes to the weight, not the admissibility of the expert's opinion." Ferrara & DiMercurio v. St. Paul Mercury Insurance Co., 240 F.3d 1, 9 (1st Cir.2001).

   FN13. This parallelism extends even to Mr. Posey's typographical errors.

*7 The plaintiff next points evidence that Posey's report "was prepared with the assistance of counsel" as showing her bias and lack of independent judgment. (Doc. 301 at 11,

16). That "assistance," as disclosed by the deposition excerpt cited by the plaintiff, consisted of typing portions of her report at her direction. (Id., Exhibit D at 205).

Finally, the plaintiff argues that Posey's willingness to opine that its investigation was of such a quality as to suggest bad faith shows that she is a biased parrot of the defendants. (Doc. 301 at 15-16). As noted, Posey will not be allowed to testify in such terms at trial. Her willingness to do so indicates she agrees with the defendants' position, but it hardly demonstrates that her assessment-or any of her other opinions-are not her own.

         ii. Unprofessional practices.

The plaintiff complains that Posey: kept no notes on the information she gathered; kept materials in the wrong files; purported to rely on materials not found in her files; provided in her report an incomplete list of the materials she reviewed; and could not recall reviewing certain documents listed in her report. (Doc. 301 at 13). The plaintiff does not argue that these lapses render her opinions unreliable but only that they preclude "independent verification of what information she had in rendering her opinions in this case." (Id.). Whatever impact Posey's organizational failures may have on the jury's assessment of her opinions, they plainly do not undermine the reliability of those opinions for purposes of Daubert.

The plaintiff also faults Posey for: spending only two hours inspecting the premises; relying on Cochran's representation that the extension cord she examined came from the place of the fire's origin; and relying on photographs in determining the positioning of the cord relative to the metal filing cabinet. (Doc. 301 at 13, 24). The plaintiff does not offer to explain why a two-hour inspection would be inadequate, why an expert should be required to independently verify the chain of custody of a piece of evidence, or why an expert cannot rely on photographs in reconstructing a scene. These matters do not draw the reliability of Posey's opinions into question for purposes of Daubert.

         iii. Dismissal of conflicting evidence.

The plaintiff asserts that Posey's testimony is contrary to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Slip Copy
Slip Copy, 2005 WL 2179799 (S.D.Ala.)
(Cite as: Slip Copy)

evidence provided by various witnesses, including fire marshals, eyewitnesses, Deese, Owen Posey and Cochran. (Doc. 301 at 18). Rather than expend any significant effort to support this proposition, the plaintiff invites the Court to review the entirety of Posey's 104-page report and 400-page deposition, to compare those documents with the 300-plus pages of materials the plaintiff submitted in support of its motion to reconsider, (Doc. 236), and to identify for itself inconsistencies between Posey's views and the statements of other witnesses. (Doc. 301 at 17-18). The adversarial process, however, depends upon the parties to develop and support their arguments, and it is not the office of this Court to perform the parties' tasks for them. The Court thus confines its review to those particular inconsistencies to which the plaintiff has specifically drawn its attention. FN14

> FN14. A party is presumed to present its strongest arguments to the Court, and the inadequacy of the arguments presented by the plaintiff, as discussed in this opinion, confirms that the presumptively weaker arguments it desires the Court to formulate on its behalf could not carry the day.

*8 The short answer to the plaintiff's argument is that an expert is not required to agree with, or defer to, other experts, and mere disagreement is not the stuff of which disqualification under *Daubert* is made; such disagreements implicate credibility but not admissibility. At any rate, the specific instances identified by the plaintiff are considerably less impressive than advertised.

The plaintiff emphasizes what it construes as Posey's tortured effort to minimize the impact of a police report-that Cochran "turned on the lights, and his computer began to spark, and flames began shooting out"-by questioning the qualifications of a police officer to "write down relevant things, observations from a fire." (Doc. 301, Exhibit D at 268-69). FN15 According to the plaintiff, this exchange demonstrates that "any time information is not favorable to Eleanor Posey's theory then it is simply eliminated, ipse dixit, for no objective or substantial reason." (Doc. 301 at 19-20). This is of course a sweeping generalization to draw from a single example, but even the example is not so straightforward as the plaintiff suggests. A review of the

portions of the exchange ignored by the plaintiff reflects that the substance of Posey's reaction was her skepticism that a police officer would necessarily paraphrase a witness's words without unintentionally altering their meaning, especially when the subject (cause and origin) may be beyond the officer's expertise and especially when the witness is not given the opportunity to review the statement and confirm its accuracy. (*Id.*, Exhibit D at 269-70). FN16

> FN15. Posey acknowledges that the computer did not spark up and that there is no forensic evidence that would support such a theory. (*Id.*, Exhibit D at 271-72).

