IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

MCKESSON INFORMATION           )
SOLUTIONS, LLC,                )
                               )
          Plaintiff,           )
                               )
     v.                        )          C.A. No. 04-1258 (SLR)
                               )
THE TRIZETTO GROUP, INC.,      )
                               )
          Defendant.           )

**THE TRIZETTO GROUP INC.'S REPLY BRIEF
IN SUPPORT OF ITS MOTION TO PRECLUDE THE EXPERT
<u>TESTIMONY OF MICHAEL J. WAGNER</u>**

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Jack B. Blumenfeld (#1014)
Rodger D. Smith II (#3778)
1201 North Market Street
P.O. Box 1347
Wilmington, Delaware 19899-1347
(302) 658-9200
  *Attorneys for Defendant*
  *The TriZetto Group, Inc.*

OF COUNSEL:

Jeffrey T. Thomas
David A. Segal
Michael A. Sitzman
GIBSON, DUNN & CRUTCHER LLP
Jamboree Center, 4 Park Plaza
Irvine, California 92614-8557
(949) 451-3800

January 12, 2006

TABLE OF CONTENTS

                                                                                      Page

I.      INTRODUCTION ...................................................................................................1

II.     ARGUMENT ........................................................................................................3

        A.      McKesson Has Not Shown That Wagner Properly Considered Non-
                Infringing Alternatives .............................................................................3

        B.      McKesson Has Not Shown That Wagner's Use Of The Book Of
                Wisdom Is Proper As A Matter Of Law And Public Policy ...................8

        C.      McKesson Has Not Shown That Wagner's Use Of The Entire Market
                Value Rule Is Proper As A Matter Of Law............................................12

III.    CONCLUSION ...................................................................................................15

TABLE OF AUTHORITIES

Page(s)

**Cases**

*Fonar Corp. v. Gen. Elec. Co.*,
   107 F.3d 1543 (Fed. Cir. 1997)...............................................................................3

*Gen. Elec. Co. v. Joiner*,
   522 U.S. 136 (1997)..............................................................................................12

*Grain Processing Corp. v. Am. Maize-Prods. Co.*,
   185 F.3d 1341 (Fed. Cir. 1999)..........................................................................4, 5

*Honeywell Int'l, Inc. v. Hamilton Sunstrand Corp.*,
   378 F. Supp. 2d 459 (D. Del. 2005)....................................................................8, 9

*Integra Life Sciences I Ltd. v. Merck KGaA*,
   331 F.3d 860 (Fed. Cir. 2003)................................................................................9

*King Instruments Corp. v. Perego*,
   65 F.3d 941 (Fed. Cir. 1995).................................................................................3

*Panduit v. Stahlin Bros. Fibre Works, Inc.*,
   575 F.2d 1152 (6th Cir. 1978) ...............................................................................2

*Sinclair Refining Co. v. Jenkins Petroleum Process Co.*,
   289 U.S. 689 (1933)...............................................................................................8

*St. Clair Intellectual Prop. Consultants, Inc. v. Canon, Inc.*,
   C.A. No. 03-241, 2004 WL 2213562 (D. Del. Sept. 28, 2004) ..............................9

*Total Containment Inc. v. Environ Prods., Inc.*,
   921 F. Supp. 1355 (E.D. Pa. 1995),
   *aff'd*, 106 F.3d 427 (Fed. Cir. 1997) ...................................................................3

*TWN Mfg. Co. v. Dura Corp.*,
   789 F.2d 895 (Fed. Cir. 1986).............................................................................12

*W. Elec. Co. v. Stewart-Warner Corp.*,
   631 F.2d 333 (4th Cir. 1980) ..............................................................................12

**Statutes**

35 U.S.C. § 286.............................................................................................................6

1.

