# EXHIBIT F

## Page 1

1    UNITED STATES DISTRICT COURT
2    DISTRICT OF DELAWARE
3
4   McKESSON INFORMATION SOLUTIONS, LLC,
5        Plaintiff
6   v.                CA NO. 04-1258 (SLR)
7   THE TRIZETTO GROUP, INC.,
8        Defendant
9
10
11

12        VOLUME I
13    VIDEOTAPED DEPOSITION OF RANDALL
14 DAVIS, Ph.D., a witness called on behalf of
15 the Plaintiff, pursuant to the Federal Rules
16 of Civil Procedure, before Jessica L.
17 Williamson, Registered Merit Reporter,
18 Certified Realtime Reporter and Notary
19 Public in and for the Commonwealth of
20 Massachusetts, at the Offices of Skadden,
21 Arps, Slate, Meagher & Flom LLP, One Beacon
22 Street, Boston, Massachusetts, on Wednesday,
23 November 30, 2005, commencing at 9:27 a.m.
24 JOB NO. 41297
25

## Page 3

1         I N D E X
2   DEPONENT            PAGE
3   RANDALL DAVIS, Ph.D.
4   Examination By Mr. Randall    5, 310
5   Examination By Mr. Segal      297
6
7      E X H I B I T S
8   NO.              PAGE
9   1 Copy of '164 patent        11
10  2 Expert Report dated October    22
         24, 2005
11
    3 Expert Report dated November    22
12    14, 2005
13  4 Article entitled "Enhancing    28
      Accuracy and Timeliness is
14    Integral to the Claims
      Adjudication Process"
15
    5 Document relating to AMS     141
16    entitled "Setting a New
      Standard"
17
    6 Document bearing Bates stamp   142
18    Nos. RD000314 - 324
19  7 Document entitled "AMS June    142
      1986 HDI-Proprietary"
20
    8 One-page document bearing    142
21    Bates stamp No. RD000420
22
23
24
25

## Page 2

1   A P P E A R A N C E S
2
3   SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
4    (By Jeff Randall, Esq.)
5    525 University Avenue
6    Palo Alto, California 94301
7    (650) 470-4500
8    jrandall@skadden.com
9    Counsel for the Plaintiff
10
11  GIBSON, DUNN & CRUTCHER LLP
12   (By David A. Segal, Esq.)
13   4 Park Plaza
14   Irvine, California 92614-8557
15   (949) 451-3973
16   dsegal@gibsondunn.com
17   Counsel for the Defendant
18
19  ALSO PRESENT:
20
21   George Dobrentey, Videographer
22
23
24
25

## Page 4

            P R O C E E D I N G S
09:10:46  1
09:27:22  2        THE VIDEOGRAPHER:  Good morning.
09:27:33  3   We are recording and are now on the record.
09:27:35  4   Today's date is November the 30th, 2005, and
09:27:38  5   the time is 9:27 a.m.  My name is George
09:27:42  6   Dobrentey.  I'm a legal videographer for G &
09:27:46  7   M Court Reporters, Ltd.  Our business
09:27:46  8   address is 42 Chauncy Street, Suite 1A,
09:27:50  9   Boston, Massachusetts 02111.
09:27:51 10       This is the deposition of Randall
09:27:55 11   Davis in the matter of McKesson Information
09:28:00 12   Solutions vs. TriZetto Group in the United
09:28:04 13   States District Court in the District of
09:28:06 14   Delaware, Civil Action No. 04-1258 (SLR).
09:28:11 15       This deposition is being taken at One
09:28:15 16   Beacon Street in Boston, Massachusetts on
09:28:17 17   behalf of the plaintiff.  The court reporter
09:28:18 18   is Jessica Williamson.  The counsel will
09:28:19 19   state their appearances, and the court
09:28:21 20   reporter will administer the oath.
09:28:22 21       MR. RANDALL:  Jeff Randall
09:28:24 22   representing plaintiff, McKesson.
09:28:26 23       MR. SEGAL:  David Segal on behalf
09:28:27 24   of the TriZetto Corp.
         25

**SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES**
**877.955.3855**

05:56:40  1    are contained in the claim, what does it do,
05:56:43  2    the system?
05:56:44  3         MR. SEGAL: By the way, I note that
05:56:45  4    counsel's at seven hours of testimony time.
05:56:47  5    I'll allow him to finish his questioning,
05:56:49  6    and then I have a couple of questions, but I
05:56:52  7    believe he's out of time. And I advised him
05:56:53  8    at the last break that I had some questions,
05:56:55  9    and I advised him about a half hour ago on
05:56:59 10    the record that I had questions.
05:57:00 11         Ask the court reporter to read back
05:57:01 12    the question because I probably --
05:57:06 13  Q.  You can answer the question.
05:57:04 14         MR. SEGAL: -- interrupted the
05:57:06 15    flow.
05:57:06 16  A.  Actually, to make it accurate, if you don't
05:57:08 17    mind, it would help to have it read back.
05:57:13 18  Q.  Once the three accused infringing systems
05:57:18 19    determine how many medical service codes are
05:57:20 20    contained in a given claim, what do the
05:57:25 21    systems do next?
05:57:26 22  A.  Okay. The reason that is a little bit
05:57:33 23    difficult to say easily is that that's --
05:57:39 24    the answer to the question is largely
05:57:42 25    contained in my November 14th report at Page

