# EXHIBIT A

# HBO & CO

301 PERIMETER CTR N
ATLANTA, GA 30346
770. 393.6000

## 10-K

FORM 10-K
Filed on 03/12/1998 — Period: 12/31/1997
File Number 000-09900



GSI

LEADGAR® Information Provided by Global Securities Information, Inc.
800.669.1154
www.gsionline.com

SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, DC 20549

FORM 10-K

(Mark One)

/X/  ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE
ACT OF 1934

FOR THE FISCAL YEAR ENDED DECEMBER 31, 1997

OR

/ /  TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES
EXCHANGE ACT OF 1934

FOR THE TRANSITION PERIOD FROM _____ TO _____

COMMISSION FILE NUMBER 0-9900

HBO & COMPANY
(Exact name of registrant as specified in its charter)

| DELAWARE | 37-0986839 |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (IRS Employer Identification No.) |
| 301 PERIMETER CENTER NORTH ATLANTA, GEORGIA | 30346 |
| (Address of principal executive office) | (Zip Code) |

Registrant's telephone number, including area code: (770) 393-6000

Securities registered pursuant to Section 12(b) of the Act: NONE

Securities registered pursuant to Section 12(g) of the Act:

COMMON STOCK, $.05 PAR VALUE

(Title of Class)

Indicate by check mark whether the registrant (1) has filed all reports
required to be filed by Section 13 or 15(d) of the Securities Exchange Act of
1934 during the preceding 12 months (or for such shorter period that the
registrant was required to file such reports), and (2) has been subject to such
filing requirements for the past 90 days. Yes /X/ No / /

Indicate by check mark if disclosure of delinquent filers pursuant to Item
405 of Regulation S-K is not contained herein, and will not be contained, to the
best of the registrant's knowledge, in definitive proxy or information
statements incorporated by reference in Part III of this Form 10-K, or any
amendment to this Form 10-K. / /

Aggregate market value of the voting stock held by nonaffiliates of the
registrant, computed using the closing price as reported by The Nasdaq Stock
Market's National Market for the Company's common stock on February 28, 1998:
$11,551,175,807.

Indicate the number of shares outstanding of the registrant's common stock
as of the latest practicable date:

|  | OUTSTANDING AT FEBRUARY 28, 1998 |
|---|---|
| CLASS |  |
| Common Stock, $.05 par value...... | 213,416,717 |

DOCUMENTS INCORPORATED BY REFERENCE

Portions of the Annual Report to Stockholders for the year ended December
31, 1997, are incorporated by reference into Parts I, II and IV of this Form
10-K.

Portions of the definitive Proxy Statement for the Annual Meeting of
Stockholders to be held on May 12, 1998, are incorporated by reference into Part
III of this Form 10-K.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (CONTINUED)

8. ACQUISITIONS: (CONTINUED)

On December 23, 1997, the Company completed the acquisition of HPR, a leading provider of clinical information systems for the managed care industry. The stockholders of HPR received 0.6 of a share of HBOC common stock for each share of HPR common stock, or approximately 9.2 million HBOC shares.

On December 29, 1997, the Company completed the acquisition of NHES, a leading provider of health information technology solutions specializing in demand and disease management products. The stockholders of NHES received 0.3084 of a share of HBOC common stock for each share of NHES common stock, or approximately 1.8 million HBOC shares.

On August 21, 1996, the Company completed the acquisition of CyCare, a provider of physician practice management software systems and electronic commerce services for medical group practices, faculty practice plans and medical enterprises. CyCare stockholders received 0.43 of a share of HBOC Common Stock for each share of outstanding CyCare Common Stock, or an aggregate of approximately 8.0 million shares.

On September 19, 1996, the Company completed the acquisition of MSI, a privately held provider of software solutions for the homecare industry. MSI stockholders received approximately 1.7 million shares of HBOC Common Stock in the transaction.

On December 9, 1996, the Company completed the acquisition of GMIS, a developer of data quality and decision support software for the payor marketplace. GMIS stockholders received 0.21 of a share of HBOC Common Stock for each share of GMIS Common Stock, or an aggregate of approximately 7.4 million shares.

