# EXHIBIT 1
# REDACTED IN ITS ENTIRETY

# EXHIBIT 2
# REDACTED IN ITS ENTIRETY

# EXHIBIT 3
# REDACTED IN ITS ENTIRETY

# EXHIBIT 4
# REDACTED IN ITS ENTIRETY

# EXHIBIT 5

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

McKESSON INFORMATION SOLUTIONS, LLC,
Plaintiff,
Civil Action No. 04-1258-SLR

vs.

THE TRIZETTO GROUP, INC.,
Defendant.

The videotaped deposition of JOHN PETER DANZA, called by the Plaintiff for examination, pursuant to Notice, and pursuant to the Rules of Civil Procedure for the United States District Courts, taken before Sandra L. Rocca, CSR and Notary Public in and for the County of DuPage, and State of Illinois, at 333 West Wacker Drive, Chicago, Illinois, on the 12th day of September, 2005, at the hour of 9:45 a.m.

JOB NO. 38561

APPEARANCES:

SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP
By: MR. MICHAEL HENDERSHOT
525 University Avenue
Palo Alto, CA 94301
(650)470-4500/Fax: (650)470-4570
mhenders@skadden.com

appeared on behalf of the Plaintiff;

GIBSON, DUNN & CRUTCHER
By: MR. DANIEL P. MUINO
4 Park Plaza, Suite 1400
Irvine, CA 92614-8557
(415)393-8233/Fax: (949)475-4670
dmuino@gibsondunn.com

appeared on behalf of the Defendant.

Also Present:

Ben Stanson, Videographer

INDEX

| WITNESS | PAGE |
|---|---|
| JOHN PETER DANZA | |
| EXAMINED BY | |
| Mr. Hendershot | 5 |
| Mr. Muino | 111 |
| Mr. Hendershot (Recross) | 115 |

EXHIBITS

| NUMBER | MARKED FOR ID |
|---|---|
| Danza Deposition Exhibit | |
| No. 1 | 3 |
| No. 2 | 22 |
| Nos. 3 through 6 | 43 |
| No. 7 | 67 |
| No. 8 | 82 |
| No. 9 | 89 |
| No. 10 | 107 |

09:45:45 VIDEOGRAPHER: Good morning. Here begins
09:48:51 videotape Number 1 of the deposition of John P.
09:48:53 Danza in the matter of McKesson Information
09:48:57 Systems, LLC, versus The TriZetto Group,
09:49:01 Incorporated. This case is in the U.S. District
09:49:04 Court for the District of Delaware. The case
09:49:07 number is 04-1258-SLR. Today's date is September
09:49:14 12th, 2005. The time is 9:49 a.m. as indicated on
09:49:20 the video screen.
09:49:22 This deposition is taking place at 333
09:49:26 West Wacker Drive in Chicago, Illinois and is being
09:49:30 taken on behalf of the Plaintiffs. The
09:49:32 videographer is Ben Stanson employed by Sarnoff
09:49:36 Court Reporters and Legal Technologies. Would
09:49:39 counsel please identify themselves and state whom
09:49:42 you represent?
09:49:43 MR. HENDERSHOT: Michael Hendershot of
09:49:45 Skadden, Arps, Slate, Meagher & Flom in Palo Alto
09:49:49 representing the Plaintiff, McKesson Information
09:49:51 Solutions.
09:49:52 MR. MUINO: Daniel Muino of Gibson, Dunn
09:49:55 & Crutcher for Defendant The TriZetto Group and the
09:49:56 witness John Danza.
09:49:58 VIDEOGRAPHER: Thank you. The court

reasons even for the billing -- even for the billing rules.

Q. But there are some relationships within the database of ClinicaLogic where it is medically possible to perform code A and -- the services represented by code A and code B, yet code A and code B should not be paid on the same claim, is that right?

A. Yes, that's correct.

Q. So they're not medically exclusive, but they should be billed as a single code in that example?

A. In that example you gave, yes, that's correct. I think there are rules.

Q. I guess also I would assume that the ClinicaLogic database within QicLink would catch claims where multiple medical service codes are submitted and it is medically impossible to perform the submitted codes, like amputating the same leg twice?

A. Right, I believe ClinicaLogic and both Auto Audit, yeah, have those as well.

Q. It's a good thing to include. If you have it, use it. Does TriZetto update the

ClinicaLogic database from time to time?

A. Yes, it does.

Q. Is that typically on an annual basis when the CPT-4 codes are updated?

A. Yes, it is done annually.

Q. Are there any other -- strike that.

Does TriZetto update the database at any other period other than annually, that being the ClinicaLogic database?

A. Not typically, no.

Q. And the database of ClinicaLogic within QicLink when it ships to a customer and the database being the medical service codes and the relationships among those are predetermined before the product is shipped to the customer, is that right?

A. Yes, that's right.

Q. Why is it important that the database be fixed?

A. Well, I'm not sure that the database is truly fixed. What it is is that those rules are set up ahead of time because that's essentially what the client is paying for is a -- is rules determined by a medical Board so that they have

some backing.

Q. So they can have some consistency amongst the editing amongst their claims?

A. I'm not -- I'm sure consistency -- I'm sure consistency does work its way into it. It's primarily because you need medical staff to actually have determined that. They don't want somebody like you or me -- they want to know somebody with a medical background has done it.

Q. Because a doctor may come back and contest the thing, say hey, this really is right, you don't know what you're talking about?

A. Exactly.

Q. I'd like to mark as the next exhibit in sequence United States Patent No. 5,253,164 issued to Holloway, et al.

(Document marked as Danza Exhibit No. 7 for identification.)

BY MR. HENDERSHOT:

Q. Have you seen this document before, Mr. Danza?

A. No, I haven't.

Q. Have you ever seen a patent before, Mr. Danza?

A. I have seen patents before.

Q. Are you a named inventor on any patents?

A. I am.

Q. How many patents?

A. One.

Q. What's the subject matter of the patent?

A. It is a -- it is a processing rule set for doing consumer directed health care.

Q. Do you recall roughly when you filed for that patent or if you know the specific date?

A. Sometime earlier this year.

Q. Earlier this year?

A. Uh-huh.

Q. Could you describe in a little greater detail what your patent relates to?

A. It's a set of rules and processes for linking different companies together to do an automated claim process for consumer directed health care.

Q. Do you know the number of it by any chance?

A. I don't. I don't know if they have it yet or not.

Q. So you filed for it?

12:00:32 within Claim 5 that is not practiced by the QicLink product?
12:00:35 A. No.
12:00:36 Q. Turning to Claim 6, is there any element within Claim 6 that's not practiced by the QicLink product?
12:00:42 A. No.
12:00:42 Q. Turning to Claim 8, if you could read that for me.
12:01:00 A. Okay.
12:01:01 Q. Are there any elements of Claim 8 that are not practiced by the QicLink product?
12:01:05 A. No.
12:01:06 Q. Actually let me rephrase that if you don't mind. Are there any elements within Claim 8 that are not included within the QicLink product?
12:01:18 A. No.
12:01:18 Q. Would you turn to Claim 9, please?
12:01:23 A. Okay. Okay.
12:01:32 Q. Are there any elements within Claim 9 that are not included within the QicLink product?
12:01:36 A. No. And again if I may, for just a minute, you're referencing QicLink and I'm answering based on ClinicaLogic.

12:01:45 Q. Yes, with respect to all of my questions about these claims, I'm discussing QicLink including ClinicaLogic and/or Auto Audit?
12:01:56 A. Right. I just wanted to be clear. Okay, great. Thanks.
12:01:59 Q. Just so the record's clear, because I struck the last one, all of these questions about the claims of the '164 patent are directed at QicLink including either the Auto Audit or the ClinicaLogic clinical editing modules?
12:02:11 A. Understand. Thank you.
12:02:14 Q. So none of your answers would change given that caveat?
12:02:17 A. That's correct.
12:02:18 Q. And that was an assumption you were making in answering all those questions?
12:02:22 A. That's correct.
12:02:22 Q. I was as well. Can we take a two-minute break and I'll see if I can wrap it up with a few questions.
12:02:53 MR. MUINO: Sure.
12:02:54 VIDEOGRAPHER: We are off the record at 12:03 p.m. with the end of tape Number 1.
12:03:02 (Short recess.)

12:13:18 VIDEOGRAPHER: We are back on the record at 12:13 p.m. with the beginning of tape Number 2.
12:13:41 BY MR. HENDERSHOT:
12:13:43 Q. So, Mr. Danza, before we went off the record we were discussing the claims of the '164 patent which has been marked as Exhibit 7. And correct me if I'm wrong, but we had gone through Claims 1, 2, 3, 4, 5, 6, 8 and 9 and you had not identified any element recited in those claims that was not present in the QicLink product, is that correct?
12:14:10 A. That's correct.
12:14:11 MR. MUINO: Let me just state that I still have my standing objection to this line of questioning.
12:14:15 MR. HENDERSHOT: Understood.
12:14:16 Q. So if I could direct your attention to the last subparagraph of Claim 10, beginning with "means for determining," do you see that, Mr. Danza?
12:14:30 A. I do.
12:14:30 Q. Could you review that for me?
12:14:41 A. I'm just reading the top of 10 if that's okay.

12:14:44 Q. Okay.
12:14:45 A. Just because since that sub is kind of a continuation I guess of that sentence. Okay.
12:15:00 Q. So have you read all of Claim 10?
12:15:03 A. I didn't read all of 10. I just read the opening of 10 and then the last indented. That's what you indicated for me.
12:15:11 Q. The third from the last?
12:15:12 A. The third from the last. I'm sorry.
12:15:14 Q. That's all right.
12:15:23 A. Okay, yes, I've got it.
12:15:24 Q. So is there any element described in the third from the last subparagraph of Claim 10 of the '164 patent that's not present in the QicLink product?
12:15:33 A. No.
12:15:33 Q. Did you identify anything else in the sections of Claim 10 that you read that's not present in the QicLink product?
12:15:41 A. No, I'd only read the one at the very bottom.
12:15:45 Q. Okay.
12:15:49 A. And that would be included as well.
12:15:52 Q. Then if you could look at Claim 11 for

# EXHIBIT 6

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

MCKESSON INFORMATION SOLUTIONS, LLC,

Plaintiff,

vs. Civil Action No. 04-1258SLR

THE TRIZETTO GROUP, INC.,

Defendant.

---

DEPOSITION OF PATRICIA KEPLINGER
Taken at the offices of
Westin Hotel
310 South High Street
Columbus, Ohio 43215

on September 14, 2005, at 9:04 a.m.

Reported by: Angela R. Starbuck, RPR/CRR

JOB NO. 38563

APPEARANCES:

Mr. Michael Hendershot
SKADDEN, ARPS, SLATE, MEAGHER & FLOW, LLP
525 University Avenue
Palo Alto, CA 94301
(650) 470-4500

on behalf of the Plaintiff.

Mr. J. Scot Kennedy
GIBSON, DUNN & CRUTCHER, LLP
4 Park Plaza
Irvine, CA 92614-8557
(949) 451-3805

on behalf of the Defendant.

Mr. Brian M. Garvine
266 North Fourth Street, Suite 100
Columbus, Ohio 43215-2511
(614) 716-0500

on behalf of the Witness.

ALSO PRESENT:

Mr. Joe Smith, Videographer

-=0=-

STIPULATIONS

It is stipulated by and among counsel for the respective parties that the deposition of PATRICIA KEPLINGER, the Witness herein, called by the Plaintiff, under the applicable Rules of Federal Civil Court Procedure, may be taken at this time by the notary pursuant to notice; that said deposition may be reduced to writing in stenotypy by the notary, whose notes thereafter may be transcribed out of the presence of the witness; and that the proof of the official character and qualification of the notary is waived; that the reading and signature of the said witness to the transcript of the deposition are expressly waived by counsel and the witness; said deposition to have the same force and effect as though signed by the said witness.

-=0=-

INDEX OF EXAMINATION

| | PAGE |
|---|---|
| BY MR. HENDERSHOT: | 6 |
| BY MR. KENNEDY: | 155 |
| BY MR. HENDERSHOT: | 164 |
| BY MR. KENNEDY: | 169 |

INDEX OF EXHIBITS

| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| 1 | Letter with subpoena and deposition notice | 11 |
| 2 | Copy of United States Patent Number 5,253,164 | 104 |

09:49 Q. But Harrington was using ClaimFacts when you started work there?
09:49 A. Right.
09:49 Q. And you've used ClaimFacts while at Harrington?
09:49 A. Yes.
09:49 Q. How did you learn how to use ClaimFacts while at Harrington?
09:49 A. At Borden.
09:49 Q. Okay. Does TriZetto provide any documentation in support of its product; its product being the ClaimFacts product.
09:49 A. Yes, there are various user manuals that are available.
09:49 Q. And those user manuals regarding the ClaimFacts product are provided to Harrington?
09:49 A. Yes.
09:49 Q. Is there a standard level of frequency with which Harrington receives the manuals from TriZetto?
09:49 A. There are -- there's not a standard frequency.
09:49 Q. With respect to the ClinicaLogic module, are there updates to that product

09:50 annually?
09:50 A. There are updates to the code -- code edits on an annual basis, yes.
09:50 Q. And when you say the code edits that are updated by TriZetto in their ClinicaLogic product, could you give me a brief description of what you understand those to be.
09:50 A. Yes. New codes that are added, deleted codes, changes in the way codes are -- are used within the industry are captured there, and all of the different editing criteria that goes with those. So any changes in the rules that are currently in place for one year to another that may change.
09:50 Q. And TriZetto does that for Harrington?
09:50 A. Yes.
09:51 Q. Has TriZetto ever suggested to Harrington that the clinical editing function of its ClaimFacts product should not be used?
09:51 A. Not that I'm aware of.
09:51 Q. And correct me if I'm wrong, but you

09:51 testified earlier that if Harrington didn't use some clinical editing protocols or logic on the claims it was processing, its customers might have an issue with that?
09:51 A. Since we currently have one in place today, if we were to try to remove something and not put something else in its place, I would say, yes, they would -- they would question why we would do that.
09:51 Q. Outside of the individualized circumstances you described where a customer may -- may request that there's not clinical editing, is the application of clinical editing logic to medical claims standard in the industry?
09:51 A. I don't know within the industry.
09:52 With the individuals I've talked to, most companies do have some sort of editing process in place for medical claims.
09:52 Q. Does TriZetto maintain its -- its ClaimFacts product for Harrington beyond the updates to the ClinicaLogic database?
09:52 A. Yes.
09:52 Q. And ClaimFacts is software, I take it?

09:52 A. Uh-huh.
09:52 Q. What sort of hardware does Harrington run ClaimFacts on?
09:52 A. It runs on a mainframe.
09:53 Q. Do you know the brand of the mainframe or any --
09:53 A. No. It's IBM.
09:53 Q. Okay. So as software, ClaimFacts requires some sort of computer to operate?
09:53 A. Correct.
09:53 Q. And Harrington does indeed use a computer to operate --
09:53 A. Yes.
09:53 Q. -- ClaimFacts?
09:53 And the computer it uses, I assume, includes some sort of processing unit and storage and memory?
09:53 A. Uh-huh.
09:53 Q. Maybe we can take a step back and walk through sort of how Harrington uses the Clinica -- ClaimFacts and ClinicaLogic to process the claims.
09:53 So a claim is input into the -- the
09:54 ClaimFacts software --
09:54 A. Uh-huh.

