D

# Redacted

E

# Redacted

F

# Redacted

G

# Redacted

# H

Redacted

I

Redacted

J

HPR, Int.          TEL:1-708-955-3435          Jan 25.94   11:48 No.003 P.02
JAN-14-94 FRI 18:27 SALES-BOSTON                4172669182              P.02

 

**H E A L T H
PAYMENT
REVIEW INC.**

160 Newbury Street          617-266-2520
Boston, MA 02115          FAX 617-266-3170

### HEALTH PAYMENT REVIEW'S CODEREVIEW® PRODUCT
### AWARDED U.S. PATENT

BOSTON, MA —Jan. 14, 1994—Health Payment Review, Inc. (HPR), the Boston-based developer of health care cost containment and provider profiling software systems, announced that it has been awarded U.S. Patent no. 5,253,264 for the system and methodology embodied in its CodeReview® product.

"Being award this patent clearly demonstrates HPR's leadership position in the health care cost containment industry," says Marcia Radosevich, Ph.D., CEO of Health Payment Review. "We expect this patent to further propel our rapid growth in the health care information systems marketplace."

Industry sources say that overpayment due to medical billing code manipulation and errors accounts for approximately 1% of all health care spending, or an estimated $9-10 billion in 1994. Health Payment Review's CodeReview® product, a medically-based software system, is designed to combat overpayment of physician claims by recognizing and correcting coding errors.

The CodeReview® software system combines medical expertise with advanced computer technology to provide a "medical peer review" software system that can detect and correct errors in billing such as up-coding and unbundling. "Up-coding" is selecting a medical coded for a more extensive surgical procedure or service than actually occurred. "Unbundling" is when the provider charges for individual procedures or services rather than using the global code encompassing the entire service.

The expert clinical knowledge base of the CodeReview® product is developed, maintained and enhanced by physicians, surgeons and subspecialists. The CodeReview® product can be seamlessly integrated into the users' automated claims processing system and is available on a wide range of hardware platforms, from, PCs to minicomputers and mainframe environments. Data gathered from customers who use the CodeReview® software show savings of approximately 5% - 8% of total physician billed charges.

JAN 25 '94 11:43                                    1 708 955 3435          PAGE.002

MCK 038115

Confidential Information Subject to D. Del. LR 26.2

04-CV-1258-SLR (D.Del.)

HPR, Inc.    TEL:1-708-955-3435    Jan 25,94  11:47 No.003 P.03

Founded in 1987, Health Payment Review, Inc. provides clinically-based health care cost containment and provider profiling solutions. HPR is a private company comprised of nationally prominent physicians, health care executives and computer professionals. HPR's customers include many of the nation's largest insurance carriers, managed care providers, third-party administrators, Blue Cross/Blue Shield plans and self-insured/self-administered companies.

Contact:    Deirdè O'Connell        Kristin Pottz
            Michelle Goodall        Manager of Marketing Communications
            Schwartz Communications  Health Payment Review
            (617) 431-0770          (617) 266-2520

JAN 25 '94 11:41                    1 708 955 3435    PAGE.003
                                            == TOTAL PAGE.004

MCK 038116

04-CV-1258-SLR (D.Del.)

Confidential Information Subject to D. Del. LR 26.2

K

PRODIGY(R) interactive personal service          01/26/94          2:17 PM

COMPANY NEWS (sm) provided by Dow Jones/News Retrieval
Copyright (c)1994 Dow Jones & Company

Symbol Searched: GMIS

1/21/94 GMIS - Patent -3-: Health Payment To Enforce Patent
>GMIS


    Although it remains to be seen exactly what course of
action Health Payment will take, the private company
clearly hopes to exploit the recently issued patent.
    ''We are planning to enforce our patent rights,'' says
the company's chief executive officer, Marcia Radosevich.
She declines to comment on specific competitors but
acknowledges that the patent does cover some rival
products.
    Health Payment received the patent in late October but
chose not to release the news publicly until last week. The
company currently is pursuing a strategy with its patent
attorney, Radosevich says.
    Officials from GMIS aren't available for comment.
    Despite the market's visible concern about the recently
issued patent, some Wall Street analysts see little to
worry about.
    Dillon Read's Sara Fisher notes that broad software
patents rarely - if ever - stick. In this case, she says
t`  intellectual property at issue is a coding system that
i. publicly available from the American Medical
Association.
    Some analysts also are suggesting the patent might be
worthless.
    In a written report, C.J. Lawrence's Gary Frazier says
Health Payment might have filed the patent application more
than a year after the launch of its Code Review product.
According to U.S. patent laws, Frazier writes, the length
of this interval could make the patent worthless.
    (END) DOW JONES NEWS 01-21-94
    2:38 PM



PLAINTIFF'S
EXHIBIT
Frazier- 4
JO 12/19/94

**MCK 151754**

Confidential Information Subject to D. Del. LR 26.2 - HIGHLY CONFIDENTIAL          04-CV-1258-SLR (D.Del.)

