CC

# Redacted

DD

LEXSEE 2003 U.S. DIST. LEXIS 12784

GENZYME CORPORATION, Plaintiff, v. ATRIUM MEDICAL CORPORATION, Defendant.

Civil Action No. 00-958-MPT

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE

2003 U.S. Dist. LEXIS 12784

July 22, 2003, Decided

SUBSEQUENT HISTORY: Motion for new trial denied by, Motion granted by, Motion denied by, Injunction denied by Genzyme Corp. v. Atrium Med. Corp., 2004 U.S. Dist. LEXIS 10984 (D. Del., Apr. 22, 2004)

PRIOR HISTORY: Genzyme Corp. v. Atrium Med. Corp., 212 F. Supp. 2d 292, 2002 U.S. Dist. LEXIS 13878 (D. Del., 2002)

DISPOSITION: [*1] Defendant's motion on the defense of laches was denied.

COUNSEL: William J. Wade, Esquire, Richards, Layton & Finger, Wilmington, Delaware.

Of Counsel: Donald R. Dunner, Esquire, Richard L. Stroup, Esquire, Robert L. Burns, Esquire, and Adam Avrunin, Esquire, Finnegan, Henderson, Farabow, Garrett & Dunner, Washington, D.C.; counsel for plaintiff Genzyme Corporation.

Josy W. Ingersoll, Esquire, John W. Shaw, Esquire, and Christian Douglas Wright, Young Conaway Stargatt & Taylor, Wilmington, Delaware.

Of Counsel: William Lee, Esquire, Merriann M. Panarella, Esquire, and Wayne Stoner, Esquire, Hale and Dorr, L.L.P., Boston, MA.

JUDGES: Thynge, Magistrate Judge.

OPINIONBY: Thynge

OPINION:

## MEMORANDUM OPINION

Wilmington, Delaware

Thynge, Magistrate Judge

## I. INTRODUCTION

In July 2002, this court issued a claim construction opinion after a *Markman* hearing n1 held in May 2002. In November 2002, a trial was held on the patent infringement dispute between Genzyme and Atrium over designs for pulmonary drainage devices. Genzyme sued for damages for the marketing and sale of Atrium's "OASIS" and "EXPRESS" devices, which allegedly infringed Genzyme's "Elliot patents" [*2] (U.S. Patent Nos. 4,544,370; 4,715,856; 4,747,844 and 4,822,346 ) and its "D'Antonio patent" (U.S. Patent No. 4,899,531). Both parties reserved the right at the close of evidence to have the court make a determination of certain issues of law and fact after the jury verdict. After an eight day trial, the jury found that Atrium did not infringe any claims of the patents-in-suit and that all patents-in-suit were invalid.

> n1 *Markman v. Westview Instruments, Inc.,* 52 F.3d 967, 970-71 (Fed. Cir. 1995). For a more complete review of the asserted claims of the D'Antonio and Elliot patents, see the court's claim construction opinion, *Genzyme v. Atrium,* 212 F. Supp.2d 292 (D. Del. 2002). The description of the claims in this opinion cover only those claim limitations that are germane to the current motion addressed by the court.

Presently before the court are post trial motions for a new trial on the defense of laches, for judgement as a matter of law on validity and infringement of both [*3] the Elliot and D'Antonio patents and an award for damages. D.I. 284. This opinion is directed only to Atrium's laches motion. D.I. 282.

## II. BACKGROUND

Case 1:04-cv-01258-SLR    Document 236-4    Filed 01/18/2006    Page 5 of 71

Page 2
2003 U.S. Dist. LEXIS 12784, *

## A. The Chronology of Events

Knowledge of Competitive Devices and Product Introduction

In 1989, Deknatel released the "first" pulmonary drainage device using a dry suction regulator based on the technology outlined in the '531 D'Antonio patent. D.I. 269 at 576. This patent application was filed in August 1986, and issued in December 1989. In September 1991, Atrium began development of its OASIS chest drainage device with knowledge of the D'Antonio patent. D.I. 272 at 1940 - 1942. During the research and development phase, Atrium sought the opinions of two law firms with regard to potential infringement of the patent. D.I. 272 at 1956 - 1957. In the Spring of 1996, Atrium released the OASIS device and in May 1996, Deknatel approved a competitive testing protocol which specified Atrium's new OASIS device. Deknatel obtained an OASIS device and analyzed it. D.I. 269 at 512 - 513. Thereafter, a recommendation was made to Deknatel management concerning the review of the OASIS device and the D'Antonio patent. D.I. 269 at [*4] 516.

In the same year, Genzyme acquired Deknatel and the patents-in-suit. n2 Shortly after this acquisition, Genzyme introduced its SAHARA device, incorporating technology from the Elliot patents, which it believed would render the OASIS device obsolete. D.I. 269 at 518. In the Fall of 1997, after a corporate reorganization, a new manager joined Genzyme's R&D and in 1998, that manager was advised that Atrium's OASIS product infringed. At that time, Genzyme started to "think seriously" about infringement. D.I. 268 at 336 - 337 and 381. Through information from an industry research report, Genzyme concluded that OASIS sales of 67 thousand units in 1997 accounted for nearly $ 900,000 in lost profits. During 1998, OASIS sales nearly doubled to approximately 130 thousand units. As a result, Genzyme announced in a 1999 report to shareholders that Atrium was a competitor who hurt performance and sales. D.I. 271 at 1573 - 1574. In 2000, Atrium introduced the EXPRESS device which Genzyme viewed as "knock-off" of its SAHARA device and infringed the Elliot patents. D.I. 268 at 400. After losing over $ 2 million in profits to OASIS sales (170,000 units) in 1999, and the prospect of new competition [*5] from the EXPRESS product, Genzyme determined that no other alternative existed and filed suit. D.I. 268 at 336.

n2 The acquisition included the Elliot patents, as well. The '370 patent was filed in May 1982 and issued in October 1985. The '856 patent was filed in August 1985 and issued in December 1987. The '844 patent was filed in September

1986 and issued in May 1988. The '346 patent was filed in April 1988 and issued in April 1989.

In November 2000, Genzyme filed this action against Atrium alleging that its OASIS and EXPRESS products infringed the D'Antonio and Elliot patents. During trial, Atrium moved, pursuant to Fed. R. Civ. P. 52 and 58, for judgement in its favor on sales of its OASIS product prior to November 14, 2000, relying on the equitable doctrine of laches. The court reserved decision until after post trial briefing was completed.

## B. The Technology

The Elliot Patents

Chest drainage devices remove fluid and air from a patient's chest cavity through the use of vacuum suction. Body [*6] fluids are drained through a tube into a collection chamber within the device. Because of the negative pressure exerted on the device when a patient inhales, proper operation requires the use of one-way "valves" to prevent the reverse flow of collected fluids. Prior art devices used a water column to act as a one-way valve or "water seal" to prevent reverse flow. The Elliot patents disclose a "waterless" (or "dry") device that replaces water seals with a mechanical one- way valve. The patents further disclose a number of pressure relief and control valves to allow for accurate pressure regulation and reverse flow protection.

The D'Antonio Patent

Chest drainage devices that used water columns as one way valves to prevent the flow of fluid back into the patient also act to regulate the suction applied to the patient by preferentially allowing air from the atmosphere into the suction and collection chambers. Medical personnel would regulate the suction by varying the amount of water in U-shaped tubes within the device. Instead of employing a water-based control mechanism, the D'Antonio patent utilizes mechanical valves that "self-adjust" to regulate the pressure in the suction chamber. [*7] This is accomplished, in part, by a gas port closing member positioned between the vacuum and collection chambers within the device.

## III. Laches

The law on laches is rooted in the equitable principle that courts will not assist one who has "slept on his rights." *Jarrow Formulas, Inc. v. Nutrition Now, Inc.* 304 F.3d 829, 835 (9th Cir. 2002). In the interest of fairness and equity, those who are granted a monopoly under the patent system have an obligation to enforce their rights in a timely manner. *Advanced Hydraulics, Inc. v. Eaton Corp.,* 415 F. Supp. 283, 286 (N.D. Ill. 1976). Laches

protects a potential infringer from unfair damage claims resulting from the intentional or neglectful delay of a patent holder to file suit. Two elements underlie this defense: (a) the patentee's delay in bringing suit was unreasonable and inexcusable, and (b) the alleged infringer suffered material prejudice attributable to the delay. *Bayer AG v. Sony Electronics, Inc.,* 229 F. Supp.2d 332, 366 (D. Del. 2002).

### Delay in Bringing Suit

Laches, as defined under 35 U.S.C. § 282 (1988), is an equitable defense to a [*8] claim for patent infringement. This provision in the Patent Act bars recovery of damages for any infringement committed more than six years prior to the filing of the complaint or a counterclaim for infringement. Courts have almost unanimously "borrowed" this six year time provision in order to protect a potential infringer from damages due to either the intentional or negligent delay of a patent holder in bringing suit. This period can be described as the "reasonable" period required to create a presumption of laches. It begins when the patentee knew or should have known of the alleged infringer's activity. The presumption of six years "represents an equitable balancing of the interests of the parties." *A.C. Aukerman Co. v. R.L. Chaides Constr. Co.,* 960 F.2d 1020, 1035 (Fed. Cir. 1992). It also represents the point at which the burden of proof shifts from the defendant to the plaintiff. A six-year delay requires the patentee to rebut the presumption of laches. But where the delay is less than six years, no presumption operates, and an accused infringer relying on laches must demonstrate the existence of both elements, namely, inexcusable delay and resulting prejudice. [*9] *Id.* at 1034-1037.

The degree of infringement may be relevant to the issue of when the period of delay begins. See, *Lever Bros. v. Procter & Gamble Distributing Co.,* 668 F. Supp. 924 (D. N.J. 1987). A delay of less than 6 years in bringing an infringement action has been excused where the infringer's actions are not commercially significant. *Illinois Tool Works Inc. v. Grip-Pak,* Inc., 725 F. Supp. 951, 953 (N.D. Ill. 1989). In *ITW,* the patentee waited 5 years to determine whether it would be economically prudent to initiate an action against Grip-Pak, an infringer. The court determined that patent owners are not expected to incur considerable expense to silence commercially insignificant infringers. In a similar finding, the court in *Mead Digital Systems, Inc. v. A.B. Dick Co.,* 521 F. Supp. 164, 183 (S.D. Ohio 1981) found that a 3 year wait to file suit *after* the infringer reached *profitability* was not unreasonable.

