A

Redacted

B

9/16/2005  Bellomo, Anthony

1            UNITED STATES DISTRICT COURT

2           FOR THE DISTRICT OF DELAWARE

3

4    McKESSON INFORMATION SOLUTIONS LLC,

5              Plaintiff,

6        vs.          Civil Action No.

                      04-1258-SLR

7    THE TRIZETTO GROUP, INC.,

8              Defendant.

9

10

11

_____

12

13           Videotaped deposition of ANTHONY

14    BENJAMIN BELLOMO held at the offices of Skadden

15    Arps Slate Meagher & Flom, Four Times Square,

16    New York, New York, on Friday, September 16,

17    2005, commencing at 9:00 a.m., before David

18    Sanders, Legal Video Specialist, and James W.

19    Johnson, Registered Professional Reporter and

20    a Notary Public of the State of New York.

21

22

23    JOB No. 38485

24

25

9/16/2005  Bellomo, Anthony

1     object and instruct you not to answer on any

2     discussions that you may or may not have had

3     during the litigation with counsel about

4     resolving the litigation, but other than that

5     you can answer the question.

6         A.    The only discussion we had was during,

7     after the litigation began, and that was a

8     discussion that was held internally with counsel

9     and which I'm not going to share with you.

10        Q.    Prior to the lawsuit being filed you

11    were not aware of any consideration at TriZetto

12    regarding what TriZetto would be willing to pay

13    McKesson to resolve this patent dispute; is that

14    right?

15        A.    That's correct.

16        Q.    Erisco never considered what it would

17    pay McKesson or its predecessor to resolve any

18    patent issues, correct?

19        A.    Correct.

20        MR. RANDALL:  I'll mark for

21    identification as Exhibit 7 the McKesson '164

22    patent.

23        (Bellomo Exhibit 7, United States Patent

24    Number 5,253,164, marked for identification.)

25    seven

1     A.   Have you got a half-hour while I read

2     this?

3     Q.   Well, let me ask you, Mr. Bellomo, have

4     you ever read this patent?

5     A.   I've -- I don't know that I've read it

6     front to back, but I have read pieces of it.

7     Q.   And you've attended meetings wherein

8     you've discussed this patent, right?

9     A.   Say it again.  I'm sorry.

10    Q.   You have attended meetings wherein you

11    have discussed this patent, right?

12    A.   Correct.

13    Q.   And, in fact, in the fall of 2004 you

14    spent all day with your lawyer and other TriZetto

15    employees discussing the patent, correct, with

16    Ms. Lampe present and Mr. Luftig present?

17    A.   We spent -- I don't know when it was.

18    I'll take you at your word.  I'm sure you've

19    validated it before throwing that out.  We did have

20    an all-day meeting with counsel and some

21    individuals internally.  I remember Craig being

22    there.

23    Q.   And Ms. Lampe, correct?

24    A.   I don't remember her being there or not.

25    I remember Craig and I and our counsel.

85

1    Q.   And who was your attorney leading the

2    discussion?

3    A.   I don't remember.  I believe it was a

4    predecessor to our current attorneys, if I remember

5    right.

6    Q.   Mr. Palmer?

7    A.   Probably, but I couldn't say for sure.

8    Q.   But nonetheless in October or November

9    of last year you spent with your outside attorney a

10   full day going through the McKesson '164 patent,

11   correct?

12   A.   Yes.

13   Q.   Let me direct your attention to the

14   second-to-last page.

15   A.   Is that the page labeled 117?

16   Q.   Yeah, that's column 117.  These are the

17   claims of the patent, and they are each numbered in

18   separate paragraphs one through, if you look at the

19   next page, 16.

20      Do you see that?

21   A.   Mm hmm, yes.

22   Q.   Could you read claim one, and then I'm

23   going to ask you a couple of questions about it.

24   A.   Do you want me to read it aloud?

25   Q.   No, you can just read it to yourself.

9/16/2005  Bellomo, Anthony

1    Let me ask you a question so you have it in

2    context.  All right?

3            I'm going to ask you if TriZetto's

4    Facets and ClaimFacts systems perform the steps

5    described in claim one.

6            MR. THOMAS:  And I'm going to object,

7    calls for a legal conclusion, also requires

8    claim construction to be completed in this

9    matter, and without a construed claim

10   construction before the witness it's an

11   inappropriate question.

12           MR. RANDALL:  All right, and I'm willing

13   to give you a running objection to that on my

14   questions on these claims.  Is that all right,

15   Mr. Thomas?

16           MR. THOMAS:  That's fine.

17           THE WITNESS:  So what does this all mean

18   to me?

19           MR. THOMAS:  It means you can answer the

20   question as best you can, but we have an

21   understanding that there's a standing

22   objection to all questions about comparing

23   systems to these claims that, in my view, the

24   questions are inappropriate because it

25   requires an interpretation of the claims to be

87

1    done as a matter of law that is not being

2    provided to you.

3    Q.    Mr. Bellomo, your lawyer's objection is

4    preserved, and the judge will decide it later, but

5    you still have to answer the question.

6    A.    Understood, and can you be kind enough

7    to tell me when we're out of this section and we're

8    no longer under the objections.

9    Q.    Sure.

10    A.    In a broad sense, is the best I

11    understand it, we do elements of this.

12    Q.    Well, I'm asking you if TriZetto's

13    ClaimFacts and Facets perform each of the steps

14    identified in claim one.

15    A.    I couldn't tell you.  It's not my area

16    of expertise.  In a broad and a high-level sense,

17    we compare the codes that are on a claim that's

18    being submitted against codes in a database and do

19    various checks on them for validity and for

20    relationships to each other.  If that's what that

21    says, that's what we do.  I don't quite understand

22    it.

23    Q.    Well, prior to the submission of a

24    medical service code to either ClaimFacts or Facets

25    is there a predetermined set of relationships

1    specified in, among the medical service codes in

2    the database?

3        MR. THOMAS:  Objection, vague and

4        ambiguous as to "predetermined."  You can

5        answer it.

6    A.    Just, I'm sorry, repeat it.  I don't

7    want to be difficult, but I want to answer your

8    question.

9        MR. RANDALL:  Would you read it, please.

10        (Record read.)

11    A.    Predetermined set of relationships?

12    There are multiple predetermined sets of

13    relationships between codes that exist in the

14    clinical database that you're referring to, as well

15    as elsewhere within the product.

16    Q.    And they are --

17    A.    And they exist with or without the

18    submission of a claim.  The data exists, and it's

19    under the user control that they can change it,

20    modify it or view it, so data exist in files,

21    tables, relating to clinical data as well as the

22    validity of claims, the validity of codes in

23    general.

24        They rely in what we're referring to as

25    "PACE," right?  And they also exist in other places

1    of the system to do validations against, to see

2    whether or not those codes are reasonable, if

3    they're supported by the plan, you know, a lot of

4    code processing, and the data to process that code

5    exists within the database whether or not you have

6    a claim being submitted against it.

7           So is that what -- is that answering

8    your question?  Is that what you're asking?

9       Q.    Partly.  I want to take you through the

10   process of a claim being processed through either

11   Facets or ClaimFacts, all right?

12      A.    Which is different.

13      Q.    Okay.  Start with Facets.

14      A.    Okay.

15      Q.    Facets is capable of receiving a claim,

16   correct?

17      A.    Correct.

18      Q.    And Facets is capable of determining

19   whether a medical service code contained in the

20   claim is not present in the predetermined set of

21   medical service codes in the database, correct?

22      A.    So for a medical service code on the

23   claim we can figure out if it's not on the

24   database?

25      Q.    Yes.

9/16/2005  Bellomo, Anthony

1      A.    Yeah, that would be an invalid claim, an

2    invalid ID, yes.

3      Q.    All right.  And Facets is capable of

4    informing the user that a medical service code is

5    not contained in the database, correct?

6      A.    Correct.

7      Q.    So, with that in mind, could you read

8    claim one again and let me know if it's your

9    understanding that Facets is capable of performing

10   the steps identified in claim one.

11     A.    When you narrow down the steps the way

12   you indicated in your question, I answered

13   correctly in that we do those, are capable of

14   informing the user whether or not a service is on a

15   database.  We do that.

16         There's a lot of other things that are

17   written here in terms of sequencing and steps that

18   are taken which I don't feel comfortable, you know,

19   commenting on.  I don't know whether or not we're

20   doing all of these things or not.

21     Q.    All right, take a look at claim one and

22   let me know, is there anything, any step contained

23   within claim one that you believe Facets does not

24   perform?

25         MR. THOMAS:  And you're referring to the

9/16/2005 Bellomo, Anthony

1    part following "steps of?"

2        MR. RANDALL: I'm referring to all of

3    claim one.

4        MR. THOMAS: Well, that's different than

5    your prior question.

6    A.   Well, first of all, the database is not

7    predetermined, because it's affected by our

8    customers, so the database that's contained in

9    Facets for both the clinical editing as well as the

10    other parts of the application is modifiable, able

11    to be modified, added to, augmented, deleted by

12    each and every customer of ours.

13        So that's one difference, in that it's

14    not a predetermined database. We supply a starting

15    point, and customers do what they want.

16    Q.   And we'll, we'll circle back to that in

17    a minute.

18    A.   Okay, so should I continue?

19    Q.   Yes, please.

20    A.   The issue of determining when service

21    codes are valid when input with other service

22    codes, do you see that about middle down of the

23    first paragraph?

24        We generally don't determine if things

25    are valid. We'll determine invalid if it's not

1    present on tables that have nothing to do with

2    clinical editing, so there are other tables in the

3    system that determine the validity or invalidity of

4    the codes that are selected that are apart from the

5    clinical editing function that we're determining.

6         What is making it a little bit confusing

7    is that the clinical editing function is one small

8    slice of the pie that's contained in Facets.  The

9    other many, many slices of the pie which exist with

10   or without clinical editing, which exist even one

11   in Michigan's case, where they plugged in McKesson,

12   the rest of that still performed lots of functions.

13        Some of what's indicated here are

14   performed in core foundation Facets in ClaimFacts,

15   apart from what's getting done in the clinical

16   editing piece.

17        Q.   All right, and I'm --

18        A.   In aggregate between the two of them,

19   they test for valid codes, but their test for valid

20   is done in ClaimFacts and in Facets, not in

21   clinical editing in general.

