F

9/14/2002  Smith, Tara

1       UNITED STATES DISTRICT COURT

2       FOR THE DISTRICT OF DELAWARE

3

4    McKESSON INFORMATION SOLUTIONS LLC,

5           Plaintiff,

6       -against-        Civil Action No.

              04-1258-SLR

7    THE TRIZETTO GROUP, INC.,

8           Defendant.

9

10

11

          _____

12

13          Videotaped deposition of TARA SMITH held

14       at the offices of Skadden Arps Slate Meagher &

15       Flom, Four Times Square, New York, New York,

16       on Wednesday, September 14, 2005, commencing

17       at 10:22 a.m., before David Sanders, Legal

18       Video Specialist, and James W. Johnson,

19       Registered Professional Reporter and a Notary

20       Public of the State of New York.

21

22

23    JOB NO. 38479

24

25

1

9/14/2002  Smith, Tara

1     Q.    The code that you wrote, what was its --

2     was its primary function to translate into HML?

3     A.    XML.

4     Q.    XML, I'm sorry.

5     A.    Yeah, translate it into XML and then,

6     when it came back, put it back into the Facets

7     format, making changes as necessary.

8     Q.    To your knowledge, is the Facets program

9     intended to be used on a computer system, with a

10    CPU and associated memory?

11         MR. ROOSEVELT:  Objection, vague and

12         ambiguous.

13    A.    Yes.

14    Q.    And is it your understanding that the

15    Facets software won't work unless you load it into

16    a computer system that has a CPU and associated

17    memory?

18         MR. ROOSEVELT:  Same objection.

19    A.    Yes.

20    Q.    Do you have any knowledge or familiarity

21    with the hardware requirements for clients that

22    purchase software -- I'm sorry -- that purchase the

23    Facets software?

24    A.    No.

25    Q.    Do you know whether or not the claim

9/14/2002  Smith, Tara

1    editing function within Facets is capable of

2    identifying claims with unbundled procedures and

3    rebundling them?

4        MR. ROOSEVELT:  Calls for speculation,

5    vague and ambiguous.

6        MS. HUTTNER:  It doesn't call for

7    speculation.  The question was "do you know,"

8    and if you continue with these kinds of

9    objections I'll raise a formal complaint with

10   the magistrate.  These are not permissible

11   objections in the Third Circuit.  I invite you

12   to research the law.

13       I'd be happy to give you a case, but if

14   you have a specific -- I don't know what could

15   possibly be vague about the question.  Would

16   you like to tell me?  What's been vague or

17   ambiguous about it?  Because I'd like to

18   correct it, because I don't want the witness

19   to be confused, or you either.

20       MR. ROOSEVELT:  Well, the witness

21   testified that she doesn't know how the, that

22   function of Facets works.

23       MS. HUTTNER:  Well, I didn't ask her how

24   that function of Facets worked.  I asked her

25   "do you know" followed by a question, and if

9/14/2002  Smith, Tara

1       the answer is no the witness can say no, I do

2       not know, so unless you're planning on

3       testifying for the witness -- what's ambiguous

4       about the question?

5              Is there anything ambiguous about it?

6       Can you tell me what it is so I can fix it.

7              MR. ROOSEVELT:  At this point I don't

8       even recall the question.

9              MS. HUTTNER:  Well, let me read it back

10      to you.

11         Q.   Do you know whether or not the claim

12      editing function within Facets is capable of

13      identifying claims with unbundled procedures and

14      rebundling them?

15             MS. HUTTNER:  Which part of that is

16      ambiguous?

17             MR. ROOSEVELT:  Counsel, I'm just going

18      to assert objections.

19             MS. HUTTNER:  Okay, if you assert

20      objections you have to tell me, since all

21      objections are reserved except as to form, to

22      the extent you are asserting a form objection

23      you are obligated to tell me what the

24      objection is so that I can fix the form.

25      That's the rule, and if you don't do that,

1          then you waive the objection.

2                  Do you understand that?

3                  MR. ROOSEVELT:  All right, I said that

4          the question was vague and ambiguous and calls

5          for speculation because the witness has given

6          previous testimony that indicates that she

7          would not know the answer to that question.

8                  MS. HUTTNER:  Okay, then she can say,

9          "No, I don't know," but my question to you --

10         and I'll repeat it again -- is what is vague

11         and what is ambiguous about the question as

12         phrased?  She may or may not know the answer

13         to the question.

14                 My question is, as to form, what is

15         vague or ambiguous about the question I just

16         asked?

17                 MR. ROOSEVELT:  I'm not going to sit

18         here and be interrogated by you.

19                 MS. HUTTNER:  Okay, then don't make

20         objections that you can't explain, because

21         it's not a buzzword to say, "vague and

22         ambiguous," and if you can't explain the

23         objection or tell me what's wrong with the

24         form of the question, then I will assume that

25         you have pre-established some code with the

1    witness where if you say, "vague and

2    ambiguous," it means don't answer the

3    question.

4         Okay?  Because if you have a form

5    objection --

6         MR. ROOSEVELT:  I've explained the

7    objection to you twice.

8         MS. HUTTNER:  No, actually, you haven't

9    explained it even once.

10         MR. ROOSEVELT:  And there's no

11    preestablished code that's been established.

12         MS. HUTTNER:  Okay, well, I'm glad to

13    hear that, but, like I say, if you have a form

14    objection you are obligated to explain it so I

15    can fix the question.

16         MR. ROOSEVELT:  And I've done that.

17         MS. HUTTNER:  You haven't, but we'll

18    pursue that later.  Okay, so I don't know

19    whether we ever got an answer to that

20    question, so let's ask it again.

21    Q.    Do you know whether or not the claim

22    editing function within Facets is capable of

23    identifying claims with unbundled procedures and

24    rebundling them?

25         MR. ROOSEVELT:  Same objections.

9/14/2002  Smith, Tara

1      A.    I know that it has rebundled, but that's

2   just because of what I did in ClaimCheck.

3      Q.    Okay, well, regardless of how you know,

4   do you have an understanding of what's meant by

5   "unbundled procedures?"

6      A.    Yes.

7      Q.    What is that understanding?

8      A.    Where you'd have a procedure that, let's

9   say it's on three different lines using three

10  different procedure codes and it really should have

11  been one procedure code.  Then it's unbundled and

12  it gets rebundled into that one particular

13  procedure code.

14     Q.    Okay, so that it gets paid under one

15  procedure code as opposed to multiple?

16     A.    Under one, right, as opposed to --

17  right.  Right.

18     Q.    Do you know whether or not Facets has

19  the ability to receive claims with associated

20  medical service codes?

21     A.    I don't know.  I don't know.

22     Q.    What -- I think you testified that, to

23  your understanding, Facets contains a claim

24  processing, claim editing feature; is that right?

25     A.    Yes.

9/14/2002 Smith, Tara

1      Q.   And in that connection is it your

2  understanding that claims are submitted into the

3  Facets system?

4      A.   Yes, they're submitted.

5      Q.   And is it your understanding that when

6  they are submitted they are submitted with an

7  associated service code?

8      A.   Yes.

9      Q.   And that on occasion there may be more

10  than one associated service code submitted with a

11  claim, is that also your understanding?

12      A.   No, it's not.  I don't have --

13      Q.   Well, in the case of unbundled

14  procedures is it your understanding that --

15      A.   Are you talking about procedure codes?

16      Q.   Yes, procedure codes.

17      A.   Yes.

18      Q.   I'm sorry, what did I say, "service

19  codes?"

20      A.   "Service codes."

21      Q.   I meant procedure codes.

22      A.   Okay.

23      Q.   So let me rephrase the question.

24      So is it your understanding that when

25  claims are submitted to Facets that they are

91

9/14/2002  Smith, Tara

1  received by Facets with one or more medical service

2  codes?

3      A.   Procedure codes.

4      Q.   Procedure codes, I'm sorry.

5      A.   Yes.

6      Q.   Procedure codes associated with the

7  claim.

8      A.   Yes.

9      Q.   And is it your understanding that within

10  Facets there is a table or tables that contain a

11  set of rules that establish relationships between

12  medical procedure codes?

13      A.   I don't know of any tables.

14      Q.   Whether it's some table or not, is it

15  your understanding that Facets in some form

16  includes a set of rules that establish

17  relationships between medical procedure codes?

18      MR. ROOSEVELT:  Vague and ambiguous,

19      calls for speculation.

20      A.   It, it would be an assumption, but -- so

21  I'd say no.  I'm not aware of exactly how it does

22  any of its --

23      Q.   Okay.  Do you know how Facets is able to

24  determine when procedure codes have been unbundled?

25      MR. ROOSEVELT:  Assumes facts not in

92

1       evidence.

2              MS. HUTTNER:  What facts does it assume

3       not in evidence?

4              MR. ROOSEVELT:  That that's what Facets

5       does.

6              MS. HUTTNER:  She already testified

7       that's what it does.

8       A.    Can you repeat the question.  I'm sorry.

9       Q.    My -- the question is, do you have any

10      understanding of how -- you testified earlier that

11      it's your understanding that when claims are

12      submitted into Facets with multiple medical

13      procedure codes which are basically an unbundling

14      of services that should be under one number instead

15      of multiple numbers that Facets has the ability to

16      detect that and to rebundle it under one service

17      code, correct?

18      A.    Yes.

19      Q.    Do you know how it performs that

20      function?

21      A.    No.

22      Q.    Do you know what rules it relies on to

23      decide whether or not something has been improperly

24      unbundled?

25      A.    No.

9/14/2002  Smith, Tara

1    Q.   Do you know if there are rules in that

2    regard within Facets?

3    A.   Yes.  I know, I'm sure there are.

4    Q.   Okay.  When you say -- can you tell me

5    what you understand in that regard.

6    A.   It would go back to what I've done on

7    ClaimCheck, just to know --

8    Q.   Well, how, whatever it goes back to, can

9    you tell me what your understanding is in that

10   regard.

11   A.   I know that a few of the things that we

12   did with the ClaimCheck integration, we wanted it

13   to somewhat mimic what Facets did, so that's how I

14   know that, you know, we had situations where there

15   were multiple procedure codes and it went into one,

16   and, you know, how that related to Facets.

17   Q.   Okay, so it was your understanding that

18   that's something that Facets did?

