IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

MCKESSON INFORMATION
SOLUTIONS LLC,

              Plaintiff,

       v.

THE TRIZETTO GROUP, INC.

           Defendant.

Civil Action No. 04-1258-SLR

**REDACTED VERSION**

### THE TRIZETTO GROUP, INC.'S ANSWERING BRIEF IN OPPOSITION TO MCKESSON'S MOTION FOR SUMMARY JUDGMENT REGARDING TRIZETTO'S EIGHTH AFFIRMATIVE DEFENSE

MORRIS, NICHOLS, ARSHT & TUNNELL, LLP
Jack B. Blumenfeld (#1014)
Rodger D. Smith, II (#3778)
1201 North Market Street
P.O. Box 1347
Wilmington, Delaware 19899-1347
(302) 658-9200

*Attorneys for Defendant*
*The TriZetto Group, Inc.*

OF COUNSEL:

Jeffrey T. Thomas
David A. Segal
Michael A. Sitzman
GIBSON, DUNN & CRUTCHER LLP
Jamboree Center, 4 Park Plaza
Irvine, California 92614-8557
(949) 451-3800

Original Filing Date:  January 10, 2006

Redacted Filing Date:  January 18, 2006

# TABLE OF CONTENTS

Page

TABLE OF CITATIONS — iv

NATURE AND STAGE OF PROCEEDINGS — 1

SUMMARY OF ARGUMENT — 2

STATEMENT OF FACTS — 4

A. As Early As 1988, McKesson And Its Predecessors Recognized TriZetto's Predecessors As Competitors With Competitive And Potentially Infringing Products — 4

B. After The Patent Issued, McKesson's Predecessors Took No Action To Assert The '164 Patent Against Erisco Or RIMS — 6

C. There Was Still No Action Taken To Assert Or Enforce The '164 Patent When TriZetto Acquired Erisco And RIMS — 8

ARGUMENT — 9

A. McKesson's Burden On Summary Judgment — 9

B. Summary Judgment Dismissing TriZetto's Laches Defense Must Be Denied Because The Six-Year Presumption Applies And McKesson Has Proffered No Legally Cognizable Excuse To Justify Its Delay — 9

1. TriZetto Is Entitled To A Presumption That Laches Applies Because McKesson Delayed Filing Suit For More Than Six Years — 10

2. No Excuses Apply To Justify McKesson's Prolonged And Unreasonable Delay In Filing Suit — 11

a. HPR's "Other Litigation" With GMIS Does Not Excuse McKesson's Delay — 11

b. McKesson's "Business Negotiations" With TriZetto Do Not Excuse McKesson's Delay — 13

c. The Change In Management At HPR Does Not Excuse McKesson's Delay And Is Not An Excuse For Laches — 16

iii.

d.  There Was More Than a Six-Year Delay Even If All of McKesson's Excuses Are Accepted.   18

3.  TriZetto Has Been Significantly Prejudiced As A Result Of McKesson's Delay   19

a.  Economic Prejudice   19

b.  Evidentiary Prejudice   23

4.  TriZetto's Laches Defense Precludes Recovery By McKesson For Damages Accrued Prior To The Date Of Filing Of The Complaint   27

C.  A Significant Issue Of Material Fact Exists Such That Summary Judgment Dismissing TriZetto's Equitable Estoppel Defense Is Inappropriate   28

1.  McKesson's Conduct Was Misleading   29

2.  TriZetto Relied On McKesson's Conduct   32

3.  TriZetto Would Suffer Material Prejudice If This Suit Were Allowed To Proceed.   35

4.  Summary Judgment In Favor Of McKesson Is Inappropriate At This Time Because The Special Discovery Master's Recent Orders Will Potentially Uncover Further Information Relevant To TriZetto's Equitable Defenses   36

CONCLUSION   37

iv.

## TABLE OF CITATIONS

                                                                        Page(s)

Cases

*A.C. Aukerman Co. v. R.L. Chaides Constr. Co.*,
    960 F.2d 1020 (Fed. Cir. 1992)                      passim

*ABB Robotics, Inc. v. GMFanuc Robotics Corp.*,
    52 F.3d 1062 (Fed. Cir. 1995)                        20, 29

*Adelberg Labs., Inc. v. Miles, Inc.*,
    921 F.2d 1267 (Fed. Cir. 1990)                       11, 22

*American Home Prod. Corp. v. Lockwood Mfg. Co.*,
    483 F.2d 1120 (6th Cir. 1973)                            22

*Continental Coatings Corp. v. Metco, Inc.*,
    464 F.2d 1375 (7th Cir. 1972)                            13

*Eastman Kodak Co. v. The Goodyear Tire & Rubber Co.*,
    114 F.3d 1547 (Fed. Cir. 1997)                           17

*Ecolab, Inc. v. Envirochem, Inc.*,
    264 F.3d 1358 (Fed. Cir. 2001)                           20

*General Electric Co. v. Sciaky Brothers*,
    304 F.2d 724 (6th Cir. 1962)                             13

*Genzyme Corp. v. Atrium Med. Corp.*,
    2003 U.S. Dist. LEXIS 12784 (D. Del. 2003)           16, 17

*Giese v. Pierce Chem. Co.*,
    29 F. Supp. 2d 33 (D. Mass. 1998)                13, 14, 16

*GMIS v. HPR, Inc.*,
    Civil Action 94-CV-0576 (E.D. Pa.)                    6, 31

*Hall v. Aqua Queen Mfg., Inc.*,
    93 F.3d 1548 (Fed. Cir. 1996)                        12, 27

*Helifix Ltd. v. Blok-Lok, Ltd.*,
    208 F.3d 1339 (Fed. Cir. 2000)                           24

v.

*Hemstreet v. Computer Entry Systems Corp.*,
   972 F.2d 1290 (Fed. Cir. 1992)      19

*Hermes Int'l v. Lederer de Paris Fifth Ave., Inc.*,
   219 F.3d 104 (2d Cir. 2000)      27

*Horowitz v. Fed. Kemper Life Assurance Co.*,
   57 F.3d 300 (3d Cir. 1995)      9

*Jamesbury Corp. v. Litton Indus. Prods., Inc.*,
   839 F.2d 1544 (Fed. Cir. 1988)      12

*Lane & Bodley Co. v. Locke*,
   150 U.S. 193 (1893)      15

*Lemelson v. Wang Labs., Inc.*,
   874 F. Supp. 430 (D. Mass. 1994)      13

*Myers v. Asics Corp.*,
   974 F.2d 1304 (Fed. Cir. 1992)      29

*Myers v. Brooks Shoe, Inc.*,
   912 F.2d 1459 (Fed. Cir. 1992)      29

*Northern Telecom Inc. v. Datapoint Corp.*,
   23 U.S.P.Q.2d 1881 (N.D. Tex. 1992)      26

*Odetics, Inc. v. Storage Tech. Corp.*,
   14 F. Supp. 2d 785 (E.D. Va. 1998)      2, 18, 27

*Odetics, Inc. v. Storage Tech. Corp.*,
   185 F.3d 1259 (Fed. Cir. 1999)      17

*Pa. Coal Ass'n v. Babbitt*,
   63 F.3d 231 (3d Cir. 1995)      9

*Philips Elecs. N. Am. Corp. v. Contec Corp.*,
   312 F. Supp. 2d 639 (D. Del. 2004)      28

*RCA Corp. v. Data General Corp.*,
   701 F. Supp. 456 (D. Del. 1988)      13

*Scholle Corp. v. Blackhawk Molding Co.*,
   133 F.3d 1469 (Fed. Cir. 1998)      28

*Vaupel Testilmaschinen KG v. Meccanica Euro Italia S.P.A.*,
   944 F.2d 870 (Fed. Cir. 1991)      11, 12

vi.

