IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

MCKESSON INFORMATION SOLUTIONS LLC,

              Plaintiff,

       v.

THE TRIZETTO GROUP, INC.

            Defendant.

Civil Action No. 04-1258-SLR

**REDACTED VERSION**

**DEFENDANT THE TRIZETTO GROUP INC.'S ANSWERING
BRIEF IN OPPOSITION TO PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT REGARDING TRIZETTO'S
<u>INEQUITABLE CONDUCT DEFENSE AND COUNTERCLAIM</u>**

MORRIS, NICHOLS, ARSHT & TUNNELL, LLP
Jack B. Blumenfeld (#1014)
Rodger D. Smith, II (#3778)
1201 North Market Street
P.O. Box 1347
Wilmington, Delaware 19899-1347
(302) 658-9200

*Attorneys for Defendant
The TriZetto Group, Inc.*

OF COUNSEL:

Jeffrey T. Thomas
David A. Segal
Michael A. Sitzman
GIBSON, DUNN & CRUTCHER LLP
Jamboree Center, 4 Park Plaza
Irvine, California 92614-8557
(949) 451-3800

Original Filing Date: January 10, 2006
Redacted Filing Date: January 18, 2006

i.

## TABLE OF CONTENTS

Page

TABLE OF CITATIONS ................................................................................ iii

NATURE AND STAGE OF PROCEEDINGS ........................................... 1

SUMMARY OF ARGUMENT ..................................................................... 2

STATEMENT OF FACTS ............................................................................ 5

I.      BACKGROUND ............................................................................. 5

II.     THE DEVELOPMENT OF THE PATENTED INVENTION ..... 6

III.    THE APPLICANTS FOR THE '164 PATENT WITHHELD HERTENSTEIN'S WORK AT CATERPILLAR AND OTHER MATERIAL INFORMATION FROM THE PTO .............................. 9

ARGUMENT ................................................................................................. 11

I.      BASIC LEGAL STANDARDS GOVERNING SUMMARY JUDGMENT ................................................................................... 11

II.     LEGAL STANDARDS GOVERNING THE DEFENSE OF INEQUITABLE CONDUCT ........................................................... 11

III.    THE APPLICANTS FOR THE '164 PATENT FAILED TO DISCLOSE MATERIAL INFORMATION TO THE PTO ............ 13

        A.      Hertenstein's Manual Process For Reviewing Medical Claims At Caterpillar Was Material ..................................... 14

                1.      The Patented Invention Was Designed To Match Precisely Hertenstein's Manual System For Reviewing Medical Claims ..................................... 14

                2.      McKesson's Proposed Construction Of The Claims Of The '164 Patent Renders Statements Made To The PTO Misleading .................................................... 19

                3.      Hertenstein's Manual System For Reviewing Medical Claims Is Not Cumulative Of The Information Provided To The PTO ................................ 21

ii.

<u>TABLE OF CONTENTS (continued)</u>

|  |  |  |  | Page |
|---|---|---|---|---|
| | B. | McKesson's Opening Brief Fails To Address Two Pieces Of Material Information That The Applicants Withheld From The PTO | | 23 |
| | | 1. | Aetna Insurance Company | 23 |
| | | 2. | Advanced MedLogic System | 26 |
| IV. | THERE ARE TRIABLE ISSUES OF FACT AS TO WHETHER THE APPLICANTS FOR THE '164 PATENT INTENDED TO MISLEAD OR DECEIVE THE PTO | | | 28 |
| | A. | The Applicants' Testimony Concerning The Filing Of The Application And The Information That Was Withheld From The PTO | | 29 |
| | B. | The Applicants' Ignorance Of The Duty Of Candor Is No Excuse For Their Withholding Of Information From The PTO | | 32 |
| CONCLUSION | | | | 33 |

iii.

TABLE OF CITATIONS

Page(s)

Cases

*Akron Polymer Container Corp. v. Exxel Container, Inc.,*
148 F.3d 1380 (Fed. Cir. 1998) ........................................... 13

*Anderson v. Liberty Lobby, Inc.,*
477 U.S. 242 (1986) ........................................... 11

*Brasseler U.S.A., L.L.P. v. Stryker Sales Corp.,*
93 F. Supp. 2d 1255 (S.D. Ga. 1999) ........................................... 32, 33

*Brasseler, U.S.A. L.L.P. v. Stryker Sales Corp.,*
267 F.3d 1370 (Fed. Cir. 2001) ........................................... 28, 32

*Bristol-Myers Squibb Co. v. Rhone-Poulenc Rorer, Inc.,*
326 F.3d 1226 (Fed. Cir. 2003) ........................................... 29

*Bruno Ind. Living Aids, Inc. v. Acorn Mobility Servs., Ltd.,*
394 F.3d 1348 (Fed. Cir. 2005) ........................................... 12, 31

*Critikon, Inc. v. Becton Dickinson Vascular Access, Inc.,*
120 F.3d 1253 (Fed. Cir. 1997) ........................................... 13, 28

*GFI, Inc. v. Franklin Corp.,*
265 F.3d 1268 (Fed. Cir. 2001) ........................................... 13, 28

*Hoffmann-LaRoche, Inc. v. Promega Corp.,*
323 F.3d 1354 (Fed. Cir. 2003) ........................................... 12, 13

*Horowitz v. Fed. Kemper Life Assur. Co.,*
57 F.3d 300 (3d Cir. 1995) ........................................... 11

*KeyStone Retaining Wall Systems, Inc. v. Westrock, Inc.,*
997 F.2d 1444 (Fed. Cir. 1993) ........................................... 25

*LaBounty Mfg., Inc. v. United States Int'l Trade Comm'n,*
958 F.2d 1066 (Fed. Cir. 1992) ........................................... 28

*Merck & Co. v. Danbury Pharmacal, Inc.,*
873 F.2d 1418 (Fed. Cir. 1989) ........................................... 13

iv.

