# Exhibit 2

Redacted

# Exhibit 3

Reprinted from ANNALS of SURGERY, Vol. 206, No. 3, September 1987.
Copyright, © 1987, by J. B. Lippincott Company.    Printed in U.S.A.

# An Access-oriented Negotiated Fee Schedule

*The Caterpillar Experience*

RICHARD H. EGDAHL, M.D. and ROBERT D. HERTENSTEIN, M.D.

From the Department of Surgery and Health Policy Institute,
Boston University Medical Center, Boston, Massachusetts,
and Caterpillar Corporation, Peoria, Illinois

This paper describes the system used by Caterpillar Corporation (CAT) in Peoria, Illinois, to reimburse surgeons. The CAT system assures access for Caterpillar employees and their families to a selection of qualified surgeons, while achieving cost savings through improvements in processing of surgical claims and negotiation of selected fees. CPT-4 codes are recoded for greater accuracy, when indicated, surgical services that have been incorrectly unbundled are rebundled, and the appropriateness of surgical assistant charges is reviewed. A "degree of difficulty" relative value scale (DODRVS) of surgical services is periodically revised in processing of technology changes. The DODRVS multiplied by a regional factor, determined by local market research, establishes the fee that CAT will pay the surgeon. Balance billing is permitted if the patient (1) is informed in advance by the surgeon that the fee will be higher than CAT will pay, and (2) knows that the service can be obtained from other local surgeons who will accept the CAT fee. The goal of the CAT method of surgeon reimbursement is to gain physician support for an access-oriented, market-driven negotiated fee schedule. Compared with a resource-based relative value scale (RBRVS) methodology, the CAT system is not formula-driven and depends on physician acceptance.

FOR MORE THAN 25 years, physicians have benefited from a generous fee-for-service system of payment. However, between 1965 and 1985, national expenditures for physicians' services have increased almost tenfold, from $8.5 billion in 1965 to $82.8 billion in 1985.[1] As a result, several possible physician payment reforms are being considered. Prospective payment by diagnostic-related groups (DRGs), put in place to control Medicare hospital expenditures, is a fact of life for hospitals. Medicare and Medicaid are now pushing for changes in the way they pay physicians. Managed care programs are negotiating discounts from all types of health care providers.

Presented at the 107th Annual Meeting of The American Surgical Association, Palm Beach, Florida, April 21–23, 1987.

Reprint requests: Richard H. Egdahl, M.D., Boston University Medical Center, 720 Harrison Avenue (1107), Boston, MA 02118.

Submitted for publication: April 24, 1987.

Reform activity can be identified on many fronts: (1) Congress has frozen Medicare fees, effective June 1984 through January 1987. Congress's intent is now to shift the burden of effectively constraining the growth of Medicare Part B costs to providers rather than Medicare beneficiaries. (2) The Physician Payment Review Commission, created by Congress, has issued a recent major report, outlining ways that physicians could be reimbursed under Medicare in the future.[2] (3) In fall 1985, the Health Care Financing Administration (HCFA) contracted with Harvard University to conduct a 30-month study of resource-based relative value scales (RBRVS) for physician services.[3] This system is being developed under the direction of William Hsiao, Ph.D., Harvard School of Public Health. The American Medical Association is a subcontractor on the study for HCFA. The study is scheduled to be completed in July 1988. (4) The Massachusetts Rate Setting Commission is revising its Medicaid fee schedule, based on the RBRVS, for planned application in mid-1987. (5) The Massachusetts Insurance Commissioner asked Blue Shield to consider reforms in physician payment, with an emphasis on developing an RBRVS, as a condition of his approving a Blue Shield rate increase in 1987. (6) Congressional hearings on physician fee schedules continue, and congressionally sponsored studies of physician fees have recently been published.[4,5]

Within the administration in Washington, proponents of physician fee reform are calling for an expanded use of capitation in the long term, or some form of physician DRGs.[6] But these changes are not imminent. During the next several years, fee payment modifications will be based on fee-for-service recalculations. If the revised physician fee schedules achieve acceptable levels

CAT 0878

TABLE 1. *Medicare Prevailing Fees ($, 1984)\**

| State | CABG | Appendectomy | Cataract |
|-------|------|--------------|----------|
| New York | 6000 | 1134 | 1547 |
| Michigan | 3100 | 399 | 825 |
| Rhode Island | 2587 | 516 | 928 |

\* The charges indicated are for specialists and for the large urban areas within the states listed.

From the U.S. Department of Health and Human Services, Health Care Financing Administration. Medicare Directory of Prevailing Charges 1984. Washington DC: U.S. Government Printing Office, 1984.

of patient access and physician support, they will be part of the blueprint for future health care delivery in both private and public arenas.

### Background

Medicare's "customary, prevailing, and reasonable" (CPR) payment system is, by general consensus, unsatisfactory in today's competitive market in health services. There are many problems associated with CPR. It tends to be inflationary and slow to respond to alternatives in technology and changes in both availability of physicians and need for services. Some charges appear excessive to most observers, even taking into account geographic cost-of-living variations and other variables. For example, under Medicare, the cost of a triple vessel CABG (coronary artery bypass graft) in New York in 1984 was $5500. The cost of this same procedure in Michigan was $3100 and $2587 in Rhode Island (Table 1).

Similar variations are found in fees from the private sector. For example, unexplained fee variations exist in managed health care models such as independent practice associations (IPAs). Hip replacement at three different IPAs in the eastern part of the country ranged from $2808 to $4274 (see Table 2).

Noting these wide discrepancies, the federal government and a number of large private purchasers of health services have turned their attention to the ways physicians are compensated for the care they provide. Fundamental changes in the methodology of physician reimbursement are being discussed. Serious consideration

TABLE 2. *Fee Variations in 3 IPAs, 1986 Fees ($)\**

| Operation | Plan #1 | Plan #2 | Plan #3 |
|-----------|---------|---------|---------|
| Appendectomy | 645 | 950 | 1111 |
| Cholecystectomy | 1055 | 1465 | 1710 |
| Cataract removal | 1280 | 1650 | 1980 |
| Hip replacement | 2808 | 3666 | 4274 |
| CABG (3-vessel) | 4690 | 6123 | 7139 |

\* Plan names withheld because fees were given in confidence to Health Policy Institute by IPA executives.

is being given to systems that would pay physicians by capitation or by including the physician payment with the hospital DRG payment. However, both options represent a radical departure from the current system and are viewed as politically unrealistic, at least in the short term.

Several interim remedies are being devised, however. One approach adjusts a few fees that are grossly out of line. Invoking "inherent reasonableness" authority, HCFA uses this approach to reduce payments for "overpriced" procedures. Although corrections have been made for a few services such as cataract removal and installation of pacemakers, most physician payments currently are based on historic trends.

Another approach used by HCFA to control "runaway" costs involves a recalculation of the Medicare Economic Index (MEI), an inflation index for increases in physician office expenses that result from inflation.[7] HCFA estimates that this downward modification in the MEI will save Medicare an increasing amount of money.

Another approach, more far-reaching in concept than the interim measures described previously, but less radical than capitation and physician DRGs, was tried by the Boston University Health Policy Institute (BUHPI) in the fall of 1984.[8] BUHPI compiled a group of 12 Massachusetts surgeons in a pilot effort to develop a complexity-severity index (C/S index) of surgical services, based on professional judgment, that could provide the basis for a relative value scale.

Building this kind of index, although intuitively appealing, proved time consuming and cumbersome. It also raised questions of antitrust. The Federal Trade Commission has barred professional groups from developing relative values guides on the grounds that such guides ". . . established by competitors in a commercial context, probably would constitute illegal price fixing because the dissemination of information and agreement on establishment of price structures usually lead to price uniformity and stabilization."[9]

In this pilot study, BUHPI identified a private corporation that had captured the essence of the C/S index and developed a practical way to convert it to a physician payment management system. The approach of Caterpillar Corporation (CAT), based in Peoria, Illinois, has resulted in the evolution of "degree of difficulty" relative value scales (DODRVS) and regional multipliers that appear to accomplish a pragmatic fee schedule reform. Access to physicians is achieved for CAT employees and their families, and local physician acceptance of the overall CAT process is maximized. Since CAT is not a dominant payer in any geographic area and is not a provider, the potential for antitrust challenges is minimal.

CAT 0879

Table 3 shows the close correlation between the C/S index numbers, arrived at through the BUHPI study, and CAT's DODRVS, reached by consultation with regional surgeons. This striking correlation between the two processes suggested to the BUHPI that CAT was on target in its surgical fee activities, and led to the collaborative project described in this paper.

### The Caterpillar Method

CAT is an international manufacturer of earthmoving machinery and equipment, employing an estimated 54,000 employees in 15 domestic and 13 foreign plants. CAT health benefits cover employees and dependents, as well as 21,000 retirees. The benefit package includes hospitalization, physicians' services, laboratory, x-ray, prescription drugs, and dental and eye care. The CAT health plan is self-insured and self-administered.

In 1983, CAT implemented for its U.S. employees a negotiated fee schedule approach to physician fees for surgical and invasive procedures. The CAT physician payment system emphasizes (1) employee access to a wide range of qualified surgeons, (2) fees negotiated with local surgeons that are considered reasonable and consistent with local market forces, and (3) billing practices review applied consistently to all incoming claims. Particular features of this approach are described below.

