# Exhibit 15

0408v
H0433/7002

07 **648314**

#14/ℓ

B/A
4-8-91

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

Applicant     :   Donald C. Holloway, Robert D. Hertenstein,
                  George A. Goldberg and Kelli A. Dugan
Filing Date   :   Herewith
For           :   EXPERT SYSTEM AND METHOD FOR ASSESSING MEDICAL
                  CLAIMS

Hon. Commissioner of
Patents and Trademarks
Washington, D.C.  20231

PRELIMINARY AMENDMENT

Dear Sir:

Prior to examination, please amend the
above-identified application as follows:

IN THE CLAIMS

Please cancel claims 1-6 without prejudice, and substitute in
their place claims 7-32.

7. In a computer system having means for operating on
a predetermined database containing medical service codes and a
set of relationships among the medical service codes defining
whether selected ones of the medical service codes are valid
when input with other selected ones of the medical service
codes, a method for processing input claims containing at least
one medical service code, comprising the steps of:

**MCK 000278**

receiving at least one claim;

ascertaining whether the at least one claim contains a plurality of medical service codes;

determining whether one of the medical service codes in the plurality of medical service codes is valid or invalid by interacting with the database and the set of relationships contained in the database;

authorizing medical service codes which are valid in response to the determining step; and

rejecting medical service codes which are invalid in response to the determining step.

8. The method of claim 7, further comprising the step of revising the at least one claim to delete invalid medical service codes.

9. The method of claim 8, further comprising the step of informing a user why the at least one claim was revised.

10. The method of claim 7, wherein the database containing medical service codes includes medical service codes described by CPT codes.

11. The method of claim 7, wherein the database containing medical service codes includes medical service codes described by CRVS codes.

- 2. -

MCK 000279

12. The method of claim 7, further comprising the step of requesting further information from a user regarding the at least one claim.

13. The method of claim 7, wherein the relationships among the medical service codes include medically determined relationships.

14. In a computer system having means for operating on a predetermined database containing medical service codes and a set of relationships among the medical service codes defining whether selected ones of the medical service codes are valid when input with other selected ones of the medical service codes, a method for processing input claims containing at least one medical service code, comprising the steps of:



  receiving at least one claim;

  ascertaining whether the at least one claim contains a plurality of medical service codes;

  determining whether one of the medical service codes in the at least one claim is included in any other medical service code in the at least one claim;

  authorizing medical service codes which are not contained in any other medical service code; and

  rejecting medical service codes which are contained in any other medical service code.

— 3 —

MCK 000280

15. The method of claim 14, further comprising the step of revising the at least one claim to not include a rejected medical service code.

16. In a computer system having means for operating on a predetermined database containing medical service codes and a set of relationships among the medical service codes defining whether selected ones of the medical service codes are valid when input with other selected ones of the medical service codes, a method for processing input claims containing at least one medical service code, comprising the steps of:

receiving at least one claim;

ascertaining whether the at least one claim contains a plurality of medical service codes;

determining whether one of the medical service codes in the at least one claim is medically exclusive with any other medical service code in the at least one claim;



authorizing medical service codes which are not medically exclusive with any other medical service codes contained in the at least one claim in response to the determining step; and

rejecting medical service codes which are medically exclusive with any other medical service codes contained in the at least one claim in response to the determining step.

— 4 —

MCK 000281

C.H    17. In a computer system having means for operating on a predetermined database containing medical service codes and a set of relationships among the medical service codes defining whether selected ones of the medical service codes are valid when input with other selected ones of the medical service codes, a method for processing input claims containing at least one medical service code, comprising the steps of:

P|    receiving at least one claim;

L    determining whether any medical service code contained in the at least one claim is not present in the predetermined database; and

P|    informing a user that a medical service code is not contained in the predetermined database.

18. In a computer system having means for operating on a predetermined database containing medical service codes and a set of relationships among the medical service codes defining whether selected ones of the medical service codes are valid when input with other selected ones of the medical service codes, a method for processing input claims containing at least one medical service code, comprising the steps of:

P|    receiving at least one claim;

L    ascertaining whether the at least one claim contains a plurality of medical service codes;

- 5 -



determining whether one of the medical service codes in the at least one claim is mutually exclusive due to non-medical criteria with any other medical service code in the at least one claim;

authorizing medical service codes which are not mutually exclusive due to non-medical criteria with any other medical service codes contained in the at least one claim in response to the determining step; and

rejecting medical service codes which are mutually exclusive due to non-medical criteria with any other medical service codes contained in the at least one claim in response to the determining step.

3
15. A computer system including a central processing unit and associated memory for processing input claims containing at least one medical service code, comprising:

a predetermined database stored in the associated memory, the database containing medical service codes and a set of relationships among the medical service codes defining whether selected ones of the medical service codes are valid when received with other selected ones of the medical service codes;

means for receiving at least one claim;

means for ascertaining whether the at least one claim contains a plurality of medical service codes;

MCK 000283

means for determining whether one of the medical service codes in the plurality of medical service codes is valid or invalid by interacting with the database and the set of relationships contained in the database;

means for authorizing medical service codes which are valid in response to the means for determining; and

means for rejecting medical service codes which are invalid in response to the means for determining.

20. The apparatus of claim 19, further comprising means for revising the at least one claim to delete invalid medical service codes.

21. The apparatus of claim 20, further comprising means for informing a user why the at least one claim was revised.

22. The apparatus of claim 19, wherein the database containing medical service codes includes medical service codes described by CPT codes.

23. The apparatus of claim 19, wherein the database containing medical service codes includes medical service codes described by CRVS codes.

- 7. -

MCK 000284

8
24. The apparatus of claim 19, further comprising
means for requesting further information from a user regarding
the at least one claim.

9
25. The apparatus of claim 19, wherein the
relationships among the medical service codes include medically
determined relationships.

10
26. A computer system including a central processing
unit and associated memory for processing input claims
containing at least one medical service claim, comprising:

a predetermined database stored in the associated
memory, the database containing medical service codes and a set
of relationships among the medical service codes defining
whether selected ones of the medical service codes are valid
when received with other selected ones of the medical service
codes;

means for receiving at least one claim;

means for ascertaining whether the at least one claim
contains a plurality of medical service codes;

means for determining whether one of the medical
service codes in the at least one claim is included in any
other medical service code in the at least one claim;

means for authorizing medical service codes which are
not contained in any other medical service code; and

- 8 -

106

MCK 000285

means for rejecting medical service codes which are contained in any other medical service code.

