# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

MCKESSON INFORMATION SOLUTIONS,
LLC,

             Plaintiff,

    v.

THE TRIZETTO GROUP, INC.,

             Defendant.

C.A. No. 04-1258 (SLR)

---

# DEFENDANT THE TRIZETTO GROUP, INC.'S RESPONSE TO MCKESSON INFORMATION SOLUTIONS, LLC'S FIRST SET OF INTERROGATORIES

MORRIS, NICHOLS, ARSHT & TUNNEL
Jack B. Blumenfeld (#1014)
Rodger D. Smith, II (#3778)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
Attorneys for Defendant
The TriZetto Group, Inc.

OF COUNSEL:

John M. Benassi
Jessica R. Wolff
Paul, Hastings, Janofsky & Walker LLP
3579 Valley Centre Drive
San Diego, CA 92130
(858) 720-2500

Matthew C. Lapple
Paul, Hastings, Janofsky & Walker LLP
695 Town Center Drive., 17th Floor
Costa Mesa, CA 92626
(714) 668-6200

## PRELIMINARY STATEMENT

TriZetto has not completed its discovery in this action and has not completed its preparation for trial. Therefore, TriZetto has drawn only on the pre-trial investigation completed to date in preparing these responses.

The responses here are given without prejudice to TriZetto's right to later produce evidence, discovered after the date of these responses, or to subsequently discover facts or interpretations thereof and/or to add to, modify, or otherwise change the responses herein. The information hereinafter set forth is true and correct to the best of TriZetto's knowledge at this time and is subject to correction for inadvertent errors or omissions, if any, which may be found to exist.

TriZetto also reserves the right to introduce such documents and/or information into evidence at the time of trial. However, TriZetto undertakes no obligation to supplement its responses to any of McKesson's interrogatories in any way that exceeds the obligations, if any, imposed by the Federal Rules of Civil Procedure.

## GENERAL OBJECTIONS

TriZetto makes the following general objections to McKesson's definitions, instructions and interrogatories. Each such general objection is intended to apply to each and every interrogatory in this set of interrogatories, and failure to specifically restate any general objection in response to an interrogatory shall not be taken as a waiver of that general objection.

1.    TriZetto objects generally to interrogatories 1 through 17 to the extent that McKesson seeks the production and/or inspection of documents, things, or other information that are protected from disclosure on the grounds of: (a) attorney-client privilege; (b) the attorney work product doctrine; (c) privacy privileges (both TriZetto's and its employees' and its customers); or (d) pursuant to any other lawful privilege or protection, including, but not limited to the trade secret privilege and or a contractual or legal obligation not to disclose. To the extent that TriZetto produces any privileged documents, or discloses such information, such disclosure would be inadvertent and should not be construed to be a waiver of such privilege. Should TriZetto decide to waive the attorney-client privilege, the attorney work product privilege, or any other privilege that apply to any documents or information, TriZetto shall notify McKesson and produce such information or documents within a reasonable time before the end of the discovery period consistent with the applicable rules and/or the Scheduling Order entered in this action.

2.    TriZetto objects to instruction number two regarding claims of attorney client privilege or attorney work product to the extent that this instruction purports to require TriZetto to make a greater disclosure of information regarding its claim of privilege than is required under the Federal Rules of Civil Procedure. To the extent that TriZetto claims privilege for any information responsive to an interrogatory and withheld on the basis of privilege, TriZetto will prepare and provide a privilege log in accordance with the Federal Rules of Civil Procedure at a future date.

3.    TriZetto objects to the definition of "document" as vague, ambiguous, overbroad, and unduly burdensome.

4.    TriZetto objects to the definition of "relate to," "relating to," and "relates to" as vague, ambiguous, overbroad and unduly burdensome.

5.    TriZetto objects to the definition of "TriZetto" as vague, ambiguous, overbroad and unduly burdensome. Further, to the extent that the definition of "TriZetto" includes within it attorneys or representatives of attorneys, TriZetto objects to this definition as improperly calling for the disclosure of attorney client communications and attorney work product.

6.    TriZetto objects to the definition of "TriZetto's Product" and "TriZetto's Products" as vague and ambiguous.

7.    TriZetto objects to each interrogatory to the extent that it calls for the production of documents containing confidential business information, trade secrets, or commercially sensitive information of TriZetto or the disclosure of any such information.

8.    TriZetto objects to all instructions, definitions and interrogatories to the extent that they seek information not currently in TriZetto's possession, custody or control, or refer to persons, entities, or events not known to TriZetto, on the grounds that such instructions, definitions, or interrogatories seek to require more of TriZetto than any obligation imposed by law, they subject TriZetto to unreasonable and undue burden and expense, and further seek to impose upon TriZetto unreasonable and undue burden and expense, and further seek to impose upon TriZetto an obligation to investigate or discover information or materials from third parties or sources which are equally accessible to McKesson.

9.    TriZetto objects to each and every interrogatory to the extent that each interrogatory requests information that is neither relevant to the subject matter of this action nor reasonably calculated to lead to the discovery of admissible evidence.

10.    TriZetto objects to each and every interrogatory seeking the identification of "all" and or "any" documents, facts, or materials in connection with a particular topic or issue as overbroad and unduly burdensome.

## RESPONSES TO INTERROGATORIES

INTERROGATORY NO. 1:

State in detail TriZetto's proposed construction of each term of each claim of the '164 patent, by means of a claim chart including:  TriZetto's proposed construction of each term of the '164 patent claims; whether TriZetto's construction is based on the ordinary meaning; any intrinsic and extrinsic support for TriZetto's construction; whether TriZetto contends any claim term has any meaning other than its ordinary meaning and any evidence TriZetto contends supports any such construction other than the ordinary meaning; and, for elements or limitations TriZetto contends are written in means-plus-function format pursuant to 35 U.S.C. § 112 ¶ 6, the structure or acts disclosed in the specification that correspond to those elements or limitations.

RESPONSE TO INTERROGATORY NO. 1:

TriZetto objects to this interrogatory as vague, ambiguous and compound.

TriZetto objects to this interrogatory as overbroad, unduly burdensome and not calculated to lead to the discovery of admissible evidence.  The interrogatory purports to

infringement lawsuit, McKesson demanded TriZetto's agreement that TriZetto would make McKesson its "code auditing vendor of choice" and would actively promote McKesson's Claim Check software to TriZetto's customers.  McKesson also demanded that TriZetto cease all development and improvement of any TriZetto software that could perform code auditing, cease distribution of any TriZetto product that could perform code auditing, and thereafter exclusively promote McKesson's Claim Check software to TriZetto's customers. TriZetto rejected these demands.  TriZetto denied the applicability of the '164 patent to its own software, but nevertheless expended significant funds and effort to develop an interface for TriZetto's software products so that McKesson's Claim Check software could operate in conjunction with TriZetto's enterprise software.  TriZetto also provided McKesson access to TriZetto confidential information and customer information in order to engage in certain joint marketing efforts.  Despite this, McKesson has brought suit against TriZetto for alleged infringement of the '164 patent.  McKesson has also engaged in a pattern and practice of seeking to eliminate competing products through other means.  Thus, McKesson has sought to monopolize a segment of the health care software marketplace by asserting a patent that it knew to be invalid and unenforceable.

INTERROGATORY NO. 9:

State in complete detail each and every basis for your assertion that the '164 patent is unenforceable due to inequitable conduct.  Your response should include, without limitation, an identification of any information allegedly withheld from the Patent Office and a detailed description of the basis for TriZetto's contentions that such information: would have been material to the examination of the '164 patent; was not cumulative to information before the '164 patent examiner (including an identification of each limitation of the '164 patent claims that TriZetto contends is disclosed by the allegedly withheld information and

not by the information before the '164 patent examiner); and was withheld with an intent to deceive the Patent Office.

RESPONSE TO INTERROGATORY NO. 9:

TriZetto objects to this interrogatory as vague, ambiguous and compound.

TriZetto objects to this interrogatory on the grounds that it calls for the disclosure of information protected by the attorney client communications privilege and/or the attorney work product doctrine. To the extent that TriZetto claims privilege for any information responsive to this interrogatory and withholds on the basis of privilege, TriZetto will prepare and provide a privilege log in accordance with the Federal Rules of Civil Procedure at a future date.

TriZetto objects to this interrogatory on the grounds that it contains multiple sub-parts and purports to require TriZetto to respond to several different interrogatories through the use of sub-parts.

TriZetto objects on the basis that discovery and investigation are on-going and it continues to gather evidence which may affect its answer to this interrogatory. Thus, TriZetto reserves the right to amend, modify or add to its respons to this interrogatory during the course of this lawsuit.

Subject to these objections, and TriZetto's General Objections, which are incorporated herein, TriZetto responds as follows. TriZetto incorporates by reference its response to Interrogatory 8 above. On information and belief, one or more of the inventors of the '164 patent, and/or officers or directors of McKesson's precedessor-in-interest, HPR, Inc. were aware that the '164 patent was invalid and unenforceable, based upon, *inter alia*, the inventors' failure to disclose their own prior publications, and the acknowledged obviousness of the claimed invention, to the Patent Office. One such invalidating prior publication is "An Access-oriented Negotiated Fee Schedule: The Caterpillar Experience,"

published by Richard H. Egdahl and Robert D. Hertenstein at the 107th Annual Meeting of

The American Surgical Association in Palm Beach, Florida, on or about April 21-23, 1987.

Further, as discussed in the article "Marcia Radosevich and Health Payment Review:

1989(A)," Ms. Radosevich, HPR's president, believed that the alleged invention was "a

simple and ho-hum idea," demonstrating HPR's knowledge that the '164 patent was, at a

minimum, invalid for obviousness. Both referenced documents have already been produced

to McKesson.


INTERROGATORY NO. 10:

State in complete detail each and every basis for your assertion that

McKesson's claims are barred by the doctrine of estoppel.


RESPONSE TO INTERROGATORY NO. 10:

TriZetto objects to this interrogatory as vague, ambiguous and compound.

