# EXHIBIT J

0408v
H0433/7002

07 648314

#14/8

B14
4-8-91

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

Applicant      :  Donald C. Holloway, Robert D. Hertenstein,
                  George A. Goldberg and Kelli A. Dugan
Filing Date    :  Herewith
For            :  EXPERT SYSTEM AND METHOD FOR ASSESSING MEDICAL
                  CLAIMS

Hon. Commissioner of
Patents and Trademarks
Washington, D.C.  20231

### PRELIMINARY AMENDMENT

Dear Sir:

        Prior to examination, please amend the

above-identified application as follows:


### IN THE CLAIMS


Please cancel claims 1-6 without prejudice, and substitute in

their place claims 7-32.


        7. In a computer system having means for operating on

a predetermined database containing medical service codes and a

set of relationships among the medical service codes defining

whether selected ones of the medical service codes are valid

when input with other selected ones of the medical service

codes, a method for processing input claims containing at least

one medical service code, comprising the steps of:

MCK 000278

receiving at least one claim;

ascertaining whether the at least one claim contains a plurality of medical service codes;

determining whether one of the medical service codes in the plurality of medical service codes is valid or invalid by interacting with the database and the set of relationships contained in the database;

authorizing medical service codes which are valid in response to the determining step; and

rejecting medical service codes which are invalid in response to the determining step.

8. The method of claim 7, further comprising the step of revising the at least one claim to delete invalid medical service codes.

9. The method of claim 8, further comprising the step of informing a user why the at least one claim was revised.

10. The method of claim 7, wherein the database containing medical service codes includes medical service codes described by CPT codes.

11. The method of claim 7, wherein the database containing medical service codes includes medical service codes described by CRVS codes.

- 2 -

MCK 000279

12. The method of claim 7, further comprising the step of requesting further information from a user regarding the at least one claim.

13. The method of claim 7, wherein the relationships among the medical service codes include medically determined relationships.

14. In a computer system having means for operating on a predetermined database containing medical service codes and a set of relationships among the medical service codes defining whether selected ones of the medical service codes are valid when input with other selected ones of the medical service codes, a method for processing input claims containing at least one medical service code, comprising the steps of:

    receiving at least one claim;

    ascertaining whether the at least one claim contains a plurality of medical service codes;

    determining whether one of the medical service codes in the at least one claim is included in any other medical service code in the at least one claim;

    authorizing medical service codes which are not contained in any other medical service code; and

    rejecting medical service codes which are contained in any other medical service code.

— 3 —

MCK 000280

15. The method of claim 14, further comprising the step of revising the at least one claim to not include a rejected medical service code.

16. In a computer system having means for operating on a predetermined database containing medical service codes and a set of relationships among the medical service codes defining whether selected ones of the medical service codes are valid when input with other selected ones of the medical service codes, a method for processing input claims containing at least one medical service code, comprising the steps of:

receiving at least one claim;

ascertaining whether the at least one claim contains a plurality of medical service codes;



determining whether one of the medical service codes in the at least one claim is medically exclusive with any other medical service code in the at least one claim;

authorizing medical service codes which are not medically exclusive with any other medical service codes contained in the at least one claim in response to the determining step; and

rejecting medical service codes which are medically exclusive with any other medical service codes contained in the at least one claim in response to the determining step.

— 4 —

**MCK 000281**

C.M    17. In a computer system having means for operating on a predetermined database containing medical service codes and a set of relationships among the medical service codes defining whether selected ones of the medical service codes are valid when input with other selected ones of the medical service codes, a method for processing input claims containing at least one medical service code, comprising the steps of:

receiving at least one claim;

determining whether any medical service code contained in the at least one claim is not present in the predetermined database; and

informing a user that a medical service code is not contained in the predetermined database.

18. In a computer system having means for operating on a predetermined database containing medical service codes and a set of relationships among the medical service codes defining whether selected ones of the medical service codes are valid when input with other selected ones of the medical service codes, a method for processing input claims containing at least one medical service code, comprising the steps of:

receiving at least one claim;

ascertaining whether the at least one claim contains a plurality of medical service codes;

- 5 -

MCK 000282

determining whether one of the medical service codes in the at least one claim is mutually exclusive due to non-medical criteria with any other medical service code in the at least one claim;

authorizing medical service codes which are not mutually exclusive due to non-medical criteria with any other medical service codes contained in the at least one claim in response to the determining step; and

rejecting medical service codes which are mutually exclusive due to non-medical criteria with any other medical service codes contained in the at least one claim in response to the determining step.

15. A computer system including a central processing unit and associated memory for processing input claims containing at least one medical service code, comprising:

a predetermined database stored in the associated memory, the database containing medical service codes and a set of relationships among the medical service codes defining whether selected ones of the medical service codes are valid when received with other selected ones of the medical service codes;

means for receiving at least one claim;

means for ascertaining whether the at least one claim contains a plurality of medical service codes;

MCK 000283

means for determining whether one of the medical service codes in the plurality of medical service codes is valid or invalid by interacting with the database and the set of relationships contained in the database;

means for authorizing medical service codes which are valid in response to the means for determining; and

means for rejecting medical service codes which are invalid in response to the means for determining.

4 (20). The apparatus of claim 3 (19), further comprising means for revising the at least one claim to delete invalid medical service codes.

5 (21). The apparatus of claim 4 (20), further comprising means for informing a user why the at least one claim was revised.

6 (22). The apparatus of claim 3 (19), wherein the database containing medical service codes includes medical service codes described by CPT codes.

7 (23). The apparatus of claim 3 (19), wherein the database containing medical service codes includes medical service codes described by CRVS codes.

105

MCK 000284

8
24. The apparatus of claim 3, further comprising
means for requesting further information from a user regarding
the at least one claim.

9
25. The apparatus of claim 3, wherein the
relationships among the medical service codes include medically
determined relationships.

10
26. A computer system including a central processing
unit and associated memory for processing input claims
containing at least one medical service claim, comprising:

a predetermined database stored in the associated
memory, the database containing medical service codes and a set
of relationships among the medical service codes defining
whether selected ones of the medical service codes are valid
when received with other selected ones of the medical service
codes;

means for receiving at least one claim;

means for ascertaining whether the at least one claim
contains a plurality of medical service codes;

means for determining whether one of the medical
service codes in the at least one claim is included in any
other medical service code in the at least one claim;

means for authorizing medical service codes which are
not contained in any other medical service code; and

— 8 —

106

MCK 000285

means for rejecting medical service codes which are contained in any other medical service code.

27. The apparatus of claim 26, further comprising means for revising the at least one claim to not include a rejected medical service code.

28. A computer system including a central processing unit and associated memory for processing input claims containing at least one medical service code, comprising:

a predetermined database stored in the associated memory, the database containing medical service codes and a set of relationships among the medical service codes defining whether selected ones of the medical service codes are valid when received with other selected ones of the medical service codes;

means for receiving at least one claim;

means for ascertaining whether the at least one claim contains a plurality of medical service codes;

means for determining whether one of the medical service codes in the at least one claim is medically exclusive with any other medical service code in the at least one claim;

means for authorizing medical service codes which are not medically exclusive with any other medical service codes

107

MCK 000286

contained in the at least one claim in response to the means
for determining; and

P¦    means for rejecting medical service codes which are
medically exclusive with any other medical service codes
contained in the at least one claim in response to the
determining step.

13
29. A computer system including a central processing
unit and associated memory for processing input claims
containing at least one medical service code, comprising:

P¦ a predetermined database stored in the associated
memory, the database containing medical service codes and a set
of relationships among the medical service codes defining
whether selected ones of the medical service codes are valid
when received with other selected ones of the medical service
codes;

P¦    means for receiving at least one claim;

L    means for determining whether any medical service code
contained in the at least one claim is not present in the
predetermined database; and

P¦    means for informing a user that a medical service code
is not contained in the predetermined database.

14
30. A computer system including a central processing
unit and associated memory for processing input claims
containing at least one medical service code, comprising:

— 10 —

108

MCK 000287

a predetermined database stored in the associated memory, the database containing medical service codes and a set of relationships among the medical service codes defining whether selected ones of the medical service codes are valid when received with other selected ones of the medical service codes;

means for receiving at least one claim;

means for ascertaining whether the at least one claim contains a plurality of medical service codes;

means for determining whether one of the medical service codes in the at least one claim is mutually exclusive due to non-medical criteria with any other medical service code in the at least one claim;



means for authorizing medical services codes which are not mutually exclusive due to non-medical criteria with any other medical service codes contained in the at least one claim in response to the means for determining; and

means for rejecting medical service codes which are mutually exclusive due to non-medical criteria with any other medical service codes contained in the at least one claim in response to the means for determining.

15
21. A computer system including a central processing unit and associated memory for processing input claims containing at least one medical service code, comprising:

109

**MCK 000288**

a predetermined database stored in the associated memory, the database containing medical service codes and a set of relationships among the medical service codes defining whether selected ones of the medical service codes are valid when received with other selected ones of the medical service codes;

means for receiving at least one claim;

means for ascertaining whether the at least one claim contains a plurality of medical service codes;

means for determining whether one of the medical service codes in the plurality of medical service codes is valid or invalid by interacting with the database and the set of relationships contained in the database;

means for authorizing the at least one claim in response to the means for determining; and

means for rejecting the at least one claim in response to the means for determining.



16
32. In a computer system having means for operating on a predetermined database containing medical service codes and a set of relationships among the medical service codes defining whether selected ones of the medical service codes are valid when input with other selected ones of the medical services codes, a method for processing input claims containing at least one medical service code, comprising the steps of:

MCK 000289

receiving at least one claim;

ascertaining whether the at least one claim contains a plurality of medical service codes;

determining whether one of the medical service codes in the plurality of medical service codes is valid or invalid by interacting with the database and the set of relationships contained in the database;

authorizing the at least one claim in response to the determining step; and

rejecting the at least one claim in response to the determining step.

## REMARKS

This is a preliminary amendment accompanying the filing of a continuation application. Claims 1-6 have been cancelled without prejudice. In their place, Applicants have submitted new claims 7-32 which are believed to clearly and patentably distinguish the present invention over the prior art of record.

In the Office Action of October 29, 1990, claims 1 and 2 were rejected under 35 U.S.C. §102(a) as being anticipated by, or in the alternative under 35 U.S.C. §103 as obvious over Weitzel et al. Claims 3-6 were rejected under 35 U.S.C. §103 as being unpatentable over the combination of Weitzel et al. in view of Hardy et al. Applicants respectfully traverse this rejection.

– 13 –

MCK 000290

Applicants do not believe that the Weitzel et al. reference is a valid reference under 35 U.S.C. §102. To be a valid reference, the Weitzel et al., reference must enable someone to practice the invention. It does not do that.

