# EXHIBIT Q

1          IN THE UNITED STATES DISTRICT COURT

2             FOR THE DISTRICT OF DELAWARE

3

4    McKESSON INFORMATION

     SOLUTIONS, LLC,

5                      Civil Action

          Plaintiff,      No. 04-1258-SLR

6

          vs.

7

     THE TRIZETTO GROUP, INC.,

8

          Defendant.

9

10

11

          _____

12

13   The videotaped deposition of JOHN PETER

14   DANZA, called by the Plaintiff for examination,

15   pursuant to Notice, and pursuant to the Rules of

16   Civil Procedure for the United States District

17   Courts, taken before Sandra L. Rocca, CSR and

18   Notary Public in and for the County of DuPage, and

19   State of Illinois, at 333 West Wacker Drive,

20   Chicago, Illinois, on the 12th day of September,

21   2005, at the hour of 9:45 a.m.

22

23   JOB NO. 38561

24

**9/12/2005  Danza, John**

1       A.  Yes, that's correct.

2       Q.  I'd like to direct your attention back to

3   Danza Exhibit 7, which is the patent numbered

4   5,253,164.  Flip to the second to last page,

5   please.

6       A.  Okay.

7       Q.   If we could just walk through what is

8   numbered paragraph 1 and you can stop me and say I

9   don't understand your question at any point, feel

10   free.  And you can have your standing objection

11   again.

12        MR. MUINO:  Yes, please.

13   BY MR. HENDERSHOT:

14       Q.   On the first line of paragraph 1,

15   Mr. Danza, it says -- at the opening of paragraph

16   -- strike that.

17        Paragraph 1 opens with, "In a computer

18   system having a means for operating on a

19   predetermined database."  Do you see that?

20       A.  I do.

21       Q.   To your understanding, does QicLink

22   operate with a computer system having means for

23   operating on a predetermined database?

24       A.  On a predetermined database.  Again, I

9/12/2005 Danza, John

1    don't know what a predetermined database would

2    indicate, but yes, it has a database.

3        Q.   If the database being included within

4    ClinicaLogic -- strike that.

5            Does QicLink also include a database

6    containing medical service codes and a set of

7    relationships among the medical service codes

8    defining whether a selected one of the medical

9    service codes are valid when input with other

10   selected ones of the medical service codes?

11       A.   Yes, it does.

12       Q.   That database that contains those

13   relationships, its contents are predetermined prior

14   to shipment to a customer, is that correct?

15       A.   Yes, that's correct.

16       Q.   And QicLink also includes -- I'm at the

17   bottom of paragraph 1, the first paragraph

18   underneath heading one.  QicLink also includes a

19   method for processing input claims containing at

20   least one medical service code, is that correct?

21       A.   Oh, I see.  You're not on the indented

22   piece?

23       Q.   No, I'm on the first piece still.

24       A.   Yes, that's correct.

9/12/2005  Danza, John

1    Q.   So QicLink does include a method for

2    processing input claims containing at least one

3    medical service code?

4    A.   QicLink does, yes.

5    Q.   And the method for processing input

6    claims included within QicLink includes the step of

7    receiving at least one claim, is that correct?

8    A.   It does receive.

9    Q.   Then moving down to the next indented

10   section, QicLink includes the ability to determine

11   -- strike that.

12       QicLink determines whether any medical

13   service code contained in the at least one claim is

14   not present in the predetermined database, is that

15   correct.

16   A.   It does.

17   Q.   Turning to the last statement underneath

18   heading one, QicLink includes -- strike that.

19       QicLink informs a user that a medical

20   service code is not contained in the predetermined

21   database, is that correct?

22   A.   It does do that.

23   Q.   Is there any element in the text on page

24   -- strike that.

1        Within Claim 1 of the '164 patent that's

2    been marked as Danza Exhibit --

3        MR. MUINO:  7.

4    BY MR. HENDERSHOT:

5        Q.   Strike that.  Within paragraph 1 which is

6    Claim 1 of the '164 patent which has been marked as

7    Danza Exhibit 7, do you see any element that is not

8    practiced by QicLink?

9        A.   Actually I've not even evaluated this

10   paragraph.  I've just answered your questions.

11       Q.   Every answer to the questions I just

12   offered was consistent with your knowledge to the

13   operations of QicLink?

