IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| MCKESSON INFORMATION SOLUTIONS LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 04-1258 (SLR) |
| | ) | |
| THE TRIZETTO GROUP, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**THE TRIZETTO GROUP, INC.'S
<u>ANSWERING CLAIM CONSTRUCTION BRIEF</u>**

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Jack B. Blumenfeld (#1014)
Rodger D. Smith II (#3778)
1201 N. Market Street
Wilmington, Delaware 19899
(302) 658-9200

Attorneys for Defendant The TriZetto Group, Inc.

OF COUNSEL:

Jeffrey T. Thomas
David Segal
Michael A. Sitzman
Daniel P. Muino
GIBSON, DUNN & CRUTCHER LLP
Jamboree Center, 4 Park Plaza
Irvine, CA 92614

January 20, 2006

## TABLE OF CONTENTS

Page

I.   NATURE AND STAGE OF THE PROCEEDINGS ........................................................ 1

II.  SUMMARY OF ARGUMENT .................................................................................... 1

III. STATEMENT OF FACTS .......................................................................................... 2

IV.  THE LEGAL STANDARD FOR CLAIM CONSTRUCTION ........................................ 2

    A.   McKesson Misstates The Applicable Legal Standards Governing Claim
        Construction ........................................................................................................ 2

    B.   McKesson Fails To Satisfy Its Obligation to Identify Corresponding Structure For
        The Claimed Functions Of The Patent................................................................... 6

        1.   Neither The Portions Of The Specification Nor Law Cited By McKesson
            Support Its Identification of "Any Software And/Or Hardware" As The
            Structure For Every § 112, ¶ 6 Claim Element ........................................ 10

        2.   To The Extent That The Software Code In The Patent Constitutes
            Corresponding Structure, It Must Be Identified As Part Of The Court's
            Claim Construction .................................................................................. 13

    C.   The Method Claims Recite Functions, Not Acts, And Therefore Are Also
        Governed By § 112, ¶ 6 ..................................................................................... 14

V.   THE DISPUTED CLAIM TERMS .............................................................................. 16

    A.   Predetermined Database....................................................................................... 16

        1.   McKesson's Proposed Construction Eliminates The Word "Predetermined"
            ............................................................................................................... 16

        2.   TriZetto's Proposed Construction Gives Meaning To The Words
            "Predetermined Database" And Is Supported By The Intrinsic Evidence. 17

        3.   The "Predetermined Database" Must Contain Both The Medical Service
            Codes And The Relationships Between Them ........................................... 21

    B.   Means For Ascertaining Whether The At Least One Claim Contains A Plurality
        Of Medical Service Codes .................................................................................... 22

        1.   Functionally, Counting Codes Is Not The Same As Ascertaining Whether
            More Than One Code Exists.................................................................... 22

## TABLE OF CONTENTS

Page

2.   Figure 2, Box 20 Of The Specification Provides The Corresponding Structure..................................................................................... 24

C.   The Determining Elements ................................................................................. 25

1.   Determining The Presence Of A Code (Claims 1(b) and 13(c)) ............. 27

2.   Determining If One Of The Codes is "Valid Or Invalid"  (Claims 3(d), 15(d), 16(c)) ....................................................................... 28

3.   Determining By Comparing One Code With Another Code  (Claim (Claims 2(c), 10(d), 12(d), 14(d) and 12(e))............................................ 30

4.   "Non-medical criteria" (Claims 2 and 14) .............................................. 32

5.   "Medically determined relationships" (Claim 12) .................................. 32

6.   The Undisclosed Predetermined Database Is Essential Structure To The Determining Means.................................................................................. 33

D.   "Authorizing" And "Rejecting" Means And Steps .............................................. 33

E.   "Means For Receiving At Least One Claim" (Claims 3, 10, 12-15) .................. 36

F.   "Means For Operating On A Predetermined Database" (Claims 1, 2, and 16).... 36

G.   The Additional Limitations Of The Dependent Claims....................................... 37

1.   Means for revising the at least one claim (claims 4 and 11)................... 37

2.   Means for informing the user (claims 5 and 13)..................................... 38

3.   Means for requesting further information from the user (claim 8).......... 38

VI.   MCKESSON OFFERS NO BASIS FOR THE COURT TO PRECLUDE TRIZETTO'S TIMELY SERVED CLAIM CONSTRUCTIONS ......................................................... 39

VII.   CONCLUSION.................................................................................................... 40

# TABLE OF AUTHORITIES

Page

**Cases**

*Altiris, Inc. v. Symantec Corp.*,
   318 F.3d 1363 (Fed. Cir. 2003)...........................................................................7

*AquaTex Indus. v. Techniche Sol'ns*,
   419 F.3d 1374 (Fed. Cir. 2005)...........................................................................3

*AT&T Corp. v. Microsoft Corp.*,
   2003 U.S. Dist. LEXIS 10716 (S.D.N.Y. 2003)...................................................13

*B. Braun Med., Inc. v. Abbott Labs.*, 124 F.3d 1419 (Fed. Cir. 1997)........................................11

*Budde v. Harley-Davidson, Inc.*,
   250 F.3d 1369 (Fed. Cir. 2002)...........................................................................12

*Cross Med. Prods., Inc. v. Medtronic Sofamor Danek, Inc.*,
   424 F.3d 1293 (Fed. Cir. 2005)...........................................................................5

*Faroudja Lab., Inc. v. Dwin Elecs., Inc.*,
   76 F. Supp. 2d 999 (N.D. Cal. 1999) ...................................................................6

*Fonar Corp. v. GE*,
   107 F.3d 1543 (Fed. Cir. 1997)........................................................................6, 13

*Harris Corp. v. Ericsson Inc.*,
   417 F.3d 1241 (Fed. Cir. 2005)...........................................................................7

*Information Technology Innovation, LLC v. Motorola, Inc.*,
   391 F. Supp. 2d 719 (N.D. Ill. 2005) ...................................................................3

*LizardTech, Inc. v. Earth Resource Mapping, Inc.*,
   2006 U.S. App. LEXIS 137 (Fed. Cir. Jan. 5, 2006) ...............................................5

*Medical Instrumentation & Diagnostic Corp. v. Elekta AB ("MIDCO")*,
   344 F.3d 1205 (Fed. Cir. 2003)...................................................................6, 11, 12

*Nomos Corp. v. Brainlab USA, Inc.*,
   357 F.3d 1364 (Fed. Cir. 2004)...........................................................................5

*Nystrom v. Trex Co.*,
   424 F.3d 1136 (Fed. Cir. 2005)...........................................................................3

*O.I. Corp. v. Tekmar Co.*,
   115 F.3d 1576 (Fed. Cir. 1997)...........................................................................6

iv.

# <u>TABLE OF AUTHORITIES</u>

<u>Page</u>

*Pennwalt Corp. v. Durand-Wayland, Inc.*,
   833 F.2d 931 (Fed. Cir. 1987)................................................................8

*Phillips v. AWH Corp.*,
   415 F.3d 1303 (Fed. Cir. 2005)...............................................1, 2, 3, 4

*SciMed Life Sys. v. Advanced Cardiovascular Sys.*,
   242 F.3d 1337 (Fed. Cir. 2001)................................................................4

*Signtech USA, Ltd. v. Vutek, Inc.*,
   174 F.3d 1352 (Fed. Cir. 1999)................................................................6

*Texas Digital Sys. v. Telegenix, Inc.*,
   308 F.3d 1193 (Fed. Cir. 2002)................................................................2

*Wang Lab., Inc. v. AOL*,
   197 F.3d 1377 (Fed. Cir. 1999)................................................................4

*WMS Gaming Inc. v. Int'l Game Tech.*,
   184 F.3d 1339 (Fed. Cir. 1999)...........................................7, 12, 13

**Statutes**

35 U.S.C. § 112..................................................................................1

## I.    NATURE AND STAGE OF THE PROCEEDINGS

On September 13, 2004, McKesson Information Solutions, LLC ("McKesson") filed this suit against The TriZetto Group, Inc. ("TriZetto") alleging infringement of U.S. Patent No. 5,253,164 ("the '164 patent").   On October 1, 2004, McKesson amended its Complaint.   On November 1, 2004, TriZetto answered and filed a counterclaim seeking a declaratory judgment.

With the exception of matters pending before the Special Master, fact and expert discovery have been completed.   The Court has bifurcated the issue of invalidity and stayed motion practice and trial on that issue.   Motion practice is proceeding on the non-bifurcated issues and a hearing is scheduled for February 16, at which time the Court is also scheduled to consider any issues of claim construction.   Trial on the issues of infringement, damages, and equitable defenses is currently set for April 17.

TriZetto filed its opening claim construction brief on December 15, 2005.   D.I. 158. McKesson filed its opening claim construction brief on December 16.   D.I. 170.   Pursuant to the Court's revised standing order and the parties' stipulation, this is TriZetto's response to McKesson's claim construction brief.

## II.    SUMMARY OF ARGUMENT

McKesson's opening claim construction brief fails to remedy the inherent defects in its proposed claim construction.   Although McKesson suggests that "ordinary meaning" is enough to construe the majority of the claim elements, the Federal Circuit has repeatedly emphasized that a claim must be construed in light of the specification, and any "ordinary meaning" cannot be contrary to its usage in the specification.   *See, e.g., Phillips v. AWH Corp.,* 415 F.3d 1303 (Fed. Cir. 2005) (*en banc*).   Nor can the ordinary meaning be used where there simply *is* no ordinary meaning or even evidence submitted as to such meaning.

While its misstatement of the principles of claim construction is enough to render much of its proposed construction worthless, McKesson further compounds the problem by ignoring Federal Circuit precedents regarding the construction of claims governed by 35 U.S.C. § 112, ¶ 6.   Throughout its Brief, McKesson creates the appearance that it is identifying corresponding

structure by repeatedly referencing rules and figures from the patent, but, in the end, any corresponding structure magically gets reduced to "any software." In short, McKesson's attempt to recapture improperly all means and acts of the claimed functions should not be permitted.

This brief and TriZetto's Opening Brief (D.I. 158) present ample support in the case law, intrinsic and extrinsic evidence to demonstrate the many flaws inherent in McKesson's proposed construction. Thus, TriZetto respectfully requests that the Court adopt its proposed construction.

### III.    STATEMENT OF FACTS

The relevant facts have been provided in TriZetto's Opening Brief. *See* D.I. 158.

### IV.    THE LEGAL STANDARD FOR CLAIM CONSTRUCTION

The applicable claim construction standards are set forth in TriZetto's Opening Brief. *See generally* D.I. 158 at 6-9; *see also Phillips,* 415 F.3d 1303.

### A.    McKesson Misstates The Applicable Legal Standards Governing Claim Construction

The overall theme of McKesson's brief is that the "words of a claim are generally given their ordinary and customary meaning." D.I. 170 at 3 (*citing Phillips*, 415 F.3d at 1312). McKesson further asserts that the "presumption that terms should be given their ordinary meaning is only rebutted if the patentee 'has disavowed or disclaimed [this] scope of coverage, by using words or expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope.'" D.I. 170 at 3-4 (citations omitted). These general are incomplete.

