IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| MCKESSON INFORMATION SOLUTIONS LLC, | ) | |
| | ) | |
| Plaintiff, | ) | CIVIL ACTION NO. 04-1258-SLR |
| | ) | |
| v. | ) | |
| | ) | **REDACTED PUBLIC** |
| THE TRIZETTO GROUP, INC., | ) | **VERSION** |
| | ) | |
| Defendant. | ) | |
| | ) | |

**PLAINTIFF'S REPLY BRIEF IN SUPPORT OF ITS MOTION FOR
SUMMARY JUDGMENT REGARDING DEFENDANT'S SEVENTH
AFFIRMATIVE DEFENSE OF INEQUITABLE CONDUCT AND
COUNTERCLAIM FOR DECLARATION OF UNENFORCEABILITY**

Thomas J. Allingham II (#0476)
Michael A. Barlow (#3928)
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
One Rodney Square
P.O. Box 636
Wilmington, Delaware 19899
(302) 651-3000

Attorneys for Plaintiff
McKesson Information Solutions LLC

OF COUNSEL:
Jeffrey G. Randall
David W. Hansen
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
525 University Avenue, Suite 1100
Palo Alto, California 94301
(650) 470-4500

DATED: January 20, 2006
Redacted Public Version Filed: January 25, 2006

# TABLE OF CONTENTS

**Page**

I.    NATURE AND STAGE OF PROCEEDINGS ...................................................... 1

II.   SUMMARY OF ARGUMENT ........................................................................... 1

III.  SUMMARY JUDGMENT OF NO INEQUITABLE CONDUCT IS
      PROPER BECAUSE TRIZETTO HAS FAILED TO RAISE A TRIABLE
      ISSUE AS TO EVERY ESSENTIAL ELEMENT OF ITS DEFENSE.................. 2

      A.    TriZetto Has Not Offered any Evidence that Could Properly
            Support a Finding of Intent to Deceive ........................................................ 3

      B.    TriZetto Lacks Sufficient Evidence to Prove that any of the
            Allegedly Undisclosed Information Was Material ..................................... 5

            1.    The Four Alleged Nondisclosures Identified in TriZetto's
                  Answer and Interrogatory Response ............................................... 5

            2.    TriZetto's Three Newly Alleged Nondisclosures .......................... 7

                  (a)    Dr. Hertenstein's Manual Review of Medical
                         Claims .............................................................................. 7

                  (b)    The July 1987 Proposal to AEtna ...................................... 9

                  (c)    AMS .............................................................................. 11

      C.    TriZetto Has Failed to Develop any Evidence that the Applicants
            Considered the Allegedly Undisclosed Information to be Material. ....... 13

IV.   TRIZETTO CANNOT RELY ON THE THREE NEWLY ALLEGED
      NONDISCLOSURES BECAUSE TRIZETTO NEVER IDENTIFIED
      THEM IN ITS PLEADINGS OR DURING DISCOVERY ................................ 15

V.    CONCLUSION................................................................................................... 20

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Alfa Leisure, Inc. v. King of the Road,*
  314 F. Supp. 2d 1010 (C.D. Cal. 2004) ....................................................... 4

*Am. Stock Exch., LLC v. Mopex, Inc.,*
  215 F.R.D. 87 (S.D.N.Y. 2002) ................................................................. 16

*Braun Inc. v. Dynamics Corp. of America,*
  975 F.2d 815 (Fed. Cir. 1992) ................................................................... 3

*Catalina Lighting, Inc. v. Lamps Plus, Inc.,*
  295 F.3d 1277 (Fed. Cir. 2002) ................................................................. 4

*Dayco Prods., Inc. v. Total Containment, Inc.,*
  329 F.3d 1358 (Fed. Cir. 2003) ................................................................. 3

*Group One, Ltd. v. Hallmark Cards, Inc.,*
  254 F.3d 1041 (Fed. Cir. 2001) ............................................................... 10

*Halliburton Co. v. Schlumberger Tech. Corp.,*
  925 F.2d 1435 (Fed. Cir. 1991) ............................................................... 13

*Praxair, Inc. v. ATMI, Inc.,*
  231 F.R.D. 457 (D. Del. 2005) .......................................................... 16, 17

*Sunbeam Prods., Inc. v. Wing Shing Prods. (BVI) Ltd.,*
  311 B.R. 378 (S.D.N.Y. 2004) ................................................................. 4

*Warner-Lambert Co. v. Teva Pharms. USA, Inc.,*
  418 F.3d 1326 (Fed. Cir. 2005) ............................................................... 13

**STATUTES**

FED. R. CIV. P. 26(e)(2) ............................................................................. 19

FED. R. CIV. P. 37(c)(1) ............................................................................. 16

Plaintiff McKesson Information Solutions LLC ("McKesson") respectfully submits its reply brief in support of its motion for summary judgment on defendant The TriZetto Group, Inc.'s ("TriZetto") Seventh Affirmative Defense of unenforceability due to inequitable conduct and its Counterclaim seeking a declaration of unenforceability on the same ground.

## I.    NATURE AND STAGE OF PROCEEDINGS.

The nature and stage of proceedings are set forth in McKesson's opening brief. (D.I. 150.)

