# EXHIBIT 17

CONFIDENTIAL - ATTORNEYS' EYES ONLY

VOLUME II

DEPOSITION OF DONALD HOLLOWAY

MCKESSON INFORMATION SOLUTIONS, LLC

VS.

THE TRIZETTO GROUP, INC.

September 8, 2005

CONDENSED TRANSCRIPT AND KEYWORD INDEX



| Los Angeles | Orange County | San Francisco | San Diego | Inland Empire | Palm Springs | San Fernando Valley | San Jose |
|---|---|---|---|---|---|---|---|
| (310) 207.8000 | (949) 955.0400 | (415) 433.5777 | (858) 455.5444 | (951) 686.0606 | (760) 322.2240 | (818) 702.0202 | (408) 885.0550 |

1  in other words — well, if I read what I wrote,  10:27
2  Clipper is a Database III Plus compiler. So what  10:27
3  that means is we were writing it in Database III  10:28
4  and not II, which I had forgotten, and not only  10:28
5  that, Database III Plus.  10:28
6  And the difference between -- between  10:28
7  writing -- using the Database code and using  10:28
8  Clipper was that Clipper would have been source  10:28
9  code and it compiled and made the Database III  10:28
10  readable by the programmers, by the people who were  10:28
11  writing it, but would not be readable by a client.  10:28
12  Q  And the Clipper source code was not something that  10:29
13  was written by HPR?  10:29
14  A  No.  10:29
15  Q  It was code that was purchased from an outside  10:29
16  vendor?  10:29
17  A  Yes.  10:29
18  Q  Okay. And that assisted you in using the -- the  10:29
19  dBASE program?  10:29
20  A  Yes.  10:29
21  Q  Okay. And the dBASE program was also provided --  10:29
22  was it provided by a separate vendor or was it  10:29
23  integrated with Clipper when you purchased Clipper?  10:29
24  A  It was not integrated.  10:29
25  Q  So did you acquire Clipper --  10:29

Page 226

1  A  Yeah.  10:29
2  Q  -- and dBASE from two separate vendors?  10:29
3  A  Yes.  10:29
4  MR. THOMAS: Okay. We're going to mark  10:30
5  as Exhibit 104, a document with control numbers  10:30
6  MCK 119859 and 0395 -- strike that.  10:30
7  It bears control numbers H 000001 and 2.  10:30
8  (Exhibit No. 104 marked for  10:31
9  identification.)  10:31
10  BY MR. THOMAS:  10:31
11  Q  Dr. Holloway, is this a letter that you sent to  10:31
12  Aetna in July of 1987?  10:31
13  A  I -- it's my signature.  10:31
14  Q  Okay. My only question's on the first page, third  10:31
15  paragraph, you write, "Coding audits are our first  10:31
16  step toward building clinical decision rules for  10:31
17  software that will assist the claims processing  10:31
18  units in assigning codes using all available  10:31
19  information on a claim form or in deciding when it  10:31
20  is cost effective to order an operative report."  10:31
21  Do you see that?  10:31
22  A  Yes.  10:31
23  Q  Is it true that in July of 1987, you were  10:31
24  discussing with Aetna the concept of using software  10:32
25  to do the editing of the CPT-4 codes?  10:32

Page 227

1  MR. SHEK: Object as to form.  10:32
2  THE DEPONENT: It doesn't say so here.  10:33
3  BY MR. THOMAS:  10:33
4  Q  Well, in the third paragraph of your letter on the  10:33
5  first page to Dr. Fager, aren't you proposing that  10:33
6  ultimately software would be created or could be  10:33
7  created to do this CPT-4 code editing?  10:33
8  MR. SHEK: Object as to form.  10:33
9  Mischaracterizes the document.  10:33
10  THE DEPONENT: So ask your question  10:34
11  again.  10:34
12  BY MR. THOMAS:  10:34
13  Q  Okay. Well, let's back up. At this time in July  10:34
14  of 1987, you had -- Dr. Hertenstein had already  10:34
15  performed his review and recoding of the Sun claims  10:34
16  received from Aetna, right?  10:34
17  A  Right.  10:34
18  Q  And you were continuing to have discussions with  10:34
19  Aetna on that subject as part of an attempt to --  10:34
20  to raise funds, right?  10:34
21  A  Yes. In this case, 65,000.  10:34
22  Q  And in those discussions in July of 1987, you  10:34
23  brought up the idea of ultimately creating some  10:34
24  software that could be used to edit -- to check and  10:35
25  edit the CPT-4 codes on the claims, right?  10:35

Page 228

1  MR. SHEK: Object as to form.  10:35
2  Mischaracterizes the prior testimony and this  10:35
3  document.  10:35
4  THE DEPONENT: The operative sentence is  10:35
5  on the last paragraph. "In our final report, we  10:35
6  will also describe and analyze the systems and  10:35
7  procedures for correcting codes at each site and  10:35
8  recommend changes that will enhance the process."  10:35
9  BY MR. THOMAS:  10:35
10  Q  Okay. Sir --  10:35
11  A  This could be done manually.  10:35
12  Q  I understand.  10:35
13  A  So at this point, in July 29th, 1987, we could have  10:35
14  come back and said here -- and it wasn't unusual at  10:35
15  that point for there to be clinical decision  10:35
16  rules -- they were called protocols -- for trained  10:35
17  medical staff to -- either physicians or nurses to  10:35
18  use in reviewing medical records or reviewing  10:36
19  anything.  10:36
20  So here is -- in this case, it's claims.  10:36
21  And it's -- while I said building clinical decision  10:36
22  rules for software, many of those prototype,  10:36
23  protocols that got developed are developed at a  10:36
24  level that can be put into a computer.  10:36
25  Now, whether I said we're -- I didn't  10:36

Page 229

8 (Pages 226 to 229)

DONALD HOLLOWAY - VOLUME II

1  say -- you know, I didn't say we'd build you  10:36
2  software, that we will deliver software, that  10:36
3  we'll -- I mean, at this point I was saying we  10:36
4  needed to do an audit to find out how big your  10:36
5  problem is and come back to you with  10:36
6  recommendations on how to solve it. One of the  10:36
7  recommendations might have been improve the  10:36
8  training of your medical unit.  10:36
9  Q  What did you mean when you said "Coding audits are  10:37
10 our first step toward building clinical decision  10:37
11 rules for software that will assist the claims  10:37
12 processing units in assigning codes using all  10:37
13 available information on a claim form"? What did  10:37
14 you mean; what were you trying to convey there?  10:37
15 A  That the way to develop clinical decision rules is  10:37
16 to look at existing claims and have physicians  10:37
17 identify how the claim should have been coded  10:37
18 compared to how it was actually coded. And then  10:37
19 develop decision rules that would make it so that  10:37
20 these -- what came in would get converted to what  10:37
21 the physicians said would have to be done.  10:37
22 Q  And that ultimately is precisely what you did when  10:37
23 you developed CodeReview, right?  10:37
24 A  Eventually.  10:37
25 Q  And you were raising with Aetna the concept -- I  10:37

Page 230

1  and ambiguous.  10:40
2  THE DEPONENT: No.  10:40
3  MR. THOMAS: Mark as Exhibit 105, a  10:40
4  document bearing control numbers DH 0240 through  10:40
5  251.  10:40
6  (Exhibit No. 105 marked for  10:40
7  identification.)  10:40
8  BY MR. THOMAS:  10:40
9  Q  Sir, this is an article that I believe was produced  10:40
10 out of your files in this litigation. I don't need  10:40
11 you to read the whole thing, but would you look at  10:40
12 it and tell me whether you've seen it before?  10:41
13 A  It was not out of my files.  10:41
14 Q  It's not?  10:41
15 A  No. And I have not seen it before.  10:41
16 Q  Do you have any familiarity with the work that was  10:41
17 done by the University of South Carolina and Blue  10:41
18 Cross Blue Shield of South Carolina?  10:41
19 A  No.  10:41
20 Q  Okay. During the time when the patent application  10:41
21 was being prepared and was pending, did you ever  10:41
22 hear about this work that was being done in South  10:41
23 Carolina?  10:42
24 A  No.  10:42
25 Q  Have you ever heard of John Weitzel?  10:42

Page 232

1  know you weren't promising to deliver software, you  10:38
2  didn't have software to deliver, but you were  10:38
3  raising with them the concept that ultimately that  10:38
4  might be the way you would go?  10:38
5  MR. SHEK: Object as to form.  10:38
6  Mischaracterizes the prior testimony. Also asked  10:38
7  and answered.  10:38
8  THE DEPONENT: It would be more accurate  10:38
9  to say that it would be a way for them to go, not a  10:38
10 way for us to go.  10:38
11 BY MR. THOMAS:  10:39
12 Q  Okay. Did -- you know, as of July of 1987, were  10:39
13 you making any attempts in your discussions with  10:39
14 Aetna to keep secret the idea that perhaps software  10:39
15 could be used to replace the manual system?  10:39
16 MR. SHEK: Object as to form. Assumes  10:39
17 facts not in evidence.  10:39
18 THE DEPONENT: Ask the question again.  10:39
19 BY MR. THOMAS:  10:39
20 Q  Sure. As of July of 1987, when you were having  10:39
21 these ongoing discussions with Aetna, did you make  10:39
22 any attempt to keep the general idea that perhaps  10:39
23 software could be used to replace this manual  10:39
24 system secret from Aetna?  10:39
25 MR. SHEK: Object as to form. Also vague  10:40

Page 231

1  A  No.  10:42
2  Q  Did you have a general understanding that expert  10:42
3  systems, as we've talked about it here today or  10:42
4  yesterday, had been used for the processing of  10:42
5  medical claims?  10:42
6  MR. SHEK: Object as to form. Also vague  10:42
7  and ambiguous.  10:42
8  THE DEPONENT: I -- I can't -- I'm trying  10:42
9  to recall. And I can't think of knowing that  10:42
10 anyone ever told me that an expert had been used to  10:42
11 process claims.  10:43
12 Q  Did you believe back in 1988 that CodeReview was  10:43
13 the first expert system that had been created for  10:43
14 the review or processing of medical claims?  10:43
15 MR. SHEK: Object as to form.  10:43
16 THE DEPONENT: What do you mean by review  10:43
17 or processing?  10:43
18 BY MR. THOMAS:  10:43
19 Q  Well, I'm asking a general question. Did you  10:43
20 believe in 1988 that no one had previously created  10:43
21 any expert system that was -- that used in any  10:43
22 way to determine the accuracy of a medical claim or  10:43
23 the amount that should be paid on a medical claim?  10:43
24 MR. SHEK: Object as to form. Also vague  10:43

Page 233

1  Q   No. I'm not saying it should have or shouldn't  01:50
2      have done anything. I'm just asking you questions  01:50
3      about what you understand to be here.  01:50
4  A   Okay.  01:50
5  Q   Okay? So in Claim 1, it's true, isn't it, that  01:50
6      neither the metarules nor the code specific rules  01:50
7      are disclosed?  01:50
8          MR. SHEK: Objection as to form.  01:50
9          THE DEPONENT: That's right.  01:50
10     BY MR. THOMAS:  01:50
11 Q   In terms of what is disclosed in Claim 1 itself is  01:50
12     simply the concept of having a database that  01:50
13     includes relationships among codes of some kind?  01:50
14         MR. SHEK: Objection as to form.  01:50
15     Mischaracterizes the document. Calls for a legal  01:50
16     conclusion.  01:50
17         THE DEPONENT: "In a computer system  01:51
18     having means for operating on a predetermined  01:51
19     database containing medical service codes and a set  01:51
20     of relationships among the medical services codes,  01:51
21     defining whether selected one of the medical  01:51
22     service codes are valid when input with other  01:51
23     selected ones of the medical services codes and the  01:51
24     method for processing what's been put in"; that's  01:51
25     what it says.  01:51

Page 286

1      BY MR. THOMAS:  01:51
2  Q   All right. So it's describing --  01:51
3  A   If that's what you said, yes.  01:51
4  Q   Okay. Now, was -- do you know whether one of the  01:51
5      reasons that the -- that the thousands of rules  01:51
6      that were developed for relationships among the  01:51
7      specific codes were not disclosed in the patent  01:51
8      because HPR wanted to keep that database secret and  01:51
9      proprietary?  01:52
10         MR. SHEK: Would you repeat that  01:52
11     question?  01:52
12         (Testimony referred to was read by the  01:52
13     stenographer.)  01:52
14         MR. SHEK: Object to the form. Objection  01:52
15     to form. Vague and ambiguous. Also instruct the  01:52
16     witness that to the extent this question involves  01:52
17     discussions with attorneys, that you not reveal the  01:52
18     substance of those communications.  01:52
19         THE DEPONENT: Okay.  01:52
20     BY MR. THOMAS:  01:53
21 Q   Okay. Let me -- let me --  01:53
22 A   Repeat the question.  01:53
23 Q   -- back up.  01:53
24     When the patent application was filed, you were  01:53
25     aware that the -- the full database, including all  01:53

