# EXHIBIT 24



## THE INFORMATION EXCHANGE

O ne of the critical keys to keeping pace in the competitive insurance industry is finding ways to capitalize on the latest concepts in technology. Insurers who can't afford to sit placidly on the sidelines have long known that their destiny lies on the leading edge.

Increasingly, that leading edge is being found beyond the confines of traditional data processing in a fresher frontier — the territory of artificial intelligence (AI). In the land of AI, computers are much more than number-crunchers; they're "expert" decision-makers and idea generators, and their systems are capable of giving human counterparts a real run for their money. The results are increases in efficiency and productivity.

Of course, the theory behind AI is nothing new — but many of the applications backing that theory are. The AI-based systems being marketed by software vendors today can underwrite, adjudicate, process, model and plan with expert style. They speak the insurers' language and, best of all, they're both practical and proven. Some highlights and examples follow.

 Christy Snyder

**The Personal Finance Frontier**

Expert systems for financial service institutions are among the most widely promoted, and may be useful to insurers whose services include personal financial planning. These systems go a long way toward reducing the time and trouble inherent in offering personal financial planning.

One vendor of personal financial planning software is Sterling Wentworth Corporation, Salt Lake City, Utah. The company's Financial Planning System is made up of three standalone, but fully integrated, components: Planman, a personal financial planning expert system; Database, a client tracking system which stores clients' financial information for ready access; and Graphics, which automatically creates charts and graphs from the tables and numbers in Planman-generated financial plans.

Planman operates on the IBM Personal Computer (PC), AT, XT and compatibles. Clients fill out a questionnaire regarding their financial status, goals and personal philosophies, and the questionnaire is then entered into the system in a matter of 20 to 25 minutes. The system generates reports in eight to 40 minutes, depending on the hardware, and puts them in word processing files where they may be accessed for editing by the planner. Topics include taxes, cash flow, portfolio management, debt level, retirement planning, educational funding, estate planning, and life, disability, property and casualty insurance.

The Warren Agency Inc. (doing business as Financial Concepts), based in Fort Lauderdale and Marathon, Florida, has been using Planman on an IBM PC-XT for about three years, according to Dave Warren, president. The agency deals in life insurance, health insurance and investments, and uses Planman to develop personal financial plans for clients.

Warren reports that the system's

MCK 028137
04-CV-1258-SLR (D.Del.)

## REALITY

features include analyzing whether current insurance rates are competitive, calculating a dollar amount of liquidity, and recommending the types of insurance policies which would be most appropriate for clients, based on their individual circumstances.

Prior to adopting Planman, the agency was using another system that "was nothing more than an enhanced Lotus 1-2-3," according to Warren, and required the planner to spend hours developing reports after the numbers had been run. "Planman does 80 percent of that for you," he says. With regard to using Planman versus preparing a report manually, he comments, "If you put out a 40-page report to a client that covers every aspect of this personal financial plan, it'll save you about 10 to 12 hours per report."

### Inroads in Decision Support

Execucom Systems Corporation of Austin, Texas, a veteran vendor of financial modeling and decision support systems, has introduced Interactive Financial Planning System (IFPS)/Plus 3.0, which now allows IFPS users to ask their computers "why" in addition to "what-if" and "how" questions, and get the answers in plain English.

A combination of expert system and natural language technologies, IFPS/Plus 3.0 was developed by Execucom Systems along with artificial intelligence experts at the Intelligent Systems Laboratory at Carnegie-Mellon University in Pittsburgh, Pennsylvania.

"It is an extension of the interrogation facilities of the traditional decision support system — one in which the user now begins to have more of a dialogue with the actual model structure itself," says Kirk Jones, vice president of research and development. "It specifically is designed to support a class of questions that users have not been able to ask in the past."

These questions inquire into the reasons for trends that become evident in the course of traditional financial modeling. For example, the user might ask about the reasons for dips or peaks in multicolumn patterns, such as "Why did net income go down in the third quarter?" The system analyzes the pattern and the variables that contribute to it, and offers a plain-language response, such as "Net income went down in the third quarter because sales declined in region four."

### The Advent of the Automated Operator

If insurance companies are called upon to field questions from policyholders and agents routinely, and the most obvious means of handling that responsibility is to train human operators to respond to phone inquiries. There is, however, an alternative.

The Continuum Company Inc., an Austin, Texas-based provider of software and services to the life, health and financial services industries is exemplifying it via an exclusive value-added reseller agreement with Syntellect Inc., a Scottsdale, Arizona-based manufacturer of a family of trainable voice and data information systems called infobots.

"Infobots utilize AI technology to emulate the exact keystroke sequences that a human operator would use to access information and then report the information from the screens to the caller," explains Brian Mulconrey, director of marketing at Continuum. They effectively combine voice and expert system technologies, capturing, digitizing and recombining the voice, and utilizing the expertise of terminal operators.

Continuum has pre-trained infobots to be fully compatible with its proprietary products: Life-Comm, Life/70 and Client/Contract Administration (CCA). Additionally, the firm has designed training programs to train companies' staffs to adapt infobot to work with their own applications if they have other software packages or internally-developed systems. "We may not have trained infobot to access a particular company's claims system, but that doesn't mean that that company's personnel can't sit down with infobot and within a short period of time, train it to do what it needs to do," stresses Mulconrey.

"Training infobot can be thought of as very similar to training a new employee to access a system," says Mulconrey. "It's not really a programming effort." Rather, the trainer simply keys into a terminal the same sequences of keystrokes that a human operator would use. "It doesn't require any changes to the applications programs," he continues. "It fits in between the CRT controller and the telephone switch and replaces the functions of the terminal operator."

Infobots offer several advantages over human operators. They reduce the training problems associated with frequent turnover among lower-level clerical employees, and eliminate the potential for poor service that may result with inexperienced operators. Additionally, Mulconrey states, "You rarely find in one person the knowledge necessary to do as many things as the infobot can be trained to do."

A call to a demonstration version of an actual infobot (courtesy of Continuum) provided me, posing as a policyholder, the option of requesting premium billing information, loan information, an annual statement, investment fund value and/or interfund transfers. Upon assuming the identity of an agent, I was given the option to request year-to-date commission amount and/or national quality awards standings. (Note: These options would vary from one company to another in accordance with individual needs and preferences.) Selecting an option entailed the push of a button on the telephone keypad (e.g., press one for premium billing information, press two for loan information, etc.).

Access to the system involved entering either a policy number or an agent identification number. (Additional layers of security, in the form of personal identification numbers or passwords, may be added to the system if desired.)

The polite, female voice providing the information sounded very much like that heard on a telephone directory assistance recording — though perfectly understandable, the inflection of the voice varied incongruously at times. Throughout the recording, I was repeatedly given the opportunity to have options repeated, change my request and, most importantly, to have the call transferred to a human assistant if I so desired.

All in all, the system presented itself as a non-intimidating, unimposing and efficient way to obtain information on an as-needed basis. In this user's opinion, chances are good that the friendly computer operator will score a victory among both insurers and insureds.

The program requires no programming on the part of the user. "All users have to do is write an IFPS model and the system keys off the model itself," says Jones, noting that it also will work with any existing IFPS models.

Although IFPS/Plus 3.0 is marketed on a cross-industry basis, insurance is one of the industries that Execucom has penetrated heavily. Execucom is a subsidiary of Travelers/Diebold Technology Company of Chicago, a joint venture of The Travelers Insurance Company and John Diebold Management Consultants located in New York City. The new product is available for IBM MVS/TSO and VM/CMS, Digital VAX, Prime and selected Unisys Corporation environments.

continued on page 26

MCK 028138
04-CV-1258-SLR (D.Del.)

## REALITY

continued from page 24

**Business Overseers**

InsureLink Corporation, Annapolis, Maryland, has announced the development of Knowledgelink, an expert system technology which interfaces to InsureLink's data base, the DataLink Insurance Management System. Knowledgelink has three modules: Business Manager, Underwriters' Assistant and Adjusters' Assistant.

Business Manager is driven by the book of business and loss experience data base to control exposure, decide constraints on reserve, and establish acceptance rules and premium adjustments. Underwriters' Assistant operates directly from application information to rate applications, handle deviations and produce exception reports to monitor departure decisions. Adjusters Assistant simplifies and speeds the adjusting task, and can explain the adjustment rationale and monitor adjustment costs. Together, these components oversee several aspects of the insurance business.

Currently undergoing beta testing, Knowledgelink runs on IBM, Honeywell and Digital Equipment Corporation (DEC) minicomputers and mainframes. Additionally, some portions of the system may be pulled down to an IBM PC or Macintosh personal computer, which provides greater graphics capabilities.

The Palladian Operations Advisor from Palladian Software Inc., Cambridge, Massachusetts, also has the ability to oversee business functions. Its function is to model various processes, thereby examining such issues as capacity, consolidation, staffing and the introduction of automation, says Andy Audet, account manager.

