# EXHIBIT 1
# REDACTED IN ITS
# ENTIRETY

EXHIBIT 2



# Merriam-Webster's Collegiate® Dictionary

## TENTH EDITION

Merriam-Webster, Incorporated
Springfield, Massachusetts, U.S.A.

**Ascension Day** n (14c) : the Thursday 40 days after Easter observed in commemoration of Christ's ascension into Heaven

**as·cen·sive** \ə-'sen(t)-siv\ adj (1646) : rising or tending to rise

**as·cent** \ə-'sent, a-\ n [irreg. fr. ascend] (ca. 1590) 1 a : the act of rising or mounting upward : CLIMB b : an upward slope or rising grade : ACCLIVITY c : the degree of elevation : INCLINATION, GRADIENT 2 : an advance in social status or reputation : PROGRESS 3 : a going back in time or upward in order of genealogical succession

**as·cer·tain** \a-sə(r)-'tān\ vt [ME: acertainen, fr. MF acertainer, fr. a- (fr. L ad-) + certain] (15c) 1 archaic : to make certain, exact, or precise 2 : to find out or learn with certainty — **as·cer·tain·able** \-'tā-nə-bəl\ adj — **as·cer·tain·ment** \-'tān-mənt\ n

**as·ce·sis** \a-'sē-səs\ n, pl ** as·ce·ses** \-,sēz\ [Gk askēsis, lit. fr. Gk askein, lit. exercise, fr. askeein] (1873) : SELF-DISCIPLINE, ASCETICISM

**as·cet·ic** \ə-'se-tik, a-\ n, also ascet·i·cal \-ti-kəl\ adj [Gk askētikos, lit., laborious, fr. askeein one that exercises, hermit, fr. askein to work, exercise] (1646) 1 : practicing strict self-denial as a measure of personal and esp. spiritual discipline 2 : austere in appearance, manner, or attitude   syn see SEVERE — **ascetic** n — **as·cet·i·cal·ly** \-ti-k(ə-)lē\ adv — **as·cet·i·cism** \-'se-tə-,si-zəm\ n

**as·ci·di·an** \ə-'si-dē-ən\ n [NL Ascidia, group comprising tunicates, fr. Ascidium, genus name, fr. Gk askidion, dim. of askos wineskin, bladder] (1856) : any of a class (Ascidiacea) of solitary or colonial sessile tunicates that have an oral and an atrial siphon — called also sea squirt

**ASCII** \'as-(,)kē\ n [American Standard Code for Information Interchange] (1963) : a code for representing alphanumeric information

**as·ci·tes** \ə-'sī-tēz\ n, pl **ascites** [ME ascytes, fr. LL ascites, fr. Gk askitēs, fr. askos] (14c) : accumulation of serous fluid in the spaces between tissues and organs in the cavity of the abdomen — **as·cit·ic** \-'si-tik\ adj

**as·cle·pi·ad** \a-'sklē-pē-,ad, ,a-, -,əd\ n [ultim. fr. Gk asklēpiad-, asklēpias swallowwort, fr. Asklēpios, Greek god of medicine] (1859) : MILKWEED

**as·co·carp** \'as-kə-,kärp\ n (ca. 1887) : the mature fruiting body of an ascomycetous fungus; broadly : such a body with its enclosed asci, spores, and paraphyses - - also **as·co·car·pic** \,as-kə-'kär-pik\ adj

**as·co·go·ni·um** \,as-kə-'gō-nē-əm\ n, pl **-nia** \-nē-ə\ [NL] (1875) : the female sex organ in ascomycetous fungi

**as·co·my·cete** \,as-kō-'mī-,set, -mī-'sēt\ n [ultim. fr. Gk askos + mykēs, mykēt- fungus: akin to Gk myxa mucus — more at MUCUS] (1875) : any of a class (Ascomycetes) or subdivision (Ascomycotina) of higher fungi (as yeasts or molds) with septate hyphae and spores formed in asci — **as·co·my·ce·tous** \-,mī-'sē-təs\ adj

**as·cor·bate** \ə-'skör-,bat, -bət\ n (1941) : a salt of ascorbic acid

**ascor·bic acid** \ə-'skor-bik-\ n [ISV a- + NL scorbutus scurvy - more at SCORBUTIC] (1933) : VITAMIN C

**as·co·spore** \'as-kə-,spor, -,spōr\ n (1875) : any of the spores contained in an ascus - - **as·co·spor·ic** \,as-kə-'spor-ik, -'spōr-\ adj

**as·cot** \'as-kət, -,kät\ n [Ascot Heath, racetrack near Ascot, England] (1890) : a broad neck scarf that is looped under the chin

**as·cribe** \ə-'skrib\ vt **as·cribed; as·crib·ing** [ME, fr. L ascribere, fr. ad- + scribere to write - more at SCRIBE] (15c) : to refer to a supposed cause, source, or author : **as·crib·able** \-'skri-bə-bəl\ adj

**syn** ASCRIBE, ATTRIBUTE, ASSIGN, IMPUTE, CREDIT mean to lay something to the account of a person or thing. ASCRIBE suggests an inferring or conjecturing of cause, quality, authorship (forged paintings formerly ascribed to masters). ATTRIBUTE suggests less tentativeness than AS-CRIBE; less definiteness than ASSIGN (attributed to Rembrandt but possibly done by an associate). ASSIGN implies ascribing with certainty or after deliberation (assigned the bones to the Cretaceous Period). IM-PUTE suggests ascribing something that brings discredit by way of accusation or blame (tried to impute sinister motives to my actions). CREDIT implies ascribing a thing or esp. an action to a person or other thing as its agent, source, or explanation (credited his teammates for his success).

**ascribed** adj (1972) : acquired or assigned arbitrarily (as at birth) (~ social status)

**as·crip·tion** \ə-'skrip-shən\ n [LL ascriptio-, ascriptio, fr. L, written addition, fr. ascribere] (1600) 1 : the act of ascribing : ATTRIBUTION 2 : arbitrary placement (as at birth) in a particular social status

**as·crip·tive** \ə-'skrip-tiv\ adj (1650) : relating to, marked by, or involving ascription

**as·cus** \'as-kəs\ n, pl **as·ci** \'as-,kī, -,kē, 'a-,sī\ [NL, fr. Gk askos wineskin, bladder] (1830) : the membranous oval or tubular spore case of an ascomycete

**as·dic** \'az-(,)dik\ n [fr. aydics underwater echo ranging, prob. fr. Anti-Submarine Division (British Admiralty department 1916–18) + -ics] (1939) chiefly Brit : SONAR

**¹-ase** a suffix [F, fr. diastase] : enzyme (protease)

**asep·sis** \(,)ā-'sep-səs, ə-\ n [NL] (1892) 1 : the condition of being aseptic 2 : the methods of making or keeping aseptic

