# EXHIBIT 1

LEXSEE 2004 U.S. DIST. LEXIS 24949

METROLOGIC INSTRUMENTS, INC., Plaintiff, v. PSC, INC., Defendant.

Civil Action No. 99–4876 (JBS)

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW JERSEY

*2004 U.S. Dist. LEXIS 24949*

December 13, 2004, Decided
December 13, 2004, Filed

**PRIOR HISTORY:** *Metrologic Instruments, Inc. v. PSC Inc., 2004 U.S. Dist. LEXIS 28422 (D.N.J., May 6, 2004)*

**DISPOSITION:** Plaintiffs' motion for summary judgment of infringement granted. Defendant's motion for summary judgment granted in part and denied in part.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** In a patent infringement action, plaintiff patentee filed a motion for summary judgment as to several of its claims, and defendant alleged infringer filed a motion for partial summary judgment of non-infringement and invalidity of the patents at issue.

**OVERVIEW:** The patentee filed an infringement action alleging that a device infringed upon its patent of a device that processed digital input signals, such as signals from bar code scanners. The alleged infringer sought a declaratory judgment of non-infringement and invalidity of the patent. Both parties sought summary judgment. The court found that the function of the accused devices appeared identical to the function disclosed in the patent's specification. Even if the accused devices could not be held to literally infringe the patent, they infringed under the doctrine of equivalents. Therefore, the court granted summary judgment to the patentee as to one of the patents. However, the court granted summary judgment in favor of the alleged infringer as to the other patent because the patentee failed to comply with marking requirement of *35 U.S.C.S. § 287.*

**OUTCOME:** The court granted summary judgment in favor of the patentee and denied the alleged infringer's summary judgment motion as to one of the patents. The court granted summary judgment for the alleged infringer as to the other patent.

**LexisNexis(R) Headnotes**

*Patent Law > Claims & Specifications > Claim Language > General Overview*
[HN1] During claim construction, a court is only obligated to construe disputed claim terms.

*Patent Law > Infringement Actions > General Overview*
[HN2] An infringement analysis is a two-step process. The first step is for the court, as a matter of law, to construe the disputed claim terms. The second step is to compare the construed claims to the accused device to determine, as an issue of fact, whether all of the claim limitations are present in the accused device, either literally or by substantial equivalent.

*Patent Law > Infringement Actions > General Overview*
[HN3] A patent claim is infringed if every claim limitation finds correspondence in the accused device, either literally or by substantial equivalents. In determining literal infringement of claims written in means–plus–function language as provided for by *35 U.S.C.S. § 112,* the relevant structure in the accused device must perform the identical function recited in the claim and be identical or equivalent to the corresponding structure in the patent specification. Equivalence of structure is found when the differences between the structure in the accused device and any disclosed in the specification are insubstantial. The test for insubstantial differences is whether the assertedly equivalent structure performs the claimed function in substantially the same way to achieve substantially the same result as the corresponding structure described in the specification.

*Patent Law > Infringement Actions > Summary Judgment > General Overview*
[HN4] Summary judgment shall be granted when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law, pursuant to Fed. R. Civ. P. 56(c). Summary judgment is proper in patent infringement cases, when no reasonable jury could determine that every limitation recited in the properly con-

2004 U.S. Dist. LEXIS 24949, *

strued claim is not found in the accused device. Moreover, Rule 56(c) provides that judgment "shall be entered," unless the nonmoving party offers specific facts contradicting the facts averred by the movant, which indicate that there is a genuine issue for trial. If the evidence of the nonmoving party is "merely colorable or is not significantly probative, summary judgment may be granted. Summary judgment of infringement is proper after a court has conducted a Markman hearing and construed the claims.

*Patent Law > Infringement Actions > Claim Interpretation > Claim Differentiation*
[HN5] To determine whether a claim limitation is met literally, where expressed as a means for performing a stated function, a court must compare the accused structure with the disclosed structure, and must find equivalent structure as well as identity of claimed function for that structure.

*Patent Law > Infringement Actions > Infringing Acts > General Overview*
[HN6] To determine whether the accused devices infringe, it must be determined whether each and every element of the asserted claim is present in the accused device. If even a single claim element is not present, the claim is not infringed.

*Patent Law > Infringement Actions > Infringing Acts > General Overview*
[HN7] 35 U.S.C.S. § 287 requires a patentee to give either constructive or actual notice of infringement before monetary damages for infringement can accrue. A patentee may give notice either by fixing on the patented article the word "patent" or the abbreviation "pat.", together with the number of the patent, or when, from the character of the article, this can not be done, by fixing to it, or to the package wherein one or more of them is contained, a label containing a like notice. In the event of failure so to mark, no damages shall be recovered by the patentee in any action for infringement and continued to infringe thereafter, in which event damages may be recovered only for infringement occurring after such notice. One way to satisfy § 287 is to provide actual notice of infringement to the infringer. The requirements as to what constitutes actual notice are strict: the patentee must provide the accused infringer with specific and actual notice that charges infringement of an identified patent by a specific accused product. Any notice that does not identify the patent number and the accused product does not qualify as actual notice under § 287.

*Patent Law > Infringement Actions > Infringing Acts > General Overview*
[HN8] One way to satisfy *35 U.S.C.S. § 287* is to provide "constructive notice" by complying with the strict

marking requirements set forth in the statute. However, a patentee does not comply with the marking requirements until it can show that it "consistently marked substantially all of its patented products, and it was no longer distributing unmarked products.

*Civil Procedure > Pleading & Practice > Pleadings > Amended Pleadings*
*Civil Procedure > Pleading & Practice > Pleadings > Relation Back*
[HN9] See Fed. R. Civ. P. 15(c).

*Civil Procedure > Pleading & Practice > Pleadings > Relation Back*
[HN10] Fed. R. Civ. P. 15(c) is most frequently applied to avoid the dismissal of claims on statute of limitation grounds, but has also been applied in patent cases with respect to the patent damages provisions of *35 U.S.C.S. § 286.*

*Patent Law > Remedies > Damages > Time Limitations*
[HN11] *35 U.S.C.S. § 286* is not a true statute of limitations, but instead serves to limit infringement damages to six years prior to the filing of the complaint. In patent cases, the two most common relation back scenarios involve adding a related patent or adding a related party.

*Civil Procedure > Pleading & Practice > Pleadings > Relation Back*
*Patent Law > Remedies > Damages > Time Limitations*
[HN12] Infringement of one patent is not the same conduct or occurrence as infringement of another patent for the purposes of relation back, unless the claims with respect to the second patent are an integral part of the claims in the first action.

COUNSEL: [*1] Edwin Choicey, Esq., RIKER, DANZIG, SCHERER, HYLAND & PERRETTI, LLP, Morristown, New Jersey; Dennis J. Mondolino, Esq., Michael F. Hurley, Esq., MORGAN, LEWIS & BOCKIUS, LLP, New York, New York, for Plaintiff Metrologic Instruments, Inc.

Joel Schneider, Esq., ARCHER & GREINER, P.C., Haddonfield, New Jersey; James Shalek, Esq., Robert Mayer, Esq., PROSKAUER ROSE LLP, New York, New York, for Defendant PSC, Inc.

JUDGES: HONORABLE JEROME B. SIMANDLE.

OPINIONBY: JEROME B. SIMANDLE

OPINION:

2004 U.S. Dist. LEXIS 24949, *1

## OPINION

### Filed: December 13, 2004

SIMANDLE, District Judge:

This matter comes before the Court upon Plaintiff Metrologic's motion for summary judgment of infringement of Claims 8 and 10 of U.S. Patent No. 5,081,342 (the '342 patent) and Claims 1, 6 and 28 of U.S. Patent No. 5,343,027 (the '027 patent). Also before the Court are Defendant PSC Inc.'s motion for partial summary judgment of noninfringement and invalidity of U.S. Patent No. 5,637,852 (the '852 patent) as well as PSC Inc.'s motion for summary judgment under 35 U.S.C. § 287 on the '342 patent. n1

> n1 Plaintiff and Defendant entered a stipulation and order on August 16, 2004 that partial summary judgment could be entered against Metrologic with respect to its claim of PSC's infringement of U.S. Patent Nos. 5,081,359 and 5,789,731. The parties also stipulated that PSC's affirmative defenses and counterclaims for invalidity and unenforceability with respect to U.S. Patent Nos. 5,081,359 and 5,789,731 are dismissed without prejudice pursuant to Fed. R. Civ. P. 41 (a) (1).

[*2]

## I. BACKGROUND

### A. Procedural Posture

Metrologic Instruments, Inc. ("Metrologic") brought this action for patent infringement against PSC Inc. ("PSC") on October 12, 1999, alleging that Defendant's products infringed Metrologic's United States Patent Nos. 5,637,852 (the '852 patent), 5,627,359 (the '359 patent), 5,789,731 (the '731 patent), 5,260,553 (the '553 patent), 5,343,027 (the '027 patent), 5,686,717 (the '717 patent), 5,828,049 (the '049 patent), and 5,081,342 (the '342 patent). PSC filed a counterclaim, seeking a declaratory judgment of non-infringement and alleging unfair competition under § 43 of the Lanham Act.

This Court held a Markman hearing on August 6 and 7, 2002 to construe the claims at issue. After Defendant filed bankruptcy in December 2002, the case was administratively terminated on December 17, 2002. The case was reopened on July 18, 2003, after Defendant emerged from bankruptcy protection. In its lengthy Opinion of August 26, 2003, this Court set forth its construction of the disputed claim limitations in Metrologic's '359, '731, '852, '027, and '342 patents. Metrologic Instruments, Inc. v. PSC, Inc., 2003 WL 22077652 [*3] (D.N.J. Aug. 26,

2003) ("Markman Decision"). Metrologic filed its motion for reconsideration on an aspect of the decision relating to the multi-port '342 patent, which this Court denied on May 6, 2004.

The present summary judgment motions were filed and briefed by the parties at the time of the Markman hearing. However, PSC's voluntary bankruptcy placed an automatic stay on this action and, by agreement of the parties, the motions were deferred pending the Markman Decision. Supplemental briefing was permitted on the present motions and the Court heard oral argument on October 1, 2004.

B. Metrologic's Motion for Partial Summary Judgment of Infringement of Claims 8 and 10 of the '342 Patent and Claims 1, 6 and 28 of the '027 Patent

Metrologic seeks partial summary judgment as to its assertion that PSC's Magellan, Magellan SL, HS1250, and VS1200 products (collectively, the "Magellan Devices") infringe claims 8 and 10 of the '342 patent and claims 1, 6, and 28 of the '027 patent.

In the original summary judgment papers submitted to the Court, Metrologic identified ten limitations in the '342 patent claims: Limitation 1-5 within the preamble of independent claim 5, Limitations [*4] 6-8 within the body of claim 5, and Limitation 9 and 10 within the bodies of dependent claims 8 and 10, respectively. Metrologic asserted that the preamble contains affirmative limitations, which PSC disputed, and the parties disputed the meaning of Limitation 6-9. This Court determined in its Markman Decision that the preamble did not contain affirmative limitations. Moreover, this Court held that Limitation 8 was not a limitation and declined to construe it. This Court thus construed only Limitations 6, 7, and 9 of the '342 patent. See Markman Decision at *43. Similarly, for the '027 patent, Metrologic identified nine limitations, the meanings of two of which, Limitations 5 and 7, were disputed by the parties. The Court construed these two limitations. n2 Id.

> n2 [HN1] During claim construction, a court is only obligated to construe disputed claim terms. See United States Surgical Corp. v. Ethicon, Inc., 103 F.3d 1554, 1568 (Fed. Cir. 1997), cert. denied, 522 U.S. 950, 139 L. Ed. 2d 287, 118 S. Ct. 369 (1997).

[*5]

#### 1. Claims 8 and 10 of the '342 Patent

Metrologic asserts that the Magellan Devices infringe claims 8 and 10 of the '342 patent. Claim 8 depends from independent claim 5, and claim 10 depends from claim 8.

2004 U.S. Dist. LEXIS 24949, *5

The claims recite a device that processes digital input signals, such as signals from bar code scanners. The device accepts at least two digital input signals, such as an input from a high-speed, in-counter (or "slot") scanner and an input from a low-speed, hand-held scanner or light pen. (See '342 patent, 1:51-59.) Each digital input signal has two levels, such as low and high, representing the bars and spaces (or spaces and bars) on a bar code symbol. The input signals may be transmitted at different frequencies (or bit rates), based on the type of scanner and the resolution of the bar code symbol read. Some bar codes are "low density," such as those printed on a rough material, like cardboard, and others are "high density," such as those printed on a smooth material, like paper, and this will affect the frequency required to detect and process the bar code signal. (See id., 2:10-23.)

The claimed device generates a plurality of predetermined frequencies. It does [*6] this by using a clock input 12 to generate a fundamental or reference frequency, e.g., 40 MHz, and then uses a series of dividers (clock divider circuitry 14) to generate frequencies stepping down from the fundamental frequency by successive factors of 2, e.g., 20 MHz, 10 MHz, 5 MHz, 2.5 MHz, 1.25 MHz, 625 kHz, 312 kHz, 156 kHz, 78 kHz, 39 kHz, 19.5 kHz, 9.25 kHz, 4.875 kHz, and 2.44 kHz. (See id., 4:47-50, 9:33-68.) Clock input 12 accepts a number of input signals (which are external to clock input 12) in order to generate the fundamental or reference frequency. The word "predetermined" "refers not to a precise starting frequency determined beforehand, but to the known set of divisions that are applied through the clock divider circuitry 14 each time the device is operated, which creates the plurality of frequencies." Markman Decision at *31.

The claimed device measures the time duration of the high and low bar code signal levels using one of the plurality of frequencies previously generated. The device then produces digital data representing the measured time durations. The device measures the time durations by first selecting one of the predetermined clock frequencies using [*7] the clock mux n3 16, id. at *35, then counting the length of the high and low levels using the transition detector 24, the sequencing means 28, and the digitizing counting means 30. Id.; ('342 patent, 5:16-34.)

> n3 The word "mux" stands for "multiplexer," an electronic device that takes several signals as inputs and selects one of the input signals as an output.

The claimed device also includes a decoder for decoding the bar code signal information. This decoder decodes UPC and EAN bar codes, as well as a wide variety of other codes. (See '342 patent, 2:24-33.)

### 2. Claims 1, 6 and 28 of the '027 Patent

Metrologic asserts that the Magellan Devices also infringe claims 1, 6, and 28 of the '027 patent. Claims 1 and 28 are independent; claim 6 depends from claim 1.

The claims recite a device that decodes digital data signals, such as signals from bar code scanners. Each digital data signal has two levels, such as low and high, representing the bars and spaces (or spaces and bars) on a bar code symbol. [*8] The device includes at least two data input ports, each of which is connected to a scanner, and each of which receives one of the digital data signals. The digital data signals are connected to a transition detector, which detects transitions from low to high and high to low. Sequencing means 28 and digitizing counting means 30 take the output of the transition detector and produce signal level transition data.

The claimed device measures the time duration of the high and low bar code signal levels and produces digital data relating to the measured time durations. The device measures the time durations by using a fundamental or reference frequency, e.g., the output of clock input 12, and clock divider circuitry 14 to generate a plurality of frequencies. Clock mux 16 selects one of the plurality of frequencies and then counters 50 and 52 are used to count the length of the high and low levels. Markman Decision at *40.

The claimed device also includes a controller that controls the operation of the clock mux 16 and the selected frequencies based on the signal level transition data produced by the transition detector. The device further includes a programmable decoder, e.g., programmable [*9] processor 26 or fixed program decoder 20, for processing the digital data to produce decoded symbol data representative of the bar code symbol being scanned. Markman Decision at *43. Decoded symbol data is transmitted to a host device, e.g., a computer, through a data output port. The device may be realized as an integrated circuit chip. ('027 patent, 20:22-30.)

### 3. PSC's Accused Devices Relating to the '342 and '027 Patents

"X," "Y," and "Z" were code names given to scanner designs that Spectra-Physics (which PSC acquired in 1996) developed beginning in 1993. The "X" became the VS1000/VS1200 models, released in 1994; the "Y" became the HS1250, released in 1995; and the "Z" became the Magellan, also released in 1994 (the Magellan SL was released in 1997). These models share much of the same internal design, but differ by virtue of their different scanning orientations: the VS1200 has a vertical scanning window, the HS1250 has a horizontal scanning window, and the Magellans combine a vertical and hori-

zontal scanning window.

Each of the four accused devices, the Magellan, Magellan SL, VS1200 and HS1250, contain a port for connecting an undecoded hand-held device, which PSC [*10] refers to as a "hand-held laser control" (HHLC) port. (See Latimer Dep., Metrologic Ex. 5, p. 160; HS1250 Marketing Brochure, Metrologic Ex. 16, p. 2 ("peripheral port for undecoded handheld scanner"); VS1200 Marketing Brochure, Metrologic Ex. 17, p. l("peripheral port for undecoded scanner"); Magellan Marketing Brochure, Metrologic Ex. 29, p. 2 ("undecoded handheld scanner port").) The HHLC provides the input for connecting a slower speed hand-held device to the common decoding architecture of the high-speed scanner. (See Actis Dep. 1, Metrologic Ex. 4, p. 33:4–8.)

The outputs from the hand-held device and the high-speed device are provided to the DAT II ("Decoder by [Robert] Actis and [Andrew] Taussig") chip to decode barcode data. (See id.) The DAT II chip is a type of integrated circuit – an "ASIC" or "application specific integrated circuit." (See Actis Dep. I, Ex. 4, 82:16–23.) The Magellans use three DAT II chips, while the VS1200 and HS1250 each use a single DAT II chip. (See Magellan System Controller Diag. (Drawing 1–0244), Metrologic Ex. 6, p. 5 (PSC 0014699), items U25, U26, and U27; VS1000/VS1200 Mega-Main Diag. (Drawing 1–0249), Metrologic [*11] Ex. 7, p. 2 (PSC 0019728), item U7; HS1250 Speaker Main Diag. (Drawing 1–0260), Metrologic Ex. 8, p. 2 (PSC 0019784), item U9). Each of these representative drawings uses the same DAT II chip.

There are several inputs to the DAT II chip. These include "undecoded auxiliary input and standard scanner input." (Actis Dep 1, Metrologic Ex. 4, 79:16–23.) Standard scanner input uses the RTV[approximately]and STV_BAR[approximately]flip-flop to generate a BAR_HS (high speed) signal. (DAT II Theory of Operation, Metrologic Ex. 24, p. 7.) Auxiliary input, which could be a "single video data stream from an alternate scanning device (such as a wand)," can use the BAR_LS (low-speed) input to the chip. (Id.)

The DAT II chip generates a set of frequencies, which allows the device to "switch[] from a high speed clock for a high performance scanner to a low speed clock for a slower data input from a wand, for example. (Id. at 13.) The chip does this by using a clock input circuit to generate a fundamental clock, called "CLK" ("that runs the entire chip," DAT II Theory of Operation, Ex. 24, p. 13), creating a cleaner version of the fundamental clock called CLOCK0, and then uses a series [*12] of flip-flop circuits ("ripple counter divider," id.) to generate 16 clock frequencies (labeled CLOCK1–CLOCK 16) stepping down from the fundamental frequency (e.g. 40 MHz)

by successive factors of 2.

The DAT II chip "measure[s] and process[es] the relative time differences between bars and spaces in the [bar code] label." (Id. at 3.) The incoming signal from the bar code scanner is "converted into a series of 13 bit binary numbers by counting the number of cycles, of a fixed time base clock, between transitions of the signal (bar code edges)" (Id.)

The "fixed time base clock" (INTVL_CLK) is the clock selected from the 16 clock frequencies generated to match the speed of the transition data from the bar code scanner. (Id. at 13 ("INTVL_CLK can be selected, by the scanner controller, . . . [which] allows switching from a high speed clock for a high performance scanner to a low speed clock for a slower data input from a wand, for example.").) INTVL_CLK is selected using a group of four multiplexers shown in the middle of that DAT II Clock Generation Diagram. (Metrologic Ex. 23, p. 14, col. 4.)

The counting of the 13-bit number is performed in the "front end" circuit. (See id. at 6.) This front end circuit includes a transition detector and a counter. The transition detector consists of the "front end state controller[, which] detects bar/space transitions." (id. at 7.) The counter is a "13 bit parallel load ripple counter." (Id. at 8.)

Also included in the "front end" circuit is a sequencer. Item 28 in the '027 patent and '342 patent is called "sequencing means." This sequencer is also termed a "control means."

The DAT II chip also includes two decoders, termed "decoder 1" and "decoder 2." (See DAT II Top Level Block Diagram, Metrologic Ex. 23, p. 1 (PSC0020075); DAT II Theory of Operation, Metrologic Ex. 24, p. 4, item 3.) The decoders (also called "decode microprocessors" or "decode processors") can access the 13-bit binary numbers or count data (which are stored in RAM buffers) generated by the counters, and then the decoders "extract patterns from the counts, primarily by computing ratios of the numbers." (DAT II Theory of Operations, Metrologic Ex. 24, p. 3.) Each decoder "processes counts into decoded or partially decoded bar code label information." (Id. at 17.) Because the decode processors are microprocessors, they [*14] are programmable. Decoded symbol data is transmitted to a host device, e.g., a computer or controller, through a data output port.

C. PSC's Motion for Partial Summary Judgment of Noninfringement of the '852 Patent

Plaintiff Metrologic's '852 patent was filed on June 7, 1995, and issued on June 10, 1997. The patent claims priority as a continuation of U.S. Patent No. 5,216,232,

which was filed on September 10, 1990. The *'852 Patent* is directed to a bar code scanner that sits above a counter and projects a narrow, dense pattern of light, the cross-section of which is patterned. The scanner is designed to read the bar code of objects placed within this dense pattern, regardless of its orientation. This is achieved by projecting many lines of laser light at different angles in front of the scanner. The ability to scan bar codes no matter what angle they face the scanner is beneficial because it allows a clerk at a high–volume check–out counter to scan items quickly, irrespective of their orientation. In addition, counter space, particularly at smaller and lower-volume retail establishments, is preserved by the scanner's placement above the counter. Although placement above the counter [*15] had previously caused scanners to inadvertently read bar codes of items located nearby, an additional benefit with this device is that items placed nearby are not scanned, due to the narrowness of the laser light. Thus, Metrologic's *'852 patent* discloses and claims an optical design capable of generating a scan pattern which is rich in scan lines and which has a scan pattern of narrow volume.

