# EXHIBIT 4

**H**

Motions, Pleadings and Filings

Only the Westlaw citation is currently available.

United States District Court,
E.D. Texas, Marshall Division.
ORION IP, LLC Plaintiff
v.
STAPLES, INC., et al. Defendants
**No. 2:04-CV-297.**

Dec. 15, 2005.

**Background:** In litigation involving patents for computerized system to assist salespersons with product parts sale and for electronic system for creating customized product proposals, numerous claim terms were submitted for construction.

**Holdings:** The District Court, Davis, J., held that:
(1) terms submitted were used in sense of ordinary lay meaning and did not require construction, and
(2) practitioners are advised to limit construction submissions to terms that might be unfamiliar to the jury, confusing to the jury, or affected by the specification or prosecution history.
So ordered.

**[1] Patents 165(2)**

291k165(2) Most Cited Cases
It is a bedrock principle of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude.

**[2] Patents 157(1)**
291k157(1) Most Cited Cases
In patent claim construction, courts examine the patent's intrinsic evidence to define the patented invention's scope.

**[3] Patents 165(1)**
291k165(1) Most Cited Cases

**[3] Patents 167(1)**
291k167(1) Most Cited Cases

**[3] Patents 168(2.1)**
291k168(2.1) Most Cited Cases
Intrinsic evidence examined by courts construing patent claims includes the claims themselves, the specification, and the prosecution history.

**[4] Patents 161**
291k161 Most Cited Cases
Courts construing patent claims give claim terms their ordinary and accustomed meaning as understood by one of ordinary skill in the art at the time of the invention in the context of the entire patent.

**[5] Patents 165(5)**
291k165(5) Most Cited Cases
For purposes of construing patent claim terms, when a dependent claim adds a limitation to an independent claim, it is presumed that the independent claim does not include the limitation.

**[6] Patents 167(1)**
291k167(1) Most Cited Cases
Patent claims must be read in view of the specification, of which they are a part; specification is usually dispositive, as it is the single best guide to the meaning of a disputed term.

**[7] Patents 162**
291k162 Most Cited Cases
Patentee may define his own terms, give a claim term a different meaning than the term would otherwise possess, or disclaim or disavow the claim scope, and in those situations, the inventor's lexicography governs.

**[8] Patents 167(1.1)**
291k167(1.1) Most Cited Cases
Patent specification may resolve ambiguous claim terms where the ordinary and accustomed meaning of the words used in the claims lack sufficient clarity to permit the scope of the claim to be ascertained from the words alone, but although the specification may aid the court in interpreting the meaning of disputed claim language, particular embodiments and examples appearing in the specification will not generally be read into the claims.

**[9] Patents 168(2.1)**
291k168(2.1) Most Cited Cases
Patent prosecution history is one tool to supply the

2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

proper context for claim construction because a patent applicant may also define a term in prosecuting the patent.

**[10] Patents 159**
291k159 Most Cited Cases
Although extrinsic evidence can be useful in construing patent claim terms, it is less significant than the intrinsic record, the patent and its prosecution history, in determining the legally operative meaning of claim language.

**[11] Patents 159**
291k159 Most Cited Cases
Technical dictionaries and treatises may help a court understand the underlying technology and the manner in which one skilled in the art might use patent claim terms, but technical dictionaries and treatises may provide definitions that are too broad or may not be indicative of how the term is used in the patent.

**[12] Patents 159**
291k159 Most Cited Cases
Expert testimony may aid a court in understanding the technology underlying a patent claim and determining the particular meaning of a term in the pertinent field, but an expert's conclusory, unsupported assertions as to a term's definition is entirely unhelpful to a court in construing patent claim terms.

**[13] Patents 101(2)**
291k101(2) Most Cited Cases
Claim term "proposal," in patents for computerized system to assist salesperson with product parts sales and for electronic system for creating customized product proposals after determining customers' needs and interests, means "information intended for conveyance to a potential customer," which does not require that the proposal be actually shown to the customer or that the information be "sales information."

**[14] Patents 101(2)**
291k101(2) Most Cited Cases
Claim terms "customer" and "user," in patent for electronic system for creating customized product proposals after determining customers' needs and interests, were not used in the claims in any manner different from that of their ordinary meaning in the art, which was no different than the ordinary lay meaning, and therefore terms did not require construction.

**[15] Patents 101(2)**
291k101(2) Most Cited Cases
Claim terms "customer" and "user," in patent for electronic system for creating customized product proposals after determining customers' needs and interests, did not require that different people fulfill the roles of customer, who answered the plurality of questions relating to the product's features and uses, and user, the person using the computer.

**[16] Patents 101(2)**
291k101(2) Most Cited Cases
Ordinary meaning of term "customer," as used in patent for electronic system for creating customized product proposals after determining customers' needs and interests, did not contemplate that claim was directed only to a situation where one person operated computer in an effort to sell products to multiple customers; more specifically, steps of the claim did not require multiple customers.

**[17] Patents 101(2)**
291k101(2) Most Cited Cases
Claim terms used in patent for electronic system for creating customized product proposals after determining customers' needs and interests, namely, "plurality of questions relating to features and uses of the products," "plurality of questions related to at least one of a desired feature and desired use of the product," and "plurality of customer answers to the questions, the answers specifying a customer's desired product features and uses," did not require construction beyond noting that term "and" was used in patent parlance as a disjunctive, so that it was not necessary that at least one question or answer relate to a desired product feature and at least one question or answer relates to a desired product use.

**[18] Patents 101(2)**
291k101(2) Most Cited Cases
Claim term "questions," used in patent for electronic system for creating customized product proposals after determining customers' needs and interests, was used in its ordinary meaning and required no construction, much less the stringently limited construction proposed, that the term did not include commands, statements, menus presenting options, or words or phrases not in question form that were selected with a cursor or other selection device.

**[19] Patents 101(2)**
291k101(2) Most Cited Cases
Claim term "features of the products," as used in patent for electronic system for creating customized product proposals after determining customers' needs and interests, was used in ordinary meaning and

2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

required no construction, as evidenced in part by construction proponent's citations to non-technical dictionaries in support of its construction that product itself could not be a feature of the product.

**[20] Patents 101(2)**
291k101(2) Most Cited Cases
Claim term "uses of the products," used in patent for electronic system for creating customized product proposals after determining customers' needs and interests, was used in it ordinary meaning and required no further construction, including proposed restriction to product's application in a customer's preferred physical environment, selected during customization process, a selection that could just as well relate to product's features as its uses.

**[21] Patents 101(2)**
291k101(2) Most Cited Cases
Claim term "customer answers" to questions, used in patent for electronic system for creating customized product proposals after determining customers' needs and interests, was used in ordinary sense and did not warrant construction excluding actions in response to commands or statements, or menu or other selections.

**[22] Patents 101(3)**
291k101(3) Most Cited Cases
Claim terms, "storing product pictures, product environment pictures and text segments," and "computer storing product images, product environment images and text segments," used in patent for electronic system for creating customized product proposals after determining customers' needs and interests, limited the storing step to storing the product pictures, product environment pictures, and text segments as "separate and distinct" items.

**[23] Patents 101(2)**
291k101(2) Most Cited Cases
Claim terms used in patent for electronic system for creating customized product proposals after determining customers' needs and interests, namely, "product pictures" or "product images," and "product environment pictures" or "product environment images," were subject to ordinary understanding and did not require a construction that the two types of pictures or images be stored and selected separately and distinctly.

**[24] Patents 101(2)**
291k101(2) Most Cited Cases
Claim term "environments," used in patent for electronic system for creating customized product proposals after determining customers' needs and interests, was used according to its plain meaning and did not warrant construction that, inter alia, a product could not be an environment for its component parts.

**[25] Patents 101(2)**
291k101(2) Most Cited Cases
Claim terms used in patent for electronic system for creating customized product proposals after determining customers' needs and interests, namely, "selecting a particular product in response to at least one of the customer answers," "selecting a particular environment picture in response to at least one of the customer answers," and "selecting a particular text segment in response to at least one of the customer answers," did not require construction emphasizing "separate" selections, as it was sufficiently clear that a particular product picture, a particular product environment picture, and a particular text segment were selected in three separate steps.

**[26] Patents 101(2)**
291k101(2) Most Cited Cases
Claim terms used in patent for electronic system for creating customized product proposals after determining customers' needs and interests, namely "generating a customized proposal for the customer using the particular product picture, the particular product environment picture and the particular text segment," and "generating a proposal customized for the customer using the selected product image, the selected product environment image and the selected text segment," did not require construction, as they were in fact based on other terms previously found not to require construction.

**[27] Patents 101(2)**
291k101(2) Most Cited Cases
Claim term used in patent for electronic system for creating customized product proposals after determining customers' needs and interests, namely, "customer answers of the customer to the plurality of questions," did not require construction at all, much less to mean "more than one answer of the customer, at least one of which specifies a product feature and at least one of which specifies a product use."

**[28] Patents 101(2)**
291k101(2) Most Cited Cases
Claim term used in patent for electronic system for creating customized product proposals after determining customers' needs and interests, namely, "automatically selecting, in response to at least one of the customer answers, a product image, a product

environment image and a text segment," did not require a construction emphasizing the separate and distinct nature of the selections.

[29] **Patents 101(2)**
291k101(2) Most Cited Cases
Claim term used in patent for computerized system to assist salespersons in training and with products part sales, namely, "computerized method of selling parts for particular equipment specified by a customer," was used in accordance with its ordinary lay meaning, carried no unique meaning in the art, and required no construction.

[30] **Patents 101(2)**
291k101(2) Most Cited Cases
Claim term "parts," used in patent for computerized system to assist salespersons in training and with products part sales, was used in accordance with its ordinary lay meaning, carried no unique meaning in the art, and required no construction, including as proposed "sub-components of equipment."

[31] **Patents 101(2)**
291k101(2) Most Cited Cases
Claim term "equipment," used in patent for computerized system to assist salespersons in training and with products part sales, was used in accordance with its ordinary lay meaning, carried no unique meaning in the art, and required no construction to mean "implements such as machinery or tools used in an operation or activity."

[32] **Patents 101(2)**
291k101(2) Most Cited Cases
Claim term used in patent for computerized system to assist salespersons in training and with products part sales, namely, "receiving information identifying a customer's parts requirements for the equipment," was used in accordance with its ordinary lay meaning, carried no unique meaning in the art, and required no construction.

[33] **Patents 101(2)**
291k101(2) Most Cited Cases
Claim term used in patent for computerized system to assist salespersons in training and with products part sales, namely, "electronically specifying information identifying a plurality of parts and specifications for the parts," was used in accordance with its ordinary lay meaning, carried no unique meaning in the art, and required no construction.

[34] **Patents 101(2)**
291k101(2) Most Cited Cases
Claim terms used in patent for computerized system to assist salespersons in training and with products part sales, namely, "specification for the parts" and "specifications corresponding to the parts," were used in accordance with their ordinary lay meaning, carried no unique meaning in the art, and required no construction.

[35] **Patents 101(2)**
291k101(2) Most Cited Cases
Claim term used in patent for computerized system to assist salespersons in training and with products part sales, namely, "gathering parts-related information for one or more parts within the plurality of parts which meets the customer's requirements," was used in accordance with its ordinary lay meaning, carried no unique meaning in the art, and required no construction.

[36] **Patents 101(2)**
291k101(2) Most Cited Cases
Claim term used in patent for computerized system to assist salespersons in training and with products part sales, namely, "a method of selling ... comprising ... compiling the parts-related information into a proposal meeting the customer's requirements," was used in accordance with its ordinary lay meaning, carried no unique meaning in the art, and required no construction.

[37] **Patents 314(2)**
291k314(2) Most Cited Cases
Rather than imposing time limits for *Markman* arguments or limiting number of patent claim terms submitted for construction, District Court for the Eastern District of Texas fully expects the parties and their attorneys to limit the terms they submit to those that might be unfamiliar to the jury, confusing to the jury, or affected by the specification or the prosecution history, noting that although every word used in a claim has a meaning, not every word requires a construction.

**Patents 328(2)**
291k328(2) Most Cited Cases
4,775,935. Cited as Prior Art.

**Patents 328(2)**
291k328(2) Most Cited Cases
5,367,627, 5,615,342. Construed.

**Patents 328(2)**
291k328(2) Most Cited Cases

2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

5,493,490. Cited.

Danny Lloyd Williams, J. Mike Amerson, James A. Jorgensen, Williams Morgan & Amerson, Houston, TX, David Pridham, Orin IP, LLC, Elizabeth L. Derieux, Brown McCarroll, Longview, TX, Franklin Jones, Jr., Jones & Jones, Marshall, TX, Jack Wesley Hill, Otis W Carroll, Jr., Ireland Carroll & Kelley, PC, Robert Christopher Bunt, Parker & Bunt, P.C., Tyler, TX, for Plaintiff.

J. Thad Heartfield, Jr., Heartfield & McGinnis, Beaumont, TX, Jennifer L. Yokoyama, McDermott Will & Emergy, Irvine, CA, Marc E. Brown, Mark P. Wine, Michael G. Oleinik, Tiffany M. Scurry, McDermott Will & Emery, Los Angeles, CA, William L. Lafuze, John Joseph Edmonds, Vinson & Elkins, Houston, TX, Guy N. Harrison, Attorney at Law, Longview, TX, Jennifer Parker Ainsworth, Wilson Sheehy Knowles Robertson & Cornelius PC, Tyler, TX, Dan Duncan Davison, Fulbright & Jaworski, Dallas, TX, for Defendants.

MEMORANDUM OPINION

DAVIS, J.

***1** This Memorandum Opinion construes terms in U.S. Patent Nos. 5,367,627 (the " '627 patent") and 5,615,342 (the " '342 patent").

BACKGROUND

The following is a general summary of the patents-in-suit, and should not be construed as adopting any of the parties' proposed constructions. The actual disclosures of the patents-in-suit are discussed in greater detail below in conjunction with deciding the construction of disputed terms and phrases. The '627 patent generally describes a computerized system that assists a salesperson in training and with sales of parts corresponding to particularized products. The system includes a data storage device that stores graphic and textual information including specifications, features, and customer benefits. A display apparatus displays portions of this information. A part selection device electronically navigates through part-choice menus based on previously entered information. The invention is said to eliminate the need for salespeople to use more cumbersome paper-based methods of determining the most appropriate part for a customer.

The '342 patent generally describes an electronic system for creating customized product proposals. The system queries a user to determine a customer's needs and interests and then uses stored pictures and text segments to create a customized proposal that appeals to the customer.

