IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

MCKESSON INFORMATION SOLUTIONS LLC, )
)
)          C.A. No. 04-1258 (SLR)
    Plaintiff, )
)          **REDACTED VERSION**
    v. )
)
THE TRIZETTO GROUP, INC., )
)
    Defendant. )

**THE TRIZETTO GROUP, INC.'S SUPPLEMENTAL APPENDIX
OF EXHIBITS IN SUPPORT OF ITS REPLY BRIEF IN SUPPORT
OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT OF LACHES**

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Jack B. Blumenfeld (#1014)
Rodger D. Smith II (#3778)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
   *Attorneys for Defendant*
   *The TriZetto Group, Inc.*

OF COUNSEL:

Jeffrey T. Thomas
David Segal
Michael A. Sitzman
GIBSON, DUNN & CRUTCHER LLP
Jamboree Center, 4 Park Plaza
Irvine, CA 92614

Original Filing Date: January 20, 2006

Redacted Filing Date: January 27, 2006

**THE TRIZETTO GROUP, INC.'S SUPPLEMENTAL APPENDIX OF EXHIBITS
IN SUPPORT OF ITS REPLY BRIEF IN SUPPORT OF ITS MOTION FOR
PARTIAL SUMMARY JUDGMENT OF LACHES**

| Appendix Exhibit Number | Description |
|---|---|
| 31. | Excerpts from the deposition of Marcia Radosevich, taken July 7, 2005 |
| 32. | Excerpts from the deposition of Carolyn Wukitch, taken August 26, 2005 |
| 33. | Excerpts from the deposition of Michael Cesarz, taken September 9, 2005 |
| 34. | MCK 034231-MCK 034234 |
| 35. | Excerpts from the deposition of Mark Musen, taken November 22, 2005 |
| 36. | Excerpts from the deposition of Jeffrey Margolis, taken October 3, 2005 |
| 37. | Excerpts from the deposition of Michael Wagner, taken November 21, 2005 |
| 38. | Excerpts from the deposition of John Danza, taken September 12, 2005 |
| 39. | Excerpts from the deposition of Anthony Bellomo, taken September 19, 2005 |
| 40. | Excerpts from the deposition of Robert Hertenstein, taken September 14, 2005 |

# Exhibit 31

Redacted

# Exhibit 32

Redacted

# Exhibit 33

Redacted

Exhibit 34

Redacted

# Exhibit 35

1          IN THE UNITED STATES DISTRICT COURT

2          FOR THE DISTRICT OF DELAWARE

3

4     MCKESSON INFORMATION          )

      SOLUTIONS, LLC,          )

5                    )

           PLAINTIFF,   )

6     vs.              ) Case No. 04-1258-SLR

                    )

7     THE TRIZETTO GROUP, INC.,    )

                    )

8          DEFENDANT.    )

      _____)

9

10

11

12

13

14     VIDEO DEPOSITION OF MARK MUSEN, M.D., PH.D.

15     Held at Skadden, Arps, Slate, Meagher & Flom

16        525 University Avenue, 11th Floor

17           Palo Alto, California

18      Tuesday, November 22, 2005, 9:11 a.m.

19

20

21

22

23

24     REPORTED BY: CHRIS DE GEORGE, CSR. NO. 7069

25

1

1    Q.  Other than the disclosure of software, have

2    you reviewed anything that tells you what the structure

3    of the software is, what the code is, what the

4    subroutines are, what the processes are, how it

5    processes its claims so that you can identify that

6    portion of the Facets product that carries out that

7    function?

8        MR. HENDERSHOT:  Objection.  Compound, asked

9    and answered.

10        THE WITNESS:  I have not delved down to a

11    lower level of granularity to dissect the -- the

12    component pieces that would allow me to answer that

13    question.  I based my assessment on my understanding of

14    the necessary structure as dictated by the memorandum

15    of -- of September 20th.  And if software is a

16    sufficient means for achieve- -- achieving the necessary

17    functionality, I -- I deem that to be sufficient.

