# EXHIBIT 26
# REDACTED IN ITS ENTIRETY

EXHIBIT 27


CONRAD
O'BRIEN
GELLMAN
& ROHN, PC

Louis C. Bechtle
*Attorney at Law*
Direct Dial: 215.864.8060
lbechtle@cogr.com

December 19, 2005

Jack B. Blumenfeld, Esquire
Morris, Nichols, Arsht & Tunnell
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899-1347

Michael A. Barlow, Esquire
Skadden Arps, Slate, Meagher & Flom
One Rodney Square
P.O. Box 636
Wilmington, DE  19899

    RE:  McKesson Information Solutions LLC v.
        The TriZetto Group, Inc.
        No. 04-1258 (SLR) (D.Del.)

Dear Counsel:

    Enclosed herewith is Special Master Order No. 5 in the above-referenced matter.

            Sincerely,

            Louis C. Bechtle

LCB/jrw
Enclosure

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| MCKESSON INFORMATION SOLUTIONS, LLC, | : |
| Plaintiff, | : |
| v. | :     NO.: 04-1256-SLR |
| THE TRIZETTO GROUP, INC., | : |
| Defendant. | : |

### SPECIAL MASTER ORDER NO. 5

Louis C. Bechtle, Special Discovery Master         December 19, 2005

      In correspondence provided to the Special Discovery Master (SDM) by counsel ( Defendants' letters of October 18, 2005, November 10, 2005, and plaintiff's letter of November 17, 2005, the views of counsel have focused on a contention by defendant that plaintiff's counsel improperly instructed its witnesses not to answer certain questions at depositions taken of Michael Cesarz – 9/9/05; Janet Cutcliff – 9/16/05; Mark E. Owen – 9/8/05; and Carolyn Wukitch 8/26/05 and; Marsha Radosevich – 7/7/05.  Counsel have differing views as to whether or not Judge Robinson included the defendant's complaints in this regard as within the scope of the assignment to the SDM.  I have waited to consider those positions in depth until I had an accurate view of the position of the parties that I thought

could best be ascertained from my efforts to complete the other assignments that are not disputed as to my work as the SDM. As a result of that other work, I have come to the view that I believe Judge Robinson does expect the SDM to consider the questions regarding the questioning of plaintiff's witnesses at their depositions and this SDM Order will address those concerns. I will be reviewing the excerpts provided in defendant's letter of October 18, 2005 in this exercise.

1.    I begin this Order by denying defendant's request that any privilege that could apply to the excerpts to be considered here have been waived because of the alleged failure of the plaintiff to conform to the Stipulated Protective Order approved by the court.

2.    Deposition of Michael Cesarz – Vice President – Project Manager – Tab 1 – Page 152 – Line 3 – 15.

Privilege not allowed. To instruct a witness not to answer based on the presence of grounds for privilege, counsel must advise as to the basis of that assertion. Comments by and among plaintiff's non-attorney employees or those of third parties or affiliates are not entitled to attorney client privilege protection unless the comments would disclose a confidential communication of the attorney. That is not the ground for refusing to answer offered here.

Tab 2 – Page 212 – Line 15 to Page 213 – Line 9.

If the reference mentioned on Line 20 was designed for or to a certain goal that was all or part of a communication by counsel to the witness, the

2

privilege is allowed. On the other hand if the witness (who is testifying from a document that he prepared) is listing tasks to be performed by others, and they represent the witness' judgment as to what is to be done, the answer to the question is not privileged even though it follows and may be the result, in whole or in part, of an attorney communication. It is the communication that is protected, not the conduct that follows or results from attorney client communication. If a client is advised by his attorney to go to the bank and make a certain deposit on or before a certain date, any discussions that the client has with third parties or others, or the fact that he followed that advice is not protected by the attorney client privilege. It is the communication with the lawyer to the client is protected, not what the client's reaction to that advice is.

<u>Tab 3 – Page 218 – Line 13 to Page 219 – Line 4.</u>

Privilege asserted on Page 218, Line 13 to Line 18 is proper. It specifically protects the substance of a communication with counsel. The privilege asserted on Page 218 – Line 22 to Page 219 – Line 4 is not proper. The witness's decision or judgment following the rendering of attorney advice is not protected. Again, clients often follow their attorney's advice and engage in conduct that reflects. Despite that, the conduct is not protected. It is the advice that is protected.

3

<u>Tab 4 – Page 223 – Line 17 to Page 224 – Line 16.</u>

If the associated risks are those within the attorney's expertise <u>and</u> of the type the attorney was retained to assess and communicate to the client, that communication is privileged. However, if the risks are risks that non lawyer management type employees are trained and expected to assess – even if they reflect or are influenced by attorney communications, the assessments are not privileged. What is being expressed in the document here, by its terms, are the business opinions of plaintiff's employees and not a communication with counsel. The question should be answered.

<u>Tab 4 – Page 226 – Line 1 to 10.</u>

Privilege is not allowed. The witness' judgment, though based on a communication of counsel is not privileged.

<u>Tab – 4 Page 226 – Line 12 to 22.</u>

Plaintiff's counsel's assertion of the privilege that could disclose substantive communications is appropriate.

<u>Tab 5 – Page 237 – Line 11 to Page 238 – Line 23.</u>

Privilege not allowed. While the expression of privilege by plaintiff's counsel at Page 237—Line 20 – 23 and Page 238 – Line 19 to 22 is correct, it does not appear that the premise ("legal advice" or "communications") can be satisfied by the document that was authored by this witness and says that these judgments

4

are being made from a business perspective. The truth of this is buttressed by the note that the legal assessment has not yet been made. If attorney communications are restated in the business assessments, they should or could have been redacted as attorney client communications.

Tab 5 – Page 240 – Line 11 to Page 241 – Line 2.

Privilege is not allowed. This question seeks testimony concerning "events" with a competitor. In the first place, such events are not confidential if they are with a competitor or if they occurred in connection with any other third party, and secondly, the question has nothing to do with attorney client communications. The witness is not being asked what attorney client communications, but merely what the events were.

Tab 6 – Page 261 – Line 15 to 22.

Assertion of privilege is proper.

Tab 6 – Page 262 – Line 14 to Page 263 – Line 4.

A reading of this excerpt suggests that the plaintiff answered the question the best that he could.

Tab 6 – Page 264 – Line 21 to Page 265 – Line 15.

Assertion of privilege is proper.

<u>Tab 6 – Page 266 – Line 3 to Page 267 – Line 7.</u>

Privilege not allowed.  The witness is being asked what he was doing that resulted in his making notes that he put in his memorandum.  What non-attorneys do are not covered by the attorney client privilege.  Any instructions or communications he may receive from his attorney are protected.  What action he took as a result of those communications and written by him in his memorandum are not protected.  If the witness can say truthfully – under oath – that the entries in his notes were told to him by his counsel, they may be protected, subject to confidentiality and wavier concerns.

<u>Tab 7 – Page 290 – Line 11 to Line 25.</u>

Reference to "main concern" is troublesome.  Witnesses should be asked if the main concern is in its entirety a legal one that has been communicated confidentially to plaintiff (and employees with a need to know).  If that is "yes", plaintiff should provide that communication to the SDM for *en camera* review.  If it is "no" the question should be answered.

Tab 8 – Page 83 – Line 5 to Line 21 (Janet Cutcliff – Vice President Business Development).

No ruling needed.

<u>Tab 9 – Page 92 – Line 11 to Page 94 – Line 4.</u>

Assertion of privilege is proper.

<u>Tab 10 – Page 51 – Line 13 to Page 52 – Line 6 (Mark Owen, Sr. V.P.)</u>

Note enough information to rule.

<u>Tab 11 – Page 124 – Line 1 to Line 19 (Marsha Radosevich).</u>

Witness is unable to answer the question.

<u>Tab 11 – Page 126 – Line 15 to – Line 25.</u>

Privilege disallowed.  Witness is merely being asked to name persons that she communicated with to assist in the review of patent applications.  She can answer that without disclosing any communications from counsel.

Tab 12 – Page 166 – Line 13 to Page 168 – Line 1 and <u>Page 169 – Line 10-21.</u>

In the SDM's view, the witness answered the question properly.

<u>Tab 13 – Page 175 – Line 19 to Page 177 – Line 7.</u>

Privilege disallowed.  Here, the witness is asked what the witness said about what was to be told to customers.  Even if that was an attorney client communication, what was to be told to customers, presumably was not intended to be confidential between attorney and client.

