IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

MCKESSON INFORMATION SOLUTIONS
LLC,

          Plaintiff,

      v.

THE TRIZETTO GROUP, INC.,

          Defendant.

)
)
)
)
)
)
)
)
)
)

C.A. No. 04-1258 (SLR)

REDACTED VERSION

**REPLY BRIEF IN SUPPORT OF THE TRIZETTO GROUP, INC.'S
MOTION FOR PARTIAL SUMMARY JUDGMENT OF LACHES**

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Jack B. Blumenfeld (#1014)
Rodger D. Smith II (#3778)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
  *Attorneys for Defendant*
  *The TriZetto Group, Inc.*

OF COUNSEL:

Jeffrey T. Thomas
David Segal
Michael A. Sitzman
GIBSON, DUNN & CRUTCHER LLP
Jamboree Center, 4 Park Plaza
Irvine, CA  92614

Original Filing Date:  January 20, 2006

Redacted Filing Date:  January 27, 2006

i.

# TABLE OF CONTENTS

Page

I. INTRODUCTION ................................................................................................ 1

II. ARGUMENT ................................................................................................... 1

    A.    The Delay Period Began In October 1993 When The '164 Patent  Issued. ........... 2

    B.    No Portion Of The Eleven-Year Delay Period May Be Excused. ......................... 6

        1.    The "Other Litigation" Excuse Does Not Apply Because McKesson Failed To Provide Notice To TriZetto Of The GMIS Suit *And* McKesson's Intent To Sue When The Litigation Concluded. ............................................................................... 6

        2.    The Business Negotiations Between TriZetto And McKesson Do Not Excuse McKesson's Delay In Filing Suit. .......................................... 7

        3.    No "Change In Management" Justification Exists To Excuse McKesson's Delay In Enforcement Of The '164 Patent. ........................... 9

        4.    No Excuse Allows A Patentee To Wait Until Damages Have Accrued To Sue An Alleged Infringer. ................................................... 10

    C.    McKesson's Delay In Filing Suit Has Materially Prejudiced TriZetto. ............... 13

        1.    TriZetto Has Suffered Economic Prejudice As A Result Of McKesson's Delay In Filing Suit. ........................................................... 14

        2.    TriZetto Has Suffered Evidentiary Prejudice As A Result Of McKesson's Delay In Filing Suit. ........................................................... 17

III. CONCLUSION .............................................................................................. 20

<u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

Cases

*A.C. Aukerman v. R.L. Chaides*,
   960 F.2d 1020 (Fed. Cir. 1992) ................................................................. 1, 2, 6, 7

*A.R. Mosler & Co. v. Lurie*,
   209 F. 364 (2d Cir. 1913) ..................................................................... 4

*ABB Robotics, Inc. v. GMFanuc Robotics Corp.*,
   52 F.3d 1062 (Fed. Cir. 1995) ................................................................ 15

*American Home Prod. Corp. v. Lockwood Mfg. Co.*,
   483 F.2d 1120 (6th Cir. 1973) ............................................................... 16

*Autoclave Eng'rs, Inc. v. Duriron Co.*,
   1976 U.S. Dist. LEXIS 16575 (E.D. Pa. Feb. 19, 1976) ........................................ 12

*Baker Mfg. Co. v. Whitewater Mfg. Co.*,
   430 F.2d 1008 (7th Cir. 1970) ............................................................... 11

*Continental Coatings Corp. v. Metco, Inc.*,
   464 F.2d 1375 (7th Cir. 1972) ................................................................ 7

*Eastman Kodak Co. v. The Goodyear Tire & Rubber Co.*,
   114 F.3d 1547 (Fed. Cir. 1997) ............................................................ 4, 10

*Ecolab, Inc. v. Envirochem, Inc.*,
   264 F.3d 1358 (Fed. Cir. 2001) .............................................................. 15

*Gen. Elec. Co. v. Sciaky Bros., Inc.*,
   304 F.2d 724 (6th Cir. 1962) ............................................................... 7, 8

*Genzyme Corp. v. Atrium Med. Corp.*,
   2003 U.S. Dist. LEXIS 12784 (D. Del. 2003) .................................................. 9

*Giese v. Pierce Chem. Co.*,
   29 F. Supp. 33 (D. Mass. 1998) .............................................................. 7

*Hemstreet v. Computer Entry Sys. Corp.*,
   972 F. 2d 1290 (Fed. Cir. 1992) ............................................................. 14

*Ill. Tool Works Inc. v. Grip-Pak, Inc.*,
   725 F. Supp. 951 (N.D. Ill. 1989) ....................................................... 11, 12

<u>TABLE OF AUTHORITIES (CONT'D)</u>

<u>Page(s)</u>

*James River Corp. of Va. v. Hallmark Cards,*
    915 F. Supp. 968 (E.D. Wis. 1996) ........................................................................................ 18

*Jamesbury Corp. v. Litton Indus. Prods., Inc.,*
    839 F.2d 1544 (Fed. Cir. 1988) .............................................................................................. 6

*Johnston v. Standard Mining Co.,*
    148 U.S. 360 (1893) ................................................................................................................ 3

*Lane & Bodley Co. v. Locke,*
    150 U.S. 193 (1893) ................................................................................................................ 9

*Lemelson v. Wang Labs., Inc.,*
    874 F. Supp. 430 (D. Mass. 1994) ......................................................................................... 7

