IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

MCKESSON INFORMATION SOLUTIONS
LLC,

                    Plaintiff,

          v.                                          Civil Action No. 04-1258-SLR

THE TRIZETTO GROUP, INC.

                    Defendant.

**EXHIBIT 5**

**THE TRIZETTO GROUP, INC.'S STATEMENT OF**
**ISSUES OF LAW THAT REMAIN TO BE LITIGATED**

## I.    NON-INFRINGEMENT

### A.    Generally

McKesson accuses the ClinicaLogic component of three of TriZetto's[1] software products
– Facets, ClaimFacts and QicLink – of infringing claims 1-6 and 8-16 of U.S. Patent No.
5,253,164.  McKesson has the burden of proving patent infringement by a preponderance of the
evidence.  *SmithKline Diagnostics, Inc. v. Helena Lab Corp.*, 859 F.2d 878, 889 (Fed. Cir.
1988); *Nomos Corp. v. Brainlab, Inc.*, 239 F. Supp. 2d 430, 434 (D. Del. 2003); *Novartis
Pharms. Corp. v. EON Labs Mfg.*, 234 F. Supp. 2d 464, 467 (D. Del. 2002).  An accused
infringer has no burden of proving non-infringement.  *Under Sea Indus., Inc. v. Dacor Corp.*,

---

[1] References herein to "TriZetto" are to The TriZetto Group, Inc., as well as its predecessors,
Erisco and RIMS, unless otherwise noted.  References herein to "McKesson" are to
McKesson Information Solutions LLC, as well as its predecessors, HBOC, GMIS and HPR,
unless otherwise noted.

833 F.2d 1551, 1557 (Fed. Cir. 1987) ("[t]he district court erred to the extent it apparently placed the burden on [the accused infringer] of showing non-infringement").

An infringement analysis involves two steps: "1) claim construction; and 2) application of the properly construed claim to the accused product." *Tech Search, L.L.C. v. Intel Corp.*, 286 F.3d 1360, 1369 (Fed. Cir. 2002). First, the Court must construe the disputed terms of the patent at issue. *Nomos*, 239 F. Supp. 2d at 434-35; *Novartis*, 234 F. Supp. 2d at 467. The claims must be construed as they would be understood by a person of ordinary skill in the art. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005) ("[a] court construing a patent claim seeks to accord a claim the meaning it would have to a person of ordinary skill in the art at the time of the invention").

Second, the Court must compare the accused products with the properly construed claims of the patent. *Nomos*, 239 F. Supp. 2d at 434-35; *Novartis*, 234 F. Supp. 2d at 467. Intent to infringe a patent is irrelevant to the infringement analysis. *Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 35 (1997).

### B.    Literal Infringement[2]

Literal infringement does not occur unless each element of at least one asserted claim of the patent is found in the alleged infringer's product. *Nomos*, 239 F. Supp. 2d at 434; *Novartis*, 234 F. Supp. 2d at 467. All the limitations of a claim must be considered meaningful and the absence of even one limitation negates infringement. *Perkin-Elmer Corp. v. Westinghouse Elec.*

---

[2] McKesson is limited to proving literal infringement in this case, because it has forfeited the ability to invoke the doctrine of equivalents. McKesson's experts failed to offer any equivalents analysis in their expert reports, leaving McKesson without support for a doctrine of equivalents theory. *See MKS Instruments, Inc., v. Advanced Energy Indus., Inc.*, 325 F. Supp. 2d 471, 474 (D. Del. 2004) (granting motion to exclude expert testimony because of failure to timely provide evidence to support claim of infringement under the doctrine of equivalents in expert report). Other than arguments offered by McKesson's counsel (which are not evidence), McKesson has no support for an infringement theory based on the doctrine of equivalents.

*Corp.*, 822 F.2d 1528, 1533 (Fed. Cir. 1987); *Unique Concepts, Inc. v. Brown*, 939 F.2d 1553, 1562 (Fed. Cir. 1991).

### C.    Infringement Of A Means-Plus-Function Or Step-Plus-Function Element

Each of the asserted claims of the '164 patent contains at least one element in means-plus-function form.  Elements written in "means-plus-function" form are permitted by 35 U.S.C. § 112(6), which states:

> An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof.

In exchange for the benefit of writing a claim element in the simplified means-plus-function form, the patentee is obliged to clearly link the claimed function to corresponding structure disclosed in the patent specification.  *See Medical Instrumentation & Diagnostics Corp. v. Elekta AB* ("*MIDCO*"), 344 F.3d 1205, 1211 (Fed. Cir. 2003) ("[t]he duty of a patentee to clearly link or associate structure with the claimed function is the quid pro quo for allowing the patentee to express the claim in terms of function under section 112, paragraph 6"); *O.I. Corp. v. Tekmar Co.*, 115 F.3d 1576, 1583 (Fed. Cir. 1997) ("the price that must be paid for use of that convenience is limitation of the claim to the means specified in the written description and equivalents thereof").  The asserted claims of the '164 patent contain at least 23 distinct means-plus-function elements, each of which must be linked to a particular corresponding structure from the patent specification.  It is not appropriate to use a single, generic structure to cover multiple distinct functions – each function must be clearly linked to its own particular structure. *See MIDCO*, 344 F.3d at 1218 ("[t]here must be something in the disclosure to indicate to the public that the patentee intends for a particular structure to correspond to the claimed function").

Determining infringement of a means-plus-function element is a four-step process:

(1)    Identify the claimed function of the element;

(2)    Identify the corresponding structure in the patent specification that performs the function;

3

(3)    Perform a function-to-function comparison to see if the accused products have the identical function as the claim element; and

(4)    Perform a structure-to-structure comparison to see if the accused products have identical or equivalent structure as that corresponding to the claim element.

*See MIDCO,* 344 F.3d 1205, 1211 (Fed. Cir. 2003); *Mas-Hamilton Group v. LaGard, Inc.,* 156 F.3d 1206, 1211-12 (Fed. Cir. 1998).

As with any infringement analysis, the four-step process for determining infringement of a means-plus-function element includes both "1) claim construction; and 2) application of the properly construed claim to the accused product." *TechSearch,* 286 F.3d at 1369. The first two steps involve construction of the means-plus-function element:

(1)    "The first step . . . is to identify the particular claimed function."

(2)    "The second step in the analysis is to look to the specification and identify the corresponding structure for that function."

*MIDCO,* 344 F.3d at 1210. The third and fourth steps involve comparing the accused products to the construed claim element:

(3)    A function-to-function comparison: "[D]etermine whether the accused device performs an identical function to the one recited in the means-plus-function clause."

(4)    A structure-to-structure comparison: "[D]etermine whether the accused device utilizes the same structure or materials as described in the specification, or their equivalents."

*Mas-Hamilton,* 156 F.3d at 1211-12; *see also Pennwalt Corp. v. Durand-Wayland, Inc.,* 833 F.2d 931, 934 (Fed. Cir. 1987) ("the court must compare the accused structure *with the disclosed structure,* and must find equivalent *structure* as well as *identity* of claimed *function* for the structure") (emphasis in original). In other words, infringement cannot be shown without proof that the structure in the accused product is equivalent to the structures from the patent specification that correspond with the functions described in the claims.

4

The Federal Circuit has recently reiterated this requirement. In *CytoLogix Corp. v. Ventana Med. Sys., Inc.*, 424 F.3d 1168 (Fed. Cir. 2005), the Court reversed a jury verdict of infringement due to the lack of a structure-to-structure analysis, and explained as follows:

> Ventana argues that CytoLogix failed to present substantial evidence of infringement of claim 13 of the '693 patent because it did not conduct a structural analysis of means-plus-function limitations in that claim. The "temperature controller" limitation of claim 13 is a means-plus-function limitation as defined by 35 U.S.C. § 112, ¶ 6. Infringement of a means-plus-function limitation "requires that the relevant structure in the accused device . . . be identical or equivalent to the corresponding structure in the specification." *Odetics, Inc. v. Storage Tech. Corp.*, 185 F.3d 1259, 1267, 51 U.S.P.Q.2d 1225 (Fed. Cir. 1999). To establish infringement under § 112, ¶ 6, it is insufficient for the patent holder to present testimony "based only on a functional, not a structural, analysis." *Alpex Computer Corp. v. Nintendo Co.*, 102 F.3d 1214, 1222, 40 U.S.P.Q.2d 1667 (Fed. Cir. 1996). Here, CytoLogix failed to identify the structure in the specification that is the "temperature controller means" and compare it to the structure of the accused device. Accordingly, because CytoLogix failed to present substantial evidence of infringement of claim 13 of the '693 patent, the jury verdict of infringement of claim 13 must be reversed.

