# EXHIBIT A

Page 125

1  happened so long ago, and what I can't remember, and
2  that's why I'm afraid to say anything, is because,
3  you know, I don't know if my attorney said, have so
4  and so look at this and tell me what he thinks of
5  this paragraph or have somebody review that. I
6  can't remember that stuff. I know that that
7  happened. I know that there were many occasions
8  when the attorney would say, you know, could you
9  have so and so look at this and tell me what he or
10 she thinks. And I can't -- I don't know when that
11 happened and when it didn't happen.
12     Q. Okay. Could I just get it on -- and we
13 will move on, could I just get it on the record that
14 she, as my question is phrased, she's being
15 instructed not to answer?
16     MR. RANDALL: There wasn't an instruction
17 not to answer.
18 BY MR. THOMAS:
19     Q. Okay. Well, then I'll ask the question
20 again.
21     Who, at HPR, reviewed and commented on the
22 drafts of the patent applications.
23     MR. GUTKOWSKI: And the instruction, just
24 for clarity on the record, is to the extent
25 that you can answer that by providing what it

Page 126

1  calls for, namely a name or list of names,
2  based upon your independent recollection now,
3  of your independent knowledge at the time, you
4  may provide an answer.
5      To the extent that it would call for you,
6  to the extent you can remember, to reveal names
7  provided to you through instructions or
8  communications with counsel, then you should
9  decline to answer.
10     MR. RANDALL: And the witness has already
11 responded so it's been asked and answered.
12     THE WITNESS: Yes. I'm uncomfortable
13 answering that question.
14 BY MR. THOMAS:
15     Q. Did you personally ever ask anyone at HPR
16 to assist in the review of the patent applications?
17     A. Did I personally? Yes.
18     Q. Okay. And who did you ask to assist?
19     MR. RANDALL: I'm going to caution you in
20 answering that question not to reveal any
21 communications that you had with your attorneys
22 or any directions given to you by your
23 attorneys in connection with the patent
24 prosecution process.
25     THE WITNESS: So we're in the same place.

Page 127

1      I'm sorry.
2  BY MR. THOMAS:
3      Q. Are the only people --
4      MR. RANDALL: Counsel --
5  BY MR. THOMAS:
6      Q. Are the only people that you asked to
7  assist in the review of the patent applications
8  people who your attorneys told you you should ask to
9  help?
10     A. I don't remember.
11     Q. Did you have discussions with others at
12 HPR about the patent applications at which your
13 attorney was not present?
14     MR. RANDALL: I'm going to caution you not
15 to reveal, in answering that question, any
16 communications provided between you and your
17 attorney or any instructions or directions
18 given by your attorney that you were acting on.
19 BY MR. THOMAS:
20     Q. This is simply a yes or no question.
21     A. Say it again, please.
22     Q. Sure. Did you have any discussions with
23 other folks at HPR about the patent application at
24 which your attorney was not present?
25     A. Yes.

Page 128

1      Q. And during those discussions, did you
2  discuss things other than information you had
3  received from your attorney?
4      A. Yes.
5      Q. Okay. Could you tell me, as best you can
6  recall, what was said during those discussions other
7  than advice or information you received from your
8  attorneys?
9      MR. RANDALL: Or direction provided by the
10 attorney, counsel?
11     MR. THOMAS: Yes.
12     THE WITNESS: Well, here's what I
13 remember. Yes, boy, what a pain in the ass
14 this is, I have a lot of work to do, or how is
15 the patent application, coming?
16     It's coming.
17 BY MR. THOMAS:
18     Q. Do you recall any discussions about the
19 substance of the application?
20     A. About the substance of the application?
21     MR. RANDALL: Other than that was being
22 communicated --
23     THE WITNESS: That was being worked on
24 with the attorney?
25 BY MR. THOMAS:

# EXHIBIT B

Page 173

1   about the patent?
2       A.  Again, I can tell you that every
3   communication that went out from me or the company
4   about CodeReview, the patent, was part of this over-
5   arching strategy about how to deal with it.
6       Q.  Well, Ms. Radosevich, I don't think, and
7   this will be up to your counsel to decide, but I
8   don't think you can use the attorney-client
9   privilege to shield company policies or instructions
10  you may have given to sales people about what they
11  should say to customers and that kind of thing.  So
12  I'll ask you the question and then your counsel can
13  decide.
14          What was -- what were the sales people
15  told about what they should or shouldn't say about
16  the patent to customers or potential customers?
17          MR. RANDALL:  I'm going to object and
18      caution you not to reveal any privileged
19      communications that may have taken place
20      between you and your attorney or your attorneys
21      and your sales people with respect to what not
22      to say to customers.  Whatever was, in fact,
23      said obviously is not privileged.
24          THE WITNESS:  So...
25  BY MR. THOMAS:

