# EXHIBIT E



**WILCOX & FETZER LTD.**

# In the Matter Of:

# McKesson Information Solutions

# v.

# The Trizetto Group, Inc.

## C.A. # 04-1258 (SLR)

---

### Transcript of:

### Marcia J. Radosevich, Ph.D

### April 10, 2006

---

Wilcox & Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: lhertzog@wilfet.com
Internet: www.wilfet.com

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

McKESSON INFORMATION                )
SOLUTIONS, LLC,                     )
                                    )
            Plaintiff,              )
                                    )      Civil Action
v.                                  )      No. 04-1258 (SLR)
                                    )
THE TRIZETTO GROUP, INC.,           )
                                    )
            Defendant.              )

            Telephonic videotape deposition of MARCIA
J. RADOSEVICH, PH.D., taken pursuant to notice at the law
offices of Morris, Nichols, Arsht & Tunnell, 1201 North
Market Street, 16th Floor, Wilmington, Delaware,
beginning at 10:55 a.m. on Monday, April 10, 2006, before
Kathleen White Palmer, Registered Merit Reporter and
Notary Public.


APPEARANCES:

            (Via telephone):
            JEFFREY G. RANDALL, ESQUIRE
            SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP
               525 University Avenue
               Palo Alto, California   94301
               for the Plaintiff
            JEFFREY T. THOMAS, ESQUIRE
            GIBSON, DUNN & CRUTCHER LLP
               4 Park Plaza
               Irvine, California   92614-8557
               for the Defendant


            -------------------------------------------------
                        WILCOX & FETZER
            1330 King Street - Wilmington, Delaware 19801
                         (302) 655-0477

McKesson Information Solutions
Marcia J. Radosevich, Ph.D

C.A. # 04-1258 (SLR)

The TriZetto Group, Inc.
April 10, 2006

Page 2

1   APPEARANCES (Continued):
2
       (Via telephone):
3       JOHN GUTKOSKI, ESQUIRE
        DAY, BERRY & HOWARD
4       One International Place
        Boston, Massachusetts  02110
5       for the Witness
6   ALSO PRESENT:
7       SYLVANUS HOLLEY, Videographer
        Eagle Video Services, Inc.
8       Fort Lauderdale, Florida
9           - - - - -
10          THE VIDEOGRAPHER:  Today is April 10th in
11   2006, approximately 11:00 a.m. Eastern Standard Time, for
12   the video deposition of Marcia Radosevich in the matter
13   of McKesson vs. TriZetto Group.  The court reporter today
14   is Kathleen Palmer.  My name is Sylvanus Holley from
15   Eagle Video Services, Inc.  The deposition is being
16   conducted at 1000 County Road, West Palm Beach, Florida.
17          Will counsel please announce their
18   appearance for the record?
19          MR. RANDALL:  Jeff Randall with Skadden
20   Arps representing plaintiff, McKesson.
21          MR. GUTKOSKI:  John Gutkoski, Day, Berry &
22   Howard representing the witness.
23          MR. THOMAS:  Jeff Thomas representing
24   TriZetto.

Page 3

1          THE VIDEOGRAPHER:  Will the court reporter
2   swear in the witness?
3          - - - - -
4          MARCIA J. RADOSEVICH, PH.D.,
5       the witness herein, having first been
6       duly sworn on oath, was examined and
7       testified as follows:
8   BY MR. THOMAS:
9       Q.  Miss Radosevich, this is Jeff Thomas.  This is a
10   hopefully brief follow-up to your prior deposition.  As
11   you may know, we have a court order that you appear to
12   testify on essentially two subjects:  the assistance and
13   involvement of folks in the preparation of the patent
14   applications and communications that may have gone out
15   from HPR to HPR customers involving the patent.  So we'll
16   be covering those two things today.
17          Do you understand that although we are
18   doing this informally and over the phone, that you are
19   under oath just as if you were testifying in court or in
20   a live deposition?
21       A.  Yes, I do.
22       Q.  Okay.
23          MR. RANDALL:  Jeff, before you go on, I'd
24   just like to state on the record on Ms. Radosevich's

Page 4

1   behalf that she was given neither notice nor an
2   opportunity to be heard in regard to that court order.
3          Nonetheless, we understand that the issues
4   between the parties regarding the two lines of inquiry
5   that you've just listed primarily involve the privilege
6   now owned by McKesson and that McKesson was present and
7   given an opportunity to be heard.
8          In light of that, Miss Radosevich has
9   agreed to appear and answer questions on those two topics
10   here, but she does so without any waiver of her rights to
11   address those issues with the Court on her own behalf if
12   need be.
13          MR. THOMAS:  That's fine.  And I believe
14   you've stated it correctly that the privilege that was
15   asserted before was the privilege that McKesson was
16   asserting as the current owner of the privilege.  So I
17   agree with that.
18          MR. RANDALL:  Okay.
19   BY MR. THOMAS:
20       Q.  Okay.  Miss Radosevich, with regard to the
21   original patent application that was filed back in 1988,
22   what individuals assisted in the preparation of that
23   patent application?
24       A.  To the best of my recollection it was -- and

Page 5

1   George Goldberg.
2       Q.  George Goldberg and who?
3       A.  George Goldberg, Don Holloway, and Kelly Dugan.
4       Q.  So Dr. Hertenstein did not assist or participate
5   in the process in any way?
6       A.  Well, you know, he talked to people.  I don't
7   know that he actually read anything or wrote anything.
8   He may have and I just don't know.  George Goldberg was,
9   Dr. Goldberg was sort of our in-house doctor.  He was
10   working there closely with Dr. Hertenstein.  I'm sure
11   they must have talked about it, but I don't know for sure
12   if he ever actually saw anything in writing.
13       Q.  What exactly was Dr. Goldberg's role in
14   assisting with the patent application?
15       A.  Dr. Goldberg was primarily interested in
16   clinical -- the clinical content of anything that ended
17   up in the patent and -- yeah, because he's an M.D.
18   Dr. Holloway is not.  He's a Ph.D., so he didn't really
19   have anything to say about the clinical content.
20       Q.  How did Dr. Holloway participate or assist in
21   the preparation of the patent application?
22       A.  Dr. Holloway was primarily involved in insuring
23   that the representation of the logic of the code, the
24   software code, c-o-d-e, was correct.

2 (Pages 2 to 5)

Wilcox & Fetzer, Ltd.          Professional Court Reporters          (302)655-0477

Case 1:04-cv-01258-SLR    Document 321-3    Filed 04/11/2006    Page 5 of 34

McKesson Information Solutions                                    The Trizetto Group, Inc.
Marcia J. Radosevich, Ph.D                                       April 10, 2006
                                    v.
                          C.A. # 04-1258 (SLR)

Page 6

1    Q.  And what about Ms. Dugan, how did she
2  participate in the preparation of the application?
3         MR. RANDALL:  Objection.  Lacks foundation.
4         THE WITNESS:  Should I answer that
5  question, anyway?
6    A.  Kelly was involved largely like -- as was
7  Dr. Holloway, which was in reviewing the logic of the
8  software code.
9  BY MR. THOMAS:
10   Q.  Did all three of these individuals --
11 Dr. Goldberg, Dr. Holloway, and Ms. Dugan -- review the
12 patent application before it was filed?
13        MR. RANDALL:  Objection.  Lacks foundation.
14   A.  All three of those...
15   Q.  If you're talking, we can't hear you.
16   A.  I was talking.
17   Q.  Sorry.  We are not picking up.
18   A.  Oh, I'll speak more loudly.
19        All three of them reviewed different pieces
20 of the application at different stages of the application
21 process.
22   Q.  Did any of them review the entire application
23 before it was filed?
24        MR. RANDALL:  Same objection.  Lacks

Page 7

1  foundation.
2    A.  I actually do not know.  You have to ask them.
3  I don't know if any one of them read the entire
4  application from start to finish.
5    Q.  Now, with regard to the subsequent patent
6  applications that were filed later, did all three of
7  those individuals participate or assist with all of those
8  other applications?
9         MR. RANDALL:  Objection.  It lacks
10 foundation.
11   A.  I can't remember exactly because I know that
12 both doctor -- well, all three -- Holloway, Goldberg, and
13 Dugan -- left the company at one point to pursue other
14 interests, and I honestly don't remember exactly what
15 years that they left and whether or not we were still
16 applying for applications.
17   I can say that if they were employed with
18 the company, I'm sure that I would -- that I asked them
19 to participate.  So as long as they were employed with
20 the company, they were participating in subsequent patent
21 applications processes, but not after they left the
22 company.
23   Q.  Okay.  So after they left the company, you're
24 not aware of any attempt to contact them to get assist --

Page 8

1  further assistance on the patent applications?
2         MR. RANDALL:  Objection.  It lacks
3  foundation.
4    A.  That is correct.  I am not aware of any efforts
5  to contact them about the patent after the -- after they
6  left the company.
7    Q.  Are you aware of anyone explaining to any of the
8  inventors the duty of candor that is required in
9  submitting patent applications?
10   A.  Yes, I am.
11   Q.  Okay.  And do you know who explained that duty
12 of candor to them?
13   A.  Our patent attorney.
14   Q.  And who was that?
15   A.  It was -- it was either Jason Mirabito or Peter
16 Devlin.  I had two patent attorneys at two different
17 times.
18   Q.  And were you actually present when the duty of
19 candor was explained to the inventors?
20   A.  I think I was.  I don't have an explicit
21 recollection of it, but I think I was.  I remember being
22 talked to about that myself and we were in a group.  So
23 that's what I recall.
24   Q.  And were the types of materials in -- with

Page 9

1  regard to articles and publications and prior patents and
2  those sorts of things, the types of those materials that
3  should be disclosed explained to the inventors?
4         MR. RANDALL:  Objection.  Assumes facts not
5  in evidence, number 1.
6         And number 2, I would caution the witness
7  not to disclose any confidential attorney/client
8  communications in answering that question.
9         MR. THOMAS:  Well, let me just --
10 BY MR. THOMAS:
11   Q.  I'm just asking a foundational question at this
12 point, Miss Radosevich, and it's a yes-or-no question.
13        Do you know whether any explanation was
14 given to the inventors of the types of prior art and
15 other historical information that should be disclosed to
16 the patent office?
17   A.  Yes.
18   Q.  And was such an explanation given to all of the
19 inventors?
20   A.  Yes.
21   Q.  And was that given by the patent attorneys?
22   A.  Correct.
23   Q.  Do you personally know what materials, if any,
24 the inventors turned over to the patent attorneys in the

3 (Pages 6 to 9)

McKesson Information Solutions
Marcia J. Radosevich, Ph.D

v.
C.A. # 04-1258 (SLR)

The Trizetto Group, Inc.
April 10, 2006

Page 10

1  way of prior art?
2      A.  I knew at one time.  I don't really -- I don't
3  remember now, but I did know because I was the primary
4  conduit for that.  And I know that we made a very
5  aggressive, very thorough effort to find anything because
6  we were a very little company at the time with even less
7  money.  And so we did not want to waste time or money.
8  At the time we thought it would cost us $10,000 to apply
9  for the patent and that was a whole lot of money to us.
10  So we didn't want to waste that, let alone waste time if
11  there was some prior art out there.
12          So we searched as thoroughly as we could
13  and we are researchers, so we have pretty good research
14  skills, and tried to find anything that might make this
15  exercise worthless because we did not want to waste our
16  time or money pursuing this if there was something
17  already out there.
18          So I know we did cast as thorough a net as
19  we could, as we were capable of and we submitted anything
20  that we found, anything that was -- anything that we
21  looked at we submitted to the attorney.
22      Q.  And then when you say you were the conduit, do
23  you mean that the inventors would give you information or
24  materials and you would then pass that along to the

Page 11

1  patent attorneys?
2      A.  Initially when we were first looking for prior
3  art, yes, because I wanted to know -- I wanted to see
4  anything they turned up, as well.  Again, we did not want
5  to waste any time or money on this thing if there was
6  already something published that would invalidate the
7  whole process.
8          Once we were confident that there was
9  nothing out there and these individuals would, on
10  occasion, have direct contact with the patent attorney
11  when I wasn't present or involved in that.
12      Q.  So as a result of this process, you at one time
13  knew what information was turned over to the patent
14  attorneys, but today after the passage of time, you're
15  not able to recall everything that was turned in?
16          MR. RANDALL:  Objection.  That misstates
17  the witness' testimony, number 1.
18          And number 2, I think she did say that she
19  turned -- they turned over everything.
20          MR. THOMAS:  Well, let me just ask my
21  question.
22  BY MR. THOMAS:
23      Q.  Miss Radosevich, in terms of what specifically,
24  what pieces of prior art were located and turned over,

Page 12

1  you at one time knew what all of those materials were,
2  but you can't recall today what they were?  Is that
3  accurate?
4      A.  We found no prior art.  That's the point.  But
5  any article that mentioned anything that could remotely
6  be interpreted as, you know, bearing on this, we turned
7  it over.
8      Q.  Okay.  So some materials, we don't need to call
9  it prior art if you don't want to, but some materials
10  were turned over to the patent attorneys?
11      A.  Yes.
12      Q.  Okay.  But today, given the passage of time, you
13  can't tell me what all those materials were?
14      A.  I don't recall all those materials, that's
15  correct.
16      Q.  Okay.  Now, in your discussions of what
17  materials to gather and turn over with the inventors, did
18  the subject of the articles and presentations that had
19  been written and done about Dr. Hertenstein's work at
20  Caterpillar discussed?
21      A.  Yes.
22      Q.  And was there a discussion of whether the
23  articles and presentations that had been made on
24  Dr. Hertenstein's work, was there a discussion of whether

Page 13

1  those materials should be turned over to the PTO?
2      A.  Yes.
3      Q.  And what decision was reached on that?
4      A.  PTO is patent --
5      Q.  Patent and Trademark Office.  I'm sorry.  The
6  patent office.
7      A.  No.  I'm talking -- we are not even talking yet
8  about the patent office.  Okay?  We are not even there
9  yet.  This is talking to a patent attorney.  So maybe I
10  didn't make myself clear.  I'm sorry.
11          Before we even wrote a line of the patent
12  application, we conducted what we -- we conducted the
13  most thorough investigation we could conduct of anything
14  that might bear on this and turned it over to our patent
15  attorney.
16          What subsequently happened to those
17  materials, I don't know, but those materials included
18  documents or articles, newspaper articles, whatever, that
19  had been written about Dr. Hertenstein because our patent
20  attorney directed us to turn -- to find if anything was
21  relevant or related to the review, the thinking of it,
22  anything over to him.  And so that's what we did.  Not to
23  the patent office.
24          This is before we even started the

4 (Pages 10 to 13)

Page 14

1  application process because I did not want to waste any
2  money or time on the patent application process if there
3  was something -- if there was prior art. We found no
4  prior -- we found nothing that our patent attorneys
5  defined as prior art, so we decided to go ahead with the
6  patent application.
7      Q. So you believe that the articles that had been
8  written about Dr. Hertenstein's work at Caterpillar were
9  turned over to the patent attorney?
10         MR. RANDALL: Objection. That misstates
11  the witness' testimony.
12      A. We turned over everything that we had or could
13  find about articles about Dr. Hertenstein, about
14  Caterpillar, about anything else that might even
15  obliquely bear on this topic of CodeReview, of what
16  eventually became CodeReview to our patent attorney.
17      Q. Do you know why -- let me strike that.
18         Do you know whether those materials about
19  Dr. Hertenstein's work were submitted by your patent
20  attorney to the patent office?
21         MR. RANDALL: Objection. Number 1, it
22  assumes facts not in evidence that there were such
23  materials.
24         But number 2, are you talking about in

Page 15

1  addition to the express reference to the manual process
2  in the patent?
3         MR. THOMAS: I'm talking about whether
4  Ms. Radosevich knows whether articles that appeared in
5  journals or newspapers or that sort of thing about
6  Dr. Hertenstein's work were turned over to the patent
7  office.
8      A. I don't know. Can't you find that out by asking
9  the patent office?
10  BY MR. THOMAS:
11      Q. Well, I'm just asking you whether you know,
12  whether you recall from when you were involved in the
13  process --
14      A. Not intending to be a smart mouth, I just don't
15  know. I don't know.
16      Q. Do you know whether, in fact, journal articles
17  and newspaper articles about Dr. Hertenstein were, in
18  fact, turned over to the patent attorney?
19         MR. RANDALL: Objection. Assumes facts not
20  in evidence that such materials were located.
21         And number 2, she's been asked and answered
22  the question.
23      Q. Do you have the question in mind,
24  Ms. Radosevich?

Page 16

1      A. I do and I believe you've already asked me that
2  and the answer is the same and that is we turned over --
3  yes, we found some -- whatever existed in writing about
4  Dr. Hertenstein, Caterpillar, anything related to the
5  subject even obliquely and turned it to our patent
6  attorney.
7      Q. As part of this process, did you, in fact, find
8  some journal articles or newspaper articles or scholarly
9  presentations about Dr. Hertenstein's work?
10         MR. RANDALL: Objection. That is vague and
11  ambiguous, and it's also been asked and answered.
12      Q. Ms. Radosevich, I understand you believe that
13  everything you found you turned over. I understand that.
14         My question is: Do you recall whether any
15  publications about Dr. Hertenstein's work were, in fact,
16  found and gathered during this process?
17         MR. RANDALL: Objection.
18      A. I do recall and we turned them over to our
19  patent attorney.
20      Q. Okay. Thank you.
21         Did you have any discussions with the
22  inventors about whether they thought those materials were
23  pertinent to the patent?
24         MR. RANDALL: Objection. That's vague and

Page 17

1  ambiguous. It also calls for a legal conclusion.
2         MR. THOMAS: No, it most certainly does
3  not.
4  BY MR. THOMAS:
5      Q. I'm asking, Miss Radosevich, whether you had any
6  discussions with the inventors about what they thought
7  about these articles that you found with regard to
8  whether they were relevant to the patent application?
9         MR. RANDALL: Same objection.
10      A. We had discussions about much of the material
11  that we uncovered including any mention about
12  Dr. Hertenstein and decided to err on the side of caution
13  and send everything we found to the patent attorney so
14  that he could exercise his judgment as to whether or not
15  it was relevant.
16         Do you understand what I'm saying?
17      Q. And then you left it up to him to make that
18  decision?
19      A. Yes, because we honestly didn't know. I mean,
20  he gave us some guidelines, of course, but beyond that,
21  who knows in this arcane world. So that's what I paid
22  him to do.
23         He also, by the way, conducted his own
24  research into the patentability of prior art and -- yeah.

5 (Pages 14 to 17)

Page 18

1   So he didn't just rely upon us.  He conducted his own
2   research, as well.
3       Q.  Do you know whether an article about
4   Dr. Hertenstein's work that was coauthored by Dr. Egdahl
5   was turned over to your patent attorney?
6           MR. RANDALL: I'm going to object.
7       Mr. Thomas, how does this relate to the two
8   questions? And I've given you, by the way, an
9   extraordinary amount of latitude in the scope of your
10  examination thus far in hopes that you would wrap it up
11  soon, but you apparently are going as far as you possibly
12  can afield from the two questions that the special master
13  allowed to be answered.
14          So while the special master did permit
15  reasonable follow-up and I am giving you latitude in the
16  area of your examination, you've gone too far.
17          So please explain:  How does this relate to
18  who she showed the patent application to?  I believe that
19  was the question.
20          MR. THOMAS:  Well, the question was a
21  foundational question in order to get into who provided
22  what assistance with regard to drafting the patent
23  application.  That was cut off in its entirety at the
24  prior deposition.

Page 19

1           And so now that I'm able to ask about
2   assistance that was provided, I'm trying to find out what
3   assistance was provided.  And I'm going to ask the
4   question and it's up to counsel, I guess, to either
5   instruct her not to answer or allow her to.
6   BY MR. THOMAS:
7       Q.  But the pending question is simply:
8   Miss Radosevich, do you know whether an article
9   coauthored by Dr. Egdahl was turned over to your patent
10  attorneys?
11      A.  Without seeing the article, I can't respond.
12  I'm sorry.
13      Q.  You just don't remember?
14      A.  I don't remember.  I'd have to see what you are
15  referring to to respond.  And even then I may not
16  remember, but at least I'd have a chance.
17      Q.  Okay.  All right.  In your conversations with
18  the inventors who were assisting on the patent
19  application, did the subject of prior communications with
20  Aetna come up?
21      A.  Yes.  My answer is yes.
22      Q.  And do you know whether any information or
23  materials about the communications with Aetna were turned
24  over to your patent attorneys?

