# EXHIBIT A

**From:**      Randall, Jeff
**To:**        'JBlumenfeld@MNAT.com'; Anderson, Jeremy
**Subject:**   Re: McKesson v. TriZetto
**Date:**      4/10/2006 7:30:42 PM
**CC:**        Hansen, David; Barlow, Michael; 'jtthomas@gibsondunn.com';
'msitzman@gibsondunn.com'
**BCC:**       Shek, Bernard

**Message:**

Jack, why are you refusing to identify the "new" opinions--or any opinions for that
matter--that you object to and the full basis for your objections.  I have asked you three
times for this information and you have yet to provide any specifics.  Please make a good
faith effort to provide this information if you are serious about these "objections."
************************************************

This e-mail and any attachments thereto, is intended only for use by the addressee(s)
named herein and may contain legally privileged and/or confidential information. If you
are not the intended recipient of this e-mail, you are hereby notified any dissemination,
distribution or copying of this email, and any attachments thereto, is strictly prohibited. If
you receive this email in error please immediately notify me at (212) 735-3000 and
permanently delete the original copy and any copy of any e-mail, and any printout thereof.

Further information about the firm, a list of the Partners and their professional
qualifications will be provided upon request.
************************************************

-----Original Message-----
From: Jack B. Blumenfeld
To: Randall, Jeff; Anderson, Jeremy
CC: Hansen, David; Barlow, Michael; jtthomas@gibsondunn.com;
msitzman@gibsondunn.com
Sent: Mon Apr 10 21:09:26 2006
Subject: RE: McKesson v. TriZetto

Jeff -- There is a difference between providing additional supporting materials for
opinions already expressed in Dr, Musen's original report and providing new opinions.
As it appears that you are contending that the new report does not contain new opinions,
we have a fundamental difference of view. Unless you notify us tonight that you will
withdraw the report, we will file a motion.

Jack

        -----Original Message-----
        From: Randall, Jeff [mailto:JRANDALL@skadden.com]
        Sent: Monday, April 10, 2006 8:36 PM
        To: Jack B. Blumenfeld; Anderson, Jeremy

Cc: Hansen, David; Barlow, Michael; jtthomas@gibsondunn.com;
msitzman@gibsondunn.com
Subject: Re: McKesson v. TriZetto


Jack, what are the new opinions and analysis that you object to? Also, given that
the supplemental report is based on the operation of the recently produced accused
systems--discovery exclusively in TriZetto's control that was witheld during dicovery in
violation of a number of court orders--please identify your specific objections to each
opinion that you believe warrants submission to the court.
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
This e-mail and any attachments thereto, is intended only for use by the
addressee(s) named herein and may contain legally privileged and/or confidential
information. If you are not the intended recipient of this e-mail, you are hereby notified
any dissemination, distribution or copying of this email, and any attachments thereto, is
strictly prohibited. If you receive this email in error please immediately notify me at (212)
735-3000 and permanently delete the original copy and any copy of any e-mail, and any
printout thereof.

Further information about the firm, a list of the Partners and their professional
qualifications will be provided upon request.
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

-----Original Message-----
From: Jack B. Blumenfeld
To: Randall, Jeff; Anderson, Jeremy
CC: Hansen, David; Barlow, Michael; jtthomas@gibsondunn.com;
msitzman@gibsondunn.com
Sent: Mon Apr 10 19:29:59 2006
Subject: Re: McKesson v. TriZetto

Thanks, Jeff. McKesson's infringement reports were due last October. His new
report contains almost entirely new opinions and analysis which were not in his original
report. It also addresses the 12 claims as to which the Court has already granted summary
judgment of noninfringement. We do object to the entire report.

Jack


Jack Blumenfeld
(302) 351-9291
Jblumenfeld@mnat.com
--------------------------

-----Original Message-----
From: Randall, Jeff <JRANDALL@skadden.com>
To: Jack B. Blumenfeld <JBlumenfeld@MNAT.com>; Anderson, Jeremy
<JDANDERS@skadden.com>
CC: Hansen, David <DHANSEN@skadden.com>; Barlow, Michael
<MBARLOW@skadden.com>; jtthomas@gibsondunn.com
<jtthomas@gibsondunn.com>; msitzman@gibsondunn.com
<msitzman@gibsondunn.com>
Sent: Mon Apr 10 19:14:13 2006
Subject: Re: McKesson v. TriZetto

Jack, why do you believe the supplemental report is untimely and inappropriate?
Also, please let me know whether you object to the entire report or just certain portions.
As you know, we discussed the need to supplement at the PTC and judge Robinson
provided us guidance on what would be acceptable.  I believe that we followed her
guidance in the supplemental report we served on Thursday.  As we move forward,
please understand that I may need more than a couple of hours to respond to concerns
that you have with filings made four days ago.  Thanks.  Jeff
************************************************
This e-mail and any attachments thereto, is intended only for use by the
addressee(s) named herein and may contain legally privileged and/or confidential
information. If you are not the intended recipient of this e-mail, you are hereby notified
any dissemination, distribution or copying of this email, and any attachments thereto, is
strictly prohibited. If you receive this email in error please immediately notify me at (212)
735-3000 and permanently delete the original copy and any copy of any e-mail, and any
printout thereof.

Further information about the firm, a list of the Partners and their professional
qualifications will be provided upon request.
************************************************

-----Original Message-----
From: Jack B. Blumenfeld
To: Randall, Jeff; Anderson, Jeremy
CC: Hansen, David; Barlow, Michael; jtthomas@gibsondunn.com;
msitzman@gibsondunn.com
Sent: Mon Apr 10 18:53:05 2006
Subject: McKesson v. TriZetto

Jeff and Jeremy:

Last Thursday night, you served a supplemental expert report of Dr. Musen. We
believe that that report is untimely and inappropriate. Please let me know this evening

whether McKesson will withdraw that report.  If I don't hear from you in a couple hours, we will assume that McKesson will not agree to do so.

Jack

.....

This message, including any accompanying documents or attachments, may contain information that is confidential or that is privileged. If you are not the intended recipient of this message, please note that the dissemination, distribution, use or copying of this message or any of the accompanying documents or attachments is strictly prohibited. If you believe that you may have received this message in error, please contact me at (302) 658-9200 or by return e-mail.

.....

