Appendix to McKesson's April 17, 2006 Motion

**All Questions By Mr. Randall (McKesson) At April 10, 2006 Deposition**

| Topic No. | Topic | Questions |
|---|---|---|
| 1. | Challenging Reliability of Witness's Responses to TriZetto's Counsel's Questions | Q. Ms. Radosevich, let me follow up with respect to some questions that Mr. Thomas asked you. First, Mr. Thomas isn't here at this deposition. He's participating by telephone; is that right? [32:2-6]<br>Q. And Mr. Thomas previously deposed you for the better part of a day; correct? [32:8-9]<br>Q. In person here in Florida; correct? [32:11]<br>Q. And during that time he showed you a number of documents; correct? [32:13-14]<br>Q. During his examination today, Mr. Thomas referenced a collection of material that may have been assembled in connection with the patent application process; is that correct? [32:16-19]<br>Q. And he asked you a number of questions about what documents may have been collected and what documents may have been provided to the attorneys and what documents may have been discussed; correct? [32:21-24]<br>Q. Did he show you today any of the documents that he was specifically referring to if he was referring to any specific documents? [33:2-4]<br>Q. You believe it may have assisted you in recalling what specific documents were collected or provided to your attorney if Mr. Thomas had provided you the specific documents he was interested in so that you could look at them? [33:7-11]<br>Q. But he didn't do that? [33:13]<br>Q. So he didn't show you any of the documents he was perhaps referring to to refresh your recollection about whether those documents were collected or provided to any attorney? [33:15-18] |
| 2. | Communications With Prospective Customer (Erisco) | Q. Before you I have Exhibit 5 that was marked earlier in your deposition. Do you have that exhibit? [33:20-21]<br>Q. And that is a January 24, 1989, letter from you to Ms. Faith Glover who was the director of health information at Erisco. Do you see that? [33:23-34:1]<br>Q. And you previously testified that you believe that this is a letter that you wrote and sent to Ms. Glover on or about January 24, 1989; correct? [34:3-5]<br>Q. And at the bottom of this letter it says "Enclosures." Do you see that? [34:12-13]<br>Q. And at the top of the letter it states: "Dear Faith, At your request I am enclosing materials which describe HPR and our expert system, CodeReview(tm), which corrects physician claim coding errors. Please forgive me for the long delay between our first telephone conversation and this response; I was under the impression that materials had already been sent." Do you see that? [34:15-22]<br>Q. So, Miss Radosevich, does this indicate to you that on or about January 24, 1989, you sent to Erisco, specifically Ms. Faith Glover, the director of health information, materials describing your HPR CodeReview product which she previously requested? [36:6-10]<br>Q. At the bottom of this letter you state: "You mentioned the possibility of my speaking to your annual users' conference. I would appreciate the opportunity to do so, and would like to discuss this further with you. Please call me once you have the opportunity to review the enclosed materials so that we might explore this possibility." Do you see that? [36:14-21]<br><br>(continued on next page) |

A-1

Appendix to McKesson's April 17, 2006 Motion

**All Questions By Mr. Randall (McKesson) At April 10, 2006 Deposition**

| Topic No. | Topic | Questions |
|---|---|---|
| 2. | Communications With Prospective Customer (Erisco) | Q. Why did you want the opportunity to speak to Erisco's annual users' conference? [36:23-24]<br>Q. As of at least the date of this letter, January 24, 1989, and based on your discussions with Erisco prior to that, did you believe in those discussions that Erisco perhaps was a potential customer of HPR CodeReview process? [37:15-19]<br>Q. All right. So as of January 24, 1989, Erisco had had at least expressed interest to you in obtaining materials regarding your HPR CodeReview product so that they could integrate it into their claims processing system? [38:4-8]<br>Q. And in response to this request from Erisco, you, in fact, did provide materials describing HPR's CodeReview product to Erisco; correct? [38:18-20]<br>Q. Did Erisco at that time ever tell you that, in fact, they didn't want to become a customer of HPR's, but instead wanted -- were thinking about developing a competing product? [38:24-39:3]<br>Q. Do you recall at or prior to this letter, which is dated January 24, 1989, Erisco explaining to HPR that it intended to use HPR's CodeReview product materials to assist it in developing a competing product? [39:22-40:1]<br>Q. Miss Radosevich, did Erisco ever ask HPR whether CodeReview was a patented product as of the date of this letter, January 24, 1989? [40:8-10]<br>Q. Did Erisco ever ask HPR prior to this letter whether HPR had a pending patent application on its CodeReview product at the time but prior to this letter being sent? [40:12-15]<br>Q. Did you ever -- do you recall ever informing Erisco as of the date of this letter that the CodeReview product was the subject of a patent application? [40:19-21]<br>Q. Do you know whether any of HPR's salespeople prior to this letter being sent disclosed to Erisco that HPR's CodeReview product was the subject of a pending patent application? [40:24-41:3]<br>Q. They never asked? [41:7]<br>. . .<br>Q. Do you recall prior to this date of the annual report for the period ending June 30, 1996, do you recall at any time prior to that any salesperson ever informing you that Erisco had communicated a concern about the HPR patent? [61:5-9]<br>Q. Did, to your knowledge, HPR's management ever have to respond to any specific concern raised by Erisco or communications by one of their salespeople Erisco had regarding the patent? [61:13-16]<br>. . .<br>Q. To your knowledge, did Erisco at any time while you were running HPR ever ask to review HPR's patent application or review the patent or discuss it with HPR? [75:4-6] |

