IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| MCKESSON INFORMATION SOLUTIONS LLC, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | C.A. No. 04-1258 (SLR) |
| THE TRIZETTO GROUP, INC., | ) ) ) | |
| Defendant. | ) | |

**DECLARATION OF GUNTER SIEMSENS
IN SUPPORT OF THE TRIZETTO GROUP, INC.'S
<u>MOTION FOR SUMMARY JUDGMENT OF INVALDITY</u>**

                                            MORRIS, NICHOLS, ARSHT & TUNNELL LLP
                                            Jack B. Blumenfeld (#1014)
                                            Rodger D. Smith, II (#3778)
                                            1201 N. Market Street
                                            P.O. Box 1347
                                            Wilmington, DE  19899
                                            (302) 658-9200

                                            *Attorneys for Defendant The TriZetto Group, Inc.*

OF COUNSEL:

Jeffrey T. Thomas
David A. Segal
Michael A. Sitzman
GIBSON, DUNN & CRUTCHER LLP
Jamboree Center
4 Park Plaza
Irvine, CA  92614-8557
(949) 451-3800

June 1, 2006

I, Gunter Siemsen, declare as follows:

1. I am the former Assistant Vice-President of Systems Development for Blue Cross/Blue Shield of New Jersey ("BC/BS NJ"), now Horizon Blue Cross Blue Shield of New Jersey. From 1963 to 1986, I worked with the computerized claims processing systems that were used at BC/BS NJ. I have personal knowledge of the facts set forth herein, and if called upon to do so, I could and would competently testify thereto.

2. In September 1963, I was hired by BC/BS NJ as a Management Trainee functioning as a computer programmer to participate in the development and implementation of a health insurance claims system on an IBM 1401/7070 computer system. This system was specifically designed to automate the company's claims processing functions for both medical and hospital claims. This 7070 System was implemented at BC/BS NJ and was processing medical claims by the second quarter of 1964.

3. The 7070 System had a number of features and functions that I understand to be relevant in this current litigation. Specifically, the 7070 System validated medical service codes that were submitted on individual medical claims in the following manner:

(a) A medical claim was received by the 7070 System by a process that involved the keypunching of data from medical claim forms into 80-column punch cards that were fed into the system. Medical claim forms often contained billings for multiple procedures or services. Due to card data capacity limitations the system handled such situations by having each service keyed into an individual punch card. Once the cards, containing claim and service information, were read into the system they were converted to magnetic tape transactions, augmented with other data and sorted to facilitate validation and computer adjudication.

(b) In 1964, BC/BS NJ was not using CPT codes to describe medical services. Instead, it was using a predecessor medical code classification system that was developed by the National Association of Blue Shield Plans (NABSP) and used throughout the BC/BS network. These codes had two elements, type of service, representing major classifications of medical services and a four digit "dioperative code," representing the detailed service or procedure. The

1

dioperative codes were considered medical service codes, because each dioperative code represented a particular medical service or procedure.

  (c) Upon receipt of the data from the keypunched cards, the 7070 System insured that the keyed data was valid under the editing rules established for each of the data fields. Specifically, with regard to validating dioperative codes, if a claim was received that did not contain a valid dioperative code the 7070 System would reject the claim and indicate that the dioperative code was not valid. The technique used to validate the dioperative codes was to employ logic within the computer program that checked incoming codes against an internal list of valid codes or code ranges.

  4. The 7070 System was also designed to edit for duplicate or redundant dioperative codes in two different ways.

  (a) <u>First</u>, the 7070 System utilized a file containing all historical medical claims that had been previously processed and adjudicated for each patient. All medical claims that were submitted for each patient were processed by the 7070 System by reviewing claims previously processed as recorded on the history file. This facility allowed for several adjudication functions such as benefit limitation management and duplicate checking to be automated. Included in the duplicate checking process, dioperative codes on the current claim were compared to dioperative codes on claims previously paid for the same patient as recorded on the history file. If a duplicate code situation was found, the current claim was rejected for manual review.

  (b) <u>Second</u>, the 7070 System also identified duplicate or redundant dioperative codes that existed on a single medical claim. The 7070 System processed each dioperative code on a line-by-line basis. If, after processing the first dioperative code, the 7070 System detected an identical dioperative code on a subsequent line within the same medical claim, the 7070 System would reject that code in that line as being duplicative.

