IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| MCKESSON INFORMATION SOLUTIONS LLC, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | C.A. No. 04-1258 (SLR) |
| THE TRIZETTO GROUP, INC., | ) ) | **REDACTED VERSION** |
| Defendant. | ) ) | |

**OPENING BRIEF IN SUPPORT OF THE TRIZETTO GROUP, INC.'S
MOTION FOR SUMMARY JUDGMENT OF INVALIDITY FOR INDEFINITENESS
AND FAILURE TO ADEQUATELY DESCRIBE THE CLAIMED INVENTION**

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Jack B. Blumenfeld (#1014)
Rodger D. Smith, II (#3778)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200

*Attorneys for Defendant The TriZetto Group, Inc.*

OF COUNSEL:

Jeffrey T. Thomas
David A. Segal
Michael A. Sitzman
GIBSON, DUNN & CRUTCHER LLP
Jamboree Center
4 Park Plaza
Irvine, CA  92614-8557
(949) 451-3800

Original Filing Date:  June 1, 2006
Redacted Filing Date:  June 7, 2006

**TABLE OF CONTENTS**

Page

I.    NATURE AND STAGE OF PROCEEDINGS ................................................. 1

II.   SUMMARY OF ARGUMENT .................................................................. 1

III.  STATEMENT OF FACTS ....................................................................... 2

      A.    BACKGROUND ........................................................................ 2

            1.    The '164 Patent ............................................................... 2

            2.    Background Of The Technology .......................................... 3

            3.    Claim 2 Of The '164 Patent And The Patent Specification ....... 3

            4.    Persons Skilled in the Art Could Not Define, Or Consistently
                  Offer Examples, Of "Non-Medical Criteria" ......................... 5

            5.    The Patent Owners Have Varied The Scope Of "Non-Medical
                  Criteria" Over The Life Of The '164 Patent .......................... 6

IV.   ARGUMENT ....................................................................................... 7

      A.    STANDARD FOR SUMMARY JUDGMENT ..................................... 7

      B.    THE DEFINITENESS REQUIREMENT ............................................ 8

      C.    CLAIM 2 OF THE '164 PATENT IS INVALID FOR
            INDEFINITENESS ..................................................................... 9

            1.    "Non-Medical Criteria" Lacks Ordinary Meaning And Is Not
                  Defined In The Specification ............................................ 10

            2.    The Inventors Could Not Define "Non-Medical Criteria" ......... 12

            3.    McKesson And The Previous Owner Of The '164 Patent
                  Have Relied On The Lack Of Any Clear, Objective
                  Definition Of "Non-Medical Criteria" To Alter The Scope Of
                  Claim 2 To Fit Their Needs .............................................. 14

      D.    CLAIM 2 FAILS TO SATISFY THE WRITTEN DESCRIPTION
            REQUIREMENT OF SECTION 112(1) ........................................... 25

            1.    The Written Description Requirement .................................. 25

       2.    The Specification Fails To Describe The Method Set Forth in
Claim 2 ................................................................................................ 26

V.    CONCLUSION ................................................................................................ 28

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Acacia Media Technologies Corp. v. New Destiny Internet Group.*,
    405 F. Supp. 2d 1127 (N.D. Cal. 2005) .................................................................. 12

*ACTV, Inc. v. Walt Disney Co.*,
    346 F.3d 1082 (Fed. Cir. 2003) .............................................................................. 10

*Amgen, Inc. v. Hoechst Marion Roussel, Inc.*,
    314 F.3d 1313 (Fed. Cir. 2003) ................................................................................ 9

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986) ................................................................................................. 8

*Datamize, LLC v. Plumtree Software, Inc.*,
    417 F.3d 1342 (Fed. Cir. 2005) ..................................................................... 8, 9, 19

*Karol v. Burton Corp.*,
    234 F. Supp. 2d 450 (D. Vt. 2002) .................................................................. 26, 27

*LizardTech, Inc. v. Earth Res. Mapping, Inc.*,
    424 F.3d 1336 (Fed. Cir. 2005) .............................................................................. 27

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986) ................................................................................................. 7

*New Hampshire v. Maine*,
    532 U.S. 742 (2001) ............................................................................................... 15

*Personalized Media Communications, LLC v. ITC*,
    161 F.3d 696 (Fed. Cir. 1998) ................................................................................. 8

*Purdue Pharma L.P. v. Faulding Inc.*,
    230 F.3d 1320 (Fed. Cir. 2000) .............................................................................. 25

*Semmler v. American Honda Motor Co., Inc.*,
    990 F. Supp. 967 (S.D. Ohio 1997) ................................................................. 12, 23

*TurboCare Div. of Demag Delaval Turbomachinery Corp. v. GE*,
    264 F.3d 1111 (Fed. Cir. 2001) .............................................................................. 28

*United States v. Union Corp.*,
    259 F. Supp. 2d 356 (E.D. Pa. 2003) ..................................................................... 15

*Vas-Cath, Inc. v. Mahurkar*,
    935 F.2d 1555 (Fed. Cir. 1991) ....................................................................... 8, 25

## Statutes

35 U.S.C. § 112(1) .......................................................................................... 1, 25, 28

35 U.S.C. § 112(2) .................................................................................... 1, 8, 22, 28

Fed. R. Civ. P. 56(c) ................................................................................................. 7

Pursuant to the Court's May 4, 2006, Scheduling Order, defendant The TriZetto Group, Inc. ("TriZetto") hereby submits this brief in support of its Motion for Partial Summary Judgment declaring Claim 2 of U.S. Patent No. 5,253,164 (the "'164 patent") invalid for failure to satisfy the definiteness requirement of 35 U.S.C. § 112(2) and the written description requirement of 35 U.S.C. § 112(1).

