# EXHIBIT 4

REDACTED

# EXHIBIT 5

REDACTED

# EXHIBIT 6

REDACTED

# EXHIBIT 7

REDACTED

# EXHIBIT 8

REDACTED

EXHIBIT 9

REDACTED

# EXHIBIT 10

Jury Trial - Volume B                CondenseIt™                Tuesday, April 18, 2006

Page 242

```
 1              VOLUME B
 2        IN THE UNITED STATES DISTRICT COURT
 3        IN AND FOR THE DISTRICT OF DELAWARE
 4              - - -
 5  McKESSON INFORMATION SOLUTIONS    :  CIVIL ACTION
    LLC,                             :
 6              Plaintiff            :
 7        vs.                        :
 8  THE TRIZETTO GROUP, INC.,        :
 9              Defendant            :  NO. 04-01258 (SLR)
10              - - -
11              Wilmington, Delaware
                Tuesday, April 18, 2006
12              8:30 o'clock, a.m.
13              - - -
14  BEFORE:  HONORABLE SUE L. ROBINSON, Chief Judge, and a jury
15              - - -
16  APPEARANCES:
17        SKADDEN, ARPS, SLATE, MEAGHER & FLOM
          BY:  MICHAEL BARLOW, ESQ.
18
              -and-
19
          SKADDEN, ARPS, SLATE, MEAGHER & FLOM
20        BY:  JEFF RANDALL, ESQ.,
               BERNARD SHEK, ESQ. and
21             MICHAEL HENDERSHOT, ESQ.
               (Palo Alto, California)
22
                 Counsel for Plaintiff
23
                 Valerie J. Gunning and
24               Leonard A. Dibbs,
                 Official Court Reporters
25
```

Page 243

```
 1  APPEARANCES (Continued):
 2
          MORRIS, NICHOLS, ARSHT & TUNNELL
 3        BY:  JACK B. BLUMENFELD, ESQ.
 4
              -and-
 5
 6        GIBSON, DUNN & CRUTCHER LLP
          BY:  JEFFREY THOMAS, ESQ. and
 7             DAVID SEGAL, ESQ.
               (Irvine, California)
 8
 9            -and-
10
          GIBSON, DUNN & CRUTCHER LLP
11        BY:  MICHAEL SITZMAN, ESQ.
               (San Francisco, California)
12
                 Counsel for Defendant
13
14            - - -
15
16
17
18
19
20
21
22
23
24
25
```

Page 244

 1                    PROCEEDINGS
 2
 3
 4        (Proceedings convened at 8:30 a.m., and the
 5  following occurred without the presence of the jury.)
 6        THE COURT: Good morning, counsel.
 7        (Counsel respond "Good morning, your Honor.")
 8        THE COURT: I guess you can lay out what
 9  issues we need to address in what order. I have an idea
10  of what we need to address today, but I will let you be
11  the ringmasters here.
12        Are we all set with depositions? I
13  understand from the e-mail that at least some of these
14  depositions are going to go forward, consistent, I hope,
15  with my guidelines.
16        Mr. Randall?
17        MR. RANDALL: Yes, your Honor. We have --
18  we've gone through the transcripts and we have at least
19  done our best to take out questions that referenced
20  either the patent or the claims in the questions, also
21  any questions that referenced the term predetermined
22  database.
23        We have done our best to remove those and
24  have made our designations and have given them to the
25  other side. With respect to proceeding this morning

Page 245

 1  in terms of the witnesses, we'd like to call our expert,
 2  Dr. Musen, to the stand. The only issues with respect
 3  to his testimony are the submission within the Court's
 4  guidelines prior to 48 hours before he took the stand,
 5  we sent over screen shots that were previously disclosed
 6  to counsel and videos of what are represented by the
 7  screen shots. Basically, the screen shots fading into
 8  each other.
 9        So we provided those. The only objection
10  we got was we're objecting to the extent that you
11  intend to go beyond the scope of his report. It's
12  really just a restatement of the rule that you made
13  very clear to both sides. We don't intend to violate
14  that rule, so we -- they really didn't make any
15  objection to the substance of those documents.
16        And then the other issues that we would
17  like to bring up would be, one, a brief, brief argument
18  regarding Document J issue. And then raise issues with
19  respect to Trizetto's attempts to put witnesses and
20  evidence on during their case. Specifically, Ms.
21  Wukitch, who is here regarding our infringement case.
22  She is an employee of McKesson. She really does not
23  have any information relating to the operation of the
24  products.
25        We've asked them if there's anything that's

Jury Trial - Volume B            CondenseIt™            Tuesday, April 18, 2006

Page 298

1      Thank you.
2  BY MR. HENDERSHOT:
3  Q.  So in this example, Dr. Musen, the physician
4  administered an anesthetic agent?
5  A.  That's right.
6  Q.  Is that a good idea if someone has something
7  imbedded in their arm?
8  A.  It's essential.
9  Q.  All right.
10  A.  Most people prefer anesthesia.
11  Q.  Okay.  So they administer the anesthesia.  So for
12  medical purposes, the anesthesia was necessary?
13  A.  Absolutely.
14  Q.  But because of some billing convention, there's
15  some other non-medical reason it shouldn't be paid?
16  A.  Right.  The billing convention, the cost of the
17  anesthesia is included in the overall service.
18  Q.  There are circumstances where codes may accurately
19  in general describe and appear to describe what services
20  were administered to a patient that would have been
21  completely medically appropriate but nonetheless shouldn't
22  be paid for some reason?
23  A.  Right.  Indeed, the physician, when he writes his
24  note that describes what happens in the office will
25  describe in great detail what kind of anesthesia was

Page 299

1  administered.  Will indicate that there was a nerve block
2  that was performed to numb up the area before surgery
3  was done.  So the medical documentation includes all the
4  information about the anesthesia.  It's just not an
5  appropriate billing code for the form that gets submitted
6  to the anesthesia.
7      MR. HENDERSHOT:  Let's go back one slide,
8  please.  Go back one more.
9      Actually, go back four.  Sorry about that.
10  BY MR. HENDERSHOT:
11  Q.  So in this example, Dr. Musen, there are two
12  medical service codes submitted on the claim?
13  A.  That's correct.
14  Q.  And there's a charge associated with the entire
15  claim, which is $159, I believe you saw in the example?
16  A.  That's correct.
17  Q.  Where did that total charge come from?
18  A.  There was a line item for the anesthesia and a line
19  item for the removal of the foreign body.
20  Q.  So each item on a claim or medical service code on
21  a claim will have a corresponding charge with it; is that
22  correct?
23  A.  That's correct.
24  Q.  And the sum of those charges result in the total
25  claim that's being submitted?

Page 300

1  A.  Right.  It's like going to a restaurant and getting
2  a bill.  You get a bill for your salad.  You get a bill
3  for your entree.  You get a bill for desert.  That's
4  just what a medical claim is.
5  Q.  So each of the items correlate in that example to
6  a medical service code whereas the entire bill for the
7  meal is the claim?
8  A.  That's right.
9  Q.  In this instance, the restaurant tried to charge
10  for the silverware?
11  A.  Yes.  That's part of the deal.  You don't expect
12  to pay for silverware rental when you go to a restaurant.
13  Q.  So in this example, one of the codes should have
14  been paid, one of them shouldn't?
15  A.  Exactly.
16  Q.  What is the end effect of that in this example?
17  A.  What ultimately happens is that the insurance
18  company ends up paying more for the service than is
19  appropriate and we assume that means the premium of
20  the patient would go up in the grand scheme of things.
21  Q.  So who, in general, bears the cost of increased
22  health care expenses like this additional payment here?
23  A.  Well, we all do because it means either the cost
24  of Medicare goes up or the cost of private insurance
25  goes up and, in every case, that gets passed on to the

Page 301

1  recipients in terms of more taxes or more premiums.
2  Q.  Now, we've seen a single example with two codes
3  here?
4  A.  That's correct.
5  Q.  You mention there are 10,000 codes or so, roughly,
6  in the CPT manual?
7  A.  That's right.
8  Q.  That sounds like millions of combinations to me?
9  A.  That's right.  That's why coding is so complicated
10  and that's why it takes specialists to do it.
11  Q.  So we've seen one example.  Is the potential for
12  overpayment due to miscoding, is that a significant risk
13  to the national health care industry?
14  A.  Well, in Trizetto's product or sales literature, it
15  says that customers can expect a 5 to 15 percent savings
16  if they can identify these kinds of situations.
17  Q.  5 to 15 percent, if you apply that to national health
18  care costs generally, do you have any ball park
19  where that would get us?
20  A.  I'm not a health economist.  If you think health
21  care costs 14, 15 percent of the gross domestic product
22  annually, that's millions or billions of dollars that
23  might be saved.
24  Q.  That's millions or billions of dollars that might
25  be saved and passed on to patients and people like us?

Page 382

1 on this claim based on your explanation earlier?
2 A. That's correct.
3 Q. And is one of them 12036?
4 A. Right. 12036 is a particular code for repair of
5 a laceration. I believe 20 to 31 centimeters and I
6 don't have it memorized.
7 Q. Okay. I forgive you that.
8      There's an arrow on what has been labeled
9 Line 2?
10 A. Line 2 refers to a different procedure code for
11 12037, which is the cost of repairing a really big
12 laceration. As I recall, it's more than 31 centimeters.
13 Q. Okay. So if you -- I believe you discussed this
14 description as to the procedure here under the line item
15 table.
16 A. Yes. Okay. Oh, that is very helpful.
17      So Line 2 is, indeed, repair of a laceration
18 of the scalp or trunk or extremity and that's over 37
19 centimeters in length.
20 Q. So this is a situation where you, as you had
21 discussed, multiple lacerations, repair of multiple
22 lacerations are being submitted on a claim?
23 A. That's correct.
24 Q. And this slide is taken from an example you were
25 able to run at Facets?

