IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

MCKESSON INFORMATION SOLUTIONS LLC, )
)
)
Plaintiff, )
)
v. )          C.A. No. 04-1258 (SLR)
)
THE TRIZETTO GROUP, INC., )          **REDACTED VERSION**
)
Defendant. )

**OPENING BRIEF IN SUPPORT OF THE TRIZETTO GROUP INC.'S
MOTION FOR SUMMARY JUDGMENT OF INVALIDITY
ON GROUNDS OF ANTICIPATION AND OBVIOUSNESS**

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Jack B. Blumenfeld (#1014)
Rodger D. Smith, II (#3778)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200

*Attorneys for Defendant The TriZetto Group, Inc.*

OF COUNSEL:

Jeffrey T. Thomas
David A. Segal
Michael A. Sitzman
GIBSON, DUNN & CRUTCHER LLP
Jamboree Center
4 Park Plaza
Irvine, CA  92614-8557
(949) 451-3800

Original Filing Date:  June 1, 2006

Redacted Filing Date:  June 8, 2006

**TABLE OF CONTENTS**

Page

I.    NATURE AND STAGE OF THE PROCEEDING ............................................... 1

II.   SUMMARY OF ARGUMENT ......................................................................... 1

III.  STATEMENT OF FACTS ............................................................................. 4

      A.    The '164 Patent ................................................................................. 4

            1.    Background of the Technology ............................................... 5

            2.    Development of CodeReview .................................................. 5

            3.    Early Public Disclosure And Marketing Of CodeReview/MedReview .... 7

            4.    Claims 1 and 2 Of The '164 Patent ......................................... 10

      B.    Overview Of Prior Art:  Computerized Medical Claims Processing Systems .... 13

IV.   LEGAL PRINCIPLES ................................................................................. 14

      A.    Summary Judgment Standard .......................................................... 14

      B.    Patent Invalidity:  Anticipation ...................................................... 14

      C.    Patent Invalidity:  Obviousness ...................................................... 15

V.    ARGUMENT ............................................................................................. 16

      A.    McKesson's "Any Software" Claim Construction Position Renders Claims 1 And 2 Invalid .... 19

      B.    Claim 1 Is Invalid As Anticipated By The Prior Art ........................ 21

            1.    Erisco's ClaimFacts ............................................................... 21

            2.    Doyle Patent ........................................................................... 23

            3.    GMIS's AutoCoder ................................................................. 24

            4.    HDI's Advanced MedLogic System ("AMS") ...................... 25

            5.    Blue Cross/Blue Shield of New Jersey's IBM 7070 System (the "7070 System") .... 28

i

6.      Cortron's Health Care Processing System ("HCPS") .................................. 29

7.      Health Systems International's Clinical Data Editor ................................. 30

C.      Claim 2 Is Invalid As Anticipated By The Prior Art ......................................... 30

1.      Erisco's ClaimFacts ................................................................................. 31

2.      HDI's Advanced MedLogic System ("AMS") ......................................... 31

3.      Blue Cross/Blue Shield of New Jersey's IBM 7070 System (the "7070 System") ...................................................................................................... 32

4.      Cortron's Health Care Processing System ("HCPS") ............................. 33

D.      Claims 1 and 2 Are Obvious In Light Of The Prior Art ...................................... 34

1.      Claims 1 and 2 Would Have Been Obvious To A Person Of Ordinary Skill In The Art .............................................................................................. 34

2.      The Automation Of Dr. Hertenstein's Known Manual Code-Checking Technique Was Not A Patentable Invention ............................................. 36

3.      There Was Substantial Motivation To Develop The Methods Of Claims 1 And 2 In the 1980s ................................................................................... 39

VI.     CONCLUSION .............................................................................................................. 40

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Apple Computer, Inc. v. Articulate Sys., Inc.*
234 F.3d 14 (Fed. Cir. 2000)................................................................. 14

*Atlas Powder Co. v. IRECO Inc.,*
190 F.3d 1342 (Fed. Cir. 1999)........................................................ 15, 30

*Becton Dickinson & Co. v. C.R. Bard, Inc.,*
922 F.2d 792 (Fed. Cir. 1990).............................................................. 14

*Cable Elec. Prods., Inc. v. Genmark, Inc.,*
770 F.2d 1015 (Fed. Cir. 1985)............................................................ 14

*Celeritas Techs., Ltd. v. Rockwell Int'l Corp.,*
150 F.3d 1354 (Fed. Cir. 1998)............................................................ 15

*Celotex Corp. v. Catrett,*
477 U.S. 317 (1986)............................................................................ 14

*Chem-Nuclear Sys., LLC v. Braun,*
2006 U.S. Dist. LEXIS 10192 (D.S.C. 2006)........................................ 38

*Connell v. Sears, Roebuck & Co.,*
722 F.2d 1542 (Fed. Cir. 1983)............................................................ 34

*Dennison Mfg. Co. v. Panduit Corp.,*
475 U.S. 809 (1986);............................................................................ 16

*Graham v. John Deere Co.,*
383 U.S. 1 (1966)......................................................................... 16, 35

*In re Dembiczak,*
175 F.3d 994 (Fed. Cir. 1999).............................................................. 16

*In re Epstein,*
32 F.3d 1559 (Fed. Cir. 1994)........................................................ 15, 27

*In re Pearson,*
494 F.2d 1399 (C.C.P.A. 1974)............................................................ 34

*In Re Venner,*
46 C.C.P.A. 754 (C.C.P.A. 1958)......................................................... 38

*National Presto Indus. v. West Bend Co.,*
  76 F.3d 1185 (Fed. Cir. 1996)................................................................. 14

*Polaroid Corp. v. Eastman Kodak Co.,*
  789 F.2d 1556 (Fed. Cir. 1986)................................................................ 23

*Princeton Biochemicals, Inc. v. Beckman Coulter, Inc.,*
  2004 U.S. Dist. LEXIS 11918, at * 63 (D.N.J. 2004).............................. 39

*Richdel, Inc. v. Sunspool Corp.,*
  714 F.2d 1573 (Fed. Cir. 1983)........................................................ 35, 36

*Rockwell Int'l Corp. v. United States,*
  147 F.3d 1358 (Fed. Cir. 1998)................................................................ 16

*Ruiz v. A.B. Chance Co.,*
  357 F.3d 1270 (Fed. Cir. 2004)................................................................ 16

*WMS Gaming, Inc. v. Int'l Game Tech.,*
  184 F.3d 1339 (Fed. Cir. 1999)................................................................ 15

*Woodland Trust v. Flowertree Nursery, Inc.,*
  148 F.3d 1368 (Fed. Cir. 1998)................................................................ 15

**Statutes**

35 U.S.C. § 102............................................................................................ 15
35 U.S.C. § 102(a)........................................................................................ 15
35 U.S.C. § 102(b)........................................................................................ 15
35 U.S.C. § 103(a)........................................................................................ 16
Fed. R. Civ. P. 56......................................................................................... 14
Fed. R. Civ. P. 56(c) .................................................................................... 14

## I.    NATURE AND STAGE OF THE PROCEEDING

On September 13, 2004, plaintiff McKesson Information Solutions, LLC ("McKesson") filed this suit against The TriZetto Group, Inc. ("TriZetto"), alleging that three of TriZetto's products (Facets, ClaimFacts and QicLink) infringe fifteen claims (Claims 1-6 and 8-16) of U.S. Patent No. 5,253,164 ("the '164 patent"). On October 1, 2004, McKesson amended its Complaint. On November 1, 2004, TriZetto answered and filed a counterclaim seeking a declaratory judgment of invalidity, unenforceability, and non-infringement.

Fact and expert discovery were completed in late 2005. The Court construed the patent claims in its Order of April 5, 2006 (D.I. 307), which was later amended by the Order of April 11, 2006 (D.I. 320). Also on April 5, 2006, the Court granted TriZetto's motion for summary judgment of non-infringement as to Claims 3-6 and 8-15. D.I. 301. A jury trial on infringement of the remaining claims – Claims 1, 2 and 16 – commenced on April 17, 2006. The jury returned a verdict finding literal infringement of Claims 1 and 2, but no infringement of Claim 16. D.I. 358. Hence, only Claims 1 and 2 now remain in the case.

The Court has scheduled a trial on the issues of willfulness, damages, invalidity, laches, equitable estoppel and inequitable conduct to commence October 3, 2006. Dispositive motions on invalidity are scheduled to be heard on August 2, 2006. This is TriZetto's opening brief in support of its motion for summary judgment of invalidity on grounds of anticipation and obviousness.

## II.    SUMMARY OF ARGUMENT

The '164 patent describes an "expert computer system for processing medical claims" whereby "the inputted claims are interpreted according to specific rules and against a predetermined database to determine whether the medical claims are appropriate." Ex. 1, Abstract. The patent inventors believed that the novelty of the patent was found in the "specific rules" relating particular medical codes to each other, plus the 21 "metarules" (categories of rules) contained in Appendix B of the patent. Inventors Dr. Hertenstein and Dr. Holloway testified that the rules and "metarules" they had created were the "basis of the patent application"

and its sole point of novelty. Developing these rules and metarules was the primary labor of the inventors, consuming many months of their time.

In this litigation, McKesson has completely jettisoned the rules and metarules created by the inventors, the only part of the technology that was arguably novel. In order to avoid a finding of non-infringement, McKesson has taken the position that the patent claims are not defined or limited by *anything* in the patent specification – not the figures, the examples in Appendix A, the "metarules" in Appendix B, the source code in Appendix D, or anything else. At McKesson's urging, the Court's claim construction did not incorporate the Appendix B metarules or any other limitations into Claims 1 and 2, the only remaining claims in the case. Accordingly, McKesson is left with a bare-bones concept of a "predetermined database" of rules governing code combinations, but devoid of the actual rules and metarules the inventors created.

