# EXHIBIT 2

Development of CodeReview(TM)'s Medical Knowledge Base

CodeReview initially evolved from Dr. Robert Hertenstein's work at Caterpillar. During his seven years of reviewing Caterpillar claims, Dr. Hertenstein recognized that many physicians were submitting claims with inappropriate coding. He used this opportunity to discuss these patterns with other physicians, many of whom are recognized as leading experts in their fields. Dr. Hertenstein compiled this information and was implementing it manually on behalf of Caterpillar.

In 1987, through his association with Boston University's Health Policy Institute, an opportunity to automate Dr. Hertenstein's system was identified. The automation of Dr. Hertenstein's work lead to the development of CodeReview. It was recognized immediately that in order for the product to have credibility and to gain national acceptance by physicians and health care payors, the physician input to the product would have to be widely expanded and incorporate national practice patterns. This lead to the development of physician panels in each the surgical sub-specialties. The purpose of these panels is to review the rule base in their specialty and to determine the consensus for implementation. For those rules where a clear-cut consensus can not be reached, an optional rule is created. This allows the customer to determine how their organization will address the specific issue. Finally, prior to marketing CodeReview, the product was demonstated to groups of physicians to gain their feedback. CodeReview is the only product of its kind to be reviewed by the American College of Surgeons. Although these demonstrations did not allow for the detailed feedback of the consensus panels, they did result in resounding approval of CodeReview's Medical Knowledge Base.

In order to maintain its clinical credibility and physician acceptance, CodeReview must have on-going physician input. This is accomplished in three ways. The first is through our client base. The CodeReview Decision History File offers a wealth of information, not only on CodeReview's performance, but also on new coding patterns that are being devised. This leads to the creation of new rules, which are developed according to the steps outlined in the paragraph above. Secondly, Medical Directors with each of our clients are also a valuable source of information for product enhancements. Many client requests lead to the generation of new CodeReview rules. Thirdly, the annual publication of the AMA's CPT Manual results in modifications to CodeReview's Knowledge Base. Each year's first quarterly release of CodeReview contains new rules to conform with the AMA's most recent standards.

HPR is committed to maintaining our standard of physician involvement in CodeReview. We recognize that the integrity of our product lies within the richness of our physician contribution, and that a product without this validation risks repudiation by physician leadership. HPR believes there is no similar product on the market that can approach the breadth and depth of physician input that exists in CodeReview.

H000748

MCK 050516

04-CV-1258-SLR (D.Del.)

# EXHIBIT 3

REDACTED

# EXHIBIT 4

REDACTED

# EXHIBIT 5

# REDACTED

# EXHIBIT 6

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

------------------------x
MC KESSON INFORMATION SYSTEMS, :
Plaintiff, : Case No.
vs. : 04-1258 SLR
THE TRIZETTO GROUP, :
Defendant. :
------------------------x

VIDEOTAPED DEPOSITION OF GEORGE A. GOLDBERG

Washington, D.C.
Tuesday, September 13, 2005

REPORTED BY:
CARMEN SMITH

Deposition of GEORGE A. GOLDBERG, called for examination pursuant to notice of deposition, on Tuesday, September 13, 2005, in Washington, D.C. at the offices of Gibson, Dunn & Crutcher, 1050 Connecticut Avenue Northwest, at 9:03 a.m. before CARMEN SMITH, a Notary Public within and for the District of Columbia, when were present on behalf of the respective parties:

BERNARD SHEK, ESQ.
Skadden, Arps, Slate, Meagher & Flom LLP
525 University Avenue, Suite 1100
Palo Alto, California 94301
650-470-4500
On behalf of Plaintiff and Witness

DAVID A. SEGAL, ESQ.
Gibson, Dunn & Crutcher LLP
4 Park Plaza, Suite 1400
Irvine, California 92614-8557
949-451-3973
On behalf of Defendant

Also present:
LARRY FLOWERS, Video Operator

P R O C E E D I N G S

VIDEO OPERATOR: This is the deposition of Mr. George A. Goldberg, taken on behalf of Defendant in the matter of McKesson Information Systems LLC, Plaintiff, versus Trizetto Group, Inc., Defendant, Case Number 04-1258 SLR, for the U.S. District Court, District of Delaware.

This deposition is being taken at the offices of Gibson Dunn, 1050 Connecticut Avenue, Washington, D.C. The time is approximately 9:03 a.m. The date is September 13, 2005.

The court reporter is Carmen Smith, on behalf of Barkley Court Reporters, 2040 Main Street, Suite 250, Irvine, California. I am the video operator, Larry Flowers, also on behalf of Barkley.

The reporter may now swear the witness.

Whereupon,

GEORGE A. GOLDBERG

was called as a witness and, having first been duly affirmed, was examined and testified as follows:

VIDEO OPERATOR: Will counsel identify themselves and who they represent.

MR. SEGAL: David Segal of Gibson, Dunn & Crutcher on behalf of the Trizetto Group, Inc.

MR. SHEK: Bernard Shek for Plaintiff, also representing the witness, Dr. Goldberg, at this deposition.

EXAMINATION

BY MR. SEGAL:

Q Good morning.

A **Good morning.**

Q Can you please state your full name for the record?

A **George Ansbach Goldberg.**

Q Can you spell the middle name for the court reporter?

A **A-n-s-b-a-c-h.**

Q Have you ever had your deposition taken before, Dr. Goldberg?

A **Which deposition?**

Q Any time, have you ever been deposed in a deposition before?

A **Yes.**

Q How many times?

A **I believe once.**

Q And have you ever testified in court before?

A **No.**

Q Now, you've had your deposition taken before, and we'll go back and visit about that

**A Computers became so much more powerful is the other piece. You can't conceive of how basic they were in the old days. Nobody in this room, given their age, can remember that as well as I can fuzzily remember that.**

MR. SEGAL: We've been going a little over an hour, so we will take a short break.

THE WITNESS: I'd appreciate that.

MR. SEGAL: Thank you.

VIDEO OPERATOR: We're off the record. The time is approximately 10:12 a.m.

(Recess.)

VIDEO OPERATOR: We are back on the record. The time is approximately 10:26 a.m.

BY MR. SEGAL:

Q You understand you're still under oath?

**A Yes, I do.**

Q In connection with your work on the Health Insurance Experiment, did you have the opportunity to learn what other insurance companies or claims processors -- let me rephrase the question.

In connection with your work at The RAND Corporation, did you have the opportunity to learn what health insurance companies -- or how health insurance companies were processing claims?

MR. SHEK: Objection; vague and ambiguous.

THE WITNESS: Did you say -- would you repeat the question, please, the rephrased question?

BY MR. SEGAL:

Q In connection with your work at The RAND Corporation, did you have the opportunity to learn how health insurance companies were processing claims?

**A No, other than Glenn Slaughter & Associates, which is not -- which was not -- which although it was doing that function, is actually a pension plan -- was a pension plan company, not a health insurance company.**

Q If I refer to "payors," p-a-y-o-r-s, to refer to individuals that take -- or companies that take care of claims processing, is that a term that you are comfortable with?

**A Yes.**

Q In connection with your work at The RAND Corporation, did you have an opportunity to learn what payors other than Glenn Slaughter were doing in connection with claims processing?

**A No.**

Q And I believe your CV indicates that in about 1985, you left The RAND Corporation; is that

correct?

**A That is what my CV shows, and it's correct.**

Q Why did you leave The RAND Corporation?

**A The Health Insurance Experiment had ended.**

Q Any other reasons?

**A It was time to move -- I thought it was time to move back to the East Coast to be near my aging parents.**

Q And you -- from your CV, it looks like you joined a company Health Data Institute in Lexington, Massachusetts; is that correct?

**A That is correct.**

Q And it references developmental work on an Advanced MedLogic, M-e-d, cap L-o-g-i-c, System?

**A Yes, it does.**

Q Which indicates that it does cost/quality procedure code based claims review.

**A That's what it says.**

Q Can you provide a more detailed explanation what the Advanced MedLogic System was?

**A The Advanced MedLogic System was a series of computerized tables, lookup tables, that received, processed and paid claims. In other words, it was post-payment claims databases, and**

**reviewed them to perform single-code edits of various kinds. Post-process, post-payment.**

Q There's also a notation on your CV about a prospective payment system?

**A The prospective payment system is the government's DRG system.**

Q And does that -- did that system deal with claims processing prior to payment?

**A The DR -- the answer is yes and no.**

Q Can you explain?

**A The DRG system, which is performed -- which applies to hospital claims only, or certainly did in those days, the DRG system, diagnosis related groups. Groups diagnoses with some on hospital discharge claims, with attention as well to ICD9 procedure-coded procedures on hospital claims, and assigns every hospital discharged claim to one and only one DRG, a number that at that time went somewhere between 001 and 4XX. There were 400-some-odd DRGs.**

**And it functions for payment purposes because at some point, Medicare and Medicaid and the occasional private insurer paid for a hospital stay on the basis of the DRG to which a hospital discharge claim was assigned.**

A HPR? No, but I believe there was talk about it. But I don't recall if they ever did.
Q Were you involved -- are you familiar with Bloodhound, a company named as Bloodhound?
A Bloodhound, yes.
Q What is your knowledge of what Bloodhound is?
A I was contacted a few years ago in the 1990s in the second -- I assume in the second half of the 1990s, but I don't recall the exact date, by a company called "Bloodhound." Oh, wait a minute. No, I think originally I was contact -- originally, they were a client of either Value -- I think ProtoCare Sciences, the successor company to Value Health Sciences. You're testing my memory in ways I'm not sure about.
Bloodhound was a client of one of the companies I worked for. I met them at the time. Later on they approached me privately, and for a while, I was a consultant to them, probably short enough and embarrassing enough that I never put it on my resume.
Q What was the nature of your consulting services with Bloodhound?
A They were using a rebundling system, and

they came to it might have been MEDecision, Inc., MEDecision, Inc., which I have never been an employee of but I've been a -- my company has sold -- that's it. My company has sold my time to MEDecision, Inc. It's M-E-D is capital, and then the rest of the word, decision. So there's only one D in MEDecision, Inc.
Whether it was Constella -- I don't mean Constella. What was the name of the next company? ProtoCare. If I said Constella before, that was not relevant. It was either ProtoCare Sciences or MEDecision that had Bloodhound as a client, and I met them through that. I met them through that -- the company I was working for.
Q And did you ever discuss the '164 patent with Bloodhound?
A What is the '164 patent?
Q It's the patent on which you are named as an inventor.
A I don't recall if I did or not.
Q Did you ever provide any private consulting to HBOC or HBO and company?
A Not that I recall. HBOC, not that I recall.
Q Did you ever provide any private

consulting to GMIS?
A Not that I recall. I think the answer is no, but that was enough years ago that I'm saying "not that I recall" instead of "no."
MR. SEGAL: Probably a good time to break for lunch.
VIDEO OPERATOR: We're off the record. The time is approximately 11:58 a.m.
(Whereupon, at 11:58 a.m., the deposition was recessed, to be reconvened at 12:45 p.m. this same day.)

