# EXHIBIT 10

SAVINGS FROM ACCURATE CODING

OF SURGICAL CLAIMS: THE

CATERPILLAR METHOD

Don C. Holloway, Ph.D. 1

Robert D. Hertenstein, M.D. 2

Richard H. Egdahl, M.D. 1



1 From the Health Policy
Institute, Boston University,
Boston, Massachusetts

2 From Caterpillar, Inc.
Peoria, Illinois

Reprint requests:
Don C. Holloway, Ph.D.
Health Policy Institute
Boston University
53 Bay State Road
Boston, MA 02215

(For publication in Business and Health, Fall 1987)

HII000043

CONFIDENTIAL

## ABSTRACT

Current attempts to modify the physician fee-for-service payment method focus on only a portion of the equation: the price. Evidence is accumulating that, while many errors are inadvertent, some physicians are increasing their reimbursement by focusing on the other component of the equation: the codes describing the procedures performed. Caterpillar has achieved significant savings using a unique system for assigning accurate codes to surgeons' claims. The system results in a 10-12% reduction in surgeon payments, in comparison to the coding method used for two other large corporations. The Health Policy Institute is working with the surgeon reviewers at Caterpillar to make this system available to other corporations through the use of an "expert system shell", an artificial intelligence software that allows the surgeon reviewers' "rules of thumb" to be made available to claims processors. The process for achieving additional savings by negotiating and applying "access-oriented" surgical fees at a local level is described elsewhere. (See Egdahl and Hertenstein, Annals of Surgery, in press)

## BACKGROUND

The declines in inpatient care and physician visits of the past five years have been more than offset by the increase in prices of all providers. The net result has been an actual increase in the rate of real growth in health care expenditures over the past ten years, after consideration of lower general inflation. Cost containment efforts, having focused on reducing unnecessary use, are only beginning to address price. Additionally, the focus has been on hospitals more than physicians, and yet the cost for physician services, the second largest component of health care costs, is projected at 19.8% of total costs for 1986, up from 18.9% in 1980. These costs for



CONFIDENTIAL

MCK 048026

04-CV-1258-SLR (D.Del.)

-2-

physician services are projected to increase to 20.3% of total costs in 1990.

In an effort to retain their current volume of patients, physicians are negotiating agreements with managed care programs such as Health Maintenance Organizations (HMOs) and Preferred Provider Organizations (PPOs). Physicians give price concessions to these organizations through a negotiated fee schedule or a discount from historic charges. In addition, physicians agree to strong utilization controls to reduce unnecessary use. As a consequence, unless total patient volume increases, physicians' best option for maintaining their income is to increase dramatically their charges to "unmanaged" fee-for-service patients whose benefit plans currently often pay the price that is "customary" in the physician community, and/or to increase their charges to managed care programs by the indirect method of "upcoding" the procedures they charge for.

The pressure for reform in the method of physician payment for Medicare and Medicaid is evident in the level of activity in Washington. While alternative methods of payment are being considered, widespread implementation of capitation or physician diagnosis-related groups (DRGs) is not imminent. Instead, modifications to the fee-for-service payment system are likely in the next several years. If such modifications can maintain satisfactory levels of patient access while gaining physician support, a modified fee-for-service method will remain the major payment method in both the private and public sectors.

In attempting to modify the fee-for-service payment method, most current attention is being given to only one component of the equation, the method for establishing the price. Examples of such efforts include: 1) Medicare fees were frozen by Congress from June, 1984, through January, 1987, 2) a resource-based relative value scale for use in establishing relative prices of

H██000045

CONFIDENTIAL

MCK 048027

-3-

physician services is being developed by Hsiao and collegues at Harvard with funding from the Health Care Financing Administration, 3) Massachusetts' Medicaid fee schedule is being revised by the Rate Setting Commission, and 4) fees paid by Blue Shield in Massachusetts will be based on a revised relative value scale at the request of the Insurance Commisssioner as a condition for approving a rate increase in 1987.

While the payment amount needs to be established, it is only a portion of the equation. There are two independent components that determine the fees that physicians are paid:

1) the code specifying the service provided, and

2) the corresponding price.

This article focuses on the significance of accurate coding regardless of the payment level. Evidence is accumulating that, while many errors are inadvertent, some physicians are increasing their reimbursement by "upcoding", or by "unpackaging" services that were intended to be bundled into a single code. The administrative systems that are currently available and we have studied are not adequate to control for most of these errors.

In 1986, Caterpillar, Inc. approached the Health Policy Institute of Boston University for assistance in evaluating its process for managing surgeon claims. Caterpillar had been self-administering health claims since the early 1950's, and believed it had achieved significant savings with a surgeon bill review process implemented in 1983. The Health Policy Institute conducted a comparison of Caterpillar's process for assuring accurate codes to those used by claims administrators for two other large corporations. The results are described in this paper.

H 000046
CONFIDENTIAL

Confidential Information Subject to D. Del. LR 26.2

-4-

## CURRENT CONTROLS ON ACCURATE CODING

Standard industry practice allows claims processors to enter the codes submitted on surgeon claims into a computer system. Fee screens are applied to these codes, establishing the maximum amount that will be paid. One of two coding methods is most frequently used: either the American Medical Association's Current Procedural Terminology, Fourth Edition , (CPT-4), or the California Relative Value Studies (CRVS). Some claims administrators allow their claims processors to assign a code if it is absent from the claim; others return the claim to the physician's office for a code. Once entered into the claims processing system, the code is typically edited for consistency with the age and sex of the patient (for example, no obstetric payments for a male, or for a woman over 44 years old). Some administrators have edits for assuring that the most obvious rules in the coding manuals are being followed. After this step, if there is still a perceived problem with either the code or the fee, the claim is removed from the production process and sent to staff with clinical background for review. This staff may request an operative report, and/or call for a physician to review the claim. A payment for the claim is established, and the claim is returned to the claims processor for payment. Emphasis throughout the industry is on rapid turnaround of a claim, rather than on accuracy of the claim, in order to minimize the time between when a claim is received and when it is paid.

## CATERPILLAR'S APPROACH

After observing the claims processing systems of several administrators as well as Caterpillar, and interviewing key individuals at these facilities, five features of the Caterpillar process emerged as different from routine

HBB000047

**CONFIDENTIAL**

Confidential Information Subject to D. Del. LR 26.2

MCK 048029

04-CV-1258-SLR (D.Del.)

-5-

industry practice. Each feature will be discussed separately.

1. **Systems and procedures in claims processing are designed assuming that 100% of the claims will be submitted with inaccurate codes.**

Based on a random sample of over 350 claims for surgery and invasive procedures, over 50% of claims are submitted with inaccurate or absent codes. Rather than return claims to the surgeons' offices for coding, Caterpillar assigns an accurate code using its expert staff.

2. **A surgeon controls the processing of surgeons' claims.**

Since 1983, the surgeon reviewers employed by Caterpillar to review claims have reviewed thousands of surgeons' claims. Based on this experience, they have developed "rules of thumb" for when codes can be accepted or changed based on the available information, or when an operative report must be used.

The surgeon reviewers' "rules of thumb" are passed on to a surgical technician to reduce the number of claims which subsequently require a surgeon reviewer's personal attention. Similarly, some of the rules can be passed on to claims processors, thereby reducing dependence on the surgical technician. However, each week the chief surgeon reviewer examines a sample of the decisions made by the claims processors and surgical technician to assure that the rules are being applied properly.

In contrast, the standard industry practice among administrators we reviewed is to use very little professional input in coding decisions. Physicians are involved at the discretion of the claims processing staff, rather than in an integrated, structured manner as part of the flow of the claim.

H00000048
CONFIDENTIAL

MCK 048030

04-CV-1258-SLR (D.Del.)

-6-

3. **Caterpillar's claim forms have a clause requesting physicians to submit "operative reports for unusual or complicated services or procedures".**

In order to assure an accurate surgical code, it is necessary to review the operative report. In practice, some surgeons always send an operative report, thereby eliminating delays in payment. However, only 10% of all surgeon claims are initially submitted with operative reports. An additional 10% of surgeon claims processed by Caterpillar require operative reports before they can be paid. The remaining 80% are audited based on the narrative description of the procedures written on the claim because the coding decision is unlikely to change even if an operative report were available.

In contrast, over 97% of the claims were paid without an operative report by the administrators for the other two corporations. One administrator does not even require a narrative description and, therefore, has very little information to make coding decisions.

4. **Codes are assigned to the "claim" rather than to the line items for each procedure.**

While the code for each procedure on a claim may be accurate, the claim itself may be inaccurately coded. To illustrate the point, the four codes in Example 1. are accurately assigned to line items.

Example 1

| Line Item Description | CPT-4 Code | | Fee |
|---|---|---|---|
| Splenectomy | 38100 | | $1,000 |
| Laparotomy | 49000 | | $ 600 |
| Gastrectomy | 43620 | | $2,200 |
| Lysis of Adhesions | 44005 | | $ 700 |
| | | Total | $4,500 |
| Correct Code for Claim: | 43620 | | $2,200 |

However, one claim could be submitted with all four codes. While the services are accurately coded, the claim is not. The accurate code for the claim is

H⬛⬛000049
**CONFIDENTIAL**

Confidential Information Subject to D. Del. LR 26.2

MCK 048031

04-CV-1258-SLR (D.Del.)

-7-

43620, Gastrectomy, and the appropriate fee is $2,200. Services need to be packaged, and the CPT-4 manual is often not explicit as to the rules for these packages. For this reason, a surgeon's judgment is applied to Caterpillar's claims.

