# EXHIBIT 12

REDACTED

# EXHIBIT 13

1      IN THE UNITED STATES DISTRICT COURT
2        FOR THE DISTRICT OF DELAWARE
3
4  MCKESSON INFORMATION    )
   SOLUTIONS, LLC,        )
5                  )
        PLAINTIFF,  )
6  vs.           ) Case No. 04-1258-SLR
                 )
7  THE TRIZETTO GROUP, INC.,  )
                 )
8     DEFENDANT.  )
  _____)
9
10
11
12
13
14  VIDEO DEPOSITION OF MARK MUSEN, M.D., PH.D.
15  Held at Skadden, Arps, Slate, Meagher & Flom
16      525 University Avenue, 11th Floor
17          Palo Alto, California
18    Tuesday, November 22, 2005, 9:11 a.m.
19
20
21
22
23
24  REPORTED BY: CHRIS DE GEORGE, CSR. NO. 7069
25

Page 1

A P P E A R A N C E S

For the Plaintiff:

    Skadden, Arps, Slate, Meagher & Flom, LLP
    BY: MICHAEL HENDERSHOT and JON SWENSON,
    Attorneys at Law
    525 University Avenue, 11th Floor
    Palo Alto, California 94301
    (650) 470-4500

For the Defendant:

    GIBSON, DUNN & CRUTCHER LLP
    BY: MICHAEL A. SITZMAN and DANIEL MUINO,
    Attorneys at Law
    One Montgomery Street
    San Francisco, California 94104-4505
    (415) 393-8221
    msitzman@gibsondunn.com

Also present: Michael Barber,
Videographer

Page 2

INDEX

EXAMINATION             PAGE
  BY: MR. SITZMAN        5, 292
  BY: MR. HENDERSHOT     277

INDEX OF EXHIBITS
NUMBER     DESCRIPTION        PAGE
MM-1  Multi-page Expert Report of Mark   5
      A. Musen, M.D., Ph.D.

MM-2  Rebuttal Expert Report of Mark    5
      A. Musen, M.D., Ph.D.; 37 pages
MM-3  United States Patent Number     15
      5,253,164

MM-4  Paper entitled "An Access-oriented  72
      Negotiated Fee Schedule, The
      Caterpillar Experience," pages
      349-357
MM-5  Memorandum Order; 4 pages     109
MM-6  PEW Conference Presentation    173
      Managing Physician Fees; 4 pages

MM-7  Vendor Comparison dated 1-18-88;  180
      1 page
MM-8  Exhibit C, Materials Examined;   193
      9 pages

MM-9  Expert Report of Dr. Margaret   298
      L. Johnson, Ph.D; 30 pages

Page 3

     BE IT REMEMBERED that, pursuant to Notice, and
on Tuesday, November 22, 2005, commencing at the hour of
9:11 a.m. thereof, at the Law Offices of Skadden, Arps,
Slate, Meagher & Flom, LLP, 525 University Avenue, 11th
Floor, Palo Alto, California, before me, Chris De
George, CSR #7069, State of California, there personally
appeared
       MARK MUSEN, M.D., PH.D.,
called as a witness herein by Defendant, who, being
first duly sworn, was examined as is
hereinafter set forth.
02:27         --oOo--
08:39

09:10     THE VIDEOGRAPHER: Good morning. My name is
09:10  Michael Barber. I am a videographer associated with
09:10  Barkley Court Reporters located at 222 Front Street,
09:11  Suite 600, San Francisco, California 94111. The date is
09:11  November 22nd, 2005. The time is 9:11 a.m.
09:11     This deposition is taking place at Skadden,
09:11  Arps, Slate, Meagher & Flom, LLP, 525 University Avenue,
09:11  Palo Alto, California 94301 in the matter of McKesson
09:11  Information Solutions, LLC, versus the TriZetto Group,
09:11  Inc., Case Number 04-1258-SLR.
09:11     This is the videotape deposition of Mark
09:11  Musen, M.D., Ph.D. being taken on behalf of the defense.

Page 4

1 (Pages 1 to 4)

MARK MUSEN, M.D., PH.D.

02:02 1 try the approach that Dr. —

02:02 2     Q. Hertenstein.

02:02 3     A. — Hertenstein had used but, rather, to

02:02 4 finesse the problem by using the DRG approach.

02:02 5     Q. All right.

02:02 6     MR. SITZMAN: Can we take a quick break? Do

02:02 7 you mind?

02:02 8     MR. HENDERSHOT: Yeah, that's fine.

02:02 9     THE VIDEOGRAPHER: This is the end of

02:02 10 Videotape Number 2, Volume 1, in the deposition of Mark

02:03 11 Musen, M.D., Ph.D.

02:03 12     The time is 2:02 p.m., and we are off the

02:03 13 record.

02:03 14     (Recess taken.)

02:10 15     THE VIDEOGRAPHER: Back on the record. This

02:10 16 is the beginning of Videotape Number 3, Volume 1, in the

02:10 17 deposition of Mark Musen, Ph.D., M.D. The time is

02:10 18 2:10 p.m. on November 22nd, 2005.

02:11 19 BY MR. SITZMAN:

02:11 20     Q. Back to MM-4 —

02:11 21     A. Okay.

02:11 22     Q. — and Table 4, I just want to make sure we're

02:11 23 clear on a couple things.

02:11 24     Writing a computer program or writing a

02:11 25 knowledge-based system —

Page 165

02:11 1     A. Right.

02:11 2     Q. — or using a knowledge-based system to get to

02:11 3 a solution, any of those three, that dealt with the

02:11 4 bundling problem set forth in Table 4 only, would have

02:11 5 been obvious to one of ordinary skill of the art, given

02:11 6 the Egdahl-Hertenstein disclosure.

02:11 7     A. I — I'm not trying to be difficult, but

02:11 8 the — the information in Table 4 provides one result of

02:11 9 the millions and millions of possible combinations of

02:11 10 claim codes. So it would be obvious that there would be

02:12 11 a way of solving this one particular case out of the

02:12 12 many millions, but I'm not sure why anybody would want

02:12 13 to begin to try to solve a case that actually might

02:12 14 never occur again, given this particular combination.

02:12 15     Q. Right. No, I — I understand. So this — but

02:12 16 it would have been obvious given this disclosure to deal

02:12 17 — you could deal with this one. Sorry. I'll make it

02:12 18 more specific.

02:12 19     You could write a program to deal with this

02:12 20 one, even though there are — are millions of other

02:12 21 relationships and issues and even though this one

02:12 22 exclusivity or unbundling problem may never ever come

02:12 23 along again.

02:12 24     A. People would question your sanity but, yes,

02:12 25 you could do it.

Page 166

02:12 1     Q. You could do it, though. You could do it at

02:12 2 the time that the article was written. That — that was

02:12 3 the important part there.

02:12 4     A. You could recognize this one situation, yes.

02:13 5     Q. In a computerized system.

02:13 6     A. If you had a means for acquiring the claim,

02:13 7 which obviously is the first step, but yes.

02:13 8     Q. Okay. Now, returning to the patent for a

02:13 9 second and comparing Rule E2 to what is in Table 4 —

02:13 10     A. What column are you on?

02:13 11     Q. Oh, it's Column 47.

02:13 12     A. Okay.

02:13 13     Q. Isn't Rule E2 a rule designed to carry out

02:13 14 what is set forth in Table 4?

02:13 15     MR. HENDERSHOT: Objection. Vague and

02:13 16 ambiguous as to "designed to."

02:13 17     THE WITNESS: The procedure represented by

02:14 18 Rule E2 would carry out the step that Hertenstein did in

02:14 19 this one example, yes. It would obviously apply in

02:14 20 multiple other examples, and being able to come up with

02:14 21 a general rule and know its applicability is, obviously,

02:14 22 the interesting part of the patent.

02:14 23 BY MR. SITZMAN:

02:14 24     Q. So — right. So you could come up with

02:14 25 Rule E2 to deal with Table 4, but the beauty is E2 also

Page 167

02:14 1 could deal with other things.

02:14 2     A. Right. And you could imagine other frame —

02:14 3 other formulations of rules that would match the editing

02:14 4 processing being done in Table 4 that would have a

02:14 5 representation different from Rule E2 which would seem

02:14 6 to be sufficient for the problem that the figure

02:14 7 identifies, and only with experimentation would you

02:14 8 realize that either you had been too general or too

02:14 9 specific and would want to recast the way in which you

02:14 10 were dealing with the situation in Table 4 in some other

02:15 11 way.

02:15 12     Q. Okay. Now, we've already talked, again, just,

02:15 13 sort of looking at the rules now on the patent side, we

02:15 14 know that Rules R1 through R4 are not in the patent

02:15 15 claims.

02:15 16     A. That's not true. The — certainly the

02:15 17 left-hand sides of those rules are.

02:15 18     Q. Okay. The entirety of those rules, those

02:15 19 rules are not express from start to finish —

02:15 20     A. [Simultaneously] That's correct.

02:15 21     Q. — in any of the patent claims.

02:15 22     Okay. E2 is, and we've just talked about the

02:15 23 fact that that was a rule that would deal with the

02:15 24 Table 4 problem in the Hertenstein article. E1, E1 is

02:15 25 in the patent claims, right?

Page 168

42 (Pages 165 to 168)

MARK MUSEN, M.D., PH.D.

