EXHIBIT 20

REDACTED

# EXHIBIT 21

1    UNITED STATES DISTRICT COURT
2        DISTRICT OF DELAWARE
3
4    McKESSON INFORMATION SOLUTIONS, LLC,
5            Plaintiff
6    v.        CA NO. 04-1258 (SLR)
7    THE TRIZETTO GROUP, INC.,
8            Defendant
9
10
11

12        VOLUME 1
13    VIDEOTAPED DEPOSITION OF RANDALL
14    DAVIS, Ph.D., a witness called on behalf of
15    the Plaintiff, pursuant to the Federal Rules
16    of Civil Procedure, before Jessica L.
17    Williamson, Registered Merit Reporter,
18    Certified Realtime Reporter and Notary
19    Public in and for the Commonwealth of
20    Massachusetts, at the Offices of Skadden,
21    Arps, Slate, Meagher & Flom LLP, One Beacon
22    Street, Boston, Massachusetts, on Wednesday,
23    November 30, 2005, commencing at 9:27 a.m.
24    JOB NO. 41297
25

Page 1

1    INDEX
2    DEPONENT                PAGE
3    RANDALL DAVIS, Ph.D.
4    Examination By Mr. Randall      5, 310
5    Examination By Mr. Segal        297
6
7    EXHIBITS
8    NO.                    PAGE
9    1 Copy of '164 patent          11
10   2 Expert Report dated October  22
        24, 2005
11
12   3 Expert Report dated November 22
        14, 2005
13   4 Article entitled "Enhancing  28
        Accuracy and Timeliness is
14       Integral to the Claims
         Adjudication Process"
15
     5 Document relating to AMS      141
16     entitled "Setting a New
        Standard"
17
     6 Document bearing Bates stamp  142
18    Nos. RD000314 - 324
19   7 Document entitled "AMS June   142
        1986 HDI-Proprietary"
20
     8 One-page document bearing     142
21    Bates stamp No. RD000420
22
23
24
25

Page 3

APPEARANCES
1
2
3    SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
4    (By Jeff Randall, Esq.)
5    525 University Avenue
6    Palo Alto, California 94301
7    (650) 470-4500
8    jrandall@skadden.com
9    Counsel for the Plaintiff
10
11   GIBSON, DUNN & CRUTCHER LLP
12   (By David A. Segal, Esq.)
13   4 Park Plaza
14   Irvine, California 92614-8557
15   (949) 451-3973
16   dsegal@gibsondunn.com
17   Counsel for the Defendant
18
19   ALSO PRESENT:
20
21   George Dobrentey, Videographer
22
23
24
25

Page 2

PROCEEDINGS
09:10:46  1
09:27:22  2    THE VIDEOGRAPHER:  Good morning.
09:27:33  3    We are recording and are now on the record.
09:27:35  4    Today's date is November the 30th, 2005, and
09:27:38  5    the time is 9:27 a.m.  My name is George
09:27:42  6    Dobrentey.  I'm a legal videographer for G &
09:27:46  7    M Court Reporters, Ltd.  Our business
09:27:46  8    address is 42 Chauncy Street, Suite 1A,
09:27:50  9    Boston, Massachusetts 02111.
09:27:51  10    This is the deposition of Randall
09:27:55  11   Davis in the matter of McKesson Information
09:28:00  12   Solutions vs. TriZetto Group in the United
09:28:04  13   States District Court in the District of
09:28:06  14   Delaware, Civil Action No. 04-1258 (SLR).
09:28:11  15    This deposition is being taken at One
09:28:15  16   Beacon Street in Boston, Massachusetts on
09:28:17  17   behalf of the plaintiff.  The court reporter
09:28:18  18   is Jessica Williamson.  The counsel will
09:28:19  19   state their appearances, and the court
09:28:21  20   reporter will administer the oath.
09:28:22  21    MR. RANDALL:  Jeff Randall
09:28:24  22   representing plaintiff, McKesson.
09:28:26  23    MR. SEGAL:  David Segal on behalf
09:28:27  24   of the TriZetto Corp.
           25

Page 4

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
877.955.3855

11:58:21 1   Q. Let me direct your attention to your report
11:59:02 2     dated October 24, Exhibit 2, specifically
11:59:07 3     Exhibit C and Page C-1.
11:59:23 4   A. I have it.
11:59:23 5   Q. These four AMS documents that you testified
11:59:27 6     about earlier, do you see that?
11:59:28 7   A. Yes.
11:59:35 8   Q. Can you describe how and when you collected
11:59:37 9     those documents?
11:59:39 10   A. Yes. I talked to a number of colleagues and
11:59:51 11     former colleagues about whether they knew of
11:59:55 12     any systems in roughly the time period of
12:00:00 13     the patent, the relevant time period, that
12:00:07 14     were similar in some fashion to the system
12:00:11 15     described in the patent. One of the
12:00:12 16     pointers that I got was to a system
12:00:14 17     called — or, sorry, a system built by a
12:00:17 18     company called GMIS.
12:00:22 19     So I went searching on the Web for
12:00:24 20     pointers to GMIS, and it turns out that
12:00:28 21     someone who once worked for GMIS also worked
12:00:33 22     at the company that created the AMS system.
12:00:41 23     I'm blocking on their name at the moment.
12:00:43 24     HDI, I think. He also worked — he had
12:00:46 25     formerly worked at GMIS, I believe, and then

Page 89

12:00:51 1     came to work at HDI.
12:00:53 2     And I went to talk to him because it
12:00:54 3     turns out he lives about a mile from where I
12:00:58 4     live at home. So I talked to him about
12:01:02 5     GMIS, and then we got to talking about the
12:01:03 6     AMS system, and he had the documents in his
12:01:06 7     possession.
12:01:09 8   Q. And what's his name?
12:01:10 9   A. Dr. Robert Bargar, B-A-R-G-A-R. He — it's
12:01:17 10     his signature that shows up in the letter
12:01:19 11     that's one of the AMS documents.
12:01:37 12   Q. How did you — did TriZetto's attorneys
12:01:41 13     provide you the information regarding — any
12:01:47 14     information regarding the AMS system?
12:01:49 15   A. No.
12:01:49 16   Q. Did they provide you any information
12:01:52 17     regarding the former employee of GMIS that
12:02:02 18     went to work for the company that
12:02:04 19     developed —
12:02:04 20   A. No. I found him on my own. My recollection
12:02:07 21     is that they were surprised when I mentioned
12:02:10 22     this. I think they had independently
12:02:15 23     discovered the material — not the material,
12:02:18 24     the existence of the system, but I don't
12:02:19 25     recall that detail. I do know that I found

Page 90

12:02:21 1     this on my own.
12:02:25 2   Q. How did you find it?
12:02:25 3   A. In the manner I just described. I asked a
12:02:29 4     colleague about previous systems that they
12:02:32 5     knew about in the mid-1980s that did any
12:02:35 6     form of claim review. One of them mentioned
12:02:39 7     GMIS. I started doing Web search on GMIS.
12:02:43 8     I covered a number of references and
12:02:45 9     documents to it, but by the chance of Google
12:02:50 10     also discovered this individual who had
12:02:53 11     something written about himself describing
12:02:54 12     his work at both GMIS and at HDI. And since
12:03:01 13     he was quite nearby, I called him up.
12:03:03 14   Q. So you were doing Web searches regarding
12:03:07 15     GMIS to determine when they had a system
12:03:14 16     that may invalidate the claims of the
12:03:17 17     patent; is that right?
12:03:18 18   A. It was part of a prior art search, and I
12:03:22 19     didn't know very much about them except
12:03:24 20     someone had pointed me to them as possibly
12:03:26 21     relevant.
12:03:27 22   Q. So you were doing a prior art search to
12:03:29 23     determine if GMIS had potential prior art to
12:03:33 24     the '164; is that right?
12:03:35 25   A. No.

