IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| MCKESSON INFORMATION SOLUTIONS LLC, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | C.A. No. 04-1258 (SLR) |
| THE TRIZETTO GROUP, INC., | ) ) | **REDACTED VERSION** |
| Defendant. | ) ) | |

**OPENING BRIEF IN SUPPORT OF THE TRIZETTO GROUP INC.'S
MOTION FOR SUMMARY JUDGMENT OF INVALIDITY
BASED ON THE ON-SALE BAR (35 U.S.C. § 102(b))**

<div style="margin-left:40%">

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Jack B. Blumenfeld (#1014)
Rodger D. Smith, II (#3778)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
  *Attorneys for Defendant The TriZetto Group, Inc.*

</div>

OF COUNSEL:

Jeffrey T. Thomas
David A. Segal
Michael A. Sitzman
GIBSON, DUNN & CRUTCHER LLP
Jamboree Center
4 Park Plaza
Irvine, CA 92614-8557
(949) 451-3800

Original Filing Date: June 1, 2006
Redacted Filing Date: June 8, 2006

**TABLE OF CONTENTS**

Page

I.      NATURE AND STAGE OF THE PROCEEDING ........................................................ 1

II.     SUMMARY OF ARGUMENT ................................................................................... 1

III.    STATEMENT OF FACTS .......................................................................................... 3

        A.      The '164 Patent ................................................................................................ 3

                1.      Claim 1:  Code Validation ...................................................................... 4

                2.      Claim 2:  Checking For Duplicate Codes .............................................. 5

        B.      History Of The Claimed Technology ............................................................. 7

                1.      Dr. Hertenstein's Manual System:  "Surgeon Bill Review" By
                        Caterpillar Inc. ...................................................................................... 7

                2.      HPI's Plan For A Software Product To Incorporate Dr.
                        Hertenstein's "Surgeon Bill Review" Process ....................................... 8

        C.      Early Disclosures Of The Patented Invention ............................................... 10

                1.      Fifteen Months Before The Critical Date, HPI Disclosed The
                        Patented Invention At A Pew Conference Entitled "Managing
                        Physician Fees" .................................................................................... 10

                2.      Dr. Egdahl & Dr. Hertenstein Present "The Caterpillar
                        Experience" To The American Surgical Association ........................... 11

        D.      One Year Before The Critical Date, HPI Launched A "First Step"
                Software Project With Aetna To Identify CPT Code Combinations
                That Were Considered "Incompatible" ......................................................... 12

        E.      Seven Months Before the Critical Date, HPI Used Dr. Hertenstein's
                Manual System To Review Claims For Aetna ............................................. 14

        F.      Two Months Before The Critical Date, HPI Offered Aetna Software
                That Would Review Claims In The Same Way That The Sun Claims
                Were Reviewed Manually .......................................................................... 16

IV.     ARGUMENT .......................................................................................................... 20

        A.      LEGAL PRINCIPLES .................................................................................. 20

i

## Table of Contents
## (Continued)

Page

1. Standard For Summary Judgment ............................................................. 20

2. Standard For Statutory On-Sale Bar Under 35 U.S.C. § 102(b) ............. 21

B. HPI MADE A COMMERCIAL OFFER FOR SALE OF THE PATENTED INVENTION TO AETNA BEFORE THE CRITICAL DATE .......................................................................................................... 22

    1. HPI's Actions And July 1987 Proposal Constitute A "Commercial Offer" For Sale ............................................................... 23

    2. HPI's July 1987 Proposal Constitutes An Offer To Sell The Patented Invention ......................................................................... 24

C. THE INVENTION WAS READY FOR PATENTING BEFORE THE CRITICAL DATE ............................................................................... 28

    1. Prior To the Critical Date, The Inventors Described The Invention In Sufficiently Specific Terms To Enable A Person Skilled In The Art To Practice The Invention ........................................ 29

    2. The Patented Invention Was Reduced To Practice Before The Critical Date ............................................................................... 33

V. CONCLUSION .............................................................................................. 35

# TABLE OF AUTHORITIES

<u>Page(s)</u>

## Cases

*Allen Eng'g Corp. v. Bartell Indus. Inc.*, 299 F.3d 1336 (Fed. Cir.  2002) ...................................... 4

*Apple Computer, Inc. v. Articulate Sys., Inc.*, 234 F.3d 14 (Fed. Cir. 2000) ................................ 21

*Barmag Barmer and Maschinensabrik AG v. Murata Mach Limited*, 731 F.2d 831 (Fed. Cir. 1984)............................................................................................................ 21

*Becton Dickinson & Co. v. C.R. Bard, Inc.*, 922 F.2d 792 (Fed. Cir. 1990) ................................ 21

*Brasseler, U.S.A. L.P. v. Stryker Sales Corp.*, 182 F.3d 888 (Fed. Cir. 1999) ............................ 22

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ....................................................................... 20

*General Electric Co. v. United States*, 1979 U.S. Ct. Cl. LEXIS 1008 ........................................ 23

*Group One, Ltd. v. Hallmark Cards, Inc.*, 254 F.3d 1041 (Fed. Cir. 2001) ..................... 22, 23, 24

*Intellicall, Inc. v. Phonometrics, Inc.*, 952 F.2d 1384 (Fed. Cir. 1992)......................................... 20

*Matsushita Elec. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986) .............................................. 21

*Pfaff v. Wells Elecs., Inc.*, 525 U.S. 55 (1998)............................................................ 21, 22, 28, 33

*RCA Corp. v. Data General Corp.*, 887 F.2d 1056 (Fed. Cir. 1989)............................................. 23

*Robotic Vision Systems, Inc. v. View Engineering, Inc.*, 1996 U.S. Dist. LEXIS 11917 (C.D. Cal. 1996)........................................................................................................ 32

*Robotic Vision Systems, Inc. v. View Engineering, Inc.*, 249 F.3d 1307 (Fed. Cir. 2001) ........................................................................................................... passim

*Scaltech, Inc. v. Retec/Tetra, L.L.C.*, 178 F.3d 1378 (Fed. Cir. 1999) ................................... 25, 34

*Scaltech, Inc. v. Retec/Tetra, L.L.C.*, 269 F.3d 1321 (Fed. Cir. 2001) ..................................... 3, 22

*The B.F. Goodrich Co. v. Aircraft Braking Systems Corp.*, 1994 U.S. Dist. LEXIS 21537 (D. Del. 1994) ............................................................................................................. 23

*UMC Elec. Co. v. United States*, 816 F.2d 647 (Fed. Cir. 1987).................................................. 22

**Table of Authorities**
**(Continued)**

Page(s)

**Statutes**

35 U.S.C. § 102(b) .................................................................................................................. 21

Fed. R. Civ. P. 56(c) .............................................................................................................. 21

## I.    NATURE AND STAGE OF THE PROCEEDING

On September 13, 2004, plaintiff McKesson Information Solutions, LLC ("McKesson") filed this suit against The TriZetto Group, Inc. ("TriZetto"), alleging that three of TriZetto's products (Facets, ClaimFacts and QicLink) infringe fifteen claims (Claims 1-6 and 8-16) of U.S. Patent No. 5,253,164 ("the '164 patent"). On October 1, 2004, McKesson amended its Complaint. On November 1, 2004, TriZetto answered and filed a counterclaim seeking a declaratory judgment of invalidity, unenforceability, and non-infringement.

