EXHIBIT 2

Page 242

```
 1              VOLUME B
                IN THE UNITED STATES DISTRICT COURT
 2              IN AND FOR THE DISTRICT OF DELAWARE
 3
 4  McKESSON INFORMATION SOLUTIONS  :    CIVIL ACTION
    LLC,                           :
 5          Plaintiff             :
 6          vs.                   :
 7  THE TRIZETTO GROUP, INC.,     :
 8          Defendant            :    NO. 04-01258 (SLR)
 9                  - - -
10                          Wilmington, Delaware
11                          Tuesday, April 18, 2006
                            8:20 o'clock, a.m.
12
                    - - -
13
    BEFORE:  HONORABLE SUE L. ROBINSON, Chief Judge, and a jury
14
15
    APPEARANCES:
16
         SKADDEN, ARPS, SLATE, MEAGHER & FLOM
17       BY:  MICHAEL BARLOW, ESQ.
18              -and-
19       SKADDEN, ARPS, SLATE, MEAGHER & FLOM
         BY:  JEFF RANDALL, ESQ.,
20           BERNARD SHEK, ESQ. and
             MICHAEL HENDERSHOT, ESQ.
21           (Palo Alto, California)
22                  Counsel for Plaintiff
23                          Valerie J. Gunning and
24                          Leonard A. Dibbs,
                            Official Court Reporters
25
```

Page 243

```
 1  APPEARANCES (Continued):
 2       MORRIS, NICHOLS, ARSHT & TUNNELL
 3       BY:  JACK B. BLUMENFELD, ESQ.
 4              -and-
 5
 6       GIBSON, DUNN & CRUTCHER LLP
 7       BY:  JEFFREY THOMAS, ESQ. and
             DAVID SEGAL, ESQ.
 8           (Irvine, California)
 9              -and-
10
11       GIBSON, DUNN & CRUTCHER LLP
         BY:  MICHAEL SITMAN, ESQ.
12           (San Francisco, California)
13                  Counsel for Defendant
                    - - -
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 244

2            PROCEEDINGS

4       (Proceedings convened at 8:30 a.m., and the
5  following occurred without the presence of the jury.)
6       THE COURT:  Good morning, counsel.
7       (Counsel respond "Good morning, your Honor.)
8       THE COURT:  I guess you can lay out what
9  issues we need to address in what order.  I have an idea
10 of what we need to address today, but I will let you be
11 the ringmasters here.
12      Are we all set with depositions?  I
13 understand from the e-mail that at least some of these
14 depositions are going to go forward, consistent, I hope,
15 with my guidelines.
16      Mr. Randall?
17      MR. RANDALL:  Yes, your Honor.  We have --
18 we've gone through the transcripts and we have at least
19 done our best to take out questions that referenced
20 either the patent or the claims in the questions, also
21 any questions that referenced the term predetermined
22 database.
23      We have done our best to remove those and
24 have made our designations and have given them to the
25 other side.  With respect to proceeding this morning

Page 245

1  in terms of the witnesses, we'd like to call our expert,
2  Dr. Musen, to the stand.  The only issues with respect
3  to his testimony are the submission within the Court's
4  guidelines prior to 48 hours before he took the stand,
5  we sent over screen shots that were previously disclosed
6  to counsel and videos of what are represented by the
7  screen shots.  Basically, the screen shots fading into
8  each other.
9       So we provided those.  The only objection
10 we got was we're objecting to the extent that you
11 intend to go beyond the scope of his report.  It's
12 really just a restatement of the rule that you made
13 very clear to both sides.  We don't intend to violate
14 that rule, so we -- they really didn't make any
15 objection to the substance of those documents.
16      And then the other issues that we would
17 like to bring up would be, one, a brief, brief argument
18 regarding Document J issue.  And then raise issues with
19 respect to Trizetto's attempts to put witnesses and
20 evidence on during their case.  Specifically, Ms.
21 Wukitch, who is here regarding our infringement case.
22 She is an employee of McKesson.  She really does not
23 have any information relating to the operation of the
24 products.
25      We've asked them if there's anything that's

4/18/2006  Trial Transcript - Day 2

1  BY MR. SITZMAN:

2    Q.   And we know what the predetermined database is

3  supposed to contain.

4    A.   Yes.

5    Q.   Okay?  This is the one that has the rules on it

6  and it has the expert clinical judgment in it and the set

7  of relationships are in there, et cetera.

8    A.   Right.

9    Q.   Okay?  Let's also say we've got another database

10  over here (indicating).

11    A.   Right.

12    Q.   And all it has in it is all the CPT codes.

13    A.   Right.

14    Q.   Every one, 10,000 of them.  Okay?

15    A.   Okay.

16    Q.   The program starts, comes in.  I want the graphic

17  with the Claim 1 on there.  I think it's 12 or 13.

18  Thank you.

19    A.   There's Claim 16.

20    Q.   Two more.  Sorry.

21       The program starts.  It comes in.  It comes

22  in.  And the first thing it does, 66460 — I can't

23  remember the code you were using this morning.

24    A.   We can try 12345.

25    Q.   Okay.  Let's use 12345.

4/18/2006  Trial Transcript - Day 2

1  Okay.  The code comes in?

2    A.   Yes.

3    Q.   Okay.  The program — this is — goes to this

4  database to see if 12345 is a real code.

5    A.   Right.

6    Q.   And it turns out, because we know this morning,

7  12345 is not a real code.  And so it comes right back out

8  and says, not valid.

9       The predetermined database has never been

10  touched.

11    A.   Correct.

12    Q.   Is it your opinion, Doctor, that that process

13  infringes Claim 1 of the patent?

14    A.   Yes.

15    Q.   Okay.

16       MR. SITZMAN:  Let me move this out of the way.

17  I don't want to block anybody's view.

18       THE WITNESS:  I will restate it.  Claim 1

19  does not say that the predetermined database is used in

20  the determining step.  It only says that it exists.

21  BY MR. SITZMAN:

22    Q.   So the fourth step is that it is not used, but it

23  determines if a code is contained in the predetermined

24  database?

25       MR. HENDERSHOT:  Your Honor, I'd like to

4/18/2006  Trial Transcript - Day 2

1  interpose an objection to the extent counsel is stating

2  the requirement of the claim.  What's recited in the

3  claim is what's not stated in the database.  I think

4  he's —

5       THE COURT:  Excellent fodder for redirect.

6  Thank you.

7       MR. HENDERSHOT:  Okay.

8  BY MR. SITZMAN:

9    Q.   Okay.  In terms of the TriZetto programs, the

10  TriZetto programs and their functionality, I asked you

11  in your deposition whether or not the TriZetto programs

12  used the decision-making rules to do the invalidity

13  check.

14       Do you recall that question and answer?

15    A.   Right.  The invalidity of the claim or the code?

16    Q.   Of the code.

17    A.   Yes.

18    Q.   And do you recall what you said at your deposition?

19    A.   I believe I said they do.

20    Q.   Okay.  And is it your testimony, then, not having

21  seen the source code, not having looked at the program,

22  not knowing how the database is created, that the

23  TriZetto programs access the predetermined database to

24  make the invalidity check?

25    A.   I find it inconceivable that TriZetto would have

4/18/2006  Trial Transcript - Day 2

1  in all its marketing materials discussions of how the

2  database drives that determination.  I find it

3  inconceivable that the program would show you the

4  database if you want to understand why — it's not being

5  used for that purpose.  I find it inconceivable that Dr.

6  Johnson would get it wrong when he evaluated the

7  software.

8    Q.   If Dr. Johnson got it wrong, if there, in fact, is

9  two databases, and if, in fact, the TriZetto programs

10  do go to a different database to do the validity check,

11  that will change your opinion, won't it?

12    A.   Validity of the combination of codes or —

13    Q.   Just the codes.

14    A.   In Claim 1?

15    Q.   Yes.  Just whether the code is a valid code.

16    A.   I'm sorry.

17    Q.   That's okay.  Just whether or not it's in the

18  A.M.A. code book.

19    A.   My reading of Claim 1 is that there's no language

20  that describes how the validity check needs to be made.

21    Q.   Whether it checks any database?

22    A.   Whether it checks any database or phones a friend.

23    Q.   And just returning one more time to that step up

24  there, it can make that determination whether a

25  predetermined database exists in the system, doesn't

Page 486

1 used with Dr. Musen that there was no objection.
2      MR. RANDALL: You did move it in. You
3 walked up and said I'm going to move it in, there's no
4 objection.
5      THE COURT: Well, I don't know that that was
6 a formal —
7      MR. SITZMAN: May I move?
8      THE COURT: Yes, you certainly may.
9      MR. SITZMAN: Thank you, your Honor.
10      THE COURT: All right. Let's bring our jury
11 in, then.
12      (Pause.)
13      (At this point the jury entered the courtroom
14 and took their seats in the box.)
15      THE COURT: All right. You may continue.
16 Redirect? Are we having redirect?
17      MR. HENDERSHOT: My colleague is a little
18 eager.
19      REDIRECT EXAMINATION
20 BY MR. HENDERSHOT:
21 Q. Dr. Musen, I'd like to talk to you about a few
22 minutes that has just been raised in cross-examination.
23 A. Sure.
24 Q. Can we pull up Slide 14, which is Claim 1 of the
25 '465?

Page 487

1      While he's doing that, Dr. Musen, I'd like to
2 ask you a few questions.
3      You reviewed Claim 1 and understand it?
4 A. Yes.
5 Q. What is your understanding of the determining step
6 in Claim 1 of the '164 patent as to what it requires?
7 A. It requires a means to determine whether a code is
8 absent from the database.
9 Q. And does it require a means or just that that
10 function be performed?
11 A. That the function be performed.
12 Q. Have you reviewed the courts claim construction of
13 that element?
14 A. Yes.
15 Q. Do you understand it to be limited to any
16 particular way of performing that function?
17 A. I don't read that at all.
18 Q. And the function in that step requires that the
19 computer system determine whether a code is not in the
20 predetermined database, not that it's in the
21 predetermined database; is that correct?
22 A. That's correct.
23 Q. And you had suggested that one way to perform that
24 step — strike that.
25      You said there were multiple ways that step

Page 488

1 _____
2 A. That's right.
3 Q. Could you describe just a few or one or two?
4 A. Yes. I think I did for Mr. Sitzman.
5      One could exhaustively go through the
6 database codes to see if the code was there, and if he
7 didn't find it, he would report that it was missing.
8      One could have an index that would keep a
9 list of all the possible codes in the database that would
10 be maintained separately. Some modern database systems
11 would automatically create such indices that such things
12 would exist without actual programming effort on the
13 part of the end user.
14 Q. Okay. Looking at Claim 1 here, just up on the
15 screen, can you see that all right?
16 A. Yes, I do.
17 Q. The determining step says, determining whether any
18 medical service code contained in the at least one claim
19 is not present in the predetermined database.
20 A. Right.
21 Q. Do you read anything in that limitation that's
22 requiring that the predetermined database be used to
23 make that determination?
24 A. Nothing at all.
25 Q. You had identified looking in a separate index as

Page 489

1 a possibility of doing that?
2 A. That's right.
3 Q. In your view, in your expert opinion, could that
4 element be satisfied by looking at an index of all
5 possible codes in the predetermined database?
6 A. That's — that is the way most people would
7 program that step.
8 Q. Can you analogize looking in the index to determine
9 if something is present in another set of information?
10 A. Yes. I mean, it's the difference between going to
11 the card catalogue in the library and seeing if the book
12 is there versus spending your afternoon looking at every
13 book in the stacks and it would make much more sense to
14 go to an index to do that.
15      Having the index available would make life
16 much simpler.
17 Q. And that's a way to verify that a piece of
18 information is not present in a collection; is that
19 correct?
20 A. Well, failure to find something would be a way of
21 determining that it's not there.
22 Q. All right. Mr. Sitzman also asked you a number of
23 questions about other functionality in Facets and other
24 applications, so forth. Do you recall that discussion?
25 A. Yes, I do.

Page 977

