# EXHIBIT 13

1  UNITED STATES DISTRICT COURT
2  FOR THE DISTRICT OF DELAWARE
3
4
5  ————————————x
6  MC KESSON INFORMATION SYSTEMS, :
7      Plaintiff,     : Case No.
8      vs.        : 04-1258 SLR
9  THE TRIZETTO GROUP,      :
10     Defendant.     :
11 ————————————x
12
13
14 VIDEOTAPED DEPOSITION OF GEORGE A. GOLDBERG
15
16
17      Washington, D.C.
18      Tuesday, September 13, 2005
19
20
21
22
23
24 REPORTED BY:
25   CARMEN SMITH

Page 1

1      Deposition of GEORGE A. GOLDBERG, called for
2  examination pursuant to notice of deposition, on
3  Tuesday, September 13, 2005, in Washington, D.C. at
4  the offices of Gibson, Dunn & Crutcher, 1050
5  Connecticut Avenue Northwest, at 9:03 a.m. before
6  CARMEN SMITH, a Notary Public within and for the
7  District of Columbia, when were present on behalf of
8  the respective parties:
9
10     BERNARD SHEK, ESQ.
11     Skadden, Arps, Slate, Meagher & Flom LLP
12     525 University Avenue, Suite 1100
13     Palo Alto, California 94301
14     650-470-4500
15     On behalf of Plaintiff and Witness
16
17     DAVID A. SEGAL, ESQ.
18     Gibson, Dunn & Crutcher LLP
19     4 Park Plaza, Suite 1400
20     Irvine, California 92614-8557
21     949-451-3973
22     On behalf of Defendant
23
24 Also present:
25     LARRY FLOWERS, Video Operator

Page 2

1      PROCEEDINGS
2      VIDEO OPERATOR:  This is the deposition of
3  Mr. George A. Goldberg, taken on behalf of Defendant
4  in the matter of McKesson Information Systems LLC,
5  Plaintiff, versus Trizetto Group, Inc., Defendant,
6  Case Number 04-1258 SLR, for the U.S. District
7  Court, District of Delaware.
8      This deposition is being taken at the
9  offices of Gibson Dunn, 1050 Connecticut Avenue,
10 Washington, D.C.  The time is approximately 9:03
11 a.m.  The date is September 13, 2005.
12      The court reporter is Carmen Smith, on
13 behalf of Barkley Court Reporters, 2040 Main Street,
14 Suite 250, Irvine, California.  I am the video
15 operator, Larry Flowers, also on behalf of Barkley.
16      The reporter may now swear the witness.
17 Whereupon,
18      GEORGE A. GOLDBERG
19 was called as a witness and, having first been duly
20 affirmed, was examined and testified as follows:
21      VIDEO OPERATOR:  Will counsel identify
22 themselves and who they represent.
23      MR. SEGAL:  David Segal of Gibson, Dunn &
24 Crutcher on behalf of the Trizetto Group, Inc.
25      MR. SHEK:  Bernard Shek for Plaintiff,

Page 3

1  also representing the witness, Dr. Goldberg, at this
2  deposition.
3      EXAMINATION
4  BY MR. SEGAL:
5   Q  Good morning.
6   A  Good morning.
7   Q  Can you please state your full name for
8  the record?
9   A  George Ansbach Goldberg.
10  Q  Can you spell the middle name for the
11 court reporter?
12  A  A-n-s-b-a-c-h.
13  Q  Have you ever had your deposition taken
14 before, Dr. Goldberg?
15  A  Which deposition?
16  Q  Any time, have you ever been deposed in a
17 deposition before?
18  A  Yes.
19  Q  How many times?
20  A  I believe once.
21  Q  And have you ever testified in court
22 before?
23  A  No.
24  Q  Now, you've had your deposition taken
25 before, and we'll go back and visit about that

Page 4

1    A   HPR?  No, but I believe there was talk
2  about it.  But I don't recall if they ever did.
3    Q   Were you involved -- are you familiar with
4  Bloodhound, a company named as Bloodhound?
5    A   Bloodhound, yes.
6    Q   What is your knowledge of what Bloodhound
7  is?
8    A   I was contacted a few years ago in the
9  1990s in the second -- I assume in the second half
10  of the 1990s, but I don't recall the exact date, by
11  a company called "Bloodhound."  Oh, wait a minute.
12  No, I think originally I was contact -- originally,
13  they were a client of either Value -- I think
14  ProtoCare Sciences, the successor company to Value
15  Health Sciences.  You're testing my memory in ways
16  I'm not sure about.
17      Bloodhound was a client of one of the
18  companies I worked for.  I met them at the time.
19  Later on they approached me privately, and for a
20  while, I was a consultant to them, probably short
21  enough and embarrassing enough that I never put it
22  on my resume.
23    Q   What was the nature of your consulting
24  services with Bloodhound?
25    A   They were using a rebundling system, and
                    Page 105

1  they came to it might have been MEDecision, Inc.,
2  MEDecision, Inc., which I have never been an
3  employee of but I've been a -- my company has sold
4  -- that's it.  My company has sold my time to
5  MEDecision, Inc.  It's M-E-D is capital, and then
6  the rest of the word, decision.  So there's only one
7  D in MEDecision, Inc.
8      Whether it was Constella -- I don't mean
9  Constella.  What was the name of the next company?
10  ProtoCare.  If I said Constella before, that was not
11  relevant.  It was either ProtoCare Sciences or
12  MEDecision that had Bloodhound as a client, and I
13  met them through that.  I met them through that --
14  the company I was working for.
15    Q   And did you ever discuss the '164 patent
16  with Bloodhound?
17    A   What is the '164 patent?
18    Q   It's the patent on which you are named as
19  an inventor.
20    A   I don't recall if I did or not.
21    Q   Did you ever provide any private
22  consulting to HBOC or HBO and company?
23    A   Not that I recall.  HBOC, not that I
24  recall.
25    Q   Did you ever provide any private
                    Page 106

1  consulting to GMIS?
2    A   Not that I recall.  I think the answer is
3  no, but that was enough years ago that I'm saying
4  "not that I recall" instead of "no."
5      MR. SEGAL:  Probably a good time to break
6  for lunch.
7      VIDEO OPERATOR:  We're off the record.
8  The time is approximately 11:58 a.m.
9      (Whereupon, at 11:58 a.m., the deposition
10  was recessed, to be reconvened at 12:45 p.m. this
11  same day.)
                    Page 107

1    AFTERNOON SESSION       (12:46 p.m.)
2  Whereupon,
3        GEORGE A. GOLDBERG
4  resumed the stand and, having been previously duly
5  affirmed, was examined and testified further as
6  follows:
7      VIDEO OPERATOR:  We are back on the
8  record.  The time is approximately 12:46 p.m.
9      BY MR. SEGAL:
10    Q   Good afternoon.
11    A   Good afternoon.
12    Q   Are you familiar with the Pew Fellows
13  Conference, P-e-w?
14    A   When I was at the Health Policy Institute,
15  there was something called the Pews Fellow or
16  Fellows Conference, yes.
17    Q   Can you tell us what it was?
18    A   My understanding is that it was a
19  coming-together of various corporate employees whom
20  Richard Egdahl, head of the Health Policy Institute,
21  could attract because of his connections.  And they
22  came together, I don't recall the periodicity, to --
23  came together just to talk amongst themselves for a
24  few days and to educate themselves as to what the
25  other corporations were doing all in the area, I
                    Page 108

1  believe, of benefits, corporate benefits. Maybe
2  only in health, but I don't even recall that it was
3  limited to health.
4      Q   Did you ever attend any of the Pew Fellows
5  Conferences?
6      A   Yes.
7      Q   Do you recall which ones?
8      A   No. The reason I know I did and the
9  reason I'm so sure I did is I remember at one I was
10 having bad back trouble and had to spend most of the
11 time getting up — standing at the back of the room
12 instead of sitting. And that's why I'm — and it
13 was a Pew conference, so that's why I'm sure I was
14 at one. And I think I was at more than one, but I
15 don't recall them.
16     Q   Do you recall any of the locations for any
17 of the conferences you went to of the Pew Fellows?
18     A   I think every one I went to was in the
19 Boston area. I believe the one where I had — there
20 was one meeting that we had at a fancy hotel facing
21 the Boston Public Gardens or Boston Commons, one of
22 the two, though I'm not sure that was a Pew Fellows
23 meeting, but that was an HPI-sponsored meeting at
24 that hotel. And I believe there was another hotel
25 where we also met.

Page 109

1      So I think it was typically at hotels in
2  the Boston area.
3      Q   At any of the conferences that you
4  attended, do you recall anyone from HPI or HPR
5  giving any presentations?
6      A   I don't recall it. I'm sure they did, but
7  I would not be able to point to it.
8      Q   And what period of time, to the best of
9  your recollections, were the Pew Fellows Conferences
10 taking place?
11     A   I think they were underway from the time I
12 came to HPI, throughout my time there. So
13 roughly '86 to '90. That's — sorry — yeah, '86
14 through '89. But I don't remember any precise
15 dates. They happened.
16     MR. SEGAL: I'm going to ask the court
17 reporter to mark as Exhibit 2 to your deposition a
18 multipage document, Bates numbered GG 0006 through
19 17.
20     (Deposition Exhibit 2 identified.)
21     THE WITNESS: Here are my publications,
22 thank you.
23     BY MR. SEGAL:
24     Q   I'll ask you if you recognize that
25 document.

Page 110

1      (Witness reviewed the document.)
2      A   Yes, I recognize this document.
3      Q   Can you tell us what it is?
4      A   This is what I would — this is either —
5  yes, this is in my view part of my resume, even when
6  it's presented separately or — that's what it is,
7  uh-huh.
8      Q   And to the best of your knowledge, was
9  this document which we've marked as Exhibit 2
10 complete up and to including January 2005?
11     A   I would have tried to make it complete
12 through that date. I'm looking, of course, at the
13 end, which actually — the first few pages are
14 called "selected publications," so there's clearly
15 no — just the opposite of intending to have it be
16 complete.
17         The next one in the old-fashioned type
18 that comes from an old text file program I still use
19 was attempting to be complete up to, it appears to
20 be, '05. It's an attempt to be complete.
21     Q   Did you ever give any presentations at any
22 Pew conferences?
23     A   I would think I did, but I took the
24 opportunity to look here, as I was paging through,
25 making sure this was all mine, I took particular —

Page 111

1  made a particular look at this page 6 of the old
2  type, 6 on top. And when I see the time period, I
3  don't see — I don't see anything that
4  particularly — that specifically names a Pew
5  conference. That's a surprise to me.
6          The answer is I think I did give a
7  presentation, but I don't see it here.
8      Q   Do you recall what you gave a presentation
9  on to the Pew Fellows Conference?
10     A   No. I note that the presentations I gave
11 here in that time period all dealt with quality, as
12 you can see for yourself.
13     Q   In doing your work on —
14     A   There is one on utilization.
15     Q   — quality and utilization during the
16 mid-1980s, did you review electronic claims data?
17     MR. SHEK: Objection; vague as to form.
18 Objection as to form; vague and ambiguous.
19     THE WITNESS: I'm not sure what you mean
20 by "review," so please help me. Did you review
21 claims data — electronic — would you please —
22     BY MR. SEGAL:
23     Q   Why don't you tell me what you mean by
24 "review" and we'll try and use your word, so that we
25 have no confusion and I don't try and impose a

Page 112

28 (Pages 109 to 112)

GEORGE A. GOLDBERG

1   something that could be turned in — for something
2   that could be turned into what I'm calling a salable
3   product, that is, a commercial product that would be
4   profitable and useful.
5       If I'm remembering what MedReview was
6   correctly, Dick Egdahl brought aboard a gentleman
7   named Charlie Moore, who had, I believe, a business
8   background, to assist us in terms of business
9   analysis, another term I did not know then, of the
10   possible products.
11       This laundry list of all possible products
12   became, I think, "MedReview." That's why I said it
13   was a dream, not a product.
14       As we examined the various pieces of —
15   nonexistent or partially existent pieces of
16   MedReview, it became clear over time that a code
17   rebundler offered the best chance of a commercial
18   product. And perhaps I should have been using the
19   word "commercial product" all along rather than
20   "salable product." I'm not a businessperson.
21       CodeReview, not called "CodeReview" at
22   that time, a code rebundling product was on the
23   list, if I remember MedReview correctly, because of
24   interactions between Don Holloway, Bob Hertenstein
25   and Dick Egdahl.

