# EXHIBIT 4

AN EXPERT OPINION IN THE MATTER OF:

# McKesson Information Solutions, LLC v. The TriZetto Group, Inc.

RE: U.S. Patent No. 5,253,164

SYSTEM AND METHOD FOR DETECTING FRAUDULENT MEDICAL CLAMS VIA EXAMINATION OF SERVICE CODES

OPINION PREPARED BY:

**Philip M. Hawley, Jr., MD**

October 24, 2005

| | | |
|---|---|---|
| **Section One:** | Qualifications | 1 |
| **Section Two:** | Disclosures | 3 |
| **Section Three:** | Health Insurance Industry Trends, Medical Billing Practices, & Claim Auditing Prior To September 30, 1987 | 4 |
| **Section Four:** | Claims Of The '164 patent | 8 |
| **Section Five:** | Opinions Concerning The '164 Patent | 13 |
| **Appendix A:** | Curriculum Vitae – Philip M. Hawley, Jr., MD | 30 |

## SECTION ONE: QUALIFICATIONS

A summary of my educational background and employment history are presented in my curriculum vitae in Appendix A of this report.

My qualifications for offering an opinion in this matter include the following:

1. Two years as Executive Vice President and the senior medical officer of AMI Group Health Services, Inc., a health insurance company that performed auditing of CPT-coded medical claims.

2. Twelve years as a consultant with Pace Healthcare Management, the managed care consulting that firm I founded in 1986. [1] I regularly worked on projects involving medical claim adjudication, medical claim auditing, clinical data reporting and other issues requiring an in-depth knowledge of CPT-coding. During the 12-year period of my association with Pace Healthcare Management, I provided consulting services to health insurance companies and HMOs on matters pertaining to medical cost management, including claim auditing. Our firm's medical claim auditing clients included:

   - Federal programs, including the U.S. Health Care Financing Administration (H.C.F.A., which administers the Medicare program) and the U.S. Government Employee Healthcare Association

   - Large corporate healthcare purchasers, including John Deere, Walgreens, and Southern California Edison

   - The health insurance divisions of companies such as Northwestern National Life and New York Life

   - Zenith Insurance Company (a Worker's Compensation insurer)

   In addition, and on behalf of large self-insured employers (i.e., corporate purchasers such as AT&T), our firm performed operational evaluations of the medical claim auditing programs at several health insurance companies and HMOs, including Aetna, CIGNA, Prudential, U.S. Healthcare, Capital Blue

---

[1] Pace Healthcare Management refers to the consulting firm that was variably known throughout its existence as Pace Healthplan Management, Inc., Pace Healthcare Management, Inc., Pace Healthcare Management, LP, and Pace Healthcare Management, LLC.

Cross, Blue Cross of California, Health Net, PacifiCare, and Travelers Life
Insurance Company.

3.  My experience working with one of my consulting clients, Erisco Systems
    (now The TriZetto Group, Inc.), to create a computer-based system for
    auditing CPT-coded medical claims, detecting aberrant billing practices, and
    amending improperly billed claims.

## SECTION TWO: DISCLOSURES

I am being reimbursed at an hourly rate of $325 for my work in connection with this case.

I have served as an expert witness on approximately three other occasions. In each instance that I was called upon as an expert, the issues pertained to managed healthcare.

In forming my opinions about this case, I reviewed the following materials:

- U.S. Patent No. 5,253,164 (System and Method for Detecting Fraudulent Medical Claims via Examination of Service Codes);
- Physicians Current Procedural Terminology Fourth Edition, 1985, American Medical Association (Discovery Document labeled "Appendix A — CPT-4 Manual," MCK 053146 through 053392);
- The deposition of George A. Goldberg, MD, in connection with McKesson Information Solutions, LLC v. The TriZetto Group, Inc. (Case No. 04-1258 SLR), dated September 13 and 28, 2005;
- Articles and documents that are recorded in the footnotes of this document (with URLs where available).

I asked to review my Pace Healthcare Management files containing records from my consulting work for Erisco Systems (now The TriZetto Group) in connection with ClinicaLogic—a computer-based system for auditing CPT-coded medical claims. I understand that those files are now in the possession of Deloitte & Touche, the consulting firm that acquired Pace in 2000. I did not receive copies of those files in sufficient time to review them and discuss them in my report. There may be documents in those files that would refresh my recollection about contextual issues important to this case. I will supplement this report should I discover information that is relevant to this case.

## SECTION THREE: HEALTH INSURANCE INDUSTRY TRENDS, MEDICAL BILLING PRACTICES, & CLAIM AUDITING PRIOR TO SEPTEMBER 30, 1987

Coincident with the advent of Medicare and Medicaid in 1965, and against the backdrop of the then-increasing prevalence of employer-sponsored health insurance programs, U.S. healthcare costs began rising at a rate that has consumed an ever-larger share of the U.S. Gross Domestic Product (GDP)—climbing steadily from 5.7% of GDP in 1965 to 14.1% in 2001. [2]  Throughout this period, trends in healthcare spending for physician services reveal an inflationary trend consistently and significantly above the U.S economy's underlying Consumer Price Index (CPI). [3]

As Drs. Egdahl and Hertenstein wrote in their 1987 article, *An Access-oriented Negotiated Fee Schedule*, "between 1965 and 1985, national expenditures for physicians' services have increased almost tenfold, from $8.5 billion in 1965 to $82.8 billion in 1985." [4]

There are many reasons for this—including legislative trends toward more universal healthcare coverage, the explosion of new and costly medical therapies and technologies, so-called defensive medicine during an era of increasing malpractice litigation, to name but a few—but the relevance of this fact to the current litigation involving the '164 patent lies in noting that these cost trends, and their effects, were well underway by the late-1970s.

Concerns about rising healthcare costs and affordability gave rise to the HMO Act of 1973, which ushered in the era of "managed care." By the early 1980s, health maintenance organizations (HMOs), preferred provider organizations (PPOs), and other managed care programs were commonplace, if not yet the norm for most Americans.

By 1984, the majority of commercial health plans—be they traditional health insurance plans, PPOs, or HMOs—had medical cost control programs in place. Many of the larger health insurers used multiple cost control strategies, including utilization review (i.e.,

---

[2]  Source: U.S. Bureau of the Census; and U.S Department of Commerce, Bureau of Economic Analysis (2003). URL to chart (National Health Care Trends in Public versus Private Funding): http://63.241.27.79/researchers/pubs/datacompendium/2003/03pg14.pdf

[3]  Source: National Medical Price Indicators, *1965 – 2002*, U.S. Department of Labor, Bureau of Labor Statistics (November, 2003).  URL to chart (National Medical Care Price Indicators): http://www.cms.hhs.gov/researchers/pubs/datacompendium/2003/03pg1718.pdf

[4]  Richard H. Egdahl, M.D. and Robert D. Hertenstein, M.D., *An Access-Oriented Negotiated Fee Schedule*, Ann. Surgery September, 1987; 206(3):349-57

the pre-treatment authorization of medical services) and audits of both non-CPT-coded medical claims (e.g., inpatient hospital claims) and CPT-coded claims (CPT is an acronym for the American Medical Association's "Current Procedural Terminology"). [5]

In this context, I use the term "audit" to denote the pre- and/or post-payment examination of medical claims to detect improperly billed services or charges. Hereinafter, all references to "claims," "medical claims," "physician bills," and similar terms refer to CPT-coded claims, except where otherwise noted.

By 1984, the audit of medical claims was a common practice among health insurance companies and HMOs. I know this because, as one of the founding executives and senior medical officer of AMI Group Health Services—a health insurance company that marketed both PPOs and HMOs—I surveyed then-current (1984) industry practices as part of our initial market research.

By that time, CPT was the prevailing coding convention used by health insurance companies and HMOs when adjudicating and paying claims for medical services and procedures. Occasionally, insurers added their own unique codes for services not included in the CPT coding system (such as durable medical equipment), but this did not change the fact that CPT had become the standard for medical coding and billing by virtue of its prevalence. [6] Because CPT coding conventions had become the industry standard, it followed that medical claims comprising services and procedures for which a CPT code existed would also be judged against that standard. And as I describe below, that is exactly what was occurring.

For insurers and HMOs, the CPT coding system had several advantages. First created in 1966, it is maintained and updated by expert physician panels of the American Medical Association (AMA) and, thus, is generally accepted by physicians and other healthcare providers. [7] It is comprehensive, encompassing all non-experimental physician services as

---

[5] Throughout this report, I used the terms CPT and CPT-4 interchangeably. During the 1980s, CPT coding encompassed the following categories of medical services: Medicine (e.g., physician office visits), Surgery, Anesthesia, Radiology, Pathology and Laboratory.

[6] In 1983, the Health Care Financing Administration, HCFA, formally adopted CPT codes as the basis for Medicare's HCPCS coding system (HCPCS is an acronym for *HFCA Common Procedural Coding System*).

[7] CPT codes are assigned by the AMA's CPT Editorial Panel.

well as laboratory and radiology services. [8] And finally, the CPT coding system offers explicit rules that can be used to audit medical claims. [9]

Many improperly coded medical claims were simply the result of unintentional errors. But by 1984, health insurance companies and HMOs were also aware that some physicians, laboratories, and other medical practitioners were "gaming the system." The techniques were many and varied, and included those methods described in the Specification and Appendices of the '164 patent. Examples include:

- Unbundling—breaking down a service or procedure into its component parts and submitting a bill with several CPT codes, rather than properly using a single CPT code that encompasses all of the rendered services.

- Fragmentation—billing for incidental procedures performed as part of a larger procedure, or for services that are integral to a larger procedure (e.g., billing for an appendectomy when performing a colectomy – removal of the colon).

- Redundant codes—billing multiple times for the same procedure or service.

- Upcoding—using a CPT code that represents a more complex service than the one that was actually performed.

- Incompatible services—procedures that are inconsistent with, or unnecessary, in light of the patient's diagnosis, age, or gender; other procedures listed on the medical claim.

- Outdated or nonexistent codes—using obsolete or fictitious codes (e.g., to sidestep the automated fee-determining algorithms built into claim processing software).

- Inappropriate place-of-service—rendering care in a setting that results in unnecessary costs (e.g., admitting an otherwise healthy patient to the hospital for cataract surgery), or duplicate billing.

One might ask: Why did physicians and other healthcare providers engage in these aberrant billing practices, and why was the prevalence of such practices increasing during the

---

[8]  There are currently over 8,500 CPT codes, significantly more than existed in the mid 1980s. The number of codes grows each year as new services and procedures are accepted into the coding terminology.

[9]  A discussion of the process and criteria for creating CPT codes can be viewed on the web site of the American Medical Association (AMA).  URL to article (CPT Process — How a code becomes a code): http://www.ama-assn.org/ama/pub/category/3882.html

early 1980s?  Ironically, most physicians with whom I discussed this issue at that time did not view their "creative" billing as an attempt to defraud insurers, but rather as a means of achieving what they considered fair and just compensation for their services.  With the advent of managed care, physicians were subjected to increasing amounts of paper work for which they were not reimbursed, and had negotiated reduced per-service fee rates in exchange for the promise of increased patient volume that in many cases never materialized.  For many physicians, the cost of managing their offices was rising while their incomes were stagnating or declining.  Furthermore, many physicians felt that public and private payors were unfairly targeting doctors, as when, in 1984, Medicare temporarily froze physician fees.  Unbundling and similarly irregular billing practices were, in the view of some physicians, simply a means of earning what they considered equitable reimbursement for their services.

Moreover, an entire cottage industry relating to physician billing had sprung up by the mid 1980s.  Several so-called consulting firms specialized in training the billing personnel in physicians' offices how to maximize their reimbursement by using unorthodox billing techniques.  By 1985, it had become a classic game of cat-and-mouse, and some insurance companies sent their supervising claim examiners and/or claim auditing staff to these seminars (as I did) to identify trends in what we considered clearly deceptive billing practices.

During this period, pre-payment medical claim auditing practices varied from company to company, just as business practices do in most industries.  Some insurance companies had a defined audit initiation procedure with specific criteria for triggering a medical claim audit, while others relied on the coding knowledge and judgment of their claim examiners to trigger an audit. [10]

Many of the larger insurers had one or more physicians on staff (and, often, some registered nurses) who were proficient in coding and billing practices.  In addition, many insurers had a formal or informal panel of physician auditors—practicing physicians in various specialties who, for a fee, would audit claims when the coding and billing issues required specialty-matched review.

By the mid 1980s, medical claim auditing (using CPT coding conventions) by health insurance companies and HMOs was a commonplace activity.

---

[10] In this context, claim examiners are non-medical personnel trained to process medical claims.

## SECTION FOUR:  CLAIMS OF THE '164 PATENT

The claims of the '164 patent describe a computer system and a database comprising a process for: (1) receiving medical claims containing medical service codes and applying auditing (fraud detection) rules to those medical claims, and (2) authorizing or rejecting one or more of the code(s) and/or claim(s).  Hereinafter, I will refer to this general description as the "basic system and method" of the '164 patent.

The claims of the '164 patent appear to refer to medical claims that include codes for medical services performed by physicians and other licensed medical practitioners (such as chiropractors and audiologists), as well as certain facility-based services (e.g., lab tests and x-rays).

What follows is my understanding of the claims of the '164 patent, including any ambiguities contained within the language of the claims (my numbering coincides with the numbering of the patent claims in the '164 patent):

1. A method for: receiving medical claims (single or multiple); interacting with a database of codes to determine and inform the user whether the billed code(s) are contained in the database; informing the user that a medical code is not contained in the database. [11]

This patent claim also describes the computer system on which these methods are applied, a computer with a "predetermined" database that contains relationships for defining whether one medical service code is valid when it appears on the same claim(s) with another code from the same database.

The term "predetermined" is never defined in the '164 patent.  The term hints at something that is fixed and unchanging, but the term is never clarified. While the Specification and Appendices provide examples of the codes and relationships within the predetermined database, the specific contents of this database are never fully disclosed.

---

[11] Throughout the claims of the '164 patent, I assume that the terms "input claim" and "claim" refer to a bill (invoice) for medical services.

2.  The basic system and method, and a method for determining whether any code contained in the claim(s) is mutually exclusive of another code appearing on the same claim(s) due to non-medical reasons.

The terms "mutually exclusive" and "non-medical" are not defined in the '164 patent. Are the gender and age of a patient non-medical issues, or medical issues? Certainly, they are medical facts. The patent does not provide sufficient information for me to determine the meaning of these terms in this patent claim. Further, this patent claim refers to one code being mutually exclusive with respect to another code, not with respect to a demographic factor such as the patient's gender or age. Ultimately, the audit method contemplated in patent claim #2 is not specifically identified.

Also, please see my discussion of the predetermined database under patent claim #1.

3.  The basic system and method, and a system for determining whether one of multiple billed codes is valid or invalid.

The terms "valid" and "invalid" are not defined, and one may choose to construe their meaning broadly or narrowly. It is not clear whether the terms "valid" and "invalid" were used with the intent of: (a) encompassing all audit detection methods and systems described in the Specification and Appendices; (b) encompassing only some of the audit detection methods and systems described in the Specification and Appendices; or (c) broadly encompassing all of the audit detection methods and systems described in the Specification and Appendices, as well as any future audit detection methods and systems.

Whatever the case, the terms "valid" and "invalid" do not summon to mind specific audit detection techniques, but rather the general concept of improperly billed codes and claims.

Also, please see my discussion of the predetermined database under patent claim #1.

4.  The apparatus of patent claim #3, with a system for removing invalid medical codes from the medical claim(s).

    Please see my discussion of "valid" and "invalid" under patent claim #3.

5.  The apparatus of patent claim #4, with a system for informing the user why codes were deleted from the medical claim(s).

