# EXHIBIT 10

# REDACTED IN ITS ENTIRETY

EXHIBIT 11

**Westlaw.**

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2001 WL 253117 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

Page 1

**H**
Only the Westlaw citation is currently available.
United States District Court, D. Delaware.
MOORE NORTH AMERICA, INC., Plaintiff,
Counter-Defendant,
v.
POSER BUSINESS FORMS, INC., Defendant,
Counter-Claimant.
**No. Civ.A. 97-712-SLR.**

March 8, 2001.

Thomas P. Preston, of Reed, Smith, Shaw & McClay, Wilmington, Delaware, for plaintiff, counter-defendant.
Robert A. Vanderhye, James D. Berquist, Robert A. Rowan, and Jonathon Reavill, of Nixon & Vanderhye, Arlington, Virginia, for plaintiff, counter-defendant, of counsel.
N. Richard Powers, and Patricia Smink Rogowski, of Connolly, Bove, Lodge & Hutz, Wilmington, Delaware, for defendant, counter-claimant.
Thomas H. Young, Stephen D. Bell, and W. Robinson H. Clark, of Dorsey & Whitney, Denver, Colorado, for defendant, counter-claimant, of counsel.

MEMORANDUM OPINION

ROBINSON, Chief J.

I. INTRODUCTION

*1 Plaintiff Moore North America, Inc. filed this patent infringement action on December 30, 1997 against defendant Poser Business Forms, Inc., alleging that defendant infringes U.S. Patent No. 4,918,128 ("the '128 patent"); U.S. Patent No. 5,201,464 ("the '464 patent"); and U.S. Patent No. 5,253,798 ("the '798 patent"). Both plaintiff and defendant are engaged in the business of manufacturing and selling preformed, paper mailers. (D.I.158) Both the '464 and '798 patents

are directed to the construction of a "one-piece mailer" which is a single sheet of paper that can be printed, folded, sealed, and mailed without the need for a separate envelope. (D.I. 139 at 4) The '128 patent is directed toward a pressure-sensitive adhesive that holds different mailers together.

Defendant denied infringement of all three patents-in-suit and filed a counterclaim for declaratory judgment of noninfringement, invalidity, and unenforceability. Defendant subsequently filed additional unfair competition counterclaims. The court has previously issued several orders in this case relating to claim construction and summary judgment motions.

Currently before the court are several motions for partial summary judgment submitted by both parties regarding the '128 patent. Both parties submitted extensive briefs on these issues, and oral argument was heard on February 28, 2001. The court decides the various motions as follows.

II. BACKGROUND

Both parties filed cross motions for summary judgment on the issues of infringement and validity. Poser challenges the validity of the '128 patent under various theories, including anticipation under 35 U.S.C. § 102, obviousness under 35 U.S.C. § 103, and lack of enablement and failure to describe the best mode under 35 U.S.C. § 112 ¶ 1.[FN1] Poser also claims the '128 patent is unenforceable due to inequitable conduct. (D.I.281) Moore filed a motion for summary judgment that the claims of the '128 patent were not invalid for lack of enablement, indefiniteness, and adding new matter under 35 U.S.C. § 132. (D.I.286) Poser did not oppose the motions based on indefiniteness and adding new matter. Therefore, plaintiff's corresponding motions are granted with respect to those defenses.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2001 WL 253117 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

FN1. Poser's best mode defense is addressed in the court's decisions to the motions in limine.

Claims 1 and 3 of the '128 patent, the only claims at issue, provide:
1. A pressure-sensitive adhesive which comprises in admixture:
(a) natural rubber graft copolymerized with styrene and methyl methacrylate in the form of a latex; and
(b) a finely divided hard particulate matter having no thermoplasticity dispersed in the latex.
3. The pressure-sensitive adhesive as claimed in claim 1 wherein the finely divided particulate material having no thermoplasticity is a silica gel powder or a zeolite powder.

On February 14, 2001, the court issued a claim construction order defining the term " pressure-sensitive adhesive" to mean a " composition which allows adhesion to be initiated through the application of pressure." (D.I.353) The court reserved ruling on other disputed claim terms.

## A. VALIDITY

### 1. Anticipation

*2 Poser points to four prior art references that allegedly anticipate claims 1 and 3 under 35 U.S.C. § 102(b). The references include: GB patent no. 788,651 ("GB '651"); EP patent application no. 0043512 A1 ("EP '512"); U.S. patent no. 4,495,324 ("the '324 patent"); and GB patent no. 936,666 (" GB '666"). Moore argues that none of these references contain each claim limitation of the claims in dispute.

### 2. Obviousness

Poser cites fourteen additional prior art references [FN2] and asserts that the '128 patent would have been obvious to one of ordinary skill in the art at the time of the invention. Poser posits three obviousness theories. First, Poser argues that the

claims are anticipated by the four prior art references described above. Second, Poser asserts that both (1) a graft copolymer of MMA, styrene, and natural rubber and (2) silica were known in the adhesive art, as were their effects, making their combination in an adhesive obvious. Finally, it would have been obvious to substitute styrene for some of the MMA found in prior art adhesives that describe adhesive mixtures of MMA/natural rubber graft copolymer and silica. (D.I. 283 at 9) Moore and its experts disagree on the scope and content of the prior art references and whether there was a motivation to combine any of the fourteen references.

FN2. The references include Canadian patent no. 647, 530; U.S. patent nos. 3,644,584; 3,956,217; 3,925,271; 4,782,106; and Japanese patent and/or abstract nos. JP 57-28178; JP 50-80330; JP 59-164377; JP 61-35279; JP 62-158771; JP 158772; JP 62-158773; JP 57-192474; and JP 57-192475.

### 3. Enablement

Both parties filed cross motions for summary judgment on the issue of enablement. Poser asserts that the '128 patent is invalid because the claimed invention is not enabled. Specifically, Poser contends that the '128 patent does not disclose details enabling one skilled in the art to make the claimed graft copolymer. Moore contends that those of skill in the art have known for forty years how to create a graft copolymer of natural rubber, MMA, and styrene.

The issue of enablement came up during prosecution. After the applicant submitted the original claim language, the examiner queried:
How is the graft-copolymerization performed? It is the Examiner's position that applicants have not provided an enabling disclosure of the graft copolymerization of natural rubber with styrene and methyl methacrylate.

(D.I. 138 at B19) The applicant responded:[A]pplicant submits that graft

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2001 WL 253117 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

Page 3

polymerization techniques are well known in the art, as are emulsion polymerization, suspension polymerization, and the like. One skilled in the art would have no difficulty in finding suitable conditions for such graft polymerization without undue experimentation.

(*Id.* at B21) The examiner allowed all the claims following that explanation. (*Id.* at B24-25)

## B. INFRINGEMENT

The accused product in this case is known by its trade designation, "KHP-300." KHP-300 contains MMA, styrene, natural rubber, and silica. The parties agree that MMA is grafted to natural rubber. The parties also agree that silica is present in the accused product. The parties disagree on whether styrene is grafted to the natural rubber.

## III. STANDARD OF REVIEW

*3 A court shall grant summary judgment only if " the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party bears the burden of proving that no genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 n. 10 (1986). "Facts that could alter the outcome are ' material,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." *Horowitz v. Federal Kemper Life Assurance Co.,* 57 F.3d 300, 302 n. 1 (3d Cir.1995) (internal citations omitted). If the moving party has demonstrated an absence of material fact, the nonmoving party then "must come forward with 'specific facts showing that there is a genuine issue for trial.' " *Matsushita,* 475 U.S. at 587 (quoting Fed.R.Civ.P. 56(e)). The court will " view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." *Pennsylvania Coal*

*Ass'n v. Babbitt,* 63 F.3d 231, 236 (3d Cir.1995). The mere existence of some evidence in support of the nonmoving party, however, will not be sufficient for denial of a motion for summary judgment; there must be enough evidence to enable a jury reasonably to find for the nonmoving party on that issue. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986). If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986).

## IV. DISCUSSION

### A. VALIDITY

#### 1. Anticipation

Poser's first invalidity contention is that claims 1 and 3 are anticipated. A claim is anticipated if each and every limitation is found either expressly or inherently in a single prior art reference. *Celeritas Techs., Ltd. v. Rockwell Int'l Corp.,* 150 F.3d 1354, 1361 (Fed.Cir.1998); *see also PPG Indus., Inc. v. Guardian Indus. Corp.,* 75 F.3d 1558, 1566 (Fed.Cir.1996); *Scripps Clinic & Research Found. v. Genentech, Inc.,* 927 F.2d 1565, 1576 (Fed.Cir.1991). "There must be no difference between the claimed invention and the reference disclosure, as viewed by a person of ordinary skill in the field of the invention." *Id.* at 1576. Thus, the factual inquiry relevant to the anticipation analysis is whether a single prior art reference discloses every element of the challenged claim and enables one skilled in the art to make the anticipatory subject matter. *See, e.g., PPG Indus.,* 75 F.3d at 1566.

Poser contends that GB '651 anticipates the claims because it describes a combination of (1) a graft copolymer of methyl methacrylate ("MMA"), styrene, and natural rubber and (2) hard particulate filler. Based on the current record, however, GB '651 is not directed toward a composition which

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2001 WL 253117 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

allows adhesion to be initiated through the application of pressure, which is a limitation of claim 1.[FN3] GB '651 does not disclose every element of the challenged claim and, therefore, does not anticipate under 35 U.S.C. § 102(b).

> FN3. The court is mindful that "it is contrary to the letter of the patent laws that patents should be granted for old compositions of matter based upon new uses." *In re Shoenwald,* 964 F.2d 1122, 1123 (Fed.Cir.1992), citing *In re Thuau,* 135 F.2d 344, 346, (C .C.P.A.1943). The '128 patent is directed to a composition of matter that allows adhesion to be initiated through the application of pressure. Being capable of adhering to a surface through the application of pressure is a characteristic of a composition rather than a new use. If a prior art reference does not disclose such an adhesive, it cannot anticipate the claims of the '128 patent.

*4 Two of the remaining three prior art references, EP '512 and the '124 patent, likewise contain no mention of being a composition which allows adhesion to be initiated through the application of pressure. Thus, those references do not anticipate based on the current record. Unless Poser can present evidence at trial that the pressure-sensitive limitation is inherently found in GB '651, EP '512, or the '124 patent, Poser is precluded from proffering these references as anticipatory.

The final anticipatory reference, GB '666, "relates to a process for uniting natural or synthetic elastomers with elastomers or other materials." (D.I. 285 at D-12888) The invention provides:
[A] process for uniting synthetic resins, leather, textiles, natural or synthetic elastomers or vulcanisates with natural or synthetic elastomers wherein a graft polymer of an elastomeric polymer .. . and an ester of acrylic or methacrylic acid with a monohydric saturated aliphatic alcohol containing from 1 to 4 carbon atoms is used as a bonding agent.

Advantageously methyl methacrylate is used as the ester component for the formation of the graft polymer.

From a technical point of view, it may be advantageous in many cases to use the polymer in the form of a latex.

The natural or synthetic elastomers to be united with the materials ... may be the co-polymers of butadiene and styrene.... These elastomers are used as vulcanisable mixture containing ... fillers, for example furnace black, channel black, clay, silica and pigment dyes.
The production bond between the materials to be united can be effected in known manner by the cold-sticking method, i.e., by coating both parts with a solution or latex of graft polymers and thereafter pressing them together.

(*Id.* at D-12888-89) (emphasis added). Poser submits that GB '666 contains each claim limitation and, therefore, anticipates the '128 patent. Moore contends that while GB '666 is directed to a process for joining different elastomers with a bonding agent, the silica filler described in the specification is only present in the elastomer materials being bonded and not the adhesive. Poser disagrees. (D.I. 317 at 6) After carefully studying GB '666 and the other evidence of record, the court finds that there is a genuine issue of material fact regarding whether GB '666 teaches a single pressure-sensitive adhesive which contains MMA, styrene, natural rubber, and silica as required by the claims. The court, therefore, denies the motion for summary judgment of invalidity based on anticipation.

2. Obviousness

Even if the claims are not anticipated, Poser argues that the claims would have been obvious at the time of the application. A patent is invalid for obviousness
if the differences between the subject matter sought

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                    Page 5

Not Reported in F.Supp.2d, 2001 WL 253117 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains.

*5 35 U.S.C. § 103. The ultimate determination of obviousness is a question of law based on underlying factual inquiries. *See Richardson-Vicks Inc. v. Upjohn Co.,* 122 F.3d 1476, 1479 (Fed.Cir.1997). Those factual inquiries involve consideration of the four so-called Graham factors: (1) the scope and content of the prior art; (2) the differences between the claims and the prior art; (3) the level of ordinary skill in the pertinent art; [FN4] (4) and any secondary considerations of nonobviousness, such as commercial success. *See Graham v. John Deere Co. of Kansas City,* 383 U.S. 1, 17-18 (1966); *B.F. Goodrich Co. v. Aircraft Braking Sys. Corp.,* 72 F.3d 1577, 1582 (Fed.Cir.1996). The existence of each element of a claim in the prior art does not, by itself, demonstrate obviousness. Instead, there must be a "reason, suggestion, or motivation in the prior art that would lead one of ordinary skill in the art to combine the references, and that would also suggest a reasonable likelihood of success." *Smith Indus. Med. Sys., Inc. v. Vital Signs, Inc.,* 183 F.3d 1347, 1353 (Fed.Cir.1999). "Such a suggestion or motivation may come from the references themselves, from knowledge by those skilled in the art that certain references are of special interest in a field, or even from the nature of the problem to be solved." *Id.* at 1356.

> FN4. The factfinder must evaluate the invention, "not through the eyes of the inventor, who may have been of exceptional skill, but as by one of ' ordinary skill." ' *Interconnect Planning Corp. v. Feil,* 774 F.2d 1132, 1138 (Fed.Cir.1985).

Because the court cannot conclude, based on the current record, whether one of ordinary skill in the art would have been motivated to combine the above references or would otherwise conclude that the claims of the '128 patent were obvious at the

time of the application, the court denies the motion for summary judgment of obviousness.

### 3. Enablement

The last invalidity contention addressed by this memorandum opinion is enablement. Both parties moved for summary judgment on this issue. Under the enablement requirement, a patent must teach those skilled in the art how to make and use the full scope of the claimed invention without undue experimentation. *See In re Wright,* 999 F.2d 1557, 1561 (Fed.Cir.1993). As apparent from § 112, a patent specification is required to contain a disclosure, either through illustrative examples or written description, that is sufficient to teach one skilled in the art how to make and use the invention as broadly as it is claimed. *Id.* "[I]t is not necessary that a patent applicant test all the embodiments of his invention; what is necessary is that he provide a disclosure sufficient to enable one skilled in the art to carry out the invention commensurate with the scope of his claims." *Amgen, Inc. v. Chugai Pharm. Co., Ltd.,* 927 F.2d 1200, 1213 (Fed.Cir.1991) (internal citation omitted); accord *In re Vaeck,* 947 F.2d 488, 496 (Fed.Cir.1991) ("It is well settled that patent applicants are not required to disclose every species encompassed by their claims, even in an unpredictable art."). Furthermore, a patent need not teach, and preferably omits, that which is well known in the art. *See Ajinomoto Co. v. Archer-Daniels-Midland Co.,* 228 F.3d 1338, 1345 (Fed.Cir.2000), citing, *Hybritech, Inc. v. Monoclonal Antibodies, Inc.,* 802 F.2d 1367, 1384 (Fed.Cir.1986).

*6 Poser's expert witness, Dr. Ray L. Hauser, points to seven different ways to make a graft copolymer with natural rubber, methyl methacrylate, and styrene. For example, different polymerization conditions may include:
a. Natural rubber latex + methyl methacrylate + styrene with sufficient time for dissolution, followed by uniform polymerization.
b. Natural rubber latex + methyl methacrylate with sufficient time for dissolution, followed by uniform polymerization, followed by addition of styrene monomer with sufficient time for dissolution,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2001 WL 253117 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

followed by secondary polymerization.

(D.I. 285 at tab 5, p. 7) Dr. Hauser points to five more possibilities and concludes that "[t]he following polymerization conditions could provide very different products." (*Id.*) Based on that evidence, Poser argues that one of ordinary skill in the art would not know, based on the disclosure, how to make and use the invention.

Poser's other expert, Dr. H. James Harwood, gave a similar opinion on lack of enablement. Dr. Harwood said:

There are a number of different ways to make graft copolymers. For instance, one can attach multiple monomers simultaneously onto a single base polymer to achieve copolymer side chains. Alternatively, one can graft monomers sequentially onto the base polymer to achieve homopolymer side chains. Furthermore, the length of these grafted chains is determined by the rate in which the graft polymerization is initiated. This will depend on initiator concentration, initiator type, and the temperature of the reaction. Graft copolymers with side chains of different lengths can exhibit markedly different properties. Also, the average number of grafts per chain can be influenced by polymerization conditions. The method employed by [the patent applicant] is not identified. Therefore, the '128 patent is invalid because it does not provide one of ordinary skill in the art with sufficient information to practice the invention.

(D.I. 185 at tab 6, p. 4)

Neither Dr. Hauser's nor Dr. Harwood's statement meets the clear and convincing threshold required for summary judgment of invalidity. Dr. Hauser says that the different possible polymerization conditions could provide very different products. Dr. Hauser does not say, however, that these very different products would not be pressure-sensitive adhesives made of a graft copolymer of natural rubber, MMA, and styrene with a hard particulate dispersed in the latex. Likewise, Dr. Harwood says that different techniques can result in "markedly different properties;" but he never says that these different properties fall outside the scope of the claims.

