# EXHIBIT 1

Westlaw.

--- F.3d ----
--- F.3d ----, 2006 WL 1228887 (C.A.Fed.)
(Cite as: --- F.3d ----)

Page 1

Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States Court of Appeals,Federal Circuit.
OLD TOWN CANOE COMPANY,
Plaintiff-Appellant,
v.
CONFLUENCE HOLDINGS CORP.,
Defendant-Cross Appellant.
No. 05-1123, 05-1148.

May 9, 2006.

Appealed from: United States District Court for the District of Oregon. Magistrate Judge Donald C. Ashmanskas.

Edward E. Vassallo, Fitzpatrick, Cella, Harper & Scinto, of New York, New York, argued for plaintiff-appellant. With him on the brief was Douglas Sharrott. Also on the brief was Mark J. Lee, Brownlie Evans Wolf & Lee, LLP, of Bellingham, Washington. Hadrian R. Katz, Arnold & Porter LLP, of Washington, DC, argued for defendant-cross appellant. With him on the brief was Joseph A. Micallef.

Before MAYER, SCHALL, and LINN, Circuit Judges.

Opinion for the court filed by Circuit Judge LINN. Dissenting opinion filed by Circuit Judge MAYER.LINN.

*1 Old Town Canoe Company ("Old Town") appeals from the grant of Confluence Holdings Corp.'s ("Confluence") motion for judgment as a matter of law ("JMOL") of noninfringement of U.S. Patent No. 4,836,963 (filed May 26, 1987) ("the '963 patent"). See Old Town Canoe Co. v. Confluence Holdings Corp., No. 02-CV-0093 (D.Or. Nov. 10, 2004). Confluence cross-appeals from the grant of Old Town's motion for JMOL of no invalidity based on obviousness, lack of enablement, or failure to disclose best mode, and of no unenforceability based on inequitable conduct. See id. Because the district court did not err in its construction of the claims and correctly concluded that no reasonable juror could find infringement, we affirm the judgment of noninfringement. Because we cannot conclude that no reasonable juror could find in favor of Confluence on

the invalidity issues, we vacate the District Court's grant of JMOL on those issues and remand for further proceedings consistent with this opinion. Because the district court did not abuse its discretion in granting Old Town's motion for JMOL of no inequitable conduct, we affirm on that issue.

I. BACKGROUND

The parties manufacture layered polyethylene canoes. Old Town is the assignee of the '963 patent, which relates to a method of making multilayered plastic laminate boat hulls by rotational molding. The '963 patent describes a method of releasing successive charges of plastic particulate into a heated mold, which is rotated on two axes in a large oven. Each charge melts and flows together to form a cross-linked plastic layer. A successive charge is not released into the mold until the layer formed by the prior charge has reached an appropriate state. The boat hull will not be usable if a successive charge is released too soon or too late, making it critical to recognize when the preceding layer has reached the appropriate state of completion. The invention recognizes that coalescence of the particulate material will continue to completion even after the mold is removed from the oven if the mold doors are kept closed to retain the residual heat of the mold, thereby reducing oven time and cost.

In January 2002, Old Town filed suit against Confluence, alleging infringement of the '963 patent. Confluence filed a counterclaim, seeking a declaratory judgment that the patent was invalid and unenforceable. The parties asked the district court to construe certain claim terms, including the limitation of opening the mold assembly "after coalescence of the third charge is completed," the only limitation at issue in this appeal. See Old Town Canoe Co. v. Confluence Holdings Corp., No. 02-0093-AS (D.Or. Mar. 2, 2004) ("Claim Construction Order"). This limitation speaks to a step that takes place after the mold assembly has been removed from the oven and has been air cooled. The parties agreed that "coalescence" is a process, referring to a 7-stage diagram by Confluence's expert, Paul Nugent (the "Nugent diagram," depicted below), but disputed the nature of the process and the point at which "coalescence" is "completed." Id., slip op. at 3. Both parties agreed that the completion of coalescence did

--- F.3d ----
--- F.3d ----, 2006 WL 1228887 (C.A.Fed.)
(Cite as: --- F.3d ----)

Page 2

not refer to the first two early stages, nor did it refer to the last two stages. Confluence argued coalescence was complete at stage 3 (i.e., when an uneven layer with bubbles is first formed), whereas Old Town

argued coalescence was complete at stage 5 (i.e., optimum cure). Id.

Material Cross Section:

      

Powder | Powder & Molten Layer | Uneven & Bubbles | Smooth & Bubbles | Optimum | Slight Overcure | Severe Overcure

*2 On June 2, 2003, the district court conducted a *Markman* hearing and, having evaluated the intrinsic record, contemporaneous dictionaries, cited prior art, and expert testimony, concluded that "it would be understood that 'coalescence' is not complete merely because a layer has been formed," rather, "coalescence" was " 'complete' when it has all necessary parts, elements or steps, or is fully carried out." Id., slip op. at 8. Thus, the district court construed the claims as meaning "coalescence" is "completed" at optimum stage 5 of the Nugent diagram.

A jury trial began on October 20, 2004. After 5 days of trial, the parties filed cross-motions for JMOL, Confluence moving for noninfringement and Old Town moving that its patent was not invalid and not unenforceable. After hearing argument on the infringement question, the district court granted Confluence's motion, concluding from the bench that Confluence's canoes do not infringe Old Town's '963 patent. The following day, the district court entertained argument on validity and enforceability and summarily concluded, without explanation, that, because there was not sufficient evidence to meet the clear and convincing evidence standard required to overcome the presumption of validity, the invalidity issues would not be sent to the jury. The district court also held that there was not sufficient evidence for it to find inequitable conduct. On November 10, 2004, the district court entered judgment, granting both motions for JMOL and dismissing without prejudice all remaining claims.

Old Town appeals the district court's grant of JMOL of noninfringement, arguing that the district court strayed from its *Markman* claim construction when finding noninfringement as a matter of law.[FN1] Old Town argues that stage 5 of the Nugent diagram may

have bubbles and that the court wrongly imposed a requirement that optimum cure have no bubbles and thus incorrectly concluded that, because Confluence's canoes have bubbles, they do not infringe, either literally or under the doctrine of equivalents. Old Town argues, in the alternative, that the district court's claim construction was erroneous in that "completion" does not necessitate that coalescence reach optimum stage 5 of the Nugent Diagram; rather, completion includes other stages during coalescence that can be attained by bringing the process to a halt to produce a commercially viable (i.e., usable) product.

FN1. Although Claims 3, 4, 9 and 10 of the '963 patent were asserted at trial, Old Town only appeals JMOL for noninfringement with respect to claims 9 and 10.

Confluence counters that Old Town should be bound by its admission to the district court that coalescence is a process that ends at stage 5 of the Nugent diagram, and that Old Town's new construction on appeal, which attempts to define "complete" as "not complete," is inconsistent with the claim language and intrinsic record. Confluence argues that the district court's judgment of noninfringement was not based on the presence or absence of bubbles. Rather, the district court correctly held that the limitation requires the plastic laminate to reach the end of coalescence, that is, optimum stage 5, and that the weight of the evidence supports that its products do not infringe because they never reach optimum stage 5. Confluence also cross-appeals the grant of Old Town's motion for JMOL of no invalidity and unenforceability, arguing that, on the evidence presented, when viewed in a light most favorable to Confluence, the district court clearly erred in concluding that no reasonable juror could find in Confluence's favor.

*3 We have jurisdiction under 35 U.S.C.

--- F.3d ----
--- F.3d ----, 2006 WL 1228887 (C.A.Fed.)
**(Cite as: --- F.3d ----)**

Page 3

1295(a)(1).

## II. DISCUSSION

### A. Noninfringement

Old Town argues that the district court failed to apply its own claim construction and wrongly imposed a requirement that optimum cure have no bubbles, contending that the grant of JMOL of noninfringement "appears to be based on the presence of some bubbles in Confluence's accused canoes." Old Town asserts that the requirement for an infringing canoe to have no bubbles is error because there was expert testimony that optimum stage 5 on the Nugent diagram can have some bubbles and because the Nugent diagram states that stage 5 has "few to no bubbles." Old Town also argues that, even if optimum cure requires no bubbles, a reasonable jury could still find infringement under the doctrine of equivalents.

Confluence disagrees that the district court required that optimum stage 5 have no bubbles, arguing that the district court instead recognized that optimum stage 5 may or may not contain bubbles and that the complete absence of bubbles was not required for a product to infringe. Confluence asserts that all of the experts who addressed the subject agreed that Confluence's canoes never reached optimum stage 5, despite their recognition that optimum stage 5 may contain bubbles. As to the doctrine of equivalence, Confluence argues that prosecution history estoppel applies and precludes a finding of infringement under the doctrine of equivalents in this case.

This court "review[s] a grant of JMOL de novo, reapplying the district court's JMOL standard anew." Union Carbide Chems. & Plastics Tech. Corp. v. Shell Oil Co., 308 F.3d 1167, 1185 (Fed.Cir.2002). The district court sitting in the Ninth Circuit considers a motion for JMOL by drawing all reasonable inferences from the evidence most favorably to the non-movant. See Horphag Research Ltd. v. Pellegrini, 337 F.3d 1036, 1040 (9th Cir.2003). A motion for JMOL is properly granted only if no reasonable juror could find in the non-movant's favor. See Sanghvi v. City of Claremont, 328 F.3d 532, 536 (9th Cir.2003). The determination of infringement is a factual question. See Bai v. L & L Wings, Inc., 160 F.3d 1350, 1353 (Fed.Cir.1998).

In granting Confluence's motion for JMOL of noninfringement of the '962 patent, the district court

noted the testimony of Confluence's expert, Mr. Petruccelli, that a condition of zero bubbles may be detrimental to optimum physical properties and that an industry acceptable and preferred condition of complete coalescence is when there are some remaining bubbles and the process is otherwise complete. The district court made no "bubble/no bubble" distinction, but rather stressed that all of the parties' experts testified that Confluence's canoes never reached optimum stage 5 of the Nugent diagram.

The evidence overwhelmingly shows that, even if some bubbles may be present at optimum stage 5 of the Nugent diagram, Confluence's canoes did not reach optimum stage 5. While Old Town argues that the district court was influenced by arguments and testimony relating to the presence or absence of bubbles, it cites to no testimony contradicting the district court's conclusion that none of the accused structures reached optimum stage 5. Based on this record, we agree with the district court that no reasonable juror could find that the particulate used in Confluence's canoes reached optimum coalescence, as required by the asserted claims. We therefore hold that the district court did not stray from its Markman claim construction and correctly granted Confluence's JMOL of no literal infringement.

*4 As for equivalents, the prosecution history shows that the claims were narrowed, triggering a presumption that subject matter was surrendered. Old Town amended claim 1 of the '963 patent in response to a rejection by the examiner to include the limitation that coalescence comes to completion. The amendment to claim 1 applies with equal force to the scope of claim 9, which contains the same limitation. See Builders Concrete, Inc. v. Bremerton Concrete Prods. Co., 757 F.2d 255, 260 (Fed.Cir.1985) ("The fact that the 'passage' clause of patent claim 10 was not itself amended during prosecution does not mean that it can be extended by the doctrine of equivalents to cover the precise subject matter that was relinquished in order to obtain allowance of claim 1."). The amendment of claim 1 was related to patentability, and Old Town disclaimed methods in which coalescence of the inner layer did not reach a point of completion. In so doing, Old Town narrowed the scope of its claim, resulting in a presumption that Old Town surrendered the territory between the original claims and the amended claims. See Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., 535 U.S. 722, 740 (2002) ("A patentee's decision to narrow his claims through amendment may be presumed to be a general disclaimer of the territory between the original claim and the amended claim.").

--- F.3d ----
--- F.3d ----, 2006 WL 1228887 (C.A.Fed.)
(Cite as: --- F.3d ----)

Page 4

Old Town has not come forward with evidence or argument that any of the criteria for rebutting the presumption apply in this case. *See id. at 740-41.* Because Old Town has not rebutted the presumption that it surrendered the territory between the original claims and the amended claims, it is precluded from asserting infringement under the doctrine of equivalents.

### B. Claim Construction

Old Town argues in the alternative that JMOL of noninfringement was wrongly entered because the district court erred in its construction of the limitation "after coalescence of the third charge is completed." Although Old Town maintains that coalescence is a process that encompasses stages 1 through 5 of the Nugent diagram, Old Town urges that "coalescence can be completed by bringing the process 'to a halt.' " Old Town argues that because a dictionary definition includes "brought to an end" as a definition for "complete," the "completion of coalescence" limitation does not necessitate that coalescence reach its optimal state, but includes other stages at which an operator brings the process to a halt, such as stage 4 of the Nugent diagram, so long as a usable product is produced.

Confluence counters that Old Town admitted to the district court that coalescence is a process that ends at optimal stage 5 of the Nugent diagram, and that Old Town's proffered construction here attempts to define "complete" as "not complete." Confluence argues that the district court correctly held that the limitation requires the plastic laminate to reach the end of coalescence, that is, its optimum state at stage 5.

**\*5** We begin our claim construction analysis with the words of the claim, which are generally given their ordinary and customary meaning. *Phillips v. AWH Corp.,* 415 F.3d 1303, 1312-13 (Fed.Cir.2005) (*en banc* ) (citation omitted). Claim 9, the only independent claim at issue in this appeal, recites:
A rotational molding method for making a laminated plastic boat hull in a mold assembly mold cavity, comprising:
rotating the mold assembly containing the first charge of particulate thermoplastic material within the mold cavity within an oven heated to a temperature to coalesce the first charge along the cavity wall to form a first layer;
releasing into the mold cavity a second charge of a particulate thermoplastic material that includes a blowing agent while continuing rotation of the model

assembly within the oven;
continuing such mold assembly rotation within the oven until the blowing agent foams and the second charge coalesces along the first layer to form a second layer;
releasing into the mold cavity a third charge of particulate thermoplastic material while continuing rotation of the mold assembly within the oven;
removing the mold assembly from the oven prior to the completion of the coalescence of the third charge;
air cooling the mold assembly after removal of the mold assembly from the oven while continuing mold assembly rotation during continued coalescence of the third charge;
opening the mold assembly *after coalescence of the third charge is completed* while continuing to air cool the mold assembly so as to expose the mold cavity to cooling air.

'963 patent, col. 8, ll. 18-46 (emphasis added).

In *Phillips,* we held that
there is no magic formula or catechism for conducting claim construction. Nor is the court barred from considering any particular sources or required to analyze sources in any specific sequence, as long as those sources are not used to contradict claim meaning that is unambiguous in light of the intrinsic evidence. For example, a judge who encounters a claim term while reading a patent might consult a general purpose or specialized dictionary to begin to understand the meaning of the term, before reviewing the remainder of the patent to determine how the patentee has used the term. The sequence of steps used by the judge in consulting various sources is not important; what matters is for the court to attach the appropriate weight to be assigned to those sources in light of the statutes and policies that inform patent law.

