# EXHIBIT 8

Westlaw.

Not Reported in F.Supp.
Not Reported in F.Supp., 1994 WL 16019986 (D.Del.)
(Cite as: 1994 WL 16019986 (D.Del.))

Page 1

H

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
D. Delaware.
THE B.F. GOODRICH COMPANY, a New York corporation, Plaintiff,
v.
AIRCRAFT BRAKING SYSTEMS, CORPORATION, and Allied-Signal Incorporated, a Delaware corporation, Defendants.
Nos. C.A. 91-CV-48-SLR, C.A. 91-515-SLR.

Nov. 10, 1994.

Donald F. Parsons, Jr., of Morris, Nichols, Arsht & Tunnell, Wilmington, Delaware, for plaintiff The B.F. Goodrich Company, Harry J. Roper, William P. Oberhardt, Raymond N. Nimrod, Aaron A. Barlow, and Sarah L. Taylor, of Roper & Quigg, Chicago, Illinois, of counsel.

Harold Pezzner, of Connolly Bove Lodge & Hutz, Wilmington, Delaware, for defendant Aircraft Braking Systems Corporation, Ray L. Weber, of Renner, Kenner, Grieve, Bobak, Taylor & Weber, Akron, Ohio, of counsel.

Bruce M. Stargatt, and Josy W. Ingersoll, of Young, Conaway, Stargatt & Taylor, Wilmington, Delaware, for defendant Allied-Signal Incorporated, Donald G. Kempf, Jr., Kirkland & Ellis, Chicago, Illinois, and Finnegan, Henderson, Farabow, Garrett & Dunner, Washington, D.C., of counsel.

OPINION

ROBINSON, J.

I. INTRODUCTION

*1 In this consolidated action, plaintiff The B.F.Goodrich Company ("BFG") seeks damages and an injunction against defendants Aircraft Braking Systems Corp. ("ABS") and Allied-Signal Inc. ("Allied-Signal") for alleged infringement of two patents relating to aircraft brakes in violation of Section 271(a) of Title 35, United States Code.

Specifically, BFG charges that ABS and Allied-Signal's Bendix division ("Bendix") [FN1] willfully infringed Claims 2-3 of United States Patent No. 4,472,895 (the " '895 patent"), issued in 1988, and Claims 1-4 of United States Patent No. 4,613,017 (the " '017 patent"), issued in 1986. The parent application to these two patents was filed by Lowell D. Bok, plaintiff's assignor, in 1984. Claims 2-3 of the '895 patent provide:

> FN1. Throughout this opinion, "Allied-Signal" will be used when referring to the defendant as a party, and "Bendix" when referring to Allied-Signal's Bendix Division in connection with its historical acts. As a legal matter, the two are interchangeable.

2. A disk brake assembly comprising a first group of brake disks and a second group of brake disks in axially aligned and interleaved relationship, said disks of said first group being interleaved with said disks of said second group in alternating relationship, each of said disks of said first group and said second group having oppositely disposed wear surfaces, said wear surfaces on opposite sides of each brake disk of said first group are equal in thickness, said wear surfaces on opposite sides of each brake disk of said second group are equal in thickness, said wear surfaces of said first group of said disks having a first thickness, said wear surfaces of said second group of said disks having a second thickness, said first thickness of said first group of said disks being less than said second thickness of said second group of said disks whereby after a predetermined number of brake applications the available wear thickness of said first group of said disks are substantially fully worn away at an intermediate overhaul time and said available wear thickness of said second group of said disks are not worn away.

3. A disk brake assembly as set forth in claim 2 wherein both sides of each of said disks of said first group have available wear thicknesses which are one-half worn compared to the available wear thickness of said second group, and both sides of each of said disks of said second group have available wear thicknesses which are not worn whereby said first thickness of said first group of disks is one-half said second thickness of said

Not Reported in F.Supp.
Not Reported in F.Supp., 1994 WL 16019986 (D.Del.)
(Cite as: 1994 WL 16019986 (D.Del.))

Page 2

second group of disks.
(PX 1002) Claims 1-4 of the '017 patent provide:
1. A method of assembling and overhauling a disk brake having a plurality of disks with available wear portions of predetermined different thicknesses comprising positioning a first group of said disks in overlapping relationship with a second group of said disks, said first group of said disks having each of said available wear portions of a first thickness, said second group of said disks having each of said available wear portions of a second thickness, said first thickness of each of said available wear portions of said first group of said disks being less than said second thickness of each of said available wear portions of said second group of said disks, replacing said first group of said disks with a third group of said disks at an intermediate brake overhaul time when said available wear portions of said first group are substantially fully worn, said available wear portions of each of said third group of said disks having a third thickness greater than the thickness of each of said available wear portions of said second group of said disks at said intermediate brake overhaul time.
*2 2. The method of claim 1 including positioning said first group and said second group of said disks in overlapping relation with said first thickness being one-half said second thickness, said available wear portions of said second group being not worn and said available wear portions of said first group being one-half worn.
3. The method of claim 4 including replacing said first group of said disks with said third group of said disks at said intermediate brake overhaul time when said first group of said disks have available wear portions which are substantially fully worn and said second group have available wear portions which are half worn.
4. The method of claim 3 including replacing said first group of disks at said intermediate brake overhaul time with said third group of disks, each having available wear portions which are not worn and having a thickness which is twice the thickness of said available wear portions of each of said second group of said disks at said intermediate brake overhaul time.
(PX 1001)

Defendants deny infringement and challenge the validity of the patents under 35 U.S.C. ʃ ʃ 102(b) ("anticipation" and the "on-sale" bar), 103 ("obviousness"), and 102(g) ("prior invention"). [FN2] Specifically, defendants charge that the patented invention was anticipated by a publication appearing more than one year prior to the date of the patent application (ʃ 102(b)); that the invention was on sale in this country more than one year prior to the date of the patent application (ʃ 102(b)); that differences between the patented invention and the prior art are such that the invention would have been obvious to one of ordinary skill in the pertinent art ( 103); and that before the applicant's invention, the invention was made in this country by another who did not abandon, suppress or conceal it (ʃ 102(g)). Additionally, defendants affirmatively defend that the patents are invalid because BFG conducted itself inequitably in its prosecution of the patent applications by denying the existence of pertinent prior art.

> FN2. Throughout this opinion, where defendants have briefed issues jointly, the Court will credit them jointly, regardless of whether a given issue appertains to them both.

The Court has jurisdiction over this action under Section 1338(a) of Title 28, United States Code.

This Opinion shall constitute the Court's Findings of Fact and Conclusions of Law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

II. BACKGROUND

For years, most aircraft brakes have been assembled as "multiple disk brakes," so called because they operate through the interaction of a stack of disks, called "rotors" and "stators," positioned within a "heat sink" at the core of the brake assembly. Rotors are connected to the aircraft wheels and rotate with them; stators are connected to a brake frame attached to the landing gear and are stationary. Rotors and stators are positioned in an alternating relationship and are slidable along separate keyways. When the brakes are applied, brake pistons push the disks against one another, and the resultant friction stops the plane. The portion of each disk that can be worn away at landing is the disk's "wear portion" or "wear thickness." The most common multiple disk brake is the "uniform" or "balanced" brake. In the uniform brake, each rotor and stator has the same weight and wear thickness. When the disks become too thin safely to function, the brake is "overhauled," and the rotors and stators are replaced.

*3 The disks in multiple disk brakes have traditionally been made of steel. In 1981, however, aircraft brake manufacturers began constructing brakes with disks made of carbon, which was

Not Reported in F.Supp.
Not Reported in F.Supp., 1994 WL 16019986 (D.Del.)
(Cite as: 1994 WL 16019986 (D.Del.))