> FN16. According to fire marshal Larry Hansen, about a week after the fire Cochran told him that, when he turned on the lights, "sparks shot out from under [the computer] desk." (Doc. 301, Exhibit G at 1). It would seem possible that Cochran said the same to the officer, who either heard it incorrectly or paraphrased it poorly.

The plaintiff next complains that Posey "ignored testimony of Harold Deese and Owen Posey that the cord from that area [of the computer desk and metal filing cabinet, where Posey says the fire began] was tracked and found as not being the electrical cause of the fire." (Doc. 301 at 24). Posey's report, however, expressly states that Owen Posey's testimony did not address the cord at issue. (*Id.*, Exhibit C at 20). It also accuses Deese of either missing the cord at issue or as having rendered an unsupportable opinion as to the cause of its burned insulation. (*Id.* at 44-46). Far from ignoring the testimony of the plaintiff's experts, Posey directly challenged it.

With respect to Posey's opinions concerning the quality of the plaintiff's investigation, the plaintiff bemoans her "fail[ure] to note" all the things that it did properly. (Doc. 301 at 25). The plaintiff offers no support for its remarkable, implicit position that an expert may not criticize another's performance without also praising it.

iv. Unsupported opinions.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Slip Copy
Slip Copy, 2005 WL 2179799 (S.D.Ala.)
(Cite as: Slip Copy)

The plaintiff contends that Posey's theory of how the fire started "def[ies] logic." (Doc. 301 at 10, 16, 18-19, 21). As the plaintiff describes that theory, Posey believes that "the fire was actually burning for months" before it burst into the four-foot flame Cochran says he observed. (*Id.* at 21). The plaintiff says this is illogical because there is no evidence that any employee or customer ever saw or smelled a fire. (*Id.* at 19, 21).

*9 The deposition excerpts cited by the plaintiff, however, reflect that she testified to an ongoing short, not an ongoing fire, and that she testified she did not know how long the short had existed but affirmatively denied saying it had been months. (Doc. 301, Exhibit D at 240-41). [FN17] Posey further testified that the shorted cord might emit an odor, but that its position under the metal filing cabinet would make detection unlikely. (*Id.* at 241). The plaintiff has identified nothing inherently illogical or impossible concerning Posey's actual testimony. [FN18]

> FN17. In her report, Posey states that it was the progressive deterioration of the cord after the short appeared that eventually gave rise to the arcing that caused the fire. (*Id.,* Exhibit C at 10-12).

> FN18. The plaintiff points out that a Florida trial court once found Posey's theory in that case to "def[y] logic." *Ray v. State,* 760 So.2d 903, 909 (Fla.2000). However, "the views of prior judges about [an expert's qualifications] would be largely irrelevant" in a subsequent case, because "[c]ircumstances change from trial to trial, and admissibility rulings may also change from judge to judge and trial to trial." *Ferrara & DiMercurio v. St. Paul Mercury Insurance,* 240 F.3d at 8 n. 4. If that is true concerning qualifications, it is certainly true with respect to reliability, as theories of cause and origin necessarily differ from case to case.

The plaintiff continues that Posey's theory depends on some combustible material that the arcing could ignite and that she has filled this void in her theory only by impermissibly speculating that paper, dust and other combustible materials were present behind the computer desk. (Doc. 301 at 21). As

Posey describes the physical location of the computer desk and metal filing cabinet, the equipment and materials in the vicinity, and the business's cleaning habits, (*id.,* Exhibit D at 285-87), the presence of such materials does not appear impermissibly speculative.

The plaintiff also questions the strikingly coincidental timing that Cochran entered the office late at night, just as the arcing occurred, the fire ignited, and other materials began burning sufficiently to produce a four-foot flame. (Doc. 301 at 18). The plaintiff, however, has provided no argument or authority for the proposition that *Daubert* requires an expert, not merely to provide a reliable explanation of how the fire began, but also to provide an innocent explanation for her client's behavior. Cochran's conduct may well lead a jury to decide that the fire was intentionally set, but it does not undermine for purposes of *Daubert* the reliability of Posey's opinion that an accidental electrical fire fits the physical evidence.

Next, the plaintiff objects to Posey's reliance on "generalizations unsupported by any treatise, documented facts, or other relevant authority [including] studies [or] scientific principles." (Doc. 301 at 17). Rather than identifying any of these generalizations, the plaintiff again invites the Court to peruse some 500 pages of Posey's report and deposition and draw its own conclusions. (*Id.*). For the reasons set forth earlier, the Court declines to do so.