## I. INTRODUCTION

In support of its Motion to Preclude the Expert Testimony of Michael J. Wagner ("Wagner"), The TriZetto Group, Inc. ("TriZetto") provided several reasons why the methodology Wagner employs and the conclusions he reaches are inadmissible. McKesson Information Solutions, LLC ("McKesson") does not sufficiently address any of them. Instead, McKesson continues to misstate the facts of this case, mischaracterize the nature of Wagner's testimony and distort federal court precedent. Through these distortions, McKesson seeks to add new levels to the house of cards that Wagner has erected. McKesson's Opposition suffers from the following fundamental flaws and inaccuracies:

- TriZetto has demonstrated that Wagner essentially ignored the many non-infringing alternatives available to TriZetto during the alleged infringement period and thus failed to properly reconstruct the but-for marketplace. McKesson responds by alleging that Wagner need not consider such alternatives and that the "onus" is on TriZetto to prove that the existence of such substitutes make his conclusions unreasonable. This is simply incorrect. In reconstructing the but-for marketplace, Wagner's methodology must be based on sound economic principles and rational competitor behavior. Sound economic theory dictates that, when faced with the dilemma of choosing a non-infringing alternative or leaving the market completely, a rational competitor will choose the alternative. Thus, Wagner cannot merely assume that alternatives indisputably available to TriZetto are irrelevant. If the undisputed facts demonstrate that alternatives were available, Wagner must address them. Otherwise, he cannot properly reconstruct the but-for marketplace.

- TriZetto has demonstrated that Wagner's application of the "book of wisdom" approach is wrong as a matter of law because it renders the hypothetical negotiation date irrelevant and disregards what the actual parties to that negotiation would have done in light of subsequent events. McKesson responds by stating that TriZetto's approach is not flexible enough and that it clashes with this Court's own precedent. McKesson does not, however, cite a single case holding that the book of wisdom can be used to change the actual parties at the bargaining table and disregard the hypothetical negotiation date. By Wagner's own admission, there is no such precedent. Thus, Wagner's methodology for calculating reasonable royalty damages is based on erroneous legal principles.

- TriZetto has demonstrated that Wagner's application of the entire market value rule is incorrect because he has performed no investigation into whether McKesson's clinical editing software is essential to customer demand for all of TriZetto's products and services. Instead, he merely assumes this determinative fact. (Actually, as discussed below, he assumes the opposite, but then ignores that assumption in applying the entire market value rule.) As a result, there is a large analytical gap between his conclusions and the facts of this case.

McKesson fails to show by a preponderance of the evidence that Wagner's opinions are admissible. Consequently, TriZetto's Motion should be granted in its entirety.

## II.  ARGUMENT

### A.    McKesson Has Not Shown That Wagner Properly Considered Non-Infringing Alternatives

In its Opening Brief, TriZetto demonstrated that Wagner's opinions regarding lost profit damages should be held inadmissible because his methodology is flawed and unreliable. Specifically, TriZetto demonstrated that Wagner failed to consider several non-infringing alternatives indisputably available to TriZetto, as required by *Panduit v. Stahlin Bros. Fiber Works, Inc.*, 575 F.2d 1152 (6th Cir. 1978).  McKesson responds by alleging that Wagner need not consider all such alternatives and that the onus is on TriZetto to prove that such substitutes make his conclusions unreasonable.  This is not the law.  When claiming lost profits, the patentee has a threshold duty to prove that it would have received the additional profits but-for the infringement.  *King Instruments Corp. v. Perego*, 65 F.3d 941, 952 (Fed. Cir. 1995) ("the patentee bears the burden to present evidence sufficient to show a reasonable probability that it would have made the asserted profits absent infringement").  To meet this burden, the patent owner must demonstrate that it reasonably meets *all* of the *Panduit* requirements.[1]  *Total Containment Inc. v. Environ Prods., Inc.*, 921 F. Supp. 1355, 1402 (E.D. Pa. 1995), *aff'd*, 106 F.3d 427 (Fed. Cir. 1997).  Only when the patent owner demonstrates that – with reasonable probability – does it meet its burden such that the infringer must show that the but-for inference is unreasonable.  *Fonar Corp. v. Gen. Elec. Co.*, 107 F.3d 1543, 1553 (Fed. Cir. 1997).