Page 293

05:57:48  1    B-4. It's one of the flow charts, and the
05:57:53  2    shortest answer to your question, the most
05:57:55  3    compact answer is this is what happens, all
05:57:57  4    of this, which is why it's hard to simply
05:58:00  5    say what you said. Sorry. Let me say that
05:58:04  6    again. That's why I can't simply agree with
05:58:06  7    what you said because it's noticeably more
05:58:08  8    complicated than that.
05:58:09  9  Q.  Do all of the three accused infringing      .
05:58:13 10    systems satisfy the next element in Claim 3,
05:58:16 11    means for determining whether one of the
05:58:17 12    medical service codes in a plurality of
05:58:19 13    medical service codes is valid by
05:58:22 14    interacting with the database in a set of
05:58:27 15    relationships contained in the database?
05:58:40 16  A.  Yes, they can do that.
05:58:41 17  Q.  And do each of the three accused systems
05:58:44 18    satisfy the next element, the means for
05:58:46 19    authorizing an element?
05:58:48 20  A.  Yes.
05:58:48 21  Q.  And do each of the three accused infringing
05:58:51 22    systems satisfy the last element, the means
05:58:54 23    for rejecting medical service codes?
05:58:56 24  A.  Yes.
05:58:57 25  Q.  All right. So with respect to Claim 3 --

Page 294

05:58:59  1         MR. SEGAL: You're out of time,
05:59:00  2    counsel.
05:59:00  3         MR. RANDALL: I have one more
05:59:01  4    question.
05:59:01  5         MR. SEGAL: Okay.
05:59:02 .6  Q.  With respect to Claim 3, would you agree
05:59:04  7    that the only dispute regarding whether or
05:59:07  8    not the three accused systems infringed that
05:59:11  9    claim is the word "predetermined" and the
05:59:20 10    element that states "means for ascertaining
05:59:23 11    whether the at least one claim contains a
05:59:25 12    plurality of medical service codes"?
05:59:28 13  A.  Those are the distinctions I would make at
05:59:30 14    the moment, yes.
05:59:30 15  Q.  And those are the only ones?
05:59:31 16  A.  These are the only ones I know of right now,
05:59:34 17    yes.
05:59:35 18  Q.  And so other than those two element --
05:59:37 19         MR. SEGAL: You said one question,
05:59:39 20    counsel. You're now on four.
05:59:40 21  Q.  Other than those two exceptions, you would
05:59:50 22    agree that the three accused systems
05:59:55 23    infringe Claim 3, correct?
05:59:56 24  A.  I wouldn't say they infringe Claim 3,
05:59:59 25    because, as you've just said, they don't

Page 295

06:00:02  1    have elements of the claim, so I don't know
06:00:04  2    what it would mean to infringe Claim 3 if
06:00:07  3    we're taking elements of Claim 3 out of
06:00:09  4    there. So may I say something more specific
06:00:11  5    for the sake of time? You and I have gone
06:00:13  6    through this list, and when looking at
06:00:15  7    individual elements we have agreed or agreed
06:00:18  8    to disagree about each of those individual
06:00:20  9    elements. That's what I'm prepared to stand
06:00:22 10    on. I won't offer an opinion on a claim
06:00:24 11    that isn't what's in the patent. .
06:00:27 12  Q.  The three systems include all of the
06:00:30 13    components of Claim 3 except for the term
06:00:37 14    "predetermined" and except for, in your
06:00:38 15    opinion, the element that says "means for
06:00:41 16    ascertaining whether the at least one claim
06:00:43 17    contains a plurality of medical service
06:00:44 18    codes," correct?
06:00:45 19  A.  That, I will agree with.
06:00:47 20         MR. RANDALL: Okay. Counsel?
06:00:48 21         MR. SEGAL: Okay.
         22
         23
         24
         25

Page 296

74 (Pages 293 to 296)

**SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES**
**877.955.3855**

# EXHIBIT G

# CONDENSED TRANSCRIPT & WORD INDEX

## DEPOSITION OF MARK MUSEN, M.D., PH.D.

## MCKESSON VS. TRIZETTO GROUP

### NOVEMBER 22, 2005



(310) 207.8000   Los Angeles
(949) 955.0400   Orange County
(415) 433.5777   San Francisco

(916) 922.5777   Sacramento
(408) 885.0550   San Jose
(951) 686.0606   Inland Empire

(818) 702.0202   San Fernando Valley
(858) 455.5444   San Diego
(760) 322.2240   Palm Springs

09:56  1  between a predetermined database and some other kind of
09:56  2  database, that -- so that I would not -- I would not
09:56  3  view that term as having special meaning in -- in
09:56  4  computer science jargon.
09:56  5      MR. HENDERSHOT:  Do you mind if we go off the
09:57  6  record for just a minute?
09:57  7      MR. SITZMAN:  Yeah.
09:57  8      MR. HENDERSHOT:  You don't mind?
09:57  9      MR. SITZMAN:  You don't have to stop the
09:57 10  video. It can take a while to get on.
09:57 11      (Discussion off the record.)
09:57 12      MR. SITZMAN:  Back on the record.
09:57 13      Q.  The predetermined database. So I think what
09:57 14  you're saying is, is that in the literature in
09:57 15  computer science world, there wouldn't be a distinction
09:57 16  between predetermined database and database.
09:57 17      A.  That's correct. I would -- I would not see
09:57 18  that as a -- as a buzzword.
09:58 19      Q.  Okay. And -- okay. However, the drafters of
09:58 20  the patent use the phrase "predetermined database" and I
09:58 21  guess the question I have for you is do you think, based
09:58 22  on your expertise, that predetermined database should be
09:58 23  given some special meaning, then?
09:58 24      A.  I --
09:58 25      THE REPORTER:  Did or didn't?