All of the above acquisitions were accounted for as poolings of interests, therefore, all prior period amounts have been restated. A reconciliation between revenue and net income as previously reported and as restated follows:

|  | FOR THE YEAR ENDED DECEMBER 31 | |
| --- | --- | --- |
|  | 1996 | 1995 |
|  | (000 OMITTED) | |
| REVENUE: |  |  |
| As Previously Reported.................................................. | $ 796,578 | $ 607,242 |
| AMISYS, ESI, HPR & NHES................................................. | 154,212 | 108,661 |
| Adjustments............................................................ | 121 | (1) |
| As Restated........................................................... | $ 950,911 | $ 715,902 |
| NET INCOME (LOSS): |  |  |
| As Previously Reported.................................................. | $ 73,954 | $ (17,569) |
| AMISYS, ESI, HPR & NHES................................................. | 8,306 | 10,256 |
| Adjustments............................................................ | 73 | (580) |
| As Restated........................................................... | $ 82,333 | $ (7,895) |

The following acquisitions have been accounted for under the purchase method of accounting. The results of operations for each acquisition have been included in the accompanying financial statements since each date of acquisition.

On October 31, 1997, the Company completed the acquisition, for approximately $30 million in cash, of AT&T Healthcare, a provider of software solutions and remote processing services for financial and payroll needs of healthcare providers in the United Kingdom. In connection with the acquisition, the Company allocated $7.7 million of the purchase price to incomplete research and development projects as determined by independent appraisal. Accordingly, these costs were expensed as of the acquisition date.

# EXHIBIT B

 TRIZETTO

# TRIZETTO GROUP INC (TZIX)

567 NICHOLAS DRIVE SUITE 360
NEWPORT BEACH, CA 92660
949. 719.2200
http://www.trizetto.com

# 10−K

**FORM 10−K DATED DECEMBER 31, 2002**
**Filed on 03/31/2003 ~ Period: 12/31/2002**
File Number 000−27501

GSIᘓ

LIVEDGAR Information Provided by Global Securities Information, Inc.
800.969.4121
www.gsionline.com

Table of Contents

# UNITED STATES
## SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

## FORM 10-K

☒  ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the fiscal year ended December 31, 2002

**OR**

☐  TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the transition period from                    ·    to

Commission file number 0-27501

## The TriZetto Group, Inc.
(Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Delaware**<br>(State or other jurisdiction of<br>incorporation or organization) | **33-0761159**<br>(I.R.S. Employer<br>Identification Number) |

**567 San Nicolas Drive, Suite 360**
**Newport Beach, California 92660**
(Address of principal executive offices and Zip Code)

Registrant's telephone number, including area code: (949) 719-2200

Securities registered pursuant to section 12(b) of the Act:  None

Securities registered pursuant to Section 12(g) of the Act:  Common Stock, $0.001 par value, and Series A Junior Participating Preferred Stock, $0.001 par value

Indicate by check mark whether the registrant: (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.  Yes ☒  No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K.  ☒

Indicate by check mark whether the registrant is an accelerated filer (as defined in Rule 12b-2 of the Act). Yes ☒  No ☐

As of June 28, 2002, the aggregate market value of voting stock held by non-affiliates of the registrant, based upon the closing sales price for the registrant's Common Stock, as reported in the Nasdaq National Market System, was $266.3 million. Shares of Common Stock held by each officer and director and by each person who owns 10% or more of the outstanding Common Stock have been excluded in that such persons may be deemed to be affiliates. This determination of affiliate status is not necessarily a conclusive determination for any other purpose.

The number of shares of the registrant's Common Stock outstanding as of February 28, 2003 was 46,089,469.

**Documents Incorporated by Reference**

Part III of this Report incorporates by reference information from the definitive Proxy Statement for the registrant's 2003 Annual Meeting of Stockholders.

Table of Contents

The TriZetto Group, Inc. and Subsidiaries
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS—(Continued)

decided to postpone the release of the in-process technology, and has incurred no further research and development expense related to the product.