09:58 Q. And that's included within ClaimFacts?
09:58 A. Within ClaimFacts.
09:58 Q. So the ClinicaLogic -- Clinica -- strike that.
09:58 ClinicaLogic within ClaimFacts includes a database of medical service codes and some relationships among those medical service codes that define whether or not those codes are valid or invalid when bundled together?
09:58 MR. KENNEDY: Objection; leading and compound.
09:58 A. I believe that -- how I understand your question is, yes, there are -- there are standards set within the ClinicaLogic software piece of ClaimCheck -- ClaimFacts that -- that do state whether or not two codes could be billed together, things along that nature.
09:59 Q. And the contents of that database are predetermined by TriZetto before they ship the product to Harrington?
09:59 A. Yes.
09:59 Q. So just so I'm clear, Harrington

09:59 uses ClaimFacts, which includes ClinicaLogic as a module, and ClinicaLogic includes a database of medical service codes and relationships among those medical service codes that determine whether or not those codes are valid or invalid when received on a claim together?
09:59 A. I'm not sure database is the right term, but ClinicaLogic is the set of rules that tie all of those coding variances together, you know, whether or not this is industry standard to bill code A and code B together.
10:00 Q. So assuming that the industry standard is to not bill code A and code B together --
10:00 A. Uh-huh.
10:00 Q. -- if ClaimFacts, as used by Harrington with ClinicaLogic, receives code A and code B together, ClaimFacts would likely -- strike that.
10:00 Assuming that it's industry standard to not include code A and code B together on the same claim, and ClaimFacts with ClinicaLogic, as used by Harrington,

10:00 receives a claim with code A and code B --
10:00 A. Uh-huh.
10:00 Q. -- the ClaimFacts system has some means to determine that code A should not be billed with code B?
10:00 A. That's correct.
10:00 Q. So if -- are you familiar with the term "unbundling"?
10:00 A. Yes.
10:00 Q. So if code A is included within code B on an unbundled claim, ClaimFacts, as used by Harrington, has the ability to determine that code A is included with -- within code B and reject code A and approve code B for payment?
10:01 A. That is correct.
10:01 MR. KENNEDY: Objection; leading.
10:01 I'm sorry, I didn't mean to step on your answer.
10:01 THE WITNESS: No, that's okay.
10:01 MR. HENDERSHOT: Did you get her answer?
10:01 COURT REPORTER: Uh-huh.
10:01 BY MR. HENDERSHOT:
10:01 Q. I used the term unbundling. I

10:01 probably should lay some foundation for that.
10:01 You understand the term "unbundling"?
10:01 A. Yes.
10:01 Q. Could you explain your understanding of what unbundling is.
10:01 A. When a provider bills multiple codes when they could have one code represent all of them.
10:01 Q. So there's -- unbundling is a case where there's one comprehensive code that may cover an entire service that may have certain subparts and the subparts are billed as independent codes?
10:02 A. Yes.
10:02 Q. And ClaimFacts, as used by Harrington, has the ability to detect unbundling?
10:02 A. Through the ClinicaLogic module.
10:02 Q. So ClaimFacts with ClinicaLogic, as used by Harrington, has a means for determining whether a code is included within another code and should not be billed separately?

A. Correct.
Q. Is that a process done within ClinicaLogic at Harrington?
A. Yes, it is.
Q. Is that done on a weekly basis, a daily basis?
A. It's normally done when we get a new client or a new plan within a client that the -- the client desires different edit -- edits to be applied based probably on the type of business.
Q. Are there some default settings within ClinicaLogic that are set when it's provided by TriZetto?
A. I don't believe so. I believe when ClinicaLogic is first installed, there is an online screen where you set up your edits, and I don't believe the edits are there, already set.
Q. So Harrington has to go through all the CPT-4 codes --
A. No.
Q. -- and the relationships among them?
A. No. There are sets of codes as it's defined for like x-ray, surgery, lab,

anesthesia, that you set at that level. So -- so the warning and denials can be set at those levels.
Q. But all the relationships within the ClinicaLogic database that establish the validity or invalidity of claim -- or codes when received with other codes comes with the TriZetto product at the time?
A. Right.
Q. And how long does the process of choosing what edits you want active and which ones you don't take?
A. Depends on how long it takes the client to make up their mind.
Q. Once the client has made up their mind, how long does this activation process take?
A. It would take less than a half an hour.
Q. So it's an online sort of pull-down menu, check-a-box-type thing?
A. Yeah.
Q. But that pull-down menu process when you're -- when you're setting the plan, that doesn't, to your knowledge, alter the

contents of the database? And by that I mean the codes or the individual relationships among codes defined --
A. No, that does not.
Q. That's just saying that the activation process and there's a category of codes I want this to happen or this to happen or this to happen?
A. That's correct.
Q. And you can do that in about a half an hour, once the customer makes up their mind?
A. Yes.
Q. So is it correct that this process of customizing the settings, so to speak, within TriZetto's ClaimFacts product did not provide Harrington the ability to customize ClinicaLogic to comply with the CCI?
A. No.
Q. Why is that?
A. That particular screen or set of screens is only saying what's going to happen -- what you want to happen if you get an edit. There are other screens that contain the actual codes and how they relate

to other codes that don't have enough space even to -- to capture all the different variables to get close to the NCCI edits.
Q. So the customization or the activation screen doesn't provide that degree of flexibility --
A. No.
Q. -- in terms of the product?
And all the functionality we discussed earlier in terms of ClaimFacts' and ClinicaLogic's ability to detect and correct invalid codes or authorize valid codes is included within the TriZetto product as it comes to you, correct?
A. All the codes, checking for invalid codes, deleted codes, does come from TriZetto.
Q. Without any modification by Harrington?
A. Yes. Although there is modification that we are allowed to do.
Q. I assume you could turn the whole thing off if you wanted to?
A. Yes.
Q. But you had said that the

Page 133

11:35 A. Yes.
11:35 Q. Does the same hold true for the next subparagraph, "Means for determining"?
11:35 A. Yes.
11:35 Q. Does the same hold true for the next subparagraph beginning, "Means for authorizing"?
11:35 A. Yes.
11:35 Q. And does the same hold true for the next subparagraph beginning, "Means for rejecting"?
11:35 A. Yes.
11:35 Q. So every element described in Claim 15 of the '164 patent is included within ClaimFacts with ClinicaLogic as received from TriZetto?
11:35 A. Yes.
11:35 Q. Could you turn to Claim 16 and read the first subparagraph to yourself, please.
11:36 (Pause in proceedings.)
11:36 THE WITNESS: Okay.
11:36 BY MR. HENDERSHOT:
11:36 Q. Is everything described in the first subparagraph of Claim 16 included within -- with -- strike that.

Page 134

11:36 Is everything described in the first subparagraph of Claim 16 included within ClaimFacts with ClinicaLogic?
11:36 A. Yes.
11:36 Q. Does the same hold true for the next line, beginning with receiving?
11:36 A. Yes.
11:36 Q. Does the same hold true for the next line beginning with, "Ascertaining"?
11:36 A. Yes.
11:36 Q. Does the same hold true for the next line beginning with, "Determining"?
11:36 A. Yes.
11:36 Q. Does the same hold true with the next line beginning with, "Authorizing"?
11:36 A. Yes.
11:36 Q. And does the same hold true with the next line with respect to "Rejecting"?
11:36 A. Yes.
11:36 Q. So every element described in Claim 16 of the '164 patent is present in ClaimFacts with ClinicaLogic as that product is received from TriZetto?
11:37 A. Yes.
11:37 Q. So to make sure I've got everything

Page 135

11:37 straight, it is your testimony that every element of Claims 1, 2, 3, 4, 5, 6, 8, 9, 10, 11, 12, 13, 14, 15, and 16, of the '164 patent is either present in or practiced by ClaimFacts with ClinicaLogic as that product is received from TriZetto?
11:37 MR. KENNEDY: Objection; asked and answered.
11:37 BY MR. HENDERSHOT:
11:37 Q. You can answer.
11:37 A. Yes.
11:38 Q. So the only claim within the '164 patent that we've discussed here today where every limitation -- strike that.
11:38 So the only claim within the '164 patent, which are the numbered paragraphs at the back of Exhibit 2, where every element is not present within ClaimFacts with ClinicaLogic is Claim 7 with respect to the CRVS codes?
11:38 A. Yes.
11:38 Q. Every other element of every other claim described here in the '164 patent is present in ClaimFacts and ClinicaLogic?
11:38 MR. KENNEDY: Same objection. Asked

Page 136

11:38 and answered.
11:38 A. Yes.
11:38 Q. Okay. Direct your attention to Claim 3. The third subparagraph begins with, "Means for receiving at least one claim"?
11:38 A. Uh-huh.
11:38 Q. What is the means for receiving a claim when using ClinicaLogic -- strike that.
11:39 What is the means for receiving at least one claim in ClaimFacts with ClinicaLogic?
11:39 A. Same as it would be without it. I mean, either a claim can be entered manually or it can be entered electronically into the system.
11:39 Q. And in either event, it's an interface with a computer system --
11:39 A. Yes.
11:39 Q. -- where the claim is input?
11:39 A. That's correct.
11:39 Q. And with respect to the next subparagraph, it says, "Means for ascertaining whether the at least one claim

Harrington ever contacted TriZetto to obtain an explanation regarding the clinical reasoning behind an edit?

A. Yes.

Q. So Harrington, I take it, does not in every case go through every rule and every relationship within the ClinicaLogic database and verify for itself that that is clinically sound?

A. No.

Q. Would you say they do that in any case?

A. There are some -- there is some research that's done by the nurse probably before we would go to TriZetto for -- for assistance in trying to determine what the validity is on the edit.

Q. But before you decide what -- what rules you're going to apply to claims that you're processing --

A. No.

Q. No --

A. No, we do not.

Q. So just so the record's clear, Harrington does not go through the rules and

relationships within the ClinicaLogic database that define whether or not medical service codes are valid or invalid and verify for themselves that those individual rules are appropriate or not appropriate; is that correct?

A. That is correct.

Q. Instead, so I take it, Harrington takes the rules and relationships that define whether or not medical service codes are valid or invalid that are provided in the predetermined database that TriZetto provides and applies those to the claims it processes?

A. That's correct.

Q. And at times, issues will come up where Harrington has to go to TriZetto to find out the rationale for some of those rules; is that correct?

A. That is correct.

MR. HENDERSHOT: That's all I've got.

MR. KENNEDY: One last question on the -- on the patent, and this is -- this is to clarify the record.

EXAMINATION

BY MR. KENNEDY:

Q. You've never seen an order or anything construing the -- the meaning of each claims in the -- in Exhibit 2?

A. No.

Q. Okay.

MR. KENNEDY: That's all I have.

MR. HENDERSHOT: That's all I have as well.

(Discussion off the record.)

MR. GARVINE: We're going to waive signature.

MR. HENDERSHOT: Okay.

MR. KENNEDY: Okay.

MR. HENDERSHOT: The witness has waived signature?

MR. GARVINE: Yeah, the witness waives signature.

MR. HENDERSHOT: I've got nothing further.

MR. KENNEDY: I don't have any further, so I think we're concluded.

MR. HENDERSHOT: Thank you very much for your time.

THE WITNESS: You're welcome.

(Signature waived.)

-=O=-

Thereupon, the testimony of September 14, 2005, was concluded at p.m.

-=O=-

# EXHIBIT 7

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

McKESSON INFORMATION SOLUTIONS, LLC,
Plaintiff,
vs. Case No. 04-1258-SLR
THE TRIZETTO GROUP, INC.,
Defendant.

---

VIDEOTAPED 30(b)(6) DEPOSITION OF KIRSTEN C. KEMP
Seattle, Washington
Monday, October 10, 2005

Reported by:
Tia B. Reidt
CSR No. 2798
Job No. 39348

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

McKESSON INFORMATION SOLUTIONS, LLC,
Plaintiff,
vs. Case No. 04-1258-SLR
THE TRIZETTO GROUP, INC.,
Defendant.

---

BE IT REMEMBERED THAT, pursuant to the Washington Rules of Civil Procedure, the deposition of KIRSTEN C. KEMP, was taken before Tia B. Reidt, #2798, a Certified Shorthand Reporter, and a Notary Public for the State of Washington, on October 10, 2005, commencing at the hour of 10:26 a.m., the proceedings being reported at Lane, Powell, Spears, Lubersky, LLP, 1420 5th Avenue, Suite 4100, Seattle, Washington.

APPEARANCES

Appearing on behalf of the Plaintiff
SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP
BY: JEFFREY RANDALL
Attorney at Law
525 University Avenue, Suite 1100
Palo Alto, CA 94301
(650) 470-4500
(650) 470-4570 Fax
Jrandall@skadden.com

Appearing on behalf of the Defendant
GIBSON, DUNN & CRUTCHER, LLP
BY: T. KEVIN ROOSEVELT
Attorney at Law
4 Park Plaza
Irvine, CA 92614
(949) 451-3932
(949) 475-4744 Fax
Kroosevelt@gibsondunn.com

Appearing on behalf of the Witness Premera Blue Cross
PREMERA BLUE CROSS
BY: JANET E. McKINNON
Attorney at Law
7001 220th St. SW, MS 316
PO Box 327
Mountlake Terrace, WA 98043
(425) 918-5785
(425) 918-5787 Fax
Janet.mckinnon@premera.com

ALSO PRESENT:
Casey Muldoon
Videographer,
Naegeli Reporting Corporation

| EXHIBIT NUMBER | DESCRIPTION | PAGE NUMBER |
|---|---|---|
| 1 | 1-page letter from Khoi D. Nguyen to Premera Blue Cross dated 8/26/05 and a 5-page Subpoena. | 12 |
| 2 | 66-page Facets License Agreement. | 15 |
| 3 | 66-page United States Patent Number 5,253,164. | 31 |
| 4 | 277-page Facets Extended Enterprise Claims Processing User Guide and Supplement. | 41 |
| 5 | 2-page ClinicaLogic Physician Claim Screening System brochure. | 59 |

contain a preset list of medical service codes and relationships among those medical service codes?

MR. ROOSEVELT: Same objections.

THE WITNESS: Facets includes a list of codes, but then Premera comes along and decides what we're going to do with those codes in our configuration.

BY MR. RANDALL:

Q. I'm not asking about what action Premera chooses to take when a particular relationship or irregularity has been detected. I'm just asking, does Premera understand that Facets has a predetermined set of relationships among medical service codes within a system?

MR. ROOSEVELT: Same objections.

THE WITNESS: Yes.

BY MR. RANDALL:

Q. And the Facets System operates to detect irregularities in the relationships among medical service codes within a particular claim, correct?

MR. ROOSEVELT: Same objections.

THE WITNESS: Yes, if you configure it that way.

MR. RANDALL: Counsel, when you say "same objections," I don't know what you mean.

MR. ROOSEVELT: I have the same objections that I made; that the question calls for a legal conclusion and that it's vague and ambiguous.

BY MR. RANDALL:

Q. Does the Facets System operate to disallow medical service codes that are contained within a medical claim based on determining an irregularity between the presence of that particular medical service code and other medical service codes within the claim?

MR. ROOSEVELT: Same objections.

THE WITNESS: Yes.

MR. RANDALL: I'll mark for identification as Exhibit 3, the McKesson -164 patent.

(Whereupon, a 66-page United States Patent Number 5,253,164 was marked Exhibit-3 for identification.)

BY MR. RANDALL:

Q. Ms. Kemp, I'd like to direct your attention to the second-to-the-last page of this document.

A. (Witness complies.)

Q. The upper left-hand column is labeled 117, and that's the column number. And then below that there are, on this page and the next page, a set of numbered paragraphs or claims numbered 1 through 16.