L

FOCUS - 36 OF 79 STORIES

Copyright 1994 PR Newswire Association, Inc.
PR Newswire

January 31, 1994, Monday

SECTION: Financial News

DISTRIBUTION: TO BUSINESS EDITOR

LENGTH: 225 words

HEADLINE: GMIS FILES COMPLAINT AGAINST HPR

DATELINE: MALVERN, Pa., Jan. 31

BODY:
GMIS Inc. (NASDAQ: GMIS) announced that it had this day filed a complaint in the United States District Court for the Eastern District of Pennsylvania against Health Payment Review, Inc. ("HPR"), to declare HPR's recently issued software patent invalid, not infringed and unenforceable. GMIS also alleges that HPR interfered with GMIS' business relationships.

In the complaint, GMIS has alleged that the patent is unenforceable because after repeated refusals by the patent examiner in charge of the application to allow the claims in the application, HPR misrepresented the state of the prior art to the patent examiner in order to obtain allowance of such claims. Thomas R. Owens, President and CEO of GMIS said, "We are dealing with this patent situation head on and intend to pursue it in an expeditious fashion to its conclusion."

GMIS is a leading developer and marketer of automated clinical knowledge products. The Company's products allow payors to access proprietary databases incorporating clinical expertise in medical claims processing, perform utilization review and provider profiling and address matters critical to the management of health care delivery: cost containment and the appropriateness, quality and efficiency of medical care.

// CONTACT: Jeffrey Stello of GMIS, 215-296-3838, ext. 1101

LANGUAGE: ENGLISH

LOAD-DATE-MDC: February 1, 1994

MCK 044679

Confidential Information Subject to D. Del. LR 26.2

04-CV-1258-SLR (D.Del.)

M

Redacted

N

Redacted

O

Redacted

P

Redacted

Q

Redacted

R

Redacted

S

Redacted

T

Redacted

U

Redacted

V

Redacted

W

Redacted

X

Redacted

Y

Redacted

Z

9/16/2005  Bellomo, Anthony

1       UNITED STATES DISTRICT COURT

2       FOR THE DISTRICT OF DELAWARE

3

4    McKESSON INFORMATION SOLUTIONS LLC,

5             Plaintiff,

6       vs.              Civil Action No.

            04-1258-SLR

7    THE TRIZETTO GROUP, INC.,

8             Defendant.

9

10

11

_____

12

13           Videotaped deposition of ANTHONY

14    BENJAMIN BELLOMO held at the offices of Skadden

15    Arps Slate Meagher & Flom, Four Times Square,

16    New York, New York, on Friday, September 16,

17    2005, commencing at 9:00 a.m., before David

18    Sanders, Legal Video Specialist, and James W.

19    Johnson, Registered Professional Reporter and

20    a Notary Public of the State of New York.

21

22

23    JOB No. 38485

24

25

9/16/2005  Bellomo, Anthony

1    reluctant to do that until we had more in the way

2    of paper agreed to.

3        Q.    And these negotiations lasted from 2001

4    through the middle of 2003; is that right?

5        A.    That's my recollection, roughly those

6    timeframes.

7        Q.    And you testified that it was TriZetto's

8    view that it should, the relationship should take

9    one of two approaches; one would be business

10   partners between TriZetto and McKesson and the

11   other would be file a patent lawsuit; is that

12   right?

13       A.    I testified that I would not go into a

14   business partnership with a company that was, was,

15   was reserving the right to later on come back after

16   us with any kind of a legal problem.

17       Q.    I understand that, but the, in

18   TriZetto's view, these negotiations that took place

19   between 2001 and the middle of 2003 should result

20   in two different alternatives; one, the business

21   partnership between McKesson and TriZetto; or two,

22   a patent infringement lawsuit, right?