Finally, the court will consider these factors, the evidence, and other relevant circumstances to determine whether equity should intercede to bar pre-filing damages. "Laches is not *established* [*10] by undue delay and prejudice. These factors merely lay the foundation for the trial court's exercise of discretion." *Aukerman,* 960 F.2d at 1036. Ultimately, it is within the court's prerogative, based on its evaluation of all relevant evidence, to determine whether a delay of fewer than 6 years is unreasonable or inexcusable.

### Material Prejudice

In order to satisfy the second element of laches, a defendant must prove that he suffered material prejudice attributable to the delay. Material prejudice is defined to be either economic or evidentiary prejudice. See *Pappan Enterprises, Inc. v. Hardee's Food Systems,* Inc., 143 F.3d 800, 804 (3rd Cir. 1998). Economic prejudice requires a change in the economic position of a defendant as a result of delay, while evidentiary prejudice arises when a defendant is impeded from presenting a full and fair defense on the merits. See *Bayer,* 229 F. Supp.2d at 366.

#### Economic Prejudice

To establish economic prejudice, a change in the economic position of the alleged infringer during the period of delay must have occurred. See *Aukerman,* 960 F.2d at 1033. "The change must be [*11] *because of and as a result of* the delay, not simply a business decision to capitalize on a market opportunity." *Hemstreet v. Computer Entry Systems Corp.,* 972 F.2d 1290, 1294 (Fed. Cir. 1992) (emphasis added). Therefore, economic prejudice is shown by evidence of either loss of investment expenditures or damages from increasing sales which might have been prevented by the institution of an earlier suit. *Aukerman* and *Hemstreet* make it clear that damages or monetary losses must be, "because of and as a result of" the delay. In order for this required nexus to exist, the defendant must have had reason to believe that the patentee did not intend to file suit for infringement. *ABB Robotics, Inc. v. GM Fanuc Robotics Corp.,* 828 F. Supp. 1386, 1395 (E.D. Wl. 1993). See also, *Mead Digital Systems, Inc. v. A.B. Dick Co.,* 723 F.2d 455 (6th Cir. 1983) (a three-year wait to file suit after an infringer achieved profitability is not unreasonable); *E.I. du Pont de Nemours & Co. v. Polaroid Graphics Imaging, Inc.,* 706 F. Supp. 1135 (D. Del. 1989) (where the court found that it was not unreasonable for Dupont to notify [*12] Polaroid of infringement until it was economically worthwhile to file suit).

#### Evidentiary Prejudice

Evidentiary prejudice arises where the "defendant's inability to present a full and fair defense on the merits due to the loss of records, the death of a witness, or the unreliability of memories of long past events ..." undermines the court's ability to judge facts. *Aukerman,* 960

F.2d at 1033. When a party has met its burden of production, "the presumption evaporates" with respect to evidentiary prejudice. *Id.* Thus, for laches, the length of delay, the seriousness of the prejudice or harm suffered, the justification for the delay, and the defendant's conduct or culpability must be weighed to determine whether the patentee dealt unfairly with the alleged infringer by not promptly filing suit. In sum, a court must weigh all pertinent facts and equities in making a decision on the laches defense.

## IV. DISCUSSION

### Parties Positions

#### Unreasonable Delay

Atrium claims that Genzyme's 4 1/2 year delay in filing claims of infringement on the D'Antonio patent is unreasonable since Genzyme had notice of the potential infringement in 1996 and failed to [*13] notify Atrium of its intention to file suit. Atrium further argues that there is direct evidence of Genzyme's intention to file suit, as evidenced by the relevant documents unearthed during discovery. Atrium implies in its argument that Genzyme has an affirmative duty to inform, and that its failure to do so was unreasonable. Atrium sites *Odetics Inc. v. Storage Tech. Corp.,* 919 F. Supp. 911 (E.D. Va. 1996) as a case where the court found that 3 year delay was unreasonable. Atrium further relies on *Bott v. Four Star Corp.,* 807 F.2d 1567 (Fed. Cir. 1986) (defining constructive notice) and *Galliher v. Cadwell,* 145 U.S. 368, 36 L. Ed. 738, 12 S. Ct. 873 (1862) (determining that reasonableness depends on the circumstances) and several other cases where a delay shorter than six years was found to be unreasonable.

Alternately, Genzyme asserts that, as pronounced by the Federal Circuit, delays of less than 6 years are not unreasonable. In support of its position, Genzyme relies on *Meyers v Asics Corp.,* 974 F.2d 1304 (Fed. Cir. 1990) (where a 5 1/2 year delay was not unreasonable), *Gasser Chair Co. v. Infanti Chair Manufacturing Corp.,* 60 F.3d 770 (Fed. Cir. 1995) [*14] and *Hall v. Aqua Queen Manufacturing Inc.,* 93 F.3d 1548 (Fed. Cir. 1996) (delays of 5 or more years were not unreasonable). According to Genzyme, Atrium has an affirmative obligation to prove that a 4 1/2 year delay is unreasonable and has failed to do so. Genzyme "blends" these arguments with the principles of equitable estoppel to support its position that a delay of less than 6 years is unreasonable only when a patent holder misleads a potential infringer into believing that it is "safe from suit."

Genzyme's delay in bringing suit was not unreasonable. In contrast to *Bott* and *Odetics,* actual or constructive notice of potential infringement and the delay in

bringing suit is not in dispute. At issue, here, is whether the 6 year guideline set forth in previous opinions is reasonable under the circumstances. See *Aukerman,* 960 F.2d at 1033. In the majority of cases, while a patent holder is under an obligation to bring suit in a timely manner, a 6 year wait is reasonable. In contrast, where a patent holder was found to have clearly mislead an infringer and its reliance ultimately led to material prejudice, the courts have applied equitable estoppel [*15] and ruled that a time period of less than 6 years was unreasonable. See *Wafer Shave, Inc. v. Gillette Co.,* 857 F. Supp. 112 (D. Mass. 1993) and *Digital Sys. Int'l v. Davox Corp.,* 1993 U.S. Dist. LEXIS 20443, 1993 WL 664647 (W.D. Wash. July 1, 1993). Although equitable estoppel has not been directly raised, its application has been cited in defense of laches claims and should be considered herein. See *Odetics,* 919 F. Supp. at 923 (where intentional delay caused evidentiary prejudice).

While providing notice to an infringer may be the typical start to licensing negotiations, it is not required to excuse delay associated with initiating an infringement suit. *Odetics,* 919 F. Supp. at 921. This court is unable to find an authoritative or reasonably persuasive source which would require the conclusion that Genzyme was under an affirmative duty to disclose future plans to file suit. n3 In fact, it would be illogical for companies in a highly competitive market to provide this information in advance, particularly in the absence of any intent to license intellectual property.

n3 Nothing cited by Atrium is authoritative for this proposition.

[*16]

In conclusion, Genzyme's 4 1/2 year delay in bringing suit is within the range set forth in the majority of cases. Its conduct is consistent with the "borrowed" statutory guideline set forth under 35 U.S.C. § 282, and the principles set forth under equitable estoppel, and is not unreasonable based on lack of notice.

#### Inexcusable Delay

While the court agrees that a patent holder has an obligation to enforce its rights in a timely manner, applying this concept in equity should only bar a plaintiff whose "institution of the action was inexcusably delayed." *Advanced Hydraulics, Inc. v. Eaton Corp.,* 415 F. Supp. 283, 286 (N.D. Ill. 1976).

Atrium argues that no reasonable excuse for the 4 1/2 year delay has been offered by Genzyme, particularly since it did not lack the necessary financial resources to pursue a claim, was not preoccupied with other litigation, nor involved in licensing negotiations. Genzyme's excuse

2003 U.S. Dist. LEXIS 12784, *

that litigation is a "painful and crude alternative" is a *non sequitur* since it enthusiastically pursued litigation four years later. Further, delaying litigation until Atrium's EXPRESS product was introduced does not make [*17] sense since it only constitutes a small portion of the revenues lost compared to the losses incurred due to the OASIS product.

Contrary to Atrium's position, Genzyme presents several valid reasons for its delay. According to the testimony, Genzyme underwent a change in management during the relevant time period. As a result, litigation remained a low priority until the "dust settled." Delay to minimize litigation costs and to combine litigation against one potential infringer is appropriate. Similarly, in *ITW*, the court found "ripeness" to be a reasonable excuse for delay. "Patent owners are not expected to incur such large costs to silence commercially insignificant infringers." *Id.* at 953. While a court cannot precisely define when a sum or percentage of sales reaches "commercial significance" in every circumstance, based on the evidence, Genzyme initiated suit when it was compelled to do so by weighing the cost of litigation with the risk of potential losses by the introduction of Atrium's EXPRESS product. Waiting until litigation makes clear economic sense is reasonable. Interestingly, Atrium supports this conclusion by its argument that large, publically-held corporations [*18] move more slowly in the decision-making process than smaller, privately-held companies.