22        Q.   And I, just so you understand -- and I

23   appreciate your clarification -- my question is

24   dealing with the Facets system as a whole.  I'm not

25   asking you to segment in your answer the

9/16/2005  Bellomo, Anthony

1     functionality that is performed by various

2     components of Facets.  I'm simply saying, in

3     aggregate, does Facets perform the steps recited in

4     claim one?

5         A.    And -- are you asking about the Facets

6     with the McKesson interface?

7         Q.    No.

8         A.    Or without the McKesson interface?

9         Q.    Not with -- I'm asking about Facets with

10    its shipped and embedded and integrated clinical

11    editing functionality that is turned on.

12        A.    Okay.

13        Q.    So, with that clarification in mind,

14    does Facets perform the steps described in claim

15    one, each of them?

16            MR. THOMAS:  Vague, objection, vague and

17        ambiguous as to whether you mean the language

18        following the steps or the entire claim.

19            MR. RANDALL:  Counsel, you can just stop

20        your objection at the legal objection.  If the

21        objection is "vague and ambiguous," that's

22        fine, you can make it.  I would appreciate it

23        if you don't go beyond that.  I can figure out

24        in the question whether or not I need to

25        rephrase it.

9/16/2005  Bellomo, Anthony

1    MR. THOMAS:  Well, I'm saying it's vague

2    and ambiguous as to what you mean by "the

3    steps of."

4    MR. RANDALL:  Well, counsel, you need to

5    stop attempting to coach the witness, all

6    right?

7    MR. THOMAS:  I'm not coaching the

8    witness.

9    MR. RANDALL:  Well, then just state the

10   legal objection.

11   MR. THOMAS:  You're asking two different

12   questions and mixing them up.

13   MR. RANDALL:  Just state the legal

14   objection.

15   MR. THOMAS:  I am.

16   A.   We make recommendations, assuming that

17   the claims, assuming that the service codes are

18   valid, we do determine if the service codes are

19   valid, so we do that.

20   In the case also where there's multiple

21   service codes that are valid, we will not, we will

22   make a recommendation on how they should be paid,

23   if you will.  We're not saying that it's invalid.

24   If it's a valid code it's a valid code.  We don't

25   then turn around and say it's invalid because it's

1      used in combination with this one.

2              So we do not do that.  What we do do is

3      say these are valid codes and normally you would

4      not pay them this way, whether they were submitted

5      together on the same claim or in a reasonable time

6      period or other such criteria, so no, we don't do

7      that, as I understand it.

8          Q.    Let me take you through step by step

9      claim one.

10             Is your system designed to operate, is

11     the Facets product designed to operate on a

12     computer system?

13         A.    Yes.

14         Q.    And does it operate with a predetermined

15     database?

16             And when I say "predetermined" I mean a

17     database that contains medical service codes and a

18     relationship among those medical service codes that

19     is preset, whether it's by TriZetto or by the

20     customer, prior to the time a claim is submitted to

21     it.  All right?

22         A.    Yes, with the caveat that the customer

23     is in control.

24         Q.    All right.  And do the, does the Facets

25     system include the ability to define whether

1   certain medical service codes are valid when input

2   with other medical service codes within a claim?

3       A.   I don't believe so.

4       Q.   Why not?

5       A.   Because I don't believe a medical code

6   is valid in and of it -- in and of its own, so if

7   you look at the CPT book it contains an extensive

8   list of all the valid procedures that you could

9   perform on somebody.

10          Those are valid procedures no matter how

11  they're input.  They're valid procedures.  Even if

12  you input inappropriate ones next to each other,

13  they're still valid.  What we comment on is the

14  fact that procedure A and procedure B, it's

15  inappropriate to submit both of those on the claim

16  at the same time.  They're still both valid

17  procedures.

18      Q.   Does Facets perform on occasion the step

19  of disallowing a particular medical service code

20  for payment when that medical service code is

21  contained in a claim with another medical service

22  code?

23      A.   Yes.

24      Q.   And while I'm asking you these questions

25  about claim one I'd ask that you apply the meaning

9/16/2005  Bellomo, Anthony

1    to "valid" or "invalid" as either allowed for

2    payment or disallowed for payment.

3          Do you understand that?

4      A.    I would disagree with that.  I'm, I'm

5    not going to do that, because if you're asking

6    me -- because your final question is likely to be,

7    well, do you do this, after you've misdirected the

8    meaning of the words.  Then I'm going to have to

9    answer no to that, because we do not do, we do not

10   determine that codes are valid or invalid based

11   upon their combination.

12          We may recommend a disallowance of a

13   charge, but we do not say that a code is invalid

14   because it's in combination with another one, and

15   even if in this setting you're saying to ignore

16   that distinction, I'm not comfortable doing that,

17   because you're asking me to compare what the system

18   does to this document, not to your words.

19          If you want to rip this up and go by

20   words, we can do that too.

21     Q.    Are you reading claim one as requiring a

22   medical service code to be invalid because it is

23   input with another medical service code?

24     A.    I believe that's what this sentence

25   says.

9/16/2005  Bellomo, Anthony

1      Q.    Where?

2      A.    About the fourth or fifth line down I

3    believe what it says is that a set of relationships

4    among medical service codes defining whether

5    selected ones of the medical service codes are

6    valid when input with other ones of the medical

7    service codes.

8          So what I interpret this to be is that

9    we are determining that a code is invalid because

10   of the appearance of another service code, and that

11   is what I'm disagreeing with.

12     Q.    And you'd agree that Facets does that

13   with respect to determining whether one medical

14   service code is, should be disallowed for payment

15   when included in a claim with another medical

16   service code, correct?

17     A.    Correct.

18     Q.    And Facets also operates to determine

19   when a medical service code is valid when input

20   with other medical service codes, correct?

21     A.    No, we determine the validity of the

22   medical service code on its own.  It's not in

23   conjunction with other medical service codes.  A

24   valid code is a valid code regardless of how it was

25   submitted with other service codes.

9/16/2005  Bellomo, Anthony

1     Q.    And you're -- the, the meaning that you

2     are attributing to "valid" is whether or not it is

3     a, it is a code listed as valid by the CPT manual;

4     is that right?

5     A.    A valid code in the context of a

6     one-piece solution, of a computer software

7     solution, which you asked me whether Facets is a

8     computer software solution, in this context "valid"

9     means that it is a code that is on the database

10    capable of being entered.  That's a valid code.

11          It has validity to be entered into this

12    field, and it passes the basic edit of being a

13    valid code.  The distinction is that when two valid

14    codes are input together sometimes one of them is

15    appropriately disallowed for payment or recommended

16    a different payment vehicle, but they are both

17    valid codes regardless of the fact that they might

18    have been entered together or apart.

19    Q.    All right, let's back up for a minute.

20          Facets operates within a computer

21    system, correct?

22    A.    Correct.

23    Q.    And Facets operates within a computer

24    system that includes a central processing unit and

25    associated memory, correct?

9/16/2005  Bellomo, Anthony

1      A.   Yes.

2      Q.   Facets operates with a database

3    containing medical service codes and a set of

4    relationships among the medical service codes,

5    correct?

6      A.   Are you in a different place in the

7    document?

8      Q.   I'm just asking you.

9      A.   Say it again.  Please ask me.

10         MR. RANDALL:  Can you read that question

11    back.

12         (Record read.)

13     A.   Correct.

14     Q.   The medical service codes and the

15    relationship among the medical service codes in the

16    database is predetermined at the time a claim is

17    entered into the system, correct?

18     A.   No.

19     Q.   The medical service codes and the set of

20    relationships among medical service codes are

21    unknown at the time a claim was entered?

22    Unpredictable?

23     A.   No, that's not true either.

24     Q.   Well, can you explain why you say that

25    they are not set or predetermined at the time a

1    claim is entered.

2        A.    I was answering your question.  It was

3    ambiguous, and it's, the answer was no to the way

4    you asked the question.

5        Q.    Why?  What, what was ambiguous about it?

6        A.    The, the codes exist within the database

7    as modi-- as modified by the customer.  Those codes

8    now exist.  The relationships between those codes

9    exist as can be modified by our customers.

10          The sources of those codes are from many

11    different places.  Some of them come from the AMA.

12    Some of them come from ICD.  Some of them come from

13    customer input.  There's a whole variety of places

14    that make up the medical codes.  Some of them we

15    supply in the, you know, what's known as the PACE

16    or the D&T criteria.

17          So you have a database that's come from

18    many different places -- it's modified by

19    customers -- that has in it valid codes and

20    relationships.

21          Those codes and relationships are used

22    for a variety of purposes, including producing

23    bills, constructing claims payments, making

24    recommendations on what should and should not be

25    paid, and a whole host of other things.  The

1    database exists.  The claim comes in.  It has on it

2    various codes.

3            Those codes are then validated against

4    the database that existed, and then it is

5    processed.  That's the procedures that we follow in

6    general.

7    MO      MR. RANDALL:  Well, I move to strike

8        that as nonresponsive.

9        Q.   I'm talking about the database that

10   exists at the time a customer inputs a claim for

11   processing, and at that time the medical service

12   codes on that particular database and the

13   relationships among those medical service codes is

14   preset, correct?

15       A.   The ones that exist in the database are

16   preset, and the ones that are on the incoming claim

17   are whatever happens to be on the incoming claim.

18   They're measured against the preset database.

19       Q.   The Facets system operates to receive

20   claims that contain one or more medical service

21   codes, correct?

22       A.   Yes.

23       Q.   Facets operates to determine whether a

24   medical service code contained in a claim is not

25   present in the preset database, correct?

9/16/2005  Bellomo, Anthony

1        A.    You're asking if it operates to see if

2   the code is not in the database?

3        Q.    Yes.

4        A.    Yes.

5        Q.    And Facets operates to inform the user

6   that a medical service code contained in a

7   particular claim is not in the preset database,

8   correct?

9        A.    Correct.

10       Q.    Facets operates to determine whether a

11  particular medical service code within a claim

12  should be allowed for payment when that medical

13  service code is input with other medical service

14  codes, correct?

15       A.    Correct.

16       Q.    Does the Facets system operate to check

17  nonmedical criteria for determining whether to

18  allow for payment of a particular medical code?