19   A.   Right, because we weren't going to do

20   anything that went completely against the norm of

21   what Facets did, so --

22   Q.   Okay, and is there any -- you had

23   mentioned age, I think, and sex, but is there any

24   other, do you have any other understanding of what

25   Facets did that you, in that regard that you tried

9/14/2002  Smith, Tara

1    to mimic in your --

2        A.    No.

3        Q.    -- in your integration module?

4        A.    No.

5        Q.    Okay.  And I think I asked you this

6    before, and if I did I apologize, but do you have

7    any understanding of what database or databases are

8    associated with Facets?

9            MR. ROOSEVELT:  Assumes facts not in

10           evidence.

11       A.    I know we use Sybase, Oracle, Microsoft.

12       Q.    Okay, do you have any understanding of

13   whether the Facets product as it's packaged and

14   sent to customers includes a database?

15           MR. ROOSEVELT:  Asked and answered.

16       A.    I don't know.

17           MS. HUTTNER:  I'm going to just, I'm

18           going to say it again, and I'm going to give

19           you the opportunity to fix it.

20           If a special master for discovery were

21           assigned to this case right now I would be on

22           the phone with him or her, because it is

23           without question in Delaware, where they take

24           these things very seriously, improper to make

25           objections like "asked and answered,

9/14/2002  Smith, Tara

1      A.    On the intranet.

2      Q.    Let me show you a really big, thick

3    document with lots of small print which is a

4    patent.  First of all, do you know what a patent

5    is?

6      A.    Basically, yes.

7      Q.    Okay.  This is a patent that has a bunch

8    of -- it's 5,253,164.  I'll call it "the '164

9    patent."  It's entitled "A system and method for

10   detecting fraudulent medical claims via examination

11   of service codes," and I'll represent to you that

12   it's owned by McKesson and it is the patent that

13   has been asserted against TriZetto by McKesson.

14         First of all, let me ask you, do you

15   understand that McKesson is suing TriZetto for

16   patent infringement?

17     A.    Yes.

18     Q.    Have you ever seen the '164 patent

19   before?

20         MS. HUTTNER:  I'm not going to mark it,

21       counselor, unless you want me to.

22         MR. ROOSEVELT:  Only if you're going to

23       ask her questions about it.

24         MS. HUTTNER:  Okay.

25     A.    I don't have to sit here and read it,

1       right?

2               Q.    Absolutely not.

3               Have you seen it before?

4               A.    Yes.

5               Q.    When did you see it for the first time?

6               A.    Earlier this week.

7               Q.    Can you tell me who showed it to you and

8       how you came to see it.

9               A.    My attorney.

10              Q.    Was that in connection with your

11      preparation for your deposition here today?

12              A.    Yes.

13              Q.    Did you meet with your attorney in

14      person?

15              A.    Yes.

16              Q.    How long did the meeting last?

17              A.    An hour, maybe a little less.

18              Q.    And that was last week?

19              A.    No, it's -- what's today, Tuesday,

20      Wednesday? -- this week.  Sorry.

21              Q.    Okay, so when this week, Monday or

22      Tuesday?

23              A.    Yesterday.  Tuesday.

24              Q.    Tuesday, and was it on Tuesday,

25      yesterday was the first time you saw the '164

1

2

3

4

5

6

7

8

9       I, TARA SMITH, do hereby declare under

10   penalty of perjury that I have read the foregoing

11   transcript; that I have made any corrections as appear

12   noted, in ink, initialed by me, or attached hereto; that

13   my testimony as contained herein, as corrected, is true

14   and correct.

15       EXECUTED this ___2___ day of ___December___,

16   20_05_ , at ___Union___, ___New Jersey___.
                     (City)                (State)

17

18

19

20   _____

21              TARA SMITH

22

23

24

25

147

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
877.955.3855

G

1              IN THE UNITED STATES DISTRICT COURT

2                FOR THE DISTRICT OF DELAWARE

3

4     McKESSON INFORMATION SOLUTIONS, LLC,

5              Plaintiff,

6         vs.              Case No. 04-1258-SLR

7     THE TRIZETTO GROUP, INC.,

8              Defendant.

9

10

11

            _____

12

13              VIDEOTAPE DEPOSITIONS OF

14           TRACY PIERSON AND CAROLYN DRINI

15            TAKEN ON BEHALF OF PLAINTIFF

16            MONDAY, SEPTEMBER 12, 2005

17     BE IT REMEMBERED THAT, pursuant to the Federal Rules

18     of Civil Procedure, the videotape depositions of

19     TRACY PIERSON and CAROLYN DRINI were taken before

20     Laurie A. Volker, Registered Professional Reporter,

21     on September 12, 2005, commencing at the hour of 1:16

22     p.m., the proceedings being reported at 750 SW Alder

23     Street, Portland, Oregon.

24     JOB NO. 38520

25

9/12/2005  Drini, Carolyn & Pierson, Tracy (Providence Health)

1    either the purchase process and decision-making or

2    the use of Facets, did TriZetto ever communicate to

3    Providence that the product might infringe on

4    McKesson's patent?

5      A1.  No.

6      Q.  Are you aware of any discussions whatsoever

7    between anyone on behalf of TriZetto and anyone at

8    Providence regarding whether the Facets system

9    infringes McKesson's patent?

10     A1.  No.

11     Q.  Do you understand that Providence is fully

12   indemnified by TriZetto in case it does infringe?

13     A1.  No, but that's good.  Sorry.

14        MR. WATERS:  That's okay.

15        MR. RANDALL:  I'll mark as Providence

16   Exhibit 4 the McKesson Patent No. '164.

17        (Whereupon Exhibit-4, the McKesson Patent

18   No. '164, was marked for identification.)

19   BY MR. RANDALL:

20     Q.  Let me show you the patent I've marked as

21   Exhibit 4, and I just want to use this as a reference

22   in asking you a series of questions.  Probably to

23   you, Ms. Drini.

24        Can you turn to the second-to-the-last

25   page.  I don't mean to exclude you, Ms. Pierson --

9/12/2005  Drini, Carolyn & Pierson, Tracy (Providence Health)

1    A1.  That's okay.

2        Q.  But if you want to jump in and answer, feel

3    free.

4            And the first paragraph is paragraph 1.  Do

5    you see that?

6    A2.  Yes.

7        Q.  That's actually a claim.  I might call it a

8    claim, but that's Claim No. 1.

9            Could you just read through that claim, and

10   I'm going to ask you if, based on your understanding,

11   the Facets system performs or operates pursuant to

12   what's described there?

13           MR. KENNEDY:  I would object to this as

14   calling for a legal conclusion.

15           MR. WATERS:  And I'm going to object to

16   this that I think it's calling for an expert

17   conclusion.

18   BY MR. RANDALL:

19       Q.  Ms. Drini, I want this to be perfectly

20   clear.  I'm asking for your understanding as to how

21   Facets operates.  That's all.

22   A2.  Okay.

23           (Pause in the proceedings.)

24   A2.  It appears that it would.

25       Q.  Okay.  Based on your understanding, the

9/12/2005  Drini, Carolyn & Pierson, Tracy (Providence Health)

1    Facets system does operate pursuant to the steps

2    identified in Claim 1?

3       A2.  I would say yes.

4       Q.   I'd like you to look at Claim 2, and I'm

5    going to ask you the same question about Claim 2.

6          MR. KENNEDY:  Same objection.

7          (Pause in the proceedings.)

8    BY MR. RANDALL:

9       Q.   Does the Facets system, based on your

10   understanding, Ms. Drini, operate pursuant to the

11   steps described in Claim 2?

12      A2.  Based on my understanding, yes.

13      Q.   Could you read Claim 3, and I have the same

14   question.

15         MR. KENNEDY:  Same objection.

16         (Pause in the proceedings.)

17   BY MR. RANDALL:

18      Q.   Based on your understanding, Ms. Drini,

19   does the Facets system comprise the components

20   described in Claim 3?

21         MR. KENNEDY:  Objection as calling for a

22   legal conclusion.

23      A2.  Based on my understanding, I would say yes.

24   BY MR. RANDALL:

25      Q.   Could you read Claim 4?  And I have the

9/12/2005  Drini, Carolyn & Pierson, Tracy (Providence Health)

1     same question.

2          Claim 4, by the way, is the same as Claim

3     3, just with a slight modification.

4          MR. KENNEDY:  Same objection.

5     A2.  I would have to qualify it and say I don't

6     believe it deletes invalid medical service codes.

7     BY MR. RANDALL:

8          Q.  All right.  With respect --

9     A2.  It would --

10         Q.  I'm sorry?

11    A2.  It would identify them.

12         Q.  Okay.

13         With respect to Claim 4, is it your

14    understanding that the Facets system is comprised of

15    all of the components of Claim 3 and the added

16    modification of Claim 4, given that instead of

17    deleting the claim, it eliminates it from further

18    consideration for payment?

19         MR. KENNEDY:  Same objection.

20    A2.  I would say probably yes, but there are so

21    many variations in how a claim is processed and all

22    of the codes are adjudicated, that it's difficult to

23    be absolute on my answer.

24    BY MR. RANDALL:

25         Q.  Okay.

1       Is it your understanding that the Facets

2   system operates to eliminate from further

3   consideration of subsequent rules a medical code that

4   Facets determines is invalid?

5       MR. KENNEDY:  Objection.  Vague and

6   ambiguous.

7    A2.  Could you say that again?

8       MR. RANDALL:  Could you read that back.

9       (Whereupon the requested question was read

10  back.)

11   A2.  I believe it does.

12  BY MR. RANDALL:

13      Q.   With that understanding regarding what the

14  term "delete" means in Claim 4, is it your

15  understanding that the Facets system comprises the

16  components identified in Claims 3 and 4?

17   A2.  I believe so.

18      Q.   With that understanding with respect to the

19  word "delete," could you also read Claim 5, and I

20  have the same question.

21      (Pause in the proceedings.)

22   A2.  If I understand what it's saying, I would

23  say yes, it does inform the user why the claim is

24  being adjudicated in the manner it is.

25      Q.   Okay.  Why, for instance, an invalid

1    medical service code is being eliminated from further

2    consideration?

3       A2.  Yes.

4       Q.  So with that understanding, do you -- is it

5    your understanding that the Facets system operates --

6    strike that.

7        The Facets system comprises the components

8    identified in Claims 3, 4, and 5?

9        MR. KENNEDY:  Objection.  Compound and

10    calls for a legal conclusion.

11    BY MR. RANDALL:

12       Q.  You can answer the question.

13    A2.  I believe so.

14       Q.  Could you read Claim 6?  And Claim 6 is --

15    includes all of the elements of Claim 3 plus an

16    additional limitation as described in Claim 6.  Could

17    you read Claim 6.