*Wanlass Int'l Inc. v. General Electric Co.*,
    148 F.3d 1334 (Fed. Cir. 1998)    9, 24

*Watkins v. Northwestern Ohio Tractor Pullers Ass'n.*,
    630 F.2d 1155 (6th Cir. 1980)    13

Statutes

35 U.S.C. § 102(b)    23

## NATURE AND STAGE OF PROCEEDINGS

On September 13, 2004, McKesson Information Solutions, LLC ("McKesson") filed this suit against The TriZetto Group, Inc. ("TriZetto") alleging infringement of U.S. Patent No. 5,253,164 (the "'164 patent"), which issued nearly eleven years earlier. On October 1, 2004, McKesson amended its Complaint. On November 1, 2004, TriZetto answered and filed a counterclaim seeking a declaratory judgment of invalidity, unenforceability, and non-infringement.

McKesson alleges that three of TriZetto's products (Facets, ClaimFacts and QicLink) infringe fifteen claims of the '164 patent (Claims 1-6 and 8-16). Fact and expert discovery have been completed, except for further depositions of senior McKesson officers and the former CEO of McKesson's predecessor, Health Payment Review, Inc. ("HPR"), who were improperly instructed not to respond to questions regarding TriZetto's equitable estoppel defense and McKesson's patent strategies. Pursuant to an Order of the Special Discovery Master, McKesson must make these individuals available for redeposition. McKesson was also ordered to produce certain documents relating to TriZetto's equitable defenses and McKesson's strategy to delay pursuit of patent enforcement, which McKesson had withheld on the grounds of privilege.

The Court has bifurcated the issue of invalidity and stayed motion practice and trial on those issues. On the issues of infringement, damages and equitable defenses, motion practice is proceeding and scheduled for hearing on February 16, 2006, at which time the Court is also scheduled to consider any issues of claim construction. Trial on the issues of infringement, damages and equitable defenses is set for April 17, 2006.

2.

On December 15, 2006, TriZetto moved for summary judgment on the basis of laches. McKesson also filed a motion for summary judgment challenging TriZetto's laches, equitable estoppel, waiver, and acquiescence defenses (collectively, the "Eighth Affirmative Defense"). This is TriZetto's brief in opposition to McKesson's Motion for Summary Judgment Regarding TriZetto's Eighth Affirmative Defense.

## SUMMARY OF ARGUMENT

McKesson's motion for summary judgment of TriZetto's Eighth Affirmative Defense combines the facts, evidence and law applicable to the "separate and distinct" defenses of equitable estoppel and laches.[1] Focusing on the equitable estoppel defense, McKesson acknowledges that there was no mention of patent infringement, no threat of patent enforcement or any discussion of licensing the '164 patent to TriZetto or its predecessors between the time the patent issued in October 1993 until a copy of the patent was sent to TriZetto's CEO in October 2001 – eight years later. *See, e.g.,* D.I. 160, at 4-5; 9; 11-14. Thus, McKesson contends, there was no action taken by McKesson (or its predecessors) that should have caused TriZetto (or its predecessors) to be concerned that there was an imminent threat of legal action. This firmly establishes the existence of the laches presumption and the fact that McKesson cannot rebut it.

---

[1]    Laches and estoppel are two "separate and distinct" defenses. *Odetics, Inc. v. Storage Tech. Corp.,* 14 F. Supp. 2d 785, 789 (E.D. Va. 1998), *aff'd in part, rev'd in part by* 185 F.3d 1259 (Fed. Cir. 1999). Although facts may sometimes lend themselves to analysis under the principles of both equitable estoppel and laches, the Federal Circuit has clearly held that the two defenses are not the same. *A.C. Aukerman Co. v. R.L. Chaides Constr. Co.,* 960 F.2d 1020, 1034, 1042 (Fed. Cir. 1992) (*en banc*). Although the prejudice prong for both defenses is similar, the other elements are quite different. *See id.* at 1042-43 ("[T]he concepts of equitable estoppel and laches are distinct from one another."). The most significant difference is that laches, unlike equitable estoppel, has a six-year presumption. *Id.* at 1043. TriZetto clearly proved this presumption in its moving papers, while McKesson wholly fails to rebut this presumption.

3.

Thus, TriZetto moved for partial summary judgment on the doctrine of laches, because there is no issue of material fact as to that defense and McKesson has proffered no reasonable or valid excuse to justify its delay.

TriZetto did not move for summary judgment on equitable estoppel because issues of material fact exist. The evidence shows that McKesson's conduct was misleading, that TriZetto relied upon McKesson's silence and other inconsistent conduct, and that McKesson's misleading conduct caused TriZetto material prejudice, both economic and evidentiary.


REDACTED



Together with its decade-long decision not to pursue patent enforcement against Erisco following its self-proclaimed victory against GMIS in 1995, HPR's actions, inactions and silence were at best misleading.

McKesson argues that there is no evidence that TriZetto relied on McKesson's conduct, because it continued its business as usual and did not make any significant product changes. Although this argument is repeatedly made, it misses the mark on each occasion. First, TriZetto substantially changed its position based on McKesson's actions by, *inter alia*, purchasing RIMS and Erisco for more than $325 million, and neither of those companies had

---

2    All references to exhibits in this brief refer to exhibits submitted in TriZetto's Appendix of Exhibits in Support of Its Answering Brief In Opposition To McKesson's Motion For Summary Judgment Regarding TriZetto's Eighth Affirmative Defense. Beginning bates numbers have been noted in parentheticals.

4.

been sued by McKesson's predecessors or threatened. Second, TriZetto made significant changes to its product line-up when it decided to discontinue using the clinical editing module from Solucient, a licensee under the '164 patent, in favor of its own clinical editing module. Third, continuing business as usual and maintaining the status quo was entirely consistent with a patentee that appeared to have abandoned any claim it might have for patent infringement. Certainly after six years of inaction, TriZetto was entitled to believe that McKesson would not pursue patent enforcement. At a minimum, the foregoing evidence demonstrates the existence of a genuine issue of material fact, and thus, McKesson's motion for summary judgment on equitable estoppel should be denied. With regard to laches, there is sufficient undisputed evidence to support summary judgment in TriZetto's favor.[3]

## STATEMENT OF FACTS

A.    As Early As 1988, McKesson And Its Predecessors Recognized TriZetto's Predecessors As Competitors With Competitive And Potentially Infringing Products

The grandparent patent application that resulted in the '164 patent was filed on September 30, 1988, by McKesson's predecessor HPR and issued on October 12, 1993. *See* Ex. B ('164 Patent) at 1. The patent is directed to computer software for reviewing claims for payment submitted by medical care providers to health care insurance companies. Specifically, the patent describes software used to determine whether the "procedure codes" (codes used to

---

[3]    To the extent that TriZetto's Eighth Affirmative Defense is directed to acquiescence or waiver, TriZetto withdraws defenses. However, based upon TriZetto's motion for partial summary judgment on laches and this opposition, McKesson's summary judgment motion on the Eighth Affirmative Defense should be denied as to laches and equitable estoppel.