*Molins PLC v. Textron, Inc.,*
    48 F.3d 1172 (Fed. Cir. 1995)                                      11, 12, 13

*Mycogen Plant Science, Inc. v. Monsanto Co.,*
    61 F. Supp. 2d 199 (D. Del. 1999)                                  32

*Pa. Coal Ass'n v. Babbitt,*
    63 F.3d 231 (3d Cir. 1995)                                         11

*Paragon Podiatry Lab., Inc. v. KLM Labs. Inc.,*
    984 F.2d 1182 (Fed. Cir. 1993)                                     12, 28

*Purdue Pharma L.P. v. Boehringer Ingelheim GMBH,*
    237 F.3d 1359 (Fed. Cir. 2001)                                     12

Statutes

35 U.S.C. § 102(b)                                                     25

NATURE AND STAGE OF PROCEEDINGS

On September 13, 2004, plaintiff McKesson Information Solutions, LLC ("McKesson") filed this suit alleging infringement of U.S. Patent No. 5,253,164 (the "'164 patent") against The TriZetto Group, Inc. ("TriZetto"). On October 1, 2004, McKesson amended its Complaint. On November 1, 2004, TriZetto answered and filed a counterclaim seeking a declaratory judgment of invalidity, unenforceability, and non-infringement.

McKesson alleges that three of TriZetto's products (Facets, ClaimFacts and QicLink) infringe fifteen claims of the '164 patent (Claims 1-6 and 8-16). Fact and expert discovery have been completed. The Court has bifurcated and stayed motion practice and trial on the invalidity issues. Motion practice is proceeding on the infringement issues, damages and equitable defenses. The Court has scheduled a hearing for February 16, 2006, to consider summary judgment motions and issues of claim construction. Trial on the issues of infringement, damages and equitable defenses is set for April 17, 2006.

On December 15, 2005, McKesson filed a motion for summary judgment challenging TriZetto's inequitable conduct claim (as set forth in its Seventh Affirmative Defense and Counterclaim for Declaration of Unenforceability). This is TriZetto's

2.

Answering Brief in Opposition to McKesson's Motion for Summary Judgment Regarding TriZetto's Inequitable Conduct Defense and Counterclaim.[1]

## SUMMARY OF ARGUMENT

The '164 patent purports to claim an expert computer system for editing medical procedure codes in claims for payment for medical service. The inventors of the '164 patent have acknowledged that the computer system at issue was designed to match precisely a manual system for editing medical procedure codes that Robert Hertenstein, M.D. had developed while working at Caterpillar Corporation in the 1980s. The applicants for the '164 patent, however, never disclosed Hertenstein's manual system to the Patent and Trademark Office ("PTO") while the patent was being prosecuted. They also did not disclose that details of the manual system, and the idea that it could be incorporated into a claim processing system, were publicly disclosed more than a year before the first patent application. Nor did they disclose several other pieces of material information, including a proposal by the applicants to sell the patented system to Aetna

---

[1]    In order to prevail on its inequitable conduct defense, TriZetto will have to establish a misrepresentation or omission of a material fact, together with an intent to deceive the PTO. Although materiality in this context is not limited to prior art, but embraces *any* information that a reasonable examiner would consider important in deciding whether to allow an application to issue as a patent, the motion raises numerous issues concerning the prior art at issue in this case. Although the Court has stayed motion practice on the issue of invalidity, it has ordered motion practice on equitable issues to proceed consistent with the scheduling order in this case. (D.I. 145.) Given the substantial overlap between the issues raised on this motion and the issues of prior art that will be litigated at the invalidity phase of the trial, the Court may want to defer ruling on this motion until the invalidity phase.

3.

Life and Casualty Insurance Company and a computerized system for reviewing medical claims developed in part by one of the inventors (the Advanced MedLogic System), which the applicants knew about well before filing of the application on September 30, 1988. Nonetheless, in its motion, McKesson asserts that there is no evidence that the applicants for the '164 patent engaged in inequitable conduct before the PTO. The facts and the law are to the contrary.

McKesson first asserts that the manual system Hertenstein developed at Caterpillar to review medical claims was not material. McKesson's arguments on this point are somewhat contradictory. On the one hand, McKesson claims that the patented invention is "significantly different" than the manual system Hertenstein developed at Caterpillar. (D.I. 150.) At the same time, McKesson claims that the Hertenstein system and the public disclosure thereof is cumulative of information that had already been provided to the PTO; namely that procedure codes had previously been reviewed on a manual basis. (D.I. 150 at 2, 9-10.) Neither of McKesson's arguments are supported by the facts. The applicants for the '164 patent testified at length that the patented invention was designed to match exactly the manual system for reviewing procedure codes that Hertenstein had used beginning in 1982 at Caterpillar. Moreover, the portion of the patent that McKesson points to in support of its cumulativeness argument merely discloses that code review had been done generally on a manual basis. That so-called disclosure is misleading at best. The inventors' testimony reveals that the general disclosure in the patent should have made specific reference to the manual system Hertenstein had developed at Caterpillar. Perhaps more importantly, the applicants

4.

should have told the PTO that Hertenstein did not keep his manual process a secret, but instead disclosed it to the public more than a year before the patent application was filed.

In addition, McKesson fails to address two additional pieces of material information that the applicants improperly withheld from the PTO. From 1986 to 1987, the inventors of the '164 patent sent correspondence and detailed proposals offering to sell the patented invention to Aetna Life and Casualty Insurance Company. Moreover, one of the inventors, George Goldberg, had worked on a computer system called Advanced MedLogic System, which was developed more than a year before the filing of the application and performed several of the functions set forth in the claims of the '164 patent. Neither of these pieces of material information were provided to the PTO during the patent's prosecution.