*Establish a fair fee cap.* With input from respected community physicians in locations with a large number of CAT employees, CAT establishes a fair fee cap for surgical services. The CAT method involves convening a limited number of meetings with selected representatives of the surgical community and the CAT medical director for group insurance (CAT M.D.). Where it makes the most efficient use of time, the CAT M.D. meets with individual specialty groups. Operating under a "physician friendly" philosophy and the assumption that physician education and involvement help achieve a mutually agreeable solution, the CAT M.D. describes the situation from CAT's point of view: (1) there are wide variations in fees and billing practices; (2) there is often insufficient documentation to properly process claims; (3) a way is needed to compare the difficulty of various services so their "relative value" can be considered for payment decisions; and (4) a reassessment of the need for surgical assistants is needed.

Actual claims received are used as examples (with patient and provider identities protected). The CAT M.D. then solicits provider input on how problems can be corrected. General consensus is gained on reasonable billing practices and relative degree of difficulty of various procedures, based on recommendations by the CAT M.D. and discussions with physician groups.

*Use of geographic multipliers.* CAT's DODRVS is combined with a regional dollar multiplier to calculate

TABLE 3. *BUHPI C/S Index Compared with CAT DODRVS*

|  | C/S Index | DODRVS |
|---|---|---|
| Thoracentesis | 3 | 3.4 |
| Appendectomy | 24 | 26.4 |
| Cholecystectomy (with common bile duct exploration) | 48 | 47.7 |
| Total thyroid lobectomy | 40 | 41.8 |
| Modified radical mastectomy | 45 | 47.7 |
| Colectomy, partial | 55 | 54.5 |
| Pancreatoduodenectomy | 100 | 100.0 |

the actual dollar payment limit. The regional multiplier is based on market research by the CAT M.D. Where there are unusual market conditions for certain specialties, CAT may adjust the multiplier up or down for some services rather than changing the entire region's multiplier. This system allows CAT to take into account the local health care market, legitimate variations in provider billing and medical practices, and variations in the cost of living.

*Continual audit and recoding of physician bills.* CAT claims processors subject each incoming physician bill to a coding analysis of CPT-4 codes as a first step, and recode claims where irregularities are found. Obvious simple coding errors are corrected first. Individuals with clinical knowledge and judgment then compare the provider's description of services with submitted codes; operative reports are requested for most surgical claims and follow-up calls to provider offices for clarifying information are common. Once the claim reviewer is satisfied that enough information is available to code the bill consistent with CAT procedures, recoding is finalized, and the correct codes are compared with established regional fee schedules. Reviewers with clinical experience consult the CAT M.D. as needed, assuring that a high level of understanding of the surgical experience is applied in the review process.

Tables 4–7 illustrate some features of the CAT process. They are representative of some claims received by CAT.

In Table 4, the appropriate payment is $1000 for code 38100. The patient was hospitalized for an elective splenectomy. The CAT reviewer would disallow codes and

TABLE 4. *Bundling of "Unbundled" Bill*

| Procedure | CPT Code | Charge |
|---|---|---|
| Splenectomy | 38100 | $1000 |
| Laparotomy | 49000 | 600 |
| Appendectomy | 44950 | 600 |
| Preoperative check (in hospital) | 90215 | 125 |
| Suture removal | 90270 | 100 |
| Total charge |  | $2425 |
| Amount paid |  | $1000 |

CAT 0880

TABLE 5. *Excessive Fee Reduced, Assistant Surgeon Claim Denied as Not Medically Necessary*

| Procedure | CPT Code | Charge |
|-----------|----------|--------|
| Excision biopsy, breast (R) | 19120 | $1500 |
| Excision biopsy, breast (L) | 19120-50 | 1500 |
| Charge | | $3000 |
| Assistant surgeon fee (R) | 19120-80 | $1200 |
| Assistant surgeon fee (L) | 19120-50-80 | 1200 |
| Charge | | $2400 |
| Total charge | | $5400 |
| Amount paid | | $ 750 |

TABLE 7. *Fee Adjustment*

| Procedure | CPT Code | Charge |
|-----------|----------|--------|
| Coronary artery bypass graft, 3 vessel | 33512 | $8000 |
| Total charge | | $8000 |
| Amount paid | | $5000 |

charges for all except the splenectomy: a charge for laparotomy and incidental appendectomy is warranted only if done as a separate procedure and preoperative check and postoperative care are conventionally part of the global surgery fee. A charge of $1000 for the splenectomy is in line with the regional fee schedule and is the amount ultimately approved.

In Table 5, the appropriate payment is $750 to the primary surgeon for code 19121 (excision biopsy, breast, bilateral). Under most conditions, one surgeon can perform a breat biopsy. The operative report indicates no unusual circumstances. The assistant surgeon is not reimbursed, and the patient is informed of CAT's review decision.

In Table 6, the appropriate regional payment is $60 for code 17100. The procedure was actually a simple wart removal. The operative report describes a 0.25-inch plantar wart on one foot. Excision combined with use of the laser constitutes excessive treatment for this common condition. Wart removal is most accurately coded as 17100 ("destruction by any method of benign skin lesion").

CAT knows that four local experienced, board-certified cardiac surgeons will carry out a three-vessel coronary artery bypass for $5000, assuring that access can be achieved for that fee (Table 7).

Tables 4–7 demonstrate that complete and knowledgeable recoding of claims requires familiarity with both the content of various surgical procedures and the details of coding surgical services.

*Physician negotiations.* Individual physician negotiations are carried out for selected claims. After establish-

TABLE 6. *Recoding of Unnecessary Procedure, Excessive Fee Reduced*

| Provider Description | CPT Code | Charge |
|---------------------|----------|--------|
| Excision, benign lesion, foot and use of CO$_2$ laser | 11421 | $450 |
| Total charge | | $450 |
| Amount paid | | $ 60 |

ing an overall fee schedule with local physician representatives, CAT continues its negotiations on a selected claim-by-claim basis. If the amount charged for corrected codes significantly exceeds the regional fee cap, CAT contacts the billing physician, giving information on the corrected codes and the amount allowed. The CAT M.D. makes many of these calls. Usually the provider is willing to accept CAT's recoding and reduced fee. Discussions of claims with physicians have revealed that providers enter practice largely ignorant of common billing practices. Most admit they do not know what various procedures are worth. At best they occasionally may ask other providers what they charge. Those who use an RVS have access only to a wide variety of unstandardized sources. Some are advised to start charging high rates to get a high fee profile. Often, physician offices have an office clerk coding claims who is not trained in medical terms or coding, whereas other physicians rely on central billing services that promise to "maximize reimbursement," often with "creative" upcoding or unbundling of services.

*Employee communication.* CAT has a program of employee communication that defines the employees' responsibilities and options when payment is less than the fee charged by a surgeon. A letter of explanation is automatically generated to the employee when there has been a payment reduction. It states that if the employee has discussed the fee with the physician before the procedure, the employee is responsible for the amount in excess of CAT's fee cap. Also, employees are told when their provider has agreed to accept CAT's reimbursement as payment in full.

*Patient held harmless.* If a physician bills an employee for the amount that exceeds the fee cap, the employee is instructed to contact CAT, and a CAT provider relations specialist discusses the situation with the physician. Patients are not required to pay the physicians' balance bill above the CAT payment (that is, they are "held harmless") if the physicians have not informed the patients of the higher-than-cap fee before the procedure. CAT intervenes on the patient's behalf when the physician refuses to lower his/her fee to the established cap. On average, of about 20,000 physician claims received per year, CAT has less than a dozen instances in which providers insist on trying to obtain reimbursement above the CAT fee through claims court. In over 95% of

these cases, the judge has agreed that CAT's payment is reasonable for the services, based on local surgeon input.

*Study of Savings with CAT Method*

CAT's internal calculations indicate that it achieves significant savings with its surgeon bill review process by reducing fees that otherwise would have been paid in full. The BUHPI is conducting an external evaluation of the CAT process for managing surgeon fees. Standard surgical fee processing by large insurance companies and third-party administrators is being compared with the potential cost savings of the CAT process. The BUHPI has obtained samples of consecutively filed claims for surgical services that have been processed for several large self-insured corporations that administer their claims through major insurance carriers. The benefit plans establish payment caps at a percentile of usual and customary fees, and the carriers' auditing of codes was representative of current industry standards. CAT's recoding and bundling procedures, as well as payment caps, were applied to these claims, with the goal of finding if the savings from payment reduction significantly exceeded those achieved by these carriers.

Hard copies of the providers' originally submitted claims were processed by CAT staff without information about changes from charges that had been made by the carriers before these claims had been paid. Confounding variables of payment due to copayments, deductibles, or coordination of benefits were eliminated.

The total charges included in the sample claims were over $140,000. The carriers adjusted 13 to 15% of their claims and paid 4.3 to 35% less than total charges. CAT adjusted 35 to 40% of these same claims and reduced payment from charges by 22 to 43%. Therefore, CAT would have achieved an additional savings of 8 to 17.7% if CAT's procedures and the lower of CAT or the administrator's fee schedule were used. One third of the additional savings came from coding changes in the original bills and two thirds by the application of the CAT negotiated fee schedule. In some instances providers submitted an incorrect code that significantly *undervalued* the procedure that was done. If the provider's code had been used, the payment would have been cut to an unreasonable level. In these instances, the CAT reviewer "upcoded" to the correct code and allowed the more appropriate fee; the savings potential includes these corrections in favor of billing surgeons.