27. The apparatus of claim 26, further comprising means for revising the at least one claim to not include a rejected medical service code.

28. A computer system including a central processing unit and associated memory for processing input claims containing at least one medical service code, comprising:

a predetermined database stored in the associated memory, the database containing medical service codes and a set of relationships among the medical service codes defining whether selected ones of the medical service codes are valid when received with other selected ones of the medical service codes;

means for receiving at least one claim;

means for ascertaining whether the at least one claim contains a plurality of medical service codes;

means for determining whether one of the medical service codes in the at least one claim is medically exclusive with any other medical service code in the at least one claim;

means for authorizing medical service codes which are not medically exclusive with any other medical service codes

- 9. -

107

MCK 000286

contained in the at least one claim in response to the means
for determining; and

means for rejecting medical service codes which are
medically exclusive with any other medical service codes
contained in the at least one claim in response to the
determining step.

25. A computer system including a central processing
unit and associated memory for processing input claims
containing at least one medical service code, comprising:

a predetermined database stored in the associated
memory, the database containing medical service codes and a set
of relationships among the medical service codes defining
whether selected ones of the medical service codes are valid
when received with other selected ones of the medical service
codes;

means for receiving at least one claim;

means for determining whether any medical service code
contained in the at least one claim is not present in the
predetermined database; and

means for informing a user that a medical service code
is not contained in the predetermined database.

26. A computer system including a central processing
unit and associated memory for processing input claims
containing at least one medical service code, comprising:

— 10 —

MCK 000287

P( a predetermined database stored in the associated memory, the database containing medical service codes and a set of relationships among the medical service codes defining whether selected ones of the medical service codes are valid when received with other selected ones of the medical service codes;

P| means for receiving at least one claim;

L means for ascertaining whether the at least one claim contains a plurality of medical service codes;

P( means for determining whether one of the medical service codes in the at least one claim is mutually exclusive due to non-medical criteria with any other medical service code in the at least one claim;



P( means for authorizing medical services codes which are not mutually exclusive due to non-medical criteria with any other medical service codes contained in the at least one claim in response to the means for determining; and

P| means for rejecting medical service codes which are mutually exclusive due to non-medical criteria with any other medical service codes contained in the at least one claim in response to the means for determining.

15
31. A computer system including a central processing unit and associated memory for processing input claims containing at least one medical service code, comprising:

MCK 000288

a predetermined database stored in the associated memory, the database containing medical service codes and a set of relationships among the medical service codes defining whether selected ones of the medical service codes are valid when received with other selected ones of the medical service codes;

means for receiving at least one claim;

means for ascertaining whether the at least one claim contains a plurality of medical service codes;

means for determining whether one of the medical service codes in the plurality of medical service codes is valid or invalid by interacting with the database and the set of relationships contained in the database;

means for authorizing the at least one claim in response to the means for determining; and

means for rejecting the at least one claim in response to the means for determining.

32. In a computer system having means for operating on a predetermined database containing medical service codes and a set of relationships among the medical service codes defining whether selected ones of the medical service codes are valid when input with other selected ones of the medical services codes, a method for processing input claims containing at least one medical service code, comprising the steps of:

MCK 000289

receiving at least one claim;

ascertaining whether the at least one claim contains a plurality of medical service codes;

determining whether one of the medical service codes in the plurality of medical service codes is valid or invalid by interacting with the database and the set of relationships contained in the database;

authorizing the at least one claim in response to the determining step; and

rejecting the at least one claim in response to the determining step.

<u>REMARKS</u>

This is a preliminary amendment accompanying the filing of a continuation application.  Claims 1-6 have been cancelled without prejudice.  In their place, Applicants have submitted new claims 7-32 which are believed to clearly and patentably distinguish the present invention over the prior art of record.

In the Office Action of October 29, 1990, claims 1 and 2 were rejected under 35 U.S.C. §102(a) as being anticipated by, or in the alternative under 35 U.S.C. §103 as obvious over Weitzel et al.  Claims 3-6 were rejected under 35 U.S.C. §103 as being unpatentable over the combination of Weitzel et al. in view of Hardy et al.  Applicants respectfully traverse this rejection.

- 13 -

MCK 000290

Applicants do not believe that the Weitzel et al. reference is a valid reference under 35 U.S.C. §102. To be a valid reference, the Weitzel et al., reference must enable someone to practice the invention. It does not do that.

In Reading & Bates Construction Co. v. Baker Energy Resources Corporation and Baker Marine Corp., 233 USPQ 1168, 1173 (Fed. Cir. 1984), appeal No. 84-527, decided November 15, 1984, the Court held:

> . . .For the invention of the '903 patent to be described in the Smith brochure pursuant to §102(b), the Smith brochure itself must enable someone to practice the invention of the '903 patent. Preemption Devices Inc. v. Minnesota Mining & Mfg. Co., 732 F.2d 903, 906-221 USPQ 841 (Fed. Cir. 1984). It does not do that. The mere fact that the Smith brochure, a one-page promotional brochure, boasts the ability and results of the process of the '903 patent is insufficient, as a matter of law, to constitute an enabling disclosure of the process of the '903 patent.
>
> The Smith brochure itself may qualify as a prior art reference under §103, but only for what is disclosed in it. It cannot serve as the vehicle by which the '903 patent and the more detailed disclosure it contains may also be considered as prior art. (Emphasis in original)

In view of the Federal Circuit holding, Applicants believe that the Weitzel et al. reference is only valid for what is disclosed in it. The Office Action states, with respect to p. 30 Weitzel et al., "This phrase implies that the system does revise a medical claim not to include inappropriate medical claims, exactly what is claimed by applicants". The Applicants believe that functions should not be and cannot be

— 14 —

MCK 000291

inferred from statements in the Weitzel et al. reference. Weitzel et al. merely state the results of processing, not how the processing is accomplished, or any of the rules used. The reference is only valid for what it does disclose, and nothing more. It is inappropriate to infer that Weitzel et al. performs any functions beyond the statements of the abilities of the system and results of the claim review procedures.