TriZetto objects to this interrogatory on the grounds that it calls for the

disclosure of information protected by the attorney client communications privilege and/or

the attorney work product doctrine. To the extent that TriZetto claims privilege for any

information responsive to this interrogatory and withholds on the basis of privilege, TriZetto

will prepare and provide a privilege log in accordance with the Federal Rules of Civil

Procedure at a future date.

TriZetto objects on the basis that discovery and investigation are on-going and

it continues to gather evidence which may affect its answer to this interrogatory. Thus,

TriZetto reserves the right to amend, modify or add to its respons to this interrogatory during

the course of this lawsuit.

Subject to these objections, and TriZetto's General Objections, which are

incorporated herein, TriZetto responds as follows. TriZetto incorporates by reference its

TriZetto further objects to this interrogatory as overbroad and unduly burdensome given the fact that McKesson has failed to identify any TriZetto product or system that allegedly infringes any claim of its '164 patent or make any effort to set forth a prima facie case that any TriZetto product or system infringes. Accordingly, TriZetto is under no obligation to disclose such confidential business information. However, TriZetto reserves the right to do so in the future and, to the extent it understands this interrogatory, will produce documents evidencing McKesson's communications to TriZetto.

Dated: January 20, 2005                    By: _____
                                           Matthew C. Lapple
                                           PAUL, HASTINGS, JANOFSKY & WALKER
                                           LLP

                                           Jack B. Blumenfeld
                                           MORRIS, NICHOLS, ARSHT & TUNNEL

                                           Attorneys for Defendant
                                           THE TRIZETTO GROUP, INC.,
                                           a Delaware corporation,

OF COUNSEL:
John M. Benassi
Jessica R. Wolff
Matthew C. Lapple
PAUL, HASTINGS, JANOFSKY & WALKER LLP

# EXHIBIT 2

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

MCKESSON INFORMATION SOLUTIONS  )
LLC,                             )
                                 )
            Plaintiff,           )
                                 )
    v.                           )          C.A. No. 04-1258 (SLR)
                                 )
THE TRIZETTO GROUP, INC.,        )
                                 )
            Defendant.           )

## DEFENDANT'S RULE 26(a)(1) DISCLOSURE STATEMENT

Pursuant to Fed. R. Civ. P. 26(a)(1), Defendant The TriZetto Group, Inc. ("TriZetto"),

hereby submits its initial Disclosure Statement. The following response is given without

prejudice to Defendant's right to produce any evidence, whenever discovered, relating to the

proof of facts subsequently discovered to be material. In addition, Defendant reserves the right

to produce and refer to at trial, or at any other hearing, any evidence, facts, documents, or

information not yet discovered, or the relevance of which has not yet been determined, by

Defendant or its counsel.

I.    **WITNESSES**

TriZetto sets forth below the names, and if known, addresses of witnesses currently

known to TriZetto who are likely to have discoverable information that TriZetto may use to

support its claims or defenses, unless solely for impeachment, and the subjects of such

information. TriZetto reserves the right to supplement this list should additional witnesses, or

potential witnesses, be discovered during the course of discovery and investigation in this case.

TriZetto notes that several of the individuals listed are TriZetto employees. If Plaintiff chooses

to depose any of these individuals, TriZetto requests that all arrangements for such deposition be made through TriZetto's counsel.

## A.   Party Witnesses

1.   Anthony Bellomo, Executive Vice President
The TriZetto Group, Enterprise Software Div.
Union, New Jersey

Mr. Bellomo is likely to have discoverable information regarding the development history of TriZetto's software product and its current embodiment.

2.   Craig Luftig
The TriZetto Group, Enterprise Software Div.
Union, New Jersey

Mr. Luftig is the Director of Facets development at TriZetto.  Mr. Luftig is likely to have discoverable information regarding the development history of TriZetto's software and its current embodiment.

3.   Ms. Karen Lampe
The TriZetto Group, Enterprise Software Div.
Union, New Jersey

Ms. Lampe was involved in development of TriZetto's software and was previously employed as a claims processing specialist at several large insurance companies. She is likely to have discoverable information concerning the design and features of TriZetto's software, its development and the historical development of claim editing practices in the health insurance industry.

4.   Tommy Smith,
Regional Vice-President of Sales, McKesson HBOC
Address Unknown

Mr. Smith is likely to have discoverable information regarding communications between TriZetto and McKesson pertaining to possible cooperative relationships, licensing, acquisitions, and

2

other business negotiations between the parties that relate to the patent-in-suit and defendant's affirmative defenses.

      5.    Jeff Margolis
              CEO, The TriZetto Group, Inc.
              567 San Nicolas Drive, Suite 360
              Newport Beach, California 92660

Mr. Margolis is likely to have discoverable information regarding communications between TriZetto and McKesson pertaining to possible cooperative relationships, licensing, acquisitions, and other business negotiations between the parties that relate to the patent-in-suit and defendant's affirmative defenses.

      6.    John Kao
              Executive VP and Chief Revenue Officer, The TriZetto Group, Inc.
              567 San Nicolas Drive, Suite 360
              Newport Beach, California 92660

Mr. Kao is likely to have discoverable information regarding communications between TriZetto and McKesson pertaining to possible cooperative relationships, licensing, acquisitions, and other business negotiations between the parties that relate to the patent-in-suit and defendant's affirmative defenses.

      7.    Mark Owen
              Executive Vice President, Corporate Strategy and Business
              Development, McKesson HBOC

Mr. Owen is likely to have discoverable information regarding communications between TriZetto and McKesson pertaining to possible cooperative relationships, licensing, acquisitions, and other business negotiations between the parties that relate to the patent-in-suit and defendant's affirmative defenses.

      8.    Pete Vanderheide
              The TriZetto Group, Enterprise Software Div.
              Union, New Jersey

Mr. Vanderhyde is likely to have discoverable information regarding the development history of TriZetto's software and its current embodiment.

> 9.  Duffey Richardson
> Director, Product Development
> The TriZetto Group, Enterprise Software Div.
> Union, New Jersey

Mr. Richardson is likely to have discoverable information regarding communications between TriZetto and McKesson pertaining to possible cooperative relationships, licensing, acquisitions, and other business negotiations between the parties that relate to the patent-in-suit and defendant's affirmative defenses.

> 10.  Linda Bernier
> Vice President, Business Development,
> The TriZetto Group, Inc.

Ms. Bernier is likely to have discoverable information regarding communications between TriZetto and McKesson pertaining to possible cooperative relationships, licensing, acquisitions, and other business negotiations between the parties that relate to the patent-in-suit and defendant's affirmative defenses.

> 11.  James Sullivan
> Senior Vice President and General Counsel,
> The TriZetto Group Inc.,
> 567 San Nicolas Drive, Suite 360
> Newport Beach, California 92660

Mr. Sullivan is Vice President and General Counsel of TriZetto. He is likely to have discoverable information regarding communications between TriZetto and McKesson pertaining to possible cooperative relationships, licensing, acquisitions, and other business negotiations between the parties that relate to the patent-in-suit and defendant's affirmative defenses.

B. **Third Party Witnesses:**

1.  Robert D. Hertenstein, MD
    Medical Director for Group Insurance
    Caterpillar, Inc.
    41 Diamond Pt
    Morton, IL 61550-1186

Dr. Hertenstein is a co-inventor of the patent-in-suit and was also Medical Director for Group Insurance at Caterpillar during the period preceding the filing of the patent-in-suit and thereafter. Dr. Hertenstein is also coauthor of a prior art publication titled "An Access-oriented Negotiated Fee Schedule: The Caterpillar Experience." Dr. Hertenstein is likely to have discoverable information regarding the development of medical claim editing procedures at Caterpillar, the cooperative relationship between Caterpillar and Boston University's Health Policy Institute and the formation of Health Payment Review as a private company to undertake development of a software solution to Caterpillar's claim editing problems and its funding by Caterpillar. Dr. Hertenstein is further expected to have discoverable information regarding the "Caterpillar Experience" paper and its relation to the alleged conception of the patent-in-suit as well as regarding his role in its alleged conception and reduction to practice, and to issues pertaining to its alleged validity.

2.  Donald C. Holloway, MD
    Whereabouts presently unknown.

Dr. Holloway, a co-inventor of the patent-in-suit, is expected to testify regarding his role in the alleged conception and reduction to practice of the claimed invention, and to issues pertaining to the alleged validity of the patent-in-suit.

3.  George A. Goldberg, MD
    Whereabouts presently unknown.

Dr. Goldberg, a co-inventor of the patent-in-suit, is expected to testify regarding his role in the alleged conception and reduction to practice of the claimed invention, and to issues pertaining to the alleged validity of the patent-in-suit.

    4.    Kelli A. Dugan, MD
            Whereabouts presently unknown.

Dr. Dugan, a co-inventor of the patent-in-suit, is expected to testify regarding his role in the alleged conception and reduction to practice of the claimed invention, and to issues pertaining to the alleged validity of the patent-in-suit.

    5.    Richard H Egdahl, MD
            333 Commonwealth Ave
            Boston, MA 02115-1933

Dr. Egdahl is Professor of Surgery at Boston University and participated in the Health Policy Institute's collaboration with Caterpillar to address Caterpillar's medical claim editing issues. Dr. Egdahl is also coauthor of a prior art publication titled "An Access-oriented Negotiated Fee Schedule: The Caterpillar Experience." As a consequence of that activity, Dr. Egdahl was involved with Health Payment Review ("HPR"), Caterpillar and Dr. Hertenstein and is likely to have knowledge regarding their relationships, the alleged validity of the patents-in-suit, and regarding the alleged conception and reduction to practice of the alleged inventions described in the '164 patent.

    6.    Marcia J. Radosevich, PhD
            Whereabouts presently unknown.

Dr. Radosevich, who served as president of HPR from shortly after its inception, is likely to have discoverable information regarding the development of the software product "CodeReview," the business agreements and possible intellectual property transfers between Caterpillar, Inc., Boston University, and HPR during the time prior to the filing date of the

patent-in-suit, her public statements pertaining to enforcement of the patent-in-suit, its alleged conception, reduction to practice, and validity.