In <u>Reading & Bates Construction Co. v. Baker Energy Resources Corporation and Baker Marine Corp.</u>, 233 USPQ 1168, 1173 (Fed. Cir. 1984), appeal No. 84-527, decided November 15, 1984, the Court held:

> . . .For the <u>invention</u> of the '903 patent to be <u>described</u> in the Smith brochure pursuant to §102(b), the Smith brochure itself must enable someone to practice the invention of the '903 patent. <u>Preemption Devices Inc. v. Minnesota Mining & Mfg. Co.</u>, 732 F.2d 903, 906-221 USPQ 841 (Fed. Cir. 1984). It does not do that. The mere fact that the Smith brochure, a one-page promotional brochure, boasts the ability and results of the process of the '903 patent is insufficient, as a matter of law, to constitute an enabling disclosure of the process of the '903 patent.
>
> The Smith brochure itself may qualify as a prior art reference under §103, but only for what is disclosed in it. It cannot serve as the vehicle by which the '903 patent and the more detailed disclosure it contains may also be considered as prior art. (Emphasis in original)

In view of the Federal Circuit holding, Applicants believe that the Weitzel et al. reference is only valid for what is disclosed in it. The Office Action states, with respect to p. 30 Weitzel et al., "This phrase implies that the system does revise a medical claim not to include inappropriate medical claims, exactly what is claimed by applicants". The Applicants believe that functions should not be and cannot be

- 14 -

MCK 000291

inferred from statements in the Weitzel et al. reference.
Weitzel et al. merely state the _results_ of processing, not how
the processing is accomplished, or any of the rules used. The
reference is only valid for what it does disclose, and nothing
more. It is inappropriate to infer that Weitzel et al.
performs any functions beyond the statements of the abilities
of the system and results of the claim review procedures.

Even assuming that Weitzel et al. is a valid
reference, the present invention, as claimed, is still
patentably distinct from Weitzel et al. Weitzel et al. is a
system for reviewing claims to determine if the health care
services performed were medically necessary and properly
authorized. On page 28 of Weitzel et al., determining medical
"necessity" is described as assessing the patient's diagnosis,
surgical procedures, the length of time since they occurred and
severity of the patient's condition. On page 29 of Weitzel et
al., an indicator of a patient's prognosis is described as the
device by which the patient's recouprative potential and
therefore the type and degree of medical services necessary, is
assessed. Thus, Weitzel et al. is concerned with determining
whether or not the total services billed were appropriate given
the patient's medical condition.

By contrast, the present invention is concerned with
determining whether or not service providers are attempting to
claim excess payment for medical services by violating rules

- 15 -

MCK 000292

which interrelate predetermined medical service codes.  Unlike
Weitzel et al., the present invention does not assess the
patient's "prognosis" to determine whether or not the medical
service claims are appropriate for the patient's condition.
The present invention uses and claims a set of rules that
describe the relationship between medical service codes (which
correspond to particular medical services or procedures) to
determine whether or not there are improper medical service
codes in a particular claim.

Even when additionally combined with the Hardy et al.
reference, there are still no teachings or suggestions of the
present invention, as claimed.  Hardy et al. discloses a basic
expert system tool including a knowledge base having facts and
ruled, and editing and communication tools.  There is no
teaching or suggestion in either Hardy et al. or Weitzel that
these references may be combined in the manner stated in the
Office Action.  Further, even if these references could be
combined as stated in the Office Action, the combination would
not meet the limitations of the claims.  The combination of
Weitzel et al. and Hardy et al. suggests an expert system which
reviews medical service claims and assesses the appropriateness
of the medical services in light of the patient's prognosis or
medical condition and is then able to inform the user of the
system's decision process or request further information from
the user.  As with Weitzel et al. itself, there is no teaching

— 16 —

MCK 000293

or suggestion of rules describing relationships among
particular medical service codes for assessing whether a
medical service claim contains medical service codes which
violate the rules.

With regard to the claims, Applicants are submitting a
set of claims which are believed to clearly distinguish over
the Weitzel et al. and Hardy et al. references, either singly
or in combination.  Claims 7—12, and 31 are method claims, of
which claim 7, 14, 16, 17, 18, and 31 are independent.  Claims
19—30, and 32 are apparatus claims, of which claims 19, 26, 28,
29, 30, and 32 are independent.

Taking claim 7 as exemplary of the method claims,
claim 7 recites a computer system having means for operating on
"a predetermined database containing medical service codes and
a set of relationships among the medical service codes defining
whether selected ones of the medical service codes are valid
when input with selected ones of the medical service codes."
Claim 7 additionally cites receiving at least one claim and
ascertaining whether there are a plurality of medical service
codes in the at least one claim.  Claim 7 further recites
"determining whether one of the medical service codes in the
plurality of medical service is valid or invalid by interacting
with the database and the set of relationships contained in the
database" and "authorizing medical service codes which are
valid", and "rejecting medical service codes which are invalid

- 17 -

MCK 000294

in response to the determining step". Applicants believe that these recitations in claim 7, such as, _inter alia_, describing the predetermined database as containing medical service codes and a set of relationships among the codes, processing the codes to determine which codes are valid, and authorizing valid medical service codes and rejecting invalid medical service codes distinguish the present invention over the art of record. Applicants believe that the prior art, either singly or in combination, contains no teaching or suggestion of a database containing medical service codes and relationships among the codes. The prior art of record, namely, the Weitzel et al. reference, only refers to a method for determining whether or not a particular course of medical treatment is authorized or not.

Claim 14 describes a method similar to claim 7 and recites _inter alia_ "determining whether one of the medical service codes in the at least one claim is included in any other medical service code in the at least one claim, authorizing medical service codes not contained in any other medical service code, and rejecting medical service codes which are contained in any other medical service code".

Claim 16 describes a similar method as claim 7 and recites, _inter alia_ "determining whether one of the medical service codes in the at least one claim is medically exclusive

— 18 —

MCK 000295

with any other medical service code in the at least one claim",
"authorizing medical service codes which are not medically
exclusive with any other medical service codes", and "rejecting
medical service codes which are medically exclusive with any
other medical service codes" in response to the determining
step.

Claim 17 describes a method similar to claim 7 and
recites, _inter alia_, "determining whether any medical service
code contained in the at least one claim is not present in the
predetermined database", and "informing a user that a medical
service code is not contained in the predetermined database".

Claim 18 describes a similar method as claim 7 and
recites, _inter alia_, "determining whether one of the medical
service codes in the at least one claim is mutually exclusive
due to non-medical criteria with any other medical service
code", "authorizing medical service codes which are not
mutually exclusive due to non-medical criteria with any other
medical service codes", and "rejecting medical service codes
which are mutually exclusive due to non-medical criteria with
any other medical service codes" in response to the determining
step.

Claim 19 describes a computer system including a
central processing unit and associated memory for processing
input claims including "a predetermined database stored in the

- 19 -

MCK 000296

associated memory, the database containing medical service codes and a set of relationships among the medical service codes defining whether selected ones of the medical service codes are valid when received with other selected ones of the medical service codes", "means for receiving at least one claim", and "means for ascertaining whether the at least one claim contains a plurality of medical service codes".

Claim 19 further recites "means for determining whether one of the medical service codes in the plurality of medical service codes are valid or invalid by interacting with the database and set of relationships contained in the database", and "means for authorizing valid medical service codes" and "means for rejecting invalid medical service codes". Claim 19 is believed to distinguish over the prior art of record because, inter alia, there is no means for determining whether one of the medical service codes is valid or invalid and no means for authorizing valid medical service codes and no means for rejecting invalid medical service codes disclosed or suggested in the prior art of record.

Claim 26 describes a system similar as claim 19 and recites, inter alia, "means for determining whether one of the medical service codes in the at least one claim is included in any other medical service code in the at least one claim", "means for authorizing medical service codes which are not

— 20 —

MCK 000297

contained in any other medical service code", and "means for
rejecting medical service codes which are contained in any
other medical service code".

Claim 28 describes a system similar to claim 19 and
recites, _inter alia_, "means for determining whether one of the
medical service codes in the at least one claim is medically
exclusive with any other medical service code in the at least
one claim", "means for authorizing medical service codes which
are not medically exclusive with any other medical service
codes", and "means for rejecting medical service codes which
are medically exclusive with any other medical service codes"
in response to the means for determining.

Claim 29 describes a system similar to claim 19 and
describes, _inter alia_, "means for determining whether any
medical service code contained in the at least one claim is not
present in the predetermined database" and "means for informing
a user that a medical service code is not contained in the
predetermined database".

Claim 30 describes a system similar to claim 19 and
recites, _inter alia_, "means for determining whether one of the
medical service codes in the at least one claim is mutually
exclusive due to non-medical criteria with any other medical
service code in the at least one claim", "means for authorizing
medical service codes which are not mutually exclusive due to

- 21 -

MCK 000298

non-medical criteria with any other medical service codes", and "means for rejecting medical service codes which are mutually exclusive due to non-medical criteria with any other medical service codes" in response to the means for determining.

Claim 31 describes a similar method as claim 7 and recites, inter alia, "determining whether one of the medical service codes in a plurality of medical service codes is valid or invalid by interacting with the database and the set of relationships contained in the database", "authorizing the at least one claim in response to the determining step," and "rejecting the at least one claim in response to the determining step".

Claim 32 describes a system similar to claim 19 and recites, inter alia, "means for determining whether one of the medical service codes in the plurality of medical service codes is valid or invalid by interacting with the database and the set of relationships contained in the database", "means for authorizing the at least claim in response to the means for determining", and "means for rejecting the at least one claim in response to the means for determining".

The dependent claims additionally describe further patentable features of the present invention.

In view of the foregoing amendments and remarks, application should now be in condition for allowance. A notice

MCK 000299

to this effect is respectfully requested.  Should further
questions arise concerning this application, the Examiner is
invited to call the Applicants' attorney at the number listed
below.

                              Respectfully submitted,

                              Donald C. Holloway, et al.

                              By _____
                              A. Jason Mirabito
                              Reg. No. 28,161
                              Wolf, Greenfield & Sacks, P.C.
                              600 Atlantic Avenue
                              Boston, MA  02210-2211
                              Tel.: (617) 720-3500

Docket no. H033/7002

Dated:  January 29, 1991

0408v

                              - 23 -

                                             MCK 000300

# EXHIBIT K

Redacted

# EXHIBIT L

1          UNITED STATES DISTRICT COURT

2          DISTRICT OF DELAWARE

3

4    McKESSON INFORMATION SOLUTIONS, LLC,

5          Plaintiff

6    v.              CA NO. 04-1258 (SLR)

7    THE TRIZETTO GROUP, INC.,

8          Defendant

9

10

11

_____

12              VOLUME 1

13        VIDEOTAPED DEPOSITION OF RANDALL

14   DAVIS, Ph.D., a witness called on behalf of

15   the Plaintiff, pursuant to the Federal Rules

16   of Civil Procedure, before Jessica L.

17   Williamson, Registered Merit Reporter,

18   Certified Realtime Reporter and Notary

19   Public in and for the Commonwealth of

20   Massachusetts, at the Offices of Skadden,

21   Arps, Slate, Meagher & Flom LLP, One Beacon

22   Street, Boston, Massachusetts, on Wednesday,

23   November 30, 2005, commencing at 9:27 a.m.

24   JOB NO. 41297

25

1    will process a single code on the claim.

2    And they do both of those in the same

3    fashion.  There's no difference in how they

4    proceed on those.

5  Q.  Okay.  That's not my -- my question is

6    simply this:  Do --

7  A.  Okay.  So can I rephrase my answer perhaps

8    to, excuse me, address your question?