14       A.   Yes, that's correct.

15       Q.   So could you do me a favor and actually

16   read paragraph 1 now?

17       A.   I can.  I did that previously, but I can.

18       Q.   Do you see any elements in there as you

19   read it now that isn't present within QicLink?

20       A.   Again, when broken down in a certain way

21   that isn't broken down in here, there is different

22   pieces of it QicLink does do, yes.

23       Q.   Do you see any piece that QicLink doesn't

24   do?

1    A.  No, I don't.

2    Q.  Okay.

3    A.  And again it's just the general lack of

4  punctuation that kind of screws up the reading of

5  this.

6    Q.  Understandable.  So if I could direct

7  your attention to paragraph 2, I believe we've

8  discussed or established that QicLink with the

9  ClinicaLogic or Auto Audit module includes a

10  computer system having the means to operate on a

11  predetermined database with relationships among

12  medical service codes that determines whether or

13  not the codes are valid or invalid as recited on

14  the first paragraph of Claim 2, is that correct?

15    A.  Actually I haven't read paragraph 2.  So

16  do you want me to?

17    Q.  If you could read all of the text to

18  yourself between two and three.

19    A.  Okay.  I'm sorry, this is kind of

20  difficult to read.

21    Q.  Where are you?

22    A.  I'm about halfway through it.

23    Q.  Have you read the first subparagraph

24  under two?

9/12/2005  Danza, John

1      A.   Yeah, I have.

2      Q.   Did you see any element in this first

3   subparagraph of Claim 2 that is not present within

4   QicLink?

5      A.   I'm sorry.  I'm just trying to break this

6   down to kind of make it make sense.  Yes, I think

7   up through the first comma, that would be -- yes,

8   that would be present.

9      Q.   And that's up to a method for processing

10   input claims, is that correct?

11      A.   Yes, up to but not including that part.

12   That's as far as I went.

13      Q.   Then moving forward from there.

14      A.   Okay.  I've read through the rest of it.

15      Q.   Do you see any element within Claim 2 as

16   you've read it now that's not present within

17   QicLink?

18      A.   No.

19      Q.   Okay.  So I'm going to try to save you

20   some reading now.  I'll try to direct your

21   attention to specific paragraphs and try to save

22   some time.

23      A.   Thank you.

24      Q.   If you could look at -- these are called

9/12/2005  Danza, John

1    claims, Claim 3 underneath column 117 of the '164

2    patent.

3        A.  So is that the item numbered three?

4        Q.  Yes.

5        A.  Okay.

6        Q.  So in the fourth indented paragraph of

7    Claim 3, there is discussed a means for determining

8    whether one of the medical service codes, do you

9    see that subparagraph?

10       A.  I do.

11       Q.  Could you read that for me?  Not for the

12   record, just to yourself, please.

13       A.  Okay.  If you don't mind, I'm going to

14   read the entry into it as well.

15       Q.  Okay.

16       A.  Okay.

17       Q.  Do you see anything within that fourth

18   indented paragraph of Claim 3 starting with means

19   for determining that's not present within QicLink?

20       A.  No, I don't.

21       Q.  If you would look at Claim 4 or the item

22   numbered four underneath column 117 of the '164

23   patent?

24       A.  Okay.

9/12/2005  Danza, John

1    Q.  Could you read that?

2    A.  Okay, sorry.

3    Q.  Do you see anything --

4    A.  It took so long to read that sentence.

5    Q.  I want to make sure your answers are

6    accurate.  So I appreciate it.

7    A.  Okay, go ahead.

8    Q.  Do you see anything within Claim 4 that

9    you've just read of the '164 patent that is not

10   included with TriZetto's QicLink product?

11   A.  Given that it relates to the entirety of

12   Number 3 before there and I've only kind of looked

13   through the one indentation, I would say no, that

14   would --

15   Q.  Subject to that caveat.

16   A.  That's correct.  So I would say --

17   Q.  Would you turn to Number 5 on the top of

18   column 118 of the '164 patent, please?

19   A.  Okay.

20   Q.  Is there anything within Claim 5 of the

21   '164 patent at the top of column 118 that is not

22   practiced by the QicLink product?