Specifically, in *Phillips*, the Federal Circuit "made clear . . . that the ordinary and customary meaning of a claim term is the meaning that the term *would have to a person of ordinary skill in the art* in question *at the time of the invention*." *Phillips,* 415 F.3d at 1313 (emphasis added). The Court further held that, "[i]mportantly, the person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, *including the specification*." *Id.* (emphasis added). With respect to the suggestion in *Texas Digital Sys. v. Telegenix, Inc.*, 308 F.3d 1193 (Fed. Cir. 2002) that any disavowal of ordinary meaning (as, for example, set forth in a dictionary) must be express, the Federal Circuit in *Phillips* held that "[a]ssigning such a limited

role to the specification, and in particular requiring that any definition of claim language in the specification be express, is inconsistent with our rulings that the specification is 'the single best guide to the meaning of a disputed term.'"  *Id.* at 1319-21.

To this end, several post-*Phillips* decisions have questioned the notion (advanced by McKesson) that a patentee can rely exclusively on the "ordinary meaning" of claim terms divorced from the overall context of the intrinsic record.  *See, e.g., Nystrom v. Trex Co.*, 424 F.3d 1136, 1144-45 (Fed. Cir. 2005) ("as explained in *Phillips*, [the patentee] is not entitled to a claim construction divorced from the context of the written description and prosecution history"); *AquaTex Indus. v. Techniche Sol'ns*, 419 F.3d 1374, 1380 (Fed. Cir. 2005) ("[t]he specification is of central importance in construing claims. . . . Where, as here, the disputed claim term is technical or a term of art, 'the best source for understanding [it] is the specification from which it arose.").[1]  Accordingly, contrary to McKesson's assertions and proposed constructions, the proper construction of claim terms is not simply based on the untethered "ordinary meaning" of the words, but must be considered in light of the patent specification from the point of view of one of ordinary skill in the art at the time of the patent filing.

Building on its incomplete statements about ordinary meaning, McKesson suggests that *Phillips* provides unqualified support of the use of general-purpose dictionaries to ascertain the ordinary meaning of claim terms.  D.I. 170 at 3-4.  McKesson's portrayal of *Phillips* in this

---

[1]    The district court in *Information Technology Innovation, LLC v. Motorola, Inc.*, 391 F. Supp. 2d 719 (N.D. Ill. 2005), further explained:

[T]he Federal Circuit clarified the approach courts should use when analyzing claim language.  District courts are directed to focus at the outset on how the patentee used the claim term in the claims, specification, and prosecution history rather than beginning the analysis by consulting dictionaries or similar sources.  Criticizing the over-reliance on dictionaries that resulted from the methodology adopted in *Texas Digital*, [*Phillips*] noted that "heavy reliance on the dictionary divorced from the intrinsic evidence risks transforming the meaning of the claim term to the artisan into the meaning of the term in the abstract."

. . . . But although dictionaries can inform claim construction, the focus should remain on the how the term is used within the patent.  Courts must be careful to not adopt a definition that contradicts the intrinsic evidence.  (*Id.* at 723, 725 (citations to *Phillips* omitted)).

regard also is misleading. *Phillips* does state that general purpose dictionaries may be helpful "[i]n some cases [where] the ordinary meaning of claim language *as understood by a person of skill in the art* may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." 415 F.3d at 1314 (emphasis added). *Phillips* also recognized, however, that "[i]n many cases that give rise to litigation . . . determining the ordinary and customary meaning of the claim requires examination of terms that have a particular meaning in a field of art," which requires looking to sources other than general purpose dictionaries, including the intrinsic evidence. *Id.* (internal citations omitted).

In fact, the *Phillips* court expressly cautioned against placing too much reliance on general-purpose dictionaries, explaining:

> The problem is that if the district court starts with the broad dictionary definition in every case and fails to fully appreciate how the specification implicitly limits that definition, the error will systematically cause the construction of the claim to be unduly expansive. The risk of systematic overbreadth is greatly reduced if the court instead focuses at the outset on how the patentee used the claim term in the claims, specification, and prosecution history, rather than starting with a broad definition and whittling it down.

415 F.3d at 1320-23 (citations omitted). Here, McKesson's proposed "ordinary meaning" and dictionary definitions evidence the risk discussed in *Phillips* – it would result in a claim scope that extends far beyond what the inventors believed they had invented and had in their possession at the time of the '164 patent filing.

Additionally, although TriZetto agrees with McKesson that the Court must be careful not to limit improperly the scope of claims based on the specification, where the specification makes clear that the claimed invention is narrower than the claim language might imply, it is entirely permissible and proper to limit the claims. *SciMed Life Sys. v. Advanced Cardiovascular Sys.,* 242 F.3d 1337, 1345 (Fed. Cir. 2001); *Wang Lab., Inc. v. AOL,* 197 F.3d 1377, 1383 (Fed. Cir. 1999) ("when the 'preferred embodiment' is described as the invention itself, the claims are not entitled to a broader scope than that embodiment"); *see also LizardTech, Inc. v. Earth Resource Mapping, Inc.*, 2006 U.S. App. LEXIS 137, at ** 5-6 (Fed. Cir. Jan. 5, 2006) ("[I]n whatever

form the claims are finally issued, they must be interpreted, in light of the written description, but not beyond it, because otherwise they would be interpreted to cover inventions or aspects of an invention that have not been disclosed. Claims are not necessarily limited to preferred embodiments, but, if there are no other embodiments, and no other disclosure, then they may be so limited. One does not receive entitlement to a period of exclusivity for what one has not disclosed to the public.") (Lourie, J. concurring).

Similar to the circumstances in *SciMed* and *Wang,* the '164 patent contains no detailed description of the invention other than the preferred embodiment. Indeed, the Figures discussed as part of the "preferred embodiment" are expressly identified as depicting "*the* overall operation of *the* programmed computer of *the* present invention," and the rules listed in Figure 6 and set forth in Appendix B are specifically identified as "*the* categories of rules applied to *the* entries in *the* present invention." *See* Ex. A, col. 4, figs. 2, 6 (emphasis added); *see also id.,* Figs. 1-7 (identifying the figures as depicting *the* – not *an* – embodiment of *the* invention).

Moreover, with respect to claim elements governed by Section 112, paragraph 6, the structure corresponding to those elements is expressly limited to the structure disclosed in the specification, which often will include the preferred embodiment. When the preferred embodiment is the only corresponding structure disclosed in the specification, the means-plus-function element is limited to covering the preferred embodiment and its equivalents. *See Nomos Corp. v. Brainlab USA, Inc.*, 357 F.3d 1364, 1368 (Fed. Cir. 2004) ("This is the only embodiment of the invention described in the . . . patent. As a result, the corresponding structure is limited to that embodiment . . . and its equivalents.").[2]

---

[2]     *See also Cross Med. Prods., Inc. v. Medtronic Sofamor Danek, Inc.*, 424 F.3d 1293, 1304 (Fed. Cir. 2005) ("because there is only one embodiment described in the specification . . . there is no basis on which to extend the limitation to cover alternative, non-disclosed structure not shown to be structurally equivalent"); *Faroudja Lab., Inc. v. Dwin Elecs., Inc.*, 76 F. Supp. 2d 999, 1013 (N.D. Cal. 1999) ("'[a]lthough patentees are not necessarily limited to their preferred embodiment, interpretation of a means-plus-function element requires this court to consult the structure disclosed in the specification, which often, as in this case, describes little more than the preferred embodiment'") (*quoting Signtech USA, Ltd. v. Vutek, Inc.*, 174 F.3d 1352, 1356 (Fed. Cir. 1999)); *id.* ("[c]ourts

[Footnote continued on next page]

**B.    McKesson Fails To Satisfy Its Obligation to Identify Corresponding Structure For The Claimed Functions Of The Patent**

As the authority cited by McKesson (D.I. 170 at 5) makes clear:

Section 112, ¶ 6, as is well-documented, was intended to permit use of means expressions without recitation of all the possible means that might be used in a claimed apparatus . . . The price that must be paid for use of that convenience is limitation of the claim to the means specified in the written description and equivalents thereof.

*O.I. Corp. v. Tekmar Co.,* 115 F.3d 1576, 1583 (Fed. Cir. 1997).  Additionally, in exchange for the benefit of writing a claim element in the simplified means-plus-function form, the patentee is obliged to clearly link the claimed function to the corresponding structure disclosed in the patent specification.  *See Medical Instrumentation & Diagnostic Corp. v. Elekta AB ("MIDCO"),* 344 F.3d 1205, 1211 (Fed. Cir. 2003) ("[t]he duty of the patentee to clearly link or associate structure with the claimed function is the *quid pro quo* for allowing the patentee to express the claim in terms of function under section 112, paragraph 6").

In its brief, McKesson states that "[a]dditional portions of the specification further disclose or infer the algorithms and other structures corresponding to the claim functions," including figures 1, 2, and 4, and Appendices A through D (which includes the software code). D.I. 170 at 18.  In its claim construction, however, while repeatedly making statements that there is corresponding structure linked to the claimed functions (*see, e.g., id.* at 21, 23, 31, 33, 37-40*),* McKesson never identifies any "corresponding structure" beyond "any software."

For example, in the discussion of determining means, McKesson broadly cites to various rules that are used in connection with the disclosed system to determine whether one or more codes submitted on a claim should be authorized or rejected.  *Id.* at 30-31.  After going through that exercise, however, McKesson does not construe the claims to include the specific rules that it identifies and fails to identify any specific structure that is clearly linked to the precise

---

[Footnote continued from previous page]

have also made it clear that a specification that merely mentions the possibility of alternative structures without specifically identifying them is not sufficient to expand the scope of the claim beyond the single example used") (*citing Fonar Corp. v. GE,* 107 F.3d 1543, 1551 (Fed. Cir. 1997)).

determination criteria in the claims, such as "non-medical criteria" or "medically exclusive."[3] Instead, McKesson construes the corresponding structure to be "software capable of interacting with the database" to perform the determining functions.