## II.    SUMMARY OF ARGUMENT.

In addition to the reasons set forth in McKesson's opening brief, McKesson is entitled to summary judgment of no inequitable conduct for the following reasons:

1.    TriZetto's only evidence of intent to deceive is that some of the applicants knew about some of the allegedly undisclosed information but did not disclose the information to the U.S. Patent and Trademark Office ("PTO").[1] The Federal Circuit and numerous district courts have held that deceptive intent cannot be inferred solely from an applicant's knowledge of material information and his failure to disclose that information to the PTO. Because TriZetto has no other evidence regarding intent, TriZetto cannot prove this essential element of its inequitable conduct defense as a matter of law.

2.    TriZetto has failed to show that there is a triable issue as to the materiality of any of the allegedly undisclosed information. The prior art and prior public uses identified by TriZetto were not material or were cumulative of information already before the PTO. The proposal that TriZetto alleges was a prior offer for sale also was not material because the evidence shows that the proposal was not an offer for sale and did not trigger the on-sale bar under 35 U.S.C. § 102(b).

---

[1] "Applicants" refers to the named inventors and those substantively involved in prosecuting the '164 patent.

1

3.    TriZetto cannot prove that the applicants believed that any of the allegedly undisclosed information was material. TriZetto has failed to offer evidence that could support a finding of knowledge of materiality, and in fact, the evidence indicates that the applicants did not consider or would not have considered the information to be material.

4.    TriZetto should be limited to relying on the four alleged nondisclosures identified in its Answer and during discovery. In its opposition, TriZetto identified three new alleged nondisclosures as bases for its inequitable conduct defense. TriZetto's failure to identify these newly alleged bases in its pleadings or during discovery violates TriZetto's discovery obligations and the Court's Scheduling Order, is not substantially justified, and has harmed McKesson and the Court. Accordingly, TriZetto should be precluded from relying on these newly alleged nondisclosures.

Because TriZetto has failed to present sufficient evidence to show any genuine issue of material fact, McKesson is entitled to judgment as a matter of law. Accordingly, McKesson respectfully requests that the Court grant its motion for summary judgment as to TriZetto's inequitable conduct defense and counterclaim.

## III.   SUMMARY JUDGMENT OF NO INEQUITABLE CONDUCT IS PROPER BECAUSE TRIZETTO HAS FAILED TO RAISE A TRIABLE ISSUE AS TO EVERY ESSENTIAL ELEMENT OF ITS DEFENSE.

Prior to filing its opposition last week, TriZetto had alleged four nondisclosures on which it based its inequitable conduct defense and counterclaim: the alleged nondisclosure of (1) the Egdahl & Hertenstein article;[2] (2) a 1994 statement by former HPR President, Marcia Radosevich, allegedly regarding the obviousness of the patented invention; (3) other alleged inventors; and (4) information regarding government funding. (D.I. 10 at 5-6; D.I. 151, Exh. 1 at 17-18.) In its opening brief, McKesson showed that

---

[2]  Richard Egdahl, M.D. & Robert Hertenstein, M.D., *An Access-oriented Negotiated Fee Schedule--The Caterpillar Experience*, ANN. SURG. 206(3), pp. 349-357 (Sept. 1987) (D.I. 151, Exh. 4.).

2

TriZetto lacked sufficient evidence to prove every essential element of inequitable conduct based on each of these four alleged nondisclosures.  (D.I. 150.)

In its opposition, TriZetto devoted little attention to the Egdahl & Hertenstein article and completely ignored the other three alleged nondisclosures.  Instead, TriZetto focused on three alleged nondisclosures that it had never previously identified in this litigation: the alleged nondisclosure of (1) inventor Robert Hertenstein's prior manual review of medical claims at Caterpillar, (2) a July 1987 proposal to AEtna, and (3) the Advanced MedLogic System ("AMS").

TriZetto has failed to show that any of its previously or newly alleged nondisclosures supports a finding of inequitable conduct.  In addition, the Court should preclude TriZetto from relying on any of the newly alleged nondisclosures because TriZetto failed to identify them in its pleadings or during discovery.

## A.    TriZetto Has Not Offered any Evidence that Could Properly Support a Finding of Intent to Deceive.

TriZetto lacks sufficient evidence to prove that any of the applicants intended to deceive the PTO.  TriZetto offers no documentary evidence of deceptive intent, and the testimonial evidence on which TriZetto relies cannot support an inference of intent to deceive as a matter of law.

The only evidence that TriZetto comes forward with on the issue of intent is testimony that some of the applicants knew about some of the allegedly undisclosed information but did not disclose the information to the PTO.  The Federal Circuit, however, has held that deceptive intent cannot be inferred "solely from [an applicant's] failure to present to the PTO material prior art of which it was aware." *Braun Inc. v. Dynamics Corp. of America*, 975 F.2d 815, 822 (Fed. Cir. 1992). *See also Dayco Prods., Inc. v. Total Containment, Inc.*, 329 F.3d 1358, 1367 (Fed. Cir. 2003) ("On the issue of intent, the district court also erred in concluding that the mere fact that the prosecuting attorney knew of the Wilson reference and decided not to submit it to the examiner

3

established intent."); *Catalina Lighting, Inc. v. Lamps Plus, Inc.*, 295 F.3d 1277, 1288-89 (Fed. Cir. 2002) (rejecting argument that deceptive intent could be inferred solely from the fact that material information known to the applicant was not disclosed).