Page 287

1      of the rules for how the codes relate to each  01:53
2      other, was not disclosed to the Patent Office,  01:53
3      right?  01:53
4          MR. SHEK: Objection as to form.  01:53
5          THE DEPONENT: No. The metarules were  01:53
6      disclosed.  01:53
7      BY MR. THOMAS:  01:53
8  Q   Sir, I'm not asking about the metarules.  01:53
9  A   Well, I just want to make sure because you said all  01:53
10     the rules, so I -- all -- all the application of  01:53
11     the metarules was not disclosed.  01:53
12 Q   Right.  01:53
13 A   That had to do with the fact that there would be  01:53
14     many, many more rules added; that to offer the set  01:53
15     that was available at the point this was submitted  01:53
16     would have been -- you know, this was constantly  01:53
17     learning; it was constantly getting better. So  01:54
18     that's one answer.  01:54
19         The second answer is, no, it was not done  01:54
20     to keep a secret, assuming, based on what we talked  01:54
21     about before, we had a patent attorney. A patent  01:54
22     attorney wrote it, structured what should go in it  01:54
23     and we did what he told us to do.  01:54
24 Q   In order to actually construct a system that did  01:54
25     editing of the CPT-4 codes along the lines of  01:54

Page 288

1      CodeReview, you would actually have to create a  01:54
2      database that included all of those rules, specific  01:54
3      code rules and how they relate to each other,  01:54
4      correct?  01:55
5          MR. SHEK: Objection as to form.  01:55
6          THE DEPONENT: You would -- you would  01:55
7      have to work with an expert to tell you how a claim  01:55
8      should be coded, given what they see. And then  01:55
9      this patent would tell you what to do to get it so  01:55
10     the computer would respond the way the physician  01:55
11     did.  01:55
12     BY MR. THOMAS:  01:55
13 Q   In order to get a fully functioning system that  01:55
14     would actually help claims processors to edit the  01:56
15     codes, you would need the full database with all  01:56
16     the rules among the codes, right?  01:56
17         MR. SHEK: Objection to form.  01:56
18         THE DEPONENT: There's no such thing as a  01:56
19     full database -- oh, sorry.  01:56
20         MR. SHEK: Objection to form. Vague and  01:56
21     ambiguous.  01:56
22     BY MR. THOMAS:  01:56
23 Q   Let me put it this way. You'd need a database that  01:56
24     had not just the metarules, but all of the  01:56
25     specific -- not all, but a number of the specific  01:56

Page 289

# EXHIBIT 18

HIGHLY CONFIDENTIAL

PURSUANT TO PROTECTIVE ORDER

VOLUME II

DEPOSITION OF ROBERT HERTENSTEIN, M.D.

MCKESSON INFORMATION SOLUTIONS, LLC

VS.

THE TRIZETTO GROUP, INC.

September 14, 2005

CONDENSED TRANSCRIPT AND KEYWORD INDEX



| Los Angeles | Orange County | San Francisco | San Diego | Inland Empire | Palm Springs | San Fernando Valley | San Jose |
|---|---|---|---|---|---|---|---|
| (310) 207.8000 | (949) 955.0400 | (415) 433.5777 | (858) 455.5444 | (951) 686.0606 | (760) 322.2240 | (818) 702.0202 | (408) 885.0550 |

1    was that the database was used to develop the
2    system that they were applying the patent for.
3    BY MR. THOMAS:
4    Q.   And did you have any discussions with
5    anybody about why the database itself wasn't
6    disclosed in the patent application?
7            MR. HANSEN: Object to the form.
8            THE WITNESS: The answer's no.
9    BY MR. THOMAS:
10    Q.   Sir, we'll come back to the patent in a
11    moment, but I'd like to also put in front of
12    you what we will mark as Exhibit 146, which is
13    a transcript of your deposition in the GMIS HPR
14    litigation.
15            (Exhibit No. 146 marked for
16            identification.)
17    BY MR. THOMAS:
18    Q.   Now, sir, if you would turn please to page
19    104 of your deposition transcript from the
20    prior case.
21            MR. HANSEN: I'm sorry. This is
22    146?
23            MR. THOMAS: Yes.

Page 184

1    the system would be able to use the knowledge
2    that I imparted. That was the purpose.
3    Q.   You would agree that the idea was to get
4    your knowledge that you'd been using into a
5    computer system so that it could then be
6    accessed?
7    A.   Yes.
8    Q.   Turn, please, to page 111 of your
9    transcript.
10    A.   Okay.
11    Q.   And starting at line 14, you were asked;
12    do you know whether or not your expertise is
13    contained in that patent.
14            Answer; my impression is that my
15    expertise is not in the patent, that the patent
16    is a method by which of a program that uses my
17    expertise.
18            Question; does the program that's
19    disclosed in the patent have the information
20    which includes your expertise in it?
21            Answer; no, it does not.  Do you
22    still agree with those answers?
23            MR. HANSEN: Object to the form.

Page 186

1            MR. HANSEN: Thank you.
2            THE WITNESS: 104 is what?
3    BY MR. THOMAS:
4    Q.   Page 104 in that transcript that I have in
5    front of you.
6    A.   Okay. I see it. I didn't see.
7    Q.   Back toward the back. The pages are in
8    the upper right corner.
9    A.   144?
10    Q.   104.
11    A.   104. All right.
12    Q.   And if you look down to line ten. You
13    were asked a question; and the purpose of
14    CodeReview was to embody your unique knowledge
15    in a computer system, is that correct.
16            Your answer; that's correct.
17    You still agree with that?
18    A.   Repeat the question.
19    Q.   Yeah. Do you still agree with your answer
20    here that the purpose of CodeReview was to
21    embody your unique knowledge in a computer
22    system?
23    A.   Yes. I could, it could also be said that

Page 185

1            THE WITNESS:  My understanding
2    that the, my database was not in the patent and
3    my, but it did, but the patent allowed them to
4    use my database to provide the answers.
5    BY MR. THOMAS:
6    Q.   But do you still agree with your answer
7    here that the patent itself doesn't disclose
8    your expertise, the information reflecting your
9    expertise?
10            MR. HANSEN: Object to the form.
11    That's not what he said.
12            THE WITNESS: The patent does not
13    include my database, no.
14    BY MR. THOMAS:
15    Q.   And the database was what you contributed
16    to CodeReview and this invention, correct?
17            MR. HANSEN: Object to the form.
18            THE WITNESS:  My answer is that
19    they couldn't have developed the program
20    without the database.
21    BY MR. THOMAS:
22    Q.   And that that's what you contributed?
23    A.   And I contributed that, yes.

Page 187

6 (Pages 184 to 187)

ROBERT HERTENSTEIN, M.D.

# EXHIBIT 19

DEPOSITION OF GEORGE A. GOLDBERG

MCKESSON INFORMATION SOLUTIONS

VS.

THE TRIZETTO GROUP

September 13, 2005

CONDENSED TRANSCRIPT AND KEYWORD INDEX



| Los Angeles | Orange County | San Francisco | San Diego | Inland Empire | Palm Springs | San Fernando Valley | San Jose |
|---|---|---|---|---|---|---|---|
| (310) 207.8000 | (949) 955.0400 | (415) 433.5777 | (858) 455.5444 | (951) 686.0606 | (760) 322.2240 | (818) 702.0202 | (408) 885.0550 |

1    A    Computers became so much more powerful is
2  the other piece. You can't conceive of how basic
3  they were in the old days. Nobody in this room,
4  given their age, can remember that as well as I can
5  fuzzily remember that.
6         MR. SEGAL: We've been going a little over
7  an hour, so we will take a short break.
8         THE WITNESS: I'd appreciate that.
9         MR. SEGAL: Thank you.
10        VIDEO OPERATOR: We're off the record.
11  The time is approximately 10:12 a.m.
12        (Recess.)
13        VIDEO OPERATOR: We are back on the
14  record. The time is approximately 10:26 a.m.
15        BY MR. SEGAL:
16   Q   You understand you're still under oath?
17   A   Yes, I do.
18   Q   In connection with your work on the Health
19  Insurance Experiment, did you have the opportunity
20  to learn what other insurance companies or claims
21  processors -- let me rephrase the question.
22        In connection with your work at The RAND
23  Corporation, did you have the opportunity to learn
24  what health insurance companies -- or how health
25  insurance companies were processing claims?

Page 49

1         MR. SHEK: Objection; vague and ambiguous.
2         THE WITNESS: Did you say -- would you
3  repeat the question, please, the rephrased question?
4         BY MR. SEGAL:
5    Q   In connection with your work at The RAND
6  Corporation, did you have the opportunity to learn
7  how health insurance companies were processing
8  claims?
9    A   No, other than Glenn Slaughter &
10  Associates, which is not -- which was not -- which
11  although it was doing that function, is actually a
12  pension plan -- was a pension plan company, not a
13  health insurance company.
14   Q   If I refer to "payors," p-a-y-o-r-s, to
15  refer to individuals that take -- or companies that
16  take care of claims processing, is that a term that
17  you are comfortable with?
18   A   Yes.
19   Q   In connection with your work at The RAND
20  Corporation, did you have an opportunity to learn
21  what payors other than Glenn Slaughter were doing in
22  connection with claims processing?
23   A   No.
24   Q   And I believe your CV indicates that in
25  about 1985, you left The RAND Corporation; is that

Page 50

1  correct?
2    A   That is what my CV shows, and it's
3  correct.
4    Q   Why did you leave The RAND Corporation?
5    A   The Health Insurance Experiment had ended.
6    Q   Any other reasons?
7    A   It was time to move -- I thought it was
8  time to move back to the East Coast to be near my
9  aging parents.
10   Q   And you -- from your CV, it looks like you
11  joined a company Health Data Institute in Lexington,
12  Massachusetts; is that correct?
13   A   That is correct.
14   Q   And it references developmental work on an
15  Advanced MedLogic, M-e-d, cap L-o-g-i-c, System?
16   A   Yes, it does.
17   Q   Which indicates that it does cost/quality
18  procedure code based claims review.
19   A   That's what it says.
20   Q   Can you provide a more detailed
21  explanation what the Advanced MedLogic System was?
22   A   The Advanced MedLogic System was a series
23  of computerized tables, lookup tables, that
24  received, processed and paid claims. In other
25  words, it was post-payment claims databases, and

Page 51

1  reviewed them to perform single-code edits of
2  various kinds. Post-process, post-payment.
3    Q   There's also a notation on your CV about a
4  prospective payment system?
5    A   The prospective payment system is the
6  government's DRG system.
7    Q   And does that -- did that system deal with
8  claims processing prior to payment?
9    A   The DR -- the answer is yes and no.
10   Q   Can you explain?
11   A   The DRG system, which is performed --
12  did in those days, the DRG system, diagnosis related
13  groups. Groups diagnoses with some on hospital
14  discharge claims, with attention as well to ICD9
15  procedure-coded procedures on hospital claims, and
16  assigns every hospital discharged claim to one and
17  only one DRG, a number that at that time went
18  somewhere between 001 and 4XX. There were
19  400-some-odd DRGs.
20        And it functions for payment purposes
21  because at some point, Medicare and Medicaid and the
22  occasional private insurer paid for a hospital stay
23  on the basis of the DRG to which a hospital
24  discharge claim was assigned.

Page 52

13 (Pages 49 to 52)

GEORGE A. GOLDBERG

1    patent application, in my understanding.
2        Q    Okay. Well, let's first do this. Did you
3    ever review a completed application before it was
4    filed?
5        A    I don't remember.
6        Q    Did you ever review any comments from the
7    Patent Office that may have come back during the
8    prosecution of the patent?
9        A    I don't remember, and I strongly doubt it,
10   because I don't remember any comments coming back
11   from the Patent Office, though perhaps they did
12   after I left HPR. But I don't -- the bottom line is
13   I don't remember.
14       Q    And when did you learn that the patent had
15   been issued?
16       A    That I definitely do not remember.
17       Q    Okay. You were going to tell me what you
18   believed your input to be to the application, and
19   you were thumbing through Exhibit A to Exhibit 5 to
20   do that.
21       A    No, I wanted to see if there was something
22   I recognized here as clearly some input so I could
23   just answer your question in a yes or a no. As soon
24   as I found something that clearly I had an input
25   into, then I could answer yes, I had a role in this

Page 153

1    patent application, once, to my understanding, you
2    had explained that anything I'm seeing -- where you
3    didn't say it precisely this way, but implied that
4    anything I'm seeing here was part of the patent
5    application.
6        Q    What problem were the inventors trying to
7    solve when they conceived of the disclosed system
8    and method?
9        A    We were trying to solve the problem of
10   incorrectly coded procedures on medical claims
11   when -- in an automated and -- in an automated
12   system that would be -- an automated system, period.
13   There are other things I could say, but I'll stop
14   there for a one-sentence answer.
15       Q    How else would you amplify your answer?
16       A    They were business considerations that I
17   learned about along the way. Like, for example, it
18   had to be palate -- it had to be cost-effective. A
19   payor had to decide that this was going to be
20   valuable to the payor.
21           One of my concerns was that it had to be
22   fair to the providers submitting the claims as well.
23   It couldn't just say no to procedures in order to
24   save money. It had to be a question of whether the
25   coding had been correct or incorrect. There were

Page 154

1    considerations like that that also needed to be --
2    to be taken into account.
3        Q    When did you first become aware of the
4    problem of incorrectly coded procedures on medical
5    claims?
6        A    I first became aware after I was an
7    employee at HPI, when Don, I would say -- when --
8    period. Period. After I became employed at HPI.
9        Q    After your work in HDI --
10       A    P, I'm sorry. No, now you're back at HDI,
11   I'm sorry.
12       Q    Yes. Different question. Based on your
13   work at HDI, were you aware that medical claims were
14   being submitted with incorrect codes?
15       A    With incorrect codes, yes, as I have
16   described with such things as impossible diagnoses,
17   procedures that didn't match the sex or age. That's
18   one kind of incorrect coding, but that's not the
19   kind of coding I'm talking about when I talk about
20   incorrect coding.
21       Q    Earlier today you used the example of
22   gravity, and although you referred to Galileo --
23       A    I'm sorry, that was -- I misspoke. We've
24   now, what's it called, corrected the record that I
25   meant Sir Isaac Newton, as in the address of my

Page 155

1    current employer.
2        Q    So in sort of referring to the theory of
3    gravity as something that's the idea and what you
4    need to know and understand in order to then do some
5    additional work, was the problem of knowing there's
6    incorrect coding procedures on medical claims and
7    knowing you needed to do that automated, the gravity
8    that you needed to know, the theory of gravity?
9        A    No.
10       Q    What more would you need to know?
11       A    We needed to realize that it wasn't just,
12   oh, this is wrong, oh, this combination is incorrect
13   coding. We needed to go more -- we needed to go
14   beyond that to realize that a system could be
15   constructed and put on a computer, which is not what
16   computers were used for in those days, had been used
17   for in those days.
18           What have I said so far? I'm in the
19   middle of a sentence, pardon me. I'm being
20   distracted. It will stop.
21       Q    Yes, and I'm hoping we can just --
22       A    I'm sorry, the phone ringing distracted
23   me.
24           MR. SEGAL: We'll ask the court reporter
25   to read back your answer and then you can continue.