It allows the user to ask what-if questions in the course of examining proposed changes to flows and operations. For example, the user might inquire about the effects of adding new products, hiring new staff or increasing automation. The ultimate goal is to optimize operations.

Though the product was not designed exclusively for insurers, an insurance firm was one of several types of companies called upon to provide input during the development phase. On the market for less than a year, the Palladian Operations Advisor runs on Lisp workstations — the Symbolics 3600 Series and the TI Explorer. Palladian is investigating moving the technology to more conventional machines as well, says Audet.

**Automatic Adjudication**

Policy Management Systems Corporation (PMSC), Columbia, South Carolina, has introduced a new claims-handling system called ExClaim. A commercial workstation operating on a local area network of IBM PC-ATs, ExClaim completely automates the health claims adjudication process.

The claims examiner prompts ExClaim by entering basic claim information, such as the claimant's name and address, dates of service, amounts of charges, provider information, diagnoses, procedures performed, and category of service (office visits, inpatient or outpatient surgery, etc.). Based on that data, ExClaim then determines the resultant payment or final reconciliation of the claim, which the claims examiner may review if he so chooses.

Keith Wild, division manager for ExClaim product management and services, explains that the system contains an underlying base of knowledge regarding how to operate in the claims industry. Beyond that, there is a layer of customization consisting of parameters which are defined on a per contract basis to accommodate variable factors. "This customization would be done by a senior claims examiner or contract administrator — someone who can translate a contract into the adjudication logic," Wild says.

While ExClaim is designed to ultimately make claims departments self-sufficient, the initial set-up typically involves data processing professionals. Their expertise can aid the firm in migrating from whatever existing technology is being utilized (usually a Cobol, mainframe-based system) to the new PC-based system, which is written in the Lisp and C languages.

ExClaim increases productivity in a number of areas. One of these is volume. Says Wild, "There should be

### An Eye on the Competition

Curious about what the competition is up to in the expert systems arena? A recent survey commissioned by Coopers & Lybrand, a New York City-based "Big Eight" accounting and consulting powerhouse, reveals some scintillating insights with regard to the artificial intelligence (AI) endeavors of major insurers. The survey, conducted during the first half of 1986 by the Decision Support Group of Coopers & Lybrand in cooperation with Schubert Associates, an independent research firm, is based on the responses of 92 of the nation's 100 leading insurance companies — the top 50 life and top 50 property and casualty insurers. The resulting report, titled *Expert Systems in the Insurance Industry*, addresses six key areas: level of activity among insurers, attitudes toward expert systems, application areas, benefits sought in expert systems, proposals, approaches to expert systems development, and perceived obstacles to progress. Following are excerpts from the report's executive summary.

While only two percent of the respondents reported actually using expert systems, less than three percent said they never intend to undertake expert systems activities. The remaining 95 percent fall somewhere in between these two extremes. Roughly a third of the companies interviewed are undertaking expert systems activities, and another third have research planned. Of those currently uninvolved in expert systems activities, more than half expect to begin development within three years, and another 30 percent have a definite timetable of more than three years, says the report.

Just how important is this new emphasis on expert systems applications? Interestingly, nearly half of the respondents were unsure, stating, "It is too early for us to have an opinion." Among those who did feel confident enough to voice an opinion, the most common response was, "We need the technology to gain a strategic advantage or get ahead of our competition." Sixteen percent went so far as to characterize expert systems technology as a matter of life or death, responding, "We will need the technology to survive against our competition."

With regard to application areas being emphasized, Dr. David Shpilberg, principal in charge of Coopers & Lybrand's Decision Support Group, summarizes, "Insurers are not merely thinking of expert systems in abstract terms; they are using, developing or planning specific applications — in essence, focusing on the nuts and bolts of moving the technology from the laboratory into the practice."

Overall, the most popular applications among emerging expert systems are underwriting, claims and investment planning and management. However, the report notes that different priority patterns emerge between property/casualty and life insurers. Personal financial planning ties with claims as the second major

MCK 028139
04-CV-1258-SLR (D.Del.)

area of interest for life companies. Further, property/casualty carriers show an interest in applications such as product matching and risk management, while life carriers are seeking marketing/sales support.

Nearly half of the respondents cited improved quality and consistency of employee output as the primary benefit sought from expert systems. The more active the respondent, the greater the emphasis tended to be on qualitative as opposed to quantitative benefits. Similarly, those active in expert systems have a tendency to stress other possible benefits such as return on investment and increased productivity. The same benefits expected from traditional data processing systems. Shpilberg comments: This would indicate a lack of awareness of the fundamental differences between expert systems and traditional data processing. The actual overall, practically prevailed. Fewer than five percent of respondents indicated a technology for technology's sake mentality as their motivation.

Fifty-six percent of those involved in expert systems development was found to be using both internal and external resources. Similarly, those undertaking internal development are heavily relying on a combination of proprietary and commercial tools. While companies ultimately desire customization to the fullest extent, commercially available systems are serving to fill the gaps in proprietary expert systems expertise.

One of optimism, all is not coming up roses in the garden of development. Shortages of current development tools and technical people & knowledge engineers were cited as obstacles by one-third of survey participants.

The shortage of people is a significant problem, says Shpilberg, particularly for companies just beginning to explore the technology. A shortage of technical people is likely to remain a problem for the next few years until an increasing awareness of the field's growth potential generates a pool of knowledgeable talent.

Meanwhile, Shpilberg expects to see the level of activity increase greatly over both the short and the long term. For those who haven't yet gotten their feet wet in the wave of expert systems activity, there's still time to play catch-up. The report indicates that companies already using applications typically began formal planning between one and two years ago, while those currently building expert systems began planning a little as six months ago to as long as three years ago.

Summarily, the report observes: Clearly, a late start in the field doesn't necessarily mean a long-term competitive disadvantage. A well-planned approach can overcome an experience gap, as long as it isn't permitted to grow too wide.

Note: Copies of the detailed study report, Expert Systems in the Insurance Industry, are available from Coopers & Lybrand for $75 each. To order, call Dr. David Shpilberg at 212-536-3385.

more claims per day per examiner." Another benefit is a reduction in errors and an increase in consistency among examiners, due to the fact that the system makes the same decisions the same way every time. Further, Wild comments that "the need for high-level examiners should be reduced and an examiner with less experience should be able to do a higher volume and quality of work than before." Finally, productivity gains are achieved through the product's PC-orientation. The PC provides quicker response and is neither dependent upon nor in contention with the mainframe.

On the drawing board, PMSC has plans to add mainframe connectivity to the system to increase the volume of claims that can be processed, and to address issues of data distribution, consolidation and control. Wild also states that PMSC is actively pursuing expansion of the system's capabilities into other areas, such as property and casualty insurance.

**Underwriting Made Easier**

The Underwriting Advisor from Syntelligence Inc., Sunnyvale, California, aids underwriters in the process of risk evaluation. It helps underwriters to determine whether a given risk would be acceptable to the insurance firm and, if so, assists in the evaluation of all pertinent factors. The Underwriting Advisor enhances the productivity of relatively inexperienced underwriters in much the same way that the aforementioned ExClaim assists claims examiners. It assures consistency and offers managers increased control by guaranteeing that procedural dictums and changes are automatically instituted among all underwriters.

An added plus is the system's compatibility with existing mainframe applications, including rating and coding systems on the front and policy processing systems on the output side.

A new release of the Underwriting Advisor provides enhancements to the input process, which now accepts items

such as loss history, reformatting the data when necessary; the output process, to make underwriting risk characteristics accessible for management or financial reporting; and an enhanced underwriting component, which shows reasoning.

Cogensys Corporation, La Jolla, California, is also vending an expert system technology with the potential to revolutionize the underwriting process. Cogensys Judgment Software teaches the computer to acquire the "pragmatic expertise" of human underwriters, says Andrew Jaine, senior vice president of marketing.

"Most traditional expert systems are rule-based systems which require the expert to translate his or her expertise into a set of explicit rules," Jaine explains. "We don't do that at all." Cogensys has bypassed this knowledge engineering phase by inventing a technology whereby the system learns by example. Generally speaking, 500 to 800 examples are required to teach the system underwriting. Human underwriters, who need have no data processing experience, simply provide the system with the data used to make a decision (i.e., the data from the application form), and the final decision made (i.e., whether the application is accepted or rejected). The system builds a model of the decision-making process via induction, ultimately acquiring the ability to make judgments in the same way that the institution's own experts make judgments.

The result is a highly individualized system. "Most vendors that are developing expert systems using conventional AI technology hire their own people from the industry and implement what is, in essence, a consensus of the right way to do underwriting in the opinion of those hired," Jaine asserts. "We don't do that because the thing that differentiates insurance companies is their ability to be competitive through accepting or declining different underwriting situations. That is a very specific, individual capability.

"Our focus right now is underwriting, but any area in which an institution can see the need to capture and emulate human judgment is an area in which we can have them train a system," Jaine concludes. "The process of training is the same."