**asep·tic** \(,)ā-'sep-tik, ə-\ adj [ISV] (ca. 1859) 1 a : preventing infection (~ techniques) b : free or freed from pathogenic microorganisms (an ~ operating room) 2 : lacking vitality, emotion, or warmth (~ essays) — **asep·ti·cal·ly** \-ti-k(ə-)lē\ adv

**asex·u·al** \(,)ā-'sek-sh(ə-)wəl, -'sek-shəl\ adj (1830) 1 : lacking sex or functional sex organs (~ plants) 2 : involving or reproducing by reproductive processes (as cell division, spore formation, fission, or budding) that do not involve the union of individuals or germ cells (~ reproduction) (an ~ generation) b : produced by asexual reproduction (~ spores) 3 : devoid of sexuality (an ~ relationship) — **asex·u·al·i·ty** \(,)ā-,sek-sha-'wa-l-tē\ n — **asex·u·al·ly** \(,)ā-'sek-sh(ə-)wə-lē, -'sek-shə-lē\ adv

**¹as far as** conj (14c) : to the extent or degree that (is safe, as far as we know) - - often used in expressions like "as far as (something) goes" and "as far as (something) is concerned" to mean "with regard to (something)" (we felt pretty safe as far as the fire was concerned — Mark Twain) or in expressions like "as far as (someone) is concerned" to mean "in (someone's) opinion" (as far as I'm concerned, it's a mistake)

**²as far as** prep (1523) : with regard to : CONCERNING (neatly groomed and, as far as clothes, casual looking —N.Y. Times) (as far as being mentioned in the Ten Commandments, I think it is —Billy Graham) chiefly in oral use

**as for** prep (1533) : with regard to : CONCERNING (as for the others, they'll arrive later)

**As·gard** \'as-,gärd, 'az-\ n [ON ásgarthr] : the home of the Norse gods

**ash** \'ash\ n [ME asshe, fr. OE æsc; akin to OHG ask ash, L ornus mountain ash] (bef. 12c) 1 : any of a genus (Fraxinus) of trees of the olive family with pinnate leaves, thin furrowed bark, and gray branchlets 2 : the tough elastic wood of an ash 3 [OE æsc, name of the corresponding rune letter]: the ligature æ used in Old English and some phonetic alphabets to represent a low front vowel \a\

**²ash** n, often attrib [ME asshe, fr. OE æsce — more at ARID] (bef. 12c) 1 : something that symbolizes grief, repentance, or humiliation 2 a : the solid residue left when combustible material is thoroughly burned or is oxidized by chemical means b : fine particles of mineral matter from a volcanic vent 3 pl : the remains of the dead human body after cremation or disintegration 4 pl : deathly pallor (the lip of ~es and the cheek of flame —Lord Byron) 5 pl : RUINS — **ash·less** \-ləs\ adj

**³ash** vt (1894) : to convert into ash

**ashamed** \ə-'shāmd\ adj [ME, fr. OE āscamod, pp. of āscamian to shame, fr. ā- (perfective prefix) + scamian to shame — more at ABIDE, SHAME] (bef. 12c) 1 a : feeling shame, guilt, or disgrace b : feeling inferior or unworthy 2 : restrained by anticipation of shame (was ~ to beg) — **asham·ed·ly** \-'shā-məd-lē\ adv

**Ashan·ti** \ə-'shän-tē, -'shän-\ n, pl **Ashanti** or **Ashantis** [Twi àsántè] (1721) 1 : a member of a people of southern Ghana 2 : the dialect of Akan spoken by the Ashanti people

**ash-blond** or **ash-blonde** \'ash-'bländ\ adj (1903) : pale or grayish blond (~ hair)

**Ash·can** \'ash-,kan\ adj (1939) : of or relating to a group of 20th century American painters who depicted city life realistically (~ school)

**ash can** n (1889) 1 : a metal receptacle for refuse 2 slang : DEPTH CHARGE

**¹ash·en** \'a-shən\ adj (bef. 12c) : of, relating to, or made from ash wood

**²ashen** adj (14c) : resembling ashes (as in color); esp : deadly pale (a face ~ and haggard)

**Ash·er** \'a-shər\ n [Heb Āshēr] : a son of Jacob and the traditional eponymous ancestor of one of the tribes of Israel

**ash·fall** \'ash-,föl\ n (1923) : a deposit of volcanic ash

**Ash·ke·naz·i** \,äsh-kə-'nä-zē, ,ash-\ n, pl **-naz·im** \-'nä-zəm, -'na-\ [LHeb Ashkĕnazi, fr. Ashkĕnāz, medieval rabbinical name for Germany] (1839) : a member of one of the two great divisions of Jews comprising the eastern European Yiddish-speaking Jews — compare SEPHARDI — **Ash·ke·naz·ic** \-'nä-zik, -'na-\ adj

**ash·lar** \'ash-lər\ n [ME aschelar, fr. MF aiscelier traverse beam, fr. OF, fr. aissel, fr. L axis, alter. of assis] (14c) 1 : hewn or squared stone; also : masonry of such stone 2 : a thin squared and dressed stone for facing a wall of rubble or brick

**ashore** \ə-'shōr, -'shör\ adv (1582) : on or to the shore

**as how** conj (1771) : THAT (allowed as how she was glad to be here)

**ash·ram** \'äsh-rəm, -räm; 'ash-rəm\ n [Skt āśrama, fr. āśrama religious exercise] (1917) 1 : a secluded dwelling of a Hindu sage; also : the group of disciples instructed there 2 : a religious retreat

**Ash·to·reth** \'ash-tə-,reth\ n [Heb 'Ashtōreth] : ASTARTE

**ash·tray** \'ash-,trā\ n (1887) : a receptacle for tobacco ashes and for cigar and cigarette butts

**Ashur** \'ä-,shür\ n [Akkadian Ashur] : the chief deity of the Assyrians

**Ash Wednesday** n (14c) : the first day of Lent — see EASTER table

**ashy** \'a-shē\ adj **ash·i·er; -est** (14c) 1 : of or relating to ashes 2 : ASHEN

**Asia·go** \,ä-zhē-'ä-(,)gō, ,ä-sē-, -shē-\ n [Asiago, town in Italy] (1938) : a pungent hard yellow cheese of Italian origin suitable for grating

**¹Asian** \'ā-zhən also -shən\ adj (1550) : of, relating to, or characteristic of the continent of Asia or its people

**²Asian** n (ca. 1890) : a native or inhabitant of Asia

**Asian–Amer·i·can** \-ə-'mer-ə-kən\ n (1974) : an American of Asian descent — **Asian–American** adj

**Asian elephant** n (1981) : ELEPHANT 1b

**Asian influenza** n (1957) : influenza caused by a mutant strain of the influenza virus isolated during the 1957 epidemic in Asia — called also Asian flu