## II. DISCUSSION

### A. Legal Standards

[HN2] An infringement analysis is a two–step process. The first step is for the Court, as a matter of law, to construe the disputed claim terms. The second step is to compare the construed claims to the accused device to determine, as an issue of fact, whether all of the claim limitations are present in the accused device, either literally or by substantial equivalent. *Karlin Tech., Inc. v. Surgical Dynamics, Inc., 177 F.3d 968, 971 (Fed. Cir. 1999).* This Court has already completed the first step of the process, see Markman Decision, and now undertakes the second in the context of summary judgment review.

[HN3] A patent claim is infringed if every claim limitation finds correspondence in the accused device -- either literally or [*16] by substantial equivalents. *Warner-Jenkinson Co. v. Hilton Davis Chem. Co., 520 U.S. 17, 29, 137 L. Ed. 2d 146, 117 S. Ct. 1040 (1997).* In determining literal infringement of claims written in means-plus-function language as provided for by *35 U.S.C. § 112, P 6,* "the relevant structure in the accused device [must] perform the identical function recited in the claim and be identical or equivalent to the corresponding structure in the [patent] specification." *Odetics, Inc. v. Storage Technology Corp., 185 F.3d 1259, 1266-67 (Fed. Cir. 1999).* Equivalence of structure is found when "the differences between the structure in the accused device and any disclosed in the specification are insubstantial." *Chiuminatta Concrete Concepts, Inc. v. Cardinal Indus.,* *Inc., 145 F.3d 1303, 1309 (Fed. Cir. 1998)* (emphasis added). The test for insubstantial differences is whether "the assertedly equivalent structure performs the claimed function in substantially the same way to achieve substantially the same result as the corresponding structure described in the specification." *Odetics, 185 F.3d at 1267.*

[HN4] Summary judgment shall be granted when [*17] there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *Fed. R. Civ. P. 56(c); Karlin Tech., 177 F.3d at 970.* Summary judgment is proper in patent infringement cases, when "no reasonable jury could determine that every limitation recited in the properly construed claim . . . is not found in the accused device." *Karlin Tech., 177 F.3d at 974; SDS USA Inc. v. Ken Specialties Inc., 122 F. Supp. 2d 533, 536-37 (D.N.J. 2000).* Moreover, *Rule 56(e)* provides that judgment "shall be entered," unless the nonmoving party offers specific facts contradicting the facts averred by the movant, which indicate that there is a genuine issue for trial. See *Lujan v. Nat'l Wildlife Federation, 497 U.S. 871, 888, 111 L. Ed. 2d 695, 110 S. Ct. 3177 (1990).* If the evidence of the nonmoving party is "merely colorable or is not significantly probative, summary judgment may be granted." *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249–50, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986)* (citations omitted). Summary judgment of infringement is proper after a court has conducted a Markman hearing and construed the claims. See, e.g., *SDS USA, Inc., 122 F. Supp. 2d at 536.* [*18]

### B. Metrologic's Motion on the *'342 Patent*

As this Court declined to construe limitation 8 as an affirmative limitation, the parties are now only contesting the application of Limitations 6, 7, and 9 of the *'342 patent* against PSC's Magellan Devices.

#### 1. Claims 8 & 10, Limitation 6 – "means for generating a plurality of predetermined frequencies"

Limitation 6 recites a "means for generating a plurality of predetermined frequencies." In its Markman Decision, this Court construed the function of the limitation as:

> generating a plurality of predetermined frequencies, predetermined meaning that the division of the clock pulse frequency by two is a constant, fixed process which allows the frequency to always constitute half of its original number. "Predetermined" does not mean that the frequencies must be determined in advance, or that the frequency must be fixed conclusively or authoritatively beforehand.

Markman Decision at *32 (emphasis in original). This Court construed the corresponding structure of the means as:

> Clock Input 12, which is either the Crystal Oscillator 13 or other External Clock 15, and the Clock Circuitry Divider 14 [*19] . That is, the clock input 12 consists of a 40 MHz crystal oscillator or an equivalent external clock.

Id. (emphasis in original).

This Court construed Limitation 6 to be a means-plus-function element. [HN5] "To determine whether a claim limitation is met literally, where expressed as a means for performing a stated function, the court must compare the accused structure with the disclosed structure, and must find equivalent structure as well as identity of claimed function for that structure." *Pennwalt Corp. v. Durand-Wayland, Inc., 833 F.2d 931, 934 (Fed. Cir. 1987)* (en banc) (emphasis in original). Having identified the corresponding structure of the recited means, the next question is whether the structure of the accused device is equivalent to Metrologic's patented structure. "*Section 112*, paragraph 6, rules out the possibility that any and every means which performs the function specified in the claim literally satisfies that limitation." *Pennwalt Corp., 833 F.2d at 934*. Rather, the proper test is whether the differences between the structure in the accused device and any disclosed in the specification are insubstantial. [*20] See *Chiuminatta Concrete Concepts, Inc., 145 F.3d at 1309*.

The DAT II chip in PSC's devices generates a fundamental clock, CLK (equivalent to CLOCK0). CLOCK0 is successively divided down into 16 other clocks, CLOCK1–CLOCK16, ranging from 40 MHz to 610 Hz. These 16 frequencies are "a plurality of predetermined frequencies." These are the same frequencies that are disclosed in the '342 patent (see '342 patent, 9:33–68.) PSC's expert, Roger Palmer, confirmed this division operation in his deposition. (See Palmer Dep., Metrologic Ex. 21, pp. 111–13). Thus, the function of the accused devices appears identical to the function disclosed in the patent's specification. Having determined identical identity of claimed function, the Court must additionally determine whether the structure performing that function is equivalent.

PSC argues that the Magellan scanners (and some models of VS1200 and HS1250 scanners) use a ring oscillator, not the crystal oscillator included as an example of a clock input in the '342 patent, thereby precluding a finding of literal infringement. Notably, though, some of

PSC's products, namely a percentage of the VS1200 and HS1250 models, use [*21] crystal oscillators. However, even if the accused devices cannot be held to literally infringe the '342 patent, those devices certainly infringe under the doctrine of equivalents, as now explained.

In the PSC devices, the DAT II chip has a clock input circuit configured to use an external crystal oscillator, an external oscillator module, or an external ring oscillator to generate the fundamental reference frequency CLK. The VS1200 and HS1250 scanners use an external crystal oscillator for generating the fundamental clock frequency, CLK. (See VS1200 schematic, Metrologic Ex. 7, p. 2 (PSC0019728), grid B7; HS1250 schematic, Metrologic Ex. 8, p. 2 (PSC0019784), grid B7.) The Magellan products (and, according to PSC, some VS1200 and HS1250 scanners) do not use the external crystal oscillator, but instead use the ring oscillator external to the clock input circuit. (See Magellan schematic, Metrologic Ex. 6, p. 5 (PSC0014699) (XTAL1_IN is grounded and XTAL2 is not connected); DAT II Internal Oscillator Diag., Metrologic Ex. 23, p. 13 (PSC0020086), grid D3.)

The external crystal oscillator and external ring oscillator are external inputs to the DAT II chip's clock input circuit, [*22] just as the external crystal oscillator 13 and external clock 15 are external inputs to the '342 patent's clock input 12. The external ring oscillator is an external clock 15. (Compare DAT II Internal Oscillator Diagram, Metrologic Ex. 23, p. 13 (PSC0020086), grid D3 and its external inputs with '342 patent, Figs. 1, 2, and 4A, clock input 12 and its external inputs.)

In addition, all of the Magellan Devices contain the DAT II chip, which includes a series of dividers that successively divide down the clock source so as to generate a plurality of predetermined frequencies. Metrologic contends that this is the identical function as called for by the claim as required by *Section 112*, P 6, law. See *Odetics, 185 F.3d at 1267*. As noted above, the predetermined frequencies generated by the DAT II chip include 40 MHz, 20 MHz, 10 MHz, 5 MHz, . . . , 78 kHz, 39 kHz, . . . , 4.875 kHz, and 2.44 kHz, the same ones described in the '342 patent.

PSC contends that the Magellan scanners (and some models of VS1200 and HS1250 scanners) use a ring oscillator, which PSC claims is not equivalent to the crystal oscillator included as an example of a clock input in the '342 patent. [*23] This Court, however, in its Markman Decision, concluded that the term "predetermined" means the division of the clock pulse frequency is a fixed process and does not require "that the frequency must be fixed conclusively or authoritatively beforehand." Markman Decision at *32. Thus, for purposes of equivalence, a ring oscillator functions in the same way as a

crystal oscillator.

PSC further argues that whether the ring oscillator in the accused devices is equivalent to the crystal oscillator is an issue of fact, precluding summary judgment. However, based on the Court's claim construction, the record demonstrates no genuine issue of material fact to be in dispute. PSC's own documents show that for decoding purposes, the two oscillators are equivalent:

> The exact accuracy and stability of this clock is not critical as long as it does not exceed the operating frequency of the rest of the design, 48 MHz, and is relatively constant over the length of the label being scanned.

(DAT II Theory of Operation, Metrologic Ex. 24, p. 11.) A ring oscillator provides a frequency to the clock input circuit to generate the fundamental CLK operating frequency. This CLK operating [*24] frequency is stable over the millisecond or so it takes to scan a bar code making the ring oscillator equivalent to the crystal oscillator described in the '342 patent that generates that fundamental operating frequency. Moreover, PSC's own expert, Roger Palmer, confirmed the equivalence between the crystal oscillator and the ring oscillator:

> Q: When you answered my previous question that it wouldn't have made a difference for scanning a particular bar code at a particular time whether you used a crystal oscillator or a ring oscillator, why would there be no difference?
>
> A: Because the decoding process is looking at relative counts between bars and spaces. If the counts were differing in all respects, by 10 or 20 percent in one case versus another, that would not have made a major difference in decodability.

(Palmer Dep., Metrologic Ex. 21, at 109:6-17.)

Finally, the fact that the DAT II chip is designed to use either a ring oscillator or a crystal oscillator supports Metrologic's argument of equivalence. Some PSC products use a crystal oscillator (the VS1200 and HS1250) and some use a ring oscillator (Magellan). PSC argues, however, that interchangeability is [*25] not sufficient to establish equivalence, citing Chiuminatta, 145 F.3d at 1309. There, the Federal Circuit recognized that interchangeability is not "dispositive," but stated that "known interchangeability" is an "important factor" in finding equivalence, especially if "those of ordinary skill in the art

recognize[] the interchangeability" of the claimed structure with the accused element. Id. at 1309-10.

In addition to the fact that PSC has acknowledged in its design of the DAT II chip that the ring oscillator and the crystal oscillator are interchangeable, this Court, with its claim construction, has recognized the equivalence. See Chiuminatta, 145 F.3d at 1309 (two structures are equivalent because the differences between them are insubstantial in the context of the claim construction propounded by the Court). If the function of the clock input in the '342 patent is to produce a fundamental frequency that can be used to generate a plurality of subfrequencies, or, in the language of the claim, "predetermined" frequencies, then the ring oscillator is equivalent to the crystal oscillator. This Court interpreted "predetermined" to [*26] mean a set of frequencies having a known relation with one another, such as being successively divided down by two from a fundamental frequency. See Markman Decision at *32. With such an interpretation, the ring oscillator "performs the claimed function" of generating a plurality of predetermined frequencies "in substantially the same way to achieve substantially the same result as the" crystal oscillator, and is therefore "equivalent" under Section 112, P6. See Odetics, 185 F.3d at 1267. Thus, with respect to Limitation 6, summary judgment shall be granted to Metrologic.

2. Claims 8 & 10, Limitation 7 – "means for measuring the time duration of the digital input signals using one of said plurality of frequencies producing digital data representing said measured time durations"

Limitation 7 recites "means for measuring the time duration of each of said first and second levels of said digital input signals using one of said plurality of frequencies and producing digital data representing said measured time durations." In its Markman Decision, this Court construed the functions of this limitation

> to use a frequency from one of the predetermined [*27] frequencies, thereby selecting a frequency, according to the scanner type that is inputted into the structure and to process the output signals from the input means so as to produce digital data representing measured time durations, allowing counting of the clock signals by further means.

Id. at *35 (emphasis in original). The Court construed the corresponding structure as:

> the clock mux 16, the transition detector 24, sequencing means 28, and digitizer counting means 30.

Id. (emphasis in original).

The construed functions are (1) selecting a frequency from one of the predetermined frequencies, (2) measuring the time durations using the selected frequency, and (3) producing digital time duration data. PSC's devices perform these functions by selecting one of the predetermined frequencies for each "scanner type." Each of these frequencies allows the counting means to count the time durations of the high and low levels received from the bar code from each scanner type. These time durations are indicative of the relative widths of the bars and spaces in the bar code symbols. The DAT II chip

> processes the signal [from the scanner by] convert [*28] [ing it] into a series of 13 bit binary numbers by counting the number of cycles, of a fixed time base clock, between transitions of the signal (bar code edges).

(DAT II Theory of Operation, Metrologic Ex. 24, p. 3.)

The structure for performing this function includes a clock mux, a transition detector, sequencing means, and digitizer counting means. A clock mux takes several different clock inputs and outputs one of them according to a control command. The control command may request the fastest clock or the slowest clock or a clock with a specific frequency. That DAT II chip includes a clock mux to select frequencies. (See DAT II Clock Generation Diag., Metrologic Ex. 23, p. 14, col. 4.)

"The front end state controller detects bar/space transitions and generates 13 bit numbers which are the count of . . . clock cycles between transitions." (DAT II Theory of Operations, Metrologic Ex. 24, p. 7.) This is the transition detector. According to PSC's expert, Roger Palmer, the DAT II Front End diagram, Metrologic Ex. 23, p. 6 (PSC0020080) includes a sequencer, "which provide[s] a similar functionality to that in item 28 in the '027 patent." Item 28 in the '027 patent [*29] and '342 patent is the "sequencing means." The "13 bit parallel load ripple counter" (id. at 8) is the digitizer counting means.

PSC's only argument regarding this limitation involved its proper construction. See Markman Decision at *34 ("The parties' dispute with respect to the corresponding structure for this function revolves around whether the clock mux 16 is included as part of the structure.") Now that the Court has construed the limitation in favor of Metrologic, the record does not reflect a factual dispute regarding infringement and summary judgment is properly entered in favor of Metrologic.

3. Claims 8 & 10, Limitation 9 – "decoder pro-

grammable for decoding a second type of bar code"

Limitation 9 recites "wherein said device comprises a second decoder for receiving said processed signals, said second decoder being programmable for decoding a second type of bar code or other digital code." This limitation is not written in means-plus-function format. The Court construed Limitation 9 as follows:

> the decoder must be programmable to decode a wide variety of codes and a symbology, and refers to a programmable processor. This decoder does not refer to [*30] the fixed program decoder, which is inflexible. The use of the word "second" does not require that a first decoder be included within the patent. Although the element is not a means-plus-function element, the corresponding structure is a programmable processor, equivalent to the programmable processor 26.

Id. at *39 (emphasis in original).

Limitation 9 requires a programmable decoder/processor. The Magellan Devices include this element. Each of PSC's devices incorporates at least one DAT II chip, and each DAT II chip has two decoders, either one of which satisfies this limitation. (See DAT II Theory of Operation, Metrologic Ex. 24, p. 4 ("The DAT II has two decode processors that can access the interval count data. This enables two different bar code types to be decoded in real time by one DAT II.").)

PSC's only arguments involved the proper construction of this limitation and thus, the record standing as it does, warrants the granting of summary judgment in favor of Metrologic.

4. Limitation 10 – "means for providing a reference input frequency and plural frequency dividing means for successively dividing said reference input frequency"

Limitation 10 recites [*31] "wherein said means for generating a plurality of frequencies compromises means for providing a reference input frequency and plural frequency dividing means for successively dividing said reference input frequency." Metrologic's construction of this claim has not been contested by PSC, and thus the Court did not construe it. This is a means-plus-function claim element that further describes the means for generating a plurality of frequencies in Limitation 6.

Limitation 10 includes two parts: the first part is "means for providing a reference input frequency," and the second part is "plural frequency dividing means for successively dividing said reference input frequency." The function of the first means is to provide a reference fre-

quency, and the function of the second means is to successively divide the reference frequency. The reference frequency is the frequency generated by the clock input (e.g., the crystal oscillator in the *342 patent*). Dividing the reference frequency means generating subfrequencies in a predetermined relationship to the reference frequency, such as dividing by factors of 2.

The structure of Limitation 6 was construed by the Court as "the Clock Input [*32] 12, which is either the Crystal Oscillator 13 or other External Clock 15, and the Clock Circuitry Divider 14." Markman Decision at *32 (emphasis in original). The structure of Limitation 10 is therefore parsed into two parts corresponding respectively to each of the functions in Limitation 10: (1) "the Clock Input 12, which is either the Crystal Oscillator 13 or other External Clock 15" and (2) "the Clock Circuitry Divider 14."

Metrologic contends that Limitation 10 is merely a more specific rendering of Limitation 6, where the functions and structures of the two parts were construed by the Court. The DAT II chip generates a fundamental reference clock, CLK (equivalent to CLOCK0). This fundamental clock is a reference input frequency. CLK is generated using an external crystal oscillator, an external oscillator module, or an external ring oscillator. The DAT II chip's external ring oscillator is an external input to the clock input circuit on the DAT II chip schematic, and it corresponds to external clock 15 which is an external input to clock input 12 of the *342 patent*.

CLK (or its derivative, CLOCK0) is successively divided down into 16 other clocks, CLOCK1–CLOCK 16, ranging [*33] from 40 MHz to 610 Hz. The DAT II chip includes a series of dividers that successively divide down the clock source. This is the identical function as called for by Limitation 10 and Metrologic is therefore entitled to summary judgment.

C. Metrologic's Motion on the *027 Patent*

Metrologic also argues that summary judgment should be granted in its favor with respect to the *027 patent*, contending that PSC's accused devices meet each and every element of Claims 1, 6, and 28 of the *027 Patent*.

1. Claims 1 & 6, Limitation 5 – "common timing means" Limitation 5 recites:

> common timing means for measuring the time duration of the first and second signal levels between the detected signal level transitions in the supplied digital data signal, and producing digital data related to the time duration of the first and second signal levels in

the supplied digital data signal.

In its Markman Decision, this Court construed the function of this limitation as "measuring the time durations of the digital data signals using the frequency appropriate for the scanner type detected." Id. at *40 (emphasis in original). The Court construed the corresponding structure [*34] as:

> the clock input 12 (either from a crystal oscillator 13 or other external clock 15), the clock divider circuitry 14, the clock mux 16, and the counters 50 and 52.

Id. (emphasis in original).

The construed functions thus are (1) measuring the time durations of the digital data signals using the frequency appropriate for the scanner type detected and (2) producing digital time duration data. The Magellan Devices perform the recited function of using a clock input that is either a crystal oscillator or another external clock, a clock circuitry divider, clock mux, and counters (or their equivalents).

Metrologic contends that infringement of this limitation is extremely similar to infringement of Limitations 6 and 7 of the *342 patent*. The Magellan Devices perform these functions by generating a fundamental clock reference frequency, CLK, and generating a plurality of subfrequencies (CLOCK0–CLOCK16) related to the fundamental frequency. One of the subfrequencies is selected for each "scanner type" and each of these frequencies allows the counting means to count the time durations of the high and low levels received from the bar code for each scanner type. [*35]

These time durations are indicative of the relative widths of the bars and spaces in the bar code symbols. The DAT II chip then produces digital count data related to the time duration of the high and low signals coming from the scanners.

The structures for performing these functions include a clock input, clock divider circuitry, clock multiplexer, and counters. The DAT II chip has a clock input circuit to generate the fundamental frequency. This clock input circuit has inputs from an external crystal oscillator, an external oscillator module, or an external ring oscillator. The DAT II chip's external ring oscillator used with the Magellan scanners and some of the VS1200 and HS1250 scanners is an external input to the clock input circuit on the DAT II chip schematic, and it corresponds to external clock 15 which is an external input to clock input 12 of the *027 patent*. The DAT II chip has clock divider circuitry as well made up of a bank of flip-flops to divide the

2004 U.S. Dist. LEXIS 24949, *35

fundamental frequency into subfrequencies. Metrologic contends that this is the identical function as called for by the claim and *§ 112*, P 6. See *Odetics, 185 F.3d at 1267*.

In addition, the DAT II [*36] chip has a clock mux that takes as inputs the subfrequencies and outputs one of them according to a control command. The control command may request the fastest clock or the slowest clock or a clock with a specific frequency. The DAT II chip has a counter realized by the "13 bit parallel load ripple counter" depicted in DAT II Front End Diagram, Metrologic Ex. 23, p. 8 (PSC0020080).

PSC again argues that the ring oscillator frequency it uses is not as exact as that of a crystal oscillator and therefore "the count values measured in the bar/space counters in [devices using a ring oscillator] do not correspond to time durations." (PSC's Opp. Brief at 25.) Instead, PSC argues, its devices process "the ratios of neighboring bar/space widths . . . regardless of the actual amount of time of any given bar or space" and do not know the "amount of time that corresponds to any given count" and therefore do not perform the function of measuring time durations. (Id.)

In its Markman Decision, this Court stated that "there is nothing in the claim language itself which requires that the actual time corresponding to bar and space widths be known." Id. at *40. Thus, even if PSC's devices [*37] do not know the "amount of time that corresponds to any given count," they do nonetheless count pulses and bar and space widths, thereby performing the recited function and infringing this limitation. For this reason, Metrologic's motion for summary judgment will be granted.

2. Claims 1 & 6, Limitation 7 -- "common data processing means"

Limitation 7 recites:

> common data processing means operably associated with said common timing means and programmed for processing said digital data from the supplied digital data signal, so as to produce decoded symbol data representative of the bar code symbol being scanned by said scanning device producing the supplied digital signal.

This Court construed the function of this limitation as:

> processing digital data from the supplied data signal to produce decoded symbol data representative of the bar code symbol being scanned by said scanning device producing the supplied digital signal.

Markman Decision at *43 (emphasis in original). Neither party disputed the interpretation of this function. Id at *41. The Court thus construed the corresponding structure as:

> consisting of either the programmable [*38] processor 26 or the fixed program decoder 20. There is no requirement that the structure must consist of both the programmable processor 26 and the fixed program decoder 20.