Defendants have submitted numerous terms for construction. Orion contends that only two terms require construction, "proposal" and "customized proposal." During the hearing, the parties eventually agreed that "customized proposal" does not require construction. Orion contends that the remaining terms that Defendants want construed do not require construction because they are used according to their well-understood lay meanings and Defendants' constructions either complicate the easily understood terms or include additional unwarranted limitations on the terms.

APPLICABLE LAW

[1][2][3][4] "It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude." *Phillips v. AWH Corp.,* 415 F.3d 1303, 1312 (Fed.Cir.2005) (en banc) (quoting *Innova/Pure Water Inc. v. Safari Water Filtration Sys., Inc.,* 381 F.3d 1111, 1115 (Fed.Cir.2004)). In claim construction, courts examine the patent's intrinsic evidence to define the patented invention's scope. *See id.; C.R. Bard, Inc. v. U.S. Surgical Corp.,* 388 F.3d 858, 861 (Fed.Cir.2004); *Bell Atl. Network Servs., Inc. v. Covad Communications Group, Inc.,* 262 F.3d 1258, 1267 (Fed.Cir.2001). This intrinsic evidence includes the claims themselves, the specification, and the prosecution history. *See Phillips,* 415 F.3d at 1314; *C.R. Bard, Inc.,* 388 F.3d at 861. Courts give claim terms their ordinary and accustomed meaning as understood by one of ordinary skill in the art at the time of the invention in the context of the entire patent. *Phillips,* 415 F.3d at 1312-13; *Alloc, Inc. v. Int'l Trade Comm'n,* 342 F.3d 1361, 1368 (Fed.Cir.2003).

***2** [5] The claims themselves provide substantial guidance in determining the meaning of particular claim terms. *Phillips,* 415 F.3d at 1314. First, a term's context in the asserted claim can be very instructive. *Id.* Other asserted or unasserted claims can also aid in determining the claim's meaning because claim terms are typically used consistently throughout the patent. *Id.* Differences among the claim terms can also assist in understanding a term's meaning. *Id.* For example, when a dependent claim adds a limitation to an independent claim, it is presumed that the independent claim does not include the limitation. *Id.* at 1314-15.

[6][7][8][9] Claims "must be read in view of the specification, of which they are a part." *Id.* (quoting *Markman v. Westview Instruments, Inc.,* 52 F.3d 967,

2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

978 (Fed.Cir.1995)). "[T]he specification 'is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.' " *Id.* (quoting *Vitronics Corp. v. Conceptronic, Inc.,* 90 F.3d 1576, 1582 (Fed.Cir.1996)); *Teleflex, Inc. v. Ficosa N. Am. Corp.,* 299 F.3d 1313, 1325 (Fed.Cir.2002). This is true because a patentee may define his own terms, give a claim term a different meaning than the term would otherwise possess, or disclaim or disavow the claim scope. *Phillips,* 415 F.3d at 1316. In these situations, the inventor's lexicography governs. *Id.* Also, the specification may resolve ambiguous claim terms "where the ordinary and accustomed meaning of the words used in the claims lack sufficient clarity to permit the scope of the claim to be ascertained from the words alone." *Teleflex, Inc.,* 299 F.3d at 1325. But, "although the specification may aid the court in interpreting the meaning of disputed claim language, particular embodiments and examples appearing in the specification will not generally be read into the claims." *Comark Communications, Inc. v. Harris Corp.,* 156 F.3d 1182, 1187 (Fed.Cir.1998); *see also Phillips,* 415 F.3d at 1323. The prosecution history is another tool to supply the proper context for claim construction because a patent applicant may also define a term in prosecuting the patent. *Home Diagnostics, Inc., v. Lifescan, Inc.,* 381 F.3d 1352, 1356 (Fed.Cir.2004) ("As in the case of the specification, a patent applicant may define a term in prosecuting a patent.").

[10][11][12] Although extrinsic evidence can be useful, it is "less significant than the intrinsic record in determining 'the legally operative meaning of claim language.' " *Phillips,* 415 F.3d at 1317 (quoting *C.R. Bard, Inc.,* 388 F.3d at 862). Technical dictionaries and treatises may help a court understand the underlying technology and the manner in which one skilled in the art might use claim terms, but technical dictionaries and treatises may provide definitions that are too broad or may not be indicative of how the term is used in the patent. *Id.* at 1318. Similarly, expert testimony may aid a court in understanding the underlying technology and determining the particular meaning of a term in the pertinent field, but an expert's conclusory, unsupported assertions as to a term's definition is entirely unhelpful to a court. *Id.* Generally, extrinsic evidence is "less reliable than the patent and its prosecution history in determining how to read claim terms." *Id.*

COMMON TERM [FN1]

Proposal

***3** [13] "Proposal" is common to both patents, and, although the patents are not related, the parties agree it should be construed consistently for both patents. The Court construes "proposal" to mean "information intended for conveyance to a potential customer." Orion argues the term should be construed as "sales information presented to a customer for promoting a sale." Defendants urge the Court to construe the term as "information to be considered for a potential sale." Thus, according to Orion, Defendants' construction does not limit the term to sales information or to information presented to a customer.

Orion argues its construction reflects the term's plain and ordinary meaning as understood by those skilled in the art. Orion contends that because both patents are for the purpose of selling, the relevant information must be "sales information." Because Defendants' construction does not require "sales information" or presentation to a customer, Orion argues it ignores the inventions' very purposes.

Defendants argue that claim 1 of the '627 patent describes the proposal as containing parts-related information, which Orion's construction ignores. *See* '627 patent, col. 30:21-22 ("compiling the parts-related information into a proposal"). Defendants also argue that the Summary of the Invention in the '627 patent explains the "computerized system is provided for providing a salesperson with assistance related to ... sales of parts ...."; thus the ' 627 patent does not require the proposal be shown to a customer. *See* '627 patent, col. 1:53-55.

The Court agrees with Defendants that Orion's phrase "sales information" is too vague to be helpful. The Court also agrees with Defendants that, based on both patents' claim language and the '627 patent's Summary of the Invention, it is clear that the patents do not require that a proposal is shown to the customer. The Court however agrees with Orion that the patents intend that this information is conveyed to the customer, otherwise it would do little to assist in a sale to a customer. Accordingly, the Court construes "proposal" to mean "information intended for conveyance to a potential customer."

'342 PATENT

Customized Proposal

The parties agreed that "customized proposal" does not require additional construction. The Court agrees. Since the Court has already construed "proposal," "customized proposal" is not a term with special

2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

meaning in the art or in this patent. It is an everyday term that the jury will be sufficiently familiar with. Accordingly, it does not require construction.

Customer

[14] Defendants urge the Court to construe the term to mean: "The potential purchaser of a product for whom the proposal is customized. The customer is not the person using the computer to customize the proposal for the customer." Thus, Defendants argue that the customer and user cannot be the same person.

The claims do distinguish between the roles of customer and user: "presenting to a user of the computer a plurality of questions ... inputting into the computer a plurality of customer answers to the questions...." Col. 39:56-60; *see also* col. 41:65-42:2. Thus, according to the claim language, the user is the person using the computer and the customer is the person who answers the plurality of questions relating to the product's features and uses. But the claims do not require that different people fulfill the roles of customer and user.

*4 [15][16] Defendants argue that the claim language does require that the user and customer be different people because claim 1 is drawn to a method "for selling products to particular customers" by "presenting to a user" a plurality of questions. Defendants contend the claim is directed to a situation where one user operates a computer in an effort to sell products to multiple customers. The claim language belies Defendants' argument. Claim 1 goes on to describe "inputting ... a plurality of *customer* answers [FN2] ..., the answers specifying *a customer's* desired product features and uses." Col. 40:57-60 (emphasis added). Thus, the steps of the claim do not require multiple customers.

Defendants also contend the specification describes the user and customer as different individuals. *See e.g.,* col. 8:46-53 ("[W]hen a user begins to deal with a customer, the user will typically want to gather specific customer and product information...."). Although in the preferred embodiment, the user and customer may be different individuals, Defendants have not shown that this limitation of different individuals as opposed to different roles should be imported into the claim language. Accordingly, the Court does not adopt it. "Customer" is not used in the claims in any manner different from that of its ordinary meaning in the art, which is no different than its ordinary lay meaning. "Customer" does not require construction.

User

Defendants contend "user" should be construed to mean: "The person using the computer to customize the proposal. The user is not the customer for whom the proposal is customized." Thus, Defendants again assert that a "customer" and a "user" cannot be the same person. For the reasons given above, the Court rejects this argument. The patent uses this term according to its plain lay meaning. This term does not require construction.

Plurality of questions relating to features and uses of the products

[17] Defendants argue that this term and others like it, including "a plurality of questions related to at least one of a desired feature and desired use of the product," and "a plurality of customer answers to the questions, the answers specifying a customer's desired product features and uses," require constructions indicating that at least one question (or answer) relates to a desired product feature *and* at least one question (or answer) relates to a desired product use. Orion argues that these terms do not require construction. Orion also argues that "and" is fairly common in patent claiming and it is understood in patent parlance that "and" may be used in the disjunctive, depending on the context in which it is used. Orion contends that the phrases mean there are desired features and desired uses and the questions must relate to at least one of those--the questions must relate to either desired features, or desired uses, or both.

The Court agrees. The specification does not require questions and answers on both features and uses. The phrase "features and uses" appears only in the claims. The '342 patent abstract refers to "needs and interests": "The system queries a user to determine a customer's needs and interests." The specification also says:

> *5 The system queries a customer to determine his or her interests and desired options. The interests may include a "use" desired by the customer, such as a marina or golf course. The interests may also include the type of information, such as technical, that the customer would like in the proposal. The desired options may include the various features of interest to the customer, such as the type of engine desired.

Col. 2:12-19. Thus, the specification language tends to equate "interest" with "use" and "features" with "options." But nowhere is there any statement that the invention requires--at a minimum--a question and an answer on a customer's desired options (or features)

2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

and a question and an answer on a customer's desired interests (or uses).

It further seems clear that the patentee did not intend for the claims to be read to require questions and answers on both features and uses. The claims are drawn generally to a method "for selling products." *See* Claim 1. Some products may not have "options" or multiple "features" and the only actual variation is seeing that product in various environments. Defendants' constructions would require that all products have both multiple "features" and "uses." Further, in both claims 1 and 11, only one answer is required for the "selecting" step or steps. It is not reasonable to read claim 1 as requiring a minimum of four questions and two answers, and claim 11 as requiring a minimum of two questions and two answers, when only one answer is required for the "selecting" step or steps, especially when nothing in the specification or prosecution history requires the same. [FN3]

Thus the Court agrees with Orion that "and," in context, is used in the disjunctive. Therefore Defendants' proposed construction is unduly narrow, and the Court does not adopt it. Since this is the only clarification Defendants' construction makes to the claim language, the language does not require construction.

Questions

[18] Defendants contend "questions" should be construed to mean: "More than one inquiry that requests an answer and ends with a question mark. Commands and statements are not questions. Menus presenting options are not questions. Words or phrases not in question form that are selected with a cursor or selection device are not questions." Defendants argue that this narrowed definition is necessary to reflect the Applicant's disclaimer of a broader meaning during prosecution to overcome prior art.

During prosecution, the Examiner rejected various claims in view of prior-art patents to Donald and Yourick (U.K. Patent No. 2,177,245 and U.S. Patent No. 4,775,935):

> Donald fails to expressly disclose presenting questions to users and receiving answers in order to associate the answers with stored images or text portions. Instead, Donald's system is drawn to generating images or other information in response to direct user entries on a keyboard or user selections from a menu-driven software program.
> *6 However, question and answer query systems for presenting a product for selection are known in the art.... In particular, Yourick's system queries the user for preferences by asking questions and makes suggestions in response to selected answers in order to present a product most suited to the needs and desires of the user. It would have been obvious to one of ordinary skill in the art at the time of the invention to apply the teaching of Yourick within the system disclosed by Donald with the motivation of presenting items which most likely appeal to the user.

Office Action 8/29/96, pp. 8-9. The Applicant distinguished his invention from Donald and Yourick:

> It is respectfully submitted that Donald and Yourick, alone or in combination, fail to disclose this combination of features. Neither Donald nor Yourick teach [ sic.], for example, teach or suggest the selection of particular pictures and text segments in response to a customer's answers to computer generated questions. Even if the teachings of Donald and Yourick are combined, the specific claimed combination is not suggested without use of hindsight and the teachings of the present application.

Amendment & Request for Reconsideration, 9/24/96. The Examiner accepted the Applicant's argument:

> The prior art fails to teach or fairly suggest, either singly or in combination, the utilization of a customer's answers to computer-generated questions to select stored pictures of products, stored pictures of product environments, and stored text segments, and to compile this information accordingly, so as to generate a customized proposal for the sale of the product....

Notice of Allowance, 10/2/96. Defendants contend that the Applicant explicitly argued that neither Donald nor Yourick taught "questions" and "answers," thus disclaiming any broader meaning that "questions" might otherwise convey.

The Court disagrees. Neither the Examiner's rejection, nor the Applicant's argument was premised on a narrowed definition of "questions." Rather, the Examiner clearly reasoned that Donald failed to disclose the claimed combination of "presenting questions to users and receiving answers in order to associate the answers with stored images or text portions." The Examiner did not reason that Donald failed to disclose "questions." Similarly, the Applicant responded that the references did not disclose the claimed "combination of features." The Applicant did not contend that Donald failed to disclose "questions," nor would such an argument have succeeded because Yourick taught using questions. Instead, the Applicant argued the invention's novelty (and non-obviousness)

2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

was using questions and answers to select stored product pictures, product environment pictures, and text segments to generate a customized proposal.

Thus, there is nothing in the prosecution history indicating that the Applicant disclaimed a broader meaning of "questions." Further, there is no reason within the patent to believe the Applicant used "questions" in any manner besides its ordinary meaning. Accordingly, there is no need to construe the term, much less to stringently limit the meaning of "questions" as Defendants would like.

Features of the products

*7 [19] Defendants argue the term should be construed to mean: "More than one distinctive quality of the product. A product itself is not a feature of the product." Defendants argue that the claim and specification confirm that the product itself is not a "feature." Defendants direct the Court to two non-technical dictionaries that they assert support their construction. But Defendants have not demonstrated why construction of this term is necessary. They do not argue that the term is used in the claims or specification inconsistent with its ordinary meaning. Their citation to non-technical dictionaries confirms that they do not believe the term is a technical term with a specialized meaning to those skilled in the art. Defendants have not shown that their construction adds any clarity to the term, which is used according to its ordinary meaning. Accordingly, this term does not require construction.