18    BY MR. SITZMAN:

19    Q.  Is it fair to say that you stopped looking or

20    decided not to look beyond the product once you

21    concluded that it must be software-based, and since the

22    functionality was the same, you must conclude that it

23    must have the same structure or a similar structure?

24        MR. HENDERSHOT:  Objection.  Argumentative.

25        THE WITNESS.  My approach seemed very

301

1    reasonable to me.

2    BY MR. SITZMAN:

3        Q.  I'm sorry.  In my statement, was -- was there

4    anything wrong in what I had said?

5        A.  It wasn't -- I do not believe it was necessary

6    to go to a lower level of granularity to ascertain those

7    specific components.

8        Q.  Okay.  And why did you not believe that?

9            MR. HENDERSHOT:  Objection.  Asked and

10    answered.

11            THE WITNESS:  Because if the function needed

12    to be reproduced and the testimony and the -- and the

13    product literature suggests that it was and the

14    structure was clearly software, then my job was done.

15    BY MR. SITZMAN:

16        Q.  Okay.  And then the log- -- logical leap,

17    then, is any software program that performs those

18    functions, according to your analysis, would infringe

19    that claim limitation.

20        A.  That's my understanding of the court memo.

21        Q.  Okay.  And that was the first sentence of

22    paragraph 1 that Mr. Hendershot read to you and not the

23    last two sentences of that -- of the memorandum.

24        A.  I read the entire paragraph.

25        Q.  Okay.  The -- the part that says, on page 2,

302

1    beginning with the word "therefore": "Therefore,

2    plaintiff must supplement its claim construction by

3    identifying those portions of the specification that

4    disclose the correspondence between the software ... and

5    the function disclosed by each claim limitation, as well

6    as the specific algorithm disclosed in the

7    specification, or where it is disclosed (or otherwise

8    inferred) that the algorithm/software is known to those

9    of skill in the art"?

10       MR. HENDERSHOT:  I'm just going to note that

11    you missed the first where it says the correspondence

12    between the software, paren, "the structure," closed

13    paren.

14       MR. SITZMAN:  Okay.

15    Q.  You included that sentence in your analysis

16    that you didn't need to go beyond the fact that it was

17    embodied in software.

18    A.  The algorithms that practice the claims in the

19    '164 patent directly flow from the functions that are

20    described in those claims.  Dr. Davis said as much in --

21    in his initial report.  The algorithms are

22    straightforward and are immediately inferable from the

23    functions.

24    Q.  Well, since we're working on the -- the "means

25    for receiving at least one claim," what is the algorithm

11/22/2005  Musen, Mark

1     we've been asking for for months.

2     BY MR. SITZMAN:

3         Q.  Okay.  Now, is -- is it your testimony, then,

4     that Dr. Johnson has identified -- she has identified

5     the structure of each of the three TriZetto products for

6     each of the means for claims?

7         A.  She has identified the functionality that's

8     embedded in the three products, and the -- to the degree

9     that the software implements the functionality of the

10    claims, yes.

11        Q.  Okay.  She has looked at functionality, and

12    you, based on the functionality, have assumed that the

13    software employed in Facets, QicLink, and ClaimFacts

14    must necessarily be identical to or equivalent to the

15    software disclosed in the patent.

16        A.  It's necessary --

17            MR. HENDERSHOT:  Objection.  Misstates his

18    testimony.

19            THE WITNESS:  It's necessarily equivalent.

20    BY MR. SITZMAN:

21        Q.  It's necessarily equivalent.  Why is it

22    necessarily equivalent?

23            MR. HENDERSHOT:  He said the structure is

24    software.  I mean I just -- if we want to cut to the

25    chase.

1    BY MR. SITZMAN:

2        Q.  Well, we -- we -- I thought we were pretty

3    clear and closed on it this morning, so that's why

4    I'm -- I'm struggling through --

5        A.  I don't think anything's changed.  The

6    algorithms for performing the claims in the '164 patent

7    are straightforward.  There is really a limited way in

8    which those algorithms could be implemented in software,

9    and variations in the design decisions would be

10   relevant.