Tab 14 – Page 93 – Line 10 to Line 23 (Carolyn Wukitch – Sr. V.P. and <u>General Manager.</u>

Instruction to witness appropriate under the circumstances.

7

<u>Tab 15 – Page 119 – Line 9 to Page 120 – Line 17.</u>

Plaintiff's position is correct here. A claim of inadvertent production on Page 119 justifies counsel's instruction to the witness.

<u>Tab 16 – Page 168 – Line 19 to Page 169 – Line 11.</u>

Counsel's instruction to witness is proper for the same reasons as set forth in the ruling in Tab 15.

<u>Tab 17 – Page 172 – Line 1 to Page 173 – Line 7.</u>

Privilege not allowed as to whether email was sent before or after witness received legal summary. Witness is being asked about something she did, not what or even whether, counsel instructed her to do that.

<u>Tab 18 – Page 182 – Line 9 to Page 183 – Line 2.</u>

Witness is being asked to give an answer from a business prospective whether a license price was a concern " . . . yes or no." A business decision influenced or "driven" by a lawyer is not privileged. What the attorney said is privileged. What the client's business assessment is resulting from that advice is not. Privilege is not allowed.

<u>Tab 19 – Page 191 – Line 22 to Page 192 – Line 25.</u>

Initially, the inquiry on Page 192 at Line 4 to 25 should be addressed. It is perfectly plain that the witness is being questions about her role and a document she wrote as a high-ranking official of the plaintiff corporation and not as an

8

individual. Accordingly, decisions she makes in regard to these matters involving this case are on behalf of McKesson, the plaintiff. With that background she is asked on Line 16 whether McKesson aggressively pursued the patent and used it as leverage for the broader deal. (Presumably meaning a business arrangement McKesson and TriZetto were in negotiations about regarding their combined business goals). The witness is a senior vice president and general manager of the plaintiff (see plaintiff's list of non-attorneys.) It is fair to assume that in that post, she either participated in or has knowledge about the basis of the lawsuit and, of equal importance, the reasons for filing it. In the normal course of things, it is the client that authorizes the filing of a lawsuit and the attorneys who either recommend it or recommend against it. A party must have good grounds to sue another party and the attorneys are crucial in arriving at that decision. Their communications in that regard are privileged. That is not what is being asked here. What is being asked here is whether there are, in addition to what the attorneys may have communicated to the parties, parallel business reasons for aggressive pursuit of the patent. The question should and can be answered by the witness

9

without compromising the protection plaintiff is entitled to for attorney client

communication concerning legal advice in regard to the filing of this lawsuit.

SO ORDERED:

LOUIS C. BECHTLE
SPECIAL DISCOVERY MASTER

DATE:  December 19, 2005

# EXHIBIT 28



CONRAD
O'BRIEN
GELLMAN
& ROHN, PC

Louis C. Bechtle
*Attorney at Law*
Direct Dial: 215.864.8060
lbechtle@cogr.com

December 5, 2005

Jack B. Blumenfeld, Esquire
Morris, Nichols, Arsht & Tunnell
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899-1347

Michael A. Barlow, Esquire
Skadden Arps, Slate, Meagher & Flom
One Rodney Square
P.O. Box 636
Wilmington, DE 19899

RE:    McKesson Information Solutions LLC v.
       The Trizetto Group, Inc.
       No. 04-1258 (SLR) (D.Del.)

Dear Counsel:

Enclosed herewith is Special Master Order No. 3 in the above-referenced matter.

Sincerely,

Louis C. Bechtle

LCB/jrw
Enclosure

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

MCKESSON INFORMATION
SOLUTIONS, LLC,                          :
                                         :
          Plaintiff,                     :
                                         :
                                         :    NO.: 04-1256-SLR
     v.                                  :
                                         :
THE TRIZETTO GROUP, INC.,                :
                                         :
          Defendant.                     :

SPECIAL MASTER ORDER NO. 3

Louis C. Bechtle, Special Discovery Master            December 5, 2005

        This Special Discovery Master (SDM) Order responds to the request in

plaintiff's letter of November 11, 2005 that defendant produce to the SDM certain

documents selected by the plaintiff from defendant's privilege log.  The defendant

has provided to the SDM each of the documents selected, and they have been

presented for review as follows:

Exhibit A – 50 documents where attorney client privilege and/or work product

protection is being challenged in connection with the waiver of those privileges by

the defendant in respect to its defense laches, estoppel and willfulness.

<u>Exhibit B</u> – 15 documents that plaintiff contends are inadequately described in order to determine whether or not they are entitled to protection, or, as respects 1B, 2B, 14B, and 15B, might fall within the defendants' waiver.

<u>Exhibit C</u> – consists of 27 documents that plaintiff contends could be communication with its opinion counsel from the law firms of Blakely, Sokoloff & Straddling Yocca, and if so, should be produced under the standard that applies to the application of the waiver by defendant based on opinion of counsel.

The standards to be used in regard to attorney client privilege and work product protection (which includes Judge Robinson's ruling that post litigation communications are not subject to the waiver that applies to communication between defendant and counsel in this case).

**Attorney Client Privilege**

The attorney client privilege will apply:  1. [w]here legal advice of any kind is sought; (2) from a professional legal advisor in his capacity as such; (3) the communications relating to that purpose; (4) made in confidence; (5) by the client; (6) are at this instance permanently protected; (7) from disclosure by himself or by legal advisor; (8) except the protection be waived."

**Work Product Doctrine**

Federal Rule of Civil *Procedure* 26(b)(3) provides in respect to the doctrine of work product as follows:

2

(3)    Trial preparation: Materials.  Subject to the provisions of subdivision (b)(4) of this Rule, a party may obtain discovery of documents and tangible things otherwise discoverable under subdivision (b)(1) of this Rule and prepared in anticipation of litigation or for trial by or for another party or by or for that other party's representative (including the other party's attorney, consultant, surety, indemnitor, insurer or agent) only upon a showing that the party seeking discovery has substantial need of the materials in the preparation of the party's case and that the party is unable without undue hardship to obtain the substantial equivalent of the materials by other means.  In ordering the discovery of such materials when the required showing has been made, the Court shall protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation.

As can be seen, this provision articulates the condition under which otherwise broad discovery under F.R.C.P. Rule 26(b)(1) can be blocked in order to protect the product of an attorney's professional contribution to his client's cause in the form of strategy, theories, analyses, impressions, and related input on behalf of his client.  This protection is qualified under the provisions of the Rule in the face of substantial need or undue hardship determined by the court to warrant intrusion into the work product.

With the foregoing in mind, the SDM rules in regard to each of these exhibits as follows:

Exhibit A

3

The following documents have been or will be produced:  1A, 4A, 6A, 7A, 8A, 10A, 12A, 13A, 14A, 16A, 17A, 18A, 19A, 21A, 22A, 23A, 24A, 26A, 27A, 30A, 31A, 34A, 35A, 37A, 38A, 40A, 42A, 43A, 44A, 45A, 47A, 48A, 49A, 50A.

The following documents are entitled to the privilege or protection claimed: 2A, 3A, 5A, 9A, 11A, 15A, 20A, 25A, 28A, 29A, 32A, 33A, 36A, 39A, 41A, 46A, (in addition, 41A and 46A are post-litigation communications not subject to the waiver).

Exhibit B -- As to 1B.

The SDM should be furnished with some information, by declaration or otherwise, that provides some reference to the date prepared, the author, the recipients or copyees (if the documents were transmitted).

The following documents have been or will be produced:  3B, 7B, 10B, 11B, 13B.

The following documents are entitled to privilege or protection claimed: 2B, 4B, 5B, 6B, 8B, 9B, 12B, 14B.

Exhibit C

The following documents have been or will be produced:  1C, 2C, 3C, 4C, 5C, 6C, 7C, 8C, 9C, 11C, 12C, 13C, 14C, 15C, 16C, 17C, 18C, 20C, 21C, 22C, 23C, 25C, 27C.

The following documents are entitled to the privilege or protection claimed:

4

10C, 19C, 26C.

The following document has been noted as "lost": 24C.

This information concerning Item 1B referred to above should be provided within five business days.

SO ORDERED:

LOUIS C. BECHTLE
SPECIAL DISCOVERY MASTER

DATED: December 5, 2005

5

# EXHIBIT 29

1

IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE DISTRICT OF DELAWARE

— — —

| | | |
|---|---|---|
| McKESSON INFORMATION SOLUTIONS LLC, | : | CIVIL ACTION |
| Plaintiff | : | |
| vs. | : | |
| THE TRIZETTO GROUP, INC., | : | |
| Defendant | : | NO. 04-01258 (SLR) |

— — —

Wilmington, Delaware
Thursday, September 8, 2005
11:00 o'clock, a.m.