*Northern Telecom, Inc. v. Datapoint Corp.,*
    23 U.S.P.Q.2d 1881 (N.D. Tex. 1992) ................................................................................ 11

*Odetics, Inc. v. Storage Tech. Corp.,*
    185 F.3d 1259 (Fed. Cir. 1999) ...................................................................................... 10, 11

*Odetics, Inc. v. Storage Tech. Corp.,*
    919 F. Supp. 911 (E.D. Va. 1996) ................................................................................... 11, 13

*RCA Corp. v. Data General Corp.,*
    701 F. Supp. 456 (D. Del. 1988) ......................................................................... 7, 8, 17, 18

*State Contracting & Eng'g Corp. v. Condotte Am., Inc.,*
    346 F.3d 1057 (Fed. Cir. 2003) ........................................................................................... 14

*Symbol Techs., Inc. v. Proxim Inc.,*
    2004 U.S. Dist. LEXIS 14949 (D. Del. July 28, 2004) ....................................................... 18

*Tenneco Auto. Corp. v. Visteon Corp.,*
    375 F. Supp. 2d 375 (D. Del. 2005) ..................................................................................... 14

*Vaupel Testilmaschinen KG v. Meccanica Euro Italia S.P.A.,*
    944 F.2d 870 (Fed. Cir. 1991) ............................................................................................... 6

*Wanlass v. Gen. Elec. Co.,*
    148 F.3d 1334 (Fed. Cir. 1998) ..................................................................................... 2, 3, 4

*Watkins v. Northwestern Ohio Tractor Pullers Ass'n.,*
    630 F.2d 1155 (6th Cir. 1980) ............................................................................................... 7

iv.

TABLE OF AUTHORITIES (CONT'D)

Page(s)

Other Authorities

6 Donald S. Chisum, *Chisum on Patents*, § 19.05[2][b][v] (2005) .............................................. 12

## I.    **INTRODUCTION**

This case presents a classic example of when and how the doctrine of laches applies. Although McKesson and its predecessors waited nearly eleven years to initiate this action, McKesson now disclaims sufficient knowledge or awareness of TriZetto's products to initiate suit earlier.

REDACTED

Equity, however, will not reward those who sit on their rights. As a result of McKesson's unreasonable and inexcusable delay, the six-year laches presumption established by the Federal Circuit in *A.C. Aukerman v. R.L. Chaides*, 960 F.2d 1020 (Fed. Cir. 1992) (*en banc*), bars McKesson from recovering any damages prior to the date it filed this action. McKesson has not and cannot rebut this presumption, and accordingly, TriZetto's motion for partial summary judgment of laches should be granted.

## II.    **ARGUMENT**

"A presumption of laches arises where a patentee delays bringing suit for more than six years after the date the patentee knew or should have known of the alleged infringer's activity." *Aukerman*, 960 F.2d at 1028. Once the alleged infringer has shown that the patentee has delayed

---

[1]    Exhibits 1 through 30 were previously submitted (D.I. 168) with TriZetto's Opening Brief in support of its Motion for Partial Summary Judgment of Laches. Exhibits A through UU are contained in TriZetto's Appendix of Exhibits filed with TriZetto's Answering Brief in Opposition to McKesson's Motion for Summary Judgment Regarding TriZetto's Eighth Affirmative Defense. D.I. 213. Exhibits 31 through 40 are contained in TriZetto's Supplemental Appendix Of Exhibits filed with this Reply Brief.

filing suit for six years, the defendant has made a prima facie showing of the elements of laches – unreasonable delay and prejudice – and the burden of coming forward with competent evidence to rebut this showing shifts to the patentee. *Id*. at 1035, 1037-38. Although McKesson's opposition is long on argument, it is devoid of any evidence to rebut the presumption of unreasonable delay and prejudice.

### A. The Delay Period Began In October 1993 When The '164 Patent Issued.

The period of laches in this case commenced on the date the '164 patent issued. The period of delay is measured from the time when the patent owner knew or, in the exercise of due diligence, should have known of the defendant's alleged infringing activity. *See, e.g., Aukerman*, 960 F.2d at 1032; *Wanlass v. Gen. Elec. Co.*, 148 F.3d 1334, 1337 (Fed. Cir. 1998). Overwhelming evidence demonstrates that McKesson knew or was aware that TriZetto's predecessors (Erisco and RIMS) were entering the clinical editing market in the late 1980's and had entered the clinical editing market by the time the '164 patent issued in October 1993.

REDACTED

McKesson's suggestion that HPR did not know about Erisco's clinical editing product is further belied by the testimony of its Chief Executive Officer, Marcia Radosevich.

REDACTED

REDACTED

McKesson's opposition brief demonstrates a fundamental lack of understanding of a

patentee's *duty* to investigate potential infringement.

> [T]he law is well settled that where the question of laches is in issue, the plaintiff
> is chargeable with such knowledge as he might have obtained upon inquiry,
> provided the facts already known to him were such as to put upon a man of
> ordinary intelligence the duty of inquiry.

*Johnston v. Standard Mining Co.*, 148 U.S. 360, 369 (1893); *see also Wanlass*, 148 F.3d at 1338

("The availability of delay based on constructive knowledge of the alleged infringer's activities

imposes on patentees the duty to police their rights.").

A patentee has an affirmative duty to investigate potential infringement. "[P]ervasive,

open, and notorious activities that a reasonable patentee would suspect were infringing" imposes

on patentees a duty to make inquiry and investigation. *Id.* (noting as examples sales, marketing,

publication, or public use of a product similar to or embodying technology similar to the patented

invention or published descriptions of the defendant's potentially infringing activities).