424 F.3d at 1178.

### D.    Corresponding Structure For A Computer-Implemented Means-Plus-Function Element

The corresponding structure for a means-plus-function element in a software patent is the disclosed algorithm. Simply invoking the word "software" is not enough – the particular algorithm in the specification that performs the claimed function must be identified. Section 112(6) requires that specific structure be clearly linked to the element as a *quid pro quo* for drafting the element in the simplified means-plus-function form. Federal Circuit precedent instructs that the corresponding structure for "[a] computer-implemented means-plus-function term . . . is the algorithm" disclosed in the patent specification. *Harris Corp. v. Ericsson Inc.*, 417 F.3d 1241, 1253 (Fed. Cir. 2005); *see also* D.I. 99 (Court Order, September 20, 2005) (the specification must disclose "software" as the corresponding structure that performs the specific function in a means-plus-function claim limitation, "*and the corresponding structure is the algorithm*"). Thus, such computer-implemented means-plus-function claims are limited to the

algorithm(s) that the specification both identifies and specifically links to each function stated in the claims.

The Federal Circuit has held that the correct structure for a computer-implemented means-plus-function element is a specific algorithm expressly disclosed in the patent specification. *WMS Gaming Inc. v. Int'l Game Tech.*, 184 F.3d 1339, 1349 (Fed. Cir. 1999). In *WMS Gaming*, the court reviewed several computer-implemented means-plus-function elements, including the element "means for assigning a plurality of numbers representing said angular positions of said reel . . . ." *Id.* at 1346. The District Court had construed the corresponding structure broadly to be "an algorithm executed by a computer." *Id.* at 1348. The Federal Circuit found that the district court "erred by failing to limit the claim to the algorithm disclosed in the specification." *Id.* The appropriate structure was not simply any "algorithm" for carrying out the claimed function, but the specific algorithm disclosed in the patent. *Id.* ("[t]he structure of a microprocessor programmed to carry out an algorithm is limited by the disclosed algorithm").

The Federal Circuit requires that the specific corresponding structure from the patent specification must be identified in order to support the means-plus-function elements. *Altiris, Inc. v. Symantec Corp.,* 318 F.3d 1363 (Fed. Cir. 2003). In *Altiris*, the court examined the means-plus-function element "means of booting said digital computer." *Id.* at 1375. The element itself actually provided some definition for "means of booting": "said means of booting including a first set of commands . . . and a second set of commands . . . ." *Id.* The patentee argued that the "commands" were software for booting the computer and insisted that such invocation of "software" was sufficient structure. The court rejected that argument:

> [M]erely pointing out that the relevant structure is software rather than hardware is insufficient. As stated above, because "commands" (i.e., software) is so broad as to give little indication of the particular structure used here and is described only functionally, one must still look to the specification for an adequate understanding of the structure of that software.

*Id.* at 1376.

In *Harris Corp. v. Ericsson Inc.*, 417 F.3d 1241 (Fed. Cir. 2005), the Federal Circuit acknowledged "the rule of *WMS Gaming*, which established that the corresponding structure for

a [means-plus-function] claim for a computer-implemented function is the algorithm disclosed in the specification." *Id.* at 1249. The patentee argued that *WMS Gaming* did not limit computer-implemented means-plus-function elements to only the "disclosed algorithm." *Id.* at 1253. The *Harris* court rejected this notion, confirming that "*WMS Gaming* restricts computer-implemented means-plus-function terms to the algorithm disclosed in the specification." *Id.* The Court proceeded to examine the means-plus-function element at issue, finding the corresponding structure in a specific algorithm in the patent specification. *Id.* at 1254.

In *MIDCO*, the Federal Circuit addressed the issue of sufficient corresponding structures. 344 F.3d at 1205. In that case, the court was looking for software structure to support a "means" for performing a "digital-to-digital conversion." *Id.* at 1211-12. The district court found the structure requirement satisfied, because "techniques for performing those conversions were known to those of skill in the art at the time the application was filed." *Id.* at 1211. The Federal Circuit rejected that approach to establishing structure: "It is important to determine whether one of skill in the art would understand the specification itself to disclose the structure, not simply whether that person would be capable of implementing that structure." *Id.* at 1212 (*citing Atmel Corp. v. Info. Storage Devices, Inc.*, 198 F.3d 1374, 1382 (Fed. Cir. 1999) ("Fulfillment of the § 112, P6 trade-off cannot be satisfied when there is a total omission of structure. There must be structure in the specification.")). The court concluded that the structure requirement was not met unless there was some actual software structure revealed in the patent specification. *Id.* ("it is not proper to look to the knowledge of one skilled in the art apart from and unconnected to the disclosure of the patent").

The patentee in *MIDCO* argued that the corresponding structure was provided by a general statement in the specification indicating that software for performing the patented functions was "either commercially available or within the skill of practitioners in the programming arts." *Id.* at 1217. The patentee insisted that this statement was sufficient to establish "software," in a generic sense, as the corresponding structure. The *MIDCO* court

disagreed, observing that "the references to commercially available software or software known in the art" were not clearly linked to any particular functions. *Id.* The court explained:

> Although the specification refers to the use of software programs that 'are either commercially available or within the skill of practitioners in the programming arts,' . . . this statement in no way links software to the function [in question]. . . . There must be something in the disclosure to indicate to the public that the patentee intends for a particular structure to correspond to a claimed function.

*Id.* at 1217-18.

### E.    Direct Infringement

A method claim is not directly infringed by the mere manufacture and sale of a product capable of performing that method. *See, e.g., Joy Techs., Inc. v. Flakt, Inc.*, 6 F.3d 770, 773 (Fed. Cir. 1993). A method claim can only be directly infringed when the method is actually performed by the product user. *Id.* at 773-74. Claims 1, 2 and 16 of the '164 Patent are all method claims. Therefore, TriZetto's sales of the accused products cannot constitute direct infringement of these claims. In order for TriZetto to be found liable for contributing to the infringement of these claims, McKesson must prove direct infringement by a third party. *See, e.g., Serrano v. Tellular Corp.*, 111 F.3d 1578, 1583 (Fed. Cir. 1997) ("There can be no contributory infringement without direct infringement"); *C.R. Bard, Inc. v. Advanced Cardiovascular Sys., Inc.*, 911 F.2d 670, 673 (Fed. Cir. 1990); *Enpat, Inc. v. Microsoft Corp.*, 6 F. Supp. 2d 537, 538 (E.D. Va. 1998). Similarly, TriZetto cannot be liable for inducing infringement unless there is evidence of direct infringement by a third party. *Water Technologies Corp. v. Calco, Ltd.*, 850 F.2d 660, 668 N. 7 (Fed. Cir. 1988) ("Direct infringement is a prerequisite to finding induced infringement"); *Black & Decker (US) v. Catalina Lighting*, 953 F. Supp. 134, 138 (E.D. Va. 1997).

### F.    Contributory Infringement

McKesson accuses TriZetto of contributory infringement in connection with TriZetto's sale of the accused products. Contributory infringement occurs when one:

> offers to sell or sells within the United States or imports into the United States a component of a patented machine, manufacture, combination or composition, or a material or apparatus for use in practicing a patented process, constituting a material part

of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity suitable for substantial noninfringing use.

35 U.S.C. § 271(c).

"[T]he Supreme Court established that to be liable for contributory infringement the accused infringer must know of the patent and also know of the infringement." *Dynamis, Inc. v. Leepoxy Plastics*, 831 F. Supp. 651, 654 (N.D. Ind. 1993) (*citing Aro Mfg. Co. v. Convertible Top Replacement Co.*, 377 U.S. 476 (1964)).

Only one part of the accused products (the ClinicaLogic module) performs functions that allegedly infringe the '164 patent. The accused products as a whole perform many other functions beyond the allegedly infringing ones. The sale of a staple article or commodity suitable for a substantial non-infringing use is not contributory infringement. *See C.R. Bard*, 911 F.2d 670. To determine whether an accused device has substantial non-infringing uses, a Court must consider the entire device, not just the component part that is capable of practicing the patented claims. *Universal Elecs., Inc. v. Zenith Elecs. Corp.*, 846 F. Supp. 641, 651 (N.D. Ill. 1994), *aff'd*, 41 F.3d 1520 (Fed. Cir. 1994) (citing *Hodosh v. Block Drug Co.*, 833 F.2d 1575, 1578 (Fed. Cir. 1987)). The critical inquiry is whether the device as a whole, not just the component part, has any substantial non-infringing uses. *See Rhone-Poulenc Agrochime, S.A. v. Biagro Western Sales, Inc.*, 35 U.S.P.Q. 2d 1203, 1207 (E.D. Cal. 1994); *Hoffmann-La Roche, Inc. v. Promega Corp.*, 33 U.S.P.Q. 2d 1641, 1648 (N.D. Cal. 1994). When an accused device is capable of performing a patented method, but is also capable of substantial non-infringing uses independent of the patented method, a claim for contributory infringement will not lie. *See Sony Corp. of America v. Universal City Studios, Inc.*, 464 U.S. 417, 441 (1984) ("a sale of an article which though adapted to an infringing use is also adapted to other and lawful uses, is not enough to make the seller a contributory infringer"). "Substantial non-infringing use" is any non-infringing use that is not fanciful or concocted merely for purposes of litigation. *Dawson Chem. Co., v. Rohm & Haas Co.*, 448 US 176, 198 (1980); *see also Sony*, 464 U.S. at 441.