Page 174

1       Q.  So my question, and you're going to have
2   to get a clear instruction on whether you're going
3   to answer it, is what were your sales people told by
4   the management of the company about what they should
5   say to customers and potential customers about the
6   patent?
7           MR. GUTKOSKI:  To the extent you can
8       answer that question without revealing
9       communications with or instructions from your
10      legal counsel, you may do so.  If you're unable
11      to answer that question without revealing such
12      instruction or communications from counsel,
13      then decline to answer.
14          THE WITNESS:  The company's policy with
15      respect to communications about the patent were
16      all -- were devised as part of an over-arching
17      strategy in conjunction with my attorney.  So
18      if that's the case, it seems to me that this
19      falls under that category, but I...
20          MR. THOMAS:  Well, I wanted the record to
21      be clear here, John, because if things were
22      said by management to sales people about what
23      positions they should take with customers and
24      potential customers, and I'm not going to be
25      allowed to delve into that because there's some

Page 175

1   sort of privilege being asserted for it, that
2   may be something we have to come back on.  So I
3   just want the record to be clear on that.
4           MR. RANDALL:  Counsel, why don't you ask,
5       and maybe you will get to this, but what was
6       said by sales people or management to third
7       parties?
8           Obviously that communication is not
9       privileged and I don't think that counsel or
10      the witness is objecting to disclosure of that
11      information at all.
12          I think what they are objecting to, at
13      least it's my understanding, it's very clear to
14      me that what they are doing is they are
15      objecting and being careful not to disclose
16      privileged communications between their
17      attorney and their employees.
18  BY MR. THOMAS:
19      Q.  And let me be clear.  I'm not asking about
20  communications between your attorneys and your sales
21  people.  What I want to know, and let's just -- I
22  don't want to waste any more time on this -- is what
23  was said to the sales people by yourself and other
24  members of HPR management about what customers
25  should be told about the patent?

Page 176

1           THE WITNESS:  Okay.  So what -- let me ask
2       you.
3           MR. THOMAS:  Wait.  Wait.  Wait.  I just
4       want to make one cautionary instruction.  I'm
5       going to caution you not to reveal not only
6       that which was communicated directly from the
7       attorney to the sales people, but also that
8       which was directed from management at the
9       direction of the attorneys to the sales people.
10          THE WITNESS:  Well, that's the point.
11          MR. GUTKOSKI:  Well, I think, to be clear,
12      I think that is the distinction you need to
13      draw in it deciding whether or not you can
14      answer the question, because you have the
15      information, either there were things that you
16      told -- you or management told the sales people
17      that you decided on your own or for some other
18      reason, other than a communication or direction
19      with counsel or from counsel, that you decided
20      to tell them.
21          If there are any such things that you can
22      remember, you should provide that as an answer
23      to Mr. Thomas' question.
24          If, however, everything you can recall
25      instructing the sales people in regard to

Page 177

1  patents or any of the other topics he's
2  mentioned were either passing on what the
3  attorneys told you at the direction of
4  counsel, then you should decline to answer on
5  the grounds of privilege.
6      THE WITNESS: Then I need to decline to
7  answer.
8  BY MR. THOMAS:
9      Q.  Okay.  We will raise that later.
10     Were customers and potential customers, in
11  fact, told that the patent had issued?
12     A.  We issued the press release and some
13  customers and potential customers were told that a
14  patent had issued.  Which ones, I don't remember.  I
15  actually don't know, but that was what was done.
16     Q.  Was Mr. Stare telling Caremark about the
17  patent in any way a violation of any company policy?
18     A.  No.
19     Q.  Was it your hope that if customers were
20  informed of the patent, it was more likely that they
21  would purchase CodeReview rather than a competitive
22  program?
23     A.  It was my hope that it would be a factor
24  that they would weigh in their decision-making
25  process that would weigh in our favor, yes.