Page 20

1           MR. RANDALL: Objection.  That assumes
2   facts not in evidence.
3       A.  Absolutely every scrap of anything that we
4   found, yes, everything we -- everything we found that
5   could be related to the application for the patent was
6   turned over to my patent attorney.
7       So, yes, everything -- we scoured our
8   files, we scoured either -- we scoured everything we
9   possessed, as well as we went to, you know, the library
10  back then, the library not on line, and searched, you
11  know, publications, newspapers, whatever we could find
12  and everything we found that was even remotely related to
13  this project we turned over to our patent attorney,
14  again, I would repeat, because we did not want to waste
15  time and money filing an application for a patent that
16  was going to be invalidated because there was prior art.
17          The other thing I might mention is we did
18  not want a patent if we didn't deserve it.  You know, we
19  were academics at the time and intellectual integrity was
20  very important and nobody wanted -- you know, none of us
21  wanted a patent on something if there was prior art and
22  we, therefore, did not deserve it.
23          So that's what -- the other dimension of
24  this.

Page 21

1       Q.  And do you know -- do you actually recall that
2   among these materials you turned over to the patent
3   attorney, there were proposals that were made to Aetna?
4           MR. RANDALL:  Objection.  That assumes
5   facts not in evidence, number 1.
6           Number 2, it's already been asked and
7   answered.
8           And number 3, you are still way beyond the
9   scope of any reasonable follow-up of the one question
10  that was permitted to be asked -- answered.
11      Q.  Miss Radosevich, just so you have the question
12  in mind, it's very simple:  Do you recall now whether the
13  materials that you turned over actually did include
14  proposals that had been made as of that time to Aetna?
15          MR. RANDALL:  Same objections.
16      A.  I'm sorry.  Again, without seeing the documents
17  themselves, I cannot comment on any particular piece
18  of -- any particular document or piece of information.  I
19  know that at the Aetna -- I know that the -- there had
20  been some prior conversations even before I joined the
21  group with Aetna and I know that we pulled all of that
22  stuff out of our files anything relating to Aetna and
23  gave it to our patent attorney.
24          Whether there was a specific proposal or

6 (Pages 18 to 21)

McKesson Information Solutions                    The Trizetto Group, Inc.
                                    v.
Marcia J. Radosevich, Ph.D          C.A. # 04-1258 (SLR)              April 10, 2006

Page 22

1  letter or document or something, I'm sorry, without
2  seeing it in front of me, I just can't comment on that.
3       But I know that our intention and what I
4  believed that we actually did was pull everything from
5  the files that had to do with communications with Aetna
6  and give that to our attorney.
7    Q.  When you were getting the assistance from the
8  inventors on the application and having discussions with
9  them about that, did the subject of an older software
10 system called AMS come up?
11      MR. RANDALL:  Objection.
12      Mr. Thomas, you still continue to go on far
13 afield from the subject matter that was permitted by the
14 special master, and it's clear to me that your intent
15 simply is to go as far as you possibly can until the
16 witness is instructed not to continue to answer these
17 questions.
18      Can you please explain why you couldn't
19 have asked these questions at her deposition?  Why
20 couldn't you, while you were present and given that you
21 have chosen to participate by phone now, why couldn't you
22 previously have deposed Ms. Radosevich on this subject,
23 brought the documents, shown them to her, whatever
24 documents you have in mind, and let her answer these

Page 23

1  questions?
2       But it's improper for you to do so now by
3  the phone speaking in generalities, particularly after
4  the witness has said a number of times if she could see
5  the document you are referring to, she may be able to
6  answer your question.  But you don't have the documents.
7  You're not here.  And you didn't do it while you had a
8  chance to depose her.
9       So I'm urging you to please get back on
10 track and focus on the issues that are the proper subject
11 of this follow-up.  Otherwise, I am going to have to seek
12 relief from the court.
13      MR. THOMAS:  Well, first of all, last time
14 around I wasn't even allowed to ask who she talked to,
15 much less what was said.  So that was a rather
16 fundamental block.  I have about two more questions in
17 this area before I move on to the second one.
18 BY MR. THOMAS:
19   Q.  And the current question, Miss Radosevich, is
20 simply whether you recall in the discussions you had with
21 the inventors about preparation of the patent application
22 whether the subject of a software system called AMS ever
23 came up.
24      MR. RANDALL:  Objection.  It's vague and

Page 24

1  ambiguous.  And it also assumes facts not in evidence.
2    A.  I'm sorry.  I don't recall.  It's just been too
3  long.
4    Q.  Okay.  That's fine.  Thank you.
5       All right.  Let me move on to the second
6  subject matter that we are allowed to cover today, and
7  that is:  Can you tell me, please, what were the HPR
8  salespeople instructed to say to customers about the
9  patent?
10   A.  Those people were instructed to say that we had
11 received a patent on CodeReview, and that was pretty much
12 it.  That we were proud, you know, whatever.  We were
13 proud to announce or we were proud to say that we had
14 received a patent on CodeReview, and I think often we
15 would list the patent number or something.
16   Q.  Were salespeople allowed to tell customers that
17 if the customer was using someone else's clinical editing
18 software, there was an infringement of the patent
19 occurring?
20   A.  Absolutely not.  And, in fact, if they did -- if
21 they did that and I found out about it, those were
22 grounds for dismissal.
23   Q.  Was any instruction given to the salespeople
24 about which of the competitive clinical editing systems

Page 25

1  you believed were infringing?
2       MR. RANDALL:  Objection.  That assumes
3  facts not in evidence that at that time or any time,
4  because your question is vague and ambiguous, believed
5  that other systems were infringing or had the
6  foundational knowledge to make that determination.
7       MR. THOMAS:  Okay.  Well, I'll take you up
8  on your request that I lay a foundation.
9  BY MR. THOMAS:
10   Q.  Miss Radosevich, did you believe that any of the
11 competitive clinical editing systems were infringing your
12 patent?
13      MR. RANDALL:  Objection.  Your question is
14 vague and ambiguous both as to time and the systems you
15 are asking about.
16   Q.  You can answer the question.
17   A.  When -- what -- when are you talking about?
18   Q.  During the period when you were the president of
19 HPR, during that time period, did you ever have any
20 opinion or belief as to which of the other clinical
21 editing systems that were out there were infringing your
22 patent?
23      MR. RANDALL:  Objection.  That question
24 lacks foundation.

7 (Pages 22 to 25)

McKesson Information Solutions                                    The Trizetto Group, Inc.
Marcia J. Radosevich, Ph.D          C.A. # 04-1258 (SLR)                April 10, 2006

Page 26

1    Go ahead.
2    A.  You're asking a technical legal question.
3  You're asking a legal technical question as to whether or
4  not other products infringed the patent.
5        In my opinion, and my approach was to turn
6  over whatever information we could find to our patent
7  attorney, let him examine it, and then tell me whether or
8  not he thought someone was infringing.
9        I -- you know, I'm not a patent attorney
10  and I do appreciate how arcane that whole world is.  And
11  so to me, that's a technical legal decision that I was
12  never capable of making.
13        And so as I said, I turned over whatever
14  materials I thought would be interesting to him and then
15  he would come back and tell me whether or not what he
16  thought we should -- how he thought we should proceed.
17    Q.  In the instructions that were given to the
18  salespeople about what they were to say to the customers,
19  was there any distinction made based on which competitor
20  a customer was considering?
21        MR. RANDALL:  Objection.  And that assumes
22  facts not in evidence as to competitors, and it also is
23  vague and ambiguous as to who you mean.
24    A.  Absolutely not.  I spent more time telling the

Page 27

1  sales guys what they could not tell, what they could not
2  say than telling them what they could say.  And I tried
3  to make it very clear, and I think that they got the
4  point because I never got other feedback or feedback to
5  the contrary.
6        I believe they understood that it was a
7  matter of legal requirement that they be very, very, very
8  cautious about what they say about this.  So they were
9  instructed -- they were allowed to say that we had
10  received a patent, we are very proud about this, but to
11  not go any further.
12        And, in fact, as I said, I told them that
13  if I found out that any of them were making more
14  grandiose claims, they could be dismissed because it was
15  that important.  And I think they got it.  I had a very
16  intelligent although aggressive sales team and I never
17  got feedback to the contrary that they were using this in
18  an inappropriate way.  If I had gotten feedback, I would
19  have fired people.  I never had to fire anybody.  I never
20  even had to question anyone.  I never got any indication
21  that they were not telling the mark on this.
22    Q.  Do you know whether any of your salespeople said
23  anything about the patent to Erisco customers?
24        MR. RANDALL:  Objection.  That question

Page 28

1  lacks foundation.  Which companies are you referring to?
2  It's also vague and ambiguous.
3    Q.  I'm asking, Miss Radosevich:  While you were the
4  president of HPR, do you know whether any HPR salespeople
5  said anything about the patent to Erisco customers?
6        MR. RANDALL:  Which customers?  I mean, the
7  question lacks foundation as to which customers.  It
8  calls for speculation.
9    Q.  You can answer the question, Miss Radosevich.
10    A.  I don't know.  I don't know.  I had a large
11  sales force and they were involved in many dozens of
12  sales cycles at any one time, so I don't know -- at this
13  point, in particular, I don't know who they were talking
14  to.
15    Q.  Do you know whether your sales people even
16  called on Erisco customers?
17        MR. RANDALL:  Objection.  That also lacks
18  foundation and calls for speculation.
19    A.  To answer that, I don't know today.  To answer
20  that question, I'd have to go back and look at old
21  documents or something, sales calls logs which probably
22  don't even exist anymore because we did keep track of
23  those things, but I imagine they've all been long
24  destroyed since they are so out of date.  So I don't

Page 29

1  know.
2    Q.  Okay.
3        MR. THOMAS:  I have no further questions.
4  Thank you very much, Miss Radosevich.
5        THE WITNESS:  You're welcome.
6        MR. RANDALL:  Mr. Thomas, has your local
7  counsel given you the documents?
8        MR. THOMAS:  No.
9        MR. RANDALL:  Brian, are you on the phone?
10        (No response.)
11        MR. RANDALL:  Brian?
12        (No response.)
13        MR. RANDALL:  All right.  Give me just a
14  minute.  Let me make a phone call.  Can you also, Jeff,
15  why don't we just take a minute and why don't you call
16  your local -- you know, walk over if you want to, but
17  find out why it hasn't been delivered to you?  Because
18  I'm sure that it's been faxed.
19        MR. THOMAS:  I'm willing to step out and
20  check, although I certainly object to the use of any
21  exhibits that are being sent in the middle of the
22  deposition.  But I'll check.
23        THE VIDEOGRAPHER:  Going off the video
24  record.

8 (Pages 26 to 29)

McKesson Information Solutions             v.              The Trizetto Group, Inc.
Marcia J. Radosevich, Ph.D              C.A. # 04-1258 (SLR)              April 10, 2006

Page 30

1      (A recess was taken at this time.)
2          MR. THOMAS: I just want to make a note on
3   the record that I do not believe that Judge Bechtle's
4   order allows for any examination by Ms. Radosevich by
5   Mr. Randall. We don't have to resolve that here or argue
6   about it here. I just want it on the record that I do
7   not believe that Judge Bechtle's order allows for any
8   examination of Ms. Radosevich by Mr. Randall.
9          MR. RANDALL: I'm sorry, Jeff. Are you
10  suggesting that you can examine the witness and I have no
11  opportunity to cross-examine the witness? Is that your
12  position?
13         MR. THOMAS: My position is you had your
14  opportunity to cross-examine the witness at the first
15  deposition and that the purpose of this session today is
16  simply to follow up on some questions that she was
17  improperly instructed not to answer at the prior
18  deposition.
19         MR. RANDALL: Jeff, I think I have and my
20  client has a fundamental right to cross-examine a witness
21  and the testimony should not be presented if it was not
22  at least subject to cross-examination. So I disagree
23  with you.
24         MR. THOMAS: I knew you would. I just want

Page 31

1   to make a record.
2          MR. RANDALL: Jeff, I want to go off the
3   record and I want to make sure that you get these
4   documents.
5          (Discussion off the record.)
6          MR. THOMAS: I've just been handed a stack
7   of documents that appear to be about an inch thick. I
8   don't know what they are. I haven't seen them before.
9   And just for the record, I object to any examination of
10  the witness on these documents.
11         MR. RANDALL: We are back on the record.
12         And, Mr. Thomas, by the way, you have been,
13  I understand, delivered exhibits that I may use during
14  this cross-examination, so you got them and you are
15  participating by phone. I will proceed through this
16  examination and certainly you've made your objection
17  about the documents.
18         MR. THOMAS: Yes. And for the record, I am
19  participating by phone because Judge Bechtle ordered that
20  this deposition be taken by phone.
21         We also had an understanding that any
22  exhibits to be used would be exchanged on Friday. I was
23  just handed these documents about one minute ago.
24         MR. RANDALL: All right.

Page 32

1   BY MR. RANDALL:
2      Q.   Ms. Radosevich, let me follow up with respect to
3   some questions that Mr. Thomas asked you.
4          First, Mr. Thomas isn't here at this
5   deposition. He's participating by telephone; is that
6   right?
7      A.   Yes.
8      Q.   And Mr. Thomas previously deposed you for the
9   better part of a day; correct?
10     A.   Yes.
11     Q.   In person here in Florida; correct?
12     A.   Yes.
13     Q.   And during that time he showed you a number of
14  documents; correct?
15     A.   I was here.
16     Q.   During his examination today, Mr. Thomas
17  referenced a collection of material that may have been
18  assembled in connection with the patent application
19  process; is that correct?
20     A.   Correct.
21     Q.   And he asked you a number of questions about
22  what documents may have been collected and what documents
23  may have been provided to the attorneys and what
24  documents may have been discussed; correct?

Page 33

1      A.   Correct.
2      Q.   Did he show you today any of the documents that
3   he was specifically referring to if he was referring to
4   any specific documents?
5      A.   He did refer to some specific documents but he
6   did not show them to me.
7      Q.   You believe it may have assisted you in
8   recalling what specific documents were collected or
9   provided to your attorney if Mr. Thomas had provided you
10  the specific documents he was interested in so that you
11  could look at them?
12     A.   Of course, yes.
13     Q.   But he didn't do that?
14     A.   No.
15     Q.   So he didn't show you any of the documents he
16  was perhaps referring to to refresh your recollection
17  about whether those documents were collected or provided
18  to any attorney?
19     A.   That's correct.
20     Q.   Before you I have Exhibit 5 that was marked
21  earlier in your deposition. Do you have that exhibit?
22     A.   I do.
23     Q.   And that is a January 24, 1989, letter from you
24  to Ms. Faith Glover who was the director of health

9 (Pages 30 to 33)

Case 1:04-cv-01258-SLR    Document 321-3    Filed 04/11/2006    Page 12 of 34

McKesson Information Solutions                                    The Trizetto Group, Inc.
Marcia J. Radosevich, Ph.D          v.                                    April 10, 2006
                              C.A. # 04-1258 (SLR)

Page 34

1  information at Erisco. Do you see that?
2      A. Yes, I do.
3      Q. And you previously testified that you believe
4  that this is a letter that you wrote and sent to
5  Ms. Glover on or about January 24, 1989; correct?
6      A. Correct.
7          MR. THOMAS: I object specifically to
8  questioning about this letter. I can't imagine how this
9  has anything to do with preparation of the patent
10  application or communications by salespeople with
11  customers. It's outside the scope of today's deposition.
12      Q. And at the bottom of this letter it says
13  "Enclosures." Do you see that?
14      A. Yes.
15      Q. And at the top of the letter it states: "Dear
16  Faith, At your request I am enclosing materials which
17  describe HPR and our expert system, CodeReview(tm), which
18  corrects physician claim coding errors. Please forgive
19  me for the long delay between our first telephone
20  conversation and this response; I was under the
21  impression that materials had already been sent."
22          Do you see that?
23      A. Yes, I do.
24          MR. THOMAS: Jeff, do you want to explain

Page 35

1  on the record how this has anything to do with
2  preparation of the patent application or communications
3  with customers?
4          MR. RANDALL: Your objection is noted. It
5  falls squarely within the subject.
6          MR. THOMAS: How? Go ahead and say on the
7  record how.
8          MR. RANDALL: I'm not going to argue with
9  you.
10          MR. THOMAS: Well, you have to lay some
11  foundation or give some justification for going into this
12  and going outside the scope of the deposition for today.
13  What is your justification for this?
14          MR. RANDALL: Jeff, I'm not going to argue
15  with you.
16          MR. THOMAS: You don't have one. That's
17  why you are not going to argue with me.
18          MR. RANDALL: If you would refrain from
19  obstructing this deposition, you would soon find out the
20  relevance of this.
21          MR. THOMAS: I just want an explanation.
22  That's all.
23          MR. RANDALL: I don't have to give it to
24  you right now. You can listen to the witness' answers.

Page 36

1  If you need to move to strike it later, you can. You are
2  simply obstructing the witness. I'm asking you politely:
3  Please stop it.
4  BY MR. RANDALL:
5      Q. Down at the bottom -- strike that.
6          So, Miss Radosevich, does this indicate to
7  you that on or about January 24, 1989, you sent to
8  Erisco, specifically Ms. Faith Glover, the director of
9  health information, materials describing your HPR
10  CodeReview product which she previously requested?
11          MR. THOMAS: Objection. Outside the scope
12  of the deposition.
13      A. Yes.
14      Q. At the bottom of this letter you state: "You
15  mentioned the possibility of my speaking to your annual
16  users' conference. I would appreciate the opportunity to
17  do so, and would like to discuss this further with you.
18  Please call me once you have the opportunity to review
19  the enclosed materials so that we might explore this
20  possibility."
21          Do you see that?
22      A. Yes, I do.
23      Q. Why did you want the opportunity to speak to
24  Erisco's annual users' conference?