--------------------------------------------------------------------------
     To ensure compliance with Treasury Department regulations, we advise you that, unless otherwise expressly indicated, any federal tax advice contained in this message was not intended or written to be used, and cannot be used, for the purpose of (i) avoiding tax-related penalties under the Internal Revenue Code or applicable state or local tax law provisions or (ii) promoting, marketing or recommending to another party any tax-related matters addressed herein.

===============================================================
======================= ====

.....

This message, including any accompanying documents or attachments, may contain information that is confidential or that is privileged. If you are not the intended recipient of this message, please note that the dissemination, distribution, use or copying of this message or any of the accompanying documents or attachments is strictly prohibited. If you believe that you may have received this message in error, please contact me at (302) 658-9200 or by return e-mail.

.....


.....


This message, including any accompanying documents or attachments, may contain information that is confidential or that is privileged. If you are not the intended recipient of this message, please note that the dissemination, distribution, use or copying of this message or any of the accompanying documents or attachments is strictly prohibited. If you believe that you may have received this message in error, please contact me at (302) 658-9200 or by return e-mail.

.....

# EXHIBIT B

**From:**        Randall, Jeff
**To:**          'Jack B. Blumenfeld'; Hansen, David; Barlow, Michael; Anderson, Jeremy
**Subject:**     RE: McKesson v. TriZetto
**Date:**        4/12/2006 7:38:44 AM
**CC:**          jtthomas@gibsondunn.com; msitzman@gibsondunn.com
**BCC:**         Shek, Bernard; Hendershot, Michael; Randall, Jeff

**Message:**

Jack, we don't intend to ask Dr. Johnson to opine on infringement of the claims that the Court has issued summary judgment on. However, TriZetto should seriously consider agreeing to permit McKesson to present infringement evidence on all asserted claims as the Court's ruling on that issue will be reversed. Jeff.

Jeff Randall
Skadden, Arps, Slate, Meagher & Flom LLP
525 University Avenue, Suite 100
Palo Alto, CA 94301
Main: (650) 470-4500
Direct: (650) 470-4580
Email: jrandall@skadden.com
Direct Fax: (888) 329-6150

――――

From: Jack B. Blumenfeld [mailto:JBlumenfeld@MNAT.com]
Sent: Wednesday, April 12, 2006 7:29 AM
To: Randall, Jeff; Hansen, David; Barlow, Michael; Anderson, Jeremy
Cc: jtthomas@gibsondunn.com; msitzman@gibsondunn.com
Subject: McKesson v. TriZetto

Jeff --

We have now had a chance to review the Supplement Expert Report of Margaret Johnson that McKesson served on us late yesterday afternoon. That report is untimely and improper, providing analysis and opinions not included in her October 2005 report. It is also irrelevant to the extent that it relates to issues on which the Court has already granted summary judgment. Unless we hear from you this morning that McKesson will withdraw that report, we intend to move to strike it.

Jack

.....

This message, including any accompanying documents or attachments, may contain information that is confidential or that is privileged. If you are not the intended recipient of this message, please note that the dissemination, distribution, use or copying of this message or any of the accompanying documents or attachments is strictly prohibited. If you believe that you may have received this message in error, please contact me at (302) 658-9200 or by return e-mail.

.....

# EXHIBIT C

```
 1              IN THE UNITED STATES DISTRICT COURT

 2                  FOR THE DISTRICT OF DELAWARE

 3

 4    MCKESSON INFORMATION            )

      SOLUTIONS, LLC,                 )

 5                                    )

                    PLAINTIFF,        )

 6    vs.                            ) Case No. 04-1258-SLR

                                      )

 7    THE TRIZETTO GROUP, INC.,       )

                                      )

 8                  DEFENDANT.        )

      _____)

 9

10

11

12

13

14         VIDEO DEPOSITION OF MARK MUSEN, M.D., PH.D.

15        Held at Skadden, Arps, Slate, Meagher & Flom

16            525 University Avenue, 11th Floor

17                 Palo Alto, California

18         Tuesday, November 22, 2005, 9:11 a.m.

19

20

21

22

23

24    REPORTED BY:  CHRIS DE GEORGE, CSR. NO. 7069

25                           1
```

MARK MUSEN, M.D., PH.D.

BARKLEY
Court Reporters

| 09:56 | 1 | between a predetermined database and some other kind of |
| 09:56 | 2 | database, that -- so that I would not -- I would not |
| 09:56 | 3 | view that term as having special meaning in -- in |
| 09:56 | 4 | computer science jargon. |
| 09:56 | 5 | MR. HENDERSHOT:  Do you mind if we go off the |
| 09:57 | 6 | record for just a minute? |
| 09:57 | 7 | MR. SITZMAN:  Yeah. |
| 09:57 | 8 | MR. HENDERSHOT:  You don't mind? |
| 09:57 | 9 | MR. SITZMAN:  You don't have to stop the |
| 09:57 | 10 | video.  It can take a while to get on. |
| 09:57 | 11 | (Discussion off the record.) |
| 09:57 | 12 | MR. SITZMAN:  Back on the record. |
| 09:57 | 13 | Q.    The predetermined database.  So I think what |
| 09:57 | 14 | you're saying is, is that in the literature in the |
| 09:57 | 15 | computer science world, there wouldn't be a distinction |
| 09:57 | 16 | between predetermined database and database. |
| 09:57 | 17 | A.    That's correct.  I would -- I would not see |
| 09:57 | 18 | that as a -- as a buzzword. |
| 09:58 | 19 | Q.    Okay.  And -- okay.  However, the drafters of |
| 09:58 | 20 | the patent use the phrase "predetermined database" and I |
| 09:58 | 21 | guess the question I have for you is do you think, based |
| 09:58 | 22 | on your expertise, that predetermined database should be |
| 09:58 | 23 | given some special meaning, then? |
| 09:58 | 24 | A.    I -- |
| 09:58 | 25 | THE REPORTER:  Did or didn't? |