Appendix to McKesson's April 17, 2006 Motion

All Questions By Mr. Randall (McKesson) At April 10, 2006 Deposition

| Topic No. | Topic | Questions |
|---|---|---|
| 3. | Types Of Communications With Customers | Q. Miss Radosevich, would you look through this document and tell me whether this document is an accurate description of the HPR CodeReview product that was the subject of the patent application as of early 1989? [42:3-6]<br>Q. Was this a document that HPR in early 1989 would provide to customers regarding its patented CodeReview product? [42:11-13]<br>Q. So, for instance, in early 1989, if a customer like Erisco wanted information regarding HPR's patented CodeReview product, this is the type of information that would be provided to potential customers? [43:1-4]<br>Q. And does this document, Exhibit 5-A, accurately describe the patented CodeReview product functionality as of early 1989? [43:7-9] |
| 4. | Knowledge of Prospective Customer's Products | Q. Were you deposed, Miss Radosevich, in the EMIS/HPR patent litigation on or about November 29, 1994? [43:19-20]<br>Q. Take a moment to look through this testimony and then answer this question: Does this transcript appear to be the transcript of your deposition taken in the GMIS case? [43:24-44:3]<br>Q. I would like to direct your attention to page 9, line 11 through 13. The question is: "Have you ever heard of a company called Erisco?" Answer: "Yes." Do you see that? [44:5-9]<br>Q. Were you asked that question and did you give that answer in 1994? [44:11-12]<br>Q. And directing your attention to page 10 of your transcript and page 11 of your transcript, if you need to review those pages to refresh your recollection about answering this question, please do so. But the question is: Do you recall being asked at that deposition whether or not you were aware of the features of a claim processing system that Erisco had? [44:16-23]<br>Q. I am directing your attention specifically to page 10, line 24, and proceeding over to page 11 to line 5, the question is: "But do you know if you knew about the product at that time? Answer: "I knew that Erisco was a claims processing software vendor and that it was owned by Dun & Bradstreet, but I don't remember specifics about the products." Do you see that? [45:5-13]<br>Q. And as of 1994, was that your best recollection at the time that while you were aware of Erisco, you did not recall the specifics about the operation of any of their products? [45:15-18] |
| 5. | Instructions To Salespeople Regarding GMIS | Q. Do you see that article, Ms. Radosevich? [46:4]<br>Q. It's entitled "HPR's healthy settlement," despite -- "Dispute concluded over CodeReview." Do you see that? [46:6-8]<br>Q. Can you please read this into the record? [46:10]<br>Q. Let me ask you a few questions specifically about how you instructed your salespeople, either informed customers about these events or to handle questions that may arise from customers based on the patent. Apparently there was a lawsuit between GMIS and HPR in early 1993; is that right? [48:5-11]<br>Q. And this article is dated in early February 1995, and it indicates that you were set to go to trial on January 23 of 1995; is that correct? [48:16-18]<br>Q. And GMIS took a license to the HPR patent instead of going to trial; is that right? [48:22-23]<br><br>(continued on next page) |