5. Adjudication controls, including extensive duplicate checking, was a primary objective of the 7070 System. Two factors contributed to this emphasis. First, the use of keypunching for data entry subjected the process to keying errors, both typographical and through simple mishandling. Second, physician billing practices were not automated, lacked controls and were prone to clerical errors in the completion of the claim form. One billing practice that was particularly onerous for BC/BS NJ involved duplicate payments. At that time, it was not uncommon for claim payments due to a variety of reasons to be delayed or even lost. As a result, a common practice of the unpaid physician was to have his or her office staff follow-up by resubmitting their unpaid claims. In its pre-computer days, BC/BS NJ experienced significant duplicate payment occurrences. In the worst case scenario, the double payment went undetected, while in the best case scenario, significant clerical effort was required to either reprocess returned checks or initiate recapture of the erroneous payment. Thus, it was the objective of the 7070 System to extensively look for duplicate billing situations, including on a code-by-code basis.

6. In 1969, the 7070 System was replaced with a new system based on the IBM 360 computer. This was a significant technological change with many economic and performance improvement benefits. The most notable technological impact was the use of random access devices for data storage. Additionally, the functionality of the system was expanded through maintenance simplification and enhanced computer adjudication so as to further automate the claims process into areas such as medical policy. The data validation processes and redundant code edits were all carried forward from the 7070 System into the new system. The claims history file was converted from tape into a direct access device.

7. Additionally, the 360 System also included a new database, the pricing file. It separately identified the reimbursed amount or formula factors for the various dioperative codes. The validity of the dioperative codes was separately checked as previously described in the 7070 System, and as a part of the adjudication process the amount to be reimbursed would be calculated based on the pricing data in the pricing file.

8. While the 360 System was continually upgraded during the 1970's, the American Medical Association's promulgation of a nationwide standardized coding system, CPT-4, would ultimately require replacement of the system. Simultaneously, around 1979, Blue Shield of NJ began evaluating it's relationship with Blue Cross of NJ both from a technological and operational perspective. This led to a concurrent effort by Blue Cross of NJ to evaluate it's options in separating itself from Blue Shield and offering medical insurance products on it's own. During this period I was tasked with examining commercially available systems, which could readily be implemented by Blue Cross, providing the functionality of the 360 System with support for the new CPT-4 codes. I recall looking at a system offered by ASA, a Chicago based company, and another system from McDonnell Douglas out of St. Louis, that were both capable of providing the functionality of our 360 System.

9. Ultimately, Blue Shield of NJ replaced the 360 System by entering into a facilities management arrangement with Electronic Data Systems, Inc. ("EDS"). EDS provided their generic health insurance operating system, customized to Blue Shield requirements. Implementation of this system, which became known as the ICS System, began in the early 80's and was fully installed by 1984. Blue Cross of NJ acquired the ASA System and had it installed in development mode, but never put the system in production as the issues between the company's were resolved by their merger.

10. The ICS System carried forward all of the functionality previously described, but using CPT-4 codes instead of dioperative codes. Specifically, the dioperative codes database was replaced with a CPT-4 database that included all of the valid CPT-4 codes. Additional functionality was also provided in the ICS System, including expanded medical policy rules,

4

which would be applied to the medical claims in order to detect incompatible or inconsistent CPT codes that appeared within a single medical claim or other medical claims.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

This declaration was executed this 20th day of May, 2006, at Hardyston, New Jersey.

*Gunter Siemsen*
Gunter Siemsen

wsAB.tmp

5

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on June 1, 2006, caused to be electronically filed the Declaration of Gunter Siemsen in Support of The Trizetto Group, Inc.'s Motion for Summary Judgment of Invalidity with the Clerk of the Court using CM/ECF, which will send notification of such filing(s) to the following:

    Michael A. Barlow
    Skadden, Arps, Slate, Meagher & Flom LLP

I also certify that copies were caused to be served on June 1, 2006, upon the following in the manner indicated:

### BY EMAIL AND HAND

Michael A. Barlow
Skadden, Arps, Slate, Meagher & Flom LLP
One Rodney Square
Wilmington, DE 19801

### BY EMAIL AND FEDERAL EXPRESS

Jeffrey G. Randall
Skadden, Arps, Slate, Meagher & Flom LLP
525 University Avenue
Suite 1100
Palo Alto, CA 94301

    /s/ *Rodger D. Smith II (#3778)*
    Morris, Nichols, Arsht & Tunnell LLP
    1201 N. Market Street
    P.O. Box 1347
    Wilmington, DE 19899
    (302) 658-9200
    rsmith@mnat.com