## I.    NATURE AND STAGE OF PROCEEDINGS

On September 13, 2004, plaintiff McKesson Information Solutions, LLC ("McKesson") sued TriZetto for infringement of the '164 patent.  McKesson alleged that three TriZetto products – Facets, QicLink, and ClaimFacts – infringed fifteen claims of the '164 patent. On November 1, 2004, TriZetto answered and filed a counterclaim seeking a declaratory judgment of invalidity, unenforceability, and non-infringement.  The Court bifurcated the issue of invalidity and stayed motion practice and trial on that issue.  The Court entered its Claim Construction Order on April 5, 2006, but did not construe the term "non-medical criteria," which appears in Claims 2 and 14, or address TriZetto's contention that the term was indefinite.  On April 26, 2006, the jury returned a verdict that the Accused TriZetto's Products infringe Claims 1 and 2 of the '164 patent.  The Court has set trial on the remaining issues, including invalidity, for October 3, 2006.  This is TriZetto's Opening Brief in support of its Motion for Partial Summary Judgment of invalidity with respect to Claim 2 for indefiniteness and inadequate written description.

## II.    SUMMARY OF ARGUMENT

Claim 2 of the '164 patent is invalid as a matter of law because the term "non-medical criteria" is fatally indefinite in violation of Section 112, paragraph 2.  The undisputed evidence clearly and convincingly compels this conclusion because:  (1) the term is not defined

1

in the patent specification; (2) the term does not have any unified, objective meaning to persons of ordinary skill in the art; and (3) McKesson's expert witness, its attorneys, and its predecessors have continuously changed the meaning of the term "non-medical criteria" to alter the scope of Claim 2 to fit their needs from the date the patent was issued through the infringement trial. The only way that McKesson has attempted to provide any concrete boundaries for Claim 2 is by referring to the nebulous distinction between "medical rules" and rules purportedly having to do with "billing conventions." No one, including McKesson, however, has been able to consistently and objectively discern this alleged demarcation of Claim 2's scope.

Even assuming that the Court concludes that Claim 2 is not invalid for indefiniteness, the specification fails to adequately describe the claimed invention. Claim 2 sets forth a method, including a step that determines whether one medical service code in a medical claim is mutually exclusive with other codes in the claim based on "non-medical criteria," but the specification fails to evidence that the inventors actually had invented such a method at the time they filed their original application. Accordingly, the specification fails to satisfy the written description requirement of Section 112(1).

## III.    STATEMENT OF FACTS

### A.    BACKGROUND

#### 1.    The '164 Patent

The '164 patent discloses an expert computer system for processing medical claims containing medical service codes. Ex. 1 ('164 patent), Abstract. The patent was issued on October 12, 1993, was originally assigned to HPR, Inc., and is now owned by McKesson, HPR's successor-in-interest.

2.    **Background Of The Technology**

The technology described in the '164 patent pertains to reimbursement of bills submitted by physicians for services rendered. Physicians receive payment for their medical services by submitting bills (known as "medical claims") to insurance companies, health maintenance organizations (HMOs), preferred provider organizations (PPOs), and other health benefit providers. *See* Ex. 1 ('164 patent), cols. 1-2. The physician will list on a medical claim certain "medical service codes" developed by the American Medical Association, which indicate the particular services or procedures performed. Some physicians may submit medical claims with improper code combinations, either "assigning a higher paying code than a procedure merits, or [] unpackaging services that were intended to be bundled into a single code." *Id.*, col. 2:8-14. In some instances, these improper code combinations are inadvertent. In other cases, a physician will deliberately submit improper code combinations in order to obtain greater reimbursement. *Id.* In response to these coding problems, manual techniques were created to allow medical claim reviewers to catch and correct coding errors in submitted medical claims. *Id.*, col. 3:25-29. HPR developed one such manual code-checking technique into a computer system, called CodeReview. *Id.*, col. 3:17-29.

3.    **Claim 2 Of The '164 Patent And The Patent Specification**

Claim 2 (originally claim 18) was added to the patent by a January 29, 1991 Preliminary Amendment to the second continuation application of the original 1988 patent application. Ex. 2 (1991 Amend.), at 5. This was the first time the concept of comparing codes based on "non-medical criteria" was mentioned in connection with the '164 patent. In the original 1988 patent application, the claims only covered a computer system and method for

determining whether medical codes were "inappropriate" when received together.  Ex. 3 (Original Application), at 24-25.

As described in the specification, the disclosed system and method "examine[d] the multiple codes presented to determine whether payment or payment authorization for each of the stated codes is *medically appropriate*, or whether one or more of the codes is *medically inappropriate*, or whether one or all of the multiple codes should be replaced by other code(s)." Ex. 1 ('164 patent), col. 5:60-65 (emphasis added).  That is, the inventors claimed that they had invented a system and method that made determinations only based on *medical* appropriateness.