Page 383

1 A. Exactly.
2      MR. HENDERSHOT: Would you bring up Exhibit
3 1125?
4 BY MR. HENDERSHOT:
5 Q. Dr. Musen, do you recognize what Exhibit 1125 is?
6 A. Yes. It's an example of Facets doing the right
7 thing.
8 Q. It --
9 A. It shows you the two codes, 12036 and 12037, and
10 generates the error message that tells you the two
11 codes appropriately should be bundled into a single
12 code.
13 Q. In this example, one did 12036 represent?
14 A. 12036 was repair of a smaller size laceration and
15 according to CPT coding convention, when you have two
16 lacerations and you repair both of them, then you only
17 get credit for the total length or, in this case, you
18 get credit for a very large laceration greater than 30
19 centimeters.
20 Q. So the doctor in this example treated two
21 lacerations?
22 A. That's correct.
23 Q. But should have billed for one?
24 A. That is correct.
25 Q. Which corresponds to this 12037?

Page 384

1 A. Right. And we have to be a little bit careful
2 about the language. It's not that the doctor should
3 have billed for one laceration. The one laceration on
4 the form doesn't really exist anatomically. It's not
5 a medical reality of the patient. It's simply the way
6 that one bills when there are multiple injuries and one
7 does multiple repairs.
8 Q. All right. So the billing convention as an example
9 is divorced from the medical condition of the patent?
10 A. Right.
11 Q. The patient?
12 A. Exactly.
13      MR. HENDERSHOT: Could you pull up Slide
14 1126?
15 BY MR. HENDERSHOT:
16 Q. Do you recognize this screen?
17 A. Yes.
18 Q. Is this also from your example?
19 A. It's also from my example and also from Facets.
20 Q. Okay. It says clinical editing criteria indicative
21 for 12037?
22 A. Correct.
23 Q. We also see the subset category again?
24 A. Yes.
25 Q. Have we discussed that before today?

Page 385

1 A. Yes.
2 Q. Is there any relevant information with respect to
3 this information underneath that tab?
4 A. Yes. The same Subset 1 relationship exists between
5 the ten medical service codes that we see in that open,
6 open box, dialogue box that we saw in relationship to
7 the code for the surgical excision of the foreign body.
8 In other words, whenever a clinician bills for repair
9 of a laceration that is over 30 centimeters, then any
10 other lacerations that might be on that patient do not
11 justify a separate bill, they should all be bundled
12 into the same charge.
13      It's not that the lacerations don't exist,
14 but the billing should be for one big one.
15 Q. So it's a non-medical criteria?
16 A. It's non-medical.
17 Q. Did any of these play into the process we saw by
18 Facets?
19 A. Absolutely. Any of those other codes on the claim
20 form would be disallowed and the one that we approved
21 would be the one for the laceration greater than 30
22 centimeters.
23 Q. Okay. So -- and because 12036 is included on this
24 list of relationships?
25 A. That's correct.

Page 390

1 Q. Is this from the QicLink system?
2 A. Yes.
3 Q. And is this from the example that you observed?
4 A. Yes. This is the example that I observed at
5 QicLink.
6 Q. All right. I believe we discussed earlier that
7 the medical service codes are -- that have been received
8 are indicated on the bottom half of the screen?
9 A. That is correct.
10 Q. Could you explain what's indicated here for this
11 claim?
12 A. Right. There are two -- it turns out two entries
13 for Code 12032, which is a small laceration. One for
14 the intermediate laceration of 12035 and one for the
15 big laceration, which is 12036, but not for the code
16 that corresponds to lacerations greater than 30
17 centimeters.
18 Q. All right.
19 A. You'll notice each one has a particular charge as
20 well, and the total charge for the unbundled bill is
21 $838.75.
22 Q. So to this point in the processing, has QicLink
23 received a claim?
24 A. Yes.
25 Q. It has a -- has it numbered the codes?

Page 391

1 A. It has numbered the codes.
2 Q. But they've yet to be processed?
3 A. That is correct.
4     MR. HENDERSHOT: Would you bring up Exhibit
5 1268?
6 BY MR. HENDERSHOT:
7 Q. Do you recognize this screen, Dr. Musen?
8 A. Yes, I do.
9 Q. Could you explain what's being displayed in the
10 ClinicaLogic messages?
11 A. Right. It's the same kind of message we've seen
12 previously from QicLink and the other TriZetto products.
13 It says when performed on the same lesion or site,
14 Code 12032 is usually considered part of a more
15 comprehensive procedure and billed using Code 12037.
16 If in doubt, have the physician review the claim.
17     So it's beginning to bundle up those codes
18 into the code for the large laceration.
19 Q. And that's based on the billing convention you
20 discussed?
21 A. That's right. It's not the patient's laceration
22 has disappeared, it's just the way it's billed.
23     MR. HENDERSHOT: Can we bring up Exhibit
24 1269?
25

Page 392

1 BY MR. HENDERSHOT:
2 Q. Dr. Musen, it says the procedure being explained
3 here is 12035.
4 A. We're going pretty fast.
5 Q. Yes. Go back to Exhibit 1269.
6     So, again, do you see the original procedure
7 number here, Dr. Musen?
8 A. That's correct.
9 Q. What does that indicate to you?
10 A. That the -- that the Procedure 12035 has been
11 determined to be invalid and been rejected and it's
12 going to ultimately be bundled with the 12037 code we
13 mentioned earlier.
14 Q. It's the same sort of determination?
15 A. Same sort of determination.
16 Q. Can we pull up Exhibit 1270? That's the one we
17 were getting a glimpse of.
18 A. And so we see the same logic being applied to Code
19 12036.
20 Q. Okay. So in your view of the processing of this
21 claim and the QicLink system, could you explain what
22 happened to the claim and the processing?
23 A. Right. The patient had four separate lacerations.
24 The provider billed separately for each of the four
25 lacerations, was able to generate a bill for over $800.

Page 393

1 The QicLink product -- all the TriZetto products were
2 able to see through this unbundling of the bills,
3 recognized that it was appropriate not to issue payment
4 for each laceration, but to give the appropriate payment
5 for the sum total, and replace the codes that were on
6 the claim form with 12037, which is a code for any
7 laceration repair involving a sum total of more than
8 30 inches of suturing.
9 Q. And were you able to draw any conclusions
10 regarding the relationship between the processing of
11 the three systems?
12 A. Well, the three systems operate on the same
13 database that we saw for the example of the foreign
14 body and the anesthesia. In all examples, it was able
15 to identify codes that should be mutually exclusive.
16     They were mutually exclusive because
17 non-medical criterias, essentially how one does the
18 billing, not what the anatomy of the patient is, and in
19 all cases they rejected the initial claim, made edits
20 to the claim and then approved the claim as it was
21 reconstituted.
22 Q. So, Dr. Musen, you've had the opportunity to review
23 and analyze Claim 2 of the '164 patent?
24 A. Yes, I have.
25 Q. Have you reached any conclusions as to whether or

Page 797

1 A. Yes. This appears to be our initial proposal,
2 which includes nine types of edits.
3 Q. Did the edits change? Did they grow and get
4 modified? Is that what I'm understanding?
5 A. Erisco, in back and forth discussion, added a few
6 additional edits.
7 Q. Okay. If we flip a couple more pages further,
8 Page 38, it looks like it describes in detail each of
9 the edits. I'm looking at number one there, where it
10 says age not consistent with procedure.
11 A. That's correct.
12 Q. That was one of the edits that PACE created for
13 Erisco?
14 A. Yes, it was.
15 Q. Can you describe that for us? Let's talk about
16 that one in a little detail.
17        What does that generally describe?
18 A. Well, when we talk about a procedure, I'm referring
19 to a medical service code or surgical code contained
20 within the CPT nomenclature and the age not consistent
21 with procedure was an edit designed to determine the
22 age range beyond which a procedure might commonly be
23 done.
24        So if you ended up with a medical claim that
25 had an age that was unusual or inappropriate for the

Page 798

1 procedure that was performed, it would identify that
2 fact for the claims processor.
3 Q. Now, there's one description in here -- oh, I'm
4 sorry. The two bullet points. The usual age range of
5 patients undergoing the procedure, the boundaries of
6 age beyond which it is unlikely that the procedure would
7 be performed.
8 A. That's correct.
9 Q. Those were the parameters that you used to create
10 the rules?
11 A. Yes. Now, when you say that I used, I had to rely
12 on our physician consultants and a panel of physician
13 advisors because I don't know enough about each category
14 of medicine and surgery to be able to define what the
15 appropriate age range might be.
16 Q. Okay. I meant it in terms of PACE.
17 A. Okay.
18 Q. But thank you.
19        Can you give me an example, Doctor, of one
20 of the rules you or PACE, PACE created that would fall
21 into this category of age not consistent with procedure?
22 A. Yes. I offer two examples in that lower -- in
23 that bottom paragraph, the notion of a C section and
24 cataract surgery, and I chose those two examples because I
25 think they're generally easy to understand. There are