Moreover, McKesson's surprising arguments at the April 2006 trial have effectively stripped even the concept of a "predetermined database" out of the methods of Claims 1 and 2. In support of its infringement position, McKesson portrayed Claim 1 as a method for determining the validity of medical codes using *any* database or list of all valid codes – it does not require checking or using a predetermined database at all. As for Claim 2, McKesson presented it, in one example, as a method for eliminating double billing – correcting duplicate codes or other forms of double billing on the same claim. During claim construction, McKesson contended that the method of Claim 2 did not require use of the "predetermined database," since the database is not mentioned in the steps of the method. These were the positions that McKesson took to establish infringement, positions that are now binding on McKesson in the validity phase.

Claims 1 and 2 are invalid based on McKesson's own claim construction arguments. Although the '164 patent is a software patent, and the allegedly infringing products are software programs, Claims 1 and 2 do not describe any novel software. McKesson has successfully argued herein that software of the type described in the patent claims was well known at the time the patent application was filed, and so the claims are not limited to any algorithm in the

specification. Thus, McKesson has conceded that *any* software that performs the simple, basic functions described in the claims is anticipatory, and it has admitted that software of that type was well known at the time the purported invention was made. McKesson's claim construction arguments are an independent basis for a finding of invalidity.

Additionally, as now defined by McKesson, Claims 1 and 2 are invalid because the purported inventions of those claims were clearly known, used, described, in public use, and/or on sale in the United States more than one year before the patent application was filed on September 30, 1988 (the critical date is September 30, 1987).

From as early as 1964, no fewer than seven prior art systems (computerized medical claims processing systems) have performed the medical code validation method of Claim 1, three even containing a "predetermined database" (although that is not required to perform the method of Claim 1, under McKesson's interpretation). Among the prior art systems was ClaimFacts – one of the TriZetto products found to infringe Claim 1 – which has performed the exact same "infringing" code validation technique since 1980. Another prior art system, described in the Doyle Patent, was reviewed at deposition with McKesson's expert, Dr. Mark Musen, who admitted that it covered the method of Claim 1. Yet another system, AutoCoder, was demonstrated to patent inventors Kelli Dugan and Donald Holloway while they worked on the claimed invention. They both testified that AutoCoder performed the method of Claim 1. And there are four other systems, which are discussed below. There can be no doubt that Claim 1 is invalid as anticipated and/or obvious in light of the prior art.

At least four prior art systems performed the method of Claim 2 pursuant to the "double billing" example provided by McKesson – i.e., checking for and eliminating duplicate codes and other forms of double billing. One system dates back to 1964. Three systems included a "predetermined database," although that is not required to perform the steps of Claim 2, according to McKesson. A couple of systems even included the precise double billing rule used by McKesson's counsel at trial to illustrate Claim 2 – the rule that initial and subsequent medical

3

services should not be billed on the same claim. Claim 2 is invalid as anticipated and/or obvious in light of the prior art.

There is no doubt that payers of medical claims were performing the basic functions described in Claims 1 and 2 — validating codes and checking for double billing — long before this patent application was filed. Many of the payers were using automated systems to do so, but even if they were not, Claims 1 and 2 would still be invalid. Since the functions themselves were well known, in order for the automation of the functions to be patentable, some novel way of accomplishing the automation must be provided. The mere idea of using automation of some kind, without any specifics, to perform well-known functions is not patentable. This principle applies here because McKesson has committed itself to the position that Claims 1 and 2 cover *any software system of any kind that performs the functions in any manner.* As so construed, Claims 1 and 2 merely describe the notion of using a computer and a well-known type of software to perform well-known functions. That is not a patentable idea.

Finally, the inventors and the patent assignee did not keep the development of the invention a secret in 1986 and 1987. During those years, the inventors made presentations at conferences, submitted articles for publication, and delivered proposals to potential customers revealing (1) the medical coding problems they were trying to solve, (2) Dr. Hertenstein's manual code-checking technique on which the patented technology is based, and (3) the concept and development status of the computerized code-checking system that they were building. This information, together with the prior art, was more than sufficient to render Claims 1 and 2 obvious, providing both the motivation and knowledge needed to build the purported invention.

## III.     STATEMENT OF FACTS

### A.     The '164 Patent

The '164 patent claims an expert computer system for processing medical claims containing medical service codes. Ex. 1, Abstract. The patent was issued on October 12, 1993, to Health Payment Review, Inc. ("HPR"), and is now owned by McKesson. The patent has an

effective filing date of September 30, 1988. The inventors named on the '164 patent are Dr. Donald Holloway, Dr. Robert Hertenstein, Dr. George Goldberg, and Kelli Dugan.

## 1.     Background of the Technology

The technology described in the '164 patent pertains to physician billing. Physicians receive payment for their medical services by submitting bills (known as "medical claims") to insurance companies, health maintenance organizations (HMOs), preferred provider organizations (PPOs), and other health benefit providers. *See* Ex. 1, Cols. 1-2. The physician will list on a medical claim certain "medical service codes" which indicate the particular services or procedures performed for that patient. The medical service codes most commonly used are the CPT codes, developed by the American Medical Association ("AMA"). *Id.*, Cols. 2:21-23. The CPT code set contains numerous codes reflecting a wide range of medical services and procedures (e.g., "exploration of the abdomen," "partial colectomy"). *Id.*, Col. 3:38-68.

From time to time, some physicians submit medical claims with improper code combinations, either "assigning a higher paying code than a procedure merits, or [] unpackaging services that were intended to be bundled into a single code." *Id.*, Col. 2:8-14. In some instances, these code combinations reflect an inadvertent error. In other cases, the physician deliberately submits the code combination in order to secure greater reimbursement for his or her services. *Id.*

In response to these coding problems, computerized systems and manual techniques were created to allow medical claim reviewers to catch and correct the coding errors in submitted medical claims. *See, id.,* Col. 3:25-29. One such manual code-checking technique was developed into a computer system called CodeReview, by HPR, the assignee of the '164 patent. *Id.*, Col. 3:17-29. CodeReview is the basis for the purported invention of the '164 patent.

## 2.     Development of CodeReview

CodeReview (originally called MedReview) was a computer software product developed by HPR (and its predecessor Health Policy Institute ("HPI")) to automatically catch and correct coding errors on medical claims. *See* Ex. 1, Col. 3:17-29. CodeReview was based on the

manual code-checking technique developed by '164 inventor Dr. Robert Hertenstein in the early 1980s for Caterpillar Corporation.  *See* Ex. 2 (MCK 050516, "Development of CodeReview's Medical Knowledge Base").  Dr. Hertenstein "recognized that many physicians were submitting claims with inappropriate coding."  *Id.*  He devised a manual method for detecting and correcting improperly coded medical claims.  *Id.*  Dr. Hertenstein's method was based in part on the explicit instructions in the CPT-4 Manual, a book published by the AMA that contains all the CPT codes and instructions on how to use them.

## REDACTED

In 1987, HPR/HPI began developing software to automate Dr. Hertenstein's manual code-checking technique.  *See* Ex. 2 ("In 1987, through his association with Boston University's Health Policy Institute, an opportunity to automate Dr. Hertenstein's system was identified.  The automation of Dr. Hertenstein's work led to the development of CodeReview.").  CodeReview utilized a database of decision-making rules to determine if particular combinations of medical codes were appropriate for payment.  Ex. 1, Col. 3:30-37.  These decision-making rules were drawn directly from the rules that Dr. Hertenstein had been applying manually at Caterpillar.  *See* Ex. 3 (Hertenstein Dep.), at 223:14-226:13.  Like Dr. Hertenstein's manual rules, the rules in CodeReview were based on the instructions in the CPT-4 Manual itself.  Ex. 1, Col. 5:67-6:4 ("These rules were derived using the CPT-4 classification system . . .").  Dr. Hertenstein acknowledged that the information needed to create the database of rules was "public knowledge" and that such a collection of code-checking rules could have been created by any group of physicians.

## REDACTED

6

The alleged novelty of CodeReview, according to Dr. Hertenstein and co-inventor Dr. Donald Holloway, was found in the "metarules" listed in Appendix B of the '164 patent. These "metarules" were generic distillations of the specific code-checking rules contained in the database. For example, the specific rule stating that if Codes 64450 and 10120 are found together on the same claim, 64450 is rejected and 10120 is authorized (this is Example 1 of Appendix A of the patent), fits within "metarule" E1 of Appendix B – "If ACODE appears with another code in the range of (and including) BCODE to CCODE, exclude ACODE, and keep BCODE to CCODE." Ex. 1, Cols. 11 & 47.

**REDACTED**

3.     **Early Public Disclosure And Marketing Of CodeReview/MedReview**

Throughout 1986 and 1987, HPR/HPI publicly disclosed and/or offered for sale (1) the concept of a computerized medical code-checking system, (2) Dr. Hertenstein's manual code-checking method, and (3) the CodeReview/MedReview product.

a.     **Pew Conference – Summer 1986**

In the summer of 1986, the chief financial officer of HPI (predecessor of patent assignee HPR), Charles Moore, Jr., made a presentation at a Pew Conference in Boston on the topic of **REDACTED**     . *See* Ex. 5 (MCK 119635-639); Ex. 6 (Goldberg Dep.), at 213:6-20. The Pew Conferences, which occurred in the mid to late 1980s, brought together "various corporate employees" to discuss health benefits and related business issues. Ex. 6 at 108:12-110:15. At the summer 1986 conference, Mr. Moore discussed the medical billing problems (i.e., coding problems) that existed at the time and Dr. Hertenstein's manual code-checking technique used at Caterpillar. *See* Ex. 5, at MCK 119636-638. He also presented the idea of

developing computer software to catch and correct medical coding errors, as reflected in his presentation outline:

REDACTED

Accordingly, the concept of a computerized medical code-checking system was publicly known at least as of this time.

**b.    Proposal to Aetna:  Quality-of-Health-Care Monitoring – September 1986**

In September 1986, HPI submitted a proposal to Aetna Insurance Company to develop a computerized system for examining the data on medical claims and flagging problems for further review.  *See* Ex. 7 (MCK 039604-631).  HPI's proposed product included the following steps:

REDACTED

The problems that the system would flag included

REDACTED      – i.e., when multiple related procedures were performed on the patient during the same hospital admission.  *Id.* at MCK 039630.  The proposal noted that such

REDACTED      This was the same type of medical billing problem that was addressed by the '164 patent.  *See* Section III.A.1, *supra*.