AFTERNOON SESSION (12:46 p.m.)
Whereupon,
GEORGE A. GOLDBERG
resumed the stand and, having been previously duly affirmed, was examined and testified further as follows:
VIDEO OPERATOR: We are back on the record. The time is approximately 12:46 p.m.
BY MR. SEGAL:
Q Good afternoon.
A Good afternoon.
Q Are you familiar with the Pew Fellows Conference, P-e-w?
A When I was at the Health Policy Institute, there was something called the Pews Fellow or Fellows Conference, yes.
Q Can you tell us what it was?
A My understanding is that it was a coming-together of various corporate employees whom Richard Egdahl, head of the Health Policy Institute, could attract because of his connections. And they came together, I don't recall the periodicity, to -- came together just to talk amongst themselves for a few days and to educate themselves as to what the other corporations were doing all in the area, I

believe, of benefits, corporate benefits. Maybe only in health, but I don't even recall that it was limited to health.

Q Did you ever attend any of the Pew Fellows Conferences?

A Yes.

Q Do you recall which ones?

A No. The reason I know I did and the reason I'm so sure I did is I remember at one I was having bad back trouble and had to spend most of the time getting up -- standing at the back of the room instead of sitting. And that's why I'm -- and it was a Pew conference, so that's why I'm sure I was at one. And I think I was at more than one, but I don't recall them.

Q Do you recall any of the locations for any of the conferences you went to of the Pew Fellows?

A I think every one I went to was in the Boston area. I believe the one where I had -- there was one meeting that we had at a fancy hotel facing the Boston Public Gardens or Boston Commons, one of the two, though I'm not sure that was a Pew Fellows meeting, but that was an HPI-sponsored meeting at that hotel. And I believe there was another hotel where we also met.

So I think it was typically at hotels in the Boston area.

Q At any of the conferences that you attended, do you recall anyone from HPI or HPR giving any presentations?

A I don't recall it. I'm sure they did, but I would not be able to point to it.

Q And what period of time, to the best of your recollections, were the Pew Fellows Conferences taking place?

A I think they were underway from the time I came to HPI, throughout my time there. So roughly '86 to '90. That's -- sorry -- yeah, '86 through '89. But I don't remember any precise dates. They happened.

MR. SEGAL: I'm going to ask the court reporter to mark as Exhibit 2 to your deposition a multipage document, Bates numbered GG 0006 through 17.

(Deposition Exhibit 2 identified.)

THE WITNESS: Here are my publications, thank you.

BY MR. SEGAL:

Q I'll ask you if you recognize that document.

(Witness reviewed the document.)

A Yes, I recognize this document.

Q Can you tell us what it is?

A This is what I would -- this is either -- yes, this is in my view part of my resume, even when it's presented separately or -- that's what it is, uh-huh.

Q And to the best of your knowledge, was this document which we've marked as Exhibit 2 complete up and to including January 2005?

A I would have tried to make it complete through that date. I'm looking, of course, at the end, which actually -- the first few pages are called "selected publications," so there's clearly no -- just the opposite of intending to have it be complete.

The next one in the old-fashioned type that comes from an old text file program I still use was attempting to be complete up to, it appears to be, '05. It's an attempt to be complete.

Q Did you ever give any presentations at any Pew conferences?

A I would think I did, but I took the opportunity to look here, as I was paging through, making sure this was all mine, I took particular --

made a particular look at this page 6 of the old type, 6 on top. And when I see the time period, I don't see -- I don't see anything that particularly -- that specifically names a Pew conference. That's a surprise to me.

The answer is I think I did give a presentation, but I don't see it here.

Q Do you recall what you gave a presentation on to the Pew Fellows Conference?

A No. I note that the presentations I gave here in that time period all dealt with quality, as you can see for yourself.

Q In doing your work on --

A There is one on utilization.

Q -- quality and utilization during the mid-1980s, did you review electronic claims data?

MR. SHEK: Objection; vague as to form. Objection as to form; vague and ambiguous.

THE WITNESS: I'm not sure what you mean by "review," so please help me. Did you review claims data -- electronic -- would you please --

BY MR. SEGAL:

Q Why don't you tell me what you mean by "review" and we'll try and use your word, so that we have no confusion and I don't try and impose a

suddenly, so many of these observations which heretofore had looked contradictory suddenly fit into the system.

And we needed to understand what pieces a system and method would require, and we had to find those underlying principles that would suddenly have everything click into place.

Q Prior to --

A I think that's more than what you described.

Q Prior to October 1993, did you ever disclose to any party the detailed operation and description of rules that were in CodeReview?

A I don't know if I -- I think on every sales -- at every sales meeting, those rather few sales meetings that I was involved in, I personally disclosed these things, which once they had been elucidated seemed very obvious, the way gravity and planetary motion seem obvious to us.

Q And what were the principles that you recall elucidating at every sales meeting?

A The ones I can recall at this moment, which are only a subset, I would imagine, were -- was that rebundling of codes which when seen together were -- reflected incorrect coding could

be -- rebundling could be achieved by an automated system that would rebundle reliably and reproducibly. It would provide output that made sense to payors and providers.

It could achieve this because there were not 147 or 9000 different recoding -- excuse me, that was incorrect, rebundling statements, but in fact, that things boiled down to a very small number, which meant that a computer application -- and I'm not even sure the word "application" existed in those days, that a computer application could be developed, and not only that, we had developed it.

Q Did you ever disclose the small number of rules that the rebundling statements could be boiled down to prior to the issuance of the '164 patent?

A When was the patent issued?

Q October 12, 1993.

A Then I would say the answer is yes.

Q Okay. When do you first recall revealing the specifics of the small number of rules to which the rebundling statements could be boiled down to?

A Re --

Q I'm trying to use your words so --

A I understand. I appreciate that. Revealed to whom?

Q To any third party, anyone outside HPR.

A A third party. Aside from the fact that it was in the late 1980s, I don't recall.

Q Do you recall to whom you disclosed the specifics of the small number of rules to which the rebundling statements could be boiled down to?

A To a third party? To a third party?

Q To a third party.

A I don't remember. My guess is first to Caterpillar, Inc., as separate from Robert Hertenstein, an employee of Caterpillar, Inc., and probably to potential customers, to I think the modern word is "qualified" customers, customers who have been qualified. Yeah. Potential customers who have been qualified as being serious customers.

Q Prior to the issuance of the '164 patent, did you hear of any other companies that did not have access to your small number -- specific small number of rules that had developed computer software that would address the problem of code rebundling?

A Yes.

Q Can you tell me who?

A I remember that there were two others. That's how many I knew of. And one of them I don't recall the name of the company, but I know it was

headed by Dr. Leslie Levy, and I believe that was headquartered in the Hartford -- somewhere in the Hartford, Connecticut area. And the other I guess was GMIS. I don't know the exact name, but there was another company, and I believe -- my best recollection would be that it was GMIS.

So the barriers of entry I mentioned seemed to be fairly high, if there were three and only three companies working on this, of which we were one.

Q And so the barriers to entry were, one, the amount of effort to come up with the specific rules for the rules database; is that correct?

A I call that number seven, but okay, it's one of the elements.

Q Well, you gave me two elements. So if you have seven elements, I would like to know what they are.

A I -- yes.

Q What are the barriers that you viewed to entry?

A I thought I gave you three -- I thought I mentioned three barriers. Number one was the state of computers at the time.

Q Okay.

Peoria that I remember making.

Q And the second paragraph refers to a presentation on Health Bills that Mr. Moore was scheduled to make on Friday morning?

A Uh-huh.

Q Do you recall attending a Pew conference in early June 1986 at which Mr. Moore made a presentation on managing physician fees?

A I don't recall attending the Pew conference you mention.

Q Do you have any reason to believe that Mr. Moore did not use his outline in giving a presentation at the Pew conference in early June 1986?

A I think it's highly likely that Charlie gave a presentation at the Pew -- at the -- at a subsequent Pew conference mentioned in his letter, though I have no idea of the date of that conference. You have mentioned June twice, but I don't know that.

But I really don't know if he used this outline or not, and I have -- I really don't know if he did or not.

Q Do you recall attending a Pew conference at which Mr. Moore discussed bundling and unbundling

and implementing a model approach to physician fee review that was implemented and tested by Caterpillar?

A I don't recall attending that.

Q Do you recall which individuals were general attendees at Pew conferences in the '86 time frame?

A I think I do.

Q Can you tell me who that would be?

A It would be all -- the goal would have been to have all Health Policy Institute employees other than support staff attending the Pew conference, and then the Pew fellows as well.

Q Do you recall who the Pew fellows were in the mid-1986 time frame?

A They were various corporate employees. They were employees -- let me rephrase that, though I'm not trying to change the meaning. I'm just trying to clarify.

They were employees of various corporations who were concerned with the health and/or benefit program of that corporation, and they attended the Pew conferences in their role as Pew fellows, which I believe was a time-limited designation. So there was regular turnover.

Q Do you recall a great roast beef dinner in Peoria?

A I do not, but it really fits, in that Robert Hertenstein would have done that, would have found us a great roast beef dinner in Peoria, before and after his heart attack.

Q Do you know -- does seeing Exhibit 74 --

A Yes.

Q -- help you determine whether or not discussions regarding using software to check claims for rebundling or unbundling -- let me rephrase the question, sorry.

Does reviewing Exhibit 74 help you determine whether or not HPI disclosed the concept of using software to check claims for rebundling codes appearing on claims was occurring in 1986?

A I still don't understand the question. The "was occurring" doesn't seem to fit, so please, maybe I'm just not -- I'm not -- let me not look at this and you'll repeat or rephrase, your option.

Q I will do both.

A Okay.

Q Or a combination of both.

A Okay.

Q Does reviewing Exhibit 74 lead you to

believe that in the 1986 time period, HPI was disclosing to third parties the concept of using software to deal with the issue of unbundling codes or rather rebundling codes that appeared on medical claims?

A No. Wait a minute. I see now I have completed only -- I now see that the outline, I was looking only at Roman I. So let me continue.

Q And carefully review the document to see.

A Thank you.

(Witness reviewed the document.)

In item 5 on what you would call page 638 --

Q You're getting good at this.

A I'm trying. You see a few examples and then you can do it. I see at the end of number 5 the words "and build into software." And on number 6 I see "enter into computer."

So I don't remember what was disclosed at this meeting or at any other Pew meeting, unless perhaps you can remind -- jog my -- refresh my memory in some way. But it looks to me as if the words "computer" and "software" are in this outline. And of course, we have no idea -- once again, "software" as people would have thought of it in

from Dr. Hert -- to Dr. Hertenstein from Mr. Moore, and you are indicated as receiving a blind copy?
A That's correct.
Q Do you recall receiving this document?
A I do not.
Q Do you have any reason to believe that you did not receive it?
A I don't remember if I received it or not. I have no reason to believe that I did not receive it, though I can't -- I don't know if I received it or not.
MR. SEGAL: I actually need to use the restroom, so I apologize. Off the record, sorry.
VIDEO OPERATOR: We're off the record. The time is approximately 4:36 p.m.
(Recess.)
VIDEO OPERATOR: Back on the record. The time is approximately 4:42 p.m.
BY MR. SEGAL:
Q Do you agree that a rules database of some sort is required to practice the system and method disclosed in the '164 patent?
A Please repeat the question.
(The reporter read the record as requested.)