5.  Significant changes to codes are explained to the surgeons' offices.

While surgeons are taking an increasingly more active interest in coding, untrained staff in their offices are usually responsible for assigning the submitted code. In order to establish the best provider relations possible, Caterpillar contacts physicians' offices and explains why the code has been changed, if the change is going to result in a payment reduction.


SAVINGS ESTIMATE

A random sample of over 350 claims for surgery and invasive procedures was obtained from claims administrators for two large corporations. Hard copies of the claims and any accompanying operative reports were sent to Caterpillar without the coding decisions made by the claims administrators. Caterpillar processed the claims using its normal process.

Physicians at the Health Policy Institute reviewed the accuracy of Caterpillar's codes. The claims administrators provided their total fees for the accurate codes, and the Health Policy Institute calculated the difference in payment that would have resulted from using the accurate codes.

For both corporations, the savings that would have resulted from accurate coding is 10-12% of submitted charges. The two administrators were making reductions of 4.3% and 35.0% of charges, respectively, and would have made another 10-12% reduction had the coding been accurate. Occasionally surgeons submit incorrect codes that undervalue the procedures done; if those codes had been used, payments would have been reduced even further. For these claims,

H██000050
**CONFIDENTIAL**

Confidential Information Subject to D. Del. LR 26.2

MCK 048032

04-CV-1258-SLR (D.Del.)

-8-

the Caterpillar surgeon reviewer assigned the correct code and allowed the higher payment; the 10-12% savings estimate also includes those corrections in favor of the billing surgeons.

The following three examples illustrate the types of problems that are not routinely being corrected by claims administrators. The first two examples illustrate how difficult it is to apply the CPT-4 rules correctly, even when the rules are explicit. The last example illustrates a case where there are no explicit CPT-4 rules. Example 1 above also illustrated this point. These cases require review by a surgeon, or the application of a surgeon's "rule of thumb".

Example 2:

| Date | Code | Description | Charges |
|------|------|-------------|---------|
| 8/28/86 | 58120 | Dilation and Curettage (D&C) | $400 |
| 8/28/86 | 57505 | Endocervical Curettage | $400 |
| | | Total | $800 |

Example 2 illustrates that, while each line is coded accurately, the accurate code for the <u>claim</u> is 58120. The CPT-4 manual explicitly states that 57505 is to be used only when it is "not done as part of a dilation and curettage." This physician was inappropriately paid for a presumably separate operation. Given the complexity of the task, and the qualifications of claims processors, it is not surprising that this rule is not routinely applied.

Another case is shown in Example 3.

Example 3:

| Date | Code | Description | Charges |
|------|------|-------------|---------|
| 8/13/86 | 64430 | Peripheral Nerve Block | $ 54 |
| 8/13/86 | 10120 | Subcutaneous Foreign Body Removal-Simple | $ 70 |
| | | Total | $124 |

The CPT-4 manual explicitly states that "listed surgical procedures include the operation per se, local infiltration, digital block or topical anesthesia when used, and normal, uncomplicated follow-up care." A peripheral nerve

HSE000051
CONFIDENTIAL

-9-

block, 64450, is therefore included in 10120. Again, the physician was inappropriately paid separately for a component part of the primary procedure.

The final example (Example 4) illustrates a case where a surgeon's "rule of thumb" is required. The claim is for a simple wart removal. According to the operative report, a 0.25-inch plantar wart on one foot was removed. Removing the wart using the combination of an excision (removing the wart with a knife) and a CO2 (carbon dioxide) laser is excessive treatment. One or the other would have done the job. Using the surgeon reviewers' "rules of thumb," simple wart removals are most accurately coded as 17100. The more expensive alternative was unnecessary.

Example 4:

| Line Item Description | CPT-4 Code | Fee |
|---|---|---|
| Excision, benign lesion, foot and use of CO2 laser | 11421 | $ 400 |
| | Total | $ 400 |
| Correct Code "Destruction by any method of benign skin lesion" | 17100 | $ 60 |

DISCUSSION

Caterpillar has achieved significant savings using a manual system of review, and several large corporations and claims administrators have expressed interest in gaining access to this expertise. The Health Policy Institute is working with the chief surgeon reviewer at Caterpillar to make explicit the "rules of thumb" he and his staff carry in their heads. These rules are well suited to incorporation in software generically called "expert system shells." Expert system shells have evolved from research on artificial intelligence. This type of software provides a vehicle for widespread distribution of an expert's "rules of thumb." However, a surgeon will always

H██000052
CONFIDENTIAL

-10-

be required to make coding decisions on those claims that are submitted with a combination of codes that have not as yet been seen by the surgeon, and therefore, not programmed into the software.

Unfortunately, it is not possible to evaluate the performance of claims administrators in achieving the potential savings due to accurate coding without an audit of claims. Although reductions from charges made by the administrator are available on management reports, one part of the reduction is the result of lowering excessive fees. The portion due to correcting inaccurate codes cannot be determined without an audit of the claim itself. Periodic audits of claims by an external agency are required in order to ensure that the claims administrator is achieving the full savings potential.

H██000053

CONFIDENTIAL

Confidential Information Subject to D. Del. LR 26.2

MCK 048035

04-CV-1258-SLR (D.Del.)

# EXHIBIT 11

Page 242

```
 1              - VOLUME B -
 2      IN THE UNITED STATES DISTRICT COURT
 3        IN AND FOR THE DISTRICT OF DELAWARE
                    - - -
 4
   McKESSON INFORMATION SOLUTIONS   :   CIVIL ACTION
 5  LLC,                            :
        Plaintiff                   :
 6                                  :
        vs.                         :
 7                                  :
   THE TRIZETTO GROUP, INC.,        :
 8                                  :
        Defendant                   :   NO. 04-01258 (SLR)
 9                 - - -
10              Wilmington, Delaware
                Tuesday, April 18, 2006
11              8:30 o'clock, a.m.
12
                    - - -
13
   BEFORE:  HONORABLE SUE L. ROBINSON, Chief Judge, and a jury
14
15
   APPEARANCES:
16
17       SKADDEN, ARPS, SLATE, MEAGHER & FLOM
         BY:  MICHAEL BARLOW, ESQ.
18            -and-
19       SKADDEN, ARPS, SLATE, MEAGHER & FLOM
         BY:  JEFF RANDALL, ESQ.,
20            BERNARD SHEK, ESQ. and
              MICHAEL HENDERSHOT, ESQ.
21            (Palo Alto, California)
22            Counsel for Plaintiff
23                 Valerie J. Gunning and
24                 Leonard A. Dibbs,
                   Official Court Reporters
25
```

Page 243
```
 1  APPEARANCES (Continued):
 2
 3       MORRIS, NICHOLS, ARSHT & TUNNELL
         BY:  JACK B. BLUMENFELD, ESQ.
 4
 5            -and-
 6       GIBSON, DUNN & CRUTCHER LLP
         BY:  JEFFREY THOMAS, ESQ. and
 7            DAVID SEGAL, ESQ.
              (Irvine, California)
 8
 9            -and-
10       GIBSON, DUNN & CRUTCHER LLP
11       BY:  MICHAEL ROBINSON, ESQ.
              (San Francisco, California)
12
              Counsel for Defendant
13                 - - -
```

Page 244

## PROCEEDINGS

(Proceedings convened at 8:30 a.m., and the following occurred without the presence of the jury.)

THE COURT: Good morning, counsel.

(Counsel respond "Good morning, your Honor.)

THE COURT: I guess you can lay out what issues we need to address in what order. I have an idea of what we need to address today, but I will let you be the ringmasters here.

Are we all set with depositions? I understand from the e-mail that at least some of these depositions are going to go forward, consistent, I hope, with my guidelines.

Mr. Randall?

MR. RANDALL: Yes, your Honor. We have -- we've gone through the transcripts and we have at least done our best to take out questions that referenced either the patent or the claims in the questions, also any questions that referenced the term predetermined database.

We have done our best to remove those and have made our designations and have given them to the other side. With respect to proceeding this morning

Page 245

in terms of the witnesses, we'd like to call our expert, Dr. Musen, to the stand. The only issues with respect to his testimony are the submission within the Court's guidelines prior to 48 hours before he took the stand, we sent over screen shots that were previously disclosed to counsel and videos of what are represented by the screen shots. Basically, the screen shots fading into each other.

So we provided those. The only objection we got was we're objecting to the extent that you intend to go beyond the scope of his report. It's really just a restatement of the rule that you made very clear to both sides. We don't intend to violate that rule, so we -- they really didn't make any objection to the substance of those documents.

And then the other issues that we would like to bring up would be, one, a brief, brief argument regarding Document J issue. And then raise issues with respect to Trizetto's attempts to put witnesses and evidence on during their case. Specifically, Ms. Wukitch, who is here regarding our infringement case. She is an employee of McKesson. She really does not have any information relating to the operation of the products.