04:52 1 clearly, the Doyle patent has a component of code
04:52 2 validity checking which is provided functionally in
04:52 3 Claim 1. The structure is -- is -- is obviously
04:52 4 different.
04:52 5     Q. Okay. And -- and how is the structure
04:52 6 different?
04:52 7     A. The structure is different in that the
04:52 8 database for validity checking is designed in a way to
04:52 9 support that task, as well as the other tasks which we
04:52 10 don't want to talk about. If we were willing to talk
04:52 11 about the other claims in the patent, then I think in
04:52 12 that context it -- it makes sense that Claim 1 is an
04:52 13 advance over what's claimed in Doyle.
04:52 14     Q. It's an advance but a functional equivalent.
04:52 15     A. It's a functional equivalent in the context of
04:52 16 a system that also does unbundling.
04:53 17     Q. Right. Okay. Claim 13, same series of
04:53 18 questions, and -- and we can narrow it to
04:53 19 Doyle in that I also consider, and I wanted to know
04:53 20 whether or not you consider, Claim 13 a claim -- sorry,
04:53 21 a code validity checking claim.
04:53 22     A. Yes, I do.
04:53 23     Q. Okay. And you would have the same responses
04:53 24 vis-a-vis the Doyle patent with regard to Claim 13?
04:53 25     MR. HENDERSHOT: I want to interpose an

Page 269

04:53 1 objection to this line, again, about validity. I've
04:53 2 heard "valid" used in the context of the database with
04:53 3 relationships to finding whether or not a code is valid
04:53 4 with other codes. I'm also aware implicitly in the
04:53 5 conversation there is a -- may be another meaning from
04:53 6 the computer science standpoint. And to the extent that
04:53 7 the -- the questions don't delineate really which one or
04:53 8 the other, I object to it as vague and ambiguous.
04:53 9     THE WITNESS: As I read Claim 13 --
04:54 10 BY MR. SITZMAN:
04:54 11     Q. Right.
04:54 12     A. -- I view that as a means for determining
04:54 13 whether the code is in the database, meaning whether the
04:54 14 code is valid in a computer science sense. The other
04:54 15 claims in the -- in the patent use the term "valid" and
04:54 16 there it seems to mean valid for payment.
04:54 17     Q. Right. But -- but, again, let's just focus on
04:54 18 13.
04:54 19     A. Okay.
04:54 20     Q. And wouldn't you -- would you agree with me,
04:54 21 then, that the Doyle patent also discloses a -- that
04:54 22 same functionality in that it checks to see -- I'm
04:54 23 looking at your characterization -- checked to see if
04:54 24 diagnosis and procedure codes are "fictitious" by
04:54 25 looking them up in a database much like that described

Page 270

04:54 1 in Claim 13?
04:54 2     A. Okay. Take- -- taking the claim completely
04:54 3 out of context, yes.
04:54 4     Q. Okay. Out of context in the sense of looking
04:54 5 at it by itself?
04:55 6     A. Yes.
04:55 7     MR. HENDERSHOT: And looking at every
04:55 8 limitation?
04:55 9     MR. SITZMAN: Yes.
04:55 10     MR. HENDERSHOT: Okay.
04:55 11 BY MR. SITZMAN:
04:55 12     Q. I want to turn your attention to Advanced
04:55 13 MedLogic, pages 24 and 25 of your report.
04:55 14     I think I'm going to skip that. Hold on. I
04:55 15 think we covered a lot of that.
04:55 16     Now, Doctor, doesn't -- getting back to the
04:55 17 Hawley report, doesn't the fact that Dr. Hawley was
04:55 18 working on a similar solution, the unbundling task and
04:56 19 solution, at the same time as the assignee and patentees
04:56 20 of the '164 patent -- and they were doing it on opposite
04:56 21 coasts, by the way -- doesn't the fact that he was
04:56 22 working on it at the same time and coming to a solution
04:56 23 suggest the obviousness of the '164 patent?
04:56 24     MR. HENDERSHOT: Objection. Assumes facts not
04:56 25 in evidence with respect to them working at the same

Page 271

04:56 1 time and to the extent that it implies that it was
04:56 2 completely independent.
04:56 3 BY MR. SITZMAN:
04:56 4     Q. Let -- let's assume that it was completely
04:56 5 independent, and let's assume that it was at the same
04:56 6 time.
04:56 7     A. All I can say is that it might be obvious to
04:56 8 try.
04:56 9     Q. Okay. But you would agree with me, though,
04:56 10 if -- if you think about, you know, multiple people at
04:56 11 multiple places all trying independently.
04:56 12     A. Right.
04:56 13     Q. You know, with no coordination, coordination
04:56 14 with each other, to come up with a solution and they
04:56 15 come up with probably various solutions to the same
04:57 16 task, doesn't that indicate to you, though, that the
04:57 17 solution may have been obvious, especially if multiple
04:57 18 people were independently developing it at the same
04:57 19 time?
04:57 20     MR. HENDERSHOT: Objection. Asked and
04:57 21 answered.
04:57 22     THE WITNESS: I look at the questions that
04:57 23 appeared after the -- the Egdahl-Hertenstein article
04:57 24 that we discussed --
04:57 25 BY MR. SITZMAN:

Page 272

68 (Pages 269 to 272)

MARK MUSEN, M.D., PH.D.

1    State of CALIFORNIA            )

2    County of *Santa Clara*        )

3

4

5

6

7            I, the undersigned, declare under penalty of

8    that I have read the foregoing transcript, and I have

9    made any corrections, additions or deletions that I was

10   desirous of making; that the foregoing is a true and

11   correct transcript of my testimony therein.

12           EXECUTED this _*17*_ day of _*December*_,

13   2005, at _*Stanford*_, _*CA*_.

                 (City)              (State)

14

15

16

17

18   _____ *M.D., Ph.D*

             MARK MUSEN, M.D., PH.D.

19

20

21

22

23

24

25                        326

BARKLEY
Court Reporters

# EXHIBIT 14

# United States Patent [19]

## Doyle, Jr. et al.

[11] Patent Number: 5,070,452

[45] Date of Patent: Dec. 3, 1991

[54] COMPUTERIZED MEDICAL INSURANCE SYSTEM INCLUDING MEANS TO AUTOMATICALLY UPDATE MEMBER ELIGIBILITY FILES AT PRE-ESTABLISHED INTERVALS

[75] Inventors: Findley C. Doyle, Jr., Rochester; William D. Alcott, III, Grosse Pointe Farms, both of Mich.

[73] Assignee: NGS American, Inc., St. Clair Shores, Mich.

[21] Appl. No.: 422,625

[22] Filed: Oct. 17, 1989

### Related U.S. Application Data

[62] Division of Ser. No. 68,240, Jun. 30, 1987.

[51] Int. Cl.⁵ ............................... G06F 15/42
[52] U.S. Cl. .................. 364/401; 364/413.01; 364/408
[58] Field of Search ........... 364/401, 406, 408, 413.01; 235/375

[56]                References Cited

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,491,725 | 6/1985 | Pritchard | 235/375 |
| 4,667,292 | 5/1987 | Mohlenbrock et al. | 364/406 |
| 4,831,526 | 5/1989 | Luchs et al. | 364/405 |

### OTHER PUBLICATIONS

"COBRA Software Added to Flex Benefit Plans", National Underwriter: Life and Health/Financial Services Edition, vol. 91, No. 9 p. 6, Mar. 1987.
Travella, Steve, "Employers Get Help with COBRA Burden", Business Ins. vol. 20, No. 51, pp. 10-16.

*Primary Examiner*—Gail O. Hayes
*Attorney, Agent, or Firm*—Krass & Young

[57]                ABSTRACT

The computerized insurance claim processing system links the physician's office and the provider of insurance coverage by means of a central administration computer. The system provides up-to-date information to the provider of health care services as to insurance coverage of a patient. The system also allows real time modification of the information, including the identity of patients covered and the type of insurance benefits.

**9 Claims, 7 Drawing Sheets**





*Fig-1*



1A

KEY IN FIRST
VISIT FOR
CONDITION
YES/NO

KEY IN
OCCURENCE
DATE

KEY IN IF
PATIENT HAS
OTHER COVERAGE

SELECT PROVIDER
FROM TABLE
IN PROVIDER
TERMINAL

TRANSMIT TO
HOST COMPUTER
TYMNET DIAL-UP
NETWORK

2

*Fig-2A*

START

CARD HOLDER
BRINGS CARD
TO PROVIDER
SITE

SWIPE MAG. CARD
THRU CARD READER
IF NOT READABLE
KEY IN CLIENT
CODE & SSN

1B

KEY IN PATIENT
D.O.B & RELATION-
SHIP TO CARD
HOLDER

SELECT REASON
FOR VISIT FROM
TABLE IN
PROVIDER TERMINAL

REASON
=
ACCIDENT

Y

DISPLAY
FILL OUT
SUBROGATION
FORM

N

1A

*Fig-2*

TRZ001068



*IFig-2B*

*IFig-2C*

TRZ001069

U.S. Patent        Dec. 3, 1991        Sheet 4 of 7        5,070,452



IFig-3B

TRZ001070



*IFig-3A*

*IFig-3*

TRZ001071



*IFig-4*



_IFig-5_

TRZ001073

5,070,452

1

# COMPUTERIZED MEDICAL INSURANCE SYSTEM INCLUDING MEANS TO AUTOMATICALLY UPDATE MEMBER ELIGIBILITY FILES AT PRE-ESTABLISHED INTERVALS

This application is a division of application Ser. No. 068,240, filed June 30, 1987.

The invention relates to computerized systems for processing insurance claims.

## BACKGROUND OF THE INVENTION

A type of processing system for medical insurance claims is discussed in U.S. Pat. No. 4,491,725, issued to Pritchard, on Jan. 1, 1985. This patent is incorporated by reference. The patent discusses a system in which a patient seeking medical treatment presents an identification card at a physician's office. Coded data is electronically read from the card, and transmitted to a central brokerage computer. The brokerage computer ascertains from a data base whether the patient is covered by an insurance policy, and, if so, whether the policy will fully pay for the medical treatment sought by the patient. The brokerage computer informs the physician immediately of the information found. The patent further discusses various types of funds transfer which can occur as payment for the medical treatment.

However, this patent does not appear to address the question of (1) How the information contained in the data base is derived, and (2) How and when the information in the data base is updated. The latter question can significantly affect the cost incurred by an employer in providing a group medical insurance plan for its employees. For example, the data base contains a roster of insured employees which must be updated as employees leave the employing company. However, because of various delays, some rosters are updated only once per month. This monthly updating has the result that an employee leaving the service of a company nevertheless retains the ability, whether intended or not, to obtain treatment under the medical insurance coverage until his name is removed from the roster. If a month is assumed to contain thirty days, then, on average, every employee who leaves the employment of a company retains insurance coverage for fifteen days afterward, at the employer's expense.