Page 91

12:03:39 1   Q. No?
12:03:40 2   A. No.
12:03:40 3   Q. Why were you doing a Web search regarding
12:03:47 4     GMIS?
12:03:48 5   A. But that wasn't the only thing I was doing.
12:03:51 6     I was trying to determine what previous
12:03:52 7     systems, if any, might be relevant. One of
12:03:54 8     the things I was looking for — your
12:03:56 9     question seemed to constrain it too
12:03:58 10     narrowly. It wasn't that I was looking for
12:04:01 11     GMIS specifically. At that point I was
12:04:03 12     looking at GMIS I was also looking at a
12:04:06 13     number of other systems.
12:04:07 14   Q. And you could have been drinking coffee at
12:04:10 15     the time, too. I don't know what else you
12:04:11 16     were doing, but I am saying that while —
12:04:13 17     when you decided to sit down at your
12:04:16 18     computer and search the Internet regarding
12:04:19 19     GMIS, you were doing so to determine perhaps
12:04:23 20     whether GMIS was an invalidating system,
12:04:28 21     right?
12:04:28 22   A. Fair enough. For that specific search. I
12:04:30 23     misunderstood the question perhaps. That
12:04:31 24     specific search was addressed to that issue.
12:04:40 25   Q. And as you were doing that, you came across

Page 92

23 (Pages 89 to 92)

**Page 93**

```
12:04:44  1   what, something on the Internet that
12:04:46  2   suggested that a former GMIS employee went
12:04:48  3   to work subsequently for HDI?
12:04:52  4  A.  Plus some reference to HDI, and I'm not
12:04:59  5   sure, possibly to AMS.
12:05:01  6  Q.  And did you print that information out?
12:05:10  7  A.  I don't know if I printed out the very first
12:05:13  8   thing that I found.  I don't recall
12:05:14  9   having -- doing so, but I can't swear to it.
12:05:20 10  Q.  Well, you came across this Dr. Robert
12:05:22 11   Bargar, right?
12:05:23 12  A.  Bargar.
12:05:23 13  Q.  And did you print out any information
12:05:26 14   regarding him that you discovered during
12:05:28 15   your search?
12:05:28 16  A.  I wrote down his name -- his name, address
12:05:31 17   and phone number.
12:06:10 18  Q.  When did you do this Internet search
12:06:12 19   regarding GMIS?
12:06:13 20  A.  I can't narrow it down very much for you
12:06:24 21   except to say it would have been fairly
12:06:25 22   early on in my involvement in this, clearly
12:06:28 23   before writing the report, but I can't from
12:06:32 24   memory narrow it down any further than that.
12:06:37 25  Q.  Well, clearly it took a significant amount
```

**Page 94**

```
12:06:41  1   of time, did it not, for you to do this
12:06:43  2   searching on the Internet regarding GMIS in
12:06:46  3   order to come up with Dr. Robert Bargar
12:06:48  4   from -- that worked on the AMS system,
12:06:54  5   right?
12:06:54  6  A.  No.  That's the marvel of Google.  It did
12:06:59  7   not take very long.
12:07:00  8  Q.  How long did it take?  How long did it take,
12:07:03  9   approximately?
12:07:03 10  A.  To find this once I started looking?
12:07:05 11  Q.  Yes.
12:07:05 12  A.  Oh, it was all within the same day.
12:07:07 13  Q.  But it took an entire day, eight hours?
12:07:09 14  A.  Oh, no.  God, no.  No, no, no.  No.  To find
12:07:17 15   this -- to find him once I started looking
12:07:19 16   for background on GMS -- GMIS, no, clearly
12:07:25 17   not a day.
12:07:26 18  Q.  Four hours?
12:07:27 19  A.  I don't believe so.  I'm tempted to say it
12:07:32 20   was one of the first things I tripped over,
12:07:34 21   but I can't swear to that.  It's, I don't
12:07:36 22   know, maybe an hour or so.
12:07:38 23  Q.  So are you suggesting, then, that you
12:07:41 24   just -- you were doing some investigation of
12:07:43 25   GMIS to see invalidating art, and that led
```

**Page 95**

```
12:07:49  1   you directly to Robert Bargar and his work
12:07:51  2   in the MI -- work on the AMS system?
12:07:54  3  A.  If we take "directly" to mean within an hour
12:07:57  4   or so, yes, that's exactly what happened.
12:08:02  5  Q.  But then once you found his name, how long
12:08:07  6   did it take you searching to determine his
12:08:07  7   address and phone number?
12:08:08  8  A.  It was on the document.  It's, as I said,
12:08:14  9   one of the wonders of Google.  One of the
12:08:16 10   documents that I found was his name, address
12:08:18 11   and -- it was essentially a short -- if
12:08:22 12   memory serves, it was a short sort of mini
12:08:27 13   resume that he had posted on the Web for
12:08:29 14   some reason.
12:08:30 15  Q.  And -- well, how many hours did you spend
12:08:32 16   working on locating him, getting in contact
12:08:36 17   with him and actually retrieving the
12:08:40 18   documents that you have identified here in
12:08:43 19   Exhibit C?
12:08:43 20  A.  Locating him, as I said, it was a matter of
12:08:49 21   an interval of time measured in minutes,
12:08:51 22   perhaps 60 minutes, but I doubt it.  I'm
12:08:54 23   sorry, the other words that you used were
12:08:56 24   what?
12:08:56 25  Q.  Well, how much time did you then spend
```

**Page 96**

```
12:08:59  1   actually getting in contact with him and
12:09:02  2   meeting with him to get the documents that
12:09:04  3   you have included in your report in Exhibit
12:09:07  4   C?
12:09:07  5  A.  If memory serves, I called him that day,
12:09:12  6   told him what I was interested in.  He
12:09:15  7   agreed to meet.  My recollection was it was
12:09:21  8   either a Friday or on a Saturday morning
12:09:25  9   that I called, and we agreed to meet either
12:09:29 10   on Sunday or Monday.  And as I said, he
12:09:32 11   lives about a mile away, so I drove to his
12:09:35 12   house, and we probably spent -- I might have
12:09:43 13   spent two hours sitting with him going over
12:09:44 14   some of the documents that he had, looking
12:09:46 15   at them.  And he made some copies for me at
12:09:50 16   that point.
12:09:53 17  Q.  And so when you -- you spent what, you said,
12:09:56 18   a couple hours with him?
12:09:57 19  A.  My recollection is, yeah, on the order of a
12:10:00 20   couple hours.
12:10:00 21  Q.  So when you left, you had the documents in
12:10:02 22   your hand?
12:10:03 23  A.  I had some documents in my hand.  After
12:10:05 24   further reading the documents and talking to
12:10:07 25   him again by phone -- let me back up.  He
```