Fact and expert discovery were completed in late 2005. The Court construed the patent claims in its April 5, 2006 Order (D.I. 307), which was later amended by an April 11, 2006 Order (D.I. 320). Also on April 5, 2006, the Court granted TriZetto's motion for summary judgment of non-infringement as to Claims 3-6 and 8-15. D.I. 301. A jury trial on infringement of the remaining claims – Claims 1, 2 and 16 – commenced on April 17, 2006. The jury returned a verdict finding literal infringement of Claims 1 and 2, but no infringement of Claim 16. D.I. 358.

The Court has scheduled a trial on the issues of willfulness, damages, invalidity, laches, equitable estoppel and inequitable conduct to commence on October 3, 2006. Dispositive motions concerning invalidity are scheduled to be heard on August 2, 2006. This is TriZetto's opening brief in support of its motion for summary judgment of invalidity based on the statutory on-sale bar provisions of 35 U.S.C. § 102(b) ("Section 102(b)").

## II.    SUMMARY OF ARGUMENT

McKesson's predecessors offered the patented invention for sale to Aetna Life and Casualty Insurance Co. ("Aetna") before the critical date for the '164 patent (September 30, 1987). Documents and disclosures made by McKesson's predecessors before and after the

1

commercial offer demonstrate that the invention was reduced to practice and ready for patenting before the critical date. This evidence triggers the on-sale bar provisions of Section 102(b), and the '164 patent is therefore invalid.

The following is a chronological summary of the key dates and evidence establishing a Section 102(b) bar, with a more detailed discussion in the remainder of the brief:

- March 1986        HPI and Dr. Hertenstein collaborate on "Health Bills," a project to evaluate Dr. Hertenstein's process and structure a software product to replicate the process for other companies.

- June 6, 1986       At HPI's Pew Conference presentation entitled, "Managing Physician Fees," the invention claimed in the '164 patent is publicly disclosed.

- September 1986   HPI and Aetna launch a "First Step" software project focusing on computerized screens for incompatible surgical procedures. Detailed CPT code-to-code rules and relationships are identified.

- February 1987    HPI and Aetna begin a claims auditing project comparing Dr. Hertenstein's manual process with Aetna's process on medical claims submitted by Aetna's client, Sun Company.

- April 1987         Dr. Egdahl and Dr. Hertenstein present "The Caterpillar Experience," to the American Surgical Association, and disclose Dr. Hertenstein's manual review process.

- July 2, 1987       HPI and Aetna meet to discuss: (i) the analysis and outcome of the incompatible surgery results; and (ii) the Sun medical claim audit and comparison. Aetna asks: "What are the alternative solutions for improving the accuracy of coding that could be readily integrated into Aetna's processing system?"

- July 29, 1987      HPI's Proposal to Aetna includes building "clinical decision rules for software that will assist in the claims processing units."

- September 14, 1987   Inventor Don Holloway informs HPI/HPR members, "We have a software product (MedReview)," incorporating the rules and relationships for reviewing surgical claims and outlines the deal between HPR and Aetna.

- September 30, 1987   Critical date for the '164 patent.

2

When these facts are combined with McKesson's position that the invention is any software program that performs the general code editing functions described in the patent, it becomes clear that McKesson's predecessor offered the invention for sale before the critical date. Given how broadly McKesson has construed the patent (*e.g.*, no limits on the algorithm of the software or the structure of the database), any offer to sell software to be used for clinical editing is an offer to sell the invention, and such offers did occur here.

### III.    STATEMENT OF FACTS

**A.    The '164 Patent**

The earliest application upon which the '164 patent claims priority was filed on September 30, 1988. The date exactly one year prior to the date of a patent application for a patent is known as the "critical date" for purposes of the statutory bars. *Scaltech, Inc. v. Retec/Tetra, L.L.C.*, 269 F.3d 1321, 1327 (Fed. Cir. 2001).

The patent application was filed by four inventors, Donald C. Holloway, Robert D. Hertenstein, George A. Goldberg and Kelli A. Dugan, and was assigned to HPR, Inc. ("HPR"). Prior to the formation of HPR, three of the four inventors (Holloway, Goldberg and Dugan) were employed by the Health Policy Institute ("HPI") at Boston University. The '164 patent ultimately issued on October 12, 1993, and is now owned by McKesson.

The '164 patent broadly claims an expert computer system for processing medical claims containing medical service codes. *See* Ex. 1 ['164 Patent], Abstract. As the Court indicated in its Claim Construction Order, the "computer system" described and claimed in the '164 patent is "any type of suitable computer system which can interact with the program of the present invention." D.I. 307 at 2. McKesson contends that the program of the present invention is simply any "commercially available . . . software" known to those of ordinary skill in the art

3

that is programmed to carry out the functions described in the claims. *See, e.g.*, D.I. 170 at 18, 21, 22, 25, 39 (McKesson's Opening Claim Construction Brief); D.I. 255 at 9, 19 (McKesson's Answering Claim Construction Brief).

A Section 102(b) bar is evaluated on a claim-by-claim basis. *Allen Eng'g Corp. v. Bartell Indus. Inc.*, 299 F.3d 1336 (Fed. Cir. 2002). Claims 1 and 2 are the only claims of the '164 patent still remaining in this case. Based on the Court's claim construction and the positions McKesson has taken herein (including at the April 2006 infringement trial), Claims 1 and 2 are exceedingly broad and simple.

### 1.    Claim 1:  Code Validation

Claim 1 describes a method for performing medical code validation – *i.e.*, determining whether a medical code on a submitted claim is a valid CPT code contained in the computer's database. The steps of Claim 1 are as follows:

> receiving a medical claim;
>
> determining if the medical codes listed on that claim are not present in a "predetermined database" – defined by the Court as "a set of decision-making rules that incorporate a medical code classification system and expert medical clinical judgment" (D.I. 307 at 3); and
>
> informing the user that a medical code is not present in the predetermined database.

In its effort to establish infringement at the April 2006 trial, McKesson argued that the method of Claim 1 does *not* require actually using the predetermined database. McKesson's expert, Dr. Mark Musen, testified that Claim 1 could be performed by checking *any* database or list of all CPT codes – the predetermined database itself need not be checked or used

in any way.  Ex. 2 [Trial Tr.] at 437:17-22 ("My reading of Claim 1 is that there's no language that describes how the validity check needs to be made.  Q.  Whether it checks any database? A. Whether it checks any database or phones a friend."); 487:25-489:7.  Because the TriZetto products do not use a "predetermined database" to validate CPT codes, McKesson was compelled to make this argument to establish infringement of Claim 1.  Accordingly, based on McKesson's position taken during trial, Claim 1 covers medical code validation performed using *any* database or list of CPT codes.