```
 1              - VOLUME E -
 2      IN THE UNITED STATES DISTRICT COURT
 3      IN AND FOR THE DISTRICT OF DELAWARE
 4                  - - -
 5  McKESSON INFORMATION SOLUTIONS  :   CIVIL ACTION
    LLC,
 6          Plaintiff             :
 7      vs.                       :
 8  THE TRIZETTO GROUP, INC.,     :
 9          Defendant            :   NO. 04-01258 (SLR)
10                  - - -
11                      Wilmington, Delaware
                        Monday, April 24, 2006
12                      8:30 o'clock, a.m.
13                  - - -
14  BEFORE:  HONORABLE SUE L. ROBINSON, Chief Judge, and a jury
15                  - - -
16  APPEARANCES:
17      SKADDEN, ARPS, SLATE, MEAGHER & FLOM
        BY:  MICHAEL BARLOW, ESQ.
18          -and-
19      SKADDEN, ARPS, SLATE, MEAGHER & FLOM
        BY:  JEFF RANDALL, ESQ.,
20          BERNARD SHEK, ESQ. and
            MICHAEL HENDERSHOT, ESQ.
21          (Palo Alto, California)
22          Counsel for Plaintiff
23                      Valerie J. Gunning and
                        Leonard A. Dibbs
24                      Official Court Reporters
25
```

Page 978

```
 1  APPEARANCES (Continued):
 2      MORRIS, NICHOLS, ARSHT & TUNNELL
        BY:  JACK B. BLUMENFELD, ESQ.
 3
 4          -and-
 5      GIBSON, DUNN & CRUTCHER LLP
        BY:  JEFFREY THOMAS, ESQ. and
 6          DAVID SEGAL, ESQ. and
            T. KEVIN ROOSEVELT, ESQ.
 7          (Irvine, California)
 8
 9          -and-
10      GIBSON, DUNN & CRUTCHER LLP
        BY:  MICHAEL SITZMAN, ESQ.
11          (San Francisco, California)
12          Counsel for Defendant
13                  - - -
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 979

```
 1                  P R O C E E D I N G S
 2
 3      (Proceedings convened at 8:30 a.m., and the
 4  following occurred without the presence of the jury.)
 5
 6      THE COURT: Not surprisingly, I've got all
 7  sorts of papers in my folder, which I really have not had
 8  a chance to look at.
 9      Our purpose this morning is to go through the
10  jury instructions, so that is what we'll do first. I
11  also have not had a chance to look at the proposals you
12  have for changing them, but I guess we will get to those
13  as we get to the instructions you want to change.
14      So as is normal for what I do in a charge
15  conference, we'll go you through the instructions page
16  by page and find out where you have your objections or
17  suggestions for changes.
18      The first set of instructions are my standard
19  instructions.
20      Does anyone have any problems through Page 12?
21      You don't have to come to the podium, Mr.
22  Thomas.
23      MR. THOMAS: Okay. Thank you.
24      MR. THOMAS: Not really, your Honor. Page
```

Page 980

```
 1  12, it's a nit and probably not important, but the name
 2  ClinicaLogic.
 3      THE COURT: Maybe you don't have the same
 4  Page 12 I do.
 5      MR. THOMAS: It's entitled Plaintiff's
 6  Contentions.
 7      THE COURT: Oh, no. My page 12 is deposition
 8  testimony.
 9      MR. RANDALL: As is mine.
10      MR. THOMAS: Okay. That would be Page 11 in
11  my set, your Honor.
12      Page 13, I suppose, plaintiff's contentions.
13      THE COURT: Well, Page 13 is the parties.
14  Maybe we should go by the title. Any changes with the
15  parties?
16      MR. THOMAS: Plaintiff's contentions?
17      THE COURT: All right. Which is Page 14. All
18  right.
19      MR. THOMAS: It's simply that the name
20  ClinicaLogic is not used with the Facets system. It's
21  used with ClaimFacts and QicLink.
22      THE COURT: All right.
23      MR. THOMAS: But I don't think it really makes
24  a big difference.
25      THE COURT: Well, it should be -- if that's
```

Jury Trial - Volume E                CondenseIt™                McKesson v. TriZetto

Page 1033

1
2        MR. RANDALL: Can you pull up Exhibit 419,
3    Page 1?
4    BY MR. RANDALL:
5    Q.  This is the clinical editing reference database
6    user guide for 2003.
7        Do you see that?
8    A.  Yes.
9    Q.  I direct your attention to the first paragraph.
10   This is a tool -- this document is a tool designed to
11   give TriZetto's customers greater information on the
12   sources and rationale of edits built into the systems;
13   correct?
14   A.  Yes.
15   Q.  And I'd like to -- can you move to Page 20 of
16   Exhibit 197 Yes.
17       Blow up that bottom paragraph.
18       So you mentioned that there are no mutually
19   exclusive procedures in your systems. There are mutually
20   exclusive procedures, are there not?
21   A.  There are no -- there isn't a mutually -- there
22   isn't an edit called mutually exclusive. These
23   mutually exclusive procedures are part of the national
24   correct coding initiative. And that's the Medicare
25   edits and those are reviewed by our medical consultants

Page 1034

1    and the ones that are appropriate to be placed in the
2    database for editing purposes are. However, we don't
3    call them mutually exclusive edits. They're inserted
4    into our subset tables.
5    Q.  Well, this is a manual that is produced by TriZetto
6    and provided to its customers as a tool to assist them
7    in working, in using your products; is that correct?
8    A.  Yes.
9    Q.  All right. And in the user guide that you present
10   to your customers to assist them in using your products,
11   you refer to mutually exclusive procedures; correct?
12   A.  Yes. This --
13   Q.  All right.
14   A.  This is the definition from NCCI. It's taken right
15   out of the public use files. It's a cut and paste. It
16   wasn't created by us. We did not word it that way.
17   It's strictly to give our customers the information as
18   to what national correct coding initiative determined an
19   edit to be.
20   Q.  Well, your systems, Ms. Lampe, detect mutually
21   exclusive procedures, both through subset edits and
22   rebundle edits; correct?
23   A.  Based on this definition here?
24   Q.  Yes.
25   A.  Yes, I would agree with that.

Page 1035

1    Q.  All right.
2        THE COURT: And, Mr. Randall, has this exhibit
3    been admitted?
4        MR. RANDALL: Well, there's no objection to it.
5        THE COURT: All right. Well, let's admit it,
6    though, just to stay consistent with my rules as Exhibit
7    419.
8        MR. RANDALL: Thank you, your Honor.
9        THE COURT: All right.
10   ***      (Exhibit No. 419 was received into evidence.)
11   BY MR. RANDALL:
12   Q.  So this document states, there are numerous
13   procedure codes that should not be reported together
14   because they are mutually exclusive of each other.
15       Do you see that?
16   A.  Yes.
17   Q.  And the clinical editing functionality of TriZetto
18   detects these numerous procedure codes that should not
19   be reported together because they are mutually exclusive
20   of each other; correct?
21   A.  Could you repeat the first part of that question,
22   please?
23   Q.  Sure. The clinical editing or clinical edit,
24   ClinicaLogic, we'll call it, detects that there are
25   these numerous procedure codes that should not be

Page 1036

1    reported together because they are mutually exclusive of
2    each other; correct?
3    A.  Yes.
4    Q.  And in some instances, it disallows both codes and
5    inserts a new comprehensive code, and that's called the
6    rebundle edit; right?
7    A.  Yes.
8    Q.  And in some instances it detects the two mutually
9    exclusive codes and it passes one of them on for further
10   adjudication and disallows for payment the other, and
11   that's called the subset edit; correct?
12   A.  Yes.
13   Q.  All right.
14   A.  But I don't know that you can separate out calling
15   the rebundle mutually exclusive and not referring to the
16   subset as mutually exclusive as well.
17   Q.  They both are; correct?
18   A.  I would think a subset is more a proper definition
19   of mutually exclusive based on this than the rebundle.
20   Q.  Well, in the rebundle example, there are two codes
21   that are detected by the accused products that should
22   not be reported together and in that instance, both of
23   them are disallowed for payment and a new -- a new code
24   is inserted for further adjudication; correct? Is that
25   a fair statement?