Page 177

1       MR. SEGAL: We've been going about an
2   hour. Why don't we take a short break.
3       VIDEO OPERATOR: We're off the record.
4   The time is approximately 2:59 p.m.
5       (Recess.)
6       VIDEO OPERATOR: We are back on the
7   record. The time is approximately 3:10 p.m.
8       BY MR. SEGAL:
9     Q   Have you ever heard of something called
10   Health Bills?
11     A   Everything I was telling you about
12   MedReview was Health Bills. Every time I said
13   "MedReview," if I know what that is, I meant Health
14   Bills. I believe you have just described — you
15   have just named what I have been describing all
16   along. If that is the case, then I don't really
17   know what MedReview was. But one of those two was
18   the laundry list of dreams that I have been talking
19   about for a while.
20     Q   Did you ever review any drafts of memos
21   from Dr. Egdahl, describing Health Bills?
22     A   Highly probable.
23       MR. SEGAL: I'm going to ask our court
24   reporter to mark as Exhibit 6 to your deposition a
25   multipage document, Bates numbered MCK 119633

Page 178

1   through 623. And I'm going to ask you to look at
2   that and let me know if you've seen it before.
3       (Deposition Exhibit 6 identified.)
4       (Witness reviewed the document.)
5       THE WITNESS: I'm still looking. Okay.
6   I'm ready to ask your — answer your question.
7   Would you please repeat it?
8       BY MR. SEGAL:
9     Q   Sure. Is this a document that you've seen
10   before?
11     A   I am very familiar with its content, but I
12   don't recall having seen it before, and I note that
13   it's dated prior to when I started working at Health
14   Policy Institute.
15     Q   And if you go to the page ending in 617,
16   there's a table.
17     A   617, MCK. Uh-huh.
18     Q   And item 2 lists process definition and
19   says "G. Goldberg scheduled to start on April 14,
20   1986."
21     A   That sounds right.
22     Q   Does that sound like when you started your
23   work at HPI?
24     A   Yes, it does.
25     Q   And you indicated you're familiar with the

Page 179

1   contents of this document, even though you didn't
2   see this specific document; is that correct?
3     A   I didn't say I didn't see this specific
4   document. I said I don't remember this specific
5   document. I may have seen it.
6     Q   Okay.
7     A   I'm sorry, I didn't mean to snap at you.
8   I'm just clarifying.
9     Q   No problem. In item 3(b), there's a
10   reference to profits from several — on the first
11   page, I'm sorry, profits from several income
12   streams. Do you see that?
13     A   3(b) to me says "lease fees for software."
14   What do you see?
15     Q   3 says profits come from several income
16   streams.
17     A   Yes.
18     Q   And then (b), one of the streams is lease
19   fees for software.
20     A   Uh-huh.
21     Q   Do you have any understanding of what the
22   software that was going to be leased was?
23     A   Not at all. As I mentioned before, this
24   was a dream, and that's — I have no idea what that
25   software was. I'm sure it was vaporware at that

Page 180

45 (Pages 177 to 180)

GEORGE A. GOLDBERG

1 Peoria that I remember making.
2    Q   And the second paragraph refers to a
3 presentation on Health Bills that Mr. Moore was
4 scheduled to make on Friday morning?
5    A   Uh-huh.
6    Q   Do you recall attending a Pew conference
7 in early June 1986 at which Mr. Moore made a
8 presentation on managing physician fees?
9    A   I don't recall attending the Pew
10 conference you mention.
11    Q   Do you have any reason to believe that
12 Mr. Moore did not use his outline in giving a
13 presentation at the Pew conference in early June
14 1986?
15    A   I think it's highly likely that Charlie
16 gave a presentation at the Pew -- at the -- at a
17 subsequent Pew conference mentioned in his letter,
18 though I have no idea of the date of that
19 conference. You have mentioned June twice, but I
20 don't know that.
21       But I really don't know if he used this
22 outline or not, and I have -- I really don't know if
23 he did or not.
24    Q   Do you recall attending a Pew conference
25 at which Mr. Moore discussed bundling and unbundling

Page 213

1    Q   Do you recall a great roast beef dinner in
2 Peoria?
3    A   I do not, but it really fits, in that
4 Robert Hertenstein would have done that, would have
5 found us a great roast beef dinner in Peoria, before
6 and after his heart attack.
7    Q   Do you know -- does seeing Exhibit 74 --
8    A   Yes.
9    Q   -- help you determine whether or not
10 discussions regarding using software to check claims
11 for rebundling or unbundling -- let me rephrase the
12 question, sorry.
13       Does reviewing Exhibit 74 help you
14 determine whether or not HPI disclosed the concept
15 of using software to check claims for rebundling
16 codes appearing on claims was occurring in 1986?
17    A   I still don't understand the question.
18 The "was occurring" doesn't seem to fit, so please,
19 maybe I'm just not -- I'm not -- let me not look at
20 this and you'll repeat or rephrase, your option.
21    Q   I will do both.
22    A   Okay.
23    Q   Or a combination of both.
24    A   Okay.
25    Q   Does reviewing Exhibit 74 lead you to

Page 215

1 and implementing a model approach to physician fee
2 review that was implemented and tested by
3 Caterpillar?
4    A   I don't recall attending that.
5    Q   Do you recall which individuals were
6 general attendees at Pew conferences in the '86 time
7 frame?
8    A   I think I do.
9    Q   Can you tell me who that would be?
10    A   It would be all -- the goal would have
11 been to have all Health Policy Institute employees
12 other than support staff attending the Pew
13 conference, and then the Pew fellows as well.
14    Q   Do you recall who the Pew fellows were in
15 the mid-1986 time frame?
16    A   They were various corporate employees.
17 They were employees -- let me rephrase that, though
18 I'm not trying to change the meaning. I'm just
19 trying to clarify.
20       They were employees of various
21 corporations who were concerned with the health
22 and/or benefit program of that corporation, and they
23 attended the Pew conferences in their role as Pew
24 fellows, which I believe was a time-limited
25 designation. So there was regular turnover.

Page 214

1 believe that in the 1986 time period, HPI was
2 disclosing to third parties the concept of using
3 software to deal with the issue of unbundling codes
4 or rather rebundling codes that appeared on medical
5 claims?
6    A   No. Wait a minute. I see now I have
7 completed only -- I now see that the outline, I was
8 looking only at Roman I. So let me continue.
9    Q   And carefully review the document to see.
10    A   Thank you.
11       (Witness reviewed the document.)
12       In item 5 on what you would call page
13 638 --
14    Q   You're getting good at this.
15    A   I'm trying. You see a few examples and
16 then you can do it. I see at the end of number 5
17 the words "and build into software." And on number
18 6 I see "enter into computer."
19       So I don't remember what was disclosed at
20 this meeting or at any other Pew meeting, unless
21 perhaps you can remind -- jog my -- refresh my
22 memory in some way. But it looks to me as if the
23 words "computer" and "software" are in this outline.
24 And of course, we have no idea -- once again,
25 "software" as people would have thought of it in

Page 216

54 (Pages 213 to 216)

GEORGE A. GOLDBERG

1       I HEREBY CERTIFY that I have read this

2   transcript of my deposition and that this transcript

3   accurately states the testimony given by me, with

4   the changes or corrections, if any, as noted.

5

6

7                   x    _George A. Goldberg_____

8                            10/18/2005

9

10

11  Subscribed and sworn to before me this      day of

12                  , 20      .

13

14

15

16                  X

17                  Notary Public

18

19

20

21  My commission expires:

22

23

24

25

                        254

                GEORGE A. GOLDBERG

BARKLEY
Court Reporters

# EXHIBIT 14

REDACTED

EXHIBIT 15

REDACTED

# EXHIBIT 16

REDACTED

# EXHIBIT 17

REDACTED

# EXHIBIT 18

REDACTED

# EXHIBIT 19

REDACTED

EXHIBIT 20

REDACTED

EXHIBIT 21

### Development of CodeReview(TM)'s Medical Knowledge Base

CodeReview initially evolved from Dr. Robert Hertenstein's work at Caterpillar. During his seven years of reviewing Caterpillar claims, Dr. Hertenstein recognized that many physicians were submitting claims with inappropriate coding. He used this opportunity to discuss these patterns with other physicians, many of whom are recognized as leading experts in their fields. Dr. Hertenstein compiled this information and was implementing it manually on behalf of Caterpillar.

In 1987, through his association with Boston University's Health Policy Institute, an opportunity to automate Dr. Hertenstein's system was identified. The automation of Dr. Hertenstein's work lead to the development of CodeReview. It was recognized immediately that in order for the product to have credibility and to gain national acceptance by physicians and health care payors, the physician input to the product would have to be widely expanded and incorporate national practice patterns. This lead to the development of physician panels in each the surgical sub-specialties. The purpose of these panels is to review the rule base in their specialty and to determine the consensus for implementation. For those rules where a clear-cut consensus can not be reached, an optional rule is created. This allows the customer to determine how their organization will address the specific issue. Finally, prior to marketing CodeReview, the product was demonstated to groups of physicians to gain their feedback. CodeReview is the only product of its kind to be reviewed by the American College of Surgeons. Although these demonstrations did not allow for the detailed feedback of the consensus panels, they did result in resounding approval of CodeReview's Medical Knowledge Base.

In order to maintain its clinical credibility and physician acceptance, CodeReview must have on-going physician input. This is accomplished in three ways. The first is through our client base. The CodeReview Decision History File offers a wealth of information, not only on CodeReview's performance, but also on new coding patterns that are being devised. This leads to the creation of new rules, which are developed according to the steps outlined in the paragraph above. Secondly, Medical Directors with each of our clients are also a valuable source of information for product enhancements. Many client requests lead to the generation of new CodeReview rules. Thirdly, the annual publication of the AMA's CPT Manual results in modifications to CodeReview's Knowledge Base. Each year's first quarterly release of CodeReview contains new rules to conform with the AMA's most recent standards.

HPR is committed to maintaining our standard of physician involvement in CodeReview. We recognize that the integrity of our product lies within the richness of our physician contribution, and that a product without this validation risks repudiation by physician leadership. HPR believes there is no similar product on the market that can approach the breadth and depth of physician input that exists in CodeReview.

H000748

MCK 050516

04-CV-1258-SLR (D.Del.)

# EXHIBIT 22

## Page 1

1    IN THE UNITED STATES DISTRICT COURT
2    FOR THE DISTRICT OF DELAWARE
3
4  MCKESSON INFORMATION        )
   SOLUTIONS, LLC,        )
5                       )
         PLAINTIFF,    )
6  vs.            ) Case No. 04-1258-SLR
                   )
7  THE TRIZETTO GROUP, INC.,    )
                   )
8        DEFENDANT.   )
   _____)
9
10
11
12
13
14    VIDEO DEPOSITION OF MARK MUSEN, M.D., PH.D.
15    Held at Skadden, Arps, Slate, Meagher & Flom
16       525 University Avenue, 11th Floor
17          Palo Alto, California
18    Tuesday, November 22, 2005, 9:11 a.m.
19
20
21
22
23
24  REPORTED BY: CHRIS DE GEORGE, CSR. NO. 7069
25

## Page 2

1       A P P E A R A N C E S
2
3  For the Plaintiff:
4    Skadden, Arps, Slate, Meagher & Flom, LLP
5    BY: MICHAEL HENDERSHOT and JON SWENSON,
6    Attorneys at Law
7    525 University Avenue, 11th Floor
8    Palo Alto, California 94301
9    (650) 470-4500
10
11 For the Defendant:
12   GIBSON, DUNN & CRUTCHER LLP
13   BY: MICHAEL A. SITZMAN and DANIEL MUINO,
14   Attorneys at Law
15   One Montgomery Street
16   San Francisco, California 94104-4505
17   (415) 393-8221
18   msitzman@gibsondunn.com
19
20
21  Also present: Michael Barber,
22  Videographer
23
24
25

## Page 3

1              I N D E X
2
3  EXAMINATION              PAGE
4    BY: MR. SITZMAN          5, 292
5    BY: MR. HENDERSHOT       277
6
7
       INDEX OF EXHIBITS
8
9  NUMBER       DESCRIPTION       PAGE
10 MM-1  Multi-page Expert Report of Mark    5
        A. Musen, M.D., Ph.D.
11
     MM-2  Rebuttal Expert Report of Mark    5
12     A. Musen, M.D., Ph.D.; 37 pages
13 MM-3  United States Patent Number       15
        5,253,164
14
   MM-4  Paper entitled "An Access-oriented   72
15     Negotiated Fee Schedule, The
       Caterpillar Experience," pages
16     349-357
17 MM-5  Memorandum Order; 4 pages          109
18 MM-6  PEW Conference Presentation        173
       Managing Physician Fees; 4 pages
19
   MM-7  Vendor Comparison dated 1-18-88;   180
20     1 page
21 MM-8  Exhibit C, Materials Examined;     193
       9 pages
22
   MM-9  Expert Report of Dr. Margaret      298
23     L. Johnson, Ph.D; 30 pages
24
25

## Page 4

1       BE IT REMEMBERED that, pursuant to Notice, and
2  on Tuesday, November 22, 2005, commencing at the hour of
3  9:11 a.m. thereof, at the Law Offices of Skadden, Arps,
4  Slate, Meagher & Flom, LLP, 525 University Avenue, 11th
5  Floor, Palo Alto, California, before me, Chris De
6  George, CSR #7069, State of California, there personally
7  appeared
8       MARK MUSEN, M.D., PH.D.,
9  called as a witness herein by Defendant, who, being
10 first duly sworn, was examined as is
11 hereinafter set forth.
02:27 12       --oOo--
08:39 13
09:10 14       THE VIDEOGRAPHER:  Good morning.  My name is
09:10 15 Michael Barber.  I am a videographer associated with
09:10 16 Barkley Court Reporters located at 222 Front Street,
09:11 17 Suite 600, San Francisco, California 94111.  The date is
09:11 18 November 22nd, 2005.  The time is 9:11 a.m.
09:11 19       This deposition is taking place at Skadden,
09:11 20 Arps, Slate, Meagher & Flom, LLP, 525 University Avenue,
09:11 21 Palo Alto, California 94301 in the matter of McKesson
09:11 22 Information Solutions, LLC, versus the TriZetto Group,
09:11 23 Inc., Case Number 04-1258-SLR.
09:11 24       This is the videotape deposition of Mark
09:11 25 Musen, M.D., Ph.D. being taken on behalf of the defense.