6.  The apparatus of patent claim #3, noting that the database of medical service codes refers to CPT codes.

    Please see my discussion of "valid" and "invalid" under patent claim #3.

7.  I understand that patent claim #7 is not being asserted.

8.  The apparatus of patent claim #3, with a system for requesting additional information from the user of the system.

    Please see my discussion of "valid" and "invalid" under patent claim #3.

9.  The apparatus of patent claim #3, noting that there are medically determined relationships among the medical service codes in the database.

    Please see my discussion of the predetermined database under patent claim #1.

    Also, please see my discussion of "valid" and "invalid" under patent claim #3.

10. The basic system and method, with a system for determining whether a single billed code among multiple billed codes is part of ("included in") one of the other billed codes.

    Please see my discussion of the predetermined database under patent claim #1.

11. The apparatus of patent claim #10, with a system for removing the rejected code(s) from the medical claim(s).

12. The basic system and method, with a system for determining whether any code contained in the claim(s) is exclusive of another code appearing on the same claim(s) for medical reasons.

    The term "medically exclusive" is not defined. Therefore, there is no way to determine how this audit detection issue—medically exclusive—differs from a code being "invalid by interacting with the database" (patent claim #3). Also, nowhere in the '164 patent did I find a discussion of the distinction between "non-medical" (as used in patent claims #2 and #14) and "medical" (as used in patent claim #12).

Please also see my discussion of the predetermined database under patent claim #1.

13. The basic system and method, with a system for determining and informing the user whether the billed code(s) are contained in the database.

Please also see my discussion of the predetermined database under patent claim #1.

14. The basic system and method, with a system for determining whether any code contained in the claim(s) is mutually exclusive of another code appearing on the same claim(s) due to non-medical reasons.

The terms "mutually exclusive" and "non-medical" are not defined (please see my discussion under patent claim #2, above). Also, please see my discussion of the predetermined database under patent claim #1.

15. The basic system and method, with a system for determining whether a single billed code among the multiple billed codes is valid or invalid, and rejecting or authorizing the claim(s).

Please see my discussion of "valid" and "invalid" under patent claim #3. Also, please see my discussion of the predetermined database under patent claim #1.

16. The basic system and method, with a method for determining whether a single billed code among the multiple billed codes is valid or invalid, and rejecting or authorizing the claim(s).

Please see my discussion of "valid" and "invalid" under patent claim #3. Also, please see my discussion of the predetermined database under patent claim #1.

Only three of the 16 patent claims are described in a manner that one can reasonably correlate to audit detection techniques described in the Specification and Appendices. Those are the method and apparatus claims (patent claims #1 and #13, respectively) that describe a method and computer system for determining whether a code appearing on a medical claim (or claims) is contained in the predetermined database, and the apparatus-only claim (patent claim #10) that describes a computer system for determining whether one code among multiple billed codes is part of ("included in") any of the other billed codes appearing on a medical claim or claims.

None of the other medical claim auditing methods and apparatuses described in the Specification, or rendered as examples in the Appendices, are specifically identified in the claims of the '164 patent.

I understand that the Court has not yet interpreted the claims of the '164 patent or identified the required structure. I may supplement this opinion once the Court renders its claim construction.

## SECTION FIVE:  OPINIONS CONCERNING THE '164 PATENT

During the 12-year period of my association with Pace Healthcare Management, I regularly worked on consulting projects involving medical claim adjudication, medical claim auditing, clinical data reporting and other issues requiring an in-depth knowledge of CPT-coding.  From 1986 through 1998, I provided consulting services to health insurance companies and HMOs on matters pertaining to claim auditing.  I am familiar with computer-based claim auditing systems because of my consulting work with health insurance companies and HMOs, and my consulting role in developing The TriZetto Group's ClinicaLogic product.

It is based on this experience and knowledge—coupled with my training, education, and work experience outlined above—that I offer my opinions concerning the '164 patent.  In forming my opinions, I relied on my reading of the '164 patent as well as my understanding and expertise in coding rules that govern medical billing practices.  To the best of my knowledge and recollection, all comments and opinions are framed within the context of industry conditions that existed prior to the summer of 1987 (which I understand to be the date claimed by McKesson as the date of conception of the '164 patent).

As previously discussed, with the exception of patent claims #1, #10, and #13, the claims of the '164 patent do not disclose the specific nature of the claim auditing methods and apparatuses (hereinafter referred to as the "claim auditing process") described in the Specification and Appendices.  However, I understand that the claims of the '164 patent are intended to describe a system and method that performs some number of the claim auditing methods described in the Specification and Appendices of the '164 patent.  Thus, my opinions are in reference to the claim auditing process described in the patent claims, Specification and Appendices of the '164 patent.

### The claim auditing process described in the '164 patent was known and would have been obvious to a person of ordinary skill in the art.

I have been informed by counsel for TriZetto that, as set forth in 35 U.S.C. § 102, an invention is not novel if "the invention was known or used by others in this country, or patented or described in a printed publication in this or a foreign country, before the invention

thereof by the applicant for patent." I have also been informed by counsel for TriZetto that, as set forth in 35 U.S.C § 103, "a patent may not be obtained…if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." **I conclude that the claim auditing process described in the asserted claims of the '164 patent was known and would have been obvious at the time the invention was made to a person having ordinary skill in the art, for the reasons described below.**

The '164 patent states the following about the claim auditing rules described in the patent: "Each of the rules was developed as a result of reviewing medical procedures by expert medical personnel and is consistent with the CPT-4 classification system. However, expert medical personnel also applied clinical judgment to situations where the CPT-4 classification system is not explicit or non-existent." (Col. 6, lines 7-13)

This statement identifies the information sources for the claim auditing rules disclosed in the patent: (1) CPT coding conventions, and (2) the clinical judgment(s) of expert medical personnel. Having myself used these same two information sources when working as a consultant to Erisco (now TriZetto) and developing auditing rules and the database for a computer-based claim auditing system with comparable functionality—ClinicaLogic—I am very familiar with the developmental process and information sources to which the '164 patent refers.

In fact, it is in part owing to my experience with ClinicaLogic that I conclude the claim auditing process of the '164 patent was not novel. As the '164 patent acknowledges (Col. 6, lines 7-13), the auditing rules described in the '164 patent are "consistent with the CPT-4 classification system," meaning that, in effect, many of the rules were drawn directly from CPT coding conventions, as discussed in more detail below. Certainly, methods drawn from a long-existing publication would fail any test of novelty. [12]

That leaves the second source of information disclosed in the '164 patent—the judgments of expert medical personnel. What exactly does this comprise? It is true that,

---

[12] Dr. George A. Goldberg, one of the inventors of the '164 patent, agreed that many of the claim auditing rules contained in the '164 patent could be discerned from the CPT-4 Manual. On page 230 of his deposition, he acknowledged that, in 1988, he had written, "'anybody' can go through the coding book [CPT-4 Manual] and identify a large number of decision rules."

while the AMA rendered then-current coding conventions in their CPT manual, some related clinical issues were not explicitly addressed. For example, the AMA did not address place-of-service issues (the setting in which a procedure would normally be performed), age and gender issues (at what age is a specific service or procedure likely to be performed, and is the procedure gender-specific?), or incompatible diagnoses (procedures that are inconsistent with, or unnecessary, in light of: the patient's diagnosis, age, or gender; or other procedures listed on the medical claim).

However, there was no reason to explicitly address these concepts in the CPT coding manual because they were already known to physicians and many medical claim auditors by virtue of their training. Physicians and nurses who worked as claim auditors knew that most cataract surgery is done as an outpatient, and they knew that seventy-year-old women do not typically give birth. The issue of incompatible services (related to diagnosis) could raise valid questions in a pre-payment claim audit, but a specialty-matched physician claim auditor would readily know which diagnoses are appropriate for each of the procedures performed by specialists in his or her field.

To be fair, there were also occasional ambiguities in the CPT coding conventions as they related to specific medical procedures. However, these ambiguities were infrequent and were readily filled in: (1) by way of analogy (i.e., if a certain coding convention applied to urological procedures, it reasonably also applied to gynecologic procedures), or (2) by seeking the judgment of expert medical personnel (generally, the consensus opinion of specialty-matched physicians).

Ultimately, then, these judgments by expert medical personnel were either: (a) knowledge widely known to physician claim auditors (e.g., incompatible diagnosis, age, and gender); (b) analogous applications of already-existing CPT coding conventions (i.e., to address infrequent ambiguities); or (c) a simple consensus opinion. As such, the claim auditing process described in the claim, Specification and Appendices was not based on novel ideas or methods.

Moreover, for the invention to be accepted by healthcare insurance companies and medical providers, it had to be based on some acceptable pre-existing standards. In this instance, those standards were:

1.   The CPT coding conventions.

2.    The judgment of expert medical personnel.

While the '164 patent does not disclose the full set of claim auditing rules, I think it is instructive to examine the types of claim auditing rules revealed in the Specification and Appendices of the '164 patent because doing so reveals pre-existing sources—sources that existed prior to the summer of 1987—for the methods comprising those auditing rules.

Under the "Description of the Preferred Embodiment" (Col. 4-10), the '164 patent describes a process that begins with the user entering information from the medical claim. This is followed by a series of steps that include:

> (1) Determining whether medical service code(s) appearing on a medical claim are contained within the predetermined database (Col. 7, lines 16-22).
>
> This step corresponds to the method and computer system described in patent claims #1 and #13. Ultimately, though, determining whether a code that appears on the medical claim is contained in the invention's database is a mundane task and not something that rises to the level of a novel claim auditing process. In any case, this process element would have been obvious to a person having ordinary skill in the art.

> (2) Identifying and replacing any code appearing in the medical claim that has been superseded by "another code entry in an updated version of the CPT-4 classification" (Col. 5, lines 26-34).
>
> I could find no patent claim that corresponds to this step. In any case, Appendix B of the CPT-4 Manual (See MCK 053333-053337, 1985 CPT-4 Manual) contains a listing of new codes, deleted codes, and revised codes. Wherever applicable, Appendix B also identifies which CPT code should be used in place of a deleted (superseded) code. Clearly, replacing obsolete CPT codes with newer CPT codes is not something that rises to the level of a novel claim auditing process. This process element was known to claim auditors and would have been obvious to a person having ordinary skill in the art.

> (3) Eliminating duplicate codes not considered "valid" by the '164 invention (Col 5, lines 34-41).

This claim auditing method is implicit in the CPT coding conventions. (See MCK 053147-053392, 1985 CPT-4 Manual). CPT code 38100 in the 1985 CPT-4 Manual offers an example of this auditing rule. [13] The description of code 38100 reads, "Splenectomy; total." In everyday English, this code describes surgery to remove a patient's spleen. Since humans have only one spleen, it is reasonable to conclude that listing code 38100 twice on a medical claim for the same patient would be invalid, and the second listing of code 38100 should be removed. The claim auditing rule described in this section of the Specification was known to claim auditors and would have been obvious to a person having ordinary skill in the art.

The remainder of the '164 patent Specification describes how "a set of rules developed for use of this program is now invoked" (Col 5, lines 67-68). The alphanumeric designation (E1, R1, L1, etc) of the rules described in the remainder of the Specification corresponds to the list of rules appearing in Appendix B ("Rules Descriptions," Col. 47-52). The rules listed in Appendix B (some of which are rendered as examples in Appendix A), are grouped into the following categories:

Rules Applied to Multiple Codes

- R1, R2, R3, and R4 (rules that result in the replacement of a code). [14]
- E1, E2, EA, EP, (rules that result in the exclusion of a code).
- L1 (rule that limits payment of a code). [15]
- QM, QS, QB (rules that alert the user that the coding issue(s) cannot be dealt with programmatically, and human intervention is required).

Rules Applied to Each Code Individually

- Q1 through Q9 (rules that generate a request for more information).

---

[13] I found no example of this claim auditing rule in the '164 patent.
[14] I found no patent claim(s) that appear to correspond to rules R1, R2, R3 or R4.
[15] I found no patent claim(s) that appear to correspond to the L1 rule.

**Rules R1, R2, R3, and R4.** Based on the descriptions provided in Appendix B and the examples rendered in Appendix A, rules R1 through R4 (rules that result in the replacement of a code) appear to detect: (A) <u>Unbundling</u> (breaking down a service or procedure into its component parts and submitting a bill with several CPT codes, rather than properly using a single CPT code that encompasses all of the rendered services); and (B) <u>Upcoding</u> (using a CPT code that represents a more complex service than the one that was actually performed). The following examples from Appendix A of the '164 patent reveal the nature of these claim auditing rules.

(A) <u>Unbundling.</u> Example #2 in Appendix A of the '164 patent (Col. 11 through 14)—the R2 rule—renders an example of unbundling. When CPT codes 58260 (hysterectomy – removal of the uterus) and 57250 (colporrhaphy – repair of the vagina) both appear on the same medical claim, these are replaced by code 58265 because 58265 includes both procedures—a hysterectomy and colporrhaphy. The following descriptions of these codes from the 1985 CPT-4 Manual provide the information needed to make this claim audit determination (underlining is mine):

58260  <u>Vaginal hysterectomy</u>

57250  <u>Posterior colporrhaphy</u>, repair of rectocele with or without perineorrhaphy

The above codes represent unbundling and are replaced by the following single code:

58265  <u>Vaginal hysterectomy; with</u> plastic repair of vagina, anterior and/or <u>posterior colporrhaphy</u>

Even without understanding all of the medical terms, one can see that 58265 includes the primary surgical elements of codes 57250 and 58260. The words appearing after the comma in the description of code 57250 are simply an explanation of the reason for the colporrhaphy (to repair a rectocele), and clarify that this code also encompasses a perineorrhaphy (if done).

This claim auditing rule follows implicitly from the CPT code descriptions. As such, the claim auditing rule depicted in this example from Appendix A of

the '164 patent would have been obvious to a person having ordinary skill in the art.

(B) Upcoding. Example #3 in Appendix B of the '164 patent (Col. 13 through 16)—the R1 rule—renders an example of upcoding. When CPT codes 52283 and 52281 both appear on the same medical claim, 52283 is authorized but code 52281 is replaced by code 51600 because 52281 represents a more complex service than the one actually performed. The descriptions of these codes from the 1985 CPT-4 Manual offer the information needed to make this claim audit determination (underlining is mine):

52283  Cystourethroscopy, with steroid injection into stricture
52281  Cystourethroscopy, with calibration and/or dilation of urethral stricture or stenosis, with or without meatotomy and injection procedure for cystography, male or female

The logic of this audit rule is as follows: The physician has billed for the cystourethroscopy, as well as opening the stricture (i.e., narrowing or stenosis), using code 52283. The next code, 52281, duplicates these two elements that already appear on the medical claim, and thus, is largely redundant (the minor element of a meatotomy, if done, is considered merely incidental). The only additional element encompassed by code 52281 is the injection procedure for cystography. Thus, code 52281 describes a more complex service than what was actually performed when considered in combination with code 52283. Since the only additional service identified in code 52281 is an injection procedure or cystography, code 52281 is replaced by the code for an injection procedure only (CPT code 51600).

Again, the CPT code descriptions themselves provide the information required to execute this claim auditing rule. As such, the claim auditing rule depicted in this example from Appendix A of the '164 patent would have been obvious to a person having ordinary skill in the art.

To the limited extent that they were disclosed in the '164 patent, claim auditing rules R1, R2, R3, and R4 encompass a claim auditing process that was implicit in the CPT coding

conventions. These claim auditing rules were not novel and would have been obvious to a person having ordinary skill in the art.

  **Rules E1, E2, EA, and EP.** Based on the descriptions provided in Appendix B and the examples rendered in Appendix A, rules E1, E2, EA, and EP (rules that result in the exclusion of a code) appear to detect <u>Fragmentation</u> (billing for incidental procedures performed as part of a larger procedure, or for services that are integral to a larger procedure). The following example from Appendix A of the '164 patent reveals the nature of these claim auditing rules.