The '128 patent is directed toward a composition of matter that has the characteristic of being a pressure-sensitive adhesive. Since the patentee did not claim the process used to make the pressure-sensitive adhesive, merely saying that there are multiple ways of making the claimed composition is insufficient to sustain an lack of enablement defense. Poser's motion for summary judgment of lack of enablement is denied.

**\*7** Moore's motion for summary judgment of enablement is granted. A patent is presumed to be valid. 35 U.S.C. § 282. Poser has the burden of proving lack of enablement by clear and convincing evidence. *Apple Computer, Inc. v. Articulate Sys., Inc.,* 234 F.2d 14, 20 (Fed.Cir.2000). Poser's defense to Moore's motion for summary judgment of enablement is supported only by the statements of Drs. Hauser and Harwood. (D.I. 283 at 16-18; D.I. 317 at 14) If the issue of enablement were to go to trial, the testimony of Poser's expert witnesses would be limited to the information contained in their expert reports. Because their expert reports contain nothing that indicates that one of ordinary skill in the art would not know how to make a pressure-sensitive adhesive that falls within the claims of the patent, Poser will not be permitted to go forward with this defense.

### B. INFRINGEMENT

Because the parties and their experts disagree on whether styrene is grafted to natural rubber, the court finds that there is a genuine issue of material fact for trial. Namely, are styrene and methyl methacrylate, and not substances made from styrene and methyl methacrylate, grafted on a common natural rubber backbone in the form of a latex? The court, therefore, denies both Moore's motion for partial summary judgment of infringement of claims 1 and 3 of the '128 patent (D.I.237) and Poser's motion for partial summary judgment of infringement of the '128 patent (D.I.255).

### V. CONCLUSION

For the foregoing reasons, the court denies Poser's

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 12

Westlaw.

Slip Copy

Slip Copy, 2005 WL 3159054 (D.Del.)
**(Cite as: Slip Copy)**

**H**
Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court,D. Delaware.
PRAXAIR, INC. and Praxair Technology, Inc.,
Plaintiffs,
v.
ATMI, INC. and Advanced Technology Materials,
Inc., Defendants.
**No. Civ. 03-1158-SLR.**

Nov. 28, 2005.

Jack B. Blumenfeld, Rodger Dallery Smith, II,
Morris, Nichols, Arsht & Tunnell, Wilmington, DE,
for Plaintiffs.
Frederick L. Cottrell, III, Robert H. Richards, III,
Alyssa M. Schwartz, Richards, Layton & Finger,
Keith A. Walter, Jr., Fish & Richardson P.C.,
Nicholas L. Coch, Theodore J. Mlynar, Kramer
Levin Naftalis & Frankel LLP, New York, NY, for
Defendants.

MEMORANDUM ORDER
ROBINSON, J.

I. INTRODUCTION

*1 Praxair, Inc. and Praxair Technology Inc. ("
plaintiffs") filed this patent infringement action on
January 9, 2004 against ATMI, Inc. and Advanced
Technology Materials, Inc. ("defendants"). (D.I.1)
A pretrial conference was held on November 9,
2005 in which several issues from the Joint Pretrial
Order (D.I.230) were addressed. (D.I.239) The
court requested brief memoranda from defendants
on three of these issues by November 16, with
replies by plaintiffs due on November 23. (D.I.239)

II. BACKGROUND

Plaintiffs sued defendants for infringement of

certain claims of United States Patent Nos.
6,045,115 ("the '115 patent"), 6,007,609 ("the '609
patent") and 5,937,895 ("the '895 patent"). (D.I.1)
The patents in suit disclose embodiments of an
apparatus, which safely controls the discharge of
pressurized fluids from the outlet of pressurized
tanks. (D.I. 131 at 7) The inventions disclosed by
the patents help control the handling, storage and
delivery of toxic fluids and constrain the flow of gas
during normal operating, as well as during any kind
of valve mishandling or downstream failure. *Id.* at 8

On November 8, 2005, the court granted partial
summary judgment to defendants that claim 1, and
all depending claims, of the '895 patent were invalid
as indefinite. (D.I.233) The remaining claims at
issue are claims 1, 2, 6, 7 and 8 of the '609 patent
and claims 18 and 20 of the '115 patent. The court
also granted plaintiffs' motion to exclude several
belatedly-identified prior art references. (D.I.233)

During the pretrial conference, the court ruled on
several discovery and evidentiary disputes. The
court decided that Mr. Sackett of Swagelok, who
was not identified by name during discovery, is
precluded from testifying regarding the identity of
the filter disclosed in the Zang reference.[FN1] (D.I.
239 at 52) The court also ruled that any documents
inadvertently disclosed by plaintiffs need not be
returned because plaintiffs did not properly follow
the provisions of the protective order to regain
possession of the documents. (D.I. 239 at 56) The
court ruled that no legal impediment exists for
defendants to assert that any of the remaining
claims at issue are indefinite. (D.I. 239 at 57)
Finally, the court concluded that Dr. Sherman's
expert testimony is admissible because defendants
were given the name of every past case in which Dr.
Sherman testified, even though they were not given
the actual trial or deposition testimony. (D.I. 239 at
67)

FN1. Defendants did disclose Swagelok

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                    Page 2

Slip Copy, 2005 WL 3159054 (D.Del.)
(Cite as: Slip Copy)

during discovery and that a representative would be testifying pursuant to the scheduling order. The representative was identified by topic and document discovery was performed. However, the document discovery had nothing to do with Mr. Sackett's testimony regarding the type of filter disclosed in the Zhang patent.

The remaining issues, on which the court did not rule, were: whether defendants can present evidence of plaintiffs' commercial product and its prototypes; whether defendants timely disclosed the issue of simultaneous invention during the discovery phase of the trial; whether Dr. Karvelis' supplement to his expert report of the proper testing protocol prejudiced defendants and, therefore, should be excluded; [FN2] whether capillary action in sintered metal filters is excluded from the case; and whether the Skousgaard and Miller references were timely identified.

> FN2. Defendants no longer assert the need to rebut the supplement to Dr. Karvelis' expert report because the testing relates only to the '895 patent, which is no longer in the case. (D.I.235)

### III. DISCUSSION

#### A. Definiteness of Construed Claims

*2 As an initial matter, the court revisits a ruling made on the bench during the pretrial conference. In light of *Bancorp Servs., L.L.C. v. Hartford Life Ins. Co.*, 359 F.3d 1367 (Fed.Cir.2004), the construed claims are definite, as a matter of law. "We have held that a claim is not indefinite merely because it poses a difficult issue of claim construction; if the claim is subject to construction, i.e., it is not insolubly ambiguous, it is not invalid for indefiniteness." *Id.* at 1371. (citing *Honeywell Int'l, Inc. v. Int'l Trade Comm'n*, 341 F.3d 1332, 1338-39 (Fed.Cir.2003). "That is, if the meaning of the claim is discernible, 'even though the task may be formidable and the conclusion may be one over which reasonable persons will disagree, we have

held the claim sufficiently clear to avoid invalidity on indefiniteness grounds.' *Exxon Research & Eng'g Co. v. United States*, 265 F.3d 1371, 1375 (Fed.Cir.2001)." *Id.* Because the court was able to construe the limitation "at about the axial midpoint," the claims are definite, as a matter of law. *Id.* at 1371.

#### B. Commercial Embodiment of Claimed Invention

Defendants argue that evidence of plaintiffs' commercial embodiment of the claimed invention, UpTime, and "events leading up to the filing of the patents-in-suit" are relevant to the issues of noninfringement and the reverse doctrine of equivalents. (D.I.237) The court concludes, however, that such evidence shall be excluded in the infringement determination.[FN3]

> FN3. While evidence leading up to the filing of the patents may have been relevant evidence, the court notes that the earliest date noted on any of the documents produced was 1999, by which time all the patents in issue had been filed. Therefore, even though defendants' brief states "events leading up to the filing of the patents" (D.I. 237 at 4), the documents instead relate to events leading up to the commercial embodiment.

The Federal Circuit has been very clear that "it is error for a court to compare in its infringement analysis the accused product or process with the patentee's commercial embodiment or other version of the product or process; the only proper comparison is with the claims of the patent," as construed by the court. *Zenith Laboratories, Inc. v. Bristol-Myers Squibb Co.*, 19 F.3d 1418, 1423 (Fed.Cir.1994). Defendants argue that, because the UpTime product has both a "flow restrictor" and a "filter," plaintiffs referred to, and considered, a flow restrictor as separate from a filter. The claims, as construed by this court, define a flow restrictor as something that "serve[s] to restrict the rate of flow [of gas]." (D.I.234) Whether or not a filter serves to restrict the flow of gas is a question for the jury and

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

Slip Copy, 2005 WL 3159054 (D.Del.)
(Cite as: Slip Copy)

Page 3

does not require analysis of the UpTime product. [FN4] Therefore, the court declines to allow as evidence of noninfringement the UpTime product or the events in its development. The risks of jury confusion and prejudice far outweigh the probative value of such evidence.

> FN4. The only evidence of this kind that could be relevant is evidence that plaintiffs admitted in some tests or prototypes that the filters did not restrict the rate of flow of the gas.

### C. Disclosure of Simultaneous Invention

Plaintiffs assert that any testimony [FN5] or evidence regarding when defendants designed the inventions claimed in defendants' U.S. Patent Nos. 6,101,816 (the '816 patent) and 6,089,027 (the '027 patent) should be excluded because the '816 and '027 patents cannot be considered prior art and the evidence will only confuse the jury. In this case, witnesses (including Luping Wang) were made available to plaintiffs for discovery regarding the time of conception and reduction to practice of the claimed inventions of the '816 and '027 patents. These patents disclose the use of a membrane [FN6] (D.I. 236 at 1) and plaintiffs assert that a membrane can be a flow restrictor, as defined in the patents at issue.

> FN5. Specifically, plaintiffs contest the testimony of Luping Wang.

> FN6. The parties apparently had an agreement to consolidate deposition discovery in this Delaware action and in a New York law suit involving the '816 and '027 patents. An interrogatory was answered by defendants on August 19, 2004 in the New York action disclosing the relevant information.

*3 Evidence of simultaneous invention is relevant to the issue of obviousness, as a factor in the determination of the level of skill in the art. *Ecolochem, Inc. v. S. Cal. Edison Co.,* 227 F.3d

1361, 1379 (Fed.Cir.2000) ("The fact of near-simultaneous invention, though not determinative of statutory obviousness, is strong evidence of what constitutes the level of ordinary skill in the art.... [T]he possibility of near simultaneous invention by two or more equally talented inventors working independently, ... may or may not be an indication of obviousness when considered in light of all the circumstances." )(internal citations omitted). However, in the case at bar, defendants repudiated their claim to an early conception date; in the New York litigation, defendants did not dispute that the inventors of plaintiffs' patents were first to invent. Therefore, plaintiffs had no reason to conduct discovery on the issue of first to invent. Furthermore, the disclosure of the invention dates of the '816 and '027 patents contains no mention of a simultaneous invention argument, giving plaintiffs no reason to conduct discovery on the issue of simultaneous invention. To avoid unfair surprise, the testimony of Luping Wang is inadmissible as evidence of simultaneous invention.

### D. Capillary Action

The claims at issue use the term "capillary" to describe tubes and passageways. Plaintiffs argued, during the claim construction phase of the case, that "capillary passages" must be construed to mean " passages that exhibit capillary action." (D.I. 234 at 8) The court concluded that, as used in the specification and the claims, the term "capillary" means "pertaining to or resembling a hair; fine and slender." (D.I. 234 at 9) Plaintiffs assert that capillary action is still relevant to the issues at bar in that it is a test for the existence of capillary tubes, as properly construed. Plaintiffs contend that placing a filter into a liquid is one way to test for the existence of fine and slender tubes. If the liquid disappears, the filter must have fine and slender tubes into which the liquid is flowing. [FN7] If the liquid does not disappear, no such tubes exists.

> FN7. This phenomenon is called capillary action.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                        Page 4

Slip Copy, 2005 WL 3159054 (D.Del.)
**(Cite as: Slip Copy)**

The court finds that evidence of capillary action will be unduly confusing to the jury. Capillary action is not required in the claim construction. Presenting the jury with this test and calling it " capillary action" and then reading the claims which require "capillary passageways" will confuse and mislead the jury. Furthermore, the phenomenon of upward movement of a liquid through a narrow tube is not relevant to the invention at issue. The invention, as claimed and construed, is related to the restriction of gas flow through fine and slender tubes. The court concludes that evidence of the phenomenon of capillary action is excluded under Fed.R.Evid. 403 because its probative value, as one way to prove the existence of thin and slender tubes, is outweighed by the danger of unfair prejudice, confusion of the proper claim construction and the potential for misleading the jury.

### E. Prior Art References

*4 Defendants have raised reargument on the issue of excluding United States Patent Nos. 2,666,297 (the "Skousgaard patent") and 3,245,583 (the " Miller patent"). The court declines to change its prior ruling regarding the two prior art references. (D.I.233) Prior art references must be disclosed during fact discovery and the parties must disclose their intent to rely thereon, regardless of whether or not the opposing party is aware of the reference. It is undisputed that the two references at issue, and the intent to rely on them for invalidating the asserted claims, were not disclosed to plaintiffs by defendants until after the close of fact discovery. Therefore, these references are excluded from defendants' invalidity case.

### IV. CONCLUSION

At Wilmington this 28th day of November, 2005, having reviewed the evidentiary disputes raised at the pretrial conference; [FN8]

> FN8. The evidentiary disputes are detailed in the transcript for the pretrial conference. (D.I.239)

IT IS SO ORDERED that:

1. Defendants are precluded, as a matter of law, from raising the issue of indefiniteness as it relates to claims that have been construed.

2. Evidence of the commercial embodiment of the claimed invention is not admissible for the infringement analysis, but may be used for the reverse doctrine of equivalents analysis.

3. Testimony by Luping Wang regarding simultaneous invention is inadmissible.

4. Evidence of capillary action is excluded.

5. The Skousgaard and Miller references are excluded.

D.Del.,2005.
Praxair, Inc. v. ATMI, Inc.
Slip Copy, 2005 WL 3159054 (D.Del.)

Briefs and Other Related Documents (Back to top)

• 2006 WL 1182413 (Trial Motion, Memorandum and Affidavit) ATMI's Reply Brief in Support of its Inequitable Conduct Case (Mar. 17, 2006) Original Image of this Document (PDF)
• 2006 WL 1182414 (Trial Motion, Memorandum and Affidavit) ATMI's Reply Brief in Support of its Renewed Motion for Judgment as A Matter of Law (Mar. 17, 2006) Original Image of this Document (PDF)
• 2006 WL 1182415 (Trial Motion, Memorandum and Affidavit) Reply Brief in Support of Atmi's Motion for A New Trial (Mar. 17, 2006) Original Image of this Document (PDF)
• 2006 WL 1182410 (Trial Motion, Memorandum and Affidavit) Praxair's Answering Brief in Opposition to ATMP's Motion for Judgment as a Matter of Law (Mar. 2, 2006) Original Image of this Document (PDF)
• 2006 WL 1182411 (Trial Motion, Memorandum and Affidavit) Praxair's Answering Brief in Opposition to Atmps Post-Trial Motion Concerning Inequitable Conduct (Mar. 2, 2006) Original Image of this Document (PDF)
• 2006 WL 1182412 (Trial Motion, Memorandum

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

Page 5

Slip Copy, 2005 WL 3159054 (D.Del.)
**(Cite as: Slip Copy)**

and Affidavit) Praxair's Answering Brief in Opposition to ATMI's Motion for a New Trial (Mar. 2, 2006) Original Image of this Document (PDF)
• 2006 WL 809089 (Trial Motion, Memorandum and Affidavit) Atmi's Reply Brief in Support of its Motion to Compel Production of Documents from Praxair and Uop Based on Waiver of Attorney-Client Privilege and Work Product Immunity (Feb. 3, 2006)
• 2006 WL 809088 (Trial Motion, Memorandum and Affidavit) Atmi's Amended Opening Brief in Support of its Renewed Motion for Judgment as A Matter of Law (Feb. 1, 2006)
• 2006 WL 819615 (Trial Motion, Memorandum and Affidavit) Atmi's Amended Opening Brief in Support of its Inequitable Conduct Case (Feb. 1, 2006)
• 2006 WL 819620 (Trial Motion, Memorandum and Affidavit) Amended Opening Brief in Support of Atmi's Motion for A New Trial (Feb. 1, 2006)
• 2005 WL 3667341 (Trial Motion, Memorandum and Affidavit) Praxair's Discovery Designations, Atmi's Counter Designations and Objections to Praxair's Discovery Designations and Praxair's Objections to Atmi's Counter Designations (Nov. 4, 2005)
• 2005 WL 3666787 (Trial Motion, Memorandum and Affidavit) Praxair's Motion to Strike Another New Witness and more New Documents Identified by Atmi and to Preclude Atmi from Relying on them at Trial (Oct. 31, 2005)
• 2005 WL 2867905 (Trial Motion, Memorandum and Affidavit) Praxair's Reply Brief in Support of its Motion to Strike the Declarations of Philip Chen and Christopher Jones (Sep. 19, 2005)
• 2003 WL 24229530 (Trial Pleading) Complaint for Patent Infringement (Dec. 22, 2003)
• 1:03cv01158 (Docket) (Dec. 22, 2003)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 13

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

MCKESSON INFORMATION SOLUTIONS )
LLC, )
                               )
                Plaintiff, )
                )
     v. )          CIVIL ACTION NO. 04-1258-SLR
                )
THE TRIZETTO GROUP, INC., )
                )
            Defendant. )
                )

## MCKESSON INFORMATION SOLUTIONS LLC'S
## FIRST SET OF INTERROGATORIES

Plaintiff, McKesson Information Solutions LLC, pursuant to Rule 33 of the Federal Rules of Civil Procedure, propounds the following Interrogatories to defendant, The TriZetto Group, Inc., to be answered in writing and under oath within the time and in the manner set forth in Rule 33.