*Phillips,* 415 F.3d at 1324 (internal citations omitted). In construing the claim terms in this case, the district court began its analysis by referring to dictionary definitions presented by the parties. The district court's reference to the dictionary was not an improper attempt to find meaning in the abstract divorced from the context of the intrinsic record but properly was a starting point in its analysis, which was centered around the intrinsic record consistent with *Phillips.* The consulted dictionary definitions of "coalesce" include: (1) 1: to grow together ...: unite by growth into one body ... 2 a: to unite or join together into one body or product; become integrated into a whole. *Webster's Third New International Dictionary* (1971); (2) to combine into one body or to grow together. *The Phillips Petroleum Glossary of Plastic Terms* (4th

ed.1965); (3) 1: to grow together or into one body ... 2: to unite so as to form one mass, community, etc ... 3: to blend or come together ... 4: to cause to unite in one body or mass. *The Random House Dictionary of the English Language* (2d ed.1987). The consulted dictionary definition of "completion" is: having all necessary parts, elements, or steps; brought to an end; fully carried out. *See Claim Construction Order,* slip op. at 8-9.

*6 The claim does not state explicitly whether the completion of coalescence means that the plastic particulate must reach its optimum state. However, the written description provides guidance in describing coalescence as being complete when it reaches an optimal state as opposed to when the process is brought to a halt. It states that "[d]uring such early portion of the cooling time, the mold cavity remains closed and coalescing of the third charge continues. Inside layer 16 formed by the coalescing third charge will be intimately joined with insulating layer 14." '963 patent, col. 6, ll. 7-11. Layers 14 and 16 are "tightly interconnected at their respective interfaces by virtue of the rotational molding process." *Id.,* col. 5, ll. 9-11. The written description further describes the invention with reference to and as an improvement over the coalescence process shown in U.S. Patent No. 3,936,595 (filed May 3, 1974) ("the '595 patent"). The '595 patent describes the coalescing charge as initially adhering to the heated mold surface (*i.e.,* forming an uneven layer) and thereafter coalescing into a continuous skin element. The '595 patent uses "coalescence" to include the process that follows the particles adhering to the mold wall, *i.e.,* the process following the formation of a layer. It describes the process as a transformative one in which particles adhering to the mold surface (*i.e.,* forming an uneven layer) progress to a point where the particles have become united to form a skin-like state (*i.e.,* optimum stage 5). This supports the conclusion that one of ordinary skill in the art would understand the ordinary and customary meaning of coalescence to refer to a process that evolves beyond the point at which a layer is first formed, which marks not the completion of coalescence, but the start of the transformation of the particulate material from discrete particles to a consolidated layer. This is also consistent with the dictionary definitions, which indicate that "coalescence" is "completed" when the layer formed by the particulate is united to possess all necessary parts, elements, or steps, *i.e.,* when it reaches its optimal state.

Nothing in the written description suggests that to achieve the stated objects of the invention, namely to

shorten the time of the molding cycle and to reduce warping problems, coalescence could or should be stopped at some unspecified point prior to the optimum conclusion of the process. Indeed, the written description teaches that the molding time is not reduced by stopping coalescence prior to its completed state, but rather by removing the mold from the oven prior to the completion of coalescence and keeping the mold cavity closed to allow coalescence to continue to completion. '963 patent, col. 3, ll. 34-40. The written description also teaches that warping problems are reduced by providing a "cooling headstart" while coalescence continues to completion. *Id.,* col. 4, ll. 39-45. As the district court found, if coalescence were complete merely because a layer had been formed, the mold assembly would be opened prematurely and that would produce an unusable part. *See Claim Construction Order,* slip op. at 8-9.

*7 The prosecution history supports the conclusion that completion of coalescence means progress of coalescence to the optimum state as opposed to being brought to a halt at an arbitrary point by operator intervention. Originally, claim 1 recited that cooling was concurrent with coalescence, but did not specify whether coalescence would reach a point of completion. Concerned whether coalescence would continue to completion while the mold is cooling (versus come to a halt by virtue of the mold having been removed from the oven), the examiner rejected the pending claim. In response, the applicant amended claim 1 to require that cooling be concurrent with the *completion* of coalescence. The examiner also rejected claim 1 because "the times of removal and the temperature conditions are indeterminent [sic] and not understood." In response, the applicant argued that the removal times and temperature conditions "are matters within the ordinary skill in the art." The applicant stated that the understanding of those skilled in the art is illustrated in the '595 patent, which describes coalescence as a process that begins with particulate material, '595 patent, col. 7, ll. 15-21, "and [is] progressively formed into a skin," *id.,* col. 8, ll. 19-21. Similarly, the applicant argued that U.S. Patent No. 3,455,483 (filed Nov. 3, 1964), also cited as prior art, uses "coalesced" to refer to a process that produces a "coherent fused layer of required thickness."

From the foregoing discussion of the written description and prosecution history, we conclude that the district court's constructions of "coalescence" and "complete" are correct and do not cover a process of coalescence that fails to reach optimum stage 5. Old Town is not entitled to a claim construction divorced

--- F.3d ----
--- F.3d ----, 2006 WL 1228887 (C.A.Fed.)
(Cite as: --- F.3d ----)

from the context of the written description and prosecution history. See *Nystrom v. Trex, Co.,* 424 F.3d 1136, 1145 (Fed.Cir.2005) ("In the absence of something in the written description and/or prosecution history to provide explicit or implicit notice to the public-*i.e.,* those of ordinary skill in the art-that the inventor intended a disputed term to cover more than the ordinary and customary meaning revealed by the context of the intrinsic record, it is improper to read the term to encompass a broader definition simply because it may be found in a dictionary, treatise, or other extrinsic source."). Nothing in the context of the intrinsic record explicitly or implicitly indicates that one of ordinary skill in the art would consider coalescence to be complete before the particulates have fully melted, flowed together, become cross-linked, and reached optimum stage 5. Thus, there is no basis to conclude that one of ordinary skill would have understood completion of coalescence, as used in claim 9, to mean anything other than reaching an optimum stage. See *Phillips,* 415 F.3d at 1316 ("The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction." (citation omitted)).

**\*8** We reject Old Town's argument that the completion of coalescence would include instances where coalescence is brought to an end through intervention to produce a product that is other than at its optimum stage. That definition would sweep within the scope of the claims points during coalescence that are beyond the ordinary meaning of the expression "completion of coalescence" and that find no support in the intrinsic record. For the foregoing reasons, we affirm the district court's construction that "coalescence" is "complete" when the process of forming a uniform, homogeneous body has all necessary parts, elements or steps, or is fully carried out, *i.e.,* the layer formed from the particulate reaches its optimum state.

### C. Invalidity and Unenforceability

Confluence cross-appeals the JMOL order of the district court holding the '963 patent not invalid or unenforceable.[FN2]

> FN2. During oral argument, the court asked counsel for Confluence if it would be necessary for the court to address the issues raised in the cross-appeal if we were to affirm the appeal. While counsel recognized that if

his client were successful in obtaining an affirmance of the noninfringement judgment on appeal, the client would have to decide whether there was any reason to pursue the invalidity or unenforceability issues presented in the cross-appeal, he stopped short of agreeing to dismiss the cross-appeal without a vacatur of the judgment based on Old Town's underlying motion of no invalidity and unenforceability. This would be tantamount to the relief sought on the merits of the cross-appeal. Because our affirmance of the noninfringement issues presented in the appeal does not moot the invalidity and unenforceability issues on cross-appeal and because nothing said at oral argument otherwise warrants vacatur of the underlying motion or JMOL of no invalidity or unenforceability without consideration of the issues raised in the cross-appeal, the court is required to address the merits of the cross-appeal. See *Cardinal Chem. Co. v. Morton Int'l, Inc.,* 508 U.S. 83 (1993).

#### 1. Obviousness

Confluence argues that, in combination, the '595 patent and prior art articles published by Ramazzotti, et al. (the "Ramazzotti articles") teach every element of the asserted claims and thus render the asserted claims obvious. Although the Ramazzotti articles pertain to single-layer molding versus multi-layer molding, Confluence argues that persons of skill in the art at the time would have been motivated to apply the prior art teachings of single-layer techniques to the multi-layer techniques of the '963 patent. Confluence provided evidence suggesting that the motivation to combine would have been inherent in rotational molding techniques known at the time and in the nature of the problem to be solved, *i .e.,* the desire to maximize production and reduce oven time. Confluence also presented evidence to support that single-layer molding techniques are essentially the same as multi-layer techniques, and that single-layer techniques may be used in the construction of multi-layer products.

Old Town argues in rebuttal that the prior art references each have shortcomings and that there is no motivation to combine the teachings. Old Town points out that the Ramazzotti articles do not teach: (1) removal from the oven prior to complete coalescence in a multi-layer manufacturing process; (2) how to prevent warping; or (3) the cooling method disclosed in the '963 patent. Old Town also argues that it

presented evidence to suggest that persons skilled in the art at the time of the invention were surprised at the solution taught by the '963 patent.

"A patent may not be obtained ... if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." 35 U.S.C. 7 103(a) (2000).

Confluence introduced clear and convincing evidence that, in combination, the '595 patent and the Ramazzotti articles disclose every element of claim 9, and that "rotational molders were motivated" to combine these sources. Confluence also provided evidence that the motivation to combine would have been inherent in rotational molding techniques known at the time and in the nature of the problem to be solved, by showing that single-layer molding techniques are essentially the same as multi-layer techniques and that single-layer techniques may be used in the construction of multi-layer products.

*9 The parties' arguments highlight a number of disputed fact questions, including credibility determinations, to be resolved by the jury. When viewed in a light most favorable to Confluence, a reasonable juror could find support for Confluence's argument that the '963 patent would have been an obvious improvement over the prior art. We therefore vacate the district court's grant of JMOL that the '963 patent was not invalid for obviousness.

2. Enablement

Confluence contends that the '963 patent was not enabled because it failed to set forth the time and temperature parameters for the molding process. Confluence points out that rotational molding, at the time of the '963 patent, was a process of trial and error and that, after reading the patent's discussion of steps to take during and after coalescence, a person skilled in the art at the time of the invention would face inordinate experimentation regarding oven and cooling times and temperatures.

Old Town admits that "a molder would need to do some experimentation to determine the time and oven temperature," but cites the Ramazzotti articles for support that experimentation is not tedious because there are a number of time/temperature combinations that will give satisfactory results. Old Town suggests

that a person of ordinary skill in the art could cut open the mold after removal from the oven and assess coalescence. Old Town also asserts that the experts were able to practice the invention with minimal experimentation.

Confluence responds that, contrary to Old Town's assertion, its expert was not able to carry out the entire process as set forth in the '963 patent. Confluence argues an issue of fact exists as to the type and amount of experimentation required and that a reasonable juror could find that a person skilled in the art could not cut open the mold and deduce the correct time and temperature.

Enablement is a matter of law that we review without deference; however, this court reviews the factual underpinnings of enablement to determine whether there was sufficient evidence to support a verdict by a jury. BJ Servs. Co. v. Halliburton Energy Servs., Inc., 338 F.3d 1368, 1371-72 (Fed.Cir.2003) (citations omitted).

Confluence introduced clear and convincing evidence that, in attempting to practice the invention disclosed in the '963 patent, persons of ordinary skill in the art would have to develop time and temperature parameters through repeated experimental attempts to practice the invention. Confluence also showed that, contrary to Old Town's assertion, its expert was not able to carry out the entire process as set forth in the '963 patent. When viewed in a light most favorable to Confluence, this evidence, if believed by a juror, could support Confluence's claim of invalidity on the ground that the '963 patent is not enabled. Because Confluence produced evidence sufficient for a reasonable juror to conclude that the trial and error required to practice the claimed invention could be unduly laborious, we vacate the district court's grant of JMOL on the issue of enablement.

3. Best Mode

*10 Confluence argues that, at the time of filing of the patent application, the inventor had a preferred way of using the invention that included (1) optimal timing periods for coalescence and cooling, and (2) a way to construct cooling doors to permit opening the mold for cooling without disassembly. Confluence alleges that the design of the cooling doors was critical to cooling and that Old Town did not disclose their importance or how to implement them. Confluence points out that one of plaintiffs' experts admitted that it would not have been clear to a person of ordinary skill in the art

--- F.3d ----
--- F.3d ----, 2006 WL 1228887 (C.A.Fed.)
(Cite as: --- F.3d ----)

how to implement the cooling doors.

Old Town counters that Confluence relies on an undated, two-page document that is not persuasive because the inventor could not recall the time period during which it was prepared. Old Town asserts that there is no evidence that the best mode was concealed, and that the cooling doors are irrelevant because they are not limitations of the claims, relying on *Cardiac Pacemakers, Inc. v. St. Jude Medical, Inc.*, 381 F.3d 1371 (Fed.Cir.2004).

Confluence responds that the authenticity of the inventor's document was not challenged, and that there is evidence that the inventor prepared the document before the application was filed and gave it to his patent lawyer. Confluence adds that the cooling doors were relevant to the limitation of claim 9 that requires "opening the mold assembly after coalescence of the third charge is complete while continuing to air cool the mold assembly so as to expose the mold cavity to cooling air." Confluence also argues that the cooling doors were necessary to practice the invention.

A patent specification must set forth the "best mode contemplated by the inventor of carrying out his invention." 35 U.S.C. ¶ 112, ¶ 1. Determining whether a patent fails to comply with the best mode requirement is and thus invalid involves two factual inquiries. First, the fact-finder must determine whether at the time an applicant filed an application for patent, he or she had a best mode of practicing the invention, which is a subjective determination. Second, if the inventor had a best mode of practicing the invention, the fact-finder must determine whether the best mode was disclosed in sufficient detail to allow a skilled artisan to practice it without undue experimentation, which is an objective determination.

*Nobelpharma AB v. Implant Innovations, Inc.*, 141 F.3d 1059, 1064 (Fed.Cir.1998) (citation omitted).

Confluence's evidence suggests that Old Town did not disclose the details of the best mode of the invention. While we note that "[s]ubject matter that is not part of the invention that is claimed need not be included in the specification, and thus is not subject to the best mode requirement," *Cardiac Pacemakers*, 381 F.3d at 1379 (citing *Engel Indus., Inc. v. Lockformer Co.*, 946 F.2d 1528, 1532 (Fed.Cir.1991) ("The best mode inquiry is directed to what the applicant regards as the invention, which in turn is measured by the claims.")), we need not decide here whether the cooling doors are

part of the invention as claimed. Confluence produced clear and convincing evidence that Old Town documented a preferred mode describing timing parameters as well as cooling doors and that Old Town did not disclose that document to the Patent and Trademark Office (the "PTO"). Confluence came forward with a document produced by Old Town entitled "Rotational Molding of Canoes by Old Town" that described, *inter alia*, precise timing parameters for the molding process. Confluence presented evidence that the inventor prepared the document before the patent application was filed and gave the document to his patent lawyer. A reasonable juror could find that the specification's failure to disclose that which was detailed in the document produced by Old Town was a failure to disclose the best mode. We therefore vacate the district court's grant of JMOL on the ground of no best mode violation.

### 4. Inequitable Conduct

*11 As the final argument of its cross-appeal, Confluence asserts that the district court erred in granting Old Town's motion for JMOL that the '963 patent is not unenforceable due to inequitable conduct. Confluence presented evidence that Old Town made, used, and sold 500 so-called "RPF" canoes under the patented process more than one year prior to filing the patent application. Confluence cites the testimony of the inventor that the inner layer of these canoes was not completely coalesced upon removal from the oven. Confluence argues these 500 RPF canoes are, at a minimum, material and, because Old Town knew or should have known of their materiality, the court should infer intent to deceive the PTO. Old Town counters that the 500 RPF canoes were made using the method disclosed in the '595 patent rather than the method disclosed in the '963 patent and that it therefore had no duty to disclose those canoes because they were cumulative to the '595 patent.