Page 3

considered a superior material, in part because it is lighter. Historically, it has also proven more costly and for this reason, soon after its introduction, aircraft brake manufacturers began exploring methods of maximizing carbon utilization on new and existing brakes.

The patented brake (specification drawings at Figure 1) was one result of these efforts. The brake is initially configured with two groups of disks having different wear thicknesses. At overhaul, only the originally thinner disks are replaced. Through this positioning and method, carbon utilization is enhanced. Further, the overall weight of the brake is less than that of a uniform brake having disks of the same thickness as the originally thick disks on the patented brake, and the piston travel is reduced.

Subsequent to the issuance of the '895 patent in 1988, both Bendix and ABS developed allegedly infringing brakes. The Bendix "Multi-Tour" brake was allegedly tested and proposed for the Boeing 767-300 and 777 aircraft projects. (D.I. 373 at 18) The ABS "Thermally Balanced" brake and ABS "Pressure Balanced" brake were made for the Airbus A321 and A330/340 programs. (D.I. 373 at 13)

III. DISCUSSION

A. Infringement.

1. Preliminary Considerations.

A patent is infringed if a party "makes, uses or sells" the patented invention without authority. 35 U.S.C. 7 271(a). A party may infringe a patent either literally or under the doctrine of equivalents. Literal infringement requires that the infringing device embody every limitation of the asserted claims. Hi-Life Products, Inc. v. American National Water-Mattress Corp., 842 F.2d 323 (Fed.Cir.1988). In determining what these limitations are, the claims must be construed. The rules of construction require that the Court give relevant terms their ordinary meaning, unless the patent specification or prosecution history indicates that the inventor intended that some other meaning be used. ZMI Corp. v. Cardiac Resuscitator Corp., 844 F.2d 1576, 1582 (Fed.Cir.1988), citing Envirotech Corp. v. Al George, Inc., 730 F.2d 753, 759, 221 USPQ 473, 477 (Fed.Cir.1984).

The doctrine of equivalents is an equitable doctrine designed to prevent parties from realizing the benefits of another's patent by designing around the patent's literal language. Under the doctrine of equivalents, infringement may be found if the accused device performs substantially the same function in substantially the same way to obtain the same result. Conair Group, Inc. v. Automatik Apparate-Maschinenbau GMBH, 944 F.2d 862 (Fed.Cir.1991). In applying the doctrine, claim limitations cannot be ignored, Pennwalt Corp. v. Durand-Wayland, Inc., 833 F.2d 931 (Fed.Cir.1987), cert. denied, 485 U.S. 961 (1988), as "[i]nfringement requires that every limitation of the patent claim must be found in the accused device either literally or equivalently." ZMI Corp., 844 F.2d at 1582. Interchangeable devices are not necessarily "equivalent" devices. Key Mfg. Group, Inc. v. Microdot, Inc., 925 F.2d 1444 (Fed.Cir.1991).

*4 The party alleging infringement under either theory has the burden of proving infringement by a preponderance of the evidence. ZMI Corp., 844 F.2d at 1582.

Plaintiff alleges that the Bendix Multi-Tour and the ABS Thermally Balanced brakes literally and equivalently infringe claims 2 and 3 of the '895 patent and claims 1-4 of the '017 patent and that the ABS Pressure Balanced brake literally and equivalently infringes claims 2 and 3 of the '895 patent. Twenty-eight separate rulings are consequently required on the issue of infringement, one for each combination of brake, claim and theory. In the discussion that follows, several of these rulings are combined.

2. Bendix Multi-Tour Brake.

The Bendix Multi-Tour brake closely resembles the BFG brake and has been marketed to several prospective vendees. Bendix claims to have developed the Multi-Tour brake in reliance on opinions of counsel that the BFG patents are invalid.

a. The '895 Patent.

BFG contends that Bendix's Multi-Tour brake infringes Claims 2 and 3 of the '895 patent both literally and under the doctrine of equivalents.

(1) Literal Infringement.

BFG argues that the Multi-Tour brake literally infringes Claim 2 of the '895 patent because (a) the Bendix brake is "an assembly" of brake disks; (b) the disks of the Bendix brake are in two groups differentiated by their wear thicknesses and are axially aligned, interleaved and alternating; (c) the first group

Not Reported in F.Supp.
Not Reported in F.Supp., 1994 WL 16019986 (D.Del.)
(Cite as: 1994 WL 16019986 (D.Del.))

Page 4

of disks have thinner wear thicknesses than the second group of disks; (d) after a predetermined number of landings, the disks of the first group are substantially fully worn; this predetermined number of landings establishes an intermediate overhaul time; and (e) at the intermediate overhaul time, the second group of disks are not fully worn. BFG contends that the brake infringes Claim 3 of the '895 patent because the wear thicknesses of the two groups are in a two-to-one relationship. (D.I. 373 at 45-49)

Defendants argue that neither Bendix's marketing efforts nor its limited testing of this brake provides an adequate legal basis for a finding of infringement. Bendix's marketing efforts centered on the Boeing 777 project. On May 1, 1991, Bendix submitted to Boeing a technical proposal for a "thick/thin" brake for the 777. (D.I. 372 at 90) On August 19, 1991, Boeing formally decided to certify both Bendix and BFG for the supply of brakes for the 777. (D.I. 372 at 102) After certification, Bendix submitted bids incorporating the Multi-Tour brake to Boeing and specific "launch-customer" airlines. (D.I. 372 at 104) Two of these airlines--British Airways and Japan Airlines--contracted with Bendix for the supply of brakes. (D.I. 372 at 105) Following this Court's denial of defendants' motion for summary judgment, Bendix notified Boeing, British Airways and Japan Airlines that it intended to deliver uniform brakes rather than Multi-Tour brakes on the 777 (D.I. 372 at 107) and informed two potential customers, Thai and Emirates airlines, that it was modifying its proposals to include uniform brakes. (D.I. 372 at 106) Bendix has delivered no Multi-Tour brakes to any customer. (D.I. 372 at 108) Bendix conducted laboratory testing on two Multi-Tour brakes prior to September 19, 1991 in connection with the 767-300 project. (D.I. 365, Traughber 9/23/92 Dep. Tr. at 520-22, 527) Bendix also assembled and tested fifteen Multi-Tour 777 brakes beginning in 1991. (D.I. 372 at 96)

*5 Defendants do not contest BFG's description of the Multi-Tour brake, and the Court finds that BFG has met its burden of proving that the Multi-Tour brake embodies every limitation of the asserted claims. The Court must further determine whether BFG has met its burden of proving that Bendix has "made" or "sold" the Multi-Tour brake. [FN3]

> FN3. BFG does not allege that Allied-Signal "used" the brake, an activity similarly and independently proscribed by Section 271(a) of Title 35, United States Code.

This Court has held that merely "promoting, advertising, and soliciting orders for" a product similar or identical to the patented product does not constitute infringement. _Powerlock Floors, Inc. v. Robbins Flooring Co._, 327 F.Supp. 388, 390 (D.Del.1971), aff'd, 464 F.2d 1022 (3d Cir.1972). Here, defendant Allied-Signal actually entered into sales contracts for such a product. Allied-Signal has not, however, delivered any Multi-Tour brakes to any purchaser. The question for the Court, therefore, is whether proof of delivery is necessary to a finding that the product has been "sold" for purposes of Section 271(a).

Defendants urge the Court in deciding this issue to adopt the holding of the United States District Court for the District of Connecticut in _Ecodyne Corp. v. Croll-Reynolds Engineering Co._, 491 F.Supp. 194 (D.Conn.1979). In _Ecodyne_, plaintiff sought damages and a permanent injunction prohibiting defendant Croll-Reynolds from installing a condensate polishing apparatus pursuant to its contract with Iowa Southern Utilities Company in violation of two of plaintiff's patents. Plaintiff alleged that the court had jurisdiction to hear the action under 28 U.S.C. 7 1338, on the grounds that defendant's contract of sale with Iowa constituted a "sale" for purposes of 35 U.S.C. 7 271(a).