The plaintiff also complains that Posey unfairly criticizes it for failing to discover that, within a few weeks before the fire, the office allegedly had been widely sprayed with WD-40, after flooding from Hurricane Georges. (Doc. 301 at 22). The plaintiff states (without citation to evidence) that its representative asked Cochran "whether such non-medium petroleum distillates got in the room, and how was the room used," and it posits (without explanation or authority) that this inquiry satisfied any duty it had to determine possible non-arson sources of such distillates. (*Id.*). The argument is too poorly supported to evaluate, but it is not intuitively obvious that the single, vague question identified by the plaintiff would meet appropriate arson investigation standards.

*10 Next, the plaintiff challenges Posey's opinion that the

Westlaw.

Slip Copy
Slip Copy, 2005 WL 2179799 (S.D.Ala.)
(Cite as: Slip Copy)

medium petroleum distillate ("MPD") found in the debris samples were the result of flooding from Georges, which she opines distributed the MPD used in the shop area across the carpeted floor of the office. (Doc. 301 at 23). The plaintiff argues that Posey has an inadequate factual and/or scientific basis for concluding that a sufficient volume of MPD was or could have been floated from the shop area to the office and deposited there to account for Waters' sampling results. (*Id.*). When questioned about this at her deposition, Posey could cite only her knowledge that MPD is lighter than water (and thus would float), her "common sense" conclusion that this flotation would have redeposited the MPD in a different area of the business, and her personal observation that the building is "greasy just about everywhere you go." (*Id.*, Exhibit D at 309-14). She conducted no tests, performed no calculations, and consulted no authorities in forming this opinion, (*id.*), which is patently unreliable under *Daubert.* Accordingly, Posey will not be permitted to testify at trial that pre-existing MPD were redistributed into the office by flooding.

The plaintiff makes a similar argument concerning WD-40, a MPD that was sprayed in the office after the flooding. (Doc. 301 at 23). Posey presumably may testify reliably that WD-40 is a MPD and that it could have ignited during an electrical fire. However, based on her deposition testimony, (*id.*, Exhibit D at 309-14), she may not testify that the MPD in the tested samples came from the WD-40.

The plaintiff complains that Posey's use of the term "spoliation" is unexplained. (Doc. 301 at 24, 25). The Court will not review 500 pages of report and deposition to provide the plaintiff an explanation of what conduct Posey intends thereby to apprehend, but it does pause to clarify that only conduct which has been identified in the report or deposition may form the basis of this allegation.[FN19] The same response disposes of the plaintiff's similar argument concerning the statement in Posey's report that critical evidence was "ignored, never sought out, spoliated, suppressed, or altered." (*Id.* at 25; *id.*, Exhibit C at 17).

> FN19. Posey appears to use the term "spoliation" synonymously with "alteration," which includes at least the alleged conduct of Deese and Owen Posey in removing and caring for electrical evidence. As

noted in Part A.1, Posey is precluded from using the term "spoliation" at trial.

With respect to Posey's criticism of its documentation, the plaintiff responds that she was guilty of worse lapses, as discussed in Part A.3.ii. (Doc. 301 at 24-25). Posey's shortcomings may not be flattering, but they do not so undermine her opinions concerning the plaintiff's own shortcomings as to render them inadmissible.

In conclusion, the plaintiff for the third time requests the Court to independently review almost 1,000 pages of evidence and reach its own determination concerning the reliability of Posey's opinions. (Doc. 301 at 26-27). For the reasons set forth earlier, the Court will not do so.

### 4. Videotape.

The plaintiff also moves to exclude a videotape created by Posey in the 1980's "illustrating the behavior of ... energized electrical conductors in a wood burning fire." (Doc. 301, Exhibit D, Posey Deposition at 35). The plaintiff argues that the video is irrelevant, consists of hearsay, would unduly prejudice it, and does not satisfy *Daubert.* (Doc. 301 at 27-28). Although questioned at length in her deposition, Posey was unable to explain the relevance of the experiment to the facts of this case. (*Id.*, Exhibit D, Posey Deposition at 41-50).[FN20] Nor do the defendants respond to the plaintiff's motion in any manner. Accordingly, the videotape will be excluded from trial.

> FN20. Posey testified that a few of the videotaped tests involve conductors "like th[e] extension cord" that she believes was the source of the instant fire. (*Id.* at 42). However, the videotape does not attempt to explain how such a cord could cause a fire, but only how it might behave when consumed by a pre-existing fire.