McKesson states that Wagner "was under no obligation to address" all of the alternatives available here and the "onus" is on TriZetto to show the alternatives preclude the

---

[1]    *Panduit* requires the patent owner to show all of the following to recover lost profits: (1) demand for the patented product; (2) absence of non-infringing alternatives; (3) manufacturing and marketing capability to exploit the demand; and (4) the amount of lost profits.

possibility of lost profits.  D.I. 199 at 8-9.  This approach is erroneous because it fails to treat each *Panduit* factor as a separate and vital inquiry.  McKesson seems to argue that even if a patent owner fails to address one of the *Panduit* factors, it can make up for that shortcoming by a strong showing on the other three.  This is simply incorrect.  The law clearly requires that the patent owner must establish – with reasonable probability – that it meets *all* of the *Panduit* criteria.  *Total Containment Inc.*, 921 F. Supp. at 1402.  If an expert fails to take into account alternatives indisputably available to the alleged infringer, he cannot reach the necessary conclusion regarding lost profits with reasonable probability.

Wagner has chosen to use the *Panduit* methodology.  Wagner Report at 4.  Thus, he must reasonably address all four *Panduit* factors, including whether there were non-infringing alternatives available to TriZetto.  Instead of addressing the adequacy of these alternatives, however, Wagner nakedly assumes that they also infringed McKesson's patent.[2]  Wagner Report at 6.  This assumption is made, however, with no facts or data to support it.  Thus, Wagner cannot demonstrate that – with reasonable probability – TriZetto caused the damages McKesson seeks in this case.

Failing to consider non-infringing alternatives makes Wagner's reconstruction of the but-for marketplace economically unsound.  In *Grain Processing Corp. v. American Maize-Products Co.*, 185 F.3d 1341, 1350 (Fed. Cir. 1999), the court held that the but-for inquiry requires a "reconstruction of the market" as it could have developed in the absence of infringement.  The court warned, however, that to prevent this hypothetical exercise from lapsing

---

[2]    In his Report, Wagner states that, "It is my understanding that there are other code editing products.  *I have been asked to assume that these products also infringe the '164 patent*."  Wagner Report at 6.

into pure speculation, there must be "*sound economic proof* of the nature of the market and likely outcomes with infringement factored out of the economic picture." *Id.* (emphasis added). Most importantly, the court determined that "sound economic proof" must reflect rational competitor behavior. The court then concluded that a rational competitor would take advantage of non-infringing alternatives available to him:

> Without the infringing product, a rational would be-infringer is likely to offer an acceptable noninfringing alternative, if available, to compete with the patent owner rather than leave the market altogether. The competitor in the "but for" marketplace is hardly likely to surrender its complete market share when faced with a patent, if it can compete in some other lawful manner.

*Id.* at 1351. As a result, the court held that "an accurate reconstruction of the but-for market takes into account any alternatives available to the infringer." *Id*. (emphasis added). Because Wagner ignores such alternatives in his Report, his methodology lacks the type of sound economic proof required by *Grain Processing*.

Despite arguing that Wagner need not consider the alternatives that were available, McKesson also argues that Wagner did in fact conduct such an analysis. This is not correct. Wagner's discussion of alternatives in connection with his lost profits opinion is found at pages 6 through 8 of his report. That discussion addresses only one alternative, the Solucient (Auto-Audit) license, and ignores all others (Wagner Report at 6-8), even though Wagner himself testified that other alternatives *were available to TriZetto*. For example, at his deposition, Wagner stated that the VHS license was an option available to TriZetto as of October 31, 1994. D.I. 177, Exh. C, at 101:25; 102:1-4. Yet, Wagner chose not to address the VHS option in his lost profits opinion, stating that he has assumed that all other alternatives also infringe McKesson's patent. Wagner Report at 6. Furthermore, Medicode also offered a non-infringing alternative that Wagner fails to address. Yet, as with the VHS alternative, Wagner testified that

the Medicode option was available to TriZetto.  *Id.* at 105:10-15; 106:5-11.  As with VHS,
Wagner chose to ignore this indisputably available substitute.