Page 41

09:58  1      THE WITNESS:  I -- I didn't say either.
09:58  2      I give it, the term, the ordinary meaning that
09:58  3  one would infer from the way the claim is written
09:58  4  stating that the database of -- of codes is created
09:58  5  prior to processing, and that's -- I think that's all it
09:58  6  means.
09:58  7  BY MR. SITZMAN:
09:58  8      Q.  Okay. Now, when we get down to other words,
09:58  9  however, let me see if I can quickly find one in this
09:58 10  chart.
09:58 11      Yeah. Turn to page 11 of the same tab we're
09:58 12  looking at.
09:58 13      A.  Okay.
09:58 14      Q.  And in that bottom cell, on the bottom cell
09:59 15  left, there -- it uses the phrase "non-medical
09:59 16  criteria."
09:59 17      A.  Yeah.
09:59 18      Q.  Now, when you -- when you saw that phrase,
09:59 19  what meaning did you give that phrase?
09:59 20      A.  Well, I have to -- I have to just back up a
09:59 21  minute. I read that claim in the context of the claims
09:59 22  that talked about medical criteria, so my initial
09:59 23  reading was that, presumably, medical criteria had a
09:59 24  meaning, and non-medical criteria was the complement of
09:59 25  that.

Page 42

09:59  1      I -- I infer that by non-medical criteria, the
09:59  2  emphasis here is on criteria that are not a function of
09:59  3  patient care or the procedure being performed as much as
09:59  4  the mechanics of billing or of claim -- claims
09:59  5  processing.
09:59  6      Q.  Well, can -- can you give me an example of
09:59  7  what you mean by non-medical criteria, then, in that
09:59  8  context?
10:00  9      A.  Okay. The -- one of the classic examples
10:00 10  would be the surgeon who charges for the operation and
10:00 11  then also charges for the instruments of the operation
10:00 12  or for cleaning the instruments of the operation or for
10:00 13  the tray used to perform the procedure.
10:00 14      There was a time, perhaps, when it was
10:00 15  appropriate to bill separately for those non-medical
10:00 16  components of performing the procedure. Now those
10:00 17  codes, kinds of codes, usually are -- are disallowed.
10:00 18      Q.  Okay. And are you aware of the existence of
10:00 19  codes that are associated with the non-medical criteria
10:00 20  that you're talking about?
10:00 21      A.  As I just said, there are CPT codes for
10:00 22  procedure trays or for instruments or for setups, and
10:01 23  those are -- those are appropriate ser- -- service
10:01 24  codes. Whether they're allowable for reimbursement is
10:01 25  another question.

Page 43

10:01  1      Q.  And you're personally aware of these
10:01  2  procedural codes that you're -- that you're referring
10:01  3  to?
10:01  4      A.  Absolutely. When I was a medical resident, we
10:01  5  were all instructed to make sure that we kept little
10:01  6  stickers on the procedure trays because those would be
10:01  7  billed for separately. That was a while back.
10:01  8      Q.  Okay. How -- how is, looking at this one --
10:01  9  at this one cell, this -- this one step --
10:01 10      A.  Sure.
10:01 11      Q.  -- how is it, then -- can you give me an
10:01 12  explanation or an example of how one code, then, is
10:01 13  mutually exclusive with another code based on
10:01 14  non-medical criteria?
10:01 15      A.  Well, as I just said, if you're billing
10:01 16  someone for a lumbar puncture and you're billing someone
10:02 17  for a lumbar puncture tray, then those would be mutually
10:02 18  exclusive. You couldn't bill for both of those.
10:02 19      Q.  And why couldn't you?
10:02 20      A.  You could -- you could bill for them. Would
10:02 21  they be allowed? That's the question. And they would
10:02 22  not be allowed because, presumably, the cost of
10:02 23  performing the procedure is tied in with the cost of the
10:02 24  supplies used to do the procedure, and so many payers
10:02 25  would argue that their reimbursement for the procedure

Page 44

11 (Pages 41 to 44)

MARK MUSEN, M.D., PH.D.

12:17 1 a medical service code?

12:17 2    A. Okay. Okay.

12:17 3    Q. And a set of -- that whole phraseology, if it

12:17 4 is going to be the customer that's going to decide the

12:17 5 valid and invalid?

12:17 6    A. And I think where we're having difficulty here

12:17 7 is that you and I are construing the word

12:17 8 "predetermined" in a different way.

12:17 9    Q. Okay.

12:17 10    A. As I look at the claims, I view predetermined

12:17 11 to mean that prior to the claims processing step, this

12:17 12 database exists as opposed to a database which is

12:17 13 altered or -- or developed at run time in some way. And

12:17 14 so in the '164 patent, the database is predetermined

12:17 15 prior to claims processing. That doesn't rule out the

12:17 16 possibility that the customer may take over the database

12:17 17 in any way he or she feels.