In valuing HME's developed, in-process and core technologies, the Company utilized the discounted cash flows method. The discounted cash flows method includes an analysis of the completion costs, cash flows and risks associated with achieving such cash flows. This income stream was tax effected and discounted to its present value to estimate the value of the core and in-process technologies. For purposes of this analysis, the Company used 20% and 25% discount rates for the core and in-process technologies, respectively. These discount rates are consistent with the risks inherent in achieving the projected cash flows. The amount allocated to in-process technology was determined by establishing the stage of completion of the in-process research and development project at the date of acquisition.

In December 2001, the net balance for goodwill and other intangibles of $1.9 million were expensed as restructuring and related impairment charges (Note 13).

*Erisco Managed Care Technologies, Inc.*

In May 2000, the Company entered into an Agreement and Plan of Reorganization with Elbejay Acquisition Corp. ("Elbejay") a wholly owned subsidiary of the Company, IMS Health Incorporated ("IMS HEALTH"), and Erisco Managed Care Technologies, Inc. ("Erisco") pursuant to which Elbejay would merge with and into Erisco resulting in Erisco becoming a wholly owned subsidiary of the Company. In October 2000, the Company consummated the transaction, and Erisco became a wholly owned subsidiary of the Company. Erisco is a leading provider of software in the managed care industry. The purchase price of approximately $228.4 million consisted of 12,142,857 shares of common stock with a value of $15.89 per share, assumed liabilities of $30.0 million, which includes $14.2 million of deferred tax liability resulting from the difference between the book and tax basis of the intangible assets arising as a result of the acquisition and acquisition costs of approximately $5.5 million. In addition, the Company issued 231,404 shares of restricted stock to certain Erisco employees.

The acquisition was accounted for using the purchase method of accounting and accordingly, the purchase price was allocated to the tangible and intangible assets acquired and liabilities assumed on the basis of their estimated fair market values on the acquisition date. The excess of the purchase price over the estimated fair market value of the assets purchased and liabilities assumed was $187.8 million and was allocated to goodwill and intangible assets consisting of assembled workforce, core technology, trademarks and customer lists.

*Resource Information Management Systems, Inc.*

In December 2000, the Company acquired all of the issued and outstanding capital stock of Resource Information Management Systems, Inc., an Illinois corporation ("RIMS"), in accordance with the terms and conditions of the Agreement and Plan of Merger, dated as of November 2, 2000 (the "Merger Agreement") by and among TriZetto, Cidadaw Acquisition Corp., a Delaware corporation and wholly owned subsidiary of TriZetto, RIMS, the shareholders of RIMS, and Terry L. Kirch and Thomas H. Heimsoth, and the First Amendment to Agreement and Plan of Merger, dated as of December 1, 2000 (the "First Amendment"), by and among TriZetto, Cidadaw Acquisition Corp., RIMS, the shareholders of RIMS, and Terry L. Kirch and Thomas H. Heimsoth. The acquisition was effected by a merger (the "Merger") of Cidadaw Acquisition Corp. with and into RIMS, with RIMS surviving the merger as a wholly owned subsidiary of TriZetto.

The purchase price of approximately $96.8 million consisted of cash in the amount of $3.0 million, 2,588,427 shares of common stock with a value of $21.20 per share, the fair value of approximately 300,000 fully vested options assumed of $4.7 million, assumed liabilities of $32.8 million, which includes $13.7 million of deferred tax liability resulting from the difference between the book and tax basis of the intangible assets arising as a result of the acquisition and acquisition costs of approximately $1.4 million. In addition, the Company issued 82,553 shares of restricted stock to certain RIMS employees. Of the 2,588,427 shares of common stock which were issued in connection with this Merger, 517,685 shares of common stock were held in escrow to indemnify the Company for any breach of warranty, any inaccuracy of any representation made by the seller or any breach of any covenant in the purchase agreement, until they were released to the seller in December 2001.