Do you see that?

A. Yes.

Q. I'd like you to take a look at what is described as Claim No. 1, so that would be the first column, 117, and I'm going to ask you to read that.

And the question is: Does the Facets System perform the steps described in Claim 1?

MR. ROOSEVELT: And I'll just object on the grounds that it calls for a legal conclusion, calls for expert testimony, and is vague and ambiguous and calls for speculation. And if we can just have a standing objection as we go through these; is that okay, Counsel?

MR. RANDALL: That's fine.

THE WITNESS: What was your question again? I've read this.

BY MR. RANDALL:

Q. Does the Facets System operate to perform the steps described in Claim 1?

A. (Witness peruses document.)

Yes.

Q. I'd like you to look at Claim 2, and I have the same question, which is: Does the Facets System operate to perform the steps described in Claim 2?

A. (Witness peruses document.)

Yes.

Q. With respect to Claim 3, it's slightly different. It is an apparatus claim, so I'm going to change the question slightly.

And the question is: With respect to Claim 3, does the Facets System include the components

described in Claim 3?

A. (Witness peruses document.)

Yes.

Q. With respect to Claim 4, Claim 4 is also an apparatus claim, and it adds an additional limitation to the components from Claim 3.

So the question is: Does the Facets System include the components of both Claim 3 and the added component identified in Claim 4?

A. (Witness peruses document.)

I don't believe so, not the "delete" part.

Q. Does -- does the Facets System include the components of Claim 3 and the added component of a means or mechanism for revising at least one claim to discontinue further processing of an invalid medical service code?

A. (Witness peruses document.)

Yes.

Q. Can you read Claim 5? And the question is: Does the Facets System include the components of Claim 3 and Claim 4 and the added component described in Claim 5 with the understanding that, at least with respect to the word "delete," you should use -- you should apply the understanding that it means discontinuing any further processing of an invalid medical service code?

11:18:39 A. (Witness peruses document.)
11:18:42 Yes.
11:18:45 Q. With respect to Claim 6, the question is:
11:18:50 Does the Facets System include the components described in
11:19:02 just Claim 3 and the added component of Claim 6?
11:19:02 A. (Witness peruses document.)
11:19:02 Yes.
11:19:06 Q. Does the Facets System include the components
11:19:10 described in Claim 3 and the added component described in
11:19:18 Claim 8?
11:19:18 A. Sorry.
11:19:38 (Witness peruses document.)
11:19:39 Yes.
11:19:42 Q. Does the Facets System include the components
11:19:46 described in Claim 3 and the added component described in
11:19:55 Claim 9?
11:20:01 A. (Witness peruses document.)
11:20:01 Yes.
11:20:04 Q. Claim 10 is an independent claim that stands
11:20:08 on its own, so the question is: Does the Facets System
11:20:46 contain the components described in Claim 10?
11:20:46 A. (Witness peruses document.)
11:20:46 Yes.
Q. Does the Facets System include the components
11:20:54 described in both Claim 10 and the added element of

11:21:01 Claim 11?
11:21:12 A. (Witness peruses document.)
11:21:12 Yes.
11:21:16 Q. Claim 12 is an independent claim, so it
11:21:18 stands on its own.
11:21:19 Does the Facets System include the
11:21:51 components described in Claim 12?
11:21:52 A. (Witness peruses document.)
11:21:54 Yes.
11:21:58 Q. Claim 13 is also an independent claim, and it
11:21:59 stands on its own.
11:22:05 Does the Facets System include the
11:22:21 components described in Claim 13?
11:22:23 A. (Witness peruses document.)
11:22:24 Yes.
11:22:27 Q. Claim 14 is also an independent claim, and so
11:22:30 it stands on its own as well.
11:22:33 Does the Facets System include the
11:22:37 components described in Claim 14?
11:22:52 A. (Witness peruses document.)
11:22:53 Yes.
11:22:58 Q. Claim 15 is also an independent claim.
11:23:01 Does the Facets System include the
components described in Claim 15?
11:23:18 A. (Witness peruses document.)

11:23:18 Yes.
11:23:23 Q. Claim 16 is an independent method claim, so
11:23:26 the question is slightly different.
11:23:29 Does the Facets System operate to perform
11:23:48 the steps described in Claim 16?
11:23:57 A. (Witness peruses document.)
11:23:57 Yes.
11:24:01 Q. In answering my questions about these claims,
11:24:06 did you read the entire claim right after the numbered
11:24:09 claim number through the end of it?
11:24:10 A. Yes, I did.
11:24:15 Q. And did you understand the language contained
11:24:18 in each of the claims?
11:24:22 A. I believe so.
11:24:25 Q. Did you answer my questions regarding these
11:24:33 claims based on your experience working in the industry at
11:24:40 Premera since 1979 and your familiarity in working with
11:24:48 the Facets System since at least going live in June of
11:24:48 2002?
11:24:50 MR. ROOSEVELT: That will be the end of my
11:24:54 standing objections, and I will object to this on the
11:24:56 grounds that it assumes facts not in evidence.
11:24:56 THE WITNESS: Yes.
BY MR. RANDALL:
11:24:59 Q. Have you become familiar with the operation

11:25:01 of the Facets System?
11:25:02 A. Yes.
11:25:04 Q. And can you describe the basis for that
11:25:06 familiarity?
11:25:12 A. I was on the original project team and helped
11:25:17 work through the gaps and then managed the configuration
11:25:21 directly pre go-live.
11:25:26 Q. Did you also assist in coordinating the
11:25:28 implementation of Facets?
11:25:29 A. Yes.
11:25:31 Q. When you said you assisted on the team to
11:25:37 identify the gaps, are you talking about, I believe it was
11:25:42 Schedule F of the agreement that identified gaps in the
11:25:46 functionality of Facets?
11:25:54 A. Yes, I did.
11:25:59 Q. What responsibility have you had with respect
11:26:04 to the operation of Facets at Premera over the last two
11:26:05 years?
11:26:11 A. I've had responsibility for the
11:26:14 configuration, which includes claims, membership,
11:26:21 eligibility; the testing specifically of Facets and the
11:26:26 implementation of any new businesses as it sells over to
11:26:29 Facets; as well as overall, not just related to Facets,
claims management accountabilities.
11:26:41 Q. Did you have any question in your mind

# EXHIBIT 8

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

MCKESSON INFORMATION SOLUTIONS, LLC,
PLAINTIFF,
vs. ) Case No. 04-1258-SLR
THE TRIZETTO GROUP, INC.,
DEFENDANT.

VIDEO DEPOSITION OF MARK MUSEN, M.D., PH.D.
Held at Skadden, Arps, Slate, Meagher & Flom
525 University Avenue, 11th Floor
Palo Alto, California
Tuesday, November 22, 2005, 9:11 a.m.

REPORTED BY: CHRIS DE GEORGE, CSR NO. 7069

APPEARANCES

For the Plaintiff:
Skadden, Arps, Slate, Meagher & Flom, LLP
BY: MICHAEL HENDERSHOT and JON SWENSON,
Attorneys at Law
525 University Avenue, 11th Floor
Palo Alto, California 94301
(650) 470-4500

For the Defendant:
GIBSON, DUNN & CRUTCHER LLP
BY: MICHAEL A. SITZMAN and DANIEL MUINO,
Attorneys at Law
One Montgomery Street
San Francisco, California 94104-4505
(415) 393-8221
msitzman@gibsondunn.com

Also present: Michael Barber,
Videographer

INDEX

| EXAMINATION | PAGE |
|---|---|
| BY: MR. SITZMAN | 5, 292 |
| BY: MR. HENDERSHOT | 277 |

INDEX OF EXHIBITS

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| MM-1 | Multi-page Expert Report of Mark A. Musen, M.D., Ph.D. | 5 |
| MM-2 | Rebuttal Expert Report of Mark A. Musen, M.D., Ph.D.; 37 pages | 5 |
| MM-3 | United States Patent Number 5,253,164 | 15 |
| MM-4 | Paper entitled "An Access-oriented Negotiated Fee Schedule, The Caterpillar Experience," pages 349-357 | 72 |
| MM-5 | Memorandum Order; 4 pages | 109 |
| MM-6 | PEW Conference Presentation Managing Physician Fees; 4 pages | 173 |
| MM-7 | Vendor Comparison dated 1-18-88; 1 page | 180 |
| MM-8 | Exhibit C, Materials Examined; 9 pages | 193 |
| MM-9 | Expert Report of Dr. Margaret L. Johnson, Ph.D; 30 pages | 298 |

BE IT REMEMBERED that, pursuant to Notice, and on Tuesday, November 22, 2005, commencing at the hour of 9:11 a.m. thereof, at the Law Offices of Skadden, Arps, Slate, Meagher & Flom, LLP, 525 University Avenue, 11th Floor, Palo Alto, California, before me, Chris De George, CSR #7069, State of California, there personally appeared

MARK MUSEN, M.D., PH.D.,

called as a witness herein by Defendant, who, being first duly sworn, was examined as is hereinafter set forth.

--oOo--

02:27
08:39

09:10 THE VIDEOGRAPHER: Good morning. My name is
09:10 Michael Barber. I am a videographer associated with
09:10 Barkley Court Reporters located at 222 Front Street,
09:11 Suite 600, San Francisco, California 94111. The date is
09:11 November 22nd, 2005. The time is 9:11 a.m.
09:11 This deposition is taking place at Skadden,
09:11 Arps, Slate, Meagher & Flom, LLP, 525 University Avenue,
09:11 Palo Alto, California 94301 in the matter of McKesson
09:11 Information Solutions, LLC, versus the TriZetto Group,
09:11 Inc., Case Number 04-1258-SLR.
09:11 This is the videotape deposition of Mark
09:11 Musen, M.D., Ph.D. being taken on behalf of the defense.

Q. But when you said that there was -- they were appended to the -- to the report, was that the table that you were thinking of?

A. Well, you ask- -- you asked me how I construed the claims.

Q. Yes.

A. Not how others had, and I construed them in -- in the terms that are defined in Tabs 3, 4, and -- 2, 3, and 4.

Q. Okay. Okay.

A. Which have remark- -- a remarkable correspondence to the McKesson construction.

Q. Okay. So in -- well, let's -- for instance, let's just flip open, then, to Tab 2 --

A. Sure.

Q. -- 'cause I know I'll need a little help.

Just kind of jumping in, so on the first page of Tab 2, there's an item that says Claim 1.

A. Yeah.

Q. And Claim 1 is, I think, recited or the preamble is recited there in that first column. So when you got to the word, for instance, "Predetermined database," did you construe that phrase or term?

A. I construed it to have its ordinary meaning.

Q. Okay. And what meaning is it that you ascribe

to that?

A. I ascribed the database to be a database which is a conceptual structure that stores data where the data, prior to run time, had been fixed.

Q. All right. So given that interpretation or construction, have you -- have -- did you put that down, that definition you just gave me, anywhere in your report or the tabs that we're looking at?

A. No. As I said, I -- I considered that construction is defined operationally in terms of the evidence provided. Ultimately, the court construes the claims, but my belief is that predetermined database takes on its ordinary meaning.

Q. Okay. Okay. When you say "operationally," are you making a distinction between operationally and functionally?

A. That sounds like a legal question. Operationally, I'm using the term in the vernacular meaning that the -- the testimony and the references to the TriZetto literature that supports the claim-infringement documentation assumes that there -- there are definitions of those terms that are consistent with the testimony provided and by the quotes from the product literature.

Q. I don't want to mischaracterize, so let me

make sure I understand it. For instance, the definition you gave me for predetermined database --

A. Right.

Q. -- a minute ago, reading through the -- the sections or the deposition cited sections here, what people had to say about the predetermined database was consistent with what the ordinary meaning or the definition you ascribed to predetermined database was.

A. That's correct.

Q. And so therefore, there was no question in your mind as to what predetermined database was.

A. I assumed the ordinary interpretation --

Q. And --

A. -- and my assumption was that the deponents that are -- whose testimony is provided here did so as well.

Q. Okay. Okay. Well, for instance, what's cited here is the deposition of Jeffrey Margolis, the CEO from TriZetto. Are you assuming, then, that -- that the CEO of TriZetto knows what a predetermined database is from the context of somebody who, you know, works in knowledge-based expert systems like yourself?

A. I'm assuming that someone who has knowledge of information technology would assume the ordinary meaning of that term.

Q. Okay. And that Mr. Margolis knew what that meaning was?

A. That is correct.

Q. And the same thing with Anthony Bellomo and then the rest of the people here, right?

A. That's correct.

Q. Including the customer -- I think there's two customers cited here. One is Providence Health Plan and the other is Blue Cross Blue Shield.

A. Correct.

Q. Okay.

A. If I can clarify my question [sic], predetermined database is not a term that you would ordinarily see in the computer science literature. That's an -- the adjective is odd, and so it would be unusual to assume that that would have a special meaning with respect to --

THE REPORTER: "With respect to" what?

THE WITNESS: People skilled in computer science.

BY MR. SITZMAN:

Q. Assuming -- I think what you said was it's not a word that normally appears.

A. It -- that is correct, that the database literature would not typically make a distinction

(Record read.)

BY MR. HENDERSHOT:

Q. So it's your opinion that -- strike that.

So you would -- just so I understand, the rule described in EP of Appendix B of the '164 patent defines a situation where two codes would be mutually exclusive to one another in a claim based on a non-medical criteria where the non-medical criteria is the place of service?

A. Precisely.

Q. Okay. We have talked a few times today, probably more than a few, if you would recall, about the term "algorithm." Could you explain to me what one of skill in the art would understand an algorithm to be?

A. An algorithm is an abstraction that provides a procedure for performing some computation which may then be implemented in software.

Q. So software is an implementation of an algorithm which is a -- would be understood to be a broader logical abstraction?

A. That's right, but one can choose --

THE REPORTER: I need that again.

THE WITNESS: One can choose a variety of programming languages to implement the algorithm and the algorithm is still preserved.

BY MR. SITZMAN:

Q. So does the '164 patent disclose -- strike that.

Does the '164 patent disclose the algorithm for performing the various functions described in the means for limitations of the claims?

A. Yes, it does.

Q. Speaking generally, where would that be found?

A. It exists in two places: in the flow charts in the figures at the beginning of the patent which provide for the sequence of indication of the rules; but more to the point, in the claims of the patent where the functionality described in each claim establishes a procedure for validity for checking the necessary constraints associated with that claim.

Q. So with respect to the determining limitations of the claims, the means for determining --

A. As far as the claims are concerned, the algorithm flows directly from the description of -- of the functionality.

Q. And this -- is that algorithm for those elements described in -- for at least some of those elements described in Appendix B?

A. Absolutely.

Q. It's Appendix B of the '164 patent?

A. Yes.

Q. If the structure corresponding to -- strike that.

If the claims are construed, the claims of the '164 patent are construed in such a way that the means for elements are acquired to include the algorithm for the functions for the -- are required to include the algorithm described in the '164 patent as corresponding with that function, would that affect your infringement opinion?

A. You're saying if -- if they were construed to require the algorithm as opposed to just generically software?

Q. Yeah. If they were construed to require software to implement the algorithm described in that function.

A. The answer is yes. The algorithm is obvious from looking at the function. Dr. Davis testified as such.

Q. Okay. And the algo- -- the algorithms being the algorithms that are describe in the '164 patent specification?

A. Yes.

Q. In performing your infringement analysis with respect to the '164 claims and the -- the accused

products, there are -- there are a series of elements in the patent -- in the patent, and we've talked about a lot today, that are means for, "means for" elements, and I believe Mr. Sitzman established or you two had discussed that each one of those corresponds to -- had a corresponding function in the claim. Is that correct?