23       A.    No, what I positionally had was that we

24   were desirous of a business relationship and we

25   were working toward that end and had expended lots

1    of energy on that, so that was the desired outcome.

2    However, we were not going to reach an, a final

3    agreement if it was silent about McKesson's ability

4    to turn around after we had this agreement and then

5    come after us from a legal perspective.

6            So if you want to have a business

7    agreement with us, then we have to figure out a

8    way, whether it's a licensing approach or something

9    else, we have to have a legal vehicle that put to

10   bed the issue of the patent so that you can't bring

11   it back up again after we have our business

12   arrangement.

13       Q.    So TriZetto's view during these

14   negotiations that took place in 2001 to the middle

15   of 2003 was that it would not enter into any final

16   agreement with McKesson unless it received a full

17   patent license for its current and future products;

18   is that right?

19       A.    No, unless there was some provision made

20   in the final agreement that prohibited McKesson

21   from taking action against us or our customers on

22   the patent.

23            What the form of that would take was

24   open for debate and was left to the lawyers to

25   discuss, but the business point was that if we are

71

9/16/2005  Bellomo, Anthony

1     A.   Correct.

2     Q.   You were aware of that patent through,

3   among other means, a newspaper article in the New

4   York Times, correct?

5     A.   I was aware of it through trade

6   journals.  I had come across an article there, and

7   I remember that specifically.  There may have been

8   other, you know, points of my awareness, but I

9   certainly remember being aware through a specific

10   article in the trade journals.

11     Q.   And you understand as early as 1994 that

12   HPR had accused Erisco of infringing the patent

13   that is now being litigated today?

14     A.   No.

15     Q.   When did you understand on behalf of

16   Erisco that HPR -- when was the first time you

17   understood that HPR or its successor, McKesson, was

18   asserting that Erisco infringed McKesson patents?

19     A.   There were, in 1994 when I read the

20   article about HPR bringing suit against GMIS and I

21   had read statements from, that were attributed to

22   Marcia that indicated that she intended to enforce

23   the patent on other companies or enforce the patent

24   against other companies and viciously -- or not

25   viciously; the right word is "aggressively" --

9/16/2005  Bellomo, Anthony

1    defend their rights, however you say it, that's

2    when I became aware of the fact that, you know, we

3    very well could be one of those companies that they

4    would be being aggressive against.

5        So it wasn't a formal notification, if

6    you will, but it was certainly out there in the

7    trade journals and in various articles, and in my

8    mind it was, once the GMIS suit gets settled, then

9    in all likelihood we would be contacted by HPR and

10   could very well find ourselves in a similar boat,

11   based upon public statements in public documents

12   that I'm certainly aware of and had read.

13       Q.   When was the first time, if at all, that

14   you understood on behalf of Erisco that HPR or its

15   successor, McKesson, asserted that Erisco infringed

16   the '164 patent?

17       A.   I don't recall any specific event where

18   HPR was making a claim against Erisco for

19   infringing.  As I said, I'm aware of the general

20   knowledge in the industry and the implications of

21   that, but the threat specifically from HPR to

22   Erisco others may recall, but I don't recall the

23   specific date that that happened.

24       Q.   As president of Erisco you never

25   understood that HPR was accusing Erisco of

193

9/16/2005  Bellomo, Anthony

1    infringing the '164 patent, correct?

2        A.   I understood that HPR was accusing

3    people in the industry at large.  I think our name

4    might have been mentioned amongst those in articles

5    or in press or in, certainly in the talk in the

6    industry, but we did not get a formal notice from

7    HPR accusing us.

8            I think we were, we were out there.  We

9    were certainly -- our position in the industry,

10   being a large player that both HPR and GMIS had

11   lost business to certainly made me aware of the

12   fact that we were on their radar screen.  You

13   refreshed my memory about the conversation with

14   Marcia that took place earlier, so I know she knew

15   about us.

16           Certainly knew it, I knew it prior to

17   that.  I know GMIS knew about us, so, you know, I

18   had every reason to think that, every reason to

19   believe that once the, as I said, the GMIS

20   settlement or suit was resolved that we, you know,

21   very much expected to be next.

22       Q.   Well, you can't point to any statement

23   by anyone at HPR directed to Erisco that Erisco

24   infringed the '164 patent, correct?

25       A.   Correct.

**9/16/2005 Bellomo, Anthony**

1    issued by Marcia the year before, the company

2    annual report was left with me.