**Material Prejudice**

Economic Prejudice

Atrium claims that, while Genzyme delayed, there was 30 fold increase in sales of its OASIS product, that Genzyme knew of this increase, and as a result, intentionally procrastinated to cause greater economic harm to Atrium. The thrust of this argument is that Genzyme "laid in wait" for damages to build, while providing no notice to Atrium of its intention to file suit. *Raber v. Pittway Corp.*, 1994 U.S. Dist. LEXIS 9646, 1994 WL 374542 (N.D. Cal. July 11, 1994). Further, since Genzyme had market share information (IMS data), it had knowledge of Atrium's increase, and acted upon that knowledge by deferring suit. In support of this argument, Atrium relies on the *Aptargroup, Manus* and *Digital Systems* n4 cases where sales and damages increased during the time when a patent holder might have filed suit. In those cases, the *potential* for damages during the period of delay was enough to support a finding of laches. *Actual* damages were not required. n5

n4 *Aptargroup Inc. v. Summit Packing Sys., Inc.*, 1996 U.S. Dist. LEXIS 3026, 1996 WL

114781 (N.D. Ill. March 14, 1996); *Manus v. Playworld Systems, Inc.*, 893 F. Supp. 8 (E.D. Pa. 1995); *Digital Sys. Int'l, Inc. v. Davox Co.*, 1993 U.S. Dist. LEXIS 20443, 1993 WL 664647 (W.D. Wash. July 1, 1993).

[*19]

n5 *Aptargroup*, 1996 U.S. Dist. LEXIS 3026, 1996 WL 114781 *at *9; Manus*, 893 F. Supp. at 10; *Digital*, 1993 U.S. Dist. LEXIS 20443, 1993 WL 664647 at *3-*4.

Genzyme argues that there is no reason to believe that Atrium would have changed its conduct as a result of being notified of potential infringement. Economic prejudice is shown by evidence of either loss of investment expenditures or damages (from increasing sales) which might have been prevented by an earlier suit. As a result, to prove economic prejudice necessarily requires Atrium to produce facts that, for example, show expenditures made in reliance upon Genzyme's inaction. Genzyme points out that Atrium continued selling the OASIS device and developed new devices based on its original design *after* this action was filed. In addition, the testimony establishes that Atrium believes that it is not infringing the D'Antonio patent. Further, mere proof of investment in research and development and increased sales, in and of themselves, are not evidence of economic prejudice. Genzyme also contends that Atrium fails to provide a "causal nexus," [*20] the connection between the patent holder's actions and the change in the economic position of the alleged infringing party, during the period of the delay. Thus, Atrium's knowledge of its potential infringement and its continued infringement after suit reinforces Genzyme's position.

Atrium did not suffer economic prejudice during the 4 1/2 years that Genzyme waited to file this action for infringement. To demonstrate the impact of delay on its unit sales, Atrium compares the sales of its OASIS product (30 fold increase over 4 1/2 years) to the *Raber* and *ABB* cases, which, respectively, involved a six- and three-fold increase. In *Raber*, the delay of 11 years in filing suit was clearly beyond the six year limit for a presumption of laches. In that case, there was both intentional delay and acquiescence on the part of the patent holder, which created a presumption of laches by shifting the burden of proof and by raising an assumption of material prejudice. In *ABB*, the defendant's (Fanuc) sales tripled over 5 years. However, the court found evidence that if Fanuc had knowledge of ABB's intentions to file suit, it would have modified its conduct. *Id.* at 1397. In addition, [*21] there was evidence that ABB led Fanuc to believe that it would license the technology, but then

delayed doing so. ABB failed to offer evidence to rebut the presumption of economic prejudice, and the court found the defense of laches to be valid.

There is no similar delay in this case, and therefore, no shift in the burden of proof nor assumption of material prejudice. In contrast, Atrium has failed to offer any evidence to suggest that it considered altering its business strategies or operations as a result of Genzyme's action or inaction. Further, Genzyme did not induce Atrium into believing that a license was imminent, only to delay and then file suit 4 1/2 years later.

The law protects the potential infringer from economic hardships due to intentional or negligent delay by the patent holder who neither informs of infringement nor files suit. The underlying reasoning behind this element is to protect an infringer, who is ignorant of his potential infringement. Here, Atrium had reason to believe that it would be sued by Genzyme for infringement as shown by the evidence at trial. n6

n6 Atrium admitted to reviewing the D'Antonio patent and Genzyme's Pleur-Evac A-6000 device. D.I. 272 at 1937 - 1943. Atrium sought the opinion of two law firms on potential infringement. D.I. 272 at 2085 - 2091.

[*22]

Moreover, although Atrium's sales significantly increased during the 4 1/2 year period, exponential growth in product sales are a normal consequence of new product introduction. Between 1998 and 1999, when Genzyme focused on the impact of OASIS sales, the growth in those sales was far less than the thirty-fold increase that Atrium contends. A more accurate number is approximately a thirty *percent*, or roughly one-third, increase. Further, the testimony reveals that Genzyme did evaluate sales of the OASIS product and their effect and filed suit when it made economic sense. Efficiency and economy resulted in combining the claims for infringement on both the D'Antonio and Elliot patents.

Despite Atrium's contention that a large, financially successful corporation should be less concerned about the economic impact of litigation and, therefore, should not delay filing a claim, it does not make economic sense for a company to hastily rush into litigation over losses to a competitor which are less than 1.2% of its overall revenues. n7 Equity notwithstanding, applying significantly different standards to small and large corporations is not reasonable in determining when the obligation [*23] to file suit exists. In addition, courts have held that an individual plaintiff could reasonably delay bringing suit until he could determine that the possible infringe-

ment made litigation "monetarily ripe." *Tripp v. U.S.*, 186 Ct. Cl. 872, 406 F.2d 1066, 1071 (Ct. Cl. 1969) (where plaintiff waited 5 years after advising the United States government of infringement). In contrast, courts have not found delay in excess of six years to be reasonable, where there was insufficient evidence to support the argument of lack of "ripeness." See *Cooper v. North American Philips Corp.*, 1989 U.S. Dist. LEXIS 14104, 1989 WL 205666 (D. Alaska 1989) and *Jensen v. Western Irr. and Mfg., Inc.*, 650 F.2d 165, 168 (9th Cir. 1980). In conclusion, there is ample evidence that Genzyme waited for the matter to be economically justified prior to filing suit. Moreover, the delay here was less than the prescribed 6-year period.

n7 In 1998, Genzyme's annual revenues were approximately $ 560 million, while Atrium's OASIS sales were approximately $ 6.3 million.

[*24]

Evidentiary Prejudice

Atrium claims that the jury made its decision under several evidentiary handicaps that prevented a full and fair presentation of its defense on the merits. The basis for this claim is that several important witnesses were unavailable or failed to remember key events that would have "further debunked" Genzyme's copying allegations and its arguments regarding the scope of the claims of the patents-in-suit. Atrium asserts that the advanced age and ill health of one of its key witnesses prevented him from appearing in court, and required his video-taped deposition be taken. Therefore, the delay caused a prejudicial evidentiary presentation to the jury.

Genzyme responds that video-taped depositions are not prejudicial, and that Atrium could have subpoenaed witnesses that they claimed were unavailable. Citing *Aukerman*, Genzyme further asserts that Atrium must demonstrate how unavailable evidence was important to its defense. *Id.* at 1034. Since Atrium has failed to meet this requirement, it has not established evidentiary prejudice.

This court finds that 4 1/2 year delay in filing suit did not substantially contribute to evidentiary prejudice against [*25] Atrium. A witness's failure to remember specific past events is not, in and of itself, indicative of evidentiary prejudice. Here, no evidence has been presented suggesting that, due to delay, either the destruction of records or incapacity of witnesses vital to Atrium should compel this court to find such prejudice. Records disclosed during discovery adequately support the positions of both parties. While it is difficult to determine what allegedly "missing" information would impact a

2003 U.S. Dist. LEXIS 12784, *

jury's decision, juries are expected to weigh a witness's inability to remember, along with the other information presented, to determine the facts. Further, neither party in this action legitimately complained during the pretrial conference nor in their pretrial motions that they were unable to obtain necessary information due to delay to prepare their case.

Further, the burden of proof falls on Atrium to clearly establish how unavailable evidence would be important to its defense. Atrium has failed to demon-strate to the court that the delay prevented it from pre-senting a full and fair defense on the merits.

**V. Conclusion**

In conclusion, based on the above analysis, Gen-zyme's delay in bringing [*26] suit was not unreasonable or inexcusable, and thus Atrium suffered no material prejudice attributable to the delay. As a result, Atrium's motion on the defense of laches (D.I. 282) is DENIED.

EE

1              IN THE UNITED STATES DISTRICT COURT

2                 FOR THE DISTRICT OF DELAWARE

3

4      McKESSON INFORMATION

       SOLUTIONS, LLC,

5                              Civil Action

              Plaintiff,        No. 04-1258-SLR

6

       vs.

7

       THE TRIZETTO GROUP, INC.,

8

              Defendant.

9

10

11

       _____

12

13        The videotaped deposition of JOHN PETER

14     DANZA, called by the Plaintiff for examination,

15     pursuant to Notice, and pursuant to the Rules of

16     Civil Procedure for the United States District

17     Courts, taken before Sandra L. Rocca, CSR and

18     Notary Public in and for the County of DuPage, and

19     State of Illinois, at 333 West Wacker Drive,

20     Chicago, Illinois, on the 12th day of September,

21     2005, at the hour of 9:45 a.m.

22

23        JOB NO. 38561

24

9/12/2005  Danza, John

1    Q.   Is there an advantage to doing clinical

2    editing during the claims auditing process?

3        A.   We market it that it's -- we market it

4    that it's a work flow choice by the client.  Some

5    clients deem that it is.  Others deem that it's

6    not.

7    Q.   Can you give me a rough estimation of

8    what percentage of QicLink customers that select

9    clinical editing choose ClinicaLogic versus Auto

10   Audit?

11       A.   The best of my knowledge at this point of

12   the clients that have clinical editing capability,

13   there's about -- it's roughly 50/50, about half

14   have ClinicaLogic, about half have Auto Audit.

15       Q.   That includes new customers or recent

16   customers coming in to purchase clinical editing

17   functionality for QicLink?

18       A.   We've only sold a couple of new systems

19   over the last couple years.  Each of those clients

20   I believe chose ClinicaLogic.

21       Q.   When you said Auto Audit is an add-on

22   option, it's not an add-on option that's offered

23   for free.  I assume there's some sort of license

24   fee?

27

9/12/2005 Danza, John

1    A.  Yes, that's correct.

2    Q.  The same for ClinicaLogic?

3    A.  Yes.

4    Q.  Do you recall why ClinicaLogic was

5    offered as an option in 2002 to Auto Audit?