19       MR. THOMAS:  Are we still in the area

20       where I have my standing objection?

21       MR. RANDALL:  Yes.

22       A.    Can you give me an example of nonmedical

23  criteria.  I don't know what that means.

24       Q.    Sure.  For instance, a customer may want

25  to disallow a cosmetic procedures even though the

9/16/2005  Bellomo, Anthony

1    actual medical procedure was actually performed and

2    was legitimate; it's just that the benefits

3    associated with that customer are such that

4    cosmetic procedures are not allowed as claims.

5        A.    I don't see how that's nonmedical

6    criteria.  Can you explain that further.

7        Q.    If a decision is made to simply not pay

8    for certain claims, it's an administrative decision

9    not to pay for certain claims, does Facets have

10   built within its system nonmedical criteria for

11   disallowing for payment of claims, such as won't

12   pay for a cosmetic procedures or will only pay

13   fixed amounts for certain medical procedures?

14       A.    I contend that that's medical

15   procedures.  That's, that is not nonmedical

16   criteria.  This, the criteria is that it's a

17   cosmetic surgery?  Well, that's a medical

18   criterion.  You can determine if you don't want to

19   pay from a benefits point of view for certain kinds

20   of medical services that are provided.

21           So that, that's a determination that the

22   customer makes, how they want to enforce the rules

23   of what they want to pay for and what they don't

24   want to pay for, but those rules are applied on the

25   medical, on the medical codes that are submitted

9/16/2005  Bellomo, Anthony

1    within a claim and contained within a database that

2    we spoke about previously.

3        Q.    Does Facets operate to disallow payment

4    on certain medical codes based on a preset

5    limitation of what the benefits or what the

6    customer will pay on a given claim?

7        A.    Yes.

8        Q.    Does Facets operate to disallow some

9    medical service codes based on place of service

10    criteria?

11        A.    I believe so, but I'm not positive.

12        Q.    Does Facets operate to determine whether

13    one medical service code within a claim containing

14    several medical service codes is valid for payment

15    or invalid for payment by interacting with the

16    database and a set of relationships contained in

17    the database?

18        A.    We're back to the discussion about

19    valid.  Medical codes are valid in and of

20    themselves, and payment is a separate issue, so we

21    do not invalidate codes based upon the appearance

22    of that code in combination with other ones.  No,

23    we don't do that.

24        Q.    Does Facets operate to determine whether

25    one medical service code within a claim containing

9/16/2005  Bellomo, Anthony

1   several medical service codes should be allowed or

2   disallowed for payment by interacting with the

3   database and the set of relationships between

4   medical codes contained in the database?

5       A.   Yes.

6       Q.   Does Facets have the capability of

7   authorizing medical service codes which are

8   determined to be allowed for payment and the

9   capability of rejecting for payment those medical

10  service codes which are determined to be disallowed

11  for payment?

12          THE WITNESS:  Can you repeat that.

13          (Record read.)

14      A.   "Authorizing" may not be exactly the

15  right word.  We allow payment on medical service

16  codes that are coded to be paid, and we disallow

17  payment on medical service codes that are coded in

18  the database not to be paid.  "Authorizing" has a

19  different connotation in the healthcare arena.

20      Q.   Does Facets have the capability of

21  revising a claim to delete a medical service code

22  that is invalid?

23      A.   If it was invalid it would not have been

24  allowed to be put in there in the first place.

25      Q.   Well, for instance, if a claim were

1    submitted into the Facets system and it contained

2    an invalid service code, does Facets determine that

3    the medical service code is invalid and then delete

4    that code from the claim?

5      A.   No.

6      Q.   Does Facets contain the capability of

7    determining that a medical service code is invalid

8    and then eliminating that particular code for

9    further consideration within the claim?

10     A.   No.

11     Q.   What does the Facets system do when it

12   detects an invalid medical service code within a

13   claim?

14     A.   It flags it as an error and it requires

15   it to be corrected by a, usually by a processor, so

16   that we continue.

17     Q.   Well, in some instances it automatically

18   inserts a new medical service code in its place,

19   correct?

20     A.   We do not correct invalid service codes,

21   so if you enter an invalid code, as you indicated,

22   then the process stops until it's corrected.

23     Q.   You're sure about that?

24     A.   Yes.  If you input an invalid code, you

25   inputted an invalid code, you need to correct it.

9/16/2005  Bellomo, Anthony

1    Q.   Well, but doesn't the system itself in

2    some instances replace that invalid code with a

3    valid code and move on with the process

4    automatically?

5    A.   Under the definition of an invalid code,

6    meaning a code that is invalid by, by its, you

7    know, by a standard IT definition, no.

8    Q.   What about a duplicate code, for

9    instance, if the, if the -- does the Facets system

10   operate to delete a duplicate medical service code

11   within a particular claim?

12   A.   No.

13   Q.   What does it do when it detects a

14   duplicate medical service code within a claim?

15   A.   It flags it as a duplicate, and it

16   doesn't pay it.  It doesn't delete it.  It doesn't

17   correct it.  It doesn't -- it flags it as this is a

18   duplicate service as of a prior one, and then it

19   will not pay for it.

20   Q.   Is it your testimony that Facets never

21   under any circumstance replaces one medical service

22   code with another?

23   A.   No, it's not my testimony.

24   Q.   It does in fact do that, doesn't it?

25       MR. THOMAS:  Objection, argumentative.

1          MR. RANDALL:  It's a question.

2      Q.    Does Facets operate --

3      A.    To replace?

4      Q.    -- to replace one medical service code

5  with another within a claim, based on checking the

6  set of relationships among medical service codes

7  within a database?

8      A.    Yes.

9      Q.    And what does it do with that medical

10  service code that has been replaced?

11      A.    It keeps a history of it so that we know

12  what was replaced and why, and it continues the

13  process with the code that it was replaced by.

14      Q.    The system does not continue to process

15  the replaced medical service code, correct?

16      A.    Correct.

17      Q.    And the system in that event revises the

18  claim to include the, the new medical service code,

19  correct?

20      A.    Correct.

21      Q.    Does the Facets system operate with a

22  database containing medical service codes that

23  include CPT codes?

24      A.    Yes.

25          MR. RANDALL:  I just got my notice that

9/16/2005  Bellomo, Anthony

1     we need to change the tape, so why don't we

2     change the tape, and I'd like to continue for

3     a few more minutes.

4          MR. THOMAS:  Well, it's 12:40, or

5     something like that.  I'd like the witness to

6     be able to eat.

7          MR. RANDALL:  Well, why don't we do

8     this.  Why don't we change the tape and then

9     continue with the examination -- I'm right in

10    the middle of an examination; you know that,

11    counsel -- and then we'll take a lunch break.

12         MR. THOMAS:  Ten minutes.

13         THE VIDEOGRAPHER:  The time is now

14    12:41.  This ends tape three.  We're going off

15    the record.

16         (The videographer changed tapes.)

17         THE VIDEOGRAPHER:  The time is

18    approximately 12:42.  This begins tape four of

19    the video deposition of Tony Bellomo.  We are

20    on the record.

21    Q.    Mr. Bellomo, does Facets operate with a

22    database that contains relationships among medical

23    service codes that are based on medical

24    relationships?

25    A.    Define "medical relationships."

9/16/2005  Bellomo, Anthony

1     Q.    Do you have any understanding at all

2   about the relationships of medical service codes

3   contained in the database that Facets operates

4   with?

5     A.    Yes, I do.

6     Q.    And what is your understanding about

7   those relationships?

8     A.    That we are interpreting the CPT book

9   that is published, and in there it has

10   recommendations for what procedures go with each

11   other and what is generally authorized for payment.

12     Q.    And the medical relationships that

13   determine what procedures go with each other,

14   that's based on medical reasons, correct?

15     A.    My presumption is it is, but it's, the

16   medical reasoning is not within Facets.  The codes

17   are in Facets, and it's dictated by the suppliers

18   of that data.

19          They've probably based -- in fact, they

20   should base their, their construction of that

21   database on the way medicine is practiced and

22   should be practiced, but they're not contained, we

23   don't have medical relationships within the

24   database in a broad sense of the word.  We may be

25   in a semantic question at this point.

9/16/2005  Bellomo, Anthony

1      Q.    Does the database that operates with

2    Facets contain a set of relationships among medical

3    service codes that are based on medical factors?

4      A.    Yes.

5      Q.    Does Facets have the capability for

6    determining whether one medical service code within

7    a claim should be disallowed because it should have

8    been included within another medical service code

9    also listed within the claim?

10     A.    Yes.

11     Q.    Does Facets contain the capability for

12   authorizing for payment medical service codes that

13   are determined not to be included within another

14   medical service code?

15         MR. THOMAS:  Can I have that read back,

16      please.

17         (Record read.)

18         MR. THOMAS:  Objection, vague and

19      ambiguous.

20     Q.    It's in effect the converse of what --

21     A.    I mean, you're just allowing things to

22   happen.  Do we allow service codes to be paid?

23   Yes.

24     Q.    Well, there's a check performed, is

25   there not?  There's a check performed to see if a

1    medical service code within a claim should be

2    included within another medical service schedule,

3    correct?

4        A.    Correct.

5        Q.    And if it's not, if it's determined that

6    it need not be included within the other medical

7    service code within the claim, then it may be

8    allowed for payment, correct?

9        A.    Maybe.  It --

10       Q.    That's right.

11       A.    -- got past that gate and will continue.

12       Q.    All right.

13       A.    Correct.

14       Q.    And Facets contains the capability for

15   disallowing for payment those medical claims that

16   are determined to be included within another

17   medical service code within the claim, correct?

18       A.    Yes.

19       Q.    Does Facets contain the capability of

20   determining whether one medical service code within

21   a claim is mutually exclusive with another medical

22   service code contained in the claim?

23       A.    I don't know.

24       Q.    You simply don't know if that clinical

25   edit exists in Facets?

1     A.   Correct.

2          MR. RANDALL:  All right, we can take our

3     lunch break.

4          THE VIDEOGRAPHER:  The time is

5     approximately 12:49.  This ends tape four of

6     the deposition of Tony Bellomo.  We are going

7     off the record.