18        And my question is, based on your

19    understanding, does Facets include the components of

20    Claim 6?

21    A2.  Yes.

22       Q.  Do you know what CRVS codes are?

23    A2.  I believe it stands for California Relative

24    Value System.

25       Q.  Correct.

1        Does the Facets system include those codes?

2        A2.  I don't believe that's a coding system, so

3    no.

4        Q.   Could you read Claim 8?  And Claim 8

5    includes all of the components of Claim 3 plus the

6    added information in Claim 8.

7        And the question is:  Does the Facets

8    system, based on your understanding, include the

9    components of Claim 8?

10        MR. KENNEDY:  Objection as calling for a

11    legal conclusion.

12        (Pause in the proceedings.)

13    A2.  I believe that would be part of the method

14    of informing the user of the status of that

15    particular service code, but I don't know

16    specifically, no.

17    BY MR. RANDALL:

18        Q.   Does the Facets system, on occasion,

19    request additional information regarding a medical

20    service code that has been determined to be invalid?

21        A.   Say that again.

22        Q.   Yes.

23        MR. RANDALL:  Can you read it back, please.

24        (Whereupon the requested question was read

25    back.)

9/12/2005  Drini, Carolyn & Pierson, Tracy (Providence Health)

1      A2.  Not to my knowledge.

2    BY MR. RANDALL:

3      Q.  Ms. Pierson, can you answer that?

4      A1.  Can you repeat the question?  I'm sorry.

5      Q.  Sure.

6        (Whereupon the requested question was read

7    back.)

8      A1.  I don't know.

9    BY MR. RANDALL:

10      Q.  Could you read Claim 9, Ms. Drini.  And

11    Claim 9 includes all of the components of Claim 3

12    plus the added limitation described in Claim 9.

13        And the question is:  Does the Facets

14    system, as you understand it, include the components

15    required by Claim 9?

16        MR. KENNEDY:  Objection.  Calls for a legal

17    conclusion.

18        (Pause in the proceedings.)

19      A2.  I would say yes.

20    BY MR. RANDALL:

21      Q.  Could you read Claim 10.  And I'm going to

22    ask you the same question which is:  Does the Facets

23    system, based on your understanding, include the

24    components described in Claim 10?

25        MR. KENNEDY:  Same objection.

1          (Pause in the proceedings.)

2      A2.  In my opinion, I would say yes.

3    BY MR. RANDALL:

4        Q.   And could you read Claim 11.  And again,

5    Claim 11 includes all of the same components of

6    Claim 10 with the further component identified in

7    Claim 11.

8          And the question is:  Based on your

9    understanding, does the Facets system include the

10   components described in Claim 11?

11         MR. KENNEDY:  Same objection.

12         (Pause in the proceedings.)

13     A2.  I would say it does.

14   BY MR. RANDALL:

15       Q.   Could you read Claim 12.  And I'll ask you,

16   based on your understanding, does the Facets system

17   include the components described in Claim 12?

18         MR. KENNEDY:  Same objection.

19         (Pause in the proceedings.)

20     A2.  I believe it does.

21         MR. RANDALL:  We have to take a break in

22   order to change the videotape.  It's going to be just

23   a couple minutes, and then we'll go back on the

24   record, and I'll go for another five or ten minutes,

25   and then we can take an afternoon break, if that

9/12/2005  Drini, Carolyn & Pierson, Tracy (Providence Health)

1    would be okay with everybody.

2            THE VIDEOGRAPHER:  This concludes Tape

3    No. 1.  We're off the record at 3:16 p.m.

4        (Whereupon a break was taken.)

5            THE VIDEOGRAPHER:  This begins Tape No. 2.

6    We're back on the record at 3:18 p.m.

7    BY MR. RANDALL:

8      Q.  Ms. Drini, could you read Claim 13 of the

9    McKesson patent, and I'll ask you the same question,

10   which is:  Based on your understanding, does the

11   Facets system include the components described in

12   Claim 13?

13           MR. KENNEDY:  Object again as calling for a

14   legal conclusion.

15       (Pause in the proceedings.)

16     A2.  I believe it does.

17   BY MR. RANDALL:

18     Q.  Could you read Claim 14, and I'll ask you

19   the same question.

20       Does the Facets system, based on your

21   understanding, include the components described in

22   Claim 14?

23           MR. KENNEDY:  Same objection.

24       (Pause in the proceedings.)

25     A2.  I would have to say based on your previous

76

1    definition of nonmedical, I could say yes.

2    BY MR. RANDALL:

3        Q.   Okay.  You say you could say yes.  You mean

4    you would say yes?

5        A2.  I would say yes.

6        Q.   Okay.

7             Could you read Claim 15.  And I'll ask you

8    the same question.

9            Does the Facets system, based on your

10   understanding, include the components described in

11   Claim 15?

12           MR. KENNEDY:  Same objection.

13           (Pause in the proceedings.)

14       A2.  I would say yes.

15   BY MR. RANDALL:

16       Q.   Could you read Claim 16.  And I'll ask you,

17   based on your understanding, does the Facets system

18   operate pursuant to the steps described in Claim 16?

19           MR. KENNEDY:  Same objection.

20           (Pause in the proceedings.)

21       A2.  Based on my understanding, I would say yes.

22       MR. RANDALL:  Okay.  Why don't we take a short

23   afternoon break now.  Maybe ten minutes, if that's

24   all right with everybody.

25       A1.  Sure.

H

9/22/2005  Blake, John (BC/BS Tennessee)

1               IN THE UNITED STATES DISTRICT COURT
2                 FOR THE DISTRICT OF DELAWARE
3

4        MCKESSON INFORMATION SOLUTIONS
         LLC,
5

                 Plaintiff,        CIVIL ACTION NO.
6                              04-1258-SLR

         v.
7

         THE TRIZETTO GROUP, INC.,
8

                 Defendant.
9
10
11

─────────────────────────────────────────────────
12
13
14                       VOLUME 1
15        VIDEOTAPED DEPOSITION OF JOHN BLAKE
16              Chattanooga, Tennessee
17           Thursday, September 22, 2005
18
19
20
21       Reported by:
         TRENNA M. LACY
22       Notary Public
23       JOB NO. 38592
24
25

                                                          1

9/22/2005  Blake, John (BC/BS Tennessee)

1        identification.)

2        Q.    (By Mr. Hansen)  Mr. Blake, this is the

3    patent that's at issue in the lawsuit.  I just want

4    to go -- if you turn to the last two pages.  It might

5    be easier if I took the clip off for you.  It has a

6    column on the left side that's numbered 117.  Do you

7    see that?

8        A.    Yes.  Yes, I do.

9        Q.    And if you would look at -- you see at the

10   top it says, what is claimed and then a colon?

11       A.    Yes.

12       Q.    That has various numbers 1 through 16

13   continuing over to the next page?

14       A.    Yes.

15       Q.    These are what are known as in the trade

16   as patent claims.  I just want if you would take a

17   moment please and read the claim numbered 1 and let

18   me know based on your understanding of Facets whether

19   Facets operates according to the -- as described in

20   claim 1?

21            MR. ROOSEVELT:  And I'll just object

22        on the grounds that the question calls for

23        legal conclusion, calls for expert

24        testimony, vague and ambiguous.  Calls for

25        speculation.

9/22/2005  Blake, John (BC/BS Tennessee)

1          MR. HANSEN:  I'm going to go through

2      all the ones at issue in this case and I'll

3      let you know now I'll let you have the

4      continuing objection to move things along.

5          MR. ROOSEVELT:  Great.

6          THE WITNESS:  (Peruses Document).

7          MR. HOOTON:  You say you want him to

8      go through all of them.

9          MR. HANSEN:  The ones that are just

10     asserted in the case.

11         MR. HOOTON:  So I think it might be

12     easier if we went off the record that way

13     you're not sitting there burning a lot of

14     tape.  Well, it happens however you want to

15     do it.  It makes no difference to me, but I

16     just -- how much tape do you have left?

17         THE VIDEOGRAPHER:  An hour.

18         MR. HANSEN:  I'll be done before

19     that.  I hope.

20     Q.    (By Mr. Hansen)  Have you had a chance to

21     review claim 1, Mr. Blake?

22     A.    I've read it a couple times, yeah.

23     Q.    Can you tell me what based on your

24     understanding of the Facets System whether Facets

25     operates according to what's described in claim 1?

9/22/2005  Blake, John (BC/BS Tennessee)

1      A.   As best I can determine, does the Facet

2    System do that type of comparison or review of items

3    when it gets into like a medical service code, yes,

4    putting in that's a broad sense.  Most all claim

5    systems or operating systems would do some type of

6    activity in one in very general sense.  It's not --

7    I'm not sure what it really drives at when it says

8    medical service is a very broad term.  But, again,

9    yes, does the system do that, yes.

10     Q.   Could you take a look -- I want to ask the

11   same question with respect to claim 2.  If you would

12   just read that and then tell me whether or not based

13   on your understanding of Facets, how Facets operates

14   pursuant to the steps in claim 2?

15     A.   (Peruses Document).

16          Okay, again, your question.

17     Q.   Now that you -- have you had a chance to

18   review claim 2?

19     A.   This second paragraph?

20     Q.   Yes.

21     A.   Yes.

22     Q.   Can you tell me based on your

23   understanding of Facets whether it operates according

24   to what's described in claim 2?

25     A.   It has the ability to do that, yes.

1    Q.   Can you just read claim 3.  It will

2    start -- some of the claims will start to have

3    similarities to them so if you could read claim 3

4    please then I'll ask you the same question?

5    A.   (Peruses Document).

6         Okay.  Question for three.

7    Q.   Now have you had a chance to review claim

8    3?

9    A.   I have reviewed three.

10   Q.   Can you tell me whether or not based on

11   your understanding of Facets, the Facets System

12   includes the components described in claim 3?

13   A.   I think I was understand what was said

14   there.  Yes, does it have the ability to do that,

15   yes.

16   Q.   Can you look at claim 4.  Claim 4 is

17   what's called a dependent claim which means it

18   includes the elements of claim 3 and has the

19   additional elements set forth in claim 4?

20   A.   Okay.

21   Q.   Can you tell me whether or not the Facets

22   System includes the ability that's set forth in claim

23   4?

24   A.   (Peruses Document).

25        Yes, I think, you know, four.  Yes, does

1    Facets have the ability to do that, I think so, yes.

2      Q.   Could you look at claim 5, then, please,

3    which adds the informing a user why the at least one

4    claim was revised, do you see that?