5.

designate what medical treatment was performed) on claims for payment are accurate. This type of software is called clinical editing software.

Beginning in 1986, HPR developed a clinical editing program called CodeReview, which it introduced in 1988. During the five-year period while the HPR patent applications were pending, HPR was aware of several companies marketing competing products. One of those companies was Erisco Managed Care Technologies, Inc. ("Erisco"), a predecessor-in-interest to TriZetto. Erisco was selling its ClaimFacts product, which was a complete medical claims processing solution involving many different programs. In 1989, Erisco added a clinical editing component as part of its ClaimFacts suite of products.

HPR knew of, and tracked, Erisco's development and marketing of the clinical editing module of the ClaimFacts system.

REDACTED

6.

REDACTED

HPR also knew that Resource Information Management Systems, Inc. ("RIMS"), another company later acquired by TriZetto, offered a competing medical claims processing system.[4]

REDACTED

As with Erisco, RIMS also decided not to license HPR's clinical editing software, and instead began offering clinical editing software provided by one of HPR's competitors.  Notwithstanding HPR's interactions with both RIMS and Erisco in 1989, and HPR's knowledge of their competing products, HPR failed to assert the '164 patent against either company when the patent issued in 1993, or for eleven years thereafter.

      B.      After The Patent Issued, McKesson's Predecessors Took No Action To Assert The '164 Patent Against Erisco Or RIMS

REDACTED

In a declaratory judgment action brought in the Eastern District of Pennsylvania by one of HPR's competitors (GMIS, Inc.), HPR counterclaimed for infringement of the '164 patent. *GMIS v. HPR, Inc.*, Civil Action 94-CV-0576 (E.D. Pa.).  Both the issuance of the patent

---

[4]      The clinical editing programs accused of infringement here are software programs TriZetto acquired when it purchased Erisco and RIMS in 2000.

7.

and the ensuing GMIS litigation were widely publicized. *See* Ex. K (MCK 151754) *and* Ex. L (MCK 044679).

REDACTED

Yet, neither HPR nor any of its successors (including McKesson) took any legal action against TriZetto or its predecessors until September 2004.

A year after the settlement, a company named HBO & Company ("HBOC") acquired GMIS, and then in 1997, HBOC acquired HPR and the rights to the '164 patent. HBOC employees continued to analyze and track both Erisco's and RIMS' product offerings, but they took no action to enforce or assert the '164 patent against them. HBOC, in fact, became increasingly concerned about Erisco's newly developed Facets claims processing system and its clinical editing capabilities.

REDACTED

8.

REDACTED

C.    There Was Still No Action Taken To Assert Or Enforce The '164
      Patent When TriZetto Acquired Erisco And RIMS

In January 1999, McKesson acquired HBOC and the rights to the '164 patent. In 2000, TriZetto acquired both Erisco and RIMS. After these acquisitions, TriZetto entered into discussions with McKesson regarding a potential marketing agreement under which TriZetto customers would be given a choice between the clinical editing programs offered by TriZetto and McKesson.

REDACTED

McKesson waited two more years to file this action on September 13, 2004.

---

[5]    In 2001, McKesson sent TriZetto a copy of the patent, but did not assert infringement; the patent did not become an issue in the negotiations until 2002.

ARGUMENT

A.   McKesson's Burden On Summary Judgment

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is improper where the evidence reveals a genuine issue of material fact. A factual dispute is "genuine" where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Factual disputes are "material," and will preclude the entry of summary judgment, where the resolution of such disputes "might affect the outcome of the suit under the governing law." *Id.*; *see also Horowitz v. Fed. Kemper Life Assurance Co.*, 57 F.3d 300, 302 n.1 (3d Cir. 1995). The court will "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." *Pa. Coal Ass'n v. Babbitt*, 63 F.3d 231, 236 (3d Cir. 1995).

B.   Summary Judgment Dismissing TriZetto's Laches Defense Must Be Denied Because The Six-Year Presumption Applies And McKesson Has Proffered No Legally Cognizable Excuse To Justify Its Delay

When an alleged infringer establishes laches, the patentee may not recover damages for infringement occurring prior to the filing of the lawsuit. *A.C. Aukerman Co. v. R.L. Chaides Constr. Co.*, 960 F.2d 1020, 1041 (Fed. Cir. 1992) (*en banc*). To establish laches, an alleged infringer must show that: (1) the patentee delayed filing suit for an unreasonable and inexcusable length of time from the time the patentee knew or reasonably should have known of its claim against the alleged infringer; and (2) the delay operated to the prejudice or injury of the alleged infringer. *Wanless Int'l, Inc. v. General Electric Co.*, 148 F.3d 1334, 1337 (Fed. Cir. 1998); *see also A.C. Aukerman*, 960 F.2d at 1032. A presumption of unreasonable delay and prejudice arises when a patent holder fails to bring suit within six years after the patent holder

10.

knew or should have known of the potential infringement. *A.C. Aukerman*, 960 F.2d at 1037; *see also* 6 Donald S. Chisum, *Chisum on Patents* § 19.05[2][a][i] (2005) ("The delay is measured from the time the patent owner knew or, in the exercise of due diligence, should have known of the defendant's allegedly infringing activity."). When the presumption applies, unreasonable delay and prejudice "*must* be inferred, absent rebuttal evidence." *A.C. Aukerman*, 960 F.2d at 1037 (emphasis in original).

     1.     TriZetto Is Entitled To A Presumption That Laches Applies Because McKesson Delayed Filing Suit For More Than Six Years

McKesson's assertion that the six-year laches presumption does not apply is simply wrong. The '164 patent issued in October 1993, and McKesson did not initiate this action until September 2004 – a nearly eleven year delay .

REDACTED

In fact, in an industry as small as the claims editing field, it would be absurd to believe that HPR did *not* know about Erisco's clinical editing software.

REDACTED

11.

Thus, HPR was on notice that Erisco's products potentially infringed as soon as the '164 patent issued in October 1993. Having delayed for nearly eleven years to bring this action, the laches presumption applies.

Second, there is no legally cognizable excuse to rebut the presumption of laches. For the reasons stated in support of TriZetto's motion for summary judgment, and as discussed in further detail below, neither the GMIS litigation nor the business negotiations between TriZetto and McKesson in 2001-2003 excuses the eleven-year period of delay. And, McKesson's newly invented "change in management" excuse has no support in the law. Moreover, even if McKesson were given credit for all of the excuses to which it asserts entitlement, the total period of delay is still over six years, which firmly establishes that the laches presumption applies and cannot be rebutted.

2.  No Excuses Apply To Justify McKesson's Prolonged And Unreasonable Delay In Filing Suit

a.  HPR's "Other Litigation" With GMIS Does Not Excuse McKesson's Delay

HPR's early litigation with GMIS cannot justify McKesson's delay in asserting its patent rights against TriZetto. This excuse applies where a patentee reasonably defers suit against an infringer until conclusion of an action against another infringer, *provided* notice is given to the infringer in waiting. *Vaupel Testilmaschinen KG v. Meccanica Euro Italia S.P.A.*, 944 F.2d 870, 876-77 (Fed. Cir. 1991). The "other litigation" excuse only applies where adequate notice of the proceedings is given to the accused infringer, *and* the notice informs the alleged infringer of the patentee's intention to enforce its patent upon completion of that proceeding. *Id.* at 877; *see also Adelberg Labs., Inc. v. Miles, Inc.*, 921 F.2d 1267, 1272 (Fed. Cir. 1990) (affirming summary judgment on laches and stating patentee's obligation to

12.

communicate to an accused infringer whom it did not sue because of other litigation that it was not acquiescing in the infringement); *Hall v. Aqua Queen Mfg., Inc.*, 93 F.3d 1548, 1554 (Fed. Cir. 1996) (finding that patentee could not rely upon other litigation as excuse for delay because patentee had not informed the alleged infringer of its intent to sue after conclusion of other suit).