Finally, there are material issues of facts as to whether the applicants acted with intent to mislead or deceive the PTO in failing to disclose the foregoing information. Because direct proof of wrongful intent is rare in inequitable conduct cases, intent is usually proven by inferences drawn from facts. Here, all of the inventors signed an affidavit acknowledging that they were aware of their duties of disclosure and candor to the PTO. Nevertheless, none of the inventors disclosed the backbone of the patented invention – Hertenstein's manual system for reviewing medical claims that he had developed at Caterpillar. The President of HPR admitted that she discussed with HPR's attorneys the idea of disclosing the database (i.e., the thousands of rules that Hertenstein utilized while reviewing medical claims at Caterpillar) to the PTO, but she could not recall how those discussions came out. Given that Hertenstein's system was never

5.

disclosed, it is reasonable to infer that Radosevich and HPR's attorneys decided to withhold that information from the PTO. This is consistent with the inventors' recollection that HPR considered the database to be proprietary and that it should not be disclosed to the public.

STATEMENT OF FACTS

I.    BACKGROUND

The grandparent patent application that resulted in the '164 patent was filed on September 30, 1988, by McKesson's predecessor, Health Payment Review, Inc. ("HPR"). (See Declaration of Jeffrey T. Thomas filed herewith ("Thomas Decl."), Exh. 1 ('164 Patent), p. 1.) The patent issued on October 12, 1993. It is directed to computer software used for reviewing claims for payment submitted by medical care providers to health care insurance companies. Specifically, the patent describes software used to determine whether "procedure codes" (codes used to designate what medical treatment was performed) on claims for payment are accurate. These procedure codes, also known as CPT-4 codes, are numerical codes that were developed by the American Medical Association.

The named inventors on the '164 patent are Donald Holloway, Robert Hertenstein, George Goldberg and Kelli Dugan. (Thomas Decl., Exh. 1, p. 1.)

REDACTED

6.

II.    THE    DEVELOPMENT    OF    THE    PATENTED
INVENTION

Hertenstein joined Caterpillar Corporation in 1981.    (Thomas Decl.,
Exh. 2 at 8:4-12.)    At the time, Caterpillar was self-insured and Hertenstein's
responsibilities were to assist the medical payment center with medical claims that they
did not understand. (Thomas Decl., Exh. 2 at 15:23-16:8.) Six months later, Hertenstein
became the medical director of insurance at Caterpillar where he developed a system to
review medical insurance claims submitted on behalf of Caterpillar's employees.
(Thomas Decl., Exh. 2 at 16:14-17:6.)    The system that Hertenstein developed is
described in an article authored by Hertenstein and a HPR employee named Richard
Egdahl entitled "An Access-oriented Negotiated Fee Schedule:    The Caterpillar
Experience" ("the Caterpillar Experience").  (Thomas Decl., Exh. 3.)  The article was
presented and distributed by Egdahl between April 21 and 23, 1987 at the 107th Annual
Meeting of the American Surgical Association and describes Hertenstein's system as
follows:

> [Caterpillar] claims processors subject each incoming
> physician bill to a coding analysis of CPT-4 codes as a first
> set, and recode claims where irregularities are found.
> Obvious simple coding errors are corrected first.
> Individuals with clinical knowledge and judgment then
> compare the provider's description of services with
> submitted codes . . . . Reviewers with clinical experience
> consult the [Caterpillar] MD [i.e., Hertenstein] as needed,
> assuring a high level of understanding of the surgical
> experience is applied in the review process.

(Thomas Decl., Exh. 2 at 51:20-52:17; Thomas Decl., Exh. 3, p. 3.)  The article then
provides examples of the recoding of CPT-4 codes that Hertenstein was doing at

7.

Caterpillar. (Thomas Decl., Exh. 2 at 53:14-54:20; Thomas Decl., Exh. 3, pp. 3-4.) For example, Table 4 provides an example of "unbundling." (Thomas Decl., Exh. 2 at 57:20-58:1.) Unbundling occurs when a provider of medical care lists codes for each component step of a medical procedure on a medical claim instead of the appropriate code for the entire procedure. (Thomas Decl., Exh. 2 at 26:14-27:7.) Hertenstein began training the technicians at Caterpillar to look for coding errors such as unbundling as early as 1982. (*Id.* at 27:8-14.) It is undisputed that correcting for unbundling is one of the primary functions of the software described in the '164 patent.

In 1986, Hertenstein made a presentation to several Fortune 500 companies at Boston University's Health Policy Institute ("HPI") where he demonstrated examples of coding errors, including unbundling. (Thomas Decl., Exh. 2 at 77:12-78:21.) Thereafter, he was contacted by individuals affiliated with HPI, including Holloway and Goldberg, "who suggested that Hertenstein's mental rule book for evaluating claims be put on a computer and sold to other companies." (*Id.* at 79:3-20; Thomas Decl., Exh. 4.) The idea was to develop software "that could be used with a computer to utilize the system that [Hertenstein] had been doing manually" at Caterpillar. (Thomas Decl., Exh. 2 at 71:5-72:1.)

REDACTED

8.

REDACTED

The product was initially called MedReview and later became known as CodeReview. (Thomas Decl., Exh. 2 at 111:13-14.)

The product contained a database that consisted of Hertenstein's expertise and the rules that he had developed at Caterpillar concerning what CPT-4 codes could be combined with other codes. (Thomas Decl., Exh. 2 at 111:23-112:23.) Hertenstein devoted approximately one thousand hours explaining and passing on his rules to Goldberg, who then placed them in the database. (*Id.* at 112:24-113:13.) By the time the

9.

process had ended, Hertenstein estimated that the knowledge base contained 45,000 rules that were based on his experience at Caterpillar in reviewing medical claims. (*Id.* at 113:14-21; 120:6-22.)

III.   THE   APPLICANTS   FOR   THE   '164   PATENT
WITHHELD     HERTENSTEIN'S     WORK     AT
CATERPILLAR     AND     OTHER     MATERIAL
INFORMATION FROM THE PTO

In 1987, the inventors on the '164 patent formed HPR to market and sell the computer system that was based on the knowledge and rules that Hertenstein had developed on a manual basis at Caterpillar. (Thomas Decl., Exh. 2 at 9:13-10:22.)


REDACTED


On September 30, 1988, HPR filed the application for what would become the '164 patent. (Thomas Decl., Exh. 1.)