*Discussion*

The CAT system for managing surgeons' fees has been developed by a progressive benefit department in a large American corporation. The system depends on detailed knowledge of surgical practice so that recoding and bundling of procedures categorized by CPT-4 codes can be accurately carried out. It requires contact with local surgeons in regions with a high concentration of employees so that market forces can be taken into account in determining an appropriate level of local fees.

An access-oriented negotiated fee schedule can have many permutations. In areas with a surgeon surplus, a corporation may be able to negotiate lower fees with surgeons than those previously paid. In areas with few surgeons, fees lower than customary are more likely to create patient access problems should the surgeons resist reductions negotiated elsewhere. Still, modified versions of CAT's approach would be similar to processes already used by the government in establishing "inherent reasonableness" for cataract extraction and pacemaker installation fees.

The key concern about any new surgeon payment approach should be the ability to attract a good representation of local surgeons who will accept it. Ensuring employees' access to qualified surgeons is the paramount goal. All other considerations, even inherent reasonableness of lower fees because of technological advantages or cost containment, should remain secondary.

Based on the BUHPI's analysis, the CAT process is a workable and market-tested solution to the need to balance access and cost management. It is suitable for large corporations such as CAT with both self-funded and self-administered health benefits. It can also be used (after eligibility is certified and benefits are coordinated) by claims processing systems. Accurate implementation of the CAT process requires (1) hard copies of the CPT-4 codes submitted by the surgeon and availability of the operative notes, to reconcile discrepancies between CPT-4 codes and the surgical service, and (2) access-oriented negotiated fee schedules obtained by applying a geographic multiplier to an RVS, such as CAT's DODRVS.

State and federal governments can modify the CAT process for Medicaid and Medicare, with the same goals that motivate the private sector: access and cost management. Regional fee schedules could be established with national DODRVS values and regional multipliers based on market forces. Balance billing is optional, using the CAT model. However, its effectiveness as a cost management approach is strengthened with its "hold harmless" provision. In the CAT system, if a patient knows a surgeon is charging a fee higher than the negotiated fee, the patient is responsible for the balance. If no discussion has occurred, the patient is held harmless for bills in excess of the fee cap.

If adequate access is to be preserved without the need for balance billing, payments must be established so that a majority of qualified surgeons in each region will accept the negotiated fee as payment in full. If this acceptance is not achieved, then access problems will arise, as

CAT 0882

TABLE 8. *Comparison of "Resource-based Relative Value Scale" (RBRVS) and "Access-oriented Negotiated Fee Schedule" (AONFS) for Physician Reimbursement*

| | RBRVS (Hsiao) | AONFS (CAT) |
|---|---|---|
| Goal | A "comparable worth" reform for physicians, a group with high incomes relative to most other occupations. | Patient access to local physicians at a negotiated price. |
| Methodology | Complex formula determines RBRVS; time is a major determinant. | Revision of fees is based on negotiations, M.D. fee acceptance patterns (market forces, not payment of charges). |
| Application | Two basic problems: (1) RBRVS is not a fee, and knowledge is needed of regional situations to use multiplier effectively, (2) when applied in Massachusetts, shown to need extensive modification to get support of, and access to, local surgeons. | In routine use. CAT knows that well-qualified local physicians will accept the AONFS. |

\* AONF = DODRVS × regional multiplier.

occurred in 1986 for the Massachusetts Medicaid program. That program was forced to increase significantly its fees for normal deliveries. As stated in the *Boston Globe*, ". . . responding to a crisis in access to obstetrical care in many areas of the state, the panel hiked the all-inclusive fee for pregnancy care and childbirth from $508 to as much as $1,200."[10] This is a good example of the futility of a fee schedule that does not build on knowledge of physicians' availability at different fee levels in each region. The Massachusetts Medicaid program had a previous experience with attempting to introduce a fee schedule based on a "resource-based" formula.

In July 1983, the *Boston Globe* described a new strategy that was suggested by the Massachusetts Rate Setting Commission for the Medicaid program and workers compensation.[11] Based on the 1979 study by Drs. Hsiao and Stason from the Harvard School of Public Health,[12] the Rate Setting Commission proposed that the fees for 21 common surgical procedures should be cut by amounts ranging from 4% to 59%. At the same time, physicians seeing patients in their office were to get 71% more for initial visits. These proposed changes were the estimated relative resource requirements of different physician services, with a strong focus on the time involved. The formulas were established in the Hsiao/Stason analysis of physician practices.

These changes were adopted in September 1983, but on August 23, 1984, the Rate Setting Commission raised the fees that the state Medicaid program paid to doctors for surgical procedures. As stated in the *Boston Globe*, "no prior hearing was held or public notice given before the August reversal because the Commission subsequently said physician resignations from Medicaid had reached the level of a public health emergency. Most striking of these defections were obstetricians/gynecologists."[13] This experience suggests that fees ultimately paid by Medicaid were primarily driven by the need to get access to Medicaid patients to physicians, and not by a formula for "resource costs."

The American Society of Internal Medicine and the American Medical Association have supported an elaborate study of the Hsiao methodology commissioned by HCFA, and there is much speculation about the possible use of an RBRVS for the determination of Medicare fees when it becomes available in the summer of 1988. The investigators of the BUHPI originally believed that the consensus process to determine a C/S index could be developed as the basis for fee reform that would be acceptable and perceived as fair by physicians. However, the consensus approach is laborious, and much time would have been necessary to interrelate all specialties and resolve potential conflicts. It was then that the BUHPI began to study the CAT system, and found that it involved a process with appropriate goals, methodology, and application for cost management and market acceptance.

Table 8 outlines the basic differences between a "resource based" RVS and an access-oriented negotiated fee schedule, as used by CAT. A basic goal of the RBRVS is to "reform" physician reimbursement in the direction of more equity between procedure-oriented specialists and generalists. However, as the evidence suggests, this goal will be in conflict with realities of the marketplace and will result in paying fees that are either unnecessarily high or too low to get ready access for insurees to local physicians.

The methodology of the RBRVS is based on a formula unrelated to local market forces, whereas the access-oriented negotiated fee schedule used by CAT builds on negotiations and local fee acceptance patterns to gain access. The CAT system's ability to adjust for regional differences in the market is the essential difference in the two approaches. The CAT system is in routine use and will continue to be modified by changes in local physician manpower and other factors such as increases in malpractice premiums. We suggest that an access-oriented negotiated fee schedule such as the CAT system deserves consideration as the preferred method of fee reform.

## References

1. Waldo DR, Levit KR, Lazenby H. National health expenditures, 1985. Health Care Financing Review 1986; 8:14.
2. Physician Payment Review Commission. Medicare Physician Payment: an Agenda for Reform. Annual Report to Congress. Washington DC: U.S. Government Printing Office, March 1, 1987.
3. Knox RA. Study on Equalizing Medicare Bills Begins. The Boston Globe, September 13, 1985; 4.
4. Congress of the United States. Physician Reimbursement Under Medicare: Options for Change. Washington DC: Congressional Budget Office, April 1984.
5. Congress of the United States. Payment for Physician Services: Strategies for Medicare. Washington DC: Office of Technology Assessment, February 1986.
6. Jencks SF, Dobson A. Strategies for reforming medicare's physician payments: physician diagnosis-related groups and other approaches. N Engl J Med 1985; 312:1492–1499.
7. Dutton BL, McMenamin P. The medicare economic index: its background and beginnings. Health Care Financing Review September 1981; 3:137–139.
8. Egdahl RH, Manuel B. A consensus process to determine the relative complexity-severity of frequently performed surgical services. Surg Gynecol Obstet 1985; 160:403–406.
9. Pollard MR. Anti-trust and Physician Payment. Reforming Physician Payment 1984. Institute of Medicine: Report of a Conference. Washington DC: National Academy Press, 1984; 75–86.
10. Knox RA. Proposal Would Raise Medicaid Fees. The Boston Globe, April 17, 1986; 27.
11. Knox RA. Medicaid Fee Shifts Adopted. The Boston Globe, September 16, 1983; 17.
12. Hsiao WC, Stason WB. Toward developing a relative value scale for medical and surgical services. Health Care Financing Review, Fall 1979; 1:23–38.
13. Knox RA. State Shifts on Medicaid Fee Cuts. The Boston Globe, September 27, 1984; 1.

---

## DISCUSSION

DR. W. GERALD AUSTEN (Boston, Massachusetts): I congratulate Drs. Egdahl and Hertenstein on an excellent and stimulating paper. They have worked long and hard on physician payment reform, and they recognized early the importance of physician acceptance in any proposed reform. Thus, a major element of the current proposal includes the active participation of the physicians.

Three and a half years ago, the Regents of the American College of Surgeons created a Committee on Physician Reimbursement of which I have been Chairman. This committee, with much input from the surgical specialty societies, has developed recommendations for the reform of the Medicare physician payment program, and these recommendations were approved by the Regents in October 1986.