Even assuming that Weitzel et al. is a valid reference, the present invention, as claimed, is still patentably distinct from Weitzel et al. Weitzel et al. is a system for reviewing claims to determine if the health care services performed were medically necessary and properly authorized. On page 28 of Weitzel et al., determining medical "necessity" is described as assessing the patient's diagnosis, surgical procedures, the length of time since they occurred and severity of the patient's condition. On page 29 of Weitzel et al., an indicator of a patient's prognosis is described as the device by which the patient's recouprative potential and therefore the type and degree of medical services necessary, is assessed. Thus, Weitzel et al. is concerned with determining whether or not the total services billed were appropriate given the patient's medical condition.

By contrast, the present invention is concerned with determining whether or not service providers are attempting to claim excess payment for medical services by violating rules

- 15 -

MCK 000292

which interrelate predetermined medical service codes.  Unlike
Weitzel et al., the present invention does not assess the
patient's "prognosis" to determine whether or not the medical
service claims are appropriate for the patient's condition.
The present invention uses and claims a set of rules that
describe the relationship between medical service codes (which
correspond to particular medical services or procedures) to
determine whether or not there are improper medical service
codes in a particular claim.

Even when additionally combined with the Hardy et al.
reference, there are still no teachings or suggestions of the
present invention, as claimed.  Hardy et al. discloses a basic
expert system tool including a knowledge base having facts and
ruled, and editing and communication tools.  There is no
teaching or suggestion in either Hardy et al. or Weitzel that
these references may be combined in the manner stated in the
Office Action.  Further, even if these references could be
combined as stated in the Office Action, the combination would
not meet the limitations of the claims.  The combination of
Weitzel et al. and Hardy et al. suggests an expert system which
reviews medical service claims and assesses the appropriateness
of the medical services in light of the patient's prognosis or
medical condition and is then able to inform the user of the
system's decision process or request further information from
the user.  As with Weitzel et al. itself, there is no teaching

- 16 -

MCK 000293

or suggestion of rules describing relationships among particular medical service codes for assessing whether a medical service claim contains medical service codes which violate the rules.

With regard to the claims, Applicants are submitting a set of claims which are believed to clearly distinguish over the Weitzel et al. and Hardy et al. references, either singly or in combination. Claims 7-12, and 31 are method claims, of which claim 7, 14, 16, 17, 18, and 31 are independent. Claims 19-30, and 32 are apparatus claims, of which claims 19, 26, 28, 29, 30, and 32 are independent.

Taking claim 7 as exemplary of the method claims, claim 7 recites a computer system having means for operating on "a predetermined database containing medical service codes and a set of relationships among the medical service codes defining whether selected ones of the medical service codes are valid when input with selected ones of the medical service codes." Claim 7 additionally cites receiving at least one claim and ascertaining whether there are a plurality of medical service codes in the at least one claim. Claim 7 further recites "determining whether one of the medical service codes in the plurality of medical service is valid or invalid by interacting with the database and the set of relationships contained in the database" and "authorizing medical service codes which are valid", and "rejecting medical service codes which are invalid

- 17 -

MCK 000294

in response to the determining step". Applicants believe that
these recitations in claim 7, such as, <u>inter alia</u>, describing
the predetermined database as containing medical service codes
and a set of relationships among the codes, processing the
codes to determine which codes are valid, and authorizing valid
medical service codes and rejecting invalid medical service
codes distinguish the present invention over the art of
record. Applicants believe that the prior art, either singly
or in combination, contains no teaching or suggestion of a
database containing medical service codes and relationships
among the codes. The prior art of record, namely, the Weitzel
et al. reference, only refers to a method for determining
whether or not a particular course of medical treatment is
authorized or not.

Claim 14 describes a method similar to claim 7 and
recites <u>inter alia</u> "determining whether one of the medical
service codes in the at least one claim is included in any
other medical service code in the at least one claim,
authorizing medical service codes not contained in any other
medical service code, and rejecting medical service codes which
are contained in any other medical service code".

Claim 16 describes a similar method as claim 7 and
recites, <u>inter alia</u> "determining whether one of the medical
service codes in the at least one claim is medically exclusive

MCK 000295

with any other medical service code in the at least one claim",
"authorizing medical service codes which are not medically
exclusive with any other medical service codes", and "rejecting
medical service codes which are medically exclusive with any
other medical service codes" in response to the determining
step.

Claim 17 describes a method similar to claim 7 and
recites, inter alia, "determining whether any medical service
code contained in the at least one claim is not present in the
predetermined database", and "informing a user that a medical
service code is not contained in the predetermined database".

Claim 18 describes a similar method as claim 7 and
recites, inter alia, "determining whether one of the medical
service codes in the at least one claim is mutually exclusive
due to non-medical criteria with any other medical service
code", "authorizing medical service codes which are not
mutually exclusive due to non-medical criteria with any other
medical service codes", and "rejecting medical service codes
which are mutually exclusive due to non-medical criteria with
any other medical service codes" in response to the determining
step.

Claim 19 describes a computer system including a
central processing unit and associated memory for processing
input claims including "a predetermined database stored in the

— 19 —

MCK 000296

associated memory, the database containing medical service codes and a set of relationships among the medical service codes defining whether selected ones of the medical service codes are valid when received with other selected ones of the medical service codes", "means for receiving at least one claim", and "means for ascertaining whether the at least one claim contains a plurality of medical service codes".

Claim 19 further recites "means for determining whether one of the medical service codes in the plurality of medical service codes are valid or invalid by interacting with the database and set of relationships contained in the database", and "means for authorizing valid medical service codes" and "means for rejecting invalid medical service codes". Claim 19 is believed to distinguish over the prior art of record because, inter alia, there is no means for determining whether one of the medical service codes is valid or invalid and no means for authorizing valid medical service codes and no means for rejecting invalid medical service codes disclosed or suggested in the prior art of record.

Claim 26 describes a system similar as claim 19 and recites, inter alia, "means for determining whether one of the medical service codes in the at least one claim is included in any other medical service code in the at least one claim", "means for authorizing medical service codes which are not

— 20 —

MCK 000297

contained in any other medical service code", and "means for rejecting medical service codes which are contained in any other medical service code".