7.    William Ryker, MD
        Whereabouts presently unknown.

Dr. Ryker was involved with HPR and was publicly identified by Dr. Radosevich as having responsibility for "deciding how to build" HPR's "CodeReview" product. He likely has discoverable information regarding the alleged conception and reduction to practice of the claimed invention in the patent-in-suit and the alleged validity of the patent-in-suit.

8.    Steve Graham
        122 South Main St., Unit C
        Breckenridge, CO 80424

Mr. Graham has an Masters of Science degree in Artificial Intelligence and served as Director of Software Development for Insurance Software Packages, Inc. (ISP) in Tampa Florida. Mr. Graham is likely to have discoverable information regarding ISP's prior art HealthStar health benefits management system software product.

9.    Jason M. Honeyman
        Gaston & Snow
        One Federal Street
        Boston, MA 02110

Mr. Honeyman was one of the attorneys who prosecuted the '164 patent and as such, likely has discoverable information regarding its alleged validity and enforceability.

10.    A. Jason Mirabito
        Gaston & Snow
        One Federal Street
        Boston, MA 02110

Mr. Mirabito was one of the attorneys who prosecuted the '164 patent and as such, likely has discoverable information regarding its alleged validity and enforceability.

7

11.  Peter F. Corless
     Gaston & Snow
     One Federal Street
     Boston, MA 02110

Mr. Corless was one of the attorneys who prosecuted the '164 patent and as such, likely has discoverable information regarding its alleged validity and enforceability.

TriZetto identifies and hereby incorporates by reference all potential witnesses identified by Plaintiff.

## II.  DESCRIPTION OF DOCUMENTS AND TANGIBLE THINGS

TriZetto is still in the process of gathering and copying documents to be produced pursuant to Fed. R. Civ. P. 26(a)(1)(B) and will produce said copies when they are available. In lieu of that production, TriZetto identifies the following categories of documents:

A.  Prior art publication titled "An Access-oriented Negotiated Fee Schedule: The Caterpillar Experience", Richard H. Egdahl & Robert D. Hertenstein, Ann Surg. 206(3):349-57 (1987)

B.  *A Guide to Expert Systems* by Donald A. Waterman, Addison-Wesley 1985.

C.  *Marcia Radosevich and Health Payment Review* (Document No. 9-394-204 Rev. February 5, 1999) published by the Harvard Business School.

D.  Prosecution history of the patent-in-suit (U.S. Pat. No. 5,253,164) including all cited prior art.

E.  Written communications and records of discussions between officers of the parties-in-suit pertaining to proposals for cooperative agreements, licensing of the patent-in-suit, and related joint business ventures.

8

F.    Current Procedural Terminology (CPT) published by the American Medical Association and all supporting documents thereto published prior to the filing date of the patent-in-suit.

G.    Other prior art publications, including without limitation:

1.    "Modelling database expert systems at the conceptual level" Ramin Yasdi, ACM Annual Computer Science Conference, Proceedings of the 1985 ACM thirteenth annual conference on Computer Science, New Orleans, LA pp. 400-413 (1985)

2.    U.S. Pat. No. 4,667,292 "Medical Reimbursement Computer System", Mohlenbrock, et al.

H.    All publications and patents authored by the inventors of the patents-in-suit.

I.    Pleadings and other publicly available documents in the case of *GMIS, Inc. v. Health Payment Review, Inc.*, Civil Action 94-576, U.S. District Court for the Eastern District of Pennsylvania

J.    "Patents," Teresa Riordan, New York Times, January 24, 1994, p. D2.

TriZetto reserves the right to supplement the above referenced documents and categories and to seek discovery of additional categories of non-privileged documents relating to these and other topics as their relevance becomes known.

## III.    DAMAGES

At present, TriZetto has not made any demand for damages, other than its attorney fees incurred in the defense of this lawsuit.  However, to the extent that TriZetto amends its counterclaims to demand damages, it will supplement this disclosure.

9

## IV.  INSURANCE

At present, TriZetto is unaware of any insurance agreement applicable to this case. However, to the extent that TriZetto identifies such an insurance agreement, it will produce a copy of same.

MORRIS, NICHOLS, ARSHT & TUNNELL

Jack B. Blumenfeld (#1014)
Rodger D. Smith, II (#3778)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
   Attorneys for Defendant
   The TriZetto Group, Inc.

OF COUNSEL:

John M. Benassi
Jessica R. Wolff
Matthew C. Lapple
Paul, Hastings, Janofsky & Walker LLP
3579 Valley Centre Drive
San Diego, CA  92130
(858) 720-2500

December 15, 2004

10

CERTIFICATE OF SERVICE

I, Jack B. Blumenfeld, hereby certify that copies of the foregoing were caused to

be served on December 15, 2004 upon the following in the manner indicated:

BY HAND

Thomas J. Allingham, II
Skadden, Arps, Slate, Meagher & Flom LLP
One Rodney Square
P.O. Box 636
Wilmington, DE  19899

BY FEDERAL EXPRESS

Jeffrey G. Randall
Skadden, Arps, Slate, Meagher & Flom LLP
525 University Avenue
Suite 1100
Palo Alto, CA  94301]

_____
Jack B. Blumenfeld

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

MCKESSON INFORMATION SOLUTIONS LLC,                     )
                                                        )
                                                        )
                        Plaintiff,                      )
                                                        )
          v.                                            )          C.A. No. 04-1258 (SLR)
                                                        )
THE TRIZETTO GROUP, INC.,                               )
                                                        )
                        Defendant.                      )

## NOTICE OF SERVICE

The undersigned hereby certifies that copies of Defendant's Rule 26(a)(1)

Disclosure Statement were caused to be served on December 15, 2004 upon the following in the

manner indicated:

### BY HAND

Thomas J. Allingham, II
Skadden, Arps, Slate, Meagher & Flom LLP
One Rodney Square
P.O. Box 636
Wilmington, DE  19899

### BY FEDERAL EXPRESS

Jeffrey G. Randall
Skadden, Arps, Slate, Meagher & Flom LLP
525 University Avenue
Suite 1100
Palo Alto, CA  94301]

MORRIS, NICHOLS, ARSHT & TUNNELL

_____

Jack B. Blumenfeld (#1014)
Rodger D. Smith, II (#3778)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
    Attorneys for Defendant
    The TriZetto Group, Inc.

OF COUNSEL:

John M. Benassi
Jessica R. Wolff
Matthew C. Lapple
Paul, Hastings, Janofsky & Walker LLP
3579 Valley Centre Drive
San Diego, CA  92130
(858) 720-2500

# EXHIBIT 3

CERTIFIED COPY

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| MCKESSON INFORMATION SOLUTIONS, LLC, | ) ) ) |
| Plaintiff, | ) ) |
| vs. | ) CIVIL ACTION NO. ) 04-1258 SLR |
| THE TRIZETTO GROUP, INC., | ) ) |
| Defendant. | ) ) |

C O N F I D E N T I A L – ATTORNEYS' EYES ONLY

VOLUME II

DEPOSITION OF DONALD HOLLOWAY

September 8, 2005

**BARKLEY**
*Court Reporters*

206453

| Los Angeles | Orange County | San Francisco | San Diego | Inland Empire | Palm Springs | San Fernando Valley | San Jose |
|---|---|---|---|---|---|---|---|
| (310) 207.8000 | (949) 955.0400 | (415) 433.5777 | (858) 455.5444 | (951) 686.0606 | (760) 322.2240 | (818) 702.0202 | (408) 885.0550 |

|    |   |                                                                      |       |
|----|---|----------------------------------------------------------------------|-------|
| 1  |   | BY MR. THOMAS:                                                        | 09:51 |
| 2  | Q | Sir, I don't need you to review this entire                          | 09:51 |
| 3  |   | document.  Will you just take whatever time you                      | 09:51 |
| 4  |   | need to tell me whether you've ever seen it before.                  | 09:51 |
| 5  | A | I have not.                                                           | 09:51 |
| 6  | Q | Okay.  This is a Harvard case study on HPR and                       | 09:51 |
| 7  |   | the -- the early stages of HPR.  I just have only a                  | 09:52 |
| 8  |   | couple of questions about it.  If you would turn                     | 09:52 |
| 9  |   | over, please, to page TRZ 000808.  At the bottom of                  | 09:52 |
| 10 |   | the page, there's a quote there from Ms. Radosevich                  | 09:52 |
| 11 |   | which begins, "Rule 101 in software development is                   | 09:52 |
| 12 |   | you never sell a prototype.  But we are running out                  | 09:52 |
| 13 |   | of money because William Ryker, who's brilliant,                     | 09:52 |
| 14 |   | decided he wanted to be vice-president for software                  | 09:52 |
| 15 |   | development.  He went to the BU bookstore, bought a                  | 09:52 |
| 16 |   | book on expert systems and decided how to build the                  | 09:52 |
| 17 |   | system."                                                             | 09:52 |
| 18 |   | First of all, who's William Ryker?                                   | 09:52 |
| 19 | A | I have no idea.                                                       | 09:52 |
| 20 | Q | You've never heard of William Ryker?                                 | 09:52 |
| 21 | A | No.                                                                   | 09:53 |
| 22 | Q | Do you -- are you aware of anybody who went to the                   | 09:53 |
| 23 |   | BU bookstore and bought a system on expert systems                   | 09:53 |
| 24 |   | as part of the development of CodeReview?                            | 09:53 |
| 25 | A | I don't know of anybody who went and bought a                        | 09:53 |