9  Q.  I want the question and answer.

10  A.  Certainly.

11  Q.  All three of the accused TriZetto systems in

12    fact operate to apply clinical editing to a

13    plurality of medical service codes within a

14    given claim, correct?

15       MR. SEGAL:  Vague and ambiguous,

16    incomplete description.

17  A.  That is correct, but incomplete.

18  Q.  Well, and the incomplete part is that they

19    are also capable of and in fact perform

20    clinical editing on one medical service code

21    contained in the claim, correct?

22  A.  That's part of the incompleteness.  Another

23    part of the incompleteness is they do both

24    of those indistinguishably where the

25    McKesson system explicitly distinguishes and

1        does something different.  In each case it's

2        in the code, it's in the flow charts, it's

3        in the text of the patent, and it's in the

4        claim.

5    Q.  All right.  You have an argument that you

6        want to advance regarding your position on

7        non-infringement, and I understand that.

8        There will be a time and place for that.

9        All I'm asking you is a simple yes or no

10       question, which is, do all three of the

11       TriZetto systems operate to apply clinical

12       editing to a plurality of medical service

13       codes contained in a given medical claim?

14            MR. SEGAL:  Objection, vague.

15   A.  As an incomplete description that is

16       accurate -- I'm sorry, that's an accurate

17       but incomplete description.

18   Q.  And I'm not attempting to articulate or

19       characterize all the operations of the

20       system, I'm just asking, does it perform

21       that function?  And the answer is yes?

22   A.  It's part of what it does, it performs that

23       function.

24   Q.  All right.  That's fine.  Do all three of

25       the TriZetto-accused infringing systems also

# EXHIBIT M

Redacted

# EXHIBIT N

1          UNITED STATES DISTRICT COURT

2          FOR THE DISTRICT OF DELAWARE

3

4     McKESSON INFORMATION SOLUTIONS LLC,

5              Plaintiff,

6         vs.              Civil Action No.

                           04-1258-SLR

7     THE TRIZETTO GROUP, INC.,

8              Defendant.

9

10

11

          _____

12

13          Videotaped deposition of ANTHONY

14     BENJAMIN BELLOMO held at the offices of Skadden

15     Arps Slate Meagher & Flom, Four Times Square,

16     New York, New York, on Friday, September 16,

17     2005, commencing at 9:00 a.m., before David

18     Sanders, Legal Video Specialist, and James W.

19     Johnson, Registered Professional Reporter and

20     a Notary Public of the State of New York.

21

22

23     JOB No. 38485

24

25

9/16/2005  Bellomo, Anthony

1    object and instruct you not to answer on any

2    discussions that you may or may not have had

3    during the litigation with counsel about

4    resolving the litigation, but other than that

5    you can answer the question.

6        A.    The only discussion we had was during,

7    after the litigation began, and that was a

8    discussion that was held internally with counsel

9    and which I'm not going to share with you.

10       Q.    Prior to the lawsuit being filed you

11   were not aware of any consideration at TriZetto

12   regarding what TriZetto would be willing to pay

13   McKesson to resolve this patent dispute; is that

14   right?

15       A.    That's correct.

16       Q.    Erisco never considered what it would

17   pay McKesson or its predecessor to resolve any

18   patent issues, correct?

19       A.    Correct.

20           MR. RANDALL:  I'll mark for

21   identification as Exhibit 7 the McKesson '164

22   patent.

23           (Bellomo Exhibit  United States Patent

24   Number 5,253,164, marked for identification.)

25   seven

9/16/2005  Bellomo, Anthony

1       A.    Have you got a half-hour while I read

2    this?

3       Q.    Well, let me ask you, Mr. Bellomo, have

4    you ever read this patent?

5       A.    I've -- I don't know that I've read it

6    front to back, but I have read pieces of it.

7       Q.    And you've attended meetings wherein

8    you've discussed this patent, right?

9       A.    Say it again.  I'm sorry.

10      Q.    You have attended meetings wherein you

11   have discussed this patent, right?

12      A.    Correct.

13      Q.    And, in fact, in the fall of 2004 you

14   spent all day with your lawyer and other TriZetto

15   employees discussing the patent, correct, with

16   Ms. Lampe present and Mr. Luftig present?

17      A.    We spent -- I don't know when it was.

18   I'll take you at your word.  I'm sure you've

19   validated it before throwing that out.  We did have

20   an all-day meeting with counsel and some

21   individuals internally.  I remember Craig being

22   there.

23      Q.    And Ms. Lampe, correct?

24      A.    I don't remember her being there or not.

25   I remember Craig and I and our counsel.

1      Q.    And who was your attorney leading the

2    discussion?

3      A.    I don't remember.  I believe it was a

4    predecessor to our current attorneys, if I remember

5    right.

6      Q.    Mr. Palmer?

7      A.    Probably, but I couldn't say for sure.

8      Q.    But nonetheless in October or November

9    of last year you spent with your outside attorney a

10   full day going through the McKesson '164 patent,

11   correct?

12     A.    Yes.

13     Q.    Let me direct your attention to the

14   second-to-last page.

15     A.    Is that the page labeled 117?

16     Q.    Yeah, that's column 117.  These are the

17   claims of the patent, and they are each numbered in

18   separate paragraphs one through, if you look at the

19   next page, 16.

20        Do you see that?

21     A.    Mm hmm, yes.

22     Q.    Could you read claim one, and then I'm

23   going to ask you a couple of questions about it.

24     A.    Do you want me to read it aloud?

25     Q.    No, you can just read it to yourself.

9/16/2005  Bellomo, Anthony

1    Let me ask you a question so you have it in

2    context.  All right?

3          I'm going to ask you if TriZetto's

4    Facets and ClaimFacts systems perform the steps

5    described in claim one.

6        MR. THOMAS:  And I'm going to object,

7    calls for a legal conclusion, also requires

8    claim construction to be completed in this

9    matter, and without a construed claim

10    construction before the witness it's an

11    inappropriate question.

12        MR. RANDALL:  All right, and I'm willing

13    to give you a running objection to that on my

14    questions on these claims.  Is that all right,

15    Mr. Thomas?

16        MR. THOMAS:  That's fine.

17        THE WITNESS:  So what does this all mean

18    to me?

19        MR. THOMAS:  It means you can answer the

20    question as best you can, but we have an

21    understanding that there's a standing

22    objection to all questions about comparing

23    systems to these claims that, in my view, the

24    questions are inappropriate because it

25    requires an interpretation of the claims to be

9/16/2005  Bellomo, Anthony

1      done as a matter of law that is not being

2      provided to you.

3      Q.    Mr. Bellomo, your lawyer's objection is

4  preserved, and the judge will decide it later, but

5  you still have to answer the question.

6      A.    Understood, and can you be kind enough

7  to tell me when we're out of this section and we're

8  no longer under the objections.

9      Q.    Sure.

10      A.    In a broad sense, is the best I

11  understand it, we do elements of this.

12      Q.    Well, I'm asking you if TriZetto's

13  ClaimFacts and Facets perform each of the steps

14  identified in claim one.

15      A.    I couldn't tell you.  It's not my area

16  of expertise.  In a broad and a high-level sense,

17  we compare the codes that are on a claim that's

18  being submitted against codes in a database and do

19  various checks on them for validity and for

20  relationships to each other.  If that's what that

21  says, that's what we do.  I don't quite understand

22  it.

23      Q.    Well, prior to the submission of a

24  medical service code to either ClaimFacts or Facets

25  is there a predetermined set of relationships

1    specified in, among the medical service codes in

2    the database?

3        MR. THOMAS:  Objection, vague and

4    ambiguous as to "predetermined."  You can

5    answer it.

6    A.    Just, I'm sorry, repeat it.  I don't

7    want to be difficult, but I want to answer your

8    question.

9        MR. RANDALL:  Would you read it, please.

10        (Record read.)

11    A.    Predetermined set of relationships?

12    There are multiple predetermined sets of

13    relationships between codes that exist in the

14    clinical database that you're referring to, as well

15    as elsewhere within the product.

16    Q.    And they are --

17    A.    And they exist with or without the

18    submission of a claim.  The data exists, and it's

19    under the user control that they can change it,

20    modify it or view it, so data exist in files,

21    tables, relating to clinical data as well as the

22    validity of claims, the validity of codes in

23    general.

24        They rely in what we're referring to as

25    "PACE," right?  And they also exist in other places

**9/16/2005  Bellomo, Anthony**

1    of the system to do validations against, to see

2    whether or not those codes are reasonable, if

3    they're supported by the plan, you know, a lot of

4    code processing, and the data to process that code

5    exists within the database whether or not you have

6    a claim being submitted against it.

7        So is that what -- is that answering

8    your question?  Is that what you're asking?

9        Q.    Partly.  I want to take you through the

10    process of a claim being processed through either

11    Facets or ClaimFacts, all right?

12        A.    Which is different.

13        Q.    Okay.  Start with Facets.

14        A.    Okay.

15        Q.    Facets is capable of receiving a claim,

16    correct?

17        A.    Correct.

18        Q.    And Facets is capable of determining

19    whether a medical service code contained in the

20    claim is not present in the predetermined set of

21    medical service codes in the database, correct?

22        A.    So for a medical service code on the

23    claim we can figure out if it's not on the

24    database?

25        Q.    Yes.

1      A.    Yeah, that would be an invalid claim, an

2      invalid ID, yes.

3      Q.    All right.  And Facets is capable of

4      informing the user that a medical service code is

5      not contained in the database, correct?

6      A.    Correct.

7      Q.    So, with that in mind, could you read

8      claim one again and let me know if it's your

9      understanding that Facets is capable of performing

10     the steps identified in claim one.

11     A.    When you narrow down the steps the way

12     you indicated in your question, I answered

13     correctly in that we do those, are capable of

14     informing the user whether or not a service is on a

15     database.  We do that.

16           There's a lot of other things that are

17     written here in terms of sequencing and steps that

18     are taken which I don't feel comfortable, you know,

19     commenting on.  I don't know whether or not we're

20     doing all of these things or not.

21     Q.    All right, take a look at claim one and

22     let me know, is there anything, any step contained

23     within claim one that you believe Facets does not

24     perform?

25           MR. THOMAS:  And you're referring to the

1    part following "steps of?"

2        MR. RANDALL:  I'm referring to all of

3    claim one.

4        MR. THOMAS:  Well, that's different than

5    your prior question.

6        A.    Well, first of all, the database is not

7    predetermined, because it's affected by our

8    customers, so the database that's contained in

9    Facets for both the clinical editing as well as the

10    other parts of the application is modifiable, able

11    to be modified, added to, augmented, deleted by

12    each and every customer of ours.

13        So that's one difference, in that it's

14    not a predetermined database.  We supply a starting

15    point, and customers do what they want.

16        Q.    And we'll, we'll circle back to that in

17    a minute.

18        A.    Okay, so should I continue?

19        Q.    Yes, please.

20        A.    The issue of determining when service

21    codes are valid when input with other service

22    codes, do you see that about middle down of the

23    first paragraph?