23   A.  No.

24   Q.  Would you turn to Number 6?

9/12/2005  Danza, John

1      A.  Okay.

2      Q.  Is there anything -- is there any element

3   of Claim Number 6 of the '164 patent that is not

4   included within the QicLink product?

5      A.  Again, given that it refers to the

6   entirety of Number 3 that I haven't looked through

7   the entirety of, no.  I would say no.

8      Q.  Why don't you look through the entirety

9   of three real quickly?  As quickly as you feel you

10   can.  There's no goal to meet.

11      A.  Okay, thanks.

12      Q.  Thank you.  Having reviewed Claim 3 of

13   the '164 patent, are there any elements within

14   Claim 3 that are not practiced by the QicLink

15   product?

16      A.  No, there isn't.

17      Q.  So given that there are no elements

18   within Claim 3 of the '164 patent that are not

19   practiced by the QicLink product, turning to

20   Claim 4 which includes all those limitations, is

21   there any element within Claim 4 that is not

22   practiced by the QicLink product?

23      A.  No.

24      Q.  Turning to Claim 5, is there any element

9/12/2005 Danza, John

1    within Claim 5 that is not practiced by the QicLink

2    product?

3       A.  No.

4       Q.  Turning to Claim 6, is there any element

5    within Claim 6 that's not practiced by the QicLink

6    product?

7       A.  No.

8       Q.  Turning to Claim 8, if you could read

9    that for me.

10      A.  Okay.

11      Q.  Are there any elements of Claim 8 that

12   are not practiced by the QicLink product?

13      A.  No.

14      Q.  Actually let me rephrase that if you

15   don't mind.  Are there any elements within Claim 8

16   that are not included within the QicLink product?

17      A.  No.

18      Q.  Would you turn to Claim 9, please?

19      A.  Okay.  Okay.

20      Q.  Are there any elements within Claim 9

21   that are not included within the QicLink product?

22      A.  No.  And again if I may, for just a

23   minute, you're referencing QicLink and I'm

24   answering based on ClinicaLogic.

9/12/2005  Danza, John

1    Q.  Yes, with respect to all of my questions

2  about these claims, I'm discussing QicLink

3  including ClinicaLogic and/or Auto Audit?

4    A.  Right.  I just wanted to be clear.  Okay,

5  great.  Thanks.

6    Q.  Just so the record's clear, because I

7  struck the last one, all of these questions about

8  the claims of the '164 patent are directed at

9  QicLink including either the Auto Audit or the

10  ClinicaLogic clinical editing modules?

11    A.  Understand.  Thank you.

12    Q.  So none of your answers would change

13  given that caveat?

14    A.  That's correct.

15    Q.  And that was an assumption you were

16  making in answering all those questions?

17    A.  That's correct.

18    Q.  I was as well.  Can we take a two-minute

19  break and I'll see if I can wrap it up with a few

20  questions.

21    MR. MUINO:  Sure.

22    VIDEOGRAPHER:  We are off the record at

23  12:03 p.m. with the end of tape Number 1.

24    (Short recess.)

102

9/12/2005  Danza, John

1        VIDEOGRAPHER:  We are back on the record

2    at 12:13 p.m. with the beginning of tape Number 2.

3    BY MR. HENDERSHOT:

4        Q.  So, Mr. Danza, before we went off the

5    record we were discussing the claims of the '164

6    patent which has been marked as Exhibit 7.  And

7    correct me if I'm wrong, but we had gone through

8    Claims 1, 2, 3, 4, 5, 6, 8 and 9 and you had not

9    identified any element recited in those claims that

10   was not present in the QicLink product, is that

11   correct?

12       A.  That's correct.

13       MR. MUINO:  Let me just state that I

14   still have my standing objection to this line of

15   questioning.

16       MR. HENDERSHOT:  Understood.

17       Q.  So if I could direct your attention to

18   the last subparagraph of Claim 10, beginning with

19   "means for determining," do you see that,

20   Mr. Danza?

21       A.  I do.

22       Q.  Could you review that for me?

23       A.  I'm just reading the top of 10 if that's

24   okay.

9/12/2005  Danza, John

1       Q.  Okay.

2       A.  Just because since that sub is kind of a

3   continuation I guess of that sentence.  Okay.