Indeed, for each means-plus-function element of the claims, McKesson references some specific structure but then concludes that the relevant structure is simply "software," or "hardware and software."  D.I. 170 at 21, 23, 31, 33, 37-40.  When construing means-plus-function terms, simply invoking "software" or "hardware and software" as corresponding structure is not enough – the specific algorithm in the specification must be identified.  *Harris Corp. v. Ericsson Inc.*, 417 F.3d 1241, 1253 (Fed. Cir. 2005) ("[a] computer-implemented means-plus-function term is limited to the corresponding structure disclosed in the specification and equivalents thereof, and the corresponding structure is the algorithm"); *WMS Gaming Inc. v. Int'l Game Tech.*, 184 F.3d 1339, 1348 (Fed. Cir. 1999) ("[t]he structure of a microprocessor programmed to carry out an algorithm is limited by the disclosed algorithm"); *Altiris, Inc. v. Symantec Corp.,* 318 F.3d 1363, 1376 (Fed. Cir. 2003) ("merely pointing out that the relevant structure is software rather than hardware is insufficient . . . one must still look to the

---

[3]    As detailed below, McKesson does not point to such clearly linked structure because there is none, at least as to some elements.  The patent specification describes a system and utility of applying specific clinical editing rules to make an expert determination about appropriateness of submitted medical codes, while the claims of the patent inexplicably and confusingly recite various vague "determining" functions.  For example, *compare* Ex. A, col. 5, l. 60-68 ("[T]he program will examine the multiple codes presented to determine whether payment or payment authorization for each of the stated codes is medically appropriate, or whether one or more of the codes is medically inappropriate, or whether one or all of the multiple codes should be replaced by other code(s).  In order to accomplish this, a set of rules developed for use of this program is now invoked."); col. 6, ll. 13-16 ("Therefore, for both single and multiple code entries, a set of rules applicable to CPT-4 codes singly and in combination are used to evaluate the appropriate ness of the codes for payment.") *with* Ex. A, Claim 12 ("means for determining whether one of the medical services codes in the at least one claim is medically exclusive with any other medical service code in the at least one claim"); Claim 14 ("means for determining whether one of the medical service codes in the at least one claim is mutually exclusive due to non-medical criteria with any other medical service code in the at least one claim").

specification for an adequate understanding of the structure of that software"). By characterizing the structure as "software" or "hardware and software" to support the purely functional claims in the '164 patent, McKesson impermissibly seeks to capture *all means* to perform the claimed functions. *Pennwalt Corp. v. Durand-Wayland, Inc.*, 833 F.2d 931, 934 (Fed. Cir. 1987) ("section 112, paragraph 6, rules out the possibility that any and every means which performs the function specified in the claim literally satisfies that limitation").

Importantly, if the Court were to adopt McKesson's broad definition of structure to include any hardware and/or software, the '164 patent would be rendered obvious, unsupported by the written description, and subject to an on-sale bar as a matter of law. By asserting that one of ordinary skill would know how to implement every recited function in the patent claims (*see, e.g.*, D.I. 170 at 22, 29, 39), McKesson is essentially admitting that the patent was obvious to one of ordinary skill in the art.[4]

Indeed, one of the inventors of the '164 patent *admitted* that much of what is recited in the claims is not novel. Dr. Holloway admitted that the basic idea of using software to correct for unbundling was not novel in 1987. *See* Ex. K (Holloway Dep.) at 144:12-24. Rather, according to Dr. Holloway, the claimed invention's novelty arises from the disclosed twenty-one "metarules" and the specific order of their application.[5] *Id.* at 147:9-14 ("Q: Okay. So it was once you – it was once that you had those 21 metarules and you had discovered the sequence in which they needed to be fired, it was at that point that you thought you had something novel? A:

---

[4]     In contrast, when opining that the '164 patent is valid, McKesson's experts point to the specific details of the implementation, including the rules in Appendix B. *See infra*, at 9. If McKesson is correct and the rules are not part of the claims, the Court can readily deal with the question of validity as a matter of law prior to any trial on infringement.

[5]     Dr. Holloway also testified that the "database containing medical service codes and a set of relationships among the medical service codes" was novel, but that the specific relationships were not disclosed in the patent. Ex. K (Holloway Dep.) at 275:12-276:3.

Yes."); *see also* Ex. L (Hertenstein Dep.) at 228:19-229:4 (the basis for the patent was the Appendix B rules).[6]

McKesson's invalidity expert, Dr. David Wilson, also asserts that the patent was novel over the prior art principally because of the specific clinical editing rules developed by the inventors. Ex. M (Wilson Report) at 18 (noting that the operation of the rules in Appendix B is explained in the description of the preferred embodiment, but not identifying those rules in the patent claims); 29 (describing process for developing rules); 30 (noting that the techniques used in the '164 patent are completely different from Dr. Hertenstein's manual process). In attempting to distinguish the prior art, Dr. Wilson relies on the Appendix B rules. *See, e.g.,* Ex. N (Wilson Dep.) at 35-36 (stating that reference disclosing manual process for clinical editing did not anticipate because it did not disclose the relevant rules); 38 (stating that MEDCLAIM does not anticipate because it does not show "program logic or processing rules"). Yet, under McKesson's proposed "any software" claim construction, these rules are *not* part of the claims of the '164 patent.

Furthermore, Dr. Wilson's report emphasizes the central role of the specification. Dr. Wilson spends several pages of his expert report describing how the rules contained in the '164 patent "disclose[] exactly how one might design a knowledge base for medical codes." Ex. M (Wilson Report) at 31. Wilson further notes that "[t]he database design *must* match the structure of the logic used in the knowledge base interpreter in order for CodeReview to work efficiently." *Id.* (emphasis added) (explaining that the Appendix C database design correlates with the Appendix B rules).

Finally, McKesson's proposed construction, which does not include the set of clinical editing rules utilized in the flowcharts and outlined in Appendix B, is directly contrary to the arguments the patentee made during prosecution. Specifically, in attempting to overcome the

---

6    Other than the Appendix B rules, the patent merely describes using a computer and a database to automate Dr. Hertenstein's manual Caterpillar process. *See* Ex. L (Hertenstein Dep.) at 209:20-210:1.

repeated rejection of its claims, the patentee asserted that "[t]he present invention *uses and claims a set of rules* that describe the relationship between medical service codes (which correspond to particular medical services or procedures) to determine whether or not there are improper medical service codes in a particular claim."  Ex. O (Prelim. Amend., dated Jan. 29, 1991) at 16.  Thus, because McKesson's construction fails to expressly include the particular set of rules disclosed in the patent, it should be rejected.

For these reasons, the Court should not permit McKesson to avoid "paying the price" for having written claims that are governed by 35 U.S.C. § 112, ¶ 6 and obtain claim coverage for any software implementation of the claimed functions.

### 1. Neither The Portions Of The Specification Nor Law Cited By McKesson Support Its Identification of "Any Software And/Or Hardware" As The Structure For Every § 112, ¶ 6 Claim Element

As noted above, McKesson argues that the corresponding structure for all of the claim elements governed by § 112, ¶ 6 can be construed to be any software or any hardware and software.  *See* D.I. 170 at 21, 23, 31, 33, 37-40.  In support of this argument, McKesson principally relies on one section of the specification, which states:

> The computer system **2** may be any type of which can interact with the present invention. One such suitable computer system is the well-known IBM "personal computer" containing sufficient data processing capabilities and memory and suitable commercially available database management software programs to perform the desired functions.  Other suitable computer systems exist and are intended to come within the scope of the present invention.

Ex. A, col. 4, ll. 33-42; *see also* D.I. 170 at 20, 22, 23 (citing same).[7]

Contrary to McKesson's contention, this section of the specification plainly refers to the fact that the disclosed program (CodeReview) can be run on any suitable general purpose computer in conjunction with a commercially-available database program.  In the case of the

---

[7]    McKesson also relies on the general disclaimer that appears before the claims that states that other variations are intended to come within the scope of the claims.  *See* '164 patent, col. 10, ll. 60-64.  This language, however, is indisputably not linked to any claimed function, nor does it identify any specific structure.  As such, it cannot support McKesson's position.

11.

disclosed method and apparatus, the source code in Appendix D ran on an IBM personal computer with DBase III. *See* Ex. A, col. 4, ll. 33-40; Ex. K (Holloway Dep.) at 178:16-179:6; 193:14-25. Yet, McKesson does not incorporate CodeReview, Dbase III, or any other software algorithm or program as corresponding structure for the means-plus-function elements.

Additionally, although this section refers to performing the "desired functions" (Ex. A, col. 4, l. 40), it does not specifically refer to any of the claimed functions such as "ascertaining," "determining," "authorizing," or "rejecting." *B. Braun Med., Inc. v. Abbott Labs.*, 124 F.3d 1419, 1424 (Fed. Cir. 1997) (noting that a disclosed structure is corresponding "only if the specification or the prosecution history clearly links or associates that structure to the function recited in the claim"). Rather, in the context of and in light of the reference to the use of commercially-available database software, it is apparent that the "desired functions" here refers to the functionality of having a program (the "interpreter") interact with data in the database files (the "knowledge base"), as opposed to the other specific functions set forth in the claims.

In sum, this section of the specification does *not* stand for the proposition that the purported inventive method and apparatus could be practiced without any reference to the specific program flowcharts, rules, and other structure disclosed in the specification. Accordingly, because it provides the essential foundation for McKesson's proposed claim construction, McKesson's construction should be rejected.

Just as the factual basis for McKesson's "any software" construction is without merit, so are McKesson's legal arguments. McKesson misreads the Federal Circuit's *MIDCO* case to support its position. First, *MIDCO* does *not* permit a patentee to satisfy the structural requirement by having its expert invoke "software," as McKesson suggests. D.I. 170 at 14. *MIDCO* made clear that specific software structure had to be revealed in the patent specification. *MIDCO*, 344 F.3d at 1212 ("it is not proper to look to the knowledge of one skilled in the art apart from and unconnected to the disclosure of the patent"). The patentee in *MIDCO* argued, as McKesson does here, that corresponding structure was provided by a general statement in the patent specification indicating that software for performing the patented functions was "either

commercially available or within the skill of practitioners in the programming arts." *Id*. at 1217. The Federal Circuit rejected this contention, observing that such a generic reference to "software" did not disclose specific structure linked to each claim element. *Id*. at 1217-18 ("there must be something in the disclosure to indicate to the public that the patentee intends for a particular structure to correspond to a claimed function").

Second, in *MIDCO,* the patentee did not assert that every means-plus-function element could be implemented in software, but only asserted that the digital-to-analog converting means of one element had such corresponding structure.[8]   By contrast, McKesson would effectively be admitting obviousness by contending that the "determining" means and steps – purportedly the very inventive contribution made by the '164 patent – was capable of being implemented in "any software" known to one of ordinary skill in the art.   McKesson's proposal is especially remarkable as the idea of using software to perform claims editing, including unbundling, was not only publicly disclosed by the inventors more than one year prior to the patent filing, but was also offered for sale by them.

Third, McKesson's reading of *MIDCO* conflicts with other Federal Circuit authority. Specifically, as McKesson quotes (D.I. 170 at 13)*, WMS Gaming* held that "[i]n a means-plus-function claim in which the disclosed structure is a computer, or microprocessor, programmed to carry out an algorithm, the disclosed structure is not the general purpose computer, *but rather the special purpose computer programmed to perform the disclosed algorithm.*"   184 F.3d at 1349 (emphasis added).   In other words, *WMS Gaming* rejected the very position advanced by McKesson that the corresponding structure for a computer-implemented means-plus-function element is simply "software" (*i.e*., "an[y] algorithm executed by a computer").  *Id.* at 1348.