District courts have also refused to infer deceptive intent from the fact that material information was known to the applicant but not disclosed to the PTO. *See, e.g., Alfa Leisure, Inc. v. King of the Road*, 314 F. Supp. 2d 1010, 1016 (C.D. Cal. 2004) (refusing to infer intent to deceive from "the alleged omissions of prior art by [inventor] Crean and his knowledge of those omissions"); *Sunbeam Prods., Inc. v. Wing Shing Prods. (BVI) Ltd.*, 311 B.R. 378, 399 (S.D.N.Y. 2004) ("[I]ntent to deceive cannot be inferred solely from the fact that information was known to the patentee and not disclosed to the PTO; there must be a factual basis for a finding of deceptive intent.").

TriZetto's inequitable conduct defense fails as a matter of law because TriZetto has not offered, and indeed cannot offer, evidence that would provide a factual basis for a finding of deceptive intent. TriZetto has no evidence that any of the applicants made any conscious or purposeful decision to withhold the allegedly undisclosed information. TriZetto chose not to depose any of the prosecuting attorneys, all of whom are outside the jurisdiction of the Court and therefore cannot be subpoenaed for trial. Although TriZetto extensively deposed all the named inventors and Dr. Radosevich, TriZetto only examined a few of them regarding some of the alleged nondisclosures. For example, TriZetto did not examine Dr. Hertenstein about any of the alleged nondisclosures, including the alleged failures to disclose his manual review of medical claims and the Egdahl & Hertenstein article.    TriZetto also failed to examine anyone about the alleged nondisclosures of AMS and the July 1987 proposal to AEtna.

Moreover, in the few instances where TriZetto did question the inventors or Dr. Radosevich about some of the allegedly undisclosed information, the testimony refutes a finding of intent. Inventors Don Holloway and Kelli Dugan testified that they recalled having no discussions regarding whether to disclose or withhold the Egdahl &

4

Hertenstein article.   (D.I. 151, Exh. 3 at 293:15-19 & Exh. 13 at 106:24-107:6.)
Dr. Radosevich also testified that she had no discussions about whether or not to disclose
the knowledge base (*i.e.*, the specific relationships between particular medical service
codes) to the PTO.  (D.I. 215, Exh. 11 at 132:22-133:6.)[3]  Indeed, Dr. Radosevich did not
even know whether the knowledge base was withheld from the PTO.  (*Id*. at 132:16-21.)

There are simply no facts that would support a finding of intent to deceive the
PTO.  TriZetto's attempt to manufacture a triable issue regarding intent through improper
inferences cannot hide the conspicuous absence of supporting evidence.   Because
TriZetto cannot prove deceptive intent as a matter of law, summary judgment of no
inequitable conduct should be granted.

### B.    TriZetto Lacks Sufficient Evidence to Prove that any of the Allegedly Undisclosed Information Was Material.

#### 1.    The Four Alleged Nondisclosures Identified in TriZetto's Answer and Interrogatory Response.

Of the four alleged nondisclosures identified by TriZetto in its Answer and during
discovery, TriZetto only addresses one in its opposition brief--the Egdahl & Hertenstein
article.     TriZetto offers no evidence concerning the alleged nondisclosure of
Dr. Radosevich's alleged belief regarding the obviousness of the patented invention,
other alleged inventors, or government funding.   In fact, TriZetto's opposition brief
completely ignores these alleged nondisclosures.  Because TriZetto has not presented any
evidence supporting inequitable conduct based on these alleged nondisclosures, summary
judgment of no inequitable conduct is proper.

With regard to the Egdahl & Hertenstein article, TriZetto fails to show that the
article was not cumulative of information that was before the PTO.  As discussed in

---

[3]  TriZetto wrongly asserts that Dr. Radosevich "admitted that she discussed with HPR's attorneys
the idea of disclosing the database ... to the PTO, but she could not recall how those discussions
came out." (D.I. 214 at 10.)  The testimony to which TriZetto refers does not concern discussions
about disclosing the database to the PTO, but relates to discussions about different ways to
protect HPR's proprietary interests in the database. (D.I. 215, Exh. 11 at 135:17-136:5.)

McKesson's opening brief, the article focuses primarily on Caterpillar's access-oriented approach to preventing overpayment of medical fees by negotiating reasonable fee schedules with physicians to help ensure that Caterpillar employees and their families have broad access to medical providers. (D.I. 150 at 6; D.I. 151, Exh. 4 at 350-54.) The article also includes a brief description of Caterpillar's manual review of physician bills for coding errors. (D.I. 151, Exh. 4 at 351.) This description, however, is cumulative of information disclosed in the '164 patent regarding the manual review of medical claims. (D.I. 150 at 9-10 (comparing the two disclosures).) TriZetto fails to show otherwise.

In its opposition, TriZetto does not identify any material information in the Egdahl & Hertenstein article that is not also disclosed in the '164 patent. TriZetto characterizes the article as "describ[ing] the system used by Hertenstein at Caterpillar whereby '[s]urgical services that have been incorrectly bundled are rebundled, and the appropriateness of surgical assistant charges is reviewed.'" (D.I. 214 at 17.) The '164 patent, however, also discloses that physician reviewers had manually reviewed claims to correct problems regarding the assignment of appropriate codes:

> CodeReview, a product of HPR, Inc., the assignee of the present invention, uses expert systems techniques especially suited to representing the medical judgment required to assign appropriate codes to surgeon's claims. ...The prompts and recommendations provided by CodeReview are based on the decision rules that physician reviewers have already used on a manual basis to solve identical problems and are consistent with informed surgical opinion.