Page 156

39 (Pages 153 to 156)

GEORGE A. GOLDBERG

1  detecting fraudulent medical claims via examination
2  of medical -- of service codes. I'd need an entire
3  system and method.
4      Q   And what parts of the system and method
5  would you need in order to go out and build --
6      A   I thought I had answered that question
7  before. I'll try to do it again. I'm sorry, please
8  repeat the question.
9          (The reporter read the record as
10 requested.)
11     BY MR. SEGAL:
12     Q   You cut me off, so.
13     A   I'm sorry. To build what?
14     Q   In order to create your system and method,
15 what other parts of the system and method would you
16 need to know?
17     A   Everything. We'd like -- we'd need to
18 know what we were trying to put onto computer, the
19 principles that underlay it, the capacity of the
20 computer -- of computers at that time to handle what
21 we could think of. Because in those days what we
22 could think of always outran what a computer could
23 do.
24         We would need to understand the problem
25 and the approach and the basic principles that I've

Page 197

1  method by showing -- in order to elucidate the
2  system and method. If you see -- if you're faced
3  with this kind of hand in this kind of situation and
4  you are in this position, you may want to do such
5  and so. That's examples, and heaven knows that
6  people who have trained as physicians are used to
7  working by example.
8          But you wouldn't dream that you would need
9  an appendix to the book or that an integral part --
10 that contained every possible situation that -- in
11 which this system and method for playing bridge --
12 this new system for playing -- method for playing
13 bridge could be -- would be handled and how you
14 would act in each one of those systems. It would be
15 unnecessary, and it would not be part of the system
16 and method.
17         It's -- you just expect that having given
18 the examples and having set out your new system and
19 method for fabulous bridge playing, that you'd be
20 all set and you could issue your book.
21         So in that sense, whether it's an appendix
22 or an integral part, to have to list every -- every
23 hand and every situation in which you'll do this or
24 that, I would not call that -- I would not use the
25 words you used that implied that it was a key

Page 199

1  mentioned before, the three elements that I've been
2  able to annunciate earlier today, even though I
3  still think there are more, and again, I cannot
4  remember more than three.
5      Q   So one of the -- if I recall your
6  testimony from earlier, one of the components and
7  basic principles that you recall needing would be
8  the rules database?
9      A   It's not a basic principle. It's a
10 component.
11     Q   And without that component, you don't have
12 a system and method for -- let me get the title
13 correct here -- system and method for detecting
14 fraudulent medical claims via examination of service
15 codes as set forth in the '164 patent?
16     A   I disagree with the implication of your
17 question.
18     Q   What do you disagree with about my
19 question?
20     A   I'll use an analogy. If one invents a
21 system and a method for playing the card game of
22 bridge, a new system, and a method, and you write a
23 book about it and you publish that book or whatever
24 would be done in the 21st century, you would
25 certainly give some examples of the system and

Page 198

1  feature.
2      Q   But you indicated it would be a barrier
3  that it would take all this time to develop this
4  specific rules database, isn't it?
5      A   Yes, developing it is -- was a barrier
6  to -- would be a barrier to entry. You need it,
7  just the way you need a computer. You need it.
8      Q   And it would take a lot of time to develop
9  that rules database; is that correct?
10     A   Hey, time, absolutely.
11     Q   And expertise in claims handling?
12     A   I doubt it.
13     Q   What about experience with processing
14 claims? Is that something that would be needed to
15 create the rules database for a system and method as
16 disclosed in the --
17     A   The rules database, the rebundling rules
18 database?
19     Q   That's what -- yeah.
20     A   So we're not talking about our system and
21 method anymore. We're talking about the rules
22 database -- rebundling rules database, which you're
23 implying is part of the system and method and I'm
24 saying is not any more than the total list of how to
25 handle various hands in a bridge -- in bridge

Page 200

50 (Pages 197 to 200)

GEORGE A. GOLDBERG

McKesson Information Solutions LLC v. The TriZetto Group, Inc.
District of Delaware Case No. 04-1258 SLR

Deposition of George Goldberg
Date of Deposition:  September 13, 2005

## TRANSCRIPT ERRATA

| PAGE:LINE(S) | CURRENT VERSION | CHANGE TO | REASON FOR CHANGE |
|---|---|---|---|
| 10:16 | in | and | |
| 11:3,5,6 | Buzz | Buz | |
| 23:19 | helped | help | |
| 23:22 | for diagnosis | or diagnosis | |
| 44:14 | Royal | ROIL | |
| 48:11 | available | aware | |
| 51:24 | Received, processed and paid claims | Received processed and paid claims (no comma after received) | The claims it received had already been processed & paid! |
| 51:29 | was | received | clarity |

| PAGE:LINE(S) | CURRENT VERSION | CHANGE TO | REASON FOR CHANGE |
|---|---|---|---|
| 52:14 | with some | (delete) | clarity |
| 57:25 | Freedman | Friedman | Make change in multiple places, please |
| 65:24 – 66:1 | report, interesting | report while I was an employee of HOI — interesting | clarification |
| 75:8-9 | and it was always in the | (delete) | See lines 10 & 11 |
| 77:12 | enduring | during | — |
| 77:24 | see | do | I mis-spoke. |
| 94:20 | a | (delete) | clarity |
| 97:9 | not | now | clarity |
| 99:10 | relationship | relationships | — |
| 101:14 | automated | automate | — |

Deposition of George Goldberg

| PAGE:LINE(S) | CURRENT VERSION | CHANGE TO | REASON FOR CHANGE |
|---|---|---|---|
| 108:15 | Pews | Pew | — |
| 116:20 | to ask | asked | — |
| 135:7 | had | (delete) | clarity |
| 147: 22-23 | Jack Lemmon | Walter Matthau | correction |
| 151:12 | Woundsocket | Woonsocket | — |
| 172:14 | visiting | reviewing | — |
| 176:19-20 | absence of quote marks | Place quote mark before use and after necessary). | |
| 148:2 | annunciate | enunciate | |
| 219:2 | dictate | dictated | — |

| PAGE:LINE(S) | CURRENT VERSION | CHANGE TO | REASON FOR CHANGE |
|---|---|---|---|
| 221:11 | can | can't | mis-transcription? |
| 230:15 | Represented | misRepresented | correction |
| 231:3 | say | see | I believe I said "see", given the context. |
| 242:23 | different | differentiation | — |
| 243:6 | and | but | a better word producing the contrast I intended to show |
| 244:9 | goal then | goal, then | — |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

Deposition of George Goldberg

```
 1        I HEREBY CERTIFY that I have read this

 2    transcript of my deposition and that this transcript

 3    accurately states the testimony given by me, with

 4    the changes or corrections, if any, as noted.

 5

 6

 7              X_____George A. Goldberg_____

 8                         10/18/2005

 9

10

11    Subscribed and sworn to before me this        day of

12                   , 20        .

13

14

15

16              X

17              Notary Public

18

19

20

21    My commission expires:

22

23

24

25
```

254

GEORGE A. GOLDBERG

BARKLEY
Court Reporters

VOLUME II

DEPOSITION OF GEORGE A. GOLDBERG, M.D.

McKESSON INFORMATION SOLUTIONS

VS.

THE TRIZETTO GROUP

September 28, 2005

CONDENSED TRANSCRIPT AND KEYWORD INDEX



| Los Angeles | Orange County | San Francisco | San Diego | Inland Empire | Palm Springs | San Fernando Valley | San Jose |
|---|---|---|---|---|---|---|---|
| (310) 207.8000 | (949) 955.0400 | (415) 433.5777 | (858) 455.5444 | (951) 686.0606 | (760) 322.2240 | (818) 702.0202 | (408) 885.0550 |

1　　　　PROCEEDINGS
2　　(Announcement by the Videographer.)
3　Thereupon,
4　　　　GEORGE A. GOLDBERG, M.D.
5　a Witness, called for examination by counsel for the
6　Defendant and, after having been first duly sworn, was
7　examined and testified as follows:
8　　　EXAMINATION BY COUNSEL FOR THE DEFENDANT
9　　　BY MR. SEGAL:
10　Q　Good morning.
11　A　Good morning.
12　Q　Welcome back.
13　A　Welcome back to you.
14　Q　You understand that you are still under oath?
15　A　Yes.
16　Q　Just to be safe, because we have a different
17　court reporter, and we had you sworn again this morning.
18　　　Did you have an opportunity at all to review your
19　transcript from your first deposition?
20　A　No, I did not.
21　Q　Have you had the opportunity to prepare any more
22　for your deposition since our last session?
23　A　I've had the opportunity, but I did not do any
24　such preparation.
25　Q　In thinking about your testimony if you've done

Page 261

1　Q　And under that you list your development work?
2　A　On Advanced MedLogic System. Yes, I see that.
3　Q　So the Advanced MedLogic System was the name of
4　the system that you worked on?
5　A　It is probable that that was the original name of
6　the system; that is, that the Health Data Institute, in its
7　marketing wisdom, decided to call it the Advanced MedLogic
8　System.
9　Q　And the Advanced MedLogic System was a program
10　that ran on computers?
11　A　Not in the sense that today we consider it a
12　program. Advanced MedLogic System was a series of lookup
13　tables and reports got produced off a computer.
14　Q　And there were instructions that the computer
15　followed to know how to look up information in the tables,
16　and compare claims data with information in the tables?
17　　　MR. SHEK: Object as to form.
18　　　THE WITNESS: I have actually no idea how it was
19　done.
20　　　BY MR. SEGAL:
21　Q　Do you know if it operated on a computer?
22　A　I know that computers were used in the Advanced -
23　- what seems to be called the Advanced MedLogic System.
24　Q　And you spoke about the lookup tables that you
25　some input in, of that system. Is that correct?

Page 263

1　so, have you realized you made any errors in your testimony?
2　A　I haven't thought about my testimony, and if
3　parts of it have popped into my head, I haven't noted any
4　errors.
5　Q　In your last deposition, we were discussing a
6　system known as Advanced MedLogic? Do you recall that.
7　A　Yes, Advanced MedLogic.
8　Q　And that was a system that was used by Health
9　Data Institute, I believe? HDI.
10　A　I'm not sure I would call Advanced MedLogic a
11　system, at least not today. I don't know what I said two
12　weeks ago. I'd call it a review mechanism, and it was
13　developed by HDI, Health Data Institute.
14　Q　And actually, the system name was Advanced
15　MedLogic System.
16　A　I don't recall.
17　Q　Let me show you what was previously marked as
18　Exhibit 1 to your deposition, which was your c.v. And I
19　would trust that you've made an effort in preparing your
20　c.v. to make sure it's accurate and complete?
21　A　Yes, I have. And understandable to a person who
22　would read it.
23　Q　If you look on the first page under point 3,
24　where it refers to Health Data Institute.
25　A　Yes, I see that.