Cogensys Judgment Software is available for IBM PCs or compatibles, including local area network configurations. In addition the product will

MCK 028140
04-CV-1258-SLR (D.Del.)

# REALITY

soon be available for IBM mainframes and Unix-based hardware.

Indianapolis, Indiana-based PALLM, Inc. is developing a workstation for managers, underwriters and decision makers that will consist of a large expert system for underwriting workers' compensation insurance in the property and casualty arena. A beta version of the system is slated to be released this summer.

The system runs on Digital Equipment Corporation's Micro-VAX and provides 3270 transparency so that it can be networked into clients' mainframe administrative systems. Larry Laswell, vice president of product planning, emphasizes the importance of this integration. "If you treat an expert system like an island, if that expert system is not integrated to the rest of the world where all the information comes from and goes, you lose a great amount of productivity."

The system contains a core of underwriting knowledge which will be tailored to meet individual clients' needs. "The basic system we've built has about 50 percent of the problem solved for moving into any other type of liability or personal line of underwriting," Laswell says. "The inferencing strategies and key components are there so we could very quickly add knowledge bases for additional lines of insurance."

### The Big Picture

While the aforementioned PALLM professional-level workstations/expert systems can be used on a standalone basis, they are actually just one component or building block of a much more comprehensive workstation environment currently under development.

Laswell explains that about 80 percent of the professional-level workstation is AI-based (the other 20 percent entailing traditional data processing to integrate the workstation with the normal policy administration system). In the overall workstation environment, however, that equation is reversed: Only about 20 percent of the total environment's functionality is actually based on AI. In this latter environment, AI capabilities exist in the form of small "kernels," designed to address particular problems that cannot be appropriately solved with a traditional data processing approach.

This workstation environment merges several state-of-the-art technologies, including mainframe capabilities, laser storage of documents, desktop publishing, laser printing, networking and AI. It is based on a unique tomorrow-today philosophical approach to insurance data processing.

Those involved in the workstation development project began by asking themselves, "If we were to eliminate all current technological constraints by assuming, for instance, that we've just been set into the 28th century and anything that we want to be possible is possible, how would we want an insurance company to operate?" Based on



nformation on a customer can quickly be translated into bigger profits for the seller

this presumption, they designed a model of what the work flow should ultimately look like. They then proceeded by saying, "Given that this is what we want to accomplish, what technologies do we currently have to accomplish this and how should we configure and integrate those technologies?" From this line of thinking came the actual proposed workstation environment.

"The workstation environment operates not at the transaction level, but at the goal level," says Laswell. It will eliminate procedural worries, like the proper, physical entry of numerous transactions, and will free users to focus on the goal at hand.

The workstation environment will leave to existing mainframe hardware and software those policy administration functions for which they are best suited, such as premium calculation and information storage, and will instead address the administration that currently takes place at the desks of

clerks and managers. It will serve to gather intelligence, guide the user through company procedures, and make routine decisions automatically.

Although Laswell maintains that it will be applicable to virtually every area within an insurance company, initial efforts are focusing on new business, "because that is the beginning point of all administration." One AI-related feature of the system is that in the course of new policy administration, it can analyze given policyholder information and determine whether potential exists for related sales. For example, based on a new policy buyer's income and investment status, the system might determine that the buyer would be a good candidate for a tax-sheltered annuity. The system, in essence, would say to the user, "Historically, if we offer this type of product to this type of person, there is a 75 percent probability that he's going to buy it." Such valuable information can quickly and easily be translated into bigger dollars for the seller.

PALLM began preliminary investigation and research in mid-1985, moved forward with project planning at the beginning of 1986, and began staffing expert systems personnel in June. Final feasibility studies are underway, and the vendor expects to announce an availability date for the system in six to nine months.

Although the precise hardware implementation has not yet been determined, Laswell comments, "The insurance industry is 94 percent IBM, so we'll maintain at least IBM compatibility, if not the actual Big Blue name on the box."

When PALLM's workstation environment evolves from research to reality, its impact on insurance data processing is expected to be dramatic. Laswell concludes, "We feel that with the overall project we can achieve an increase in productivity in the order of 100 percent plus."

### Promises Made

Unsurprisingly, it's predictions like Laswell's that are turning the insurance industry's ears and initiatives toward the promise of expert systems. Promises they are, and to the extent that they are kept, insurance companies are assured of moving forward competitively and strategically as they converge on the leading edge.∎

*Christy Snyder is a high-technology writer working out of Milwaukee, Wisconsin.*

MCK 028141
04-CV-1258-SLR (D.Del.)

# EXHIBIT 25

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

525 UNIVERSITY AVENUE

PALO ALTO, CALIFORNIA 94301-1908
————
TEL: (650) 470-4500

FAX: (650) 470-4570

www.skadden.com

DIRECT DIAL
i0-470-4582
DIRECT FAX
38-329-4185
EMAIL ADDRESS
.GUYEN@SKADDEN.COM

FIRM/AFFILIATE OFFICES
————
BOSTON
CHICAGO
HOUSTON
LOS ANGELES
NEWARK
NEW YORK
SAN FRANCISCO
WASHINGTON, D.C.
WILMINGTON
————
BEIJING
BRUSSELS
FRANKFURT
HONG KONG
LONDON
MOSCOW
PARIS
SINGAPORE
SYDNEY
TOKYO
TORONTO
VIENNA

May 3, 2005

Via Federal Express

T.K. Roosevelt, Esq.
Gibson, Dunn & Crutcher LLP
Jamboree Center
4 Park Plaza, Suite 1400
Irvine, California 92614-8557

RE:    *McKesson Information Solutions, LLC v. The TriZetto Group, Inc.*
       *Case No. 04-1258-SLR (D. Del.)*

Dear Kevin:

Enclosed are documents which are being produced by McKesson Information Solutions bearing Bates Nos. MCK113278 – MCK127770.

Sincerely,

Khoi D. Nguyen

Enclosures

cc:    Jack B. Blumenfeld, Esq. *(w/o encls.)*
       Michael A. Sitzman, Esq. *(w/o encls.)*

# EXHIBIT 26

LEVINE & MANDELBAUM
ATTORNEYS AT LAW
EMPIRE STATE BUILDING
SUITE 7814
350 FIFTH AVENUE
NEW YORK, N.Y. 10118

PATENTS AND TRADEMARKS
TELEPHONE: 212-239-4162
TELECOPIER: 212-629-4204

ALAN H. LEVINE
OWARD F. MANDELBAUM

May 9, 1995

Scott H. Slayton, Esq.
Erisco, Inc.
1700 Broadway
New York, NY 10019

Re: GMIS, Inc. v. Health Payment Review, Inc.
Civil Action No. 94-CV-576

Dear Scott:

Enclosed are copies of the court docket for this case, four memorandum opinions with orders disposing of what appear to be a final round of summary judgment motions, and a stipulation of dismissal.

As anticipated, the case was settled on terms set forth in an agreement which is not part of the court record. The agreement is referred to in the stipulation of dismissal insofar as the court retains jurisdiction to enforce it.

From the memorandum opinions it can be seen that GMIS attempted to avoid a trial by seeking summary judgment that the patent claims were invalid as directed to unpatentable subject matter, for indefiniteness, and for failure to disclose the best mode of the invention. All of its motions were denied. HPR successfully moved to dismiss a claim against it for tortious interference with business relationships. Within two days of the denial of GMIS' motions the case was settled. From the timing, it would not be unreasonable infer that the settlement was at least partially favorable to HPR.

Please don't hesitate to call if you need anything further or have any questions.

Sincerely,

Howard F. Mandelbaum

Confidential

TRZ837459

# EXHIBIT 27

(68)

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

GMIS, INC.                                                    CIVIL ACTION
                                          JAN 1 9 1995

          v.                                    :

HEALTH PAYMENT REVIEW, INC. 7  :Dep. ClerkNO. 94-576
                                          MICHAEL E. KUNZ, Clerk

Newcomer, J.                                            January  1 9 , 1995.

                        M E M O R A N D U M

          Presently before the Court is plaintiff's First Motion

for Partial Summary Judgment (the "Best Mode" Motion), and the

defendant's response thereto.  For the reasons that follow, the

motion will be denied.

I.          Background

          This action was brought by plaintiff GMIS, Inc.

("GMIS") seeking a declaratory judgment that United States Patent

No. 5,253,164 (the "'164 patent") is invalid, unenforceable, and

not infringed.  The '164 patent issued on October 12, 1993 and is

based on an application filed on September 30, 1988.  Defendant

Health Payment Review, Inc. ("HPR") is the patent holder.