**Asi·at·ic** \,ā-zhē-'a-tik, -zē-\ adj (1602) : ASIAN — sometimes taken to be offensive — **Asiatic** n

**Asiatic cholera** n (1831) : cholera of Asian origin that is caused by virulent strains of the cholera vibrio (Vibrio cholerae)

**Asiatic elephant** n (1930) : ELEPHANT 1b

**¹aside** \ə-'sīd\ adv (14c) 1 : to or toward the side (stepped ~) 2 : away from others or into privacy (pulled him ~) 3 : out of the way esp. for future use : AWAY (putting ~ savings) 4 : away from one's thought or consideration (jesting ~)

**²aside** prep (1592) also : BEYOND, PAST

**³aside** n (ca. 1751) 1 : an utterance meant to be inaudible to someone; esp : an actor's speech heard by the audience but supposedly not by other characters 2 : a straying from the theme : DIGRESSION

**aside from** prep (1818) 1 : in addition to : BESIDES 2 : EXCEPT FOR

**as if** conj (13c) 1 : as it would be if (it was as if he had lost his last friend) 2 : as one would do if (he ran as if ghosts were chasing him) 3 : THAT (it seemed as if the day would never end)

**as·i·nine** \'a-s'n-,īn\ adj [L asininus, fr. asinus ass] (15c) 1 : marked by inexcusable failure to exercise intelligence or sound judgment (an ~ excuse) 2 : of, relating to, or resembling an ass   syn see SIMPLE — **as·i·nine·ly** adv — **as·i·nin·i·ty** \,a-s'n-'i-nə-tē\ n

**¹ask** \'ask, 'ask; dial 'aks\ vb **asked** \'as(k)t, 'as(k)t, 'ask; dial 'akst\; **ask·ing** [ME, fr. OE āscian; akin to OHG eiscōn to ask, Lith eiškóti to seek, Skt icchati he seeks] vt (bef. 12c) 1 a : to call (on) for an answer b : to put a question about : c : SPEAK, UTTER (~ a question) 2 a : to make a request of (she ~ed her teacher for help) b : to make a request for (she ~ed help from her teacher) 3 a : to call for : REQUIRE 4 : to set as a price (~ed $3000 for the car) 5 : INVITE (~ ~ 1 : to

\ə\ abut \ᵊ\ kitten, F table \ər\ further \a\ ash \ā\ ace \ä\ mop, mar \aù\ out \ch\ chin \e\ bet \ē\ easy \g\ go \i\ hit \ī\ ice \j\ job \ŋ\ sing \ō\ go \ò\ law \ói\ boy \th\ thin \ṯh\ the \ü\ loot \ù\ foot \y\ yet \zh\ vision \a, ᵏ, ᵉ, œ, œ̄, ue, uᵉ, ᵛ\ see Guide to Pronunciation

# EXHIBIT 3
# REDACTED IN ITS ENTIRETY

# EXHIBIT 4
# REDACTED IN ITS
# ENTIRETY

# EXHIBIT 5

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE


McKESSON INFORMATION SOLUTIONS LLC,

Plaintiff,

-against-                          Civil Action No.
                                   04-1258-SLR

THE TRIZETTO GROUP, INC.,

Defendant.

CERTIFIED
COPY

---

VIDEOTAPED DEPOSITION OF KAREN LAMPE

New York, New York

Wednesday, September 14, 2005


Reported by:
CATHI IRISH
RPR/CLVS

JOB NO. 38481

www.sarnoffcourtreporters.com
46 Corporate Park, Suite 100      445 South Figueroa St., Suite 2950
Irvine, CA 92606                  Los Angeles, CA 90071
                phone  877.955.3855
                fax    949.955.3854



SARNOFF
Court Reporters and
Legal Technologies

Page 21

12:38 1  you started in 1998?
12:38 2       A.  Just in -- once this lawsuit came up,
12:38 3  we were asked to -- anybody that knew anything or
12:38 4  knew where to find documents or if we had
12:38 5  documents at our desk to look through whatever we
12:38 6  had, go back in your memory.  So there were -- I
12:38 7  was one -- not a point person, but I was someone
12:38 8  that they came to.  And I said I wasn't here, but
12:38 9  I did ask some programmers, you know, if they had
12:38 10  any involvement, you know, trying to track down
12:38 11  somebody that was here at that time.  But I didn't
12:38 12  have any information that came up.
12:38 13      Q.  Are you prepared to testify regarding
12:38 14  how and when Erisco developed ClaimFacts or
12:38 15  ClinicaLogic?
12:38 16      A.  No.
12:39 17      Q.  Have you had any discussions with
12:39 18  anyone all the way up until today about the
12:39 19  development at Erisco of ClaimFacts or
12:39 20  ClinicaLogic before you started in 1998, other
12:39 21  than what you just mentioned?
12:39 22      A.  No.
12:39 23      Q.  What positions have you held at Erisco
12:39 24  starting in 1998?
12:39 25      A.  Business analyst, senior business

Page 22

12:39 1  analyst, and currently business analysis
12:40 2  specialist in product development of ClaimFacts.
12:40 3      Q.  Have you worked with -- strike that.
12:40 4       Have you had responsibility for
12:40 5  ClaimFacts the entire time you've worked at
12:40 6  Erisco?
12:40 7      A.  Yes.
12:40 8      Q.  Who have you reported to?
12:40 9      A.  Originally Tim Brix.  Then Bob
12:40 10  Reynolds, then Bernadette Flesch, and currently
12:40 11  Bob Reynolds again.
12:40 12      Q.  What's Bob Reynolds' position?
12:40 13      A.  Manager, product development, I think.
12:40 14  No, QA.  He's manager of QA and product
12:40 15  development is under that.
12:41 16      Q.  Can you testify regarding any of the
12:41 17  development work at Erisco regarding clinical
12:41 18  editing of medical service codes before 1998?
12:41 19      A.  No.
12:41 20      Q.  Can you testify regarding the
12:41 21  development of ClaimFacts at Erisco prior to 1998?
12:42 22      A.  No.
12:42 23      Q.  When was the first time that you heard
12:42 24  of McKesson's patent that we have asserted against
12:42 25  TriZetto in this lawsuit?