Id. (emphasis in original). Thus, Limitation 7 requires a programmable processor or a fixed program decoder.

PSC argues that summary judgment must be denied because Metrologic has not established that the common data processing means in the *'027 patent* is present in the accused devices. [HN6] To determine whether the accused devices infringe, it must be determined whether each and every element of the asserted claim is present in the accused device. If even a single claim element is not present, the claim is not infringed. *Telemac Cellular Corp. v. Topp Telecom, Inc., 247 F.3d 1316, 1330 (Fed. Cir. 2001)*.

PSC relies primarily upon the second paragraph of *35 U.S.C. § 112* for purposes of opposing Metrologic's motion for summary judgment. *35 U.S.C. § 112*, P 2 provides: "The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention. [*39] " PSC, citing to *Tehrani v. Hamilton Medical, Inc., 331 F.3d 1355 (Fed. Cir. 2003)* and *WMS Gaming Inc. v. International Game Tech., 184 F.3d 1339 (Fed. Cir. 1999)*, argues that the structure of a microprocessor in a means-plus-function element includes the algorithm used to implement the recited function. Moreover, PSC contends that under Federal Circuit precedent, *§ 112* P 2 requires disclosure of structure in the specification, and does not permit reliance on knowledge of persons skilled in the relevant arts when no structure is disclosed. See *Atmel Corp. v. Information Storage Devices Inc., 198 F.3d 1374, 1382 (Fed. Cir. 1999)*. PSC concludes that because the *'027 patent* does not disclose the relevant algorithm or reference known algorithms, its accused devices cannot infringe. In other words, in view of the requirements for reciting structure in the specification, and in view of the fact that the algorithm or program for microprocessor-based devices is part of the structure, failure to disclose the algorithm or program implemented in such devices is a failure to disclose the structure that is required by *§ 112* PP 2 and [*40] 6.

The Federal Circuit has found, however, that "there

would be no need for a disclosure of the specific program code if . . . one skilled in the art would know the kind of program to use." *Medical Instrumentation and Diagnostics Corp. v. Elekta AB, 344 F.3d 1205, 1214 (Fed. Cir. 2003)*, cert. denied, *541 U.S. 959, 124 S. Ct. 1715, 158 L. Ed. 2d 400 (2004)*. The cases cited by PSC specifically held that the corresponding structure for the claim limitations at issue necessarily included the algorithms. That is not the case here. As the '027 patent discloses, the "programmable processor decoder can be programmed to decode a wide variety of codes," including UPC and EAN codes. ('027 patent, 2:36-49.) The programmable processor 26 is described in the illustrative embodiment as an 8-bit microprocessor with a first-in, first-out (FIFO) memory having the same characteristic as known programmable processor decoders. (Id., 4:2-8 and 20:2-4.)

Moreover, both cases cited by PSC are inapposite to the present situation and thus distinguishable. In WMS Gaming, the algorithm at issue was not only unknown to one of ordinary skill in the art, but was also the only point of novelty in the patent [*41] at issue. In the instant case, however, the algorithms used by the programmable processor in the '027 patent are well known, not novel, and "in prevalent use." (See '027 patent, 2:30). Indeed, PSC's own expert, Roger Palmer conceded as much:

> Q: Would one of ordinary skill in the art understand what was involved in writing software for a programmable processor to be able to decode a symbology without any further instruction in the patent?
>
> A: Yes.

(Palmer Dep., Metrologic Ex. 21, 155:24 to 156:5; see also Dec. of Roger Palmer in Support of PSC's Opposition to Metrologic's Motion for Summary Judgment of Infringement of *U.S. Patent Nos. 5,081,342 & 5,343,027* (May 30, 2002), PP97-101.)

In Tehrani, the invention at issue was an apparatus which automatically controlled a respirator and used an algorithm to calculate breath frequency and tidal volume based on five variables or data inputs. The parties there agreed that the structure corresponding to the processing function included a microprocessor and an algorithm. The algorithm in Tehrani was not known to one of ordinary skill in the art and was instead the point of novelty. *Tehrani, 331 F.3d at 1360* [*42] (noting that the invention so advised the Patent and Trademark Office during prosecution, "The novelty of the present invention lies in its use of all of the data recited in claims 1 and 16 in determining the ventilation and breathing frequency for a patient.").

As Metrologic points out, here neither the programmable decoder of the '027 patent nor the decoding algorithm is the precise point of novelty. The invention of the '027 patent is not a bar code decoder per se, but rather a bar code reader having the ability to handle inputs from multiple bar code scanners. The bar codes decoded by the '027 patent decoder are standard bar code symbologies and the decoding algorithms are standardized in the industry and thus very well known.

Thus, no genuine issue of material fact appears to exist as to structural equivalence between programmable processor 26 and the DAT II chip's programmable decoder, as they seemingly perform the same function of processing and decoding data with identical structure, a programmable processor. Summary judgment is therefore appropriate on Limitation 7 in favor of Metrologic.

### D. PSC's Motion on the '852 Patent

PSC moves for summary judgment, alleging that [*43] its Duet and VS800 bar code scanners do not infringe Metrologic's '852 patent. PSC contends that under this Court's construction of the first of the asserted four claim limitations -- the highly collimated projected scanning pattern -- PSC is entitled to summary judgment.

#### 1. Claim Construction of the "Highly Collimated Scanning Pattern" Limitation and Alleged Infringement

This Court stated in its Markman Decision:

> This Court construes the claim language "highly collimated projected scanning pattern" as a scanning pattern of scan lines that is columnar in nature, or as columnar as possible, given practicable design constraints. The Court does not construe "highly collimated" as referring to the richness of the scan pattern into which bar coded items can be presented for reading irrespective of orientation. Rather, "highly collimated" refers to the columnar nature of the laser light projection containing the scan pattern.

Id. at *22 (emphasis in original). The Court warned further that "plaintiff is estopped from asserting that the claim language 'highly collimated' refers to anything other than 'roughly columnar,' opposite from widely divergent." Id [*44] . at *20.

PSC argues that the accused devices do not have a highly collimated scanning pattern, thereby not infringing the '852 patent, and points to four separate pieces of evidence to establish that the scanning patterns of its devices are not highly collimated. If even a single claim element is not present in the accused device, the claim is

not infringed. *Telemac Cellular Corp. v. Topp Telecom, Inc., 247 F.3d 1316, 1330 (Fed. Cir. 2001).*

First, PSC finds support for its position in the photos attached to its expert, Roger Palmer's Declaration. Exhibit J to Roger Palmer's Declaration shows the projected scan pattern of the Duet at 0, 2, 4, 6, and 8 inches from the scanner window. Also, Exhibit K shows the projected scan pattern of the VS800 at 0, 2, 4, 6, and 8 inches from the scanner window. Second, PSC asserts that Roger Palmer's expert declaration establishes that the scanning patterns are not columnar in nature. In that Declaration, Mr. Palmer concluded, based on his observations of the scanning patterns, that the scanning patterns "are not columnar. To the contrary - they rapidly increase in size and drastically change in shape as the distance from the scanner [*45] window increases." (Palmer Decl. at P 62.) Third, PSC argues that the scanning patterns were intentionally designed to be relatively wide and diverging to accommodate sweep scanning applications. (See Palmer Decl. at P 72.) PSC contends that no evidence has been proffered in opposition to PSC's proof that the accused devices were designed to operate in sweep mode, where a wider scanning pattern is more desirable. It thus follows that the scan patterns of the accused devices are neither columnar in nature, nor as columnar as possible, given practicable design constraints. Finally, PSC asserts that the testimony of Mark Schmidt, Vice President of Metrologic, confirms that the scanning patterns are not columnar in nature. Mr. Schmidt testified that the scanning patterns had vertical lines that extended "quite far up" and "off to the sides." (Palmer Decl. at P 69 and Exhibit O attached thereto.) Moreover, after examining a Duet at a trade show, Mr. Schmidt wrote a memorandum that described the scan pattern of the Duet as "not highly collimated (not really narrow)." (Palmer Decl. at P 65 and Exhibit L thereto.)

Metrologic responds that Figure 1 of the '842 patent actually illustrates the [*46] scan pattern of the patented device. (See '842 Patent, Figure 1; 10/1/04 Oral Argument Tr. 39:3-5.) Figure 1 shows a scan pattern that is a frustrum shape, radiating out and producing a scan that is highly collimated. Metrologic contends that if Figure 1's scan pattern is compared with Palmer's photographed scanning patterns of the accused devices, the two are of a very similar shape. Moreover, Metrologic argues that the tests performed by Mr. Palmer are misleading in that there are a number of single lines that extend out, giving the impression that the scan pattern is not columnar, but rather is widely divergent. However, such an image does not indicate where, within the scan pattern, the barcode scanner is actually capable of reading the barcode that is placed before it. (10/1/04 Oral Argument Tr. 40:6-15.) Metrologic's expert, Dr. David Daut, performed tests similar to those of Mr. Palmer, but produced diagrams

showing the scan pattern for the areas in which the barcode was actually readable. (See Decl. of David Daut, Ph.D., Metrologic Ex. 1; Metrologic Ex. 2.) These images, Metrologic contends, support its position that the accused devices' scan patterns are indeed columnar [*47] in nature.

This conflicting evidence contained in the record as presently developed demonstrates that a question of fact indeed remains that is best resolved by a jury, rather than an issue which can be decided on a motion for summary judgment. While it is well established that "patent drawings do not define the precise proportions of the elements and may not be relied on to show particular sizes if the specification is completely silent on the issue," *Hockerson-Halberstadt, Inc. v. Avia Group Intern., Inc., 222 F.3d 951, 55 U.S.P.Q.2d 1487, 1491 (Fed. Cir. 2000),* reasonable minds could conclude that the accused devices do indeed produce a scan pattern that is "columnar in nature, or as columnar as possible, given practicable design constraints." At the same time, reasonable minds could conclude the exact opposite. Thus, summary judgment must be denied.

E. PSC's Motion for Summary Judgment under *35 U.S.C. § 287* on the *'342 Patent*

Defendant PSC moves for summary judgment under *35 U.S.C. § 287,* arguing that this statute provides a basis for eliminating damages for its infringement of the *'342 patent* between 1994 and June 2001. Notably, [*48] in footnote 1 of its Opposition Brief, Metrologic states that it is not contesting PSC's motion as to the patents-in-suit other than the *'342 patent.* Accordingly, the date of notice for the other patents-in-suit should be the date of the filing of the initial complaint and PSC's motion should be granted as to all patents-in-suit other than the *'342 patent.*

Metrologic's *'342 patent* issued on January 14, 1992. Shortly thereafter, Metrologic began to mark the *'342 patent* number on a label that was affixed to the products. (Declaration of Dari Buchhofer at P 3, Metrologic Ex. 2). From February 1992 continuously through December 1999, Metrologic affixed a label with the *'342 patent* on the Metrologic covered products. During this time period, the labels typically had no more than 2-3 patent numbers. (Id.)

In December 1996, Metrologic entered into a license agreement with Symbol, the leading seller of bar code scanners for the United States retail market. (Declaration of Mark Schmidt at P 2, Metrologic Ex. 3). Under this license agreement, both parties elected (or could elect) to take certain licenses to the other party's patents. Consequently, Metrologic ultimately became obligated [*49] to mark each of its products with approximately

45-50 Symbol patents depending on the product. Owing to the number of patents involved and the impracticality of placing all the Symbol patents on Metrologic's products, the agreement specified that Metrologic mark its products by placing "See Reference Manual for Patent Coverage" (or a substantially similar statement) on the product and list the patent numbers in the reference manual. (See Metrologic Ex. 17; Declaration of Nancy Smith at P 2, Metrologic Ex. 4.)

In December 1999, Metrologic adopted the marking approach set forth in the agreement with Symbol for its patents as well as the Symbol patents. Thus, Metrologic patent numbers were removed from the products and in place of the specific patent numbers, the product label contained the notice phrase, "See User's Guide for Patent Coverage." (Metrologic Ex. 8.)

The *'342 patent* was added to this suit in June of 2001, and the first time Metrologic placed PSC on actual notice of this claim of infringement of the *'342 patent* was in a letter dated April 10, 2001, requesting leave to amend its Complaint. PSC contends that because Metrologic failed to mark substantially all its products [*50] consistently and continuously in compliance with *§ 287*, Metrologic is barred from recovering damages for any acts of infringement of the *'342 patent* prior to April 10, 2001.

[HN7] *Section 287* of the patent statute requires a patentee to give either constructive or actual notice of infringement before monetary damages for infringement can accrue. A patentee may give notice

> either by fixing [on the patented article] the word "patent" or the abbreviation "pat.", together with the number of the patent, or when, from the character of the article, this can not be done, by fixing to it, or to the package wherein one or more of them is contained, a label containing a like notice. In the event of failure so to mark, no damages shall be recovered by the patentee in any action for infringement and continued to infringe thereafter, in which event damages may be recovered only for infringement occurring after such notice.

*35 U.S.C. § 287.*

One way to satisfy *§ 287* is to provide actual notice of infringement to the infringer. *Lans v. Digital Equipment Co., 252 F.3d 1320, 1326 (Fed Cir. 2001); Amsted Indus. v. Buckeye Steel Castings Co., 24 F.3d 178, 185 (Fed. Cir. 1993).* [*51] The requirements as to what constitutes actual notice are strict: the patentee must provide the accused infringer with specific and actual notice that charges

infringement of an identified patent by a specific accused product. *Amstead Indus. Inc., 24 F.3d at 187.* Any notice that does not identify the patent number and the accused product does not qualify as actual notice under *§ 287*.

[HN8] The other way to satisfy *§ 287* is to provide "constructive notice" by complying with the strict marking requirements set forth in the statute. However, a patentee does not comply with the marking requirements until it can show that it "consistently marked substantially all of its patented products, and it was no longer distributing unmarked products," *American Medical Systems, Inc. v. Medical Engineering Corp., 6 F.3d 1523, 1538 (Fed Cir. 1993),* cert. denied, *511 U.S. 1070, 128 L. Ed. 2d 366, 114 S. Ct. 1647 (1997).*

PSC argues that Metrologic did not comply with *35 U.S.C. § 287* in two separate ways, either one of which would be sufficient to bar damages. First, PSC argues that Metrologic's use of the "See User's Guide" marking does not satisfy the strict requirements [*52] of *§ 287*. Second, PSC contends that Metrologic failed to mark the *'342 patent* on its MS7120 and MS6720 barcode scanners ("the unmarked products"), which are covered by at least claim 5 of the *'342 patent*.

### 1. Improper Marking: The User Guide

PSC argues that Metrologic did not provide actual notice of infringement to PSC until April 10, 2001, at the time that it filed its amended complaint. (Hyun Decl. at P 15.) Metrologic, however, contends that this is incorrect because its amended complaint "relates back" to the October 1999 filing date under *Fed. R. Civ. P. 15(c). Rule 15(c)* provides in pertinent part:

> [HN9] An amendment of a pleading relates back to the date of the original pleading when . . . (2) the claim or defense asserted in the amended pleading arose out of conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading.

*Fed. R. Civ. P. 15(c)* (emphasis added). [HN10] *Rule 15(c)* is most frequently applied to avoid the dismissal of claims on statute of limitation grounds, but has also been applied in patent cases with respect to the patent damages provisions of *35 U.S.C. § 286.* n4

> n4 [HN11] *35 U.S.C. § 286* is not a true statute of limitations, but instead serves to limit infringement damages to six years prior to the filing of the Complaint. See *Standard Oil Co. v. Nippon Shokubai Kagaku Kogyo Co., 754 F.2d 345, 348 (Fed. Cir. 1985).* In patent cases, the two most

common relation back scenarios involve adding a related patent, see *Applied Vision Inc. v. Optical Coating Lab., 1997 U.S. Dist. LEXIS 16306, 1997 WL 601425 (N.D. Cal. Sept. 23, 1997); Hooker Chem. & Plastics Corp. v. Diamond Shamrock Corp., 87 F.R.D. 398, 503 (W.D.N.Y. 1980),* or adding a related party, see *Aerotel, Ltd. v. Sprint Corp., 100 F. Supp. 2d 189 (S.D.N.Y. 2000); E.I. duPont de Nemours & Co. v. Phillips Petroleum Co., 621 F. Supp. 310 (D. Del. 1985).*

[*53]

The Federal Circuit has offered little, if any, guidance on the applicability of the relation back doctrine to patent infringement claims. District courts which have entertained the issue tend to find that [HN12] infringement of one patent is not the same conduct or occurrence as infringement of another patent for the purposes of relation back, unless the claims with respect to the second patent are an integral part of the claims in the first action. See e.g., *Tahoe Sierra Preservation Council v. Tahoe Regional Planning Agency, 808 F. Supp. 1474, 1482 (D. Nev. 1992),* aff'd in part, rev'd in part on other grounds, *34 F.3d 753 (9th Cir. 1992),* amended by, *42 F.3d 1306 (9th Cir. 1994),* cert. denied sub nom, *514 U.S. 1036, 131 L. Ed. 2d 288, 115 S. Ct. 1401 (1995); Illinois Tool Works, Inc. v. Foster Grant Co., Inc., 395 F. Supp. 234, 250-51 (N.D. Ill. 1974),* aff'd, *574 F.2d 1300, 1976 U.S. App. LEXIS 6009 (7th Cir. 1976).*

Many of the cases dealing with relation back focus on whether fair notice was given to the opposing party. However, the concept of fair notice under *Fed. R. Civ. P. 15(c)* is seemingly in direct tension with *35 U.S.C. § 287* [*54] 's strict requirements of actual notice, wherein the patentee must provide the accused infringer with specific and actual notice that charges infringement of an identified patent by a specific accused product. See *Amsted, 24 F.3d at 187.*

Moreover, unlike in the cases cited by Metrologic in support of its position, namely *Hooker Chem. & Plastics Corp. v. Diamond Shamrock Corp., 87 F.R.D. 398 (W.D.N.Y. 1980),* and *Applied Vision, Inc. v. Optical Coating Lab., 1997 U.S. Dist. LEXIS 16306, 1997 WL 601425 (N.D. Cal. Sept. 23, 1997),* this is not a situation in which the amendment concerned the inclusion of a newly issued continuation patent of the patent-in-suit. Instead, the *'342 patent* is the parent application to the three later continuations - the *'027 patent,* the *'717* patent, and the *'049* patent - all three of which were included in the original Complaint. While it may be said that a Complaint including allegations of infringement of the parent patent (the *'342*) would provide sufficient notice of infringement

of the continuations (the *'027, '717,* and *'049* patents) as well, the reverse does not necessarily hold true. Thus, the Court finds that Metrologic's original [*55] Complaint did not afford the degree of notice contemplated by *35 U.S.C. § 287* and holds relation back to be inappropriate.

Metrologic nevertheless contends that even if PSC lacked actual notice, it had constructive notice of its alleged infringement. Constructive notice is provided only when the patentee complies with the marking requirements set forth in *35 U.S.C. § 287.* Moreover, marking of the patented article must comply strictly with this section to constitute notice to the world. See *T.C. Weygandt Co. v. Van Emden, 40 F.2d 938 (S.D.N.Y. 1930).* Here, it is undisputed that after December 1999, Metrologic stopped marking the number of the *'342 patent* directly on its covered products (e.g., the 700 series scanners), and replaced the patent number with the phrase "See User's Guide for Patent Coverage." After December 1999, the *'342 patent* number was listed only in the user's guide. (Hynn Decl. at P 20.) The statutory language plainly recites, however, that marking is proper when it appears either on the product itself or on the package containing the product.

Metrologic has admitted that, although it was physically possible [*56] to continue marking the patent number directly on its products after December 1999, it ceased doing so for pure reasons of marketing; aesthetics counseled against defacing the product with a multitude of patent numbers. (Id. at P 22.) Despite the fact that Plaintiff failed to comply with the statute's preferred method of marking, Metrologic further failed in not adhering to the statute's alternative method of providing constructive notice: marking the package. Instead, Metrologic, through a label on its products' boxes, directed the public to the user guide for patent information.

Metrologic argues that listing the patent numbers of its products in the related instruction manuals comports with the marking requirement imposed by *35 U.S.C. § 287.* It is true that lower courts have refused to "severely scrutinize the character of the patented articles to determine whether the article was capable of being marked." See *Rutherford v. Trim-Tex, Inc., 803 F. Supp. 158, 161 (N.D. Ill. 1992).* Indeed, a variety of product character considerations such as "defacement, custom of the trade, expense and other reasonable factors" are taken into account in [*57] determining whether alternative marking is permissible. *Id. at 163* (citing *Wayne-Gossard Corp. v. Sondra Mfg., Inc., 579 F.2d 41, 43 (3d Cir. 1978)).* Furthermore, Metrologic points to a sizable line of cases that stand for the proposition that placing patent numbers on the associated packaging complies with the marking statute even though it is physically possible to place the patent number on the article itself. See e.g., *Chicago*

*Pneumatic Tool Co. v. Hughes Tool Co., 192 F.2d 620, 626 (10th Cir. 1951); Saf-gard Products, Inc. v. Serv. Parts, Inc., 491 F. Supp. 996, 1010 (D. Ariz. 1980); Bergstrom v. Sears, Roebuck and Co., 496 F. Supp. 476, 494 n.9 (D. Minn. 1980).* Even the Supreme Court has not mandated that the article be marked if at all physically possible, but rather allows great discretion in the patentee to alternatively mark the package. *Sessions v. Romadka, 145 U.S. 29, 36 L. Ed. 609, 12 S. Ct. 799, 1892 Dec. Comm'r Pat. 382 (1892).* This precedent, therefore, would seemingly excuse Metrologic for its failure to mark its patent numbers directly on the associated products, even though it was physically possible to do so.

Those same [*58] cases, however, do not excuse Metrologic for its additional failure in providing patent numbers on the packages containing the product, as the language of the marking statute explicitly requires. Metrologic points to *Rexnord, Inc. v. Laitram Corp., 6 U.S.P.Q.2d 1817, 1845 (E.D. Wisc. 1988)*, to argue that packaging for purposes of § 287 is broadly construed to include any literature that is shipped with the device. In Rexnord, patented conveyor belt products were marked with some but not all applicable patent numbers. Included with each shipment, however, were installation instructions that listed all the patents-in-suit including one patent that was not marked on the product. *Id. at 1845.* The court held there that listing the additional patent numbers in the installation guide shipped with the product constituted proper notice under § 287. Id.