Uses of the products

[20] Defendants urge the Court to construe this term to mean: "More than one physical environment in which a product may be used, e.g., a marina or golf course. A product itself is not a 'use' of the product." Defendants argue that claim 1 refers to "uses" as the physical environments in which a product may be used because environment pictures for the customized proposals are selected based on the customer's answers about "uses" for the desired products. Defendants also contend that the specification supports this construction: "The interests may include a 'use' desired by the customer, such as a marina or golf course." Col. 2:14-15.

Although the specification discloses that a "use" may be a location where the product may be used, there is nothing in the specification or claims that indicate "uses" should be restricted to its application in the preferred embodiment. Defendants' argument that claim 1 supports their construction also fails. Defendants contend that in claim 1 environment pictures are selected based on the customer's answers to questions about "uses" for the desired product. *See* col. 39:56-60, 66-67. Claim 1 includes a step of "selecting a particular product environment picture in response to at least one of the customer answers." Col. 39:66-67. But there is no necessary linkage between the product environment picture's selection and the customer's answer to a question about usage. The claim states that the picture is selected in response to at least one of the customer answers. Even under Defendants' constructions of "plurality of questions" and "customer answers," which require at least one question and answer about features and at least one question and answer about uses, the claim does not require that a product environment picture is selected in response to the customer's answer about use; the product environment picture is selected in response to at least one customer answer, and that answer could relate to the product's features. Had the patentee intended to restrict the product environment picture selection as a response to the customer's answer about use, he could have easily done so in the claim language: "selecting a particular product environment picture in response to at least one of the customer answers relating to uses of the products." Accordingly, the Court will not import this limitation into the claim language. Because it is not appropriate to restrict this term to its meaning in the preferred embodiment and there is no other support for finding that it is used in a manner different from its ordinary meaning, no further construction is necessary.

Customer answers [to the questions]

*8 [21] Defendants argue this term should be construed to mean: "At least one customer answer to each question. Actions in response to command or statements are not answers. Menu selections are not answers. A selection--for example, with a cursor or other selection device--not in response to a question is not an answer." Defendants justify this construction based on their arguments for their construction of the term "questions." The Court rejects this construction for the same reasons it rejected Defendants' constructions of "questions" and "plurality of questions." This term, like "questions," does not require construction.

Storing product pictures, product environment pictures and text segments *and* The computer storing product images, product environment images and text segments

2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[22] Defendants argue these terms should be construed as "storing each of the product pictures, product environment pictures and text segments as separate and distinct items." Defendants argue that the claims, the specification, and the prosecution history support their proposed construction. This issue of whether the product pictures, product environment pictures, and text segments are "separate and distinct" implicates many of the remaining claim terms in the '342 patent.

*Claim language and specification*

Defendants contend the claim language supports their proposed construction because the claims recite the product pictures and product environment pictures as separate elements, which are selected through an independent process according to particular customer answers. Further, Defendants argue, the storing step, the selecting step, and the customized proposal step each refer separately to product pictures, product environment pictures, and text segments. Defendants also argue the specification supports their proposed construction because the specification describes the pictures as "building blocks" to create a customized proposal and as being separate and distinct (though those words are not used in the specification). *See* Abstract; col. 5:31-40, 1:9-16. Defendants argue Figure 1A shows separately stored product pictures, product environment pictures, and text segments and Figure 1B shows how they are combined to create a customized proposal for specific customers. Defendants further contend that Figures 1A and 1B illustrate the invention itself rather than a preferred embodiment. *See* col. 2:57-59, 60-62.

Orion responds that the claims do not limit whether the pictures and text segments can be stored separately or in combination with one another. Orion contends that Defendants are attempting to limit the claims to the disclosed embodiment. According to Orion, this is improper because the patentee did not demonstrate "a clear intention to limit the claim scope using words or expressions of manifest exclusion or restriction." *See* Liebel-Flarsheim Co. v. Medrad, Inc., 358 F.3d 898, 906 (Fed.Cir.2004). Further, Orion does not agree that the specification supports the Defendants' contentions. Orion contends that one statement from the specification that Defendants use to support their argument, "each combination of pictures for a finished template need not be pre-stored, since the system dynamically builds a template" actually supports Orion's position. *See* col. 5:37-40. According to Orion, "each combination ... need not" allows for the possibility that some images may be stored as combinations or sub-combinations. Orion also contends that Figure 1A is merely illustrative and that, in an alternative embodiment, the shown pictures and segments can be stored in any combination. *See* col. 5:48-51.

*9 The Court agrees with Orion that the claim language does not require that the product pictures, product environment pictures, and text segments be stored separately. Although the "selecting" steps require that three items be selected, the storing step does not limit how those items are stored. The Court also agrees with Orion that the specification does not require that the product pictures, product environment pictures, and text segments be stored "separately and distinctly." Although the preferred embodiment may do so, there is no clear evidence from the specification that the actual invention requires doing so. Given that claims are to be given their broadest meaning unless there is a clear disclaimer or disavowal, *see* Liebel-Flarsheim Co., 358 F.3d at 906, the Court will not impose this limitation based on the claim language and specification.

*Prosecution history*

Defendants argue that the prosecution history of both the '342 patent and its parent application, which became the '490 patent, support their proposed construction. Defendants contend that to overcome rejections based on Yourick and Donald, the Applicant argued that his invention did not use complete images but instead assembled different images based on customer-specific information. '490 patent, Amendment & Response 6/19/95, p. 3. Yourick did not combine customer-specific pieces of information, but simply retrieved and displayed predefined complete images. *Id.* at 4. Donald combined generic images, but did not disclose gathering and formatting customer-specific information. *Id.* at 3. The Examiner allowed the claim because

> [t]he prior art fails to teach or fairly suggest, either singly or in combination, the utilization of a customer's answers to computer-generated questions to select stored pictures of products, stored pictures of product environments, and stored text segments, and to *compile* this information accordingly, so as to generate a customized proposal for the sale of the product, as recited in independent Claim 30 (now renumbered 1).

'490 patent, Notice of Allowance 8/10/95, p. 2 (emphasis added). According to Defendants, the Examiner understood that the product pictures, product environment pictures, and text segments were

2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

separate and distinct.

Defendants argue the Examiner also rejected various claims in light of Donald and Yourick reasoning that it would have been obvious to combine the references as discussed above. '342 patent, Office Action 8/29/96, p. 7. Defendants contend the Applicant overcame this rejection by arguing that neither Donald nor Yourick disclose the selection of "particular pictures" and text segments in response to a customer's answers to computer generated questions. The Examiner allowed the '342 patent stating:

> The prior art fails to teach or fairly suggest, either singly or in combination, the utilization of a customer's answers to computer generated questions to select stored pictures of products, stored pictures of product environments, and stored text segments, and to compile this information accordingly, so as to generate a customized proposal for the sale of the product, and as recited in independent Claims 30, 35, 40, 45, and 50 (now renumbered 1, 6, 11, respectively).

*10 '342 patent, Notice of Allowance 10/2/96.

First, Orion responds that claim 30 of the '490 patent did not include a "storing" element, and the Examiner and Applicant did not discuss whether the product pictures, product environment pictures, and text segments were stored separately or in combination. Orion argues the Applicant distinguished Donald on the grounds that Donald did not teach the claimed steps of gathering and formatting customer-specific information. Orion contends that the Applicant did not make the statement that Donald "shows the combining of generic images and text to make a composite image" in an attempt to distinguish the Applicant's invention from Donald, but rather in an attempt to contrast Donald with Yourick who did "not combine various customer-specific pieces of information." *See* '490 patent, Amendment & Response 6/19/95, pp. 3-4. Orion argues the Applicant distinguished Yourick because Yourick did not teach "formatting," not because Yourick taught "predefined complete images." *Id.* at 4. According to Orion, these statements to the Examiner do not meet the standard for disclaimer. Second, Orion contends the prosecution history of the '342 patent is silent as to how the product pictures, product environment pictures, and text segments are stored. Orion insists this term does not require construction since it retains its plain and ordinary meaning.

The Court agrees with Orion's characterization of the '342 patent's prosecution history. The Applicant distinguished the '342 patent from Donald and Yourick:

> The claimed system selects a particular product picture, a particular product environment picture, and a particular text segment "in response to at least one of the customer answers." The selected pictures and text segment are used to generate "a customized proposal for the customer."
>
> .... Neither Donald nor Yourick teach, for example, teach or suggest the selection of particular pictures and text segments in response to a customer's answers to computer generated questions.

'342 patent, Amendment & Request for Reconsideration 9/24/96, p. 3. The Applicant's statement cannot be fairly characterized as a disclaimer or disavowal of the plain meaning of the claim term.

The Court also agrees with Orion's interpretation of the '490 patent's prosecution history. The Applicant distinguished Donald and Yourick because "the present invention includes means for 'gathering customer-specific vehicle information' and for 'formatting the customer-specific vehicle information according to criteria related to a layout of the customized proposal.' " '490 patent, Amendment & Response 6/19/95, p. 3. The Applicant argued that although Donald mentioned combining composite images, Donald did not disclose gathering and formatting customer-specific information including vehicle pictures, environment pictures, and text. *Id.* The Applicant also argued that because Yourick displayed complete images rather than assembled images, Yourick did not format the information for a particular layout. *Id.* at 4. The Applicant further argued that Yourick did not disclose associating a user's responses with product pictures, environments, and text. *Id.*

*Conclusion*

*11 Although the claim language requires "storing in the computer product pictures, product environment pictures and text segments," neither the claim language itself, nor the specification, nor the prosecution history clearly limit the storing step to storing the product pictures, product environment pictures, and text segments as "separate and distinct" items. Since Defendants urge the Court to separately construe "product pictures" and "product environment pictures," these terms do not require further construction.

Product pictures [images] and Product environment pictures [images] [FN4]

[23] Defendants urge the Court to construe "product pictures" as: "More than one picture, each of which is of a product and does not include a product environment picture or text segment. Each product picture must be capable of being placed within more than one product environment picture." Defendants urge the Court to construe "product environment pictures" as: "More than one picture, each of which is an environment that will serve as a background within which a product picture is placed and which does not include either a product picture or text segment. Each product environment picture must be capable of serving as a background for more than one product picture."

Given the interrelatedness of Defendants' proposed constructions for these terms, the Court considers them together. To a great extent, these terms determine the "separate and distinct" issue since it is these items that Defendants contend must be stored and selected separately and distinctly. Defendants' constructions place two limitations on both terms: (1) exclusivity ("does not include ...") and (2) the ability to be superimposed on the other type of picture.

The specification does not define "product pictures" or "product environment pictures," but the specification does give various examples of both. According to the Abstract, "[t]he pictures may include various products, environments in which the products may be used, and available product options." In describing Figure 1B, the specification also explains that

> Based upon the answers to the queries, the system may "fill in" the template 60 to customize a proposal for the customer. For example, if the customer has an interest in sailing or boating, the system may choose a picture of a marina environment 51 to use as the background or environment 62 in picture 61 of template 60. Likewise, if the customer has an interest in golfing, the system may choose a golf course environment 52. Within the environment 62, the system places a product 63 by selecting one of the plurality of product picture 56 based upon the customer's answers.
>
> Each product 63 typically has several options available to the customer, such as the type of engine and wheels. Based upon the customer's answers, which indicate the customer's desired options, the system may select parts from the picture database 50 for parts 64 and 65 on product 63 in the template.

*12 Col. 5:4-20. In that example, the environment picture is used as the "background" for product picture 63. The "parts" are illustrated as being superimposed on product picture 63. Finally, the specification explains, "[t]he system may also select one of the plurality of text segments 59 to fill in text frame 66. The text in text frame 66 would typically correspond to picture 61 and, for example, provide a description of the product or its performance specifications." Col. 5:20-24. Those text segments are not illustrated as being superimposed on environment picture 62. But all of this is only exemplary since "[o]ne skilled in the art will recognize that the system is capable of creating different types of templates or proposals based on different picture building blocks or different combinations of the building blocks." Col. 5:48- 53. Further, "the user may select from several generic types of pages to include in the printed proposal. The types of pages typically include cover sheets, personalized letters, product description pages, product specification pages, performance specification pages, trade-in specification pages...." Col. 11:63-12:3. That is, the template may vary.

*Exclusivity limitation*

Thus, although the specification does not define what constitutes "product pictures" as opposed to "environment pictures," the specification does describe "environment pictures" as relating to the environment in which a product may be used and "product pictures" as relating to features and benefits of a product. The patentee used the terms (1) "product pictures," (2) "environment pictures," and (3) "text segments" to refer to three separate types of pictures. But that does not necessarily mean that a "product picture" must be devoid of anything but the product or that an "environment picture" must be devoid of anything but the environment.

Although the specification describes the invention in the context of selling vehicles, claim 1 is not limited to that context, but rather is drawn to "[a] computer assisted method of generating a customized proposal for selling products to particular customers." Claim 11 is similar. There is no inherent limitation on the types of "products" that may be sold. Thus, while it is fairly easy to visualize a pickup truck as a "product," and a "marina" as an "environment," that is not necessarily the case when the products change. An exclusivity limitation is not required by the claims, the specification, or the disclosed invention.

*Superimposed limitation*

The "storing" and "selecting" limitations of claim 1 do not go beyond the steps of "storing" and "selecting." Nothing in those limitations expressly or inherently requires that "[e]ach product picture must

be capable of being placed within more than one product environment picture" or "[e]ach product environment picture must be capable of serving as a background for more than one product picture." The "generating" step also does not expressly or inherently require those limitations. The claim language simply calls for "generating" a proposal "using the particular product picture...." This step does not say how the pictures and text are used and does not require that the product picture be superimposed or placed within the environment picture.

***13** As noted above, the user has flexibility in designing the template and formatting the proposal. *See* col. 17:38-43; 18:64-19:27. Although superimposing a product on a background or environment is certainly described in connection with the embodiment of Figure 1B, there is nothing in the specification that necessarily limits the invention to doing so. Nor is there anything in the prosecution history of either the '342 patent or its parent application that would so limit the claims.

Thus, the method steps of "selecting" and then "generating a customized proposal" are not necessarily limited to the template of Figure 1B in which the "product picture" is superimposed on the "product environment picture." Such a limitation is inconsistent with the claim language. Claim 1 calls for "selecting" (1) "a particular product picture," (2) "a particular product environment picture," and (3) "a particular text segment." The claim requires "selecting" a "text segment," but Figure 1B does not illustrate the "text segment" as being superimposed on the background or "product environment picture."