11           THE REPORTER:  Would be "relevant"?

12           THE WITNESS:  Irrelevant.

13   BY MR. SITZMAN:

14       Q.  And why would they be irrelevant?

15       A.  Because, one, the structure that matters is

16   simply software at this point, but in terms of the

17   capabilities of the system or qualities of the system or

18   its duplication of function, that would be -- precisely

19   how the software would be implemented would be

20   irrelevant 'cause there are infinite ways in which one

21   could program a system but the algorithms would be

22   relatively straightforward and the same.

23       Q.  All right.  Well, let's -- let's -- let's see

24   if we can cut to the chase.  Okay?  Let's get to the

25   bottom line.  I don't mean to cut you off, and I thought

1    it was much clearer this morning, but if we want to get

2    through this, let's see if we can --

3        A.  Okay.

4        Q.  -- come to either a stipulation or a

5    conclusion or a wrap-up.

6            I think what you're saying is the '164 patent,

7    the support, the structure that supports all of the

8    means-plus-function claim language is software in the

9    '164 patent, and it -- and the software performs the

10   function described in the claims, and the TriZetto

11   products, in your opinion, infringe because they perform

12   identical function?

13       A.  Yes.

14       Q.  And they're embodied in software so they must

15   necessarily have either identical software structure or

16   equivalent software structure.  Is that too compound?

17           MR. HENDERSHOT:  I think -- I think there's

18   one -- if -- if I can address one assumption in it.

19           MR. SITZMAN:  Go ahead.

20           MR. HENDERSHOT:  I thought his testimony was

21   that the patent identified software, generally

22   commercially available software, as the structure that

23   performed functions, and that's -- that's my

24   understanding.  I'm not the witness.  If --

25           MR. SITZMAN:  Okay.  Let's -- let's clean it

1  State of CALIFORNIA          )

2  County of _Santa Clara____ )

3

4

5

6

7          I, the undersigned, declare under penalty of

8  that I have read the foregoing transcript, and I have

9  made any corrections, additions or deletions that I was

10 desirous of making; that the foregoing is a true and

11 correct transcript of my testimony therein.

12          EXECUTED this ___17___ day of _December_,

13 2005, at ___Stanford___, ___CA___.

                 (City)              (State)

14

15

16

17

18    _____ , M.D., Ph.D.

           MARK MUSEN, M.D., PH.D.

19

20

21

22

23

24

25

                       326

# Exhibit 36

Redacted

# Exhibit 37

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

---o0o---

McKESSON INFORMATION SOLUTIONS,   )

LLC,                              )

                                  )

        Plaintiff,                )

                                  ) Case No.

    vs.                           ) 04-01258-SLR

                                  )

TRIZETTO GROUP, INC.,             )

                                  )

        Defendant.                )

                                  )

---o0o---

MONDAY, NOVEMBER 21, 2005

VIDEOTAPE DEPOSITION OF MICHAEL J. WAGNER

CONFIDENTIAL TRANSCRIPT

---o0o---

REPORTED BY: BALINDA DUNLAP, CSR 10710, RPR, CRR, RMR

1

BARKLEY COURT REPORTERS (415) 433-5777

1   A.   Well, I think there's some affect of that, but also

2   it had proven over time to be a superior product in the

3   marketplace.

4   Q.   But putting aside the quantity of the sales, was the

5   nature of the competition, in terms of the types of products

6   the companies sold and customers they called on, similar

7   before and after TriZetto acquired Erisco and McKesson

8   acquired HBOC?

9   A.   I think that the type of customers being addressed

10  pretty much is uniform.  But the amount of competition each

11  year may be very different, and I don't have the data to tell

12  me how different it would be.