— — —

BEFORE:  HONORABLE SUE L. ROBINSON, Chief Judge

— — —

APPEARANCES:

SKADDEN, ARPS, SLATE, MEAGHER & FLOM
BY:  MICHAEL A. BARLOW, ESQ.

-and-

SKADDEN, ARPS, SLATE, MEAGHER & FLOM
BY:  JEFF RANDALL, ESQ. and
(Palo Alto, California)

Counsel for Plaintiff

Valerie J. Gunning
Official Court Reporter

Multi-Page™

**Page 2**

```
1   APPEARANCES (continued):
2        MORRIS, NICHOLS, ARSHT & TUNNELL
         BY: JACK B. BLUMENFELD, ESQ.
3
4             Counsel for Defendant
5                    - - -
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 3**

```
1
2        P R O C E E D I N G S
3
4        (Proceedings commenced in the courtroom,
5   beginning at 11:00 a.m.)
6
7        MR. BLUMENFELD: Good morning, your Honor.
8        MR. RANDALL: Good morning, your Honor.
9        THE COURT: Good morning.
10       I think it was -- well, whoever requested the
11  conference should go forward and let me know what business we
12  need to address this morning.
13       MR. RANDALL: Thank you you, your Honor.
14       Jeff Randall with Skadden Arps, representing the
15  plaintiff, McKesson.
16       Your Honor, we have a few remaining, both
17  disputes regarding documents and disputes regarding
18  depositions. Mainly, however, they are document
19  disputes.
20       And to give the Court a bit of background, we
21  served our document requests in December of 2004. Prior to
22  the close of document discovery, defendant, TriZetto produced
23  about 26 boxes. After the close of discovery, well after,
24  they produced another 450 boxes, including many CDs,
25  literally millions of documents after the close of document
```

**Page 4**

```
1   discovery.
2        They've known about the patent in suit for
3   years. Their predecessor company apparently knew about it
4   apparently since 1995 in previous litigation that we had.
5   TriZetto has known about it at least since October of 2001,
6   when we gave them a notice letter. They should have been at
7   least prepared regarding the suit. They did get an
8   infringement e-mail opinion letter that I think they report
9   to say is an opinion letter. They got that on laches and
10  estoppel, nothing on noninfringement.
11       When we asked for our documents, we not only got
12  them after the close of discovery, but also there was an
13  issue about what the accused products were, and when we were
14  here before you in April, you ordered them to identify those
15  systems that contained the functionality that basically
16  infringes or the patent covers. They identified three such
17  products: Claim Facts, Facets and Quick Link. And as to
18  those three products, they identified them on April 26th.
19  They should have produced and completed their production with
20  respect to, at a minimum, those three products, and they
21  simply have not done so.
22       When we -- after we got their document
23  production, we started going through it in preparation
24  for depositions. They identified in August three of
25  their most knowledgeable employees regarding the three
```

**Page 5**