Furthermore, constructive knowledge "may be imputed to the patentee even where he has no

actual knowledge of the sales, marketing, publication, public use, or other conspicuous activities

of potential infringement if these activities are sufficiently prevalent in the inventor's field of

---

2    REDACTED

> When RIMS declined to partner with HPR,
> HPR did not do any further investigation of potential infringement. *See* Ex. 31
> (Radosevich Dep.) at 12. When RIMS decided to partner with another company for
> clinical editing software instead of HPR, HPR was on notice of RIMS' potential
> infringement. Notwithstanding HPR's interaction with both RIMS and Erisco in 1989,
> and HPR's knowledge of their competing products, HPR failed to assert the '164 patent
> against either company when the patent issued in 1993, or for eleven years thereafter.

endeavor." *Id.* Because the *Wanlass* defendant's allegedly infringing activities were "open and notorious," the Federal Circuit held that the presumption of laches applied because the patentee had a duty to investigate in 1986 – nine years before the patentee finally filed suit in 1995. *Id.* at 1340. *See also A.R. Mosler & Co. v. Lurie*, 209 F. 364, 370-71 (2d Cir. 1913) (applying laches presumption because "[d]uring this long period the successive owners [of the patent] treated this patent as if it were of no importance whatever, of no use to any one. . . . Had the owner taken the trouble to send a competent man to the warerooms of a few dealers . . . there can be little doubt that infringement would have been discovered years ago.").


REDACTED


Other companies also knew of Erisco's sales activities, including McKesson's other predecessor-in-interest, GMIS.[3]


REDACTED


---

[3]    As with HPR, GMIS's knowledge of Erisco's allegedly infringing products and activities is also imputed to McKesson. *See Eastman Kodak Co. v. The Goodyear Tire & Rubber Co.*, 114 F.3d 1547, 1559 (Fed. Cir. 1997), *overruled on other grounds by Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448 (Fed. Cir. 1998).

McKesson tries to counter this evidence by claiming that it did not know exactly how the Erisco programs worked, and should not be bound by its earlier knowledge. D.I. 208. McKesson's knowledge of the functionality of Erisco's clinical editing software is more than enough, however, to impute knowledge of potential infringement to McKesson. As the Federal Circuit held in *Wanlass*, McKesson had a duty to investigate TriZetto's activities, because it had constructive knowledge that RIMS and Erisco had entered the clinical editing market by at least 1991. Whether McKesson knew exactly how the Erisco software programs worked is irrelevant.


REDACTED


McKesson loses sight of its proposed claim construction, in which it contends that the structure corresponding to all 32 means-plus-function claim limitations is simply "software." *See* D.I. 208.


REDACTED


Still further, McKesson fails to explain what it learned recently to cause it to sue TriZetto in 2004. On the one hand, McKesson claims it did not have enough information to know whether TriZetto's products infringed in the 1990's, and on the other hand, McKesson claims it had sufficient information to file a good faith infringement action in 2004. Yet McKesson never explains how TriZetto's programs changed or what new information it learned. In fact, the

---

4     Conversely, if its simply "software" construction is not adopted by the Court, McKesson admits that TriZetto's products do not infringe. Given McKesson's stated positions, it must lose either its motion for summary judgment of infringement or TriZetto's motion for partial summary judgment of laches.

essential features of the TriZetto programs have not changed.  The only thing that changed was McKesson's corporate mindset – i.e., McKesson decided that it wanted concessions in business negotiations from TriZetto unrelated to the patent that it could not get unless it used the patent as "leverage."  In light of its actual knowledge predating the patent issuance, McKesson's delay in bringing suit must commence with the issuance of the patent in October 1993.

**B.** **No Portion Of The Eleven-Year Delay Period May Be Excused.**

Despite McKesson's unsupported allegations, TriZetto's Opening Brief (D.I. 166) and opposition to McKesson's motion for summary judgment (D.I. 212) demonstrate that no valid excuse exists to toll or excuse the delay period.

**1.** **The "Other Litigation" Excuse Does Not Apply Because McKesson Failed To Provide Notice To TriZetto Of The GMIS Suit *And* McKesson's Intent To Sue When The Litigation Concluded.**

McKesson has misapplied the Federal Circuit's holding in *Aukerman* regarding the litigation excuse, and specifically the notice requirement to the infringer-in-waiting.  Although *Aukerman* states that the requirement of notice is not to be "rigidly imposed," the *Aukerman* Court cautioned that "*[w]here there is prior contact*, the overall equities may require appropriate notice, as in *Jamesbury*."  *Aukerman*, 960 F.2d at 1039.  In *Jamesbury*, the Federal Circuit held that a patent owner engaged in litigation against another party must notify the defendant in the later suit not only of the other litigation, but also of its intention to enforce its rights against the defendant after termination of that litigation.  *Jamesbury Corp. v. Litton Indus. Prods., Inc.*, 839 F.2d 1544, 1553 (Fed. Cir. 1988), *overruled on other grounds by Aukerman*, 960 F.2d 102; *see also Vaupel Testilmaschinen KG v. Meccanica Euro Italia S.P.A.*, 944 F.2d 870, 876-77 (Fed. Cir. 1991) (outlining the same notice requirements for application of "other litigation" excuse). *Aukerman* makes clear that where there is prior contact between the parties, the patentee has a duty to give notice of both the pending litigation *and* its intent to enforce the patent against the alleged infringer after the other litigation has concluded.  *See Aukerman*, 960 F.2d at 1039.