### G.    Active Inducement

"Whoever actively induces infringement of a patent shall be liable as an infringer." 35 U.S.C. § 271(b).  To sustain a claim of inducement, the plaintiff must establish that the defendant purposefully caused, urged or encouraged another individual to infringe plaintiff's patent with knowledge of the likely infringing result.  *See Goodwall Construction Co. v. Beers Constr. Co.,* 216 U.S.P.Q. 1006 (N.D. Ga. 1981).

> "[T]o establish a claim for inducement the following elements must be proved:
>
> (1) an inducer's knowledge of the asserted patent;
>
> (2) the presence of direct infringement by the third party allegedly induced;
>
> (3) an inducer's actual intent to cause the acts which "he knew or should have known would induce actual infringements"; and
>
> (4) the commission of an act that constitutes inducement, not merely the power to act or the failure to act.

*Black & Decker (US) v. Catalina Lighting,* 953 F. Supp. 134, 138 (E.D. Va. 1997) (citations omitted); *see also Manville Sales Corp. v. Paramount Sys., Inc.,* 917 F.2d 544, 553 (Fed. Cir. 1990) (liability for active inducement requires that "defendant possessed specific intent to encourage another's infringement and not merely that the defendant had knowledge of the acts alleged to constitute inducement"); *Water Technologies Corp. v. Calco, Ltd.,* 850 F.2d 660, 668 (Fed. Cir. 1988) ("a person [actively induces infringement] by actively and knowingly aiding and abetting another's direct infringement"); *Dynamis,* 831 F. Supp. at 657 ("under § 271(b) an accused infringer must be shown to have actual knowledge of the patent and the infringement and have the actual intent to induce the infringement").

## II.    LACHES

### A.    Generally

The '164 patent issued in October 1993.  McKesson did not initiate this action against TriZetto until September 2004, a delay of 11 years.  For fifteen years prior to filing this action, McKesson has known about the software programs sold by TriZetto and its predecessors that

McKesson now contends infringe the '164 patent. The assignee of the '164 patent, HPR, made public statements shortly after the patent issued regarding its intent to enforce the patent, but TriZetto and its predecessors received no specific notice of infringement until 2003. The only litigation that involved the '164 patent occurred in 1994 between GMIS and HPR. That case lasted one year and was settled in 1995. HPR took no action against and provided no notification to TriZetto's predecessors regarding potential patent infringement. Despite HPR's inaction, TriZetto sought and obtained an opinion of counsel concerning the '164 patent. Among other things, TriZetto was advised that due to the passage of time and McKesson's conduct, the '164 patent was unenforceable against TriZetto based upon the theories of laches and equitable estoppel.[3]

   "Laches is cognizable under 35 U.S.C. § 282 as an equitable defense to a claim for patent infringement." *A.C. Aukerman Co. v. R.L. Chaides Constr. Co.*, 960 F.2d 1020, 1028, 1032 (Fed. Cir. 1992) (*en banc*) (hereinafter "*Aukerman*"). When an alleged infringer establishes laches, the patentee may not recover damages for infringement occurring prior to the filing of the lawsuit. *Id.* at 1041. Laches is defined generally as a "slackness or carelessness towards duty or opportunity." *Aukerman*, 960 F.2d 1020, 1028 (Fed. Cir. 1992) (en banc). In a legal context, laches is defined as the neglect or delay in bringing suit to remedy an alleged wrong, which taken together with lapse of time and other circumstances, causes prejudice to the adverse party and operates as an equitable bar. *Id.* at 1028-29. "Courts of equity, it has often been said, will not assist one who slept upon his rights, and shows no excuse for his laches in asserting them." *Lane & Bodley*, 150 U.S. 193, 201 (1893).

---

[3] When considering the issue of willful infringement, the "totality of the circumstances" surrounding TriZetto's state of mind must be considered by the jury. *Knorr-Bremse Systeme Fuer Nutzfahrzeuge GmbH v. Dana Corp.*, 383 Fed. 3d 1337, 1342 (Fed. Cir. 2004). TriZetto's state of mind as to its laches and equitable estoppel defenses must therefore be considered by the jury in the first trial of this matter, even if those defenses are to be tried to the Court.

To establish laches, an alleged infringer must show that (1) the patentee delayed filing suit for an unreasonable and inexcusable length of time from the time the patentee knew or reasonably should have known of its claim against the alleged infringer; and (2) the delay operated to the prejudice or injury of the alleged infringer. *Wanlass Int'l Inc. v. General Electric Co.*, 148 F.3d 1334, 1337 (Fed. Cir. 1998); *see also Aukerman*, 960 F.2d at 1032.

### B.    Presumption Of Laches

A presumption of unreasonable delay and prejudice arises when a patent holder fails to bring suit within six years after the holder knew or should have known of the potential infringement. *Aukerman*, 960 F.2d at 1037; *see also* 6 Donald S. Chisum, *Chisum on Patents* § 19.05[2][a][i] (2005) ("The delay is measured from the time the patent owner knew or, in the exercise of due diligence, should have known of the defendant's allegedly infringing activity"). When the presumption applies, unreasonable delay and prejudice "must be inferred, absent rebuttal evidence." *Aukerman*, 960 F.2d at 1037. If the patentee has delayed for more than six years in filing suit, the presumption of laches applies, creating a prima facie defense of laches.

The presumption establishes as a matter of law that: (1) the patentee delayed filing suit for an unreasonable and inexcusable length of time from when the patentee knew or reasonably should have known of its claim against the alleged infringer; and (2) the delay operated to the prejudice or injury of the alleged infringer. *Aukerman*, 960 F.2d at 1037. In order to rebut the presumption, the patentee must proffer competent evidence that the delay was not unreasonable and that the alleged infringer was not prejudiced. *Id.* Absent a preponderance of evidence to rebut the presumption, laches is established as a matter of law. *See Gifford*, 153 F.2d at 211.

### C.    First Element: Unreasonable and Inexcusable Delay

The Federal Circuit has identified that "the period of delay begins at the time the patentee has actual or constructive knowledge of the defendant's potentially infringing activities." *Wanlass Int'l Inc.*, 148 F.3d at 1337. Courts have found that the patentee has constructive knowledge where a defendant conducts pervasive, open and notorious activities that a reasonable patentee would suspect were infringing. *Id.* at 1338 (noting that this includes actual knowledge

of "sales, marketing, publication, or public use of a product similar to or embodying technology similar to the patented invention, or published descriptions of the defendant's potentially infringing activities"). Constructive knowledge may also be imputed to the patentee where the defendant's sales and marketing activities or public uses of allegedly infringing technology "are sufficiently prevalent in the inventor's field of endeavor." *Id.*

It is well-established that in calculating the length of the delay before filing suit, the transferee of a patent must accept the consequences of the dilatory conduct of the transferors. *Eastman Kodak Co. v. The Goodyear Tire & Rubber Co.*, 114 F.3d 1547, 1559 (Fed. Cir. 1997) (noting that a patentee cannot avoid the consequences of his laches by transferring the patent), *overruled on other grounds by Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448 (Fed. Cir. 1998). *See also* Donald S. Chisum, *Chisum on Patents*, § 19.05[2][a][ii] (discussing tacking and transfers of interest).

## D.     Limited Excuses Which Would Justify A Delay

*Aukerman* recognized several excuses, including other litigation, negotiations with the accused, poverty and illness, wartime conditions, extent of infringement, and dispute over ownership of patent, which can potentially justify a delay in filing an infringement action. *Aukerman*, 960 F.2d at 1033.

The "other litigation" excuse applies where a patentee reasonably defers suit against an infringer until conclusion of an action against another infringer. *Vaupel Textilmaschinen KG v. Meccanica Euro Italia S.P.A.*, 944 F.2d 870, 877 (Fed. Cir. 1991). For other litigation to excuse a delay in bringing suit, there must be adequate notice of the proceedings to the accused infringer, and the notice must also inform the alleged infringer of the patentee's intention to enforce its patent upon completion of that proceeding. *Vaupel*, 944 F.2d at 877; *see also Adelberg Labs., Inc. v. Miles, Inc.*, 921 F.2d 1267, 1272 (Fed. Cir. 1990) (affirming summary judgment on laches and stating patentee's obligation to communicate to an accused infringer whom it has contacted and failed to sue because of other litigation that it was not acquiescing in the infringement); *Hall v. Aqua Queen Mfg., Inc.*, 93 F.3d 1548, 1554 (Fed. Cir. 1996) (finding

that patentee could not rely upon other litigation as excuse for delay because patentee had not informed alleged infringer of intent to sue after conclusion of other suit).  Where there is prior contact between the patentee and the accused infringer, the overall equities require that the patentee give appropriate notice to the alleged infringer.  *See Aukerman*, 960 F.2d at 1039; *Watkins v. Northwestern Ohio Tractor Pullers Ass'n.*, 630 F.2d 1155, 1163 (6th Cir. 1980) (because another infringer was being sued, and defendant was not, *and* defendant had not been advised that it would be sued, the court held that defendant was entitled to infer that the patentee did not intend to sue it).