Page 178

1      Q.  Were customers ever told that if they
2  purchased a competitive program they might be guilty
3  of patent infringement?
4      A.  Not to my knowledge.
5      Q.  Do you know how many customers or
6  potential customers were informed of the patent?
7      A.  No.  I would guess that all of our
8  customers were because typically our press releases
9  were sent to all existing customers.  But, you know,
10  that's a presumption, but that was our practice.
11  With respect to prospectives, it would be up to
12  sales people.
13     Q.  So it was your practice to send your press
14  release to all your customers?
15     A.  Correct.
16     Q.  And do you have any reason to believe that
17  that practice wasn't followed with regard to the
18  press release on the patent?
19     A.  I have no reason to believe that.
20     Q.  We will mark as Exhibit 21 the document
21  bearing Control Number MCK 03457.
22     (Defendant's Exhibit No. 21 was marked for
23  identification.)
24  BY MR. THOMAS:
25     Q.  Do you recall ever seeing this document

Page 179

1  before?
2      A.  I don't recall this specific document.
3      Q.  Do you recall -- do you know who Volpe
4  Welty & Company is?
5      A.  Yes.
6      Q.  Who were they in 1994?
7      A.  They were an investment banking house
8  company.
9      Q.  And do you recall in 1994, following the
10  press release on the patent, that they changed their
11  recommendation on GMIS stock from a buy to a hold?
12     A.  Well, I read it here, so...
13     Q.  Do you recall that happening?
14     A.  I recall, I recall that a number of
15  analysts who followed GMIS reduced their rating.  I
16  don't recall specifically who, but I know that a
17  number of them did.
18     Q.  The third bullet point here says "We have
19  a copy of the patent and have discussed it with HPR
20  management."  Do you recall having any discussion
21  with Volpe Welty & Co about that?
22     A.  It's Volpe Welty.
23     Q.  Volpe Welty.
24     A.  Do I recall?  I don't recall a specific
25  conversation.

Page 180

1      Q.  Do you recall generally speaking with
2  Volpe Welty & Company about the patent?
3      A.  No.  I just recalled speaking with
4  investment banking houses about the, you know,
5  various people about the patent.
6      Q.  And when you were contacted by an
7  investment banker or financial advisor about the
8  patent, what would you tell them?
9      MR. RANDALL: Objection.  Calls for
10  speculation.
11     THE WITNESS: What would I tell them?
12  BY MR. THOMAS:
13     Q.  What did you tell them when they contacted
14  you about the patent?
15     MR. RANDALL: Objection.  Lacks
16  foundation.
17     THE WITNESS: So this was part of our
18  strategy.
19  BY MR. THOMAS:
20     Q.  Well, trust me, what you told an
21  investment banker is not covered by the
22  attorney-client privilege.  Even Mr. Randall would
23  agree with that.
24     MR. RANDALL: I agree with most of what
25  you say, Mr. Thomas.

Page 181

1      THE WITNESS: Okay. So I can't remember
2    what the whole little -- what the whole, you
3    know, what's it called, script was, but the
4    intention, our intention was to communicate to
5    them, yes, we got the patent, we intend to
6    enforce it, and beyond that we can't discuss
7    it.
8  BY MR. THOMAS:
9      Q. And what did you say to the investment
10   bankers about your intent to enforce it?
11     A. Just that we intended to enforce it.
12     Q. Did you provide any more detail about how
13   you intended to enforce it?
14     A. No.
15     Q. In the sixth bullet point it writes, "More
16   important, though, is that HPR can use the patent as
17   a disruptive competitive weapon. In particular, HPR
18   can inform current GMIS customers and potential
19   future GMIS customers that HPR holds a patent to the
20   code reviewing software." Do you see that?
21     A. Yes.
22     Q. Do you know whether GMIS customers were,
23   in fact, informed about the patent?
24     A. I don't know any particulars, but I know
25   if we were selling against them, and I, at this

Page 182

1    point, remember I had a quite a large sales force.
2    If we were selling against them, we would inform
3    people that we held the patent to the CodeReview
4    product.
5      Q. Okay. It was part of your company policy
6    to inform them of that?
7      A. Yes.
8      Q. And you hoped that that would be a selling
9    point that might lead them to choose your software
10   over the competitors'?
11     A. Yes.
12     Q. At this point in time in January 1994, was
13   Erisco a competitor?
14         MR. RANDALL: Objection. Was she aware of
15   whether or not Erisco is a competitor?
16   BY MR. THOMAS:
17     Q. Did you consider Erisco to be a competitor
18   in 1994?
19     A. I considered Erisco to be a claims
20   processing company. As such, they were not a
21   competitor because we did not process claims. I was
22   aware that Erisco either wanted to embed some
23   similar functionality into their claims processing
24   system or had plans to do it or claimed that they
25   were doing it or something. But I never -- but