Page 37

1          MR. THOMAS: Objection. Outside the scope
2  of the deposition.
3      A. Because I had been in conversations with Erisco
4  about their integrating our CodeReview product into their
5  claims processing system. And talking about CodeReview
6  in front of their customer base would be a great way of
7  introducing both the concept of CodeReview and then
8  hopefully generate sales of CodeReview integrated into
9  the Erisco claims processing system.
10          Erisco at the time wanted to have this type
11  of functionality and did not have it, and so we were
12  discussing their licensing our software, then integrating
13  it into their larger claims processing system, and then
14  their sales force selling it to their market.
15      Q. As of at least the date of this letter,
16  January 24, 1989, and based on your discussions with
17  Erisco prior to that, did you believe in those
18  discussions that Erisco perhaps was a potential customer
19  of HPR CodeReview process?
20          MR. THOMAS: Objection. Outside the scope
21  of the deposition.
22      A. We considered Erisco a potential -- what we
23  would call a third-party vendor where, yes, so that they
24  would be a customer but they, themselves, would not use

10 (Pages 34 to 37)

Case 1:04-cv-01258-SLR   Document 321-3   Filed 04/11/2006   Page 13 of 34

McKesson Information Solutions                                    The Trizetto Group, Inc.
Marcia J. Radosevich, Ph.D                                              April 10, 2006
v.
C.A. # 04-1258 (SLR)

Page 38

1  the software, but rather integrate it into a larger
2  software system and then their customers would use our
3  software.
4      Q.  All right.  So as of January 24, 1989, Erisco
5  had had at least expressed interest to you in obtaining
6  materials regarding your HPR CodeReview product so that
7  they could integrate it into their claims processing
8  system?
9          MR. THOMAS:  Objection.  Outside the scope
10  of the deposition.  Obviously has nothing to do with
11  patent preparation or communications with customers.
12      A.  Erisco not only wanted materials about
13  CodeReview, they wanted CodeReview.  If they wanted to do
14  this, we would have to turn over all of our technical
15  documentation as well as code, and then they would
16  integrate our code into theirs.  So that's -- our
17  understanding was that's what they wanted.
18      Q.  And in response to this request from Erisco,
19  you, in fact, did provide materials describing HPR's
20  CodeReview product to Erisco; correct?
21          MR. THOMAS:  Objection.  Shamelessly
22  outside the scope of the deposition.
23      A.  The answer is correct.
24      Q.  Did Erisco at that time ever tell you that, in

Page 39

1  fact, they didn't want to become a customer of HPR's, but
2  instead wanted -- were thinking about developing a
3  competing product?
4          MR. THOMAS:  Jeff, what in the world are
5  you doing?  How does that have anything to do with the
6  scope of today's deposition, with communications with
7  customers or patent application?  This is ridiculous.
8  What are you doing?
9      Q.  You can answer.
10          MR. THOMAS:  Object.  Outside the scope of
11  the deposition.  And I do want to note that I'm going to
12  be seeking sanctions with regard to today's deposition.
13      Q.  You can answer the question.
14      A.  At the time of this letter, at the time of these
15  discussions which took place before and shortly after
16  this letter, my understanding was that Erisco wanted to
17  license our code so that they wouldn't either have to or
18  they didn't even know how to write their own code.  And
19  so this was easier and faster and better for them to just
20  license it from us in order to provide a need that they
21  saw among their customer base.
22      Q.  Do you recall at or prior to this letter, which
23  is dated January 24, 1989, Erisco explaining to HPR that
24  it intended to use HPR's CodeReview product materials to

Page 40

1  assist it in developing a competing product?
2      A.  Of course not.  I wouldn't have sent them any
3  material.
4          MR. THOMAS:  Jeff, in fairness, I just want
5  you to know that this transcript is going to be going to
6  Judge Bechtle and Judge Robinson just as soon as we can
7  get it with a request for sanctions.
8      Q.  Miss Radosevich, did Erisco ever ask HPR whether
9  CodeReview was a patented product as of the date of this
10  letter, January 24, 1989?
11      A.  Not that I recall, no.
12      Q.  Did Erisco ever ask HPR whether
13  whether HPR had a pending patent application on its
14  CodeReview product at the time but prior to this letter
15  being sent?
16          MR. THOMAS:  Continuing objection.  All
17  this is outside the scope of the deposition.
18      A.  I don't recall them ever asking that.
19      Q.  Did you ever -- do you recall ever informing
20  Erisco as of the date of this letter that the CodeReview
21  product was the subject of a patent application?
22      A.  I don't recall ever mentioning that.
23      Q.  Did you know whether any of your -- strike that.
24          Do you know whether any of HPR's

Page 41

1  salespeople prior to this letter being sent disclosed to
2  Erisco that HPR's CodeReview product was the subject of a
3  pending patent application?
4      A.  I can't imagine that any of them would.  I don't
5  even know that they would even know that we had applied
6  for a patent.
7      Q.  They never asked?
8      A.  No, and we weren't talking broadly about it at
9  the time because we just applied and we knew it was going
10  to be a multi, you know, faceted project and so we didn't
11  talk about it.
12          MR. RANDALL:  Let me mark for
13  identification as Exhibit 6 a document bearing Bates
14  stamp numbers MCK 051638 through 051661 and it's entitled
15  "HPR."
16      Q.  Ms. Radosevich, does this document...
17          MR. THOMAS:  If somebody is talking, we
18  can't hear you.
19          MR. RANDALL:  We are just getting a copy
20  for the witness.
21          MR. RANDALL:  We are getting a copy for the
22  witness.  I'll mark this document as Exhibit 5-A to the
23  deposition.
24          (Exhibit 5-A was marked for

11 (Pages 38 to 41)

Page 42

1  identification.)
2  BY MR. RANDALL:
3     Q.  Miss Radosevich, would you look through this
4  document and tell me whether this document is an accurate
5  description of the HPR CodeReview product that was the
6  subject of the patent application as of early 1989?
7     **A.  I'm looking. Yes, this looks like the document**
8  **that we used, describes CodeReview. CodeReview is the**
9  **name of our product. Yes.**
10    Q.  And directing your attention to -- strike that.
11          Was this a document that HPR in early 1989
12  would provide to customers regarding its patented
13  CodeReview product?
14          MR. THOMAS:  I object. It's outside the
15  scope of the deposition. I've looked through this
16  document. I can't see anything that relates to the
17  preparation of the patent application or communications
18  to salespeople about what they were to say to customers.
19  This is obviously, again, far outside the scope of the
20  deposition.
21    **A.  This was a -- the type of document and perhaps**
22  **exactly, I can't remember exactly, but this is what we**
23  **would send to people to describe the product in a sales**
24  **cycle, yes.**

Page 43

1     Q.  So, for instance, in early 1989, if a customer
2  like Erisco wanted information regarding HPR's patented
3  CodeReview product, this is the type of information that
4  would be provided to potential customers?
5          MR. THOMAS:  Same objection.
6     **A.  That was correct.**
7     Q.  And does this document, Exhibit 5-A, accurately
8  describe the patented CodeReview product functionality as
9  of early 1989?
10          MR. THOMAS:  Same objection.
11    **A.  Yes, it does.**
12          MR. RANDALL:  I'll mark for identification
13  as Exhibit 6 your previous deposition taken in the GMIS
14  case, between GMIS and HPR, and it's dated November 29,
15  1994. There bears Bates stamp numbers MCK 39718 through
16  39768.
17          (Exhibit 6 was marked for identification.)
18  BY MR. RANDALL:
19    Q.  Were you deposed, Miss Radosevich, in the
20  EMIS/HPR patent litigation on or about November 29, 1994?
21          MR. THOMAS:  We didn't get an answer.
22          THE WITNESS:  I said yes, I was.
23  BY MR. RANDALL:
24    Q.  Take a moment to look through this testimony and

Page 44

1  then answer this question:  Does this transcript appear
2  to be the transcript of your deposition taken in the GMIS
3  case?
4     **A.  Yes, or it appears to be that.**
5     Q.  I would like to direct your attention to page 9,
6  line 11 through 13.
7          The question is:  "Have you ever heard of a
8  company called Erisco?"  Answer:  "Yes."
9          Do you see that?
10    **A.  Yes.**
11    Q.  Were you asked that question and did you give
12  that answer in 1994?
13          MR. THOMAS:  Objection. Outside the scope
14  of the deposition.
15    **A.  To the best that I can remember, yeah.**
16    Q.  And directing your attention to page 10 of your
17  transcript and page 11 of your transcript, if you need to
18  review those pages to refresh your recollection about
19  answering this question, please do so.
20          But the question is:  Do you recall being
21  asked at that deposition whether or not you were aware of
22  the features of a claim processing system that Erisco
23  had?
24    **A.  Yes.**

Page 45

1          MR. THOMAS:  Objection. Outside the scope
2  of the deposition. Best evidence.
3     **A.  Yes, the claims processing system that Erisco**
4  **had.**
5     Q.  I am directing your attention specifically to
6  page 10, line 24, and proceeding over to page 11 to
7  line 5, the question is:  "But do you know if you knew
8  about the product at that time?"
9          Answer:  "I knew that Erisco was a claims
10  processing software vendor and that it was owned by Dun &
11  Bradstreet, but I don't remember specifics about the
12  products."
13          Do you see that?
14    **A.  Yes, I do.**
15    Q.  And as of 1994, was that your best recollection
16  at the time that while you were aware of Erisco, you did
17  not recall the specifics about the operation of any of
18  their products?
19          MR. THOMAS:  Objection. Outside the scope
20  of the deposition. Best evidence.
21    **A.  Correct.**
22          MR. RANDALL:  Mark for identification as
23  Exhibit 7 a one-page article from Boston Business Journal
24  dated February -- I believe it says 9 -- 8-9, 1995. It

12 (Pages 42 to 45)

Page 46

1   bears Bates stamp number MCK 036458.

2        (Exhibit 7 was marked for identification.)

3   BY MR. RANDALL:

4        Q.  Do you see that article, Ms. Radosevich?

5        A.  Yes, I do.

6        Q.  It's entitled "HPR's healthy settlement,"

7   despite -- "Dispute concluded over CodeReview."  Do you

8   see that?

9        A.  Yes, I do.

10       Q.  Can you please read this into the record?

11           MR. THOMAS:  I'm going to object to any

12   questioning about this -- about this article.  I don't

13   see anything in here about the application of the patent

14   application or what was told to salespeople about what

15   they should say to customers.  This is obviously outside

16   the scope of the deposition.

17       A.  You want me to read this article?

18       Q.  Yes.

19       A.  "Boston-based Health Payment Review, Inc. and

20   Malvern, Pa.-based GMIS Inc. both said they were" -- I'm

21   sorry -- "both said they were pleased with the settlement

22   of a patent dispute last week, but HPR seems to be the

23   only one smiling."  That's my own laughing.  I'm sorry.

24   Okay.

Page 47

1        "The two makers of health care cost

2   containment software were set to go to court January 23

3   over a patent awarded in 1993 for HPR's CodeReview

4   product.  But, the long-simmering dispute was resolved

5   hours before the court appearance.

6        "Neither side would discuss terms of the

7   agreement, but GMIS immediately issued a release saying

8   the deal would result in a one-time charge of its

9   earnings in the fourth quarter of 1994 and would

10   'significantly' affect its 1994 profits.  It also said

11   the agreement would not affect future profits.

12       "Do you" -- I'm sorry.  It's kind of funny.

13   Journalism is a little weird.  Okay.

14       "Do you smell a big payout to HPR?

15       "Eight-year-old HPR is scheduled to have

16   two new products ready for release in the spring.  One

17   will identify doctors who are out of the norm on cost or

18   amount of treatment rendered and another will produce

19   reports on quality of care based on an industry standard

20   called the Health Plan Employer Data Information Set.

21   Company review will approach $20 million for the year

22   ending June 30.

23       "Resolving the patent dispute removed one

24   more hurdle in the way of a potential HPR initial public

Page 48

1   offering, said CFO Brian Cahill.  Depending on the IPO

2   market, the company could go public as early as the fall.

3   But, the offering is more likely to happen within the

4   next 24 months, Cahill said."

5        Q.  Let me ask you a few questions specifically

6   about how you instructed your salespeople, either

7   informed customers about these events or to handle

8   questions that may arise from customers based on the

9   patent.

10           Apparently there was a lawsuit between GMIS

11   and HPR in early 1993; is that right?

12       A.  Settled in 1993 -- no.  Was this settled in --

13   yes, there was a lawsuit.  GMIS sued HPR and we engaged

14   in a year-long dispute which was finally resolved in

15   HPR's favor.

16       Q.  And this article is dated in early February

17   1995, and it indicates that you were set to go to trial

18   on January 23 of 1995; is that correct?

19           MR. THOMAS:  Objection.  Outside the scope

20   of the deposition.

21       A.  That is correct.

22       Q.  And GMIS took a license to the HPR patent

23   instead of going to trial; is that right?

24       A.  Yes.  Hours, literally hours before we were

Page 49

1   scheduled to go to court GMIS settled and they agreed to

2   pay us a $7.2 million license to our software.

3        Q.  During the litigation, from the start of 1993

4   through the time that GMIS ultimately took a $7.2 million

5   paid-up license in early 1995, did you instruct your

6   salespeople about how to handle inquiries from customers

7   regarding your patent?

8        A.  Yes.

9        Q.  Did you instruct your salespeople to -- strike

10   that.

11           How did you instruct them?

12           MR. THOMAS:  Objection.  Asked and

13   answered.

14       A.  We -- I told them that they could acknowledge

15   that we have reviewed the patent, and if they were

16   questioned about what they were hearing about the

17   dispute, they could simply say, yes, we are in dispute

18   and that was it.  They were told that if they gave any

19   more information than that, it could completely disrupt

20   our litigation and that they would be, therefore, fired.

21       Q.  From the time GMIS sued HPR regarding its patent

22   to the time it took the license in early 1995, how many

23   salespeople brought to your attention Erisco's concern

24   over this patent?

13 (Pages 46 to 49)

McKesson Information Solutions                                                    The Crizetta Group, Inc.
Marcia J. Radosevich, Ph.D                    C.A. # 04-1258 (SLR)                        April 10, 2006

Page 50

1     MR. THOMAS: Objection. Outside the scope
2  of the deposition. Assumes facts not in evidence.
3     MR. RANDALL: Let me rephrase it.
4  BY MR. RANDALL:
5     Q.  How many times, if any, can you recall Erisco
6  raising concerns about the HPR patent to HPR salespeople
7  from the time the lawsuit by GMIS was first initiated in
8  early 1993 to the time that GMIS first took a license in
9  early '95?
10    MR. THOMAS: Objection. Outside the scope
11 of the deposition.
12    **A.  I don't recall ever hearing any concern on**
13 **Erisco's part about this.**
14    Q.  Whether it came from a salesperson or directly
15 to you?
16    **A.  That is correct.**
17    Q.  Did you --
18    MR. THOMAS: Can I ask a question?
19 Mr. Gutkoski, are you taking any position
20 at all as to whether this questioning is within the scope
21 of today's deposition?
22    MR. RANDALL: Counsel, I'm sure that if he
23 was going to object, he would --
24    MR. THOMAS: Why don't you not interrupt,

Page 51

1  Jeff? And I'm directing a question to Mr. Gutkoski
2  because I just would like his position.
3     Mr. Gutkoski, are you taking any position
4  as to whether this questioning is within the scope of
5  today's deposition?
6     MR. GUTKOSKI: Not knowing the underlying
7  facts and details of the case, I'm not taking any
8  position other than to state that it is Miss Radosevich's
9  position that this deposition will be and should be the
10 last time she needs to appear in this matter and,
11 therefore, it's in her interest to allow the parties the
12 opportunity to ask the questions that they have of her
13 that relate to the topic in the special master's order
14 including any fair cross-examination. She wants to get
15 this done and over with today. And for those reasons,
16 I'm allowing Mr. Randall to go forward with these
17 questions.
18 BY MR. RANDALL:
19    Q.  Miss Radosevich, did any concerns that Erisco
20 may have had regarding the patents up until the time that
21 GMIS took the license ever raise the need in your mind to
22 specifically instruct your salespeople about how to deal
23 with Erisco's concerns over the patent, if they had any?
24    MR. THOMAS: Objection. Outside the scope

Page 52

1  of the deposition.
2     **A.  The answer is no.**
3     Q.  The last paragraph of this article indicates
4  that "Resolving the patent dispute removed one more
5  hurdle in the way of a potential HPR initial public
6  offering, said CFO Brian Cahill."
7     Do you see that?
8     **A.  Yes, I do.**
9     Q.  It also states: "Depending on the IPO market,
10 the company could go public as early as the fall. But,
11 the offering is more likely to happen within the next
12 24 months, Cahill said."
13    Do you see that?
14    **A.  Yes.**
15    Q.  Can you explain what HPR's management was
16 engaged in after the conclusion of this litigation?
17    **A.  I can't --**
18    MR. THOMAS: Objection. Outside the scope
19 of the deposition.
20    **A.  I'm also chuckling a bit because Brian Cahill,**
21 **our CFO, hoped that we would have 24 hours -- or 24**
22 **months in which to go public because it's a huge amount**
23 **of work for a company to do an IPO. And, of course, the**
24 **lion's share of that work falls on the financial group.**

Page 53

1  But, in fact, we went public in August of this year.
2     So from -- yes. We had been wanting to go
3  public for a while. We were working very hard to, first
4  of all, achieve that threshold of revenues which at the
5  time was about 20 million, give or take, in order to have
6  enough critical mass to go public.
7     But then we had to resolve this lawsuit
8  with GMIS because we never wanted the lawsuit in the
9  first place. I never threatened to sue him. I did not
10 sue him. He sued me and then I had to -- I guess we
11 technically countersued or something in order to protect
12 ourselves. We wanted to get this thing behind us because
13 we did not think and our advisors did not think it was a
14 good idea to take a company public when you were in the
15 midst of a patent lawsuit.
16    So the moment we got this out of the way,
17 we focused very intensely on our -- on an IPO. It was my
18 sense that in January of this year, of '95, that the
19 market was beginning to open up again to small companies
20 like mine, healthcare IT companies.
21    Prior to that the window had actually been
22 closed for about a year and a half, two years. And even
23 if we had been ready to go out, we probably -- it
24 probably wasn't the best of circumstances.

14 (Pages 50 to 53)

Case 1:04-cv-01258-SLR   Document 321-3   Filed 04/11/2006   Page 1 of 3

McKesson Information Solutions
Marcia J. Radosevich, Ph.D

The Trizetto Group, Inc.
April 10, 2006

C.A. # 04-1258 (SLR)

1    So we finally got this lawsuit against us
2  and we were finally getting the sense that the market
3  might open up to us and I wanted to push as aggressively
4  as we possibly could to get ready to go public if and
5  when that window opened. I was afraid it might open for
6  a short time and close. In fact, that's what happened.
7  But that's why we put a full court press on going public,
8  getting public.
9    So in January as soon as the dispute was
10 resolved with GMIS, at my word, we decided to try to get
11 public or at least get ready to be public in 1995 if the
12 window opened. So we began that process of selecting
13 investment bankers. I began going on the circuit
14 speaking at investment banking conferences. Our
15 financial group began getting all their books in order.
16 I got my lawyers lined up. And it was -- it was an
17 unbelievable -- it was unbelievable.
18    I'm very proud of Brian and his team
19 because a lot of people said it wasn't even possible to
20 get public that fast, but we did. And we got out in
21 August before Wall Street goes to sleep for the summer.
22 And it was a very successful IPO. But it was incredibly
23 intense. It was a sprint to the finish line.
24    Q. From the time that GMIS took a license in

1  January of 1995 through the time period that HPR went
2  public in August of '95, did that activity affect your
3  instructions to your salespeople on what they should say
4  about your patent?
5    A. Well, not really. I mean, the same instructions
6  applied which was we have the patent, we are proud, yes,
7  we have a dispute with GMIS, we are proud, we are happy,
8  that stuff, period. That was it. That's all they were
9  allowed to say.
10    Really, the major effect was on management.
11 Mike Hearn, my CFO, his people, my marketing people, we
12 were almost -- 90 percent of our time was focused on
13 getting public and the rest of it was spent running the
14 company. So that was -- the largest effect was on senior
15 management who had to work with lawyers and investment
16 bankers to get our company public.
17    Q. Did the focus that was required by your
18 management in January of '95 through August of '95 on the
19 IPO, did that have anything to do with you not
20 instructing your salespeople to go out and tout
21 victory -- tout the fact that GMIS took a significant
22 license to your patent and, therefore, your patent was
23 threatened in some way? Does that affect it?
24    MR. THOMAS: Objection. Outside the scope

1  of the deposition.
2    A. Well, first of all, of course, we wanted to be
3  classy about our win. It's always important to be a
4  classy winner. There's no need to rub GMIS's nose in it.
5  We got what we wanted.
6    Secondly, we really did not -- I mean, we
7  didn't want to be involved in litigation. We were afraid
8  that if we were involved in any litigation, we wouldn't
9  be able to get public. So that, you know, it was just
10 important that we stay focused on what the business
11 needed, which was we needed to get public, to raise
12 revenues, to continue to grow the business, to be more
13 competitive in the market, and that's what we did.
14    Q. Did management's view that it did not want to be
15 engaged in litigation, was that affected by the fact that
16 GMIS sued HPR as soon as the patent was publicized by the
17 press when it issued in late '93?
18    MR. THOMAS: Objection. Outside the scope
19 of the deposition.
20    A. Well --
21    Q. Let me withdraw the question.
22    Did HPR's instructions to its salespeople
23 on how to respond to questions about the patent have
24 anything to do with the fact that GMIS sued HPR promptly

1  upon publication of the patent?
2    MR. THOMAS: Objection. Outside the scope
3  of the deposition.
4    A. We were all made much more cautious after GMIS
5  sued us because it was never our intention to get
6  involved in a lawsuit. My intention had been to simply
7  ask for licensing from GMIS.
8    In fact, when we were issued the patent, I
9  called Tom Owens, who was then the president of GMIS, and
10 told him that I had gotten the patent. He did not know
11 that. I offered to send him a copy of the patent, which
12 I did. And I said to him, look, why don't you take a
13 month, get your lawyers and your people, your advisors
14 lined up, study the document, and I said to Tom, then you
15 and I need to meet and discuss what this means for our
16 prospective companies. And so I had no intention of
17 suing him. It was our intention of asking for a license.
18    And so the next thing I knew -- and so I
19 thought that was a, you know, good business move. I
20 also thought it was the right thing to do, the proper use
21 of the patent as a tool, not a weapon, and I was shocked
22 when his response was to fire us.
23    There's someone at the door. It's
24 housekeeping. We are going to tell them to go away.