41

BARKLEY
Court Reporters

| | | |
|---|---|---|
| 09:58 | 1 | THE WITNESS:  I -- I didn't say either. |
| 09:58 | 2 | I give it, the term, the ordinary meaning that |
| 09:58 | 3 | one would infer from the way the claim is written |
| 09:58 | 4 | stating that the database of -- of codes is created |
| 09:58 | 5 | prior to processing, and that's -- I think that's all it |
| 09:58 | 6 | means. |
| 09:58 | 7 | BY MR. SITZMAN: |
| 09:58 | 8 | Q.   Okay.  Now, when we get down to other words, |
| 09:58 | 9 | however, let me see if I can quickly find one in this |
| 09:58 | 10 | chart. |
| 09:58 | 11 | Yeah.  Turn to page 11 of the same tab we're |
| 09:58 | 12 | looking at. |
| 09:58 | 13 | A.   Okay. |
| 09:58 | 14 | Q.   And in that bottom cell, on the bottom cell |
| 09:59 | 15 | left, there -- it uses the phrase "non-medical |
| 09:59 | 16 | criteria." |
| 09:59 | 17 | A.   Yeah. |
| 09:59 | 18 | Q.   Now, when you -- when you saw that phrase, |
| 09:59 | 19 | what meaning did you give that phrase? |
| 09:59 | 20 | A.   Well, I have to -- I have to just back up a |
| 09:59 | 21 | minute.  I read that claim in the context of the claims |
| 09:59 | 22 | that talked about medical criteria, so my initial |
| 09:59 | 23 | reading was that, presumably, medical criteria had a |
| 09:59 | 24 | meaning, and non-medical criteria was the complement of |
| 09:59 | 25 | that. |

42

MARK MUSEN, M.D., PH.D.

BARKLEY
Court Reporters

09:59  1          I -- I infer that by non-medical criteria, the

09:59  2    emphasis here is on criteria that are not a function of

09:59  3    patient care or the procedure being performed as much as

09:59  4    the mechanics of billing or of claim -- claims

09:59  5    processing.

09:59  6          Q.    Well, can -- can you give me an example of

09:59  7    what you mean by non-medical criteria, then, in that

09:59  8    context?

10:00  9          A.    Okay.  The -- one of the classic examples

10:00  10   would be the surgeon who charges for the operation and

10:00  11   then also charges for the instruments of the operation

10:00  12   or for cleaning the instruments of the operation or for

10:00  13   the tray used to perform the procedure.

10:00  14          There was a time, perhaps, when it was

10:00  15   appropriate to bill separately for those non-medical

10:00  16   components of performing the procedure.  Now those

10:00  17   codes, kinds of codes, usually are -- are disallowed.

10:00  18          Q.    Okay.  And are you aware of the existence of

10:00  19   codes that are associated with the non-medical criteria

10:00  20   that you're talking about?

10:00  21          A.    As I just said, there are CPT codes for

10:00  22   procedure trays or for instruments or for setups, and

10:01  23   those are -- those are appropriate ser- -- service

10:01  24   codes.  Whether they're allowable for reimbursement is

10:01  25   another question.

                                  43

BARKLEY
Court Reporters

| | | |
|---|---|---|
| 10:01 | 1 | Q.    And you're personally aware of these |
| 10:01 | 2 | procedural codes that you're -- that you're referring |
| 10:01 | 3 | to? |
| 10:01 | 4 | A.    Absolutely.  When I was a medical resident, we |
| 10:01 | 5 | were all instructed to make sure that we kept little |
| 10:01 | 6 | stickers on the procedure trays because those would be |
| 10:01 | 7 | billed for separately.  That was a while back. |
| 10:01 | 8 | Q.    Okay.  How -- how is, looking at this one -- |
| 10:01 | 9 | at this one cell, this -- this one step -- |
| 10:01 | 10 | A.    Sure. |
| 10:01 | 11 | Q.    -- how is it, then -- can you give me an |
| 10:01 | 12 | explanation or an example of how one code, then, is |
| 10:01 | 13 | mutually exclusive with another code based on |
| 10:01 | 14 | non-medical criteria? |
| 10:01 | 15 | A.    Well, as I just said, if you're billing |
| 10:01 | 16 | someone for a lumbar puncture and you're billing someone |
| 10:02 | 17 | for a lumbar puncture tray, then those would be mutually |
| 10:02 | 18 | exclusive.  You couldn't bill for both of those. |
| 10:02 | 19 | Q.    And why couldn't you? |
| 10:02 | 20 | A.    You could -- you could bill for them.  Would |
| 10:02 | 21 | they be allowed?  That's the question.  And they would |
| 10:02 | 22 | not be allowed because, presumably, the cost of |
| 10:02 | 23 | performing the procedure is tied in with the cost of the |
| 10:02 | 24 | supplies used to do the procedure, and so many payers |
| 10:02 | 25 | would argue that their reimbursement for the procedure |

44

MARK MUSEN, M.D., PH.D.

BARKLEY
Court Reporters

| | | |
|---|---|---|
| 10:02 | 1 | should include the cost of infrastructure. |
| 10:02 | 2 | Q.   So -- all right.  Let me back up.  On your |
| 10:02 | 3 | example, though, clearly a -- a lumbar tray is required |
| 10:02 | 4 | for the lumbar -- the punctured lumbar surgery. |
| 10:02 | 5 | A.   Correct. |
| 10:02 | 6 | Q.   Well, I mean, in this example, right? |
| 10:02 | 7 | A.   You would not want to do it without the tray. |
| 10:02 | 8 | Q.   Okay.  And I think what you're saying, then, |
| 10:02 | 9 | is the assumption that you -- that you have is that the |
| 10:03 | 10 | lumbar surgery, surgical procedure -- |
| 10:03 | 11 | A.   Yes. |
| 10:03 | 12 | Q.   -- includes the lumbar tray. |
| 10:03 | 13 | A.   That's not my assumption.  That would be the |
| 10:03 | 14 | assumption of the payer who would disallow both codes. |
| 10:03 | 15 | So the payer would presumably allow reimbursement for |
| 10:03 | 16 | the procedure but not be willing to pay an additional |
| 10:03 | 17 | amount for the tools required to do the procedure. |
| 10:03 | 18 | That's -- and that's non-medical. |
| 10:03 | 19 | Q.   And that -- and that's mutually exclusive. |
| 10:03 | 20 | A.   That's correct.  There may be a setting -- |
| 10:03 | 21 | I'm -- I'm -- I'm only speculating -- where it might be |
| 10:03 | 22 | appropriate to bill for a tray in the absence of a |
| 10:03 | 23 | procedure so that would be mutually exclusive in the |
| 10:03 | 24 | other direction.  I -- I'm not sure -- I can't really |
| 10:03 | 25 | think of how you could bill for the tray if you actually |

45

MARK MUSEN, M.D., PH.D.