Appendix to McKesson's April 17, 2006 Motion

All Questions By Mr. Randall (McKesson) At April 10, 2006 Deposition

| Topic No. | Topic | Questions |
|---|---|---|
| 5. | Instructions To Salespeople Regarding GMIS | Q. During the litigation, from the start of 1993 through the time that GMIS ultimately took a $7.2 million paid-up license in early 1995, did you instruct your salespeople on how to handle inquiries from customers regarding your patent? [49:3-7]<br>Q. How did you instruct them? [49:11]<br>Q. How many times, if any, can you recall Erisco raising concerns about the HPR patent to HPR salespeople from the time the lawsuit by GMIS was first initiated in early 1993 to the time that GMIS first took a license in early '95? [50:5-9]<br>Q. Whether it came from a salesperson or directly to you? [50:14-15]<br>Q. Miss Radosevich, did any concerns that Erisco may have had regarding the patents up until the time that GMIS took the license ever raise the need in your mind to specifically instruct your salespeople about how to deal with Erisco's concerns over the patent, if they had any? [51:19-23]<br>Q. The last paragraph of this article indicates that "Resolving the patent dispute removed one more hurdle in the way of a potential HPR initial public offering, said CFO Brian Cahill." Do you see that? [52:3-7]<br>Q. It also states: "Depending on the IPO market, the company could go public as early as the fall. But, the offering is more likely to happen within the next 24 months, Cahill said." Do you see that? [52:9-13]<br>Q. Can you explain what HPR's management was engaged in after the conclusion of this litigation? [52:15-16]<br>Q. From the time that GMIS took a license in January of 1995 through the time period that HPR went public in August of '95, did that activity affect your instructions to your salespeople on what they should say about your patent? [54:24-55:4]<br>Q. Did the focus that was required by your management in January of '95 through August of '95 on the IPO, did that have anything to do with you not instructing your salespeople to go out and tout victory -- tout the fact that GMIS took a significant license to your patent and, therefore, your patent was threatened in some way? Does that affect it? [55:17-23]<br>Q. Did HPR's instructions to its salespeople on how to respond to questions about the patent have anything to do with the fact that GMIS sued HPR promptly upon publication of the patent? [56:22-57:1]<br>Q. Did that affect the fact that you had already been sued once and been embroiled in two years of litigation and that you wanted to take the company public and were focused on doing that, did those two events play a part in the careful instructions that you provided your salespeople? [58:12-17]<br>Q. Can you take a look at this annual report from HPR for the period ending June 30, 1996, Miss Radosevich? The question is: Does this appear to be a true and correct copy of HPR's annual report which it filed with the Securities & Exchange Commission for the period ending June 30, 1996? [59:14-20]<br>Q. Let me direct your attention to five pages into this document. Are yours copied on double sides? [60:4-5]<br>Q. Can you read the paragraph that starts with "HPR was awarded a U.S. patent"? [60:10-11]<br>Q. As a result of this public disclosure of the paid-up license agreement that was entered into between HPR and GMIS for $7.2 million, did you alter in any way your instructions to your salespeople on how to respond to questions about patents? [60:23-61:3] |

Appendix to McKesson's April 17, 2006 Motion

All Questions By Mr. Randall (McKesson) At April 10, 2006 Deposition

| Topic No. | Topic | Questions |
|---|---|---|
| 6. | Customer Inquiries | Q. Let me direct your attention to two or three more pages beyond where we are and this the heading, it says "Fiscal Years Ended June 30, 1994, 1995, and 1996." [61:20-22]<br>Q. Can you read the first paragraph where it starts with "Revenues"? [61:24-62:1]<br>Q. I'm sorry. I want you to read -- [62:5]<br>Q. -- the paragraph that appears right underneath the heading that says "Fiscal Years Ended June 30, 1994, 1995, and 1996." I'll move forward two or three pages. [62:7-9]<br>Q. Now let me ask you a question. CodeReview, HPR's CodeReview product was HPR's patented product; correct? [62:18-20]<br>Q. I take it from this document that HPR's patented CodeReview product was a significant success in the marketplace, at least from years 1994, 1995, and 1996; is that correct? [62:22-63:1]<br>Q. As a result of the tremendous success that HPR's patented CodeReview product had in the marketplace, did HPR receive increasing number of inquiries through its sales force regarding the patent? [63:5-8]<br>Q. Okay. Can you elaborate on that? [63:12]<br>Q. Could you turn two pages forward in the document to the heading "Management of Growth"? [64:18-19]<br>Q. The first sentence states: "The Company is currently experiencing a period of rapid growth and expansion which could place a significant strain on the Company's personnel and resources." Do you see that? [64:21-65:1]<br>Q. Was that one of the factors, at least as of June of 1996, that contributed to your careful instructions to your salespeople regarding how to communicate with customers regarding the patent? [65:3-6]<br>Q. Did the focus of the management of HPR from August of '95 through February of '96 on the secondary offering contribute to the careful instructions given to salespeople regarding how to communicate with customers on the patents? [66:8-12] |
| 7. | Instructions To Salespeople Regarding Merger | Q. After the secondary offering in February of '96, did HPR's management turn its focus at some point to perhaps finding a strategic partner to merge with? [67:8-10]<br>Q. And ultimately did HPR reach a merger agreement with a company called HBOC? [67:14-15]<br>Q. In addition to the rapid growth that HPR was experiencing, specifically from early '96 until the fall of 1997, in addition to that, was the management's attention at HPR focused on identifying the correct strategic partner to merge with? [67:20-24]<br>Q. Did that focus by HPR's management contribute during that time period to the careful instructions given to HPR salespeople regarding communications with customers relating to the patent? [68:2-5]<br>Q. Let me show you what has been marked as Exhibit 9, which is a document filed with the Securities & Exchange Commission dated November 21, 1996, and it relates to the merger between HBOC and HPR. Do you see that, Ms. Radosevich? [68:13-17]<br><br>(continued on next page) |