The inventors' original limitation of what they believed they had invented to *medical* determinations is also consistent with the other portions of the specification and this Court's construction of the predetermined database.  In particular, throughout the specification, the inventors repeatedly emphasized that the database of the invention – which contained the detailed rules as to which codes should remain on a claim and which should be rejected – "was developed as a result of reviewing *medical* procedures by expert *medical* personnel and is consistent with the CPT-4 classification system," the medical procedures of which "were examined classified, and possible combinations of procedures assessed by expert medical specialists," based on the "application of *clinical* judgment" by such "expert medical personnel." Ex. 1 ('164 patent), col. 5:68-6:13 (emphasis added).  Indeed, the phrase "non-medical criteria" never appears anywhere in the '164 patent's specification.  Consistent with this description of the claimed invention, the Court also concluded that the "predetermined database," which is an element of all of the claims, incorporated "a *medical* classification system and expert *medical clinical* judgment." D.I. 303 (Mem. Order, Apr. 5, 2006), at 4 (emphasis added).

Faced with no support for any construction of the phrase "non-medical criteria," McKesson never attempted to define the phrase and instead simply argued that the phrase should be given its "ordinary meaning."  D.I. 170 (McKesson's Opening Claim Construction Brief), at 11.  TriZetto contended what it again asserts by way of this motion:  the phrase "non-medical criteria" is so indefinite that it cannot be given any reasonable construction.  D.I. 158 (TriZetto's Opening Claim Construction Brief), at 27-29.   In its Order, the Court did not specifically construe the phrase "non-medical criteria" or address TriZetto's indefiniteness contention, presumably leaving the issue of indefinitiveness for this invalidity phase of the case.

### 4.    Persons Skilled in the Art Could Not Define, Or Consistently Offer Examples, Of "Non-Medical Criteria"

As explained in detail below, the inventors were unable to advance a consistent definition for "non-medical criteria."   Indeed, the inventors were confused by the term.

REDACTED

When pressed, the inventors guessed and provided a number of contradictory examples of what "non-medical criteria" might mean.

REDACTED

5

REDACTED

**5.     The Patent Owners Have Varied The Scope Of "Non-Medical Criteria" Over The Life Of The '164 Patent**

In 1994, GMIS, a competitor of HPR, brought an action in the United States District Court for the Eastern District of Pennsylvania for a declaratory judgment that the '164 patent was invalid, not infringed, and unenforceable.

REDACTED

Now that McKesson acquired HPR and is the owner of the '164 patent, McKesson has relied on the lack of any clear, objective definition of "non-medical criteria" to alter the scope of Claim 2 to cover the accused products.

REDACTED

6

REDACTED

By the time of trial, however, Dr. Musen had abandoned his single code examples of "non-medical" and asserted that, among other things, "unbundling" rules were based on "non-medical criteria." This is of course precisely the opposite of the position taken by McKesson's predecessor HPR twelve years ago. *See, e.g.*, Ex. 10 (Trial Tr.), at 298:14-23 (testimony of Dr. Musen that Example 1 from the patent specification is an unbundling rule and that such rule is "non-medical"); *id.*, at 385:2-16 (testimony of Dr. Musen identifying multiple wound repair example as "non-medical"); *id.*, at 1202:3-1203:4 (closing argument identifying multiple wound repair example as "non-medical").

The confusion and contradictions permitted by the inclusion of the undefined term "non-medical criteria" in Claim 2 should result in that claim being found invalid.

## IV.    ARGUMENT

### A.    STANDARD FOR SUMMARY JUDGMENT

The Court should grant summary judgment for TriZetto if the evidence before the Court "shows that there is no genuine issue as to any material fact and that [TriZetto] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). TriZetto bears the burden of proving that no genuine issue of material fact exists. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, n.10, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986). Because TriZetto's Motion demonstrates an absence of material facts, McKesson, as the non-moving party, "must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 587. The mere existence of some evidence in support of the non-moving party, however, will not be sufficient

for denial of a motion for summary judgment; there must be enough evidence to enable a jury reasonably to find for McKesson on the issue. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

To prove invalidity here, TriZetto must show either that (1) Claim 2, and specifically the term "non-medical criteria," defies reasonable efforts at claim construction, *Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342, 1347-48 (Fed. Cir. 2005), or (2) the patent specification fails to "clearly allow persons of ordinary skill in the art to recognize that the inventors invented what is claimed [by Claim 2]." *Vas-Cath, Inc. v. Mahurkar*, 935 F.2d 1555, 1563 (Fed. Cir. 1991). The incontrovertible evidence presented in this Motion clearly supports both of these conclusions.

## B.    THE DEFINITENESS REQUIREMENT

A patent's specification must conclude with claims "particularly pointing out and *distinctly claiming* the subject matter which the applicant regards as his invention." 35 U.S.C. § 112(2) (emphasis added). The Court must evaluate whether a claim meets this requirement from the point of view of one skilled in the art and in light of the specification. *Personalized Media Communications, LLC v. ITC*, 161 F.3d 696, 705 (Fed. Cir. 1998). "The purpose behind the definiteness requirement is to ensure that the claims delineate the scope of the invention using language that adequately notifies the public of the patentee's right to exclude." *Datamize LLC v. Plumtree Software, Inc.*, 417 F.3d 1342, 1347 (Fed. Cir. 2005).