Page 799

1 many examples in the CPT nomenclature that are far
2 more difficult and even these caused some considerable
3 back and forth discussion and even in some cases debate
4 about where to define those age ranges.
5 Q. Can you give us an example of one of the more
6 difficult ones that you or the PACE people that were
7 working on the database had to confront that fell into
8 this category?
9 A. Well, one example would be a meatotomy. I
10 apologize in advance for a somewhat graphic example, but
11 it portrays the point.
12        The urethra, the passageway through which
13 urine leaves the body, sometimes can become obstructed
14 and a meatotomy is a procedure used to relieve that
15 obstruction and allow urine to flow normally. There
16 are two codes for meatotomy. One having to do with a
17 meatotomy in an infant and the other a meatotomy in a
18 patient other than an infant.
19        I vividly recall this example because, even
20 as a pediatrician, I looked at it and I didn't know the
21 reason that they chose to draw some dividing line
22 between infants and non-infants and why that made a
23 difference. And, further, I wasn't certain how they
24 were defining the term infant.
25        And it was through discussion with, it so

Page 800

1 happened our urologist, that I learned that meatotomies,
2 that is the procedure to relieve this obstruction, when
3 it's done in an infant, it's often for and to relieve
4 an obstruction that was present at birth, so-called
5 congenital problems, which can be more complex than the
6 obstructions that occurred later.
7        I'm sure there was more to it than that, but
8 that's what I happen to recall.
9        I remember there being a lot of discussion
10 about, okay, if that's the case, where do we draw this
11 line? Do we say a meatotomy on an infant is
12 appropriate up to the age of one month? Presuming it
13 was present at birth, you would hope that surgery was
14 done soon, or is it later? And there are a lot of
15 confounding issues. Therefore, example, maybe it was
16 a partial obstruction and maybe it wasn't diagnosed
17 even on this infant who had it at birth, maybe it
18 wasn't diagnosed until six, seven months of age or
19 later.
20        Well, we did not want to be responsible for
21 creating a database that inappropriately rejected
22 medical claims for services that were medically necessary
23 and appropriate, so defining where to draw that
24 appropriate age guideline, that threshold, that age
25 boundary for these procedures, I recall it involved a

Page 869

1  So then you would have to say, good. Please
2  make the determination. Is the number that you
3  determined by the counting greater than one or not?
4  And I don't mean this in a kind of figural sense or
5  metaphysical sense. There is a separate computer
6  instruction. There is a computer instruction for
7  counting and there's a separate and distinct computer
8  instruction which says now take the number you got by
9  counting and compare it to one.
10  Now let's admit, that's not rocket science.
11  That's not a complicated computer instruction. It
12  just happens to be a separate and distinct one, which
13  is why counting is not the same as determining
14  plurality.
15  Q. Dr. Musen indicated that he was going to rely on
16  Dr. Johnson's analysis of the code to determine whether
17  or not the ascertaining step was in the TriZetto
18  products.
19  Was there something in Dr. Johnson's
20  deposition about her understanding of the word plurality
21  that might raise a concern about Dr. Musen's reliance on
22  Dr. Johnson?
23  MR. RANDALL: Objection, your Honor. I don't
24  know that her deposition is relevant. I know that you
25  made a ruling about her report.

Page 870

1  THE COURT: Well, if you are talking about
2  literally, there was no mention in Dr. Musen's
3  testimony that you pointed to me that referred to her
4  deposition, so I will say the objection is sustained.
5  MR. SEGAL: Okay. Thank you, your Honor.
6  BY MR. SEGAL:
7  Q. Let's move on. Is anything in the '164 patent
8  specification that -- you know, the part that we all
9  learned comes before the claims. There are lots of
10  pages describing the invention and the last two pages
11  are the claims.
12  Is there anything in that part before that
13  hopefully everyone on the jury is going to love to read
14  some day that supports your opinion?
15  A. Yes.
16  Q. And what is that? Actually, you know what, before
17  we get to that, let me ask you just a foundational
18  question. Do you agree with Dr. Musen, that the patent
19  specification, although it can't change the words of
20  the claim, it does provide guidance as to what the terms
21  in the claim mean?
22  A. Yes.
23  Q. Where in the patent spec do you want us to turn?
24  A. I'd like to look at Figure 2 as a way of
25  understanding the meaning of the terms.

Page 871

1  Q. Okay. I think the jury all has that and probably
2  knows this figure real well since we've put it up a
3  couple times. Trial Exhibit 1, Figure 2.
4  What does Figure 2 show us?
5  A. Figure 2 is what's called a flow chart, which is a
6  graphical way of, as I suspect some of you know, is a
7  graphical way of indicating the sequence of steps that
8  a program should carry out in order to accomplish a
9  particular task.
10  Q. And whose program is depicted by these steps?
11  A. This is the program that the inventors created as
12  what I understand is called the preferred embodiment.
13  Inventors are, is as I understand it, asked to indicate
14  the best way to create the invention that's described
15  in the patent, and this flow chart is part of what
16  they developed as a description, as their description
17  of the preferred embodiment.
18  Q. But I thought Dr. Musen told you that Example 1
19  was the best example in the patent.
20  A. Well, Example 1 is exactly that: It's an example.
21  It's an example in the appendix to the patent indicating
22  how the program performed. It's only one of 18 examples
23  that are in the patent and it's an example out of its
24  behavior. It's not like Figure 2, a description of
25  how to actually build the invention.

Page 872

1  Q. By the way, you said there are 18 examples in
2  the appendix. Did you happen to run the other 17
3  examples that Dr. Musen didn't run?
4  A. I asked that those other 17 examples be run.
5  Yes, I did.
6  Q. And what were the results?
7  A. The example number one is the only one that the
8  Facets program produces the same result. In the other
9  17 examples, the Facets program produces a different
10  result.
11  Q. Well, does that mean we can all go home? We
12  can't infringe because we don't match the other 17
13  examples?
14  A. No. That's only about the, once again, that's
15  about the external behavior of the program and the
16  external behavior of the program on a particular -- on
17  particular medical examples is not teaching us the
18  details of the step the program carries out.
19  Q. If the jury went to the other answer, we'll have
20  to proceed.
21  All right. Now, are you saying that in
22  order to infringe the steps of Claim 1 -- Claim 2 of
23  the patent, that TriZetto would have to have a figure
24  that's programmed that performs exactly the steps
25  shown in Figure 2?

Page 873

1  A.  No.  I'm not talking about Figure 2 as being the
2  only way to carry out the steps in the program.  That is
3  not the point of this discussion.
4  Q.  Then what are you saying?
5  A.  I want to use this as a way of understanding clearly
6  what the inventors meant by -- sorry.  Let me say that
7  again.
8          I want to use this as a way of understanding
9  clearly what the meaning of the patent term -- one more
10 time.
11         I want to use this as a way of understanding
12 clearly the words that are used in the claim of the
13 patent.
14 Q.  I feel better for not -- for having a partner in
15 the stumbling, so this is good.
16         Did you ask that some graphics be prepared
17 to illustrate your opinion about why Figure 2 is
18 important in your opinion that TriZetto does not perform
19 the ascertaining step of Claim 2?
20 A.  Yes.
21 Q.  Okay.
22     MR. SEGAL:  If we can put up Graphic 2,
23 please...
24 BY MR. SEGAL:
25 Q.  I will ask the witness to explain what's shown

Page 874

1  here.
2  A.  We have on the left-hand side of the screen a
3  small version of the patent claims and then blown up
4  at the top right, one phrase out of patent Claim No.
5  2, which also happens to appear in patent Claim 16
6  with the identical wording.  That phrase, that claim
7  element is, ascertaining whether the at least one claim
8  contains a plurality of medical service codes.  That's
9  what's shown there.
10        And then --
11 Q.  If I may just interrupt, is Box 20 what you're
12 saying is one implementation of ascertaining a plurality?
13 A.  As I was about to get to --
14 Q.  Sorry.
15 A.  -- on the lower part of the screen is Figure 2, and
16 we have highlighted Box 20, which is one implementation
17 of what it means to ascertain whether the at least one
18 claim contains a plurality of medical service codes.
19 Q.  By the way, did Dr. Musen agree with you that Box
20 20 is actually ascertaining whether there is a plurality
21 of codes on the claim?
22 A.  That's my recollection of his testimony, yes.
23 Q.  Okay.  Continue.  I'm sorry.
24 A.  All right.  Let's go to the next slide, please.
25        That is simply reminding you that there is

Page 875

1  consequences to making the decision.  The important
2  point here is that ascertaining is making a yes or no
3  distinction.  That's really what I'm focusing on here.
4          Next slide, please.
5          Now, what I'd like to do is look at another
6  part of the patent specification.  In this case, I'd
7  like to take a look -- next slide -- at this box.  This
8  box just above Box 20 is Box No. 7.  It says entry
9  program.  And that's a kind of abbreviation.  That's a
10 way of saying there's a bunch of processing that
11 happens here regarding data entry.  So what I'd now
12 like to do is use Figure 1.
13 Q.  Figure 3, I believe.
14 A.  I'm sorry.  Figure 3.  My mistake.
15         Use Figure 3, which is a blowup of Box No.
16 7.
17 Q.  Since the jury has not seen Figure 3 before, can
18 you explain what Figure 3 is showing?
19 A.  Figure 3 is another flow chart.  Figure 3 is the
20 flow chart that describes the processing in the
21 preferred embodiment, one way of implementing the
22 patented invention, dealing, in particular, with data
23 entry.
24         If you will look at Box No. 9, for example,
25 it says, read and validate the code.  It then goes on

Page 876

1  and does some other things.
2          The important point here is Figure 3 is an
3  expansion of what goes on in Box 17.  Box 17 is just a
4  kind of shortcut.
5          Now, on the next slide -- you're a step
6  ahead of me.  On the next slide we have highlighted the
7  last two boxes in Figure No. 3, Box 18 and 19, because
8  I'd like to call your attention to those.
9          Box 18 says, count the number of codes.
10 Box 19 says, return.  That's just a way of saying,
11 remember we expanded Box 7 to say this is what is
12 inside it, and the return just says, now go back to
13 where you were before you expanded the box.
14         So to indicate that graphically on the next
15 slide, for the moment I'm just going to isolate those
16 two steps, put them back into the context of the
17 processing, so that's what would happen as the entry
18 program got finished.  It would count the number of
19 codes and then go back to the rest of the flow chart.
20         And in the next slide, I'm going to make
21 that real big so we can read it.  Okay?  And I want
22 to consider those three boxes out of the preferred
23 embodiment in patent description.
24 Q.  So we have Box 18 and 19 from Figure 3 and Box 20
25 with yes, no from Figure 2?