**c.    Egdahl & Hertenstein, "The Caterpillar Experience" – April 1987**

In April 1987, Dr. Hertenstein and HPI physician Dr. Richard Egdahl presented an article for publication and discussion at the 107th Annual Meeting of the American Surgical Association in Palm Beach, Florida.  *See* Ex. 8 (MCK 035619-627).  The article offered a detailed explanation of the manual code-checking technique that Dr. Hertenstein had developed at Caterpillar.  *Id.*  The article included examples of specific medical coding problems and explained how those problems were resolved by authorizing payment of some codes and

8

rejecting others. *Id.* at MCK 035621-622. The article also explained that Dr. Hertenstein's technique could be integrated into computerized claims processing systems already in use:

> [T]he CAT process is a workable and market-tested solution to the need to balance access and cost management. It is suitable for large corporations such as CAT with both self-funded and self-administered health benefits. It can also be used (after eligibility is certified and benefits are coordinated) by claims processing systems.

*Id.* at MCK 035623.

### d.  Proposal to Aetna:  Evaluating Potential Savings from Increased Accuracy in CPT-4 Coding – July 1987

In July 1987, HPI submitted a proposal to evaluate Aetna's CPT coding problems in anticipation of building a software product for identifying and correcting medical coding errors. *See* Ex. 9 (MCK 047992-48002). The proposal stated:

**REDACTED**

This was HPI's first offer to sell the software product that would become CodeReview/MedReview – i.e., the purported invention of the '164 patent.

### e.  Holloway, Hertenstein & Egdahl, "Savings From Accurate Coding of Surgical Claims:  The Caterpillar Method" – Fall 1987

In the fall of 1987, Drs. Holloway, Hertenstein and Egdahl submitted an article for publication in the magazine *Business and Health*, entitled "Savings From Accurate Coding of Surgical Claims:  The Caterpillar Method." *See* Ex. 10 (MCK 048025-35). This article disclosed much of the purported invention of the '164 patent, including:  (1) a description of medical coding problems that the patent set out to solve, (2) a discussion of Dr. Hertenstein's manual code-checking system at Caterpillar on which the patented invention is based, and (3) an

overview of HPI's efforts to build a software product for medical code-checking (i.e., the CodeReview/MedReview software). *Id.* at MCK 048026-32. The article explained:

> Caterpillar has achieved significant savings using a unique system for assigning accurate codes to surgeons' claims. . . . The Health Policy Institute is working with the surgeon reviewers at Caterpillar to make this system available to other corporations through the use of an "expert system shell," an artificial intelligence software that allows the surgeon reviewers' "rules of thumb" to be made available to claims processors.

*Id.* at MCK 048026. The article even disclosed one of the specific rules in the '164 patent – Example 1 of Appendix A of the patent, pertaining to Codes 64450 and 10120. *Id.* at MCK 048033. The article explained that the rule concerning Codes 64450 and 10120 is drawn directly from the express instructions of the CPT-4 manual. *Id.* Accordingly, this Fall 1987 article disclosed not only the overall concept of the patented invention, but some of the specific rules as well.

### 4.    Claims 1 and 2 Of The '164 Patent

Claims 1 and 2 are the only claims of the '164 patent still remaining in this case. Based on the Court's construction of these claims and McKesson's interpretations offered at the April 2006 trial, Claims 1 and 2 are exceedingly broad and simple. Although the inventors of the '164 patent believed that the Appendix B "metarules" were the patent's point of novelty, those rules have not been incorporated into Claims 1 and 2. At McKesson's request (*see* D.I. 255 at 3), the Court did not limit Claims 1 and 2 to any particular coding rules, software algorithms, or anything else in the patent specification. D.I. 307. Consequently, Claims 1 and 2 have the broadest possible meaning, made even broader by McKesson's interpretations at trial.

#### a.    Claim 1 – Code Validation

Claim 1 describes a method for performing medical code validation – i.e., determining whether a medical code on a submitted claim is a valid CPT code contained in the computer's database. The steps of Claim 1 are as follows:

1) receiving a medical claim;

10

2)  determining if the medical codes listed on that claim are not present in a
"predetermined database" – defined by the Court as "a set of decision-making
rules that incorporate a medical code classification system and expert medical
clinical judgment" (D.I. 307 at 3); and

3)  informing the user that a medical code is not present in the predetermined
database.

In its effort to establish infringement at the April 2006 trial, McKesson argued that the
steps of Claim 1 do not require actually using the predetermined database. McKesson's expert,
Dr. Mark Musen, testified that Claim 1 could be performed by checking *any* database or list of
all CPT codes – the predetermined database itself need not be checked or used in any way. Ex.
11 (Trial Tr.), at 487:25-489:7 (Musen Testimony: "Q. Do you read anything in [Claim 1] that's
requiring that the predetermined database be used to make that determination? A. Nothing at
all."). McKesson was compelled to make this argument in order to prove infringement, because
the TriZetto products do not perform code validation by checking the predetermined database –
they use an entirely separate database containing all of the CPT codes recognized by the AMA.
*Id.* at 851:5-852:23, 859:19-860:7. McKesson's counsel argued in closing that TriZetto infringes
Claim 1 by checking codes against the separate CPT database. *Id.* at 1291:1-17 ("They look in
the all codes database. They determine it's not there."). The jury obviously accepted that
argument.

Accordingly, based on McKesson's arguments during trial, Claim 1 covers medical code
validation performed using *any* database or list of CPT codes.

**b.    Claim 2 – Eliminating Double Billing**

In at least one example offered at the April 2006 trial, McKesson characterized Claim 2
as a method for eliminating double billing – i.e., correcting medical claims containing duplicate
codes or other forms of double billing. The steps of Claim 2 are as follows:

1)  receiving a medical claim;

2)  ascertaining whether the claim contains more than one medical code;

3)  determining whether a code on the claim is "mutually exclusive due to non-
medical criteria" with another code on the claim;

11

4)  authorizing codes that are not "mutually exclusive";

5)  rejecting codes that are "mutually exclusive."

Given that the patent specification never defines the terms "mutually exclusive" or "non-medical criteria," as used in Claim 2, it is not surprising that McKesson struggled to find examples to fit Claim 2 at trial. McKesson's expert, Dr. Musen, provided two examples of rules that he believed matched Claim 2: (1) the combination of Codes 64450 and 10120, whereby 10120 is authorized and 64450 is rejected; and (2) the combination of Codes 12036 and 12037, whereby 12037 is authorized and 12036 is rejected. Ex. 11 (Trial Tr.), at 342:2-345:8, 383:2-25.

Subsequently, McKesson's counsel questioned TriZetto employee Karen Lampe regarding certain MediCare edits, called "mutually exclusive" edits, incorporated into TriZetto's products. *Id.* at 1033:18-1036:12. One example of those "mutually exclusive" edits is a rule that initial and subsequent medical services should not be billed at the same time. *Id.* at 1039:17-21. Counsel characterized that situation as "double billing." *Id.* at 1039:22-25.

In closing argument, McKesson's counsel told the jury that identifying "double billing" was one manifestation of Claim 2:

> We don't need a doctor to tell us that it's not exclusively a medical criteria to say that when you go visit a doctor, you should only be charged once for that visit. All right? We all know that. We don't – in life we don't want to be double-billed for anything, but that's not a medical issue. It is a strictly administrative billing issue. Let's not bill twice. Let's not bill the insurance companies. Let's not bill the patients. Let's not bill anybody twice. That's a simple non-medical issue, and there are others, like Dr. Musen testified to as well. . . .
>
> [W]e've talked about the double billing. I mean, I asked, if you need a doctor or medical judgment to determine that you shouldn't be double-billed, and [Ms. Lampe] said no, and you don't. . . . [T]he determining step [of Claim 2] [is] satisfied.

*Id.* at 1202:14-25, 1228:21-1229:2.

Consequently, based on McKesson's arguments at trial, one example of Claim 2 is a method for eliminating double billing on a medical claim.

12

Although a "predetermined database" is mentioned in the preamble to Claim 2, it is not actually invoked in the steps of the method. During claim construction, McKesson contended that the method of Claim 2 did not require the "predetermined database," because the steps did not expressly mention that limitation. D.I. 255 at 25-26 ("[W]hen the inventors intended to limit a 'determining . . .' element by drawing a connection to the 'relationships' in the database, they expressly included such a limitation in the claims. In claims 2, 10, 12, and 14, by contrast, that limiting language is conspicuously and intentionally absent."). Embracing McKesson's position, the Court did not construe Claim 2 to require use of the "predetermined database" in the steps of the method. D.I. 307. Accordingly, McKesson cannot rely on the "predetermined database" to save Claim 2 from a finding of invalidity.

**B.     Overview Of Prior Art: Computerized Medical Claims Processing Systems**

Long before HPR filed its patent application on September 30, 1988, there were numerous computerized systems for medical claims processing available on the market. Dr. Goldberg, one of the '164 patent inventors, personally knew of two companies – GMIS and a company in Hartford, Connecticut – that were independently developing software for catching medical coding errors in the 1980s contemporaneous with HPR's development. Ex. 6 (Goldberg Dep.), at 163:16-164:6, 228:3-18 ("[T]here was essentially independent development going on at these two companies and our company, based on the tenor of the times and the emerge – continually, gradually emerging improving power of automation"). Computer systems that were receiving medical claims and performing the simple functions of Claims 1 and 2 included:

1) *Erisco's ClaimFacts*: Since 1980, ClaimFacts performed medical code validation and checked for and corrected duplicate medical codes.

2) *Doyle Patent*: This patent, with a priority date of June 30, 1987, describes a system for performing medical code validation.

3) *GMIS's AutoCoder*: Since at least April 1987, AutoCoder performed medical code validation.

4) *HDI's Advanced MedLogic System ("AMS")*: Since 1986, AMS performed medical code validation and detection of double billing.