Page 225

THE WITNESS: I agree that a rebundling rules database is necessary for a system and method to work on.
BY MR. SEGAL:
Q And do you believe that a specific system, the one that's disclosed and claimed in the '164 patent, for that system and method, you need to have a rules database about -- that contains information about rebundling rules for CPT codes?
A I do believe that you have to have a lookup table of -- not of rebundling rules but of code combinations, which when encountered on claims will require rebundling.
Q Would it be fair to describe these -- this lookup table of code combinations as a rules database?
A I'm willing to call it a rebundling rules -- yeah, I think I've called it rebundling rules database earlier today. I don't know if it's fair or not, but I'm willing to call it that.
Q I was -- I would have called it "knowledge base," but I'm going to use your earlier definition -- your earlier terminology so that the record is clear and you have an understanding of what we're talking about.

Page 226

A Thank you. That expression, "knowledge base," I discovered at some point that I was a knowledge engineer. I had never heard of such a phrase before. That was one of the things I was.
Q Before the filing of the original application for the '164 patent -- let me rephrase.
Before the filing of the patent application for the -- start this again, it's getting late for everyone, I think.
Before the filing of the application that ultimately matured into the '164 patent, did you learn that other companies were offering software to automate bundling of codes?
A Oh, yes.
Q When do you first recall learning that there were other companies that were offering software products to deal with bundling of codes?
A I now have to distinguish, I realize, between offering and developing. As I mentioned earlier today, I do understand that -- did understand that there were two companies that were developing software to handle -- to perform code rebundling on claims that needed it.
But as for offering, I'm not sure. I don't remember if either of those two or any other

Page 227

were offering them before we did, because I don't remember the dates well enough.
Q Did you ever determine whether or not those companies were developing a product before you started developing the CodeReview product?
A I can answer this, but I need to remember what you -- would you repeat the question, please?
(The reporter read the record as requested.)
THE WITNESS: Not only did I not determine that those companies were developing a product before we developed our product, but also I am under the impression, and was at the time and still am, that there was essentially independent development going on at these two companies and our company, based on the tenor of the times and the emerge -- continually, gradually emerging improving power of automation.
MR. SEGAL: I'd like to ask madam court reporter to please mark as Exhibit 9 a multipage document Bates numbered MCK 119819 through 922.
(Deposition Exhibit 9 identified.)
BY MR. SEGAL:
Q I'll ask you to take a look at that document.

Page 228

A A little easier to read, thank you.
(Witness reviewed the document.)
I've finished my general review of this letter.
Q This purports to be a letter sent by you to Dr. Howard Bailit of Aetna Life Insurance Company.
A Yes.
Q On January 12, 1988?
A Okay. Yes, it does purport.
Q Do you recall it to be that -- do you recognize the document?
A I do not recognize the document.
Q Do you have any reason to believe that this is not a letter that you sent to Mr. Bailit on January 12, 1988?
A No, meaning I have no reason to believe that it is not a letter I wrote and sent to Dr. Bailit on approximately January 12, 1988.
Q And in drafting a letter to Dr. Bailit, would you have been careful to make sure what you were representing or stating in the letter was accurate?
MR. SHEK: Objection as to form.
THE WITNESS: I always attempt to be

careful. What I see here is George Goldberg in sales mode, a situation I had essentially never experienced before. I didn't need it during college, medical school, residency or my 11-year tenure at The RAND Corporation, nor had I to my recollection been involved in the one year I was in the private sector at Health Data Institute, nor at the start of my tenure at the Health Policy Institute. But I certainly would have tried to be careful. I always try.
BY MR. SEGAL:
Q And you wouldn't have intentionally misrepresented anything to Dr. Bailit?
A I would not have intentionally represented, but I might have engaged in emphasis of certain factors, as opposed to others which at that time was my understanding was one of the things that was necessary for sales.
Q Okay. At the bottom of the first page, you state, "'anybody' can go through the coding book and identify a large number of decision rules." Do you see that?
A I do see that.
Q Is that a statement that you made to Dr. Bailit on January 12, 1988?

A I'd say the odds are essentially 100 percent that I made that statement and want to point out, I'm very happy to say that that word "anybody" is in quotation marks.
Q What did you mean by putting "anybody" in quotation marks?
A It's what I explained, I believe, earlier today, and I'm happy to repeat that a large number of people, given some orientation to the way this AMA's CPT code book is organized, would be able to understand certain codes that trump other codes. And I give two examples there, not all that different from the one I gave in a more theoretical form earlier today, when I talked about, I believe, procedure A plus something as opposed to procedure A alone.
Q And on the top of page 2, you note that "there are many such self-evident, logical examples." Do you see that?
A I see that.
Q Did you believe that there were many self-evident, logical examples of procedure codes that could be identified by going through the coding book?
A As of January 1988, I believe I did.

Q And did you believe that on September 30, 1988?
A I have no idea what I believed on September 30, 1988. Is there a reason you're choosing that date?
Q It's just the filing date of the patent.
A Oh, thank you.
Q Do you have any reason to believe that your opinion about whether there were many self-evident, logical examples of rules that could be gleaned from the coding book --
A I believe I would say that it's essentially certain that on -- that for all of the year of 1988, at least from January 12 on, I believed that where there were a number of coding combinations, that anybody, in quotation marks, who understood the organization of the CPT code book could -- could deduce.
Q Okay. And you tell Dr. Bailit that the decision rules that would be included in HPR's product go far beyond the self-evident rules; is that correct?
A That's what it says. "However, our decision rules go far beyond the self-evident rules."

I HEREBY CERTIFY that I have read this transcript of my deposition and that this transcript accurately states the testimony given by me, with the changes or corrections, if any, as noted.

x George A. Goldberg
10/18/2005

Subscribed and sworn to before me this day of , 20 .

x
Notary Public

My commission expires:

IN THE UNITED STATES DISTRICT COURT
for the District of Delaware

------------------x

McKESSON INFORMATION SYSTEMS, :

Plaintiffs, :

: Case No.

v. : 04-1258 SLR

THE TRIZETTO GROUP, :

Defendant. :

------------------x

Washington, D.C.
Volume II
September 28, 2005

REPORTED BY:
DANIEL W. HAWKINS

Video Deposition of

GEORGE A. GOLDBERG, M.D.

called for examination pursuant to notice of deposition, at the law offices of Gibson, Dunn & Crutcher, 1050 Connecticut Avenue, Northwest, 2nd Floor, Conference Room 3B, Washington, D.C., beginning at 9:21 a.m., before DANIEL W. HAWKINS, a Notary Public within and for the District of Columbia, when were present on behalf of the respective parties:

BERNARD SHEK, ESQ.
Skadden, Arps, Slate, Meagher & Flom LLP
528 University Avenue, Suite 1100
Palo Alto, California 94301
Phone 650.470.4500
Fax 650.470.4570
E-mail bshek@skadden.com
On behalf of Plaintiff and Witness

APEARENCES (continued)

DAVID A. SEGAL, ESQ.
Gibson, Dunn & Cructher LLP
4 Park Plaza, Suite 1400
Irvine, California 92614-8557
Phone 949.451.3973
Fax 949.475.4663
E-mail dsegal@gibsondunn.com
On behalf of Defendant

Also present: T.J. O'Toole, CLVS, Videographer

CONTENTS

| Witness: | Examination by: |
|---|---|
| Dr. Goldberg | Mr. Segal: 261, 389 |
| | Mr. Shek: 382, 391 |

EXHIBITS

| Deposition Exhibit | Marked |
|---|---|
| 10 | 268 |
| 11 | 270 |
| 12 | 276 |
| 13 | 276 |
| 14 | 325 |
| 15 | 327 |
| 16 | 330 |
| 17 | 338 |
| 18 | 345 |
| 19 | 348 |
| 20 | 351 |
| 21 | 357 |
| 22 | 367 |
| 23 | 380 |

(Exhibits attached.)

PROCEEDINGS

(Announcement by the Videographer.)

Thereupon,

GEORGE A. GOLDBERG, M.D.

a Witness, called for examination by counsel for the Defendant and, after having been first duly sworn, was examined and testified as follows:

EXAMINATION BY COUNSEL FOR THE DEFENDANT

BY MR. SEGAL:

Q Good morning.
A **Good morning.**
Q Welcome back.
A **Welcome back to you.**
Q You understand that you are still under oath?
A **Yes.**
Q Just to be safe, because we have a different court reporter, and we had you sworn again this morning.

Did you have an opportunity at all to review your transcript from your first deposition?
A **No, I did not.**
Q Have you had the opportunity to prepare any more for your deposition since our last session?
A **I've had the opportunity, but I did not do any such preparation.**
Q In thinking about your testimony if you've done

so, have you realized you made any errors in your testimony?
A **I haven't thought about my testimony, and if parts of it have popped into my head, I haven't noted any errors.**
Q In your last deposition, we were discussing a system known as Advanced MedLogic? Do you recall that.
A **Yes, Advanced MedLogic.**
Q And that was a system that was used by Health Data Institute, I believe? HDI.
A **I'm not sure I would call Advanced MedLogic a system, at least not today. I don't know what I said two weeks ago. I'd call it a review mechanism, and it was developed by HDI, Health Data Institute.**
Q And actually, the system name was Advanced MedLogic System.
A **I don't recall.**
Q Let me show you what was previously marked as Exhibit 1 to your deposition, which was your c.v. And I would trust that you've made an effort in preparing your c.v. to make sure it's accurate and complete?
A **Yes, I have. And understandable to a person who would read it.**
Q If you look on the first page under point 3, where it refers to Health Data Institute.
A **Yes, I see that.**

Q And under that you list your development work?
A **On Advanced MedLogic System. Yes, I see that.**
Q So the Advanced MedLogic System was the name of the system that you worked on?
A **It is probable that that was the original name of the system; that is, that the Health Data Institute, in its marketing wisdom, decided to call it the Advanced MedLogic System.**
Q And the Advanced MedLogic System was a program that ran on computers?
A **Not in the sense that today we consider it a program. Advanced MedLogic System was a series of lookup tables and reports got produced off a computer.**
Q And there were instructions that the computer followed to know how to look up information in the tables, and compare claims data with information in the tables?

MR. SHEK: Object as to form.

THE WITNESS: I have actually no idea how it was done.

BY MR. SEGAL:

Q Do you know if it operated on a computer?
A **I know that computers were used in the Advanced -- what seems to be called the Advanced MedLogic System.**
Q And you spoke about the lookup tables that you some input in, of that system. Is that correct?

A **Yes. I helped, I mostly reviewed those tables that had been developed by a group of nurses.**
Q And the last time we established that those tables had things such as procedure codes and diagnoses codes, or procedure codes and gender. Is that correct?
A **They were a series of edits designed to -- edits in the old fashioned sense of the word. Yes, they were looking for mismatches between age and diagnosis, age and procedure, sex and diagnosis, sex and procedure, or just diagnoses that were so unusual you wouldn't expect to see them in the United States; although they might be perfectly common in parts of Africa, for example.**
Q And the lookup tables were used in conjunction with reviewing claims data, is that correct?
A **Please repeat the question.**
Q The lookup tables were used in connection with the Advanced MedLogic System, and in reviewing claims data.
A **Those lookup tables were used in the review of batches of already paid claims data.**
Q The claims data, you're talking about medical claims data. Is that correct?
A **Yes, what you would call medical claims data, what I would break down and call facility claims data and professional claims data.**
Q How many different of these edits were in the

lookup tables in the Advanced MedLogic System?