We've asked them if there's anything that's

Page 342

1  for certain services, that other things -- by the nature
2  of the service, bundled in.
3        There may be situations when a patient should
4  be charged explicitly for an office visit, but one should
5  not be charged for an office visit at the same time that
6  the surgery takes place because the surgical code
7  includes the amount of reimbursement that the physician
8  should receive for allowing the patient to come into the
9  office.
10        MR. HENDERSHOT: Could we pull up Slide 1116?
11  Trial Exhibit 1116?
12  BY MR. HENDERSHOT:
13  Q. And these relationships we see here, Dr. Musen,
14  between these two codes, do they come into play at all
15  in the processing of a claim in the Facets system?
16  A. Absolutely. These are the relationships in the
17  database that Facets uses in order to do its clinical
18  editing.
19  Q. All right.
20        MR. HENDERSHOT: Could we see Slide 1116?
21  BY MR. HENDERSHOT:
22  Q. So what are we seeing on this screen, Dr. Musen?
23  A. We're seeing the screen we saw a moment ago, where
24  on the upper left we see Lines 1 and 2, where the
25  procedure codes have been entered for the particular

Page 343

1  claim, the 64450 code for the anesthesia and the 10120
2  code for the surgery. And what we see is that there
3  has been a process that has taken place whereby Facets
4  has indicated that there's a subset procedure detected
5  on Line 1, that clinical edits exist. I'm reading the
6  warning message you see on the upper right.
7        And this is essentially how Facets informs
8  the user the same way that the patented product did
9  that the code for the anesthetic should not be billed
10  at the same time that there's a code on the form for
11  the surgical procedure.
12  Q. So there's an arrow to the left of Line 1 there,
13  Dr. Musen?
14  A. That's correct.
15  Q. What does that indicate?
16  A. That means that the computer is viewing Line 1
17  and that the warning message applies to Line 1 and
18  actually, if we also go down to the bottom of the
19  screen, where it says N-O 1, we also see the message
20  subset procedure disallowed.
21  Q. So that means -- what does that indicate to you
22  about this code on Line 1?
23  A. That the code has been rejected, and if we look at
24  the actual dollar numbers, we see that the considered
25  charge for the anesthesia in Line 1 is $71.62.

Page 344

1  Q. Are you referring to the considered charge right
2  here, Dr. Musen?
3  A. That's correct.
4        And that the allowed -- the allowed charge is
5  zero.
6  Q. And does it indicate over here (indicating) $71.62
7  next to disallow?
8  A. That's correct. So the charge for the anesthetic
9  has been disallowed because the code has been rejected
10  because the code for the surgery should include all the
11  costs that the physician incurred for which he's to be
12  reimbursed.
13        MR. HENDERSHOT: Can we bring up Exhibit
14  1117?
15  BY MR. HENDERSHOT:
16  Q. Now, Dr. Musen, the arrow here on this slide is now
17  on what looks to be Line 2?
18  A. That's correct.
19  Q. I guess the system numbers the line items in the
20  medical service codes?
21  A. That's correct.
22  Q. So what is the arrow being on Line 2 indicate to
23  you?
24  A. Well, it gives us context for what we see in the
25  screen that's below and you'll see the considered charge

Page 345

1  for the surgical component of the visit, the $88.27,
2  refers to the removal of the foreign body, and all of
3  that charge has been allowed.
4        It turns out that Facets has determined
5  there's a co-pay of $25 and so actually the benefit to
6  the patient is $63.27. But fundamentally what we see is
7  that the first code has been rejected and the second
8  code has been accepted.
9  Q. Is that consistent with the examples you've been
10  explaining earlier today?
11  A. That's exactly what the patented invention did. We
12  saw that one.
13        MR. HENDERSHOT: Could we see the next exhibit
14  in sequence?
15        The next exhibit?
16        How about 1115? 1115, please.
17  BY MR. HENDERSHOT:
18  Q. Now, Dr. Musen, we're taking a step back in time
19  here in the process, as I understand it. Do you
20  understand, have an understanding as to where in the
21  stage of process --
22  A. Yes, I do. We've just gone back to before the
23  clinical edits were applied.
24  Q. And what's being indicated on the screen here?
25  A. Well, the user is attempting to save the claim as

Jury Trial - Volume B                 CondenseIt™                Tuesday, April 18, 2006

---

Page 382

1 on this claim based on your explanation earlier?
2 A. That's correct.
3 Q. And is one of them 12036?
4 A. Right.  12036 is a particular code for repair of
5 a laceration.  I believe 20 to 31 centimeters and I
6 don't have it memorized.
7 Q. Okay.  I forgive you that.
8     There's an arrow on what has been labeled
9 Line 2?
10 A. Line 2 refers to a different procedure code for
11 12037, which is the cost of repairing a really big
12 laceration.  As I recall, it's more than 31 centimeters.
13 Q. Okay.  So if you — I believe you discussed this
14 description as to the procedure here under the line item
15 table.
16 A. Yes.  Okay.  Oh, that is very helpful.
17     So Line 2 is, indeed, repair of a laceration
18 of the scalp or trunk or extremity and that's over 37
19 centimeters in length.
20 Q. So this is a situation where you, as you had
21 discussed, multiple lacerations, repair of multiple
22 lacerations are being submitted on a claim?
23 A. That's correct.
24 Q. And this slide is taken from an example you were
25 able to run at Facets?

---

Page 383

1 A. Exactly.
2     MR. HENDERSHOT:  Would you bring up Exhibit
3 1125?
4 BY MR. HENDERSHOT:
5 Q. Dr. Musen, do you recognize what Exhibit 1125 is?
6 A. Yes.  It's an example of Facets doing the right
7 thing.
8 Q. It —
9 A. It shows you the two codes, 12036 and 12037, and
10 generates the error message that tells you the two
11 codes appropriately should be bundled into a single
12 code.
13 Q. In this example, one did 12036 represent?
14 A. 12036 was repair of a smaller size laceration and
15 according to CPT coding convention, when you have two
16 lacerations and you repair both of them, then you only
17 get credit for the total length or, in this case, you
18 get credit for a very large laceration greater than 30
19 centimeters.
20 Q. So the doctor in this example treated two
21 lacerations?
22 A. That's correct.
23 Q. But should have billed for one?
24 A. That is correct.
25 Q. Which corresponds to this 12037?

---

Page 384

1 A. Right.  And we have to be a little bit careful
2 about the language.  It's not that the doctor should
3 have billed for one laceration.  The one laceration on
4 the form doesn't really exist anatomically.  It's not
5 a medical reality of the patient.  It's simply the way
6 that one bills when there are multiple injuries and one
7 does multiple repairs.
8 Q. All right.  So the billing convention as an example
9 is divorced from the medical condition of the patent?
10 A. Right.
11 Q. The patient?
12 A. Exactly.
13     MR. HENDERSHOT:  Could you pull up Slide
14 1126?
15 BY MR. HENDERSHOT:
16 Q. Do you recognize this screen?
17 A. Yes.
18 Q. Is this also from your example?
19 A. It's also from my example and also from Facets.
20 Q. Okay.  It says clinical editing criteria indicative
21 for 12037?
22 A. Correct.
23 Q. We also see the subset category again?
24 A. Yes.
25 Q. Have we discussed that before today?

---

Page 385

1 A. Yes.
2 Q. Is there any relevant information with respect to
3 this information underneath that tab?
4 A. Yes.  The same Subset 1 relationship exists between
5 the ten medical service codes that we see in that open,
6 open box, dialogue box that we saw in relationship to
7 the code for the surgical excision of the foreign body.
8 In other words, whenever a clinician bills for repair
9 of a laceration that is over 30 centimeters, then any
10 other lacerations that might be on that patient do not
11 justify a separate bill, they should all be bundled
12 into the same charge.
13     It's not that the lacerations don't exist,
14 but the billing should be for one big one.
15 Q. So it's a non-medical criteria?
16 A. It's non-medical.
17 Q. Did any of these play into the process we saw by
18 Facets?
19 A. Absolutely.  Any of those other codes on the claim
20 form would be disallowed and the one that we approved
21 would be the one for the laceration greater than 30
22 centimeters.
23 Q. Okay.  So — and because 12036 is included on this
24 list of relationships?
25 A. That's correct.

---

Jury Trial - Volume B          CondenseIt™          Tuesday, April 18, 2006

Page 486

1  used with Dr. Musen that there was no objection.
2      MR. RANDALL: You did move it in. You
3  walked up and said I'm going to move it in, there's no
4  objection.
5      THE COURT: Well, I don't know that that was
6  a formal --
7      MR. SITZMAN: May I move?
8      THE COURT: Yes, you certainly may.
9      MR. SITZMAN: Thank you, your Honor.
10     THE COURT: All right. Let's bring our jury
11 in, then.
12     (Pause.)
13     (At this point the jury entered the courtroom
14 and took their seats in the box.)
15     THE COURT: All right. You may continue.
16 Redirect? Are we having redirect?
17     MR. HENDERSHOT: My colleague is a little
18 eager.
19         REDIRECT EXAMINATION
20 BY MR. HENDERSHOT:
21 Q. Dr. Musen, I'd like to talk to you about a few
22 minutes that has just been raised in cross-examination.
23 A. Sure.
24 Q. Can we pull up Slide 14, which is Claim 1 of the
25 '465?