In addition, there is another possible source of expense to employers based on departing employees. The Consolidated Omnibus Budget Reconciliation Act of 1985 (COBRA) (P.L. 99-272) requires that, under certain circumstances, an employer must continue an employee's insurance coverage after terminating employment.

Both the occurrence of late roster updating, together with the existence of COBRA, create complications when a former employee seeks medical care, because they create uncertainty as to the insurance coverage of the employee. It is very important that the treating physician know whether the employee has insurance benefits.

## OBJECT OF THE INVENTION

It is an object of the invention to provide an improved system for the administration of medical insurance claims.

2

## SUMMARY OF THE INVENTION

In one form of the invention, a third party maintains a data base in an administration computer. The data base includes a comprehensive roster of all persons holding insurance benefits under a given insurance plan, as well as the types of benefits available, including the particular medical treatments which are reimbursable by insurance, and the dollar value of the reimbursement for each treatment. A treating physician has communication equipment which can communicate in real time with the administration computer in order to ascertain whether a given patient is on the roster of covered individuals for a given insurance plan, and whether a proposed treatment is reimbursable, as well as the amount of reimbursement. If the data base indicates that the proposed treatment is in fact covered, the physician can request that the amount of reimbursement be immediately credited to him, as by a funds transfer to his bank.

An employer, who provides the insurance coverage for the benefit of an employee-patient, also has communication equipment which can link to the administration computer, but in a different manner than that of the physician: the employer can modify, in real time, the data base. For example, an employer can add and delete persons to the roster of those insured, as people enter and leave his employment. Further, the employer can change the benefits which the plan provides. For example, he may change the reimbursement amount for treatment of a sprained wrist from X dollar to Y dollars.

Further, the employer can audit the activity of his insurance plan as reported by the data base. For example, he can track, by addressing the data base, the insurance claim activity of each insured individual.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 illustrates a simplified overview of the system.

FIGS. 2, 2A–2C, 3A–3C, 4 and 5 illustrate a flow chart which describes the operation of parts of the system of FIG. 1.

## DETAILED DESCRIPTION OF THE INVENTION

FIG. 1 depicts a simplified overview of one form of the invention. An administration computer 3 maintains a data base for each insurance plan provided by an employer. File 6 indicates the data base for plan ABC maintained by employer Alpha Company. The file includes a roster of all insured employees of Alpha Company, their spouses and dependents. In addition, the file includes a list of all medical treatments for which insurance compensation is available. (Each treatment is typically called a diagnosis, because the physician usually undertakes a diagnosis prior to embarking upon the treatment which the diagnosis indicates. An example would be a diagnosis of a sprained wrist in a patient Adam, followed by the treatment considered proper under the circumstances.) The file also contains a list of dollar amounts payable for each type of diagnosis. For example, in the file, X dollars is associated with the diagnosis for sprained wrist, meaning that insurance plan ABC will pay X dollars for the treatment of a sprained wrist.

When a patient 9 visits a physician for treatment of the sprained wrist, the patient 9 presents an identification card 15 as evidence that the patient is covered by insurance plan ABC. The physician, using data terminal

3
5,070,452
4

18, communicates with the administration computer 3 on data link 21, and states to the computer the identity of the patient (Adam), the name of the patient's plan (ABC in this case) together with the diagnosis (sprained wrist). A computer 3 locates the file corresponding to plan ABC, confirms that the patient Adam is on the roster of insured persons, confirms whether the plan ABC will pay the physician for the given diagnosis (sprained wrist) and states the amount of reimbursement. In response, the physician can request the computer 3 to arrange a transfer of funds as payment.

If the amount of reimbursement is less than the normal charge made by the physician, a balance would exist. The physician then gives the patient an option of charging the balance to the patient's credit card. If the patient wishes to do so, the patient provides a suitable credit card number, which is communicated to the computer 3, which appropriately charges the patient's credit card account.

In addition, the computer stores the diagnosis and the amount paid to the physician, together with other relevant data, in a separate file associated with the patient's name. Thus, the file for plan ABC is updated at the time of treatment, and, further, the physician's office itself does the updating, although in an indirect manner.

The employer which provides insurance coverage to patient 9 also has access to the administration computer 3 along data link 24. However, the employer has access to a wider range of data in the file for the ABC plan than does the physician. As stated above, the physician only has access to data indicating whether or not a particular diagnosis is covered, the amount of reimbursement, and other similar data. In contrast, the employer has access to all data contained within the file for the ABC plan. Further, the employer can modify the data in the file. For example, the employer can add and delete the names of insured persons as appropriate. Still further, the employer can change the benefits provided by the plan ABC as needed. For example, the employer can change the types of diagnoses for which reimbursement will be allowed. The employer may decide that elective cosmetic facial surgery, as distinct from restorative facial surgery used to restore damage caused by an accident, should not be cost borne by plan ABC, but should be paid by the patient. In such a case, the employer would change the file to so indicate.

The employer can also change the dollar amount of reimbursement for a given diagnosis. For example, the employer may change the dollars reimbursements for a sprained wrist from X dollars to Y dollars.

In addition, the employer Alpha can audit the operation of his own plan ABC. For example, the roster of insured persons is available to him, so that he knows information as to the eligibility of his employees for insurance benefits. Also, as mentioned above, the computer 3 stores the diagnosis and treatment information as they occur. This allows the employer to retrieve such information and to evaluate the insurance claim activity of his employees. The employer can also make detailed statistical analyses of claim activity and plan expenditures by using the data available. FIGS. 2-5 contain a flow chart describing in more detail the operation of the system of FIG. 1 and will now be considered.

Block 30 in FIG. 2 indicates that a card holder (i.e., a patient) brings his card (the card 15 in FIG. 1) to a provider site. "Provider site" is a term in the art used to refer to one who provides medical services, namely, a physician or hospital. Block 33 indicates that the card is

read by an "8610". "8610" is shorthand notation for a Datatrol 8610 computer terminal and associated printer indicated by numeral 18 in FIG. 1. This equipment is available from Datatrol Corporation, located in Minnetonka, Minn. Block 33 indicates that if the card is not readable, then an operator at the provider site types in the client's identification symbol, namely, his social security number (SSN), and a client code, which is a number identifying the ABC plan, from which insurance coverage is sought.

Block 36 indicates that the patient's date of birth (DOB) and relationship to the card holder is keyed into the terminal. In this example, the relationship is "employee", because Adam himself is seeking treatment. Were his wife to do so, the relationship would be "spouse".

Blocks 33 and 36 provide identification of the patient in order to assure that only the actual patient whose name is on the plan's roster receives medical treatment, and that no imposters do.

Block 39 refers to statement of a reason for the visit to the physician selected from a table. One type of table includes four reasons, namely, the reasons of illness, prevention, maternity or accident. The reason for the visit can be important for insurance purposes because different insurance coverage may be available for different reasons motivating a visit. For example, plan ABC may provide maternity benefits for Adam's wife, but not his daughter. Further, some reasons, such as accident, can cause legal rights to arise for the benefit of in the plan, and so special procedures should be taken. For example, the YES (Y) path leading from block 42 indicates that an accident motivated the visit to the physician's office. Block 45 indicates that the computer terminal prompts the patient to complete a subrogation form which can give certain subrogation rights to the plan ABC. For example, an automobile accident may have caused the condition, so that an automobile insurance company may have a liability to the patient or to Plan ABC.

Block 48 indicates that the patient states whether he has previously been treated for the present condition. As block 51 indicates, another insurance plan may be liable to the patient for the condition. For example, a wife may be employed and have insurance benefits making the husband's plan primarily liable, meaning that the patient and the wife's plan are only liable after the husband's plan pays. Block 54 indicates that the identity of the provider is selected (i.e., the physician) from a table of codes.

The inventors point out that, up to blocks 54 in FIG. 2A, no communication with the administration computer has yet been undertaken. However, at block 57, the local terminal 18 in the physician's office communicates data via a local telephone call to the administration (i.e., host) computer 3. Blocks 63, 66 and 68 indicate that block 71 is reached if the data base for plan ABC indicates that (1) the proper social security number, (2) proper provider, (3) proper date of birth and (4) proper relationship have been given by the patient. If not, circles 3A and 3B are reached, as will be later discussed.

Restated, reaching block 71 indicates that the patient is not an imposter. Now it must be ascertained whether the person has insurance coverage. Block 71 indicates that the administration computer searches the roster to determine this. If the patient is found on the roster, then block 73 is reached. (The other situations indicated in

5,070,452

5

block 71 will be discussed later.) Block 73 refers to a search by the administration computer of the data base of plan ABC to ascertain whether the reason for the visit in block 39 in FIG. 2 is covered (i.e., reimbursible) by plan ABC. In addition, though not indicated in FIG. 2B, block 73 can determine at this time whether the diagnosis (i.e., sprained wrist) is covered.

If the visit is covered, block 76 refers to the assignment of an authorization code for the transaction (i.e., treatment). An authorization code is a unique symbol, which identifies the transaction in an unmistakable manner as eligible for treatment. The authorization code functions to facilitate bookkeeping, much in the way that a serial number on an invoice for other purchases does so.

Block 79 refers to the creation of an eligibility record in the administration computer. This refers to an allocation of memory space, having the authorization code as an address, in anticipation of data which will later be received from the physician, after treatment has been completed. Block 82 indicates that the eligibility record is transmitted to the physician's terminal. This means that an indication that the patient is in fact on the plan's roster, together with an affirmation that the reason for the visit is covered, is transmitted. One type of message indicating eligibility would be "eligibility approved". In addition, the authorization code assigned in block 76 is transmitted. The blocks in FIG. 3B following block 82 relate to error handling and are considered self-explanatory. The block labeled "terminate" indicates that the telephone connection is terminated.

At this time a physician has information indicating that treatment of the diagnosed condition is covered by insurance. Following treatment, the physician, as indicated by block 85 in FIG. 3, enters authorization code into his local terminal in FIG. 1. Blocks 88 and 91 indicate that the local terminal searches and finds the patient's name, Adam, so that the treatment portion of the transaction can be completed and transmitted to the administration computer.