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
877.955.3855

12:10:11 1 was being very nice and photocopying on a
12:10:14 2 home photocopy machine a bunch of pieces of
12:10:16 3 paper. I was trying to be nice and not
12:10:18 4 saying, "Take this box and copy it for me,"
12:10:21 5 so I got some samples.
12:10:24 6     When it became clear to me that this
12:10:26 7 would be particularly relevant, I then asked
12:10:28 8 him to take the documents that are cited
12:10:30 9 here (indicating) and have them scanned in
12:10:33 10 somewhere methodically to include all the
12:10:35 11 pages. And I think he went to a local
12:10:37 12 Kinko's and got them scanned in, and that's
12:10:39 13 the form of the documents that we have.
12:10:43 14 Q. Did he have any -- to your knowledge, does
12:10:47 15 he have any other documents at all that
12:10:49 16 relate to the AMS system, other than the
12:10:52 17 ones -- the four that you've included in
12:10:54 18 your report?
12:11:04 19 A. It's possible, but I can't swear to it one
12:11:08 20 way or the other. I know I was trying to
12:11:08 21 look through -- let me back up.
12:11:09 22     This is one of those circumstances
12:11:10 23 where the first thing he said was "I think
12:11:13 24 I've got some boxes of documents still down
12:11:14 25 in the basement. They might have been

Page 97

12:11:16 1 ruined when my oil tank sprang a leak. I'll
12:11:20 2 check for you." So he came a couple days
12:11:22 3 later, and he found the box -- a box or two
12:11:24 4 of documents, but it was a jumbled
12:11:26 5 collection of things having to do with a
12:11:28 6 variety of different things that he would be
12:11:29 7 involved in. Some of them were GMIS. Some
12:11:33 8 of them where AMS. And I was at that point
12:11:36 9 focusing mostly on AMS, though I believe I
12:11:40 10 looked at some GMIS documents because at
12:11:42 11 that point I didn't know the timing of GMIS
12:11:45 12 and put it aside for later.
12:11:47 13     It's a longwinded question (sic), but
12:11:49 14 I'm trying to give you the context for the
12:11:51 15 answer that says I can't be sure of whether
12:11:53 16 he had other AMS documents. I know the ones
12:11:56 17 that I have.
12:11:56 18 Q. Well, did you ever ask him? Did you ever
12:12:00 19 say, "Robert, do you have any more documents
12:12:03 20 than the four you've given me?"
12:12:05 21 A. He didn't give me the documents. We were
12:12:07 22 looking through some boxes together, and
12:12:09 23 these are the ones that I picked out as we
12:12:11 24 looked through the two boxes of documents.
12:12:15 25 Q. Well, when you were looking through the two

Page 98

12:12:17 1 boxes of documents, did you see any other
12:12:19 2 documents that related to the AMS system?
12:12:21 3 A. Again, I say I don't believe so, but I can't
12:12:24 4 be positive, as I sit here.
12:12:44 5 Q. And you said this was early on in your
12:12:45 6 engagement in this case. That would have
12:12:48 7 been in early September; is that right?
12:12:48 8 A. Mid-September, somewhere around there, yeah.
12:12:51 9 Q. But you concealed both your discovery of Mr.
12:12:55 10 Bargar and the AMS system and your meeting
12:12:57 11 with him from TriZetto's lawyers, right?
12:13:03 12     MR. SEGAL: Objection, vague.
12:13:06 13 A. No. In fact, I did just the opposite. What
12:13:08 14 do you mean I concealed it?
12:13:09 15 Q. Did you tell them right away?
12:13:12 16 A. I can't swear that it was the moment I found
12:13:14 17 him, but as soon as I realized that the
12:13:17 18 material was relevant, yes, I told them.
12:13:18 19 Q. Within a matter of days?
12:13:20 20 A. I don't remember, but concealing is
12:13:26 21 certainly an entirely inappropriate term. I
12:13:30 22 would have no motivation or desire to
12:13:32 23 conceal it.
12:13:33 24 Q. Did you receive any authorization whatsoever
12:13:35 25 from TriZetto's attorneys to go meet with

Page 99

12:13:39 1 Mr. Bargar?
12:13:40 2 A. It never occurred to me I would need an
12:13:43 3 authorization. I was doing background
12:13:44 4 research.
12:13:45 5 Q. Did you ask for authorization?
12:13:46 6 A. It did not occur to me, and I did not ask
12:13:49 7 for authorization.
12:13:51 8 Q. Did you at least let them know that you were
12:13:53 9 going over to meet with this potential prior
12:13:56 10 art witness?
12:13:56 11 A. No, because I had no idea whether it was
12:13:59 12 relevant.
12:13:59 13 Q. Within a matter of days after meeting with
12:14:01 14 him you did let them know about this and
12:14:04 15 sent them the documents, correct?
12:14:06 16 A. No, within --
12:14:06 17 Q. And when I say "them," it's the TriZetto
12:14:08 18 attorneys.
12:14:09 19 A. I remembered mentioning it to them
12:14:12 20 reasonably soon after I discovered it. I
12:14:15 21 don't recall sending the documents at that
12:14:18 22 point.
12:14:18 23 Q. They never asked for them?
12:14:20 24 A. If they had asked, I would have sent them,
12:14:30 25 so I don't recall them asking.

Page 100

25 (Pages 97 to 100)