> 2.    **Claim 2:  Checking For Duplicate Codes**
>
> The steps of Claim 2 are as follows:
>
> 1)    receiving a medical claim;
>
> 2)    ascertaining whether the claim contains more than one medical code;
>
> 3)    determining whether a code on the claim is "mutually exclusive due to non-medical criteria" with another code on the claim;
>
> 4)    authorizing codes that are not "mutually exclusive"; and
>
> 5)    rejecting codes that are "mutually exclusive."

Based on McKesson's arguments at the April 2006 trial, Claim 2 covers a method for identifying and correcting medical claims containing "billing issues," including, for example, duplicate codes.  Although a "predetermined database" is mentioned in the preamble to Claim 2, it is not actually invoked in the steps of the method.  McKesson contended that the method of Claim 2 did not require the "predetermined database," because the steps did not expressly mention that limitation.  D.I. 255 at 25-26.  Embracing McKesson's position, the Court did not construe Claim 2 to require use of the "predetermined database" in the steps of the method.  D.I. 307.

Accordingly, McKesson cannot rely on the "predetermined database" to save Claim 2 from a finding of invalidity.

Given that the patent specification never defines the terms "mutually exclusive" or "non-medical criteria," it is not surprising that McKesson never attempted to define these terms and struggled to find examples to fit Claim 2 at trial. At trial, McKesson's counsel questioned TriZetto employee Karen Lampe regarding certain edits that the MediCare rules call "mutually exclusive" edits, which are incorporated into TriZetto's products. Ex. 2 [Trial Tr.] at 1033:18-1036:12. One example of those "mutually exclusive" edits is a rule that initial and subsequent medical services should not be billed at the same time. *Id.* at 1039:17-21. Counsel characterized that situation as "double billing." *Id.* at 1039:22-25. In closing argument, McKesson's counsel told the jury that identifying "double billing" was one "concrete example" of a Claim 2 process:

> We don't need a doctor to tell us that it's not exclusively a medical criteria to say that when you go visit a doctor, you should only be charged once for that visit. All right? We all know that. We don't – in life we don't want to be double-billed for anything, but that's not a medical issue. It is a strictly administrative billing issue. Let's not bill twice. Let's not bill the insurance companies. Let's not bill the patients. Let's not bill anybody twice. That's a simple non-medical issue, and there are others, like Dr. Musen testified to as well. . . .
>
> [W]e've talked about the double billing. I mean, I asked, if you need a doctor or medical judgment to determine that you shouldn't be double-billed, and [Ms. Lampe] said no, and you don't. . . . [T]he determining step [of Claim 2] [is] satisfied.

Ex. 2 [Trial Tr.] at 1202:14-25; 1228:21-1229:2; 1293:3-1294:15 ("And it says, you can't bill the initial and subsequent visit at the same time. And I said that's like double billing, and she [Karen Lampe] said yes."). Consequently, based on McKesson's arguments at trial, Claim 2 covers a

method for eliminating double billing – *i.e.*, identifying and correcting medical claims containing duplicate codes.

**B.**    <u>History Of The Claimed Technology</u>

The technology described in the '164 patent pertains to physician billing. Physicians receive payment for their medical services by submitting medical claims to insurance companies, health maintenance organizations (HMOs), preferred provider organizations (PPOs), and other health benefit providers. *See* Ex. 1, Cols. 1-2. Typically, the physician will list on a medical claim certain "medical service codes," which indicate the particular services or procedures performed for that patient. The medical service codes most commonly used are the Current Procedural Terminology ("CPT") codes, developed by the American Medical Association ("AMA") (*id.*, Col. 2:21-23) and reflect a wide range of medical services and procedures (*e.g.*, "exploration of the abdomen," "partial colectomy") (*id.*, Col. 3:38-68).

From time to time, some physicians submit medical claims with invalid codes or code combinations. *Id.*, Col. 2:8-14. In some instances, these coding errors are merely inadvertent. In other cases, the physician may deliberately submit codes to secure greater reimbursement for his or her services. *Id.* In response to these coding problems, manual techniques evolved by which medical claim reviewers identified and corrected coding errors. *Id.*, Col. 3:25-29.

**1.**    **Dr. Hertenstein's Manual System:  "Surgeon Bill Review" By Caterpillar Inc.**

Since the early 1950's, Caterpillar Inc. ("CAT") directly provided health care benefits to its employees; *i.e.*, it was self-insured for health care. It also handled all administration of its health care program internally, including the processing of medical claims.

7

Ex. 3. Like many other providers, CAT experienced a tremendous rise in health care costs and expenses in the 1970's. *Id.* In 1983, CAT implemented a manual review process called the "Surgeon Bill Review" process that was designed and administered by Dr. Robert Hertenstein, one of the inventors of the '164 patent.    **REDACTED**

The Surgeon Bill Review process required claims processors at CAT to examine each incoming physician bill and perform a coding analysis of CPT-4 codes that was created by Dr. Hertenstein.    **REDACTED**    . Obvious simple coding errors, *e.g.*, invalid or duplicate codes, would be corrected first. *Id.;*    **REDACTED**    . Next, individuals with clinical knowledge and judgment ("surgeon reviewers") would compare the provider's description of services with the submitted codes.

Ex. 7 [Holloway et al., "The Caterpillar Method"] at MCK 048030. Having reviewed and processed thousands of surgical claims, the surgeon reviewers developed "rules of thumb" for when codes could be accepted or changed. *Id.* Once enough information had been gathered to ensure consistency with Dr. Hertenstein's review process, recoding the medical claim would be finalized to produce the correct codes.

**REDACTED**

2.    **HPI's Plan For A Software Product To Incorporate Dr. Hertenstein's "Surgeon Bill Review" Process**

In 1986, CAT approached HPI to evaluate the effects of its Surgeon Bill Review process. Exs. 3, 8. HPI conducted a comparison of Dr. Hertenstein's manual review process "to

those used by claims administrators for two other large corporations." Ex. 7. HPI concluded that CAT had achieved significant savings using Dr. Hertenstein's manual process, and that "several large corporations and claims administrators have expressed interest in gaining access to this expertise." *Id.*

In March 1986, HPI designed and defined what was then called the "Health Bills" project, in which HPI would '

**REDACTED**

. As set forth in the "Product Definition" of Health Bills, the contemplated product would carry out the following steps:

**REDACTED**

At this early stage (two and a half years before the patent application was filed), HPI clearly envisioned a software product that would incorporate Dr. Hertenstein's manual

9

review process. As described by HPI, the Health Bills product was the earliest description of the
patented invention.[1]

C.     **Early Disclosures Of The Patented Invention**

    1.     **Fifteen Months Before The Critical Date, HPI Disclosed The
Patented Invention At A Pew Conference Entitled "Managing
Physician Fees"**

        In June 1986, HPI delivered a presentation on Health Bills to a forum of Pew
Fellows in which the patented invention was described .