**Page 1037**

1  A.  It's fair.  I mean, I've agreed to it, but I
2  still don't like disallowed.  I still don't like the
3  codes are rejected or disallowed.
4        I'm not -- that's not the way I see the --
5  the rebundle has happened.
6  Q.  Your documents, your documents say that the codes
7  are disallowed, don't they, ma'am?
8  A.  I don't believe -- does it say that for the
9  rebundle, that those two codes are disallowed?  I --
10 Q.  I'm asking you.
11 A.  I don't think it did.
12 Q.  Do your documents indicate and state that codes
13 are disallowed?
14 A.  That codes in general can be disallowed?  Yes, it
15 does.
16 Q.  All right.  So this document goes on to state,
17 mutually exclusive codes are those codes that cannot
18 reasonably be done in the same session.
19        Do you see that?
20 A.  Yes.
21 Q.  That's the definition for mutually exclusive codes
22 as detected by your products; is that correct?
23 A.  For the NCCI edits that are included in our -- in
24 our criteria, yes.
25 Q.  And that's the national correct coding initiative;

**Page 1038**

1  correct?
2  A.  Yes.
3  Q.  And your systems are compliant with that; correct?
4  A.  Not a hundred percent.
5  Q.  They are compliant with it with respect to
6  detecting mutually exclusive codes?
7  A.  The ones our medical consultants have determined
8  are appropriate to be put in the criteria.
9  Q.  Okay.
10        MR. RANDALL:  Can you go to Exhibit 419,
11 Page 21?  The upper -- the upper paragraph.
12        There we go.
13 BY MR. RANDALL:
14 Q.  Now, you recognize this, Ms. Lampe, as a list of
15 examples of these mutually exclusive procedures; correct?
16 A.  Yes.
17 Q.  All right.  And this is Exhibit 419, Page 20, Page
18 21.
19        So this goes on to state that a third example
20 is the reporting of an initial service and a subsequent
21 service.  It is contrary for a service to be classified
22 as an initial and a subsequent service at the same time.
23        Do you see that?
24 A.  Yes.
25 Q.  All right.  So some of the mutually exclusive edits

**Page 1039**

1  that are detected by your systems are detected because
2  you can't report an initial -- you can't have a code
3  that bills for an initial service with a subsequent
4  service at the same time in the same claim; right?
5  A.  Well, that would depend on whether or not the
6  consultants, the medical consultants put those edits into
7  our system.  I don't know off the top of my head if they
8  did.
9  Q.  You have no idea whether or not the one of three
10 examples provided by the national correct coding
11 initiative is actually implemented in your system?
12 A.  No, because they're not all in our system.
13 Q.  I understand they are not all, but this is the one
14 of three examples that the national correct coding
15 initiative provides.  Would you agree with me there?
16 A.  Yes.
17 Q.  Okay.  And one of the three examples of a mutually
18 exclusive code is that initial service and subsequent
19 service shouldn't be billed at the same time on the same
20 claim; right?
21 A.  Yes.
22 Q.  All right.  And that's basically double billing,
23 isn't it?  You shouldn't bill for the first visit, the
24 second visit at the same time on the same claim; right?
25 A.  Correct.

**Page 1040**

1  Q.  Okay.
2        (Pause.)
3        MR. RANDALL:  Can you move down to the next
4  paragraph, please?  Thank you.
5  BY MR. RANDALL:
6  Q.  You also say to your customers that CPT codes
7  which are mutually exclusive of one another based
8  either on the CPT definition or the medical
9  impossibility/improbability that the procedures could
10 be performed at the same session can be identified as
11 code pairs; correct?
12 A.  Yes, based on the Medicare NCCI.  Again, this is
13 all part of that definition.
14 Q.  Well, you include this in what you tell your
15 customers you can detect; right?
16 A.  This is how Medicare created these edits and our
17 medical consultants review them and decide if they --
18 should be in our database.  So if one of these edits
19 happens to come up and a customer needs more information,
20 this is the information that is supplied, because it's
21 added because it's a Medicare national correct coding
22 initiative.
23 Q.  All right.  But this document is a tool for your
24 customers and in this document you're telling them,
25 your customers, that these mutually exclusive codes,

Page 1195

```
1              - VOLUME F -
2      IN THE UNITED STATES DISTRICT COURT
3      IN AND FOR THE DISTRICT OF DELAWARE
              - - -
5  McKESSON INFORMATION SOLUTIONS  :    CIVIL ACTION
   LLC,
6          Plaintiff              :
7          vs.                    :
8  THE TRIZETTO GROUP, INC.,      :
9          Defendant              :    NO. 04-01258 (SLR)
10
11              Wilmington, Delaware
                Tuesday, April 25, 2006
12              9:30 o'clock, a.m.
13
   BEFORE:  HONORABLE SUE L. ROBINSON, Chief Judge, and a jury
14
              - - -
15
   APPEARANCES:
16
17     SKADDEN, ARPS, SLATE, MEAGHER & FLOM
       BY:  MICHAEL BARLOW, ESQ.
18
          -and-
19
       SKADDEN, ARPS, SLATE, MEAGHER & FLOM
20     BY:  JEFF RANDALL, ESQ.,
            BERNARD SHEK, ESQ. and
21          MICHAEL HENDERSHOT, ESQ.
            (Palo Alto, California)
22
              Counsel for Plaintiff
23
              Valerie J. Gunning and
24            Leonard A. Dibbs,
              Official Court Reporters
25
```

Page 1196

```
1  APPEARANCES (Continued):
2
3      MORRIS, NICHOLS, ARSHT & TUNNELL
       BY:  JACK B. BLUMENFELD, ESQ.
4
5          -and-
6
   GIBSON, DUNN & CRUTCHER LLP
7      BY:  JEFFREY THOMAS, ESQ. and
            DAVID SEGAL, ESQ. and
8           T. KEVIN ROOSEVELT, ESQ.
            (Irvine, California)
9
10         -and-
11
   GIBSON, DUNN & CRUTCHER LLP
12     BY:  MICHAEL SITZMAN, ESQ.
            (San Francisco, California)
13
              Counsel for Defendant
14            - - -
15
16
17
18
19
20
21
22
23
24
25
```

Page 1197

```
1
2              P R O C E E D I N G S
3
4      (Proceedings convened at 9:30 a.m., and the
5  following occurred without the presence of the jury.)
6
7      THE COURT: Before we bring the jury in, I've
8  been thinking about how we're going to manage the rest of
9  this trial. I truly don't think we will have the time
10 to try both willfulness and damages, so I'm going to — I
11 think we can only try one of those issues, and I will
12 leave it to the plaintiff which of the issues it wants
13 to go forward with: Damages or willfulness.
14     All right. Let's bring the jury in for
15 closings.
16     (At this point the jury entered the courtroom
17 and took their seats in the box.)
18     THE COURT: Good morning and welcome back,
19 ladies and gentlemen.
20     Mr. Randall?
21     MR. RANDALL: Thank you, your Honor.
22     May it please the Court, ladies and gentlemen
23 of the jury, this is an interesting case because the
24 facts about the operation of the accused system are
25 really not in dispute. We don't dispute how they
```

Page 1198

```
1  operate. What has happened here is that McKesson has
2  presented overwhelming evidence about how the accused
3  products operate. We presented that evidence through
4  their own witnesses, TriZetto's witnesses, and we
5  presented it through the documents and we presented it
6  through credible, straightforward testimony from our
7  qualified expert, Dr. Musen.
8      They can't dispute that. So their defense
9  has been reduced in this case to contorting and twisting
10 the English language to suit their purpose. It is as if
11 they are an octopus and see -- octopus, they don't have
12 a defense mechanism. They don't have much. What they
13 do have is this ink; right? So they spew ink all over
14 the place when they feel threatened and due to that
15 confusion, they escape. That's what happened in this
16 case.
17     They had relied on their computer science,
18 their MIT expert, to come in here and say that certain
19 words, plain, simple English, doesn't mean what we all
20 know it means. They have said that, for instance,
21 ascertaining that there's more than one medical code on
22 a claim, they've said ascertaining the number of codes
23 does not mean ascertaining there's more than one.
24 Ascertaining, as Ms. Lampe testified yesterday, they
25 ascertained that there's a code on the claim that they
```

### Page 1199

1  have to process. They ascertained that there is another
2  one and another one and they know when to stop and they
3  know when to go forward but, she said, I don't know how
4  we do it, but we know.
5          They know that there's multiple codes on
6  that claim to process and that's how they process it.
7  But they said that's not determine that there are
8  multiple codes on a claim. That's not determining that
9  there's a plurality of codes on a claim.
10         They talk about mutually exclusive. Their
11 expert and a number of their witnesses said we just don't
12 know what mutually exclusive means, but in the manual, in
13 the user manual itself, it gives the definition. It
14 means two codes that can't be billed together. That's
15 what it means.
16         Now, they know that because they've read the
17 manuals. Dr. Davis was supposed to have read all the
18 manuals. This is a claim term. You would think he
19 would have gone through everything.
20         Ms. Lampe works with the product. She has
21 worked with the product since 1998. She knows it well.
22 She knew that that definition existed and she said, well,
23 that's just a Government definition.
24         Just a Government definition? It's just for
25 Medicare and Medicaid? That's it? That's a pretty big

### Page 1200

1  part of their business.
2          They knew that the definition exists and they
3  knew it's simple. You've got two codes, they can't be
4  billed together, they're mutually exclusive. And they
5  treat them in some ways, sometimes they will disallow
6  both the codes and reinsert another third code, which is
7  called rebundling. Sometimes they'll call it a subset.
8  They'll take one of the mutually exclusive codes,
9  disallow it, and pay the other one.
10         But they knew what that meant.
11         Ms. Lampe had a real tough time saying that
12 codes and claims were rejected; right? And the reason
13 for that is that is what the claim language says. But
14 their documents are laden with, and we'll go through
15 them, and we went through some with her. She ultimately
16 admitted, right, after I showed her a few, she
17 ultimately admitted, all right, fine. We disallow claims
18 for payment. We disallow codes. We disallow claims.
19 Yes, we do that. But somehow disallowing codes and
20 claims for payment does not mean rejecting it for
21 payment.
22         That's nonsense.
23         The other part of that, by the way, is how in
24 the world do you come in here and you tout your product
25 as saving billions and billions of dollars. They say

### Page 1201

1  this product, you use our clinical editing portion of
2  our product, you use that, you will save a ton of money.
3  You'll save this percentage, you'll save that percentage.
4          How in the world do you ever save any money
5  if you never reject any claims? If you never reject
6  any codes, you never reject any codes, how in the world
7  can you tell the world and the customers that you do
8  save money by doing that?
9          And so Dr. Davis' testimony, we went around
10 and around and around. Finally, I said, does the product,
11 do these accused products ever, ever reject any claims?
12 Reject any codes? He sat there for a long time and said,
13 no. Well, that would have saved me a lot of time; right?
14 I would have gotten that out of him and just moved on.
15         He's wrong. These products, they reject
16 codes, they reject claims. They report and save --
17 they report a savings report on that and they report to
18 the customers. The customers can run a savings report
19 and we'll go through this. They can run a savings
20 report and they can show how much money they saved by
21 rejecting certain codes and how much money they saved by
22 rejecting certain claims.
23         You don't save money if you don't reject
24 these things. It's a difference between what you, the
25 claim that comes in and the claim that is paid. That's