MARK MUSEN, M.D., PH.D.

| | |
|---|---|
| 12:22 1 MR. HENDERSHOT: If we're approaching a | 01:27 1 THE WITNESS: It wasn't processible |
| 12:22 2 convenient time for lunch, whenever you get a chance. | 01:27 2 electronically, but he had it in — on his desk. |
| 12:22 3 MR. SITZMAN: I was going to try to get just | 01:27 3 BY MR. SITZMAN: |
| 12:22 4 through the remaining portions of the actual | 01:27 4 Q. Manually. |
| 12:22 5 infringement. Hold on just a second. | 01:27 5 A. Yes. |
| 12:23 6 Okay. Why don't we, if we can, why don't we | 01:27 6 Q. Okay. And the next step "means for |
| 12:23 7 break there, if that's okay. | 01:28 7 ascertaining whether the at least one claim contains a |
| 12:23 8 MR. HENDERSHOT: Okay. | 01:28 8 plurality of medical service codes," didn't |
| 12:23 9 MR. SITZMAN: Yeah. Why don't we break for | 01:28 9 Dr. Hertenstein's manual process have the function of |
| 12:23 10 lunch. | 01:28 10 making sure there were more than one claim that he was |
| 12:23 11 THE VIDEOGRAPHER: Going off the record, the | 01:28 11 looking at? |
| 12:23 12 time is 12:23 p.m. | 01:28 12 A. We believe that he can count. |
| 12:23 13 (Lunch recess taken at 12:23 p.m.) | 01:28 13 Q. Okay. So that's a "yes"? |
| 12:23 14 --oOo-- | 01:28 14 A. Yes. |
| 12:23 15 | 01:28 15 Q. Okay. And then the function, "means for |
| 12:23 16 AFTERNOON SESSION | 01:28 16 determining whether one of the medical service codes in |
| 01:01 17 THE VIDEOGRAPHER: Back on the record. The | 01:28 17 the at least one claim is medically exclusive with any |
| 01:25 18 time is 1:25 p.m. | 01:28 18 other medical service code in the at least one claim." |
| 09:37 19 BY MR. SITZMAN: | 01:28 19 Didn't — wasn't that the function that he would apply |
| 01:26 20 Q. I think I marked one of these before the | 01:28 20 to the claims he was reviewing? |
| 01:26 21 break, the Hertenstein article. | 01:28 21 A. So he would be able to look at the claims and |
| 01:26 22 A. Sure. | 01:28 22 cognitively there would be some mechanism by which he |
| 01:26 23 Q. MM-4? Yeah? | 01:28 23 would deter-- make that determination. |
| 01:26 24 MR. HENDERSHOT: What exhibit number did we | 01:28 24 Q. Right. Or mentally. |
| 01:26 25 get up to? | 01:28 25 A. Mentally. |
| Page 133 | Page 135 |

| | |
|---|---|
| 01:26 1 THE REPORTER: We're up to — 6 will be the | 01:28 1 Q. And in fact, we've looked at an example of |
| 01:26 2 next one. | 01:28 2 that here in Table 4 on — in his article itself. |
| 01:26 3 MR. SITZMAN: We think it's MM-4. | 01:28 3 A. Correct. |
| 01:26 4 Q. I'd like to do this, and I'd like you to take | 01:28 4 Q. Okay. Then the next step, "means for |
| 01:26 5 a look also at the claims of the patent, which is MM-3, | 01:29 5 authorizing medical service codes which are not |
| 01:26 6 and in particular I want to go through Claim 12. | 01:29 6 medically exclusive with any other medical service codes |
| 01:26 7 A. Okay. | 01:29 7 contained in the at least one claim in response to the |
| 01:26 8 Q. Okay? Now, we talked — you talked earlier, | 01:29 8 means for determining," that function was also carried |
| 01:26 9 you mentioned earlier this morning the -- that | 01:29 9 out by Dr. Hertenstein. He would say authorize that |
| 01:27 10 Dr. Hertenstein had a manual process — | 01:29 10 claim. |
| 01:27 11 A. Right. | 01:29 11 A. That's correct. |
| 01:27 12 Q. — for reviewing of claims, and a section of | 01:29 12 Q. Okay. And then the final step, "means for |
| 01:27 13 this article at MM-4 describes a portion of that, and we | 01:29 13 rejecting medical service codes which are medically |
| 01:27 14 looked at it earlier today with the unbundling. | 01:29 14 exclusive with any other medical service codes contained |
| 01:27 15 All right. What I want to do is I want to | 01:29 15 in the at least one claim in response to the determining |
| 01:27 16 walk through the elements here in Claim 12. I want | 01:29 16 step," and Dr. Hertenstein — that function was carried |
| 01:27 17 to — the "means for" sections here. Claim 12 says | 01:29 17 out again by Dr. Hertenstein which was rejecting those |
| 01:27 18 "means for receiving at least one claim." Didn't | 01:29 18 that were not medically exclusive — or that were |
| 01:27 19 Dr. Hertenstein's manual process, didn't he receive one | 01:29 19 medically exclusive. Sorry. |
| 01:27 20 claim as part of his process? | 01:29 20 A. That's correct. |
| 01:27 21 A. Sure. | 01:29 21 Q. Okay. So given that all of that was disclosed |
| 01:27 22 Q. And — or at least his — his process had that | 01:29 22 in the prior art or was already in use by |
| 01:27 23 function, the function of receiving a claim. | 01:29 23 Dr. Hertenstein, doesn't that render — we're just |
| 01:27 24 A. Right. | 01:29 24 looking at Claim 12 so we'll just focus on Claim 12 |
| 01:27 25 MR. HENDERSHOT: Objection. | 01:30 25 right now — doesn't that render Claim 12 invalid? |
| Page 134 | Page 136 |

34 (Pages 133 to 136)

MARK MUSEN, M.D., PH.D.

01:34 1  Dr. Hertenstein.
01:34 2      Q.  Okay.  But let me ask you this.  We went
01:34 3  · through the one, two, three, four -- five means steps.
01:34 4      A.  Yes.
01:34 5      Q.  And we said that those functions were either
01:34 6  being carried out by Dr. Hertenstein or were described
01:34 7  in his article.
01:34 8      A.  There -- well, cer- -- they presumably were
01:34 9  being carried out by Dr. Hertenstein.  The article
01:34 10 actually is pretty vague about the processes involved.
01:34 11 He gives examples without really going into the details
01:34 12 of how those particular details were handled.
01:34 13      I just feel a little bit uncomfortable when we
01:34 14 say there's a direct equivalence between a cognitive
01:34 15 process, which is not really well documented, and a
01:34 16 computational process, which is.
01:34 17      Q.  Okay.  And the computational process you're
01:34 18 talking about, I think you said this morning the
01:34 19 computational process is described in functionality, and
01:34 20 that's here in the claim.
01:35 21      A.  Right.
01:35 22      Q.  Okay.  I think you also testified this morning
01:35 23 that a person of ordinary skill in the art, looking at
01:35 24 that functionality, would need nothing more because they
01:35 25 could write the software program to carry out that

Page 141

01:35 1  functionality.
01:35 2      A.  That's correct.
01:35 3      MR. HENDERSHOT:  Objection.  Vague and
01:35 4  ambiguous.  Would need nothing more to do what?  I just
01:35 5  didn't understand what the --
01:35 6      MR. SITZMAN:  To write the software program --
01:35 7      MR. HENDERSHOT:  Okay.
01:35 8      MR. SITZMAN:  -- to carry out that
01:35 9  functionality.
01:35 10     Q.  If that's the case, then, and we know -- we
01:35 11 don't know precisely what Dr. Hertenstein was doing but
01:35 12 we do know that he carried out these steps, and we know
01:35 13 the function that he was or it was described or
01:35 14 disclosed what the function is that Dr. Hertenstein was
01:35 15 achieving with this process, given that, and given that
01:35 16 a software engineer could write software program to
01:35 17 carry that out, wouldn't it have been obvious, then, to
01:36 18 create the '164 invention or Claim 12 as we're looking
01:36 19 at?
01:36 20     MR. HENDERSHOT:  I'm going to object to that
01:36 21 as misstating his testimony.  I don't believe that he
01:36 22 testified that given any function, it would be obvious,
01:36 23 without more, to be able to write the code to implement
01:36 24 it.  I believe he was talking about various design
01:36 25 choices in implementing something that had been designed

Page 142

01:36 1  or modeled.
01:36 2      Other than that, to the extent you can answer
01:36 3  the question --
01:36 4      THE WITNESS:  And -- and -- and I think what
01:36 5  you're glossing over is the patent defines more than
01:36 6  just these steps.  The patent defines relationships
01:36 7  among service codes which are essential for these steps
01:36 8  to be carried out.  Elucidating what those relationships
01:36 9  are is actually one of the key elements of the patent.
01:36 10 BY MR. SITZMAN:
01:36 11     Q.  Where is that set forth in the patent, the
01:36 12 relationships between the codes that -- that you were
01:36 13 saying would have to be ferreted out?
01:36 14     A.  Well, I mean the fact that the relationships
01:36 15 exist is defined in the claims.  Examples of those
01:36 16 relationships are defined in the -- the rules in
01:36 17 Appendix B.
01:36 18     Q.  But the claims don't contain specificity about
01:37 19 what those relationships are, correct?
01:37 20     MR. HENDERSHOT:  Objection.  Vague and
01:37 21 ambiguous as to "specificity."
01:37 22     THE WITNESS:  Yeah.
01:37 23 BY MR. SITZMAN:
01:37 24     Q.  Well, the examples that you're talking about
01:37 25 in the specification, those are not set forth in the

Page 143

01:37 1  actual claim language, correct?
01:37 2      A.  They are implied by the claim language, and
01:37 3  presumably, if one had this collection of claims and the
01:37 4  collection of relationships that were inferred from
01:37 5  those claims, they would -- they would exist.  And in
01:37 6  fact, that -- we know people who have been able to
01:37 7  recreate this, the overall functionality, on the basis
01:37 8  of the claims and -- and the specification.
01:37 9      Q.  But why couldn't somebody of ordinary skill in
01:37 10 the art, as you described this morning --
01:37 11     A.  Right.
01:37 12     Q.  -- knowing the function that Dr. Hertenstein
01:37 13 was carrying out, why couldn't that person of ordinary
01:37 14 skill in the art just simply write a software program?
01:37 15     MR. HENDERSHOT:  Objection.  Vague and
01:38 16 ambiguous as to what function you're referring to.
01:38 17     MR. SITZMAN:  Well, any of the functions we
01:38 18 just went through that Dr. Hertenstein was doing
01:38 19 manually.
01:38 20     THE WITNESS:  Right.  As I described in detail
01:38 21 in my second report, there is a tremendous difference
01:38 22 between having a person who is capable of carrying out
01:38 23 some professional activity and being able to translate
01:38 24 those steps into a computer program that's able to
01:38 25 achieve the same functionality; that it is not always

Page 144

36 (Pages 141 to 144)

MARK MUSEN, M.D., PH.D.