    Example #1 in Appendix A of the '164 patent (Col. 11 and 12)—the E1/E2 rule—renders an example of fragmentation. When CPT codes 10120 (removal of a foreign body that is lodged in the skin) and 64450 (injection of a local anesthetic) both appear on the same medical claim, code 10120 is authorized but 64450 is excluded (i.e., rejected).

   The descriptions of these codes from the 1985 CPT-4 Manual are as follows:

    10120  Incision and removal of foreign body, subcutaneous tissues; simple
    64450  Injection, anesthetic agent; other peripheral nerve or branch

   Code 64450 is rejected because of an explicit CPT coding rule that appeared on page 57 of the 1985 CPT-4 Manual (see MCK 053187). With regard to surgical procedures, it states, "Listed surgical procedures include the operation per se, <u>local infiltration, digital block or topical anesthesia</u> when used, and the normal uncomplicated followup care." (underlining mine). This concept is referred to as a 'package' for surgical procedures." The underlined words refer to all common forms of local anesthetic and are, by CPT coding convention, included as part of the surgical procedure. Thus, in this example the physician should not have listed code 64450 (injection of an anesthetic) on the medical claim.

   In other words, the claim auditing rule depicted in this example is taken directly from the CPT Manual. The claim auditing rule depicted in this example from Appendix A of the '164 patent would have been obvious to a person having ordinary skill in the art.

To the limited extent that they were disclosed in the '164 patent, claim auditing rules E1, E2, EA, and EP encompass a claim auditing process that was implicit or explicit in the CPT coding conventions. These claim auditing rules were not novel and would have been obvious to a person having ordinary skill in the art.

**The L1 Rule.** The L1 rule (a rule that limits payment of a code) is disclosed only in a general sense in Appendix B, and by way of one example (# 16) in Appendix A (Col. 41 and 42). Example #16 shows how one of two billed surgical procedures should be paid at a lesser dollar amount because it is a secondary procedure (a lesser procedure done at the same time as the primary surgical procedure).

The medical claim in Example #16 contains two CPT codes:

43840 Gastrorrhaphy, suture of perforated duodenal or gastric ulcer, wound, or injury

43830 Gastrostomy, temporary (tube, rubber or plastic)

Code 43840 (gastrorrhaphy – repair of the stomach) is authorized with no change, but it is recommended that payment for code 43830 (gastrostomy – placement of a feeding tube) be limited to $150.

As stated above, the common term for this rule within the health insurance industry is a "secondary surgical procedure" (a procedure for which payment is reduced when it is done at the same time as another surgical procedure). This claim auditing rule was common to virtually every health insurance company when the 1985 CPT-4 Manual was published. The claim auditing rule depicted in this example from Appendix A of the '164 patent would have been obvious to a person having ordinary skill in the art.

Claim auditing rule L1 encompasses a claim auditing process that was widely known throughout the health insurance industry. This claim auditing rule was not novel and would have been obvious to a person having ordinary skill in the art.

**Rules QM, QS, and QB.** Based on the descriptions provided in Appendix B and the examples rendered in Appendix A, rules QM, QS, and QB (rules that generate a question about the billed codes and alert the user that human intervention is required) appear to detect: (A) Unbundling (breaking down a service or procedure into its component parts and

submitting a bill with several CPT codes, rather than properly using a single CPT code that encompasses all of the rendered services); and (B) Fragmentation (billing for incidental procedures performed as part of a larger procedure, or for services that are integral to a larger procedure). The following examples from Appendix A of the '164 patent reveal the nature of these claim auditing rules.

(A) Unbundling. Example #5 in Appendix A of the '164 patent (Col. 17 and 18)—the QM rule—renders an example of unbundling. When CPT codes 58980 (laparoscopy of the pelvis) and 44000 (enterolysis – freeing of intestinal adhesions) both appear on the same medical claim, these codes are replaced by code 58265 because 58265 includes both procedures—a hysterectomy and enterolysis. The descriptions of these codes from the 1985 CPT-4 Manual offer the information needed to make this claim audit determination (underlining is mine):

58980  Laparoscopy for visualization of pelvic viscera;

44000  Enterolysis, freeing of intestinal adhesion (separate procedure)

The above codes represent unbundling and are replaced by the following code:

58985  Laparoscopy for visualization of pelvic viscera; with lysis of adhesions

Even without understanding all of the medical terms, one can see that 58985 includes both a pelvic laparoscopy (code 58980) and lysis (enterolysis) of adhesions (code 44000). Note that code 44000 includes the parenthetical—"(separate procedure)"—indicating that this code should be used only when the procedure was done separately. Thus, codes 58980 and 44000 are an unbundled form of code 58985.

The claim auditing rule depicted in this example from Appendix A of the '164 patent would have been obvious to a person having ordinary skill in the art.

(B) Fragmentation. Example #6 in Appendix A of the '164 patent (Col. 17 through 20)—the QS/QB rule—renders an example of fragmentation. When CPT codes 33512 (triple coronary artery bypass surgery) and 35820 (surgery to

control postoperative bleeding) both appear on the same medical claim, code 33512 is authorized but 35820 generates a request for further information before being authorized.

The descriptions of these codes from the 1985 CPT-4 Manual are as follows:

- 33512  Coronary artery bypass, autogenous graft, eg, saphenous vein or internal mammary artery; three coronary arteries

    35820  Exploration for postoperative hemorrhage or thrombosis; chest

Authorization of code 35820 is deferred (pending further information) until it can be determined whether the bleeding (hemorrhage) actually occurred during the postoperative period and required a separate surgical procedure, or was simply part of the coronary bypass surgery (and thus, should not have been listed on the medical claim). There was an explicit CPT coding rule that dealt with this issue, which appeared on page 58 of the 1985 CPT-4 Manual (see MCK 053188). With regard to surgical procedures, it states, "Some of the listed procedures are commonly carried out as an <u>integral part of the total service</u>, and as such do no warrant a separate identification." Thus, in this example, the physician should not have listed code 35820 if the bleeding was an intra-operative difficulty that occurred during the coronary artery bypass surgery.

In other words, the claim auditing method depicted in this example is taken directly from the CPT Manual. As such, the claim auditing rule depicted in this example from Appendix A of the '164 patent would have been obvious to a person having ordinary skill in the art.

To the limited extent that they were disclosed in the '164 patent, claim auditing rules QM, QS, and QB encompass a claim auditing process that was implicit or explicit in the CPT coding conventions. These claim auditing rules were not novel and would have been obvious to a person having ordinary skill in the art.

**Rules Q1 through Q9.** Based on the descriptions provided in Appendix B and the examples rendered in Appendix A, rules Q1 through Q9 (rules that generate a request for more information) appear to detect: (A) <u>Upcoding</u> (using a CPT code that represents a more

complex service than the one that was actually performed); (B) <u>Incompatible Services</u> (procedures that are inconsistent with, or unnecessary, in light of: the patient's diagnosis, age, or gender; other procedures listed on the medical claim); (C) <u>Inappropriate Place-Of-Service</u> (rendering care in a setting that results in unnecessary costs, or duplicate billing); and (D) <u>Billed Dollar Amounts That Exceed Certain Limits</u>. The following examples from Appendix A of the '164 patent reveal the nature of these claim auditing rules.

(A) <u>Upcoding.</u> Example #12 in Appendix A of the '164 patent (Col. 31 through 34)—the Q6 rule—renders an example of upcoding. Code 92502 (ear-nose-and-throat exam under general anesthesia) appears on a medical claim. If the medical claim contains no indication that anesthesia was used, code 95202 is rejected.

The CPT code description itself, which includes the words "under general anesthesia," provides the information required to execute this claim auditing rule. As such, the claim auditing rule depicted in this example from Appendix A of the '164 patent would have been obvious to a person having ordinary skill in the art.

(B) <u>Incompatible Services.</u> Example #15 in Appendix A of the '164 patent (Col. 39 through 42)—the Q9 rule—renders an example of incompatible services. Code 58605 (ligation or transection of fallopian tubes during the postpartum period—after giving birth, and while still hospitalized) appears on a medical claim with no other codes. Code 58605 is rejected because, presumably, there should be other information or procedure codes on the claim indicating that the patient had recently given birth. The following action is recommended.

*Replace the code appearing on the medical claim:*

58605  Ligation or transection of fallopian tube(s), abdominal or vaginal approach, postpartum, unilateral or bilateral, during same hospitalization

*With the following code* (which is used when the patient is <u>not</u> hospitalized following childbirth):

58600  Ligation or transection of fallopian tube(s), abdominal or vaginal approach, unilateral or bilateral

The CPT code descriptions themselves provide the information required to execute this claim auditing rule. As such, the claim auditing rule depicted in this example from Appendix A of the '164 patent would have been obvious to a person having ordinary skill in the art.

(C) Inappropriate Place of Service. Example #11 in Appendix A of the '164 patent (Col. 29 through 32)—the Q5 rule—renders an example of this auditing issue. A medical claim (presumably submitted by a physician) for code 93220 (vectorcardiogram, testing and interpretation) is rejected and replaced with code 93222 (vectorcardiogram, interpretation only) if the patient was hospitalized at the time of the test. This is done because hospitals generally provide the equipment and perform the test—and submit a medical claim for these services—while the physician who interprets the test submits a bill (medical claim) only for his or her service (interpretation and reporting).

This billing practice—hospitals performing and billing for tests like vectorcardiograms, and physicians billing for interpreting the test—was a very well known convention throughout the health insurance industry when the 1985 CPT-4 Manual was published. The claim auditing rule depicted in this example from Appendix A of the '164 patent would have been obvious to a person having ordinary skill in the art.

(D) Billed Dollar Amounts That Exceed Certain Limits. Example #9 in Appendix A of the '164 patent (Col. 25 through 28)—the Q3 rule—renders an example of this auditing issue. If the billed charge for code 38500 (biopsy and excision of a lymph node, unspecified body location) is $300 or more, authorization is deferred until further information is known about the procedure.

As in the prior example, this claim auditing issue was well known throughout the health insurance industry. As compared to the CPT codes immediately following it in the CPT Manual, code 38500 was not specific or precise as to body location, as shown here:

38500  Biopsy or excision of lymph node, unspecified

38510  Biopsy or excision of lymph node, deep cervical node

38530  Biopsy or excision of lymph node, internal mammary gland

The use of vague CPT codes was a well-known "red flag" among claim examiners and claim auditors alike. In addition, methods for detecting billed dollar amounts that exceed certain limits were an already robust element of most claim processing software systems at that time. The claim auditing rule depicted in this example from Appendix A of the '164 patent would have been obvious to a person having ordinary skill in the art.

To the limited extent that they were disclosed in the '164 patent, claim auditing rules Q1 through Q9 encompass a claim auditing process that was implicit in the CPT coding conventions and known to persons skilled in claim auditing. These claim auditing rules were not novel and would have been obvious to a person having ordinary skill in the art.

## Concluding Opinions

From personal experience, I can attest to the tedious and painstaking effort involved in reducing coding conventions to a database and a set of logical rules. But the claim auditing process described in the '164 patent was not novel, as explained above.

I believe a very close analogy can be drawn between this case and the accounting profession. The Financial Accounting Standards Board (FASB) promulgates accounting rules just as the AMA defines CPT coding rules. And just as a financial auditor scrutinizes the financial records of a corporation using FASB rules and simple arithmetic relationships (e.g., credits and debits must balance), so too the auditing rules described in the Specification and Appendices of the '164 patent are basic rules of logic applied to knowledge that already existed in the form of CPT coding conventions and medical knowledge common to physicians and others who use those codes.

In my opinion, the '164 patent is akin to some enterprising accountant having patented FASB regulations and the basic arithmetic rules of accounting. As improbable and unsupportable as that hypothetical scenario may be, I believe it is an apt analogy for what happened in this case.

Earlier in this report, while describing the context and background of managed care in the 1980s, I explained that health insurance companies and HMOs were well aware of the

aberrant billing practices some physicians used to "game the system." By 1985, medical claim auditing was a common practice among health insurance companies and HMOs.

In their 1987 article, *An Access-oriented Negotiated Fee Schedule*, Drs. Egdahl and Hertenstein discuss their then-current practice of "auditing and recoding" physician medical claims. [16] Nowhere in their description do they suggest that their auditing practices were exclusive to Caterpillar Corporation—because they were not.

Three years prior to the initial application for the '164 patent on September 30, 1988, the health insurance company that I helped found (AMI Group Health Services) regularly audited medical claims against billing and CPT coding criteria that were similar to those found in the '164 patent. And AMI was not an aberration in the mid-1980s. We had an ambitious audit program, but most large health insurance companies had similar capabilities to a greater or lesser extent, depending upon how significant they perceived the problem to be in their particular geographic markets.

Who staffed these pre-payment audit programs? It was generally a tiered effort, with claim examiners, claim supervisors, nurses, and physicians each playing a role. The point is, there were not just a handful of persons skilled in the art of coding and auditing medical claims in accordance with CPT conventions. Rather, there were skilled practitioners throughout the country because, for reasons described earlier, the tools used to audit medical claims comprised primarily two components: (1) CPT coding conventions, which were published in booklet form and electronic media, and (2) knowledge common to medical personnel who use those codes, including physician claim auditors.

As such, the claim auditing process described in the claim, Specification and Appendices of the '164 patent was already known to those skilled in this art. Moreover, if one breaks down the claim auditing rules into their component parts, one is left with simple "if-then" rules of logic (similar to what was contained in ClinicaLogic). The algorithms themselves are quite simple. And as discussed above, the coding rules are either an explicit application of CPT conventions, an analogous application of those conventions, or a byproduct of common medical knowledge.

---

[16] Richard H. Egdahl, M.D. and Robert D. Hertenstein, M.D., *An Access-Oriented Negotiated Fee Schedule,* Ann. Surgery September, 1987; 206(3):349-57

True, this is a technical subject, but the claim auditing process described in the '164 patent would have been obvious to a person having ordinary skill in the art. The auditing rules were not a new invention, but rather a rendering of pre-existing knowledge and methods into an automated form.

Date:  October 24, 2005

Philip M. Hawley, Jr., M.D.

## APPENDIX A:  CURRICULUM VITAE – PHILIP M. HAWLEY, JR, MD

### PROFESSIONAL EXPERIENCE

| | | |
|---|---|---|
| 2000 - Present | **Attending Pediatrician** | **Childrens Hospital Los Angeles** |

Attending pediatrician at this southern California pediatric medical center.

| | | |
|---|---|---|
| 1986 - 1999 | **President and Chief Executive** | **Pace Healthcare Management, LLC** |

Founded and managed this consulting firm specializing in health insurance operations, medical cost management and medical quality assurance.  Worked with healthcare purchasers and payors to develop innovative managed care programs.  Scope of projects included operational consulting on issues including provider networks, utilization management, and health plan administration.  Developed financial modeling tools, statistical modeling tools, and patient management systems for clients that included HMOs and PPOs, indemnity insurers, large corporate purchasers, and several specialty firms within the managed care industry.

| | | |
|---|---|---|
| 1984 – 1986 | **Executive Vice President** | **AMI Group Health Services, Inc.** |

Created and managed over 20 HMOs and PPOs in 10 states throughout the country with more than $200 million in annual revenue.  Held profit and loss responsibility for this all aspects of medical management and provider networks.

| | | |
|---|---|---|
| 1982 – 1984 | **Director of Operational Analysis** | **Occidental Petroleum Corporation** |

Reporting to the Executive Vice President of Science & Technology, responsibilities included operational and financial analyses of investment opportunities, as well as the negotiation and sale of several business units.

| | | |
|---|---|---|
| 1979 – 1980 | **Pediatric Resident** | **Childrens Hospital Los Angeles** |
| 1999 – 2000 | | |

Completed General Pediatric residency.  Responsible for inpatient and outpatient care, as well as the education of interns and medical students.

| | | |
|---|---|---|
| 1978 – 1979 | **Pediatric Intern** | **Childrens Hospital Los Angeles** |

Completed General Pediatric internship, comprising inpatient and outpatient care.