### DEFINITIONS AND INSTRUCTIONS

Without limiting the scope of the Local Rules or the Federal Rules of Civil Procedure, the following instructions shall also apply to these Interrogatories:

1. These Interrogatories shall be deemed continuing in character so as to require further and supplemental responses if you obtain or discover further or different information with respect to any Interrogatory.

2. Each prior art patent identified by you in response to these Interrogatories shall be identified by the patent number, country of origin, and date of issue. Each prior art publication identified by you in response to these Interrogatories shall be identified by its title, date of publication, and where feasible, author and publisher.

3. In accordance with Federal Rule of Civil Procedure 26(b)(5), where any information is not provided in response to any Interrogatory based on a claim of

the patent that corresponds to the recited element), state whether or not each claim element is present in or practiced by the products, systems, or services identified in response to Interrogatory No. 2, and, if not, an explanation of how each product, system, or service identified in response to Interrogatory No. 2 operates or functions differently than, and does not include a substantial equivalent of, any such claim element.

## INTERROGATORY NO. 4:

For each claim of the '164 patent, state whether TriZetto relies or will rely at trial on the doctrine of prosecution history estoppel as a basis for non-infringement under the doctrine of equivalents and explain in detail each fact that supports or refutes or otherwise relates to TriZetto's allegation of prosecution history estoppel for each such claim and explain in detail why such facts would or would not support a finding of non-infringement.

## INTERROGATORY NO. 5:

For each product, system, or service identified in response to Interrogatory No. 2, state in complete detail the steps and functions performed by that product, system, or service in performing clinical editing or auditing of medical payment claims (including, without limitation, the detection or correction of unbundled medical procedures or claims billed incorrectly due to coding errors).

## INTERROGATORY NO. 6:

State in complete detail each and every basis for your assertion that the claims of the '164 patent are invalid under 35 U.S.C. §§ 102 or 103. Your response should, without limitation: identify each prior art reference you contend anticipates any claim of the '164 patent under 35 U.S.C. § 102 and each prior art reference or combination of references you contend renders any claim of the '164 patent obvious under 35 U.S.C. § 103; state in complete detail, by means of a claim chart, where TriZetto contends each limitation of any allegedly invalid claim of the '164 patent is disclosed by each

reference or combination of references; and state in complete detail the basis for TriZetto's assertion that one of ordinary skill in the art at the time of the '164 patent's invention would have been motivated to combine or modify any prior art reference or combination of references TriZetto contends is invalidating under 35 U.S.C. § 103.

**INTERROGATORY NO. 7:**

State in complete detail each and every basis for your assertion that the claims of the '164 patent are invalid because they do not particularly point out and distinctly claim the subject matter of the invention.

**INTERROGATORY NO. 8:**

State in complete detail each and every basis for your assertion that the '164 patent is unenforceable because McKesson comes into Court with unclean hands and has committed patent misuse.

**INTERROGATORY NO. 9:**

State in complete detail each and every basis for your assertion that the '164 patent is unenforceable due to inequitable conduct. Your response should include, without limitation, an identification of any information allegedly withheld from the Patent Office and a detailed description of the basis for TriZetto's contentions that such information: would have been material to the examination of the '164 patent; was not cumulative to information before the '164 patent examiner (including an identification of each limitation of the '164 patent claims that TriZetto contends is disclosed by the allegedly withheld information and not by the information before the '164 patent examiner); and was withheld with an intent to deceive the Patent Office.

**INTERROGATORY NO. 10:**

State in complete detail each and every basis for your assertion that McKesson's claims are barred by the doctrine of estoppel.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

MCKESSON INFORMATION SOLUTIONS )
LLC, )
 )
 )
Plaintiff, )
v. )     CIVIL ACTION NO. 04-1258-SLR
 )
THE TRIZETTO GROUP, INC. )
 )
 )
Defendant. )

## NOTICE OF SERVICE

The undersigned, as counsel for Plaintiff McKesson Information Solutions LLC,

certifies that on December 21, 2004, copies of McKesson Information Solutions LLC's

First Set of Requests for the Production of Documents and Things, and McKesson

Information Solutions LLC's First Set of Interrogatories were served by hand on the

following counsel:

Jack B. Blumenfeld, Esq.
Rodger D. Smith, II, Esq.
MORRIS NICHOLS ARSHT
 & TUNNELL
1201 North Market Street
P.O. Box 1347
Wilmington, Delaware 19899

Thomas J. Allingham II (#0476)
Michael A. Barlow (#3928)
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
One Rodney Square
P.O. Box 636
Wilmington, Delaware 19899

Attorneys for Plaintiff McKesson
  Information Solutions LLC

OF COUNSEL:
Jeffery G. Randall
David W. Hansen
Michael Hendershot
Donna Hill
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
525 University Avenue, Suite 1100
Palo Alto, California 94301

 - and -

Allan M. Soobert
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
1440 New York Avenue, N.W.
Washington, D.C. 20005-2111

DATED:  December 22, 2004

# EXHIBIT 14

**CERTIFIED COPY**

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

MCKESSON INFORMATION SOLUTIONS,    )
                                   )
                    Plaintiff,     )
                                   )
        vs.                        )  CASE NO.
                                   )  04-1258 SLR
THE TRIZETTO GROUP,                )
                                   )
                    Defendant.     )
                                   )
_____)

DEPOSITION OF GEORGE A. GOLDBERG

September 13, 2005

206921

**BARKLEY**
Court Reporters

| Los Angeles | Orange County | San Francisco | San Diego | Inland Empire | Palm Springs | San Fernando Valley | San Jose |
|---|---|---|---|---|---|---|---|
| (310) 207.8000 | (949) 955.0400 | (415) 433.5777 | (858) 455.5444 | (951) 686.0606 | (760) 322.2240 | (818) 702.0202 | (408) 885.0550 |

1    correct?

2        A    That is what my CV shows, and it's

3    correct.

4        Q    Why did you leave The RAND Corporation?

5        A    The Health Insurance Experiment had ended.

6        Q    Any other reasons?

7        A    It was time to move -- I thought it was

8    time to move back to the East Coast to be near my

9    aging parents.

10        Q    And you -- from your CV, it looks like you

11    joined a company Health Data Institute in Lexington,

12    Massachusetts; is that correct?

13        A    That is correct.

14        Q    And it references developmental work on an

15    Advanced MedLogic, M-e-d, cap L-o-g-i-c, System?

16        A    Yes, it does.

17        Q    Which indicates that it does cost/quality

18    procedure code based claims review.

19        A    That's what it says.

20        Q    Can you provide a more detailed

21    explanation what the Advanced MedLogic System was?

22        A    The Advanced MedLogic System was a series

23    of computerized tables, lookup tables, that

24    received, processed and paid claims.  In other

25    words, it was post-payment claims databases, and

51

GEORGE A. GOLDBERG

1    reviewed them to perform single-code edits of

2    various kinds.    Post-process, post-payment.

3        Q        There's also a notation on your CV about a

4    prospective payment system?

5        A        The prospective payment system is the

6    government's DRG system.

7        Q        And does that -- did that system deal with

8    claims processing prior to payment?

9        A        The DR -- the answer is yes and no.

10       Q        Can you explain?

11       A        The DRG system, which is performed --

12   which applies to hospital claims only, or certainly

13   did in those days, the DRG system, diagnosis related

14   groups.    Groups diagnoses with some on hospital

15   discharge claims, with attention as well to ICD9

16   procedure-coded procedures on hospital claims, and

17   assigns every hospital discharged claim to one and

18   only one DRG, a number that at that time went

19   somewhere between 001 and 4XX.    There were

20   400-some-odd DRGs.

21            And it functions for payment purposes

22   because at some point, Medicare and Medicaid and the

23   occasional private insurer paid for a hospital stay

24   on the basis of the DRG to which a hospital

25   discharge claim was assigned.

52

GEORGE A. GOLDBERG



1      Q    In connection with the Advanced MedLogic

2    System, did that review procedure codes that would

3    have been inappropriate for some other criteria,

4    such as gender or age?

5           MR. SHEK:  Objection as to form, also

6    vague and ambiguous.

7           THE WITNESS:  Would you repeat the

8    question, please?  Or would you rephrase the

9    question, please?

10          BY MR. SEGAL:

11     Q    Sure, sure.  I'm trying to go -- we

12   previously -- you cautioned me you didn't want to

13   jumble all code editing or claims editing together,

14   and we had talked about three or four different

15   types of claims edits.

16     A    Yes, sir.

17     Q    So what I'm trying to determine is whether

18   Advanced MedLogic looked at claims data to determine

19   whether a procedure code was inappropriate for the

20   patient -- for some other criteria, such as the

21   patient's gender or age.

22          MR. SHEK:  Object to form again, also

23   vague and ambiguous.

24          THE WITNESS:  One of the functions of the

25   Advanced MedLogic System was to review procedures in

53

GEORGE A. GOLDBERG

1    relation to such things as the patient's age or sex.

2         BY MR. SEGAL:

3    Q    And what would happen if the claims data

4    you were looking at as part of the Advanced MedLogic

5    System showed a CPT code that was inappropriate for

6    some other criteria, such as the gender or age of a

7    patient?

8    A    The code -- first of all, I don't know.

9    Excuse me.  That depended on the client, for with

10   some clients, nothing would happen, we would merely

11   count these discrepancies and report the

12   discrepancies.  Remember, these were post-payment,

13   post-processed claims.  And in other cases, we might

14   exclude the procedure -- it has nothing to do with

15   payment.  We might exclude the procedure from a

16   count of such procedures.

17        In other words, this had to do with

18   analysis, data analysis.

19   Q    And was H -- is it okay if I refer to

20   Health Data Institute as "HDI"?  Is that an acronym

21   you used?

22   A    Yes, for both questions.

23   Q    Okay.  Good.  So just to try and shorten

24   up.

25   A    HDI is what we called it.

GEORGE A. GOLDBERG

BARKLEY
Court Reporters

1      Q    Okay.  Did HDI sell its services using the

2  Advanced MedLogic System?

3      A    They --

4           MR. SHEK:  Objection as to form; vague as

5  to time.

6           THE WITNESS:  They tried to sell it.

7           BY MR. SEGAL:

8      Q    Okay.  So they went to companies and said

9  give us your claims data and we'll process it

10  through our system, our computer program, and

11  provide some reports to you or some analysis to you.

12  Is that fair?

13     A    My guess is that happened, but I was never

14  involved in any of those sales trips.

15     Q    Okay.  Do you recall any of the other

16  individuals that worked with you at HDI?

17     A    Yes, I do.

18     Q    Can you tell me the names that you recall?

19     A    I recall the name Paul Gertman,

20  G-e-r-t-m-a-n.  I recall Lance Lazo, I think it's

21  L-a-z-o.  I'm not sure.  I recall Breck, and I don't

22  remember his last name.  I recall Mayde Rosen,

23  M-a-y-d-e.  I recall Elizabeth Pappius,

24  P-a-p-p-i-u-s.  I recall Larry Shor, and I don't

25  remember how -- there's no E at the end, but I don't

55

GEORGE A. GOLDBERG

1    System?

2             MR. SHEK:  Object as to form.

3             THE WITNESS:  Can you rephrase the

4    question, please?

5             BY MR. SEGAL:

6        Q    Sure.  You indicated that Advanced

7    MedLogic had lookup tables; is that correct?

8        A    That's correct.

9        Q    And that you reviewed those tables and

10   commented on them; is that correct?

11       A    That's correct.

12       Q    Okay.  Can you describe what the contents

13   of the lookup tables were for the Advanced MedLogic

14   System?

15       A    Well, for the ones I remember I can.

16       Q    That would be all I can ask for.  And if

17   there are others that you don't recall, if you just

18   let us know that.

19       A    Okay.  There are some that I do not

20   recall.

21       Q    Okay.  And then why don't you tell us the

22   contents of the tables that you do recall.

23       A    There was one table that would -- that

24   listed diagnoses that could not be right for certain

25   age groups.  There could be more -- could have been

63

GEORGE A. GOLDBERG

BARKLEY
Court Reporters

1   more than one of those tables.  One form of table

2   was if it's this age, you can't -- if it's this --

3   if it's this diagnosis, only this age range can have

4   it.

5        There was another table, if it's this

6   sex -- if it's this procedure, only this sex can

7   have it.  Another table, if it's this age -- if it's

8   this -- did I do that -- diagnoses and another one

9   for procedures.  If it's this age, you can't -- I

10  don't know if the tables were -- probably -- I don't

11  know if they were done negatively or positively, but

12  they basically, one of them looked at age versus

13  diagnosis, another one or group of them for age

14  versus procedure, another one for sex versus

15  diagnosis, another one for -- for example, you're

16  not going to see a heart attack in a 3-year-old, or

17  if you do, it's a suspect claim.

18        Another one would have been age against

19  procedure.  Then there was a list of weird --

20  geographically unlikely diagnoses for the United

21  States.  And at the moment, those are -- those are

22  the tables I recall.

23        Q    Do you recall what type of discrepancies

24  were identified for the reports that would have --

25  that were provided to clients of HDI?

64

GEORGE A. GOLDBERG

BARKLEY
Court Reporters

```
 1      A    Do you mean discrepancies as in the way I
 2  used the word a while back?
 3      Q    Yeah, I am referring to you indicated that
 4  Advanced MedLogic would either report discrepancies
 5  to the client or exclude the procedure from some
 6  count.
 7      A    That's -- I do recall saying that.
 8      Q    Okay.  So I'm trying to go back to your
 9  words and testimony so that the record is as clear
10  as possible.
11           In connection with reporting
12  discrepancies --
13      A    Yes.
14      Q    -- do you recall what types of
15  discrepancies were reported to clients of HDI?
16      A    You know, I'm not sure I ever saw an
17  Advanced MedLogic report.  My speculation is that it
18  would have been the number of age/procedure
19  discrepancies, age/diagnosis discrepancies,
20  sex/procedure discrepancies, sex/diagnosis
21  discrepancies, literally a count of the number of
22  times something on the table had registered, so to
23  speak.
24           But I never saw an Advanced MedLogic
25  report, interesting -- amazingly enough, that I
```

65

BARKLEY
Court Reporters

1     that you can put a time frame on when you would have

2     learned that -- when you learned that HDI had gone

3     out of business?

4         A    Nothing that I remember.

5         Q    Okay.  If someone were to ask you when HDI

6     went out of business and asked you to find the

7     person who would know that, who would you call?

8     Sort of the lifeline on the game show.

9         A    Paul Gertman.

10        Q    Did you take any documents with you from

11    HDI when you left?

12        A    Probably.  Yes, yes.

13        Q    What do you recall taking with you from

14    HDI?

15        A    I recall taking some final reports.

16        Q    Do you recall if those final reports were

17    Advanced MedLogic Systems reports?

18        A    I do not recall -- no, I don't.  And I

19    don't think they were, but I don't recall.

20        Q    So you don't know one way or the other

21    whether or not some Advanced MedLogic reports were

22    among the materials you took with you when you left

23    HDI; is that correct?

24        A    That is correct.

25        Q    In connection with your work at HDI and

GEORGE A. GOLDBERG

BARKLEY
Court Reporters

1    Advanced MedLogic, was there ever any discussion

2    about performing the analysis prior to paying

3    claims?

4        A    Not that I remember.

5        Q    Who were some of the clients, to the best

6    you can recall, of Advanced MedLogic System?

7        A    I remember clients of HDI, but I do not --

8    cannot recall one client that I am sure was a client

9    of the Advanced MedLogic System.

10       Q    Why don't you give us the names of the

11   clients that you recall that were clients of HDI.

12       A    Ford, Chrysler, General Motors.  Those are

13   the only ones I recall with certainty.  No, that

14   probably was for one of the motors.

15       Q    And did you perform any work for either

16   Ford, Chrysler or GM in connection with your work at

17   HDI?

18       A    Oh, I'm sure I did.

19       Q    Did you directly work with anyone from

20   either Ford, Chrysler or GM during your time at HDI?

21       A    I don't remember doing that.  That's the

22   role of the lead analyst.

23       Q    Do you recall whether there were any

24   lookup tables in Advanced MedLogic System that had

25   multiple procedure codes?

68

BARKLEY
Court Reporters

1          MR. SHEK:  Objection as to form; vague and

2    ambiguous.

3          THE WITNESS:  I don't recall any such

4    table in Advanced MedLogic.

5          BY MR. SEGAL:

6      Q    You don't recall one way or the other

7    whether or not there was a table that had more than

8    one procedure code in a sort of line of the table?

9          MR. SHEK:  Objection as to form; vague and

10   ambiguous.

11         THE WITNESS:  We had never conceived of

12   it, but of course, I don't remember the table --

13   such a table either way.  But we had never conceived

14   of the idea.

15         BY MR. SEGAL:

16     Q    So you don't know if, in fact, there was a

17   table?  You just have no recollection of whether or

18   not there was one or wasn't one; is that correct?