Alternatively, Confluence argues that inequitable conduct could lay independently based on Old Town's failure to disclose best mode. *See Consol. Aluminum Corp. v. Foseco Int'l, Ltd.*, 910 F.2d 804, 809 (Fed.Cir.1990) (finding inequitable conduct due to intentional concealment of the best mode coupled with disclosure of a false mode of practicing an invention). Confluence argues that *Beacon Theatres, Inc. v. Westover*, 359 U.S. 500 (1959), and *Cabinet Vision v. Cabnetware*, 129 F.3d 595 (Fed.Cir.1997), preclude a trial judge from conducting a bench trial on the equitable issue of unenforceability where that trial would resolve issues that are common to invalidity

issues subject to jury resolution. Confluence overlooks our precedent, which explains that inequitable conduct and invalidity "are distinct and without commonality either as claims or in a relation to the underlying fact issues." *Gardco Mfg., Inc. v. Herst Lighting Co.*, 820 F.2d 1209, 1213 (Fed.Cir.1987). Because the issues of invalidity and unenforceability are distinct in this case, we must address whether the district court abused its discretion in finding the absence of clear and convincing evidence to support Confluence's argument for inequitable conduct based on the failure to disclose the 500 RPF canoes or the best mode. *See Kingsdown Med. Consultants Ltd. v. Hollister Inc.*, 863 F.2d 867, 876 (Fed.Cir.1988) (*en banc* ), cert. denied, 490 U.S. 1067 (1989).

Establishing inequitable conduct requires proof by clear and convincing evidence that the misrepresentation made to the PTO was material, and that the patentee acted with intent to deceive the PTO. *Id. at 872.* Because it is an equitable issue, the ultimate determination of inequitable conduct is committed to the discretion of the trial court. *Id. at 876.*

As to materiality, there is some evidence that the 500 RPF canoes were material based on their alleged manufacture under the patented method. Concerning best mode, we have held that, "[b]ecause disclosure of the best mode is statutorily required, see 35 U.S.C. 7 112, failure to disclose the best mode is inherently material and, we believe, reaches the minimum level of materiality necessary for a finding of inequitable conduct." *Consol. Aluminum*, 910 F.2d at 808 (citing *J.P. Stevens & Co., Inc. v. Lex Tex Ltd., Inc.*, 747 F.2d 1553, 1559 (Fed.Cir.1984)). The record evidence supporting a failure to disclose best mode may be relevant to a determination of materiality.

**\*12** Even if materiality is shown, however, Confluence points to no evidence of intent to deceive the PTO. "[M]ateriality does not presume intent, which is a separate and essential component of inequitable conduct." *Allen Eng'g Corp. v. Bartell Indus., Inc.*, 299 F.3d 1336, 1351 (Fed.Cir.2002) (quotation and citation omitted). Furthermore, in *Consolidated Aluminum*, 910 F.2d at 808, we stated that "since the failure to disclose the best mode is not excused even if unintentional, but inequitable conduct requires a 'threshold' level of intent, the failure to disclose the best mode will not constitute inequitable conduct in every case." (citations omitted). Confluence does little more than urge this court to draw an inference of intent to deceive, arguing that the applicant or his attorney knew, or should have known

that withheld information would be material. Confluence's general argument on this record is not sufficient to enable us to conclude that the district court abused its discretion in finding no inequitable conduct. The district court's JMOL of no inequitable conduct is, thus, affirmed.

### III. CONCLUSION

For the foregoing reasons we affirm the district court's judgment of noninfringement of the '963 patent, affirm the district court's grant of Old Town's motion for JMOL of no inequitable conduct, vacate the district court's grant of Old Town's motion for JMOL of no invalidity and remand for further proceedings consistent with this opinion.[FN3]

> FN3. The court's comments on the presence of disputed fact questions should not be construed as a determination by this court of the ultimate merit of any of the asserted grounds of invalidity, which remain open for consideration by the district court on remand.

AFFIRMED-IN-PART, VACATED-IN-PART, AND REMANDED.

### IV. COSTS

Costs are assessed against Old Town.

MAYER, Circuit Judge, dissenting.
I agree that Confluence does not infringe U.S. Patent No. 4,836,963. However, because there is no longer an actual controversy over the invalidity and unenforceability counterclaims, I dissent from the court's resolution of the cross-appeal on the merits.

Under the Declaratory Judgment Act, 28 U.S.C. 7 2201(a), a district court has jurisdiction over a declaratory judgment action only when there is an "actual controversy." Relatedly, the existence of a sufficiently concrete dispute between the parties is an ongoing jurisdictional predicate to maintaining such an action. *See Super Sack Mfg. Corp. v. Chase Packaging Corp.*, 57 F.3d 1054, 1058 (Fed.Cir.1995). Indeed, the "actual controversy must be extant at all stages of review, not merely at the time the complaint is filed." *Preiser v. Newkirk*, 422 U.S. 395, 401 (1975) (citations omitted). We review whether such controversy exists in light of our precedent, based on the "totality of the circumstances" of each case. *See*

--- F.3d ----
--- F.3d ----, 2006 WL 1228887 (C.A.Fed.)
(Cite as: --- F.3d ----)

Page 10

*Gen-Probe Inc. v. Vysis, Inc.*, 359 F.3d 1376, 1380 (Fed.Cir.2004). Critical to this inquiry is whether or not the declaratory judgment plaintiff has a reasonable apprehension that it will face an infringement suit. *See, e.g., Teva Pharm. USA, Inc. v. Pfizer, Inc.*, 395 F.3d 1324, 1332 (Fed.Cir.2005) (discussing our two-part test for determining whether an actual controversy exists).

**\*13** Here, once we affirmed the trial court's finding of no infringement, there ceased to be an actual controversy supporting jurisdiction over the invalidity and unenforceability counterclaims, because Confluence no longer desired to maintain its cross-appeal and admitted that it no longer had any reasonable apprehension of suit. For the majority nevertheless to address the merits of the cross-appeal, and remand for further proceedings, is wasteful and advisory. In view of Confluence's request for vacatur, our only appropriate course of action is to vacate the trial court's judgment on invalidity and unenforceability and remand with directions to dismiss. *See United States v. Munsingwear, Inc.*, 340 U.S. 36, 39 (1950) ("The established practice of the Court in dealing with a civil case from a court in the federal system which has become moot while on its way here or pending our decision on the merits is to reverse or vacate the judgment below and remand with a direction to dismiss.").

*Cardinal Chemical Co. v. Morton International, Inc.*, 508 U.S. 83 (1993), is not to the contrary. It explicitly recognizes the rule in *Munsingwear. See Cardinal*, 508 U.S. at 98 ("If, before the [Federal Circuit] had decided the case, either party had advised it of a material change in circumstances that entirely terminated the party's controversy, it would have been proper ... to vacate the entire judgment of the District Court.") (citing *Munsingwear*, 340 U.S. at 39); *see also Super Sack*, 57 F.3d at 1060 (characterizing the decision in *Cardinal* as a "relatively narrow one"). Moreover, *Cardinal* recognized that "intervening events," *see id.* at 96, or "further information," *see id.* at 98, could, as here, moot the declaratory judgment action, and divest this court of jurisdiction. The irony of the majority's disposition is that because vacatur without remand would leave Old Town's patent with a full presumption of validity, it has essentially nothing to gain, but everything to lose on remand. *See, e.g., Ethicon, Inc. v. Quigg*, 849 F.2d 1422, 1429 n. 3 (Fed.Cir.1988) (discussing the limited preclusion effects of a judgment finding a patent not invalid) (citing *Stevenson v. Sears, Roebuck & Co.*, 713 F.2d 705, 710-11 (Fed.Cir.1983)). Perhaps this is why Old Town scarcely objected at oral argument to

Confluence's offer to dismiss its cross-appeal and have the trial court's judgment on invalidity and unenforceability vacated.

C.A.Fed.,2006.
Old Town Canoe Co. v. Confluence Holdings Corp.
--- F.3d ----, 2006 WL 1228887 (C.A.Fed.)

Briefs and Other Related Documents (Back to top)

• 2005 WL 1397799 (Appellate Brief) Reply Brief for Defendant-Cross Appellant Confluence Holdings Corp. (May 19, 2005) Original Image of this Document (PDF)
• 2005 WL 1308578 (Appellate Brief) Reply Brief for Plaintiff-Appellant Old Town Canoe Company (May 2, 2005) Original Image of this Document (PDF)
• 2005 WL 1178159 (Appellate Brief) Brief for Defendant-Cross Appellant Confluence Holdings Corp. (Corrected) (Mar. 21, 2005)
• 2005 WL 3937334 (Appellate Brief) Brief for Defendant-Cross Appellant Confluence Holdings Corp. (Corrected) (Mar. 21, 2005) Original Image of this Document (PDF)
• 2005 WL 771086 (Appellate Brief) Brief for Plaintiff-Appellant Old Town Canow Company (Feb. 7, 2005) Original Image of this Document with Appendix (PDF)
• 2005 WL 986382 (Appellate Brief) Brief for Plaintiff-Appellant Old Town Canoe Company (Corrected) (Feb. 7, 2005) Original Image of this Document (PDF)
• 05-1148 (Docket) (Dec. 21, 2004)
• 05-1123 (Docket) (Dec. 7, 2004)

END OF DOCUMENT

# EXHIBIT 2

Westlaw.

Not Reported in F.Supp.2d                                                Page 1
Not Reported in F.Supp.2d, 2004 WL 1770290 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

**H**
Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court,D. Delaware.
SYMBOL TECHNOLOGIES, INCORPORATED,
Plaintiff,
v.
PROXIM INCORPORATED, Defendant.
**No. Civ. 01-801-SLR.**

July 28, 2004.

Andre G. Bouchard, and Karen L. Pascale, of
Bouchard, Margules & Friedlander, Wilmington,
Delaware, for Plaintiff, Eric J. Lobenfeld, Ira J.
Schaefer, Jonathan M. Sobel, and Ernest Yakob, of
Hogan & Hartson L.L.P., New York, New York, of
counsel.
Richard L. Horwitz, David E. Moore, of Potter,
Anderson & Corroon, LLP, Wilmington, Delaware,
for Defendant, Harry J. Roper, George S. Bosey,
Raymond N. Nimrod, Aaron A. Barlow, and Timothy
J. Barron, of Roper & Quigg, Chicago, Illinois, of
counsel.

OPINION

ROBINSON, Chief J.

I. INTRODUCTION

*1 On December 4, 2001, plaintiff Symbol
Technologies, Incorporated ("Symbol") filed this
action against defendant Proxim, Incorporated
("Proxim") alleging infringement of four U.S. Patents
owned by plaintiff.[FN1] (D.I.1) On December 18, 2001,
Proxim answered the complaint and asserted, *inter
alia*, a counterclaim of infringement of one of its own
patents.[FN2] (D.I.6) Plaintiff subsequently dismissed
the '803 patent from its case.

FN1. U.S. Patent Nos. 5,029,183 ("the '183
patent"), 5,103,461 ("the '461 patent"),
5,479,441 ("the '441 patent") and 5,668,803
(the '803 patent") (collectively the "Tymes
patents").

FN2. U.S. Patent No. 5,231,634 ("the '634
patent").

A jury trial was held from September 8 through
September 12, 2003. The jury rendered a verdict in
Symbol's favor, finding that Proxim's OpenAir and
802.11 products infringe the '183 and '441 patents.
Both of these patents relate to a power saving feature
in wireless local area network ("WLAN")
communications protocols. The jury awarded a six
percent royalty on sales of Proxim's OpenAir and
802.11 products.

On November 24, 2003, the court conducted a one day
bench trial to hear evidence on Proxim's defenses of
laches and equitable estoppel. Proxim asserts the
defense of laches only with respect to its OpenAir
products and equitable estoppel only with respect to
its 802.11 products. For the reasons stated below, the
court finds that Proxim has failed to prove by a
preponderance of the evidence its defenses of laches
and equitable estoppel; these are the court's findings of
fact and conclusions of law pursuant to Fed.R.Civ.P.
52.

II. FINDINGS OF FACT

A. Background

1. Symbol is a Delaware corporation with corporate
headquarters in Holtzville, New York. (D.I.273)
Proxim is a Delaware corporation with corporate
headquarters in Sunnyvale, California.

2. Symbols owns the Tymes patents at issue in this
action. The '183 patent was issued on June 29, 1991;
the '441 patent issued on December 26, 1995. (PTX 1;
PTX 2) The application for the '183 patent is the
parent of the application for the '441 patent. (PTX 1;
PTX 2; PTX 5, PTX 6 at SBLP 165776) Symbol filed
a terminal disclaimer of the '441 patent, disclaiming
any rights therein beyond the expiration of the '183
patent. (PTX 2; PTX 6 at SBLP 165977-79)

3. The claims of the '183 and '441 patents are directed
to methods and systems of transferring data packets
between remote units and base stations. (PTX 1; PTX
2) Claim 1 of the '183 patent, a representative claim of
the patents at issue, claims:
A method of transmitting data packets from one of a
plurality of remote terminal units to a base station,

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 1770290 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

Page 2

comprising the steps of: (a) transmitting a data packet from said one unit to said base station during a first time period selected by the unit; (b) receiving at said one unit from said base station an acknowledge signal during a second period occurring only a fixed time delay after said first time period, said second time period being the same for at least some of said units.

(PTX 1, col. 23, 11. 42-52)

4. The jury found that Proxim's OpenAir products and 802.11 products infringe the Tymes patents. (D.I.294)

## B. Laches

*2 5. Proxim contends that it is entitled to the defense of laches with respect to its OpenAir products because Symbol had either actual or constructive knowledge as early as 1993-94 that the OpenAir products infringed Symbol's patents. Proxim contends that it sustained both economic and evidentiary prejudice as a result of Symbol's unreasonable delay in bringing suit. (D.I. 340 at 5-6)

6. Symbol first filed its claims for patent infringement against Proxim on May 1, 2001 in the form of a counterclaim in *Proxim Inc. v. 3COM Corp., et al.,* No. 01-155-SLR. (D.I. 273 at 1). The counterclaims did not identify the OpenAir products as the subject of Symbol's infringement allegations. Symbol first accused Proxim's OpenAir products of infringement on December 24, 2002, when it served its expert report concerning infringement. (D.I. 328 at 260-61)

7. The OpenAir products were sold under the RangeLAN2 name. (D.I. 328 at 85-86) The accused OpenAir products included PC cards and access points. (*Id.* at 24, 27, 86) Proxim began selling the OpenAir product line in 1994.

8. The OpenAir products utilized a proprietary protocol developed by Proxim and known only to members of an industry organization, the Wirless LAN Interoperability Forum ("WLIF").[FN3] (D.I. 311 at 350-51; D.I. 328 at 17, 244-45) Proxim vigorously guards the confidentiality of its OpenAir source code.