In its opinion, the court held that this assertion was incorrect, for the following reasons:
> At common law, the term "sale" was variously defined. Blackstone termed it "a transmutation of property from one man to another in consideration of some price." 2 Bl.446. In Benjamin on Sales 1 the following are listed as elements of a sale: (1) parties competent to contract; (2) mutual assent; (3) a thing, the absolute or general property in which is transferred from the seller to the buyer, and (4) a price in money, paid or promised. "If any one of these ingredients be wanting, there is no sale." Atkinson on Sales, 5. See generally _Butler v. Thomson_, 92 U.S. (2 Otto) 412, 414-15, 23 L.Ed. 684 (1875). It is well understood that delivery of the property is one of the elements of a sale, _Norfolk and Western Ry. Co. v. Sims_, 191 U.S. 441, 447, 24 S.Ct. 151, 48 L.Ed. 254 (1903), and "the transfer of the property in the thing is effected by the transfer of the thing itself to the purchaser." _Stephens v. Gifford_, 137 Pa. 219, 20 A. 542, 543 (1890). In sum, a sale is an executed contract, to constitute which delivery in fact or in law is indispensable, and it cannot be given of a thing which has not fully come into existence. _Clemens v. Davis_, 7 Pa. (7 Barr) 263, 264 (1847)1 see also _Pabst Brewing Co. v._

Not Reported in F.Supp.
Not Reported in F.Supp., 1994 WL 16019986 (D.Del.)
(Cite as: 1994 WL 16019986 (D.Del.))

Page 5

*Commonwealth*, 32 Ky.Law. Rep. 1010, 107 S.W. 728, 729 (Ky.App.1908). As the Supreme Court of Rhode Island expressed it, " 'sale' is a word of precise legal import that connotes the formation of a contract under which the seller, in consideration of payment or the promise of payment, transfers to the buyer title and possession to property [citing to *Butler, supra* ]. Under this definition, a sale is evidenced by the formation of a contract and by an exchange in rights to property." *State v. Eckert*, R.I., 389 A.2d 1234, 1240 (1978).

*6 Clearly, then, by whatever definition, possession of the thing itself, or the immediate right to its possession (obtained, for instance, by negotiation of a warehouse receipt or a bill of lading) is a necessary component of a "delivery", which is itself a necessary component of a sale. *Ecodyne*, 491 F.Supp. at 197. Consequently, the court found the action premature and dismissed for lack of jurisdiction.

This Court finds the *Ecodyne* decision persuasive. For the purposes of Section 271(a), a "sale" is not complete until the infringing product is actually delivered to a purchaser. Allied-Signal has delivered no allegedly infringing Multi-Tour brakes to any purchaser. Accordingly, the Court finds that Allied-Signal has not "sold" the Multi-Tour brake for purposes of Section 271(a).

The proscription on "making" a patented product is violated by the unauthorized construction and testing of an "operable assembly" of its component parts. *Paper Converting Machine Co. v. Magna-Graphics Corp.*, 745 F.2d 11, 19-20, 223 USPQ 591, 597 (Fed.Cir.1984), aff'd after remand, 785 F.2d 1013, 228 USPQ 938 (Fed.Cir.1986). Here, Bendix admittedly constructed and tested complete assemblies of the patented invention. Allied-Signal urges that this testing was "limited" and did not impact BFG economically. This contention, if true, relates to the issue of damages and is for present purposes irrelevant. The Court finds that BFG has met its burden of proving that Bendix "made" the Multi-Tour brake.

Accordingly, the Court holds that the Bendix Multi-Tour brake literally infringes Claims 2 and 3 of the '895 patent.

(b) Doctrine of Equivalents.

Because the Court holds that the Multi-Tour brake literally infringes Claims 2 and 3 of the '895 patent, it finds it unnecessary to rule on plaintiff's claim that the Multi-Tour brake also infringes the asserted claims under the doctrine of equivalents.

b. The '017 Patent.

(1) Literal Infringement.

The '017 patent, a method patent, is infringed when the method is performed. BFG argues that Bendix literally infringed claims 1-4 of the '017 patent when it assembled and overhauled its Multi-Tour brake for the 777 aircraft. (D.I. 373 at 31) BFG alleges that Bendix literally infringed Claim 1 of the '017 patent because (a) the Multi-Tour brake is a multiple disk brake having disks with predetermined different thicknesses; (b) the brake is assembled by positioning disks of the two groups in overlapping relationship; (c) the disks of the first group all have the same thin wear thicknesses, while those of the second group all have the same thicker wear thickness; (d) the brake is overhauled at an intermediate overhaul time when the wear thicknesses of the disks of the first group are worn away, at which time they are replaced by a third group of disks; and (e) at the time of intermediate overhaul, the disks of the third group have a greater wear thickness than do the disks of the second group. The brake allegedly infringes Claims 2 through 4 of the '017 patent because (a) the brake utilizes a two-to-one ratio in wear thicknesses; (b) the first group of disks are replaced by a third group of disks at intermediate overhaul; and (c) the wear thickness ratio between the third and second groups of disks is two-to-one. (D.I. 373 at 32-34)

*7 Defendants offered no evidence at trial to refute these allegations. During discovery, Allied Signal's Rule 30(b)(6) designee, Pitner Traughber, essentially confirmed them. (D.I. 364, Traughber 5/19/92 Dep. Tr., *seriatim* ) The Court concludes that in testing the Multi-Tour brake, Bendix indeed replicated the patented method.

Accordingly, the Court holds that, in constructing and overhauling the Multi-Tour brake, Bendix literally infringed Claims 1-4 of the '017 patent.

(2) Doctrine of Equivalents.

Because the Court holds that in constructing and overhauling the Multi-Tour brake Bendix literally infringed claims 1-4 of the '017 patent, it finds it unnecessary to rule on BFG's claim of infringement under the doctrine of equivalents.

3. ABS Brakes.

Not Reported in F.Supp.
Not Reported in F.Supp., 1994 WL 16019986 (D.Del.)
(Cite as: 1994 WL 16019986 (D.Del.))

Page 6

According to defendants, the ABS Thermally Balanced brake was designed to optimize brake cooling by positioning thin disks, which reach the highest temperature during landing, at the outer ends of the heat sink, which are the fastest cooling positions, and thick disks, which reach lower temperatures, at the center, where they will cool relatively more slowly. Brake cooling time is important because aircraft cannot take off after landing before the brake has cooled to a specified temperature without risking brake failure should the takeoff be aborted. The faster the brake cools, the sooner the airplane can return to the air. Time spent between flights while the brake cools is called "turnaround time." By tailoring the thickness of the disks to their position in the heat sink, ABS optimized turnaround time. (D.I. 372 at 187) Because of ABS's determination that brake disk cooling time is position dependent, the Thermally Balanced brake is configured and overhauled so that the brake is always returned to the same basic configuration.

ABS developed the ABS Pressure Balanced brake to address a lack of suitable pressure distribution in the heat stack, a problem noted when the Thermally Balanced brake was used on the Airbus A321 aircraft. The Pressure Balanced brake is essentially a Thermally Balanced brake with a thick rotor moved to the end of each heat stack. The new design improved brake efficiency by reducing the "fade" in the brake that occurred when the brake was in the worn condition. As with the Thermally Balanced brake, the Pressure Balanced brake is returned to its original configuration at overhaul. (D.I 372 at 188)

a. The '895 patent.

(1) Literal Infringement.