### 5. Conclusion.

**\*11** For the reasons set forth above, the plaintiff's motion in limine concerning Eleanor Posey is granted to the extent that she: (1) may not offer expert opinions concerning Cochran's state of mind or behavior; (2) may not offer expert opinions concerning proper insurance practices; (3)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Slip Copy                                                                    Page 10
Slip Copy, 2005 WL 2179799 (S.D.Ala.)
(Cite as: Slip Copy)

may not offer expert opinions that the fire investigation of
the plaintiff or any individual is indicative of bad faith or
spoliation; (4) may not offer expert opinions concerning the
testing of debris samples by Waters or any other witness; (5)
may not offer expert opinions that pre-existing MPD were
redistributed into the office by flooding; (6) may not offer
expert opinions that the MPD in the tested samples came
from WD-40; and (7) may not offer the videotape discussed
above. In all other respects, the plaintiff's motion concerning
Posey is denied.

### B. James Posey.

The plaintiff acknowledges that Posey has been identified as
an expert concerning cause and origin as well as bad faith.
This includes the adjustment and investigation of the claim,
including spoliation. (Doc. 301 at 28). [FN21]

> FN21. Posey is not listed as a witness in the pretrial
> order, either as a lay witness, an expert witness, or
> a witness whose testimony will be presented by
> deposition. (Doc. 297 at 26-27, 37-43).

### 1. Qualifications.

The    plaintiff    identifies    no    objection    to    Posey's
qualifications.

### 2. Relevance.

The plaintiff alleges generally that Posey's opinions
concerning the quality of its adjustment and investigation of
the claim lack relevance, apparently on the ground that
Posey could not articulate a causal relation between the
alleged improprieties and either his investigation or the
existence of a debatable reason to deny the claim. (Doc. 301
at 28-29, 31-32). The relevance, of course, is to show that
the denial of benefits was made in bad faith, including the
failure to determine whether a debatable reason for denial
existed. *See generally Acceptance Insurance Co. v. Brown,*
832 So.2d 1, 16 (Ala.2001)(claim for abnormal bad faith
may be based on the insurer's "fail [ure] to properly
investigate the claim or to subject the results of the
investigation to a cognitive evaluation and review").

However, the plaintiff also argues that Posey's opinion

concerning the alleged bad faith and spoliation by the
plaintiff and its representatives "does not meaningfully
assist the jury." (Doc. 301 at 30-31). As with his wife, once
Posey sets forth the components of a proper adjustment or
fire investigation and the plaintiff's deviations therefrom, the
jury is as capable as he of drawing an inference of bad faith
or spoliation.

The plaintiff attempts to stretch this argument too far,
however,    when    it    argues    that    the    same
reasoning-unhelpfulness to the jury-applies to Posey's
testimony "about the duties of a claims handler." (Doc. 301
at 30). It is true, as the plaintiff notes, that the Court will
instruct the jury concerning the duty of an insurer, but only
in broad, legal terms. The plaintiff has not attempted to
show that juries innately know what the specific duties of a
claims handler are, and without such information they will
be ill-equipped to determine whether the plaintiff's
adjustment of this claim meaningfully deviated from the
norm.

*12 The plaintiff does identify several items that are plainly
irrelevant: that the policy does not list Douglas Perryman as
the loss payee; that Cochran's signature on the application
was not witnessed; and that the agent did not sign the
application. (Doc. 301 at 28; *id.,* Exhibit I at 31-32).
Testimony on these matters will be excluded.

### 3. Reliability.

With respect to cause and origin, the plaintiff argues
generally that Posey "was hired after the fact, his
conclusions dispute on-the-scene fire investigators, [his
testimony] contains generalizations and vague assertions
without any analysis or specific basis to challenge." (Doc.
301 at 32). This sweeping, unsupported pronouncement is
itself too generalized and vague to support relief.

The plaintiff offers no challenge to any specific opinion
concerning cause and origin. Its one effort to do
misconceives the testimony on which it is based. When
Posey testified that the plastic floor mat in the office was a
possible source of the MPD found in a sample taken from
underneath it, he was not testifying that it was in fact a
source but that the plaintiff's investigation was flawed in not

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Slip Copy
Slip Copy, 2005 WL 2179799 (S.D.Ala.)
(Cite as: Slip Copy)

considering the possibility. (Doc. 301, Posey Deposition, Exhibit I at 71-72). Thus, the plaintiff's argument that Posey "can provide no basis that meets *Daubert* for th[e] assertion" that the mat might contain MPD misses the mark. (Doc. 301 at 29).