      Most conspicuous among Wagner's omissions regarding alternatives available to
TriZetto is the GMIS option.  GMIS developed and sold the ClaimCheck product, and had a
license under the '164 patent to sell it to others, including companies that intended to resell it to
their customers.  According to Wagner, ClaimCheck is the product TriZetto would have selected
had it not sold the products accused of infringement.  Thus, the very product Wagner relies on
was itself a non-infringing alternative.  Once again, Wagner admits that this was an option for
TriZetto (D.I. 177, Exh. C, at 65:21-25), but he does not factor this into his report.  McKesson
tries to explain this away by stating that, "throughout the damages period," McKesson controlled
ClaimCheck and thus it was not available as an alternative.  D.I. 199 at 9.  McKesson, however,
did not control ClaimCheck until it acquired HBOC in 1999.  In 1995, GMIS obtained a license
to the '164 patent.  For a number of years thereafter, it was an independent company that could
have sold ClaimCheck to TriZetto and its predecessors.[3]  Thus, the flaw in McKesson's argument
about the GMIS alternative is that, while McKesson did control ClaimCheck during the *damages
period*, that period is artificially limited to six years by federal law.  35 U.S.C. § 286.  This
statutory damages period has nothing to do with when the infringement began or when, in the
but-for world, the infringer would have looked for alternatives.[4]  It is beyond dispute that during

---

[3]    Interestingly, McKesson relies heavily on the fact that TriZetto would not have used any
alternative because it so strongly preferred ClaimCheck.  But, through the GMIS license,
TriZetto could have lawfully obtained a license for ClaimCheck – *but chose not to*.

[4]    The reason the damages period is different from the period during which TriZetto's
predecessors would have been assessing the alternatives is that McKesson waited eleven
years from the beginning of the alleged infringement to bring this action.

the relevant period – the first few years of the alleged infringement – ClaimCheck was an obvious and available alternative. As a result, Wagner had no excuse for ignoring it in his report.

Finally, Wagner's own reasons for ignoring these indisputably available alternatives ring hollow:

- Wagner cites the fact that TriZetto did not create an interface between these alternatives and its claims processing system. Wagner Report at 6-8. In other words, he dismisses these alternatives because TriZetto did not actually use them. This is, however, the case in every patent infringement lawsuit. If the alleged infringer had actually used the alternative, there would have been no infringement.

- Wagner cites the fact that, in 2002, TriZetto did create an interface between its system and ClaimCheck at the behest of a few customers. *Id.* This deal, however, did *not* include TriZetto ceasing to sell its own clinical editing software; ClaimCheck was not selected as a replacement for TriZetto's own programs. This fact proves nothing about what TriZetto would have done had it elected to not offer its own clinical editing programs.

- Wagner cites the fact that TriZetto's predecessor – Erisco – was initially concerned that McKesson's predecessor – HPR – might file an infringement action against it. It is hard to see how this is relevant. The issue is what alternatives Erisco would have had if it had chosen not to offer its own product. Again, the fact that it did not actually use one of the available alternatives does not relieve Wagner of his burden to consider those alternatives as part of the *Panduit* inquiry.

McKesson argues this is simply a case of TriZetto disagreeing with an expert's assumptions, and that should be addressed during cross-examination at trial. That is not right. Once an expert asserts lost profits damages based on the *Panduit* analysis, he must follow the roadmap the law provides and cannot simply assume his way around one of the legal requirements and the facts related to that requirement. That will lead only to legally insufficient testimony and jury confusion. That is what Wagner has done here, and his opinions regarding lost profits damages should be held inadmissible.

### B.     McKesson Has Not Shown That Wagner's Use Of The Book Of Wisdom Is Proper As A Matter Of Law And Public Policy

In its Opening Brief, TriZetto argued that Wagner's application of the "book of wisdom" approach is wrong as a matter of law because it changes the actual parties at the bargaining table and completely disregards the hypothetical negotiation date. McKesson responds by mischaracterizing TriZetto's argument and by distorting this Court's own precedent. McKesson claims that TriZetto's argument regarding Wagner's use of the "book of wisdom" is "based on an overly narrow and rigid view." D.I. 199 at 14. TriZetto does not argue, however, that all events that occurred after the date of the hypothetical negotiation should be excluded. Rather, information on how successful the patented product became in subsequent years should be admissible to ensure that the patentee is not short-changed. Nevertheless, the impact of such events must be considered *from the position of the patentee at the time of infringement.* In other words, what would the patentee at the time have done if it had known what actually happened in subsequent years. In this case, however, Wagner goes too far by using subsequent mergers and changes in patent ownership to alter the actual parties at the negotiation table. As a result,

Wagner is able to artificially inflate McKesson's damages far beyond that which would justly compensate it for infringement. The book of wisdom cannot be stretched that far.