12:17 18    Q. And the tinkering in this instance would be

12:18 19 the determination of what it considers valid and

12:18 20 invalid.

12:18 21    MR. HENDERSHOT: In which case, in the '164

12:18 22 patent and some hypothetical customer or --

12:18 23    MR. SITZMAN: The hypothetical we were just

12:18 24 last working with where the valid and invalid was

12:18 25 constructs that the customer would decide.

Page 129

12:18 1    THE WITNESS: I mean, as we -- since we all

12:18 2 have health insurance, we all know that different payers

12:18 3 have different rules for what they will pay for and what

12:18 4 they won't pay for, and necessarily, any product that is

12:18 5 going to be doing claims processing has to have a

12:18 6 mechanism for the customer to be able to modify the

12:18 7 database in order for the policies of the customer to be

12:18 8 reflected in the software. Otherwise, no one would buy

12:18 9 the product. And so necessarily, the predetermined

12:18 10 database needs to be predetermined prior to claims

12:18 11 processing but not prior to purchase.

12:18 12 BY MR. SITZMAN:

12:19 13    Q. And I know this may sound redundant, but I

12:19 14 think it's worth going through. Let me turn your

12:19 15 attention to paragraph 42, Claim 12.

12:19 16    A. Okay.

12:19 17    Q. Here your analysis -- it's -- I'm looking --

12:19 18 and you might want to look at Claim 12, by the way.

12:19 19    A. I am.

12:19 20    Q. Okay. Good.

12:19 21    Claim 12, in the determining step, uses a

12:19 22 phraseology "medically exclusive with any other medical

12:19 23 service code." Do you see that?

12:19 24    A. Yep.

12:19 25    Q. Your analysis at -- at paragraph 42 does not

Page 130

12:20 1 include a discussion of whether or not the allegedly

12:20 2 infringing products determines whether the codes are

12:20 3 medically exclusive with any other medical service code.

12:20 4 Is -- is that implied somewhere in -- in paragraph 42?

12:20 5    A. Well, it -- it's implied in paragraph 42, and

12:20 6 I think when you go to the supporting information in --

12:20 7 in the appendices, it's clear that that's the case.

12:20 8    Q. All right. What -- give me -- can you give me

12:20 9 an example of -- of codes that are medically exclusive

12:20 10 of one another when they're submitted?

12:20 11    A. Well, that would be analogous to the medical

12:20 12 criteria that could lead codes to be mutually exclusive.

12:20 13 It would be impossible to do two separate procedures in

12:21 14 certain circumstances. Let me just see if I can come up

12:21 15 with an example.

12:21 16    You wouldn't be able to perform an amputation

12:21 17 on a patient who -- you wouldn't be able to perform the

12:21 18 same amputation twice, for example.

12:21 19    Q. Okay.

12:21 20    A. That would be medically exclusive.

12:21 21    Q. Okay. Now, would you need historical

12:21 22 information or are you thinking sort of two claims

12:21 23 coming in for amputation of the same leg --

12:21 24    THE REPORTER: "Amputation of the same leg" is

12:21 25 what I got.

Page 131

12:21 1    MR. SITZMAN: Same leg twice.

12:21 2    MR. HENDERSHOT: I'm just going to interpose

12:21 3 an objection. This line is misstating his testimony

12:21 4 from earlier in which he discussed the --

12:21 5    THE REPORTER: "In which he discussed" -- say

12:21 6 that again.

12:21 7    MR. HENDERSHOT: Sorry.

12:21 8    In which he discussed the distinction between

12:21 9 and the definitions of mutually exclusive due to

12:21 10 non-medical criteria and medically exclusive.

12:22 11    THE WITNESS: But to answer your question, a

12:22 12 claim that had amputation of the right leg as two pro-

12:22 13 -- two billable procedures would be -- would obviously

12:22 14 involve two mutually exclusive medically related codes.

12:22 15 BY MR. SITZMAN:

12:22 16    Q. And in that -- would the claims come in to --

12:22 17 would -- it would be a singular claim with two codes for

12:22 18 amputating the same leg --

12:22 19    A. Right.

12:22 20    Q. -- in this hypothetical that we're talking

12:22 21 about.

12:22 22    A. In this hypothetical, which is highly

12:22 23 hypothetical.

12:22 24    Q. I gotcha. But that would be an example. I

12:22 25 gotcha.

Page 132

33 (Pages 129 to 132)

MARK MUSEN, M.D., PH.D.

# EXHIBIT H

Page 1

```
 1        IN THE UNITED STATES DISTRICT COURT
 2          FOR THE DISTRICT OF DELAWARE
 3
 4   MCKESSON INFORMATION SOLUTIONS, LLC,
 5              Plaintiff,
 6         vs.          No. 04-1258-SLR
 7   THE TRIZETTO GROUP, INC.,
 8              Defendant.
 9
10
11
     _____
12
13
14
15      DEPOSITION OF PHILIP M. HAWLEY, JR., M.D.
16            Los Angeles, California
17          Wednesday, November 30, 2005
18
19
20
21   Reported by:
     RENEE A. PACHECO, RPR
22   CSR NO. 11564
23   JOB NO. 41623
24
25
```