According to the terms and conditions of the Merger Agreement, the shares issued to effect the Merger are subject to lock-up restrictions such that 50% of the shares are released on the one-year anniversary of the Merger and 12.5% of the shares are released on the 15-month, 18-month, 21-month and two year anniversaries of the

F-29

# EXHIBIT C
# REDACTED IN ITS
# ENTIRETY

# EXHIBIT D
# REDACTED IN ITS
# ENTIRETY

# EXHIBIT E
# REDACTED IN ITS ENTIRETY

# EXHIBIT F

# MCKESSON

*Empowering Healthcare*

# MCKESSON CORP (MCK)

ONE POST ST
MCKESSON PLAZA
SAN FRANCISCO, CA 94104
415. 983.8300
http://www.mckesson.com/

# 10-Q

FORM 10-Q FOR PERIOD ENDED JUNE 30, 1999
Filed on 08/13/1999 — Period: 06/30/1999
File Number 001-13252

GSI

LIVEDGAR Information Provided by Global Securities Information, Inc.
800.624.xxxx
www.gsionline.com

=========================================================================

SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

-----------------

FORM 10-Q

(Mark One)

[X]    QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES
       EXCHANGE ACT OF 1934

       For quarter ended June 30, 1999

[_]    TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES
       EXCHANGE ACT OF 1934

       For the transition period from _____ to _____

Commission file number 1-13252

-----------------

McKESSON HBOC, INC.
(Exact name of Registrant as specified in its charter)

Delaware                                        94-3207296
(State or other jurisdiction of incorporation or
organization)                              (IRS Employer Identification No.)
One Post Street, San Francisco, California       94104
(Address of principal executive offices)       (Zip Code)

(415) 983-8300
(Registrant's telephone number, including area code)

Indicate by check mark whether the Registrant (1) has filed all reports
required to be filed by Section 13 or 15(d) of the Securities Exchange Act of
1934 during the preceding 12 months (or for such shorter period that the
Registrant was required to file such reports), and (2) has been subject to
such filing requirements for the past 90 days. Yes [X]   No [_]

Indicate the number of shares outstanding of each of the issuer's classes of
common stock, as of the latest practicable date.

Class                                 Outstanding at June 30, 1999
-----------------                     ----------------------------

Common stock, $.01 par value                  281,277,000 shares

=========================================================================

McKESSON HBOC, INC.

FINANCIAL NOTES
(unaudited)

1. Interim Financial Statements

In the opinion of the Company, these unaudited condensed consolidated
financial statements include all adjustments necessary for a fair presentation
of its financial position as of June 30, 1999 and the results of its
operations and its cash flows for the three months ended June 30, 1999 and
1998.

The results of operations for the three months ended June 30, 1999 and 1998
are not necessarily indicative of the results for the full years.

It is suggested that these interim financial statements be read in
conjunction with the annual audited financial statements, accounting policies
and financial notes thereto included in the Company's 1999 Consolidated
Financial Statements which have previously been filed with the Securities and
Exchange Commission.

2. Marketable Securities

The June 30, 1999 marketable securities balance includes $23 million held in
trust as exchange property for the Company's $37.3 million principal amount of
4.5% exchangeable subordinated debentures which remain outstanding.

3. Convertible Preferred Securities

In February 1997, a wholly owned subsidiary trust of the Company issued 4
million shares of preferred securities to the public and 123,720 common
securities to the Company, which are convertible at the holder's option into
McKesson HBOC common stock. The proceeds of such issuances were invested by
the trust in $206,186,000 aggregate principal amount of the Company's 5%
Convertible Junior Subordinated Debentures due 2027 (the "Debentures"). The
Debentures represent the sole assets of the trust. The Debentures mature on
June 1, 2027, bear interest at the rate of 5%, payable quarterly, and are
redeemable by the Company beginning in March 2000 at 103.5% of the principal
amount thereof.

Holders of the securities are entitled to cumulative cash distributions at
an annual rate of 5% of the liquidation amount of $50 per security. Each
preferred security is convertible at the rate of 1.3418 shares of McKesson
HBOC common stock, subject to adjustment in certain circumstances. The
preferred securities will be redeemed upon repayment of the Debentures, and
are callable by the Company at 103.5% of the liquidation amount beginning in
March 2000.