A. Correct.

Q. For -- in reaching your conclusions that the products infringe, did you interpret -- strike that.

Purely in terms of interpreting the claims in reaching your -- your understanding of those, with respect to the "means for" elements, did you identify the function that corresponds to each element?

A. Yes.

Q. What did you do, then, with respect to the '164 patent to identify what that claim meant?

A. It was important to identify what the corresponding software structures were that could implement that, that functionality.

Q. So for each means for elements in the '164 claims -- sorry. Strike that.

So for each, quote, means for, closed quote, element in the '164 claims, you identified the function recited for that means in the claims and identified the structure described in the specification of the '164

patent for performing that patent?
A. Yes.
Q. And you had testified earlier, I believe, that the '164 patent describes software --
A. Correct.
Q. -- generally as the -- as the structure for performing many of the -- the claimed functions.
A. Correct.
Q. Was there any point in the specification that you looked to that id- -- that you saw that identified that when you were performing your analysis?
A. Any point in specification?
Q. Strike that.
A. The description -- do you want me to answer that or not?
Q. No. Strike the question.
A. Okay.
Q. Just directing your attention to Column 4 of the patent --
A. Yeah.
Q. -- within the first paragraph, under the "Description of the Preferred Embodiment," did you rely on any of the statements in that section of the patent in that general area in reaching your opinion that the '164 patent describes software generally as the

Page 285

structure for performing many of the function of the claims?
A. Sure. The description of the preferred embodiment describes the system as being implementable on any suitable commercial computer system using suitable commercial software, and we know that the actual implementation provided was one that used dBase and Clipper, which were widely available software tools at the time.
Q. Is it your opinion that one of ordinary skill in the art at the time of the invention, reading the specification, would have understood the structure disclosed for performing any of the -- the "means for" function as being limited to any programming language or given program?
A. No.
Q. If I could direct your attention to MM-5, which I believe was the Court's order of September 20.
A. Okay.
Q. Did you review paragraph 1 in reaching your opinion that the corresponding structure for at least the means for determining elements was software?
A. Yes.
Q. The -- the order in paragraph 1 -- I'll just go through a couple sentences for you. Hopefully, we

Page 286

can get through this, get you on your way to the airport.
MR. SITZMAN: Unlikely.
MR. HENDERSHOT: Okay.
Q. "In order for this language to pass muster under Federal Circuit precedent, the specification must disclose 'software' as the corresponding structure that performs the specific function in a means-plus-function claim limitation."
Did you understand the specification to make such a disclosure?
A. Yes.
Q. Okay. And is that in part what you based your opinion that the corresponding structure for the "means for" functions was software or software and hardware?
A. Yes.
Q. And in assessing the infringement, did you identify for each "means for" element of the '164 claims the identical function in the accused products?
A. That's correct. That's the appendices in my initial report.
Q. And having identified those functions, did you identify, in forming your infringement opinion, whether or not the structure was equivalent or identical to the structure disclosed in the '164 patent?

Page 287

A. They were necessarily equivalent because they were implemented in software.
Q. Okay. Mr. Sitzman had noted earlier that you didn't -- strike that.
You had testified earlier that you didn't recall reviewing the deposition transcripts of any software engineers from TriZetto; is that correct?
A. That's correct.
Q. Did you understand that TriZetto had identified witnesses as -- strike that.
Did you review TriZetto deposition transcripts?
A. Absolutely.
Q. Were some of those deposition transcripts indicated as 30(b)(6) deposition transcripts? Do you recall?
A. I, frankly, don't recall.
Q. Do you recall if any of the deposition transcripts you reviewed of TriZetto witnesses were of witnesses that TriZetto had identified as the individuals most knowledgeable about their products?
A. That's correct.
Q. Okay.
THE REPORTER: I didn't hear the last part.
THE WITNESS: Certainly they seemed

Page 288

Q. Other than the disclosure of software, have you reviewed anything that tells you what the structure of the software is, what the code is, what the subroutines are, what the processes are, how it processes its claims so that you can identify that portion of the Facets product that carries out that function?

MR. HENDERSHOT: Objection. Compound, asked and answered.

THE WITNESS: I have not delved down to a lower level of granularity to dissect the -- the component pieces that would allow me to answer that question. I based my assessment on my understanding of the necessary structure as dictated by the memorandum of -- of September 20th. And if software is a sufficient means for achieve- -- achieving the necessary functionality, I -- I deem that to be sufficient.

BY MR. SITZMAN:

Q. Is it fair to say that you stopped looking or decided not to look beyond the product once you concluded that it must be software-based, and since the functionality was the same, you must conclude that it must have the same structure or a similar structure?

MR. HENDERSHOT: Objection. Argumentative.

THE WITNESS: My approach seemed very

reasonable to me.

BY MR. SITZMAN:

Q. I'm sorry. In my statement, was -- was there anything wrong in what I had said?

A. It wasn't -- I do not believe it was necessary to go to a lower level of granularity to ascertain those specific components.

Q. Okay. And why did you not believe that?

MR. HENDERSHOT: Objection. Asked and answered.

THE WITNESS: Because if the function needed to be reproduced and the testimony and the -- and the product literature suggests that it was and the structure was clearly software, then my job was done.

BY MR. SITZMAN:

Q. Okay. And then the log- -- logical leap, then, is any software program that performs those functions, according to your analysis, would infringe that claim limitation.

A. That's my understanding of the court memo.

Q. Okay. And that was the first sentence of paragraph 1 that Mr. Hendershot read to you and not the last two sentences of that -- of the memorandum.

A. I read the entire paragraph.

Q. Okay. The -- the part that says, on page 2,

beginning with the word "therefore": "Therefore, plaintiff must supplement its claim construction by identifying those portions of the specification that disclose the correspondence between the software ... and the function disclosed by each claim limitation, as well as the specific algorithm disclosed in the specification, or where it is disclosed (or otherwise inferred) that the algorithm/software is known to those of skill in the art"?

MR. HENDERSHOT: I'm just going to note that you missed the first where it says the correspondence between the software, paren, "the structure," closed paren.

MR. SITZMAN: Okay.

Q. You included that sentence in your analysis that you didn't need to go beyond the fact that it was embodied in software.

A. The algorithms that practice the claims in the '164 patent directly flow from the functions that are described in those claims. Dr. Davis said as much in -- in his initial report. The algorithms are straightforward and are immediately inferable from the functions.

Q. Well, since we're working on the -- the "means for receiving at least one claim," what is the algorithm

that is immediately inferable from that function?

A. That the data of the claim are input into the computer and stored in some database or temporary storage location.

Q. And how is that implemented in the '164 patent?

A. It's implemented in Clipper code.

Q. And how is it implemented in the Facet software?

A. In -- in corresponding software.

Q. Do you know what the corresponding software is?

MR. HENDERSHOT: Objection. Asked and answered.

BY MR. SITZMAN:

Q. Do you know what the corresponding --

A. No. I have not --

THE REPORTER: I'm sorry?

THE WITNESS: I have not examined the source code.

BY MR. SITZMAN:

Q. And when you said it's -- it's embodied in Clipper code, you don't have any particular code in mind. You're just basing that off of Appendix D which has a por- -- a portion of the Clipper code used in this

# EXHIBIT 9

Page 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

McKESSON INFORMATION SOLUTIONS LLC,
Plaintiff,
-against- Civil Action No. 04-1258-SLR
THE TRIZETTO GROUP, INC.,
Defendant.

VIDEOTAPED DEPOSITION OF KAREN LAMPE
New York, New York
Wednesday, September 14, 2005

Reported by:
CATHI IRISH
RPR/CLVS
JOB NO. 38481

Page 2

September 14, 2005
12:04 p.m.

Videotaped deposition of KAREN LAMPE, held at Skadden, Arps, Slate, Meagher & Flom LLP, 4 Times Square, 38th Floor, New York, New York, pursuant to Notice, before Cathi Irish, a Registered Professional Reporter and Notary Public of the State of New York.

Page 3

APPEARANCES:

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Attorneys for Plaintiff
525 University Avenue
Palo Alto, California 94301
(650) 470-4500
BY: JEFF RANDALL, ESQ.
E-mail: jrandall@skadden.com

GIBSON, DUNN & CRUTCHER LLP
Attorneys for Defendant
One Montgomery Street
San Francisco, California 94104-4505
(415) 393-8233
BY: DANIEL P. MUINO, ESQ.
E-mail: dmuino@gibsondunn.com

ALSO PRESENT:
Jeffrey Suazo, videographer

Page 4

12:03 THE VIDEOGRAPHER: This is tape number 1 of the videotaped deposition of Karen Lampe in the matter McKesson Information Solutions LLC, plaintiff, versus The TriZetto Group, Inc., defendant in the United States District Court for the District of Delaware, Civil Action Number 04-1258-SLR.

12:04 This deposition is being held at Skadden, Arps, Slate, Meagher & Flom LLP, 4 Times Square, 38th Floor, New York, New York, 10036 on September 14, 2005 at approximately 12:04 p.m. My name is Jeffrey Suazo from the firm of Global Deposition Services, Inc. and I am the legal video specialist. The court reporter is Cathi Irish in association with Global Deposition Services, Inc.

12:04 Would Counsel please introduce themselves?

12:05 MR. RANDALL: Jeff Randall with Skadden, Arps representing plaintiff McKesson.

12:05 MR. MUINO: Daniel Muino with Gibson, Dunn & Crutcher for defendant The TriZetto Group and witness Karen Lampe.

12:05 THE VIDEOGRAPHER: Will the court reporter please swear in the witness?

Page 57

01:43 that I won't be able to examine any witness on anything pre-1998, given that your designee can't testify about that.

01:43 MR. MUINO: Well, sure you will. You can examine Mr. Luftig on that subject. I've said that several times. I'm not going to object to you asking any questions about ClaimFacts. They were cross-designated on each of these topics.

01:43 MR. RANDALL: When is Mr. Luftig available, by the way, for his 30(b)(6)?

01:43 MR. MUINO: I have no idea. We're working on it, though.

01:44 MR. RANDALL: I've marked for identification as Exhibit 2 the McKesson patent.

01:44 (Lampe Exhibit 2, United States patent 5,253,164, marked for identification, as of this date.)

01:45 BY MR. RANDALL:

01:45 Q. Ms. Lampe, I'm going to ask you a few questions about how ClaimFacts operates.

01:45 Does ClaimFacts operate with a database?

01:45 A. I don't know. No, I don't --

Page 58

01:45 programming lingo, I'm not sure. It's written in Cobalt.

01:45 Q. Doesn't ClaimFacts utilize a database that has a predetermined set of relationships between medical service codes?

01:45 A. Oh, ClinicaLogic, yes, there are records set up that are -- where our criteria lives. So I don't know that it would be classified as a database because it's not separate; it's incorporated into the system. But yes, there are separate records for the ClinicaLogic function.

01:46 Q. So we get this, I want to get my terminology correct. ClaimFacts is a system that has integrated into it ClinicaLogic, and this database has a predetermined set of relationships between medical service codes; is that right?

01:46 A. Yes, I would say that's correct.

01:46 Q. And ClaimFacts operates to utilize these predetermined set of relationships between medical service codes to determine if one or more medical codes in a claim is valid or invalid, correct?

01:46 A. Yes.

01:46 Q. And the predetermined set of

Page 59

01:47 relationships between medical service codes in ClaimFacts is based in part on medical reasons or medical considerations, correct?

01:47 A. Correct.

01:47 Q. Does ClaimFacts also operate to invalidate one or more medical service codes based on non-medical reasons?

01:47 MR. MUINO: Objection, vague and ambiguous as to --

01:47 BY MR. RANDALL:

01:47 Q. Do you know what I mean by non-medical reasons?

01:47 A. No.

01:47 Q. So for instance, if the medical procedure were a cosmetic procedure, if the medical procedure exceeded a preset cost for that medical procedure, things like that.

01:47 A. Okay. The preset cost is handled outside of ClinicaLogic. ClinicaLogic doesn't have -- have -- doesn't include usual customary fees. Cosmetic, experimental, or investigative age parameters, gender parameters, inpatient versus outpatient designations for the site of the services, those types of things, yes, it does have those.

Page 60

01:48 Q. So, for instance, ClaimFacts does operate to invalidate some medical service codes based on non-medical reasons as I explained it, correct?

01:48 A. Yes.

01:48 Q. The vast majority, however, are based on medical reasons, correct?

01:48 A. I would have to say that's correct.

01:48 Q. I'm going to ask you to look at the McKesson patent. I've marked it as Exhibit 2. Can you look at the second to last page?

01:49 I'm sorry. I'll just give you a copy.

01:49 A. Thank you.

01:49 Q. The second to last page contains a list of numbered paragraphs or claims. These are each claim numbers. Do you see that?

01:49 A. Uh-huh, yes.

01:49 Q. And on this page and on the next page it shows claims 1 through 16. Do you see that?

01:49 A. 1 through 16?

01:49 Q. Paragraphs 1 through 16 or claims 1 through 16 on the two pages -- the last two pages of the patent.

01:50 A. Oh, oh, yes.

01:50 Q. So I want to direct your attention to

Page 73

service codes that it determines to be invalid for, among other reasons, the fact that the medical service code is no longer valid and has been replaced with another one, correct?
A. Correct.
Q. So -- and I don't have to go -- I'm not going to go through all the different instances in which this is done. That's just simply one, correct?
A. Okay.
Q. With that in mind, would you agree that the TriZetto ClaimFacts system contains all of the elements described in both claim 3 and claim 4?
A. Yes.
Q. Could you read claim 5? And claim 5 is a claim that includes the apparatus or the system of claim 4. It just has one further limitation.
A. Yeah, there's a display that tells the examiner what happened with the claim and why.
Q. So would you agree that TriZetto's ClaimFacts includes the components described in claims 3, 4 and 5?
A. Yes.
Q. Could you read claim 6? Claim 6 includes all of the components of claim 3 and the

Page 74

added limitation in claim 6.
A. Yes.
Q. So is it your understanding that TriZetto's ClaimFacts product includes all the components of claim 3 and claim 6?
A. Yes.
Q. Do you know what the CRV codes are in claim 7?
A. I believe they are customary and reasonable value codes, or pricing codes. Is that correct? Relative value system. It's California relative value system which is no longer used, actually.
Q. Does ClaimFacts use that?
A. No. Well, ClinicaLogic doesn't use it. ClaimFacts has its pricing separate from ClinicaLogic.
Q. So does ClaimFacts include all of the components of claim 3 and claim 7?
A. No.
Q. Because it doesn't utilize CRV codes?
A. Correct.
Q. Could you read claim 8? Claim 8 includes all the components of claim 3 and the added limitation from claim 8.

Page 75

A. Yes.
Q. So is it your understanding that ClaimFacts includes all of the components of claims 3 and 8?
A. Yes.
Q. Claim 9 also includes all the components of claim 3. Could you read that and tell me if ClaimFacts includes all of the components of claims 3 and 9?
A. Yes.
Q. ClaimFacts does include all the components of claims 3 and 9?
A. Yes.
Q. Could you read claim 10? Claim 10 is an independent claim, meaning it's just -- if you could just read all of claim 10. And I'm going to ask you if ClaimFacts includes the components listed in claim 10.
A. Okay.
Q. Does ClaimFacts contain all of the components described in claim 10?
A. Yes.
Q. Can you read claim 11? Claim 11 includes all the components from claim 10 plus the added limitation in claim 11.