3          There is an accurate description in that

4    annual report about the patent and about the

5    position and about the aggressively enforcing it,

6    and we went on to discuss other topics, agreeing to

7    leave that alone.

8          So in my mind in '94, when we became

9    aware of the suit from HPR to GMIS, albeit it may

10   have been started by GMIS -- I'm not denying that,

11   but that's not the way I recall it -- that feeling

12   we would be next once that settled and then, quite

13   frankly, waiting for the other shoe to drop.

14         And that never happened, and we

15   continued to run our business and continuing to

16   invest in our products and offer it out to the

17   marketplace at large, and then in '97, once we had

18   this meeting with principals of HPR I was put at

19   ease, because here was another example where if

20   there was a problem with that patent or if there

21   was any aggressiveness that was going to be taken

22   against us, then that would have been a perfect

23   opportunity to do it, because you wouldn't, you

24   know, put my arm around you about one deal and

25   smack you in the head about another deal.

9/16/2005  Bellomo, Anthony

1   which anyone from HPR communicated to you, either

2   orally or in writing, that Erisco infringed the

3   '164 patent?  Yes or no.

4       A.   No.

5       Q.   Did you as the president of Erisco ever

6   understand, rightfully or wrongly, that HPR was

7   threatening Erisco with respect to the '164 patent?

8       A.   I understood that they were threatening

9   all of the suppliers of clinical editing data.  I

10  was aware that they had gone after other companies

11  and settled with them or gave them licenses or

12  there was some action that was taking place in

13  addition to what happened with GMIS, so I was aware

14  of the general tone of HPR to enforce the patent.

15          I was aware of what happened with GMIS.

16  I was aware of what was happening with other

17  similar vendors in the industry, and I was

18  certainly aware of the statements that were

19  attributed to Marcia where she was going to

20  aggressively go after companies, like ours, that

21  she felt were infringing upon their patent.

22      Q.   Can you listen to my question and just

23  answer my question, please, sir.

24          MR. RANDALL:  Can you repeat it.

25          (Record read.)

200 .

9/16/2005  Bellomo, Anthony

1   your parent company detailing the threat and risk

2   you felt subjected to by HPR --

3        A.   No.

4        Q.   -- as a result of its patent?

5        A.   No.

6        Q.   And can you identify any report, e-mail,

7   memo or analysis in written form sent by anyone at

8   Erisco to anyone within the parent organization

9   detailing this threat you felt HPR was imposing

10   upon you as a result of the patent?

11        A.   I'd have to look around.  I don't know.

12        Q.   Can you identify any for me today?

13        A.   Off the top of my head, no.

14        Q.   Do you want to think about it for a

15   minute?

16        A.   No.  I don't need to.  I can't remember

17   any specific communications, which does not mean it

18   does not exist.  There's a lot of things that go

19   on, and this is, you know, going on 10 years ago.

20        Q.   You hired legal counsel in 1994 to

21   assist you in analyzing this threat that you felt

22   imposed upon you by HPR, correct?

23        A.   We hired legal counsel to keep an eye on

24   this action.  We, when I came across this in that

25   trade magazine, I passed it on to our corporate

204

1    attorney, Scott, and he and I jointly decided that

2    we should have our outside attorneys do some

3    investigation and keep an eye on this and let us

4    know when it concluded and what the conclusion was.

5        Q.   You understood, did you not, as head of,

6    president of Erisco that you had corporate

7    responsibility to behave reasonably in light of a

8    legitimate threat to the company or its products,

9    such as a patent threat, correct?

10       A.   Sure.

11       Q.   And you understood as president and the

12   leader of Erisco from 1994 to 1997 that if you were

13   faced with a legitimate threat of infringement to

14   one or more of your product lines that you would be

15   required, among other things, to get an opinion of

16   counsel identifying what defenses you could rely on

17   in proceeding with the manufacture and sale of

18   arguably infringing products, correct?

19            MR. THOMAS:  Objection.

20       A.   No.

21            MR. THOMAS:  Calls for a legal

22   conclusion.