6    A.  It was because it was a package already

7    part of the TriZetto family.

8    Q.  So the ability to do realtime claim

9    editing during -- or clinical editing during claim

10   processing wasn't a factor, it was strictly that it

11   was a TriZetto product?

12   A.  We had -- we had -- it's primarily

13   because it was a TriZetto product.  We did have one

14   customer whose contract indicated that within a

15   certain period of time, they needed to have

16   realtime -- at time of claim adjudication clinical

17   editing occur.  So that was an additional driving

18   force.

19   Q.  Do you recall the name of that customer?

20   A.  Yes.  It was Gallagher Benefits

21   Administrators.

22   Q.  You say that TriZetto or -- strike that.

23   You say that ClinicaLogic was part of the TriZetto

24   product line.  What advantage is there to that in

I, JOHN PETER DANZA, do hereby declare under penalty of perjury that I have read the foregoing transcript; that I have made any corrections as appear noted, in ink, initialed by me, or attached hereto; that my testimony as contained herein, as corrected, is true and correct.

EXECUTED this **2** day of *December* , 20 **05** , at *Naperville* , *Illinois* .
               (City)           (State)

JOHN PETER DANZA

120

FF

Redacted

GG

Redacted

HH

Redacted

II

Redacted

**JJ**

Redacted

KK



**UNITED STATES DEPARTMENT OF COMMERCE**
Patent and Trademark Office
Address: COMMISSIONER OF PATENTS AND TRADEMARKS
Washington, D.C. 20231

| SERIAL NUMBER | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. |
|---|---|---|---|
| 07/648,314 | 01/29/91 | HOLLOWAY | D    H0433/7002 |

|  EXAMINER  |
|---|
| HAYES,G |

A. JASON MIRABITO
600 ATLANTIC AVENUE
BOSTON, MASSACHUSETTS  02210

| ART UNIT | PAPER NUMBER |
|---|---|
| 2311 | 22 |

DATE MAILED:04/08/92

This is a communication from the examiner in charge of your application.
COMMISSIONER OF PATENTS AND TRADEMARKS

☑ This application has been examined    ☑ Responsive to communication filed on _1-29-91_    ☐ This action is made final.

A shortened statutory period for response to this action is set to expire _3_ month(s), _____ days from the date of this letter.
Failure to respond within the period for response will cause the application to become abandoned. 35 U.S.C. 133

**Part I** THE FOLLOWING ATTACHMENT(S) ARE PART OF THIS ACTION:

1. ☐ Notice of References Cited by Examiner, PTO-892.    2. ☐ Notice re Patent Drawing, PTO-948.
3. ☐ Notice of Art Cited by Applicant, PTO-1449.    4. ☐ Notice of Informal Patent Application, Form PTO-152.
5. ☐ Information on How to Effect Drawing Changes, PTO-1474.    6. ☐ _____

**Part II** SUMMARY OF ACTION

1. ☑ Claims _7 - 32_ are pending in the application.

    Of the above, claims _____ are withdrawn from consideration.

2. ☑ Claims _1 - 6_ have been cancelled.

3. ☑ Claims _17 - 32_ are allowed.

4. ☑ Claims _7 - 16_ are rejected.

5. ☐ Claims _____ are objected to.

6. ☐ Claims _____ are subject to restriction or election requirement.

7. ☐ This application has been filed with informal drawings under 37 C.F.R. 1.85 which are acceptable for examination purposes.

8. ☐ Formal drawings are required in response to this Office action.

9. ☐ The corrected or substitute drawings have been received on _____. Under 37 C.F.R. 1.84 these drawings
    are ☐ acceptable. ☐ not acceptable (see explanation or Notice re Patent Drawing, PTO-948).

10. ☐ The proposed additional or substitute sheet(s) of drawings, filed on _____ has (have) been ☐ approved by the
    examiner. ☐ disapproved by the examiner (see explanation).

11. ☐ The proposed drawing correction, filed on _____ has been ☐ approved. ☐ disapproved (see explanation).

12. ☐ Acknowledgment is made of the claim for priority under U.S.C. 119. The certified copy has ☐ been received ☐ not been received
    ☐ been filed in parent application, serial no. _____; filed on _____

13. ☐ Since this application appears to be in condition for allowance except for formal matters, prosecution as to the merits is closed in
    accordance with the practice under Ex parte Quayle, 1935 C.D. 11; 453 O.G. 213.

14. ☐ Other

MCK 000331

**EXAMINER'S ACTION**

PTOL-326 (Rev. 9-89)

Serial No. 07/648,314                                    -2-
Art Unit   2311

1.    The title of the invention is not descriptive.  A new title is
required that is clearly indicative of the invention to which the
claims are directed.

2.    The following is a quotation of the appropriate paragraphs of
35 U.S.C. § 102 that form the basis for the rejections under this
section made in this Office action:

> A person shall be entitled to a patent unless --
> (b) the invention was patented or described in a printed
> publication in this or a foreign country or in public use or
> on sale in this country, more than one year prior to the date
> of application for patent in the United States.

As discussed in the previous Office Action, Weitzel et al. is
directed to an expert computer system for processing medical
claims.   Use of the system involves receipt of the claim;
determination of whether or not the claim makes use of medical
service codes; authorization of valid claims and rejection of the
invalid codes.

3.    The following is a quotation of 35 U.S.C. § 103 which forms
the basis for all obviousness rejections set forth in this Office
action:

> A patent may not be obtained though the invention is not
> identically disclosed or described as set forth in section 102
> of this title, if the differences between the subject matter
> sought to be patented and the prior art are such that the
> subject matter as a whole would have been obvious at the time
> the invention was made to a person having ordinary skill in
> the art to which said subject matter pertains.  Patentability
> shall not be negatived by the manner in which the invention
> was made.

> Subject matter developed by another person, which qualifies as
> prior art only under subsection (f) or (g) of section 102 of
> this title, shall not preclude patentability under this
> section where the subject matter and the claimed invention
> were, at the time the invention was made, owned by the same
> person or subject to an obligation of assignment to the same
> person.

MCK 000332

Serial No. 07/648,314                    -3-
Art Unit   2311

Claims 7-8 are rejected under 35 U.S.C. § 103 as being unpatentable over Software Packages.

Software packages introduced a software system comprising Levels I and II which includes means for checking medical claims and prepares a report which explains reduced and disallowed charges. While no explicit details are provided in the article, the Examiner asserts that in order to check the claims, means for receiving the claim, to determine whether ICD-9 diagnostic codes are present and rejection or authorization of claims in the prepared report must be present. Claim 7 is rejected.

The Examiner respectfully asserts that motivation for Software Packages to update its system by elimination of defunct codes would be to provide a product on which their customers could depend. Claim 8 is rejected.

The Examiner respectfully asserts that the report of Level II would inform the user of any changes made. Claim 9 is rejected.

Use of existing service codes would be a design choice. Claims 10-11 are rejected.

In order to examine medical claims, Level II would have to have input of data regarding the claim. Claim 12 is rejected.

The IDC-9 codes represent medically determined relationships. Claim 13 is rejected.

Claims 14-16 are apparatus claims corresponding to method claims 7-8 and are rejected on the same basis.

MCK 000333

Serial No. 07/648,314                        -4-
Art Unit   2311

4.                    -RESPONSE TO REMARKS-

    Applicant traverses use of Weitzel as a reference by asserting

that the reference is non-enabling.   The Examiner respectfully

asserts that the reference is evidence that a system for performing

the disclosed function was available to the public prior to

Applicant's filing date and is thus valid prior art.

5.   Any  inquiry  concerning  this  communication  or  earlier
communications from the examiner should be directed to Gail Hayes
whose telephone number is (703) 308-1670.

    Any inquiry of a general nature or relating to the status of
this application should be directed to the Group receptionist whose
telephone number is (703) 0754.


                                        Gail Hayes
                                     GAIL O. HAYES
                                    PATENT EXAMINER
                                      GROUP 230

    g.o.h.
    April 8, 1992


MCK 000334

# Cost Containment— The Caterpillar Experience

Ronald Hurst

One of the challenges and new realities on the health care horizon is the growing concern, awareness, and involvement of American industry, as exemplified by what is taking place within my own company, Caterpillar Tractor of Peoria, Illinois. Taken altogether we are administering benefits for more than 200,000 people in the United States—70,000 employees, another 120,000 dependents, and 15,000 retirees and survivors. We are concerned about the cost of these benefits.

Last year in Illinois, where we have the pleasure of being the largest private employer, $350,000,000 in hospital charges was shifted from public payors to private payors. As a largely self-insured, self-administered payor, we are concerned about this trend. However, since part of the problem is a management problem, we at Caterpillar have asked how we can better manage health care payments. That information is what I will share in some detail in this article.

## Caterpillar

First, let me provide a bit of background about Caterpillar Tractor. In 1981 our sales were just over $9 billion, half of which was in foreign countries, where we are one of the major exporters from the U.S. We had a profit of $579 million in 1981. Last year our health benefit payments amounted to just over $150 million. Of that amount, half went to hospitals. Our number one competitor is not General Motors, Allis Chalmers, or International Harvester but a Japanese company named Komatsu. Part

*Mr. Hurst is manager of health care planning with Caterpillar Tractor Company in Peoria, Illinois. His paper was originally presented at the 1982 NAPPH annual meeting in Scottsdale, Arizona.*

of our management plan is to make sure that Komatsu never becomes as familiar to you as Datsun, Toyota, or Sony.

The reason Caterpillar is as involved as it is in health care is that we have a big stake invested financially. As I noted, last year we paid $150 million for health care, exclusive of workers' compensation payments, taxes for Medicare and Medicaid, disability payments, and death and survivor payments; so we are talking about a sizable sum.