8          (Luncheon recess taken:  12:49 p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

9/16/2005  Bellomo, Anthony

1      A F T E R N O O N   S E S S I O N

2           (Time noted:  1:48 p.m.)

3           THE VIDEOGRAPHER:  The time is

4      approximately 1:48 p.m.  This begins tape five

5      of the video deposition of Tony Bellomo.  We

6      are on the record.

7      A N T H O N Y   B E N J A M I N   B E L L O M O,

8           resumed as a witness, having been previously

9           sworn by a Notary Public, was examined and

10          testified under oath as follows:

11     EXAMINATION BY MR. RANDALL:

12          Q.    Mr. Bellomo, does Facets have the

13     capability of determining whether at least one

14     medical service code within a claim is medically

15     exclusive with any other medical service code in

16     that claim?

17          MR. THOMAS:  Objection, vague,

18          ambiguous.

19          A.    I, I'm not sure I understand what the

20     term "medically exclusive" means.  Can you define

21     that.

22          Q.    Well, for instance, if the claim and

23     medical service codes indicated that an ovary was

24     removed from a man.

25          A.    So meaning that it would be

9/16/2005  Bellomo, Anthony

1  inappropriate for that age/gender?

2     Q.   No, it would be, the medical service

3  codes contained in a claim would be mutually

4  exclusive for medical reasons, such as you can't

5  remove an ovary from a man.

6        MR. THOMAS:  Objection, vague,

7     ambiguous.

8     A.   We have some logic in the database that

9  relates procedure codes against gender and age.

10  There is that logic in the database, so if that's

11  the question you're asking, the answer to it is

12  yes, we, we relate procedure codes in some cases to

13  age and gender.

14     Q.   And to -- well, do you believe that a

15  medical service code within a claim that identifies

16  removal, for instance, of an ovary from a man, from

17  a man would be medically exclusive?

18        MR. THOMAS:  Same objection.

19     A.   I don't know what "medically exclusive"

20  means.  It's not a term that I'm familiar with.

21     Q.   Does Facets operate to identify mutually

22  exclusive procedures based on medical service codes

23  that are defined based on medical practice

24  standards?

25        MR. THOMAS:  The same objections.

1      A.   I don't understand what you mean.

2      Q.   Well, when I'm talking about medically

3   exclusive -- all right? -- I'm talking about two or

4   more medical service codes that by medical practice

5   standards would not be billed on the same patient

6   on the same day of service.

7      A.   Yes, we do that.

8      Q.   And so Facets operates to determine

9   whether a medical service code by medical practice

10  standards would not be billed on the same patient

11  on the same date of service for medical reasons,

12  correct?

13      MR. THOMAS:  Same objection.

14      A.   See, what I'm finding hard to follow is

15  that you ask a question which I don't quite get the

16  terms on.  Then you give an example which I could

17  agree with, and then you move the two aboard a

18  statement which is back to the original terms which

19  I didn't understand, so I can't say yes to that.

20          I could say yes to your specific

21  question, but you're asking broad questions with

22  vague terms in it that I'm not comfortable saying

23  yes to.

24      Q.   Does Facets' clinical editing system

25  also check for invalid codes?

118

9/16/2005  Bellomo, Anthony

1    A.    Facets checks for invalid codes.

2    Q.    And it disallows for payment invalid

3    codes, correct?

4    A.    No.

5        MR. RANDALL:  I'll mark for

6    identification as Exhibit 8 a one-page

7    document entitled "Provider Perspective."

8        (Bellomo Exhibit 8, Provider

9    Perspective, marked for identification.)

10    Q.    This document is entitled "Provider

11    Perspective," and it bears a date of spring 2004,

12    volume 8, number 1 and the title "M*Plan replacing

13    clinical editing system," and it goes on to state,

14    "M*plan is replacing its previous clinical editing

15    system, ClaimCheck, with the PACE clinical editing

16    system."

17        Do you see that, Mr. Bellomo?

18    A.    Yes.

19    Q.    Is M*plan a customer of Erisco -- I

20    mean, I'm sorry -- of TriZetto?

21    A.    Yes.

22    Q.    And is this an example of a McKesson

23    customer switching clinical editing systems from

24    McKesson to TriZetto?

25    A.    It appears to be.

119

Page 209

```
 1
 2
 3
 4
 5
 6
 7
 8
 9      I, ANTHONY BENJAMIN BELLOMO, do hereby declare under
10   penalty of perjury that I have read the foregoing
11   transcript; that I have made any corrections as appear
12   noted, in ink, initialed by me, or attached hereto; that
13   my testimony as contained herein, as corrected, is true
14   and correct.
15      EXECUTED this  14  day of  November  ,
16   20 05  , at  Union ,   NJ  .  _____
                       (City)         (State)
17
18
19
20          _____
          ANTHONY BENJAMIN BELLOMO
21
22
23
24
25
```

Page 210

```
 1              C E R T I F I C A T E
 2
 3   STATE OF NEW YORK  )
 4                      )  Ss
 5   COUNTY OF NEW YORK )
 6
 7         I, JAMES W. JOHNSON, a Registered
 8   Professional Reporter and Notary Public within
 9   and for the State of New York, do hereby
10   certify:
11         That ANTHONY BENJAMIN BELLOMO, the
12   witness whose deposition is hereinbefore set
13   forth, was duly sworn by me and that such
14   deposition is a true record of the testimony
15   given by such witness.
16         I further certify that I am not related
17   to any of the parties to this action by blood
18   or marriage and that I am in no way interested
19   in the outcome of this matter.
20         IN WITNESS WHEREOF I have hereunto set
21   my hand this 25th day of September 2005.
22
23
             _____
24              JAMES W. JOHNSON
             Registration #01J05000925
             Commission Expires 9/4/2006
25
```

Page 211

```
 1
 2   --------------------I N D E X--------------------
 3   WITNESS         EXAMINATION BY        PAGE
 4   Anthony Bellomo    Mr. Randall         5
 5
 6
 7   --------------------MOTIONS--------------------
 8   PAGES  50, 81, 103
 9
10
11   --------------EXHIBITS--------------
12   BELLOMO                          PAGE
13     1    E-Mail, TRZ 637190-191        42
14     2    E-Mail, TRZ 207303            47
15     3    E-Mail, TRZ 358484            52
16     4    E-Mail, TRZ 687691-7692       57
17     5    Letter, Aug 20, 1998, MCK034337-338   59
18
19
20
21
22
23
24
25
```

Page 212

```
 1
 2
 3   --------------------EXHIBITS--------------------
 4   BELLOMO                          PAGE
 5     6    E-Mail, TRZ 295420-5421       62
 6     7    US Patent Number 5,253,164    84
 7     8    Provider Perspective         119
 8     9    Letter, Jan 24, 1989, MCK117578    151
 9    10    Letter, Jun 29, 1989, TRZ 837458   165
10    11    Letter, Jun 13, 1989, TRZ 837024-25  169
11    12    Letter, Jul 3, 1989, TRZ 837026-047  170
12    13    TriZetto Group Web Page Printout   182
13    14    Notice of 30(b)(6) Deposition   183
14    15    Notice of 30(b)(6) Deposition   194
15    16    Letter, Aug 30, 2005         188
16
17
18
19
20
21
22
23
24
25
```

53 (Pages 209 to 212)

**SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES**
**877.955.3855**

C

Redacted

D

1       UNITED STATES DISTRICT COURT

2       FOR THE DISTRICT OF DELAWARE

3

4    McKESSON INFORMATION SOLUTIONS LLC,

5              Plaintiff,

6         -against-        Civil Action No.

                   04-1258-SLR

7    THE TRIZETTO GROUP, INC.,

8              Defendant.

9

10

11

                 _____

12

13

14       VIDEOTAPED DEPOSITION OF KAREN LAMPE

15            New York, New York

16         Wednesday, September 14, 2005

17

18

19

20

21    Reported by:

      CATHI IRISH

22    RPR/CLVS

23    JOB NO. 38481

24

25

9/14/2005  Lampe, Karen

1     Q.   Okay, Union.

2          What was the purpose of the meeting?

3     A.   To explain to us about the lawsuit and

4     to go over the patent and to gather information.

5     Q.   Had you read the patent by the time the

6     meeting started?

7     A.   No.

8     Q.   Did you receive a copy of the patent at

9     the meeting?

10    A.   Yes.

11    Q.   Did you read it after that?

12    A.   No.

13    Q.   Have you read it since?

14    A.   No.

15    Q.   Did you understand from the meeting or

16    anything you learned after the meeting that anyone

17    else at the meeting had read the patent at that

18    time from TriZetto?

19    A.   During the meeting, we went through the

20    patent, but I don't know of anyone that continued

21    to read it or study it or anything afterwards.  Is

22    that what you were asking?

23    Q.   Sure.  Were there any documents handed

24    out at the meeting?

25    A.   The patent.  I can't remember anything

9/14/2005  Lampe, Karen

1    that I won't be able to examine any witness on

2    anything pre-1998, given that your designee

3    can't testify about that.

4         MR. MUINO:  Well, sure you will.  You

5    can examine Mr. Luftig on that subject.  I've

6    said that several times.  I'm not going to

7    object to you asking any questions about

8    ClaimFacts.  They were cross-designated on

9    each of these topics.

10        MR. RANDALL:  When is Mr. Luftig

11   available, by the way, for his 30(b)(6)?

12        MR. MUINO:  I have no idea.  We're

13   working on it, though.

14        MR. RANDALL:  I've marked for

15   identification as Exhibit 2 the McKesson

16   patent.

17        (Lampe Exhibit 2, United States patent

18   5,253,164, marked for identification, as of

19   this date.)

20   BY MR. RANDALL:

21   Q.    Ms. Lampe, I'm going to ask you a few

22   questions about how ClaimFacts operates.

23        Does ClaimFacts operate with a

24   database?

25   A.    I don't know.  No, I don't --

57

9/14/2005  Lampe, Karen

1     programming lingo, I'm not sure.  It's written in

2     Cobalt.

3          Q.    Doesn't ClaimFacts utilize a database

4     that has a predetermined set of relationships

5     between medical service codes?