5      A.   Yes, I do.

6      Q.   Does Facets System have that capability?

7      A.   Yes.

8      Q.   Is that capability used by Tennessee?

9      A.   Yes.

10     Q.   And then Claim 6 had the limitation of the

11    database containing medical service codes includes

12    medical service codes described by CPT codes.  Do you

13    see that?

14     A.   Yes.

15     Q.   Does the Facets System, as you understand

16    it, include the elements of Claim 6?

17     A.   Yes.

18     Q.   And then Claim 7 talks about CRVS codes.

19    Facets System doesn't use CRVS codes, does it?

20     A.   CRVS California relative value system

21    codes, no, it does not.

22     Q.   At least as used by Tennessee, you don't

23    use CRVS codes?

24     A.   No, CRVS goes way back in time, yeah.  A

25    lot of CPT and CRVS were the same codes.

9/22/2005  Blake, John (BC/BS Tennessee)

1    Q.   The CPT was derived in some respect from

2   CRVS?

3    A.   That I don't know.  I just know they're a

4   lot of the same codes.

5    Q.   The numbering is the same for the

6   procedures?

7    A.   They were, but again, you're putting some

8   age on both of us.

9    Q.   Could you look at eight for me, please.

10   I've got enough age going on me.  If you could look

11   at eight, please.  Does the Facets System have the

12   ability to request further information from a user

13   regarding claims?

14    A.   Yes.

15    Q.   And then could you look at claim 9, please

16   and just read it and tell me whether or not the

17   Facets System includes that capability?

18    A.   (Peruses Document).

19       On number 9, I think the answer is yes.

20   If I understand what the definition of relationships

21   is being implied to here and I'm not sure, you know,

22   it's a vary -- medical service codes can mean lots of

23   different things but, you know, can it code

24   relationships, yes.

25    Q.   And the relationships can be medically

1    determined?

2        A.    Medically determined, boy, that's a tough

3    one.  Do you have relationships between series of

4    codes and other codes, yes, are they medically

5    appropriate, that depends on how you define that, and

6    again the system doesn't determine the medical

7    necessity of it.  It's just saying it's editing

8    against certain criteria, whatever criteria would be,

9    so from that standpoint I'll, yes, yes, does it do

10   that, yes.  Is it medically doing that, it doesn't do

11   it medically.  It's just like I said, computers

12   aren't very bright they just do what they're codified

13   to do.

14       Q.    But the codes themselves are determined by

15   the AMA and others?

16       A.    By the AMA and other criteria sets or

17   review agencies or whatever else you're using to set

18   your rationale for your criteria, yes.

19       Q.    The relationship that would determine say

20   whether claims have been unbundled that can be in

21   part based on medical reasons?

22       A.    That could be.  I would make the

23   assumption, yes.  It was based on some kind of

24   medical rationale reason.

25       Q.    Could you please read claim 10?

9/22/2005  Blake, John (BC/BS Tennessee)

1      A.    (Peruses Document).

2            I've read ten.  I'm not sure exactly what

3      it's driving at at this point in time.

4      Q.    What part is confusing you?

5      A.    Well, again, I've read the other nine at

6      this point in time.  I'm not sure whether it's trying

7      to say, am I looking back in history or am I just

8      looking at the codes for this one claim, you know,

9      I'm not sure where we're driving to it at this time.

10     Q.    To the extent that it relates to looking

11     at code in a particular claim, can you tell me

12     whether or not Facets performs the operations in

13     claim 10?

14     A.    I think it does but I'd have to really sit

15     here and think about it and then look at some coding

16     claims and make sure it doesn't begin it's starting

17     to run together at that point in time.

18     Q.    But based on your understanding at this

19     point?

20     A.    It would appear to do that activity, yes.

21     Q.    It being Facets?

22     A.    It being Facets.

23     Q.    And in terms of 11, I think we had

24     discussed this earlier.  Can you tell me whether

25     Facets performs the elements set forth in claim 11?

1    A.   (Peruses Document).

2         Again, you're starting to -- I'm not the

3    coding expert.  The means for revising at least one

4    claim cannot include a rejected medical service code.

5    I'm not sure what it's driving at.  Is it a

6    previously rejected code or a rejected code here.

7    Q.   In connection with our rebundling

8    discussions we talked about previously, do you

9    understand the Facets System it could replace the

10   medical service codes in a claim with the proper

11   service code?

12   A.   And I wouldn't call it a service code.

13   You would replace it with the proper procedure code.

14   A service code for me means something different.

15   Q.   A CPT code?

16   A.   CPT code, yeah.

17   Q.   With that understanding, would the Facets

18   System perform the element of claim 11?

19   A.   Yes, it does.

20   Q.   Could you read claim 12, please?

21   A.   (Peruses Document).

22        I've read 12.

23   Q.   Can you tell me based on your

24   understanding of the Facets System whether it

25   includes the components set forth in claim 12?

9/22/2005  Blake, John (BC/BS Tennessee)

1    A.    I think it does.

2    Q.    Could you look at claim 13 for me, please?

3    A.    I have read 13.

4    Q.    Based on your understanding of Facets, can

5    you tell me whether it includes the components in

6    claim 13?

7    A.    I think what it's driving at on 13 is I

8    can determine whether or not a code is not in the

9    system for you to input and use.  From that

10    standpoint, yeah, I think the system won't let you

11    use a code that is not a part of its database.

12    Q.    Thanks.

13          Could you look at -- kind of makes you

14    want to be a patent lawyer, does it?

15    A.    Not really.

16    Q.    Could you look at claim 14, please and

17    just read it first?

18    A.    (Peruses Document).

19          I've read 14.

20    Q.    Can you tell me based on your

21    understanding of Facets whether it includes the

22    components of claim 13?

23    A.    I'm not sure.  I think it does.  Actually

24    14 looks similar to either 12 or 11 or 10 at this

25    point.

1      Q.    They start to look similar?

2      A.    Yeah.

3      Q.    And could you look at claim 15 for me

4    please and read that?

5      A.    (Peruses Document).

6            I've read 15.

7      Q.    Can you tell me based on your

8    understanding of Facets whether it includes the

9    components of claim 15?

10     A.    I think it does, but, again, 14, 15, and

11   10 and 11 or whatever else are starting to look like

12   they're repeating themselves and I'm not a coding

13   expert, so I can't really ascertain the finding

14   differences between those.

15     Q.    And claim 16, would you read that for me,

16   please?

17     A.    (Peruses Document).

18           I've read 16.

19     Q.    And based on your understanding of the

20   Facets System, is it your opinion it includes the

21   components of claim 16?

22     A.    I think it does.  But again I think 16,

23   15, 14, 10, and 11 are all basically saying the same

24   thing.  But again, I'm not a coding expert.

25     Q.    But based on your understanding of the

9/22/2005  Blake, John (BC/BS Tennessee)

1    system --

2        A.    My understanding.

3        Q.    -- you would say it includes the elements

4    of those claims?

5        A.    It would include those types of elements

6    if I fully understand it but again I'm not a -- I

7    apologize.  I'm not a code expert.

8        Q.    You're not an expert in the CPT codes?

9        A.    No, I'm not a expert in the CPT codes.  I

10    haven't memorized the book yet.

11        Q.    Let me just have this marked.

12        A.    You want me to put this up?

13        Q.    Yes, thank you.

14        MR. HANSEN:  Let's mark this as 7.

15        (Blake Exhibit 7 was marked for

16        identification.)

17        Q.    (By Mr. Hansen)  Mr. Blake, I would just

18    ask you to review what's been marked as Blake Exhibit

19    7 and I'm only going to ask you about the second

20    paragraph of the e-mail set forth on the first page

21    sort of near the bottom the one that begins, John?

22        A.    Okay, I see that.

23        Q.    And the second paragraph says, quote, also

24    comma Craig Luftig mentioned in our teleconference

25    meeting that if BlueCross BlueShield of Tennessee

1    having to have fancy editing systems, whether in

2    Facets or outside of Facets it becomes a common

3    language.  I've expressed the view that as the more

4    we drive towards Medicare based reimbursement.  We're

5    going to find ourselves in the situation of the

6    provider saying, I want my editing to balance against

7    Medicare criteria.  You know, most editing I don't

8    care whether it's TriZetto or whether it's McKesson

9    through ClaimCheck or HPR, they all use clinical

10   people surrounding them.  But a lot of it, you know,

11   related to Medicare reimbursement there is standard

12   editing and the provider is 40 percent of their

13   claims come from Medicare individuals so they look

14   for some kind of commonality.  But again I think

15   that's where we're driving at this point in time.

16       Q.   Okay.  Why don't you go back to Exhibit 6,

17   which is the patent.  I believe that you testified

18   that you had not seen this before today; is that

19   correct?

20       A.   No, I had not seen that before today.

21       Q.   Are you familiar with patents generally?

22       A.   No.

23       Q.   Have you ever seen a patent before?

24       A.   No.

25       Q.   Okay.  Now, Mr. Hansen had you looking at

1    editing function functions to a certain degree.  Can

2    I go in and make any of those kinds of changes, no, I

3    cannot.

4        Q.    Okay.  So you don't -- you've never

5    actually operated the Facets program?

6        A.    No.  They don't allow me to.

7        Q.    Okay.  Mr. Hansen had you go through all

8    16 of the claims on the last couple of pages.  Were

9    you fairly certain as to what these claims meant?

10        MR. HANSEN:  Object to the form.

11        THE WITNESS:  Again, the question.

12        Q.    (By Mr. Roosevelt)  Did you have a full

13    understanding of what these claims meant?

14        MR. HANSEN:  Object to the form.  Go

15        ahead.  Sorry.

16        THE WITNESS:  A full understanding,

17        no.  A general understanding, I think it's

18        talking about how the editing process would

19        work for whatever application this is

20        associated with and I'm not sure which one

21        it is associated with.

22        Q.    (By Mr. Roosevelt)  For example, if you

23    look on -- in the first claim, the second line it

24    mentions a predetermined database, do you see that?

25        A.    Right.

9/22/2005  Blake, John (BC/BS Tennessee)

1      Q.   And that's predetermined database is

2    repeated throughout many of the claims.  Do you know

3    what that is?

4      A.   No, I would make the assumption

5    predetermined database is somebody that has

6    established the structure that's already been

7    determined for you and you're using that structure

8    and bringing it in.

9      Q.   But that's just an assumption, you don't

10   know for sure?