McKesson mischaracterizes the Federal Circuit's holding in *Vaupel*, arguing that any delay is tolled as long as the alleged infringer knows about the other litigation. D.I. 161 at 28. *Vaupel* actually holds that the notice must inform the alleged infringer of the patentee's intention to enforce its patent rights upon completion of that proceeding. 944 F.2d at 877. *See also Jamesbury Corp. v. Litton Indus. Prods., Inc.*, 839 F.2d 1544, 1552 (Fed. Cir. 1988), (holding that a patent owner engaged in litigation against another party must have notified the defendant in the later suit not only of the other litigation *but also of its intention to enforce its rights* against the defendant after termination of that litigation), *overruled on other grounds by A.C. Aukerman*, 960 F.2d 102. The *Vaupel* court based its finding on the fact that defendant was "deeply involved" in the other litigation. 944 F.2d at 877-78 ("During the reissue proceeding, [defendant] … actively and continuously opposed maintenance of the patent claims."). And, "all the communications" between the parties, including letters warning of infringement and threatening litigation showed patentee's intent to enforce its rights and notice to the infringer thereof. *Id*. at 878. Furthermore, if there was prior contact between the parties, the patentee's duty to give appropriate notice to the alleged infringer is especially clear. *See A.C. Aukerman*, 960 F.2d at 1039.

REDACTED

13.

Here, it is undisputed that HPR did not give Erisco any notice of its intent to sue Erisco once the GMIS litigation was complete.

Thus, McKesson cannot rely upon the GMIS litigation to excuse any part of its unreasonable delay in filing suit. *See also Watkins v. Nw. Ohio Tractor Pullers Ass'n*, 630 F.2d 1155, 1163 (6th Cir. 1980) (because another infringer was being sued, and defendant was not, *and* defendant had not been advised that it would be sued, the court held that defendant was entitled to infer that the patentee did not intend to sue it).

> b.     McKesson's "Business Negotiations" With TriZetto
>        Do Not Excuse McKesson's Delay

McKesson's negotiations with TriZetto to enter into a joint marketing agreement and integrate its software products with TriZetto's also does not excuse McKesson's delay. Although genuine *continuous and bilateral* negotiations to license or settle *the patent dispute* may constitute an excuse for delay in filing suit, the negotiations must involve attempts by the patentee to resolve a patent dispute without resort to litigation. *See Giese v. Pierce Chem. Co.*, 29 F. Supp. 2d 33, 40 (D. Mass. 1998) (*citing Gen. Elec. Co. v. Sciaky Bros.*, 304 F.2d 724, 727 (6th Cir. 1962) *and Continental Coatings Corp. v. Metco, Inc.*, 464 F.2d 1375, 1377-78 (7th Cir. 1972)). *See also A.C. Aukerman*, 960 F.2d at 1033.

McKesson asserts this proposition – that negotiations with the alleged infringer to *settle or license the patent* should excuse McKesson's delay in filing suit, *see* D.I. 161 at 29 – and cites two cases that concern a patentee's efforts to license the patent (*see RCA Corp. v. Data General Corp.*, 701 F. Supp. 456, 477 (D. Del. 1988)) and ongoing correspondence between the parties (*see Lemelson v. Wang Labs., Inc.*, 874 F. Supp. 430, 435 (D. Mass. 1994)).

14.

In stark contrast here, the discussions between McKesson and TriZetto beginning in 2001 were negotiations aimed at creating a joint marketing agreement. *See* Ex. Z (Bellomo Dep.) at 70-71. Neither the '164 patent nor efforts to settle a "patent dispute" were the focus of those negotiations. McKesson concedes this point in the equitable estoppel portion of its brief, arguing that the patent was never discussed between the parties. *See, e.g.,* D.I. 161 at 11-14. Then, in the laches portion of its brief, McKesson mischaracterizes the evidence and specifically the testimony of Erisco's president, Mr. Bellomo, to suggest that the discussions were specifically directed to the '164 patent. *See id.* at 29 n.34. But in fact, Mr. Bellomo testified only that Erisco was "desirous of a business relationship" and referred to this desired outcome as "our business arrangement." *Id.* McKesson also incorrectly asserts that the "parties were actively engaged in efforts to resolve their patent dispute." *See id.* at 30. Yet, there was clearly no "ongoing correspondence" between the parties regarding the patent or efforts to license the patent. Thus, the negotiations between McKesson and TriZetto beginning in 2001 and aimed at creating a joint marketing agreement do not constitute the type of bilateral negotiations to settle or license the patent that would justify a delay in bringing suit. *See Giese,* 29 F. Supp. 2d at 41.

McKesson wanted a deal with TriZetto under which TriZetto would actively market McKesson's products to TriZetto's customers. Thus, the focus of the negotiations was not a license to TriZetto that would allow it to sell its own products.

REDACTED

These were not the types of negotiations that the case law recognizes as excuses for long delays in asserting patent rights.

---

6

REDACTED

(continued . . .)

REDACTED

However, the desire to maintain "amicable relations" with the defendant, or otherwise maintain good business relations between parties simply *does not* serve to justify a patentee's laches. *Lane & Bodley Co. v. Locke*, 150 U.S. 193, 200-01 (1893) (noting that such behavior is entitled to less favorable consideration by a court of equity than mere inaction).

McKesson chose not to assert the patent against TriZetto after it acquired Erisco and RIMS because it wanted something other than a license agreement from TriZetto. The discussions in 2001 focused entirely on business negotiations. *See* Ex. Z (Bellomo Dep.) at 70-71.

REDACTED

---

(. . . continued)

REDACTED

In Special Master Order No. 5, dated December 19, 2005, Judge Bechtle ruled that McKesson's counsel's instructions not to answer questions regarding the email were improper. *See* Ex. TT (Special Master Order No. 5). Specifically, the judge ruled that business decisions or assessments informed by conversations with counsel were not privileged. *Id.* As a result, several key McKesson witnesses will now need to be re-deposed. *See id.*

16.