In connection with the filing of the application, all the inventors signed a Combined Declaration and Power of Attorney, which included an Acknowledgment of Review of Papers and Duty of Candor. (Thomas Decl., Exh. 12.)  In doing so, they acknowledged their "duty to disclose information which is required to the examination of this application in accordance with [Rule 56]." (*Id.,* p. 2.)

By the time the inventors' depositions were taken in this case, seventeen years had passed since the application was filed.  As a result, none of the inventors could recall much about the filing of the application or the information that they provided to the

10.

attorneys who were representing HPR in prosecuting the patent.

REDACTED

---

[2]  On December 19, 2005, the Special Discovery Master issued an order finding that Radosevich was improperly instructed not to answer questions regarding, among other things, who she communicated with to assist in the review of the patent application. (Thomas Decl., Exh. 13.) McKesson has not cooperated with TriZetto in its attempts to reconvene Radosevich's deposition. TriZetto will supplement this brief, if necessary, after it has the opportunity to question Radosevich on her communications to assist in the review of the patent application.

11.

ARGUMENT

I.    BASIC   LEGAL   STANDARDS   GOVERNING
      SUMMARY JUDGMENT

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is improper where the evidence reveals a genuine issue of material fact. A factual dispute is "genuine" where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). Factual disputes are "material," and will preclude the entry of summary judgment, where the resolution of such disputes "might affect the outcome of the suit under the governing law." *Id.; see also Horowitz v. Fed. Kemper Life Assur. Co.,* 57 F.3d 300, 302 n.1 (3d Cir. 1995). The court will "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." *Pa. Coal Ass'n v. Babbitt,* 63 F.3d 231, 236 (3d Cir. 1995).

II.   LEGAL STANDARDS GOVERNING THE DEFENSE
      OF INEQUITABLE CONDUCT

The defense of inequitable conduct arises from a patent applicant's breach of the duties of candor, good faith and/or honesty in prosecuting an invention. *See Molins PLC v. Textron, Inc.,* 48 F.3d 1172, 1178 (Fed. Cir. 1995). The term "[a]pplicant" in this context "includes anyone under a duty to disclose material information to the PTO pursuant to 37 C.F.R. § 1.56, namely: the inventor[s], the prosecuting attorney[s] or agent[s], and anyone associated with the inventor[s] or the assignee who is substantially involved in the preparation or prosecution of the application." *Bruno Ind. Living Aids, Inc. v. Acorn Mobility Servs., Ltd.,* 394 F.3d 1348,

12.

1351 n.3 (Fed. Cir. 2005) (citing *Molins,* 48 F.3d at 1178 n.6).  A successful inequitable

conduct defense renders all of the claims of a patent unenforceable. *Purdue Pharma L.P.*

*v. Boehringer Ingelheim GMBH,* 237 F.3d 1359, 1366 (Fed. Cir. 2001).

To prevail on an inequitable conduct defense, a party must establish by

clear and convincing evidence "misrepresentation or omission of a material fact, together

with an intent to deceive the PTO." *Hoffmann-LaRoche, Inc. v. Promega Corp.,* 323

F.3d 1354, 1359 (Fed. Cir. 2003).  Because intent and materiality generally implicate

issues of fact which must be resolved before the court can rule on the defense, the issue is

not ordinarily amenable to resolution on a motion for summary judgment. *See Paragon*

*Podiatry Lab., Inc. v. KLM Labs. Inc.,* 984 F.2d 1182, 1190 (Fed. Cir. 1993).

Where, as here, a party is alleging inequitable conduct that occurred prior

to 1992, the materiality element is satisfied "when there is a substantial likelihood that a

reasonable examiner would consider [the information] important in deciding whether to

allow the application to issue." *Hoffman-La Roche,* 323 F.3d at 1367.[3]  The second

element – intent to deceive – is rarely proven by direct evidence; it "is generally inferred

from the facts and circumstances surrounding a knowing failure to disclose material

information." *Bruno,* 394 F.3d at 1354 (citing *Paragon,* 984 F.2d at 1193).  Although

gross negligence alone in failing to disclose material references is insufficient to justify

an inference of an intent to deceive the PTO, intent may be inferred where, as here, the

---

[3]    In 1992, the PTO expounded upon the materiality standard set forth in 37 C.F.R.
§ 1.56 ("Rule 56").  The revised Rule 56, however, is not retroactive and thus
does not apply to allegations of inequitable conduct occurring before 1992. *See*
*Molins,* 48 F.3d at 1179 n.8.

13.

applicant knew or should have known that withheld information would be material to the

PTO's consideration. *See Critikon, Inc. v. Becton Dickinson Vascular Access, Inc.,* 120

F.3d 1253, 1256 (Fed. Cir. 1997). The more material the omission or misrepresentation,

the lower level of intent that is required; conversely, when persuasive evidence of an

intent to deceive is offered, a diminished showing of materiality is required. *Id.*

III.   THE APPLICANTS FOR THE '164 PATENT FAILED
       TO DISCLOSE MATERIAL INFORMATION TO THE
       PTO

"Materiality is not limited to prior art, but instead embraces any

information that a reasonable examiner would be substantially likely to consider

important in deciding whether to allow an application to issue as a patent." *GFI, Inc. v.*

*Franklin Corp.,* 265 F.3d 1268, 1274 (Fed. Cir. 2001) (citing *Akron Polymer Container*

*Corp. v. Exxel Container, Inc.,* 148 F.3d 1380, 1382 (Fed. Cir. 1998)).   Similarly,

materiality is not confined to matters reflected in the claims of a patent. *Hoffmann-La*

*Roche, Inc.,* 323 F.3d at 1367.   Thus, information may be material even though it does

not ultimately render the patent claims invalid. *Merck & Co. v. Danbury Pharmacal,*

*Inc.,* 873 F.2d 1418, 1420-21 (Fed. Cir. 1989); *see also Molins PLC,* 48 F.3d at 1179

(finding information is not "immaterial simply because the claims are eventually deemed

by an examiner to be patentable thereover").   Here, there is no doubt that the applicants

for the '164 patent failed to disclose material information to the PTO.

14.