The aim of the College, like the approach presented today, is to identify ways to achieve a more rational payment system with cost savings and at the same time ensuring adequate access to quality care.

The ACS approach has a number of similarities to the program presented this morning; the ACS proposal includes the creation of a Medicare relative value scale based on physician charge data and with modifiers based on geographic differences in practice costs, the definition of payment units with emphasis on a global fee and the creation of definitions and guidelines to determine when an assistant at surgery for Medicare payment purposes is necessary.

I have one question for the authors. The Caterpillar Corporation has approximately 50,000 employees in 15 domestic plants, and it also has a very persuasive, sensible medical director. How would you expand your proposal from one company to a national program?

Finally, I would like to add that it is crucial that surgery be involved as much as possible in the current debate on physician reimbursement reform, and we need to be able to present sensible and fair approaches backed by solid data. The next year and a half is probably going to be crucial.

I would urge Drs. Egdahl and Hertenstein to continue to gather information and to make every effort to present their data and recommendations to the appropriate congressional committees and to the Administration.

DR. OLIVER H. BEAHRS (Rochester, Minnesota): Drs. Egdahl and Hertenstein have done us a favor by developing and reporting a modification of the CPR fee for service reimbursement for surgical services. I appreciate the opportunity to have read the manuscript.

Their program, which is a negotiated access RVS, is in contrast to the Harvard–AMA resource based RVS, and is being developed under contract from HCFA. This RVS is of concern because of the inordinate weight given to time as a factor and the methodology being used.

There is great anticipation regarding this study in Washington and some are thinking of it as the only game in town.

The Physician Payment Review Commission (PhysPRC) established by Congress in 1986 made its first report to Congress on March 1, 1987. The Commission supports a fee scale based on a national RVS with appropriate regional multipliers to determine fees. The basis for the RVS has not been determined, but hopefully it might be based somewhat on historic charges and not the strictly resourced criteria of the based parameters used in the Harvard Study.

The use of the CPT-4 Code has come under criticism: first a dictionary of 2000 codes, and now 7000 and with multipliers 48,000. It was established primarily for medical record keeping not to establish charges. It has led to unbundling of services and upcoding to establish fee for services. This practice has led to excessively high fees in at least 10% of cases because of unbundling or upcoding.

I would be interested in the author's suggestions how the CPT-4 codes might be collapsed or bundled and what policy could be established to prevent these abuses.

A long-term program for physician payment is probably several years away and may be a fee scale hopefully, but there is administrative and congressional support for capitation or voucher arrangement, possibly DRGs. Congress is looking for a near-term solution to its budget problem for 1988.

The budget mark-up will be in the next few weeks and the recommendations to meet the cut almost certain in physician reimbursement will be in place by September.

The reduction in reimbursement might be another freeze, a shaving downward of the medical economic index, selecting the high-cost outliers such as coronary artery bypass, hip reconstruction, and/or TUR for across-the-board decreases as was done to cataract surgery in 1986 and 1987, or selective decrease in the high rollers or by addressing the reduction by using the inherent reasonable rule that is already in legislation.

My second question to Dr. Egdahl and Dr. Hertenstein is: what are your recommendations in the next month or two to meet the 1988 budget limits?

DR. MARTIN ALLGÖWER (Basel, Switzerland): I appreciate the invitation to look "with a Swiss eye" at the presentation of Dr. Egdahl.

In Switzerland it is said that the surgeon goes through two stages. At the beginning of his career, collecting a fee, he gets red in the face. Later on his face reddens when he does not get paid!

The Swiss economic system is a rather complex mixture of free enterprise and institutions run almost exclusively by public bodies. We consider many of the things you do not as public responsibilities. These include post and telephone services, railway services, schooling and university formation, and most hospitals are run by local government agencies. The health care system is furthermore complicated by the fact that insurance conditions for accidents are very different from

CAT 0884

those for diseases. It is obvious that this difficult distinction keeps our lawyers busy!

Basically, surgeons are mostly employed on a geographical full-time basis in a state hospital. Those state hospitals, however, have private, semiprivate, and general wards. This, I believe, is a rather favorable arrangement, combining a salaried position for the administrative obligations as well as for the care of the general patient with a fee-for-service system for the private patients. Now, comparing this with the cap system, we find great similarities because the Union of Swiss Surgical Societies, including all specialties, has set up a range of fees that may be reasonably asked from a patient or from the insurance, i.e., the third party paying. Those ranges, just to give you an idea, would range from 400 to 1000 francs for an appendectomy, for a gallbladder from 1000 to 2000 francs, and for major operations such as a total gastrectomy, a Whipple, an acetabular repair or a resection of an abdominal aneurysm, from 3000 to 6000 Swiss francs. That is about the maximum fee we are allowed to ask or, at least, that the Union will support, if it is contested in court. You may divide the figures by 2 to arrive at dollar values, because that is about the realistic comparison in terms of buying power.

It is a fairly democratic self-regulating peer controlled system. What we dislike in Switzerland is the "big brother" state watching us and telling us what to do.

We have one advantage over you. The contingency system is unacceptable and the one party who loses "the battle" usually has to pay the other's legal expenses. That often prevents people from going to court, although there has been a definite increase in liability claims in recent years.

Overall our system results in an average income of some 300,000 to 400,000 francs for a Swiss surgeon. Out of that he pays some 50% in taxes. Our rather democratic system is similar to what Dr. Egdahl has just presented. It is based on a fee for service "common sense scale," the majority of surgeons working in a geographical full-time scheme.

DR. WILLIAM R. DRUCKER (Rochester, New York): I appreciate the opportunity I had to review this paper. Dr. Egdahl has given us a clear presentation of an industry-sponsored plan that attempts to gain physician compliance with a method of reducing costs of medical care through reduction in fees.

It is a very clear example that in addition to government today, our health care system is being strongly influenced by industry.

I have a couple of editorial comments and then a couple of questions. The major factor in the rise in health care costs is not physician fees. This is simply illustrated by a look at the average fees of physicians across the country, somewhere in the range of $50,000–$150,000. I realize that others make considerably more, but each physician can be estimated to cost the health care system something in the order of three quarters of a million dollars per year by the exercise of his physician rights in doing his job of taking care of patients. Therefore, the major target that needs to be addressed is physician behavior, not physician fees. Nevertheless, fees are perceived as a problem that is going to be addressed whether we like it or not.

I wonder whether this paper is simply the expression of a last gasp hope that current physician fees and the fee for service system will continue. I sincerely hope this is not its purpose and I believe Dr. Egdahl agrees based on the way he has presented the paper. My reading from the paper is that Dr. Egdahl is presenting a plan that is asking clearly for physicians to get together and plan to help solve the problem of fees rather than having it done for us by external agencies; that means industry and government.

My questions are these. They are straightforward, I believe, and can be answered simply. What will happen in the case of an emergency when one of the patients in the system under the cap must have an emergency operation and they seek a doctor who does not agree with the system: would this be settled in claims court?

What about quality? Does the system depend on the physician participants to ensure quality or do they have other ways to ensure that their employees are obtaining the quality of care that they would under the current system of fee selection.

How about comparison with other systems? Has there been enough experience to date to show that this system is gaining popularity? Is

there any way to compare this system with others in terms of two factors: physician acceptance to work in the system, and employee acceptance of this system for their health insurance?

Then there is a question of cost. This is a very complex system. It seems very costly if one reads carefully. What is the cost? Is there any estimate of what the cost would be of setting up and maintaining this system that requires close scrutiny of all bills that come in; a very complex system of monitoring these bills? Is the billing method unique to CAT or can other insurance systems do this too? Is this system for sale? Do other insurance companies look at claims this carefully?

DR. BENSON B. ROE (San Francisco, California): Dr. Egdahl is to be thanked for bringing to our attention a sensible proposal to address a serious threat to the fee-for-service system. I believe we finally are all aware of this threat, and I am delighted that we are prepared to gather our forces to get behind something positive.

About 8 years ago I became aware of the enormity of the abuses to the current system that were taking place, perhaps not by the respectable members of our profession but by an alarming number of those who did the kind of unbundling and some of the things that he showed you. I published an article that was intended to stir us to take some initiative in this problem rather than hoping it would go away. I hope it is not too late.

It is equally important that we get behind some system that establishes fiscal integrity so that we do not jeopardize the precious and unique privilege that we have of self-governance. This privilege is threatened by the behavior of some of our colleagues who have abused the system and brought this problem to our attention.

In addition to the proposals that Dr. Egdahl has made, I believe we should place emphasis on the magnitude of responsibility to cover not only accessory procedures but complications. No one can tell me whether my complication was part of the patient's underlying disease or could possibly be one from some flaw in my technique or management. We should accept as a part of our primary responsibility the full scope of managing a patient from start to finish without throwing in extra for everything that can be imagined. If we had done that, we would have reduced our total cost to the public by at least 20%.

DR. JAMES R. JUDE (Miami, Florida): I rise because I am confronted by patients who are faced with billing problems after hospital discharge. One of the problems is the unbundling that Dr. Egdahl has brought up.