Claim 28 describes a system similar to claim 19 and recites, inter alia, "means for determining whether one of the medical service codes in the at least one claim is medically exclusive with any other medical service code in the at least one claim", "means for authorizing medical service codes which are not medically exclusive with any other medical service codes", and "means for rejecting medical service codes which are medically exclusive with any other medical service codes" in response to the means for determining.

Claim 29 describes a system similar to claim 19 and describes, inter alia, "means for determining whether any medical service code contained in the at least one claim is not present in the predetermined database" and "means for informing a user that a medical service code is not contained in the predetermined database".

Claim 30 describes a system similar to claim 19 and recites, inter alia, "means for determining whether one of the medical service codes in the at least one claim is mutually exclusive due to non-medical criteria with any other medical service code in the at least one claim", "means for authorizing medical service codes which are not mutually exclusive due to

– 21 –

MCK 000298

non-medical criteria with any other medical service codes", and "means for rejecting medical service codes which are mutually exclusive due to non-medical criteria with any other medical service codes" in response to the means for determining.

Claim 31 describes a similar method as claim 7 and recites, _inter_ _alia_, "determining whether one of the medical service codes in a plurality of medical service codes is valid or invalid by interacting with the database and the set of relationships contained in the database", "authorizing the at least one claim in response to the determining step," and "rejecting the at least one claim in response to the determining step".

Claim 32 describes a system similar to claim 19 and recites, _inter_ _alia_, "means for determining whether one of the medical service codes in the plurality of medical service codes is valid or invalid by interacting with the database and the set of relationships contained in the database", "means for authorizing the at least claim in response to the means for determining", and "means for rejecting the at least one claim in response to the means for determining".

The dependent claims additionally describe further patentable features of the present invention.

In view of the foregoing amendments and remarks, application should now be in condition for allowance. A notice

**MCK 000299**

to this effect is respectfully requested.  Should further
questions arise concerning this application, the Examiner is
invited to call the Applicants' attorney at the number listed
below.

Respectfully submitted,

Donald C. Holloway, et al.

By _____
A. Jason Mirabito
Reg. No. 28,161
Wolf, Greenfield & Sacks, P.C.
600 Atlantic Avenue
Boston, MA  02210-2211
Tel.: (617) 720-3500

Docket no. H033/7002

Dated:  January 29, 1991

0408v

– 23 –

MCK 000300

# Exhibit 16

1     UNITED STATES DISTRICT COURT

2     FOR THE DISTRICT OF DELAWARE

3

4

5     --------------------------------x

6     MC KESSON INFORMATION SYSTEMS, :

7          Plaintiff,          :    Case No.

8     vs.                      :    04-1258 SLR

9     THE TRIZETTO GROUP,          :

10         Defendant.          :

11    --------------------------------x

12

13

14    VIDEOTAPED DEPOSITION OF GEORGE A. GOLDBERG

15

16

17              Washington, D.C.

18              Tuesday, September 13, 2005

19

20

21

22

23

24    REPORTED BY:

25    CARMEN SMITH

9/28/2005  Goldberg, George, Vol II

1              IN THE UNITED STATES DISTRICT COURT

2                  for the District of Delaware

3

4          - - - - - - - - - - - - - - - - - - x

5                              :

6      McKESSON INFORMATION SYSTEMS,       :

7                              :

8          Plaintiffs,          :

9                              : Case No.

10     v.                      : 04-1258 SLR

11                             :

12     THE TRIZETTO GROUP,             :

13                             :

14         Defendant.         :

15                             :

16         - - - - - - - - - - - - - - - - - - x

17                  Washington, D.C.

18                  Volume II

19                  September 28, 2005

20

21

22

23     REPORTED BY:

24         DANIEL W. HAWKINS

25

1    correct?

2        A    That is what my CV shows, and it's

3    correct.

4        Q    Why did you leave The RAND Corporation?

5        A    The Health Insurance Experiment had ended.

6        Q    Any other reasons?

7        A    It was time to move -- I thought it was

8    time to move back to the East Coast to be near my

9    aging parents.

10       Q    And you -- from your CV, it looks like you

11   joined a company Health Data Institute in Lexington,

12   Massachusetts; is that correct?

13       A    That is correct.

14       Q    And it references developmental work on an

15   Advanced MedLogic, M-e-d, cap L-o-g-i-c, System?

16       A    Yes, it does.

17       Q    Which indicates that it does cost/quality

18   procedure code based claims review.

19       A    That's what it says.

20       Q    Can you provide a more detailed

21   explanation what the Advanced MedLogic System was?

22       A    The Advanced MedLogic System was a series

23   of computerized tables, lookup tables, that

24   received, processed and paid claims.  In other

25   words, it was post-payment claims databases, and

9/13/2005  Goldberg, George

1    reviewed them to perform single-code edits of

2    various kinds.  Post-process, post-payment.

3        Q    There's also a notation on your CV about a

4    prospective payment system?

5        A    The prospective payment system is the

6    government's DRG system.

7        Q    And does that -- did that system deal with

8    claims processing prior to payment?

9        A    The DR -- the answer is yes and no.

10       Q    Can you explain?

11       A    The DRG system, which is performed --

12   which applies to hospital claims only, or certainly

13   did in those days, the DRG system, diagnosis related

14   groups.  Groups diagnoses with some on hospital

15   discharge claims, with attention as well to ICD9

16   procedure-coded procedures on hospital claims, and

17   assigns every hospital discharged claim to one and

18   only one DRG, a number that at that time went

19   somewhere between 001 and 4XX.  There were

20   400-some-odd DRGs.

21        And it functions for payment purposes

22   because at some point, Medicare and Medicaid and the

23   occasional private insurer paid for a hospital stay

24   on the basis of the DRG to which a hospital

25   discharge claim was assigned.

1     Q    In connection with the Advanced MedLogic

2     System, did that review procedure codes that would

3     have been inappropriate for some other criteria,

4     such as gender or age?

5         MR. SHEK:  Objection as to form, also

6     vague and ambiguous.

7         THE WITNESS:  Would you repeat the

8     question, please?  Or would you rephrase the

9     question, please?