209

BARKLEY
Court Reporters

| | | | |
|---|---|---|---|
| 1 | | system at the book -- at a bookstore. | 09:53 |
| 2 | Q | Okay.  If you turn to the last page of the | 09:53 |
| 3 | | document, please.  The very last paragraph there | 09:53 |
| 4 | | begins, "It's actually a very simple program.  It | 09:53 |
| 5 | | only has" -- | 09:53 |
| 6 | A | Wait.  I'm -- I'm not on the right page. | 09:53 |
| 7 | Q | Oh, sorry.  The very last page of the document. | 09:53 |
| 8 | A | Oh, okay. | 09:53 |
| 9 | Q | Page TRZ 000817. | 09:53 |
| 10 | A | Uh-huh. | 09:53 |
| 11 | Q | Last paragraph, "It actually is a very simple | 09:53 |
| 12 | | program.  It only has about 6,000 lines of code." | 09:53 |
| 13 | | Is that consistent with your recollection of | 09:54 |
| 14 | | CodeReview? | 09:54 |
| 15 | A | I had left CodeReview by this time.  I had left HPR | 09:54 |
| 16 | | by this time. | 09:54 |
| 17 | Q | Okay.  When -- when you left HRP, do you recall how | 09:54 |
| 18 | | many lines of code existed in CodeReview? | 09:54 |
| 19 | A | No. | 09:54 |
| 20 | Q | Do you agree that it's a fairly -- it's a very | 09:54 |
| 21 | | simple program, the software itself? | 09:54 |
| 22 | A | No. | 09:54 |
| 23 | Q | Okay.  This quote goes on to say, "Quite a number | 09:54 |
| 24 | | of times, big companies say, 'I have me an Army of | 09:54 |
| 25 | | COBOL programmers, I don't need you.'  I say to | 09:54 |

210

BARKLEY
Court Reporters

| | | | |
|---|---|---|---|
| 1 | | on his rules? | 12:38 |
| 2 | | MR. SHEK: Objection as to form. | 12:38 |
| 3 | | BY MR. THOMAS: | 12:38 |
| 4 | Q | Right? | 12:38 |
| 5 | A | The novelty there is to have a computer do it. | 12:38 |
| 6 | Q | Right. So looking at Claim 10 as a whole, what it | 12:38 |
| 7 | | describes is the idea generally of using a computer | 12:38 |
| 8 | | and a database to do what Dr. Hertenstein had been | 12:38 |
| 9 | | doing manually? | 12:38 |
| 10 | | MR. SHEK: Objection as to form. | 12:38 |
| 11 | | Mischaracterizes the prior testimony. Calls for a | 12:38 |
| 12 | | legal conclusion. | 12:39 |
| 13 | | THE DEPONENT: I -- I see you're pushing | 12:39 |
| 14 | | on this issue, and I -- I'm thinking I'm about to | 12:39 |
| 15 | | change my mind, because while you say | 12:39 |
| 16 | | Dr. Hertenstein did this manually, he did not use | 12:39 |
| 17 | | these rules manually. He didn't have a list of | 12:39 |
| 18 | | these rules anywhere. He didn't -- he couldn't | 12:39 |
| 19 | | describe these rules if you had asked him. | 12:39 |
| 20 | | What he did was look at a claim and come | 12:39 |
| 21 | | up with an answer. He had no idea what process he | 12:39 |
| 22 | | was using to go from what was on the claim to his | 12:40 |
| 23 | | answer. | 12:40 |
| 24 | | So I would argue or I'm -- I'm responding | 12:40 |
| 25 | | now saying, no, these are not -- this is not what | 12:40 |

278

BARKLEY
Court Reporters

1    Dr. Hertenstein did.  The answer corresponded to    12:40

2    the answer he came up with, but this was not the    12:40

3    process he used to get there.    12:40

4    BY MR. THOMAS:    12:40

5    Q    Okay.  Looking at -- again at claim 10 where it    12:40

6    says "Determining whether one of the medical    12:40

7    service codes in the at least one claim is included    12:40

8    in any other medical service code," that's -- goes    12:40

9    into determining unbundling, right?    12:40

10    MR. SHEK:  Objection as to form.    12:40

11    Ambiguous.    12:40

12    THE DEPONENT:  Actually, no.    12:40

13    BY MR. THOMAS:    12:40

14    Q    Okay.  Let me ask a better question.  Isn't it true    12:40

15    that one of the things that Dr. Hertenstein did as    12:41

16    part of his manual process was to determine where    12:41

17    there -- where there were more than one claim or --    12:41

18    excuse me -- where there were one more -- start    12:41

19    over.    12:41

20    As part of his manual process, where    12:41

21    there was more than one code in a claim,    12:41

22    Dr. Hertenstein would look to determine whether one    12:41

23    or more of the codes was included in another code?    12:41

24    MR. SHEK:  Objection as to form.  Vague    12:41

25    and ambiguous.    12:41

BARKLEY
Court Reporters

|    |   |   |   |
|----|---|---|---|
| 1 |   | It's -- in fact -- well -- it's been written in | 02:01 |
| 2 |   | multiple languages. | 02:02 |
| 3 |   | BY MR. THOMAS: | 02:02 |
| 4 | Q | We saw earlier some articles and presentations | 02:02 |
| 5 |   | about Dr. Hertenstein's manual system, for example, | 02:02 |
| 6 |   | the article written by Dr. Egdahl and | 02:02 |
| 7 |   | Dr. Hertenstein; do you recall those? | 02:02 |
| 8 | A | Yes. | 02:02 |
| 9 | Q | Do you know whether any of those articles or | 02:02 |
| 10 |   | presentations about his manual system were provided | 02:02 |
| 11 |   | to the Patent Office? | 02:02 |
| 12 |   | MR. SHEK: This is a yes or no answer. | 02:02 |
| 13 |   | THE DEPONENT: No, I don't know. | 02:02 |
| 14 |   | BY MR. THOMAS: | 02:02 |
| 15 | Q | Okay. Were there any -- again, this is a yes or no | 02:02 |
| 16 |   | question. Were there any discussions at HPR or HPI | 02:02 |
| 17 |   | about whether those articles should be given to the | 02:02 |
| 18 |   | Patent Office? | 02:02 |
| 19 | A | Not that I remember. | 02:02 |
| 20 |   | MR. THOMAS: Mark as Exhibit 108, | 02:03 |
| 21 |   | transcript from Dr. Holloway's deposition in GMIS, | 02:03 |
| 22 |   | Inc. versus Health Payment Review, Inc., bears | 02:03 |
| 23 |   | control numbers MCK 03619 through 036856. | 02:03 |
| 24 |   | (Exhibit No. 108 marked for | 02:04 |
| 25 |   | identification.) | 02:04 |

293

BARKLEY
Court Reporters

# EXHIBIT 4

# An Access-oriented Negotiated Fee Schedule

*The Caterpillar Experience*

RICHARD H. EGDAHL, M.D. and ROBERT D. HERTENSTEIN, M.D.

From the Department of Surgery and Health Policy Institute,
Boston University Medical Center, Boston, Massachusetts,
and Caterpillar Corporation, Peoria, Illinois

This paper describes the system used by Caterpillar Corporation (CAT) in Peoria, Illinois, to reimburse surgeons. The CAT system assures access for Caterpillar employees and their families to a selection of qualified surgeons, while achieving cost savings through improvements in processing of surgical claims and negotiation of selected fees. CPT-4 codes are recoded for greater accuracy, when indicated, surgical services that have been incorrectly unbundled are rebundled, and the appropriateness of surgical assistant charges is reviewed. A "degree of difficulty" relative value scale (DODRVS) of surgical services is periodically revised as technology changes. The DODRVS multiplied by a regional factor, determined by local market research, establishes the fee that CAT will pay the surgeon. Balance billing is permitted if the patient (1) is informed in advance by the surgeon that the fee will be higher than CAT will pay, and (2) knows that the service can be obtained from other local surgeons who will accept the CAT fee. The goal of the CAT method of surgeon reimbursement is to gain physician support for an access-oriented, market-driven negotiated fee schedule. Compared with a resource-based relative value scale (RBRVS) methodology, the CAT system is not formula-driven and depends on physician acceptance.

FOR MORE THAN 25 years, physicians have benefited from a generous fee-for-service system of payment. However, between 1965 and 1985, national expenditures for physicians' services have increased almost tenfold, from $8.5 billion in 1965 to $82.8 billion in 1985.[1] As a result, several possible physician payment reforms are being considered. Prospective payment by diagnostic-related groups (DRGs), put in place to control Medicare hospital expenditures, is a fact of life for hospitals. Medicare and Medicaid are now pushing for changes in the way they pay physicians. Managed care programs are negotiating discounts from all types of health care providers.

Presented at the 107th Annual Meeting of The American Surgical Association, Palm Beach, Florida, April 21-23, 1987.
Reprint requests: Richard H. Egdahl, M.D., Boston University Medical Center, 720 Harrison Avenue (1107), Boston, MA 02118.
Submitted for publication: April 24, 1987.

Reform activity can be identified on many fronts: (1) Congress has frozen Medicare fees, effective June 1984 through January 1987. Congress' intent is now to shift the burden of effectively constraining the growth of Medicare Part B costs to providers rather than Medicare beneficiaries. (2) The Physician Payment Review Commission, created by Congress, has issued a recent major report, outlining ways that physicians could be reimbursed under Medicare in the future.[2] (3) In fall 1985, the Health Care Financing Administration (HCFA) contracted with Harvard University to conduct a 30-month study of resource-based relative value scales (RBRVS) for physician services.[3] This system is being developed under the direction of William Hsiao, Ph.D., Harvard School of Public Health. The American Medical Association is a subcontractor on the study for HCFA. The study is scheduled to be completed in July 1988. (4) The Massachusetts Rate Setting Commission is revising its Medicaid fee schedule, based on the RBRVS, for planned application in mid-1987. (5) The Massachusetts Insurance Commissioner asked Blue Shield to consider reforms in physician payment, with an emphasis on developing an RBRVS, as a condition of his approving a Blue Shield rate increase in 1987. (6) Congressional hearings on physician fee schedules continue, and congressionally sponsored studies of physician fees have recently been published.[4,5]

Within the administration in Washington, proponents of physician fee reform are calling for an expanded use of capitation in the long term, or some form of physician DRGs.[6] But these changes are not imminent. During the next several years, fee payment modifications will be based on fee-for-service recalculations. If the revised physician fee schedules achieve acceptable levels

Supplied by the British Library - "The world's knowledge" www.bl.uk

LK000020

00000007.1

EGDAHL AND HERTENSTEIN   Ann. Surg. • September 1987

TABLE 1. *Medicare Prevailing Fees ($, 1984)\**

| State | CABG | Appendectomy | Cataract |
|-------|------|--------------|----------|
| New York | 6000 | 1134 | 1547 |
| Michigan | 3100 | 399 | 825 |
| Rhode Island | 2587 | 516 | 928 |

\* The charges indicated are for specialists and for the large urban areas within the states listed.