24        We generally don't determine if things

25    are valid.  We'll determine invalid if it's not

1    present on tables that have nothing to do with

2    clinical editing, so there are other tables in the

3    system that determine the validity or invalidity of

4    the codes that are selected that are apart from the

5    clinical editing function that we're determining.

6          What is making it a little bit confusing

7    is that the clinical editing function is one small

8    slice of the pie that's contained in Facets.  The

9    other many, many slices of the pie which exist with

10   or without clinical editing, which exist even one

11   in Michigan's case, where they plugged in McKesson,

12   the rest of that still performed lots of functions.

13         Some of what's indicated here are

14   performed in core foundation Facets in ClaimFacts,

15   apart from what's getting done in the clinical

16   editing piece.

17   Q.   All right, and I'm --

18   A.   In aggregate between the two of them,

19   they test for valid codes, but their test for valid

20   is done in ClaimFacts and in Facets, not in

21   clinical editing in general.

22   Q.   And I, just so you understand -- and I

23   appreciate your clarification -- my question is

24   dealing with the Facets system as a whole.  I'm not

25   asking you to segment in your answer the

1    functionality that is performed by various

2    components of Facets.  I'm simply saying, in

3    aggregate, does Facets perform the steps recited in

4    claim one?

5        A.    And -- are you asking about the Facets

6    with the McKesson interface?

7        Q.    No.

8        A.    Or without the McKesson interface?

9        Q.    Not with -- I'm asking about Facets with

10   its shipped and embedded and integrated clinical

11   editing functionality that is turned on.

12       A.    Okay.

13       Q.    So, with that clarification in mind,

14   does Facets perform the steps described in claim

15   one, each of them?

16           MR. THOMAS:  Vague, objection, vague and

17       ambiguous as to whether you mean the language

18       following the steps or the entire claim.

19           MR. RANDALL:  Counsel, you can just stop

20       your objection at the legal objection.  If the

21       objection is "vague and ambiguous," that's

22       fine, you can make it.  I would appreciate it

23       if you don't go beyond that.  I can figure out

24       in the question whether or not I need to

25       rephrase it.

1        MR. THOMAS:  Well, I'm saying it's vague

2    and ambiguous as to what you mean by "the

3    steps of."

4        MR. RANDALL:  Well, counsel, you need to

5    stop attempting to coach the witness, all

6    right?

7        MR. THOMAS:  I'm not coaching the

8    witness.

9        MR. RANDALL:  Well, then just state the

10   legal objection.

11       MR. THOMAS:  You're asking two different

12   questions and mixing them up.

13       MR. RANDALL:  Just state the legal

14   objection.

15       MR. THOMAS:  I am.

16   A.    We make recommendations, assuming that

17   the claims, assuming that the service codes are

18   valid, we do determine if the service codes are

19   valid, so we do that.

20        In the case also where there's multiple

21   service codes that are valid, we will not, we will

22   make a recommendation on how they should be paid,

23   if you will.  We're not saying that it's invalid.

24   If it's a valid code it's a valid code.  We don't

25   then turn around and say it's invalid because it's

1    used in combination with this one.

2         So we do not do that.  What we do do is

3    say these are valid codes and normally you would

4    not pay them this way, whether they were submitted

5    together on the same claim or in a reasonable time

6    period or other such criteria, so no, we don't do

7    that, as I understand it.

8    Q.    Let me take you through step by step

9    claim one.

10        Is your system designed to operate, is

11   the Facets product designed to operate on a

12   computer system?

13   A.    Yes.

14   Q.    And does it operate with a predetermined

15   database?

16        And when I say "predetermined" I mean a

17   database that contains medical service codes and a

18   relationship among those medical service codes that

19   is preset, whether it's by TriZetto or by the

20   customer, prior to the time a claim is submitted to

21   it.  All right?

22   A.    Yes, with the caveat that the customer

23   is in control.

24   Q.    All right.  And do the, does the Facets

25   system include the ability to define whether

1    certain medical service codes are valid when input

2    with other medical service codes within a claim?

3        A.    I don't believe so.

4        Q.    Why not?

5        A.    Because I don't believe a medical code

6    is valid in and of it -- in and of its own, so if

7    you look at the CPT book it contains an extensive

8    list of all the valid procedures that you could

9    perform on somebody.

10            Those are valid procedures no matter how

11    they're input.  They're valid procedures.  Even if

12    you input inappropriate ones next to each other,

13    they're still valid.  What we comment on is the

14    fact that procedure A and procedure B, it's

15    inappropriate to submit both of those on the claim

16    at the same time.  They're still both valid

17    procedures.

18        Q.    Does Facets perform on occasion the step

19    of disallowing a particular medical service code

20    for payment when that medical service code is

21    contained in a claim with another medical service

22    code?

23        A.    Yes.

24        Q.    And while I'm asking you these questions

25    about claim one I'd ask that you apply the meaning

9/16/2005  Bellomo, Anthony

1    to "valid" or "invalid" as either allowed for

2    payment or disallowed for payment.

3         Do you understand that?

4    A.   I would disagree with that.  I'm, I'm

5    not going to do that, because if you're asking

6    me -- because your final question is likely to be,

7    well, do you do this, after you've misdirected the

8    meaning of the words.  Then I'm going to have to

9    answer no to that, because we do not do, we do not

10   determine that codes are valid or invalid based

11   upon their combination.

12        We may recommend a disallowance of a

13   charge, but we do not say that a code is invalid

14   because it's in combination with another one, and

15   even if in this setting you're saying to ignore

16   that distinction, I'm not comfortable doing that,

17   because you're asking me to compare what the system

18   does to this document, not to your words.

19        If you want to rip this up and go by

20   words, we can do that too.

21   Q.   Are you reading claim one as requiring a

22   medical service code to be invalid because it is

23   input with another medical service code?

24   A.   I believe that's what this sentence

25   says.

9/16/2005  Bellomo, Anthony

1      Q.    Where?

2      A.    About the fourth or fifth line down I

3    believe what it says is that a set of relationships

4    among medical service codes defining whether

5    selected ones of the medical service codes are

6    valid when input with other ones of the medical

7    service codes.

8           So what I interpret this to be is that

9    we are determining that a code is invalid because

10   of the appearance of another service code, and that

11   is what I'm disagreeing with.

12     Q.    And you'd agree that Facets does that

13   with respect to determining whether one medical

14   service code is, should be disallowed for payment

15   when included in a claim with another medical

16   service code, correct?

17     A.    Correct.

18     Q.    And Facets also operates to determine

19   when a medical service code is valid when input

20   with other medical service codes, correct?

21     A.    No, we determine the validity of the

22   medical service code on its own.  It's not in

23   conjunction with other medical service codes.  A

24   valid code is a valid code regardless of how it was

25   submitted with other service codes.

9/16/2005  Bellomo, Anthony

1    Q.    And you're -- the, the meaning that you

2    are attributing to "valid" is whether or not it is

3    a, it is a code listed as valid by the CPT manual;

4    is that right?

5    A.    A valid code in the context of a

6    one-piece solution, of a computer software

7    solution, which you asked me whether Facets is a

8    computer software solution, in this context "valid"

9    means that it is a code that is on the database

10   capable of being entered.  That's a valid code.

11       It has validity to be entered into this

12   field, and it passes the basic edit of being a

13   valid code.  The distinction is that when two valid

14   codes are input together sometimes one of them is

15   appropriately disallowed for payment or recommended

16   a different payment vehicle, but they are both

17   valid codes regardless of the fact that they might

18   have been entered together or apart.

19   Q.    All right, let's back up for a minute.

20       Facets operates within a computer

21   system, correct?

22   A.    Correct.

23   Q.    And Facets operates within a computer

24   system that includes a central processing unit and

25   associated memory, correct?

100

1      A.   Yes.

2      Q.   Facets operates with a database

3   containing medical service codes and a set of

4   relationships among the medical service codes,

5   correct?

6      A.   Are you in a different place in the

7   document?

8      Q.   I'm just asking you.

9      A.   Say it again.  Please ask me.

10         MR. RANDALL:  Can you read that question

11   back.

12         (Record read.)

13     A.   Correct.

14     Q.   The medical service codes and the

15   relationship among the medical service codes in the

16   database is predetermined at the time a claim is

17   entered into the system, correct?

18     A.   No.

19     Q.   The medical service codes and the set of

20   relationships among medical service codes are

21   unknown at the time a claim was entered?

22   Unpredictable?

23     A.   No, that's not true either.

24     Q.   Well, can you explain why you say that

25   they are not set or predetermined at the time a

101

9/16/2005 Bellomo, Anthony

1    claim is entered.

2        A.    I was answering your question.  It was

3    ambiguous, and it's, the answer was no to the way

4    you asked the question.

5        Q.    Why?  What, what was ambiguous about it?

6        A.    The, the codes exist within the database

7    as modi-- as modified by the customer.  Those codes

8    now exist.  The relationships between those codes

9    exist as can be modified by our customers.

10        The sources of those codes are from many

11    different places.  Some of them come from the AMA.

12    Some of them come from ICD.  Some of them come from

13    customer input.  There's a whole variety of places

14    that make up the medical codes.  Some of them we

15    supply in the, you know, what's known as the PACE

16    or the D&T criteria.

17        So you have a database that's come from

18    many different places -- it's modified by

19    customers -- that has in it valid codes and

20    relationships.

21        Those codes and relationships are used

22    for a variety of purposes, including producing

23    bills, constructing claims payments, making

24    recommendations on what should and should not be

25    paid, and a whole host of other things.  The

9/16/2005  Bellomo, Anthony

1    database exists.  The claim comes in.  It has on it

2    various codes.

3            Those codes are then validated against

4    the database that existed, and then it is

5    processed.  That's the procedures that we follow in

6    general.

7    MO        MR. RANDALL:  Well, I move to strike

8        that as nonresponsive.

9        Q.    I'm talking about the database that

10   exists at the time a customer inputs a claim for

11   processing, and at that time the medical service

12   codes on that particular database and the

13   relationships among those medical service codes is

14   preset, correct?

15       A.    The ones that exist in the database are

16   preset, and the ones that are on the incoming claim

17   are whatever happens to be on the incoming claim.

18   They're measured against the preset database.

19       Q.    The Facets system operates to receive

20   claims that contain one or more medical service

21   codes, correct?

22       A.    Yes.

23       Q.    Facets operates to determine whether a

24   medical service code contained in a claim is not

25   present in the preset database, correct?

9/16/2005  Bellomo, Anthony

1       A.    You're asking if it operates to see if

2    the code is not in the database?

3       Q.    Yes.

4       A.    Yes.

5       Q.    And Facets operates to inform the user

6    that a medical service code contained in a

7    particular claim is not in the preset database,

8    correct?

9       A.    Correct.

10      Q.    Facets operates to determine whether a

11   particular medical service code within a claim

12   should be allowed for payment when that medical

13   service code is input with other medical service

14   codes, correct?

15      A.    Correct.

16      Q.    Does the Facets system operate to check

17   nonmedical criteria for determining whether to

18   allow for payment of a particular medical code?

19         MR. THOMAS:  Are we still in the area

20         where I have my standing objection?

21         MR. RANDALL:  Yes.

22      A.    Can you give me an example of nonmedical

23   criteria.  I don't know what that means.