4       Q.  So have you read all of Claim 10?

5       A.  I didn't read all of 10.  I just read the

6   opening of 10 and then the last indented.  That's

7   what you indicated for me.

8       Q.  The third from the last?

9       A.  The third from the last.  I'm sorry.

10      Q.  That's all right.

11      A.  Okay, yes, I've got it.

12      Q.  So is there any element described in the

13  third from the last subparagraph of Claim 10 of the

14  '164 patent that's not present in the QicLink

15  product?

16      A.  No.

17      Q.  Did you identify anything else in the

18  sections of Claim 10 that you read that's not

19  present in the QicLink product?

20      A.  No, I'd only read the one at the very

21  bottom.

22      Q.  Okay.

23      A.  And that would be included as well.

24      Q.  Then if you could look at Claim 11 for

9/12/2005  Danza, John

1    me, Mr. Danza.

2        A.   Okay.

3        Q.   The element that's recited in Claim 11 of

4    the '164 patent, is that included within the

5    QicLink product?

6        A.   Yes.

7        Q.   Okay.  Now, all of our questions about

8    the claims of the '164 patent as we discussed

9    assume that it's a QicLink product that includes

10   the ClinicaLogic or Auto Audit additional module,

11   is that correct?

12       A.   Yes, that's correct.

13       Q.   And the ClinicaLogic module to your

14   knowledge is used in the Facets product and the

15   ClaimFacts product offered by TriZetto as well?

16       A.   That's correct.

17       Q.   And since your answers to the questions

18   regarding the claims of the '164 patent assumed

19   that ClinicaLogic was involved -- strike that.

20          To your knowledge, does ClinicaLogic

21   operate in any material -- any materially different

22   manner within Facets or ClaimFacts than it does

23   within QicLink?

24       A.   I have no idea how they operate -- how it

9/12/2005 Danza, John

1    at 12:26 p.m.

2           MR. HENDERSHOT:  Do you mind if I put

3    something on the record really quickly?

4           MR. MUINO:  No.

5           MR. HENDERSHOT:  It's our position that

6    your examination of this witness doesn't count

7    against our 30(b)(6) time in terms of our

8    deposition limit.

9           MR. MUINO:  Absolutely.  This should only

10   take a couple minutes.

11       Q.  Earlier counsel had presented you with

12   what has been marked as Exhibit Number 7 which is

13   the '164 patent?

14       A.  Yes.

15       Q.  Do you remember that?

16       A.  I do.

17       Q.  Prior to having looked at it today and

18   other than the portions that counsel showed to you

19   today, have you ever read the '164 patent before?

20       A.  I have not.

21       Q.  There is a very lengthy portion of the

22   patent that is other than the last two pages which

23   are the claims.  That portion of the patent, have

24   you ever had a chance to read that portion before?

9/12/2005  Danza, John

1      A.  I've not.

2      Q.  Okay.  Do you understand that the court

3   in the process of this litigation will undertake to

4   define the terms in the claims of the patent?

5      A.  Okay.

6      Q.  Is it your understanding that the court

7   has not yet undertaken a construction of those

8   claim terms?

9      A.  Yes, it is my understanding of that.

10      Q.  And naturally, you have no way of knowing

11   how the court is going to construe those claim

12   terms, do you?

13      A.  I would have no idea.

14      Q.  Are you aware that the parties in the

15   course of this litigation have already put forward

16   preliminary claim constructions?  Is that something

17   you're aware of previously?

18      A.  No, I'm not really aware of any of that.

19      Q.  I'll represent to you that the parties

20   have, in fact, put forward preliminary claim

21   constructions.  Have you ever seen those

22   preliminary claim constructions?

23      A.  No, I haven't.

24      Q.  Were you in any way involved in trying --

I, JOHN PETER DANZA, do hereby declare under
penalty of perjury that I have read the foregoing
transcript; that I have made any corrections as appear
noted, in ink, initialed by me, or attached hereto; that
my testimony as contained herein, as corrected, is true
and correct.

EXECUTED this _2_ day of _December_,
20_05_, at _Naperville_, _Illinois_.
                    (City)              (State)


                    _[signature]_
                    JOHN PETER DANZA

# EXHIBIT R

1       UNITED STATES DISTRICT COURT

2       FOR THE DISTRICT OF DELAWARE

3

4   McKESSON INFORMATION SOLUTIONS LLC,

5           Plaintiff,

6       -against-        Civil Action No.