---

8    Similarly, in *Budde v. Harley-Davidson, Inc.*, 250 F.3d 1369 (Fed. Cir. 2002), discussed in *MIDCO* and relied upon by McKesson (D.I. 170 at 14), the corresponding structure was a *particular* device – a "vacuum sensor" – disclosed in the patent for performing a specific claimed function.  *Budde*, 250 F.3d at 1381.  Unlike the selected quotes relied on by McKesson, the specification in *Budde* referenced the specific function – vacuum sensors – which were "commercially available units which produce analog signals for the control unit."  *Id.*

### 2. To The Extent That The Software Code In The Patent Constitutes Corresponding Structure, It Must Be Identified As Part Of The Court's Claim Construction

McKesson suggests that TriZetto's proffered constructions of the structure of the means-plus-function elements are improper because they include specific portions of the software code. D.I. 170 at 18-19. As support, McKesson relies on the Federal Circuit's opinion in *Fonar*. The portion of *Fonar* cited by McKesson concerns a patentee's obligation to disclose the *best mode* of an invention, not whether disclosed software must be considered as part of the means-plus-function or steps-plus-function analysis. *Fonar*, 107 F.3d at 1549 (holding that "[s]tating the functions of the best mode software satisfies that [best mode] description test"). Moreover, even if the source code is not required for purposes of best mode, this does not compel the conclusion that when source code is disclosed as structure for the claimed functions – which McKesson admits[9] – that code can simply be ignored. Thus, the quoted portion of *Fonar* is completely inapplicable here. Correspondingly, McKesson's assertion that *Fonar* provides support for its construction of the corresponding structure is simply wrong.

McKesson also alleges that the court would "abdicate" its role of claim construction if it identified specific software as the structure for any claim elements. D.I. 170 at 19 (*citing Markman*). Nothing in *Markman* (or any other patent case), however, precludes the appropriate identification of portions of software code as structure corresponding to means-plus-function or steps-plus-function elements. To the contrary, where software code is disclosed in a patent, and is clearly linked to the functions of the claims, it is appropriate that the specific code that performs those functions be identified as corresponding structure. *See, e.g., AT&T Corp. v. Microsoft Corp.*, 2003 U.S. Dist. LEXIS 10716 (S.D.N.Y. 2003) (holding, in a claim construction order, that various appendices containing short subroutines of software code are corresponding structure that implement certain boxes of the flow charts in the specification).

---

[9]     *See, e.g.,* D.I. 170 at 29 (McKesson identifying the entirety of Appendix D (the software code) as the structure for claim elements).

By refusing to identify the specific structure in the specification that corresponds and is clearly linked to the claimed functions, McKesson has abdicated its obligation to identify specifically the alleged scope of the claimed invention.

## C.    The Method Claims Recite Functions, Not Acts, And Therefore Are Also Governed By § 112, ¶ 6

Finally, the inventors' use of "steps of" rather than "steps for" language only means that there is no presumption that the elements of claims 1, 2, and 16 are drafted in step-plus-function format.  Accordingly, the claims must be analyzed in light of the intrinsic evidence to determine whether § 112, ¶ 6 applies.  *Masco Corp. v. United States,* 303 F.3d 1316, 1327 (Fed. Cir. 2002); *Seal-Flex, Inc. v. Athletic Track & Court Constr.,* 172 F.3d 836, 849 (Fed. Cir. 1999) (Rader, J., concurring) ("[C]laim elements without express step-plus-function language may nevertheless fall within § 112, ¶ 6 if they merely claim the underlying function without recitation of acts for performing that function"); *see O.I. Corp.,* 115 F.3d at 1583 ("Each claim must be independently reviewed in order to determine if it is subject to the requirements of section 112, P 6.").

The Court made clear in *Masco* that claims employing "steps of" language are subject to § 112, ¶ 6 if "the limitation contains nothing that can be construed as an act."  *Masco,* 303 F.3d at 1327.  The *Seal-Flex* court cited Judge Rader's elucidation of the distinction between "acts" and "functions":

> In general terms, the "underlying function" of a method claim element corresponds to what that element ultimately accomplishes in relationship to what the other elements of the claim and the claim as a whole accomplish.  "Acts," on the other hand, correspond to how the function is accomplished.  Therefore, claim interpretation focuses on what the claim limitation accomplishes, i.e., its underlying function, in relation to what is accomplished by the other limitations and the claim as a whole.  If a claim element recites only an underlying function without acts for performing it, then § 112, ¶ 6 applies even without express step-plus-function language.

*Seal-Flex,* 172 F.3d at 849-50 (Rader, J., concurring).  The question in this case, therefore, is whether the steps of the method claims in the '164 patent recite any acts.

In *Masco*, "transmitting a force . . .to drive the lever" to contact the cam was the act that accomplished the function of "driv[ing] the lever into the cam." 303 F.3d at 1327-28.  Similarly,

the patent in *Seal-Flex* recited the step of "spreading an adhesive tack coating for adhering the mat to the foundation." 172 F.3d at 839. Judge Rader concluded that "the function of 'adhering' is the result achieved by performing the claimed act of 'spreading.'" *Id.* at 850-51 (concurring opinion). But "if this claim limitation had specified only the underlying function, namely, 'adhering the mat to the foundation,' without recital of specific acts for 'adhering,' [then] § 112 ¶ 6 would have governed, *despite the lack of 'step for' language.*" *Id.* at 851 (emphasis added). In this case, the elements of the method claims – which, although not determinative, include identical admittedly functional language used in the apparatus claims – also do not recite any corresponding act and, thus, are governed by § 112, ¶ 6.

In contrast to the situations in *Masco* and *Seal-Flex*, none of McKesson's various filings in this case even attempt to identify the function of the method steps other than the cited functions in the claims themselves. McKesson cannot identify the acts in the method claims, because the claims only identify the relevant functions. Specifically, here, the function of "receiving" a claim is performed by the act of "entering" the claim information, the function of "determining" is performed by the act of "applying" the rules and "checking" the relevant databases, and the functions of "authorizing" and "rejecting" codes is performed by the act of "displaying: a message to the user advising him or her which codes to assign to the claim.

In any event, even if the steps of the method claims are not governed by § 112, ¶ 6, the proper construction of the terms limit their interpretation to the specific structures disclosed in the specification. *See, e.g., O.I. Corp.*, 115 F.3d at 1583-84 (even though "passage" was not governed by § 112, ¶ 6, limiting term to non-smooth walled structures disclosed in the specification). For example, during prosecution the patentee argued that "[t]he present invention *uses and claims **a set of rules*** that describe the relationship between medical service codes (which correspond to particular medical services or procedures) to determine whether or not there are improper medical service codes in a particular claim." Ex. O (Prelim. Amend., dated Jan. 29, 1991) at 16. In the patent, the inventors make clear that, when dealing with multiple codes, the claim should be processed by both the multiple and single code edits in order for

codes to be properly authorized or rejected for payment. *See* Ex. A ('164 patent), col. 6, ll. 13-16 ("Therefore, for both single and multiple code entries, a set of rules applicable to CPT-4 codes singly and in combination are used to evaluate the appropriateness of codes for payment."); col. 4, ll. 5-14 (descriptions of figures 2, 4, and 5 as showing the relevant flow of operation of the claimed invention). In fact, nowhere in the patent is there a suggestion that only applying some narrow subset of the rules provides the utility of the claimed invention. Thus, the "determining" step must be read to include the rules and specific database. Correspondingly, the construction of the "ascertaining whether" and "authorizing/rejecting" steps also should be narrowly construed to conform with the specification.

## V.    THE DISPUTED CLAIM TERMS

### A.    Predetermined Database

#### 1.    McKesson's Proposed Construction Eliminates The Word "Predetermined."

In its Opening Brief, McKesson proposes that the phrase "predetermined database" be interpreted with the phrase "containing medical service codes and a set of relationships among the medical service codes" as meaning "*a database* containing relationships among medical service codes for processing medical claims to detect potential coding errors." D.I. 170 at 7. By packing all of these terms together and claiming that they should be given their "ordinary meaning," McKesson hopes that the Court will overlook the fact that its interpretation of the word "predetermined" effectively eliminates the word from the claims.

Specifically, McKesson asserts that the "clear" ordinary meaning of the word "predetermined" "from the context of each claim" requires that the relationships in the database are determined before the claim is received for processing. D.I. 170 at 7. The context of the claim, in which the predetermined database is never modified, however, makes clear that the database – whether or not it was predetermined – would need to be determined before the claim is received for processing. Thus, there are two fundamental and obvious flaws in McKesson's approach.

*First*, McKesson's proposed construction effectively gives the word "predetermined" no meaning and improperly reads it out of the claims. *Elekta Instrument S.A. v. O.U.R. Scientific Int'l, Inc.*, 214 F.3d 1302, 1307 (Fed. Cir. 2000) (construing claim to avoid rendering the 30 degree claim limitation superfluous); *Gen. Am. Transp. Corp. v. Cryo-Trans, Inc.*, 93 F.3d 766, 770 (Fed. Cir. 1996) (rejecting the district court's claim construction because it rendered superfluous the claim requirement for openings adjacent to the end walls). It is a fundamental aspect of claim construction that the Court must give meaning to each claim limitation at issue. *Ethicon*, 93 F.3d at 1582. From the outset of prosecution, the drafters of the '164 patent included the word "predetermined" as a modifier of the word "database" in each and every one of the patent claims. Pretending that the word has no meaning or real effect should not be permitted.

*Second*, contrary to McKesson's contention, there is no ordinary meaning for the phrase "predetermined database." In fact, the evidence from McKesson's own experts reveals that the phrase "predetermined database" has no ordinary meaning to one of ordinary skill in the art. *See* D.I. 158 at 12-13 (collecting testimony of experts). Indeed, when pressed to define "predetermined database," McKesson's experts could not even agree on a definition. *See id.* (same). If the phrase "predetermined database," did have an "ordinary meaning," presumably McKesson's experts would have agreed on a definition.

Thus, the proposed construction offered by McKesson eliminating the word "predetermined" from the claims altogether cannot stand.

### 2. TriZetto's Proposed Construction Gives Meaning To The Words "Predetermined Database" And Is Supported By The Intrinsic Evidence.

In contrast to McKesson's approach, TriZetto has attempted to offer a construction of the phrase "predetermined database," that gives meaning and effect to both words and that is supported by the disclosures in the patent specification:

> A database . . . that is designed to be modified or updated only by the system designer or vendor, and that is not designed to be modifiable by the end user.

McKesson argues that TriZetto is attempting to add limitations to claims that do not exist. On the contrary, TriZetto is attempting to provide a construction that gives meaning to each claim

term and is consistent with the intrinsic evidence.  When deciding between the two constructions, TriZetto's construction must be adopted because all of the claim terms must be given preference. *Merck & Co. v. Teva Pharms. USA, Inc.*, 395 F.3d 1364, 1372 (Fed. Cir. 2005) ("A claim construction that gives meaning to all the terms of the claim is preferred over one that does not do so.").

### a.    "Predetermined" by whom?

A principal dispute between the parties' is not whether the knowledge base (*i.e.*, the predetermined database) can ever be updated, as McKesson attempts to suggest, but who has access to and the ability to update the rules in the "predetermined database" – the end user or the "experts," whose judgments were the basis for the specific claims edits included in the program. *See* Ex. A, col. 5, l. 67-col. 6, l. 11 ("In order to [determine whether payment or payment authorization for each code on the claim was medically appropriate or not], a set of rules were developed for use of this program . . .  These rules were derived using the CPT-4 classification system, . . . and possible combinations of procedures *assessed by expert medical specialists*. . . . Each of the rules was developed as a result of reviewing medical procedures *by expert medical personnel* . . . . [and the] expert medical personnel also appl[ying] clinical judgment.").[10]  To this end, McKesson's argument that TriZetto's construction would exclude the preferred embodiment because the patent describes the fact that the database can be updated and modified based on the claims history, D.I. 170 at 8, is wrong – TriZetto's construction does not preclude modification or update of the database, but simply specifies who can make such modifications or updates.