(D.I. 7, Exh. A at col. 3, ll. 17-29.)

Moreover, TriZetto does not even argue that the Egdahl & Hertenstein article is non-cumulative. TriZetto's only discussion regarding cumulativeness relates to Dr. Hertenstein's prior manual review of claims, not the article itself. (D.I. 214 at 21-22.) TriZetto asserts that Dr. Hertenstein's prior manual review is not cumulative because the patent does not disclose that the patented invention was designed to "replicate precisely" Dr. Hertenstein's manual review of claims. (*Id.*) Setting aside for the moment TriZetto's gross mischaracterization of the patented invention, TriZetto's argument has no bearing

6

on the Egdahl & Hertenstein article because the article does not disclose anything about using a computer system to replicate the manual review of medical claims.

Because TriZetto has failed to show a genuine issue as to the materiality of the Egdahl & Hertenstein article or the other undisclosed information alleged in TriZetto's Answer and interrogatory response, the Court should grant summary judgment of no inequitable conduct.

### 2.    TriZetto's Three Newly Alleged Nondisclosures.

TriZetto's last-minute identification of three new bases for its inequitable conduct defense is improper and, as shown later, TriZetto should be precluded from relying on those newly alleged nondisclosures. However, even if permitted to rely on them, TriZetto cannot show that the allegedly undisclosed information was material.

### (a)    Dr. Hertenstein's Manual Review of Medical Claims.

TriZetto asserts that Dr. Hertenstein's prior manual review of medical claims was material because his review of medical claims was the only novel aspect of the patented invention. TriZetto's argument, however, incorrectly assumes that the inventors were seeking to patent a computerized version of Dr. Hertenstein's manual review process. The invention of the '164 patent was never designed to replicate Dr. Hertenstein's review process because Dr. Hertenstein did not actually have a "process" that could be replicated or computerized. In distinguishing the patented invention from Dr. Hertenstein's manual review of claims, Dr. Holloway explained:

> ...while you say Dr. Hertenstein did this manually, he did not use these rules [in the patent] manually. He didn't have a list of these rules anywhere. He didn't -- he couldn't describe these rules if you had asked him.
>
> **What he did was look at a claim and come up with an answer. He had no idea what process he was using to go from what was on the [medical] claim to his answer.**
>
> So I would argue or I'm -- I'm responding now saying, no, these are not -- **this is not what Dr. Hertenstein did. The answer corresponded to the answer he came up with, but this was not the process he used to get there.**

(D.I. 151, Exh. 3 at 278:6-279:3 (emphasis added).)

As with the Egdahl & Hertenstein article, the fact that Dr. Hertenstein manually reviewed medical claims also was not material because it was cumulative of the '164 patent's disclosure that physician reviewers had manually reviewed medical claims for the same types of coding errors as the '164 patent. (D.I. 7, Exh. A at col. 3, ll. 17-29.)

TriZetto also errs in its assertion that the specific relationships between particular medical service codes that were identified by Dr. Hertenstein should have been disclosed to the PTO. The patented invention was a system and method for reviewing and correcting medical claims for certain coding errors; it was not the underlying data used in that system and method. (Exh. 17 at 289:9-11 ("...this patent would tell you what to do to get it so the computer would respond the way the physician did"); Exh. 18 at 187:3-4 ("...the patent allowed them to use my database to provide the answers").[4]) As Dr. Goldberg explained at his deposition:

> I'll use an analogy. If one invents a system and a method for playing the card game of bridge, a new system, and a method, and you write a book about it and you publish that book or whatever would be done in the 21st century, you would certainly give some examples of the system and method by showing -- in order to elucidate the system and method. ...
>
> But you wouldn't dream that you would need an appendix to the book or that an integral part --that contained every possible situation that -- in which this system and method for playing bridge -- this new system for playing -- method for playing bridge could be -- would be handled and how you would act in each one of those systems. It would be unnecessary, and it would not be part of the system and method.
>
> &#42; &#42; &#42;
>
> So in that sense, whether it's an appendix or an integral part, to have to list every -- every hand and every situation in which you'll do this or that, I would not call that -- I would not use the words you used that implied that it was a key feature.

---

[4] Exhibits 17 through 32 are attached to the Declaration of Michael A. Barlow in Support of Plaintiff's Reply Brief in Support of Its Motion for Summary Judgment Regarding Defendant's Seventh Affirmative Defense of Inequitable Conduct and Counterclaim for Declaration of Unenforceability, filed herewith.

(Exh. 19 at 198:20-200:1.) Thus, the specific relationships among medical service codes that may have been used or identified by Dr. Hertenstein were not material to the patented invention because the patented invention was intended to operate on any set of medical service codes and relationships among those codes that happened to be contained in the database.

TriZetto's assertion that McKesson's proposed claim construction shows that Dr. Hertenstein's manual review of medical claims was material is equally unfounded because it misrepresents McKesson's claim construction.    TriZetto contends that McKesson has identified structures for the means-plus-function claim elements that do not correspond to the patent's disclosure, particularly the various rules disclosed in the patent. (D.I. 214 at 20.) To the contrary, consistent with Federal Circuit precedent and the Court's September 20, 2005 Memorandum Order, all of the structures identified by McKesson are clearly linked to the patent's specification, including, where applicable, the patent's disclosures of the rules-based algorithms used by the invention. (D.I. 179 at 30 ("…one of ordinary skill in the art would recognize that the structures that contain and implement the rules-based algorithms of the invention are the structures corresponding to the 'determining' functions"); D.I. 148, Exh. A.)