Page 262

1　A　Yes. I helped, I mostly reviewed those tables
2　that had been developed by a group of nurses.
3　Q　And the last time we established that those
4　tables had things such as procedure codes and diagnoses
5　codes, or procedure codes and gender. Is that correct?
6　A　They were a series of edits designed to -- edits
7　in the old fashioned sense of the word. Yes, they were
8　looking for mismatches between age and diagnosis, age and
9　procedure, sex and diagnosis, sex and procedure, or just
10　diagnoses that were so unusual you wouldn't expect to see
11　them in the United States; although they might be perfectly
12　common in parts of Africa, for example.
13　Q　And the lookup tables were used in conjunction
14　with reviewing claims data, is that correct?
15　A　Please repeat the question.
16　Q　The lookup tables were used in connection with
17　the Advanced MedLogic System, and in reviewing claims data.
18　A　Those lookup tables were used in the review of
19　batches of already paid claims data.
20　Q　The claims data, you're talking about medical
21　claims data. Is that correct?
22　A　Yes, what you would call medical claims data,
23　what I would break down and call facility claims data and
24　professional claims data.
25　Q　How many different of these edits were in the

Page 264

2 (Pages 261 to 264)

GEORGE A. GOLDBERG, M.D. - VOLUME II

1    A    Yes.
2    Q    Is this the document that you believe was the
3    cover letter to an affidavit?
4    A    Yes.
5    Q    Do you know if it was the cover letter to the
6    affidavit we marked as Exhibit 22?
7        Go down the mystery trail.
8    A    It was either a cover for this or for the
9    subsequent version, or even for the initial version. I
10   don't know, it was a cover to one of them. To one version
11   of the affidavit.
12   Q    I believe during your first day of deposition you
13   mentioned someone named Buz?
14   A    Buz Waitzkin.
15   Q    Who was --?
16   A    That's Michael B. Waitzkin.
17   Q    Was Mr. Waitzkin your counsel?
18   A    Yes.
19   Q    This is a letter from a Michelle Herman to Mr.
20   Waitzkin, and it says: Per our recent voice mail message,
21   please consider replacing the sentence in paragraph 11 of
22   Dr. Goldberg's affidavit which begins, quote: My role
23   consisted.. close quote, with the following.
24       Do you know if the change reflected in this
25   letter was ever made?

Page 381

1    A    Without referring to document 22, and even then
2    that wouldn't tell us about the final version -- I don't
3    know,
4        MR. SEGAL: Subject to your cross, I'll pass the
5    witness.
6        (Brief recess)
7    EXAMINATION BY COUNSEL FOR THE PLAINTIFF
8        BY MR. SHEK:
9    Q    I just had a few questions for you, Dr. Goldberg.
10   A    Okay.
11   Q    First, in 1986, do you have an understanding as
12   to how Caterpillar and Dr. Hertenstein were reviewing claims
13   with respect to the accuracy of codes?
14   A    You mean the examples, sex versus procedure, age
15   versus diagnosis? That kind of accuracy?
16   Q    More in terms of unbundling, for example.
17   A    Oh. My understanding is that, and it started
18   with Bob Hertenstein performing the reviews, and then
19   realizing that there were certain things he was finding
20   repetitively that didn't require his medical judgment, so he
21   handed those tasks over to Peggy Saal, S a a l, who was I
22   believe an R.N. who worked in his office. And she began
23   doing some of the more routine reviews, then he reserved
24   himself for the more complicated or arcane reviews.
25   Q    Do you have an understanding as to whether in

Page 382

1    1986 Dr. Hertenstein or Ms. Saal was using software or
2    computers to perform this type of review or assist him in
3    performing this type of review of claims?
4    A    As for the review concerning what we now call
5    rebundling, they did not have any software for that. I
6    don't know what software they were using in their office for
7    some simpler checks of eligibility, for example.
8    Q    To your knowledge, neither Ms. Saal nor Dr.
9    Hertenstein were using software computer systems to perform
10   the type of review of claims and coding accuracy that we
11   were discussing?
12   A    That's correct.
13   Q    This was in the 1986 time frame.
14   A    Well, it's when I first -- 1986 is pretty easy,
15   because that's when I first came, when I first heard about
16   Caterpillar. Their purpose was well described to me.
17   Q    Taking you back to Health Data Institute, HDI and
18   Advanced MedLogic, to your knowledge during your time at
19   HDI, did Advanced MedLogic ever do any checks of codes with
20   respect to their relationship to other codes? So procedure,
21   you talked about earlier, procedure versus sex or procedure
22   versus age. Did Advanced MedLogic, during the time you were
23   at HDI, ever perform any checks of claims where it was
24   comparing procedure code versus procedure code?
25       MR. SEGAL: Objection. Vague. Leading.

Page 383

1        THE WITNESS: To my knowledge, Advanced MedLogic
2    had no capability of comparing procedure code to procedure
3    code, or diagnosis to diagnosis.
4        BY MR. SHEK:
5    Q    Do you have any understanding as to whether,
6    after you left HDI, if Advanced MedLogic acquired that
7    functionality?
8        MR. SEGAL: Objection. Lacks foundation. Vague.
9    Leading.
10       THE WITNESS: As a matter of --
11       MR. SHEK: Let me withdraw the question.
12       BY MR. SHEK:
13   Q    Do you have any understanding as to, or did you
14   learn anything about Advanced MedLogic after you left HDI?
15   A    Yes. I was in a unique position to learn more
16   about Advanced MedLogic after I left HDI.
17   Q    Could you describe what you learned?
18   A    Yes. When HPR got started, we needed some cash,
19   and HPR sold a day or a day and a half, I really don't
20   remember precisely how much of my time, to PHCS, Private
21   Health Care Systems, a consortium of commercial insurance
22   companies who provided health insurance.
23       I did consulting work for PHCS on ways of
24   monitoring the quality and utilization of care received by
25   PPO members. PHCS was not only located in the same building

Page 384

32 (Pages 381 to 384)

GEORGE A. GOLDBERG, M.D. - VOLUME II

McKesson Information Solutions LLC v. The TriZetto Group, Inc.
District of Delaware Case No. 04-1258 SLR

Deposition of George Goldberg
Date of Deposition: September 28, 2005

## TRANSCRIPT ERRATA

| PAGE:LINE(S) | CURRENT VERSION | CHANGE TO | REASON FOR CHANGE |
|---|---|---|---|
| 270:13 | @ | A | Part of Goldberg's answer |
| 273:9 | if that | is that | — |
| 275:2 | with lookup | (delete) | clarity |
| 282:3 | agree, but | agree that | clarity |
| 240:24 | Helper | HPR | correction (of stenographer I think) |
| 294:19 | you | we | correction |
| 297:11 | penned | pended | correction |
| 297:14 | penned | pended | correction (of stenographer) |

| PAGE:LINE(S) | CURRENT VERSION | CHANGE TO | REASON FOR CHANGE |
|---|---|---|---|
| 297:23 | penned | penned | correction |
| 299:23 | two of the things | "two of the things" | clarity |
| 301:12 | the | their | — |
| 302:24 | date | statement | — |
| 305:3 | ? | . | — |
| 307:1 | criteria | criterion | correction |
| 307:19 | with | "with" | — |
| 314:23 | insurance | assurance | — |
| 314:5 | procedures | procedures, | clarity |
| 314:15 | Then | And | clarity |

Deposition of George Goldberg

| PAGE:LINE(S) | CURRENT VERSION | CHANGE TO | REASON FOR CHANGE |
|---|---|---|---|
| 317:5 | for a to | for to | clarity |
| 330:15 | Know | Knew | — |
| 331:12 | move | moved | — |
| 336:2 | penned | pend | — |
| 340:10 | ala | a la | — |
| 342:9 | they | there | — |
| 351:18 | I do | I do not | If I said "I do," I mis-spoke. |
| 351:23 | parentheses | quotes | Correction |
| 353:24 | saw | saw it | clarity |
| 355:10 | negotiation | negotiated | — |

Deposition of George Goldberg

| PAGE:LINE(S) | CURRENT VERSION | CHANGE TO | REASON FOR CHANGE |
|---|---|---|---|
| 356:20 | company would | company, the lower-paying code | clarity |
| 361:19 | thymine | thymidine | — |
| 365:6 | if I'm | (delete) | clarity |
| 370:22 | of | in | clarity |
| 372:22 | that | what | — |
| 376:21 | and | (delete) | clarity |
| 377:21 | there two | there were two | clarity |
| 384:19 | a half, | a half each week, | correction |
| 386:16 | primed | pend | — |
|  |  |  |  |
|  |  |  |  |

Deposition of George Goldberg

1          I HEREBY CERTIFY that I have read this transcript

2     of my deposition and that this transcript accurately states

3     the testimony given by me, with the changes or corrections,

4     if any, as noted.

5

6

7

8     x _George A. Goldberg_____

9         10/18/2005

10

11    Subscribed and sworn to before me this          day of

12                  20   .

13

14

15

16    _____

17

18    Notary Public

19

20    My commission expires:

21

22

23

24

25

392

GEORGE A. GOLDBERG, M.D. - VOLUME II

BARKLEY
Court Reporters

# EXHIBIT 20
# REDACTED IN ITS
# ENTIRETY

# EXHIBIT 21



# Enhancing Accuracy And Timeliness Is Integral To The Claims Adjudication Process

Claims administration is more than just a check-issuing process, Brenda Welsh told the attendees at the 1985 Health Care Conference, sponsored by Charles D. Spencer & Associates, Inc. Ms. Welsh is director of human resources at the Automobile Club of Southern California, which self insures the benefits program offered to its 6,000 employees.

Ms. Welsh discussed the process of entering claims data into a computer system and how the design of special edit features can enhance accuracy and timeliness of claims adjudication.

Before the claims data is entered into a computer system, Ms. Welsh advised, a decision should be made about the kind of information needed to accomplish desired objectives. Data extracted from enrollment cards should be carefully scrutinized and coded to assist the claims adjuster in easily identifying those claims that should or should not be paid.

By designing special codes, data can be easily "red flagged" to alert adjusters to inconsistencies with plan provisions, overpayments, billing errors, or potential cases of fraud.

### Eligibility Data

Ms. Welsh suggested that when data on age, sex, effective dates, and cancellation date are entered into the computer system, certain red flags can be built into the system to warn that a covered individual is near or past eligibility status.

Age edits will alert claims adjusters to

those participants who are over age 65 and eligible for Medicare, and will identify students age 19 to 23 or whatever limitation might be under the plan. This edit also can be used as a basis for obtaining advance printouts, or for triggering letters to employees to remind them to file for Medicare, or to submit student verification.

"It's amazing how many errors occur due to billing or due to incorrectly entering data in the system in regard to the sex of employees." Edits for data on the sex of employees will avoid costly mistakes such as billing for a hysterectomy on a male employee.

Effective date entries can guard against paying for charges filed prior to eligibility for coverage or for pre-existing conditions and can "flag those who are transferring or from a health maintenance organization during open enrollment."

In the case of cancellation of coverage, this date will identify those disabled at termination and eligible for extension benefits.

### Plan Provisions

The Auto Club has compiled plan provisions in two parts — medical and dental — because there are some unique edits under its separate dental program. Ms. Welsh suggested that "don't pay" and "red flag" codes be included in the system to alert the claims adjuster to the deductibles, plan maximums, and hospitalization provisions. Another edit to include involves pre-existing conditions.

[right column, partially cut off:]

"Aside from th... ...e-existing cond... ...ogram will apply... ...at diagnosis, or ...ed diagnoses. I... ...ne covered to li... Concerning co... ...es. Welsh warne... ...up everything. C... ...juster recognize... ...verage and ente... ...nce entered. ...

...er insurance p... ...ur plan owes p... ...he COB entry i... ...or that claimant ...rs,"

...Some "special ...ded in the syst... ...gs, and you can ...se. For examp... ...tain bad guys ...de for that pr... ...reen reflects so ...ire or trigger a... ...pervisor. It's a... ...te good guys. ...hers with whom ...scount. Other e... ...ental procedure... ...n claims, and n... ...ique to your pl...

**Administrative E...**

...gotiate for an en...

"If you a... data bas...

'10

MCK 027923
04-CV-1258-SLR (D.Del.)



"Aside from the eligibility issue, once a pre-existing condition is determined, the program will apply any dollar limitations to that diagnosis, or can 'red flag' other related diagnoses. It can track the period of time covered to lift the limit."

Concerning coordination of benefits, Welsh warned that the system "can't do everything. COB works so long as the adjuster recognizes there is other insurance for Medicare and enters a code into the system. Once entered, the adjuster calculates other insurance payments and the amount your plan owes plus any benefit reserves. The COB entry identifies all future claims for that claimant or other family members."

Some "special edits" also can be included in the system. These "are your red flags, and you can have the most fun with these. For example, if you want to have certain bad guys identified, just enter a code for that provider and be sure the screen reflects some edit which may require or trigger action by the adjuster or supervisor. It's also good for identifying the good guys, your PPO providers or others with whom you have negotiated a discount. Other edits include new experimental procedures, Workers' Compensation claims, and many other special edits unique to your plan or organization."

### Administrative Edits

Ms. Welsh suggested that "if possible, negotiate for an entire screen versus a few lines. All kinds of messages and information for the adjuster can be included in the system to prevent the adjuster from having to pull the paper file.

"These messages include COB notations, carrier information, leave of absence status, payment of premiums, special handling for executives. As many items as your imagination and needs dictate can be handled on this screen."

Other administrative edits include overpayments; duplicate bills; adjuster edits, which include totals when there are many line items; limits on adjuster authority by amount or by procedure; and special cases requiring supervisor referral. Letters and eligibility of benefits forms can be included but may require frequent revisions. The system should be programmed for specific and different requests, such as computer printouts of data or automatic follow-up letters.

### Diagnostic Edits

"Diagnostic edits are the most difficult to design, but the most important in terms of cost containment. If you are buying a system," Ms. Welsh said, "find out if you can share in the data base of other users or clients.