          The '164 patent is directed to an expert computer

system designed to detect improprieties in medical reimbursement

claims.  Health care providers submit claims for payment to

payors (i.e. insurance companies or self-insurers) using

standardized codes rather than verbal descriptions to detail the

procedures received by a patient.[1]  These coding systems permit

----

1.  An example of such codes are Current Procedure Terminology
Codes ("CPT Codes"), which are published by the American Medical
Association.  There are approximately 8,500 existing CPT Codes.
The codes are regularly updated.  Though the CPT Codes are the
most widely used in the health care industry, other coding
systems also exist.

TRZ000756

the payor to administer large volumes of claims efficiently and quickly. The coding system was not, however, without drawbacks. Some health care providers were engaging in a practice, known in the industry as "unbundling," where a single medical procedure with a corresponding code was billed as a series of included procedures, each with its own code, resulting in a higher aggregate price then the single, inclusive procedure warranted. The practice of unbundling was the impetus for of the computer system at issue.

Caterpillar, Inc. ("Caterpillar"), a large construction equipment corporation, has, since the early 1950s, been a self-insurer. The corporation faced continually increasing costs from its health benefits program. As one method of controlling costs, Caterpillar sought to develop a system that would permit it to determine if it was making appropriate payments on submitted claims. To this end, it hired Dr. Robert Hertenstein to work in its benefits department as Medical Director of Group Insurance. Dr. Hertenstein introduced the use of CPT Codes to monitor claims; he was able, through review of submitted claims, to recognize and correct unbundling. Caterpillar's health benefits costs decreased substantially.

Eventually, a computer program was developed which could perform this review function. This program became the subject of the '164 patent. Simply put, the computer exercises a set of decision making rules on a submitted claim. It is designed to identify medical service code that are inappropriate

2

TRZ000756

for billing together, and to suggest a proper alternative. The '164 patent uses a "predetermined database," comprised of the medical procedures, the codes and the interrelationships among the procedures and the codes. This database is likened to a physician's "knowledge base." The program applies this knowledge base to the submitted claims through the decision making rules, generating recommendations to pay the claim as submitted or suggesting modifications to the claim. The '164 patent discloses the entire computer program, the set of interpretive rules, and examples of how the rules are to be applied to the codes. It does not disclose the knowledge base as developed by its inventors (Dr. Hertenstein and his programming team).

GMIS now seeks summary judgment declaring the patent invalid for an alleged failure to disclose the inventors' contemplated "best mode" of carrying out the invention. GMIS contends that the particular knowledge base, or, in the language of the patent, predetermined database, used by the inventors in developing the program is the best mode of carrying out the invention.

II.    Summary Judgment Standard

A reviewing court may enter summary judgment where there are no genuine issues as to any material fact and one party is entitled to judgment as a matter of law. White v. Westinghouse Electric Co., 862 F.2d 56, 59 (3d Cir. 1988). "The inquiry is whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is

3

TRZ000757

so one sided that one party must, as a matter of law, prevail over the other." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).

This analysis required on a motion for summary judgment necessarily incorporates the substantive burden of proof that would fall on the parties at trial. Id. at 252-54. A patent carries a presumption of validity. 35 U.S.C. § 282; Continental Can Co. v. Monsanto Co., 948 F.2d 1264, 1266-67 (Fed Cir. 1991). The burden of establishing the invalidity of a patent is a heavy one. Nutrition 21 v. United States, 930 F.2d 867, 869 (Fed. Cir. 1991). To prevail on the instant motion, therefore, GMIS must demonstrate its entitlement to summary judgment by clear and convincing evidence based on undisputed facts. Multi-Tech Systems, Inc. v. Hayes Microcomputer Products, Inc., 800 F. Supp. 825, 833 (D. Minn. 1992), appeal dismissed, 988 F.2d 130 (Fed. Cir. 1993).

III.    The Statutory Best Mode Requirement

35 U.S.C. § 112 states, in pertinent part:

> The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, **and shall set forth the best mode contemplated by the inventor of carrying out his invention.** (emphasis added)

"best mode is a question of fact." Dana Corp. v. IPC Ltd. Partnership, 860 F.2d 415, 417 (Fed. Cir. 1988), cert. denied, 490 U.S. 1067 (1989). A best mode inquiry must be made

4

TRZ000758

in two stages. First, it must be determined if the inventor, at the time the patent application was filed, knew of a mode of practicing the invention which the inventor considered to be better than any other. Chemcast Corp. v. ARCO Indus. Corp., 913 F.2d 923, 928-29 (Fed. Cir. 1990). This first stage of inquiry is wholly subjective, focusing as it does on the inventor's state of mind. Id. at 929.

The second part of the analysis, addressed only if the first part yields an affirmative answer, seeks to determine if the disclosure made by the inventor is adequate to enable one skilled in the relevant art to practice the best mode. Id. This examination is an objective one, and its result depends on the scope of the claimed invention and the level of skill in the relevant art. Id. A finding that this second question is satisfactorily answered requires more than general reference to the best mode in the patent; the heart of the inquiry is the quality or adequacy of the disclosure. Spectra-Physics, Inc. v. Coherent, Inc., 827 F.2d 1524, 1536 (Fed. Cir. 1987).

IV.    Discussion

Both parties state that the '164 patent's inventors knew of a mode of practicing their invention, at the time of the filing of their application, that they considered to be superior to any other. Therefore, little attention is paid by the parties to the initial Chemcast inquiry of whether a best mode was contemplated. The parties' briefing of this motion centers around the second part of the best mode analysis, that is,

5

TRZ000769

whether the disclosure by the inventors was adequate. GMIS
contends that the inventors failed to disclose their best mode at
all, while HPR claims that GMIS misconstrues the scope of the
claimed invention and, thus, also misconstrues the adequacy of
the disclosure. As this Court views the facts as set forth in
the briefing, however, it appears that by concentrating on the
adequacy issue the parties have failed to recognize that their
agreement as to the inventors' contemplation of a best mode masks
an underlying disputed material issue.

     While both GMIS and HPR gloss over the initial stage of
the best mode inquiry with the simple statement that the
inventors knew of a best mode of practicing their invention,
neither realizes that there is no agreement as to exactly what
this contemplated best mode was. It must be recognized that as a
subjective foray into the minds of the inventors, the initial
inquiry is a difficult one to resolve without aid of a
factfinder. GMIS claims that, at the time of their patent
application, the inventors of the '164 patent considered the
knowledge base created by the programmers and Dr. Bertenstein to
be the best mode of carrying out the invention. There is
certainly evidence in the record before this Court that supports
this view. Because this knowledge base was not disclosed, GMIS
argues that the best mode requirement was violated.

     HPR claims, however, that disclosure of the knowledge
base was not required. As HPR casts the facts, the knowledge
base is an entity separate and distinct from the actual computer

6

TRZ000760

program and set of interpretive rules. While it is true that the program operates on a knowledge base, it need not operate on the knowledge base developed by the inventors. In fact, HPR continues, the knowledge base at issue became obsolete nearly as soon as it was created because of the American Medical Association's practice of providing frequent updates to the CPT Codes. Moreover, though the knowledge base developed by the inventors used CPT Codes, the program was designed to operate on other coding systems as well. HPR offers evidence that a team of experts could create a knowledge base quickly and without undue experimentation. All of this, HPR claims, supports the position that the failure to disclose the knowledge base was not inadequate considering the level of skill in the relevant art and the scope of the claimed invention. This Court believes that HPR has pointed to the facts which preclude entry of summary judgment without quite placing these facts in the context of the proper issue. Rather than relating to the adequacy of the disclosure, HPR's construct, which has record support, challenges GMIS' assertion that the inventors believed the knowledge base that they created to be the best mode of carrying out their invention.

The issue of what the contemplated best mode was is one which must be resolved by a jury. Summary judgment is therefore inappropriate on this issue.

An appropriate Order follows:

Clarence C. Newcomer, J.

7

TRZ000761

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

CMIS, INC.                                          CIVIL ACTION

                    v.                    JAN 19 1995

HEALTH PAYMENT REVIEW, INC.,       MICHAEL E. KUNZ, Clerk
                                        Dep. Clerk   NO. 94-576

                        O R D E R

AND NOW, this 19<u>th</u> day of January, 1995, upon
consideration of plaintiff's First Motion for Partial Summary
Judgment (the "Best Mode" Motion), and defendant's response
thereto, and consistent with the foregoing Memorandum, it is
hereby ORDERED that said motion is DENIED.

        AND IT IS SO ORDERED.