Page 23

12:42 1       A.  In relation to this lawsuit.
12:42 2       Q.  After the lawsuit was filed?
12:42 3       A.  Might have been before the lawsuit was
12:42 4  filed but in relation to McKesson, I guess,
12:42 5  contacting TriZetto.
12:42 6       Q.  When was the first time you heard about
12:42 7  the patent?
12:42 8       A.  I know that it was during fall of last
12:42 9  year when outside counsel came to the office.  I
12:42 10  might have heard about it prior to that, you know,
12:42 11  office -- just people in the office talking or
12:42 12  someone telling me since I was involved with
12:42 13  ClinicaLogic.
12:42 14      Q.  Can you specifically recall any
12:43 15  discussions or communications you had at TriZetto
12:43 16  regarding the McKesson patent before this lawsuit?
12:43 17      A.  No.
12:43 18      Q.  Are you -- strike that.
12:43 19       Are you aware of any efforts at all by
12:43 20  TriZetto to change any of its products or services
12:43 21  as a result of McKesson's patent?
12:43 22      A.  No.
12:43 23      Q.  During the entire time -- and that
12:43 24  question covers from 1998 when you started.
12:43 25      A.  Uh-huh.

Page 24

12:43 1       Q.  You understood that?
12:43 2       A.  Yes.
12:43 3       Q.  To your knowledge, has TriZetto or its
12:43 4  predecessor, Erisco, done anything differently at
12:44 5  all within the company as a result of being aware
12:44 6  of the McKesson patent?
12:44 7       A.  No.
12:44 8       Q.  Business as usual?
12:44 9       A.  Yes.
12:44 10      Q.  But do you believe that you would have
12:44 11  known if there were discussions or consideration
12:44 12  at Erisco or TriZetto about changing ClaimFacts or
12:44 13  ClinicaLogic as a result of the patent?
12:44 14      A.  All the changes for ClinicaLogic pretty
12:44 15  much go through me.  And since I've been there,
12:44 16  all the changes have been customer-driven through
12:44 17  our enhancement committee.
12:44 18      Q.  So you would have known if the company
12:44 19  said we've got this patent issue and we're going
12:44 20  to have to modify ClaimFacts or ClinicaLogic,
12:44 21  right?
12:44 22      A.  I would think so, yes.
12:44 23      Q.  Since the lawsuit was filed, have you
12:45 24  had any discussions or been a part of any meetings
12:45 25  where the patent was discussed?

6 (Pages 21 to 24)

Page 25

12:45  1    A.   Yes.
12:45  2    Q.   How many?
12:45  3    A.   Four maybe. Four or five.
12:45  4    Q.   When was the first such meeting?
12:45  5    A.   It was last fall sometime with outside
12:45  6  counsel.
12:45  7    Q.   When you say outside counsel, do you
12:45  8  know which law firm it was?
12:45  9    A.   No, I don't remember the law firm. I
12:45  10  remember the gentleman that came.
12:45  11    Q.   What was his name?
12:45  12    A.   Bob Palmer.
12:45  13    Q.   Who attended the meeting?
12:45  14    A.   Me, Tony Bellomo, Ellen Buttolph, Craig
12:46  15  Luftig. There were two technical writers that
12:46  16  were invited. I don't know who they were. They
12:46  17  were working with Ellen because she's over the
12:46  18  technical -- or the documentation control. There
12:46  19  were other people there, but I can't place them.
12:46  20    Q.   How long did the meeting last?
12:46  21    A.   Maybe all day.
12:46  22    Q.   Where was the meeting?
12:46  23    A.   At our office in Union.
12:46  24    Q.   Union City, New Jersey?
12:46  25    A.   No, Union, New Jersey.

Page 26

12:46  1    Q.   Okay, Union.
12:46  2         What was the purpose of the meeting?
12:47  3    A.   To explain to us about the lawsuit and
12:47  4  to go over the patent and to gather information.
12:47  5    Q.   Had you read the patent by the time the
12:47  6  meeting started?
12:47  7    A.   No.
12:47  8    Q.   Did you receive a copy of the patent at
12:47  9  the meeting?
12:47  10    A.   Yes.
12:47  11    Q.   Did you read it after that?
12:47  12    A.   No.
12:47  13    Q.   Have you read it since?
12:47  14    A.   No.
12:47  15    Q.   Did you understand from the meeting or
12:47  16  anything you learned after the meeting that anyone
12:47  17  else at the meeting had read the patent at that
12:47  18  time from TriZetto?
12:47  19    A.   During the meeting, we went through the
12:47  20  patent, but I don't know of anyone that continued
12:47  21  to read it or study it or anything afterwards. Is
12:47  22  that what you were asking?
12:47  23    Q.   Sure. Were there any documents handed
12:47  24  out at the meeting?
12:48  25    A.   The patent. I can't remember anything

Page 27

12:48  1  else.
12:48  2    Q.   Was there discussion at the meeting
12:48  3  about whether TriZetto infringed the patent?
12:48  4  DI       MR. MUINO: I have to object. This is
12:48  5    getting into privileged territory, so I have
12:48  6    to instruct you not to answer that, Karen.
12:48  7         MR. RANDALL: It calls for a yes or no.
12:48  8         MR. MUINO: It doesn't matter.
12:48  9  BY MR. RANDALL:
12:48  10    Q.   Was there discussion at the meeting
12:48  11  about whether the patent was invalid?
12:48  12  DI       MR. MUINO: That's pretty much the same
12:48  13    area. It's privileged and I instruct you not
12:48  14    to answer.
12:48  15    Q.   Was there a discussion at the meeting
12:48  16  about whether or not the patent would not be able
12:48  17  to be enforced by McKesson for any reason?
12:49  18  DI       MR. MUINO: Same objection and same
12:49  19    instruction.
12:49  20    Q.   Was there any discussion at the meeting
12:49  21  regarding whether McKesson had delayed too long in
12:49  22  asserting the patent against TriZetto?
12:49  23  DI       MR. MUINO: Same objection, same
12:49  24    instruction.
12:49  25    Q.   Was there any discussion at the meeting

Page 28

12:49  1  about whether or not McKesson had done or said
12:49  2  anything that would lead TriZetto to believe that
12:49  3  McKesson was not going to assert the patent
12:49  4  against TriZetto?
12:49  5  DI       MR. MUINO: Same objection, same
12:49  6    instruction.
12:49  7         MR. RANDALL: Counsel, just so we save
12:49  8    some time, I take it you're not going to allow
12:49  9    the witness to testify about any
12:49  10    communications that occurred during that
12:49  11    meeting; is that right?
12:49  12         MR. MUINO: To the extent that our
12:49  13    waiver covers opinion letters generated by the
12:49  14    firm of Blakely, Sokoloff, you can ask about
12:49  15    that.
12:49  16         MR. RANDALL: That's what I've been
12:50  17    asking about.
12:50  18         MR. MUINO: If you tailor it
12:50  19    specifically to that, I won't object.
12:50  20         MR. RANDALL: That's what I was doing.
12:50  21         MR. MUINO: Those aren't the questions
12:50  22    I heard.
12:50  23         MR. RANDALL: It's all in the
12:50  24    application of the scope of the waiver. So
12:50  25    you may say that you believe you are applying