Unlike in *Rexnord*, however, here, Metrologic did not include a single patent number in either of the two ways that the statute delineates: either on the product itself or on that product's package. In Rexnord, at least one patent-in-suit number was included in the statutorily proscribed manner, [*59] with additional applicable patent numbers appearing in the installation guide.

Courts have noted that a practical common sense approach must be taken when dealing with issues of compliance for the marking provisions of § 287, given that the purpose of the statute is to provide notice to the public of patent coverage. See *Rutherford, 803 F. Supp. at 163; Shields—Jetco, Inc. v. Torti, 314 F. Supp. 1292 (D.R.I. 1970), aff'd, 436 F.2d 1061 (1st Cir. 1971).* When, as here, the public finds no marking or writing on the product itself, the statute contemplates that the packaging is the next most logical place for effective notice of the existence of the patent. Metrologic failed to provide that notice on the package. All that was to be found on those packages were labels stating "See User's Guide for Patent Coverage." Although Metrologic argues that a user's guide is different in important ways from the fact sheets bearing the appropriate patent numbers that were distributed in *Calmar,*

*Inc. v. Emson Research, Inc., 850 F. Supp. 861 (C.D. Cal. 1994)*, and is likely to follow the product through its life in a way that the packaging [*60] is not, marking the user's guide is yet another step removed from the product. And it is, in addition, a step beyond that which the explicit language of the marking statute contemplates.

While this Court now finds that PSC is entitled to summary judgment and Metrologic is therefore precluded from collecting damages under the *'342 patent* after December 1999 and prior to April 10, 2001, that portion of PSC's motion pertaining to damages from January 1994 to December 1999 must be denied. PSC does not dispute that Metrologic properly marked its products shortly after the issuance of the *'342 patent* in 1992 or that Metrologic properly marks its products continuously through December 1999. As PSC's first date of alleged infringement was in 1994, it is further undisputed that Metrologic was properly marking its products at the time PSC began to infringe. During this period of proper marking, would-be-infringers had constructive notice. Moreover, as the District of Colorado held in *Clancy Sys. Int'L, Inc. v. Symbol Techs., Inc., 953 F. Supp. 1170 (D. Col. 1997)*, a subsequent failure to mark does not insulate the infringer from damages for the period in which proper marking [*61] was in effect. *Id. at 1174.* n5 "It would make no sense to hold that . . . failure to mark eliminates, retroactively, years of appropriate proper notice." Id. Thus, that portion of PSC's motion with respect to damages from January 1994 to December 1999 must be denied.

> n5 PSC argues that Clancy is inapplicable because it applies only to licensees, not patentees. It is not entirely clear that this is an accurate characterization, however. Indeed, both the court's actual language in *Clancy* as well as its underlying logic does not support PSC's argument on this point.

2. Failure to Mark the MS7120 and MS6720 Scanners

Even if Metrologic had properly complied with the marking statute, PSC contends that it additionally does not satisfy the requirements of *35 U.S.C. § 287* by its failure to mark the MS7120 and MS 6720 scanners. PSC argues that these scanners are covered by claim 5 of the *'342 patent* based on this Court's August 26, 2003 claim construction and, furthermore, [*62] contends that because Metrologic did not mark these scanners, Metrologic's damages should be limited. While Metrologic does not dispute that its MS6720 and MS7120 scanners meet the "means for generating" element of claim 5, Metrologic contends that these products do not meet the "means for measuring" element because they do not select a fre-

quency.

Claim 5 of the '342 patent states as follows:

> [Preamble] A device for processing plural digital input signals, each said digital input signal having first and second levels, and being provided to said device by at least one input means, and each said digital input signal representing a code symbol recorded on a medium read by said input means, the frequency of each said digital input signal from said input means being a function of the type of said input means and the resolution of said code symbol as recorded on said medium, said device comprising
>
> [Limitation 6] means for generating a plurality of predetermined frequencies and
>
> [Limitation 7] means for measuring the time duration of each of said first and second levels of said digital input signals using one of said plurality of frequencies and producing digital data [*63] representing said measured time durations for use by decoder means for decoding said code symbol.

This Court ruled that the preamble of claim 5 is not a limitation and that the decoder means is not a separate element of claim 5. Markman Decision at *30, *38. Thus, claim 5 is left with only two limiting elements: the "means for generating" element and the "means for measuring" element. The frequency selection requirement, which Metrologic now asserts is not present in the MS6720 and MS7120, is part of the "means for measuring" element.

This Court treated both of these elements as "means plus function" elements. For the means for generating element, this Court ruled that the function is "to generate a plurality of predetermined frequencies, predetermined meaning that the division of the clock pulse frequency by two is a constant, fixed process which allows the frequency to always constitute half its original number." Id. at *30, *33. It also identified the structures corresponding to this function as: (a) the clock input 12, (b) either the crystal oscillator 13 or the external clock 15, and (c) the clock divider circuitry 14. Id. at *32.

For the means for measuring [*64] element, this Court ruled that the function is

> to use a frequency from one of the predetermined frequencies, thereby selecting a fre-

quency, according to the scanner type that is inputted into the structure and to process the output signals from the input means so as to produce digital data representing measured time durations, allowing counting of the clock signals by further means.

Id. at *35. Moreover, this Court identified the structures corresponding to this function as: (a) the clock mux 16, (b) the transition detector 24, (c) the sequencing means 28, and (d) the digitizer counting means 30. Id. As claim 5 includes only the two limitations discussed above, that claim covers any device that includes both elements.

Metrologic does not dispute that its MS6720 and MS7120 scanners meet the "means for generating" element, but does contend that these products do not meet the "means for measuring" element because they do not select a frequency. PSC asserts that since the unmarked products include a structure that is the same as or equivalent to the transition detector 24, the sequencing means 28, the digitizer counting means 30, and since the unmarked products [*65] also include a structure that is the same as or equivalent to the clock mux 16, the unmarked products satisfy the means for measuring element of claim 5 of the '342 patent. These products are therefore patented articles and invoke the marking requirements of 35 U.S.C. § 287.

Metrologic argues that the MS6720 and MS7120 scanners do not perform the function of "selecting a frequency" from one of the predetermined frequencies and therefore do not meet all the limitations of claim 5. In particular, these products do not "use a frequency from one of the predetermined frequencies, thereby selecting a frequency" because the scanners operate at only a single frequency. The MS6720 and MS7120 are not designed or configured to handle digital input signals at different frequencies. (Witz Decl., App., Ex. 5, P 2.) The '342 patent, however, is directed toward a device that operates at more than one frequency, and is capable of selecting "one of a plurality of operating frequencies." Markman Decision at *35 (emphasis in original). Metrologic's basic argument therefore is that because the MS6720 and MS7120 scanners do not select a frequency from one of the predetermined [*66] frequencies, as a matter of law they cannot fall within the claims.

PSC previously set forth proof at the Markman hearing that establishes that the unmarked products contain the transition detector 24, the sequencing means 28, and the digitizer counting means. The only issue remaining for this Court therefore is whether the unmarked products also contain a structure that is identical or equivalent to the clock mux 16.

Metrologic has admitted that it sold MS6720 and

MS7120 scanners that included a 26282 ASIC. (Palmer's § 287 Decl. at PP 70, 76.) That ASIC contains a clock mux. PSC's expert, Roger Palmer, relied on DX110 to explain the operation of the 26282 ASIC as follows:

> In the 26282 ASIC, a plurality of predetermined frequencies are available (see Exhibit E at page M010798 and the Kolis 11/12/01 deposition, Exhibit F, at p 460). Those frequencies are binary divisions of the crystal frequency (see Exhibit E at page M010798). One of those frequencies is selected by writing to the four CLOCK CONTROL bits of register # 5. (See Exhibit E at page M010798).

(Palmer's § 287 Decl. at P 66.) DX110 describes the operation of the 26282 ASIC in more detail:

> Basically, [*67] the digitizer-sequencer section of the ASIC is responsible for converting the varying width intervals of a scanner's bi-level data signal into "time count" and "sign" information for decoding. The time duration of each count is dependent upon the ASIC's crystal frequency and the programming of the CLOCK CONTROL bits in register # 5. This "digitizing frequency" is selected to match the line speed of the scanner which produced the scan signal. Generally, the faster this line speed is, the higher the digitizing frequency required to resolve the scan signal.

(Palmer's § 287 Decl. Ex. E at M10797-98.) This passage thus discloses the function that this Court identified previously of "selecting a frequency, according to the scanner type that is inputted into the structure." DX110 continues, providing additional detail on selecting an appropriate frequency:

> Fifteen digitizing frequencies are available for selection by using the 4 CLOCK CONTROL bits of register # 5. The highest is the crystal frequency which is what the circuit defaults to when the CLOCK CONTROL bits are all zero. Programming the CLOCK CONTROL for 1-14 provides binary divisions of the crystal frequency while [*68] programming a 15 disables the digitizer by turning the clock off. The digitizing clock is selected so that it produces valid interval time counts from the incoming scanner signal within a range of 8 to 255 or 8 to

> 2047 depending upon which count resolution is selected (8 or 11 bits).

(Palmer's § 287 Decl. Ex. E at M10798).

This language supports PSC's contention that the unmarked products "use a frequency from one of the predetermined frequencies" and "[select] a frequency, according to the scanner type that is inputted into the structure," as required by this Court's claim construction.

The remaining functions of "processing the output signals from the input means so as to produce digital data representing measured time durations, allowing counting of the clock signals by further means" are performed by the transition detector, the sequencing means, and the digitizer counting means – for which PSC has previously submitted sufficient evidence to establish the presence of those structures in the unmarked products.

Having established this, the Court must now determine whether the selecting structure in the unmarked products is the same as or equivalent to the clock mux [*69] 16 shown in Fig. 1 of the '342 patent. In S3 Inc. v. Nvidia Corp., 259 F.3d 1364 (Fed. Cir. 2001), the Federal Circuit held that "a selector is of well known electronic structure that performs a common electronic function." Id. at 1371. There, the Federal Circuit effectively accepted testimony that equated a selector with a multiplexer as well. Id. at 1370-71. DX110's description of the 26282 establishes that it selects one of the available frequencies in the 26282 and therefore contains a selector. The New IEEE (Institute of Electrical and Electronics Engineers) Standard Dictionary of Electrical and Electronics Terms defines a multiplexer as a "device for selecting one of a number of inputs and switching its information to the output." (PSC's Supplemental Ex. A.) Thus, the 26282 ASIC contains a structure that is the same as or equivalent to the clock mux 16 in the '342 patent.

Metrologic, in response, now attempts to argue that the MS6720 and MS7120 scanners do not perform the function of "selecting a frequency" from one of the predetermined frequencies and therefore do not meet all the limitations in claim 5. These products, according [*70] to Metrologic, do not "use a frequency from one of the predetermined frequencies, thereby selecting a frequency" because the scanners operate at only a single frequency. In so arguing, Metrologic apparently would read into the words "thereby selecting a frequency" in this Court's August 26, 2003 Opinion the requirement of a device that operates at different frequencies at two different times depending upon what signals are input into the device. This Court came to a very different conclusion and Metrologic's interpretation, which seemingly reads the programmable processor 26 into the claim, misconstrues this Court's

2004 U.S. Dist. LEXIS 24949, *70

construction of the claim.

The unmarked products therefore include all the elements of claim 5, thereby rendering them "patented articles" and invoking the marking requirements of *35 U.S.C. § 287.* Despite the fact that these articles should have been marked pursuant to the marking statute, they were not. Therefore, PSC is entitled to summary judgment on this issue.

## III. CONCLUSION

For the reasons discussed above, summary judgment will be granted in favor of Metrologic on its motion regarding infringement of Claims 8 and 10 of the [*71] *'342 patent* and Claims 1, 6 and 28 of the *'027 patent.* In addition, PSC's motion for partial summary judgment of noninfringement and invalidity of the *'852 patent* will be denied. Finally, PSC's motion for summary judgment under *35 U.S.C. § 287* will be granted in part and denied in part. The accompanying Order will be entered.

December 13, 2004
Date

    s/ Jerome B. Simandle

    JEROME B. SIMANDLE

    United States District Judge

    **ORDER**

    **Filed: December 13, 2004**

This matter came before the Court upon Plaintiff Metrologic Instruments, Inc.'s motion for summary judgment of infringement of Claims 8 and 10 of *U.S. Patent No. 5,081,342* (the *'342 patent*) and Claims 1, 6 and 28 of *U.S. Patent No. 5,343,027* (the *'027 patent*), in addition to Defendant PSC, Inc.'s motion for partial summary judg-

ment of noninfringement and invalidity of *U.S. Patent No. 5,637,852* (the *'852 patent*), and finally, Defendant PSC, Inc.'s motion for summary judgment under *35 U.S.C. § 287*; and the Court having considered the papers submitted in supported thereof and in opposition thereto; and the Court having heard oral argument on October 1, 2004; [*72] and for the reasons stated in the Opinion of today's date; and for good cause shown;

    IT IS on this 13th day of December, 2004 hereby

ORDERED that Plaintiff Metrologic Instruments, Inc.'s motion for summary judgment of infringement of Claims 8 and 10 of the *'342 patent* and Claims 1, 6 and 28 of the *'027 patent* [Docket Item No. 84-1] shall be, and hereby is, **GRANTED;** and

IT IS FURTHER ORDERED that Defendant PSC, Inc.'s motion for partial summary judgment of noninfringement and invalidity of the *'852 patent* [Docket Item No. 77-1] shall be, and hereby is, **DENIED;** and

IT IS FURTHER ORDERED that Defendant PSC, Inc.'s motion for summary judgment under *35 U.S.C. § 287* [Docket Item No. 63-1] shall be, and hereby is, **GRANTED IN PART AND DENIED IN PART;** and

IT IS FURTHER ORDERED that with respect to Defendant PSC, Inc.'s motion for summary judgment under *35 U.S.C. § 287*, Plaintiff Metrologic Instruments, Inc. is precluded from asserting damages under the *'342 patent* after December 1999 and prior to April 10, 2001, but may do so for the period of alleged infringement occurring between January 1994 [*73] and December 1999.

    s/ Jerome B. Simandle

    JEROME B. SIMANDLE

    United States District Judge

# EXHIBIT 2

Page 1

```
 1        IN THE UNITED STATES DISTRICT COURT
 2           FOR THE DISTRICT OF DELAWARE
 3
 4   MCKESSON INFORMATION SOLUTIONS, LLC,
 5              Plaintiff,
 6        vs.             No. 04-1258-SLR
 7   THE TRIZETTO GROUP, INC.,
 8              Defendant.
 9
10
11
                _____
12
13
14
15        DEPOSITION OF PHILIP M. HAWLEY, JR., M.D.
16              Los Angeles, California
17              Wednesday, November 30, 2005
18
19
20
21   Reported by:
     RENEE A. PACHECO, RPR
22   CSR NO. 11564
23   JOB NO. 41623
24
25
```

Page 2

```
 1        IN THE UNITED STATES DISTRICT COURT
 2           FOR THE DISTRICT OF DELAWARE
 3
 4   MCKESSON INFORMATION SOLUTIONS, LLC,
 5              Plaintiff,
 6        vs.             No. 04-1258-SLR
 7   THE TRIZETTO GROUP, INC.,
 8              Defendant.
 9
10
             _____
11
12
13
14
15      Deposition of PHILIP M. HAWLEY, JR., M.D., taken on
16   behalf of Plaintiff, at 333 South Grand Avenue,
17   Los Angeles, California, beginning at 9:13 a.m. and
18   ending at 4:59 p.m. on Wednesday, November 30, 2005,
19   before RENEE A. PACHECO, RPR, Certified Shorthand
20   Reporter No. 11564.
21
22
23
24
25
```

Page 3

```
 1   APPEARANCES:
 2
 3   For Plaintiff:
 4     SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLC
       BY: MICHAEL HENDERSHOT
 5     Attorney at Law
       525 University Avenue
 6     Suite 1100
       Palo Alto, California 94301
 7     (650) 470-4500
 8   For Defendant and the Witness:
 9     GIBSON, DUNN & CRUTCHER
       BY: THEODORE KEVIN ROOSEVELT
10     Attorney at Law
       333 South Grand Avenue
11     Los Angeles, California 90071-3197
       (213) 229-7000
12
     Videographer:
13
       MAX BUSHMAN
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1              INDEX
 2   WITNESS              EXAMINATION
 3   PHILIP M. HAWLEY, JR., M.D.
 4
 5
     BY MR. HENDERSHOT            6
 6
     AFTERNOON SESSION           136
 7
 8
            EXHIBITS
 9
10   HAWLEY               PAGE
     1   Dr. Hawley's Report        47
11
12   2   U.S. Patent No. 5,253,164      118
13   3   Article by Richard Egdahl, M.D. and
         Robert Hertenstein, M.D.        158
14
15
16
          INFORMATION REQUESTED
17
            NONE.
18
19
20
21
          INSTRUCTION NOT TO ANSWER
22
            NONE.
23
24
25
```

**SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES**
**877.955.3855**

Page 181

```
    1    A  Yes.
    2    Q  It says:
    3           "Authorizing medical service codes
    4        which are valid."
03:10   5        Does it say that those codes there have to be
    6    submitted on the claim initially?
    7    A  It's, I believe, implicit by the use of the
    8    terms.  If -- if you read the introduction to No. 3:
    9           "The computer system including a
03:10  10        central processing unit associated
   11        memory for processing input claims
   12        containing at least one medical
   13        service code."
   14        It's -- it's describing, to my reading, the
03:10  15    medical service codes that appear on that claim and that
   16    claim only.
   17    Q  Isn't -- doesn't the claim also discuss at least
   18    an Element 1 database with medical service codes in it?
   19    Or, I'm sorry, element -- the first element?
03:10  20    A  Yes, it does.
   21    Q  And I -- I assume you would agree, correct me if
   22    I'm wrong, that the -- the data -- all the medical
   23    service codes in that database -- strike that.
   24        I assume you would agree there are more medical
03:11  25    service codes in that database than there are just on the
```

Page 182

```
    1    submitted claim; is that correct?
    2    A  Yes.
    3    Q  And so there -- the claim is contemplating at
    4    least two sources of medical service codes -- is that
03:11   5    correct? -- those on the claim and those in the database.
    6        MR. ROOSEVELT:  Objection; vague and ambiguous
    7    to the term "database."
    8        The term "database" is used in the patent claim?
    9        MR. HENDERSHOT:  We're -- we're discussing
03:11  10    Claim 3, yeah.
   11        MR. ROOSEVELT:  Okay.  Well, vague and ambiguous
   12    as to that term.
   13        MR. HENDERSHOT:  As to "database"?
   14        MR. ROOSEVELT:  Yes.
03:11  15    BY MR. HENDERSHOT:
   16    Q  Do you know what a "database" is, Dr. Hawley?
   17    A  I do understand what a database is.
   18    Q  Okay.  So I'll restate my question.
   19        Claim 3, of the '164 patent that you're looking
03:12  20    at, would you agree that it discusses two sources of
   21    medical service codes, those in the database and those on
   22    the claim?
   23    A  The action -- I wouldn't agree with that,
   24    because I think it -- it creates the wrong thought.  I
03:12  25    mean, the action is occurring on the codes that appear
```

Page 183

```
    1    in -- on that claim.
    2        Yes, it acknowledges the existence of a
    3    database, it includes procedural codes.  But the action
    4    isn't being taken on the database.
03:12   5        The action is being taken, as is clearly
    6    described here, on the claim that's received that
    7    includes certain medical service codes.
    8        The database is what allows you to perform that
    9    action on the claim, that claim audit action.
03:13  10    Q  So just flip back -- turning back to R1 -- or
   11    the R Rules, which is what we're discussing, don't the
   12    R Rules -- you would agree, would you not, that the
   13    R Rules discuss determining whether or not one of the
   14    medical service codes and the plurality of medical
03:13  15    service codes is valid or invalid by --
   16        MR. ROOSEVELT:  All the R Rules or just --
   17        MR. HENDERSHOT:  Yes.  Every R Rule.
   18        THE WITNESS:  It -- that is one of the functions
   19    contemplated, certainly not the primary function, but one
03:13  20    of the functions -- the -- I would call it a preceding
   21    function to the primary function of the R Rules.
   22    BY MR. HENDERSHOT:
   23    Q  But a necessary one to the R Rules; is that
   24    correct?
03:13  25    A  A necessary function, absolutely.
```

Page 184

```
    1    Q  And is -- do the R Rules not -- and I believe
    2    we're driving towards the second half of what we're
    3    talking about -- reject medical service codes which are
    4    invalid in response to that determination?
03:14   5    A  Yes, they --
    6        MR. ROOSEVELT:  Objection; vague and ambiguous
    7    as to the term "invalid."
    8        THE WITNESS:  I agree that the term "invalid" is
    9    vague, but as stated here it rejects medical service
03:14  10    codes, which are invalid.  So --
   11    BY MR. HENDERSHOT:
   12    Q  We've been -- we've been discussing the term
   13    "invalid" here for a few minutes now --
   14    A  Right.
03:14  15    Q  -- and then he says it's --
   16        Do you have an understanding of what invalid is?
   17    A  I understand the term as it's used in the
   18    English language.  I -- I -- as I stated in my opinions
   19    in my report, I think that its use in the claims is --
03:14  20    is -- is vague and ambiguous, but -- but --
   21    Q  I think you said in your report, correct me if
   22    I'm wrong, that you read valid as something that could
   23    encompass all or some combination of the editing rules
   24    applied to the multiple --
03:14  25    A  Right.
```

46 (Pages 181 to 184)

Page 185

1    Q -- service codes?
2    A Right.
3    Q That's a understanding of what it means in the
4  claims, is it not?
03:14 5    A Yeah. It's just a -- it's a term that doesn't
6  have specific meaning for me. It has a very broad
7  meaning of this is an acceptable or unacceptable
8  circumstance is how I would paraphrase it.
9    Q Okay. So -- so applying that understanding,
03:15 10  which is the one underlying the opinion in your report;
11  is that correct?
12    A Yes.
13    Q Okay. And I want to flip back to that. And
14  take R1 as an example.
03:15 15    Do you have it in front of you?
16    A Uh-huh.
17    Q If -- does R1 not describe determining that
18  A Code is invalid based on its receipt with B Code and
19  C Code, in your opinion?
03:15 20    A Yes. It does describe determining whether the
21  A Code is valid.
22    Q Okay. And in -- in fact, in this description of
23  R1, R1 describes determining that A Code is invalid and
24  the code within B Code to C Code is valid; is that
03:15 25  correct?