The specification speaks in terms of "linking" together product pictures, environment pictures and text, but "linking" is not restricted to "superimposing" or placing a product picture "within" an environment picture. *See* col. 1:9-12.; 2:20-31. The specification speaks in terms of "linking" textual descriptions, yet even in the preferred embodiment, the textural description is not "superimposed" on a background or a "product environment picture."

*Conclusion*

Nothing in the claim language, specification, or prosecution history supports Defendants' proposed limitations. Thus, the Court does not adopt them. Without these limitations, Defendants' proposed construction of "product pictures" is "more than one picture, each of which is of a product." This is no different than how "product pictures" would ordinarily be understood. Accordingly, "product pictures" does not require construction. Without these limitations, Defendants' proposed construction of "product environment pictures" is similarly reduced to "more than one picture, each of which is an environment." Likewise, this adds nothing to the term "product environment pictures," and the term does not require further construction.

Environments

[24] Defendants argue "environments" means: "More than one surrounding (e.g. a golf course, marina or city environment) in which a product may be used. The surroundings in which a product may be used do not include artificial backdrops such as blank, solid colored or patterned backdrops. A product is not an environment for its parts, for example, a car is not an environment for an engine and an engine is not an environment for a spark plug." Defendants urge that an "environment" is separate from a product itself, or its parts, based on the separateness of the "product pictures" and "product environment pictures." Defendants also contend that Figure 1B supports their position. Thus, to some extent, this term also depends on the "separate and distinct" issue.

***14** Orion contends this term is used according to its plain meaning and does not require construction. The Court agrees. During the hearing, Orion agreed that a blank background is not an environment. Orion also agreed that a solid colored or patterned backdrop is also not an environment. [FN5] Therefore, the second sentence of Defendants' construction is unnecessary. The Court also rejects Defendants' argument that the patent itself does not allow an object to be an environment for its parts. This limitation is not required or implied by the claim language. Figure IB is "a diagram illustrating conceptually *an* electronic proposal template of the computerized proposal system," *see* col. 2:60-62 (emphasis added), and Defendants have not shown that one skilled in the art would believe this to be the only possible embodiment of the claimed system. Accordingly, the Court will not import this limitation into the claim language. Based on the Court's constructions regarding the "separate and distinct" issue and the reasons just given, the Court determines that this term does not require construction.

Selecting a particular product in response to at least one of the customer answers; selecting a particular environment picture in response to at least one of the customer answers; selecting a particular text segment in response to at least one of the customer answers

2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[25] Defendants urge the Court to construe this term to mean: "Separately selecting one of multiple product pictures; separately selecting one of multiple product environment pictures; and separately selecting one of multiple text segments. These three selections are performed separately such that one of multiple product environment pictures could be selected for the separately selected product picture. Each of the separate selections must be based on a customer answer to at least one of the questions." This term also raises the "separate and distinct issue" already discussed.

Both claims 1 and 11 require selecting at least three separate items, namely (1) a product picture, (2) a product environment picture, and (3) a text segment. Neither claim 1 nor claim 11 requires selecting a product picture, product environment picture, and text segment based on separate answers. The claims allow selecting each of a product picture, a product environment picture, and a text segment based on the same answer. Although that is difficult to visualize in the context of the preferred embodiment, i.e., cars, trucks, and other vehicles, again the claims of the '342 patent are drawn to "products," which goes far beyond "vehicles."

This term does not require construction. As Defendants' construction reflects, the claim language expressly requires making three selections. The Court rejects Defendants' construction because, in addition to including the limitation the Court rejected in the previous paragraph, it does not clarify the term. The sentence "These three selections are performed separately such that one of multiple product environment pictures could be selected for the separately selected product picture" implies the product picture is selected first. Defendants' construction also implies that the product environment picture is selected "for" the product picture. This implication is ambiguous, since the claim requires that the environment picture be selected "in response to at least one of the customer answers" and does not reference the product picture in this selection step. Accordingly, the claim language is sufficiently clear that a particular product picture, a particular product environment picture, and a particular text segment are selected in three separate steps.

Generating a customized proposal for the customer using the particular product picture, the particular product environment picture and the particular text segment and Generating a proposal customized for the customer using the selected product image, the selected product environment image and the selected text segment

*15 [26] Defendants urge the Court to construe these terms as "[g]enerating individualized information to be considered for the potential sale of a product that includes the particular selected product picture, the particular selected product environment picture and the particular selected text segment. The product environment picture for the product picture is selected from different environment pictures." Defendants' proposal is based on their construction of "proposal" and their position on the "separate and distinct" issue. The Court has already decided both of these issues. According, this term does not require construction.

Customer answers of the customer to the plurality of questions

[27] Defendants argue this term should be construed to mean "more than one answer of the customer, at least one of which specifies a product feature and at least one of which specifies a product use." The Court has already addressed the issue behind the parties' disagreement in its construction of "plurality of questions relating to features and uses of the products." Accordingly, the Court determines this term does not require construction.

Automatically selecting, in response to at least one of the customer answers, a product image, a product environment image and a text segment

[28] Defendants contend this term means "[t]he computer separately selecting one of multiple product pictures, separately selecting one of multiple product environment pictures, and separately selecting one of multiple text segments. The computer performs the selection separately such that one of multiple product environment pictures could be selected for the separately selected product picture. The computer automatically makes each of the separate selections based on a customer answer to at least one of the questions without additional input from the user." This term's construction turns on the "separate and distinct" issue discussed under the "storing" step. Given the Court's outcome on that issue, this term does not require construction.

'627 PATENT
A computerized method of selling parts for particular equipment specified by a customer

[29] Defendants urge the Court to construe this term as "a method each step of which is performed by the

computer." This limitation is not required by the claim language or the specification. Further, Defendants do not argue that "computerized method" is not likely to be understood by lay jurors. Accordingly, the Court determines that this term does not require construction.

Parts

[30] Defendants argue this term should be construed to mean "sub-components of equipment." Orion contends "parts" does not require construction, and the Court agrees. Defendants have not demonstrated that this term is used in a manner inconsistent with its ordinary lay meaning. Further, Defendants' construction overly complicates the term. "In the preferred embodiment, the types of parts under the cross-referencing/parts selection procedure include batteries, filters, remanufactured electric parts, lubrication and bearings." Col. 9:4-8. While a lay jury would likely consider batteries or lubrication to be "parts," it is less certain that they would consider them to be "sub-components of equipment."

Equipment

*16 [31] Defendants argue "equipment" should be construed as "implements such as machinery or tools used in an operation or activity." Again, the Court agrees with Orion that this term does not require construction. "Equipment" is not used in a manner inconsistent with its ordinary lay meaning. Like "parts," "equipment" is a common word that any jury will understand. Further, Defendants' construction is again likely to be misleading. As Defendants point out, Figure 29 lists "industrial, road & misc. equipment, farm equipment, light trucks & vans, passenger cars, trucks, buses & coaches" as examples of equipment. It may not be obvious to a jury that they are to consider light trucks and vans, passenger cars, trucks, and buses to be "implements."

Receiving information identifying a customer's parts requirements for the equipment

[32] Defendants contend this term should be construed as "Receiving information identifying the parts required by the customer for the equipment. Identification of the equipment alone is not sufficient because it is not enough to identify the parts which the customer requires for that equipment." Defendants argue that merely identifying the equipment in which the part is to be used does not sufficiently identify the part the customer requires. Defendants also contend that every embodiment described in the specification gives more information than that merely identifying the equipment. Orion argues that Defendants' construction alters the claim language's meaning because their construction requires an identification of the "parts," whereas the claim requires the identification of the "parts requirements." Orion also contends that claim 1's structure requires no more than an "identification of the equipment," which is the opposite of Defendants' construction. The Court agrees. This term does not require construction.

Electronically specifying information identifying a plurality of parts and specifications for the parts

[33] Although Defendants originally submitted this term for construction, they withdrew the term during the hearing. Orion contends the term does not require construction. The Court agrees.

Specification for the parts and Specifications corresponding to the ... parts

[34] Defendants urge the Court to construe these terms as "specific characteristics of the parts, such as part numbers, part attributes or part descriptions." Defendants contend "the patent specification lists 'part number,' 'part attribute' and 'part description' as examples of 'specifications.' Dictionaries, in turn, consistently define 'specification' to include 'a specific character.'" ' Defendants entirely fail to inform the Court why these terms should be limited to what the specification "may" include. *See* col. 6:33-35. To support their construction, Defendants also turn to the Oxford English Dictionary as an example of the "consistent dictionary definition." Thus, Defendants do not contend that the terms have any meaning unique to the technology-at-issue. Defendants' only explanation for why these terms need construction is so that "Orion is not allowed to argue any meaning to the jury." The same could be said for every single word in any claim. This is not a sufficient reason to construe a term.

Gathering parts-related information for one or more parts within the plurality of parts which meets the customer's requirements

*17 [35] Defendants urge the Court to construe this term as "gathering information about parts that meet the customer's requirements from the electronically specified part information." Defendants argue this construction is necessary to define what is meant by "*the* plurality of parts," which refers to the parts that were defined in element (b) of claim 1 with the language "electronically specifying information

identifying a plurality of parts." Defendants' construction requires multiple parts to meet the customer's requirements; the claim language requires *one* or more parts. Defendants construction is also susceptible to being misunderstood. Orion seems to understand the construction to mean that the information is gathered from the electronically specified part information. Defendants contend that the plurality of parts are those that were electronically specified.

The Court agrees with Orion that this phrase does not require construction. In some contexts, "the plurality of parts" or similar terms may be confusing to a lay jury. Here, the antecedent "plurality of parts" is identified in the previous step. Given the close proximity of the phrases, it is highly unlikely to be confusing.

A method of selling ... comprising ... compiling the parts-related information into a proposal meeting the customer's requirements

[36] Defendants contend this term should be construed as "a method of selling ... comprising ... collecting the parts-related information into a collection of parts-related information to be considered for the potential sale of the parts that meet the customer's requirements." The construction dispute between the parties concerns the construction of "proposal," which this Court has already addressed. The Court declines to further construe the term.

CONCLUSION

For the foregoing reasons, the Court interprets the claim language in this case in the manner set forth above. For ease of reference, the Court's claim interpretations are set forth in a table as Appendix B. The claims with the disputed terms in bold are set forth in Appendix A.

[37] Orion submitted two terms for the Court's construction, "proposal" and "customized proposal," but "customized proposal" was eventually withdrawn. Defendants also wanted those terms construed and submitted twenty-one additional distinct terms. These terms included words such as "parts," "equipment," and "specifications." After examining both sides' arguments, the Court has determined none of those terms required construction because they are all used in accordance with their ordinary lay meanings. These are common words familiar to most English speakers. Defendants did not argue that these terms carried a unique meaning in the art making their construction necessary. Instead, many of Defendants' constructions seemed geared to their future non-infringement arguments. The Court realizes that claim construction may prove to be crucial to parties' infringement and invalidity cases, but those issues are best left for summary judgment and jury arguments. The Court is aware that other courts give parties time limits for their *Markman* arguments or limit the number of terms they may submit for construction. This Court does not do that. Instead, the Court fully expects the parties and their attorneys to limit the terms they submit to those that might be unfamiliar to the jury, confusing to the jury, or affected by the specification or the prosecution history. *See* United States Surgical Corp. v. Ethicon, Inc., 103 F.3d 1554, 1568 (Fed.Cir.1997) ("Claim construction is a matter of resolution of disputed meanings and technical scope, to clarify and when necessary to explain what the patentee covered by the claims, for use in the determination of infringement. It is not an obligatory exercise in redundancy."). Attorneys practicing before this Court would be wise to realize that although every word used in a claim has a meaning, not every word requires a construction.

***18** So ORDERED.

APPENDIX A

U.S. PATENT NO. 5,615,342

1. A computer assisted method of generating a customized proposal for selling products to particular customers, the method comprising the steps of:

presenting to a user of the computer a plurality of questions relating to features and uses of the products;

inputting into the computer a plurality of customer answers to the questions, the answers specifying a customer's desired product features and uses;

storing in the computer product pictures, product environment pictures and text segments;

selecting a particular product picture in response to at least one of the customer answers;

selecting a particular product environment picture in response to at least one of the customer answers;

selecting a particular text segment in response to at least one of the customer answers; and

generating a customized proposal for the customer using the particular product picture, the particular product environment picture and the particular text segment.

3. A method as recited in claim 1, further comprising the steps of:

storing a plurality of product specifications related to producing the products in a variety of configurations which are of varying interest to different potential customers who may purchase the

product;
linking at least one of the customer answers with a product specification which is of particular interest to the customer; and
generating, for inclusion in the proposal, one or more individualized pages comprising the product specification which is of particular interest to the customer.

4. A method as recited in claim 1, further comprising the steps of:
storing a plurality of performance specifications related to the performance of the products in a variety of configurations which are of varying interest to different potential customers who may purchase the product;
linking at least one of the customer answers with a performance specification which is of particular interest to the customer; and
generating, for inclusion in the proposal, one or more individualized pages comprising the performance specification which is of particular interest to the customer.

5. A method as recited in claim 1, further comprising the steps of:
presenting a series of predetermined queries related to financing a product of interest to different potential customers who may purchase the product;
receiving individualized answers to the predetermined queries, the individualized answers relating to financing a product configuration of particular interest to the customer; and
generating, for inclusion in the proposal, one or more individualized pages comprising the financing information related to the product configuration which is of particular interest to the customer.

11. A computer assisted method of generating a customized proposal for a customer to facilitate a sale of a product, the computer storing product images, product environment images and text segments, the method comprising the steps of:
*19 prompting a user of the computer with a plurality of questions related to at least one of a desired feature and desired use of the product;
receiving into the computer customer answers of the customer to the plurality of questions;
automatically selecting, in response to at least one of the customer answers, a product image, a product environment image and a text segment; and
generating a proposal customized for the customer using the selected product image, the selected product environment image and the selected text segment.

13. A method as recited in claim 11, further comprising the steps of:
storing a plurality of product specifications related to producing the products in a variety of configurations which are of varying interest to different potential customers who may purchase the product;
linking at least one of the customer answers with a product specification which is of particular interest to the customer; and
generating, for inclusion in the proposal, one or more individualized pages comprising the product specification which is of particular interest to the customer.

14. A method as recited in claim 11, further comprising the steps of:
storing a plurality of performance specifications related to the performance of the products in a variety of configurations which are of varying interest to different potential customers who may purchase the product;
linking at least one of the customer answers with a performance specification which is of particular interest to the customer; and
generating, for inclusion in the proposal, one or more individualized pages comprising the performance specification which is of particular interest to the customer.