13  Q.   Turn, please, to page 29 of your report.  With regard

14  to factor No. 8, which is "The established profitability of

15  the product made under the patent, its commercial success and

16  its current popularity."

17      Then your first sentence you state: "For purposes of

18  determining a reasonable royalty, the most relevant

19  profitability data are the infringer's operating profit

20  projections prepared around the date of the hypothetical

21  negotiation." Do you see that?

22  A.   I do.

23  Q.   And here the date of the hypothetical negotiation is

24  October 1993?

25  A.   Yes.

# Exhibit 38

9/12/2005 Danza, John

1  IN THE UNITED STATES DISTRICT COURT

2  FOR THE DISTRICT OF DELAWARE

3

4  McKESSON INFORMATION

   SOLUTIONS, LLC,

5                       Civil Action

          Plaintiff,     No. 04-1258-SLR

6

          vs.

7

   THE TRIZETTO GROUP, INC.,

8

          Defendant.

9

10

11

          _____

12

13  The videotaped deposition of JOHN PETER

14  DANZA, called by the Plaintiff for examination,

15  pursuant to Notice, and pursuant to the Rules of

16  Civil Procedure for the United States District

17  Courts, taken before Sandra L. Rocca, CSR and

18  Notary Public in and for the County of DuPage, and

19  State of Illinois, at 333 West Wacker Drive,

20  Chicago, Illinois, on the 12th day of September,

21  2005, at the hour of 9:45 a.m.

22

23  JOB NO. 38561

24

1

1    ability to perform clinical editing?

2        A.  From the point that I started with the

3    company in 1993, we've always had a module that did

4    that, yes.

5        Q.  When was QicLink first offered as a

6    product?

7        A.  QicLink actually dates to the original

8    name being QicClaim, Q-i-c-C-l-a-i-m, that was

9    originally offered by Resource Information

10   Management Systems early 1980's.  The product, you

11   know, was enhanced over time.  The QicClaim system

12   began offering a clinical editing capability in

13   1992, early 1993.

14       Q.  Was there a point in time where a product

15   called Auto Audit was used as the clinical editing

16   tool for QicLink?

17       A.  Yes, and it still is.

18       Q.  So that's an option for clinical editing

19   — strike that.

20           Auto Audit is a option for a new QicLink

21   customer to select as its clinical editing tool?

22       A.  Yes, it is.

23       Q.  When did TriZetto or its predecessor

24   begin to offer Auto Audit as a clinical editing

I, JOHN PETER DANZA, do hereby declare under penalty of perjury that I have read the foregoing transcript; that I have made any corrections as appear noted, in ink, initialed by me, or attached hereto; that my testimony as contained herein, as corrected, is true and correct.

EXECUTED this *2* day of *December*, 20*05*, at *Naperville*, *Illinois*.
(City)                    (State)


JOHN PETER DANZA

120

# Exhibit 39

Redacted

# Exhibit 40

Redacted

## CERTIFICATE OF SERVICE

I, Melissa Stone Myers, hereby certify that on January 27, 2006 I electronically filed the redacted version of The TriZetto Group, Inc.'s Supplemental Appendix of Exhibits in Support of Its Reply Brief In Support of Its Motion For Partial Summary Judgment of Laches (Redacted Version) with the Clerk of the Court using CM/ECF, which will send notification of such filing(s) to the following:

> Michael A. Barlow
> Skadden, Arps, Slate, Meagher & Flom LLP

I also certify that copies were caused to be served on January 27, 2006 upon the following in the manner indicated:

### BY EMAIL and FEDERAL EXPRESS

> Jeffrey G. Randall
> Skadden, Arps, Slate, Meagher & Flom LLP
> 525 University Avenue
> Suite 1100
> Palo Alto, CA  94301

> /s/     Melissa Stone Myers (#3985)
> Morris, Nichols, Arsht & Tunnell
> 1201 N. Market Street
> P.O. Box 1347
> Wilmington, DE  19899
> (302) 658-9200
> mmyers@mnat.com