```
1   accused products. Namely Facets, Claim Facts and Quick
2   Link.
3        In preparation for those depositions, we
4   discover that they had not even produced the manuals to those
5   products. We asked them on August 12 for full and complete
6   sets of manuals on the accused products. Again, we asked
7   them on August 15 for the complete manuals on all the
8   three accused products, and on August 17, we get an e-mail
9   back from lead counsel, Mr. Thomas for TriZetto, and he
10  says, The record is clear, we have never a greed to produce
11  those.
12       There is a little -- there are some discussions
13  over the next couple of days, us trying to get the documents,
14  TriZetto refusing. Finally, because we have these
15  depositions that we need to take, obviously, we asked the
16  Court for a discovery conference.
17       In response to the discovery conference, and
18  while there are at least a dozen letters pending on discovery
19  disputes, TriZetto writes to the Court and says, We don't
20  know what issues are going to be addressed.
21       Well, and we responded, without arguing, because
22  I know that you don't want us to argue what the issues are,
23  we said, It's the issues in our letters.
24       When the Court granted the request for a
25  discovery hearing and indicated on August 29 that it was
```

Multi-Page™

1  going to hold one, that same day we get an e-mail from
2  Mr. Thomas, saying he is close to completing and gathering
3  the documents we've requested in our August 15 letter and
4  will send them to us.
5       Well, that's great. Unfortunately, you
6  see the point, this is without a discovery conference,
7  they give us nothing. However, we didn't get those
8  documents until yesterday, and we still didn't get all
9  the documents. And I'd like, if I may, to just hand up to
10  the Court a three-page document that is part of their
11  production.
12       May I do that? I've highlighted it (handing
13  documents to the Court).
14       This document is a response to a request for
15  proposal, so apparently Pacific Care asked TriZetto to
16  respond to a proposal and indicate how their systems could
17  meet the requirements.
18       And within this document, it indicates that the
19  Facets documentation, that's one of the key -- that is the
20  key revenue-generating infringing product, the Facets
21  documentation consists of user and technical manuals, et
22  cetera. It indicates that the user and technical manuals
23  includes a whole host of guides and manuals listed
24  A through T.
25       And then it says, These manuals are included on

1  well, and they simply have not provided it.
2       With respect to the database, they argue before
3  your Honor that there was some lack of disclosure with
4  respect to the database in the patent and therefore the
5  entire patent is invalid, yet when we asked them for their
6  database, they say, Why do you need it? Why is it relevant?
7  We don't need to provide it.
8       That's their product. Their product is software
9  and a database and we've asked them for that and they've
10  simply refused to provide it. It's a simple thing. That's
11  what they provide to their hundreds of customers.
12       So that's one issue.
13       The second issue is requests for proposals. They
14  have indicated that nearly all of their customers, when
15  they sell a system to their customer, requires them to
16  fill out what's called a response to a request for proposal.
17  And those are usually a detailed description of the system,
18  how it operates and how it can meet their needs. We
19  have asked for all of them. They have hundreds of
20  customers.
21       We need to show for damages, for instance,
22  how each of those systems operate and what they've told
23  those customers. They've given us about four out of
24  hundreds.
25       In response to our request to say why don't you

1  the Facets products CD we don't have that CD. We never got
2  it. We don't have those materials provided. They provide
3  them readily to customers.
4       All they needed to do at any time prior to this
5  minute to satisfy much of our requests with respect to the
6  three infringing products was to simply give us the full and
7  complete product CD that has all the manuals already on it.
8  They have not done it. What they have done is given us a
9  hodgepodge of documents and materials and code that simply
10  does not work, incomplete software programs that cannot be
11  run.
12       When we asked them for this, they simply said, as
13  Mr. Thomas indicated, We'll be getting it to you on the
14  29th. We still don't have it.
15       So we're asking for complete product manuals,
16  user guides, maintenance manuals. Whatever they give to the
17  customer along the lines of this document with respect to
18  each of the three infringing products, we're asking for
19  that. We're also asking for a CD that works.
20       This is not a system where it's difficult for
21  them to provide it. They've got their software package on a
22  CD and they've got a database that it operates with. That is
23  what we want. That's what they give to customers. That's
24  what we want so we can inspect and prepare not only for
25  depositions, but also for expert reports that are upcoming as

1  give us all of your responses to our requested proposals that
2  you have, they said, We have an entire marketing department.
3  What do you mean? What do you want?
4       And it's real simple. It's the lead document for
5  any customer when you have a sale cycle. You start by
6  getting in the door and the second thing they do is they say,
7  Well, here's our requirements. Respond to this. What can
8  you do?
9       And the typically formal responses like this
10  document, and this is only a portion of the document, but
11  there are about a hundred pages along, and they've got
12  them. It's clear. And they just simply refuse to produce
13  them.
14       The next main category of documents, so we've
15  got the manuals, the working CDs and databases, the responses
16  to the RFPs, and the next issue is a big one. And that is
17  their willfulness, laches and estoppel waivers have --
18  requires them to produce nearly all of the documents on the
19  privilege log. They have a privilege log that is 74 pages
20  long, depending upon how you paginate it. They list
21  literally hundreds, probably well over six or 700 documents
22  on their privilege log. Many of those say attorney/client
23  relating to McKesson dispute. The only dispute we have with
24  them is this patent. That's the dispute.
25       And they were required in -- in April you ordered

1 them to produce any documents relating to their willfulness
2 defense. If they were going to waive, they needed to do it a
3 month before the close of discovery or I think approximately
4 August 19. That's when they needed to do it.
5        August 19 came. We sent them a letter, asked
6 for it. They didn't respond. They ultimately sent,
7 just sent by mail just the opinion letter on the 24th of
8 August.
9        We then wrote back and said, No, you have a
10 much broader waiver than just the opinion letter. You've
11 got to produce a whole host of other material as well.
12        And that started a series of letters that led
13 to today. And we have cited them cases and we've indicated
14 that what they need to produce are all of the documents
15 regarding TriZetto and its predecessor company's awareness
16 and consideration and knowledge of the patent. And that
17 would include any internal memos or any other memos about how
18 they dealt with the patent. And part of it is not just
19 because they've waived on willfulness, but their laches
20 defense and estoppel defense.
21        With respect to the estoppel defense, they claim
22 that we led them to believe that we would never assert the
23 patent. And they claim that by some words or conduct on our
24 part, we led them to believe we wouldn't assert the patent,
25 and therefore they were under the impression that we were not

1 going to assert the patent.
2        Well, all of these documents within the company
3 addressing this dispute absolutely wipe out that defense, and
4 so how can they possibly argue that they were led to believe
5 we would never assert the patent while they not only have
6 opinion letters and lots of other documents, but they have a
7 whole host of internal documents discussing the patent,
8 discussing the dispute, discussing the threat of McKesson
9 suing them and so forth. All of those documents need to be
10 produced. And when you look at the privilege log, really,
11 that is the vast majority of the documents are documents
12 relating to this dispute with McKesson.
13        Now, there might be some documents that would be
14 privileged on their privilege log. For instance, when they
15 purchased Erisco or when they purchased RIMS, if there were
16 attorney/client documents in connection with SEC disclosure
17 requirements with respect to the purchase of those, those
18 aren't waived, and I acknowledge that. But that's not what
19 the vast majority of these documents on the privilege log
20 are. The descriptions are disputes with McKesson issues
21 relating to the patent.
22        All of those should be produced by the combined
23 waivers associated with their estoppel, laches and
24 willfulness defenses. And when we told them that after they
25 just produced the one letter, I had a conference call on the

1 30th with their lawyer who was in here last time and he said,
2 Well, I disagree. I think that we only have to produce the
3 letter. I don't think it's a broad waiver at all.
4        And I said, Whether it's broad or not, it's all
5 documents that you have in your company that relate to
6 knowledge and consideration, awareness of the patent issues
7 and the threat based on patents by McKesson.
8        And he disagreed and that's why we're here.
9        They did produce yesterday about 15 pages of
10 documents. That's it. Out of 600-and-some-odd documents,
11 they produced about 15 pages yesterday and that's it.
12        I think what they need to do is produce nearly
13 all of the documents on the privilege log and what should
14 remain are only those documents that are truly
15 attorney/client or work product privilege, solely in
16 connection with their acquisitions of their predecessor
17 companies and totally unrelated to any patent issue or
18 totally unrelated to McKesson.
19        If it relates to McKesson or the patent, it
20 should be produced, and they simply refuse to do that.
21        By the way, I do have a copy of the log,
22 your Honor. I will hand it up (handing documents to the
23 Court).
24        So from that log, they have produced the letter.
25 They've produced an e-mail and they've produced less than 20

1 other pages of documents, and that's it.
2        One other document issue. Two others. The two
3 other document issues are — I will do the one.
4        We were sitting in a deposition about a week ago
5 or so, maybe ten days ago, and TriZetto attempted to use a
6 number of inadvertently produced privileged documents. We
7 informed them that those documents were inadvertently
8 produced and were privileged and asked for the return of
9 them. Over a period of time based on a series of letters
10 TriZetto has refused to do that.
11        We then, I think because we were obligated to do
12 it and because we wanted to make sure that we did not have