Here, it is undisputed that there was prior contact between the parties.

REDACTED

REDACTED         McKesson does not dispute that it failed to

give Erisco *any* notice of its intent to sue once the GMIS litigation was complete.  McKesson

simply argues, incorrectly, that it should not be required to have done so.  A proper application

of the cited legal authorities does not support McKesson's position.  *See Watkins v. Nw. Ohio*

*Tractor Pullers Ass'n*, 630 F.2d 1155, 1163 (6th Cir. 1980) (because another infringer was being

sued, and defendant was not, *and* defendant had not been advised that it would be sued, the

defendant was entitled to infer that the patentee did not intend to sue it).  TriZetto's knowledge of

the GMIS litigation is irrelevant.  Because the laches defense focuses entirely on the conduct of

the patentee, it is the conduct of the patentee at issue in applying the litigation excuse.  *See*

*Aukerman*, 960 F.2d at 1031-32.  McKesson's failure to provide notice to TriZetto means that it

cannot rely upon the GMIS litigation to excuse any part of its delay in filing this action.

> ### 2.    The Business Negotiations Between TriZetto And McKesson Do Not Excuse McKesson's Delay In Filing Suit.

McKesson's negotiations with TriZetto to enter into a "joint marketing agreement" and

integrate its software products with TriZetto's system does not excuse McKesson's delay.  Not

surprisingly, the cases cited by McKesson concern efforts by a patentee to *license the patent*

(*RCA Corp. v. Data General Corp.*, 701 F. Supp. 456, 476-77 (D. Del. 1988)) or other

correspondence between the parties regarding *licensing of a patent* (*Lemelson v. Wang Labs.,*

*Inc.*, 874 F. Supp. 430, 435 (D. Mass. 1994)).  *See* D.I. 208 at 15.  Business negotiations that do

not focus on the licensing of the patent asserted, however, do not constitute an excuse for delay

in filing suit.  *See, e.g., Gen. Elec. Co. v. Sciaky Bros., Inc.*, 304 F.2d 724, 727 (6th Cir. 1962).

To constitute a valid excuse, the negotiations must involve attempts by the patentee to resolve a

patent dispute without resort to litigation.  *Giese v. Pierce Chem. Co.*, 29 F. Supp. 2d 33, 40-41

(D. Mass. 1998), *citing Gen. Elec. Co*, 304 F.2d at 727 *and Continental Coatings Corp. v. Metco,*

*Inc.*, 464 F.2d 1375, 1377-78 (7th Cir. 1972).

Both parties have acknowledged that the discussions between McKesson and TriZetto

beginning in 2001 focused on creating a marketing agreement under which TriZetto would

8.

bundle and sell McKesson's products to TriZetto's customers.   These are not the types of negotiations that the cases recognize as an excuse for delays in asserting patent rights.  *Compare RCA Corp.*, 701 F. Supp. at 477 (excusing delay based on diligent efforts to license patent) *with Gen. Elec. Co.*, 304 F.2d at 727 (rejecting negotiation excuse based on patentee's desire to maintain good business relations with defendant).

REDACTED

---

5

REDACTED

REDACTED

The desire to maintain "amicable relations" with the defendant, or otherwise maintain good business relations between parties does not justify a patentee's laches. *Lane & Bodley Co. v. Locke*, 150 U.S. 193, 200-01 (1893) (noting that such behavior is entitled to less favorable consideration by a court of equity than mere inaction).

Because it made a conscious decision not to assert its patent for business reasons unrelated to negotiating a patent license and because none of these negotiations could be considered "continuous and bilateral" attempts to resolve a patent dispute, McKesson's "business negotiations" excuse must be rejected.

### 3.    No "Change In Management" Justification Exists To Excuse McKesson's Delay In Enforcement Of The '164 Patent.

As in its motion for summary judgment, McKesson inaccurately asserts that a change in management at HPR (due to its acquisition by HBOC and the subsequent acquisition of HBOC by McKesson) serves as an excuse for its delay in asserting the '164 patent. D.I. 161. And as TriZetto noted in response to McKesson's motion, no such excuse has ever been recognized by the Federal Circuit. D.I. 212.

As its sole support for this novel excuse, McKesson relies on *Genzyme Corp. v. Atrium Med. Corp.*, 2003 U.S. Dist. LEXIS 12784, at *17 (D. Del. July 22, 2003), where the court observed in dicta that as a result of patentee's change in management, "litigation remained a low priority until the 'dust settled.'" *Id.* (noting that patentee waited 4 1/2 years to initiate suit). McKesson attempts to rely upon this dicta to argue that HPR's "change in management" overcomes the presumption applicable in this case (and not in *Genzyme*) that McKesson's eleven-year delay was unreasonable and caused TriZetto material prejudice. *Genzyme* provides no legal support for this excuse, or application where the six-year presumption applies, or for McKesson's arbitrary calculation of the impact that its change in management had on its period of delay. *See id.* at 16-17.