Although genuine *continuous and bilateral* negotiations to license or settle *the patent dispute* may constitute an excuse for delay in filing suit, the primary rationale behind the negotiations excuse is to allow a patentee to resolve a patent dispute without resort to litigation. *See Giese v. Pierce Chem. Co.*, 29 F. Supp. 2d 33, 40 (D. Mass. 1998) (citing *General Electric Co. v. Sciaky Brothers*, 304 F.2d 724, 727 (6th Cir. 1962)); *Continental Coatings Corp. v. Metco, Inc.*, 464 F.2d 1375, 1377-78 (7th Cir. 1972)); *see Aukerman*, 960 F.2d at 1033.  The desire to maintain "amicable relations" with the defendant, or otherwise maintain good business relations between parties, however, *does not* serve to justify a patentee's laches.  *Lane & Bodley Co. v. Locke*, 150 U.S. 193, 200-201 (1893) (noting that such behavior is entitled to less favorable consideration by a court of equity than mere inaction).  Thus, in the absence of "continuous and bilateral" negotiations to resolve the patent dispute, the "business negotiation" excuse for delay in filing suit does not apply.  *See Giese*, 29 F. Supp. 2d at 40.

A change in patentee's management is not recognized as an excuse for delay in asserting patent claims.  Federal Circuit case law requires the transferee of a patent to accept the consequences of the dilatory conduct of any transferors.  *Eastman Kodak Co.*, 114 F.3d at 1559 (noting that a patentee cannot avoid the consequences of his laches by transferring the patent).  Hence, the acquisition of HPR (the patent assignee) by HBOC, and the subsequent acquisition of HBOC by McKesson do not excuse McKesson's delay in filing this suit.

14

Additionally, a patentee cannot delay filing its infringement suit until sales by the alleged infringer have grown and the patentee's damages have increased. *See Baker Mfg. Co. v. Whitewater Mfg. Co.*, 430 F.2d 1008, 1014-15 (7th Cir. 1970) (rejecting patentee's excuse that it wished to wait until defendant's business had grown and litigation would be worthwhile); *Odetics, Inc. v. Storage Tech. Corp.*, 919 F. Supp. 911, 922 (E.D. Va. 1996) (rejecting patentee's excuse that "it had no reason to investigate [the accused infringer's product] because the two companies were operating and selling their respective products in different competitive markets"), *aff'd in part, rev'd in part*, 185 F.3d 1259 (Fed. Cir. 1999).

### E.    Second Element:  Prejudice

The second element of the laches defense is that the alleged infringer "suffered material prejudice attributable to the" patentee's delay in filing suit. *Genzyme Corp. v. Atrium Med. Corp.*, 2003 U.S. Dist. LEXIS 12784, *10 (D. Del. 2003).  "Material prejudice is defined to be either economic or evidentiary prejudice." *Id.*  "Economic prejudice requires a change in the economic position of a defendant as a result of the delay, while evidentiary prejudice arises when a defendant is impeded from presenting a full and fair defense on the merits." *Id.*  The six-year presumption, discussed above, establishes material prejudice as a matter of law. *Aukerman*, 960 F.2d at 1035.

#### 1.    Economic Prejudice

"Economic prejudice may arise where a defendant and possibly others will suffer the loss of monetary investments or incur damages which likely would have been prevented by earlier suit." *Aukerman*, 960 F.2d at 1033.  For example, if the economic position of the alleged infringer changes during the period of delay, economic prejudice exists. *See id.*  "[T]he key is whether there is a nexus between the delay and the infringer's decision to expand the infringing activity." *ABB Robotics, Inc. v. GMFanuc Robotics Corp.*, 828 F. Supp. 1386, 1395 (E.D. Wis. 1993) (finding economic prejudice and granting defendant's motion for summary judgment on laches).  Economic prejudice can be shown by evidence of either loss of investment expenditures or damages (from increasing sales) which might have been prevented by an earlier suit. *Id.* at

1396. Such losses or damages must be "because of and as a result of" the patentee's delay. *Aukerman*, 960 F.2d at 1033; *Hemstreet v. Computer Entry Sys. Corp.*, 972 F.2d 1290, 1294 (Fed. Cir. 1992). *See also Adelberg Laboratories, Inc. v. Miles, Inc.*, 921 F.2d 1267, 1272 (Fed. Cir. 1990) (Adelberg failed to rebut the presumption of material prejudice to Cutter as Cutter expended capital to expand its business and build up its clamp business, while it had no reason to believe that Adelberg was going to sue for patent infringement. This activity could have been costly to Cutter if Adelberg had successfully sued and recovered lost profits or increased damages to compensate for the infringement.); *AptarGroup, Inc. v. Summit Packaging Sys.*, 1996 U.S. Dist. LEXIS 3026 (D. Ill. 1996) (economic prejudice is demonstrated, because "while sales and thus potential damages increased, AptarGroup could have switched to another design if it had been previously determined that the Taperseal infringed the '236 patent"); *American Home Prod. Corp. v. Lockwood Mfg. Co.*, 483 F.2d 1120, 1124 (6th Cir. 1973) (holding that the new owners of allegedly infringing assets were "deprived of the opportunity to consider the effect which [the] litigation might have upon the company, and unaware of any claim against the company, built up the business by expanding the operations of the company using the contested product and process").

A significant and gradual investment by the alleged infringer in the expansion of its business over a period of many years constitutes economic prejudice. *See, e.g., ABB Robotics, Inc. v. GMFanuc Robotics Corp.*, 52 F.3d 1062, 1065 (Fed. Cir. 1995) (affirming trial court's finding of economic prejudice where the defendant demonstrated that this suit would "result in damages which likely would have been prevented by an earlier suit"). Furthermore, a potential increase in liability for damages constitutes economic prejudice. *See Herman Miller, Inc. v. Palazzetti Imps. & Exps., Inc.*, 270 F.3d 298, 322 (6th Cir. 2001) (Palazzetti suffered prejudice because of Herman Miller's delay since Palazzetti's potential liability for damages increased).

### 2.    Evidentiary Prejudice

Evidentiary prejudice "may arise by reason of a defendant's inability to present a full and fair defense on the merits due to the loss of records, the death of a witness, or the unreliability of

16

memories of long past events, thereby undermining the court's ability to judge the facts."

*Aukerman*, 960 F.2d at 1033; *see also Wanlass Int'l*, 148 F.3d at 1340 (finding evidentiary

prejudice where there was a presumption of laches and where the defendant's policy was to

destroy internal documents after six years, key witnesses were deceased or unavailable or had

fading memories, and the defendant no longer kept models of some of the accused products).

## III.    EQUITABLE ESTOPPEL

To establish an equitable estoppel defense, the alleged infringer must prove by a

preponderance of the evidence the following three elements:

> (1)  The patentee, through misleading conduct, led the alleged infringer to reasonably
> infer that the patentee did not intend to enforce its patent against the alleged infringer.
> 'Conduct' may include specific statements, action, inaction, or silence where there was
> an obligation to speak.

> (2)  The alleged infringer relied on that conduct.

> (3)  Due to its reliance, the alleged infringer will be materially prejudiced if the
> patentee is allowed to proceed with its claim.

*Philips Elecs. N. Am. Corp. v. Contec Corp.*, 312 F. Supp. 2d 639, 641 (D. Del. 2004) (quoting

*Scholle Corp. v. Blackhawk Molding Co.*, 133 F.3d 1469, 1471 (Fed. Cir. 1998)). *See also*

*Aukerman*, 960 F.2d at 1041.

"Where equitable estoppel is established, all relief on a claim may be barred." *Id.*, 960

F.2d at 1041. Furthermore, "[l]ike laches, equitable estoppel is not limited to a particular factual

situation nor subject to resolution by simple or hard and fast rules." *Id.* ("At most, courts have

provided general guidelines based on fact patterns which have been litigated, albeit attempting to

provide a unifying set of principles"). Estoppel is an equitable defense, addressed to the sound

discretion of the trial court, and in evaluating equitable defenses, a court must look at all the

surrounding facts and circumstances. *Id.*, 960 F.2d at 1041. *See also Scholle Corp. v.*

*Blackhawk Molding Co.*, 133 F.3d 1469, 1471-72 (Fed. Cir. 1998) (emphasizing equitable nature

of estoppel defense and finding that defendant's inference, based on the surrounding

circumstances, that patentee would not sue for infringement "was only reinforced by the course

of dealings between the parties").