Page 183

1    because the nature of the -- but that was the end of
2    it.
3      Their sales, their whole sales things was
4    very different from HPR's because they were selling
5    claims processing system. We were selling an
6    embedable niche product, so it was -- we wouldn't
7    find ourselves in the same sales cycle as I would
8    with, for example, GMIS or Value Health Sciences.
9      Q. Did you, at any point, learn that Erisco
10   was selling or licensing software that would correct
11   inaccurate CPT-4 codes on medical claims?
12     A. I was aware that Erisco was selling claims
13   processing systems so they would do the whole soup
14   to nuts administrative processing of claims and
15   they were claiming to either have some functionality
16   that did some claims editing, if you will, similar
17   to what CodeReview did, but that it was a piece of
18   this big system.
19     Q. Were --
20     A. I wasn't aware that they were selling it
21   separately.
22     Q. Were you aware that one piece of their
23   bigger system would correct for CPT-4 codes that had
24   either been unbundled or were otherwise incorrect?
25         MR. RANDALL: At what time period?

Page 184

1  BY MR. THOMAS:
2      Q. Did you ever learn that while you were
3    working at HPR?
4      A. I was aware that they had a module or they
5    claimed to have had a module -- I never saw it or
6    anything -- that would do some code correction that
7    was embedded as part of their overall claims
8    processing system.
9      Q. And when you say code correction, do you
10   mean CPT-4 codes?
11     A. Yes, I do.
12     Q. Would that claim correction include
13   bundling codes that had been inappropriately
14   unbundled, for example?
15         MR. RANDALL: Objection. Lack of
16   foundation and calls for speculation.
17         THE WITNESS: What I -- you know, I never
18   saw it. I never saw it demoed, but I heard
19   that, yes.
20         MR. THOMAS: We need to change the tape.
21         THE VIDEOGRAPHER: We are now going off
22   video record on tape number three. We will be
23   back on tape number four. The time on the
24   monitor, 2:31 p.m.
25         (Brief recess.)

10 (Pages 181 to 184)

EXHIBIT C

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

525 UNIVERSITY AVENUE

PALO ALTO, CALIFORNIA 94301

TEL: (650) 470-4500

FAX: (650) 470-4570

www.skadden.com

DIRECT DIAL
650-470-4580
EMAIL ADDRESS
JRANDALL@SKADDEN.COM

FIRM/AFFILIATE OFFICES

BOSTON
CHICAGO
HOUSTON
LOS ANGELES
NEW YORK
SAN FRANCISCO
WASHINGTON, D.C.
WILMINGTON

BEIJING
BRUSSELS
FRANKFURT
HONG KONG
LONDON
MOSCOW
MUNICH
PARIS
SINGAPORE
SYDNEY
TOKYO
TORONTO
VIENNA

January 26, 2006

**By Fax**

Hon. Louis C. Bechtle
Conrad, O'Brien, Gellman & Rohn, PC
1515 Market Street, 16th Floor
Philadelphia, PA 19102-1916

      RE:    *McKesson Information Solutions LLC v. The TriZetto Group, Inc.,*
              C.A. No. 04-1258 (SLR) (D. Del.)

Dear Judge Bechtle:

      We respectfully submit this letter briefly responding to one of the issues raised in TriZetto's letter of today.

      Contrary to TriZetto's assertion, McKesson's request that TriZetto comply with Your Honor's order expressly requiring further depositions of TriZetto employees Luftig and Lampe is entirely consistent with McKesson's provision of sworn declarations by Mr. Cesarz and Ms. Wukitch answering the questions for which Your Honor ordered responses.[1] Although TriZetto admits that Your Honor did not order a second deposition of Mr. Cesarz or Ms. Wukitch, TriZetto contends that it is entitled to the same relief granted to McKesson with regard to TriZetto's witnesses because the situations are similar. The situations, however, are completely different.