15 (Pages 54 to 57)

Page 58

1    So I was shocked when their response was to
2  sue us. It was never my intention to get involved in a
3  lawsuit with them or anybody. And the fact that that was
4  their response made us very, very cautious, even more so
5  than we had been before, because we did not want to get
6  involved in another one of those, especially when we were
7  focused on trying to get public. That was the -- you
8  know, I was really in business, not a law firm, and the
9  business needed to get public. That was the
10 imperative -- the business imperative. That was my job
11 as CEO and I didn't want anything to interfere with that.
12    Q.  Did that affect the fact that you had already
13 been sued once and been embroiled in two years of
14 litigation and that you wanted to take the company public
15 and were focused on doing that, did those two events play
16 a part in the careful instructions that you provided your
17 salespeople?
18    A.  Sure, because I didn't want any more trouble.
19        MR. RANDALL: I would like to mark for
20 identification as Exhibit 8 the annual report for HPR for
21 the period ending June 30, 1996.
22        (Exhibit 8 was marked for identification.)
23        MR. THOMAS: I note this has no Bates
24 numbers on it. Has this been produced in the litigation?

Page 59

1        MR. RANDALL: It's a publicly available
2  document.
3        MR. THOMAS: That wasn't my question.
4        Do you know whether this has been produced
5  in the litigation?
6        MR. RANDALL: I'm not sure. It doesn't
7  have a Bates stamp number. It was produced to you -- and
8  it was publicly available. So if it wasn't produced in
9  litigation, it was likely because it was a publicly
10 available business record.
11 BY MR. RANDALL:
12    Q.  But in any event, I have a few questions about
13 this.
14        Can you take a look at this annual report
15 from HPR for the period ending June 30, 1996,
16 Miss Radosevich?
17        The question is: Does this appear to be a
18 true and correct copy of HPR's annual report which it
19 filed with the Securities & Exchange Commission for the
20 period ending June 30, 1996?
21        MR. THOMAS: Object to questions on this
22 document. I can't see how it could possibly be relevant
23 to the patent application process or instructions given
24 to customers about communications with salespeople or

Page 60

1  vice versa.
2    A.  It appears to be that, yes, based upon a cursory
3  examination.
4    Q.  Let me direct your attention to five pages into
5  this document. Are yours copied on double sides?
6    A.  No.
7    Q.  Maybe it's 10 then. And the heading at the top
8  of the page is "Intellectual Property."
9    A.  Yes, I found it.
10    Q.  Can you read the paragraph that starts with "HPR
11 was awarded a U.S. patent"?
12    A.  "HPR was awarded a U.S. Patent (No. 5,253,164)
13 in October 1993 for the system and methodology embodied
14 in CodeReview. On January 23, 1995, the Company and
15 GMIS, Inc. entered into an agreement settling certain
16 litigation initiated by GMIS to declare the Company's
17 patent invalid and responded to by the Company with a
18 countersuit for patent infringement. Under the
19 settlement agreement, the Company granted GMIS a
20 non-exclusive license under the patent, and GMIS
21 acknowledged the validity of the patent and made a
22 one-time payment of $7,200,000 to the Company."
23    Q.  As a result of this public disclosure of the
24 paid-up license agreement that was entered into between

Page 61

1  HPR and GMIS for $7.2 million, did you alter in any way
2  your instructions to your salespeople on how to respond
3  to questions about patents?
4    A.  No.
5    Q.  Do you recall prior to this date of the annual
6  report for the period ending June 30, 1996, do you recall
7  at any time prior to that any salesperson ever informing
8  you that Erisco had communicated a concern about the HPR
9  patent?
10        MR. THOMAS: Objection. Outside the scope
11 of the deposition.
12    A.  No.
13    Q.  Did, to your knowledge, HPR's management ever
14 have to respond to any specific concern raised by Erisco
15 or communications by one of their salespeople Erisco had
16 regarding the patent?
17        MR. THOMAS: Objection. Outside the scope
18 of the deposition.
19    A.  No.
20    Q.  Let me direct your attention to two or three
21 more pages beyond where we are and this the heading, it
22 says "Fiscal Years Ended June 30, 1994, 1995, and 1996."
23    A.  Yes.
24    Q.  Can you read the first paragraph where it starts

16 (Pages 58 to 61)

Page 62

1  with "Revenues"?

2      MR. THOMAS: Objection. Outside the scope

3  of the deposition.

4      A. "Revenues" -- you want me to read the table?

5      Q. I'm sorry. I want you to read --

6      A. The paragraph?

7      Q. -- the paragraph that appears right underneath

8  the heading that says "Fiscal Years Ended June 30, 1994,

9  1995, and 1996." I'll move forward two or three pages.

10     A. Okay. Oh, okay. "Fiscal years ended June 30,

11 1994, 1995, and 1997. Revenues increased 30% from

12 $14,065,000 in 1994 to $18,264,000 in 1995 and 55% to

13 $28,310,000 in 1996. CodeReview has shown continued year

14 over year growth since its initial release in 1988" --

15     MR. THOMAS: We can't hear you.

16     A. -- "1988 through new licenses and renewals of

17 existing licenses."

18     Q. Now let me ask you a question.

19        CodeReview, HPR's CodeReview product was

20 HPR's patented product; correct?

21     A. Correct.

22     Q. I take it from this document that HPR's patented

23 CodeReview product was a significant success in the

24 marketplace, at least from years 1994, 1995, and 1996; is

Page 63

1  that correct?

2      MR. THOMAS: Objection. I can't imagine

3  how any reasonable person would assume that this is

4  within the scope of the deposition for today.

5      Q. As a result of the tremendous success that HPR's

6  patented CodeReview product had in the marketplace, did

7  HPR receive increasing number of inquiries through its

8  sales force regarding the patent?

9      MR. THOMAS: Objection. Outside the scope

10 of the deposition.

11     A. I would have to say yes.

12     Q. Okay. Can you elaborate on that?

13     A. Well, because it was so public and at the time

14 you have to remember software patents were not common

15 back then as they have become today, but then it was

16 still quite a novelty.

17        And so as this information became public,

18 it really heightened the awareness of the market in

19 general about the possibility of patenting software, and

20 also about the business importance of patenting software.

21        This today sounds silly maybe, but back

22 then it wasn't that long ago, but back then it was a

23 very -- it was a different world and software patents

24 were not very common and there was even some question

Page 64

1  among some people as to whether or not software could be

2  patented. So it was the early days of that, of the

3  development of that, sort of that branch of patent law.

4      As a result of that, as this information

5  became public, yeah, there was a lot of interest in it

6  from a lot of parties, some of it directly related to

7  CodeReview, some of it just in general, what does this

8  mean for the market.

9      And two of my competitors actually called

10 me and asked me if we could negotiate some sort of

11 cross-licensing deal because they didn't want any -- they

12 didn't want problems. And they thought that perhaps they

13 might have some problems with the patent, although no one

14 admitted infringement, and I did not accuse anyone of

15 infringement. They were concerned. And so they asked if

16 they could take licenses or we could do some kind of a

17 cross-licensing deal which we went on to effect.

18     Q. Could you turn two pages forward in the document

19 to the heading "Management of Growth"?

20     A. Yes.

21     Q. The first sentence states: "The Company is

22 currently experiencing a period of rapid growth and

23 expansion which could place a significant strain on the

24 Company's personnel and resources."

Page 65

1      Do you see that?

2      A. Yes.

3      Q. Was that one of the factors, at least as of June

4  of 1996, that contributed to your careful instructions to

5  your salespeople regarding how to communicate with

6  customers regarding the patent?

7      MR. THOMAS: Objection. Outside the scope

8  of the deposition.

9      A. Yes. As you could tell from our numbers, we

10 were growing very, very fast. That was my job. That was

11 the mission of the company. The company's mission was

12 not to engage in patent dispute. And so we were very

13 focused on managing growth.

14        One of the biggest problems that small,

15 successful companies have is growing out of control.

16 It's because of that case that while we got public in

17 August of '95, we had a follow-on offering in February of

18 1996, the purpose of which was to manage the distribution

19 of the Gralock shares to their limited partners which

20 would then come out onto the market. We had a fear that

21 that could -- a concern that that might diminish the

22 stock price of the company, so we wanted to manage the

23 release of all those shares to the market because we had

24 a concern that it would have a depressive effect on the

17 (Pages 62 to 65)

Case 1:04-cv-01258-SLR    Document 321-3    Filed 04/11/2006    Page 20 of 34

McKesson Information Solutions                    v.                    The Trizetto Group, Inc.
Marcia J. Radosevich, Ph.D                C.A. # 04-1258 (SLR)                    April 10, 2006

Page 66

1  stock price.
2      So we were actually very engaged in the
3  follow-on offering which took place in February of 1996
4  in addition to following a very rapidly growing and
5  expanding company.
6      Q.  Did the management of HPR's focus from -- strike
7  that.
8      Did the focus of the management of HPR from
9  August of '95 through February of '96 on the secondary
10 offering contribute to the careful instructions given to
11 salespeople regarding how to communicate with customers
12 on the patents?
13     MR. THOMAS: Objection. Outside the scope.
14     A.  Yes, of course it did, because once again, a
15 follow-on offering is an offering to the public which
16 could well be tainted or even tanked if a company got
17 involved in a patent dispute or any kind of legal -- had
18 any kind of legal dispute sort of, you know, souring
19 them, hanging over them.
20     So we wanted to not get involved in a
21 situation like that because it was very important that we
22 manage the release of all those shares to the public or
23 else we would have suffered -- we thought we would have
24 suffered a severe depression in our stock price.

Page 67

1      So that was really our number one focus, to
2  protect the shareholder, to protect the stock price. And
3  in order to do that shortly after the IPO, we began
4  gearing up for our follow-on knowing that the Gralock
5  shares would be distributed within six months to the
6  limited partners, and then we would have a huge number of
7  shares coming on the market.
8      Q.  After the secondary offering in February of '96,
9  did HPR's management turn its focus at some point to
10 perhaps finding a strategic partner to merge with?
11     MR. THOMAS: Objection. Outside the scope.
12     A.  It was sometime in 1996, probably, yeah, around
13 the summer of '96 that we started thinking about that.
14     Q.  And ultimately did HPR reach a merger agreement
15 with a company called HBOC?
16     MR. THOMAS: Objection. Outside the scope.
17     A.  Yes. In 1997, in September of '97 we signed a
18 preliminary agreement to be acquired by HBOC, and then
19 that deal was closed in December of 1997.
20     Q.  In addition to the rapid growth that HPR was
21 experiencing, specifically from early '96 until the fall
22 of 1997, in addition to that, was the management's
23 attention at HPR focused on identifying the correct
24 strategic partner to merge with?

Page 68

1      A.  That took quite a bit of time.
2      Q.  Did that focus by HPR's management contribute
3  during that time period to the careful instructions given
4  to HPR salespeople regarding communications with
5  customers relating to the patent?
6      A.  Yes. Because once again, we did not want a
7  legal dispute. We thought that if we were involved in a
8  legal dispute, it would make us much less attractive to
9  any potential acquirer, and that it would be a huge
10 distraction from the goal, the twin goals of growing the
11 company and managing this rapid growth as well as
12 negotiating with potential acquirers.
13     Q.  Let me show you what has been marked as
14 Exhibit 9, which is a document filed with the
15 Securities & Exchange Commission dated November 21, 1996,
16 and it relates to the merger between HBOC and HPR.  Do
17 you see that, Ms. Radosevich?
18     A.  Yes, I do.
19     MR. THOMAS:  And I will object to the use
20 of this document.  It doesn't appear to have been
21 produced in the litigation and it's also outside the
22 scope of the examination for today.
23     Q.  Does this appear, Ms. Radosevich, to be a true
24 and correct copy of the filing with the Securities &

Page 69

1  Exchange Commission on November 21, 1997, relating to the
2  merger agreement that you previously testified to between
3  HBOC and HPR?
4      MR. THOMAS:  Same objection.
5      A.  Yes, it does. I'm just wondering about the
6  date.
7      Q.  That appears on the first page of the document.
8      A.  Yes, this is fine.
9      Q.  I direct your attention, Miss Radosevich, to --
10     A.  This is it.
11     Q.  -- the fourth page.
12     A.  Got it.
13     Q.  This is a draft letter that was sent over your
14 signature as chairman, president, and chief executive
15 officer of HPR to your stockholders regarding the merger
16 with HBOC; correct?
17     A.  Correct.
18     Q.  And specifically I'd like to direct your
19 attention to page 23 of this document.  Page numbers
20 appear about three quarters of the way down each page.
21     A.  Got it.
22     Q.  Specifically the heading entitled "The Merger
23 Proposal" and the subheading "Background of the Merger."
24     This public filing describes in four pages

18 (Pages 66 to 69)

Page 70

1 the numerous activities leading up to the proposed merger
2 with HBOC. Do you see that?
3    A. Yes.
4    Q. And do those entries accurately describe the
5 activities and focus of HPR's management during that time
6 period?
7    A. Yes.
8    Q. And during that time period leading up to the
9 merger with HBOC, did the specific discussions with a
10 number of interested parties including HBOC continue to
11 contribute to your careful instructions to your
12 salespeople regarding what they could and could not say
13 to customers relating to the patent?
14    A. Yes. I didn't want anything to screw this up.
15    Q. I direct your attention to page 47 of this
16 public filing. Two-thirds of the way down the page
17 underneath the heading "Business of HPR," it states: "As
18 of September 30, 1997, HPR employed 194 individuals."
19          Do you see that?
20    A. Yes.
21    Q. And was that accurate with respect to the number
22 of individuals who were employed by HPR?
23          MR. THOMAS: Objection. Outside the scope.
24    Q. And did -- strike that.

Page 71

1          Was HPR's management careful in trusting
2 not only the salespeople, but its management people also
3 in what it could and could not say about the patent?
4    A. We were careful in what we instructed not just
5 management and sales, but the entire company in what they
6 could say or not say about the patent.
7    Q. Directing your attention to the appendix of this
8 document, it is page A-18 --
9    A. Okay.
10    Q. Specifically, Section 3.10, "Litigation."
11    A. Mm-hmm.
12    Q. It states: "Except as otherwise set forth in
13 Exhibit 3.1 hereto, there is no suit, action,
14 arbitration, proceeding, claim or investigation pending
15 or, to the knowledge of the Acquired Company, threatened
16 against or affecting the Acquired Company...."
17          Do you see that?
18    A. Yes, I do.
19    Q. Do you believe it was important leading up to
20 the merger with HBOC that HPR be as free of litigation as
21 reasonably possible?
22          MR. THOMAS: Objection. Outside the scope.
23    A. I do.
24    Q. Did that confirm your recollection regarding the

Page 72

1 specific instructions given to your employees regarding
2 what they could and could not say about the patent?
3    A. Yes.
4    Q. At any time leading up to this merger with HBOC,
5 did you believe that HPR was engaged in the patent
6 litigation business?
7    A. Look, we never wanted any legal dispute over
8 anything from the beginning. And, you know, there were a
9 lot of reasons for that. One is it's bad business. It's
10 bad business because it distracts management's focus.
11 It's bad business because who wants -- no offense -- but
12 who wants to spend their time with a bunch of lawyers
13 instead of business people? No offense to those present
14 or on the phone. It's distasteful. Who wants to -- it's
15 a waste of time.
16          I ran a company. We built products. We
17 sold products. We supported products. We were
18 innovative, creative. That was fun. We created value.
19 We created social value as well as material value. We
20 were doing something we believed in. We believed that
21 what we were doing was improving the American healthcare
22 system to make it more affordable for everybody -- old
23 people, poor people, employed people, insurance people,
24 everybody -- to get the healthcare that they needed. We

Page 73

1 thought we were on a mission that was a lot more
2 important than hanging out in rooms with a bunch of
3 lawyers fighting fights about anything.
4          So we were focused on growing, building a
5 company that we thought was not only a successful
6 commercial enterprise, but a company that was making a
7 positive difference in how the American healthcare system
8 worked.
9          And so we have much bigger goals, much
10 loftier missions, and that's really what we wanted to
11 spend our time on, and that's what we did. And I think
12 we did it extremely well and I'm very proud of the people
13 who made that happen with me.
14    Q. Prior to leaving the company, did you ever
15 instruct any of your salespeople or any of your employees
16 to go out and investigate and come up with potential
17 patent infringers so that he could sue them?
18          MR. THOMAS: Objection. Outside the scope.
19    A. Absolutely not. It wasn't even on my radar
20 screen. I have some more important things to do, as did
21 they.
22    Q. In terms of your instructions to your employees
23 and your salespeople regarding what they could or could
24 not say regarding the patent, did you ever instruct them

19 (Pages 70 to 73)

McKesson Information Solutions
Marcia J. Radosevich, Ph.D

The Trizetto Group, Inc

C.A. # 04-1258 (SLR)

April 10, 2006

### Page 74

1 to investigate potential competitors in order to sue
2 those competitors?
3        MR. THOMAS: Objection. Outside the scope.
4    A. No, I never did. Once again, that wasn't our
5 focus.
6    Q. Other than defending your company against the
7 claims that you ultimately prevailed on brought against
8 you by GMIS, did you ever -- did it ever come to your
9 attention that you needed to pursue patent litigation
10 against any potential competitor?
11        MR. THOMAS: Objection. Outside the scope.
12 Assumes facts not in evidence. Misstates the evidence.
13    A. We never pursued patent litigation against
14 anybody else, only GMIS, and that was only in
15 self-defense.
16    Q. How long after the -- strike that.
17        When did you leave HPR?
18    A. I left my operating role on December 27th, 1997,
19 but I was still employed through the end of March of
20 1998.
21    Q. To your knowledge, did other executives from HPR
22 leave at or soon following your departure, ultimate
23 departure from HPR in March of '98?
24        MR. THOMAS: Objection. Outside the scope.