BARKLEY
Court Reporters

| | | |
|---|---|---|
| 10:03 | 1 | don't do anything with it.  But certainly you would not |
| 10:04 | 2 | be able to bill for the procedure without the tray. |
| 10:04 | 3 | Q.   Well, let's -- for example, I'm just trying to |
| 10:04 | 4 | see if I can keep ferreting -- |
| 10:04 | 5 | A.   Sure. |
| 10:04 | 6 | Q.   -- out more information here from you. |
| 10:04 | 7 | If, for instance, you ordered an epidural |
| 10:04 | 8 | during a pregnancy delivery. |
| 10:04 | 9 | A.   Right. |
| 10:04 | 10 | Q.   You were so far along that the epidural then |
| 10:04 | 11 | became unnecessary or further complicated the procedure |
| 10:04 | 12 | such that the epidural was never administered. |
| 10:04 | 13 | A.   Right. |
| 10:04 | 14 | Q.   Therefore, presumably you would bill for the |
| 10:04 | 15 | epidural tray since it was ordered and delivered and |
| 10:04 | 16 | cannot be reused along with all the other delivery |
| 10:04 | 17 | procedures. |
| 10:04 | 18 | A.   Right.  Well, whether that's an authorized |
| 10:04 | 19 | service or not is a -- is a function of the payer. |
| 10:04 | 20 | Q.   So how does -- in the example I'm just -- I'm |
| 10:04 | 21 | giving you, how does the payer know whether or not to |
| 10:04 | 22 | exclude reimbursement of the epidural tray if it -- if |
| 10:05 | 23 | the epidural was administered or include it if the |
| 10:05 | 24 | epidural tray was not administered due to some other |
| 10:05 | 25 | complication? |

46

MARK MUSEN, M.D., PH.D.

BARKLEY
Court Reporters

10:05   1       A.    Okay.   So you're asking me how do payers

10:05   2   manage conflicts with healthcare organizations over

10:05   3   reimbursement?

10:05   4       Q.    Well, I guess what I'm asking is -- let me

10:05   5   rephrase it.   What I'm asking is, is how do those codes

10:05   6   associated with the epidural tray, and presumably the

10:05   7   delivery process or the -- the -- the pregnancy, the

10:05   8   delivery, how is it that they're mutually exclusive if

10:05   9   you could have both outcomes?

10:05   10      A.    What we're -- what you're not stating is that

10:05   11  they're mutually exclusive in the context of the

10:05   12  policies of the payer who ultimately is going to be

10:05   13  reimbursing the service.   So for one -- one payer who

10:06   14  may have one policy regarding wasted trays, they may not

10:06   15  be mutually exclusive.   For another payer who refuses to

10:06   16  pay for trays, they may be mutually exclusive.

10:06   17          We're talk- -- we're talking in the context of

10:06   18  reimbursement, and so what -- what the McKesson and

10:06   19  TriZetto systems enforce are policies of the re- -- of

10:06   20  the payers who provide the reimbursement.   They're not

10:06   21  making statements about medical care in general.

10:06   22      Q.    Uh-huh.   Well, suppose that we have a payer

10:06   23  that excludes trays.

10:06   24      A.    Okay.

10:06   25      Q.    I'm sorry.   Suppose we have a payer that does

                                47

10:06  1  not reimburse trays, unused trays, and the claim comes

10:06  2  in for a delivery and for an epidural tray.

10:07  3       A.  Right.

10:07  4       Q.  Is the epidural tray excluded or is it

10:07  5  included for reimbursement?

10:07  6       A.  If it's the policy of the payer to exclude,

10:07  7  then if the payer is following its policy, then that

10:07  8  tray would be excluded for -- for reimbursement.

10:07  9       Q.  But I -- I made a slight distinction.  Its

10:07  10  policy is to only reim- -- or not reimburse unused

10:07  11  trays.

10:07  12       THE REPORTER:  Could you say that -- I'm

10:07  13  sorry.  Could you say it again, please?

10:07  14  BY MR. SITZMAN:

10:07  15       Q.  Sure.  Let me start again.  The payer -- the

10:07  16  hypothetical is that the payer does not reimburse for

10:07  17  unused trays.  The claim comes in for a delivery and an

10:07  18  epidural tray.

10:07  19       A.  Right.

10:07  20       Q.  How does the system know, according to your

10:07  21  definition of non-medical criteria, whether or not these

10:07  22  are mutually exclusive or not mutually exclusive?

10:08  23       MR. HENDERSHOT:  I'm going to object.  I think

10:08  24  your hypothetical's incomplete.  Does it -- does it

10:08  25  include a code for the administration of the epidural or

48

BARKLEY
Court Reporters

| 10:08 | 1 | just those two codes that you identified?  Are there |
|---|---|---|

10:08　1　just those two codes that you identified?  Are there

10:08　2　other codes on the claim?  And you mentioned a system as

10:08　3　well.  That's the first time I've sort of heard that in

10:08　4　hypothetical.

10:08　5　BY MR. SITZMAN:

10:08　6　　Q.　Well, is it possible for you to answer my

10:08　7　question?

10:08　8　　A.　It's -- it's hard because it depends on the

10:08　9　policies that are in place by a particular payer dealing

10:08　10　with that particular situation, and so I -- I can't tell

10:08　11　you in a generic sense how that would be handled.

10:08　12　　　　In many situations, the code or the claim for

10:08　13　the tray would be summarily rejected and then there

10:08　14　would have to be an appeal on the part of the healthcare

10:08　15　organization; in other cases there might be a way of

10:08　16　providing documentation up front, but it's very

10:08　17　situation-specific.