Appendix to McKesson's April 17, 2006 Motion

**All Questions By Mr. Randall (McKesson) At April 10, 2006 Deposition**

| Topic No. | Topic | Questions |
|---|---|---|
| 7. | Instructions To Salespeople Regarding Merger | Q. Does this appear, Ms. Radosevich, to be a true and correct copy of the filing with the Securities & Exchange Commission on November 21, 1997, relating to the merger agreement that you previously testified to between HBOC and HPR? [68:23-69:3]<br>Q. That appears on the first page of the document. [69:7]<br>Q. I direct your attention, Miss Radosevich, to -- [69:9]<br>Q. -- the fourth page. [69:11]<br>Q. This is a draft letter that was sent over your signature as chairman, president, and chief executive officer of HPR to your stockholders regarding the merger with HBOC; correct? [69:13-16]<br>Q. And specifically I'd like to direct your attention to page 23 of this document. Page numbers appear about three quarters of the way down each page. [69:18-20]<br>Q. Specifically the heading entitled "The Merger Proposal" and the subheading "Background of the Merger." This public filing describes in four pages the numerous activities leading up to the proposed merger with HBOC. Do you see that? [69:22-70:2]<br>Q. And do those entries accurately describe the activities and focus of HPR's management during that time period? [70:4-6]<br>Q. And during that time period leading up to the merger with HBOC, did the specific discussions with a number of interested parties including HBOC continue to contribute to your careful instructions to your salespeople regarding what they could and could not say to customers relating to the patent? [70:8-13] |
| 8. | Instructions To All Employees, Including Salespeople, Regarding Patent | Q. I direct your attention to page 47 of this public filing. Two-thirds of the way down the page underneath the heading "Business of HPR," it states: "As of September 30, 1997, HPR employed 194 individuals." Do you see that? [70:15-19]<br>Q. And was that accurate with respect to the number of individuals who were employed by HPR? [70:21-22]<br>Q. Was HPR's management careful in trusting not only the salespeople, but its management people also in what it could and could not say about the patent? [71:1-3]<br>Q. Directing your attention to the appendix of this document, it is page A-18 -- [71:7-8]<br>Q. Specifically, Section 3.10, "Litigation." [71:10]<br>Q. It states: "Except as otherwise set forth in Exhibit 3.1 hereto, there is no suit, action, arbitration, proceeding, claim or investigation pending or, to the knowledge of the Acquired Company, threatened against or affecting the Acquired Company...." Do you see that? [71:12-17]<br>Q. Do you believe it was important leading up to the merger with HBOC that HPR be as free of litigation as reasonably possible? [71:19-21]<br>Q. Did that confirm your recollection regarding the specific instructions given to your employees regarding what they could and could not say about the patent? [71:24-72:2] |