When indefiniteness is asserted, ordinary principles of claim construction apply – that is, the Court must first examine the challenged phrase's meaning in light of the specification. *Id.* at 1348. The Court may also examine extrinsic evidence when the meaning of a term is not

apparent from the intrinsic evidence. *Id.* Application of these principles to the term "non-medical criteria" demonstrates that the term is fatally indefinite.

## C.    CLAIM 2 OF THE '164 PATENT IS INVALID FOR INDEFINITENESS

Claim 2 fails to perform the most basic function that patent claims are supposed to perform – it fails to place the public, and potential competitors such as TriZetto, on notice of the scope of the patentee's rights. Claim 2 fails at this basic requirement because the term "non-medical criteria," in the context of the specification and the patent claims, is not "sufficiently precise to permit a potential competitor [such as TriZetto] to determine whether or not [it] is infringing," and "it does not apprise those skilled in the art of the scope of the invention." *Amgen, Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1342 (Fed. Cir. 2003) (citation omitted).

Indeed, as detailed below, if the Court were to order TriZetto to remove the infringing aspects from its products, TriZetto would be at a loss as to how to comply. McKesson acknowledged as much at trial, explaining "probably most of the relationships contained in the predetermined database are based on medical criteria." Ex. 10 (Trial Tr.), at 1293:17-19. McKesson, however, and anyone else who has attempted, has been unable to determine which admittedly small subset of the rules purportedly contained the predetermined database of the accused products are "mutually exclusive due to non-medical criteria." There is simply no objective way the Court or TriZetto could identify the specific rules in TriZetto's database that would have to be removed to avoid infringement.

1.     **"Non-Medical Criteria" Lacks Ordinary Meaning And Is Not Defined In The Specification**

As an initial matter, the only guidance provided by the patent regarding "non-medical criteria" is from Claim 2 itself, which states that the "non-medical criteria" must be the basis upon which one medical service code on a medical claim is determined to be mutually exclusive with other codes on the claim. Ex. 1 ('164 patent), col. 117:28-30; *ACTV, Inc. v. Walt Disney Co.*, 346 F.3d 1082, 1088 (Fed. Cir. 2003) ("the context of the surrounding words of the claim must be considered in determining the ordinary and customary meaning of [a term]").[1] This provides no help in defining "non-medical criteria," and in fact further confuses the issue. Codes are generally mutually exclusive due to some medical relationship between them (e.g., one code is part of a procedure represented by the other code or proper medical practice would preclude both procedures from being performed together). Thus, at least in a majority of situations, it makes no sense for two codes to be mutually exclusive for some non-medical reason. The claims provide no hint as to why or how some code combinations would be improper for reasons not medical in nature.

The specification also provides no guidance in distinguishing "medical criteria" from "non-medical criteria." Indeed, the entire invention is directed to an "expert computer system for processing *medical* claims." Ex. 1 ('164 patent), Abstract. In other words, each and

---

[1]     During claim construction, at McKesson's urging, the Court did not construe the term "non-medical criteria," instead leaving the issue of indefiniteness to be decided in connection with invalidity. The Court construed the term "medical service codes" to mean codes representing medical services or procedures. D.I. 307, ¶ 2. The Court also construed a corresponding means-plus-function claim with similar language to Claim 2 as software programmed to perform the algorithms disclosed in the specifications performing the function of determining whether two medical service codes are exclusive due to non-medical criteria. *Id.*, ¶ 23.

every aspect of the claimed invention relates to medical bills. The specification also states "each of the rules was developed as a result of reviewing *medical* procedures by expert *medical* personnel and is consistent with the CPT-4 classification system. However, *expert medical personnel* also applied *clinical* judgment to situations where the CPT-4 classification system is not explicit or non-existent." *Id.*, col. 6:7-13 (emphasis added).

All of the algorithms set forth in the specification are generic, explaining rules that the system might use to evaluate to code-to-code relationships. The rules set forth in the specification provide no guidance for what criteria might be applied to these relationships, nor do they provide guidance as to distinguishing what the inventors considered to be "non-medical," as opposed to "medical" criteria.[2]

Similarly, the Court's construction of the term "predetermined database" makes clear that the claimed invention is based on expert *medical* judgment:

> "predetermined database is construed to mean:  'a set of decision-making rules that incorporate a medical code classification system and *expert medical clinical judgment*'."

D.I. 320, at ¶ 11 (emphasis added).

The fact that the term "non-medical" does not appear anywhere in the patent specification perhaps is not surprising. The term did not appear anywhere in the prosecution history until a 1991 amendment added the reference to "non-medical criteria" as part of two new

---

[2] The Court granted summary judgment in TriZetto's favor on the only other claim in the patent (Claim 14) that uses the term "non-medical criteria." D.I. 302. The Court did so based on the fact that McKesson's experts did not identify any corresponding structure to carry out the determining means. Specifically, with regard to the determining step of Claim 14 (which is identical to Claim 2, save for the "means for" language), the Court recognized that McKesson's experts have "never articulated what specific algorithm [is] disclosed in the '164 patent corresponding to" the non-medical determination.

claims. Ex. 2 (1991 Amendment), at 5-6. Even in that amendment, however, the prosecuting attorneys said nothing about what "non-medical criteria" means or the basis for the addition of the two new claims referencing mutually-exclusive determinations based on "non-medical criteria."