Jury Trial - Volume E                    CondenseIt™                    McKesson v. TriZetto

Page 977

```
1              - VOLUME E -
        IN THE UNITED STATES DISTRICT COURT
2
        IN AND FOR THE DISTRICT OF DELAWARE
3
                    - - -
4
McKESSON INFORMATION SOLUTIONS   :    CIVIL ACTION
5 LLC,
            Plaintiff            :
6
        vs.                      :
7
THE TRIZETTO GROUP, INC.,        :
8
            Defendant            :    NO. 04-01258 (SLR)
9
                    - - -
10
                        Wilmington, Delaware
11                      Monday, April 24, 2006
                        8:30 o'clock, a.m.
12
13
BEFORE:  HONORABLE SUE L. ROBINSON, Chief Judge, and a jury
14
                    - - -
15
APPEARANCES:
16
        SKADDEN, ARPS, SLATE, MEAGHER & FLOM
17      BY:  MICHAEL BARLOW, ESQ.

18          -and-

19      SKADDEN, ARPS, SLATE, MEAGHER & FLOM
        BY:  JEFF RANDALL, ESQ.,
20           BERNARD SHEK, ESQ. and
             MICHAEL HENDERSHOT, ESQ.
21           (Palo Alto, California)

22              Counsel for Plaintiff

23                      Valerie J. Gunning and
                        Leonard A. Dibbs,
24                      Official Court Reporters

25
```