13

5) *Blue Cross/Blue Shield of New Jersey's IBM 7070 System (the "7070 System")*: Since 1964, the 7070 System performed medical code validation and checked for and corrected duplicate medical codes.

6) *Cortron's Health Care Processing System ("HCPS")*: Since 1984, HCPS performed medical code validation and checked for and corrected duplicate medical codes.

7) *Health Systems International's Clinical Data Editor*: Since at least February 1984, Clinical Data Editor performed medical code validation.

Each of these systems will be discussed in more detail below.

## IV.    LEGAL PRINCIPLES

### A.    Summary Judgment Standard

Summary judgment is proper if "there is no genuine issue as to any material fact" and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The burden is upon the movant to establish the absence of genuine issues of material fact and entitlement to judgment as a matter of law. *Cable Elec. Prods., Inc. v. Genmark, Inc.*, 770 F.2d 1015, 1022 (Fed. Cir. 1985). Once the movant has established a prima facie case for summary judgment, the non-movant must come forward with evidence demonstrating a genuine issue of material fact. *Id.*

Summary judgment is appropriate in a patent case as in any other. *Becton Dickinson & Co. v. C.R. Bard, Inc.*, 922 F.2d 792, 795 (Fed. Cir. 1990) ("As in other cases, the grant of summary judgment under Fed. R. Civ. P. 56 is appropriate in a patent case where no genuine issue of material fact exists and the movant is entitled to judgment as a matter of law"). Patent invalidity is a proper issue for summary judgment. *See, e.g., Apple Computer, Inc. v. Articulate Sys., Inc.*, 234 F.3d 14, 24 (Fed. Cir. 2000); *National Presto Indus. v. West Bend Co.*, 76 F.3d 1185, 1189 (Fed. Cir. 1996).

### B.    Patent Invalidity: Anticipation

In order to be patentable, a method or apparatus must be "novel" at the time of its invention. *See* 35 U.S.C. § 102; *Woodland Trust v. Flowertree Nursery, Inc.*, 148 F.3d 1368, 1370 (Fed. Cir. 1998) ("[A] person cannot patent what was already known to others. If the

14

invention was known to or used by others in this country before the date of the patentee's invention, the later inventor has not contributed to the store of knowledge, and has no entitlement to a patent."). A patent is invalid if:

> [T]he invention was known or used by others in this country, or patented or described in a printed publication in this or a foreign country, before the invention thereof by the applicant for patent, or

> [T]he invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States.

35 U.S.C. § 102(a) & (b).

If every element of a claimed invention is disclosed in a single prior art reference or embodied in a single prior art system, the claimed invention is invalid as "anticipated." *Celeritas Techs., Ltd. v. Rockwell Int'l Corp.*, 150 F.3d 1354, 1361 (Fed. Cir. 1998). Prior art includes disclosures in printed publications, as well as devices "in public use" or "on sale" more than one year prior to the date of the patent application. *In re Epstein*, 32 F.3d 1559, 1564 (Fed. Cir. 1994) ("[t]he section 102(b) 'public use' and 'on sale' bars are not limited to sales or uses by the inventor or one under the inventor's control, but may result from activities of a third party which anticipate the invention, or render it obvious"). When a patented method has multiple potential manifestations, a single prior art reference disclosing any example of the method will anticipate the claim. *Atlas Powder Co. v. IRECO Inc.*, 190 F.3d 1342, 1346 (Fed. Cir. 1999) ("a single prior art species within the patent's claimed genus reads on the generic claim and anticipates"). The burden of proving invalidity is more easily carried where, as here, the relevant prior art was not considered by the patent examiner. *See, e.g., WMS Gaming, Inc. v. Int'l Game Tech.*, 184 F.3d 1339, 1355 (Fed. Cir. 1999).

## C.    Patent Invalidity: Obviousness

A patent may be found invalid for obviousness under 35 U.S.C. § 103(a):

> A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the

15

> subject matter as a whole would have been obvious at the time the invention
> was made to a person having ordinary skill in the art to which said subject
> matter pertains.

*See also Graham v. John Deere Co.*, 383 U.S. 1, 17-18 (1966). The person alleging invalidity

must show prior art (either publications or devices "in public use" or "on sale") which alone or

combined with other prior art would have rendered the invention obvious to one of ordinary skill

in the art at the time of invention. *See Dennison Mfg. Co. v. Panduit Corp.*, 475 U.S. 809, 810

(1986); *Rockwell Int'l Corp. v. United States*, 147 F.3d 1358, 1364 (Fed. Cir. 1998).

The Supreme Court has provided the following guidelines for determining the

obviousness of a patent claim:

> Under § 103, the scope and content of the prior art are to be determined;
> differences between the prior art and the claims at issue are to be ascertained;
> and the level of ordinary skill in the pertinent art resolved. Against this
> background, the obviousness or nonobviousness of the subject matter is
> determined. Such secondary considerations as commercial success, long felt
> but unsolved needs, failure of others, etc., might be utilized to give light to the
> circumstances surrounding the origin of the subject matter sought to be
> patented.

*Graham*, 383 U.S. at 17. The Federal Circuit additionally requires a party alleging obviousness

based on combinations of prior art to show a suggestion or motivation to combine the prior art.

*Ruiz v. A.B. Chance Co.*, 357 F.3d 1270, 1275 (Fed. Cir. 2004). "Evidence of a suggestion,

teaching, or motivation to combine may flow from the prior art references themselves, the

knowledge of one of ordinary skill in the art, or, in some cases, from the nature of the problem to

be solved." *In re Dembiczak*, 175 F.3d 994, 999 (Fed. Cir. 1999).

## V.    ARGUMENT

According to the inventors of the '164 patent, the patent's alleged novelty is found in the

"metarules" listed in Appendix B of the patent, plus the specific rules relating particular codes to

each other.

16

**REDACTED**          McKesson itself, in its claim construction briefing, acknowledged that the metarules were "the heart of the invention." D.I. 170 at 30. Developing these rules and metarules was the main task of the inventors, on which they expended many months of effort. Ex. 4 (Holloway Dep.), at 168:20-170:16.[1]

Dr. Holloway admitted that the other features in the patent claims were not novel:

**REDACTED**

Additionally, McKesson conceded during claim construction that the steps of the patent claims were performed using "commercially available" hardware and software known to those of ordinary skill in the art. D.I. 170 at 18, 21, 22, 25, 39; D.I. 255 at 9, 19. And McKesson's expert, Dr. Musen, admitted that once the coding rules were known, the creation of a software program to execute those rules was obvious. Ex. 13 (Musen Dep.), at 165:24-166:25. Hence, it

---

[1]    McKesson's validity expert, David A. Wilson, focused most of his validity report on the inventors' efforts to develop rules and metarules and capture them in a database. *See* Ex. 12 (Wilson Report), at 19-27, 30-33. Dr. Wilson stated:          **REDACTED**

Dr. Wilson acknowledged the centrality of the rules to the purported invention:

**REDACTED**

is clear that the sole purported novelty of the invention consisted of the rules and metarules the inventors had created and captured in a database.

Now, however, McKesson has abandoned the rules and metarules created by the inventors, the only conceivably novel feature of the technology. McKesson has insisted that the claims are not limited by anything in the patent specification, including the metarules of Appendix B. At McKesson's urging, the Court's claim construction did not incorporate the Appendix B metarules or any other limitations into Claims 1 and 2. D.I. 307. And McKesson did not address the Appendix B metarules at all during the April 2006 trial. Consequently, McKesson is left with a generic concept of a "predetermined database" of rules governing code combinations, but lacking the actual rules and metarules the inventors developed.

Moreover, McKesson's arguments at the April 2006 trial have effectively removed even the "predetermined database" from the methods of Claims 1 and 2. According to McKesson, Claim 1 is a method for performing medical code validation using *any* database or list of all CPT codes – it does not require checking or using a predetermined database at all. *See* Ex. 11 (Trial Tr.), at 487:25-489:7. And Claim 2, in at least one example, is a method for eliminating double billing – catching duplicate codes on the same claim. *Id.* at 1202:14-25, 1228:21-1229:2. McKesson argued during claim construction that the method of Claim 2 does not require the "predetermined database," because the database is not referenced in the steps of the method. D.I. 255 at 25-26 ("[W]hen the inventors intended to limit a 'determining . . .' element by drawing a connection to the 'relationships' in the database, they expressly included such a limitation in the claims. In claims 2, 10, 12, and 14, by contrast, that limiting language is conspicuously and intentionally absent.").

Claims 1 and 2 are invalid based on McKesson's own claim construction positions in this case. McKesson strenuously argued to the Court that the patent claims should not be limited to any particular software algorithms, because software for performing the functions of the patent claims was known to those of ordinary skill in the art at the time of the patent application. By

this argument, McKesson conceded that the software described in the patent claims was not novel.

Furthermore, the alleged inventions of Claims 1 and 2 were known, used, described, in public use, and/or on sale in the United States more than one year before the patent application was filed (the critical date is September 30, 1987). The prior art systems (1) performed medical code validation, and (2) checked for and corrected duplicate medical codes and other forms of double billing. Some even contained and used a "predetermined database" (although that is not part of the methods of Claims 1 and 2, as defined by McKesson). Consequently, Claims 1 and 2 are invalid, pursuant to 35 U.S.C. § 102(a) & (b), as anticipated by the prior art. Alternatively, Claims 1 and 2 are obvious in light of the prior art, pursuant to 35 U.S.C. § 103(a).

A.    **McKesson's "Any Software" Claim Construction Position Renders Claims 1 And 2 Invalid**

During claim construction, McKesson argued that the patent claims were not limited to particular software algorithms, because software for performing the patented functions was known to those of ordinary skill in the art at the time of the patent application. A couple of samples from McKesson's claim construction briefs will suffice to illustrate McKesson's argument:

> Thus, the '164 patent 'disclose[s] 'software' as the corresponding structure that performs the specific function[s],' clearly shows the correspondence between the software and the claimed functions, and discloses that the algorithm/software for 'perform[ing] the desired functions' was 'commercially available' and therefore known to those of skill in the art. Claimed functions, such as 'operating on a database,' 'receiving at least one claim,' or 'determining whether a code is not present in a database,' need not be supported by or limited to specific, expressly disclosed algorithms where the specification expressly states that skilled artisans would understand how to implement these functions in 'commercially available' software.