A Well, of course the real answer is I don't know the number; but I think there were somewhere between 10 and 20 lookup tables, and I guess that there were anywhere from 20 to several hundred elements in each table.

Q Do you have any knowledge as to what type of rules were applied in the program that utilized those lookup tables?

MR. SHEK: Objection as to form. Vague and ambiguous. Also lacks foundation.

BY MR. SEGAL:

Q Do you have any understanding as to whether any rules were used by a program in utilizing the lookup tables as part of the Advanced MedLogic System?

A Well, I'll answer that with the understanding that the word 'rules' is a loaded word that can mean ten different things.

This system was looking for the occurrence of certain codes or code combinations, and whenever it saw one thing, my understanding is, because I was neither responsible -- I was not responsible for -- I was just giving input, consulting input to the nurses. It counted them, it counted -- it was a counter of finding certain combinations of code code, code sex, code age, and basically produced counts.

I'm not sure I call those rules. Period.

Q Were there programmers that worked at HDI on the Advanced MedLogic System?

A There must have been, but I can't be any more specific than that, because it wasn't part of what I did.

Q In December 1986, were you part of the Product Development Group at HPI, the Health Policy Institute?

A I don't remember that exact -- I don't recall that exact name, but it's highly likely that I was -- I was in fact a part of a group of people at Health Policy Institute who were trying to develop a product, a commercial product.

Q I'm going to show you what was previously marked in a deposition as Exhibit 81. It's a multipage document bearing Bates numbers MCK 119 650 through 654, and ask you to take a look at that, and I'll ask you whether you recognize it.

A (Viewing document.).

Q The first question is, do you recognize this document as a document you would have received in December 1986 while you were at HPI.

A I do not recognize this document. I don't recognize this document; it surely is a matter of memory, but I do not recognize it.

Q Let me see if -- I'm trying to refresh your

recollection. In the second paragraph it says coding. Do you see that?

A I sure do.

Q It says Aetna's claims processors re-code procedures when they determine there is justification.

Do you recall learning in about December 1986 that Aetna's claims processors re-coded procedures when they determined there is justification?

A I don't recall learning that in December 1986.

Q Did you know that in 1986 that Aetna had claims processors that re-coded procedures when they determined there was justification?

A I don't remember if I knew that in 1986.

Q Further in that paragraph it says: They bundled the surgeon's hospital visits into the overall surgical fee. They use a similar formula as CAT, for combining multiple procedures.

Do you see that?

A I do see that.

Q First question is, is it your understanding that c a t CAT refers to Caterpillar?

A Yes. That is my understanding.

Q Do you recall learning that Aetna's claims processors bundled the surgeon's hospital visits into the overall surgical fee, and that they used a similar formula

as CAT for combining multiple procedures, in 1986?

A I do not recall learning that in 1986 or in any other year. I don't doubt for a second that at some point I learned it, but I don't recall learning it, and I don't recall that it was in 1986.

MR. SEGAL: Okay, let me ask the court reporter to mark as Exhibit 10 to your deposition a multipage document bearing Bates numbers MCK 11 9935 through 46.

(Goldberg Deposition Exhibit No. 10 was marked for identification.)

(Document handed to witness.)

BY MR. SEGAL:

Q I'll ask you to take a look at what we've had marked as Exhibit 10.

A Okay, I have Exhibit 10. What would you like me to do?

Q Is this a document you recognize from your days at Health Policy Institute?

A (Viewing document.)

Well, it's actually easy to answer your direct question. I do not recognize this document.

Q Did you have any involvement in a report given to Caterpillar and Sun Company on the evaluation of negotiated surgeon claims in or about February 1987?

MR. SHEK: Object as to form.

THE WITNESS: It is a complicated question, all right?

In this document, I, "little old me" in quotation marks, merely an M.D., do not know what authorizing means, and I do not know what nonmedical criteria mean fully. I can guess, but I don't know.

BY MR. SEGAL:

Q As one of the inventors on this patent, you don't know what authorized or nonmedical criteria mean, as used in this claim?

A On September 28, 2005, I am not sure of what these words meant to us or to me in 198--whatever, when this patent was first -- I see it was approved in -- dated 1993. It says filed 1991, after I had left the company. I can make very good guesses, but this is not my wording; I think it was not my wording, and that many years later I am not certain.

Q What is your best understanding of what 'nonmedical criteria' refers to?

A My best understanding is that nonmedical criteria refers to coding criteria. The rules of coding, as enunciated by the owner of CPT procedure codes, the American Medical Association, at any particular time.

Q What do you mean by the coding criteria?

A The American Medical Association's CPT procedure book describes, in introductory sections; not only at the beginning of the book but at the beginning of many subsections, not only in many subsections, but also before individual codes, how coding is supposed to be carried out, how codes are supposed to be used; the comments are most often general and especially in the 1980s, rarely specific. And over the years, there have been, there has been an evolution in that area.

But there are rules of coding that are printed in AMA procedure books going back to the early years.

Q Now are those rules of coding based on any medical criteria?

MR. SHEK: Object as to form.

THE WITNESS: The rules of coding are not based on medical criteria; some of the rules about when to use -- period.

BY MR. SEGAL:

Q I'm going back to your explanation. These explanations, would they be based on things about medical treatment? Or would they be based on what's nonmedical criteria, is my question.

A That if you -- one example is that if you have a code that is indented under another code, you should not be using both those codes. That is an example, but I am not

telling you that it's in fact a real example. That would be the example of a nonmedical instruction regarding the use of codes.

Another one is that a physician of any specialty can use any code in the CPT book no matter what it's location. So that a specialist in internal medicine, if he or she wants to, can use a code in the orthopedic section. That's an example of a coding criterion, and in that sense it's a nonmedical criteria, and it just says anybody can submit a code from the book; a code in one section doesn't belong to the specialty that typically uses the codes in that section.

Q What would make a code mutually exclusive due to nonmedical criteria?

A The example I gave you is one of those where there's an indentation of one code under another, and one -- that indented code clearly says 'with something.' And it's not a medical, in my view, not a medical criterion to understand that the word with means that the indented code includes what was in the non-indented code; it has something else extra. In particular because the CPT manual explains indented codes as including everything up to the semicolon in the non-indented code.

Q And the CPT book that explains that the indented codes are included in the non-indented code was publicly

available prior to 1987?

A It's that the non-indented code is included in the indented code.

Q I'm sorry?

A That book, so far as I know, has been available; it's updated annually since sometime in the 1970s.

Q And it would include the information about the non-indented codes being --

A Well, about the relationship between non-indented codes and indented codes? It might have. The book developed over time, and additional language of this nature. In other words, coding rules. I'm sorry, you're right, I'm now the one who's using 'rule' as opposed -- I chided you the first day for using 'rules' in a different way.

These coding criteria, nonmedical criteria, I call these coding guidelines, directives, nonmedical criteria. If I'm having trouble answering this, all I can say is that I started by saying that I wrote, myself, only a certain -- very key, but relatively limited portion of this patent.

Q Back to Claim 2. Talks about rejecting the medical service codes that were mutually exclusive due to the nonmedical criteria. Do you see that?

A I see that.

Q Do you have an understanding of whether the

individuals at Caterpillar prior to 1987 rejected medical service codes which were mutually exclusive due to nonmedical criteria in connection with their claims processing at Caterpillar?

A I do believe they rejected medical service codes which are mutually exclusive, in a method that bore a relationship to the method we built.

Q You indicated that you didn't know what authorizing meant? That you might have some general concept of what it might mean? Is that right.

A I don't like the word authorizing, and had anybody asked me, I would have said it even I believe at that time because the word 'authorizing' in the world of claims has so many different meanings, including the very common phrase, 'prior authorization' where authorizing means that an insurance company says in advance that if this procedure is done on this patient, the insurance company will pay for the procedure; and that's called prior authorization.

That's not the sense in which authorizing is used here. So I would have preferred another word. But here, authorizing medical service codes, I think I can say with insurance means letting them pass -- no, I'm not going to say letting them pass -- means presenting medical service codes as being recommended for payment.

So that an initially-submitted code either passes through unchanged, and that is why I used the word passed initially, but there's another example where a code which did not exist originally is substituted for one or more codes that were submitted originally; and that substituted code is also "authorized" -- in quotation marks. So yes, I think I do understand what authorizing means, I just would have preferred a different word.

Q In connection with your reading of these steps in Claim 2, do you read them to include the replacement of a code that was not on the original claim?

MR. SHEK: Object as to form.

THE WITNESS: It says authorizing medical service codes. It doesn't make any comment, at least not right there, as to whether that was an original code or not. By original code, I mean a code originally submitted on a claim.

BY MR. SEGAL:

Q The determining step refers to the medical service codes in the claim being mutually exclusive with any other medical service code in the claim.

A Yes.

Q And so that step is limited to just looking at the codes on the claim?

MR. SHEK: Object as to form.

MR. SEGAL: In your best understanding?

THE WITNESS: Yes, that is. And I note that in the authorizing, you've got a clause, paragraph -- in the authorizing portion, that the words 'in the at least one claim' those words do occur in the second half, but not in the first half. It does not say: authorizing medical service codes in the at least one claim, which are not mutually exclusive to the nonmedical criteria with any other medical service codes contained in the at least one claim.

So I'm not saying that my position is proved, but it is not disproved.

BY MR. SEGAL:

Q And the rejecting also doesn't include reference so it can reject all other codes? Is that how you read the rejecting step?

MR. SHEK: Object as to form.

THE WITNESS: I'm not sure I understand the question. Can you repeat it, please.

BY MR. SEGAL:

Q And what medical service codes get rejected, in the language, by looking at the language of the rejecting step of Claim 2?

A It doesn't specify, except to say that they are the ones considered mutually exclusive.

Q Looking at Claim 3.

A Okay.

Q And reading through that, do you have an understanding of what it means for a medical service code to be valid or invalid?

A I believe so, but give me a chance to read it.

I'm going to have to read some more, because I see that the word 'and valid' appears at the end, as well as 'valid' at the beginning. So I'm going to have to read the whole thing and not just the first piece.

I have now looked at the use of the word valid and invalid in Claim 3. So what's your question.

Q What is your understanding that valid or invalid means?

A It means if they bear a medically-plausible relationship to other codes, or not.

Q And if they bear a medically plausible relationship, they are valid?

A That's my interpretation in 2005 of these words, yes.

Q And if it doesn't have a medically plausible relationship, it would be invalid?

A Yes, that's the way it appears to me in 2005.

Q Can you think of anything other than a medically plausible relationship that would make a code valid or invalid as it's used in Claim 3?

I HEREBY CERTIFY that I have read this transcript of my deposition and that this transcript accurately states the testimony given by me, with the changes or corrections, if any, as noted.

x George A. Goldberg
10/18/2005

Subscribed and sworn to before me this day of

20 .

______________________________

Notary Public

My commission expires:

# EXHIBIT 7

REDACTED

# EXHIBIT 8

# An Access-oriented Negotiated Fee Schedule

*The Caterpillar Experience*

RICHARD H. EGDAHL, M.D. and ROBERT D. HERTENSTEIN, M.D.