Page 487

1      While he's doing that, Dr. Musen, I'd like to
2  ask you a few questions.
3      You reviewed Claim 1 and understand it?
4  A. Yes.
5  Q. What is your understanding of the determining step
6  in Claim 1 of the '164 patent as to what it requires?
7  A. It requires a means to determine whether a code is
8  absent from the database.
9  Q. And does it require a means or just that that
10 function be performed?
11 A. That the function be performed.
12 Q. Have you reviewed the courts claim construction of
13 that element?
14 A. Yes.
15 Q. Do you understand it to be limited to any
16 particular way of performing that function?
17 A. I don't read that at all.
18 Q. And the function in that step requires that the
19 computer system determine whether a code is not in the
20 predetermined database, not that it's in the
21 predetermined database; is that correct?
22 A. That's correct.
23 Q. And you had suggested that one way to perform that
24 step -- strike that.
25     You said there were multiple ways that step

Page 488

1  could be performed?
2  A. That's right.
3  Q. Could you describe just a few -- or one or two?
4  A. Yes. I think I did for Mr. Sitzman.
5      One could exhaustively go through the
6  database codes to see if the code was there, and if he
7  didn't find it, he would report that it was missing.
8      One could have an index that would keep a
9  list of all the possible codes in the database that would
10 be maintained separately. Some modern database systems
11 would automatically create such indices that such things
12 would exist without actual programming effort on the
13 part of the end user.
14 Q. Okay. Looking at Claim 1 here, just up on the
15 screen, can you see that all right?
16 A. Yes, I do.
17 Q. The determining step says, determining whether any
18 medical service code contained in the at least one claim
19 is not present in the predetermined database?
20 A. Right.
21 Q. Do you read anything in that limitation that's
22 requiring that the predetermined database be used to
23 make that determination?
24 A. Nothing at all.
25 Q. You had identified looking in a separate index as

Page 489

1  a possibility of doing that?
2  A. That's right.
3  Q. In your view, in your expert opinion, could that
4  element be satisfied by looking at an index of all
5  possible codes in the predetermined database?
6  A. That's -- that is the way most people would
7  program that step.
8  Q. Can you analogize looking in the index to determine
9  if something is present in another set of information?
10 A. Yes. I mean, it's the difference between going to
11 the card catalogue in the library and seeing if the book
12 is there versus spending your afternoon looking at every
13 book in the stacks and it would make much more sense to
14 go to an index to do that.
15     Having the index available would make life
16 much simpler.
17 Q. And that's a way to verify that a piece of
18 information is not present in a collection; is that
19 correct?
20 A. Well, failure to find something would be a way of
21 determining that it's not there.
22 Q. All right. Mr. Sitzman also asked you a number of
23 questions about other functionality in Facets and other
24 applications, so forth. Do you recall that discussion?
25 A. Yes, I do.

Jury Trial - Volume D                 CondenseIt™                    Thursday, April 20, 2006

```
                                Page 769
1              - VOLUME D -
       IN THE UNITED STATES DISTRICT COURT
2
       IN AND FOR THE DISTRICT OF DELAWARE
3            - - -
4
   McKESSON INFORMATION SOLUTIONS  :   CIVIL ACTION
5  LLC,
          Plaintiff               :
6
          vs.                     :
7
   THE TRIZETTO GROUP, INC.,       :
8
          Defendant               :   NO. 04-01258 (SLR)
9
10                          Wilmington, Delaware
11                          Thursday, April 20, 2006
                            10:27 o'clock, a.m.
12
13            - - -
14 BEFORE: HONORABLE SUE L. ROBINSON, Chief Judge, and a jury
15            - - -
16 APPEARANCES:
17   SKADDEN, ARPS, SLATE, MEAGHER & FLOM
     BY: MICHAEL BARLOW, ESQ.
18
            -and-
19
     SKADDEN, ARPS, SLATE, MEAGHER & FLOM
20   BY: JEFF RANDALL, ESQ.,
         BERNARD SHEK, ESQ. and
21       MICHAEL HENDERSHOT, ESQ.
         (Palo Alto, California)
22
            Counsel for Plaintiff
23
                     Valerie J. Gunning and
24                   Leonard A. Dibbs,
                     Official Court Reporters
25
```

```
                                Page 770
1  APPEARANCES (Continued):
2
     MORRIS, NICHOLS, ARSHT & TUNNELL
3    BY: JACK B. BLUMENFELD, ESQ.
4
            -and-
5
6    GIBSON, DUNN & CRUTCHER LLP
     BY: JEFFREY THOMAS, ESQ. and
7        DAVID SEGAL, ESQ. and
         T. KEVIN ROOSEVELT, ESQ.
8        (Irvine, California)
9
            -and-
10
11   GIBSON, DUNN & CRUTCHER LLP
     BY: MICHAEL SITZMAN, ESQ.
12       (San Francisco, California)
13          Counsel for Defendant
14            - - -
```

```
                                Page 771
1
2            P R O C E E D I N G S
3
4        (Proceedings convened at 10:27 a.m., and the
5  following occurred without the presence of the jury.)
6
7        THE COURT: All right. Do we have issues
8  with the first presentation of evidence? Not with the
9  entire case, just with what's happening first thing.
10       MR. RANDALL: We do, your Honor.
11       With respect to the demonstratives that Mr.
12 Davis intends to testify about, we have objections as to
13 most of the demonstratives. I have a copy set of them
14 right here, if I could hand them up?
15       THE COURT: All right.
16       (Mr. Randall handed documents to the Court.)
17       MR. RANDALL: The first, not necessarily in
18 order, but I just want to cover one right away. At 4-8,
19 they're numbered at the bottom right-hand corner,
20 there's a demonstrative with up in the upper left-hand
21 corner, it references Dr. Johnson's expert report. I
22 don't think that's appropriate. She didn't testify.
23       THE COURT: I agree, and reports aren't
24 part of the case, ever, so that should not be shown
25       MR. RANDALL: With respect to the second
```

```
                                Page 772
1  slide, 4-2, and on forward through 4-6, what Mr.
2  Davis is attempting to testify about is that the step
3  of ascertaining whether at least one claim contains a
4  plurality of medical service codes is limited to the
5  structure in the Figure 2. That's what all of those
6  slides are about. They are going to present to the
7  jury their theory that the reasonable interpretation
8  of that term is that it's limited to the structure and
9  that's simply contrary to what your Honor ruled at
10 Markman. That's what they advanced with respect to
11 the Markman hearing and they didn't receive that
12 construction properly. And they are going to advance
13 it in front of the jury.
14       It's simply error to permit them to present
15 an argument that is directly contrary to your Honor's
16 ruling, and there's no other purpose for that for all
17 of those figures.
18       With respect to 4-10 -- I'm sorry, 4-9,
19 no objections.
20       4-10, Dr. Davis did not opine on anything
21 regarding predetermined database that is relevant to
22 your Honor's construction. His construction of
23 predetermined database was that it required user -- it
24 precluded user modification, and so there are a series
25 of slides that he's going to testify about regarding
```

Page 849

1  the brain of a human?
2  A.  Yes, I recall that.
3  Q.  Do you agree with that statement?
4  A.  No, I don't.
5  Q.  Why not?
6  A.  I understand that McKesson's -- I'm sorry,
7  TriZetto's software can and is used without clinical
8  editing at all.  That is one can purchase the product
9  without the clinical editing functionality or you can
10  purchase the product and turn off the clinical editing
11  functional, and if a customer were to do either one of
12  those things, one would have to ask if the analogy were
13  true, why they would want a piece of brain-dead software.
14      So I don't think the analogy is apt.  That
15  is, there's substantial additional functionality in the
16  software, which is much beyond the clinical editing.
17  Otherwise, customers would not want the software without
18  the clinical editing.  So that's why the analogy just
19  seems inappropriate to me.
20  Q.  All right.  So we're going to start out with Claim
21  1.  I'm going to put up aboard with the three claims so
22  we can follow as we go through and make some progress.
23      They also, I believe, has the patent in
24  their book and Claim 1 is on the second-to-last page of
25  Trial Exhibit 1, which is in evidence (placing chart on

Page 850

1  the easel).
2      The first question to you, Professor Davis:
3  Does TriZetto's software practice -- perform the steps
4  of Claim 1 of the '164 patent?
5  A.  No, I do not believe it does.
6  Q.  All right.  Do you recall yesterday McKesson
7  showing their trial Exhibit 1120?
8      MR. SEGAL:  If we can get that up, please...
9  BY MR. SEGAL:
10  Q.  And explaining -- this is the screen that shows
11  there's an invalid procedure code when Dr. Musen entered
12  one two three four in the system.
13      There we go.
14      And I believe this was from the Facets
15  software and Dr. Musen showed a similar message comes up
16  in TriZetto's other software.
17      Do you recall that testimony?
18  A.  I do.
19  Q.  And Dr. Musen used the screen shot to say that
20  the steps of Claim 1 were performed by TriZetto's
21  software?
22  A.  In particular, all the steps of Claim 1 were
23  performed by the software.
24  Q.  As initial matter, when is the first time you
25  saw --

Page 851

1      MR. SEGAL:  Something happened to that.
2  BY MR. SEGAL:
3  Q.  When is the first time you heard any support --
4  let me rephrase the question.  Sorry.
5      I thought Dr. Musen, in his testimony, said
6  that TriZetto could infringe Claim 1 even if it didn't
7  look up codes in the predetermined database, but instead
8  used an index.
9      Do you recall that?
10  A.  I recall that.
11  Q.  Is he correct?
12  A.  In principle, it is arguable.  I don't know if
13  it's correct, but it's certainly arguable that if the
14  TriZetto code actually used an index into the
15  predetermined database, then I suppose one could argue
16  that a program that performed that way was, indeed,
17  carrying out the determining step in Claim 1.  The
18  important point, however, is that's not how the
19  TriZetto software works.  It does not use an index into
20  the predetermined database.
21  Q.  Okay.  Upon hearing Dr. Musen's testimony in court,
22  did you ask that some graphics be prepared to explain
23  what your opinion is about how TriZetto does not
24  infringe Claim 1?
25  A.  Yes.