Block 95 indicates that the physician enters a code identifying the diagnosis (sprained wrist). Block 97 indicates that the physician enters up to ten "procedure codes", which refer to the treatments for a sprained wrist selected by the physician. Blocks 101 and 104 indicate that the diagnosis and procedure codes are now transmitted via a local telephone call to the administration computer 3. Block 106 indicates that a check is made to verify that the codes received are actually existing, and not fictitious, codes. Block 109 indicates that the administration computer searches the data base for plan ABC and calculates the reimbursement specified by the employer for each treatment. Block 112 indicates that these reimbursements are under the employer's control, and will be discussed later in more detail. Block 115 ascertains whether the present diagnosis (sprained wrist) is covered by plan ABC, whether the given treatments (e.g. anaesthetics applied, immobilization by a plaster cast) are covered, the dollar amounts of the coverage, and whether a deductible amount or a co-payment apply. As indicated by blocks 118 and 121, data regarding the net payment which the plan ABC will reimburse the physician is transmitted to the physician's terminal. A printer 130 prints the relevant data on a receipt 131, as indicated by block 125. The patient signs the receipt as acknowledgement that treatment was done. Block 135 indicates that the data

6

link between the physician's terminal and the administration computer is then terminated.

At this point, the patient's identity has been verified, as well as his coverage under plan ABC (i.e., his eligibility). Also, the diagnosis and treatments have been transmitted to the administration computer, wherein they are stored for future use, and the administration computer has transmitted to the physician's terminal the reimbursement amounts for the treatments involved. It is possible that the reimbursement amounts are less than the physician's customary charges for the treatments that the patient owes a deductible, or that the computer 3 found the patient or the treatments to be non-insured, with the result that a balance of payment remains. FIG. 4 describes an option under which the patient can charge the balance to a credit card. The YES path from block 140 indicates that the charges are to be placed upon a credit card account. Block 140 indicates that the necessary information is either electronically read ("swiped"), or directly types into the physician's terminal, together with the dollar amount. At this time, the data link is established between the physician's terminal and the administration computer. Block 144 indicates that the administration computer verifies with the bank issuing the credit card has stated that the balance amount can be properly applied to the credit card account. If so, block 146 is reached, wherein the necessary information is printed by printer 130 in FIG. 1 upon a receipt 131, and the data link is terminated by block 148.

FIG. 5 indicates one procedure for providing plan payment to the physician. The inquiry of block 150 refers to the authorization discussed in connection with block 76 in FIG. 2B, wherein the authorization code was established and stored. If payment was authorized, block 152 is reached, which indicates that a check is drawn on the client's bank account and mailed to the provider. This means that the administration computer prints a bank check drawing upon a bank account which is funded by plan ABC, or by the insurance company itself, and mailed to the provider, that is, to the physician. Block 155 indicates that the administration computer maintains a record of checks printed in block 152. The record is available to the employer and the insurance company through data link 24 in FIG. 1. Further discussion of systems which accomplish the funds transfer described in FIGS. 4 and 5 is found in U.S. Pat. No. 4,346,442, Musmanno, 1982, which is incorporated by reference.

If block 150 indicates that no payment was authorized, then block 157 indicates that a message, indicating that payment is not authorized, is sent to the physician's terminal.

The preceding discussion has been chiefly concerned with aspects of verification. That is, verification of the patient's identity was undertaken, verification that the diagnoses and treatments were of the type which a give plan (ABC) would reimburse, and verification or ascertainment of the dollar amounts reimbursible for each treatment. However, in some circumstances, a system of notification and tracking of former employees may be desirable, as discussed above, in order to comply with contractual or statutory requirements. One such system will now be described in connection with the following Table 1. Table 1 outlines a sequence of steps taken by, and in connection with, the administration computer.

TRZ001076

7

5,070,452

8

## TABLE I

1. Delete Adams, spouse, and dependents from roster of insured persons.

2. Notify Adams and perhaps others of the termination of insurance coverage. Notify them that they have the option within X days to continue certain insurance benefits at stated premium rates. Send these notices by certified mail.

3. If notified person respond within predetermined time, indicating desire to purchase insurance, print and send a package of payment coupons for making periodic payments.

4. If participants make no response within the predetermined time, record this fact in the data base for plan ABC.

5. (Optional) If, as in paragraph 4, no response has been received, print and transmit to the former participants a second, backup notice.

Line 1 in Table 1 indicates that the Adams family is deleted from the roster of insured persons under the ABC plan, perhaps because of termination of employment. This is done directly by the employer or data link 24. One significant consequence of this deletion from the roster is that, should a physician make inquiry using the physician's data link 21, the administration computer has information, almost on an immediate basis, allowing the computer to inform the physician that the Adams family is no longer covered by the ABC plan. However, in some cases, discussed later, the computer may refrain from stating that the family is not covered by the ABC plan, and instead indicate that the family presently has an indeterminate status as to coverage.

Upon deletion of the Adams' participants from the plan, and if the employer so requests, either at the time of deletion, or at a prior time, administration computer 3 activates a printer 170 which prints a notice which is transmitted to one or more members of the family, notifying them of the fact of termination, and offering them the option to purchase within a stated period of time the same or similar insurance which they previously had, at stated premium rates. The letter is transmitted to the Adams family, and the administration computer then sets into motion a programming routine, known in the art, to track the response of the Adams' family, when it occurs.

If one or more of the family members respond favorably, in writing, an operator enters the proper data into the administration computer. In response, the computer, using printer 170, prints a group of payment coupons, which are mailed to the electing participants. The participants return the coupons with payment, on a periodic basis, and the coupons assist the administration computer in tracking the payment history of the electing participants. The coupons bear sufficient information to do this, and can be machine-readable by the administration computer, as known in the art.

If no response is received in the stated time, the computer, having an internal time clock, as known in the art, notifies the data base for plan ABC, and programming steps are taken to change the status of the Adams family from indeterminate to terminated, as will now be discussed. discussed.

As was stated earlier, it may be the case that an option was given to the Adams family to elect to purchase insurance within a stated time period. This option can be given in fulfillment of a collective bargaining agreement, state or federal statutes, as discussed earlier, or for

other reasons. Further, the option may have certain retroactive aspects. For example, the employer may be required to give the former employee the right to exercise the option for a stated period of time, such as sixty days. If the option is retroactive, the following sequence of events can occur. Termination of employment can occur on July 1. The notice described in Line 2 of Table 1 can be sent on the same day, July 1. The notice can be received by the employee of July 2 and the notice can give him sixty days within which to decide whether to purchase insurance. The employee may visit a physician on July 15, but before he exercised the option. If he exercises the option on July 20, and pays the insurance premium as required, the ABC plan may be required to pay for the July 15 visit to the physician. Therefore, the administration computer, in searching the data base in response to the physician's inquiry on July 15, classifies the Adams family as intermediate until the option is exercised, or the option expires.

Continuing the example, if the option expires on Sept. 1, without being exercised, and if Adams visits a physician on September 10, the administration computer, in response to the physician's inquiry states that Adams is terminated from the ABC plan, and not under indeterminate status. Further, the classification was made by the computer immediately upon expiration of the option, which was a stated period, (sixty days in this case) after mailing of the notice discussed in Line 2 of Table 1.

Several important aspects of the invention are the following:

1. As FIG. 1 indicates, an employer can add and delete beneficiaries, as well as change provisions of a plan, by using data link 24. Further, as the discussion above indicates, these changes can be done in real time, causing the currency of the data base to be limited only by the diligence of the employer. The fact that the data base is current has two significant results: first, the average lag period of fifteen days, discussed above, is eliminated. Therefore, a former employee cannot exploit the existence of the lag and obtain treatment, because treating physicians will be able to know immediately when an employee is deleted from the roster of insured persons.

A second release relates to COBRA requirements. The occurrence of updates to the roster can trigger the notification procedure described above into action. For example, detection routine, or circuit, known in the art, detects a deletion of a person from the roster and, in response, immediately causes a notification to be sent, as outlined in Table 1. The immediate notification prevents COBRA mandated insurance from arising at the employer's expense.

These two results are similar in the respect that they both limit the liability, borne by an employer, which arises through the running of time. Viewed another way, the same event which eliminates the fifteen-day lag in insurance termination (i.e., the event of real-time deletion from the roster) also triggers into action the notification procedure of Table 1.

2. The computation of the patient's bill, discussed in connection with block 118 in FIG. 3B, includes a computation of any deductible amount owed by the patient. This is possible because the administration computer retains records of all insurance activity by the patient Adam. For example, if Adam has a One Hundred Dollar deductible amount per year, if Adam has received no other treatment in the year, and if the charge for the

TRZ001077

5,070,452

9

present treatment is Eighty Dollars, the entire Eighty Dollars is paid by Adam. This fact is indicated on the bill printed by terminal 18 in FIG. 1.

Block 118 also indicates the administration computer calculates any co-payment amounts. This refers to amounts which the patient may be required to co-pay with the plan ABC. For example, Plan ABC may pay fully for treatments for sprained wrists, but only pay one-half for cosmetic facial surgery. In the latter case, the patient co-pays the remaining one-half.

3. The preceding discussion has been made in the context of a patient visiting a physician. However, it should be understood that the invention can be used by any provider of health care services, including physicians, dentists, hospitals, pharmacists, podiatrists, chiropodists, and psychologists. In this respect, a programming routine can be added which examines whether the given provider is authorized to perform the treatment for which treatment is sought. For example, a podiatrist may not be authorized by state law to perform some types of surgery. The limits on the treatments which a provider can perform are stored in the administration computer, and are retrieved at the time the identity of the provider is verified, in block 63 in FIG. 2B. The routine prevents payments to unauthorized providers.

4. The card 15 in FIG. 1, which is carried by the patient, is the only card used by him, irrespective of the type of health benefits sought. That is, the patient presents the same card to his dentist, his pharmacist, his psychologist, etc.

5. A telephone connection between the physician's terminal 18 and the administration computer, and also between the administration computer and the employer, has been discussed. The preferred telephone connection uses a communications network, known in the art, such as Tymnet, available from McDonnell Douglas Corporation. The network allows a physician in one city to communicate with the administration computer located in a different city, by making a local, non-toll, telephone call.