| | |
|---|---|
| 12:14:31 1 Q. Didn't you tell them "I met with Robert<br>12:14:34 2      Bargar, who had some information regarding<br>12:14:36 3      this potential prior art system, AMS, and<br>12:14:40 4      I've got some documents. How about if I<br>12:14:43 5      send them to you?" Did that happen?<br>12:14:45 6           MR. SEGAL: Objection,<br>12:14:46 7      argumentative.<br>12:14:46 8 A. I called to tell them I spoke with Mr. -- I<br>12:14:53 9      forget, I think it was Dan Muino, told them<br>12:14:57 10      I had discovered this system. I don't<br>12:15:05 11      remember if I mentioned Dr. Bargar -- no, I<br>12:15:07 12      must have, because that's where I got the<br>12:15:08 13      documents from. Now, your question was, did<br>12:15:15 14      I offer to send them the documents, yes?<br>12:15:17 15 Q. Did you offer? Did they ask?<br>12:15:20 16 A. I don't recall offering. I don't recall<br>12:15:22 17      them asking.<br>12:15:22 18 Q. But you did tell them that you had the<br>12:15:24 19      documents?<br>12:15:24 20 A. I don't remember what I said in that<br>12:15:30 21      conversation. It was a couple of months<br>12:15:31 22      ago. I don't remember that level of<br>12:15:33 23      detail. I know I told them that I had<br>12:15:35 24      discovered this system.<br>12:15:36 25 Q. And I still -- I've got some additional<br><br>Page 101 | 12:17:35 1 A. No, that's not possible.<br>12:17:36 2 Q. You're positive?<br>12:17:37 3 A. It was not Labor Day, yes, I'm positive.<br>12:17:39 4 Q. And you're now positive it was in October<br>12:17:42 5      and not September?<br>12:17:43 6 A. No, I'm positive it was not Labor Day. I<br>12:17:47 7      hadn't done any work as of Labor Day.<br>12:17:49 8 Q. So you don't know -- at this point are you<br>12:17:52 9      telling me that you don't know whether it<br>12:17:54 10      was in mid-September or in -- sometime in<br>12:17:58 11      October?<br>12:17:58 12 A. Early October, that's correct. As I sit<br>12:18:00 13      here, I can't tell you exactly when I met<br>12:18:03 14      him.<br>12:18:03 15 Q. And I'm not asking for exactly. I'm asking<br>12:18:06 16      for -- it was only a few weeks ago if it's<br>12:18:08 17      October, right?<br>12:18:09 18 A. To the best of my recollection, it was<br>12:18:10 19      somewhere between mid-September and Columbus<br>12:18:14 20      Day in October. That's as narrowly as I can<br>12:18:18 21      define it right now.<br>12:18:22 22 Q. Have you spoken with any other potential<br>12:18:26 23      prior art witnesses other than perhaps the<br>12:18:29 24      experts that were disclosed by TriZetto's<br>12:18:32 25      counsel and Mr. Bargar?<br><br>Page 103 |
| 12:15:38 1      questions on this subject, but we have to<br>12:15:41 2      change the videotapes. Why don't we change<br>12:15:43 3      it, and then we'll continue on.<br>12:15:45 4 A. Sure.<br>12:15:46 5           THE VIDEOGRAPHER: The time is<br>12:15:50 6      12:15. This is the end of Tape 2, and we<br>12:15:52 7      are off the record.<br>12:15:54 8           (Discussion off the record.)<br>12:16:57 9           THE VIDEOGRAPHER: Stand by. The<br>12:16:58 10      time is 12:16. This is the beginning of<br>12:17:01 11      Tape 3, and we are back on the record.<br>12:17:02 12 A. May I augment an earlier answer?<br>12:17:05 13 Q. Sure.<br>12:17:05 14 A. I'm trying to remember the timing, and I<br>12:17:08 15      have the sense that I visited him on a<br>12:17:11 16      Monday that was a holiday, which means it<br>12:17:13 17      might actually have been in October. It<br>12:17:15 18      might have been Columbus Day holiday. I'm<br>12:17:19 19      not positive. I might be able to figure it<br>12:17:21 20      out from records somewhere, but it's<br>12:17:24 21      possible it was as late as the October<br>12:17:27 22      Columbus Day holiday.<br>12:17:29 23 Q. Or Labor Day?<br>12:17:30 24 A. Labor Day? Early September?<br>12:17:33 25 Q. Yeah.<br><br>Page 102 | 12:18:36 1 A. No.<br>12:18:39 2 Q. After your meeting with Mr. Bargar, did you<br>12:18:45 3      ever have any additional discussions with<br>12:18:48 4      him?<br>12:18:49 5 A. Yes.<br>12:18:49 6 Q. How many?<br>12:18:55 7 A. Two, one concerning logistics and one<br>12:18:57 8      concerning some details of the system.<br>12:18:59 9 Q. And the one concerning logistics, was that<br>12:19:01 10      all that was discussed, no substance?<br>12:19:03 11 A. It was about getting the electronic copy of<br>12:19:05 12      the document. So just to be clear --<br>12:19:16 13 Q. By getting the electronic copy of the<br>12:19:19 14      document, what do you mean by that?<br>12:19:21 15 A. I'm sorry, let me start again. It's what I<br>12:19:23 16      meant a few moments ago when I said I asked<br>12:19:26 17      him to get the documents scanned in so that<br>12:19:31 18      I could have a complete copy of a document<br>12:19:33 19      that I had taken only a couple of pages<br>12:19:37 20      copied of at his house. As I said, I was<br>12:19:40 21      trying to be nice and not ask him to copy a<br>12:19:42 22      document extensively on his home copier.<br>12:19:45 23      And then when I realized it was important, I<br>12:19:47 24      asked him to in some fashion get a copy of<br>12:19:50 25      the document to me, the complete copies of<br><br>Page 104 |

26 (Pages 101 to 104)

12:19:54 1   the documents you have in my report.
12:19:55 2      And it turns out the easiest way for
12:19:57 3   him to do that was to go to a Kinko's, have
12:20:00 4   it scanned in and e-mail me the resulting
12:20:04 5   file. That was his decision about how to do
12:20:04 6   it. And that's what I mean by "electronic,"
12:20:06 7   simply that it was scanned in and sent to me
12:20:08 8   electronically.
12:20:09 9   Q. So as of today's date, neither you nor, to
12:20:15 10   your knowledge, TriZetto's counsel has ever
12:20:16 11   asked Mr. Bargar whether he has additional
12:20:18 12   documents relating to this system; is that
12:20:20 13   right?
12:20:20 14   A. I don't — well, I know that I didn't ask
12:20:27 15   the question because I think I had the sense
12:20:30 16   that I had what he had. Having gone through
12:20:32 17   the boxes, I had the impression that I had
12:20:36 18   whatever documents he had that I had seen
12:20:40 19   them, but I did not subsequently say, "Do
12:20:43 20   you have anything else?"
12:20:57 21   Q. Do you have a record of the documents that
12:20:59 22   TriZetto gave you — TriZetto's counsel gave
12:21:02 23   you to review in connection with this case?
12:21:05 24   A. I made a hard copy binder of them, so in
12:21:09 25   that sense I have a record of them.

Page 105

12:21:13 1   Q. So every time they send you something you've
12:21:16 2   kept it? You've got a record of what
12:21:18 3   they've given you to review, right?
12:21:20 4   A. I believe that to be true.
12:21:27 5   Q. And there are no — there's no substantive
12:21:29 6   analysis or commentary by TriZetto's
12:21:33 7   attorneys with respect to prior art or
12:21:36 8   infringement issues in any of the materials
12:21:38 9   they gave you?
12:21:39 10   A. I'm going to have to think back. I think
12:21:44 11   the answer to that is no, but let me think
12:21:47 12   back and make sure.
12:22:03 13      Sitting here, I don't recall any.
12:22:12 14   Q. You were given in connection with your work
12:22:20 15   in this case documents relating to the AMS
12:22:24 16   system that were produced by McKesson in
12:22:27 17   this case, correct?
12:22:28 18   A. It's possible. I don't remember, sitting
12:22:41 19   here. Ah, the McKesson production, yes. I
12:22:53 20   can't — I don't have a mental picture of
12:22:54 21   the specific document, but I know I got
12:22:56 22   some — some amount of McKesson production
12:22:58 23   in electronic form also, in PDF files.
12:23:05 24   Q. Relating to the AMS system, correct?
12:23:07 25   A. I believe so, but I'm not positive as I sit