        . The Pew Conferences, which occurred in the mid to late
1980s, brought together "employees of various corporations who were concerned with the health
and/or benefit program of that corporation" to discuss health benefits and related business issues.
Ex. 13 [Goldberg Dep. Tr.] at 108:12-110:15; 214:14-25. As set forth in the presentation outline,
HPI discussed "The Model Approach to Physician Fee Review: Implemented and Tested by
Caterpillar," and explained that HPI's approach would include:

---

[1]    The Health Bills product would later become known as "MedReview," which, due to
trademark restrictions, would be renamed "CodeReview." *See* Ex. 10 at MCK 119940;
Ex. 11 at MCK 119729; Ex. 5 [Hertenstein Dep. Tr.] at 111:10-15; Ex. 12 [Dugan Dep.
Tr.] at 120:6-11 *and* Ex. 13 [Goldberg Dep. Tr.] at 178:11-14 ("Everything I was telling
you about MedReview was HealthBills. Every time I said 'MedReview' . . . I meant
Health Bills.").

        The CodeReview product by HPR is cited throughout the
'164 patent as embodying the patented invention. *See, e.g.,* Ex. 1 [Col. 3:17-25 &
Appendix A "Typical Session with CodeReview"].

10

' (emphasis added).  HPI concluded the presentation by declaring,

*Id.* at MCK 119639.  Fifteen months before the critical date, HPI had publicly announced its intention to market the software claims review system that was eventually claimed in the '164 patent.

## 2.    Dr. Egdahl & Dr. Hertenstein Present "The Caterpillar Experience" To The American Surgical Association

In April 1987, Dr. Hertenstein and HPI director, Dr. Richard Egdahl, presented an article for publication and discussion at the 107th Annual Meeting of the American Surgical Association in Palm Beach, Florida.  *See* Ex. 23 [Egdahl et al., "The Caterpillar Experience"] at MCK 035619-627.  The article offered a detailed explanation of all the steps of Dr. Hertenstein's manual process developed at CAT.  *Id.*  The article included examples of specific medical coding problems and explained how those problems were resolved by authorizing payment of some codes and rejecting others.  *Id.* at MCK 035621-622.  The article also explained that Dr. Hertenstein's technique could be integrated into computerized claims processing systems already in use:

> [T]he CAT process is a workable and market-tested solution to the need to balance access and cost management.  It is suitable for large corporations such as CAT with both self-funded and self-administered health benefits.  It can also be used (after eligibility is certified and benefits are coordinated) by claims processing systems.

11

*Id.* at MCK 035623.  As acknowledged by McKesson's expert, this article disclosed all the steps of Dr. Hertenstein's manual process.  *See* Ex. 22 [Musen Dep. Tr.] at 134:8-136:20; 261:21-262:4.

**D.     One Year Before The Critical Date, HPI Launched A "First Step" Software Project With Aetna To Identify CPT Code Combinations That Were Considered "Incompatible"**

In September 1986, HPI and Aetna began working on a software project to identify CPT code combinations from _____ REDACTED _____

This "First Step" focused on surgical operations that occurred during the same admission, and identified the corresponding CPT codes that should not occur together.

REDACTED

To carry out this project, HPI proposed using computer screens to identify the incompatible surgeries on a CPT code by code basis.  As described by HPI,

REDACTED

From the results of the study,

REDACTED     Below is a small illustration of HPI's findings:

12

**REDACTED**

As shown above, HPI determined that in connection with a hysterectomy, certain surgical procedures done at the same time (*i.e.*, enterotomy, excision of small intestine, cholocystectomy) were either inconsistent or incompatible and should not be allowed. HPI identified the specific CPT-4 codes that corresponded with each of these incompatible procedures (*i.e.*, 58150-58285, 51597, 51925, 59135, 59580-5951 with 44020, 44025, 44110-44115). These are examples of code-to-code rules and relationships that HPI described in the '164 patent and disclosed to Aetna before the critical date. Ex. 1, Cols. 5:68-6:16 ("These rules were derived using the CPT-4 classification system, and from various medical procedures which were examined, classified, and possible combinations of procedures assessed by expert medical specialists."); Ex. 16.

At the conclusion of this project, HPI prepared a report to Aetna enclosing the foregoing coding rules and relationships, and detailing the '

**REDACTED**

According to HPI, the computer screens had '

**REDACTED**

13

E.     **Seven Months Before the Critical Date, HPI Used Dr. Hertenstein's**
       **Manual System To Review Claims For Aetna**

In February 1987, HPI approached Aetna to demonstrate the savings that could be obtained by applying Dr. Hertenstein's Surgeon Bill Review process.

**REDACTED**

In May 1987, HPI prepared a report for Aetna and Sun containing detailed findings and specific comparisons of the outcomes HPI obtained. Ex. 18 [HPI's Final Report re: Sun Claims] at MCK 119696-707. Several individual case studies were highlighted to illustrate the advantages of Dr. Hertenstein's manual review process. Highlighted below is one of the case studies, where two identical CPT codes (67226) were submitted on a single claim by a Provider/Physician. The illustration shows how the two CPT codes were handled by Aetna ("Aetna Code"), and how the two CPT codes were processed using Dr. Hertenstein's manual review process ("CAT Code").

**REDACTED**

14

**REDACTED**

As indicated above, Dr. Hertenstein's manual review process identified the duplicate code error, which went undetected by Aetna's review process. *Id.* As noted at the bottom,

**REDACTED**                          . This is the *exact same* code edit that McKesson claims is covered by Claim 2 of the '164 patent. Ex. 2 [Trial Tr.] at 1293:3-1294:13. And yet, it was disclosed to Aetna *four months before the critical date*. It is an identical procedure performed a second time as part of a subsequent visit. McKesson calls this "double billing" and a "concrete example" of a Claim 2 process. Ex. 2 [Trial Tr.] at 1202:14-25; 1228:21-1229:2; 1293:3-1294:15 (McKesson's counsel argues to the jury: "And it says, you can't bill the initial and subsequent visit at the same time. And I said that's like double billing, and she [Karen Lampe] said yes.").