### Page 1202

1  the savings. That's what they've testified to. And you
2  only get there by rejecting codes and claims.
3          The other issue, medical and non-medical.
4  Albeit, the database, the predetermined database, it
5  absolutely contains a whole host of medical relationships.
6  I'm not going to tell you it doesn't. It does, no doubt
7  about it, but it also contains billing issues. It
8  contains, Dr. Musen told you, he said a number of those
9  relationships are billing-related. They are. It makes
10 sense. Doctors want to get paid for what they do, and
11 I don't blame them for it. They should get paid for
12 what they do; right? But some of those relationships
13 in there are for billing reasons, like the double billing
14 issue. We don't need a doctor to tell us that and it's
15 not exclusively a medical criteria to say that when you
16 go visit a doctor, you should only be charged once for
17 that visit. All right? We all know that. We don't --
18 in life we don't want to be double-billed for anything,
19 but that's not a medical issue. It is a strictly
20 administrative billing issue.
21         Let's not bill twice. Let's not bill the
22 insurance companies. Let's not bill the patients. Let's
23 not bill anybody twice. That's a simple non-medical
24 issue, and there are others, like Dr. Musen testified
25 to as well. For instance, the idea that you should add

Page 1227

1 guide. I'm sorry. It's at Page 20 of the document,
2 actually.
3          And hear it makes it very clear what
4 mutually exclusive procedures are. There are numerous
5 procedures that should not be reported together because
6 they are mutually exclusive of each other. Mutually
7 exclusive codes are those codes that cannot reasonably
8 be done in the same session.
9          That's it. And they determine the codes
10 are mutually exclusive all the time. They do it through
11 a number of their edits.
12          Can you go to the next page, Page 21?
13          They set forth in their user guide, and this
14 is a TriZetto user guide, they set forth the examples of
15 non -- I'm sorry, of mutually exclusive codes.
16                       - - -
17          MR. RANDALL (Continuing): And the third
18 example here is -- would you highlight the last sentence
19 or two of the top paragraph?
20          Thank you.
21          The third example is reporting of an initial
22 service and a subsequent service. It is contradictory
23 for a service to be classified as an initial and a
24 subsequent service at the same time.
25                       - - -

Page 1228

1
2          MR. RANDALL (Continuing): That's not a
3 medical reason. That's a simple, simple billing concept.
4 And Dr. Musen went through why physicians want to be,
5 and should be paid for what they do. And there are
6 certain billing issues.
7          Dr. Hawley said that Erisco and customers
8 of Erisco periodically made suggestions based on cost.
9          If there is no doubt that most -- I would
10 admit that most of the relationships in these databases
11 are medically related, but a number of them are billing
12 related. There's no doubt about that either. And
13 that's the whole purpose of breaking down every possible
14 thing that a doctor does into a code. Right?
15          I mean, the reason why you break it down,
16 just like mechanics break it down, just like a whole host
17 of service industries break down into the smallest detail
18 what they do. They do it because they want to get paid
19 for it. I think they should be paid for it, but that is
20 why they do it.
21          And that last issue, we've talked about the
22 double billing. I mean, I asked, if you need a doctor
23 or medical judgment to determine that you shouldn't be
24 double-billed, and she said no, and you don't. So that
25 element -- can we go back to the claim? So both the

Page 1229

1 ascertaining step we already talked about and the
2 determining step are both satisfied.
3          Now, these next two elements talk about
4 authorizing codes and rejecting codes. And we'll talk
5 about that. And we went through it. The dispute there
6 is that when you allow codes and you disallow codes for
7 payment, and you generate savings based on those,
8 somehow that's not rejecting or authorizing. That's a
9 silly argument, too.
10          And their documents are just laden with the
11 language of allowing and disallowing claims.
12          So can you go to Exhibit 30-10?
13          Go to the second box in the far left-hand
14 corner. No, I'm sorry. It's the second box on the
15 top. Yes, that one.
16          So, by the way, this is, as I mentioned,
17 this is ClinicaLogic user guide. It's Exhibit 30, and
18 that's at Page 2. And this is a conceptual diagram of
19 the -- of ClinicaLogic. And right there, it says,
20 define system action, deny. So they can deny whether
21 to code or a claim, they can deny it if it's
22 inappropriate.
23          Let's talk about the reports that they
24 generate.
25          Can you go back and show the main diagram?

Page 1230

1          The bottom left-hand box, and you can do the
2 whole box.
3          So these are the reports that it generates.
4 And it can generate -- it can print savings data by
5 claim or edit. All right?
6          So what is printing is it's printing the
7 savings that you achieve by rejecting, you pick a word,
8 rejecting, disallowing, denying claims and codes. You
9 can print a report and say how much money have we saved
10 by denying this one particular edit. How much money
11 have we saved denying claims, rejecting them.
12          Let's go to the next page of there document,
13 Page 3. I'm sorry. Page -- one more page. It's
14 probably Page 12. Okay.
15          So I'm going to just talk about the right-
16 hand side of these boxes. Item number one. Just the
17 right-hand side of the boxes. The system responses.
18 I'm sorry. The other side. Yes.
19          If you take a look at this, and this is at
20 Page 4 of the document that you have, it is Trial
21 Exhibit 30. You go down to system responses. It says,
22 disallow the charges. Go down to the next box. Many
23 the same thing: Disallows the charges. Go down to
24 the next box. Disallows the charges. Go to the next
25 box. Disallows the charges, and on and on and on.

**Page 1291**

1    They look in the all codes database. They
2  determine it's not there. There are two ways to determine
3  something is not in the predetermined database. Two ways
4  to determine, at least two ways, maybe more, to determine
5  it's not in there. One is to look in there, just like
6  you'd look in your local library for the book. That's
7  one way.
8    The other way is to look in the all codes
9  database. You can do that. You can look in the Library
10  of Congress index to determine if the book is not there.
11  There are two ways to do it. You will not receive
12  instructions saying that we have -- that in order to
13  infringe, it has to be done in a certain way. It simply
14  has to be done. And they do it. They determine that
15  the code, when a code comes in, they determine that it's
16  not in that database by looking at all of the codes list.
17  That's how they do it. That's one way to do it. It
18  happens to be the most efficient and effective way of
19  doing it, and that is why they do it. And there's no
20  question about it.
21    And we are not required to prove that they
22  actually look through this or look through the local
23  library for the book. Simply, that they determine that
24  it's not there. That is one of the stems in the claims.
25    And you won't see -- again, you won't find

**Page 1292**

1  an instruction requiring us, requiring that we show how
2  they determine that step. No way. It's not in there
3  because it's not required.
4    You've heard from Mr. Bellomo on this. And
5  Mr. Bellomo -- I hate to -- to touch this.
6    If, for example, you wanted to determine, if
7  you wanted to determine whether or not a code was in
8  here, the predetermined database, for instance, A, B, C,
9  it was not in the predetermined database, you could, if
10  you wanted to, check the CPT list, this list, and if
11  it's not on the CPT list, for example, A through Z, if
12  it's not there, you know it's not in this, the
13  predetermined database; right? The answer is, it's
14  probably not, that's correct, when the system is
15  operating correctly.
16    It's probably not. You know it's not.
17  It's absolutely not to a mathematical certainty if the
18  system is operating as intended and properly.
19    On Claim 2 -- by the way, that's the only
20  defense on noninfringement, on Claim 1.
21    On Claim 2, there were two issues. I wanted
22  to get -- mutually exclusive and non-medical criteria.
23    On the mutually exclusive, he readily
24  admitted it now, but throughout this trial, they didn't.
25  So throughout this trial, they fought that. They said

**Page 1293**

1  I don't know what that means. I don't know what it
2  means. Their expert didn't know what it means. Dr.
3  Hawley didn't know what it means. Ms. Lampe didn't
4  know what it meant until I pulled the document out and
5  said, it's defined right here. It's a simple definition.
6  It means two codes shouldn't be billed together.
7    And counsel said, well, okay, fine. We want
8  to use their definition.
9    It's not our definition. It's theirs. It
10  came out of their user manual.
11    Now they say, okay, fine, you caught us. I
12  will admit that, we got that. Now they're still fighting
13  on medical, non-medical based relationships. Now he
14  says, okay, they are all billing relationships, but he
15  says they're all medical relationships. And I have said
16  and I will be honest and candid with you, there are a
17  number, and probably most of the relationships contained
18  in the predetermined database are based on medical
19  criteria. Whether one operation should be performed
20  with another, that's clear. There's no doubt about that,
21  but there's also no doubt that in that database of
22  thousands and hundreds of thousands of relationships,
23  there are also rules based on non-medical criteria.
24  Absolutely. And those rules are based on simple
25  billing things.

**Page 1294**

1    Even Dr. Hawley said, yes, we got some of
2  the rules from Erisco. We got some of the rules from
3  Erisco's customers. And one of the three examples used
4  by Medicare to show they are mutually exclusive codes,
5  one of the three examples they used, it's in the user
6  manual, is based on non-medical criteria.
7    And it says, you can't bill the initial and
8  subsequent visit at the same time. And I said that's
9  like double billing, and she said yes.
10    That's right, you can't do it. That's
11  common sense. So there are common-sense administrative
12  billing relationships built into the database and one
13  of the examples, a concrete example, one of three given
14  by Medicaid or Medicare was right there in their user
15  manual.
16    And, by the way, Dr. Musen testified
17  absolutely, a number of these relationships are based
18  on non-medical reasons, and he testified about that.
19    Who did they have to testify about it? They
20  had Dr. Davis, the computer scientist from MIT. He's
21  not qualified. He wasn't qualified by the Court to
22  testify about that, and he wasn't qualified to testify
23  in front of you on that issue, to say that he has
24  looked at all of them and he knows that they are all
25  medically related. He simply cannot do it.