01:38 1    obvious, and I'm almost afraid to use the word
01:38 2    "obvious," but it's -- it's not apparent by knowing what
01:38 3    a person does or claims to do in some professional
-01:38 4   activity to be able to translate that directly into some
01:38 5    computational system.
01:38 6        We know, for example -- for example, even in
01:38 7    the case of this patent, the inventors, including
01:38 8    Dr. Hertenstein, spent an enormous amount of time trying
01:38 9    to be able to do that translation, and that translation
01:38 10   was not obvious to them.
01:39 11   BY MR. SITZMAN:
01:39 12   Q.  So it took a long time.
01:39 13   A.  Yeah.
01:39 14   Q.  Okay.  But you'll agree with me, Doctor, that
01:39 15   just because it took a long time doesn't make it novel
01:39 16   in terms of its inventive quality.
01:39 17       MR. HENDERSHOT:  Objection.  Misstates his
01:39 18   testimony.  I don't think the -- the full extent of what
01:39 19   he identified as the reason why it was not obvious is
01:39 20   the amount of time that it took.
01:39 21       THE WITNESS:  People typically view the
01:39 22   creation of any knowledge-based system as much more than
01:39 23   the translation of some manual process into some
01:39 24   automated process, that in order to get from the manual
01:39 25   process, which is usually not well understood by the

01:39 1    person who carries it out to something which is
01:39 2    regularly automated, requires a fair amount of inventive
01:39 3    activity to come up with a computational model that will
01:39 4    achieve the same goals.  So what Dr. Hertenstein may
01:39 5    have been doing eyeballing these claims may not have
01:40 6    been actually this sequence of steps laid out in the
01:40 7    claims for the patent, but this turns out to be a model
01:40 8    that will achieve the goals that Dr. Hertenstein was
01:40 9    able to do in his -- in his manual process.
01:40 10   BY MR. SITZMAN:
01:40 11   Q.  Well, I'm confused then.  Then if -- if what
01:40 12   I'm hearing you say then -- well, strike that.
01:40 13       Earlier this morning you said that the
01:40 14   functional language that's described in the claim is so
01:40 15   specific that anyone of ordinary skill in the art could
01:40 16   have designed a software program to carry out that
01:40 17   function.  That structure, the actual algorithm and the
01:40 18   actual software necessary to carry that structure out,
01:40 19   need not have been disclosed in the patent.
01:40 20       MR. HENDERSHOT:  Objection.  That's a
01:40 21   mischaracterization of his earlier testimony.  He didn't
01:40 22   say it wasn't disclosed in the patent or need not be
01:40 23   disclosed in the patent.  I think he had testified to a
01:40 24   tight correlation between the algorithm and the function
01:40 25   itself.  I -- I could be wrong, but I think that's what

01:40 1    I recall.
01:40 2        THE WITNESS:  No, that was my testimony, and
01:40 3    I -- I -- I do think the patent discloses the means by
01:41 4    which to achieve the functions.  What -- but what I'm
01:41 5    saying is that these particular functions create a
01:41 6    plausible, regularized, automated description of what
01:41 7    Dr. Hertenstein was doing, but we have no way of knowing
01:41 8    exactly what he was doing when he was eyeballing claims.
01:41 9    BY MR. SITZMAN:
01:41 10   Q.  Okay.  Well, let's -- let's go back 'cause I
01:41 11   do think we've got a change in some of the testimony,
01:41 12   and maybe it's just my misunderstanding.  Let's take the
01:41 13   first one, the "means for receiving at least one claim."
01:41 14   Where is it that that structure or that software, that
01:41 15   program, that code, is described in the patent?
01:41 16   A.  The specification actually lays out a -- a
01:41 17   work flow.  I mean, in fact, these flow charts document
01:41 18   the way in which information gets entered into the
01:41 19   computer system and so the -- the means for receiving
01:41 20   the claim is a function of inputting the claim data into
01:42 21   the -- into the pro-- into the program.
01:42 22   Q.  Okay.  But there is no software program that's
01:42 23   described to carry that function out, is there?
01:42 24       MR. HENDERSHOT:  Objection.  Vague and
01:42 25   ambiguous as "described to carry that function out."  Do

01:42 1    you mean line by line, code by code is disclosed or if
01:42 2    it's described or disclosed generally?
01:42 3        MR. SITZMAN:  Either one.
01:42 4        THE WITNESS:  Well, what is disclosed is that
01:42 5    this is all implementable using commercial software
01:42 6    systems and basically dBase, and entering information
01:42 7    into a computer program is a relatively straightforward
01:42 8    thing to do.  It doesn't require a lot of elaboration
01:42 9    for someone skilled in the art to know how to input
01:42 10   data.
01:42 11   BY MR. SITZMAN:
01:42 12   Q.  But how do we know what structure is -- what
01:42 13   software program was designed by the inventors for
01:42 14   achieving the function of receiving at least one claim?
01:42 15   A.  Well, I mean they -- they obviously provide
01:42 16   their code, or parts of the code, the code is
01:43 17   incomplete, and they provide, more important, the flow
01:43 18   charts described in the figures which provide the basis
01:43 19   by which one would be able to reproduce their work.
01:43 20   Q.  And I think you testified -- okay.  Well,
01:43 21   let's -- let's go to the -- you'll agree with me that
01:43 22   the code isn't complete that's attached as Appendix D,
01:43 23   right?
01:43 24   A.  My understanding is that it -- that it isn't.
01:43 25   complete.  Obviously, there's no way of testing it to

02:21 1     I want to turn to this.
02:21 2     Are you familiar, Doctor, with PEW
02:21 3  conferences?
02:21 4    A. No.
02:21 5    Q. P-E-W, the PEW Foundation?
02:21 6    A. I am familiar with the PEW Foundation.
02:21 7    MR. SITZMAN: Okay. Let me mark this as the
02:21 8  next in order.
02:21 9    THE REPORTER: Number 6.
02:21 10    (Defendant's Exhibit MM-6 was marked.)
02:21 11  BY MR. SITZMAN:
02:21 12    Q. Have you look at MM-6. I don't know whether
02:21 13  or not this was part of your materials that you
02:21 14  reviewed.
02:21 15    A. No. This is the first time I've seen this.
02:21 16    Q. Okay. If you could take a look at that
02:21 17  document for a second, I'd appreciate that.
02:22 18    MR. HENDERSHOT: It's 6, I think.
02:22 19    MR. SITZMAN: Oh, thanks.
02:22 20    THE WITNESS: Okay.
02:22 21  BY MR. SITZMAN:
02:22 22    Q. Were you aware that HPI delivered a
02:23 23  presentation to the PEW or some colleagues of the PEW
02:23 24  Foundation in April 1986?
02:23 25    A. No.

Page 173

02:23 1    Q. No? This is an outline of the presentation
02:23 2  that was given. You see the -- I'll draw your attention
02:23 3  to page 119638.
02:23 4    A. Okay.
02:23 5    Q. It's entitled "The Model Approach to Physician
02:23 6  Fee Review."
02:23 7    A. Yeah.
02:23 8    Q. And it talks about the survey of medical
02:23 9  community, compare the community findings.
02:23 10    Draw your attention to Item Number 5 and then
02:23 11  Number 6. Five says: "Develop, from" the "above, rate
02:23 12  schedules, appropriate bundling guidelines, service
02:23 13  descriptions, and appropriate service/diagnosis/
02:23 14  procedure correlation and build into software."
02:24 15    And then 6 says: "Recode selected bills and
02:24 16  enter into computer. Computer identifies exceptions to
02:24 17  rate schedules, bundling, use of assistant surgeons, and
02:24 18  so forth."
02:24 19    Doctor, does this disclosure, in your mind,
02:24 20  provide the outline or work-up of what's disclosed in
02:24 21  the '164 patent?
02:24 22    MR. HENDERSHOT: Objection. Vague and
02:24 23  ambiguous as to "outline or work-up."
02:24 24    THE WITNESS: I mean, it certainly is
02:24 25  consonant with the goals of the '164 patent.

Page 174

02:24 1  BY MR. SITZMAN:
02:24 2    Q. And it expresses the -- the idea that it would
02:24 3  be developed and built into software?
02:24 4    A. I -- I'm reading that here just as you are.
02:24 5    Q. And if they had disclosed, HPI had disclosed
02:25 6  publicly, you know, the -- well, strike that.
02:25 7    We already -- we already have the Hertenstein
02:25 8  article --
02:25 9    A. Uh-huh.
02:25 10    Q. -- and we also have a year earlier this
02:25 11  presentation that was done at the PEW conference showing
02:25 12  the intent, the model approach which would be built into
02:25 13  software. Would you agree now that we've now had this
02:25 14  disclosure to the public about a system that could be
02:25 15  computerized using Dr. Hertenstein's system as a model?
02:25 16    MR. HENDERSHOT: Objection. Calls for a legal
02:25 17  conclusion as to "disclosure to the public."
02:25 18  BY MR. SITZMAN:
02:25 19    Q. Well, you would agree with me --
02:25 20    A. Well, I would agree that it --
02:25 21    THE REPORTER: One at a time. "You would
02:25 22  agree with me" -- and whoever.
02:25 23  BY MR. SITZMAN:
02:25 24    Q. You would agree with me that there's been a
02:25 25  disclosure now of the computerized system.

Page 175

02:25 1    A. I would agree that there's been a disclosure
02:25 2  to the attendees at this meeting that there is the
02:26 3  potential to build such a computer. I don't think the
02:26 4  computer system has been disclosed in this outline.
02:26 5    Q. Okay.
02:26 6    A. I guess I'm confused by this 'cause it was my
02:26 7  understanding that Hertenstein was sort of a -- a
02:26 8  one-man show at this particular time doing this work for
02:26 9  Caterpillar, so I'm not -- I'm not sure who is making
02:26 10  this presentation.
02:26 11    Q. Well, Charlie Moore at HPI was the one who was
02:26 12  in charge of making this presentation back in Boston,
02:26 13  but I think the evidence will show that he was working
02:26 14  very closely with Dr. Holloway and Dr. Hertenstein in
02:26 15  the development of this process.
02:26 16    Did you ask, as part of your analysis and part
02:26 17  of your report to get information, about what
02:26 18  disclosures had been made by Caterpillar or HPI or any
02:26 19  of the earlier developers as to what disclosures had
02:26 20  been made of the computerized system?
02:27 21    A. I discussed that with McKesson's counsel.
02:27 22    Q. Okay. And what were you told about these
02:27 23  disclosures to the public?
02:27 24    A. I was told that the only thing that was
02:27 25  disclosed was the idea that the manual processing had

Page 176

44 (Pages 173 to 176)

MARK MUSEN, M.D., PH.D.

02:36 1  beyond the scope of the claims.
02:36 2      A.  That's correct.
02:37 3      Q.  As a relationship to the entire product, do
02:37 4  you know or can you quantify for me the functionality,
02:37 5  you know, either as a percentage or as, you know, a — I
02:37 6  don't know how otherwise to quantify it, the
02:37 7  functionality that is embraced or embodied in the 16
02:37 8  claims in the patent?
02:37 9      A.  I wouldn't know what the denominator is.  I —
02:37 10  I'm not sure how to answer that question.
02:37 11      Q.  Right.  So I don't know if the denominator is
02:37 12  1,000 or 2,000 or 4.
02:37 13      A.  Right.  I mean my understanding is that
02:37 14  what — what's at stake today is whether the claims are
02:37 15  infringed and everything else is — is window dressing.
02:37 16      Q.  Okay.  Window dressing in the sense that it —
02:37 17  it's not part of your analysis?
02:37 18      A.  It's not part of my analysis.
02:37 19      Q.  Okay.  Now, you have not expressed any opinion
02:38 20  or provided any analysis in your reports as to whether
02:38 21  the allegedly infringing products infringed the '164
02:38 22  patent under a doctrine-of-equivalence analysis,
02:38 23  correct?
02:38 24      A.  Those are legal terms that are — that you'll
02:38 25  have to explain to me.

Page 185

02:38 1      Q.  Well, you have not been asked to render an
02:38 2  opinion under the doctrine of equivalence.  Has anybody
02:38 3  asked you to do that?
02:38 4      A.  Not to my knowledge.
02:38 5      Q.  Not to your knowledge.  And if it wasn't to
02:38 6  your knowledge, it certainly didn't make it into your
02:38 7  report.
02:38 8      A.  That's correct.
02:38 9      Q.  Okay.  We bounced around a little bit so some
02:38 10  of this —
02:38 11      A.  Yeah.
02:38 12      Q.  It will not be duplicative but it — it may
02:38 13  seem like it's more bouncing.  I apologize.
02:39 14      You'll agree with me, Doctor, won't you, that
02:39 15  people knew about knowledge-based expert systems prior
02:39 16  to 1987.
02:39 17      A.  Of course.
02:39 18      Q.  And you'll also agree with me that people knew
02:39 19  how to design knowledge-based systems prior to '87?
02:39 20      A.  Sure.
02:39 21      Q.  And in fact, people were designing them before
02:39 22  1987.
02:39 23      A.  Yes.
02:39 24      Q.  And that they were in use and in the public
02:39 25  do- — domain before 1987.

Page 186

02:39 1      A.  That's correct.
02:39 2      Q.  And you'll also agree with me that just
02:39 3  because something, the design of a system or
02:39 4  computerized program, is time-consuming or expensive to
02:39 5  build, like a knowledge-based system —
02:39 6      A.  Yeah.
02:39 7      Q.  — just because it's expensive or
02:39 8  time-consuming does not make it patentable just because
02:39 9  it's time-consuming or expensive.
02:39 10      A.  No.  It has to be novel.
02:39 11      Q.  In fact, I was just thinking about really
02:39 12  early testimony this morning, the system that you tried
02:39 13  to patent based on your thesis —
02:39 14      A.  Yes.
02:39 15      Q.  — I'm sure that was time-consuming.
02:39 16      A.  Yes.
02:39 17      Q.  And that turned out to be not patentable.
02:40 18      A.  For non-medical reasons.
02:40 19      Q.  I shudder to ask for a definition there, but
02:40 20  it was not patentable.
02:40 21      A.  No.
02:40 22      Q.  All right.  With regard to your invalidity
02:40 23  report, MM-2.
02:40 24      A.  Okay.
02:40 25      Q.  We haven't really looked at that in any detail

Page 187

02:40 1  yet, and I'm actually thinking about paragraph 10 in
02:40 2  particular but I think the generalized statement will be
02:40 3  fine, but this is where I was going.
02:40 4      It — it appears to me that you agree with
02:41 5  Dr. Davis that by the early '80s the tasks required for
02:41 6  building an expert system were widely known, but I think
02:41 7  you disagree with Dr. Davis about the weight that he
02:41 8  gives the challenge or the work that's inherent in the
02:41 9  process.
02:41 10      A.  I think that's fair.
02:41 11      Q.  Okay.  Now, the — the nine cited references
02:41 12  on pages 6 and 7, I — I think, kind of underscore that.
02:41 13  Again, there's an agreement between you, Dr. Davis, and
02:41 14  Dr. Kerschberg that the creation of knowledge-based
02:41 15  expert systems is time-consuming and difficult.
02:41 16      A.  Yes.
02:41 17      Q.  Okay.  And just because someone built a
02:41 18  knowledge-based system, according to your analysis, just
02:42 19  because somebody built a knowledge-based system to solve
02:42 20  one problem, does not mean that person could easily
02:42 21  build a knowledge-based system to solve another problem.
02:42 22      A.  Or at least the results were not transferable.
02:42 23      Q.  Okay.  Once you assemble a '64 Ford Mustang
02:42 24  from scratch doesn't mean you can assemble a Ford
02:42 25  Expedition or a Nissan Pathfinder with any great ease.