### EDUCATION & TRAINING

| | | |
|---|---|---|
| 1980 - 1982 | **Harvard Graduate School of Business** | **Boston, Massachusetts** |
| | Master in Business Administration degree | |
| 1974 - 1978 | **University of Southern California** | **Los Angeles, California** |
| | Doctor of Medicine degree | |
| 1970 - 1974 | **University of Notre Dame** | **South Bend, Indiana** |
| | Bachelor of Science degree | |

### CERTIFICATIONS

| | |
|---|---|
| 2000 | **American Board of Pediatrics** |
| 1987 | **American Board of Quality Assurance & Utilization Review** |

# EXHIBIT 5

UNITED STATES DISTRICT COURT

DISTRICT OF DELAWARE

McKESSON INFORMATION SOLUTIONS, LLC,

Plaintiff

v.                           CA NO. 04-1258 (SLR)

THE TRIZETTO GROUP, INC.,

Defendant

CERTIFIED
COPY

---

VOLUME 1

VIDEOTAPED DEPOSITION OF RANDALL

DAVIS, Ph.D., a witness called on behalf of

the Plaintiff, pursuant to the Federal Rules

of Civil Procedure, before Jessica L.

Williamson, Registered Merit Reporter,

Certified Realtime Reporter and Notary

Public in and for the Commonwealth of

Massachusetts, at the Offices of Skadden,

Arps, Slate, Meagher & Flom LLP, One Beacon

Street, Boston, Massachusetts, on Wednesday,

November 30, 2005, commencing at 9:27 a.m.

JOB NO. 41297



www.sarnoffcourtreporters.com
Irvine • Los Angeles • San Francisco
phone 877.955.3855 • fax 949.955.3854

SARNOFF
Court Reporters and
Legal Technologies

| | | |
|---|---|---|
| 11:58:21 | 1 | Q. Let me direct your attention to your report |
| 11:59:02 | 2 | dated October 24, Exhibit 2, specifically |
| 11:59:07 | 3 | Exhibit C and Page C-1. |
| 11:59:23 | 4 | A. I have it. |
| 11:59:23 | 5 | Q. These four AMS documents that you testified |
| 11:59:27 | 6 | about earlier, do you see that? |
| 11:59:28 | 7 | A. Yes. |
| 11:59:35 | 8 | Q. Can you describe how and when you collected |
| 11:59:37 | 9 | those documents? |
| 11:59:39 | 10 | A. Yes. I talked to a number of colleagues and |
| 11:59:51 | 11 | former colleagues about whether they knew of |
| 11:59:55 | 12 | any systems in roughly the time period of |
| 12:00:00 | 13 | the patent, the relevant time period, that |
| 12:00:07 | 14 | were similar in some fashion to the system |
| 12:00:11 | 15 | described in the patent. One of the |
| 12:00:12 | 16 | pointers that I got was to a system |
| 12:00:14 | 17 | called -- or, sorry, a system built by a |
| 12:00:17 | 18 | company called GMIS. |
| 12:00:22 | 19 | So I went searching on the Web for |
| 12:00:24 | 20 | pointers to GMIS, and it turns out that |
| 12:00:28 | 21 | someone who once worked for GMIS also worked |
| 12:00:33 | 22 | at the company that created the AMS system. |
| 12:00:41 | 23 | I'm blocking on their name at the moment. |
| 12:00:43 | 24 | HDI, I think. He also had worked -- he had |
| 12:00:46 | 25 | formerly worked at GMIS, I believe, and then |

89

| | | |
|---|---|---|
| 12:00:51 | 1 | came to work at HDI. |
| 12:00:53 | 2 | And I went to talk to him because it |
| 12:00:54 | 3 | turns out he lives about a mile from where I |
| 12:00:58 | 4 | live at home.  So I talked to him about |
| 12:01:02 | 5 | GMIS, and then we got to talking about the |
| 12:01:03 | 6 | AMS system, and he had the documents in his |
| 12:01:06 | 7 | possession. |
| 12:01:09 | 8 | Q.   And what's his name? |
| 12:01:10 | 9 | A.   Dr. Robert Bargar, B-A-R-G-A-R.  He -- it's |
| 12:01:17 | 10 | his signature that shows up in the letter |
| 12:01:19 | 11 | that's one of the AMS documents. |
| 12:01:37 | 12 | Q.   How did you -- did TriZetto's attorneys |
| 12:01:41 | 13 | provide you the information regarding -- any |
| 12:01:47 | 14 | information regarding the AMS system? |
| 12:01:49 | 15 | A.   No. |
| 12:01:49 | 16 | Q.   Did they provide you any information |
| 12:01:52 | 17 | regarding the former employee of GMIS that |
| 12:02:02 | 18 | went to work for the company that |
| 12:02:04 | 19 | developed -- |
| 12:02:04 | 20 | A.   No.  I found him on my own.  My recollection |
| 12:02:07 | 21 | is that they were surprised when I mentioned |
| 12:02:10 | 22 | this.  I think they had independently |
| 12:02:15 | 23 | discovered the material -- not the material, |
| 12:02:18 | 24 | the existence of the system, but I don't |
| 12:02:19 | 25 | recall that detail.  I do know that I found |

90

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
877.955.3855

| | | |
|---|---|---|
| 03:37:22 | 1 | review of the source code, correct? |
| 03:37:24 | 2 | A.  For most of them, except for McDermott. |
| 03:37:27 | 3 | Q.  Is it your opinion, sir, that any individual |
| 03:37:43 | 4 | reference or system anticipates any one |
| 03:37:49 | 5 | claim of the -- strike that. |
| 03:37:53 | 6 | Is it your opinion that any one |
| 03:37:55 | 7 | reference or system anticipates all asserted |
| 03:38:00 | 8 | claims of the '164 patent? |
| 03:38:04 | 9 | A.  As I understand the term "anticipates," the |
| 03:38:07 | 10 | answer is no. |
| 03:38:08 | 11 | Q.  Is it your opinion that any one reference or |
| 03:38:13 | 12 | system anticipates any claim of the '164 |
| 03:38:19 | 13 | patent? |
| 03:38:24 | 14 | (Witness reviews document.) |
| 03:38:24 | 15 | A.  Okay.  So the question is, again, is there |
| 03:39:05 | 16 | any one reference that anticipates any claim |
| 03:39:09 | 17 | of the '164 patent?  Do I have it right? |
| 03:39:13 | 18 | Q.  Reference or system, yes. |
| 03:39:15 | 19 | A.  No. |
| 03:39:19 | 20 | Q.  So it's your opinion, sir, that you have not |
| 03:39:24 | 21 | found any one reference or any one system |
| 03:39:29 | 22 | that you believe anticipates any asserted |
| 03:39:32 | 23 | claim of the '164 patent, correct? |
| 03:39:36 | 24 | A.  I guess I would want to -- as I sit here, I |
| 03:39:49 | 25 | would want to give a little more thought -- |

03:39:51   1      I'd just go back and do more examination of

03:39:53   2      the AMS system with respect to Claims 1 and

03:39:56   3      13 in particular, but at this moment I'm not

03:39:58   4      prepared to answer that -- to anticipate how

03:40:03   5      that query would come out.  So I would have

03:40:05   6      to say for the moment I have not found a

03:40:06   7      system which anticipates any one claim --

03:40:10   8   Q.  Or --

03:40:11   9   A.  -- any one system or -- any one reference or

03:40:13  10      system which anticipates any claim.

03:40:21  11   Q.  So to the extent that your report suggests

03:40:24  12      otherwise, your report is inaccurate,

03:40:26  13      correct?

03:40:26  14   A.  There is at least one place in the report

03:40:28  15      that uses the language "anticipate" that on

03:40:31  16      reflection should not have.

03:40:35  17   Q.  Well, to the extent anywhere in your report

03:40:39  18      it suggests that any claim is anticipated by

03:40:43  19      a reference or a system it's inaccurate,

03:40:45  20      correct?

03:40:45  21   A.  It should not have used the term

03:40:48  22      "anticipate."

03:40:48  23   Q.  So, sir, you do not intend to express an

03:41:04  24      opinion and testify about today that any one

03:41:10  25      system or one reference anticipates any

| | | |
|---|---|---|
| 03:41:15 | 1 | claim in the '164 patent, correct? |
| 03:41:17 | 2 | A.    That's correct. |
| 03:41:17 | 3 | Q.    Is there any combination of systems or |
| 03:41:33 | 4 | references that you believe anticipates -- |
| 03:41:37 | 5 | strike that -- that you believe renders |
| 03:41:40 | 6 | obvious all of the claims of the one six -- |
| 03:41:44 | 7 | of the asserted '164 patent?  Strike that. |
| 03:41:48 | 8 | Let me rephrase it. |
| 03:41:51 | 9 | Is there any combination of systems or |
| 03:41:53 | 10 | references that you believe renders obvious |
| 03:41:56 | 11 | all of the asserted claims of the '164 |
| 03:41:59 | 12 | patent? |
| 03:42:00 | 13 | A.    Yes. |
| 03:42:00 | 14 | Q.    And what is the combination that you are |
| 03:42:09 | 15 | relying on? |
| 03:42:10 | 16 | A.    It's on Page 34 of my report. |
| 03:42:19 | 17 | Q.    And specifically what is the combination |
| 03:42:21 | 18 | that you're referring to when you answered |
| 03:42:23 | 19 | my question that there is a combination of |
| 03:42:26 | 20 | references and/or systems that render all of |
| 03:42:30 | 21 | the asserted claims of the '164 patent |
| 03:42:35 | 22 | obvious? |
| 03:42:35 | 23 | A.    They are, first of all, the union of all of |
| 03:42:38 | 24 | the references the system cited here; that |
| 03:42:44 | 25 | is, take all of these and eliminate |

202

| | | |
|---|---|---|
| 04:05:41 | 1 | claims.  With respect to Claim 1, what is |
| 04:05:43 | 2 | your opinion regarding -- strike that. |
| 04:05:50 | 3 | I'm going to ask you for your best |
| 04:05:52 | 4 | combination, okay, the one that you feel |
| 04:05:54 | 5 | most confident in -- |
| 04:05:56 | 6 | A.   Okay. |
| 04:05:56 | 7 | Q.   -- all right?  Do you understand that? |
| 04:05:57 | 8 | A.   I do, but that's a tall order.  That's why |
| 04:06:00 | 9 | I'm laughing. |
| 04:06:00 | 10 | Q.   With respect to Claim 1, please tell me what |
| 04:06:03 | 11 | your best combination of references is to |
| 04:06:08 | 12 | invalidate Claim 1 based on obviousness? |
| 04:06:12 | 13 | MR. SEGAL:  Best and minimum, Jeff, |
| 04:06:14 | 14 | or is -- |
| 04:06:15 | 15 | A.   Is that what "best" means? |
| 04:06:17 | 16 | Q.   Well, let's just start with the one that you |
| 04:06:20 | 17 | feel most confident in. |
| 04:06:21 | 18 | A.   Okay. |
| 04:06:43 | 19 | Q.   Well, let me back up for a minute.  Do you |
| 04:06:45 | 20 | at any place in your report identify a |
| 04:06:49 | 21 | particular combination of references or |
| 04:06:51 | 22 | systems that render each claim obvious? |
| 04:07:02 | 23 | A.   No, I don't think I isolated it out as a way |
| 04:07:25 | 24 | of saying this alone or, you know, just |
| 04:07:29 | 25 | these two in combination is enough to make |

218

| | | |
|---|---|---|
| 04:07:31 | 1 | this obvious or just that one alone is |
| 04:07:34 | 2 | enough to make it obvious.  That's what |
| 04:07:36 | 3 | you're asking, right? |
| 04:07:37 | 4 | Q.  Yes. |
| 04:07:37 | 5 | A.  No, I don't think I assembled such a list. |
| 04:07:39 | 6 | I put this chart in simply as a totally |
| 04:07:42 | 7 | inclusive summary that in effect indexes |
| 04:07:46 | 8 | from claim to relevant prior art, but it |
| 04:07:48 | 9 | doesn't try and do the kind of minimal or |
| 04:07:51 | 10 | best selection that you're asking for. |
| 04:07:54 | 11 | Q.  You also did not in your report anywhere |
| 04:07:58 | 12 | identify for each claim limitation in a |
| 04:08:06 | 13 | particular claim where the corresponding |
| 04:08:08 | 14 | quote from each reference you're relying on |
| 04:08:10 | 15 | is found, correct? |
| 04:08:11 | 16 | A.  Correct. |
| 04:08:11 | 17 | Q.  And I'm going to say that that's a claim |
| 04:08:16 | 18 | chart? |
| 04:08:17 | 19 | A.  Yes. |
| 04:08:17 | 20 | Q.  You understand that, right? |
| 04:08:18 | 21 | A.  Uh-huh. |
| 04:08:18 | 22 | Q.  So you didn't provide any claim charts with |
| 04:08:20 | 23 | respect to your obviousness opinions, |
| 04:08:22 | 24 | correct? |
| 04:08:23 | 25 | A.  I provided the claim chart shown on Page 34 |

219

| | | |
|---|---|---|
| 04:08:25 | 1 | which does not go down to the level of |
| 04:08:28 | 2 | elements of claims. |
| 04:08:29 | 3 | Q. All right.  So your opinion, at least with |
| 04:08:37 | 4 | respect to Claim 1, is that Bennett, Egdahl, |
| 04:08:42 | 5 | the AMS brochure, AMS rules, Doyle patent, |
| 04:08:48 | 6 | Stachura84, Nathanson85 and Dornfest84, in |
| 04:08:54 | 7 | combination, rendered Claim 1 obvious, |
| 04:08:56 | 8 | right? |
| 04:08:56 | 9 | A. Yes.  And it may be that some subset of them |
| 04:09:01 | 10 | also renders it obvious, but it's at least |
| 04:09:04 | 11 | an easy claim -- sorry, it's at least a |
| 04:09:08 | 12 | claim I can easily agree with that this |
| 04:09:11 | 13 | combination will render it obvious. |
| 04:09:14 | 14 | Q. You have not identified anywhere in your |
| 04:09:17 | 15 | report any other combination of references |
| 04:09:21 | 16 | that would render Claim 1 invalid for |
| 04:09:26 | 17 | obviousness, other than that combination |
| 04:09:28 | 18 | which is disclosed on Page 34, correct? |
| 04:09:31 | 19 | A. Correct. |
| 04:09:31 | 20 | Q. And for any one of the asserted claims you |
| 04:09:34 | 21 | have not identified anywhere in your report |
| 04:09:35 | 22 | any other combination of references other |
| 04:09:39 | 23 | than those that appear in Claim 34 that in |
| 04:09:43 | 24 | combination would render any asserted claim |
| 04:09:48 | 25 | invalid for obviousness, correct? |

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
877.955.3855

| 04:15:43 | 1 | | argument. |
|---|---|---|---|

04:15:44    2    Q.    And you haven't endeavored, at least as of

04:15:58    3          today, to form an opinion regarding a

04:16:00    4          combination of fewer references than for

04:16:07    5          each asserted claim for your opinion of

04:16:10    6          obviousness other than those listed on 34,

04:16:12    7          plus the five references, Snyder,

04:16:16    8          Mohlenbrock, Gibbons, Miller and Gallant,

04:16:20    9          correct?

04:16:20    10   A.    That is correct.  I have not attempted to

04:16:22    11         find a smaller subset to date.