19     A    I believe there was none.  If I remember

20   it with certainty, thinking back 20 years, there's

21   very little I remember with certainty, except names

22   of people and meals I've eaten.

23         (Laughter.)

24     Q    Hopefully, this deposition won't knock it

25   down to the meals you've eaten, but I appreciate you

                        69

GEORGE A. GOLDBERG

BARKLEY
Court Reporters

1  I HEREBY CERTIFY that I have read this

2 transcript of my deposition and that this transcript

3 accurately states the testimony given by me, with

4 the changes or corrections, if any, as noted.

5

6

7     X *George A. Goldberg*

8        10/18/2005

9

10

11 Subscribed and sworn to before me this  day of

12     , 20

13

14

15

16     X

17     Notary Public

18

19

20

21 My commission expires:

22

23

24

25

GEORGE A. GOLDBERG

BARKLEY
Court Reporters

McKesson Information Solutions LLC v. The TriZetto Group, Inc.
District of Delaware Case No. 04-1258 SLR

Deposition of George Goldberg
Date of Deposition: September 13, 2005

## TRANSCRIPT ERRATA

| PAGE:LINE(S) | CURRENT VERSION | CHANGE TO | REASON FOR CHANGE |
|---|---|---|---|
| 10:16 | in | and | — |
| 11:3,5,6 | Buzz | Buz | — |
| 23:19 | helped | help | — |
| 23:22 | for diognosis | or diognosis | — |
| 44:14 | Royal | ROIL | — |
| 48:11 | available | aware | — |
| 57:24 | Received, processed and paid claims | Received processed and paid claims (no comma after received) | The claims it received had already been processed & paid! |
| 57:25 | was | received | Clarity |

| PAGE:LINE(S) | CURRENT VERSION | CHANGE TO | REASON FOR CHANGE |
|---|---|---|---|
| 52:14 | with some | (delete) | clarity |
| 59:25 | Friedman | Friedman | Make change in multiple places, please |
| 65:24 – 66:1 | report, interesting | report while I was an employee of HOI – interesting | clarification |
| 75:8-9 | and it was always a 'she | (delete) | See lines 10 & 11 |
| 77:12 | enduring | during | — |
| 77:24 | see | do | I mis-spoke. |
| 94:20 | a | (delete) | clarity |
| 97:9 | not | now | clarity |
| 99:10 | relationship | relationships | — |
| 101:14 | automated | automate | — |

| PAGE:LINE(S) | CURRENT VERSION | CHANGE TO | REASON FOR CHANGE |
|---|---|---|---|
| 108:15 | Pews | Pew | — |
| 116:20 | to ask | asked | — |
| 135:7 | had | ( delete ) | clarity |
| 147:22-23 | Jack Lemmon | Walter Matthau | correction |
| 150:12 | Woundsocket | Woonsocket | — |
| 172:14 | visiting | reviewing | — |
| 176:19-20 | absence of quote marks | Place quote mark before use and after necessary. | |
| 198:2 | annunciate | enunciate | |
| 219:2 | dictate | dictated | — |

| PAGE:LINE(S) | CURRENT VERSION | CHANGE TO | REASON FOR CHANGE |
|---|---|---|---|
| 221:11 | can | can't | mis-transcription? |
| 230:15 | represented | misrepresented | correction |
| 231:3 | say | see | I believe I said "see" given the context. |
| 242:23 | different | differentiation | — |
| 243:6 | and | but | a better word producing the contrast I intended to show |
| 244:9 | goal than | goal, than | — |
| | | | |
| | | | |
| | | | |
| | | | |

# EXHIBIT 15

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

McKESSON INFORMATION SOLUTIONS,
LLC,

      Plaintiff,

      vs.           No. 04-1258-SLR

THE TRIZETTO GROUP, INC.,

      Defendant.


CERTIFIED COPY

DEPOSITION OF ERIC KING

Costa Mesa, California

Tuesday, October 4, 2005

Reported by:
SUZANNE C. STRINGFELLOW
CSR No. 5652

JOB No. 38925



www.sarnoffcourtreporters.com
46 Corporate Park, Suite 100   445 South Figueroa St., Suite 2950
Irvine, CA 92606         Los Angeles, CA 90071

phone  877.955.3855
fax    949.955.3854

SARNOFF
Court Reporters and
Legal Technologies

1  followed that lawsuit closely, and that I might be

2  asked about that.  But I don't really have any

3  particular insight into that.

4      Q  Prior to his discussing the deposition

10:57  5  testimony regarding that, that being TriZetto or

6  its predecessor companies following --

7      A  I guess Erisco was following the GMIS/HPR

8  litigation.

9      Q  So prior to your discussion with

10:57  10  Mr. Thomas, were you aware that Erisco had been

11  following the GMIS/HPR litigation?

12      A  Yeah; tangentially, yeah.  They had said

13  they had provided documents regarding GMIS versus

14  HPR, and that they had followed it and were going

10:57  15  to see if, at some point, whether -- well, I guess

16  at that point it would have been HPR would have

17  served their patent.  I'm actually not sure when

18  McKesson bought it.  But they had followed the

19  litigation and looked at the -- I mean if you want

10:58  20  me to go into the factual basis of the opinion, it

21  kind of relates back to it.

22      Q  Were you aware of their following the

23  litigation when you prepared the opinion?

24      A  Yeah, I know they had followed it.  They

10:58  25  had actually supplied me documents from the

71

1    GMIS/HPR litigation, so I know they had closely

2    watched it and then, afterwards, were kind of

3    waiting to see what would happen, if HPR would ever

4    assert their patent against them.  And they waited

10:58    5    and kind of basically at that point inferred that

6    HPR, and I guess later McKesson, was not going to

7    assert their patent, for whatever reason, due to a

8    big time delay.

9         Q    And that inference -- your knowledge of

10:58    10    that inference was based on discussions with

11    employees at TriZetto?

12         A    Yeah.  With Jim Sullivan, yeah, mainly.

13         Q    So mainly Jim Sullivan?

14         A    Yeah, he was our point of contact.

10:59    15    Although he referred us to some other people to

16    actually gather information.

17         Q    What's Jim Sullivan's position within

18    TriZetto?

19         A    I believe he was general counsel and vice

10:59    20    president of -- I know he's vice president and

21    general counsel.

22         Q    He was in-house attorney?

23         A    He was an in-house attorney, correct.

24         Q    And do you recall the names of any of

10:59    25    these other individuals that Mr. Sullivan directed

72

1

2

3

4          I, the undersigned, a Certified Shorthand

5   Reporter of the State of California, do hereby certify:

6          That the foregoing proceedings were taken

7   before me at the time and place herein set forth; that

8   any witnesses in the foregoing proceedings, prior to

9   testifying, were placed under oath; that a verbatim

10  record of the proceedings was made by me using machine

11  shorthand which was thereafter transcribed under my

12  direction; further, that the foregoing is an accurate

13  transcription thereof.

14         I further certify that I am neither

15  financially interested in the action nor a relative or

16  employee of any attorney of any of the parties.

17         IN WITNESS WHEREOF, I have this date

18  subscribed my name.

19

20  Dated: _____ OCT 2 7 2005 _____

21

22

23

            SUZANNE STRINGFELLOW
24          CSR No. 5652

25

# EXHIBIT 16

LEXSEE 2003 U.S. DIST. LEXIS 2372

**INTEL CORPORATION, Plaintiff, v. BROADCOM CORPORATION, Defendant.**

Civil Action No. 00-796-SLR

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

*2003 U.S. Dist. LEXIS 2372*

**February 13, 2003, Decided**

**DISPOSITION:** [*1] Intel's motion for summary judgment denied. Intel's motion for new trial granted in part and denied in part. Broadcom's motion for judgment as a matter of law.

**COUNSEL:** William J. Marsden, Jr., Esquire of Fish & Richardson, P.C., Wilmington, Delaware. Counsel for Plaintiff. Of Counsel: John E. Gartman, Esquire and Juanita Brooks, Esquire of Fish & Richardson, P.C., San Diego, California.

Richard H. Morse, Esquire and John W. Shaw, Esquire of Young Conaway Stargatt & Taylor, L.L.P., Wilmington, Delaware. Counsel for Defendant. Of Counsel: Wilson Sonsini Goodrich & Rosati, P.C., Palo Alto, California. McDermott Will & Emery, Palo Alto, California. McDermott Will & Emery, Washington, D.C.

**JUDGES:** Sue L. Robinson, United States District Judge.

**OPINIONBY:** Sue L. Robinson

**OPINION:** Dated: February 13, 2003
Wilmington, Delaware

**ROBINSON, Chief Judge**

**I. INTRODUCTION**

On August 30, 2000, plaintiff Intel Corporation ("Intel") filed this action against defendant Broadcom Corporation ("Broadcom"), alleging infringement of certain claims [*2] of United States Patent Nos. 4,975,830 (the " '830 patent"), 4,823,201 (the " '201 patent"), 5,894,410 (the " '410 patent"), 5,079,630 (the " '630 patent") and 5,134,478 (the " '478 patent") (collectively, the "Intel patents"). The Intel patents cover three different technologies (smart networking products, semiconductor chip packaging structures, and digital video encoding and decoding techniques) that plaintiff alleges intersect in

defendant's high-speed networking and communications products. The parties tried their claims regarding the '830 and '201 patents to a jury from November 28, 2001 to December 14, 2001. Currently before the court are the parties' motions for judgment as a matter of law and motions for a new trial.

**II. BACKGROUND**

**A. The Patents in Suit**

**1. The '830 Patent**

The '830 patent, entitled "Computer Communication System Having Supplemental Formats," issued on December 4, 1990. The named inventors are George E. Gerpheide, Kerry D. Sharp, Daniel J. Lee, David C. Olsen, David B. Meyer and Mark E. Kohagen. The listed assignee is Dayna Communication, Inc. Intel acquired the rights to the '830 patent when it acquired Dayna Communications.

The '830 patent discloses [*3] a communication system, such as a computer network, in which devices on the network (called nodes) can dynamically choose between multiple formats (e.g., various transmission characteristics including transmission speeds, encoding protocols, compression protocols, and encryption protocols) by which to transmit and receive data to and from one another over a common communication medium. Using the invention, a device on the network that seeks to transmit information can dynamically determine all of the formats by which it can communicate with a device that it wishes to send information. The optimal format that is supported by both devices is then selected and used to transmit information. In this way, when faster devices are added to a network they can dynamically communicate with each other using that fast format, but also communicate with slower devices using a slower format.

The invention, as described by the patent, works as follows. Each device on the network includes in its memory a list of its own transfer formats and the transfer

2003 U.S. Dist. LEXIS 2372, *

formats that are supported by every other device on the network. These format sets are represented in memory by strings of bits. For example, a string [*4] of 001 would mean that the associated node does not support transfer format 1 or 2, but supports transfer format 3. When a device needs to transmit information to another device, it searches its memory for the supported format set of the destination device. If no format set is located for the device to which it wishes to send information, the transmitting device performs an inquiry dialog with the other device to learn and store the other device's supported format set. Then, using algorithms that are applied through circuitry and software, it selects the optimal format which is mutually compatible with itself and the destination device. A flow chart of the logic used by the algorithm to select a transfer format is shown in Figure 4 below.

[SEE FIG. 4 IN ORIGINAL]

Intel asserted infringement of claims 1, 7, 15, and 18 of the '830 patent. Claims 1 and 7 are directed at networks (computer communications systems), while claims 15 and 18 are directed at chips.

Claim 1 of the '830 patent recites:

> 1. A computer communication system for transferring data between a plurality of nodes comprising:
>
>> (a) a communication medium;
>> (b) a plurality of nodes coupled to said communication [*5] medium for a transfer of data between said nodes; wherein said transfer of data is a transfer of data from a source node selected from said nodes to a destination node selected from said nodes, and
>> (c) transfer format selection means for selecting a format for the transfer of data from said source node to said destination node;
>> wherein said plurality of nodes is comprised of at least one default node and at least two supplemented nodes;
>> wherein each of said nodes has a format set comprised of one or more formats;

> wherein said formats are defined in terms of data architecture;
> wherein said data architecture is defined in terms of at least one member of a group consisting of encoding, encryption, compression, and protocol;
> wherein each of said format sets includes at least one default format;
> wherein said at least one default format is included in the format sets of each of said nodes;
> wherein the format set of each of said supplemented nodes includes at least one supplemental format in addition to said at least one default format; and
> wherein said transfer format selection means is adapted to select a format which is common to the format sets of the source node and destination [*6] node and which is compatible with said communication medium.

('830 patent, col. 11, lns. 23-55)

Claim 7 depends from claims 1, 2 and 6. Claims 2, 6 and 7 read:

> 2. A computer communication system in accordance with claim 1 wherein said transfer format selection means is comprised of a source node cache for node format sets and a destination node cache for node format sets; and wherein transfer format selection is made by the source node by searching for the destination node format set in said source node cache and by selecting a format which is included in said destination node format set and the source node format set.

> 6. A computer communication system in accordance with claim 2 wherein said format sets are represented by bit strings.

> 7. A computer communication system in accordance with claim 6 wherein bit

2003 U.S. Dist. LEXIS 2372, *

positions of said bit strings represent formats.

( '830 patent, col. 11, lns. 56-64; col. 12, lns. 22-24; col. 12, lns. 25-27)

Claim 15 of the '830 patent recites:

15. A network interface for interfacing with a network having nodes and for supplementing the nodes of the network, said network interface comprising:

(a) at least one supplemental format, [*7] and
(b) transfer format selection means for selecting a format for the transfer of data from a source node to a destination node; wherein said network is comprised of a communication medium and a plurality of nodes coupled to said communication medium for the transfer of data between nodes;
wherein said transfer of data is a transfer of data from a source node selected from said nodes to a destination node selected from said nodes;
wherein each of said nodes has a format set comprised of at least one default format common to each format set;
wherein said network interface is adapted to supplement a node selected from said nodes by adding said at least one supplemental format to the format set of said selected node;
wherein said transfer selection means is adapted to select a format which is common to the format sets of the source node and destination node and which is compatible with said communication medium; and

wherein said formats are defined in terms of data architecture; wherein said data architecture is defined in terms of at least one member of the group consisting of encoding, encryption, compression and protocol.

( '830 patent, col. 12, ln. 62-col. 13, ln. [*8] 24)

Claim 18 depends from claims 15, 16 and 17. Claims 16, 17 and 18 read:

16. A network interface in accordance with claim 15 wherein said transfer format selection means is comprised of a source node cache for node format sets; and wherein transfer format selection is made by the source node by searching for the destination node format set in said source node cache and by selecting a format which is included in said destination node format set and the source node format set.

17. A network interface in accordance with claim 16 wherein said format sets are represented by bit strings.

18. A network interface in accordance with claim 17 wherein bit positions of said bit strings represent formats.

( '830 patent, col. 13, lns. 25-32; col. 13, lns. 33-34; col. 13, lns. 35-37)

The court construed the disputed terms of the asserted claims of the '830 patent. The most significant constructions for the purposes of resolving the parties' post-trial motions are as follows: n1

(1) "A plurality of nodes coupled to said communication medium for a transfer of data between said nodes; wherein said transfer of data is a transfer of data from a source node selected from said nodes [*9] to a destination node selected from said nodes."

The term "node" means any data processing device, including, but not limited to,

a computer, a file server, a bridge, a gateway, a co-processor, modem server, memory, or printer, that includes a network interface, through which it is coupled to the communication medium. While a node must be a device that includes a network interface, it does not as part of its own definition have to be coupled, or electronically connected, to the communication medium. Source nodes and destination nodes are not limited to the original source of the data to be transmitted or the ultimate destination of the transmitted data.

The term "transfer" means "to transmit something from one node to another." The term "data" means anything passed between nodes that conveys meaning. The term "source node" means "node" as defined above, that has the capability to transmit data. A "destination node" is a "node," as defined above, that has the capability of receiving data.

(2) "Transfer format selection means for selecting a format for the transfer of data from said source node to said destination node ... wherein said transfer format selection means [*10] is adapted to select a format which is common to the format sets of the source node and destination node and which is compatible with said communication medium."

The term "data" means anything passed between nodes that conveys mean-

ing. This claim element is in means-plus-function format. The claimed function is selecting a format for the transfer of data from said source node to said destination node, which is common to the format sets of the source node and the destination node and which is compatible with said communication medium.

The corresponding structure is (1) a bit string representation of the destination node's supported format set; (2) that is retrieved in accordance with an algorithm disclosed in Figure 4 that first searches the source node's associated memory, and then, if necessary, conducts an inquiry dialog; and (3) any circuitry configuration or any software programmed to execute an algorithm that first uses the bit string representation of the destination node's supported format set to determine which transfer formats are common to the transfer format sets of the source node and the destination node and compatible with the communication medium and then selects [*11] one transfer format from those common transfer formats to use in transmitting the information to the destination node.

The term "source node" is a "node" as defined above, that has the capability to transmit data. A "destination node" is a "node," as defined above, that has the capability of receiving data. The source node does not have to be the original source of data being transmitted. The "selected

2003 U.S. Dist. LEXIS 2372, *

from said nodes" phrase that modifies both the source node and the destination node simply requires the source node and the destination node to each be one of the plurality of nodes that is referenced earlier in the claim.

(3) "Wherein said plurality of nodes is comprised of at least one default node and at least two supplemented nodes."