> FN3. "Protocol" refers to the rules under which a product operates. A protocol specification is a document detailing the "rules" of the protocol. (D.I. 328 at 244) "Source code" is the computer language through which the protocol is implemented.

(*Id.* at 7-11; D.I. 311 at 383-84)

9. Symbol's infringement expert testified that he performed his infringement analysis for the OpenAir products using both the OpenAir protocol description and the OpenAir source code. (D.I. 311 at 354-55, 375-83) The infringement expert testified that, to determine direct infringement, both the protocol and source code were required. (*Id.* at 386)

10. The OpenAir protocol and source code were proprietary to Proxim. In order for Symbol lawfully to obtain the source coude, it would have had to join Proxim's WLIF organization. (D.I. 328 at 244) Symbol did not join the WLIF as the WLIF promoted a wireless standard, OpenAir, that directly competed with the 802.11 standard endorsed by Symbol. (*Id.* at 245)

11. As Proxim was a direct competitor of Symbol, Symbol was aware of Proxim's product lines and product features. (D.I. 328 at 22-27) Through publicly available information, Symbol became aware that Proxim's OpenAir PC cards had advanced power management features. (*Id.* at 27; DTX 1158; DTX 7153)

12. In April 1995, Proxim made a direct sale of an accused OpenAir PC card to Symbol. (D.I. 328 at 32, 86, 98-101) The PC card was sold to Symbol so that Symbol could determine whether the OpenAir product could be installed in a Symbol hand-held device for use in a customer network. (*Id.* at 96-98) In the fall of 1996, Symbol tested both a Proxim PC card and access point with a spectrum analyzer, which measured the amount of information that a laptop computer sends to an access point through the PC card. (D.I. 328 at 33; DTX 1160)

13. In September 1996, senior management at Symbol received an internal memorandum discussing Proxim's OpenAir products which were competitive with Symbol (the "September 1996 memoranda"). (D.I. 328 at 34-38; DTX 1036) It compared the features and functions of Symbol's products with that of Proxim's. Included in the September 1996 memorandum was a discussion concerning Proxim's power management function. (D.I. 328 at 40; DTX 1036) It also showed test results indicating that Proxim's products transferred significantly more files per second when the power management feature was activated. Overall, the September 1996 memorandum reported that the OpenAir products had a competitive advantage over Symbol's own products.

Not Reported in F.Supp.2d                                                    Page 3
Not Reported in F.Supp.2d, 2004 WL 1770290 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

*3 14. The September 1996 memoranda explained that Proxim's products utilized a request-to-send and clear-to-send protocol ("RTS-CTS"). (DTX 1036) RTS-CTS was the basis of Symbol's infringement expert's testimony that Proxim's products infringed the '183 and '441 patents.

15. Between 1994 and 2000, Proxim advertised and promoted its OpenAir product lines. (D.I. 328 at 108-09) In that time period, Proxim spent approximately $250,000 in advertising for its OpenAir products. (Id. at 108-09)

16. Proxim contends that it was substantially prejudiced by having invested several million dollars in its OpenAir products between 1994 and 2001, that it lost the opportunity to re-engineer its products to avoid infringement, and that it lost the opportunity to negotiate a licensing agreement. Proxim also contends that it sustained evidentiary prejudice which prevented it from raising defenses on the basis of inventorship, invalidity and inequitable conduct.

17. Conclusions of Law. It is well established that laches is a defense to a patent infringement suit. See Lane & Bodley Co. v. Locke, 150 U.S. 193 (1893); Wollensak v. Reiher, 115 U.S. 96 (1885); Mahn v. Harwood, 112 U.S. 354 (1884); A.C. Aukerman Co. v. R.L. Chaides Const. Co. 960 F.2d 1020, 1028 (Fed.Cir.1992). "In a legal context, laches may be defined as the neglect or delay in bringing suit to remedy an alleged wrong, which taken together with lapse of time and other circumstances, causes prejudice to the adverse party and operates as an equitable bar." A.C. Aukerman Co ., 960 F.2d at 1028-29.

18. To prevail on its equitable defense of laches, Proxim must prove by a preponderance of the evidence that: (1) Symbol delayed filing suit for an unreasonable and inexcusable period from the time that Symbol knew or should have known of its infringement claim against Proxim; and (2) Symbol's delay operated to Symbol's prejudice or injury. Id. at 1032.

19. The first prong of a laches defense requires proof that the patent holder had either actual or constructive knowledge of infringing activity. See Johnston v. Standard Min. Co., 148 U.S. 360, 370 (1893); Eastman Kodak Co. v. Goodyear Tire & Rubber Co., 114 F.3d 1547, 1559 (Fed.Cir.1997). Constructive knowledge imposes upon patent holders the duty to police their rights. See Wanlass v. Fedders Corp, 145 F.3d 1461, 1464-67 (Fed.Cir.1998); Wanlass v.

General Electric Co., 148 F.3d 1334, 1338 (Fed.Cir.1998). Under the constructive knowledge theory, a patentee is charged with "such knowledge as he might have obtained upon inquiry, provided the facts already known by him were such as to put upon a man of ordinary intelligence the duty of inquiry." Johnston, 148 U.S. at 370.

20. A patentee's duty to inquire is subject to a standard of reasonableness. As such, the extent to which a reasonable method of detection of infringement is available to the patentee is relevant. See Wanlass v. General Elec., 148 F.3d at 1340 (holding that the "frequency with which [infringement] investigations should ... occur[ ] is a function of their cost and difficulty."); Wanlass v. Fedders Corp, 145 F.3d at 1464-67 (finding that a finding of laches was not appropriate on summary judgment where record did not demonstrate that a testing of all possible infringing products was feasible and affordable). Circumstances which give rise to a duty to inquire must be "pervasive, open, and notorious" and include "sales, marketing, publication or public use of a product similar to or embodying technology similar to the patented invention, or published descriptions of the defendant's potentially infringing activities." Wanlass v. General Elec., 148 F.3d at 1339.

*4 21. The defense of laches focuses on the conduct of the patentee, not the infringer. Nevertheless, the infringer's activities are relevant to whether the patentee's conduct was reasonable, including the infringer's efforts to maintain the secrecy of its processes and its denials of infringement. See Eastman Kodak Co., 114 F.3d at 1559. An infringer cannot cloak its activities in secrecy and simultaneously accuse the patent holder of failing to adequately protect its rights. See, e.g., Fromson v. Western Litho Plate and Supply Co., 670 F.Supp. 861, 868-69 (E.D.Mo.1987), rev'd on other grounds by 853 F.2d 1568 (Fed.Cir.1988).

22. After determining the point in time at which a patentee had knowledge, actual or constructive, of the infringing activities, the court must then determine whether the delay in bringing suit is unreasonable or inexcusable. See A.C. Auckerman, 960 F.2d at 1032. If the delay in filing suit is more than six years, a presumption arises that the delay is unreasonable. See id. at 1035.

23. Absence of Requisite Knowledge. Proxim produced no evidence that demonstrates Symbol had actual knowledge of Symbol's infringing activities. Instead, Proxim's laches defense rests upon whether

Not Reported in F.Supp.2d                                                                    Page 4
Not Reported in F.Supp.2d, 2004 WL 1770290 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

there were sufficient facts in Symbol's possession to place Symbol on notice of potentially infringing activities and from which a duty to inquire would arise. The court concludes that under these circumstances, the publicly available facts did not give rise to a duty to inquire.

24. In *Wanlass v. General Elec.*, the Federal Circuit articulated a duty to inquire that will arise when sufficient facts are available to put the patentee on notice of infringement. 148 F.3d at 1339. A principal justification for this duty is that the burden is less costly on patentees to police their rights than it would be to impose a burden upon potential infringers to review all patent art for potential infringement. *Id.*

25. It is not the case, however, that all inventions, and the activities which may infringe them, are so readily susceptible to low cost detection. *See Wanlass v. Fedders*, 145 F.3d at 1467. The case at bar highlights this tension. Symbol did have knowledge of Proxim's power save feature. If Symbol's patent were so broad that any power saving function in a wireless device might infringe, this certainly may impose a duty upon Symbol to inquire further. Symbol's patent, however, is not of such breadth.

26. Under different circumstances, Symbol may have had a duty to investigate. For example, if evidence indicated that Symbol actually suspected Proxim's OpenAir products of infringement at a time prior to when it filed suit, but did nothing, laches might attach. Or if Proxim's proprietary source code was reasonably and lawfully available to Symbol, its duty may have been different. Under the facts at bar, however, the court finds that Proxim has not established that Symbol had sufficient knowledge to put it on notice of Proxim's infringing activities.

*5 27. Absence of Requisite Prejudice. Even if the court were to find that Symbol had knowledge, constructive or otherwise, of Proxim's infringing activities, Proxim has still failed to prove the requisite prejudice. "Evidentiary, or 'defense' prejudice, may arise by reason of a defendant's inability to present a full and fair defense on the merits due to the loss of records, the death of a witness, or the unreliability of memories of long past events, thereby undermining the court's ability to judge the facts." *A.C. Auckerman, 960 F.2d at 1032.* In *Wanlass v. General Elec.*, the Federal Circuit found evidentiary prejudice where the defendant had a policy of destroying internal documents after six years, key witnesses were deceased or unavailable, and the defendant no longer had models of some of the accused products. 148 F.3d

at 1340.

28. Proxim contends that it suffered evidentiary prejudice stemming from Symbol's delay in that two witnesses were unable to recall certain facts during depositions and that a certain document was not produced by Symbol during discovery. This, according to Proxim, prejudiced its ability to assert defenses pertaining to inventorship and inequitable conduct.

29. Proxim's inventorship defense supposedly relates to whether John Kramer was a co-inventor of the '441 patent. Initially, Kramer was named as a co-inventor, something which Symbol contends was mistaken and undiscovered until this litigation. (PTX 2) Symbol, pursuant to 35 U.S.C. 7 256, applied for and obtained a correction from the PTO based upon certifications by both Tymes and Kramer asserting that the original application was in error in that respect. (D.I. 311 at 268-73; PTX 151; PTX 331) At trial, Tymes testified that he was the sole inventor of the '441 patent. (D.I. 311 at 268)

30. Proxim did not raise inventorship at trial as a defense and did not question Tymes on the issue of inventorship in its cross-examination of him. As Kramer has disclaimed any inventorship in the patents at issue and Proxim has no evidence otherwise to counter such a claim, it eludes the court as to how Proxim was in fact prejudiced. Where, as here, a deposed witness has indicated that he does not have a recollection of a particular fact, the lapse in memory is susceptible to more than one reasonable inference; in the absence of other evidence to support defendant's contention, its alleged evidentiary prejudice is no more likely than not.

31. The second basis for evidentiary prejudice was Symbol's failure to produce a certain document, or perhaps a group of related documents, created by Tymes in preparation for the patent applications. During his deposition, Tymes described preparing a memorandum which explained format and procedures pertaining to his invention but could not recall specifics about these documents or their present location. (D.I. 328 at 314-15) Like the absence of memory by a witness, the absence of a document that was once known to exist, without more, does not give rise to an inference of evidentiary prejudice. Proxim offered no evidence to suggest that such a document likely contained material that would have aided its invalidity defense of inventorship.[FN4] Therefore, the court finds that Proxim has not demonstrated that it sustained evidentiary prejudice to support its defense

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 1770290 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

of laches.

> FN4. Proxim also, in conclusory fashion, suggests that this unavailable evidence might have aided it in a defense of inequitable conduct. (D.I. 340 at     65) Of course, conclusory assertions of evidentiary prejudice cannot form the basis of a laches defense. See Meyers v. Asics Corp., 974 F.2d 1304, 1307 (Fed.Cir.1992). Moreover, in the case of inequitable conduct where the law requires proof by clear and convincing evidence, the absence of any evidence of deceit or fraud undermines Proxim's claims of prejudice.

**\*6** 32. Economic prejudice results where the infringer "will suffer the loss of monetary investments or incur damages which likely would have been prevented by earlier suit." A.C. Auckerman, 960 F.2d at 1033. There must be a nexus between the patentee's delay and the infringer's injury. See Gasser Chair Co., Inc. v. Infanti Chair Mfg. Corp., 60 F.3d 770, 774 (Fed.Cir.1995). Simply that the infringer expended capital in pursuit of its infringing activities does not support a finding of a causal connection. See Hemstreet v. Computer Entry Systems Corp., 972 F.2d 1290, 1294 (Fed.Cir.1992) ("It is not enough that the alleged infringer changed his position-i.e., invested in production of the allegedly infringing device. The change must be because of and as a result of the delay, not simply a business decision to capitalize on a market opportunity.").

33. Proxim has insufficiently demonstrated the existence of actual prejudice that is causally linked to Symbol's delay. The economic prejudice Proxim relies upon is of the ordinary kind that any infringer would incur, namely, the loss of the opportunity to engage in noninfringing economic activities. While in some cases, a patentee's conduct may justify laches in such circumstances, it does not here. For example, had Proxim proven actual knowledge by Symbol of Proxim's infringing activity, such economic losses might constitute actual prejudice. Dwight & Lloyd Sintering Co. v. Greenawalt, 27 F.2d 823, 827 (2d Cir.1928) ("[T]here is abundant authority to deny an accounting when the patentee has let the infringer slowly build up a large business without protest.").

34. Proxim's allegation of nexus also fails to the extent it relies upon its post hoc awareness of the scope and validity of the Tymes patents. Proxim contends that had it known its products infringed valid patents held

by Symbol, it would have designed around them or diverted its investments to noninfringing technologies. (D.I. 347 at 52) This argument is on four corners with that rejected by the Federal Circuit in State Contracting & Engineering Corp. v. Condotte America, Inc. 346 F.3d 1057 (Fed.Cir.2003). In that case, the infringer argued that had it received earlier notice of the patent at issue in that case, it would have designed around the patent and would not have included the patented invention in its project bids. Id. at 1066. The Federal Circuit rejected this argument as lacking the requisite nexus between the delay and the injury.[FN5] Id. at 1067. In particular, the Federal Circuit noted that the infringer failed to prove that it would have changed its design. Id. Similarly, in Gasser Chair, the Federal Circuit found that an infringer's belief that the patent was invalid undercut its argument that it would have engaged in a different course of conduct. Gasser Chair Co., Inc. v. Infanti Chair Mfg. Corp., 60 F.3d 770, 775 (Fed.Cir.1995).

> FN5. The Federal Circuit also found that the alleged prejudice was inadequate to serve as a basis for laches, as it was the kind of loss attributable to ordinary liability for infringement. Id. at 1067.

35. In the case at bar, Proxim has not demonstrated that the prejudice it allegedly sustained has a nexus to Symbol's delay. Consequently, the court finds that Proxim has failed to prove the required elements of laches by a preponderance of the evidence.

### C. Equitable Estoppel

**\*7** 36. Proxim contends that Symbol, by not informing the IEEE of the existence of the Tymes patents and their applicability to the 802.11 standard, misled Proxim into believing that Symbol held no patents relating to the 802.11 standard.

37. Proxim first began selling the infringing 802.11 product line in 1998. (D.I. 312 at 675) Proxim's 802.11 products were sold under various names, including RangeLAN802, Skyline, Harmony and Orinoco.