BFG contends that the ABS Thermally Balanced and Pressure Balanced brakes literally infringe Claims 2 and 3 of the '895 patent. According to plaintiff, the ABS Thermally Balanced and Pressure Balanced Brakes literally infringe Claim 2 of the patent because (a) each of the ABS brakes is "an assembly" of brake disks; (b) the disks of the ABS brakes are in two groups differentiated by their wear thicknesses and are axially aligned, interleaved and alternating; (c) the first group of disks have thinner wear thicknesses than the second group of disks; (d) after a predetermined number of landings, the disks of the first group are substantially fully worn; this predetermined number of landings establishes an intermediate overhaul time; and (e) at the intermediate overhaul time, the second group of disks are not fully worn. BFG contends that the brakes infringe Claim 3 of the '895 patent because the wear thicknesses of the two groups are in a two-to-one relationship. (D.I. 373 at 22-24)

*8 Defendants contend that proper construction of the term "interleaved" in that portion of claim 2 of the '895 patent requiring "a first group of [thin] brake disks and a second group of [thick] brake disks in axially aligned and interleaved relationship, said disks of said first group being interleaved with said disks of said second group in alternating relationship," compels a finding that the claim is limited to brakes in which all the disks of one of the groups are stators and all those of the other are rotors. (D.I. 372 at 189- 190) Given this limitation, defendants contend the ABS brakes cannot be found to infringe.

The rules of claim construction are well-settled. "The terms of a claim will be given their ordinary meaning, unless it appears that the inventor used them differently." ZMI Corp., 844 F.2d at 1579, citing Envirotech Corp. v. Al George, Inc., 730 F.2d 753, 759, 221 USPQ 473, 477 (Fed.Cir.1984). To determine if the inventor used a term differently, the Court must look to the specification and prosecution history. Id. at 1580.

In the present case, the relevant claim protects:
A brake disk assembly comprising a first group of brake disks and a second group of brake disks in axially aligned and interleaved relationship, said disks of said first group being interleaved with said disks of said second group in alternating relationship ...
(PX 1002 at column 5, lines 44-48) (emphasis added).

Plaintiff contends that the proper construction to be given the term "interleaved" in this passage is that advocated by plaintiff's expert Ben H. Lightfoot:
Q ... How do you interpret the word "interleaved" and for that matter, the word "alternating" later in that claim?
A Interleaved is interspersed. Interleaved, I like to think of it as two decks of cards, a blue deck and a red deck, and you shuffle the cards and you interleave the cards. They can be in various arrangements, in terms of members [sic] of those cards being interleaved with the other cards.
The alternating relationship in the brakes we've been speaking of, the disks alternate from one disk of one group to one disk of the other group. Here the disks of one group alternate with the disks of the other group, but there are three of them and then

Not Reported in F.Supp.
Not Reported in F.Supp., 1994 WL 16019986 (D.Del.)
(Cite as: 1994 WL 16019986 (D.Del.))

Page 7

four and then two. But they still alternate from one group to the other group.
(D.I. 340 at 290)
A [The claim] says the disks of one group are interleaved with the disks of the second group. And you can--you don't have to have one-to-one in alternating relationship. You can have two with three with one with two. You can have any combination, as long as the disks of the first group are interleaved with the disks of the second group.
(D.I. 341 at 597) Defendants offered no witnesses to testify against Mr. Lightfoot on this point, but instead vigorously, albeit unsuccessfully, attempted in cross-examination to persuade Mr. Lightfoot to change his mind.

Plaintiff's expert's construction of the term is not binding on the Court, and the Court concludes that Mr. Lightfoot's construction is simply wrong. To interleave is not, in fact, to "intersperse." The latter means "to scatter here and there or place at intervals among other things." *The Random House College Dictionary* 698 (Revised ed.1980) (emphasis added). The former, in contrast, means "to insert blank leaves between (the regular printed leaves)." *Id.* at 695. In its definition of "among," the same dictionary states: "Precise users of English use AMONG when more than two ... things are involved ... and use BETWEEN when only two ... things are involved...." *Id.* at 45. As noted, the claim states: "[S]aid disks of said first group being interleaved with said disks of said second group." The antecedent in this phrase is "disks." The phrase thus means that each disk of the first group is positioned between two disks of the second group. [FN4] The use of "alternating" serves to reinforce this conclusion. The fact that the disks of the first group alternate with those of the second is consistent only with an interpretation of "interleaved" that positions one thick disk between two thin, and vice versa, along the length of the axle.

> FN4. Had the construction advocated by plaintiff been intended, the claim would have read "said disks of said first group being interspersed among said disks of said second group."

*9 The ordinary meaning of these terms will apply if neither the specification nor the prosecution history reveals a different use. The specification is comprised of (1) "a written description of the invention, and of the manner of making and using it, ... [which] shall set forth the best mode contemplated by the inventor of carrying out his invention" and (2) the claims themselves. 35 U.S.C. 7 112. In the present case, the specification contains no evidence that the inventor used the term "interleaved" in other than the ordinary manner. The drawings accompanying the descriptive part "show one preferred form and a modification made in accordance with and embodying th[e] invention and are representative of how th[e] invention may be practiced." (PX 1002 at column 2, lines 23-26) The "preferred form" appears in Figures 4 and 5 of the specification, the former "a view ... showing a brake ... with disks assembled in accordance with the method and construction of this invention." (PX 1002 at column 2, lines 38-41) The "Detailed Description" of the drawings states that in this "preferred embodiment, ... the first thickness of the available wear portions ... of the stators ... is one-half the thickness of the available wear portions of the rotors.... In accordance with this invention the fully worn stators ... are replaced at the intermediate brake overhaul time by new or refurbished stators...." (PX 1002 at column 3, line 65--column 4, line 11) (emphasis added). The modification is shown in Figures 7 and 8 of the specification, which illustrate differences in the length of the brake envelope. Again, at intermediate overhaul, "the stators ... are replaced by new or refurbished disks with unworn available wear portions[,] ... and the rotors ... have available wear portions with a thickness which is one-half the thickness of the unworn wear portions of the stators,...." (D.I. PX 1002 at column 4, lines 55-60) (emphasis added). The descriptive portion thus clearly embodies an assembly in which all rotors are thick and all stators thin, or vice versa.

While the specification drawing does not define the claim, *SRI Int'l v. Matsushita Elec. Corp.*, 775 F.2d 1107, 1121 (Fed.Cir.1985) (*en banc*), it is clear that this specification fails to indicate any contrary use of the relevant terms.

Prosecution history "limits the interpretation of claims so as to exclude any interpretation that may have been disclaimed or disavowed during prosecution in order to obtain claim allowance." *Standard Oil Co.*, 774 F.2d at 453; *see also ZMI Corp.*, 844 F.2d at 1580. The prosecution history for the '895 patent appears as PX 1005. Plaintiff offers no argument that anything in the prosecution history limits the interpretation of the term "interleaved" in Claim 2 to anything other than its ordinary meaning. The Court's independent review of the prosecution history has similarly uncovered no evidence that the interpretation of these terms in accordance with their ordinary meaning was ever disclaimed or disavowed. Indeed, the specification contained in the prosecution history, essentially the same as that in the final patent,

Not Reported in F.Supp.
Not Reported in F.Supp., 1994 WL 16019986 (D.Del.)
(Cite as: 1994 WL 16019986 (D.Del.))

Page 8

in the same way reinforces the Court's interpretation.

*10 The Court thus finds that the term "interleaved" in Claim 2 of the '895 patent limits the claim to brakes in which individual thin disks are positioned against individual thick disks in a repeating sequence. Since stators cannot be positioned beside stators, nor rotors beside rotors, this limitation in effect means that all stators on the patented or infringing brake must be of equal wear thickness, and all rotors must be of equal wear thickness.