With respect to bad faith investigation, the plaintiff first objects that one of its witnesses disputes Posey's opinion that removal of electrical evidence was improper. (Doc. 301 at 28). A duel of witnesses, of course, does not require exclusion of one or the other, as it is the jury's function to determine the weight of each.

Next, the plaintiff faults Posey for not taking comparison samples even though he criticizes the plaintiff's representatives for doing likewise. (Doc. 301 at 29, 31). Because the plaintiff provides only an incorrect record citation for this proposition, it cannot be evaluated. At any rate, the plaintiff has not challenged Posey's qualifications to offer opinions as to a proper fire investigation, and any unexcused [FN22] failure on his part to follow his own opinion in this respect does not so rob his opinion of reliability as to render it inadmissible.

> FN22. The defendants hint that, by the time Posey arrived, it was too late to take such samples. (Doc. 310 at 33).

The plaintiff characterizes Posey's opinion that it should have considered the possibility of an intruder as "bizarre because it completely ignores how Mr. Cochran testified that the fire started." (Doc. 301 at 29, 31). Posey, who relies on an incorrect record citation, fails to explain how the possibility of an intruder was eliminated by Cochran's testimony, and the Court cannot identify any such impossibility on its own.

With respect to bad faith adjustment, the plaintiff complains that Posey has no support for his belief that hiring the Richardson law firm reflects an intent to deny the claim. (Doc. 301 at 28). In deposition, Posey admitted that his only basis for this belief was his ignorance of any other reason for the hiring. (*Id.*, Exhibit 1 at 34-35). Ignorance does not constitute one an expert, nor does it lend one's opinions an air of authority. *See Michigan Millers Mutual Insurance*

*Corp. v. Benfield*, 140 F.3d 915, 921 (11th Cir.1998)(cause and origin expert properly excluded when his opinion of arson was based largely on his inability to identify the source of ignition). Posey may not offer his speculation on the Richardson hiring at trial.

#### 4. Conclusion.

**\*13** For the reasons set forth above, the plaintiff's motion in limine concerning James Posey is granted to the extent that he: (1) may not offer expert opinions concerning errors in naming the loss payee and in obtaining signatures on the application; (2) may not offer expert opinions that the claims adjustment or fire investigation of the plaintiff or any individual is indicative of bad faith or spoliation; and (3) may not offer expert opinions concerning the hiring of the Richardson law firm. In all other respects, the plaintiff's motion concerning Posey is denied.

#### C. Pyron Pounds and Jesse Sprayberry.

Pounds administered a polygraph test to Cochran, in which Cochran denied playing any role in, or having any advance knowledge about, the fire. Pounds concluded that Cochran had not attempted to deceive in providing these denials. (Doc. 310 at 35-36). Pounds then died without giving sworn testimony. The defendants have identified Sprayberry as an expert in polygraph analysis, to testify as to the validity of the analysis and report of Pounds. (Doc. 297 at 41).

Until 1989, the Eleventh Circuit embraced a prophylactic rule prohibiting the introduction of polygraph evidence. In that year, the Court concluded that such evidence could be admitted in two situations: (1) when the parties have stipulated as to its admissibility; and (2) when the evidence is used to "impeach or corroborate the testimony of a witness at trial." *United States v. Piccinonna*, 885 F.2d 1529, 1536 (11th Cir.1989)(en banc). The parties have entered no stipulation concerning the use of polygraph evidence. Moreover, because the defendants admit that the polygraph evidence is to be presented "not on the issue of Mr. Cochran's responsibility for the fire" but on the issue of the plaintiff's "state of mind" when it denied the claim, (Doc. 310 at 35), the evidence is not offered as corroboration of Cochran's expected trial testimony.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Slip Copy                                                                                                Page 12
Slip Copy, 2005 WL 2179799 (S.D.Ala.)
(Cite as: Slip Copy)

Accordingly, it is inadmissible under *Piccinonna.* [FN23]

> [FN23]. The defendants rely on authority from the
> Sixth Circuit, but its broader views on the
> admissibility of polygraph evidence cannot trump
> controlling precedent from the Eleventh.

Even had the defendants not disavowed corroboration as a
purpose, it does not appear that the evidence could be
admitted. First, it is not clear that the plaintiff "was given
reasonable opportunity to have its own polygraph expert
administer a test covering substantially the same questions."
*United States v. Piccinonna,* 885 F.2d at 1536. Second,
corroboration evidence is admissible only to the extent that
other rules of evidence allow, *id.,* and the defendants have
identified no rule that would authorize the use of their
polygraph evidence in this fashion. [FN24]

> [FN24]. The *Piccinonna* Court identified Rule 608
> as a possible source of such authority, *id.* at 1536,
> but it has been noted that polygraph evidence does
> not easily conform to the strictures of that rule.
> *E.g., Maddox v. Cash Loans II,* 21 F.Supp.2d 1336,
> 1338-40 (N.D.Ala.1998).