The book of wisdom was not designed to swallow up the black letter rule that the date of the negotiation is the time infringement began. This Court has recognized the importance of this date in determining the "risks and expectations" of the actual parties at the hypothetical negotiation table. *Honeywell Int'l, Inc. v. Hamilton Sunstrand Corp.*, 378 F. Supp. 2d 459, 469 (D. Del. 2005). Factors such as subsequent market share and the success and popularity of the invention should be considered because these are elements of value that are inherent in the quality of the protected invention. The book of wisdom, however, does not allow an expert to disregard completely the negotiation date, the actual parties at the bargaining table or the circumstances that existed at that time. As the court stated in *Sinclair*, "the use of the book of wisdom does not charge the offender with elements of value non-existent at the time of his offense. *It is to bring out and expose to light the elements of value that were there from the beginning*." *Sinclair Refining Co. v. Jenkins Petroleum Process Co.*, 289 U.S. 689, 698 (1933) (emphasis added). Subsequent events such as mergers and changes in patent ownership have nothing to do with the inherent value of the protected invention. Thus, to disregard the negotiation date and to change the actual parties at the hypothetical bargaining table based on such events grants the patent owner elements of value that did not exist at the time infringement began.

In support of its position, McKesson cites two cases decided by this Court that analyze the book of wisdom. Neither, however, supports a change in the actual parties at the bargaining table or a wholesale disregard of the hypothetical negotiation date. In *Honeywell*, this Court determined that sales projections not available at the time infringement began may be used

as a royalty base to calculate damages.  *Honeywell* does not stand for the proposition, however, that the actual parties at the bargaining table may be changed or that the negotiation date may be totally disregarded.  In fact, the opinion validates the proposition that there are limits on what post-negotiation information may be used to calculate damages.  In *Honeywell*, this Court cited Federal Circuit authority supporting this very proposition, and although that authority was found to not preclude the use of post-negotiation sales data, this Court found no fault with the position that some post-negotiation information may not be used to calculate damages.  378 F. Supp. 2d at 468 (*citing Integra Life Sciences I Ltd. v. Merck KGaA*, 331 F.3d 860 (Fed. Cir. 2003)).  Thus, although flexible, the book of wisdom approach is not without limits.

In *St. Clair Intellectual Property Consultants, Inc. v. Canon, Inc.*, C.A. No. 03-241, 2004 WL 2213562 (D. Del. Sept. 28, 2004), this Court allowed Wagner to use some post-negotiation information to determine the value of a license.  This information was admitted because there was a lack of evidence of the invention's value at the time of infringement.  *Id.* at *9.  The Court did not, however, give Wagner free reign to substitute the actual parties at the bargaining table or to disregard totally the hypothetical negotiation date.  Although endorsing a flexible approach to the book of wisdom, the Court recognized the need for the reasonable royalty analysis to be based on facts *that existed at the time of the hypothetical infringement*.  *Id.* at *7.  Nothing in *St. Clair* indicates that this Court was sanctioning a change in the actual parties to the hypothetical negotiation as Wagner advocates.

McKesson does not deny that Wagner used the post-negotiation events to establish *McKesson's* hypothetical bargaining position but never applied this methodology to HPR – the patent holder at the time infringement began.  It is one thing to ask what HPR would have done had it been able accurately to predict the future, but quite another to assume the

royalty would be set by a company that did not even own the patent until many years after the fact. Nothing in either *Honeywell* or *St. Clair* sanctions this distorted use of the book of wisdom. Furthermore, Wagner himself admits that there is no federal court precedent supporting his approach:

> Q:   Are you aware of any case holding that it's appropriate to assume the actual parties to the hypothetical negotiation were parties that were neither the patentee nor the accused infringer as of the date of the negotiation?
>
> A:   No. *And believe me, I have looked.* I think this is an area we need guidance from either the Federal Circuit or the Supreme Court of the United States, because it is a question that comes up often in cases that I deal with, *and there is absolutely zero case law on this topic*.[5]

D.I. 177, Exh. C, at 153:11-19 (emphasis added). By substituting the companies that would have participated in the hypothetical negotiation, and relying on the positions and practices of two new companies (McKesson and TriZetto) as they existed over ten years after the alleged infringement began, Wagner removes the final trace of what makes the negotiation date relevant. Without respect for what the actual parties to the hypothetical negotiation would have done in light of subsequent events, the date of the hypothetical negotiation becomes meaningless.