Page 2

```
 1        IN THE UNITED STATES DISTRICT COURT
 2          FOR THE DISTRICT OF DELAWARE
 3
 4   MCKESSON INFORMATION SOLUTIONS, LLC,
 5              Plaintiff,
 6         vs.          No. 04-1258-SLR
 7   THE TRIZETTO GROUP, INC.,
 8              Defendant.
 9
10
     _____
11
12
13
14
15       Deposition of PHILIP M. HAWLEY, JR., M.D., taken on
16   behalf of Plaintiff, at 333 South Grand Avenue,
17   Los Angeles, California, beginning at 9:13 a.m. and
18   ending at 4:59 p.m. on Wednesday, November 30, 2005,
19   before RENEE A. PACHECO, RPR, Certified Shorthand
20   Reporter No. 11564.
21
22
23
24
25
```

Page 3

```
 1   APPEARANCES:
 2
 3   For Plaintiff:
 4     SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLC
       BY:  MICHAEL HENDERSHOT
 5     Attorney at Law
       525 University Avenue
 6     Suite 1100
       Palo Alto, California  94301
 7     (650) 470-4500
 8   For Defendant and the Witness:
 9     GIBSON, DUNN & CRUTCHER
       BY:  THEODORE KEVIN ROOSEVELT
10     Attorney at Law
       333 South Grand Avenue
11     Los Angeles, California  90071-3197
       (213) 229-7000
12
     Videographer:
13
       MAX BUSHMAN
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1             INDEX
 2   WITNESS                    EXAMINATION
 3   PHILIP M. HAWLEY, JR., M.D.
 4
 5
       BY MR. HENDERSHOT             6
 6
       AFTERNOON SESSION            136
 7
 8
            EXHIBITS
 9
     HAWLEY                     PAGE
10
     1  Dr. Hawley's Report        47
11
     2  U.S. Patent No. 5,253,164        118
12
     3  Article by Richard Egdahl, M.D. and
13     Robert Hertenstein, M.D.        158
14
15
16
          INFORMATION REQUESTED
17
            NONE.
18
19
20
21
          INSTRUCTION NOT TO ANSWER
22
            NONE.
23
24
25
```

1 (Pages 1 to 4)

Page 221

```
 1      A   Okay.
 2      Q   And it's the convention we talked about, in the
 3   hypothetical earlier, would you agree that Code A and
 4   Code B, be one for a one-centimeter repair and a
04:12  5   two-centimeter repair are mutually exclusive from a
 6   claims processing standpoint and that they shouldn't be
 7   submitted on the same claim?
 8      A   The latter phrase I would agree with, that they
 9   shouldn't be submitted on the same claim, assuming the
04:12 10   hypothetical, which I believe likely is consistent with
11   coding conventions at that time, that you're supposed to
12   aggregate those. So the latter phrase I would agree
13   with.
14      Whether you're doing it on the basis of medical
04:12 15   exclusivity, it wouldn't be the way my mind would think
16   about it.
17      It would -- that would be a case of
18   fragmentation, breaking down a service into more than the
19   necessary parts, or redundancy. You know, a lot of times
04:12 20   it's -- can be classified under any of a couple of --
21   of -- of -- of rubrics.
22      Q   Okay. So -- so is it -- is it fair to say that
23   in your opinion, generally speaking, if you have two
24   unbundled codes on a claim, those codes are incompatible,
04:13 25   if they should be rebundled? Or do you apply different
```

Page 222

```
 1   definitions?
 2      A   The term -- I call it unbundling. I don't call
 3   it medically exclusive. I mean, no, I wouldn't think to
 4   ever call that -- that example medically exclusive. I
04:13  5   would call it unbundling.
 6      Q   Well, would you ever pay, say, Code A and
 7   Code B, whenever they're received on a claim together,
 8   100 percent of the time should be rebundled into Code C?
 9      A   Okay.
04:13 10      Q   Doesn't -- would you -- in that case, Code A and
11   Code B, under -- under that rule would never be paid
12   together on the same claim; is that correct?
13      A   Right. Or should not be paid.
14      Q   Should not be paid.
04:14 15      A   Yeah.
16      Q   So code -- both Code A and Code B in -- in that
17   example, in your opinion, would be determined invalid, to
18   bring it back to sort of the language of Claim 3?
19      MR. ROOSEVELT: Vague and ambiguous to the term
04:14 20   "invalid."
21   BY MR. HENDERSHOT:
22      Q   As you understand its use in Claim 3.
23      A   It could fall within the definition of valid and
24   invalid as presented in Claim 3.
04:14 25      Q   But you have a differing understanding of
```

Page 223

```
 1   exclusivity?
 2      Doesn't -- doesn't the receipt -- in that -- in
 3   that hypothetical, doesn't the receipt of Code A with
 4   Code B exclude the payment of Code B?
04:14  5      A   It certainly wouldn't be the way that I think
 6   most people in the -- in -- in this world, that is to
 7   say, the world of claim auditing, would describe it. It
 8   would be a very odd and unusual way.
 9      And I've known many people in the claim auditing
04:15 10   world. So they would not typically use those words.
11      Medically exclusive would be used for things,
12   like, for example, that -- that hypothetical I just gave,
13   you know.
14      You -- you can't be operating on a male and
04:15 15   female body part at the same time. You can't remove two
16   spleens from the same patient. There are, you know,
17   ready examples of it, but that's not one that I would --
18      Q   Okay.
19      A   -- think of, but --
04:15 20      Q   So I just want to -- I'm trying to -- I had
21   something in my mind from earlier, and I may have -- I
22   may have misinterpreted it.
23      You had said that in your view, in terms of
24   claims processing, the relationships between medical
04:15 25   service codes are almost always going to be medical, in
```