The Company has guaranteed, on a subordinated basis, distributions and other
payments due on the preferred securities (the "Guarantee"). The Guarantee,
when taken together with the Company's obligations under the Debentures and in
the indenture pursuant to which the Debentures were issued and the Company's
obligations under the Amended and Restated Declaration of Trust governing the
subsidiary trust, provides a full and unconditional guarantee of amounts due
on the preferred securities.

The Debentures and related trust investment in the Debentures have been
eliminated in consolidation and the preferred securities are reflected as
outstanding in the accompanying consolidated financial statements.

4. Charges in Continuing Operations

On January 12, 1999, McKesson Corporation ("McKesson") completed the
acquisition of HBO & Company ("HBOC"), a leading health care information
technology company, by exchanging 177 million shares of McKesson common stock
for all of the issued and outstanding common stock of HBOC. The transaction
was

6

McKESSON HBOC, INC.

FINANCIAL NOTES--(Continued)
(unaudited)

accounted for as a pooling of interests. In April 1999, the Company discovered improper accounting practices at HBOC (see Financial Note 8). In July, the Audit Committee of the Company's Board of Directors completed an investigation into such matters (the "Investigation"), which resulted in the restatement of the Company's historical consolidated financial statements related to HBOC (pre-merger) in fiscal 1999, 1998, and 1997.

During the quarter ended June 30, 1999, the Company incurred costs in connection with the Investigation and the resulting restatement of the historical consolidated financial statements. The Company recorded associated accounting and legal fees and other costs totaling $6.3 million. The Company also incurred $18.5 million in severance and benefit costs resulting from the change in executive management announced June 21, 1999, and $1.7 million in retention benefits. For segment reporting purposes (see Financial Note 9), these charges are included in the Corporate segment.

During the quarter ended June 30, 1998, the Company incurred charges totaling $7.7 million in the Health Care Supply Management segment and $7.6 million in the Health Care Information Technology segment. The Health Care Supply Management segment's charge consisted of $4.9 million for the terminated merger transaction with AmeriSource Health Corporation ("AmeriSource") and $2.8 million in integration costs incurred in connection with recent acquisitions. The Health Care Information Technology segment's charge consisted primarily of acquisition-related employee severance.

5. Comprehensive Income

Comprehensive income is defined as all changes in stockholders' equity from non-owner sources. As such, it includes net income and amounts arising from foreign currency translations, unrecognized pension costs and unrealized gains or losses on marketable securities classified as available for sale which are recorded directly to stockholders' equity. Total comprehensive income for the three months ended June 30, 1999 and 1998 is as follows:

| | Three Months Ended June 30, | |
| --- | --- | --- |
| | 1999 | 1998 |
| | (in millions) | |
| Net income................................................... | $70.1 | $69.1 |
| Foreign currency translation adjustments...................... | (0.3) | (1.8) |
| | $69.8 | $67.3 |

7

# EXHIBIT G
# REDACTED IN ITS ENTIRETY

# EXHIBIT H
# REDACTED IN ITS ENTIRETY

# EXHIBIT I
# REDACTED IN ITS
# ENTIRETY

# EXHIBIT J
# REDACTED IN ITS
# ENTIRETY

# EXHIBIT K
# REDACTED IN ITS
# ENTIRETY

# EXHIBIT L
# REDACTED IN ITS
# ENTIRETY

# EXHIBIT M

**MCKESSON**
*Empowering Healthcare*

# MCKESSON CORP (MCK)

ONE POST ST
MCKESSON PLAZA
SAN FRANCISCO, CA 94104
415. 983.8300
http://www.mckesson.com/

## 10-K

FORM 10-K
Filed on 06/13/2000 - Period: 03/31/2000
File Number 001-13252



LIVEDGAR® Information Provided by Global Securities Information, Inc.
1.800.669.1154
www.gsionline.com

---
---

SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

----------------

FORM 10-K

[X] ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE
ACT OF 1934

For the fiscal year ended March 31, 2000

OR

[_] TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES
EXCHANGE ACT OF 1934

Commission File Number 1-13252

----------------

McKESSON HBOC, INC.
A Delaware Corporation

I.R.S. Employer Identification Number
94-3207296

McKessonHBOC Plaza,
One Post Street,
San Francisco, CA 94104

Telephone--Area Code (415) 983-8300

Securities registered pursuant to Section 12(b) of the Act:

| (Title of Each Class) | (Name of Each Exchange on Which Registered) |
|---|---|
| Common Stock, $.01 par value | New York Stock Exchange |
| | Pacific Exchange, Inc. |
| Preferred Stock Purchase Rights | New York Stock Exchange |
| | Pacific Exchange, Inc. |

Securities registered pursuant to Section 12(g) of the Act: None.