Page 76

A. I'm not sure. I need an explanation on that. Seems simple enough, but...
Q. For instance, when we just discussed this example, when ClaimFacts determines that a medical service code is no longer valid or has been deleted, and it has been substituted with a new medical service code, ClaimFacts will reject the deleted or invalid code and actually replace it with the updated code, correct?
A. Correct.
Q. All right. So with that clarification in mind and that example in mind, does ClaimFacts include all the components of claims 11 and 10?
A. Yes.
Q. Would you read claim 12, and I'll ask you if ClaimFacts contains the components described in claim 12.
A. Okay.
Q. Does ClaimFacts contain all the components described in claim 12?
A. Yes.
Q. Can you read claim 13 and I'll ask you the same question: Does ClaimFacts contain all the components described in claim 13?
A. Okay.

# EXHIBIT 10

# EXPERT REPORT OF RANDALL DAVIS

*McKesson Information Solutions LLC v. The Trizetto Group, Inc*

October 24, 2005

(typically) a set of rules that specify the knowledge necessary to do that task, and having that set of rules represented in the system in a way that is distinct from the code that examines the rules and applies them to the task. It is this focus on task-specific knowledge (the rules) and their representation distinct from the code that characterizes expert systems as a specific class of computer program.

The '164 patent contains both method (1, 2, and 16) and apparatus claims (3-15). I begin by considering the method claims. In each case the analysis below focuses on selected language in the claim.

**III.A. Method Claims**

*III.A.1. Claim 1*

I take the "predetermined database…containing medical service codes" recited in claim 1 to be a fixed set of service codes containing every code known to be valid at the time the program is run. The remainder of the claim then recites a straightforward check of each code in a claim to determine whether it is not present in the predetermined database, and informing the user if a code is not contained in the database. Although the claim also includes "relationships among the medical service codes" in the predetermined database, it does not appear that these relationships are utilized to perform the code-checking function described in the claim.

Checking the validity of input data by comparing it against a list of known good values is one of the most fundamental techniques taught in every introductory programming course. It is one way of dealing with a phenomenon that has been recognized since at least the 1960's-era of computing: "Garbage in, garbage out." In other words, if your input data is not good, the results will not be good either; hence the first step always is to check the input to be sure it is good, and reject it otherwise.

This claim appears to recite nothing more than this time-honored aphorism, which is known to be universally applicable to every computer program, including those further specified by the claim elements of a database of medical service codes and a set of relationships.

*III.A.2. Claim 2*

Claim two recites the means for "determining whether one of the medical service codes in the at least one claim is mutually exclusive due to non-medical criteria with any other medical service code in the at least one claim." The term "non-medical criteria" is not to my understanding a term of art, nor does it appear anywhere in the patent other than the claims.

Appendix B of the patent gives 12 generic categories of "if/then" rules that are applied to multiple codes; Appendix A offers 9 concrete examples of these rules (two examples illustrate two categories of rules each, one category of rule – R4 – has no example). None of these rules relies on anything that may sensibly be termed "non-medical criteria."

Example 1 of Appendix A shows an "Example of 'E1/E2' Rule;" this is clearly a medical criterion for exclusion as it depends on knowing about appropriate uses of local anesthesia. Example 2 relies on a medical criterion involving understanding gynecological procedures. Example 3 relies on a medical criterion involving understanding what a cystoscopy is. Example 4 relies on a medical criterion involving understanding heart catheterization procedures. Example 5 relies on a medical criterion involving understanding the laparoscopy procedure. Example 6 relies on a medical criterion involving understanding the possible complications of a coronary artery bypass procedure. (Examples 7 – 15 involve rules applied to each code individually and hence are not relevant to this claim, which is limited to "determining whether one of the medical service codes in the at least one claim is mutually exclusive due to non-medical criteria with any other medical service code in the at least one claim.") Example 16 relies on a medical criterion involving understanding the steps involved in repairing a stomach lesion. Example 17 relies on a

medical criterion involving understanding electrocardiograms and their interpretation. Finally, Example 18 relies on a medical criterion involving an understanding of heart catheterization procedures.

As the patent text provides no guidance, I turn to ordinary language. The Oxford English Dictionary has no entry for *non-medical*, except under the generic definition of the prefix *non-*. For *medical* it suggests, among several definitions, the first of which is "Of, relating to, or designating the science or practice of medicine in general, or its practitioners." So presumably a non-medical criteria would be something not relating to the science or practice of medicine.

One possibility is the sort of check found in other medical service code review programs, which check such things as patient gender against gender-specific procedures (e.g., hysterectomy). But this is not covered by claim 2, as it calls specifically for "determining whether *one of the medical service codes* in the at least one claim is mutually exclusive due to non-medical criteria *with any other medical service code* in the at least one claim." That is, it specifies mutual exclusion between medical service codes, not exclusion of a medical service code based on information about the patient.

As the term "non-medical criteria" is not a term of art, and as the claim specifies exclusion between non-medical service codes, claim 2 cannot in my opinion, be sensibly interpreted based on the record available. I reserve the right to supplement my opinion if and at such time as the Court determines the proper construction of claim 2.

*III.A.3. Claim 16*

Claim 16 appears to be quite general, specifying "a set of relationships among the medical service codes defining whether selected ones of the medical service codes are valid when received with other selected ones of the medical service codes" and a method involving "determining whether one of the medical service codes in the plurality of medical service codes

is valid or invalid by interacting with the database and the set of relationships contained in the database" It does not further specify the form in which those relationships are embodied or on what grounds a code might be considered valid in the context of another code. I interpret the claim with reference to the body of the patent, which indicates that the "set of relationships" is in fact a set of rules of the form shown in Appendix B, and that the grounds on which a code might be considered valid or invalid include appearing (or not) in the database of all known good codes, and appearing (or not) in one of actual the rules whose general form is shown in Appendix B.

I note also that where claims 1-14 recite the authorizing or rejecting of specific medical procedure *codes*, claim 16 refers to the authorization or rejection of the *claim* in which the medical procedure codes are found.

## III.B. Apparatus Claims

### *III.B.1. Claim 3*

Claim 3 is parallel to claim 16, recited in apparatus form, and focused on acceptance and rejection of medical service codes (rather than claims).

### *III.B.2. Claims 4-9*

Claims 4 through 9 are dependent on claim 3, and specify further:

claim 4: means for revising a claim to delete an invalid medical service code

claim 5: means for informing why a claim was revised

claim 6: that the database may contain medical service codes described by CPT codes

claim 7: that the database may contain medical service codes described by CRVS codes[2]

claim 8: means for requesting further information from the user

---

[2] I understand this is the only claim not being asserted by McKesson in this litigation.

claim 9: that the relationships among the medical service codes include medically determined relationships.

I take the phrase "medically determined relationships" in claim 9 to be any relation among medical service codes that could have been written only by someone with knowledge of medicine, in keeping with the analysis above of claim 2.

*III.B.3. Claims 10-11*

Claim 10 recites a general means for "determining whether one of the medical service codes in the at least one claim is included in any other medical service code in the at least one claim." Example 3 in the body of the patent appears to be one example of such inclusion.

Claim 11 is dependent on 10 and further specifies a means for revising a claim to not include a rejected medical service code.

*III.B.4. Claim 12*

Claim 12 recites a means for determining whether one medical service code is "medically exclusive with any other medical service code," and the means for rejecting such codes. I take this to refer to Examples 1, 17, and 18 in Appendix A, as these are the only rules that act on multiple codes to *exclude* (i.e., reject) a code (rather than, for example, *replacing* it with another code).

It is unclear how "determining whether one of the medical service codes . . . is medically exclusive with any other medical service code" differs from the determining element of certain other claims, particularly Claims 3 and 16 ("determining whether one of the medical service codes . . . is valid or invalid") and Claim 9 ("relationships among the medical service codes include medically determined relationships"). These claims appear to significantly overlap in their functionality.

*III.B.5. Claim 13*

Claim 13 is the apparatus version of claim 1.

*III.B.6. Claim 14*

Claim 14 is the apparatus version of claim 2.

*III.B.7. Claim 15*

Claim 15 is the apparatus version of claim 16, and like claim 15 recites rejecting claims rather than service codes.

## IV. PRIOR ART

I consider next a number of prior art publications and systems and point out their relevance to various aspects of the '164 patent, starting with references relevant to expert systems in general, then turning to those relevant to processing medical claims.[3]

### IV.A. Expert Systems Prior Art

*IV.A.1. Davis77: Davis, Buchanan, Shortliffe, Production Rules as a Representation for a Knowledge-Based Consultant Program,* Artificial Intelligence, *8:15-45, 1977.*[4]

This paper, which I published in 1977, was one of the first expositions of the fundamental concept and architecture for expert systems. It established several basic concepts, including the basic architecture (Fig 3 from the paper, reproduced below), the use of simple if/then rules as a way of capturing non-trivial expertise in a domain (Section 3.2 of the paper), the ability to revise the rules in the knowledge base (Section 6.3 of the paper), and the concept and mechanism for having the program explain its results (Section 6.2 of the paper).

---

[3] In the course of preparing this report, I considered prior art references from among a large collection of publications related to the subject matter of the '164 patent. *See* Exhibit C. I also considered textbooks and articles known to me from my experience in the expert system field and materials uncovered through my own investigation.
[4] For ease of reference later, cited references are given a label composed of the first author's last name and (for papers) the year of publication appended.

# EXHIBIT 11

**AN EXPERT OPINION IN THE MATTER OF:**

# McKesson Information Solutions, LLC v. The TriZetto Group, Inc.

**RE: U.S. Patent No. 5,253,164**

**SYSTEM AND METHOD FOR DETECTING FRAUDULENT MEDICAL CLAMS VIA EXAMINATION OF SERVICE CODES**

OPINION PREPARED BY:

**Philip M. Hawley, Jr., MD**

October 24, 2005

| | | |
|---|---|---|
| **Section One:** | Qualifications | 1 |
| **Section Two:** | Disclosures | 3 |
| **Section Three:** | Health Insurance Industry Trends, Medical Billing Practices, & Claim Auditing Prior To September 30, 1987 | 4 |
| **Section Four:** | Claims Of The '164 patent | 8 |
| **Section Five:** | Opinions Concerning The '164 Patent | 13 |
| **Appendix A:** | Curriculum Vitae – Philip M. Hawley, Jr., MD | 30 |

## SECTION FOUR: CLAIMS OF THE '164 PATENT

The claims of the '164 patent describe a computer system and a database comprising a process for: (1) receiving medical claims containing medical service codes and applying auditing (fraud detection) rules to those medical claims, and (2) authorizing or rejecting one or more of the code(s) and/or claim(s). Hereinafter, I will refer to this general description as the "basic system and method" of the '164 patent.

The claims of the '164 patent appear to refer to medical claims that include codes for medical services performed by physicians and other licensed medical practitioners (such as chiropractors and audiologists), as well as certain facility-based services (e.g., lab tests and x-rays).

What follows is my understanding of the claims of the '164 patent, including any ambiguities contained within the language of the claims (my numbering coincides with the numbering of the patent claims in the '164 patent):

1. A method for: receiving medical claims (single or multiple); interacting with a database of codes to determine and inform the user whether the billed code(s) are contained in the database; informing the user that a medical code is not contained in the database. [11]

   This patent claim also describes the computer system on which these methods are applied, a computer with a "predetermined" database that contains relationships for defining whether one medical service code is valid when it appears on the same claim(s) with another code from the same database.

   The term "predetermined" is never defined in the '164 patent. The term hints at something that is fixed and unchanging, but the term is never clarified. While the Specification and Appendices provide examples of the codes and relationships within the predetermined database, the specific contents of this database are never fully disclosed.

[11] Throughout the claims of the '164 patent, I assume that the terms "input claim" and "claim" refer to a bill (invoice) for medical services.

2.  The basic system and method, and a method for determining whether any code contained in the claim(s) is mutually exclusive of another code appearing on the same claim(s) due to non-medical reasons.

The terms "mutually exclusive" and "non-medical" are not defined in the '164 patent. Are the gender and age of a patient non-medical issues, or medical issues? Certainly, they are medical facts. The patent does not provide sufficient information for me to determine the meaning of these terms in this patent claim. Further, this patent claim refers to one code being mutually exclusive with respect to another code, not with respect to a demographic factor such as the patient's gender or age. Ultimately, the audit method contemplated in patent claim #2 is not specifically identified.

Also, please see my discussion of the predetermined database under patent claim #1.

3.  The basic system and method, and a system for determining whether one of multiple billed codes is valid or invalid.

The terms "valid" and "invalid" are not defined, and one may choose to construe their meaning broadly or narrowly. It is not clear whether the terms "valid" and "invalid" were used with the intent of: (a) encompassing all audit detection methods and systems described in the Specification and Appendices; (b) encompassing only some of the audit detection methods and systems described in the Specification and Appendices; or (c) broadly encompassing all of the audit detection methods and systems described in the Specification and Appendices, as well as any future audit detection methods and systems.

Whatever the case, the terms "valid" and "invalid" do not summon to mind specific audit detection techniques, but rather the general concept of improperly billed codes and claims.

Also, please see my discussion of the predetermined database under patent claim #1.

4. The apparatus of patent claim #3, with a system for removing invalid medical codes from the medical claim(s).

   Please see my discussion of "valid" and "invalid" under patent claim #3.

5. The apparatus of patent claim #4, with a system for informing the user why codes were deleted from the medical claim(s).

6. The apparatus of patent claim #3, noting that the database of medical service codes refers to CPT codes.

   Please see my discussion of "valid" and "invalid" under patent claim #3.

7. I understand that patent claim #7 is not being asserted.

8. The apparatus of patent claim #3, with a system for requesting additional information from the user of the system.

   Please see my discussion of "valid" and "invalid" under patent claim #3.

9. The apparatus of patent claim #3, noting that there are medically determined relationships among the medical service codes in the database.

   Please see my discussion of the predetermined database under patent claim #1. Also, please see my discussion of "valid" and "invalid" under patent claim #3.

10. The basic system and method, with a system for determining whether a single billed code among multiple billed codes is part of ("included in") one of the other billed codes.

    Please see my discussion of the predetermined database under patent claim #1.

11. The apparatus of patent claim #10, with a system for removing the rejected code(s) from the medical claim(s).

12. The basic system and method, with a system for determining whether any code contained in the claim(s) is exclusive of another code appearing on the same claim(s) for medical reasons.

    The term "medically exclusive" is not defined. Therefore, there is no way to determine how this audit detection issue—medically exclusive—differs from a code being "invalid by interacting with the database" (patent claim #3). Also, nowhere in the '164 patent did I find a discussion of the distinction between "non-medical" (as used in patent claims #2 and #14) and "medical" (as used in patent claim #12).

Please also see my discussion of the predetermined database under patent claim #1.

13. The basic system and method, with a system for determining and informing the user whether the billed code(s) are contained in the database.

    Please also see my discussion of the predetermined database under patent claim #1.

14. The basic system and method, with a system for determining whether any code contained in the claim(s) is mutually exclusive of another code appearing on the same claim(s) due to non-medical reasons.

    The terms "mutually exclusive" and "non-medical" are not defined (please see my discussion under patent claim #2, above). Also, please see my discussion of the predetermined database under patent claim #1.

15. The basic system and method, with a system for determining whether a single billed code among the multiple billed codes is valid or invalid, and rejecting or authorizing the claim(s).