23       Q.   You didn't understand that?

24       A.   I just said no.

25       Q.   Did Erisco from 1994 to 1997 ever even

9/16/2005  Bellomo, Anthony

1

2  -------------------I N D E X-------------------

3  WITNESS          EXAMINATION BY          PAGE

4  Anthony Bellomo     Mr. Randall          5

5

6

7  ----------------------MOTIONS----------------------

8  PAGES  50, 81, 103

9

10

11  ----------------------EXHIBITS--------------------

12  BELLOMO                    PAGE

13  1    E-Mail, TRZ 637190-191          42

14  2    E-Mail, TRZ 207303          47

15  3    E-Mail, TRZ 358484          52

16  4    E-Mail, TRZ 687691-7692          57

17  5    Letter, Aug 20, 1998, MCK034337-338   59

18

19

20

21

22

23

24

25

211

9/16/2005  Bellomo, Anthony

1

2

3        --------------------EXHIBITS--------------------

4      BELLOMO                                    PAGE

5        6    E-Mail, TRZ 295420-5421            62

6        7    US Patent Number 5,253,164           84

7        8    Provider Perspective            119

8        9    Letter, Jan 24, 1989, MCK117578      151

9       10    Letter, Jun 29, 1989, TRZ 837458    165

10      11    Letter, Jun 13, 1989, TRZ 837024-25  169

11      12    Letter, Jul 3, 1989, TRZ 837026-047  170

12      13    TriZetto Group Web Page Printout     182

13      14    Notice of 30(b)(6) Deposition      183

14      15    Notice of 30(b)(6) Deposition      194

15      16    Letter, Aug 30, 2005            188

16

17

18

19

20

21

22

23

24

25

Page 209

```
 1
 2
 3
 4
 5
 6
 7
 8
 9    I, ANTHONY BENJAMIN BELLOMO, do hereby declare under
10    penalty of perjury that I have read the foregoing
11    transcript; that I have made any corrections as appear
12    noted, in ink, initialed by me, or attached hereto; that
13    my testimony as contained herein, as corrected, is true
14    and correct.
15        EXECUTED this  14  day of  November
16    20 05 , at  Union ,  NJ
                (City)        (State)
17
18
19
20
              _____
                ANTHONY BENJAMIN BELLOMO
21
22
23
24
25
```

Page 210

```
 1          C E R T I F I C A T E
 2
 3    STATE OF NEW YORK )
 4                     ) Ss
 5    COUNTY OF NEW YORK )
 6
 7        I, JAMES W. JOHNSON, a Registered
 8    Professional Reporter and Notary Public within
 9    and for the State of New York, do hereby
10    certify:
11        That ANTHONY BENJAMIN BELLOMO, the
12    witness whose deposition is hereinbefore set
13    forth, was duly sworn by me and that such
14    deposition is a true record of the testimony
15    given by such witness.
16        I further certify that I am not related
17    to any of the parties to this action by blood
18    or marriage and that I am in no way interested
19    in the outcome of this matter.
20        IN WITNESS WHEREOF I have hereunto set
21    my hand this 25th day of September 2005.
22
23
              _____
24              JAMES W. JOHNSON
                Registration #01J05000925
                Commission Expires 9/4/2006
25
```

Page 211

```
 1
 2    ----------------I N D E X----------------
 3    WITNESS        EXAMINATION BY        PAGE
 4    Anthony Bellomo    Mr. Randall        5
 5
 6
 7    ----------------MOTIONS----------------
 8    PAGES  50, 81, 103
 9
10
11    ----------------EXHIBITS----------------
12    BELLOMO                    PAGE
13    1    E-Mail, TRZ 637190-191      42
14    2    E-Mail, TRZ 207303          47
15    3    E-Mail, TRZ 358484          52
16    4    E-Mail, TRZ 687691-7692     57
17    5    Letter, Aug 20, 1998, MCK034337-338  59
18
19
20
21
22
23
24
25
```

Page 212

```
 1
 2
 3    ----------------EXHIBITS----------------
 4    BELLOMO                    PAGE
 5    6    E-Mail, TRZ 295420-5421     62
 6    7    US Patent Number 5,253,164   84
 7    8    Provider Perspective       119
 8    9    Letter, Jan 24, 1989, MCK117578    151
 9   10    Letter, Jun 29, 1989, TRZ 837458   165
10   11    Letter, Jun 13, 1989, TRZ 837024-25  169
11   12    Letter, Jul 3, 1989, TRZ 837026-047  170
12   13    TriZetto Group Web Page Printout   182
13   14    Notice of 30(b)(6) Deposition      183
14   15    Notice of 30(b)(6) Deposition      194
15   16    Letter, Aug 30, 2005               188
16
17
18
19
20
21
22
23
24
25
```

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
877.955.3855

AA

Redacted

BB

Redacted