Another principle behind our management approach to health care: We do not blame the doctors or dentists; we do not blame the hospitals. We do not blame labor or government. Industry helped to create the problem by agreeing in its union negotiations on comprehensive first dollar coverage. What we have is a system that is reacting rationally to what amounts to almost a blank check. We in industry need to do something about this situation. The buck has to stop with industry and with labor. It has to stop with doctors, hospitals, and dentists. All of us who helped create the problem need to come together to address it. And we must do so without reducing the quality of health care.

Our management approach, then, has two main aspects: what we are doing inside the company and what we are doing outside. I will describe what we are doing inside first because that is the first area we have to straighten out—clearly a management problem.

## The Inside Approach

My job was created three years ago to coordinate all aspects of health care delivery because we found that we had a number of departments working on their own: data processing, labor relations, communications, medical, and compensation. My job was to bring them together to assure that we are all "singing from the same hymn book,"

102

Supplied by the British Library - "The world's knowledge" www.bl.uk

if you will. To bring about such a unified approach, top level support from the chairman of the board and the president is necessary. Fortunately, I have had this backing within Caterpillar.

Although Caterpillar has been largely self-insured and self-administered for many years, the company has made some new efforts to improve its ability to monitor costs. For example, we have improved our ability to collect and analyze data. We now are able to identify a specific physician whose costs are severely out of line or whose practice patterns do not conform to the norm or identify a hospital that charges excessive amounts for given procedures. We do not simply take such reports and put them aside. We sit down with the doctors, the hospitals, the boards, the administrators, and the dentists. We have 85 people monitoring and processing claims. We are training them so that they are better aware of what they are doing, and we are involving professionals in the claims process. We have hired a physician and a dentist to help improve the medical knowledge of our claims processors and to be involved in their training.

In the area of disability absence control, we have organized programs at all of our major facilities to make sure our plant physicians are talking with the admitting or attending physicians about whether or not each employee may return to work. This activity has a high return not just in terms of dollars but in terms of humanity. We have found that malingering has not been as much of a problem as our own structure and requirements for return to work on the part of employees who are on disability absence. So this area is something we had to clean up within our own house.

In attempting to coordinate benefits, we have an aggressive program to make sure that we pay only if we are responsible for the bill. If another insurance company should be taking care of the bill, we make sure that it does. We have found that we have had to make clear specifications in the area of what we consider usual and customary fees for services.

Although I am not a data processing professional, I had to become involved in data processing because that is where our claims are processed and paid. As you get into this area, if you do, what you need to remember is that a

> "Another area we have tried to enhance is communications with employees. If we do not tell the employees that we have a...benefit, how are they supposed to know?"

> "Externally, we have entered into a contract with a professional standards review organization (PSRO) in central Illinois which has had a return on our investment of no less than $10 for every $1 we have put into it."

computer is a tool—and that is all it is. That is all computer programs are too; they are tools by which to accomplish a specific objective and should be used to their best advantage toward that end.

## Benefit Plans

Another project we are undertaking inside Caterpillar is to look at our benefit plans. We often negotiated benefits that forced employees and employers into the highest cost option because we did not pay for certain benefits such as outpatient care. We are looking at the cost-effectiveness of the benefits we offer. Among the options we have added are home health care that is under the direction of a licensed physician and performed by a registered nurse and reimbursement for certain ambulatory services. We have not come up with a program for second surgical opinions because our research indicates that it probably costs as much as it benefits, both in health and dollars. We are taking a close look at hospices because we are seeing more evidence that they are both humane and cost-effective. As for dental reviews, we have found more abuse in dental payments than in any other single category, so we have an aggressive multi-faceted program related to dental payments.

Caterpillar now offers 15 health maintenance organizations (HMOs), and we have had an aggressive chemical dependency and alcohol abuse or drug abuse program since before World War II. We have found very high cost-effectiveness from these programs in addition to the humanity of keeping an employee well so that he can get the job done. Obviously, this approach is better for the employee and the family, and it is certainly better for the job being done at work.

Another area we have tried to enhance is communications with employees. If we do not tell the employees that we have a home health care benefit, how are they supposed to know? If we do not tell them that we have an ambulatory benefit so they do not have to be hospitalized to be reimbursed for a given procedure, they may not use the benefit. Half of the time the physician is in a position of knowing more about a given benefit than the employee is,

Supplied by the British Library - "The world's knowledge" www.bl.uk

> "In terms of our psychiatric confinements in particular,...13 percent of our patient days are psychiatric, four percent of our admissions are psychiatric, and the average length of stay for the psychiatric confinement is about three times the average length of stay for other illnesses."

and that is not as it should be. So we have extended our communications extensively, even getting into the area of life styles. The most obvious message that we are spreading is that the way to avoid health care costs is to stay healthy. However, we have not yet been able to define a return on investment from exhaustive programs of the physical fitness or health club type. We are not sure that corporations need to become involved in a major way in this area, but that may depend on where the company is located. What has worked for us may not apply to other employers such as Kimberly-Clark in Wisconsin, for example: In that area of the country, if the company does not do it, it simply does not get done. Kimberly-Clark has spent about $6 million on a gymnasium, a track, and other facilities for its employees. For them, it is a suitable program; however, for us at this point, in our major location, it is not necessary.

## On the Outside

These are just some of the strategies Caterpillar is using internally. Externally, we have entered into a contract with a professional standards review organization (PSRO) in central Illinois which has had a return on our investment of no less than $10 for every $1 we have put into it. We have been so persuaded that we have extended the hospital review to nursing homes and to two of our other production sites at which we have about 6,000 employees each. I think there will come a time when physicians are going to seriously regret having abandoned the PSRO program, which is already in place, operated by doctors, and can be run cost effectively. The physician's message has not been communicated where PSROs have been effective. Doctors seem to be abandoning physician control of the medical cost issue and turning it over to theoreticians and bureaucrats. Where we have contracts we will fund them because our return has been so remarkable. Let me give you the details.

Between 1977, the last full year before Caterpillar contracted with a PSRO, and 1980, our admissions rate per 1,000 covered persons per year declined from 156 to 140. Our patient days per thousand covered persons per

year, excluding Medicare, went down from 1,000 to 830. The average length of stay went down from 6.4 to 5.8 days, so we have had significant reductions. We can point to no other variable that specifically would have caused those savings other than the PSRO review. Return on investment has been high for us.

According to our PSRO representative, one of the reasons Caterpillar's return on investment has been so high is that we firmly requested what we wanted, made comparisons with our data, and really worked with the PSRO to get a good program. Now six other major employers in central Illinois also have private review contracts.

In terms of psychiatric confinements in particular, I can share with you that 13 percent of our patient days are psychiatric, four percent of our admissions are psychiatric, and the average length of stay for the psychiatric confinement is about three times the average length of stay for other illnesses. Our data on these factors are very concrete since we have been largely self-insured, self-administered for so long.

Our psychiatric admission criteria were developed by a group of local psychiatrists who are involved in the PSRO program. The criteria deal with clinical and laboratory findings, appropriateness of medication, need for hospitalization, discharge criteria, and a number of other treatment factors.

What problems have we had with psychiatric confinements in our PSRO program? We now have had the program for four years, so the problems no longer exist for us in any magnitude. In the beginning, however, we had to deal with the issues of subjectivity and confidentiality of records.

Caterpillar also has 15 contracts with health maintenance organizations. We are involved in about half a dozen business coalitions on health care costs, and we have begun talking to the medical community more than we did in the past—making presentations to medical society boards, sitting down with individual physicians, encouraging regular dialogue rather than just calling infrequently to discuss a claim or a single patient. We need to know more about the problems of the providers, just as the providers need to know more about the problems of the payors, so we are enhancing the dialogue.

## Conclusion

There is an old saying in the field of management that managers are supposed to make something happen. But the question is a complex one, and I hope I have not oversimplified it. The issue is terribly difficult, volatile, and sensitive; and there is no silver bullet. Nonetheless, we at Caterpillar are trying to make cost containment happen ■

104

MM

9/21/2005  Hurst, Ronald

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

McKESSON INFORMATION

SOLUTIONS, LLC,

                 CIVIL ACTION NO. 04-1258 SLR

    Plaintiff,

vs.

THE TRIZETTO GROUP, INC.,

    Defendant.

_____/

VIDEOTAPED

DEPOSITION OF:        RONALD A. HURST

TAKEN:            Pursuant to Notice

                   Instance of Defendant

DATE:             September 21, 2005

TIME:             Commencing at 9:09 a.m.

PLACE:           Wyngate Inn

                   17301 Dona Michelle Drive

                   Tampa, Florida

BEFORE:          TONYA H. MAGEE

                   Court Reporter and

                   Notary Public, State

                   of Florida at Large

VIDEOGRAPHER:        RICK SPECTOR

1    A.  Yes, I did.

2    Q.  Okay.  And I think he said that he was

3  otherwise gonna be here with you today.

4    A.  He called Monday and said that he had to go to

5  Chicago.

6    Q.  Okay.  All right.  Did he tell you not to

7  proceed with the deposition or anything?

8    A.  No, no.

9    Q.  Okay.

10    A.  I've actually gotten two subpoenas.  The first

11  one was to provide documents.  And I called Caterpillar

12  and I said, what is this?  You know, I wasn't employed

13  by Caterpillar at the time it was written.  And I said,

14  what are they talking about?  I left Caterpillar in

15  1985.  That's 20 years ago.  And I've moved several

16  times since then and I have no documents.

17    So Andy sent a letter to whoever sent that

18  subpoena saying, he has no documents.  And I thought

19  that was the end of it.  Then three months later or

20  thereabouts, I get another subpoena saying, well, even

21  if you don't have any documents, we want you to give a

22  deposition.  So that's the conversation I had with Andy,

23  what do I do.

24    Q.  Thank you.  Thank you very much.  That's

25  helpful.  The -- and you did a great job, by the way,

Redacted

OO

9/13/2005  Goldberg, George

1    UNITED STATES DISTRICT COURT

2    FOR THE DISTRICT OF DELAWARE

3

4

5    -----------------------------x

6    MC KESSON INFORMATION SYSTEMS, :

7        Plaintiff,        :   Case No.

8      vs.                 :   04-1258 SLR

9    THE TRIZETTO GROUP,       :

10      Defendant.          :

11    -----------------------------x

12

13

14    VIDEOTAPED DEPOSITION OF GEORGE A. GOLDBERG

15

16

17            Washington, D.C.

18            Tuesday, September 13, 2005

19

20

21

22

23

24    REPORTED BY:

25      CARMEN SMITH

1

9/13/2005 Goldberg, George

1    Q    At any point in time, did you have any

2    documents concerning the CodeReview product?