6          A.    Oh, ClinicaLogic, yes, there are

7     records set up that are -- where our criteria

8     lives.  So I don't know that it would be

9     classified as a database because it's not

10    separate; it's incorporated into the system.  But

11    yes, there are separate records for the

12    ClinicaLogic function.

13         Q.    So we get this, I want to get my

14    terminology correct.  ClaimFacts is a system that

15    has integrated into it ClinicaLogic, and this

16    database has a predetermined set of relationships

17    between medical service codes; is that right?

18         A.    Yes, I would say that's correct.

19         Q.    And ClaimFacts operates to utilize

20    these predetermined set of relationships between

21    medical service codes to determine if one or more

22    medical codes in a claim is valid or invalid,

23    correct?

24         A.    Yes.

25         Q.    And the predetermined set of

58

9/14/2005  Lampe, Karen

1    relationships between medical service codes in

2    ClaimFacts is based in part on medical reasons or

3    medical considerations, correct?

4        A.    Correct.

5        Q.    Does ClaimFacts also operate to

6    invalidate one or more medical service codes based

7    on non-medical reasons?

8            MR. MUINO:  Objection, vague and

9        ambiguous as to --

10   BY MR. RANDALL:

11       Q.    Do you know what I mean by non-medical

12   reasons?

13       A.    No.

14       Q.    So for instance, if the medical

15   procedure were a cosmetic procedure, if the

16   medical procedure exceeded a preset cost for that

17   medical procedure, things like that.

18       A.    Okay.  The preset cost is handled

19   outside of ClinicaLogic.  ClinicaLogic doesn't

20   have -- have -- doesn't include usual customary

21   fees.  Cosmetic, experimental, or investigative

22   age parameters, gender parameters, inpatient

23   versus outpatient designations for the site of the

24   services, those types of things, yes, it does have

25   those.

1      Q.   So, for instance, ClaimFacts does

2    operate to invalidate some medical service codes

3    based on non-medical reasons as I explained it,

4    correct?

5      A.   Yes.

6      Q.   The vast majority, however, are based

7    on medical reasons, correct?

8      A.   I would have to say that's correct.

9      Q.   I'm going to ask you to look at the

10   McKesson patent.  I've marked it as Exhibit 2.

11   Can you look at the second to last page?

12            I'm sorry.  I'll just give you a copy.

13     A.   Thank you.

14     Q.   The second to last page contains a list

15   of numbered paragraphs or claims.  These are each

16   claim numbers.  Do you see that?

17     A.   Uh-huh, yes.

18     Q.   And on this page and on the next page

19   it shows claims 1 through 16.  Do you see that?

20     A.   1 through 16?

21     Q.   Paragraphs 1 through 16 or claims 1

22   through 16 on the two pages -- the last two pages

23   of the patent.

24     A.   Oh, oh, yes.

25     Q.   So I want to direct your attention to

60

1    claim 1 and that's at the top of column 117.  Do

2    you see that?

3        A.   Yes.

4        Q.   Can you read just that claim which is

5    just paragraph 1 there?  And I want to ask you if

6    ClaimFacts performs the steps described in claim

7    1.

8        A.   Okay.

9            MR. MUINO:  While she's reading,

10           Counsel, can I put a standing objection on the

11           record to this line of questions?

12           MR. RANDALL:  What's your standing

13           objection?

14           MR. MUINO:  The objection is first, it

15           calls for a legal conclusion, it calls for

16           speculation, it calls for expert opinion.

17           Those are the objections.  If I could get a

18           standing objection to this line of questions.

19           MR. RANDALL:  Yes, you can.

20           THE WITNESS:  Okay.

21   BY MR. RANDALL:

22       Q.   The question, Ms. Lampe, is:  Does

23   ClaimFacts perform the steps described in claim 1

24   of the McKesson patent?

25       A.   It performs -- it performs -- yes, it

9/14/2005  Lampe, Karen

1   performs them.  I don't know if it performs them

2   in the same order.

3        Q.   That's fine.

4        A.   But -- but we -- I guess this is how we

5   describe it.  It's not the way I would describe

6   it.

7        Q.   I understand.  But nonetheless, this

8   does -- strike that.

9             ClaimFacts does operate to perform the

10  steps in claim 1, correct?

11       A.   Yes.

12       Q.   Can you look at claim 2?  I'm going ask

13  you the same question.

14       A.   Okay.

15       Q.   Does ClaimFacts perform the steps

16  described in claim 2 of the McKesson patent?

17       A.   I think we need to break it down

18  because there's some that I'm not sure.

19       Q.   What's the first uncertainty that you

20  have?

21       A.   Let's see.  Ascertaining whether at

22  least one claim contained the plurality of medical

23  service codes.

24       Q.   More than one.

25       A.   Just more than one?

62

1    Q.    Yes.  So that element.

2    A.    Yes, yes.

3    Q.    With that clarification, does

4    TriZetto's ClaimFacts perform the steps described

5    in claim 2 of the McKesson patent?

6    A.    The next one?

7    Q.    Yes.

8    A.    Determining whether one of the medical

9    service codes and at least one claim is mutually

10   exclusive due to non-medical criteria and with any

11   other medical service code in least one claim?

12   That's not the terminology I would use in the

13   ClinicaLogic world, so I'm not sure what they're

14   meaning by mutually exclusive.

15   Q.    Well, for instance, is a medical

16   service code for a particular procedure on a

17   particular day that was performed both within the

18   hospital and outside the hospital, that would be

19   mutually exclusive based on the non-medical

20   reason, correct?

21          I'm asking you:  Is there any instance

22   at all within ClaimFacts where ClaimFacts will

23   determine that one medical service code is invalid

24   because it's mutually exclusive for some reason

25   with another medical service code, for some reason

1    other than medical reasons?

2        A.    I'm not sure.  I'm not sure I can

3    answer that.  One code against another code for

4    non-medical reasons.  The edits that I can recall,

5    and I work with them a lot, when you're talking

6    about a code to code relationship, a procedure

7    code to procedure code relationship, I think it's

8    all based on medical or CPT guidelines, NCCI

9    edits.

10        I can't think of one that does it based

11    on gender or age or any of the other non-medical

12    ones.  I mean, an age or a gender edit would go

13    against a specific code, but I don't know that one

14    code would edit against the other one because of

15    that.

16        The system does not -- well, I don't

17    know that you would even input a claim that had

18    procedure on one day inpatient and procedure on

19    the same date outpatient.  That would be an input

20    error.  And it would be that line that would come

21    up as an edit, not the codes against each other.

22        Q.    What types of checks does ClaimFacts

23    conduct on medical service codes that are

24    non-medical in nature?

25        A.    Okay, it checks for if the code has

9/14/2005  Lampe, Karen

1    been deleted by the AMA.  It checks for

2    inpatient versus -- place of setting.  It checks

3    for investigative or experimental procedures,

4    outdated procedures, age, gender parameters, for

5    anesthesia time parameters.

6           If anesthesia is valid for that

7    surgical code, general anesthesia is usually

8    required for that surgical code or not.  It will

9    cross walk to an anesthesia code.

10   Q.    Let me ask you a question about deleted

11   codes, for instance.  If a claim, for instance,

12   included a medical service code that was deleted

13   and also included a medical service code for the

14   same service, however, that was a different code,

15   it was updated, would the Facets system detect for

16   non-medical reasons?

17   A.    ClaimFacts system.

18   Q.    ClaimFacts system detect for

19   non-medical reasons that these two medical service

20   codes were mutually inclusive, namely that

21   couldn't perform a deleted service code at the

22   same time performing a legitimate service code for

23   the same procedure?

24   A.    The system will take that deleted code

25   and reformat it or put the correct new valid code

9/14/2005  Lampe, Karen

1    in it and it will edit on that new valid code.

2        Q.    And then it would determine that they

3    are mutually exclusive because there's two exact

4    duplicates of the same code, correct?

5        A.    Yes.

6        Q.    So with this clarification in mind,

7    namely that there are -- strike that.

8            ClaimFacts does edit medical service

9    codes for non-medical reasons, correct?

10       A.    Correct.

11       Q.    And could you look at claim 2,

12    specifically the step of ascertaining whether

13    the -- at least one claim contains --

14    determining -- looking at claim 2, the step is

15    determining whether one of the medical service

16    codes and at least one claim is mutually exclusive

17    due to non-medical criteria with any other medical

18    service code in the at least one claim.

19            Does ClaimFacts on occasion perform

20    that step?

21       A.    Based on the example we talked about,

22    yes.

23       Q.    Were there any other issues with

24    respect to claim 2 that you had, any other

25    uncertainties, other than the two you mentioned?

9/14/2005  Lampe, Karen

1    A.   Yeah, we can go to the next one.

2    Q.   Okay.

3    A.   "Authorizing medical service codes

4    which are not mutually exclusive due to

5    non-medical criteria with any other medical codes

6    contained in the at least one claim in response to

7    the determining step."

8    Q.   So what that means is if -- does

9    ClaimFacts actually authorize on occasion medical

10   service codes that are not mutually exclusive due

11   to non-medical criteria?  It's really the converse

12   of the --

13   A.   It's converse of the other one, so it

14   allows codes.

15   Q.   That's right.

16   A.   It tells you that the code is eligible,

17   yes, it does.

18   Q.   Any other uncertainties with respect to

19   claim 2?

20   A.   We'd better go to the last one just to

21   be sure.

22        "Rejecting medical service codes which

23   are mutually exclusive due to non-medical criteria

24   with any other medical service codes contained in

25   the at least one claim in response to the

1    determining step."

2        Q.    Well, the determining step was simply

3    determining if that relationship existed for

4    non-medical reasons?

5        A.    Okay.

6        Q.    The rejecting step means if that's the

7    case, then the --

8        A.    Claim is disallowed.

9        Q.    -- the mutually exclusive code for

10   non-medical reasons is rejected.

11       A.    I'm sorry, say that again.

12       Q.    Yes.

13           This last step means that the mutually

14   exclusive medical code that is determined at the

15   determining step is actually rejected.

16       A.    Yes.

17       Q.    So with those clarifications that we've

18   discussed, does ClaimFacts perform the steps of

19   claim 2 of the McKesson patent?

20       A.    Yes.

21       Q.    Could you look at claim 3.  And I'm

22   going to ask you the same question which is:

23   Does -- slightly different.

24           Does ClaimFacts include the components

25   described in claim 3 of the McKesson patent?