11     A.   That's an assumption.  I don't know for

12   sure.

13     Q.   Also, if you go down to, for example,

14   claim No. 3 it mentions means for several times, do

15   you see that?

16     A.   (Peruses Document).

17          Yes.

18     Q.   Do you know what the means it's referring

19   to?

20     A.   No.  In my quick review of it I would

21   assume it says, you are comparing the claim that

22   you're processing against whatever is stored in your

23   database.

24     Q.   I just mean generally, do you know what

25   the terms means for means?

I

1          IN THE UNITED STATES DISTRICT COURT

           SOUTHERN DISTRICT OF OHIO

2              EASTERN DIVISION

3

4      MCKESSON INFORMATION

       SOLUTIONS, LLC,

5

           Plaintiff,

6

       vs.            Civil Action No.

7                 04-1258SLR

       THE TRIZETTO GROUP,

8      INC.,

9          Defendant.

10

11

                _____

12

13

14      DEPOSITION OF PATRICIA KEPLINGER

15         Taken at the offices of

              Westin Hotel

16          310 South High Street

           Columbus, Ohio  43215

17

        on September 14, 2005, at 9:04 a.m.

18

       Reported by: Angela R. Starbuck, RPR/CRR

19

20

21

22

23      JOB NO. 38563

24

25

                                                    1

9/14/2005  Keplinger, Patricia (Harrington Benefit Services)

1    itself.

2       Q.  Okay.

3       MR. HENDERSHOT:  I'd like to mark as

4    Exhibit 2 a United States Patent

5    Number 5,253,164, issued to Holloway, et al.

6    BY MR. HENDERSHOT:

7       Q.  Sorry to make you break out the

8    reading glasses.

9       A.  Yeah.

10      Q.  Have you ever seen what's been

11   marked as Exhibit 2 before?

12      A.  No.

13      Q.  Have you ever seen a patent before?

14      A.  No.

15      Q.  First time for everything.

16      A.  Yes.

17      Q.  I'll represent to you that what's

18   been marked as Exhibit 2 is a patent that's

19   been issued and eventually assigned to

20   McKesson Information Solution -- strike

21   that.

22      I'll represent to you that this is

23   the patent at issue between McKesson and

24   TriZetto in their litigation.

25      If it's all right with you, I'll

9/14/2005  Keplinger, Patricia (Harrington Benefit Services)

1    quicker to do that --

2        MR. KENNEDY:  Yeah, yeah.

3    BY MR. HENDERSHOT:

4        Q.  Okay.  If you could look at the

5    paragraph numbered 1, and there are a series

6    of numbered paragraphs on this page.  I'll

7    refer to those as claims.  That's what

8    they're referred to in a patent.  So that

9    all the text under Paragraph 1 or Heading 1

10   would be Claim 1, and I'll direct you to

11   different subparts underneath it.

12       A.  Okay.

13       Q.  I just want to ask you some

14   questions about this.

15       A.  Sure.

16       Q.  So in Claim 1, if you could read to

17   yourself for me, please, the -- the text of

18   the first paragraph after Heading 1.

19          (Pause in proceedings.)

20          THE WITNESS:  Okay.

21   BY MR. HENDERSHOT:

22       Q.  Is there anything within that

23   paragraph that you don't understand, any

24   term?

25       A.  No.

1    Q.  Do you see anything described in the

2    first paragraph of Claim 1 that is not

3    present in ClaimFacts with ClinicaLogic as

4    used by Harrington?

5        MR. KENNEDY:  At this point, I want

6    to object to this question as lack of

7    foundation and is calling for an expert

8    conclusion.

9        MR. HENDERSHOT:  What foundation

10   does it lack, so we can clean that up?

11       MR. KENNEDY:  We haven't -- we

12   haven't established that the witness is

13   qualified to state the meaning of claims in

14   the patent.

15   BY MR. HENDERSHOT:

16   Q.  You had stated that there weren't

17   any words in that paragraph you understood,

18   correct?

19   A.  I'm not sure I understand the whole

20   meaning of the -- the whole -- the

21   comprehensive meaning of everything here.  I

22   understand what I believe it's trying to say

23   is that -- establishing that there are set

24   relationships between codes within a system

25   and that in -- in some databases, there is a

9/14/2005  Keplinger, Patricia (Harrington Benefit Services)

1    set of relationships that then will be

2    audited and taken appropriate steps on.

3        Q.  That's what you understand that

4    paragraph to mean?

5        A.  Uh-huh.

6        MR. KENNEDY:  I think -- I think if

7    we can stipulate to those two objections as

8    to any questions you have regarding the

9    meaning of -- of each particular claim, then

10   we -- we can proceed with the questioning.

11       MR. HENDERSHOT:  That's fine.

12       MR. KENNEDY:  Okay.

13   BY MR. HENDERSHOT:

14       Q.  And just so we're clear, your

15   understanding of these terms is based on

16   your 18-odd years working in the health care

17   industry with claims processing?

18       A.  Uh-huh.

19       Q.  And I just want -- and you're

20   answering these questions -- you answered

21   that question in terms of your understanding

22   as a person who's worked 18 years in the

23   industry; is that correct?

24       A.  Yes.

25       Q.  So returning to the first paragraph

1    of Claim 1, is the system that's at least in

2    part described in that paragraph consistent

3    with your understanding of the operations

4    and functionality of ClaimFacts?

5        A.  Yes.

6        Q.  So there's nothing in that first

7    paragraph of Claim 1, of the '164 patent,

8    that you see that is -- that is not present

9    in ClaimFacts with ClinicaLogic?

10       A.  Well, after the quick --

11       Q.  Yeah.

12       A.  -- review, no, nothing at this

13   point.

14       Q.  Well, ClinicaLogic -- we discussed

15   earlier, ClinicaLogic uses a computer

16   system, correct?

17       A.  That is correct.

18       Q.  And that computer system includes a

19   means for operating on a predetermined

20   database?

21       A.  Yes.

22       Q.  And that predetermined database

23   contains medical service codes and a set of

24   relationships among the medical service

25   codes; is that correct?

9/14/2005  Keplinger, Patricia (Harrington Benefit Services)

1      A.  Yes.

2      Q.  And those relationships among the

3   medical service codes within the

4   ClinicaLogic database in ClaimFacts define

5   whether medical service codes are valid when

6   input with other medical service codes on a

7   claim, correct?

8      A.  Correct.

9      Q.  And the ClaimFacts system includes a

10  method for processing input claims

11  containing at least one medical service

12  code, correct?

13     A.  Yes.

14     Q.  And did I cover all the text in

15  Paragraph 1 of Claim 1 there?

16     A.  Yes, I believe so.

17     Q.  Okay.  So everything, as you read it

18  here, as we've discussed, included from the

19  first paragraph of Claim 1 is present in the

20  ClaimFacts system with ClinicaLogic?

21     A.  Yes.

22     Q.  If you could move to the next line,

23  beginning with the word "receiving."

24     A.  Uh-huh.

25     Q.  Have you read that?

9/14/2005  Keplinger, Patricia (Harrington Benefit Services)

1     A. Yes.

2     Q. Do you understand the term

3   "receiving at least one claim"?

4     A. I'm assuming that it means one -- at

5   least one service is present on the claim.

6     Q. Okay. Does the ClaimFacts system

7   with ClinicaLogic include the ability to

8   process multiple claims?

9     A. Yes.

10    Q. So ClaimFacts, as you understand it,

11  includes the ability to receive one claim or

12  more claims?

13    A. Yes.

14    Q. So ClaimFacts with ClinicaLogic

15  includes the ability to receive at least one

16  claim as recited here?

17    A. Yes.

18    Q. If you could move on to the next

19  line, it says, "determining whether any

20  medical service code," do you see that?

21    A. Yes.

22    Q. Could you read that to yourself for

23  me, please.

24        (Pause in proceedings.)

25        THE WITNESS: Okay.

9/14/2005  Keplinger, Patricia (Harrington Benefit Services)

1    BY MR. HENDERSHOT:

2       Q.  And at the end of that sentence or

3    that -- those three lines, it says -- it

4    references a predetermined database.

5       A.  Uh-huh.

6       Q.  We discussed earlier that there's a

7    predetermined database of medical service

8    codes and relationships in ClinicaLogic,

9    correct?

10      A.  Right.

11      Q.  Is that the data -- strike that.

12         So -- strike that.

13         Is it your understanding that

14   ClinicaLogic includes the ability to

15   determine whether any medical service code

16   contained in the at least one claim is not

17   present in the predetermined database?

18      A.  Yes.

19      Q.  So there's nothing thus far in

20   Claim 1 that we've discussed that is not

21   present in ClaimFacts, to your

22   understanding?

23      A.  Correct.

24      Q.  If you would turn to the last two

25   lines of Claim 1, beginning with the term --

9/14/2005  Keplinger, Patricia (Harrington Benefit Services)

1    the words, "informing a user."  Do you see

2    that?

3        A.  Yes.

4        Q.  Could you read those lines to

5    yourself for me, please.

6        A.  Yes.

7        Q.  Is there anything in those last two

8    lines that begin with "informing a user" in

9    Claim 1 that is not present, to your

10   knowledge, in the ClaimFacts system?

11       A.  No.

12       Q.  And you've used the ClaimFacts

13   system for over 11 years?

14       A.  Yes.

15       Q.  And you're being offered today as

16   the person most knowledgeable regarding

17   Harrington's use of ClaimFacts; is that

18   correct?

19       A.  Yes.

20       Q.  So as the person most knowledgeable

21   regarding Harrington's use of ClaimFacts and

22   a person who's used ClaimFacts for over 11

23   years, is there anything in the text of

24   Claim 1 that we've just been through that is

25   not present in the ClaimFacts product?

9/14/2005  Keplinger, Patricia (Harrington Benefit Services)

1    A.  Not that I can think of today.

2    Q.  Okay.  If you could turn to

3    Paragraph 2 or Claim 2.

4        MR. KENNEDY:  Just to clarify, my

5    earlier objections are going to apply to

6    each and every claim that we go through.

7        MR. HENDERSHOT:  Yeah, that's what I

8    assumed.

9        MR. KENNEDY:  Okay.

10   BY MR. HENDERSHOT:

11   Q.  If you could read the first

12   paragraph of Claim 2 for me.

13       Some of the text is similar to other

14   paragraphs, but if you could just go ahead

15   and read through each one for me, beginning

16   with the first paragraph now.

17       (Pause in proceedings.)