REDACTED

A patentee that makes a conscious decision not to assert its patent for business reasons unrelated to negotiating a license agreement should be held responsible for that delay and inaction.   In the absence of "continuous and bilateral" negotiations to resolve a patent dispute, there is no "business negotiation" excuse for McKesson's delay in filing suit. *See Giese*, 29 F. Supp. 2d at 40.

        c.      The Change In Management At HPR Does Not Excuse McKesson's Delay And Is Not An Excuse For Laches

McKesson suggests that a change in management at HPR due to its acquisition by HBOC, and the subsequent acquisition of HBOC by McKesson, serves as an excuse for the delay in asserting the '164 patent.  McKesson relies on *Genzyme Corp. v. Atrium Med. Corp.*, 2003

---

[7] REDACTED

U.S. Dist. LEXIS 12784, at *17 (D. Del. 2003) (attached as Ex. DD), where the court merely observed that as a result of patentee's change in management, "litigation remained a low priority until the '*dust settled.*'" *Id.* (emphasis added). McKesson attempts to rely upon this dicta to establish that its eleven-year delay in filing suit should be excused. McKesson then arbitrarily asserts an excusable period of delay of just over a year, from the date of HBOC's acquisition of HPR in December 1997, to McKesson's subsequent acquisition of HBOC in January 1999. Nowhere does *Genzyme* support McKesson's random calculations as the method for determining how a change in management would impact the period of delay. In fact, nowhere in *Genzyme* does the court even mention the change in management (other than the single cited sentence above), much less establish *any* method for calculating an excusable period of delay. *See generally id.*

It is well-established that in calculating the length of the delay before filing suit, the transferee of a patent must accept the consequences of the dilatory conduct of the transferors. *Eastman Kodak Co. v. The Goodyear Tire & Rubber Co.*, 114 F.3d 1547, 1559 (Fed. Cir. 1997) (noting that a patentee cannot avoid the consequences of his laches by transferring the patent), *overruled on other grounds by Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448 (Fed. Cir. 1998). *See also* Donald S. Chisum, *Chisum on Patents*, § 19.05[2][a][ii] (discussing tacking and transfers of interest). Here, all the companies continued to sell the same products before and after the various acquisitions – the only thing that changed was the management of the company that owned the patent. If that were enough to serve as an excuse for the application of the doctrine of laches, a company could delay asserting a patent forever, and allow damages to accrue, by simply hiring new management people from time to time. This would be contrary to the very public policy underlying the laches defense. *See Odetics, Inc. v. Storage Tech. Corp.*,

18.

185 F.3d 1259, 1273 (Fed. Cir. 1999) (noting that "[l]aches is firmly rooted in the equitable principle that courts will not assist one who has slept on his rights") (*citing Lane & Bodley Co.,* 150 U.S. at 201).[8]  Furthermore, the court-established excuses discussed above each require that some notice be given to the alleged infringer by the patentee concerning the patent, to excuse the period of delay.  McKesson's newly invented "change of management" excuse, which does not require that any such notice be given, is inconsistent with the established principles of the laches defense and does not excuse McKesson's delay.

> d.     There Was More Than a Six-Year Delay Even If
> All of McKesson's Excuses Are Accepted.

Even if McKesson were given credit for all of the excuses to which it asserts entitlement, the total period of delay is still over six years long, which firmly establishes that the laches presumption applies and cannot be rebutted.  The total period of delay was 10 years and 11 months (October 1993 to September 2004), and the amount of credit McKesson suggests that it is entitled to totals 4 years and 7 months.  Thus, the remaining period of delay based on McKesson's calculations is 6 years and 4 months.  The presumption of laches is not rebuttable and therefore clearly applies.

---

[8]     "The purpose of a laches defense is to punish dilatory patentees and in so doing to encourage all patentees to seek infringement remedies in a timely manner." *Odetics, Inc.,* 14 F. Supp. 2d at 790.  The Federal Circuit affirmed on appeal that "if laches is to retain vitality with respect to patented products, it must result … in the abrogation of the [patentee's] right to exclude products sold prior to the filing date of the complaint." *Odetics, Inc.,* 185 F.3d at 1274.

19.

3.    TriZetto Has Been Significantly Prejudiced As A Result Of
      McKesson's Delay

The final prong of the laches defense is whether the delay operated to the prejudice or injury of the alleged infringer.   Such prejudice may be *either* economic *or* evidentiary prejudice.  *A.C. Aukerman*, 960 F.2d at 1033.  Because the delay here was more than six years, the burden shifts to McKesson to show there was no prejudice.  As set forth in detail below, and as discussed in TriZetto's motion for summary judgment on the doctrine of laches, TriZetto has suffered material prejudice – both economic and evidentiary – as a result of McKesson's unreasonable and prolonged delay.  *See id.*  McKesson has not met, and cannot meet, its burden to rebut the presumption and prove that no prejudice resulted from its prolonged delay.

a.    Economic Prejudice

TriZetto has suffered material economic prejudice "because of and as a result of" McKesson's delay.  *See Hemstreet v. Computer Entry Systems Corp.*, 972 F.2d 1290, 1294 (Fed. Cir. 1992).  In determining whether a defendant has suffered economic prejudice, the proper inquiry is whether there has been a "change in the economic position of the alleged infringer during the period of delay."  *A.C. Aukerman*, 960 F.2d at 1033.  In its opening brief, McKesson repeatedly asserts that Erisco and TriZetto were not economically prejudiced because they conducted "business as usual."  D.I. 161 at 24, 33, 34.  This argument is misleading at best. What McKesson calls "business as usual" is in fact ongoing and continuous investment by TriZetto and its predecessors in the allegedly infringing products for many years after the '164 patent issued.  That investment began before the patent issued and has continued to the present based in large part on the fact that McKesson took no action with regard to its patent.  This

20.

"business as usual" is exactly the type of investment the law recognizes as the basis for economic prejudice.

Some cases in which courts have found no economic prejudice, such as the *Ecolab, Inc. v. Envirochem, Inc.*, 264 F.3d 1358 (Fed. Cir. 2001), a case cited by McKesson, address situations where an alleged infringer makes a short-term investment to develop and market an infringing product. Such fact patterns are distinct from cases in which an alleged infringer makes a gradual investment and expansion of its business over a period of eleven years while the patentee sits by and fails to assert its patent rights. Indeed, a significant investment in the business is precisely the kind of economic prejudice envisioned by the Federal Circuit. *See, e.g., ABB Robotics, Inc. v. GMFanuc Robotics Corp.*, 52 F.3d 1062, 1065 (Fed. Cir. 1995) (affirming trial court's finding of economic prejudice where the defendant demonstrated that this suit would "result in damages which likely would have been prevented by an earlier suit").

Here, Erisco and TriZetto continued to invest in and expand their clinical editing product in the eleven years after the patent issued, just as they had for the three years before the patent issued, because they reasonably concluded that the patent was not going to be asserted. Had McKesson or any of its predecessors filed suit earlier, TriZetto and its predecessors would not have continued upgrading and developing updates to its clinical editing product. *See* D.I. 169 (Bellomo Decl.) at ¶ 9. Had Erisco or TriZetto been notified of any purported infringement of the '164 patent, Erisco and TriZetto would have investigated other available alternatives, such as partnering with or acquiring software from a provider that had a license to the '164 patent. *Id.* at ¶ 8. Indeed, TriZetto's decision to change the clinical editing module of its QicLink product from Auto Audit by Solucient (which has a license to the '164 patent) to ClinicaLogic was based in large measure on the fact that there was no need to buy a "licensed" module when there was

21.

no expectation that McKesson would sue for patent infringement. *See* Ex. EE (Danza Dep.) at 27-28.

Erisco would also have had several options other than the development of a non-infringing software product but for McKesson's unreasonable and inexcusably prolonged delay.

REDACTED

Had HPR contacted Erisco with its concerns about potential infringement, it is reasonable to conclude that Erisco could have obtained a license from HPR for a modest amount.

Had HPR asserted the '164 patent, Erisco could have turned to one of the licensees of the '164 patent to acquire the software.

REDACTED

REDACTED

In addition, TriZetto acquired Erisco and RIMS in 2000, seven years after the alleged infringement began.   TriZetto invested large amounts of money to make those acquisitions.  At that time, TriZetto had no reason to believe that it was buying a lawsuit.