A.    Hertenstein's Manual Process For Reviewing
Medical Claims At Caterpillar Was Material

McKesson asserts that the manual system Hertenstein developed at Caterpillar to review medical claims was not material. McKesson's arguments on this point are somewhat contradictory. On the one hand, McKesson claims that the patented invention is "significantly different" than the manual system Hertenstein developed at Caterpillar. (D.I. 150 at 5.) At the same time, McKesson claims that the Hertenstein system and the public disclosure thereof is cumulative of information that had already been provided to the PTO; namely a one sentence statement that medical claims had previously been reviewed generally for coding errors on a manual basis. (D.I. 150 at 2, 9-10.) Neither of McKesson's arguments is supported by the facts.

1.    The Patented Invention Was Designed To
Match Precisely Hertenstein's Manual
System For Reviewing Medical Claims

The applicants for the '164 patent testified at length that the patented invention was designed to match precisely the manual system for reviewing medical claims that Hertenstein had developed beginning in 1982 at Caterpillar.

REDACTED

15.

REDACTED

16.

REDACTED

17.

REDACTED

In other words, the idea of automating the manual system is not the novel feature of the alleged invention; instead, it is the code review process, including the rules Hertenstein used at Caterpillar that were loaded into a database. McKesson now tries to distinguish Hertenstein's system by saying it was manual while the '164 patent discusses an automated system, but the mere idea of using automation for this purpose is not novel. Thus, the examiner would clearly have been interested in knowing that the functions described in the patent application matched exactly a manual process that was publicly disclosed more than a year before the application was filed.

Finally, the inventors of the '164 patent testified that the manual system for reviewing medical claims that Hertenstein developed at Caterpillar was disclosed publicly more than a year before the filing of the patent application on September 30, 1988. Specifically, in April 1987, Hertenstein and another person affiliated with HPR, Richard Egdahl, presented and distributed the Caterpillar Experience at the 107th Annual Meeting of the American Surgical Association. (Thomas Decl., Exh. 3.) The Caterpillar Experience describes the system used by Hertenstein at Caterpillar whereby "[s]urgical services that have been incorrectly bundled are rebundled, and the appropriateness of surgical assistant charges is reviewed." (*Id.*, p. 1.)

REDACTED

18.

REDACTED

The relevance of Hertenstein's system to the validity of the patent is further underscored by his testimony that the computer system described in the patent was based entirely on the rules he used in his manual system, *and in turn those rules were based on publicly available information.*

REDACTED

19.

REDACTED                    It is, therefore, clear that the details of

Hertenstein's manual system and the source of the information he used in connection

with that system are at the heart of the alleged invention and cast serious doubt on the

validity of the patent.  Nevertheless, that is precisely the information that HPR elected to

not share with the PTO.

        Given the foregoing testimony, there is no doubt that the manual system

for reviewing medical claims that Hertenstein developed at Caterpillar, as well as the

Caterpillar Experience, was information that a reasonable examiner would consider

important in deciding whether to allow the application for what would mature into the

'164 patent to issue.

        2.    McKesson's Proposed Construction Of The
             Claims Of The '164 Patent Renders
             Statements Made To The PTO Misleading

        McKesson points to a portion of Holloway's testimony where he referred

to the rules listed in Appendix B of the recitals of the '164 patent to distinguish the patent

from Hertenstein's manual system for reviewing medical claims.   (D.I. 150 at 5.)

REDACTED

        During the prosecution of the '164 patent, HPR's attorneys

relied on those rules to argue to the PTO that the invention was not invalid: "The present

invention uses *and claims* a set of rules that describe the relationship between medical

service codes (which correspond to particular medical service codes or procedures) to

determine whether or not there are improper medical service codes in a particular claim."

20.

(Thomas Decl., Exh. 15 at MCK 000293 (emphasis added).)  They further relied on the database, which consisted of Hertenstein's expertise and the rules that he had developed at Caterpillar concerning what CPT-4 codes could be combined with other codes, when they asserted that the claims in the patent "describing the predetermined database as containing medical service codes and a set of relationships among the codes . . . distinguish the present invention over the art of record." (*Id.* at MCK 000295.)

But that is not what McKesson has asserted in this litigation.  McKesson has now asserted that *any* software – not just software that uses the rules listed in Appendix B – that performs the functions set forth in the claims is covered by the '164 patent.  (*See, e.g.*, McKesson's proposed claim construction, D.I. 170.)  Under McKesson's construction of the claims of the '164 patent, the foregoing statements to the PTO were completely misleading.  Indeed, if the examiner had assumed that the patent would be interpreted as McKesson now contends, and he or she knew the details of Hertenstein's manual system for reviewing medical claims and the fact that Hertenstein's system had been publicly disclosed, the patent would not have issued.


REDACTED


According to McKesson, the invention consists of only two elements: (1) the idea to review medical claims as Hertenstein did at Caterpillar; and (2) the notion that that review system could be automated by using software of some kind.  The inventors have admitted that the second element is obvious.  Thus, the fact that the first

21.

element was known, practiced and publicly disclosed more than a year before the patent

application was filed certainly would have been of great interest to the examiner.

> 3.    Hertenstein's    Manual    System    For
> Reviewing    Medical    Claims    Is    Not
> Cumulative Of The Information Provided
> To The PTO

The '164 patent states in the recitals that "[t]he prompts and

recommendations provided by CodeReview are based on the decision rules that physician

reviewers have already used on a manual basis to solve identical problems and are

consistent with informed surgical opinion." (Thomas Decl., Exh. 1, col. 3, ll. 25-29.)

McKesson argues from this section of the patent that the disclosure of Hertenstein's

manual system for reviewing medical claims at Caterpillar would have been cumulative

because the patent already discloses that claims had previously been reviewed on a

manual basis. That is wrong. In fact, disclosure of Hertenstein's manual system was

necessary to make the application not misleading.

REDACTED

22.

REDACTED

Goldberg similarly testified that the so-called disclosure of the manual review of medical claims in the '164 patent was "based on the procedures followed by Dr. Hertenstein and his staff at Caterpillar, yes." (Thomas Decl., Exh. 16 at 295:22-296:23.)