Ten years ago on an Ethics Committee of our local medical society we, out of hand, tossed unbundling out as a completely immoral approach to any type of billing. I did not believe it even could possibly exist any more, but there is more of a problem than just the bundling together of the surgical fee. The problem is much greater than that. We always keep our office open to speak to any patients about any problems, and it is very common for them to present with bills of what really amounts to an unbundling of the bills of other physicians who were involved in their treatment.

Most commonly this applied to anesthesiology, which frequently approaches 50% of the surgical fee. It is not, however, only the anesthesiologists, it is also the internists, the radiologists, the pathologists, and possibly the cardiologists who are reading electrocardiograms. Patients receive an enormous number of bills from physicians, and so it is a total physician unbundling and not just a surgical fee unbundling that is occurring.

Some way or other we have to approach the problem whereby there will be some type of bundling together of all physician fees as a package.

As our President presented yesterday in his Presidential Address, many treatments that we do are not all surgical anymore, but rather a blending over into medicine, and medicine is delivering over surgery and surgery is delivering medicine. Therefore, we should give a great consideration to the total care and the total charge.

Dr. Egdahl, what if anything have you considered about these other fees in respect to a global cap or other industry approaches to the total cost of care in surgery?

Vol. 206 • No. 3     AN ACCESS-ORIENTED NEGOTIATED FEE SCHEDULE                  357

DR. JONATHAN E. RHOADS (Philadelphia, Pennsylvania): I listened to this paper with a great deal of interest. I would emphasize that if most people have a 50% overhead, that a 15% reduction in fee is a 30% reduction in take-home remuneration. That is well to keep in mind.

There is one aspect of the overhead that has gotten bigger and that is liability insurance. This in a way is the loose cannon on the deck, and when you have a fee schedule set, whether by government or by consent, and this expense is assumed to be something that the physician will pay, you have an unpredictable situation.

I raise the question and ask the authors if there is any precedent for malpractice insurance being billed on a per case basis or a percentage of the fee. No doubt this would require the insurance company to have access to one's tax returns and so forth to be sure that it was honest, but it would have certain great advantages. It would permit the young physician starting out to start out on his own, pay his share of the liability costs, but not be expected to pay immediately the same amount that a person would be paying who is doing 10 times as much work in the middle of his career.

Perhaps the far greater advantage in my belief is that this could appear and should appear as a separate item on the bill.

I can think of no way that would educate more of the public as to the true cost of liability insurance than to have a bill (operation $300, insurance $125, or whatever it might come to).

I rose to raise this issue and to ask the authors if they knew if there was any precedent for such a plan and to ask whether they believe there is any way this could be tried out before we get tied into a fee schedule system with an unpredictable cost for liability insurance.


DR. RICHARD H. EGDAHL (Closing discussion): Dr. Austen's question about the possibility of expanding the Caterpillar program as it now exists to a national level is an important one. The problem is that major national programs such as Medicare necessarily involve a large bureaucracy, whereas a private self-administered company such as Caterpillar does not require the same degree of routinization of operations and an easily replicated methodology. The country could certainly be divided into 6–12 regions, each consisting of several states. I do not know whether appropriate flexibility could be built into the management and technical components of the administrative structure which would be part of a national program.

Dr. Beahrs raises questions about the future use of CPT-4 codes and asks what we can do in the short range to control outlier Medicare fees. I believe we can use CPT-4 as long as we understand the basis for matching up the procedures that actually were carried out with the codes, and have some way to ratchet downward those charges that seem inappropriate. Certainly there are a few groups selling systems with the goal of achieving code creep, which is basically dishonest. On the other hand, the majority of codes that are incorrect represent simple errors based on the difficulty of each doctor's office knowing all the technicalities of coding. We can stick with CPT-4, but must match the operative note with the CPT-4 code, using physician judgment to determine if the code is appropriate. The short-term answer for HCFA is to expand the principle of inherent reasonableness, which thus far has been limited to a few surgical conditions. Another 20–30 big-ticket items that appear to be out of line could be revised downward or upward.

Dr. Martin Allgöwer from Basel talked about the Swiss system and the apparent success of physician-sickness fund negotiations. This type of negotiation, with the government playing a catalytic role, might have relevance to the U.S. system in the private sector. However, Medicare will probably demand a closer involvement in the process than exists in Switzerland, since the government is paying the bill directly.

Dr. Drucker asked a key question about what happens in emergencies under the Caterpillar system. Usually Caterpillar pays charges in emergencies, but also has a strategy involving clearance for appropriateness of treatment in emergencies, when there is time. If gross overcharges are billed, even for emergency situations, and local surgeons support that the charges are unreasonable, then payment of those charges can be challenged.

Dr. Roe discussed his analysis of fees, and raised the question about possible antitrust issues if physicians are in the position of commenting on the appropriateness of their fees. Industry does not want to see private medicine nationalized, but could turn on us if we do not cooperate in developing a rational method of physician reimbursement. The key to not raising antitrust issues is for surgeons to act as individual consultants to payers who determine those fees, such as large industry.

Dr. Jude asked about how to get our internist colleagues involved in the process of fee negotiations. We found in our complexity/severity work with the Massachusetts Chapter of the American College of Surgeons that we could relatively easily get consensus on the "relative value" or "complexity/severity" of surgical services among that group. We then talked to internists and achieved some preliminary agreements; for example, an "intermediate acute myocardial infarction," from the time a patient comes into the emergency room, is taken into the critical care unit, and discharged, appeared to be similar in complexity/severity to an uncomplicated cholecystectomy, from initial diagnosis through discharge from the hospital after surgery. Reimbursement for some general medical conditions can be converted into a global fee, but for many medical conditions it is a more difficult process than for surgical cases.

Finally, Dr. Rhoads talked about malpractice problems associated with surgery. I return to the principal goal of Caterpillar and its fee process, which is access for their employees and their families to a significant number of high-quality local surgeons. Overall, malpractice problems will probably get worse before they get better. A solution will flow from severe access problems in different parts of the country, and a realization by both legislators and the public that the ordinary rigors of surgical practice are being compounded manyfold by additional financial and psychological pressures from the omnipresent danger of malpractice suits. We suggest that the Caterpillar process of negotiating access-oriented maximal fees with local surgical groups represents a reasonable compromise between paying charges, on the one hand, and accepting a formulaic-driven fee schedule not negotiated with some local physicians with access as a goal, on the other hand.

Increases in malpractice premiums will result in increased surgical fees, or the public will not have available the surgeons that they want in the variety of practice sites and numbers of specialties that are desired. We have only a modest amount of time before HCFA and the Congress will take some kind of action on fees, as they have on hospital reimbursement under Medicare. Industry can be our strongest ally in achieving a workable system of access-oriented negotiated fees.

CAT 0886

# Exhibit 4

# Doc's knowledge translates to cost reduction

When Caterpillar hired Dr. Robert Hertenstein to help with "problem medical claims," the company probably got more than it bargained for.

Hertenstein was chief of surgery at St. Francis Medical Center on 12 years before joining Cat in 1991. That experience quickly paid off in his new job at Group Insurance medical director. During his first year, Hertenstein detected a number of classes of inflated fees for health insurance provided to employees.

By catching such overcharges, Hertenstein has helped Caterpillar save several millions of dollars. And his skill at evaluating claims—especially difficult ones—has grown steadily.

"I didn't intend to amass a rule book in my head, I was just solving one problem at a time," he said. Nevertheless, those "rules" accumulated and instances of overcharging declined.

Caterpillar's cost saving success in claim review went largely unnoticed outside the company until 1989, when Hertenstein addressed a meeting at Boston University. Representatives from several Fortune 500 companies had shown up to discuss concerns over health care costs. During a presentation, Hertenstein showed examples of "upcoding" and "unbundling," two practices that encountered, but, if undetected, result in higher-than-actual medical fees.

"Basically, upcoding is identifying a medical service with a code that refers to a more expensive procedure," he explained. "For example, the removal of a patient's ovary might be improperly "up-coded" on the medical claim as a complete hysterectomy.

"Unbundling, on the other hand, is taking a complex procedure like the hysterectomy and breaking it down into smaller procedures—removing the ovary, removing the uterus, etc.—on the claim. By charging for each procedure separately, the physician would hope to receive a higher fee."

Hertenstein stressed that upcoding and unbundling aren't always done intentionally—often the culprit is inexperienced billing staff. Still, both problems occur frequently enough to warrant looking closely at all sorts of claims, which Caterpillar does, he said.

Several representatives at the meeting apparently were convinced. Afterward, seven medical directors asked Hertenstein to review and evaluate their respective companies.

"Every group of claims we reviewed showed that the companies had missed instances of overcharging. They simply accepted what the doctor had submitted and paid the bill. They were paying between 10 and 17 percent more in physician fees than they should have been."

Hertenstein declined a request to process these completed future claims—"Caterpillar is just not in that business." But he was intrigued by an idea brought forth by a Boston University staff member, who suggested that Hertenstein's mental "rule book" for evaluating claims be put on computer and sold to other companies.

The project's marketability was promising enough for Caterpillar, which agreed to co-fund its development. The company also allowed Hertenstein the time necessary to pass on his expertise.

Health Policy Institute (HPI), a spin-off organization of the university, paid the other half of development costs and provided computer programming capability as well as additional physician experience. HPI the exact model talked regularly with an HPI artificial intelligence engineer, going over appropriate billing for every imaginable medical procedure.