10        BY MR. SEGAL:

11    Q    Sure, sure.  I'm trying to go -- we

12    previously -- you cautioned me you didn't want to

13    jumble all code editing or claims editing together,

14    and we had talked about three or four different

15    types of claims edits.

16    A    Yes, sir.

17    Q    So what I'm trying to determine is whether

18    Advanced MedLogic looked at claims data to determine

19    whether a procedure code was inappropriate for the

20    patient -- for some other criteria, such as the

21    patient's gender or age.

22        MR. SHEK:  Object to form again, also

23    vague and ambiguous.

24        THE WITNESS:  One of the functions of the

25    Advanced MedLogic System was to review procedures in

9/13/2005  Goldberg, George

1    relation to such things as the patient's age or sex.

2        BY MR. SEGAL:

3        Q    And what would happen if the claims data

4    you were looking at as part of the Advanced MedLogic

5    System showed a CPT code that was inappropriate for

6    some other criteria, such as the gender or age of a

7    patient?

8        A    The code -- first of all, I don't know.

9    Excuse me.  That depended on the client, for with

10   some clients, nothing would happen, we would merely

11   count these discrepancies and report the

12   discrepancies.  Remember, these were post-payment,

13   post-processed claims.  And in other cases, we might

14   exclude the procedure -- it has nothing to do with

15   payment.  We might exclude the procedure from a

16   count of such procedures.

17       In other words, this had to do with

18   analysis, data analysis.

19       Q    And was H -- is it okay if I refer to

20   Health Data Institute as "HDI"?  Is that an acronym

21   you used?

22       A    Yes, for both questions.

23       Q    Okay.  Good.  So just to try and shorten

24   up.

25       A    HDI is what we called it.

54

9/13/2005  Goldberg, George

1     Q    Okay.  Did HDI sell its services using the

2   Advanced MedLogic System?

3     A    They --

4         MR. SHEK:  Objection as to form; vague as

5   to time.

6         THE WITNESS:  They tried to sell it.

7         BY MR. SEGAL:

8     Q    Okay.  So they went to companies and said

9   give us your claims data and we'll process it

10  through our system, our computer program, and

11  provide some reports to you or some analysis to you.

12  Is that fair?

13    A    My guess is that happened, but I was never

14  involved in any of those sales trips.

15    Q    Okay.  Do you recall any of the other

16  individuals that worked with you at HDI?

17    A    Yes, I do.

18    Q    Can you tell me the names that you recall?

19    A    I recall the name Paul Gertman,

20  G-e-r-t-m-a-n.  I recall Lance Lazo, I think it's

21  L-a-z-o.  I'm not sure.  I recall Breck, and I don't

22  remember his last name.  I recall Mayde Rosen,

23  M-a-y-d-e.  I recall Elizabeth Pappius,

24  P-a-p-p-i-u-s.  I recall Larry Shor, and I don't

25  remember how -- there's no E at the end, but I don't

55

1    know if he spells it S-h-o-r or S-c-h-o-r.

2        I recall Marcia Radosevich. Do I need to

3    spell that name for you?

4        Q    If you could, that would be great.

5        A    R-a-d-o-s-e-v-i-c-h, I believe. M-a-r --

6    actually, I don't know how she spells "Marcia." I

7    don't remember anymore how "Marcia" was spelled.

8        I recall Nurit Freedman, N-u-r-i-t. Breck

9    Eagle. Eagle was Breck's family name. I could work

10   harder to recall more people, but those are the

11   people I recall. And I recall Jennifer Daley,

12   D-a-l-e-y. I've gone over to another department.

13   And Howard Birnbaum, B-i-r-n-b-a-u-m. And Annette

14   Delaney. And Kevin O'Grady. That's all the people

15   I recall at this moment.

16       Q    Do you know the whereabouts of any of the

17   individuals that you named, the current whereabouts?

18       A    Yes, I do.

19       Q    Would it help if I give you the names

20   back?

21       A    Is the idea that you want to know where --

22   their whereabouts?

23       Q    If you know them, yes.

24       A    All right. Go ahead.

25       Q    Mr. Gertman?

9/13/2005  Goldberg, George

1       Q    I assume it was in the mind prior to

2    September 30, 1988, when the initial application was

3    filed?

4       A    I think we can assume that.

5       Q    Were you involved at all --

6       A    I'm not -- what was the date?

7       Q    September 30, 1988.

8       A    So my best estimate would be 1987, but I

9    can't -- when -- the complete -- you said "the

10   complete system and method."  My estimate would be

11   1987, but I'm not even sure of that.  So it was

12   first filed in '88, okay.

13      Q    Did you have any involvement with the

14   preparation of the patent application that

15   ultimately matured into the '164 patent?

16      A    By "application," I think you mean

17   anything in here.  Is this all of the patent

18   application?  Is the patent application just a

19   two-page summary that goes into the Patent Office?

20      Q    There's an entire document that is an

21   application for a patent that goes in, which has,

22   among other things, some of the text that's here,

23   perhaps it was revised.

24      A    Well, in my understanding of the term, I

25   did have input, if that was your word, into the

9/13/2005  Goldberg, George

1    patent application, in my understanding.

2        Q    Okay.  Well, let's first do this.  Did you

3    ever review a completed application before it was

4    filed?

5        A    I don't remember.

6        Q    Did you ever review any comments from the

7    Patent Office that may have come back during the

8    prosecution of the patent?

9        A    I don't remember, and I strongly doubt it,

10   because I don't remember any comments coming back

11   from the Patent Office, though perhaps they did

12   after I left HPR.  But I don't -- the bottom line is

13   I don't remember.

14       Q    And when did you learn that the patent had

15   been issued?

16       A    That I definitely do not remember.

17       Q    Okay.  You were going to tell me what you

18   believed your input to be to the application, and

19   you were thumbing through Exhibit A to Exhibit 5 to

20   do that.

21       A    No, I wanted to see if there was something

22   I recognized here as clearly some input so I could

23   just answer your question in a yes or a no.  As soon

24   as I found something that clearly I had an input

25   into, then I could answer yes, I had a role in this

1    clear as to time frame.