From the U.S. Department of Health and Human Services, Health Care Financing Administration. Medicare Directory of Prevailing Charges 1984. Washington DC: U.S. Government Printing Office, 1984.

of patient access and physician support, they will be part of the blueprint for future health care delivery in both private and public arenas.

### Background

Medicare's "customary, prevailing, and reasonable" (CPR) payment system is, by general consensus, unsatisfactory in today's competitive market in health services. There are many problems associated with CPR. It tends to be inflationary and slow to respond to alternatives in technology and changes in both availability of physicians and need for services. Some charges appear excessive to most observers, even taking into account geographic cost-of-living variations and other variables. For example, under Medicare, the cost of a triple vessel CABG (coronary artery bypass graft) in New York in 1984 was $5500. The cost of this same procedure in Michigan was $3100 and $2587 in Rhode Island (Table 1).

Similar variations are found in fees from the private sector. For example, unexplained fee variations exist in managed health care models such as independent practice associations (IPAs). Hip replacement at three different IPAs in the eastern part of the country ranged from $2808 to $4274 (see Table 2).

Noting these wide discrepancies, the federal government and a number of large private purchasers of health services have turned their attention to the ways physicians are compensated for the care they provide. Fundamental changes in the methodology of physician reimbursement are being discussed. Serious consideration

TABLE 2. *Fee Variations in 3 IPAs, 1986 Fees ($)\**

| Operation | Plan #1 | Plan #2 | Plan #3 |
|-----------|---------|---------|---------|
| Appendectomy | 645 | 950 | 1111 |
| Cholecystectomy | 1055 | 1465 | 1710 |
| Cataract removal | 1280 | 1650 | 1980 |
| Hip replacement | 2808 | 3666 | 4274 |
| CABG (3-vessel) | 4690 | 6123 | 7139 |

\* Plan names withheld because fees were given in confidence to Health Policy Institute by IPA executives.

is being given to systems that would pay physicians by capitation or by including the physician payment with the hospital DRG payment. However, both options represent a radical departure from the current system and are viewed as politically unrealistic, at least in the short term.

Several interim remedies are being devised, however. One approach adjusts a few fees that are grossly out of line. Invoking "inherent reasonableness" authority, HCFA uses this approach to reduce payments for "overpriced" procedures. Although corrections have been made for a few services such as cataract removal and installation of pacemakers, most physician payments currently are based on historic trends.

Another approach used by HCFA to control "runaway" costs involves a recalculation of the Medicare Economic Index (MEI), an inflation index for increases in physician office expenses that result from inflation.[7] HCFA estimates that this downward modification in the MEI will save Medicare an increasing amount of money.

Another approach, more far-reaching in concept than the interim measures described previously, but less radical than capitation and physician DRGs, was tried by the Boston University Health Policy Institute (BUHPI) in the fall of 1984.[8] BUHPI compiled a group of 12 Massachusetts surgeons in a pilot effort to develop a complexity-severity index (C/S index) of surgical services, based on professional judgment, that could provide the basis for a relative value scale.

Building this kind of index, although intuitively appealing, proved time consuming and cumbersome. It also raised questions of antitrust. The Federal Trade Commission has barred professional groups from developing relative values guides on the grounds that such guides ". . . established by competitors in a commercial context, probably would constitute illegal price fixing because the dissemination of information and agreement on establishment of price structures usually lead to price uniformity and stabilization."[9]

In this pilot study, BUHPI identified a private corporation that had captured the essence of the C/S index and developed a practical way to convert it to a physician payment management system. The approach of Caterpillar Corporation (CAT), based in Peoria, Illinois, has resulted in the evolution of "degree of difficulty" relative value scales (DODRVS) and regional multipliers that appear to accomplish a pragmatic fee schedule reform. Access to physicians is achieved for CAT employees and their families, and local physician acceptance of the overall CAT process is maximized. Since CAT is not a dominant payer in any geographic area and is not a provider, the potential for antitrust challenges is minimal.

Supplied by the British Library - "The world's knowledge" www.bl.uk

LK000021

Table 3 shows the close correlation between the C/S index numbers, arrived at through the BUHPI study, and CAT's DODRVS, reached by consultation with regional surgeons. This striking correlation between the two processes suggested to the BUHPI that CAT was on target in its surgical fee activities, and led to the collaborative project described in this paper.

### The Caterpillar Method

CAT is an international manufacturer of earthmoving machinery and equipment, employing an estimated 54,000 employees in 15 domestic and 13 foreign plants. CAT health benefits cover employees and dependents, as well as 21,000 retirees. The benefit package includes hospitalization, physicians' services, laboratory, x-ray, prescription drugs, and dental and eye care. The CAT health plan is self-insured and self-administered.

In 1983, CAT implemented for its U.S. employees a negotiated fee schedule approach to physician fees for surgical and invasive procedures. The CAT physician payment system emphasizes (1) employee access to a wide range of qualified surgeons, (2) fees negotiated with local surgeons that are considered reasonable and consistent with local market forces, and (3) billing practices review applied consistently to all incoming claims. Particular features of this approach are described below.

*Establish a fair fee cap.* With input from respected community physicians in locations with a large number of CAT employees, CAT establishes a fair fee cap for surgical services. The CAT method involves convening a limited number of meetings with selected representatives of the surgical community and the CAT medical director for group insurance (CAT M.D.). Where it makes the most efficient use of time, the CAT M.D. meets with individual specialty groups. Operating under a "physician friendly" philosophy and the assumption that physician education and involvement help achieve a mutually agreeable outcome, the CAT M.D. describes the situation from CAT's point of view: (1) there are wide variations in fees and billing practices; (2) there is often insufficient documentation to properly process claims; (3) a way is needed to compare the difficulty of various services so their "relative value" can be considered for payment decisions; and (4) a reassessment of the need for surgical assistants is needed.

Actual claims received are used as examples (with patient and provider identities protected). The CAT M.D. then solicits provider input on how problems can be corrected. General consensus is gained on reasonable billing practices and relative degree of difficulty of various procedures, based on recommendations by the CAT M.D. and discussions with physician groups.

*Use of geographic multipliers.* CAT's DODRVS is combined with a regional dollar multiplier to calculate

**TABLE 3.** *BUHPI C/S Index Compared with CAT DODRVS*

|  | C/S Index | DODRVS |
|---|---|---|
| Thoracentesis | 3 | 3.4 |
| Appendectomy | 24 | 26.4 |
| Cholecystectomy (with common bile duct exploration) | 48 | 47.7 |
| Total thyroid lobectomy | 40 | 41.8 |
| Modified radical mastectomy | 45 | 47.7 |
| Colectomy, partial | 55 | 54.5 |
| Pancreatoduodenectomy | 100 | 100.0 |

the actual dollar payment limit. The regional multiplier is based on market research by the CAT M.D. Where there are unusual market conditions for certain specialties, CAT may adjust the multiplier up or down for some services rather than changing the entire region's multiplier. This system allows CAT to take into account the local health care market, legitimate variations in provider billing and medical practices, and variations in the cost of living.

*Continual audit and recoding of physician bills.* CAT claims processors subject each incoming physician bill to a coding analysis of CPT-4 codes as a first step, and recode claims where irregularities are found. Obvious simple coding errors are corrected first. Individuals with clinical knowledge and judgment then compare the provider's description of services with submitted codes; operative reports are requested for most surgical claims and follow-up calls to provider offices for clarifying information are common. Once the claim reviewer is satisfied that enough information is available to code the bill consistent with CAT procedures, recoding is finalized, and the correct codes are compared with established regional fee schedules. Reviewers with clinical experience consult the CAT M.D. as needed, assuring that a high level of understanding of the surgical experience is applied in the review process.

Tables 4–7 illustrate some features of the CAT process. They are representative of some claims received by CAT.

In Table 4, the appropriate payment is $1000 for code 38100. The patient was hospitalized for an elective splenectomy. The CAT reviewer would disallow codes and

**TABLE 4.** *Bundling of "Unbundled" Bill*

| Procedure | CPT Code | Charge |
|---|---|---|
| Splenectomy | 38100 | $1000 |
| Laparotomy | 49000 | 600 |
| Appendectomy | 44950 | 600 |
| Preoperative check (in hospital) | 90215 | 125 |
| Suture removal | 90270 | 100 |
| Total charge |  | $2425 |
| Amount paid |  | $1000 |

Supplied by the British Library - "The world's knowledge" www.bl.uk

LK000022

352                              EGDAHL AND HERTENSTEIN                    Ann. Surg. • September 1993

TABLE 5. *Excessive Fee Reduced, Assistant Surgeon Claim Denied as Not Medically Necessary*

| Procedure | CPT Code | Charge |
|---|---|---|
| Excision biopsy, breast (R) | 19120 | $1500 |
| Excision biopsy, breast (L) | 19120-50 | 1500 |
| Charge | | $3000 |
| Assistant surgeon fee (R) | 19120-80 | $1200 |
| Assistant surgeon fee (L) | 19120-50-80 | 1200 |
| Charge | | $2400 |
| Total charge | | $5400 |
| Amount paid | | $ 750 |

charges for all except the splenectomy: a charge for laparotomy and incidental appendectomy is warranted only if done as a separate procedure and preoperative check and postoperative care are conventionally part of the global surgery fee. A charge of $1000 for the splenectomy is in line with the regional fee schedule and is the amount ultimately approved.