24      Q.    Sure.  For instance, a customer may want

25   to disallow a cosmetic procedures even though the

**9/16/2005  Bellomo, Anthony**

1    actual medical procedure was actually performed and

2    was legitimate; it's just that the benefits

3    associated with that customer are such that

4    cosmetic procedures are not allowed as claims.

5         A.    I don't see how that's nonmedical

6    criteria.  Can you explain that further.

7         Q.    If a decision is made to simply not pay

8    for certain claims, it's an administrative decision

9    not to pay for certain claims, does Facets have

10   built within its system nonmedical criteria for

11   disallowing for payment of claims, such as won't

12   pay for a cosmetic procedures or will only pay

13   fixed amounts for certain medical procedures?

14        A.    I contend that that's medical

15   procedures.  That's, that is not nonmedical

16   criteria.  This, the criteria is that it's a

17   cosmetic surgery?  Well, that's a medical

18   criterion.  You can determine if you don't want to

19   pay from a benefits point of view for certain kinds

20   of medical services that are provided.

21            So that, that's a determination that the

22   customer makes, how they want to enforce the rules

23   of what they want to pay for and what they don't

24   want to pay for, but those rules are applied on the

25   medical, on the medical codes that are submitted

105

9/16/2005 Bellomo, Anthony

1    within a claim and contained within a database that

2    we spoke about previously.

3        Q.    Does Facets operate to disallow payment

4    on certain medical codes based on a preset

5    limitation of what the benefits or what the

6    customer will pay on a given claim?

7        A.    Yes.

8        Q.    Does Facets operate to disallow some

9    medical service codes based on place of service

10   criteria?

11       A.    I believe so, but I'm not positive.

12       Q.    Does Facets operate to determine whether

13   one medical service code within a claim containing

14   several medical service codes is valid for payment

15   or invalid for payment by interacting with the

16   database and a set of relationships contained in

17   the database?

18       A.    We're back to the discussion about

19   valid.  Medical codes are valid in and of

20   themselves, and payment is a separate issue, so we

21   do not invalidate codes based upon the appearance

22   of that code in combination with other ones.  No,

23   we don't do that.

24       Q.    Does Facets operate to determine whether

25   one medical service code within a claim containing

**9/16/2005  Bellomo, Anthony**

1    several medical service codes should be allowed or

2    disallowed for payment by interacting with the

3    database and the set of relationships between

4    medical codes contained in the database?

5        A.    Yes.

6        Q.    Does Facets have the capability of

7    authorizing medical service codes which are

8    determined to be allowed for payment and the

9    capability of rejecting for payment those medical

10    service codes which are determined to be disallowed

11    for payment?

12            THE WITNESS:  Can you repeat that.

13            (Record read.)

14        A.    "Authorizing" may not be exactly the

15    right word.  We allow payment on medical service

16    codes that are coded to be paid, and we disallow

17    payment on medical service codes that are coded in

18    the database not to be paid.  "Authorizing" has a

19    different connotation in the healthcare arena.

20        Q.    Does Facets have the capability of

21    revising a claim to delete a medical service code

22    that is invalid?

23        A.    If it was invalid it would not have been

24    allowed to be put in there in the first place.

25        Q.    Well, for instance, if a claim were

107

9/16/2005  Bellomo, Anthony

1    submitted into the Facets system and it contained

2    an invalid service code, does Facets determine that

3    the medical service code is invalid and then delete

4    that code from the claim?

5        A.    No.

6        Q.    Does Facets contain the capability of

7    determining that a medical service code is invalid

8    and then eliminating that particular code for

9    further consideration within the claim?

10       A.    No.

11       Q.    What does the Facets system do when it

12   detects an invalid medical service code within a

13   claim?

14       A.    It flags it as an error and it requires

15   it to be corrected by a, usually by a processor, so

16   that we continue.

17       Q.    Well, in some instances it automatically

18   inserts a new medical service code in its place,

19   correct?

20       A.    We do not correct invalid service codes,

21   so if you enter an invalid code, as you indicated,

22   then the process stops until it's corrected.

23       Q.    You're sure about that?

24       A.    Yes.  If you input an invalid code, you

25   inputted an invalid code, you need to correct it.

9/16/2005  Bellomo, Anthony

1       Q.    Well, but doesn't the system itself in

2    some instances replace that invalid code with a

3    valid code and move on with the process

4    automatically?

5       A.    Under the definition of an invalid code,

6    meaning a code that is invalid by, by its, you

7    know, by a standard IT definition, no.

8       Q.    What about a duplicate code, for

9    instance, if the, if the -- does the Facets system

10   operate to delete a duplicate medical service code

11   within a particular claim?

12      A.    No.

13      Q.    What does it do when it detects a

14   duplicate medical service code within a claim?

15      A.    It flags it as a duplicate, and it

16   doesn't pay it.  It doesn't delete it.  It doesn't

17   correct it.  It doesn't -- it flags it as this is a

18   duplicate service as of a prior one, and then it

19   will not pay for it.

20      Q.    Is it your testimony that Facets never

21   under any circumstance replaces one medical service

22   code with another?

23      A.    No, it's not my testimony.

24      Q.    It does in fact do that, doesn't it?

25         MR. THOMAS:  Objection, argumentative.

109

9/16/2005  Bellomo, Anthony

1        MR. RANDALL:  It's a question.

2        Q.    Does Facets operate --

3        A.    To replace?

4        Q.    -- to replace one medical service code

5    with another within a claim, based on checking the

6    set of relationships among medical service codes

7    within a database?

8        A.    Yes.

9        Q.    And what does it do with that medical

10    service code that has been replaced?

11        A.    It keeps a history of it so that we know

12    what was replaced and why, and it continues the

13    process with the code that it was replaced by.

14        Q.    The system does not continue to process

15    the replaced medical service code, correct?

16        A.    Correct.

17        Q.    And the system in that event revises the

18    claim to include the, the new medical service code,

19    correct?

20        A.    Correct.

21        Q.    Does the Facets system operate with a

22    database containing medical service codes that

23    include CPT codes?

24        A.    Yes.

25        MR. RANDALL:  I just got my notice that

9/16/2005  Bellomo, Anthony

1     we need to change the tape, so why don't we

2     change the tape, and I'd like to continue for

3     a few more minutes.

4          MR. THOMAS:  Well, it's 12:40, or

5     something like that.  I'd like the witness to

6     be able to eat.

7          MR. RANDALL:  Well, why don't we do

8     this.  Why don't we change the tape and then

9     continue with the examination -- I'm right in

10    the middle of an examination; you know that,

11    counsel -- and then we'll take a lunch break.

12         MR. THOMAS:  Ten minutes.

13         THE VIDEOGRAPHER:  The time is now

14    12:41.  This ends tape three.  We're going off

15    the record.

16         (The videographer changed tapes.)

17         THE VIDEOGRAPHER:  The time is

18    approximately 12:42.  This begins tape four of

19    the video deposition of Tony Bellomo.  We are

20    on the record.

21    Q.    Mr. Bellomo, does Facets operate with a

22    database that contains relationships among medical

23    service codes that are based on medical

24    relationships?

25    A.    Define "medical relationships."

1       Q.    Do you have any understanding at all

2    about the relationships of medical service codes

3    contained in the database that Facets operates

4    with?

5       A.    Yes, I do.

6       Q.    And what is your understanding about

7    those relationships?

8       A.    That we are interpreting the CPT book

9    that is published, and in there it has

10   recommendations for what procedures go with each

11   other and what is generally authorized for payment.

12      Q.    And the medical relationships that

13   determine what procedures go with each other,

14   that's based on medical reasons, correct?

15      A.    My presumption is it is, but it's, the

16   medical reasoning is not within Facets.  The codes

17   are in Facets, and it's dictated by the suppliers

18   of that data.

19           They've probably based -- in fact, they

20   should base their, their construction of that

21   database on the way medicine is practiced and

22   should be practiced, but they're not contained, we

23   don't have medical relationships within the

24   database in a broad sense of the word.  We may be

25   in a semantical question at this point.

9/16/2005  Bellomo, Anthony

1      Q.    Does the database that operates with

2   Facets contain a set of relationships among medical

3   service codes that are based on medical factors?

4      A.    Yes.

5      Q.    Does Facets have the capability for

6   determining whether one medical service code within

7   a claim should be disallowed because it should have

8   been included within another medical service code

9   also listed within the claim?

10     A.    Yes.

11     Q.    Does Facets contain the capability for

12  authorizing for payment medical service codes that

13  are determined not to be included within another

14  medical service code?

15         MR. THOMAS:  Can I have that read back,

16  please.

17         (Record read.)

18          MR. THOMAS:  Objection, vague and

19  ambiguous.

20     Q.    It's in effect the converse of what --

21     A.    I mean, you're just allowing things to

22  happen.  Do we allow service codes to be paid?

23  Yes.

24     Q.    Well, there's a check performed, is

25  there not?  There's a check performed to see if a

1    medical service code within a claim should be

2    included within another medical service schedule,

3    correct?

4        A.    Correct.

5        Q.    And if it's not, if it's determined that

6    it need not be included within the other medical

7    service code within the claim, then it may be

8    allowed for payment, correct?

9        A.    Maybe.  It --

10        Q.    That's right.

11        A.    -- got past that gate and will continue.

12        Q.    All right.

13        A.    Correct.

14        Q.    And Facets contains the capability for

15    disallowing for payment those medical claims that

16    are determined to be included within another

17    medical service code within the claim, correct?

18        A.    Yes.

19        Q.    Does Facets contain the capability of

20    determining whether one medical service code within

21    a claim is mutually exclusive with another medical

22    service code contained in the claim?

23        A.    I don't know.

24        Q.    You simply don't know if that clinical

25    edit exists in Facets?

114

9/16/2005  Bellomo, Anthony

1    A.    Correct.

2          MR. RANDALL:  All right, we can take our

3    lunch break.

4          THE VIDEOGRAPHER:  The time is

5    approximately 12:49.  This ends tape four of

6    the deposition of Tony Bellomo.  We are going

7    off the record.

8          (Luncheon recess taken:  12:49 p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          A F T E R N O O N   S E S S I O N

2          (Time noted:  1:48 p.m.)

3          THE VIDEOGRAPHER:  The time is

4     approximately 1:48 p.m.  This begins tape five

5     of the video deposition of Tony Bellomo.  We

6     are on the record.

7     A N T H O N Y   B E N J A M I N   B E L L O M O,

8          resumed as a witness, having been previously

9          sworn by a Notary Public, was examined and

10         testified under oath as follows:

11    EXAMINATION BY MR. RANDALL:

12         Q.    Mr. Bellomo, does Facets have the

13    capability of determining whether at least one

14    medical service code within a claim is medically

15    exclusive with any other medical service code in

16    that claim?

17         MR. THOMAS:  Objection, vague,

18    ambiguous.

19         A.    I, I'm not sure I understand what the

20    term "medically exclusive" means.  Can you define

21    that.

22         Q.    Well, for instance, if the claim and

23    medical service codes indicated that an ovary was

24    removed from a man.

25         A.    So meaning that it would be

1    inappropriate for that age/gender?