            04-1258-SLR

7   THE TRIZETTO GROUP, INC.,

8           Defendant.

9

10

11

_____

12

13       Videotaped deposition of TARA SMITH held

14   at the offices of Skadden Arps Slate Meagher &

15   Flom, Four Times Square, New York, New York,

16   on Wednesday, September 14, 2005, commencing

17   at 10:22 a.m., before David Sanders, Legal

18   Video Specialist, and James W. Johnson,

19   Registered Professional Reporter and a Notary

20   Public of the State of New York.

21

22

23   JOB NO. 38479

24

25

1      Q.    The code that you wrote, what was its --

2    was its primary function to translate into HML?

3      A.    XML.

4      Q.    XML, I'm sorry.

5      A.    Yeah, translate it into XML and then,

6    when it came back, put it back into the Facets

7    format, making changes as necessary.

8      Q.    To your knowledge, is the Facets program

9    intended to be used on a computer system, with a

10    CPU and associated memory?

11          MR. ROOSEVELT:  Objection, vague and

12    ambiguous.

13      A.    Yes.

14      Q.    And is it your understanding that the

15    Facets software won't work unless you load it into

16    a computer system that has a CPU and associated

17    memory?

18          MR. ROOSEVELT:  Same objection.

19      A.    Yes.

20      Q.    Do you have any knowledge or familiarity

21    with the hardware requirements for clients that

22    purchase software -- I'm sorry -- that purchase the

23    Facets software?

24      A.    No.

25      Q.    Do you know whether or not the claim

1    editing function within Facets is capable of

2    identifying claims with unbundled procedures and

3    rebundling them?

4        MR. ROOSEVELT:  Calls for speculation,

5    vague and ambiguous.

6        MS. HUTTNER:  It doesn't call for

7    speculation.  The question was "do you know,"

8    and if you continue with these kinds of

9    objections I'll raise a formal complaint with

10   the magistrate.  These are not permissible

11   objections in the Third Circuit.  I invite you

12   to research the law.

13       I'd be happy to give you a case, but if

14   you have a specific -- I don't know what could

15   possibly be vague about the question.  Would

16   you like to tell me?  What's been vague or

17   ambiguous about it?  Because I'd like to

18   correct it, because I don't want the witness

19   to be confused, or you either.

20       MR. ROOSEVELT:  Well, the witness

21   testified that she doesn't know how the, that

22   function of Facets works.

23       MS. HUTTNER:  Well, I didn't ask her how

24   that function of Facets worked.  I asked her

25   "do you know" followed by a question, and if

1    the answer is no the witness can say no, I do

2    not know, so unless you're planning on

3    testifying for the witness -- what's ambiguous

4    about the question?

5        Is there anything ambiguous about it?

6    Can you tell me what it is so I can fix it.

7        MR. ROOSEVELT:  At this point I don't

8    even recall the question.

9        MS. HUTTNER:  Well, let me read it back

10    to you.

11    Q.    Do you know whether or not the claim

12    editing function within Facets is capable of

13    identifying claims with unbundled procedures and

14    rebundling them?

15        MS. HUTTNER:  Which part of that is

16    ambiguous?

17        MR. ROOSEVELT:  Counsel, I'm just going

18    to assert objections.

19        MS. HUTTNER:  Okay, if you assert

20    objections you have to tell me, since all

21    objections are reserved except as to form, to

22    the extent you are asserting a form objection

23    you are obligated to tell me what the

24    objection is so that I can fix the form.

25    That's the rule, and if you don't do that,

1    then you waive the objection.

2        Do you understand that?

3        MR. ROOSEVELT:  All right, I said that

4    the question was vague and ambiguous and calls

5    for speculation because the witness has given

6    previous testimony that indicates that she

7    would not know the answer to that question.

8        MS. HUTTNER:  Okay, then she can say,

9    "No, I don't know," but my question to you --

10   and I'll repeat it again -- is what is vague

11   and what is ambiguous about the question as

12   phrased?  She may or may not know the answer

13   to the question.

14       My question is, as to form, what is

15   vague or ambiguous about the question I just

16   asked?