---

[10]    McKesson also argues that TriZetto's construction may permit one to avoid infringement by permitting users to modify the "predetermined database." D.I. 170 at 8.  TriZetto submits that whether a particular system would literally infringe a claim as properly construed in light of the intrinsic record, however, is not appropriately considered as part of the Court's claim construction. *Markman v. Westview Instruments, Inc.*, 517 U.S. 370 (1996) (holding that construing patent claims is a question of law for the judge, separate from determining whether infringement occurred which is a question of fact to be submitted to the jury).

In the context of disclosing the purpose and function of the "predetermined database," the patent specification makes repeated reference to the expert-decision-making rules contained in the "predetermined database." *See* Ex. A, col. 3, ll. 42-45 ("The knowledge base interpreter is a part of the CodeReview program and contains an association of the CPT-4 codes with the knowledge base of *expert-derived* decisions or rules."); *id.*, col. 5, ll. 67-68 ("In order to accomplish this, a set of rules *developed for use of this program* is now invoked."); *id.*, col. 5, l. 68-col. 6, l. 4 ("These rules were derived using the CPT-4 classification system, and from various medical procedures which were examined, classified, and possible combinations of procedures assessed by *expert medical specialists*."). The specification also makes clear that the rules are created by the manufacturer or vendor and they are not user-modifiable. *See, e.g.*, *id.*, col. 3, ll. 32-34 ("There is *included* [with the CodeReview program] a knowledge base and a knowledge base interpreter which applies the knowledge base using the rules specified in the knowledge base interpreter"). Indeed, there is no suggestion or hint in the specification that modification by an end user of the preset rules can be achieved by the '164 invention or that such functionality was ever contemplated by the inventors. Nowhere in the specification, flowcharts, or the appendices is there any computer code or other mechanism that would permit the end user to *view*, let alone *modify,* the rules contained in the "predetermined database."

McKesson erroneously relies on the patent's discussion of the HISTORY database as evidence that the "predetermined database" is user modifiable. D.I. 170 at 8. The description of the HISTORY database in the specification, however, actually supports TriZetto's position.

First, there is no disclosure of any means for the user of the computer system to view the contents of the HISTORY database, and there is no explanation of how an end-user should or could use the contents of the HISTORY database to modify the "predetermined database." In contrast, the specification does provide support that "experts" (that is, the system designer or vendor) can and should review the HISTORY database in order to provide updates to the system rules *and program* based on errors, changes and other new coding issues. Ex. A, col. 10, ll. 3-8 (the HISTORY database is used "as a means to study these 'case histories' and refine, update, and

change the rules and the knowledge base interpreter" (*i.e.,* the computer code of the program itself)).    Additionally, McKesson has not submitted any evidence that one of ordinary skill would consider the end users discussed in the specification "experts" or that they would understand how to use the HISTORY database to modify the rules or the code of the program.

Importantly, the extrinsic evidence also supports TriZetto's construction.  The inventors testified that including a new rule or edit in the database was not simply a process of inserting it into the database, but rather required careful checking to make sure the interaction with the entire program flow produced the correct result.    Ex. P (Goldberg Dep.) at 330-334 (describing interviewing process required to develop rules); Ex. K (Holloway Dep.) at 91-93 (stating that the rules were developed by spending a lot of time with Dr. Hertenstein and by comparing the computer's trial results with Dr. Hertenstein's judgment); Ex. L (Hertenstein Dep.) at 224-227. Additionally, the rules databases in CodeReview, the program on which the '164 patent is based (*see, e.g.,* Ex. A, col. 3, ll. 17-29; App. A (examples of "typical session[s] with CodeReview"), could not be viewed or modified by the users.  See Ex. Q (MCK 119730).    In fact, in CodeReview, the HISTORY database was returned to HPR (the vendor of the CodeReview program described in the '164 patent) on a regular basis so that HPR could review and update the rules.[11]

---

[11]    *See, e.g.,* Ex. R ("Functional Specifications for Batch Version of Code Review," revised Oct. 27. 1989) at MCK 042486 ("There are three reasons for CodeReview™ to maintain [the History File]: . . . 2) to allow *HPR physicians to evaluate* CodeReview's™ recommendations and increase its clinical astuteness by providing solutions to the most recently derived coding problems . . ." (emphasis added)); *id.* (the customer will "send the Decision History file to HPR" on a monthly basis); Ex. S ("Code Review" hand typed manual) at MCK 028722 ("It is important that you keep a backup [of the pended and history files] for HPR Inc. as it will indicate . . . whether or not CodeReview decisions need to be altered to better suit your needs."); Ex. T (CodeReview™ User Guide, copyright 1989) at MCK 051136 ("Backing up the History File—Send to HPR"); *see also* Ex. U (Product Description for CodeReview™ Release 1.0, Feb. 1989) (describing the updating of the Knowledge Base by HPR, including review of the coding file).

Accordingly, TriZetto submits that all of the intrinsic and extrinsic evidence supports its construction that the "predetermined database" of the '164 patent was expressly designed to be "predetermined" by the experts and not the end users.

### b.   Database

As used in the '164 patent specification a "database" consists of a single table of data[12] – such as, the ALLCODE, INTERACT, BYITSELF, and MESSAGE databases.[13] Specifically, the specification repeatedly describes each of these tables of data (*see* Ex. A, App. C) as a single, separate "database,"[14] and also references the collection of separate database tables with the plural "databases." *See id.*, col. 10, ll. 48-50 ("Of course, the process described with reference to program 10 may be performed with *databases* other than the CPT-4 example given." (emphasis added)). Although today "database" may have an "ordinary meaning" of a single database file potentially containing multiple tables, the intrinsic evidence unambiguously establishes that the inventors consistently used the term "database" to refer to a single table of data.[15]

### 3.   The "Predetermined Database" Must Contain Both The Medical Service Codes And The Relationships Between Them

As expressly set forth in the specification, TriZetto's proposed construction requires that the "predetermined database" includes *both* "the medical service codes and a set of relationships among the medical service codes." McKesson does not dispute this aspect of TriZetto's construction. Rather, it argues that it is unnecessary. D.I. 170 at 8. The clarification that the

---

[12]   A database table is a two-dimensional arrangement of rows and columns that hold data.

[13]   The patent also describes a PROCESS and a HISTORY database, but the fields in these databases are not set forth in the patent. *Compare* '164 patent, Fig. 2 *with id.*, App. C.

[14]   *See, e.g.,* Ex. A, col. 5, 13-15 ("it is determined whether the code entry is valid or invalid by reference to *the ALLCODE database*" (emphasis added)); *id.*, col. 6, l. 59 ("If so, after a lookup in *the INTERACT database . . .*" (emphasis added)); col. 8, ll. 45-49 ("It must be appreciated that not all codes will be in *the BYITSELF database*, so . . . perhaps only one of those three will be in *the BYITSELF file . . .*" (emphasis added)).

[15]   The extrinsic evidence also supports this construction. In DBase III, a database contained a single table of data and multiple *databases* were used if more than one set of records (tables) were desired. *See* Ex. V at 9-10 (DBASE III Manual, 1986).

"predetermined database" referred to in the claims include both the codes and their relationships is important because the patent specification refers to several different databases. Specifically, the specification includes disclosure of databases that lists all codes (ALLCODE), one that lists superseded codes (SUPERSED), one that lists codes and relationships (INTERACT), one that list codes with other criteria such as place of service, anesthesia, diagnosis, etc. (BYITSELF), and a database of messages (MESSAGE). *See* Ex. A, App. C; *see also* note 13. The claims, however, all specifically refer to the one database that contains the codes *and* relationships (INTERACT) as the "predetermined database." Accordingly, TriZetto respectfully submits that the term "predetermined database" should be construed to unambiguously refer to the database that includes both the medical service codes and their relationships.

**B.     Means For Ascertaining Whether The At Least One Claim Contains A Plurality Of Medical Service Codes**

   **1.     Functionally, Counting Codes Is Not The Same As Ascertaining Whether More Than One Code Exists**

Relying on a 1996 dictionary definition, McKesson contends that the function of the "ascertaining" element should be given its ordinary meaning. D.I. 170 at 24.[16] For the most part, the parties do not dispute the meaning of the word "ascertaining." The principal dispute between the parties is whether this entire claim limitation equates to simply counting the number of medical service codes on the claim, as McKesson asserts (*see* D.I. 158 at 17),[17] or whether the function of this limitation is to determine if the medical claim contains more than one medical

---

[16]   McKesson provides no basis for the Court to rely on a 1996 dictionary when the patent was filed in 1988.

[17]   McKesson's experts proffer a definition that outright *contradicts* any supposed ordinary meaning in this claim element. McKesson's experts improperly construe this claim element to refer simply to a "count" of the number of codes that has no impact on subsequent steps. *See* Ex. E (Musen Dep.) at 113:6-11, 113:23-114:5 (stating that merely "numbering codes" meets the "ascertaining whether" element); *see also* Ex. F (Johnson Dep.) at 96:1-6 ("Q.   Okay.  Now, with respect to step three, 'Processing to determine' -- this is of the algorithm [that Dr. Johnson previously testified corresponded to the "ascertaining" element] now – 'if more than one medical procedure code has been entered,' do you read that to mean that the computer is counting the number of procedure codes on the claim?  A.   Could be.  That's a possible implementation.").

service code as proposed by TriZetto.  D.I. 158 at 17 (proposed construction:  Identifying if the claim contains more than one medical service code in order to determine whether multiple code edits should be checked).

In contesting TriZetto's proposed construction, McKesson accuses TriZetto of incorporating "wholly new limitations" into the "ascertaining" element by linking it to the checking of "multiple code edits."  D.I. 170 at 24.  TriZetto's construction, however,  flows directly from and is fully supported by the specification and the language of the claims.

*First*, the specification – in the figures, text, and source code – expressly distinguishes between the function of counting codes (which is performed when the claims are received), and ascertaining whether a plurality of codes exist on a medical claim (which is established before the "determining" step of the claims is executed).  In particular, the entry program described in the patent counts the number of codes on a submitted claim.  *See* '164 patent, Fig. 3, box 18 ("Count No. of Codes"); App. D, col. 59.   This count, however, is separate from the "ascertaining" function.  *See id*., col. 5, ll. 45-56 (distinguishing the entry program step of counting codes from ascertaining if the number of codes is greater than one); App. D, col. 59. That is, if the programmed computer of the claimed invention ascertains there is not a plurality of codes, it performs processing using a database that does not contain code relationships (BYITSELF) and bypasses the use of the database containing codes and relationships (INTERACT).  *See* Ex. A, col. 4, ll. 5-6 (describing Fig. 2); Fig. 2, boxes 20, 21, 31, 34, App. D, 59.