Because TriZetto fails to establish that Dr. Hertenstein's prior manual review of medical claims was material and noncumulative, its alleged nondisclosure to the PTO cannot support a finding of inequitable conduct.

### (b)    The July 1987 Proposal to AEtna.

TriZetto contends that the inventors should have disclosed a July 1987 proposal to AEtna because the proposal constitutes an offer for sale triggering the on-sale bar under 35 U.S.C. § 102(b). The evidence, however, does not support a finding that the July 1987 proposal was an offer for sale. The Federal Circuit has held that "[o]nly an offer which rises to the level of a commercial offer for sale, one which the other party could make into a binding contract by simple acceptance (assuming consideration), constitutes an

9

offer for sale under § 102(b)." *Group One, Ltd. v. Hallmark Cards, Inc.*, 254 F.3d 1041, 1048 (Fed. Cir. 2001). On its face, the July 1987 proposal does not rise to the level of a commercial offer for sale.

The July 1987 proposal clearly stated that its purpose was to study AEtna's claims processing system, not to sell AEtna a product:

**REDACTED**

**REDACTED**

**REDACTED**

**REDACTED**

(*Id*. at MCK 028653.)

Because the July 1987 proposal to AEtna did not constitute an offer to sell for purposes of the on-sale bar under 35 U.S.C. § 102(b), TriZetto cannot prove inequitable conduct based on its nondisclosure to the PTO.[5]

### (c)  AMS.

AMS also did not need to be disclosed to the PTO because AMS was cumulative of and less material than the prior art references already before the patent examiner. Unlike the patented invention, which is directed to performing multiple-procedure code edits (*i.e.*, editing claims based on relationships among multiple procedure codes), AMS was a single-code editing system that compared a single procedure or diagnosis with some criteria other than another procedure or diagnosis, such as age or gender. Dr. Goldberg described AMS as follows:

- "The Advanced MedLogic System was a series of computerized tables, lookup tables, that received processed-and-paid claims. In other words, it received post-payment claims databases, and reviewed them to perform single-code edits of various kinds. Post-process, post-payment." (Exh. 19 at 51:22-52:2.)

---

[5] TriZetto also erroneously states that the patented invention had been reduced to practice by September 14, 1987. (D.I. 214 at 24-25.) Dr. Holloway testified that the inventors had not yet reduced their invention to practice by that time. (D.I. 215, Exh. 6 at 135:8-11 ("Q. So by September 14 of 1987, you had -- you actually had the product, the software had been written, the knowledge base had been created? A. No.").)

11

- "[T]hey were looking for mismatches between age and diagnosis, age and procedure, sex and diagnosis, sex and procedure, or just diagnoses that were so unusual you wouldn't expect to see them in the United States; although they might be perfectly common in parts of Africa, for example." (*Id.* at 262:7-12.)

- "To my knowledge, Advanced MedLogic had no capability of comparing procedure code to procedure code, or diagnosis to diagnosis." (*Id.* at 384:1-3.)

This type of single-code editing system, however, was disclosed in numerous prior art references that were considered and rejected by the patent examiner during the prosecution of the '164 patent. The table below identifies those references.

| Cited Prior Art | Disclosure |
|---|---|
| Anonymous, "Enhancing Accuracy and Timeliness Is Integral To The Claims Adjudication Process," *Employee Benefit Plan Review*, Dec. 1985, pp. 10-12. | "Ms. Welsh discussed the process of entering claims data into a computer system and how the design of special edit features can enhance accuracy and timeliness of claims adjudication. …Ms. Welsh suggested that when data on age, sex, effective dates, and cancellation date are entered into the computer system, certain red flags can be built into the system to warn that a covered individual is near or past eligibility status." (Exh. 21 at 10.) |
| "System validates medical fee schedules," *Bests Review: Life/Health*, June 1987, p. 92. | "Called the Medical C Schedule and Audit System, the system allows claims examiners to validate medical procedure codes and ICD-9 Diagnosis Codes for questions of medical appropriateness and causal relationship." (Exh. 22 at 92.) |
| Weitzel, J.R. et al., "A Company/ University Joint Venture to Build a Knowledge-Based System," *MIS Quarterly*, vol. 12, no. 1, Mar. 1988, pp. 23-34. | "The remaining part of the problem was to determine if health care services were medically necessary. Medical necessity involved assessing the patient's diagnoses, surgical procedures, the length of time since they occurred, and the severity of the patient's condition." (Exh. 23 at 28.) |
| Snyder, C., "From research to reality: the leading edge of expert systems," *Insurance* Software *Review*, vol. 12, no. 3, Autumn 1987, pp. 23-27, 30. | "The claims examiner prompts ExClaim by entering basic claim information, such as the claimant's name and address, dates of service, amounts of charges, provider information, diagnoses, procedures performed, and category of service (office visits, inpatient or outpatient surgery, etc.). Based on that data, ExClaim then determines the resultant payment or final reconciliation of the claim, which the claims examiner may review if he so chooses." (Exh. 24 at 26.) |

In addition to being cumulative of those references, AMS would have been considered less material than the cited prior art because AMS was not in the field of the patented invention. The '164 patent describes the field of invention as "medical claims analysis and decision-making mechanisms *for analyzing and applying payments to such*

12

*medical claims*." (D.I. 7, Exh. A at col. 1, ll. 10-15 (emphasis added).)  Unlike the systems disclosed in the cited prior art, which were used prior to payment of medical claims, AMS only looked at claims after they had been paid.  (Exh. 19 at 51:22-52:2.) Because AMS was cumulative of and less material than the prior art already before the PTO, the inventors had no obligation to disclose it.  *See Halliburton Co. v. Schlumberger Tech. Corp.*, 925 F.2d 1435, 1440 (Fed. Cir. 1991) ("[A] patentee has no obligation to disclose an otherwise material reference if the reference is cumulative or less material than those already before the examiner.").  Thus, TriZetto cannot maintain an inequitable conduct defense based on the nondisclosure of AMS.