"This is especially helpful if you are a small employer and in terms of health profiles anything under 100,000 lives is small. Tapping into the data of other companies will enable you to compare and assess the norms based on your geographical area for

"If you are buying a system, find out if you can share in the data base of other users or clients."

MCK 027924
04-CV-1258-SLR (D.Del.)



hundreds of thousands of claimants. The idea is to eventually build your own health profile, which can be edited by procedure or diagnosis and claimant demographics to determine if the treatment falls within the profile.

"For example, if the average hospital length of stay for a given procedure is two days and you receive a bill for five days, the health profile will edit the discrepancy or red flag the claim for further investigation or concurrent review. It will identify X-ray and lab work that is not consistent with the diagnosis, which is an indication of preventive medicine, or defensive medicine, or financing a Rolls Royce. It can edit an-

cillary charges, follow-up visits that should be included in the surgical fee, and so on.

"The biggest problem is getting to the data or finding someone who'll share. However, in spite of some legal concerns, the trend with self funded employers is in sharing the data through user associations or through the service bureau.

"If you're able to share the data, find out the coding system common to the data base. If procedural, is it RVS (relative value study) or CPT (current procedural terminology); if diagnostic, is it ICD (international classification of diseases) or DRG (diagnostic related group)? Codes are for access, for comparing and for profiling."

## Specifications, Bidding Vital In Hiring Administrator

The selection of an administrator to handle a company's group health programs should not be taken lightly. Many plan sponsors often look at more than one insurance company or third party administrator before making a decision.

Detailed specifications are essential because they tell the administrator what is desired — something on which to bid. Stephen F. Rasnick, president, Claims Administration Services, recommends they include

- a definition of the scope of the plan(s),
- a detailed description of the group being covered,
- the type of coverage,
- the systems of financing that will be employed,
- any reinsurance specifications,
- terms of the contract, and
- statistical data about the group, including claims data.

The specifications should outline what types of services are being sought from the administrator. Elimination of certain re-

ports might affect the price that the administrator will quote.

### Use A Broker Or Consultant

Speaking at the 1985 Health Care Conference sponsored by Charles D. Spencer & Associates, Inc., Mr. Rasnick suggested using a broker/consultant to actually operate the bidding process, and avoid dealing with unqualified "personal friends." The broker should know the corporate benefits objectives and have complete information about the plan and the employee group.

He strongly suggested not using more than one broker. A good broker will be able to select four or five good administrators that meet the needs of the company. More brokers will simply mean more administrators to consider; the sheer volume will confuse the issue. He noted that many administrators and insurance companies do not like to receive more than one bid request for the same case. This is what happens when more than one broker is handling the case. "Who really controls this

MCK 027925
04-CV-1258-SLR (D.Del.)



that should
nd so on,
ting to th
'll share
l concerns
loyers is i
ssociation
ita, find ou
o the dat
S (relativ
procedure
ICD (inter
es) or DRC
des are fo
ofiling."

## "Will the administrator take responsibility for the mistakes and make sure the claims reviewer understands the plan?"

se?" is often asked.

After the specifications have been sent,t, wait five or six weeks for the reonses. A good bid cannot be prepared ino weeks. Once the bids have been rerived, look at them carefully to see howosely they reflect the specifications.

Once the field has been narrowed, Mr. Rasnick suggests a close look at the administrator. Asking for references is always good, but the employer should also

itrator
the admini

k for several cases that the administratorcently lost. (A simple request for references will always result in talking to theost satisfied customers.)

Find out why they left the administrator.they left without bad feelings, the administrator will probably be a good compuny with which to work.

Care Con
D. Spence
x suggested
tually oper
oid dealing
ends." Th
ate benefits
information
ee group.
using more
will be able
ninistrator
pany. More
re adminis
volume wi
at many ad
mpanies de
one bid re
x what hap
ker is han
ontrols this

### Responsibility Of The Firm

Next, look into how responsible the firmakes mistakes. Every administratorakes mistakes, he noted. But will the administrator take responsibility for the mis-

takes and make sure the claims reviewer understands the plan?

He also recommended using only administrators that have errors and omissions coverage. The coverage is expensive, but it helps to alleviate the problem of who pays for the really big mistakes. They do not happen very often, but when they do, a big mistake can cause severe financial hardship without adequate errors and omissions coverage.

Mr. Rasnick also suggested that the administrator's ability to perform coordination of benefits procedures and pursue subrogation be investigated. Accuracy is important here because the administrator is working in the largest part of the benefits dollar — claims.

The selection of a good administrator requires well-written specifications as well as being on top of the bidding process. The task can be boring, he concluded, but it is a necessary one that helps to define a case accurately and possibly saves some health care dollars.  □

---

## Claims Processing Requires Flexibility As Well As Attention To Facts, Trends

A good claims processing operationould be fast, fair, frugal, and efficient. Itould not pay claims that are not covered,d it should pay covered claims quicklyd accurately, pointed out Jack Helitzer,ce-president, group staff operations,etropolitan Life Insurance Co.

Alternative methods of care also should

be explored even if they are initially more expensive. In the long run, they may save money. To illustrate this, attendees at the 1985 Health Care Conference sponsored by Charles D. Spencer & Associates, Inc., were given the following example:

A burn patient is transferred to an expensive, high quality burn center. The initial costs will be high, but the excellent treatment probably will reduce costs in the long run.

Data should be gathered from the claims

MCK 027926
04-CV-1258-SLR (D.Del.)

# EXHIBIT 22





JUNE 1987
LIFE/HEALTH
INSURANCE EDITION

# best's review

## Features

INVESTMENTS IN THE LIMELIGHT
As investments assume more importance, life insurers can learn
much from the banking and investment management industries
By Andrew C. Power and Joel Bleeke ........................ 12

AGENT/COMPANY ROUNDTABLE
Producers and company representatives take a candid look at how the
traditional distribution system is faring in a changing environment
A workshop conducted by Doris Fenske and Pamela Loos ...... 20

THE WORLD OF FINANCIAL PLANNING
INCREASING THE FINANCIAL HARVEST
By Jeff J. Saccacio ......................................... 36

MARKETING FACTS AND IDEAS
JAPAN: LAND OF RISING OPPORTUNITY
By Michael J. Murphy ....................................... 46

NEW PLANS, NEW POLICIES .................................. 54

SINGLE-PREMIUM WHOLE LIFE POLICY COMPARISON
A Best's Review study ....................................... 68

TECHNOLOGY TODAY AND TOMORROW
HIGH-TECH MARKETING TO EMPLOYEES
By John H. Adee ............................................ 86

INSURANCE TAXATION
THE BIG BITE: BUSINESS MEAL EXPENSE DEDUCTIONS
By Gerald I. Lenrow, Michael J. Cuddy and Craig B. Larsen .... 94

MANAGEMENT INSIGHTS
HAPPINESS IS MODIFIED GAAP
By John Fibiger ............................................. 98

ORGANIZATION NOTES—HIAA ANNUAL MEETING
NO EASY SOLUTIONS FOR HEALTH INSURERS
By Pamela Loos ............................................ 126

## Columns

102  CURRENT TAX DEVELOPMENTS
104  LIFE INSURANCE TAXATION

## Departments

2  LETTERS & COMMENTARY
5  MONTH IN BRIEF
8  INSURANCE STOCKS
10  ON-LINE REPORTS
92  AUTOMATION REVIEW
114  MARKET DEVELOPMENTS
126  ORGANIZATION NOTES
136  NEW PUBLICATIONS
138  REPORTS ON COMPANIES
139  EXECUTIVE CHANGES
142  NEW DIRECTORS
142  RETIREMENTS
142  CONVENTION CALENDAR
143  COMPANY REPORTS INDEX

ABOUT THE COVER: Are companies and producers losing touch with each other's
needs in an insurance market characterized by constant change? The candid discussion
that begins on page 20 explores some of the tensions in the agent/company relationship.

COVER BY KEVIN J. McDONALD


A BEST

IMES

u to discuss
re the ben-
mployees
al norms.
nmenda-

! Manage-
te to
vice,
CT 06152.

GNA

MCK 052195

04-CV-1258-SLR (D.Del.)

LETTERS & COMMENTARY

# PAGE TWO

## best's review

LIFE/HEALTH INSURANCE EDITION

PRESIDENT & PUBLISHER
Arthur Snyder

VICE PRESIDENT
Paul E. Wish

EDITOR
Doris Fenske

SENIOR ASSOCIATE EDITOR
Marian Freedman

ASSOCIATE EDITORS
Barbara Talvanis Benham
Anne Gilmore Clarke
Charles Wasilewski

COPY EDITOR
Ruth G. Kastrud

ASSISTANT EDITOR
Mercedes M. Perez

CONTRIBUTING EDITOR
Richard L. Hall

EDITORIAL PRODUCTION MANAGER
Pamela Loos

PUBLICATION DESIGN
Diane Poli Stafford, supervisor
Bernice Engelbrecht
Robert M. Zimmermann

TYPESETTING
F. Louise Fleming, supervisor
Ann H. Belcher
Carol Delibero
Michael A. Hildebrant

ART
Suzanne Kowitz, supervisor
Kevin J. McDonald, illustrator
Jean M. Irwin
Victoria J. Loukas

ADVERTISING
Jill D. Robinson, manager
Winifred M. Dunlap

ADVISORY EDITORS
C. Burton Kellogg II
Robert J. King

Copyright 1987
A.M. Best Company Inc
Ambest Road
Oldwick, N.J. 08858
(201) 439-2200

Best's Review—Life/Health Insurance Edition (ISSN 0005-9706). Published monthly by the A.M. Best Co. Inc. Editorial and executive offices, Ambest Road, Oldwick, N.J. 08858. Telephone (201) 439-2200. Telex: 837744. Printing offices, Hamilton Printing Co., Columbia Turnpike, Box 200, Rensselaer, N.Y. 12144. Second class postage paid at Oldwick, N.J. 08858 and at additional mailing offices. Subscription rates: U.S. and Canada, $14 (two years $25) foreign, $18 (two years $30). Single copy $2.50. Back copies (first months short) $4. Payment must accompany order. All rights reserved; reproduction in whole or part without permission is prohibited. Reprints of articles appearing in Best's Review are available from the reprint editor at the editorial office. Prices on request.
Postmaster: Please send change-of-address notices to Best's Review—Life/Health Insurance Edition, Oldwick, NJ 08858.

## COMPANY'S PRODUCT WAS NOT MENTIONED

To the Editor:

We read with interest the article regarding long-term nursing care insurance in the April issue. (See "Mature Customers, Immature Products" by Charles Wasilewski.) The article contained quite a bit of useful information, including the names of a number of insurance carriers currently offering long-term care insurance. Regrettably, however, the article failed to include any mention of the nursing care policies offered by Acceleration Life.

Since 1982 the Acceleration Group of Companies has been offering nursing care insurance through its exclusive marketing representative, Interstate Service Insurance Agency, Inc. Our current series of policies compares extremely favorably with the products offered by the companies mentioned in your article. Quite honestly, many of the products offered by the companies which you mentioned contain the innovative benefits we feel we have developed over the past several years.

Some of the unique features of our coverage include:

(1) No prior skilled nursing home confinement is required in order to obtain benefits for custodial care.

(2) No prior nursing home care is required prior to obtaining benefits for home care.

(3) Daily benefits are the same for all levels of covered nursing care and home care.

(4) All benefits are obtainable from the first day; there is no initial wait.

(5) Waiver of premium is included.

Our policies provide benefits for up to five years and include a benefit for hospice care. These policies also include a single-premium option and automatic temporary insurance. Besides our nursing care policies, we also offer a comprehensive line of Medicare supplement products that include a benefit not often found in this type of policy: prescription drugs. We also offer policies covering home health care. All of these products are available on both an individual and group basis.

If you have any questions regarding the company or its products, we would appreciate hearing from you. In the meantime, thank you for bringing to your readers' attention the availability of products such as long-term nursing care coverage.

*Bennett L. Katz*
*Consulting Attorney*
*Acceleration Life*
*Columbus, Ohio*

## CRAGG SPEAKS OUT ON POLICY ILLUSTRATIONS

*In an address to the 48th annual Combination Companies Conference in Nashville, Ernest E. Cragg, president and chief executive officer of the Life Insurance Marketing and Research Association, sounded a warning about the deceptive use of policy illustrations and called for greater integrity in marketing. Excerpts from his address follow.*

There is some verse that says, "Like a little dash of powder and a little dab of paint, numbers make a lot of facts appear like what they ain't."

So, one should not be misled by the numbers game. When reviewing policy illustrations, we must remember this about nonguaranteed numbers: they are not facts; they are not even estimates of the future. They almost certainly will never be applied. They may change at any time, even as soon as tomorrow.

The slightest interest crediting change will result in a substantial change in long-range numbers. The actual numbers applied will either be higher or lower than illustrated today at this time. And no one knows today what those actual numbers will be. And since it is impossible for any company to know what its future results will be, doesn't it make sense to go with proven performers whom you have learned to trust!

MCK 052196

04-CV-1258-SLR (D.Del.)

agents generally are producers who are active in business insurance and advanced underwriting sales. They may be involved with payroll-deduction individual life sales but see GUL as a more saleable fit for larger accounts. When such producers measure the cost/benefit economics of the products within their business operations, they find the non-commission aspect of GUL attractive since enrollment and employee services are provided elsewhere.