                                        _____
                                        Clarence C. Newcomer, J.

TRZ000762

# EXHIBIT 28

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

525 UNIVERSITY AVENUE

PALO ALTO, CALIFORNIA 94301-1908
———
TEL: (650) 470-4500
FAX: (650) 470-4570
www.skadden.com

DIRECT DIAL
2-470-4582
DIRECT FAX
3-329-4186
EMAIL ADDRESS
iUYEN@SKADDEN.COM

FIRM/AFFILIATE OFFICES
BOSTON
CHICAGO
HOUSTON
LOS ANGELES
NEWARK
NEW YORK
SAN FRANCISCO
WASHINGTON, D.C.
WILMINGTON
———
BEIJING
BRUSSELS
FRANKFURT
HONG KONG
LONDON
MOSCOW
PARIS
SINGAPORE
SYDNEY
TOKYO
TORONTO
VIENNA

April 28, 2005

**Via Federal Express**

T.K. Roosevelt, Esq.
Gibson, Dunn & Crutcher LLP
Jamboree Center
4 Park Plaza, Suite 1400
Irvine, California 92614-8557

RE:    *McKesson Information Solutions, LLC v. The TriZetto Group, Inc.*
       *Case No. 04-1258-SLR (D. Del.)*

Dear Kevin:

    Enclosed are documents which are being produced by McKesson Information
Solutions bearing Bates Nos. MCK033868 – MCK053031.

                            Sincerely,

                            Khoi D. Nguyen

Enclosures

cc:    Jack B. Blumenfeld, Esq. *(w/o encls.)*
       Michael A. Sitzman, Esq. *(w/o encls.)*

# EXHIBIT 29
# REDACTED IN ITS
# ENTIRETY

# EXHIBIT 30
# REDACTED IN ITS
# ENTIRETY

# EXHIBIT 31

LAW OFFICES

# COBRIN GITTES & SAMUEL

PATENTS, TRADEMARKS AND COPYRIGHTS

PETER T. COBRIN
MARVIN S. GITTES
RICHARD I. SAMUEL*

JONATHAN HUDIS
DAVID A. JACOBS
KERRY P.L. MILLER
EILEEN M. EBEL

*NJ & DC BARS ONLY

535 MADISON AVENUE
NEW YORK, N.Y. 10022

TELEPHONE (212) 486-6300
TELECOPIER (212) 486-4307

NEW JERSEY OFFICE
SUITE PH-S
8200 BOULEVARD EAST
NORTH BERGEN, NJ 07047
(201) 869-2975

24 June 1994

Via Facsimile and Federal Express
William T. Hangley, Esq.
Hangley Connolly Epstein
   Chicco Foxman & Ewing
Ninth Floor
1515 Market Street
Philadelphia, PA 19102-1909

Re:  GMIS, Inc. v. Health Payment Review, Inc.
     No. 94-CV-5767

Dear Mr. Hangley:

In accordance with my telephone discussion with Al Bixler, we are responding

to your letter dated 15 June 1994 addressed to Dick Samuel, in an effort to resolve

certain discovery disputes noted therein.[1]

### Point 1

GMIS considers that it has responded adequately to the Discovery Requests

propounded by HPR, including HPR's requests for identification of 30(b)(6) witnesses

---

[1]A diskette containing a machine-readable copy of the previously-served GMIS
Responses is enclosed with the original of this letter.

MCK 035718

04-CV-1258-SLR (D.Del.)

## COBRIN GITTES & SAMUEL

William T. Hangley, Esq.
24 June 1994
Page 2

for GMIS. HPR's Requests seek identification, on a Request-by-Request basis, of

individuals who will testify in connection with the subject matter of each Request.

In response, GMIS stated its objection thereto and identified Jeff Stello and

Leah Kelly as its 30(b)(6) witnesses. Counsel for GMIS has stated to HPR's counsel

that GMIS would produce such witnesses at agreed-upon times and place.

Rule 30(b)(6), Fed.R.Civ.P., states in pertinent part:

> A party may in the party's notice and in a subpoena name
> as the deponent a ... corporation ... and describe with
> reasonable particularity the matters on which examination
> is requested. In that event, the organization shall designate
> one or more officers, directors, or managing agents, or
> other persons who consent to testify on its behalf, and may
> set forth, for each person designated, the matters on which
> the person will testify. [Emphasis added.][2]

---

[2]Commentary to the Rule states that "A party may name a corporation... as the deponent and designate the matters on which he requests examination, and the organization shall then name one or more of its officers, directors, or managing agents ... consenting to appear and testify on its behalf with respect to matters known or reasonably available to the organization."

MCK 035719

Confidential Information Subject to D. Del. LR 26.2                    04-CV-1258-SLR (D.Del.)

## COBRIN GITTES & SAMUEL

William T. Hangley, Esq.
24 June 1994
Page 3

Neither the Rule nor the Commentary suggest that a party should be compelled to separately designate witnesses on an individual request-by-request basis. However, GMIS has no wish to enter into a discovery dispute. Accordingly, the following is an identification and designation of individuals who will be produced as 30(b)(6) witnesses for GMIS, together with a listing of discovery requests which relate to subject matter upon which the named individuals will testify.[3]

Jeffrey Stello will testify as a 30(b)(6) witness for GMIS on subject matter relating to HPR's Request Nos. 1d, 2d, 3d, 4d, 21d, 22e, 23d, 24d, 25d, 26d, 27d, 28e, 29d, 30d, 31d, 32d, 33d, 34d, 35d, 36c, 37e, 38d, 39d, 40d, 41d, 42e, 43d, 44d, 49d, 50d.

Ginny Klenske will testify as a 30(b)(6) witness for GMIS on subject matter relating to Request Nos. 5d, 6d, 7d, 8e, 9e, 11e, 12e, 13e, 14e, 15e, 16e, 17e, 18e, 47d.

With regard to Request Nos. 45d, 46c, and 48d, these Requests seek admissions from GMIS that the patent in suit is valid and enforceable. No witness who is not a patent law expert is competent to answer whether the patent in suit is

---

[3]During the above-referenced telephone conversation Mr. Bixler declined to confirm that depositions would commence on 5 July 1994, instead stating that the timing of the depositions would depend on the content of this Response and any motions filed by HPR.

Confidential Information Subject to D. Del. LR 26.2

## COBRIN GITTES & SAMUEL

William T. Hangley, Esq.
24 June 1994
Page 4

valid and/or enforceable. Accordingly, while Mr. Stello and Ms. Klenske will testify
as to facts known to them which may bear on the validity and/or enforceability of the
patent in suit, they will not answer, on behalf of GMIS, whether the subject patent
is valid or enforceable.

Please note that the list provided herein is not intended to be exclusive. Other
individuals may be subsequently identified who have knowledge concerning the
subject matter of the Requests. In keeping with the Federal and Local Rules, such
individuals will be identified as they become known to GMIS.

### Point 2

Your characterization of GMIS' answers to Requests 5-20 as "uniformly
evasive" is incorrect.

In each of the noted Requests the operative question is whether GMIS made,
used or sold product(s) which are specified, in terms of claim language, to include one
or more "means plus function" or "functional" elements. In particular, each request
recites at least one "means or step for performing a specified function without recital
of structure, material or acts in support thereof," precisely as encompassed by 35

MCK 035721

Confidential Information Subject to D. Del. LR 26.2                    04-CV-1258-SLR (D.Del.)

# COBRIN GITTES & SAMUEL

William T. Hangley, Esq.
24 June 1994
Page 5

U.S.C. § 112, Para. 6.[4] By operation of 35 U.S.C. §112, Para. 6, the language used in the Requests, cast as it is in functional terms, has only one meaning -- that which obtains when such language is read in light of the specification of the patent in suit. The meaning of "functional" claim language has been discussed extensively by the Court of Appeals for the Federal Circuit.  *See Pennwalt Corporation v. Durand-Wayland, Inc.*, 833 F.2d 931 (Fed. Cir. 1987); *Valmont Industries, Inc. v. Reinke Manufacturing Company, Inc.*, 983 F.2d 1039 (Fed. Cir. 1993); and *In re Donaldson*, 16 F.3d 1189 (Fed. Cir. 1994).

The law, statutory and decisional, is clear on this point.  A claim cast in "functional" language shall be construed to cover the corresponding structure,

---

[4]*See*, for example, Request No. 7: "On or after October 12, 1993, GMIS made, used or sold either (1) a computer system including a central processing unit and associated memory, or (2) software which, when combined with a computer system including a central processing unit and associated memory, would constitute a system for processing input claims containing at least one medical service code, comprising: a predetermined database stored in the associated memory, the database containing medical service codes and a set of relationships among the medical service codes defining whether selected ones of the medical service codes are valid when received with other selected ones of the medical service codes; means for receiving at least one claim; means for ascertaining whether the at least one claim contains a plurality of medical service codes; means for ascertaining whether one of the medical service codes in the plurality of medical service codes is valid or invalid by interacting with the database and the set of relationships contained in the database; means for authorizing medical service codes which are valid in response to the means for determining; and means for rejecting medical service codes which are invalid in response to the means for determining." [Emphasis added.]

Confidential Information Subject to D. Del. LR 26.2

## COBRIN GITTES & SAMUEL

William T. Hangley, Esq.
24 June 1994
Page 6

material or acts described in the specification and equivalents thereof. (35 U.S.C. §

112, Para. 6.) In applying the statutorily-mandated reference to the structure and/or

acts described in the specification of the suit patent, GMIS' responses set forth direct

answers to each of Requests 5-20.