7 (Pages 25 to 28)

Page 29

12:50  1    a certain scope, but the proof is in the
12:50  2    pudding, so to speak. And the questions I've
12:50  3    asked and the instructions you've given, do
12:50  4    you still stand by all your instructions?
12:50  5        MR. MUINO: Yes, yes, I do. I mean,
12:50  6    you understand as of now we haven't yet
12:50  7    resolved that issue. If it's resolved in your
12:50  8    favor, you can ask those questions.
12:50  9        MR. RANDALL: You'll make the witness
12:50 10    available?
12:50 11        MR. MUINO: If we have to.
12:50 12        MR. RANDALL: Well, I mean, the
12:50 13    question is, if it's determined that the
12:50 14    waiver is beyond the scope that you think it
12:50 15    is and the way you've applied it, then you'll
12:50 16    make the witness available, right?
12:50 17        MR. MUINO: If we have to, Counsel,
12:50 18    yes.
12:50 19    BY MR. RANDALL:
12:50 20    Q.    During this meeting -- strike that.
12:50 21        What's your best estimate as to when
12:51 22    the meeting was? You said it was in the fall of
12:51 23    last year. What month is your best estimate?
12:51 24    A.    October, November.
12:51 25    Q.    And that is the first time you ever

Page 30

12:51  1    heard anything at TriZetto about McKesson's
12:51  2    patent; is that right?
12:51  3    A.    It's the first time I recall hearing
12:51  4    it. Certainly the first time I saw it.
12:51  5    Q.    And you don't recall any other
12:51  6    discussions or consideration at TriZetto about
12:51  7    this patent other than, at least to the best of
12:51  8    your recollection, having this meeting in the fall
12:51  9    of last year, correct?
12:51 10    A.    Correct.
12:51 11    Q.    During the meeting, did -- was there
12:51 12    any discussion at all about an opinion by outside
12:51 13    counsel regarding the patent?
12:51 14        MR. MUINO: You can answer.
12:51 15        THE WITNESS: Yes.
12:51 16    BY MR. RANDALL:
12:52 17    Q.    So there was a discussion about what
12:52 18    outside counsel thought about the McKesson patent;
12:52 19    is that right?
12:52 20    A.    Yes.
12:52 21    Q.    And what was discussed?
12:52 22    A.    Outside counsel felt that there was
12:52 23    prior art and therefore the patent may not be
12:52 24    enforceable.
12:52 25    Q.    Was there anything else that was

Page 31

12:52  1    discussed at the meeting about the patent, other
12:52  2    than what you just testified to?
12:52  3 DI       MR. MUINO: I have to object to that.
12:52  4    I think that's privileged and I instruct you
12:52  5    not to answer.
12:52  6    BY MR. RANDALL:
12:52  7    Q.    Was there any document, memo or letter
12:52  8    or anything from outside counsel regarding the
12:52  9    patent that was reviewed or discussed at the
12:52 10    meeting?
12:52 11    A.    I don't remember.
12:53 12    Q.    Was there any prior art, by that I mean
12:53 13    articles or patents or anything else, other
12:53 14    documents specifically discussed at the meeting?
12:53 15    A.    Yes.
12:53 16    Q.    What was discussed?
12:53 17    A.    It was the Caterpillar editing system
12:53 18    or direction. There was an article that prior
12:53 19    counsel had come across. I remember it being
12:53 20    Caterpillar but --
12:53 21    Q.    A Caterpillar article?
12:53 22    A.    Yes.
12:53 23    Q.    Was there any other specific prior art
12:53 24    discussed at the meeting?
12:53 25    A.    Well, I mentioned that I used to do

Page 32

12:53  1    this manually out of experience, but other than
12:53  2    that I don't recall anything.
12:54  3    Q.    When you say used to do "this", used to
12:54  4    do what is described in the patent?
12:54  5    A.    Well, no, as we talked about clinical
12:54  6    editing or clinical -- or how codes relate to one
12:54  7    another, multiple surgeries, that sort of thing is
12:54  8    what I used -- one of the things I did in
12:54  9    reviewing claims.
12:54 10    Q.    Did you discuss at the meeting that
12:54 11    TriZetto -- TriZetto's products operate as
12:54 12    described in the patent?
12:54 13    A.    I don't recall that -- well, maybe I
12:54 14    don't understand your question.
12:54 15    Q.    All right.
12:54 16        You said that you had a discussion
12:54 17    about clinical editing, right?
12:54 18    A.    Right.
12:54 19    Q.    And you understood that's what the
12:54 20    patent covered, right?
12:54 21    A.    Right.
12:54 22    Q.    Okay. And you said you used to do it
12:54 23    manually, right?
12:54 24    A.    Yes.
12:54 25    Q.    Was there any discussion that that's in

8 (Pages 29 to 32)

# EXHIBIT 6

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

McKESSON INFORMATION
SOLUTIONS, LLC,

       Plaintiff,

   vs.

THE TRIZETTO GROUP, INC.,

    Defendant.

Civil Action
No. 04-1258-SLR



The videotaped deposition of JOHN PETER

DANZA, called by the Plaintiff for examination,

pursuant to Notice, and pursuant to the Rules of

Civil Procedure for the United States District

Courts, taken before Sandra L. Rocca, CSR and

Notary Public in and for the County of DuPage, and

State of Illinois, at 333 West Wacker Drive,

Chicago, Illinois, on the 12th day of September,

2005, at the hour of 9:45 a.m.


JOB NO. 38561



www.sarnoffcourtreporters.com
46 Corporate Park, Suite 100    445 South Figueroa St., Suite 2950
Irvine, CA  92606         Los Angeles, CA  90071
phone  877.955.3855
fax     949.955.3854

SARNOFF
Court Reporters and
Legal Technologies

Page 5

```
09:50:00  1    reporter today is Sandi Rocca with Sarnoff Court
09:50:03  2    Reporters of San Francisco, California. Will you
09:50:07  3    please swear in the witness?
09:50:14  4         JOHN PETER DANZA,
09:50:14  5    having been first duly sworn, was examined and
09:50:14  6    testified as follows:
09:50:16  7         EXAMINATION
09:50:16  8    BY MR. HENDERSHOT:
09:50:16  9         Q. Morning, Mr. Danza.
09:50:17 10         A. Morning.
09:50:18 11         Q. Do you understand generally what the
09:50:19 12    procedures of this deposition will be today?
09:50:22 13         A. Yes, I believe so.
09:50:22 14         Q. Have you been deposed before?
09:50:24 15         A. I have.
09:50:24 16         Q. How many times?
09:50:25 17         A. Twice.
09:50:26 18         Q. And in connection with what matters?
09:50:27 19         A. Once involving a personal -- a personal
09:50:31 20    lawsuit and once involving an action involving
09:50:34 21    TriZetto.
09:50:35 22         Q. And the action involving TriZetto, what
09:50:38 23    was the subject matter of that action?
09:50:40 24         A. That was a contract dispute between
```