Page 186

1    A That's what it suggests there, yes.
2    Q And it -- does it also suggest rejecting A Code
3  and authorizing the code within B Code to C Code?
4    A B Code to C Code it -- it suggests authorizing
03:16 5  keeping, as it says there, but --
6    Q Okay. And I understand that D Code is added
7  from off of the claim?
8    A Right.
9    Q Does R1 not in its -- in its execution determine
03:16 10  that D Code is a valid code, and authorize D Code by
11  adding it to the claim?
12    A R1 or Claim 3?
13    Q R1.
14    A R1 describes adding D Code, too, yes.
03:16 15    Q And does that -- and I'm -- I'm asking the
16  question based on the language comparing R1 to Claim 3.
17    A Yeah. Nowhere in Claim 3 do I see any mention
18  of adding a code that doesn't appear on the claim when
19  it's -- when it's received.
03:17 20    Q But is the added code authorized?
21    MR. ROOSEVELT: Objection; vague and ambiguous
22  as to the term "authorized."
23    BY MR. HENDERSHOT:
24    Q Isn't -- is it a fair statement to say that the
03:17 25  description of R1, where A Code is received with a code

Page 187

1  and B Code to C Code determines that A Code is invalid
2  and rejects it, determines the code -- that the proper
3  codes are the code within B Code to C Code and D Code,
4  and authorizes B Code to C Code and D Code?
03:17 5    A Okay.
6    MR. ROOSEVELT: It misstates the document.
7    THE WITNESS: Ignoring Claim 3 and -- and -- and
8  speaking only about R1 you're asking me?
9    BY MR. HENDERSHOT:
03:17 10    Q Yeah. Was -- was that a fair description?
11    A Yeah. I think you just read R1, didn't you, or
12  more or less paraphrased it.
13    Q More or less, yeah, paraphrased it.
14    A Okay.
03:17 15    Q Is the best way to put it. I -- I don't want to
16  represent to you that I read it verbatim, because I did
17  not.
18    A A claim consisting of A Code, B Code, and C Code
19  is received, the action is to delete A Code, to keep B
03:18 20  and C Codes, and to add D Code.
21    Q But if it's saying B Code to C Code and D Code
22  are the proper codes, isn't it determining that those are
23  the valid codes for that claim?
24    A Yes.
03:18 25    Q And authorizing those codes?

Page 188

1    A R1 suggests authorizing B Code, C Code, and
2  adding D Code, yes.
3    Q And because it's adding D Code as one of the --
4  one of the proper valid codes, it's authorizing D Code?
03:18 5    A It would ultimately authorize it, too, but
6  only --
7    Q After it added it?
8    A -- after it -- after it added it.
9    Q Okay. So in terms of Claim 3, turning back to
03:18 10  it, I understand that it -- the term "adding a code" does
11  not appear in Claim 3, but all the elements we just
12  discussed, aren't all of those -- aren't all of these
13  elements in Claim 3 implemented in our -- the discussion
14  we just had about R1?
03:19 15    MR. ROOSEVELT: Other than adding a code?
16    MR. HENDERSHOT: Yes, other than adding a code.
17    THE WITNESS: Yes. Other than adding a code,
18  which is the primary thrust of R1 which is I think
19  important to point out -- but other than adding the code,
03:19 20  yes, authorizing and rejecting the codes is what's
21  described here and -- and that's included in Claim 3.
22    BY MR. HENDERSHOT:
23    Q Okay. In formulating your opinions that are set
24  forth in your report, did any of TriZetto's attorneys
03:19 25  discuss with you the significance of the term

47 (Pages 185 to 188)

Page 209

1      "The term hints at something that
2   is fixed and unchanging, but the term
3   is never clarified."
4      Do you see that?
03:56  5    A  Yes.
6    Q  Was that something -- how did you arrive at that
7   fact that that hints at that?  Was that through
8   discussions with anyone?
9    A  No.  It was not.  It was just through an overall
03:56 10  reading of the patent, including the specifications and
11  examples.
12    Q  Could you explain to me how the term
13  "predetermined" hints at fixed and unchanging.
14    A  I'd have to read through the patent to refresh
03:56 15  my memory of what caused me to draw that conclusion.
16     But it was I -- I should say let me strike the
17  word "conclusion," because as I freely acknowledge here,
18  the term is never clarified.  So I'm simply offering
19  speculation that it hints at this.
03:57 20     It's -- it certainly is not essential to my
21  opinion one way or another whether -- whether the
22  predetermined database is fixed and unchanging didn't
23  influence my opinion, if that's where --
24    Q  Okay.
03:57 25    A  -- you're leading with this.

Page 210

1    Q  In -- in the context of the claims, when -- when
2   you see "predetermined," what -- do you understand that
3   to be predetermined at like -- strike that.
4      Do you think the term "predetermined" requires
03:57  5  clarification?
6    A  Well, it depends on what the writer is trying to
7   accomplish here.  If they want me to understand what that
8   database comprises, yes, it begs for definition.
9      If they're -- if they don't care that I
03:58 10  understand it, then -- then I guess they don't need to
11  clarify it.
12    Q  I mean, did you look it up?  Did you look in a
13  dictionary to see what "predetermine" means?
14    A  I don't think so.
03:58 15    Q  You said it needs clarification.  It seems like
16  a natural course of action to me.
17      You didn't look it up in a dictionary?
18      MR. ROOSEVELT:  Argumentative.
19      THE WITNESS:  I mean, I may have.  I -- I --
03:58 20  honestly, I don't recall looking it up, but I may have.
21  BY MR. HENDERSHOT:
22    Q  Well, working with what you suggest it hints at,
23  does the term "predetermined" to you suggest that it is
24  determined at a certain point in time?
03:58 25    A  The way I would use that term, it suggests to me

Page 211

1   that something exists as of a certain moment in time.
2      But, as I say, given the language of the entire
3   document, I don't recall exactly where it, in some
4   places, hinted at something that was fixed and
03:59  5  unchanging.
6      It wasn't -- it wasn't something upon which I
7   hinged any opinion or anything, but --
8    Q  Okay.  And in the context of the claim, given
9   that we've talked that it -- it's -- predetermined
03:59 10  implies that it's at least in your -- fixed and
11  unchanging at a certain time; is that correct?
12    A  No.  It -- it -- it -- it -- what I say the term
13  "pre" -- take it out of the context of this claim.
14      The -- the word "predetermined" suggests to
03:59 15  me -- or one usage of the word would be something that as
16  of a moment in time exists as defined.
17    Q  Okay.  And but -- okay.  So that's your
18  definition outside of the claim.
19      What about putting it back in the claim strips
03:59 20  it of that meaning?
21    A  It doesn't strip it of that meaning.
22    Q  Okay.
23    A  It's -- it's -- the two can exist side by side,
24  the two definitions.
04:00 25    Q  So you said it didn't affect your opinion.

Page 212

1      The presence of the word "predetermined" and the
2   fact that you articulated what could be one of two
3   definitions, didn't deprive you of the ability to
4   determine what the claims mean; is that correct?
04:00  5    A  Correct.
6    Q  Direct your attention to Claim 2, on Page 9 --
7   or your discussion of Claim 2, on Page 9 of your report.
8      (Document reviewed by the witness.)
9      THE WITNESS:  Okay.
04:01 10  BY MR. HENDERSHOT:
11    Q  You -- if I'm read -- and correct me if I'm
12  misstating your opinion, you don't have an understanding
13  of what mutually exclusive means.
14      Is that your opinion in the context of Claim 2?
04:01 15    A  I'm -- I'm assuming a general discussion that it
16  is incompatible with.  I'm using that sort of synonymous
17  synonym to insert, you know.
18      If they -- if they meant something different
19  than that, then someone will have to tell me, but that's
04:01 20  the meaning I used.
21    Q  That's what you understand permeated in the
22  claim?
23    A  Yes.
24    Q  Okay.  And incompatible, would it be -- is it a
04:01 25  fair statement that when you say that incompatible -- and

53 (Pages 209 to 212)

Page 221

1    A  Okay.
2    Q  And it's the convention we talked about, in the
3  hypothetical earlier, would you agree that Code A and
4  Code B, be one for a one-centimeter repair and a
04:12  5  two-centimeter repair are mutually exclusive from a
6  claims processing standpoint and that they shouldn't be
7  submitted on the same claim?
8    A  The latter phrase I would agree with, that they
9  shouldn't be submitted on the same claim, assuming the
04:12 10  hypothetical, which I believe likely is consistent with
11  coding conventions at that time, that you're supposed to
12  aggregate those.  So the latter phrase I would agree
13  with.
14    Whether you're doing it on the basis of medical
04:12 15  exclusivity, it wouldn't be the way my mind would think
16  about it.
17    It would -- that would be a case of
18  fragmentation, breaking down a service into more than the
19  necessary parts, or redundancy.  You know, a lot of that
04:12 20  it's -- can be classified under any of a couple of --
21  of -- of -- of rubrics.
22    Q  Okay.  So -- so is it -- is it fair to say that
23  in your opinion, generally speaking, if you have two
24  unbundled codes on a claim, those codes are incompatible,
04:13 25  if they should be rebundled?  Or do you apply different

Page 222

1  definitions?
2    A  The term -- I call it unbundling.  I don't call
3  it medically exclusive.  I mean, no.  I wouldn't think to
4  ever call that -- that example medically exclusive.  I
04:13  5  would call it unbundling.
6    Q  Well, would you ever pay, say, Code A and
7  Code B, whenever they're received on a claim together,
8  100 percent of the time should be rebundled into Code C?
9    A  Okay.
04:13 10    Q  Doesn't -- would you -- in that case, Code A and
11  Code B, under -- under that rule would never be paid
12  together on the same claim; is that correct?
13    A  Right.  Or should not be paid.
14    Q  Should not be paid.
04:14 15    A  Yeah.
16    Q  So code -- both Code A and Code B in -- in that
17  example, in your opinion, would be determined invalid, to
18  bring it back to sort of the language of Claim 3?
19    MR. ROOSEVELT:  Vague and ambiguous to the term
04:14 20  "invalid."
21  BY MR. HENDERSHOT:
22    Q  As you understand its use in Claim 3.
23    A  It could fall within the definition of valid and
24  invalid as presented in Claim 3.
04:14 25    Q  But you have a differing understanding of

Page 223

1  exclusivity?
2    Doesn't -- doesn't the receipt -- in that -- in
3  that hypothetical, doesn't the receipt of Code A with
4  Code B exclude the payment of Code B?
04:14  5    A  It certainly wouldn't be the way that I think
6  most people in the -- in -- in this world, that is to
7  say, the world of claim auditing, would describe it.  It
8  would be a very odd and unusual way.
9    And I've known many people in the claim auditing
04:15 10  world.  So they would not typically use those words.
11    Medically exclusive would be used for things,
12  like, for example, that -- that hypothetical I just gave,
13  you know.
14    You -- you can't be operating on a male and
04:15 15  female body part at the same time.  You can't remove two
16  spleens from the same patient.  There are, you know,
17  ready examples of it, but that's not one that I would --
18    Q  Okay.
19    A  -- think of, but --
04:15 20    Q  So I just want to -- I'm trying to -- I had
21  something in my mind from earlier, and I may have -- I
22  may have misinterpreted it.
23    You had said that in your view, in terms of
24  claims processing, the relationships between medical
04:15 25  service codes are almost always going to be medical, in

Page 224

1  terms of those relationships you would apply in
2  processing them; is that correct?
3    A  When you're talking about the -- the question of
4  incompatibility; in other words, A doesn't fit with B,
04:16  5  you know, it's a medically inconsistent fact.
6    I mean, I -- I think you may be reading more
7  into my statement --
8    Q  Okay.
9    A  -- than -- than -- than I intend.  I mean I --
04:16 10  I -- I -- it's -- it's certainly is not -- this
11  is not an issue that comes anywhere close to affecting my
12  opinion on this -- regarding this patent.
13    Q  Okay.  So -- so maybe we'll short-circuit all of
14  this.  There -- there was no term anywhere in any of the
04:16 15  '164 claims you looked at that prevented you from
16  ascertaining sort of the scope of that claim in a
17  sufficient manner to enable you to prepare your
18  invalidity opinion?
19    A  Correct.
04:16 20    Q  So you were able to determine for yourself the
21  meets and bounds of each claim so you could decide
22  whether what falls within those meets and bounds would be
23  obvious?
24    A  Correct.
04:17 25    Q  Okay.  And that's true for every claim in the

56 (Pages 221 to 224)

Page 225

1 '164 patent that you reviewed?

2     A  Yes.  Yes.

3     MR. HENDERSHOT:  Do you mind if we go off the

4  record for about five minutes?  I just want to take a

04:17  5  look through my notes.

6     MR. ROOSEVELT:  Sure.

7     MR. HENDERSHOT:  Is that okay with you?

8     THE WITNESS:  That's fine.

9     THE VIDEOGRAPHER:  Going off -- excuse me.

04:17 10  Going off the record.  The time is 4:17 p.m.

11     (Recess.)

12     THE VIDEOGRAPHER:  And we are back on the

13  record.  The time is 4:25 p.m.

14  BY MR. HENDERSHOT:

04:26 15     Q  Dr. Hawley, in formulating your opinions that

16  are set forth in your report, did you review McKesson's

17  proposed construction of the claims in this case?

18     A  I -- I don't -- no, I don't believe I did.

19     Q  Did you -- do you know if you reviewed

04:26 20  TriZetto's proposed construction of the claims in this

21  case?

22     A  No.  I -- I know I didn't review either, in

23  fact, as I think about it, no.

24     Q  Okay.  And just so I'm clear, your -- the

04:26 25  practices within the industry, prior to 1987, that you

Page 226

1  refer to in --

2     A  Yes.

3     Q  -- your report, your knowledge of those

4  practices was based on your interaction with people

04:27  5  within your own companies and from companies you -- AMI

6  spoke with during the survey?

7     A  I would say more broadly based on my experience

8  at AMI Group L services, as well as my experience as a

9  consultant.

04:27 10     Q  And you gained that knowledge -- strike that.

11     And the experience you describe that you just

12  referenced in your last response, being your experience

13  at AMI and your experience as a consultant, the knowledge

14  you gained from that experience, regarding the -- the

04:27 15  practices you describe in your report, was that gleaned

16  from discussions, interactions with people from other

17  companies I take it?

18     A  And work performed, my own claim audit

19  experience, the claim audit experience of the staff that

04:28 20  worked for me ultimately.

21     Q  You just suggested -- strike that.

22     In your report, you offer your opinion that

23  the -- the categories of claim auditing, the specific

24  types of rules that you discuss here, were --

04:28 25     A  Yes.

Page 227

1     Q  -- were known on and inputted on a manual

2  basis --

3     A  That's correct.

4     Q  -- prior to the -- prior to 1987?

04:28  5     A  That's correct.

6     Q  Are you aware of any publication or publicly

7  available document or resource that would have described

8  those processes prior to 1987?

9     A  I'm not.  I haven't done an exhaustive search

04:29 10  for such a document, but -- but, no, as I sit here I'm

11  not.

12     Q  Okay.  Would it affect your opinion if, in order

13  to qualify as prior art that is relevant to the claims of

14  the '164 patent, that the practices you discuss must have

04:29 15  been publicly known and generally accessible to the

16  public, would it affect your opinion, if that was the

17  law?

18     A  I'm sort of assuming that's the case, because my

19  sources were public sources.  They weren't private,

04:30 20  confidential sources.

21     Q  Well, they -- they were consulting clients at

22  least -- strike that.

23     Let me walk through a list of some of the

24  sources.  Were some of them consulting clients of yours?

04:30 25     A  Consulting clients of ours, yes.

Page 228

1     Q  Companies -- companies with which AMI had

2  discussions during their survey or that AMI's consultants

3  had discussions with during their survey?

4     A  That, and the experience of the consultants

04:30  5  themselves, many of whom had previously worked for health

6  insurance companies.  It was one of the reasons we would

7  have retained them.

8     Q  So if I wanted to build a system, like the ones

9  described in the claims of the '164 patent, where would I

04:30 10  go about accessing the information, that -- that

11  knowledge, amongst these people?

12     A  Well, just as is described in the '164 patent,

13  just as I acknowledged I used in the work on

14  ClinicalLogic, it's in the form of nurses and doctors who

04:31 15  do this for a living that -- where that knowledge is

16  retained.

17     Most of the claim auditors in the country I'd

18  surmise, certainly based on my experience, are not

19  full-time claim auditors.  They're -- and part of their

04:31 20  value is that they are practicing clinicians in the -- in

21  the community and have credibility for the fact that

22  they're practicing physicians.

23     And so they're -- they're readily available.

24  They're not hidden behind some confidential source.

04:32 25  They're just out there in the community.  And were at

57 (Pages 225 to 228)

Hawley, Philip

1

2

3

4

5

6

7

8      I, PHILIP M. HAWLEY, JR., M.D., do hereby

9   declare under penalty of perjury that I have read the

10   foregoing transcript; that I have made any corrections as

11   appear noted, in ink, initialed by me, or attached

12   hereto; that my testimony as contained herein, as

13   corrected, is true and correct.

14      EXECUTED this _7th_ day of _January_,

15   _2006_, at _Los Angeles_, _California_

       (City)            (State)

16

17

18

19   _[signature]_

       PHILIP M. HAWLEY, JR., M.D.

20

21

22

23

24

25

EXHIBIT 3

Westlaw.

Slip Copy
Slip Copy, 2005 WL 1378752 (E.D.Mich.)
(Cite as: Slip Copy)

Page 1

**H**
Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court,E.D. Michigan, Southern
Division.
WARRIOR LACROSSE, INC., Plaintiff,
v.
STX, LLC, Defendant.
No. 04-70363.

June 2, 2005.

John A. Artz, John S. Artz, Robert P. Renke, Artz & Artz,
Southfield, MI, for Plaintiff.
Lawrence J. Gotts, Pillsbury, Winthrop, McLean, VA,
Lawrence R. Jordan, Jaffe, Raitt, Ann Arbor, MI, Scott R.
Torpey, George A. Summit, Jaffe, Raitt, Southfield, MI, for
Defendant.

ORDER

COOK, J.
*1 The attorneys who represent Defendant STX, LLC are:

Lawrence Gotts

Aslan Baghdadi

Brett C. Martin

PILLSBURY WINTHROP SHAW PITTMAN LLP

1650 Tysons Boulevard

McLean, VA 22102-4859

The attorneys who represented the Plaintiff Warrior
Lacrosse, Inc ., are:

John A. Artz

John S. Artz

Robert P. Renke

Artz & Artz, P.C.

28333 Telegraph Road, Suite 250

Southfield, MI 48034

In this law suit, the Plaintiff, Warrior Lacrosse, Inc.
("Warrior"), has charged the Defendant, STX, LLC
("STX") with infringing three of its patents; namely, U.S.
Patent Nos. RE 38, 216 ("the '216 patent"), 6,561,932 ("the
'932 patent"), and 6,676,547 ("the '547 patent"). Each of
these patents relates generally to technological advances in
lacrosse heads.

On April 18, 2005, this Court conducted a hearing pursuant
to *Markman v. Westview Instruments, Inc.*, 517 U.S. 370,
116 S.Ct. 1384, 134 L.Ed.2d 577 (1996). Now before the
Court is the task of construing certain claim terms over
which the parties remain in dispute.

I.

In 1995, the Federal Circuit Court of Appeals declared that
a trial court should undertake a two step process when
attempting to determine if a patent infringement has
occurred; namely, (1) construe all of the disputed claims,
and (2) then determine if the accused product infringes upon
any of the claims as properly construed. *Markman v.
Westview Instruments, Inc.*, 52 F.3d 967, 976
(Fed.Cir.1995), *aff'd*, 517 U.S. 370, 116 S.Ct. 1384, 134
L.Ed.2d 577 (1996).

Claim construction is a matter of law which is the
responsibility of the trial court. *Cybor v. FAS Techs., Inc.*,
138 F.3d 1448, 1456 (Fed.Cir.1998). It is "the process of
giving proper meaning to the claim language." *Abtox, Inc. v.
Exitron Corp.*, 122 F.3d 1019, 1023 (Fed.Cir.1997). As
such, this process is designed to "define the scope of the
protected invention." *Id.*

When construing claims, a court should initially consider
the language of the patent claim. *Teleflex, Inc. v. Ficosa
North America Corp.*, 299 F.3d 1313, 1324 (Fed.Cir.2002).
In the absence of an express intent to impart a novel
meaning to a term within the claim, there is a "heavy
presumption" that a term carries its ordinary and customary
meaning to a person of ordinary skill in the relevant art.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Slip Copy
Slip Copy, 2005 WL 1378752 (E.D.Mich.)
(Cite as: Slip Copy)

*Teleflex*, 299 F.3d at 1325. Thus, when "construing claims, the analytical focus must begin and remain centered on the language of the claims themselves, for it is that language that the patentee chose to use to 'particularly point out and distinctly claim the subject matter which the patentee regards as his own invention." ' *Interactive Gift Express, Inc. v. Compuserve, Inc.*, 256 F.3d 1323, 1331 (Fed.Cir.2001) (quoting 35 U.S.C. § 112). Often, dictionaries are useful resources to assist the court in determining the ordinary and customary meanings of claim terms, as well as the meanings that would have been ascribed to technical terms by those of skill in the relevant art. *Texas Digital Sys. Inc. v. Telegenix, Inc.*, 308 F.3d 1193, 1202 (Fed.Cir.2002).

*2 The trial courts are also encouraged to examine the intrinsic record in every case in order to "determine whether the presumption of ordinary and customary meaning is rebutted." *Texas Digital*, 308 F.3d at 1209. Although words in a claim are generally given their ordinary and customary meaning, "a patentee may choose to be his own lexicographer" and assign special definitions to the words in the claim, as long as those definitions are clearly stated in the patent specification or file history. *Hoechst Celanese Corp. v. BP Chems. Ltd.*, 78 F.3d 1575, 1578 (Fed.Cir.1996). Thus, intrinsic evidence can provide much needed "context and clarification about the meaning of claim terms." *Teleflex*, 299 F.3d at 1325.