15. A method as recited in claim 11, further comprising the steps of:
presenting a series of predetermined queries related to financing a product of interest to different potential customers who may purchase the product;
receiving individualized answers to the predetermined queries, the individualized answers relating to financing a product configuration of particular interest to the customer; and
generating, for inclusion in the proposal, one or more individualized pages comprising the financing information related to the product configuration which is of particular interest to the customer.

U.S. PATENT NO. 5,367,627

1. A computerized method of selling parts for particular equipment specified by a customer, comprising the steps of:
a) receiving information identifying a customer's parts requirements for the equipment, comprising the step of receiving equipment application information, comprising an identification of the equipment with which one or more parts are to be used;

2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

b) electronically specifying information identifying a plurality of parts and specifications for the parts;
c) gathering parts-related information for one or more parts within the plurality of parts which meets the customer's requirements, comprising the step of electronically associating at least one of the parts within the plurality of parts with the received equipment application information; and
*20 d) receiving the gathered parts-related information and compiling the parts-related information into a proposal meeting the customer's requirements.

5. The method of claim 1 wherein the step (d) comprises the step of generating a printed version of the proposal.

6. The method of claim 1 wherein the step (d) further comprises the step of including within the proposal specifications corresponding to the one or more parts which meets the customer's requirements.

7. The method of claim 1 wherein the step (d) further comprises the step of including within the proposal price information corresponding to the one or more parts which meets the customer's requirements.

8. The method of claim 1 wherein the step (d) comprises the step of including within the proposal graphical information corresponding to the one or more parts which meets the customer's requirements.

9. The method of claim 1 wherein the step (d) comprises the step of including within the proposal textual information corresponding to the one or more parts which meets the customer's requirements.

11. The method of claim 1 wherein the step (d) comprises the step of graphically illustrating within the proposal construction features of a particular one of the parts which meets the customer's requirements.

APPENDIX B
U.S. PATENT NO. 5,615,342

| Claim Language | Court's Construction |
| --- | --- |
| 1. A computer assisted method of generating a customized proposal for selling products to particular customers, the method comprising the steps of: | Proposal: information intended for conveyance to a potential customer<br>Customized proposal: no construction necessary<br>Customer: no construction necessary |
| presenting to a user of the computer a plurality of questions relating to features and uses of the products; | User [of the computer]: no construction necessary<br>Plurality of questions relating to features and uses of the products: no construction necessary<br>Questions: no construction necessary<br>Features of the products: no construction necessary<br>Uses of the products: no construction necessary |
| inputting into the computer a plurality of customer | Customer answers [to the questions]: no construction |

| Claim language | Construction |
| --- | --- |
| answers to the questions, the answers specifying a | necessary |
| customer's desired product features and uses; | A plurality of customer answers to the questions, the answers specifying a customer's desired product features and uses: no construction necessary |
| storing in the computer product pictures, product environment pictures and text segments; | Storing product pictures, product environment pictures and text segments: no construction necessary<br>Product pictures: no construction necessary<br>Environments: no construction necessary<br>Product environment pictures: no construction necessary |
| selecting a particular product picture in response to at least one of the customer answers;<br>selecting a particular product environment picture in response to at least one of the customer answers;<br>selecting a particular text segment in response to at least one of the customer answers; and | Selecting a particular product picture in response to at least one of the customer answers; selecting a particular environment picture in response to at least one of the customer answers; selecting a particular text segment in response to at least one of the customer answers: no construction necessary |
| generating a customized proposal for the customer using the particular product picture, the particular product environment picture and the particular text segment. | generating a customized proposal for the customer using the particular product picture, the particular product environment picture and the particular text segment.: no construction necessary |
| 3. A method as recited in claim 1, further comprising the steps of:<br>storing a plurality of product specifications | Customer: no construction necessary<br>Customer answers: no construction necessary |

| Claim language | Court's construction |
| --- | --- |
| related to producing the products in a variety of configurations which are of varying interest to different potential customers who may purchase the product; linking at least one of the customer answers with a product specification which is of particular interest to the customer; and generating, for inclusion in the proposal, one or more individualized pages comprising the product specification which is of particular interest to the customer. | |
| 4. A method as recited in claim 1, further comprising the steps of: storing a plurality of performance specifications related to the performance of the products in a variety of configurations which are of varying interest to different potential customers who may purchase the product; linking at least one of the customer answers with a performance specification which is of particular interest to the customer; and generating, for inclusion in the proposal, one or more individualized pages comprising the performance specification which is of particular interest to the customer. | Customer: no construction necessary<br>Customer answers: no construction necessary |
| 5. A method as recited in claim 1, further comprising the steps of: presenting a series of predetermined queries related to financing a product of interest to different potential | Customer: no construction necessary |

customers who may purchase the product;

receiving individualized answers to the predetermined queries, the individualized answers relating to financing a product configuration of particular interest to the customer; and

generating, for inclusion in the proposal, one or more individualized pages comprising the financing information related to the product configuration which is of particular interest to the customer.

| | |
|---|---|
| 11. A computer assisted method of generating a customized proposal for a customer to facilitate a sale of a product, the computer storing product images, product environment images and text segments, the method comprising the steps of: | Customized proposal: no construction necessary<br>Customer: no construction necessary<br>Product images: no construction necessary<br>Environment: no construction necessary<br>Product environment images: no construction necessary<br>The computer storing product images, product environment images and text segments: no construction necessary |
| prompting a user of the computer with a plurality of questions related to at least one of a desired feature and desired use of the product; | User [of the computer]: no construction necessary<br>Questions: no construction necessary<br>Feature [of the product]: no construction necessary<br>Use [of the product]: no construction necessary<br>A plurality of questions related to at least one of a desired feature and desired |

2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

| | |
|---|---|
| | use of the product: no construction necessary |
| receiving into the computer customer answers of the customer to the plurality of questions; | Customer answers: no construction necessary<br>Customer answers of the customer to the plurality of questions: no construction necessary |
| automatically selecting, in response to at least one of the customer answers, a product image, a product environment image and a text segment; and | Automatically selecting, in response to at least one of the customer answers, a product image, a product environment image and a text segment: no construction necessary |
| generating a proposal customized for the customer using the selected product image, the selected product environment image and the selected text segment. | Generating a proposal customized for the customer using the selected product image, the selected product environment image and the selected text segment: no construction necessary |
| 13. A method as recited in claim 11, further comprising the steps of:<br><br>storing a plurality of product specifications related to producing the products in a variety of configurations which are of varying interest to different potential customers who may purchase the product; | Customer: no construction necessary |
| linking at least one of the customer answers with a product specification which is of particular interest to the customer; and<br><br>generating, for inclusion in the proposal, one or more individualized pages comprising the product specification | Customer answers: no construction necessary |

2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

which is of particular interest to the customer.

| | |
|---|---|
| 14. A method as recited in claim 11, further comprising the steps of: storing a plurality of performance specifications related to the performance of the products in a variety of configurations which are of varying interest to different potential customers who may purchase the product; linking at least one of the customer answers with a performance specification which is of particular interest to the customer; and generating, for inclusion in the proposal, one or more individualized pages comprising the performance specification which is of particular interest to the customer. | Customer: no construction necessary<br>Customer answers: no construction necessary |
| 15. A method as recited in claim 11, further comprising the steps of: presenting a series of predetermined queries related to financing a product of interest to different potential customers who may purchase the product; receiving individualized answers to the predetermined queries, the individualized answers relating to financing a product configuration of particular interest to the customer; and generating, for inclusion in the proposal, one or more individualized pages comprising the financing information related to the product configuration | Customer: no construction necessary |

2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

which is of particular interest to the customer.

U.S. PATENT NO. 5,367,627

| Claim Language | Court's Construction |
| --- | --- |
| 1. A computerized method of selling parts for particular equipment specified by a customer, comprising the steps of: | A computerized method of selling parts for particular equipment specified by a customer: no construction necessary<br><br>Parts: no construction necessary<br>Equipment: no construction necessary |
| a) receiving information identifying a customer's parts requirements for the equipment, comprising the step of receiving equipment application information, comprising an identification of the equipment with which one or more are to be used; | Receiving information identifying a customer's parts requirements for the equipment: no construction necessary |
| b) electronically specifying information identifying a plurality of parts and specifications for the parts; | Electronically specifying information identifying a plurality of parts and specifications for the parts: no construction necessary<br>Specifications for the parts: no construction necessary |
| c) gathering parts-related information for one or more parts within the plurality of parts which meets the customer's requirements, comprising the step of electronically associating at least one of the parts within the plurality of parts with the received equipment application information; and | Gathering parts-related information for one or more parts within the plurality of parts which meets the customer's requirements: no construction necessary |
| d) receiving the gathered parts-related information and | Proposal: information intended for conveyance to a |

| | |
|---|---|
| compiling the parts-related information into a proposal meeting the customer's requirements. | potential customer<br><br>A method of selling ... comprising ... compiling the parts-related information into a proposal meeting the customer's requirements: no construction necessary |
| 5. The method of claim 1 wherein the step (d) comprises the step of generating a printed version of the proposal | Proposal: information intended for conveyance to a potential customer |
| 6. The method of claim 1 wherein the step (d) further comprises the step of including within the proposal specifications corresponding to the one or more parts which meets the customer's requirements. | Proposal: information intended for conveyance to a potential customer<br><br>Specifications corresponding to the ... parts: no construction necessary<br>Parts: no construction necessary |
| 7. The method of claim 1 wherein the step (d) further comprises the step of including within the proposal price information corresponding to the one or more parts which meets the customer's requirements. | Proposal: information intended for conveyance to a potential customer<br><br>Parts: no construction necessary |
| 8. The method of claim 1 wherein the step (d) comprises the step of including within the proposal graphical information corresponding to the one or more parts which meets the customer's requirements. | Proposal: information intended for conveyance to a potential customer<br><br>Parts: no construction necessary |
| 9. The method of claim 1 wherein the step (d) comprises the step of including within the proposal textual information corresponding to the one or more parts which meets the customer's requirements. | Proposal: information intended for conveyance to a potential customer<br><br>Parts: no construction necessary |
| 11. The method of claim 1 wherein the step | Proposal: information intended |

2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

```
  (d) comprises                                  for conveyance to a
the step of graphically illustrating within    potential customer
  the proposal
construction features of a particular one of
  the parts
which meets the customer's requirements.       Parts: no construction necessary
-------------------------------------------------------------------------------
```

FN1. Appendix A contains the relevant claims with the disputed terms in bold.

FN2. The Court also notes that in their proposed construction of "plurality of customer answers," Defendants do not contend that "plurality" modifies "customer," instead they argue plurality modifies "answers."

FN3. This is in contrast to the *Superguide* case, which Defendants rely on, where the specification taught that the user must choose a value for each designated category. *See* Superguide Corp. v. DirecTV Enters., Inc., 358 F.3d 870, 887 (Fed.Cir.2004).

FN4. "Product images" and "product environment images" are used in claim 11.

FN5. Orion did qualify that a checkered floor might be an environment.

--- F.Supp.2d ----, 2005 WL 3447887 (E.D.Tex.)

**Motions, Pleadings and Filings** **(Back to top)**

• 2005 WL 2667143 (Trial Motion, Memorandum and Affidavit) Reply Brief in Support of Defendant Home Depot's Motion for Summary Judgment of Invalidity of Claims 1, 3, 11, and 13 of U.S. Patent 5,615,342 (Sep. 08, 2005)

• 2005 WL 2667142 (Trial Motion, Memorandum and Affidavit) Plaintiff Orion's Response To Defendant Home Depot's Motion For Summary Judgment of Invalidity of Claims 1, 3 11, And 13 of U.S. Patent No. 5,615,342 (Aug. 26, 2005)

• 2005 WL 2666859 (Trial Motion, Memorandum and Affidavit) Plaintiff Orion's Reply Brief Regarding Claim Construction Issues Pursuant to Patent Rule 4-5(c) (Aug. 11, 2005)

• 2005 WL 2299719 (Trial Motion, Memorandum and Affidavit) Defendant Home Depot's Motion for Summary Judgment of Invalidity of Claims 1,3, 11, and 13 of U.S. Patent 5,615,342 (Aug. 04, 2005)

• 2005 WL 2299713 (Trial Motion, Memorandum and Affidavit) Plaintiff Orion's Opening Brief Regarding Claim Construction Issues Pursuant to Patent Rule 4-5(a) (Jul. 20, 2005)

• 2005 WL 1924149 (Trial Motion, Memorandum and Affidavit) Plaintiff's Sur-Reply to Defendants' Motion to Compel Answers to Interrogatory Nos. 6 and 7 (Jun. 20, 2005)

• 2005 WL 1594274 (Trial Motion, Memorandum and Affidavit) Plaintiff's Response to Defendant Toyota Motor Sales, Usa, Inc.'s Motion to Enforce Orion's Compliance with Paragraph 3-7 of the Patent Rules and Plaintiff's Cross Motion to Compel Toyota's Compliance with Disclosure and Discovery Requirements (Jun. 08, 2005)

• 2005 WL 1594275 (Trial Motion, Memorandum and Affidavit) Plaintiff's Response to Defendant Toyota Motor Sales, Usa, Inc.'s Motion to Enforce Orion's Compliance with Paragraph 3-7 of the Patent Rules and Plaintiff's Cross Motion to Compel Toyota's Compliance with Disclosure and Discovery Requirements (Jun. 08, 2005)

• 2005 WL 1594270 (Trial Pleading) Orion IP, LLC's Reply to Toyota Motor Sales, Usa Inc.'s First Amended Counterclaims (Jun. 07, 2005)

• 2005 WL 1594271 (Trial Pleading) Orion ip, LLC's Reply to Home Depot Usa, Inc.'s Amended Counterclaims (Jun. 07, 2005)

• 2005 WL 1594272 (Trial Pleading) Orion ip, llc's Reply to the Pep Boys -- Manny, Moe & Jack's Counterclaims (Jun. 07, 2005)

• 2005 WL 1594273 (Trial Pleading) Orion ip, llc's Reply to Harley-Davidson, Inc.'s Counterclaims (Jun. 07, 2005)

• 2005 WL 1366205 (Trial Motion, Memorandum and Affidavit) Stipulated Motion for Dismissal with Prejudice (Mar. 21, 2005)

• 2005 WL 1366202 (Trial Motion, Memorandum and

2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Affidavit) Motion To Dismiss Defendant Alford Buick Pontiac Gmc. Inc., d/b/a Alford Toyota (Feb. 03, 2005)

• 2005 WL 1366198 (Trial Pleading) Third-Party Defendant's Answer to Fuji Photo Film U.S.A., Inc.'s First Amended Complaint Against Satisfusion, Inc. (Jan. 13, 2005)