13 any others, went through our production and scoured our
14 production for any other possible inadvertently produced
15 documents and we found a number of them.
16        What what we did was, there were a number of
17 documents that were privileged entirely and we asked TriZetto
18 to identify by Bates-stamp numbers those documents. We asked
19 them to return them and destroy all copies of them. And
20 there were a number that only a paragraph or a line was
21 privileged in an otherwise unprivileged document, and what we
22 did is we redacted those documents, sent them to them and
23 asked for the return of the clean document.
24        They have so far refused to agree with any of our
25 requests, and so that is another outstanding issue, that they

Multi-Page™

**Page 14**

1  simply should be ordered not to use the inadvertently
2  produced documents, and if they do, they can use the redacted
3  versions that we've provided.
4      The next few issues are a few discrete issues
5  regarding depositions.
6      The first issue is the Court, as you know, has
7  limited the number of depositions we can take, I believe to
8  14, number one.
9      Number two, we can only take a total of 14 hours
10  of 30(b)(6) depositions of each of the two litigants, the
11  parties.
12      And, number three, TriZetto is able to take two
13  full days of the depositions of all of the four inventors, so
14  they get eight days of depositions with the inventors. And
15  these inventors were never McKesson employees. They're third
16  parties.
17      And so we've had to clearly limit and be
18  judicious about the time we spent in 30(b)(6) depositions
19  and also make sure that we identify key individuals to
20  depose.
21      There are two individuals that are absolutely
22  key, far more than the four inventors collectively at
23  TriZetto. One is Mr. Ballomo and the other is Mr. Luftig.
24  And both of them have been identified to cover nearly all of
25  the 30(b)(6) topics that -- of our notices. They also happen

**Page 15**

1  to have a long history not only with TriZetto, but also with
2  TriZetto's predecessor company that they purchased to buy the
3  infringing product, Erisco.
4      So they have worked for Erisco developing the
5  accused product and then have worked for TriZetto in
6  leadership positions and we have indicated that we are going
7  to take not only obviously the 30(b)(6) deposition, but also
8  an individual deposition of them.
9      What TriZetto has done is said, Well, no, you'll
10  get one day. You'll do both the individual and the 30(b)(6)
11  at the same time, and we have pushed back and said, No,
12  we're not going to.
13      They cite as support the fact that they
14  did that with respect to one of our witnesses. That was
15  their choice. We didn't force them to do that. We didn't
16  take the position that they were obligated to. We simply
17  said, How long would you like the witness? And they said,
18  We'll do them both in one day. And we said, Fine, but that
19  was it.
20      These two witnesses are key witnesses. We'd like
21  to take their individual deposition for a day and then if
22  there's any remaining information that we need to obtain from
23  them or that we need to make sure that they are testifying on
24  behalf of the company regarding, then we can take the
25  30(b)(6).

**Page 16**

1      They have, at least with respect to Mr. Ballomo,
2  they have agreed to produce him for his individual deposition
3  and then said if there's remaining 30(b)(6) time left and you
4  want to take him, fine.
5      I think that is probably solved unless they're
6  going to take a position otherwise now.
7      With respect to Mr. Luftig, what they have said
8  is, No, we think you can take him in one day. And I've said,
9  We'll take his individual deposition and we only have 14
10  hours of 30(b)(6) time. I've indicated that I don't think it
11  will take a full day, but I think that it may take five or
12  six hours in addition to his individual deposition, and
13  they've simply refused.
14      So that is one issue, and really, it is I, think,
15  and I'm hoping it's only limited now to Mr. Luftig.
16      There is an issue, and I hate to even raise this,
17  but it's an issue and it's important, and that is there's an
18  issue about the location of the depositions.
19      They have a number of their employees that work
20  in Union City, New Jersey, which is just a few miles from
21  Manhattan, and we have asked that the depositions be taken in
22  our offices in Manhattan for a few reasons.
23      One, because of the late-produced documents and
24  all of the documents in this case, millions of pages, I don't
25  know what these witnesses are going to say. Many of them are

**Page 17**

1  individual witnesses and, therefore, they're not required to
2  be prepared on any particular issue, and if they say, Gee, I
3  don't know about that issue, but if I could see the manual,
4  if I could see this, we have the documents in a database. I
5  can print them out. I can refresh the witness' recollection
6  at any time during the deposition.
7      And so we have access to all of the documents.
8  It is convenient in that it's only, I think it's less than
9  ten miles away from where these witnesses work, and yet
10  TriZetto has said, No, you're going to take them at the
11  location of their facility apparently. We've asked, no, to
12  do it in our offices a few miles away.
13      The last issue or the last communication on the
14  subject was yesterday. There was an e-mail from TriZetto
15  saying, quote, If you would accommodate their travel needs in
16  order to get into New York, then perhaps we could work out a
17  resolution of this issue.
18      So we did. I wrote back and I said, We will
19  pay each witness $100 to cover any travel expenses to make
20  it the few miles from Union City, New Jersey to Manhattan,
21  and given they're only going to be there one day, we'd give
22  them $100, which would cover any expenses that they have
23  about coming. And I got a letter late last night saying, No,
24  they're going to go forward in New Jersey. So that's another
25  issue.

Page 14 - Page 17

Multi-Page™

Page 18

1    Those are the issues that I have.
2    I did write, right after the Court indicated
3  that it would hold our conference, I wrote a letter to
4  opposing counsel and asked them if they had any issues at all
5  that they'd like to discuss. I then had a conference call
6  the next day with them and, again, asked them, do they have
7  any issues they'd like to discuss, and they said no. And I
8  followed that up with a letter, again asking them, and they
9  have not raised any issues with us. They have claimed that
10  we produced some documents recently. However, those
11  documents were produced right after we prepared a privilege
12  log, and in connection with preparing witnesses, we found
13  some documents that were relevant and we produced them
14  voluntarily, without ever being asked to. The other side
15  simply refused to produce anything to us.
16    Those are the issues, your Honor.
17    THE COURT: All right. Thank you.
18    MR. BLUMENFELD: Your Honor, I really don't
19  understand how Mr. Randall can stand here with a straight
20  face and say that we told them we didn't have any issues to
21  raise because we've been discussing issues back and forth and
22  back and forth and as recently as last night we sent them an
23  e-mail with issues. So -- but the procedural point, I will
24  try to get by.
25    I think there actually are a lot of issues here

Page 19

1  and I would like to clear some of this up because it sounded
2  from Mr. Randall's presentation like we must be really awful
3  people and how could we do these things, and I once told
4  myself, your Honor, that I was never going to make a federal
5  judge, or I was never going to argue to a federal judge about
6  which side of the Hudson River a deposition was going to
7  occur on, and I hope that we don't have to do that today, but
8  there are actually a lot of things out there, and if I could,
9  I'd like to just put this into context.
10    We have a September 16th discovery cutoff date.
11  That's next Friday. And we've had that for quite some time.
12  Your Honor extended that, but that's when it is. And they
13  requested this conference on August 25th, and with one or two
14  exceptions, almost all of these issues are issues that
15  they've created since then. They were not issues that were
16  on the table on August 25th.
17    And I guess I would switch things around because
18  Mr. Randall said he thinks the document issues are the most
19  significant, but there are deposition issues. I guess I
20  would say given that we're eight days before the close of
21  discovery, that the deposition issues are really the more
22  important issues. To fill you in on where we are on that,
23  are there problems? Yes. Are they limited perhaps to Mr.
24  Bollomo, who I don't think is a problem, and Mr. Luftig, who
25  I'm not sure is a problem either? Yes.

Page 20

1    And why do we have those? Well, the reason, or
2  the reasons that we have those issues are because McKesson
3  waited until August 26th or later to ask for 11 new
4  depositions. And that's why we are where we are, where
5  everyone is scrambling around in this last week and a half of
6  discovery, trying to get things done.
7    We've been jumping through hoops to try to get
8  things done, and what happened was that on Friday night,
9  August 26th, at 9:30 at night, Mr. Randall faxed us a notice
10  of deposition of seven TriZetto people, five of whom had
11  never been mentioned before. And, you know, I had to ask
12  myself, when I see someone sending me a notice of deposition
13  at 9:30 on Friday night, what is it they're trying to do?
14  Are they they're trying to get the depositions? Are they
15  trying to do something else?
16    Things got a little worse after that because
17  apparently the same day TriZetto, or McKesson, rather, issued
18  five subpoenas, five deposition subpoenas for five of our
19  customers all over the country: Indiana, Oregon, Washington,
20  Tennessee, Ohio. That was August 26.
21    They issued the subpoenas. Apparently, they went
22  forward in serving them. They never sent copies to us. We
23  did not even know that they had issued the subpoenas. We
24  didn't know that they were subpoenaing our customers until we
25  started to hear from one of the customers, saying, What's all

Page 21

1  this about? Kind of reminded me of what happened with the
2  document subpoenas a few months ago.
3    They waited until September 1st to give us a
4  copy. We were negotiating deposition schedules. They never
5  even mentioned that they had done that. And I wrote to them
6  three times on September 1st, on September 2nd and September
7  6th after that, saying, Are these depositions going to go
8  forward? Have you served them? What's going on?
9    Your Honor, you know when I got an answer to
10  that? You want to talk about doing things in preparation for
11  a discovery conference. When I woke up this morning, there
12  was a letter that had come from one of Mr. Randall's partners
13  to my computer at 2:59 a.m., saying, yes, two of those
14  depositions are going forward next Monday and next Wednesday
15  in Portland, Oregon and in Columbus, Ohio, I believe. And
16  the other three we're going to have to put off until after