HBOC and McKesson – the successor entities – both continued to sell the same products after the various acquisitions. Allowing a "change in management" to serve as an excuse to

laches would completely undo the defense and encourage a company to delay asserting its patent rights (allowing damages and prejudice to accrue) by occasionally hiring new management. Indeed, according to McKesson, every time a patentee changed its CEO, it would be entitled to some period of delay in pursuing its claims. This new excuse is completely contrary to the public policy underlying the laches defense. *See Odetics, Inc. v. Storage Tech. Corp.*, 185 F.3d 1259, 1273 (Fed. Cir. 1999) (noting that "[l]aches is firmly rooted in the equitable principle that courts will not assist one who has slept on his rights"). Furthermore, the recognized excuses discussed in Section II.B.1 and II.B.2, *supra*, each require that some notice be given to the alleged infringer by the patentee of its intent to sue at a later time. The alleged infringer must be made aware of the reason the patentee plans to delay suit and an internal change of management does not fit this definition.

In fact, McKesson's excuse runs contrary to established Federal Circuit case law that requires the transferee of a patent to accept the consequences of the dilatory conduct of any transferors. *Eastman Kodak Co.*, 114 F.3d at 1559 (noting that a patentee cannot avoid the consequences of his laches by transferring the patent).

Further, McKesson presents no evidentiary support that it had *any* business issues justifying a delay occasioned by its "change in management." McKesson refers haphazardly to boilerplate language in its 10-K annual report regarding potential risks facing its business at the time it acquired HBOC. D.I. 208. These risks, however, are of the same nature and extent facing any business in the process of growing or expanding, and do not suggest that McKesson deserves any preferential treatment over other companies that have transferred their patent rights and undergone a similar "change in management." Nor do these risks itemize any actual time or energy expended in post-merger activity. The business priorities noted by Mr. Cesarz fail to provide any convincing rationale to excuse McKesson's delay.

### 4.    No Excuse Allows A Patentee To Wait Until Damages Have Accrued To Sue An Alleged Infringer.

Finally, McKesson suggests that there is an excuse that allows a patentee to delay filing suit "until litigation makes clear economic sense." D.I. 208 at 20-22. This excuse appears for

the first time in McKesson's opposition to TriZetto's motion for summary judgment, and did not appear in McKesson's Opening Brief for summary judgment on this same issue filed nearly a month earlier. *Compare* D.I. 208 *with* D.I. 161. Because the excuses originally offered by McKesson left more than six years of delay, McKesson was forced to create a new excuse to try and eliminate the six-year presumption. As demonstrated below, McKesson's new excuse lacks substantive merit.

No excuse allows a patentee to delay suit against a potential infringer until damages have accrued. No Federal Circuit case makes such a blanket pronouncement, and analogous circuit court cases have flatly rejected a patentee's reliance on such an excuse. *See Baker Mfg. Co. v. Whitewater Mfg. Co.*, 430 F.2d 1008, 1014-15 (7th Cir. 1970) (rejecting patentee's excuse that it wished to wait until defendant's business had grown and litigation would be worthwhile). Likewise, district courts have rejected the proposition that a delay is excused if the extent of the alleged infringement is too minimal to justify suit. *Northern Telecom, Inc. v. Datapoint Corp.*, 23 U.S.P.Q.2d 1881 (N.D. Tex. 1992); *see also Odetics, Inc. v. Storage Tech. Corp.*, 919 F. Supp. 911, 922 (E.D. Va. 1996) (rejecting patentee's excuse that "it had no reason to investigate [the accused infringer's product] because the two companies were operating and selling their respective products in different competitive markets"), *aff'd in part, rev'd in part*, 185 F.3d 1259 (Fed. Cir. 1999). Furthermore, the policy underlying laches rejects this as a potential excuse. A patentee cannot wait to sue for many years while a small infringing company becomes a large company. *See Odetics, Inc.*, 185 F.3d at 1273 (noting that if a patentee sleeps on his rights, he authorizes the public to infringe a patented invention during the laches period).

McKesson cites two pre-*Aukerman* cases to support the proposition that "waiting until litigation makes clear economic sense is reasonable." *See* D.I. 208 at 20-21. The first case, *Ill. Tool Works Inc. v. Grip-Pak, Inc.*, 725 F. Supp. 951 (N.D. Ill. 1989), involves the district court's determination of a patentee's request for preliminary injunction after the defendant presented a defense of equitable estoppel. At a preliminary injunction hearing, the district court concluded based on all the circumstances that the patentee's "delay in filing suit probably was not

unreasonable." *Id.* at 953. McKesson's reliance upon the district court's preliminary conclusion is misplaced given the additional evidence and circumstances in an equitable estoppel case that do not exist in the case at bar. *Id.* Similarly, McKesson mischaracterizes the holding in *Autoclave Eng'rs, Inc. v. Duriron Co.*, 1976 U.S. Dist. LEXIS 16575 (E.D. Pa. Feb. 19, 1976). *See* D.I. 208 at 21. Although the *Autoclave* court excused plaintiff's five-year delay in bringing suit, the main reason for the excuse centered around the "business negotiations" that occurred between the parties during the five-year period: "[Plaintiff] engaged in negotiations with [defendant] concerning merger in 1963, 1964, 1965, 1967, and 1968 and royalty licensing in 1968, thus excusing the delay from 1963 to 1968." *Autoclave*, 1976 U.S. Dist. LEXIS 16575, at *15. Moreover, even if such an excuse existed, the patentee would be required (as required by the other excuses) to provide clear notice to the alleged infringer of its intent to sue later when the infringer's financial conditions changed. *See* 6 Donald S. Chisum, *Chisum on Patents*, § 19.05[2][b][v] (2005) (noting that if the excuse exists at all, it requires a patentee to clearly notify the infringer of its intentions to sue at some later date). Again, McKesson provided no such notice.