17

Silence coupled with *other actions or communications* may constitute an estoppel. *Myers v. Asics Corp.*, 974 F.2d at 1308-09 (noting expressly that silence was not at issue in that case); *see also Myers v. Brooks Shoe Inc.*, 912 F.2d at 1464 (stating that silence "can lead to estoppel if it is sufficiently misleading to induce the alleged infringer to reasonably infer that the patentee has abandoned his patent claims").

Silence and inaction can constitute misleading conduct when combined with other facts, even if those other facts do not include a specific threat from the patentee to the infringer. *See ABB Robotics, Inc.*, 52 F.3d at 1064 (stating that although "an immediate threat of enforcement followed by silence may be the most common scenario, [that] does not mean that it is the only set of facts which can support a finding of misleading silence"). *See also Aukerman*, 960 F.2d at 1042 (noting that "plaintiff's inaction must be combined with other facts respecting the relationship or contacts between the parties to give rise to the necessary inference that the claim against the defendant is abandoned").

The final prong of an equitable estoppel defense examines whether the alleged infringer would be materially prejudiced if the patentee is allowed to proceed with its claim. "As with laches, the prejudice may be a change of economic position *or* loss of evidence." *Aukerman*, 960 F.2d at 1041 (emphasis added) (*see supra*, Section II.E).

## IV.    INEQUITABLE CONDUCT

The inventors and other individuals who are substantively involved in the preparation or prosecution of a patent application have an affirmative duty of candor and good faith in dealing with the Patent Office, which includes a duty to disclose all information material to the patentability of the invention. 37 C.F.R. § 1.56(a); *see also Bristol-Myers Squibb Co. v. Rhone-Poulenc Roher, Inc.*, 326 F.3d 1226, 1233 (Fed. Cir. 2003) ("It is well settled that patent applicants are required to prosecute patent applications 'with candor, good faith, and honesty.' A breach of this duty can take several forms: 'affirmative misrepresentations of a material fact, failure to disclose material information, or submission of false, material information.'") (citations omitted); *Fox Indus., Inc. v. Structural Pres. Sys., Inc.*, 922 F.2d 801, 803 (Fed. Cir. 1990);

18

*Bruno Ind. Living Aids, Inc. v. Acorn Mobility Servs., Ltd.*, 394 F.3d 1348, 1351 n.3 (Fed. Cir. 2005) (citing *Molins PLC v. Textron, Inc.*, 48 F.3d 1172, 1178 n.6 (Fed. Cir. 1995)).

HPR (the assignee of the '164 patent) and the patent inventors failed to disclose to the PTO several material pieces of prior art that the inventors possessed. These included (1) materials related to inventor Robert Hertenstein's manual code-checking system, upon which the '164 patent was based, including published articles on that system, (2) several proposals sent by HPR to Aetna Life and Casualty Insurance Company offering to sell an early prototype of the invention, and (3) written materials concerning a computerized system for reviewing medical claims (Advanced MedLogic System) developed in part by inventor George Goldberg.

A patent will be rendered unenforceable if the assignee or inventors (1) fails to disclose material prior art or other information, (2) with the intent to mislead the Patent Office. *Semiconductor Energy Lab. Co. v. Samsung Elecs. Co.*, 204 F.3d 1368, 1373 (Fed. Cir. 2000); *Molins*, 48 F.3d at 1178; *Fox Indus.*, 922 F.2d at 804; *Hoffmann-LaRoche, Inc. v. Promega Corp.*, 323 F.3d 1354, 1359 (Fed. Cir. 2003). When the duty of candor is breached, both the Patent Office and the public are harmed, and any rights under resulting patents are forfeited. *See Akron Polymer Container Corp. v. Exxel Container, Inc.*, 148 F.3d 1380, 1383 (Fed. Cir. 1998) ("Inequitable conduct is an offense against the PTO and the public . . . the offense deserves its penalty because the processes of the PTO have been transgressed").

A misrepresentation or omission is material if "a reasonable examiner would be substantially likely to consider [it] important in deciding whether to allow an application to issue as a patent." *Bristol Myers*, 326 F.3d at 1234 *quoting GFI, Inc. v. Franklin Corp.*, 265 F.3d 1268, 1274 (Fed. Cir. 2001); *Hoffmann-La Roche*, 323 F.3d at 1367. "Information is material when there is a substantial likelihood that a reasonable examiner would have considered the information important in deciding whether to allow the application to issue as a patent." *Life Techs., Inc. v. Clonetech*, 224 F.3d 1320, 1325 (Fed. Cir. 2000).

A withheld reference, or a misrepresentation, need not be invalidating to be material. *Bristol Myers*, 326 F.3d at 1234; *see also PerSeptive Biosys., Inc. v. Pharmacia Biotech, Inc.*,

225 F.3d 1315, 1322 (Fed. Cir. 2000) ("[W]hether concealed prior art would actually invalidate the patent is irrelevant to materiality"); *Merck & Co. v. Danbury Pharmacal, Inc.*, 873 F.2d 1418 (Fed. Cir. 1989) (district court properly held patent unenforceable for inequitable conduct, despite holding that the prior art withheld, and information misrepresented, by the applicant did not render any of the asserted claims invalid); *Li Second Family Ltd. P'ship v. Toshiba Corp.,* 231 F.3d 1373, 1380 (Fed. Cir. 2000) ("Information concealed from the PTO may be material even though it would not invalidate the patent.")

A patent applicant's duty to disclose is not limited to disclosing prior art. A patent applicant must disclose *any* material information to the Patent Office. 37 C.F.R. § 1.56. For example, information concerning the actual inventors of an application is clearly material, so that mis-naming the inventive entity may constitute inequitable conduct. *PerSeptive Biosys.*, 225 F.3d 1315, 1321 (Fed. Cir. 2000). Similarly, intentionally withholding a portion of a reference, or additional information about a reference, with the intent to deceive the Patent Office, will support a finding of inequitable conduct. *Semiconductor Energy Lab.,* 204 F.3d at 1376-77.

An intentional failure to disclose information that is material to claims in an initial application amounts to inequitable conduct even if the information is immaterial to the claims that are ultimately allowed. *Becton Dickinson & Co. v. C.R. Bard, Inc.,* 719 F. Supp. 1228, 1237-38 (D. N.J. 1989), *aff'd,* 992 F.2d 792 (Fed. Cir. 1990).

The intent to mislead need not be proven by direct evidence, but is usually inferred from the facts and circumstances surrounding the applicants' overall conduct. *Lipman v. Dickinson,* 174 F.3d 1363, 1370 (Fed. Cir. 1999); *Elk Corp. of Dallas v. GAF Bldg. Materials Corp.*, 168 F.3d 28, 32 (Fed. Cir. 1999).

Materiality and intent must be considered together. The more material the misrepresentation or omission, the less intent is necessary to show inequitable conduct. *PerSeptive Biosys.*, 225 F.3d at 1319; *Life Techs.*, 224 F.3d at 1324; *NV Akzo v. E.I. du Pont de Nemours & Co.,* 810 F.2d 1148, 1153 (Fed. Cir. 1987). Conversely, when persuasive evidence

of an intent to deceive is offered, a diminished showing of materiality is required. *Critikon, Inc. v. Becton Dickinson Vascular Access, Inc.*, 120 F.3d 1253, 1256 (Fed. Cir. 1997).

Once the threshold showings of materiality and intent are made, the burden shifts to the patentee "to come forward with evidence which would require reassessment of the validity of the defense." *Paragon Podiatry Lab., Inc. v. KLM Labs., Inc.*, 984 F.2d 1182, 1191 (Fed. Cir. 1993). If the patentee comes forward with such evidence, the court balances materiality and intent and, in light of all of the circumstances, makes a discretionary, equitable judgment regarding whether the patent should be rendered unenforceable. *Bristol Meyers*, 326 F.3d at 1234. In making this judgment, the "more material the conduct, the less evidence of intent will be required in order to find that inequitable conduct has occurred." *PerSeptive Biosys.*, 225 F.3d at 1319.

A determination of inequitable conduct during the prosecution of a patent application renders the subsequently issued patent unenforceable. *Life Techs.*, 224 F.3d at 1324. "[I]f inequitable conduct is established as to any claim, all claims of the patent are rendered unenforceable." *Lummus Indus., Inc. v. D.M & E. Corp.*, 862 F.2d 267, 274 (Fed. Cir. 1988); *see also J.P. Stevens & Co., Inc, v. Lex Tex Ltd, Inc.*, 747 F.2d 1553, 1561 (Fed. Cir. 1984); *Purdue Pharma L.P. v. Boehringer Ingelheim GMBH*, 237 F.3d 1359, 1366 (Fed. Cir. 2001).