      TriZetto's improper instructions to Mr. Luftig and Ms. Lampe relate to entire **subject matters** that TriZetto improperly obstructed McKesson from inquiring into based on TriZetto's incorrect stance concerning the scope of its waiver of the attorney-client privilege. *See* McKesson's Letter dated Nov. 6, 2005, Exhs. B-E. Chief Judge Robinson specifically ordered that "to the extent that [TriZetto] has exceeded the scope of the privilege ultimately determined to be appropriate by the Special Master, [TriZetto] shall be responsible for the costs incurred by [McKesson] in re-deposing any witnesses who failed to answer questions based on the assertion

---

[1] As discussed in McKesson's letter of January 25, 2006, Dr. Radosevich is a third party witness who resides in Florida. It would be unnecessary and unduly burdensome to require her to submit to a further deposition simply to answer the two questions that Your Honor ordered be answered.

Hon. Louis C. Bechtle
January 26, 2006
Page 2

of privilege." *See* Sept. 20, 2005 Order at 3-4. Consistent with Chief Judge Robinson's order, Your Honor ordered to produce Mr. Luftig and Ms. Lampe for re-deposition because "[i]t is plain, reading the challenged testimony provided that these two witnesses were *severely restricted* in answering the cited questions posed at them during the deposition in relation to the scope of waiver that now applies." Order No. 2 at 4 (emphasis added). Because McKesson was precluded from obtaining answers not only to specific questions, but also as to entire subject matter, Your Honor allowed McKesson "reasonable follow up" in connection with the answers provided during the re-depositions. *See id.*

In contrast, Your Honor only found that three questions posed to Ms. Wukitch and six questions posed to Mr. Cesarz required answers.[2] Unlike the subject matter preclusion McKesson was subjected to in connection with the Luftig and Lampe depositions, all of the nine questions from Ms. Wukitch and Mr. Cesarz's depositions were self-contained questions concerning discrete issues. Moreover, Ms. Wukitch and Mr. Cesarz fully answered the questions in their declarations, with the exception of one question that relates to a document currently under reconsideration by Your Honor. Accordingly, there was and is no reason to order either of McKesson's witnesses to sit for another deposition simply to respond to a few, limited questions that can be and have been answered by declaration.

Accordingly, TriZetto's request for a second deposition of Mr. Cesarz, Ms. Wukitch, and Dr. Radosevich should be denied.

Respectfully submitted,

Jeffrey G. Randall

cc:    Jeffrey T. Thomas, Esq. (by email)
       Jack Blumenfeld, Esq. (by email)

---

[2] As to Mr. Cesarz, Your Honor also identified three questions as to which Your Honor would sustain the privilege objections if certain additional information were provided. Because Mr. Cesarz provided the requested information in his declaration, those questions were properly objected to based on privilege.

# EXHIBIT D

## Roosevelt, T. Kevin

| | |
|---|---|
| **From:** | Sitzman, Michael A. |
| **Sent:** | Friday, April 07, 2006 3:45 PM |
| **To:** | Shek, Bernard; Gutkoski, John T.; Roosevelt, T. Kevin |
| **Cc:** | Thomas, Jeffrey T. |
| **Subject:** | RE: McKesson/TriZetto Radosevich Deposition |

Let's start at 10:30.  That should help everyone.  Unfortunately, we cannot start earlier than that on our end.

John:  no exhibits.

Mike

---

**From:** Shek, Bernard [mailto:BSHEK@skadden.com]
**Sent:** Friday, April 07, 2006 12:50 PM
**To:** Gutkoski, John T.; Sitzman, Michael A.; Roosevelt, T. Kevin
**Cc:** Thomas, Jeffrey T.
**Subject:** RE: McKesson/TriZetto Radosevich Deposition

Mike:

You have stated that you believe your examination of Dr. Radosevich will last about an hour.  Of course, we may have follow up after you conclude your examination.  Given Dr. Radosevich's commitments in the afternoon and her continued preference to start at 10, we should start at 10 to give both parties sufficient time and avoid further inconveniencing the witness.  Please confirm that we will begin at 10 am.

Bernard

---

**From:** Gutkoski, John T. [mailto:jtgutkoski@dbh.com]
**Sent:** Friday, April 07, 2006 12:41 PM
**To:** Sitzman, Michael A.; Shek, Bernard; Roosevelt, T. Kevin
**Cc:** Thomas, Jeffrey T.
**Subject:** RE: McKesson/TriZetto Radosevich Deposition

Gentlemen -

My client would like to begin as early as possible.  We originally suggested 10 am and that is still our preference.  11 am was the latest time that seemed to work.