### Page 75

1    A. Yes. In fact, I think my entire management team
2 left. I think some left before I did and others left not
3 too long after I did.
4    Q. To your knowledge, did Erisco at any time while
5 you were running HPR ever ask to review HPR's patent
6 application or review the patent or discuss it with HPR?
7        MR. THOMAS: Objection. Outside the scope.
8    A. No, we were never asked any of those things.
9    Q. Did you or to your knowledge -- strike that.
10        MR. RANDALL: I have no further questions.
11        MR. THOMAS: This is Mr. Thomas.
12        I believe it would be both improper and
13 unethical for me to do redirect of Ms. Radosevich on the
14 questions that Mr. Randall has asked her outside the
15 scope ordered by Judge Bechtle, so I will not do so.
16 Instead, we will submit today's transcript to
17 Judge Bechtle with a motion to strike and a request for
18 sanctions.
19        MR. RANDALL: Mr. Thomas, if you would like
20 to examine the witness on the areas that I have covered,
21 you are welcome to do so, but I don't believe that given
22 counsel's previous statements that you'll have that
23 opportunity if you don't take it now.
24        MR. THOMAS: I have no intention of asking

### Page 76

1 Ms. Radosevich to come back. I have the intention of
2 following Judge Bechtle's order that this was to be a
3 very limited deposition.
4        MR. RANDALL: That's fine. So you have no
5 questions?
6        MR. THOMAS: I have no questions with
7 regard to the questions that you asked outside the scope,
8 and we'll submit this to Judge Bechtle for his decision.
9        MR. RANDALL: Fine. Thank you very much.
10        THE WITNESS: Thank you.
11        MR. THOMAS: Thank you. Bye.
12        (The deposition was then concluded at
13 1:10 p.m.)
14        - - - - -
15
16
17
18
19
20
21
22
23
24

### Page 77

1        INDEX TO TESTIMONY
2
3
MARCIA J. RADOSEVICH, PH.D.        PAGE
4
5 Examination by Mr. Thomas        3
  Examination by Mr. Randall        32
6
7        - - - - -
8
        INDEX TO EXHIBITS
9
10 EXHIBIT NO.:        PAGE
11
  5-A  A multipage copy of a document entitled
12    "HPR"        42
13 6    A multipage copy of a deposition of Marcia
     Radosevich dated November 29, 1994        43
14
  7    A one-page copy of an article from the
15    Boston Business Journal        46
16 8    A multipage copy of a Form 10-K for the
     period ending 6/30/1996        58
17
18        - - - - -
19
20
21
22
23
24

20 (Pages 74 to 77)

McKesson Information Solutions
Marcia J. Radosevich, Ph.D

v.
C.A. # 04-1258 (SLR)

The Trizetto Group, Inc.
April 10, 2006

Page 78

```
1
2
3
4
5
6
7
8         REPLACE THIS PAGE
9
10        WITH THE ERRATA SHEET
11
12        AFTER IT HAS BEEN
13
14        COMPLETED AND SIGNED
15
16        BY THE DEPONENT.
17
18
19
20
21
22
23
24
```

Page 79

```
1   State of Delaware )
2                    )
3   New Castle County )
4
5          CERTIFICATE OF REPORTER
6
7          I, Kathleen White Palmer, Registered Merit
    Reporter and Notary Public, do hereby certify that there
8   came before me on the 10th day of April, 2006, the
    deponent herein, MARCIA RADOSEVICH, who was duly sworn by
9   me and thereafter examined by counsel for the respective
    parties; that the questions asked of said deponent and
10  the answers given were taken down by me in Stenotype
    notes and thereafter transcribed into typewriting under
11  my direction.
12          I further certify that the foregoing is a
    true and correct transcript of the testimony given at
13  said examination of said witness.
14          I further certify that I am not counsel,
    attorney, or relative of either party, or otherwise
15  interested in the event of this suit.
16
17
18
19          Kathleen White Palmer, RPR, RMR
            Certification No. 149-RPR
20          (Expires January 31, 2008)
21
    DATED:  April 10, 2006
22
23
24
```

Wilcox & Fetzer, Ltd.　　　Professional Court Reporters　　　(302)655-0477

McKesson Information Solutions
Marcia J. Radosevich, Ph.D

v.
C.A. # 04-1258 (SLR)

The Trizetto Group, Inc.
April 10, 2006

Page 80

**A**

able 11:15 19:1
23:5 56:9
about 5:11,19 6:1
8:5,22 12:19 13:8
13:19 14:8,13,13
14:13,14,18,24
15:3,5,17 16:3,9
16:15,22 17:6,7
17:10,11 18:3
19:1,23 22:9
23:16,21 24:8,21
24:24 25:15,17
26:18 27:8,8,10
27:23 28:5 30:6
31:7,17,23 32:21
33:17 34:5,8 36:7
37:4,5 38:12 39:2
41:8,11 42:18
43:20 44:18 45:8
45:11,17 46:12,12
46:13,14 48:6,7
49:16,16 50:6,13
51:22 53:5,22
55:4 56:3,23
59:12,24 61:3,8
63:19,20 67:13
69:5,20 71:3,6
72:2 73:3
Absolutely 20:3
24:20 26:24 73:19
academics 20:19
accurate 12:3 42:4
70:21
accurately 43:7
70:4
accuse 64:14
achieve 53:4
acknowledge 49:14
acknowledged
60:21
acquired 67:18
71:15,16
acquirer 68:9
acquirers 68:12
action 1:5 71:13
activities 70:1,5
activity 55:2
actually 5:7,12 7:2
8:18 21:1,13 22:4
53:21 64:9 66:2
addition 15:1 66:4
67:20,22
address 4:11
admitted 64:14
advisors 53:13

57:13
Aetna 19:20,23
21:3,14,19,21,22
22:5
affect 47:10,11 55:2
55:23 58:12
affected 56:15
affecting 71:16
affordable 72:22
afield 18:12 22:13
afraid 54:5 56:7
after 7:21,23 8:5,5
11:14 23:3 39:15
52:16 57:4 67:3,8
74:16 75:3 78:12
again 11:4 20:14
21:16 42:19 53:19
66:14 68:6 74:4
against 54:1 71:16
74:6,7,10,13
aggressive 10:5
27:16
aggressively 54:3
ago 31:23 63:22
agree 4:17
agreed 4:9 49:1
agreement 47:7,11
60:15,19,24 67:14
67:18 69:2
ahead 14:5 26:1
35:6
allow 19:5 51:11
allowed 18:13 23:14
24:6,16 27:9 55:9
allowing 51:16
allows 30:4,7
almost 55:12
alone 10:10
along 10:24
already 10:17 11:6
16:1 21:6 34:21
58:12
alter 61:1
although 3:17 27:16
29:20 64:13
Alto 1:17
always 56:3
ambiguous 16:11
17:1 24:1 25:4,14
26:23 28:2
American 72:21
73:7
among 21:2 39:21
64:1
amount 18:9 47:18
52:22
AMS 22:10 23:22

announce 2:17
24:13
annual 36:15,24
58:20 59:14,18
61:5
another 47:18 58:6
answer 4:9 6:4 16:2
19:5,21 22:16,24
23:6 25:16 28:9
28:19,19 30:17
38:23 39:9,13
43:21 44:1,8,12
45:9 52:2
answered 15:21
16:11 18:13 21:7
21:10 49:13
answering 9:8
44:19
answers 35:24
79:10
anybody 27:19 58:3
74:14
anymore 28:22
anyone 8:7 27:20
64:14
anything 5:7,7,12
5:16,19 10:5,14
10:19,20,20 11:4
12:5 13:13,20,22
14:14 16:4 20:3
21:22 27:23 28:5
34:9 35:1 39:5
42:16 46:13 55:19
56:24 58:11 70:14
72:8 73:3
anyway 6:5
apparently 18:11
48:10
appear 3:11 4:9
31:7 44:1 51:10
59:17 68:20,23
69:20
appearance 2:18
47:5
APPEARANCES
1:14 2:1
appeared 15:4
appears 44:4 60:2
62:7 69:7
appendix 71:7
application 4:21,23
5:14,21 6:2,12,20
6:20,22 7:4 13:12
14:1,2,6 17:8
18:18,23 19:19
20:5,15 22:8
23:21 32:18 34:10

35:2 39:7 40:13
40:21 41:3 42:6
42:17 46:13,14
59:23 75:6
applications 3:14
7:6,8,16,21 8:1,9
applied 41:5,9 55:6
apply 10:8
applying 7:16
appreciate 26:10
36:16
approach 26:5
47:21
approximately 2:11
April 1:11 2:10 79:8
79:21
arbitration 71:14
arcane 17:21 26:10
area 18:16 23:17
areas 75:20
argue 30:5 35:8,14
35:17
arise 48:8
around 23:14 67:12
Arps 1:16 2:20
Arsht 1:10
art 9:14 10:1,11
11:3,24 12:4,9
14:3,5 17:24
20:16,21
article 12:5 18:3
19:8,11 45:23
46:4,12,17 48:16
52:3 77:14
articles 9:11 12:18
12:23 13:18,18
14:7,13 15:4,16
15:17 16:8,8 17:7
asked 7:18 15:21
16:1,11 21:6,10
22:19 32:3,21
41:7 44:11,21
49:12 64:10,15
75:8,14 76:7 79:9
asking 9:11 15:8,11
17:5 25:15 26:2,3
28:3 36:2 40:18
57:17 75:24
assembled 32:18
asserted 4:15
asserting 4:16
assist 5:4,20 7:7,24
40:1
assistance 3:12 8:1
18:22 19:2,3 22:7
assisted 4:22 33:7
assisting 5:14 19:18

assume 63:3
assumes 9:4 14:22
15:19 20:1 21:4
24:1 25:2 26:21
50:2 74:12
attempt 7:24
attention 42:10
44:5,16 45:5
49:23 60:4 61:20
67:23 69:9,19
70:15 71:7 74:9
attorney 8:13 10:21
11:10 13:9,15,20
14:9,16,20 15:18
16:6,19 17:13
18:5 20:6,13 21:3
21:23 22:6 26:7,9
33:9,18 79:14
attorneys 8:16 9:21
9:24 11:1,14
12:10 14:4 19:10
19:24 32:23
attorney/client 9:7
attractive 68:8
August 53:1 54:21
55:2,18 65:17
66:9
available 59:1,8,10
Avenue 1:17
awarded 47:3 60:11
60:12
aware 7:24 8:4,7
44:21 45:16
awareness 63:18
away 57:24
A-18 71:8
a.m 1:11 2:11

**B**

back 4:21 20:10
23:9 26:15 28:20
31:11 63:15,21,22
76:1
Background 69:23
bad 72:9,10,11
bankers 54:13
55:16
banking 54:14
base 37:6 39:21
based 26:19 37:16
46:20 47:19 48:8
60:2
Bates 41:13 43:15
46:1 58:23 59:7
Beach 2:16
bear 13:14 14:15
bearing 12:6 41:13

McKesson Information Solutions
Marcia J. Radosevich, Ph.D

C.A. # 04-1258 (SLR)

The TriZetto Group, Inc.
April 10, 2006

Page 81

bears 43:15 46:1
became 14:16 63:17
  64:5
Bechtle 31:19 40:6
  75:15,17 76:8
Bechtle's 30:3,7
  76:2
become 39:1 63:15
before 1:11 3:23
  4:15 6:12,23
  13:11,24 21:20
  23:17 31:8 33:20
  39:15 47:5 48:24
  54:21 58:5 75:2
  79:8
began 54:12,13,15
  67:3
beginning 1:11
  53:19 72:8
behalf 4:1,11
behind 53:12
being 2:15 8:21
  29:21 40:15 41:1
  44:20
belief 25:20
believe 4:13 14:7
  16:1,12 18:18
  25:10 27:6 30:3,7
  33:7 34:3 37:17
  45:24 71:19 72:5
  75:12,21
believed 22:4 25:1,4
  72:20,20
Berry 2:3,21
best 4:24 44:15 45:2
  45:15,20 53:24
better 32:9 39:19
between 4:4 34:19
  43:14 48:10 60:24
  68:16 69:2
beyond 17:20 21:8
  61:21
big 47:14
bigger 73:9
biggest 65:14
bit 52:20 68:1
block 23:16
books 54:15
Boston 2:4 45:23
  77:15
Boston-based 46:19
both 7:12 25:14
  37:7 46:20,21
  75:12
bottom 34:12 36:5
  36:14
Bradstreet 45:11

branch 64:3
Brian 29:9,11 48:1
  52:6,20 54:18
brief 3:10
broadly 41:8
brought 22:23
  49:23 74:7
building 73:4
built 72:16
bunch 72:12 73:2
business 45:23
  56:10,12 57:19
  58:8,9,10 59:10
  63:20 70:17 72:6
  72:9,10,11,13
  77:15
Bye 76:11

**C**
Cahill 48:1,4 52:6
  52:12,20
California 1:17,20
call 12:8 29:14,15
  36:18 37:23
called 22:10 23:22
  28:16 44:8 47:20
  57:9 64:9 67:15
calls 17:1 28:8,18
  28:21
came 23:23 50:14
  79:8
candor 8:8,12,19
capable 10:19 26:12
care 47:1,19
careful 58:16 65:4
  66:10 68:3 70:11
  71:1,4
case 43:14 44:3
  51:7 65:16
cast 10:18
Castle 79:3
Caterpillar 12:20
  14:8,14 16:4
caution 9:6 17:12
cautious 27:8 57:4
  58:4
CEO 58:11
certain 60:15
certainly 17:2 29:20
  31:16
CERTIFICATE
  79:5
Certification 79:19
certify 79:7,12,14
CFO 48:1 52:6,21
  55:11
chairman 69:14

chance 19:16 23:8
charge 47:8
check 29:20,22
chief 69:14
chosen 22:21
chuckling 52:20
circuit 54:13
circumstances
  53:24
Civil 1:5
claim 34:18 44:22
  71:14
claims 27:14 37:5,9
  37:13 38:7 45:3,9
  74:7
classy 56:3,4
clear 13:10 22:14
  27:3
client 30:20
clinical 5:16,16,19
  24:17,24 25:11,20
close 54:6
closed 53:22 67:19
closely 5:10
coauthored 18:4
  19:9
code 5:23,24 6:8
  38:15,16 39:17,18
CodeReview 14:15
  14:16 24:11,14
  36:10 37:4,5,7,8
  37:19 38:6,13,13
  38:20 39:24 40:9
  40:14,20 41:2
  42:5,8,8,13 43:3,8
  46:7 47:3 60:14
  62:13,19,19,23
  63:6 64:7
CodeReview(tm)
  34:17
coding 34:18
collected 32:22 33:8
  33:17
collection 32:17
come 19:20 22:10
  26:15 65:20 73:16
  74:8 76:1
coming 67:7
comment 21:17
  22:2
commercial 73:6
Commission 59:19
  68:15 69:1
common 63:14,24
communicate 65:5
  66:11
communicated 61:8

communications
  3:14 9:8 19:19,23
  22:5 34:10 35:2
  38:11 39:6 42:17
  59:24 61:15 68:4
companies 28:1
  53:19,20 57:16
  65:15
company 7:13,18
  7:20,22,23 8:6
  10:6 44:8 47:21
  48:2 52:10,23
  53:14 55:14,16
  58:14 60:14,17,19
  60:22 64:21 65:11
  65:22 66:5,16
  67:15 68:11 71:5
  71:15,16 72:16
  73:5,6,14 74:6
company's 60:16
  64:24 65:11
competing 39:3
  40:1
competitive 24:24
  25:11 56:13
competitor 26:19
  74:10
competitors 26:22
  64:9 74:1,2
**COMPLETED**
  78:14
completely 49:19
concept 37:7
concern 49:23
  50:12 61:8,14
  65:21,24
concerned 64:15
concerns 50:6 51:19
  51:23
concluded 46:7
  76:12
conclusion 17:1
  52:16
conduct 13:13
conducted 2:16
  13:12,12 17:23
  18:1
conduit 10:4,22
conference 36:16
  36:24
conferences 54:14
confident 11:8
confidential 71:9
confirm 71:24
connection 32:18
considered 37:22
considering 26:20

contact 7:24 8:5
  11:10
containment 47:2
content 5:16,19
continue 22:12,16
  56:12 70:10
continued 2:1 62:13
Continuing 40:16
contrary 27:5,17
contribute 66:10
  68:2 70:11
contributed 65:4
control 65:15
conversation 34:20
conversations 19:17
  21;20 37:3
copied 60:5
copy 41:19,21 57:11
  59:18 68:24 77:11
  77:13,14,16
correct 5:24 8:4
  9:22 12:15 32:9
  32:11,14,19,20,24
  33:1,19 34:5,6
  38:20,23 43:6
  45:21 48:18,21
  50:16 59:18 62:20
  62:21 63:1 67:23
  68:24 69:16,17
  79:12
correctly 4:14
corrects 34:18
cost 10:8 47:1,17
counsel 2:17 19:4
  29:7 50:22 79:9
  79:14
counsel's 75:22
countersued 53:11
countersuit 60:18
County 2:16 79:3
course 17:20 33:12
  40:2 52:23 56:2
  66:14
court 1:1 2:13 3:1
  3:11,19 4:2,11
  23:12 47:2,5 49:1
  54:7
cover 24:6
covered 75:20
covering 3:16
created 72:18,19
creative 72:18
critical 53:6
cross-examination
  30:22 31:14 51:14
cross-examine
  30:11,14,20

cross-licensing 64:11,17
CRUTCHER 1:19
current 4:16 23:19
currently 64:22
cursory 60:2
customer 24:17 26:20 37:6,18,24 39:1,21 43:1
customers 3:15 24:8 24:16 26:18 27:23 28:5,6,7,16 34:11 35:3 38:2,11 39:7 42:12,18 43:4 46:15 48:7,8 49:6 59:24 65:6 66:11 68:5 70:13
cut 18:23
cycle 42:24
cycles 28:12
c-o-d-e 5:24

**D**
Data 47:20
date 28:24 37:15 40:9,20 61:5 69:6
dated 39:23 43:14 45:24 48:16 68:15 77:13 79:21
day 2:3,21 32:9 79:8
days 64:2
deal 47:8 51:22 64:11,17 67:19
Dear 34:15
December 67:19 74:18
decided 14:5 17:12 54:10
decision 13:3 17:18 26:11 76:8
declare 60:16
Defendant 1:8,21
defending 74:6
defined 14:5
Delaware 1:2,11,23 79:1
delay 34:19
delivered 29:17 31:13
departure 74:22,23
Depending 48:1 52:9
deponent 78:16 79:8,9
depose 23:8
deposed 22:22 32:8

43:19
deposition 1:9 2:12 2:15 3:10,20 18:24 22:19 29:22 30:15,18 31:20 32:5 33:21 34:11 35:12,19 36:12 37:2,21 38:10,22 39:6,11,12 40:17 41:23 42:15,20 43:13 44:2,14,21 45:2,20 46:16 48:20 50:2,11,21 51:5,9 52:1,19 56:1,19 57:3 61:11,18 62:3 63:4,10 65:8 76:3 76:12 77:13
depression 66:24
depressive 65:24
describe 34:17 42:23 43:8 70:4
describes 42:8 69:24
describing 36:9 38:19
description 42:5
deserve 20:18,22
despite 46:7
destroyed 28:24
details 51:7
determination 25:6
developing 39:2 40:1
development 64:3
Devlin 8:16
difference 73:7
different 6:19,20 8:16 63:23
dimension 20:23
diminish 65:21
direct 11:10 44:5 60:4 61:20 69:9 69:18 70:15
directed 13:20
directing 42:10 44:16 45:5 51:1 71:7
direction 79:11
directly 50:14 64:6
director 33:24 36:8
disagree 30:22
disclose 9:7
disclosed 9:3,15 41:1
disclosure 60:23
discuss 36:17 47:6

57:15 75:6
discussed 12:20 32:24
discussing 37:12
discussion 12:22,24 31:5
discussions 12:16 16:21 17:6,10 22:8 23:20 37:16 37:18 39:15 70:9
dismissal 24:22
dismissed 27:14
dispute 46:7,22 47:4,23 48:14 49:17,17 52:4 54:9 55:7 65:12 66:17,18 68:7,8 72:7
disrupt 49:19
distasteful 72:14
distinction 26:19
distraction 68:10
distracts 72:10
distributed 67:5
distribution 65:18
DISTRICT 1:1,2
doctor 5:9 7:12
doctors 47:17
document 21:18 22:1 23:5 41:13 41:16,22 42:4,4,7 42:11,16,21 43:7 57:14 59:2,22 60:5 62:22 64:18 68:14,20 69:7,19 71:8 77:11
documentation 38:15
documents 13:18 21:16 22:23,24 23:6 28:21 29:7 31:4,7,10,17,23 32:14,22,22,24 33:2,4,5,8,10,15 33:17
doing 3:18 39:5,8 58:15 72:20,21
Don 5:3
done 12:19 51:15
door 57:23
double 60:5
down 36:5 69:20 70:16 79:10
dozens 28:11
Dr 5:4,9,10,13,15 5:18,20,22 6:7,11 6:11 12:19,24

13:19 14:8,13,19 15:6,17 16:4,9,15 17:12 18:4,4 19:9
draft 69:13
drafting 18:22
Dugan 5:3 6:1,11 7:13
duly 3:6 79:8
Dun 45:10
DUNN 1:19
during 16:16 25:18 25:19 31:13 32:13 32:16 49:3 68:3 70:5,8
duty 8:8,11,18

**E**
each 69:20
Eagle 2:7,15
earlier 33:21
early 42:6,11 43:1,9 48:2,11,16 49:5 49:22 50:8,9 52:10 64:2 67:21
earnings 47:9
easier 39:19
Eastern 2:11
editing 24:17,24 25:11,21
effect 55:10,14 64:17 65:24
effort 10:5
efforts 8:4
Egdahl 18:4 19:9
Eight-year-old 47:15
either 8:15 19:4 20:8 39:17 48:6 79:14
elaborate 63:12
else's 24:17
embodied 60:13
embroiled 58:13
EMIS/HPR 43:20
employed 7:17,19 70:18,22 72:23 74:19
employees 72:1 73:15,22
Employer 47:20
enclosed 36:19
enclosing 34:16
Enclosures 34:13
end 74:19
ended 5:16 61:22 62:8,10
ending 47:22 58:21

59:15,20 61:6 77:16
engage 65:12
engaged 48:13 52:16 56:15 66:2 72:5
enough 53:6
entered 60:15,24
enterprise 73:6
entire 6:22 7:3 71:5 75:1
entirety 18:23
entitled 41:14 46:6 69:22 77:11
entries 70:4
Erisco 27:23 28:5 28:16 34:1 36:8 37:3,9,10,17,18 37:22 38:4,12,18 38:20,24 39:16,23 40:8,12,20 41:2 43:2 44:8,22 45:3 45:9,16 50:5 51:19 61:8,14,15 75:4
Erisco's 36:24 49:23 50:13 51:23 err 17:12
ERRATA 78:10
errors 34:18
especially 58:6
ESQUIRE 1:16,19 2:3
essentially 3:12
even 10:6 13:7,8,11 13:24 14:14 16:5 19:15 20:12 21:20 23:14 27:20 28:15 28:22 39:18 41:5 41:5 53:22 54:19 58:4 63:24 66:16 73:19
event 59:12 79:15
events 48:7 58:15
eventually 14:16
ever 5:12 23:22 25:19 38:24 40:8 40:12,18,19,19,22 44:7 50:12 51:21 61:7,13 73:14,24 74:8,8 75:5
every 20:3
everybody 72:22,24
everything 11:15,19 14:12 16:13 17:13 20:4,4,7,8,12 22:4 evidence 9:5 14:22