10:08　18　　Q.　And I -- and I apologize for getting too far

10:08　19　upfield here.  I guess I wanted to really focus in on --

10:09　20　on where you were going with or your interpretation of

10:09　21　mutually exclusive due to non-medical criteria, and I

10:09　22　think your non-medical criteria has to do, in the

10:09　23　hypotheticals we've been talking about, is really things

10:09　24　like procedural trays, and that's what would make it

10:09　25　mutually exclusive, the lumbar tray example that you

49

BARKLEY
Court Reporters

| 10:09 | 1 | gave us. |
| 10:09 | 2 | MR. HENDERSHOT:  I'm going to object that |
| 10:09 | 3 | misstates his testimony.  I think that was an example |
| 10:09 | 4 | that he gave but -- |
| 10:09 | 5 | THE WITNESS:  We can explore other examples, |
| 10:09 | 6 | if you think that would be better. |
| 10:09 | 7 | BY MR. SITZMAN: |
| 10:09 | 8 | Q.   No.  I think we'll come back -- we'll come |
| 10:09 | 9 | back to it. |
| 10:09 | 10 | A.   Okay. |
| 10:09 | 11 | Q.   Yeah.  Where -- let's look real quickly at the |
| 10:09 | 12 | patent, the '164 patent. |
| 10:09 | 13 | A.   Sure. |
| 10:09 | 14 | Q.   Where in the patent have, returning back to |
| 10:09 | 15 | the non-medical criteria, is non-medical criteria |
| 10:09 | 16 | defined as you have defined it? |
| 10:10 | 17 | A.   Well, the narrative of the patent doesn't |
| 10:10 | 18 | actually use those terms.  It does not make a |
| 10:10 | 19 | distinction here.  The claims make a distinction between |
| 10:10 | 20 | medical and non-medical, and I believe in my |
| 10:10 | 21 | interpretation the claims are doing that so that they |
| 10:10 | 22 | can claim the universe of criteria. |
| 10:10 | 23 | Q.   And I under -- I understand where you are |
| 10:10 | 24 | with -- with the claim, you know, the mutual |
| 10:10 | 25 | exclusivity, but in terms of trying to figure out what |

                                    50

MARK MUSEN, M.D., PH.D.

BARKLEY
Court Reporters

10:10  1  criterion is used between medical and non-medical, is

10:10  2  there anything in the patent that gives any guidance as

10:10  3  to that?

10:10  4      A.   The patent specification provides the basis by

10:10  5  which one can implement the predetermined database that

10:10  6  contains the codes that are mutually exclusive.  The

10:10  7  method provided by the patent is sufficiently broad and

10:10  8  general that it doesn't need to make a distinction

10:11  9  between medical or non-medical.  That presumably is left

10:11  10  as a distinction that the implementer of the database

10:11  11  would make.

10:11  12      Q.   But someone reading a -- for instance, the

10:11  13  claim -- what claim are we on?  I think it may be

10:11  14  Claim 2 in the patent.

10:11  15      A.   Let me see if I have the claims marked here.

10:11  16          MR. HENDERSHOT:  The last couple pages.

10:11  17          THE WITNESS:  Yeah.

10:11  18          MR. HENDERSHOT:  It would be all the way in

10:11  19  the back.

10:11  20          THE WITNESS:  Here we go.

10:11  21  BY MR. SITZMAN:

10:11  22      Q.   Yeah, it's Column 117.

10:11  23      A.   Yep.

10:11  24      Q.   Claim 2, in the step that says, "determining,"

10:11  25  "determining whether one of the medical service codes in

51

MARK MUSEN, M.D., PH.D.

BARKLEY
Court Reporters

| 10:11 | 1 | the at least one claim is mutually exclusive due to |
| 10:11 | 2 | non-medical criteria with any other medical service code |
| 10:12 | 3 | in the at least one claim." |
| 10:12 | 4 | A.    Okay. |
| 10:12 | 5 | Q.    So someone reading that, how do they know, I |
| 10:12 | 6 | think what you're telling me is that it's up to the |
| 10:12 | 7 | database programmer, but somebody reading this claim |
| 10:12 | 8 | needs to understand the scope of the patent claim.  What |
| 10:12 | 9 | is it that tells me what the non-medical criteria is? |
| 10:12 | 10 | MR. HENDERSHOT:  You mean outside of the |
| 10:12 | 11 | ordinary meaning he identified earlier? |
| 10:12 | 12 | MR. SITZMAN:  Well, and -- and if that's what |
| 10:12 | 13 | he wants to tell me, that non-medical criteria has |
| 10:12 | 14 | ordinary meaning and that was the ordinary meaning that |
| 10:12 | 15 | he gave it, that's fine. |
| 10:12 | 16 | Q.    But I need to either know whether or not |
| 10:12 | 17 | that's your interpretation of ordinary meaning or if |
| 10:12 | 18 | it's in the patent somewhere. |
| 10:12 | 19 | A.    Well, my -- my testimony was that it's not |
| 10:12 | 20 | essential for the database implementer to make that |
| 10:12 | 21 | distinction between medical and non-medical because the |
| 10:12 | 22 | framework provided by the patent is sufficiently general |
| 10:12 | 23 | that it will apply to criteria of both kinds. |
| 10:13 | 24 | Q.    "Both kinds" being? |
| 10:13 | 25 | A.    Medical and non-medical.  That the data -- |

52

BARKLEY
Court Reporters

10:13  1   database implementer has available a structure provided

10:13  2   by the patent that allows mutual exclusivity among

10:13  3   conditions to be represented in the database.  It is

10:13  4   really immaterial to the desi- -- to the entry of the

10:13  5   codes into the database as to whether they are

10:13  6   specifically medical or non-medical, but the developer

10:13  7   can take advantage of both non-medical and medical

10:13  8   relationships in building the database.

10:13  9       Q.   I think what you're saying is it doesn't

10:13  10  matter what the definition is of medical/non-medical.

10:13  11  It's -- frankly, it can be anything because it's really

10:13  12  just a relationship of the codes that's important.

10:13  13          MR. HENDERSHOT:  Objection.  Vague and

10:13  14  ambiguous as to -- I think that misstates his testimony.

10:14  15  I think he said in -- in developing a system, an

10:14  16  automatic system.

10:14  17          THE WITNESS:  It certainly matters for

10:14  18  reimbursement.  It certainly matters in terms of

10:14  19  building the database in terms of its logical content.

10:14  20  From a computational perspective, it doesn't matter, is

10:14  21  what I'm saying.

10:14  22  BY MR. SITZMAN:

10:14  23      Q.   How do you distinguish between those products

10:14  24  or methods that infringe this claim and those that don't

10:14  25  if you don't have a definition of non-medical criteria

53

MARK MUSEN, M.D., PH.D.