Appendix to McKesson's April 17, 2006 Motion

All Questions By Mr. Randall (McKesson) At April 10, 2006 Deposition

| Topic No. | Topic | Questions |
|---|---|---|
| 9. | Instructions To Salespeople Regarding Patent Litigation | Q. At any time leading up to this merger with HBOC, did you believe that HPR was engaged in the patent litigation business? [72:4-6]<br>Q. Prior to leaving the company, did you ever instruct any of your salespeople or any of your employees to go out and investigate and come up with potential patent infringers so that he could sue them? [73:14-17]<br>Q. In terms of your instructions to your employees and your salespeople regarding what they could or could not say regarding the patent, did you ever instruct them to investigate potential competitors in order to sue those competitors? [73:22-74:2]<br>Q. Other than defending your company against the claims that you ultimately prevailed on brought against you by GMIS, did you ever -- did it ever come to your attention that you needed to pursue patent litigation against any potential competitor? [74:6-10] |
| 10. | Personal | Q. When did you leave HPR? [74:17]<br>Q. To your knowledge, did other executives from HPR leave at or soon following your departure, ultimate departure from HPR in March of '98? [74:21-23] |

A - 7

Appendix to McKesson's April 17, 2006 Motion

All Questions By Mr. Thomas (TriZetto) At April 10, 2006 Deposition

| Topic No. | Topic | Questions |
|---|---|---|
| 1. | Preparation Of Patent Applications | Q. Okay. Miss Radosevich, with regard to the original patent application that was filed back in 1988, what individuals assisted in the preparation of that patent application? [4:20-23]<br>Q. What exactly was Dr. Goldberg's role in assisting with the patent application? [5:13-14]<br>Q. How did Dr. Holloway participate or assist in the preparation of the patent application? [5:20-21]<br>Q. And what about Ms. Dugan, how did she participate in the preparation of the application? [6:1-2]<br>Q. Did all three of these individuals -- Dr. Goldberg, Dr. Holloway, and Ms. Dugan -- review the patent application before it was filed? [6:10-12]<br>Q. Did any of them review the entire application before it was filed? [6:22-23]<br>Q. Now, with regard to the subsequent patent applications that were filed later, did all three of those individuals participate or assist with all of those other applications? [7:5-8]<br>Q. Okay. So after they left the company, you're not aware of any attempt to contact them to get assist -- further assistance on the patent applications? [7:23-8:1] |
| 2. | Duty of Candor | Q. Are you aware of anyone explaining to any of the inventors the duty of candor that is required in submitting patent applications? [8:7-9]<br>Q. Okay. And do you know who explained that duty of candor to them? [8:11-12]<br>Q. And who was that? [8:14]<br>Q. And were you actually present when the duty of candor was explained to the inventors? [8:18-19]<br>Q. And were the types of materials in -- with regard to articles and publications and prior patents and those sorts of things, the types of those materials that should be disclosed explained to the inventors? [8:24-9:3]<br>Q. I'm just asking a foundational question at this point, Miss Radosevich, and it's a yes-or-no question. Do you know whether any explanation was given to the inventors of the types of prior art and other historical information that should be disclosed to the patent office? [9:11-16]<br>Q. And was such an explanation given to all of the inventors? [9:18-19]<br>Q. And was that given by the patent attorneys? [9:21] |
| 3. | Prior Art | Q. Do you personally know what materials, if any, the inventors turned over to the patent attorneys in the way of prior art? [9:23-10:1]<br>Q. And then when you say you were the conduit, do you mean that the inventors would give you information or materials and you would then pass that along to the patent attorneys? [10:22-11:1]<br>Q. So as a result of this process, you at one time knew what information was turned over to the patent attorneys, but today after the passage of time, you're not able to recall everything that was turned in? [11:12-15]<br>Q. Miss Radosevich, in terms of what specifically, what pieces of prior art were located and turned over, you at one time knew what all of those materials were, but you can't recall today what they were? Is that accurate? [11:23-12:3]<br><br>(continued on next page) |