Because the specification itself fails to define "non-medical," or provide the slightest guidance as to what "non-medical criteria" might be, Claim 2's use of the term renders it indefinite. *See Acacia Media Technologies Corp. v. New Destiny Internet Group.*, 405 F. Supp. 2d 1127, 1138-39 (N.D. Cal. 2005) (claim term was indefinite where the specification failed to disclose the relationship between the "sequence encoder" and other claim elements); *Semmler v. American Honda Motor Co., Inc.*, 990 F. Supp. 967, 975 (S.D. Ohio 1997) (term "whenever engine is overrunning" indefinite because specification provided no fixed standard for determining when this criteria applied).

### 2. The Inventors Could Not Define "Non-Medical Criteria"

Not only is the specification devoid of any mention of non-medical criteria, but the term "non-medical criteria" also was meaningless to the named inventors, who presumably were persons of ordinary skill in the art.

REDACTED

_____

REDACTED

REDACTED

When pressed, the inventors provided wide ranging and inconsistent possible examples of what might be encompassed by the term "non-medical."

REDACTED

REDACTED

Moreover, the patent specification expressly states that computer-based systems that made determinations based on age or gender already existed in the prior art. Ex. 1 ('164 patent), col. 2:17-30. Thus, age and gender determination presumptions could not be the basis for Claim 2, if that claim is presumed to be valid.

### 3. McKesson And The Previous Owner Of The '164 Patent Have Relied On The Lack Of Any Clear, Objective Definition Of "Non-Medical Criteria" To Alter The Scope Of Claim 2 To Fit Their Needs

#### a. The Patent Owner's Original Position

Apparently relying on the lack of a definition for non-medical criteria in the patent, known to the inventers, or known in the art, McKesson and its predecessor-in-interest, HPR, have changed the scope of Claim 2 at will. As an initial matter, in 1994, in the GMIS litigation, HPR (McKesson's predecessor-in-interest) took precisely the opposite position as McKesson took at the infringement trial before this Court regarding the scope of Claim 2.

REDACTED

14

REDACTED

---

[4] To the extent that HPR was able to convince the HPR-GMIS court to accept its meaning for the term "non-medical criteria," McKesson should be estopped from advancing an inconsistent position before this Court.  "Where a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him.  *New Hampshire v. Maine*, 532 U.S. 742, 749, 121 S. Ct. 1808, 149 L. Ed. 2d 968 (2001); *see also United States v. Union Corp.*, 259 F. Supp. 2d 356, 390 (E.D. Pa. 2003) (party could not deny that it was the owner of property at issue where it held itself out as owner in two previous suits).  In the GMIS-HPR litigation, HPR attempted to show that the term "non-medical criteria" was not indefinite by advancing a specific meaning for the term.  To the extent that HPR was successful in establishing its asserted meaning for the term, McKesson and avoiding summary judgment, as HPR's successor in interest, should not be able to advance an inconsistent meaning.

In addition, if McKesson now tries to argue that its position is consistent with HPR's earlier position, the Court would have to vacate the jury's verdict of infringement because McKesson introduced no evidence at trial that TriZetto's systems determined "selected combinations of codes [were] inappropriate" due to place of service or cost factors unrelated to clinical criteria.

**b.    McKesson's Expert Changed The Scope of Claim 2
Throughout The Case**

REDACTED

REDACTED

That is, whether a procedure code is cosmetic and thus not covered by an insurance policy does not involve a comparison between codes, but rather a determination of whether a particular procedure (*i.e.*, one code) is cosmetic.[5]

By the time of trial, Dr. Musen had abandoned his single code examples of "non-medical," and testified that "unbundling" rules were non-medical. In particular, at trial, Dr. Musen first relied on Example 1 from Appendix A of the patent as a determination based on "non-medical criteria."[6] He testified that this example illustrated non-medical criteria because it represented a "billing convention." Ex. 10 (Trial Tr.), at 298:14-23.

Importantly, however, Dr. Musen's reliance on Example 1 from Appendix A of the patent is inconsistent with the plain language of the specification. Example A sets forth a rule whereby Code 64450 (injection for nerve block) is excluded from payment when submitted with 10120 (remove foreign body). Ex. 1 ('164 patent), col. 11-12. Dr. Musen testified that the reason for this exclusion was a "billing convention" because the charge for local anesthesia is included in the charge for the removal of a foreign object. The patent specification, however, gives the reason for the edit as "64550 [nerve block] *is inappropriate to use for local*

───────────────

[5]    REDACTED

[6]    The undisputed evidence at trial established that of the 18 examples in Appendix A of the patent, example 1 is the only one actually included in the accused products. Ex. 10 (Trial Tr.), at 872:1-10.

*anesthesia.*" Ex. 1 ('164 patent), col. 11-12. That is, according to the specification, the example involves a comparison between the code on the claim and the procedure that was actually appropriate to perform, e.g. local anesthesia versus a nerve block. Thus, the specification defines this example as being based on medical, not non-medical, criteria.