Page 978

```
1 APPEARANCES (Continued):

2
        MORRIS, NICHOLS, ARSHT & TUNNELL
3       BY:  JACK B. BLUMENFELD, ESQ.

4           -and-

5
        GIBSON, DUNN & CRUTCHER LLP
6       BY:  JEFFREY THOMAS, ESQ. and
             DAVID SEGAL, ESQ. and
7            T. KEVIN ROOSEVELT, ESQ.
             (Irvine, California)
8
9           -and-
10
        GIBSON, DUNN & CRUTCHER LLP
11      BY:  MICHAEL SITZMAN, ESQ.
             (San Francisco, California)
12
13              Counsel for Defendant
                    - - -
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 979

1                    P R O C E E D I N G S

2

3

4          (Proceedings convened at 8:30 a.m., and the

5  following occurred without the presence of the jury.)

6

7          THE COURT: Not surprisingly, I've got all

8  sorts of papers in my folder, which I really have not had

9  a chance to look at.

10         Our purpose this morning is to go through the

11 jury instructions, so that is what we'll do first.  I

12 also have not had a chance to look at the proposals you

13 have for changing them, but I guess we will get to those

14 as we get to the instructions you want to change.

15         So as is normal for what I do in a charge

16 conference, we'll go you through the instructions page

17 by page and find out where you have your objections or

18 suggestions for changes.

19         The first set of instructions are my standard

20 instructions.

21         Does anyone have any problems through Page 12?

22         You don't have to come to the podium, Mr.

23 Thomas.

24         MR. THOMAS: Okay.  Thank you.

25         MR. THOMAS: Not really, your Honor.  Page

Page 980

1  12, it's a nit and probably not important, but the name

2  ClinicalLogic.

3          THE COURT: Maybe you don't have the same

4  Page 12 I do.

5          MR. THOMAS: It's entitled Plaintiff's

6  Contentions.

7          THE COURT: Oh, no.  My page 12 is deposition

8  testimony.

9          MR. RANDALL: As is mine.

10         MR. THOMAS: Okay.  That would be Page 11 in

11 my set, your Honor.

12         Page 13, I suppose, plaintiff's contentions.

13         THE COURT: Well, Page 13 is the parties.

14 Maybe we should go by the title.  Any changes with the

15 parties?

16         MR. THOMAS: Plaintiff's contentions?

17         THE COURT: All right.  Which is Page 14.  All

18 right.

19         MR. THOMAS: It's simply that the name

20 ClinicalLogic is not used with the Facets system.  It's

21 used with ClaimFacts and QicLink.

22         THE COURT: All right.

23         MR. THOMAS: But I don't think it really makes

24 a big difference.

25         THE COURT: Well, it should be -- if that's

Jury Trial - Volume E                    CondenseIt™                    McKesson v. TriZetto

Page 1037

1  ʼAʼ. It's fair. I mean, I've agreed to it, but I
2  still don't like disallowed. I still don't like the
3  codes are rejected or disallowed.
4         I'm not -- that's not the way I see the --
5  the rebundle has happened.
6  Q. Your documents, your documents say that the codes
7  are disallowed, don't they, ma'am?
8  A. I don't believe -- does it say that for the
9  rebundle, that those two codes are disallowed? I --
10 Q. I'm asking you.
11 A. I don't think it did.
12 Q. Do your documents indicate and state that codes
13 are disallowed?
14 A. That codes in general can be disallowed? Yes, it
15 does.
16 Q. All right. So this document goes on to state,
17 mutually exclusive codes are those codes that cannot
18 reasonably be done in the same session.
19        Do you see that?
20 A. Yes.
21 Q. That's the definition for mutually exclusive codes
22 as detected by your products; is that correct?
23 A. For the NCCI edits that are included in our -- in
24 our criteria, yes.
25 Q. And that's the national correct coding initiative;

Page 1038

1  correct?
2  A. Yes.
3  Q. And your systems are compliant with that; correct?
4  A. Not a hundred percent.
5  Q. They are compliant with it with respect to
6  detecting mutually exclusive codes?
7  A. The ones our medical consultants have determined
8  are appropriate to be put in the criteria.
9  Q. Okay.
10        MR. RANDALL: Can you go to Exhibit 419,
11 Page 21? The upper -- the upper paragraph.
12        There we go.
13 BY MR. RANDALL:
14 Q. Now, you recognize this, Ms. Lampe, as a list of
15 examples of these mutually exclusive procedures; correct?
16 A. Yes.
17 Q. All right. And this is Exhibit 419, Page 20, Page
18 21.
19        So this goes on to state that a third example
20 is the reporting of an initial service and a subsequent
21 service. It is contrary for a service to be classified
22 as an initial and a subsequent service at the same time.
23        Do you see that?
24 A. Yes.
25 Q. All right. So some of the mutually exclusive edits

Page 1039

1  that are detected by your systems are detected because
2  you can't report an initial -- you can't have a code
3  that bills for an initial service with a subsequent
4  service at the same time in the same claim; right?
5  A. Well, that would depend on whether or not the
6  consultants, the medical consultants put those edits into
7  our system. I don't know off the top of my head if they
8  did.
9  Q. You have no idea whether or not the one of three
10 examples provided by the national correct coding
11 initiative is actually implemented in your system?
12 A. No, because they're not all in our system.
13 Q. I understand they are not all, but this is the one
14 of three examples that the national correct coding
15 initiative provides. Would you agree with me there?
16 A. Yes.
17 Q. Okay. And one of the three examples of a mutually
18 exclusive code is that initial service and subsequent
19 service shouldn't be billed at the same time on the same
20 claim; right?
21 A. Yes.
22 Q. All right. And that's basically double billing,
23 isn't it? You shouldn't bill for the first visit, the
24 second visit at the same time on the same claim; right?
25 A. Correct.

Page 1040

1  Q. Okay.
2         (Pause.)
3         MR. RANDALL: Can you move down to the next
4  paragraph, please? Thank you.
5  BY MR. RANDALL:
6  Q. You also say to your customers that CPT codes
7  which are mutually exclusive of one another based
8  either on the CPT definition or the medical
9  impossibility/improbability that the procedures could
10 be performed at the same session can be identified as
11 code pairs; correct?
12 A. Yes, based on the Medicare NCCI. Again, this is
13 all part of that definition.
14 Q. Well, you include this in what you tell your
15 customers you can detect; right?
16 A. This is how Medicare created these edits and our
17 medical consultants review them and decide if they
18 should be in our database. So if one of these edits
19 happens to come up and a customer needs more information,
20 this is the information that is supplied, because it's
21 added because it's a Medicare national correct coding
22 initiative.
23 Q. All right. But this document is a tool for your
24 customers and in this document you're telling them,
25 your customers, that these mutually exclusive codes,

Page 1085

1
2          (Court resumed after the recess.)
3
4          THE COURT: All right. Let's bring our jury
5    in.
6          (At this point the jury entered the courtroom
7    and took their seats in the box.)
8          THE COURT: All right. Mr. Randall?
9              REDIRECT EXAMINATION
10   BY MR. RANDALL:
11   Q. Ms. Lampe, while I examined you, do you recall my
12   questions about the mutually exclusive code errors and
13   rules database?
14   A. Yes.
15   Q. And one of them, one of the examples was, you can't
16   bill for the same service twice; right?
17   A. The same service twice?
18   Q. Right.
19   A. No, I don't remember that.
20   Q. Well, do you remember the example given, where you
21   can't bill for an initial and a subsequent service at
22   the same time on the same claims?
23   A. Yes.
24   Q. Okay. And I said that's basically an example of
25   double billing and you can't double bill; right?

Page 1086

1    A. Yes.
2    Q. Okay. And you said during cross-examination by
3    your counsel that all of these rules are medically
4    related; right?
5    A. Yes.
6    Q. Okay. It does not take a doctor to determine that
7    you shouldn't be double-billed for something, does it?
8    A. It depends on what the procedure code is. So, yes,
9    it would take a doctor to determine that.
10   Q. That you shouldn't be billed twice for the same
11   visit?
12   A. Well --
13   Q. Does it take a doctor to figure that out?
14   A. For the same visit?
15   Q. Yes.
16   A. The same procedure code? The same date of service?
17   Same everything?
18   Q. Yes.
19   A. That would be a duplicate billing for -- for the
20   same procedure.
21   Q. And it does not take a doctor to tell you that,
22   does it?
23   A. But that would probably edit out in the duplicate --
24   in the duplicate edits in ClaimFacts if it made it
25   through those edits because of whatever parameters were

Page 1087

1    set up. There's what we call the redundant edit setup
2    in the medical criteria database that says when a
3    procedure can be billed more than once a day than when
4    it can't be.
5    Q. The question is simply, does it take a doctor to
6    tell you that you shouldn't be billed for the same
7    visit twice? Yes or no? In your opinion?
8    A. No.
9    Q. Okay.
10         MR. RANDALL: No further questions.
11         THE COURT: All right. You may step down.
12             (Witness excused)
13                   - - -
14         THE COURT: Mr. Thomas?
15         MR. THOMAS: Thank you, your Honor. We call
16   Mr. Tony Bellomo.
17         Mr. Bellomo, will you take the stand?
18                   - - -
19             ... ANTHONY BELLOMO, having been
20             duly sworn as a witness, was examined
21             and testified as follows ...
22             DIRECT EXAMINATION
23   BY MR. THOMAS:
24   Q. Good morning, Mr. Bellomo.
25   A. Good morning.

Page 1088

1    Q. Where do you work?
2    A. I work at TriZetto.
3    Q. And what is your role at TriZetto?
4    A. I'm an Executive Vice President, generally in charge
5    of the software applications.
6    Q. Software applications such as Facets?
7    A. Yes, sir.
8    Q. How long have you been working at TriZetto?
9    A. I've been there since 2000.
10   Q. Where did you work before you became a TriZetto
11   employee?
12   A. I worked at Erisco prior to that.
13   Q. Did you become a TriZetto employee when TriZetto
14   acquired Erisco?
15   A. Yes, that's correct.
16   Q. That's how you became a TriZetto employee?
17   A. Exactly.
18   Q. How long did you work at Erisco before 2000?
19   A. I joined in 1977, so I've been there almost 28 years
20   or so.
21   Q. What was your role when you first joined Erisco back
22   in 1977?
23   A. I was the Manager of Systems and Programming and, as
24   such, I had the programming team reporting up through me.
25   Q. At that time, were you a hands-on programmer, you

Page 1061

1

2  THE COURT: All right.

3  MR. RANDALL: Thank you.

4  THE COURT: Thank you very much.

5  ***    (Exhibit No. 418 was received into evidence.)

6  CROSS-EXAMINATION

7  BY MR. THOMAS:

8  Q. Good morning, Ms. Lampe.

9  A. Good morning.

10  Q. As I understand it, your job at TriZetto is

11  working with the ClinicaLogic part of ClaimFacts; right?

12  A. Yes.

13  Q. And as you told Mr. Randall, you've been doing that

14  for about eight years?

15  A. Yes.

16  Q. Could you tell us what you did before you started

17  that job?

18  A. I worked for about 20 years in the group health

19  insurance industry for three different carriers, where

20  I was a claims examiner and then technical claims

21  specialist and a claims analyst.

22  Q. So for 20-some years you were actually working at

23  insurance companies processing claims in one way or

24  another?

25  A. Yes.

Page 1062

1  Q. Are you a software engineer?

2  A. No.

3  Q. Have you ever written software code?

4  A. No.

5  Q. Is part of your job at TriZetto to do any computer

6  programming?

7  A. No.

8  Q. Okay. Let's take a step back here so we can put all

9  of this in context.

10    First, just tell us very quickly what

11  ClinicaLogic is.

12  A. ClinicaLogic is a subsystem of ClaimFacts that will

13  allow customers to review procedure codes as they relate

14  to one another and also for various types of medical

15  edits, such as cosmetic or investigate and whether it's

16  experimental or not, based on criteria that has been

17  developed by our medical consultants.

18  Q. Now, is it part of a medical billing and medical

19  claims processing system?

20  A. Yes.

21  Q. Is it used for anything that is not medical in some

22  way?

23  A. No, not that I'm aware of.

24  Q. Now, Mr. Randall asked you if there are ClaimFacts

25  customers who have ClinicaLogic but don't use it or don't

Page 1063

1  turn it on. Do you recall that?

2  A. Yes.

3  Q. Now, other than those customers, are there customers

4  who use ClaimFacts to do claims processing but don't have

5  ClinicaLogic at all?

6  A. Yes.

7  Q. Are those customers able to process claims even

8  though they don't have ClinicaLogic?

9  A. Yes.

10  Q. How is that possible?

11  A. Well, ClinicaLogic is just a piece of the

12  adjudication process. All the other functionality

13  regarding processing a claim and determining the

14  benefits and whether the claim is eligible or not

15  eligible under the -- the insurance -- the insured's

16  policy or plan are handled outside of ClinicaLogic and

17  ClaimFacts.

18  Q. Now, Mr. Randall asked you some questions about

19  what you explained was the IP record, the database that's

20  used to figure out if a code is actually a real A.M.A.

21  code. Do you recall that?

22  A. Yes.

23  Q. Do the customers who don't have ClinicaLogic at all,

24  is that IP record part of ClaimFacts for those customers?

25  A. Yes.

Page 1064

1  Q. Are those customers able to check to see if a code

2  is a real A.M.A. code even though they don't have

3  ClinicaLogic at all?

4  A. Yes.

5  Q. Why is it that the system is able to perform that

6  check even when it doesn't do clinical editing at all?

7  A. Because clinical editing doesn't perform that

8  function. It's handled outside of clinical editing with

9  the procedure code maintenance record or the IP record.

10  Q. Now, there is a database that is in ClinicaLogic;

11  right?