> [A]nyone of ordinary skill in the art would understand that such 'commercially available database management software programs' correspond to the particular function of 'determining whether any medical service code . . . is not present in the predetermined database.' Indeed, TriZetto's own expert has opined that '[c]hecking the validity of input data by comparing it

against a list of known good values is one of the most fundamental techniques
taught by every introductory programming course.'

D.I. 255 at 3, 19.

The Court accepted McKesson's claim construction approach with respect to Claim 1 and

2, which the Court did not limit to any software algorithms, specific rules or metarules. D.I. 307.

McKesson reiterated its position at trial, telling the jury that the claims encompassed *any*

software or method for carrying out the simple functions of the claims:

> The last thing that Mr. Thomas just said is something that is irrelevant. He
> said that we have not shown that the software works in a certain way. That's
> not what is at issue here. These are method steps. They are steps performed.
> When you look at the claims, you look at each of the steps and you ask, have
> we proven by a preponderance of evidence that they actually perform the
> steps. . . . We don't have to show that TriZetto performs these steps in a
> certain specific way. We don't have to show that pursuant to their software,
> they perform these steps a certain precise way . . . . If they perform the steps,
> they infringe. That's the question.

Ex. 11 (Trial Tr.), at 1289:8-1290:8.

Having argued that the claims cover any software implementation and, in fact, that the

software for performing the claimed steps was "'commercially available' and . . . known to those

of skill in the art," McKesson has established the invalidity of Claims 1 and 2. That is,

McKesson cannot now save Claims 1 and 2 by pointing to any details in the patent specification,

when it completely abandoned those details in the claim construction and infringement

proceedings. Nor can McKesson argue that Claims 1 and 2 were novel software methods, when

it insisted that software for performing those methods was well-known. McKesson's broad

claim construction and infringement positions necessarily invalidate Claims 1 and 2.

Since McKesson has asserted that the inventors used well-known software to perform the

simple functions of Claims 1 and 2, one is left wondering just what the "invention" of Claims 1

and 2 actually is? McKesson is likely to contend the novelty of Claims 1 and 2 lies in having a

"predetermined database" with relationships among the codes. But the mere idea of having such

a database, without any specifics on how the database is structured or what rules it contains, is

not an invention. The AMA's CPT Manual itself contains many rules for handling combinations

of codes, which the inventors admitted were the basis of their own rules. McKesson seems to be arguing that the idea of implementing the CPT Manual and its rules in electronic form is patentable. That, of course, is wrong. Had McKesson shown that specific, novel rules from the patent specification were incorporated into the "predetermined database" of Claims 1 and 2, this might be a closer issue, but McKesson did not do so. Instead, it argued that *nothing* in the specification defines the "predetermined database" or otherwise limits the claims. Accordingly, McKesson is left with only a generic concept of a "predetermined database," devoid of any novel features.

**B.    Claim 1 Is Invalid As Anticipated By The Prior Art**

The medical code validation function of Claim 1 – determining whether a medical code is not present in *any* database or list of valid medical codes – has been performed by computer systems since as early as 1964. The following prior art systems performed code validation either with a database of valid codes or with a "predetermined database," as defined by the Court.

**1.    Erisco's ClaimFacts**

ClaimFacts is one of the accused TriZetto products found to infringe Claims 1 and 2. ClaimFacts is a computer software product that provides automated processing of medical claims. *See* Declaration of Anthony B. Bellomo ("Bellomo Decl."), filed herewith, at ¶ 4. It was launched in 1980 by Erisco Managed Care Technologies, Inc. ("Erisco"), a predecessor of TriZetto. *Id.* at ¶¶ 2, 4. ClaimFacts was sold to and used by Erisco's customers beginning in 1980. *Id.* at ¶ 6.

Since 1980, ClaimFacts has been capable of validating codes on medical claims using the following steps (*id.* at ¶ 5):

- ClaimFacts would receive medical claims containing one or more medical codes;

- ClaimFacts would check its CPT database (a database of all valid CPT codes recognized by the AMA) to determine whether or not a submitted medical code was present in that database;

21

- If a medical code was not present in the CPT database, ClaimFacts would display an error message informing the user that the code was not found.

ClaimFacts has used the same code validation technique from 1980 to the present day. *Id.* at ¶ 7. This is the exact technique that was presented to the jury at the April 2006 trial and was found to infringe Claim 1 of the patent. McKesson's expert, Dr. Musen, testified that although Claim 1 calls for determining whether a code is not present in the "predetermined database," it actually does not require checking or using the predetermined database in any way. Ex. 11 (Trial Tr.), at 487:25-489:7 (Musen Testimony: "Q. Do you read anything in [Claim 1] that's requiring that the predetermined database be used to make that determination? A. Nothing at all."). McKesson argued that ClaimFacts infringes Claim 1 by checking the CPT database, which is separate from the predetermined database. *Id.* at 1291:1-17 (McKesson's closing argument: "They look in the all codes database. They determine it's not there."). But that is how ClaimFacts has always performed code validation since its launch in 1980, with or without a predetermined database.[2] Consequently, the ClaimFacts code validation technique that was found to infringe Claim 1 necessarily anticipates that claim. *Polaroid Corp. v. Eastman Kodak Co.*, 789 F.2d 1556, 1573 (Fed. Cir. 1986) ("that which infringes if later anticipates if earlier").

---

[2]    The fact that ClaimFacts has always performed code validation the same way, even before the predetermined database was added in 1989, reveals the fictitious infringement case that McKesson foisted on the jury. The ClaimFacts code validation technique cannot be a method for determining something about a predetermined database (as actually required by Claim 1) when (1) the technique worked the same way even without the predetermined database, and (2) the technique never used the predetermined database even after that was added to the system. McKesson prevailed only by arguing that the predetermined database is irrelevant to the code validation method. McKesson cannot now contend that Claim 1 is novel because it recites a "predetermined database," when McKesson has already said the predetermined database need not be used. Indeed, if accepted, McKesson's position would result in TriZetto being unable to perform a method that it had been performing for more than six years before the inventors even started work on their claimed invention.

22

2.     **Doyle Patent**

The Doyle Patent (U.S. Patent No. 5,070,452) was originally filed on June 30, 1987. Ex. 14 (TRZ001066-1079). The patent discloses a "computerized insurance claim processing system" for providing "up-to-date information to the provider of health care services as to insurance coverage of a patient." *Id.* at TRZ001066, Abstract.

The system included a method for validating input medical codes, described as follows:

> Block 95 indicates that the physician enters a code identifying the diagnosis (sprained wrist). Block 97 indicates that the physician enters up to ten "procedure codes," which refer to the treatments for a sprained wrist selected by the physician. . . . *Block 106 indicates that a check is made to verify that the codes received are actually existing, and not fictitious, codes.* Block 109 indicates that the administration computer searches the data base for plan ABC and calculates the reimbursement specified by the employer for each treatment.

*Id.* at TRZ001076 at Col. 5:42-54 (emphasis added). Figure 3A of the patent further clarified the code validation method: "Verify ICD 9 & CPT 4 code against master file" to determine whether "all codes [are] valid." *Id.* at TRZ001071 at Fig. 3A. From this description, the Doyle patent clearly reveals a computer system with a database of medical codes, capable of receiving medical claims, determining if the codes on those claims are not present in the system's database (i.e., "master file"), and informing the user if they are not.

McKesson's expert, Dr. Musen, admitted that the Doyle patent anticipates Claim 1:

> Q. If we say only Claim 1 exists in this patent, and we're only looking at Claim 1, [doesn't] the reference, the Doyle reference . . . disclose the claim limitations that are in Claim 1?
>
> A. . . . Doyle, obviously, does some degree of claims checking, and inasmuch as the claim made in Claim 1 addresses claim checking, then there is relevance there. As I said previously, my interpretation of the claims is that the motivation for Claim 1 is to clarify that the task performed for claim validity checking can be handled using the same structures that are ultimately used for the other components of the patent.
>
> Q. Right. But if we focus in on claim validity checking, which I think is a fair characterization of claim 1.
>
> A. Yes. . . .

23

> Q. Code validity checking.
>
> A. And I guess my response is that, clearly, the Doyle patent has a component of code validity checking which is provided functionally in Claim 1. The structure is obviously different.
>
> Q. Okay. And how is the structure different?
>
> A. The structure is different in that the database for validity checking is designed in a way to support that task, as well as the other tasks [of the patent] . . .

Ex. 13 (Musen Dep.), at 267:4-269:13. Dr. Musen's only attempt to defend the validity of Claim 1 at his deposition was to note that the "database for validity checking" in Claim 1 was the same that is used to perform the other functions of the patent – i.e., the "predetermined database." Of course, Dr. Musen took a contrary position at trial, arguing that the "predetermined database" *need not be used* to perform the code validation function. Ex. 11 (Trial Tr.), at 487:25-489:7. Having abandoned the notion that Claim 1 uses a "predetermined database" to perform code validation, Dr. Musen's admission concerning Doyle establishes the invalidity of Claim 1.

### 3.     GMIS's AutoCoder

AutoCoder was a software product developed by GMIS (ultimately acquired by McKesson) and used to perform CPT code validation. *See* Ex. 15 (Dugan Dep.), at 44:17-45:25, 48:6-11, 181:14-182:18;               **REDACTED**                              . The relevant details of AutoCoder were explained by Ms. Dugan and Dr. Holloway, two of the '164 patent inventors, at their depositions. *Id.* They were familiar with the functionality of AutoCoder from having seen it in operation when they worked at HPI in the 1980s. *Id.*;

### **REDACTED**

AutoCoder was designed to determine whether an input medical procedure code was valid. Ms. Dugan testified:

> Q. So, AutoCoder, if I can classify that, that program from GMIS, was being used, or that software program had been created, to determine the accuracy of the code or the validity of the code; whether or not it was a valid code?