**his paper describes the system used by Caterpillar Corpora- n (CAT) in Peoria, Illinois, to reimburse surgeons. The CAT ystem assures access for Caterpillar employees and their fam- ies to a selection of qualified surgeons, while achieving cost vings through improvements in processing of surgical claims nd negotiation of selected fees. CPT-4 codes are recoded for reater accuracy, when indicated, surgical services that have een incorrectly unbundled are rebundled, and the appropriate- ss of surgical assistant charges is reviewed. A "degree of ifficulty" relative value scale (DODRVS) of surgical services s periodically revised as technology changes. The DODRVS ultiplied by a regional factor, determined by local market esearch, establishes the fee that CAT will pay the surgeon. alance billing is permitted if the patient (1) is informed in dvance by the surgeon that the fee will be higher than CAT ill pay, and (2) knows that the service can be obtained from ther local surgeons who will accept the CAT fee. The goal of e CAT method of surgeon reimbursement is to gain physician upport for an access-oriented, market-driven negotiated fee chedule. Compared with a resource-based relative value scale RBRVS) methodology, the CAT system is not formula-driven nd depends on physician acceptance.**

*From the Department of Surgery and Health Policy Institute, Boston University Medical Center, Boston, Massachusetts, and Caterpillar Corporation, Peoria, Illinois*

FOR MORE THAN 25 years, physicians have benefited from a generous fee-for-service system of payment. However, between 1965 and 1985, ational expenditures for physicians' services have increased almost tenfold, from $8.5 billion in 1965 to 2.8 billion in 1985.[1] As a result, several possible physician payment reforms are being considered. Prospective payment by diagnostic-related groups (DRGs), put in place to control Medicare hospital expenditures, is a t of life for hospitals. Medicare and Medicaid are now ooking for changes in the way they pay physicians. anaged care programs are negotiating discounts from types of health care providers.

Reform activity can be identified on many fronts: (1) Congress has frozen Medicare fees, effective June 1984 through January 1987. Congress' intent is now to shift the burden of effectively constraining the growth of Medicare Part B costs to providers rather than Medicare beneficiaries. (2) The Physician Payment Review Commission, created by Congress, has issued a recent major report, outlining ways that physicians could be reimbursed under Medicare in the future.[2] (3) In fall 1985, the Health Care Financing Administration (HCFA) contracted with Harvard University to conduct a 30-month study of resource-based relative value scales (RBRVS) for physician services.[3] This system is being developed under the direction of William Hsiao, Ph.D., Harvard School of Public Health. The American Medical Association is a subcontractor on the study for HCFA. The study is scheduled to be completed in July 1988. (4) The Massachusetts Rate Setting Commission is revising its Medicaid fee schedule, based on the RBRVS, for planned application in mid-1987. (5) The Massachusetts Insurance Commissioner asked Blue Shield to consider reforms in physician payment, with an emphasis on developing an RBRVS, as a condition of his approving a Blue Shield rate increase in 1987. (6) Congressional hearings on physician fee schedules continue, and congressionally sponsored studies of physician fees have recently been published.[4,5]

Within the administration in Washington, proponents of physician fee reform are calling for an expanded use of capitation in the long term, or some form of physician DRGs.[6] But these changes are not imminent. During the next several years, fee payment modifications will be based in fee-for-service recalculations. If the revised physician fee schedules achieve acceptable levels

Presented at the 107th Annual Meeting of The American Surgical sociation, Palm Beach, Florida, April 21–23, 1987.
Reprint requests: Richard H. Egdahl, M.D., Boston University Medical Center, 720 Harrison Avenue (1107), Boston, MA 02118.
Submitted for publication: April 24, 1987.

000006

MCK 035619
04-CV-1258-SLR (D.Del.)

Confidential Information
Subject to D. Del. LR 26.2

TABLE 1. *Medicare Prevailing Fees ($, 1984)*[a]

| State | CABG | Appendectomy | Cataract |
|---|---|---|---|
| New York | 6000 | 1134 | 1547 |
| Michigan | 3100 | 399 | 825 |
| Rhode Island | 2587 | 516 | 928 |

[a] The charges indicated are for specialists and for the large urban areas within the states listed.

From the U.S. Department of Health and Human Services. Health Care Financing Administration. Medicare Directory of Prevailing Charges 1984. Washington DC: U.S. Government Printing Office. 1984.

of patient access and physician support, they will be part of the blueprint for future health care delivery in both private and public arenas.

## Background

Medicare's "customary, prevailing, and reasonable" (CPR) payment system is, by general consensus, unsatisfactory in today's competitive market in health services. There are many problems associated with CPR. It tends to be inflationary and slow to respond to alternatives in technology and changes in both availability of physicians and need for services. Some charges appear excessive to most observers, even taking into account geographic cost-of-living variations and other variables. For example, under Medicare, the cost of a triple vessel CABG (coronary artery bypass graft) in New York in 1984 was $5500. The cost of this same procedure in Michigan was $3100 and $2587 in Rhode Island (Table 1).

Similar variations are found in fees from the private sector. For example, unexplained fee variations exist in managed health care models such as independent practice associations (IPAs). Hip replacement at three different IPAs in the eastern part of the country ranged from $2808 to $4274 (see Table 2).

Noting these wide discrepancies, the federal government and a number of large private purchasers of health services have turned their attention to the ways physicians are compensated for the care they provide. Fundamental changes in the methodology of physician reimbursement are being discussed. Serious consideration

TABLE 2. *Fee Variations in 3 IPAs, 1986 Fees ($)*[a]

| Operation | Plan #1 | Plan #2 | Plan #3 |
|---|---|---|---|
| Appendectomy | 645 | 950 | 1111 |
| Cholecystectomy | 1055 | 1465 | 1710 |
| Cataract removal | 1280 | 1650 | 1980 |
| Hip replacement | 2808 | 3666 | 4274 |
| CABG (3-vessel) | 4690 | 6123 | 7139 |

[a] Plan names withheld because fees were given in confidence to Health Policy Institute by IPA executives

is being given to systems that would pay physicians ... capitation or by including the physician payment w... the hospital DRG payment. However, both options ... resent a radical departure from the current system ... are viewed as politically unrealistic, at least in the sh... term.

Several interim remedies are being devised, howev... One approach adjusts a few fees that are grossly out ... line. Invoking "inherent reasonableness" authori... HCFA uses this approach to reduce payments ... "overpriced" procedures. Although corrections h... been made for a few services such as cataract remo... and installation of pacemakers, most physician pa... ments currently are based on historic trends.

Another approach used by HCFA to control "ru... away" costs involves a recalculation of the Medica... Economic Index (MEI), an inflation index for increa... in physician office expenses that result from inflati... HCFA estimates that this downward modification in t... MEI will save Medicare an increasing amount ... money.

Another approach, more far-reaching in concept th... the interim measures described previously, but less ra... cal than capitation and physician DRGs, was inve... the Boston University Health Policy Institute (BUHPI) in the fall of 1984.[5] BUHPI compiled a group o... Massachusetts surgeons in a pilot effort to develo... complexity-severity index (C/S index) of surgical se... vices, based on professional judgment, that could pro... vide the basis for a relative value scale.

Building this kind of index, although intuitively ap... pealing, proved time consuming and cumbersome ... also raised questions of antitrust. The Federal Tra... Commission has barred professional groups from dev... oping relative values guides on the grounds that su... guides "... established by competitors in a commerc... context, probably would constitute illegal price fix... because the dissemination of information and agree... ment on establishment of price structures usually lead... price uniformity and stabilization."[6]

In this pilot study, BUHPI identified a private corp... ration that had captured the essence of the C/S ind... and developed a practical way to convert it to a phys... cian payment management system. The approach ... Caterpillar Corporation (CAT), based in Peoria, Illinois ... has resulted in the evolution of "degree of difficult... relative value scales (DODRVS) and regional mult... pliers that appear to accomplish a pragmatic fee sche... ule reform. Access to physicians is achieved for CAT employees and their families, and local physician acc... tance of the overall CAT process is maximized. Sin... CAT is not a dominant payer in any geographic are... and is not a provider, the potential for antitrust challenge ... minimal.

000007

MCK 035620
04-CV-1258-SLR (D.Del.)

Confidential Information
Subject to D. Del. LR 26.2

Table 3 shows the close correlation between the C/S numbers, arrived at through the BUHPI study, and CAT's DODRVS, reached by consultation with respected surgeons. This striking correlation between the two processes suggested to the BUHPI that CAT was on target in its surgical fee activities, and led to the collaborative project described in this paper.

### The Caterpillar Method

CAT is an international manufacturer of earthmoving machinery and equipment, employing an estimated ...000 employees in 15 domestic and 13 foreign plants. CAT health benefits cover employees and dependents, as well as 21,000 retirees. The benefit package includes hospitalization, physicians' services, laboratory, x-ray, prescription drugs, and dental and eye care. The CAT health plan is self-insured and self-administered.

In 1983, CAT implemented for its U.S. employees a negotiated fee schedule approach to physician fees for surgical and invasive procedures. The CAT physician payment system emphasizes (1) employee access to a broad range of qualified surgeons, (2) fees negotiated with local surgeons that are considered reasonable and consistent with local market forces, and (3) billing practices that are applied consistently to all incoming claims. Particular features of this approach are described below.

*Establish a fair fee cap.* With input from respected community physicians in locations with a large number of CAT employees, CAT establishes a fair fee cap for surgical services. The CAT method involves convening a limited number of meetings with selected representatives of the surgical community and the CAT medical director for group insurance (CAT M.D.). Where it provides the most efficient use of time, the CAT M.D. meets with individual specialty groups. Operating under a "physician friendly" philosophy and the assumption that physician education and involvement help achieve a mutually agreeable solution, the CAT M.D. describes the situation from CAT's point of view: (1) there are wide variations in fees and billing practices; (2) there is often insufficient documentation to properly process claims; (3) a way is needed to compare the difficulty of various services so their "relative value" can be considered for payment decisions; and (4) a reassessment of the need for surgical assistants is needed.

Actual claims received are used as examples (with patient and provider identities protected). The CAT M.D. then solicits provider input on how problems can be corrected. General consensus is gained on reasonable billing practices and relative degree of difficulty of various procedures, based on recommendations by the CAT M.D. and discussions with physician groups.

*Use of geographic multipliers.* CAT's DODRVS is combined with a regional dollar multiplier to calculate the actual dollar payment limit. The regional multiplier is based on market research by the CAT M.D. Where there are unusual market conditions for certain specialties, CAT may adjust the multiplier up or down for some services rather than changing the entire region's multiplier. This system allows CAT to take into account the local health care market, legitimate variations in provider billing and medical practices, and variations in the cost of living.

*Continual audit and recoding of physician bills.* CAT claims processors subject each incoming physician bill to a coding analysis of CPT-4 codes as a first step, and recode claims where irregularities are found. Obvious simple coding errors are corrected first. Individuals with clinical knowledge and judgment then compare the provider's description of services with submitted codes; operative reports are requested for most surgical claims and follow-up calls to provider offices for clarifying information are common. Once the claim reviewer is satisfied that enough information is available to code the bill consistent with CAT procedures, recoding is finalized, and the correct codes are compared with established regional fee schedules. Reviewers with clinical experience consult the CAT M.D. as needed, assuring that a high level of understanding of the surgical experience is applied in the review process.

Tables 4–7 illustrate some features of the CAT process. They are representative of some claims received by CAT.