Page 852

1      MR. SEGAL:  And if we can have Graphic 10
2  up, please...
3      And if we start the graphic...
4  BY MR. SEGAL:
5  Q.  And if you can explain to the jury what this graphic
6  is intended to depict...
7  A.  The important point here is that there are two
8  separate and distinct databases in the Facets software
9  and the other programs as well.  There is a database
10  called, labeled up there, the CPT code list, which
11  contains an exhaustive list of all of the CPT codes
12  taken as suggested by the little animation there
13  directly from a publication provided by the American
14  Medical Association.  That's all the codes that the
15  program is supposed to know about.
16  Q.  And what is the second list?
17  A.  On the right-hand side of the screen is something
18  labeled clinical editing rules.  That is the
19  predetermined database that we have been talking about
20  in this case.  And as you can see there, the company
21  called Deloitte & Touche provides the clinical editing
22  rules, and those are loaded into what has been called in
23  this case the predetermined database.
24  Q.  But isn't the CPT code list just an index of the
25  codes, of all the codes that are in the rules?

Page 857

1      In fact, do the next part of it. We don't
2 get an error. Why? Because where we look is in the
3 CPT code list, which is separate, distinct and
4 disconnected from the predetermined database.
5      Having removed that editing rule in that code
6 from the predetermined database, if that's where the
7 TriZetto code looked, it would have to say, it would have
8 to determine that that medical service code is not present
9 in the predetermined database. That's not the behavior of
10 the program, so we've demonstrated that that is not where
11 the TriZetto code is looking to make that determination.
12 Q. Are these graphics that you had prepared not only
13 consistent with the demonstration you saw in the live
14 Facets software, but also consistent with your review of
15 the source code and database tables in the program?
16 A. Yes.
17 Q. By the way, did you see anything in the code that
18 said to call a friend or phone a friend to determine
19 whether a code is not in the database?
20 A. No. After Dr. Musen suggested the code might do
21 that, I took another look and I did not find anything
22 like that.
23 Q. I would like to show you on the Elmo some trial
24 testimony from Dr. Musen's testimony. I've highlighted
25 it.

Page 858

1      In connection with this testimony, Dr. Musen
2 was testifying about how he thought the index would have
3 to work. And he said, I find it inconceivable that Dr.
4 Johnson would get it wrong when she, although it says
5 he there, evaluated the software.
6      Question: If Dr. Johnson got it wrong, if
7 there, in fact, is two databases, and if, in fact, the
8 TriZetto programs do go to a different database to do
9 the validity check, that would change -- will change
10 your opinion, won't it?
11      Answer: Validity of the combination of
12 codes or --
13      Question: Just the codes.
14      Answer: In Claim 1?
15      Question: Yes. Just whether the code is a
16 valid code.
17      Answer: I'm sorry.
18      Did Dr. Johnson make a determination as to
19 whether or not the TriZetto software used a separate
20 database to check and give that invalidity check?
21 A. Yes. In her deposition, she indicated that there
22 was, indeed, a second database used to the invalidity
23 check.
24 Q. Did she refer to it as a separate database? Do
25 you recall?

Page 859

1 A. I believe she did. I don't -- I don't recall the
2 precise language, but I'm fairly sure that she referred
3 to it as a separate database.
4 Q. So Dr. Johnson agrees with your opinion; is that
5 right?
6 A. That's correct.
7 Q. I would also like to -- do you generally recall
8 Dr. Musen also testifying about his assumptions to
9 support his opinion that TriZetto used an index of
10 codes of the predetermined database to validate
11 procedure codes?
12 A. I remember -- I generally remember that testimony.
13 Q. I'd like to read to you from Page 438 of the
14 trial transcript from Tuesday.
15      MR. SEGAL: And if we can put up 1120,
16 because that was the exhibit that was up and about
17 which Dr. Musen was testifying.
18 BY MR. SEGAL:
19 Q. Question: And you have no idea, based on your
20 testimony, what database the Facets software went to
21 check and return that message; correct?
22      Answer: I'm not clueless. I mean, I would
23 assume that if the program were created in a reasonable
24 way, there would be an index into the ClinicalLogic
25 database and it would use that index to find the answer,

Page 860

1 but I don't know for sure.
2      Dr. Davis, do you know for sure whether a
3 separate database is used by TriZetto in performing the
4 validity check?
5 A. Yes. From having examined the behavior of the
6 program and from having examined the software, I do know
7 for sure, and there is a separate database used.
8 Q. Does that mean TriZetto's software was created in
9 an unreasonable way?
10 A. No. Dr. Musen is making a reasonable presumption
11 about the possibility that there might have been an
12 index. That would have been a second sensible way to
13 do this, but it turns out there's more than one sensible
14 way to have designed this program and his answer about
15 the claim, the element of the Claim No. 1 just happens
16 to depend on an assumption that the program is designed
17 in a way in which it is not, in fact, designed.
18      - - -
19 A. (Continuing) The program is designed and built
20 differently such that it doesn't carry out that element
21 of that claim.
22 Q. So your testimony is not based on an assumption?
23 A. That's correct. It's based on looking at the
24 code.
25 Q. Did you also learn anything about the history of

**Page 977**

```
 1              - VOLUME E -
 2      IN THE UNITED STATES DISTRICT COURT
 3      IN AND FOR THE DISTRICT OF DELAWARE
 4  McKESSON INFORMATION SOLUTIONS  :   CIVIL ACTION
    LLC,
 5            Plaintiff            :
 6            vs.                  :
 7  THE TRIZETTO GROUP, INC.,      :
 8            Defendant            :   NO. 04-01258 (SLR)
 9
10                          Wilmington, Delaware
11                          Monday, April 24, 2006
12                          8:30 o'clock, a.m.
13  BEFORE:  HONORABLE SUE L. ROBINSON, Chief Judge, and a jury
14
15  APPEARANCES:
16
17       SKADDEN, ARPS, SLATE, MEAGHER & FLOM
         BY: MICHAEL BARLOW, ESQ.
18                   -and-
19       SKADDEN, ARPS, SLATE, MEAGHER & FLOM
         BY: JEFF RANDALL, ESQ.,
20            BERNARD SHEK, ESQ. and
              MICHAEL HENDERSHOT, ESQ.
21       (Palo Alto, California)
22            Counsel for Plaintiff
23                      Valerie J. Gunning and
                        Leonard A. Dibbs,
24                      Official Court Reporters
25
```

**Page 978**

```
 1  APPEARANCES (Continued):
 2       MORRIS, NICHOLS, ARSHT & TUNNELL
 3       BY: JACK B. BLUMENFELD, ESQ.
 4                   -and-
 5
 6       GIBSON, DUNN & CRUTCHER LLP
         BY: JEFFREY THOMAS, ESQ. and
 7            DAVID SEGAL, ESQ. and
              T. KEVIN ROOSEVELT, ESQ.
 8       (Irvine, California)
 9
10                   -and-
11       GIBSON, DUNN & CRUTCHER LLP
         BY: MICHAEL SITZMAN, ESQ.
12       (San Francisco, California)
13            Counsel for Defendant
14
```

**Page 979**

```
 1
 2              PROCEEDINGS
 3
 4       (Proceedings convened at 8:30 a.m., and the
 5  following occurred without the presence of the jury.)
 6
 7       THE COURT: Not surprisingly, I've got all
 8  sorts of papers in my folder, which I really have not had
 9  a chance to look at.
10       Our purpose this morning is to go through the
11  jury instructions, so that is what we'll do first. I
12  also have not had a chance to look at the proposals you
13  have for changing them, but I guess we will get to those
14  as we get to the instructions you want to change.
15       So as is normal for what I do in a charge
16  conference, we'll go you through the instructions page
17  by page and find out where you have your objections or
18  suggestions for changes.
19       The first set of instructions are my standard
20  instructions.
21       Does anyone have any problems through Page 12?
22       You don't have to come to the podium, Mr.
23  Thomas.
24       MR. THOMAS: Okay. Thank you.
25       MR. THOMAS: Not really, your Honor. Page
```

**Page 980**

```
 1  12, it's a nit and probably not important, but the name
 2  ClinicaLogic.
 3       THE COURT: Maybe you don't have the same
 4  Page 12 I do.
 5       MR. THOMAS: It's entitled Plaintiff's
 6  Contentions.
 7       THE COURT: Oh, no. My page 12 is deposition
 8  testimony.
 9       MR. RANDALL: As is mine.
10       MR. THOMAS: Okay. That would be Page 11 in
11  my set, your Honor.
12       Page 13, I suppose, plaintiff's contentions.
13       THE COURT: Well, Page 13 is the parties.
14  Maybe we should go by the title. Any changes with the
15  parties?
16       MR. THOMAS: Plaintiff's contentions?
17       THE COURT: All right. Which is Page 14. All
18  right.
19       MR. THOMAS: It's simply that the name
20  ClinicaLogic is not used with the Facets system. It's
21  used with ClaimFacts and QicLink.
22       THE COURT: All right.
23       MR. THOMAS: But I don't think it really makes
24  a big difference.
25       THE COURT: Well, it should be -- if that's
```

Jury Trial - Volume E                CondenseIt™                McKesson v. TriZetto