6. If the patient has recently terminated employment, and then seeks medical treatment, the administration computer, as outlined in Table 1, records the patient's insurance status as indeterminate and informs the physician accordingly. In such a case, the physician must decide the manner in which to collect payment, as plan ABC makes no commitment at this time.

7. The invention has been described in terms of health benefits claims. However, it is applicable to any generic plan under which a third party pays money for the benefit of a beneficiary. One example is a food stamp program, in which a beneficiary presents food stamps (i.e., the "card" 15 in FIG. 1) to a supermarket (the "provider") which can verify, using terminal 18, whether the stamps are valid, and whether the beneficiary is entitled to use them. In this case, the roster is a roster of food stamp beneficiaries.

In another example, a governmental workman's compensation program is treated an analogous to plan ABC, and provides payment.

8. In addition to the verification procedures described above for verifying the identity of the patient, other procedures can be used. Voiceprint, fingerprint, and signature verification can be used, as known in the art.

9. From one point of view, the invention allows the physician to only address and read the data base, while the employer can address, read, and, in addition, modify the data base, as by deleting beneficiaries. (Of course,

10

the physician, in a sense, can modify the data base, because the treatments which he performs are stored by the administration computer. However, this type of modification does not affect the benefits available to beneficiaries. The employer can modify the benefits.

10. FIG. 4 describes an optional procedure by which a patient can pay the balance which plan ABC does not cover. FIG. 5 describes a procedure by which plan ABC pays the physician.

11. Plan ABC has been described as an insurance plan. However, it need not be such. Plan ABC can be a self-insurance plan of the employer, or any entity which provides benefits to beneficiaries for specified types of health care.

An invention has been described wherein a physician, at the time and location of rendering medical treatment, obtains information as to the amount of payment for the treatment, and also, in some cases, actual payment itself. The information is obtained from a database which is updated, in real time, by the employer providing the insurance.

Numerous substitutions and modifications can be undertaken without departing from the true spirit and scope of the invention as defined in the claims.

What is claimed is:

1. Apparatus for updating a central data base consisting of the identities of beneficiaries who at a point in time are members of an employment group having post-membership option rights for continuing health care benefits comprising:

a file of predetermined time spans between active and pending states of benefit plan eligibility based on the status of association between the beneficiary and the employment group;

a clock function means responsive to changes in beneficiary member status for updating the beneficiary plan eligibility state in the file at said predetermined time spans; and

a two-way data communication link between at least one benefit provider and the file for inputting member identification information and receiving current data representing the status of the beneficiary relevant to the employment group and plan eligibility during both active and pending status periods.

2. Apparatus as defined in claim 1 further including means for generating a notification to a group member upon the occurrence of a change in status.

3. Apparatus as defined in claim 2 wherein the notification includes information regarding continuing benefit plan options.

4. For use in combination with a central data base which is maintained by a health care benefit plan administrator and which consists of at least (a) employment group member identification data, (b) employment group member benefit eligibility status data, (c) defined benefit payment amounts and (d) a clock function which modifies the plan eligibility status data for individual employment group members at appropriate times related to a change in employment group membership status:

a two-way data communication apparatus for location at a benefit provider station which is remote from the central data base and which includes:

means for inputting beneficiary identification data and sending such identification data to the central data base for verification as to the association between the proposed beneficiary and the employ-

5,070,452

| 11 | 12 |

ment group benefit plan and, according to said
clock function, the status of beneficiary eligibility;

means for receiving and displaying proposed benefi-
ciary eligibility confirmation from the central data
base as a result of the inputting of beneficiary iden-
tification data;

means for inputting proposed benefit identification
data and sending such benefit identification data to
the central data base;

means for receiving and displaying the payment
amount data from the central data base which cor-
responds to the previously inputted proposed bene-
fit identification data; and

means for inputting and sending to the central data
base a payment request based on the proposed
benefit payment amount.

5. Apparatus as defined in claim 4 further including a
two-way data communication link between said devices
and the central data base.

6. Apparatus as defined in claim 5 further including
means for updating the contents of the central data base
to show both active and pending states of benefit plan
eligibility for each beneficiary whose identification data
is in the central data base.

7. Apparatus as defined in claim 6 further including
notice generating means interconnected with said cen-
tral data base for receiving data representing changes in
status of a beneficiary relative to the employment group
and for generating notices of benefit plan eligibility and
options associated with said eligibility for transmission
to beneficiaries/employment group members; and

clock means for initiating activation of said notice
generating means a regulated time span following
an employment group membership status change.

8. For use in combination with the central data base
which is maintained by a health care benefit plan admin-
istrator and which consists of at least (a) employment
group member identification data, (b) employment
group member benefit eligibility status data, (c) defined
benefit payment amounts and (d) a clock function means
which modifies the plan eligibility status data for indi-
vidual employment group members at appropriate times
related to a change in employment group membership
status;

a two-way data communication apparatus for loca-
tion at a benefit provider station which is remote
from the central data base and which includes:

means for inputting beneficiary identification data
and sending such identification data to the central
data base for verification as to the association be-
tween the proposed beneficiary and the employ-
ment group benefit plan and, according to said
clock function means, the status of beneficiary
eligibility;

means for receiving and displaying proposed benefi-
ciary eligibility confirmation from the central data
base as a result of the inputting of beneficiary iden-
tification data;

means for inputting proposed benefit identification
data and sending such benefit identification data to
the central data base; and

means for receiving and displaying the payment
amount data from the central data base which cor-
responds to the previously inputted proposed bene-
fit identification data.

9. For use in combination with the central data base
which is maintained by a health care benefit plan admin-
istrator and which consists of at least (a) employment
group member identification data, (b) employment
group member benefit eligibility status data, (c) defined
benefit payment amounts and (d) a clock function means
which modifies the plan eligibility status data for indi-
vidual employment group members at appropriate times
related to a change in employment group membership
status;

a two-way data communication apparatus for loca-
tion at a benefit provider station which is remote
from the central data base and which includes:

means for inputting beneficiary identification data
and sending such identification data to the central
data base for verification as to the association be-
tween the proposed beneficiary and the employ-
ment group benefit plan and, according to said
clock function means, the status of beneficiary
eligibility; and

means for receiving and displaying proposed benefi-
ciary eligibility confirmation from the central data
base as a result of the inputting of beneficiary iden-
tification data.

* * * * *

# EXHIBIT 15

| | |
|---|---|
| 1  IN THE UNITED STATES DISTRICT COURT | 1  APPEARANCES: |
| 2  FOR THE DISTRICT OF DELAWARE | 2  On behalf of the Plaintiff: |
| 3  CIVIL ACTION NO. 04-1258 SLR | 3  BERNARD SHEK, ESQ. |
| 4 | 4  Skadden, Arps, Slate, Meagher & Flom, LLP |
| 5  ——————————X | 5  525 University Avenue, Suite 1100 |
| 6  MCKESSON INFORMATION    : | 6  Palo Alto, California 94301 |
| 7  SOLUTIONS, LLC,           : | 7  (650) 470-4500 |
| 8      Plaintiff,        : | 8  On behalf of Defendant: |
| 9  vs.                     : | 9  MICHAEL A. SITZMAN, ESQ. |
| 10  THE TRIZETTO GROUP, INC., : | 10  Gibson, Dunn & Crutcher, LLP |
| 11      Defendant.        : | 11  One Montgomery Street |
| 12  ——————————X | Telesis Tower, Suite 31 |
| 13 | 12  San Francisco, California 94104-4505 |
| 14  Durham, North Carolina | 13  (415) 393-8221 |
| 15  Friday, September 23, 2005 | 14 |
| 16 | 15  BRENT TROUBLEFIELD, VIDEOGRAPHER |
| 17  VIDEOTAPE DEPOSITION OF KELLI A. DUGAN, | 16 |
| 18  a witness herein, called for examination by counsel | 17 |
| 19  for the Defendant, in the above-entitled matter, | 18 |
| 20  pursuant to notice, the witness being duly sworn by | 19 |
| 21  DARLENE M. BRYANT, Registered Professional Reporter | 20 |
| 22  and Notary Public in and for the State of North | 21 |
| 23  Carolina, taken at the offices of Interactive World, | 22 |
| 24  1000 Park Forty Plaza, Suite 300, Durham, North | 23 |
| 25  Carolina, at 8:06 a.m., September 23, 2005, and the | 24 |
|  | 25 |
| Page 1 | Page 3 |

| | |
|---|---|
| 1  proceedings being taken down by Stenotype by DARLENE | 1  C O N T E N T S |
| 2  M. BRYANT and transcribed under her direction. | 2 |
| 3 | 3  THE WITNESS        EXAMINATION BY COUNSEL FOR |
| 4 | 4  KELLI A. DUGAN:    Plaintiff    Defendant |
| 5 | 5  By Mr. Sitzman:              7, 180 |
| 6 | 6  By Mr. Shek:        177 |
| 7 | 7 |
| 8 | 8 |
| 9 | 9  E X H I B I T S |
| 10 | 10 |
| 11 | 11  EXHIBIT NO.                PAGE NO. |
| 12 | 12  1  7-29-87, Holloway to Fager        53 |
| 13 | 13  2  10-14-87 Holloway to Fager       55 |
| 14 | 14  3  US Patent 5, 253,164             66 |
| 15 | 15  4  Subpoena                103 |
| 16 | 16  5  Article, The Caterpillar Experience  105 |
| 17 | 17  6  Memo, 1-29-88, Holloway to Egdahl     108 |
| 18 | 18  7  5-20-88, Holloway to Egdahl       121 |
| 19 | 19  8  RICS                  122 |
| 20 | 20  9  Flow Charting Worksheet      124 |
| 21 | 21  10  Memo, To HPR Staff, 1-17-89      127 |
| 22 | 22  11  CRW, 1-25-89            129 |
| 23 | 23  12  1-26-89, Holloway To Bolz       130 |
| 24 | 24  13  2-13-89, Don & Kelli To PDT     132 |
| 25 | 25  14  12-12-89, Goldberg to Dugan     136 |
| Page 2 | Page 4 |