Page 106

12:23:10 1   here. There was a fair amount of material
12:23:12 2   that I have been given over the course of
12:23:13 3   this case.
12:23:15 4   Q. Other than the few references relating to
12:23:19 5   the work by other TriZetto-designated
12:23:21 6   experts, you did review the materials that
12:23:24 7   were provided to you by TriZetto's
12:23:26 8   attorneys, right?
12:23:26 9   A. Yes.
12:23:27 10   Q. And you recall reviewing McKesson production
12:23:30 11   documents relating to the AMS system,
12:23:32 12   correct?
12:23:32 13   A. No. Actually, for some reason I'm drawing a
12:23:40 14   blank sitting here thinking about AMS
12:23:44 15   documents from the McKesson production.
12:23:45 16   It's possible I did, but I don't remember.
12:23:52 17   Q. Well, didn't you — when you came across the
12:23:54 18   AMS system with Mr. Bargar, didn't you
12:23:56 19   say — didn't it spark a recollection in
12:24:00 20   your mind that, in fact, TriZetto's
12:24:03 21   attorneys had given you McKesson production
12:24:06 22   documents related to AMS?
12:24:07 23   A. At that point I don't think so. I don't
12:24:09 24   think I had looked at the McKesson
12:24:10 25   production documents yet, so it wouldn't

Page 107

12:24:13 1   have sparked a memory.
12:24:21 2   Q. But you do, sitting here today, recall — at
12:24:25 3   least your best recollection is that you
12:24:28 4   have received from TriZetto's attorneys
12:24:32 5   McKesson production documents relating to
12:24:34 6   the AMS system, right?
12:24:35 7   A. As I've said, and I will say it carefully, I
12:24:40 8   believe that to be the case, but I cannot
12:24:42 9   recall specific documents as I sit here. I
12:24:45 10   can't conjure up a specific picture of the
12:24:48 11   documents. I would have to go back and
12:24:49 12   check.
12:24:54 13   Q. And how would you check to determine either
12:24:59 14   when you received those documents or when
12:25:00 15   you reviewed them?
12:25:01 16   A. I don't think I can determine when I
12:25:03 17   reviewed them. Probably the file date on my
12:25:09 18   computer will tell me when I put them on the
12:25:11 19   machine, and then I'll rereview them.
12:25:14 20   Q. After getting these AMS documents from Mr.
12:25:19 21   Bargar, didn't you go back and look at and
12:25:28 22   review the McKesson production documents
12:25:30 23   relating to the same system?
12:25:33 24      MR. SEGAL: Objection, lacks
12:25:34 25   foundation, vague.

Page 108

27 (Pages 105 to 108)

12:25:35 1   A. Now, I had a great deal of material to go
12:25:41 2       through and time was starting to get short,
12:25:43 3       so I did not specifically say I'm going to
12:25:46 4       go looking for this.
12:26:08 5   Q. Did you assist TriZetto's attorneys in any
12:26:10 6       way in preparing discovery responses
12:26:15 7       regarding prior art or infringement issues?
12:26:24 8   A. Only -- I'm not sure I understand the
12:26:27 9       question, but only in the sense that I cited
12:26:31 10      certain things in my report. I don't think
12:26:34 11      I was part of the formal discovery response
12:26:39 12      mechanism. They asked me when I put
12:26:41 13      together this report to supply documents,
12:26:45 14      which I supplied to them. The copies of,
12:26:49 15      for instance, any of the articles that I had
12:26:50 16      found that they hadn't supplied to me I made
12:26:53 17      sure to send them a copy of. Is that the
12:26:55 18      kind of thing that you're talking about?
12:26:57 19   Q. Fair enough. Have you -- to your knowledge,
12:27:01 20      have TriZetto's lawyers talked with Mr.
12:27:03 21      Bargar about the AMS system?
12:27:05 22   A. To my knowledge, I guess I don't know one
12:27:10 23      way or the other. I don't know that they
12:27:15 24      have, and I don't know that they haven't.
12:27:16 25   Q. You mentioned that you met with him for

12:27:19 1      about two hours, correct?
12:27:20 2   A. Correct.
12:27:21 3   Q. Then you had a telephone conference with him
12:27:23 4      about it, the system; is that right?
12:27:27 5   A. Correct.
12:27:28 6   Q. How long did that telephone conference last?
12:27:30 7   A. That was relatively brief. I would say it
12:27:33 8      was on the order of about a half hour.
12:27:35 9   Q. And other than those two communications and
12:27:38 10     the one logistical, strictly logistical
12:27:42 11     communication that you had with him, were
12:27:43 12     there any other communications between you
12:27:44 13     and Mr. Bargar regarding the potential prior
12:28:04 14     art?
12:28:04 15   A. I don't recall any others, as I sit here.
12:28:06 16   Q. Did you -- what did you and Mr. Bargar
12:28:08 17     discuss during this -- during the meeting
12:28:14 18     you had with him?
12:28:14 19   A. When I was at his house?
12:28:16 20   Q. Yes.
12:28:22 21   A. It was primarily focused around going
12:28:24 22     through the box of documents with me trying
12:28:27 23     to decide which ones I felt were conceivably
12:28:31 24     relevant to the task, and I probably asked
12:28:37 25     him some basic questions about both AMS and

12:28:42 1      the GMIS system. I don't recall in detail,
12:28:45 2      but I'm sure I must have asked some basic
12:28:47 3      questions about what they were and how they
12:28:50 4      worked.
12:28:50 5   Q. Do you recall what he said? Well, let me
12:29:01 6      back up for a minute. Do you recall what
12:29:03 7      you asked him?
12:29:03 8   A. Not in any finer level of detail than I've
12:29:06 9      just characterized for you.
12:29:07 10   Q. Do you recall what he said?
12:29:14 11   A. No, I don't recall specifically what I said.
12:29:17 12     What I'm --
12:29:18 13   Q. What he said.
12:29:19 14   A. I'm sorry, that's what I meant. I don't
12:29:21 15     recall specifically what he said. I
12:29:23 16     remember that what I was listening for was a
12:29:25 17     sense of is this stuff going to be relevant,
12:29:28 18     as best I can tell sitting here talking
12:29:30 19     about this. So the sense I came -- I know I
12:29:35 20     came away with was, yes, this is potentially
12:29:38 21     relevant material, because there were
12:29:40 22     documents he put on the table that seemed to
12:29:42 23     me not relevant, and so, you know, those
12:29:44 24     were set aside. They had to do with other
12:29:47 25     companies, other systems.