In its final report to Sun, HPI explained the significant savings that would be achieved using Dr. Hertenstein's manual review process, and that '

**REDACTED**

**REDACTED**

. On July 2, 1987, HPI and Aetna met to review the "First Step" computer screens for incompatible surgeries and the results of the comparison study for Sun.                                        In discussing the savings from the Sun comparison study, Aetna asked for '      **REDACTED**

**F.      Two Months Before The Critical Date, HPI Offered Aetna Software That Would Review Claims In The Same Way That The Sun Claims Were Reviewed Manually**

On July 29, 1987, HPI sent an offer to sell what would become the patented invention. *See* Ex. 20 at MCK 119859-60, 047992-048002. HPI's proposal was to design and implement software to review claims in the same way that the Sun claims were reviewed; *i.e.*, using Dr. Hertenstein's method. *Id.* As inventor Dr. Don Holloway explained in his cover letter,

**REDACTED**

In answering Aetna's question about integrating a solution into Aetna's processing system, HPI explained:

**REDACTED**

16

**REDACTED**

HPI explained its familiarity with a product known as Autocoder that validated CPT codes and had the ability to turn medical terminology into codes. *Id.* at MCK 047994. HPI cautioned Aetna that, '

**REDACTED**

To address these shortcomings, HPI explained that its software solution

**REDACTED**

Discussions between HPI and Aetna following the July 1987 proposal reveal that the offer was discussed, considered and pursued it. Sometime prior to September 14, 1987, Aetna had its lawyers draw up documents formalizing an option to buy the product, referred to in September as MedReview. Ex. 11 [9/14/87 HPR Memo re: Aetna Deal] at MCK 119729-36. In

17

an internal HPR[2] Memorandum dated two weeks before the critical date, Dr. Holloway

explained HPR's need for legal assistance to respond to Aetna's option to buy MedReview.  "In

REDACTED

As described by Dr. Holloway:

REDACTED

*Id.*  In this pre-critical date memorandum, Dr. Holloway outlines to the members of HPR and

inventor Dr. Hertenstein several significant and important details of HPI's commercial offer to

sell the patented invention to Aetna and the current state of the MedReview product.

*First*, Dr. Holloway describes HPR's existing MedReview software product as a

REDACTED

Specifically, Dr. Holloway explains each of the four key components of the MedReview product

as:

---

2    HPR was first incorporated on September 28, 1987.  HPR was formed by the medical
review study team at HPI.  *See, e.g.*, Ex. 4 [Holloway Dep. Tr.] at 40:13-42:18 *and* Ex. 5
[Hertenstein Dep. Tr.] at 9:13-12:9.  The founding members of HPR included
Dr. Holloway and Dr. Hertenstein.  *Id.*    REDACTED

18

**REDACTED**

**REDACTED**

*Second*, Dr. Holloway explains that HPR has already purchased a license for the Texas Instrument ("TI") expert shell – called Personal Consultant Plus(tm) – to use the software to develop, test, and demonstrate MedReview. *Id.*[3]

*Third*, HPR specifies three licensing and subscription service options offered to Aetna (*id.* at MCK 119731),[4] and discusses Aetna's purchase of other comparable products. *Id.* at MCK 119732.[5]

_____

**REDACTED**

[4]

[Footnote continued on next page]

19

*Fourth*, and most importantly, in response to HPR's offer for sale, Aetna had its lawyers draw up a contract to obtain an option for purchasing MedReview. *Id.* at MCK 119736.[6]

This detailed pre-critical date memorandum from Dr. Holloway demonstrates that HPI had offered to create and sell software to Aetna that would review Aetna's claims in the same way that HPI had reviewed Sun's claims using Dr. Hertenstein's manual system.

## IV.    ARGUMENT

### A.    <u>LEGAL PRINCIPLES</u>

#### 1.    <u>Standard For Summary Judgment</u>

The Supreme Court's decision in *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986), requires the party bearing the burden of proof at trial to come forward with facts showing that there is a genuine issue of material fact for trial. *Id.* at 321-22. As the Supreme Court held in *Celotex*, "the plain language of Rule 56(c) mandates the entry of summary judgment . . . against the party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322. This standard has been adopted in patent cases as well. *See, e.g., Intellicall, Inc. v. Phonometrics, Inc.*, 952 F.2d 1384, 1389 (Fed. Cir. 1992) (affirming summary judgment of non-

---

[Footnote continued from previous page]

## REDACTED

[6]    In describing the success of HPI's prior "Quality-of-Care" Monitoring Screens project for Aetna, the memo states that Aetna had offered three approaches that they might consider for MedReview, and because '     REDACTED

McKesson has not produced the attached document to TriZetto in this case.

infringement because of patent owner's failure of proof); *Barmag Barmer and Maschinensabrik AG v. Murata Mach. Ltd.*, 731 F.2d 831, 835 (Fed. Cir. 1984) (summary judgment is appropriate in a patent case as in any other).

Summary judgment is proper if "there is no genuine issue as to any material fact," and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). Rule 56(e) requires the nonmoving party to respond by submitting evidentiary materials that designate "specific facts showing that there is a genuine issue for trial." *See, e.g., Matsushita Elec. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The invalidity of the claims of a patent is an appropriate issue for summary judgment. *See, e.g., Apple Computer, Inc. v. Articulate Sys., Inc.*, 234 F.3d 14, 24 (Fed. Cir. 2000); *Becton Dickinson & Co. v. C.R. Bard, Inc.*, 922 F.2d 792, 795 (Fed. Cir. 1990) ("As in other cases, the grant of summary judgment under Fed. R. Civ. P. 56, is appropriate in a patent case where no genuine issue of material fact exists and the movant is entitled to judgment as a matter of law.").

## 2.    Standard For Statutory On-Sale Bar Under 35 U.S.C. § 102(b)

Section 102(b) provides in relevant part that "[a] person shall be entitled to a patent unless ... the invention was ... on sale in this country, more than one year prior to the date of application for patent in the United States...." 35 U.S.C. § 102(b). The Supreme Court has established a two-prong test governing the application of the on-sale bar: "First, the product must be the subject of a commercial offer for sale.... Second, the invention must be ready for patenting." *Pfaff v. Wells Elecs., Inc.*, 525 U.S. 55, 67 (1998). The second prong may be satisfied in at least two ways: By proof that prior to the critical date the inventors disclosed the invention in sufficiently specific detail to enable a person skilled in the art to practice the invention; or by proof that prior to the critical date the invention was reduced to practice. *See id.*

21

at 66-67.  Whether an invention is "on-sale" within the meaning of Section 102(b) is a question of law based on underlying factual findings.  *Brasseler, U.S.A. L.P. v. Stryker Sales Corp.*, 182 F.3d 888, 889 (Fed. Cir. 1999).  Invalidity under Section 102(b) requires proof by clear and convincing evidence that the patented device was "on-sale" before the critical date.  *Group One, Ltd. v. Hallmark Cards, Inc.*, 254 F.3d 1041, 1045-46 (Fed. Cir. 2001).