# EXHIBIT 3

REDACTED

EXHIBIT 4

REDACTED

# EXHIBIT 5

REDACTED

EXHIBIT 6

REDACTED

# EXHIBIT 7

SAVINGS FROM ACCURATE CODING

OF SURGICAL CLAIMS: THE

CATERPILLAR METHOD

Don C. Holloway, Ph.D. 1

Robert D. Hertenstein, M.D. 2

Richard H. Egdahl, M.D. 1


1 From the Health Policy
  Institute, Boston University,
  Boston, Massachusetts

2 From Caterpillar, Inc.
  Peoria, Illinois

Reprint requests:
  Don C. Holloway, Ph.D.
  Health Policy Institute
  Boston University
  53 Bay State Road
  Boston, MA 02215

(For publication in Business and Health, Fall 1987)

HBB000043

CONFIDENTIAL

## ABSTRACT

Current attempts to modify the physician fee-for-service payment method focus on only a portion of the equation: the price. Evidence is accumulating that, while many errors are inadvertent, some physicians are increasing their reimbursement by focusing on the other component of the equation: the codes describing the procedures performed. Caterpillar has achieved significant savings using a unique system for assigning accurate codes to surgeons' claims. The system results in a 10-12% reduction in surgeon payments, in comparison to the coding method used for two other large corporations. The Health Policy Institute is working with the surgeon reviewers at Caterpillar to make this system available to other corporations through the use of an "expert system shell", an artificial intelligence software that allows the surgeon reviewers' "rules of thumb" to be made available to claims processors. The process for achieving additional savings by negotiating and applying "access-oriented" surgical fees at a local level is described elsewhere. (See Egdahl and Hartenstein, <u>Annals of Surgery</u>, in press)

## BACKGROUND

The declines in inpatient care and physician visits of the past five years have been more than offset by the increase in prices of all providers. The net result has been an actual increase in the rate of real growth in health care expenditures over the past ten years, after consideration of lower general inflation. Cost containment efforts, having focused on reducing unnecessary use, are only beginning to address price. Additionally, the focus has been on hospitals more than physicians, and yet the cost for physician services, the second largest component of health care costs, is projected at 19.8% of total costs for 1986, up from 18.9% in 1980. These costs for



H_G000044
CONFIDENTIAL

MCK 048026

04-CV-1258-SLR (D.Del.)

-2-

physician services are projected to increase to 20.3% of total costs in 1990.

In an effort to retain their current volume of patients, physicians are negotiating agreements with managed care programs such as Health Maintenance Organizations (HMOs) and Preferred Provider Organizations (PPOs). Physicians give price concessions to these organizations through a negotiated fee schedule or a discount from historic charges. In addition, physicians agree to strong utilization controls to reduce unnecessary use. As a consequence, unless total patient volume increases, physicians' best option for maintaining their income is to increase dramatically their charges to "unmanaged" fee-for-service patients whose benefit plans currently often pay the price that is "customary" in the physician community, and/or to increase their charges to managed care programs by the indirect method of "upcoding" the procedures they charge for.

The pressure for reform in the method of physician payment for Medicare and Medicaid is evident in the level of activity in Washington. While alternative methods of payment are being considered, widespread implementation of capitation or physician diagnosis-related groups (DRGs) is not imminent. Instead, modifications to the fee-for-service payment system are likely in the next several years. If such modifications can maintain satisfactory levels of patient access while gaining physician support, a modified fee-for-service method will remain the major payment method in both the private and public sectors.

In attempting to modify the fee-for-service payment method, most current attention is being given to only one component of the equation, the method for establishing the price. Examples of such efforts include: 1) Medicare fees were frozen by Congress from June, 1984, through January, 1987, 2) a resource-based relative value scale for use in establishing relative prices of

H██000045

**CONFIDENTIAL**

MCK 048027

Confidential Information Subject to D. Del. LR 26.2

04-CV-1258-SLR (D.Del.)

-3-

physician services is being developed by Hsiao and colleagues at Harvard with funding from the Health Care Financing Administration, 3) Massachusetts' Medicaid fee schedule is being revised by the Rate Setting Commission, and 4) fees paid by Blue Shield in Massachusetts will be based on a revised relative value scale at the request of the Insurance Commissioner as a condition for approving a rate increase in 1987.

While the payment amount needs to be established, it is only a portion of the equation. There are two independent components that determine the fees that physicians are paid:

1) the code specifying the service provided, and

2) the corresponding price.

This article focuses on the significance of accurate coding regardless of the payment level. Evidence is accumulating that, while many errors are inadvertent, some physicians are increasing their reimbursement by "upcoding", or by "unpackaging" services that were intended to be bundled into a single code. The administrative systems that are currently available and we have studied are not adequate to control for most of these errors.

In 1986, Caterpillar, Inc. approached the Health Policy Institute of Boston University for assistance in evaluating its process for managing surgeon claims. Caterpillar had been self-administering health claims since the early 1950's, and believed it had achieved significant savings with a surgeon bill review process implemented in 1983. The Health Policy Institute conducted a comparison of Caterpillar's process for assuring accurate codes to those used by claims administrators for two other large corporations. The results are described in this paper.

HB000046
CONFIDENTIAL

MCK 048028

-4-

## CURRENT CONTROLS ON ACCURATE CODING

Standard industry practice allows claims processors to enter the codes submitted on surgeon claims into a computer system. Fee screens are applied to these codes, establishing the maximum amount that will be paid. One of two coding methods is most frequently used: either the American Medical Association's Current Procedural Terminology, Fourth Edition , (CPT-4), or the California Relative Value Studies (CRVS). Some claims administrators allow their claims processors to assign a code if it is absent from the claim; others return the claim to the physician's office for a code. Once entered into the claims processing system, the code is typically edited for consistency with the age and sex of the patient (for example, no obstetric payments for a male, or for a woman over 44 years old). Some administrators have edits for assuring that the most obvious rules in the coding manuals are being followed. After this step, if there is still a perceived problem with either the code or the fee, the claim is removed from the production process and sent to staff with clinical background for review. This staff may request an operative report, and/or call for a physician to review the claim. A payment for the claim is established, and the claim is returned to the claims processor for payment. Emphasis throughout the industry is on rapid turnaround of a claim, rather than on accuracy of the claim, in order to minimize the time between when a claim is received and when it is paid.

## CATERPILLAR'S APPROACH

After observing the claims processing systems of several administrators as well as Caterpillar, and interviewing key individuals at these facilities, five features of the Caterpillar process emerged as different from routine

NMC000047

**CONFIDENTIAL**

MCK 048029

-5-

industry practice. Each feature will be discussed separately.

1. Systems and procedures in claims processing are designed assuming that 100% of the claims will be submitted with inaccurate codes.

Based on a random sample of over 350 claims for surgery and invasive procedures, over 50% of claims are submitted with inaccurate or absent codes. Rather than return claims to the surgeons' offices for coding, Caterpillar assigns an accurate code using its expert staff.

2. A surgeon controls the processing of surgeons' claims.

Since 1983, the surgeon reviewers employed by Caterpillar to review claims have reviewed thousands of surgeons' claims. Based on this experience, they have developed "rules of thumb" for when codes can be accepted or changed based on the available information, or when an operative report must be used.

The surgeon reviewers' "rules of thumb" are passed on to a surgical technician to reduce the number of claims which subsequently require a surgeon reviewer's personal attention. Similarly, some of the rules can be passed on to claims processors, thereby reducing dependence on the surgical technician. However, each week the chief surgeon reviewer examines a sample of the decisions made by the claims processors and surgical technician to assure that the rules are being applied properly.

In contrast, the standard industry practice among administrators we reviewed is to use very little professional input in coding decisions. Physicians are involved at the discretion of the claims processing staff, rather than in an integrated, structured manner as part of the flow of the claim.

HMI000048

CONFIDENTIAL

MCK 048030

-6-

3. <u>Caterpillar's claim forms have a clause requesting physicians to submit</u>
<u>"operative reports for unusual or complicated services or procedures"</u>.

In order to assure an accurate surgical code, it is necessary to review
the operative report. In practice, some surgeons always send an operative
report, thereby eliminating delays in payment. However, only 10% of all
surgeon claims are initially submitted with operative reports. An additional
10% of surgeon claims processed by Caterpillar require operative reports
before they can be paid. The remaining 80% are audited based on the narrative
description of the procedures written on the claim because the coding decision
is unlikely to change even if an operative report were available.

In contrast, over 97% of the claims were paid without an operative report
by the administrators for the other two corporations. One administrator does
not even require a narrative description and, therefore, has very little
information to make coding decisions.

4. <u>Codes are assigned to the "claim" rather than to the line items for each</u>
<u>procedure</u>.

While the code for each procedure on a claim may be accurate, the <u>claim</u>
itself may be inaccurately coded. To illustrate the point, the four codes in
Example 1. are accurately assigned to line items.

Example 1

| Line Item Description | CPT-4 Code | | Fee |
|---|---|---|---|
| Splenectomy | 38100 | | $1,000 |
| Laparotomy | 49000 | | $ 600 |
| Gastrectomy | 43620 | | $2,200 |
| Lysis of Adhesions | 44005 | | $ 700 |
| | | Total | $4,500 |
| Correct Code for Claim: | 43620 | | $2,200 |

However, one claim could be submitted with all four codes. While the services
are accurately coded, <u>the claim is not</u>. The accurate code for the claim is

HM000049
**CONFIDENTIAL**

MCK 048031

-7-

43620, Gastrectomy, and the appropriate fee is $2,200. Services need to be packaged, and the CPT-4 manual is often not explicit as to the rules for these packages. For this reason, a surgeon's judgment is applied to Caterpillar's claims.

5. Significant changes to codes are explained to the surgeons' offices.

While surgeons are taking an increasingly more active interest in coding, untrained staff in their offices are usually responsible for assigning the submitted code. In order to establish the best provider relations possible, Caterpillar contacts physicians' offices and explains why the code has been changed, if the change is going to result in a payment reduction.

SAVINGS ESTIMATE

A random sample of over 350 claims for surgery and invasive procedures was obtained from claims administrators for two large corporations. Hard copies of the claims and any accompanying operative reports were sent to Caterpillar without the coding decisions made by the claims administrators. Caterpillar processed the claims using its normal process.

Physicians at the Health Policy Institute reviewed the accuracy of Caterpillar's codes. The claims administrators provided their total fees for the accurate codes, and the Health Policy Institute calculated the difference in payment that would have resulted from using the accurate codes.