Page 188

47 (Pages 185 to 188)

MARK MUSEN, M.D., PH.D.

04:08 1      MR. HENDERSHOT: Objection. Misstates his
04:08 2  testimony.
04:08 3      THE WITNESS: There is an interplay between
04:08 4  the claims and the specification, and when I look at the
04:09 5  intentions of the inventors, as described in the
04:09 6  specification, it gives me the knowledge that this
04:09 7  patent is meant to apply to more than three instances.
04:09 8  BY MR. SITZMAN:
04:09 9      Q. All right. Let's go back to my hypothetical
04:09 10  where we were just building a system that dealt with
04:09 11  Table 4 in the Hertenstein article, something that we've
04:09 12  all determined and said was in the public domain, was
04:09 13  capable, was obvious.
04:09 14     A. Yes.
04:09 15     Q. A system just dealing with Table 4. Okay?
04:09 16     MR. HENDERSHOT: I'll object and say that the
04:09 17  fact that a computer system, including that being in the
04:09 18  public domain, was -- assumes a fact not in evidence.
04:09 19     MR. SITZMAN: It was not in the public domain.
04:09 20  It was something, though, that could be done and would
04:09 21  have been obvious to somebody who was skilled in the
04:09 22  arts at the time to build a system that was just dealing
04:09 23  with Table 4.
04:09 24     MR. HENDERSHOT: Objection. Assumes facts not
04:09 25  in evidence and misstates his testimony as to whether or

04:10 1  for considering obviousness divorced of any motivation,
04:11 2  but --
04:11 3      THE WITNESS: More important, one would not
04:11 4  use a system based on Rule E2 to implement a system that
04:11 5  worked with the single rule in Table 4 of the Egbert
04:11 6  [sic] and Hertenstein paper. The way in which that
04:11 7  would presume -- would ordinarily be implemented would
04:11 8  not be in the -- by using a rule as general as that in
04:11 9  the embodiment described in the patent specification.
04:11 10  BY MR. SITZMAN:
04:11 11     Q. Okay. But if you did -- well, actually,
04:11 12  let's -- let's do it the motivation. We've talked about
04:11 13  this -- this reference on page 353 of the same article,
04:11 14  that it can also be used by claims processing systems.
04:11 15     A. Right.
04:11 16     Q. Let's suppose that that motivated somebody to
04:11 17  deal with -- to come up to Dr. Hertenstein or Dr. Egdahl
04:11 18  after the presentation and say, I want to build into my
04:11 19  claims processing system something to deal with this
04:12 20  unbundling problem in Table 4. Wouldn't they construct
04:12 21  the system -- we know that they could, but wouldn't they
04:12 22  construct a system, the ordinary skill-in-the-art person
04:12 23  would construct a system building a rule that was
04:12 24  identical to E2?
04:12 25     A. No.

04:09 1  not it would have been obvious to build that. I think
04:09 2  he's testified that no one would have been motivated to
04:10 3  build that.
04:10 4  BY MR. SITZMAN:
04:10 5      Q. All right. They may not have been motivated,
04:10 6  but somebody could have done it.
04:10 7      A. Yeah.
04:10 8      Q. No question as to that.
04:10 9      A. That's correct.
04:10 10     Q. In fact, you've raised the, "Why would
04:10 11  somebody be motivated to do that?"
04:10 12     A. Exactly.
04:10 13     Q. Assuming somebody was, somebody was motivated
04:10 14  to build that system --
04:10 15     A. Right.
04:10 16     Q. -- okay, A, they could build it in 1987, okay?
04:10 17  Why then, if they could build it, and I think you've
04:10 18  previously testified that a rule that would deal with
04:10 19  Table 4 would be E2 --
04:10 20     A. Yeah.
04:10 21     Q. -- in the patent, why, then, would it -- why
04:10 22  isn't it obvious, then, that other codes and other
04:10 23  relationships could have been done the same way?
04:10 24     MR. HENDERSHOT: Objection. Calls for a legal
04:10 25  conclusion as to "obvious," and also vague and ambiguous

04:12 1      Q. Okay. Why not?
04:12 2      A. Because if the system were to work only in the
04:12 3  context of that table, the rule would be one that
04:12 4  references the specific entries in that table. It
04:12 5  wouldn't be the generic template that exists in the
04:12 6  patent specification.
04:12 7      Q. I gotcha. So in other words, if it was only
04:12 8  that one hypothetical, you wouldn't have to build the
04:12 9  generic. You'd have the -- you'd have the specifi- --
04:12 10  specific.
04:12 11     A. You would build Rule E2 only if you had the
04:12 12  intention of scaling to a large number of codes.
04:12 13     Q. Okay. But what if it was two or three? What
04:12 14  if after this presentation -- actually, I think
04:12 15  there's -- didn't we have another one? Yeah. Recoding
04:13 16  of unnecessary procedure, Table 6. What if we wanted
04:13 17  to -- to -- to -- to build into that construct Table 4,
04:13 18  Table 6, Table 5 and say, all right, we're going to deal
04:13 19  with those three problems.
04:13 20     A. But each one of those would be programmed as a
04:13 21  rule that dealt with the data in those specific tables.
04:13 22  As soon as you want to deal with a situation which is
04:13 23  scalable to a larger number of codes, then you need to
04:13 24  go into the framework that's described in the patent.
04:13 25  That requires a fair amount of experimentation. That

04:41 1  Hertenstein article address the unbundling task?
04:41 2      A.  We're dealing with a vague word. It
04:41 3  addresses the unbundling tasks; it doesn't offer an
04:41 4  automated solution to the unbundling task.
04:41 5      Q.  Okay. What, in your mind, in the references
04:41 6  you've cited provides the solution but not the
04:41 7  unbundling task?
04:41 8      MR. HENDERSHOT:  Objection. Again misstates
04:41 9  his testimony.
04:41 10     MR. SITZMAN:  Strike that. Let me rephrase
04:41 11 it.
04:41 12     Q.  Have you discovered in any of these references
04:41 13 the solution addressed by the '164 patent without the
04:42 14 unbundling task?
04:42 15     MR. HENDERSHOT:  Objection. Vague and
04:42 16 ambiguous as to the solution and —
04:42 17     THE WITNESS:  I find that an oxymoronic
04:42 18 question. I don't understand how there can be a
04:42 19 solution that doesn't address the task that's relevant.
04:42 20 BY MR. SITZMAN:
04:42 21     Q.  Okay. So the solution — your reference to
04:42 22 the Egdahl-Hertenstein article as — as describing the
04:42 23 unbundling task but not the solution —
04:42 24     A.  It's not automated.
04:42 25     Q.  * It's not automated. And that is the only

04:42 1  thing that's missing then from the Egdahl-Hertenstein
04:42 2  article that would otherwise have rendered the '164
04:42 3  patent invalid.
04:42 4      A.  And that only thing is a major thing.
04:42 5      Q.  I'm not taking anything away from it. I just
04:42 6  want to make sure I've got the parts of the puzzle.
04:42 7      A.  Right.
04:42 8      Q.  Okay.
04:42 9      MR. HENDERSHOT:  Can I hear that question a
04:42 10 couple times before? There was some reference to the
04:42 11 patent being rendered invalid.
04:43 12     (* Record read.)
04:43 13     MR. HENDERSHOT:  I'm going to interpose an
04:43 14 objection. This is compound and vague and ambiguous as
04:43 15 to which claim or what grounds for invalidity.
04:43 16 BY MR. SITZMAN:
04:43 17     Q.  I want to have you turn to page 22 of the
04:43 18 report. You have a discussion of the Nathanson experts
04:43 19 or the Nathanson article experts. In there you describe
04:43 20 the Nathanson article. "This article discusses a
04:43 21 computer system for preparing Medicare claims prior to
04:43 22 submission for payment to look up codes based on textual
04:43 23 descriptions." Do you see that?
04:43 24     A.  Yes, I do.
04:43 25     Q.  And also — let's see. Sorry. Okay. And —

04:44 1  and then back a couple pages, page 19, the Doyle patent,
04:44 2  that starts at the bottom of page 19 there, '452: "With
04:44 3  respect to the '164 patent claims, this patent indicates
04:44 4  little more than the fact that a computer system could
04:44 5  be used to check if diagnosis and procedure codes are
04:44 6  'fictitious' and that multiple procedures may be
04:44 7  submitted on a single claim." You see that?
04:44 8      A.  I see that.
04:44 9      Q.  Now, in comparing that, those two, the
04:44 10 Nathanson and the Doyle references, either in isolation
04:44 11 or in combination with Claim 1 of the patent, can you
04:45 12 explain to me why it is that neither of those render
04:45 13 Claim 1 of the patent invalid or obvious?
04:45 14     MR. HENDERSHOT:  Objection. Calls for a
04:45 15 narrative.
04:45 16 BY MR. SITZMAN:
04:45 17     Q.  Well, let me ask your conclusion. Is it your
04:45 18 conclusion that neither of those references render
04:45 19 Claim 1 invalid?
04:45 20     A.  Yes.
04:45 21     Q.  Okay. And why?
04:45 22     MR. HENDERSHOT:  Objection. Again, calls for
04:45 23 a narrative. At this point the document largely speaks
04:45 24 for itself.
04:45 25     THE WITNESS:  That the task performed by those

04:45 1  two patents or the systems that were implemented using
04:45 2  those two patents is different from that of the '164
04:45 3  patent.
04:45 4  BY MR. SITZMAN:
04:45 5      Q.  But looking at Claim 1, Claim 1 is nearer than
04:45 6  the other claims in that all it does, if you — if you
04:45 7  ascribe to my interpretation, it receives a claim and it
04:46 8  determines whether any medical service claim is — is
04:46 9  contained in the at least one claim is not present in
04:46 10 the predetermined database. It looks up to see if it's
04:46 11 in the database.
04:46 12     MR. HENDERSHOT:  Objection. Assumes facts not
04:46 13 in evidence. It misstates the content of the claim,
04:46 14 ignores wholly half of the claim.
04:46 15 BY MR. SITZMAN:
04:46 16     Q.  All right. What is it you believe Claim 1
04:46 17 does?
04:46 18     A.  Well, it — let's go through it.
04:46 19     Q.  Okay.
04:46 20     A.  "In a computer system having means for
04:46 21 operating on a predetermined database containing medical
04:46 22 service codes and a set of relationships among the
04:46 23 medical service codes defining whether selected ones of
04:46 24 the medical service codes are valid when input with
04:46 25 other selected ones of the medical service codes, a

1  State of CALIFORNIA          )

2  County of Santa Clara        )

3

4

5

6

7        I, the undersigned, declare under penalty of

8  that I have read the foregoing transcript, and I have

9  made any corrections, additions or deletions that I was

10 desirous of making; that the foregoing is a true and

11 correct transcript of my testimony therein.

12        EXECUTED this 17 day of December,

13 2005, at Stanford, CA.

           (City)                    (State)

14

15

16

17

18        _____ M, PhD

           MARK MUSEN, M.D., PH.D.

19

20

21

22

23

24

25

                        326

           MARK MUSEN, M.D., PH.D.

# EXHIBIT 23

# An Access-oriented Negotiated Fee Schedule
## The Caterpillar Experience


PLAINTIFF'S
EXHIBIT
B

RICHARD H. EGDAHL, M.D., and ROBERT D. HERTENSTEIN, M.D.

From the Department of Surgery and Health Policy Institute, Boston University Medical Center, Boston, Massachusetts, and Caterpillar Corporation, Peoria, Illinois

This paper describes the system used by Caterpillar Corporation (CAT) in Peoria, Illinois, to reimburse surgeons. The CAT system assures access for Caterpillar employees and their families to a selection of qualified surgeons, while achieving cost savings through improvements in processing of surgical claims and negotiation of selected fees. CPT-4 codes are recoded for greater accuracy, when indicated, surgical services that have been incorrectly unbundled are rebundled, and the appropriateness of surgical assistant charges is reviewed. A "degree of intensity" relative value scale (DODRVS) of surgical services is periodically revised as technology changes. The DODRVS multiplied by a regional factor, determined by local market research, establishes the fee that CAT will pay the surgeon. Balance billing is permitted if the patient (1) is informed in advance by the surgeon that the fee will be higher than CAT will pay, and (2) knows that the service can be obtained from other local surgeons who will accept the CAT fee. The goal of the CAT method of surgeon reimbursement is to gain physician support for an access-oriented, market-driven negotiated fee schedule. Compared with a resource-based relative value scale (RBRVS) methodology, the CAT system is not formula-driven and depends on physician acceptance.