04:16:23    12   Q.    And you have not attempted to find what the

04:16:32    13         best combination from all of those

04:16:34    14         references is for any one of the asserted

04:16:38    15         claims, correct?

04:16:39    16   A.    I'm not sure what a best combination would

04:16:41    17         be, but I haven't -- even without knowing

04:16:44    18         it, I know I haven't tried to do it, but

04:16:46    19         before I could do it, I would need to know

04:16:48    20         what "best" meant.

04:16:49    21   Q.    And you also have not determined for any of

04:16:54    22         the asserted claims which one, if any, of

04:17:01    23         the references that you've cited on the

04:17:04    24         chart on 34 plus the other five references

04:17:07    25         would be unnecessary to an opinion of

| 04:20:09 | 1 | | it, if I've got your question right.  You're |
| 04:20:12 | 2 | | frowning, so perhaps I misunderstood the |
| 04:20:14 | 3 | | question. |
| 04:20:24 | 4 | Q. | In analyzing, for instance, all of the |
| 04:20:26 | 5 | | references that you are relying on for your |
| 04:20:28 | 6 | | obviousness opinion regarding, for instance, |
| 04:20:32 | 7 | | Claim 1, did you attempt to determine what |
| 04:20:38 | 8 | | claim element or claim elements were missing |
| 04:20:42 | 9 | | from a particular reference and then |
| 04:20:47 | 10 | | determine whether or not that reference |
| 04:20:50 | 11 | | suggested combining it with another |
| 04:20:54 | 12 | | reference that would satisfy the missing |
| 04:20:57 | 13 | | elements from the first reference? |
| 04:21:00 | 14 | A. | I understand.  No, I don't believe I did |
| 04:21:10 | 15 | | that kind of analysis on these. |
| 04:21:12 | 16 | Q. | So for any one of the asserted claims you |
| 04:21:18 | 17 | | did not examine each reference to determine |
| 04:21:24 | 18 | | if it suggested combining it with another |
| 04:21:29 | 19 | | one of the listed references in order to |
| 04:21:33 | 20 | | satisfy the missing claim elements from the |
| 04:21:36 | 21 | | first reference, correct? |
| 04:21:40 | 22 | | MR. SEGAL:  Vague and |
| 04:21:45 | 23 | | mischaracterizes his earlier testimony. |
| 04:21:47 | 24 | A. | There were a number of cases here in this |
| 04:21:58 | 25 | | table where I think these references are |

| | |
|---|---|
| 04:22:02 | 1 |
| 04:22:06 | 2 |
| 04:22:09 | 3 |
| 04:22:13 | 4 |
| 04:22:16 | 5 |
| 04:22:18 | 6 |
| 04:22:21 | 7 |
| 04:22:23 | 8 |
| 04:22:27 | 9 |
| 04:22:29 | 10 |
| 04:22:32 | 11 |
| 04:22:35 | 12 |
| 04:22:38 | 13 |
| 04:22:39 | 14 |
| 04:22:39 | 15 |
| 04:22:43 | 16 |
| 04:22:44 | 17 |
| 04:22:47 | 18 |
| 04:22:50 | 19 |
| 04:22:52 | 20 |
| 04:22:56 | 21 |
| 04:22:58 | 22 |
| 04:23:03 | 23 |
| 04:23:08 | 24 |
| 04:23:15 | 25 |

adequate by themselves, okay? But there may

also be ones where, as you say, a claim

element was missing. I did not examine

these to see if they suggested combining in

such a fashion as to cover all the claim

elements in the cases where a claim element

might have been missing.

Q. Okay. So to draw an analogy, you looked at,

for instance, any given claim and the

elements that are contained in that claim as

a puzzle, for instance, with each element

representing a piece to the puzzle? Do you

follow me so far?

MR. SEGAL: Objection, vague.

A. I follow the analogy. I'm not sure I

believe it, but I follow it.

Q. And so did you then look at the prior art

and determine what pieces of prior art would

satisfy the elements and then combine them

to render the claim obvious?

A. No, I don't think that's how I thought about

it. I think I was looking at these prior

art references as things that rendered the

claim obvious; that is, they had all of the

elements of the claim.

229

| | | |
|---|---|---|
| 04:23:16 | 1 | Now, I would have to go back and see |
| 04:23:18 | 2 | whether I want to take any of those out on |
| 04:23:20 | 3 | that standard, but I believe they cover -- |
| 04:23:26 | 4 | I'm hesitating because I would have to go |
| 04:23:28 | 5 | back and look.  Let me back up.  I did not |
| 04:23:32 | 6 | approach this as if it were a puzzle of |
| 04:23:34 | 7 | independent pieces. |
| 04:23:35 | 8 | Q.   All right.  Looking -- well, let me just ask |
| 04:23:37 | 9 | you a few questions about this.  I'll just |
| 04:23:40 | 10 | take, for instance, Claim 1 on the chart on |
| 04:23:43 | 11 | Page 34.  Did you examine, for instance, the |
| 04:23:46 | 12 | Bennett patent to determine if it suggested |
| 04:23:49 | 13 | in any way that you should combine it with |
| 04:23:55 | 14 | the Doyle patent to solve a problem that was |
| 04:23:59 | 15 | solved by Claim 1 of the '164 patent? |
| 04:24:03 | 16 | A.   No.  I think I can say in general I did not |
| 04:24:07 | 17 | try to look at these to see if they |
| 04:24:09 | 18 | suggested combining among themselves. |
| 04:24:12 | 19 | Q.   And that's true of any of the asserted |
| 04:24:15 | 20 | claims with respect to your opinions in your |
| 04:24:19 | 21 | expert report, correct? |
| 04:24:19 | 22 | A.   That's correct.  But keep in mind that I |
| 04:24:24 | 23 | believe many of these cover the -- all the |
| 04:24:27 | 24 | elements of the claim.  So the combination |
| 04:24:29 | 25 | would not be necessary.  Where the |

230

| | | |
|---|---|---|
| 04:24:35 | 1 | combination is necessary I haven't come up |
| 04:24:37 | 2 | with the subset and the motivations for |
| 04:24:40 | 3 | combining, but I did not approach this as if |
| 04:24:43 | 4 | it were independent pieces of a jigsaw |
| 04:24:46 | 5 | puzzle. |
| 04:24:49 | 6 | Q.  Well, in order to support your opinion that |
| 04:24:52 | 7 | the asserted -- any one of the asserted |
| 04:24:54 | 8 | claims is invalid, you are relying on a |
| 04:24:57 | 9 | combination of art or systems, correct? |
| 04:24:59 | 10 | A.  No.  This takes us back to a little earlier. |
| 04:25:05 | 11 | I tried to say it carefully, so let me say |
| 04:25:08 | 12 | it again, that this is an exhaustive list -- |
| 04:25:13 | 13 | let's take Row No. 1.  It's an exhaustive |
| 04:25:16 | 14 | list of all the prior art references that |
| 04:25:18 | 15 | seem to me to have an impact on Claim No. 1, |
| 04:25:22 | 16 | okay?  I did not analyze -- I did not report |
| 04:25:25 | 17 | them down to the level of individual |
| 04:25:27 | 18 | elements, but this row (indicating), for |
| 04:25:30 | 19 | example, is not there to suggest that eight |
| 04:25:37 | 20 | different things are needed in order to |
| 04:25:40 | 21 | cover Claim No. 1.  That wouldn't even make |
| 04:25:42 | 22 | sense, because Claim No. 1 only had, you |
| 04:25:46 | 23 | know, three or four elements to it.  So this |
| 04:25:49 | 24 | is a list of any of the prior art references |
| 04:25:55 | 25 | that had an impact on -- that by itself had |

| | | |
|---|---|---|
| 04:25:58 | 1 | an impact on Claim No. 1. |
| 04:26:00 | 2 | Q. On any one of the elements of Claim No. 1? |
| 04:26:03 | 3 | A. What I haven't done is make sure that they |
| 04:26:05 | 4 | have an impact on either all of the elements |
| 04:26:07 | 5 | or if they didn't, to specify at that next |
| 04:26:11 | 6 | level of detail. I agreed with that |
| 04:26:13 | 7 | earlier. I haven't reported that here. |
| 04:26:15 | 8 | Q. Actually, what you testified to is it's 13 |
| 04:26:18 | 9 | references that should be included in Box |
| 04:26:20 | 10 | No. 1, correct? |
| 04:26:21 | 11 | A. Fair enough. Because -- well, Egdahl needs |
| 04:26:33 | 12 | one of the five things we listed from the |
| 04:26:35 | 13 | box on Page 37 to establish the suggestion |
| 04:26:38 | 14 | to combine, okay? So that's -- it's Egdahl |
| 04:26:41 | 15 | that needs the suggestion to combine |
| 04:26:43 | 16 | reference. |
| 04:26:44 | 17 | So it's more like -- what is it? -- so |
| 04:26:53 | 18 | it's nine things that would be in there but |
| 04:26:55 | 19 | not because nine things are needed to be |
| 04:26:58 | 20 | combined to cover Claim No. 1. That's not |
| 04:27:01 | 21 | what that's intended to represent. So it |
| 04:27:04 | 22 | shouldn't be read that way. There aren't |
| 04:27:08 | 23 | nine things to be accounted for in Claim |
| 04:27:09 | 24 | No. 1. |
| 04:27:10 | 25 | Q. But you have not expressed in your report |

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
877.955.3855

| | | |
|---|---|---|
| 04:27:15 | 1 | nor are you prepared today to testify |
| 04:27:19 | 2 | regarding which combination less than the, |
| 04:27:25 | 3 | for instance, 13 references on Row -- on |
| 04:27:29 | 4 | Claim 1 support your obviousness opinion, |
| 04:27:32 | 5 | correct? |
| 04:27:32 | 6 | A.    I'm not prepared to do that as we sit here, |
| 04:27:34 | 7 | yes. |
| 04:27:40 | 8 | Q.    All right.  And you -- in rendering your |
| 04:27:42 | 9 | obviousness opinion for each of the asserted |
| 04:27:43 | 10 | claims, you identified the prior art that |
| 04:27:48 | 11 | you believed was relevant to those claims, |
| 04:27:49 | 12 | correct? |
| 04:27:50 | 13 | A.    Yes. |
| 04:27:51 | 14 | Q.    Did you endeavor to determine if each of the |
| 04:27:55 | 15 | elements of that particular claim were |
| 04:28:01 | 16 | actually disclosed in the combination of |
| 04:28:05 | 17 | references that you have cited? |
| 04:28:07 | 18 | MR. SEGAL:  I'm going to object. |
| 04:28:09 | 19 | Mischaracterizes his testimony. |
| 04:28:11 | 20 | Q.    All of them? |
| 04:28:12 | 21 | A.    Not necessarily in combination.  You -- let |
| 04:28:18 | 22 | me start again. |
| 04:28:40 | 23 | If I may, let me take a slightly |
| 04:28:42 | 24 | different tack, and then if this doesn't |
| 04:28:44 | 25 | answer your question, you can reask the |

04:30:10   1         additional five that you've mentioned,

04:30:12   2         actually disclose all of the elements for

04:30:18   3         the corresponding asserted claim, correct?

04:30:21   4    A.   Well, look, I would be willing to take five

04:30:24   5         minutes and do the best I can on that and

04:30:26   6         give you --

04:30:27   7    Q.   What I'm asking you, sir, is -- you know,

04:30:30   8         it's now 4:30, and I'm at least entitled to

04:30:34   9         determine what your opinions are from your

04:30:37  10         report and what you came here to testify

04:30:41  11         about.  And that's what I'm doing.

04:30:43  12    A.   Okay.

04:30:43  13    Q.   And I think that you just simply have to

04:30:45  14         answer my questions as they come without

04:30:47  15         doing an analysis on the fly.  So my

04:30:50  16         question is still pending, and the question,

04:31:00  17         I believe, is, aside from what you've just

04:31:02  18         mentioned regarding Claim 3 -- strike that.

04:31:12  19         I'll withdraw the question.

04:31:13  20              Did you, sir, in rendering your

04:31:19  21         opinions in this case attempt to analyze the

04:31:25  22         collective combination of references that

04:31:31  23         you have listed on Page 34, plus the

04:31:33  24         additional five that you have mentioned for

04:31:35  25         each asserted claim, to determine

235

| | | |
|---|---|---|
| 04:31:37 | 1 | specifically that that collection of |
| 04:31:39 | 2 | references disclosed each and every element |
| 04:31:42 | 3 | of the corresponding asserted claim, yes or |
| 04:31:44 | 4 | no? |
| 04:31:44 | 5 | A.   No. |
| 04:31:45 | 6 | MR. SEGAL:  Mischaracterizes the |
| 04:31:46 | 7 | testimony, objection. |
| 04:31:49 | 8 | Q.   You didn't do that in forming your opinions, |
| 04:31:51 | 9 | and you're not prepared to at least testify |
| 04:31:53 | 10 | to that today without kind of forming |
| 04:31:55 | 11 | opinions on the fly, correct? |
| 04:31:56 | 12 | A.   No, that's not correct.  In reviewing these |
| 04:32:07 | 13 | pieces of prior art, I did compare each of |
| 04:32:10 | 14 | them individually to the claim against which |
| 04:32:13 | 15 | they are listed, okay?  So I did do that |
| 04:32:15 | 16 | analysis.  What I failed to do is put that |
| 04:32:18 | 17 | level of detail into the report.  I did not |
| 04:32:23 | 18 | break it out by individual claim element. |
| 04:32:29 | 19 | I'm sorry, I said that badly.  I did not |
| 04:32:33 | 20 | break it out by individual claim element. |
| 04:32:45 | 21 | Q.   Mr. Davis, given that you did not for each |
| 04:32:49 | 22 | of the asserted claims determine if the |
| 04:32:55 | 23 | combination of prior art references that |
| 04:32:58 | 24 | you're relying on for each asserted claim -- |
| 04:33:00 | 25 | strike that. |

| | | |
|---|---|---|
| 04:33:02 | 1 | I think you've already answered this a |
| 04:33:04 | 2 | number of times. I just want to make sure |
| 04:33:06 | 3 | that we're clear on this, that you did not |
| 04:33:12 | 4 | examine all -- strike that. Strike the |
| 04:33:16 | 5 | question. |
| 04:33:17 | 6 | Did you, sir, in rendering your |
| 04:33:29 | 7 | validity opinions in this case determine |
| 04:33:35 | 8 | whether or not all of the elements in each |
| 04:33:37 | 9 | of the asserted claims were disclosed in the |
| 04:33:45 | 10 | collection of combined references that you |
| 04:33:50 | 11 | have listed on the chart on 34 plus the five |
| 04:33:53 | 12 | references that you've added? |
| 04:33:58 | 13 | MR. SEGAL: Objection, vague. |
| 04:33:59 | 14 | A. Please read it back. I'm not being |
| 04:34:01 | 15 | difficult, I just want to make sure -- this |
| 04:34:03 | 16 | is an important question -- that I |
| 04:34:05 | 17 | understand it right. |
| 04:34:05 | 18 | Q. I understand, sir -- let me see if we can |
| 04:34:07 | 19 | clear this up. |
| 04:34:08 | 20 | A. Okay. |
| 04:34:08 | 21 | Q. I understand your testimony that you looked |
| 04:34:11 | 22 | at each individual reference and determined |
| 04:34:14 | 23 | if it was relevant to one or more elements |
| 04:34:16 | 24 | of a particular claim -- |
| 04:34:17 | 25 | A. Good. |