The term "plurality" standing alone, means at least two. However, the plurality of nodes referred to in the claims is limited by the wherein clause that describes that the plurality must be "comprised of" at least one default node and at least two supplemented nodes. Therefore, as used in claim 1, the term "plurality" requires at least three nodes. The term default node is a node coupled to the communication medium which can transfer data [*12] over the network only in the default format or default formats. The term supplemented node is a node coupled to the communication medium which can transfer data over the network in the default format or default formats and which can also transfer data over the network in one or more supplemental formats.

(4) "Wherein each of said format sets includes at least one default format wherein said at least one default format is included in the format sets of each of said nodes."

The term default format means a common format that every node coupled to the communication medium can use to transfer data to every other node coupled to that medium.

(5) "Wherein the format set of each of said supplemented nodes includes at least one supplemental format in addition to said at least one default format."

The term supplemental format means an additional format, distinct from the default format, that is not common to all nodes coupled to the network.

(D.I. 689 at 25-28)

n1 The recited claim construction was provided to the jury in the final jury instructions. The court's complete claim construction opinion for the '830 patent is provided in *Intel Corp. v. Broadcom Corp., 172 F. Supp. 2d 478 (D. Del. 2001).*

[*13]

### 2. The '201 Patent

The '201 patent, the '630 patent, and '478 patents (collectively "the digital video patents") generally relate to devices that implement techniques used to reduce digital data volume and then expanding the data back to its original state so that it can be displayed and viewed normally. These techniques are commonly referred to as compression or encoding and decompression or decoding. All of these patents relate to compression or decompression of digital video data.

Specifically, the invention of the '201 patent is a single-chip integrated circuit that enables the decompression of compressed full motion video data in real time. The claimed video processor includes a statistical decoder, a pixel interpolator, and arithmetic logic circuitry, all of which are controlled by a sequencer.

The statistical decoder decompresses information that has been compressed using statistical encoding. Statistical encoding is an encoding technique that involves

2003 U.S. Dist. LEXIS 2372, *

assigning short bit strings for data that occurs frequently, and long codes for data that occurs infrequently.

The pixel interpolator of the '201 patent is used in the decoding of inter-frame coded images. Inter-frame [*14] coding refers to a coding technique that uses differences between an initial frame and a subsequent frame to encode and compress the frame data (i.e., instead of sending the full subsequent frame, the decoder sends the differences between the initial frame and the subsequent frame and the decoder than reconstructs the subsequent frame using this information). Operating on the pixels from the previously decoded image, the pixel interpolator generates "interpolated pixel values" that approximate pixel values between the pixel values from the previously decoded image retrieved from memory.

The arithmetic logic circuitry performs arithmetic operations (such as addition) or logical operations (such as AND or OR). For example, during inter-frame encoding, arithmetic logic circuitry may be used to add interpolated pixel values from the previously decoded video image to error data from the current video image.

The sequencer conditions the statistical decoder, pixel interpolator, and arithmetic logic circuitry to operate simultaneously to produce decompressed pixel data. As compared with each element performing its function in serial, simultaneous operation allows the decoding process to [*15] be performed faster.

Intel asserts infringement of claims 1 and 10 of the '201 patent.

Claim 1 is directed to a video signal processor. The video signal processor includes an input means, a statistical decoding means, a pixel interpolating means, an arithmetic data processing means, an output means, and a sequencing means.

Specifically, claim 1 of the '201 patent recites:

> 1. A video signal processor including:
> input means for applying digital data representing a video image including compressed video data and pixel data, wherein a portion of said digital data is statistically encoded;
> statistical decoding means, coupled to said input means and responsive to a control signal for decoding the statistically encoded digital data provided by said input means to generate decoded digital data;
> pixel interpolating means, responsive to said control signal and to the pixel data provided by said input means for developing interpolated pixel values representing pixels in said video image which are interstitial to pixels in said video image that are represented by said pixel data;
> arithmetic data processing means, responsive to said control signal, for performing arithmetic operations [*16] on the digital data provided by said statistical decoding means and on the interpolated pixel values provided by said pixel interpolating means;
> output means, coupled to said arithmetic data output means, processing means for providing processed video data from said arithmetic data processing means as an output signal; and
> sequencing means for generating said control signal to condition said statistical decoding means, said arithmetic data processing means and said pixel interpolating means to operate simultaneously to produce decoded and decompressed pixel data as said output signal.

( '201 patent, col. 60, lns. 4-35)

Claim 10 is directed to an integrated circuit for processing compressed video signals to provide decompressed video signals. The claimed integrated circuit includes an I/O port, an address output port, a statistical decoder, I/O circuitry, a pixel interpolator, an arithmetic processing means, a selectively interconnecting means, a control means, and an address generating means. Specifically, claim 10 of the '201 patent recites:

> 10. An integrated circuit for processing compressed video signal, segments of which having been encoded using different encoding [*17] processes, to provide decompressed video signal representing moving images, said integrated circuit comprising:
>
>> an I/O port for coupling said integrated circuit to memory means;
>> an address output port for coupling address signals to said memory means;
>> a statistical decoder coupled to said I/O port for decoding variable-length-encoded compressed video signals;
>> I/O circuitry coupled to said I/O port, for providing

processed video signal to said I/O port, and for accepting a processed video signal from said I/O port; a pixel interpolator for generating values representing pixels interstitial to pixel values represented by said processed video signal; arithmetic processing means responsive to control signals, for performing arithmetic and Boolean functions on binary values; means responsive to further control signals for selectively interconnecting said statistical decoder, said I/O circuitry, said pixel interpolator and said arithmetic processing means; control means for generating said control signals and said further control signals to selectively condition said arithmetic processing means to perform one of a plurality of decoding algorithms on compressed video data [*18] provided at said I/O port; and address generating means coupled to said address output port and responsive to at least said control means for generating memory address signals for said memory means.

('201 patent, col. 61, ln. 45-col. 62, ln. 32)

The court construed the disputed terms of the asserted claims of the '201 patent. The most significant constructions for the purposes of resolving the parties' post-trial motions are as follows: n2

(1) "Statistical decoding means, coupled to said input means and responsive to a control signal for decoding the statistically encoded digital data provided by said input means to generate decoded digital data."

This claim element is in a means-plus-function format. The function is decoding the statistically encoded digital data provided by said input means to generate decoded digital data.

The term "control signal" means an electronic signal used to control internal or external devices or processes.

The statistical decoder must be responsive to the same control signal that is generated by the sequencing means to condition the statistical decoding means, the arithmetic processing means and the pixel interpolating [*19] means of claim 1. The term "responsive" means to respond or react.

The corresponding structure is the statistical decoding circuitry 1014, and structural equivalents. The term "coupled" means electrically connected directly or indirectly.

(2) "Pixel interpolating means, responsive to said control signal and to the pixel data provided by said input means for developing interpolated pixel values representing pixels in said video image which are interstitial to pixels in said video image that are represented by said pixel data."

This claim element is in means-plus-function format. The function, as recited in the claim, is "developing interpolated pixel

2003 U.S. Dist. LEXIS 2372, *

values representing pixels in said video image which are interstitial to pixels in said video image that are represented by pixel data." The function means that pixel values are created for a current image being decoded that are between pixels from a previously decoded image.

The pixel values are created for a current image being decoded that are between pixels from a previously decoded image. The term "pixel data" refers to decoded pixel data from a previously decoded image.

The pixel interpolating means must be [*20] responsive to the same control signal that is generated by the sequencing means to condition the statistical decoding means, the arithmetic processing means and the pixel interpolating means of claim 1. As stated above, the term "responsive" means to respond or to react.

The corresponding structure is subtractor 824, multiplier 825, adders 856 and 858, and two input registers, and structural equivalents.

(3) "Arithmetic data processing means, responsive to said control signal, for performing arithmetic operations on the digital data provided by said statistical decoding means and on the interpolated pixel values provided by said pixel interpolating means."

This element is written in means-plus-function format. The function of the

"arithmetic data processing means" is to perform arithmetic operations (e.g., addition, subtraction, multiplication, and/or division) on digital data provided by the "statistical decoding means" and on the interpolated pixel values provided by the "pixel interpolating means."

The arithmetic data processing means [is] to be responsive to the control signal that is generated by the sequencing means to condition the statistical decoding [*21] means, the arithmetic processing means and the pixel interpolating means of claim 1. As stated above, the term "responsive" means to respond or react.

The corresponding structure for the "arithmetic data processing means" is adder 450 or adder 452, and structural equivalents. Performing "arithmetic operations" does not require the performance of both addition and subtraction. For example, a structure that performs only successive addition operations satisfies the function of performing arithmetic operations.

(4) "Sequencing means for generating said control signal to condition said statistical decoding means, said arithmetic data processing means and said pixel interpolating means to operate simultaneously to produce decoded and decompressed pixel data as said output signal."

This claim element is in means-plus-function format. The "sequencing means" performs the function of generating a control signal to condition the operation of the "statistical decoding means," the "arithmetic data processing means" and the "pixel interpolating means" to operate simultaneously.

The above components-the statistical decoding means, the arithmetic data processing means, and the [*22] pixel interpolating means-are required by the claim language to be responsive to (i.e., each component must be able to respond or react to) this control signal such that when the control signal is received, the component is put into a specified state.

The corresponding structure of the sequencing means is the microcode RAM 310, instruction register 316, multiplexor 320, and a portion of the control block 308 that generates the LI and MXC signals, and structural equivalents. The term "to condition" means to put into a specified state.

(5) "Arithmetic processing means responsive to control signals, for performing arithmetic and Boolean functions on binary values."

This claim element is in means-plus-function format. The arithmetic processing means performs arithmetic and Boolean functions on binary values. "Arithmetic functions" are one or more of the opera-

tions of addition, subtraction, division, or multiplication. "Boolean functions" are one or more of the logical operations that can be performed on binary data such as AND, OR, NOT or XOR. "Binary values" are data represented by 1s and 0s.

The function of this claim element is "performing arithmetic and Boolean [*23] functions on binary values." Thus, the function of the "arithmetic processing means" is to perform operations which include both arithmetic functions (e.g., addition or subtraction) and Boolean functions (e.g., AND or NOT) on data values represented by 1s and 0s.

The corresponding structure of arithmetic processing means of claim 10 is the corresponding structure of the claim 1 arithmetic processing means and one or more of the Boolean logic gates (such as OR, NOR, XOR, AND, or NOT) depicted in Figure 4B, and structural equivalents. A structure that performs only successive addition operations satisfies the function of performing arithmetic operations.

(6) "Means responsive to further control signals for selectively interconnecting said statistical decoder, said I/O circuitry, said pixel interpolator and said arithmetic processing means."

This claim element is in means-plus-function format. The function, as re-

cited in the claim, is "selectively interconnecting said statistical decoder, said I/O circuitry, said pixel interpolator and said arithmetic processing means." The recited function is to connect the four stated elements to each other and not merely to connect [*24] those four elements to other elements on the chip.

The corresponding structure of the means responsive to further control signals is either 1) any one of the general purpose registers of the register file 510; 2) the bus gate 520; or 3) the input registers contained in the statistical decoder, pixel interpolator, and ALU, and structural equivalents.

(7) "Control means for generating said control signals and said further control signals to selectively condition said arithmetic processing means to perform one of a plurality of decoding algorithms on compressed video data provided at said I/O port."

This claim element is in means-plus-function format. The function of the "control means" is to generate control signals to selectively condition the arithmetic processing means to perform one of a plurality of decoding algorithm on video data.

The term "control signal" means an electronic signal used to control internal or external devices or processes. The term "condition"

means "to put into a specified state." The control signal contains instructions that are read by the arithmetic processing means. The arithmetic processing means responds to these instructions by performing [*25] the specified type of decoding called for in the control signal.

The corresponding structure of the control means is the microcode RAM 310, instruction register 316, multiplexor 320, and a portion of the control block 308 that generates the LI and MXC signals, and structural equivalents.

(D.I. 689)

n2 The recited claim construction was provided to the jury in the final jury instructions. The court's complete claim construction opinion for the '201 patent is provided in *Intel Corp. v. Broadcom Corp., 172 F. Supp. 2d 478, 515 (D. Del. 2001)*.

## C. The Accused Products

Intel alleged that Broadcom's Ethernet compliant "PHY chips," which implement a feature called auto-negotiation to automatically configure the transmission protocols and formats used by new devices added to a network, infringe the asserted claims of its '830 patent. PHY chips (of which Broadcom's BCM 5228 and 5040 products are representative) are attached to devices, such as computers or printers, so that the devices [*26] can be connected to a computer network. Broadcom's PHY chips are designed to be used in an Ethernet network.

In addition, Intel alleged that Broadcom's digital video decoding devices (of which Broadcom's BCM 7010 and 7020 products are representative) infringe the asserted claims of its '201 patent.

## D. Procedural History n3

n3 On September 6, 2000, this action was assigned to the Honorable Roderick R. McKelvie. Judge McKelvie ruled on the pre-trial motions and

issued the claim construction opinions. He also presided over the trial. On January 23, 2002 this action was reassigned to Chief Judge Sue L. Robinson. Judge McKelvie resigned from the office of United States District Judge on June 28, 2002.

On October 10, 2000, defendant moved to dismiss plaintiff's complaint or, in the alternative, to transfer the action to the United States District Court for the Northern District of California. After eleven months of discovery, the court heard oral argument on defendant's motion on September 24, 2001. In a memorandum [*27] opinion dated October 9, 2001, the court denied defendant's motion. Defendant subsequently answered plaintiff's complaint on October 23, 2001. As defendant had indicated it would in earlier interrogatory responses, the answer included a number of affirmative defenses relating to license agreements.

In anticipation of these affirmative defenses, plaintiff filed three sets of partial summary judgment motions relating to defendant's license defenses. The first concerned a January 22, 1995 Intel Product Development and License Agreement (the "Joint Development Agreement") between plaintiff and defendant. Plaintiff moved for summary judgment that defendant's allegedly infringing products are not licensed under the '830 or '410 patents, arguing that the scope of the Joint Development Agreement does not include a license for defendant to make, sell, or use the accused products in this suit under either the '830 or '410 patent. The second and third motions concern the effect of licenses between plaintiff and numerous third parties to whom defendant sells its allegedly infringing products (the "Intel licensees"). Defendant contends that the licenses, which give the Intel licensees the right [*28] to "have [the products] made," insulates defendant to the extent it sells the allegedly infringing products to the Intel licensees. Plaintiff contends that these licenses do not insulate defendant's infringement as a matter of law. Defendant cross-moved for summary judgment on these two motions, contending that it is licensed as a matter of law.

On September 24, 2001, the court heard oral argument in accordance with *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 134 L. Ed. 2d 577, 116 S. Ct. 1384 (1996), to construe the claims of the patents.

In order to simplify the issues before the jury and to shorten the length of the jury trial, the court required that the trial proceed in two parts. The first trial was to be a three-week jury trial on the '830 and '201 patents. A subsequent trial would cover the remaining patents.

On November 6, 2001, the court issued two claim construction opinions regarding the '830 and '201 patents. See *Intel Corp. v. Broadcom Corp.*, 172 F. Supp. 2d 478

(D. Del. 2001); *Intel Corp. v. Broadcom Corp.*, 172 F. Supp. 2d 478, 515 (D. Del. 2001).

On November 20, 2001, the court issued a memorandum opinion [*29] addressing the motions regarding defendant's license defense. See *Intel Corp. v. Broadcom Corp.*, 173 F. Supp. 2d 201 (D. Del. 2001). Therein, the court granted plaintiff's motions for partial summary judgment that the Joint Development Agreement does not include a license on the '830 or '410 patents, and that the Motorola license agreement does not confer a license to defendant for products sold to Motorola subsidiary, General Instrument. As to the remainder of the licenses containing "have made" rights, the court reasoned that "an unlicensed third party in the position of Broadcom only is afforded the protections of [such] a license if those protections are conveyed by the licensee to the third party as an exercise of the licensed party's 'have made' rights." *Intel*, 173 F. Supp. 2d at 203. The court found

that genuine issues of material fact remain as to whether the sale transactions to Intel licensees conveyed any of those licensees' rights to Broadcom. Accordingly, the court will deny both parties' summary judgment motions. Should Broadcom be unable, at trial or through documents submitted with post-trial briefing, to set forth any such [*30] facts, this license defense will be without legal merit. However, should Broadcom set forth facts that indicate that Broadcom was indeed making these allegedly infringing products in response to requests by Intel licensees 'to make' them, Broadcom may pursue this defense.

*Id.* at 235. The court also found that the licenses did not cover the '830 or '410 patents.

### E. The Trial

The parties tried their claims regarding the '830 and '201 patents to a jury from November 28, 2001 to December 14, 2001. The jury returned a verdict finding that: (1) the accused products did not infringe any of the asserted claims of the '830 or '201 patents; (2) the asserted claims of the '830 patent were each invalid as anticipated by and as obvious in view of the Flashtalk/ Flashcard prior art product; (3) defendant owes no damages to plaintiff; and (4) defendant had authority to sell products accused of infringing plaintiff's '201 and '830 patents to twelve of plaintiff's third-party licensees by virtue of those licensees' agreements with plaintiff.

2003 U.S. Dist. LEXIS 2372, *

The verdict form required the jury to mark which limitations they found were absent from the accused products that they found [*31] not to infringe. The jury found the following limitations missing:

'830 patent, claim 1: (1) transfer format selections means for selecting a format for the transfer of data from said source node to said destination node ("TFSM" or "transfer format selection means"); (2) wherein each of said format sets includes at least one default format; and (3) wherein said transfer format selection means is adapted to select a format which is common to the format sets of the source node and destination node and which is compatible with said communication medium.