38. The IEEE 802.11 standard is an industry standard drafted by the working group members of the 802.11 committee, of which Symbol and Proxim were both members. (D.I. 328 at 52)

39. The IEEE Standards Board Bylaws contemplate that IEEE standards may include the use of subject

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 1770290 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

matter covered by known patents or pending patent applications. (PTX 400) The Bylaws require that such patented subject matter may only be included if the patentee provides either: (1) a general disclaimer against assertion of any present or future patent rights against persons or entities practicing a patented invention in order to comply with the IEEE standard; or (2) a statement that a license will be made available "without compensation or under reasonable rates, with reasonable terms and conditions that are demonstrably free of any unfair discrimination." (PTX 400)

40. In September 1995, the chairperson of the 802.11 committee sent a letter to all committee members requesting that each member identify whether they held patents related to technology embodied in the draft agreement and whether they would be willing to "license their technology on a non-discriminatory basis and under fair and reasonable terms." (DTX 6166 at P511051) Attached to the chairperson's letter was a sample letter which provided blank spaces for the inclusion of U.S. Patent Numbers. (*Id.* at P511052)

41. In April 1996, Symbol responded to the chairperson's letter with a letter of assurance. (DTX 6166 at P511048) Symbol's letter did not identify any specific patents or patent applications. (*Id.*) Instead, the letter stated that in the event the 802.11 standard is adopted, Symbol would "be willing to negotiate a non-exclusive, worldwide license, under the relevant claims of such patent or patents, on a nondiscriminatory basis and on reasonable terms and conditions including its then current royalty rates." (*Id.*) Symbol's letter is consistent with submissions made by several other companies. In an August 1996 memorandum, the IEEE Standards Board chairperson provided a list as to which committee members had complied with this request for an assurance letter. Symbol, along with several other companies, was denoted as having an "IP statement available." (*Id.* at P511030)

42. In 1997, testing was performed at a laboratory at the University of New Hampshire to determine whether products offered by various 802.11 participants had interoperability. (D.I. 328 at 49-50, 197-198) This third-party testing confirmed that Proxim and Symbol's products were interoperable. (*Id.* At 51-52)

**\*8** 43. Conclusions of Law. Equitable estoppel is similar to laches but focuses on the reasonableness of the infringer's reliance rather than the unreasonableness of the patentee's delay. To obtain relief from enforcement of a patent under the doctrine

of equitable estoppel, Proxim must prove three elements by the preponderance of the evidence: (1) Symbol, through misleading conduct, led Proxim to reasonably infer that Symbol did not intend to enforce its patent; (2) Proxim relied on Symbol's misleading conduct; and (3) material prejudice resulted to Proxim. See *A.C. Auckerman Co., 960 F.2d at 1028.*

44. Silence may give rise to the defense of equitable estoppel only when coupled with either affirmative conduct [FN6] or an affirmative obligation. [FN7] *Id.*

> FN6. For example, if a patentee threatened enforcement, but then delayed in bringing suit. See *Meyers, 974 F.2d at 1308-09.*
>
> FN7. For example, if a patentee and infringer had a relationship from which there exists an affirmative obligation to speak. See *A.C. Auckerman, 960 F.2d at 1042.*

45. Proxim contends that Symbol had a duty to disclose the existence of patents relevant to the IEEE standards development. Proxim relies upon the Federal Circuit's decision in *Rambus, Inc. v. Infineon Tech Corp., 318 F.3d 1081 (Fed.Cir.2003),* to support the existence of a duty to disclose. Proxim's reliance is misplaced.

46. *Rambus* does not stand for a general duty of disclosure for participants in an industry standards organization. First, the portion of the *Rambus* opinion relied upon by Proxim addressed a state law claim of fraud, not equitable estoppel. *Rambus, 318 F.3d at 1096.* Second, the Federal Circuit focused substantially on the contractual duty of disclosure of the specific industry standards organization. *Id.* at 1097-1101. The contractual nature of this duty was further reinforced by court of appeal dicta admonishing open standards committees to adopt clearer policies relating to the disclosure of intellectual property by its members. *Id.* at 1102.

47. If Proxim sought to rely upon the existence of a contractual duty to disclose, it had the burden of proving the existence thereof and the scope thereto. Proxim, however, failed to provide evidence to support its claim that IEEE Standards Board members bore a duty to disclose their patent rights. Indeed, the evidence demonstrates that IEEE Standards Board members could either disclose their specific patents or pledge to license on a reasonable and nondiscriminatory basis, the latter being the course selected by Symbol and several other significant

Not Reported in F.Supp.2d                                                                Page 7
Not Reported in F.Supp.2d, 2004 WL 1770290 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

technology holders. Proxim produced no controlling agreement that expressed a duty to the contrary. Given the course of conduct of the IEEE members, the court finds that no such duty existed. In the absence of a duty to speak, Symbol's silence cannot constitute the basis for a charge of equitable estoppel as a matter of law. _A.C. Auckerman, 960 F.2d at 1042_ ("[S]ilence alone will not create an estoppel unless there was a clear duty to speak.").

48. Proxim also contends that Symbol's silence following the interoperability testing between Proxim and Symbol constituted misleading conduct. Proxim, however, offered no evidence that the third-party interoperability testing affirmatively imposed the duty to speak upon any participating 802.11 vendor. In the absence of such a duty, Symbol's silence cannot be misleading as a matter of law. Moreover, Proxim has not shown any evidence of reliance that is connected to the interoperability testing. _Id. at 1043._

*9 49. Consequently, the court finds Proxim has failed to prove by a preponderance of the evidence its defense of equitable estoppel.

## IV. PREJUDGMENT INTEREST

Symbol filed a motion for an award of prejudgment interest and for a six percent royalty on future infringing sales by Proxim. (D.I.324) At the conclusion of the jury trial, the jury found by a preponderance of the evidence that Symbol was entitled to damages both for infringement by the 802.11 products and the OpenAir products. (D.I. 294 at    27) Question 28 asked the jury "[w]hat amount of damages in the form of a reasonable royalty do you find that Symbol has proven by a preponderance of the evidence it is entitled to receive from Proxim?" (_Id._ at    28) Following the question, two boxes were provided for the jury's response: (1) a box which contained a blank line after which the "% royalty rate" appeared; (2) a box which began with a dollar symbol after which a blank line was provided. (_Id._) The jury indicated on the verdict form that a six percent royalty rate was awarded. (_Id._) The jury drew a dash through the second box containing the dollar symbol.

Proxim contends that the jury's response to the second box indicates that it determined that no damages should be awarded Symbol. (D.I.346) This argument, however, cannot be reconciled with the verdict form, the jury's full response to question 28 nor Proxim's argument at trial. The verdict form supplied to the jury was agreed to by both parties. (D.I. 314 at 1073-74)

Neither party requested that the jury be asked to make a special finding as to the royalty base. Both parties' experts used a royalty base based upon Proxim's reported sales data for the accused products. (DTX 2008; DTX 2026; DTX 2018; DTX 2036; DTX 2041; D.I. 312 at 584-85; D.I. 313 at 958-59) Indeed, it was Proxim's argument, as proffered through its damages expert, that the proper royalty, if not zero, should be a lump sum. (D.I. 313 at 961) At no point during the trial did Proxim introduce evidence to contradict the royalty base figure. Consequently, the court finds that the undisputed evidence offered at trial supports the conclusion that the proper royalty base is $381,091,287, based upon defendant's reported sales figures for the products found to have infringed the Tymes patents. (DTX 2008; DTX 2011; DTX 2018; DTX 2026; DTX 2036; DTX 2041; D.I. 312 at 584) Consequently, based upon the jury's finding of a six percent royalty, Symbol is entitled to an award of damages in the amount of $22,865,477.

Symbol proposes an award of prejudgment interest based upon the average annual prime rate compounded annually. (D.I.324) The rate, if any, of prejudgment interest to be awarded is within the discretion of the court. See _Studiengesellschaft Kohle, m.b.H. v. Dart Industries, Inc._, 862 F.2d 1564, 1580 (Fed.Cir.1988). A patent holder need not prove that it borrowed at the prime rate in order to be entitled to prejudgment interest on that basis. See _Uniroyal, Inc. V. Rudkin-Wiley Corp._, 939 F.2d 1540, 1545 (Fed.Cir.1991). The determination of whether to award simple or compounded interest is within the discretion of the court. See _Rite-Hite Corp._, 56 F.3d at 1555. "[I]t may be appropriate to limit prejudgment interest, or perhaps even deny it altogether, where the patent owner has been responsible for undue delay in prosecuting the lawsuit." _General Motors Corp. v. Devex Corp._, 461 U.S. 648, 657 (1983). "Any justification for withholding the award ... must have some relationship to the award of prejudgment interest itself." _Crystal Semiconductor Corp. v. TriTech Microelectronics Intern._, Inc. 246 F.3d 1336, 1361 (Fed.Cir.2001).

*10 Mindful of its discretion, the court concludes that Symbol is entitled to simple interest based upon the United States Treasury Bill One Year Constant Rate for a period beginning in May 1995 and ending in July 2004.[FN8] Prejudgment interest, calculated consistent with Symbol's expert's methodology, shall be awarded in the amount of $3,052,192.

FN8. The interest rates employed by the

Not Reported in F.Supp.2d                                                                    Page 8
Not Reported in F.Supp.2d, 2004 WL 1770290 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

court are as follows: (1995) 5.96%; (1996)
5.52%; (1997) 5.63%; (1998) 5.05%; (1999)
5.08%; (2000) 6.11%; (2001) 3.49%; (2002)
2.00%; (2003) 1.24%; and (2004) 1 .29%.
*See* United States Federal Reserve, Selected
Interest Rates(2004) *at* http://ww
w.federalreserve.gov/releases/h15/data.htm.

## V. FUTURE ROYALTIES

Symbol contends that in lieu of a permanent
injunction it should be awarded a six percent royalty
on sales of infringing products by Proxim occurring
after September 2003. (D.I.324) Symbol relies upon
*Shatterproof Glass Corp. v. Libbey-Owens Ford Co.,*
*758 F.2d 613, 616, 628 (Fed.Cir.1985),* for its
argument that it should receive a court imposed
royalty on future sales. In *Shatterproof Glass,*
however, the patentee sought a permanent injunction.
The district court denied the injunction and instead
ordered a compulsory license to be granted to the
infringer. In the case at bar, Symbol has not sought a
permanent injunction and Proxim has not sought a
compulsory license. In the absence thereof, the court
declines to consider whether a judicially determined
royalty on future sales is appropriate relief in the
present case.

## VI. CONCLUSION

For the reasons stated above, the court finds that
Proxim has failed to establish by a preponderance of
the evidence its equitable defenses of estoppel and
laches. The court also finds that, consistent with the
jury's award of a six percent royalty on the infringing
products, Symbol is entitled to an award of damages in
the amount $22,865,477 and interest in the amount of
$3,052,192. An order shall issue.

D.Del.,2004.
Symbol Technologies, Inc. v. Proxim Inc.
Not Reported in F.Supp.2d, 2004 WL 1770290
(D.Del.)

Briefs and Other Related Documents (Back to top)

• 2003 WL 24302583 () Supplemental Expert Report
of Dr. Izhakrubin (Mar. 2, 2003)
• 2003 WL 24302584 () Deposition of Izhak Rubin
(Mar. 2, 2003)
• 2003 WL 24307200 (Trial Pleading) Amended
Complaint (Jan. 2, 2003) Original Image of this
Document (PDF)
• 2002 WL 33003952 () Rebuttal Expert Report of

Joseph V. Colaianni (Dec. 24, 2002)
• 2002 WL 33003953 () Expert Report of Joseph V.
Colaianni (Dec. 20, 2002)
• 2002 WL 33006690 (Trial Motion, Memorandum
and Affidavit) Opening Brief in Support of Symbol's
Motion to Dismiss Proxim's Sixth, Seventh and Eighth
Counterclaims, and to Strike Proxim's Tenth
Affirmative Defense (Jan. 31, 2002) Original Image of
this Document (PDF)
• 1:01CV00801 (Docket) (Dec. 04, 2001)
• 2001 WL 34900760 () (Partial Testimony) (2001)
• 2001 WL 34900761 () Expert Report of Joseph V.
Colaianni (2001)

**END OF DOCUMENT**

# EXHIBIT 3

# REDACTED IN ITS ENTIRETY

# EXHIBIT 4

# REDACTED IN ITS ENTIRETY

# EXHIBIT 5



# NEWS RELEASE

<u>For Immediate Release</u>

## TriZetto's Record Q1 Results Exceed Guidance; New Contract Bookings Up 65%

NEWPORT BEACH, Calif. – April 25, 2006 – The TriZetto Group, Inc. (Nasdaq: TZIX) today reported diluted earnings per share (EPS) for the first quarter of 2006 of $0.15, on revenue of $85.3 million. EPS performance was $0.01 better than the high end of the company's guidance range. It represents an increase of 50% over the year-ago quarter, even though the current quarter was negatively affected by ($0.04) for the effects of expensing stock-based compensation under SFAS 123R. New contract bookings increased 64.6% to $87.4 million from the first quarter last year.

"TriZetto is well-positioned to facilitate sweeping changes in the healthcare industry as payers build new consumer-retail relationships with their members and tackle government-sponsored managed care initiatives, " said Jeff Margolis, TriZetto's chairman and CEO. "First quarter results demonstrate TriZetto's strengthening ability to provide our customers with industrial strength solutions for complex core administration challenges and advanced cost and quality of care programs."

Added Kathleen Earley, TriZetto's president and COO, "TriZetto generated the highest new business bookings in seven quarters, highlighted by a number of new consulting contracts and sales of CareAdvance and Facets licenses. Record revenue and net income were the result of the operations team delivering solid growth."

<u>Financial Summary</u> (in millions, except per share amounts)

|  | Quarter Ended Mar. 31, 2006 | Quarter Ended Mar. 31, 2005 | Change |
|---|---|---|---|
| Revenue | $85.3 | $71.8 | 18.8% |
| Bookings | $87.4 | $53.1 | 64.6% |
| Total Backlog | $704.6 | $604.8 | 16.5% |
| Diluted EPS | $0.15 | $0.10 | 50.0% |
| Net Income | $6.8 | $4.3 | 58.1% |
| Adjusted EBITDA* | $15.7 | $12.0 | 30.8% |
| Cash Resources | $89.7 | $54.1 | 65.8% |
| Cash Provided by Operations | $5.1 | $8.6 | -40.7% |
| Capital Expenditures | $3.6 | $1.5 | 140.0% |

* Definition and reconciliation to GAAP is included in the attached financial schedules

## Revenue

First quarter 2006 revenue totaled $85.3 million, versus $71.8 million for the first quarter of 2005. The $13.5 million change included increases of $5.5 million in consulting, $3.3 million in software license, $3.2 million in outsourced services and $1.5 million in software maintenance revenue.

Non-recurring revenue represented 48.8% of total revenue in the first quarter of 2006, compared to 45.7% in the year-ago quarter, driven by the larger increases in license and consulting revenue.

## New Business Bookings

TriZetto signed 233 new customer contracts in the first quarter of 2006 with a total value of $87.4 million, compared to $53.1 million in the year-ago quarter. Contract bookings comprise a mix of current and future period revenue and represent the expected minimum total revenue to be generated under each contract. New contract bookings will vary from one quarter to the next. The company targets approximately $50 to $60 million of new contract bookings each quarter.