Literal infringement requires that the infringing brake embody every limitation of the asserted claims. Hi-Life Products, Inc., 842 F.2d 323. The ABS brakes do not embody the limitation that the individual disks of the thin group are interleaved with the individual disks of the thick group, i.e., that the rotors are of one thickness and the stators of another. Therefore, the Court holds that the ABS Thermally Balanced and Pressure Balanced brakes do not literally infringe claim 2 of the '895 patent.

Claim 3 of the '895 patent claims "[a] disk brake assembly as set forth in claim 2" possessing certain defined characteristics. (PX 1002 at column 6, line 35) Because claim 3 is dependent on claim 2, the Court necessarily finds that the ABS brakes do not literally infringe claim 3 of the '895 patent.

(2) Doctrine of Equivalents.

BFG further alleges that the ABS brakes infringe Claims 1 and 2 of the '895 patent under the doctrine of equivalents, because they perform substantially the same function in substantially the same way to achieve the same result. Specifically, plaintiff contends that the ABS brakes "are assembled with two groups of disks with predetermined different thicknesses," which "are related to the predetermined overhaul schedule. In [each] of the accused brakes, an intermediate overhaul time is set when the wear thicknesses of the disks of the first thinner group wear out. In this way, ... the accused brakes accomplish the same advantageous results as the [patented] invention and they do it by performing the same function in the same way." (D.I. 373 at 25) These "advantageous results" are lower carbon costs, smaller size, lower weight and shorter piston travel compared to a uniform brake having the same number of landings per disk. (D.I. 377 at 6)

Relying on the testimony of its expert, Ben H. Lightfoot, plaintiff asserts that (1) the brakes obviously perform the same function, namely stopping the aircraft.... They also do it in the same way. ABS's brakes are assembled with two groups of disks having predetermined thicknesses related to the overhaul schedule, such that when the thinner disks wear out, and the greater wear thickness disks are half worn, the brake is overhauled.... At the overhaul, the first group of disks is removed, and unworn disks with greater wear thicknesses than the second group at the time of the overhaul are inserted.... ABS's brakes also use the preferred two-to-one ratio in wear thicknesses.... Finally, the ABS brakes and method of operation achieve the same results as the claimed invention [:] ... lower carbon costs, smaller size, lower weight, and shorter piston travel compared to a uniform brake having the same landings per disk.

*11 (D.I. 377 at 6)

Defendants argue (1) that Lightfoot's characterizations of the "function", "way" and "result" of the patented brake were so broad that virtually every brake made would infringe under the doctrine of equivalents; (2) that the ABS brakes are significantly different from the patented brakes, which have stators of uniform thickness and rotors of uniform thickness, and no movement of the thick and thin disks within the brake stack during overhaul; and (3) that the ABS brakes enjoy benefits unattainable by the patented brakes.

The doctrine of equivalents is an equitable doctrine designed to "relieve an inventor from a semantic straight jacket when equity requires." Perkin-Elmer Corp. v. Westinghouse Elec. Corp., 822 F.2d 1528, 1532, 3 USPQ2d 1321, 1324 (Fed.Cir.1987). Under the doctrine, infringement may be found if the alleged infringing device "performs substantially the same overall function or work, in substantially the same way, to obtain substantially the same overall result as the claimed invention." Pennwalt Corp. v. Durand-Wayland, Inc., 833 F.2d 931, 934 (Fed.Cir.1987), citing Perkin-Elmer v. Computervision Corp., 732 F.2d 888, 901-02, 221 USPQ 669, 679 (Fed.Cir.), cert. denied, 469 U.S. 857, 105 S.Ct. 187, 83 L.Ed.2d 120 (1984); Graver Tank & Mfg. Co. v. Linde Air Prods. Co., 339 U.S. 605, 607, 70 S.Ct. 854, 855, 94 L.Ed. 1097 (1950). In determining whether equivalent infringement has occurred, the Court must look to the claim limitations. The United States Court of Appeals for the Federal Circuit has set out the following summary of the appropriate line of inquiry:

> One must start with the claim, and though a "non-pioneer" [FN5] invention may be entitled to some range of equivalents, a court may not, under

Not Reported in F.Supp.
Not Reported in F.Supp., 1994 WL 16019986 (D.Del.)
(Cite as: 1994 WL 16019986 (D.Del.))

Page 9

the guise of applying the doctrine of equivalents, erase a plethora of meaningful structural and functional limitations of the claim on which the public is entitled to rely in avoiding infringement.... Though the doctrine of equivalents is designed to do equity, ... it is not designed to permit wholesale redrafting of a claim to cover non-equivalent devices, i.e., to permit a claim expansion that would encompass more than an insubstantial change. (Citations omitted.)

> FN5. "A pioneer patent is a patent covering a function never before performed, a wholly novel device as distinguished from a mere improvement or perfection of what had gone before." Shields v. Halliburton Co., 493 F.Supp. 1376, 1390 n52, 207 USPQ 304 (W.D.La.1980), aff'd 667 F.2d 1232, 216 USPQ 1066 (5th Cir.1982). In the present case, the Court cannot find that the patented inventions rise to the level of "pioneer." Aircraft brake manufacturers had devised means of constructing and overhauling brakes to increase carbon utilization as early as the 1982 Dunlop Paper. At best, the patented brakes represent an improvement on that earlier art.

... [I]n applying the doctrine of equivalents, each limitation must be viewed in the context of the entire claim.... "It is ... well settled that each element of a claim is material and essential, and that in order for a court to find infringement, that plaintiff must show the presence of every element or its substantial equivalent in the accused device." Lemelson v. United States, 752 F.2d 1538, 1551, 224 USPQ 526, 533 (Fed.Cir.1985) (footnote omitted). To be a "substantial equivalent," the element substituted in the accused device for the element set forth in the claim must not be such as would substantially change the way in which the function of the claimed invention is performed.
*12 Pennwalt Corp v. Durand-Wayland, Inc., 833 F.2d 931, 935 (Fed.Cir.1987), quoting Perkin-Elmer, 822 F.2d at 1532-33, 3 USPQ2d at 1324-25.

Applying these considerations, the Court finds that the ABS Thermally Balanced and Pressure Balanced brakes do not perform substantially the same function in substantially the same way to achieve the same result as the patented brake. The characterizations of the manner of assembly and method of overhaul of the patented brake offered by plaintiff in support of its argument ignore material limitations of the claims. Indeed, they are so broad that, were these characterizations a complete description of the claims, the patents would certainly have been anticipated by the Dunlop Paper, Figure 14 of which falls squarely within them. The fact that both brakes are ultimately designed to stop the aircraft, which plaintiff asserts to be the "substantially equivalent" function of each, is hardly persuasive, the ascribed function being so broad as to encompass all braking devices and thus effectively eliminate "function" as a consideration in an equivalence analysis.

In fact, the patented brake in the present case is limited to a brake assembly in which rotors are of one size and stators of another. This material limitation, which arises from the use of the term "interleaved" in the '895 patent, as discussed above, must be replicated either literally or equivalently in the accused brakes in order for the brakes to be found to infringe claims 2 and 3 of the '895 patent under the doctrine of equivalents. The Court has already determined that the ABS Thermally Balanced and Pressure Balanced brakes do not literally replicate this limitation. The Court now finds that neither do they equivalently replicate it.

The position-dependent arrangement of the ABS brakes, which persists at overhaul, is radically different from that of the patented brake. The principal function of this arrangement--to reduce turn-around time by positioning faster and slower cooling disks in positions where they will cool at a more equivalent rate--would be undermined by the limitation that the thick and thin disks be interleaved and alternating. Further, given the position-dependence of each, it can hardly be said that the ABS brakes and the patented brakes perform their respective functions in "substantially the same way." For these reasons, the Court finds that the ABS Thermally Balanced and Pressure Balanced brakes do not equivalently infringe claim 2 of the '895 patent. Because claim 3 is dependent, the Court finds that neither does the ABS Thermally Balanced or Pressure Balanced brake infringe claim 3.

b. The '017 Patent.