The plaintiff's assertion that the evidence should be
excluded under *Daubert* and Rule 403, (Doc. 301 at 33), is
too generalized to be evaluated but, in light of the
defendants' failure to satisfy *Piccinonna,* the failure does not
alter the result of its motion. [FN25]

> [FN25]. See generally *United States v. Henderson,*
> 409 F.3d 1293, 1303 & n. 7 (11th Cir.2005)
> (satisfaction of *Piccinonna* does not obviate
> satisfaction of *Daubert* ).

For the reasons set forth above, the plaintiff's motion in
limine concerning Pyron Pounds and Jesse Sprayberry is
granted. The plaintiff's substantively identical motion in
limine regarding polygraph examination, (Doc. 303), is
likewise granted. No evidence concerning polygraph testing
or results will be allowed at trial.

                    D. Don Mosley.

**\*14** Mosley has been identified as an expert concerning the

analysis of audio recordings. (Doc. 297 at 41). He is being
offered to testify to alterations allegedly made to an audio
cassette recording of Deese's interviews of Cochran and
witness Pete Preston.

Mosley first listened to the tape using very good speakers
and during both interviews heard "holes," (events where the
ambient background noise disappeared), including one of
approximately 27 seconds in the Preston interview. (Mosley
Deposition at 47, 54, 57 & Exhibit 6). He testified that such
holes can result from a tape defect (which he considered
highly unlikely given modern tape technology), from
erasing the taped material, or from recording over the taped
material. (*Id.* at 49, 51, 54 & Exhibit 6). He later used
computer software to detect a "record signature" at the
beginning of the 27-second hole and to compare that
signature to the record signature at the beginning of the
Preston interview, which he found to be the same, leading
him to conclude that the same machine that recorded the
Preston interview also recorded over the 27-second
segment. (*Id.* at 52-55, 58, 80 & Exhibit 6).

                    1. Qualifications.

Although compressed by the parties, Mosley's qualifications
must be gauged at three separate points: (1) his
qualifications to identify holes aurally; (2) his qualifications
to identify the probable cause of such holes; and (3) his
qualifications to run the computer software and interpret the
results.

Mosley testified that it is "pretty obvious" when a hole
occurs, (Mosley Deposition at 54), and the plaintiff does not
challenge this statement. Neither is it facially dubious, since
the absence of background noise would appear to be readily
detectable by most patient listeners, especially where the
hole is prolonged. The Court concludes that Mosley is
qualified to render an expert opinion as to the presence of
holes on the tape.

Mosley testified that he has operated a recording studio and
production company for 30 years, (Mosley Deposition at 12,
14), work that would presumably provide him with
substantial experience with holes and their causes. The
Court concludes that Mosley is qualified to render an expert

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Slip Copy                                                                          Page 13
Slip Copy, 2005 WL 2179799 (S.D.Ala.)
(Cite as: Slip Copy)

opinion as to the probable causes of the holes he detected on
the tape.

Mosley has not identified any qualifications to run the
computer software or to interpret its results. Because
interpretation is just as important to his opinions as to a
radiologist's, [FN26] the lack of any such qualifications
precludes him from testifying as to his computer analysis.
[FN27]

> FN26. The graphs which purportedly reflect the
> computer analysis of the two record signatures,
> (Mosley Deposition, Exhibit 6), do not obviously
> support Mosley's conclusion that they are
> "identical." (Id. at 55). Thus, his interpretation is
> essential to allow the inference that the signatures
> came from the same machine.

> FN27. Because Mosley is not qualified to interpret
> the computer results, it would be unduly prejudicial
> to allow him to testify that he performed a
> computer analysis-unless, of course, the plaintiff
> opens the door, as by suggesting that Mosley's
> work was superficial. (See, e.g., Doc. 301 at 38
> (challenging Mosley's reliability because he was
> "on a tight budget")).

### 2. Relevance.

The plaintiff suggests without explanation that any
alteration of the Preston interview is irrelevant. (Doc. 301 at
37). Alteration of the Preston interview would appear to be
relevant for the same reason as alteration of the Cochran
interview-to support the defendants' theory that the plaintiff
manipulated the evidence to support its conclusion of arson.