McKesson relies heavily on this Court's statement in *Honeywell* that application of the book of wisdom must be flexible in order to discourage infringement. 378 F. Supp. 2d at 465-66. An approach that would allow a change in the actual parties to the hypothetical negotiation, however, would strain the book of wisdom beyond its breaking point. If a patent owner could increase its bargaining position in patent litigation through a series of mergers or acquisitions involving larger entities, it may be encouraged to delay litigation in order to do so.

---

[5]    It is interesting to note that both *Honeywell* and *St. Clair* were decided prior to Wagner's deposition date, and that Wagner was directly involved in the *St. Clair* case. Nevertheless, when asked at his deposition if he was aware of any Federal Circuit case that supported his current approach to the book of wisdom, *he did not cite either case*.

12.

Once the patent owner realizes that he has a viable infringement claim, it could auction itself to the high bidder who hopes to increase its potential recovery due to its more lucrative bargaining position. Ultimately, the patent owners who will benefit most from Wagner's approach to the book of wisdom are large entities that acquire smaller companies with lucrative causes of action for patent infringement. This cannot be what the book of wisdom was meant to achieve.

By respecting the hypothetical negotiation date and the actual parties involved at that time, this public policy nightmare can be avoided and still give patentees the benefit of post-negotiation success of the invention. Thus, while some information concerning subsequent events should be allowed in order to determine its effect on the *actual parties* to the hypothetical negotiation, other information that would change the identity of those parties should be excluded.

In the end, Wagner's approach to the book of wisdom is not supported by any federal court decision. By changing the actual parties at the negotiation table and thereby rendering the date of the hypothetical negotiation irrelevant, Wagner overcompensates McKesson pursuant to a hypothetical negotiation not supported by the law. As such, his book of wisdom methodology is flawed and unreliable.

### C.    McKesson Has Not Shown That Wagner's Use Of The Entire Market Value Rule Is Proper As A Matter Of Law

In its Opening Brief, TriZetto demonstrated that Wagner has misinterpreted the entire market value rule and used that misinterpretation as the basis for his reasonable royalty analysis. Under the entire market value rule, patentees may claim damages for unpatented products sold alongside the patented invention if three strict standards are met:  (1) the patented feature must form the basis for customer demand for the entire product sold; (2) the patentee must reasonably anticipate the sale of the unpatented parts along with the patented component;

13.

and (3) the patented and the unpatented inventions must be functionally related. *TWN Mfg. Co. v. Dura Corp.*, 789 F.2d 895, 901 (Fed. Cir. 1986). Furthermore, the Federal Circuit has held that a critical fact in applying the entire market value rule is that the infringing product derives substantially all, if not its entire, value from use of the patented component. *W. Elec. Co. v. Stewart-Warner Corp.*, 631 F.2d 333, 341 (4th Cir. 1980).

McKesson cannot defend Wagner's misuse of the entire market value rule in this case. Through misapplication of this rule, Wagner is able to inflate significantly McKesson's reasonable royalty damages by applying his already contrived reasonable royalty rate to *all of TriZetto's revenue* – including revenue not associated with clinical editing. In fact, as McKesson and Wagner know, clinical editing is a small fraction of TriZetto's business, and so by seeking damages based on all of TriZetto's revenue, they are taking what should be a very modest case and expanding it into a claim for huge damages.

For expert testimony to be admissible, there must not be too large an analytical gap between the facts of the case and the opinions offered. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). In this case, McKesson is unable to show any connection between Wagner's application of the entire market value rule and the facts of this case. To use the entire market value rule, Wagner must show that TriZetto would not be able to sell its other products and services without offering clinical editing software. He has made no such showing. McKesson attempts to justify Wagner's use of the entire market value rule based on the fact that TriZetto's customers might gain substantial savings by using clinical editing software. D.I. 199 at 20-21. This does not, however, demonstrate that without a clinical editing product TriZetto's entire claims processing business would crumble; it may show the clinical editing software has value,

but it has little to do with whether TriZetto's other products and services have value separate from clinical editing.