Page 224

```
 1   terms of those relationships you would apply in
 2   processing them; is that correct?
 3      A   When you're talking about the -- the question of
 4   incompatibility; in other words, A doesn't fit with B,
04:16  5   you know, it's a medically inconsistent fact.
 6      I mean, I -- I think you may be reading more
 7   into my statement --
 8      Q   Okay.
 9      A   -- than -- than -- than I intend. I mean I --
04:16 10   I -- I -- it's -- it's -- it's certainly is not -- this
11   is not an issue that comes anywhere close to affecting my
12   opinion on this -- regarding this patent.
13      Q   Okay. So -- so maybe we'll short-circuit all of
14   this. There -- there was no term anywhere in any of the
04:16 15   '164 claims you looked at that prevented you from
16   ascertaining sort of the scope of that claim in a
17   sufficient manner to enable you to prepare your
18   invalidity opinion?
19      A   Correct.
04:16 20      Q   So you were able to determine for yourself the
21   meets and bounds of each claim so you could decide
22   whether what falls within those meets and bounds would be
23   obvious?
24      A   Correct.
04:17 25      Q   Okay. And that's true for every claim in the
```

56 (Pages 221 to 224)

Page 225

1　'164 patent that you reviewed?

2　A　Yes. Yes.

3　MR. HENDERSHOT: Do you mind if we go off the

4　record for about five minutes? I just want to take a

04:17　5　look through my notes.

6　MR. ROOSEVELT: Sure.

7　MR. HENDERSHOT: Is that okay with you?

8　THE WITNESS: That's fine.

9　THE VIDEOGRAPHER: Going off -- excuse me.

04:17　10　Going off the record. The time is 4:17 p.m.

11　(Recess.)

12　THE VIDEOGRAPHER: And we are back on the

13　record. The time is 4:25 p.m.

14　BY MR. HENDERSHOT:

04:26　15　Q　Dr. Hawley, in formulating your opinions that

16　are set forth in your report, did you review McKesson's

17　proposed construction of the claims in this case?

18　A　I -- I don't -- no, I don't believe I did.

19　Q　Did you -- do you know if you reviewed

04:26　20　TriZetto's proposed construction of the claims in this

21　case?

22　A　No. I -- I know I didn't review either, in

23　fact, as I think about it, no.

24　Q　Okay. And just so I'm clear, your -- the

04:26　25　practices within the industry, prior to 1987, that you

Page 226

1　refer to in --

2　A　Yes.

3　Q　-- your report, your knowledge of those

4　practices was based on your interaction with people

04:27　5　within your own company and from companies you -- AMI

6　spoke with during the survey?

7　A　I would say more broadly based on my experience

8　at AMI Group L services, as well as my experience as a

9　consultant.

04:27　10　Q　And you gained that knowledge -- strike that.

11　And the experience you describe that you just

12　referenced in your last response, being your experience

13　at AMI and your experience as a consultant, the knowledge

14　you gained from that experience, regarding the -- the

04:27　15　practices you describe in your report, was that gleaned

16　from discussions, interactions with people from other

17　companies I take it?

18　A　And work performed, my own claim audit

19　experience, the claim audit experience of the staff that

04:28　20　worked for me ultimately.

21　Q　You just suggested -- strike that.

22　In your report, you offer your opinion that

23　the -- the categories of claim auditing, the specific

24　types of rules that you discuss here, were --

04:28　25　A　Yes.

Page 227

1　Q　-- were known on and inputted on a manual

2　basis --

3　A　That's correct.

4　Q　-- prior to the -- prior to 1987?

04:28　5　A　That's correct.

6　Q　Are you aware of any publication or publicly

7　available document or resource that would have described

8　those processes prior to 1987?

9　A　I'm not. I haven't done an exhaustive search

04:29　10　for such a document, but -- but no, as I sit here I'm

11　not.

12　Q　Okay. Would it affect your opinion if, in order

13　to qualify as prior art that is relevant to the claims of

14　the '164 patent, that the practices you discuss must have

04:29　15　been publicly known and generally accessible to the

16　public, would it affect your opinion, if that was the

17　law?

18　A　I'm sort of assuming that's the case, because my

19　sources were public sources. They weren't private,

04:30　20　confidential sources.

21　Q　Well, they -- they were consulting clients at

22　least -- strike that.

23　Let me walk through a list of some of the

24　sources. Were some of them consulting clients of yours?

04:30　25　A　Consulting clients of ours, yes.

Page 228

1　Q　Companies -- companies with which AMI had

2　discussions during their survey or that AMI's consultants

3　had discussions with during their survey?

4　A　That, and the experience of the consultants

04:30　5　themselves, many of whom had previously worked for health

6　insurance companies. It was one of the reasons we would

7　have retained them.

8　Q　So if I wanted to build a system, like the ones

9　described in the claims of the '164 patent, where would I

04:30　10　go about accessing the information, that -- that

11　knowledge, amongst these people?

12　A　Well, just as is described in the '164 patent,

13　just as I acknowledged I used in the work on

14　ClinicaLogic, it's in the form of nurses and doctors who

04:31　15　do this for a living that -- where that knowledge is

16　retained.