Indicate by check mark whether the Registrant (1) has filed all reports
required to be filed by Section 13 or 15(d) of the Securities Exchange Act of
1934 during the preceding 12 months (or for such shorter period that the
Registrant was required to file such reports), and (2) has been subject to
such filing requirements for the past 90 days. Yes  [X]  No

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405
of Regulation S-K is not contained herein, and will not be contained, to the
best of Registrant's knowledge, in definitive proxy or information statements
incorporated by reference in Part III of this Form 10-K or any amendment to
this Form 10-K. [_]

Aggregate market value of voting stock held by nonaffiliates of the Registrant
at June 1, 2000: $4,689,007,884

Number of shares of common stock outstanding at June 1, 2000: 284,182,296

Documents Incorporated By Reference

Portions of the Registrant's Proxy Statement for its Annual Meeting of
Stockholders to be held on July 26, 2000 are incorporated by reference into
Part III of this report.

---
---

McKESSON HBOC, INC.

FINANCIAL REVIEW--(Concluded)

The Company's business could be hindered if it is unable to complete and integrate acquisitions successfully.

An element of the Company's business is to pursue strategic acquisitions that either expand or complement its business. The Company routinely reviews such potential acquisition opportunities and has historically engaged in numerous acquisitions. Integration of acquisitions, including the HBOC Transaction, involves a number of special risks. Such risks include:

- the diversion of management's attention to the assimilation of the operations of businesses the Company has acquired;

- difficulties in the integration of operations and systems and the realization of potential operating synergies;

- difficulties in the integration of any acquired companies operating in a different sector of the health care industry;

- delays or difficulties in opening and operating larger distribution centers in a larger and more complex distribution network;

- the assimilation and retention of the personnel of the acquired companies;

- challenges in retaining the customers of the combined businesses; and

- potential adverse effects on operating results.

If the Company is unable to successfully complete and integrate strategic acquisitions in a timely manner, its business and the Company's growth strategies could be negatively affected.

The Company's issuance of equity to finance acquisitions could have a potential dilutive effect on its stock.

The Company anticipates that it will finance acquisitions, at least partly by incurring debt or by the issuance of additional securities. The use of equity financing, rather than debt, for acquisitions would dilute the ownership of the Company's then current stockholders.

F-28

# EXHIBIT N
# REDACTED IN ITS
# ENTIRETY

# EXHIBIT O
# REDACTED IN ITS
# ENTIRETY

# EXHIBIT P
# REDACTED IN ITS
# ENTIRETY

# EXHIBIT Q

# Gartner

**Research**

Publication Date: 7 December 1998

ID Number: R-06-8685

## Managed Care: No Silver Bullets

Judith Carr, Janice Young, Alden Cushman

Dynamic and rapid change in the healthcare marketplace is jeopardizing and augmenting the roles of the industry's main stakeholders: consumers seeking care; health plan sponsors that pay for the majority of care; managed care organizations (MCOs) that process claims; integrated delivery systems (IDSs) that provide care settings; and providers that provide the care. For example, cost pressures on employers, customer and provider dissatisfaction with MCOs, and shifts in stakeholder responsibility are placing the role of the MCO in jeopardy. Recent high-profile accounts, such as Oxford Health Plans and Aetna Health Plans, have further highlighted the inability of some MCOs to even perform their core competency of administration, including adjudicating claims, sending out bills and paying providers. The focus of this *Strategic Analysis Report* is on the future of managed care processing.