    Please see my discussion of "valid" and "invalid" under patent claim #3. Also, please see my discussion of the predetermined database under patent claim #1.

16. The basic system and method, with a method for determining whether a single billed code among the multiple billed codes is valid or invalid, and rejecting or authorizing the claim(s).

    Please see my discussion of "valid" and "invalid" under patent claim #3. Also, please see my discussion of the predetermined database under patent claim #1.

Only three of the 16 patent claims are described in a manner that one can reasonably correlate to audit detection techniques described in the Specification and Appendices. Those are the method and apparatus claims (patent claims #1 and #13, respectively) that describe a method and computer system for determining whether a code appearing on a medical claim (or claims) is contained in the predetermined database, and the apparatus-only claim (patent claim #10) that describes a computer system for determining whether one code among multiple billed codes is part of ("included in") any of the other billed codes appearing on a medical claim or claims.

None of the other medical claim auditing methods and apparatuses described in the Specification, or rendered as examples in the Appendices, are specifically identified in the claims of the '164 patent.

I understand that the Court has not yet interpreted the claims of the '164 patent or identified the required structure. I may supplement this opinion once the Court renders its claim construction.

# EXHIBIT 12

# REPORT OF EXPERT WITNESS

Pursuant to Federal Rule of Civil Procedure 26(a)(2)(B)

Dr. Larry Kerschberg

---

In the United States District Court
District of Delaware

McKesson Information Solutions LLC v. The TriZetto Group, Inc.
Case No. 04-01258-SLR

---

Report on Invalidity of '164 Patent
October 24, 2005

---

## I. Professional Background

I received my B.S. in Engineering Science with Honors from Case Institute of Technology in Cleveland Ohio in 1964. I then obtained an M.S. in Electrical Engineering from the University of Wisconsin — Madison in 1966. I received my PhD in Systems Engineering in 1969 from Case Western Reserve University.

I have worked and taught at the Federal University and the Catholic University, both in Rio de Janeiro, Brazil (1969-1976), the University of Maryland — College Park (1976-1977), Bell Telephone Laboratories (1977-1981), the University of South Carolina (USC) — Columbia (1981-1986), and George Mason University (1986-Present).

I am currently Professor of Information and Software Engineering, Director of the M.S. in E-Commerce program and Director of the E-Center for E-Business at George Mason University. I am also a founding editor and serve as an Editor-in-Chief of the *Journal of Intelligent Information Systems: Integrating AI and Database Technologies*, published by Springer Publishing Company. Springer publishes six issues of the journal per year. I am an Associate Editor for the Data Mining and Knowledge Discovery Journal, also published by Springer. I am also a member of the Editorial Board for the *Journal of Data Semantics*, published by Springer.

During the 1970's, while in Brazil, I co-created with Mr. Joao Pacheco, the Functional Data Model, which can be used to specify a conceptual model for a database application. This model is still being used world-wide in research prototypes and has gained popularity in specifying applications that exploit the infrastructure provided by the

As expert system technology matured, several companies began selling expert system shells. These shells were programs that embodied the concepts, architecture and reasoning techniques proposed by the leading researchers and practitioners in the field. In this way, "knowledge engineers" could use these shells to build expert system applications in a chosen application domain. The shell provided an environment to develop an expert system application. It included components to represent and store rules in a rule base, to accept facts from the user, to reason about the set of facts using the rules, and to explain the reasoning process to the knowledge engineer and also to the users of the system. Several companies began marketing these shells, including Teknowledge, Inc., which introduced a shell called M1 in 1985. This is the shell that was used to build the MEDCLAIM system discussed in section VIII.

## VII. Overview of the Patent Claims

In this section, I provide a general description of the system and method of the '164 patent, followed by a short summary of each patent claim. Additional analysis of each claim can be found in Section XI: Claim Chart in which the text of a claim is followed by my opinion regarding that claim.

The '164 patent indicates that the system and method was developed to address skyrocketing health care costs and the need to control spending by self-insured companies and the Federal Government. They talk about the increased importance of Health Maintenance Organizations (HMOs) and Preferred Provider Organizations (PPOs) and how physicians reduce their fees through negotiated fee schedules with these organizations (See column 1, lines 39-54). In order to compensate for these reduced fees, physicians greatly increase their fee-for-services charges and do what is known as upcoding in which they charge a higher paying code than that for the procedure performed. Another approach is called unbundling of each surgical procedure rather than billing for them as a group, when they are components of an overarching procedure (See column 2, lines 5-16). It was this environment that motivated the development of the system and method. The practices of upcoding, bundling and unbundling is discussed in the Egdahl and Hertenstein paper [12] (See Egdahl/Hertenstein, page 349 (Abstract), page 351 (Section on "Continual audit and recoding of physician claims")).

The system and method of the '164 patent is a computer system consisting of a central processing unit and associated memory that allows it to process medical claims consisting of medical service codes. The system interacts with a human user to assist in processing the medical claims. Part of that interaction with a user may be to inform the user that a claim has been revised or that additional information is needed to determine whether a claim may be authorized (Column 4, lines 23-68; column 5, lines 1-3).

In order to determine whether the medical claim should be authorized, the system and method accepts the claim and the medical service codes present in the claim, it then examines the service codes to first verify that the codes are valid (Column 5, lines 5-25). This is done by accessing a predetermined database of codes to verify that the billed codes are present in the database. Next, the system and method may apply several types of rules to examine whether the service codes have specific relationships among themselves. For example, the system and method looks for codes that have been listed separately, when in fact they are part of a more general surgical procedure (this is known

as 'unbundling'). It has the ability to reject the separately listed code (Column 5, lines 26-68; column 6, lines 1-65).

The system and method may also look for mutually exclusive codes, which I interpret to mean that one code may be billed and not the other, and vice-versa. It may also invalidate certain service codes based on mutual exclusion due to non-medical rules. There are additional rules to determine whether the billed service codes are appropriate for the surgical procedure that was performed. The system and method may delete inappropriate service codes and may replace them with the medically appropriate service codes. The system and method accesses the predetermined database to verify the relationships among the codes. The system and method has the ability to interact with the user to obtain additional information and to explain to the user why certain actions were taken in the claim processing process (Column 7, lines 1-10).

The patent abstract describes the system and method as an "expert computer system for processing medical claims." The medical claims are submitted to the system and are interpreted according to "specific rules and a predetermined database" to ascertain whether the services billed on the medical claims are appropriate (Title Page, second column).

This statement is important in that it refers to the system and method as an 'expert' computer system, so I conclude that the system and method designers were influenced by Expert System theory and practice, as exemplified by [11, 13-16]. In fact, the '164 patent references the Weitzel and Andrews paper that describes the joint-venture between Blue Cross/Blue Shield of South Carolina and the University of South Carolina to build an expert system for medical claims review in the area of Home Health Care. [14] (See Title Page, second column).

Figure 1 of the system and method provides an overview of the system which I paraphrase here. The numbers refer to the components indicated on the diagram. Generally, the user (2) will enter into the computer system (2) a description of the medical claims for which reimbursement of payments is requested or the codes associated with such claims or both. The appropriate codes are then sent to the knowledge base interpreter (5) for its assessment of the coded claims. The interpreter (5) uses the rules of the CodeReview system, interacts with the knowledge base (6) and returns to the user: 1) either a recommendation as to the code(s) for which payment is proper, or 2) requests that the user provide more information, or obtain additional information from the entity requesting payment, or 3) refers the claim to trained medical personnel for assessment (Column 4, lines 23-68; column 5, lines 1-3).

When the knowledge base interpreter (5) has recommended approval of payment of a particular type, the user (3) may authorize payment to the provider of the processed claim or may forward that information via input into the computer system (4). A history database (7) is used to refine and update the knowledge base interpreter (6) and to monitor savings associated with the recommendation, that is, a comparison of the costs associated with the original service codes on the claim, as compared with the revised service codes. (Column 4, lines 23-68; column 5, lines 1-3).

Figures 2 through 7 of the '164 patent provide schematics (flow charts) of the workflow for processing medical claims. The '164 patent includes some additional detail on the various database files that contain data relevant to processing the service codes.

They include the following: ALLCODE, SUPERSEDE, PROCESS, INTERACT, BYITSELF, etc. Each database is used to assess the appropriateness of the codes appearing in a medical claim. However, the actual contents of these databases are not disclosed, except for the 21 rule templates of the INTERACT and BYITSELF databases (Columns 5-10).

Now I review the '164 patent claim by claim.

Claim 1: This claim describes the basic method with the capabilities of operating on a predefined database, receiving at least one claim, determining whether any medical service code is present in the database, and informing the user if the code is not present.

Note: The claim does not use the complete apparatus of Claim 1a. (See Section XI, below, Claim Chart). For example it does not use the relationships among the database codes. Rather, it compares the claim code on the submitted form to verify whether it is contained in the database.

Claim 2: This claim describes the basic method and focuses on receiving at least one claim, determining if the claim has several (a plurality) medical services codes, determining whether there exist mutually exclusive codes due to non-medical reasons, and rejecting those mutually-exclusive service codes, and authorizing those valid service codes that are not mutually exclusive due to non-medical criteria for the surgical procedure.

Note: I think the terminology, "mutually exclusive codes due to non-medical criteria" is quite vague, and can be open to various interpretations. I was not able to find a formal definition of this concept in the '164 patent.

In his deposition Dr. Goldberg admits that he does not know precisely the meaning of the term "mutual exclusion due to non-medical criteria" (Goldberg Deposition, page 305).

On page 199 lines 12-23 and page 200 lines 1-23 of his deposition, Dr. Hertenstein discusses the term 'mutually exclusive due to non-medical criteria' and he gives an example of Breast Enlargement as perhaps not being covered by a plan. Another example he states might be a 'valid' operation, a breast reconstruction some time after a mastectomy and on the same claim also plastic surgery, say a face lift. "And non-medical would mean that the second one would be excluded because it's not something covered."

However, on Page 200 lines 22-23 of his deposition, Dr. Hertenstein states "I don't know what mutually exclusive means. Okay?" This shows that the concept is confusing, even to the expert who helped to create the rules in the '164 patent.

Claim 3: This claim is similar to Claim 2 but distinguishes itself by stating that the system determines whether one medical service code on the claim is valid or invalid when received on a claim with other codes. This is done by consulting the predetermined database of medical service codes and their relationships with other codes, means for authorizing the valid codes obtained from database consultation, and either authorizing valid service codes or rejecting invalid service codes obtained from database consultation.

Note: The notion of valid or invalid service codes is very ambiguous. It appears that the term 'valid' in Claim 1 is used to denote whether the billed service code is also in the database of codes. In Claim 3, a code is valid and remains in the medical claim if it

passes a number of tests, based on its relationship with other codes on the claim form and after a database access to assess the code's relationships to other codes in the database. The term 'valid' is ambiguous and needs a more precise definition and interpretation.

Also, there is no indication in Claim 3 as to which rules are used to determine the valid or invalid service codes.

Claim 4: Claim 4 is similar to Claim 3, and allows for revising a claim by deleting 'invalid' medical service codes.

**Note:** The same ambiguity regarding the terms 'valid' and 'invalid' in the note for Claim 3 also holds for Claim 4.

Claim 5: Claim 5 is similar to Claim 4, and in addition incorporates a way of informing a user as to why the claim has been revised.

Claim 6: Claim 6 is similar to Claim 3 but in addition specifies that the database includes medical service codes described by CPT-4 codes.

Claim 7: I understand that McKesson is not asserting Claim 7 in this litigation.

Claim 8: Claim 8 is similar to Claim 3 but also stipulates that the user may be asked to provide additional information regarding the claim.

Claim 9: Claim 9 is similar to Claim 3 but also provides additional information regarding the contents of the database, namely, that the relationships among the medical service codes include medically determined relationships.

**Note:** The concept of medically determined relationships may be subject to interpretation, and I have trouble understanding how these would be represented in the database. I would think that Claim 3 would suffice in determining the 'validity' of a medical service code, so that Claim 9 seems unnecessary, unless the database has other relationships among the codes that are not medically determined. Here again, we have an ambiguous term being used in a Claim, and it is the only thing that distinguishes it from Claim 3.

Claim 10: Claim 10 describes the basic system, the associated database of medical service codes and a set of relationships among the service codes, and more specific features related to determining bundling, means for rejecting unbundled medical service codes and means "for authorizing medical service codes which are not contained in any other service code."

**Note:** I interpret the statement in quotes as referring to those medical services codes that are valid, and not bundled with other medical service codes.

Claim 11: Claim 11 is similar to Claim 10 with the additional feature that the medical claim can be revised to not include the rejected medical service code.

Claim 12: Claim 12 follows the basic system and adds a clause which uses new wording to compare medical codes, namely, "means for determining whether one of the medical services codes in the at least one claim is medically exclusive with any other medical service code in the at least one claim.

**Note:** Other claims use the term 'mutually exclusive' among services codes. This is the first instance of the term 'medically exclusive.' It is not clear how the terms 'mutually exclusive' and 'medically exclusive' differ.

Pages 29-31 of Dr. Hertenstein's deposition gives an example of mutually-exclusive codes (and presumably medically exclusive codes): a hysterectomy is mutually exclusive from removing an ovary and a tube.

Claim 13: Claim 13 is very similar to Claim 1. Whereas Claim 1 describes a method, Claim 13 describes an apparatus.

Claim 14: Claim 14 is similar to Claim 2. Whereas Claim 2 describes a method, Claim 14 describes an apparatus

Claim 15: Claim 15 is straightforward in that it receives a claim, checks whether codes are valid by consulting the database, and either authorizes or rejects the medical claim.

Claim 16: Claim 16 is a method claim similar to Claim 15 in that the medical services codes on the medical claim are checked for validity, and the medical claim is authorized or rejected.

Appendix C of the patent provides portions of the program code for the system and method. It is not clear to me whether all the code is provided, nor could I find the rule databases of CPT-4 codes anywhere in the patent.

I note that from the deposition of Ms. Kelli Dugan, the programming tools used to implement CodeReview were a program called Clipper and a database program called dBase III (See Page 71 line 22 and Page 76 lines 14-15).

## VIII. The MEDCLAIM System

In 1982, while at USC, I became interested in the then-emerging area of expert systems. I sat in on a course on Building Expert Systems, offered by the Electrical Engineering department, using a book by the same name [13].

Until that time my background, research interests and publications were in the area of database management, that is, how to organize corporate data to be captured, stored and retrieved from the database. The database management area was also relatively new and several companies were beginning to market Database Management Systems, which were the database equivalent of "shells" for the construction and management of large databases. Some companies at the time were Oracle (now the Industry leader), Relational Technology, makers of Ingres (now part of Computer Associates), and Aston-Tate (makers of dBase II for personal computers). I noticed the need to have expert systems "talk" to database systems so that we could take advantage of their relative strengths while mitigating their weaknesses.

One of the shortcomings of expert system shells was that all the facts and rules had to reside in main memory (small and costly at that time), while databases were adept at handling large collections of facts stored in secondary, or associated, storage on disk. Database systems would benefit from having rules "close" to the data, in the form of alerts or triggers. Several architectural concepts emerged at that time, including the notions of loosely-coupled and tightly-coupled Expert Database Systems.

In 1984, following the success of the EDS Workshop, sponsored by USC's Institute for Information Management, Technology and Policy, I met with a Senior Vice President of Blue Cross/Blue Shield of South Carolina, and he mentioned the trouble they were having in handling the sharp increase in medical claims for home health care. He

# EXHIBIT 13

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

McKESSON INFORMATION SOLUTIONS, LLC,

Plaintiff,

vs. No. 04-1258-SLR

THE TRIZETTO GROUP, INC.,

Defendant.