3    A    Yes.

4    Q    When is the last time you think you had

5    those documents?

6    A    About a year after the previous -- the one

7    previous time I was subpoenaed and did whatever I

8    did.

9    Q    So whenever -- if we can at some point

10   figure out when that was.  Mid-1990s I think you

11   indicated?

12   A    That was my rough estimate.  Of course,

13   you know precisely when it was, but I don't.

14   Q    Okay.  And at that point, you had

15   additional documents concerning the CodeReview

16   product that you don't currently have today?

17   A    Right.

18   Q    Okay.  Did you have -- did you also have

19   additional documents concerning HPR at the time in

20   the mid-1990s that you don't have today?

21   A    Oh, I'm sorry, I was not distinguishing

22   them.  The answer is probably, yes, I had all the

23   documents concerned with HPR, Caterpillar,

24   CodeReview, patent -- '164 patent.  I don't know

25   precisely what I had, but I had a bunch that dealt

1      I HEREBY CERTIFY that I have read this

2   transcript of my deposition and that this transcript

3   accurately states the testimony given by me, with

4   the changes or corrections, if any, as noted.

5

6

7            x _____ George A. Goldberg _____

8                   10/18/2005

9

10

11   Subscribed and sworn to before me this      day of

12            , 20      .

13

14

15

16             X

17             Notary Public

18

19

20

21   My commission expires:

22

23

24

25

254

GEORGE A. GOLDBERG

BARKLEY<br/>Court Reporters

```
 1          I HEREBY CERTIFY that I have read this transcript

 2     of my deposition and that this transcript accurately states

 3     the testimony given by me, with the changes or corrections,

 4     if any, as noted.

 5

 6

 7

 8     x    George A. Goldberg
                10/18/2005
 9

10

11     Subscribed and sworn to before me this          day of

12               20  .

13

14

15

16     _____

17

18     Notary Public

19

20     My commission expires:

21

22

23

24

25
```

GEORGE A. GOLDBERG, M.D. - VOLUME II

BARKLEY
Court Reporters

PP

 

**HPR**

Suite 600
2443 Warrenville Road          708-955-3434
Lisle, IL 60532               FAX 708-955-3435

H E A L T H
PAYMENT
REVIEW INC.

### HEALTH PAYMENT REVIEW'S CODEREVIEW® PRODUCT AWARDED U.S. PATENT

BOSTON, MA–January 14, 1994–Health Payment Review, Inc. (HPR), the Boston-based developer of health care cost containment and provider profiling software systems, announced that it has been awarded U.S. Patent no. 5,253,264 for the system and methodology embodied in its CodeReview® product.

"Being awarded this patent clearly demonstrates HPR's leadership position in the health care cost containment industry," says Marcia Radosevich, Ph.D., CEO of Health Payment Review. "We expect this patent to further propel our rapid growth in the health care information systems marketplace."

Industry sources say that overpayment due to medical billing code manipulation and errors accounts for approximately 1% of all health care spending, or an estimated $9-10 billion in 1994. Health Payment Review's CodeReview® product, a medically-based software system, is designed to combat overpayment of physician claims by recognizing and correcting coding errors.

The CodeReview® software system combines medical expertise with advanced computer technology to provide a "medical peer review" software system that can detect and correct errors in billing such as up-coding and unbundling. "Up-coding" is selecting a medical code for a more extensive surgical procedure or service than actually occurred. "Unbundling" is when the provider charges for individual procedures or services rather than using the global code encompassing the entire service.

The expert clinical knowledge base of the CodeReview® product is developed, maintained and enhanced by physicians, surgeons and sub-specialists. The CodeReview® product can be seamlessly integrated into the user's automated claims processing system and is available on a wide range of hardware platforms, from PCs to minicomputers and mainframe environments. Data gathered from customers who use the CodeReview® software show savings of approximately 5%-8% of total physician-billed charges.

**MCK 034492**
**04-CV-1258-SLR (D.Del.)**

**Confidential Information**
**Subject to D. Del. LR 26.2**

Founded in 1987, Health Payment Review, Inc. provides clinically-based health care cost containment and provider profiling solutions. HPR is a private company comprised of nationally prominent physicians, health care executives and computer professionals. HPR's customers include many of the nation's largest insurance carriers, managed care providers, third-party administrators, Blue Cross/Blue Shield plans and self-insured/self-administered companies.

Contact:       Deirde O'Connell              Kristin Potts
               Michelle Goodall              Manager of Marketing Communications
               Schwartz Communications       Health Payment Review
               (617) 431-0070                (617) 266-2520

**MCK 034493**
04-CV-1258-SLR (D.Del.)

Confidential Information
Subject to D. Del. LR 26.2

QQ

01/31/1994  14:54    6172662178        HPR BOSTON                PAGE  82

From: A A

GMIS Suit -3-:
Alleges Firm Interfered With Business >GMIS

MALVERN, Pa. -DJ- GMIS Inc. (GMIS) said it filed a complaint in the U.S.
District Court for Pennsylvania against Health Payment Review Inc. to
declare Health Payment's software patent invalid and unenforceable.

As reported Jan. 21, Boston-based Health Payment Review was granted a
patent for software which examines physician reimbursement claims to spot
billing mistakes and invalid claims. GMIS sells a competing program called
ClaimCheck.

GMIS' suit alleges that the patent is unenforceable because Health Payment
Review ''misrepresented the state of the prior art to the patent examiner''
to obtain allowance of claims which were previously refused by the patent
examiner.

The company also claims Health Payment Review interfered with its business
relationships.

(END) DOW JONES NEWS 01-31-94

2:20 PM
-0- 2 20 PM EST 01-31-94

| Post-it® Fax Note | 7871 | Date 1/31/94 | # |
|---|---|---|---|
| To MJB | | From Ben Parks | |
| Co./Dept. | | Co. Adams, Anthony & Hill | |
| Phone # 266-2520 | | Phone # 2-92-9345 | |
| Fax # 266-3170 | | Fax # | |

EXHIBIT
H-87

MCK 042479

Confidential Information Subject to D. Del. LR 26.2

RR

**4**

## In The Courts

# GMIS And Health Payment Square Off In Court Over Software Patent Validity

Two of the biggest names in claims analysis software—GMIS Inc. in Malvern, Pa., and Boston-based Health Payment Review Inc.—are squaring off in court over of a software patent Health Payment Review received last October.

On Jan. 31, GMIS filed suit in United States District Court in Philadelphia alleging that Health Payment Review's patent for a new version of claims analysis software that helps insurance companies detect provider billing errors and fraudulent health claims was invalid. The case has been assigned to a judge, but hearings have yet to be scheduled. Health Payment Review received federal government approval for its software patent Oct. 12, but delayed announcing it in Wall Street analysts and the automated medical payments processing market until last month.

Health Payment's Code Review, like GMIS' Claim Check, is claims auditing software that allows payers to identify and correct provider billing errors.

If, for instance, a provider submits an unbundled claim—billing separately for each part of a surgical procedure or seeking payment for patient visits already covered in a procedure package—a payer can use the software to detect the padded charges and pay only the amount covering the entire procedure.

To date, almost all claims analysis software companies have their products protected by copyright laws, but none are protected by a patent. Health Payment Review's patent is the first.

Claims analysis software companies traditionally haven't applied for patents because the U.S. Patent Office only began issuing software patents a few years

ago and because they didn't believe they were a necessary precaution. "Getting a patent means you are inventing something new and until now writing claims analysis software wasn't new," says Jeanne Scott, director of legislative and legal affairs for CIS Technologies Inc. "What made claims analysis software companies different from one another was how they developed their data base, their computer algorithms and how they computer coded the medical procedures in the data base. These kinds of things are protected by copyright law and not a patent." The Health Payment Review patent, as well as the outcome of the GMIS law suit, could have a monumental impact on the claims analysis software market for several reasons. If a judge does rule in favor of Health Payment Review, market analysts contend that other software development companies may wind up having to pay Health Payment Review royalty fees.

"I don't think the court will uphold the patent's validity, but there are those who believe its impact will be significant," says Sally Fisher, a vice president and research analyst with Dillon Read, a New York investment banking firm that tracks the claims analysis software market.

GMIS' lawsuit contends that Health Payment Review's patent is invalid because Health Payment Review misrepresented available software to the U.S. Patent Office after the agency asked Health Payment Review to better document the history of claims analysis software de-

velopment. "Health Payment Review misrepresented the state of the prior art to the patent examiner in order to obtain allowance of such claims," says GMIS President Tom Owens.

GMIS is also suing Health Payment Review for an unspecified amount of money, claiming that when news of the patent reached Wall Street, stock analysts' adverse reaction to the patent caused GMIS stock to plunge. On Jan. 21, more than 1.8 million shares of GMIS stock changed hands. Normal average daily volume is about 123,000 shares. Before the news on Jan. 20, GMIS' stock was trading for as high as $16.75 a share. By the close of business on Jan. 21, GMIS' stock had plunged to $11.50 a share. For its part, Health Payment Review says the GMIS suit is without merit. "I don't believe we have misrepresented any art," Marcia Radosevich, president of Health Payment Review, told *Faulkner & Gray's Medical Utilization Management* newsletter. "To the best of our ability, we have properly characterized anything that might be considered prior art." ○

## Health Card Update

# SPS Buys Into The Health Card Market By Inking A Deal With United Surgical Funding

Hoping to capitalize on the growth of out-of-pocket medical expenses, SPS Payment Systems of Riverwoods, Ill. has formed a joint venture with United Surgical Funding & Systems Inc. of Kansas City, Kan. USF&S markets extended credit to patients who incur large out-of-pocket expenses. The MedCash program allows patients to apply for credit at a provider's office and receive immediate adjudication. "We set up a payment plan that meets the patient's and doctor's needs," says Roger Sigler, president of USF&S.