1    A.    Okay.  Computer system including

2    essential processing unit?

3    Q.    Yes.

4    A.    I'm not sure how that would be defined

5    in -- I guess it would be.  I guess there's a main

6    computer -- no.  I'm not sure about the technology

7    on that and how it -- and how it would relate to

8    what we do.  The steps in the number 3 as to what

9    it does, yes, we do do that.

10    Q.    So the only thing you're unclear about

11    with respect to the components of claim 3 and

12    ClaimFacts is whether ClaimFacts includes a

13    central processing unit; is that right?

14    A.    That's correct.

15    Q.    And assuming that ClaimFacts, including

16    its servers, do have a central processing unit,

17    then would you agree that ClaimFacts includes all

18    of the components listed in claim 3 of the

19    McKesson patent?

20    A.    Yes.

21    Q.    I'm going to ask you specifically a

22    couple of questions about 3, for instance.  How

23    are claims received by ClaimFacts?

24    A.    They can be received through electronic

25    data interchange, so you know, wireless -- or

1    paperless claims processing, and they can be input

2    by a claims exam -- claims examiner manually.

3        Q.    And if it's done manually, the claims

4    examiner would input data from a claim into a form

5    on the computer; is that right?

6        A.    Correct.

7        Q.    And I have a question about these means

8    for ascertaining, means for determining, means for

9    authorizing and means for rejecting in claim 3.

10   Do you see that?

11       A.    Uh-huh.

12       Q.    Are those components in ClaimFacts

13   software; is that what does that?

14       A.    Yes.

15       Q.    Can you read claim 4?  And claim 4 is

16   the same system as claim 3, except it has that

17   additional limitation.  So could you read that and

18   tell me if TriZetto's ClaimFacts includes the

19   components of claim 3 and claim 4?

20       A.    "Delete invalid medical service codes."

21       Q.    Yes.

22       A.    Does that mean a code is no longer

23   active?

24       Q.    That's right.

25       A.    Yes, then that's correct.

70

9/14/2005  Lampe, Karen

1    Q.    It also takes an invalid medical

2    service code and it discontinues any future

3    processing of that code, correct?  It eliminates

4    it from any further consideration?

5    A.    Yes, well, I don't know actually.  I

6    don't know where that step would fall into the --

7    actually no, it doesn't.  If it's a deleted code

8    with a replacement by the AMA, the system will

9    automatically replace it with the new code and

10   continue processing.

11   Q.    And if it's a code for any other reason

12   that's determined to be invalid, then --

13   A.    There's one thing I'd like to clarify.

14   Q.    Sure.

15   A.    In the ClinicaLogic system we have an

16   edit called invalid.  That is a user defined edit.

17   That gives the customers an opportunity to

18   determine that that code, for whatever reason,

19   isn't covered under their plan.  So invalid means

20   something a little bit different to me, so I'm

21   just clarifying that.

22   Q.    Okay.  And a user could determine that

23   any given -- any number of medical service codes

24   are invalid for either medical or non-medical

25   reasons, correct?

71

1      A.    Correct.

2      Q.    Using the definition for delete an

3    invalid medical service code as you've indicated,

4    either it deletes it and it replaces it, or it

5    simply sets it aside and does not engage in any

6    further processing of that code?

7      A.    No, that's not correct.  If the code is

8    deleted without a replacement, an issue message is

9    displayed for the examiner that says this code is

10   deleted.  Have a code -- return it to the

11   program -- to the physician or refer it to a

12   supervisor, that code will still be in play in the

13   claim because it's not a hard edit in the system.

14   Only the format edit where it automatically

15   changes is a hard edit.

16         So if there's also a delete for a code

17   deleted by the AMA where there could be more than

18   one possible replacement codes, more than one

19   possible new codes to use in place of that, the

20   system will notify the examiner that there are

21   one, two, three, four codes, that this is deleted,

22   there are four possible replacements, pick one.

23   And the system will continue processing based on

24   whatever they choose.

25     Q.    ClaimFacts operates to delete medical

1    service codes that it determines to be invalid

2    for, among other reasons, the fact that the

3    medical service code is no longer valid and has

4    been replaced with another one, correct?

5         A.   Correct.

6         Q.   So -- and I don't have to go -- I'm not

7    going to go through all the different instances in

8    which this is done.  That's just simply one,

9    correct?

10        A.   Okay.

11        Q.   With that in mind, would you agree that

12   the TriZetto ClaimFacts system contains all of the

13   elements described in both claim 3 and claim 4?

14        A.   Yes.

15        Q.   Could you read claim 5?  And claim 5 is

16   a claim that includes the apparatus or the system

17   of claim 4.  It just has one further limitation.

18        A.   Yeah, there's a display that tells the

19   examiner what happened with the claim and why.

20        Q.   So would you agree that TriZetto's

21   ClaimFacts includes the components described in

22   claims 3, 4 and 5?

23        A.   Yes.

24        Q.   Could you read claim 6?  Claim 6

25   includes all of the components of claim 3 and the

1    added limitation in claim 6.

2        A.   Yes.

3        Q.   So is it your understanding that

4    TriZetto's ClaimFacts product includes all the

5    components of claim 3 and claim 6?

6        A.   Yes.

7        Q.   Do you know what the CRV codes are in

8    claim 7?

9        A.   I believe they are customary and

10   reasonable value codes, or pricing codes.  Is that

11   correct?  Relative value system.  It's California

12   relative value system which is no longer used,

13   actually.

14       Q.   Does ClaimFacts use that?

15       A.   No.  Well, ClinicaLogic doesn't use it.

16   ClaimFacts has its pricing separate from

17   ClinicaLogic.

18       Q.   So does ClaimFacts include all of the

19   components of claim 3 and claim 7?

20       A.   No.

21       Q.   Because it doesn't utilize CRV codes?

22       A.   Correct.

23       Q.   Could you read claim 8?  Claim 8

24   includes all the components of claim 3 and the

25   added limitation from claim 8.

9/14/2005  Lampe, Karen

1    A.   Yes.

2    Q.   So is it your understanding that

3    ClaimFacts includes all of the components of

4    claims 3 and 8?

5    A.   Yes.

6    Q.   Claim 9 also includes all the

7    components of claim 3.  Could you read that and

8    tell me if ClaimFacts includes all of the

9    components of claims 3 and 9?

10    A.   Yes.

11    Q.   ClaimFacts does include all the

12    components of claims 3 and 9?

13    A.   Yes.

14    Q.   Could you read claim 10?  Claim 10 is

15    an independent claim, meaning it's just -- if you

16    could just read all of claim 10.  And I'm going to

17    ask you if ClaimFacts includes the components

18    listed in claim 10.

19    A.   Okay.

20    Q.   Does ClaimFacts contain all of the

21    components described in claim 10?

22    A.   Yes.

23    Q.   Can you read claim 11?  Claim 11

24    includes all the components from claim 10 plus the

25    added limitation in claim 11.

1    A.    I'm not sure.  I need an explanation on

2    that.  Seems simple enough, but...

3    Q.    For instance, when we just discussed

4    this example, when ClaimFacts determines that a

5    medical service code is no longer valid or has

6    been deleted, and it has been substituted with a

7    new medical service code, ClaimFacts will reject

8    the deleted or invalid code and actually replace

9    it with the updated code, correct?

10    A.    Correct.

11    Q.    All right.  So with that clarification

12    in mind and that example in mind, does ClaimFacts

13    include all the components of claims 11 and 10?

14    A.    Yes.

15    Q.    Would you read claim 12, and I'll ask

16    you if ClaimFacts contains the components

17    described in claim 12.

18    A.    Okay.

19    Q.    Does ClaimFacts contain all the

20    components described in claim 12?

21    A.    Yes.

22    Q.    Can you read claim 13 and I'll ask you

23    the same question:  Does ClaimFacts contain all

24    the components described in claim 13?

25    A.    Okay.

9/14/2005  Lampe, Karen

1      Q.   Does ClaimFacts contain all of the

2    components described in claim 13?

3      A.   Yes.

4      Q.   Can you read claim 14 and I'll ask you

5    the same question:  Does ClaimFacts contain all of

6    the components described in claim 14?

7      A.   This is very similar to another one, to

8    one of the other ones where it's talking about

9    mutually exclusive based on non-medical reasons.

10   Okay.

11     Q.   So does -- does, based on your

12   understanding, ClaimFacts include all of the

13   components described in claim 14?

14     A.   Yes.

15     Q.   Could you read claim 15 and I'll ask:

16   Does ClaimFacts include all of the components of

17   claim --

18        MR. RANDALL:  I'm sorry.  We have to

19     stop to change the tape and then we'll come

20     back on the record, all right?

21        THE VIDEOGRAPHER:  The time is now 2:20

22     p.m. and this ends tape number 2 of the

23     videotaped deposition of Karen Lampe.

24        (Discussion off the record.)

25        THE VIDEOGRAPHER:  The time is now 2:22

9/14/2005  Lampe, Karen

1    p.m. and this begins tape number 3 of the

2    videotaped deposition of Karen Lampe.

3    BY MR. RANDALL:

4    Q.    Ms. Lampe, can you read claim 15 and

5    I'll ask you whether ClaimFacts includes all of

6    the components of claim 15.

7    MR. MUINO:  Counsel, just to clarify, I

8    still have a standing objection.

9    MR. RANDALL:  The objection you stated,

10    yes.

11    THE WITNESS:  Okay.

12    BY MR. RANDALL:

13    Q.    Does ClaimFacts contain the components

14    described in claim 15?

15    A.    Yes.

16    Q.    I'll ask you the same question, or a

17    similar question with respect to claim 16.  Does

18    ClaimFacts perform the steps described in claim

19    16?

20    A.    I don't see the difference between 15

21    and 16.

22    Q.    Well, one difference is that one is an

23    apparatus claim or system and the other one is a

24    method of steps that are performed, so I

25    understand why you can see a great similarity in

1   those two.  But one is the physical apparatus and

2   one is a method of steps being performed.  And

3   that's why in asking the question I asked, do you

4   understand ClaimFacts to perform the steps

5   described in claim 16?

6       A.   Oh, you asked the question differently.

7       Q.   Yes.

8       A.   Now I have to reread it.

9       Q.   Okay.

10      A.   Okay.

11      Q.   Does ClaimFacts include -- does

12  ClaimFacts perform the steps described in claim

13  16?