18       THE WITNESS:  Okay.

19   BY MR. HENDERSHOT:

20   Q.  Having read the first paragraph of

21   Claim 2 of the '164 patent, do you see any

22   elements described in that paragraph that is

23   not present in ClaimFacts, to your

24   understanding?

25   A.  No.

110

1 Q.  If you could move on to the next

2 line, beginning with "receiving," within

3 Claim 2.  Have you read that?

4 A.  Yes.

5 Q.  Do you understand ClaimFacts to

6 include the ability to receive at least one

7 claim --

8 A.  Yes.

9 Q.  -- as recited here in Claim 2?

10 A.  Yes.

11 Q.  If you turn to the -- move on to the

12 next two lines, which begin with

13 "ascertaining."

14 A.  Uh-huh.

15 Q.  Have you read those lines?

16 A.  Yes.

17 Q.  Is it your understanding that

18 ClaimFacts includes the ability to ascertain

19 whether the at least one claim contains a

20 plurality of medical service codes?

21 A.  Yes.

22 Q.  If you move on to the next

23 subparagraph beginning with "determining."

24 Let me know when you've read that.

25 (Pause in proceedings.)

9/14/2005  Keplinger, Patricia (Harrington Benefit Services)

1        THE WITNESS:  All right.

2    BY MR. HENDERSHOT:

3        Q.  Is there anything described in that

4    subparagraph of Claim 2 of the '164 patent

5    that is not present in the ClaimFacts

6    system?

7        A.  Not to my knowledge.

8        Q.  Move on to the next subparagraph

9    beginning with "authorizing."

10       Let me know when you've read that.

11       (Pause in proceedings.)

12       THE WITNESS:  Okay.

13   BY MR. HENDERSHOT:

14       Q.  Do you see anything in that

15   paragraph of Claim 2 that is not present in

16   the ClaimFacts system?

17       A.  No.

18       Q.  If you could move on to the final

19   subparagraph of Claim 2 for me.

20       Let me know when you've read it.

21       (Pause in proceedings.)

22       THE WITNESS:  All right.

23   BY MR. HENDERSHOT:

24       Q.  Is everything described in that

25   subparagraph included within the ClaimFacts

1    system as you understand it?

2       A.  Yes.

3       Q.  So every element described in

4    Claim 2 that you've just read is included

5    with claim -- strike that.

6          So every element of Claim 2 that you

7    just read of the '164 patent is included

8    within the ClaimFacts system?

9       A.  With ClaimCheck -- Claim --

10   ClinicaLogic.

11      Q.  Okay.  So every element of Claim 2

12   of the '164 patent that you just read is

13   included within TriZetto's ClaimFacts

14   product with ClinicaLogic?

15      A.  Yes.

16      Q.  If you would turn to Claim 3.  Read

17   the first paragraph beginning "a computer

18   system."

19         (Pause in proceedings.)

20         THE WITNESS:  All right.

21   BY MR. HENDERSHOT:

22      Q.  Is every element described in that

23   first paragraph of Claim 3 of the '164

24   patent present in the ClaimFacts system?

25      A.  Yes.

113

9/14/2005  Keplinger, Patricia (Harrington Benefit Services)

1      Q.  If you could turn to the next

2    subparagraph of Claim 3.

3              (Pause in proceedings.)

4         THE WITNESS:  Okay.

5    BY MR. HENDERSHOT:

6      Q.  Is every element in that

7    subparagraph of Claim 3 of the '164 patent

8    included within the ClaimFacts system with

9    ClinicaLogic?

10      A.  Yes.

11      Q.  Got a short one now.  If you'd turn

12    to the next line, "means for receiving."

13      A.  Uh-huh.

14      Q.  Do you understand ClaimFacts

15    including a means for receiving at least one

16    claim as recited here in Claim 3 of the '164

17    patent?

18      A.  Yes.

19      Q.  Read the next two lines, beginning

20    with "means for ascertaining."

21      A.  Okay.

22      Q.  Do you understand ClinicaLogic with

23    ClaimFacts -- strike that.

24          Do you understand ClaimFacts with

25    ClinicaLogic to include a means for

114

1    ascertaining whether the at least one claim

2    contains a plurality of medical service

3    codes?

4      A.  Yes.

5      Q.  If you could turn to the next

6    subparagraph, beginning with "means for

7    determining."

8          (Pause in proceedings.)

9        THE WITNESS:  Okay.

10   BY MR. HENDERSHOT:

11     Q.  Is every element here in this

12   subparagraph, beginning with "means for

13   determining," of Claim 3 of the '164 patent

14   included within ClaimFacts with

15   ClinicaLogic?

16     A.  Yes.

17     Q.  Would you turn to the next

18   subparagraph, which is -- begins with "means

19   for authorizing."

20     A.  All right.

21     Q.  Is everything described in that

22   subparagraph of Claim 3 of the '164 patent

23   included within ClaimFacts with

24   ClinicaLogic?

25     A.  Yes.

9/14/2005  Keplinger, Patricia (Harrington Benefit Services)

1      Q.  If you could turn to the last

2      subparagraph, Claim 3, beginning with "means

3      for rejecting."

4      A.  Uh-huh.

5      Q.  Is everything included within that

6      subparagraph of Claim 3 of the '164 patent

7      included within the ClaimFacts system with

8      ClinicaLogic?

9      A.  Yes.

10     Q.  So every element described here in

11     Claim 3 of the '164 patent is included

12     within the ClaimFacts system with

13     ClinicaLogic?

14     A.  Yes.

15     Q.  And it's included within the

16     claim -- strike that.

17          And every element of Claim 3

18     described here in the '164 patent is

19     included within ClaimFacts with ClinicaLogic

20     as you received it from TriZetto?

21     A.  Yes.

22     Q.  And that last question, is -- do

23     you -- is the answer also yes for Claims 2

24     and 1 that we've been through?

25     A.  Yes.

116

1      THE VIDEOGRAPHER:  Excuse me.  We

2   need to change the tapes real quick.  We're

3   off the record.

4          (Pause in proceedings.)

5   BY MR. HENDERSHOT:

6      Q.  Ms. Keplinger, before we went off

7   the record, I believe we discussed the

8   elements of Claims 1, 2, and 3 of the '164

9   patent; is that correct?

10     A.  Correct.

11     Q.  And with respect to Claim 1 of the

12  '164 patent, you had identified no steps in

13  the method recited in Claim 1 that are not

14  performed by ClaimFacts with ClinicaLogic;

15  is that correct?

16     A.  Correct.

17     Q.  So everything disclosed in Claim 1

18  of the '164 patent is performed by

19  ClaimFacts with ClinicaLogic?

20     A.  Yes.

21     Q.  And with respect to Claim 2, every

22  step disclosed in the method of Claim 2 of

23  the '164 patent is performed by ClinicaLogic

24  with -- strike that.

25         With respect to Claim 2 of the '164

1    patent, every step of the method recited in

2    Claim 2 is performed by ClaimFacts with

3    ClinicaLogic; is that correct?

4        A.  Correct.

5        Q.  With respect to Claim 3, every

6    element of Claim 3 as described here in the

7    '164 patent is present in the ClaimFacts

8    system with ClinicaLogic; is that correct?

9        A.  Correct.

10       Q.  If I could turn your attention to

11   Claim 4, which is at the bottom of Column

12   117.

13       A.  Uh-huh.

14       Q.  Claim 4 begins with the language

15   saying, "the apparatus of Claim 3."

16           I'll represent to you that that

17   means the elements of Claim 3 are

18   incorporated by reference in Claim 4.

19       A.  All right.

20       Q.  Given that we've discussed that all

21   the elements of Claim 3 of the '164 patent

22   are present in ClaimFacts with ClinicaLogic,

23   I assume that that would hold true for that

24   part of Claim 4, as well?

25       A.  That is correct.

118

9/14/2005  Keplinger, Patricia (Harrington Benefit Services)

1      Q.  Could you read the remainder of

2   Claim 4 for me.

3            (Pause in proceedings.)

4        THE WITNESS:  Okay.

5   BY MR. HENDERSHOT:

6      Q.  Is there anything described in

7   Claim 4 that is not performed by Clinic --

8   ClaimFacts with ClinicaLogic?

9      A.  No.

10     Q.  So everything described in Claim 4,

11   including the elements referenced by

12   Claim 3, are present in ClaimFacts with

13   ClinicaLogic?

14     A.  Yes.

15     Q.  I'll direct your attention to

16   Claim 5 at the top of Column 118.  Claim 5

17   again incorporates the elements of 4 and 3.

18          Could you read the remainder of

19   Claim 5 for me, please.

20            (Pause in proceedings.)

21        THE WITNESS:  Okay.

22   BY MR. HENDERSHOT:

23     Q.  Does Claim 5 -- strike that.

24          Is there anything described in

25   Claim 5 of the '164 patent that is not

9/14/2005  Keplinger, Patricia (Harrington Benefit Services)

1    present in ClaimFacts with ClinicaLogic?

2        A.  No.

3        Q.  Would you turn to Claim 6, please.

4            Is there anything within Claim 6

5    that's not included within ClaimFacts with

6    ClinicaLogic?

7        A.  No.

8        Q.  Are you familiar with CRVS codes,

9    Ms. Keplinger?

10       A.  Not to any degree of detail.

11       Q.  Do you know if any CRVS codes are

12   included within ClaimFacts and ClinicaLogic?

13       A.  Not to my knowledge.

14       Q.  Okay.  If you could turn to Claim 8

15   in Column 118.

16           (Pause in proceedings.)

17       THE WITNESS:  Okay.

18   BY MR. HENDERSHOT:

19       Q.  Is there any element in Claim 8 that

20   is not -- strike that.

21           Is everything described in Claim 8

22   included within ClaimFacts with

23   ClinicaLogic?

24       A.  Yes.

25       Q.  Turn to Claim 9.

1          (Pause in proceedings.)

2          THE WITNESS:  Okay.

3      BY MR. HENDERSHOT:

4          Q.  Is everything described in Claim 9

5      of the '164 patent included within

6      ClaimFacts with ClinicaLogic?

7          A.  Yes.

8          Q.  So just to be clear, every element

9      described in each of Claims 1, 2, 3, 4, 5,

10     6, 8, and 9, is included and/or performed by

11     ClaimFacts with ClinicaLogic?

12         A.  Yes.

13         Q.  Okay.  Would you read the first

14     paragraph of Claim 10 for me.  Actually,

15     take -- strike that.  Take a step back real

16     quick.