REDACTED

Because Erisco had sold clinical editing software for ten years and the patent had been around for seven years by the time of the acquisitions, it was reasonable to conclude that the patent was not going to be asserted against Erisco.  Similarly, RIMS had been selling clinical editing software with its claims processing system for at least eight years (since 1992 or 1993) and never faced any accusations of patent infringement.  McKesson's prolonged delay thus caused material economic prejudice to TriZetto, when TriZetto purchased Erisco and RIMS.  *See American Home Prod. Corp. v. Lockwood Mfg. Co.*, 483 F.2d 1120, 1124 (6th Cir. 1973) (holding that the new owners of allegedly infringing assets were "deprived of the opportunity to consider the effect which [the] litigation might have upon the company, and unaware of any claim against the company, built up the business by expanding the operations of the company using the contested product and process"); *see also Adelberg Labs., Inc. v. Miles, Inc.*, 921 F.2d at 1272 (holding that patentee

23.

failed to rebut a presumption of material prejudice to defendant where defendant expended capital to expand its business).

It is precisely McKesson's unreasonable and prolonged delay in asserting the patent against TriZetto that led to Erisco and TriZetto behaving as if they were *not* going to be sued. McKesson's prolonged delay is also the reason for what McKesson terms as TriZetto's "indifference toward the patent." *See* D.I. 161 at 34. The clear nexus between McKesson's dilatory conduct and TriZetto's costs and decisions made in connection with the sales of the accused products and corporate acquisitions demonstrate real and significant economic prejudice.

### b.     Evidentiary Prejudice

McKesson asserts that its prolonged delay has not caused any evidentiary prejudice to TriZetto because TriZetto's defense focuses on prior art patents and publications. McKesson's assertions are overly simplistic, arguing that because TriZetto's defense focuses on prior art patents and publications, these documents can serve to invalidate the patent entirely under 35 U.S.C. § 102(b), and nothing further is needed. Surely McKesson cannot be saying that TriZetto is *not* prejudiced because its attempts to locate and uncover invalidating evidence have been frustrated.

Because of the passage of time, in fact, prior art documents, publications, records, and other information have been lost, destroyed or are otherwise unavailable to TriZetto. TriZetto's subpoenas to third parties who were developing clinical editing software systems in the late 1980's were fairly ineffective because many of the subpoena recipients did not retain or have in their possession any documents from those projects or that time frame. *See, e.g.*, D.I. 51 (Ventiv Health, Inc.) *and* D.I. 59 (Daniel Mgmt. Center, Moore School of Business). In one

24.

instance, a subpoena recipient that was believed to have invalidating prior art indicated that it had no responsive documents. *See* Ex. KK (PTO patent prosecution rejection) at MCK 000331-334 (noting identification of relevant prior art product developed by Insurance Software Packages, Inc., later acquired by Pharmacy Management Services, Inc.). TriZetto attempted to subpoena documents from Pharmacy Management Services, Inc., but no responsive documents were produced. TriZetto also tried to subpoena documents from Ronald Hurst, the former manager of health care planning at Caterpillar, Inc. Prior to Robert Hertenstein (one of the inventors of the '164 patent) joining Caterpillar, Mr. Hurst published articles on cost containment efforts in the medical claims handling field. Ex. LL (Hurst, *Cost Containment*) at 102-04. In response to TriZetto's subpoena, Mr. Hurst responded that he had no documents. As he explained at his subsequent deposition, "I left Caterpillar in 1985. That's 20 years ago. And I've moved several times since then and I have no documents." Ex. MM (Hurst Dep.) at 10. Moreover, contrary to McKesson's assertion (and even the case cited by McKesson), deposition testimony is and may be required to establish that a prior art reference is enabling. *Helifix Ltd. v. Blok-Lok, Ltd.*, 208 F.3d 1339, 1347 (Fed. Cir. 2000).

Additionally, TriZetto has many other invalidity defenses, including obviousness, inequitable conduct, public use and on-sale bar under 35 U.S.C. § 102(b). Once again, however, due to the passage of time and the loss of memory over this time period, many of the witnesses that TriZetto has contacted or deposed are deceased, unavailable, or have fading memories. *See Wanlass Int'l, Inc.*, 148 F.3d at 1340 (finding evidentiary prejudice where internal documents had been destroyed, key witnesses were deceased or unavailable or had fading memories, and the defendant no longer kept models of some of the accused products).

25.

As discussed in TriZetto's opening brief in support of its motion for partial summary judgment on the doctrine of laches (D.I. 166), the record is replete with instances of such loss of evidence due to the passage of time.

REDACTED

McKesson suggests that TriZetto can rely on documents related to the *GMIS v. HPR* litigation. McKesson ignores, however, that TriZetto is not GMIS, and that many of the issues in TriZetto's case, such as infringement, are different from the ones faced by GMIS. In any event, not all the information available at the time of the GMIS litigation is still available

26.

today. For example, two inventors were not deposed in the GMIS litigation, so their thoughts and records in 1994 are not available to TriZetto. Furthermore, the record clearly indicates that documents produced in that litigation have been since lost or destroyed. *See* Ex. OO (Goldberg Dep.) at 140 (stating that Dr. Goldberg disposed of documents relevant to HPR, Caterpillar, CodeReview and the '164 patent after the GMIS litigation settled). TriZetto has, therefore, suffered evidentiary prejudice because it has not had the opportunity for full discovery that it would have had if McKesson had initiated its suit years earlier.

REDACTED

These facts demonstrate that there is significant evidentiary prejudice. *See Northern Telecom Inc. v. Datapoint Corp.*, 23 U.S.P.Q.2d 1881, 1892 (N.D. Tex. 1992) ("While a defendant cannot prove laches merely by pointing to the absence of documents *simpliciter*, coupled with the passage of time, the broad, equitable nature of the defense excuses a party from proving material prejudice with the precision that [the patentee] urges.").

---

9

REDACTED

27.

    4.      TriZetto's Laches Defense Precludes Recovery By McKesson For Damages Accrued Prior To The Date Of Filing Of The Complaint

Finally, McKesson postulates that TriZetto's laches defense must somehow give way to McKesson's assertion of willful infringement. McKesson, however, confuses the issue of laches with willful infringement. McKesson suggests that it is improper to rely on an opinion of counsel regarding the laches to rebut allegations of willful infringement. Such evidence, however, does rebut allegations of willful infringement. As stated in *Hall*, "the test of willful infringement is whether, under all circumstances, a reasonable person would prudently conduct himself with any confidence that a court might hold the patent invalid or not infringed." 93 F.3d at 1555. Because the patentee failed to sue any of the defendants on the patent for an extended period of time, any allegations of willful infringement were only "weakly supported and certainly do not justify refusing to apply an otherwise-proper defense of laches." *Id*. at 1555.

McKesson concedes that under Federal Circuit case law, laches bars any damages before the filing of the litigation, and TriZetto has never asserted that laches bars any relief other than pre-litigation damages.[10] Willful infringement, on the other hand, may lead to enhanced damages. Where the damages prior to the filing of a suit are barred due to laches, there is nothing to enhance.[11]

---

[10]    Additionally, "the sale of an infringing product during the laches period is beyond the reach of the patent: the patentee cannot later enjoin the use of a product sold during that time." *Odetics, Inc.*, 185 F.3d at 1273.