Thus, the patented invention was designed to match *exactly* the manual system for reviewing procedure codes that Hertenstein had used beginning in 1982 at Caterpillar. The patent, however, merely discloses in a single sentence that code review of some kind had been done generally on a manual basis. There is obviously a significant difference between disclosing that the claims of the '164 patent replicate precisely what Hertenstein had been doing on a manual basis at Caterpillar and merely disclosing that this type of code review generally had been done. That difference is made even more significant by the fact that Hertenstein did not keep his manual process secret, but instead disclosed it to the public in the Caterpillar Experience more than a year before the patent application was filed. Therefore, merely disclosing that code review had been done generally on a manual basis was not sufficient to satisfy the duty of candor that the applicants had to the PTO.

23.

B.    McKesson's Opening Brief Fails To Address Two
Pieces Of Material Information That The Applicants
Withheld From The PTO

1.    Aetna Insurance Company

From 1986 to 1987, the inventors of the '164 patent sent correspondence

and detailed proposals offering to sell the patented invention to Aetna.

REDACTED

24.

131:16-132:7.)[4]   The purpose of the proposal was to convince Aetna to fund the development of software that would combine several CPT-4 procedure codes into a single all-inclusive code (i.e., unbundling), as Hertenstein had done as part of his manual process for reviewing medical claims at Caterpillar.  (Thomas Decl., Exh. 6 at 133:6-134:7; Thomas Decl., Exh. 9 at pp. 1-2.)  The proposal states that HPI will "build[] clinical decision rules for software that will assist [Aetna's] claims processing units in: 1) assigning accurate codes to the combination of procedure codes on a claim, and 2) deciding when it is cost effective to request an operative report."  (Thomas Decl., Exh. 9 at p. 2.)

Holloway has testified that following a public presentation of his manual system in 1986, the idea of automating his system was suggested to him.  Within the next year – by no later than July 1987 – the idea of such a computerized system was being proposed to potential sources of funding, including Aetna.  (Thomas Decl., Exh. 2 at 243:3-246:3.)

By September 14, 1987, HPR had developed a prototype software product that consisted of a knowledge base containing some of the rules that Hertenstein had developed at Caterpillar and an expert system shell sold by Texas Instruments (Personal Consultant Plus).  (Thomas Decl., Exh. 6 at 135:1-136:25; Thomas Decl., Exh. 10.)  Holloway described the computer software as follows: "if you put the rules of thumb that

_____

[4]    Goldberg recalled meeting with representatives from Aetna around this time, but he could not recall anything that was discussed during the meetings.  (Thomas Decl., Exh. 16 at 277:19-279:14.)

25.

Bob [Hertenstein] was giving us into the computer, it would – it would give back Bob [Hertenstein's] answer." (Thomas Decl., Exh. 6 at 136:20-22.) Holloway further testified that at this time, the software worked, but it was cumbersome and not user friendly. (*Id.* at 138:10-139:5.) The software at issue is what later became CodeReview. (Thomas Decl., Exh. 2 at 106:25-114:17; 245:15-246:3; Thomas Decl., Exh. 9.)

35 U.S.C. § 102(b) prevents the issuance of a patent if "the invention was . . . in public use or on sale in this country, more than one year prior to the application for patent in the United States." 35 U.S.C. § 102(b). "An on sale bar determination requires that the claimed invention asserted to be on sale was operable, the complete invention claimed was embodied in or obvious in view of the device offered for sale, and the sale or offer was primarily for profit rather than for experimental purposes." *KeyStone Retaining Wall Systems, Inc. v. Westrock, Inc.*, 997 F.2d 1444, 1451 (Fed. Cir. 1993). Here, the applicants had sent a proposal to Aetna offering to sell software that would automate what Hertenstein had previously done at Caterpillar more than a year prior to the filing of the application. The applicants had also developed an operable software program that would perform the functions described in the claims of the patent more than a year prior to the filing of the application. Nevertheless, the applicants never disclosed any of that information to the PTO. Given the public use and on sale bar of 35 U.S.C. § 102(b), a reasonable examiner would obviously have considered such information important in deciding whether to allow the application to issue as the '164 patent.

26.

The disclosure and offer to sell sent to Aetna is particularly important given McKesson's current claim construction (i.e., any software that performs the functions described in the patent). Since HPR clearly disclosed the relevant functionality to Aetna, and offered to provide some type of software that would perform those functions, if McKesson's construction is correct, the Aetna disclosure and offer likely invalidates the patent and certainly should have been disclosed to the PTO.

2.    Advanced MedLogic System

Advanced MedLogic Systems ("AMS") was a computerized medical code review system that one of the inventors of the '164 patent – George Goldberg – worked on in the 1980s at a company called Health Data Institute. (Thomas Decl., Exh. 16 at 262:23-263:8l; Thomas Decl., Exh. 18.)  Radosevich also worked on the AMS project during the time that she was employed at Health Data Institute. (Thomas Decl., Exh. 16 at 55:15-56:3.)  AMS included a database and software that had the capability of reviewing claims and performing CPT-4 code edits. (*Id.* at 51:20-52:2.)  For example, one of the functions of AMS was to review medical procedures and/or diagnoses in relation to certain non-medical criteria such as a patient's age or sex. (*Id.* at 53:17-54:1; 264:3-12.)  AMS consisted of a series of computerized tables that received and processed medical claims. (*Id.* at 51:20-52:2.)  Goldberg admitted that the tables contained in AMS could have been modified so that the computer could detect unbundling. (*Id.* at 389:21-390:2; 390:13-20.)

Thus, AMS performed several of the functions of the claims of the '164 patent and was developed more than a year prior to the filing of the application for the

27.

'164 patent. (Thomas Decl., Exh. 19.) Nevertheless, neither Goldberg nor Radosevich disclosed AMS to the PTO during the patent's prosecution.