The end result was staggering.

The rule book Hertenstein had committed to memory totaled some 55,000 rules. CodeReview, as the program was later called, turned out to be one of the largest uses of an artificial intelligence system in the world.

To check the validity of CodeReview's rules, Hertenstein had groups of special lists from Peoria's and Boston's medical community evaluate the program.

"In every case, the pros agreed that the rules were logical, that they made sense. That was very reassuring."

As a final check, Hertenstein put the program into the program by his colleagues in Chicago at the American College of Surgeons. There, too, unanticipated program to back acceptable.

For Caterpillar, an immediate benefit of CodeReview has been here use of the system. And since the program makes an "expert" out of staff members with less experience, it's freed up some of Hertenstein's time. In the long run, a percentage of royalties to Cat is expected to more than offset the company's development costs.

To use the program, someone simply enters the codes from the billing statement, Hertenstein said. CodeReview does its rest, providing the user not only with the correct payment amount, but with reasons for any discrepancies.

"The program is available on personal computer or mainframe and already has about 20 customers.

"We reviewed a sample of two large insurance companies' claims, and they estimated conservatively that CodeReview would save them $400 million a year. We don't have to sell this product—it sells itself."



Dr. Robert Hertenstein

## ASM seminar set for Feb. 21, 28

The Peoria Chapter, American Society for Metals, will hold its 1991 educational seminar on "Finite Element Method Theory and Application for Materials Engineers" Feb. 21 and 28.

Sessions will meet from 5 to 8:30 p.m. in the East Peoria Building H4 Theater. The $5 fee includes a snack break.

Guest lecturers will be Bradley University professor Dr. Rohit Bhalachandra and Dr. Raghu Natarajan of Rush Presbyterian St. Luke's Medical Center.

To register, call John Wolosik, ext. 57755, or Linda Paulson, ext. 53794.

## Jr. Achievement...

CATERPILLAR®

**Folks**

Caterpillar Inc.
Peoria, IL 61629-1475
A nual employee newspaper

Vol. XLI, No. 1, Jan. 18, 1991

Gary Ohnen ............... Editor
Bill McVey ........... Staff Writer
.................... Manager,
French's Owen ... Employee Information

Send story suggestions to...
ext. AB 1475, Public Affairs, Cat.

©1991 Caterpillar Inc.

Page 2

# Exhibit 5

Redacted

# Exhibit 6

Redacted

# Exhibit 7

Redacted

# Exhibit 8

Redacted

# Exhibit 9

Redacted

# Exhibit 10

Redacted

# Exhibit 11

Redacted

# Exhibit 12

Expre:    il #B63396425

MAIL ROOM
JAN 17 1989
PAT. & TRADEMARK OFF

#3

PATENT

Attorney's Docket No. _____

## COMBINED DECLARATION AND POWER OF ATTORNEY

### (ORIGINAL, DESIGN, NATIONAL STAGE OF PCT, SUPPLEMENTAL, DIVISIONAL, CONTINUATION OR CIP)

As a below named inventor, I hereby declare that:

### TYPE OF DECLARATION

This declaration is of the following type: (check one applicable item below)

- ☒ original
- ☐ design

NOTE: If the declaration is for an International Application being filed as a divisional, continuation or continuation-in-part application do *not* check any of next two items and check appropriate one of last three items.

- ☐ national stage of PCT
- ☐ supplemental

NOTE: If one of the following 3 items apply then complete and also attach ADDED PAGES FOR DIVISIONAL, CONTINUATION OR CIP.

- ☐ divisional
- ☐ continuation
- ☐ continuation-in-part (CIP)

### INVENTORSHIP IDENTIFICATION

WARNING: If the inventors are each not the inventors of all the claims an explanation of the facts, including the ownership of all the claims at the time the last claimed invention was made, should be submitted.

My residence, post office address and citizenship are as stated below next to my name, I believe I am the original, first and sole inventor (if only one name is listed below) or an original, first and joint inventor (if plural names are listed below) of the subject matter which is claimed and for which a patent is sought on the invention entitled:

### TITLE OF INVENTION

EXPERT SYSTEM AND METHOD FOR ASSESSING MEDICAL CLAIM APPLICATIONS

### SPECIFICATION IDENTIFICATION

the specification of which: (complete (a), (b) or (c))

- (a) ☐ is attached hereto.
- (b) ☒ was filed on **September 30, 1988** as ☐ Serial No. **252,307**
  or ☐ Express Mail No., as Serial No. not yet known _____
  and was amended on _____ (if applicable ).

NOTE: Amendments filed after the original papers are deposited with the PTO which contain new matter are not accorded a filing date by being referred to in the declaration. Accordingly, the amendments involved are those filed with the application papers or, in the case of a supplemental declaration, are those amendments claiming matter not encompassed in the original statement of invention or claims. See 37 CFR 1.67.

(Declaration and Power of Attorney [1-1]—page 1 of 4)

EXHIBIT
#17(D)

MCK 000195

(c) ☐ was described and claimed in PCT International Application No. _____ filed on _____ and as amended under PCT Article 19 on _____ . (if any).

## ACKNOWLEDGEMENT OF REVIEW OF PAPERS AND DUTY OF CANDOR

I hereby state that I have reviewed and understand the contents of the above identified specification, including the claims, as amended by any amendment referred to above.

I acknowledge the duty to disclose information which is material to the examination of this application in accordance with Title 37, Code of Federal Regulations. § 1.56(a).

☐ In compliance with this duty there is attached an information disclosure statement 37 CFR 1.97.

## PRIORITY CLAIM

I hereby claim foreign priority benefits under Title 35, United States Code, § 119 of any foreign application(s) for patent or inventor's certificate or of any PCT international application(s) designating at least one country other than the United States of America listed below and have also identified below any foreign application(s) for patent or inventor's certificate or any PCT international application(s) designating at least one country other than the United States of America filed by me on the same subject matter having a filing date before that of the application(s) of which priority is claimed.

*(complete (d) or (e))*

(d) ☑ no such applications have been filed.

(e) ☐ such applications have been filed as follows:

*NOTE: Where item (c) is entered above and the International Application which designated the U.S. claimed priority check item (e), enter the details below and make the priority claim.*

### EARLIEST FOREIGN APPLICATION(S), IF ANY FILED WITHIN 12 MONTHS (6 MONTHS FOR DESIGN) PRIOR TO THIS U.S. APPLICATION

| COUNTRY | APPLICATION NUMBER | DATE OF FILING (month, day, year) | PRIORITY CLAIMED UNDER 37 USC 119 |
|---------|--------------------|-----------------------------------|-----------------------------------|
|         |                    |                                   | ☐ YES  NO ☐ |
|         |                    |                                   | ☐ YES  NO ☐ |
|         |                    |                                   | ☐ YES  NO ☐ |
|         |                    |                                   | ☐ YES  NO ☐ |
|         |                    |                                   | ☐ YES  NO ☐ |

### ALL FOREIGN APPLICATION(S), IF ANY FILED MORE THAN 12 MONTHS (6 MONTHS FOR DESIGN) PRIOR TO THIS U.S. APPLICATION

_____

_____

_____

*(Declaration and Power of Attorney [1-1]—page 2 of 4)*

MCK 000196

(Rule 33-4197  Feb 670)                    FORM 1-1                                  1-1

## POWER OF ATTORNEY

As a named inventor, I hereby appoint the following attorney(s) and/or agent(s) to prose-
cute this application and transact all business in the Patent and Trademark Office con-
nected therewith. (List name and registration number)

301

A. Jason Mirabito    #28,161

Jason M. Honeyman    #31,624


SEND CORRESPONDENCE TO                          DIRECT TELEPHONE CALLS TO:
                                                (Name and telephone number)

601 Jason M. Honeyman, Esq.
602 GASTON & SNOW                               Jason M. Honeyman
701 One Federal Street
702 Boston, MA  02110                           (617) 426-4600


## DECLARATION

I hereby declare that all statements made herein of my own knowledge are true and that
all statements made on information and belief are believed to be true; and further that
these statements were made with the knowledge that willful false statements and the like
so made are punishable by fine or imprisonment, or both under Section 1001 of Title 18 of
the United States Code and that such willful false statements may jeopardize the validity of
the application or any patent issued thereon.

### SIGNATURE(S)                                  40100

Full name of sole or first inventor  Donald C. Holloway
Inventor's signature  Donald Holloway
Date  11/14/88        Country of Citizenship  U.S.A.
Residence  Wellesley Hills, MA        MF
Post Office Address  15 Sylvan Road, Wellesley Hills, MA  02181

                                                40300

Full name of second joint inventor, if any  Dr. Robert W. Berenstein
Inventor's signature  Robert W. Berenstein
Date  11-19-88        Country of Citizenship  U.S.A.
Residence  Morton, IL        IL
Post Office Address  524 North Missouri Avenue, Morton, IL  61550

(Declaration and Power of Attorney [1-1]—page 3 of 4)


MCK 000197

Full name of third joint inventor George M. Goldbarg

Inventor's signature _____

Date 11/17/88    Country of Citizenship    U.S.A.

Residence Newton, MA

Post Office Address  38 Everett Street, Newton, MA  02159


Full name of fourth joint inventor Kelli A. Dugan

Inventor's signature _____

Date 11-14-88    Country of Citizenship    U.S.A.