2        A    Please.

3        Q    Prior to the litigation that we've been

4    referring to occurring in the mid-1990s --

5        A    Prior to the litigation.

6        Q    Yes.  Do you have any recollection of

7    speaking to a patent attorney in connection with the

8    CodeReview product or the patent application that

9    ultimately matured into the '164 patent?

10       A    I have no recollection of having done

11   that.

12       Q    During the 1988 time frame, do you ever

13   recall hearing the phrase "prior art" as it related

14   to the CodeReview product?

15       A    In 1988?

16       Q    Uh-huh.

17       A    I do not recall hearing it at that time.

18       Q    Do you recall any conversations during

19   1988 in which the phrase "prior art" was used in

20   connection with the CodeReview product?

21       A    As of September 13, 2005, I do not have

22   any such recollection.

23       Q    Do you have any recollection of any

24   conversations you've had during the 1988 time period

25   concerning the phrase "duty of candor"?

1      A    It's a wonderful phrase.  It sounds as if

2    I've heard it before, but I certainly have no

3    recollection that I heard that phrase "duty of

4    candor" in the 1988 time frame.

5      Q    Would it be fair to say that prior to the

6    time of the litigation between HPR and GMIS --

7      A    So it was GMIS, okay.

8      Q    -- that you had not heard the phrases

9    "prior art" or "duty of candor"?

10     A    That's my best guess, although that is a

11   guess.  I do -- period.  I do -- well, I do recall

12   hearing the phrase "prior art" at that time.

13     Q    And you don't recall hearing it prior to

14   the litigation?

15     A    I don't recall it.

16     Q    When do you recall HPR having the first

17   prototype of a system that did any code rebundling?

18     A    I absolutely can't give a date to it, I'm

19   sorry.

20     Q    Have you ever heard of a product called

21   MedReview?

22     A    MedReview.  Yes.

23     Q    What is your recollection of the

24   product -- of a product called MedReview?

25     A    It wasn't a product; it was a dream.  Did

1    so, have you realized you made any errors in your testimony?

2       A    I haven't thought about my testimony, and if

3    parts of it have popped into my head, I haven't noted any

4    errors.

5       Q    In your last deposition, we were discussing a

6    system known as Advanced MedLogic?  Do you recall that.

7       A    Yes, Advanced MedLogic.

8       Q    And that was a system that was used by Health

9    Data Institute, I believe?  HDI.

10      A    I'm not sure I would call Advanced MedLogic a

11   system, at least not today.  I don't know what I said two

12   weeks ago.  I'd call it a review mechanism, and it was

13   developed by HDI, Health Data Institute.

14      Q    And actually, the system name was Advanced

15   MedLogic System.

16      A    I don't recall.

17      Q    Let me show you what was previously marked as

18   Exhibit 1 to your deposition, which was your c.v.  And I

19   would trust that you've made an effort in preparing your

20   c.v. to make sure it's accurate and complete?

21      A    Yes, I have.  And understandable to a person who

22   would read it.

23      Q    If you look on the first page under point 3,

24   where it refers to Health Data Institute.

25      A    Yes, I see that.

9/28/2005 Goldberg, George, Vol II

1    Q   And under that you list your development work?

2    A   On Advanced MedLogic System.  Yes, I see that.

3    Q   So the Advanced MedLogic System was the name of

4  the system that you worked on?

5    A   It is probable that that was the original name of

6  the system; that is, that the Health Data Institute, in its

7  marketing wisdom, decided to call it the Advanced MedLogic

8  System.

9    Q   And the Advanced MedLogic System was a program

10  that ran on computers?

11    A   Not in the sense that today we consider it a

12  program.  Advanced MedLogic System was a series of lookup

13  tables and reports got produced off a computer.

14    Q   And there were instructions that the computer

15  followed to know how to look up information in the tables,

16  and compare claims data with information in the tables?

17        MR. SHEK:  Object as to form.

18        THE WITNESS:  I have actually no idea how it was

19  done.

20        BY MR. SEGAL:

21    Q   Do you know if it operated on a computer?

22    A   I know that computers were used in the Advanced -

23  - what seems to be called the Advanced MedLogic System.

24    Q   And you spoke about the lookup tables that you

25  some input in, of that system.  Is that correct?

1    A    Yes.  I helped, I mostly reviewed those tables

2    that had been developed by a group of nurses.

3    Q    And the last time we established that those

4    tables had things such as procedure codes and diagnoses

5    codes, or procedure codes and gender.   Is that correct?

6    A    They were a series of edits designed to -- edits

7    in the old fashioned sense of the word.  Yes, they were

8    looking for mismatches between age and diagnosis, age and

9    procedure, sex and diagnosis, sex and procedure, or just

10   diagnoses that were so unusual you wouldn't expect to see

11   them in the United States; although they might be perfectly

12   common in parts of Africa, for example.

13   Q    And the lookup tables were used in conjunction

14   with reviewing claims data, is that correct?

15   A    Please repeat the question.

16   Q    The lookup tables were used in connection with

17   the Advanced MedLogic System, and in reviewing claims data.

18   A    Those lookup tables were used in the review of

19   batches of already paid claims data.

20   Q    The claims data, you're talking about medical

21   claims data.  Is that correct?

22   A    Yes, what you would call medical claims data,

23   what I would break down and call facility claims data and

24   professional claims data.

25   Q    How many different of these edits were in the

1    perform an evaluation of potential savings from increased

2    accuracy in CPT-4 coding.

3    A    I agree .

4    Q    Dated July '87.

5    A    I agree.

6    Q    Do you have any reason to believe that Exhibit 13

7    is not the proposal that accompanies Exhibit 12?

8    A    I have no reason not to believe that.

9    Q    This letter that is marked as Exhibit 12 is

10   stamped 'confidential.'  Is that a stamp that was on the

11   original letter, to the best of your recollection?

12   A    I don't remember the original letter, and so I

13   certainly don't remember if 'confidential' was ever stamped

14   on it or not.

15   Q    The letter refers to a July 2, 1987 meeting with

16   Aetna and HPI.  Do you see that?

17   A    Yes.  I see in the first two paragraphs of the

18   letter that mention is made to a July 2, 1987 meeting.