In Table 5, the appropriate payment is $750 to the primary surgeon for code 19121 (excision biopsy, breast, bilateral). Under most conditions, one surgeon can perform a breast biopsy. The operative report indicates no unusual circumstances. The assistant surgeon is not reimbursed, and the patient is informed of CAT's review decision.

In Table 6, the appropriate regional payment is $60 for code 17100. The procedure was actually a simple wart removal. The operative report describes a 0.25-inch plantar wart on one foot. Excision combined with use of the laser constitutes excessive treatment for this common condition. Wart removal is most accurately coded as 17100 ("destruction by any method of benign skin lesion").

CAT knows that four local experienced, board-certified cardiac surgeons will carry out a three-vessel coronary artery bypass for $5000, assuring that access can be achieved for that fee (Table 7).

Tables 4–7 demonstrate that complete and knowledgeable recoding of claims requires familiarity with both the content of various surgical procedures and the details of coding surgical services.

*Physician negotiations.* Individual physician negotiations are carried out for selected claims. After establish-

TABLE 6. *Recoding of Unnecessary Procedure, Excessive Fee Reduced*

| Provider Description | CPT Code | Charge |
|---|---|---|
| Excision, benign lesion, foot and use of $CO_2$ laser | 11421 | $450 |
| Total charge | | $450 |
| Amount paid | | $ 60 |

TABLE 7. *Fee Adjustment*

| Procedure | CPT Code | Charge |
|---|---|---|
| Coronary artery bypass graft, 3 vessel | 33512 | $8000 |
| Total charge | | $8000 |
| Amount paid | | $5000 |

ing an overall fee schedule with local physician representatives, CAT continues its negotiations on a selected claim-by-claim basis. If the amount charged for corrected codes significantly exceeds the regional fee cap, CAT contacts the billing physician, giving information on the corrected codes and the amount allowed. The CAT M.D. makes many of these calls. Usually the provider is willing to accept CAT's recoding and reduced fee. Discussions of claims with physicians have revealed that providers enter practice largely ignorant of common billing practices. Most admit they do not know what various procedures are worth: At best they occasionally may ask other providers what they charge. Those who use an RVS have access only to a wide variety of unstandardized sources. Some are advised to start charging high rates to get a high fee profile. Often, physician offices have an office clerk coding claims who is not trained in medical terms or coding, whereas other physicians rely on central billing services that promise to "maximize reimbursement," often with "creative" upcoding or unbundling of services.

*Employee communication.* CAT has a program of employee communication that defines the employees' responsibilities and options when payment is less than the fee charged by a surgeon. A letter of explanation is automatically generated to the employee when there has been a payment reduction. It states that if the employee has discussed the fee with the physician before the procedure, the employee is responsible for the amount in excess of CAT's fee cap. Also, employees are told when their provider has agreed to accept CAT's reimbursement as payment in full.

*Patient held harmless.* If a physician bills an employee for the amount that exceeds the fee cap, the employee is instructed to contact CAT, and a CAT provider relations specialist discusses the situation with the physician. Patients are not required to pay the physicians' balance bill above the CAT payment (that is, they are "held harmless") if the physicians have not informed the patients of the higher-than-cap fee before the procedure. CAT intervenes on the patient's behalf when the physician refuses to lower his/her fee to the established cap. On average, of about 20,000 physician claims received per year, CAT has less than a dozen instances in which providers insist on trying to obtain reimbursement above the CAT fee through claims court. In over 95% of

Supplied by the British Library - "The world's knowledge" www.bl.uk

LK000023

these cases, the judge has agreed that CAT's payment is reasonable for the services, based on local surgeon input.

### Study of Savings with CAT Method

CAT's internal calculations indicate that it achieves significant savings with its surgeon bill review process by reducing fees that otherwise would have been paid in full. The BUHPI is conducting an external evaluation of the CAT process for managing surgeon fees. Standard surgical fee processing by large insurance companies and third-party administrators is being compared with the potential cost savings of the CAT process. The BUHPI has obtained samples of consecutively filed claims for surgical services that have been processed for several large self-insured corporations that administer their claims through major insurance carriers. The benefit plans establish payment caps at a percentile of usual and customary fees, and the carriers' auditing of codes was representative of current industry standards. CAT's recoding and bundling procedures, as well as payment caps, were applied to these claims, with the goal of finding if the savings from payment reduction significantly exceeded those achieved by these carriers.

Hard copies of the providers' originally submitted claims were processed by CAT staff without information about changes from charges that had been made by the carriers before these claims had been paid. Confounding variables of payment due to copayments, deductibles, or coordination of benefits were eliminated.

The total charges included in the sample claims were over $140,000. The carriers adjusted 13 to 15% of their claims and paid 4.3 to 35% less than total charges. CAT adjusted 35 to 40% of these same claims and reduced payment from charges by 22 to 43%. Therefore, CAT would have achieved an additional savings of 8 to 17.7% if CAT's procedures and the lower of CAT or the administrator's fee schedule were used. One third of the additional savings came from coding changes in the original bills and two thirds by the application of the CAT negotiated fee schedule. In some instances providers submitted an incorrect code that significantly *underualued* the procedure that was done. If the provider's code had been used, the payment would have been cut to an unreasonable level. In these instances, the CAT reviewer "up-coded" to the correct code and allowed the more appropriate fee; the savings potential includes these corrections in favor of billing surgeons.

### Discussion

The CAT system for managing surgeons' fees has been developed by a progressive benefit department in a large American corporation. The system depends on detailed knowledge of surgical practice so that recoding and bundling of procedures categorized by CPT-4 codes

can be accurately carried out. It requires contact with local surgeons in regions with a high concentration of employees so that market forces can be taken into account in determining an appropriate level of local fees.

An access-oriented negotiated fee schedule can have many permutations. In areas with a surgeon surplus, a corporation may be able to negotiate lower fees with surgeons than those previously paid. In areas with few surgeons, fees lower than customary are more likely to create patient access problems should the surgeons resist reductions negotiated elsewhere. Still, modified versions of CAT's approach would be similar to processes already used by the government in establishing "inherent reasonableness" for cataract extraction and pacemaker installation fees.

The key concern about any new surgeon payment approach should be the ability to attract a good representation of local surgeons who will accept it. Ensuring employees' access to qualified surgeons is the paramount goal. All other considerations, even inherent reasonableness of lower fees because of technological advantages or cost containment, should remain secondary.

Based on the BUHPI's analysis, the CAT process is a workable and market-tested solution to the need to balance access and cost management. It is suitable for large corporations such as CAT with both self-funded and self-administered health benefits. It can also be used (after eligibility is certified and benefits are coordinated) by claims processing systems. Accurate implementation of the CAT process requires (1) hard copies of the CPT-4 codes submitted by the surgeon and availability of the operative notes, to reconcile discrepancies between CPT-4 codes and the negotiated fee service, and (2) access-oriented negotiated fee schedules obtained by applying a geographic multiplier to an RVS, such as CAT's DODRVS.

State and federal governments can modify the CAT process for Medicaid and Medicare, with the same goals that motivate the private sector: access and cost management. Regional fee schedules could be established with national DODRVS values and regional multipliers based on market forces. Balance billing is optional, using the CAT model. However, its effectiveness as a cost management approach is strengthened with its "hold harmless" provision. In the CAT system, if a patient knows a surgeon is charging a fee higher than the negotiated fee, the patient is responsible for the balance. If no discussion has occurred, the patient is held harmless for bills in excess of the fee cap.

If adequate access is to be preserved without the need for balance billing, payments must be established so that a majority of qualified surgeons in each region will accept the negotiated fee as payment in full. If this acceptance is not achieved, then access problems will arise, as

Supplied by the British Library - "The world's knowledge" www.bl.uk

LK000024

354          EGDAHL AND BERTENSTEIN        Am. Surg. • September 1997

TABLE 8. *Comparison of "Resource-based Relative Value Scale" (RBRVS) and "Access-oriented Negotiated Fee Schedule" (AONFS) for Physician Reimbursement\**

| | RBRVS (Hsiao) | AONFS (CAT) |
|---|---|---|
| Goal | A "comparable worth" reform for physicians, a group with high incomes relative to most other occupations. | Patient access to local physicians at a negotiated price. |
| Methodology | Complex formula determines RBRVS; time is a major determinant. | Revision of fees is based on negotiations, M.D. fee acceptance patterns (market forces, not payment of charges). |
| Application | Two basic problems: (1) RBRVS is not a fee, and knowledge is needed of how to use its multiplier effectively, (2) when applied in Massachusetts, shown to need extensive modification to get support of, and access to, local surgeons. | In routine use. CAT knows that well-qualified local physicians will accept the AONFS. |

\* AONF = DODRVS × regional multiplier.

occurred in 1986 for the Massachusetts Medicaid program. That program was forced to increase significantly its fees for normal deliveries. As stated in the *Boston Globe*, ". . . responding to a crisis in access to obstetrical care in many areas of the state, the panel hiked the all-inclusive fee for pregnancy care and childbirth from $508 to as much as $1,200."[10] This is a good example of the futility of a fee schedule that does not build on knowledge of physicians' availability at different fee levels in each region. The Massachusetts Medicaid program had a previous experience with attempting to introduce a fee schedule based on a "resource-based" formula.

In July 1983, the *Boston Globe* described a new strategy that was suggested by the Massachusetts Rate Setting Commission for the Medicaid program and workers compensation.[11] Based on the 1979 study by Drs. Hsiao and Stason from the Harvard School of Public Health,[12] the Rate Setting Commission proposed that the fees for 21 common surgical procedures should be cut by amounts ranging from 4% to 59%. At the same time, physicians seeing patients in their office were to get 71% more for initial visits. These proposed changes were the estimated relative resource requirements of different physician services, with a strong focus on the time involved. The formulas were established in the Hsiao/Stason analysis of physician practices.

These changes were adopted in September 1983, but on August 23, 1984, the Rate Setting Commission raised the fees that the state Medicaid program paid to doctors for surgical procedures. As stated in the *Boston Globe*, "no prior hearing was held or public notice given before the August reversal because the Commission subsequently said physician resignations from Medicaid had reached the level of a public health emergency. Most striking of these defections were obstetricians/gynecologists."[13] This experience suggests that fees ultimately paid by Medicaid were primarily driven by the need to get access to Medicaid patients to physicians, and not by a formula for "resource costs."