2        Q.    No, it would be, the medical service

3    codes contained in a claim would be mutually

4    exclusive for medical reasons, such as you can't

5    remove an ovary from a man.

6        MR. THOMAS:  Objection, vague,

7        ambiguous.

8        A.    We have some logic in the database that

9    relates procedure codes against gender and age.

10   There is that logic in the database, so if that's

11   the question you're asking, the answer to it is

12   yes, we, we relate procedure codes in some cases to

13   age and gender.

14       Q.    And to -- well, do you believe that a

15   medical service code within a claim that identifies

16   removal, for instance, of an ovary from a man, from

17   a man would be medically exclusive?

18       MR. THOMAS:  Same objection.

19       A.    I don't know what "medically exclusive"

20   means.  It's not a term that I'm familiar with.

21       Q.    Does Facets operate to identify mutually

22   exclusive procedures based on medical service codes

23   that are defined based on medical practice

24   standards?

25       MR. THOMAS:  The same objections.

9/16/2005  Bellomo, Anthony

1       A.    I don't understand what you mean.

2       Q.    Well, when I'm talking about medically

3   exclusive -- all right? -- I'm talking about two or

4   more medical service codes that by medical practice

5   standards would not be billed on the same patient

6   on the same day of service.

7       A.    Yes, we do that.

8       Q.    And so Facets operates to determine

9   whether a medical service code by medical practice

10  standards would not be billed on the same patient

11  on the same date of service for medical reasons,

12  correct?

13          MR. THOMAS:  Same objection.

14      A.    See, what I'm finding hard to follow is

15  that you ask a question which I don't quite get the

16  terms on.  Then you give an example which I could

17  agree with, and then you move the two aboard a

18  statement which is back to the original terms which

19  I didn't understand, so I can't say yes to that.

20          I could say yes to your specific

21  question, but you're asking broad questions with

22  vague terms in it that I'm not comfortable saying

23  yes to.

24      Q.    Does Facets' clinical editing system

25  also check for invalid codes?

1      A.   Facets checks for invalid codes.

2      Q.   And it disallows for payment invalid

3   codes, correct?

4      A.   No.

5           MR. RANDALL:  I'll mark for

6   identification as Exhibit 8 a one-page

7   document entitled "Provider Perspective."

8           (Bellomo Exhibit 8, Provider

9   Perspective, marked for identification.)

10     Q.   This document is entitled "Provider

11  Perspective," and it bears a date of spring 2004,

12  volume 8, number 1 and the title "M*Plan replacing

13  clinical editing system," and it goes on to state,

14  "M*plan is replacing its previous clinical editing

15  system, ClaimCheck, with the PACE clinical editing

16  system."

17          Do you see that, Mr. Bellomo?

18     A.   Yes.

19     Q.   Is M*plan a customer of Erisco -- I

20  mean, I'm sorry -- of TriZetto?

21     A.   Yes.

22     Q.   And is this an example of a McKesson

23  customer switching clinical editing systems from

24  McKesson to TriZetto?

25     A.   It appears to be.

Page 209

```
 1
 2
 3
 4
 5
 6
 7
 8
 9    I, ANTHONY BENJAMIN BELLOMO, do hereby declare under
10  penalty of perjury that I have read the foregoing
11  transcript; that I have made any corrections as appear
12  noted, in ink, initialed by me, or attached hereto; that
13  my testimony as contained herein, as corrected, is true
14  and correct.
15      EXECUTED this 14 day of November
16  20 05, at Union, NJ
                (City)        (State)
17
18
19
20
              ANTHONY BENJAMIN BELLOMO
21
22
23
24
25
```

---

Page 210

```
 1          C E R T I F I C A T E
 2
 3  STATE OF NEW YORK )
 4                   ) Ss
 5  COUNTY OF NEW YORK )
 6
 7      I, JAMES W. JOHNSON, a Registered
 8  Professional Reporter and Notary Public within
 9  and for the State of New York, do hereby
10  certify:
11      That ANTHONY BENJAMIN BELLOMO, the
12  witness whose deposition is hereinbefore set
13  forth, was duly sworn by me and that such
14  deposition is a true record of the testimony
15  given by such witness.
16      I further certify that I am not related
17  to any of the parties to this action by blood
18  or marriage and that I am in no way interested
19  in the outcome of this matter.
20      IN WITNESS WHEREOF I have hereunto set
21  my hand this 25th day of September 2005.
22
23
            _____
24          JAMES W. JOHNSON
            Registration #01J05000925
            Commission Expires 9/4/2006
25
```

---

Page 211

```
 1
 2  ------------------I N D E X------------------
 3  WITNESS        EXAMINATION BY        PAGE
 4  Anthony Bellomo    Mr. Randall        5
 5
 6
 7  ------------------MOTIONS------------------
 8  PAGES  50, 81, 103
 9
10
11  ------------------EXHIBITS------------------
12  BELLOMO                    PAGE
13    1   E-Mail, TRZ 637190-191       42
14    2   E-Mail, TRZ 207303           47
15    3   E-Mail, TRZ 358484           52
16    4   E-Mail, TRZ 687691-7692      57
17    5   Letter, Aug 20, 1998, MCK034337-338  59
18
19
20
21
22
23
24
25
```

---

Page 212

```
 1
 2
 3  ------------------EXHIBITS------------------
 4  BELLOMO                    PAGE
 5    6   E-Mail, TRZ 295420-5421     62
 6    7   US Patent Number 5,253,164  84
 7    8   Provider Perspective        119
 8    9   Letter, Jan 24, 1989, MCK117578  151
 9   10   Letter, Jun 29, 1989, TRZ 837458  165
10   11   Letter, Jun 13, 1989, TRZ 837024-25  169
11   12   Letter, Jul 3, 1989, TRZ 837026-047  170
12   13   TriZetto Group Web Page Printout  182
13   14   Notice of 30(b)(6) Deposition  183
14   15   Notice of 30(b)(6) Deposition  194
15   16   Letter, Aug 30, 2005         188
16
17
18
19
20
21
22
23
24
25
```

53 (Pages 209 to 212)

# EXHIBIT O

Redacted

# EXHIBIT P

1          UNITED STATES DISTRICT COURT

2          FOR THE DISTRICT OF DELAWARE

3

4     McKESSON INFORMATION SOLUTIONS LLC,

5              Plaintiff,

6          -against-        Civil Action No.

                            04-1258-SLR

7     THE TRIZETTO GROUP, INC.,

8              Defendant.

9

10

11                  .

_____

12

13

14     VIDEOTAPED DEPOSITION OF KAREN LAMPE

15            New York, New York

16        Wednesday, September 14, 2005

17

18

19

20

21     Reported by:

       CATHI IRISH

22     RPR/CLVS

23     JOB NO. 38481

24

25

9/14/2005  Lampe, Karen

1      Q.   Okay, Union.

2           What was the purpose of the meeting?

3      A.   To explain to us about the lawsuit and

4    to go over the patent and to gather information.

5      Q.   Had you read the patent by the time the

6    meeting started?

7      A.   No.

8      Q.   Did you receive a copy of the patent at

9    the meeting?

10     A.   Yes.

11     Q.   Did you read it after that?

12     A.   No.

13     Q.   Have you read it since?

14     A.   No.

15     Q.   Did you understand from the meeting or

16   anything you learned after the meeting that anyone

17   else at the meeting had read the patent at that

18   time from TriZetto?

19     A.   During the meeting, we went through the

20   patent, but I don't know of anyone that continued

21   to read it or study it or anything afterwards.  Is

22   that what you were asking?

23     Q.   Sure.  Were there any documents handed

24   out at the meeting?

25     A.   The patent.  I can't remember anything

1    that I won't be able to examine any witness on

2    anything pre-1998, given that your designee

3    can't testify about that.

4         MR. MUINO:  Well, sure you will.  You

5    can examine Mr. Luftig on that subject.  I've

6    said that several times.  I'm not going to

7    object to you asking any questions about

8    ClaimFacts.  They were cross-designated on

9    each of these topics.

10        MR. RANDALL:  When is Mr. Luftig

11    available, by the way, for his 30(b)(6)?

12        MR. MUINO:  I have no idea.  We're

13    working on it, though.

14        MR. RANDALL:  I've marked for

15    identification as Exhibit 2 the McKesson

16    patent.

17        (Lampe Exhibit 2, United States patent

18    5,253,164, marked for identification, as of

19    this date.)

20   BY MR. RANDALL:

21    Q.    Ms. Lampe, I'm going to ask you a few

22   questions about how ClaimFacts operates.

23        Does ClaimFacts operate with a

24   database?

25    A.    I don't know.  No, I don't --

57

1    programming lingo, I'm not sure.  It's written in

2    Cobalt.

3        Q.    Doesn't ClaimFacts utilize a database

4    that has a predetermined set of relationships

5    between medical service codes?

6        A.    Oh, ClinicaLogic, yes, there are

7    records set up that are -- where our criteria

8    lives.  So I don't know that it would be

9    classified as a database because it's not

10    separate; it's incorporated into the system.  But

11    yes, there are separate records for the

12    ClinicaLogic function.

13        Q.    So we get this, I want to get my

14    terminology correct.  ClaimFacts is a system that

15    has integrated into it ClinicaLogic, and this

16    database has a predetermined set of relationships

17    between medical service codes; is that right?

18        A.    Yes, I would say that's correct.

19        Q.    And ClaimFacts operates to utilize

20    these predetermined set of relationships between

21    medical service codes to determine if one or more

22    medical codes in a claim is valid or invalid,

23    correct?

24        A.    Yes.

25        Q.    And the predetermined set of

1    relationships between medical service codes in

2    ClaimFacts is based in part on medical reasons or

3    medical considerations, correct?

4        A.    Correct.

5        Q.    Does ClaimFacts also operate to

6    invalidate one or more medical service codes based

7    on non-medical reasons?

8            MR. MUINO:  Objection, vague and

9        ambiguous as to --

10    BY MR. RANDALL:

11        Q.    Do you know what I mean by non-medical

12    reasons?

13        A.    No.

14        Q.    So for instance, if the medical

15    procedure were a cosmetic procedure, if the

16    medical procedure exceeded a preset cost for that

17    medical procedure, things like that.

18        A.    Okay.  The preset cost is handled

19    outside of ClinicaLogic.  ClinicaLogic doesn't

20    have -- have -- doesn't include usual customary

21    fees.  Cosmetic, experimental, or investigative

22    age parameters, gender parameters, inpatient

23    versus outpatient designations for the site of the

24    services, those types of things, yes, it does have

25    those.

1    Q.   So, for instance, ClaimFacts does

2    operate to invalidate some medical service codes

3    based on non-medical reasons as I explained it,

4    correct?

5    A.   Yes.

6    Q.   The vast majority, however, are based

7    on medical reasons, correct?

8    A.   I would have to say that's correct.

9    Q.   I'm going to ask you to look at the

10   McKesson patent.  I've marked it as Exhibit 2.

11   Can you look at the second to last page?

12        I'm sorry.  I'll just give you a copy.

13   A.   Thank you.

14   Q.   The second to last page contains a list

15   of numbered paragraphs or claims.  These are each

16   claim numbers.  Do you see that?