17       MR. ROOSEVELT:  I'm not going to sit

18   here and be interrogated by you.

19       MS. HUTTNER:  Okay, then don't make

20   objections that you can't explain, because

21   it's not a buzzword to say, "vague and

22   ambiguous," and if you can't explain the

23   objection or tell me what's wrong with the

24   form of the question, then I will assume that

25   you have pre-established some code with the

9/14/2002  Smith, Tara

1    witness where if you say, "vague and

2    ambiguous," it means don't answer the

3    question.

4          Okay?  Because if you have a form

5    objection --

6          MR. ROOSEVELT:  I've explained the

7    objection to you twice.

8          MS. HUTTNER:  No, actually, you haven't

9    explained it even once.

10         MR. ROOSEVELT:  And there's no

11   preestablished code that's been established.

12         MS. HUTTNER:  Okay, well, I'm glad to

13   hear that, but, like I say, if you have a form

14   objection you are obligated to explain it so I

15   can fix the question.

16         MR. ROOSEVELT:  And I've done that.

17         MS. HUTTNER:  You haven't, but we'll

18   pursue that later.  Okay, so I don't know

19   whether we ever got an answer to that

20   question, so let's ask it again.

21    Q.    Do you know whether or not the claim

22   editing function within Facets is capable of

23   identifying claims with unbundled procedures and

24   rebundling them?

25         MR. ROOSEVELT:  Same objections.

1        A.    I know that it has rebundled, but that's

2    just because of what I did in ClaimCheck.

3        Q.    Okay, well, regardless of how you know,

4    do you have an understanding of what's meant by

5    "unbundled procedures?"

6        A.    Yes.

7        Q.    What is that understanding?

8        A.    Where you'd have a procedure that, let's

9    say it's on three different lines using three

10    different procedure codes and it really should have

11    been one procedure code.  Then it's unbundled and

12    it gets rebundled into that one particular

13    procedure code.

14        Q.    Okay, so that it gets paid under one

15    procedure code as opposed to multiple?

16        A.    Under one, right, as opposed to --

17    right.  Right.

18        Q.    Do you know whether or not Facets has

19    the ability to receive claims with associated

20    medical service codes?

21        A.    I don't know.  I don't know.

22        Q.    What -- I think you testified that, to

23    your understanding, Facets contains a claim

24    processing, claim editing feature; is that right?

25        A.    Yes.

9/14/2002  Smith, Tara

1     Q.    And in that connection is it your

2    understanding that claims are submitted into the

3    Facets system?

4     A.    Yes, they're submitted.

5     Q.    And is it your understanding that when

6    they are submitted they are submitted with an

7    associated service code?

8     A.    Yes.

9     Q.    And that on occasion there may be more

10    than one associated service code submitted with a

11    claim, is that also your understanding?

12    A.    No, it's not.  I don't have --

13    Q.    Well, in the case of unbundled

14    procedures is it your understanding that --

15    A.    Are you talking about procedure codes?

16    Q.    Yes, procedure codes.

17    A.    Yes.

18    Q.    I'm sorry, what did I say, "service

19    codes?"

20    A.    "Service codes."

21    Q.    I meant procedure codes.

22    A.    Okay.

23    Q.    So let me rephrase the question.

24          So is it your understanding that when

25    claims are submitted to Facets that they are

9/14/2002  Smith, Tara

1       received by Facets with one or more medical service

2       codes?

3           A.    Procedure codes.

4           Q.    Procedure codes, I'm sorry.

5           A.    Yes.

6           Q.    Procedure codes associated with the

7       claim.

8           A.    Yes.

9           Q.    And is it your understanding that within

10      Facets there is a table or tables that contain a

11      set of rules that establish relationships between

12      medical procedure codes?

13          A.    I don't know of any tables.

14          Q.    Whether it's some table or not, is it

15      your understanding that Facets in some form

16      includes a set of rules that establish

17      relationships between medical procedure codes?

18              MR. ROOSEVELT:  Vague and ambiguous,

19          calls for speculation.

20          A.    It, it would be an assumption, but -- so

21      I'd say no.  I'm not aware of exactly how it does

22      any of its --

23          Q.    Okay.  Do you know how Facets is able to

24      determine when procedure codes have been unbundled?