*Second*, the ascertaining element does not simply state that the number of codes are ascertained, but rather it is expressed as a means for (or a step of) ascertaining *whether* the claim contains a plurality of codes.  The use of the word "whether" denotes that a determination is made ("whether" or not) the claim contains more than one service code.[18]  If the determination is

---

18     The term "whether" has no special meaning in the '164 patent and generally refers to a
       question involving alternatives or "a choice between alternatives" – that is, this element
       determines whether the claim has more than one code on it or not, *see* Ex. H (Webster's

[Footnote continued on next page]

made that the claim contains more than one service code, the system progresses to the next step in the claims editing process.  It makes no functional sense for this element to simply count the number of codes without any consequences if it is ascertained there are not a plurality of codes on the claim.  A decision must be made, so that the portion of the system or method dealing with multiple codes is not applied if the claim has only one code.  Counting codes does not itself provide such a determination.

*Third*, consistent with the detailed description of the invention in the specification, the claim elements following the "ascertaining" step presume that the claim being processed contains multiple codes.  For example, the determining means of claim 3 references "one of the medical service codes *in the plurality* of medical service codes."  Ex. A, claim 3; *see also* claim 2 ("determining whether one of the medical service *codes* in the at least one claim"), 16 (corresponding method claim to claim 2 containing ascertaining step).  If the ascertaining element had no impact on the overall operation of the programmed computer or method, as McKesson contends, the described operation would simply be illogical.  That is, under McKesson's construction, the operation of the computer (or the steps of the applicable method claims) would simply count the number of codes and regardless of whether there were a plurality of codes, it would then proceed to make determinations and authorizations that only operate on a plurality of codes.  As described in the specification, the reason and purpose behind the "ascertaining" element is to process claims that contain more than one code differently from those that contain only one code.  Accordingly, the ascertaining claim element must be construed as a decision whose outcome depends on whether a plurality of codes exist.

### 2.    Figure 2, Box 20 Of The Specification Provides The Corresponding Structure.

As with all of the means-plus-function claim limitations, McKesson contends that the corresponding structure is simply "software capable of performing the function."  *See* D.I. 170 at

---

[Footnote continued from previous page]
    Third New Int'l Dictionary (Merriam-Webster 1986)) at 2603, and takes appropriate action if the system "ascertains" that there is more than one code on the claim.

25.   In its Opening Brief, McKesson erroneously cites to portions of specification where the number of medical codes is counted as corresponding to the claimed function.  *Id.* (citing '164 patent, col. 5, ll. 45-47, 52-53).  These portions of the specification, however, do not correspond to the ascertaining operation.  Rather these counts precede the "ascertaining" step, where a determination of "whether" the claim contains more than one code is made in order for the programmed computer to make a decision about whether to perform operations utilizing the database containing codes and relationships (INTERACT).  *See, e.g.,* Ex. A, col. 5, ll. 47-49 ("This count will determine whether a particular program for multiple entries must be run . . . ."), 53-55 ("In step **20**, if the number of codes determined was more than one, then MULTIPLE PROGRAM is run . . . .").

In contrast to McKesson's identification of inapplicable structure, TriZetto has properly identified the specific structures in the specification that are clearly linked to the ascertaining step or operation for the processing of claims containing multiple codes.  *See* D.I. 158 at 18-19 (identifying the specific algorithm for the "ascertaining" step and means).  In particular, in box 20 of Figure 2, which is performed after the claim is entered (or received), the system specifically asks whether the number of codes on the claim is greater than one ("No. of codes > 1").  If, and only if, the answer to this question is "Yes," the system proceeds to apply its multi-code edits (using the Interact.dbf database).  If the answer is "No," the system does not apply the multi-code edits.  This algorithm in particular, describes the process that is performed in the ascertaining step; namely, those claims that contain more than one medical service code are passed along to the multiple code-editing portion of the claimed process and apparatus.

## C.    **The Determining Elements**

McKesson lumps each of the "determining" elements from the nine asserted independent claims together in one section, and in doing so, attempts to avoid the very distinct differences that exist between these elements.[19]  *See* D.I. 170 at 26-33.  Instead of offering any proposed

---

[19]    McKesson has not included Claim 1 in its discussion of the determining elements. Because the determining elements of both claims recite the identical function and do not

[Footnote continued on next page]

construction for the function of the determining means and step at the heart of the nine independent claims, McKesson suggests only the "ordinary meaning" for each of the nine independent claims.  McKesson then attacks TriZetto's attempts to define the meaning of the determining elements by focusing on inconsequential differences between TriZetto's proposed construction and the plain language (i.e., "determining" vs. "making a determination"; "in the claim" vs. "entered on the claim"; and "by interacting with" vs. "based on").  *Id.* at 26. McKesson's complaints in this regard are without merit and simply seek to divert the Court's attention from the substantive claim construction issues.[20]

In its jumbled presentation, McKesson fails to identify or link any specific corresponding structure for any of the nine determining means elements.  Instead McKesson spends eight pages of its brief generally identifying structure from the specification, but never linking the particular claimed function (such as, the "means for determining whether" one code in the claim is "mutually exclusive due to non-medical criteria" with any other code in the claim, *see* Ex. A, claim 14).[21]

---

[Footnote continued from previous page]

    include any acts or structure, TriZetto submits that proper construction of these elements is governed by § 112(6).

[20]    For example, McKesson accuses TriZetto of limiting the determining functions to medical service codes that have been "manually 'entered on the claim.'"  *Id.* at 26 ("[N]either the 'determining' elements nor any other element of the asserted claims requires that codes be 'entered,' manually or otherwise.")  TriZetto's construction, however, is based on the fact that the only way that a code can exist in the disclosed system and method is if the codes from the claim were first entered.  As set forth the specification, all claims are entered by the user.  *See, e.g.*, Ex. A, Fig. 1, Box 3 (showing USE[R]);col. 4, ll. 51-54 ("Generally, the user 3 will enter into the computer system 2 a description of the medical claims for which reimbursement or payment is requested or the codes associated with such claims or both.").  Accordingly, the wording of TriZetto's proposed construction does not improperly add a limitation to the claims.

[21]    The closest that McKesson comes to identifying structure is its citation to the examples from Appendix A that it claims function in the same manner as the functions described in the claims.  *See* D.I. 170 at 32.  These examples, however, are not clearly linked to the specific determining functions of the claims.  Rather, they simply show the user interface of the claimed invention, as opposed to reflecting means for or acts of how the determinations were made.

Additionally, in its analysis, McKesson continues to avoid its obligation to identify the corresponding structure by stating that "one of ordinary skill" could identify the structure. *See* D.I. 170 at 30 ("one of ordinary skill in the art would recognize the structures that contain and implement the rule-based algorithms of the invention are the structures corresponding to the 'determining' functions."). Of course, as set forth in TriZetto's motion to exclude McKesson's infringement experts, McKesson's experts failed to identify the structures that McKesson contends could be readily identified. *See generally* D.I. 179 & D.I. 228.

On the other hand, TriZetto has offered meaningful and reasonable constructions for the functions and, where possible, has both *identified* the corresponding structure (or, in some cases where there was no structure, the "most relevant" structure to the claimed function) and demonstrated how this structure is *linked* to the determining elements. We can now turn to each of the determining means, which for convenience, can be grouped into three basic categories:

1) Determining whether any code is present in the predetermined database on claims containing one or more than one codes (Claims 1 and 13);

2) Determining whether one code from a plurality of codes is "valid or invalid" by interacting with the predetermined database (Claims 3, 15, and 16); and

3) Determining elements based on a comparison of one code on the claim with another code on the claim (Claims 2, 10, 12, and 14, and dependent claims).

## 1.    Determining The Presence Of A Code (Claims 1(b) and 13(c))

TriZetto submits that the function of the determining element in Claims 1(b) and 13(c) perform a check to verify if the medical services codes input on the medical claim are present in the predetermined database. *See* D.I. 158 at 19. McKesson has not disputed the substance of TriZetto's construction of the function, but instead states that no construction of these claim elements is necessary. *See* Ex. B at 4.

In its Brief, McKesson states that, for element 13(c),"the specification provides a detailed description of software capable of interacting with the database to accomplish the claimed function," and that one example of such a database is the ALLCODE database (*id.*)." D.I. 170 at

32.[22]  The structure identified by McKesson evidences a critical problem with claims 1 and 13: The structure McKesson identifies cannot be the structure of the claims because the claims only include a predetermined database that includes codes and relationships (the INTERACT database).[23]  The ALLCODE database, however, contains a listing of codes, but does not contain code relationships.  *See* Ex. A, App. C (ALLCODE).  Thus, McKesson's identification of the structure relating to ALLCODE supports TriZetto's contention that there is no corresponding structure to the specific claimed determining functions in claim 1 and 13.

In addition, McKesson also alleges that part of the MULTIPLE PROGRAM software interacts directly with the predetermined INTERACT database to "look[] up . . . any references to . . . specific multiple codes . . . to which will be applied one or more of the rules."  *Id.* at 32-33, *citing* Ex. A ('164 patent), col. 6, ll. 19-26.  In addition to not identifying the specific portion of the MULTIPLE PROGRAM that performs this function, McKesson's construction cannot be corresponding structure because the context of the determining functions of claim 1 and 13 is for a "validity check" to let the user know when nonexistent code has been entered.  There is no part of MULTIPLE PROGRAM or any where in the specification in which a structure for performing a validity check (including telling the user the code is not in the database) using the INTERACT database (*i.e.*, the database containing codes and relationships) can be found.

### 2.  Determining If One Of The Codes is "Valid Or Invalid" (Claims 3(d), 15(d), 16(c))

McKesson's proposed construction of "valid or invalid" in the context of the comparison of single codes is directly contradicted by the plain language in the specification, which clearly states:

---

[22]  In the parties' joint submission, McKesson originally only broadly identified Figures 2, 4, and 6 and all of the Appendices as structure from which one of ordinary skill purportedly could discern the appropriate structure.  *See, e.g.*, Ex. B at 16.

[23]  McKesson admits that the INTERACT database is the predetermined database which is referred to throughout the claims.  *See* D.I. 170 at 32 (McKesson referring to INTERACT as the "predetermined" INTERACT database).

> [T]hen in step 9 it is determined whether the entry is *valid or invalid* by reference to the ALLCODE database. . . . .   By valid is meant that there is a code or codes for the treatment given a patient.   *It does not mean that the entry or entries are valid for payment.*

Ex. A, col. 5, ll. 13-15, 20-23 (emphasis added).  McKesson's proffered definition that "valid or invalid" should be construed to mean "appropriate or inappropriate for payment" is completely improper in light of the patent specification.

TriZetto has offered a definition based on the ordinary meaning of the claim language and which is consistent with the patent specification and the claim language itself.  *See Phillips*, at 1312, 1315.  TriZetto submits that the phrase "valid or invalid" should be construed to mean that the medical code exists in the database or the medical code does not exist in the database.  *See* Ex. B at 16, 49, 54.   This proposed construction is specifically supported by the specification.

McKesson attempts to argue that TriZetto's definition is incorrect by confusing two uses of valid in the patent claims – the first is set forth above when used in connection with a code being "valid or invalid" – and the second is the meaning of valid when used in connection with a code being valid based on the contents of the predetermined database.  As set forth in the parties' joint claim construction, TriZetto agrees with McKesson that when used in connection with describing what is in the predetermined database, the term "valid" does mean appropriate for payment.  In other words, like the specification, TriZetto defines "valid" differently depending on the context.  *Compare* Ex. A, col. 5, ll. 13-15, 20-23 (referring to a code being "valid or invalid" based on the presence in the database) *with id.*, col. 10, ll. 10 ("At this point the user has either confirmed that the code(s) for which is requested are valid or have been modified to become valid . . . .").