### C.    TriZetto Has Failed to Develop any Evidence that the Applicants Considered the Allegedly Undisclosed Information to be Material.

An essential element of TriZetto's inequitable conduct defense is that the applicants knew of the allegedly undisclosed information and of its materiality.  *See Warner-Lambert Co. v. Teva Pharms. USA, Inc.*, 418 F.3d 1326, 1342-43 (Fed. Cir. 2005).  TriZetto, however, cannot prove this element because it has failed to develop any evidence showing that any of the applicants believed that the allegedly undisclosed information was material to the patentability of the '164 patent.

Although TriZetto extensively deposed all four named inventors and Dr. Radosevich, TriZetto did not examine them about their views regarding the materiality of any of allegedly undisclosed information.  TriZetto did not even ask them if they believed that any of the allegedly undisclosed information should have been disclosed to the PTO.  Having failed to subpoena any of the prosecuting attorneys for deposition, TriZetto also has no evidence that the prosecuting attorneys believed any of the allegedly undisclosed information to be material.

Nor is there evidence showing that the applicants should have known that any of the allegedly undisclosed information was material.  With regard to the Egdahl & Hertenstein article and Dr. Hertenstein's manual review of medical claims, the evidence

13

indicates that none of the inventors considered the information to be material because they did not believe that Dr. Hertenstein's manual review of claims disclosed the rules or process described and claimed in the '164 patent. In distinguishing Dr. Hertenstein's manual review from the patented invention, Dr. Holloway explained:

> ...while you say Dr. Hertenstein did this manually, he did not use these rules [in the patent] manually. He didn't have a list of these rules anywhere. He didn't -- he couldn't describe these rules if you had asked him.
>
> What he did was look at a claim and come up with an answer. He had no idea what process he was using to go from what was on the [medical] claim to his answer.
>
> So I would argue or I'm -- I'm responding now saying, no, these are not -- this is not what Dr. Hertenstein did. The answer corresponded to the answer he came up with, but this was not the process he used to get there.

(D.I. 151, Exh. 3 at 278:6-279:3. *See also* D.I. 151, Exh. 13 at 21:16-17 ("The way you talk about a manual process makes it sound like it was something more than it was.") & Exh. 14 at 168:7-8 ("I'm not sure he [Dr. Hertenstein] ever methodized [his manual process] in the sense of systematized it.").) Even Dr. Hertenstein "didn't think it was possible to develop a system to do" what he did manually. (D.I. 151, Exh. 15 at 222:5-9.)

With regard to the July 1987 proposal to AEtna, there was no reason for the inventors to believe that the proposal was material because, as shown above, the proposal was not an offer to sell the patented invention. Moreover, Dr. Holloway testified that he did not consider his July 1987 discussions with AEtna to constitute an offer to build or develop any software, but merely to determine how big AEtna's problem was and recommend possible solutions:

> Q.    And in those discussions in July of 1987, you brought up the idea of ultimately creating some software that could be used to edit -- to check and edit the CPT-4 codes on the claims, right?
>
> * * *
>
> A.    So at this point, in July 29th, 1987, ... I didn't say we'd build you software, that we will deliver software, that we'll -- I mean, at this point I was saying we needed to do an audit to find out how big your problem is

14

and come back to you with recommendations on how to solve it. One of the recommendations might have been improve the training of your medical unit.

(Exh. 17 at 228:22-230:8.)

With regard to AMS, the evidence indicates that Dr. Goldberg did not consider AMS to be material because he believed it was addressing a different problem than the patented invention:

> Q. What problem were the inventors trying to solve when they conceived of the disclosed system and method?
>
> A. We were trying to solve the problem of incorrectly coded procedures on medical claims when -- in an automated and -- in an automated system that would be -- an automated system, period. There are other things I could say, but I'll stop there for a one-sentence answer.
>
> * * *
>
> Q. ... Based on your work at HDI [with AMS], were you aware that medical claims were being submitted with incorrect codes?
>
> A. With incorrect codes, yes, as I have described with such things as impossible diagnoses, procedures that didn't match the sex or age. That's one kind of incorrect coding, but that's not the kind of coding I'm talking about when I talk about incorrect coding.

(Exh. 19 at 154:6-14 & 155:12-20.)

Because TriZetto has no evidence, let alone clear and convincing evidence, that any of the applicants considered any of the allegedly undisclosed information to be material, McKesson is entitled to summary judgment of no inequitable conduct.

## IV. TRIZETTO CANNOT RELY ON THE THREE NEWLY ALLEGED NONDISCLOSURES BECAUSE TRIZETTO NEVER IDENTIFIED THEM IN ITS PLEADINGS OR DURING DISCOVERY.