### A LEGITIMATE CONCERN

The other body of agents are those who perceive middle-America as their bread-and-butter market. This group will probably see their carrier's offering GUL products as the beginning of a move to an alternative distribution system. This is an understandable concern, but agents can take comfort from the following marketplace facts:

(1) Based on industry statistics, life carriers in the aggregate are not delivering products to the middle market very effectively.

(2) Carriers currently offering GUL seem to view the product as supplemental, not alternative, distribution which reaches the middle- and lower-middle income group, where many agents choose not to prospect. The product also reaches more consumers than the size of the carriers' agent body permits.

(3) The true GUL product in today's market offers substantial guaranteed standard issue limits and little or no back-end loading. It is competitive with individual UL plans, but because of its user-friendly features, it is not markedly superior in terms of cash-value buildup after the surrender charges on individual plans have been worked off.

(4) The agent will still use individual policy payroll-deduction plans for small businesses. Minimum eligibility criteria for GUL, combined with group underwriting standards, will make GUL unavailable to many small companies.

(5) The agent can earn attractive commissions from GUL master sales.

(6) It is difficult to imagine that an insurer would benefit by shifting its individual sales plan away from agents to GUL. No one has yet perfected an enrollment or employee communication process that approaches the predictable results of agent-prospect-

ing activities. Again, supplemental, not alternative distribution, is the key to incremental business and profitability.

(7) Many consumers will prefer dealing with an agent and receiving the personal service that a group approach cannot provide.

This employee-marketing approach responds both to the employer's need for a comprehensive benefits package with carefully contained costs and to the employee's need for product value and the flexibility to customize benefits to fit widely varying individual circumstances. Today all parties can be winners when insurers make the effort to apply technology to the right tasks. □

## AUTOMATION REVIEW

### SYSTEM VALIDATES MEDICAL FEE SCHEDULES

A stand-alone system that validates medical fee schedules was introduced by Insurance Software Packages, Tampa, Fla. Called the Medical C Schedule and Audit System, the system allows claims examiners to validate medical procedure codes and ICD-9 Diagnosis Codes for questions of medical appropriateness and causal relationship.

The Level I version offers screen displays of procedures, charges, allowable amounts and reasons for any reductions in charges, and the system can print each screen display. Level II is a medical billing management system that compiles medical claims history, checks duplicate billings, monitors surgery follow-up days and prepares reports that explain reduced and disallowed charges.

The system can be used to create UCR schedules in states without fee schedules and for employee health benefits programs. For more information call (800) 237-8133.

### TOOL EVALUATES CLAIMS, PINPOINTS HIGH COSTS

Health Data Analysis is a diagnostic tool designed to help insurers evaluate medical claims and pinpoint high-cost areas. Introduced by ConServCo, Tampa, Fla., the program is available as a stand-alone product or as part of a health care management program that includes hospital review, bill audit, chiropractic management, psychiatric review, vocational

rehabilitation, in-patient medical care review, medical case management and computerized medical bill review.

For more information, call (813) 969-0701.

### SOFTWARE SUPPORTS SALES PRESENTATIONS

The Beneficial EDGE is a software package designed to support agents' sales presentations to prospective clients. Introduced by Beneficial Standard Life, Los Angeles, the software allows agents to compare instantly the insurer's life insurance products to a competitor's product or other investment vehicles. The prospect then is given a computer read-out of the side-by-side comparisons for his own reference. The software can be run on a mainframe computer, a personal computer or a laptop computer.

### NEW SYSTEM TRACKS PROSPECTS AND CLIENTS

The Broker's Choice, introduced by Pacesetter Software, Foster City, Calif., is a prospect and client tracking system designed for financial professionals. The system provides client and prospect profiles, financial histories, telephone follow-up reports, a seminar organizer, appointments schedule, word processing, mass updates, and automatic hard-disk backup. For more information call (415) 571-5566.

### PREMIUMS COMBINED INTO ONE MONTHLY BILL

The "Aetna Service Account Plus" (ASA Plus) is a billing system that combines a client's property/casualty and life premiums into one monthly statement. Introduced by Aetna Life & Casualty, Hartford, Conn., the system features laser-printed bills that display the agent's name and telephone number, the total combined balance and the minimum amount due.

Messages regarding support and further development of the multi-policy account also appear on the statement. For example, the statement informs the insured about how much of a discount he or she is receiving for having multiple policies with the insurer. The statement offers a toll-free customer service number. Service representatives handling these calls are supported by terminals that

CONTINUED ON PAGE 121

MCK 052197

04-CV-1258-SLR (D.Del.)

# EXHIBIT 23

A Company/University Joint Venture to Build a Knowledge-Bas
Weitzel, John R.; Andrews, Kenneth R.
MIS Quarterly; Mar 1988; 12, 1; ABI/INFORM Global
pg. 23

# A Company/ University Joint Venture to Build a Knowledge-Based System

By: John R. Weitzel
Management Science Department

Kenneth R. Andrews
Linguistics Department

University of South Carolina
Columbia, South Carolina 29208

## Abstract

*A joint venture between a university-based research institute and a health insurance company to build a knowledge-based system to perform medical review of health insurance claims is described. In an early formal test, the system made appropriate decisions for approximately 70% of the claims. The remaining claims were referred to human reviewers in accordance with company policy. Forming a joint venture proved to be a reasonable cost alternative to distant and more expensive consultants.*

*The article examines the impact of the differing cultures of the company and the university on the cohesion in the joint knowledge engineering group. It also examines the current literature on the development cycle for building knowledge-based systems as the framework for analyzing the events in this project, particularly the influence of the claims review task on system design. From another perspective, it examines participant roles in terms of shifts of attention among domain knowledge, knowledge representation, system performance, and the kinds of skills needed to improve the evolving system. The conclusion includes a series of recommendations that may assist other companies and universities setting up similar joint ventures.*

Keywords: System development, insurance claims processing, knowledge-based systems

ACM Categories: K.6.1, I.2.1, H.4.2

## Introduction

In September 1985, Blue Cross and Blue Shield (BC/BS) of South Carolina and the Institute of Information Management, Technology, and Policy (IIMTP) in the College of Business Administration at the University of South Carolina formed a joint venture to build a knowledge based system to perform medical review on Medicare claims.[1]

Managing the knowledge engineering process was complicated by having members from two dissimilar organizations on the same knowledge engineering group. This arrangement affected cohesion within the knowledge engineering group and inter-organizational dynamics. It also influenced the definition of the problem, the design of the system, and its final form.

The venture developed from circumstances similar to those that led Digital Equipment Company and Carnegie-Mellon University to start the development of an expert system to configure computer systems (McDermott, 1984); someone in the company was aware of the university's work in developing knowledge-based systems. At a meeting of the advisory committee, a professor in the Department of Management Science made a presentation on the university's work to date in building knowledge-based systems and on their potential to solve significant business problems. This presentation caught the attention of a senior vice president of BC/BS who was a member of IIMTP's advisory committee. He believed that an expert system approach could provide BC/BS with a competitive advantage.

He had a number of strategic and operational reasons to improve the processing of Medicare claims. First, in 1984 Medicare claims comprised 41% of the company's total volume and 48% of the total value of benefits paid (Blue Cross, 1984). BC/BS anticipated substantial growth in the volume of health care claims under this program. Second, the federal Health Care Financing Administration (HCFA) was beginning to place increased emphasis on prepayment review of claims. Third, although the company relied on computation to produce economies of scale in processing, the labor-intensive manual review of these claims had not yielded to attempts at automation. Hiring and training suffi-

[1] The project described in this article was funded in its entirety by Blue Cross and Blue Shield of South Carolina

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

TRZ000818

*Knowledge-Based Implementation*

cient reviewers to capture a competitive advantage would have significantly increased personnel and supervisory costs. Fourth, certain characteristics of the review process seemed suited to a knowledge-based approach. The process was subjective and partly judgmental (Harmon and David, 1985). Registered nurses with clinical experience gained knowledge of detailed review policies and procedures through a long on-the-job apprenticeship. The most experienced reviewers were significantly faster and made fewer errors than the least experienced reviewers.

BC/BS management decided to search for a way to learn about knowledge-based systems. After considering several choices (see Table 1), they decided to strengthen the company's ties with IIMTP and to use faculty members' experience in building experimental knowledge-based systems as a foundation for building a commercial system.

By engaging IIMTP solely as an external consultant, BC/BS would not have increased its skills in developing knowledge-based systems. Because BC/BS and IIMTP both wanted to develop a permanent source of internal expertise, they created a knowledge engineering team by taking existing personnel from both organizations and providing them with training in knowledge engineering methodology and programming. This team consisted of two members of BC/BS's data processing staff, two faculty members and one doctoral candidate from the Department of Management Science, a staff member from IIMTP, and a master's candidate from the Department of Computer Science.[1]

IIMTP participants were responsible for project management during the project's first two contractual phases, which lasted approximately ten months. During this time, the knowledge engineering group reached a technical solution to the problem. In the third contractual phase, which lasted seven months, the project changed from exploratory research and development to recoding the knowledge-based system in a procedural language for operation with the company's other production systems. Consequently, during the third phase of the project BC/BS participants assumed responsibility for project management.

---

[1] At the end of the second phase one professor and the two graduate students left the project.

# The Development Cycle in Building Knowledge-Based Systems

There are several descriptions of the development cycle. Various authors call the stages by different names and emphasize slightly different activities in each stage. Most versions describe similar activities in essentially the same sequence, and suggest a single underlying model containing five stages: identification, conceptualization, formalization, implementation and validation.

The first stage identifies a domain, a problem within that domain, and a task (Bobrow, et al., 1986 and Buchanan, et al., 1983). "Task" refers to the role that an automated system will play in relation to the humans whose expertise it will emulate and the level of expertise it should exhibit (McDermott, 1984). This stage requires identifying available resources to undertake a knowledge-based approach: an articulate expert whose time can be devoted to the project, knowledge engineers, and suitable knowledge engineering tools. It also requires the identification of a user, test cases, and acceptable solutions (Bobrow, et al., 1986). Finally, the system developers should identify a performance objective and an estimate of the economic benefits and costs to attain them (Harmon and King, 1985).

The second stage is conceptualization (Bobrow, et al., 1986, and Buchanan, et al., 1983). The knowledge engineers begin to observe the expert's problem solving approach. They and the expert often organize working sessions around actual cases (Harmon and King, 1985, and Bobrow, et al., 1985). The expert describes the approach in solving the case, and the knowledge engineers identify key facts and relationships.

The third stage, formalization (Buchanan, et al., 1983), shifts the primary focus of attention from discovering the expert's problem solving approach to identifying an appropriate representation of the knowledge.

The fourth stage is implementation (Buchanan, et al., 1983). In this stage the knowledge engineers build a prototype. They should select an "implementation technology" from among existing expert system shells. These shells have built-in programming features which accommodate quick changes to the evolving system. The knowledge engineers attempt to get the prototype to run "correctly" from start to finish. The

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

TRZ000819

*Knowledge-Based Implementation*

**Table 1. Organizational Choices to Build a Knowledge System**

| Source | Option | Advantages | Disadvantages |
|--------|--------|-----------|---------------|
| Internal Development | MIS professionals | Available source of talent | Lack of familiarity with AI or knowledge engineering or selected of tools |
| | | Systems analysis experience is transferrable | |
| | | Knowledge of integration into existing MIP systems (if maintaining support necessary) | |
| | | Desire to learn | |
| | Existing users | Available source of talent | Lack of knowledge of data processing |
| | | | Unfamiliarity with AI or knowledge engineering processes or tools |
| | New style of AI professionals | Current knowledge of AI, its tools and potential applications | High demand and low supply creates asking salaries in the $80K-75K range |
| | | | Assumes continuing demand for services |
| Development by Outside Consultants | Private sector | Short term commitment possible | No local source |
| | | | Distance would have raised costs considerably |
| | | | Most real applications require extended development time; extremely short supply; costs would have been excessive |
| | Academic sector (national reputations) | Short term commitment possible | Far away |
| | | | Limited availability |
| | | | Expensive cost |
| Joint Ventures | Company-to-company research | Long range development | Company not oriented toward research and development |
| | | | Competitor companies also unfamiliar with AI |
| | | | Potential difficulties in sharing proprietary knowledge |
| | | | Potential conflicts of interest |
| | | | Potential complications with federal regulations |
| | Investing in an AI start-up company | Commitment to company | Exceedingly risky |
| | | | Exceedingly expensive |
| | | | Long-range potential uncertain |
| | Company-to-local-university joint venture | Local availability; more reasonable cost | Few faculty in the field |
| | | Experience in building small knowledge systems for instructional and demonstration purposes | |
| | | Desire more experience | |

expert observes and comments on inadequacies and oversights, and the knowledge engineers make improvements to the system. Problems discovered during this process frequently lead the knowledge engineers and the expert to start over. The case-driven "test and refine" process and informal testing continue throughout the development cycle. The prototype often convinces the expert of the validity of a knowledge-based approach (Harmon and King, 1985).

Like decision support systems, knowledge-based systems must evolve (Keen, 1986). The design process must prevent blockage of evolution because of inflexible design structures or development tools. Therefore, attention may

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

TRZ000820

Knowledge-Based Implementation

shift from domain knowledge to a way to find or develop better tools, then shift back to domain knowledge (Smith, 1984).