Thus, for example, where Request 7 seeks an admission of whether GMIS has

made, used or sold products having each and every one of the following "means" --

> means for receiving at least one claim, means for
> ascertaining whether the at least one claim contains a
> plurality of medical service codes, means for ascertaining
> whether one of the medical service codes in the plurality of
> medical service codes is valid or invalid by interacting with
> the database and the set of relationships contained in the
> database, means for authorizing medical service codes
> which are valid in response to the means for determining,
> and means for rejecting medical service codes which are
> invalid in response to the means for determining --

MCK 035723

04-CV-1258-SLR (D.Del.)

Confidential Information Subject to D. Del. LR 26.2

## COBRIN GITTES & SAMUEL

William T. Hangley, Esq.
24 June 1994
Page 7

then the 35 U.S.C. § 112, para. 6 analysis is triggered. The operation of the statute can not be abrogated for the benefit of the patentee, and application of the statute does not render the responses provided anything less than "honest and complete answers to these requests."

To the extent that HPR's Requests 5-20 are an attempt to give meaning to the language of the claims outside of the proper context of the claims (as defined by the statute and the specification), then such Requests are not likely to lead to the discovery of admissible evidence.

### Point 3

Your letter of 15 June 1994 asserts that GMIS failed to identify conversations or events in response to "numerous interrogatories, including nos. 22(c), 28(c), 37(c), and 42(c)."

GMIS has provided identification of conversations and/or events responsive to the Requests propounded by HPR to the best of information reasonably available to GMIS at the time the Requests were served. As investigation continues, such information will be supplemented as required by the Local Rules and the Federal Rules. It is expected that further information and identification can be elicited during the upcoming depositions.

MCK 035724

04-CV-1258-SLR (D.Del.)

Confidential Information Subject to D. Del. LR 26.2

# COBRIN GITTES & SAMUEL

William T. Hangley, Esq.
24 June 1994
Page 8

<u>Point 4</u>

The following is a supplement to Responses provided to Interrogatories 45(b)
and 46(b), upon information developed through ongoing investigation.

<u>Invalidity Under 35 U.S.C. §§ 102 and/or 103</u>:

Initial investigation indicates that Dr. Hertenstein, one of the individuals named
as inventor in the suit patent published several papers relevant to the subject matter
of the claims of the suit patent. A number of these publications are not of record in
the file history of the suit patent. Investigation of these publications is ongoing and
the results of such investigation will be provided in accordance with the Local and
Federal Rules.

One such publication, which Dr. Hertenstein published with Dr. Egdahl, is as
follows: Egdahl, Hertenstein, *An Access-Oriented Negotiated Fee Schedule (The
Caterpillar Experience)*, Ann. Surg., pp. 349-357, September 1987. This article,
published prior to the critical date (September 30, 1987) and <u>not</u> of record in the file
history of the patent, describes a system utilized by Caterpillar to evaluate medical
claims and to reimburse surgeons. The publication discusses the utilization of CPT-4
codes in connection with rebundling and unbundling, in a manner similar to that set
forth in the claims of the suit patent.

MCK 035725

04-CV-1258-SLR (D.Del.)

Confidential Information Subject to D. Del. LR 26.2

## COBRIN GITTES & SAMUEL

William T. Hangley, Esq.
24 June 1994
Page 9

Initial investigation accordingly indicates that the Egdahl/Hertenstein publication, taken separately or in combination with other references, invalidates the claims of the patent in suit under 35 U.S.C. §§ 102 and/or 103.

Preliminary investigation indicates that the Health Data Institute, with which both Dr. Egdahl and Dr. Hertenstein appear to have had affiliations, made available as early as December 1986 a product referred to as Advanced MedLogic Systems ("AMS"). This product was a computer-based system for medical claim administration and payment. Among the functions of AMS was the automatic editing and validation, based upon rules, of received medical codes. This system utilized a number of criteria in the validation process, including age, sex, medical necessity, and Diagnosis Related Groups (DRGs), which represent groups of medical service codes having predetermined relationships therebetween.

Preliminary investigation also indicates that the Autocoder product of GMIS was available prior to the critical date and had the capability of receiving a service code, checking whether the received code was present in a database of codes, and informing the user if the code was not present in the database of codes. The Autocoder product of GMIS was therefore capable of executing the functions recited in at least claims 1 and 13 of the patent in suit.

Confidential Information Subject to D. Del. LR 26.2

COBRIN GITTES & SAMUEL

William T. Hangley, Esq.
24 June 1994
Page 10

Initial investigation further indicates that other, non-machine-based implementations of rebundling and other claimed functions were present in the prior art. Review of this aspect of the prior art is ongoing, and results of the same will be provided in accordance with the Local and Federal Rules.

Preliminary investigation indicates that prior to the critical date, September 30, 1987, Dr. Hertenstein stated to at least one other individual that rebundling techniques utilizing computer-based rules and databases were known in the art; and that features which were later recited in the claims of the suit patent were presented in conference papers and in other works of which Dr. Hertenstein was aware. The circumstances and contents of these statements by Dr. Hertenstein will be the subject of further discovery.[5]

Non-statutory subject matter: The subject matter recited in the claims of the suit patent is non-statutory subject matter under 35 U.S.C. § 101. This position is taken for the reason that the claims may be characterized as either directed to a

_____

[5] As noted in GMIS' Responses to HPR's Requests, indications that many elements of the CodeReview data bundling methodology were disclosed at a 1984 conference at the Four Seasons Hotel Boston were given by Mr. Frazier to Mr. Stello.

MCK 035727

Confidential Information Subject to D. Del. LR 26.2

## Cobrin Gittes & Samuel

William T. Hangley, Esq.
24 June 1994
Page 11

method of doing business, or as containing a mathematical algorithm without sufficient physical activity to pass muster under the *Freeman-Walter-Abele* test[6].

The subject matter of the claims in suit is analogous to that recently discussed by the Court of Appeals for the Federal Circuit in *In re Schrader*[7]. In that case, the Federal Circuit found that claims directed to a method for competitively bidding on a plurality of related items, including the steps of entering the bids into computer-readable "records" and using a computer to assemble a "completion" record from the entered bids, were properly rejected for lack of statutory subject matter under 35 U.S.C. § 101.

Best Mode and Enablement: Review of the computer code set forth in the patent-in-suit suggests that there may be gaps in the code, particularly in connection with code necessary to execute calls of the rules base. Investigation of this point is continuing. However, it is clear that in the absence of calls to the rules base the system can not execute the functions required by the claims. If operative code is not set forth to call the necessary rules, then it would appear that the patent disclosure sets forth, at best, an inoperative embodiment of the claimed invention. Moreover,

---

[6] *See Application of Freeman*, 573 F.2d 1237 (CCPA 1978); *In re Walter*, 618 F.2d 758 (CCPA 1980); *In re Abele*, 684 F.2d 902 (CCPA 1982).

[7] *In re Schrader*, ___ F.3d ___, 30 USPQ2d 1455 (Fed. Cir. 1994).

Confidential Information Subject to D. Del. LR 26.2

# COBRIN GITTES & SAMUEL

William T. Hangley, Esq.
24 June 1994
Page 12

failure to provide sufficient detail to show how the rules are called by the main program or subroutines would be tantamount to a failure to provide an enabling disclosure or to disclose the best mode contemplated by the inventors at the time of filing, as required by 35 U.S.C. § 112.[8]

Inequitable Conduct: GMIS's Responses to HPR's Requests clearly noted the following:    During prosecution of the application that matured into the patent in suit, an Amendment dated January 29, 1991 signed by the prosecuting patent attorney, A. Jason Mirabito, asserted that "Applicants believe that the prior art, either singly or in combination, contains no teaching or suggestion of a database containing medical service codes and relationships among the codes." [Emphasis added.]

Preliminary investigation, however, casts doubt upon the veracity of that statement. It would appear that Dr. Hertenstein, one of the applicants, stated to at least one other individual that rebundling techniques utilizing computer-based rules and databases were known in the art; and that features which were later recited in the claims of the suit patent were presented at conferences and in other works of which Dr. Hertenstein was aware.    Moreover, the Hertenstein/Egdahl publications noted

---

[8]Also being investigated are potential discrepancies between the written narrative description and the software code provided, as the same affects the sufficiency of disclosure under 35 U.S.C. §112.

MCK 035729

04-CV-1258-SLR (D.Del.)

Confidential Information Subject to D. Del. LR 26.2

# COBRIN GITTES & SAMUEL

William T. Hangley, Esq.
24 June 1994
Page 13

above involved at least one of the individuals who signed the Declaration(s) in the file history of the suit patent. Thus, at least one of the applicants was aware of such relevant publications at the time of filing, but failed to bring such articles to the attention of the Examiner as required by Rule 56. The articles set forth subject matter which is relevant to the claimed invention and thus material to prosecution of the application upon which the suit patent issued.