Page 6

```
09:50:42  1    TriZetto and one of its clients.
09:50:44  2         Q. What was that contract dispute relating
09:50:46  3    to specifically?
09:50:46  4         A. It was relating to specific items that
09:50:48  5    the plaintiff had indicated that were -- situations
09:50:53  6    that were or statements that were made during the
09:50:55  7    sales cycle that they felt that were not true once
09:50:58  8    they became a client.
09:50:59  9         Q. And statements regarding what, that the
09:51:02 10    customer felt was untrue?
09:51:03 11         A. That they felt that TriZetto had made
09:51:07 12    some positions that the software did certain
09:51:10 13    functionality that they felt that it didn't once
09:51:13 14    they actually got the software and were using it.
09:51:15 15         Q. And what sort of functionality is that?
09:51:19 16         A. It involved the building of benefit
09:51:21 17    plans.
09:51:21 18         Q. And specifically within that general area
09:51:24 19    of building benefit plans, what was the specific
09:51:26 20    area of functionality that they thought the product
09:51:29 21    did not deliver?
09:51:30 22         A. They felt that it delivered the ability
09:51:33 23    to have multiple plans attached to a given employee
09:51:42 24    and that product -- the product does not do that
```

Page 7

```
09:51:46  1    and, in fact, has one plan per employee.
09:51:48  2         Q. Okay. What was the name of the customer
09:51:50  3    in that action?
09:51:51  4         A. It was Associated Third Party
09:51:55  5    Administrators.
09:51:56  6         Q. Okay. So backtrack here a little bit.
09:52:00  7    You understand the oath you took earlier in this
09:52:02  8    deposition attaches as if it were taken in a court
09:52:05  9    of law and the penalty of perjury attaches to it?
09:52:08 10         A. Yes.
09:52:08 11         Q. Is there any reason sitting here today
09:52:11 12    you don't think you can testify fully and
09:52:13 13    accurately?
09:52:13 14         A. No reason.
09:52:14 15         Q. Can you be describe your formal education
09:52:16 16    following high school?
09:52:17 17         A. Sure. Post-high school I have a degree
09:52:20 18    from Elmhurst College. It's a Bachelor of Arts I
09:52:26 19    believe it is, Bachelor of Arts or Bachelor of
09:52:28 20    Science, one or the other, in business
09:52:30 21    administration and economics.
09:52:32 22         Q. What year did you receive that degree?
09:52:33 23         A. 1990.
09:52:35 24         Q. And how long have you been employed by
```

Page 8

```
09:52:38  1    TriZetto?
09:52:38  2         A. I've been employed by TriZetto actually
09:52:41  3    -- one of the TriZetto purchased companies since
09:52:43  4    1993.
09:52:44  5         Q. And what did you do from 1990 to 1993
09:52:47  6    specifically in terms of your employment?
09:52:49  7         A. Oh, I was working for United Insurance
09:52:52  8    Company of America.
09:52:52  9         Q. And what did you do for United Insurance
09:52:55 10    Company of America from 1990 to 1993?
09:52:56 11         A. I was a systems manager, so managed some
09:53:00 12    of the administration systems.
09:53:02 13         Q. When you say administration systems, did
09:53:04 14    those administration systems involve editing of
09:53:09 15    claims or processing medical claims?
09:53:11 16         A. One of the systems was our claims system,
09:53:13 17    and the other a policy management system.
09:53:15 18         Q. What claims system did you use?
09:53:16 19         A. We used two different systems, one was an
09:53:18 20    in-house written system, the other one was a -- was
09:53:21 21    a vendor system that was purchased or licensed from
09:53:25 22    a company called Cybertech.
09:53:27 23         Q. Okay. Do you have a title at TriZetto?
09:53:33 24         A. Yes.
```

2 (Pages 5 to 8)

Page 9

09:53:33  1    Q.  What's that title?
09:53:35  2    A.  It is manager of QicLink product
09:53:38  3  management.
09:53:38  4    Q.  What are your responsibilities as manager
09:53:40  5  of QicLink product management?
09:53:42  6    A.  My department sets the business
09:53:44  7  direction, the business functionality direction for
09:53:46  8  the QicLink product line.
09:53:48  9    Q.  And do you report to anyone?
09:53:50 10    A.  I do.
09:53:50 11    Q.  Who do you report to?
09:53:51 12    A.  A gentleman by the name of Rob
09:53:56 13  Schleicher.  That's S-c-h-l-e-i-c-h-e-r.
09:53:58 14    Q.  Did you work at a company called Resource
09:54:05 15  Information Management Systems prior to TriZetto?
09:54:06 16    A.  That was the company that hired me in
09:54:08 17  1993, yes.
09:54:09 18    Q.  They were acquired by TriZetto?
09:54:11 19    A.  They were, yes.
09:54:12 20    Q.  Around what year?
09:54:13 21    A.  It was 2000, end of 2000.
09:54:15 22    Q.  I'd like to mark as Danza Exhibit 1,
09:54:18 23  Notice of Deposition of Defendant TriZetto pursuant
09:54:21 24  to FRCP 30(b)(6).

Page 10

09:54:41  1      (Document marked as Danza Exhibit No. 1
09:54:42  2  for identification.)
09:54:42  3  BY MR. HENDERSHOT:
09:54:43  4    Q.  Take a moment to review it.  Have you
09:54:53  5  seen this document before, Mr. Danza?
09:54:54  6    A.  This is the first time I've seen it.
09:54:58  7    Q.  Okay.  Well, have your attorneys
09:55:00  8  discussed with you the fact that you're testifying
09:55:02  9  here on behalf of TriZetto today?
09:55:04 10    A.  Yes.
09:55:04 11    Q.  And if you would, look at page 2 of the
09:55:08 12  document marked as Exhibit 1.  It lists Topic 1,
09:55:23 13  the functionality of every accused product.  Do you
09:55:26 14  see that?
09:55:26 15    A.  I do.
09:55:27 16    Q.  Do you understand you're being offered to
09:55:29 17  testify on behalf of TriZetto here today regarding
09:55:31 18  the functionality of an accused product?
09:55:33 19    A.  Yes.
09:55:33 20    Q.  Is that product QicLink?
09:55:34 21    A.  It is.
09:55:35 22    Q.  Do you understand that TriZetto has
09:55:37 23  designated you as the person most knowledgeable
09:55:40 24  regarding the functionality of the QicLink product?