Of all the intrinsic evidence, the Federal Circuit has indicated that the specification is the "single best guide to the meaning of a disputed term." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed.Cir.1996). In fact, the specification is usually "dispositive." *Id.* The trial court may consult the specification in order to (1) resolve an ambiguity if the ordinary and customary meanings of the words within the claims are not sufficiently clear to allow its scope to be determined from the words alone, or (2) reveal limitations to the scope of the claim. *Teleflex*, 299 F.3d at 1325. Thus, claims "must be read in view of the specification, of which they are a part." *Markman*, 52 F.3d at 979.

However, it would be improper to read a limitation from the specification into the claims. *Liebel-Flarsheim Co. v.*

*Medrad, Inc.*, 358 F.3d 898, 904 (Fed.Cir.2004). For example, if a specification contains only one embodiment, the scope of the claim must not be limited to the embodiment in the specification. *Teleflex, Inc.*, 299 F.3d at 1326.

In evaluating the intrinsic record, the trial court is encouraged to consider the prosecution history of the patent. *Vitronics*, 90 F.3d at 1582. During the course of these proceedings, the applicant may have made express representations regarding the scope of the invention. Thus, the prosecution history is "often of critical importance to determining the meaning of the claims." *Id.* at 1582 (citing *Markman*, 52 F.3d at 980). This history may demonstrate that the claims do not cover some matters which would otherwise be encompassed in the plain meaning of the words used or may limit an interpretation of the terms within the claim. *Southwall Tech., Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1576 (Fed.Cir.1995).

Finally, although trial courts may examine extrinsic evidence, including inventor and expert testimony, such an approach should be utilized only in rare cases. *Frank's Casing Crew & Rental Tools, Inc. v. PMR Techs., Ltd.*, 292 F.3d 1363, 1374 (Fed.Cir.2002). The Federal Circuit has held that a trial court may consult extrinsic evidence only for the limited purpose of (1) allowing it to acquire an understanding of the claim terminology or (2) to resolve an ambiguity in a disputed claim term on the basis of the intrinsic evidence. *Markman*, 52 F.3d at 986. Significantly, extrinsic evidence "cannot be used to alter a claim construction dictated by a proper analysis of the intrinsic evidence." *On-Line Tech. v. Bodenseewerk Perkin-Elmer GmbH*, 386 F.3d 1133, 1139 (Fed.Cir.2004).

*3 In fashioning a claim construction, a court should define terms that may be readily understood by lay persons. One district judge recently noted that "claim construction is essentially the crafting of a jury instruction, so the term definition must be comprehensible by a lay juror as well as one skilled in the art." *Leighton Tech. LLC v. Oberthur Card Systems, S.A.*, 2005 WL 589333 (S.D.N.Y., Mar.9, 2005) (unpublished).

II.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Slip Copy                                                                                            Page 3
Slip Copy, 2005 WL 1378752 (E.D.Mich.)
(Cite as: Slip Copy)

The parties have identified twenty six claims from the '216 Patent that require construction by the Court; namely, 58, 59, 61, 62, 69-71, 77, 81-86, 88, 89, 91-96, and 98-101. Many of the disputed terms appear in several of the claims. At the *Markman* hearing on April 18, 2005, the parties agreed on the construction of three terms that had been previously disputed: (1) "offset from said plane," (2) "handle/head axis," and (3) "below said plane." [FN1] Hence, the four remaining terms that require construction are (1) "adjacent," (2) "half of the lengths of said sidewalls," (3) "socket," and (4) "defining a plane" and "which defines a plane."

> FN1. The parties agree that the term "offset from said plane" should be construed as "lowered with respect to the plane by an appreciable amount." Addressing the term, "handle/head axis," the parties have agreed to construe this term as "a straight line coaxial with the opening in the projection and the portion of the handle inside the opening." For the term, "below said plane," the parties have assigned the same construction to this term as "offset from said plane;" namely, "lowered with respect to the plane by an appreciable amount."

### A. "Adjacent"

The word, "adjacent," appears in Claims 58, 70, 77, 81, 83-85, 88, 91, 94, 96, 98, and 100 of the '216 Patent. Claim 85 is a good example of how this word is used: "A head for a lacrosse stick comprising: ....said front side of said sidewalls, beginning adjacent said base, curving downwardly to a point below said plane as to impart a curved geometry when viewed in side elevation."

Warrior submits that "adjacent" should be construed to mean "close to or near," whereas STX asserts that this word means "next to." The ordinary meaning of "adjacent" supports both parties' proposed constructions. Warrior cites a dictionary definition of "adjacent" as "to lie near ... near or close to, adjoining ... Next to; adjoining." Webster's New World College Dictionary 16 (3d ed. 1997) ("Webster's"). STX, by contrast, cites Webster's as well as the American Heritage Dictionary, which defines "adjacent" as "close to;

lying near ... Next to; adjoining." American Heritage Dictionary 79 (2d ed. 1991) ("American Heritage").

During their prosecution, the patent applicants ("Applicants") added the word, "adjacent," to the claims in order to distinguish this patent over prior art; namely, the MacNeil patent. Initially, the Patent Examiner had rejected the Applicants' Claims 58, 59, 75, and 76, as anticipated by the MacNeil patent. The Examiner wrote that the MacNeil patent presented "a front side of said sidewalls curving generally downwardly to a point below said plane beginning adjacent said base so as to impart a curved geometry when viewed in side elevation." Pl.'s Ex. 6, p. W08328. Following the Examiner's initial rejection, the Applicants amended their claims, noting that "[a]ny curving in MacNeil does not begin adjacent the base, but instead begins remote from the base." *Id.*, p. W08288. The Examiner ultimately accepted this argument. *Id.*, p. W08367.

\*4 Warrior argues that this prosecution history illustrates that by adding "adjacent," the Applicants were attempting to distinguish their '216 patent from the MacNeil patent which requires a lowering of the sidewalls near the scoop, but not near the base. According to Warrior, to limit this word to a definition other than "close to or near" would contradict the plain meaning of the term, as well as the specification and prosecution history.

STX counters by asserting that the prosecution history supports its proposed construction. In its brief, STX reproduced a figure of the MacNeil lacrosse head and argued that a measurement of the length of the head clearly demonstrates that the lowering of the sidewalls actually occurs closer to the base than to the scoop of the lacrosse head. STX submits that, inasmuch as the lowering in the MacNeil head is actually "near[er] or "close[r] to" the base (instead of the scoop), the Applicants must have intended "adjacent" to mean "next to." Otherwise, STX argues that the Applicants would not have been able to distinguish the '216 patent from the prior art.

In the opinion of this Court, neither the prosecution history nor the specification resolves the claim construction for "adjacent." Warrior's contention that the Applicants had used "adjacent" to mean "close to or near" in an effort to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Slip Copy                                                                                                  Page 4
Slip Copy, 2005 WL 1378752 (E.D.Mich.)
(Cite as: Slip Copy)

distinguish the prior art is without merit. Because "near or close to" is a much broader term than "next to," the Applicants could have successfully distinguished the MacNeil patent if they had used "adjacent" to mean "next to." On the other hand, the prosecution history does not conclusively support the application of "next to" as a viable alternative definition, as STX argues. As the illustration of the MacNeil patent shows, the lowering of the sidewalls in this patent occurs almost halfway the length of the sidewall. *See* STX Resp. Br., at 11. Since the lowering of the sidewalls in the '216 patent does occur "close[r] to" the base than in the MacNeil patent, the Applicants may very well have intended "adjacent" to mean "close to" or "near."

Since the intrinsic record does not shed any light on whether "adjacent" should be defined as "close to or near" or "next to," the Court must choose between equally applicable dictionary definitions. In this context, the Federal Circuit has instructed that,
[b]ecause words often have multiple dictionary definitions ... the intrinsic record must always be consulted to identify which of the different possible dictionary meanings of the claim terms in issue is most consistent with the use of the words by the inventor....If more than one dictionary definition is consistent with the use of the words in the intrinsic record, the claim terms may be construed to encompass all such consistent meanings.

*Texas Digital,* 308 F.3d at 1203; *see also Bilstad v. Wakalopulos,* 385 F.3d 1112, 1116 (Fed.Cir.2004). Here, both proffered dictionary definitions are consistent with the use of the word "adjacent." Inasmuch as Warrior's proposed claim construction is broader and encompasses both definitions of adjacent as "close to or near" *and* "next to," the Court will adopt Warrior's proposed claim construction and construe this word to mean as "close to or near."

B. "Half of the lengths of said sidewalls"

*5 The term, "half of the lengths of said sidewalls," is used in Claims 62, 70, 71, 77-80, and 91. For example, Claim 62 indicates that the sidewalls "are of uniform thickness between said front and back sides thereof for about one-half of the overall length of said sidewalls."

Warrior proposes that this term should be construed as being "one part of the sidewall that is approximately equal to the other part." STX, by contrast, contends that this term is incapable of construction and must be rendered invalid under 35 U.S.C. § 112. *See Honeywell Int'l, Inc. v. Int'l Trade Com'n,* 341 F.3d 1332, 1338 (Fed.Cir.2003) ("If the court determines that a claim is not 'amenable to construction,' then the claim is invalid as indefinite under 35 U.S.C. § 112, ¶ 2") (internal citations omitted). STX posits that since neither the jury nor an ordinary person who is skilled in the art can identify where the sidewalls begin or end, this term lacks the requisite specificity.

The Court disagrees. Warrior's proposed construction tracks the ordinary meaning of the words "half" and "length." Moreover, the term "half the lengths of said sidewalls" does not require strict mathematical precision. Indeed, the prosecution history reveals that the Patent Examiner fully understood "sidewall" and its metes and boundaries. As such, the Court concludes that any one who is possessed of the ordinary skill in the art can identify the halfway point in the lengths of the sidewalls.[FN2]

> FN2. The Court notes that the extrinsic evidence also supports Warrior's argument on this issue. In support of its position, Warrior has proffered the declaration of Jesse Hubbard-the inventor of the '216 patent-who asserts that (1) the word "sidewall" is well known to those in the industry and, in his judgment, (2) the boundaries of a sidewall are identifiable *See* Pl.'s Br., Ex. 43, ¶ 7(b).

In order to demonstrate that this claim is sufficiently indefinite as to be invalid under 35 U.S.C. § 112, a party must demonstrate by clear and convincing evidence that it "is insolubly ambiguous, and no narrowing construction can properly be adopted[.]" *Exxon Research & Eng'g Co. v. United States,* 265 F.3d 1371, 1375 (Fed.Cir.2001). STX has failed to make this requisite showing. As the Federal Circuit has instructed, "[w]hen claims are amenable to more than one construction, they should, when reasonably possible, be interpreted so as to preserve their validity ." *Process Control Corp. v. HydReclaim Corp.,* 190 F.3d 1350, 1356 (Fed.Cir.1999), *cert. denied,* 529 U.S. 1037, 120

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Slip Copy
Slip Copy, 2005 WL 1378752 (E.D.Mich.)
(Cite as: Slip Copy)

Page 5

S.Ct. 1531, 146 L.Ed.2d 346 (2000).

Since Warrior's proposed definition of "half of the lengths of said sidewalls" as "one part of the sidewall that is approximately equal to the other part" is consistent with the language of the claim, specification, and prosecution history, the Court will adopt this proposed claim construction.

### C. "Socket"

The word, "socket," appears in Claims 85, 88, 91, 96, and 98. Claims 85, 88, 91 require "a socket extending from said base for attachment of a handle." Claims 96 and 98 require "a socket exteriorly projecting from said base for attachment of a handle."

Warrior proposes that the word, "socket," should be construed as "a portion of the frame having an opening for receiving a part." STX offers its own construction as "a hollow structure open at one end for receiving a handle." Despite their differences of opinion, both parties agree that the word, "socket," requires an opening for receiving a lacrosse handle. Thus, the key dispute is whether a "socket" demands a hollow structure.

*6 The ordinary meaning of the word, "socket," supports both parties' constructions. A "socket" is defined as "a hollow piece or part into which something fits," Webster's at 1273, or as "an opening or a cavity into which an inserted part is designed to fit," American Heritage at 1292. Moreover, the specification-standing alone-does not resolve the construction of this word by the Court. Although STX has correctly noted that all of patent drawings in the '216 patent illustrate the socket as a hollow opening, Warrior has argued that it is error to limit the claims to the preferred embodiment within the specification. See *Teleflex*, 299 F.3d at 1328.

Since more than one dictionary definition is consistent with the use of the words in the intrinsic record, the claim terms must be construed to encompass all such consistent meanings. *Bilstad*, 386 F.3d at 1116. Therefore, the Court will not limit the definition of "socket" to require a "hollow structure," as STX has argued. However, since the

specification and the claim language only refer to a "socket" that connects to a handle, the Court will not fully adopt Warrior's proposed construction. Rather, the Court will construe "socket" as "a portion of the frame open at one end for receiving a handle."

### D. "Defining a plane" and "which defines a plane"

The term, "defining a plane," appears in Claims 58, 70, 88, 96, and 98, whereas the term, "which defines a plane," appears in Claims 81, 85, 91, and 100. Claim 81 is representative of the use of the term in the patent: "A head of a lacrosse stick, comprising: ..... a projection extending from said base for attachment of a handle so as to define a handle/head axis, said projections having an upper surface which defines a plane parallel to handle/head axis."

Warrior proposes that this term should be construed as "when viewed from the side, a reference plane that is parallel to the handle/head axis is disposed at the front side edge of the frame." STX opts for a simpler construction as "distinctly specifying a plane."

The ordinary meaning of "define" is "to specify distinctly," American Heritage at 364, or to "fix or mark the limits of," Webster's at 362. Thus, the ordinary meaning of the word, "defines," supports STX's proposed construction.

Warrior nevertheless submits that its proposed definition is consistent with the '216 patent claim language and specification. Warrior cites the specification which reads, in relevant part: "The front side edge 46 of that portion of the base 28 immediately adjacent to said socket 40 defines a plane 48 (FIG.6) that is offset from but parallel to handle/head axis." '216 patent, col. 4., lines 20-22. According to Warrior, the specification indicates that the plane is a "reference plane from which the locations of other components of the head are measured." Pl.'s Opening Br. at 26.

In its counter-argument, STX contends that Warrior's definition gives rise to multiple planes:
*7 [T]here can be an infinite number of "theoretical" reference planes located on the surface of a base or a projection. Being "located" is not enough, if the surface

Westlaw.

Slip Copy                                                                      Page 6
Slip Copy, 2005 WL 1378752 (E.D.Mich.)
(Cite as: Slip Copy)

does not actually *define* the reference plane. For the term to
"particularly point out and distinctly claim" what the
applicants "regard" as their invention, as required by 35
U.S.C. § 112, ¶ 2, the surface must *distinctly specify* the
plane, as pointed out by STX.

Def.'s Resp. Br., at 14 (emphasis original).

The Court finds STX's arguments on this issue to be
persuasive. Nothing in the intrinsic record expressly rebuts
the ordinary and customary meaning of the terms "which
defines a plane" or "defining a plane." *Texas Digital,* 308
F.3d at 1209. Although the specification makes reference to
the creation of a plane that "is offset from but parallel to
handle/head axis," the language within the claim
incorporates the "parallel to handle/head axis" phrase. *See,
e.g.,* '216 Patent, claim 81. [FN3] Consequently, if this Court
adopted Warrior's proposed construction, the language of
the '216 patent claims would contain meaningless
surplusage.

> FN3. Every claim that makes reference to the
> terms, "which defines a plane" or "defining a
> plane," also contains a reference to the term,
> "parallel to said handle/head axis."

The terms, "which defines a plane" and "defining a plane,"
are ordinary terms. Since STX's proposed construction
comports with the ordinary meaning of the word, "define,"
and is consistent with the specification, the Court will
construe these two terms as "distinctly specifying a plane."

                              III.

Claims 1-15, 31, 32, 34, 37, 42-49, and 52-57 of the '932
patent are at issue in this case. Of these claims, the parties
have identified seven independent claims (1, 7, 31, 42, 44,
48, and 49) which contain language that requires
construction by the Court. During the *Markman* hearing, the
parties represented to the Court that they had agreed on the
construction of two disputed terms: (1) "bend" and
"outward bend" and (2) "smaller radius of curvature." [FN4]
Nevertheless, fourteen terms remain, all of which require
construction: (1) "upper portion" or "upper section," (2)
"lower portion" or "lower section," (3) "forward portion" or

"forward section," (4) "rear portion" or "rear section," (5)
"inclined," (6) "diverge," (7) "substantially from said base
towards said scoop," (8) "recessed channel," (9) "recessed
outwardly," (10) "adjacent," (11) "disposed further
inwardly," (12) "integrally formed," (13) "stepped back,"
and (14) "socket ."

> FN4. The parties are in agreement that the terms,
> "bend" and "outward bend," have their ordinary
> meaning and do not require construction by the
> Court. The parties have also agreed that the term,
> "smaller radius of curvature," means "bends more
> sharply."

    A. "Upper portion" and "upper section"

The term, "upper portion," appears in Claims 1 and 49; and
the term, "upper section," appears in Claims 31 and 48. For
example, Claim 1 sets forth
a pair of spaced apart sidewalls, which diverge from said
base toward said scoop and define a ball receiving area,
wherein said sidewalls each have an upper portion and a
lower portion with said sidewalls being progressively
outwardly inclined substantially from said base towards said
scoop whereby said upper portion is disposed further
outwardly with respect to said axis than said lower portion.

*8 Warrior proposes that the terms, "upper portion" and
"upper section," should be construed as "the portion of the
sidewall adjacent the upper rim." [FN5] By contrast, STX
argues that, inasmuch as the parties have reached an
agreement with regard to the terms, "upper," "lower,"
"forward," and "rear," these terms are unambiguous and do
not require construction.

> FN5. The parties agree that there should be a
> consistency in the construction of these terms. *See*
> Pl.'s Resp. Br. at 13,

Warrior relies primarily upon the intrinsic record to support
its proposed construction, citing the following language
from the specification as an example::
The catching area of the lacrosse head 10 is the area defined
by the upper rims 34 of the sidewalls 16, 18, the upper rim
30 of the base 14, and the upper rim of the scoop 20. The

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Slip Copy
Slip Copy, 2005 WL 1378752 (E.D.Mich.)
(Cite as: Slip Copy)

catching area is functionally the portion of the head 10 where the lacrosse ball can be received and maintained within the head 10. *The catching area is generally defined by the upper portion of the frame.*

'932 patent, col. 5, lines 44-50 (emphasis added). Hence, the upper portion of the sidewall is structurally the part of the sidewall lying near (or adjacent to) the sidewall upper rim. Warrior also cites the prosecution history of a subsequent patent application, the 10 414,178 patent, in which the Applicants responded to the Examiner's objection to the phrase, "upper portion," by maintaining that "one of ordinary skill in the art would understand the meaning of the term 'upper portion' as used in the claims to include the portion of the sidewall located adjacent to and including the upper rim." Pl.'s Br., Ex. 48, W08721.

The Court concludes that the terms, "upper portion" and "upper section," are unambiguous and therefore do not require construction. *See, e.g., ICU Medical, Inc. v. B. Braun Medical, Inc.,* 344 F.Supp.2d 663, 673 (N.D.Cal.2004). Because the term, "upper portion," is unambiguous on its face, the specification and prosecution history of the '932 patent will be consulted only to determine if the patentee intended to deviate from the ordinary meaning of the disputed term. *See Metabolite Laboratories, Inc. v. Laboratory Corp. of America Holdings,* 370 F.3d 1354, 1374 (Fed.Cir.2004). Warrior fails to point to any language in the specification which represents a clear disavowal of the ordinary and plain meaning of these terms. Significantly, the specification reads, "the catching area is generally defined by the upper portion of the frame." '932 Patent, Col. 5, lines 49-50. This language defines the catching area *by reference* to the upper portion of frame. Contrary to Warrior's position on this issue, the specification does not define the "upper portion" of the frame. Similarly, Warrior's citation to the prosecution of a related patent does not displace the ordinary and plain meaning of the terms, "upper portion" or "upper section." FN6

> FN6. Warrior cites *Elkay Mfg. Co. v. Ebco Mfg. Co.,* 192 F.3d 973, 52 U.S.P.Q .2d 1109 (Fed.Cir.1999) for the proposition that "the interpretation and scope of the terms of the '932

patent should be construed consistently with the same terms in related patents and applications." Pl.'s Resp. Br. at 13, n. 11. Warrior misreads *Elkay.* In *Elkay,* the court made a narrower statement than that advanced by Warrior: "When multiple patents derive from the *same initial application,* the prosecution history regarding a claim limitation in any patent that has issued with equal force to *subsequently issued patents* that contain the same claim limitation." *Elkay,* 192 F.3d 973, 52 U.S.P.Q.2d at 1114 (emphasis added). Here, the prosecution history cited by Warrior relates to an application for the 10 414,178 patent. The '932 patent precedes the 10 414,178 patent. Because the prosecution history cited by Warrior follows-rather than precedes-the initial '932 patent application, it cannot be used as persuasive authority that the Applicants used the term "upper section" to mean "portion of the sidewall located adjacent to and including the upper rim" with respect to the '932 patent.

In sum, Warrior has failed to present any clear statement of disavowal in the specification or the prosecution history that would require the "adjacent to the upper rim" language to be included in the construction of this claim. The Court declines to define this term.

B. "Lower portion" and "lower section"

*9 The term, "lower portion," appears in Claims 1 and 49; whereas, the term, "lower section," appears in Claims 31 and 48.

The parties' arguments here are similar to those that were advanced by them regarding the construction of the "upper section" and "upper portion" terms. Warrior proposes that these terms should be construed as "the portion of the sidewall adjacent the lower rim." STX takes a different position, contending that these terms do not require any construction.

This Court agrees with STX on this issue, and concludes that no construction is necessary for this term. Like "upper section" and "upper portion," these terms should be

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Slip Copy
Slip Copy, 2005 WL 1378752 (E.D.Mich.)
(Cite as: Slip Copy)

Page 8

interpreted and understood according to their ordinary
meaning, consistent with the parties' agreement. Inasmuch
as Warrior has failed to point to a clear disavowal of these
terms in the intrinsic record, the Court declines to construe
them.