• 2004 WL 3377138 (Trial Pleading) Orion IP, LLC's Reply to Hitachi America Limited's Counterclaims (Dec. 22, 2004)

• 2004 WL 3377135 (Trial Pleading) Orion IP, LLC's Reply to Home Depot USA, Inc.'s Counterclaims (Dec. 15, 2004)

• 2004 WL 3377133 (Trial Pleading) Defendant Hitachi America Limited's Answer, Affirmative Defenses, and Counterclaims to the First Amended Complaint of Orion IP, LLC (Dec. 01, 2004)

• 2004 WL 3377126 (Trial Pleading) Orion Ip, LLC's To Harley-Davidson, Inc.'s Counterclaims (Nov. 24, 2004)

• 2004 WL 3377128 (Trial Pleading) Orion LP, LLC's Reply to the Pep Boys-manny, Moe & Jack's Counterclaims (Nov. 24, 2004)

• 2004 WL 3377130 (Trial Motion, Memorandum and Affidavit) Orion LP, LLC's Reoply to Fuji Photo Film U.S.A. Inc.'s Counterclaims (Nov. 24, 2004)

• 2004 WL 3377123 (Trial Pleading) Defendant Home Depot USA, Inc.'s Original Answer and Counterclaims to Plaintiff's First Amended Original Complaint for Patent Infringement (Nov. 22, 2004)

• 2004 WL 3377119 (Trial Pleading) Orion Ip, Llc's Reply To Toyota Motor Sales, USA Inc.'s Counterclaims (Nov. 19, 2004)

• 2004 WL 3377112 (Trial Pleading) Defendant Fuji Photo Film U.S.A., Inc.'s First Amended Third-Party Complaint Against Satisfusion. Inc. (Nov. 16, 2004)

• 2004 WL 3377096 (Trial Pleading) Defendant Harley-Davidson, Inc.'s Original Answer and Counterclaim (Nov. 01, 2004)

• 2004 WL 3377102 (Trial Pleading) Original Answer and Counterclaim of Defnedant, the Pep Boys - Manny Moe & Jack (Nov. 01, 2004)

• 2004 WL 3377106 (Trial Pleading) Defendant Fuji Photo Film U.S.A., Inc.'s Answer, Affirmative Defenses, and Counterclaims to the First Amended Complaint of Orion Ip, LLC (Nov. 01, 2004)

• 2004 WL 3377091 (Trial Pleading) Toyota Motor Sales, Usa, Inc.'s Answer and Counterclaims to Plaintiff's First Amended Orininal Complaint for Patent Infringement (Oct. 27, 2004)

• 2004 WL 3377083 (Trial Pleading) Defendant Alford Buick Pontiac GMC, Inc. d/b/a Alford Toyota's Original Answer (Sep. 15, 2004)

• 2004 WL 3358896 (Trial Pleading) First Amended Original Complaint For Patent Infringement (Aug. 26, 2004)

• 2004 WL 3358890 (Trial Pleading) Original Complaint for Patent Infringement (Aug. 11, 2004)

• 2:04cv00297 (Docket) (Aug. 11, 2004)

END OF DOCUMENT

2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 5

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

MCKESSON INFORMATION SOLUTIONS, LLC, )
)
PLAINTIFF, )
vs. ) Case No. 04-1258-SLR
)
THE TRIZETTO GROUP, INC., )
)
DEFENDANT. )
)

VIDEO DEPOSITION OF MARK MUSEN, M.D., PH.D.
Held at Skadden, Arps, Slate, Meagher & Flom
525 University Avenue, 11th Floor
Palo Alto, California
Tuesday, November 22, 2005, 9:11 a.m.

REPORTED BY: CHRIS DE GEORGE, CSR. NO. 7069

APPEARANCES

For the Plaintiff:

Skadden, Arps, Slate, Meagher & Flom, LLP
BY: MICHAEL HENDERSHOT and JON SWENSON,
Attorneys at Law
525 University Avenue, 11th Floor
Palo Alto, California 94301
(650) 470-4500

For the Defendant:

GIBSON, DUNN & CRUTCHER LLP
BY: MICHAEL A. SITZMAN and DANIEL MUINO,
Attorneys at Law
One Montgomery Street
San Francisco, California 94104-4505
(415) 393-8221
msitzman@gibsondunn.com

Also present: Michael Barber,
Videographer

INDEX

| EXAMINATION | PAGE |
|---|---|
| BY: MR. SITZMAN | 5, 292 |
| BY: MR. HENDERSHOT | 277 |

INDEX OF EXHIBITS

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| MM-1 | Multi-page Expert Report of Mark A. Musen, M.D., Ph.D. | 5 |
| MM-2 | Rebuttal Expert Report of Mark A. Musen, M.D., Ph.D.; 37 pages | 5 |
| MM-3 | United States Patent Number 5,253,164 | 15 |
| MM-4 | Paper entitled "An Access-oriented Negotiated Fee Schedule, The Caterpillar Experience," pages 349-357 | 72 |
| MM-5 | Memorandum Order; 4 pages | 109 |
| MM-6 | PEW Conference Presentation Managing Physician Fees; 4 pages | 173 |
| MM-7 | Vendor Comparison dated 1-18-88; 1 page | 180 |
| MM-8 | Exhibit C, Materials Examined; 9 pages | 193 |
| MM-9 | Expert Report of Dr. Margaret L. Johnson, Ph.D; 30 pages | 298 |

BE IT REMEMBERED that, pursuant to Notice, and on Tuesday, November 22, 2005, commencing at the hour of 9:11 a.m. thereof, at the Law Offices of Skadden, Arps, Slate, Meagher & Flom, LLP, 525 University Avenue, 11th Floor, Palo Alto, California, before me, Chris De George, CSR #7069, State of California, there personally appeared

MARK MUSEN, M.D., PH.D.,

called as a witness herein by Defendant, who, being first duly sworn, was examined as is hereinafter set forth.

--oOo--

02:27
08:39
09:10 THE VIDEOGRAPHER: Good morning. My name is
09:10 Michael Barber. I am a videographer associated with
09:10 Barkley Court Reporters located at 222 Front Street,
09:11 Suite 600, San Francisco, California 94111. The date is
09:11 November 22nd, 2005. The time is 9:11 a.m.
09:11 This deposition is taking place at Skadden,
09:11 Arps, Slate, Meagher & Flom, LLP, 525 University Avenue,
09:11 Palo Alto, California 94301 in the matter of McKesson
09:11 Information Solutions, LLC, versus the TriZetto Group,
09:11 Inc., Case Number 04-1258-SLR.
09:11 This is the videotape deposition of Mark
09:11 Musen, M.D., Ph.D. being taken on behalf of the defense.

09:51 Q. But when you said that there was -- they were appended to the -- to the report, was that the table that you were thinking of?
09:51 A. Well, you ask- -- you asked me how I construed the claims.
09:51 Q. Yes.
09:51 A. Not how others had, and I construed them in -- in the terms that are defined in Tabs 3, 4, and -- 2, 3, and 4.
09:52 Q. Okay. Okay.
09:52 A. Which have remark- -- a remarkable correspondence to the McKesson construction.
09:52 Q. Okay. So in -- well, let's -- for instance, let's just flip open, then, to Tab 2 --
09:52 A. Sure.
09:52 Q. -- 'cause I know I'll need a little help.
09:52 Just kind of jumping in, so on the first page of Tab 2, there's an item that says Claim 1.
09:52 A. Yeah.
09:52 Q. And Claim 1 is, I think, recited or the preamble is recited there in that first column. So when you got to the word, for instance, "Predetermined database," did you construe that phrase or term?
09:52 A. I construed it to have its ordinary meaning.
09:52 Q. Okay. And what meaning is it that you ascribe

09:52 to that?
09:52 A. I ascribed the database to be a database which is a conceptual structure that stores data where the data, prior to run time, had been fixed.
09:53 Q. All right. So given that interpretation or construction, have you -- have -- did you put that down, that definition you just gave me, anywhere in your report or the tabs that we're looking at?
09:53 A. No. As I said, I -- I considered that construction is defined operationally in terms of the evidence provided. Ultimately, the court construes the claims, but my belief is that predetermined database takes on its ordinary meaning.
09:53 Q. Okay. Okay. When you say "operationally," are you making a distinction between operationally and functionally?
09:53 A. That sounds like a legal question. Operationally, I'm using the term in the vernacular meaning that the -- the testimony and the references to the TriZetto literature that supports the claim-infringement documentation assumes that there -- there are definitions of those terms that are consistent with the testimony provided and by the quotes from the product literature.
09:54 Q. I don't want to mischaracterize, so let me

09:54 make sure I understand it. For instance, the definition you gave me for predetermined database --
09:54 A. Right.
09:54 Q. -- a minute ago, reading through the -- the sections or the deposition cited sections here, what people had to say about the predetermined database was consistent with what the ordinary meaning or the definition you ascribed to predetermined database was.
09:54 A. That's correct.
09:54 Q. And so therefore, there was no question in your mind as to what predetermined database was.
09:54 A. I assumed the ordinary interpretation --
09:54 Q. And --
09:54 A. -- and my assumption was that the deponents that are -- whose testimony is provided here did so as well.
09:54 Q. Okay. Okay. Well, for instance, what's cited here is the deposition of Jeffrey Margolis, the CEO from TriZetto. Are you assuming, then, that -- that the CEO of TriZetto knows what a predetermined database is from the context of somebody who, you know, works in knowledge-based expert systems like yourself?
09:55 A. I'm assuming that someone who has knowledge of information technology would assume the ordinary meaning of that term.

09:55 Q. Okay. And that Mr. Margolis knew what that meaning was?
09:55 A. That is correct.
09:55 Q. And the same thing with Anthony Bellomo and then the rest of the people here, right?
09:55 A. That's correct.
09:55 Q. Including the customer -- I think there's two customers cited here. One is Providence Health Plan and the other is Blue Cross Blue Shield.
09:55 A. Correct.
09:55 Q. Okay.
09:56 A. If I can clarify my question [sic], predetermined database is not a term that you would ordinarily see in the computer science literature. That's an -- the adjective is odd, and so it would be unusual to assume that that would have a special meaning with respect to --
09:56 THE REPORTER: "With respect to" what?
09:56 THE WITNESS: People skilled in computer science.
09:56 BY MR. SITZMAN:
09:56 Q. Assuming -- I think what you said was it's not a word that normally appears.
09:56 A. It -- that is correct, that the database literature would not typically make a distinction

just those two codes that you identified? Are there other codes on the claim? And you mentioned a system as well. That's the first time I've sort of heard that in hypothetical.

BY MR. SITZMAN:

Q. Well, is it possible for you to answer my question?

A. It's -- it's hard because it depends on the policies that are in place by a particular payer dealing with that particular situation, and so I -- I can't tell you in a generic sense how that would be handled.

In many situations, the code or the claim for the tray would be summarily rejected and then there would have to be an appeal on the part of the healthcare organization; in other cases there might be a way of providing documentation up front, but it's very situation-specific.

Q. And I -- and I apologize for getting too far upfield here. I guess I wanted to really focus in on -- on where you were going with or your interpretation of mutually exclusive due to non-medical criteria, and I think your non-medical criteria has to do, in the hypotheticals we've been talking about, is really things like procedural trays, and that's what would make it mutually exclusive, the lumbar tray example that you

gave us.

MR. HENDERSHOT: I'm going to object that misstates his testimony. I think that was an example that he gave but --

THE WITNESS: We can explore other examples, if you think that would be better.

BY MR. SITZMAN:

Q. No. I think we'll come back -- we'll come back to it.

A. Okay.

Q. Yeah. Where -- let's look real quickly at the patent, the '164 patent.

A. Sure.

Q. Where in the patent have, returning back to the non-medical criteria, is non-medical criteria defined as you have defined it?

A. Well, the narrative of the patent doesn't actually use those terms. It does not make a distinction here. The claims make a distinction between medical and non-medical, and I believe in my interpretation the claims are doing that so that they can claim the universe of criteria.

Q. And I under -- I understand where you are with -- with the claim, you know, the mutual exclusivity, but in terms of trying to figure out what

criterion is used between medical and non-medical, is there anything in the patent that gives any guidance as to that?

A. The patent specification provides the basis by which one can implement the predetermined database that contains the codes that are mutually exclusive. The method provided by the patent is sufficiently broad and general that it doesn't need to make a distinction between medical or non-medical. That presumably is left as a distinction that the implementer of the database would make.

Q. But someone reading a -- for instance, the claim -- what claim are we on? I think it may be Claim 2 in the patent.

A. Let me see if I have the claims marked here.

MR. HENDERSHOT: The last couple pages.

THE WITNESS: Yeah.

MR. HENDERSHOT: It would be all the way in the back.

THE WITNESS: Here we go.

BY MR. SITZMAN:

Q. Yeah, it's Column 117.

A. Yep.

Q. Claim 2, in the step that says, "determining," "determining whether one of the medical service codes in

the at least one claim is mutually exclusive due to non-medical criteria with any other medical service code in the at least one claim."

A. Okay.

Q. So someone reading that, how do they know, I think what you're telling me is that it's up to the database programmer, but somebody reading this claim needs to understand the scope of the patent claim. What is it that tells me what the non-medical criteria is?

MR. HENDERSHOT: You mean outside of the ordinary meaning he identified earlier?

MR. SITZMAN: Well, and -- and if that's what he wants to tell me, that non-medical criteria has ordinary meaning and that was the ordinary meaning that he gave it, that's fine.

Q. But I need to either know whether or not that's your interpretation of ordinary meaning or if it's in the patent somewhere.

A. Well, my -- my testimony was that it's not essential for the database implementer to make that distinction between medical and non-medical because the framework provided by the patent is sufficiently general that it will apply to criteria of both kinds.

Q. "Both kinds" being?

A. Medical and non-medical. That the data --

database implementer has available a structure provided by the patent that allows mutual exclusivity among conditions to be represented in the database. It is really immaterial to the desi- -- to the entry of the codes into the database as to whether they are specifically medical or non-medical, but the developer can take advantage of both non-medical and medical relationships in building the database.

Q. I think what you're saying is it doesn't matter what the definition is of medical/non-medical. It's -- frankly, it can be anything because it's really just a relationship of the codes that's important.

MR. HENDERSHOT: Objection. Vague and ambiguous as to -- I think that misstates his testimony. I think he said in -- in developing a system, an automatic system.

THE WITNESS: It certainly matters for reimbursement. It certainly matters in terms of building the database in terms of its logical content. From a computational perspective, it doesn't matter, is what I'm saying.