17  the discovery conference, but we're continuing to negotiate
18  with these people.
19    They're sending us an e-mail at 3:00 o'clock in
20  the morning on Friday, telling us that -- on Thursday,
21  telling us that depositions are going to go forward in Oregon
22  and in Ohio next Monday and Wednesday. We've been asking for
23  more than a week whether these things are going forward.
24    Now, in contrast, we subpoenaed people, two third
25  parties, on August 18th, for the last week of discovery for

Multi-Page™

**Page 22**

1 next week. A couple weeks ago, their lawyers told us they
2 could not do it that week, could they put it off until after
3 the close of discovery.
4     We immediately let McKesson know. They won't
5 even tell us whether they'll agree that we can take those
6 depositions, I think September 21st, 27th or 24th and 27th,
7 when those third-party witnesses say they can be there, but
8 we're getting letters at three o'clock in the morning, telling
9 us depositions are going to happen next week.
10     On September 1st, they told us for the first
11 time, that's a week ago today, that they wanted the
12 deposition of our CEO, Mr. Margolis. Had never mentioned him
13 before in this case.
14     We said, We'll get you a date, but we cannot get
15 you a date before the discovery cutoff on September 16th. We
16 got this the day before the holiday weekend and he is our CEO
17 and he's busy. And we said, We'll get you a date.
18     So what do they do? Yesterday they send us a
19 subpoena, saying that they're demanding that he appear on
20 September 13th.
21     That's the kind of cooperation that we're
22 getting. We're getting notices of depositions on Friday
23 night. We're getting letters in the middle of the night.
24 We're getting subpoenas for witnesses we've agreed that we'll
25 produce.

**Page 23**

1     The privileged documents that Mr. Randall talked
2 about where he said, So far we have not heard back from them,
3 well, they have not heard back from us because they sent us
4 that letter last night. And it was not only saying we'd like
5 two privileged documents back, they sent us a letter with a
6 huge list of documents. The stack of documents they want
7 back is seven inches thick. We're in the last week of
8 discovery. We're in depositions and preparations for
9 depositions. We have a protective order which says
10 that if you inadvertently produce a document, you've got
11 20 days to request it back. These documents were produced
12 last May.
13     And in the middle of depositions, we're getting
14 a letter saying, Return to us immediately seven inches of
15 documents that you're in the middle of using for
16 depositions.
17     Now, it's a huge practical problem to have to
18 deal with something like that in the middle of this and what
19 really concerns us about it, your Honor, I don't know how
20 we're going to get this issue before you. Mr. Randall raised
21 a privilege issue. These documents that they're requesting
22 back and the ones we used at the deposition, they don't have
23 anything to do with lawyers. It seems like the position
24 they're taking is that if a businessperson writes to another
25 businessperson and they mention the strength or the

**Page 24**

1 enforcement of the '164 patent, that's privileged and we have
2 to return it. And we're not willing to do that. We're
3 certainly not willing to do it voluntarily. We're not
4 required to do it under the protective order and we do need
5 to find a way to get that issue on the table if they're going
6 to pursue it.
7     Now, that's kind of where we are on the
8 deposition issues. I think -- let me finish up the
9 deposition issues because I might as well address Luftig and
10 Bollomo and New Jersey/New York while I'm on the
11 depositions. But Mr. Randall said that we told them that
12 they would have to take Bollomo and Luftig in their
13 individual and in their 30(b)(6) capacities in one day. We
14 never said that. We said what we'd like them to do is take
15 those depositions at one time.
16     I think Mr. Bollomo isn't an issue. He's going
17 to testify the 16th and I think we've told them that if they
18 need more time, that we'll produce him again the following
19 week.
20     The problem is Mr. Luftig, and we did not
21 say one day. What we said was they could have him yesterday
22 afternoon, I'm sorry, they could have him this afternoon
23 and tomorrow, the 8th and the 9th. We never said one
24 day.
25     They said No, we want him one day this week

**Page 25**

1 and one day next week. And it seems to me that as an
2 accommodation to witnesses, if we're going to make a witness
3 testify, we at least ought to try to accommodate the
4 witness. There was nothing wrong with doing it today and
5 tomorrow. They were the ones who insisted, no, that we're
6 going to do one day and then we're going to come back later
7 and do another day. He's not available the days they want to
8 do him next week. It's not a matter of resisting this. It's
9 a matter of scheduling it.
10     On the location of depositions, I said this
11 was an issue I hoped I would never have and, you know, if
12 Mr. Randall wants to transport these people from New Jersey
13 to New York, then I guess I would ask that they make some
14 arrangements at Skadden to have these people picked up and
15 have them returned to New Jersey, that's fine.
16     The problem is it's only a few miles, but
17 traveling in and out of Manhattan is not the easiest thing in
18 the world. And I don't want to put that issue before your
19 Honor, but I am sure that if they can make arrangements for
20 the travel, that our people will go to Manhattan.
21     The other deposition issues that we have, I
22 don't know where we are on the two third parties who said
23 they couldn't appear until the 21st and the 27th of
24 September. We've asked them several times and they've never
25 given us an answer as to whether they are going to fight that

Page 22 - Page 25

Multi-Page™

Page 26

1  or not. These are people who were involved early on with
2  this project.
3          The other deposition issue that we have is one of
4  the inventors, Kelly Dugan. We've been asking about her
5  since June. We requested her on August 10th. They've
6  offered her to us twice. The first time on Monday, August
7  29th, they said, you can have her Friday, September 2nd,
8  and we said we can't operate on that kind of a schedule. You
9  have to give us more than a few days notice, especially when
10 our people are in California and they have to fly across
11 the country. So they say, Okay, what what they do? They
12 come back on September 2nd, the Friday before Labor Day
13 weekend, and they say, You can have her next Wednesday,
14 September 7th.
15         Same issue. They give us two days' notice. And
16 I think the position they've taken now is, you know, even
17 though you asked for her back on August 10th, we've now
18 offered her twice and you can't have her. And that's an
19 issue that we need to get resolved also.
20         On the documents, what has happened here, your
21 Honor, is on the one hand, we keep on hearing Mr. Randall say
22 they are flooding us with documents, they're producing
23 millions of pages and then, on the other hand, we don't have
24 enough documents. And what happened here is he wrote to us
25 or one of his partners wrote to us on August 12th and again

Page 27

1  on the 15th, and they requested some documents.
2          Some of the things they requested were, as he
3  said, the software for -- or the source code for two of
4  the -- he said the accused products, Claim Fact and Quick
5  Link. They have had the Facets software. They have never
6  accused Claim Fact or Quick Link of infringement. We
7  answered that Interrogatory you told us to answer back in
8  April. They have never supplemented their answer. They have
9  never given us a claim chart and they have never put those
10 things into issue.
11         Well, nevertheless, we've now told them, we'll
12 produce that. We'll produce the code, and I understand that
13 we'll be able to get it to them by early next week. We've
14 told them that, so that one is not an issue even though they
15 have not accused those products.
16         But after the 15th of August, when they asked for
17 the conference on August 25th, then we started getting longer
18 letters. And what we got on August 26th was a very much
19 longer letter, and what we got on August 31st was a very,
20 very much longer letter, and it seems like every day or every
21 week that goes by here, we just get another letter making
22 more and more document demands.
23         I mean, we heard today about these RFP responses,
24 request for proposal responses. The first time that this
25 came up in one of their discovery letters was on August 31st,

Page 28

1  the first time.
2          The problem with those is we're now two weeks
3  from the end of discovery. My understanding is they're not
4  in any central organized place. Until very recently, I'm not
5  sure they were kept at all. And to get that request on
6  August 31st and now to be told, Well, you know, you're in
7  your last two weeks of discovery and we want you now to go
8  back and get a bunch of documents, it really creates a lot of
9  problems for us.
10         The manuals, we've given them all the manuals
11 they have. I don't know if we've given them the CD that's
12 mentioned in that document, but we have given them the
13 manuals. We've told them we'd give them the manuals.
14         He mentioned the Rules database. Well, I think
15 Mr. Randall has taken the position that the Rules database
16 is irrelevant to these patent claims. And if he wants
17 to tell us it's relevant, I guess I'd like to hear how
18 and maybe we don't have an issue there and we can give it
19 to them.
20         The waiver documents. We have waived privilege
21 and we've produced a few opinions and we've produced after
22 they raised the issue of other documents off of our list.
23 And what I'm told is that we've produced all of the documents
24 that have been withheld as privileged which mention or relate
25 to the '164 patent.

Page 29

1          So when Mr. Randall sits there and says there's a
2  whole host of internal documents about this patent, I haven't
3  looked at the documents, but I'm told that that just isn't
4  correct, that we've gone through and we've produced those
5  documents.
6          The other side of this is the documents that they
7  have. And I guess, your Honor, if we're going to deal with
8  privileged documents, and I think we will have to, if they
9  want to raise that argument, that's fine. I think we're
10 going to have to on both sides, because if I can hand up
11 their list which we got on August 19th, it's 178 pages long
12 (handing documents to the Court).
13         And your Honor can look at it. I mean, the
14 descriptions, at least in my experience in this Court, are
15 totally inadequate. It does not provide sufficient
16 information. And, moreover, a lot of the documents that are
17 being withheld, it's consistent with the documents that
18 they've asked us to return to them. And that is they're not
19 documents involving lawyers. What they are doing is they are
20 claiming as privileged documents that involve businesspeople
21 if they have something to do with the strength or the
22 enforcement of the patent. And we're very, very concerned
23 about what we're not getting because from what we've seen