Notwithstanding the lack of support, McKesson has offered no evidence to suggest that Erisco's revenues or profits did not warrant earlier suit. Nor can it.


REDACTED


In 1993, when the '164 patent issued, the Dun & Bradstreet Corporation noted that its Erisco subsidiary "develops and markets proprietary software applications and services used primarily in the administration of health care benefits." D.I. 174, Ex. B at 4 (citing Dun & Bradstreet Corp. Form 10-K, 1993). At that time, Erisco had "nearly 300 clients for its claims processing and utilization review software." *Id.* (citing Faulkner & Gray, *Automated Medical Payment News*, Oct. 1993).

13.

REDACTED

All this means is that HPR made a decision not to pursue potential infringers who sold clinical editing as part of a larger claims processing system. Ms. Radosevich did not say that those companies were not believed to infringe, nor did she say that those companies were not taking potential customers from HPR. She simply stated that HPR did not pursue anyone other than the niche clinical editing companies. *Id.* Eleven years later, TriZetto is still selling clinical editing only as a part of a larger claims processing system, and the nature of the competition between TriZetto and McKesson has not changed, but McKesson must have revisited its decision not to sue such competitors because it has now initiated suit against TriZetto.[6] The fact that Erisco offered a full claims processing solution and not just clinical editing software does not excuse HPR's laches. *See Odetics, Inc.*, 919 F. Supp. at 922 (rejecting excuse where "the patentee already knew about the product, knew that it involved technology similar to the patented invention, and knew that it accomplished a similar result"). Accordingly, McKesson's delay in filing suit cannot be excused because of any supposed "economic sense" rationale.

**C.**     **McKesson's Delay In Filing Suit Has Materially Prejudiced TriZetto.**

McKesson's inability to rebut the *Aukerman* presumption means that, as a matter of law, McKesson's delay in filing suit is presumed to have prejudiced TriZetto. But even if the presumption did not apply, or if McKesson could rebut the presumption (which it cannot), the undisputed evidence establishes that TriZetto suffered significant economic and evidentiary prejudice as a result of McKesson's inordinate delay.

---

6     Even McKesson's own damages expert, Dr. Wagner, testified that the nature of the competition between Erisco/TriZetto and HPR/McKesson has not changed over the eleven or more years that the parties have been competing. Ex. 37 (Wagner Dep.) at 201 ("I think that the type of customers being addressed pretty much is uniform.").

### 1.    TriZetto Has Suffered Economic Prejudice As A Result Of McKesson's Delay In Filing Suit.

With regard to economic prejudice, McKesson misconstrues the applicable case law illogically to *require* that TriZetto change its behavior as a result of McKesson's failure to assert its patent. This requirement makes little sense, for if TriZetto had in fact changed its behavior to avoid suit or minimize damages, TriZetto would have a difficult time showing any prejudice. It is precisely where an accused infringer proceeds on the assumption it will not be sued that a lawsuit filed many years later (eleven for example) causes extreme prejudice. Where, as here, the alleged infringement begins before the patent issues, and the accused infringer continues to develop and invest in the relevant product for many years thereafter because the patentee takes no action, the economic prejudice element of laches is met.

Several of the cases McKesson cites in support of its argument rest largely on the fact that a patentee provided notice of its intent to sue and the alleged infringer failed to change its behavior. *See State Contracting & Eng'g Corp. v. Condotte Am., Inc.*, 346 F.3d 1057 (Fed. Cir. 2003); *Hemstreet v. Computer Entry Sys. Corp.*, 972 F.2d 1290 (Fed. Cir. 1992). These cases are inapposite and inapplicable to the case at bar because McKesson never provided TriZetto with any notice of its intent to sue. *See supra*, Section V.B.

McKesson mischaracterizes this Court's decision in *Tenneco Auto. Corp. v. Visteon Corp.*, 375 F. Supp. 2d 375 (D. Del. 2005). *Tenneco* notes that "[e]conomic prejudice arises where a defendant suffers the loss of monetary investments or incurs damages which would have been prevented if the plaintiff had filed suit earlier. In this regard, courts must look for a change in the economic position of the alleged infringer during the period of delay." *Id*. at 381. As in *Tenneco*, TriZetto has been prejudiced because of its ongoing and continuous investment in and strategic decisions concerning the allegedly infringing products for many years after the '164 patent issued. TriZetto's investment began before the patent issued and has continued to the present *because* McKesson took no action with regard to its patent. TriZetto's decision to acquire Erisco and RIMS, while ignoring opportunities such as Solucient, which had a license to the '164 patent, was based in large part on the fact that McKesson had taken no action against

Erisco or RIMS.   Further, after acquiring RIMS, TriZetto changed the QicLink product, eliminating the clinical editing module from Solucient in favor of an unlicensed clinical editing module from PACE.  Ex. EE (Danza Dep.) at 27-28.  This "business as usual" (as characterized by McKesson) is exactly the type of investment and product design changes that the law recognizes as the basis for economic prejudice.