## V.    WILLFUL INFRINGEMENT

"Whether infringement is willful is a question of fact, and must be established by clear and convincing evidence." *Comark Communs., Inc. v. Harris Corp.*, 156 F.3d 1182, 1190 (Fed. Cir. 1998). "[A] determination of willfulness is made on consideration of the totality of the circumstances and may include contributions of several factors . . . ." *Knorr-Bremse Systeme Fuer Nutzfahrzeuge GmbH v. Dana Corp.*, 383 F.3d 1337, 1342 (Fed. Cir. 2004). Some of these factors include: "(1) whether the infringer deliberately copied the ideas or design of another; (2) whether the infringer, when he knew of the other's patent protection, investigated the scope of the patent and formed a good-faith belief that it was invalid or that it was not infringed, and (3) the infringer's behavior as a party to the litigation." *Bott v. Four Star Corp.*, 807 F.2d 1567,

21

1572 (Fed. Cir. 1986), *cited in Read Corp. v. Portec, Inc.*, 970 F.2d 816, 827 (Fed. Cir. 1992).

Additional factors include (4) the size and financial condition of the defendant; (5) the closeness

of the merits of the case; (6) the duration of the alleged misconduct; (7) any remedial action

taken by the infringer; (8) the infringer's motivation, if any, for harm; (9) whether the infringer

attempted to conceal its misconduct; (10) whether notice by the patentee was provided to the

infringer; (11) whether the patentee delayed in bringing suit or engaged in bad faith or

misleading actions prior to bringing suit; and (12) whether the infringer obtained and followed

the advice of a competent lawyer. *Read Corp.*, 970 F.2d at 827; *see also Gustafson, Inc. v.

Intersystems Indus. Prods., Inc.*, 897 F.2d 508, 510-11 (Fed. Cir. 1990); *Knorr-Bremse*, 383 F.3d

at 1342; *Westvaco Corp. v. Int'l Paper Co.*, 991 F.2d 735, 743 (Fed. Cir. 1993); *Hall v. Aqua

Queen Mfg.*, 93 F.3d 1548, 1553 (Fed. Cir. 1996).

  An infringer cannot willfully infringe a patent of which it had no notice. *See State Indus.,

Inc. v. A.O. Smith Co.*, 751 F.2d 1226, 1236 (Fed. Cir. 1985) ("To willfully infringe a patent, the

patent must exist and one must have knowledge of it"). Notice of the patent must be *actual*, not

constructive. *See Imonex Servs. Inc. v. W. H. Munzprufer Dietmar Trenner GmbH*, 408 F.3d

1374, 1377 (Fed. Cir. 2005) (*citing Rolls-Royce Ltd. v. GTE Valeron Corp.*, 800 F.2d 1101, 1109

(Fed. Cir. 1986) and *Nike, Inc. v. Wal-Mart Stores, Inc.*, 138 F.3d 1437, 1446 (Fed. Cir. 1998)).

McKesson did not provide TriZetto with actual notice of its infringement contentions under the

'164 patent until 2003.

  One factor militating strongly against a finding of willful infringement is defendants'

good faith reliance on the opinion of competent patent counsel regarding noninfringement,

invalidity or unenforceability of the subject patent. *See Thorn EMI North America v. Micron

Technology, Inc.*, 837 F. Supp. 616, 620 (D. Del. 1993); *Comark Communications, Inc. v. Harris

Corp.*, 156 F.3d 1182, 1190 (Fed. Cir. 1998). Ordinarily, absent evidence of deliberate copying

or concealment of infringing activity, an infringer who obtains and acts upon the competent

advice of its counsel regarding patent invalidity or noninfringement will not be found to have willfully infringed.[4]  *See, e.g., Graco, Inc. v. Binks Mfg. Co.*, 60 F.3d 785 (Fed. Cir. 1995); *Transmatic, Inc. v. Gulton Indus., Inc.*, 53 F.3d 1270, 1279 (Fed. Cir. 1995).  In assessing a defendant's discharge of its affirmative duty of due care and good faith reliance on the opinion of competent counsel, a court will not find willfulness simply because the advice of counsel was later found to be erroneous. *See Ortho Pharm. Corp. v. Smith*, 959 F.2d 936, 944 (Fed. Cir. 1992).  Rather, the opinion must be thorough enough to instill a belief in the defendant that a court might reasonably hold that the patent is invalid, not infringed or unenforceable. *Id.*

Under the Federal Circuit's *en banc Knorr-Bremse* opinion, an adverse inference may not be drawn from the absence of an opinion of counsel. *Knorr-Bremse Systeme F.N. GMBH v. Dana Corp.*, 383 F.3d 1337 (Fed. Cir. 2004).  Specifically, the Federal Circuit has held that "the failure to obtain an exculpatory opinion of counsel shall no longer provide an adverse inference or evidentiary presumption that such an opinion would have been unfavorable." *Id.* at 1346.  Rather, a determination of willfulness is to be made based on a "totality of the circumstances." *Id.* at 1342.

## VI.    DAMAGES

### A.    Generally

"Upon finding for the claimant the court shall award the claimant damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the court."  35 U.S.C. § 284.  "Adequate to compensate" means that the damages arrived at must be reasonable

---

[4]  As previously stated, one of TriZetto's defenses to McKesson's allegation of willful infringement is an opinion of counsel letter obtained by TriZetto on the issue of laches and equitable estoppel. *See, supra,* II.A.  Although these equitable defenses will be tried to the Court, the jury will need to hear evidence of and be instructed concerning these equitable defenses in order to evaluate the "totality of the circumstances" and TriZetto's state of mind as a defense to willful infringement.

under the circumstances – i.e., they must be a close approximation of what would be "adequate to compensate" for the "use made of the invention by the infringer." *Fromson v. Western Litho Plate & Supply Co.*, 853 F.2d 1568, 1575 (Fed. Cir. 1988), *overruled on other grounds by Knorr-Bremse*, 383 F.3d at 1344-45. A patentee must prove its damages by a preponderance of the evidence. *See Proctor & Gamble Co. v. Paragon Trade Brands*, 989 F. Supp. 547, 599 (D. Del. 1997).

### B.    Lost Profits

To recover lost profits damages, a patentee "must show that it would have received the additional profits 'but for' the infringement. The patent owner bears the burden to present evidence sufficient to show a reasonable probability that it would have made the asserted profits absent infringement." *King Instruments Corp. v. Perego*, 65 F.3d 942, 952 (Fed. Cir. 1995).

The Federal Circuit has adopted the *Panduit* test as a standard, non-exclusive method for a patentee to establish lost profits damages. *See Rite-Hite Corp. v. Kelly Co., Inc.*, 56 F.3d 1538, 1545 (Fed. Cir. 1995) (en banc). The *Panduit* test requires the patentee to show:  (a) demand for the patented product; (b) absence of acceptable non-infringing substitutes; (c) manufacturing and marketing capability; and (d) the amount of lost profit. *See Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*, 575 F.2d 1152, 1156 (6th Cir. 1978). The patentee must show the existence of each of these elements by a preponderance of the evidence.

With respect to non-infringing substitutes, the Federal Circuit has held that "an accurate reconstruction of the but-for market takes into account any alternatives available to the infringer." *Grain Processing Corp. v. American Maize-Products Co.*, 185 F.3d 1341, 1351 (Fed. Cir. 1999). The existence of licensees of the patent may demonstrate that acceptable non-infringing substitutes exist. *See id.* ("the 'would-be infringer' in this case would have been able to stay in the but-for marketplace by making sales of the accused products 'in some other lawful manner'"). McKesson and its predecessors have granted at least four licenses under the '164 patent to third parties. The licensees had the right to sell their software to distributors and other resellers, and thus TriZetto could have acquired the software it needed from any of these

licensees and avoided potential infringement. McKesson has not submitted any market share approach to lost profits damages, but instead has taken an all or nothing approach by claiming it would have been the only supplier of clinical editing software to TriZetto's customers. For these reasons, a lost profits theory of damages is improper in this case.

Once the patent owner has met its initial burden, "[t]he burden then shifts to the infringer to show that the ['but for' claim] is unreasonable for some or all of the lost sales." *Rite-Hite*, 56 F.3d at 1545.

### C.    Reasonable Royalty

A reasonable royalty is defined as the amount that a willing licensor and licensee would bargain for at an arm's-length hypothetical negotiation occurring on the eve of the first infringement. *See Proctor & Gamble*, 989 F. Supp. at 606. For the purposes of the hypothetical negotiation, it is assumed that the parties would know all relevant information. *Id.* "Although this analysis necessarily involves an element of approximation and uncertainty, a trier of fact must have some factual basis for a determination of a reasonable royalty. Any rate determined by the trier of fact must be supported by relevant evidence in the record." *Unisplay S.A. v. American Electronic Sign Co.*, 69 F.3d 512, 517 (Fed. Cir. 1995).