Also, I note that the email string below notes the possibility of my receiving exhibits today.  I have received none.

    -- John


    -----Original Message-----

**From:** Sitzman, Michael A. [mailto:MSitzman@gibsondunn.com]
**Sent:** Friday, April 07, 2006 3:33 PM
**To:** Shek, Bernard; Roosevelt, T. Kevin; Gutkoski, John T.
**Cc:** Thomas, Jeffrey T.
**Subject:** RE: McKesson/TriZetto Radosevich Deposition

Bernard:

I did not confuse time zones.  I was hoping to start her deposition at 1pm EDT.
But, as John noted below, he and his client need to start by 11am EDT.  We have
arranged for the Court reporter and the conference call to take place at 11am EDT.

Mike

---

**From:** Shek, Bernard [mailto:BSHEK@skadden.com]
**Sent:** Friday, April 07, 2006 12:32 PM
**To:** Roosevelt, T. Kevin; Sitzman, Michael A.; Gutkoski, John T.
**Cc:** Thomas, Jeffrey T.
**Subject:** RE: McKesson/TriZetto Radosevich Deposition

Kevin:  Based on Mr. Gutkoski's March 30 email, it is our understanding that Monday's deposition will start
at 10:00 a.m. EDT.  Mike's email appears to have confused time zones.  We have double-checked with Mr.
Gutkoski and he confirmed that his client would like to start at that time.

Bernard

-----Original Message-----
From: Roosevelt, T. Kevin [mailto:kroosevelt@gibsondunn.com]
Sent: Thursday, April 06, 2006 5:36 PM
To: Sitzman, Michael A.; Gutkoski, John T.
Cc: Shek, Bernard; Thomas, Jeffrey T.
Subject: RE: McKesson/TriZetto Radosevich Deposition

The dial-in number for Ms. Radosevich's deposition on Monday is 888-422-7128.  The participant code is
815462.  Please let me know if you have any additional questions.  Thanks.


T. Kevin Roosevelt
Gibson, Dunn & Crutcher LLP
Jamboree Center
4 Park Plaza
Irvine, California 92614
Direct Dial: 949 451 3932
Direct Fax: 949 475 4744
Email: kroosevelt@gibsondunn.com


-----Original Message-----
From: Sitzman, Michael A.
Sent: Wednesday, April 05, 2006 10:10 AM
To: Gutkoski, John T.

Cc: Roosevelt, T. Kevin; Shek, Bernard
Subject: RE: McKesson/TriZetto litigation

We will work with this.  Thanks

-----Original Message-----
From: Gutkoski, John T. [mailto:jtgutkoski@dbh.com]
Sent: Wednesday, April 05, 2006 8:46 AM
To: Sitzman, Michael A.
Cc: Roosevelt, T. Kevin; Shek, Bernard
Subject: RE: McKesson/TriZetto litigation

That all sounds fine except for the start time. We need to begin late morning no later than 11 am EDT. See
my initial confirmation below.

Please confirm the revised start time.



-----Original Message-----
From:   Sitzman, Michael A. [mailto:MSitzman@gibsondunn.com]
Sent:   Wed Apr 05 11:26:18 2006
To:     Gutkoski, John T.
Cc:     Roosevelt, T. Kevin; Shek, Bernard
Subject:      RE: McKesson/TriZetto litigation

Yes.  We are making telephonic arrangements.  We will circulate a call in number for you and your client to
call in, and for McKesson's counsel to also attend telephonically.  We will have a Court reporter on the line
to record the deposition stenographically in accordance with the Federal Rules.  We are currently planning
on a 1pm EDT start time.

To the extent that there are any exhibits that we need to show Ms.
Radosivich, we will Fed Ex them to you for Friday delivery at your office in Boston, and ask that you bring
them with you when you meet with her for the deposition.  Again, we think the deposition should last
approximately 1 hour.

Kevin Roosevelt of our office will send you additional details later this week, including a conference call
number.  If you have any questions, please do not hesitate to email or call me.