Case 1:04-cv-01258-SLR    Document 321-3    Filed 04/11/2006    Page 27 of 34

McKesson Information Solutions
Marcia J. Radosevich, Ph.D

The Trizetto Group, Inc.
April 10, 2006

C.A. # 04-1258 (SLR)

Page 83

15:20 20:2 21:5
24:1 25:3 26:22
45:2,20 50:2
74:12,12
**exactly** 5:13 7:11,14
42:22,22
**examination** 18:10
18:16 30:4,8 31:9
31:16 32:16 60:3
68:22 77:5,5
79:13
**examine** 26:7 30:10
75:20
**examined** 3:6 79:9
**Except** 71:12
**Exchange** 59:19
68:15 69:1
**exchanged** 31:22
**executive** 69:14
**executives** 74:21
**exercise** 10:15
17:14
**exhibit** 33:20,21
41:13,22,24 43:7
43:13,17 45:23
46:2 58:20,22
68:14 71:13 77:10
**exhibits** 29:21
31:13,22 77:8
**exist** 28:22
**existed** 16:3
**existing** 62:17
**expanding** 66:5
**expansion** 64:23
**experiencing** 64:22
67:21
**expert** 34:17
**Expires** 79:20
**explain** 18:17 22:18
34:24 52:15
**explained** 8:11,19
9:3
**explaining** 8:7
39:23
**explanation** 9:13,18
35:21
**explicit** 8:20
**explore** 36:19
**express** 15:1
**expressed** 38:5
**extraordinary** 18:9
**extremely** 73:12

---

**F**

**faceted** 41:10
**fact** 15:16,18 16:7
16:15 24:20 27:12

38:19 39:1 53:1
54:6 55:21 56:15
56:24 57:8 58:3
58:12 75:1
**factors** 65:3
**facts** 9:4 14:22
15:19 20:2 21:5
24:1 25:3 26:22
50:2 51:7 74:12
**fair** 51:14
**fairness** 40:4
**Faith** 33:24 34:16
36:8
**fall** 48:2 52:10
67:21
**falls** 35:5 52:24
**far** 18:10,11,16
22:12,15 42:19
**fast** 54:20 65:10
**faster** 39:19
**favor** 48:15
**faxed** 29:18
**fear** 65:20
**features** 44:22
**February** 45:24
48:16 65:17 66:3
66:9 67:8
**feedback** 27:4,4,17
27:18
**FETZER** 1:23
**few** 48:5 59:12
**fighting** 73:3
**fights** 73:3
**filed** 4:21 6:12,23
7:6 59:19 68:14
**files** 20:8 21:22 22:5
**filing** 20:15 68:24
69:24 70:16
**finally** 48:14 54:1,2
**financial** 52:24
54:15
**find** 10:5,14 13:20
14:13 15:8 16:7
19:2 20:11 26:6
29:17 35:19
**finding** 67:10
**fine** 4:13 24:4 69:8
76:4,9
**finish** 7:4 54:23
**fire** 27:19 57:22
**fired** 27:19 49:20
**firm** 58:8
**first** 3:5 11:2 23:13
30:14 32:4 34:19
50:7,8 53:3,9 56:2
61:24 64:21 69:7
**Fiscal** 61:22 62:8,10

**five** 60:4
**FLOM** 1:16
**Floor** 1:11
**Florida** 2:8,16
32:11
**focus** 23:10 55:17
66:6,8 67:1,9 68:2
70:5 72:10 74:5
**focused** 53:17 55:12
56:10 58:7,15
65:13 67:23 73:4
**folks** 3:13
**follow** 30:16 32:2
**following** 66:4
74:22 76:2
**follows** 3:7
**follow-on** 65:17
66:3,15 67:4
**follow-up** 3:10
18:15 21:9 23:11
**force** 28:11 37:14
63:8
**foregoing** 79:12
**forgive** 34:18
**Form** 77:16
**Fort** 2:8
**forth** 71:12
**forward** 51:16 62:9
64:18
**found** 10:20 12:4
14:3,4 16:3,13,16
17:7,13 20:4,4,12
24:21 27:13 60:9
**foundation** 6:3,13
7:1,10 8:3 25:8,24
28:1,7,18 35:11
**foundational** 9:11
18:21 25:6
**four** 69:24
**fourth** 47:9 69:11
**free** 71:20
**Friday** 31:22
**from** 2:14 3:15 7:4
15:12 18:12 22:4
22:7,13 23:12
33:23 35:18 38:18
39:20 45:23 48:8
49:3,6,21 50:7,14
53:2 54:24 57:7
59:15 62:11,22,24
64:6 65:9 66:6,8
67:21 68:10 72:8
74:21,23 77:14
**front** 22:2 37:6
**full** 54:7
**fun** 72:18
**functionality** 37:11

43:8
**fundamental** 23:16
30:20
**funny** 47:12
**further** 8:1 27:11
29:3 36:17 75:10
79:12,14
**future** 47:11

---

**G**

**G** 1:16
**gather** 12:17
**gathered** 16:16
**gave** 17:20 21:23
49:18
**gearing** 67:4
**general** 63:19 64:7
**generalities** 23:3
**generate** 37:8
**George** 5:1,2,3,8
**getting** 22:7 41:19
41:21 54:2,8,15
55:13
**GIBSON** 1:19
**give** 10:23 22:6
29:13 35:11,23
44:11 53:5
**given** 4:1,7 9:14,18
9:21 12:12 18:8
22:20 24:23 26:17
29:7 59:23 66:10
68:3 72:1 75:21
79:10,12
**giving** 18:15
**Glover** 33:24 34:5
36:8
**GMIS** 43:13,14
44:2 46:20 47:7
48:10,13,22 49:1
49:4,21 50:7,8
51:21 53:8 54:10
54:24 55:7,21
56:16,24 57:4,7,9
60:15,16,19,20
61:1 74:8,14
**GMIS's** 56:4
**go** 3:23 14:5 22:12
22:15 26:1 27:11
28:20 31:2 35:6
47:2 48:2,17 49:1
51:16 52:10,22
53:2,6,23 54:4
55:20 57:24 73:16
**goal** 68:10
**goals** 68:10 73:9
**goes** 54:21
**going** 18:6,11 19:3

20:16 23:11 29:23
35:8,11,12,14,17
39:11 40:5,5 41:9
46:11 48:23 50:23
54:7,13 57:24
**Goldberg** 5:1,2,3,8
5:9,15 6:11 7:12
**Goldberg's** 5:13
**gone** 3:14 18:16
**good** 10:13 53:14
57:19
**gotten** 27:18 57:10
**Gralock** 65:19 67:4
**grandiose** 27:14
**granted** 60:19
**great** 37:6
**grounds** 24:22
**group** 1:7 2:13 8:22
21:21 52:24 54:15
**grow** 56:12
**growing** 65:10,15
66:4 68:10 73:4
**growth** 62:14 64:19
64:22 65:13 67:20
68:11
**guess** 19:4 53:10
**guidelines** 17:20
**Gutkoski** 2:3,21,21
50:19 51:1,3,6
**guys** 27:1

---

**H**

**half** 53:22
**handed** 31:6,23
**handle** 48:7 49:6
**hanging** 66:19 73:2
**happen** 48:3 52:11
73:13
**happened** 13:16
54:6
**happy** 55:7
**hard** 53:3
**having** 3:5 22:8
**HBOC** 67:15,18
68:16 69:3,16
70:2,9,10 71:20
72:4
**heading** 60:7 61:21
62:8 64:19 69:22
70:17
**health** 33:24 36:9
46:19 47:1,20
**healthcare** 53:20
72:21,24 73:7
**healthy** 46:6
**hear** 6:15 41:18
62:15

---

Case 1:04-cv-01258-SLR    Document 321-3    Filed 04/11/2006    Page 28 of 34

McKesson Information Solutions                    The Trizetto Group, Inc.
Marcia J. Radosevich, Ph.D          v.                      April 10, 2006
                              C.A. # 04-1258 (SLR)
Page 84

heard 4:2,7 44:7
hearing 49:16 50:12
Hearn 55:11
heightened 63:18
her 4:10,11 19:5,5
  22:19,23,24 23:8
  51:11,12 75:14
hereto 71:13
Hertenstein 5:4,10
  13:19 14:13 15:17
  16:4 17:12
Hertenstein's 12:19
  12:24 14:8,19
  15:6 16:9,15 18:4
him 13:22 17:17,22
  26:7,14 53:9,10
  57:10,11,12,17
historical 9:15
Holley 2:7,14
Holloway 5:3,18,20
  5:22 6:7,11 7:12
honestly 7:14 17:19
hoped 52:21
hopefully 3:10 37:8
hopes 18:10
hours 47:5 48:24,24
  52:21
housekeeping 57:24
Howard 2:3,22
HPR 3:15,15 24:7
  25:19 28:4,4
  34:17 36:9 37:19
  38:6 39:23 40:8
  40:12,13 41:15
  42:5,11 43:14
  46:22 47:14,15,24
  48:11,13,22 49:21
  50:6,6 52:5 55:1
  56:16,24 58:20
  59:15 60:10,12
  61:1,8 63:7 66:8
  67:14,20,23 68:4
  68:16 69:3,15
  70:17,18,22 71:20
  72:5 74:17,21,23
  75:5,6 77:12
HPR's 38:19 39:1
  39:24 40:24 41:2
  43:2 46:6 47:3
  48:15 52:15 56:22
  59:18 61:13 62:19
  62:20,22 63:5
  66:6 67:9 68:2
  70:5 71:1 75:5
huge 52:22 67:6
  68:9
hurdle 47:24 52:5

**I**

idea 53:14
identification 41:13
  42:1 43:12,17
  45:22 46:2 58:20
  58:22
identify 47:17
identifying 67:23
imagine 28:23 34:8
  41:4 63:2
immediately 47:7
imperative 58:10,10
importance 63:20
important 20:20
  27:15 56:3,10
  66:21 71:19 73:2
  73:20
impression 34:21
improper 23:2
  75:12
improperly 30:17
improving 72:21
inappropriate
  27:18
Inc 1:7 2:7,15 46:19
  46:20 60:15
inch 31:7
include 21:13
included 13:17
including 17:11
  51:14 70:10
increased 62:11
increasing 63:7
incredibly 54:22
INDEX 77:1,8
indicate 36:6
indicates 48:17 52:3
indication 27:20
individuals 4:22
  6:10 7:7 11:9
  70:18,22
industry 47:19
informally 3:18
information 1:3
  9:15 10:23 11:13
  19:22 21:18 26:6
  34:1 36:9 43:2,3
  47:20 49:19 63:17
  64:4
informed 48:7
informing 40:19
  61:7
infringed 26:4
infringement 24:18
  60:18 64:14,15
infringers 73:17

infringing 25:1,5,11
  25:21 26:8
initial 47:24 52:5
  62:14
Initially 11:2
initiated 50:7 60:16
innovative 72:18
inquiries 49:6 63:7
inquiry 4:4
instance 43:1
instead 39:2 48:23
  72:13 75:16
instruct 19:5 49:5,9
  49:11 51:22 73:15
  73:24
instructed 22:16
  24:8,10 27:9
  30:17 48:6 71:4
instructing 55:20
instruction 24:23
instructions 26:17
  55:3,5 56:22
  58:16 59:23 61:2
  65:4 66:10 68:3
  70:11 72:1 73:22
insurance 72:23
insuring 5:22
integrate 38:1,7,16
integrated 37:8
integrating 37:4,12
integrity 20:19
intellectual 20:19
  60:8
intelligent 27:16
intended 39:24
intending 15:14
intense 54:23
intensely 53:17
intent 22:14
intention 22:3 57:5
  57:6,16,17 58:2
  75:24 76:1
interest 38:5 51:11
  64:5
interested 5:15
  33:10 70:10 79:15
interesting 26:14
interests 7:14
interfere 58:11
International 2:4
interpreted 12:6
interrupt 50:24
introducing 37:7
invalid 60:17
invalidate 11:6
invalidated 20:16
inventors 8:8,19 9:3

9:14,19,24 10:23
  12:17 16:22 17:6
  19:18 22:8 23:21
investigate 73:16
  74:1
investigation 13:13
  71:14
investment 54:13
  54:14 55:15
involve 4:5
involved 5:22 6:6
  11:11 15:12 28:11
  56:7,8 57:6 58:2,6
  66:17,20 68:7
involvement 3:13
involving 3:15
in-house 5:9
IPO 48:1 52:9,23
  53:17 54:22 55:19
  67:3
Irvine 1:20
issued 47:7 56:17
  57:8
issues 4:3,11 23:10

**J**

J 1:10 3:4 77:3
January 33:23 34:5
  36:7 37:16 38:4
  39:23 40:10 47:2
  48:18 53:18 54:9
  55:1,18 60:14
  79:20
Jason 8:15
Jeff 2:19,23 3:9,23
  29:14 30:9,19
  31:2 34:24 35:14
  39:4 40:4 51:1
JEFFREY 1:16,19
job 58:10 65:10
John 2:3,21
joined 21:20
journal 15:16 16:8
  45:23 77:15
Journalism 47:13
journals 15:5
Judge 30:3,7 31:19
  40:6,6 75:15,17
  76:2,8
judgment 17:14
June 47:22 58:21
  59:15,20 61:6,22
  62:8,10 65:3
just 3:19,24 4:5 5:8
  9:9,11 11:20
  15:11,14 18:1
  19:13 21:11 22:2

24:2 29:13,15
  30:2,6,24 31:6,9
  31:23 35:21 39:19
  40:4,6 41:9,19
  51:2 56:9 64:7
  69:5 71:4
justification 35:11
  35:13

**K**

Kathleen 1:12 2:14
  79:7,19
keep 28:22
Kelly 5:3 6:6
kind 47:12 64:16
  66:17,18
King 1:23
knew 10:2 11:13
  12:1 30:24 41:9
  45:7,9 57:18
know 3:11 5:6,7,8
  5:11 7:2,3,11 8:11
  9:13,23 10:3,4,18
  11:3 12:6 13:17
  14:17,18 15:8,11
  15:15,15,16 17:19
  18:3 19:8,22 20:9
  20:11,18,20 21:1
  21:19,19,21 22:3
  24:12 26:9 27:22
  28:4,10,10,12,13
  28:15,19 29:1,16
  31:8 39:18 40:5
  40:23,24 41:5,5
  41:10 45:7 56:9
  57:10,19 58:8
  59:4 66:18 72:8
knowing 51:6 67:4
knowledge 25:6
  61:13 71:15 74:21
  75:4,9
knows 15:4 17:21

**L**

lacks 6:3,13,24 7:9
  8:2 25:24 28:1,7
  28:17
large 28:10
largely 6:6
larger 37:13 38:1
largest 55:14
last 23:13 46:22
  51:10 52:3
late 56:17
later 7:6 36:1
latitude 18:9,15
Lauderdale 2:8

Case 1:04-cv-01258-SLR    Document 321-3    Filed 04/11/2006    Page 29 of 34

McKesson Information Solutions
Marcia J. Radosevich, Ph.D

The Trizetto Group, Inc.
April 10, 2006

v.
C.A. # 04-1258 (SLR)

Page 85

laughing 46:23
law 1:10 58:8 64:3
lawsuit 48:10,13
  50:7 53:7,8,15
  54:1 57:6 58:3
lawyers 54:16 55:15
  57:13 72:12 73:3
lay 25:8 35:10
leading 70:1,8
  71:19 72:4
least 19:16 30:22
  37:15 38:5 54:11
  62:24 65:3
leave 74:17,22
leaving 73:14
left 7:13,15,21,23
  8:6 17:17 74:18
  75:2,2,2
legal 17:1 26:2,3,11
  27:7 66:17,18
  68:7,8 72:7
less 10:6 23:15 68:8
let 9:9 10:10 11:20
  14:17 22:24 24:5
  26:7 29:14 32:2
  41:12 48:5 50:3
  56:21 60:4 61:20
  62:18 68:13
letter 22:1 33:23
  34:4,8,12,15
  36:14 37:15 39:14
  39:16,22 40:10,12
  40:14,20 41:1
  69:13
library 20:9,10
license 39:17,20
  48:22 49:2,5,22
  50:8 51:21 54:24
  55:22 57:17 60:20
  60:24
licenses 62:16,17
  64:16
licensing 37:12 57:7
light 4:8
like 3:24 6:6 36:17
  42:7 43:2 44:5
  51:2 53:20 58:19
  66:21 69:18 75:19
likely 48:3 52:11
  59:9
limited 65:19 67:6
  76:3
line 13:11 20:10
  44:6 45:6,7 54:23
lined 54:16 57:14
lines 4:4
lion's 52:24

list 24:15
listed 4:5
listen 35:24
literally 48:24
litigation 43:20
  49:3,20 52:16
  56:7,8,15 58:14
  58:24 59:5,9
  60:16 68:21 71:10
  71:20 72:6 74:9
  74:13
little 10:6 47:13
live 3:20
LLC 1:4
LLP 1:16,19
local 29:6,16
located 11:24 15:20
loftier 73:10
logic 5:23 6:7
logs 28:21
long 7:19 24:3
  28:23 34:19 63:22
  74:16 75:3
long-simmering
  47:4
look 28:20 33:11
  42:3 43:24 57:12
  59:14 72:7
looked 10:21 42:15
looking 11:2 42:7
looks 42:7
lot 10:9 54:19 64:5
  64:6 72:9 73:1
loudly 6:18

___ M ___

made 10:4 12:23
  21:3,14 26:19
  31:16 57:4 58:4
  60:21 73:13
major 55:10
make 10:14 13:10
  17:17 25:6 27:3
  29:14 30:2 31:1,3
  68:8 72:22
makers 47:1
making 26:12 27:13
  73:6
Malvern 46:20
manage 65:18,22
  66:22
management 52:15
  55:10,15,18 61:13
  64:19 66:6,8 67:9
  68:2 70:5 71:1,2,5
  75:1
management's

56:14 67:22 72:10
managing 65:13
  68:11
manual 15:1
many 28:11 49:22
  50:5
March 74:19,23
Marcia 1:9 2:12 3:4
  77:3,13 79:8
mark 27:21 41:12
  41:22 43:12 45:22
  58:19
marked 33:20 41:24
  43:17 46:2 58:22
  68:13
market 1:11 37:11
  48:2 52:9 53:19
  54:2 56:13 63:18
  64:8 65:20,23
  67:7
marketing 55:11
marketplace 62:24
  63:6
mass 53:6
Massachusetts 2:4
master 18:12,14
  22:14
master's 51:13
material 17:10
  32:17 40:3 72:19
materials 8:24 9:2
  9:23 10:24 12:1,8
  12:9,13,14,17
  13:1,17,17 14:18
  14:23 15:20 16:22
  73:1
matter 2:12 22:13
  24:6 27:7 51:10
may 3:11,14 5:8
  19:15 23:5 31:13
  32:17,22,23,24
  33:7 48:8 51:20
  maybe 13:9 60:7
  63:21
MCK 41:14 43:15
  46:1
McKESSON 1:3
  2:13,20 4:6,6,15
MEAGHER 1:16
mean 10:23 17:19
  26:23 28:6 55:5
  56:6 64:8
means 57:15
meet 57:15

mention 17:11
  20:17
mentioned 12:5
  36:15
mentioning 40:22
merge 67:10,24
merger 67:14 68:16
  69:2,15,22,23
  70:1,9 71:20 72:4
Merit 1:12 79:7
methodology 60:13
middle 29:21
midst 53:15
might 10:14 13:14
  14:14 20:17 36:19
  54:3,5 64:13
  65:21
Mike 55:11
million 47:21 49:2,4
  53:5 61:1
mind 15:23 21:12
  22:24 51:21
mine 53:20
minute 29:14,15
  31:23
Mirabito 8:15
Miss 3:9 4:8,20 9:12
  11:23 17:5 19:8
  21:11 23:19 25:10
  28:3,9 29:4 36:6
  40:8 42:3 43:19
  51:8,19 59:16
  69:9
mission 65:11,11
  73:1
missions 73:10
misstates 11:16
  14:10 74:12
Mm-hmm 71:11
moment 43:24
  53:16
Monday 1:11
money 10:7,7,9,16
  11:5 14:2 20:15
month 57:13
months 48:4 52:12
  52:22 67:5
more 6:18 23:16
  26:24 27:13 47:24
  48:3 49:19 52:4
  52:11 56:12 57:4
  58:4,18 61:21
  72:22 73:1,20
Morris 1:10
most 13:13 17:2
motion 75:17
mouth 15:14

move 23:17 24:5
  36:1 57:19 62:9
much 17:10 23:15
  24:11 29:4 57:4
  68:8 73:9,9 76:9
multi 41:10
multipage 77:11,13
  77:16
must 5:11
myself 8:22 13:10
M.D 5:17