BARKLEY
Court Reporters

| | | |
|---|---|---|
| 10:14 | 1 | in which to say, oh, that system infringes and this |
| 10:14 | 2 | system doesn't? |
| 10:14 | 3 | A.   Well, I -- I provided a definition which I |
| 10:14 | 4 | think is reasonable and I think is -- would be assumed |
| 10:14 | 5 | by -- by -- by most -- most people that a medical claim, |
| 10:14 | 6 | rather, a criterion which is medical deals with the |
| 10:15 | 7 | procedure applied to the patient as a -- and is a |
| 10:15 | 8 | consequence of the medical condition of the patient as |
| 10:15 | 9 | opposed to a non-medical criterion which is a function |
| 10:15 | 10 | of the mechanics of setting up the procedure or of |
| 10:15 | 11 | billing. |
| 10:15 | 12 | Q.   You had a chance to review the depositions of |
| 10:15 | 13 | the inventors in this case. |
| 10:15 | 14 | A.   Yes. |
| 10:15 | 15 | Q.   Were you at all startled to find out that each |
| 10:15 | 16 | of the inventors had no idea what non-medical criteria |
| 10:15 | 17 | meant? |
| 10:15 | 18 | MR. HENDERSHOT:  Objection.  Vague and |
| 10:15 | 19 | ambiguous as to "startled" and misstates the testimony |
| 10:15 | 20 | of the inventors. |
| 10:15 | 21 | BY MR. SITZMAN: |
| 10:15 | 22 | Q.   Well, you read them.  Please ascribe whatever |
| 10:15 | 23 | adjective you want.  But wasn't it interesting at all to |
| 10:15 | 24 | you that each of the inventors had no idea what |
| 10:15 | 25 | non-medical criteria meant? |

54

MARK MUSEN, M.D., PH.D.

BARKLEY
Court Reporters

| | | |
|---|---|---|
| 10:15 | 1 | A. It was interesting. I wasn't startled. I |
| 10:15 | 2 | would say that, again, you have to take the claims in |
| 10:15 | 3 | context, and I believe that the attorneys who wrote the |
| 10:16 | 4 | claims were trying to make a statement that the universe |
| 10:16 | 5 | of criteria, both non-medical and medical, applied in |
| 10:16 | 6 | this case. And so I was not startled that the inventors |
| 10:16 | 7 | may not have been completely clear about where the -- |
| 10:16 | 8 | the boundary line is, but I have a -- I mean I, and I'm |
| 10:16 | 9 | sure the inventors, have good intuition about what the |
| 10:16 | 10 | differences are. |
| 10:16 | 11 | Q. What about others, other people reading the |
| 10:16 | 12 | patent and trying to figure out what medical and |
| 10:16 | 13 | non-medical means? |
| 10:16 | 14 | A. I guess as I read it in the context of the |
| 10:16 | 15 | overall set of claims, I view this as a way of the |
| 10:16 | 16 | author of the claims communicating that the universe of |
| 10:16 | 17 | conditions is covered by the -- the criteria of which |
| 10:16 | 18 | the database is capable of representing relationships. |
| 10:16 | 19 | I did not read this as a way of necessarily defining |
| 10:16 | 20 | rigid boundaries between what is medical and what is |
| 10:17 | 21 | non-medical. |
| 10:17 | 22 | Q. And I think you used the phrase for that |
| 10:17 | 23 | reason, that last point, in terms of a functional |
| 10:17 | 24 | perspective, it doesn't matter, then, what the |
| 10:17 | 25 | definition or the boundary is between medical and |

55

BARKLEY
Court Reporters

10:17  1  non-medical.

10:17  2      MR. HENDERSHOT:  Objection.  Misstates his

10:17  3  testimony as to -- and it's vague and ambiguous as to

10:17  4  from a functional perspective.

10:17  5      THE WITNESS:  From a computational

10:17  6  perspective, it doesn't make a difference.

10:17  7  BY MR. SITZMAN:

10:17  8      Q.   And explain to me from the computational

10:17  9  perspective.  What do you mean when you say from a

10:17  10 computational -- from a -- well, why don't you explain

10:17  11 computational?

10:17  12     A.   [Simultaneously] Okay.  That the database that

10:17  13 the McKesson product provides allows one to specify

10:18  14 relationships among claims that could be classified in a

10:18  15 variety of ways, including medical and non-medical.  And

10:18  16 so in terms of the processing that's necessary to

10:18  17 determine whether claims need to be excluded or edited

10:18  18 or whatever, the computations are the same.

10:18  19     Now, obviously, when you say functional, that

10:18  20 has a legal implication, and whether one wants to

10:18  21 include non-medical or medical claims in a particular

10:18  22 system as implemented at the site of a particular payer

10:18  23 is a matter of the policies of the organization that

10:18  24 purchases a system and how it wants claims to be

10:18  25 adjusted.  So that -- that's -- those are -- those are

                              56

BARKLEY
Court Reporters

| | | |
|---|---|---|
| 10:18 | 1 | going into areas that depart from simply the |
| 10:18 | 2 | computational framework. |
| 10:18 | 3 | Q.   If you made a database and I made a database |
| 10:18 | 4 | and we dis- -- we -- we distinguish from the same |
| 10:18 | 5 | universe of codes, and I lumped mine medical and |
| 10:18 | 6 | non-medical and you lumped yours medical and |
| 10:18 | 7 | non-medical, what's the likelihood that, based on the |
| 10:19 | 8 | disclosure in the patent, that we will come up with |
| 10:19 | 9 | identical results, that you and I will both categorize |
| 10:19 | 10 | the same codes as non-medical and the same codes as -- |
| 10:19 | 11 | as medical? |
| 10:19 | 12 | MR. HENDERSHOT:  Your hypothetical's |
| 10:19 | 13 | incomplete. |
| 10:19 | 14 | Do you have the same understanding of the |
| 10:19 | 15 | ordinary meaning that he articulated when you built your |
| 10:19 | 16 | database? |
| 10:19 | 17 | MR. SITZMAN:  I -- I want him to assume that I |
| 10:19 | 18 | am a person who is ordinary, skilled in the art, and |
| 10:19 | 19 | that we are going to sit down and come up with -- we're |
| 10:19 | 20 | both going to look at the same universe, go through the |
| 10:19 | 21 | codes, and based on the disclosure in the patent, |
| 10:19 | 22 | segregate those that are non-medical from those that are |
| 10:19 | 23 | medical. |
| 10:19 | 24 | THE WITNESS:  But you're -- you're making |
| 10:19 | 25 | assumption that there is an intrinsic property of the |

57

MARK MUSEN, M.D., PH.D.