Appendix to McKesson's April 17, 2006 Motion

## All Questions By Mr. Thomas (TriZetto) At April 10, 2006 Deposition

| Topic No. | Topic | Questions |
|---|---|---|
| 3. | Prior Art | Q. Okay. So some materials, we don't need to call it prior art if you don't want to, but some materials were turned over to the patent attorneys? [12:8-10]<br>Q. Okay. But today, given the passage of time, you can't tell me what all those materials were? [12:12-13]<br>Q. Okay. Now, in your discussions of what materials to gather and turn over with the inventors, did the subject of the articles and presentations that had been written and done about Dr. Hertenstein's work at Caterpillar discussed? [12:16-20]<br>Q. And was there a discussion of whether the articles and presentations that had been made on Dr. Hertenstein's work, was there a discussion of whether those materials should be turned over to the PTO? [12:22-13:1]<br>Q. And what decision was reached on that? [13:3]<br>Q. So you believe that the articles that had been written about Dr. Hertenstein's work at Caterpillar were turned over to the patent attorney? [14:7-9]<br>Q. Do you know why -- let me strike that. Do you know whether those materials about Dr. Hertenstein's work were submitted by your patent attorney to the patent office? [14:17-20]<br>Q. Well, I'm just asking you whether you know, whether you recall from when you were involved in the process -- [15:11-13]<br>Q. Do you know whether, in fact, journal articles and newspaper articles about Dr. Hertenstein were, in fact, turned over to the patent attorney? [15:16-18]<br>Q. As part of this process, did you, in fact, find some journal articles or newspaper articles or scholarly presentations about Dr. Hertenstein's work? [16:7-9]<br>Q. Ms. Radosevich, I understand you believe that everything you found you turned over. I understand that. My question is: Do you recall whether any publications about Dr. Hertenstein's work were, in fact, found and gathered during this process? [16:12-16] |
| 4. | Discussions With Inventors | Q. Okay. Thank you. Did you have any discussions with the inventors about whether they thought those materials were pertinent to the patent? [16:20-23]<br>Q. I'm asking, Miss Radosevich, whether you had any discussions with the inventors about what they thought about these articles that you found with regard to whether they were relevant to the patent application? [17:5-8]<br>Q. And then you left it up to him to make that decision? [17:17-18]<br>Q. Do you know whether an article about Dr. Hertenstein's work that was coauthored by Dr. Egdahl was turned over to your patent attorney? [18:3-5]<br>. . .<br>Q. When you were getting the assistance from the inventors on the application and having discussions with them about that, did the subject of an older software system called AMS come up? [22:7-10]<br>Q. And the current question, Miss Radosevich, is simply whether you recall in the discussions you had with the inventors about preparation of the patent application whether the subject of a software system called AMS ever came up. [23:19-23] |

Appendix to McKesson's April 17, 2006 Motion

## All Questions By Mr. Thomas (TriZetto) At April 10, 2006 Deposition

| Topic No. | Topic | Questions |
|---|---|---|
| 5. | Discussions With Aetna | Q. Okay. All right. In your conversations with the inventors who were assisting on the patent application, did the subject of prior communications with Aetna come up? [19:17-20]<br>Q. And do you know whether any information or materials about the communications with Aetna were turned over to your patent attorneys? [19:22-24]<br>Q. And do you know -- do you actually recall that among these materials you turned over to the patent attorney, there were proposals that were made to Aetna? [21:1-3]<br>Q. Miss Radosevich, just so you have the question in mind, it's very simple: Do you recall now whether the materials that you turned over actually did include proposals that had been made as of that time to Aetna? [21:11-14] |
| 6. | Instructions To Salespeople Regarding Patent, Clinical Editing Software, Infringement, Competitors | Q. Okay. That's fine. Thank you. All right. Let me move on to the second subject matter that we are allowed to cover today, and that is: Can you tell me, please, what were the HPR salespeople instructed to say to customers about the patent? [24:4-9]<br>Q. Were salespeople allowed to tell customers that if the customer was using someone else's clinical editing software, there was an infringement of the patent occurring? [24:16-19]<br>Q. Was any instruction given to the salespeople about which of the competitive clinical editing systems you believed were infringing? [24:23-25:1]<br>. . .<br>Q. In the instructions that were given to the salespeople about what they were to say to the customers, was there any distinction made based on which competitor a customer was considering? [26:17-20] |
| 7. | Infringement | Q. Miss Radosevich, did you believe that any of the competitive clinical editing systems were infringing your patent? [25:10-12]<br>Q. During the period when you were the president of HPR, during that time period, did you ever have any opinion or belief as to which of the other clinical editing systems that were out there were infringing your patent? [25:18-22] |
| 8. | Communications By Salespeople With Erisco Customers | Q. Do you know whether any of your salespeople said anything about the patent to Erisco customers? [27:22-23]<br>Q. I'm asking, Miss Radosevich: While you were the president of HPR, do you know whether any HPR salespeople said anything about the patent to Erisco customers? [28:3-5]<br>Q. Do you know whether your sales people even called on Erisco customers? [28:15-16] |

A - 10