Dr. Musen also opined at trial that the manner in which the CPT manual required users to bill the repair of multiple wounds was an example of unbundling that constituted non-medical criteria. Dr. Musen testified,

> A:   In other words, whenever a clinician bills for repair of a laceration that is over 30 centimeters, then any other lacerations that might be on that patient do not justify a separate bill, they should all be bundled into the same charge. It's not that the lacerations don't exist, but the billing should be for one big one.
>
> Q:   So it's a non-medical criteria?
>
> A:   It's non-medical.

Ex. 10 (Trial Tr.), at 385:2-16. This unbundling example is of little help as McKesson acknowledges that many of the unbundling rules are "medical," and has provided no clear definition of which are medical and which are not.

REDACTED

In the face of conflicting examples from the inventors and even McKesson's own expert, it is readily apparent that the phrase "non-medical criteria" renders the boundaries of

Claim 2 ambiguous and subjective – the claim's scope depends on who one asks. The fact that individuals may be able to guess at or hypothesize about potential examples of "non-medical criteria" does not save Claim 2 from indefiniteness. In order to satisfy Section 112(2), a claim must provide an objective standard by which to compare potentially infringing products. *Datamize, Inc.*, 417 F.3d at 1353. For example, in *Datamize*, the disputed claim language was "aesthetically pleasing." In response to a charge of indefiniteness, like McKesson's expert here, the patentee offered expert testimony who gave *examples* of items that are aesthetically pleasing, but could not provide an objective standard for determining whether a particular device met the limitation. *Id.* at 1354. As in *Datamize*, the evidence here indicates no shortage of unrelated and often conflicting examples of "non-medical criteria," but no coherent definition or test that can be used to determine whether a rule or category of rules is based on non-medical criteria; there is nothing supporting a conclusion that the term reasonably delineates the metes and bounds of Claim 2.[7]

---

[7]    McKesson may argue that Claim 2 is not indefinite because TriZetto's expert was able to construe the claims in a general sense in order to render an opinion as to their obviousness.

REDACTED

### c.    McKesson Also Varied The Meaning Of "Non-Medical Criteria" Throughout The Case

Even outside the scope of Dr. Musen's testimony, McKesson failed to offer any objective definition of non-medical criteria.  Instead, like Dr. Musen, McKesson only attempted to offer potential *examples* of what might be considered "non-medical criteria."  In effect, whenever McKesson faced a problem with one of its earlier examples, it appeared to change course and, relying on the ambiguous nature of the phrase, simply offered up another possible example.  The hodge-podge of examples provided by McKesson demonstrate that the distinction between "medical" and "non-medical" is a nebulous distinction.  It is certainly of no value in attempting to distinguish between those rules that purportedly infringe Claim 2 and those that do not.  For example, McKesson's attorneys offered up the following definitions of "non-medical criteria" during depositions and at trial:

REDACTED

REDACTED

Not only were McKesson's myriad of examples varied and ever-changing, they were again inconsistent with HPR's earlier position, the patent specification, and the claim language.  First, there was no evidence that rejection of *a code* on a claim because it is not covered by a plan is something that is determined based on a comparison of codes on a claim.

REDACTED

REDACTED

In essence, McKesson has offered a series of shifting and changing examples that indicate that if "non-medical criteria" refers to anything, it refers to a catch all category of rules that defy definition. Perhaps the epitome of the complete undefined nature of the "non-medical criteria" – and Section 112 problem – is best evidenced by McKesson's conduct at trial. In particular, after both parties' experts had testified, McKesson apparently recognized that the above supposed "non-medical" examples may not carry the day for infringement or were fatally flawed. Accordingly, with its last witness (testifying out of order after TriZetto had nearly completed its case) and in closing, McKesson introduced – the first time it had done so with any witness or discovery response and two years into the case, almost thirteen years after the patent issued, and nearly eighteen years after the initial application was filed – yet another example of codes purportedly being mutually exclusive due to non-medical criteria – the example of "double billing." Ex. 10 (Trial Tr.), at 1038:10-11; 1038:19-1039:25; 1085:11-1087:8. That is, McKesson, on the last day of testimony, asserted that Claim 2 also covered claims "like the double billing issue. We don't need a doctor to tell us that and it's not exclusively a medical criteria to say that when you go visit a doctor, you should only be charged once for that visit. All right? We all know that. We don't – in life we don't want to be double-billed for anything . . ." Ex. 10 (Trial Tr.), at 1202:3-1203:4. McKesson's ability to continuously modify the scope of its issued claims in order to stop competition based on dubious claims of infringement is precisely the reason why Section 112 requires that a patentee "*particularly point[] out*" and "*distinctly*

*claim[]*" the subject matter of its invention.  McKesson's trial conduct undeniably proves that the patentees here did not do so.[8]

      **d.**    **The Indefiniteness Of The Term "Non-Medical Criteria"**
                  **Makes It Impossible For TriZetto's Competitors To Ensure**
                  **They Do Not Infringe**

Based on the patent owner's ever-changing, inapplicable, and contradictory examples of what criteria might fall within the scope of Claim 2, TriZetto – and any other competitor – is faced with a dilemma:  It must conduct itself so as not to infringe the '164 patent, but it cannot determine the scope of the patent because the term "non-medical criteria" lacks an objective meaning.  McKesson's own unwillingness to rely on a set and definitive definition for "non-medical criteria" unambiguously establishes the indefiniteness of Claim 2.  *See Semmler*, 990 F. Supp. at 975 (observing that patentee's proposed claim construction would render claim indefinite as it would permit patentee to change the scope of the claim at will).