12  A. Yes.

13  Q. Okay. And is that the database that contains all

14  of the rules that you get from your medical consultants?

15  A. Yes.

16  Q. Okay. Mr. Randall showed you a document that

17  referenced hundreds of thousands of these rules. Do you

18  recall that?

19  A. I know he showed me documents. I'm not sure I

20  remember which document you're talking about.

21  Q. Okay. Can you give me a general idea, how many of

22  these rules are there in the database that is, in fact,

23  in ClinicaLogic?

24  A. Oh, hundreds of thousands.

25  Q. Okay.

Page 1065

1  A.  I don't even know how many exactly.
2  Q.  Where do those rules come from?
3  A.  Those rules are developed and maintained by our
4  outside medical consultants.
5  Q.  Do all of the rules that are used to figure out
6  which codes go together and which codes should be used
7  in particular situations, do all of those rules come
8  from TriZetto's medical consultants?
9  A.  Yes.
10  Q.  Does TriZetto ever put in rules that don't come
11  from there?
12  A.  No.
13  Q.  Now, you explained earlier that this IP record,
14  that all the ClaimFacts customers get whether they have
15  ClinicaLogic or not, that's right, it's called IP record?
16  A.  Yes.
17  Q.  And that's the database that's used to figure out
18  if a code is a real A.M.A. code?
19  A.  Yes.
20  Q.  That's separate?  Is that a separate database from
21  this medical rules database we've been talking about?
22  A.  Yes.
23  Q.  Are the rules, the medical rules that are in the
24  ClinicaLogic database, are those ever used in any way
25  to figure out whether a code is a real A.M.A. code?

Page 1066

1  A.  No.
2  Q.  Now, TriZetto provides the rules data -- the
3  database that -- the ClinicaLogic database that has
4  these hundreds of thousands of medical rules, TriZetto
5  provides that to the customers?
6  A.  Yes.
7  Q.  Whose job is it at TriZetto to get the information
8  from the doctors and get it into the system and get it
9  off to the customers?
10  A.  The medical criteria database?
11  Q.  Yes.
12  A.  That's my job.
13  Q.  Is that a big part of your job?
14  A.  Yes.
15  Q.  Do you have anything to do with the IP record?
16  A.  No.
17  Q.  Do you do anything to figure out or check to see
18  if the IP record and the clinical rules database are
19  consistent?
20  A.  No.
21  Q.  Where do the customers get the IP record?
22  A.  My understanding is that they get it from the
23  American Medical Association.  They get the data from the
24  American Medical Association.
25  Q.  Now, Mr. Randall asked you some questions about

Page 1067

1  what happens when the A.M.A. changes a code.
2      When the A.M.A. changes a code, do your
3  medical consultants have to go into the rules database
4  and make whatever changes they think are appropriate?
5  A.  Yes.
6  Q.  Does -- do the medical consultants or anybody at
7  TriZetto at the same time go into the IP record to make
8  sure corresponding changes are made there?
9  A.  No.
10  Q.  Do you know whether the actual system, the
11  software, has those two databases linked in some way so
12  that when a change gets made to one, a change gets made
13  to the other?
14  A.  Not as far as I know.
15  Q.  If a claim comes in as a code -- has a code on it
16  and it makes it through the IP record, yes, it's a valid
17  code, do you know for sure one way or another whether
18  that code is in the clinical rules database?
19  A.  No.
20  Q.  Now, let me change subjects with you for a minute.
21      Mr. Randall also asked you about what happens
22  when a claim with a single code comes in.  That happens
23  sometimes, I assume?
24  A.  Yes.
25  Q.  Okay.  Because sometimes claims come in with one

Page 1068

1  code, sometimes they come in with several; right?
2  A.  Yes.
3  Q.  Now, if a claim comes in with just one code on it,
4  does that code -- in the ClinicaLogic process, the method
5  that goes through when you are using ClinicaLogic, does
6  that code that comes in all by itself get checked in any
7  way that's different from if it had come in on a claim
8  with more than one code?
9  A.  No.
10  Q.  Why not?
11  A.  Well, each line item or reach, and a procedure code
12  is one element of a line item on a claims processing
13  screen.  Each line item is handled on its own.  It's
14  reviewed on its own by ClaimFacts and ClinicaLogic, and
15  then it's reviewed against the claims history that the
16  patient has, to see if there's a relationship between
17  the code on the current line item that's being reviewed
18  and a code in the patient's claim history.  And that
19  happens for each line item on the claims processing
20  screen.
21  Q.  Okay.  When you say it checks the history, it
22  takes that one code and checks the history, what do you
23  mean?
24  A.  Other claims that have been submitted with
25  procedure codes on them for that patient, it checks to

Jury Trial – Volume E                    CondenseIt™                    McKesson v. TriZetto

### Page 1097

1  A. It's a similar weigh that Facets is used. It does
2  many of the same functions. It's not quite as large.
3  It does not have as many modules, but it processes, you
4  know, medical claims, dental claims, short-term and long-
5  term disability claims. Does similar functions.
6  Q. Used for similar purposes as Facets?
7  A. Yes, it is.
8  Q. Like Facets, does it also have a claims processing
9  module?
10  A. Yes.
11  Q. And like Facets, does it also have other modules
12  for things other than claims processing?
13  A. Yes, it does.
14  Q. Now, again, for claims facts, the ClinicaLogic would
15  be part of the claims processing module?
16  A. Yes, it would.
17  Q. Like Facets, do you have ClaimFacts customers who
18  use ClaimFacts for claims processing but don't use your
19  ClinicaLogic software at all?
20  A. Yes, we do.
21  Q. For similar reasons?
22  A. Similar reasons, and also because we sold ClaimFacts
23  as a separate module. There was a separate licensing
24  fee, in addition to which ClinicaLogic came out many
25  years after ClaimFacts, so not all of the customers of

### Page 1098

1  ClaimFacts have, you know, licensed the ClinicaLogic
2  application.
3  Q. Okay. And let's tic off the last of three
4  products. QicLink. Are you familiar with QicLink?
5  A. Yes, I am.
6  Q. What is that?
7  A. QicLink is another similar system. It's a little
8  larger than ClaimFacts, but not quite as large as
9  Facets. It's primarily intended for the benefits
10  administration and TPA market.
11       You know, it's a little bit different, but it
12  essentially does most of the same things that Facets and
13  ClaimFacts do.
14  Q. And like the other two systems, are there QicLink
15  customers who use QicLink for claims processing but don't
16  use the ClinicaLogic software?
17  A. That's correct.
18  Q. Sir, I'd like to focus you now on the ClinicaLogic
19  software itself, that piece.
20       Were you working at Erisco when ClinicaLogic
21  was developed?
22  A. Yes, I was.
23  Q. And when was it developed?
24  A. In 1989.
25  Q. Could you tell us generally what was involved in

### Page 1099

1  the building of ClinicaLogic?
2  A. Sure. We first had to understand the high-level
3  business requirements. You know, what the market was
4  looking for, what the customers were looking for. And
5  then we essentially had to do two other things. We
6  had to create the programs, write the programs, if you
7  will, design them, and then we had to design the
8  database and have the contents of the database, all of
9  the hundreds of thousands of rules that are in the
10  database, that had to be constructed as well.
11  Q. Were those two separate projects, the database and
12  the software?
13  A. They were interlinked. We designed the database
14  and wrote the software at the same time, but a different
15  group of people wrote the software than the ones that
16  actually wrote the criteria, the medical criteria,
17  that's contained in the database.
18  Q. How did you go about creating that medical
19  criteria database?
20  A. We contracted with an outside company, Dr. Phil
21  Hawley. He had a company called PACE Health Care
22  Management and they were a company that was made up
23  of physicians and other medical professionals, and we
24  contracted with them to construct the database for us.
25  Q. Why did you hire PACE and its group of doctors to

### Page 1100

1  build a database instead of doing it yourself?
2  A. Because that was not the expertise that we had.
3  We were a software development company. We were very
4  good at developing software, but since the clinical
5  rules, if you will, are medically based, that certainly
6  was not our expertise and we had to go outside for that
7  to a company that specialized in it.
8  Q. When the database was first created by PACE, did
9  all of the rules in the database come from PACE?
10  A. Yes, they did.
11  Q. Did anyone from Erisco come up with any of the
12  rules that went into the medical criteria database?
13  A. No, we did not.
14  Q. What -- what's that database called? What's your
15  term for it?
16  A. We can call it the clinical criteria database.
17  Q. Now, since that clinical criteria database was
18  first created, has it been updated?
19  A. Yes, it has.
20  Q. Can you describe that process?
21  A. Yes. Each year, the A.M.A. introduces new codes,
22  new CPT codes and, as a result, we have to have the --
23  you know, our medical consultants review the database
24  and update it for whatever is appropriate relative to
25  the new codes that may have been introduced or deleted

## Page 1101

1  or other areas of the product that we wanted to, you
2  know, strengthen.
3  Q.  So who has been responsible for updating the
4  database, changing the rules, tweaking the rules, that
5  sort of thing?
6  A.  In the early years, it continued to be PACE Health
7  Care and Dr. Hawley's team.  Some years later, he sold
8  the company to Deloitte & Touche and, you know, many of
9  the same people that were involved originally are still
10  involved and so they continue to update the database for
11  us.
12  Q.  So did Deloitte take over the updating work because
13  it acquired PACE?
14  A.  Yes.  That's correct.
15  Q.  Okay.  And did a number of the same doctors who are
16  working on the database at PACE, are they still working
17  on it today from Deloitte?
18  A.  Yes, that's correct.
19  Q.  Since Deloitte -- since PACE got sold to Deloitte,
20  has the database been updated or changed in any way that
21  was different from how it was done before?
22  A.  No.  The process is really the same.
23  Q.  Do all of the updates and rules that have been
24  changed or added to the database over the years since
25  Deloitte took over the work, do all of those rules still

## Page 1102

1  come from doctors and medical specialists?
2  A.  Yes, they do.
3          MR. RANDALL:  Objection.  Lacks foundation,
4  your Honor.
5          THE COURT:  Overruled.
6  BY MR. THOMAS:
7  Q.  You can answer.
8  A.  Yes.  All of the database updates come from PACE
9  and medical doctors, yes, and their staff.
10  Q.  Now, at any time, from way back when up until
11  today, have any rules -- let me step back for a minute.
12          How many -- can you give us some feel for
13  how many rules are in this clinical criteria database?
14  A.  It's about a hundred thousand.
15  Q.  Over the years, since the database was first
16  created and right up to today, have any rules been added
17  that did not come from your medical consultants?
18  A.  No.  The rules come from the interpretation of the
19  CPT code, which comes from the A.M.A., and that
20  interpretation is done by the medical group and we do
21  not add anything to the database.  It comes purely from
22  our medical consultants.
23  Q.  Have you ever put rules into the database that
24  come directly from customers?
25  A.  No, we do not.

## Page 1103

1  Q.  Do your customers ever ask you to expand the
2  database in any way?
3  A.  They sometimes give us feedback on areas that they
4  might want us to, you know, expand, if you will, and when
5  that happens, we, you know, take that into consideration.
6  We confer with our, you know, internal folks.  We confer
7  with our panel of experts, our medical criteria company,
8  if you will.  And if it's appropriate, then they will add
9  additional rules.
10          At no time do we take those rules from
11  customers.  They are not equipped to put that kind of
12  data in.
13  Q.  Okay.  That's the database piece of it.  Could you
14  just briefly describe what was involved in developing
15  the software part of ClinicaLogic?
16  A.  Sure.  The software, you know, part of it was much
17  like developing, you know, many other programs.  You
18  basically have to understand the business requirements
19  and, you know, our challenge at the time was because we
20  wanted to develop a system that was integrated with our
21  claims processing application.  So that's a little bit
22  different than the challenges that were out there in
23  general.
24          So we were trying to solve a different
25  business problem whereby we wanted to have clinical

## Page 1104

1  editing work in conjunction in the background, if you
2  will, as to when our claim system was processing the
3  claim, it has many, many steps that it does.  We wanted
4  one of those steps to be clinical editing.
5          So we had to write the code that performs
6  the clinical editing function and then also figure out
7  how to incorporate it into the claims processing
8  application in general.
9  Q.  Now, when you built ClinicaLogic, did you give it
10  the ability to look at both current claims that had come
11  in and older or historical claims for the same patient?
12  A.  Yes, we did.  When we were able to do that -- we
13  were able to do that because at the time that we're
14  processing the claim, we have both the current claim
15  information available to us as well as all of the
16  history for that patient.  So we are able to take both
17  into account and that was one of the things that we did
18  when we first introduced the product.
19  Q.  Let me change subjects for a minute.
20          Does TriZetto do something that you refer to
21  as hosting in the area of claims processing?
22  A.  Yes, we do.
23  Q.  What is hosting?
24  A.  Hosting is essentially when we, you know, rent a
25  customer space on one of our computers and we actually

Page 1195