24

A. That – yes. . . . [W]hat AutoCoder did, was if you typed in a code that was not valid, it would tell you it was invalid.

Ex. 15 (Dugan Dep.)., at 48:6-11, 182:12-14. After reviewing Claim 1 of the '164 patent, Ms.

Dugan agreed that AutoCoder performed the method of Claim 1. *Id.* at 90:16-91:6.

Dr. Holloway confirmed that AutoCoder performed medical code validation.

**REDACTED**

. He also agreed that AutoCoder covered the method of

Claim 1:

**REDACTED**

. With such testimony from the patent's own inventors, there can be no doubt

that AutoCoder anticipates the code validation method of Claim 1.

4.    **HDI's Advanced MedLogic System ("AMS")**

Developed by the Health Data Institute ("HDI") in 1986, AMS was a software system for

editing medical claims. *See* Declaration of Robert J. Bargar, M.D. ("Bargar Decl."), filed

herewith, at ¶ 4.[3] AMS was disclosed during discovery in this litigation through two documents

---

[3]    Dr. Bargar is a physician who was employed at HDI from 1986 to 1988 and worked directly on the development, marketing and sales of AMS. Bargar Decl., ¶¶ 3, 4, 7. Dr. Bargar was first contacted in connection with this litigation in early October 2005 by TriZetto's expert, Dr. Davis. *Id.* at ¶ 2. At his deposition, Dr. Davis described his communications with Dr. Bargar. Ex. 21 (Davis Dep.), at 89:1-105:20, 109:25-113:6. Dr. Bargar was also disclosed on TriZetto's December 30, 2005 Designation of Trial Witnesses. *See* Ex. 22.

produced by McKesson. *See* Ex. 17 (MCK 047608-619 – AMS Product Overview); Ex. 18
(MCK 047505-606 – AMS list of medical claim edits). Additionally, one of the inventors of the
'164 patent, Dr. Goldberg, testified at deposition regarding his experience with AMS when he
worked at HDI in the mid-1980s. Ex. 6 (Goldberg Dep.), at 51:10-52:2, 262:5-265:25. AMS
was also extensively discussed by TriZetto's expert, Dr. Randall Davis, in his expert report. Ex.
19 (Davis Report), at 20-24. McKesson's invalidity experts, Dr. Musen and Dr. Wilson,
responded with their own discussions of AMS in their expert reports. Ex. 12 (Wilson Report), at
39-46; Ex. 20 (Musen Report), at 24-25.

     The AMS Product Overview from May 1987 characterizes AMS as follows:

> The Advanced MedLogic System (AMS) is a computer-based medical
> utilization management tool developed by The Health Data Institute (HDI) for
> use with claims administration and payment systems. AMS can be used either
> prospectively or retrospectively to evaluate the validity of health insurance
> claims . . .

> Used prospectively by insurers, third party administrators, self-insureds and
> other claims payers, AMS can save dollars by approving only valid claims for
> medically necessary services. . . .

> AMS embodies a true "expert system" – the knowledge of medical experts
> which is synthesized into a programmable form. . . .

> Working from the Uniform Billing claims form or the Health Care Finance
> Administration claim form data, AMS edits check for valid values, internal
> consistency, and appropriateness of services and charges.

Ex. 17 at MCK 047610.

     AMS utilized numerous medical claim edits to determine the validity of medical claims

and medical codes on those claims. An AMS document from December 1986 lists more than 50

such claim edits. Ex. 18 at MCK 047505-606.[4] These included:

---

[4]    This list of AMS claim edits is marked "HDI-Proprietary," a fact that was invoked by
McKesson's expert, Dr. Wilson, to suggest that the list was not publicly disclosed. *See* Ex. 12
(Wilson Report), at 42, 44. However, TriZetto is not contending that the list was publicly

[Footnote continued on next page]

- "Acceptable Values for Data Elements" – This involved checking medical codes and other data elements on a claim to "validate the accuracy of the claims data." *Id.* at MCK 047507.

- "Outmoded or Obsolete Procedures/Tests" – This involved checking CPT-4 codes on a claim to catch outmoded procedure codes. *Id.* at MCK 047538.

- "Procedure Ordering, Temporal Sequencing" – This involved checking combinations of ICD-9 codes to "validate the accuracy of the listed procedures" in light of their temporal sequencing. *Id.* at MCK 047512. The edit would only apply when there were "at least two procedures on the claim," in which case it would determine the validity of "any combination of two procedures." *Id.*

The medical codes and other information pertinent to these claim edits were stored in a database within AMS. Bargar Decl., ¶ 6. The AMS database completely anticipates the "predetermined database" concept in the '164 patent, as defined by the Court – "a set of decision-making rules that incorporate a medical code classification system and expert medical clinical judgment."

AMS performed medical code validation through the edit entitled "Acceptable Values for Data Elements." Ex. 18 at MCK 047507. AMS compared individual data elements on the medical claim, including medical procedure codes, to a list of acceptable values in the AMS database. *Id.* ("Checks individual data elements and compares each with a list of acceptable single numbers, letters, and/or ranges. Values outside these ranges are not acceptable."). If a procedure code or other data element did not appear in the list, AMS would alert the "data entry clerk" to the error. *Id.*

Throughout 1987, AMS (including all of the edits described in the December 1986 document) was marketed to a number of potential clients and sold to at least one client. Bargar Decl., ¶¶ 7-8. Based on the functionality described above, AMS anticipates the code validation method of Claim 1 and included a "predetermined database."

---

[Footnote continued from previous page]
disclosed, but that the AMS claim edits were part of a system that was "in public use" and "on sale" more than a year before the patent application filing. Those are independent bases for invalidity under 35 U.S.C. § 102(b). *See In re Epstein*, 32 F.3d at 1564.

5.    **Blue Cross/Blue Shield of New Jersey's IBM 7070 System (the "7070 System")**

The IBM 7070 System was a computer program "specifically designed to automate . . . claims processing functions for both medical and hospital claims" at Blue Cross/Blue Shield of New Jersey ("Blue Cross") beginning in 1964. *See* Declaration of Gunter Siemsen ("Siemsen Decl."), filed herewith, at ¶ 2. Information presented in this motion on the 7070 System was provided by Gunter Siemsen, a Blue Cross employee from 1963 to 1986 who worked with the 7070 System.[5] *Id.* at ¶¶ 1-2.

Since 1964, the 7070 System was capable of validating medical codes on medical claims. The system would receive a medical claim in the form of punch cards with multiple medical codes marked. *Id.* at ¶ 3(a). The system would then check those codes against an internal list of valid medical codes. *Id.* at ¶ 3(c). If a code was not present on the list of valid codes, the system would indicate to the user that the code was not valid. *Id.*

In approximately 1969, the 7070 System was replaced with a new IBM 360 System, which also performed the code validation function. *Id.* at ¶ 6. In the early 1980s, Blue Cross replaced the 360 System with a system from Electronic Data Systems, Inc., known as the "ICS System." *Id.* at ¶ 9. The ICS System also performed code validation, but worked with CPT-4 codes rather than the older medical codes used by the earlier systems. *Id.* at ¶ 10. The ICS System was fully implemented at Blue Cross by 1984. *Id.* at ¶ 9. The ICS System had additional functionality, including "medical policy rules, which would be applied to the medical claims in order to detect incompatible or inconsistent CPT codes that appeared within a single

---

[5]    TriZetto disclosed Mr. Siemsen in its September 13, 2005 supplemental initial disclosure as a witness with knowledge of the Blue Cross/Blue Shield of New Jersey prior art system. *See* Ex. 23 at 3. TriZetto also disclosed Blue Cross/Blue Shield of New Jersey as a developer of prior art software in TriZetto's September 13, 2005 supplemental response to McKesson's Interrogatory No. 6. *See* Ex. 24 at 62.

medical claim." *Id.* at ¶ 10. This collection of medical policy rules fits squarely within the Court's definition of a "predetermined database."

The 7070 System and its successors at Blue Cross demonstrate that the computerized medical code validation method of Claim 1 was being performed more than 20 years before the patent was filed, and the ICS System clearly included a "predetermined database."

**6.    Cortron's Health Care Processing System ("HCPS")**

In 1983 and 1984, Cortron Corporation developed an automated claims processing system called Health Care Processing System ("HCPS"). *See* Declaration of Donald F. Demers ("Demers Decl."), filed herewith, at ¶ 4. HCPS was developed for use by Cortron's client, CoMed Management, Inc. *Id.* at ¶ 3. Information presented in this motion about HCPS was provided by Donald F. Demers, Cortron's president in the mid-1980s.[6] *Id.*

Since 1984, one of the core features of HCPS was medical code validation. *Id.* at ¶ 4. HCPS would receive medical claims containing CPT-4 codes. *Id.* The system would check each code against a database of all valid CPT codes recognized by the AMA. *Id.* If a medical code was not present in the CPT database, the system would inform the user that the code was invalid. *Id.* at ¶ 5. HCPS was installed at several HMOs during 1984. *Id.* at ¶ 6.

HCPS also included a "predetermined database," as defined by the Court. D.I. 307 at 3 ("A set of decision-making rules that incorporate a medical code classification system and expert medical clinical judgment"). The 1984 version of HCPS contained a database of rules associated with CPT codes that defined whether a particular code was appropriate for the age and gender of the patient. *Id.* at ¶ 7. By July 1986, HCPS included a database of rules relating medical codes to each other – i.e., determining whether "two codes represented procedures that could be performed at the same time or within a certain number of days of each other." *Id.* at ¶ 10.

---

[6]    TriZetto disclosed Mr. Demers in its September 13, 2005 supplemental initial disclosure as a witness with knowledge of prior art technology. *See* Ex. 23 at 4.

HCPS anticipates all possible aspects of Claim 1, both the code validation method and the "predetermined database" (if that is relevant).