In Table 4, the appropriate payment is $1000 for code 38100. The patient was hospitalized for an elective splenectomy. The CAT reviewer would disallow codes and

TABLE 3 *BUHPI C/S Index Compared with CAT DODRVS*

| | C/S Index | DODRVS |
|---|---|---|
| Thoracentesis | 3 | 3.4 |
| Appendectomy | 24 | 25.4 |
| Cholecystectomy (with common bile duct exploration) | 48 | 47.7 |
| Total thyroid lobectomy | 40 | 41.8 |
| Modified radical mastectomy | 45 | 47.7 |
| Colectomy, partial | 55 | 54.5 |
| Pancreatoduodenectomy | 100 | 100.0 |

TABLE 4. *Bundling of "Unbundled" Bill*

| Procedure | CPT Code | Charge |
|---|---|---|
| Splenectomy | 38100 | $1000 |
| Laparotomy | 49000 | 600 |
| Appendectomy | 44950 | 600 |
| Preoperative check (in hospital) | 90215 | 125 |
| Suture removal | 90270 | 100 |
| Total charge | | $2425 |
| Amount paid | | $1000 |

000008

MCK 035621
04-CV-1258-SLR (D.Del.)

Confidential Information
Subject to D. Del. LR 26.2

TABLE 5. *Excessive Fee Reduced, Assistant Surgeon Claim Denied as Not Medically Necessary*

| Procedure | CPT Code | Charge |
|---|---|---|
| Excision biopsy, breast (R) | 19120 | $1500 |
| Excision biopsy, breast (L) | 19120-50 | 1500 |
| Charge | | $3000 |
| Assistant surgeon fee (R) | 19120-80 | $1200 |
| Assistant surgeon fee (L) | 19120-50-80 | 1200 |
| Charge | | $2400 |
| Total charge | | $5400 |
| Amount paid | | $ 750 |

charges for all except the splenectomy: a charge for laparotomy and incidental appendectomy is warranted only if done as a separate procedure and preoperative check and postoperative care are conventionally part of the global surgery fee. A charge of $1000 for the splenectomy is in line with the regional fee schedule and is the amount ultimately approved.

In Table 5, the appropriate payment is $750 to the primary surgeon for code 19121 (excision biopsy, breast, bilateral). Under most conditions, one surgeon can perform a breast biopsy. The operative report indicates no unusual circumstances. The assistant surgeon is not reimbursed, and the patient is informed of CAT's review decision.

In Table 6, the appropriate regional payment is $60 for code 17100. The procedure was actually a simple wart removal. The operative report describes a 0.25-inch plantar wart on one foot. Excision combined with use of the laser constitutes excessive treatment for this common condition. Wart removal is most accurately coded as 17100 ("destruction by any method of benign skin lesion").

CAT knows that four local experienced, board-certified cardiac surgeons will carry out a three-vessel coronary artery bypass for $5000, assuring that access can be achieved for that fee (Table 7).

Tables 4–7 demonstrate that complete and knowledgeable recoding of claims requires familiarity with both the content of various surgical procedures and the details of coding surgical services.

*Physician negotiations.* Individual physician negotiations are carried out for selected claims. After establish-

TABLE 6. *Removal of Unnecessary Procedure, Excessive Fee Reduced*

| Provider Description | CPT Code | Charge |
|---|---|---|
| Excision benign lesion, foot and use of $CO_2$ laser | 11421 | $450 |
| Total charge | | $450 |
| Amount paid | | $ 60 |

TABLE 7. *Fee Adjustment*

| Procedure | CPT Code | Ch[illegible] |
|---|---|---|
| Coronary artery bypass graft, 3 vessel | 33512 | [illegible] |
| Total charge | | [illegible] |
| Amount paid | | [illegible] |

ing an overall fee schedule with local physician repre[sen]tatives, CAT continues its negotiations on a s[...] claim-by-claim basis. If the amount charged fo[r ...] rected codes significantly exceeds the regional fe[e ...] CAT contacts the billing physician, giving inform[ation] on the corrected codes and the amount allowed. [...] CAT M.D. makes many of these calls. Usually the [pro]vider is willing to accept CAT's recoding and re[...] fee. Discussions of claims with physicians have rev[ealed] that providers enter practice largely ignorant of [com]mon billing practices. Most admit they do not k[now] what various procedures are worth. At best they [occa]sionally may ask other providers what they cha[rge.] Those who use an RVS have access only to a wide v[ari]ety of unstandardized sources. Some are advised to [...] charging high rates to get a high fee profile. Ofte[n, phy]sician offices have an office clerk coding claims wh[o is] not trained in medical terms or coding, whereas o[ther] physicians rely on central billing services that prom[ise to] "maximize reimbursement," often with "creativ[e"] coding or unbundling of services.

*Employee communication.* CAT has a program of [em]ployee communication that defines the employee's [re]sponsibilities and options when payment is less than [the] fee charged by a surgeon. A letter of explanation is a[uto]matically generated to the employee when there [has] been a payment reduction. It states that if the emplo[yee] has discussed the fee with the physician before the [pro]cedure, the employee is responsible for the amount [in] excess of CAT's fee cap. Also, employees are told wh[en] their provider has agreed to accept CAT's reimb[urse]ment as payment in full.

*Patient held harmless.* If a physician bills an empl[oyee] for the amount that exceeds the fee cap, the employe[e is] instructed to contact CAT, and a CAT provider [rela]tions specialist discusses the situation with the phy[si]cian. Patients are not required to pay the physic[ian's] balance bill above the CAT payment (that is, they [are] "held harmless") if the physicians have not informed [their] patients of the higher-than-cap fee before the procedu[re.] CAT intervenes on the patient's behalf when the phy[si]cian refuses to lower his/her fee to the established ca[p.] On average, of about 20,000 physician claims rece[ived] per year, CAT has less than a dozen instances in wh[ich] providers insist on trying to obtain reimburseme[nt] above the CAT fee through claims court. In over 95[%]

000009

MCK 035622
04-CV-1258-SLR (D.Del.)

Confidential Information
Subject to D. Del. LR 26.2

...se cases, the judge has agreed that CAT's payment is reasonable for the services, based on local surgeon input.

*...al Savings with CAT Method*

CAT's internal calculations indicate that it achieves significant savings with its surgeon bill review process by reducing fees that otherwise would have been paid in ... The BUHPI is conducting an external evaluation of the CAT process for managing surgeon fees. Standard typical fee processing by large insurance companies and third-party administrators is being compared with the potential cost savings of the CAT process. The BUHPI has obtained samples of consecutively filed claims for surgical services that have been processed for several large self-insured corporations that administer their claims through major insurance carriers. The benefit plans establish payment caps at a percentile of usual and customary fees, and the carriers' auditing of codes is representative of current industry standards. CAT's coding and bundling procedures, as well as payment caps, were applied to these claims, with the goal of finding if the savings from payment reduction significantly exceeded those achieved by these carriers.

Hard copies of the providers' originally submitted claims were processed by CAT staff without information about changes from charges that had been made by the carriers before these claims had been paid. Confounding variables of payment due to copayments, deductibles, or coordination of benefits were eliminated.

The total charges included in the sample claims were over $140,000. The carriers adjusted 13 to 15% of their claims and paid 4.3 to 35% less than total charges. CAT adjusted 35 to 40% of these same claims and reduced payment from charges by 22 to 43%. Therefore, CAT would have achieved an additional savings of 8 to 17.7% ... CAT's procedures and the lower of CAT or the administrator's fee schedule were used. One third of the additional savings came from coding changes in the original ... and two thirds by the application of the CAT negotiated fee schedule. In some instances providers submitted an incorrect code that significantly *undervalued* the procedure that was done. If the provider's code had been used, the payment would have been cut to an unreasonable level. In these instances, the CAT reviewer "upcoded" to the correct code and allowed the more appropriate fee; the savings potential includes these corrections in favor of billing surgeons.

**Discussion**

The CAT system for managing surgeons' fees has been developed by a progressive benefit department in a large American corporation. The system depends on detailed knowledge of surgical practice so that recoding and bundling of procedures categorized by CPT-4 codes can be accurately carried out. It requires contact with local surgeons in regions with a high concentration of employees so that market forces can be taken into account in determining an appropriate level of local fees.

An access-oriented negotiated fee schedule can have many permutations. In areas with a surgeon surplus, a corporation may be able to negotiate lower fees with surgeons than those previously paid. In areas with few surgeons, fees lower than customary are more likely to create patient access problems should the surgeons resist reductions negotiated elsewhere. Still, modified versions of CAT's approach would be similar to processes already used by the government in establishing "inherent reasonableness" for cataract extraction and pacemaker installation fees.

The key concern about any new surgeon payment approach should be the ability to attract a good representation of local surgeons who will accept it. Ensuring employees' access to qualified surgeons is the paramount goal. All other considerations, even inherent reasonableness of lower fees because of technological advantages or cost containment, should remain secondary.

Based on the BUHPI's analysis, the CAT process is a workable and market-tested solution to the need to balance access and cost management. It is suitable for large corporations such as CAT with both self-funded and self-administered health benefits. It can also be used (after eligibility is certified and benefits are coordinated) by claims processing systems. Accurate implementation of the CAT process requires (1) hard copies of the CPT-4 codes submitted by the surgeon and availability of the operative notes, to reconcile discrepancies between CPT-4 codes and the surgical service, and (2) access-oriented negotiated fee schedules obtained by applying a geographic multiplier to an RVS, such as CAT's DODRVS.

State and federal governments can modify the CAT process for Medicaid and Medicare, with the same goals that motivate the private sector: access and cost management. Regional fee schedules could be established with national DODRVS values and regional multipliers based on market forces. Balance billing is optional, using the CAT model. However, its effectiveness as a cost management approach is strengthened with its "hold harmless" provision. In the CAT system, if a patient knows a surgeon is charging a fee higher than the negotiated fee, the patient is responsible for the balance. If no discussion has occurred, the patient is held harmless for bills in excess of the fee cap.

If adequate access is to be preserved without the need for balance billing, payments must be established so that a majority of qualified surgeons in each region will accept the negotiated fee as payment in full. If this acceptance is not achieved, then access problems will arise, as

000010

MCK 035623
04-CV-1258-SLR (D.Del.)

Confidential Information - Subject to D. Del. LR 26.2

TABLE 8. *Comparison of "Resource-based Relative Value Scale" (RBRVS) and "Access-oriented Negotiated Fee Schedule" (AONFS) for Physician Reimbursement**

| | RBRVS (Hsiao) | AONFS (CAT) |
|---|---|---|
| Goal | A "comparable worth" reform for physicians, a group with high incomes relative to most other occupations. | Patient access to local physicians at a negotiated price. |
| Methodology | Complex formula determines RBRVS: time is a major determinant. | Revision of fees is based on negotiations. M.D. fee acceptance patterns (market forces, not payment of charges). |
| Application | Two basic problems: (1) RBRVS is not a fee, and knowledge is needed of regional situations to use multiplier effectively. (2) when applied in Massachusetts, shown to need extensive modification to get support of, and access to, local surgeons. | In routine use, CAT knows that well-qualified local physicians will accept the AONFS. |

* AONF = DODRVS × reponal mulupier.

occurred in 1986 for the Massachusetts Medicaid program. That program was forced to increase significantly its fees for normal deliveries. As stated in the *Boston Globe*, ". . . responding to a crisis in access to obstetrical care in many areas of the state, the panel hiked the all-inclusive fee for pregnancy care and childbirth from $508 to as much as $1,200."[10] This is a good example of the futility of a fee schedule that does not build on knowledge of physicians' availability at different fee levels in each region. The Massachusetts Medicaid program had a previous experience with attempting to introduce a fee schedule based on a "resource-based" formula.