---

**Page 1033**

1
2          MR. RANDALL: Can you pull up Exhibit 419,
3   Page 1?
4   BY MR. RANDALL:
5   Q. This is the clinical editing reference database
6   user guide for 2003.
7          Do you see that?
8   A. Yes.
9   Q. I direct your attention to the first paragraph.
10  This is a tool -- this document is a tool designed to
11  give TriZetto's customers greater information on the
12  sources and rationale of edits built into the systems;
13  correct?
14  A. Yes.
15  Q. And I'd like to -- can you move to Page 20 of
16  Exhibit 19? Yes.
17          Blow up that bottom paragraph.
18          So you mentioned that there are no mutually
19  exclusive procedures in your systems. There are mutually
20  exclusive procedures, are there not?
21  A. There are no -- there isn't a mutually -- there
22  isn't an edit called mutually exclusive. These
23  mutually exclusive procedures are part of the national
24  correct coding initiative. And that's the Medicare
25  edits and those are reviewed by our medical consultants

---

**Page 1034**

1   and the ones that are appropriate to be placed in the
2   database for editing purposes are. However, we don't
3   call them mutually exclusive edits. They're inserted
4   into our subset tables.
5   Q. Well, this is a manual that is produced by TriZetto
6   and provided to its customers as a tool to assist them
7   in working, in using your products; is that correct?
8   A. Yes.
9   Q. All right. And in the user guide that you present
10  to your customers to assist them in using your products,
11  you refer to mutually exclusive procedures; correct?
12  A. Yes. This --
13  Q. All right.
14  A. This is the definition from NCCI. It's taken right
15  out of the public use files. It's a cut and paste. It
16  wasn't created by us. We did not word it that way.
17  It's strictly to give our customers the information as
18  to what national correct coding initiative determined an
19  edit to be.
20  Q. Well, your systems, Ms. Lampe, detect mutually
21  exclusive procedures, both through subset edits and
22  rebundle edits; correct?
23  A. Based on this definition here?
24  Q. Yes.
25  A. Yes, I would agree with that.

---

**Page 1035**

1   Q. All right.
2          THE COURT: And, Mr. Randall, has this exhibit
3   been admitted?
4          MR. RANDALL: Well, there's no objection to it.
5          THE COURT: All right. Well, let's admit it,
6   though, just to stay consistent with my rules as Exhibit
7   419.
8          MR. RANDALL: Thank you, your Honor.
9          THE COURT: All right.
10  ***        (Exhibit No. 419 was received into evidence.)
11  BY MR. RANDALL:
12  Q. So this document states, there are numerous
13  procedure codes that should not be reported together
14  because they are mutually exclusive of each other.
15          Do you see that?
16  A. Yes.
17  Q. And the clinical editing functionality of TriZetto
18  detects these numerous procedure codes that should not
19  be reported together because they are mutually exclusive
20  of each other; correct?
21  A. Could you repeat the first part of that question,
22  please?
23  Q. Sure. The clinical editing or clinical edit,
24  ClinicaLogic, we'll call it, detects that there are
25  these numerous procedure codes that should not be

---

**Page 1036**

1   reported together because they are mutually exclusive of
2   each other; correct?
3   A. Yes.
4   Q. And in some instances, it disallows both codes and
5   inserts a new comprehensive code, and that's called the
6   rebundle edit; right?
7   A. Yes.
8   Q. And in some instances it detects the two mutually
9   exclusive codes and it passes one of them on for further
10  adjudication and disallows for payment the other, and
11  that's called the subset edit; correct?
12  A. Yes.
13  Q. All right.
14  A. But I don't know that you can separate out calling
15  the rebundle mutually exclusive and not referring to the
16  subset as mutually exclusive as well.
17  Q. They both are; correct?
18  A. I would think a subset is a more proper definition
19  of mutually exclusive based on this than the rebundle.
20  Q. Well, in the rebundle example, there are two codes
21  that are detected by the accused products that should
22  not be reported together and in that instance, both of
23  them are disallowed for payment and a new -- a new code
24  is inserted for further adjudication; correct? Is that
25  a fair statement?

---

Jury Trial - Volume E      CondenseIt™      McKesson v. TriZetto

Page 1037

1 A. It's fair. I mean, I've agreed to it, but I
2 still don't like disallowed. I still don't like the
3 codes are rejected or disallowed.
4       I'm not -- that's not the way I see the --
5 the rebundle has happened.
6 Q. Your documents, your documents say that the codes
7 are disallowed, don't they, ma'am?
8 A. I don't believe -- does it say that for the
9 rebundle, that those two codes are disallowed? I --
10 Q. I'm asking you.
11 A. I don't think it did.
12 Q. Do your documents indicate and state that codes
13 are disallowed?
14 A. That codes in general can be disallowed? Yes, it
15 does.
16 Q. All right. So this document goes on to state,
17 mutually exclusive codes are those codes that cannot
18 reasonably be done in the same session.
19       Do you see that?
20 A. Yes.
21 Q. That's the definition for mutually exclusive codes
22 as detected by your products; is that correct?
23 A. For the NCCI edits that are included in our -- in
24 our criteria, yes.
25 Q. And that's the national correct coding initiative;

Page 1038

1 correct?
2 A. Yes.
3 Q. And your systems are compliant with that; correct?
4 A. Not a hundred percent.
5 Q. They are compliant with it with respect to
6 detecting mutually exclusive codes?
7 A. The ones our medical consultants have determined
8 are appropriate to be put in the criteria.
9 Q. Okay.
10      MR. RANDALL: Can you go to Exhibit 419,
11 Page 21? The upper -- the upper paragraph.
12      There we go.
13 BY MR. RANDALL:
14 Q. Now, you recognize this, Ms. Lampe, as a list of
15 examples of these mutually exclusive procedures; correct?
16 A. Yes.
17 Q. All right. And this is Exhibit 419, Page 20, Page
18 21.
19       So this goes on to state that a third example
20 is the reporting of an initial service and a subsequent
21 service. It is contrary for a service to be classified
22 as an initial and a subsequent service at the same time.
23       Do you see that?
24 A. Yes.
25 Q. All right. So some of the mutually exclusive edits

Page 1039

1 that are detected by your systems are detected because
2 you can't report an initial -- you can't have a code
3 that bills for an initial service with a subsequent
4 service at the same time in the same claim; right?
5 A. Well, that would depend on whether or not the
6 consultants, the medical consultants put those edits into
7 our system. I don't know off the top of my head if they
8 did.
9 Q. You have no idea whether or not the one of three
10 examples provided by the national correct coding
11 initiative is actually implemented in your system?
12 A. No, because they're not all in our system.
13 Q. I understand they are not all, but this is the one
14 of three examples that the national correct coding
15 initiative provides. Would you agree with me there?
16 A. Yes.
17 Q. Okay. And one of the three examples of a mutually
18 exclusive code is that initial service and subsequent
19 service shouldn't be billed at the same time on the same
20 claim; right?
21 A. Yes.
22 Q. All right. And that's basically double billing,
23 isn't it? You shouldn't bill for the first visit, the
24 second visit at the same time on the same claim; right?
25 A. Correct.

Page 1040

1 Q. Okay.
2       (Pause.)
3      MR. RANDALL: Can you move down to the next
4 paragraph, please? Thank you.
5 BY MR. RANDALL:
6 Q. You also say to your customers that CPT codes
7 which are mutually exclusive of one another based
8 either on the CPT definition or the medical
9 impossibility/improbability that the procedures could
10 be performed at the same session can be identified as
11 code pairs; correct?
12 A. Yes, based on the Medicare NCCI. Again, this is
13 all part of that definition.
14 Q. Well, you include this in what you tell your
15 customers you can detect; right?
16 A. This is how Medicare created these edits and our
17 medical consultants review them and decide if they
18 should be in our database. So if one of these edits
19 happens to come up and a customer needs more information,
20 this is the information that is supplied, because it's
21 added because it's a Medicare national correct coding
22 initiative.
23 Q. All right. But this document is a tool for your
24 customers and in this document you're telling them,
25 your customers, that these mutually exclusive codes,

Page 1195

```
 1              - VOLUME F -
                IN THE UNITED STATES DISTRICT COURT
 2
                IN AND FOR THE DISTRICT OF DELAWARE
 3
                         - - -
 4
    McKESSON INFORMATION SOLUTIONS   :   CIVIL ACTION
 5  LLC,
              Plaintiff             :
 6
              vs.                   :
 7
    THE TRIZETTO GROUP, INC.,       :
 8
              Defendant             :   NO. 04-01258 (SLR)
 9
                         - - -
10
                    Wilmington, Delaware
11                  Tuesday, April 25, 2006
                    9:30 o'clock, a.m.
12
                         - - -
13
    BEFORE: HONORABLE SUE L. ROBINSON, Chief Judge, and a jury
14
15
    APPEARANCES:
16
         SKADDEN, ARPS, SLATE, MEAGHER & FLOM
17       BY: MICHAEL BARLOW, ESQ.
18           -and-
19       SKADDEN, ARPS, SLATE, MEAGHER & FLOM
         BY: JEFF RANDALL, ESQ.
20           BERNARD SHEK, ESQ. and
             MICHAEL HENDERSHOT, ESQ.
21           (Palo Alto, California)
22           Counsel for Plaintiff
23                    Valerie J. Gunning and
                      Leonard A. Dibbs,
24                    Official Court Reporters
25
```

Page 1196

```
 1  APPEARANCES (Continued):
 2
         MORRIS, NICHOLS, ARSHT & TUNNELL
 3       BY: JACK B. BLUMENFELD, ESQ.
 4           -and-
 5
 6       GIBSON, DUNN & CRUTCHER LLP
         BY: JEFFREY THOMAS, ESQ. and
 7           DAVID SEGAL, ESQ. and
             T. KEVIN ROOSEVELT, ESQ.
 8           (Irvine, California)
 9           -and-
10
11       GIBSON, DUNN & CRUTCHER LLP
         BY: MICHAEL SITZMAN, ESQ.
12           (San Francisco, California)
13           Counsel for Defendant
14                    - - -
15
16
17
18
19
20
21
22
23
24
25
```

Page 1197

PROCEEDINGS

(Proceedings convened at 9:30 a.m., and the following occurred without the presence of the jury.)