1 (Pages 1 to 4)

KELLI A. DUGAN

1  speculation.
2      Q.   And when you say, doing it, are you referring
3  to the Hertenstein manual process, or are you
4  referring to code review, the automated process?
5      A.   You -- well, if you -- can we go back and see
6  a question -- a couple of questions ago, I was
7  referring to what you had said.  So now you've got me
8  confused and lost.
9      Q.   Okay.
10     A.   I'm sorry.
11     Q.   All right.  Let me -- let me break it down.
12         I --
13     A.   You asked me something about whether Don --
14  that -- what people were doing; what Bob had been
15  doing.
16     Q.   Well, let's -- let's back up.  While you were
17  at HPI --
18     A.   Yes.
19     Q.   -- I think you've testified that you did not
20  do any investigation into finding out whether or not
21  there were other entities that were manually
22  processing claims like Dr. Hertenstein?
23     A.   That's correct.
24     Q.   Okay.  And did you do anything while at HPI to
25  ascertain whether there were any companies or entities

Page 41

1      A.   Okay.  Just HPI?
2      Q.   It -- it was helpful for me, but it doesn't
3  sound like it's helpful for you.  So why don't we talk
4  about prior to filing the patent application; is that
5  any --
6      A.   That's even more difficult.
7      Q.   That's more difficult?
8      A.   HP -- HP -- if you stick with HPI, I think I
9  can -- and you really mean while I was at HPI?
10     Q.   Why -- can we -- can we focus on the pre-1989
11  time frame?
12     A.   Sure.
13     Q.   Okay.  So any -- at any time prior to 1989,
14  did you do anything to ascertain whether or not anyone
15  else, other than HPI and HPR, were working on an
16  automated system, much like the system you were
17  working on, that would handle claims that -- like
18  Dr. Hertenstein was doing manually?
19     A.   No.
20     Q.   Were you aware of any other companies or
21  entities that had software that was capable of
22  automatically processing med -- medical claims?
23     A.   No.  Processing in the way in which
24  Dr. Hertenstein had been doing manually?
25     Q.   Yes.  I'm sorry.

Page 43

1  who had automated a process like you were attempting
2  to do for Dr. Hertenstein?
3      A.   Could you repeat the question?  And I just --
4  for -- for reference, you keep saying HPI.  Can we
5  lump HPI and HPR together, since I can't tell you
6  exactly when I moved over to HPR?  And so it's hard
7  for me to make the distinction when you're limiting me
8  to the HPI time or the HPR time.
9      Q.   Okay.
10     A.   Unless you specifically want to know about
11  when I was a BU employee.
12     Q.   Well, that's what I'm trying to drive at.
13  What --
14     A.   Okay.
15     Q.   -- I'm -- I'm trying to find out, because what
16  happened in response to several questions ago, all of
17  a sudden you went forward with HPR, and then also went
18  into sales of code review while you were at HPR, which
19  took us well-beyond the period that I really wanted to
20  focus on.
21     A.   Uh-huh.
22     Q.   And I understand that -- that it's difficult
23  to cross over between HPI and HPR, but I really kind
24  of want to focus on a time period that's much
25  earlier --

Page 42

1      A.   Yes.
2      Q.   Did you do anything to determine what software
3  programs were being used by payers that examined in
4  any way CPT-4 codes being submitted on medical claims?
5      A.   Could you repeat that again?  I'm so sorry.
6      Q.   No.  That's okay.  I think I'm just trying to
7  cover way too much ground in way too much short of
8  time here.
9          At some point in time, you went to work on
10  creating software that ultimately became known as
11  CodeReview, correct?
12     A.   Correct.
13     Q.   Okay.  When is the earliest time you can
14  recall working on that software program?
15     A.   Some time in '87.
16     Q.   When you went to go work -- sorry.
17          At any time during your work on that software
18  program, did you ever do anything to find out what
19  other software programs existed that examined CPT-4
20  codes in any manner?
21     A.   Yes.
22     Q.   What did you do?
23     A.   GMIS came to HPI and demonstrated Autocoder.
24     Q.   Can you recall when they came to HPI?
25     A.   No.

Page 44

11 (Pages 41 to 44)

KELLI A. DUGAN

1  Q.  Did they come at your request or their
2  request?
3  A.  I don't know.
4  Q.  Did you get a chance to see the -- the program
5  that they had in action?
6  A.  Yes.
7  Q.  And can you generally describe for me that
8  program that you saw?
9  A.  The program was one where users would input
10  CPT-4 codes.
11  Q.  And what would -- what was the program
12  designed to do with those codes?
13  A.  My understanding of the program is that, at
14  that time, it only ensured that you had a valid code.
15  Q.  And how would it do that, or how would it
16  accomplish that based on your understanding?
17  A.  Again, it's only speculation, because I
18  didn't -- I don't know how they worked it.  But I
19  would assume they had a database of all the valid
20  codes, and it would just tell you, you know, that
21  code's invalid.
22       And I can't remember.  You may have had an
23  opportunity to type in the procedure name, to get a
24  valid code, but if you put in a code that was invalid,
25  it would tell you it was invalid.

Page 45

1  Q.  At the time you saw the odor -- Autocoder
2  system --
3  A.  Uh-huh.
4  Q.  -- had you completed your work on the
5  automated system known as CodeReview?
6  A.  Completed?  Do you mean the first prototype?
7  I mean, certainly the entire time I worked on
8  CodeReview, and even after I left from HPR, it wasn't
9  complete.  A software program is continually --
10  Q.  Okay.  Did --
11  A.  -- maintained.
12  Q.  Okay.  Did you have a working prototype of the
13  software code?
14  A.  I believe that we did.
15  Q.  Okay.  Had you filed for the patent
16  application?
17  A.  I do not know.
18  Q.  Do you recall who else was involved in the
19  meeting where GMIS came to HPI?
20  A.  It was held in Dick Egdahl's actual office,
21  which was rare, and Dr. Egdahl and Don Holloway and I
22  are those that I remember.  There may have been
23  somebody else.  I don't know.
24  Q.  And you said Dr. Egdahl's office; was this an
25  office at HPI?

Page 46

1  A.  Yes.
2  Q.  Is it fair to then assume that it occurred
3  prior to your employment at HPR?
4  A.  Not necessarily.  I can't tell.
5  Q.  Did GMIS share with you any of the technical
6  aspects of their computer program?
7  A.  No.
8  Q.  You laughed.  I didn't know -- was there a --
9  something you were thinking about?
10  A.  Yeah.  Yes.
11  Q.  What was that?
12  A.  Don had them put in one of our -- sort of --
13  our marque claims to see what it would do with it.
14  And, of course, it did nothing, because it only checks
15  the validity of the code.  And then John -- Don
16  continues to ask questions, and I just -- I just
17  remember at the end of the meeting saying to Don,
18  you're giving the store away, just he -- because Don
19  was so excited.  But, anyway, that's -- that's why I
20  remember that meeting so clearly.
21  Q.  It sounds like -- I don't want to overstate or
22  understate it, but would it be fair to say that Dr. --
23  I keep wanting to refer to him as Dr. Holloway.  Do --
24  A.  You can.  He's a Ph.D.
25  Q.  Yeah.  No.  I know that.  Is it fair to say

Page 47

1  Dr. Holloway was sort of the lead guy; I want to say
2  almost, father, of this creation?  Is that a fair
3  characterization in your mind?  Or if it's unfair, let
4  me know?
5  A.  In my mind, that's a fair characterization.
6  Q.  Okay.  So, Autocoder, if I can classify that,
7  that program from GMIS, was being used, or that
8  software program had been created, to determine the
9  accuracy of the code or the validity of the code;
10  whether or not it was a valid code or not.
11  A.  That -- yes.
12  Q.  Okay.  Okay.  By the way, now knowing what you
13  know today, or later would learn, about Expert
14  Systems --
15  A.  Uh-huh.
16  Q.  -- is it fair also to characterize the
17  Autocoder system as an Expert System?
18  A.  No.
19  Q.  Why not?
20  A.  It was simply a numerical check, to check that
21  you had -- as you can imagine, a doctor's office may
22  just put in the -- a wrong digit, transpose some
23  digits.  It was simply to get the code correct.  So it
24  had no thought.  It was just a -- like a spell check;
25  auto -- you know, CPT-4 check.

Page 48

12 (Pages 45 to 48)

KELLI A. DUGAN

1  at Caterpillar in Peoria, may have only contained a
2  few of the first rules that we'd developed. It was
3  done in a modular way. And if you think of each rule
4  as being its own sort of entity, we worked
5  rule-by-rule, and the prototype did not have all the
6  rules.
7       Q.  Additional rules would have to be created in
8  order to reach some of the results that
9  Dr. Hertenstein would otherwise have reached himself;
10 is that correct?
11      A.  Related to the prototype?
12      Q.  Yes.
13      A.  Yes.
14      Q.  Were you aware any attempts by others to
15 create their own software that would perform this
16 function?
17      A.  No.
18      Q.  Are you aware today of any other companies
19 that have created their own software to do this?
20      A.  No.
21      Q.  Is it your belief that HPR and their -- and
22 their successors, are the only people that have such
23 software?
24      A.  I have no knowledge of that.
25      Q.  While you were working at HPR, and then

Page 89

1  consulting for HPR, did you ever learn of any
2  competing software that competed with CodeReview?
3       A.  I don't think so.
4       Q.  Did you learn of any companies that were in --
5  that were competitors of -- to HPR?
6       A.  I have a memory that there was the thought
7  that GMIS may have been trying to develop something
8  that was related to this. As I told you before, they
9  had already had the Autocoder system, and I think they
10 were aware of what we were doing. And I -- and I
11 think that there was a -- a thought amongst some at
12 HPR that GMIS was -- was trying -- or wanted to create
13 something similar.
14      But, again, it's sort of speculation on my
15 part.
16      Q.  Let me -- if you would, turn to Claim 1 of the
17 patent.
18      A.  Can you tell me the page?
19      Q.  I'm sorry, it's MCK65.
20      I'm going to have you read Claim 1 for me.
21      (Pause.)
22      A.  Yes.
23      Q.  Okay. Isn't that the function of Autocoder?
24      MR. SHEK: Objection; vague and ambiguous.
25      BY MR. SITZMAN: (RESUMED.)