12:29:48 1      So I was being selective about what we
12:29:52 2      picked out and trying to get a sense from
12:29:54 3      him as to whether the system seemed
12:29:57 4      relevant. That's the level at which I was
12:29:59 5      listening, and that's what I recall.
12:30:00 6   Q. Did you tell him that you were working for
12:30:03 7      TriZetto and were specifically looking at
12:30:06 8      whether or not you could invalidate
12:30:09 9      McKesson's patent?
12:30:10 10   A. I don't recall if I mentioned TriZetto. I
12:30:11 11     did in the very first phone call tell him
12:30:14 12     that I was working as an expert witness in a
12:30:17 13     lawsuit. I don't recall whether I
12:30:18 14     identified the parties. I might have, but I
12:30:21 15     told him at the very beginning the rationale
12:30:24 16     for the inquiry.
12:30:33 17   Q. And in your subsequent discussions with Mr.
12:30:35 18     Bargar did you make him aware of the fact
12:30:39 19     that you were working to attempt to
12:30:43 20     invalidate McKesson's patent, '164 patent?
12:30:46 21      MR. SEGAL: Objection, vague and
12:30:47 22     misstates his testimony.
12:30:55 23   A. I told him that the material he had was
12:30:57 24     potentially relevant prior art. I don't
12:30:59 25     know if I mentioned the '164 patent. I did

**SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES**
**877.955.3855**

| | |
|---|---|
| 12:31:03 1 | make it clear to him, as I said, from the |
| 12:31:05 2 | very — excuse me. I did make it clear to |
| 12:31:08 3 | him, as I said, from the very beginning that |
| 12:31:11 4 | I was working in a case that involved |
| 12:31:14 5 | depending against — defending against a |
| 12:31:15 6 | charge of patent infringement. |
| 12:31:17 7 | Q. Did he mention to you that GMIS attempted to |
| 12:31:25 8 | invalidate but couldn't the McKesson '164 |
| 12:31:28 9 | patent? |
| 12:31:29 10 | A. I think that's where I heard it. I can't |
| 12:31:31 11 | recall. I know either in my discussion with |
| 12:31:33 12 | him or soon thereafter I discovered that |
| 12:31:37 13 | fact, and I can't separate it out as I sit |
| 12:31:40 14 | here when I discovered that. |
| 12:31:41 15 | Q. You discovered that GMIS failed to |
| 12:31:44 16 | invalidate in litigation the McKesson |
| 12:31:46 17 | patent, right? |
| 12:31:47 18 | A. Yes, correct. |
| 12:31:47 19 | MR. SEGAL: Objection. |
| 12:31:48 20 | THE WITNESS: I'm sorry. |
| 12:31:49 21 | Q. And did you learn that from Mr. Bargar? |
| 12:31:52 22 | A. As I say, I don't recall, because I know |
| 12:31:55 23 | I — I do believe I learned that fact close |
| 12:32:01 24 | to the time at which I was discussing the |
| 12:32:04 25 | AMS documents with him, but I don't recall |

Page 113

| | |
|---|---|
| 12:33:22 1 | lawyers. What discussion transpired after |
| 12:33:26 2 | that I wasn't privy to. |
| 12:33:29 3 | Q. What did he inquire about? |
| 12:33:31 4 | A. Whether he could be paid for the time he was |
| 12:33:33 5 | putting in, copying documents and so forth. |
| 12:33:36 6 | Q. He knew you were being paid for your time? |
| 12:33:38 7 | A. He did. That's another thing I disclosed in |
| 12:33:41 8 | the initial conversation. I wanted to be |
| 12:33:44 9 | fair with him. |
| 12:33:44 10 | Q. Did he know you were getting paid $650 an |
| 12:33:48 11 | hour or maybe $700 an hour for — |
| 12:33:51 12 | A. I do not routinely disclose that, no. |
| 12:33:53 13 | Q. Did he say he would like to be paid for his |
| 12:33:55 14 | time? |
| 12:33:55 15 | A. I never got around to discussing it. I |
| 12:33:57 16 | didn't see it as my responsibility or |
| 12:33:59 17 | concern. He seemed — |
| 12:34:01 18 | Q. But he asked you about it, right? |
| 12:34:03 19 | A. Yes. It seemed to me to be a perfectly |
| 12:34:06 20 | reasonable request. In fact, I was not at |
| 12:34:09 21 | all surprised when he asked about that. I |
| 12:34:10 22 | also knew it was not up to me to negotiate |
| 12:34:13 23 | with him on that issue. |
| 12:34:14 24 | Q. No, I understand that. But nonetheless he |
| 12:34:16 25 | expressed an interest you in being paid for |

Page 115

| | |
|---|---|
| 12:32:06 1 | whether he told me or whether I found that |
| 12:32:08 2 | out separately in part of the Web search, |
| 12:32:12 3 | perhaps. |
| 12:32:12 4 | Q. Did you take any notes during or following |
| 12:32:14 5 | any of your communications with Mr. Bargar? |
| 12:32:16 6 | A. Meeting at his house I just collected the |
| 12:32:24 7 | documents. The answer is no there. In the |
| 12:32:28 8 | subsequent telephone conversation that I |
| 12:32:29 9 | mentioned, the non-logistical one, I believe |
| 12:32:31 10 | I took a few notes on a single sheet of |
| 12:32:34 11 | paper. |
| 12:32:35 12 | Q. Did you — do you still have those notes? |
| 12:32:39 13 | A. I do still have that. |
| 12:32:41 14 | Q. And did you summarize either in an e-mail or |
| 12:32:44 15 | any other writing to TriZetto's lawyers your |
| 12:32:50 16 | communications with Mr. Bargar? |
| 12:32:53 17 | A. No. |
| 12:32:53 18 | Q. What city does Mr. Bargar live in? |
| 12:33:02 19 | A. Newton. |
| 12:33:02 20 | Q. Do you know his address? |
| 12:33:05 21 | A. Not by heart. He's in the phone book. |
| 12:33:14 22 | Q. Have you reimbursed him for any of his time |
| 12:33:17 23 | or expenses? |
| 12:33:17 24 | A. No. He did ask whether — he did raise that |
| 12:33:21 25 | issue, and I referred him to TriZetto's |

Page 114

| | |
|---|---|
| 12:34:20 1 | helping, right? |
| 12:34:21 2 | A. For the time he was putting in, he expressed |
| 12:34:23 3 | that interest, yes. |
| 12:34:25 4 | Q. And you said — you put him in touch with |
| 12:34:29 5 | who, Mr. Segal? |
| 12:34:30 6 | A. I believe I put him in touch with Mr. Muino. |
| 12:34:39 7 | MR. RANDALL: Mr. Segal, has |
| 12:34:41 8 | TriZetto retained Mr. Bargar? |
| 12:34:43 9 | MR. SEGAL: I don't know. |
| 12:34:43 10 | MR. RANDALL: Do you have any |
| 12:34:44 11 | agreement with him to pay any money? |
| 12:34:45 12 | MR. SEGAL: I don't know. I |
| 12:34:46 13 | honestly do not know. |
| 12:34:48 14 | MR. RANDALL: So you don't mind if |
| 12:34:50 15 | we go ahead and contact him? |
| 12:34:51 16 | MR. SEGAL: I can check before the |
| 12:34:53 17 | end of the day with Mr. Muino and find out |
| 12:34:55 18 | if he's been retained or not. |
| 12:34:56 19 | MR. RANDALL: Well, why don't |
| 12:34:58 20 | you — at the lunch break why don't you find |
| 12:35:00 21 | out. I think that would be something you'd |
| 12:35:00 22 | know. |
| 12:35:00 23 | MR. SEGAL: Well, I don't know |
| 12:35:02 24 | offhand because I wasn't the one dealing |
| 12:35:04 25 | with him, but I can check with Mr. Muino |

Page 116

29 (Pages 113 to 116)

Page 314

```
1
2
3
4
5
6
7
8
9        I, RANDALL DAVIS, Ph.D., do hereby declare under
10   penalty of perjury that I have read the foregoing
11   transcript; that I have made any corrections as appear
12   noted, in ink, initialed by me, or attached hereto; that
13   my testimony as contained herein, as corrected, is true
14   and correct.
15       EXECUTED this  3ʳᵈ  day of  January  ,
16   20 0 6 , at  Cambridge  ,  Mass  .
                     (City)              (State)
17
18
19
20   _____
                 RANDALL DAVIS, Ph.D.
21
22
23
24
25
```

# EXHIBIT 22

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

MCKESSON INFORMATION SOLUTIONS
LLC,

Plaintiff,

v.