Once the prima facie facts of an on-sale bar are established, the patent owner is called upon to come forward with an explanation of the circumstances surrounding what would otherwise appear to be commercialization outside the one-year grace period.  *UMC Elec. Co. v. United States*, 816 F.2d 647 (Fed. Cir. 1987).  In the context of software patents, the on-sale bar is triggered by a prior commercial offer for sale, and a subsequent enabling disclosure that demonstrates that the invention was ready for patenting before the critical date.  *Robotic Vision Systems, Inc. v. View Engineering, Inc.*, 249 F.3d 1307, 1313 (Fed. Cir. 2001) ("[W]hether or not the software needed to implement the claimed method existed at the time of the disclosure is irrelevant, provided that the disclosure of the invention was made prior to the critical date and was sufficiently specific to enable a person skilled in the art to practice the invention.").  HPI's offer to sell Aetna the computerized system to identify coding errors and "incompatible surgical procedures," before the critical date, coupled with the detailed descriptions and disclosures of the patented invention serve to invalidate the '164 patent.

## B.    HPI MADE A COMMERCIAL OFFER FOR SALE OF THE PATENTED INVENTION TO AETNA BEFORE THE CRITICAL DATE

Under the first prong of the *Pfaff* test, two conditions must be satisfied to establish that the product was the subject of a commercial offer for sale.  First, the offer must be a "commercial offer."  Second, the offer must include the patented invention.  *Scaltech, Inc. v.*

*Retec/Tetra, L.L.C.*, 269 F.3d 1321, 1328 (Fed. Cir. 2001). HPI's proposals and offer to Aetna satisfy both of these conditions.

1.    **HPI's Actions And July 1987 Proposal Constitute A "Commercial Offer" For Sale**

To constitute a commercial offer, the offer must rise to the level of a commercial offer for sale. *Group One Ltd. v. Hallmark Cards, Inc.*, 255 F.3d 1041, 1048 (Fed. Cir. 2001). It is not necessary that a sale be consummated for the bar to operate. *RCA Corp. v. Data General Corp.*, 887 F.2d 1056, 1062 (Fed. Cir. 1989). Moreover, no one specific phrase is necessarily controlling, but rather the entire set of interactions between the parties will determine if a commercial offer has been made. *Group One*, 255 F.3d at 1048.

Even before the July 1987 proposal was made, HPI engaged in conduct that establishes that a commercial offer for sale was made. For example, HPI had a meeting at Aetna on July 2, 1987, at which the parties specifically discussed how ʹ

and that ʹ                          **REDACTED**

In advance of the July 2 meeting, the technical results of the "First Step" software project were distributed, which included the CPT code analysis of the incompatible surgical procedures. Ex. 16 [6/23/87 HPI Letter & Report to Aetna]. Additionally, the Sun claims comparison analysis was also distributed. Ex. 18 [5/87 HPI Final Report re: Sun Claims]. Technical meeting presentations that are a necessary part of the sales strategy designed to induce purchase of the patented process constitute a "definite offer to sell." *The B.F. Goodrich Co. v. Aircraft Braking Systems Corp.*, 1994 U.S. Dist. LEXIS 21537, **94-95 (D. Del. 1994); *see also General Electric Co. v. United States*, 1979 U.S. Ct. Cl. LEXIS 1008, **44-45, 47 (finding that

23

plaintiff's meeting with technical people at the potential vendor's site "to discuss progress to date" on a system incorporating the patented component constituted a definite offer to sell). And, as reflected in Dr. Holloway's July 29 letter, it was the discussion and review at the July 2 meeting that resulted in the July 29 proposal. Ex. 20 [HPI's July 1987 Proposal to Aetna] at MCK 119859.

On July 29, 1987, HPI presented a written proposal to Aetna that constituted a commercial offer for sale, stating that HPI would

## REDACTED

. Aetna could have made HPI's offer into a binding contract by simple acceptance. Indeed, there was a signature line for Aetna under the heading, **REDACTED** Accordingly, HPI's offer constitutes an offer for sale under Section 102(b). *Group One*, 255 F.3d at 1048.

Subsequent discussions between the parties show the parties understood that an offer had been made. By September 14, 1987 (two weeks before the critical date), Aetna had its lawyers draw up documents formalizing an option to buy the MedReview product. Ex. 11. These discussions were sufficiently advanced that Dr. Holloway was preparing to obtain legal assistance for HPI/HPR

## REDACTED

**2.    HPI's July 1987 Proposal Constitutes An Offer To Sell The Patented Invention**

If the process that was offered for sale inherently possessed each of the claim limitations, then the process was on sale, whether or not the seller recognized that the process

24

possessed the claimed characteristics. *Scaltech, Inc. v. Retec/Tetra, L.L.C.*, 178 F.3d 1378, 1384

(Fed. Cir. 1999).  HPI's July 1987 proposal specifically included processes for

and                **REDACTED**

.  HPI offered to sell software to review Aetna's claims

in the same way that HPI had processed Sun's claims, using Dr. Hertenstein's manual system.


**REDACTED**


Dr. Hertenstein's manual system included all of the steps of Claims 1 and 2,

particularly  as  McKesson  interpreted  the  claims  during  the  infringement  trial  in  April.

Dr. Hertenstein testified that all of the steps in Claim 1 occurred at CAT as part of his manual

process, including code validation for Claim 1.


**REDACTED**


.  Dr. Hertenstein also testified that all steps

of Claim 2 occurred at CAT as part of his manual process, including duplicate code checking.

**REDACTED**          .  *See also* Ex. 13 [Goldberg Dep. Tr.] at 300:18-

302:10 (also discussing that all steps of Claim 2 occurred as part of Dr. Hertenstein's manual

system);          **REDACTED**          ; *and* Ex. 12 [Dugan Dep. Tr.] at 91:10-94:5.  In

fact, HPI showed Aetna exactly how Dr. Hertenstein's manual review process performed the

25

steps of Claim 2, when it illustrated Case Study #4 from the Sun claims comparison. *See supra* Section III.E.

The inventors of the '164 patent testified consistently that Dr. Hertenstein's manual system performed the same functionality as the patented invention CodeReview, which was previously known as MedReview and Health Bills.[7]

**REDACTED**

The decision-making rules in the patented invention were drawn directly from the rules that Dr. Hertenstein had been applying manually at CAT.    **REDACTED**    . Indeed, CodeReview was based on Dr. Hertenstein's manual code-checking technique. *See* Ex. 21 ["Development of CodeReview's Medical Knowledge Base"] at MCK 050516. Dr. Hertenstein's manual system reached the same results as the patented software.

**REDACTED**

Following the July proposal, but before the critical date, inventor Dr. Don Holloway described HPI/HPR's product offered to Aetna as follows:

**REDACTED**

---

[7]    See supra n.1.