For both corporations, the savings that would have resulted from accurate coding is 10-12% of submitted charges. The two administrators were making reductions of 4.3% and 35.0% of charges, respectively, and would have made another 10-12% reduction had the coding been accurate. Occasionally surgeons submit incorrect codes that undervalue the procedures done; if those codes had been used, payments would have been reduced even further. For these claims,

H■■000050
**CONFIDENTIAL**

**MCK 048032**

-8-

the Caterpillar surgeon reviewer assigned the correct code and allowed the higher payment; the 10-12% savings estimate also includes those corrections in favor of the billing surgeons.

The following three examples illustrate the types of problems that are not routinely being corrected by claims administrators. The first two examples illustrate how difficult it is to apply the CPT-4 rules correctly, even when the rules are explicit. The last example illustrates a case where there are no explicit CPT-4 rules. Example 1 above also illustrated this point. These cases require review by a surgeon, or the application of a surgeon's "rule of thumb".

Example 2:

| Date | Code | Description | Charges |
|------|------|-------------|---------|
| 8/28/86 | 58120 | Dilation and Curettage (D&C) | $400 |
| 8/28/86 | 57505 | Endocervical Curettage | $400 |
| | | Total | $800 |

Example 2 illustrates that, while each line is coded accurately, the accurate code for the <u>claim</u> is 58120. The CPT-4 manual explicitly states that 57505 is to be used only when it is "not done as part of a dilation and curettage." This physician was inappropriately paid for a presumably separate operation. Given the complexity of the task, and the qualifications of claims processors, it is not surprising that this rule is not routinely applied.

Another case is shown in Example 3.

Example 3:

| Date | Code | Description | Charges |
|------|------|-------------|---------|
| 8/13/86 | 64450 | Peripheral Nerve Block | $ 54 |
| 8/13/86 | 10120 | Subcutaneous Foreign Body Removal-Simple | $ 70 |
| | | Total | $124 |

The CPT-4 manual explicitly states that "listed surgical procedures include the operation per se, local infiltration, digital block or topical anesthesia when used, and normal, uncomplicated follow-up care." A peripheral nerve

HSS600051
CONFIDENTIAL

MCK 048033

-9-

block, 64450, is therefore included in 10120. Again, the physician was inappropriately paid separately for a component part of the primary procedure.

The final example (Example 4) illustrates a case where a surgeon's "rule of thumb" is required. The claim is for a simple wart removal. According to the operative report, a 0.25-inch plantar wart on one foot was removed. Removing the wart using the combination of an excision (removing the wart with a knife) and a CO2 (carbon dioxide) laser is excessive treatment. One or the other would have done the job. Using the surgeon reviewers' "rules of thumb," simple wart removals are most accurately coded as 17100. The more expensive alternative was unnecessary.

Example 4:

| Line Item Description | CPT-4 Code | Fee |
|---|---|---|
| Excision, benign lesion, foot and use of CO2 laser | 11421 | $ 400 |
| | Total | $ 400 |
| Correct Code "Destruction by any method of benign skin lesion" | 17100 | $ 60 |

DISCUSSION

Caterpillar has achieved significant savings using a manual system of review, and several large corporations and claims administrators have expressed interest in gaining access to this expertise. The Health Policy Institute is working with the chief surgeon reviewer at Caterpillar to make explicit the "rules of thumb" he and his staff carry in their heads. These rules are well suited to incorporation in software generically called "expert system shells." Expert system shells have evolved from research on artificial intelligence. This type of software provides a vehicle for widespread distribution of an expert's "rules of thumb." However, a surgeon will always

H000052
CONFIDENTIAL

MCK 048034

-10-

be required to make coding decisions on those claims that are submitted with a combination of codes that have not as yet been seen by the surgeon, and therefore, not programmed into the software.

Unfortunately, it is not possible to evaluate the performance of claims administrators in achieving the potential savings due to accurate coding without an audit of claims. Although reductions from charges made by the administrator are available on management reports, one part of the reduction is the result of lowering excessive fees. The portion due to correcting inaccurate codes cannot be determined without an audit of the claim itself. Periodic audits of claims by an external agency are required in order to ensure that the claims administrator is achieving the full savings potential.

H██000053

CONFIDENTIAL

MCK 048035

04-CV-1258-SLR (D.Del.)

# EXHIBIT 8

# Correcting Surgical Claims Codes Yields Cost Savings

By Don C. Holloway, Robert D. Hertenstein and Richard H. Egdahl

*At Caterpillar, surgeon claims reviewers have*
*helped reduce inaccuracies, overpayments.*



To date, attempts to modify fee-for-service payment of physicians have focused only on price. Evidence is accumulating that, while many errors are inadvertent, some physicians are increasing their reimbursement by targeting the other component of the equation: codes describing the procedures performed. Caterpillar Inc. of Peoria, Ill., has achieved significant savings using an improved system for assigning appropriate codes to surgeons' claims. The system results in a 10 percent to 12 percent reduction in surgeons' payments, compared with the coding methods used for two other large corporations. Boston University's Health Policy Institute (HPI) is working with reviewers of surgeons' claims at Caterpillar to make this system available to other corporations through an artificial intelligence software that allows the reviewers' decision rules to be distributed to claims processors elsewhere.

### Cost Pressures Prompt Fee Increases

Declines in inpatient care and physician visits over the last five years have been more than offset by the increase in prices of all providers. The net result has been an actual increase in the rate of real growth in health care expenditures in the past decade because of lower general inflation. Cost containment efforts, having so far concentrated on reducing unnecessary use, now are beginning to address price. Additionally, the focus has been on hospitals more than physicians. Yet the cost of physician services, the second largest component of health care costs, was



20.1 percent of total costs in 1986, up from 18.9 percent in 1980. Physician costs climbed 11 percent in 1986, compared with 7.7 percent for all medical costs and 1.5 percent for the general economy.

In an effort to retain patients amid increased health care competition, physicians are negotiating agreements with managed care programs such as health maintenance organizations (HMOs) and preferred provider organizations (PPOs). Physicians give price concessions to these organizations through a negotiated fee schedule or a discount from historic charges. In addition, they agree to strong utilization controls to reduce unnecessary use. As a consequence, unless total patient volume increases, physicians have two primary options for maintaining their income. One is to increase dramatically their charges to fee-for-service patients whose benefit plans often pay the price that is customary in the physician community. The other is to up their charges to managed care programs by the indirect method.

Incentives like these have driven the momentum in Washington, D.C., to reform the method of physician payment for Medicare and Medicaid. While various alternatives are being considered, such as capitation or physician diagnosis related groups (DRGs), widespread implementation of such approaches is not imminent. Instead, modifications to the fee-for-service payment system are likely in the next several years. If such reforms can maintain satisfactory levels of patient access while gaining physician support, a modified fee-for-service method may remain the major payment method.

Thus far, attempts to alter fee-for-service payment have included efforts such as: freezing Medicare physician fees for specified periods; developing a model for a Medicare resource based relative value scale to set prices for

*Don C. Holloway is director of health systems engineering and Richard H. Egdahl is director of the Health Policy Institute at Boston University. Robert D. Hertenstein is medical director of group insurance with Caterpillar Inc. in Peoria, Ill.*

Reprinted by special permission from the December, 1987 BUSINESS AND HEALTH Magazine; copyright 1987, BUSINESS AND HEALTH Magazine, Health Learning Systems, Inc.

MCK 039632

04-CV-1258-SLR (D.Del.)

BUSINESS AND HEALTH

different physician services (see BUSINESS AND HEALTH, July 1987, p. 7-12); and revising Medicaid fee schedules and Blue Shield relative value scales for physician reimbursement in Massachusetts.

These approaches address only part of the problem: establishing payment amount. A second, independent component for determining what physicians are paid is the code specifying the service provided. While true coding errors on payment claims will always occur, there also is evidence that some physicians are increasing their reimbursement by upcoding, assigning a higher paying code than a procedure merits, or by unpackaging services that were intended to be bundled into a single code. The administrative systems currently available are not adequate to detect and correct most of these errors.

Standard industry practice allows medical claims processors to enter the codes submitted on surgeon claims into a computer system. Fee screens are applied to these codes establishing the maximum amount that will be paid. Two coding methods most frequently used are the American Medical Association's "Current Procedural Terminology, Fourth Edition (CPT-4)," and the "California Relative Value Studies (CRVS)." Some claims administrators allow their claims processors to assign a code if it is absent from the claim; others return the claim to the physician's office for a code. Once entered into the claims processing system, the code is typically edited for consistency with the age and sex of the patient, and sometimes for obvious rules in coding. After this step, if there is still a perceived problem with either the code or the fee, the claim is removed from the production process and referred for review by clinical staff. This reviewer, usually a nurse, may request the surgeon's official operative report, a required part of the hospital record, and/or call for a physician to review the claim. A payment for the claim, if approved, is established, and the claim is returned to the processor for payment. Emphasis throughout the insurance industry is on minimizing the time between when a claim is received and when it is paid, rather than on its accuracy.

**Tackling Coding Errors at Caterpillar**

In 1986, Caterpillar approached HPI for assistance in evaluating its process for managing surgeons' claims. Caterpillar had been self-administering health claims since the early 1950s, and believed it had achieved significant savings with a surgeon bill review process implemented in 1983. HPI conducted a comparison of Caterpillar's process for assuring accurate codes with those processes used by two claims administrators for two other large corporations. A random sample of over 350 claims for surgical and invasive procedures was obtained from the claims administrators for analysis. Caterpillar also processed the claims through its system to obtain comparison data on coding accuracy. Applying the other claims administrators' fee limits, Caterpillar's more appropriate codes would have resulted in an additional reduction of 10 percent to 12 percent in surgeons' charges in the sample claims.

Five features of the Caterpillar process emerged as

different from routine industry practice. First, systems and procedures in claims processing at Caterpillar are designed assuming that 100 percent of the claims will be submitted with inaccurate codes. Based on the random sample of claims reviewed by HPI, over half of the claims in fact are submitted with inaccurate or absent codes. Rather than return such claims to the surgeons' offices for coding, Caterpillar assigns an accurate code using its expert clinical staff.

> "While true coding errors on payment claims will always occur, there also is evidence that some physicians are increasing their reimbursement by upcoding or by unpackaging services. . . . The administrative systems available are not adequate to detect and correct most of these errors."