**F**OR MORE THAN 25 years, physicians have benefited from a generous fee-for-service system of payment. However, between 1965 and 1985, national expenditures for physicians' services have increased almost tenfold, from $8.5 billion in 1965 to $83 billion in 1985.[1] As a result, several possible physician payment reforms are being considered. Prospective payment by diagnostic-related groups (DRGs), put in place to control Medicare hospital expenditures, is a way of life for hospitals. Medicare and Medicaid are now looking for changes in the way they pay physicians. Managed care programs are negotiating discounts from all types of health care providers.

Reform activity can be identified on many fronts: (1) Congress has frozen Medicare fees, effective June 1984 through January 1987. Congress' intent is now to shift the burden of effectively constraining the growth of Medicare Part B costs to providers rather than Medicare beneficiaries. (2) The Physician Payment Review Commission, created by Congress, has issued a recent major report, outlining ways that physicians could be reimbursed under Medicare in the future.[2] (3) In fall 1985, the Health Care Financing Administration (HCFA) contracted with Harvard University to conduct a 30-month study of resource-based relative value scales (RBRVS) for physician services.[3] This system is being developed under the direction of William Hsiao, Ph.D., Harvard School of Public Health. The American Medical Association is a subcontractor on the study for HCFA. The study is scheduled to be completed in July 1988. (4) The Massachusetts Rate Setting Commission is revising its Medicaid fee schedule, based on the RBRVS, for planned application in mid-1987. (5) The Massachusetts Insurance Commissioner asked Blue Shield to consider reforms in physician payment, with an emphasis on developing an RBRVS, as a condition of his approving a Blue Shield rate increase in 1987. (6) Congressional hearings on physician fee schedules continue, and congressionally sponsored studies of physician fees have recently been published.[4,5]

Within the administration in Washington, proponents of physician fee reform are calling for an expanded use of capitation in the long term, or some form of physician DRGs.[6] But these changes are not imminent. During the next several years, fee payment modifications will be based in fee-for-service recalculations. If the revised physician fee schedules achieve acceptable levels

Presented at the 107th Annual Meeting of The American Surgical Association, Palm Beach, Florida, April 21–23, 1987.

Reprint requests: Richard H. Egdahl, M.D., Boston University Medical Center, 720 Harrison Avenue (11071, Boston, MA 02118.

Submitted for publication: April 24, 1987.

349

MCK 035619
04-CV-1258-SLR (D.Del.)

Confidential Information
Subject to D. Del. LR 26.2

EGDAHL AND HERTENSTEIN

TABLE 1. *Medicare Prevailing Fees (5, 1984)[a]*

| State | CABG | Appendectomy | Cataract |
|-------|------|--------------|----------|
| New York | 6000 | 1134 | 1547 |
| Michigan | 3100 | 399 | 825 |
| Rhode Island | 2587 | 516 | 928 |

[a] The charges indicated are for specialists and for the large urban areas within the states listed.

From the U.S. Department of Health and Human Services, Health Care Financing Administration. Medicare Directory of Prevailing Charges 1984. Washington DC: U.S. Government Printing Office, 1984.

of patient access and physician support, they will be part of the blueprint for future health care delivery in both private and public arenas.

## Background

Medicare's "customary, prevailing, and reasonable" (CPR) payment system is, by general consensus, unsatisfactory in today's competitive market in health services. There are many problems associated with CPR. It tends to be inflationary and slow to respond to alternatives in technology and changes in both availability of physicians and need for services. Some charges appear excessive to most observers, even taking into account geographic cost-of-living variations and other variables. For example, under Medicare, the cost of a triple vessel CABG (coronary artery bypass graft) in New York in 1984 was $5500. The cost of this same procedure in Michigan was $3100 and $2587 in Rhode Island (Table 1).

Similar variations are found in fees from the private sector. For example, unexplained fee variations exist in managed health care models such as independent practice associations (IPAs). Hip replacement at three different IPAs in the eastern part of the country ranged from $2808 to $4274 (see Table 2).

Noting these wide discrepancies, the federal government and a number of large private purchasers of health services have turned their attention to the ways physicians are compensated for the care they provide. Fundamental changes in the methodology of physician reimbursement are being discussed. Serious consideration

TABLE 2. *Fee Variations in 3 IPAs, 1986 Fees ($)[a]*

| Operation | Plan #1 | Plan #2 | Plan #3 |
|-----------|---------|---------|---------|
| Appendectomy | 645 | 950 | 1111 |
| Cholecystectomy | 1055 | 1465 | 1710 |
| Cataract removal | 1280 | 1650 | 1980 |
| Hip replacement | 2808 | 3666 | 4274 |
| CABG (3-vessel) | 4690 | 6123 | 7139 |

[a] Plan names withheld because fees were given in confidence to Health Policy Institute by IPA executives.

is being given to systems that would pay physicians by capitation or by including the physician payment within the hospital DRG payment. However, both options represent a radical departure from the current system and are viewed as politically unrealistic, at least in the near term.

Several interim remedies are being devised, however. One approach adjusts a few fees that are grossly out of line. Invoking "inherent reasonableness" authority, HCFA uses this approach to reduce payments for "overpriced" procedures. Although corrections have been made for a few services such as cataract removal and installation of pacemakers, most physician payments currently are based on historic trends.

Another approach used by HCFA to control "runaway" costs involves a recalculation of the Medicare Economic Index (MEI), an inflation index for increases in physician office expenses that result from inflation. HCFA estimates that this downward modification in the MEI will save Medicare an increasing amount of money.

Another approach, more far-reaching in concept than the interim measures described previously, but less radical than capitation and physician DRGs, was that of the Boston University Health Policy Institute (BUHPI) in the fall of 1984.[a] BUHPI compiled a group of Massachusetts surgeons in a pilot effort to devise a complexity-severity index (C/S index) of surgical services, based on professional judgment, that could provide the basis for a relative value scale.

Building this kind of index, although intuitively appealing, proved time consuming and cumbersome. It also raised questions of antitrust. The Federal Trade Commission has barred professional groups from developing relative values guides on the grounds that such guides ". . . established by competitors in a commercial context, probably would constitute illegal price fixing because the dissemination of information and agreement on establishment of price structures usually leads to price uniformity and stabilization."[a]

In this pilot study, BUHPI identified a private corporation that had captured the essence of the C/S index and developed a practical way to convert it to a physician payment management system. The approach used by Caterpillar Corporation (CAT), based in Peoria, Illinois, has resulted in the evolution of "degree of difficulty" relative value scales (DODRVS) and regional multipliers that appear to accomplish a pragmatic fee schedule reform. Access to physicians is achieved for CAT employees and their families, and local physician acceptance of the overall CAT process is maximized. Since CAT is not a dominant payer in any geographic area and is not a provider, the potential for antitrust challenge is minimal.

000007

MCK 035620
04-CV-1258-SLR (D.Del.)

Confidential Information
Subject to D. Del. LR 26.2

AN ACCESS-ORIENTED NEGOTIATED FEE SCHEDULE 351

TABLE 3 BUHPI C/S Index Compared with C/T DODRVS

| | C/S Index | DODRVS |
|---|---|---|
| Thoracotomy | 3 | 3.4 |
| Appendectomy | 2.6 | 25.4 |
| Cholecystectomy (with common bile duct exploration) | 48 | 47.7 |
| Total thyroid lobectomy | 40 | 41.8 |
| Modified radical mastectomy | 45 | 47.7 |
| Colectomy, partial | 55 | 54.5 |
| Pancreaticoduodenectomy | 100 | 100.0 |

the actual dollar payment limit. The regional multiplier is based on market research by the CAT M.D. Where there are unusual market conditions for certain specialties. CAT may adjust the multiplier up or down for some services rather than changing the entire region's multiplier. This system allows CAT to take into account the local health care market. legitimate variations in provider billing and medical practices, and variations in the cost of living.

*Continual audit and recoding of physician bills.* CAT claims processors subject each incoming physician bill to a coding analysis of CPT-4 codes as a first step. and recode claims where irregularities are found. Obvious simple coding errors are corrected first. Individuals with clinical knowledge and judgment then compare the provider's description of services with submitted codes: operative reports are requested for most surgical claims and follow-up calls to provider offices for clarifying information are common. Once the claim reviewer is satisfied that enough information is available to code the bill consistent with CAT procedures, recoding is finalized. and the correct codes are compared with established regional fee schedules. Reviewers with clinical experience consult the CAT M.D. as needed, assuring that a high level of understanding of the surgical experience is applied in the review process.

Tables 4–7 illustrate some features of the CAT process. They are representative of some claims received by CAT.

In Table 4, the appropriate payment is $1000 for code 38100. The patient was hospitalized for an elective splenectomy. The CAT reviewer would disallow codes and

TABLE 4. Bundling of "Unbundled" Bill

| Procedure | CPT Code | Charge |
|---|---|---|
| Splenectomy | 38100 | $1000 |
| Laparotomy | 49000 | 600 |
| Appendectomy | 44950 | 600 |
| Preoperative check (in hospital) | 90215 | 125 |
| Suture removal | 90270 | 100 |
| Total charge | | $2425 |
| Amount paid | | $1000 |

000008

MCK 035621
04-CV-1258-SLR (D.Del.)

Confidential Information
Subject to D. Del. LR 26.2

352                          EGDAHL AND HERTENSTEIN                    Ann. Surg. • January 1989 • Vol. 3

**TABLE 5.** *Excessive Fee Reduced, Assistant Surgeon Claim Denied as Not Medically Necessary*

| Procedure | CPT Code | Charge |
|---|---|---|
| Excision biopsy, breast (R) | 19120 | $1500 |
| Excision biopsy, breast (L) | 19120-50 | 1500 |
| Charge | | $3000 |
| Assistant surgeon fee (R) | 19120-80 | $1200 |
| Assistant surgeon fee (L) | 19120-50-80 | 1200 |
| Charge | | $2400 |
| Total charge | | $5400 |
| Amount paid | | $ 750 |

charges for all except the splenectomy: a charge for laparotomy and incidental appendectomy is warranted only if done as a separate procedure and preoperative check and postoperative care are conventionally part of the global surgery fee. A charge of $1000 for the splenectomy is in line with the regional fee schedule and is the amount ultimately approved.

In Table 5, the appropriate payment is $750 to the primary surgeon for code 19121 (excision biopsy, breast, bilateral). Under most conditions, one surgeon can perform a breast biopsy. The operative report indicates no unusual circumstances. The assistant surgeon is not reimbursed, and the patient is informed of CAT's review decision.

In Table 6, the appropriate regional payment is $60 for code 17100. The procedure was actually a simple wart removal. The operative report describes a 0.25-inch plantar wart on one foot. Excision combined with use of the laser constitutes excessive treatment for this common condition. Wart removal is most accurately coded as 17100 ("destruction by any method of benign skin lesion").

CAT knows that four local experienced, board-certified cardiac surgeons will carry out a three-vessel coronary artery bypass for $5000, assuring that access can be achieved for that fee (Table 7).

Tables 4–7 demonstrate that complete and knowledgeable recoding of claims requires familiarity with both the content of various surgical procedures and the details of coding surgical services.

*Physician negotiations.* Individual physician negotiations are carried out for selected claims. After establish-

**TABLE 6.** *Recoding of Unnecessary Procedure, Excessive Fee Reduced*

| Provider Description | CPT Code | Charge |
|---|---|---|
| Excision benign lesion, foot and use of CO₂ laser | 11421 | $450 |
| Total charge | | $450 |
| Amount paid | | $ 60 |

**TABLE 7.** *Fee Adjustments*

| Procedure | CPT Code | |
|---|---|---|
| Coronary artery bypass graft, 3 vessel | 33512 | |
| Total charge | | |
| Amount paid | | |

ing an overall fee schedule with local physician repre... CAT tatives, CAT continues its negotiations on a sche... ical fee claim-by-claim basis. If the amount charged for ... third-pa... rected codes significantly exceeds the regional fee ... potentia... CAT contacts the billing physician, giving informa... HPI has on the corrected codes and the amount allowed. ... for su... CAT M.D. makes many of these calls. Usually the ... larg... vider is willing to accept CAT's recoding and re... claims fee. Discussions of claims with physicians have rev... plans est that providers enter practice largely ignorant of ... custom... mon billing practices. Most admit they do not k... represen... what various procedures are worth. At best they ... ning an... sionally may ask other providers what they c... were a... Those who use an RVS have access only to a wide ... if the sa... ety of unstandardized sources. Some are advised ... ...ded th... charging high rates to get a high fee profile. Often, ... ard co... sician offices have an office clerk coding claims wh... were not trained in medical terms or coding, whereas ... char physicians rely on central billing services that pres... irs be... "maximize reimbursement," often with "creative" ... ...ables of coding or unbundling of services. ... ...matio

*Employee communication.* CAT has a program of ... The total ployee communication that defines the employee's ... $140.0 ...sponsibilities and options when payment is less than... ...fee charged by a surgeon. A letter of explanation is au... ... 35 matically generated to the employee when there is ... ...ent fr... been a payment reduction. It states that if the empl... ...uld have has discussed the fee with the physician before the ... CAT's fee cedure, the employee is responsible for the amoun... ...tor's fee... excess of CAT's fee cap. Also, employees are told w... ... savin... their provider has agreed to accept CAT's reimbur... ...and re... ment as payment in full. ... ...d fee sc

*Patient held harmless.* If a physician bills an empl... ... inco for the amount that exceeds the fee cap, the employe... ...edure t... instructed to contact CAT, and a CAT provider r... ..., the pa... tions specialist discusses the situation with the ph... ...le level. cian. Patients are not required to pay the physici... ...led" to t... balance bill above the CAT payment (that is, the ... ...nd the fee... "held harmless") if the physicians have not informed ... ...s in tw... patients of the higher-than-cap fee before the proced... CAT intervenes on the patient's behalf when the pl... ...The CA... cian refuses to lower his/her fee to the established cap. On average, about 20,000 physician claims rece... ...devel... per year. CAT has less than a dozen instances in w... Amer... providers insist on trying to obtain reimburse... ...ed Ann... above the CAT fee through claims court. In over 9%... bundli...