| 04:34:17 | 1 | Q. | -- correct? |

Q. -- correct?

04:34:17 1 Q. -- correct?
04:34:18 2 A. Good. I agree with that. Thank you.
04:34:20 3 Q. And you determined individually that the
04:34:22 4 references that you listed on Page 34 plus
04:34:26 5 the five additional references each
04:34:29 6 individually were relevant to one or more
04:34:31 7 elements of the corresponding claim,
04:34:33 8 correct?
04:34:33 9 A. Correct.
04:34:34 10 Q. What you did not do was determine -- to
04:34:44 11 determine whether or not the combination of
04:34:45 12 references cited on Page 34 plus the five
04:34:47 13 additional references actually disclosed
04:34:49 14 each and every element of each corresponding
04:34:54 15 asserted claim, correct?
04:34:57 16 A. That is correct. I would just add one thing
04:34:58 17 to that, that there are a number of cases
04:35:02 18 where the individual reference had all the
04:35:06 19 elements of the claim. But in the cases --
04:35:09 20 if I were to go back through here and see
04:35:12 21 that there were cases where -- see if there
04:35:13 22 were references for which that is not the
04:35:15 23 case, I did not then look for the
04:35:17 24 combination it would cover.
04:35:20 25 Q. And in forming your opinions, you also did

| | | |
|---|---|---|
| 04:35:22 | 1 | not analyze each individual reference or |
| 04:35:29 | 2 | system to determine if there was an express |
| 04:35:34 | 3 | suggestion to combine that reference with |
| 04:35:36 | 4 | one of the other references that you are |
| 04:35:38 | 5 | relying on in combination for your opinion, |
| 04:35:41 | 6 | correct? |
| 04:35:42 | 7 | MR. SEGAL:  Objection, vague. |
| 04:35:42 | 8 | A.  I believe that's substantially correct, yes. |
| 04:35:55 | 9 | Q.  Let me direct your attention to the claims. |
| 04:36:01 | 10 | So this is Page -- I'm sorry, Exhibit 1. |
| 04:36:07 | 11 | A.  In the patent, yes, I have it in front of |
| 04:36:09 | 12 | me. |
| 04:36:10 | 13 | Q.  Exhibit 1.  First let me ask you this, sir: |
| 04:36:19 | 14 | Do you see what follows Claim 1 of the |
| 04:36:27 | 15 | patent, which says, "In a computer system |
| 04:36:30 | 16 | having means for operating on a |
| 04:36:33 | 17 | predetermined database," et cetera, and it |
| 04:36:37 | 18 | at least concludes -- that first element |
| 04:36:38 | 19 | concludes with "comprising the steps of"? |
| 04:36:41 | 20 | Do you see that? |
| 04:36:42 | 21 | A.  Yes. |
| 04:36:42 | 22 | Q.  You -- did you -- do you understand that as |
| 04:36:45 | 23 | a preamble?  Are you familiar with that term |
| 04:36:49 | 24 | or not? |
| 04:36:49 | 25 | A.  Not by that term, but I think I understand |

| | |
|---|---|
| 04:46:16 | 1 |
| 04:46:16 | 2 |
| 04:46:18 | 3 |
| 04:46:18 | 4 |
| 04:46:19 | 5 |
| 04:46:22 | 6 |
| 04:46:22 | 7 |
| 04:46:23 | 8 |
| 04:46:25 | 9 |
| 04:46:28 | 10 |
| 04:46:33 | 11 |
| 04:46:33 | 12 |
| 04:46:35 | 13 |
| 04:57:29 | 14 |
| 04:57:34 | 15 |
| 04:57:36 | 16 |
| 04:57:37 | 17 |
| 04:57:38 | 18 |
| 04:57:42 | 19 |
| 04:57:48 | 20 |
| 04:57:52 | 21 |
| 04:57:54 | 22 |
| 04:58:02 | 23 |
| 04:58:07 | 24 |
| 04:58:11 | 25 |

examination --

      MR. SEGAL:  Given the hour --

      MR. RANDALL:  -- taking a break.

      MR. SEGAL:  I think given the hour, we need to have everyone just get up and take a break.

      MR. RANDALL:  All right.  That's fine.  We can change the tape at the same time.

      THE VIDEOGRAPHER:  The time is 4:46.  This is the end of Tape 5, and we are going off the record.

    (Recess taken.)

      THE VIDEOGRAPHER:  The time is 4:57.  This is the beginning of Tape 6, and we are back on the record.

BY MR. RANDALL:

Q.  Mr. Davis, in forming your opinions in your reports, did you analyze the commercial success of the inventions?

A.  No, I didn't.

Q.  So is it fair to say, then, that you did not apply either positively or negatively any issue regarding commercial success in forming your opinions in this case?

| | | |
|---|---|---|
| 04:58:13 | 1 | A.   No. |
| 04:58:15 | 2 | Q.   That's correct, isn't it? |
| 04:58:16 | 3 | A.   I'm sorry, say it again. I'll give you -- |
| 04:58:21 | 4 | Q.   That's a correct statement? |
| 04:58:22 | 5 | A.   That's a correct statement, yes. I was |
| 04:58:25 | 6 | trying to agree with you. |
| 04:58:26 | 7 | Q.   And you are not prepared -- strike that. |
| 04:58:27 | 8 | You did not opine in your report and |
| 04:58:30 | 9 | you are not prepared today to talk about the |
| 04:58:34 | 10 | effect, if anything, of the commercial |
| 04:58:38 | 11 | success of the inventions on your opinions, |
| 04:58:40 | 12 | correct? |
| 04:58:40 | 13 | A.   Correct. |
| 04:58:41 | 14 | Q.   You also did not analyze the long-felt need |
| 04:58:50 | 15 | for the inventions in your report, correct? |
| 04:58:55 | 16 | A.   No, it -- sorry. It was not in the report. |
| 04:59:05 | 17 | I have read what some of the other reports |
| 04:59:07 | 18 | had to say about that, and -- let me just |
| 04:59:14 | 19 | leave it at that. |
| 04:59:14 | 20 | Q.   All right. So you neither expressed an |
| 04:59:20 | 21 | opinion in your report regarding the long- |
| 04:59:22 | 22 | felt need that -- for the inventions nor are |
| 04:59:25 | 23 | you prepared to testify regarding an opinion |
| 04:59:29 | 24 | today on the long-felt need of the |
| 04:59:32 | 25 | inventions, correct? |

| | | |
|---|---|---|
| 04:59:33 | 1 | A.    Well, the only opinion I do have on that |
| 04:59:37 | 2 | today is that there seemed to be a kind of |
| 04:59:47 | 3 | contradiction in taking the position, both |
| 04:59:51 | 4 | that there was a long-felt need and people |
| 04:59:53 | 5 | didn't think it could be done.  It's not a |
| 04:59:56 | 6 | direct head-to-head contradiction, but it |
| 04:59:59 | 7 | seems a curious position taken by some of |
| 05:00:02 | 8 | the other experts' -- I should say in at |
| 05:00:05 | 9 | least one of the McKesson reports that there |
| 05:00:09 | 10 | was both a long-felt need and a belief that |
| 05:00:11 | 11 | you couldn't do this.  It's a little hard to |
| 05:00:15 | 12 | reconcile those two. |
| 05:00:22 | 13 | Q.    That -- let me focus on a few things.  You |
| 05:00:24 | 14 | did not in your report express any opinion |
| 05:00:27 | 15 | regarding the long-felt need of the |
| 05:00:29 | 16 | inventions, correct? |
| 05:00:30 | 17 | A.    Correct. |
| 05:00:30 | 18 | Q.    And you didn't intend to do so, correct? |
| 05:00:32 | 19 | A.    I think the answer is correct. |
| 05:00:38 | 20 | Q.    All right.  And you are not prepared today |
| 05:00:47 | 21 | to either provide an opinion or testify |
| 05:00:50 | 22 | regarding the long-felt need of the |
| 05:00:53 | 23 | inventions other than what you've just |
| 05:00:57 | 24 | mentioned; is that right? |
| 05:00:58 | 25 | A.    That's correct. |

248

Page 314

1

2

3

4

5

6

7

8

9      I, RANDALL DAVIS, Ph.D., do hereby declare under

10  penalty of perjury that I have read the foregoing

11  transcript; that I have made any corrections as appear

12  noted, in ink, initialed by me, or attached hereto; that

13  my testimony as contained herein, as corrected, is true

14  and correct.

15          EXECUTED this _3rd_ day of _January_,

16  20_0 6_, at _Cambridge_, _Mass_.
                        (City)              (State)

17

18

19

20  _____
                RANDALL DAVIS, Ph.D.

21

22

23

24

25

eda2d3ag-55e7-49a7-af58-effb2c1a122e

# EXHIBIT 6

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

MCKESSON INFORMATION SOLUTIONS, LLC,

          Plaintiff,

     vs.                                    No. 04-1258-SLR

THE TRIZETTO GROUP, INC.,

          Defendant.

CERTIFIED
COPY

DEPOSITION OF PHILIP M. HAWLEY, JR., M.D.

Los Angeles, California

Wednesday, November 30, 2005

Reported by:
RENEE A. PACHECO, RPR
CSR NO. 11564

JOB NO. 41623

www.sarnoffcourtreporters.com

Irvine  •  Los Angeles  •  San Francisco

phone 877.955.3855  •  fax 949.955.3854


SARNOFF
Court Reporters and
Legal Technologies

1    do in some fashion with claim auditing.

2         Q    Okay.  You didn't mention it in your report, did

3    you?

4         A    I'm sorry?

11:29 5       Q    Did you mention it in your report?

6         A    Mention the --

7         Q    The Blue -- the Blue Cross.

8         A    No.  I don't believe I did, no.

9         Q    Okay.

11:29 10      A    No.

11        Q    So all of the practices you were talking about

12   in your report that you were familiar with, through your

13   involvement in the industry and your -- the survey done

14   at AMI, were -- were not software-based claim auditing,

11:29 15   they were done by -- manually by a staff of reviewers?

16        A    To the best of my recollection, with the

17   exception of that Blue Shield effort, I -- I believe

18   that's a correct statement.

19        Q    And all the ones you ref- -- are referencing in

11:30 20   your report were manual?

21        A    Yes.  Yes.

22             Let me clarify.  With one clear and obvious

23   exception, outdated and nonexistence codes where, by the

24   time I was with AMI, it was commonplace for claim systems

11:30 25   to have some automated means of identifying whether a

| | | |
|---|---|---|
| | 1 | began work on ClinicaLogic, again, I |
| | 2 | can't say with certainty, but I did |
| | 3 | become aware sometime during that time |
| | 4 | period.") |
| 11:33 | 5 | BY MR. HENDERSHOT: |
| | 6 | Q    So just maybe I can clarify this.  So none of |
| | 7 | the opinions in your report that the '164 claims are |
| | 8 | invalid -- when I say "'164," I mean the '1 -- claims of |
| | 9 | the '164 patent in this case -- are based upon the |
| 11:33 | 10 | existence of a -- a prior art software product for |
| | 11 | handling claims editing and auditing? |
| | 12 | MR. ROOSEVELT:  Objection; vague and ambiguous. |
| | 13 | THE WITNESS:  Can you repeat the question one |
| | 14 | more time? |
| 11:33 | 15 | MR. HENDERSHOT:  Can I hear it back.  Maybe I |
| | 16 | can fix it. |
| | 17 | (The previous question was read back by |
| | 18 | the court reporter as follows: |
| | 19 | "QUESTION:  So none of the opinions |
| 11:33 | 20 | that your report that the '164 claims |
| | 21 | are invalid -- when I say ''164,' I |
| | 22 | mean the claims of the '164 patent in |
| | 23 | this case -- are based upon the |
| | 24 | existence of a prior art software |
| 11:33 | 25 | product for handling claims editing and |

86

```
 1              auditing?")
 2              THE WITNESS:  I would agree with that statement.
 3      BY MR. HENDERSHOT:
 4          Q    So it's a fair statement that the opinions in
11:34 5     your report that the '164 claims are invalid are based on
 6      your opinion that the underlying clinical editing process
 7      that's implemented in a computer system in the '164
 8      claims was known.
 9              Is that a fair statement?
11:34 10        A    I would agree with that statement.
11         Q    With respect to the development of ClinicaLogic,
12     do you recall -- I think I'd assumed this earlier, I just
13     want to make sure it's clear -- did Erisco approach Pace
14     requesting their assistance in developing the product?
11:35 15    "The product" being the ClinicaLogic product.
16             MR. ROOSEVELT:  Asked and answered.
17             THE WITNESS:  Yes.  They approached Pace about
18     developing that.
19     BY MR. HENDERSHOT:
11:35 20        Q    Did they contact you -- "they" being Erisco, did
21     they contact you personally?
22         A    I would have been the first person they
23     contacted, yeah.
24         Q    Do you recall the context of their contacting
11:35 25    you or what --
```

87

```
 1   claims that limits it to a certain programming language.
 2        Q    In review of the '164 -- and when I say the
 3   specification, I refer to sort of everything in the
 4   patent other than the claims, the figures, the
 5   appendices, the prose.
 6             Did you see anything in the '164 specifications
 7   that indicated to you that the claims are limited to a
 8   certain programming language?
 9        A    I don't recall seeing anything that limits it to
10   a certain programming language.
11        Q    And then on Page 4 of your report, and in
12   Footnote 4, you cite to the access -- an access-oriented
13   negotiated fee schedule article by Drs. Egdahl and
14   Hertenstein?
15        A    Yes.
16        Q    Did you review all of that article?
17        A    I did.
18        Q    More than once?
19        A    I don't recall whether I reviewed it more than
20   once or not.
21        Q    Okay.  On the bottom of Page 7 -- sorry to make
22   you flip around.
23        A    No.  That's fine.
24        Q    -- there's a reference -- the -- the last
25   paragraph it says "By the mid-1980s."
```

12:13 5
12:13 10
12:13 15
12:14 20
12:14 25

114

1          Do you see that?

2     A     Yes.

3     Q     You reference commonplace activity by health

4  insurance companies?

12:15   5     A     Right.

6     Q     Are you referring -- what's -- what was the

7  basis for that statement?  Was it the survey and sort of

8  your industry knowledge that we talked about earlier?

9     A     Correct.

12:15   10    Q     And just -- just so I got this, can you recall

11  specifically what aspects of claim auditing any of these

12  insurance companies were doing at the time, the time you

13  did the survey in 1984?

14         MR. ROOSEVELT:  Objection; vague and ambiguous

12:15   15  as to the term "aspects of claim auditing."

16  BY MR. HENDERSHOT:

17    Q     Do you understand the question?

18    A     Well, as I sit here today, I can't itemize what

19  they were doing, if that's what you're asking.

12:15   20    Q     So as you sit here today, you couldn't say

21  Company A was definitely doing unbundling, but Company B

22  was definitely doing upcoding and this?

23    A     What I can say of the -- of the types of

24  auditing issues that -- that I described on Page 6, it

12:16   25  was common to -- I'm -- I'm making the -- the assertion

115

1      that it is common -- it was common among health insurance
2      companies to be looking at these issues in the context of
3      claim auditing.
4              What proportioned to each one, you know, and
12:16  5      starting to asking, you know, and looking at the issue of
6      specific percentages and -- and prevalences, I -- I can't
7      get that specific, but --
8          Q    Yeah.  And I'm not looking for percentage or
9      prevalences.  I'm just wondering if there's a single
12:16  10     company where you can recall this is what they were
11     doing, they were definitely doing this out of these
12     companies that you mentioned.
13         A    No.  I can't -- I can't give you that detail.
14         Q    And just so the record is clear, there are no
12:17  15     documents or exhibits attached to your report describing
16     what any of those companies were doing in the mid-1980s?
17         A    That's correct.
18         Q    Can I direct your attention to pages -- the
19     bottom of Page 13 of your report.
12:18  20         A    Yes.
21         Q    Could you review the paragraph -- and if I were
22     you I would just take -- take a moment to read it -- the
23     paragraph carrying over from the bottom of Page 13 and
24     finishing on the top of Page 14.
12:18  25             And you don't need to do it aloud.