'830 patent, claim 7: (1) a computer communication system in accordance with claim 1; (2) wherein said transfer format selection means is comprised of a source node cache for source node format sets and a destination node cache for node format sets; and (3) wherein transfer format selection is made by the source node by searching for the destination node format set in said source node cache and by selecting a format which is included in said destination node format set and the source node format set.

'830 patent, claim 15: (1) at least one supplemental format; (2) transfer format selection means for [*32] selecting a format for the transfer of data from a source node to a destination node; (3) wherein each of said nodes has a format set comprised of at least one default format common to each format set; (4) wherein said network interface is adapted to supplement a node from said nodes by adding said at least one supplemental format to the format set of said selected node; and (5) wherein said transfer format selection means is adapted to select a format which is common to the format sets of the source node and destination node and which is compatible with said communication medium.

'830 patent, claim 17: (1) a network interface in accordance with claim 15; (2) wherein said transfer format selection

means is comprised of a source node cache for node format sets; and (3) wherein transfer format selection is made by the source node by the source node by searching for the destination node format set in said source node cache and by selecting a format which is included in said destination node format set and the source node format set.

'201 patent, claim 1: (1) pixel interpolating means, responsive to said control signal and to the pixel data provided by said input [*33] means for developing interpolated pixel values representing pixels in said video image which are interstitial to pixels in said video image that are represented by said pixel data ("pixel interpolating means"); (2) arithmetic data processing means, responsive to said control signal for performing arithmetic operations on the digital data provided by said statistical decoding means and on the interpolated pixel values provided by said pixel interpolating means ("arithmetic data processing means"); and (3) sequencing means for generating said control signal to condition said statistical decoding means, said arithmetic processing means, and said pixel interpolating means to operate simultaneously to produce decoded and decompressed pixel data as said output signal ("sequencing means").

'201 patent, claim 10: (1) arithmetic processing means responsive to control signals, for performing arithmetic and Boolean functions on binary values ("arithmetic processing means"); (2) means responsive to further control signals for selectively interconnecting said statistical decoder, said I/ O circuitry, said pixel interpolator, and said arithmetic processing means ("means responsive"). [*34]

## III. STANDARDS OF REVIEW

### A. Motion for Judgment as a Matter of Law

To prevail on a renewed motion for judgment as a matter of law following a jury trial, the moving party "'must show that the jury's findings, presumed or express, are not supported by substantial evidence or, if they were, that the legal conclusions implied [by] the jury's verdict cannot in law be supported by those findings.'" *Pannu v.*

*Iolab Corp., 155 F.3d 1344, 1348 (Fed. Cir. 1998)* (quoting *Perkin-Elmer Corp. v. Computervision Corp., 732 F.2d 888, 893 (Fed. Cir. 1984))*. "'Substantial' evidence is such relevant evidence from the record taken as a whole as might be acceptable by a reasonable mind as adequate to support the finding under review." *Perkin-Elmer Corp., 732 F.2d at 893.* In assessing the sufficiency of the evidence, the court must give the non-moving party, "as [the] verdict winner, the benefit of all logical inferences that could be drawn from the evidence presented, resolve all conflicts in the evidence in his favor, and in general, view the record in the light most favorable to him." *Williamson v. Conrail, 926 F.2d 1344, 1348 (3d Cir. 1991);* [*35] *Perkin-Elmer Corp., 732 F.2d at 893.* The court may not determine the credibility of the witnesses nor "substitute its choice for that of the jury between conflicting elements of the evidence." *Perkin-Elmer Corp., 732 F.2d at 893.* In sum, the court must determine whether the evidence reasonably supports the jury's verdict. See *Dawn Equip. Co. v. Ky. Farms Inc., 140 F.3d 1009, 1014 (Fed. Cir. 1998).*

## B. Motion for a New Trial

*Federal Rule of Civil Procedure 59(a)* provides, in pertinent part:

> A new trial may be granted to all or any of the parties and on all or part of the issues in an action in which there has been a trial by jury, for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States.

*Fed. R. Civ. P. 59(a).* The decision to grant or deny a new trial is within the sound discretion of the trial court and, unlike the standard for determining judgment as a matter of law, the court need not view the evidence in the light most favorable to the verdict winner. See *Allied Chem. Corp. v. Daflion, Inc., 449 U.S. 33, 36, 66 L. Ed. 2d 193, 101 S. Ct. 188 (1980);* [*36] *Olefins Trading, Inc. v. Han Yang Chem. Corp., 9 F.3d 282 (3d Cir. 1993); LifeScan Inc. v. Home Diagnostics, Inc., 103 F. Supp. 2d 345, 350 (D. Del. 2000),* aff'd per curiam, *13 Fed. Appx. 940, Nos. 00-1485, 00-1486, 2001 WL 345439 (Fed. Cir. Apr. 6, 2001)* (citations omitted). Among the most common reasons for granting a new trial are: (1) the jury's verdict is against the clear weight of the evidence, and a new trial must be granted to prevent a miscarriage of justice; (2) newly-discovered evidence exists that would likely alter the outcome of the trial; (3) improper conduct by an attorney or the court unfairly influenced the verdict; or (4) the jury's verdict was facially inconsistent. See

*Zarow-Smith v. N.J. Transit Rail Operations, 953 F. Supp. 581, 584 (D.N.J. 1997)* (citations omitted). The court must proceed cautiously, mindful that it must not substitute its own judgment of the facts and the credibility of the witnesses for those of the jury. The court should grant a new trial on the basis that the verdict was against the weight of the evidence only where a miscarriage of justice would result if the verdict were to stand. See [*37] *Williamson, 926 F.2d at 1352; EEOC v. Del. Dep't of Health and Soc. Servs., 865 F.2d 1408, 1413 (3d Cir. 1989).*

## IV. INTEL'S MOTION FOR JUDGMENT AS A MATTER OF LAW FOR INFRINGEMENT, VALIDITY, AND DAMAGES OF THE '830 PATENT

### A. Infringement

A determination of infringement requires a two-step analysis. First, the court must construe the asserted claims so as to ascertain their meaning and scope. Second, the claims as construed are compared to the accused product. See *KCJ Corp. v. Kinetic Concepts, Inc., 223 F.3d 1351, 1355 (Fed. Cir. 2000).* Claim construction is a question of law while infringement is a question of fact. See id. To establish literal infringement, "every limitation set forth in a claim must be found in an accused product, exactly." *Southwall Tech., Inc. v. Cardinal IG Co., 54 F.3d 1570, 1575 (Fed. Cir. 1995).* An accused product that does not literally infringe a claim may still infringe under the doctrine of equivalents if each limitation of the claim is met in the accused product either literally or equivalently. See *Sextant Avionique, S.A. v. Analog Devices, Inc., 172 F.3d 817, 826 (Fed. Cir. 1999).* [*38]

The jury concluded that Broadcom's accused products did not infringe claims 1, 7, 15, and 18 of the '830 patent.

In its motion for judgment as a matter of law for infringement of the '830 patent, Intel contends that it fully met its burden of proving, by a preponderance of the evidence, that Broadcom's internal network infringes every claim limitation of claims 1 and 7 of the '830 patent and that Broadcom's accused BCM 5228 and 5040 products infringe every claim limitation of claims 15 and 18 of the '830 patent. Intel notes that while its experts Drs. Scholl and Rhyne provided detailed testimony as to how the accused products and network meet every limitation of the asserted claims of the '830 patent, Broadcom did not call its expert to testify that any of the limitations of any of the four asserted claims were missing from the accused products or network. Instead, Broadcom's "sole attempt to lay out a non-infringement case was through its cross-examination of Intel's experts ... based on improper claim construction ... and irrelevant additional features of the accused products that are outside the scope of the

2003 U.S. Dist. LEXIS 2372, *

claims-none of which diminished Intel's proof of infringement." (D.I. [*39] 725 at 1-2)

In reply, Broadcom correctly states that the only question raised by Intel's motion is whether "viewing the evidence in the light most favorable to [Broadcom] and giving [Broadcom] the advantage of every fair and reasonable inference, there is insufficient evidence from which a jury could reasonably find [non-infringement.]" n4 *Wittekamp v. Gulf & Western Inc., 991 F.2d 1137, 1141 (3rd Cir. 1993).* Furthermore, the source of evidence that supports the jury's verdict (e.g., cross-examination of Intel's experts, documents, or fact witnesses) is legally irrelevant to accessing the sufficiency of the evidence. See *Mas-Hamilton v. LaGard, Inc., 156 F.3d 1206, 1215 (Fed. Cir. 1998).* Broadcom contends that the evidence presented was sufficient to establish that the accused products do not infringe.

n4 The court notes that Intel has consistently failed to argue the appropriate standard of review in the numerous post-trial briefs filed in the case at bar. Intel argues why sufficient evidence exists for the jury to find in its favor. The court emphasizes that the appropriate standard for review of a jury verdict on a motion for judgment as a matter of law is the moving party "'must show that the jury's findings, presumed or express, are not supported by substantial evidence[.]'" *Pannu v. Iolab Corp., 155 F.3d 1344, 1348 (Fed. Cir. 1998)* (quoting *Perkin-Elmer Corp. v. Computervision Corp., 732 F.2d 888, 893 (Fed. Cir. 1984)).*

[*40]

Proving infringement was Intel's burden. *Novartis Corp. v. Ben Venue Laboratories, Inc., 271 F.3d 1043, 1046 (Fed. Cir. 2001).* Thus, Broadcom's failure to put on its own expert to testify as to non-infringement is not fatal to its case. Broadcom was not required to put on its own expert to disprove infringement because it was Intel that bore the burden of proving infringement. Broadcom built its non-infringement case from cross-examining Intel's experts. Broadcom also impeached the credibility and impartiality of Intel's main expert, Dr. Rhyne, who may have appeared to the jury like he was a "professional witness" with financial interest in Intel and a long-standing and lucrative relationship with Intel's counsel. (D.I. 708 at 2829-2835)

The sole task for the court is to determine whether there is sufficient evidence in the record from which a reasonable jury could conclude that Broadcom does not infringe the asserted claims. Here, it makes most sense to analyze the limitations within the claim elements that the jury concluded were not present in the accused products.

## 1. Transfer format selection means

### a. TFSM Function

The court construed "source node" to [*41] be "a node that has the capability to transmit data," and construed "destination node" to be "a node that has the capability to receive data."

The court rejected Broadcom's construction that the terms "source node" and "destination node" should be construed to mean the device that initiates the transfer of data and the device that is the intended final recipient of the data, respectively. Broadcom had advanced this argument so that "switched" Ethernet networks, as depicted in Exhibit 2509, would fall outside the claims (because all data travels through an intermediate point-the switch). Exhibit 2509 shows two computers (one can transmit at 10 Mbps or 100 Mbps and one at 10 Mbps only), each linked to a switch (that can transmit at 10 Mbps or 100 Mbps) that sits between them. All data flow between the two computers travels through the switch.

Under the court's construction, the switch acts as a destination node when it receives data from the first node and acts as a source node when it sends data to the second node.

Broadcom, using Exhibit 2509 to cross-examine Dr. Rhyne, asked him whether the two computers on either side of the switch auto-negotiate with each other. He stated that [*42] they did not. Broadcom contends that this shows that the function of the TFSM, "selecting a format for the transfer of data from said source node to said destination node ... that is common to both of them," is not met.

This argument is without merit. Under the court's claim construction, it does not matter that the two computers do not auto-negotiate directly with each other-both auto-negotiate (i.e., perform the function of selecting a common format for the transfer of data) with the intermediate node (the switch). Under the court's claim construction, the switch, which contains PHY chips just like those in the computers, is a source node and a destination node. Thus, the court finds that no reasonable juror could conclude that the function of the TFSM is not present in the accused products.

### b. TFSM Structure

According to the claim construction, part (2) of the structure retrieves a bit string representative of the format set "in accordance with an algorithm disclosed in Figure 4 that first searches the source node's associated memory, and then, if necessary, conducts an inquiry dialog[.]" *Intel, 172 F. Supp. 2d at 506.*

Broadcom relies upon the cross-examination [*43] of Dr. Rhyne in arguing that the first thing that always

2003 U.S. Dist. LEXIS 2372, *

happens when auto-negotiation is performed is the accused PHY chips transmit and receive signals called FLP's. Broadcom also cites the testimony of Mr. Gary Huff that the accused PHY chips do not ever attempt to retrieve information about the format supported by any other machine by first searching any memory or anything else before sending out FLP's. "It always just sends out FLP's." (D.I. 706 at 2236) Broadcom argues that this evidence proves that the TFSM structure is not present in the PHY chips, because claim construction requires the TFSM to first search its memory before performing the inquiry dialog.

Intel alleges that the FLP's are the "inquiry dialog" referred to in step 2 of the TFSM structure. Intel contends that the answers of Dr. Rhyne and the testimony of Mr. Huff do not prove anything relevant. It argues that Dr. Rhyne clarified that the FLP's come out first when it is powered up, because at that point the PHY chip does not know any other format sets, so it does not need to check its memory. There is a single bit (set to 0 initially) that indicates whether an inquiry dialog is necessary or not. This [*44] bit is checked first-corresponding to the first search-and if necessary (when the bit is set to 0), it conducts an inquiry dialog.

In response, Broadcom contends that Dr. Rhyne's testimony that the PHY chips first check the single bit before sending out FLP's contradicts his testimony on cross that the first thing that always happens is the PHY chips send out FLP's. In addition, it argues that determining whether a single bit has been checked is not retrieval from memory of a "bit string" as required by the court's claim construction. Moreover, Mr. Huff testified that the single bit is never checked by the Broadcom PHY itself (it is checked by an external device that controls the PHY).

The testimony about the FLP's provides substantial evidence for a reasonable jury to find that the structure of the TFSM is not contained in the accused devices. Thus, the court finds that Broadcom presented substantial evidence at trial to support the jury's conclusion that the claim elements that reference the TFSM are not present in the accused products.

### 2. "Default node/ format" and "Supplemental node/ format"

The term default format means "a common format that every node coupled to the [*45] communication medium can use to transfer data to every other node coupled to that medium." The term default node is "a node coupled to the communication medium which can transfer data over the network only in the default format or default formats."

The term supplemental format means "an additional format, distinct from the default format, that is not common to all nodes coupled to the network." The term supplemented node is "a node coupled to the communication medium which can transfer data over the network in the default format or default formats and which can also transfer data over the network in one or more supplemental formats."

Broadcom again relies on Exhibit 2509 and the cross-examination of Dr. Rhyne to support its argument that the accused Ethernet networks do not have a "default node/ format" or "supplemental node/ format." Dr. Rhyne testified that when auto-negotiation is performed the computer on the left will select 100 Mbps and the computer on the right will select 10 Mbps. As these are not common, Broadcom contends no default format exists. Since no default format exists, it follows that no supplemental format can exist.

This argument is without merit. As Intel points [*46] out, Broadcom analyzes the network only after the different pairs of nodes have negotiated to the optimum format for transfer of data. It is unsurprising that after doing so, some nodes determine that they speak only the default format (10 Mbps), while others will determine they speak a faster format (100 Mbps), and will thus use it. That is the whole point of the invention. The Broadcom chips "can use" (i.e., are capable of using) the default format 10 Mbps to transfer data-thus they have a default format. The fact that the chips do not use that format after auto-negotiating and picking a more optimal format to use is irrelevant. The same argument follows for "supplemental format," "supplemental node" and "adapted to supplement a node" claim limitations. Thus, the court finds that no reasonable juror could find that the accused products do not meet the "default node," "default format," "supplemental node" and "supplemental format" claim limitations.

### 3. "Source node cache" and "Destination node cache."

The dispute regarding this claim limitation is solely one of claim construction. Claim construction is an issue of law for the court. *Markman v. Westview Instruments, Inc., 517 U.S. 370, 134 L. Ed. 2d 577, 116 S. Ct. 1384 (1996).* [*47] This limitation was not disputed prior to trial, thus, the terms were not construed in the previous claim construction opinions.

Broadcom contends that claims 2 and 16 require "source node cache for node format sets," meaning that the source node cache must store more than one destination node format set. Intel responds by asserting that the term "sets" is plural because the source node cache stores both the source node format set and the destination node format set.

2003 U.S. Dist. LEXIS 2372, *

Having reviewed the patent specification and the relevant claims, the court holds that the claims only require more than one "format set," not more than one destination format set. Thus, a source node cache that stores both the source node format set and the destination node format set meets this claim limitation. Based on the evidence presented at trial, no reasonable jury could conclude that the accused products do not contain the "source node cache" and "destination node cache" claim limitations.

In sum, the court finds substantial evidence was presented regarding the absence of the structure of the transfer format selection means claim limitation in the accused products. The jury's finding that the claim [*48] elements containing the TFSM limitation are not present in the accused products is supported by substantial evidence. n5 Thus, Intel's motion for judgement as a matter of law for infringement of the '830 patent is denied.

n5 Intel's proof of inducement and contributory infringement follows from its proof of direct infringement. The jury found no direct infringement and, thus, no indirect infringement. As the court concludes there is sufficient evidence to support the jury's finding of no direct infringement, the finding of no inducement and contributory infringement is supported as well.

**B. Invalidity**

The jury concluded that claims 1, 7, 15, and 18 of the '830 patent were anticipated and rendered obvious by the Flashtalk/ Flashcard ("Flashtalk") prior art reference. Broadcom was unable to procure an actual Flashtalk product. The one remaining Flashtalk product Broadcom located belonged to the inventor, Mr. Michael Pflaumer, and he would not allow Broadcom to open it up or take it. At trial, Broadcom used [*49] a later issued patent, United States Patent No. 4,884,266 ("the '266 patent"), to describe how the product worked. Mr. Pflaumer explained that the product worked as explained in the '266 patent. Broadcom also relied on documents to show that the Flashtalk product did in fact exist, and was prior art to the '830 patent. The '266 patent itself was not prior art.