Of the new first-quarter contracts, 165 were for consulting, implementation services, software customization and other services valued at $44.5 million; 42 were software license contracts valued at $37.8 million; and 26 were outsourced services contracts (software hosting, business process outsourcing and other services) valued at $5.1 million.

## Backlog

The company's total revenue backlog was approximately $705 million at March 31, 2006, compared to $605 million at March 31, 2005 and $703 million at December 31, 2005. Twelve-month revenue backlog was approximately $187 million at March 31, 2006, compared to $172 million at March 31, 2005 and $185 million at December 31, 2005. The timing of contract closings and other factors can cause the company's backlog to vary from one quarter to the next.

## Profitability

First quarter 2006 net income was $6.8 million, or $0.15 per diluted share, compared to net income of $4.3 million, or $0.10 per share, for the first quarter in 2005. First quarter 2006 EPS included a ($0.04) negative impact from both the equity and cash expense effects of adopting Statement of Financial Accounting Standards No. 123R, which requires all companies to expense stock-based compensation for 2006. EPS of $0.15 was up 50% compared to the 2005 first quarter. Excluding the ($0.04) impact of SFAS 123R to the first quarter of 2006, EPS increased by 90% from the year-ago quarter.

Due to the utilization of Federal net operating loss (NOL) carry forwards, the quarter's tax provision represented an effective rate of approximately 8.0%. At March 31, 2006, TriZetto had $71 million in

NOL carry forwards. Adjusted EBITDA, was $15.7 million for the first quarter of 2006, compared to $12.0 million in the year ago quarter.

TriZetto reports earnings in accordance with Generally Accepted Accounting Principles (GAAP), and additionally reports certain non-GAAP measures, such as Adjusted EBITDA, believing that these provide additional information for investors to evaluate the company's financial performance. A definition of Adjusted EBITDA and a reconciliation to GAAP measures are included in the attached financial schedules.

Gross margin for the first quarter 2006 was 47.5%, compared to 44.8% a year ago. The 270 basis point increase was driven primarily by a higher-margin mix of revenue in the quarter and operating efficiencies.

Research and development expenses represented 12.3% of revenue in the first quarter 2006, 50 basis points higher than 11.8% of revenue for the year-ago quarter. This increase reflected additional development for cost and quality of care solutions, as well as continuing investments in core administration and component software to add new capabilities and functionality for future customer needs.

First quarter 2006 selling, general and administrative expenses increased $3.2 million, but remained nearly flat at 25.0% of revenue, compared to 25.2% in the first quarter 2005. The increase was primarily driven by higher compensation costs, including SFAS 123R stock option expense.

**Cash Resources and Cash Flow**

Cash, restricted cash and short-term investments totaled $89.7 million at March 31, 2006, versus $54.1 million at March 31, 2005. Net cash provided by operating activities during the first quarter of 2006 was $5.1 million, compared to $8.6 million for the 2005 quarter. Capital expenditures in the first quarter of 2006 were $3.6 million, versus $1.5 million for the year-ago quarter. Significant uses of cash in the quarter included payments for the CareKey acquisition and cash bonus payments under the company's 2005 bonus plan, which totaled $53.3 million. Days sales outstanding for the first quarter of 2006 was 63 days, versus 72 in the year-ago quarter.

**Update on McKesson Litigation**

As previously reported, McKesson Information Solutions LLC filed a lawsuit against TriZetto in September 2004 alleging that the clinical editing functionality of the company's Facets, QicLink and ClaimFacts software products infringe a patent acquired by McKesson. Earlier this month in response to TriZetto's motion for summary judgment, the court ruled, as a matter of law, that these software products do not infringe 12 of the 15 claims of McKesson's patent. Last week, the first phase of a jury

trial commenced to determine whether the software products infringe the three remaining claims of the patent.

Today, both parties completed their case on infringement, and the jury currently is deliberating on this issue. If the jury later delivers a verdict finding that any of our software products infringe one or more of the remaining three claims of the patent, a second phase of the jury trial will begin to decide the amount of damages, if any, whether the infringement was willful and TriZetto's equitable defenses of laches and estoppel. If TriZetto does not prevail on its defense of estoppel, then a second jury trial will be scheduled to decide TriZetto's allegation that the remaining claims in the patent are invalid. If the patent is found to be valid in the second trial, TriZetto is likely to appeal the verdicts of both trials.

The company has not accrued any liability related to this lawsuit as we do not believe at this time that our liability to McKesson, if any, is probable and capable of being reasonably estimated. As previously reported, TriZetto's attorney fees and other defense costs related to this matter are being expensed as incurred.

### Guidance for 2006 Includes SFAS 123R
For the full year 2006, TriZetto expects between $315 and $330 million of revenue, representing an 8% to 13% increase over 2005. TriZetto is increasing the low end of its EPS guidance for the year, and now expects diluted EPS to be $0.55 to $0.60, which includes an estimated $0.10 to $0.14 per share negative impact, as compared to 2005, for the effect of adopting Statement of Financial Accounting Standards No. 123R, which requires all companies to expense stock-based compensation for 2006. Adjusted EBITDA for 2006, which excludes stock-based compensation expense, is expected to be between $63 and $67 million, an increase of 31% to 39% over 2005 Adjusted EBITDA. Capital expenditures in 2006 are expected to be between $18 and $22 million. Diluted share count for 2006 is expected to be approximately 48 million.

For the second quarter of 2006, the company expects revenue of between $78 and $82 million, EPS between $0.11 and $0.14 on a diluted share count of approximately 47 million, and Adjusted EBITDA of between $14 and $15.5 million.

TriZetto is focused on growing Adjusted EBITDA at a long-term targeted rate approaching 30% per year, while maintaining capital spending at approximately the company's current rate. TriZetto projects that organic revenue growth of 8% to 12% will be required to achieve this target, depending on the mix of sales.

## Conference Call

TriZetto will host a conference call at 5:00 p.m. Eastern Time / 2:00 p.m. Pacific Time today to discuss the first quarter results. Investors may access the webcast through TriZetto's web site at www.trizetto.com, first by clicking on the Investors button, and then on the Company Information drop-down menu item. The conference call will be archived and available through TriZetto's web site for 30 days following the call.

The webcast will also be distributed over CCBN's Investor Distribution Network to both institutional and individual investors. Individual investors can listen to the call through CCBN's individual investor center at www.fulldisclosure.com or by visiting any of the investor sites in CCBN's Individual Investor Network. Institutional investors can access the call via CCBN's password-protected event management site, StreetEvents (www.streetevents.com).

## About TriZetto

Touching more than 35% of the U.S. insured population, TriZetto is distinctly focused on accelerating the ability of healthcare payers to lead the industry's transformation. The company provides premier information technology solutions that enhance its customers' revenue growth, drive their administrative efficiency, and improve the cost and quality of care for their members. Healthcare payers include national and regional health insurance plans, and benefits administrators that provide transaction services to self-insured employer groups. The company's broad array of payer-focused information technology offerings include enterprise and component software, hosting and business process outsourcing services, and consulting. Headquartered in Newport Beach, California, TriZetto can be reached at 949-719-2200 or at www.trizetto.com.

## Important Notice Regarding Forward-Looking Statements

This press release contains forward-looking statements that involve risks and uncertainties. The forward-looking statements are made pursuant to the safe harbor provisions of the Private Securities Litigation Reform Act of 1995. These forward-looking statements may include statements about future revenue, profits, cash flows and financial results, the market for TriZetto's services, future service offerings, industry trends, client and partner relationships, acquisitions, TriZetto's operational capabilities, future financial structure, uses of cash, acquisitions or proposed transactions. Actual results may differ materially from those stated in any forward-looking statements based on a number of factors, including the ability of TriZetto to successfully integrate the businesses of TriZetto and its acquisitions or partners; the contributions of acquisitions to TriZetto's operating results; the effectiveness of TriZetto's implementation of its business plan, the market's acceptance of TriZetto's new and existing products and services, the timing of new bookings, risks associated with management of growth, reliance on third parties to supply key components of TriZetto's services, attraction and retention of employees, variability of quarterly operating results, competitive factors, other risks associated with acquisitions, changes in demand for third party products or solutions which form the basis of TriZetto's service and product offerings, financial stability of TriZetto's customers, the ability of TriZetto to meet its contractual obligations to customers, including service level and disaster recovery commitments, changes in government laws and regulations; any adverse result in the McKesson patent litigation matter and risks associated with rapidly changing technology, as well as the other risks identified in TriZetto's SEC filings, including, but not limited to, its annual report on Form 10-K and quarterly reports on Form 10-Q, copies of which may be obtained by contacting TriZetto's Investor

Relations department at 949-719-2225 or at TriZetto's web site at www.trizetto.com. All information in this release is as of April 25, 2006. TriZetto undertakes no duty to update any forward-looking statement to conform the statement to actual results or changes in the company's expectations.

### # #

**Contacts:**    **Investors:**                      **Media:**
                 Brad Samson                      Audrey McDill
                 949-719-2220                     303-495-7197
                 brad.samson@trizetto.com         audrey.mcdill@trizetto.com

**The TriZetto Group, Inc.**
**Condensed Consolidated Statements of Operations**
**(unaudited and in thousands, except per share amounts)**

| | Three Months Ended March 31, | |
| --- | --- | --- |
| | 2006 | 2005 |
| **Revenue** | | |
| Recurring revenue | $ 43,710 | $ 39,023 |
| Non-recurring revenue | 41,608 | 32,795 |
| **Total revenue** | 85,318 | 71,818 |
| | | |
| **Cost of revenue** | | |
| Recurring revenue | 25,695 | 23,398 |
| Non-recurring revenue | 19,126 | 16,211 |
| **Total cost of revenue** | 44,821 | 39,609 |
| | | |
| **Gross profit** | 40,497 | 32,209 |
| | | |
| **Operating expenses** | | |
| Research and development | 10,478 | 8,481 |
| Selling, general and administrative | 21,316 | 18,102 |
| Amortization of other intangible assets | 1,508 | 883 |
| **Total operating expenses** | 33,302 | 27,466 |
| | | |
| **Income from operations** | 7,195 | 4,743 |
| | | |
| Interest income | 890 | 189 |
| Interest expense | (832) | (359) |
| Other income | 180 | - |
| | | |
| **Income before provision for income taxes** | 7,433 | 4,573 |
| | | |
| Provision for income taxes | (595) | (275) |
| | | |
| **Net income** | $ 6,838 | $ 4,298 |
| | | |
| **Net income per share:** | | |
| Basic | $ 0.16 | $ 0.10 |
| Diluted (1) | $ 0.15 | $ 0.10 |
| | | |
| **Weighted average shares outstanding:** | | |
| Basic | 41,899 | 41,714 |
| Diluted | 45,666 | 43,934 |
| | | |
| **Other financial data (2):** | | |
| Adjusted EBITDA | $ 15,719 | $ 12,026 |
| 12-month backlog | $ 187,300 | $ 172,000 |
| Total backlog | $ 704,600 | $ 604,800 |

(1) For the quarter ended March 31, 2006, both debt and equity treatment of the long-term convertible debt yielded the same diluted earnings per share results.

(2) See accompanying notes for a definition of 12-month and total backlog, and for a definition of Adjusted EBITDA and a reconciliation of Net income to Adjusted EBITDA

**The TriZetto Group, Inc.**
**Condensed Consolidated Statements of Operations**
**Adjusted EBITDA Presentation (2)**
**(unaudited and in thousands)**

| | Three Months Ended March 31, | |
| | 2006 | 2005 |
|---|---:|---:|
| **Revenue** | | |
| Recurring revenue | $    43,710 | $    39,023 |
| Non-recurring revenue | 41,608 | 32,795 |
| **Total revenue** | 85,318 | 71,818 |
| | | |
| **Cost of revenue** | | |
| Recurring revenue | 23,248 | 20,897 |
| Non-recurring revenue | 16,664 | 14,250 |
| **Total cost of revenue** | 39,912 | 35,147 |
| | | |
| **Gross profit** | 45,406 | 36,671 |
| | | |
| **Operating expenses** | | |
| Research and development | 10,169 | 8,250 |
| Sales and marketing | 5,876 | 5,267 |
| General and administrative | 13,642 | 11,128 |
| | 29,687 | 24,645 |
| | | |
| **Adjusted EBITDA** | 15,719 | 12,026 |
| | | |
| Operating depreciation and amortization | 5,563 | 5,588 |
| Amortization of other intangible assets | 1,508 | 883 |
| Stock-based compensation | 1,528 | 251 |
| Restructuring, impairment and other | (75) | 561 |
| | 8,524 | 7,283 |
| | | |
| **Income from operations** | 7,195 | 4,743 |
| | | |
| Interest income | 890 | 189 |
| Interest expense | (832) | (359) |
| Other income | 180 | - |
| | | |
| **Income before provision for income taxes** | 7,433 | 4,573 |
| | | |
| Provision for income taxes | (595) | (275) |
| | | |
| **Net income** | $    6,838 | $    4,298 |

(2)  See accompanying notes for a definition of Adjusted EBITDA and a reconciliation of Net Income to Adjusted EBITDA

**The TriZetto Group, Inc.**
**Condensed Consolidated Balance Sheets**
**(In thousands)**

| | March 31, 2006 | | December 31, 2005 | |
|---|---|---|---|---|
| | (unaudited) | | | |
| **Assets** | | | | |
| Current assets: | | | | |
| Cash and cash equivalents | $ | 88,654 | $ | 106,940 |
| Restricted cash | | 1,021 | | 1,543 |
| Accounts receivable, net | | 58,189 | | 41,745 |
| Prepaid expenses and other current assets | | 11,528 | | 11,375 |
| Total current assets | | 159,392 | | 161,603 |
| Property and equipment, net | | 23,572 | | 25,730 |
| Capitalized software products, net | | 28,885 | | 28,724 |
| Goodwill | | 73,570 | | 87,170 |
| Other intangible assets, net | | 32,826 | | 3,335 |
| Other assets | | 11,136 | | 11,177 |
| **Total assets** | $ | 329,381 | $ | 317,739 |
| | | | | |
| **Liabilities and Stockholders' Equity** | | | | |
| Current liabilities: | | | | |
| Short-term notes payable | $ | 546 | $ | 120 |
| Capital lease obligations | | 1,426 | | 1,979 |
| Accounts payable | | 11,306 | | 14,959 |
| Accrued liabilities | | 22,651 | | 56,957 |
| Deferred revenue | | 55,555 | | 35,625 |
| Total current liabilities | | 91,484 | | 109,640 |
| Long-term convertible debt | | 100,000 | | 100,000 |
| Long-term revolving line of credit | | 15,000 | | - |
| Other long-term liabilities | | 2,183 | | 1,752 |
| Capital lease obligations | | 879 | | 1,065 |
| Deferred revenue | | 4,378 | | 3,924 |
| Total liabilities | | 213,924 | | 216,381 |
| | | | | |
| Common stock | | 44 | | 42 |
| Additional paid-in capital | | 366,459 | | 362,186 |
| Deferred stock compensation | | - | | (2,986) |
| Accumulated deficit | | (251,046) | | (257,884) |
| Total stockholders' equity | | 115,457 | | 101,358 |
| **Total liabilities and stockholders' equity** | $ | 329,381 | $ | 317,739 |

**The TriZetto Group, Inc.**
**Notes to Unaudited Condensed Consolidated Financial Statements**

## Backlog

Total backlog is defined as revenue we expect to generate in future periods from existing customer contracts. Our 12-month backlog is defined as the revenue we expect to generate from existing customer contracts over the next 12 months. Most of the revenue in our backlog is derived from multi-year recurring revenue contracts (including software hosting, business process outsourcing, IT outsourcing, and software maintenance). For purposes of calculating our backlog and based upon our previous experience, we assume software maintenance contracts will be renewed for a period of up to five years. We classify revenue from software license and consulting contracts as non-recurring. Consulting revenue is included in the backlog when the revenue from such consulting contract will be recognized over a period exceeding 12 months.