(1) Literal Infringement.

BFG argues that ABS literally infringed the '017 patent when it assembled and overhauled Thermally Balanced brakes (PX 5013) for the A321 and A330/340 programs. (D.I. 373 at 34) Specifically, BFG alleges that the ABS Thermally Balanced brake literally infringes Claim 1 of the '017 patent because (a) it is a multiple disk brakes having disks with different

Not Reported in F.Supp.
Not Reported in F.Supp., 1994 WL 16019986 (D.Del.)
(Cite as: 1994 WL 16019986 (D.Del.))

Page 10

predetermined wear thicknesses; (b) it is assembled with disks in the first group in an overlapping relationship with disks of the second group, the disks of each group being adjacent to disks of the other group, with no disks of a third group interposed between them; (c) it has a first group of disks with thin wear thicknesses and a second group of disks with thick wear thicknesses; (d) it is overhauled at an intermediate overhaul time when the smaller available wear thicknesses of the first group of the disks are substantially worn; at that time, the disks of the first group are removed and replaced by disks of a third group; (e) at the time of the intermediate overhaul, the third group of disks has a greater available wear thickness than do the second group of disks. According to BFG, the Thermally Balanced brake infringes Claims 2 through 4 of the '017 patent because (a) the brake utilizes a two-to-one ratio in wear thicknesses; (b) the first group of disks is replaced by a third group of disks at intermediate overhaul; (c) the wear thickness ratio between the third and second groups of disks is two-to-one. (D.I. 373 at 34-37)

*13 Defendants contend that in the ABS Thermally Balanced brake, "a first group of [thin] disks" is not positioned "in overlapping relationship with a second group of said disks [thick disks]," as required in Claim 1 of the '017 patent. (D.I. 372 at 190) Defendants additionally argue that, while claim 1 of the '017 patent requires "replacing the said [fully worn] first group of said [thin] disks with a third group of said [new thick] disks at an intermediate overhaul", in the Thermally Balanced configuration, the fully worn thin disks are replaced by half worn disks from the center of the heat stack, which are themselves replaced by a new third group of disks. (D.I. 372 at 190-191) If the fully worn first group of disks were replaced with a third group of new disks as required by the '017 patent, the entire function of the Thermally Balanced brake would be defeated. (D.I. 372 at 191) To reap the cooling benefits of the Thermally Balanced brake, the half worn disks must replace the fully worn disks. The Thermally Balanced brake thus has a position-dependent arrangement of disks. (D.I. 372 at 192) The heat stack is returned to the same basic configuration after each overhaul. (D.I. 372 at 192)

BFG replies that Claim 1 of the '017 patent simply requires an overlapping relationship with disks of each group. (D.I. 373 at 35) The claim does not limit the two groups to rotor and stator groups, but rather to groups of disks that are differentiated only by their wear thicknesses. (D.I. 373 at 35) The accused brake has a first and second group of disks that meet this claim. BFG discounts ABS's contention that it does not "replace" the disks because the disks from the third group are placed in a different position in the brake than where the disks of the first group were removed, arguing that the claim does not restrict in any way the position of the third group of disks at the time of the overhaul. It simply requires that the third group be inserted in the brake, and the first group removed. In addition, according to plaintiff, ABS told its customers prior to the commencement of this litigation that the "new thick disks replace worn thin disks at overhaul." (D.I. 373 at 36) Further, at the time of the intermediate overhaul, the third group of disks in the ABS brake has a greater available wear thickness than do the second group of disks, thus technically satisfying the limitations of the claim.

Determination of literal infringement of Claim 1 of the '017 patent first requires construction of the phrase "positioning a first group of said disks in overlapping relationship with a second group of said disks." Here, recourse may again profitably be had to the dictionary. *The Random House College Dictionary* defines "overlap" as "to extend over and cover a part of." *The Random House College Dictionary* at 948. The antecedent term is "group." Thus, the ordinary meaning of the phrase is that the first group will extend over and cover a part of the second.

*14 To determine whether the inventor meant the phrase to be understood in some other sense, the Court must consider the specification and prosecution history. Both clearly evidence that the inventor did not intend the phrase to have this meaning. The relevant drawings included in the specification (Figures 4, 5, 7, and 8) all portray brake assemblies in which the disks of the first group are interleaved with those of the second. (PX 1001, *seriatim*) These same drawings are included in the prosecution history. (PX 1004, *seriatim*)

Based on the foregoing, it is evident that the inventor did not mean that the limitation would require that the first group overlap the second group, but that the disks of the first group overlap the disks of the second group. In other words, the intended antecedent must have been "disks," not "group." Read as such, and employing the ordinary meaning of "overlapping," the limitation would require that the disks of the first group be positioned to extend over and cover a part of the disks of the second group. The use of the definite article makes clear that the claim means that all, not just some, of the disks of one group will overlap with those of the other. In order, therefore, literally to infringe, each of the disks of the accused brake must

Case 1:04-cv-01258-SLR   Document 420-2   Filed 06/21/2006   Page 12 of 15

Not Reported in F.Supp.
Not Reported in F.Supp., 1994 WL 16019986 (D.Del.)
(Cite as: 1994 WL 16019986 (D.Del.))

Page 11

extend over and cover in part a disk of the other group, i.e., a disk with a different wear thickness. This construction makes the language of claim 1 consistent with that of claim 2 of the '895 patent, considered above.

Even the most cursory examination of the drawings illustrating the Thermally Balanced brake reveals that the Thermally Balanced brake does not satisfy this limitation. In the Thermally Balanced brake, the thick and thin disks do not overlap each other, but rather are in distinct groups separated from each other. Further, as defendants argue, at overhaul, the "first group of ... [thin] disks" are not replaced by "a third group of ... [thick] disks," but by half worn disks from the center of the heat stack. New thick disks then replace these half worn disks. ABS's Douglas Moseley testified that if the fully worn disks were replaced with new thick disks, "it would defeat the purpose of the thermal balancing...." (D.I. 348 at 2560)

Accordingly, the Court holds that the overhaul of the ABS Thermally Balanced brake does not infringe claim 1 of the '017 patent.

Claims 2-4 are dependent claims. Claim 2 provides "[t]he method of claim 1" with certain additional limitations. Claim 3, which literally provides "[t]he method of claim 4" with certain limitations, was intended to provide the method of claim 2 with those limitations. [FN6] Claim 4 claims "[t]he method of claim 3" with certain additional limitations. (PX 1001 at column 6, lines 21, 27 and 33) Accordingly, the Court finds that the overhaul of the ABS Thermally Balanced Brake does not infringe claims 2, 3 or 4 of the '017 patent.

> FN6. The "4" was evidently a typographical error. (D.I. 373 at 30)

(2) Doctrine of Equivalents.