### 3. Reliability.

*15 The bulk of the plaintiff's arguments are focused on
reliability, with most of them implicating Mosley's
computer analysis of the Preston interview. While the Court
shares some of the plaintiff's concerns about the reliability
of Mosley's opinions regarding the computer analysis, it is
unnecessary to reach those issues since Mosley is
unqualified to render these opinions to begin with.

The plaintiff's objections concerning Mosley's other
opinions are unavailing. [FN28] The plaintiff first complains
that Mosley in deposition was unable to explain the holes he
had described in an affidavit. (Doc. 301 at 35-36). His
affidavit, however, explains what holes are and how they are
made, (id., Exhibit 6), and the plaintiff has not suggested
what necessary detail Mosley was unable to offer. The
plaintiff obliquely criticizes Mosley's reliance on his aural
review of the tape to identify holes, (Doc. 301 at 38), but it
has not suggested why Mosley's presumably trained ear
cannot be trusted to hear holes in the recording.

> FN28. This includes the plaintiff's objection to the
> thoroughness of the defendants' Rule 26(a)(2)
> disclosures, (Doc. 301 at 37), which were
> submitted some eight months before the instant
> motion was filed.

### 4. Conclusion.

For the reasons set forth above, the plaintiff's motion in
limine concerning Don Mosley is granted to the extent that
he may not offer expert opinions concerning any computer
analysis of the tape. In all other respects, the plaintiff's
motion concerning Mosley is denied.

### E. Daniel Koch.

The defendants have identified Dr. Koch as a psychologist
and "behavioral-trauma" expert. (Doc. 297 at 41). He is
expected to testify as to the absence of any motive for
Cochran to commit arson and on the connection between
fire and critical thinking. (Doc. 301 at 39-40; Doc. 310 at
40). [FN29] Dr. Koch's opinions are based on his interview of
Cochran and administration of the MMPI-II and other tests.

> FN29. According to the defendants, Dr. Koch will
> also testify that he finds nothing remarkable about
> Cochran's behavior after discovering the fire. (Doc.
> 310 at 40).

### 1. Qualifications.

The plaintiff identifies no challenge to Dr. Koch's
qualifications to render the opinions at issue.

### 2. Relevance.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Slip Copy                                                          Page 14
Slip Copy, 2005 WL 2179799 (S.D.Ala.)
(Cite as: Slip Copy)

The plaintiff argues that Dr. Koch's opinions are irrelevant because Cochran's "state of mind" is not at issue. (Doc. 301 at 41). This is a peculiar argument to come from a party that has long insisted that Cochran had a financial motive to commit arson and that his behavior on the night of the fire is inconsistent with innocence.

### 3. Reliability.

The plaintiff does not contest the reliability of Dr. Koch's opinion that Cochran does not suffer from mental illness. Its arguments are limited to the behavioral and motive aspects of Dr. Koch's opinions.

With respect to motive, the plaintiff complains that Dr. Koch's opinion is wholly dependent on Cochran's representation that he and his business were financially successful. (Doc. 301 at 42). The difficulty as the Court sees it is not so much the reliability of the information on which Dr. Koch relied, or the reliability of his conclusion assuming the accuracy of the information he received. Rather, the difficulty is that the jury is in as good a position as Dr. Koch to determine the accuracy of Cochran's statements about his financial health and, assuming it credits his statements, to draw the conclusion that a financially successful businessman lacks the motive to commit arson.

*16 With respect to behavior, Dr. Koch has opined that "[t]rauma typically creates the suspension of critical thinking" and that "[i]t is certainly traumatic to find oneself in a fire." (Doc. 301, Exhibit U at 3). The plaintiff complains that Dr. Koch offers nothing but his ipse dixit for these statements, (Doc. 301 at 42), and the Court agrees. The defendants have pointed to nothing that could support the conclusion that Dr. Koch's opinion represents scientific knowledge. Indeed, by ignoring the plaintiff's challenge, (Doc. 310 at 39-40), they effectively concede the point.

### 4. Conclusion.

For the reasons set forth above, the plaintiff's motion in limine concerning Daniel Koch is granted to the extent that he: (1) may not offer expert opinions concerning Cochran's motive to commit arson; (2) may not offer expert opinions concerning trauma and its effect on critical thinking; and (3)

may not offer expert opinions concerning Cochran's behavior after discovering the fire. In all other respects, the plaintiff's motion concerning Dr. Koch is denied.

### F. Lewis Pannell.

Dr. Pannell is acknowledged as an expert in gas chromatography ("GC") and mass spectrometry ("MS"). (Doc. 301 at 46). He is expected to offer opinions concerning chemicals present at the scene based on the GC/MS analyses performed by the plaintiff's experts. He is also expected to offer criticisms of their methodology. (Doc. 310, Exhibit I).