Most importantly, Wagner has done no analysis or independent research to determine the importance of clinical editing to TriZetto's overall claims processing product line. Wagner testified as follows:

> Q:      What analysis have you done to determine which of TriZetto's products and services would not be sold if TriZetto did not offer clinical editing?
>
> A:      It is my understanding – *I haven't done any analysis. Because I have been told to assume* that if they did not have that functionality, that these are foundational patents to this whole area, that clients require this.

D.I. 177, Exh. C, at 135:24-25, 136:1-5 (emphasis added). Moreover, Wagner admitted that he has not studied whether TriZetto's revenues would have been affected in any way by not offering a clinical editing component as part of its overall claims processing system. *Id.* at 137:22-138:13. Without such information, Wagner cannot logically assume that his royalty rate can be applied to *all* of TriZetto's revenue under the entire market value rule. He simply does not have sufficient facts and data to make that claim. The analytical gap between Wagner's methodology and the facts of this case is simply too great to allow his testimony on this issue.

Finally, Wagner's use of the entire market value rule is at odds with what he himself says would have occurred in the but-for world. Wagner's entire damages model hinges on the idea that TriZetto would have kept all of the customers it actually has, even if it had not sold them its own clinical editing software, and it would have provided those customers with an interface between its claims processing system and ClaimCheck. In other words, the customers would have bought all of TriZetto's other products and services but would have purchased the clinical editing software from McKesson. Indeed, McKesson attempts to use this model of the

but-for world to excuse away Wagner's lack of analysis regarding non-infringing alternatives. D.I. 199 at 4-5.  Obviously, this means TriZetto can sell its other products and services without offering clinical editing software.  How then can Wagner assume TriZetto would not have sold any of its other products in the absence of clinical editing and so the entire market value rule applies?  Such inconsistent opinions make Wagner's testimony on the entire market value rule unreliable and inadmissible.

Ultimately, Wagner has simply assumed too much in applying the entire market value rule.  He has done nothing to determine the effect of the accused products on the sales of TriZetto's other products and services, and has in fact assumed TriZetto can keep its customers without offering the accused products.  To allow him to present a damages model based on all of TriZetto's revenue to the jury would be improper.  His testimony regarding the entire market rule should be excluded.

### III.  CONCLUSION

For the foregoing reasons, TriZetto respectfully submits that Wagner's opinions and testimony should be excluded.

MORRIS, NICHOLS, ARSHT &  TUNNELL LLP

*/s/ Rodger D. Smith II (#3778)*

Jack B. Blumenfeld (#1014)
Rodger D. Smith II (#3778)
1201 North Market Street
P.O. Box 1347
Wilmington, Delaware 19899-1347
(302) 658-9200
  *Attorneys for Defendant*
  *The TriZetto Group, Inc.*

16.

OF COUNSEL:

Jeffrey T. Thomas
David A. Segal
Michael A. Sitzman
GIBSON, DUNN & CRUTCHER LLP
Jamboree Center, 4 Park Plaza
Irvine, California 92614-8557
(949) 451-3800

January 12, 2006
501784

## CERTIFICATE OF SERVICE

I, Rodger D. Smith II, hereby certify that on January 12, 2006, I caused to be electronically filed The TriZetto Group Inc.'s Reply Brief In Support Of Its Motion To Preclude The Expert Testimony Of Michael J. Wagner with the Clerk of the Court using CM/ECF, which will send notification of such filing(s) to the following:

Thomas J. Allingham, II
Skadden, Arps, Slate, Meagher & Flom LLP

I also certify that copies were caused to be served on January 5, 2006, upon the following in the manner indicated:

### BY EMAIL AND HAND

Thomas J. Allingham, II
Skadden, Arps, Slate, Meagher & Flom LLP
One Rodney Square
P.O. Box 636
Wilmington, DE  19899

### BY EMAIL AND FEDERAL EXPRESS

Jeffrey G. Randall
Skadden, Arps, Slate, Meagher & Flom LLP
525 University Avenue
Suite 1100
Palo Alto, CA  94301

/s/     *Rodger D. Smith II (#3778)*
Morris, Nichols, Arsht & Tunnell LLP
1201 N. Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
rsmith@mnat.com