17　Most of the claim auditors in the country I'd

18　surmise, certainly based on my experience, are not

19　full-time claim auditors. They're -- and part of their

04:31　20　value is that they are practicing clinicians in the -- in

21　the community and have credibility for the fact that

22　they're practicing physicians.

23　And so they're -- they're readily available.

24　They're not hidden behind some confidential source.

04:32　25　They're just out there in the community. And were at

57 (Pages 225 to 228)

# EXHIBIT I



CONRAD
O'BRIEN
GELLMAN
& ROHN, PC

Louis C. Bechtle
*Attorney at Law*
Direct Dial: 215.864.8060
lbechtle@cogr.com

December 1, 2005

Jack B. Blumenfeld, Esquire
Morris, Nichols, Arsht & Tunnell
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899-1347

Michael A. Barlow, Esquire
Skadden Arps, Slate, Meagher & Flom
One Rodney Square
P.O. Box 636
Wilmington, DE  19899

RE:  McKesson Information Solutions LLC v.
The Trizetto Group, Inc.
No. 04-1258 (SLR) (D.Del.)

Dear Counsel:

Enclosed herewith is Special Master Order No. 2 in the above-referenced matter.

Sincerely,

Louis C. Bechtle

LCB/jrw
Enclosure

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

MCKESSON INFORMATION            :
SOLUTIONS, LLC,                 :
                                :
      Plaintiff,                :
                                :    NO.: 04-1256-SLR
      v.                        :
                                :
THE TRIZETTO GROUP, INC.,       :
                                :
      Defendant.                :

### SPECIAL MASTER ORDER NO. 2

Louis C. Bechtle, Special Discovery Master       December 1, 2005

     Over the last four to six weeks in particular, I received many documents

from the parties. These included letters, email communications, copies of letters to

third parties, including the court, many exhibits, and privilege logs, documents for

*en camera* review, letter briefs, and rulings by the court. I am in the process of

working through these materials as well as the various requests by plaintiffs and

defendants for relief concerning the discovery topics that have been described in

the court's order as being matters to be considered by the Special Discovery

Master (SDM). The major issue that runs through most of these requests by both

parties is in regard to the scope of the waiver that applies by reason of the

defendant's reliance upon the opinions of counsel that covers a substantial portion of the defense of the defendant to the plaintiff's claim.

On August 24, 2005, defendant produced opinions of outside counsel to the defendant of February 15, 2002 (from the law firm of Stradling Yocca) and opinions dated February 5, 2003 and November 12, 2003 from outside counsel to the defendants from Blakely Sokoloff). Additional productions were made on September 6, 2005 regarding materials from January 1994 from outside counsel relating to the defendant's defenses as well. At the September 8, 2005 conference before the court, defendant was requested to provide the standards that it used to produce privileged documents in connection with its willfulness, laches and estoppel defenses. (See transcript of September 8, 2005 hearing at pp. 38-39). The SDM has been provided with a letter dated September 12, 2005 from the defendant to the court where defendant provided the court with its standard it used to apply to the scope of its waiver. It acknowledged that the waiver of privilege under current circumstances is extensive in that it extends to documents relating to the subject matter of counsel's advice regarding the validity of the '164 patent and the laches and estoppel defenses). It cited Allergan, Inc. v. Pharmacia Corp., 2002 WL 1268047, at *2 (D.Del. May 17, 2002). ("the alleged willful infringer [should] disclose all of the information it possessed prior to or at the time it obtained opinions of counsel as to the subject matters discussed in such opinions".) Other

2

cases were cited and a similarly broad description of the standard to be used in such cases was set forth as defendant's measure of its obligation to produce materials that might otherwise be protected by privilege.

The central document, of course, following these events was Judge Robinson's ruling of September 20, 2005, which addressed the scope of the waiver as follows:

> **Waiver of privilege vis a vis defendant's willfulness defense.** As I've explained in the past, see e.g., Allergan, Inc. v. Pharmacia Corp., 2002 WL 1268047 (D. Del. 2002), once an alleged infringer relies on the opinion of counsel as a defense to the charge of willful infringement in one of my cases, the alleged infringer must disclose to the patentee "all of the information it possessed prior to or at the time it obtained opinions of counsel as to the subject matters discussed in the such opinions." Id. at 2. The scope of the waiver is not limited to what was communicated to or from counsel, but extends to all information possessed by the alleged infringer that relates to the subject matters of the opinion letters. Defendant's counsel has asserted that defendant has followed that mandate. (D.I. 86, 2-3) I agree with defendant that post-litigation privileged materials need not be disclosed.