© 1998 Gartner, Inc. and/or its Affiliates. All Rights Reserved. Reproduction of this publication in any form without prior written permission is forbidden. The information contained herein has been obtained from sources believed to be reliable. Gartner disclaims all warranties as to the accuracy, completeness or adequacy of such information. Gartner shall have no liability for errors, omissions or inadequacies in the information contained herein or for interpretations thereof. The reader assumes sole responsibility for the selection of these materials to achieve its intended results. The opinions expressed herein are subject to change without notice.

CONFIDENTIAL
TRZ 835954

## TABLE OF CONTENTS

1.0     Introduction .................................................................................................................. 4

2.0     Managed Care Processes .............................................................................................. 7
        2.1     Administration: Core Processing Functions ...................................................... 7
        2.2     Niche Applications ............................................................................................. 9

3.0     Managed Care Systems Strategies ............................................................................... 9
        3.1     Internal Development ......................................................................................... 9
        3.2     Outsourcing ....................................................................................................... 9
        3.3     Vendor Applications ......................................................................................... 11

4.0     Managed Care Vendor Applications ........................................................................... 11
        4.1     Leaders ............................................................................................................. 12
        4.2     Challengers ...................................................................................................... 13
                4.2.1     Erisco ................................................................................................ 14
                4.2.2     Health Systems Design ..................................................................... 15
                4.2.3     HBOC/AMISYS ................................................................................. 15
                4.2.4     CSC ................................................................................................... 16
        4.3     Visionaries ....................................................................................................... 17
                4.3.1     EDS ................................................................................................... 17
                4.3.2     Health Systems Technologies ........................................................... 18
        4.4     Niche Players ................................................................................................... 19
        4.5     Bottom Line ...................................................................................................... 19

5.0     Additional MCO Considerations ................................................................................ 19
        5.1     Reporting and Analysis .................................................................................... 20
        5.2     Medical Management ....................................................................................... 20
        5.3     Electronic Commerce ....................................................................................... 20
        5.4     Customer Service ............................................................................................. 21

6.0     Conclusion .................................................................................................................. 21

## LIST OF FIGURES

Figure 1. Healthcare Value Chain: 1998 ................................................................................ 5

Figure 2. Healthcare Value Chain: 2008 ................................................................................ 6

Figure 4. Core Managed Care Modules .................................................................................. 8

Publication Date: 7 December 1998/ID Number: R-06-8685

© 1998 Gartner, Inc. and/or its Affiliates. All Rights Reserved.

Gartner

CONFIDENTIAL
TRZ 835955

- While CSC has a large legacy installed base, it has yet to execute Meridia at a large MCO and is marketing PowerMHS in the meantime.

Consider challengers when:

- Multioption MCO looking for a proven functional application
- Two-tier client/server application fits MCO's strategic plan
- Established vendor preferred

Consider alternatives when:

- MCO cannot support client/server
- MCO is small or focused on one line of business
- True object-oriented design/three-tier architecture desired

### 4.2.1 Erisco

Founded in 1968 Erisco has provided administrative and analytical applications to the healthcare industry for more than 20 years. FACETS, a client/server managed care application for MCOs, was introduced in 1993. Although the company continues to shift its focus to managed care, the majority of its clients are indemnity oriented.

Although GartnerGroup does not expect Erisco to retire the FACTS application line (mainframe-based), the company's growth is stemming from FACETS, forcing corporate attentions to that application. With more than 20 live sites, FACETS has the largest installed base of any client/server managed care application, and the company continues to have strong sales to large MCOs.

Erisco continues to sign-on and install new accounts at a rapid pace and is pushing the one million member capacity mark at one site. Although no application has yet proven to be scalable for a multioption plan with more than 750,000 lives, Erisco has the most experience with client/server installations and will be a front-runner in demonstrating such scalability. Since the base FACETS application consists of only four modules, enterprises should be sure to price this application with competitors on an apples-to-apples basis. Enterprises considering FACETS must be able to support Sybase. Although Erisco has discussed plans to offer FACETS on additional RDBMSs, MCOs should not expect to see any other viable RDBMS options for the application in 1999 (0.8 probability). MCOs looking for a quick installation of a client/server application should be aware that with many large, complex installations planned to go live in 1999, Erisco has limited resources.