---

VIDEOTAPED DEPOSITION OF LARRY KERSCHBERG, PH.D.
Washington, D.C.
Monday, November 21, 2005
9:42 a.m.

Reported by:
Karen Young

Job No. 41296

Page 2

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

McKESSON INFORMATION SOLUTIONS, LLC,

Plaintiff,

vs. No. 04-1258-SLR

THE TRIZETTO GROUP, INC.,

Defendant.

---

Videotaped Deposition of LARRY KERSCHBERG, PH.D., held at the offices of:
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, Northwest
Washington, D.C. 20036
(202) 955-8500

Pursuant to notice, before Karen Young, Notary Public of the District of Columbia.

Page 3

APPEARANCES

ON BEHALF OF THE PLAINTIFF:
DAVID W. HANSEN, ESQUIRE
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
525 University Avenue, Suite 1100
Palo Alto, California 94301
(650) 470-4500

ON BEHALF OF THE DEFENDANT:
DAVID A. SEGAL, ESQUIRE
GIBSON, DUNN & CRUTCHER LLP
4 Park Plaza, Suite 1700
Irvine, California 92614-8557
(949) 451-3800

ALSO PRESENT:
Antonio Tropeano, Videographer

Page 4

CONTENTS

EXAMINATION OF LARRY KERSCHBERG, PH.D. PAGE
By Mr. Hansen .............................. 7
By Mr. Segal .............................. 216

Q. An ICD-9 code.
A. Right.
Q. Okay.
A. And there could be multiple ICD-9 codes associated. There's a principal diagnosis, surgical procedure, secondary diagnosis, so all of those have to be handled together.
Q. Yes, and the relationships between the various ICD-9 codes are coded in the database, you would say that this code --
A. Some of them are. The temporal relationships.
Q. Temporal relationships between the codes, so you would have a relationship between the --
A. And the services.
Q. Pardon?
A. Codes and the services.
Q. And the database in the MEDCLAIM system had actual relationships between the ICD-9 codes themselves?
A. I believe in some cases yes.
Q. And is that the case that you've just illustrated for me?
A. Not necessarily. I'm not sure.
Q. You're not sure.

A. Yeah, I'd have to look more closely at the database.
Q. And how would you do that? How would I do that? I want to figure that out, right? How do I do that?
A. Right. I'd have to look for the code. I couldn't find the documentation, so --
Q. But without doing that, you don't know.
A. Right.
Q. Okay.
A. I reserve the right though if I do find it that we could have an addendum to the testimony.
Q. Not in my lifetime.
A. Not in your lifetime, okay.
Q. Not if I have anything to do with it. It's not the way the process works, but we don't have to get into that now. You can talk to your lawyer.
A. Okay.
Q. This is a deposition.
A. Right.
Q. All right. Now, let me ask you, have you ever heard of means plus function claiming? You're not a patent lawyer, right?
A. No, but I've heard the expression but I couldn't give you the definition.

Q. So let's go, for example, to page -- let's pick one. Page 19 --
A. Yes.
Q. -- of your report. Sorry. Exhibit 7. Let's just start with element C, okay? You see where it says "Means for receiving"?
A. Correct.
Q. Do you have any idea -- how did you interpret that?
A. That somehow the invention would receive a claim, some mechanism by which that claim would be provided to the system.
Q. Do you have any idea whether the term "means" has any special meaning in patent law?
A. It's a mechanism. Is that -- means for determining. It's a way, a way of receiving.
Q. But in terms of -- in terms of formulating your definition of the claims for your report, you were not providing any instruction as to how means-type elements would be interpreted under patent law?
A. I think I was, but I don't remember the exact definition.
Q. Do you remember when that instruction came?
A. I think when I was talking with Mr. Muino

early on when we were talking about how to interpret the claims, he did talk about means plus function, so some of the claims are more like a computer system that would be the apparatus, and this is more of a specification. It doesn't tell you how it's done. It just says this is a specification of the system, and then it can have various embodiments, so to speak, various ways to do it. Like I could hand you a claim. That might be a means of receiving the claim. Is that okay? I mean --
Q. It's okay with me. I'm just trying to get your testimony. No, I mean that's all --
A. That's the way --
Q. -- I'm trying to do, is figure out what you did, so --
A. Right.
Q. Did you for purposes of -- let's take the next one, right, D, means for ascertaining whether the at least one claim contains a plurality of medical service codes. Do you see that?
A. Right.
Q. Did you look at the patent to determine whether any structure's disclosed for that means?
A. No.
Q. If you had, it would be set forth in your

Page 181

15:53:56 report I assume, right?
15:53:58 A. Right. I couldn't find it.
15:53:59 Q. Okay. Is that true for the next one also, E, means for determining? Did you look at the patent to determine whether there's any structure disclosed for that?
15:54:13 A. No, I didn't find it.
15:54:14 Q. All right. So that --
15:54:15 A. I mean, this is more a specification. I didn't see enough of the invention to actually see it. I mean --
15:54:34 Q. Would that be true for all of the means for elements?
15:55:00 A. Let me ask -- this is a clarification. In the description, there is an appendix with the source code. Is that the preferred embodiment to look for the means?
15:55:21 Q. Would that matter to your opinion?
15:55:23 A. No.
15:55:27 Q. I'm not trying to be rude. It's just a matter of for purposes -- all I'm trying to do is get your testimony as to what you did and --
15:55:34 A. Right, right.
15:55:35 Q. It's a question of whether or not you were -- whether or not it's right is a different issue.

Page 182

15:55:39 A. Right.
15:55:39 Q. Right, so --
15:55:40 A. I mean, I looked for these. I tried to understand obviously what they mean, and you can only go up to a certain point because the database was not explained or I couldn't really see what the database organization would look like, so I think I had trouble with that.
15:56:02 Q. Did you get any assistance in terms of interpreting the means elements from counsel at TriZetto?
15:56:14 A. No.
15:56:16 Q. Do you know whether or not any of the other experts did?
15:56:20 A. I don't know.
15:56:24 MR. HANSEN: Let's mark -- what's our next one? Ten? Let's mark this as 10.

- - -

(Deposition Exhibit Number 10 was marked for identification.)

- - -

15:56:49 BY MR. HANSEN:
15:56:49 Q. Dr. Kerschberg, I've given you a portion of the rebuttal report of Randall Davis --
15:56:54 A. Okay.

Page 183

15:56:54 Q. -- because I don't want to go through the whole report, but you -- I think you said that you've seen Dr. Davis' rebuttal report in this case?
15:57:05 MR. SEGAL: I was going to object, misstates his testimony.
15:57:07 BY MR. HANSEN:
15:57:07 Q. I'm sorry. Have you seen -- do you know that Dr. Davis has submitted a rebuttal report?
15:57:12 A. No, I haven't. This is November 14th.
15:57:14 Q. And you haven't seen this.
15:57:16 A. No, I haven't.
15:57:17 Q. Okay. Sorry.
15:57:18 A. I saw the rebuttal reports for Dr. Musen and Dr. Wilson, so I have not seen this. Shall I read it?
15:57:26 Q. Well, what I'm focusing you in on is the second paragraph of page 2, "I have been informed that means plus function" -- do you see that?
15:57:36 A. Right.
15:57:37 Q. Can you just read it and tell me whether you were similarly informed at any point?
15:57:45 A. I've heard of -- okay, let me read it first.
15:57:48 Q. Yes, please.
15:57:49 A. Okay.
15:58:16 Q. Were you instructed similarly?
15:58:18 A. I heard the terminology "means plus

Page 184

15:58:23 function" in terms of some of the claims, but not how to interpret that. A step plus function, this is the first I've heard of that term.
15:58:35 Q. Uh-huh. In connection with your report, did you determine corresponding structure or acts described in the patent specification for any of the elements of the claims?
15:58:47 A. As best I could, I read through the specification. There are certain portions which talk about the codes, and so I went through that aspect, yes.
15:59:00 Q. Talked about the codes? What do you mean?
15:59:03 A. Like the A code, in the patent specification showing the flow of the system, but some of the flow charts were incomplete in that the arrows didn't go anywhere. I mean, there was no way to actually follow the logical flow in the flow charts.
15:59:23 Q. In terms of the structure, did you consider the rules, the meta-rules as you call them in Appendix B of the '164 patent? Was that a structure that you considered in connection with your claim construction, or --
15:59:50 A. The structure would be the embodiment of the requirement? Is that what the structure really means? I don't know.

# EXHIBIT 14

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

MCKESSON INFORMATION SOLUTIONS, LLC,
Plaintiff,
vs. No. 04-1258-SLR
THE TRIZETTO GROUP, INC.,
Defendant.

---

DEPOSITION OF PHILIP M. HAWLEY, JR., M.D.
Los Angeles, California
Wednesday, November 30, 2005

Reported by:
RENEE A. PACHECO, RPR
CSR NO. 11564
JOB NO. 41623

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

MCKESSON INFORMATION SOLUTIONS, LLC,
Plaintiff,
vs. No. 04-1258-SLR
THE TRIZETTO GROUP, INC.,
Defendant.

---

Deposition of PHILIP M. HAWLEY, JR., M.D., taken on behalf of Plaintiff, at 333 South Grand Avenue, Los Angeles, California, beginning at 9:13 a.m. and ending at 4:59 p.m. on Wednesday, November 30, 2005, before RENEE A. PACHECO, RPR, Certified Shorthand Reporter No. 11564.

APPEARANCES:

For Plaintiff:
SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLC
BY: MICHAEL HENDERSHOT
Attorney at Law
525 University Avenue
Suite 1100
Palo Alto, California 94301
(650) 470-4500

For Defendant and the Witness:
GIBSON, DUNN & CRUTCHER
BY: THEODORE KEVIN ROOSEVELT
Attorney at Law
333 South Grand Avenue
Los Angeles, California 90071-3197
(213) 229-7000

Videographer:
MAX BUSHMAN

INDEX

| WITNESS | EXAMINATION |
|---|---|
| PHILIP M. HAWLEY, JR., M.D. | |
| BY MR. HENDERSHOT | 6 |
| AFTERNOON SESSION | 136 |

EXHIBITS

| HAWLEY | | PAGE |
|---|---|---|
| 1 | Dr. Hawley's Report | 47 |
| 2 | U.S. Patent No. 5,253,164 | 118 |
| 3 | Article by Richard Egdahl, M.D. and Robert Hertenstein, M.D. | 158 |

INFORMATION REQUESTED
NONE.

INSTRUCTION NOT TO ANSWER
NONE.

Page 201

A It would be both. That they're broader and as in the case of the R Claims -- or the R Rules, for example, and the L Rule, I didn't see a claim that -- that dealt with that.
03:43 Q So there -- there are rules described in the specification appendixes that -- that aren't implemented in the claims -- is that correct? -- in your opinion, that aren't fully described in the claims.
A Not fully described in the claims, yes.
03:44 Q And the claims, the way they are phrased in your opinion, are broader than an individual example, they may encompass one or more examples or --
A Yes.
Q Sorry.
03:44 A That could be the case, yes.
Q For example, you'd said -- you'd spoken about valid earlier, about how it could be one of those or a combination of those rules set forth in the patent, in your opinion?
03:44 A In the specification are you --
Q In the specification.
A Yes. Yes.
Q Let me try to generalize this, save us a little time.
03:44 With respect to the -- with respect to your

Page 202

statement that the -- strike that.
I'm trying to phrase it in a way to avoid having to go through it a bunch of times.
Given that the definition of comprising I'd
03:45 articulated you earlier struck you as somewhat far afield from what you'd applied and understood, would it be a fair statement that, if, under my definition of comprising that I articulated, you might have to reconsider your statement about whether the claims
03:45 correlate to audit detection -- or audit techniques described in the specification and appendixes for those claims where you don't think they do, under your definition of comprising?
A Certainly by way of example of the R Rules
03:46 alone, yes, I'd have to reexamine my opinion.
Q Okay. Do me a favor and take a look at Claim 3 again.
Do you have the patent open?
A I do. I do.
03:46 Q Sorry. Didn't want to run off without you.
Do you see the second indented paragraph, which is a single line, that says:
"Means for receiving at least one claim"?
03:46 A Yes, I do.

Page 203

Q During your discussions with TriZetto's counsel, in which you obtained the understanding of legal principles that you applied in your opinions in your report, did any of TriZetto's attorneys direct you to
03:47 construe that element in a way different from any other element in the patent?
A I don't recall them calling out that phrase with any special consideration.
Q Do you recall interpreting it under any
03:47 different protocol than you applied to any other element to the patent, in formulating your opinion that's set forth in your report?
A No.
Q Okay. How about means for ascertaining the
03:47 element underneath it; it would be the same answer?
A Same answer.
Q There are a number of means for limitations -- or strike that.
There are a number of elements that start with
03:47 the terms "means for" in the claims.
Do you see that?
A Yes, I do.
Q. And would -- would the answers you just gave that you weren't instructed to and did not apply any
03:47 special interpretation to those, apart from what you

Page 204

applied to all of the claims, hold true for all of the means for limitations or elements?
A That -- that would be true.
Q And with respect to that interpretation that you
03:48 applied to -- to all of the elements, you just applied your regular understanding of the English language?
A Yes. As well as the definition of terms provided to me by the TriZetto attorneys.
Q And what terms would those be?
03:48 A Well, as I mentioned, they would -- they clarified the term "apparatus."
Q Plurality?
A Plurality?
Q Was plurality one of them?
03:48 A I don't recall whether we discussed that term or not, you know. I don't know whether they called out that term.
Q Can I direct you to Page 9 of your report.
A Yes.
03:49 Q Keep the claims of the patent open as well, if you don't mind.
A Okay. So you said Page 9?
Q Yes, sir. Actually, it would be Page 8. I apologize.
03:49 A 8. Okay.

# EXHIBIT 15

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

MCKESSON INFORMATION SOLUTIONS, )
Plaintiff, )
vs. ) No. 04-1258 SLR
THE TRIZETTO GROUP, )
Defendant. )

DEPOSITION OF

DAVID A. WILSON, Ph.D.

PALO ALTO, CALIFORNIA

Wednesday, November 23, 2005

REPORTED BY: JANE H. STULLER, CSR NO. 7223 (211471)

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

MCKESSON INFORMATION SOLUTIONS, )
Plaintiff, )
vs. ) No. 04-1258 SLR
THE TRIZETTO GROUP, )
Defendant. )

Deposition of DAVID A. WILSON, Ph.D., taken on behalf of Defendant, at the Law Offices of Skadden Arps, 525 University Avenue, Suite 1100, Palo Alto, California, commencing at 9:11 a.m., on Wednesday, November 23, 2005, before Jane H. Stuller, CSR #7223.