The loans carry an interest rate ranging from 17.5% to 19.8%. USF&S also installs card swipe machines in provider offices to allow patients to use credit cards to pay their bills.

In addition to switching some transactions, SPS Payment Systems will integrate funding options into billing management systems and make further upgrades as the MedCash program is enhanced. The joint venture will operate as MedCash Health Systems. ○



GMIS' Annual
Net Income
(Millions of Dollars)

Source: GMIS

Confidential Information Subject to D. Del. LR 26.2 - CONFIDENTIAL

MCK 153260

04-CV-1258-SLR (D.Del.)

SS



Boston Business Journal

# Business Journal

February 5-9, 1995

# HPR's healthy settlement
## Dispute concluded over CodeReview

by John S. McCright
JOURNAL STAFF

Boston-based Health Payment Review Inc. and Malvern, Pa.-based GMIS Inc. both said they were pleased with the settlement of a patent dispute last week, but HPR seems to be the only one smiling.

The two makers of health care cost containment software were set to go to court Jan. 23 over a patent awarded in 1993 for HPR's CodeReview product. But, the long-simmering dispute was resolved hours before the court appearance.

Neither side would discuss terms of the agreement, but GMIS immediately issued a release saying the deal would result in a one-time charge to its earnings in the fourth quarter of 1994 and would "significantly" affect its 1994 profits. It also said the agreement would not affect future profits.

Do you smell a big payout to HPR?

Eight-year-old HPR is scheduled to have two new products ready for release in the spring. One will identify doctors who are out of the norm on cost or amount of treatment rendered and another will produce reports on quality of care based on an industry standard called the Health Plan Employer Data Information Set. Company revenue will approach $20 million for the year ending June 30.

Resolving the patent dispute removed one more hurdle in the way of a potential HPR initial public offering, said CFO Brian Cahill. Depending on the IPO market, the company could go public as early as the fall. But, the offering is more likely to happen within the next 24 months, Cahill said.

MCK 036458

04-CV-1258-SLR (D.Del.)

TT



**CONRAD
O'BRIEN
GELLMAN
& ROHN, PC**

Louis C. Bechtle
*Attorney at Law*
Direct Dial: 215.864.8060
lbechtle@cogr.com

December 19, 2005

Jack B. Blumenfeld, Esquire
Morris, Nichols, Arsht & Tunnell
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899-1347

Michael A. Barlow, Esquire
Skadden Arps, Slate, Meagher & Flom
One Rodney Square
P.O. Box 636
Wilmington, DE 19899

RE:     McKesson Information Solutions LLC v.
        The TriZetto Group, Inc.
        No. 04-1258 (SLR) (D.Del.)

Dear Counsel:

Enclosed herewith is Special Master Order No. 5 in the above-referenced

matter.

Sincerely,

Louis C. Bechtle

LCB/jrw
Enclosure

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

MCKESSON INFORMATION     :
SOLUTIONS, LLC,           :

   Plaintiff,       :

            :  NO.: 04-1256-SLR

   v.          :

THE TRIZETTO GROUP, INC.,  :

   Defendant.      :

SPECIAL MASTER ORDER NO. 5

Louis C. Bechtle, Special Discovery Master     December 19, 2005

   In correspondence provided to the Special Discovery Master (SDM) by

counsel ( Defendants' letters of October 18, 2005, November 10, 2005, and

plaintiff's letter of November 17, 2005, the views of counsel have focused on a

contention by defendant that plaintiff's counsel improperly instructed its witnesses

not to answer certain questions at depositions taken of Michael Cesarz – 9/9/05;

Janet Cutcliff – 9/16/05; Mark E. Owen – 9/8/05; and Carolyn Wukitch 8/26/05

and; Marsha Radosevich – 7/7/05. Counsel have differing views as to whether or

not Judge Robinson included the defendant's complaints in this regard as within

the scope of the assignment to the SDM. I have waited to consider those positions

in depth until I had an accurate view of the position of the parties that I thought

could best be ascertained from my efforts to complete the other assignments that

are not disputed as to my work as the SDM. As a result of that other work, I have

come to the view that I believe Judge Robinson does expect the SDM to consider

the questions regarding the questioning of plaintiff's witnesses at their depositions

and this SDM Order will address those concerns. I will be reviewing the excerpts

provided in defendant's letter of October 18, 2005 in this exercise.

     1.     I begin this Order by denying defendant's request that any privilege

that could apply to the excerpts to be considered here have been waived because of

the alleged failure of the plaintiff to conform to the Stipulated Protective Order

approved by the court.

     2.     Deposition of Michael Cesarz – Vice President – Project Manager –
              Tab 1 – Page 152 – Line 3 – 15.

     Privilege not allowed. To instruct a witness not to answer based on

the presence of grounds for privilege, counsel must advise as to the basis of that

assertion. Comments by and among plaintiff's non-attorney employees or those of

third parties or affiliates are not entitled to attorney client privilege protection

unless the comments would disclose a confidential communication of the attorney.

That is not the ground for refusing to answer offered here.

           Tab 2 – Page 212 – Line 15 to Page 213 – Line 9.

     If the reference mentioned on Line 20 was designed for or to a certain

goal that was all or part of a communication by counsel to the witness, the

2

privilege is allowed.  On the other hand if the witness (who is testifying from a

document that he prepared) is listing tasks to be performed by others, and they

represent the witness' judgment as to what is to be done, the answer to the question

is not privileged even though it follows and may be the result, in whole or in part,

of an attorney communication.  It is the communication that is protected, not the

conduct that follows or results from attorney client communication.  If a client is

advised by his attorney to go to the bank and make a certain deposit on or before a

certain date, any discussions that the client has with third parties or others, or the

fact that he followed that advice is not protected by the attorney client privilege.  It

is the communication with the lawyer to the client is protected, not what the

client's reaction to that advice is.

<u>Tab 3 – Page 218 – Line 13  to Page 219 – Line 4.</u>

Privilege asserted on Page 218, Line 13 to Line 18 is proper.  It

specifically protects the substance of a communication with counsel.  The privilege

asserted on Page 218 – Line 22 to Page 219 – Line 4 is not proper.  The witness's

decision or judgment following the rendering of attorney advice is not protected.

Again, clients often follow their attorney's advice and engage in conduct that

reflects.  Despite that, the conduct is not protected.  It is the advice that is

protected.

3

### Tab 4 – Page 223 – Line 17 to Page 224 – Line 16.

If the associated risks are those within the attorney's expertise <u>and</u> of the type the attorney was retained to assess and communicate to the client, that communication is privileged. However, if the risks are risks that non lawyer management type employees are trained and expected to assess – even if they reflect or are influenced by attorney communications, the assessments are not privileged. What is being expressed in the document here, by its terms, are the business opinions of plaintiff's employees and not a communication with counsel. The question should be answered.

### Tab 4 – Page 226 – Line 1 to 10.

Privilege is not allowed. The witness' judgment, though based on a communication of counsel is not privileged.

### Tab – 4 Page 226 – Line 12 to 22.

Plaintiff's counsel's assertion of the privilege that could disclose substantive communications is appropriate.

### Tab 5 – Page 237 – Line 11 to Page 238 – Line 23.

Privilege not allowed. While the expression of privilege by plaintiff's counsel at Page 237—Line 20 -- 23 and Page 238 – Line 19 to 22 is correct, it does not appear that the premise ("legal advice" or "communications") can be satisfied by the document that was authored by this witness and says that these judgments

4

are being made from a business perspective. The truth of this is buttressed by the note that the legal assessment has not yet been made. If attorney communications are restated in the business assessments, they should or could have been redacted as attorney client communications.

Tab 5 – Page 240 – Line 11 to Page 241 – Line 2.

Privilege is not allowed. This question seeks testimony concerning "events" with a competitor. In the first place, such events are not confidential if they are with a competitor or if they occurred in connection with any other third party, and secondly, the question has nothing to do with attorney client communications. The witness is not being asked what attorney client communications, but merely what the events were.

Tab 6 – Page 261 – Line 15 to 22.

Assertion of privilege is proper.

Tab 6 – Page 262 – Line 14 to Page 263 – Line 4.

A reading of this excerpt suggests that the plaintiff answered the question the best that he could.

Tab 6 – Page 264 – Line 21 to Page 265 – Line 15.

Assertion of privilege is proper.

5

Tab 6 – Page 266 – Line 3 to Page 267 – Line 7.

Privilege not allowed. The witness is being asked what he was doing that resulted in his making notes that he put in his memorandum. What non-attorneys do are not covered by the attorney client privilege. Any instructions or communications he may receive from his attorney are protected. What action he took as a result of those communications and written by him in his memorandum are not protected. If the witness can say truthfully – under oath – that the entries in his notes were told to him by his counsel, they may be protected, subject to confidentiality and wavier concerns.

Tab 7 – Page 290 – Line 11 to Line 25.

Reference to "main concern" is troublesome. Witnesses should be asked if the main concern is in its entirety a legal one that has been communicated confidentially to plaintiff (and employees with a need to know). If that is "yes", plaintiff should provide that communication to the SDM for *en camera* review. If it is "no" the question should be answered.

Tab 8 – Page 83 – Line 5 to Line 21 (Janet Cutcliff – Vice President Business Development).

No ruling needed.

Tab 9 – Page 92 – Line 11 to Page 94 – Line 4.

Assertion of privilege is proper.

6

Tab 10 – Page 51 – Line 13 to Page 52 – Line 6 (Mark Owen, Sr. V.P.)

Note enough information to rule.

Tab 11 – Page 124 – Line 1 to Line 19 (Marsha Radosevich).

Witness is unable to answer the question.

Tab 11 – Page 126 – Line 15 to – Line 25.

Privilege disallowed. Witness is merely being asked to name persons that she communicated with to assist in the review of patent applications. She can answer that without disclosing any communications from counsel.