14      A.   Yes.

15      Q.   You've just gone through all 16 claims

16  and you've noticed, I'm sure, that many, if not

17  all of them -- strike that.

18          We've just gone through all 16 claims

19  in the McKesson patent.  And many of the claims

20  have language that says, for instance, "means for

21  ascertaining", "means for determining", "means for

22  authorizing" and "means for rejecting".

23          Do you recall that?

24      A.   Yes.

25      Q.   And those elements, means for

9/14/2005  Lampe, Karen

1    ascertaining, determining, authorizing and

2    rejecting are related to the predetermined

3    relationships of the medical service codes in the

4    database, correct?

5        A.   Yes.

6        Q.   And did you -- do you understand

7    ClaimFacts to utilize software as the means for

8    ascertaining and determining these relationships?

9        A.   Yes.

10       Q.   And do you understand ClaimFacts as

11   utilizing software for -- as the means for

12   authorizing and rejecting these medical service

13   codes based on the preset or predetermined

14   relationships in the database?

15       A.   Yes.  Can I clarify something else?

16       Q.   Absolutely.

17       A.   We're referring to this as ClaimFacts,

18   but in truth ClaimFacts, if we really get down to

19   it, doesn't do these things.  ClinicaLogic does.

20   Because you can operate and process claims on

21   ClaimFacts without having ClinicaLogic turned on

22   or even loaded into the system.

23       Q.   Your answers are all correct and

24   accurate if, for example, ClinicaLogic is included

25   within the integrated system of ClaimFacts,

9/14/2005  Lampe, Karen

1      A.   Yes.

2      Q.   From the time that you started at

3      TriZetto or Erisco in 1998 until today, has

4      ClinicaLogic's software been organized by having

5      these approximately 29 high-level rules or

6      clinical edits and then a number of relationships

7      that fall within each of those categories?

8      A.   Yes.

9           MR. RANDALL:  I have no further

10     questions subject to the dispute we have

11     regarding privilege.

12          MR. MUINO:  I have just a few

13     questions.

14     EXAMINATION BY

15     MR. MUINO:

16     Q.   Ms. Lampe, can you tell me are you a

17     patent lawyer?

18     A.   No.

19     Q.   Are you a lawyer at all?

20     A.   No.

21     Q.   Has TriZetto designated you as an

22     expert witness in this case?

23     A.   No.

24     Q.   Prior to today when you reviewed the

25     claims of the '164 patent, have you had a chance

9/14/2005  Lampe, Karen

1    ever to in detail read the patent?

2        A.    No, not since -- well, not since that

3    meeting with the attorney, but I didn't read it in

4    detail.  It was sort of read.

5        Q.    Okay.  And today, did you have the

6    opportunity, other than the two pages of claims at

7    the back of the patent, to read the -- this

8    portion of it which is usually called the

9    specification?

10       A.    No.

11       Q.    Do you understand, Ms. Lampe, that the

12   court in this case will undertake to construe any

13   ambiguous terms that are contained in the claims

14   of the '164 patent?

15       A.    Yes.

16       Q.    Do you understand the court hasn't yet

17   construed those claims?

18       A.    Yes.

19       Q.    And obviously you don't have any idea

20   as to how the court is going to construe those

21   claims, do you?

22       A.    No.

23       Q.    Do you understand that the parties have

24   exchanged preliminary claim constructions in this

25   litigation?

1

2

3

4

5

6

7

8

9      I, KAREN LAMPE, do hereby declare under

10  penalty of perjury that I have read the foregoing

11  transcript; that I have made any corrections as appear

12  noted, in ink, initialed by me, or attached hereto; that

13  my testimony as contained herein, as corrected, is true

14  and correct.

15      EXECUTED this _1st_ day of _December_,

16  20_05_, at _Union_ , _NJ_.
              (City)        (State)

17

18

19

20                 KAREN LAMPE

21

22

23

24

25

100

E

1                    IN THE UNITED STATES DISTRICT COURT

2                       FOR THE DISTRICT OF DELAWARE

3

4          McKESSON INFORMATION

           SOLUTIONS, LLC,

5                                    Civil Action

                    Plaintiff,        No. 04-1258-SLR

6

                vs.

7

           THE TRIZETTO GROUP, INC.,

8

                Defendant.

9

10

11

           _____

12

13         The videotaped deposition of JOHN PETER

14         DANZA, called by the Plaintiff for examination,

15         pursuant to Notice, and pursuant to the Rules of

16         Civil Procedure for the United States District

17         Courts, taken before Sandra L. Rocca, CSR and

18         Notary Public in and for the County of DuPage, and

19         State of Illinois, at 333 West Wacker Drive,

20         Chicago, Illinois, on the 12th day of September,

21         2005, at the hour of 9:45 a.m.

22

23         JOB NO. 38561

24

9/12/2005  Danza, John

1       A.  Yes, that's correct.

2       Q.  I'd like to direct your attention back to

3    Danza Exhibit 7, which is the patent numbered

4    5,253,164.  Flip to the second to last page,

5    please.

6       A.  Okay.

7       Q.  If we could just walk through what is

8    numbered paragraph 1 and you can stop me and say I

9    don't understand your question at any point, feel

10   free.  And you can have your standing objection

11   again.

12        MR. MUINO:  Yes, please.

13   BY MR. HENDERSHOT:

14      Q.  On the first line of paragraph 1,

15   Mr. Danza, it says -- at the opening of paragraph

16   -- strike that.

17        Paragraph 1 opens with, "In a computer

18   system having a means for operating on a

19   predetermined database."  Do you see that?

20      A.  I do.

21      Q.  To your understanding, does QicLink

22   operate with a computer system having means for

23   operating on a predetermined database?

24      A.  On a predetermined database.  Again, I

9/12/2005  Danza, John

1    don't know what a predetermined database would

2    indicate, but yes, it has a database.

3        Q.   If the database being included within

4    ClinicaLogic -- strike that.

5            Does QicLink also include a database

6    containing medical service codes and a set of

7    relationships among the medical service codes

8    defining whether a selected one of the medical

9    service codes are valid when input with other

10   selected ones of the medical service codes?

11       A.   Yes, it does.

12       Q.   That database that contains those

13   relationships, its contents are predetermined prior

14   to shipment to a customer, is that correct?

15       A.   Yes, that's correct.

16       Q.   And QicLink also includes -- I'm at the

17   bottom of paragraph 1, the first paragraph

18   underneath heading one.  QicLink also includes a

19   method for processing input claims containing at

20   least one medical service code, is that correct?

21       A.   Oh, I see.  You're not on the indented

22   piece?

23       Q.   No, I'm on the first piece still.

24       A.   Yes, that's correct.

9/12/2005  Danza, John

1       Q.   So QicLink does include a method for

2   processing input claims containing at least one

3   medical service code?

4       A.   QicLink does, yes.

5       Q.   And the method for processing input

6   claims included within QicLink includes the step of

7   receiving at least one claim, is that correct?

8       A.   It does receive.

9       Q.   Then moving down to the next indented

10  section, QicLink includes the ability to determine

11  -- strike that.

12          QicLink determines whether any medical

13  service code contained in the at least one claim is

14  not present in the predetermined database, is that

15  correct.

16      A.   It does.

17      Q.   Turning to the last statement underneath

18  heading one, QicLink includes -- strike that.

19          QicLink informs a user that a medical

20  service code is not contained in the predetermined

21  database, is that correct?

22      A.   It does do that.

23      Q.   Is there any element in the text on page

24  -- strike that.

9/12/2005  Danza, John

1       Within Claim 1 of the '164 patent that's

2   been marked as Danza Exhibit --

3       MR. MUINO:  7.

4   BY MR. HENDERSHOT:

5       Q.  Strike that.  Within paragraph 1 which is

6   Claim 1 of the '164 patent which has been marked as

7   Danza Exhibit 7, do you see any element that is not

8   practiced by QicLink?

9       A.  Actually I've not even evaluated this

10  paragraph.  I've just answered your questions.

11      Q.  Every answer to the questions I just

12  offered was consistent with your knowledge to the

13  operations of QicLink?

14      A.  Yes, that's correct.

15      Q.  So could you do me a favor and actually

16  read paragraph 1 now?

17      A.  I can.  I did that previously, but I can.

18      Q.  Do you see any elements in there as you

19  read it now that isn't present within QicLink?

20      A.  Again, when broken down in a certain way

21  that isn't broken down in here, there is different

22  pieces of it QicLink does do, yes.

23      Q.  Do you see any piece that QicLink doesn't

24  do?

9/12/2005  Danza, John

1       A.   No, I don't.

2       Q.   Okay.

3       A.   And again it's just the general lack of

4    punctuation that kind of screws up the reading of

5    this.

6       Q.   Understandable.  So if I could direct

7    your attention to paragraph 2, I believe we've

8    discussed or established that QicLink with the

9    ClinicaLogic or Auto Audit module includes a

10   computer system having the means to operate on a

11   predetermined database with relationships among

12   medical service codes that determines whether or

13   not the codes are valid or invalid as recited on

14   the first paragraph of Claim 2, is that correct?

15      A.   Actually I haven't read paragraph 2.  So

16   do you want me to?

17      Q.   If you could read all of the text to

18   yourself between two and three.

19      A.   Okay.  I'm sorry, this is kind of

20   difficult to read.

21      Q.   Where are you?

22      A.   I'm about halfway through it.

23      Q.   Have you read the first subparagraph

24   under two?

9/12/2005  Danza, John

1     A.  Yeah, I have.

2     Q.  Did you see any element in this first

3  subparagraph of Claim 2 that is not present within

4  QicLink?

5     A.  I'm sorry.  I'm just trying to break this

6  down to kind of make it make sense.  Yes, I think

7  up through the first comma, that would be -- yes,

8  that would be present.

9     Q.  And that's up to a method for processing

10  input claims, is that correct?

11     A.  Yes, up to but not including that part.

12  That's as far as I went.

13     Q.  Then moving forward from there.

14     A.  Okay.  I've read through the rest of it.

15     Q.  Do you see any element within Claim 2 as

16  you've read it now that's not present within

17  QicLink?

18     A.  No.

19     Q.  Okay.  So I'm going to try to save you

20  some reading now.  I'll try to direct your

21  attention to specific paragraphs and try to save

22  some time.