17          And all of the elements of Claims 1,

18     2, 3, 4, 5, 6, 8, and 9, which are either

19     present in or performed by ClaimFacts with

20     ClinicaLogic are present in or performed by

21     ClaimFacts with ClinicaLogic as received by

22     TriZetto; is that correct?

23         A.  Yes.

24         Q.  Now, if you could read the first

25     paragraph of Claim 10 for me.

9/14/2005  Keplinger, Patricia (Harrington Benefit Services)

1          (Pause in proceedings.)

2          THE WITNESS:  Okay.

3    BY MR. HENDERSHOT:

4        Q.  Is everything described in the first

5    paragraph of Claim 10 of the '164 patent

6    included within ClaimFacts with

7    ClinicaLogic?

8        A.  Yes.

9        Q.  Would you read the next paragraph,

10   beginning with, "A predetermined database,"

11   right there.

12          (Pause in proceedings.)

13          THE WITNESS:  Okay.

14   BY MR. HENDERSHOT:

15       Q.  Is there anything described in that

16   paragraph that is not present in ClaimFacts

17   with ClinicaLogic?

18       A.  No.

19       Q.  Could you read the next line.

20   Begins with "Means for receiving."

21       A.  Uh-huh.

22       Q.  Is there anything described in that

23   line that is not included within ClaimFacts

24   with ClinicaLogic?

25       A.  No.

122

9/14/2005  Keplinger, Patricia (Harrington Benefit Services)

1     Q.  If you'd read the next two lines,

2  beginning with, "Means for ascertaining."

3     A.  Okay.

4     Q.  Is everything described in those two

5  lines of Claim 10 of the '164 patent

6  included within ClaimFacts with

7  ClinicaLogic?

8     A.  Yes.

9     Q.  If you'd read the next subparagraph

10  of Claim 10 of the '164 patent.

11     A.  Okay.

12     Q.  Is there anything in -- strike that.

13       Is everything described in that

14  subparagraph present in ClaimFacts with

15  ClinicaLogic?

16     A.  Yes.

17     Q.  Could you read the next subparagraph

18  of Claim 10.

19     A.  Okay.

20     Q.  Is everything described in that

21  subparagraph of Claim 10 of ClinicaLogic --

22  strike that.

23       Is everything in that subparagraph

24  of Claim 10 of the '164 patent included with

25  ClaimFacts with ClinicaLogic?

123

9/14/2005  Keplinger, Patricia (Harrington Benefit Services)

1       A.  Yes.

2       Q.  And just so the record's clear, what

3   do you have as the next subparagraph of

4   Claim 10?

5       A.  "Means for rejecting."

6       Q.  Could you read that subparagraph to

7   yourself for me, please.

8            (Pause in proceedings.)

9            THE WITNESS:  Okay.

10  BY MR. HENDERSHOT:

11      Q.  Is everything described in that

12  subparagraph of Claim 10 of the '164 patent

13  present within ClaimFacts?

14      A.  Yes.

15      Q.  So every element -- so every element

16  described in Claim 10 of the '164 patent,

17  which has been marked as Exhibit 2, is

18  included within ClaimFacts with

19  ClinicaLogic?

20      A.  Yes.

21      Q.  And it's included within -- and each

22  element -- strike that.

23          And each element of Claim 10 of the

24  '164 patent is included within ClaimFacts

25  with ClinicaLogic as received from TriZetto?

9/14/2005  Keplinger, Patricia (Harrington Benefit Services)

1      A.  Yes.

2      Q.  Could you please read Claim 11 for

3    me.

4          THE WITNESS:  All right.

5      BY MR. HENDERSHOT:

6      Q.  Is everything recited in Claim 11 of

7    the '164 patent included within ClaimFacts

8    with ClinicaLogic?

9      A.  I'm not sure what "rejected" means

10   in this paragraph.

11     Q.  Okay.  If we refer back to Claim 10,

12   the last paragraph which you said was

13   present in ClaimFacts --

14     A.  Oh, okay.  Yes.

15     Q.  So is everything in Claim 11 present

16   in ClaimFacts with ClinicaLogic?

17     A.  Yes.

18     Q.  So everything within Claim 11 of the

19   '164 patent is included within ClaimFacts

20   with ClinicaLogic as received by TriZetto?

21     A.  Yes.

22     Q.  As received from TriZetto?

23     A.  Yes.

24     Q.  Turn to Claim 12 for me.

25     A.  Okay.

125

9/14/2005 Keplinger, Patricia (Harrington Benefit Services)

1      Q.  Have you reviewed the first

2    subparagraph of Claim 12?

3         Is there anything in the first

4    subparagraph of Claim 12 that is not present

5    in ClaimFacts with ClinicaLogic?

6      A.  No.

7      Q.  Could you read the second

8    subparagraph of Claim 10 -- or strike that.

9         Could you read the second

10    subparagraph of Claim 12 beginning with, "A

11    predetermined database."

12         THE WITNESS:  Okay.

13    BY MR. HENDERSHOT:

14      Q.  Is there anything in the second

15    subparagraph of Claim 12 that's not present

16    in ClaimFacts with ClinicaLogic?

17      A.  No.

18      Q.  Would you read the third

19    subparagraph of Claim 11.

20      A.  Uh-huh.

21      Q.  Is there anything in that

22    subparagraph that's not present in

23    ClaimFacts with ClinicaLogic?

24      A.  No.

25      Q.  Could you read the next

1    subparagraph, beginning with, "Means for

2    ascertaining."

3        A.  Okay.

4        Q.  Is there anything in that

5    subparagraph that's not present in

6    ClaimFacts with ClinicaLogic?

7        A.  No.

8        Q.  Would you read the next subparagraph

9    beginning with, "Means for determining."

10        A.  Okay.

11        Q.  Is there anything in that

12    subparagraph of Claim 12 of the '164 patent

13    that's not present in ClaimFacts with

14    ClinicaLogic?

15        A.  No.

16        Q.  And what do you have as the next

17    subparagraph?

18        A.  "Means for authorizing."

19        Q.  Could you read that subparagraph for

20    me.

21        THE WITNESS:  Okay.

22    BY MR. HENDERSHOT:

23        Q.  Is there anything in that

24    subparagraph that's not present in

25    ClaimFacts with ClinicaLogic?

1      A.  No.

2      Q.  Could you read the final

3  subparagraph.

4      A.  Okay.

5      Q.  Is there anything described in the

6  final subparagraph of Claim 12 that's not

7  present in ClaimFacts with ClinicaLogic?

8      A.  No.

9      Q.  So every element described in

10  Claim 12 of the '164 patent is present in

11  ClaimFacts with ClinicaLogic?

12      A.  Yes.

13      Q.  And every element of Claim 12 of the

14  '164 patent is present in ClaimFacts with

15  ClinicaLogic as received from TriZetto?

16      A.  Yes.

17      Q.  Turn to Claim 13.  Could you read

18  the first subparagraph to yourself for me.

19      A.  Okay.

20      Q.  Is there anything recited in the

21  first subparagraph of Claim 13 of the '164

22  patent that's not included within

23  ClaimFacts?

24      A.  No.

25      Q.  Could you read the second

1    subparagraph beginning with, "A

2    predetermined database."

3         A.  Okay.

4         Q.  Is there anything within that

5    subparagraph of Claim 13 that is not present

6    within ClaimFacts with ClinicaLogic?

7         A.  No.

8         Q.  Could you read the next line of

9    Claim 13 beginning with, "Means for

10   receiving."

11        A.  Okay.

12        Q.  Is there anything present in that

13   line -- strike that.

14             Is everything described in that line

15   of Claim 13 present in ClaimFacts with

16   ClinicaLogic?

17        A.  Yes.

18        Q.  Would you read the next subparagraph

19   beginning with, "Means for determining."

20        A.  Okay.

21        Q.  Is there anything described in that

22   subparagraph of Claim 13 that's not present

23   in ClaimFacts with ClinicaLogic?

24        A.  No.

25        Q.  And what do you have as the next

9/14/2005  Keplinger, Patricia (Harrington Benefit Services)

1    subparagraph?

2        A.  "Means for informing."

3        Q.  Could you read that subparagraph for

4    me.

5        A.  Okay.

6        Q.  Is there anything described in that

7    subparagraph of Claim 13 that's not present

8    in ClaimFacts with ClinicaLogic?

9        A.  No.

10       Q.  So everything recited in Claim 13 of

11   the '164 patent is present within ClaimFacts

12   with ClinicaLogic as Harrington receives

13   that from TriZetto?

14       A.  Yes.

15       Q.  Could you read the first

16   subparagraph of Claim 14, please.

17       A.  Okay.

18       Q.  Is there anything included within

19   that subparagraph that's not present in

20   ClaimFacts with ClinicaLogic?

21       A.  No.

22       Q.  Would you read the next subparagraph

23   beginning, "A predetermined database."

24       A.  Okay.

25       Q.  Is there anything present in that

9/14/2005  Keplinger, Patricia (Harrington Benefit Services)

1    subparagraph of Claim 14 that's not present

2    in ClaimFacts?

3    A.  No.

4    Q.  Does the same hold true for the next

5    line?

6    A.  Yes.

7    Q.  The next subparagraph?

8    A.  Yes.

9    Q.  Everything described in the next

10   subparagraph beginning with, "Means for

11   determining," present in ClaimFacts?

12   A.  Yes.

13   Q.  Then with respect to the next

14   subparagraph that begins, "Means for

15   authorizing," is everything described in

16   that subparagraph present in ClaimFacts with

17   ClinicaLogic?

18   A.  Yes.

19   Q.  Then if you could read the last

20   paragraph of Claim 14 for me.  Let me know

21   when you've read it.

22   A.  Okay.

23   Q.  Is there anything described in that

24   subparagraph of Claim 14 that's not present

25   in ClaimFacts with -- with ClinicaLogic?

131

1    A.  No.

2    Q.  That's a no?

3    A.  That's a no.

4    Q.  So everything described in Claim 14

5    of the 164 patent is included within

6    ClaimFacts with ClinicaLogic as that product

7    is received from TriZetto?

8    A.  Correct.

9    Q.  Would you turn to Claim 15 for me,

10    please.  Read the first subparagraph.

11    A.  Okay.

12    Q.  Is everything described in the first

13    subparagraph of Claim 15 present in

14    ClaimFacts with ClinicaLogic?

15    A.  Yes.

16    Q.  Does the same hold true for the next

17    subparagraph beginning with, "A

18    predetermined database"?