[11]    McKesson miscites *Hermes Int'l v. Lederer de Paris Fifth Ave., Inc.*, 219 F.3d 104 (2d Cir. 2000), for the proposition that laches is not a defense to willful infringement. *Hermes Int'l*, however, is a trademark case addressing the availability of injunctive relief where the trademark holder had committed laches. *Hermes* does not preclude the denial of monetary relief due to a patent holder's laches. *Id*. at 109 (holding that laches barred plaintiff from obtaining monetary relief against a defendant).

28.

C.     A Significant Issue Of Material Fact Exists Such That Summary
Judgment Dismissing TriZetto's Equitable Estoppel Defense Is
Inappropriate

To establish an equitable estoppel defense, the alleged infringer must prove by a

preponderance of the evidence the following three elements:

(1)     The patentee, through misleading conduct, leads the alleged
infringer to reasonably infer that the patentee does not intend to
enforce its patent against the alleged infringer. 'Conduct' may
include specific statements, action, inaction, or silence where there
was an obligation to speak.

(2)     The alleged infringer relies on that conduct.

(3)     Due to its reliance, the alleged infringer will be materially
prejudiced if the patentee is allowed to proceed with its claim.

*Philips Elecs. N. Am. Corp. v. Contec Corp.*, 312 F. Supp. 2d 639, 641 (D. Del. 2004) (quoting

*Scholle Corp. v. Blackhawk Molding Co.*, 133 F.3d 1469, 1471 (Fed. Cir. 1998)). *See also A.C.*

*Aukerman Co.*, 960 F.2d at 1041.

"Where equitable estoppel is established, all relief on a claim may be barred." *Id.*

Furthermore, "[l]ike laches, equitable estoppel is not limited to a particular factual situation nor

subject to resolution by simple or hard and fast rules." *Id.* ("At most, courts have provided

general guidelines based on fact patterns which have been litigated, albeit attempting to provide

a unifying set of principles."). Estoppel is an equitable defense, addressed to the sound

discretion of the trial court, and in evaluating equitable defenses, a court must look at all the

surrounding facts and circumstances. *Id. See also Scholle Corp. v. Blackhawk Molding Co.*, 133

F.3d 1469, 1471-72 (Fed. Cir. 1998) (emphasizing equitable nature of estoppel defense and

finding that defendant's inference, based on the surrounding circumstances, that patentee would

not sue for infringement "was only reinforced by the course of dealings between the parties").

### 1.    McKesson's Conduct Was Misleading

McKesson's brief misstates the relationship between TriZetto and McKesson prior to the filing of the complaint in this case.  McKesson asserts, repeatedly, that TriZetto could not have relied on McKesson's misleading conduct because Erisco and RIMS never had any communications with McKesson regarding the '164 patent after the patent issued.  But this is contrary to the evidence, which demonstrates, *inter alia*, that the relationships of those parties, the communications between them, and the industry in which they competed are sufficient to establish a genuine issue of material fact that McKesson's conduct was misleading.

McKesson misconstrues *Myers v. Asics Corp.*, 974 F.2d 1304 (Fed. Cir. 1992), and *Myers v. Brooks Shoe, Inc.*, 912 F.2d 1459 (Fed. Cir. 1992), for the proposition that "[t]o be misleading, silence generally requires that the patentee first threatened immediate or vigorous enforcement of the patent against the alleged infringer." D.I. 161 at 14.  The Federal Circuit has stated that although silence *alone* is not enough to give rise to estoppel, silence coupled with *other actions or communications* may be sufficient.  *Myers v. Asics Corp.*, 974 F.2d at 1308-09 (noting expressly that silence was not at issue in that case); *see also Myers v. Brooks Shoe Inc.*, 912 F.2d at 1464 (stating that silence "can lead to estoppel if it is sufficiently misleading to induce the alleged infringer to reasonably infer that the patentee has abandoned his patent claims").

Silence and inaction can constitute misleading conduct when combined with other facts, even if those other facts do not include a specific threat from the patentee to the infringer.  *See ABB Robotics, Inc.*, 52 F.3d at 1064 (stating that although "an immediate threat of enforcement followed by silence may be the most common scenario, [that] does not mean that it is the only set of facts which can support a finding of misleading silence").  *See also A.C.*

30.

*Aukerman*, 960 F.2d at 1042 (noting that "plaintiff's inaction must be combined with other facts respecting the relationship or contacts between the parties to give rise to the necessary inference that the claim against the defendant is abandoned").

REDACTED

At this point, McKesson had already applied for a patent on such technology. *See* Ex. B ('164 patent). When Erisco and RIMS each declined to license HPR's clinical editing software, HPR knew that they had sought their own clinical editing solutions.

In January 1994, HPR announced that it had been awarded the '164 patent for the system and methodology embodied in its CodeReview product. *See* Ex. PP (MCK 034492). Shortly afterwards, *The New York Times* quoted Marcia Radosevich, chief executive officer of HPR: "We do intend to enforce our patent rights." *See* Ex. A (MCK 043191); *see also* Ex. K (MCK 151754) (*Dow Jones News* article noting that HPR "currently is pursuing a strategy with its patent attorney"). REDACTED

REDACTED

At this point in time, the clinical editing market consisted of a very small group of companies competing against each other and offering products with similar functionality.

REDACTED

These companies were all well aware of each other as competitors. When HPR announced its intent to enforce the patent against its competitors, these companies knew what HPR meant. As Mr. Bellomo testified:

> Q.   Did you as the president of Erisco ever understand, rightfully or wrongly that HPR was threatening Erisco with respect to the '164 patent?
>
> A.   I understood that they were threatening all of the suppliers of clinical editing data. I was aware that they had gone after other companies and settled with them or gave them licenses or there was some action that was taking place in addition to what happened with GMIS, so I was aware of the general tone of HPR to enforce the patent. I was aware of what happened with GMIS. I was aware of what was happening with other vendors in the industry, and I was certainly aware of the statements that were attributed to Marcia where she was going to aggressively go after companies, like ours, that she felt were infringing the patent.

Ex. Z (Bellomo Dep.) at 200.

Ms. Radosevich's statement in *The New York Times* was, in fact, one of the threats of enforcement that prompted HPR's competitor, GMIS, to file a declaratory judgment action of non-infringement and patent invalidity just one week later. *See GMIS v. HPR, Inc.*, Civil Action 95-CV-0576 (E.D. Pa.). The declaratory judgment suit was prominently featured in industry publications and general news services. *See* Ex. L (MCK 044679) (GMIS press release

32.

on PR Newswire); Ex. QQ (MCK 042479) (*Dow Jones News* article); *and* Ex. RR (MCK

153260) (*Automated Medical Payments News* article).

REDACTED

As a result of these facts and circumstances, Erisco reasonably believed that it

was on notice that it would be sued by HPR as soon as the GMIS litigation concluded. *See* Ex. Z

(Bellomo Dep.) at 192-93. The fact that Erisco monitored the GMIS case further demonstrates

that Erisco was concerned about the possibility that HPR would sue Erisco at the conclusion of

the litigation. *Id.* at 204-05. This is especially so, when the underlying litigation concluded in

favor of a multi-million dollar license paid to the patentee. A reasonable person in Erisco's

position would feel threatened as a result of all these facts, and HPR knew or should have known

that.

Because of the nature of the contacts and communications by McKesson and

between McKesson and TriZetto's predecessors, McKesson's subsequent silence regarding its

patent was misleading.