McKesson will undoubtedly assert that TriZetto did not properly disclose AMS in its responses to certain discovery requests. But it was McKesson's improper conduct that resulted in TriZetto not understanding the relevance of AMS until it took Goldberg's deposition on September 13, 2005. For example, on December 14, 2004, TriZetto served McKesson with Interrogatory No. 9, which asked McKesson to "IDENTIFY all prior art of the '164 PATENT . . . which YOU, the named inventors of the '164 PATENT . . . were aware prior to the filing the '164 PATENT." TriZetto's Interrogatory No. 10 asked McKesson to identify the person most knowledgeable about the location of that prior art and identify all documents relating to  the prior art. (*See* Thomas Decl., Exh. 20.)  Despite the fact that McKesson's attorneys represented Goldberg in connection with his response to the subpoena issued by TriZetto and at his deposition, McKesson never identified AMS in its responses to these Interrogatories.

Moreover, McKesson did not produce the documents of value that were related to AMS until August 17, 2005 – more than three months after McKesson was supposed to complete its production and only four weeks before Goldberg's deposition. These documents included a draft Goldberg declaration from the *GMIS v. HPR* litigation where Goldberg revealed that he worked on the specifications for AMS in 1986. (Thomas Decl., Exh. 21.)  They also included a vendor comparison of HPR's MedReview (which was later called CodeReview), Health Data Institute's AMS and GMIS's product called AuditCoder. (Thomas Decl., Exh. 19.)  When asked why

28.

McKesson was producing documents at this late date, McKesson's counsel simply responded that they were "only recently discovered." (Thomas Decl., Exh. 22.) Goldberg was then deposed on these documents and AMS, and it became clear for the first time how similar AMS was to the system described in the '164 patent. Therefore, any complaint that McKesson may raise concerning TriZetto's disclosure of AMS in its own discovery responses would be disingenuous at best.

IV.    THERE ARE TRIABLE ISSUES OF FACT AS TO WHETHER THE APPLICANTS FOR THE '164 PATENT INTENDED TO MISLEAD OR DECEIVE THE PTO

Because direct proof of wrongful intent is rare in inequitable conduct cases, intent is primarily "proven by inferences drawn from facts." *GFI, Inc.*, 265 F.3d at 1274. Furthermore, because intent generally implicates issues of fact which must be resolved before the court may rule on the defense, the issue is not ordinarily amenable to resolution on a motion for summary judgment. *See Paragon*, 984 F.2d at 1190.

The law requires patent applicants and their assignees to disclose any and all potential conflicts to the patent examiner and "not to unilaterally make a determination that [a reference] was not prior art." *GFI, Inc.*, 265 F.3d at 1274. "It is axiomatic that '[c]lose cases should be resolved by disclosure.'" *Critikon, Inc.*, 120 F.3d at 1257 (quoting *LaBounty Mfg., Inc. v. United States Int'l Trade Comm'n*, 958 F.2d 1066, 1076 (Fed. Cir. 1992).

Ignorance of the law is no defense for withholding material prior art. *See Brasseler, U.S.A. L.L.P. v. Stryker Sales Corp.*, 267 F.3d 1370, 1385 (Fed. Cir. 2001) ("We reiterate that inventors represented by counsel are presumed to know the law").

29.

Moreover, a "duty to inquire arises" where "counsel is on notice of the likelihood that specific, relevant, material information exists and should be disclosed." *Id.* at 1383. Although gross negligence itself is insufficient to satisfy the intent threshold, intent may be inferred based upon failure to disclose prior art or other material information with which the applicant was intimately familiar. *Bristol-Myers Squibb Co. v. Rhone-Poulenc Rorer, Inc.*, 326 F.3d 1226, 1239-40 (Fed. Cir. 2003).

        A.     The Applicants' Testimony Concerning The Filing
                 Of The Application And The Information That Was
                 Withheld From The PTO

Here, all of the inventors of the '164 patent, signed a Combined Declaration and Power of Attorney in connection with the application, which included an Acknowledgment of Review of Papers and Duty of Candor. (Thomas Decl., Exh. 12.) In doing so, the inventors acknowledged their "duty to disclose information which is required to the examination of this application in accordance with [Rule 56]." (Thomas Decl., Exh. 2 at 217:9-218:20; Thomas Decl., Exh. 12, p. 2.)

Holloway acknowledged that he worked with HPR's attorneys and assisted in preparing the application for what would become the '164 patent. (Thomas Decl., Exh. 6 at 239:25-240:24.) In doing so, he provided the attorneys with various technical materials, including the flow charts set forth in the patent's specifications, the examples of how CodeReview works listed in Appendix A, the rules for reviewing medical claims that were based on Hertenstein's work at Caterpillar listed in Appendix B, the information contained in Appendix C, and the computer code set forth in Appendix D. (*Id.* at 242:15-244:16.) Although Holloway had knowledge of

30.

Hertenstein's manual review of medical claims at Caterpillar and its public disclosure in the Caterpillar Experience, he did not recall disclosing that information to the attorneys prosecuting the patent or the PTO. (*Id.* at 95:23-97:23; 98:21-99:21; 100:13-22; 293:4-19.)

Goldberg testified that he was involved in the patent application that ultimately matured into the '164 patent. (Thomas Decl., Exh. 16 at 152:13-153:1.) Nevertheless, he could not recall any discussions he had with HPR's attorneys. (*Id.* at 173:3-174:15.) Nor could he recall hearing the phrase prior art or "duty of candor." (*Id.* at 173:3-174:15.) Goldberg did not recall being asked to provide any materials related to the claimed invention other than a series of examples of medical claims. (*Id.* at 288:24-291:21.)

Dugan attended meetings with the attorneys who were prosecuting the '164 patent on behalf of HPR. (Thomas Decl., Exh. 14 at 33:16-20.) She admitted seeing the Caterpillar Experience while she was employed by HPR. (*Id.* at 105:12-23; Thomas Decl., Exh. 3.) Nevertheless, Dugan acknowledged that she did not bring the article to the attention of the attorney that she had met with, either before the application was filed or during its prosecution. (Thomas Decl., Exh. 14 at 106:19-23.)