Residence South Natick, MA

Post Office Address  18 Water Street, South Natick, MA  01760

MCK 000198

# Exhibit 13



CONRAD
O'BRIEN
GELLMAN
& ROHN, PC

Louis C. Bechtle
*Attorney at Law*
Direct Dial: 215.864.8060
lbechtle@cogr.com

December 19, 2005

Jack B. Blumenfeld, Esquire
Morris, Nichols, Arsht & Tunnell
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899-1347

Michael A. Barlow, Esquire
Skadden Arps, Slate, Meagher & Flom
One Rodney Square
P.O. Box 636
Wilmington, DE 19899

RE:    McKesson Information Solutions LLC v.
       The TriZetto Group, Inc.
       No. 04-1258 (SLR) (D.Del.)

Dear Counsel:

Enclosed herewith is Special Master Order No. 5 in the above-referenced matter.

Sincerely,

Louis C. Bechtle

LCB/jrw
Enclosure

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

MCKESSON INFORMATION  :
SOLUTIONS, LLC,  :
　　　　　　　　　　　　　　  :
　　　　　Plaintiff,  :
　　　　　　　　　　　　　　  :
　　　　　　　　　　　　　　  :　　NO.: 04-1256-SLR
　　　　　v.  :
　　　　　　　　　　　　　　  :
THE TRIZETTO GROUP, INC.,  :
　　　　　　　　　　　　　　  :
　　　　　Defendant.  :

### SPECIAL MASTER ORDER NO. 5

Louis C. Bechtle, Special Discovery Master　　　　　　December 19, 2005

　　　　In correspondence provided to the Special Discovery Master (SDM) by

counsel ( Defendants' letters of October 18, 2005, November 10, 2005, and

plaintiff's letter of November 17, 2005, the views of counsel have focused on a

contention by defendant that plaintiff's counsel improperly instructed its witnesses

not to answer certain questions at depositions taken of Michael Cesarz – 9/9/05;

Janet Cutcliff – 9/16/05; Mark E. Owen – 9/8/05; and Carolyn Wukitch 8/26/05

and; Marsha Radosevich – 7/7/05.  Counsel have differing views as to whether or

not Judge Robinson included the defendant's complaints in this regard as within

the scope of the assignment to the SDM.  I have waited to consider those positions

in depth until I had an accurate view of the position of the parties that I thought

could best be ascertained from my efforts to complete the other assignments that are not disputed as to my work as the SDM. As a result of that other work, I have come to the view that I believe Judge Robinson does expect the SDM to consider the questions regarding the questioning of plaintiff's witnesses at their depositions and this SDM Order will address those concerns. I will be reviewing the excerpts provided in defendant's letter of October 18, 2005 in this exercise.

     1.     I begin this Order by denying defendant's request that any privilege that could apply to the excerpts to be considered here have been waived because of the alleged failure of the plaintiff to conform to the Stipulated Protective Order approved by the court.

     2.     Deposition of Michael Cesarz – Vice President – Project Manager – <u>Tab 1 – Page 152 – Line 3 – 15.</u>

     Privilege not allowed. To instruct a witness not to answer based on the presence of grounds for privilege, counsel must advise as to the basis of that assertion. Comments by and among plaintiff's non-attorney employees or those of third parties or affiliates are not entitled to attorney client privilege protection unless the comments would disclose a confidential communication of the attorney. That is not the ground for refusing to answer offered here.

     <u>Tab 2 – Page 212 – Line 15 to Page 213 – Line 9.</u>

     If the reference mentioned on Line 20 was designed for or to a certain goal that was all or part of a communication by counsel to the witness, the

2

privilege is allowed.  On the other hand if the witness (who is testifying from a document that he prepared) is listing tasks to be performed by others, and they represent the witness' judgment as to what is to be done, the answer to the question is not privileged even though it follows and may be the result, in whole or in part, of an attorney communication.  It is the communication that is protected, not the conduct that follows or results from attorney client communication.  If a client is advised by his attorney to go to the bank and make a certain deposit on or before a certain date, any discussions that the client has with third parties or others, or the fact that he followed that advice is not protected by the attorney client privilege.  It is the communication with the lawyer to the client is protected, not what the client's reaction to that advice is.

<u>Tab 3 – Page 218 – Line 13  to Page 219 – Line 4.</u>

Privilege asserted on Page 218, Line 13 to Line 18 is proper.  It specifically protects the substance of a communication with counsel.  The privilege asserted on Page 218 – Line 22 to Page 219 – Line 4 is not proper.  The witness's decision or judgment following the rendering of attorney advice is not protected. Again, clients often follow their attorney's advice and engage in conduct that reflects.  Despite that, the conduct is not protected.  It is the advice that is protected.

3

<u>Tab 4 – Page 223 – Line 17 to Page 224 – Line 16.</u>

If the associated risks are those within the attorney's expertise <u>and</u> of the type the attorney was retained to assess and communicate to the client, that communication is privileged. However, if the risks are risks that non lawyer management type employees are trained and expected to assess – even if they reflect or are influenced by attorney communications, the assessments are not privileged. What is being expressed in the document here, by its terms, are the business opinions of plaintiff's employees and not a communication with counsel. The question should be answered.

<u>Tab 4 – Page 226 – Line 1 to 10.</u>

Privilege is not allowed. The witness' judgment, though based on a communication of counsel is not privileged.

<u>Tab – 4 Page 226 – Line 12 to 22.</u>

Plaintiff's counsel's assertion of the privilege that could disclose substantive communications is appropriate.

<u>Tab 5 – Page 237 – Line 11 to Page 238 – Line 23.</u>

Privilege not allowed. While the expression of privilege by plaintiff's counsel at Page 237—Line 20 -- 23 and Page 238 – Line 19 to 22 is correct, it does not appear that the premise ("legal advice" or "communications") can be satisfied by the document that was authored by this witness and says that these judgments

4

are being made from a business perspective. The truth of this is buttressed by the note that the legal assessment has not yet been made. If attorney communications are restated in the business assessments, they should or could have been redacted as attorney client communications.

Tab 5 – Page 240 – Line 11 to Page 241 – Line 2.

Privilege is not allowed. This question seeks testimony concerning "events" with a competitor. In the first place, such events are not confidential if they are with a competitor or if they occurred in connection with any other third party, and secondly, the question has nothing to do with attorney client communications. The witness is not being asked what attorney client communications, but merely what the events were.

Tab 6 – Page 261 – Line 15 to 22.

Assertion of privilege is proper.

Tab 6 – Page 262 – Line 14 to Page 263 – Line 4.

A reading of this excerpt suggests that the plaintiff answered the question the best that he could.

Tab 6 – Page 264 – Line 21 to Page 265 – Line 15.

Assertion of privilege is proper.

<u>Tab 6 – Page 266 – Line 3 to Page 267 – Line 7.</u>

Privilege not allowed. The witness is being asked what he was doing that resulted in his making notes that he put in his memorandum. What non-attorneys do are not covered by the attorney client privilege. Any instructions or communications he may receive from his attorney are protected. What action he took as a result of those communications and written by him in his memorandum are not protected. If the witness can say truthfully – under oath – that the entries in his notes were told to him by his counsel, they may be protected, subject to confidentiality and wavier concerns.

<u>Tab 7 – Page 290 – Line 11 to Line 25.</u>

Reference to "main concern" is troublesome. Witnesses should be asked if the main concern is in its entirety a legal one that has been communicated confidentially to plaintiff (and employees with a need to know). If that is "yes", plaintiff should provide that communication to the SDM for *en camera* review. If it is "no" the question should be answered.

Tab 8 – Page 83 – Line 5 to Line 21 (Janet Cutcliff – Vice President <u>Business Development).</u>

No ruling needed.

<u>Tab 9 – Page 92 – Line 11 to Page 94 – Line 4.</u>

Assertion of privilege is proper.

6

<u>Tab 10 – Page 51 – Line 13 to Page 52 – Line 6 (Mark Owen, Sr. V.P.)</u>

Note enough information to rule.

<u>Tab 11 – Page 124 – Line 1 to Line 19 (Marsha Radosevich).</u>

Witness is unable to answer the question.

<u>Tab 11 – Page 126 – Line 15 to – Line 25.</u>

Privilege disallowed.  Witness is merely being asked to name persons that <u>she</u> communicated with to assist in the review of patent applications.  She can answer that without disclosing any communications from counsel.

Tab 12 – Page 166 – Line 13 to Page 168 – Line 1 and
<u>Page 169 – Line 10-21.</u>

In the SDM's view, the witness answered the question properly.

<u>Tab 13 – Page 175 – Line 19 to Page 177 – Line 7.</u>

Privilege disallowed.  Here, the witness is asked what the witness said about what was to be told to customers.  Even if that was an attorney client communication, what was to be told to customers, presumably was not intended to be confidential between attorney and client.

Tab 14 – Page 93 – Line 10 to Line 23 (Carolyn Wukitch – Sr. V.P. and
<u>General Manager.</u>

Instruction to witness appropriate under the circumstances.

7

<u>Tab 15 – Page 119 – Line 9 to Page 120 – Line 17.</u>

Plaintiff's position is correct here. A claim of inadvertent production on Page 119 justifies counsel's instruction to the witness.