19   Q    Do you recall a July 1987 meeting with Aetna?

20   A    First of all, I certainly would have no idea if

21   the meeting was on July 2, 1987.  However, I do recall a

22   meeting with Aetna sometime when I was at the Health Policy

23   Institute; yes, I do.

24   Q    Do you recall a meeting in which you were

25   discussing with Aetna a coding audit as a first step towards

9/28/2005  Goldberg, George, Vol II

1    building clinical decision rules for software that will

2    assist the claims processing units?

3        A    I do remember driving down to the Hartford area

4    for a meeting with Aetna, and I still remember that I lost a

5    tie that I had put in my -- this equivalent pocket, to be

6    put on when I reached the company, but we had to switch cars

7    in a parking lot outside of Route 128, outside of Boston,

8    and when we reached the parking lot at Aetna in Connecticut,

9    the tie wasn't there.

10        So I very well remember losing that tie, and I do

11   remember a meeting.  I remember neither the time of that

12   meeting nor if the meeting was in connection with this

13   particular proposal.

14       Q    Do you remember whether the meeting concerned a

15   coding audit that HPI was proposing to perform for Aetna?

16       A    I don't remember that.

17       Q    Do you remember whether the issue of code

18   rebundling was discussed at that meeting?

19       A    Well, I don't remember -- the meeting I do

20   remember?

21       Q    Uh-huh.

22       A    I don't recall if it was discussed or not,

23   because I don't recall what was discussed at that meeting.

24       Q    Do you recall whether the issue of software to

25   perform, to be used in connection with the clinical claims

9/28/2005  Goldberg, George, Vol II

1     processing was discussed at the meeting you recall with

2     Aetna?

3        A    I don't remember that from what might be 17 or 18

4     years ago.

5        Q    And as you sit here today, you have no reason to

6     believe that Dr. Holloway's recitation of what occurred at

7     the meeting was inaccurate in any way?

8        A    Well, now I've got to read in detail, greater

9     detail.

10           (Pause)

11           I have no reason to doubt that in his letter, Don

12    is describing what happened at the July 2, 1987 meeting, but

13    with the caveat that I am not at all sure that the Aetna

14    meeting I remember was in fact the July 2, 1987 meeting.

15       Q    Are you familiar with the product called

16    Autocoder?

17       A    Yes, although it depends on what you mean by

18    familiar.

19       Q    What is your understanding of the functionality

20    of a program called Autocoder, as it existed in the 1980

21    time frame?

22       A    My understanding is that Autocoder was this

23    lookup mechanism that I referred to a bit earlier today, in

24    which you could put in some English, whether it be regarding

25    a diagnosis or a procedure, and get out a code.  And

279

9/28/2005 Goldberg, George, Vol II

1          The question is if I remember this letter?  Or

2    this issue?

3      Q    Now does this refresh your recollection of any

4    discussions with Mr. Wright concerning the development of a

5    software package that would assist claims processors in

6    applying medical decision rules?

7      A    It does not refresh my memory, so I remain

8    uncertain as to what was discussed in meetings that Mr.

9    Wright and I attended, although I would be very surprised if

10   it didn't concern the subject matter you had mentioned.

11     Q    With respect to Exhibit 90, do you recall ever

12   receiving a copy of this letter?

13     A    No, I don't remember that.

14         MR. SEGAL:  We've been going about an hour; why

15   don't we take a short break, and then we'll continue.

16         (Recess; 10:22 a.m. - 10:30.)

17         BY MR. SEGAL:

18     Q    Just to figure out where we were from last time

19   in connection with patent applications, I want to go over

20   what I understand, my notes, to be sure I have it accurate.

21         Is it correct that you do not recall preparing

22   anything for the application for the patent?

23         Let me rephrase the question.

24         Do you recall preparing anything for a patent

25   application on the system and method for detecting

9/28/2005  Goldberg, George, Vol II

1    fraudulent medical claims in the examination of service

2    codes?

3        A    I recall preparing something that, if I remember

4    correctly, became part of the patent.  Now, I don't know if

5    that's the patent application or not.

6        Q    What do you recall preparing?

7        A    I recall preparing a series of examples of claims

8    that might be submitted to code review; it was called the

9    code review patent.

10       Q    Do you recall doing anything else in connection

11   with the filing of a patent application?

12       A    I do not recall doing anything else in connection

13   with the filing of that patent application.

14       Q    Do you recall being requested to review any

15   materials in connection with the filing of a patent

16   application?

17       A    I don't recall being asked to do that.

18       Q    And is it correct that you don't recall reviewing

19   a copy of an application that was filed with the U.S. Patent

20   and Trademark Office?

21       A    Although it's very likely that at some point I

22   was asked to review it, I absolutely don't recall such a

23   review.

24       Q    Do you recall providing any input on the document

25   that you reviewed?

1    A    Well, I don't remember reviewing it.  I probably

2    reviewed the part that I prepared, and I don't even remember

3    doing that.

4    Q    When did you come up with the examples of claims

5    that were submitted to code review?

6    A    Well, it would help if I were to be able to see

7    those examples; but in the absence of seeing them, my answer

8    would be based on my experience over the time during which

9    we were developing the product.

10    Q    Do you know if more than one application was

11    filed in connection with obtaining a patent on a system and

12    method for detecting fraudulent medical claims via the

13    examination of service codes?

14    A    No, I don't know that.

15    Q    You have no recollection of any applications

16    being abandoned?

17    A    That's right; I have no such recollection.

18    Q    Do you have any recollection of hearing that the

19    application had been rejected by the Patent and Trademark

20    Office?

21    A    No; and the reason I'm hesitating in that answer

22    is not just to make sure that I don't remember, and I don't

23    remember; but because I do know that we were working on the

24    patent while I was still working at Helper; yet the patent

25    wasn't approved until after I left. So it's possible that

9/28/2005  Goldberg, George, Vol II

1    there was back and forth, but I don't know about that.

2    Q    And you haven't reviewed any of the back and

3    forth with the Patent and Trademark Office, correct?

4    A    Correct.

5    Q    Were you asked to provide any materials related

6    to the invention other than the examples?

7    A    I don't remember being asked to provide any other

8    materials.

9    Q    Do you recall being asked whether you knew of any

10   systems that were involved in claims processing other than

11   the code review product?