The American Society of Internal Medicine and the American Medical Association have supported an elaborate study of the Hsiao methodology commissioned by HCFA, and there is much speculation about the possible use of an RBRVS for the determination of Medicare fees when it becomes available in the summer of 1988. The investigators of the BUHPI originally believed that the consensus process to determine a C/S index could be developed as the basis for fee reform that would be acceptable and perceived as fair by physicians. However, the consensus approach is laborious, and much time would be necessary to interrelate all specialties and resolve potential conflicts. It was then that the BUHPI began to study the CAT system, and found that it involved a process with appropriate goals, methodology, and application for cost management and market acceptance.

Table 8 outlines the basic differences between a "resource-based" RVS and an access-oriented negotiated fee schedule, as used by CAT. A basic goal of the RBRVS is to "reform" physician reimbursement in the direction of more equity between procedure-oriented specialists and generalists. However, as the evidence suggests, this goal will be in conflict with realities of the marketplace and will result in paying fees that are either unnecessarily high or too low to get ready access for insurees to local physicians.

The methodology of the RBRVS is based on a formula unrelated to local market forces, whereas the access-oriented negotiated fee schedule used by CAT builds on negotiations and local fee acceptance patterns to gain access. The CAT system's ability to adjust for regional differences in the market is the essential difference in the two approaches. The CAT system is in routine use and will continue to be modified by changes in local physician manpower and other factors such as increases in malpractice premiums. We suggest that an access-oriented negotiated fee schedule such as the CAT system deserves consideration as the preferred method of fee reform.

Supplied by the British Library - "The world's knowledge" www.bl.uk

LK000025

## References

1. Waldo DR, Levit KR, Lazenby H. National health expenditures, 1985; Health Care Financing Review 1986; 8:14.
2. Physician Payment Review Commission. Medicare Physician Payment: an Agenda for Reform. Annual Report to Congress. Washington DC: U.S. Government Printing Office, March 1, 1987.
3. Knox RA. Study on Equalizing Medicare Bills Begins. The Boston Globe, September 13, 1985; 4.
4. Congress of the United States. Physician Reimbursement Under Medicare: Options for Change. Washington DC: Congressional Budget Office, April 1986.
5. Congress of the United States. Payment for Physician Services: Strategies for Medicare. Washington DC: Office of Technology Assessment, February 1986.
6. Jencks SF, Dobson A. Strategies for reforming medicare's physician payments: physician diagnosis-related groups and other approaches. N Engl J Med 1985; 317:1492–1499.
7. Dutton BL, McMenamin P. The medicare economic index: its background and beginnings. Health Care Financing Review September 1981; 3:137–139.
8. Egdahl RH, Manuel B. A consensus process to determine the relative complexity-severity of frequently performed surgical services. Surg Gynecol Obstet 1985; 160:403–406.
9. Pollard MR. Anti-trust and Physician Payment. Reforming Physician Payment 1984. Institute of Medicine: Report of a Conference. Washington DC: National Academy Press, 1984; 73–86.
10. Knox RA. Proposal Would Raise Medicaid Fees. The Boston Globe, April 17, 1986; 27.
11. Knox RA. Medicaid Fee Shifts Adopted. The Boston Globe, September 16, 1985; 17.
12. Hsiao WC, Stason WB. Toward developing a relative value scale for medical and surgical services. Health Care Financing Review, Fall 1979; 1:23–38.
13. Knox RA. State Shifts on Medicaid Fee Cuts. The Boston Globe, September 27, 1984; 1.

---

### DISCUSSION

DR. W. GERALD AUSTEN (Boston, Massachusetts): I congratulate Drs. Egdahl and Hertenstein on an excellent and stimulating paper. They have worked long and hard on physician payment reform, and they recognized early the importance of physician acceptance in any proposed reform. Thus, a major element of the current proposal includes the active participation of the physicians.

Three and a half years ago, the Regents of the American College of Surgeons created a Committee on Physician Reimbursement of which I have been Chairman. This committee, with much input from the surgical specialty societies, has developed recommendations for the reform of the Medicare physician payment program, and these recommendations were approved by the Regents in October 1986.

The aim of the College, like the approach presented today, is to identify ways to achieve a more rational payment system with cost savings and at the same time ensuring adequate access to quality care.

The ACS approach has a number of similarities to the program presented this morning; the ACS proposal includes the creation of a Medicare relative value scale based on physician charge data and with modifiers based on geographic differences in practice costs, the definition of payment units with emphasis on a global fee and the creation of definitions and guidelines to determine when an assistant at surgery for Medicare payment purposes is necessary.

I have one question for the authors. The Caterpillar Corporation has approximately 50,000 employees in 15 domestic plants, and it also has a very persuasive, sensible medical director. How would you expand your proposal from one company to a national program?

Finally, I would like to add that it is crucial that surgery be involved as much as possible in the current debate on physician reimbursement reform, and we need to be able to present sensible and fair approaches backed by solid data. The next year and a half is probably going to be crucial.

I would urge Drs. Egdahl and Hertenstein to continue to gather information and to make every effort to present their data and recommendations to the appropriate congressional committees and to the Administration.

DR. OLIVER H. BEAHRS (Rochester, Minnesota): Drs. Egdahl and Hertenstein have done us a favor by developing and reporting a modification of the CPR fee for service reimbursement for surgical services. I appreciate the opportunity to have read the manuscript.

Their program, which is a negotiated access RVS, is in contrast to the Harvard–AMA resource based RVS, and is being developed under contract from HCFA. This RVS is of concern because of the inordinate weight given to time as a factor and the methodology being used.

There is great anticipation regarding this study in Washington and some are thinking of it as the only game in town.

The Physician Payment Review Commission (PhysPRC) established by Congress in 1986 made its first report to Congress on March 1, 1987. The Commission supports a fee scale based on a national RVS with appropriate regional multipliers to determine fees. The basis for the RVS has not been determined, but hopefully it might be based somewhat on historic charges and not the wholly resourced criteria of the based parameters used in the Harvard Study.

The use of the CPT-4 Code has come under criticism: first a dictionary of 2000 codes, and now 7000 and with multipliers 48,000. It was established primarily for medical record keeping not to establish charges. It has led to unbundling of services and upcoding to establish fee for service. This practice has led to unjustifiably high fees in at least 10% of cases because of unbundling or upcoding.

A long-term program for physician payment is probably several years away and may be a fee scale hopefully, but there is administrative and congressional support for capitation or voucher arrangements, possibly DRGs. Congress is looking for a near-term solution to its budget problem for 1988.

The budget mark-up will be in the next few weeks and the recommendations to meet the cut almost certain in physician reimbursement will be in place by September.

The reduction in reimbursement might be another freeze, a shaving downward of the medical economic index, selecting the high-cost outliers such as coronary artery bypass, hip reconstruction, and/or TUR for across-the-board decreases as was done to cataract surgery in 1986 and 1987, or selective decrease in the high rollers or by addressing the reduction by using the inherent reasonable rule that is already in legislation.

My second question to Dr. Egdahl and Dr. Hertenstein is: what are your recommendations in the next month or two to meet the 1988 budget limits?

DR. MARTIN ALLGOWER (Basel, Switzerland): I appreciate the invitation to look "with a Swiss eye" at the presentation of Dr. Egdahl.

In Switzerland it is said that the surgeon goes through two stages. At the beginning of his career, collecting a fee, he gets red in the face. Later on his face reddens when he does not get paid!

The Swiss economic system is a rather complex mixture of free enterprise and institutions run almost exclusively by public bodies. We consider many of these things we do not as public responsibilities. These include post and telephone services, railway services, schooling and university formation, and most hospitals are run by local government agencies. The health care system is furthermore complicated by the fact that insurance conditions for accidents are very different from

Supplied by the British Library - "The world's knowledge" www.bl.uk

LK000026

356         EGDAHL AND HERTENSTEIN      Ann. Surg. · September 1987

those for diseases. It is obvious that this difficult distinction keeps our lawyers busy!

Basically, surgeons are mostly employed on a geographical full-time basis in a state hospital. Those state hospitals, however, have private, semiprivate, and general wards. This, I believe, is a rather favorable arrangement, combining a salaried position for the administrative obligations as well as for the care of the general patients with a fee-for-service system for the private patients. Now, comparing this with the cap system, we find great similarities because the Union of Swiss Surgical Societies, including all specialties, has set up a range of fees that may be reasonably asked from a patient or from the insurance, i.e., the third party paying. Those ranges, just to give you an idea, would range from 400 to 1900 francs for an appendectomy, for a gallbladder from 1000 to 2000 francs, and for major operations such as a total gastrectomy, a Whipple, from 3000 to 6000 Swiss francs. That is about the maximum aneurysm, from 3000 to 6000 Swiss francs. That is about the maximum we are allowed to ask or, at least, that the Union will support. If it is contested in court, you may divide the figures by 2 to arrive at dollar values, because that is about the realistic comparison in terms of buying power.

It is a fairly democratic self-regulating peer controlled system. What we dislike in Switzerland is the "big brother" state watching us and telling us what to do.

We have one advantage over you. The contingency system is unacceptable and the one party who loses "the battle" usually has to pay the other's legal expenses. That often prevents people from going to court, although there has been a definite increase in liability claims in recent years.

Overall our system results in an average income of some 300,000 to 400,000 francs for a Swiss surgeon. Out of that he pays some 50% in taxes. Our rather democratic system is similar to what Dr. Egdahl has just presented. It is based on a fee for service "common sense scale," the majority of surgeons working in a geographical full-time scheme.

DR. WILLIAM R. DRUCKER (Rochester, New York): I appreciate the opportunity I had to review this paper. Dr. Egdahl has given us a clear presentation of an industry-sponsored plan that attempts to gain physician compliance with a method of reducing costs of medical care through reduction in fees.