17   A.   Uh-huh, yes.

18   Q.   And on this page and on the next page

19   it shows claims 1 through 16.  Do you see that?

20   A.   1 through 16?

21   Q.   Paragraphs 1 through 16 or claims 1

22   through 16 on the two pages -- the last two pages

23   of the patent.

24   A.   Oh, oh, yes.

25   Q.   So I want to direct your attention to

9/14/2005  Lampe, Karen

1    claim 1 and that's at the top of column 117.  Do

2    you see that?

3        A.   Yes.

4        Q.   Can you read just that claim which is

5    just paragraph 1 there?  And I want to ask you if

6    ClaimFacts performs the steps described in claim

7    1.

8        A.   Okay.

9            MR. MUINO:  While she's reading,

10    Counsel, can I put a standing objection on the

11    record to this line of questions?

12            MR. RANDALL:  What's your standing

13    objection?

14            MR. MUINO:  The objection is first, it

15    calls for a legal conclusion, it calls for

16    speculation, it calls for expert opinion.

17    Those are the objections.  If I could get a

18    standing objection to this line of questions.

19            MR. RANDALL:  Yes, you can.

20            THE WITNESS:  Okay.

21    BY MR. RANDALL:

22        Q.   The question, Ms. Lampe, is:  Does

23    ClaimFacts perform the steps described in claim 1

24    of the McKesson patent?

25        A.   It performs -- it performs -- yes, it

**9/14/2005  Lampe, Karen**

1    performs them.  I don't know if it performs them

2    in the same order.

3        Q.    That's fine.

4        A.    But -- but we -- I guess this is how we

5    describe it.  It's not the way I would describe

6    it.

7        Q.    I understand.  But nonetheless, this

8    does -- strike that.

9            ClaimFacts does operate to perform the

10    steps in claim 1, correct?

11        A.    Yes.

12        Q.    Can you look at claim 2?  I'm going ask

13    you the same question.

14        A.    Okay.

15        Q.    Does ClaimFacts perform the steps

16    described in claim 2 of the McKesson patent?

17        A.    I think we need to break it down

18    because there's some that I'm not sure.

19        Q.    What's the first uncertainty that you

20    have?

21        A.    Let's see.  Ascertaining whether at

22    least one claim contained the plurality of medical

23    service codes.

24        Q.    More than one.

25        A.    Just more than one?

9/14/2005  Lampe, Karen

1      Q.    Yes.  So that element.

2      A.    Yes, yes.

3      Q.    With that clarification, does

4    TriZetto's ClaimFacts perform the steps described

5    in claim 2 of the McKesson patent?

6      A.    The next one?

7      Q.    Yes.

8      A.    Determining whether one of the medical

9    service codes and at least one claim is mutually

10   exclusive due to non-medical criteria and with any

11   other medical service code in least one claim?

12   That's not the terminology I would use in the

13   ClinicaLogic world, so I'm not sure what they're

14   meaning by mutually exclusive.

15     Q.    Well, for instance, is a medical

16   service code for a particular procedure on a

17   particular day that was performed both within the

18   hospital and outside the hospital, that would be

19   mutually exclusive based on the non-medical

20   reason, correct?

21          I'm asking you:  Is there any instance

22   at all within ClaimFacts where ClaimFacts will

23   determine that one medical service code is invalid

24   because it's mutually exclusive for some reason

25   with another medical service code, for some reason

9/14/2005  Lampe, Karen

1    other than medical reasons?

2        A.   I'm not sure.  I'm not sure I can

3    answer that.  One code against another code for

4    non-medical reasons.  The edits that I can recall,

5    and I work with them a lot, when you're talking

6    about a code to code relationship, a procedure

7    code to procedure code relationship, I think it's

8    all based on medical or CPT guidelines, NCCI

9    edits.

10            I can't think of one that does it based

11   on gender or age or any of the other non-medical

12   ones.  I mean, an age or a gender edit would go

13   against a specific code, but I don't know that one

14   code would edit against the other one because of

15   that.

16            The system does not -- well, I don't

17   know that you would even input a claim that had

18   procedure on one day inpatient and procedure on

19   the same date outpatient.  That would be an input

20   error.  And it would be that line that would come

21   up as an edit, not the codes against each other.

22       Q.   What types of checks does ClaimFacts

23   conduct on medical service codes that are

24   non-medical in nature?

25       A.   Okay, it checks for if the code has

9/14/2005  Lampe, Karen

1    been deleted by the AMA.  It checks for

2    inpatient versus -- place of setting.  It checks

3    for investigative or experimental procedures,

4    outdated procedures, age, gender parameters, for

5    anesthesia time parameters.

6         If anesthesia is valid for that

7    surgical code, general anesthesia is usually

8    required for that surgical code or not.  It will

9    cross walk to an anesthesia code.

10    Q.   Let me ask you a question about deleted

11   codes, for instance.  If a claim, for instance,

12   included a medical service code that was deleted

13   and also included a medical service code for the

14   same service, however, that was a different code,

15   it was updated, would the Facets system detect for

16   non-medical reasons?

17    A.   ClaimFacts system.

18    Q.   ClaimFacts system detect for

19   non-medical reasons that these two medical service

20   codes were mutually inclusive, namely that

21   couldn't perform a deleted service code at the

22   same time performing a legitimate service code for

23   the same procedure?

24    A.   The system will take that deleted code

25   and reformat it or put the correct new valid code

65

1    in it and it will edit on that new valid code.

2        Q.    And then it would determine that they

3    are mutually exclusive because there's two exact

4    duplicates of the same code, correct?

5        A.    Yes.

6        Q.    So with this clarification in mind,

7    namely that there are -- strike that.

8            ClaimFacts does edit medical service

9    codes for non-medical reasons, correct?

10       A.    Correct.

11       Q.    And could you look at claim 2,

12   specifically the step of ascertaining whether

13   the -- at least one claim contains --

14   determining -- looking at claim 2, the step is

15   determining whether one of the medical service

16   codes and at least one claim is mutually exclusive

17   due to non-medical criteria with any other medical

18   service code in the at least one claim.

19           Does ClaimFacts on occasion perform

20   that step?

21       A.    Based on the example we talked about,

22   yes.

23       Q.    Were there any other issues with

24   respect to claim 2 that you had, any other

25   uncertainties, other than the two you mentioned?

1      A.   Yeah, we can go to the next one.

2      Q.   Okay.

3      A.   "Authorizing medical service codes

4    which are not mutually exclusive due to

5    non-medical criteria with any other medical codes

6    contained in the at least one claim in response to

7    the determining step."

8      Q.   So what that means is if -- does

9    ClaimFacts actually authorize on occasion medical

10   service codes that are not mutually exclusive due

11   to non-medical criteria?  It's really the converse

12   of the --

13     A.   It's converse of the other one, so it

14   allows codes.

15     Q.   That's right.

16     A.   It tells you that the code is eligible,

17   yes, it does.

18     Q.   Any other uncertainties with respect to

19   claim 2?

20     A.   We'd better go to the last one just to

21   be sure.

22          "Rejecting medical service codes which

23   are mutually exclusive due to non-medical criteria

24   with any other medical service codes contained in

25   the at least one claim in response to the

1    determining step."

2        Q.    Well, the determining step was simply

3    determining if that relationship existed for

4    non-medical reasons?

5        A.    Okay.

6        Q.    The rejecting step means if that's the

7    case, then the --

8        A.    Claim is disallowed.

9        Q.    -- the mutually exclusive code for

10   non-medical reasons is rejected.

11       A.    I'm sorry, say that again.

12       Q.    Yes.

13            This last step means that the mutually

14   exclusive medical code that is determined at the

15   determining step is actually rejected.

16       A.    Yes.

17       Q.    So with those clarifications that we've

18   discussed, does ClaimFacts perform the steps of

19   claim 2 of the McKesson patent?

20       A.    Yes.

21       Q.    Could you look at claim 3.  And I'm

22   going to ask you the same question which is:

23   Does -- slightly different.

24            Does ClaimFacts include the components

25   described in claim 3 of the McKesson patent?

1        A.    Okay.  Computer system including

2    essential processing unit?

3        Q.    Yes.

4        A.    I'm not sure how that would be defined

5    in -- I guess it would be.  I guess there's a main

6    computer -- no.  I'm not sure about the technology

7    on that and how it -- and how it would relate to

8    what we do.  The steps in the number 3 as to what

9    it does, yes, we do do that.

10       Q.    So the only thing you're unclear about

11   with respect to the components of claim 3 and

12   ClaimFacts is whether ClaimFacts includes a

13   central processing unit; is that right?

14       A.    That's correct.

15       Q.    And assuming that ClaimFacts, including

16   its servers, do have a central processing unit,

17   then would you agree that ClaimFacts includes all

18   of the components listed in claim 3 of the

19   McKesson patent?

20       A.    Yes.

21       Q.    I'm going to ask you specifically a

22   couple of questions about 3, for instance.  How

23   are claims received by ClaimFacts?

24       A.    They can be received through electronic

25   data interchange, so you know, wireless -- or

9/14/2005  Lampe, Karen

1    paperless claims processing, and they can be input

2    by a claims exam -- claims examiner manually.

3        Q.    And if it's done manually, the claims

4    examiner would input data from a claim into a form

5    on the computer; is that right?

6        A.    Correct.

7        Q.    And I have a question about these means

8    for ascertaining, means for determining, means for

9    authorizing and means for rejecting in claim 3.

10   Do you see that?

11       A.    Uh-huh.

12       Q.    Are those components in ClaimFacts

13   software; is that what does that?

14       A.    Yes.

15       Q.    Can you read claim 4?  And claim 4 is

16   the same system as claim 3, except it has that

17   additional limitation.  So could you read that and

18   tell me if TriZetto's ClaimFacts includes the

19   components of claim 3 and claim 4?

20       A.    "Delete invalid medical service codes."

21       Q.    Yes.

22       A.    Does that mean a code is no longer

23   active?

24       Q.    That's right.

25       A.    Yes, then that's correct.

9/14/2005  Lampe, Karen

1      Q.    It also takes an invalid medical

2   service code and it discontinues any future

3   processing of that code, correct?  It eliminates

4   it from any further consideration?

5      A.    Yes, well, I don't know actually.  I

6   don't know where that step would fall into the --

7   actually no, it doesn't.  If it's a deleted code

8   with a replacement by the AMA, the system will

9   automatically replace it with the new code and

10  continue processing.

11     Q.    And if it's a code for any other reason

12  that's determined to be invalid, then --

13     A.    There's one thing I'd like to clarify.

14     Q.    Sure.

15     A.    In the ClinicaLogic system we have an

16  edit called invalid.  That is a user defined edit.

17  That gives the customers an opportunity to

18  determine that that code, for whatever reason,

19  isn't covered under their plan.  So invalid means

20  something a little bit different to me, so I'm

21  just clarifying that.

22     Q.    Okay.  And a user could determine that

23  any given -- any number of medical service codes

24  are invalid for either medical or non-medical

25  reasons, correct?

9/14/2005  Lampe, Karen

1       A.    Correct.

2       Q.    Using the definition for delete an

3    invalid medical service code as you've indicated,

4    either it deletes it and it replaces it, or it

5    simply sets it aside and does not engage in any

6    further processing of that code?