25              MR. ROOSEVELT:  Assumes facts not in

9/14/2002  Smith, Tara

1       evidence.

2              MS. HUTTNER:  What facts does it assume

3       not in evidence?

4              MR. ROOSEVELT:  That that's what Facets

5       does.

6              MS. HUTTNER:  She already testified

7       that's what it does.

8       A.   Can you repeat the question.  I'm sorry.

9       Q.   My -- the question is, do you have any

10      understanding of how -- you testified earlier that

11      it's your understanding that when claims are

12      submitted into Facets with multiple medical

13      procedure codes which are basically an unbundling

14      of services that should be under one number instead

15      of multiple numbers that Facets has the ability to

16      detect that and to rebundle it under one service

17      code, correct?

18      A.   Yes.

19      Q.   Do you know how it performs that

20      function?

21      A.   No.

22      Q.   Do you know what rules it relies on to

23      decide whether or not something has been improperly

24      unbundled?

25      A.   No.

9/14/2002  Smith, Tara

1      Q.    Do you know if there are rules in that

2  regard within Facets?

3      A.    Yes.  I know, I'm sure there are.

4      Q.    Okay.  When you say -- can you tell me

5  what you understand in that regard.

6      A.    It would go back to what I've done on

7  ClaimCheck, just to know --

8      Q.    Well, how, whatever it goes back to, can

9  you tell me what your understanding is in that

10  regard.

11      A.    I know that a few of the things that we

12  did with the ClaimCheck integration, we wanted it

13  to somewhat mimic what Facets did, so that's how I

14  know that, you know, we had situations where there

15  were multiple procedure codes and it went into one,

16  and, you know, how that related to Facets.

17      Q.    Okay, so it was your understanding that

18  that's something that Facets did?

19      A.    Right, because we weren't going to do

20  anything that went completely against the norm of

21  what Facets did, so --

22      Q.    Okay, and is there any -- you had

23  mentioned age, I think, and sex, but is there any

24  other, do you have any other understanding of what

25  Facets did that you, in that regard that you tried

9/14/2002  Smith, Tara

1    to mimic in your --

2        A.   No.

3        Q.   -- in your integration module?

4        A.   No.

5        Q.   Okay.  And I think I asked you this

6    before, and if I did I apologize, but do you have

7    any understanding of what database or databases are

8    associated with Facets?

9            MR. ROOSEVELT:  Assumes facts not in

10           evidence.

11       A.   I know we use Sybase, Oracle, Microsoft.

12       Q.   Okay, do you have any understanding of

13   whether the Facets product as it's packaged and

14   sent to customers includes a database?

15           MR. ROOSEVELT:  Asked and answered.

16       A.   I don't know.

17           MS. HUTTNER:  I'm going to just, I'm

18           going to say it again, and I'm going to give

19           you the opportunity to fix it.

20           If a special master for discovery were

21           assigned to this case right now I would be on

22           the phone with him or her, because it is

23           without question in Delaware, where they take

24           these things very seriously, improper to make

25           objections like "asked and answered,

9/14/2002  Smith, Tara

1       A.   On the intranet.

2       Q.   Let me show you a really big, thick

3   document with lots of small print which is a

4   patent.  First of all, do you know what a patent

5   is?

6       A.   Basically, yes.

7       Q.   Okay.  This is a patent that has a bunch

8   of -- it's 5,253,164.  I'll call it "the '164

9   patent."  It's entitled "A system and method for

10  detecting fraudulent medical claims via examination

11  of service codes," and I'll represent to you that

12  it's owned by McKesson and it is the patent that

13  has been asserted against TriZetto by McKesson.

14       First of all, let me ask you, do you

15  understand that McKesson is suing TriZetto for

16  patent infringement?

17       A.   Yes.

18       Q.   Have you ever seen the '164 patent

19  before?

20       MS. HUTTNER:  I'm not going to mark it,

21  counselor, unless you want me to.

22       MR. ROOSEVELT:  Only if you're going to

23  ask her questions about it.

24       MS. HUTTNER:  Okay.

25       A.   I don't have to sit here and read it,

9/14/2002  Smith, Tara

1     right?