Finally, as with the other claims, McKesson has failed to both identify sufficient corresponding structure and to clearly link that structure to the claimed functions of claim elements 3(d), 15(d), or 16(c).  *See* Section V(C)(3), *infra*.

### 3.    Determining By Comparing One Code With Another Code (Claims 2(c), 10(d), 12(d), 14(d) and 12(e))

Claims 2, 10, 12 and 14 all include a "determining" step that determines whether one code on the medical claim is related to another code on the same medical claim. Specifically, the determination is made depending on whether the two codes on the claim are "mutually exclusive due to non-medical criteria," "included in" another medical code, or "medically exclusive.". *See* Ex. A, Claim 2, 10, 12, 14.

As an initial matter, TriZetto submits that each of these claim elements should be construed to make clear that the claimed computer system or method is making a determination based on a relationship (whether it be "non-medical" criteria, "medically exclusive," or "included in") between one code on the at least one claim with another code on the at least one claim.[24]  A problem, however, arises in construing the type and details of these relationships and in identifying the required structure corresponding to this functional element.

McKesson argues that TriZetto's construction of the determining language in Claims 10, 12, and 14 adds the limitation of "bas[ing]" the determining function on "the relationship among . . . medical service codes entered on the claim.  *See* D.I. 170 at 27.  McKesson, however, is mistaken.  The use of the term "based on the relationship" does not add any limitation that is not already present.  Furthermore, the entire patent specification, and indeed the very purpose of the described preferred embodiment in the CodeReview system, unambiguously make all determinations concerning appropriate codes based on interacting with the databases,[25] and

---

24    McKesson suggests that these terms should be given their "ordinary meaning" without providing any insight as to what that means.  *See, e.g.*, Ex. B (Claims 2(c)).  Regardless of what "ordinary meaning" McKesson believes applies, it is clear that the claim language does not address determinations based on a relationship of codes that are *not* on the claim.

25    McKesson even admits that the rules are the "heart of the invention."  D.I. 170 at 30 ("At the heart of the invention is a 'set of rules developed for use of th[e] program' used to address claims containing multiple medical service codes.").

because each independent claim explicitly claims a predetermined database, TriZetto's construction is the completely appropriate.

McKesson also argues that TriZetto's construction adds the limitation of determining whether a medical service code "is inappropriate for payment." *Id.* at 27. As with McKesson's other arguments above, this argument fails because of the explicit intrinsic evidence found in the specification itself. *See* Ex. A ('164 patent), col. 3, ll. 11-14 ("An expert system in the form of a computer program is one which reasons like a human expert *to solve the problems associated with appropriate coding of medical treatment for claims payments*."). Indeed, the parties agree that, in the context code relationships in the database, a code is "valid" if it is "authorized for payment." Thus, because the database is expressly included in the claims, TriZetto's construction does not improperly add a limitation to the claims.

McKesson also states that "[n]othing in claims 10, 12, or 14 requires or suggests that the specific claimed criterion must be the only one applied." *Id.* at 28. This statement evidences the problem with the specification and claims. Specifically, the patent addresses applying an entire set of rules in a set sequence while the claims appear to divide up the rules in some undefined and unknown fashion. With respect to the appropriate structure, McKesson continues to argue that the corresponding structure for the function of all the determining elements is "software capable of interacting with the database to determine whether one of the medical service codes in the at least one claim is [criterion], as well as its equivalents." D.I. 170 at 28-29. This is inappropriate. *See* Section IV.B. *supra.*

As addressed in TriZetto's Opening Brief and proposed constructions, there is no specific structure in the specification that corresponds to the function of, for example, "means for determining whether one of the medical service codes" "is medically exclusive" with another code on the claim since the specification never addresses which rules should apply for determining "medical[] exclusiv[ity]." TriZetto submits there is no corresponding structure for the particular criteria set forth in the claims. Alternatively, TriZetto has identified the structure that appears to be the specific determining means that is applied to multiple codes. *See* Ex. B

(claims 2(c), 10(d), 12(d), 14(d) and 12(e)).  *But see* Ex. A (the single code rules get applied to multiple codes as well, but the database for single codes (BYITSELF) is part of the claims).

### 4.    "Non-medical criteria" (Claims 2 and 14)

Although the specification, prosecution history, expert testimony, and inventor testimony all provide no suggestion as to the meaning of "non-medical criteria," McKesson simply ignores the undisputed evidence in the case and contends that this phrase is nonetheless "clear on its face."  McKesson, however, still has not offered any clear definition of and basis for the meaning of "non-medical criteria."

In fact, the depositions in this case reveal that no one understands the phrase "non-medical criteria" as used in the patent.  Each of the inventors of the patent admitted that they did not understand the meaning of "non-medical" criteria and offered different potential definitions for the phrase.  *See* D.I. 158 at 29 (collecting inventor testimony on "non-medical criteria). Likewise, McKesson's expert Dr. Johnson simply did not interpret this phrase as part of her analysis and Dr. Musen, McKesson's other liability expert offered several *possible* definitions, none of which was definitive.  *Id.* at 28 (collecting expert testimony on "non-medical criteria).

Accordingly, based on the claim language, the specification and the testimony, TriZetto submits that the term "non-medical criteria" is indefinite and incapable of proper construction.

### 5.    "Medically determined relationships" (Claim 12)

As with "non-medical criteria," TriZetto submits that the phrase "medically exclusive" as used in Claim 12, is not defined anywhere in the patent or in any dictionary that was in use at the time of the initial application appears and is therefore, indefinite.  Without providing a definition, McKesson claims "medically-determined relationships" can be given its "ordinary meaning."  As with "non-medical criteria," Dr. Johnson did not attempt to define this term and Dr. Musen used circular logic by interpreting the phrase in terms of the undefined and indefinite phrase "mutually exclusive due to non-medical criteria."  *See* D.I. 158 at 29.  Accordingly, TriZetto contends that the term "medically exclusive" is indefinite and incapable of proper construction.

6.     **The Undisclosed Predetermined Database Is Essential Structure To The Determining Means**

The specification makes clear that the determinations about whether codes are valid or appropriate for payment are reached based on the contents of the knowledge base. Every one of the patent claims includes a predetermined database, which presumably is used during the determining step of every claim. The patent, however, does not disclose the contents of the predetermined database. Without those contents, one of ordinary skill would not be able to practice the claimed system without undue experimentation. Indeed, the inventors admitted that filling out the knowledge base in the patent required hundreds of hours of interviews with medical experts. *See* Ex. P (Goldberg Dep.) at 330-334; Ex. K (Holloway Dep.) at 91-93; Ex. L (Hertenstein Dep.) at 224-227. Accordingly, the details of the predetermined database is required as part of the corresponding structure of the determining element of all of the asserted claims.

D.     **"Authorizing" And "Rejecting" Means And Steps**

As with every element of the '164 patent, McKesson argues that the "authorizing" and "rejecting" elements of Claims 2-6, 8-12 and 14-16 "should take their ordinary and accustomed meaning and simply be read to the jury." D.I. 170 at 33. Accordingly, McKesson offers no construction of the functions described in the "authorizing" and "rejecting" elements. The problem with McKesson's construction is that the specification provides a very specific manner in which codes are authorized or rejected using the claimed system and method, but McKesson ignores it. *Phillips*, 415 F.3d at 1313; *see also Nystrom*, 424 F.3d at 1136.

By contrast, TriZetto properly construes the authorizing and rejecting steps in accordance with the manner in which those functions are described in the specification. For example, TriZetto construes the "authorizing" step of Claim 3 to mean: "Displaying on a computer monitor or otherwise communicating to a user that one or more medical service codes input by the user as part of a claim should be authorized for payment, because such codes on the claim were determined in the 'determining' step to be 'valid.'" This construction does not impose any additional limitations on the "authorizing" step, but appropriately clarifies its meaning:

• The first part of TriZetto's construction, "[d]isplaying on a computer monitor or otherwise communicating to a user that one or more medical service codes . . . should be authorized for payment," explains what "authorizing" entails. McKesson does not dispute that medical codes are "authorized for payment." The patent makes clear that "authorization" occurs by communicating to the user (via a computer monitor) the recommendation to accept a given code for payment. For example, in Example 1 of Appendix A, the system displays on the computer monitor the message, "Assign the following code(s) for payment . . ." Every example in Appendix A involves communicating recommendations (i.e., accept or reject the code) to the user via the computer monitor. Even the "Summary of the Invention" explains that "the program of the present invention will recommend to the claims processor that code 49000 should [] be paid." Ex. A,, col. 3, ll. 53-55; *see also id.*, col. 4, ll. 64 ("The interpreter **5**, using the rules of the present invention, interacts with the knowledge base **6** of the present invention and returns to the user **3** either a recommendation as to code(s) for which payment is proper or request the user to provide further information or to obtain further information . . . ."). Indeed, the patent does not disclose any other technique for "authorizing" or "rejecting" codes.

McKesson incorrectly argues that TriZetto's construction conflicts with Claim 5, which includes "means for informing a user why the at least one claim was revised." D.I. 170 at 34 & n.18. But there is no conflict. "Authorizing" entails telling the user (via the computer monitor) *that* the code should be "assigned." Claim 5 involves telling the user *why* the claim "was revised." Both functions are described in Appendix A and both are performed by displaying the information on a computer monitor. For instance, in Example 1, the system first tells the user to "[a]ssign" the particular code and then explains why the code has been accepted.

• The phrase "medical service codes input by the user as part of a claim" reflects the fact that the codes which are "authorized" or "rejected" are the ones found on the input medical claim. The patent claims describe making determinations (in the "determining" steps) on codes contained in the submitted medical claim. Following those determinations, the codes are authorized or rejected. Although the patent specification discloses other types of edits, the

language of the claims appears to only address making a determination among the codes on the claim itself, as opposed to some newly introduced code.

- The last part of TriZetto's construction, "because such codes on the claim were determined in the 'determining' step to be 'valid,'" is a straightforward clarification of the language "in response to the means for determining." The system will authorize or reject those codes that were determined to be "valid" or "invalid" in the determining step. TriZetto's construction                                    makes                                    this                                    clear.

McKesson observes that the "authorizing" and "rejecting" steps of Claim 10 does not have the language "in response to the means for determining." D.I. 170 at 35. There can be no doubt, however, that Claim 10 authorizes or rejects codes based on the "determining" step, otherwise there would be no logical basis for deciding which codes to authorize or reject.

- As with every other § 112, ¶ 6 claim element, McKesson argues that corresponding structure for the "authorizing" and "rejecting" steps is simply "software capable of" performing those steps. As previously explained, this is erroneous as a matter of law. McKesson identifies some specific rules from Appendix B of the patent that are applied to medical codes in the "determining" step, after which the codes are authorized or rejected. D.I. 170 at 36. McKesson also identifies many other sections of the patent specification, figures and appendices are supporting structure for the "authorizing" and "rejecting" steps. Yet, McKesson omits this structure from its preferred construction, instead construing the structure as *any software*.