TriZetto should be precluded from relying on the alleged nondisclosures of Dr. Hertenstein's manual review, the July 1987 proposal, and AMS because TriZetto failed to disclose those bases for its inequitable conduct defense in its Answer and during discovery. TriZetto's failure to disclose the full bases for its defense is yet another example of TriZetto's pattern of disregard for its discovery obligations and the Court's Scheduling Order. The record is replete with other examples. (*See* D.I. 132 at 2 ("Three

days before the close of discovery, defendant identified multiple new prior art references and prior uses, thus preventing full and fair opportunity for discovery."); D.I. 138 at 41-42 (motion to exclude AMS and two other prior art references based on TriZetto's failure to disclose them until more than a month after close of discovery); D.I. 173 at 6-10 (motion to exclude portions of TriZetto's damages expert's opinions that were based on sales information and other documents that TriZetto was required to produce during discovery but did not produce until two months after close of discovery); D.I. 182 at 13-16 (motion to exclude portions of TriZetto's infringement expert's opinions that were based on product flowcharts documents that TriZetto was required to produce during discovery but did not produce until two months after close of discovery).)

The Court is authorized to exclude evidence as a sanction for failure to comply with discovery deadlines and the Court's scheduling orders. *See* FED. R. CIV. P. 37(c)(1); *Praxair, Inc. v. ATMI, Inc.*, 231 F.R.D. 457, 463 (D. Del. 2005). Failure to supplement an interrogatory response with information required by Federal Rule of Civil Procedure 26(e)(2) automatically results in an exclusionary sanction unless the dilatory party proves that its noncompliance was substantially justified or harmless. *See* FED. R. CIV. P. 37(c)(1); *Am. Stock Exch., LLC v. Mopex, Inc.*, 215 F.R.D. 87, 93 (S.D.N.Y. 2002). Similarly, this Court recently held that:

> "sometimes, such exclusion is necessary; fidelity to the constraints of Scheduling Orders and deadlines is critical to the Court's case management responsibilities." *Finch v. Hercules, Inc.*, 1995 WL 785100 at *9 (D. Del. 1995). The "flouting of discovery deadlines causes substantial harm to the judicial system." *Id.* (internal citations omitted). As a sanction for failure to comply with the scheduling order in this case, the court is authorized to exclude evidence proffered by the disobedient party. *United States v. 68.94 Acres of Land*, 918 F.2d 389, 396 (3d Cir. 1990).

*Praxair*, 231 F.R.D. at 463 (excluding prior art references disclosed at the end of discovery and portions of defendants' invalidity expert's report that referred to the prior art).

Here, TriZetto was obligated to disclose the full bases for its inequitable conduct defense and counterclaim in its Answer and in response to McKesson's discovery request.

TriZetto, however, waited until long after close of discovery and only three months before trial to inform McKesson about its reliance on the alleged nondisclosures of Dr. Hertenstein's prior manual review of medical claims, the July 1987 proposal, and AMS.

A defendant "must plead with particularity those facts which support the claim the patent holder acted fraudulently before the PTO." (D.I. 39 at 5-6 (citing *Ferguson Beauregard/Logic Controls v. Mega. Sys., LLC*, 350 F.3d 1327, 1343-44 (Fed. Cir. 2003)).) In its Answer, TriZetto based its inequitable conduct defense and counterclaim on the alleged nondisclosures of the Egdahl & Hertenstein article, Dr. Radosevich's alleged belief regarding the obviousness of the patented invention, other alleged inventors, and government funding. (D.I. 10 at 5-6.) Although the deadline for seeking to amend the pleadings was June 13, 2005 (D.I. 28 at 4), TriZetto never sought to amend its Answer to allege any other nondisclosures in support of its inequitable conduct defense.

In December 2004, McKesson served an interrogatory requesting that TriZetto "[s]tate in complete detail each and every basis for your assertion that the '164 patent is unenforceable due to inequitable conduct." (D.I. 151, Exh. 1 at 16.) The only alleged nondisclosures that TriZetto identified were of the Egdahl & Hertenstein article and Dr. Radosevich's alleged belief regarding the obviousness of the patented invention. (*Id.* at 17-18.) TriZetto never amended its interrogatory response to identify any other alleged nondisclosures.

TriZetto's decision to delay identifying the three newly alleged nondisclosures until last week violates the pleading and discovery deadlines set by the Court. TriZetto's disclosure was made seven months after the deadline for amendment of pleadings, four months after close of discovery, and only three months before trial. Moreover, TriZetto's violations of its discovery obligations and the Court's Scheduling Order are neither substantially justified nor harmless.

TriZetto's flouting of the discovery deadlines and the Court's orders has harmed McKesson and the Court. *See Praxair*, 231 F.R.D. at 463 ("The 'flouting of discovery

deadlines causes substantial harm to the judicial system.'") (internal quotations omitted). Because the four nondisclosures alleged in TriZetto's Answer and interrogatory response were the only nondisclosures that TriZetto had asserted in this case, McKesson focused its discovery and case preparation regarding inequitable conduct on those four alleged nondisclosures. Now, as a result of TriZetto's substantial delay in identifying the true allegations underlying its inequitable conduct defense, McKesson has to address three additional, previously unasserted nondisclosures with only three months before trial. Indeed, had McKesson not filed its motion for summary judgment, McKesson likely would not have learned about the new alleged nondisclosures until TriZetto raised them for the first time at trial. Absent exclusion of the new alleged nondisclosures, McKesson clearly will be harmed by TriZetto's delay.