Smith (1984) suggests that the purpose of the implementation stage is to demonstrate the system's commercial viability and utility. This stage should also begin the transfer of "ownership" of the knowledge-based system from its builders to its intended users, who need to begin learning how to monitor, maintain, and enhance it (Harmon and King, 1985). By the end of this stage, the knowledge engineers should have a better understanding of the design characteristics of the system, including rules, procedures, and constraints (Bobrow, et al., 1986).

A more thorough test and validation of system performance is required in the fifth stage, validation (Buchanan, et al., 1983). Although validation occurs when implementation is considered complete, problems found during validation often force reformalization and reimplementation (Bobrow, et al., 1986). The prototype may be reimplemented several more times, followed by more validation. Previously overlooked circumstances lead to the incremental expansion of the number of rules in the knowledge base.

There are two main performance criteria to be used during testing. First, the system should function well in comparison to human performance of the same task. Second, the system should perform a commercially viable task efficiently enough to show economic justification. Initial expectations of system performance are generally too high, and a lengthy apprenticeship should be anticipated before the system will begin to achieve the desired levels of functional and economic performance (Bachant and McDermott, 1984).

Initially, organizations usually concentrate on the system's performance instead of its integration into existing systems and work processes (McDermott, 1981). It is crucial that the organization develop an implementation plan that will fit the system into the established organizational structure with as little disruption as possible. Furthermore, a group must be established in the existing organization to continue monitoring and expanding the system's capabilities (Harmon and King, 1985). The final system may be recoded in procedural language as an embedded kernel in a larger system (Smith, 1984; Harmon and King, 1985). Since procedural languages limit the flexibility of the system, some organiza-

tions make and validate changes to the knowledge base in the original knowledge engineering tool, and then recode the changes in procedural language.

## Evolution of the Project: Developmental Stages

McDermott (1984) views the nature of the organizational task selected for implementation as a knowledge-based system as the motivating force behind the development cycle. Smith (1984) suggests that the development cycle is a function of the power of the knowledge engineering tool to represent the task. Elements of both viewpoints can be seen in the joint venture between BC/BS and IIMTP. The task of the medical reviewer and the kind and level of knowledge desired in the knowledge-based system largely determined system design. The focus shifted periodically from the task, the tool, and the system design.

Changes in task definition, the design of the system, the integration of databases and graphic interfaces with the knowledge engineering tool, and the need for different skills at different times created a shifting pattern of influence in the joint knowledge engineering group. In addition, the chances of continuing the joint venture rose and fell with the knowledge engineering group's progress in problem solving and its likelihood of success.

Managing risk was important to the continued existence of the joint venture. Three separate contracts permitted BC/BS to make incremental commitments to the development effort. If the first or second phase had failed, BC/BS could have limited its losses by terminating the joint venture. The next three sections describe the three phases of the joint venture.

### Phase I: requirements analysis

Organizations usually expect information system departments to deliver completed, working systems on schedule and within budget. Quite often systems are late and over budget, but they usually work after initial start-up problems are resolved. In contrast, there is no guarantee that an AI approach will produce a system at all. Senior management decided to define the project as "research and development," and they assured the managers assigned to monitor the

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

TRZ000821

project that a failure to deliver a working system would not affect annual performance reviews or bonuses.

## Objectives

The first contract funded an exploratory study of the viability of a knowledge engineering approach to review medical reimbursements. Members of the knowledge engineering group interviewed several members of BC/BS management to learn their expectations for the proposed system. With that background, the knowledge engineering team met periodically with BC/BS's top claim reviewer, who served as the domain expert throughout the project. This reviewer became an integral part of the knowledge engineering team.

In early meetings with the reviewer, the group decided to concentrate on the relatively straightforward issue of assessing a patient's eligibility for health care services. This task became the focus of the first phase of the joint venture. The team members believed that if they could first build a small prototype to solve this issue, then they had a chance to create a system that would address the entire review process. The group evaluated the features of the eligibility issue and the suitability of three commercial knowledge-based system tools. The team selected a package by the end of the first phase. At various times, three BC/BS employees and two university participants attended training sessions provided by the vendor.

## System Design and Problem Solving Approaches

The initial design assumption was that the knowledge-based system would advise experienced reviewers on difficult claims and would tutor inexperienced reviewers. This assumption implied that the system would query the user for information found on the bill and on supporting documentation.

The knowledge engineering team based its discussions on actual claims.[1] The reviewer selected a variety of claims ranging from simple to complex. The team saved these claims to test the evolving prototype.

---
[1] Information that could identify the patient was blanked out to protect the confidentiality of the records.

The knowledge engineers were overwhelmed with details during these meetings with the reviewer. When the team asked the reviewer to explain the claim decisions, they received long, detailed justifications. The explanations became difficult for the reviewer and the knowledge engineers because the reviewer had not previously scrutinized the claim reviewing process, which had become automatic, making it difficult to explain — a phenomenon noted by Johnson (1983).

After several false starts, the team members eventually drew an "and/or" tree which they reduced to an if-then formalism (Hayes-Roth, 1985). The team first wrote the if-then rules in English, and then coded them in the knowledge engineering tool. The interactive prototype followed the sequence of events that the reviewer used in examining medical claims and their supporting records. She based her decisions on a generalized expectation for any patient with a particular diagnosis and on the specific information found on this patient's claim and medical records.

## Intra-Group Dynamics and Project Leadership

The university participants saw the project as a way to gain experience in developing an actual commercial knowledge-based system. They had major research and development goals (Keen, 1980), such as studying the effect of a knowledge-based system on organizational structure and behavior, studying the kind of knowledge used to review claims, developing a knowledge engineering methodology (Weitzel and Kerschberg, 1986), designing the information system requirements, and publishing research findings. BC/BS also intended to gain experience, but its goals were more utilitarian: improved productivity, improved quality and consistency of review, the possibility of marketing the completed knowledge-based system to other BC/BS plans and health care providers, and the addition of value to the company's existing distribution networks (Kerschberg, 1985).

These different orientations surfaced in several ways. The BC/BS team members continued to believe that a failure to produce a working system would have a negative impact on their performance evaluations. They pressed to assign target dates, pushed for tangible results, and adopted tactics to reduce uncertainty and risk.

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

TRZ000822

*Knowledge-Based Implementation*

They also appeared to feel a need to take charge, so that the group would meet its targets and produce a result.

On the other hand, some of the IIMTP team were more interested in applying various theoretical constructs to a real problem. As academicians, they chafed at attempts to manage their activities. They were subject to an entirely different set of pressures, including their concern to produce a working system for BC/BS and to publish worthwhile research findings for the academic community. BC/BS team members' discomfort increased whenever the university participants addressed research issues that did not seem to be directly related to producing concrete results on schedule. Tension resulted on both sides, culminating in arguments about how the project should proceed and what the system design should look like.

### Inter-Organizational Relations

The importance of an initial prototype to maintain the expert's interest and to focus on relevant issues is well documented (Smith, 1984). Partially as a result of working with this prototype, the reviewer became a proponent of a knowledge-based approach and was the system's most enthusiastic spokesperson. Having a "champion" or a sponsor (McDermott, 1981) was a crucial element in convincing BC/BS to continue funding the project beyond the exploratory stage, especially in light of the tension between the corporate and academic cultures.

Presented with a working pilot prototype and an enthusiastic champion, BC/BS's management decided to fund the second phase of the joint venture. BC/BS and IIMTP made some changes in their working relationship to lessen the difficulties encountered during the first phase. These changes are discussed below.

## Phase II: building a prototype

### Objectives

The primary purpose of the second phase of the joint venture was to build a prototype system that addressed the entire review process, of which eligibility was only a part. A successful prototype would demonstrate the feasibility of creating a production version of the system.

### System Design and Problem Solving Approaches

Even though the eligibility issue had been solved, the remainder of the problem seemed much more difficult. The remaining part of the problem was to determine if health care services were medically necessary. Medical necessity involved assessing the patient's diagnoses, surgical procedures, the length of time since they occurred, and the severity of the patient's condition.

Initially the knowledge engineering group assumed that the problem required diagnostic knowledge. The knowledge engineering group was concerned that the system would need to reason about the underlying physiological mechanisms of the body and a patient's subsequent recovery.

In hindsight, describing the problem in terms of monitoring certain indicators on the claims and medical records is more appropriate. The system flags claims for subsequent human review if these indicators fall outside a specified range (Clancey). The reviewer used the recency of the patients' diagnoses and the severity of their condition to determine the propriety of the kind and level of health care services. Such systems, as Brown (1984) describes, "encode experiential knowledge, or empirical associations, that an expert has accumulated after seeing many similar situations . . . This kind of knowledge underlies the handling of typical cases or standard problems." (p. 85)

If this knowledge had been represented using an if-then formalism, the knowledge base would have been huge. For example, to represent 500 diagnoses and surgical procedures and the expected levels for weekly services for 100 weeks for six types of health care services would have required 300,000 production rules (500 × 100 × 6). Instead, a way to represent this knowledge was devised using a series of arrays. This insight was the first of two breakthroughs that simplified system design.

These arrays could have been put into the rulebase, but even a small number of them slowed system performance considerably. The team discussed what should be done. One viewpoint suggested that building the prototype first was more important than performance considerations. Another viewpoint suggested that if the prototype performed too slowly during demon-

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

TRZ000823

strations, BC/BS's management would not consider a production system feasible.

The second viewpoint won out. The arrays were placed in a database separate from the rule base. One of the BC/BS participants devised a graphic-interface that an expert could use directly to build arrays without the assistance of a knowledge engineer. Rule-based templates were used to extract the appropriate ranges of indicators from the arrays in the database and check the claim against them.

The eligibility prototype had been interactive, and up to this point so had the extended prototype. It became obvious that while a complete system in consultative mode might be a useful tutor for inexperienced reviewers, it would seriously degrade the productivity of more experienced reviewers.

Furthermore, the arrays were based on an average patient with a particular diagnosis. The reviewer used textual information on the medical forms to determine how the individual patient deviated from the average. Although some members of the knowledge engineering team were interested in trying to have the computer interpret the free-form text, the prevailing opinion was that such an approach was too difficult and too risky.

The system design changed from an exclusively consultative mode to a combination of batch processing and consultation. One would continue to read text to determine if the patient were better or worse than the average profile in the database and override the system's recommendation if necessary. Such a design might have produced some gain in productivity, but expecting human reviewers to wait at terminals to be queried by the automated system seemed unreasonable. Besides, the reviewers would need to read most of the form before coming to a decision, and they could make decisions faster without the system. This approach was not satisfactory.

The second breakthrough took place at this time. The reviewer was troubled by the use of an average profile. She felt that she needed an indicator of the severity of the patient's condition that could be used to assess the patient's potential for recovery. For example, severity of a heart attack affects the length and type of treatment.

The team discovered a single indicator on the forms that could be used as a proxy to classify the patient's recuperative potential. This was an

item-labeled prognosis, which consisted of five small boxes labeled from "poor" to "excellent." This indicator became a substitute for most of the reviewer's earlier, more elaborate verbal deliberations. It eliminated the need to read text and permitted a completely automated system without human intervention. This change eliminated the interactive mode. Rapid prototyping and interactive testing made it easy to rethink the problem and redesign the system.

## Intra-Group Dynamics and Project Leadership

Changes were made in the team's working relationships at the end of Phase I to alleviate some of the tensions between the academic and the corporate cultures. To reinforce the project as a research and development project, two participants from BC/BS moved into offices at IIMTP. Their relocation removed them from day-to-day pressure at BC/BS.

In keeping with the university's mode of operation, the knowledge engineering group was organized as a collection of peers to encourage diverse opinions and individual initiative. However, some problems arose from this arrangement. Neither the BC/BS participants nor the IIMTP participants had formal control over the other group. Since BC/BS was funding the project, its participants felt they should play a relatively greater leadership role. IIMTP's credibility was at stake because it said it could build a prototype. For this reason and because the faculty participants had more experience in building knowledge-based systems, IIMTP also wanted to play a greater leadership role. Differing amounts of time spent working on the project also caused problems. The team members from BC/BS and the IIMTP staff member were assigned full time to the project, whereas the faculty members and the graduate students participated on a part-time basis.

## Inter-Organizational Relations

The team completed a fully operational prototype before the end of the project's second phase. As a result of this and in spite of the tensions inside the team, relations between BC/BS and IIMTP were at their highest. BC/BS's senior executives were delighted that the gamble on a research and development project had succeeded. They perceived the knowledge-based system expan-

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

TRZ000824

ment as a success, largely as a result of the university's participation.

## Phase III: Integration into operations

### Objectives

This phase's objective was to recode the knowledge-based system in procedural language to achieve suitable run-time performance. Even though the core problem had been solved, the knowledge-based system lacked a completed database.

Most of these issues were straightforward, and they could have been accomplished without IIMTP. On the other hand, some factors indicated the need for IIMTP's continued involvement. IIMTP felt obligated to see the project through to the end. Both IIMTP and some managers at BC/BS were concerned that removing BC/BS participants from the university would result in their assignment to routine tasks in the company, leaving the knowledge-based system incomplete and unintegrated into production. The system required volume testing and a rigorous analysis of its results compared to those of human reviewers. IIMTP's participation was needed to design the test and to analyze and certify the results. BC/BS and IIMTP continued the joint venture in a third and final contractual phase.