Accordingly, preliminary investigation indicates that the above-quoted statement made by the applicants, including Dr. Hertenstein, was untrue; and that the applicants not only failed to disclose pertinent art of which they were aware, but also affirmatively stated that they were not aware of such information. Each of these circumstances may well constitute inequitable conduct sufficient to invalidate the suit patent.

## Point 5

The self-executing discovery provided by GMIS was adequate and complete at the time of filing thereof. In addition, identification and production of documents was adequate and complete at the time of response to appropriately framed Requests for Production and/or at the time of providing self-executing discovery. Ongoing

MCK 035730

Confidential Information Subject to D. Del. LR 26.2

04-CV-1258-SLR (D.Del.)

COBRIN GITTES & SAMUEL

William T. Hangley, Esq.
24 June 1994
Page 14

discovery undertaken by GMIS has identified documents which may be relevant and responsive to Requests propounded by HPR. Since substantially all of these documents are to be treated as Confidential under the Stipulated Protective Order executed by GMIS' counsel and forwarded to you with this letter, it is expected that such documents will be exchanged with HPR, and that HPR will produce its Confidential documents, within the near future as discussed by Mr. Bixler and the undersigned.

Your response in this regard is awaited.

In addition, ongoing discovery has identified additional individuals reasonably likely to have information that bears significantly on the claims and defenses of both parties. The following list is thus a supplement to Responses previously provided to Request Nos. 51-54, setting forth the names of such individuals:

> Carolyn Bannister, employee of CAREMARK
> Ginny Klenske, employee of GMIS
> Leah Kelly, employee of GMIS
> Mark Kessler, employee of GMIS

Confidential Information Subject to D. Del. LR 26.2

MCK 035731
04-CV-1258-SLR (D.Del.)

# COBRIN GITTES & SAMUEL

William T. Hangley, Esq.
24 June 1994
Page 15

Please contact us by telephone if you wish to discuss any of the points addressed in this letter, since the same may prove to be useful in resolving disputes without recourse to motion practice.

Very truly yours,

RICHARD I. SAMUEL
DAVID A. JACOBS

DAJ:acm
Enclosures
cc (via fax, w/o enc.): Frank G. Murphy, Esq.
Joseph D. Steinfield, Esq.
Joel S. Goldhammer, Esq.

Confidential Information Subject to D. Del. LR 26.2

MCK 035732

04-CV-1258-SLR (D.Del.)

# EXHIBIT 32

✓/WITH
    DJW
___ FILE

LAW OFFICES

# COBRIN GITTES & SAMUEL

PATENTS, TRADEMARKS AND COPYRIGHTS

PETER T. COBRIN
MARVIN S. GITTES
RICHARD I. SAMUEL
————
DAVID A. JACOBS
KERRY P.L. MILLER
EILEEN M. EBEL
RICHARD M. LEHRER
JAMES E. BRANDT
JILL C. GREENWALD
DAVID J. GARROD, Ph.D.*
————
*REGISTERED U.S. PATENT AGENT ONLY

750 LEXINGTON AVENUE
NEW YORK, N.Y. 10022
————
TELEPHONE (212) 486-4000
TELECOPIER (212) 486-4007

NEW JERSEY OFFICE
1271 COOPER ROAD
SCOTCH PLAINS, NJ 07076
TELEPHONE (908) 756-7406
TELECOPIER (908) 754-5930

November 8, 1994

**VIA FACSIMILE** - 215-568-0300

Michael Lieberman, Esq.
Hangley Aronchechick Segal & Pudlin
One Logan Square
Philadelphia, PA 19103

    Re:   GMIS v. HPR
          CA No. 94-CV-0576

Dear Michael:

    Pursuant to our telephone discussion, I have enclosed duplicate copies of our Discovery Production that was sent to William Hangley on September 20, 1994. Enclosed for your convenience please find copies of:

        1.   The cover letter;
        2.   The itemized list of documents sent; and
        3.   The index of the 1-Gig tape.

    The entire package was received by your old offices on September 21, 1994 and was signed for by an S. High. I assume that since your Motion to Compel The Production of Documents and For Sanctions was based on your misperception that we did not supply these documents you will be withdrawing your motion. Please confirm this fact by telephone or facsimile.

MCK 035879

Confidential Information Subject to D. Del. LR 26.2

04-CV-1258-SLR (D.Del.)

i

COBRIN GITTES & SAMUEL

Michael Lieberman, Esq.
November 8, 1994
Page 2

If you have any questions please feel free to contact me.

Very truly yours,

COBRIN GITTES & SAMUEL

Richard M. Lehrer, Esq.

RML:lm
f:\wpdata\rl\g:mis\lieb.118

MCK 035880

Confidential Information Subject to D. Del. LR 26.2

04-CV-1258-SLR (D.Del.)

LAW OFFICES

# COBRIN GITTES & SAMUEL

PATENTS, TRADEMARKS AND COPYRIGHTS

PETER T. COBRIN
MARVIN S. GITTES
RICHARD I. SAMUEL*

JONATHAN HUDIS
DAVID A. JACOBS
KERRY P.L. MILLER
EILEEN M. EBEL

*NJ & DC BARS ONLY

535 MADISON AVENUE
NEW YORK, N.Y. 10022
————
TELEPHONE (212) 486-4000
TELECOPIER (212) 486-4007
···

NEW JERSEY OFFICE
SUITE PH-S
8200 BOULEVARD EAST
NORTH BERGEN, NJ 07047
(201) 869-2975

September 20, 1994

VIA FEDERAL EXPRESS

William T. Hangley, Esq.
Hangley Connolly Epstein
   Chicco Foxman & Ewing
Ninth Floor
1515 Market Street
Philadelphia, PA 19102

Re:   GMIS, Inc. v. Health Payment Review, Inc.
      No. 94-CV-0576

Dear Bill:

This is a follow-up for our request made on Tuesday September 13, 1994 for the address and/or phone number of Kelli Dugan (Virginia and North Carolina). Please provide me with this information as soon as possible.

Further, enclosed are documents which comprise GMIS's Supplemental Response to HPR's Document Requests. We would be most appreciative if you would supply a copy of the prior art documents to Joel Goldhammer.

Very truly yours,

COBRIN GITTES & SAMUEL

Richard M. Lehrer

RML\DAJ

MCK 035881

Confidential Information Subject to D. Del. LR 26.2

04-CV-1258-SLR (D.Del.)

GMIS SUPPLEMENTAL RESPONSE TO HPR'S DOCUMENT REQUESTS

1.     Demonstration and Promotional Materials for ClaimCheck

    1.     *ClaimCheck* Product Description and History (copyright 1990-94 Charles J. Singer & Co.)

    2.     Newsletter from GMIS (*Directions*, Vol. 3, Issue 1, 1994)

    3.     Newsletter from GMIS (*Directions*, Vol. 3, Issue 2, 1994)

    4.     ClaimCheck GMIS' clinical cost-efficient approach to controlling provider reimbursement

    5.     Article reprint about ClaimCheck (business section of *Daily News* -- "A New Specialty: Doctoring the Books")

    6.     ClaimCheck Commentary (Partners and Savings AETNA and ClaimCheck)

    7.     *Technology Today and Tomorrow* (article titled "Clamping Down of Code Creep")

    8.     *Philadelphia Business Journal* (January 4-10, 1993, Health Cost Containment is His Game)

    9.     Is "unbundling" the leak in your cost containment program? (1989 GMIS advertisement)

    10.    ClaimCheck Program Unmasks "Unbundled" Medical Bills (Blue Cross/Blue Shield, January 15, 1991)

    11.    Automated Medical Management advertisement (Necessary Treatment for the Relief of Worker's Comp Cost Crisis)

    12.    Integration Services Offering Overview

    13.    A VISION OF AUTOMATED MEDICAL MANAGEMENT FOR AN INSURANCE INDUSTRY IN CRISIS (brochure)

    14.    GMIS ClaimCheck Dental, Recommended Treatment for Overpaid Dental Claims (1993)
        a.     Program Overview
        b.     Client Extract Instructions

    15.    1994 GMIS User Conference, San Diego, Ca (May 18-20, 1994 brochure)

000001

MCK 035882

16.     ClaimCheck P&C, Automated Clinical Expertise that Controls Medical Payments (1993 brochure)

17.     ClaimCheck Dental, The Expertise You Need Behind Every Dental Claim You Pay (1992 brochure)

18.     Medical Management Through Automated Clinical Expertise, ClaimCheck the GMIS Auditing System (1993 brochure)

19.     GMIS 1992 Annual Report, Reshaping the Future of Healthcare Through Automated Medical Management

20.     1993 GMIS Annual Report

21.     Claims Auditing Checklist (1993)

II.     PRIOR ART WITHIN 35 U.S.C. §§ 102 OR 103

1.      Article presented at the 107th Annual Meeting of the American Surgical Association, Palm Beach Florida, April 21-23, 1987 (reprinted in Ann. Surg., September 1987 "An Access-oriented Negotiated Fee Schedule -- The Caterpillar Experience")

2.      GMIS Auto-Coder User's Manual for IBM OS Operating Systems (July 1986) (CONFIDENTIAL)

3.      Advanced MedLogic Systems Product Overview (May 1987)

4.      AMS December 1986, Claim Level Edits (103 page manual)

5.      Autocoder Brochure, An Automated System for Coding Medical Terms, 1985

6.      GMIS Autocoder, Artificial Intelligence that Sets Free Your Human Intelligence, © 1986

7.      United States Patent to Pritchard, January 1, 1985, U.S.Patent No. 4,491,725

8.      Results of a Dialogue search relating to the use of computers in the health industry.

9.      Article on PR Newswire ("Companies are Controlling Health Care Cost Increases", dateline September 11, 1987)

000002

MCK 035883

Confidential Information Subject to D. Del. LR 26.2                                    04-CV-1258-SLR (D.Del.)