Page 11

09:55:42  1    A.  Yes, I am.
09:55:42  2    Q.  Are you the person most knowledgeable
09:55:44  3  regarding the functionality of the QicLink product
09:55:47  4  within TriZetto?
09:55:48  5    A.  Yes, I would be.
09:55:49  6    Q.  What qualifies you as the person most
09:55:54  7  knowledgeable regarding QicLink?
09:55:54  8    A.  I've been involved with the product since
09:55:56  9  my employment in '93, 1993.  And my position as the
09:56:01 10  head of product management really puts me in charge
09:56:03 11  of its business functionality.
09:56:06 12    Q.  Does it also put you in charge of its
09:56:09 13  technical functionality?
09:56:11 14    A.  It puts me in charge of the business
09:56:13 15  functionality to the point where it is rendered
09:56:15 16  into a technical form.  I do not manage the
09:56:18 17  technical -- the technical programmers.
09:56:20 18    Q.  But you're knowledgeable regarding its
09:56:22 19  technical functionality?
09:56:23 20    A.  Yes, I am.
09:56:24 21    Q.  Including its claim editing
09:56:26 22  functionality?
09:56:27 23    A.  Yes.
09:56:27 24    Q.  Can you briefly describe what TriZetto's

Page 12

09:56:30  1  QicLink product is?
09:56:31  2    A.  Sure.  It is -- the QicLink product is
09:56:34  3  designed to be a benefits management system.  It
09:56:39  4  manages the enrollment of group -- the members of a
09:56:46  5  group health claim, group health policies.  And
09:56:50  6  what it then does is allows those -- those members
09:56:57  7  to be billed properly for, you know, for their
09:57:02  8  coverage.  It allows the payment of claims for
09:57:05  9  their medical services.
09:57:07 10    Q.  Okay.  So it processes claims for medical
09:57:10 11  services?
09:57:11 12    A.  It does process claims for medical
09:57:13 13  services.
09:57:13 14    Q.  So I assume it would also receive claims
09:57:15 15  for medical services?
09:57:16 16    A.  Yes.
09:57:17 17    Q.  And is it software?  Is it a series of
09:57:19 18  people that do it?  What exactly is the product?
09:57:21 19    A.  The product QicLink is software.
09:57:23 20    Q.  Okay.  So you require some sort of
09:57:26 21  computer system to run it?
09:57:28 22    A.  Yes, that's correct.
09:57:28 23    Q.  And to run QicLink, I assume you'd also
09:57:31 24  need a computer system with some form of CPU and

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
877.955.3855

EXHIBIT 7

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION


MCKESSON INFORMATION
SOLUTIONS, LLC,

            Plaintiff,

    vs.                              Civil Action No.
                                     04-1258SLR

THE TRIZETTO GROUP,
INC.,

            Defendant.



CERTIFIED COPY

───────────────────────────────


DEPOSITION OF PATRICIA KEPLINGER

Taken at the offices of
Westin Hotel
310 South High Street
Columbus, Ohio  43215

on September 14, 2005, at 9:04 a.m.

Reported by: Angela R. Starbuck, RPR/CRR


JOB NO. 38563

www.sarnoffcourtreporters.com
46 Corporate Park, Suite 100    445 South Figueroa St., Suite 2950
Irvine, CA  92606               Los Angeles, CA  90071
        phone  877.955.3855
        fax    949.955.3854



SARNOFF
Court Reporters and
Legal Technologies

Page 5

INDEX OF OBJECTIONS

| | PAGE | LINE |
|---|---|---|
| Objection by Mr. Kennedy | 24 | 12 |
| Objection by Mr. Kennedy | 25 | 15 |
| Objection by Mr. Kennedy | 31 | 24 |
| Objection by Mr. Kennedy | 32 | 10 |
| Objection by Mr. Kennedy | 35 | 20 |
| Objection by Mr. Kennedy | 37 | 24 |
| Objection by Mr. Kennedy | 38 | 15 |
| Objection by Mr. Kennedy | 43 | 7 |
| Objection by Mr. Kennedy | 44 | 16 |
| Objection by Mr. Kennedy | 45 | 6 |
| Objection by Mr. Kennedy | 46 | 20 |
| Objection by Mr. Kennedy | 56 | 19 |
| Objection by Mr. Kennedy | 57 | 19 |
| Objection by Mr. Kennedy | 58 | 9 |
| Objection by Mr. Kennedy | 59 | 15 |
| Objection by Mr. Kennedy | 61 | 22 |
| Objection by Mr. Kennedy | 65 | 20 |
| Objection by Mr. Kennedy | 68 | 18 |
| Objection by Mr. Kennedy | 69 | 3 |
| Objection by Mr. Kennedy | 71 | 12 |
| Objection by Mr. Kennedy | 72 | 12 |
| Objection by Mr. Kennedy | 76 | 11 |
| Objection by Mr. Kennedy | 82 | 19 |
| Objection by Mr. Kennedy | 86 | 24 |
| Objection by Mr. Kennedy | 107 | 6 |
| Objection by Mr. Kennedy | 108 | 8 |
| Objection by Mr. Kennedy | 140 | 16 |
| Objection by Mr. Kennedy | 141 | 10 |
| Objection by Mr. Hendershot | 157 | 11 |
| Objection by Mr. Hendershot | 157 | 19 |
| Objection by Mr. Hendershot | 160 | 12 |
| Objection by Mr. Hendershot | 160 | 24 |
| Objection by Mr. Hendershot | 163 | 5 |

Page 6

08:50  1      MR. HENDERSHOT: Michael Hendershot
09:04  2   of Skadden, Arps, in Palo Alto, for the
09:04  3   Plaintiff, McKesson Information Solutions.
09:04  4      MR. KENNEDY: Scott Kennedy of
09:04  5   Gibson, Dunn & Crutcher, in Irvine, for the
09:04  6   Defendant, the TriZetto Group.
09:04  7      MR. GARVINE: I actually don't have
09:04  8   a microphone on. Can you --
09:04  9      THE VIDEOGRAPHER: I'll still pick
09:04  10  you up.
09:04  11     MR. GARVINE: Can you? Okay.
09:04  12     Brian Garvine from Onda, LaBuhn &
09:04  13  Rankin for Harrington Benefits.
09:04  14     PATRICIA KEPLINGER
09:04  15  being first duly sworn, as hereinafter certified,
09:04  16  deposes and says as follows:
09:04  17     EXAMINATION
09:04  18  BY MR. HENDERSHOT:
09:04  19     Q. Good morning, Mrs. Keplinger. How
09:04  20  are you?
09:04  21     A. Fine.
09:04  22     Q. Is it Keplinger or Keplinger?
09:05  23     A. Either one.
09:05  24     Q. Okay. We'll go with Keplinger.
09:05  25     A. That's fine.