C. "Forward section" and "forward portion"

The term, "forward section," appears in Claim 5. The term,
"forward portion," appears in Claims 7, 15, 31 and 44.
Claim 44, for example, reads as follows:
A lacrosse head for attachment to a lacrosse handle
comprising:
.... wherein the head includes a forward portion and a rear
portion and wherein said ball possession area has a
substantially uniform width throughout said rear section and
said ball receiving area comprises a progressively increasing
width from said base towards said scoop.

Warrior's proposed construction for these two terms is "the
portion of the head adjacent the scoop where the ball
typically enters and where the sidewalls are spaced apart a
larger distance for increased catching capabilities." STX
reiterates its argument that no construction is necessary for
this term. In addition, STX offers an alternative construction
for this term as "the part of the frame adjacent the scoop."

Like "upper portion" and "lower portion," the term,
"forward portion," is, on its face, unambiguous. Unlike
"upper portion" and "lower portion," however, the term,
"forward portion," is explicitly defined in the specification,
as follows:
The forward portion 62 generally is defined by the location
where the pocket or ball retaining area significantly
increases. In the forward portion 62, the upper rims 34 curve
outwardly with respect to the centerline CL of the stick and
also outwardly with respect to the lower rims 36 to form a
bend 64 in each sidewall 16, 18.

'932 patent, col. 6, lines 33-35.

Here, Warrior has provided intrinsic evidence which
demonstrates that the patentee deviated from the ordinary
meaning of the word, "forward," to include some reference
to the ball retaining capabilities of this area of the lacrosse

head. See *Interactive Gift Express*, 256 F.3d at 1331 ("If the
claim language is clear on its face, then our consideration of
the rest of the intrinsic evidence is restricted to determining
if a deviation from the clear language of the claims is
specified").

*10 However, the intrinsic evidence does not fully support
Warrior's proposed construction. There is no language in the
specification or the prosecution history which identifies the
location of "where the ball typically enters and where the
sidewalls are spaced apart a larger distance." In addition,
this suggested wording is not clear.

Under these circumstances, the Court must return to the
specification, which offers the following guidance: "each
sidewall 16, 18 and the area between each sidewall is
broadly divisible into a rear portion 60 adjacent the base and
a *forward portion 62 adjacent the scoop 20."* '932 patent,
col. 5, lines 26-28 (emphasis added). Because the
specification explicitly makes reference to the forward
portion of the head as being "adjacent the scoop," the Court
will construe it as meaning "the part of the frame adjacent
the scoop where the ball retaining area increases."

D. "Rear section" and "rear portion"

The word, "rear section," appears in Claim 5, whereas the
term, "rear portion," is used in Claims 7, 15, 31, and 44. As
stated in the previous section, Claim 44 offers representative
language on the use of the term, "rear portion." See '932
patent, claim 44.

Warrior urges the Court to adopt a definition of "rear
portion" as reflecting "the portion of the head adjacent the
base where the ball typically resides during possession and
where the sidewalls are spaced apart a smaller distance for
increased ball retention." On the other hand, STX contends
that either no construction is necessary for these
unambiguous terms or, as alternative, these terms should
be construed as "the part of the frame adjacent the scoop."

These arguments are identical to those positions that were
taken by the parties with regard to "forward portion" or
"forward section." Warrior cites several portions of the
specification to demonstrate that the "rear portion" is

Westlaw.

Slip Copy
Slip Copy, 2005 WL 1378752 (E.D.Mich.)
(Cite as: Slip Copy)

defined by a location near the base where the sidewalls are narrow. For example, the specification provides:

The distance between the upper rims 34 preferably slightly diverges to define a catching area that is larger than the pocket area defined by the lower rims 36. Thus, the rear portion 60 is configured to define a narrow pocket area which will facilitate retention of the ball because of the minimal width between the lower rims 36 and the lower portion 58 of the inner surfaces of the sidewalls.

'932 patent, col. 6, lines 12-19.

As with "forward portion," the terms, "rear portion" and "rear section," should be construed with reference to the language within the specification. Hence, Warrior's proposed construction will be adopted, in part. The Court finds no language within the specification or the prosecution history that would warrant an adoption of the "where the ball typically resides during possession" language. Thus, the Court will construe this term as "the part of the frame adjacent the base where the sidewalls are spaced apart a smaller distance for increased ball retention."

### E. "Incline"

*11 The word, "incline," is used in Claims 1,2,12, 32, 43, and 46 of the '932 patent. Claim 2 reads, for example, that "[t]he lacrosse head of claim 1 wherein said sidewalls are uniformly progressively outwardly inclined."

STX argues that this term does not require any construction. STX also submits that, in the alternative, if the Court deems construction to be necessary, this term should be construed as "sloped." Warrior agrees with the "sloped" suggestion, but asserts that "inclined" alternatively means "flared."

The definition of "inclined" is "to deviate from a horizontal or vertical position, course, etc.; lean; slope; slant." Webster's at 682. Thus, the ordinary meaning of the word, "inclined," is "sloped." The term "sloped" is also consistent with the language of the claim itself, the specification, and the prosecution history.

A closer question remains with Warrior's proposed construction of "inclined" as "flared." Unlike "sloped," the word, "flared," is not synonymous with "inclined." FN7

Warrior nevertheless claims that the intrinsic record supports a definition of "inclined" as "flared." The specification states:

> FN7. "Flared" means, "[t]o expand or open outward in shape." American Heritage at 517.

In the rear portion 60 of the head, the upper rims 34 are flared outwardly a smaller distance with respect to the lower rims 36 than the upper rims 34 are flared outwardly with respect to the lower rims 36 in the forward portion. This also helps created the "pinched" configuration. In other words, the upper rims 34 in the forward portion 62 are flared outwardly more than the upper rims 34 in the rear portion 60.

'932 patent, col. 5, lines 33-40. Warrior also cites the prosecution history, in which the Examiner acknowledge[d] that the intent of the claim modifications is to more clearly define that the flaring of the sidewalls is not constant but progressively increases as the sidewalls extend from the base to the scoop....The applicant may wish to ....formulate claim language that more clearly defines the "flaring" of the sidewalls....

Pl.'s Br., Ex. 19, W0141-0142. Since the specification and the prosecution history make reference to the "flaring" of the sidewalls, Warrior asserts that the meaning of "incline" should incorporate "flared." STX, in arguing that its position should be adopted, notes that Warrior, in failing to introduce any "flaring" language in the claim, maintained the "inclined" term and added other limitations to it. See Pl.'s Br., Ex. 20, p. W0159.

In the opinion of this Court, Warrior has presented sufficient intrinsic evidence to demonstrate that the patentee assigned a "special definition" to the word, "inclined," in the specification and file history. *Vitronics, 90 F.3d at 1582.* Hence, the Court will adopt Warrior's proposed construction for this term and construe the word, "inclined," as "sloped or flared."

### F. "Diverge"

This word, "diverge," which refers to the movement of the sidewalls from the base of the lacrosse head to the scoop, is

Westlaw.

Slip Copy                                                                    Page 10
Slip Copy, 2005 WL 1378752 (E.D.Mich.)
(Cite as: Slip Copy)

used in Claims 1, 31 and 57. Using Claim 57 as an example, the specification identifies the sidewalls as those which "generally diverge from said base to said scoop."

*12 Warrior proposes that this word be construed as "sidewalls that move away from one another such that the portions adjacent the scoop are further away from one another than the middle portions, i.e. the sidewalls are not arced or convex which results in a 'spoon shaped' frame configuration." STX focuses its argument on the ordinary and the commonly accepted meaning of "diverge" to create a simpler construction as "extend continuously outwardly." In its opposition, STX posits that Warrior's construction is flawed because the common point from which the sidewalls diverge must be the base, rather than the midpoint of the sidewalls.

The ordinary meaning of "diverge" is "to go or move in different directions from a common point or from each other; branch off." Webster's at 20. Although STX's construction is simpler and more consistent with the ordinary definition of "diverge," the proposed constructions which have been submitted by both parties are supported by the ordinary meaning of the word.

In its argument, Warrior urges the Court to construe this word on the basis of the intrinsic record. The specification provides that "the upper rims 34 of each of the sidewalls 16, 18 extend forwardly from the base 14 in a more diverging manner than the lower rims 36." '932 patent, col. 6, lines 5-7. However, this specification is devoid of any language that references the "spoon shaped" frame configuration of a goalie head. Moreover, the specification does not make any reference to "continuously," as suggested by STX in conjunction with its proposed construction of "diverge." Thus, the specification does not conclusively support either party's construction.

The prosecution history, on the other hand, does provide substantial support for Warrior's construction of "diverge." During the prosecution of the patent, the Applicants attempted to distinguish its patent from prior art goalie heads, which had a spoon shaped configuration. In attempting to make this distinction, the Applicants issued the following disclaimer:

Most, if not all, goalie lacrosse heads have a "spoon shaped" configuration. In other words, as the sidewalls travel from the base toward the scoop they form an arc. The sidewalls [in the '932 patent] thus converge from their widest point apart, which is located generally *in the middle of the head*, toward the scoop.

Pl.'s Ex. 19, p. W0127 (emphasis added). Warrior's proposed construction-which focuses on the movement of the sidewalls and which explicitly refers to the middle portions of the sidewalls-tracks the language in the prosecution history. Moreover, it is clear from this prosecution history that the patentee intended to disclaim any reference to prior art goalie heads. Thus, it offers unequivocal evidence that the word, "diverge," should take on a meaning that is different from its ordinary dictionary definition. *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1323 (Fed.Cir.2003). Accordingly, the Court adopts Warrior's proposed construction for "diverge" as "sidewalls that move away from one another such that the portions adjacent the scoop are further away from one another than the middle portions, i.e. the sidewalls are not arced or convex which results in a 'spoon shaped' frame configuration."

### G. "Substantially"

*13 The word, "substantially," appears in Claims 1, 5, 44, and 45. Claim 1, for example, provides that "wherein said sidewalls each have an upper portion and a lower portion with said sidewalls being progressively outwardly inclined substantially from said base to said scoop...." Claim 45, reads, in pertinent part, as follows: "The lacrosse head of claim 44, wherein said substantially uniform width throughout said rear section is slightly larger than a lacrosse ball."

Warrior proposes that "substantially" should be construed as "to a large or considerable degree." STX, while concurring with this construction for Claims 5, 44, and 45, argues that "substantially" should be construed in Claim 1 as meaning "essentially." Since the parties have limited their disagreement over the language in Claim 1, the Court will now focus its attention to the parties' arguments for this claim.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Slip Copy
Slip Copy, 2005 WL 1378752 (E.D.Mich.)
(Cite as: Slip Copy)

Both of the constructions that have been proffered by the parties are consistent with the ordinary meaning of the term, "substantially." American Heritage at 1354; Webster's at 1336. The Court thus turns to the intrinsic record for additional guidance on the meaning of this term. In an attempt to distinguish the prior art (the "Morrow" patent), the Applicants stated that their invention in Claim 1 required an outward inclination of the sidewalls along the "length or substantially the length of the sidewall." In so doing, they declared:

[T]he *Morrow* reference does not disclose sidewalls that are outwardly inclined from the base toward the scoop, i.e., along the length of the sidewall. Figure 3 of the *Morrow* reference appears to disclose some outward inclination of the sidewalls, i.e. the upper rims are spread further apart than the lower rims. However, any inclination in *Morrow* does not extend along the length or *substantially* the entire length of the sidewall.

Pl.'s Ex. 19, W0093 (emphasis added). According to STX, the inclusion of the language "the entire length of the sidewall" indicates that this claim refers to *essentially* the entire length of the sidewall. Since the Applicants did not say "substantially the length of the sidewalls," STX posits that it was the Applicants' intention to present their invention as having sidewalls inclined "essentially" the entire length of the sidewalls, not just a "large" or "considerable" extent.

The Court is not persuaded by this argument. The reference to the Morrow patent discloses a sidewall that has outward flaring or inclination along less than half of the length of the sidewall. By adding the term "substantially" to Claim 1, the Applicants sought to distinguish Morrow by demonstrating that the sidewalls of the '932 patent were outwardly flared or inclined *more than* half the length of the sidewall. The construction that most closely parallels this distinction is "to a large or considerable degree." Moreover, there is no reason for this Court to construe "substantially the entire length of the sidewall" to read "essentially the entire length of the sidewall" given the other uses of the word, "substantially," in Claims 5, 44, and 45. In making this determination, the Court is mindful that the "same term or phrase should be interpreted consistently where it appears in

claims of common ancestry." *Epcon Gas Sys. Inc. v. Bauer Compressors, Inc.,* 279 F.3d 1022, 1031 (Fed.Cir.2002).

*14 Therefore, this Court will interpret the term "substantially" throughout the patent as meaning "to a large or considerable degree ."

### H. "Recessed channel"

The term "recessed channel" appears in Claims 6, 34, 37, 42, 47, and 54. Claim 42, for example, reads as follows:
The lacrosse head comprising:
... a pair of spaced apart sidewalls extending between said scoop and said base defining a ball receiving area, at least one of said pair of sidewalls having a recessed channel formed in a lower portion of an inner side thereof to assist in retaining a lacrosse ball therein.

Warrior submits that this term should be construed as "a groove formed in the interior of the sidewall that is of sufficient size to assist in retaining a lacrosse ball in the head." STX counters by offering the following construction: "portion that is set back from the interior surface of the sidewall."

The word, "recessed," means "a receding or hollow place, as in a surface, wall, etc., niche," Webster's at 1120, or "an indentation or small hollow," American Heritage at 1140. The ordinary meaning of the word, "channel," is "a long groove or furrow," Webster's at 234, or "a trench, furrow, or groove," American Heritage at 234. The proposed constructions by both parties are supported by the ordinary meaning of "recessed channel."

STX, however, argues that Warrior's proposed construction of channel as a "groove" is flawed because "[t]here is no way for a narrow groove in a 2.0 or 1.8 sidewall to 'assist in retaining' a 2.5 ball, because the ball is too big to fit into the groove or to be affected by the groove." Def.'s Resp. Br. at 19. Warrior concedes as much, and states that it would agree with STX's proposal if the "portion set back from the interior surface of the sidewall" was of "sufficient length and depth to act as a ball retention mechanism." Pl.'s Resp. Br. at 21-22.

The language "of sufficient length and depth to assist in

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Slip Copy                                                                                          Page 12
Slip Copy, 2005 WL 1378752 (E.D.Mich.)
(Cite as: Slip Copy)

retaining a lacrosse ball in the head" is consistent with the specification and prosecution history which reads:
In addition to protecting the stringing, the recessed channel 38 also acts as a seat for the ball when it is in the netting. The recessed channel 38 thus enhances the ability of the player to retain and secure the ball in the lacrosse head 10 while also facilitating play of the ball from the head 10.

'932 patent, col. 4, lines 17-22. This specification makes explicit reference to the ball retention capabilities of the "recessed channel." In 1998, the Federal Circuit declared that "[w]hen the meaning of a term is sufficiently clear in the patent specification, that meaning shall apply." *Multiform Desiccants, Inc. v. Medzam, Ltd.*, 133 F.3d 1473, 1477 (Fed.Cir.1998). Similarly, the prosecution history provides that the recessed channel is "configured such that the ball can be retained within the head as a portion of sidewall lies over the ball." Pl.'s Ex. 19, p. W0095. Since the prosecution history reflects a modification of the ordinary meaning of the term, "recessed channel," the Court will incorporate the "ball retaining" language into its construction of this term.

*15 Accordingly, the term, "recessed channel," shall be construed as being "a portion that is set back from the interior surface of the sidewall that is of sufficient length and depth to assist in retaining a lacrosse ball in the head."

I. "Recessed outwardly"

The term, "recessed outwardly," appears in Claim 8 as follows: "The lacrosse head of claim 7, wherein each of said pair of sidewalls has an inner surface and an outer surface and at least a portion of said lower rim of each of said sidewalls is recessed outwardly with respect to said inner surface of said sidewalls."

Warrior proposes that the construction of this term reads: "the lower rim of the sidewall disposed away from the pocket with respect to an adjacent surface of the sidewall." STX, by contrast, suggests that this term should be construed as "set back outwardly."

As stated with respect to the previous term, "recessed" means "a receding or hollow place, as in a surface, wall,

etc., niche," Webster's at 1120, or "an indentation or small hollow." American Heritage at 1140. Neither of the parties' proposed constructions fully comport with the ordinary meaning of the word "recessed." Contrary to STX's argument, the term, "outwardly," is ambiguous, especially when used in conjunction with the term, "recessed." [FN8] Accordingly, this Court must examine the intrinsic record to furnish a meaning for this term.

> FN8. STX argues that the "outward" direction may be illustrated with the labels on the patent drawings, as shown in the Def.'s Ex. E. However, a literal description of this concept may be helpful for the jury.

The specification reads: "The lower rims 36 of each of the sidewalls 16, 18 are preferably recessed with respect to the sidewalls 16, 18 to form a recessed channel. The recessed channel 38 is recessed outwardly with respect to an inner surface 39, 51 of each sidewall 16, 18." '932 patent, Col. 3, 56-60. According to the specification, the lower rims may be "recessed outwardly" from an adjacent part of the inner surface of the sidewall. Thus, a portion of the inner surface of the sidewall can lie over a lacrosse ball to assist in retaining the ball in the head, that is, to create the "recessed channel." Figure 1 of the '932 patent illustrates this configuration.

The Court will construe this term as "set back away from the pocket." Although the term, "recessed," when narrowly defined, does not strictly mean "set back," it is fully consistent with (1) the other disputed claim terms ("recessed channel"), (2) the language of the claim, and (3) the intrinsic record. The phrase, "with respect to an adjacent surface of the sidewall," is redundant and facially confusing given the specific language of Claim 8.

J. "Adjacent"

This term appears in Claim 9, which reads: "The lacrosse head of claim 7, wherein at least one of said plurality of attachment structures is formed adjacent said recessed lower rim."

At the *Markman* hearing, the parties agreed that the term,

Westlaw.

Slip Copy
Slip Copy, 2005 WL 1378752 (E.D.Mich.)
(Cite as: Slip Copy)

"adjacent," should be construed consistently in the '216 and the '932 patents. Accordingly, the Court will construe this term as "close or near to."

### K. "Disposed further inwardly"

*16 This term appears in Claim 31, which reads, in part, that " ....wherein at least a portion of each of said lower sections [of the sidewalls] in said rear portion are disposed further inwardly than a corresponding portion of said upper sections." Warrior's proposed construction for this term is "the upper portions of the sidewalls flare outwardly with respect to the lower portions." STX, on the other hand, argues that no construction is necessary for this term.

The ordinary meaning of the word, "dispose," is "to place or set in a particular order; arrange." American Heritage at 401. The Webster's definition for "disposed" is "inclined; having a certain tendency." Webster's at 396.

Consistent with the plain meaning of this term, the Court will construe "disposed further inwardly" as "placed further inwardly." The Court agrees with STX's argument that Warrior's proposed construction eviscerates the plain meaning of the claim terms. Warrior's construction fails because the claim makes reference to the lower sections of the sidewalls. The subject of Warrior's proposed construction, by contrast, is the upper section of the sidewalls, which "flare outwardly." Furthermore, the specification does not support Warrior's suggested definition. The specification reads:
As shown, each sidewall 16, 18 is preferably configured such that it extends outwardly or flares from the lower rim 36 to the upper rim 38. This flaring creates a "pinched" configuration of the sidewalls. The degree to which each sidewall 16, 18 tapers or flares may be entirely uniform from the base 14 to the scoop 20, may progressively increase, may progressively decrease, or take on a variety of other configurations.

'932 patent, col. 4, line 65-col. 6, line 5. Nothing in the specification refers to the lower section of the sidewalls moving "inwardly." In the absence of any evidence from the intrinsic record to support Warrior's construction, the Court construes this term in a manner that is consistent with the

ordinary meaning of the words as "placed further outwardly."

### K. "Integrally formed"

The term, "integrally formed," appears in Claims 34 and 35. Claim 34 recites that "[t]he lacrosse head stick of claim 31 wherein lower section includes an integrally formed recessed channel ." The parties vigorously dispute the meaning of this term. Warrior argues that "integrally formed" means "a recess channel is formed in the sidewall such that they form a complete structure and are not readily separable." STX urges the Court to adopt a construction of this term as "made in a single manufacturing process." Essentially, the parties dispute whether the recessed channel and the sidewall can be created separately and then fused together (as advocated by Warrior) or whether they must be formed together as a part of a single molding or manufacturing process (as STX argues).

As always, the Court must initiate its analysis with the ordinary meaning of the disputed term. "Integral" is defined as "whole or complete; [ ] made up of parts forming a whole." Webster's at 701. The word, "integral," is defined by another dictionary source as "a complete unit; a whole." American Heritage at 706. The ordinary meaning of this word does not assist the Court in determining whether the recessed channel must be formed in the same manufacturing process as the sidewall in which it is formed. However, the addition of the word, "formed," suggests that the channel and the sidewall were created during a "single manufacturing process." As STX argues, the term, "integrally formed," can only mean that the recessed channel and the sidewall are "integral"-that is, completely whole-when they are formed together as part of a single molding process.

*17 Unfortunately, neither the specification nor the prosecution history answers this question. [FN9] Instead, Warrior focuses its argument on the extrinsic evidence; namely, STX's own patent, U.S. Patent No. 6,723,134 ("the '134 patent") entitled "Multi-Component Lacrosse Stick Head." Warrior points out that, although STX's describes the ball stop of its head as being "integral," it was not formed in a separate manufacturing process. Warrior argues

Westlaw.

Slip Copy
Slip Copy, 2005 WL 1378752 (E.D.Mich.)
(Cite as: Slip Copy)

Page 14

that STX should be precluded from offering a different definition of the term "integral," given its own construction of the '134 patent. However, the Court notes that the '134 patent did not contain the term, "integrally formed." The addition of the word, "formed," sufficiently distinguishes the '932 patent from the '134 patent.

> FN9. The specification merely recites that the "recessed channel 38 is preferably integrally formed in the lower portion of the sidewall 16, 18." '932 patent, col. 4, lines 16-17. Although the drawings in the specification illustrate a recessed channel and sidewall created in a single molding process, it is error to limit the claim terms to the preferred embodiment. *Teleflex, Inc.*, 299 F.3d at 1326.