BY MR. SITZMAN:

Q. How do you distinguish between those products or methods that infringe this claim and those that don't if you don't have a definition of non-medical criteria

in which to say, oh, that system infringes and this system doesn't?

A. Well, I -- I provided a definition which I think is reasonable and I think is -- would be assumed by -- by -- by most -- most people that a medical claim, rather, a criterion which is medical deals with the procedure applied to the patient as a -- and is a consequence of the medical condition of the patient as opposed to a non-medical criterion which is a function of the mechanics of setting up the procedure or of billing.

Q. You had a chance to review the depositions of the inventors in this case.

A. Yes.

Q. Were you at all startled to find out that each of the inventors had no idea what non-medical criteria meant?

MR. HENDERSHOT: Objection. Vague and ambiguous as to "startled" and misstates the testimony of the inventors.

BY MR. SITZMAN:

Q. Well, you read them. Please ascribe whatever adjective you want. But wasn't it interesting at all to you that each of the inventors had no idea what non-medical criteria meant?

A. It was interesting. I wasn't startled. I would say that, again, you have to take the claims in context, and I believe that the attorneys who wrote the claims were trying to make a statement that the universe of criteria, both non-medical and medical, applied in this case. And so I was not startled that the inventors may not have been completely clear about where the -- the boundary line is, but I have a -- I mean I, and I'm sure the inventors, have good intuition about what the differences are.

Q. What about others, other people reading the patent and trying to figure out what medical and non-medical means?

A. I guess as I read it in the context of the overall set of claims, I view this as a way of the author of the claims communicating that the universe of conditions is covered by the -- the criteria of which the database is capable of representing relationships. I did not read this as a way of necessarily defining rigid boundaries between what is medical and what is non-medical.

Q. And I think you used the phrase for that reason, that last point, in terms of a functional perspective, it doesn't matter, then, what the definition or the boundary is between medical and

non-medical.

MR. HENDERSHOT: Objection. Misstates his testimony as to -- and it's vague and ambiguous as to from a functional perspective.

THE WITNESS: From a computational perspective, it doesn't make a difference.

BY MR. SITZMAN:

Q. And explain to me from the computational perspective. What do you mean when you say from a computational -- from a -- well, why don't you explain computational?

A. [Simultaneously] Okay. That the database that the McKesson product provides allows one to specify relationships among claims that could be classified in a variety of ways, including medical and non-medical. And so in terms of the processing that's necessary to determine whether claims need to be excluded or edited or whatever, the computations are the same.

Now, obviously, when you say functional, that has a legal implication, and whether one wants to include non-medical or medical claims in a particular system as implemented at the site of a particular payer is a matter of the policies of the organization that purchases a system and how it wants claims to be adjusted. So that -- that's -- those are -- those are

going into areas that depart from simply the computational framework.

Q. If you made a database and I made a database and we dis- -- we -- we distinguish from the same universe of codes, and I lumped mine medical and non-medical and you lumped yours medical and non-medical, what's the likelihood that, based on the disclosure in the patent, that we will come up with identical results, that you and I will both categorize the same codes as non-medical and the same codes as -- as medical?

MR. HENDERSHOT: Your hypothetical's incomplete.

Do you have the same understanding of the ordinary meaning that he articulated when you built your database?

MR. SITZMAN: I -- I want him to assume that I am a person who is ordinary, skilled in the art, and that we are going to sit down and come up with -- we're both going to look at the same universe, go through the codes, and based on the disclosure in the patent, segregate those that are non-medical from those that are medical.

THE WITNESS: But you're -- you're making assumption that there is an intrinsic property of the

codes or a combination of the codes that defines relationship as being medical or non-medical. In some sense that's a -- an issue that reflects the policy of the organization that's implementing the database, so it's not something that is an inherent component of the codes as much as the organization that implements the database and decides how to structure it.

BY MR. SITZMAN:

Q. It's a -- I'm sorry.

A. Oh, go ahead.

Q. I didn't want to interrupt you, and I did.

A. I think the -- the more generic question is if two people were to sit down and create any kind of a database of any large scale, would they make exactly the same design decision, the answer's of course not.

Q. And -- and I'm not talking about design. I'm just talking about lumping at this point in time, really just categorizing between medical and non-medical --

A. Right.

Q. And those -- those, I'm sorry, that are mutually exclusive due to non-medical criteria.

A. See, in my mind it -- it's pretty straightforward, that if I'm dealing with combinations of codes that relate to the medical procedure. The example, of course, here is cholecystectomy --

THE REPORTER: "Cholecystectomy" --

THE WITNESS: I'm sorry. Cholecystectomy with sphincterotomy versus cholecystectomy as one code and sphincterotomy as the second code. What I -- I think anyone would assume the ordinary meanings there, that those are medical procedures that are typically combined and should not be billed separately. I think that, unambiguously, is a medical relationship.

If I look at whether I'm going to bill for both the lumbar puncture and the lumbar puncture tray, unambiguously, in my mind, that is a non-medical distinction because the two codes relate to the mechanics of how you get billed and reimbursed.

If I'm looking at a situation where a surgeon is repairing a laceration and there's one -- and there -- there are two lacerations, each of, say, 2 centimeters and -- and do I get -- do I bill for two 2-centimeter lacerations? Do I bill for one 4-centimeter laceration? It turns out there are policies that are set forth for reimbursement that determine how those are billed. Those are not really medical. The patient doesn't care whether he gets billed one way or the other. He obviously wants the lacerations repaired. But that is a function of the -- of the medical care process, and I view that as

non-medical.

BY MR. SITZMAN:

Q. What about a -- a -- a hysterectomy for a male patient, is that considered a non-medical criteria?

MR. HENDERSHOT: Are you talking about a -- in -- in your hypothetical, is there a code saying it's a male patient or are we -- or are we just talking about non-medical generally --

MR. SITZMAN: Yeah.

MR. HENDERSHOT: -- or as between two codes?

MR. SITZMAN: Yeah. Well, I'm trying -- as between a hysterectomy, a code that's being submitted, a claim that's being submitted for hysterectomy for a patient who turns out to be a male patient. Is that -- is the -- the fact that he is a male patient a non-medical criteria upon which the code is mutually exclusive?

THE WITNESS: I think that would be a potential -- I'm about to sneeze. Hold on.

MR. HENDERSHOT: While he does that, I'm going to object. Your hypothetical's incomplete. Are we talking about a medical service code for male patient or a medical service code for hysterectomy or is there -- does the claim just indicate it's a male patient?

MR. SITZMAN: It could be a code for a male

State of CALIFORNIA )

County of Santa Clara )

I, the undersigned, declare under penalty of that I have read the foregoing transcript, and I have made any corrections, additions or deletions that I was desirous of making; that the foregoing is a true and correct transcript of my testimony therein.

EXECUTED this 17 day of December, 2005, at Stanford, CA.

(City) (State)

[signature], MD, PhD

MARK MUSEN, M.D., PH.D.

# EXHIBIT 6
# REDACTED IN ITS ENTIRETY

# EXHIBIT 7

**AN EXPERT OPINION IN THE MATTER OF:**

# McKesson Information Solutions, LLC v. The TriZetto Group, Inc.

**RE: U.S. Patent No. 5,253,164**

**SYSTEM AND METHOD FOR DETECTING FRAUDULENT MEDICAL CLAMS VIA EXAMINATION OF SERVICE CODES**

OPINION PREPARED BY:

**Philip M. Hawley, Jr., MD**

October 24, 2005

| | | |
|---|---|---|
| **Section One:** | Qualifications | 1 |
| **Section Two:** | Disclosures | 3 |
| **Section Three:** | Health Insurance Industry Trends, Medical Billing Practices, & Claim Auditing Prior To September 30, 1987 | 4 |
| **Section Four:** | Claims Of The '164 patent | 8 |
| **Section Five:** | Opinions Concerning The '164 Patent | 13 |
| **Appendix A:** | Curriculum Vitae – Philip M. Hawley, Jr., MD | 30 |

early 1980s? Ironically, most physicians with whom I discussed this issue at that time did not view their "creative" billing as an attempt to defraud insurers, but rather as a means of achieving what they considered fair and just compensation for their services. With the advent of managed care, physicians were subjected to increasing amounts of paper work for which they were not reimbursed, and had negotiated reduced per-service fee rates in exchange for the promise of increased patient volume that in many cases never materialized. For many physicians, the cost of managing their offices was rising while their incomes were stagnating or declining. Furthermore, many physicians felt that public and private payors were unfairly targeting doctors, as when, in 1984, Medicare temporarily froze physician fees. Unbundling and similarly irregular billing practices were, in the view of some physicians, simply a means of earning what they considered equitable reimbursement for their services.

Moreover, an entire cottage industry relating to physician billing had sprung up by the mid 1980s. Several so-called consulting firms specialized in training the billing personnel in physicians' offices how to maximize their reimbursement by using unorthodox billing techniques. By 1985, it had become a classic game of cat-and-mouse, and some insurance companies sent their supervising claim examiners and/or claim auditing staff to these seminars (as I did) to identify trends in what we considered clearly deceptive billing practices.

During this period, pre-payment medical claim auditing practices varied from company to company, just as business practices do in most industries. Some insurance companies had a defined audit initiation procedure with specific criteria for triggering a medical claim audit, while others relied on the coding knowledge and judgment of their claim examiners to trigger an audit. [10]

Many of the larger insurers had one or more physicians on staff (and, often, some registered nurses) who were proficient in coding and billing practices. In addition, many insurers had a formal or informal panel of physician auditors—practicing physicians in various specialties who, for a fee, would audit claims when the coding and billing issues required specialty-matched review.

By the mid 1980s, medical claim auditing (using CPT coding conventions) by health insurance companies and HMOs was a commonplace activity.

---

[10] In this context, claim examiners are non-medical personnel trained to process medical claims.

Date: October 24, 2005

Philip M. Hawley, Jr., M.D.

# EXHIBIT 8

HIPAA Training 101: Achieving HIPAA Compliance Seminar

Page 1 of 3

| Home | Contact Us | Site Map | Sea

About Us | Healthcare Solutions | Healthcare Services | Partners | News & Events | Investors | Careers

Core Administration

Consumer-Directed

Care Management

Medicare

Medicaid

E-business

Connectivity

Network Management

HIPAA

HIPAA Gateway

HIPAA Privacy

HIPAA Training

# Healthcare Solutions: Health Plans

## HIPAA Training

COURSE: 101 Achieving HIPAA Compliance Seminar

A 3-Day, instructor-led, interactive session with a focus on the fundamentals of HIPAA Awareness and how to complete a HIPAA Gap Analysis. Topics covered include a detailed review of the HIPAA regulations and key compliance considerations for all areas of HIPAA including Transactions and Code Sets, Standard National Identifiers, Privacy, Security and Enforcement.

Session provides a unique environment for classroom interaction with a good cross section of other HIPAA Stakeholders from across the country. Recommended for HIPAA Stakeholders and Decision Makers, Managers, Human Resource Managers, Legal, Technical and Compliance Officers.

Back to Course List

DAY ONE

**HIPAA Regulatory Environment**
An executive summary of all HIPAA fundamentals, including an essential but brief overview of all HIPAA regulatory components – including an update of recent regulatory changes and enforcement updates. All key areas of the HIPAA regulations are covered including Transaction Sets, Code Sets and Standard Identifiers compliance, compliance for the HIPAA Privacy and Security Rules, and Enforcement considerations (1 hour, 30 minutes).

**HIPAA Compliance Checklist**
An overview of all major compliance impacts for HIPAA Covered Entities and their Business Associates. Key management, organizational and technical considerations are reviewed to provide a foundation for the development of a long-term HIPAA compliance program (1 hour, 30 minutes).

**HIPAA Standard Transaction Sets**
Review of HIPAA Transaction Set standards including the HIPAA EDI framework, who must comply, and under what conditions the HIPAA standard transactions apply. Use and function of the HIPAA EDI transactions are covered, including the standard HIPAA data elements and use and interpretation of the Implementation Guides (1 hour, 15 minutes).

**HIPAA Standard Code Sets and National Identifiers**
Review of medical and non-medical Code Sets and requirements for the four proposed national standard identifiers. Code Sets covered include Diagnosis codes, Procedure codes, Remark codes, Adjustment codes, and provider taxonomy codes. Includes code set mapping exercise (1 hour, 15 minutes).

DAY TWO

http://www.trizetto.com/hpSolutions/hipaaTraining101.asp 1/20/2006

**HIPAA Privacy Rule**
Detailed overview of HIPAA Privacy Rule including the April 13, 2003 compliance deadline, recent NPRM updates and strategies for compliance. All 58 requirements of the Privacy Rule are covered, including requirements for administrative requirements, individual rights, staff training, and implications of the general requirement to implement HIPAA Security. Includes Business Associate Mapping Exercise (2 hours).

**HIPAA Security Rule**
Review of the proposed HIPAA Security Rule including case for general security compliance concurrent with the April 2003 Privacy compliance date, core considerations and reasonable approaches to risk mitigation. All 12 requirements of the proposed rule, including Administrative requirements, Physical Safeguards, and Technical Services and Technical Mechanisms (1 hour, 30 minutes).

**HIPAA Privacy and Security Intersections**
Framework for understanding how Privacy and Security rules intersect includes a rational and simple approach to compliance strategies.. Comprehensive framework for development of operational policies and procedures for both HIPAA Privacy and Security is examined, as well a key considerations and an examination of industry best practices of how implementing security measures can ensure protecting of the confidentiality, integrity and availability of healthcare data. Includes Business Scenarios Exercise (1 hour, 30 minutes).

**HIPAA Assessment Methodology**
Overview of a full lifecycle HIPAA-compliance framework, including assessment, solution design, implementation and ongoing compliance management. A detailed focus on the assessment process includes details of how to conduct an efficient and comprehensive HIPAA assessment, including survey tools, work plan, gap and risk analyses (1 hour, 30 minutes).

DAY THREE

**HIPAA Assessment Case Studies**
Detailed side-by-side review of assessment outcomes for representative Health Plans, TPAs, Benefits Administrators and Hybrid organizations. Commonalities and key differences are examined and analyzed for impacts and prioritization (1 hour, 30 minutes).

**HIPAA Expert Panel**
Dial-In Q&A panel with nationally recognized HIPAA experts. Product Q&A included (1 hour).

**HIPAA Roundtable**
Open discussion and general Q&A (1 hour, 30 minutes).

## Information

For more detailed information, please call 1-800-569-1222 or click on the link below.

Request more information Contact a sales rep

© 2000-2006 The TriZetto Group, Inc. All rights reserved.