24 that we have gotten, those documents are very interesting and
25 we think we ought to have them.

Page 26 - Page 29

Multi-Page™

1  So I don't know how we're going to get that issue
2  before the Court, but it does seem to me that we do have to
3  get that issue before the Court.
4  As I said, the other issue, the return of the
5  documents, came up at -- came up with respect to a couple
6  documents at a deposition two weeks ago, but it came up in
7  the way Mr. Randall described last night, and we're not
8  willing voluntarily to return those documents.
9  I think I've covered everything except the last
10  time we were here, your Honor, on August 2nd, and this is
11  another document issue, but it goes the other way, I think
12  you ordered McKesson to produce the earliest software for
13  code review or its earliest product, and we still don't have
14  it or at least I'm told we still don't have it. And that is
15  a document that we would very much like to have.
16  Your Honor, from our point of view, that's
17  kind of the range of the issues that are out there
18  today.
19  THE COURT: All right, Mr. Blumenfeld, before
20  you sit down, I need to follow up on some things.
21  With respect, in your view, what products have
22  been accused of infringing in this case?
23  MR. BLUMENFELD: The only product that they've
24  put in their Interrogatory Answer they accused of infringing
25  is the Facets product. The other two products are Claim

1  Facts and Quick Link. You told us to identify any other
2  clinical editing products and we put them in there.
3  Recently they've written us letters suggesting
4  that those are, quote, accused products, but they've never
5  supplemented their Interrogatory Answers to include those.
6  They've never given us claim charts on those.
7  THE COURT: All right. In this IFP or response,
8  they do indicate that there's such a thing as a product CD.
9  And for purposes of moving this case to closure, it seems to
10  me as though, at least for Facets, if not for the other two
11  products, that that CD would go far in bringing document
12  production to a close, and therefore I'm going to have you,
13  Mr. Blumenfeld, go back and see whether these CDs have been
14  produced. If they have not, why they have not. And
15  actually, if they have not, they should be produced, the
16  product CD that is given to customers for each of these
17  products. Nothing else, just the CD. I don't want any more
18  paper; I just want those CDs.
19  At this point I am not going to do anything else
20  with the request for proposals and responses thereto. It
21  seems to me we're getting far into the game to need
22  information like that and so I am not going to order that any
23  of those be produced.
24  With respect to the waiver issues, I guess I
25  would need some kind of affidavit or averment from your

1  client indicating what documents have been produced. In
2  light of the defenses here, it is my practice to require
3  someone who waives privilege in order to assert a defense to
4  produce not only specific information about that letter, but
5  about anything having to do with the subject matter. I'm not
6  confident that relating anything that relates or mentions to
7  the '164 patent is broad enough, but it wasn't clear to me
8  that you were even clear as to what had been produced, so I
9  need to have that made clear to opposing counsel, what the
10  test was in terms of production.
11  With respect to the privilege logs and the
12  inadvertently produced documents, I'm going to refer this to
13  a Special Master to work that out. I simply can't. I don't
14  have the resources to do that and keep up with everything
15  else that you all put on our plates here.
16  So if it's important to you in terms of being
17  suspicious of each other's privilege logs, then it has to go
18  to a Special Master at extra cost to you.
19  With respect to the depositions, under our normal
20  practice here in Delaware, you are supposed to give folks at
21  least five business days notice, and I will expect that if
22  you can't agree, that that is the minimum.
23  At this point, I think it's apparent that you
24  will have to go beyond the discovery cutoff date to finish up
25  these depositions. Certainly, subpoenaing CEOs is not the

1  way we do business here in Delaware.
2  So if you all can't work this out, I am
3  reluctantly offering for you to give me the availability
4  dates of all of these folks and I will simply say yes or no.
5  This isn't rocket science. These are issues you all should
6  be able to work out.
7  So with these third parties, it seems to me if
8  that's when third parties are available, that's when they're
9  taken.
10  With respect to these employees, it sounds as
11  though, Mr. Blumenfeld, that giving them $100 to get there is
12  not what you are looking for. You are looking for them not
13  to even have to use their heads let alone their money to get
14  there. You want a car there to pick them up and transport
15  them.
16  MR. BLUMENFELD: I wouldn't think that would be a
17  terribly difficult thing to do.
18  THE COURT: Well, it probably isn't, but I guess
19  I'm just --
20  MR. BLUMENFELD: Your Honor --
21  THE COURT: I'm just not used to being picked up
22  myself. I'm used to being reimbursed and having to use my
23  own energy to make arrangements.
24  MR. BLUMENFELD: Your Honor, we'll work this
25  out. Either we'll do it financially or arrange a car,

Multi-Page™

**Page 34**

1 whatever, and we'll work that out.
2     THE COURT: All right.
3     MR. BLUMENFELD: We don't have to get you
4 involved.
5     THE COURT: All right. I think actually that
6 covers most everything.
7     MR. BLUMENFELD: Your Honor, I guess the one
8 question it raises, at least in my mind, is I don't know how
9 long the depositions are going to go forward, but it looks to
10 me like at least a couple weeks after the cutoff given that
11 they have some them are out there and we have a couple that
12 are out there.
13     We have expert reports due October 7th and
14 28th, and I don't have in mind when summary judgment/claim
15 construction is, but I think it's late November. I just
16 wonder if there's enough room there to try to move the expert
17 reports back a week or ten days so that we can finish up
18 discovery and have time to digest it. And I have not
19 discussed this with Mr. Randall because I didn't know whether
20 it was going to be an issue or not.
21     THE COURT: All right. Well, in terms of --
22     MR. RANDALL: Your Honor, I would like to address
23 that. This is the first time it's raised here.
24     THE COURT: All right. Just a minute.
25     In terms of document production, and before we

**Page 35**

1 address scheduling, Mr. Randall, the earliest version of the
2 software, it hasn't been produced yet? I am just trying to
3 get document production done first.
4     MR. RANDALL: Your Honor, we argued about that
5 and I think your ruling was look to see if you can produce
6 any code from HPR. We looked. We didn't find it. And we
7 told them that on July 29.
8     So July 29, in response to a July 27 e-mail from
9 Mr. Thomas, we responded two days later and said we looked
10 for it, we did not find it. That was it.
11     So that's the end of that issue.
12     MR. BLUMENFELD: Your Honor, that surprises me
13 because those communications were before the conference on
14 August 2nd, when you ordered him to do it. If he is saying
15 they can't find it, then there's nothing, you know, nothing I
16 could do about that.
17     THE COURT: Well, but this is the thing.
18 Generally, when it's a critical issue and a party says I
19 can't find it, I require the client to indicate what was done
20 to look for it. And I'm not confident that what has been
21 exchanged. So we're going to say that within a week that
22 exchange is made. That is, you outline what efforts were
23 made to look for it so that not only are we satisfied that
24 the search has been unsuccessful, but that an appropriate
25 search has been made.

**Page 36**

1     Also within a week the defendant shall produce
2 these product CDs for the three products, one of which has
3 been formally accused of infringement. The other two I'm not
4 confident what's going on with that. It seems to me that
5 if -- well, if, in fact, they are accused of infringement,
6 then there's a whole lot of discovery that you all owe,
7 including claim construction and how your contention
8 Interrogatories need to be updated, and I'm not confident
9 it makes -- it seems to me the accusation of infringement
10 has to come to some extent before this kind of discovery is
11 made.
12     So perhaps, Mr. Randall, you can address that.
13     MR. RANDALL: Sure. At the April hearing, we
14 were arguing about the other systems that had the same
15 functionality Facets had and therefore infringed and we
16 wanted an identification of those systems right away.
17     You ordered TriZetto to make that
18 identification. They did. They identified the other Claim
19 Facts and Quick Link. We then wrote to them and and said,
20 All right. Those are the three accused products. We would
21 like to know the most knowledgeable people on those. They
22 gave that to us. They also said, and I think you ordered us
23 to supplement an Interrogatory regarding when we first became
24 aware of those other accused products as well, and we
25 answered that Interrogatory.

**Page 37**

1     I will say this: That it was an oversight not to
2 supplement that one Interrogatory. We did, however, in every
3 other letter, every other Interrogatory, we have consistently
4 accused those three products. They know it. We know it.
5 And I can point to points in the transcript when they even
6 repeated that those were the three accused products.
7     So they've known it for some time. I will
8 supplement today that Interrogatory response and say the
9 three officially. However, I could probably point to dozens
10 of letters that indicate that those three are the accused
11 products, going back and forth. They've acknowledged it as
12 well.
13     THE COURT: All right. Then all three products.
14 Those three product CDs, whatever product CDs are given to
15 customers. And if there are no product CDs for those, then
16 you've got to supplement with all the paper.
17     MR. RANDALL: Along with the database as well,
18 because that's how the product operates. It's a product CD
19 along with the database.
20     MR. BLUMENFELD: Your Honor, I guess I'd just
21 like to hear why Mr. Randall thinks that the Rules database
22 is relevant because the position that he has taken is that
23 it's not relevant to their patent.
24     MR. RANDALL: That's just, you know -- there is a
25 dispute about that issue, about the database, and their

Page 34 - Page 37

Multi-Page™

Page 38

1 position is and they're going to litigate it, and they've
2 already litigated it and argued it is that the database is
3 covered by the claims and they are going to argue that at
4 Markman. They've already argued it to your Honor. And
5 they're going to argue that the patent lacks adequate
6 disclosure of that database.
7     Their absolute position is it is part of it. Our
8 position is that there are high-level rules that apply to the
9 application and population of a database that are definitely
10 part of the patent. And so it's an issue about how deep do
11 you want to get. Are the high-level rules and structure of a