In general, cases where courts have found no nexus between the investment and the patentee's delay, such as *Ecolab, Inc. v. Envirochem, Inc.*, 264 F.3d 1358 (Fed. Cir. 2001), address situations where an alleged infringer makes a short-term investment to develop and market an infringing product.  Such fact patterns are distinct from cases in which an alleged infringer makes a gradual investment and expansion of its business over a period of eleven years while the patentee sits by and fails to assert its patent rights.  Indeed, a significant long-term investment in the business is precisely the kind of economic prejudice envisioned by the Federal Circuit.  *See, e.g., ABB Robotics, Inc. v. GMFanuc Robotics Corp.*, 52 F.3d 1062, 1065 (Fed. Cir. 1995) (affirming trial court's finding of economic prejudice where defendant demonstrated that this suit would "result in damages which likely would have been prevented by an earlier suit").

McKesson mistakenly claims that TriZetto has failed to demonstrate that it had other alternatives to explore if McKesson initiated suit earlier.  As TriZetto explained in its Opening Brief (D.I. 166), had McKesson or any of its predecessors filed suit earlier, TriZetto and its predecessors would not have continued upgrading and developing new products and updates to its clinical editing product.  *See* D.I. 169 (Bellomo Decl.) at ¶ 9.  Had Erisco or TriZetto been notified of any purported infringement of the '164 patent, Erisco and TriZetto would have investigated other available alternatives, such as partnering with or acquiring software from a provider that had a license to the '164 patent, like Solucient, with whom TriZetto (through RIMS) already had a business relationship.[7]  *Id.* at ¶ 8.  Had HPR contacted Erisco with its

---

[7]    RIMS and TriZetto, in fact, have offered the Solucient software to their customers since 1992-93.  Ex. 38 (Danza Dep.) at 24.

concerns about potential infringement, it is reasonable to conclude that Erisco could have obtained a license from HPR for a modest amount.

REDACTED

Similarly, RIMS had been selling clinical editing software with its claims processing system for at least eight years (since 1992 or 1993) and never faced any accusations of patent infringement. McKesson's prolonged delay thus caused material economic prejudice to TriZetto, when TriZetto subsequently purchased RIMS. *See American Home Prod. Corp. v. Lockwood Mfg. Co.*, 483 F.2d 1120, 1124 (6th Cir. 1973) (holding that the new owners of allegedly infringing assets were "deprived of the opportunity to consider the effect which [the] litigation might have upon the company"); *see also Adelberg Labs., Inc. v. Miles, Inc.*, 921 F.2d 1267, 1272 (Fed. Cir. 1990) (holding that patentee failed to rebut a presumption of material prejudice to defendant where defendant expended capital to expand its business).

It is precisely McKesson's unreasonable and prolonged delay in asserting the patent against TriZetto that led to TriZetto behaving, believing and relying on McKesson's inaction that it was *not* going to be sued. McKesson's prolonged delay is also the reason for what McKesson

terms as TriZetto's "indifference toward the patent." *See* D.I. 161 at 34. The clear nexus between McKesson's dilatory conduct and TriZetto's costs and decisions made in connection with the sales of the accused products and corporate acquisitions demonstrate real and significant economic prejudice.

### 2.   TriZetto Has Suffered Evidentiary Prejudice As A Result Of McKesson's Delay In Filing Suit.

McKesson fails to dispute many of the arguments that TriZetto advanced concerning witnesses who are deceased or no longer available, documents that have been lost or destroyed, or memories that have faded. Instead, McKesson suggests that TriZetto can and should rely on documents related to the earlier *GMIS v. HPR* litigation to obviate the evidentiary prejudice that has been caused by its delay. This only highlights the prejudice that has been caused by McKesson's eleven-year delay.

TriZetto is not GMIS. And many of the issues in TriZetto's case, such as infringement, are different from the ones faced by GMIS. Furthermore, the applicable Federal Circuit law has evolved since the time of the GMIS litigation. Some of the information and discovery available at the time of the GMIS litigation is not available today. For example, two inventors were not deposed in the GMIS litigation, so their thoughts and records in 1994 are not available to TriZetto. In addition, the record in this case clearly indicates that documents produced in that litigation have since been lost or destroyed. *See* Ex. 23 (Goldberg Dep.) at 140-41 (stating that Dr. Goldberg disposed of documents relevant to HPR, Caterpillar, CodeReview and the '164 patent after the GMIS litigation settled). McKesson asserts that because Dr. Goldberg's destruction of documents occurred in approximately 1996, even if McKesson had brought suit earlier, "it is likely that Dr. Goldberg's documents still would not have been available." D.I. 208 at 34. This is nothing but sheer speculation and does not prove an absence of evidentiary prejudice.

McKesson primarily relies upon *RCA Corp. v. Data Gen. Corp.*, 701 F. Supp. 456 (D. Del. 1988), for the proposition that no material prejudice results because defendant had the "benefit of testamentary and documentary evidence from prior litigation." *See* D.I. 208 at 32.

*RCA*, however, contains glaring differences from this case. Unlike McKesson, the patentee in *RCA*, upon learning of defendant's products, promptly notified defendant of its patent and initiated license negotiations; the patentee provided defendant with notice of other litigation and notice that it would pursue claims against unlicensed manufacturers; and the patentee filed for infringement against defendant shortly after the conclusion of the other litigation. 701 F. Supp. at 476-77. This case contains none of those circumstances: McKesson did not promptly notify TriZetto upon learning of TriZetto's products; McKesson and TriZetto met to pursue a business relationship, not to negotiate a license agreement; McKesson did not notify TriZetto about the GMIS litigation or otherwise indicate that they would continue to pursue claims; and McKesson did not file for infringement against TriZetto until nine years after conclusion of the GMIS litigation. *See* D.I. 166 at 4-6; D.I. 212 at 7-8. McKesson's reliance upon *RCA* is entirely misplaced.