The determination of the amount of damages based on a reasonable royalty is an issue of fact. *Id.* In determining a reasonable royalty, the courts have listed fifteen factors that are considered relevant to that determination. These factors are:

1.    The royalties received by the patentee for the licensing of the patent in suit, proving or tending to prove an established royalty.

2.    The rates paid by the licensee for the use of other patents comparable to the patent in suit.

3.    The nature and scope of the license, as exclusive or non-exclusive, or as restricted or non-restricted in terms of territory or with respect to whom the manufactured product may be sold.

4.    The licensor's established policy and marketing program to maintain his patent monopoly by not licensing others to use the

invention or by granting licenses under special conditions designed to preserve that monopoly.

5.      The commercial relationship between the licensor and licensee, such as, whether they are competitors in the same territory in the same line of business; or whether they are inventor and promoter.

6.      The effect of selling the patented invention in promoting sales of other products of the licensee; the existing value of the invention to the licensor as a generator of sales of his non-patented items; and the extent of such derivative or convoyed sales.

7.      The duration of the patent and the term of the license.

8.      The established profitability of the product made under the patent; its commercial success; and its current popularity.

9.      The utility and advantages of the patented invention over the old modes or devices, if any, that had been used for working out similar results.

10.      The nature of the patented invention; the character of the commercial embodiment of it as owned and produced by the licensor; and the benefits to those who have used the invention.

11.      The extent to which the infringer has made use of the invention; and any evidence probative of the value of that use.

12.      The portion of the profit or of the selling price that may be customary in the particular business or in comparable businesses to allow for the use of the invention or analogous inventions.

13.      The portion of the realizable profit that should be credited to the invention as distinguished from non-patented elements, the manufacturing process, business risks, or significant features or improvements added by the infringer.

14.      The opinion testimony of qualified experts.

15.      The amount that a licensor (such as the patentee) and a licensee (such as the infringer) would have agreed upon (at the time the infringement began) if both had been reasonably and voluntarily trying to reach an agreement; that is, the amount which a prudent licensee – who desired, as a business proposition, to obtain a license to manufacture and sell a particular article embodying the patented invention – would have been willing to pay as a royalty and yet be able to make a reasonable profit and which amount

> would have been acceptable by a prudent patentee who was willing
> to grant a license.

*Georgia-Pacific Corp. v. United States Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y.

1970), *aff'd in part*, 446 F.2d 295 (2d Cir. 1971). Also, under the "willing buyer-willing seller

rule," a reasonable royalty must account for a reasonable profit by the supposed licensee (the

accused infringer). *See Georgia-Pacific Corp. v. United States Plywood Corp.*, 446 F.2d 295,

299 (2d Cir. 1971).

Although the hypothetical negotiation must be viewed as occurring on the eve of the first

infringement, courts will admit some evidence of events subsequent to that date, under what is

called the "book of wisdom" approach. *Sinclair Refining Co. v. Jenkins Petroleum Co.*, 289 U.S.

689 (1933). However, the book of wisdom approach cannot be used to change the parties to the

negotiation or ignore the date of the negotiation. *Odetics, Inc. v. Storage Technology Corp.*, 185

F.3d 1259, 1276 (Fed. Cir. 1999) ("[t]he district court correctly understood that 'the hypothetical

negotiation [required in a reasonable royalty analysis] requires the court to envision the terms of

a licensing agreement reached between the patentee and the infringer at the time infringement

began'"); *Riles v Shell Exploration & Production*, 298 F.3d 1302, 1313 (Fed. Cir. 2002) ("[a]

reasonable royalty determination for purposes of making a damages evaluation must relate to the

time infringement occurred, and not be an after-the-fact assessment"). The proper date of the

hypothetical negotiation in this case is October 1993 (just before the '164 patent issued) and the

proper parties are HPR (the patent assignee) and Erisco (TriZetto's predecessor). Any effort by

McKesson's damages expert to alter the parties or the date of the hypothetical negotiation is

improper.

Additionally, McKesson cannot claim all of TriZetto's revenues as a base for its royalty

calculation, given that most of TriZetto's revenue is not attributable to sales of the clinical

editing component (the only software that allegedly infringes the '164 patent). A patentee can

claim damages for unpatented products sold alongside the patented invention (known as

"convoyed sales") *only* if three strict standards are met: (1) the patented feature must form the

27

basis for customer demand for the entire product sold; (2) the patentee must reasonably anticipate the sale of the unpatented parts along with the patented component; and (3) the patented and the unpatented inventions must be functionally related. *TWN Mfg. Co. v. Dura Corp.*, 789 F.2d 895, 901 (Fed. Cir. 1986); *King Instrument Corp. v. Otari Corp.,* 767 F. 2d 853 (Fed. Cir. 1985); *Rite-Hite Corp. v. Kelley Co.*, 56 F.3d 1538 (Fed. Cir. 1995). The allegedly infringing clinical editing software is only a small part of TriZetto's products. Many customers do not purchase the clinical editing component, or if they do receive it as part of a bundled software package, do not use it. The Federal Circuit has held that a critical fact in applying the "convoyed sales" rule is that the infringing product derives substantially all of its value from use of the patented component. *Western Elec. Co. v. Stewart-Warner Corp.*, 631 F.2d 333, 341 (1980). This is not true of the accused TriZetto products.

**D.    Marking**

Notice to the public by marking any patented article is required by 35 U.S.C. § 287(a):

> Patentees, and persons making, offering for sale, or selling within the United States any patented article for or under them, or importing any patented article into the United States, may give notice to the public that the same is patented, either by fixing thereon the word "patent" or the abbreviation "pat.", together with the number of the patent . . . . In the event of failure so to mark, no damages shall be recovered by the patentee in any action for infringement, except on proof that the infringer was notified of the infringement and continued to infringe thereafter, in which event damages may be recovered only for infringement occurring after such notice. Filing of an action for infringement shall constitute such notice.

A patent holder that sells patented articles and seeks to recover damages for infringement occurring before suit is filed must show that it complied with the marking or actual notice requirements of 35 U.S.C. § 287(a). *See Am. Med. Sys., Inc. v. Med. Eng'g Corp.*, 6 F.3d 1523, 1537 (Fed. Cir. 1993). A patentee can only recover damages for the period after marking occurred under § 287(a) or after actual notice was given, whichever came first. *Id.* Actual notice requires "an affirmative act on the part of the patentee which informs the defendant of his infringement." *Amsted Indus. Inc. v. Buckeye Steel Castings Co.*, 24 F.3d 178, 187 (Fed. Cir. 1994).

The patentee has the burden of pleading and proving compliance with the statutory requirements. *See Maxwell v. J. Baker*, 86 F.3d 1098, 1111 (Fed. Cir. 1996) (citing *Motorola, Inc. v. United States*, 729 F.2d 765, 770 (Fed. Cir. 1984) and *Dunlap v. Schofield*, 152 U.S. 244, 248 (1894) ("The duty of alleging, and the burden of proving, either [actual notice or constructive notice] is upon the [patentee].")).

Patented inventions embodied in computer software must be marked by placing the patent number on software CDs, on user manuals, or to appear onscreen when the software is running. *See Soverain Software LLC v. Amazon.com, Inc.*, 383 F. Supp. 2d 904, 906 (E.D. Tex. 2005); *IMX, Inc. v. Lendingtree LLC*, 2005 U.S. Dist. Lexis 33179 at *4-8 (D. Del., Dec. 14, 2005). In *IMX*, this Court found that the patentee's failure to appropriately mark its patented computer software program barred damages under § 287. *IMX*, 2005 U.S. Dist. Lexis 33179 at * 4-8, 12-13. The patentee failed to mark the CDs containing the patented software and failed to mark the website which embodied the patented invention. *Id.* Patentees are also responsible for taking measures to ensure that any patent licensees mark their products containing the patented invention. *Soverain*, 383 F. Supp. 2d 904, 908-09; *Clancy Systems, Int'l, Inc. v. Symbol Technologies, Inc.*, 953 F. Supp. 1170, 1173-74 (D. Colo. 1997).

### E.     Enhanced Damages For Willful Infringement

Under 35 U.S.C. § 284, a court may "increase the damages up to three times the amount found or assessed," but only in cases involving willful infringement. "A showing of willful infringement or bad faith must support an award of enhanced damages .... Enhanced damages are punitive, not compensatory .... Therefore, an infringer may generally avoid enhanced damages with [a] meritorious good faith defense and a substantial challenge to infringement." *Delta-X Corp. v. Baker Hughes Prod. Tools, Inc.*, 984 F.2d 410, 412 (Fed. Cir. 1993).