Very truly yours,

Mike Sitzman
G I B S O N , D U N N & C R U T C H E R , L L P
1 Montgomery St
San Francisco, CA 94104
(415) 393-8221
fax (415) 986-5309



-----Original Message-----
From: Gutkoski, John T. [mailto:jtgutkoski@dbh.com]
Sent: Wednesday, April 05, 2006 8:16 AM

To: Sitzman, Michael A.
Cc: Roosevelt, T. Kevin; Shek, Bernard
Subject: RE: McKesson/TriZetto litigation

Mike-

Is this deposition going forward Monday?  If so what are the logistical details?

    John


    -----Original Message-----
From:  Gutkoski, John T.
Sent:   Thu Mar 30 17:54:49 2006
To:    'Sitzman, Michael A.'
Cc:    Roosevelt, T. Kevin; 'Shek, Bernard'
Subject:     RE: McKesson/TriZetto litigation

Mike -

This will confirm Ms. Radosevich's agreement to appear for a continuation on April 10, 2006 of her
deposition on those limited questions specifically ordered by the Special Master's Order.  She and I will
both be in the Palm Beach, FL area and can go to a location there chosen by the parties or to participate
from wherever by phone.  Ms Radosevich is available late morning East Coast time and would like to begin
at 10 am or so.  She has previously scheduled appointments in the afternoon.


Please let me know the specific arrangements.

I copy McKesson's counsel here as notice to them.

Thank you.

    John Gutkoski


    -----Original Message-----
From: Sitzman, Michael A. [mailto:MSitzman@gibsondunn.com]
Sent: Tuesday, March 28, 2006 6:14 PM
To: Gutkoski, John T.
Cc: Roosevelt, T. Kevin
Subject: RE: McKesson/TriZetto litigation


John:

Thanks for the update.  Can you let us know by Monday if we can proceed on April 10?

Thanks,
Mike

———

From: Gutkoski, John T. [mailto:jtgutkoski@dbh.com]
Sent: Tuesday, March 28, 2006 12:37 PM
To: Sitzman, Michael A.
Cc: Roosevelt, T. Kevin
Subject: RE: McKesson/TriZetto litigation

Mike -

Ms. Radosevich is considering whether to appear for the requested telephone continuation of her deposition despite the fact that she was not provided notice of TriZetto's motion to compel or any opportunity to be heard on it. If she decides to appear, we're looking at setting this for April 10th. I should be able to confirm shortly.

-- John

-----Original Message-----
From: Sitzman, Michael A.
[mailto:MSitzman@gibsondunn.com]
Sent: Tuesday, March 21, 2006 8:10 PM
To: Gutkoski, John T.
Cc: Roosevelt, T. Kevin
Subject: RE: McKesson/TriZetto litigation

John:

Can I get an update from you tomorrow regarding your progress on this issue? We are getting close to trial, and we would like to finish this remaining deposition as soon as we can.

Thanks,
Mike

From:   Sitzman, Michael A.
Sent:   Saturday, March 18, 2006 1:04 PM
To:     jtgutkoski@dbh.com
Cc:     Roosevelt, T. Kevin
Subject:   McKesson/TriZetto litigation

John:

As a follow-up to our conversation earlier in the week, I am attaching hereto the relevant Orders from Judge Bechtle (the Special Master appointed by Judge Robinson) and the relevant letter submissions that concern the follow-up deposition of Marcia Radosevich.

<< File: Special%20Order%205.pdf >>  << File: 011806 Ltr.pdf >>  << File: 012506 Ltr.pdf >> << File: Letter 4.pdf >>  <<

File: Order_7 (2).pdf >>

      As we discussed and as reflected in the submissions, a follow-up telephonic deposition of Ms. Radosevich should be sufficient to address the outstanding questions and issues that the Judge has ordered be addressed in a redeposition.  We would like to identify a date with you and your client within the next week or so that the deposition can take place.  Please let me know at your earliest convenience, when you and Ms. Radosevich will be available.

      If you have any questions, please do not hesitate to contact me.

      Very truly yours,

      Mike Sitzman
      G I B S O N , D U N N & C R U T C H E R , L L P
      1 Montgomery St
      San Francisco, CA 94104
      (415) 393-8221
      fax (415) 986-5309

====================================================================
======

      This message may contain confidential and privileged information. If it has been sent to you in error, please reply to advise the sender of the error and then immediately delete this message.

====================================================================
======

====================================================================
======

      This message may contain confidential and privileged information. If it has been sent to you in error, please reply to advise the sender of the error and then immediately delete this message.

====================================================================
======