___ N ___

name 2:14 42:9
need 4:12 12:8 36:1
  39:20 44:17 51:21
  56:4 57:15
needed 56:11,11
  58:9 72:24 74:9
needs 51:10
negotiate 64:10
negotiating 68:12
neither 4:1 47:6
net 10:18
never 26:12 27:4,16
  27:19,19,20 41:7
  53:8,9 57:5 58:2
  72:7 74:4,13 75:8
new 47:16 62:16
  79:3
newspaper 13:18
  15:17 16:8
newspapers 15:5
  20:11
next 48:4 52:11
  57:18
Nichols 1:10
nobody 20:20
none 20:20
Nonetheless 4:3
non-exclusive 60:20
norm 47:17
North 1:10
nose 56:4
Notary 1:12 79:7
note 30:2 39:11
  58:23
noted 35:4
notes 79:10
nothing 11:9 14:4
  38:10
notice 1:10 4:1
novelty 63:16
November 43:14,20
  68:15 69:1 77:13
number 9:5,6 11:17
  11:18 14:21,24

Case 1:04-cv-01258-SLR    Document 321-3    Filed 04/11/2006    Page 30 of 34

McKesson Information Solutions
Marcia J. Radosevich, Ph.D

v.
C.A. # 04-1258 (SLR)

The Trizetto Group, Inc.
April 10, 2006

Page 86

15:21 21:5,6,8
23:4 24:15 32:13
32:21 46:1 59:7
63:7 67:1,6 70:10
70:21
**numbers** 41:14
43:15 58:24 65:9
69:19
**numerous** 70:1

**O**

**oath** 3:6,19
**object** 18:6 29:20
31:9 34:7 39:10
42:14 46:11 50:23
59:21 68:19
**objection** 6:3,13,24
7:9 8:2 9:4 11:16
14:10,21 15:19
16:10,17,24 17:9
20:1 21:4 22:11
23:24 25:2,13,23
26:21 27:24 28:17
31:16 35:4 36:11
37:1,20 38:9,21
40:16 43:5,10
44:13 45:1,19
48:19 49:12 50:1
50:10 51:24 52:18
55:24 56:18 57:2
61:10,17 62:2
63:2,9 65:7 66:13
67:11,16 69:4
70:23 71:22 73:18
74:3,11,24 75:7
**objections** 21:15
**obliquely** 14:15
16:5
**obstructing** 35:19
36:2
**obtaining** 38:5
**obviously** 38:10
42:19 46:15
**occasion** 11:10
**occurring** 24:19
**October** 60:13
**off** 18:23 29:23 31:2
31:5
**offense** 72:11,13
**offered** 57:11
**offering** 48:1,3 52:6
52:11 65:17 66:3
66:10,15,15 67:8
**office** 9:16 13:5,6,8
13:23 14:20 15:7
15:9
**officer** 69:15

**offices** 1:10
**often** 24:14
**Oh** 6:18 62:10
**okay** 3:22 4:18,20
7:23 8:11 12:8,12
12:16 13:8 16:20
19:17 24:4 25:7
29:2 46:24 47:13
62:10,10 63:12
71:9
**old** 28:20 72:22
**older** 22:9
**once** 11:8 36:18
58:13 66:14 68:6
74:4
**one** 2:4 7:3,13 10:2
11:12 12:1 21:9
23:17 28:12 31:23
35:16 46:23 47:16
47:23 52:4 58:6
61:15 64:13 65:3
65:14 67:1 72:9
**one-page** 45:23
77:14
**one-time** 47:8 60:22
**only** 38:12 46:23
71:2 73:5 74:14
74:14
**onto** 65:20
**open** 53:19 54:3,5
**opened** 54:5,12
**operating** 74:18
**operation** 45:17
**opinion** 25:20 26:5
**opportunity** 4:2,7
30:11,14 36:16,18
36:23 51:12 75:23
**order** 3:11 4:2
18:21 30:4,7
39:20 51:13 53:5
53:11 54:15 67:3
74:1 76:2
**ordered** 31:19
75:15
**original** 4:21
**other** 7:8,13 9:15
20:17,23 25:5,20
26:4 27:4 51:8
74:6,21
**others** 75:2
**otherwise** 23:11
71:12 79:14
**ourselves** 53:12
**out** 3:14 10:11,17
11:9 15:8 19:2
21:22 24:21 25:21
27:13 28:24 29:17

29:19 35:19 47:17
53:16,23 54:20
55:20 65:15,20
73:2,16
**outside** 34:11 35:12
36:11 37:1,20
38:9,22 39:10
40:17 42:14,19
44:13 45:1,19
46:15 48:19 50:1
50:10 51:24 52:18
55:24 56:18 57:2
61:10,17 62:2
63:9 65:7 66:13
67:11,16 68:21
70:23 71:22 73:18
74:3,11,24 75:7
75:14 76:7
**over** 3:18 9:24
11:13,19,24 12:7
12:10,17 13:1,14
13:22 14:9,12
15:6,18 16:2,13
16:18 18:5 19:9
19:24 20:6,13
21:2,13 26:6,13
29:16 38:14 45:6
46:7 47:3 49:24
51:15,23 62:14
66:19 69:13 72:7
**Owens** 57:9
**own** 4:11 17:23
18:1 39:18 46:23
**owned** 4:6 45:10
**owner** 4:16

**P**

**Pa** 46:20
**page** 44:5,16,17
45:6,6 60:8 69:7
69:11,19,19,20
70:15,16 71:8
77:3,10 78:8
**pages** 44:18 60:4
61:21 62:9 64:18
69:24
**paid** 17:21
**paid-up** 49:5 60:24
**Palm** 2:16
**Palmer** 1:12 2:14
79:7,19
**Palo** 1:17
**paragraph** 52:3
60:10 61:24 62:6
62:7
**Park** 1:20
**part** 16:7 32:9

50:13 58:16
**participate** 5:4,20
6:2 7:7,19 22:21
**participating** 7:20
31:15,19 32:5
**particular** 21:17,18
28:13
**particularly** 23:3
**parties** 4:4 51:11
64:6 70:10 79:9
**partner** 65:17 66:4
**partners** 65:19 67:6
**party** 79:14
**pass** 10:24
**passage** 11:14 12:12
**patent** 3:13,15 4:21
4:23 5:14,17,21
6:12 7:5,20 8:1,5
8:9,13,16 9:16,21
9:24 10:9 11:1,10
11:13 12:10 13:4
13:5,6,8,9,11,14
13:19,23 14:2,4,6
14:9,16,19,20
15:2,6,9,18 16:5
16:19,23 17:8,13
18:5,18,22 19:9
19:18,24 20:5,6
20:13,15,18,21
21:2,23 23:21
24:9,11,14,15,18
25:12,22 26:4,6,9
27:10,23 28:5
32:18 34:9 35:2
38:11 39:7 40:13
40:21 41:3,6 42:6
42:17 43:20 46:13
46:22 47:3,23
48:9,22 49:7,15
49:21,24 50:6
51:23 52:4 53:15
55:4,6,22,22
56:16,23 57:1,8
57:10,11,21 59:23
60:11,12,17,18,20
60:21 61:9,16
63:8 64:3,13 65:6
65:12 66:17 68:5
70:13 71:3,6 72:2
72:5 73:17,24
74:9,13 75:5,6
**patentability** 17:24
**patented** 40:9 42:12
43:2,8 62:20,22
63:6 64:2
**patenting** 63:19,20
**patents** 9:1 51:20

61:3 63:14,23
66:12
**pay** 49:2
**payment** 46:19
60:22
**payout** 47:14
**pending** 19:7 40:13
41:3 71:14
**people** 5:6 24:10
27:19 28:15 42:23
54:19 55:11,11
57:13 64:1 71:2
72:13,23,23,23,23
73:12
**percent** 55:12
**perhaps** 33:16
37:18 42:21 64:12
67:10
**period** 25:18,19
55:1,8 58:21
59:15,20 61:6
64:22 68:3 70:6,8
77:16
**permit** 18:14
**permitted** 21:10
22:13
**person** 32:11 63:3
**personally** 9:23
**personnel** 64:24
**pertinent** 16:23
**Peter** 8:15
**phone** 3:18 22:21
23:3 29:9,14
31:15,19,20 72:14
**physician** 34:18
**Ph.D** 1:10 3:4 5:18
77:3
**picking** 6:17
**piece** 21:17,18
**pieces** 6:19 11:24
**place** 2:4 39:15 53:9
64:23 66:3
**plaintiff** 1:5,18 2:20
47:20
**Plan** 4:17
**play** 58:15
**Plaza** 1:20
**please** 2:17 18:17
22:18 23:9 24:7
34:18 36:3,18
44:19 46:10
**pleased** 46:21
**point** 7:13 9:12 12:4
27:4 28:13 67:9
**politely** 36:2
**poor** 72:23
**position** 30:12,13
50:19 51:2,3,8,9

McKesson Information Solutions
Marcia J. Radosevich, Ph.D

v.
C.A. # 04-1258 (SLR)

The Trizetto Group, Inc.
April 10, 2006

Page 87

| | | | | |
|---|---|---|---|---|
| positive 73:7 | 11:7,12 14:1,2 | published 11:6 | Radosevich's 3:24 | recollection 4:24 |
| possessed 20:9 | 15:1,13 16:7,16 | pull 22:4 | 51:8 | 8:21 33:16 44:18 |
| possibility 36:15,20 | 32:19 37:19 54:12 | pulled 21:21 | raise 51:21 56:11 | 45:15 71:24 |
| 63:19 | 59:23 | purpose 30:15 | raised 61:14 | record 2:18 3:24 |
| possible 54:19 | processes 7:21 | 65:18 | raising 50:6 | 29:24 30:3,6 31:1 |
| 71:21 | processing 37:5,9 | pursuant 1:10 | ran 72:16 | 31:3,5,9,11,18 |
| possibly 18:11 | 37:13 38:7 44:22 | pursue 7:13 74:9 | Randall 1:16 2:19 | 35:1,7 46:10 |
| 22:15 54:4 59:22 | 45:3,10 | pursued 74:13 | 2:19 3:23 4:18 6:3 | 59:10 |
| potential 37:18,22 | produce 47:18 | pursuing 10:16 | 6:13,24 7:9 8:2 | redirect 75:13 |
| 43:4 47:24 52:5 | produced 58:24 | push 54:3 | 9:4 11:16 14:10 | refer 33:5 |
| 68:9,12 73:16 | 59:4,7,8 68:21 | put 54:7 | 14:21 15:19 16:10 | reference 15:1 |
| 74:1,10 | product 36:10 37:4 | p.m 76:13 | 16:17,24 17:9 | referenced 32:17 |
| preliminary 67:18 | 38:6,20 39:3,24 | | 18:6 20:1 21:4,15 | referring 19:15 |
| preparation 3:13 | 40:1,9,14,21 41:2 | _____ | 22:11 23:24 25:2 | 23:5 28:1 33:3,3 |
| 4:22 5:21 6:2 | 42:5,9,13,23 43:3 | Q | 25:13,23 26:21 | 33:16 |
| 23:21 34:9 35:2 | 43:8 45:8 47:4 | quality 47:19 | 27:24 28:6,17 | refrain 35:18 |
| 38:11 42:17 | 62:19,20,23 63:6 | quarter 47:9 | 29:6,9,11,13 30:5 | refresh 33:16 44:18 |
| present 2:6 4:6 8:18 | products 26:4 45:12 | quarters 69:20 | 30:8,9,19 31:2,11 | regard 4:2,20 7:5 |
| 11:11 22:20 72:13 | 45:18 47:16 72:16 | question 6:5 9:8,11 | 31:24 32:1 35:4,8 | 9:1 17:7 18:22 |
| presentations 12:18 | 72:17,17 | 9:12 11:21 15:22 | 35:14,18,23 36:4 | 39:12 76:7 |
| 12:23 16:9 | profits 47:10,11 | 15:23 16:14 18:19 | 41:12,19,21 42:2 | regarding 4:4 38:6 |
| presented 30:21 | project 20:13 41:10 | 18:20,21 19:4,7 | 43:12,18,23 45:22 | 42:12 43:2 49:7 |
| president 25:18 | promptly 56:24 | 21:9,11 23:6,19 | 46:3 50:3,4,22 | 49:21 51:20 61:16 |
| 28:4 57:9 69:14 | proper 23:10 57:20 | 25:4,13,16,23 | 51:16,18 58:19 | 63:8 65:5,6 66:11 |
| press 54:7 56:17 | Property 60:8 | 26:2,3 27:20,24 | 59:1,6,11 75:10 | 68:4 69:15 70:12 |
| pretty 10:13 24:11 | proposal 21:24 | 28:7,9,20 39:13 | 75:14,19 76:4,9 | 71:24 72:1 73:23 |
| prevailed 74:7 | 69:23 | 44:1,7,11,19,20 | 77:5 | 73:24 |
| previous 43:13 | proposals 21:3,14 | 45:7 50:18 51:1 | rapid 64:22 67:20 | Registered 1:12 |
| 75:22 | proposed 70:1 | 56:21 59:3,17 | 68:11 | 79:7 |
| previously 22:22 | prospective 57:16 | 62:18 63:24 | rapidly 66:4 | relate 18:7,17 51:13 |
| 32:8 34:3 36:10 | protect 53:11 67:2 | questioned 49:16 | rather 23:15 38:1 | related 13:21 16:4 |
| 69:2 | 67:2 | questioning 34:8 | reach 67:14 | 20:5,12 64:6 |
| price 65:22 66:1,24 | proud 24:12,13,13 | 46:12 50:20 51:4 | reached 13:3 | relates 42:16 68:6 |
| 67:2 | 27:10 54:18 55:6 | questions 4:9 18:8 | read 5:7 7:3 46:10 | relating 21:22 68:5 |
| primarily 4:5 5:15 | 55:7 73:12 | 18:12 22:17,19 | 46:17 60:10 61:24 | 69:1 70:13 |
| 5:22 | provide 38:19 39:20 | 23:1,16 29:3 | 62:4,5 | relative 79:14 |
| primary 10:3 | 42:12 | 30:16 32:3,21 | ready 47:16 53:23 | release 47:7,16 |
| prior 3:10 9:1,14 | provided 18:21 | 48:5,8 51:12,17 | 54:4,11 | 62:14 65:23 66:22 |
| 10:1,11 11:2,24 | 19:2,3 32:23 33:9 | 56:23 59:12,21 | really 5:18 10:2 | relevance 35:20 |
| 12:4,9 14:3,4,5 | 33:9,17 43:4 | 61:3 75:10,14 | 55:5,10 56:6 58:8 | relevant 13:21 17:8 |
| 17:24 18:24 19:19 | 58:16 | 76:5,6,7 79:9 | 63:18 67:1 73:10 | 17:15 59:22 |
| 20:16,21 21:20 | PTO 13:1,4 | quite 63:16 68:1 | reasonable 18:15 | relief 23:12 |
| 30:17 37:17 39:22 | public 1:12 47:24 | | 21:9 63:3 | rely 18:1 |
| 40:12,14 41:1 | 48:2 52:5,10,22 | _____ | reasonably 71:21 | remember 7:11,14 |
| 53:21 61:5,7 | 53:1,3,6,14 54:4,7 | R | reasons 51:15 72:9 | 8:21 10:3 19:13 |
| 73:14 | 54:8,11,11,20 | radar 73:19 | recall 8:23 11:15 | 19:14,16 42:22 |
| privilege 4:5,14,15 | 55:2,13,16 56:9 | Radosevich 1:10 | 12:2,14 15:12 | 44:15 45:11 63:14 |
| 4:16 | 56:11 58:7,9,14 | 2:12 3:4,9 4:8,20 | 16:14,18 21:1,12 | remotely 12:5 20:12 |
| probably 28:21 | 60:23 63:13,17 | 9:12 11:23 15:4 | 23:20 24:2 39:22 | removed 47:23 52:4 |
| 53:23,24 67:12 | 64:5 65:16 66:15 | 15:24 16:12 17:5 | 40:11,18,19,22 | rendered 47:18 |
| problems 64:12,13 | 66:22 69:24 70:16 | 19:8 21:11 22:22 | 44:20 45:17 50:5 | renewals 62:16 |
| 65:14 | 79:7 | 23:19 25:10 28:3 | 50:12 61:5,6 | repeat 20:14 |
| proceed 26:16 | publication 57:1 | 28:9 29:4 30:4,8 | recalling 33:8 | rephrase 50:3 |
| 31:15 | publications 9:1 | 32:2 36:6 40:8 | receive 63:7 | REPLACE 78:8 |
| proceeding 45:6 | 16:15 20:11 | 41:16 42:3 43:19 | received 24:11,14 | report 58:20 59:14 |
| 71:14 | publicized 56:16 | 46:4 51:19 59:16 | 27:10 | 59:18 61:6 |
| process 5:5 6:21 | publicly 59:1,8,9 | 68:17,23 69:9 | recess 30:1 | reporter 1:12 2:13 |
| | | 75:13 76:1 77:3 | | |
| | | 77:13 79:8 | | |

Case 1:04-cv-01258-SLR     Document 321-3     Filed 04/11/2006     Page 32 of 34

McKesson Information Solutions
Marcia J. Radosevich, Ph.D

v.
C.A. # 04-1258 (SLR)

The Trizetto Group, Inc.
April 10, 2006

Page 88

3:1 79:5,7
**reports** 47:19
**representation** 5:23
**representing** 2:20
　2:22,23
**request** 25:8 34:16
　38:18 40:7 75:17
**requested** 36:10
**required** 8:8 55:17
**requirement** 27:7
**research** 10:13
　17:24 18:2
**researchers** 10:13
**resolve** 30:5 53:7
**resolved** 47:4 48:14
　54:10
**Resolving** 47:23
　52:4
**resources** 64:24
**respect** 32:2 70:21
**respective** 79:9
**respond** 19:11,15
　56:23 61:2,14
**responded** 60:17
**response** 29:10,12
　34:20 38:18 57:22
　58:1,4
**rest** 55:13
**result** 11:12 47:8
　60:23 63:5 64:4
**revenues** 53:4 56:12
　62:1,4,11
**review** 6:11,22
　13:21 36:18 44:18
　46:19 47:21 75:5
　75:6
**reviewed** 6:19
　49:15
**reviewing** 6:7
**ridiculous** 39:7
**right** 19:17 24:5
　29:13 30:20 31:24
　32:6 35:24 38:4
　48:11,23 57:20
　62:7
**rights** 4:10
**RMR** 79:19
**Road** 2:16
**Robinson** 40:6
**role** 5:13 74:18
**rooms** 73:2
**RPR** 79:19
**rub** 56:4
**running** 55:13 75:5

――――――――
S
――――――――
**sales** 27:1,16 28:11

28:12,15,21 37:8
　37:14 42:23 63:8
　71:5
**salespeople** 24:8,16
　24:23 26:18 27:22
　28:4 34:10 41:1
　42:18 46:14 48:6
　49:6,9,23 50:6
　51:22 55:3,20
　56:22 58:17 59:24
　61:2,15 65:5
　66:11 68:4 70:12
　71:2 73:15,23
**salesperson** 50:14
　61:7
**same** 6:24 16:2 17:9
　21:15 43:5,10
　55:5 69:4
**sanctions** 39:12
　40:7 75:18
**saw** 5:12 39:21
**saying** 17:16 47:7
**says** 34:12 45:24
　61:22 62:8
**scheduled** 47:15
　49:1
**scholarly** 16:8
**scope** 18:9 21:9
　34:11 35:12 36:11
　37:1,20 38:9,22
　39:6,10 40:17
　42:15,19 44:13
　45:1,19 46:16
　48:19 50:1,10,20
　51:4,24 52:18
　55:24 56:18 57:2
　61:10,17 62:2
　63:4,9 65:7 66:13
　67:11,16 68:22
　70:23 71:22 73:18
　74:3,11,24 75:7
　75:15 76:7
**scoured** 20:7,8,8
**scrap** 20:3
**screen** 73:20
**screw** 70:14
**searched** 10:12
　20:10
**second** 23:17 24:5
**secondary** 66:9
　67:8
**Secondly** 56:6
**Section** 71:10
**Securities** 59:19
　68:15,24
**see** 11:3 19:14 23:4
　34:1,13,22 36:21