BARKLEY
Court Reporters

| | | |
|---|---|---|
| 10:19 | 1 | codes or a combination of the codes that defines |
| 10:19 | 2 | relationship as being medical or non-medical.  In some |
| 10:19 | 3 | sense that's a -- an issue that reflects the policy of |
| 10:19 | 4 | the organization that's implementing the database, so |
| 10:19 | 5 | it's not something that is an inherent component of the |
| 10:19 | 6 | codes as much as the organization that implements the |
| 10:19 | 7 | database and decides how to structure it. |
| 10:20 | 8 | BY MR. SITZMAN: |
| 10:20 | 9 | Q.   It's a -- I'm sorry. |
| 10:20 | 10 | A.   Oh, go ahead. |
| 10:20 | 11 | Q.   I didn't want to interrupt you, and I did. |
| 10:20 | 12 | A.   I think the -- the more generic question is if |
| 10:20 | 13 | two people were to sit down and create any kind of a |
| 10:20 | 14 | database of any large scale, would they make exactly the |
| 10:20 | 15 | same design decision, the answer's of course not. |
| 10:20 | 16 | Q.   And -- and I'm not talking about design.  I'm |
| 10:20 | 17 | just talking about lumping at this point in time, really |
| 10:20 | 18 | just categorizing between medical and non-medical -- |
| 10:20 | 19 | A.   Right. |
| 10:20 | 20 | Q.   And those -- those, I'm sorry, that are |
| 10:20 | 21 | mutually exclusive due to non-medical criteria. |
| 10:20 | 22 | A.   See, in my mind it -- it's pretty |
| 10:20 | 23 | straightforward, that if I'm dealing with combinations |
| 10:20 | 24 | of codes that relate to the medical procedure.  The |
| 10:20 | 25 | example, of course, here is cholecystectomy -- |

58

MARK MUSEN, M.D., PH.D.

BARKLEY
Court Reporters

| | | |
|---|---|---|
| 10:20 | 1 | THE REPORTER:  "Cholecystectomy" -- |
| 10:20 | 2 | THE WITNESS:  I'm sorry.  Cholecystectomy with |
| 10:20 | 3 | sphincterotomy versus cholecystectomy as one code and |
| 10:20 | 4 | sphincterotomy as the second code.  What I -- I think |
| 10:21 | 5 | anyone would assume the ordinary meanings there, that |
| 10:21 | 6 | those are medical procedures that are typically combined |
| 10:21 | 7 | and should not be billed separately.  I think that, |
| 10:21 | 8 | unambiguously, is a medical relationship. |
| 10:21 | 9 | If I look at whether I'm going to bill for |
| 10:21 | 10 | both the lumbar puncture and the lumbar puncture tray, |
| 10:21 | 11 | unambiguously, in my mind, that is a non-medical |
| 10:21 | 12 | distinction because the two codes relate to the |
| 10:21 | 13 | mechanics of how you get billed and reimbursed. |
| 10:21 | 14 | If I'm looking at a situation where a surgeon |
| 10:21 | 15 | is repairing a laceration and there's one -- and |
| 10:21 | 16 | there -- there are two lacerations, each of, say, |
| 10:21 | 17 | 2 centimeters and -- and do I get -- do I bill for two |
| 10:21 | 18 | 2-centimeter lacerations?  Do I bill for one |
| 10:21 | 19 | 4-centimeter laceration?  It turns out there are |
| 10:22 | 20 | policies that are set forth for reimbursement that |
| 10:22 | 21 | determine how those are billed.  Those are not really |
| 10:22 | 22 | medical.  The patient doesn't care whether he gets |
| 10:22 | 23 | billed one way or the other.  He obviously wants the |
| 10:22 | 24 | lacerations repaired.  But that is a function of the -- |
| 10:22 | 25 | of the medical care process, and I view that as |

59

BARKLEY
Court Reporters

| | | |
|---|---|---|
| 10:22 | 1 | non-medical. |
| 10:22 | 2 | BY MR. SITZMAN: |
| 10:22 | 3 | Q.    What about a -- a -- a hysterectomy for a male |
| 10:22 | 4 | patient, is that considered a non-medical criteria? |
| 10:22 | 5 | MR. HENDERSHOT:  Are you talking about a -- |
| 10:22 | 6 | in -- in your hypothetical, is there a code saying it's |
| 10:22 | 7 | a male patient or are we -- or are we just talking about |
| 10:22 | 8 | non-medical generally -- |
| 10:22 | 9 | MR. SITZMAN:  Yeah. |
| 10:22 | 10 | MR. HENDERSHOT:   -- or as between two codes? |
| 10:22 | 11 | MR. SITZMAN:  Yeah.  Well, I'm trying -- as |
| 10:22 | 12 | between a hysterectomy, a code that's being submitted, a |
| 10:22 | 13 | claim that's being submitted for hysterectomy for a |
| 10:22 | 14 | patient who turns out to be a male patient.  Is that -- |
| 10:22 | 15 | is the -- the fact that he is a male patient a |
| 10:22 | 16 | non-medical criteria upon which the code is mutually |
| 10:23 | 17 | exclusive? |
| 10:23 | 18 | THE WITNESS:  I think that would be a |
| 10:23 | 19 | potential -- I'm about to sneeze.  Hold on. |
| 10:23 | 20 | MR. HENDERSHOT:  While he does that, I'm going |
| 10:23 | 21 | to object.  Your hypothetical's incomplete.  Are we |
| 10:23 | 22 | talking about a medical service code for male patient or |
| 10:23 | 23 | a medical service code for hysterectomy or is there -- |
| 10:23 | 24 | does the claim just indicate it's a male patient? |
| 10:23 | 25 | MR. SITZMAN:  It could be a code for a male |

60

BARKLEY
Court Reporters

10:23  1   patient, it could be -- it could just be data that is

10:23  2   submitted in the claim.  It's -- it's -- I'm just

10:23  3   throwing that in as a variable.

10:23  4       Q.   Much like you were telling me about, you know,

10:23  5   about the -- the laceration --

10:23  6       A.   Right.

10:23  7       Q.   -- hypothetical and the -- and the lumbar

10:23  8   situation.  Is the fact that the patient is a male, is

10:23  9   that a non-medical criteria upon which the hysterectomy

10:23  10  becomes a mutually exclusive code?

10:23  11      A.   And the answer is that I would -- I would view

10:23  12  that in my construction as being medical.  We don't

10:23  13  want -- really want to get into this necessarily, but

10:24  14  obviously there can be situations where a patient is

10:24  15  phenotypically male but has a uterus, in which case a

10:24  16  hysterectomy might be an appropriate procedure or that

10:24  17  might represent a billing error, in which case that

10:24  18  needs to be flagged.  But I would -- my initial

10:24  19  construction would be that that would be a medical

10:24  20  criteria that needs to be evaluated.

10:24  21      Q.   But you would consider the male gender a

10:24  22  non-medical criteria -- no, a medical criteria?

10:24  23      A.   Yeah.  Yeah.

10:24  24      Q.   Sorry.  I didn't want to mis- -- misstate you.