In fact, if the Court were to order TriZetto to remove those rules from its database that infringe Claim 2, there is no basis for the Court or TriZetto to determine which of the admittedly small number of the rules must be removed.  As McKesson argued at trial:

> [T]here are a number, and *probably most of the relationships contained in the predetermined database are based on medical criteria.*  Whether one operation should be performed with another, that's clear.  There's no doubt about that, but there's also no doubt that in that database of thousands and hundreds of thousands of

---

[8]    As an additional example of the ever-changing scope of Claim 2, in closing, McKesson asserted that if something was "not exclusively a medical criteria," it could satisfy Claim 2's requirement that the determination be based on non-medical criteria.  Ex. 10 (Trial Tr.), at 1202:14-25.  In the GMIS litigation, however, HPR took the position that to be considered "non-medical criteria," the criteria had to be *unrelated to clinical criteria.*  Ex. 12 (Boyle Decl.), ¶ 15 (emphasis added); *see also* Ex. 13 (Miller Decl.), ¶ 15 (same).

> relationships, there are also rules based on non-medical criteria.
> Absolutely. And those rules are based on simple billing things.

Ex. 10 (Trial Tr.), at 1293: 16-25 (emphasis added). In other words, the only distinction that McKesson offers between infringement and lawful conduct is that "simple billing things" infringe. This is utterly not helpful. As the patent specification states, the entire claimed invention is directed towards "billing things." Ex. 1 ('164 patent), col. 3:15-18.

For example, based on Dr. Musen's testimony, McKesson would no doubt contend that TriZetto must remove some (but not all) of the rules prohibiting the unbundling of procedure codes, such as Example 1 from the patent. But Dr. Hertenstein's testimony, HPR's assertions regarding the scope of its patent, and the patent itself, would indicate that TriZetto is permitted to include all unbundling edits in its products without infringing Claim 2 because those edits are based on medical criteria.

Finally, the evidence at trial established that all of the rules in the accused products come from the medical consultants. Ex. 10 (Trial Tr.), at 798:9-15 (Hawley testimony), *id.*, at 1064:13-1065:12 (Lampe testimony); *id.*, at 1100:7-1103:12 (Bellomo testimony). It is not as if TriZetto has a set of medical rules it gets from the medical experts and another set of rules that do not come from those experts. There is simply no way in the real world that TriZetto can parse out what allegedly is a medical rule versus a non-medical rule. Thus, the undisputed evidence clearly establishes that the term "non-medical criteria" is too amorphous to impart Claim 2 with any objective metes and bounds. As such, Claim 2 fails as a matter of law to perform its most basic function – placing the public on notice of the extent of the conduct that the patent claim prohibits.

D.    **CLAIM 2 FAILS TO SATISFY THE WRITTEN DESCRIPTION REQUIREMENT OF SECTION 112(1)**

Even if the Court finds Claim 2 to be sufficiently definite, the '164 patent specification fails to adequately describe the claimed invention and Claim 2 is therefore invalid pursuant to 35 U.S.C. § 112, paragraph 1.

1.    **The Written Description Requirement**

Section 112(1) requires that a patent specification contain "a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art . . . to make and use the same." 35 U.S.C. § 112(1).  Furthermore, "the disclosure must . . . convey with reasonable clarity to those skilled in the art that . . . [the inventor] was in possession of the invention" at the time of the filing of his or her application.  *Purdue Pharma L.P. v. Faulding Inc.*, 230 F.3d 1320, 1323 (Fed. Cir. 2000) (citations and quotations omitted).  "[T]he [patent] description must clearly allow persons of ordinary skill in the art to recognize that [he or she] invented what is claimed." *Vas-Cath, Inc. v. Mahurkar*, 935 F.2d 1555, 1563 (Fed. Cir. 1991).  The claims themselves determine what must be described pursuant to these requirements.  *Id.*

Here, the specification fails to describe which determinations, if any, are supposedly made based on non-medical criteria.  In fact, the only description of the claimed invention contained in the specification states that the disclosed system makes determinations of appropriateness based on medical, not non-medical criteria.  As such, there is no basis for one to conclude that the inventors were in possession of a system or method that made determinations that two codes were mutually exclusive due to non-medical criteria as required by Claim 2 at the time they filed their original patent application.

**2.    The Specification Fails To Describe The Method Set Forth in Claim 2**

Nowhere in the 116-column specification of the '164 patent is there any mention of the term "non-medical criteria," or even any suggestion that any of the described edits are based on non-medical criteria. *See generally* Ex. 1 ('164 patent).   To the contrary, the specification repeatedly refers to the decisions contained in the knowledge base as being determinations of "*medical*[] appropriate[ness], or . . . *medical*[] inappropriate[ness]" based on the careful and extensive application of expert medical analysis and medical clinical judgment. Ex. 1 ('164 patent), cols. 5:60-17 (emphasis added); *see also id.*, col. 2:42-64 (describing the background of the invention replacing the need for claims payors to have enough trained medical physicians available to apply medical judgment to every claim received).