```
 1                - VOLUME F -
                IN THE UNITED STATES DISTRICT COURT
 2
                IN AND FOR THE DISTRICT OF DELAWARE
 3
                        - - -
 4
   McKESSON INFORMATION SOLUTIONS    :    CIVIL ACTION
 5  LLC,
            Plaintiff                :
 6
        vs.                          :
 7
   THE TRIZETTO GROUP, INC.,         :
 8
            Defendant                :    NO. 04-01258 (SLR)
 9                                   :
                        - - -
10
                   Wilmington, Delaware
11                 Tuesday, April 25, 2006
                   9:30 o'clock, a.m.
12
                        - - -
13
   BEFORE:  HONORABLE SUE L. ROBINSON, Chief Judge, and a jury
14
                        - - -
15
   APPEARANCES:
16
            SKADDEN, ARPS, SLATE, MEAGHER & FLOM
17          BY:  MICHAEL BARLOW, ESQ.
18               -and-
19          SKADDEN, ARPS, SLATE, MEAGHER & FLOM
            BY:  JEFF RANDALL, ESQ.,
20               BERNARD SHEK, ESQ. and
                 MICHAEL HENDERSHOT, ESQ.
21               (Palo Alto, California)
22               Counsel for Plaintiff
23                              Valerie J. Gunning and
                                Leonard A. Dibbs,
24                              Official Court Reporters
25
```

Page 1196