7.     **Health Systems International's Clinical Data Editor**

An article in the February 15, 1984 edition of *Modern Healthcare* magazine disclosed a medical code validation software called "Clinical Data Editor," marketed by Health Systems International. Ex. 25 (RD000504-RD000511) at p.134. Clinical Data Editor was a "specialized medical records computer system" used to assure "the consistency of clinical data and the resulting diagnosis." *Id.* The system was described as follows:

> But even using [another software], a hospital isn't assured of the consistency of clinical data and the resulting diagnosis. For this purpose, a hospital can acquire the Clinical Data Editor marketed by Health Systems International. This product identifies erroneous or missing diagnosis and procedure codes.

*Id.* Validating medical procedure codes, as disclosed in this article, is all that Claim 1 covers.

**C.     Claim 2 Is Invalid As Anticipated By The Prior Art**

In at least one example offered by McKesson at trial, Claim 2 was portrayed as a method for identifying and correcting double billing on medical claims. Prior art systems that disclose this or any example of Claim 2 are sufficient to anticipate that claim. *See Atlas Powder*, 190 F.3d at 1346 ("a single prior art species within the patent's claimed genus reads on the generic claim and anticipates").

Although a "predetermined database" is mentioned in the preamble to Claim 2, it is never invoked in the steps of the method. McKesson contended in its claim construction briefs that the method of Claim 2 did not require the "predetermined database," because the steps did not expressly mention that limitation. D.I. 255 at 25-26. Consequently, McKesson cannot now rely on the "predetermined database" to defend Claim 2 from a finding of invalidity.

The following prior art systems have performed the method of correcting double billing on medical claims since as early as 1964, all but one including a "predetermined database."

30

1.     **Erisco's ClaimFacts**

Since its release in 1980, ClaimFacts has been capable of detecting redundant medical codes on a medical claim – i.e., double billing. Bellomo Decl., ¶ 8. ClaimFacts would receive medical claims containing multiple medical codes. *Id.* at ¶ 5. If ClaimFacts determined that the medical claim contained two identical medical codes, it would authorize one of the codes for further processing but reject the other code. *Id.* at ¶ 8. These are the precise steps of Claim 2, as defined by McKesson at trial.

2.     **HDI's Advanced MedLogic System ("AMS")**

As described above in Section V.B.4, AMS was in public use and on-sale more than one year prior to the filing of the patent application. Bargar Decl., ¶¶ 7-8. AMS included numerous medical claim edits to determine the validity of medical claims and codes on those claims. The codes and other information pertinent to these edits were stored in a database. *Id.* at ¶ 6.

In addition to the edits previously discussed, AMS had at least three edits for detecting particular forms of double billing. One such edit was entitled "Procedures and Tests/One Time Occurrence." Ex 18 at MCK 047539. The edit was designed to check "procedures and tests which should only occur once on a claim." *Id.* The edit would apply only if there were "at least two procedures on the claim." *Id.* If two procedure codes on the claim were identical, the claim would be flagged and corrected. *Id.*

Another edit was entitled "Two Charges by Same Practitioner for Ambulatory Visit and Hospital Admission on the Same Day." Ex. 18 at MCK 047554. The edit was designed to "flag duplicate billing by the same practitioner for care rendered in an ambulatory setting on the same day as hospital admission." *Id.* If two procedure codes were submitted reflecting two visits to the same doctor on the same day, the claim would be flagged and corrected. *Id.*

Finally, there was an edit entitled "Surgeon Visit on Same Day as Surgery." Ex. 18 at MCK 047556. This edit would "identify excessive billing by a surgeon for visits performed on the same day as surgery." *Id.* If a surgeon billed for a surgical procedure and a follow-up

31

medical visit on the same day, the claim would be flagged and corrected. *Id.* ("Action Options . . . Override flag with corrections . . .").

This last edit is precisely the same as one of the "mutually exclusive procedures" that McKesson offered as an example of Claim 2 at trial. McKesson's counsel asked TriZetto employee Ms. Lampe:

> Q. And one of the three examples of a mutually exclusive code is that initial service and subsequent service shouldn't be billed at the same time on the same claim, right?
>
> A. Yes.
>
> Q. All right. And that's basically double billing, isn't it? You shouldn't bill for the first visit, the second visit at the same time on the same claim, right?
>
> A. Correct.

Ex. 11 (Trial Tr.), at 1039:17-25. McKesson argued that this was one example of Claim 2 in action. *Id.* at 1227:21-1228:3. The AMS edit entitled "Surgeon Visit on Same Day as Surgery" is exactly the same.

### 3. Blue Cross/Blue Shield of New Jersey's IBM 7070 System (the "7070 System")

As described above in Section V.B.5, the IBM 7070 System used by Blue Cross/Blue Shield of New Jersey beginning in 1964 was a computer program "specifically designed to automate the company's claims processing functions for both medical and hospital claims." Siemsen Decl., ¶ 2.

Since 1964, the 7070 System was designed to identify and edit duplicate or redundant codes on medical claims. *Id.* at ¶ 4. Indeed, this was the primary objective of the 7070 System, since many physicians at the time were submitting multiple claims or duplicate codes on the same claim if they had not received reimbursement in the amount expected. *Id.* at ¶ 5. The 7070 System would receive medical claims containing multiple medical codes. *Id.* at ¶ 3(a). The system would examine each code on a line-by-line basis. *Id.* at ¶ 4(b). If the system detected two of the same code, it would authorize only one code and reject the other. *Id.*

32

In 1969, Blue Cross replaced the 7070 System with the new IBM 360 System. *Id.* at ¶ 6. In the early 1980s, the 360 System was replaced with the ICS System. *Id.* at ¶ 9. Both of these systems checked for duplicate medical codes just as the 7070 System had done. *Id.* at ¶¶ 6, 10. The ICS System also included a "predetermined database," as described above in Section V.B.5.

The various systems used by Blue Cross since 1964 reveal that editing medical claims for double billing, as taught by Claim 2 under McKesson's interpretation, was performed more than 20 years before the patent was filed.

### 4.    Cortron's Health Care Processing System ("HCPS")

As described above in Section V.B.6, HCPS was an automated claims processing system that included a "predetermined database," as defined by the Court. Demers Decl., ¶¶ 4, 7, 10. By mid-1986, HCPS included databases containing (1) rules relating CPT codes to the age and gender of the patient, and (2) rules relating CPT codes to each other – i.e., determining whether "two codes represented procedures that could be performed at the same time." *Id.*

Additionally, HCPS was capable of identifying and correcting duplicate medical codes on a claim. *Id.* at ¶ 8. HCPS would receive medical claims containing multiple codes. *Id.* If a claim included the same medical code twice, the system would recognize the duplication and would approve the first code for payment and reject the second one. *Id.*

HCPS also targeted another form of double billing – medical claims containing codes for both an initial procedure and a related follow-up treatment or visit. *Id.* at ¶ 10. HCPS would detect when initial and follow-up codes were billed on the same claim and would authorize only the initial code. *Id.* This is precisely the same as one of the examples of Claim 2 functionality offered by McKesson at trial. McKesson's counsel stated in a question to a TriZetto witness: "One of the three examples of a mutually exclusive code is that initial service and subsequent service shouldn't be billed at the same time on the same claim." Ex. 11 (Trial Tr.), at 1039:17-25. McKesson went on to argue that this was an example of Claim 2. *Id.* at 1227:21-1228:3. The HCPS functionality is exactly the same.

**D.    Claims 1 and 2 Are Obvious In Light Of The Prior Art**

An obviousness determination pursuant to 35 U.S.C. § 103 is only necessary if anticipation is lacking. *Connell v. Sears, Roebuck & Co.*, 722 F.2d 1542, 1548 (Fed. Cir. 1983). A showing of obviousness will be easier the closer the prior art comes to anticipation, since "anticipation is the epitome of obviousness." *Id.; see also In re Pearson*, 494 F.2d 1399, 1402 (C.C.P.A. 1974) ("a lack of novelty in the claimed subject matter, e.g., as evidenced by a complete disclosure of the invention in the prior art, is the 'ultimate or epitome of obviousness'").

As discussed above, every single element of Claims 1 and 2 (as defined by the Court's claim construction order and McKesson's positions at trial) is anticipated by each of the indicated prior art systems and references. If any of the prior art systems or references somehow narrowly miss anticipation, they certainly render Claims 1 and 2 obvious to a person of ordinary skill in the art.

**1.    Claims 1 and 2 Would Have Been Obvious To A Person Of Ordinary Skill In The Art**

TriZetto's expert, Dr. Randall Davis, has defined a person of ordinary skill in the art of the '164 patent "to be someone with an undergraduate degree in Computer Science with at least one course in artificial intelligence, and at least one year of experience in building expert systems." Ex. 19 (Davis Report), at 3 n.1; Declaration of Randall Davis ("Davis Decl."), filed herewith, at ¶ 3. Dr. Davis testified at deposition that in addition to the qualifications stated above, a person of ordinary skill in the art could also have personal knowledge of medical claims processing, as suggested by McKesson's experts. Davis Decl., ¶ 4. According to either of these definitions, Dr. Davis himself was a person of ordinary skill in the art during the 1980s. *Id.*

In his expert report, Dr. Davis explained that AMS, the Doyle Patent, and the Clinical Data Editor each anticipate and/or render obvious Claims 1 and 2 of the patent. Ex. 19 (Davis Report), at 20-25, 32. Subsequently, the Court's claim construction order and the new interpretations that McKesson applied to Claims 1 and 2 at trial reduced the claims to the following: (1) Claim 1 is a medical code validation method performed using *any* database of

34

codes, not necessarily a "predetermined database"; and (2) Claim 2, in one example used by McKesson at trial, is a method for correcting double billing on medical claims.