In July 1983, the *Boston Globe* described a new strategy that was suggested by the Massachusetts Rate Setting Commission for the Medicaid program and workers compensation.[11] Based on the 1979 study by Drs. Hsiao and Stason from the Harvard School of Public Health,[12] the Rate Setting Commission proposed that the fees for 21 common surgical procedures should be cut by amounts ranging from 4% to 59%. At the same time, physicians seeing patients in their office were to get 71% more for initial visits. These proposed changes were the estimated relative resource requirements of different physician services, with a strong focus on the time involved. The formulas were established in the Hsiao/Stason analysis of physician practices.

These changes were adopted in September 1983. but on August 23, 1984, the Rate Setting Commission ra[…] the fees that the state Medicaid program paid to doc[…] for surgical procedures. As stated in the *Boston Gl[…]* "no prior hearing was held or public notice given […] the August reversal because the Commission subse[…]quently said physician resignations from Medicaid h[…] reached the level of a public health emergency. M[…] striking of these defections were obstetricians/gyneco[…]gists."[13] This experience suggests that fees ultima[…] paid by Medicaid were primarily driven by the need […] get access to Medicaid patients to physicians, and not […] a formula for "resource costs."

The American Society of Internal Medicine and t[…] American Medical Association have supported an ela[…]orate study of the Hsiao methodology commissioned […] HCFA, and there is much speculation about the possi[…] use of an RBRVS for the determination of Medicare fe[…] when it becomes available in the summer of 1988. Th[…] investigators of the BUHPI originally believed that t[…] consensus process to determine a C/S index could b[…] developed as the basis for fee reform that would be a[…]ceptable and perceived as fair by physicians. Howev[…] the consensus approach is laborious, and much tim[…] would have been necessary to interrelate all specialt[…] and resolve potential conflicts. It was then that t[…] BUHPI began to study the CAT system, and found th[…] it involved a process with appropriate goals, method[…]ogy, and application for cost management and mar[…] acceptance.

Table 8 outlines the basic differences between a "re[…]source based" RVS and an access-oriented negotia[…] fee schedule, as used by CAT. A basic goal of t[…] RBRVS is to "reform" physician reimbursement in t[…] direction of more equity between procedure-orien[…] specialists and generalists. However, as the eviden[…] suggests, this goal will be in conflict with realities of t[…] marketplace and will result in paying fees that are ei[…] unnecessarily high or too low to get ready access f[…] insurees to local physicians.

The methodology of the RBRVS is based on a f[…]mula unrelated to local market forces, whereas the a[…]cess-oriented negotiated fee schedule used by CA[…] builds on negotiations and local fee acceptance patter[…] to gain access. The CAT system's ability to adjust f[…] regional differences in the market is the essential diffe[…]ence in the two approaches. The CAT system is in ro[…]tine use and will continue to be modified by changes […] local physician manpower and other factors such as i[…]creases in malpractice premiums. We suggest that a[…] access-oriented negotiated fee schedule such as the CA[…] system deserves consideration as the preferred meth[…] of fee reform.

000011

MCK 035624
04-CV-1258-SLR (D.Del.)

Confidential Information
Subject to D. Del. LR 26.2

## References

[illegible] DR. Levit KR. Lazenby H. National health expenditures, 1985. Health Care Financing Review 1986; 8:14.

[illegible] Payment Review Commission. Medicare Physician Payment: an Agenda for Reform. Annual Report to Congress. Washington DC: U.S. Government Printing Office. March 1, 1987.

[illegible] RA. Study on Equalizing Medicare Bills Begins. The Boston Globe, September 13, 1985: 4.

[illegible] of the United States. Physician Reimbursement Under Medicare: Options for Change. Washington DC: Congressional Budget Office. April 1986.

[illegible] of the United States. Payment for Physician Services: Strategies for Medicare. Washington DC: Office of Technology Assessment. February 1986.

[illegible] SF. Dobson A. Strategies for reforming medicare's physician payments: physician diagnosis-related groups and other approaches. N Engl J Med 1985; 312:1492–1499.

7. Dutton BL. McMenamin P. The medicare economic index: its background and beginnings. Health Care Financing Review September 1981; 3:137–139.

8. Egdahl RH. Manuel B. A consensus process to determine the relative complexity-severity of frequently performed surgical services. Surg Gynecol Obstet 1985; 160:403–406.

9. Pollard MR. Anti-trust and Physician Payment. Reforming Physician Payment 1984. Institute of Medicine: Report of a Conference. Washington DC: National Academy Press. 1984; 75–86.

10. Knox RA. Proposal Would Raise Medicaid Fees. The Boston Globe. April 17, 1986; 27.

11. Knox RA. Medicaid Fee Shifts Adopted. The Boston Globe, September 16, 1983; 17.

12. Hsiao WC. Stason WB. Toward developing a relative value scale for medical and surgical services. Health Care Financing Review, Fall 1979; 1:23–38.

13. Knox RA. State Shifts on Medicaid Fee Cuts. The Boston Globe. September 27, 1984; 1.

## Discussion

[illegible] W GERALD AUSTEN (Boston, Massachusetts): I congratulate [illegible] Egdahl and Hertenstein on an excellent and stimulating paper. [illegible] have worked long and hard on physician payment reform, and [illegible] recognized early the importance of physician acceptance in any [illegible] reform. Thus, a major element of the current proposal in[illegible] the active participation of the physicians.

[illegible] and a half years ago, the Regents of the American College of [illegible] created a Committee on Physician Reimbursement of which [illegible] been Chairman. This committee, with much input from the [illegible] specialty societies, has developed recommendations for the [illegible] of the Medicare physician payment program, and these recommendations were approved by the Regents in October 1986.

[illegible] aim of the College, like the approach presented today, is to [illegible] ways to achieve a more rational payment system with cost [illegible] and at the same time ensuring adequate access to quality care. [illegible] ACS approach has a number of similarities to the program [illegible] this morning; the ACS proposal includes the creation of a [illegible] relative value scale based on physician charge data and with [illegible] based on geographic differences in practice costs, the defini[illegible] payment units with emphasis on a global fee and the creation of [illegible] and guidelines to determine when an assistant at surgery for [illegible] payment purposes is necessary.

[illegible] one question for the authors. The Caterpillar Corporation has [illegible] 30,000 employees in 15 domestic plants, and it also has [illegible] persuasive, sensible medical director. How would you expand [illegible] proposal from one company to a national program?

[illegible]. I would like to add that it is crucial that surgery be involved [illegible] as possible in the current debate on physician reimbursement [illegible], and we need to be able to present sensible and fair approaches [illegible] solid data. The next year and a half is probably going to be [illegible].

I would urge Drs. Egdahl and Hertenstein to continue to gather [illegible] and to make every effort to present their data and recom[illegible] to the appropriate congressional committees and to the [illegible].

[illegible] OLIVER H. BEAHRS (Rochester, Minnesota): Drs. Egdahl and [illegible] have done us a favor by developing and reporting a modi[illegible] of the CPR fee for service reimbursement for surgical services. [illegible] appreciate the opportunity to have read the manuscript.

[illegible] program, which is a negotiated access RVS, is in contrast to [illegible] Harvard–AMA resource based RVS, and is being developed under [illegible] from HCFA. This RVS is of concern because of the inordinate [illegible] given to time as a factor and the methodology being used. There is great anticipation regarding this study in Washington and [illegible] are thinking of it as the only game in town.

The Physician Payment Review Commission (PhysPRC) established by Congress in 1986 made its first report to Congress on March 1, 1987. The Commission supports a fee scale based on a national RVS with appropriate regional multipliers to determine fees. The basis for the RVS has not been determined, but hopefully it might be based somewhat on historic charges and not the strictly resourced criteria of the based parameters used in the Harvard Study.

The use of the CPT-4 Code has come under criticism: first a dictionary of 2000 codes, and now 7000 and with multipliers 48,000. It was established primarily for medical record keeping not to establish charges. It has led to unbundling of services and upcoding to establish fee for services. This practice has led to excessively high fees in at least 10% of cases because of unbundling or upcoding.

I would be interested in the author's suggestions how the CPT-4 codes might be collapsed or bundled and what policy could be established to prevent these abuses.

A long-term program for physician payment is probably several years away and may be a fee scale hopefully, but there is administrative and congressional support for capitation or voucher arrangement, possibly DRGs. Congress is looking for a near-term solution to its budget problem for 1988.

The budget mark-up will be in the next few weeks and the recommendations to meet the cut almost certain in physician reimbursement will be in place by September.

The reduction in reimbursement might be another freeze, a shaving downward of the medical economic index, selecting the high-cost outliers such as coronary artery bypass, hip reconstruction, and/or TUR for across-the-board decreases as was done to cataract surgery in 1986 and 1987, or selective decrease in the high rollers or by addressing the reduction by using the inherent reasonable rule that is already in legislation.

My second question to Dr. Egdahl and Dr. Hertenstein is: what are your recommendations in the next month or two to meet the 1988 budget limits?

DR. MARTIN ALLGOWER (Basel, Switzerland): I appreciate the invitation to look "with a Swiss eye" at the presentation of Dr. Egdahl.

In Switzerland it is said that the surgeon goes through two stages. At the beginning of his career, collecting a fee, he gets red in the face. Later on his face reddens when he does not get paid!

The Swiss economic system is a rather complex mixture of free enterprise and institutions run almost exclusively by public bodies. We consider many of the things you do not as public responsibilities. These include post and telephone services, railway services, schooling and university formation, and most hospitals are run by local government agencies. The health care system is furthermore complicated by the fact that insurance conditions for accidents are very different from

000012

Confidential Information
Subject to D. Del. LR 26.2

those for diseases. It is obvious that this difficult distinction keeps our lawyers busy!

Basically, surgeons are mostly employed on a geographical full-time basis in a state hospital. Those state hospitals, however, have private, semiprivate, and general wards. This, I believe, is a rather favorable arrangement, combining a salaried position for the administrative obligations as well as for the care of the general patient with a fee-for-service system for the private patients. Now, comparing this with the cap system, we find great similarities because the Union of Swiss Surgical Societies, including all specialties, has set up a range of fees that may be reasonably asked from a patient or from the insurance, i.e., the third party paying. Those ranges, just to give you an idea, would range from 400 to 1000 francs for an appendectomy, for a gallbladder from 1000 to 2000 francs, and for major operations such as a total gastrectomy, a Whipple, an acetabular repair or a resection of an abdominal aneurysm, from 3000 to 6000 Swiss francs. That is about the maximum fee we are allowed to ask or, at least, that the Union will support, if it is contested in court. You may divide the figures by 2 to arrive at dollar values, because that is about the realistic comparison in terms of buying power.

It is a fairly democratic self-regulating peer controlled system. What we dislike in Switzerland is the "big brother" state watching us and telling us what to do.

We have one advantage over you. The contingency system is unacceptable and the one party who loses "the battle" usually has to pay the other's legal expenses. That often prevents people from going to court, although there has been a definite increase in liability claims in recent years.