THE COURT: Before we bring the jury in, I've been thinking about how we're going to manage the rest of this trial. I truly don't think we will have the time to try both willfulness and damages, so I'm going to — I think we can only try one of those issues, and I will leave it to the plaintiff which of the issues it wants to go forward with: Damages or willfulness.

All right. Let's bring the jury in for closings.

(At this point the jury entered the courtroom and took their seats in the box.)

THE COURT: Good morning and welcome back, ladies and gentlemen.

Mr. Randall?

MR. RANDALL: Thank you, your Honor.

May it please the Court, ladies and gentlemen of the jury, this is an interesting case because the facts about the operation of the accused system are really not in dispute. We don't dispute how they

Page 1198

operate. What has happened here is that McKesson has presented overwhelming evidence about how the accused products operate. We presented that evidence through their own witnesses, TriZetto's witnesses, and we presented it through the documents and we presented it through credible, straightforward testimony from our qualified expert, Dr. Musen.

They can't dispute that. So their defense has been reduced in this case to contorting and twisting the English language to suit their purpose. It is as if they are an octopus and see — octopus, they don't have a defense mechanism. They don't have much. What they do have is this ink; right? So they spew ink all over the place when they feel threatened and due to that confusion, they escape. That's what happened in this case.

They had relied on their computer science, their MIT expert, to come in here and say that certain words, plain, simple English, doesn't mean what we all know it means. They have said that, for instance, ascertaining that there's more than one medical code on a claim, they've said ascertaining the number of codes does not mean ascertaining there's more than one. Ascertaining, as Ms. Lampe testified yesterday, they ascertained that there's a code on the claim that they

Page 1199

1  have to process. They ascertained that there is another
2  one and another one and they know when to stop and they
3  know when to go forward but, she said, I don't know how
4  we do it, but we know.
5       They know that there's multiple codes on
6  that claim to process and that's how they process it.
7  But they said that's not determine that there are
8  multiple codes on a claim. That's not determining that
9  there's a plurality of codes on a claim.
10      They talk about mutually exclusive. Their
11 expert and a number of their witnesses said we just don't
12 know what mutually exclusive means, but in the manual, in
13 the user manual itself, it gives the definition. It
14 means two codes that can't be billed together. That's
15 what it means.
16      Now, they know that because they've read the
17 manuals. Dr. Davis was supposed to have read all the
18 manuals. This is a claim term. You would think he
19 would have gone through everything.
20      Ms. Lampe works with the product. She has
21 worked with the product since 1998. She knows it well.
22 She knew that that definition existed and she said, well,
23 that's just a Government definition.
24      Just a Government definition? It's just for
25 Medicare and Medicaid? That's it? That's a pretty big

Page 1200

1  part of their business.
2       They knew that the definition exists and they
3  knew it's simple. You've got two codes, they can't be
4  billed together, they're mutually exclusive. And they
5  treat them in some ways, sometimes they will disallow
6  both the codes and reinsert another third code, which is
7  called rebundling. Sometimes they'll call it a subset.
8  They'll take one of the mutually exclusive codes,
9  disallow it, and pay the other one.
10      But they knew that that meant.
11      Ms. Lampe had a real tough time saying that
12 codes and claims were rejected; right? And the reason
13 for that is that is what the claim language says. But
14 their documents are laden with, and we'll go through
15 them, and we went through some with her. She ultimately
16 admitted, right, after I showed her a few, she
17 ultimately admitted, all right, fine. We disallow claims
18 for payment. We disallow codes. We disallow claims.
19 Yes, we do that. But somehow disallowing codes and
20 claims for payment does not mean rejecting it for
21 payment.
22      That's nonsense.
23      The other part of that, by the way, is how in
24 the world do you come in here and you tout your product
25 as saving billions and billions of dollars. They say

Page 1201

1  this product, you use our clinical editing portion of
2  our product, you use that, you will save a ton of money.
3  You'll save this percentage, you'll save that percentage.
4       How in the world do you ever save any money
5  if you never reject any claims? If you never reject
6  any codes, you never reject any codes, how in the world
7  can you tell the world and the customers that you do
8  save money by doing that?
9       And so Dr. Davis' testimony, we went around
10 and around and around. Finally, I said, does the product,
11 do these accused products ever, ever reject any claims?
12 Reject any codes? He sat there for a long time and said,
13 no. Well, that would have saved me a lot of time; right?
14 I would have gotten that out of him and just moved on.
15      He's wrong. These products, they reject
16 codes, they reject claims. They report and save --
17 they report a savings report on that and they report to
18 the customers. The customers can run a savings report
19 and we'll go through this. They can run a savings
20 report and they can show how much money they saved by
21 rejecting certain codes and how much money they saved by
22 rejecting certain claims.
23      You don't save money if you don't reject
24 these things. It's a difference between what you, the
25 claim that comes in and the claim that is paid. That's

Page 1202

1  the savings. That's what they've testified to. And you
2  only get there by rejecting codes and claims.
3       The other issue, medical and non-medical.
4  Albeit, the database, the predetermined database, it
5  absolutely contains a whole host of medical relationships.
6  I'm not going to tell you it doesn't. It does, no doubt
7  about it, but it also contains billing issues. It
8  contains, Dr. Musen told you, he said a number of those
9  relationships are billing-related. They are. It makes
10 sense. Doctors want to get paid for what they do, and
11 I don't blame them for it. They should get paid for
12 what they do; right? But some of those relationships
13 in there are for billing reasons, like the double billing
14 issue. We don't need a doctor to tell us that and it's
15 not exclusively a medical criteria to say that when you
16 go visit a doctor, you should only be charged once for
17 that visit. All right? We all know that. We don't --
18 in life we don't want to be double-billed for anything,
19 but that's not a medical issue. It is a strictly
20 administrative billing issue.
21      Let's not bill twice. Let's not bill the
22 insurance companies. Let's not bill the patients. Let's
23 not bill anybody twice. That's a simple non-medical
24 issue, and there are others, like Dr. Musen testified
25 to as well. For instance, the idea that you should add

Page 1227

1 guide. I'm sorry. It's at Page 20 of the document,
2 actually.
3           And hear it makes it very clear what
4 mutually exclusive procedures are. There are numerous
5 procedures that should not be reported together because
6 they are mutually exclusive of each other. Mutually
7 exclusive codes are those codes that cannot reasonably
8 be done in the same session.
9           That's it. And they determine the codes
10 are mutually exclusive all the time. They do it through
11 a number of their edits.
12           Can you go to the next page, Page 21?
13           They set forth in their user guide, and this
14 is a TriZetto user guide, they set forth the examples of
15 non — I'm sorry, of mutually exclusive codes.
16           - - -
17 MR. RANDALL (Continuing): And the third
18 example here is — would you highlight the last sentence
19 or two of the top paragraph?
20           Thank you.
21           The third example is reporting of an initial
22 service and a subsequent service. It is contradictory
23 for a service to be classified as an initial and a
24 subsequent service at the same time.
25           - - -

Page 1228

1
2           MR. RANDALL (Continuing): That's not a
3 medical reason. That's a simple, simple billing concept.
4 And Dr. Musen went through why physicians want to be,
5 and should be paid for what they do. And there are
6 certain billing issues.
7           Dr. Hawley said that Erisco and customers
8 of Erisco periodically made suggestions based on cost.
9           If there is no doubt that most — I would
10 admit that most of the relationships in these databases
11 are medically related, but a number of them are billing
12 related. There's no doubt about that either. And
13 that's the whole purpose of breaking down every possible
14 thing that a doctor does into a code. Right?
15           I mean, the reason why you break it down,
16 just like mechanics break it down, just like a whole host
17 of service industries break down into the smallest detail
18 what they do. They do it because they want to get paid
19 for it. I think they should be paid for it, but that is
20 why they do it.
21           And that last issue, we've talked about the
22 double billing. I mean, I asked, if you need a doctor
23 or medical judgment to determine that you shouldn't be
24 double-billed, and she said no, you don't. So that
25 element — can we go back to the claim? So both the

Page 1229

1 ascertaining step we already talked about and the
2 determining step are both satisfied.
3           Now, these next two elements talk about
4 authorizing codes and rejecting codes. And we'll talk
5 about that. And we went through it. The dispute there
6 is that when you allow codes and you disallow codes for
7 payment, and you generate savings based on those,
8 somehow that's not rejecting or authorizing. That's a
9 silly argument, too.
10           And their documents are just laden with the
11 language of allowing and disallowing claims.
12           So can you go to Exhibit 30-10?
13           Go to the second box in the far left-hand
14 corner. No, I'm sorry. It's the second box on the
15 top. Yes, that one.
16           So, by the way, this is, as I mentioned,
17 this is ClinicaLogic user guide. It's Exhibit 30, and
18 that's at Page 2. And this is a conceptual diagram of
19 the — of ClinicaLogic. And right there, it says,
20 define system action, deny. So they can deny whether
21 to code or a claim, they can deny it if it's
22 inappropriate.
23           Let's talk about the reports that they
24 generate.
25           Can you go back and show the main diagram?