Page 90

1       Q.  You can answer.
2       A.  Autocoder, when -- when I saw it demonstrated
3  in Dick Egdahl's office?
4       Q.  Yes.
5       A.  My understanding of what I saw in Dick
6  Egdahl's office, this is what Autocoder did, yes.
7       Q.  Let me have you to turn to Claim 14.
8       Now, let's see. I'm sorry. Actually, let's
9  look at Claim 2. Sorry to jump back.
10      Let me have you read Claim 2, and I have
11 questions about that, too.
12      (Pause.)
13      A.  Okay.
14      Q.  You look puzzled.
15      A.  I'll probably have to read it again to really
16 get it.
17      Q.  Okay.
18      (Pause.)
19      A.  Okay. I've read it twice.
20      Q.  You still look troubled.
21      A.  We can proceed, however.
22      Q.  All right. You see -- you see the setoff
23 there where it says, Comprising the steps of, and then
24 it lists one --
25      A.  Yes.

Page 91

1       Q.  -- it lists one, two, three, four, five steps,
2  all of them starting with a verb; receiving,
3  ascertaining, determining, authorizing and rejecting;
4  do you see that?
5       A.  Uh-huh.
6       Q.  I just wanted you to look at the steps here
7  and confirm for me that these steps, manually, is what
8  Dr. Hertenstein and his staff were doing when they
9  received claims at Caterpillar.
10      MR. SHEK: Objection; vague and ambiguous.
11 Also calls for speculation.
12      BY MR. SITZMAN: (RESUMED.)
13      Q.  You can go ahead and respond.
14      A.  And I will have to speculate.
15      Q.  Based -- based on whatever you know or
16 learned, is it your belief that that is what they were
17 doing with the claims they received manually?
18      A.  Probably on some occasions, yes, but I'm not
19 completely sure.
20      Q.  What's causing you to hesitate there?
21      A.  Because that has such specificity, I'm not --
22 I don't know exactly what their manual method was or
23 how whomever was reviewing the claims, be it
24 Dr. Hertenstein or Peggy Saal, prior to CodeReview,
25 how they thought about exactly what they did.

Page 92

23 (Pages 89 to 92)

KELLI A. DUGAN

1    Q.  Of CodeReview.
2        And -- but for the fact, then, in responding
3    to his question about Autocoder --
4    A.  Uh-huh.
5    Q.  -- is it -- is it your belief, then, that --
6    strike that.
7        MR. SITZMAN:  Can I get her last question read
8    back to me for -- in response to Mr. Shek's last
9    question?
10       THE REPORTER:  "Question:  Do you know whether
11   or not Autocoder had such a predetermined database?"
12       "Answer:  I do not."
13       BY MR. SITZMAN:  (RESUMED.)
14   Q.  Is it clear, though, from your review of
15   Autocoder during that formal demonstration and through
16   your observations that you saw it in use at various
17   customers' facilities or you may --
18   A.  I may have seen it.
19   Q.  -- have seen it --
20   A.  Uh-huh.
21   Q.  -- that it did have the capability or ability
22   to determine whether or not the CPT-4 codes were valid
23   when input by a -- either manually or automatically by
24   the claims processing?
25       MR. SHEK:  Objection; vague and ambiguous.

Page 181

1        BY MR. SITZMAN:  (RESUMED.)
2    Q.  In other words, going back to the earlier
3    testimony --
4    A.  Yes.
5    Q.  -- what did you understand the purpose of
6    Autocoder to -- was?
7    A.  Autocoder would allow -- as you can expect,
8    physicians are sending in their claim forms; their
9    office staff is typing up these claim forms; and
10   they're not always going to get the code correct.
11   They may send in a claim that doesn't have a code.  It
12   may only have language.  So, what Autocoder did, was
13   if you typed in a code that was not valid, it would
14   tell you it was invalid.  And it would probably ask
15   you to -- I can't -- you know, I can't remember, but I
16   do know -- my recollection is that it was limited to
17   getting the code, the individual code for the
18   individual procedure correct.
19   Q.  Okay.
20   A.  So that it matched with an actual CPT-4 code.
21   Q.  Based on your knowledge and your expertise and
22   the work that you did on CodeReview --
23   A.  Uh-huh.
24   Q.  -- is it your belief that in order to
25   determine whether or not a valid code had been

Page 182

1    entered --
2    A.  Uh-huh.
3    Q.  -- that Autocoder had a database that
4    consisted of all the valid CPT-4 codes, to check that
5    code against?
6        MR. SHEK:  Objection; calls for speculation;
7    incomplete hypothetical.
8        THE WITNESS:  I don't know.  I would suspect
9    that they probably -- they had some sort of database,
10   but I don't know.  I don't know what their system
11   was.
12       BY MR. SITZMAN:  (RESUMED.)
13   Q.  And I understand Mr. Shek was -- wanted to
14   make sure that you had not seen their code, you've not
15   been given source code; you've not seen their manuals
16   and all of that?
17   A.  No.
18   Q.  But based on your experience, your expertise,
19   the work you did on CodeReview, the coding and
20   everything else --
21   A.  Uh-huh.
22   Q.  -- is it at least based on that experience,
23   your belief that there must have been a database from
24   which the Autocoder system could check to see if it
25   was valid or not valid, the CPT-4 code?

Page 183

1    A.  I'm making an -- a guess would be, yes, they
2    had to have something in order to compare the input
3    with, to something that told them whether it was a
4    code or not a code, whether it was -- and it more than
5    likely existed in the form of a database, but I don't
6    know.
7    Q.  Are there other things that it could have
8    existed in?  You saw --
9    A.  Unfortunately, I --
10   Q.  Oh.
11   A.  -- I'm probably un -- as limited as you are in
12   terms of what I know, at least now, about computers,
13   which is pretty pathetic since my name's on this
14   patent.  But I would never be one to presume that I
15   know the universe of possibility in any field, and I
16   certainly didn't then or now.  So, I -- I don't know.
17   Q.  Okay.
18   A.  What I'm saying is, it's most likely that
19   would be the simple way to have done it.
20   Q.  Okay.
21       (Pause.)
22       MR. SITZMAN:  I'm just going to ask one more
23   other follow-up and then --
24       THE WITNESS:  Okay.
25       MR. SITZMAN:  No.  No.  No, not of you.

Page 184

46 (Pages 181 to 184)

KELLI A. DUGAN

1          THE VIDEOGRAPHER:  This concludes the

2   deposition of Kelli Dugan.  The time is 1:29 p.m.

3          (Discussion off the record.)

4          (Whereupon, at 1:29 p.m., the taking of the

5   instant deposition ceased.)

6          (Whereupon, the reading and signing by the

7   witness is hereby reserved.)

8                          _____

9                          SIGNATURE OF THE WITNESS

10          SUBSCRIBED AND SWORN to before me this

11   _____ day of _____, 2005.

12

13                          _____

14   My Commission Expires:          NOTARY PUBLIC

15

16

17

18

19

20

21

22

23

24

25

186

KELLI A. DUGAN

BARKLEY
Court Reporters

# EXHIBIT 16

REDACTED

# EXHIBIT 17

Advanced MedLogic Systems™

Product Overview

May 1987

The Health Data Institute™
20 Maguire Road
Lexington, MA  02173
(617) 863-2000

000086

Confidential Information Subject to D. Del. LR 26.2

MCK 047608

04-CV-1258-SLR (D.Del.)

Advanced MedLogic Systems (AMS)

Introduction

The Advanced MedLogic System™ (AMS) is a computer-based medical utilization management tool developed by The Health Data Institute™ (HDI) for use with claims administration and payment systems. AMS can be used either prospectively or retrospectively to evaluate the validity of health insurance claims and determine the medical necessity of services. The system's edits also validate Diagnosis Related Group (DRG) assignments and examine the quality of care provided in a prospective payment system.

Used prospectively by insurers, third party administrators, self-insureds and other claims payers, AMS can save dollars by approving only valid claims for medically necessary services. By applying comprehensive, automated logic to medical and hospital claims, the system identifies medically unnecessary services so that payments can be denied outright or negotiated with providers. AMS can also provide additional savings by delaying the payment of inaccurate claims pending the outcome of the review process. Applied retrospectively, AMS can identify problems and target areas for corrective action.

000087

MCK 047609

Confidential Information Subject to D. Del. LR 26.2

04-CV-1258-SLR (D.Del.)

Overview

AMS evaluates physician and hospital services from claims or discharge abstracts. The medical logic system organizes and evaluates this data at four levels:

1. Individual claim.

2. Basic episode, such as an episode of hospitalization or ongoing outpatient therapy over a defined time period.

3. Extended episode, a longer time frame such as before and after a hospitalization.

4. Disease episode, a history of illness such as chronic heart disease over a one year time span.

AMS edits are logical sequences which examine submitted claims in part, in whole or in aggregate. This process evaluates data for validity, internal consistency (such as comparing gender with diagnosis) and medical necessity. AMS embodies a true "expert system" -- the knowledge of medical experts which is synthesized into a programmable form.

Since medical services generally entail multiple claims submissions, the edit levels incorporate a method for cross-checking all provider claims. Working from the Uniform Billing claims form (UB-82) or the Health Care Finance Administration claim form (HCFA 1500) data, AMS edits check for valid values, internal consistency, and appropriateness of services and charges. AMS can use other data sources to perform these verifications as well such as discharge abstracts.

000088

- 2 -

Confidential Information Subject to D. Del. LR 26.2

MCK 047610

04-CV-1258-SLR (D.Del.)

Description of Evaluation Levels

    o  Individual Claim

The individual claim level is a single billing submission for a delivered service to a covered policyholder or dependent. AMS will edit claims submitted by hospitals, outpatient facilities, practitioners and other suppliers such as social workers and physical therapists.