THE TRIZETTO GROUP, INC.

Defendant.

Civil Action No. 04-1258-SLR

## DEFENDANT'S DESIGNATION OF TRIAL WITNESSES

Pursuant to paragraph 2(f) of the February 18, 2005, Scheduling Order herein, defendant The TriZetto Group, Inc. hereby identifies the following fact witnesses that it may call at one or both of the trials herein, either in person or by way of deposition testimony:

| | | | |
|---|---|---|---|
| 1. | Bargar, Robert | 13. | Dugan, Kelli |
| 2. | Bell, Karen | 14. | Egdahl, Richard |
| 3. | Bellomo, Anthony | 15. | Goldberg, George |
| 4. | Blake, John | 16. | Graham, Steve |
| 5. | Blakely, Roger | 17. | Hawley, Philip |
| 6. | Bowker, Michael | 18. | Hemp, Kristen |
| 7. | Cesarz, Michael | 19. | Hertenstein, Robert |
| 8. | Cutcliff, Janet | 20. | Holloway, Donald |
| 9. | Danza, John | 21. | Hurst, Ronald |
| 10. | Davis, Randall | 22. | Jones, Clifton |
| 11. | Demers, Don | 23. | Kao, John |
| 12. | Doubleday, Chris | 24. | Kerschberg, Larry |

| | | | |
|---|---|---|---|
| 25. | King, Eric | 32. | Owen, Mark |
| 26. | Kiplinger, Patricia | 33. | Radosevich, Marcia |
| 27. | Lampe, Karen | 34. | Richardson, Duffey |
| 28. | Luftig, Craig | 35. | Siemens, Gunter |
| 29. | Margolis, Jeffrey | 36. | Smith, Tara |
| 30. | Moore, Charlie | 37. | Smith, Tommy |
| 31. | Nunnelly, John | 38. | Wukitch, Carolyn |

TriZetto reserves the right to supplement and amend the foregoing list with additional witnesses based on further investigation and review, and based on additional discovery recently ordered by Judge Bechtle. TriZetto also reserves the right to call any witnesses designed by McKesson in this matter, and to designate the same or additional witnesses for purposes of impeachment and/or rebuttal.

MORRIS, NICHOLS, ARSHT & TUNNELL

Jack B. Blumenfeld (#1014)
Rodger D. Smith, II (#3778)
1201 North Market Street
P.O. Box 1347
Wilmington, Delaware 19899-1347
(302) 658-9200

Attorneys for Defendant
THE TRIZETTO GROUP, INC.

OF COUNSEL:

Jeffrey T. Thomas
David A. Segal
Michael A. Sitzman
GIBSON, DUNN & CRUTCHER LLP
Jamboree Center, 4 Park Plaza
Irvine, California 92614-8557
(949) 451-3800

December 30, 2005

2

## CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that copies of the foregoing were caused to be served this 30th day of December, 2005, upon the following counsel in the manner indicated:

<u>BY HAND</u>

Thomas J. Allingham, II
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
One Rodney Square
P.O. Box 636
Wilmington, DE 19899

<u>BY FEDERAL EXPRESS</u>

Jeffrey G. Randall
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
525 University Avenue
Palo Alto, CA 94301

Jack B. Blumenfeld

# EXHIBIT 23

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| MCKESSON INFORMATION SOLUTIONS LLC, | ) ) ) | |
| Plaintiff, | ) ) | C.A. No. 04-1258 (SLR) |
| v. | ) ) | |
| THE TRIZETTO GROUP, INC., | ) ) | |
| Defendant. | ) ) | |

### THIRD SUPPLEMENTAL INITIAL DISCLOSURES OF DEFENDANT THE TRIZETTO GROUP, INC. PURSUANT TO RULE 26(e)(1)

Pursuant to Federal Rules of Civil Procedure 26(e)(1), Defendant The TriZetto Group, Inc. ("TriZetto") hereby supplements its Initial Disclosures that were served on December 15, 2004. The following supplemental response is given without prejudice to TriZetto's right to produce any evidence, whenever discovered, relating to the proof of facts subsequently discovered to be material. The following disclosure supplements and is in addition to the prior supplemental initial disclosures of March 18, 2005 and April 21, 2005. In addition, TriZetto reserves the right to produce and refer to at trial, or at any other hearing, any evidence, facts, documents, or information not yet discovered, or the relevance of which has not yet been determined, by TriZetto or its counsel.

I.    **WITNESSES**

TriZetto identifies and hereby incorporates by reference all persons who are likely to have discoverable information that TriZetto may use to support its claims or defenses, unless solely for impeachment, identified by Plaintiff and Defendant in their respective disclosures of December 15, 2004 and any supplemental disclosures of March 18, 2005 and April 21, 2005.

40216217_1.DOC

TriZetto further identifies the following additional persons who are likely to have discoverable information that TriZetto may use to support its claims or defenses, unless solely for impeachment. TriZetto reserves the right to supplement this list should additional witnesses, or potential witnesses, be discovered during the course of discovery and investigation in this case.

**A.    Party Witnesses**

**B.    Third Party Witnesses**

> 1.    Professor Larry Kerschberg
>        MSN 4A4, ISE Department
>        George Mason University
>        4400 University Drive
>        Fairfax, Virginia 22030-4444

Professor Kerschberg is currently a professor in the Department of Information and Software Engineering at George Mason University. In the mid-1980s, he was an associate professor in the Department of Management Science at the College of Business Administration at the University of South Carolina. During the mid-1980s, he helped developed MedClaim, a prior art medical claims processing system. TriZetto has retained Professor Kerschberg as a consultant in this matter. Professor Kerschberg is likely to have discoverable information regarding the MedClaim prior art medical claims processing system.

> 2.    Steve Graham
>        P.O. Box 4839
>        122 South Main Street, Unit C
>        Breckenridge, Colorado 80424

Mr. Graham has a Masters of Science degree in Artificial Intelligence and served as Director of Software Development for Insurance Software Packages, Inc. (ISP) in Tampa, Florida. TriZetto has retained Mr. Graham as a consultant in this matter. Mr. Graham is likely to have discoverable information regarding ISP's prior art medical claims processing software.