REDACTED

MedReview included:

REDACTED

These are the same three basic components of the preferred embodiment described in the '164 patent. *Compare id.* at MCK 119730 *with* Ex. 1, Col. 4:23-25; Fig. 1 (Figure 1 diagrams "a preferred embodiment of the present invention," comprising a "Knowledge Base; Knowledge Base Interpreter; and User Interface Computer System").    At deposition, Dr. Holloway confirmed

REDACTED

The following facts demonstrate that the software offered to Aetna was the same software described in the patent:

- The claims in the patent describe using automation to replicate Dr. Hertenstein's manual claim review process. As Dr. Hertenstein testified:

REDACTED

REDACTED


- Dr. Hertenstein used his manual system to review the Sun claims for Aetna and then HPI offered to sell Aetna software that would replicate that manual system. Dr. Hertenstein testified as follows:


REDACTED


Thus, there is no doubt that the software product proposed to Aetna was the same as what is described in the '164 patent.

C.    **THE INVENTION WAS READY FOR PATENTING BEFORE THE CRITICAL DATE**

        The second prong of the *Pfaff* test can be satisfied in at least two ways:  By proof that prior to the critical date the inventors disclosed the invention in sufficiently specific detail to enable a person skilled in the art to practice the invention; or by proof that prior to the critical date the invention was reduced to practice.  *See Pfaff*, 525 U.S. at 66-67.  While evidence of both exists in this case, proof of both is not required in order to show that the invention was ready for patenting.  *See, e.g., id.* at 68; *Robotic Systems*, 249 F.3d at 1311-12;

28

1. **Prior To the Critical Date, The Inventors Described The Invention In Sufficiently Specific Terms To Enable A Person Skilled In The Art To Practice The Invention**

Implementation of the actual software is not required to determine whether the '164 patent was ready for patenting. *Robotic Systems*, 249 F.3d at 1311 ("[W]hether or not the software needed to implement the claimed method existed at the time of the disclosure is irrelevant, provided that the disclosure of the invention was made prior to the critical date and was sufficiently specific to enable a person skilled in the art to practice the invention.") According to McKesson, the invention claimed by the '164 patent is not limited to any specific software or algorithm or any specific structure or content of the "predetermined database." *See* Ex. 2 [Trial Tr.] at 487:25-489:7; 1202:14-25; 1228:21-1229:2. Indeed, the structure and content of the "predetermined database," is neither disclosed nor claimed in the '164 patent. *See* Ex. 1. Additionally, while McKesson at one time argued that the metarules of Appendix B were "the heart of the invention" (D.I. 170 at 30), it then abandoned the metarules as being relevant to the scope of the invention or claim construction. It successfully argued that Claims 1 and 2 are not limited by anything in the patent specification, including the metarules of Appendix B. As a result, the Court's claim construction did not incorporate the Appendix B metarules or any other limitations into Claims 1 and 2. D.I. 307. What remains of the invention claimed by the '164 patent is the use of any "commercially available" software that could be used to access any database containing any code relationships to carry out the simple functions of Claims 1 and 2. And, McKesson's own expert has admitted that anyone skilled in the art in 1987 could do so. Ex. 22 [Musen Dep. Tr.] at 141:22-142:2 ("Q. I think you also testified this morning that a person of ordinary skill in the art, looking at that functionality, would need nothing more because they could write the software program to carry out that functionality. A. That's correct."); 147:22-148:10 ("Q. But there is no software program that's described to carry that function out,

is there? . . . THE WITNESS:  Well, what is disclosed is that this is all implementable using commercial software systems and basically dBase, and entering information into a computer program is a relatively straightforward thing to do.  It doesn't require a lot of elaboration for someone skilled in the art to know how to input data.").

Fifteen months before the critical date, HPI disclosed the concept of the '164 patented invention to an audience of Pew Fellows. Ex. 14 [5/30/86 HPI Letter & Outline re: Pew Conference].  Dr. Musen admits that this Pew Conference presentation reflects the invention of the '164 patent.  Ex. 22 [Musen Dep. Tr.] at 174:19-25.  In April 1987, Drs. Egdahl and Hertenstein disclosed all of the steps performed manually by Dr. Hertenstein to the American Surgical Association in a paper entitled "The Caterpillar Experience."  See Ex. 23; Ex. 22 [Musen Dep. Tr.] at 134:8-136:20; 261:21-262:4.  Again, Dr. Musen admits that the article discloses all of the steps of the '164 patent except for the computer automation.  Id. at 261:21-262:4.  Dr. Musen also admits that it would have been obvious to a person of ordinary skill in the art to write a software program to address the coding problem in the article.  Id. at 141:22-142:2; 147:22-148:10; 245:20-246:6.

When HPI began working with Aetna in 1987, it began carefully studying and describing CPT codes and relationships for incompatible surgeries.  See Ex. 16 [6/23/87 HPI Letter to Aetna].  HPI generated for Aetna detailed lists of specific CPT code relationships that it determined were incompatible or inconsistent, and that should be the basis for a database.  Id. at MCK 039592-97.  HPI then used Dr. Hertenstein's manual system to review claims for Aetna's client, Sun (see, e.g., Exs. 10, 17), and to demonstrate the savings that could be obtained.  In its published report to Aetna (and Sun), HPI specifically highlighted the fact that Dr. Hertenstein's system was able to detect *the very same duplicate coding errors* that McKesson has claimed in

30

this case are covered by Claim 2 of the '164 patent. *Compare* Ex. 18 [5/87 HPI Final Report re: Sun Claims] at MCK 119704 *with* Ex. 2 [Trial Tr.] at 1293:3-1294:15.

McKesson may argue that since the process was not performed by a computer, it cannot be invalidating. That position is without merit given McKesson's early 1986 disclosures (*i.e.*, the Pew Conference and Health Bills) of a software product that would incorporate Dr. Hertenstein's manual system and McKesson's position herein that *any* software that performs the functions is within the scope of the patent.

As early as March 1986, HPI disclosed and described the use of software to incorporate the manual process used by Dr. Hertenstein. Ex. 9 [3/14/86 HPI Letter to Dr. Hertenstein re: Health Bills] at MCK 119618-19. When Aetna inquired about

## REDACTED

`HPI responded with a proposal that included:

## REDACTED

Having disclosed the concept, the problem, the solution, and even some of the code-to-code relationships, and having performed the patented process for Aetna in reviewing claims, the only thing that remained was to use "commercially available" software to write the computer program.

In *Robotic Systems*, the on-sale bar was triggered by a prior commercial offer for sale, and a subsequent enabling disclosure that demonstrated that the invention was ready for

patenting prior to the critical date. *Id.* at 1313.[8]  Based on the positions taken by McKesson during the April 2006 trial, there can be little doubt that the disclosures made by the inventors prior to the critical date were sufficient to enable a person of ordinary skill in the art to practice the invention.   Indeed, McKesson has repeatedly argued that the software necessary to implement the patented process was any commercially available software known to those skilled in the art.  D.I. 170 at 18, 21, 22, 25, 39; D.I. 255 at 9, 19.  And, McKesson's expert, Dr. Musen, has admitted that the tools necessary to build a knowledge-based system around Dr. Hertenstein's manual system were available and publicly known in 1987.  *See, e.g.*, Ex. 22 [Musen Dep. Tr.] at 186:14-187:1.  McKesson has disavowed any claim that the software consisted of any specific algorithm, or was unknown to those skilled in the art.  Thus, the disclosures made by HPI from 1986 to the critical date constitute enabling disclosures demonstrating that the invention was ready for patenting.  That HPI may not have had a completed software product is "irrelevant" to this analysis.  *Robotic Systems*, 249 F.3d at 1311 n.2.