A second difference is that a surgeon controls the processing of surgeons' claims. Since 1983, Caterpillar has retained surgeon reviewers who have reviewed thousands of surgeons' claims. Using this experience, they have developed rules of thumb for when codes can be accepted or changed based on the available information, or when an operative report must be used. These guidelines are passed on to a surgical technician to apply in reducing the number of claims that subsequently require a surgeon's review. Similarly, some of the guidelines can be passed on to claims processors, thereby decreasing the dependence on the surgical technician. However, each week the chief surgeon reviewer examines a sample of the decisions made by the claims processors and surgical technician to assure that the guidelines are being applied properly. In contrast, the standard industry practice among administrators reviewed by HPI is to use very little physician input in coding decisions. Physicians are involved at the discretion of the claims processing staff, rather than in a structured manner as part of the flow of the claim.

Another difference is that Caterpillar's claim forms have a clause requesting physicians to submit operative reports for unusual or complicated services or procedures. To assure an accurate surgical code, it is sometimes necessary to review the operative report. In practice, some surgeons always send a report, thereby eliminating delays in payment. However, only 10 percent of all surgeon claims submitting to Caterpillar initially come in with operative reports. An additional 10 percent of surgeon claims processed by Caterpillar require operative reports, at the request of clinical staff, before they can be paid. The remaining 80 percent are audited based on the narrative

MCK 039633

04-CV-1258-SLR (D.Del.)

BUSINESS AND HEALTH

description of the procedures written on the claim, because in these particular cases the coding decision is unlikely to change even if an operative report is available. By comparison, over 97 percent of the claims were paid without an operative report by the administrators for the other two corporations reviewed by HPI. One of the administrators does not even require a narrative description of the procedure and, therefore, has very little information on which to make coding decisions.

**Table I**

| Procedure | CPT-4 Code* | Fee Charged |
|---|---|---|
| Splenectomy | 38100 | $1,000 |
| Laparotomy | 49000 | 600 |
| Gastrectomy | 43620 | 2,200 |
| Lysis of Adhesions | 44005 | 700 |
| | Total | $4,500 |
| | | |
| Correct Code for Claim | 43620 | $2,200 |

*Current Procedural Terminology, Fourth Edition

Also at Caterpillar, codes are assigned to each claim rather than to the line items for each procedure. While the code for each procedure on a claim may be accurate, the claim itself may be inaccurately coded. For example, the four codes in table I are accurately assigned to line items. However, one claim could be submitted with all four codes. While the services are accurately coded, the claim is not. The accurate code for the claim is 43620, gastrectomy, and the appropriate fee is $2,200. Services need to be packaged, and the CPT-4 manual often is not explicit as to the rules for packaging. For this reason, a surgeon's judgment is applied to Caterpillar's claims.

A fifth important difference in Caterpillar's coding system is that significant changes to codes are explained to the billing surgeons' offices. While surgeons are taking an increasingly active interest in coding, untrained staff in their offices usually are responsible for assigning the submitted code. To establish the best provider relations possible, Caterpillar contacts physicians' offices and explains why the code has been changed, if it is going to result in a payment reduction.

### Bundling Charges Leads to Savings

Three examples in table II show the types of problems that are not routinely being corrected by claims administrators. The first two illustrate how difficult it is to apply the CPT-4 rules correctly, even when the rules are explicit. The last example gives a case where there are no explicit CPT-4 rules. Such claims require actual review by or guidance from a surgeon to assure accuracy.

Example A illustrates that, while each line is coded accurately, the accurate code for the claim is 58120. The CPT-4 manual explicitly states that 57505 is to be used only when it is "not done as part of a dilatation and curettage." This physician was paid inappropriately for a presumably separate operation. Given the complexity of the task, and the qualifications of claims processors, it is not surprising that this rule is not routinely applied. Example B shows a similar error. The CPT-4 manual

states that "listed surgical procedures include the operation per se, local infiltration, digital block or topical anesthesia when used, and normal, uncomplicated follow-up care." A peripheral nerve block, 64450, therefore is included in 10120. Again, the physician was inappropriately paid for part of the primary procedure.

The final example, C, is a case where a surgeon's rule of thumb is required. The claim is for a simple wart removal. According to the operative report, a 0.25-inch plantar wart was removed on one foot. Using the combination of an excision (removing the wart with a knife) and a carbon dioxide laser to remove the wart is excessive treatment. One or the other would have done the job. Using the surgeon reviewers' guidance, simple wart removals are most accurately coded as 17100. The more expensive alternative was unnecessary.

Caterpillar has achieved significant savings using a manual system of review, and several large corporations and claims administrators have expressed interest in gaining access to this expertise. HPI is working with the chief surgeon reviewer at Caterpillar to formalize the guidelines he and his staff carry in their heads. These rules are well-suited to being incorporated in computer software such as that which has evolved from research on artificial intelli-

**Table II**

| Date | CPT-4 Code* | Description | Charges |
|---|---|---|---|
| **Example A** | | | |
| 8/28/86 | 58120 | Dilatation and Curettage | $400 |
| 8/28/86 | 57505 | Endocervical Curettage | 400 |
| | | Total | $800 |
| **Example B** | | | |
| 8/13/86 | 64450 | Peripheral Nerve Block | $ 54 |
| 8/13/86 | 10120 | Subcutaneous Foreign Body Removal-Simple | 70 |
| | | Total | $124 |

*Current Procedural Terminology, Fourth Edition

gence. This type of software provides a vehicle for widespread distribution of an expert's decision-making guidance. However, a surgeon will always be required to make coding decisions on those claims that are submitted with a new combination of codes not programmed into such software.

Unfortunately, it is not possible without an audit of claims to evaluate the performance of claims administrators in achieving the potential savings due to accurate coding. Although reductions from charges made by the administrator are available on management reports, one part of the reductions is the result of lowering excessive fees. The portion due to correcting inaccurate codes cannot be determined without claims auditing. Such periodic audits by an external agency are required in order to ensure that a claims administrator is achieving the full savings potential. ■

MCK 039634

04-CV-1258-SLR (D.Del.)

# EXHIBIT 9

REDACTED

# EXHIBIT 10

REDACTED

# EXHIBIT 11

REDACTED

# EXHIBIT 12



**Page 1**

1      IN THE UNITED STATES DISTRICT COURT
2          FOR THE DISTRICT OF DELAWARE
3          CIVIL ACTION NO. 04-1258 SLR
4
5    ------------------X
6    MCKESSON INFORMATION    :
7    SOLUTIONS, LLC,
8          Plaintiff,    :
9    vs.
10   THE TRIZETTO GROUP, INC., :
11         Defendant.    :
12   ------------------X
13
14              Durham, North Carolina
15              Friday, September 23, 2005
16
17         VIDEOTAPE DEPOSITION OF KELLI A. DUGAN,
18   a witness herein, called for examination by counsel
19   for the Defendant, in the above-entitled matter,
20   pursuant to notice, the witness being duly sworn by
21   DARLENE M. BRYANT, Registered Professional Reporter
22   and Notary Public in and for the State of North
23   Carolina, taken at the offices of Interactive World,
24   1000 Park Forty Plaza, Suite 300, Durham, North
25   Carolina, at 8:06 a.m., September 23, 2005, and the

**Page 2**

1    proceedings being taken down by Stenotype by DARLENE
2    M. BRYANT and transcribed under her direction.

**Page 3**

1    APPEARANCES:
2    On behalf of the Plaintiff:
3      BERNARD SHEK, ESQ.
4      Skadden, Arps, Slate, Meagher & Flom, LLP
5      525 University Avenue, Suite 1100
6      Palo Alto, California 94301
7      (650) 470-4500
8    On behalf of Defendant:
9      MICHAEL A. SITZMAN, ESQ.
10     Gibson, Dunn & Crutcher, LLP
11     One Montgomery Street
       Telesis Tower, Suite 31
12     San Francisco, California 94104-4505
13     (415) 393-8221
14
15     BRENT TROUBLEFIELD, VIDEOGRAPHER

**Page 4**

C O N T E N T S

THE WITNESS          EXAMINATION BY COUNSEL FOR
KELLI A. DUGAN:    Plaintiff    Defendant
By Mr. Sitzman:                    7, 180
By Mr. Shek:        177

E X H I B I T S

EXHIBIT NO.                    PAGE NO.
 1 7-29-87, Holloway to Fager        53
 2 10-14-87 Holloway to Fager        55
 3 US Patent 5, 253,164              66
 4 Subpoena                          103
 5 Article, The Caterpillar Experience   105
 6 Memo, 1-29-88, Holloway to Egdahl    108
 7 5-20-88, Holloway to Egdahl       121
 8 RICS                              122
 9 Flow Charting Worksheet           124
10 Memo, To HPR Staff, 1-17-89       127
11 CRW, 1-25-89                      129
12 1-26-89, Holloway To Bolz         130
13 2-13-89, Don & Kelli To PDT       132
14 12-12-89, Goldberg to Dugan       136

KELLI A. DUGAN

1    at Caterpillar in Peoria, may have only contained a
2    few of the first rules that we'd developed. It was
3    done in a modular way. And if you think of each rule
4    as being its own sort of entity, we worked
5    rule-by-rule, and the prototype did not have all the
6    rules.
7        Q.   Additional rules would have to be created in
8    order to reach some of the results that
9    Dr. Hertenstein would otherwise have reached himself;
10   is that correct?
11       A.   Related to the prototype?
12       Q.   Yes.
13       A.   Yes.
14       Q.   Were you aware any attempts by others to
15   create their own software that would perform this
16   function?
17       A.   No.
18       Q.   Are you aware today of any other companies
19   that have created their own software to do this?
20       A.   No.
21       Q.   Is it your belief that HPR and their — and
22   their successors, are the only people that have such
23   software?
24       A.   I have no knowledge of that.
25       Q.   While you were working at HPR, and then

1        Q.   You can answer.
2        A.   Autocoder, when — when I saw it demonstrated
3    in Dick Egdahl's office?
4        Q.   Yes.
5        A.   My understanding of what I saw in Dick
6    Egdahl's office, this is what Autocoder did, yes.
7        Q.   Let me have you to turn to Claim 14.
8            Now, let's see. I'm sorry. Actually, let's
9    look at Claim 2. Sorry to jump back.
10           Let me have you read Claim 2, and I have
11   questions about that, too.
12           (Pause.)
13       A.   Okay.
14       Q.   You look puzzled.
15       A.   I'll probably have to read it again to really
16   get it.
17       Q.   Okay.
18           (Pause.)
19       A.   Okay. I've read it twice.
20       Q.   You still look troubled.
21       A.   We can proceed, however.
22       Q.   All right. You see — you see the setoff
23   there where it says, Comprising the steps of, and then
24   it lists one —
25       A.   Yes.