MCK 035622
04-CV-1258-SLR (D.Del.)

Confidential Information
Subject to D. Del. LR 26.2

AN ACCESS-ORIENTED NEGOTIATED FEE SCHEDULE                    353

...cases, the judge has agreed that CAT's payment is [rea]sonable for the services, based on local surgeon input.

*Sample of Savings with CAT Method*

CAT's internal calculations indicate that it achieves [signifi]cant savings with its surgeon bill review process by [redu]cing fees that otherwise would have been paid in [full]. The BUHPI is conducting an external evaluation of [the] CAT process for managing surgeon fees. Standard [se]lected local fee processing by large insurance companies [for con...] third-party administrators is being compared with [fee cap...] potential cost savings of the CAT process. The [informa...] BUHPI has obtained samples of consecutively filed [rec...]. The [claims] for surgical services that have been processed for [the pre...] large self-insured corporations that administer [reduce...] claims through major insurance carriers. The ben[efit/reveal...] plans establish payment caps at a percentage of usual [of tra...] customary fees, and the carriers' auditing of codes [it knows] representative of current industry standards. CAT's [very oc...]coding and bundling procedures, as well as payment [charge...] were applied to these claims, with the goal of find[de vari...] the savings from payment reduction significantly [to surp...based] to that achieved by these carriers.

[...]hard copies of the providers' originally submitted [...]were processed by CAT staff without information [...other] changes from charges that had been made by the [...] before these claims had been paid. Confounding [...un]variables of payment due to copayments, deductibles, or [...coordination] of benefits were eliminated.

[...of em...] total charges included in the sample claims were [over] $140.00. The carriers adjusted 13 to 15% of their [claims] and paid 4.3 to 35% less than total charges. CAT [...] adjusted 35 to 40% of these same claims and reduced [...] payment from charges by 22 to 43%. Therefore, CAT [...] would have achieved an additional savings of 8 to 17.7% [... if] CAT's procedures and the lower of CAT or the admin[istrator's] fee schedule were used. One third of the addi[tional] savings came from coding changes in the original [...] and two thirds by the application of the CAT nego[tiated] fee schedule. In some instances providers submit[ted] an incorrect code that significantly undervalued the [pro]cedure that was done. If the provider's code had been [used] the payment would have been cut to an unreason[ably low] level. In these instances, the CAT reviewer "up[coded]" to the correct code and allowed the more appro[priate] fee. The savings potential includes these correc[tions] in favor of billing surgeons.

### Discussion

The CAT system for managing surgeons' fees has [been] developed by a progressive benefit department in a [large] American corporation. The system depends on de[tailed] knowledge of surgical practice so that recoding [and] bundling of procedures categorized by CPT-4 codes

can be accurately carried out. It requires contact with local surgeons in regions with a high concentration of employees so that market forces can be taken into account in determining an appropriate level of local fees.

An access-oriented negotiated fee schedule can have many permutations. In areas with a surgeon surplus, a corporation may be able to negotiate lower fees with surgeons than those previously paid. In areas with few surgeons, fees lower than customary are more likely to create patient access problems should the surgeons resist reductions negotiated elsewhere. Still, modified versions of CAT's approach would be similar to processes already used by the government in establishing "inherent reasonableness" for cataract extraction and pacemaker installation fees.

The key concern about any new surgeon payment approach should be the ability to attract a good representation of local surgeons who will accept it. Ensuring employees' access to qualified surgeons is the paramount goal. All other considerations, even inherent reasonableness of lower fees because of technological advantages or cost containment, should remain secondary.

Based on the BUHPI's analysis, the CAT process is a workable and market-tested solution to the need to balance access and cost management. It is suitable for large corporations such as CAT with both self-funded and self-administered health benefits. It can also be used (after eligibility is certified and benefits are coordinated) by claims processing systems. Accurate implementation of the CAT process requires (1) hard copies of the CPT-4 codes submitted by the surgeon and availability of the operative notes, to reconcile discrepancies between CPT-4 codes and the surgical service, and (2) access-oriented negotiated fee schedules obtained by applying a geographic multiplier to an RVS, such as CAT's DODRVS.

State and federal governments can modify the CAT process for Medicaid and Medicare. With the same goals that motivate the private sector: access and cost management. Regional fee schedules could be established with national DODRVS values and regional multipliers based on market forces. Balance billing is optional, using the CAT model. However, its effectiveness as a cost management approach is strengthened with its "hold harmless" provision. In the CAT system, if a patient knows a surgeon is charging a fee higher than the negotiated fee, the patient is responsible for the balance. If no discussion has occurred, the patient is held harmless for bills in excess of the fee cap.

If adequate access is to be preserved without the need for balance billing, payments must be established so that a majority of qualified surgeons in each region will accept the negotiated fee as payment in full. If this acceptance is not achieved, then access problems will arise, as

000010

MCK 035623
04-CV-1258-SLR (D.Del.)

Confidential Information
Subject to D. Del. LR 26.2

354                                    EGDAHL AND HERTENSTEIN                      Ann. Surg. • January 19**

TABLE 8. *Comparison of "Resource-based Relative Value Scale" (RBRVS) and "Access-oriented Negotiated Fee Schedule" (AONFS) for Physician Reimbursement*

|  | RBRVS (Hsiao) | AONFS (CAT) |
|---|---|---|
| Goal | A "comparable worth" reform for physicians, a group with high incomes relative to most other occupations. | Patient access to local physicians at a negotiated price. |
| Methodology | Complex formula determines RBRVS; time is a major determinant. | Revision of fees is based on negotiations, M.D. fee acceptance patterns (market forces, not payment of charges). |
| Application | Two basic problems: (1) RBRVS is not a fee, and knowledge is needed of regional situations to use multiplier effectively, (2) when applied in Massachusetts, shown to need extensive modification to get support of, and access to, local surgeons. | In routine use, CAT knows that well-qualified local physicians will accept the AONFS. |

* AONF = DODRVS × regional multiplier.

occurred in 1986 for the Massachusetts Medicaid program. That program was forced to increase significantly its fees for normal deliveries. As stated in the *Boston Globe*, ". . . responding to a crisis in access to obstetrical care in many areas of the state, the panel hiked the all-inclusive fee for pregnancy care and childbirth from $508 to as much as $1,200."[18] This is a good example of the futility of a fee schedule that does not build on knowledge of physicians' availability at different fee levels in each region. The Massachusetts Medicaid program had a previous experience with attempting to introduce a fee schedule based on a "resource-based" formula.

In July 1983, the *Boston Globe* described a new strategy that was suggested by the Massachusetts Rate Setting Commission for the Medicaid program and workers compensation.[11] Based on the 1979 study by Drs. Hsiao and Stason from the Harvard School of Public Health,[12] the Rate Setting Commission proposed that the fees for 21 common surgical procedures should be cut by amounts ranging from 4% to 59%. At the same time, physicians seeing patients in their office were to get 71% more for initial visits. These proposed changes were the estimated relative resource requirements of different physician services, with a strong focus on the time involved. The formulas were established in the Hsiao/Stason analysis of physician practices.

These changes were adopted in September 1983, but on August 23, 1984, the Rate Setting Commission raised the fees that the state Medicaid program paid to doctors for surgical procedures. As stated in the *Boston Globe*, "no prior hearing was held or public notice given before the August reversal because the Commission subsequently said physician resignations from Medicaid had reached the level of a public health emergency. Most striking of these defections were obstetricians/gynecologists."[13] This experience suggests that fees ultimately paid by Medicaid were primarily driven by the need to get access to Medicaid patients to physicians, and not a formula for "resource costs."

The American Society of Internal Medicine and the American Medical Association have supported an elaborate study of the Hsiao methodology commissioned by HCFA, and there is much speculation about the possible use of an RBRVS for the determination of Medicare fees when it becomes available in the summer of 1988. The investigators of the BUHPI originally believed that a consensus process to determine a C/S index could be developed as the basis for fee reform that would be acceptable and perceived as fair by physicians. However, the consensus approach is laborious, and much that would have been necessary to interrelate all specialties and resolve potential conflicts. It was then that the BUHPI began to study the CAT system, and found that it involved a process with appropriate goals, methodology, and application for cost management and market acceptance.

Table 8 outlines the basic differences between a "resource based" RVS and an access-oriented negotiated fee schedule, as used by CAT. A basic goal of the RBRVS is to "reform" physician reimbursement in the direction of more equity between procedure-oriented specialists and generalists. However, as the evidence suggests, this goal will be in conflict with realities of the marketplace and will result in paying fees that are either unnecessarily high or too low to get ready access to insurees to local physicians.

The methodology of the RBRVS is based on a formula unrelated to local market forces, whereas the access-oriented negotiated fee schedule used by CAT builds on negotiations and local fee acceptance patterns to gain access. The CAT system's ability to adjust for regional differences in the market is the essential difference in the two approaches. The CAT system is in routine use and will continue to be modified by changes in local physician manpower and other factors such as increases in malpractice premiums. We suggest that the access-oriented negotiated fee schedule such as the CAT system deserves consideration as the preferred method of fee reform.

MCK 035624
04-CV-1258-SLR (D.Del.)

Confidential Information
Subject to D. Del. LR 26.2

AN ACCESS-ORIENTED NEGOTIATED FEE SCHEDULE

255

## References

Roble DR, Levit KR, Lazenby H. National health expenditures. 1985. Health Care Financing Review 1986: 8:14.

Physician Payment Review Commission. Medicare Physician Payment: an Agenda for Reform. Annual Report to Congress. Washington DC: U.S. Government Printing Office, March 1, 1987.

Iglehart JK. Study on Equalizing Medicare Bills Begins. The Boston Globe. September 13, 1985: 4.

Roper RA. Payment of the United States. Physician Reimbursement Under Medicare: Options for Change. Washington DC: Congressional Budget Office, April 1986.

Payment of the United States. Payment for Physician Services: Strategies for Medicare. Washington DC: Office of Technology Assessment, February 1986.

Roos SF, Dobson A. Strategies for reforming medicare's physicians payments: physician diagnosis-related groups and other approaches. N Engl J Med 1985; 312:1492-1499.

7  Dutton BL, McMenamin P. The medicare economic index: its background and beginnings. Health Care Financing Review. September 1981; 3:137-139.

8  Egdahl RH, Mansel B. A consensus process to determine the relative complexity-severity of frequently performed surgical services. Surg Gynecol Obstet 1985; 160:403-406.

9  Pollard MR, Aronson and Physician Payment. Reforming Physician Payment 1984. Institute of Medicine: Report of a Conference. Washington DC: National Academy Press, 1984: 75-84.

10  Knox RA. Proposal Would Raise Medicaid Fees. The Boston Globe, April 17, 1986; 27.

11  Knox RA. Medicaid Fee Shifts Adopted. The Boston Globe, September 16, 1985; 17.

12  Hsiao WC, Stason WB. Toward developing a relative value scale for medical and surgical services. Health Care Financing Review, Fall 1979; 1:23-38.

13  Knox RA. State Shifts on Medicaid Fee Cuts. The Boston Globe, September 27, 1984; 1.

## DISCUSSION

DR GERALD AUSTEN (Boston, Massachusetts): I congratulate Egdahl and Hertenstein on an excellent and stimulating paper...

The Physician Payment Review Commission (PhysPRC) established by Congress in 1986 made its first report to Congress on March 1, 1987...

000012

MCK 035625
04-CV-1258-SLR (D.Del.)

Confidential Information
Subject to D. Del. LR 26.2

356                     EGDAHL AND HERTENSTEIN

those for diseases. It is obvious that this difficult distinction keeps our lawyers busy!