116

1    the '164 patent, and a form of clinical edit that you

2    were aware of?

3        A    Yes, as I stated in my report.

4        Q    Is it your understanding that each claim of the

12:25    5    '164 patent had to describe only a single clinical edit?

6        A    No.

7        Q    So just so we're clear, are you offering an

8    opinion in your report, to your understanding, that any

9    claim of the '164 patent is -- strike that.

12:26   10        To your understanding, are you offering any

11    opinion in your report that every element of the claim of

12    the '164 patent is disclosed by a single piece of prior

13    art?

14        MR. ROOSEVELT:   That's been asked and answered

12:26   15    twice now.

16        MR. HENDERSHOT:   I don't know that it has.

17        THE WITNESS:   I have not in my report

18    affirmatively offered the opinion that every element of

19    the '164 claims are contained in a prior piece of art.

12:26   20        I'm -- I'm not offering that opinion.  Part of

21    the reason I'm not offering that opinion is what I've

22    just described.

23        Or one of the reasons that I -- I can't express

24    an opinion, we'll put it that way, affirmatively or

12:26   25    otherwise is for the reason I just described.

121

1          But, no, I'm not offering the opinion that the

2    '164 claims were contained in a prior piece of art.

3    BY MR. HENDERSHOT:

4        Q    With respect to the teachings of the prior --

12:27  5    outside of those three claims that you're referring to,

6    do you have any opinion regarding the prior art as it

7    relates to the other claims that you set forth here in

8    your report?

9        A    Any opinion about?

12:27  10       Q    Whether they're invalid in view of the prior

11   art.

12       A    And, again, to clarify, you're asking me to

13   restrict my comments to the claims themselves, to the

14   '164 claims?

12:27  15       Q    Yeah.

16       A    Okay.

17           MR. ROOSEVELT:  Can I have that question

18   repeated.

19           (The previous question was read back by

12:27  20           the court reporter as follows:

21               What started this whole line was:

22               "QUESTION:  With respect to the

23           teachings of the prior outside" -- let

24           me start over.  "With respect to the

12:27  25           teachings of the prior -- outside of

```
 1    Claim 7, is obvious in light of the prior art; is that
 2    correct?
 3         A    That's correct.
 4         Q    You don't offer an opinion in your report that
 5    any of the claims are rendered invalid by a single piece
 6    of prior art?
 7         A    That's correct.
 8         Q    Okay.  And your opinion that the claims of the
 9    '164 patent are obvious, in view of the prior -- strike
10    that.
11              And is it a fair statement that your opinion of
12    the claims of the '164 patent are obvious is based on
13    your opinion that the -- the underlying claims auditing
14    process that they implement was done and known on a
15    manual basis in the prior art?
16         A    Correct.  That -- that's correct.
17         Q    Okay.  You're not asserting anywhere in your
18    report that any of the claims of the '164 patent are
19    obvious or not novel, because there was a preexisting
20    software application that performed that functionality,
21    the claims auditing functionality; is that correct?
22         A    Actually, I'm quite confident, as I said before,
23    with regard to Claim 1 and -- Claim 1 and Claim 13, that
24    there was a prior art form that performed that -- those
25    functions.
```

12:48
12:48
12:49
12:49
12:50

133

1    Q    Those functions within the context of all of the

2    elements of those claims?

3    A    No.  I'm sorry.  I thought you had said, if you

4    read back the question, each of the claims are --

12:50    5    Q    Yeah.  Okay.

6    And do you name that system, any of those

7    systems in the report, or do you reference them in your

8    report?

9    I didn't see them when I was reviewing it before

12:50    10    today?

11    A    No.  No.  I -- I didn't -- I didn't attempt to

12    describe it or reference it.  I think it was actually a

13    fairly common capability at that time for reasons that I

14    can explain.

12:50    15    Q    So we're clear, the opinions you set forth in

16    your report that you're prepared to testify about in this

17    case, are premised upon the claims of the '164 patent

18    being obvious, in view of the manual clinical auditing

19    practices that you discuss in your report; is that

12:51    20    correct?

21    A    That is correct.

22    MR. HENDERSHOT:  I think we can break for lunch,

23    if this is a good time for you guys.

24    MR. ROOSEVELT:  Sure.

12:51    25    THE VIDEOGRAPHER:  Going off the record.  The

1    that correct?

2         MR. ROOSEVELT:  Objection; vague and ambiguous.

3    BY MR. HENDERSHOT:

4         Q    You can answer.

01:53    5         A    Not only the logic or what I'll call the rules,

6    but the rendering of that in an automated form would have

7    been obvious.

8         Q    Would have been obvious in your opinion to a

9    person of ordinary skill in the art?

01:54    10        A    Correct.

11        Q    Who would have been a person of ordinary skill

12   in the art, in your opinion?

13        A    Typically a person who had -- who had medical

14   training, not exclusively, but typically a person of

01:54    15   medical training; for example, a nurse or a physician who

16   has sufficient experience in claim auditing work

17   experience to understand the sorts of concepts that I

18   describe in my report.

19        And that might be someone who has had at least

01:54    20   six months of -- half a year of full-time or a few years

21   of part-time experience auditing claims is how I'd

22   characterize someone of ordinary skill in the art.

23        Q    Do you set forth that definition or any

24   definition of a person of ordinary skill in the art in

01:55    25   your report?

1      A    I didn't.  I did not.

2      Q    Okay.  Let's circle back to a topic we were

3  talking about earlier.

4           You had mentioned -- we discussed a survey that

01:55  5  was conducted while you were at AMI of claim -- medical

6  claim processing in 1984; is that correct?

7      A    All administrative functions of insurance

8  companies, yes.

9      Q    Okay.  And AMI's discussions with any of those

01:55  10  third parties, did any of those third parties require AMI

11  to sign a confidentiality agreement or a nondisclosure

12  agreement?

13      A    I don't recall.  I don't recall whether they did

14  or did not.

01:56  15      Q    But some of the administrative cost containment

16  measures these companies were taking were not things that

17  they would advertise or make publicly available, were

18  they?

19      A    Can I ask you to define what you mean by

01:56  20  "publicly available"?  I mean --

21      Q    I mean, would they write papers on them?  Would

22  they --

23      A    In some cases.  I mean, you know, it's -- it's

24  an industry like most that has its share of conferences

01:56  25  and, you know, issues are discussed, operational elements

141

BY MR. HENDERSHOT:

Q    Did you consider anything other than what you said here?

MR. ROOSEVELT:    Again, vague and ambiguous.

THE WITNESS:    Consider it for the purpose of determining novelty and obviousness?

BY MR. HENDERSHOT:

Q    Yes.

A    It's fair to say that I used these definitions when considering those issues.

Q    Okay.  And you testified before the lunch break that your opinions regarding the claims of the '164 patent were not that any of the individual claims of the '164 patent that are asserted in this case are not novel, but rather your opinion is that they're all obvious?

A    I am asserting that the -- the claims -- all claims, within the '164 patent, taken as a whole they describe a claim auditing process that someone of ordinary skill would deem -- at that time would have deemed to be obvious.  I'm saying that.

And I don't recall your exact words, but I think it misstated my testimony in one respect, and that is, I am saying that I believe there were likely, when you refer to each of the claims, as in individually, as I've said before, I think there likely was at least some piece

1    of art, let's call it automated system, for executing

2    Claims 1 and 13.

3        Q    But you don't mention any such piece of art in

4    your report; is that correct?

02:00    5        A    I don't.  I don't.  That's correct.

6        Q    So with respect to the opinions set forth in

7    your report, you don't offer any opinion that any of the

8    claims of the '164 patent are not novel; is that correct?

9            MR. ROOSEVELT:  Objection; vague and ambiguous.

02:00    10            MR. HENDERSHOT:  As to what?

11            MR. ROOSEVELT:  I don't understand what you're

12    saying.

13            MR. HENDERSHOT:  Could you read the question

14    back.

02:00    15            (The previous question was read back by

16            the court reporter as follows:

17                "QUESTION:  So with respect to the

18            opinions set forth in your report, you

19            don't offer any opinion that any of the

02:00    20            claims of the '164 patent are not

21            novel; is that correct?")

22            MR. ROOSEVELT:  And he just told you what his

23    opinion was.

24            THE WITNESS:  I was trying to explain that --

02:01    25    that I believe I have expressed the discrete opinion that

1    Claims 1 and 13 do describe -- I'm sorry -- that -- that

2    assertion is not made in my report, and I understand your

3    distinction.

4         With respect to the other claims, if I

02:01   5    incorporate the examples and the specification I have, in

6    my opinion, you will see in certain places expressed the

7    explicit opinion that this claim audit technique is not

8    novel -- it's not only obvious, but it's not novel.

9         So I have made that statement about certain

02:02   10   claim audit processes techniques.  My opinion is not

11   expressed relative to a specific claim, because, as I

12   said earlier, the claims themselves are rather broad and

13   vague, but --

14   BY MR. HENDERSHOT:

02:02   15   Q    You nonetheless could -- could interpret them

16   after looking at the specification; is that what you

17   testified to earlier?

18   A    In the aggregate, as stated in my report, I -- I

19   used the claims and view them in light of what I read in

02:02   20   the specification and examples, and developed, then, an

21   image of what the '164 patent is describing, in terms of

22   an automated claim auditing system.

23   Q    What prior art are you relying upon for your

24   opinions in this report?

02:02   25   A    The prior art of claim auditing as it existed at

1    that time.

2        Q    Okay.  So the generalized state of the art of

3    claims auditing is what you're relying on --

4        A    Correct.

02:03    5        Q    -- as the prior art?

6            Not a single system or any article about

7    something or a source; is that correct?

8        A    That's correct, no single system or article.

9        Q    Okay.  So let me see if I can short-circuit

02:03    10   this.

11        A    Okay.  If the law requires -- assume this.  If

12   the law requires every element recited in an individual

13   patent claim to be disclosed in a single piece of prior

14   art for that claim to lack novelty, under Section 102, do

02:03    15   you offer any opinion in your report under that standard

16   that a claim of the '164 patent is not novel?

17            MR. ROOSEVELT:  Objection; that's vague, and

18   it's also compound.

19            If you want to go through each of the specific

02:03    20   claims and ask these questions, I think that you'd be

21   able to get to what you're trying to get at a lot easier.

22            MR. HENDERSHOT:  Can you read my question back,

23   please.

24            (The previous question was read back by

02:04    25            the court reporter as follows:

1          "QUESTION:  If the law requires --

2      assume this.  If the law requires every

3      element recited in an individual patent

4      claim to be disclosed in a single piece

02:03   5      of prior art for that claim to lack

6      novelty, under Section 102, do you

7      offer any opinion in your report under

8      that standard that a claim of the '164

9      patent is not novel?")

02:04  10      THE WITNESS:  No.  I don't offer an opinion on

11  that specific question.

12  BY MR. HENDERSHOT:

13      Q    Okay.  And with respect to what's set forth in

14  your report, other than your recollection of the state of

02:04  15  the art, do you include any other evidence of the

16  practices that you're referring to and relying upon?

17      MR. ROOSEVELT:  Objection; vague and ambiguous.

18      THE WITNESS:  Are you asking is there other

19  evidence not described here that I'm using to form my

02:05  20  opinions, or --

21  BY MR. HENDERSHOT:

22      Q    No.

23      A    -- are you asking something different than that.

24      I apologize.  I'm just not understanding.

02:05  25      Q    Other than your recollection of what was going

         1    on in the field at the time that you set forth here in

         2    your report --

         3         A    Yes.

         4         Q    -- do you point to anything else in your report

02:05    5    other than that as the basis for your opinion that this

         6    stuff was going on in the art?

         7              MR. ROOSEVELT:  You mean other than all the

         8    documents that are listed?  Vague and ambiguous.

         9              THE WITNESS:  I think the CPT book -- the 1985

02:05   10    version of the CPT book is, by inference, a significant

        11    piece of evidence that supports my views, as they're

        12    expressed in -- in this report, which goes beyond my

        13    recollection.  It goes to a tangible book containing

        14    codes and rules and so forth.

02:06   15    BY MR. HENDERSHOT:

        16         Q    Other than your recollection, is there any other

        17    piece of evidence in your report that's cited to or

        18    described, that states that anyone in the industry was

        19    addressing unbundling?

02:07   20         A    May I leaf through my report quickly?

        21         Q    Please.

        22              (Document reviewed by the witness.)

        23              THE WITNESS:  One item in particular that I'm

        24    reminded of is -- and this can be independently verified

02:08   25    I suspect -- is the existence of those unbundling or --

1    or I should say courses offered to physician offices and

2    their billing departments specifically designed to teach

3    what I'll kindly call creative billing practices.

4    Independent of my recollection, I believe that evidence

02:08    5    of that can be found.

6    BY MR. HENDERSHOT:

7        Q    But no documentary evidence of that is attached

8    to your report?

9        A    No documentary evidence is attached regarding

02:08    10    that particular issue, no.

11        Q    In your discussions with TriZetto's attorneys,

12    did they ever discuss with you the process by which a

13    patent application is examined by the United States

14    Patent and Trademark Office?

02:09    15        A    That was described very briefly for me.  I mean,

16    at the beginning of this road back in late September,

17    early October, and I -- you know, my recollection is it

18    was described in very few words.  So I don't --

19        Q    Okay.  So it's fair to say that in formulating

02:09    20    your opinions that are set forth in this report, you did

21    not consider or base those opinions upon -- strike that.

22        Is it fair to say, in formulating the opinions

23    that are set forth in this report, you did not rely upon

24    any consideration of the examination of the '164 patent

02:09    25    at the United States Patent and Trademark Office?

1          A    Can I ask you to clarify what you mean by the

2     "examination of"?

3               Do you mean are there documents that exist

4     describe their deliberation about it or --

02:10   5          Q    Yeah.    I think that's typically referred to as a

6     prosecution history.    I'll -- we can refer to it as that.

7          A    Okay.

8          Q    When I say that -- and I'll oftentimes -- I may

9     refer to the patent's prosecution, which is the process

02:10   10    by which a patent applicant seeks a patent from the

11    patent office.

12         A    I see.

13         Q    And they keep a record of that.    That's publicly

14    available, a history of that, if you will.    So they call

02:10   15    it the prosecution history.

16              And given this, I take it you -- you didn't take

17    a look at the prosecution history?

18         A    I did not.

19         Q.    You weren't provided with a copy?

02:10   20    A    I -- I was not.

21         Q    Okay.    Would it affect your opinion in any way

22    if you found out that the patent office was told, in the

23    examination of the '164 patent, that the claims auditing

24    rules that you reviewed in the '164 patent specification

02:11   25    were, in fact, performed on a manual basis before the

1    application?

2        A    No, it wouldn't.

3        Q    Would it effect your opinion in any way if,

4    after hearing that, the patent office nonetheless

02:11    5    concluded the claims of the '164 patent were novel and

6    not obvious?

7        A    No, it would not.

8        Q    Why is that?

9        A    I think given my reasoning, I -- I think in --

02:11    10    in my opinion I analogize to the world of accounting.

11        And it -- it seems as if as though this patent,

12    the '164 patent, to my mind, appears very similar to sort

13    of a hypothetical wherein somebody runs to the patent

14    office and patents basic arithmetic rules.  And I mean

02:12    15    very basic arithmetic rules.  And they're called the FASB

16    accounting regulations.

17        And I can only believe, getting to the point of

18    your question, that someone at the patent office did not

19    understand really what they were approving in this case.

02:12    20    That's my -- that's my opinion.

21        Q    And your opinion -- okay.

22        That opinion is not based on any review you've

23    ever seen what went on before the patent office in

24    examining this patent?

02:12    25        A    It's not based on any review of the prosecution

1    history.

2        Q    Okay.  Because you weren't provided with a copy

3    of that?