In this case, Broadcom did not present a separate "combining references" obviousness defense. Broadcom's obviousness defense, like its anticipation defense, was based solely on the Flashtalk reference.

Intel's motion for judgment as a matter of law raises two issues to resolve with respect to the validity of the '830 patent. First, was there legally sufficient evidence regarding the Flashtalk product itself? Second, was there substantial evidence that the Flashtalk product contained every element of the '830 invention?

**1. Was there legally sufficient evidence regarding the Flashtalk product?**

Intel first contends that Broadcom's invalidity defense fails as a matter of law because it rests on improper evidence, including a hearsay magazine article, a patent that is not prior art, and deposition testimony of Flashtalk's [*50] inventor, Michael Pflaumer. Intel contends that the testimony of Mr. Pflaumer must be corroborated. See *Price v. Symsek*, *988 F.2d 1187, 1194 (Fed. Cir. 1993); Finnigan Corp. v. ITC, 180 F.3d 1354, 1370 (Fed. Cir. 1999)*. n6

n6 There is no dispute that the Flashtalk product is prior art or that it was publicly used more than one year before the '830 application was filed. (D.I. 793 at 12)

Broadcom disputes these assertions, submitting that the September 14, 1987 magazine article about the Flashtalk product was not hearsay because it was offered for a non-hearsay purpose. Moreover, Broadcom argues that the evidence that the '266 patent describes the Flashtalk product is amply corroborated by comparing the patent itself with the testimony of Mr. Pflaumer, a third party with no interest in this litigation. According to Broadcom, this is sufficient to satisfy a "rule of reason" test. See *Sandt Tech., Ltd. v. Resco Metal and Prods. Corp., 264 F.3d 1344, 1350 (Fed. Cir. 2001)*. [*51] Broadcom also argues that Mr. Pflaumer's testimony was used to show that the Flashtalk product was publicly used and offered for sale more than a year before the '830 application was filed, and not to show that Mr. Pflaumer was the prior inventor. In any event, his testimony was corroborated by the magazine article, the testimony of his business partner, Mr. Goldhaber, and the '266 patent.

Corroboration of a witness' oral testimony is required to invalidate a patent under *35 U.S.C. § 102*. See *Finnigan Corp. v. International Trade Comm'n, 180 F.3d 1354, 1367 (Fed. Cir. 1999)*. This requirement exists regardless of whether or not the witness is an interested party or an uninterested party. See *id. at 1367-68*. Corroboration has been required by the courts "because of doubt that testimonial evidence alone in the special context of proving patent invalidity can meet the clear and convincing evidence standard to invalidate a patent." *Id. at 1368*.

There is no evidence that the '266 patent embodied anything other than the Flashtalk product and Mr. Pflaumer so testified. The disclosures of the '266 patent correspond [*52] to the product Mr. Pflaumer described.

Intel's expert, Dr. Rhyne, testified there was "no basis to dispute" that the '266 patent accurately describes the Flashtalk product. (D.I. 708 at 2797-98) Therefore, the court finds that Mr. Pflaumer's testimony was amply corroborated by the '266 patent.

### 2. Was there substantial evidence that the Flashtalk product contained every element of the    '830 invention?

Intel contends that the Flashtalk product did not contain (1) the TFSM structure (as required by all asserted claims), or (2) "format sets ... represented by bit strings; wherein bit positions of said bit strings represent formats" (as required by claims 7 and 18).

At trial, Broadcom's expert, Dr. Tobagi, went through the claims element by element and explained his opinion as to why each element was present in the Flashtalk product.

#### a. TFSM Structure

Intel argues that the Flashtalk product does not retrieve a bit string representation of the destination node's format from the destination node and that the Flashtalk product always sends an inquiry dialog as opposed to only if necessary-limitations in the second component of the structure of the court's claim [*53] construction of the TFSM limitation. See *Intel, 172 F. Supp. 2d at 506* ("The corresponding structure ... of the transfer format selection means is: (1) a bit string representation of the destination node's supported format set; (2) that is retrieved in accordance with an algorithm disclosed in Figure 4 that first searches the source node's associated memory, and then, if necessary, conducts an inquiry dialog[.]").

Intel's argument attempts to add language to the court's claim construction. The claim construction does not require the transfer format selection means to retrieve a bit string representation of the destination node's format set **from the destination node**. Although the court's claim construction noted that "in the embodiment described, ... the destination node sends back to the source node (using the default format) a bit string representation of its format set," *Intel, 172 F. Supp. 2d at 504*, this was not a limitation as defined by the court's claim construction to the jury.

The Flashtalk product does not receive a bit string representation of the destination node's format set, but rather creates a bit string representation from [*54] the information received. This created bit string representation is then stored in memory by the Flashtalk product. The bit string representation is retrieved-as required by the court's claim construction-from the memory. The court finds that a reasonable jury could find the first part of the structure of the TFSM claim element present in the Flashtalk product.

Intel also argues that the Flashtalk product always sends an inquiry dialog instead of only if necessary as required by the claim construction. The Flashtalk product sends a "request to send" message to the destination node. Intel argues the "request to send" message is the "inquiry dialog" described in the claim construction and that this "request to send" dialog is always sent by the Flashtalk product.

Broadcom counters that the "request to send" is not an inquiry dialog and that Dr. Tobagi testified that the Flashtalk product performs an inquiry dialog only if necessary.

Dr. Tobagi's testimony provides substantial evidence regarding the operation of the Flashtalk product and its relation to the court's claim construction. The jury had substantial evidence to find that the inquiry dialog is performed only if necessary. [*55]

Under the court's claim construction, substantial evidence exists to support the jury's conclusion that the Flashtalk product meets the TFSM limitation.

#### b. Format Sets Represented by Bit Strings

Intel further argues that the Flashtalk product does not contain "format sets ... represented by bit strings; wherein bit positions of said bit strings represent formats" (as required by claims 7 and 18). Intel asserts that the bits used by the Flashtalk product do not represent a format and are not a bit string as required by the claims. Broadcom argues that the Flashtalk product stores two bits (representing a high-speed frame and a low-speed frame) and that each of these bits represents a separate format and together form a bit string.

The jury was presented with contradictory testimony on this issue from each parties' expert. The testimony and cross-examination provided substantial evidence that the bits represented a format and together formed a bit string. Thus, the court finds that substantial evidence was presented for the jury to resolve the issue in favor of Broadcom.

In sum, the court finds that under the court's claim construction a reasonable juror could find the Flashtalk [*56] product embodied the TFSM structure and bit string representations of format sets. Thus, Intel's motion for judgment as a matter of law for validity of the '830 patent is denied.

### V. INTEL'S MOTION FOR JUDGMENT AS A MATTER OF LAW FOR INFRINGEMENT AND DAMAGES OF THE    '201 PATENT

The jury concluded that Broadcom's accused products did not infringe claims 1 and 10 of the '201 patent. As to claim 1, the jury found that the accused products lacked:

2003 U.S. Dist. LEXIS 2372, *

(1) the pixel interpolating means; (2) the sequencing means; and (3) the arithmetic data processing means. As to claim 10, the jury found that the accused products lacked: (1) the arithmetic processing means; and (2) the means responsive.

### A. Pixel interpolating means of claim 1

This is a means-plus-function element. The corresponding structure is subtractor 824, multiplier 825, adders 856 and 858, and two input registers, and structural equivalents. The structure must be responsive to a control signal.

Broadcom argues that the pixel interpolator of the accused devices do not use the structure identified in the court's claim construction. Specifically, Dr. Girod and Intel's expert, Dr. Von Herzen, agreed there is no subtractor [*57] circuit or multiplier circuit used. Rather, the accused devices use adders, shifters, and registers.

Dr. Von Herzen testified for Intel that one of ordinary skill in the art would consider the accused structures to be equivalent to the structure identified by the court, because the differences between the two are insubstantial. See *Odetics, Inc. v. Storage Technology Corp., 185 F.3d 1259, 1268 (Fed. Cir. 1999)* ("individual components ... of an overall structure that corresponds to the claimed function are not claim limitations. Rather, the claim limitation is the overall structure corresponding to the claimed function").

Dr. Girod testified that the structural differences between the two products were more than insubstantial and that one of ordinary skill in the art would consider adder-based interpolators to be substantially different from the subtractor and multiplier-based circuit of the claim.

Intel bore the burden of proving structural equivalents. The jury was presented with substantial evidence that the structures of the accused devices were not equivalent to those of the claim.

### B. Sequencing means of claim 1

The sequencing means performs the function [*58] of generating a control signal to condition the operation of the statistical decoding means, the arithmetic data processing means, and the pixel interpolating means to operate simultaneously. The components are required by the claim language to be responsive to (i.e., each component must be able to respond or react to) this control signal such that when the control signal is received, the component is put into a specified state. The corresponding structure of the sequencing means is the microcode RAM 310, instruction register 316, multiplexor 320, and a portion of the control block 308 that generates the LI and MXC signals, and structural equivalents.

Broadcom presented evidence that its products do not generate the claimed control signal and do not include structures that are equivalent to the corresponding structures of the claimed sequencing means.

As discussed previously, the court found that substantial evidence supports the jury finding that the accused devices do not have the claimed pixel interpolating means. As the function of the sequencing means is "generating said control signal to condition ... said pixel interpolating means," the absence of the claimed pixel interpolating [*59] means indicates that the function of the sequencing means cannot be met. n7 Thus, solely on this basis, substantial evidence exists to support the jury's conclusion that the sequencing means claim limitation is absent as well.

> n7 The same reasoning applies to the jury's finding regarding the arithmetic data processing means of claim 1. As the claim element includes the pixel interpolating means, substantial evidence exists that the element is not present in the accused products.

Broadcom further argues that Dr. Girod explained that the accused structures (7010 MB_Control and 7020 Row RISC) do not perform the function of generating the single control signal for providing instructions to the other components. He explained that the '201 control signal works "like an orchestra conductor" to coordinate all the devices, while the accused structures work "like a mailman" sending instructions to different components at different times. Finally, Broadcom asserts that numerous structural elements of the claimed sequencing [*60] means are absent from the accused structures such as a microcode RAM, an instruction register, a mux and a control block. Dr. Girod also concluded that the differences between the accused products and the patented structures were not insubstantial and that, therefore, the accused products are not equivalent to the claimed structures.

The structure of the sequencing means of claim 1 is the same as the structure of the control means of claim 10. They are essentially the same element by a different name. Intel's main argument on the sequencing means limitation is that the jury necessarily rejected Broadcom's argument because it "found the BCM 7010 and BCM 7020 include structure corresponding to the 'control means' of Claim 10[.]" (D.I. 756 at 34) Intel, therefore, believes the verdict is inconsistent.

One major problem with Intel's argument is that the jury made no definitive finding as to the control means. On the verdict form, the jury was not asked to check the

elements that it found to be present in the accused products. The jury was only required to indicate the elements they found to be missing. The court cannot conclude from the verdict form, as Intel would like to assume, [*61] that the jury unanimously found any elements to be present in the accused products. The court only knows which elements the jury unanimously found not present in the accused products.

As to function, Intel contends that the court's construction does not require a single control signal, but only that each component respond to the same control signal, which Intel argues can be accomplished as the signal passes from one component to another. Broadcom asserts that the claim construction required one signal that coordinates the simultaneous operation of the components. Intel counters that the one signal could be pipelined through the elements.

Intel argued throughout that the claim construction did not require one signal sent simultaneously to all components to be controlled. The court agrees. Nothing in the claim construction requires one signal to be sent simultaneously to all components. The claim construction only requires the components to operate simultaneously. Broadcom's expert, Dr. Girod, agreed that all of the components operate simultaneously. (D.I. 707 at 2527-2528)

As to structure, the sequencing means and control means is a programmable logic structure [*62] (including the microcode RAM and sequencer circuitry). The accused devices have a hard-wired logic circuitry ("a state machine").

Intel contends that the "hardwired" 7010 MB_Control structure is equivalent to the structure identified by the court for the sequencing means. In response, Broadcom notes that while Intel's expert, Dr. Von Herzen, testified that the "hardwired" structure could be substituted for the claimed corresponding structure, this is insufficient to establish equivalence. See *Chiuminatta Concrete Concepts, Inc. v. Cardinal Industries, Inc.*, 145 F.3d 1303, 1309-10 (Fed. Cir. 1998) (interchangeability does not establish equivalence); but see *Odetics, 185 F.3d at 1268* (rejecting notion that Chuminatta requires a "component by component" equivalence test). In addition, Broadcom's expert, Dr. Girod, concluded that these structural differences were not insubstantial and that there was no structural equivalence.

The foregoing demonstrates that Broadcom provided substantial evidence that the accused structures did not contain equivalent structures to that of the sequencing means (or control means). The jury had substantial evidence to [*63] resolve this issue in Broadcom's favor. n8

n8 Intel argues that the fact that sufficient evidence exists to support a finding of absence of the sequencing means claim element only with respect to the structure creates an inconsistent verdict. If the jury found the sequencing means structure absent, the jury should have found the structure for the control means claim element in claim 10 absent as well. Such an inconsistency is not an issue because as previously discussed, the fact that the pixel interpolating means claim element is absent is sufficient to support a finding that the function of the sequencing means claim element is absent.

### C. Arithmetic processing means of claim 10

The corresponding structure of arithmetic processing means of claim 10 is adder 450 or adder 452, and one or more of the Boolean logic gates (such as OR, NOR, XOR, AND, or NOT) depicted in figure 4B of the '210 patent. The structure must be responsive to a control signal. The function is performing arithmetic and Boolean functions [*64] on binary values. Figure 4B is reproduced below.

[SEE FIG. 4B IN ORIGINAL]

The court's claim construction requires that the arithmetic processing means performs both an arithmetic function (i.e., addition, subtraction, etc.) and a Boolean function (i.e., a logical function such as OR, AND, NOT, etc.). The arithmetic processing means must perform each of these two functions in response to the claimed control signals.

In its written contentions to the jury, Broadcom asserted that this element was not present because the Broadcom Differential Decoder and IDCT_ACC modules in the accused devices (the accused structures in the BCM 7010 and BCM 7020): (1) are incapable of performing a set of at least one arithmetic and at least one Boolean function; and (2) do not perform the required Boolean function in response to control signals.

The accused structures in Broadcom's devices perform a function called "saturation" or "clamping," which takes values less than 0 and greater than 255 and sets them at 0 or 255. This ensures that all values are between 0 and 255 and can be digitally represented in binary.

### 1. Boolean Function

Broadcom's expert, Dr. Girod, testified that the accused [*65] clamping and saturation functions were not Boolean functions, but were arithmetic functions. He testified that while the accused structures are built using a series of logic gates, this, in and of itself, does not mean that they perform a Boolean function. (D.I. 707 at 2452) During closing argument, Broadcom accentuated the

difference between having a logic gate (Boolean) structure and performing Boolean functions. Broadcom argued that the accused structures only perform arithmetic functions.

Broadcom's arguments regarding the lack of the Boolean function are against the court's claim construction. The preferred embodiment of the '201 patent itself includes an arithmetic processing means that performs the function of saturation. ('201 patent, col. 14, ll. 20-39) Therefore, it cannot be argued that the accused devices, which also perform the saturation function, do not meet the arithmetic processing means limitation, because the function of saturation is not Boolean. Furthermore, the court's claim construction states that "to satisfy the function of performing Boolean functions a structure must be able to perform at least one of the Boolean operations, such as the AND operation, for [*66] example." *Intel, 172 F. Supp. 2d at 515.* Broadcom admits that the accused devices contain Boolean logic gates such as AND/ OR gates. (D.I. 707 at 2513) It cannot be argued that these Boolean logic gates do not perform Boolean operations. Based on the court's claim construction, performing at least one Boolean operation satisfies as performing a Boolean function. As a matter of law, the accused products perform a Boolean function. n9

> n9 Broadcom's expert, Dr. Girod, appeared to misunderstand the law regarding means-plus-function claims. As a matter of law, the structure identified by the court must perform the function required by the claim. See *Asyst Tech., Inc. v. Empak, Inc., 268 F.3d 1364, 1369-70 (Fed. Cir. 2001).* Dr. Girod testified:

> > The Boolean functions that are required by the claim cannot be carried out by this circuit here in figure 4B. In fact, there is no structure, no circuit disclosed in the patent, that shows how to do that Boolean function ... The Boolean function that the claim requires is not shown in this figure 4B.

> (D.I. 707 at 2509-10) However, as Intel points out, this is incorrect as a matter of law. Figure 4B contains the structure, as identified by the court, that performs the recited function. The structure identified by the court must perform the claimed function in a means-plus-function claim. See id.

[*67]

**2. Responsive to Control Signals**

Broadcom also argues that the arithmetic processing means is not "responsive to control signals." Dr. Girod also testified that based on his review of the Verilog code, which describes the internal operation of the accused structures, the functions performed were not conditioned by (i.e., responsive to) control signals. (Id. at 2452-53)

Intel disagrees, concluding that "after finding the control means present in both the BCM7010 and BCM7020, no reasonable jury could have found that the arithmetic processing means is not responsive to control signals." (D.I. 756 at 25) As previously discussed, the jury was only required to indicate the claim elements they found to be missing. The court cannot conclude from the verdict form, as Intel would like to assume, that the jury unanimously found any elements to be present in the accused products. Thus, Intel has failed to carry its burden to prove that no reasonable jury could find the arithmetic means claim element missing from the accused products. n10 Intel's motion for judgement as a matter of law with regards to claim 10 of the '201 patent is denied. n11

> n10 Both parties agree that the jury could only find the means responsive claim element absent based on finding the arithmetic means claim element absent. Thus, the means responsive claim element's presence or absence is tied to the presence or absence of the arithmetic means claim element.