## Non-GAAP Financial Measures

In this press release and our other public statements in connection with this press release, we use the non-GAAP financial measure, "Adjusted EBITDA" , as originally defined in our press release dated October 25, 2005. We define Adjusted EBITDA as net income (loss), excluding the impact of interest expense, income taxes, depreciation and amortization, charges for facilities closures and asset impairment, stock-based compensation expense and charges for expected future loss on contracts. We use Adjusted EBITDA to provide meaningful supplemental information regarding our operating performance and profitability by excluding certain expenses and expenditures that may not be indicative of our core business operating results. Because our capital structure, effective income tax rates, capitalized asset values and equity-based compensation levels are different than those of other companies, we believe that Adjusted EBITDA facilitates comparisons of our results of operations with those of other companies. Further, we believe that Adjusted EBITDA, which excludes certain factors which are not indicative of ongoing operations such as charges for facilities closures, asset impairment and future loss on contracts, can assist management and investors in assessing the financial operating performance and underlying strength of our core business. We use Adjusted EBITDA in our cash bonus program to evaluate management's performance for compensation purposes, and we have agreed with our lender to maintain levels of an adjusted form of EBITDA as specified in financial covenants to our secured debt facility.

In the first quarter of 2005, we excluded from Adjusted EBITDA a loss of approximately $561,000 related to the closure of a facility. The charge reflected our remaining payment obligations under the lease agreement for this closed facility. Because the facility was non-performing, we excluded the charge from Adjusted EBITDA as it was not indicative of our ongoing operations. Additionally, during the first quarter of 2006, we recognized gains of $75,000 from the sale of our credentialing and verification business and $180,000 from the sale of a domain name, which were eliminated from Adjusted EBITDA. We excluded these gains from Adjusted EBITDA as they related to a business we had decided to exit and a one-time sale of an asset and therefore are not indicative of our ongoing operations.

In December 2004, the Financial Accounting Standards Board ("FASB") issued Statement of Financial Accounting Standards ("SFAS") 123R, "Share-Based Payment." This statement requires that the cost resulting from all share-based payment transactions be recognized in the financial statements. Effective January 1, 2006, the Company adopted the fair value recognition provisions of SFAS 123R, using the modified prospective method. Under this method, the provisions of SFAS 123R apply to all awards granted or modified after the date of adoption. The amount of compensation expense recognized, including restricted stock awards, was $1.5 million for the three months ended March 31, 2006 and $251,000 for the same period in 2005. Consistent with our definition noted above to exclude stock-based compensation expense, Adjusted EBITDA excludes the impact of the equity expense of SFAS 123R and other stock-based compensation expenses.

Adjusted EBITDA is not a recognized term under GAAP and should not be considered in isolation of, or as a substitute for, the information prepared and presented in accordance with GAAP. In addition, Adjusted EBITDA should not be considered as a measure of liquidity or free cash flow for management's discretionary use, as it excludes certain cash requirements such as interest expense, income taxes, costs to replace depreciated or amortized assets, costs arising from certain facilities closures and losses on contracts. Because not all companies calculate Adjusted EBITDA identically, our definition of Adjusted EBITDA may not be comparable to similarly titled measures of other companies. We compensate for these limitations by relying primarily on our GAAP results and use Adjusted EBITDA supplementally.

The following schedule provides a reconciliation of GAAP Net income to Adjusted EBITDA for the periods indicated (in thousands):

|  | Three Months Ended March 31, | |
| --- | --- | --- |
|  | 2006 | 2005 |
| Net income | $ 6,838 | $ 4,298 |
| Interest (income) expense, net | (58) | 170 |
| Provision for income taxes | 595 | 275 |
| Operating depreciation and amortization | 5,563 | 5,588 |
| Amortization of other intangible assets | 1,508 | 883 |
| Stock-based compensation | 1,528 | 251 |
| Restructuring, impairment and other charges | (75) | 561 |
| Other income | (180) | — |
| Adjusted EBITDA | $ 15,719 | $ 12,026 |

### Reconciliation of Non-GAAP Financial Guidance

The following schedules provide a reconciliation of non-GAAP financial guidance for the periods indicated (in thousands, except per share amounts):

|  | Q2 2006 Guidance | |
| --- | --- | --- |
|  | Low Range | High Range |
| Adjusted EBITDA | $ 14,000 | $ 15,500 |
| Operating expenses |  |  |
| Operating depreciation and amortization | (5,000) | (5,000) |
| Amortization of other intangible assets | (1,500) | (1,500) |
| Stock-based compensation | (1,500) | (1,500) |
| Interest and other income, net | (300) | (250) |
| Income taxes | (500) | (600) |
|  | (8,800) | (8,850) |
| Net income | $ 5,200 | $ 6,650 |
| Net income per share: |  |  |
| Diluted | $ 0.11 | $ 0.14 |
| Weighted average shares outstanding: |  |  |
| Diluted | 47,000 | 47,000 |

|  | 2006 Guidance | |
|  | Low Range | High Range |
| Adjusted EBITDA | $    63,000 | $    67,000 |
| Operating expenses | | |
| Operating depreciation and amortization | (21,500) | (22,000) |
| Amortization of other intangible assets | (5,500) | (5,500) |
| Stock-based compensation | (6,750) | (6,750) |
| Interest and other income, net | (1,000) | (900) |
| Income taxes | (2,000) | (3,000) |
|  | (36,750) | (38,150) |
| Net income | $    26,250 | $    28,850 |
| Net income per share: | | |
| Diluted | $    0.55 | $    0.60 |
| Weighted average shares outstanding: | | |
| Diluted | 48,000 | 48,000 |

# EXHIBIT 6

LEXSEE

**DANISCO A/S and DANISCO USA INC., Plaintiffs-Counterdefendants, -against-
NOVOZYMES A/S and NOVOZYMES NORTH AMERICA, Defen-
dants-Counterclaimants.**

**05 Civ. 1972 (GEL)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF
NEW YORK**

*2006 U.S. Dist. LEXIS 20367*

**April 17, 2006, Decided
April 18, 2006, Filed**

**COUNSEL:** [*1] Michael F. Borun and Kevin M.
Flowers, Marshall, Gerstein & Borun LLP, Chicago, IL,
for Plaintiffs-Counterdefendants.

Joseph R. Robinson, Steven E. Lipman, and Kevin L.
Reiner, Darby & Darby P.C., New York, NY, for De-
fendants-Counterclaimants.

Steven M. Amundson, Frommer Lawrence & Haug LLP,
New York, NY, for Frommer Lawrence & Haug LLP.

**JUDGES:** GERARD E. LYNCH, District Judge.

**OPINIONBY:** GERARD E. LYNCH

**OPINION: OPINION AND ORDER**

GERARD E. LYNCH, District Judge:

In this patent infringement action, defendant No-
vozymes moves to compel production of certain docu-
ments withheld by plaintiff Danisco on grounds of attor-
ney-client or work product privilege, arguing that these
privileges are inapplicable because the documents were
generated in furtherance of a fraud on the patent office.
The motion will be denied.

For purposes of this motion, Novozymes does not
dispute that the withheld documents would ordinarily
come within the protection of the attorney-client or work
product privilege. However, communications otherwise
protected by these privileges lose protection if they relate
to client communications made in furtherance of criminal
or fraudulent conduct. See [*2] *In re Grand Jury Sub-
poena Duces Tecum, 731 F.2d 1032, 1038 (2d Cir. 1984)*
("It is well-established that communications that other-
wise would be protected by the attorney-client privilege
or the attorney work product privilege are not protected if

they relate to client communications in furtherance of
contemplated or ongoing criminal or fraudulent con-
duct."). The party invoking this exception must show
probable cause to believe that a crime or fraud has been
attempted and that the communications in question were
made in furtherance of that fraud. See *In re Richard Roe,
Inc. (Roe II), 168 F.3d 69, 70 (2d Cir. 1999).* "This stan-
dard has been rephrased as requiring 'that a prudent per-
son have a reasonable basis to suspect the perpetration of a
crime or fraud, and that the communications were in fur-
therance thereof.'" *John Doe, Inc. v. United States (In re
John Doe, Inc.), 13 F.3d 633, 634 (1994),* quoting *In re
Grand Jury Subpoena Duces Tecum, 731 F.2d 1032, 1039
(2d Cir. 1984).* As the Second Circuit has stressed, to
properly, override the privilege, a court must determine
whether each communication at issue was made in fur-
therance of a crime or [*3] fraud. *Id. at 71; In re Richard
Roe, Inc. (Roe I), 68 F.3d 38, 40 (2d Cir. 1995).*

Almost twenty years ago, the Federal Circuit noted
that claims of inequitable conduct and fraud on the Patent
Office have become "an absolute plague." *Burlington
Indus., Inc. v. Dayco Corp., 849 F.2d 1418, 1422 (Fed.
Cir. 1988).* Such charges are easily made, and it is also
easy to cobble together the rule that only probable cause
to believe a fraud has been committed is necessary for the
crime-fraud exception to apply, with the rule that a patent
applicant has a strong "duty of candor and good faith in
dealing with the [Patent and Trademark] Office," *37
C.F.R. § 1.56(a),* to turn a good faith scientific dispute or
a minor error of fact in a patent application into a specious
argument that attorney-client privileges should be invaded
because a fraud has been committed. However, the at-
torney-client privilege serves important values, *Swidler &
Berlin v. United States, 524 U.S. 399, 403, 118 S. Ct. 2081,
141 L. Ed. 2d 379 (1998)* (observing that the "attor-
ney-client privilege is one of the oldest recognized privi-

leges for confidential communications" and "is intended [*4] to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and the administration of justice" (quotation marks omitted)), and the rule permitting that privilege to be invaded when it is abused for purposes of engaging in fraud is aimed at serious misconduct, *In re Grand Jury Investigation), 399 F.3d 527, 535 (2d Cir. 2005)* (noting that rules such as the crime-fraud exception have been developed "to limit *egregious* abuses of the protections that the privilege affords" (emphasis added)). While courts must be vigilant to prevent a client's attempt to misuse attorneys to perpetrate a crime or a genuine fraud, the privilege is not to be lightly cast aside based on speculative allegations. Cf. *Roe II, 168 F.3d at 71* (noting exceptions to privilege, including crime-fraud exception, "should not be framed so broadly as to vitiate much of the protection they afford").

Despite the lengthy briefs and voluminous supporting documents submitted by both sides on the applicability of the crime-fraud exception, the issues presented are relatively simple. Danisco seeks to [*5] enforce a patent concerning methods of baking and preparing dough by adding an enzyme to the dough that breaks down certain fat molecules in the dough, called lipids ("the '346 Patent"). In seeking the patent, Danisco claimed that its enzyme ("Lipase 3") was valuable and original because it worked to break down three distinct types of lipids: triglycerides, glycolipids (in particular, a lipid known as "DGDG"), and phospholipids. (D. Mem. 1, 10; P. Mem. 2-3.) The ability to hydrolyze all three types of lipids with a single enzyme was claimed to represent a significant advance over prior art. (P. Mem. 6.) Novozymes claims that Danisco defrauded the Patent Office in three ways: (1) by withholding information that its enzyme in fact did not work against phospholipids (D. Mem. 32-33); (2) by misrepresenting to the Patent Office that an already-extant enzyme manufactured by Danisco did not work against glycolipids ( id. at 34-35); and (3) by misrepresenting the content or significance of certain Novozymes patent documents that could be construed as prior art ( id. at 36-38).

Needless to say, the chemical transformations involved are highly sophisticated, and no doubt reasonable scientists [*6] can disagree about the effectiveness of various enzymes, or about the interpretation of the scientific evidence developed through various tests on the products in question. The Court does not purport to resolve these scientific disputes, or to reach any conclusions on the underlying merits of the patent case, on the basis of the record presented on a discovery motion. Upon careful examination of the materials submitted, however, the Court is firmly persuaded that Novozymes had failed to establish any reasonable basis for a belief that anyone

involved in prosecuting Danisco's patent intended to deceive or to commit fraud.

### 1. Does Danisco's Enzyme Work Against Phospholipids?

Novozymes asserts that Danisco obtained a patent for an enzyme that hydrolyzes, among other things, phospholipids, when in fact the enzyme does not work as claimed, and Danisco *knew* that it did not. This dramatic accusation rests on a single statement in a separate international patent application which Novozymes claims demonstrates that one of the inventors listed on the patent in suit knew that the enzyme did not work against phospholipids. (D. Mem. 32, citing WO 01/39602, Novozymes Ex. 27, at 2.) [*7]

The scientific evidence, to the extent the Court can decipher it, may be subject to different interpretations. Danisco points out that in the very application relied on by Novozymes, a table reporting the results of testing "shows unequivocally that Lipase 3 has a phospholipase activity [i.e., activity against phospholipids] of 24 PLU/g." (P. Mem. 18.) Moreover, a table in the '346 Patent itself shows a general decrease in the presence of a particular phospholipid (phosphatidyl choline) when Lipase 3 is added to dough. (P. Mem. at 18, citing Novozymes Ex. 2 clmn. 31, tbl. 8.4.) These results may well be challenged. For example, the table in the '346 Patent actually shows an increase in phosphatidyl choline when 5000 LUS/kg of Lipase 3 is present, followed by a significant decrease as the amount of Lipase 3 increases. ( Id.) And Novozymes points to another table in the '346 Patent allegedly showing ineffectiveness against phosphatidyl choline. (Reply 9, citing Novozymes Ex. 2 clmn. 32, tbl. 8.7.) Moreover, the study in the WO 01/39602 application relied on by Danisco may be questionable because the test was performed on lecithin powder in water rather than on dough, [*8] or because "phospholipase activity of 24 PLU/g" may not be all that terrific. n1 (Reply 8-9.) However, there is no allegation whatsoever that the test results submitted to the Patent Office were faked or inaccurate, and any weakness in the data on phosphatidyl choline, or inconsistency of those data with other tests regarding phospholipids, is apparent on the face of the data and was available to the patent examiner to permit the examiner to draw his or her own conclusions.

---

n1 Neither side presents sufficient information for a non-specialist judge to form an opinion of whether this level of activity is meaningful or not.