*15 BFG also contends that the Thermally Balanced brake infringes Claims 1 through 4 of the '017 patent under the doctrine of equivalents, because the methods of assembling and overhauling both the Thermally Balanced brake and the patented brake accomplish substantially the same function, in the same way, to achieve substantially the same result as the method claimed in the '017 patent. According to plaintiffs, (1) the Thermally Balanced brake is assembled with two overlapping groups of disks of predetermined different wear thicknesses; (2) at a predetermined time, an intermediate overhaul occurs when the disks with the smaller wear thicknesses are substantially worn; (3) at that time, the second group of disks are not fully worn, allowing that second group of disks to go a second run. The methods accomplish the same advantages: enhanced disk life without sacrificing weight, size, piston travel or operating temperature. (D.I. 373 at 37)

The '017 brake assembly is limited in the same way the '895 brake assembly is limited to comprise a heat sink in which all rotors are of one wear thickness and all stators of another. In its consideration of the equivalence of this assembly, the Court incorporates its discussion of the equivalence of the ABS brakes to the patented brake under the '895 patent. Here, as in the case of the '895 patent, a material limitation of the patent--in this case, the requirement that the disks overlap--is not replicated, either literally or equivalently. Furthermore, the repositioning of the disks in the Thermally Balanced brake at overhaul to return the brake to its original thermally efficient configuration fundamentally differs from the method claimed in the '017 patent, according to which new disks of one class, either rotors or stators, are substituted for fully worn disks of the same class. Plaintiff's attempt broadly to characterize the limitations of the '017 patent so as to capture the method and assembly of the ABS brake must necessarily fail. Plaintiff's characterizations (2) and (3) above would encompass the examples from Figure 14 of the Dunlop Paper, which plaintiff claims does not anticipate, and characterization (1) is simply incorrect. That the brakes realize some common advantages is on its own insufficient for a finding of infringement.

Accordingly, the Court finds that the ABS Thermally Blanced brake does not infringe claim 1 of the '017 patent. Because claims 2, 3 and 4 of the patent are dependent, as discussed above, the Court finds that neither does the brake infringe claims 2, 3 or 4 of the '017 patent under the doctrine of equivalents.

B. Validity.

1. General Considerations.

The purpose of a patent grant "is to provide an incentive for private enterprise to devote resources to innovative research, to make the investments required to put new inventions into practice, and to make the benefits of the invention available to a wider public." *Mannington Mills v. Congoleum Industries, Inc.,* 610 F.2d 1059, 1070 (3rd Cir.1979). A patent is presumed valid and the burden of proving invalidity rests with the asserting party. 35 U.S.C. 7 282 (1982). The presumption of validity may be rebutted only by clear

Not Reported in F.Supp.
Not Reported in F.Supp., 1994 WL 16019986 (D.Del.)
(Cite as: 1994 WL 16019986 (D.Del.))

Page 12

and convincing evidence. *Uniroyal, Inc. v. Rudkin-Wiley Corp.*, 837 F.2d 1044, 1050 (Fed.Cir.1988), *cert. denied,* 488 U.S. 825 (1988) (citations omitted). "The burden of proof is not reduced when prior art is presented to the court which was not considered by the P[atent and]T[rademark]O[ffice] ["PTO"].... However, reliance upon such art when that art is more pertinent than the art considered by the PTO may facilitate meeting the burden of proving invalidity." *Id.* at 1050 (citations omitted).

2. Anticipation.

**\*16** Sections 101 and 102 of Title 35, United States Code, provide that patentability is dependent on novelty. [FN7] Section 101 requires that a patentable invention be "new." Section 102 defines this term to bar the issuance of a patent for, *inter alia,* an "invention ... known or used by others in this country, or patented or described in a printed publication in this or a foreign country, before the invention thereof by the applicant for the patent...." 35 U.S.C. 7 102(a). A prior publication in this or any other country defeats "novelty" by "anticipating" the invention. Should the patent already have issued, a finding that a prior publication anticipated the invention will invalidate the patent. Anticipation is a defense, and the burden of proving anticipation rests with the party asserting invalidity. Anticipation is a question of fact. *Scripps Clinic & Research Fdn. v. Genentech, Inc.,* 927 F.2d 1565, 1576 (Fed.Cir.1991).

> FN7. The relevant sections provide:
> 7 101. Inventions patentable.
> Whoever patents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title.
> 7 102. Conditions for patentability: novelty and loss of right to patent.
> A person shall be entitled to a patent unless--
> (a) the invention was known or used by others in this country, or patented or described in a printed publication in this or a foreign country, before the invention thereof by the applicant for the patent, or ...
> (b) the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States....

Anticipation "can only be established by a single prior art reference which discloses each and every element of the claimed invention ... 'arranged as in the claim'." *Structural Rubber Products Co. v. Park Rubber Co.,* 749 F.2d 707, 715-716 (Fed.Cir.1984) (citations omitted). "There must be no difference between the claimed invention and the reference disclosure, as viewed by a person of ordinary skill in the field of the invention." *Scripps Clinic,* 927 F.2d at 1576. Prior art does not "anticipate" for purposes of 7 102 if "it is necessary to prove facts beyond those already disclosed in the reference in order to meet the claim limitations." *Id.* at 1576. Nor does prior art anticipate if only " 'the general aspects are the same' even if 'the differences in minor matters is [sic] ... such as would suggest itself to one of ordinary skill in the art." ' *Structural Rubber,* 749 F.2d at 716 (citations omitted).

Defendants allege that the patents at issue were anticipated by a paper entitled "The Economic and Safety Aspects of Commercial Aircraft Carbon Brakes" (the "Dunlop Paper") presented by Basil Lockwood-Goose, an aircraft brake engineer for Dunlop, Ltd., at the International Federation of Airworthiness Annual Conference in Long Beach, California in April 1982. (D.I 372 at 28-29, 135) Copies of the Dunlop Paper circulated widely throughout both Bendix and BFG in late 1982 and early 1983. (D.I. 372 at 136) Plaintiff did not provide the PTO a copy of the Dunlop Paper in any of its relevant patent submissions. (D.I. 372 at 182)

The Dunlop Paper is 19 pages long and includes 18 illustrations. Pages 1 through 9 and illustrations 1 through 10 relate the history of aircraft brakes and the advantages of carbon as a material for manufacturing disks. Part of page 15, pages 16 through 19 and illustrations 17 and 18 address the safety and environmental advantages of carbon as a material. The alleged anticipation appears in pages 10 through 15 and illustrations 11 through 16, which cover the "economic" aspects of carbon brakes. Because these six pages are central to the question of anticipation, as well as to the question of obviousness, considered below, the Court will explore them in some detail.

**\*17** Page 10 opens with the observation that "one of the most important considerations that affects economics is the total life that can be obtained from the carbon disks." (DX 1 at 10) Thereafter, increased carbon utilization is the section's principal theme. The Dunlop Paper continues: "Because the wear per friction face per stop is very much lower on a carbon

Not Reported in F.Supp.
Not Reported in F.Supp., 1994 WL 16019986 (D.Del.)
(Cite as: 1994 WL 16019986 (D.Del.))

Page 13

brake than on a steel brake, the life potential is very much greater.... [A] carbon brake with a life potential of 3,000 landings is the most viable.... [T]here will be a further cost advantage if the carbon brake discs can be reclaimed for a second life." The process of reclamation--achieved by "taking two fully worn discs and after a fairly simple machining process clipping them together"--is illustrated in Figure 11. Because of brake chassis corrosion, operators "have expressed reservation" about running a brake for a full 3,000 landing cycle--potentially 4 years--without overhaul, and "experience ... indicates that ... a two year cycle might be wise.... The problem is to work out how this can be accommodated without incurring a maintenance penalty." (DX 1 at 10) Pages 11 through 14 and illustrations 12 through 14 describe the Dunlop Paper's "simple solution" to this problem. "For the first life of a new brake it can be left on the aircraft for approximately 1500 landings or until it is half worn...." At that point, "[f]ollowing brake chassis inspection, the heat stack can be put back on the brake for the remainder of its life, or some of the half worn discs can be assembled with re-furbished discs from other brakes ... [I]t is possible to use reclaimed discs which are thicker than new discs.... By the use of this half life inspection routine, and by using extra thick discs mixed with part worn discs the cost per brake landing can be reduced significantly." (DX 1 at 11) Figure 12 shows a carbon heat stack with new, fully worn and half worn discs. Figure 13 is a chart listing the "life ... available from a large combination of new, part worn and reclaimed Boeing 757 Brake discs.... To interpret this into a real life situation Figure 14 shows how an operator taking delivery of 25 Boeing 757 aircraft can schedule his brake inspections." (DX 1 at 13)