### 1. Qualifications.

The plaintiff argues that, although Dr. Pannell is an expert in GC/MS, his experience using those techniques does not include fire debris analysis. (Doc. 301 at 43-48). Dr. Pannell, however, testified that the principles governing GC/MS are the same regardless of the underlying purpose of the analysis, (Doc. 301, Exhibit V at 15), and the plaintiff has not challenged that proposition.

### 2. Relevance.

The plaintiff argues that, due to his inexperience with fire debris analysis, Dr. Pannell's report references background spectra that have no significance to fire debris analysis. As the plaintiff recognizes, this is not truly a challenge to the relevance of Dr. Pannell's opinions under Rule 401 and Daubert, but the expression of a concern about juror confusion if Dr. Pannell bombards them with extraneous detail in the course of delivering his relevant opinions. (Doc. 301 at 47-48). That is a matter for another day, but the defendants may want to consider paring down Dr. Pannell's presentation prior to trial.

The plaintiff also complains that Dr. Pannell criticizes the failure of one of its experts, Laurel Waters, to look at mass spectra even though that is not required by (unidentified) regulations. (Doc. 301 at 48-49). The issue, however, is whether Waters performed an appropriate evaluation, not a minimally permissible one, and Dr. Pannell testified that there were circumstances that should have caused Waters to review the mass spectra in this case. (Doc. 301, Exhibit V at

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Slip Copy
Slip Copy, 2005 WL 2179799 (S.D.Ala.)
(Cite as: Slip Copy)

72).

**END OF DOCUMENT**

*17 Finally, the plaintiff argues that Dr. Pannell created a tempest in a teapot by criticizing Waters for identifying a MPD in a sample but failing to determine whether other distillates were present. (Doc. 301 at 49). Without a context, which the plaintiff does not provide, the Court cannot determine whether this criticism is relevant.

### 3. Reliability.

The plaintiff identifies no challenge to the reliability of Dr. Pannell's opinions. However, the Court's ruling on the defendants' motion in limine requires a corresponding ruling with respect to Dr. Pannell. The Court has ruled that Waters may not offer expert opinion concerning the "high concentration" of MPD in the samples she tested or her derivative opinion concerning the likelihood that the MPD in the samples was deposited in the office through tracking from foot traffic. Because Dr. Pannell admits he had no more information concerning the concentration of MPD than did Waters, (Doc. 307, Exhibit A-2 at 141-42), he likewise may not testify as to that concentration or the likelihood that the MPD came from tracking. Similarly, because Waters may not offer these opinions, Dr. Pannell may not criticize her for attempting to offer them.

### 4. Conclusion.

For the reasons set forth above, the plaintiff's motion in limine with respect to Lewis Pannell is granted to the extent that he: (1) may not offer expert opinions concerning the concentration of MPD in the samples tested by Waters; (2) may not offer expert opinions concerning the likelihood that the MPD found in the samples are the resulting of tracking from other areas of the business; and (3) may not offer expert opinions concerning the quality of Waters' analysis and/or opinions in these areas. In all other respects, the plaintiff's motion with respect to Dr. Pannell is denied.

DONE and ORDERED.

S.D.Ala.,2005.
Cincinnati Ins. Co. v. Cochran
Slip Copy, 2005 WL 2179799 (S.D.Ala.)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

## CERTIFICATE OF SERVICE

I, Michael A. Barlow, hereby certify that on January 5, 2006, I electronically filed Plaintiff McKesson Information Solutions LLC's Response to TriZetto's Motion to Exclude the Expert Testimony of Dr. Margaret L. Johnson and Dr. Mark A. Musen and Declaration of Michael A. Barlow using CM/ECF, which will send notification of such filing to those designated below, and that I served the following persons in the manner listed:

**VIA CM/ECF**
Rodger D. Smith, II, Esq.
MORRIS NICHOLS ARSHT
 & TUNNELL
1201 North Market Street
P.O. Box 1347
Wilmington, Delaware 19899

**HAND DELIVERY**
Jack B. Blumenfeld, Esq.
MORRIS NICHOLS ARSHT
 & TUNNELL
1201 North Market Street
P.O. Box 1347
Wilmington, Delaware 19899

Michael A. Barlow (ID No. 3928)
SKADDEN, ARPS, SLATE,
 MEAGHER & FLOM LLP
One Rodney Square
P.O. Box 636
Wilmington, Delaware 19899
(302) 651-3000
mbarlow@skadden.com

440372.01-Wilmington: S1A