The purpose of reciting this often repeated and important ruling at this time in the context of the background that brought this ruling forth is to state to the parties in regard to this SDM order, as well as any other orders hereafter issued by the SDM bearing upon the scope of the waiver, that there is no question but that the waiver in this instance is very broad. It can be expected that the SDM will apply this standard when it comes into play in matters presented to the SDM. One

of these matters is in regard to the claim by the plaintiff in its letter brief of

November 6, 2005 that defendant's counsel improperly restricted defendant

employee Craig Luftig (Defendant's Senior Director of Product Development

Management) and Karen Lampe (Defendant Business Analysis Specialist Facets

Development) from fully testifying. These depositions were taken before Judge

Robinson's order of September 20, 2005 and consequently, counsel did not have

the benefit of the court's final word concerning the scope of the waiver of privilege

by defendant. Defendant's counsel appeared to be of the view at the time of the

deposition that the attorney client privilege was in full play except in regard to the

preparation of the Blakely Sokoloff opinion letters or any conversations the

witness had with attorneys at the Blakely Sokoloff firm. Although counsel did

relent in one instance stating that communications the witness had with defendant's

in house counsel or Gibson Dunn & Clutcher on the subject of the Blakely

Sokoloff opinion letters would be waived. (See testimony cited at Exhibit C of

defendant's letter of November 6, 2005 at Transcript 151:23-152:21) It is plain,

reading the challenged testimony provided that these two witnesses were severely

restricted in answering the cited questions posed at them during the deposition in

relation to the scope of the waiver that now applies.

For this reason, in response to the request set forth in plaintiff's letter of

November 6, 2005 that these two witnesses be redeposed and asked the same (or

substantially similar) questions that they were prevented from answering at the deposition, together with reasonable follow up for any new answers provided that request, is granted.

There may be other instances where the witness's responses were limited prior to the court's September 20, 2005 ruling but which now would be permitted to be asked and answered, but not cited in plaintiff's letter of November 6, 2005 to the SDM. If that is the case, before applying to the SDM for consideration of any such review, the SDM will require the parties to confer and meet about any such specific areas of difference in an attempt to resolve them in keeping with the standard set forth in this order, which the parties should apply and that the SDM will apply.

SO ORDERED:

LOUIS C. BECHTLE
SPECIAL DISCOVERY MASTER

DATED:  December 1, 2005

5

EXHIBIT J

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

525 UNIVERSITY AVENUE
PALO ALTO, CALIFORNIA 94301
————
TEL: (650) 470-4500
FAX: (650) 470-4570
www.skadden.com

DIRECT DIAL
650-470-4880
EMAIL ADDRESS
JRANDALL@SKADDEN.COM

FIRM/AFFILIATE OFFICES
BOSTON
CHICAGO
HOUSTON
LOS ANGELES
NEW YORK
SAN FRANCISCO
WASHINGTON, D.C.
WILMINGTON
————
BEIJING
BRUSSELS
FRANKFURT
HONG KONG
LONDON
MOSCOW
MUNICH
PARIS
SINGAPORE
SYDNEY
TOKYO
TORONTO
VIENNA

November 15, 2005

**Via Facsimile (949) 475-4670**

Jeffrey Thomas, Esq.
Gibson, Dunn & Crutcher LLP
4 Park Plaza
Irvine, CA 92614

RE:    *McKesson Information Solutions LLC v. The TriZetto Group, Inc.,*
       C.A. No. 04-1258 (SLR) (D. Del.)

Dear Jeff:

Pursuant to Chief Judge Robinson's instructions during the November 7 hearing, McKesson requests that TriZetto provide fully operable Accused Systems (Facets, ClaimFacts, and QicLink). McKesson requests that TriZetto provide a technical person to install and configure each of the Accused Systems at our offices in Palo Alto. The installations would include: (i) the selection and configuration of the clinical editing criteria to apply to claims that Mr. Luftig testified in his deposition would take about 5 minutes to accomplish (Luftig Deposition at page 86); and (ii) set up and configuration of all of the necessary components to process claims including those used to add to the database during installation as indicated in Dr. Davis's rebuttal report.[1]

The access given by TriZetto should be consistent with Chief Judge Robinson's instruction that TriZetto provide a "system so that the plaintiff can run claims." This includes access to the full version of each Accused System -- not just the clinical editing portion of the systems. McKesson has accused the entire systems of infringement and TriZetto's own expert Dr. Davis states in his report that part of the infringing functionality in the Accused Systems is "not part of clinical editing, it is in fact done considerably earlier in the overall process." (Davis Report at 31.)

---

[1] Dr. Davis mentions that there are several kinds of records that must be configured during the installation of the TriZetto systems: the Clinical Edits Administrative Rules Record, a Service Maintenance Record, a Benefit Component Record, a ClaimFacts Clinical Edits Record, a ClaimFacts Anestesia Procedure Edits Record, and a Diagnosis Code Maintenance Record. (Davis Report at page 32-33)

Jeffrey Thomas, Esq.
November 15, 2005
Page 2

        Dr. Davis's report also indicates that TriZetto has set up working systems of
Facets, QicLink, and ClaimFacts for him to observe in preparation of his report
allowing Dr. Davis to view the operation of the Accused Systems and create screen
shots for use in his report. There is no legitimate reason why TriZetto was able to
provide its expert with fully operable Accused Systems but has refused to comply with
court orders requiring it to provide the operable Accused Systems to McKesson.
TriZetto's inexcusable delay has prevented McKesson's experts from the same access
to the Accused Systems in preparation of their expert reports.

        McKesson expects TriZetto to comply with its representations to the Court
during the hearing that: "we will give them everything we can…to teach them to try and
help them to get it to run." McKesson requests that TriZetto send out a technical person
by the end of this week in accordance with Judge Robinson's directive that: "It needs to
be soon because you are running out of time…."

                                                Very truly yours,

                                                Jeffrey G. Randall

cc:     David Segal, Esq. (*via facsimile*)
        Michael Sitzman, Esq. (*via facsimile*)
        Jack Blumenfeld, Esq. (*via facsimile*)