Consider when:

- Proven managed care application is desired
- Either HMO or indemnity processing must be supported
- Integrated utilization review and case management are desired
- A client/server managed care application is desired
- MCO technical environment and skill sets can support a Sybase database

Consider alternatives when:

CONFIDENTIAL
TRZ 835967

- A vendor is expected to provide the majority of the implementation
- A database other than Sybase is preferred
- MCO looking to purchase additional managed care applications from one vendor (e.g., case management and code rebundling)

### 4.2.2  Health Systems Design

Founded in 1988, HSD has as its primary focus the development, marketing and support of its DIAMOND application line of comprehensive managed care information systems. The company has experienced significant revenue and staff growth during the last five years, which has helped expedite development of its Oracle-based client/server managed care application, DIAMOND 950C/S. With the addition of this application, HSD has expanded its target market to include large, complex MCOs. Since going public in March 1996, HSD has transformed its operations from that of a startup to that of a publicly traded enterprise, including installing a new management team. Compared with its three direct competitors, HSD is the smallest in terms of staff and revenue.

HSD is a company that understands managed care and has packaged its DIAMOND application line to address the diverse needs of this market. The two-pronged strategy to target payer and provider markets is aggressive given the company's resource constraints; however, the functionality of the application makes it a viable option for each market. MCOs with limited indemnity processing should consider HSD as a managed care software vendor but should be aware of its resource constraints. With several large, high-profile installations in process, HSD will have limited implementation resources through 1999 (0.7 probability). Oracle7 is the basis for HSD's DIAMOND 950C/S application. MCOs should not expect any other RDBMS options to be forthcoming from HSD, because much of the application's business logic is Oracle7 specific.

Consider when:

- MCO looking for a vendor with expertise in managed care business processes
- Oracle RDBMS preferred
- A client/server managed care application is desired

Consider alternatives when:

- MCO has strong indemnity processing requirements
- MCO will require high levels of customization to core package (HSD's plate is full on development)
- Oracle is not a preferred RDBMS
- MCO looking to purchase additional managed care application from one vendor (e.g., data warehouse or code rebundling)

### 4.2.3  HBOC/AMISYS

A favorite of independent physician associated-model HMOs, AMISYS 3000 from HBOC is installed at more than 50 HMOs. The company continues to sign contracts for its application while preparing to launch a complete client/server application in the first quarter of 1999. AMISYS 3000 features a character-based user interface, is written in COBOL II and runs on Hewlett-Packard's (HP's) IMAGE/SQL and ALLBASE databases.

CONFIDENTIAL
TRZ 835968

# EXHIBIT R
# REDACTED IN ITS
# ENTIRETY

# EXHIBIT S
# REDACTED IN ITS
# ENTIRETY

# EXHIBIT T
# REDACTED IN ITS
# ENTIRETY

## CERTIFICATE OF SERVICE

I, Michael A. Barlow, hereby certify that on January 10, 2006, I

electronically filed Plaintiff McKesson Information Solutions LLC's Answering Brief

in Opposition to Defendant's Motion for Partial Summary Judgment of Laches and

Declaration of Michael A. Barlow using CM/ECF, which will send notification of

such filing to those designated below, and that I served the following persons in the

manner listed:

**VIA CM/ECF**
Rodger D. Smith, II, Esq.
MORRIS NICHOLS ARSHT
  & TUNNELL
1201 North Market Street
P.O. Box 1347
Wilmington, Delaware 19899

**HAND DELIVERY**
Jack B. Blumenfeld, Esq.
MORRIS NICHOLS ARSHT
  & TUNNELL
1201 North Market Street
P.O. Box 1347
Wilmington, Delaware 19899

Michael A. Barlow (ID No. 3928)
SKADDEN, ARPS, SLATE,
   MEAGHER & FLOM LLP
One Rodney Square
P.O. Box 636
Wilmington, Delaware 19899
(302) 651-3000
mbarlow@skadden.com

440372.01-Wilmington S1A