APPEARANCES

FOR THE PLAINTIFF:
SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP
BY: BERNARD SHEK, ESQUIRE
JON V. SWENSON, ESQUIRE
525 University Avenue
Suite 1100
Palo Alto, California 94301
(650) 470-4500
bshek@skadden.com

FOR THE DEFENDANT:
GIBSON, DUNN & CRUTCHER, LLP
BY: MICHAEL A. SITZMAN, ESQUIRE
DANIEL L. MUINO, ESQUIRE
One Montgomery Street
San Francisco, California 94104-4505
(415) 393-8221
msitzman@gibsondunn.com

ALSO PRESENT:
MICHAEL BARBER, VIDEOGRAPHER

INDEX

WITNESS: DAVID A. WILSON, Ph.D.

| EXAMINATION: | PAGE |
|---|---|
| BY MR. SITZMAN | 6 |
| AFTERNOON SESSION | 153 |

EXHIBITS:

DEFENDANT'S

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| 1 | Dr. Wilson's expert report | 5 |
| 2 | '164 Patent | 5 |
| 3 | Egdahl/Hertenstein article delivered in April of '87 | 133 |
| 4 | Article, Savings from Accurate Coding of Surgical Claims, the Caterpillar Method | 178 |
| 5 | Document, LK 37 to LK 145 | 236 |
| 6 | Vendor comparison sheet | 241 |
| 7 | Dr. Davis's October 24, 2005, report | 262 |

for processing dental claims, they would use any of the data showing in the patent. They would use dental codes instead and they would determine what the appropriate facts and relationships for dental codes that should go in.

They could use this same structure, if they chose to, shown in the preferred embodiment to put that data in, but they would use different actual codes, because the dental coding system is different than CPT codes.

The patent claim also -- I guess it is not being asserted -- discussed -- Claim 7 discusses a different coding system, which is, I think, obsolete now.

Q. Right.

A. But again, you have to decide what coding system you're using, and then you have to fill the database with the facts and relationships appropriate for that. This is just one, the preferred embodiment is one example of using one coding system.

Q. Okay. The -- let's stay with CPT 4 codes, though, for a minute.

The predetermined database, I think what I'm hearing you say is that the interact.dbf and the

by itself.dbf are included in the predetermined database.

A. They would be tables in the database.

Q. Now, where is that described in the patent?

A. The fact that -- that I am using the definition tables in the database, for example?

Q. Yeah, exactly.

A. It's not in -- it appears to me in the -- you know, Dbase2 was a very old-fashioned database program. And it appears to me from what I've seen that they didn't tend to use the term tables.

And they would talk about the interact database and the by itself database as if they were separate databases. But in any modern database terminology, people would define a database, and then they would define a bunch of tables in the database.

And that's the way I did it when I did my diagrams. I used a modern tool. And the modern tool, it says define the interact table and the by itself table. Those are both tables in a single database.

Q. Okay. Back in 1987 when we -- I think we went to, what, Dbase3, and now we are in the C program and everything else.

Sorry. Sorry.

Back in 1987 -- and I will actually cut out the rest.

Back in 1987 when we were only dealing with Dbase2, however, without using what you phrase as a modern tool, we would -- each one of them would have been expressed as a different database, the interact and the by itself.

A. In -- I believe in the terminology for Dbase, which again, was not the only database, but it was the database that they used in the preferred embodiment, I -- I believe they described them in separate database files, interact.dbf was a file, by itself.dbf was a file.

I don't actually know what the inventor terminology was for whether they considered those to be part of one database or multiple ones. I know that they -- they were different files.

Q. We -- you don't -- yeah. You don't know from the patent, the patent doesn't tell you looking at it whether or not they're different databases or they are combined in a singular database?

A. Certainly it was very clear me, as someone who has worked with databases for many years, that they represented a single store of knowledge, the

knowledge base. And they described it as the knowledge base. And they described these things as making up the knowledge base.

So I -- I believe that the patent makes it pretty clear that these are components of the single knowledge base, which is the predetermined database.

Q. And I appreciate that. But your knowledge, as we are sitting here today, versus where we were in 1987 is somewhat different. And in 1987, we have got a description of multiple databases.

And it is unclear from the patent, won't you agree, or at least the specification, as to whether or not those are multiple databases or whether they are a singular database?

A. Well, it -- it does, in fact, seem to be clear because Figure 1 shows a single knowledge base. It doesn't show multiple knowledge bases, as item 6 in Figure 1.

Now, in -- in Figure 2, notice that they have -- they don't just say by itself in interact, they say by itself.dbf. That is a file. That file, the interact.dbf is another file. History.dbf is another file.

But certainly in terms of the patent, I believe they're saying that interact and by itself

and also all code that supersede are database files. But the patent seems -- it seems to me clearly states they are part of the knowledge base, as shown item 6 in Figure 1. That's what is my impression is.

Q. But if look at Figure 2, since you -- say they are -- under interact.dfb, you see it makes reference to rule base. And by itself.dbf makes a reference again to rule base --

A. Yes.

Q. -- as opposed to knowledge base.

A. Yes, it does. And --

MR. SHEK: What's the question?

BY MR. SITZMAN:

Q. Well, I guess, does that change your opinion that there is nothing in the figures that suggests that all these databases are combined in a singular database or are separate databases?

A. No, I -- it certainly doesn't change my opinion. Umm --

(Witness examining document.)

A. It -- again, if you go to column 4 of the description of the preferred embodiment and go down to line 58, it talks about the knowledge base. It doesn't talk about multiple knowledge bases. And I

think all the rest of the description and the logic made it clear to me, my interpretation is that those are part of the knowledge base.

Q. Okay. Will you agree with me, however, Doctor, that this is subject to interpretation. Somebody else reading this in 1987 could interpret these as separate databases?

MR. SHEK: Objection, calls for speculation.

BY MR. SITZMAN:

Q. Given your knowledge in the field and given what you know about the person who is ordinary skilled in the art, looking at this, couldn't somebody have, in 1987, looked at this and thought, these are separate databases?

A. I believe if all they had were figure -- Figures 1 and 2, and they had not the patent specification to read, they might erroneously make that assumption. But if you read the specification, I think it is very clear that those are part of the knowledge base. It was very clear to me.

Q. Okay. Why don't you return to your report, page -- let's see here -- 164. Yeah, I want to look at this.

The Figure 4 on page 32.

A. Okay. Didn't reproduce very well, but okay.

Q. Let's see, I might have a slightly better copy.

I want to talk to you about the assembly here of the interact.dbf within that figure. Do you see that?

A. Right. Right.

Q. And there is one item in there, Rule EP; do you see that entry?

A. The last entry. Yes.

Q. How does this -- this rule work in your example with only the single code number that you have given as ACODE?

A. I don't know. ACODE is all caps.

Q. Yes. Good. Let's look at Rule EP. I did this quite a while ago, so -- oh, can you tell me --

A. What that number is? Is that 17?

Q. It is 17.

A. Okay. So that's from example 17. That's what those numbers refer to.

Q. Okay. Thank you.

A. Example 17. Well, the --

(Witness examining document.)

A. Let me look up Rule EP. I may have made a

mistake in this example.

(Witness examining document.)

A. Well, yes, I definitely made a mistake because I didn't fill anything in the range of BCODE to CCODE. Yeah, I think I just made a mistake in there.

Q. Can you -- while you are looking at it, it looks like you have got everything open. How would you have filled in the rest? It sounds like you didn't complete that one.

So how would you have filled that in?

A. This may take a while.

Q. Oh.

A. Umm, let's see . . . 17. So 93005 is ACODE.

Q. Okay.

A. 93010 is presumably in the range of BCODE to CCODE. And the place of service is in ECODE. And so I would have had to fill in a range of -- I probably would have looked up in the CPT code book to decide what range to put in for the range BCODE to CCODE.

And then the claim form would have actually entered a place of service, which -- no, let's see . . . That would be -- I take that back. That's not

# EXHIBIT 16
# REDACTED IN ITS ENTIRETY

# EXHIBIT 17

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

McKESSON INFORMATION SOLUTIONS, LLC,
Plaintiff,
vs. Case No. 04-1258-SLR
THE TRIZETTO GROUP, INC.,
Defendant.

VIDEOTAPE DEPOSITIONS OF
TRACY PIERSON AND CAROLYN DRINI
TAKEN ON BEHALF OF PLAINTIFF
MONDAY, SEPTEMBER 12, 2005

BE IT REMEMBERED THAT, pursuant to the Federal Rules of Civil Procedure, the videotape depositions of TRACY PIERSON and CAROLYN DRINI were taken before Laurie A. Volker, Registered Professional Reporter, on September 12, 2005, commencing at the hour of 1:16 p.m., the proceedings being reported at 750 SW Alder Street, Portland, Oregon.

JOB NO. 38520

APPEARANCES

JEFFREY RANDALL, ESQUIRE
Skadden, Arps, Slate, Meagher & Flom, LLP
525 University Avenue, Suite 1100
Palo Alto, California 94301
650.470.4500
Appearing on behalf of Plaintiff

J. SCOT KENNEDY, ESQUIRE
Gibson, Dunn & Crutcher, LLP
4 Park Plaza
Irvine, California 92614-8557
949.451.3805
Appearing on behalf of Defendant

SEAN T. WATERS, ESQUIRE
Marrang Long Gary Rudnick, PC
100 SW Fifth Avenue, Suite 1650
Portland, Oregon 97204
503.242.0000
Appearing on behalf of the Deponents

Also present: Travis Shields, Videographer

EXHIBIT INDEX

| No. | Description | Page/Line |
|---|---|---|
| 1 | A letter dated August 26th, 2005, with a subpoena attached. | 7/8 |
| 2 | A systems license agreement bearing Bates stamp numbers TriZetto 827355-634705. | 12/23 |
| 3 | The original response to Providence Health Plan's request for information dated 10-11-2000. | 22/12 |
| 4 | The McKesson Patent No. '164 | 67/17 |
| 5 | A document authored by Ms. Drini and last modified on 9-16-02. | 83/2 |
| 6 | A document entitled, "Comparative Analysis, McKesson HBOC ClaimCheck and Facets Clinical Editor." | 92/16 |
| 7 | A 5-page document entitled, "Providence Health Plan Facets clinical editing TriZetto Response to Identified Issues." | 97/18 |
| 8 | A document entitled, "Facets Extended Enterprise claims Processing User Guide and Supplement." | 104/11 |
| 9 | A 5-page document entitled, "Platform System Selection." | 111/5 |

PORTLAND, OREGON;
SEPTEMBER 12, 2005
1:16 P.M.
(Witness key: A1, Ms. Pierson; A2, Ms. Drini)

13:16:55
13:17:00 THE VIDEOGRAPHER: We are on the record.
13:17:00 This is a statement for a video deposition. I'm the
13:17:03 videographer. My name is Travis Shields.
13:17:05 This videotaped deposition is being noticed
13:17:08 by Attorney Jeffrey Randall and is being held on
13:17:16 September 12th, 2005, at 1:19 p.m. The location is
13:17:16 750 Southwest Alder Street, Portland, Oregon. Case
13:17:19 caption is McKesson Information Solutions, LLC, vs.
13:17:24 The TriZetto Group, Inc., U.S. District Court for the
13:17:28 District of Delaware, Case No. 04-1258-SLR.
The deponents are Carolyn Drini and Tracy
13:17:33 Pierson.
13:17:38 Would counsel and all present please
13:17:38 identify yourselves and state whom you represent.
13:17:40 MR. RANDALL: Jeff Randall with Skadden
13:17:42 Arps representing Plaintiff McKesson.
13:17:44 MR. KENNEDY: Scot Kennedy with Gibson,
13:17:46 Dunn & Crutcher representing the Defendant, The
13:17:48 TriZetto Group.
MR. WATERS: Sean Waters from Marrang Long

14:15:49 upgrade your system, you want to have seamlessly
14:15:50 integrated products with that system because the cost
14:16:01 of your upgrades is less expensive then.
14:16:03 Q. And what was -- what do you mean when you
14:16:07 say the functionality to provide automated clinical
14:16:11 editing of medical service codes is integrated into
14:16:13 the Facets system?
14:16:18 A2. I really can't answer that in detail. I'm
14:16:19 not a system person. I just know that was one of the
14:16:36 reasons that we went with it.
14:16:38 MR. WATERS: Do we have time to take a
14:16:40 break for a few minutes?
14:16:43 MR. RANDALL: Yeah, if you'd like to.
14:16:45 THE VIDEOGRAPHER: Going off the record at
14:22:32 2:18 p.m.
14:22:32 (Whereupon a break was taken.)
14:22:33 THE VIDEOGRAPHER: We are back on the
record at 2:24 p.m.
14:22:48 BY MR. RANDALL:
14:22:51 Q. Ms. Drini, did you assist at all or
14:22:56 participate in the implementation of the Facets
14:22:58 system at Providence?
14:22:58 A2. Yes.
14:23:02 Q. And during that process, I want to ask you
some questions specifically about the clinical

14:23:09 editing of the medical service codes; okay?
14:23:11 A2. Okay.
Q. Does the system that's provided -- strike
14:23:17 that.
14:23:24 Does the Facets system include a database,
14:23:27 servers, and workstations, along with the software?
14:23:30 A2. I can't answer that. That's too technical
a question for me.
14:23:32 Q. Okay.
14:23:38 Do you understand that the Facets system
14:23:44 is -- includes a database with medical service codes
14:23:48 and a relationship among those codes?
MR. KENNEDY: Objection. Compound.
14:23:51 BY MR. RANDALL:
14:23:55 Q. You can answer the question.
14:23:57 A2. As I understand it, Facets is sort of
14:24:09 designed around relational databases.
14:24:13 Q. Did TriZetto employees assist Providence in
14:24:18 setting up the Facets system so that it could
14:24:18 operate?
14:24:19 A2. The Facets system?
14:24:20 Q. Yes.
14:24:22 A2. I believe so.
14:24:26 Q. And did they -- did TriZetto assist
Providence in making sure that the database operated

14:24:35 properly?
14:24:44 A2. I really can't answer that.
14:24:50 Q. Is it your understanding that the Facets
14:24:58 system contains relationships between medical service
14:24:58 codes?
14:25:02 A2. Are you talking about clinical editor?
14:25:04 Q. Yes.
14:25:19 A2. Yes.
14:25:21 Q. Okay. And do you understand that Facets
14:25:29 operates to compare, for instance, one medical
14:25:32 service code within a claim with others that may be
14:25:35 present in the claim?
14:25:43 A2. I would say so, yes.
14:25:46 Q. I want to take you through a couple of
14:25:49 examples of processing a claim; all right?
14:25:50 A2. Okay.
14:25:57 Q. So Facets operates to receive a medical
14:25:58 claim; is that right?
14:25:59 A2. Right.
MR. KENNEDY: Objection. Leading.
14:26:01 BY MR. RANDALL:
14:26:06 Q. Do you understand that Facets operates to
14:26:06 receive at least one medical claim?
A2. Yes.
Q. Okay.

14:26:17 Do you understand that at the time Facets
14:26:28 receives the medical claim, that various system
14:26:31 parameters within the database have been set?
14:26:32 MR. KENNEDY: Objection. Vague and
ambiguous.
14:26:33 BY MR. RANDALL:
14:26:36 Q. You can answer the question.
14:26:41 A2. I'm not sure I understand what you mean by
14:26:42 "set," but -- could you better define that?
Q. Sure. That the relationships -- strike
14:26:46 that.
14:26:48 Do you understand that the Facets system
14:26:57 operates to disallow medical service codes based
14:27:02 on -- within a claim based on the relationship that
14:27:06 one or more medical service codes have to each other
14:27:07 within a claim?
14:27:12 A2. Yes. For the most part, yes.
14:27:14 Q. Okay. And do you understand that at the
14:27:19 time a claim is input into the Facets system, that
14:27:24 the set of relationships in the database among
14:27:28 medical service codes has been predetermined?
A2. Prior to the claim coming in, yes.
14:27:37 Q. Okay.
14:27:48 Do you understand the Facets system to
operate to determine, for instance, whether a

# EXHIBIT 18
# REDACTED IN ITS ENTIRETY

# EXHIBIT 19
# REDACTED IN ITS ENTIRETY