Tab 12 – Page 166 – Line 13 to Page 168 – Line 1 and Page 169 – Line 10-21.

In the SDM's view, the witness answered the question properly.

Tab 13 – Page 175 – Line 19 to Page 177 – Line 7.

Privilege disallowed. Here, the witness is asked what the witness said about what was to be told to customers. Even if that was an attorney client communication, what was to be told to customers, presumably was not intended to be confidential between attorney and client.

Tab 14 – Page 93 – Line 10 to Line 23 (Carolyn Wukitch – Sr. V.P. and General Manager.

Instruction to witness appropriate under the circumstances.

7

<u>Tab 15 – Page 119 – Line 9 to Page 120 – Line 17.</u>

Plaintiff's position is correct here. A claim of inadvertent production on Page 119 justifies counsel's instruction to the witness.

<u>Tab 16 – Page 168 – Line 19 to Page 169 – Line 11.</u>

Counsel's instruction to witness is proper for the same reasons as set forth in the ruling in Tab 15.

<u>Tab 17 – Page 172 – Line 1 to Page 173 – Line 7.</u>

Privilege not allowed as to whether email was sent before or after witness received legal summary. Witness is being asked about something she did, not what or even whether, counsel instructed her to do that.

<u>Tab 18 – Page 182 – Line 9 to Page 183 – Line 2.</u>

Witness is being asked to give an answer from a business prospective whether a license price was a concern " . . . yes or no." A business decision influenced or "driven" by a lawyer is not privileged. What the attorney said is privileged. What the client's business assessment is resulting from that advice is not. Privilege is not allowed.

<u>Tab 19 – Page 191 – Line 22 to Page 192 – Line 25.</u>

Initially, the inquiry on Page 192 at Line 4 to 25 should be addressed. It is perfectly plain that the witness is being questions about her role and a document she wrote as a high-ranking official of the plaintiff corporation and not as an

8

individual.  Accordingly, decisions she makes in regard to these matters involving

this case are on behalf of McKesson, the plaintiff.  With that background she is

asked on Line 16 whether McKesson aggressively pursued the patent and used it as

leverage for the broader deal.  (Presumably meaning a business arrangement

McKesson and TriZetto were in negotiations about regarding their combined

business goals).  The witness is a senior vice president and general manager of the

plaintiff (see plaintiff's list of non-attorneys.)  It is fair to assume that in that post,

she either participated in or has knowledge about the basis of the lawsuit and, of

equal importance, the reasons for filing it.  In the normal course of things, it is the

client that authorizes the filing of a lawsuit and the attorneys who either

recommend it or recommend against it.  A party must have good grounds to sue

another party and the attorneys are crucial in arriving at that decision.  Their

communications in that regard are privileged.  That is not what is being asked here.

What is being asked here is whether there are, in addition to what the attorneys

may have communicated to the parties, parallel business reasons for aggressive

pursuit of the patent.  The question should and can be answered by the witness

9

without compromising the protection plaintiff is entitled to for attorney client

communication concerning legal advice in regard to the filing of this lawsuit.

SO ORDERED:

LOUIS C. BECHTLE
SPECIAL DISCOVERY MASTER

DATE:  December 19, 2005

10

UU



## CONRAD O'BRIEN GELLMAN & ROHN, PC

Louis C. Bechtle
*Attorney at Law*
Direct Dial: 215.864.8060
lbechtle@cogr.com

December 29, 2005

**VIA FACSIMILE**

David W. Hansen, Esquire
Skadden, Arps, Slate, Meagher & Flom LLP
525 University Avenue
Palo Alto, CA  94301

Jack B. Blumenfeld, Esquire
Morris, Nichols, Arsht & Tunnell
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899

RE:     McKesson Information Solutions LLC
        v. The TriZetto Group, Inc.
        C.A. No. 04-1258 (SLR) (D. Del.)

Dear Counsel:

I am promptly addressing defendant's letter of December 28, 2005 without waiting for a response from counsel for McKesson in order to save some time. I say that because I will be leaving the country on January 7, 2006 for ten (10) days and I want counsel to take certain steps so upon my return we can convene and resolve outstanding issues including those set forth in the letter of December 28, 2005, if not before.

With those thoughts in mind, the following steps should be taken:

1.  The documents that I required to be produced in Special Master Order No. 4 should be produced by plaintiff to defendant immediately upon receipt of this letter.

2.  Counsel for the plaintiff should examine the documents on plaintiff's privilege log in accordance with the standards set forth in all of the previous Orders I have entered in this matter, and specifically those in Special Master Order No. 4. The extent to which the documents should be produced, they should be produced immediately upon their examination by the plaintiff, if in accordance with those standards they cannot remain as privileged documents. To the extent, following such

**CONRAD O'BRIEN GELLMAN & ROHN, PC**

David W. Hansen, Esquire
Jack B. Blumenfeld, Esquire
December 29, 2005
Page 2

---

review, that plaintiff continues to believe that any documents are
privileged, it should make a separate list of them and we shall convene
a hearing in Wilmington at the Courthouse where the documents will
be presented to me and I will review and rule upon them one by one
following my return, if not before.

3.  The eleven (11) documents on page 3 and the twenty-five (25)
    documents on page 4 to 8 inclusive should be provided to me by the
    plaintiff immediately upon receipt of this letter and I will use my best
    efforts to rule on them in-camera before I leave the country.

I want to make it plain by this letter that I expect counsel to apply the standards
that I have included in my previous Orders in reviewing the documents on Exhibit "A"
and Exhibit "B" before sending them to me for in-camera review. Many of those earlier
ruled upon documents seemed fundamentally inappropriate for a claim of privilege under
the most basic standards that apply for claiming privilege. I do not expect to see the same
grounds that have been rejected heretofore to again be asserted for claiming privilege on
these and the documents covered by this letter or otherwise.

Sincerely,

Louis C. Bechtle

LCB/rig

cc:    Michael A. Barlow, Esquire (via facsimile)

DEC. 29. 2005  3:05PM    CONRAD O'BRIEN/2158649620                    NO. 5954    P. 1/3



## CONRAD O'BRIEN GELLMAN & ROHN, PC

## TELECOMMUNICATION TRANSMITTAL

**FILE NO.:**    999-090            **DATE:**        December 29, 2005

| TO: | FAX NO.: | TELEPHONE NO.: |
|---|---|---|
| David W. Hansen, Esquire | 888-329-1840 | 650-470-4560 |
| Jack B. Blumenfeld, Esquire | 302-658-3989 | 302-575-7291 |
| Michael A. Barlow, Esquire | 888-329-2812 | 302-651-3154 |

**FROM:**    Honorable Louis C. Bechtle

TOTAL NUMBER OF PAGES INCLUDING THIS COVER SHEET:    3

IF YOU DO NOT RECEIVE ALL PAGES, PLEASE CALL AS QUICKLY AS POSSIBLE FOR RE-TRANSMISSION.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**MESSAGE:**

☐  The original will be sent by regular mail.
☐  The original will be sent by overnight delivery.
☒  No original will be sent.

**CONFIDENTIALITY NOTE:**

    The information transmitted in this facsimile message is intended only for the personal and confidential use of the recipient(s) named above. This message may be an attorney-client communication and as such is privileged and confidential. If the reader of this message is not the intended recipient or the employee or agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this document in error and that any retention, review, use, dissemination, distribution or copying of this facsimile message and the information contained therein is strictly prohibited. If you have received this facsimile in error, please immediately notify us by telephone and return the original message to us at the above address by mail (we will reimburse postage). Thank you.

1515 Market Street • 16th Floor • Philadelphia, PA 19102-1916 • T: 215.864.9600 • F: 215.864.9620 • www.cogr.com

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on January 18, 2006 he electronically filed The Trizetto Group Inc.'s Appendix of Exhibits in Support of its Opposition to McKesson's Motion For Summary Judgment Regarding Trizetto's Eighth Affirmative Defense (Redacted Version) with the Clerk of the Court using CM/ECF, which will send notification of such filing(s) to the following:

> Thomas J. Allingham, II
> Skadden, Arps, Slate, Meagher & Flom LLP

The undersigned also hereby certifies that copies were caused to be served on January 18, 2006 upon the following in the manner indicated:

### BY E-MAIL AND HAND DELIVERY

> Thomas J. Allingham, II
> Skadden, Arps, Slate, Meagher & Flom LLP
> One Rodney Square
> P.O. Box 636
> Wilmington, DE  19899

### BY E-MAIL AND FEDERAL EXPRESS

> Jeffrey G. Randall
> Skadden, Arps, Slate, Meagher & Flom LLP
> 525 University Avenue
> Suite 1100
> Palo Alto, CA  94301

> /s/ Rodger D. Smith, II
> _____
> Morris, Nichols, Arsht & Tunnell, LLP
> 1201 N. Market Street
> P.O. Box 1347
> Wilmington, DE  19899
> (302) 658-9200
> rsmith@mnat.com

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on January 18, 2006 he electronically filed The Trizetto Group Inc.'s Appendix of Exhibits (Redacted Version) in Support of its Opposition To McKesson's Motion For Summary Judgment Regarding Trizetto's Eighth Affirmative Defense with the Clerk of the Court using CM/ECF, which will send notification of such filing(s) to the following:

> Thomas J. Allingham, II
> Skadden, Arps, Slate, Meagher & Flom LLP

The undersigned also hereby certifies that copies were caused to be served on January 18, 2006 upon the following in the manner indicated:

### BY E-MAIL AND HAND DELIVERY

Thomas J. Allingham, II
Skadden, Arps, Slate, Meagher & Flom LLP
One Rodney Square
P.O. Box 636
Wilmington, DE  19899

### BY E-MAIL AND FEDERAL EXPRESS

Jeffrey G. Randall
Skadden, Arps, Slate, Meagher & Flom LLP
525 University Avenue
Suite 1100
Palo Alto, CA  94301

*/s/ Rodger D. Smith, II*

Morris, Nichols, Arsht & Tunnell, LLP
1201 N. Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
rsmith@mnat.com