23     A.  Thank you.

24     Q.  If you could look at -- these are called

9/12/2005  Danza, John

1    claims, Claim 3 underneath column 117 of the '164

2    patent.

3        A.   So is that the item numbered three?

4        Q.   Yes.

5        A.   Okay.

6        Q.   So in the fourth indented paragraph of

7    Claim 3, there is there is discussed a means for determining

8    whether one of the medical service codes, do you

9    see that subparagraph?

10       A.   I do.

11       Q.   Could you read that for me?  Not for the

12   record, just to yourself, please.

13       A.   Okay.  If you don't mind, I'm going to

14   read the entry into it as well.

15       Q.   Okay.

16       A.   Okay.

17       Q.   Do you see anything within that fourth

18   indented paragraph of Claim 3 starting with means

19   for determining that's not present within QicLink?

20       A.   No, I don't.

21       Q.   If you would look at Claim 4 or the item

22   numbered four underneath column 117 of the '164

23   patent?

24       A.   Okay.

9/12/2005  Danza, John

1      Q.   Could you read that?

2      A.   Okay, sorry.

3      Q.   Do you see anything --

4      A.   It took so long to read that sentence.

5      Q.   I want to make sure your answers are

6   accurate.  So I appreciate it.

7      A.   Okay, go ahead.

8      Q.   Do you see anything within Claim 4 that

9   you've just read of the '164 patent that is not

10  included with TriZetto's QicLink product?

11     A.   Given that it relates to the entirety of

12  Number 3 before there and I've only kind of looked

13  through the one indentation, I would say no, that

14  would --

15     Q.   Subject to that caveat.

16     A.   That's correct.  So I would say --

17     Q.   Would you turn to Number 5 on the top of

18  column 118 of the '164 patent, please?

19     A.   Okay.

20     Q.   Is there anything within Claim 5 of the

21  '164 patent at the top of column 118 that is not

22  practiced by the QicLink product?

23     A.   No.

24     Q.   Would you turn to Number 6?

9/12/2005  Danza, John

1      A.  Okay.

2      Q.  Is there anything -- is there any element

3      of Claim Number 6 of the '164 patent that is not

4      included within the QicLink product?

5      A.  Again, given that it refers to the

6      entirety of Number 3 that I haven't looked through

7      the entirety of, no.  I would say no.

8      Q.  Why don't you look through the entirety

9      of three real quickly?  As quickly as you feel you

10     can.  There's no goal to meet.

11     A.  Okay, thanks.

12     Q.  Thank you.  Having reviewed Claim 3 of

13     the '164 patent, are there any elements within

14     Claim 3 that are not practiced by the QicLink

15     product?

16     A.  No, there isn't.

17     Q.  So given that there are no elements

18     within Claim 3 of the '164 patent that are not

19     practiced by the QicLink product, turning to

20     Claim 4 which includes all those limitations, is

21     there any element within Claim 4 that is not

22     practiced by the QicLink product?

23     A.  No.

24     Q.  Turning to Claim 5, is there any element

100

9/12/2005  Danza, John

1    within Claim 5 that is not practiced by the QicLink

2    product?

3        A.  No.

4        Q.  Turning to Claim 6, is there any element

5    within Claim 6 that's not practiced by the QicLink

6    product?

7        A.  No.

8        Q.  Turning to Claim 8, if you could read

9    that for me.

10       A.  Okay.

11       Q.  Are there any elements of Claim 8 that

12   are not practiced by the QicLink product?

13       A.  No.

14       Q.  Actually let me rephrase that if you

15   don't mind.  Are there any elements within Claim 8

16   that are not included within the QicLink product?

17       A.  No.

18       Q.  Would you turn to Claim 9, please?

19       A.  Okay.  Okay.

20       Q.  Are there any elements within Claim 9

21   that are not included within the QicLink product?

22       A.  No.  And again if I may, for just a

23   minute, you're referencing QicLink and I'm

24   answering based on ClinicaLogic.

9/12/2005  Danza, John

1       Q.   Yes, with respect to all of my questions

2    about these claims, I'm discussing QicLink

3    including ClinicaLogic and/or Auto Audit?

4       A.   Right.  I just wanted to be clear.  Okay,

5    great.  Thanks.

6       Q.   Just so the record's clear, because I

7    struck the last one, all of these questions about

8    the claims of the '164 patent are directed at

9    QicLink including either the Auto Audit or the

10   ClinicaLogic clinical editing modules?

11      A.   Understand.  Thank you.

12      Q.   So none of your answers would change

13   given that caveat?

14      A.   That's correct.

15      Q.   And that was an assumption you were

16   making in answering all those questions?

17      A.   That's correct.

18      Q.   I was as well.  Can we take a two-minute

19   break and I'll see if I can wrap it up with a few

20   questions.

21          MR. MUINO:  Sure.

22          VIDEOGRAPHER:  We are off the record at

23   12:03 p.m. with the end of tape Number 1.

24          (Short recess.)

9/12/2005  Danza, John

1        VIDEOGRAPHER:  We are back on the record

2    at 12:13 p.m. with the beginning of tape Number 2.

3    BY MR. HENDERSHOT:

4        Q.   So, Mr. Danza, before we went off the

5    record we were discussing the claims of the '164

6    patent which has been marked as Exhibit 7.  And

7    correct me if I'm wrong, but we had gone through

8    Claims 1, 2, 3, 4, 5, 6, 8 and 9 and you had not

9    identified any element recited in those claims that

10   was not present in the QicLink product, is that

11   correct?

12       A.   That's correct.

13       MR. MUINO:  Let me just state that I

14   still have my standing objection to this line of

15   questioning.

16       MR. HENDERSHOT:  Understood.

17       Q.   So if I could direct your attention to

18   the last subparagraph of Claim 10, beginning with

19   "means for determining," do you see that,

20   Mr. Danza?

21       A.   I do.

22       Q.   Could you review that for me?

23       A.   I'm just reading the top of 10 if that's

24   okay.

1      Q.  Okay.

2      A.  Just because since that sub is kind of a

3    continuation I guess of that sentence.  Okay.

4      Q.  So have you read all of Claim 10?

5      A.  I didn't read all of 10.  I just read the

6    opening of 10 and then the last indented.  That's

7    what you indicated for me.

8      Q.  The third from the last?

9      A.  The third from the last.  I'm sorry.

10     Q.  That's all right.

11     A.  Okay, yes, I've got it.

12     Q.  So is there any element described in the

13   third from the last subparagraph of Claim 10 of the

14   '164 patent that's not present in the QicLink

15   product?

16     A.  No.

17     Q.  Did you identify anything else in the

18   sections of Claim 10 that you read that's not

19   present in the QicLink product?

20     A.  No, I'd only read the one at the very

21   bottom.

22     Q.  Okay.

23     A.  And that would be included as well.

24     Q.  Then if you could look at Claim 11 for

9/12/2005 Danza, John

1    me, Mr. Danza.

2        A.   Okay.

3        Q.   The element that's recited in Claim 11 of

4    the '164 patent, is that included within the

5    QicLink product?

6        A.   Yes.

7        Q.   Okay.  Now, all of our questions about

8    the claims of the '164 patent as we discussed

9    assume that it's a QicLink product that includes

10   the ClinicaLogic or Auto Audit additional module,

11   is that correct?

12       A.   Yes, that's correct.

13       Q.   And the ClinicaLogic module to your

14   knowledge is used in the Facets product and the

15   ClaimFacts product offered by TriZetto as well?

16       A.   That's correct.

17       Q.   And since your answers to the questions

18   regarding the claims of the '164 patent assumed

19   that ClinicaLogic was involved -- strike that.

20            To your knowledge, does ClinicaLogic

21   operate in any material -- any materially different

22   manner within Facets or ClaimFacts than it does

23   within QicLink?

24       A.   I have no idea how they operate -- how it

9/12/2005  Danza, John

1    at 12:26 p.m.

2         MR. HENDERSHOT:  Do you mind if I put

3    something on the record really quickly?

4         MR. MUINO:  No.

5         MR. HENDERSHOT:  It's our position that

6    your examination of this witness doesn't count

7    against our 30(b)(6) time in terms of our

8    deposition limit.

9         MR. MUINO:  Absolutely.  This should only

10   take a couple minutes.

11        Q.  Earlier counsel had presented you with

12   what has been marked as Exhibit Number 7 which is

13   the '164 patent?

14        A.  Yes.

15        Q.  Do you remember that?

16        A.  I do.

17        Q.  Prior to having looked at it today and

18   other than the portions that counsel showed to you

19   today, have you ever read the '164 patent before?

20        A.  I have not.

21        Q.  There is a very lengthy portion of the

22   patent that is other than the last two pages which

23   are the claims.  That portion of the patent, have

24   you ever had a chance to read that portion before?

112

9/12/2005  Danza, John

1    A.  I've not.

2    Q.  Okay.  Do you understand that the court

3    in the process of this litigation will undertake to

4    define the terms in the claims of the patent?

5    A.  Okay.

6    Q.  Is it your understanding that the court

7    has not yet undertaken a construction of those

8    claim terms?

9    A.  Yes, it is my understanding of that.

10   Q.  And naturally, you have no way of knowing

11   how the court is going to construe those claim

12   terms, do you?

13   A.  I would have no idea.

14   Q.  Are you aware that the parties in the

15   course of this litigation have already put forward

16   preliminary claim constructions?  Is that something

17   you're aware of previously?

18   A.  No, I'm not really aware of any of that.

19   Q.  I'll represent to you that the parties

20   have, in fact, put forward preliminary claim

21   constructions.  Have you ever seen those

22   preliminary claim constructions?

23   A.  No, I haven't.

24   Q.  Were you in any way involved in trying --

I, JOHN PETER DANZA, do hereby declare under penalty of perjury that I have read the foregoing transcript; that I have made any corrections as appear noted, in ink, initialed by me, or attached hereto; that my testimony as contained herein, as corrected, is true and correct.

EXECUTED this _2_ day of _December_,

20_05_, at _Naperville_, _Illinois_.
              (City)              (State)


_JOHN PETER DANZA_

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
877.955.3855