19    A.  Yes.

20    Q.  Does the same hold true for the next

21    line beginning, "Means for receiving"?

22    A.  Yes.

23    Q.  Does the same hold true for the next

24    two lines beginning with, "Means for

25    ascertaining"?

9/14/2005  Keplinger, Patricia (Harrington Benefit Services)

1    A.  Yes.

2    Q.  Does the same hold true for the next

3    subparagraph, "Means for determining"?

4    A.  Yes.

5    Q.  Does the same hold true for the next

6    subparagraph beginning, "Means for

7    authorizing"?

8    A.  Yes.

9    Q.  And does the same hold true for the

10   next subparagraph beginning, "Means for

11   rejecting"?

12   A.  Yes.

13   Q.  So every element described in

14   Claim 15 of the '164 patent is included

15   within ClaimFacts with ClinicaLogic as

16   received from TriZetto?

17   A.  Yes.

18   Q.  Could you turn to Claim 16 and read

19   the first subparagraph to yourself, please.

20        (Pause in proceedings.)

21      THE WITNESS:  Okay.

22   BY MR. HENDERSHOT:

23   Q.  Is everything described in the first

24   subparagraph of Claim 16 included within --

25   with -- strike that.

133

1      Is everything described in the first

2    subparagraph of Claim 16 included within

3    ClaimFacts with ClinicaLogic?

4      A. Yes.

5      Q. Does the same hold true for the next

6    line, beginning with receiving?

7      A. Yes.

8      Q. Does the same hold true for the next

9    line beginning with, "Ascertaining"?

10     A. Yes.

11     Q. Does the same hold true for the next

12   line beginning with, "Determining"?

13     A. Yes.

14     Q. Does the same hold true with the

15   next line beginning with, "Authorizing"?

16     A. Yes.

17     Q. And does the same hold true with the

18   next line with respect to "Rejecting"?

19     A. Yes.

20     Q. So every element described in

21   Claim 16 of the '164 patent is present in

22   ClaimFacts with ClinicaLogic as that product

23   is received from TriZetto?

24     A. Yes.

25     Q. So to make sure I've got everything

9/14/2005  Keplinger, Patricia (Harrington Benefit Services)

1    straight, it is your testimony that every

2    element of Claims 1, 2, 3, 4, 5, 6, 8, 9,

3    10, 11, 12, 13, 14, 15, and 16, of the '164

4    patent is either present in or practiced by

5    ClaimFacts with ClinicaLogic as that product

6    is received from TriZetto?

7        MR. KENNEDY:  Objection; asked and

8    answered.

9    BY MR. HENDERSHOT:

10    Q.  You can answer.

11    A.  Yes.

12    Q.  So the only claim within the '164

13    patent that we've discussed here today where

14    every limitation -- strike that.

15        So the only claim within the '164

16    patent, which are the numbered paragraphs at

17    the back of Exhibit 2, where every element

18    is not present within ClaimFacts with

19    ClinicaLogic is Claim 7 with respect to the

20    CRVS codes?

21    A.  Yes.

22    Q.  Every other element of every other

23    claim described here in the '164 patent is

24    present in ClaimFacts and ClinicaLogic?

25        MR. KENNEDY:  Same objection.  Asked

9/14/2005  Keplinger, Patricia (Harrington Benefit Services)

1    and answered.

2       A.  Yes.

3       Q.  Okay.  Direct your attention to

4    Claim 3.  The third subparagraph begins

5    with, "Means for receiving at least one

6    claim"?

7       A.  Uh-huh.

8       Q.  What is the means for receiving a

9    claim when using ClinicaLogic -- strike

10   that.

11        What is the means for receiving at

12   least one claim in ClaimFacts with

13   ClinicaLogic?

14      A.  Same as it would be without it.  I

15   mean, either a claim can be entered manually

16   or it can be entered electronically into the

17   system.

18      Q.  And in either event, it's an

19   interface with a computer system --

20      A.  Yes.

21      Q.  -- where the claim is input?

22      A.  That's correct.

23      Q.  And with respect to the next

24   subparagraph, it says, "Means for

25   ascertaining whether the at least one claim

1    contains a plurality of medical service

2    codes"?

3        A.  Uh-huh.

4        Q.  Is the means for ascertaining

5    whether the at least one claim contains a

6    plurality of medical service codes within

7    ClaimFacts the software?

8        A.  Yes.

9        Q.  And why would -- do you -- strike

10   that.

11        Do you know why ClaimFacts would

12   ascertain whether a plurality of medical

13   service codes are on a claim?

14       A.  Well, for a couple different

15   reasons.  One, to check for possible

16   duplicates, and another would be to check

17   for billing -- potential billing errors.

18       Q.  So ClaimFacts ascertains whether --

19   strike that.

20        So the ClaimFacts software

21   ascertains how many -- strike that.

22        So the ClaimFacts software

23   ascertains whether there are a plurality of

24   medical service codes on a claim to

25   facilitate processing of that claim for

9/14/2005  Keplinger, Patricia (Harrington Benefit Services)

1    payment?

2       A.  Yes.

3       Q.  If you look at the next

4    subparagraph, it's a means for determining.

5       A.  Uh-huh.

6       Q.  I believe we've read this in a few

7    claims by now.

8       A.  Yes.

9       Q.  Is the means for determining whether

10   one of the medical service codes in a claim

11   is valid or invalid within ClaimFacts the

12   software?

13      A.  Yes.

14      Q.  So the -- so the means for

15   determining, as described here in Claim 3 of

16   the '164 patent, the equivalent structure

17   within ClaimFacts that would provide that

18   means is the ClaimFacts software?

19      A.  (Indicates affirmatively.)

20      Q.  Would you look at the next

21   subparagraph, which is "Means for

22   authorizing."

23      A.  Okay.

24      Q.  Again, is the means for authorizing

25   within ClaimFacts the ClaimFacts software?

9/14/2005  Keplinger, Patricia (Harrington Benefit Services)

1       A.  Yes.

2       Q.  And with respect to the means for

3    rejecting, the means for rejecting within

4    ClaimFacts is the ClaimFacts software?

5       A.  Yes.

6       Q.  And just so we're clear, with

7    respect to the means for determining whether

8    one of the medical service codes in a

9    plurality of medical service codes is valid,

10   what purpose is that done, why is that done?

11      A.  Make sure the proper payment is made

12   as a result.

13      Q.  And that's done by the software

14   again?

15      A.  Yes.

16      Q.  Now, with respect to the means for

17   authorizing, the means for rejecting medical

18   service codes that are valid or invalid,

19   that's also the software, correct?

20      A.  Yes.

21      Q.  And that's also done to ensure that

22   the claims are paid properly?

23      A.  Yes.

24      Q.  Would you look at Claim 5 for me

25   really quickly.

1     Claim 5 describes a means for

2    informing a user why the at least one claim

3    was revised.  Do you see that?

4    A.  Yes.

5    Q.  Within ClaimFacts, is it the

6    ClaimFacts software that is the means for

7    informing a user why the at least one claim

8    was revised?

9    A.  Yes.

10    Q.  And do you understand why that would

11    be done in Claim -- ClaimFacts?

12    A.  Yes.

13    Q.  Why is that?

14    A.  Well, normally there is an

15    explanation that goes out to the provider of

16    service, telling them why in certain

17    situations payment change is made.

18    Q.  So to provide some rationale or

19    justification?

20    A.  Uh-huh.  Yes.

21    Q.  If you would look at Claim 11 for

22    me, please.  Claim 11 includes a means for

23    revising the at least one claim to not

24    include a rejected medical service code?

25    A.  Yes.

9/14/2005  Keplinger, Patricia (Harrington Benefit Services)

1      Q.  Within ClaimFacts, is the means for

2    revising the at least one claim to not

3    include a rejected medical service code the

4    ClaimFacts software?

5      A.  Yes.

6      Q.  And why would -- strike that.

7         And the ClaimFacts software would

8    revise the at least one claim to not include

9    a rejected medical service code to ensure

10   that the claim was paid appropriately?

11     A.  Yes.

12     Q.  And with respect to all of the edits

13   within ClaimFacts, specifically

14   ClinicaLogic, be it medical exclusivity,

15   some sort of nonmedical criteria, the means

16   for implementing all those edits and making

17   those determinations within ClaimFacts is

18   the software?

19     A.  Yes.

20     Q.  And that's the software provided by

21   TriZetto?

22     A.  Correct.

23     Q.  And all of those determinations made

24   by the ClaimFacts, probably more

25   specifically the ClinicaLogic software and

9/14/2005  Keplinger, Patricia (Harrington Benefit Services)

1    database, the purpose for making those

2    determinations, be it medical exclusivity,

3    some sort of nonmedical criteria,

4    unbundling, is to ensure that the claims are

5    paid correctly; is that right?

6        A.  Yes.

7        Q.  And the -- the means within

8    ClaimFacts or ClinicaLogic for making any

9    revisions or edits to a -- the codes on a

10   claim is the ClaimFacts software; is that

11   correct?

12       A.  Yes.

13       Q.  And if I could direct your attention

14   to Claim 1, the first subparagraph.

15       A.  Yes.

16       Q.  Beginning on the first line, on the

17   second half of it, it says, "Means for

18   operating on a predetermined database."

19       A.  Yes.

20       Q.  Is the means for operating on the

21   predetermined database within ClaimFacts

22   with ClinicaLogic the ClaimFacts software?

23       A.  Yes.

24       Q.  And the ClaimFacts software operates

25   on the predetermined database within

9/14/2005  Keplinger, Patricia (Harrington Benefit Services)

1    ClinicaLogic to ensure that a received claim

2    is paid appropriately pursuant to the

3    relationships within a ClinicaLogic

4    database?

5        A.  Yes.

6            MR. HENDERSHOT:  Can we take a brief

7    break, two minutes or so?  Is that all

8    right?

9            MR. GARVINE:  Sure.

10           MR. KENNEDY:  Yeah.

11               (Recess taken.)

12   BY MR. HENDERSHOT:

13       Q.  Ms. Keplinger, we had discussed the

14   claims with the '164 patent, and

15   specifically how every element of Claims 1

16   through 6 and 8 through 12 -- and 8 through

17   16 of the '164 patent are either present in

18   or practiced by ClaimFacts with ClinicaLogic

19   as TriZetto provides that product to

20   Harrington, correct?

21       A.  Yes.

22       Q.  With respect to the functionality

23   and sort of the elements described in the

24   claims of the '164 patent, if ClaimFacts

25   with ClinicaLogic didn't offer those