### 2. TriZetto Relied On McKesson's Conduct

The evidence also establishes the second prong of the equitable estoppel defense –

namely, that TriZetto *relied* on McKesson's misleading conduct.

Mr. Bellomo testified that HPR's conduct led him to believe that there was no

reason to bring up the patent when discussing other possible deals with HPR in April 1997 – a

meeting that McKesson prominently focuses on in its opening brief. By the time of this meeting,

however, Erisco had already relied on McKesson's inaction. From the issuance of the patent in

1993 through 1997, HPR took no action to enforce the patent against Erisco. Even after the

"healthy" settlement of the GMIS litigation in favor of HPR, no one from HPR contacted Erisco regarding the patent. *See* Ex. SS (MCK 036458) (*Boston Business Journal* article). As a result, Erisco (through its president, Mr. Bellomo) reasonably believed that HPR had decided not to pursue patent enforcement. *See* Ex. Z (Bellomo Dep.) at 197.

The April 1997 meeting between Mr. Bellomo and Ms. Radosevich further cemented Erisco's belief that HPR did not intend to enforce the patent against Erisco.

REDACTED

McKesson suggests that this 1997 meeting is both the beginning and the crux of TriZetto's contention that McKesson and its predecessors behaved as if they were not going to assert the '164 patent. That is not correct. By 1997, Erisco had been offering clinical editing

34.

software for eight years, and the patent had been in existence for four years.   Prior to the

meeting, Erisco had reasonably concluded that HPR did not intend to assert the patent against it.

The meeting merely confirmed Mr. Bellomo's belief that HPR knew about Erisco's clinical

editing software, but had no intention of asserting the patent against Erisco.   Erisco continued to

rely on McKesson's silence coupled with its years of inaction and its knowledge of Erisco's

competitive products.

Clearly, TriZetto would have structured its subsequent purchase of Erisco in

October 2000 differently had a patent infringement suit been threatened or initiated by

McKesson.


REDACTED



These facts demonstrate reliance by TriZetto on HPR and HBOC's misleading

conduct.

Against this backdrop of facts and evidence, after several years had passed

following the GMIS settlement (in a light characterized by others as favorable to HPR), a

reasonable person would have to conclude that HPR decided not to sue Erisco/TriZetto regarding

the '164 patent despite its earlier saber-rattling.   Accordingly, McKesson's behavior caused

TriZetto to infer that McKesson did not intend to enforce its patent.

35.

3.    TriZetto Would Suffer Material Prejudice If This Suit Were
      Allowed To Proceed.

The final prong of an equitable estoppel defense examines whether the alleged

infringer would be materially prejudiced if the patentee is allowed to proceed with its claim.  "As

with laches, the prejudice may be a change of economic position *or* loss of evidence."  *A.C.*

*Aukerman*, 960 F.2d at 1041 (emphasis added).  As set forth in detail above, (*see supra* Section

IV.B.3) and as discussed in TriZetto's motion for summary judgment on the doctrine of laches,

material prejudice – *both* economic *and* evidentiary – would result if this suit were allowed to

proceed.

TriZetto will suffer material economic prejudice if this suit proceeds because

there has been a "change in the economic position of the alleged infringer during the period of

delay."  *Id.*, 960 F.2d at 1033.  McKesson suggests that Erisco and TriZetto were not

economically prejudiced because they conducted "business as usual."  D.I. 161 at 24, 33, 34.

Erisco and TriZetto, however, invested in and expanded its clinical editing product in the eleven

years since the patent issued, just as it had for the three years before the patent issued, because it

reasonably concluded that the patent was *not* going to be asserted.  *See* D.I. 169 (Bellomo Decl.),

¶¶ 3-6.


REDACTED


If (as

McKesson suggests is necessary) Erisco had behaved differently in the absence of any such

threat of suit, that would show that Erisco did not rely at all on HPR's inaction.  Because Erisco

behaved as if it was *not* going to be sued, Erisco has suffered resulting economic prejudice.

REDACTED

McKesson goes so far as to suggest that TriZetto is *not* prejudiced if it cannot prove the invalidity of the '164 patent. This contravenes basic logic since invalidity of the '164 patent would render it unenforceable against TriZetto. The possibility that TriZetto may be unable to put on a full and fair defense is a fundamental basis of the evidentiary prejudice prong. *See A.C. Aukerman*, 960 F.2d at 1033.

Allowing this suit to proceed would cause material economic and evidentiary prejudice to TriZetto.

4.    Summary Judgment In Favor Of McKesson Is Inappropriate At This Time Because The Special Discovery Master's Recent Orders Will Potentially Uncover Further Information Relevant To TriZetto's Equitable Defenses

At the very least, there exists a triable issue of fact sufficient to defeat summary judgment. In fact, the results of recent discovery briefing before Special Discovery Master Bechtle highlights that McKesson is withholding evidence relevant to TriZetto's equitable defenses. Judge Bechtle's Special Order No. 5 permits TriZetto to re-depose certain key McKesson witnesses, including Michael Cesarz, Janet Cutcliff, Carolyn Wukitch (senior officers and employees of McKesson), and Marcia Radosevich (former CEO of HPR). Ex. TT (Special Master Order No. 5).

REDACTED

# REDACTED

Judge Bechtle also ordered McKesson to produce additional docs that TriZetto has not yet received. *Id.* TriZetto's failure to obtain this evidence is entirely of McKesson's own making – Judge Bechtle concluded that McKesson's privilege claims were "fundamentally inappropriate for a claim of privilege under the most basic standards." Ex. UU (correspondence from Judge Bechtle).

## CONCLUSION

For the reasons set forth above, McKesson's motion for summary judgment regarding TriZetto's equitable estoppel and laches defenses should be denied.

MORRIS, NICHOLS, ARSHT & TUNNELL, LLP

*/s/ Rodger D. Smith, II*

Jack B. Blumenfeld (#1014)
Rodger D. Smith, II (#3778)
1201 North Market Street
P.O. Box 1347
Wilmington, Delaware 19899-1347
(302) 658-9200
Attorneys for Defendant
THE TRIZETTO GROUP, INC.

OF COUNSEL:

Jeffrey T. Thomas
David A. Segal
Michael A. Sitzman
GIBSON, DUNN &
CRUTCHER LLP
Jamboree Center, 4 Park Plaza
Irvine, California 92614-8557
(949) 451-3800
January 10, 2006
501341

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on January 18, 2006 he electronically filed The Trizetto Group Inc.'s Answering Brief In Opposition To McKesson's Motion For Summary Judgment Regarding Trizetto's Eighth Affirmative Defense (Redacted Version) with the Clerk of the Court using CM/ECF, which will send notification of such filing(s) to the following:

Thomas J. Allingham, II
Skadden, Arps, Slate, Meagher & Flom LLP

The undersigned also hereby certifies that copies were caused to be served on January 18, 2006 upon the following in the manner indicated:

### BY E-MAIL AND HAND DELIVERY

Thomas J. Allingham, II
Skadden, Arps, Slate, Meagher & Flom LLP
One Rodney Square
P.O. Box 636
Wilmington, DE  19899

### BY E-MAIL AND FEDERAL EXPRESS

Jeffrey G. Randall
Skadden, Arps, Slate, Meagher & Flom LLP
525 University Avenue
Suite 1100
Palo Alto, CA  94301

*/s/ Rodger D. Smith, II*
_____
Morris, Nichols, Arsht & Tunnell, LLP
1201 N. Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
rsmith@mnat.com