Hertenstein simply could not recall being involved in the filing of the application or the patent's prosecution in any way. (Thomas Decl., Exh. 2 at 178:6-179:17.)

31.

Radosevich, as Chief Executive Officer of HPR, was ultimately responsible for supervising the work that went into the patent application.[5] (Thomas Decl., Exh. 11 at 113:21-25.) In that capacity, Radosevich worked directly with the inventors and the attorneys and reviewed some of the paperwork that went back and forth between HPR and the PTO. (*Id.* at 114:3-12; 115:18-21.) Radosevich admitted that she discussed with HPR's attorneys the idea of disclosing the database (i.e., the thousands of rules that Hertenstein utilized while reviewing medical claims at Caterpillar) to the PTO, but she could not recall how those discussions came out. (*Id.* at 132:22-133:6; 135:14-136:5.) Given that Hertenstein's manual system for reviewing medical claims was never disclosed to the PTO, it is reasonable to infer that Radosevich and HPR's attorneys made the improper decision to withhold the database from the PTO. This inference is supported by the inventors' testimony that HPR considered the database proprietary and did not want to disclose it to the public. (*Id.* at 135:14-136:5; Thomas Decl., Exh. 6 at 140:9-21.)

Furthermore, HPR's attorneys obviously knew something about some manual system for reviewing medical claims that pre-dated the patent application. Otherwise, they would not have made the vague disclosure in the patent that procedure codes had previously been reviewed on a manual basis. (Thomas Decl., Exh. 1, col. 3, ll. 25-29.) Therefore, HPR's attorneys had a "duty to inquire" about the detail of that

---

[5]     Because Radosevich was HPR's Chief Executive Officer and ultimately responsible for supervising the work that went into the patent application, she qualifies as an "applicant" and had a duty to disclose material information to the PTO under Rule 56. *See Bruno*, 349 F.3d at 1351 n.3.

32.

manual system. *Brasseler*, 267 F.3d at 1383 (a "duty to inquire" arises where "counsel is on notice of the likelihood that specific, relevant, material information exists and should be disclosed"). Given that the inventors were familiar with both Hertenstein's manual system for reviewing medical codes and the Caterpillar Experience, any sort of inquiry would have revealed the need to disclose that information.

> B.   The Applicants' Ignorance Of The Duty Of Candor Is No Excuse For Their Withholding Of Information From The PTO

Although Hertenstein, Dugan and Goldberg all denied being aware of their duty of candor to the PTO, their alleged ignorance of the law is no defense for their improper withholding of material information from the PTO. *See Brasseler*, 267 F.3d at 1385. "Where inventors employ patent counsel, it is fair to charge them with knowledge of legal requirements and the corresponding factual disclosure requirements regarding basic, 'building block' level, material information such as whether there has been a prior sale." *Brasseler U.S.A., L.L.P. v. Stryker Sales Corp.*, 93 F. Supp. 2d 1255, 1263 (S.D. Ga. 1999). This view embraces the realities of the patent process where "patent applicants and their patent attorneys disclose to the PTO information of which they are aware which is material to the examination of the application." *Mycogen Plant Science, Inc. v. Monsanto Co.*, 61 F. Supp. 2d 199, 269 (D. Del. 1999).

In other words, "inventors cannot 'empty-head' their own patent counsel, and patent counsel cannot shirk basic, § 102(b) factual inquiry requirements." *Brasseler*, 93 F. Supp. 2d at 1264. Nor can inventors, as they did in this case, execute "inventor declarations – documents which literally cite to 37 C.F.R. § 1.56(a) – yet ignore that

33.

declaration's very reminder to reasonably inquire and thus disclose any § 102(b)-invalidating facts to the PTO." *Id.*

Therefore, at the very least, there are triable issues of material fact related to the issue of whether the applicants acted with intent to mislead or deceive the PTO in connection with the prosecution of the '164 patent.

CONCLUSION

For the foregoing reasons, TriZetto respectfully requests that the Court deny McKesson's Motion for Summary Judgment Regarding TriZetto's Inequitable Conduct Defense and Counterclaim.

MORRIS, NICHOLS, ARSHT & TUNNELL, LLP

*/s/ Rodger D. Smith, II*

Jack B. Blumenfeld (#1014)
Rodger D. Smith, II (#3778)
1201 North Market Street
P.O. Box 1347
Wilmington, Delaware 19899-1347
(302) 658-9200

Attorneys for Defendant
THE TRIZETTO GROUP, INC.

OF COUNSEL:

Jeffrey T. Thomas
David A. Segal
Michael A. Sitzman
GIBSON, DUNN & CRUTCHER LLP
Jamboree Center, 4 Park Plaza
Irvine, California 92614-8557
(949) 451-3800

January 10, 2006
501337

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on January 18, 2006 he electronically filed Defendant The Trizetto Group Inc.'s Answering Brief In Opposition To Plaintiff's Motion For Summary Judgment Regarding Trizetto's Inequitable Conduct Defense And Counterclaim (Redacted Version) with the Clerk of the Court using CM/ECF, which will send notification of such filing(s) to the following:

> Thomas J. Allingham, II
> Skadden, Arps, Slate, Meagher & Flom LLP

The undersigned also hereby certifies that copies were caused to be served on January 18, 2006 upon the following in the manner indicated:

### BY E-MAIL AND HAND DELIVERY

> Thomas J. Allingham, II
> Skadden, Arps, Slate, Meagher & Flom LLP
> One Rodney Square
> P.O. Box 636
> Wilmington, DE  19899

### BY E-MAIL AND FEDERAL EXPRESS

> Jeffrey G. Randall
> Skadden, Arps, Slate, Meagher & Flom LLP
> 525 University Avenue
> Suite 1100
> Palo Alto, CA  94301

> */s/ Rodger D. Smith, II*
> _____
> Morris, Nichols, Arsht & Tunnell LLP
> 1201 N. Market Street
> P.O. Box 1347
> Wilmington, DE  19899
> (302) 658-9200
> rsmith@mnat.com