<u>Tab 16 – Page 168 – Line 19 to Page 169 – Line 11.</u>

Counsel's instruction to witness is proper for the same reasons as set forth in the ruling in Tab 15.

<u>Tab 17 – Page 172 – Line 1 to Page 173 – Line 7.</u>

Privilege not allowed as to whether email was sent before or after witness received legal summary. Witness is being asked about something she did, not what or even whether, counsel instructed her to do that.

<u>Tab 18 – Page 182 – Line 9 to Page 183 – Line 2.</u>

Witness is being asked to give an answer from a business prospective whether a license price was a concern " . . . yes or no." A business decision influenced or "driven" by a lawyer is not privileged. What the attorney said is privileged. What the client's business assessment is resulting from that advice is not. Privilege is not allowed.

<u>Tab 19 – Page 191 – Line 22 to Page 192 – Line 25.</u>

Initially, the inquiry on Page 192 at Line 4 to 25 should be addressed. It is perfectly plain that the witness is being questions about her role and a document she wrote as a high-ranking official of the plaintiff corporation and not as an

8

individual. Accordingly, decisions she makes in regard to these matters involving

this case are on behalf of McKesson, the plaintiff. With that background she is

asked on Line 16 whether McKesson aggressively pursued the patent and used it as

leverage for the broader deal. (Presumably meaning a business arrangement

McKesson and TriZetto were in negotiations about regarding their combined

business goals). The witness is a senior vice president and general manager of the

plaintiff (see plaintiff's list of non-attorneys.) It is fair to assume that in that post,

she either participated in or has knowledge about the basis of the lawsuit and, of

equal importance, the reasons for filing it. In the normal course of things, it is the

client that authorizes the filing of a lawsuit and the attorneys who either

recommend it or recommend against it. A party must have good grounds to sue

another party and the attorneys are crucial in arriving at that decision. Their

communications in that regard are privileged. That is not what is being asked here.

What is being asked here is whether there are, in addition to what the attorneys

may have communicated to the parties, parallel business reasons for aggressive

pursuit of the patent. The question should and can be answered by the witness

without compromising the protection plaintiff is entitled to for attorney client

communication concerning legal advice in regard to the filing of this lawsuit.

SO ORDERED:

LOUIS C. BECHTLE
SPECIAL DISCOVERY MASTER

DATE: December 19, 2005

10

# Exhibit 14

1          IN THE UNITED STATES DISTRICT COURT

2          FOR THE DISTRICT OF DELAWARE

3          CIVIL ACTION NO. 04-1258 SLR

4

5          --------------------------X

6          MCKESSON INFORMATION       :

7          SOLUTIONS, LLC,            :

8                 Plaintiff,          :

9          vs.                        :

10         THE TRIZETTO GROUP, INC., :

11                Defendant.          :

12         --------------------------X

13

14                 Durham, North Carolina

15                 Friday, September 23, 2005

16

17             VIDEOTAPE DEPOSITION OF KELLI A. DUGAN,

18         a witness herein, called for examination by counsel

19         for the Defendant, in the above-entitled matter,

20         pursuant to notice, the witness being duly sworn by

21         DARLENE M. BRYANT, Registered Professional Reporter

22         and Notary Public in and for the State of North

23         Carolina, taken at the offices of Interactive World,

24         1000 Park Forty Plaza, Suite 300, Durham, North

25         Carolina, at 8:06 a.m., September 23, 2005, and the

9/23/2005  Dugan, Kelli

1    A.  No.

2    Q.  Were you kept informed in any way about the

3    progress of that patent application with the Patent

4    and Trademark Office?

5    A.  Again, could you repeat the question?  I'm

6    sorry.

7    Q.  No.  That's okay.  And I don't mean to trip

8    you up or --

9    A.  Yes.

10    Q.  You remember a -- you remember an application

11    got filed?

12    A.  Yes.

13    Q.  You don't know if it -- if you were at HPI or

14    HPR?

15    A.  Right.

16    Q.  I guess my question is:  Do you recall

17    anything else about the patent application after it

18    got filed?

19    A.  Yes.  I recall one or two meetings with the

20    attorneys that were helping us with the patent.

21    Q.  And without telling me what -- what it was

22    that they said, do you -- did you do anything with

23    regard to the prosecution of that patent with the

24    Patent and Trademark Office?

25    A.  No.

33

9/23/2005  Dugan, Kelli

1    Q.  Okay.  What else was included in the database

2    files?

3    A.  There were many files related to how

4    particular codes interacted with one another in

5    different ways.

6    Q.  And that database -- I think that was referred

7    to as the Interact database.  Does that ring a bell?

8    A.  That was probably the name of the first one we

9    developed, and that sounds familiar to me.

10   Q.  Okay.  The Interact database, was that created

11   based on the rules that Dr. Hertenstein had created?

12   A.  We created the rules based on

13   Dr. Hertenstein's experience.

14   Q.  Okay.  Now, I've also seen testimony to the

15   effect that those were referred to as metarules.

16       Is that a phrase that you're familiar with?

17   A.  It sounds like something Don may have said.

18   Q.  Okay.  Are you familiar with the 21 rules that

19   are set forth in the patent?

20   A.  Could you direct me to where they are?

21   Q.  Sure.  It's at Appendix B.  It starts at

22   MCK30.

23   A.  Thank you.

24   Q.  And goes to MCK32.

25   A.  Yes.  Yes.

79

9/23/2005  Dugan, Kelli

1    Q.  Are those the rules that you created based on

2    Dr. Hertenstein's experience?

3    A.  You, being Don and me?

4    Q.  Yes.

5    A.  Yes.

6    Q.  Okay.  And just so that I understand, these

7    aren't the actual rules that you created, but rather

8    their exemplary because they use the phraseology

9    A Code, B Code, and C Code; is that correct?

10    MR. SHEK:  Objection; vague and ambiguous.

11    BY MR. SITZMAN:  (RESUMED.)

12    Q.  Well, let me ask you this --

13    A.  -- I'm going to ask you to rephrase that.

14    Q.  Sure.  If you took these rules as they're

15    written here on these pages --

16    A.  Yes.

17    Q.  -- and you put them into a computer program,

18    would they carry out the function for which you

19    intended, you and Don intended, when you created them?

20    A.  As written here?

21    Q.  As written in the patent.

22    A.  Would -- pardon me?  I'm sorry.  I'm really

23    sorry.  I just -- I want to know what you're asking

24    me.

25    Q.  Okay.

80

9/23/2005  Dugan, Kelli

1    Q.  Did you find during your search any prior art

2    as it related to the '164 patent?

3    A.  No.

4    Q.  Do you know what that phrase means, "prior

5    art"?

6    A.  Yes.

7    Q.  Did you find anything when you were doing your

8    search that revealed any articles or information that

9    you had failed to give the patent office during the

10    prosecution of this patent?

11    A.  No.

12    MR. SITZMAN:  Mark this as KD-5.

13            (The document referred to was

14            marked KD Exhibit No. 5

15            for identification.)

16    BY MR. SITZMAN:  (RESUMED.)

17    Q.  I ask you if you've ever seen that document?

18    A.  I believe that I have, yes.

19    Q.  Where did you see that document?

20    A.  I believe that I saw it in August when Bernard

21    showed it to me, and when I saw it in August, I

22    remembered having seen it when I was at HPR -- or

23    HPI.

24    Q.  Okay.  And can you explain to me the context

25    in which you saw it at HPI?

105

9/23/2005  Dugan, Kelli

1    A.  Don probably ask me to read it.

2    Q.  Okay.  And was there a reason for Don asking

3    you to read it?  Did he tell you why he wanted you to

4    read it?

5    A.  Not that I remember specifically, but I

6    certainly think it would have given me some

7    background, just to bring me up to speed, perhaps,

8    about where they were -- what they were doing, what

9    the whole issue was.

10    Q.  And what was the whole issue?

11    A.  That being that Dr. Hertenstein believed,

12    these doctors all believed, that surgeons, in

13    particular, and perhaps other providers, were -- and

14    I'm going to use their word -- "gaming" the system.

15    Q.  Do you know why this article was not given to

16    the patent office during the prosecution of this

17    patent?

18    A.  No.

19    Q.  Did you bring it to the attention of any of

20    the attorneys that you met -- that you met with,

21    either before the application was filed or the couple

22    of meetings you were referring to afterwards?

23    A.  No, I don't think so.  No.

24    Q.  Do you recall any discussion with Dr. Holloway

25    or Dr. Hertenstein about the disclosing of this

1        THE VIDEOGRAPHER:  This concludes the

2    deposition of Kelli Dugan.  The time is 1:29 p.m.

3            (Discussion off the record.)

4            (Whereupon, at 1:29 p.m., the taking of the

5    instant deposition ceased.)

6            (Whereupon, the reading and signing by the

7    witness is hereby reserved.)

8                    _____

9                        SIGNATURE OF THE WITNESS

10           SUBSCRIBED AND SWORN to before me this

11   _____ day of _____, 2005.

12                        _____

13                            NOTARY PUBLIC

14   My Commission Expires:

15

16

17

18

19

20

21

22

23

24

25

                            186

                    KELLI A. DUGAN