12   A    I remember that you asked me that several weeks

13   ago, but I don't remember it from the time that we're

14   talking about, I believe; that is the second half of the

15   1980s.

16   Q    Do you recall at any point in connection with the

17   filing of the patent application being asked when you

18   disclosed any part of the system and method for detecting

19   fraudulent medical claims in the examination of service

20   codes to any party?

21   A    No, I don't remember.

22   Q    I'm going to hand you what we previously

23   identified the first day of your deposition, and was marked

24   as Exhibit 7 at another deposition, which is a copy of U.S.

25   Patent No. 5253164, which we refer to as the 164 patent.

1      Q      As you sit here today, you don't know that a

2    different decision would have been reached by Dr.

3    Hertenstein and his staff at Caterpillar, is that correct?

4      A      Well, this reminds me, there are many things in

5    the world we can'[t be sure of, and I don't know what

6    Hertenstein would have done.  It's possible that in every

7    one of these situations, Hertenstein and his staff would

8    have reached the same situation; but you can see that in

9    general, I personally don't like the form of a question that

10   says, 'Can you be sure that this wouldn't be the case?'

11   Because that's been used in my personal experience by people

12   trying to convert me in terms of religion, to say 'Can you

13   be sure that this didn't happen?'

14            So I personally -- it's nothing to do with you --

15    I personally have a great deal of difficulty with questions

16   formulated that way.

17     Q      Turn to page 8 of Exhibit 107, and column 3?

18     A      Page 8, where are the page numbers?

19            Oh.  MCK?

20     Q      Yes.

21     A      I'm there.

22     Q      In column 3.  And you see then there's numbers

23   down --  Column 3 is at the top of the page, and there's

24   numbers down the middle?

25     A      Yes.

9/28/2005  Goldberg, George, Vol II

1    Q    Go to approximately line 25.

2    A    Yes.

3    Q    Column 3, where it starts, the prompts?

4    A    Yes.

5    Q    Do you see that:

6         The prompts and recommendations provided by

7         CodeReview are based on the decision rules that

8         physician reviewers have already used on a manual

9         basis to solve identical problems and are

10        consistent with informed surgical opinion.

11   Do you see that?

12   A    Yes, I see that sentence.

13   Q    Do you believe that to be true?

14   A    Yes, and I believe that to be true, and I call

15   your attention to the words, 'are based on'.

16   Q    I see that.  And when it refers to what has

17   already been used on a manual basis, in that sentence.

18   A    Yes, I see those words.

19   Q    Is that referring to the procedures followed by

20   Dr. Hertenstein and his staff at Caterpillar?

21   A    To the best of my knowledge, it is based on the

22   procedures followed by Dr. Hertenstein and his staff at

23   Caterpillar, yes.

24   Q    If Dr. Hertenstein had testified that for each of

25   the examples set forth in the patent, he and his staff would

9/28/2005  Goldberg, George, Vol II

1     understanding.

2          MR. SHEK:  Except further questions based on any

3     subsequent examination, I pass the witness.

4          FURTHER EXAMINATION BY COUNSEL FOR THE DEFENDANT

5          BY MR. SEGAL:

6     Q     When you were looking at the HDI tables, when you

7     went back and were doing your work for PHCS, did you review

8     all the lookup tables that were being used in the Advanced

9     MedLogic System?

10    A     I don't remember.

11    Q     Do you know if the Advanced MedLogic System could

12    have been modified to use lookup tables that included two,

13    procedure relationships between procedure codes?

14         MR. SHEK:  Objection.  Calls for speculation.

15         THE WITNESS:  It is speculative, but based on the

16    fact that there were no reports, of which I reviewed every

17    one that was presented to me, that concern that particular

18    kind of review, I doubt that they had modified their tables

19    in that way, but I don't know.

20         BY MR. SEGAL:

21    Q     The question was, do you know if the tables could

22    have been modified to have two procedure codes and a lookup

23    table that would indicate some unbundling?

24         MR. SHEK:  Objection as to form.  Calls for

25    speculation.

389

9/28/2005  Goldberg, George, Vol II

1          THE WITNESS:  Despite the absence of any reports

2     to suggest that, they could have been, yes.

3          BY MR. SEGAL:

4     Q    And my question is, do you know based on your

5     knowledge of how the system worked, whether it would have

6     been possible for you to create a lookup table that had

7     multiple procedure codes in it?

8          MR. SHEK:  Objection as to form.  Vague and

9     ambiguous.

10         MR. SEGAL:  Let me rephrase the question, to make

11    it a clear question.

12         BY MR. SEGAL:

13    Q    Based on your knowledge of the Advanced MedLogic

14    System, do you know if it would have been possible to modify

15    the table, the program to look up information in a lookup

16    table, where that lookup table contained more than one

17    procedure code on a line?

18    A    It would have been possible to set up a lookup

19    table like that, but only to count the occurrences, not to

20    make any changes.

21    Q    Do you know if the Advanced MedLogic System could

22    have been modified, that instead of counting, it actually

23    output some information that said: modify this claim?

24    A    I do not know.

25         MR. SEGAL:  I have nothing further.

1      I HEREBY CERTIFY that I have read this

2    transcript of my deposition and that this transcript

3    accurately states the testimony given by me, with

4    the changes or corrections, if any, as noted.

5

6

7                    X _____George A. Goldberg_____

8                              10/18/2005

9

10

11   Subscribed and sworn to before me this        day of

12                    , 20        .

13

14

15

16              X

17              Notary Public

18

19

20

21   My commission expires:

22

23

24

25

                          254

              GEORGE A. GOLDBERG

```
 1          I HEREBY CERTIFY that I have read this transcript
 2    of my deposition and that this transcript accurately states
 3    the testimony given by me, with the changes or corrections,
 4    if any, as noted.
 5
 6
 7
 8    x _____George A. Goldberg_____
 9              10/18/2005
10
11    Subscribed and sworn to before me this      day of
12              20  .
13
14
15
16    _____
17
18    Notary Public
19
20    My commission expires:
21
22
23
24
25
```

GEORGE A. GOLDBERG, M.D. - VOLUME II

**BARKLEY**
Court Reporters