It is a very clear statement that in addition to government today, our health care system is being strongly influenced by industry.

I have a couple of editorial comments and then a couple of questions. The major factor in the rise in health care costs is not physician fees. This is simply illustrated by a look at the average fees of physicians across the country, somewhere in the range of $50,000–$150,000. I realize that others make considerably more, but each physician can be estimated to cost the health care system something in the order of three quarters of a million dollars per year by the exercise of his physician rights in doing his job of taking care of patients. Therefore, the major target that needs to be addressed is physician behavior, not physician fees. Nevertheless, fees are perceived as a problem that is going to be addressed whether we like it or not.

I wonder whether this paper is simply the expression of a last gasp hope that current physician fees, and the fee for service system will continue. I sincerely hope this is not its purpose and I believe Dr. Egdahl agrees based on the way he has presented the paper. My reading from the paper is that Dr. Egdahl is presenting a plan that is asking clearly for physicians to get together and plan to help solve the problem of fees rather than having it done for us by external agencies; that means industry and government.

My questions are these. They are straightforward, I believe, and can be answered simply. What will happen in the case of an emergency when one of the patients in the system under the cap must have an emergency operation and they pest a doctor who does not agree with the system: would this be settled in claims court?

What about quality? Does the system depend on the physician participants to ensure quality or do they have other ways to ensure that their employees are obtaining the quality of care that they would under the current system of fee selection.

How about comparison with other systems? Has there been enough experience to date to show that this system is gaining popularity? Is

there any way to compare this system with others in terms of two factors: physician acceptance to work in the system, and employee acceptance of this system for their health insurance?

Then there is a question of cost. This is a very complex system. It seems very costly if one reads carefully. What is the cost? Is there any estimate of what the cost would be of setting up and maintaining this system that requires close scrutiny of all bills that come in; a very complex system of monitoring these bills? Is the billing method unique to CAT or one other insurance systems do this too? Is this system for sale? Do other insurance companies look at claims this carefully?

DR. BENSON B. ROE (San Francisco, California): Dr. Egdahl is to be thanked for bringing to our attention a sensible proposal to address a serious threat to the fee-for-service system. I believe we finally are all aware of this threat, and I am delighted that we are prepared to gather our forces to get behind something positive.

About 8 years ago I became aware of the enormity of the abuses in the current system that were taking place, perhaps not by the respectable members of our profession but by an alarming number of those who did the kind of unbundling and some of the things that he showed you. I published an article that was intended to stir us to take some initiative in this problem rather than hoping it would go away. I hope it is not too late.

It is equally important that we get behind some system that establishes fiscal integrity so that we do not jeopardize the precious and unique privilege that we have of self-governance. This privilege is threatened by the behavior of some of our colleagues who have abused the system and brought this problem to our attention.

In addition to the proposals that Dr. Egdahl has made, I believe we should place emphasis on the magnitude of responsibility to cover not only accessory procedures that complications. No one can tell me whether any complication was part of the patient's underlying disease or could possibly be one from some flaw in my technique or management. We should accept as a part of our primary responsibility the full scope of managing a patient from start to finish without throwing in extra for everything that can be imagined. If we had done that, we would have reduced our total cost to the public by at least 20%.

DR. JAMES R. JUDE (Miami, Florida): I rise because I am confronted by patients who are faced with billing problems after hospital discharge. One of the problems is the unbundling that Dr. Egdahl has brought up.

Ten years ago on an Ethics Committee of our local medical society we, out of hand, tossed unbundling out as a completely immoral approach to any type of billing. I did not believe it even could possibly exist any more, but these is more of a problem than just the bundling together of the surgical fee. The problem is much greater than that. We always keep our office open to speak to any patients about any problems, and it is very common for them to present with bills of what really amounts to an unbundling of the bills of other physicians who were involved in their treatment.

Most commonly this has applied to anesthesiology, which frequently approaches 50% of the surgical fee. It is not, however, only the anesthesiologist, it is also the internists, the pathologists, and possibly the cardiologists who are reading electrocardiograms. Patients receive an enormous number of bills from physicians, and so it is a total physician unbundling and not just a surgical fee unbundling that is occurring.

Some way or other we have to approach the problem whereby there will be some type of bundling together of all physician fees as a package.

As our President presented yesterday in his Presidential Address, many treatments that we do are not all surgical anymore, but rather a blending over into medicine, and medicine is delivering surgery and surgery is delivering medicine. Therefore, we should give a great consideration to the total care and the total charge.

Dr. Egdahl, what if anything have you considered about these other fees in respect to a global cap or other industry approaches to the total cost of care in surgery?

Supplied by the British Library - "The world's knowledge" www.bl.uk

LK000027

00000007.8

DR. JONATHAN E. RHOADS (Philadelphia, Pennsylvania): I listened to this paper with a great deal of interest. I would emphasize that if most people have a 50% overhead, then a 15% reduction in fee is a 30% reduction in take-home remuneration. That is well to keep in mind.

There is one aspect of the overhead that has gotten bigger and that is liability insurance. This in a way is the loose cannon on the deck, and when you have a fee schedule set, whether by government or by consent, and this expense is assumed to be something that the physician will pay, you have an unpredictable situation.

I raise the question and ask the authors if there is any precedent for malpractice insurance being billed on a per case basis or a percentage of the fee. No doubt this would require the insurance company to have access to one's tax returns and so forth to be sure that it was honest, but it would have certain great advantages. It would permit the young physician starting out to start out on his own, pay his share of the liability costs, but not be expected to pay immediately the same amount that a person would be paying who is doing 10 times as much work in the middle of his career.

Perhaps the far greater advantage in my belief is that this could appear and should appear as a separate item on the bill.

I can think of no way that would educate more of the public as to the true cost of liability insurance than to have a bill (operation $300, insurance $125, or whatever it might come to).

I rose to raise this issue and to ask the authors if they knew if there was any precedent for such a plan and to ask whether they believe there is any way this could be tried out before we get tied into a fee schedule system with an unpredictable cost for liability insurance.

DR. RICHARD H. EGDAHL (Closing discussion): Dr. Austen's question about the possibility of expanding the Caterpillar program as it now exists to a national level is an important one. The problem is that major national programs such as Medicare necessarily involve a large bureaucracy, whereas a private self-administered company such as Caterpillar does not require the same degree of routinization of operations and an easily replicated methodology. The country could certainly be divided into 6–12 regions, each consisting of several states. I do not know whether appropriate flexibility could be built into the management and technical components of the administrative structure which would be part of a national program.

Dr. Beahrs raises questions about the future use of CPT-4 codes and asks what we can do in the short range to control outlier Medicare fees. I believe we can use CPT-4 as long as we understand the basis for matching up the procedures that actually were carried out with the codes, and have some way to ratchet downward those charges that seem inappropriate. Certainly there are a few groups selling systems with the goal of achieving code creep, which is basically dishonest. On the other hand, the majority of codes that are incorrect represent simple errors based on the difficulty of each doctor's office knowing all the technicalities of coding. We can stick with CPT-4, but must match the operative note with the CPT-4 code, using physician judgment to determine if the code is appropriate. The short-term answer for HCFA is to expand the principle of inherent reasonableness, which thus far has been limited to a few surgical conditions. Another 20–30 big-ticket items that appear to be out of line could be revised downward or upward.

Dr. Martin Allgöwer from Basel talked about the Swiss system and the apparent success of physician-sickness fund negotiations. This type of negotiation, with the government playing a catalytic role, might have relevance to the U.S. system in the private sector. However, Medicare will probably demand a closer involvement in the process than exists in Switzerland, since the government is paying the bill directly.

Dr. Drucker asked a key question about what happens in emergencies under the Caterpillar system. Usually Caterpillar pays charges in emergencies, but also has a strategy involving clearance for appropriateness of treatment in emergencies, when there is time. If gross overcharges are billed, even for emergency situations, and local surgeons support that the charges are unreasonable, then payment of those charges can be challenged.

Dr. Roe discussed his analysis of fees, and raised the question about possible antitrust issues if physicians are in the position of commenting on the appropriateness of their fees. Industry does not want to see private medicine nationalized, but could turn on us if we do not cooperate in developing a rational method of physician reimbursement. The key to not raising antitrust issues is for surgeons to act as individual consultants to payers who determine those fees, such as large industry.

Dr. Jude asked about how to get our internist colleagues involved in the process of fee negotiations. We found in our complexity/severity work with the Massachusetts Chapter of the American College of Surgeons that we could relatively easily get consensus on the "relative value" or "complexity/severity" of surgical services among that group. We then talked to internists and achieved some preliminary agreements; for example, an "intermediate acute myocardial infarction," from the time a patient comes into the emergency room, is taken into the critical care unit, and discharged, appeared to be similar in complexity/severity to an uncomplicated cholecystectomy, from initial diagnosis through discharge from the hospital after surgery. Reimbursement for some general medical conditions can be converted into a global fee, but for many medical conditions it is a more difficult process than for surgical cases.

Finally, Dr. Rhoads talked about malpractice problems associated with surgery. I return to the principal goal of Caterpillar and its fee process, which is access for their employees and their families to a significant number of high-quality local surgeons. Overall, malpractice problems will probably get worse before they get better. A solution will flow from severe access problems in different parts of the country, and a realization by both legislators and the public that the ordinary rigors of surgical practice are being compounded manyfold by additional financial and psychological pressures from the omnipresent danger of malpractice suits. We suggest that the Caterpillar process of negotiating access-oriented maximal fees with local surgical groups represents a reasonable compromise between paying charges, on the one hand, and accepting a formula-driven fee schedule not negotiated with some local physicians with access as a goal, on the other hand.

Increases in malpractice premiums will result in increased surgical fees, or the public will not have available the surgeons that they want in the variety of practice sites and numbers of specialties that are desired. We have only a modest amount of time before HCFA and the Congress will take some kind of action on fees, as they have on hospital reimbursement under Medicare. Industry can be our strongest ally in achieving a workable system of access-oriented negotiated fees.

Supplied by the British Library - "The world's knowledge" www.bl.uk

LK000028