7       A.    No, that's not correct.  If the code is

8    deleted without a replacement, an issue message is

9    displayed for the examiner that says this code is

10   deleted.  Have a code -- return it to the

11   program -- to the physician or refer it to a

12   supervisor, that code will still be in play in the

13   claim because it's not a hard edit in the system.

14   Only the format edit where it automatically

15   changes is a hard edit.

16        So if there's also a delete for a code

17   deleted by the AMA where there could be more than

18   one possible replacement codes, more than one

19   possible new codes to use in place of that, the

20   system will notify the examiner that there are

21   one, two, three, four codes, that this is deleted,

22   there are four possible replacements, pick one.

23   And the system will continue processing based on

24   whatever they choose.

25      Q.    ClaimFacts operates to delete medical

72

9/14/2005  Lampe, Karen

1    service codes that it determines to be invalid

2    for, among other reasons, the fact that the

3    medical service code is no longer valid and has

4    been replaced with another one, correct?

5        A.    Correct.

6        Q.    So -- and I don't have to go -- I'm not

7    going to go through all the different instances in

8    which this is done.  That's just simply one,

9    correct?

10        A.    Okay.

11        Q.    With that in mind, would you agree that

12    the TriZetto ClaimFacts system contains all of the

13    elements described in both claim 3 and claim 4?

14        A.    Yes.

15        Q.    Could you read claim 5?  And claim 5 is

16    a claim that includes the apparatus or the system

17    of claim 4.  It just has one further limitation.

18        A.    Yeah, there's a display that tells the

19    examiner what happened with the claim and why.

20        Q.    So would you agree that TriZetto's

21    ClaimFacts includes the components described in

22    claims 3, 4 and 5?

23        A.    Yes.

24        Q.    Could you read claim 6?  Claim 6

25    includes all of the components of claim 3 and the

9/14/2005  Lampe, Karen

1     added limitation in claim 6.

2         A.    Yes.

3         Q.    So is it your understanding that

4     TriZetto's ClaimFacts product includes all the

5     components of claim 3 and claim 6?

6         A.    Yes.

7         Q.    Do you know what the CRV codes are in

8     claim 7?

9         A.    I believe they are customary and

10    reasonable value codes, or pricing codes.  Is that

11    correct?  Relative value system.  It's California

12    relative value system which is no longer used,

13    actually.

14        Q.    Does ClaimFacts use that?

15        A.    No.  Well, ClinicaLogic doesn't use it.

16    ClaimFacts has its pricing separate from

17    ClinicaLogic.

18        Q.    So does ClaimFacts include all of the

19    components of claim 3 and claim 7?

20        A.    No.

21        Q.    Because it doesn't utilize CRV codes?

22        A.    Correct.

23        Q.    Could you read claim 8?  Claim 8

24    includes all the components of claim 3 and the

25    added limitation from claim 8.

1    A.   Yes.

2    Q.   So is it your understanding that

3    ClaimFacts includes all of the components of

4    claims 3 and 8?

5    A.   Yes.

6    Q.   Claim 9 also includes all the

7    components of claim 3.  Could you read that and

8    tell me if ClaimFacts includes all of the

9    components of claims 3 and 9?

10    A.   Yes.

11    Q.   ClaimFacts does include all the

12    components of claims 3 and 9?

13    A.   Yes.

14    Q.   Could you read claim 10?  Claim 10 is

15    an independent claim, meaning it's just -- if you

16    could just read all of claim 10.  And I'm going to

17    ask you if ClaimFacts includes the components

18    listed in claim 10.

19    A.   Okay.

20    Q.   Does ClaimFacts contain all of the

21    components described in claim 10?

22    A.   Yes.

23    Q.   Can you read claim 11?  Claim 11

24    includes all the components from claim 10 plus the

25    added limitation in claim 11.

1      A.    I'm not sure.  I need an explanation on

2      that.  Seems simple enough, but...

3      Q.    For instance, when we just discussed

4      this example, when ClaimFacts determines that a

5      medical service code is no longer valid or has

6      been deleted, and it has been substituted with a

7      new medical service code, ClaimFacts will reject

8      the deleted or invalid code and actually replace

9      it with the updated code, correct?

10     A.    Correct.

11     Q.    All right.  So with that clarification

12     in mind and that example in mind, does ClaimFacts

13     include all the components of claims 11 and 10?

14     A.    Yes.

15     Q.    Would you read claim 12, and I'll ask

16     you if ClaimFacts contains the components

17     described in claim 12.

18     A.    Okay.

19     Q.    Does ClaimFacts contain all the

20     components described in claim 12?

21     A.    Yes.

22     Q.    Can you read claim 13 and I'll ask you

23     the same question:  Does ClaimFacts contain all

24     the components described in claim 13?

25     A.    Okay.

9/14/2005  Lampe, Karen

1      Q.    Does ClaimFacts contain all of the

2    components described in claim 13?

3      A.    Yes.

4      Q.    Can you read claim 14 and I'll ask you

5    the same question:  Does ClaimFacts contain all of

6    the components described in claim 14?

7      A.    This is very similar to another one, to

8    one of the other ones where it's talking about

9    mutually exclusive based on non-medical reasons.

10   Okay.

11     Q.    So does -- does, based on your

12   understanding, ClaimFacts include all of the

13   components described in claim 14?

14     A.    Yes.

15     Q.    Could you read claim 15 and I'll ask:

16   Does ClaimFacts include all of the components of

17   claim --

18        MR. RANDALL:  I'm sorry.  We have to

19   stop to change the tape and then we'll come

20   back on the record, all right?

21        THE VIDEOGRAPHER:  The time is now 2:20

22   p.m. and this ends tape number 2 of the

23   videotaped deposition of Karen Lampe.

24        (Discussion off the record.)

25        THE VIDEOGRAPHER:  The time is now 2:22

77

9/14/2005  Lampe, Karen

1    p.m. and this begins tape number 3 of the

2    videotaped deposition of Karen Lampe.

3    BY MR. RANDALL:

4        Q.   Ms. Lampe, can you read claim 15 and

5    I'll ask you whether ClaimFacts includes all of

6    the components of claim 15.

7            MR. MUINO:  Counsel, just to clarify, I

8        still have a standing objection.

9            MR. RANDALL:  The objection you stated,

10       yes.

11           THE WITNESS:  Okay.

12   BY MR. RANDALL:

13       Q.   Does ClaimFacts contain the components

14   described in claim 15?

15       A.   Yes.

16       Q.   I'll ask you the same question, or a

17   similar question with respect to claim 16.  Does

18   ClaimFacts perform the steps described in claim

19   16?

20       A.   I don't see the difference between 15

21   and 16.

22       Q.   Well, one difference is that one is an

23   apparatus claim or system and the other one is a

24   method of steps that are performed, so I

25   understand why you can see a great similarity in

9/14/2005  Lampe, Karen

1   those two.  But one is the physical apparatus and

2   one is a method of steps being performed.  And

3   that's why in asking the question I asked, do you

4   understand ClaimFacts to perform the steps

5   described in claim 16?

6   A.   Oh, you asked the question differently.

7   Q.   Yes.

8   A.   Now I have to reread it.

9   Q.   Okay.

10   A.   Okay.

11   Q.   Does ClaimFacts include -- does

12   ClaimFacts perform the steps described in claim

13   16?

14   A.   Yes.

15   Q.   You've just gone through all 16 claims

16   and you've noticed, I'm sure, that many, if not

17   all of them -- strike that.

18       We've just gone through all 16 claims

19   in the McKesson patent.  And many of the claims

20   have language that says, for instance, "means for

21   ascertaining", "means for determining", "means for

22   authorizing" and "means for rejecting".

23       Do you recall that?

24   A.   Yes.

25   Q.   And those elements, means for

9/14/2005  Lampe, Karen

1    ascertaining, determining, authorizing and

2    rejecting are related to the predetermined

3    relationships of the medical service codes in the

4    database, correct?

5        A.   Yes.

6        Q.   And did you -- do you understand

7    ClaimFacts to utilize software as the means for

8    ascertaining and determining these relationships?

9        A.   Yes.

10       Q.   And do you understand ClaimFacts as

11   utilizing software for -- as the means for

12   authorizing and rejecting these medical service

13   codes based on the preset or predetermined

14   relationships in the database?

15       A.   Yes.  Can I clarify something else?

16       Q.   Absolutely.

17       A.   We're referring to this as ClaimFacts,

18   but in truth ClaimFacts, if we really get down to

19   it, doesn't do these things.  ClinicaLogic does.

20   Because you can operate and process claims on

21   ClaimFacts without having ClinicaLogic turned on

22   or even loaded into the system.

23       Q.   Your answers are all correct and

24   accurate if, for example, ClinicaLogic is included

25   within the integrated system of ClaimFacts,

9/14/2005 Lampe, Karen

1      A.   Yes.

2      Q.   From the time that you started at

3   TriZetto or Erisco in 1998 until today, has

4   ClinicaLogic's software been organized by having

5   these approximately 29 high-level rules or

6   clinical edits and then a number of relationships

7   that fall within each of those categories?

8      A.   Yes.

9         MR. RANDALL:  I have no further

10      questions subject to the dispute we have

11      regarding privilege.

12         MR. MUINO:  I have just a few

13      questions.

14   EXAMINATION BY

15   MR. MUINO:

16      Q.   Ms. Lampe, can you tell me are you a

17   patent lawyer?

18      A.   No.

19      Q.   Are you a lawyer at all?

20      A.   No.

21      Q.   Has TriZetto designated you as an

22   expert witness in this case?

23      A.   No.

24      Q.   Prior to today when you reviewed the

25   claims of the '164 patent, have you had a chance

9/14/2005  Lampe, Karen

1   ever to in detail read the patent?

2       A.   No, not since -- well, not since that

3   meeting with the attorney, but I didn't read it in

4   detail.  It was sort of read.

5       Q.   Okay.  And today, did you have the

6   opportunity, other than the two pages of claims at

7   the back of the patent, to read the -- this

8   portion of it which is usually called the

9   specification?

10      A.   No.

11      Q.   Do you understand, Ms. Lampe, that the

12  court in this case will undertake to construe any

13  ambiguous terms that are contained in the claims

14  of the '164 patent?

15      A.   Yes.

16      Q.   Do you understand the court hasn't yet

17  construed those claims?

18      A.   Yes.

19      Q.   And obviously you don't have any idea

20  as to how the court is going to construe those

21  claims, do you?

22      A.   No.

23      Q.   Do you understand that the parties have

24  exchanged preliminary claim constructions in this

25  litigation?

96

1

2

3

4

5

6

7

8

9      I, KAREN LAMPE, do hereby declare under

10   penalty of perjury that I have read the foregoing

11   transcript; that I have made any corrections as appear

12   noted, in ink, initialed by me, or attached hereto; that

13   my testimony as contained herein, as corrected, is true

14   and correct.

15         EXECUTED this ___1st___ day of ___December___,

16   20_05_, at ___Union___, ___WJ___.
                      (City)              (State)

17

18

19

20   _____
                 KAREN LAMPE

21

22

23

24

25