2     Q.   Absolutely not.

3         Have you seen it before?

4     A.   Yes.

5     Q.   When did you see it for the first time?

6     A.   Earlier this week.

7     Q.   Can you tell me who showed it to you and

8    how you came to see it.

9     A.   My attorney.

10    Q.   Was that in connection with your

11   preparation for your deposition here today?

12    A.   Yes.

13    Q.   Did you meet with your attorney in

14   person?

15    A.   Yes.

16    Q.   How long did the meeting last?

17    A.   An hour, maybe a little less.

18    Q.   And that was last week?

19    A.   No, it's -- what's today, Tuesday,

20   Wednesday? -- this week.  Sorry.

21    Q.   Okay, so when this week, Monday or

22   Tuesday?

23    A.   Yesterday.  Tuesday.

24    Q.   Tuesday, and was it on Tuesday,

25   yesterday was the first time you saw the '164

1
2
3
4
5
6
7
8
9      I, TARA SMITH, do hereby declare under

10   penalty of perjury that I have read the foregoing

11   transcript; that I have made any corrections as appear

12   noted, in ink, initialed by me, or attached hereto; that

13   my testimony as contained herein, as corrected, is true

14   and correct.

15            EXECUTED this _2_ day of _December_,

16   20_05_ , at _Unim_____, _New Jersey_.
                        (City)                    (State)

17
18
19
20            _Tara Smith_____
21                    TARA SMITH
22
23
24
25

147

# EXHIBIT S

1                    IN THE UNITED STATES DISTRICT COURT

2                       FOR THE DISTRICT OF DELAWARE

3

4        MCKESSON INFORMATION          )

         SOLUTIONS, LLC,          )

5                           )

                 PLAINTIFF,    )

6        vs.                 ) Case No. 04-1258-SLR

                            )

7        THE TRIZETTO GROUP, INC.,    )

                            )

8                 DEFENDANT.    )

         _____)

9

10

11

12

13

14           VIDEO DEPOSITION OF MARK MUSEN, M.D., PH.D.

15           Held at Skadden, Arps, Slate, Meagher & Flom

16              525 University Avenue, 11th Floor

17                   Palo Alto, California

18           Tuesday, November 22, 2005, 9:11 a.m.

19

20

21

22

23

24        REPORTED BY:  CHRIS DE GEORGE, CSR. NO. 7069

25

1    means for claims?

2        A.   Well, that -- that information is supplemented

3    by the flowcharts and the description of the -- the

4    software in the specification.

5        Q.   I'm sorry.  Say that last part again.  And

6    the?

7        A.   Description of the software in the

8    specification of the patent.

9        Q.   Appendix D?

10       A.   And also in --

11           MR. HENDERSHOT:  Are you referring to the

12   prose?

13           THE WITNESS:  I'm talking about the prose in

14   the specification, the --

15           THE REPORTER:  Say it again.

16           THE WITNESS:  The "Description of the

17   Preferred Embodiment" that begins in Column 4.

18   BY MR. SITZMAN:

19       Q.   Let me set that aside for a second.  Let's --

20   let's switch over to the TriZetto products.

21       A.   Okay.

22       Q.   You've not identified anything in the Tri- --

23   any specific software in the TriZetto products that

24   provide the structure for the function that -- that you

25   believe is identical in the claims.

**11/22/2005  Musen, Mark**

1    A.  Apart from the overall software, no, I've

2    not -- I understand that each of those systems is a

3    software system.  I have not gone down to the next level

4    of granularity.

5    Q.  For example, you just said, a second ago you

6    said when I asked you about the structure in the '164

7    patent, I said you hadn't identified anything other than

8    just generalized software.  You said, ah, but the rules.

9    A.  Okay.

10    Q.  On the TriZetto side, you haven't identified

11    any corollary rules.

12        MR. HENDERSHOT:  Objection.  Misstates his

13    testimony or inconsistent with the -- the report and the

14    appendices.

15    BY MR. SITZMAN:

16    Q.  Have you identified any -- any rules like

17    you --

18    A.  My -- my understanding is that the TriZetto

19    products accomplished the same task by implementing the

20    software more procedurally than -- than in the

21    rule-based formulas described in the patent.

22    Q.  But do you know what structure it is that

23    carries out that function?

24    A.  There is software -- there necessarily is

25    software that carries out that function.  Do I -- can I

315