The proper corresponding structure must include the specific structural elements described in the specification for "authorizing" and "rejecting." This includes the examples in Appendix A showing that codes are authorized or rejected by displaying those recommendations on a computer monitor. Accordingly, the Court should adopt TriZetto's construction of these elements.

Finally, in addition to authorizing and rejecting codes, claims 15 and 16 authorize and reject claims. In addition to the fact that the claim 16 method appears to both authorize and reject the same claim, the only structure in the specification that appears capable of authorizing

(or rejecting) the claims itself, as opposed to the codes, is the user.  Specifically, the specification states that "the user **3** then may authorize payment to the provider of the processed claim or may forward that information via input into the system **4**."  Ex. A, col. 4, ll. 65-69.  A "user," however, cannot constitute means.  *Default Proof Credit Card Sys. Inc. v. Home Depot USA Inc*., 412 F.3d 1291, 1300 (Fed. Cir. 2005) ("a human being cannot constitute a 'means'" (citation omitted)).  Accordingly, there is no corresponding structure for the authorizing and rejecting claim means and steps in claims 15 and 16.

**E.    "Means For Receiving At Least One Claim" (Claims 3, 10, 12-15)**

Once again, McKesson admits that this element is governed by Section 112, paragraph 6. McKesson, however, again fails to identify or link the claim element to any corresponding structure and instead generally asserts that the specification references software "known to those skilled in the art" that would accomplish the function.  D.I. 170 at 21-23.[26]  *See Medical Instrumentation,* 344 F.3d at 1212 (specification must disclose specific software and cannot rely on one of ordinary skill to fill in what is not stated in the specification).

TriZetto's proposed construction, on the other hand, prooperly identifies the specific software and algorithm in the patent that can be thought to perform the relevant function of "receiving at least one claim."  As a result, TriZetto's proposed construction should be adopted.

**F.    "Means For Operating On A Predetermined Database" (Claims 1, 2, and 16)**

As noted in TriZetto's opening brief, McKesson has generally referred to structure located in the specification as support for this means-plus-function term.  TriZetto agrees that what little structure disclosed in the specification is located at Fig. 1, col. 4, ll. 33-42 and Appendix D.  However, these blanket referrals to "software" do not provide the required algorithm to support the claimed function.  *See Harris Corp.*, 417 F.3d at 1253.

---

[26]    McKesson cites generally to portions of the specification that discuss the general computer setup, as opposed to the computer programmed with the specific algorithm shown in the patent.  *See* D.I. 170, Section VII.B.3.b.; *WMS Gaming Inc.*, 184 F.3d at 1348.

McKesson's citation to col. 10, ll. 51-64 of the '164 patent as supporting structure is inappropriate. This citation attempts to circumvent established means-plus-function case law by referencing boilerplate language stating that "[w]hile the foregoing invention has been described with reference to its preferred embodiments, variations and modifications will occur to those skilled in the art." Ex. A, col. 10, ll. 60-64. This language, however, provides no valid supporting structure for the claimed function. Because this is a means-plus-function claim element, the structure corresponding to this element is expressly limited to the structure disclosed in the specification. Because the *only* disclosed structure is the preferred embodiment, the means-plus-function element is limited to covering the preferred embodiment and its equivalents – regardless of any broad reference to other undisclosed variations and modifications known to those skilled in the art. *See Nomos Corp.*, 357 F.3d at 1368; *see also Cross Med. Prods.*, 424 F.3d at 1304; *Faroudja Lab.,* 76 F. Supp. 2d at 1013 (stating that the mere mention of the possibility of alternative structures is not sufficient to expand the scope of the claim).

## G.    The Additional Limitations Of The Dependent Claims

### 1.    Means for revising the at least one claim (claims 4 and 11)

McKesson attacks TriZetto's proposed construction as an improper attempt to import "steps" into the functional language. TriZetto's proposed construction, however, clarifies the language of the dependent claim by explaining that the "means" for revising must logically follow the other functions of the relevant independent claim. It would make little sense, for example, to revise a claim to delete an invalid medical service code *prior* to determining whether or not that claim is valid or invalid. *See* Ex. A, claims 3 and 4. Despite its numerous unsupported protests regarding TriZetto's construction, McKesson *admits* that the claim terms at issue in claims 4 and 11 are purely functional and fall within the ambit of Section 112, ¶ 6.

McKesson offers no structure corresponding to the admitted functional claim "means for revising the at least one claim." Contrary to McKesson's proposed "any software" construction, a human user is the only "structure" identified in the specification to carry out the claimed function. The only description in the specification which could arguably identify some structure

corresponding to these two dependent Claims 4 and 11 relates to the user manually revising the claim. The specification does not identify any acts of the expert computer system that would "revise the claim" or "delete the code." *See* Ex. A, col. 8, ll. 6-9 (noting that the claim can be referred to a human expert); 14-18. Rather, the specification contemplates that the user, not the system, will take an action with respect to the information. Such a construction, however, would render the claim indefinite because a structure supporting a function cannot be a human. *See Default Proof Credit Card Sys. Inc.*, 412 F.3d at 1300.

   **2.     Means for informing the user (claims 5 and 13).**

   Unlike McKesson's arguments, TriZetto's proposed construction properly clarifies that "informing the user" should take place after the claim has been revised (claim 5) or after the determining that the medical service code is not in the predetermined database (claim 13).

   Although McKesson does not identify any corresponding structure, the only corresponding structure in support of these claims is in the examples – that is, the displaying of messages to the user after the system processes certain codes or claims and the user takes an affirmative action in response to the system. *See id.*, Example 1, App. A (user presses Return key after Computer Response, and computer displays further information); Examples 12, 17 and 18 (user presses Return key in multiple instances in response to Computer Responses, and computer displays further information).

   **3.     Means for requesting further information from the user (claim 8).**

   McKesson agrees that the "means for requesting further information from the user" is a functional term. Despite its agreement on this issue, McKesson once again resists any construction by relying on the "ordinary meaning" to construe the claim. And as with many of its other claim constructions, McKesson relies generally on "any software" as known to "one of ordinary skill" contrary to applicable Federal Circuit precedent. *MIDCO,* 344 F.3d at 1212. As noted by TriZetto, however, the patent specification makes clear that this means getting further information from the user to process the claim. *See* Ex. A, Apps. A, B.

### VI.    MCKESSON OFFERS NO BASIS FOR THE COURT TO PRECLUDE TRIZETTO'S TIMELY SERVED CLAIM CONSTRUCTIONS

Finally, despite the fact that claim construction is an issue of law for the Court and the parties should work towards providing the Court as much assistance as possible, McKesson takes the position that the Court should disregard TriZetto's modifications to the portions of the parties' Joint Submission that took place in the week prior to its filing.  D.I. 170 at 1.

As an initial matter, McKesson's complaints about TriZetto's purported "untimely" claim construction are ironic in light of the fact that McKesson's claim construction brief was technically filed one day late.  *See* D.I. 170.[27]  Additionally, despite this Court's order that witnesses be disclosed thirty days after the close of expert discovery (which closed on November 30 after McKesson requested that the Court not extend discovery even for a few days to accommodate the deposition of one of TriZetto's validity experts who was just returning from vacation), McKesson served and filed its witness list on January 4 – five days late.  *See* D.I. 198. Thus, under McKesson's theory and in light of its untimely filings, McKesson should be precluded from arguing any of its proposed constructions or from calling any trial witnesses.

McKesson's position also should be rejected for several additional substantive reasons. First, McKesson – despite being the plaintiff and TriZetto's repeated invitations to do so – made

---

[27]    McKesson also repeatedly frustrated discovery in this action, including wrongfully withholding thousands of pages of documents under the guise of privilege.  The results of recent discovery briefing before Special Discovery Master Bechtle highlights that McKesson is withholding evidence relevant to TriZetto's equitable defenses.  Judge Bechtle's Special Order No. 5 permits TriZetto to re-depose certain key McKesson witnesses, including Michael Cesarz, Janet Cutcliff, Carolyn Wukitch (senior officers and employees of McKesson), and Marcia Radosevich (former CEO of HPR).  Ex. W (Special Master Order No. 5).  Many of these witnesses were instructed not to respond to questions relevant to TriZetto's equitable estoppel defense, regarding McKesson's patent and business or licensing plans.  *See, e.g.*, Ex. X (Radosevich Dep.) at 175-77 (noting that the witness was instructed not to answer questions regarding what HPR management told its sales personnel regarding enforcement of the patent).  Judge Bechtle also ordered McKesson to produce additional docs that TriZetto has not yet received.  Ex. W. (Special Master Order No. 5).  TriZetto's failure to obtain this evidence is entirely of McKesson's own making – Judge Bechtle concluded that McKesson's privilege claims were "fundamentally inappropriate for a claim of privilege under the most basic standards." Ex. Y (correspondence from Judge Bechtle).

no effort to meet and confer regarding the parties' Joint Submission. Second, McKesson has not established any prejudice as a result of TriZetto's proffered claim constructions. Third, a number of TriZetto's changes resulted from the positions taken by McKesson's experts during expert discovery, which only closed on November 30. Fourth, in order to assist the Court in carrying out its obligation to construe the claims as a matter of law, TriZetto supplemented its earlier proposed constructions to offer the "most relevant" structure even with respect to those claim elements for which TriZetto contends there is no link in the specification between any structure and the specific claimed function.

Accordingly, the Court should not entertain McKesson's repeated unwarranted complaints and efforts to avoid having its claims adjudicated on the merits.

## VII.    CONCLUSION

For the foregoing reasons, TriZetto respectfully requests that the Court reject McKesson's unsupported and overly broad claim constructions, and instead, where construction is possible, adopt TriZetto's proposed claim construction as set forth in its Joint Submission and Opening Brief.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Rodger D. Smith II*

Jack B. Blumenfeld (#1014)
Rodger D. Smith II (#3778)
1201 N. Market Street
Wilmington, DE 19899
(302) 658-9200

Attorneys for Defendant The TriZetto Group, Inc.

OF COUNSEL:

Jeffrey T. Thomas
David Segal
Michael A. Sitzman
GIBSON, DUNN & CRUTCHER LLP
Jamboree Center, 4 Park Plaza
Irvine, CA 92614

January 20, 2006
503039

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on January 20, 2006, he caused to be electronically filed The TriZetto Group, Inc.'s Answering Claim Construction Brief with the Clerk of the Court using CM/ECF, which will send notification of such filing(s) to the following:

Michael A. Barlow
Skadden, Arps, Slate, Meagher & Flom LLP

I also certify that copies were caused to be served on January 20, 2006, upon the following in the manner indicated:

**BY EMAIL AND HAND**

Michael A. Barlow
Skadden, Arps, Slate, Meagher & Flom LLP
One Rodney Square
Wilmington, DE  19801

**BY EMAIL AND FEDERAL EXPRESS**

Jeffrey G. Randall
Skadden, Arps, Slate, Meagher & Flom LLP
525 University Avenue
Suite 1100
Palo Alto, CA  94301

*/s/     Rodger D. Smith II (#3778)*
Morris, Nichols, Arsht & Tunnell LLP
1201 N. Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
rsmith@mnat.com