TriZetto's delay also was not substantially justified. With regard to the alleged nondisclosures of the July 1987 proposal and Dr. Hertenstein's manual review of medical claims, TriZetto does not and cannot offer any excuse. McKesson produced the July 1987 proposal to TriZetto on May 3, 2005, more than a month before the deadline for amendment of pleadings and more than four months before close of discovery. (Exh. 25.) TriZetto has also known about Dr. Hertenstein's manual review of medical claims at Caterpillar since at least 1995, when TriZetto's predecessor Erisco obtained the pleadings from a recently settled lawsuit between original patentee HPR and its competitor GMIS regarding the '164 patent ("the *GMIS v. HPR* litigation"). (Exh. 26.) The pleadings obtained by Erisco included discussions about Dr. Hertenstein's prior work at Caterpillar. (Exh. 27 at TRZ 000756 ("[Caterpillar] hired Dr. Robert Hertenstein to work in its benefits department as Medical Director of Group Insurance. Dr. Hertenstein introduced the use of CPT Codes to monitor claims; he was able, through review of submitted claims, to recognize and correct unbundling.").)

As to AMS, TriZetto argues that it did not identify AMS earlier because McKesson did not produce documents regarding AMS until August 2005 and because TriZetto did

18

not understand "the relevance of AMS" until it deposed inventor George Goldberg on September 13, 2005. (D.I. 214 at 27.) Both excuses are without merit.

*First*, contrary to TriZetto's assertion, McKesson produced documents describing AMS prior to the close of document discovery (May 13, 2005) and months before the close of fact discovery (September 16, 2005). In April 2005, McKesson produced a 13-page document titled "Advanced MedLogic Systems: Product Overview" and a 103-page document purporting to describe "Claim Level Edits," "Basic Episode Edits" and "Extended Episode Edits" of AMS. (Exhs. 28, 39, 30.) McKesson also produced that month pleadings from the *GMIS v. HPR* litigation showing that GMIS had asserted AMS as prior art. (*See, e.g.,* Exhs. 31 & 32.) Thus, by April 2005, TriZetto knew that AMS had been asserted as prior art in other litigation and had more than 100 pages of documents describing AMS. There is simply no reason why TriZetto had to wait more than eight months until January 2006 to first disclose its reliance on AMS for its inequitable conduct defense.

*Second*, TriZetto fails to support its conclusory assertion that it did "not understand[] the relevance of AMS" until Dr. Goldberg's deposition in September 2005. TriZetto does not indicate why it could not understand "the relevance of AMS" from the numerous documents produced by McKesson in April 2005, or what new information TriZetto obtained from Dr. Goldberg regarding AMS that enabled it to understand "the relevance of AMS" for the first time. Moreover, TriZetto does not explain why it failed to amend its interrogatory response regarding inequitable conduct after Dr. Goldberg's September 13, 2005 deposition to allege the nondisclosure of AMS as a basis for its defense. Since TriZetto admits that it understood "the relevance of AMS" as of that date (D.I. 214 at 27), nothing prevented TriZetto from amending its prior interrogatory response to include AMS, and in fact, TriZetto was obligated to do so. *See* FED. R. CIV. P. 26(e)(2). TriZetto's failure to do so was improper and unjustified.

19

Because TriZetto's belated disclosure of additional bases for its inequitable conduct defense was improper and unjustified, the Court should limit TriZetto to the bases disclosed in its Answer and during discovery.

## V.    CONCLUSION.

For the reasons set forth above and in its opening brief, McKesson respectfully requests that the Court grant its motion for summary judgment as to TriZetto's Seventh Affirmative Defense of unenforceability due to inequitable conduct and its Counterclaim for a declaration of unenforceability due to inequitable conduct.

By: _____

Thomas J. Allingham II (#0476)
Michael A. Barlow (#3928)
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
One Rodney Square
P.O. Box 636
Wilmington, Delaware 19899
(302) 651-3000

Attorneys for Plaintiff
McKesson Information Solutions LLC

OF COUNSEL:
Jeffrey G. Randall
David W. Hansen
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
525 University Avenue, Suite 1100
Palo Alto, CA 94301
(650) 470-4500

DATED: January 20, 2006

20

## CERTIFICATE OF SERVICE

I, Michael A. Barlow, hereby certify that on January 20, 2006, I electronically filed Plaintiff's Reply Brief in Support of Its Motion for Summary Judgment Regarding Defendant's Seventh Affirmative Defense of Inequitable Conduct and Counterclaim for Declaration of Unenforceability and the Declaration of Michael A. Barlow using CM/ECF, which will send notification of such filing to those designated below, and that I served the following persons in the manner listed:

**VIA CM/ECF**
Rodger D. Smith, II, Esq.
MORRIS NICHOLS ARSHT
  & TUNNELL
1201 North Market Street
P.O. Box 1347
Wilmington, Delaware 19899

**HAND DELIVERY**
Jack B. Blumenfeld, Esq.
MORRIS NICHOLS ARSHT
  & TUNNELL
1201 North Market Street
P.O. Box 1347
Wilmington, Delaware 19899

Michael A. Barlow (ID No. 3928)
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
One Rodney Square
P.O. Box 636
Wilmington, Delaware 19899
(302) 651-3000
mbarlow@skadden.com

440372.02-Wilmington S1A