### System Redesign

Redesign considerations were based on a batch mode approach in which paper forms (the patients' bills and supporting documentation) would be put into electronic form at company headquarters, screened by a parameter-screening module, and passed to the production version of the knowledge-based system. The knowledge-based system would review the claims, assemble justification for its recommendation, and send a result indicator ("pay" or "suspend") and the justification to the main claims system.

Because denied claims almost always result in appeals and additional costs to BC/BS, there was no incentive to be very strict. The system was designed to make a "pay" decision not only on clear-cut but also on borderline situations. Medical service providers never appeal an overpayment, and HCFA only questions clear-cut

abuses. Therefore, minimal risk was incurred by acting on "pay" decisions without human intervention. In contrast, human reviewers would examine suspended claims, first, in case additional documentation was needed either to pay or deny, and second, because erroneous denials created extra costs.

The bias toward paying was used to increase efficiency. The knowledge-based system was redesigned to halt review of the claim when sufficient data had been collected to conclude that total services billed were authorized for reimbursement. In this situation there was no need to further analyze the claim. On the other hand, if not all services were authorized it was necessary to have a human reviewer look at the reason for partial nonpayment.

### Intra-Group Dynamics and Project Leadership

The first two phases had been oriented toward research and development. This third phase, implementation, was quite different in nature. The BC/BS team members assumed a greater leadership role, while IIMTP participants assumed the role of protecting the integrity of the system design.

### Inter-Organizational Relations

During this period, BC/BS was developing another major automated system, which in part would serve as the mechanism to pass data to the knowledge-based system. This second project was a higher priority, and it consumed large amounts of the company's resources and management attention. The team concentrated on recoding the knowledge-based system so that it would be available to go into production in conjunction with this other system. Neither BC/BS nor the knowledge engineering team had time to plan how to integrate the knowledge base into BC/BS's daily operations. Furthermore, resources were not available to create a framework to monitor and develop the system over time or to transfer its problem-solving structure to analogous claims monitoring areas.

To populate the database, the knowledge engineering group adopted a strategy similar to the one used by the Digital Equipment/Carnegie-Mellon development team on their computer configuration expert system. That development

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

TRZ000825

team decided to wait until a component showed up on an order before adding it to the parts database (Bachant and McDermott, 1984). The claims review knowledge-based system produced a report of missing diagnoses that needed to be added to the database. Unfortunately, with few resources to devote to testing, few diagnoses were added to the database during the early stages of testing.

In an early formal test, the knowledge-based system reviewed a set of claims used by HCFA for quality control testing. The system arrived at appropriate decisions for approximately 70% of the claims without further human review. Most of the remainder needed to be reviewed by a human because the database was incomplete. (Although the system designers anticipated that 5-10% of all claims would require human review because of expected suspensions and circumstances not accommodated by the system, almost all the suspensions in this test resulted from diagnoses missing from the database.) Therefore, as BC/BS prepared to implement IIMTP's plan for final system validation and installation a delay occurred while more diagnoses were added to the database.

## Conclusion

### Risk management

Although BC/BS of South Carolina funded the joint venture with the IIMTP in its entirety. Its successful outcome should not obscure the very real risk of the undertaking. There was no guarantee that any result would be forthcoming. BC/BS reduced its risk by creating opportunities to stop the joint venture at the end of each phase if the problem proved insoluble within a reasonable expenditure of time and money. The joint venture's initial objectives were modest. The costs were justifiable in relation to projected benefits. Risk diminished as the problem unraveled.

### Problem-solving approach

A refrain that occurs over and over in the current literature on building commercial knowledge-based systems is to select a problem and a design that can be solved using available technology. During this project, the knowledge engineering team discussed processing natural language and modeling the patient's diagnoses

and recuperative potential. Little is known about solving problems using these approaches. From the very first, the expert reviewer explained how decisions were made in "if-then" terms, a clue that the problem involved surface knowledge. By deciding to stay within the limitations of the available technology, an approach that found relevant indicators in the medical records, a common pattern to their use, and a constrained representation schema was discovered.

### The knowledge engineering group

Some of the desirable qualities for a knowledge engineer include analytical abilities, an ability to develop rapport with an expert (Harmon and King, 1985), curiosity, unconventional educational backgrounds (Taylor, 1985), and conventional programming skills (Smith, 1984). Unconventional educational backgrounds often include individuals with an education in the core areas of artificial intelligence, computer science, linguistics, philosophy, and psychology. Harmon and King (1985) also recommend considering instructional designers (who modernize, design, and impart knowledge), technical writers (who identify "objects," "attributes," and "values" and prepare technical specifications), and managers (who sort out complex organizational policies in writing) as candidates for the development team. Finally, the prospective knowledge engineers should be provided with training knowledge engineering methodology and programming from an experienced source. The knowledge engineering group for this project had backgrounds in computer science, linguistics, and psychology, and they received training in knowledge engineering methodology and programming from the vendor of the expert system shell.

### Project management

This project had three distinct objectives, which had varying degrees of explicitness in delineating responsibility and determining performance measures.

The first objective was learning. It was not explicit who should learn what. For example, the faculty members who had actively participated in the design of the prototype during Phase I reduced their level of activity in Phase II to allow other members of the group more opportunity to become actively involved. Some members did not take advantage of this opportunity. Since this

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

TRZ000826

objective was not clearly stated, there was no way to correct this situation.

The second objective was to learn the knowledge engineering approach. This aspect of the project involved both knowledge engineering and technical support. The faculty members had greater experience in knowledge engineering. The BC/BS participants had greater experience in using microcomputers. As a result, technical leadership shifted back and forth, but not always at the appropriate times. A more explicit delineation of responsibility would have eased this problem — at the expense of the learning objective.

The third objective was administrative. IIMTP was clearly responsible for administrative details at the university. BC/BS participants were responsible for handling administrative details such as arranging interviews with BC/BS employees. Administrative leadership was divided.

There was no simple solution to these problems. A balance was needed among learning, technical leadership, and administration. Organizations entering into a similar joint venture need to staff it with people who are flexible and have a high tolerance for ambiguity.

### Inter-organizational relationships

Companies and universities are very different organizations. These differences are apparent in inter-organizational relations and in the dynamics of our joint knowledge engineering group.

A senior vice president at BC/BS was disappointed with the organizational dynamics. Friction occurred from differences between the two organizational cultures and between individuals. BC/BS chose its most "academic" people to participate, all of whom had received vendor training in developing knowledge-based systems; but this did not contribute to as smooth of a working relationship as was expected. In part, this friction arose, because each group felt the other side was not giving enough credit for what the group knew of knowledge-based systems.

A certain level of cultural tension should be expected and tolerated. Nonetheless, at various times, different perspectives and skills contributed to better task definition, design suggestions, and technical solutions.

### Middle ground for AI applications

A senior vice president at BC/BS commented that when the project took academic ideas and people and put them together with production-oriented people, a "gray area" was discovered that is ripe for exploitation. This is an area between leading-edge artificial intelligence and everyday data processing. Many applications that are "not sophisticated enough" for artificial intelligence researchers offer promising opportunities for organizations that depend upon information systems.

### The development cycle and implementation planning

Careful attention needs to be paid to the role that the knowledge system will play in the organization, designing it to complement existing work processes, and making its future users accustomed to the benefits it will provide them in their daily jobs. Their early involvement will speed the implementation process.

Although the results of a single case study cannot be taken as universal truth, they do provide indicators of where other companies in similar situations may look for problems and opportunities. In retrospect, it seems useful to assess how this joint venture fared in relation to the other options that were available to Blue Cross and Blue Shield of South Carolina.

Developing internal expertise overcame a tight job market for AI skills. The few candidates available in the marketplace were more expensive than the company was willing to pay. Similarly, consultants with extensive background in AI were far away and too expensive. Considering these factors, the company's decision to train existing employees as knowledge engineers is a solution that many organizations are likely to follow.

The joint venture created a partnership. IIMTP was willing to risk its reputation to demonstrate it could provide leadership in an exploratory study of knowledge-based systems. BC/BS, in turn, was willing to risk funding for the venture. Both risks paid off, and comments from involved managers at BC/BS indicated that they viewed university participation as a major factor in the successful outcome.

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

TRZ000827

The joint venture had an adherent whose support and enthusiasm convinced corporate management that success was possible. As noted earlier, the demonstration of feasibility (Smith, 1984) is largely intended to convince the expert that a knowledge-based approach can help solve significant problems. The experience gained in the project is consistent with this insight. The reviewer initially told BC/BS's top management that she did not believe the automating the review of these health care claims was possible. Her change of opinion during the exploratory phase was a persuasive argument to continue funding for the second contractual phase.

The joint venture has given BC/BS a new awareness that problems they could not solve with automation five years ago now may yield to artificial intelligence techniques. As a result, BC/BS needs to re-evaluate many other systems besides Medicare.

These experiences between BC/BS and IIMTP suggest that joint ventures between business or government organizations and universities may be a viable way to develop knowledge-based systems. The organizations engaging in such a venture should limit their risks by proceeding with a series of small projects, which can be terminated if they are not working out. A productive relationship can result, even if the two cultures do not blend easily.

## References

Bachant, J. and McDermott, J. "R1 Revisited: Four Years in the Trenches," AI Magazine, 5:3, Fall 1984, pp. 21-32.

Blue Cross and Blue Shield of South Carolina and Companion Corporation. Annual Report, Columbia, SC, 1984.

Bobrow, D.G., Mittal, S., and Stefik, M.J. "Expert Systems: Perils and Promises," Communications of the ACM, 29:9, September 1986, pp. 880-894.

Brown, J.S. "The Low Road, the Middle Road, and the High Road," in The AI Business: The Commercial Uses of Artificial Intelligence, P.H. Winston and K.A. Prendergast (eds.), The MIT Press, Cambridge, MA, 1984, pp. 81-90.

Buchanan, B.G., Barstow, D., Bechtal, R., Bennett, J., Clancey, W., Kulikowski, C., Mitchell, T., and Waterman, D.A. "Constructing an Expert System," in Building Expert Systems, F.

Hayes-Roth, D.A. Waterman, and D.B. Lenat (eds.), Addison-Wesley Publishing Company, Inc., Reading, MA, 1983, pp. 127-197.

Clancey, W.J. "Heuristic Classification," Stanford Knowledge Systems Laboratory, Department of Computer Science, Stanford University, Palo Alto, CA (undated).

Harmon, P. and King, D. Expert Systems: Artificial Intelligence in Business, John Wiley & Sons, New York, NY, 1985.

Hayes-Roth, F. "Rule-Based Systems," Communications of the ACM, 28:9, September 1985, pp. 921-932.

Johnson, P.E. "What Kind of Expert Should a System Be?" The Journal of Medicine and Philosophy, 8:1, February 1983, pp. 77-97.

Keen, P.G.W. "Decision Support Systems: A Research Perspective," in The Rise of Managerial Computing: The Best of the Center for Information Systems Research, J.F. Rockart and C.V. Bullen (eds.), Dow Jones-Irwin, Homewood, IL, 1986, pp. 25-48.

Kerschberg, L. "A Proposal for the Development of an Expert System for Medical Claims Processing: MEDCLAIM," Institute of Information Management, Technology, and Policy, College of Business Administration, University of South Carolina, Columbia, SC, July 1985.

McDermott, J. "R1: The Formative Years," AI Magazine, 2:2, Summer 1981, pp. 21-29.

McDermott, J. "Building Expert Systems," in Artificial Intelligence Applications for Business, Raiman (ed.), Ablex Publishing Corporation, Norwood, NJ, 1984, pp. 11-22.

Smith, R.G. "On the Development of Commercial Expert Systems," AI Magazine, 5:3, Fall 1984, pp. 61-73.

Taylor, E.C. "Developing a Knowledge Engineering Capability in the TRW Defense Systems Group," AI Magazine, 7:2, Summer 1985, pp. 58-63.

Weitzel, J.R. and Kerschberg, L. "Developing Knowledge-Based Systems: Reorganizing the System Development Life Cycle," working paper, University of South Carolina, Columbia, SC, and George Mason University, Fairfax, VA, December 1986.

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

TRZ000828

*Knowledge-Based Implementation*

### About the Authors

John R. Weitzel is Assistant Professor of Management Science in the College of Business Administration at the University of South Carolina, Columbia. He has a Ph.D. in Management from the University of Cincinnati. Dr. Weitzel spent 13 years as a programmer, systems analyst, and project manager for computer-based information systems, primarily in the banking industry. His research interests include the strategic use of information systems, implementation of information systems, and applications of artificial intelligence to management information systems and decision support systems.

Kenneth R. Andrews was, until recently, a Senior Research Associate with the Institute of Information Management, Technology, and Policy in the College of Business Administration at the University of South Carolina, Columbia. While with the Institute, he was involved in strategic planning for information resources for several major state agencies in South Carolina and in the development of a knowledge-based system for Blue Cross and Blue Shield of South Carolina. Prior experience included budgetary, financial, and program analysis in banking and local government administration. He holds graduate degrees in Public Administration (from the University of North Carolina, Chapel Hill) and Slavic Linguistics (University of Illinois). He is currently pursuing a Ph.D. in Linguistics at the University of South Carolina.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

TRZ000829