10. Article on PR Newsire ("Tracking claims cost trends ; data-processing application" February 1985)

11. Articles written by Donald Holloway, George Goldberg, Kelli Dugan and/or Robert Hertenstein

12. Article in PR Newswire, (June 24, 1986 relating to the computer program "Patterns of Treatment" ~~NOTE: this program is referred to in Michael Stairs facsimile letter to Carolyn Bannister)~~

13. Article in Nations Business (May 1985, Slimming Health Cost; Companies Turn to Outside Administrator to Check Fees and Charges from Doctors and Hospitals; Includes Related Article on By-Passing Heart Surgery)

14. Article in PR Newswire (January 29, 1984 relating to a system called "Medical Claims Distribution System" to a company called National Electronic Information Corporation)

15. Article in PR Newswire (January 27, 1987 "COMPUTER-SCIENCES; Statement concerning status of Colorado Medicaid claims processing system)

16. Article in PR Newswire (March 5, 1982, an article relating to N.E.I.C.'s Health Claim Distribution System)

17. Articles written by Richard Egdahl

18. Articles written by Paul Gertman

19. Articles relating to Medlogic

20. Articles in PC Week (January 20, 1987 "Medical, Insurance Programs Turn Multiuser; Computer Software; Product Announcement)

21. Article in *Best's Review, Life-Health Insurance Edition* (February 1985, "Clinical Evaluation; the next step in claims processing")

22. Article in PR Newswire (January 27, 1984 relating to Medicaid Claims Distribution System)

III. <u>Daily Journal (redacted) of Jeff Stello</u>

000003

MCK 035884

Confidential Information Subject to D. Del. LR 26.2          04-CV-1258-SLR (D.Del.)

IV.    CONFIDENTIAL Documents Relating to Claimcheck

1.    CHAMPVA Center (Response to Request for Proposal with accompanying letter to Kimberly Miller, June 7, 1994)

2.    INCTST.DOC: examples

3.    Preliminary Product Strategy (ClaimCheck Group Health 1994, prepared by Carolyn Staudenmeier, October 1, 1993)

4.    ClaimCheck P&C Product Strategy (prepared by: Debi Johnson, October 1, 1993, revised: October 15, 1993)

5.    ClaimCheck Group Health Competitive Analysis (3/1/94)

6.    Memo from Terry Lunny to Lori Megni and Mike Cesarz, Re: Reports, Request for change (6/30/94)

7.    R3.2 Dental System Test Plan

8.    ClaimCheck Enhancements & Bugs, (8/9/94)

9.    IMS Instructions for the Version 13 Database for Version 3.0 Clients

10.    Letter to ClaimCheck Technical Contact from GMIS Technical Support Relating to Version 13 of the Database (13MFLET.DOC)

11.    Group Health · Custom Code or Non-Standard Client Installations (custom.doc)

12.    Software Migration and Delivery Procedures for Mainframe ClaimCheck (swdel.doc)

13.    TURNOVER; Subject: Bad account in integration (6/23/94) (1923.doc)

14.    Letter to Mary Alice Hickey from Carolyn Staudenmeier, date July 22, 1994 along with ClaimCheck Customer Support Services (Hickey.doc)

15.    Letter to Jan Costa from Carolyn Staudenmeier, date April 20, 1994 (costa.doc)

16.    (shenandh.ppt)
Data Filtering Process for Shenandoah Life Insurance Company
Dental Code Manipulation Savings,
Dental Code Manipulation Savings for Codes Adding During Rebundling,

000004

MCK 035885

Additional Code Manipulation Savings,
Provider Profile,
Savings Potential for Single Code Editing
Total Annual "Hard Dollar" Savings

17. Dental Payment Analysis, Prepared for Shenandoah Life Insurance Company, date July 12, 1994 (shenandh.doc)

18. ClaimCheck Dental Clinical Logic Diagnostic (dnxrexp.doc)

19. Letter to Ms. Kathleen Hadley, July 12, 1994 and attachments

20. Letter to Jim Jacobsen, July 18, 1994 and attachments

21. Letter to Mr. Buddy Dye, July 14, 1994

22. GMIS Proposal for IBP, Inc., November 1, 1993

23. ClaimCheck Dental Clinical Edit Clarification (02385.doc

V. Examples referenced in deposition of Ginny Klenske

VI. Outline of computer tape

f:\wpdata\elba\gmis

000005

MCK 035886

Confidential Information Subject to D. Del. LR 26.2

GMIS Category Descriptions 

## Clinical Intelligence (CI)

Internal
- Meeting Minutes
  -departmental
  -database release team meetings
- Database Project Plans
  -generic
  -customized

External
- Client Correspondence
  -client question requests/responses
  -database notification documentation
- Policy statements
- Test scripts
- Presentations

## Customer Service (CustServ)

Internal
- Site Visit Reports
  -internal report of client visit
- Call logs (paper)
  -client phone calls
- Client Alerts
  -brings attention to particular 'problem clients'
- ClaimCheck Survey (paper only)

External
- Letters
  -New clients, client correspondence
- Newsletters (paper only)

## Pre-Sales

Internal
- ClaimCheck Prospect Fact Sheet (paper only)
- PCPA Validation Form (paper only)
  -Procedure Code Payment Analysis is a report of prospect claims run through a ClaimCheck prototype for reporting auditing results and potential savings from ClaimCheck
- PCPA schedule
- Meeting Minutes

1                                    08/09/94

MCK 035887

### GMIS Category Descriptions



External
- PCPA forms (paper only)
- PCPA slide presentations
- PCPA booklets

### Product Management (Prodmgmt)

Internal
- Memos
- Project Plans
- Software bugs
- Software Enhancement Requests
- ClaimCheck Product Plans
- Meeting Minutes

External
- Client Correspondence (letters)
- ClaimCheck Advisory Committee documentation
  -Meeting of selected clients for the purpose of advising GMIS concerning software enhancements, design, and general product issues
- Prospect Inquiries

### Software Development (Develop)

Internal
- Project Management
  - Project Plans and associated documentation
- Functional Documentation
  - software functional requirements documents, memos, etc.
- Technical Documentation
  - software technical design documents, memos, etc.
- Test Plans
- Meeting Minutes

### Marketing and Communications (Marcom)

Internal
- Memos

External    NOTE: All these are on non-electronic media except where indicated
- Brochures
  - Product brochures, user conferences, trade shows
- Articles
  - publications
- Advertisements

2                                        08/09/94

MCK 035888

Confidential Information Subject to D. Del. LR 26.2

04-CV-1258-SLR (D.Del.)

## GMIS Category Descriptions

CONFIDENTIAL

- Singer Profile
- Video
- Presentations
  - electronic as well as physical slides
- Annual Report
- Press Releases

### Sales

Internal
- Memos

External
- Letters
- Proposals
- Contracts
  - Non-disclosures
  - Initial Installation Agreements
  - Procedure Code Payment Analysis (PCPA) Letter Agreement
  - License Agreements

### Technical Services (TechServ)

Internal
- Client List
- Software/Database Packaging Documents
  - describe the contents of a tape containing a software/database release
- Custom Code List
- Generally Available Software List
- Client Spreadsheet

External
- Letters
- Integration Services
  - documents relating to GMIS services to help clients integrate their claims systems with ClaimCheck
- Release Notes
  - document sent to client outlining all changes in a new software release
  - functional and technical

### Quality Assurance (QA)

Internal
- Bug Sheets

3

08/09/94

MCK 035889

Confidential Information Subject to D. Del. LR 26.2

04-CV-1258-SLR (D.Del.)

## GMIS Category Descriptions

CONFIDENTIAL

-describes software bugs when found by clients or within GMIS
- Bug/Enhancement Matrices
  -Used to prioritize and track all software bugs and enhancement requests
- Project Plans     .
- Test Plans

4                                      08/09/94

MCK  035890

Confidential Information Subject to D. Del. LR 26.2

04-CV-1258-SLR (D.Del.)