Page 7

09:05  1      Q. Do you understand what the
09:05  2   procedures of the deposition today will be
09:05  3   generally?
09:05  4      A. Yes.
09:05  5      Q. Have you been deposed before?
09:05  6      A. No.
09:05  7      Q. And you understand that even though
09:05  8   this is a somewhat informal setting, the
09:05  9   oath you just took has the same effect that
09:05  10  it would if you took it in the court of law?
09:05  11     A. Yes, I do.
09:05  12     Q. Is there any reason at all you feel
09:05  13  you cannot testify fully and accurately
09:05  14  today?
09:05  15     A. No.
09:05  16     Q. Could you briefly describe your
09:05  17  formal education since high school.
09:05  18     A. After graduating from high school, I
09:05  19  did have a couple years at Illinois Central
09:05  20  College, where I took classes in -- towards
09:05  21  a programming degree. After that, no more
09:05  22  formal education.
09:05  23     Q. Okay. And what years would those
09:05  24  have been at Illinois Central College,
09:05  25  roughly?

Page 8

09:05  1      A. I graduated high school in '70.
09:06  2      Q. Okay.
09:06  3      A. And I did not attend Illinois
09:06  4   Central right after high school, so probably
09:06  5   around 1980, or so. And that's -- that's
09:06  6   approximate.
09:06  7      Q. So prior to 1985?
09:06  8      A. I believe so.
09:06  9      Q. Okay. And are you currently an
09:06  10  employee at Harrington?
09:06  11     A. That is correct.
09:06  12     Q. And does Harrington have a full
09:06  13  formal corporate title?
09:06  14     A. Harrington Benefits Administration.
09:06  15     Q. Is it okay if I just refer to it as
09:06  16  Harrington today?
09:06  17     A. Yes.
09:06  18     Q. Okay.
09:06  19     A. Actually, it's Harrington Benefits
09:06  20  Systems, sorry.
09:06  21     Q. And do you have a title at
09:06  22  Harrington?
09:06  23     A. I'm vice-president of corporate IT
09:06  24  strategy.
09:06  25     Q. And what are your responsibilities

2 (Pages 5 to 8)

Page 9

```
09:06   1     generally as VP of corporate IT strategy?
09:06   2        A.  Project management.
09:06   3        Q.  And when you say product
09:06   4     management --
09:06   5        A.  Project.  Sorry.
09:06   6        Q.  When you say project management,
09:06   7     what sort of projects are you talking about?
09:06   8        A.  Right now, current project I'm on is
09:06   9     the upgrade of the TriZetto product from one
09:07  10     release to the more current release.
09:07  11        Q.  And when you say "the TriZetto
09:07  12     product," what product are you referring to?
09:07  13        A.  ClaimFacts.
09:07  14        Q.  Is that the only TriZetto product
09:07  15     that Harrington uses?
09:07  16        A.  No, we also use Facets.
09:07  17        Q.  And how long has Harrington used
09:07  18     Facets?
09:07  19        A.  Approximately two years.
09:07  20        Q.  Have you held any other prior titles
09:07  21     at Harrington?
09:07  22        A.  Yes.
09:07  23        Q.  Let me take a step back.  How long
09:07  24     have you been employed at Harrington?
09:07  25        A.  11 years.
```

Page 10

```
09:07   1        Q.  So that's dating back to 1994, if my
09:07   2     math's right?
09:07   3        A.  Correct, uh-huh.
09:07   4        Q.  And what have your prior titles been
09:07   5     at Harrington?
09:07   6        A.  Manager of -- I don't remember the
09:08   7     exact title.  It had to do with converting
09:08   8     groups of one system to the ClaimFacts
09:08   9     system.  And then vice-president of benefit
09:08  10     systems.
09:08  11        Q.  And how long has Harrington used the
09:08  12     ClaimFacts system?
09:08  13        A.  They've used it as long as I've been
09:08  14     there.
09:08  15        Q.  So since the mid 1980s, at least?
09:08  16        A.  I can't go back that far, so I don't
09:08  17     know.
09:08  18        Q.  Has there ever been a period of time
09:08  19     during -- during your employment at
09:08  20     Harrington where you haven't had knowledge
09:08  21     or some involvement with the use of
09:08  22     TriZetto's products?
09:08  23        A.  No.
09:08  24        Q.  I'd like to mark as Harrington
09:08  25     Deposition Exhibit 1 a letter enclosing a
```

Page 11

```
09:08   1     subpoena and deposition notice.
09:08   2           MR. KENNEDY:  Is that the subpoena?
09:08   3           MR. HENDERSHOT:  Yeah.
09:08   4           MR. KENNEDY:  Okay.  That's fine.
09:08   5     I've seen it.
09:08   6     BY MR. HENDERSHOT:
09:09   7        Q.  Would you take a look at Exhibit 1
09:09   8     for me, Mrs. Harrington -- sorry,
09:09   9     Mrs. Keplinger.
09:09  10           (Pause in proceedings.)
09:09  11     BY MR. HENDERSHOT:
09:09  12        Q.  Have you seen the document that's
09:09  13     been marked as Exhibit 1 before today?
09:09  14        A.  Yes, I have.
09:09  15        Q.  And do you recognize that as the
09:09  16     subpoena and deposition notice that you're
09:09  17     appearing here pursuant to?
09:09  18        A.  Yes.
09:09  19        Q.  I would like to direct your
09:09  20     attention to Page 2 of the deposition
09:09  21     notice -- of Exhibit A to the deposition
09:09  22     notice.  It's a page that includes the
09:10  23     heading, "Topics," about halfway down the
09:10  24     page.
09:10  25        A.  Uh-huh.
```

Page 12

```
09:10   1        Q.  Have you reviewed the topics listed
09:10   2     under the heading, "Topics," in the
09:10   3     deposition notice before today?
09:10   4        A.  Yes.
09:10   5        Q.  And you understand you're being
09:10   6     offered to testify on behalf of Harrington
09:10   7     here today?
09:10   8        A.  Yes.
09:10   9        Q.  And you understand you're being
09:10  10     offered as the person most knowledgeable
09:10  11     within Harrington regarding the topics in
09:10  12     the deposition notice?
09:10  13        A.  Yes.
09:10  14        Q.  Okay.  And are you appearing here to
09:10  15     testify today on behalf of Harrington with
09:10  16     respect to each of the topics listed in the
09:10  17     dep -- deposition notice?
09:10  18        A.  Yes.
09:10  19        Q.  With respect to Topic 1, which
09:10  20     involves the duration, extent, and manner of
09:10  21     use of any TriZetto products by Harrington
09:10  22     to perform clinical editing, what qualifies
09:10  23     you as the person most knowledgeable within
09:10  24     Harrington regarding Topic 1?
09:11  25        A.  Well, I would say it's probably
```

3 (Pages 9 to 12)