Although this is a close question, the Court will adopt STX's proposed construction. The plain language of the claim supports STX's argument that the recessed channel and the sidewall, in which it is formed, must be created during a single manufacturing process. In making this determination, the Court notes the '547 patent also contains the word, "integral." As described below, STX's proposed construction of "integral" as "formed during the manufacture of the lacrosse head in a single manufacturing process" is supported by the ordinary meaning of the claim language, the specification, and the prosecution history.

Accordingly, the Court will construe the term "integrally formed" as "made during a single manufacturing process."

### L. "Stepped back"

The term, "stepped back," appears in Claim 37, which reads, "[t]he lacrosse stick of claim 37, wherein said recessed channel is stepped back from said inner surfaces of said sidewalls." Both parties agree that the construction of this term by the Court should include the phrase "set back from." However, Warrior suggests that this term should be construed as "set back from the inside surface of the sidewall such that a ledge is formed." STX, on the other hand, contends that, inasmuch as the ordinary meaning of "step," when applied to structures, necessarily implies the creation of 90 corners, the Court should construe this

contested term to mean "set back from said inner surface such that a corner is formed on the inner surface."

The specification provides:
The recessed channel 38 in each sidewall preferably has a top surface 42, which extends outwardly from and generally perpendicular to each of the sidewalls 16, 18 and an outer surface 44, which extends generally downwardly from and generally perpendicular to the top surface 42 towards the lower rim 32. This provides a generally *stepped back* configuration.

'932 patent, col. 4, lines 10-16. STX submits that the conjunction of the top surface of the recessed channel and the sidewalls and outer surface created a perpendicular configuration. Because the two surfaces form a 90 degree angle, STX's proposed construction which refers to the formation of a "corner," is appropriate.

\*18 The key word from the specification, however, is "preferably." There is nothing in the specification that mandates the use of the term "corner." *See Playtex Products, Inc. v. Procter & Gamble Co.*, 400 F.3d 901, 906 (Fed.Cir.2005) ("The court must take care in its analysis, when locating in the written description the context for a disputed term, not to import a limitation from that written description. It must use the written description for enlightenment and not to read a limitation from the specification").

Thus, the Court agrees with Warrior that the term, "ledge," properly encompasses other "stepped back" configurations which include "slopes, corners, and rounded edges." Thus, the Court will construe this term as "set back form the inside surface of the sidewall such that a ledge is formed."

### M. "socket"

The word, "socket," appears in Claim 7 of the '932 patent, which states, in relevant part, "..a throat projecting rearwardly from said open frame and having a socket for receipt of the lacrosse handle therein; ..." The parties have expressed the collective belief that "socket" should be interpreted consistently with the '216 patent. Consequently, this word will be construed as "a portion of the frame open

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Slip Copy                                                      Page 15
Slip Copy, 2005 WL 1378752 (E.D.Mich.)
(Cite as: Slip Copy)

at one end for receiving a handle."

                    IV.

The parties have a disagreement with regard to certain
terms, all of which appear in Claims 19-26 of the '547
patent.

19. A lacrosse head comprising:
a pair of opposing sidewall portions each having a top end
and a bottom end;
a base portion extending between and connecting said
bottom ends of said pair of opposing sidewall portions; and
a scoop portion extending between and connecting said top
ends of said pair of opposing sidewalls portions;
wherein at least one of said pair of opposing sidewall
portions, said base portion, or said scoop portion has a
*integral raised non-skid textured surface* thereon to create
friction between said non-skid surface and a lacrosse ball
and thereby decrease spin resulting in improved player
control.
22. The lacrosse head of claim 19, wherein said non-skid
surface includes a plurality of surface structures formed
therein for *decreasing spin between said plurality of
structures and said lacrosse ball.*

'547 patent (emphasis added).

                A. "Integral"

Warrior offers the following construction for the word,
"integral": "a unitary structure that is not readily separable,
including overmoldings and coatings." STX proposes a
different construction: "formed during the manufacture of
the lacrosse head in a single manufacturing process (*i.e.,*
excluding a surface attached in a post-manufacturing
process, such as by using adhesives or by overmolding)."

The central dispute between the two parties is whether the
"non-skid raised surface" created at the intersection of the
sidewalls, the base, and the scoop includes "overmolded"
lacrosse heads. [FN10] Warrior argues that it does. STX
maintains that it does not.

        FN10. Overmolding is a "form of plastic injection
        molding whereby a substrate part is formed first,
        and, in a subsequent molding process, features are

molded over, onto or around portions of the
substrate part. Typically, the second process molds
a softer plastic onto portions on the firmer
substrate." Pl.'s Resp. Br. at 28. For an image of
overmolding, *see* Pl.'s Resp. Br. at 28.

*19 The ordinary meaning of the word, "integral," has been
addressed with respect to the '932 patent. As described
above, "integral" has been variously defined as "[ ] whole or
complete; [or] made up of parts forming a whole,"
Webster's at 701 or "a complete unit; a whole," American
Heritage at 706. The ordinary meaning of this word does not
conclusively support either of the parties' respective
definitions.

A critical passage within the specification reads as follows:
The scoop portion 16 preferably includes a non-skid surface
formed thereon for gripping a lacrosse ball that comes in
contact with it. Preferably the non-skid surface is a plurality
of nubs 20 formed on the scoop portion 16. However, it is
understood that various types of textured surfaces and
materials may be employed for providing friction between
the lacrosse ball and the scoop portion 16. For example, the
non-skid surface can be created by application of a separate
coating or the no-skid surface may result from the material
for which the head is manufactured. It will also be
understood that the non-skid surface can be located
anywhere on the head, including the ball stop area or the
sidewalls. Moreover, the non-skid surface may be applied
by an overmolding process.
The nubs 20 preferably are *integral* parts of the scoop
portion 16 of the lacrosse head 10, but may be otherwise as
desired. For example, a strip of plastic having nubs formed
thereon may be attached or otherwise adhered to existing
scoop portions of lacrosse heads....Further, the non-skid
structures can be created by post manufacturing processes,
such as by overmolding.

'547 patent, col. 4., lines 3-33 (emphasis added).

The first paragraph identifies two embodiments of the
invention: (1) one in which the non-skid surface is created
by the application of a separate coating, and (2) another in
which the non-skid surface is created as a result of a single
manufacturing process. STX notes that there is no other

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Slip Copy
Slip Copy, 2005 WL 1378752 (E.D.Mich.)
(Cite as: Slip Copy)

Page 16

modifier-namely, the word, "integral,"-which describes either of these two embodiments.

In the second paragraph, however, the specification clearly demarcates the non-skid surfaces that are created as a result of single manufacturing process: "The nubs 20 are preferably *integral* parts of the scoop portion of the lacrosse head 10, but may be *otherwise* as desired." *Id.,* col. 4, lines 18-21 (emphasis added). Significantly, the specification then goes on to describe how these "otherwise" created non-skid surfaces may be created-by attaching a strip of plastic nubs or by overmolding non-skid surfaces. Significantly, the specification explicitly distinguishes "integral" non-skid surfaces from other non-skid surfaces that are created by adhering a strip of plastic to the scoop or by using a post-manufacturing process such as overmolding. Thus, the specification supports STX's view that "integral" non-skid surfaces do not cover overmolding or separately affixed adhesives.

*20 STX's proposed construction is also consistent with the prosecution history. During its prosecution of the '547 patent, the Applicants petitioned the Examiner to advance the prosecution of its patent because it believed that the STX products were infringing its claims. In a document submitted to the PTO, the Applicants asserted that the "STX lacrosse heads include a non-skid overmolded elastomer material integrated on the sidewall portions and the base portion of the lacrosse head." Pl.'s Ex. 34, p. STX 0969. Inasmuch as the petition was granted by the Examiner, Warrior asserts that limiting the word, "integral," to STX's proposed definition would be contrary to the prosecution history.

This argument is without merit. As STX points out, when the Applicants made their statement to the Examiner, these claims were not limited to "integral" structures. In fact, the then-pending claims recited only "non-skid surface"-not an "integral non-skid textured surface" (as Claim 19 now recites). [FN11] *See* Pl.'s Ex 34, p. STX 0930-0931. Furthermore, the Court is not convinced that the use of the word, "integrated," in the prosecution history is dispositive for the construction of the word, "integral." Thus, STX is correct when it argues that Warrior cannot use the Examiner's statements to support its proposed construction

that "integral" includes overmolding.

> FN11. STX claims that the word, "integral," was added to an Examiner Amendment following a telephone interview with Warrior's counsel.

The thrust of Warrior's argument in support of its proposed construction centers on the language of the other '547 patent claims. Claim 19 explicitly mentions an "integral raised non-skid textured surface," and then later references "said non-skid surface." Claim 20 refers to the "lacrosse head of claim 19, wherein said non-skid surface consists of a separate coating that is applied to said frame element." Claim 21, likewise, references the lacrosse head Claim 19, wherein "said non-skid surface is applied to said frame element through an overmolding process." Because Claim 19 is independent, it must embody at least the non-skid surfaces of Claims 20 and 21, both of which are dependent. As such, the word, "integral," embodies a(1) separate coating and (2) an overmolding process. In 2003, the Federal Circuit opined that "[a]n independent claim usually covers a scope broader than the preferred embodiment, especially if the dependent claims recite the precise scope of the preferred embodiment." *RF Delaware Inc. v. Pacific Keystone Tech., Inc.,* 326 F.3d 1255, 1264 (Fed.Cir.2003).

In support of its argument, Warrior points to the principle of claim differentiation which presumes that there is "a difference in meaning and scope when different words or phrases are used in separate claims." *Comark Communications, Inc. v. Harris Corp.,* 156 F.3d 1182, 1187 (Fed.Cir.1998) (internal citations omitted). Similarly, when the same terms or phrases are used in separate claims, those terms or phrases must be interpreted consistently throughout the patent. *Southwall Tech.,* 54 F.3d at 1579. Since the term "non-skid surface" refers to "integral raised non-skid textured surface," Warrior maintains that the word, "integral," must incorporate the overmolding processes. Consequently, to exclude "overmolding" from the definition of integral would render Claim 21 superfluous. [FN12]

> FN12. STX counters that Claims 20 and 21, as originally filed, were within the scope of Claim 19, which only recited "non-skid surfaces ." According to STX, when the Examiner amended Claim 19 by

Westlaw.

Slip Copy
Slip Copy, 2005 WL 1378752 (E.D.Mich.)
(Cite as: Slip Copy)

Page 17

adding the word, "integral," he failed to modify the dependent claims for consistency. STX submits that Warrior should have corrected these claims.

\*21 However, it is also axiomatic that "the doctrine of claim differentiation creates only a presumption that each claim in a patent has a different scope that 'cannot broaden claims beyond their correct scope.' " *Fantasy Sports Properties, Inc. v. Sportsline.com, Inc., et al.,* 287 F.3d 1108, 1115 (Fed.Cir.2002) (citing *Kraft Foods, Inc. v. Int'l Trading Co.,* 203 F.3d 1362, 1368 (Fed.Cir.2000). Although Warrior's proposed use of "integral" in Claim 19 comports with the language of the other claims in the '547 patent, the presumption of identical claims is overcome by the Applicants' disclaimer of the subject matter in the specification and the prosecution history. *See Fantasy Sports,* 287 F.3d at 1116. Thus, the word, "integral," must be limited to only those non-skid textured surfaces that are created as a result of a single manufacturing process. This, in turn, has the practical effect of excluding those surfaces that were created as a result of overmolding or the affixation of a plastic strip.

Based on its review of the claim language and the intrinsic record, the Court will construe the word, "integral," with respect to the '547 patent as "formed during the manufacture of the lacrosse head in a single manufacturing process."

B. "Raised non-skid textured surface"

Warrior argues that the term, "raised non-skid textured surface," should be construed as "a raised surface that inhibits sliding contact with a lacrosse ball and which includes distinctive surface characteristics."

The Court finds that the word, "raised," is unambiguous and does not require further construction. However, the other terms are ambiguous, all of which must be construed by the Court. In doing so, the Court must look first to the ordinary meaning of these words. The definition of skid is "the act of sliding or slipping over a surface, often sideways," American Heritage at 1276, or "to slide without turning ... To slide or slip sideways," Webster's at 1257. Thus, when incorporating these definitions, a "non-skid" surface could be logically defined as one that inhibits sliding contact.

Among the definitions of texture is "distinctive or identifying character or characteristics." American Heritage at 1403. Warrior's proposed definition satisfies the ordinary meaning of the terms in the claim. Although STX's definition has the benefit of simplicity, it does not address the terms "non-skid" or "texture."

The specification also supports Warrior's construction. The specification describes the function of the claimed surface and the advantages it provides:

The scoop portion 16 preferably includes a *non-skid surface formed thereon for gripping* a lacrosse ball that comes in contact with it. Preferably, the non-skid surface is a plurality of nubs 20 formed on the scoop portion 16. However, it is understood that various types of *textured surfaces and materials* may be employed for *providing friction* between the lacrosse ball and the scoop portion 16....Moreover, while nubs 20 are the preferred *surface deformity, other surface deformities or irregularities* may be utilized including dimples ... the *non-skid surface* provides a *better grip* for the lacrosse ball. This is because of the friction applied to the ball causing it to rotate into the head *instead of skidding*.

\*22 '547 patent, col. 4, lines 4-67 (emphasis added). The language of the specification clearly supports Warrior's proposed construction. Although the non-skid surface preferably includes a "plurality of nubs," it can also incorporate "various types of textured surfaces and materials," including dimples.

Thus, Warrior's proposed definition is consistent with the ordinary meaning of the disputed term and the specification. Accordingly, the Court will construe this term as "a raised surface that inhibits sliding contact with a lacrosse ball and which includes distinctive surface characteristics."

C. "For decreasing spin between said plurality of structures and said lacrosse ball"

Warrior contends that this claim language should be construed as "that the surface structures must have the ability to create friction with a contacting lacrosse ball to reduce spin on the ball." STX, in arguing that Claim 22 is invalid, submits that no construction is possible for this term because it is scientifically impossible to create spin *between*

Westlaw.

Slip Copy
Slip Copy, 2005 WL 1378752 (E.D.Mich.)
(Cite as: Slip Copy)

Page 18

a structure and a lacrosse ball.

The specification reads:
The nubs 20 or other surface unevenness are interspersed across the scoop portion 16 to allow for increased gripping on a lacrosse ball thrown off the scoop portion 16. In other words, the nubs 20 impart friction to the lacrosse ball, which can prevent it from slipping as well as imparting spin thereto....
As the user throws a lacrosse ball off the scoop portion 16, the nubs 20 grip the lacrosse ball and prevent it from sliding off the scoop portion 16 as well as prevent it from sliding laterally or side-to-side. Instead, the nubs 20 cause the lacrosse ball to roll off the scoop portion 16 with a substantial amount of spin.

'547 patent, col. 4, lines 34-58. As STX correctly points out in its pleadings, the specification makes no mention of the nubs decreasing the spin on a lacrosse ball. Rather, the specification only refers to the nubs creating or "imparting" spin.

STX also maintains that the claim language is illogical because spin cannot be created between objects. STX submits: "Whereas the lacrosse ball may be spinning, there is no such a thing [sic] as a spin 'between' a ball and a structure." Def.'s Opening Br. at 28.

Warrior's proposed construction, which makes reference to the creation of friction "to reduce spin on the ball," is not consistent with the language of the claim, which refers to decreasing spin between the ball and "the said plurality surface structures." Thus, Warrior's construction is impermissible because it seeks to implicitly exclude "the said plurality surface structures" from the claim. *See Exxon Chemical Patents, Inc. v. Lubrizol Corp.,* 64 F.3d 1553, 1557 (Fed.Cir.1995) (court must "give meaning to all the words in [the] claims"); *see also International Rectifier Corp. v. IXYS Corp.,* 361 F.3d 1363, 1372 (Fed.Cir.2004) ("district court was not free to attribute new meaning to the term or to excuse the patentee from the consequences of its own word choice.")

*23 In support of its proposed construction, Warrior has submitted an unsigned declaration from Jesse Hubbard, the

inventor of the '547 patent, who states that one of the ordinary skill would understand the meaning "for decreasing spin between said plurality of structures and said lacrosse ball." Hubbard Decl., Pl.'s Ex 43, ¶ 10. He further asserts that "if the non-skid surface is on the scoop, it will grab the lacrosse ball as it is leaving the head and impart spin thereto. Similarly, if the non-skid surface is on the sidewalls or the base, it will grip the ball and decrease spin or reduce sliding when a lacrosse ball contacts the surface when it enters the head." *Id.,* ¶¶ 10-11.

Although Hubbard's declaration represents extrinsic evidence that may be used by the Court, *see Advanced Cardiovascular Sys., Inc. v. Scimed Life Sys., Inc.* 887 F.2d 1070, 1073 (Fed.Cir.1989), it is not consistent with the language of the claim or the specification. As the Federal Circuit stated in 1996, "extrinsic evidence in general, and expert testimony in particular, may be used only to help the court come to the proper understanding of the claims; it may not be used to vary or contradict the claim language. Nor may it contradict the import of other parts of the specification ." *Vitronics,* 90 F.3d at 1584. Moreover, although he states that one of ordinary skill would understand the term "decreasing spin between said plurality of structures and said lacrosse ball," Hubbard has not provided the Court with an adequate explanation to support Warrior's proposed construction. Thus, Hubbard's declaration will not be given any weight by the Court on this narrow issue.

Although Warrior's proposed construction for this term must be rejected, the Court concludes that STX has failed to present clear and convincing evidence to support its claim of invalidity. In order for a term to be rendered invalid under 35 U.S.C. § 112, ¶ 2, a party must demonstrate by clear and convincing evidence that the claim "is insolubly ambiguous, and no narrowing construction can properly be adopted[.]" *Exxon Research & Eng'g Co. v. United States,* 265 F.3d 1371, 1375 (Fed.Cir.2001). STX failed to make the requisite showing at the claim construction stage. Significantly, STX has not presented any expert testimony or scientific analysis to support its view that spin cannot exist between a surface and a ball.

Accordingly, the Court declines at this stage to determine

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Slip Copy
Slip Copy, 2005 WL 1378752 (E.D.Mich.)
(Cite as: Slip Copy)

that this term is invalid under 35 U.S.C. § 112, ¶ 2. The Court directs the parties to submit a short brief, not in excess of ten (10) pages, to address the validity of this term and any potential alternative constructions for this term. This brief should be submitted to the Court by the dispositive motion deadline (to wit, July 11, 2005).

IT IS SO ORDERED.

*Certificate of Service*

The undersigned certifies that a copy of the foregoing order was served on the attorneys of record by electronic means or U.S. Mail on June 2, 2005.

E.D.Mich.,2005.
Warrior Lacrosse, Inc. v. STX, LLC
Slip Copy, 2005 WL 1378752 (E.D.Mich.)

Briefs and Other Related Documents (Back to top)

• 2005 WL 2142133 (Trial Motion, Memorandum and Affidavit) Warrior's Opposition to Six L.L.C.'S Motion to Compel Discovery (Jul. 28, 2005)
• 2005 WL 2142483 (Trial Motion, Memorandum and Affidavit) Warrior's Opposition to Stx L.L.C.'s Motion to Compel Discovery (Jul. 28, 2005)
• 2005 WL 2142479 (Trial Motion, Memorandum and Affidavit) Warrior's Reply to Its Motion to Exclude (Jul. 25, 2005)
• 2005 WL 2142128 (Trial Motion, Memorandum and Affidavit) Defendant STX, LLC's Opposition to Plaintiff Warrior Lacrosse, Inc.'s Motion to Exclude (Jul. 11, 2005)
• 2005 WL 2142130 (Trial Motion, Memorandum and Affidavit) Defendant STX, L.L.C.'s Motion to Compel Discovery (Jul. 11, 2005)
• 2005 WL 2142471 (Trial Motion, Memorandum and Affidavit) Defendant Stx, LLC's Opposition to Plaintiff Warrion Lacrosse, Inc.'s Motion to Exclude (Jul. 11, 2005)
• 2005 WL 2142475 (Trial Motion, Memorandum and Affidavit) Defendant Stx, L.L.C.'s Motion to Compel Discovery (Jul. 11, 2005)
• 2004 WL 2627404 (Trial Motion, Memorandum and Affidavit) Warrior's Reply to Its Motion (1) Pursuant to Fed. R. Civ. P. 37(a) and (c) for an Order Compelling

Interrogatory Answers and Documents and (2) Pursuant to Fed. R. Civ. P. 36(a) to Determine the Sufficiency of STX's Objections to Certain Admission Re quests (Aug. 27, 2004)
• 2004 WL 2627396 (Trial Motion, Memorandum and Affidavit) Defendant STX, L.L.C.'s Opposition to Warrior's Motion (1) Pursuant to Fed. R. Civ. P. 37(a) and (c) for an Order Compelling Interrogatory Answers and Documents and (2) Pursuant to Fed. R. Civ. P. 36(a) to Determine the Sufficiency of STX's Objection s to Certain Admission Requests (Aug. 13, 2004)
• 2004 WL 2627383 (Trial Motion, Memorandum and Affidavit) STX's Reply to Warrior's Opposition to STX's Motion to Consolidate (Jun. 28, 2004)
• 2004 WL 2627373 (Trial Motion, Memorandum and Affidavit) Warrior's Opposition to Stx's Motion to Consolidate (Jun. 17, 2004)
• 2004 WL 2627365 (Trial Motion, Memorandum and Affidavit) Reply to Amended Answer and Counter Complaint, Affirmative Defenses and Jury Demand (May. 26, 2004)
• 2004 WL 2627354 (Trial Pleading) Amended Answer, Affirmative Defenses, Counterclaims and Jury Demand (May. 03, 2004)
• 2004 WL 2627340 (Trial Motion, Memorandum and Affidavit) Reply to Answer and Counter Complaint, Affirmative Defenses and Jury Demand (Apr. 22, 2004)
• 2004 WL 2627331 (Trial Pleading) Amended Answer and Counterclaims (Apr. 19, 2004)
• 2004 WL 2627321 (Trial Pleading) Answer, Counterclaims and Demand for Jury Trial (Mar. 31, 2004)
• 2004 WL 2627308 (Trial Pleading) Complaint and Demand for Jury Trial (Jan. 30, 2004)
• 2:04cv70363 (Docket) (Jan. 30, 2004)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.