EXHIBIT 9



# Merriam-Webster's Collegiate® Dictionary

TENTH EDITION

Merriam-Webster, Incorporated
Springfield, Massachusetts, U.S.A.

Case 1:04-cv-01258-SLR Document 264-3 Filed 01/25/2006 Page 47 of 47

them of the carbon dioxide formed in energy-producing reactions **3** : any of various energy-yielding oxidative reactions in living matter — **re·spi·ra·to·ry** \'res-p(ə-)rə-ˌtōr-ē, ri-'spī-rə-, -ˌtȯr-\ *adj*

**res·pi·ra·tor** \'res-pə-ˌrā-tər\ *n* (1836) **1** : a device worn over the mouth or nose for protecting the respiratory tract **2** : a device for maintaining artificial respiration

**respiratory pigment** *n* (1896) : any of various permanently or intermittently colored conjugated proteins and esp. hemoglobin that function in the transfer of oxygen in cellular respiration

**respiratory quotient** *n* (ca. 1890) : a ratio indicating the relation of the volume of carbon dioxide given off in respiration to that of the oxygen consumed

**respiratory system** *n* (1940) : a system of organs subserving the function of respiration and in air-breathing vertebrates consisting typically of the lungs and their nervous and circulatory supply and the channels by which these are continuous with the outer air

**re·spire** \ri-'spī(ə)r\ *vb* **re·spired; re·spir·ing** [ME, fr. L *respirare*, fr. *re-* + *spirare* to blow, breathe] *vi* (15c) **1** : BREATHE; *specif* : to inhale and exhale air successively **2** *of a cell or tissue* : to take up oxygen and produce carbon dioxide through oxidation ~ *vt* : BREATHE

**res·pi·rom·e·ter** \ˌres-pə-'rä-mə-tər\ *n* (ca. 1883) : an instrument for studying the character and extent of respiration — **res·pi·ro·met·ric** \-rə-'me-trik\ *adj* — **res·pi·rom·e·try** \-'rä-mə-trē\ *n*

**¹re·spite** \'res-pət *also* ri-'spīt, *Brit usu* 'res-ˌpīt\ *n* [ME *respit*, fr. OF, fr. ML *respectus*, fr. L, act of looking back — more at RESPECT] (13c) **1** : a period of temporary delay; *esp* : REPRIEVE 1b **2** : an interval of rest or relief

**²respite** *vt* **re·spit·ed; re·spit·ing** (14c) **1** : to grant a respite to **2** : PUT OFF, DELAY

**re·splen·dence** \ri-'splen-dən(t)s\ *n* (15c) : the quality or state of being resplendent : SPLENDOR

**re·splen·den·cy** \-dən(t)-sē\ *n* (1611) : RESPLENDENCE

**re·splen·dent** \-dənt\ *adj* [L *resplendent-, resplendens*, prp. of *resplendēre* to shine back, fr. *re-* + *splendēre* to shine — more at SPLENDID] (15c) : shining brilliantly : characterized by a glowing splendor ⟨meadows ~ with wildflowers — *Outdoor World*⟩ **syn** see SPLENDID — **re·splen·dent·ly** *adv*

**¹re·spond** \ri-'spänd\ *n* (15c) : an engaged pillar supporting an arch or closing a colonnade or arcade

**²respond** *vb* [MF *respondre*, fr. L *respondēre* to promise in return, answer, fr. *re-* + *spondēre* to promise — more at SPOUSE] *vi* (1719) **1** : to say something in return : make an answer ⟨~ to criticism⟩ **2 a** : to react in response ⟨~*ed* to a call for help⟩ **b** : to show favorable reaction ⟨~ to surgery⟩ **3** : to be answerable ⟨~ in damages⟩ ~ *vt* : REPLY **syn** see ANSWER — **re·spond·er** \-'spän-dər\ *n*

**¹re·spon·dent** \ri-'spän-dənt\ *n* [L *respondent-, respondens*, prp. of *respondēre*] (1528) **1** : one who responds: as **a** : one who maintains a thesis in reply **b** (1) : one who answers in various legal proceedings (as in equity cases) (2) : the prevailing party in the lower court **c** : a person who responds to a poll **2** : a reflex that occurs in response to a specific external stimulus — compare OPERANT

**²respondent** *adj* (1726) **1** : making response : RESPONSIVE; *esp* : being a respondent at law **2** : relating to or being behavior or responses to a stimulus that are followed by a reward ⟨~ conditioning⟩ — compare OPERANT 1

**re·sponse** \ri-'spän(t)s\ *n* [ME & L; ME *respounse*, fr. MF *respons*, fr. L *responsum* reply, fr. neut. of *responsus*, pp. of *respondēre*] (14c) **1** : an act of responding **2** : something constituting a reply or a reaction: as **a** : a verse, phrase, or word sung or said by the people or choir after or in reply to the officiant in a liturgical service **b** : the activity or inhibition of previous activity of an organism or any of its parts resulting from stimulation **c** : the output of a transducer or detecting device resulting from a given input

**re·spon·si·bil·i·ty** \ri-ˌspän(t)-sə-'bi-lə-tē\ *n, pl* **-ties** (1787) **1** : the quality or state of being responsible: as **a** : moral, legal, or mental accountability **b** : RELIABILITY, TRUSTWORTHINESS **2** : something for which one is responsible : BURDEN

**re·spon·si·ble** \ri-'spän(t)-sə-bəl\ *adj* (1643) **1 a** : liable to be called on to answer **b** (1) : liable to be called to account as the primary cause, motive, or agent ⟨a committee ~ for the job⟩ (2) : being the cause or explanation ⟨mechanical defects were ~ for the accident⟩ **c** : liable to legal review or in case of fault to penalties **2 a** : able to answer for one's conduct and obligations : TRUSTWORTHY **b** : able to choose for oneself between right and wrong **3** : marked by or involving responsibility or accountability ⟨~ financial policies⟩ ⟨a ~ job⟩ **4** : politically answerable; *esp* : required to submit to the electorate if defeated by the legislature — used esp. of the British cabinet — **re·spon·si·ble·ness** *n* — **re·spon·si·bly** \-blē\ *adv*

**syn** RESPONSIBLE, ANSWERABLE, ACCOUNTABLE, AMENABLE, LIABLE mean subject to being held to account. RESPONSIBLE implies holding a specific office, duty, or trust ⟨the bureau *responsible* for revenue collection⟩. ANSWERABLE suggests a relation between one having a moral or legal obligation and a court or other authority charged with oversight of its observance ⟨an intelligence agency *answerable* to Congress⟩. ACCOUNTABLE suggests imminence of retribution for unfulfilled trust or violated obligation ⟨elected officials are *accountable* to the voters⟩. AMENABLE and LIABLE stress the fact of subjection to review, censure, or control by a designated authority under certain conditions ⟨laws are *amenable* to judicial review⟩ ⟨not *liable* for the debts of the former spouse⟩.

**re·spon·sions** \ri-'spän(t)-shənz\ *n pl* [ME *responciouns* response, sum to be paid, fr. MF or ML; MF *responsion*, fr. ML *responsion-, responsio*, fr. L, answer, fr. *respondēre*] (1813) : an examination required for matriculation as an undergraduate at Oxford

**re·spon·sive** \ri-'spän(t)-siv\ *adj* (15c) **1** : giving response : constituting a response : ANSWERING ⟨a ~ glance⟩ ⟨~ aggression⟩ **2** : quick to respond or react appropriately or sympathetically : SENSITIVE **3** : using responses ⟨~ worship⟩ — **re·spon·sive·ly** *adv* — **re·spon·sive·ness** *n*

**re·spon·so·ry** \-'spän(t)s-(ə-)rē\ *n, pl* **-ries** [ME, fr. ML *responsorius*, fr. L *respondere*] (15c) : a set of versicles and responses sung or said after or during a lection

**re·spon·sum** \ri-'spän(t)-səm\ *n, pl* **-sa** \-sə\ [NL, fr. L ... sponse] (1896) : a written decision from a rabbinic auth... sponse to a submitted question or problem

**res pu·bli·ca** \'rās-'pü-bli-ˌkä\ *n* [L — more at REPUBLIC] ... : COMMONWEALTH, STATE, REPUBLIC **2** : COMMONWEAL

**res·sen·ti·ment** \rə-ˌsäⁿ-tē-'mäⁿ\ *n* [F, resentment, fr. ... — more at RESENT] (1941) : deep-seated resentment, ... hostility accompanied by a sense of being powerless to ... feelings directly

**¹rest** \'rest\ *n* [ME, fr. OE; akin to OHG *rasta* rest and ... *ruowa* calm] (bef. 12c) **1** : REPOSE, SLEEP; *specif* : a bodily ... terized by minimal functional and metabolic activities **2** ... from activity or labor **b** : a state of motionlessness or ... : the repose of death **3** : a place for resting or lodging ... mind or spirit **5 a** (1) : a rhythmic silence in music ... ter representing such a silence **b** : a brief pause in reading ... thing used for support — **at rest 1** : resting or reposing ... or death **2** : QUIESCENT, MOTIONLESS **3** : free of anxiety ...

rest 5a(2): *1* whole, *2* half, *3* quarter, *4* eighth, *5* ...

**²rest** *vi* (bef. 12c) **1 a** : to get rest by lying down; ... lie dead **2** : to cease from action or motion : refrain ... exertion **3** : to be free from anxiety or disturbance **4** ... fixed or supported ⟨a column ~*s* on its pedestal⟩ **5** ... confident : TRUST ⟨cannot ~ on that assumption⟩ **b** ... founded ⟨the verdict ~*ed* on several sound precedents⟩ ... for action or accomplishment ⟨the answer ~*s* with you⟩ ... : to remain idle or uncropped **8** : to bring to an end ... introduction of evidence in a law case ~ *vt* **1** : to ... set at rest **3** : to place on or against a support **4** ... firmly fixed ⟨~*ed* all hope in his child⟩ **5** : to stop ... presenting evidence pertinent to (a case at law) — **rest·er** ...

**³rest** *n* [ME *reste*, lit., stoppage, short for *areste*, fr. ... *arester* to arrest] (14c) : a projection or attachment on ... breastplate of medieval armor for supporting the butt ...

**⁴rest** *n* [ME, fr. MF *reste*, fr. *rester* to remain, fr. L *restare* ... to stand — more at STAND] (15c) : something that remains : REMAINDER ⟨ate the ~ of the candy⟩ — **for the rest** ... remaining issues or needs

**re·start** \(ˌ)rē-'stärt\ *vt* (1845) **1** : to start anew **2** ... activity) after interruption ~ *vi* : to resume operation ... \'rē-ˌstärt, (ˌ)rē-'\ *n* — **re·start·able** \-'stär-tə-bəl\ *adj*

**re·state** \(ˌ)rē-'stāt\ *vt* (ca. 1713) : to state again or in a ...

**re·state·ment** \-mənt\ *n* (1803) **1** : something that ... : the act of restating

**res·tau·rant** \'res-t(ə-)rənt, -tə-ˌränt, -ˌtränt, -tərnt\ ... *restaurer* to restore, fr. L *restaurare*] (1827) : a business ... where meals or refreshments may be procured

**res·tau·ra·teur** \ˌres-tə-rə-'tər\ *also* **res·tau·ran·teur** ... *restaurateur*, fr. LL *restaurator* restorer, fr. L *restaurare* ... operator or proprietor of a restaurant

**rest·ful** \'rest-fəl\ *adj* (14c) **1** : marked by, affording ... rest and repose ⟨a ~ color scheme⟩ **2** : being at rest ... COMFORTABLE — **rest·ful·ly** \-fə-lē\ *adv* — **rest·ful·ness** ...

**rest home** *n* (1926) : an establishment that provides ... eral care for the aged or the convalescent

**rest house** *n* (1807) : a building used for shelter by ...

**rest·ing** *adj* (14c) **1** : being or characterized by dormancy ... ⟨a ~ spore⟩ ⟨bulbs in the ~ state⟩ **2** : not undergoing ... division : VEGETATIVE ⟨a ~ nucleus⟩

**res·ti·tute** \'res-tə-ˌtüt, -ˌtyüt\ *vb* **-tut·ed; -tut·ing** [L ... *restituere*] *vt* (ca. 1500) **1** : to restore to a former ... : GIVE BACK; *esp* : REFUND ~ *vi* : to undergo restitution

**res·ti·tu·tion** \ˌres-tə-'tü-shən, -'tyü-\ *n* [ME, fr. AF ... *restitutio*, fr. *restituere* to restore, fr. *re-* + *statuere* ... STATUTE] (14c) **1** : an act of restoring or a condition ... as **a** : a restoration of something to its rightful owner ... good of or giving an equivalent for some injury ... serving to cause restoration of a previous state

**res·tive** \'res-tiv\ *adj* [ME *restyf*, fr. MF *restif*, fr. ... remain] (15c) **1** : stubbornly resisting control : ... impatience : FIDGETY **syn** see CONTRARY — **res·tive·ly** ... — **res·tive·ness** *n*

**rest·less** \'rest-ləs\ *adj* (bef. 12c) **1** : lacking or denying rest ... ⟨a ~ night⟩ **2** : continuously moving : UNQUIET ... : characterized by or manifesting unrest esp. of mind ... : CHANGEFUL, DISCONTENTED — **rest·less·ly** *adv* — ...

**rest mass** *n* (1914) : the mass of a body exclusive of ... the body acquires by its motion according to the theory ...

**re·stor·able** \ri-'stȯr-ə-bəl, -'stōr-\ *adj* (1611) : fit for ... claiming

**re·stor·al** \-əl\ *n* (1611) : RESTORATION

**res·to·ra·tion** \ˌres-tə-'rā-shən\ *n* (14c) **1** : an act of ... condition of being restored: as **a** : a bringing back to a former position ... tion or condition : REINSTATEMENT ⟨the ~ of peace⟩ ... **c** : a restoring to an unimpaired or improved condition ... painting⟩ **d** : the replacing of missing teeth or crowns ... that is restored; *esp* : a representation or reconstruction ... form (as of a fossil or a building) **3** *cap* **a** : the ... monarchy in England in 1660 under Charles II **b** ... glish history usu. held to coincide with the reign ... sometimes to extend through the reign of James II

**¹re·stor·ative** \ri-'stȯr-ə-tiv, -'stōr-\ *adj* (14c) : of or relating to restoration; *esp* : having power to restore

**²restorative** *n* (15c) : something that serves to restore ... ness, vigor, or health

**re·store** \ri-'stȯr, -'stōr\ *vt* **re·stored; re·stor·ing** ...