12 database that it's then populated with facts are the rules
13 part of the patent or not? And are the individual little
14 populated facts of a database part of the patent?
15     Nonetheless, the accused product is the -- the
16 software CDS that they ship out to products in conjunction
17 and operation with the database. We'd like it produced. It
18 is not a problem for them to produce it. It's a simple
19 matter.
20     THE COURT: All right. Under the understanding
21 I have, which is a high-level understanding that there's
22 a dispute about the database, it should be produced as
23 well.
24     With respect to within a week, I also need,
25 Mr. Blumenfeld, your client to specifically articulate what

Page 39

1 tests or bases or standard it used to produce the privileged
2 documents in connection with its willfulness, laches and
3 estoppel defenses.
4     I will today issue an order requesting a Special
5 Master for your privileged issues. And I guess it might, in
6 fact -- whether, in fact, sufficient production has been made
7 of privileged documents or under the waivers might well fall
8 into that.
9     All right. Mr. Randall, you had some questions
10 about discovery cutoff and extending the discovery.
11     MR. RANDALL: There were a few items that I
12 wanted to cover that I don't think you've addressed yet.
13 One of them is Margolis. We did ask for him in late August
14 and what we did is we did not subpoena him. We never have.
15 What we did is we asked them as a courtesy to give us his
16 availability. And we asked them in late August and we asked
17 them every single day thereafter, every day, including over
18 the weekend, and we were all working over the holiday
19 weekend, exchanging e-mails, and I never got a response. And
20 even today I don't have a response.
21     So, yes, we did serve a deposition notice on
22 Gibson, Dunn & Crutcher for Mr. Margolis for the 13th because
23 we did not want them to say that we, you know, scheduled or
24 something like that. But we've been asking. We just have
25 not gotten a date and we'd like a date.

Page 40

1     MR. BLUMENFELD: Your Honor, we'll give them a
2 date. We've been telling them we're dealing with our CEO and
3 over the holiday it hasn't been that easy. We'll give them a
4 date as soon as we can get it.
5     THE COURT: All right. Within a week we have to
6 get all this cleared up.
7     MR. BLUMENFELD: We'll give them a date within
8 the week. The date may be after that.
9     THE COURT: But, nevertheless, we need a date.
10     MR. RANDALL: With respect to the TriZetto
11 employees, I mean, the issue about logistics is I don't
12 want to have to ask for their personal address and what
13 time they want -- how early they want to get there before
14 the deposition. All we're saying is the deposition starts
15 on this date. They'll make their arrangement to get there.
16 We'll reimburse them, we'll pay them $100 a day. I
17 didn't want to get involved with if they want to come in
18 and have breakfast before the deposition or what they
19 want to do.
20     MR. BLUMENFELD: I thought I had taken that
21 off the table, your Honor.
22     MR. RANDALL: Okay.
23     THE COURT: All right.
24     MR. RANDALL: The Luftig issue. We'd like -- we
25 were scheduled to go forward with him tomorrow, tomorrow in

Page 41

1 New York. And I simply would like another day for his
2 30(b)(6) topics.
3     MR. BLUMENFELD: Your Honor, same issue. We
4 had hoped to do it at the same time and thought that was the
5 right accommodation. Obviously, it's not going to happen
6 today and tomorrow.
7     Assuming they have more questions for him after
8 tomorrow, we will find another day. He has health problems.
9 I understand he cannot be there next Monday and Tuesday when
10 they wanted him, but if they've got time left, we'll find
11 another half day or better part of the day, if that's what
12 they need.
13     THE COURT: All right. And I do expect counsel
14 to be courteous with respect to these witnesses. It is hard
15 enough to be deposed in these cases. They should not be
16 caught up in the escalating litigiousness of this case, so
17 don't take out your frustration with the case on these
18 folks. I expect you to be courteous with these folks and get
19 done with them and arrange dates and times that are
20 convenient as best you can.
21     MR. RANDALL: Is there a time limit for them to
22 produce these -- the product CDS and database?
23     THE COURT: I said within a weak.
24     MR. RANDALL: I'm sorry.
25     THE COURT: All of this is happening within a

Multi-Page™

1  week, within a week meaning a week from today. Noon on next
2  Thursday.
3      I expect Ms. Dugan, Inventor Dugan, to have a
4  date for her as well given.
5      MR. RANDALL: Okay. So with respect to the
6  scheduling issue, you did ask, I do think, I will tell
7  you it was difficult and I'm not going to say it was just
8  difficult for us. I understand it's difficult for both
9  sides to get as many depositions as we have confirmed in
10  the time that we have done that, but we have. We've done
11  it, so I would ask only that for those depositions that
12  have been confirmed right now, that they don't start lifting
13  and changing.
14      THE COURT: Oh, definitely not.
15      MR. RANDALL: And then we've got Dugan and we've
16  got -- they had a couple other third parties they want to
17  take and we have a couple third parties also.
18      So what I would suggest is that both sides
19  work to get those depositions completed, all of them
20  completed one week, at least one week following the
21  discovery cutoff.
22      So we have next week and then that will give
23  us an additional week to complete all the depositions. If
24  we were to do that, then I think that the opening expert
25  reports, at least my suggestion would be that the opening

1  expert reports could be moved from October 7, where they
2  stand now, to October 14.
3      The rebuttal expert reports should probably stay
4  right where they are, which is October 28. That would give
5  two full weeks for rebuttal reports following the modified
6  opening reports and then expert discovery completed by 11/30,
7  November 30. That will give us a month.
8      And I don't know if that's the current date or
9  not actually.
10      MR. BLUMENFELD: That is the current date.
11      MR. RANDALL: All right.
12      MR. BLUMENFELD: Your Honor, two little points.
13      One, I think we already know that one of the
14  witnesses, I don't remember if it's Hoechst or Egnall, told
15  us that his availability or his lawyer told us his
16  availability will be the 27th. It may be we can finish up
17  the others.
18      We'll try to do that to the extent we can. We
19  know at least one of them is going to slide over to the
20  following week.
21      I don't have a problem moving the opening reports
22  a week, but two weeks to do rebuttal reports seems very, very
23  quick for me. We're going to have to respond on at least
24  two subjects, and they presumably are going to have, I don't
25  know -- it's all going to be related in any event.

1      I would like to move the rebuttal reports a week
2  also. That would take us into the first week of November.
3  We have all of November to do depositions, expert depositions
4  and --
5      MR. RANDALL: That's fine. I don't have a
6  problem with that.
7      MR. BLUMENFELD: Okay.
8      THE COURT: All right. I will enter the order
9  requesting a Special Master. You've got lots to do in
10  the next couple weeks. I don't know whether it makes sense,
11  rather than deal with e-mails requesting another conference,
12  whether it makes sense for us to set something up or
13  whether you think you can work things out at this point
14  and we'll rely on a terse request for another meeting if
15  you need one.
16      MR. BLUMENFELD: Your Honor, I would hope we
17  won't need another one, and I guess the other thing is it
18  seems to me that people are going to be very, very busy over
19  the next three weeks at least, so I guess I'd like to leave
20  it that if we need a conference, we'll get in touch
21  with you, but I'm hoping we won't.
22      MR. RANDALL: I have one suggestion that would
23  streamline this thing significantly, I think, and that
24  would be this: That by noon tomorrow, we both submit a
25  one-page document that indicates what we think the scope

1  of the privilege ought to be with respect to our respective
2  privilege logs and then you would pick one and then a
3  Special Master would be able to say, Fine, I will take
4  all the documents in camera. I will make my cut and
5  there you go.
6      That way we don't have to wait -- that way at
7  least both sides know what you have selected as the
8  appropriate scope for their review.
9      So, for instance, what I would do is I would
10  propose that they -- that all documents relating to the
11  knowledge and awareness and consideration of the patent would
12  be waived and another category would be all internal
13  documents relating to the dispute with respect to McKesson
14  would be waived and give you some support, but all in one
15  page. And then either you say, yes or no.
16      And if you say yes, then they know they've
17  got to produce them. And then we have a Special Master
18  lined up to resolve any follow-up disputes, if there
19  are any. But that way it seems like it would streamline
20  it.
21      MR. BLUMENFELD: Your Honor, I'm not sure
22  that that will streamline anything, but -- because of the
23  nuances when you start getting into privileged documents.
24  And -- but if you want to do that, I don't know that we
25  have a problem doing it other than the suggestion that we do

Multi-Page™

Page 46

1   it tomorrow.
2        MR. RANDALL: All I'm saying, I just really don't
3   think it's, at least with respect to their waiver on those
4   defenses, I don't think it's that difficult of an issue at
5   all.
6        I think they've waived on 80, at least 80 percent
7   of those documents. And this is --
8        THE COURT: Well, of course, we don't exactly
9   know what basis they did use, so I'm happy to do that.
10       I will go ahead and enter my order, get someone
11  lined up. If you want to exchange this kind of letter on
12  Monday, that would be fine.
13       MR. RANDALL: Could they also at least on Monday
14  give us the scope that they used?
15       THE COURT: Yes. Well, I would assume that
16  the scope that they would propose is the scope that they
17  used.
18       MR. RANDALL: Well, in response to your order to
19  produce documents, we got the letter, opinion letter and an
20  e-mail.
21       MR. BLUMENFELD: I thought your Honor had already
22  ordered us within a week to --
23       THE COURT: Right. Right. We were just trying
24  to move things along if we were going to clarify this.
25       I would think that by Monday, you can exchange

Page 47

1   what you think the scope should be. And, Mr. Blumenfeld, I
2   would hope that your client used the scope -- it would be
3   helpful if you could let us know that. I am going to leave
4   your privilege log up here for the moment.
5        MR. RANDALL: Do you want me to take them or do
6   you want them?
7        THE COURT: Maybe I should keep them.
8        All right. Thank you.
9        MR. BLUMENFELD: Thank you your Honor.
10       MR. RANDALL: Thank you.
11       (Court recessed at 12:07 p.m.)
12            - - -
13
14
15
16
17
18
19
20
21
22
23
24
25