Because of the passage of time, prior art documents, publications, records, and other information have been lost, destroyed or are otherwise unavailable to TriZetto.[8] TriZetto's subpoenas to third parties who were developing clinical editing software systems in the late 1980's were fairly ineffective because many of the subpoena recipients did not retain any documents from those projects or from that time frame. *See* D.I. 166 at 23-24. Subpoenas to

---

[8] McKesson misconstrues the facts of two cases for the proposition that "merely showing loss of memory or documents it not enough." *See* D.I. 208 at 30-32. The first case, *James River Corp. of Va. v. Hallmark Cards*, 915 F. Supp. 968, 979 (E.D. Wis. 1996), involves a situation where, unlike the present case, "'most of the passage of time' occurred before [patentee's] delay," and the court found that the alleged infringer had not demonstrated that "any loss of evidence occurred solely, primarily, or even in part from the [patentee's] delay." The second case, *Symbol Techs., Inc. v. Proxim Inc.*, 2004 U.S. Dist. LEXIS 14949 (D. Del. July 28, 2004), is cited by McKesson for two sentences implying that the absence of a document or memory by a witness does not give rise to an inference of evidentiary prejudice. *See* D.I. 208 at 31. However, both of the cited sentences are contingent upon an "absence of other evidence to support defendant's contention." *Symbol*, 2004 U.S. Dist. LEXIS 14949, at *15-16; *see also id.* at *16 (qualifying lack of inference of evidentiary prejudice by "without more"). Here, TriZetto provides ample "other evidence" and "more" to support its contentions of evidentiary prejudice.

Ronald Hurst, the former manager of health care planning at Caterpillar, Inc., and other third party witnesses yielded no documents due to the passage of time. *See, e.g.*, Ex. 27 (Hurst Dep.) at 10 ("I left Caterpillar in 1985. That's 20 years ago. And I've moved several times since then and I have no documents.")

REDACTED

Finally, McKesson altogether ignores its own experts' testimony that "all events between the date of the hypothetical negotiation [until] trial are relevant to consider."[10] Ex. 21 (Wagner Dep.) at 152. Because documents evidencing these circumstances dating from 1993 were not available for his review "because it is a long time ago," and documents were misplaced or lost, Dr. Wagner's estimated damages are based on data from very recent years where sales and revenues are much higher. *See id.* As a result, Dr. Wagner admits that the passage of time

---

[9]     McKesson suggests that the original CodeReview program is irrelevant to understanding the structure of the claims or to construe the claim elements. However, McKesson glosses over the fact that the CodeReview embodiment of the '164 patent is, in fact, specifically identified in the '164 patent "Summary of the Invention" and examples in the '164 patent, entitled "Typical Session with CodeReview," show how the disclosed system works. Ex. 1, col. 3 & Appendix A. The code, however, is no longer available.

[10]    Dr. Wagner presumes the hypothetical negotiation date is October 1993, when the '164 patent issued. Ex. 21 (Wagner Dep.) at 29, 153.

caused evidentiary prejudice to TriZetto in the form of a less fair and less accurate damages estimate.

## III.    CONCLUSION

McKesson's eleven-year delay in filing suit gives rise to a presumption that its delay was unreasonable, inexcusable and prejudicial. McKesson has not and cannot rebut this presumption. Its opposition (and concurrent motion) demonstrate that there is no dispute as to the period of delay or McKesson's pre-patent knowledge. McKesson struggles mightily to find some excuse for its inordinate delay, going so far as to invent excuses that have no supporting authority. The economic and evidentiary prejudice caused by McKesson's delay is not only presumed in this case, but is material and unrebutted.

For all of these reasons, McKesson should be precluded from recovering any damages prior to filing suit against TriZetto.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Rodger D. Smith II*

Jack B. Blumenfeld (#1014)
Rodger D. Smith II (#3778)
1201 N. Market Street
Wilmington, DE 19899
(302) 658-9200

Attorneys for Defendant The TriZetto Group, Inc.

OF COUNSEL:

Jeffrey T. Thomas
David Segal
Michael A. Sitzman
GIBSON, DUNN & CRUTCHER LLP
Jamboree Center, 4 Park Plaza
Irvine, CA 92614

Original Filing Date: January 20, 2006

Redacted Filing Date: January 27, 2006

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on January 27, 2006, he caused to be electronically filed the Reply Brief In Support Of The TriZetto Group, Inc.'s Motion For Partial Summary Judgment Of Laches (Redacted Version) with the Clerk of the Court using CM/ECF, which will send notification of such filing(s) to the following:

> Michael A. Barlow
> Skadden, Arps, Slate, Meagher & Flom LLP

I also certify that copies were caused to be served on January 27, 2006, upon the following in the manner indicated:

### BY EMAIL AND HAND

> Michael A. Barlow
> Skadden, Arps, Slate, Meagher & Flom LLP
> One Rodney Square
> Wilmington, DE 19801

### BY EMAIL AND FEDERAL EXPRESS

> Jeffrey G. Randall
> Skadden, Arps, Slate, Meagher & Flom LLP
> 525 University Avenue
> Suite 1100
> Palo Alto, CA 94301

> */s/    Melissa Stone Myers (#3985)*
> Morris, Nichols, Arsht & Tunnell
> 1201 N. Market Street
> P.O. Box 1347
> Wilmington, DE 19899
> (302) 658-9200
> mmyers@mnat.com