Even where willful infringement is found, a district court has discretion to deny enhanced damages. *See id.* at 413. If the Court finds willful infringement, it must determine whether or not, under all the circumstances, increased damages are warranted. *See State Indus. Inc. v. Mor-Flo Indus., Inc.*, 948 F.2d 1573, 1576 (Fed. Cir. 1991); *Johns Hopkins Univ. v. CellPro*, 152 F.3d

1342, 1365 (Fed. Cir. 1998) ("[A] finding of willful infringement does not mandate that the district court enhance damages; it merely authorizes the court to do so at its discretion."); *Odetics, Inc. v. Storage Tech. Corp.*, 185 F.3d 1259, 1274 (Fed. Cir. 1999) ("[w]hile willful infringement may allow enhanced damages, such a finding does not compel the district court to grant them. Instead, the decision to grant or deny enhanced damages remains firmly within the scope of the district court's reasoned discretion, informed by the totality of the circumstances").

In determining whether to award increased damages, the Court should consider whether the infringer deliberately copied the ideas or design of another, the infringer's behavior as a party to the litigation, the infringer's size and financial condition, the closeness of the case, the duration of the infringer's misconduct, any remedial action of the infringer, the infringer's motivation for harm, and whether the infringer attempted to conceal its misconduct. *See CellPro*, 152 F.3d at 1352 n.16, 1364-65. A party who has obtained advice of competent counsel or otherwise acquired a bona fide belief that a patent is invalid, not infringed or unenforceable should not face increased damages even if a Court subsequently holds that its good faith belief is unfounded. *See Kloster Speedsteel AD v. Crucible, Inc.*, 793 F.2d 1565, 1581 (Fed. Cir. 1986).

When deciding the issue of willful infringement, the jury will need to consider TriZetto's invalidity defenses, as well as its non-infringement and other positions. Thus, while the Court has included willfulness in the first trial, a final determination and findings of fact on willfulness or enhanced damages cannot be made until after the second trial on validity has occurred.

## F.    Prejudgment Interest

35 U.S.C. § 284 does not require an award of prejudgment interest. "That provision states that interest shall be fixed by the court and . . . leaves the court some discretion in awarding prejudgment interest." *General Motors Corp. v. Devex Corp.*, 461 U.S. 648, 656-57 (1983). It may be appropriate in certain circumstances to limit or even deny prejudgment interest. *Id.* (giving a patent owner's undue delay in prosecuting the infringement suit as one example).

"Under 35 U.S.C. § 284, prejudgment interest ensures adequate compensation for infringement . . . . Prejudgment interest has no punitive, but only compensatory, purposes." *Oiness v. Walgreen Co.*, 88 F.3d 1025, 1033 (Fed. Cir. 1996). The interest merely compensates the patent owner for the use of its money between the date of injury and the date of judgment. *Id.*

Prejudgment interest can be awarded only on the compensatory portion of a damage award and cannot be awarded on the incremental portion of an increased damage award. *See Underwater Devices, Inc. v. Morrison-Knudsen Co., Inc.*, 717 F.2d 1380, 1389 (Fed. Cir. 1993).

### G.    Attorney's Fees

"The court in exceptional cases may award reasonable attorney fees to the prevailing party." 35 U.S.C. § 285. The party seeking attorney fees must establish the facts showing exceptionality by clear and convincing evidence. *See Reactive Metal & Alloys Corp. v. ESM, Inc.*, 769 F.2d 1578, 1582-83 (Fed. Cir. 1985). The purpose is to compensate "the prevailing party for its monetary outlays in prosecution or defense of a suit where the conduct of the losing party is clearly inequitable." *Multi-Tech, Inc. v. Components, Inc.*, 708 F. Supp. 615, 620 (D. Del. 1989).

Determining whether a case is exceptional and, therefore, eligible for an award of attorney fees under § 285 is a two-step process in which the court must first determine whether the case is exceptional and then, after determining that the case is exceptional, determine whether attorney fees are appropriate. *See Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1460 (Fed. Cir. 1998). "[F]or a case to be deemed exceptional, there must be some finding, by clear and convincing evidence, of willful infringement, inequitable conduct before the PTO, misconduct during litigation, vexatious or unjustified litigation or some similar exceptional circumstances." *Biacore*, 79 F. Supp. at 473.

It is only after a specific finding of exceptional circumstances has been made that the discretion to award attorneys fees can be exercised. *See J.P. Stevens Co., Inc. v. Lex Tex Ltd., Inc.*, 822 F.2d 1047, 1050 (Fed. Cir. 1987). Trial courts generally award attorneys' fees against a

defendant only where willful infringement has been proven. *See S.C. Johnson & Sons, Inc. v. Carter-Wallace, Inc.*, 781 F.2d 198, 200 (Fed. Cir. 1986).

A party who has obtained advice of competent counsel or otherwise acquired a basis for a *bona fide* belief that a patent is invalid, not infringed or unenforceable serves the patent system in challenging that patent in a lawsuit conducted fairly, honestly and in good faith. A party should not face increased damages or attorney fees even if a court subsequently holds that belief unfounded. *See Kloster Speedsteel AB v. Crucible, Inc.*, 793 F.2d 1565, 1581 (Fed. Cir. 1986). Attorneys' fees are unwarranted when a party raises a colorable argument that was not raised in bad faith. *See TVI Energy Corp. v. Blane*, 806 F.2d 1057, 1061 (Fed. Cir. 1986).

A patentee's inequitable conduct can justify an "exceptional case" determination under 35 U.S.C. § 285, thereby entitling a successful accused infringer to recover its attorneys' fees. *See A.B. Chance Co. v. RTE Corp.*, 854 F.2d 1307 (Fed. Cir. 1988); *Fox Indus., Inc. v. Structural Preservation Sys., Inc.*, 922 F.2d 801 (Fed. Cir. 1990). "Inequitable conduct . . . either alone or in conjunction with trial conduct, may constitute a basis for an award of attorney fees under 35 U.S.C. § 285 (1982)." *A.B. Chance*, 854 F.2d at 1312.

A patentee that enforces a patent known to have been procured by fraud or enforces in bad faith a patent known to be invalid is liable for an accused infringer's attorneys' fees and other damages. *See Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.*, 382 U.S. 172 (1965). The patentee need not have actual knowledge that the suit was baseless; rather, it sufficient that the patentee "should have known" that the suit was baseless. *Eltech Systems Corp. v. PPG Industries, Inc.*, 903 F.2d 805, 810 (Fed. Cir. 1990).

## VII.   INJUNCTION

A permanent injunction may issue only after infringement *and validity* have both been adjudged. *MercExchange, LLC v. eBay, Inc.*, 401 F.3d 1323, 1338 (Fed. Cir. 2005), *cert. granted*, 74 U.S.L.W. 3321 (U.S. November 28, 2005) (No. 05-130) (citing *Richardson v. Suzuki Motor Co.*, 868 F.2d 1226, 1246-47 (Fed. Cir. 1989)). Until both issues are adjudicated, a

permanent injunction is not appropriate. Accordingly, the issue of injunction cannot be decided until the second trial on the subject of validity has occurred.

The decision to grant or deny injunctive relief remains within the discretion of the trial judge. *See W.L. Gore & Assoc., Inc. v. Garlock, Inc.*, 842 F.2d 1274, 1281 (Fed. Cir. 1988); *See also Odetics, Inc. v. Storage Tech. Corp.*, 14 F. Supp. 2d 785, 788 (E.D. Va. 1998), *aff'd*, 185 F. 3d 1259 (Fed. Cir. 1999) ("The issuance of an injunction following a verdict of infringement is not automatic; however, district courts must instead follow the traditional equitable principles that guide the decision whether to enjoin certain conduct."). The traditional equitable principles requiring consideration, include (1) whether the patentee would face irreparable injury if the injunction did not issue; (2) whether the patentee has an adequate remedy at law; (3) whether granting an injunction is in the public interest; and (4) whether the balance of hardships tips in the patentee's favor. *Odetics, supra*, 14 F. Supp. 2d at 794 (citing *Weinberger v. Romero-Barcelo*, 456 US 305, 312 (1982)). Only where validity and continuing infringement has been clearly established is immediate irreparable harm presumed. *Odetics, supra*, 14 F. Supp. 2d at 794 (quoting *Smith Int'l, Inc. v. Hughes Tool Co.*, 718 F.2d 1573, 1581 (Fed. Cir. 1983)). Even after the presumption applies, it may be rebutted by factors that include (1) whether the infringer has ceased its infringing activity; (2) whether the patentee has granted a licenses in the past such that it can be compensated for the infringements; and (3) whether the patentee delayed in bringing the lawsuit. *Boehringer Ingelheim Vetmedica, Inc. v. Schering-Plough Corp.*, 106 F. Supp 2d 696, 701-702 (D.N.J. 2000).

The Federal Circuit has held that evidence showing that the patent holder is willing to license his patent rights "suggests that any injury suffered by [the patent holder] would be compensable in damages assessed as part of the final judgment in the case." *High Tech Medical Instrumentation, Inc. v. New Image Indus., Inc.*, 49 F.3d 1551, 1557 (Fed. Cir. 1995).

40223639_3.DOC