42:16 44:9 45:13
　46:4,8,13 52:7,13
　59:22 65:1 68:17
　70:2,19 71:17
**seeing** 19:11 21:16
　22:2
**seek** 23:11
**seeking** 39:12
**seems** 46:22
**seen** 31:8
**selecting** 54:12
**self-defense** 74:15
**selling** 37:14
**send** 17:13 42:23
　57:11
**senior** 55:14
**sense** 53:18 54:2
**sent** 29:21 34:4,21
　36:7 40:2,15 41:1
　69:13
**sentence** 64:21
**September** 67:17
　70:18
**Services** 2:7,15
**session** 30:15
**set** 47:2,20 48:17
　71:12
**settled** 48:12,12
　49:1
**settlement** 46:6,21
　60:19
**settling** 60:15
**severe** 66:24
**Shamelessly** 38:21
**share** 52:24
**shareholder** 67:2
**shares** 65:19,23
　66:22 67:5,7
**SHEET** 78:10
**shocked** 57:21 58:1
**short** 54:6
**shortly** 39:15 67:3
**show** 33:2,6,15
　68:13
**showed** 18:18 32:13
**shown** 22:23 62:13
**side** 17:12 47:6
**sides** 60:5
**signature** 69:14
**signed** 67:17 78:14
**significant** 55:21
　62:23 64:23
**significantly** 47:10
**silly** 63:21
**simple** 21:12
**simply** 19:7 22:15
　23:20 30:16 36:2

49:17 57:6
**since** 28:24 62:14
**situation** 66:21
**six** 67:5
**Skadden** 1:16 2:19
**skills** 10:14
**SLATE** 1:16
**sleep** 54:21
**SLR** 1:6
**small** 53:19 65:14
**smart** 15:14
**smell** 47:14
**smiling** 46:23
**social** 72:19
**software** 5:24 6:8
　22:9 23:22 24:18
　37:12 38:1,2,3
　45:10 47:2 49:2
　63:14,19,20,23
　64:1
**sold** 72:17
**SOLUTIONS** 1:4
**some** 10:11 12:8,9
　16:3,8 17:20
　21:20 30:16 32:3
　33:5 35:10,11
　55:23 63:24 64:1
　64:6,7,10,13,16
　67:9 73:20 75:2
**somebody** 41:17
**someone** 24:17 26:8
　57:23
**something** 10:16
　11:6 14:3 20:21
　22:1 24:15 28:21
　53:11 72:20
**sometime** 67:12
**soon** 18:11 35:19
　40:6 54:9 56:16
　74:22
**sorry** 6:17 13:5,10
　19:12 21:16 22:1
　24:2 30:9 46:21
　46:23 47:12 62:5
**sort** 5:9 15:5 64:3
　64:10 66:18
**sorts** 9:2
**sounds** 63:21
**souring** 66:18
**speak** 6:18 36:23
**speaking** 23:3 36:15
　54:14
**special** 18:12,14
　22:14 51:13
**specific** 21:24 33:4
　33:5,8,10 61:14
　70:9 72:1

**specifically** 11:23
　33:3 34:7 36:8
　45:5 48:5 51:22
　67:21 69:18,22
　71:10
**specifics** 45:11,17
**speculation** 28:8,18
**spend** 72:12 73:11
**spent** 26:24 55:13
**spring** 47:16
**sprint** 54:23
**squarely** 35:5
**stack** 31:6
**stages** 6:20
**stamp** 41:14 43:15
　46:1 59:7
**standard** 2:11
　47:19
**start** 7:4 49:3
**started** 13:24 67:13
**starts** 60:10 61:24
**state** 3:24 36:14
　51:8 79:1
**stated** 4:14
**statements** 75:22
**states** 1:1 34:15
　52:9 64:21 70:17
　71:12
**stay** 56:10
**Stenotype** 79:10
**step** 29:19
**still** 7:15 21:8 22:12
　63:16 74:19
**stock** 65:22 66:1,24
　67:2
**stockholders** 69:15
**stop** 36:3
**strain** 64:23
**strategic** 67:10,24
**Street** 1:11,23
　54:21
**strike** 14:17 36:1,5
　40:23 42:10 49:9
　66:6 70:24 74:16
　75:9,17
**study** 57:14
**stuff** 21:22 55:8
**subheading** 69:23
**subject** 12:18 16:5
　19:19 22:9,13,22
　23:10,22 24:6
　30:22 35:5 40:21
　41:2 42:6
**subjects** 3:12
**submit** 75:16 76:8
**submitted** 10:19,21
　14:19

Case 1:04-cv-01258-SLR     Document 321-3     Filed 04/11/2006     Page 33 of 34

McKesson Information Solutions                                    The Trizetto Group, Inc.
Marcia J. Radosevich, Ph.D                  v.                         April 10, 2006
                                    C.A. # 04-1258 (SLR)

Page 89

submitting 8:9
subsequent 7:5,20
subsequently 13:16
success 62:23 63:5
successful 54:22
  65:15 73:5
sue 53:9,10 58:2
  73:17 74:1
sued 48:13 49:21
  53:10 56:16,24
  57:5 58:13
suffered 66:23,24
suggesting 30:10
suing 57:17
suit 71:13 79:15
summer 54:21
  67:13
supported 72:17
sure 5:10,11 7:18
  29:18 31:3 50:22
  58:18 59:6
swear 3:2
sworn 3:6 79:8
Sylvanus 2:7,14
system 22:10 23:22
  34:17 37:5,9,13
  38:2,8 44:22 45:3
  60:13 72:22 73:7
systems 24:24 25:5
  25:11,14,21

___ T ___
T 1:19
table 62:4
tainted 66:16
take 25:7 29:15
  43:24 53:5,14
  57:12 58:14 59:14
  62:22 64:16 75:23
taken 1:10 30:1
  31:20 43:13 44:2
  79:10
taking 50:19 51:3,7
talk 41:11
talked 5:6,11 8:22
  23:14
talking 6:15,16 13:7
  13:7,9 14:24 15:3
  25:17 28:13 37:5
  41:8,17
tanked 66:16
team 27:16 54:18
  75:1
technical 26:2,3,11
  38:14
technically 53:11
telephone 1:15 2:2

32:5 34:19
Telephonic 1:9
tell 12:13 24:7,16
  26:7,15 27:1
  38:24 42:4 57:24
  65:9
telling 26:24 27:2
  27:21
terms 11:23 47:6
  73:22
testified 3:7 34:3
  69:2
testify 3:12
testifying 3:19
testimony 11:17
  14:11 30:21 43:24
  77:1 79:12
Thank 16:20 24:4
  29:4 76:9,10,11
their 2:17 37:4,4,6
  37:12,13,14,14
  38:2,7 39:18,21
  45:18 54:15 58:1
  58:4 61:15 65:19
  72:12
theirs 38:16
themselves 21:17
  37:24
thick 31:7
thing 11:5 15:5
  20:17 53:12 57:18
  57:20
things 3:16 9:2
  28:23 73:20 75:8
think 8:20,21 11:18
  24:14 27:3,15
  30:19 53:13,13
  73:11 75:1,2
thinking 13:21 39:2
  67:13
third-party 37:23
Thomas 1:19 2:23
  2:23 3:8,9 4:13,19
  6:9 9:9,10 11:20
  11:22 15:3,10
  17:2,4 18:7,20
  19:6 22:12 23:13
  23:18 25:7,9 29:3
  29:6,8,19 30:2,13
  30:24 31:6,12,18
  32:3,4,8,16 33:9
  34:7,24 35:6,10
  35:16,21 36:11
  37:1,20 38:9,21
  39:4,10 40:4,16
  41:17 42:14 43:5
  43:10,21 44:13

45:1,19 46:11
48:19 49:12 50:1
50:10,18,24 51:24
52:18 55:24 56:18
57:2 58:23 59:3
59:21 61:10,17
62:2,15 63:2,9
65:7 66:13 67:11
67:16 68:19 69:4
70:23 71:22 73:18
74:3,11,24 75:7
75:11,11,19,24
76:6,11 77:5
thorough 10:5,18
  13:13
thoroughly 10:12
thought 10:8 16:22
  17:6 26:8,14,16
  26:16 57:19,20
  64:12 66:23 68:7
  73:1,5
threatened 53:9
  55:23 71:15
three 6:10,14,19 7:6
  7:12 61:20 62:9
  69:20
threshold 53:4
through 31:15
  41:14 42:3,15
  43:15,24 44:6
  49:4 55:1,18
  62:16 63:7 66:9
  74:19
time 2:11 10:2,6,7,8
  10:10,16 11:5,12
  11:14 12:1,12
  14:2 20:15,19
  21:14 23:13 25:3
  25:3,14,19 26:24
  28:12 30:1 32:13
  37:10 38:24 39:14
  39:14 40:14 41:9
  45:8,16 49:4,21
  49:22 50:7,8
  51:10,20 53:5
  54:6,24 55:1,12
  61:7 63:13 68:1,3
  70:5,8 72:4,12,15
  73:11 75:4
times 8:17 23:4 50:5
today 2:10,13 3:16
  11:14 12:2,12
  24:6 28:19 30:15
  32:16 33:2 35:12
  51:15 63:4,15,21
  68:22
today's 34:11 39:6

39:12 50:21 51:5
  75:16
told 27:12 46:14
  49:14,18 57:10
Tom 57:9,14
tool 57:21
top 34:15 60:7
topic 14:15 51:13
topics 4:9
tout 55:20,21
track 23:10 28:22
Trademark 13:5
transcribed 79:10
transcript 40:5 44:1
  44:2,17,17 75:16
  79:12
treatment 47:18
tremendous 63:5
trial 48:17,23
tried 10:14 27:2
TriZetto 1:7 2:13
  2:24
trouble 58:18
true 59:18 68:23
  79:12
trusting 71:1
try 54:10
trying 19:2 58:7
Tunnell 1:10
turn 12:17 13:20
  26:5 38:14 64:18
  67:9
turned 9:24 11:4,13
  11:15,19,19,24
  12:6,10 13:1,14
  14:9,12 15:6,18
  16:2,5,13,18 18:5
  19:9,23 20:6,13
  21:2,13 26:13
twin 68:10
two 3:12,16 4:4,9
  8:16,16 18:7,12
  23:16 47:1,16
  53:22 58:13,15
  61:20 62:9 64:9
  64:18
Two-thirds 70:16
type 37:10 42:21
  43:3
types 8:24 9:2,14
typewriting 79:10

___ U ___
ultimate 74:22
ultimately 49:4
  67:14 74:7
unbelievable 54:17

54:17
uncovered 17:11
under 3:19 34:20
  60:18,20 79:10
underlying 51:6
underneath 62:7
  70:17
understand 3:17
  4:3 16:12,13
  17:16 31:13
understanding
  31:21 38:17 39:16
understood 27:6
unethical 75:13
UNITED 1:1
University 1:17
until 22:15 51:20
  67:21
urging 23:9
use 29:20 31:13
  37:24 38:2 39:24
  57:20 68:19
used 31:22 42:8
users 36:16,24
using 24:17 27:17
U.S 60:11,12

___ V ___
v 1:6
vague 16:10,24
  23:24 25:4,14
  26:23 28:2
validity 60:21
value 72:18,19,19
vendor 37:23 45:10
versa 60:1
very 10:4,5,6 20:20
  21:12 27:3,7,7,7
  27:10,15 29:4
  53:3,17 54:18,22
  58:4,4 63:23,24
  65:10,10,12 66:2
  66:4,21 73:12
  76:3,9
Via 1:15 2:2
vice 60:1
victory 55:21
video 2:7,12,15
  29:23
Videographer 2:7
  2:10 3:1 29:23
videotape 1:9
view 56:14
vs 2:13

___ W ___
waiver 4:10

Case 1:04-cv-01258-SLR    Document 321-3    Filed 04/11/2006    The Gazette Group, Inc.

McKesson Information Solutions
Marcia J. Radosevich, Ph.D                    C.A. # 04-1258 (SLR)                    April 10, 2006

Page 90

| | | | | |
|---|---|---|---|---|
| walk 29:16 | 24:12,13,16,21 | **wrap** 18:10 | 39:23 40:10 42:6 | 47 70:15 |
| **Wall** 54:21 | 25:1,5,11,18,21 | **write** 39:18 | 42:11 43:1,9 | |
| want 10:7,10,15 | 25:21 26:17,18 | **writing** 5:12 16:3 | **1993** 47:3 48:11,12 | **5** |
| 11:4 12:9 14:1 | 27:8,9,13,17,21 | **written** 12:19 13:19 | 49:3 50:8 60:13 | **5** 33:20 45:7 |
| 20:14,18 29:16 | 28:3,11,13 33:8 | 14:8 | **1994** 43:15,20 44:12 | **5,253,164** 60:12 |
| 30:2,6,24 31:2,3 | 33:17 37:11 39:2 | **wrote** 5:7 13:11 | 45:15 47:9,10 | **5-A** 41:22,24 43:7 |
| 34:24 35:21 36:23 | 42:18 43:19 44:11 | 34:4 | 61:22 62:8,11,12 | 77:11 |
| 39:1,11 40:4 | 44:21 45:16 46:20 | | 62:24 77:13 | **525** 1:17 |
| 46:17 56:7,14 | 46:21 47:2 48:17 | **Y** | **1995** 45:24 48:17,18 | **55%** 62:12 |
| 58:5,11,18 62:4,5 | 48:24 49:15,16,18 | **yeah** 5:17 17:24 | 49:5,22 54:11 | **58** 77:16 |
| 64:11,12 68:6 | 53:3,14 54:2 55:8 | 44:15 64:5 67:12 | 55:1 60:14 61:22 | |
| 70:14 | 55:12 56:7,8 57:4 | **year** 47:21 53:1,18 | 62:9,11,12,24 | **6** |
| **wanted** 11:3,3 | 57:8 58:6,15 | 53:22 62:13,14 | **1996** 58:21 59:15,20 | **6** 41:13 43:13,17 |
| 20:20,21 37:10 | 63:14,24 64:15 | **years** 7:15 53:22 | 61:6,22 62:9,13 | 77:13 |
| 38:12,13,13,17 | 65:10,12 66:2 | 58:13 61:22 62:8 | 62:24 65:4,18 | **6/30/1996** 77:16 |
| 39:2,16 43:2 53:8 | 68:7 70:22 71:4 | 62:10,24 | 66:3 67:12 68:15 | **655-0477** 1:24 |
| 53:12 54:3 56:2,5 | 72:8,17,20,21 | **year-long** 48:14 | **1997** 62:11 67:17,19 | |
| 58:14 65:22 66:20 | 73:1,4 75:5,8 | **yes-or-no** 9:12 | 67:22 69:1 70:18 | **7** |
| 72:7 73:10 | 79:10 | | 74:18 | **7** 45:23 46:2 77:14 |
| **wanting** 53:2 | **weren't** 41:8 | **$** | **1998** 74:20 | |
| **wants** 51:14 72:11 | **West** 2:16 | **$10,000** 10:8 | | **8** |
| 72:12,14 | **we'll** 3:15 76:8 | **$14,065,000** 62:12 | **2** | **8** 58:20,22 77:16 |
| **wasn't** 11:11 23:14 | **while** 18:14 22:20 | **$18,264,000** 62:12 | **2** 9:6 11:18 14:24 | **8-9** 45:24 |
| 53:24 54:19 59:3 | 23:7 28:3 45:16 | **$20** 47:21 | 15:21 21:6 | |
| 59:8 63:22 73:19 | 53:3 65:16 75:4 | **$28,310,000** 62:13 | **20** 53:5 | **9** |
| 74:4 | **White** 1:12 79:7,19 | **$7,200,000** 60:22 | **2006** 1:11 2:11 79:8 | **9** 44:5 45:24 68:14 |
| **waste** 10:7,10,10,15 | **whole** 10:9 11:7 | **$7.2** 49:2,4 61:1 | 79:21 | **90** 55:12 |
| 11:5 14:1 20:14 | 26:10 | | **2008** 79:20 | **92614-8557** 1:20 |
| 72:15 | **WILCOX** 1:23 | **0** | **21** 68:15 69:1 | **93** 56:17 |
| **way** 5:5 10:1 17:23 | **willing** 29:19 | **02110** 2:4 | **23** 47:2 48:18 60:14 | **94301** 1:17 |
| 18:8 21:8 27:18 | **Wilmington** 1:11,23 | **036458** 46:1 | 69:19 | **95** 50:9 53:18 55:2 |
| 31:12 37:6 47:24 | **win** 56:3 | **04-1258** 1:6 | **24** 33:23 34:5 36:7 | 55:18,18 65:17 |
| 52:5 53:16 55:23 | **window** 53:21 54:5 | **051638** 41:14 | 37:16 38:4 39:23 | 66:9 |
| 61:1 69:20 70:16 | 54:12 | **051661** 41:14 | 40:10 45:6 48:4 | **96** 66:9 67:8,13,21 |
| **weapon** 57:21 | **winner** 56:4 | | 52:12,21,21 | **97** 67:17 |
| **week** 46:22 | **withdraw** 56:21 | **1** | **27th** 74:18 | **98** 74:23 |
| **weird** 47:13 | **witness** 2:5,22 3:2,5 | **1** 9:5 11:17 14:21 | **29** 43:14,20 77:13 | |
| **welcome** 29:5 75:21 | 6:4 9:6 11:17 | 21:5 | | |
| **well** 5:6 7:12 9:9 | 14:11 22:16 23:4 | **1:10** 76:13 | **3** | |
| 11:4,20 15:11 | 29:5 30:10,11,14 | **10** 1:11 44:16 45:6 | **3** 21:8 77:5 | |
| 18:2,20 20:9 | 30:20 31:10 35:24 | 60:7 79:21 | **3.1** 71:13 | |
| 23:13 25:7 35:10 | 36:2 41:20,22 | **10th** 2:10 79:8 | **3.10** 71:10 | |
| 38:15 55:5 56:2 | 43:22 75:20 76:10 | **10-K** 77:16 | **30** 47:22 58:21 | |
| 56:20 63:13 66:16 | 79:13 | **10:55** 1:11 | 59:15,20 61:6,22 | |
| 68:11 72:19 73:12 | **wondering** 69:5 | **1000** 2:16 | 62:8,10 70:18 | |
| **went** 20:9 53:1 55:1 | **word** 54:10 | **11** 44:6,17 45:6 | **30%** 62:11 | |
| 64:17 | **work** 12:19,24 14:8 | **11:00** 2:11 | **302** 1:24 | |
| **were** 3:19 7:6,15,17 | 14:19 15:6 16:9 | **1201** 1:10 | **31** 79:20 | |
| 7:19,20 8:18,22 | 16:15 18:4 52:23 | **13** 44:6 | **32** 77:5 | |
| 8:24 10:6,19,22 | 52:24 55:15 | **1330** 1:23 | **39718** 43:15 | |
| 11:2,8,24 12:1,2 | **worked** 73:8 | **149-RPR** 79:19 | **39768** 43:16 | |
| 12:10,13 14:8,19 | **working** 5:10 53:3 | **16th** 1:11 | | |
| 14:22 15:6,12,17 | **world** 17:21 26:10 | **194** 70:18 | **4** | |
| 15:20 16:15,22 | 39:4 63:23 | **19801** 1:23 | **4** 1:20 | |
| 17:8 19:18,23 | **worthless** 10:15 | **1988** 4:21 62:14,16 | **42** 77:12 | |
| 20:19 21:3,3 22:7 | **wouldn't** 39:17 40:2 | **1989** 33:23 34:5 | **43** 77:13 | |
| 22:20 24:7,10,12 | 56:8 | 36:7 37:16 38:4 | **46** 77:15 | |