10:24  25      A.   'Cause it's not an artifact of billing or a

                                    61

MARK MUSEN, M.D., PH.D.

BARKLEY
Court Reporters

| | | |
|---|---|---|
| 10:24 | 1 | process. |
| 10:24 | 2 | Q.   Okay. |
| 10:24 | 3 | MR. HENDERSHOT:  If we're approaching a time |
| 10:24 | 4 | for a break, whenever's convenient for you, I'd |
| 10:24 | 5 | appreciate it. |
| 10:24 | 6 | MR. SITZMAN:  That would be -- I think that |
| 10:24 | 7 | right now would be just great. |
| 10:24 | 8 | MR. HENDERSHOT:  Okay. |
| 10:24 | 9 | THE VIDEOGRAPHER:  We're going off the record, |
| 10:24 | 10 | the time is 10:24 a.m. |
| 10:24 | 11 | (Recess taken.) |
| 10:37 | 12 | THE VIDEOGRAPHER:  Back on the record, the |
| 10:37 | 13 | time is 10:37 a.m. |
| 10:37 | 14 | BY MR. SITZMAN: |
| 10:37 | 15 | Q.   So, Doctor, let -- let me turn to -- back to |
| 10:37 | 16 | your report -- |
| 10:37 | 17 | A.   Okay. |
| 10:37 | 18 | Q.   -- MM-1.  I'm going to paragraph 26.  You |
| 10:37 | 19 | discuss here the -- the database.  Is -- is it your |
| 10:38 | 20 | understanding that the database consists of both med- -- |
| 10:38 | 21 | the medical service codes and the relationships among |
| 10:38 | 22 | the codes? |
| 10:38 | 23 | A.   Yes. |
| 10:38 | 24 | Q.   When you say "the relationships among the |
| 10:38 | 25 | codes," are you referring to the rules, the Appendix B |

62

BARKLEY
Court Reporters

1    State of CALIFORNIA          )

2    County of _Santa Clara_      )

3

4

5

6

7            I, the undersigned, declare under penalty of

8    that I have read the foregoing transcript, and I have

9    made any corrections, additions or deletions that I was

10   desirous of making; that the foregoing is a true and

11   correct transcript of my testimony therein.

12           EXECUTED this ___17___ day of _December_,

13   2005, at ___Stanford___, ___CA___.

                (City)                (State)

14

15

16

17

18   _____ M, PhD

             MARK MUSEN, M.D., PH.D.

19

20

21

22

23

24

25

                              326

MARK MUSEN, M.D., PH.D.

BARKLEY
Court Reporters

# EXHIBIT D

# SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

525 UNIVERSITY AVENUE

PALO ALTO, CALIFORNIA 94301
———
TEL: (650) 470-4500

FAX: (650) 470-4570

www.skadden.com

DIAL
650-470-4580
EMAIL ADDRESS
JRANDALL@SKADDEN.COM

FIRM/AFFILIATE OFFICES
———
BOSTON
CHICAGO
HOUSTON
LOS ANGELES
NEW YORK
SAN FRANCISCO
WASHINGTON, D.C.
WILMINGTON
———
BEIJING
BRUSSELS
FRANKFURT
HONG KONG
LONDON
MOSCOW
MUNICH
PARIS
SINGAPORE
SYDNEY
TOKYO
TORONTO
VIENNA

April 6, 2006

**Via Hand Delivery**

Jack B. Blumenfeld, Esq.
Morris, Nichols, Arsht & Tunnell
1201 North Market Street
P.O. Box 1347
Wilmington, Delaware 19899-1347

RE:    *McKesson Information Solutions LLC v. The TriZetto Group, Inc.,*
        C.A. No. 04-1258 (SLR) (D. Del.)

Dear Jack:

Enclosed is the Supplemental Expert Report of Mark A. Musen, M.D., Ph.D. addressing TriZetto's infringement of the '164 patent. As discussed with Chief Judge Robinson at the pre-trial conference yesterday, this report supplements his opinions based upon his recent opportunity to view the operation of TriZetto's infringing products. As you know, TriZetto previously precluded all of our repeated attempts during discovery to obtain working versions of the infringing products for review by our experts. Dr. Musen's supplemental report is consistent with his original report, including his opinions of infringement based on his reliance on Dr. Johnson's analysis of the rules in Appendix B of the '164 patent.

TriZetto's refusal to comply with the Court's orders to produce working versions of its infringing products during discovery made it impossible for Dr. Musen to present the screen captures and examples contained in his supplemental report earlier. Due to TriZetto's obstruction of our legitimate discovery requests and Chief Judge Robinson's orders, Dr. Musen was only first able to view the operation of the ClaimFacts and QicLink systems this week and the Facets system last week. In addition, TriZetto's prior manipulation of Facets and improper refusal to provide other relevant discovery on this issue prevented McKesson from having access to the entire infringing products, including the Utilization Management portion of the products, and unfairly impeded Dr. Musen's ability to fully analyze all of the infringing aspects of the products, including the Utilization Management aspects of the products. TriZetto can hardly claim prejudice from the Court and jury being provided with accurate illustrations of the workings of its own products that are consistent with Dr. Musen's prior opinions.

Jack B. Blumenfeld, Esq,
April, 6 2006
Page 2


Although we disagree with Chief Judge Robinson's ruling during yesterday's conference concerning the doctrine of equivalents and reserve our rights in this regard, consistent with that ruling we have stricken those portions of Dr. Musen's supplemental report directed to his opinion of infringement under the doctrine of equivalents. We believe that Chief Judge Robinson's preclusion order is particularly inappropriate since, as you know, TriZetto changed its claim constructions after Dr. Musen's original report was served, and it refused to provide Dr. Musen access to its products until it was very recently finally forced to do so by Chief Judge Robinson.

TriZetto also improperly prevented Dr. Johnson from having access to working versions of TriZetto's infringing products. Dr. Johnson is currently unavailable as she is testifying at trial in a case in the Eastern District of Texas this week. We intend to provide Dr. Johnson with an opportunity to finally view the operation of TriZetto's infringing products as soon as she completes her obligations in that case. We will promptly provide TriZetto with a supplemental report as appropriate and consistent with the Court's guidance provided at the pretrial conference.


Very truly yours,

Jeffrey G. Randall


cc:    Jeffrey Thomas, Esq. (*via* Federal Express, w/enclosure)
       Michael Sitzman, Esq. (*via* hand delivery, w/enclosure)