The examples in Appendix A provide no description of "non-medical" criteria, nor is there any reference to any of those examples being non-medical.  Nor is there anything helpful in the generic categories of rules in Appendix B.  That Appendix breaks down the "Rules Applied to Multiple Codes" into four categories:  "replace rules," "exclude rules," "limit rules," and "query rules."  There is no distinction whatsoever based on "medical" versus "non-medical" rules.[9]

In short, Claim 2 is invalid because "what is claimed by [Claim 2] is not the same as what is disclosed in the patent['s] specification[]."  *Karol v. Burton Corp.*, 234 F. Supp. 2d 450, 457 (D. Vt. 2002).  For example, in *Karol*, the patents claimed a binding for a snowboard

_____

[9]    REDACTED

that was activated by downward pressure. The specifications, however, described bindings entailing "various forms of door latch mechanisms." *Id.* at 457. Critically, the invention described in the specification differed from that described in the claims in that the claims set forth a binding that was activated solely by the downward pressure of the rider's boot, while the specifications described bindings that required application of force from a second source, other than the boot's downward movement into the binding. *Id.* at 454. The court held the patents invalid as a matter of law for failure to satisfy Section 112(1). As in *Karol*, Claim 2 sets forth one alleged invention – a process using "non-medical criteria" – and the specification discloses something wholly different – an "expert system" that allows claims to be edited based on rules that were designed by medical experts and example after example of rules applying medical clinical judgment and medical criteria. Thus, one skilled in the art could not read the specification and conclude that the inventors of the '164 patent had the process described in Claim 2, including a workable definition of "non-medical," in their possession at the time of the original application. *Cf. LizardTech, Inc. v. Earth Res. Mapping, Inc.*, 424 F.3d 1336, 1345 (Fed. Cir. 2005) (claim encompassing all methods for making a calculation was invalid for failure of written description where specification described only one such method).

The fact that the inventors of the '164 patent did not have in their possession a method that made determinations based on non-medical criteria is further supported by the patent's prosecution history. The originally-filed claims of the '164 patent only covered a system and method that made determinations of medical appropriateness of the procedure codes submitted on medical claims. Ex. 3 (Original Application), at 26-27. The first time that any of the rules were described as being based on non-medical criteria was in an amendment filed during the prosecution of the second continuation application three years later. Ex. 2 (1991

Amend.), at 4-5.  That amendment provides no guidance as to what "non-medical criteria" means.  The fact that the original claims described only medical rules combined with the specification's lack of disclosure, compels summary judgment here.  *Cf. TurboCare Div. of Demag Delaval Turbomachinery Corp. v. GE*, 264 F.3d 1111, 1119 (Fed. Cir. 2001) (patent was invalid for failure to satisfy written description requirement because original specification failed to describe matter claimed by a subsequent amendment).

## V.    CONCLUSION

For the foregoing reasons, TriZetto respectfully requests judgment as a matter of law that Claim 2 of the '164 patent is invalid for failure to meet the definiteness requirement of 35 U.S.C Section 112(2) and, alternatively, the written description requirement of Section 112(1).

MORRIS, NICHOLS, ARSHT & TUNNELL LLP


*/s/ Rodger D. Smith, II*                        _____
Jack B. Blumenfeld (#1014)
Rodger D. Smith, II (#3778)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
 *Attorneys for Defendant The TriZetto Group, Inc.*

OF COUNSEL:

Jeffrey T. Thomas
David A. Segal
Michael A. Sitzman
GIBSON, DUNN & CRUTCHER LLP
Jamboree Center
4 Park Plaza
Irvine, CA  92614-8557
(949) 451-3800

Original Filing Date:  June 1, 2006
Redacted Filing Date:  June 7, 2006

522999 V2

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on June 7, 2006, I caused to be electronically filed the Opening Brief in Support of the TriZetto Group, Inc.'s Motion for Summary Judgment of Invalidity for Indefiniteness and Failure to Adequately Describe the Claimed Invention (Redacted Version) with the Clerk of the Court using CM/ECF, which will send notification of such filing(s) to the following:

> Michael A. Barlow
> Skadden, Arps, Slate, Meagher & Flom LLP

I also certify that copies were caused to be served on June 7, 2006, upon the following in the manner indicated:

### BY EMAIL AND HAND

> Michael A. Barlow
> Skadden, Arps, Slate, Meagher & Flom LLP
> One Rodney Square
> Wilmington, DE 19801

### BY EMAIL AND FEDERAL EXPRESS

> Jeffrey G. Randall
> Skadden, Arps, Slate, Meagher & Flom LLP
> 525 University Avenue
> Suite 1100
> Palo Alto, CA 94301

> */s/ Rodger D. Smith II (#3778)*
> Morris, Nichols, Arsht & Tunnell LLP
> 1201 N. Market Street
> P.O. Box 1347
> Wilmington, DE 19899
> (302) 658-9200
> rsmith@mnat.com