```
 1  APPEARANCES (Continued):
 2
            MORRIS, NICHOLS, ARSHT & TUNNELL
 3          BY:  JACK B. BLUMENFELD, ESQ.
 4               -and-
 5
            GIBSON, DUNN & CRUTCHER LLP
 6          BY:  JEFFREY THOMAS, ESQ. and
                 DAVID SEGAL, ESQ. and
 7               T. KEVIN ROOSEVELT, ESQ.
                 (Irvine, California)
 8
 9               -and-
10
            GIBSON, DUNN & CRUTCHER LLP
11          BY:  MICHAEL SITZMAN, ESQ.
                 (San Francisco, California)
12
13               Counsel for Defendant
14                      - - -
15
16
17
18
19
20
21
22
23
24
25
```

Page 1197

P R O C E E D I N G S

(Proceedings convened at 9:30 a.m., and the following occurred without the presence of the jury.)

THE COURT: Before we bring the jury in, I've been thinking about how we're going to manage the rest of this trial. I truly don't think we will have the time to try both willfulness and damages, so I'm going to -- I think we can only try one of those issues, and I will leave it to the plaintiff which of the issues it wants to go forward with: Damages or willfulness.

All right. Let's bring the jury in for closings.

(At this point the jury entered the courtroom and took their seats in the box.)

THE COURT: Good morning and welcome back, ladies and gentlemen.

Mr. Randall?

MR. RANDALL: Thank you, your Honor.

May it please the Court, ladies and gentlemen of the jury, this is an interesting case because the facts about the operation of the accused system are really not in dispute. We don't dispute how they

Page 1198

operate. What has happened here is that McKesson has presented overwhelming evidence about how the accused products operate. We presented that evidence through their own witnesses, TriZetto's witnesses, and we presented it through the documents and we presented it through credible, straightforward testimony from our qualified expert, Dr. Musen.

They can't dispute that. So their defense has been reduced in this case to contorting and twisting the English language to suit their purpose. It is as if they are an octopus and see -- octopus, they don't have a defense mechanism. They don't have much. What they do have is this ink; right? So they spew ink all over the place when they feel threatened and due to that confusion, they escape. That's what happened in this case.

They had relied on their computer science, their MIT expert, to come in here and say that certain words, plain, simple English, doesn't mean what we all know it means. They have said that, for instance, ascertaining that there's more than one medical code on a claim, they've said ascertaining the number of codes does not mean ascertaining there's more than one. Ascertaining, as Ms. Lampe testified yesterday, they ascertained that there's a code on the claim that they

Page 1199

1  have to process. They ascertained that there is another
2  one and another one and they know when to stop and they
3  know when to go forward but, she said, I don't know how
4  we do it, but we know.
5        They know that there's multiple codes on
6  that claim to process and that's how they process it.
7  But they said that's not determine that there are
8  multiple codes on a claim. That's not determining that
9  there's a plurality of codes on a claim.
10       They talk about mutually exclusive. Their
11 expert and a number of their witnesses said we just don't
12 know what mutually exclusive means, but in the manual, in
13 the user manual itself, it gives the definition. It
14 means two codes that can't be billed together. That's
15 what it means.
16       Now, they know that because they've read the
17 manuals. Dr. Davis was supposed to have read all the
18 manuals. This is a claim term. You would think he
19 would have gone through everything.
20       Ms. Lampe works with the product. She has
21 worked with the product since 1998. She knows it well.
22 She knew that that definition existed and she said, well,
23 that's just a Government definition.
24       Just a Government definition? It's just for
25 Medicare and Medicaid? That's it? That's a pretty big

Page 1200

1  part of their business.
2        They knew that the definition exists and they
3  knew it's simple. You've got two codes, they can't be
4  billed together, they're mutually exclusive. And they
5  treat them in some ways, sometimes they will disallow
6  both the codes and reinsert another third code, which is
7  called rebundling. Sometimes they'll call it a subset.
8  They'll take one of the mutually exclusive codes,
9  disallow it, and pay the other one.
10       But they knew what that meant.
11       Ms. Lampe had a real tough time saying that
12 codes and claims were rejected; right? And the reason
13 for that is that is what the claim language says. But
14 their documents are laden with, and we'll go through
15 them, and we went through some with her. She ultimately
16 admitted, right, after I showed her a few, she
17 ultimately admitted, all right, fine. We disallow claims
18 for payment. We disallow codes. We disallow claims.
19 Yes, we do that. But somehow disallowing codes and
20 claims for payment does not mean rejecting it for
21 payment.
22       That's nonsense.
23       The other part of that, by the way, is how in
24 the world do you come in here and you tout your product
25 as saving billions and billions of dollars. They say

Page 1201

1  this product, you use our clinical editing portion of
2  our product, you use that, you will save a ton of money.
3  You'll save this percentage, you'll save that percentage.
4        How in the world do you ever save any money
5  if you never reject any claims? If you never reject
6  any codes, you never reject any codes, how in the world
7  can you tell the world and the customers that you do
8  save money by doing that?
9        And so Dr. Davis' testimony, we went around
10 and around and around. Finally, I said, does the product,
11 do these accused products ever, ever reject any claims?
12 Reject any codes? He sat there for a long time and said,
13 no. Well, that would have saved me a lot of time; right?
14 I would have gotten that out of him and just moved on.
15       He's wrong. These products, they reject
16 codes, they reject claims. They report and save --
17 they report a savings report on that and they report to
18 the customers. The customers can run a savings report
19 and we'll go through this. They can run a savings
20 report and they can show how much money they saved by
21 rejecting certain codes and how much money they saved by
22 rejecting certain claims.
23       You don't save money if you don't reject
24 these things. It's a difference between what you, the
25 claim that comes in and the claim that is paid. That's

Page 1202

1  the savings. That's what they've testified to. And you
2  only get there by rejecting codes and claims.
3        The other issue, medical and non-medical.
4  Albeit, the database, the predetermined database, it
5  absolutely contains a whole host of medical relationships.
6  I'm not going to tell you it doesn't. It does, no doubt
7  about it, but it also contains billing issues. It
8  contains, Dr. Musen told you, he said a number of those
9  relationships are billing-related. They are. It makes
10 sense. Doctors want to get paid for what they do, and
11 I don't blame them for it. They should get paid for
12 what they do; right? But some of those relationships
13 in there are for billing reasons, like the double billing
14 issue. We don't need a doctor to tell us that and it's
15 not exclusively a medical criteria to say that when you
16 go visit a doctor, you should only be charged once for
17 that visit. All right? We all know that. We don't --
18 in life we don't want to be double-billed for anything,
19 but that's not a medical issue. It is a strictly
20 administrative billing issue.
21       Let's not bill twice. Let's not bill the
22 insurance companies. Let's not bill the patients. Let's
23 not bill anybody twice. That's a simple non-medical
24 issue, and there are others, like Dr. Musen testified
25 to as well. For instance, the idea that you should add

Page 1203

1 up small cuts and bill it as a 10-inch cut instead of
2 ten small cuts. Is that medically related? Absolutely
3 not. It means that it is billing-related. That's a
4 billing issue.
5          Now, I want to address a few of these issues
6 that have come up in this case that really have nothing
7 to do with your decision. All right? I want to clear
8 some things up.
9          Can you pull up — and I'm going to go
10 through, by the way, some of the jury instructions that
11 you will see. The Judge is going to give you the
12 instructions. She has already given them to us. All
13 right? I just want to go through a few of them with you
14 and tell you at least explain to you how that instruction
15 applies to the evidence.
16          So can you pull up jury instruction Page 32?
17          All right. You asked a question and the Judge
18 answered it, and the question basically was whether a
19 function that was performed earlier, before the patent
20 issued, could still be found to infringe later. And the
21 Judge answered the question yes. All right?
22          And the effective filing date on the patent,
23 the effective filing date on the patent is September of
24 1988. Okay?
25          Now, this was not an issue in the case. I

Page 1204

1 didn't have to prove that we did something earlier than
2 they did and that's why I didn't waste your time with
3 it because it's not an issue before you. All right?
4          The fact of the matter, however, is that they
5 didn't develop this innovative clinical editing. Right?
6 The fact of the matter is that HPR filed this application
7 and described their expert system in 1988. They came out
8 with a product in -- before, before Erisco ever even
9 started developing this.
10          Mr. Bellomo admitted that yesterday. It's
11 an issue we didn't have to prove, but I wanted to clear
12 it up. This wasn't an innovative development at all.
13 He said, before they in started the development of this
14 portion of the product, the expert portion of the product,
15 the whole thing, the reason why we're here, the clinical
16 editing portion, that was in the spring of '89. He said
17 at the time they did that, they already knew of HPR's
18 product doing the same thing and GMIS's product doing
19 the same thing.
20          I just raise that because I want to clear up
21 any confusion. It has nothing to do with your decision.
22                      - - -
23          MR. RANDALL (Continuing): The issue before you
24 is whether these three accused systems infringe the three
25 claims. That's it. That's the issue.

Page 1205

1          Can you pull up Jury Instruction 19?
2                      - - -
3          MR. RANDALL (Continuing): Can you highlight
4 the first half of the second paragraph, all the way down
5 to the right?
6          A JUROR: Excuse me. Would you just move that
7 easel board?
8          MR. RANDALL: Oh, I'm sorry.
9          All right. So here you're going to get an
10 instruction, and this is at Page 19 of the instructions.
11 And it says, the purpose of the claims is to provide
12 notice to the public of what a patent covers and what it
13 does not cover. Okay? That's the purpose of these
14 claims. People have to know what they can do and what
15 they can't do.
16          And the other issue before you really is
17 whether or not -- it says here infringement is the act of
18 trespassing on those rights. That's the issue. Has
19 TriZetto trespassed on McKesson's rights? Have they
20 trespassed on our inventions and our claims? And the
21 answer absolutely is yes. We relied on, as I mentioned,
22 the credible, straightforward testimony from Dr. Musen,
23 who was a doctor and a computer scientist. He gave
24 straightforward testimony. He did not struggle. He did
25 not do anything. He has nothing to hide and he did not

Page 1206

1 mince words.
2          TriZetto relied on their MIT computer
3 scientist, really to dice and twist and parse and
4 contort words. He got up there and said, you have to
5 look at the source code, you have to look at the source
6 code. Really? How much source code did he rely on?
7 How much source code did he rely on? What he said was
8 disallow for payment and allow for payment is not reject
9 and authorize. He said he opined on what his medical
10 criterion was, was not. He's not a doctor. He did
11 not utilize his computer science expertise really for
12 anything.
13          When you look at the evidence, and we're
14 going to go through the evidence step by step, the only
15 reasonable and common-sense conclusion you can reach is
16 that they infringe, all three of their products, all
17 three of the claims.
18          Now, the standard of proof. What is a
19 standard of proof we have to show? It is not beyond a
20 reasonable doubt, like a criminal case. All right?
21 It's not beyond a reasonable doubt. It is not the next
22 standard down, which is clear and convincing evidence.
23 Okay?
24          The burden of proof for me, for McKesson, is
25 the preponderance of the evidence. Okay? So when you

Page 1291

1    They look in the all codes database. They
2  determine it's not there. There are two ways to determine
3  something is not in the predetermined database. Two ways
4  to determine, at least two ways, maybe more, to determine
5  it's not in there. One is to look in there, just like
6  you'd look in your local library for the book. That's
7  one way.
8       The other way is to look in the all codes
9  database. You can do that. You can look in the Library
10 of Congress index to determine if the book is not there.
11 There are two ways to do it. You will not receive
12 instructions saying that we have -- that in order to
13 infringe, it has to be done in a certain way. It simply
14 has to be done. And they do it. They determine that
15 the code, when a code comes in, they determine that it's
16 not in that database by looking at all of the codes list.
17 That's how they do it. That's one way to do it. It
18 happens to be the most efficient and effective way of
19 doing it, and that is why they do it. And there's no
20 question about it.
21      And we are not required to prove that they
22 actually look through this or look through the local
23 library for the book. Simply, that they determine that
24 it's not there. That is one of the stems in the claims.
25      And you won't see -- again, you won't find

Page 1292

1  an instruction requiring us, requiring that we show how
2  they determine that step. No way. It's not in there
3  because it's not required.
4       You've heard from Mr. Bellomo on this. And
5  Mr. Bellomo -- I hate to -- to touch this.
6       If, for example, you wanted to determine, if
7  you wanted to determine whether or not a code was in
8  here, the predetermined database, for instance, A, B, C,
9  it was not in the predetermined database, you could, if
10 you wanted to, check the CPT list, this list, and if
11 it's not on the CPT list, for example, A through Z, if
12 it's not there, you know it's not in this, the
13 predetermined database; right? The answer is, it's
14 probably not, that's correct, when the system is
15 operating correctly.
16      It's probably not. You know it's not.
17 It's absolutely not to a mathematical certainty if the
18 system is operating as intended and properly.
19      On Claim 2 -- by the way, that's the only
20 defense on noninfringement, on Claim 1.
21      On Claim 2, there were two issues. I wanted
22 to get -- mutually exclusive and non-medical criteria.
23      On the mutually exclusive, he readily
24 admitted it now, but throughout this trial, they didn't.
25 So throughout this trial, they fought that. They said

Page 1293

1  I don't know what that means. I don't know what it
2  means. Their expert didn't know what it means. Dr.
3  Hawley didn't know what it means. Ms. Lampe didn't
4  know what it meant until I pulled the document out and
5  said, it's defined right here. It's a simple definition.
6  It means two codes shouldn't be billed together.
7       And counsel said, well, okay, fine. We want
8  to use their definition.
9       It's not our definition. It's theirs. It
10 came out of their user manual.
11      Now they say, okay, fine, you caught us. I
12 will admit that, we got that. Now they're still fighting
13 on medical, non-medical based relationships. Now he
14 says, okay, they are all billing relationships, but he
15 says they're all medical relationships. And I have said
16 and I will be honest and candid with you, there are a
17 number, and probably most of the relationships contained
18 in the predetermined database are based on medical
19 criteria. Whether one operation should be performed
20 with another, that's clear. There's no doubt about that,
21 but there's also no doubt that in that database of
22 thousands and hundreds of thousands of relationships,
23 there are also rules based on non-medical criteria.
24 Absolutely. And those rules are based on simple
25 billing things.

Page 1294

1       Even Dr. Hawley said, yes, we got some of
2  the rules from Erisco. We got some of the rules from
3  Erisco's customers. And one of the three examples used
4  by Medicare to show they are mutually exclusive codes,
5  one of the three examples they used, it's in the user
6  manual, is based on non-medical criteria.
7       And it says, you can't bill the initial and
8  subsequent visit at the same time. And I said that's
9  like double billing, and she said yes.
10      That's right, you can't do it. That's
11 common sense. So there are common-sense administrative
12 billing relationships built into the database and one
13 of the examples, a concrete example, one of three given
14 by Medicaid or Medicare was right there in their user
15 manual.
16      And, by the way, Dr. Musen testified
17 absolutely, a number of these relationships are based
18 on non-medical reasons, and he testified about that.
19      Who did they have to testify about it? They
20 had Dr. Davis, the computer scientist from MIT. He's
21 not qualified. He wasn't qualified by the Court to
22 testify about that, and he wasn't qualified to testify
23 in front of you on that issue, to say that he has
24 looked at all of them and he knows that they are all
25 medically related. He simply cannot do it.

EXHIBIT 11

REDACTED

# EXHIBIT 12

REDACTED

# EXHIBIT 13

REDACTED

# EXHIBIT 14

REDACTED

EXHIBIT 15

REDACTED

# EXHIBIT 16

REDACTED

# EXHIBIT 17

REDACTED

# EXHIBIT 18

REDACTED

EXHIBIT 19

REDACTED

EXHIBIT 20

REDACTED

# EXHIBIT 21

REDACTED

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on June 7, 2006, caused to be electronically filed The TriZetto Group, Inc.'s Appendix of Exhibits in Support of Its Motion for Summary Judgment of Invalidity for Indefiniteness and Failure to Adequately Describe the Claimed Invention (Redacted Version) with the Clerk of the Court using CM/ECF, which will send notification of such filing(s) to the following:

Michael A. Barlow
Skadden, Arps, Slate, Meagher & Flom LLP

I also certify that copies were caused to be served on June 7, 2006, upon the following in the manner indicated:

### BY EMAIL AND HAND

Michael A. Barlow
Skadden, Arps, Slate, Meagher & Flom LLP
One Rodney Square
Wilmington, DE 19801

### BY EMAIL AND FEDERAL EXPRESS

Jeffrey G. Randall
Skadden, Arps, Slate, Meagher & Flom LLP
525 University Avenue
Suite 1100
Palo Alto, CA 94301

*/s/    Rodger D. Smith II (#3778)*
Morris, Nichols, Arsht & Tunnell LLP
1201 N. Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
rsmith@mnat.com