Based on those definitions, Dr. Davis can now confirm: (1) that AMS anticipates and/or renders obvious Claims 1 and 2, (2) that the Doyle Patent anticipates and/or renders obvious Claim 1, and (3) that the Clinical Data Editor anticipates and/or renders obvious Claim 1. Davis Decl., ¶ 8. AMS performed a medical code validation method and checked for double billing in precisely the same manner as Claims 1 and 2. *Id.* at ¶ 9. AMS also included a "predetermined database" of "decision-making rules that incorporate a medical code classification system and expert medical clinical judgment." *Id.* The Doyle Patent and the Clinical Data Editor performed the same medical code validation technique as Claim 1. *Id.* at ¶ 10. Dr. Davis can perceive no distinction between the claims and the prior art systems, but to the extent some slight distinction exists, it would have been obvious to a person of ordinary skill in the art to use the prior art systems in the manner of Claims 1 and 2. *Id.* at ¶ 11.

The secondary considerations of obviousness, such as "commercial success," "long felt but unsolved need," and "failure of others" to invent the technology (*see Graham*, 383 U.S. at 17), do not help Claims 1 and 2 in this circumstance. First, secondary factors cannot rescue the claims from invalidity if the claims are clearly obvious, as in this case. *Richdel, Inc. v. Sunspool Corp.*, 714 F.2d 1573, 1579 (Fed. Cir. 1983) ("where a patent is obvious, it cannot be saved from invalidity by resorting to secondary factors"). Second, whatever commercial success the CodeReview product may have enjoyed was surely not attributable to the simple functions of Claims 1 and 2. The code validation function of Claim 1 was merely a preliminary step executed at the start of the code-checking process, not the core function of CodeReview. As for Claim 2, it only covers code combinations that are "mutually exclusive due to non-medical criteria," which McKesson admits is only a small portion of any medical code-checking system. *See* Ex. 11 (Trial Tr.), at 1228:9-12 (McKesson's counsel: "I would admit that most of the relationships in these databases are medically related, but a number of them are billing related"). As such, McKesson cannot establish a nexus between the methods of Claims 1 and 2 and any alleged

commercial success of the CodeReview product. *See Richdel*, 714 F.2d at 1579 (patentee must show that "the patented improvement contributed to the commercial success").

**2.    The Automation Of Dr. Hertenstein's Known Manual Code-Checking Technique Was Not A Patentable Invention**

The '164 patent is an "expert computer system" built primarily on the expert knowledge of inventor Dr. Hertenstein. The patent was based on the CodeReview software product, which was in turn based on the manual code-checking technique developed by Dr. Hertenstein. *See* Ex. 2 ("In 1987, through his association with Boston University's Health Policy Institute, an opportunity to automate Dr. Hertenstein's system was identified. The automation of Dr. Hertenstein's work led to the development of CodeReview."). The patent inventors acknowledged that CodeReview was an automated version of Dr. Hertenstein's manual system, performing the same tasks as Dr. Hertenstein (including the tasks described in Claims 1 and 2) and containing a "predetermined database" with Dr. Hertenstein's code-checking rules:

- *Dr. Hertenstein*:

**REDACTED**

**REDACTED**

36

- *Dr. Holloway*:

**REDACTED**

**REDACTED**

- *Dr. Goldberg*:

Q.  Back to Claim 2.  Talks about rejecting the medical service codes that were mutually exclusive due to nonmedical criteria.  Do you see that?

A.  I see that.

Q.  Do you have an understanding of whether the individuals at Caterpillar prior to 1987 rejected medical service codes which were mutually exclusive due to nonmedical criteria in connection with their claims processing at Caterpillar?

A.  I do believe they rejected medical service codes which are mutually exclusive, in a method that bore a relationship to the method we built.

**REDACTED**

, Ex. 6 (Goldberg Dep.), at 308:21-309:7.

37

Dr. Hertenstein's manual code-checking method was certainly public knowledge by 1987, having been disclosed at public conferences and described in published articles in 1986 and 1987. *See* Ex. 5 (1986 Pew Conference); Ex. 8 (Egdahl & Hertenstein, *"The Caterpillar Experience"*); Ex. 10 (Holloway, Hertenstein & Egdahl, *"Savings From Accurate Coding of Surgical Claims: The Caterpillar Method"*). Moreover, Dr. Hertenstein's method was based in large part on the explicit instructions of the CPT-4 Manual, which was widely disseminated and used in the medical field at the time.

### REDACTED

Ex. 6 (Goldberg Dep.), at 231:8-11, 232:14-18 ("[A] large number of people, given some orientation to the way this AMA's CPT code book is organized, would be able to understand certain code that trump other codes. . . . I believed that where there were a number of coding combinations, that anybody, in quotation marks, who understood the organization of the CPT code book could deduce.").

Accordingly, the purported "invention" of the '164 patent is simply a computer automation of a pre-existing, well-known, manual expert system. The database of CodeReview was a collection of the code-checking rules that Dr. Hertenstein used manually at Caterpillar. The rest of the technology implemented the code-checking tasks that Dr. Hertenstein was already performing manually.

Simply automating a pre-existing manual technique is not a patentable "invention." *See In Re Venner*, 46 C.C.P.A. 754, 758 (C.C.P.A. 1958) ("it is well settled that it is not 'invention' to broadly provide a mechanical or automatic means to replace manual activity which has accomplished the same result"); *Chem-Nuclear Sys., LLC v. Braun*, 2006 U.S. Dist. LEXIS 10192 (D.S.C. 2006) (invalidating a patent on a system for cleaning wastewater which was merely a broad automation of what had been done manually). The code-checking software developed by the inventors was an obvious automation of Dr. Hertenstein's well-known manual technique. Likewise, Claims 1 and 2 are obvious automations of the pre-existing manual technique, particularly given the breadth and simplicity of Claims 1 and 2, as defined by

McKesson and the Court. *See Princeton Biochemicals, Inc. v. Beckman Coulter, Inc.*, 2004 U.S. Dist. LEXIS 11918, at * 63-64 (D.N.J. 2004) ("[i]t has been well-established that the obvious automation of a known manual process is not patentable"). Indeed, there were many well-known references in the 1980s specifically explaining how to build an expert's knowledge into a computerized expert system. Ex. 19 (Davis Report), at 9-16.

Based on McKesson's own positions and the Court's claim construction, Claims 1 and 2 are nothing more than concepts for automating known functions that were already performed manually. For this reason as well, Claims 1 and 2 are invalid as obvious in light of the prior art.

### 3. There Was Substantial Motivation To Develop The Methods Of Claims 1 And 2 In the 1980s

Throughout the 1980s, there would have been substantial motivation to combine various features from the different prior art systems to create the methods of Claims 1 and 2, given the significant development and experimentation work on computerized medical claims processing systems at the time (as evidenced by the prior art systems themselves). Additionally, the development of the '164 technology itself was revealed in publications and presented to customers throughout 1986 and 1987:

- At a Pew Conference in 1986, a representative of HPI gave a presentation discussing medical coding problems, Dr. Hertenstein's manual code-checking technique for solving those problems, and the concept of building computer software to correct medical coding errors. *See* Ex. 5 at MCK 119636-638.

- Also in 1986, HPI proposed to develop for Aetna computerized screens for examining data on medical claims and flagging medical coding problems. *See* Ex. 7 at MCK 039604-631. These problems included the performance of REDACTED – in other words, double billing, the same function that McKesson ascribes to Claim 2.

- In April 1987, Dr. Hertenstein presented an article – "The Caterpillar Experience" – at a meeting of the American Surgical Association that explained Dr. Hertenstein's manual code-checking technique in detail and suggested it could be incorporated into "claims processing systems." Ex. 7 at MCK 035623.

- In July 1987, HPI proposed to create for Aetna a software product with

**REDACTED**

39

- In the fall of 1987, Drs. Holloway and Hertenstein submitted an article for publication in *Business and Health* magazine disclosing the medical coding problems that the patent ultimately tried to solve, Dr. Hertenstein's manual code-checking technique on which the patent is based, and a summary of HPI's efforts to build a computerized code-checking system. Ex. 10 at MCK 048025-35. The article even disclosed (*Id.* at MCK 048033) one the specific rules in the '164 patent – Example 1 of Appendix A – which was used at trial by McKesson's expert, Dr. Musen, as an example of Claim 2.

Based on these disclosures and the wealth of available prior art systems, a person of ordinary skill would have had the motivation and knowledge to implement the methods of Claims 1 and 2, relying on the prior art individually or in combination.

## VI.    CONCLUSION

For the reasons set forth herein, summary judgment of invalidity should be granted to TriZetto on Claims 1 and 2.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP


*/s/ Rodger D. Smith, II*
Jack B. Blumenfeld (#1014)
Rodger D. Smith, II (#3778)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
   *Attorneys for Defendant The TriZetto Group, Inc.*

OF COUNSEL:

Jeffrey T. Thomas
David A. Segal
Michael A. Sitzman
GIBSON, DUNN & CRUTCHER LLP
Jamboree Center
4 Park Plaza
Irvine, CA  92614-8557
(949) 451-3800

Original Filing Date:  June 1, 2006
Redacted Filing Date:  June 8, 2006

523002

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on June 8, 2006, I caused to be electronically filed the Opening Brief in Support of The TriZetto Group, Inc.'s Motion for Summary Judgment of Invalidity on Grounds of Anticipation and Obviousness (Redacted Version) with the Clerk of the Court using CM/ECF, which will send notification of such filing(s) to the following:

> Michael A. Barlow
> Skadden, Arps, Slate, Meagher & Flom LLP

I also certify that copies were caused to be served on June 8, 2006, upon the following in the manner indicated:

### BY EMAIL AND HAND

> Michael A. Barlow
> Skadden, Arps, Slate, Meagher & Flom LLP
> One Rodney Square
> Wilmington, DE  19801

### BY EMAIL AND FEDERAL EXPRESS

> Jeffrey G. Randall
> Skadden, Arps, Slate, Meagher & Flom LLP
> 525 University Avenue
> Suite 1100
> Palo Alto, CA  94301

> */s/ Rodger D. Smith II (#3778)*
> Morris, Nichols, Arsht & Tunnell LLP
> 1201 N. Market Street
> P.O. Box 1347
> Wilmington, DE  19899
> (302) 658-9200
> rsmith@mnat.com