Overall our system results in an average income of some 300,000 to 400,000 francs for a Swiss surgeon. Out of that he pays some 50% in taxes. Our rather democratic system is similar to what Dr. Egdahl has just presented. It is based on a fee for service "common sense scale," the majority of surgeons working in a geographical full-time scheme.

DR. WILLIAM R. DRUCKER (Rochester, New York): I appreciate the opportunity I had to review this paper. Dr. Egdahl has given us a clear presentation of an industry-sponsored plan that attempts to gain physician compliance with a method of reducing costs of medical care through reduction in fees.

It is a very clear example that in addition to government today, our health care system is being strongly influenced by industry.

I have a couple of editorial comments and then a couple of questions. The major factor in the rise in health care costs is not physician fees. This is simply illustrated by a look at the average fees of physicians across the country, somewhere in the range of $50,000–$150,000. I realize that others make considerably more, but each physician can be estimated to cost the health care system something in the order of three quarters of a million dollars per year by the exercise of his physician rights in doing his job of taking care of patients. Therefore, the major target that needs to be addressed is physician behavior, not physician fees. Nevertheless, fees are perceived as a problem that is going to be addressed whether we like it or not.

I wonder whether this paper is simply the expression of a last gasp hope that current physician fees and the fee for service system will continue. I sincerely hope this is not its purpose and I believe Dr. Egdahl agrees based on the way he has presented the paper. My reading from the paper is that Dr. Egdahl is presenting a plan that is asking clearly for physicians to get together and plan to help solve the problem of fees rather than having it done for us by external agencies; that means industry and government.

My questions are these. They are straightforward, I believe, and can be answered simply. What will happen in the case of an emergency when one of the patients in the system under the cap must have an emergency operation and they seek a doctor who does not agree with the system: would this be settled in claims court?

What about quality? Does the system depend on the physician participants to ensure quality or do they have other ways to ensure that their employees are obtaining the quality of care that they would under the current system of fee selection?

How about comparison with other systems? Has there been enough experience to date to show that this system is gaining popularity? Is there any way to compare this system with others in term[illegible] factors: physician acceptance to work in the system, and [illegible] acceptance of this system for their health insurance?

Then there is a question of cost. This is a very complex [illegible] seems very costly if one reads carefully. What is the cost? Is [illegible] estimate of what the cost would be of setting up and maintain[illegible] system that requires close scrutiny of all bills that come [illegible] complex system of monitoring these bills? Is the billing method [illegible] to CAT or can other insurance systems do this too? Is this [illegible] sale? Do other insurance companies look at claims this carefu[illegible]

DR. BENSON B. ROE (San Francisco, California): Dr. Egdahl [illegible] thanked for bringing to our attention a sensible proposal to [illegible] serious threat to the fee-for-service system. I believe we finally [illegible] aware of this threat, and I am delighted that we are prepared to [illegible] our forces to get behind something positive.

About 8 years ago I became aware of the enormity of the [illegible] the current system that were taking place, perhaps not by the [illegible] able members of our profession but by an alarming number [illegible] who did the kind of unbundling and some of the things that [illegible] you. I published an article that was intended to stir us to take [illegible] initiative in this problem rather than hoping it would go away. [illegible] is not too late.

It is equally important that we get behind some system that [illegible] lishes fiscal integrity so that we do not jeopardize the previous [illegible] unique privilege that we have of self-governance. This [illegible] threatened by the behavior of some of our colleagues who [illegible] the system and brought this problem to our attention.

In addition to the proposals that Dr. Egdahl has made, I [illegible] should place emphasis on the magnitude of responsibility [illegible] only accessory procedures but complications. No one can [illegible] whether my complication was part of the patient's underlying [illegible] or could possibly be one from some flaw in my technique or [illegible] ment. We should accept as a part of our primary responsibility [illegible] scope of managing a patient from start to finish without [illegible] extra for everything that can be imagined. If we had done [illegible] would have reduced our total cost to the public by at least 3[illegible]

DR. JAMES R. JUDE (Miami, Florida): I rise because I am [illegible] by patients who are faced with billing problems after [illegible] charge. One of the problems is the unbundling that Dr. [illegible] brought up.

Ten years ago on an Ethics Committee of our local medical [illegible] we, out of hand, tossed unbundling out as a completely [illegible] proach to any type of billing. I did not believe it even could [illegible] exist any more, but there is more of a problem than just the [illegible] together of the surgical fee. The problem is much greater than [illegible] always keep our office open to speak to any patients about [illegible] lems, and it is very common for them to present with bills [illegible] really amounts to an unbundling of the bills of other physicians [illegible] were involved in their treatment.

Most commonly this has applied to anesthesiology, which [illegible] approaches 50% of the surgical fee. It is not, however, only the [illegible] siologists, it is also the internists, the radiologists, the patho[illegible] possibly the cardiologists who are reading electrocardiograms [illegible] receive an enormous number of bills from physicians, and [illegible] total physician unbundling and not just a surgical fee unbund[illegible] is occurring.

Some way or other we have to approach the problem [illegible] will be some type of bundling together of all physician [illegible] package.

As our President presented yesterday in his Presidential [illegible] many treatments that we do are not all surgical anymore, [illegible] blending over into medicine, and medicine is delivering [illegible] surgery is delivering medicine. Therefore, we should give a [illegible] sideration to the total care and the total charge.

Dr. Egdahl, what if anything have you considered about the [illegible] fees in respect to a global cap or other industry approaches [illegible] cost of care in surgery?

000013

MCK 035626
04-CV-1258-SLR (D.Del.)

Confidential Information
Subject to D. Del. LR 26.2

[illegible] E. RHOADS (Philadelphia, Pennsylvania): I listened [illegible] paper with a great deal of interest. I would emphasize that if [illegible] have a 50% overhead, that a 15% reduction in fee is a 30% [illegible] in take-home remuneration. That is well to keep in mind. [illegible] is one aspect of the overhead that has gotten bigger and that is [illegible] insurance. This in a way is the loose cannon on the deck, and [illegible] have a fee schedule set, whether by government or by con[illegible] this expense is assumed to be something that the physician [illegible], we have an unpredictable situation.

[illegible] the question and ask the authors if there is any precedent for [illegible] insurance being billed on a per case basis or a percentage of [illegible]. No doubt this would require the insurance company to have [illegible]one's tax returns and so forth to be sure that it was honest, but [illegible] have certain great advantages. It would permit the young [illegible] starting out to start out on his own, pay his share of the [illegible] costs, but not be expected to pay immediately the same [illegible] that a person would be paying who is doing 10 times as much [illegible] the middle of his career.

[illegible] the far greater advantage in my belief is that this could [illegible] and should appear as a separate item on the bill.

[illegible] think of no way that would educate more of the public as to the [illegible] of liability insurance than to have a bill (operation $300, [illegible] $125, or whatever it might come to).

[illegible] to raise this issue and to ask the authors if they knew if there [illegible] precedent for such a plan and to ask whether they believe there [illegible] way this could be tried out before we get tied into a fee schedule [illegible] with an unpredictable cost for liability insurance.

[illegible] RICHARD H. EGDAHL (Closing discussion): Dr. Austen's ques[illegible] about the possibility of expanding the Caterpillar program as it [illegible] to a national level is an important one. The problem is that [illegible] national programs such as Medicare necessarily involve a large [illegible]cracy, whereas a private self-administered company such as [illegible]pillar does not require the same degree of routinization of opera[illegible] and an equally sophisticated methodology. The country could cer[illegible] be divided into 6–12 regions, each consisting of several states. I [illegible] know whether appropriate flexibility could be built into the [illegible] and technical components of the administrative struc[illegible] which would be part of a national program.

[illegible] Kahn raises questions about the future use of CPT-4 codes and [illegible] we can do in the short range to control outlier Medicare fees. [illegible] we can use CPT-4 as long as we understand the basis for [illegible] up the procedures that actually were carried out with the [illegible] and have some way to ratchet downward those charges that [illegible] inappropriate. Certainly there are a few groups selling systems [illegible] goal of achieving code creep, which is basically dishonest. On [illegible] other hand, the majority of codes that are incorrect represent [illegible] errors based on the difficulty of each doctor's office knowing all [illegible] technicalities of coding. We can stick with CPT-4, but must match [illegible] operative note with the CPT-4 code, using physician judgment to [illegible] if the code is appropriate. The short-term answer for HCFA [illegible] extend the principle of inherent reasonableness, which thus far [illegible] limited to a few surgical conditions. Another 20–30 big-ticket [illegible] that appear to be out of line could be revised downward or [illegible].

Dr. Martin Allgöwer from Basel talked about the Swiss system and the apparent success of physician-sickness fund negotiations. This type of negotiation, with the government playing a catalytic role, might have relevance to the U.S. system in the private sector. However, Medicare will probably demand a closer involvement in the process than exists in Switzerland, since the government is paying the bill directly.

Dr. Drucker asked a key question about what happens in emergencies under the Caterpillar system. Usually Caterpillar pays charges in emergencies, but also has a strategy involving clearance for appropriateness of treatment in emergencies, when there is time. If gross overcharges are billed, even for emergency situations, and local surgeons support that the charges are unreasonable, then payment of those charges can be challenged.

Dr. Roe discussed his analysis of fees, and raised the question about possible antitrust issues if physicians are in the position of commenting on the appropriateness of their fees. Industry does not want to see private medicine nationalized, but could turn on us if we do not cooperate in developing a rational method of physician reimbursement. The key to not raising antitrust issues is for surgeons to act as individual consultants to payers who determine those fees, such as large industry.

Dr. Jude asked about how to get our internist colleagues involved in the process of fee negotiations. We found in our complexity/severity work with the Massachusetts Chapter of the American College of Surgeons that we could relatively easily get consensus on the "relative value" or "complexity/severity" of surgical services among that group. We then talked to internists and achieved some preliminary agreements: for example, an "intermediate acute myocardial infarction," from the time a patient comes into the emergency room, is taken into the critical care unit, and discharged, appeared to be similar in complexity/severity to an uncomplicated cholecystectomy, from initial diagnosis through discharge from the hospital after surgery. Reimbursement for some general medical conditions can be converted into a global fee, but for many medical conditions it is a more difficult process than for surgical cases.

Finally, Dr. Rhoads talked about malpractice problems associated with surgery. I return to the principal goal of Caterpillar and its fee process, which is access for their employees and their families to a significant number of high-quality local surgeons. Overall, malpractice problems will probably get worse before they get better. A solution will flow from severe access problems in different parts of the country, and a realization by both legislators and the public that the ordinary rigors of surgical practice are being compounded manyfold by additional financial and psychological pressures from the omnipresent danger of malpractice suits. We suggest that the Caterpillar process of negotiating access-oriented maximal fees with local surgical groups represents a reasonable compromise between paying charges, on the one hand, and accepting a formulaic-driven fee schedule not negotiated with some local physicians with access as a goal, on the other hand.

Increases in malpractice premiums will result in increased surgical fees, or the public will not have available the surgeons that they want in the variety of practice sites and numbers of specialties that are desired. We have only a modest amount of time before HCFA and the Congress will take some kind of action on fees, as they have on hospital reimbursement under Medicare. Industry can be our strongest ally in achieving a workable system of access-oriented negotiated fees.

000014

MCK 035627
04-CV-1258-SLR (D.Del.)

Confidential Information
Subject to D. Del. LR 26.2

# EXHIBIT 9

REDACTED