Page 1230

1           The bottom left-hand box, and you can do the
2 whole box.
3           So these are the reports that it generates.
4 And it can generate — it can print savings data by
5 claim or edit. All right?
6           So what is printing is it's printing the
7 savings that you achieve by rejecting, you pick a word,
8 rejecting, disallowing, denying claims and codes. You
9 can print a report and say how much money have we saved
10 by denying this one particular edit. How much money
11 have we saved denying claims, rejecting them.
12           Let's go to the next page of there document,
13 Page 3. I'm sorry. Page — one more page. It's
14 probably Page 12. Okay.
15           So I'm going to just talk about the right-
16 hand side of these boxes. Item number one. Just the
17 right-hand side of the boxes. The system responses.
18 I'm sorry. The other side. Yes.
19           If you take a look at this, and this is at
20 Page 4 of the document that you have, it is Trial
21 Exhibit 30. You go down to system responses. It says,
22 disallow the charges. Go down to the next box. Many
23 the same thing: Disallows the charges. Go down to
24 the next box. Disallows the charges. Go to the next
25 box. Disallows the charges, and on and on and on.

Page 1287

1  single and multi-code claims, there's no infringing, or
2  if you decide that codes are not claims. TriZetto's
3  software revises claims, that's the key, revises claims.
4  I does not authorize and reject them, and it certainly
5  does not reject and authorize the same claim.
6        So if you decide either one of those two
7  things, then we do not infringe Claim 16.
8        For these reasons, ladies and gentlemen, we
9  do not infringe any of these three claims.
10       Now, as Mr. Randall mentioned, you are going
11  to get a verdict form. And the verdict form is going to
12  have three questions on it.
13       The first question is going to be: Does the
14  use of the TriZetto software directly infringe any of
15  these three claims? For all the reasons I just went
16  over, the answer to that is no. There is no direct
17  infringement if any of the steps in any of these
18  methods are missing from the TriZetto software. And,
19  again, if you look at the jury instruction on direct
20  infringement, it will make that point clear.
21       So the answer to Question No. 1 is no, there
22  is no direct infringement.
23       Now, the next two questions that are about
24  inducing and contributory, you have to find direct
25  infringement in order to answer those questions yes,

Page 1288

1  because the customers or somebody has to be directly
2  infringing the patent for there to be inducement or
3  contributory. And that's laid out in the jury
4  instructions as well.
5        So if you agree with the points that I just
6  put up, there's no direct infringement, there's no
7  contributory infringement, there's no inducing
8  infringement.
9        Now, they have to prove other things in
10  addition for inducing and contributory, and I don't think
11  they have. For example, our systems can be used for a
12  whole lot of things other than just clinical editing.
13        - - -
14        MR. THOMAS (Continuing): But at the end of
15  the day, without direct infringement, and there has been
16  no direct infringement, the answer to all three questions
17  is no.
18        The bottom line here is that McKesson has
19  failed to prove that TriZetto's software works in a way
20  that exactly matches any of the three methods in the
21  three patent claims.
22        We ask for your verdict of no infringement.
23        Thank you very much for your time, your
24  attention and your hard work.
25        THE COURT: Mr. Randall.

Page 1289

1        MR. RANDALL: I'm ready to go. I could use a
2  short five-minute break.
3        THE COURT: It will take five minutes for the
4  jury to get up, leave and come back in.
5        MR. RANDALL: I'll do it now.
6        - - -
7        (Pause.)
8        MR. RANDALL: The last thing that Mr. Thomas
9  just said is something that is irrelevant. He said that
10  we have not shown that the software works in a certain
11  way. That's not what is at issue here. These are
12  method steps. They are steps performed. When you look
13  at the claims, you look at each of the steps and you
14  ask, have we proven by a preponderance of evidence that
15  they actually perform the steps. That's what's at issue.
16        If this were a different case, and it's not,
17  if it were, the Judge would instruct you that not only
18  do we have to prove that they perform the steps, but we
19  have to prove that they perform the steps in a certain
20  and specific way.
21        For instance, like Figure 2 or something
22  else. That is simply false. We don't have to show
23  that TriZetto performs these steps in a certain
24  specific way. We don't have to show that pursuant to
25  their software, they perform these steps a certain

Page 1290

1  precise way. That is simply false and you will not
2  find instructions in the jury instructions that require
3  us to prove that they perform these steps in a certain
4  way. You simply won't see it, because it does not
5  exist, and that is not our burden, and that's why it
6  was unnecessary for us to dig into the code.
7        If they perform the steps, they infringe.
8  That's the question.
9        He mentioned evidence that we produced. We
10  did produce Dr. Musen, and he is qualified, and he gave
11  straightforward answers. But we also produced and
12  relied on all the customer testimony. We also provided
13  testimony from Mr. Bellomo. We also provided testimony
14  in our case regarding — from Ms. Lampe. Ms. Lampe is
15  the person they designated as the person most qualified
16  to testify about ClinicaLogic. She has worked with it
17  every single day since 1998.
18        We also produced a host of documents and
19  exhibits in this case, and those don't lie, and those
20  words can't be twisted or changed.
21        I'm going to go through a few of the points
22  that were raised.
23        First, determining whether the medical service
24  code is not in the predetermined database. We did that
25  conclusively.

Page 1291

1    They look in the all codes database. They
2  determine it's not there. There are two ways to determine
3  something is not in the predetermined database. Two ways
4  to determine, at least two ways, maybe more, to determine
5  it's not in there. One is to look in there, just like
6  you'd look in your local library for the book. That's
7  one way.
8        The other way is to look in the all codes
9  database. You can do that. You can look in the Library
10 of Congress index to determine if the book is not there.
11 There are two ways to do it. You will not receive
12 instructions saying that we have -- that in order to
13 infringe, it has to be done in a certain way. It simply
14 has to be done. And they do it. They determine that
15 the code, when a code comes in, they determine that it's
16 not in that database by looking at all of the codes list.
17 That's how they do it. That's one way to do it. It
18 happens to be the most efficient and effective way of
19 doing it, and that is why they do it. And there's no
20 question about it.
21        And we are not required to prove that they
22 actually look through this or look through the local
23 library for the book. Simply, that they determine that
24 it's not there. That is one of the stems in the claims.
25        And you won't see -- again, you won't find

Page 1292

1  an instruction requiring us, requiring that we show how
2  they determine that step. No way. It's not in there
3  because it's not required.
4        You've heard from Mr. Bellomo on this. And
5  Mr. Bellomo -- I hate to -- to touch this.
6        If, for example, you wanted to determine, if
7  you wanted to determine whether or not a code was in
8  here, the predetermined database, for instance, A, B, C,
9  it was not in the predetermined database, you could, if
10 you wanted to, check the CPT list, this list, and if
11 it's not on the CPT list, for example, A through Z, if
12 it's not there, you know it's not in this, the
13 predetermined database; right? The answer is, it's
14 probably not, that's correct, when the system is
15 operating correctly.
16        It's probably not. You know it's not.
17 It's absolutely not to a mathematical certainty if the
18 system is operating as intended and properly.
19        On Claim 2 -- by the way, that's the only
20 defense on noninfringement, on Claim 1.
21        On Claim 2, there were two issues. I wanted
22 to get -- mutually exclusive and non-medical criteria.
23        On the mutually exclusive, he readily
24 admitted it now, but throughout this trial, they didn't.
25 So throughout this trial, they fought that. They said

Page 1293

1  I don't know what that means. I don't know what it
2  means. Their expert didn't know what it means. Dr.
3  Hawley didn't know what it means. Ms. Lampe didn't
4  know what it meant until I pulled the document out and
5  said, it's defined right here. It's a simple definition.
6  It means two codes shouldn't be billed together.
7        And counsel said, well, okay, fine. We want
8  to use their definition.
9        It's not our definition. It's theirs. It
10 came out of their user manual.
11        Now they say, okay, fine, you caught us. I
12 will admit that, we got that. Now they're still fighting
13 on medical, non-medical based relationships. Now he
14 says, okay, they are all billing relationships, but he
15 says they're all medical relationships. And I have said
16 and I will be honest and candid with you, there are a
17 number, and probably most of the relationships contained
18 in the predetermined database are based on medical
19 criteria. Whether one operation should be performed
20 with another, that's clear. There's no doubt about that,
21 but there's also no doubt that in that database of
22 thousands and hundreds of thousands of relationships,
23 there are also rules based on non-medical criteria.
24 Absolutely. And those rules are based on simple
25 billing things.

Page 1294

1        Even Dr. Hawley said, yes, we got some of
2  the rules from Erisco. We got some of the rules from
3  Erisco's customers. And one of the three examples used
4  by Medicare to show they are mutually exclusive codes,
5  one of the three examples they used, it's in the user
6  manual, is based on non-medical criteria.
7        And it says, you can't bill the initial and
8  subsequent visit at the same time. And I said that's
9  like double billing, and she said yes.
10        That's right, you can't do it. That's
11 common sense. So there are common-sense administrative
12 billing relationships built into the database and one
13 of the examples, a concrete example, one of three given
14 by Medicaid or Medicare was right there in their user
15 manual.
16        And, by the way, Dr. Musen testified
17 absolutely, a number of these relationships are based
18 on non-medical reasons, and he testified about that.
19        Who did they have to testify about it? They
20 had Dr. Davis, the computer scientist from MIT. He's
21 not qualified. He wasn't qualified by the Court to
22 testify about that, and he wasn't qualified to testify
23 in front of you on that issue, to say that he has
24 looked at all of them and he knows that they are all
25 medically related. He simply cannot do it.