Within the claim level function, edits exist for both data accuracy and medical necessity. Each claim is evaluated independently based on the information provided. For example, a claim level edit for age/diagnosis which identifies a 65-year-old woman with a diagnosis of Normal Delivery should result in an investigation for possible coding errors. Similarly, edits at the claim level verify procedure sequence. For example, a breast biopsy should always be done prior to a mastectomy.

    o  Basic Episode

The basic episode level defines a group of services or events to be considered as a single entity and edited together. A basic episode is the principal form of information cross-checking in AMS. To create an episode, AMS merges temporally linked claims for the same individual. All claims for a specific individual's episode of care are accumulated to construct a basic episode. Each claim must pass AMS claim level edits to be eligible for inclusion in a basic episode. AMS contains three types of basic episodes: hospital confinement, outpatient facility, and practitioner.

000089

- 3 -

MCK 047611

For example, a basic episode level edit compares the diagnosis submitted by the hospital to the diagnosis submitted by the practitioner for the same patient during one hospitalization.   If the hospital diagnoses are pneumonia and diabetes and a practitioner's diagnosis is stroke, the episode is flagged for further review to determine which diagnoses were correct.

o   Extended Episode

Like a basic episode, the extended episode level defines a group of services or events that are considered a single entity for editing purposes.  But, an extended episode also integrates all out-of-hospital experience which occurs prior to or following the hospitalization.  Each claim that has passed all pertinent AMS claim level edits is eligible for inclusion in an extended episode.

Extended episodes cover hospital confinement, outpatient facility, and practitioner claims or services.  These episodes can also include "lone" tests (i.e., procedures or tests that are not associated with a hospitalization or an outpatient visit).

An extended episode level edit, for instance, is constructed to validate the accuracy of pre- and postadmission ancillary charges.  AMS incorporates claims data for any outpatient services supplied 21 days prior to a hospital admission or seven days after discharge.  In this way, any preadmission testing or follow-up services will be included in the review.

000090

- 4 -

MCK 047612

Confidential Information Subject to D. Del. LR 26.2                                    04-CV-1258-SLR (D.Del.)

o <u>Disease Episode</u>

The disease episode level groups claims that represent a summary of an individual's health problems over a specified time period. Disease episode edits examine submitted claims as they relate to a specific patient's health care history over the previous year and a lifetime.

Central to the notion of a disease episode is the concept of a register, a file for each individual containing such pertinent information as hospitalization, procedures undergone, and diagnoses. This account of health problems forms the basis for two types of registers: disease and procedure.

If an adjuster, for example, records a claim for a diagnosis of chronic ischemic heart disease, AMS would examine both the disease and procedure registers to validate the claim. Because "chronic" implies a long-standing illness, the patient should have a previous entry of heart disease on the disease register. If no previous entry exists, AMS would flag this episode for medical review.

Also, the procedure register tracks performance of procedures over time. For example, it is not expected that a patient would have more than three cardiac catheterizations within one year. A claim for a fourth catheterization within the same year would be flagged for further review.

000091

- 5 -

MCK 047613

04-CV-1258-SLR (D.Del.)

DRG Edits

As prospective payment systems based on Diagnosis Related Groups (DRGs) become more prevalent, payers will need some standardized method to edit DRG claims to ensure validity. In many ways the DRG reimbursement system encourages providers to place patients in higher DRGs through manipulation of information. Within AMS and interspersed among the claim, basic, and disease levels are several edits designed specifically to address DRGs and their inherent potential problems.

AMS edits claim information for overt errors, misrepresented DRGs, subtle alterations in diagnoses, and patterns of readmission. AMS also checks the validity of assigned DRGs using any complications or comorbid conditions that are present. For example, if a claimant's DRG assignment is pneumonia with complications or comorbidity, the claimant's disease register should contain such a history, e.g., hypertension, heart disease, or diabetes mellitus. Under new methods of reimbursement the importance of validating coding practices is vital.

000092

- 6 -

MCK 047614

Confidential Information Subject to D. Del. LR 26.2                     04-CV-1258-SLR (D.Del.)

USER OPTIONS

The Advanced MedLogic System provides users with maximum flexibility when applying AMS to claims data. Users can select tolerance levels for editing ancillary charges. Full AMS capability can be applied to a claims system simultaneously, or AMS can be phased in. For example, data quality edits can be used initially, while medical necessity edits can be activated at a later time.

For greater flexibility, users can set the AMS ancillary tables at an aggressive, moderate, or conservative level. The level selected would depend upon the current level of community acceptance of cost containment measures, and the minimum amount at which a user feels that questioning a claim is cost effective.

An aggressive level edit for a given ancillary category such as physical therapy could be set at $50, but this would identify a large number of cases for review. A large percentage of these could turn out to be justified and, therefore, may not result in significant savings. At a moderate edit level of $100, fewer cases would be identified for review. A percentage of these may be justified, but because the unjustified cases represent higher costs, they may accrue bigger dollar savings. At a conservative level of $500, it would be extremely rare for flagged charges to be justified, and investigated cases would almost always result in cost savings. However, setting such a high dollar level would then result in unjustified charges at lower rates going undetected, i.e., those below $500.

000093

- 7 -

MCK 047615

04-CV-1258-SLR (D.Del.)

## MEDICAL REVIEW

When a claim or an episode fails an AMS edit it should be reviewed so that
1) misinformation can be corrected, 2) medical necessity can be validated,
3) conflicts can be resolved, and 4) quality of-care can be evaluated.  In the
case of claim level medical necessity edits a chart review must take place to
comply with the rule, mentioned earlier, that makes passing of all claim level
edits mandatory prior to entry into the basic episode level.

Chart review can be performed either on- or off-site.  On-site reviews may
take place at a 1) hospital, 2) medical office, or 3) outpatient facility.
Off-site reviews are performed utilizing chart copies.  These can be audited
by the HDI Medical Review team of nurses or HDI would be happy to train
client-designated personnel.

The process detailed above represents the foundation upon which AMS is based.
Corrective Action Plans are then mutually developed and implemented based on
the results of the chart audit.

000094

- 8 -

MCK 047616

Confidential Information Subject to D. Del. LR 26.2

04-CV-1258-SLR (D.Del.)

## REPORTING

AMS is capable of providing reports at various levels.  The four report types most commonly used by clients are:

1) A statistical overview of claims passing and failing all edits.

   Example 1

   | | |
   |---|---|
   | Total Number of Claims | 12,938 |
   | Number of Claims Failing At Least One Edit | 1,109 |
   | Percent of Claims Failing At Least One Edit | 8.6% |

2) An analysis of claim passes/failures by edit level - individual claim, basic episode, extended episode and disease episode.

   Example 2

   | | | |
   |---|---|---|
   | Total Number of Claims | 12,938 | |
   | | Number of Claims | Percentage of Failure |
   | Claims Failing At Least One Edit, Claim Level | 340 | 2.6% |
   | Claims Failing At Least One Edit, Basic Episode | 306 | 2.4 |
   | Claims Failing At Least One Edit, Extended Episode | 249 | 1.9 |
   | Claims Failing At Least One Edit, Disease Episode | 214 | 1.7 |

3) A compilation of claim results by provider and facility.  This technique can prove useful for PPO selection or problem provider identification.

   Example 3

   Number of Claim Submissions and Failures, Any Level, By Hospital

   | Hospital | Claim Submissions | Claim Failures | Percentage of Failure |
   |---|---|---|---|
   | A | 1,133 | 244 | 21.5% |
   | B | 3,440 | 231 | 6.7 |
   | C | 2,578 | 254 | 9.8 |
   | D | 902 | 143 | 15.8 |
   | E | 4,885 | 237 | 4.8 |
   | Total Number of Claims | 12,938 | | |

000095

- 9 -

Confidential Information Subject to D. Del. LR 26.2

MCK 047617

Example 3 (con't)

Number of Claim Submissions and Claim Failures, Any Level, By
Physician

| Physician | Claim Submissions | Claim Failures | Percentage of Failure |
|---|---|---|---|
| A | 67 | 11 | 16.4% |
| B | 32 | 7 | 21.8 |
| C | 103 | 14 | 13.6 |
| D | 82 | 5 | 6.1 |
| Total Number of Physician Claims | 284 | | |

4) A detailed breakdown of claims for each edit at all levels.

Example 4

| Data Accuracy Edits | FAILURES | | PASSES | |
|---|---|---|---|---|
| | Number | Percent | Number | Percent |
| HCFA 1500 | | | | |
| CL1B-Valid But Rare Diagnoses | 64 | 0.10% | 66,759 | 99.90% |
| CL5A-Diagnosis/Age | 134 | 1.36 | 9,751 | 98.64 |
| CL5B-Procedure/Age | 18 | 2.81 | 622 | 97.19 |
| CL5C-Diagnosis/Sex | 115 | 1.75 | 6,436 | 98.25 |
| CL5D-Procedure/Sex | 3 | 0.50 | 595 | 99.50 |
| CL6A-Type of Service-Procedure/ Diagnosis | 40 | 0.06 | 61,336 | 99.94 |
| CL6B-Place of Service-Procedure/ Diagnosis | 64 | 0.10 | 65,239 | 99.90 |
| CL30A-Outmoded or Obsolete Procedure/Tests | 45 | 0.07 | 66,778 | 99.93 |
| TOTAL | 483 | | 277,516 | |

Medical Necessity Edit

| CLAA-Procedure/Diagnoses | | | | |
|---|---|---|---|---|
| -Acceptable Match | 410 | 14.3% | 2,463 | 85.7% |

Custom analyses are available to best suit a client's needs. Customized
reports can include charges summarized by previous quarters, cost saving
potential calculated from claims flagged, and recommendations on improving
accuracy of claim submissions. While a client in the initial phases of AMS

Π00096

- 10 -

Confidential Information Subject to D. Del. LR 26.2

MCK 047618

04-CV-1258-SLR (D.Del.)

implementation may need only percentages of claims failed overall as an initial gauge of data quality, pinpointing potential problem providers may be helpful in later stages of application.  Virtually any combination of statistics can be calculated for every edit individually or within its level.

000097

- 11 -

MCK 047619

Confidential Information Subject to D. Del. LR 26.2

04-CV-1258-SLR (D.Del.)