3.    Samuel Fager, M.D., J.D., M.B.A.
      1415 Old Gulph Road
      Villanova, PA 19085

Dr. Fager is a pediatrician and former Medical Director of Aetna Insurance in Hartford, Connecticut. He received his medical degree from Drexel University School of Medicine in Philadelphia. Dr. Fager is likely to have discoverable information regarding the 1987 proposal for the development of a medical claims adjudication system submitted to Aetna Insurance by the Health Policy Institute of Boston University and Health Payment Review.

4.    Kevin Lucie
      HSS
      800.999.3747, ext. 104

Mr. Lucie is likely to have discoverable information regarding the development of a system called AccuCode from Solucient (formerly HCIA, formerly Healthcare Knowledge Resource, a company which was spun off from the Commission on Hospital Based Activates) that edited DRG codes and outpatient surgical procedures for coding accuracy.

5.    Gunter Siemens

Mr. Siemens is likely to have discoverable information regarding the development, implementation and use of a computerized system from Blue Cross Blue Shield New Jersey that would edit reimbursements for same day surgeries, edit for place of service and deny services that were inappropriate.

6.    Keith Gruber
      Ernst & Young
      216.583.1230

Mr. Gruber is likely to have discoverable information regarding the development of a system called Clinical Review System, a/k/a Chart 'N Coder from Ernst & Young that monitored costs, charges and lengths of stay.

7.    Bill Thomas
717.625.4960

Mr. Thomas is likely to have discoverable information regarding the development of a system called CODEFINDER/DRGFINDER or Clinical Claims Editor from Code 3 Health Information Systems/3M, which is a COBOL-based product that evaluates claims to assign DRG codes, evaluate the accuracy of the data, and identify coding errors.

8.    Donald DeMers
don.demers@acs-inc.com

Mr. DeMers was the Founder and President of Discorp Software and is likely to have discoverable information regarding the development of a software system called Discorp from Novalis that performed code checking and verified accuracy of code, and further developed a system called a Health Claims Processing System.

9.    John Blaney, Lee Zausner and Ken Uhlir
Schaumburg, IL

Mr. Blaney, the owner and CEO of PRIMAX Recoveries in Schaumburg, IL, is likely to have discoverable information regarding the development of a system called Medical Policy, which was an Advanced Systems Application joint venture with BCBS-NCA, where medical staff from BCBS-NCA developed the Medical Policy product and ASA developers did the design, coding and testing.

10.    Dr. Philip M. Hawley
Children's Hospital Los Angeles
4650 Sunset Boulevard
Los Angeles, CA 90027
(323) 660-2450

Dr. Hawley, a former employee of PACE Healthcare Management, LLC in Los Angeles, California, is likely to have discoverable information regarding the development of the clinical editing expert criteria used in TriZetto's ClaimFacts and Facets clinical editing programs.

## II.    DESCRIPTION OF DOCUMENTS AND TANGIBLE THINGS

TriZetto identifies the following additional documents and categories of documents to supplement those identified in its initial disclosures of December 15, 2004. TriZetto hereby identifies and incorporates by reference all documents produced to McKesson thus far, including documents identified in TriZetto's prior supplemental initial disclosures of March 18, 2005 and April 21, 2005.

TriZetto reserves the right to supplement the documents and categories of documents disclosed in this matter and to seek discovery of additional categories of non-privileged documents relating to these and other topics as their relevance becomes known.

A.    All prior art references disclosed in TriZetto's response to McKesson's Interrogatory No. 6 and all supplements thereto.

Dated: September 13, 2005                    GIBSON, DUNN & CRUTCHER LLP

                                                            *Michael A. Sitzman /amo*

                                                            Michael A. Sitzman
                                                            One Montgomery Street
                                                            31st Floor
                                                            San Francisco, California 94104
                                                            (415) 393-8200

                                                            – and –

                                                            MORRIS, NICHOLS, ARSHT & TUNNELL
                                                            Jack B. Blumenfeld (No. 1014)
                                                            Rodger D. Smith, II (No. 3778)
                                                            1201 N. Market Street
                                                            Wilmington, Delaware 19899
                                                            (302) 658-9200

                                                            Attorneys for Defendant
                                                            The TriZetto Group, Inc.

40216217_1.DOC                              5

## DECLARATION OF SERVICE

I, the undersigned, declare that I am employed in the County of San Francisco, State of California; I am over the age of eighteen years and am not a party to this action; my business address is 1 Montgomery St, San Francisco, California 94104, in said County. and State, and on the date indicated below, I served the within:

### THIRD SUPPLEMENTAL INITIAL DISCLOSURES OF DEFENDANT THE TRIZETTO GROUP, INC. PURSUANT TO RULE 26(e)(1)

by placing a true copy thereof in an envelope addressed to each of the persons named below at the address shown:

☑ **BY MAIL:** I placed a true copy in a sealed envelope addressed as indicated above, on the above-mentioned date. I am familiar with the firm's practice of collection and processing correspondence for mailing. It is deposited with the U.S. Postal Service on that same day in the ordinary course of business. I am aware that on motion of party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

☐ **BY PERSONAL SERVICE:** I placed a true copy in a sealed envelope addressed to each person[s] named at the address[es] shown and giving same to a messenger for personal delivery before 5:00 p.m. on the above-mentioned date.

☑ **BY FACSIMILE:** From facsimile machine telephone number (415) 986-5309, on the abovementioned date, I served a full and complete copy of the above-referenced document[s] by facsimile transmission to the person[s] at the number[s] indicated.

☐ **BY FEDERAL EXPRESS:** I placed a true copy in a sealed envelope addressed as indicated above, on the above-mentioned date. I am familiar with the firm's practice of collection and processing correspondence for delivery by Federal Express. Pursuant to that practice, envelopes placed for collection at designated locations .during designated hours are delivered to Federal Express with a fully completed airbill, under which all delivery charges are paid by Gibson, Dunn & Crutcher, that same day in the ordinary course of business.

☐ **BY ELECTRONIC MAIL:** From an IBM computer, e-mail address msitzman@gibsondunn.com in PDF format, to the e-mail addresses listed in the following Service List on the date indicated.

☐ **(STATE)**    I declare under penalty of perjury under the laws of the State of California that the above is true and correct and that the foregoing document(s) were printed on recycled paper.

☑ **(FEDERAL)**    I declare that I am employed in the office of a member of the bar of this court or who has been admitted *pro hac vice* at whose direction the service was made.

Executed on September 13, 2005, at San Francisco, California

Michael V. Bresso

**SERVICE LIST**

By U.S. Mail:                                    By Email:
Jeffrey G. Randall                               jrandall@dden.com
David W. Hansen                                  dhansen@skadden.com
Michael C. Hendershot                            mhenders@skadden.com
Donna Hill                                       dhill@skadden.com
SKADDEN, ARPS, SLATE, MEAGHER &
FLOM LLP
525 University Avenue, Suite 1100
Palo Alto, CA 94301

Telephone: (650) 470-4500
Facsimile: (650) 470-4570


By U.S. Mail:                                    By Email:
Thomas J. Allingham II                           tallina@skadden.com
SKADDEN, ARPS, SLATE, MEAGHER &
FLOM LLP
One Rodney Square
P.O. Box 636
Willimington, DE 19899

Telephone: (302) 651-3000
Facsimile: (302) 651-3001


40216217_1.DOC