If the invention here was limited by a specific algorithm or specific database content or structure, there may be an issue regarding whether the invention was ready for

---

[8]     *Robotic Systems* was the second time the Federal Circuit was reviewing the case.  On the first appeal, the Federal Circuit reversed the district court's summary judgment of invalidity under the on-sale bar, remanding for further fact-finding on the sole issue of whether the subject software covering the patented method had been "substantially completed" before the critical date.   *See Robotic Vision Systems, Inc. v. View Engineering, Inc.*, 1996 U.S. Dist. LEXIS 11917 (C.D. Cal. 1996) ("*Robotic I*").  While the case was on remand, the Supreme Court rendered its decision in *Pfaff*, thereby supplanting the "substantially complete" standard for the on-sale bar that the Federal Circuit had applied in *Robotic I*.  Thus, in *Robotic II*, the Federal Circuit was no longer concerned whether the software was "substantially completed" prior to the critical date. *Robotic Systems*, 249 F.3d at 1309-10.

32

patenting when the proposals were made to Aetna. But that is not the case. McKesson has successfully argued that Claims 1 and 2 of the patent are not limited by any algorithm and they cover any system that includes a database with relationships among medical service codes regardless of the structure of the database or the particular rules it contains. According to this construction, *any* system that performs the functions of Claims 1 and 2 is covered, and the invention is merely the idea to use software of *any* kind to perform those functions. That idea was clearly disclosed and offered for sale; there is no doubt that HPI offered to create and sell software that would replicate Dr. Hertenstein's manual system, and there is no doubt that the manual system included the same functions described in the patent claims. By committing itself to such a broad construction of the patent, McKesson has essentially admitted that the invention was disclosed and offered for sale more than a year before the patent application was filed.

**2.     The Patented Invention Was Reduced To Practice Before The Critical Date**

Sufficient enablement is only one of two ways to show that an invention is ready for patenting. *See, e.g., Pfaff,* 525 U.S. at 68; *Robotic Systems,* 249 F.3d at 1311-12. In addition to the pre-critical date enablement disclosures, HPI/HPR had reduced the invention to practice before the critical date. As discussed above, Dr. Hertenstein's manual system included the same claim review steps and reached the same results as the patented software. One year before the critical date, HPI began working with Aetna on a software project to identify incompatible surgical procedures using CPT codes. *See* Ex. 15 [9/11/86 HPI Letter & Proposal to Aetna]. That project resulted in detailed lists identifying code-to-code relationships and "Clinical Logic" described in the '164 patent. *See supra* Section III.D. HPI continued working with Aetna and, seven months before the critical date, HPI used Dr. Hertenstein's system to review claims for Aetna. *See, e.g.,* Exs. 10, 17. In fact, HPI reported to Aetna using Dr. Hertenstein's review to

33

detect a duplicate coding error covered by Claim 2 of the '164 patent. *See* Ex. 18 [5/87 HPI Final Report re: Sun Claims] at MCK 119704. If the process for sale inherently possessed each of the claim limitations, then the patented process was on sale. *See Scaltech v. Retec/Tetra,* 178 F.3d at 1384 (Fed. Cir. 1999).

In May 1987, or shortly thereafter,

**REDACTED**

HPI knew, however, that to make their invention marketable, it would have to have create new software to carry out the computerized method. Ex. 4 [Holloway Dep. Tr.] at 137:21-138:12. Two months before the critical date, HPI told Aetna that it would

**REDACTED**

Sixteen days before the critical date, Dr. Holloway informed the HPI/HPR members,

**REDACTED**

MedReview contained the same core components (a knowledge base, a set of rules, sessions with the computer and an expert system shell) as described in Figure 1 of the '164 patent. *Compare id.* at MCK 119730 *with* Ex. 1, Col. 4:23-25; Fig. 1 (Figure 1 diagrams "a preferred embodiment of the present invention," comprising a "Knowledge Base; Knowledge Base Interpreter; and User Interface Computer System").

HPI had disclosed to Aetna the idea of using a predetermined database of the type referenced in the claims of the '164 patent; *i.e.,* a database containing relationships among codes.

HPI had processed claims for Aetna using the patented process and specifically disclosed the steps of Claim 2. And, HPI had created MedReview, all before the critical date. Accordingly, the '164 invention was reduced to practice and ready for patenting.

### V.    CONCLUSION

For the reasons set forth herein, summary judgment of invalidity based on the on-sale bar of Section 102(b) should be granted as to Claims 1 and 2 of the '164 patent.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

/s/    *Rodger D. Smith II (#3778)*
Jack B. Blumenfeld (#1014)
Rodger D. Smith, II (#3778)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
   *Attorneys for Defendant The TriZetto Group, Inc.*

OF COUNSEL:

Jeffrey T. Thomas
David A. Segal
Michael A. Sitzman
GIBSON, DUNN & CRUTCHER LLP
Jamboree Center
4 Park Plaza
Irvine, CA  92614-8557
(949) 451-3800

Original Filing Date:  June 1, 2006
Redacted Filing Date:  June 8, 2006
522998

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on June 8, 2006, I caused to be electronically filed the Opening Brief in Support of The TriZetto Group, Inc.'s Motion for Summary Judgment of Invalidity Based on the On-Sale Bar (35 U.S.C. § 102(b)) (Redacted Version) with the Clerk of the Court using CM/ECF, which will send notification of such filing(s) to the following:

> Michael A. Barlow
> Skadden, Arps, Slate, Meagher & Flom LLP

I also certify that copies were caused to be served on June 8, 2006, upon the following in the manner indicated:

### BY EMAIL AND HAND

> Michael A. Barlow
> Skadden, Arps, Slate, Meagher & Flom LLP
> One Rodney Square
> Wilmington, DE  19801

### BY EMAIL AND FEDERAL EXPRESS

> Jeffrey G. Randall
> Skadden, Arps, Slate, Meagher & Flom LLP
> 525 University Avenue
> Suite 1100
> Palo Alto, CA  94301

> */s/    Rodger D. Smith II (#3778)*
> Morris, Nichols, Arsht & Tunnell LLP
> 1201 N. Market Street
> P.O. Box 1347
> Wilmington, DE  19899
> (302) 658-9200
> rsmith@mnat.com

36