1    consulting for HPR, did you ever learn of any
2    competing software that competed with CodeReview?
3        A.   I don't think so.
4        Q.   Did you learn of any companies that were in —
5    that were competitors of — to HPR?
6        A.   I have a memory that there was the thought
7    that GMIS may have been trying to develop something
8    that was related to this. As I told you before, they
9    had already had the Autocoder system, and I think they
10   were aware of what we were doing. And I — and I
11   think that there was a — a thought amongst some at
12   HPR that GMIS was — was trying — or wanted to create
13   something similar.
14           But, again, it's sort of speculation on my
15   part.
16       Q.   Let me — if you would, turn to Claim 1 of the
17   patent.
18       A.   Can you tell me the page?
19       Q.   I'm sorry, it's MCK65.
20           I'm going to have you read Claim 1 for me.
21           (Pause.)
22       A.   Yes.
23       Q.   Okay. Isn't that the function of Autocoder?
24           MR. SHEK: Objection; vague and ambiguous.
25           BY MR. SITZMAN: (RESUMED.)

1        Q.   — it lists one, two, three, four, five steps,
2    all of them starting with a verb; receiving,
3    ascertaining, determining, authorizing and rejecting;
4    do you see that?
5        A.   Uh-huh.
6        Q.   I just wanted you to look at the steps here
7    and confirm for me that these steps, manually, is what
8    Dr. Hertenstein and his staff were doing when they
9    received claims at Caterpillar.
10           MR. SHEK: Objection; vague and ambiguous.
11   Also calls for speculation.
12           BY MR. SITZMAN: (RESUMED.)
13       Q.   You can go ahead and respond.
14       A.   And I will have to speculate.
15       Q.   Based — based on whatever you know or
16   learned, is it your belief that that is what they were
17   doing with the claims they received manually?
18       A.   Probably on some occasions, yes, but I'm not
19   completely sure.
20       Q.   What's causing you to hesitate there?
21       A.   Because that has specificity, I'm not —
22   I don't know exactly what their manual method was or
23   how whomever was reviewing the claims, be it
24   Dr. Hertenstein or Peggy Saal, prior to CodeReview,
25   how they thought about exactly what they did.

KELLI A. DUGAN

1    Q.  All right.  Well, let's just walk through this
2  real quickly.
3    A.  Okay.
4    Q.  Is it your belief and understanding that they
5  would receive a medical claim?
6    A.  Yes.
7    Q.  Was it your belief and understanding that one
8  of the -- one of the things that they were to do is to
9  find out if there were more than one service -- CPT-4
10  code on that claim?
11    A.  Yes.
12    Q.  Okay.  Was it your knowledge and understanding
13  that they would also look at those codes when there
14  were more than one, to determine whether or not those
15  codes were mutually exclusive due to some nonmedical
16  criteria?
17    A.  I guess that's where I'm being tripped up,
18  nonmedical criteria.  It's -- I -- they don't -- my
19  understanding is that -- for instance, this is an
20  example.  Yes, that they -- that Bob and/or Peggy,
21  would look at certain claims that had more than one
22  code, and perhaps they would deny any payment on a
23  particular code because of its relation to the other
24  one, or more, that appeared on that same claim.
25    Q.  Okay.  And then they would -- based on your

Page 93

1  knowledge and understanding, they would authorize
2  those codes that were not mutually exclusive?
3    A.  Yes, I believe so.
4    Q.  And they would reject those that were?
5    A.  Yes, I believe so.
6    Q.  Can you recall your early conversations with
7  Cliff Alper, and what the general task was that was
8  given to him?
9    A.  In the beginning, I believe I wanted him to
10  make the user interface more user-friendly.  My
11  prototype was a little bit rudimentary in terms of
12  user interface.  So he did a lot of work on that, at
13  the beginning.
14    Q.  Okay.  At some point in time it sounds like
15  you then had him refine, maybe, the computer program
16  itself.
17    A.  Refine -- he -- yes, because with the onset of
18  Cliff's work with the HPR group, we moved from
19  strictly Dbase 3 to Clipper group.
20    Q.  Right.
21    A.  Which gained us a lot of speed and a lot of
22  more functionality in terms of user interface.
23    Q.  The code -- strike that.  Let me see if I can
24  get back.
25    The rules that you and Don created --

Page 94

1    A.  Uh-huh.
2    Q.  -- and the databases --
3    A.  Yes.
4    Q.  -- were two separate things?
5    A.  Yes.
6    Q.  The software code that you developed in Dbase
7  and then later Cliff developed in Clipper, or the
8  Clipper compiler on top of Dbase --
9    A.  That we -- yes, that he and I worked with,
10  yes.
11    Q.  -- was code that was designed simply to
12  interact between the rule interact; use the rules and
13  the database, and get them to function together; is
14  that a fair assessment?
15    A.  The computer code -- just one more time.
16  Repeat.
17    Q.  Okay.  The computer code that was created --
18    A.  Yes.
19    Q.  -- first by you in Dbase --
20    A.  Uh-huh.
21    Q.  -- then --
22    A.  -- with Clipper --
23    Q.  Right.
24    A.  -- with Cliff --
25    Q.  -- was code that was designed simply to get

Page 95

1  the databases and the rules to work together.
2    MR. SHEK:  Objection; vague and ambiguous.
3    THE WITNESS:  They were certainly not mutually
4  exclusive.  There were certain aspects -- of the code,
5  I believe -- you're -- what you're explaining is
6  probably the primary function of the code; is to take
7  the information that was in the databases, and with
8  the information from the incoming claim, it would take
9  all of that information and the code would work
10  through the numbers to come up with an answer.
11    BY MR. SITZMAN:  (RESUMED.)
12    Q.  Okay.  Let me see if I understand this.
13    A.  Okay.
14    Q.  I'm getting lost.
15    A.  Okay.
16    Q.  As I see CodeReview, it had three components?
17    A.  Okay.
18    Q.  It had rules, it had a database, and it had
19  software code.  Am I missing something?
20    A.  The --
21    Q.  All right.  Let me --
22    A.  -- the database -- the rules aren't really a
23  separate entity exclusive of either the database or
24  the software code.
25    Q.  Okay.  Okay.  All right.  So that's where

Page 96

24 (Pages 93 to 96)

KELLI A. DUGAN

Q. Can you recall who you took that prototype to for sales purposes?

A. No.

Q. When you went to Wausau, did you show Wausau a prototype, or something that was much more refined?

A. My memory with Wausau -- and of course, I wasn't making the high level contact with these medical directors at the insurance companies. That was almost exclusively Don's domain. And I can't remember if I made just a demonstration trip to Wausau, or if my first trip to Wausau was an actual installation of a working CodeReview.

Q. Uh-huh. Okay. Do you remember being part of any demonstrations in the 19 -- in or around this time that you did this demonstration at Peoria? So, I'm talking --

A. Uh-huh.

Q. -- 1988 -- some time in the 1988 time frame; where you were demonstrating the advantages of this product?

A. I -- nothing was -- with any level of specificity. I do recall a trip to New York with Don where we met with an individual, whose name I cannot recall and whose company I cannot recall, and I showed him what may have been a prototype. And I don't even

Page 117

know -- the reason that I can't be specific about whether it was the prototype or not is because I really can't remember who the gentleman was.

Q. Prior to doing this demonstration in Peoria, Illinois, had you done any other demonstrations of the product, or is this the first you can recall?

A. It's the first I can recall.

Q. If this was in February of '88 --

A. Uh-huh.

Q. -- when did you start -- I'm going to use the term "in earnest" -- sort of writing the computer program, or getting the - preparing the -- the code for the prototype? How long did it take?

A. I really don't know. I -- I'm sure I had started, perhaps, that fall.

Q. The Fall of '87?

A. Yeah.

Q. Okay. Were you involved at all in the formation of HPR?

MR. SHEK: Objection; vague and ambiguous.

THE WITNESS: In what way?

BY MR. SITZMAN: (RESUMED.)

Q. Were you part of the decisions to form that company?

A. My -- I like to think that I was, but in

Page 118

retrospect, given the disparity of seniority amongst those in this group, I likely wasn't, no.

Q. Were you given shares of stock in HPR?

A. Yes, I was.

Q. Do you know --

A. Which is perhaps why I think I helped form it.

Q. Do you know how many shares?

A. Yes.

Q. How many?

A. 2000.

Q. Do you know as a percentage what that was?

A. I believe it was 2 percent.

Q. Did anyone in the team ask you to leave HPI and join HPR, or was that just the natural progression for you?

A. Probably more of the natural progression.

Q. If I asked you when the development of CodeReview began, do you make a distinction between CodeReview, MedReview and the prototype, or do you go all the way back?

A. You're asking me about my perception of when CodeReview as a computer product --

Q. Yes.

A. -- began?

Page 119

Q. Yes.

A. When?

Q. Yes.

A. Again, probably the Fall, maybe late Summer, 1987.

Q. You don't make a distinction between what was done at HPI and what was done at HPR in that respect?

A. It's very difficult to do.

Q. Okay.

A. For me, it was very seamless.

Q. Who funded the majority portion -- well, strike that.

When HPR started, do you know where their sources of funding came from?

A. Pardon me?

Q. Do you know who funded HPR when it was initially formed?

A. Other than -- well, it was formed prior to our getting this money from Caterpillar in terms of an identified entity. And it just existed, I believe, under the auspices of BU and Health Policy Institute. There was a group of these people within there, and Bob Hertenstein, trying to form a company.

(Pause.)

Page 120

30 (Pages 117 to 120)

KELLI A. DUGAN

1          THE VIDEOGRAPHER:  This concludes the

2   deposition of Kelli Dugan.  The time is 1:29 p.m.

3          (Discussion off the record.)

4          (Whereupon, at 1:29 p.m., the taking of the

5   instant deposition ceased.)

6          (Whereupon, the reading and signing by the

7   witness is hereby reserved.)

8

9                          SIGNATURE OF THE WITNESS

10          SUBSCRIBED AND SWORN to before me this

11   _____ day of _____, 2005.

12                    _____

13                          NOTARY PUBLIC

14   My Commission Expires:

15

16

17

18

19

20

21

22

23

24

25

186

KELLI A. DUGAN

BARKLEY
Court Reporters