Basically, surgeons are mostly employed on a geographical full-time basis in a state hospital. Those state hospitals, however, have private, semiprivate, and general wards. This, I believe, is a rather favorable arrangement, maintaining a salaried position for the administrative obligations as well as for the care of the general patient with a fee-for-service system for the private patients. Now, comparing this with the cap system, we find great similarities because the Union of Swiss Surgical Societies, including all specialists, has set up a range of fees that may be reasonably asked from a patient or from the insurance, i.e., the third party paying. Those ranges, just to give you an idea, would range from 480 to 1000 francs for an appendectomy, for a gallbladder from 1000 to 2000 francs, and for major operations such as a total gastrectomy, a Whipple, an acetabular repair or a resection of an abdominal aneurysm, from 3000 to 6000 Swiss francs. That is about the maximum fee we are allowed to ask or, at least, that the Union will support. If it is contested in court. You may divide the figures by 2 to arrive at dollar values, because that is about the realistic comparison in terms of buying power.

It is a fairly democratic self-regulating peer controlled system. What we dislike in Switzerland is the "big brother" state watching us and telling us what to do.

We have one advantage over you. The contingency system is unacceptable and the one party who loses "the battle" usually has to pay the other's legal expenses. That often prevents people from going to court, although there has been a definite increase in liability claims in recent years.

Overall our system results in an average income of some 300,000 to 400,000 francs for a Swiss surgeon. Out of that he pays some 50% in taxes. Our rather democratic system is similar to what Dr. Egdahl has just presented. It is based on a fee for service "common sense scale." The majority of surgeons working in a geographical full-time scheme.

Dr. WILLIAM R. DRUCKER (Rochester, New York): I appreciate the opportunity I had to review this paper. Dr. Egdahl has given us a clear presentation of an industry-sponsored plan that attempts to gain physician compliance with a method of reducing costs of medical care through reduction in fees.

It is a very clear example that in addition to government today, our health care system is being strongly influenced by industry.

I have a couple of editorial comments and then a couple of questions. The major factor in the rise in health care costs is not physician fees. This is simply illustrated by a look at the average fees of physicians across the country, somewhere in the range of $50,000–$150,000. I realize that others make considerably more, but each physician can be estimated to cost the health care system something on the order of three quarters of a million dollars per year by the exercise of his physician rights in doing his job of taking care of patients. Therefore, the major target that needs to be addressed is physician behavior, not physician fees. Nevertheless, fees are perceived as a problem that is going to be addressed whether we like it or not.

I wonder whether this paper is simply the expression of a last gasp hope that current physician fees and the fee for service system will continue. I sincerely hope this is not its purpose and I believe Dr. Egdahl agrees based on the way he has presented the paper. My reading from the paper is that Dr. Egdahl is presenting a plan that is taking clearly for physicians to get together and plan to help solve the problem of fees rather than having it done for us by external agencies; that means industry and government.

My questions are these. They are straightforward, I believe, and can be answered simply. What will happen in the case of an emergency when one of the patients in the system under the cap plan have an emergency operation and they seek a doctor who does not agree with the system would that be settled in claims court?

What about quality? Does the system depend on the physician participants to ensure quality or do they have other ways to ensure that their employees are obtaining the quality of care that they would under the current system of fee selection.

How about comparison with other systems? Has there been enough experience to date to show that this system is gaining popularity? Is

there any way to compare this system with others in terms of factors; physician acceptance to work in the system, and the acceptance of this system for their health insurance?

Then there is a question of cost. This is a very complex issue and it seems very costly if one reads carefully. What is the cost? Is the estimate of what the cost would be of setting up and maintaining a system that requires close scrutiny of all bills that come in; a complex system of monitoring these bills? Is the billing method on a CAT or can other insurance systems do this too? Is this possible? Do other insurance companies look at claims this carefully?

Dr. BENSON B. ROE (San Francisco, California): Dr. Egdahl has thanked for bringing to our attention a sensible proposal to the serious threat to the fee-for-service system. I believe we both are aware of this threat, and I am delighted that we are prepared to put our forces to get behind something positive.

About 8 years ago I became aware of the enormity of the abuses of the current system that were taking place, perhaps not by the most able members of our profession but by an alarming number of those who did the kind of unbundling and some of the things that led to you. I published an article that was intended to stir us to take initiative in this problem rather than hoping it would go away. It is not too late.

It is equally important that we get behind some system that inhibits fiscal integrity so that we do not jeopardize the present unique privilege that we have of self-governance. This is being threatened by the behavior of some of our colleagues who have abused the system and brought this problem to our attention.

In addition to the proposals that Dr. Egdahl has made, I have should place emphasis on the magnitude of responsibility to end only accessory procedures but complications. No one can tell whether my complication was part of the patient's underlying illness or could possibly be one from some flaw in my technique or treatment. We should accept as a part of our primary responsibility the scope of managing a patient from start to finish without measure extra for everything that can be imagined. If we had done so, we would have reduced our total cost to the public by at least 20%.

Dr. JAMES R. JUDE (Miami, Florida): I rise because I am troubled by patients who are faced with billing problems after being in charge. One of the problems is the unbundling that Dr. Egdahl brought up.

Ten years ago on an Ethics Committee of our local medical association, we, out of hand, tossed unbundling out as a completely unsound approach to any type of billing. I did not believe it even would exist any more, but there is more of a problem than just the unbundling together of the surgical fee. The problem is much greater than that. I always keep our office open to speak to any patient about their items, and it is very common for them to present with bills that really amounts to an unbundling of the bills of other physicians who were involved in their treatment.

Most commonly this has applied to anesthesiology, which first approaches 50% of the surgical fee. It is not, however, only the anesthesiologist, it is also the internists, the radiologists who are reading possibly the cardiologists who are reading electrocardiograms, who receive an enormous number of bills from physicians, and this total physician unbundling and not just a surgical fee unbundling is occurring.

Some way or other we have to approach the problem wherein we will be some type of bundling together of all physicians into a package.

As our President presented yesterday in his Presidential address, many treatments that we do are not all surgical any more, but we are blending over into medicine, and medicine is delivering surgery, surgery is delivering medicine. Therefore, we should give a per consideration to the total care and the total charge.

Dr. Egdahl, what if anything have you considered about the effect in respect to a global cap or other industry approaches to the cost of care in surgery?

MCK 035626
04-CV-1258-SLR (D.Del.)

Confidential Information
Subject to D. Del. LR 26.2

C00013

...... E. RHOADS (Philadelphia, Pennsylvania): I listened ........ paper with a great deal of interest. I would emphasize that if ........ have a 50% overhead, that a 15% reduction in fee is a 30% ...... in take-home remuneration. That is well to keep in mind. ........ one aspect of the overhead that has gotten bigger and that is ....... insurance. This is a way is the loose cannon on the deck, and ..... we have a fee schedule set, whether by government or by con..... this expense is assumed to be something that the physician ...... we have an unpredictable situation.

..... question and ask the authors if there is any precedent for ........ insurance being billed on a per case basis or a percentage of ...... We doubt this would require the insurance company to ...... one's tax returns and so forth to be sure that it was honest, but ...... have certain gross advantages. It would permit the young ...... starting out to start out on his own, pay his share of the ...... cost, but not be expected to pay immediately the same ...... that a person would be paying who is doing 10 times as much ...... in the middle of his career.

...... the far greater advantage in my belief is that this could ...... and should appear as a separate item on the bill. ...... most of no way that would educate more of the public as to the ...... of liability insurance than to have a bill (operation $300, ...... $125, or whatever it might come to).

...... to raise this issue and to ask the authors if they have if there ...... precedent for such a plan and to ask whether they believe there ...... to say this could be tried out before we get tied into a fee schedule ...... such an unpredictable cost for liability insurance.

...... RICHARD H. EGDAHL (Closing discussant): Dr. Austen's ques-
...... about the possibility of expanding the Caterpillar program as it
...... to a national level is an important one. The problem is that
...... national programs such as Medicare necessarily involve a large
...... bureaucracy, whereas a private self-administered company such as
...... Caterpillar does not require the same degree of routinization of opera-
...... and an easily replicated methodology. The country could cer-
...... be divided into 6–12 regions, each consisting of several states. I
...... not sure whether appropriate flexibility could be built into the
...... segment and technical components of the administrative struc-
...... which would be part of a national program.
...... Dr. Scherr raises questions about the future use of CPT-4 codes and
...... what we can do in the short range to control outlier Medicare fees.
...... As we see it we use CPT-4 as long as we understand the bases for
...... setting up the procedures that actually were carried out with the
...... and have some way to ratchet downward those charges that
...... are inappropriate. Certainly there are a few groups selling systems
...... with the goal of achieving costs creep, which is basically dishonest. On
...... the other hand, the majority of codes that are incorrect represent
...... variations based on the difficulty of each doctor's office knowing all
...... the minutiae of coding. We can work with CPT-4, but must match
...... reasonable costs with the CPT-4 code, using physician judgment to
...... determine if the code is appropriate. The short-term answer for HCFA
...... is around the principle of interest reasonableness, which thus far
...... has seemed to a few surgical consultants. Another 20–30 big-ticket
...... items that appear to be out of line could be revised downward or
......

Dr Martin Allgöwer from Basel talked about the Swiss system and the
apparent success of physician-sickness fund negotiations. This type
of negotiation, with the government playing a catalyst role, might
have relevance to the U.S. system in the private sector. However,
Medicare will probably demand a closer involvement in the process
than exists in Switzerland, since the government is paying the bill
directly.

Dr. Drueker asked a key question about what happens in emergen-
cies under the Caterpillar system. Usually Caterpillar pays charges in
emergencies, but also has a strategy involving clearance for appropri-
ateness of treatment in emergencies, when there is time. If gross over-
charges are billed, even for emergency situations, and local surgeons
support that the charges are unreasonable, then payment of these
charges can be challenged.

Dr. Rue discussed his analysis of fees, and raised the question about
possible antitrust issues if physicians are in the position of commenting
on the appropriateness of their fees. Industry does not want to see
private medicine nationalized, but could turn on us if we do not coop-
erate in developing a rational method of physician reimbursement.
The key to not raising antitrust issues is for surgeons to act as individ-
ual consultants to payers who determine those fees, such as large in-
dustry.

Dr. Jude asked about how to get our internist colleagues involved in
the process of fee negotiations. We found in our complexity/severity
work with the Massachusetts Chapter of the American College of Sur-
geons that we could relatively easily get consensus on the "relative
value" or "complexity/severity" of surgical services among that group.
We then talked to internists and achieved some preliminary agree-
ments: for example, an "intermediate acute myocardial infarction,"
from the time a patient comes into the emergency room, is taken into
the critical care unit, and discharged, appeared to be similar in com-
plexity/severity to an uncomplicated cholecystectomy, from initial
diagnosis through discharge from the hospital after surgery. Reim-
bursement for some general medical conditions can be converted into
a global fee, but for many medical conditions it is a more difficult
process than for surgical cases.

Finally, Dr. Rhoads talked about malpractice problems associated
with surgery. I return to the principal goal of Caterpillar and its fee
process, which is access for their employees and their families to a
significant number of high-quality local surgeons. Overall, malpractice
problems will probably get worse before they get better. A solution will
flow from severe access problems in different parts of the country, and
a realization by both legislators and the public that the ordinary rigors
of surgical practice are being compounded manyfold by additional
financial and psychological pressures from the omnipresent danger of
malpractice suits. We suggest that the Caterpillar process of negotiating
access-oriented maximal fees with local surgical groups represents a
reasonable compromise between paying charges, on the one hand, and
accepting a formulaic-driven fee schedule not negotiated with some
local physicians with access as a goal, on the other hand.

Increases in malpractice premiums will result in increased surgical
fees, or the public will not have available the surgeons that they want in
the variety of practice sites and numbers of specialties that are desired.
We have only a modest amount of time before HCFA and the Con-
gress will take some kind of action on fees, so they have negotiated
reimbursement under Medicare. Industry can be our strongest ally in
achieving a workable system of access-oriented negotiated fees.

000014

MCK 035627
04-CV-1258-SLR (D.Del.)

Confidential Information
Subject to D. Del. LR 26.2

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on June 8, 2006, I caused to be electronically filed the The TriZetto Group, Inc.'s Appendix of Exhibits in Support of Its Motion for Summary Judgment of Invalidity Based on the On-Sale Bar (35 U.S.C. § 102(b)) (Redacted Version) with the Clerk of the Court using CM/ECF, which will send notification of such filing(s) to the following:

Michael A. Barlow
Skadden, Arps, Slate, Meagher & Flom LLP

I also certify that copies were caused to be served on June 8, 2006, upon the following in the manner indicated:

### BY EMAIL AND HAND

Michael A. Barlow
Skadden, Arps, Slate, Meagher & Flom LLP
One Rodney Square
Wilmington, DE  19801

### BY EMAIL AND FEDERAL EXPRESS

Jeffrey G. Randall
Skadden, Arps, Slate, Meagher & Flom LLP
525 University Avenue
Suite 1100
Palo Alto, CA  94301

/s/    Rodger D. Smith II (#3778)
Morris, Nichols, Arsht & Tunnell LLP
1201 N. Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
rsmith@mnat.com

36