4        A    That's correct.

02:12    5        Q    So with respect to -- just so I'm clear.  With

6    respect to your opinions regarding the claims of the '164

7    patent, the prior art that you're relying upon is the

8    general state of the claims processing or auditing art

9    prior to 1987?

02:13   10        A    Correct.

11        Q    And you had said earlier, and I want to make

12    sure -- correct me if I'm wrong -- that you're -- you're

13    not offering any opinion or holding yourself out as an

14    expert on the development of a computer software system?

02:13   15        A    That's correct.  I am not holding myself out as

16    an expert in that.

17        Q    So none of your opinions are directed to the

18    difficulty or patentability of implementing something in

19    a computer system?

02:14   20            MR. ROOSEVELT:  Objection; vague and ambiguous.

21    BY MR. HENDERSHOT:

22        Q    You can answer.

23        A    Actually, my opinions do reflect that, because I

24    lived through it myself.  I'm hoping to develop

02:14   25    ClinicaLogic and have, I think, a very good sense for the

152

1    process of developing an automated claim auditing system.

2        Q    But you're not offering an opinion as an expert

3    on that topic, on the --

4            MR. ROOSEVELT:  On what topic?

02:15    5            MR. HENDERSHOT:  I think he said two questions

6    ago that he's not -- wasn't holding himself out as an

7    expert on the development of a software or a computer

8    system.

9    BY MR. HENDERSHOT:

02:15    10        Q    Is that correct?

11            MR. ROOSEVELT:  Objection; misstates his

12    testimony.

13            THE WITNESS:  I may have misunderstood your

14    question --

02:15    15    BY MR. HENDERSHOT:

16        Q    Okay.

17        A    -- but I thought your question went to whether I

18    was holding myself out as an expert at developing a

19    software product.

02:15    20            I'm not a programmer, for instance.  That's what

21    I mean by saying no, I'm not holding myself out as an

22    expert in the development of a software product.

23        Q    Okay.  I think to be fair, you reviewed the

24    Egdahl and Hertenstein article; is that correct?

02:16    25        A    I did.

153

```
 1        Q    Okay.  But you're not relying upon that as prior
 2   art for any of your opinions -- bless you -- you're just
 3   relying upon the state of the art claims processing in
 4   the mid to late 1980s?
 5             MR. ROOSEVELT:  Objection to the extent -- I
 6   mean, what definition of prior art are we using now?
 7   Because I think there's --
 8   BY MR. HENDERSHOT:
 9        Q    Are you -- are you aware of multiple --
10             MR. ROOSEVELT:  Well, there's been a lot of
11   confusion as to -- as we just discussed right before
12   lunch, you're saying prior art.
13             The concept he has of it is -- are two different
14   things based on the two different kind of definitions
15   that you've given.
16             MR. HENDERSHOT:  What definitions have I given?
17             MR. ROOSEVELT:  You gave one definition that --
18   when you used the term "prior art," at one point you were
19   referring to a single unified prior art for purposes of
20   anticipation.
21             Then you continued to use the term "prior art"
22   to have -- the collective prior art for -- for your
23   discussion of obviousness.
24             And he was obviously -- didn't understand the
25   distinction between the two for a period of time, as you
```

02:16   5
02:16   10
02:17   15
02:17   20
02:17   25

154

1    were using them.

2         And so that's what I'm asking you to clarify in

3    your question.

4    BY MR. HENDERSHOT:

02:17  5    Q    Okay.  In your report -- let's -- let's take a

6    step back -- are you offering any opinion that the claims

7    of the '164 patent are not patentable or invalid as --

8    strike that.

9         Do you understand what invalid means when I'm

02:17  10   saying that?

11   A    It would be -- it would be helpful to have you

12   define that for purposes of discussion.

13   Q    Okay.

14        MR. ROOSEVELT:  And we've already been through

02:18  15   this.

16   BY MR. HENDERSHOT:

17   Q    Are you opining on the validity of the '164

18   patent claims in this report?

19   A    Yes.

02:18  20   Q    Okay.  And your opinion is that they're not

21   valid?

22   A    Correct.

23   Q    Okay.  And you're relying upon prior art in

24   support of that opinion?

02:18  25   A    Prior art and novelty in certain cases as

1    described in my opinions.  There are certain edits --

2    claim auditing processes that preexisted this invention.

3        Q    On a manual basis?

4        A    Correct.

02:18    5        Q    Are you relying upon for your -- for your

6    opinion that's -- that's set forth in this report, that

7    the claims of the '164 patent are obvious, any piece of

8    prior art other than your understanding of the general

9    state of the art?

02:19    10           MR. ROOSEVELT:  And what else is set forth in

11    his report?

12           THE WITNESS:  I would say the other pieces of

13    prior art include the conventions, both explicit and

14    implicit, contained in the CPT manuals.  So I'm -- I'm

02:19    15    also relying on those in -- in forming my opinion, but

16    I've stated that before.

17    BY MR. HENDERSHOT:

18        Q    Is that it, is that all the prior art that

19    you're relying upon?

02:19    20           MR. ROOSEVELT:  Objection; vague and ambiguous

21    as to the term "prior art."

22           THE WITNESS:  I mean there's a --

23    BY MR. HENDERSHOT:

24        Q    Are there any other pieces of prior art that

02:19    25    you're relying upon?

156

1        MR. ROOSEVELT: Same objection.

2        THE WITNESS: Let -- let me just briefly

3    describe -- excuse me.

4        When you say am I relying on anything else, for

02:20  5    example, I don't -- I don't think in this discussion go

6    into the experiences and knowledge of the many physician

7    auditors that I've worked with over the years.

8        It's implicit in a few of my statements, but

9    their experiences, not just with -- working with me, but

02:20  10   working with insurance companies around the country is

11   evidence of that prior art. I did not train my physician

12   auditors to be able to audit claims.

13       Quite the contrary. I sought out people who

14   were highly experienced as claim auditors. And they were

02:20  15   easy to locate, easy to find.

16       And that fact in itself is quite substantial

17   evidence of the existence of the prior art. The fact

18   that these people were -- and I mention this in my

19   report -- not -- not difficult to locate and -- and

02:21  20   retain as -- as -- as claim auditors. So I'm also

21   relying on those experiences and relationships.

22   BY MR. HENDERSHOT:

23       Q   What, if any, documents are you relying upon in

24   support of your opinions that any of -- any of the claims

02:21  25   of the '164 patent are obvious?

157

1      A    The CPT manual is one document.

2           I think Dr. Goldberg provides at least one piece

3    of evidence in his testimony, in his deposition, where he

4    says, frankly, people could go through that book and

02:21  5    discern most and many, I think is the word he used, of

6    the auditing rules. So I'd call that another piece of

7    evidence.

8           Let me look at the document -- the complete list

9    of documents. And I -- I would say that would cover it.

02:22  10      Q    Okay. And to circle back, you had read the

11   article by Drs. Egdahl and Hertenstein; right?

12      A    I -- I did, yes.

13      Q    And did you understand that to describe a -- at

14   least in a small portion of the article, an example of

02:22  15   manual rebundling?

16      A    Yes. It's been seven, eight weeks since I've

17   read the article so I don't remember the details.

18      Q    Yeah. I'll give -- I'm not trying to test your

19   memory. Let me get you a copy of the article.

02:23  20           I'd like to mark as Exhibit Hawley 3, an article

21   by Richard Egdahl and Robert Hertenstein.

22           (Hawley Exhibit 3 was marked

23           for identification by the court

24           reporter and is attached hereto.)

02:24  25           MR. ROOSEVELT: It just appears that part of the

158

1    while the -- while none of the '164 claims that are at

2    issue in this case were described or present in a single

3    piece of prior art that you're relying upon in your

4    report, they are nonetheless obvious in view of the

02:53    5    considerations you discuss in your report?

6        A    Correct.

7        Q    Okay.  And we discussed earlier in reaching your

8    conclusion that the '16 -- strike that.

9            I believe we discussed earlier that in

02:54    10    formulating the opinion set forth in this report, you

11    never considered the commercial success of automated

12    claims auditing systems; is that correct?

13        A    That's correct.

14        Q    In formulating your opinion that's set forth in

02:54    15    this report, that the asserted claims of the '164 patent

16    were obvious, did you consider or rely upon the fact that

17    the '164 patent has been licensed?

18        A    No.  I did not consider that fact.

19        Q    Are you aware that it has been licensed --

02:54    20    strike that.

21            Are you aware that companies have paid to take

22    licenses to practice what's described in the '164 patent?

23        A    Could you clarify the licensing statement?  I'm

24    aware that there are users of the HPR code review product

02:55    25    or were at that time.

170

1          Q    It's a -- it's a slightly different kind of
2     license.
3          A    Okay.
4          Q    So are -- are you aware that there are companies
02:55  5     that market products, software claims editing products,
6     that have paid to -- paid for permission to practice the
7     claims of the '164 patent; i.e., taken a license to the
8     patent, not to some software?
9          A    No.  I was -- I was not aware of that.
02:55 10          Q    Would it affect your opinion if you were aware
11     of it?
12          A    I -- I don't -- I can't think of how it would.
13     I don't believe so.
14          Q    Okay.  So in your definition of obvious that
02:56 15     you're applying, that -- that factor wouldn't have been
16     relevant to it?
17          A    Correct.
18          Q    The same with commercial success?
19          A    Correct.
02:56 20          Q    In formulating your opinion that the asserted
21     claims of the '164 patent are obvious, as set forth in
22     your report, did you consider whether anyone in the
23     industry was skeptical about whether or not the invention
24     could be built?
02:56 25          A    I don't remember wonder -- you know, posing that

1    question to myself.

2         Q    It didn't factor into your analysis?

3         A    No.   Because I was involved in -- in -- in

4    creating a product of similar functionality so I didn't

02:57    5    really need to rely on other people's thoughts about how

6    difficult or easy it might be.

7         I -- I lived through the process so I had a very

8    strong basis for my opinion.

9         Q    So you didn't consider what other people would

02:57    10   have thought about whether or not it could be built?

11        A    I did not.

12        Q    Okay.

13             THE COURT REPORTER:  Are you saying built,

14   b-u-i-l-t?

02:57    15             MR. HENDERSHOT:  Yes.

16             THE COURT REPORTER:  Thank you.

17   BY MR. HENDERSHOT:

18        Q    In formulating your opinion that the asserted

19   claims of the '164 patent are obvious, as set forth in

02:57    20   your report, did you consider whether or not the -- there

21   was a long felt need for automated clinical auditing

22   software?

23        A    Whether it impacted my opinion, I -- I can't

24   think of how it did.   I'm certainly aware of, you know,

02:58    25   at that time various industry needs, this being one of

172

1    them.

2              But the -- whether -- I don't believe it

3    factored into my opinion about the obviousness of -- of

4    the claims.

02:58    5    Q    Okay.  So there was a need, but it wasn't -- it

6    wasn't relative to the definition of obviousness you were

7    applying?

8    A    It was not relevant to the definition of

9    obviousness, no.

02:59    10   Q    In preparing your -- strike that.

11             In formulating your opinions that are set forth

12   in your report, that the asserted claims of the '164

13   patent are obvious, did any of TriZetto's attorneys

14   mention to you the term "secondary consideration"?

03:00    15   A    Not that I recall.

16   Q    Do you recall any of them mentioning the term

17   "objective evidence"?

18   A    Not that I recall, no.

19   Q    "Objective indicia"?

03:00    20   A    I probably would remember if that term had been

21   used, but I don't recall.

22   Q    Did any of TriZetto's attorneys -- strike that.

23             Your understanding of the obviousness standard

24   came from your discussions with TriZetto's attorneys;

03:00    25   correct?

173

1           A    That's correct.

2           Q    Did any of TriZetto's attorneys, in those

3    discussions that led to your understanding of the

4    obviousness standard that you applied in your report,

03:00    5    provide a list of considerations that play into the

6    obviousness determination other than what's set forth in

7    your report?

8                MR. ROOSEVELT:  Objection; vague and ambiguous.

9                THE WITNESS:  I don't have any recollection of

03:01    10    receiving a list, you know.  I have a recollection of

11    discussing that -- that statement and what it means.

12    BY MR. HENDERSHOT:

13           Q    And if they had told you, and they said it was

14    relevant to the analysis, you would have -- you would

03:01    15    have listed it in your report?

16           A    Yes.

17           Q    Okay.  In your discussions with TriZetto's

18    counsel that led to your understanding of the legal

19    principles you applied as -- in setting forth your

03:02    20    opinion in your report, did any of them mention the term

21    "means plus function" to you?

22           A    I don't recall hearing that term.

23           Q    Did any of TriZetto's attorneys, in those

24    discussions, indicate that certain elements of the '164

03:02    25    patent claims required special interpretation that other

174

1    that time is what I mean to say.

2         Q   A couple of real quick questions as well as to

3    tie up a loose end or two.

4              In formulating the opinions that you set forth

04:32   5    in your report, that the claims of the '164 patent are

6    obvious, did you consider whether the inventions claimed

7    in the '164 patent had been praised in the industry?

8              MR. ROOSEVELT:  Had been what?

9              MR. HENDERSHOT:  Praised.

04:32   10             THE WITNESS:  Praised, as in laudatory praise?

11   BY MR. HENDERSHOT:

12        Q   Yes.

13        A   Oh.  No.  No, I didn't.

14        Q   In formulating your opinions that are set forth

04:33   15   in your report, that the claims of the '164 patent are

16   obvious, did you consider whether any other entities

17   copied the inventions described in the '164 patent?

18        A   No.  No, I didn't.

19        Q   So I take it since you didn't consider them, you

04:33   20   wouldn't consider either of those factors relevant to the

21   definition of obviousness since you applied in your

22   opinion?

23        A   No.  Because when I formed my opinion, I'm --

24   I'm -- I'm conjuring again a person of ordinary skill in

04:33   25   the art.

| | |
|---|---|
| 1 | So it's not in the form of a -- an invention |
| 2 | that I'm -- I'm -- you know, or a piece of prior art. |
| 3 | It's -- it's in the form of the knowledge of those who |
| 4 | were, you know, of ordinary skill in the art of claim |
| 04:34   5 | auditing at this time, prior to 1987.  It's -- that's |
| 6 | what I imagine in trying to form my opinion. |
| 7 | Q    Nothing about your opinion has changed since you |
| 8 | wrote the report? |
| 9 | A    That's correct. |
| 04:35  10 | Q    So you would still agree that it's a tedious and |
| 11 | painstaking effort that's involved in reducing coding |
| 12 | conventions to a database instead of logical rules? |
| 13 | A    I would. |
| 14 | Q    That's borne from your personal experience? |
| 04:35  15 | A    Yes.  Correct. |
| 16 | Q    Just circling back to your -- your accounting |
| 17 | example, you had mentioned the FASB? |
| 18 | A    Yes. |
| 19 | What page are we on here? |
| 04:36  20 | Q    26 of your report. |
| 21 | A    26, okay. |
| 22 | Q    In your opinion, if a -- strike that. |
| 23 | In your opinion, if a claim in a patent |
| 24 | describes a method of automating a process that was done |
| 04:36  25 | on a manual basis before and was documented in writing |

Hawley, Philip

1

2

3

4

5

6

7

8    I, PHILIP M. HAWLEY, JR., M.D., do hereby

9    declare under penalty of perjury that I have read the

10   foregoing transcript; that I have made any corrections as

11   appear noted, in ink, initialed by me, or attached

12   hereto; that my testimony as contained herein, as

13   corrected, is true and correct.

14       EXECUTED this _7ᵗᵘ_ day of _January_,

15   _2006_, at _Los Angeles_    _California_

         (City)              (State)

16

17

18

19

     PHILIP M. HAWLEY, JR., M.D.

20

21

22

23

24

25

238