[*68]

> n11 As will be discussed, the fact that the jury found the arithmetic processing means claim element to be absent but did not find the control means claim element absent does create an inconsistent verdict and warrants a new trial on claim 10.

**VI. BROADCOM'S MOTION FOR JUDGMENT AS A MATTER OF LAW THAT BROADCOM'S PRODUCTS DO NOT MEET THE CONTROL MEANS LIMITATION OF CLAIM 10 OF THE '201 PATENT AND INTEL'S MOTION FOR NEW TRIAL WITH RESPECT TO CLAIM 10**

In finding that Broadcom's accused products did not infringe claim 10 of the '201 patent, the jury specifically found that the elements which were not present were the arithmetic processing means and the means responsive. The jury did not check the box next to the control means

2003 U.S. Dist. LEXIS 2372, *

element to indicate that it found that the control means element was also not present in the accused devices.

Broadcom has moved for judgment as a matter of law that its products do not meet the control means limitation of claim 10 of the '201 patent. The basis for its motion is that: (1) since the jury concluded that the accused products had no arithmetic processing [*69] means and the function of the control means is "to selectively condition ... said arithmetic processing means," it logically follows that the control means element cannot be satisfied because it cannot perform its function; (2) apart from that, no reasonable jury could find that the accused products have the required structures of the control means since the corresponding structures of the sequencing means and control means are identical. In response, Intel contends that Broadcom's motion demonstrates that the jury verdict is inconsistent and requires a new trial.

In its reply brief, Broadcom argues that the verdict is not inconsistent. Broadcom argues that "Intel attempts to manufacture an inconsistency by inferring that the jury made a finding nowhere present in the verdict form. Intel infers that by failing to check the box next to the control means, the jury must have unanimously found that the control means was present in the accused products." (D.I. 789 at 6) The court, however, agrees that the fact that the jury did not mark the control means element as not present in the Broadcom products does not mean that the jury unanimously found that the Broadcom products include the [*70] control means element. Because the jury was only asked to make findings as to what was not present, it is improper to infer that the jury concluded that elements which were not checked off as not present were in fact present.

Two potential inconsistencies in the jury's verdict exist. One, the jury found the sequencing means to be absent in the accused devices, but did not find the control means to be absent. As previously discussed, this is explainable. Although these two elements share the same corresponding structure, they have different corresponding functions. One function of the sequencing means is to condition the pixel interpolating means, which the jury found to be absent. Since the jury found the pixel interpolating means absent, they may have reasonably concluded that the function of the sequencing means is not performed by the accused products. The control means, on the other hand, does not interact with the pixel interpolating means.

The second potential inconsistency is that the jury found the arithmetic processing means of claim 10 to be absent, but did not find the control means to be absent. This latter "inconsistency" is the one focused on by Broadcom in its motion. [*71]

The function of the control means references and requires selectively conditioning the arithmetic processing means. If the arithmetic processing means is not present in the accused devices, the devices cannot perform the function of the control means. Thus, it logically follows that the control means (which as part of its function generates a code word that conditions the arithmetic processing means) cannot be present if the arithmetic processing means claim element is not present. The jury, however, did not reach this conclusion. In this regard, the jury verdict is inconsistent. The court cannot assume any set of facts to support the jury's conclusion that the arithmetic processing means claim element is absent and yet not find that the control means claim element is absent. The court agrees with Intel that this inconsistency illustrates the need for a new trial with respect to claim 10. Thus, Broadcom's motion for judgment as a matter of law with respect to the control means element of claim 10 is denied and Intel's motion for new trial with respect to claim 10 of the '201 patent is granted.

## VII. INTEL'S MOTION FOR NEW TRIAL

Intel's motion for a new trial lists a number [*72] of evidentiary rulings by the court and statements/ tactics by Broadcom that it contends unfairly prejudiced and tainted the proceedings. To prevail on its motion based on purported "misconduct," Intel must demonstrate both that Broadcom engaged in impropriety and that impropriety made it "reasonably probable" that the verdict was influenced by prejudicial statements." *Greenleaf v. Garlock, Inc., 174 F.3d 352, 363 (Fed. Cir. 1999)*. The court will address each of Intel's arguments in turn. n12

> n12 Intel also argues it is entitled to a new trial based on the sufficiency of the evidence with regards to each claim asserted. The court has considered these arguments with respect to Intel's motions for judgment as a matter of law.

### A. "This case is not about patents, it's about competition"

Counsel for Broadcom stated in his opening that "this case is not about patents, it's about competition." (D.I. 694 at 180) Seizing on this language, Intel contends that this language, and other language like [*73] it, improperly focused the jury on Intel's motives for filing the case, rather than the merits. Standing alone, this statement and others like it have nothing to do with whether Broadcom's products infringe the asserted claims of Intel's patents. The statements are facially improper.

However, immediately following that statement, another member of Broadcom's counsel stood up in his

opening and stated that "I want to talk about patents because this is a patent lawsuit," and proceeded to explain why Broadcom does not infringe the '201 and '830 patents. (Id.) The jury instructions, witnesses, exhibits, closing arguments and written contentions to the jury focused exclusively on patent issues. Thus, Judge McKelvie was able to corral any attempts to focus on non-patent issues and force Broadcom and the jury to focus on the patent issues. Despite certain statements, when reviewing the whole case-the complex expert testimony and evidence on both sides regarding the patents, the accused products, and the prior art-it is impossible to conclude that the case was "not about patents."

## B. The Dayna "Admission"

The '830 patent was acquired by Intel from Dayna Communications. Part of [*74] the agreement that implemented the acquisition contained a warranty by Dayna that "no products infringe" Dayna's patents. Throughout trial, Broadcom argued that the legal effect of this provision was an admission by Intel that Broadcom's then-existing auto-negotiation products do not infringe the '830 patent.

Judge McKelvie precluded this argument, stating that "to the extent Broadcom is making arguments that the statement in the Dayna documents are an admission and have some legal significance, I don't agree. I think it's irrelevant." (D.I. 707 at 2719) Broadcom chose to argue this theory of its case, but was foreclosed from doing so (after many attempts) by Judge McKelvie. Intel never asked for a curative instruction on this, nor did Judge McKelvie issue one. Nothing about the admission was in the verdict form or jury instructions. Thus, the jury was properly focused on the legal determinations that it had to make.

## C. The Intel/ Broadcom Joint Development Agreement

This was the joint development agreement that Broadcom argued conferred a license for the '830 patent. The court ruled on summary judgment, that it did not. Intel complains that despite the court's ruling, Broadcom [*75] repeatedly referred to the agreement by stating that the auto-negotiation feature that Intel is complaining about was given to Intel by Broadcom. Judge McKelvie warned that those statements "sound like the license defense," and that "if that's going to be a theme throughout the trial, we might as well shoot it now, because it's going to cause much more trouble than it's worth." (D.I. 696 at 455) Intel maintains that Broadcom continued to elicit testimony that alluded to the joint development project.

In response, Broadcom notes that it never argued to the jury that the joint development agreement conferred a license covering any of the accused products. But, as

Judge McKelvie later noted, the fact that they had a joint development agreement, were cooperating partners, and that Broadcom may have thought it was licensed "may well be relevant to willfulness." (Id. at 457) This business relationship is also relevant to determining a hypothetical reasonable royalty rate for the purpose of determining damages. Cooperating partners are more likely to negotiate lower royalty rates. See *Georgia-Pacific Corp. v. U.S. Plywood Corp., 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970).* [*76] Thus, the court allowed Broadcom to talk about the parties' commercial relationship.

Given that the agreement was relevant to damages and willfulness, Broadcom's reference to it was not unduly prejudicial. Similarly, facts regarding Intel's investment in Broadcom, which Intel accuses Broadcom of raising to show that Intel "milked" Broadcom, are relevant to damages.

## D. Appealing to the Jury for Sympathy

Intel complains that Broadcom improperly appealed to the jury for sympathy, implying that a jury verdict in favor of Intel would "shut down" Broadcom and put Broadcom's 2700 employees out of work. Intel maintains that this is grounds for a new trial. See *Draper v. Airco, Inc., 580 F.2d 91, 95 (3d Cir. 1978)* ("jurors must ultimately base their judgment on the evidence presented ... there must be limits to pleas of pure passion"); *Hillard v. Hargraves, 197 F.R.D. 358, 360 (N.D. Ill. 2000)* (where counsel implied defendants would have to pay for judgment against them out of own pocket, the court noted "improper references in closing argument are grounds for new trial").

Broadcom responds that those statements were simply the truth-the case was [*77] important to Broadcom; its fate rested with the jury's decision. It argues that the "cumulative thrust" of its argument was a detailed review of the evidence in Broadcom's favor. See *Dorsett v. American Isuzu Motors, Inc., 805 F. Supp. 1212, 1219 (E.D. Pa. 1992)* ("All attorneys have an ethical duty to zealously advocate their client's cause," and courts do "not expect advocacy to be devoid of passion").

While some of Broadcom's allusions may have been overly dramatic, most of the statements were made during closing arguments to focus the jurors on the seriousness of the task before them when weighing the facts and evidence. Broadcom was not asking them to ignore those facts out of sympathy. Thus, these statements do not merit a new trial.

## E. Attacks on Credibility

Intel complains that Broadcom attacked the credibility of its witnesses by insinuating that Intel paid for fact testimony. (e.g., "they paid him $ 200 an hour for testifying," "they paid him $ 150 an hour for his testimony,"

2003 U.S. Dist. LEXIS 2372, *

"He was represented by Intel attorneys at his deposition, because he's an Intel employee and other than the salary, obviously, he's being paid by Intel for his testimony"). (D. [*78] I. 704 at 1860, 1866; D.I. 705 at 1897) After Intel objections, Judge McKelvie ordered Broadcom to stop its references to payment. Intel states that this was not sufficient, and that a new trial is warranted.

In response, Broadcom contends that these statements were neither erroneous nor prejudicial. It maintains that it did not mean to insinuate that the content of the testimony was paid for, but only that the witnesses were paid for their time and, thus, could be biased towards Intel.

When reviewing the whole case, the court finds that the jury was properly focused by the instructions and verdict form.

### F. Admitted Evidence

Intel contends that the following evidence was improperly admitted: Mr. Huff's testimony, the TOPS article, testimony regarding non-disclosure before the PTO, and inventor deposition testimony. "In evaluating a motion for a new trial on the basis of trial error, the Court's inquiry is twofold: (1) whether an error was in fact committed, and (2) whether that error was so prejudicial that denial of a new trial would be 'inconsistent with substantial justice.'" *Finch v. Hercules Inc., 941 F. Supp. 1395 (D. Del. 1996)* (internal citation omitted). [*79] The court has reviewed Judge McKelvie's evidentiary rulings and finds no error was in fact committed. Even if any of the rulings were in error, Intel has failed to prove that denial of a new trial would be inconsistent with substantial justice.

### VIII. INTEL'S MOTION FOR JUDGMENT AS A MATTER OF LAW AND MOTION FOR NEW TRIAL REGARDING BROADCOM'S THIRD-PARTY LICENSE DEFENSES

The court's final pre-trial opinion addressed Intel's motion for partial summary judgment concerning an Intel/Broadcom Joint Development Agreement and Intel and Broadcom's cross-motions for summary judgment concerning certain license defenses raised by Broadcom. *Intel Corp. v. Broadcom Corp., 173 F. Supp. 2d 201 (D. Del. 2001).*

These license agreements are relevant to one aspect of Intel's post-trial motions. The license issue was included in the verdict form and the "have made rights" license agreements were moved into evidence, thus becoming a jury issue despite the fact that Broadcom did not offer a witness to testify about them. As part of its verdict, the jury found for Broadcom on all twelve licenses included in the verdict form. The jury found that the above licenses gave Broadcom [*80] authority to sell its prod-

ucts to those twelve Intel licensees. Intel has moved for judgement as a matter of law and for a new trial that Broadcom is not licensed under these agreements.

Intel contends that the jury's conclusion that Broadcom's infringing activities were authorized under Intel's third party license agreements was unreasonable and completely unsupported by any evidence Broadcom offered at trial. First, the only mention of Broadcom's license defense in the entire trial came from Broadcom's damages expert, who simply testified that if Broadcom did have some sort of "have made" rights under the listed Intel third party licenses, Broadcom would owe Intel about one million dollars less in damages. Second, Broadcom failed to meet the threshold requirements for Broadcom's third party license defense that the court set out in its pre-trial opinion on the license defenses. Third, Broadcom offered no evidence that its accused products qualified as licensed products under each license. Fourth, in its opinion, the court had reserved judgment on Intel's assertions that many of the Intel licenses contained restrictive provisions (i.e., "Sanyo limitations"). Broadcom did not address [*81] these at trial.

In response, Broadcom states that the jury was properly instructed on the issue and that the agreements themselves were sufficient evidence for the jury to resolve the issue. Reading the agreements shows who is licensed and whether the license contains "have made rights." Also, Broadcom notes that the testimony of its Director of Financial Operations, Ray Vincent, stating that Broadcom does not manufacture a product until it receives an order for the product from a customer establishes the fourth requirement of the jury instructions that the products were not sold "off the shelf."

Jury Instruction 8.1 provided the jury with the elements Broadcom was required to prove to establish its license defense. Jury Instruction 8.1 reads in relevant part:

> An accused infringer may be protected from infringement liability if the accused infringer makes products for the use or sale of a licensee under a patent in suit. In order to take advantage of such "have made" rights, the accused infringer must prove the following factors:

> First, the accused infringer must prove that the party for whom it produces the accused product was a licensee under the patent in suit at the time [*82] of the accused sales.

> Second, the accused infringer must prove that the licensee has valid "have made" rights under its license to the patent in suit. For the licensee to have valid "have

2003 U.S. Dist. LEXIS 2372, *

made" rights, the license agreement must authorize that licensee to have the patented product, or a portion of the patented product, made for it by an outside source like the accused infringer.

Third, the accused infringer must prove that the products it makes are "licensed products" as defined under the license.

Fourth, the accused infringer must prove that it made products pursuant to a request from the licensee. If the accused infringer sells "off the shelf" or stock products, the accused infringer would not be protected from infringement liability under "have made" rights.

(D.I. 689 at 60)

The court finds that the jury's verdict with respect to the license issues is against the clear weight of the evidence. Most compellingly, the jury found that Broadcom had authority to sell products under the Intel/Dell agreement. The Intel/Dell agreement, however, was not submitted to the jury. Thus, the jury could not have reviewed the Intel/Dell license agreement. The jury's finding on this [*83] agreement cast doubt upon the jury's findings as to all of the third party agreements.

Furthermore, upon review of the record, the court is unable to determine any factual issue to be resolved by the jury. n13 Broadcom stated that the jury would be required to determine if the accused products fit the definition of the licensed products. (D.I. 708 at 2788) Broadcom, however, provided no evidence outside of the license for the jury to make such a determination. Contract interpretation is a matter for the court, not the jury. If the determination is to be made on the face of the license agreements, the court must decide this issue as a matter of law. Thus, the jury verdict regarding Broadcom's license defense is vacated and Intel's motion for new trial on the license defense is granted.

n13 Judge McKelvie also noted his doubts regarding an issue of fact for the jury during the charge conference. (D.I. 708 at 2788)

The absence of a factual issue at trial is not surprising. In filing cross-motions for summary judgment on these licenses prior to the trial, the parties agreed that there were no disputed issues of fact-that the dispute regarding the scope and effect

of the licenses was purely a legal dispute. In its opinion, the court did not reach the contract interpretation aspect of this issue, concluding instead that the facts were insufficient to demonstrate that the third party licensees conferred their authority to Broadcom.

[*84]

## IX. CONCLUSION

For the reason's stated, Intel's motion for judgment as a matter of law and motion for new trial on infringement of the '830 patent is denied. The court finds substantial evidence exists for a reasonable jury to find the transfer format selection means claim element absent. Intel's motion for judgment as a matter of law and motion for new trial on validity of the '830 patent is also denied. The court finds substantial evidence exists to find that the Flashtalk product anticipates the '830 patent.

Intel's motion for judgment as a matter of law and motion for new trial on infringement of claim 1 of the '201 is denied. The court finds substantial evidence exists for a reasonable jury to find the pixel interpolating means, the sequencing means and the arithmetic data processing means claim elements absent from the accused products.

Intel's motion for new trial on claim 10 of the '201 patent is granted. The jury verdict is inherently inconsistent and, thus, warrants a new trial.

Intel's motion for new trial on the license defense is granted. The court finds that the jury's verdict with regards to the license defense is against the great weight of the evidence. [*85] An appropriate will issue.

## ORDER

At Wilmington, this 13th day of February, 2003, consistent with the opinion issued this same day;

IT IS ORDERED that:

1. Intel's motion for summary judgment as a matter of law (D.I. 725) is denied.

2. Intel's motion for new trial (D.I. 726) is granted in part and denied in part.

3. Broadcom's motion for judgment as a matter of law that Broadcom products do not meet the control means limitation of claim 10 of the '201 patent (D.I. 723) is denied.

Sue L. Robinson

United States District Judge