---

Assuming arguendo that a reasonable scientist could believe that the case for the phospholipase activity of Lipase 3 was not made, to make out probable cause for a

Case 1:04-cv-01258-SLR    Document 403-2    Filed 06/09/2006    Page 39 of 42

Page 3
2006 U.S. Dist. LEXIS 20367, *

finding of fraud Novozymes needs to present evidence that Danisco and its representatives did not subjectively *believe* that Danisco's product worked. The sole Danisco statement on which Novozymes relies in this regard is a statement [*9] in an international patent application by one of the inventors of Lipase 3 (Dr. Jorn Soe) that Novozymes summarizes as asserting "that the same lipase disclosed in the Danisco '394 patent application [relating to the '346 Patent] 'did *not* have a phospholipid hydrolysing [sic] effect.'" (D. Mem. 32, quoting Novozymes Ex. 27, at 2.) n2 But the reference in Dr. Soe's prior statement does not clearly refer to Lipase 3. What Dr. Soe actually says is that studies had shown that "the *Aspergillus niger* lipase did not have a phospholipid hydrolysing [sic] effect." (P. Mem. at 19, quoting Novozymes Ex. 27, at 2.) The parties dispute at some length what this means. Danisco maintains that Lipase 3 is derived from. *Aspergillus tubigensis*, which it claims is a different fungus than *Apergillus niger*, and that the unsuccessful *Aspergillus niger* enzyme referred to in the quoted extract must be one of the "prior art lipases" that Dr. Soe discusses elsewhere in the international application referred to. ( Id. at 19-20.) Novozymes retorts that *Apergillus tubigensis* is merely a variant of *Aspergillus niger*, so that Lipase 3 could plausibly be referred to [*10] as an "*Aspergillus niger* lipase," and that the crucial quotation refers to the singular "lipase disclosed in" a particular prior application (apparently Lipase 3), whereas the prior art references cited by Danisco refer to a number of different lipases. (Reply 10.)

n2 The word "not" appears in Novozymes's memorandum, as it does in the text here, emphasized by italics, boldface, and underlining, all supplied by Novozymes (although the memorandum does not so indicate). The Court gets the point.

Novozymes may have the better of the argument as to the proper interpretation of this statement. But even if Novozymes's interpretation is accepted, a disputed and cryptic "admission" of this sort is a slim reed upon which to hang an accusation of fraud. Danisco has consistently sought patents all over the world for Lipase 3, touting its virtues the while. That one of its scientists *may* have at some point suggested, in a different context, without supporting data, that the enzyme has not been shown to hydrolyze [*11] phospholipids does not render Danisco guilty of fraud when it asserted, as squarely claimed, in connection with the '346 Patent application, with supporting data available for inspection, that it did. n3

n3 As an attachment to its reply memorandum, Novozymes submits pages purporting to be min-

utes of two meetings attended by Dr. Soe, at which it was indicated that Lipase 3 is inactive against phospholipids. (Novozymes Exs. 43, 44.) It is wholly unclear that these documents, which consist of what appears to be e-mailed and cut-and-pasted text, are a complete and accurate description of what transpired at those meetings; and it is impossible to determine from them what statements were made by whom and in what context. For these reasons, the Court gives no weight to these documents. In any event, evidence that Dr. Soe attended meetings at which some presenters questioned whether Lipase 3 worked against phospholipids shows at best that the matter was subject to dispute, not that Dr. Soe or Danisco as an entity believed when they submitted the patent application that the enzyme did not do what it was claimed to do.

[*12]

2. Does Danisco's Prior Enzyme Work against Glycolipids?

Novozymes next charges that Danisco fraudulently overstated the advance represented by Lipase 3 over a prior Danisco product ("Exel"), by asserting that the lipase in that product did not break down glycolipids, when the evidence showed that it did. Ironically, in this case Novozymes and Danisco change places: with respect to the phospholipase action of Lipase 3, Danisco seizes on arguably minor evidence of the enzyme's effectiveness to defend its claims, while Novozymes derides the same evidence as tantamount to nothing at all; with respect to the effectiveness of Exel against glycolipids, Novozymes makes the same kinds of arguments from weak evidence that it characterizes as fraudulent in the former dispute, while Danisco takes up the cause of pooh-poohing weak evidence. The briefs thus inadvertently demonstrate that the scientific arguments are disputable, but the claims of "fraud" are mostly lawyers' spin.

The critical assertion in the Lipase 3 patent application is the claim, made in direct response to the patent examiner's rejection of the claim that Lipase 3 did not represent an advance over Exel, that Exel [*13] (unlike Lipase 3) has "no activity towards glycolipids." (Novozymes Ex. 29, at 10-11; see also id. Ex. 30, at 2-3.) Novozymes vigorously charges that this representation was fraudulent, because Danisco was aware of test results showing that Exel did indeed have some success in hydrolyzing certain glycolipids.

The centerpiece of this argument is a study known to Danisco's Dr. Soe that could be read to show that the lipase in Exel "hydrolyzes up to 3% of the glycolipid

DGDG." (D. Mem. 15-16.) Once again, neither party does very much to document to a non-chemist whether this is or is not impressive glycolipase activity. However, Dr. Soe has consistently cited this very study to mean that the "effect of the two commercially available lipases [including the Lipase in Exel] are [sic] negligible." (P. Mem. 23, quoting Novozymes Exs. 24 at 26, 25 at 62.) Novozymes responds not by disputing Dr. Soe's interpretation of the data, but by triumphantly declaring this proof of fraud, since "'negligible' does not mean 'none.'" (Reply 11.) Indeed it does not, and if anything turns on whether Exel has *any* glycolipase capability, a fact-finder may well conclude, when all the [*14] scientific evidence, including qualified expert testimony, is properly before it, that it does. It may even turn out, upon examination, that such activity is more than negligible. But when the issue is whether a new product that allegedly has significant ability to hydrolyze glycolipids represents a patentable advance on another product already on the market, the difference between "no" and "negligible" is not so significant that, essentially without more, the Court can infer an intent to defraud from the use of the former by a party which had in another context used the latter. This is particularly so given that Danisco maintains that numerous other experiments conducted by Dr. Soe and others showed that the lipase in Exel had no activity against glycolipids such as DGDG and MGDG (P. Mem. 24-27), test results that Novozymes does not address, let alone dispute, in its reply submission. (Reply 11-13.)

Danisco also maintains that the data cited by Novozymes showing that the lipase in Exel had activity against glycolipids are unreliable in any case (and were known to be so when the '346 Patent application was made). As with the question referred to above concerning the relevance of [*15] a study performed in a medium other than dough, there appears to be a legitimate scientific dispute about the reliability of Gas-Liquid Chromatography in measuring glycolipids in dough. (P. Mem. 28-29; Reply 13.) The Court takes no position on this controversy. But the existence of the dispute supports the inference that Danisco's conclusions about the ineffectiveness of Exel against glycolipids is not rendered manifestly incorrect by the data cited by Novozymes. Similarly, Danisco cites evidence that Novozymes's own scientists also took the position that enzymes like Exel were not active against DGDG. (P. Mem. 27-28, citing Izraelewicz Decl. Ex. G, at 16.) Novozymes is quite correct that what matters is not what *its* team thought, but whether *Danisco's* agents believed what they told the Patent Office. (Reply 13.) But in the absence of any direct evidence of Danisco's subjective beliefs about Exel - and there is none - the inference of fraudulent intent can only be drawn from evidence that what Danisco said could not reasonably be believed in good faith. If Novozymes

thought the same thing, it is hard put to argue that anyone else taking that position must be a liar.

**3.     [*16]     Did Danisco Misrepresent Novozymes's Lipopan F Patents?**

Novozymes's final claim of fraud is more complicated to explain. In support of the Lipase 3 patent, Danisco argued to the patent office that the enzyme disclosed in certain earlier Novozymes patent documents did not have the critical quality of effectiveness against all three lipids: triglycerides, glycolipids, and phospholipids. (D. Mem. 36.) Principally, Novozymes claims that the product disclosed in those documents was actually Lipopan F, the Novozymes product which Danisco asserts in this action infringes the '346 Patent, and that Danisco knew this fact but failed to mention it to the Patent Office. The patent examiner ultimately concluded that the earlier Novozymes product to which these patents applied ("Lipopan F") did have the claimed triple effect when used in dough products, but allowed the patent because Lipopan F did not constitute prior art since it "was not disclosed or available until October, 2001," after the claimed invention by Danisco of Lipase 3. (D. Mem. 36, quoting Novozymes Ex. 41, at 2.) Novozymes asserts that Danisco committed fraud in how it presented the Novozymes patents to the Patent Office. [*17]

This controversy involves a complex set of issues about what different parties knew and when they knew it. Certain facts now appear to be undisputed. Danisco concedes that the Novozymes patent documents disclose an enzyme that is in fact Lipopan F (although it was not so denominated in the patent documents) and that the use of Lipopan F in dough "satisfies all of the requirements of the asserted claims of the [Lipase 3] patent." (P. Mem. 31.) It is also undisputed, however, that Danisco *did* disclose the existence of these patent documents to the Patent Office, though Novozymes claims that the disclosure was belated. (D. Mem. 36.) In fact, Danisco actually *withdrew* its Lipase 3 application, *after* the patent examiner had already issued a Notice of Allowance, n4 so as to provide the Novozymes patents to the examiner for consideration. (P. Mem. 31-32.) It is difficult to see this as evidence of bad faith, let alone fraud. n5

-----

n4 As Novozymes observes, "[a] 'Notice of Allowance' notifies a patent applicant that the pending claims in his application are 'allowed,' *i.e.*, ready to granted in a patent, if the appropriate remaining formalities are timely addressed, including payment of all Governmental fees." (D. Mem. 18 n. 23.)

[*18]

n5 In particular, it is difficult to understand why, if Danisco had known about these references for two years prior to their actual disclosure to the Patent Office, as Novozymes claims (D. Mem. 18-19), Danisco would have suppressed this knowledge until after the patent examiner had issued a Notice of Allowance, only then to withdraw its application, disclose the references to the Patent Office, and undertake to rebut their relevance. This behavior is not consistent with a fraudulent effort to hide the Novozymes patents from the patent examiner.

However, Danisco took the position that the Novozymes patents did not "teach or suggest the instant invention." (D. Mem. 2, quoting Novozymes Ex. 34, at 1.) In effect, translated from the patent-ese, Danisco argued to the Patent Office that the Novozymes patent documents themselves did not *disclose* that the enzyme in question worked against lipids other than phospholipids, and did not refer to the use of the enzyme in dough. Therefore, even if it is *now* known that the enzyme referred to in the Novozymes patents is the product marketed as [*19] Lipopan F, and that Lipopan F has the triple lipase action in dough that was the supposed novel quality of Danisco's Lipase 3, no one would have known this from the Novozymes patent documents at the time of Danisco's claimed invention. (P. Mem. 35-37.)

Novozymes attacks this theory, arguing that it shows a "fundamental misconstruction of the well-established law of inherency." (Reply 15.) Perhaps it does. But whether or not Novozymes is correct that the Novozymes patent documents, "together with the inherent properties of what they disclose, can (and do) make the [Danisco Lipase 3] claims unpatentable/invalid" ( id.), Danisco's primary defense of the validity of its patent lies elsewhere. n6

n6 In addition, whether or not the "inherency" doctrine applies such that the information claimed to be withheld by Danisco was material and should have been disclosed, is simply a dispute about the proper application of a legal standard to the facts of this case, not grounds for an allegation that Danisco intended to or did defraud the Patent Office.

[*20]

The materiality of the parties' respective claims about what the Novozymes patent documents would have meant to one skilled in the art at the time the references came to

light appears to be limited by the fact that upon disclosing the patents to the Patent Office, Danisco submitted a declaration from its inventors purporting to establish that Danisco's Lipase 3 had been invented *before* the effective date of the Novozymes patents. (P. Mem. 31-35.) Since the Novozymes patents were entitled to priority only as of March 4, 1997 (about a month before Danisco's application was made), they would not be entitled to be considered "prior art" if Danisco's invention was made earlier than that date, and the Danisco inventors claims that it was. ( Id.) Interestingly, for all its claims of fraud, Novozymes does *not* accuse the Danisco inventors of falsifying the affidavits and other evidence they submitted purportedly demonstrating that their discovery antedated the Novozymes patents.

Once again, Novozymes is correct to point out that even if Danisco's efforts to "swear behind the prior art" would have secured the patent regardless of what properties were or weren't inherent in the [*21] disclosures made in the Novozymes patent documents (a point Novozymes disputes, on grounds that lead even deeper into the arcana of Patent Office regulations), that would not entitle Danisco to fraudulently misrepresent the nature of those patents. (Reply 15.) n7 But enough has been said to illustrate the complex issues that will have to be faced in this litigation in deciding the validity of the parties' competing claims. However those issues will ultimately be decided, on a full record, by the appropriate fact-finder, it cannot be said now, on the basis of the evidence presented by Novozymes on this motion, not merely that Novozymes is correct about some of these matters, but that it is so patently correct that Danisco's arguments to the contrary, when made to the Patent Office, must have constituted knowing fraud. n8

n7 On the other hand, the crime-fraud exception requires that the fraud be material to the decision ultimately made by the Patent Office, and that would not be the case if the Office rejected the Novozymes patent documents as reflecting prior art on the basis that the Danisco invention occurred first. (D. Mem. 26-29.) See, e.g., *In re Spalding Sports Worldwide, Inc., 203 F.3d 800, 807-08 (Fed. Cir. 2000)* (noting claim of fraud requires proof of a "justifiable reliance upon the misrepresentation by the party deceived which induces him to act thereon").

[*22]

n8 Novozymes also points out that in challenging Novozymes's European patent application for Lipopan F, Danisco suggested that Lipopan F

is identical to a lipase in a patent issued in 1985 (before Danisco's Lipase 3 invention), and that a skilled person would have known at the time that that identical lipase could have applications in the baking industry. Danisco argues primarily that it had no duty to disclose the position it took in the European proceedings, because its arguments (and the underlying facts) were immaterial to the issues before the Patent Office in passing on the '346 Patent. This dispute, like the rest, reveals parties taking adversary positions about legal standards and hotly-disputed facts relevant to the issues of materiality and the duty to disclose, not fraud or bad faith. (D. Mem. 22-24; P. Mem. 38-42; Reply 18-20.)

In short, whoever ultimately proves to have the better of the complex issues disputed by the parties, Novozymes has not succeeded in establishing any reasonable basis for a belief that any of the positions taken by Danisco in prosecuting this patent were taken [*23] in bad faith, let alone that they evidence a fraud such that all of Danisco's communications with its attorneys should be laid bare on the ground that they are communications in furtherance of a fraud. n9

n9 For essentially the same reasons, the Court rejects Novozymes's request that the Court undertake an *in camera* review of the documents withheld by Danisco. (D. Mem. 39-40.) Novozymes has failed to establish a "factual basis adequate to support a good faith belief by a reasonable person" that *in camera* review of the documents at issue "may reveal evidence to establish to claim that the crime-fraud exception applies." *United States v. Zolin, 491 U.S. 554, 572, 109 S. Ct. 2619, 105 L. Ed. 2d 469 (1989)* (quotation marks and citation omitted).

**CONCLUSION**

For the foregoing reasons, Novozymes's motion to overrule Danisco's assertion of privilege and compel production of documents withheld on that ground is denied.

SO ORDERED.

Dated: New York, New York

April 17, 2006

GERARD E. LYNCH [*24]

United States District Judge