Figure 14 of the Dunlop Paper (Figure 2 in this opinion) is at the heart of the anticipation defense. The 25 757 aircraft are individually indicated down the left side of a rectangular chart, while across the top of the chart are column headings for the months from October 1984 through June 1988. Overhauls are indicated by boxes appearing at various points of intersection of columns running down from the month headings and across from the aircraft indicators. These boxes are either solid, indicating that a new heat stack is to be installed at that overhaul, or are marked with numbers from 1 to 5, indicating that a reclaimed heat stack featuring one of five combinations of new, half-worn or reclaimed rotors and stators will be installed. Combination 3 describes a heat stack with new stators and half-worn rotors; combination 5 describes a heat stack with new rotors and half-worn stators. For aircraft numbers 18 through 25, the first and subsequent overhauls occur at 1500 miles. Aircraft 19 appears as an "Example" of the process in a box at the lower right corner of the illustration. At its first overhaul after 1500 miles, Aircraft 19's half-worn rotors are replaced by reclaimed rotors, and its half-worn stators left in place; at its next overhaul 1500 landings later, its fully-worn stators are replaced by reclaimed stators, and its half-worn rotors left in place.

*18 Defendants argue that overhaul combinations 3 and 5 comprise all of the claims included in the '895 patent, and that a sequence of alternating Methods 3 and 5, which does not appear in the chart in Figure 14, but which the Dunlop Paper allows, comprises all of the claims of the '017 patent. [FN8]

> FN8. Defendant's expert Pitner Traughber testified that one repetition of 3-2, 3-5, 5-1, or 5-3 satisfies a number of the claims from the '017 patent, but that only the sequence 5-3 or 3-5 satisfies all four claims of the '017 patent, because of the 2 for 1 requirement. (D.I. 350 at 3050) Traughber further testified that, similarly, only 3 and 5 satisfy claims 2 and 3 of the '895 patent. (D.I. 350 at 3044)

Plaintiff argues that the patents intend that "the brake 'assembly' [will have] within it a predetermined number of landings, which [will establish] the brake's 'overhaul' cycle," and that "the number of the predetermined landings corresponds to the wear thicknesses of the disks in the group of thin disks of the brake." (D.I. 377 at 13) Because the number of landings is predetermined, the brake assembly will be constructed specifically to accommodate a piston travelling only "as far as is needed to make the thin disks substantially fully worn after the predetermined number of brake landings." (D.I. 377 at 14) If this were not the case, at least two of the advantages of the brake urged in the prosecution history--that it would reduce the size of the overall brake envelope and reduce the maximum piston travel--would not apply. (D.I. 373 at 57) The Dunlop Paper anticipates a brake assembly built to accommodate heat sinks of various sizes; thus the assembly must necessarily be larger, and the piston range will necessarily be greater. The Dunlop Paper does not therefore anticipate every element of claim 2 of the '895 patent. Claim 3 of the '895 patent is a dependent claim, and thus for the reasons summarized above it too is unanticipated by the Dunlop Paper. With respect to the '017 patent, claim 1, the independent claim, provides that at overhaul disks with the same predetermined wear thickness will be inserted, "unlike the Dunlop article,

Not Reported in F.Supp.
Not Reported in F.Supp., 1994 WL 16019986 (D.Del.)
(Cite as: 1994 WL 16019986 (D.Del.))

Page 14

where it is unknown in advance how thick the replacement disks will be, and how many landings the overhauled brake will be able to achieve before the next overhaul." (D.I. 380 at 1) The Dunlop Paper, therefore, does not disclose every element of the claims.

Central to defendants' argument is defendants' interpretation of the terms "assembly" and "assembling" in claim 2 of the '895 patent and claim 1 of the '017 patent, respectively. Defendants contend that the terms should be interpreted to mean not only initial assembly but also assembly after overhaul. Should the Court adopt this definition, the argument runs, it might easily find combinations 3 and 5 to anticipate the referenced claims. Should it not, of course, defendants' case becomes much more difficult, because combinations 3 and 5 are not initial assemblies. All of the aircraft in Figure 14 initially employ uniform brakes, in which all the disks have equal wear thicknesses. Claim 2 of the '895 patent clearly provides for a brake assembly in which the wear thickness of one group of disks is less than that of a second group; claim 1 of the '017 patent provides for a method of assembling a brake having a "plurality of disks with available wear portions of predetermined different thicknesses...." (PX 1001 at column 6, lines 2-3) The Figure 14 aircraft thus obviously fail to anticipate in their initial configuration.

*19 The rules governing the construction of claim language are discussed above. To recap, the Court must apply the ordinary meaning of a term, unless the specification or prosecution history indicates that another meaning was used. _ZMI Corp., 844 F.2d at 1579_. Defendants urge that the ordinary meaning of "assembly" is that found in the AECMA Simplified English Document No. PSC-85-16598, "A Guide for the Preparation of Aircraft Maintenance Documentation in the International Aerospace Maintenance Language." According to this publication, "assembly" means: "A number of items that are connected for a specified function." As defendants point out, "[t]here is no limitation to 'new' or 'original' equipment." (D.I. 372 at 145)

Even if the Court were to adopt this definition as the ordinary meaning of "assembly," it could not apply this meaning to these claims, because the specifications and respective prosecution histories plainly evidence that the term as used is indeed limited to original construction. The specification and patent histories for both the '895 patent and the '017 patent list several advantages of the patented brake directly attributable to its utilization of disks with different wear thicknesses. All four sources provide:

> According to this invention a disk brake construction is provided which is assembled with the available wear portions of the disks having different thicknesses. The brake envelope is of a minimum size to accommodate the disks. The piston-cylinder assemblies also are of a reduced size with a reduced piston travel. An intermediate overhaul is made after a predetermined number of landings and a portion of the disks replaced by new or refurbished disks. In this way, the piston travel is reduced and the size and weight of the brake may be reduced,....

(PX 1002 at column 1, lines 45-47; PX 1001 at column 1, lines 39-41; PX 1005 at 2; PX 1004 at 1-2) These advantages would be unattainable on a brake not originally configured with disks of different wear thicknesses.

The Court finds that the terms "assembly" and "assembled" in claim 2 of the '895 patent and claim 1 of the '017 patent are limited to initial assembly of the brake and do not refer to "assembly" after overhaul.

The uniform brake aircraft in Figure 14 of the Dunlop Paper do not anticipate claim 2 of the '895 patent. Because the patented brake must be initially assembled with disks of different wear thicknesses, the method of overhaul reflected in combinations 3 and 5 of Figure 14 similarly fails to anticipate the method of claim 1 of the '017 patent. The referenced advantages of the patent--shorter piston range and reduced brake size--are not realized in the Dunlop Paper by the simple reconfiguration at first overhaul represented by combinations 3 and 5. Even with the introduction at this overhaul of disks of different wear thicknesses, the original larger brake envelope and piston range remain.

"Anticipation requires the presence in a single prior art disclosure of all elements of a claimed invention arranged as in the claim." _Connell v. Sears, Roebuck & Co., 722 F.2d 1542, 1548 (Fed.Cir.1983)_. The Court notes the similarity between the 3 and 5 combinations and the claims of the '895 patent. Because plaintiff failed to disclose the Dunlop Paper to the PTO, defendants' meeting their burden of proving anticipation by clear and convincing evidence may be facilitated. Nevertheless, for the reasons stated above, the Court cannot find that the Dunlop Paper discloses all elements of the patented brake "arranged as in the claim[s]". _Structural Rubber Products v. Park Rubber, 749 F.2d 707, 715-716 (Fed.Cir.1984)_ (citations omitted). Accordingly, the Court cannot find that claim 2 of the '895 patent was anticipated by the