Not Reported in F.Supp.
Not Reported in F.Supp., 1994 WL 16019986 (D.Del.)
(Cite as: 1994 WL 16019986 (D.Del.))

Page 15

Dunlop Paper. Claim 3 of the '895 patent is a dependent claim, and the Court consequently finds that it too was not anticipated by the Dunlop Paper. Nor can the Court find that claim 1 of the '017 patent was anticipated by the Dunlop Paper. Claims 2, 3 and 4 of the '017 are dependent claims, and the Court consequently finds that they too were not anticipated by the Dunlop Paper.

3. Obviousness.

*20 Section 103 of Title 35, United States Code, provides in relevant part that

[a] patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains.

"Obviousness ... is a legal conclusion involving a preliminary determination of four factual inquiries: (1) the scope and content of the prior art; (2) the differences between the claims and the prior art; (3) the level of ordinary skill in the pertinent art; and (4) secondary considerations, if any, of nonobviousness. Secondary considerations include objective indicia of nonobviousness such as commercial success, long-felt but unresolved need, and failure of others." *Uniroyal, Inc. v. Rudkin-Wiley Corp., 837 F.2d at 1050* (citations omitted). The Court must consider the prior art reference "in its entirety," and not "ignore[ ] those portions of the reference that argue [ ] against obviousness." *Bausch & Lomb, Inc. v. Barnes-Hind/Hydrocurve, 796 F.2d 443, 448 (Fed.Cir.1986), cert. denied, 484 U.S. 823 (1987).*

The parties agree that one of "ordinary skill in the pertinent art" is "a person with a bachelor of science degree in mechanical engineering or equivalent college-level training, with five to ten years of experience in the design, development, acquisition, use and/or overhaul of brakes, or a person having equivalent knowledge or experience." (D.I. 272 at 4, D.I. 276 at 3) The Court accepts that conclusion, and adopts it for purposes of its analysis of the remaining factors relevant to the issue of obviousness.

Defendants contend that the "scope" of the prior art comprises (1) steel brakes (specifically, U.S. Patent No. 3,480,115 (the "Lallemant" patent) and BFG prior art); (2) the Concorde; and (3) the Dunlop Paper.

Brakes equipped with steel disks of different wear thicknesses have been used for many years. Steel brakes made in the 1950s used steel rotors and stators made of a steel core covered with an asbestos-based lining pad. (D.I. 372 at 9) The asbestos pads wore out long before the steel, at which point the pads were replaced and the steel reused. (D.I. 372 at 9) In 1969, Lallemant patented a configuration of steel disks arranged in descending order of thickness. Specifically, the Lallemant patent states: "A disc brake according to the present invention is characterized by the fact that the discs of at least one of the two groups of discs, that is to say the smooth rotors and/or the lined stators, have respective thicknesses that vary from one disc to the next disc of the same group, according to the axial position of the disc in the brake." (DX 2 at column 2, lines 63-69) As the brake is applied, the disks wear thinner. When the thinnest disk is fully worn, the brake is replaced. Some of the disks are later reused in other brakes, the once-thicker disks being repositioned farther down in the heat sinks. (D.I. 372 at 9-10) The Lallemant patent brake was widely used.

*21 Since at least the 1970s, BFG has used steel brakes with steel rotors of different wear thicknesses that went through multiple tours. (D.I. 372 at 11) Steel rotors, used for three different tours, were shifted to different positions in the heat sink as they became thinner. (D.I. 372 at 11)

In the 1970s, the Concorde became the first commercial aircraft to use a carbon disk brake. During the developmental phase of this brake (1970-71 through January 1976), Dunlop, the manufacturer, used disks with different wear thicknesses at overhaul as a result of problems encountered in testing. (D.I. 372 at 12-13) The main problem was that "the metal clips which protect the rotors in their interface with the wheel ... kept on braking and falling off." (D.I. 348 at 2368) When the clips broke, the attached disks were replaced with new disks. Dunlop found that the brake "worked just as well by putting a new disk in against a partly worn disk." (D.I. 348 at 2369) Occasionally broken disks were also replaced with new disks. Consequently, the brake had "disks with different available wear surfaces remaining." (D.I. 348 at 2370) The few Concordes that were built all were initially equipped with uniform brakes. Dunlop's overhaul manual, however, directed that at overhaul, "new or serviceable part worn" disks were to be introduced into the heat stack "as required." (DX 3 at 177) As a result, after overhaul, the carbon disks in the Concorde brake were of various thicknesses. (D.I. 372 at 14)

The Dunlop Paper has been described in detail in the

Not Reported in F.Supp.
Not Reported in F.Supp., 1994 WL 16019986 (D.Del.)
(Cite as: 1994 WL 16019986 (D.Del.))

Page 16

previous section.

"To determine whether a reference is within the scope and content of the prior art," the Court must "first determine if the reference is within the field of the inventor's endeavor." *Bausch & Lomb, Inc. v. Barnes-Hind/Hydrocurve,* 796 F.2d 443, 449 (Fed.Cir.1986). In the present case, that test is clearly satisfied, as the alleged prior art represents widely-known approaches to manufacturing a more efficient aircraft brake, precisely the endeavor upon which the inventor was embarked. "Further, the art must have existed as of the date of invention, presumed to be the filing date of the application until an earlier date is proved." Here, the claimed date of invention is undeniably antedated by the alleged prior art. The Court accordingly finds that the alleged prior art is indeed prior art for purposes of this analysis.

At trial, defendants' expert, Pitner Traughber, testified that the differences between this prior art and the patented inventions were so slight that any of the above-referenced prior art alone, and certainly all of it together, made the patented inventions obvious to a person of ordinary skill in the pertinent art. Specifically, Traughber testified that as of late 1981, steel brakes, used on all aircraft but the Concorde, were assembled with rotors and stators of varying wear thicknesses, as discussed above, and as further evidenced by a letter from BFG's David Ronyack stating that BFG had "practiced for many years" a heat sink overhaul program involving the use of varying thickness rotors. (D.I. 350 at 2936, 2940) Traughber further testified that the Concorde manual, as noted, provided that the Concorde, in 1981 the only aircraft to use a carbon brake, might be overhauled with variable thickness disks. (D.I. 350 at 2944-2945) Finally, he testified that the Dunlop Paper

*22 clearly shows the idea of using a thick/thin brake concept with an intermediate overhaul for the purpose of increasing or improving carbon disk utilization. The paper also shows the idea of disks in a brake that has different thicknesses, variable thickness disks, referred to in the paper as thick/thin disks.... And, very specifically, it shows disks having a wear thickness two times that of other disks having a thinner wear thickness.... The paper also shows a brake configuration where thick and thin disks are alternating in the brake design. The paper calls attention to having a consistent carbon material through the thickness of the disk[, and] ... talks about refurbishment of carbon disks in a two-for-one refurbishment scheme.... [T]he whole story line is increased carbon utilization. (D.I. 350 at 2998)

As discussed above, Figure 14 at page 14 of the Dunlop Paper illustrates various carbon use enhancing overhaul techniques applied to a fleet of 25 Boeing 757s. In 17 of the aircraft, increased carbon utilization results when at first overhaul the brake is converted to thick/thin, a pattern restored in all but two of these aircraft (9 and 11) at successive overhauls when the thick disks, either rotors or stators, are half-worn. Defendants admit that the scheme is complicated, and Traughber testified that "someone of ordinary skill in the art" would look for ways to simplify it. The obvious simplification, according to Traughber, would be to employ a succession of overhaul configurations 3 and 5, as described above. Further, the ordinarily skilled reader would realize that as the savings advantages commenced after the brake was overhauled to thick/thin, it would be obvious "to simply just start thick/thin." (D.I. 350 at 3000) This decision would automatically lead to the reduction in size of the brake envelope: "Anyone ... of ordinary skill in the art would know to fill up the brake envelope. That is what our business is all about. To maximize use of the available space." (D.I. 350 at 3000-3001) "If you start with a thick/thin configuration, and you fill the envelope, and if you look at all five of the methods that are in the [Dunlop] paper, ... there are only two configurations that will fill the envelope, and after every overhaul, always fill the envelope. And those methods are Methods 3 and 5." (D.I. 350 at 3001)

In opposition to this testimony, plaintiff argues that steel brakes differ from carbon brakes in that "the stators are designed to have an extra thick lining material of a different, softer material than steel attached to the steel stator itself." (D.I. 373 at 82) "The thick soft lining material wears more quickly than thin steel wear thicknesses on the rotors, thus, at the time that an overhaul is needed, the thicker disks require a new layer of the lining material while the thinner rotors, in some cases, may remain in the brakes." (D.I. 373 at 83) The Lallemant patent "discloses one group of disks (*e.g.*, stators) with one wear thickness capable of going only one tour wherein each of those disks is individually interposed between several other individual disks (*e.g.*, rotors) that each have ... wear thicknesses different from each other, and indeed, different from the stators." (D.I. 373 at 84) "Thus, no disks [sic] from a single group having a single wear thickness is overlapped or interleaved with a second group of disks having a single, different wear thickness." (D.I. 373 at 84) In addition, plaintiff contends that the Dunlop Paper "was too complicated a scheme of refurbishment to be practical." (D.I. 373

Not Reported in F.Supp.
Not Reported in F.Supp., 1994 WL 16019986 (D.Del.)
(Cite as: 1994 WL 16019986 (D.Del.))

Page 17

at 88) "[T]he defendants failed to establish any teaching in the Dunlop article that would make one skilled in the art realize that starting with a uniform brake was the problem causing the scheme to be complicated." (D.I. 373 at 89-90) Further, "ABS and Bendix failed to offer any teaching within the Dunlop article that would lead one skilled in the art to the 3/5 pattern ... that defendants contend render[s] the invention of the patent obvious." (D.I. 373 at 91)

*23 Plaintiff also identifies secondary considerations that allegedly compel a finding of nonobviousness: (1) the "invention satisfied a long-felt need;" (2) "it was preceded by failures of others;" (3) "it was met with skepticism;" (4) "it was copied;" (5) "it provides enormous unexpected advantages;" and (6) "it has been a commercial success." (D.I. 377 at 23)

Plaintiff alleges that the aircraft brake industry had long been looking for a way to make carbon brakes commercially feasible, that only Bok's idea proved a successful way to increase carbon utilization above the already known 2-for-1 refurbishment method, and that, to date, no other feasible method has been found. (D.I. 377 at 24) Defendants reply that " 'long-felt need is analyzed as of the date of an articulated identified problem and evidence of efforts to solve that problem', *Texas Instruments, Inc. v. U.S. Int'l Trade Comm'n*, 988 F.2d 1165, 1178 (Fed.Cir.1993)." According to defendants, "[t]he aircraft brake industry identified the problem of decreasing the costs of carbon utilization during the developmental stages of the 757 carbon brake program in late 1981 ...; within the next few months, Dunlop, Bendix and BFG had all arrived at essentially the same solution...." (D.I. 372 at 166)

According to plaintiff, the "solutions" proposed by Bendix and Dunlop were failures.

The principal "skepticism" to which plaintiff alludes was that expressed by Boeing. (D.I. 377 at 24) Specifically, as BFG's William L. Walthall testified at trial, in 1985 Boeing indicated to BFG that BFG should "stick with the balanced brake" in its initial proposal on the 747/400. (D.I. 342 at 815)

According to plaintiff, ABS began developing its Thermally Balanced and Pressure Balanced brakes within weeks after receiving a letter from BFG's lawyers in September 1988 advising of the issuance of the patents. ABS and BFG were at the time competitors on the A330/340 program. According to plaintiff, "ABS's receipt and review of the patents confirmed that ABS would be at a competitive disadvantage, especially economically, if it continued to market its uniform carbon brakes on that program against BFG's patented approach.... As a result, ... ABS immediately began designing brakes leading to its proposal of the accused brakes described previously." (D.I. 373 at 44-45)

Bendix, plaintiff alleges, also received a letter enclosing the patents from BFG's counsel in September 1988. Subsequently, according to plaintiff, when "Bendix's customers repeatedly requested Bendix to employ efforts to get Bendix's carbon brake operating costs down by increasing the carbon utilization of its brakes[,] ... Bendix decided to use the BFG patented approach on its next major commercial carbon brake program." (D.I. 373 at 39) By early 1991, Bendix had begun building and testing infringing Multi-Tour brakes for the 777 and 767-300 projects. (D.I. 373 at 40) "In view of Bendix's awareness of BFG's design, the sequence of events described above, and the near duplication by Bendix of BFG's embodiments of the invention disclosed by the examples in the patents, the only reasonable conclusion is that Bendix slavishly copied BFG's invention either directly from the patents, or from BFG's literature in Bendix's possession describing the patented invention." (D.I. 373 at 40-41)

*24 Defendants respond, *inter alia*, that the patents were invalid and that the defendants independently developed the allegedly copying brakes.

According to plaintiff, three benefits of the patented brake--reduction in size, weight and temperature--were "enormous advantages" that none of the prior art would have led one skilled in the art to expect from a brake design. Defendants contest this characterization.

According to plaintiff, "commercial success" is evidenced by the fact that the "brakes have replaced the prior art uniform brake on several major aircraft," specifically the Boeing 747-400, Boeing 777, Airbus A320, and Airbus A321. (D.I. 377 at 25) Boeing approved the patented brake as the production standard for the 747-400 in August 1990. (D.I. 342 at 817) "In direct competition, the patented brake has allowed BFG to gain 80 percent of the market for the Airbus A330/340 aircraft giving BFG a 19 percent profit margin. Bendix has only been able to gain 20 percent of that same market even while sacrificing its profit margin at 3 percent. (D.I. 377 at 25)

Defendants argue that "[a]ircraft manufacturers and their customers desire brakes that stop airplanes and cost them as little as possible; those customers are

Not Reported in F.Supp.
Not Reported in F.Supp., 1994 WL 16019986 (D.Del.)
(Cite as: 1994 WL 16019986 (D.Del.))

Page 18

entirely indifferent to the patented brake's two-to-one wear thickness or the patented overhaul method.... Thus, any commercial success BFG has experienced is not probative of obviousness, because that success was not 'shown to have in some way been due to the nature of the claimed invention, as opposed to other economic and commercial factors unrelated to the technical quality of the patented subject matter.' *Cable Electric Products, Inc. v. Genmark Inc., 770 F.2d 1015, 1027 (Fed.Cir.1985)*." (D.I. 372 at 165-166) Defendants specifically contest plaintiff's characterization of their A330/340 returns, arguing that, contrary to plaintiff's assertions, "Bendix's A330/340 program has ... been a financial success.... Recent Bendix projections show an internal rate of return of 12.4 percent for the overall A330/340 program.... Bendix has turned a handsome profit despite its brakes' uniform configuration and despite competition from not one but two thick/thin brakes." (D.I. 372 at 86)

As noted above, parties alleging invalidity for obviousness must prove their case by clear and convincing evidence. Where the patent applicant failed to provide the PTO with the relevant prior art, meeting that burden may be facilitated. In the present case, it is undisputed that plaintiff failed to provide the PTO with the prior art to which defendants allude in their arguments alleging invalidity for obviousness. Therefore, while defendants' burden is not reduced, BFG's failure to provide this prior art to the PTO will be considered in deciding whether defendants have met their burden.

The Court is not persuaded that the steel brake art alone made the patented invention obvious to one of ordinary skill in the pertinent art. While the Court is satisfied that disks of varying thicknesses have been employed in steel brakes, it finds that plaintiff's regularized configuration and predetermined overhaul schedule and method required something more than the exercise of common imagination directed to the steel brake.

*25 Nor can the Court find that the Concorde manual alone made the patented invention obvious. Although it too allows for the utilization of disks of varying thickness at overhaul, it also lacks the order and regularity of the patents.

The Dunlop Paper is another matter. As discussed above, the Dunlop Paper only fails to anticipate claim 2 of the '895 patent because its initial configuration provides for a uniform brake designed for 3,000 landings, thus necessitating that the brake be constructed with an envelope and piston range larger and heavier than that provided for by the patents. A publication that fails to anticipate a patented invention, however, may well make that invention obvious, if the differences between the two are such as would have occurred to a person of ordinary skill in the pertinent art upon examination of the publication. Defendants offered extensive testimony on this issue. This testimony is summarized above. Considering the Dunlop Paper in its entirety, the Court finds this testimony compelling.

"[T]he whole story line" of the Dunlop Paper "is increased carbon utilization." Various overhaul reconfigurations are suggested as means of accomplishing this end. The illustration of configurations other than those defendants deem most completely anticipatory, configurations 3 and 5, does not teach away from the patents. Nor does the remainder of the text and illustrations of the Paper, which are summarized above. While "two-for-one" refurbishment--the combining of two thin disks to form one extra-thick disk--is certainly a principle theme, it is not the only theme, as the presentation of overhaul combinations 3 and 5 reveals. As defendants argue, Figure 14 plainly contemplates the continuation of the series of overhauls beyond the last date covered in the chart.

The Dunlop Paper, and especially the overhaul schedules proposed in Figure 14, are clear proof of obviousness to a person of ordinary skill in the pertinent art. Whether they are "convincing" as well depends upon a consideration of the "secondary considerations" advanced by plaintiff.

These secondary considerations must be weighed by the Court before it reaches a decision on validity under *7 103. Lindemann Maschinenfabrik v. Am. Hoist and Derrick, 730 F.2d 1452, 1461 (Fed.Cir.1984)*. As defendants contend, "long-felt need" is measured "as of the date of an articulate identified problem...." *Texas Instruments, Inc., 988 F.2d at 1178*. The problem of enhancing carbon utilization arose during the development of the 757 in late 1981. Dunlop had developed a solution which very nearly anticipated the patented invention within a matter of months. BFG was not far behind. Therefore, while it is evident that the patented brake was designed to address a real need, the Court is not persuaded that that need was "long-felt."

The Court finds that plaintiff is correct that the Bendix II-C testing was discontinued and that the Dunlop Paper overhaul scheme was never adopted.

Not Reported in F.Supp.
Not Reported in F.Supp., 1994 WL 16019986 (D.Del.)
(Cite as: 1994 WL 16019986 (D.Del.))

Page 19

The significance of these facts as evidence of nonobviousness, however, is diminished in proportion to the relatively brief period of time during which brake manufacturers actively sought a solution to the problem of increased carbon utilization, and the Court can accordingly assign them little weight.

*26 The rather abbreviated evidence of "skepticism" adduced by plaintiff is neither by itself nor in combination with the other proffered indicia strong evidence of nonobviousness.

As for the alleged copying of the patented brake by ABS and Bendix, the Court is guided by the opinion of the United States Court of Appeals for the Federal Circuit in Pentec, Inc. v. Graphic Controls Corp., 776 F.2d 309 (1985). In that case, the court found that patentee's copying argument could "be given little weight," because the alleged infringer's "effort to develop their own solution was not shown to have been extensive, its product is not identical to the claimed invention, and it vigorously denied infringement." In the present case, this analysis applies with equal force to ABS. Bendix's development of the infringing Multi-Tour brake presents a somewhat different picture. The Court is persuaded that Bendix did indeed copy BFG's patents in its construction and testing of Multi-Tour brake for the 767-300 and 777 projects. The Court is not persuaded, however, that Bendix's "effort to develop [its] own solution" to the problem of increased carbon utilization was "extensive," and the fact of its subsequent ease in substituting non-infringing uniform brakes for the Multi-Tour brake suggests that its use of the patented configuration, while at the time no doubt seen as expedient, was not necessary to its ultimate bidding success. In Custom Accessories, Inc. v. Jeffrey-Allan Industries, Inc., 807 F.2d 955, 960 (Fed.Cir.1986), upon which plaintiff relies, a validity case was vacated and remanded in part because the district court had failed to consider "concrete evidence of copying ..." that had led it to conclude that, "[t]hough 'not a major breakthrough, ... [the invention] was a better mousetrap than those on the market,' and 'others have adopted that design, so that it has become a commonly sold configuration....' Id. The same cannot be said for the patented brake, as the patented configuration, while briefly tested by Bendix, has not been "sold" by Bendix or any other manufacturer apart from BFG.

The Court is further unpersuaded that the "advantages" of the invention were as "unexpected" as plaintiff claims. Neither the fact that an initial assembly of full and half-sized disks would produce a smaller and lighter brake envelope, nor the fact that the disks might be repositioned to increase thermal efficiency (which ABS had independently accomplished), seems at all surprising, given the scope of prior art. In Lindemann Maschinenfabrik v. Am. Hoist and Derrick, 730 F.2d 1452, 1461 (Fed.Cir.1984), upon which plaintiff relies, the
> record [was] clear that ... no prior art device of any type could economically process rigidly massive scrap without pretreatment. Unchallenged testimony of experts was characterized by surprise and amazement that the claimed invention was able to accomplish that feat. That it could do so in minutes, and with a moderate sized structure, were further sources of surprise. That those skilled in the art had previously believed pretreatment of rigidly massive scrap was required was also uncontradicted.

*27 No such "unchallenged testimony" appears on the record of this case.

Lastly, the alleged "commercial success" engendered by the patents is at best ambiguous. While the patented brake has apparently brought some economic benefit to BFG, it is not clear that the uniform brake does not provide an acceptable noninfringing substitute. As carbon prices decrease, this only becomes more true. The Court cannot find that the evidence offered by plaintiff on this point, when considered with the evidence offered on the issue of validity under 7 103, is sufficient to prove nonobviousness.

Based on the foregoing, the Court finds that claims 2 and 3 of the '895 patent and claims 1, 2, 3, and 4 of the '017 patent were obvious to one of ordinary skill in the pertinent art. For this reason, the Court holds that claims 2 and 3 of the '895 patent and claims 1, 2, 3, and 4 of the '017 patent are invalid under Section 103 of Title 35, United States Code.

4. Prior invention.

Section 102(g) of Title 35, United States Code, denies patent protection if "before the applicant's invention thereof the invention was made in this country by another who had not abandoned, suppressed, or concealed it." The date of invention for purposes of 7 102(g) is the date the claimed invention is "reduced to practice." 3 D. Chisum, Patents 10.03[1], at 10-21 (1993). Reduction to practice occurs when the inventor knows that the product will "actually work[ ] for its intended purpose." Newkirk v. Lulejian, 825 F.2d 1581 (Fed.Cir.1987). As discussed above, even if a similar invention is reduced to practice before the

Not Reported in F.Supp.
Not Reported in F.Supp., 1994 WL 16019986 (D.Del.)
(Cite as: 1994 WL 16019986 (D.Del.))

Page 20

patented device, it will not be found to "anticipate" that device under 7 102(g) unless it "meet[s] every element of the claimed invention...." *Hybritech Inc. v. Monoclonal Antibodies, Inc.*, 802 F.2d 1367, 1379 (Fed.Cir.1986), cert. denied, 480 U.S. 947 (1987).

Defendants contend that the patented invention was anticipated for purposes of 7 102(g) by the Bendix "II-C" brake. Bendix constructed and tested the II-C brake as part of its development of various types of carbon brakes Bendix intended to propose for the upcoming Boeing 767. (D.I. 372 at 25) According to defendants, Bendix knew that the II-C would work for its intended purpose by September 1982, when it concluded laboratory testing. (D.I. 372 at 178). As defendants note, the BFG inventor, Lowell Bok, testified at trial that he did not have "confidence that the idea [for the patented brake] would, in fact, work" until BFG's dynamometer testing program was completed in November 1983. (D.I. 352 at 3667) In a pretrial affidavit, Bok stated that between December 1981 and May 1983, "[t]here was no invention to place on sale; at most, I had a mere concept." (D.I. 217 at 24) Consequently, defendants contend that Bendix first reduced the patented invention to practice more than one year before BFG.

Plaintiff argues that the II-C brake was never, in fact, "reduced to practice." According to plaintiff, "Bendix tried a solitary experiment on the II-C idea in June 1982, which failed miserably.... That test could not even be completed--it was discontinued after only 137 dynamometer stops ... out of a planned 600 stops ... due, in part, to the fact that the thin rotors were wearing extremely fast and were becoming too thin (the thin disks were wearing twice as fast as the thick disks, and the carbon wear rate was 2.5 times higher than uniform disks).... The test report concluded that the experiment was insufficient and that more testing was required...." (D.I. 372 at 214, 216-217) Plaintiff further alleges that even if it had been reduced to practice, the II-C brake did not anticipate the patented brake because it did not "meet every element of the claimed invention." Specifically, plaintiff argues, defendants offered no evidence concerning the relative wear thicknesses of the rotors and stators. (D.I. 377 at 26)

*28 Defendants have the burden of proving invalidity by clear and convincing evidence. The Court finds that they have not met that burden here. It is not at all clear to the Court that the II-C brake was reduced to practice. It is even less clear that it embodied every element of the claimed invention. The II-C brake was configured with the thick disks initially contiguous to one another in the center of the heat stack. (DX 91) No evidence was offered to prove that the thick and thin disks in the II-C brake were at any point "interleaved and alternating," as those terms are commonly used. The Court has held that this interleaving is an essential element of the independent claim 2 of the '895 patent and therefore of the dependent claim 3 of the same patent. Similarly, the Court has held that the requirement of independent claim 1 of the '017 patent that the disks "overlap" mandates that the thick and thin disks interleave. Dependent claims 2-4 carry the same limitation.

For these reasons, the Court finds that claims 2 and 3 of the '895 patent and claims 1, 2, 3 and 4 of the '017 patent were not anticipated by the Bendix II-C brake.

5. On Sale.

Section 102(b) of Title 35, United States Code, denies patent protection if "the invention was ... on sale in this country, more than one year prior to the date of the application for patent in the United States...." If a claimed invention is "on sale" more than one year prior to the date of patent application, the patent is invalid as a matter of law.

As this Court noted in its memorandum opinion denying defendants' motion for summary judgment, several well-established policy considerations provide a backdrop against which a determination of validity under Section 102(b) is to be made:

> First, there is a policy against removing inventions from the public which the public has justifiably come to believe are freely available to all as a consequence of prolonged sales activity. Next, there is a policy favoring prompt and widespread disclosure of new inventions to the public. The inventor is forced to file promptly or risk possible forfeiture of his invention [patent] rights due to prior sales. A third policy is to prevent the inventor from commercially exploiting the exclusivity of his invention substantially beyond the statutorily authorized 17-year period. The on-sale bar forces the inventor to choose between seeking patent protection promptly following sales activity or taking his chances with his competitors without the benefit of patent protection. The fourth and final identifiable policy is to give the inventor a reasonable amount of time following sales activity (set by statute as 1 year) to determine whether a patent is a worthwhile investment. This benefits the public because it tends to minimize the filing of inventions [sic] of only marginal public interest.
> *General Electric Co. v. United States*, 654 F.2d 55,

Not Reported in F.Supp.
Not Reported in F.Supp., 1994 WL 16019986 (D.Del.)
(Cite as: 1994 WL 16019986 (D.Del.))

Page 21

61-64 (Ct.Cl.1981) (*quoted in UMC Electronics v. United States,* 816 F.2d 647, 652 (Fed.Cir.1987), *cert. denied,* 484 U.S. 1025 (1988)).

**\*29** The party alleging invalidity "has the burden of proving that there was a definite sale or offer to sell more than one year before the application for the subject patent, and that the subject matter of the sale or offer to sell fully anticipated the claimed invention or would have rendered the claimed invention obvious by its addition to the prior art." *UMC Electronics,* 816 F.2d at 656.

The on-sale bar thus applies not only to sales, but to offers to sell. *King Instrument Corp. v. Otari Corp.,* 767 F.2d 853, 860 (Fed.Cir.1985), *cert. denied,* 475 U.S. 1016 (1986). "Where there is no sale, a definite offer to sell is an essential requirement of the on-sale bar." *RCA Corp. v. Data General Corp.,* 887 F.2d 1056, 1062 (Fed.Cir.1989). "[T]he requirement of a definite offer excludes merely indefinite or nebulous discussion about a possible sale.... [T]his requirement may be met by a patentee's commercial activity which does not rise to the level of a formal 'offer' under contract law principles...." *Id.* at 1062 (emphasis in original). Parties challenging the validity of a patent under 7 102(b) need prove only one sale or offer to sell in order to prevail. *King Instrument,* 767 F.2d at 860.

Defendants contend that the patented brake was offered for sale in this country more than one year prior to the patent application date of July 7, 1984. Indeed, defendants allege that patented brakes "have been on sale in this country continuously since December 1981 ." (D.I. 376 at 22) Specifically:

(1) On November 2, 1981, BFG made a formal sales proposal to Boeing for carbon brakes for the Boeing 757-200 aircraft. At a sales presentation at Boeing on December 7, 1981, BFG indicated that the proposal would be revised to incorporate the intermediate overhaul brake design and method, and BFG submitted to Boeing a written proposal modification to this effect on December 11, 1981. (DX 28; D.I. 372 at 19)

BFG made contemporaneous sales presentations to Delta and American Airlines. On December 11, 1981, BFG formally offered the intermediate overhaul brakes to Delta; on December 17, BFG made a similar offer to American. (D.I. 372 at 20; DX 73; DX 74)

BFG argues that these were not "definite offers" for purposes of 7 102(b) because the invention at that time was a "mere concept." At the summary judgment stage of this proceeding, in support of this averment, plaintiff offered an affidavit executed by the inventor, Lowell Bok. (D.I. 217 at B19- B37)

In its memorandum opinion denying defendants' motion for summary judgment, this Court interpreted the opinion of the United States Court of Appeals for the Federal Circuit in *A.B. Chance Co. v. RTE Corporation,* 854 F.2d 1307 (Fed.Cir.1988) to hold that the on-sale bar requires something more than the marketing of a concept only. In *A.B. Chance,* the court found that the invention at issue was a mere concept when "critical components of the claimed invention had not been developed, no embodiment had been built, and the inventors did not know and could not have known whether their invention would work." *A.B. Chance Co.,* 854 F.2d at 1311. Since in the present case "(1) critical components of the claimed invention allegedly had not been developed, (2) no embodiment had been built, and (3) Mr. Bok allegedly did not know and allegedly could not have known whether his invention would work," the Court followed the holding in *A.B. Chance* and found that, in 1981, the invention was a mere concept and was not on-sale.

**\*30** At trial, defendants offered evidence to prove that prior to December 1981, BFG had "performed a sophisticated thermal model analysis of the claimed invention that had 'the capability of predicting temperatures on the real critical conditions of the specification' and predicted improved temperatures for the claimed invention...." Defendants also produced evidence indicating that prior to 1981, "BFG [had] also presented dynamometer temperature data and wear data to substantiate its thick/thin brake proposal...." (D.I. 372 at 169) This evidence goes to show that Mr. Bok could have known in 1981 that his invention would work. It does not, however, satisfy the Court that the invention was on sale in 1981. Defendants did not prove that all critical components of the claimed invention had been developed, or that an embodiment of the claims had been built.

Therefore, the Court finds that the patented invention was, for purposes of 7 102(b), a mere concept in 1981, and was not on sale or offered for sale at that time.

(2) Defendants further allege that plaintiffs "offered to sell" the invention for 7 102(b) purposes at a March 24, 1983 technical meeting with Boeing. (D.I. 376 at 24; D.I. 372 at 39) At the time of issuance of the Court's memorandum opinion denying defendants' motion for summary judgment, it was undisputed that by January 1983 the patented brake was "beyond a

Not Reported in F.Supp.
Not Reported in F.Supp., 1994 WL 16019986 (D.Del.)
(Cite as: 1994 WL 16019986 (D.Del.))

Page 22

mere concept," and based on the evidence presented the Court concluded that the patented invention was sufficiently well-developed by that time that its sale would implicate ¶ 102(b). No evidence produced at trial has persuaded the Court to amend this conclusion.

Therefore, the only question for the Court is whether there was a "definite offer to sell" in March 1983.

Plaintiff argues that the March 1983 meeting was a "technical coordination meeting" ("TCM") and that "no offer [of sale], let alone a definite offer," was made at that time. (D.I. 380 at 7) According to plaintiff,
> technical coordination meetings such as this one are an opportunity for Boeing to ask the wheel and brake manufacturers questions and for the wheel and brake manufacturers to find out at the most general level where Boeing is headed.... Only later, after Boeing develops a clearer picture of what the aircraft design will be, does Boeing send a Request for Information ("RFI") to the wheel and brake manufacturers.... Still later, after Boeing develops the specification, it develops a Request for Proposal ("RFP"), which includes the specification and a specific request that the wheel and brake manufacturer propose a wheel and brake for that aircraft program.... Boeing does not contemplate that an offer for sale will be made until after the RFP has been sent....

(D.I. 373 at 66) In support of this argument, plaintiff cites the testimony of Boeing's Garrett H. DeVlieg, who stated that the meeting " 'could not have involved the brake[']s being for sale per se ... because the R[equest ]F[or ] Proposal did not go out until sometime [six months] after that." ' (D.I. 377 at 29) In addition, "[t]he actual proposals were not submitted until May 1984 (DX 252)--some fourteen months after the T[echnical ]C[oordination ]Meeting. Thus, the March 1993 TCM involved only preliminary concepts of a technical nature that hardly constituted a definite, firm offer for sale. *RCA Corp. v. Data General Corp., 887 F.2d 1056, 1062 (Fed.Cir.1989).*" (D.I. 377 at 30)

*31 Plaintiff's reliance on its sole legal authority, *RCA*, is misplaced. Indeed, BFG seems to have misconstrued the requirements of ¶ 102(b) in much the same way RCA did. As the United States Court of Appeals for the Federal Circuit stated in its opinion in that case:
> RCA is correct that, where there is no sale, a definite offer to sell is an essential requirement of the on-sale bar, *UMC, 816 F.2d at 656, 2 USPQ2d at 1472;* however RCA misinterprets that requirement. The requirement of a definite offer excludes merely indefinite or nebulous discussion about a possible sale.... [T]his requirement may be met by a patentee's commercial activity which does not rise to the level of a formal "offer" under contract law principles, (*see, e.g.,* analysis of pre-bid activities related to a government contract in *General Elec. Co. v. United States,* 206 USPQ 260, 276-77 (Ct.Cl.Tr.Div.1979)...."

*RCA,* 887 F.2d at 1062 (emphasis in original).

In *General Electric Co. v. United States,* 206 U.S.P.Q. 260 (Ct.Cl.Trial Div.1979), the United States Court of Claims found the on-sale bar triggered when GE representatives met with "technical people" at the Air Force Wright Air Development Center "to discuss progress to date" on [a system incorporating] the patented component. *Id.* at 276. Although "[n]one of the Air Force personnel who attended the Wright Field meeting had contracting authority, ... they were the people whose approval would be required to establish the requirement and initiate procurement of the item." *Id.* at 276-277. Earlier testimony indicated that "the overall purpose" of the meeting was "to stimulate" the prospective vendees' "interest in testing further or buying" the component. *Id.* at 276 (emphasis in original), *quoting* deposition of meeting participant Gaynor. "On the whole," the court concluded, the trip was designed "to induce Wright Field to accept the [claimed invention] as the vital component of a flight control system which GE was anxious to develop." *Id.* at 277.

At trial, BFG conceded that the March 1983 meeting was indeed "part of an on-going effort at BFG to interest Boeing in purchasing brakes incorporating" the claimed invention. (D.I. 346 at 2054, D.I. 353 at 3779) One of the two purposes of the meeting was "to discuss the carbon brake half life analysis." (DX 31) At trial, Lowell Bok testified that "carbon brake half life analysis" "referr[ed] to the configuration as we described it by our EDL and patents." (D.I. 346 at 2053-54) As Bok's contemporaneous notes reveal, "BF Goodrich presented its carbon brake half life analysis" to Boeing "as a means of demonstrating the advantages of the concept." (DX 31). "Boeing likewise understood that, at the meeting, BFG was trying 'to convince Boeing that Boeing should select [BFG's] brakes' so that Boeing would 'end up buying their brakes." ' (D.I. 372 at 170)

The Court finds the 1983 technical meeting indistinguishable for all relevant purposes from the technical meeting at issue in *General Electric*. As in *General Electric,* the March 1983 technical meeting was a necessary part of a sales strategy. BFG's hope at

Not Reported in F.Supp.
Not Reported in F.Supp., 1994 WL 16019986 (D.Del.)
**(Cite as: 1994 WL 16019986 (D.Del.))**

Page 23

this meeting was that the prospective vendee's technical representatives would like the product and encourage its acquisition. Indeed, the meeting was designed to induce Boeing to buy the brake and the method for the 767. The request for information for the 767, a necessary precursor to the RFP, was sent out the following month. The invention was well beyond the stage of a mere concept.

**\*32** For these reasons, the Court finds that BFG's March 1983 technical meeting presentation to Boeing constituted a "definite offer to sell" for purposes of 7 102(b). Accordingly, the Court finds the '895 patent and the '017 patent invalid under Section 102(b) of Title 35, United States Code.

(3) In January 1983, BFG made a sales presentation to Airbus Industries in France proposing carbon brakes for the A310-300 aircraft. On April 13, 1983, Airbus sent BFG a request for proposal for A310-300 aircraft carbon brakes, and BFG complied by submitting a written proposal to Airbus in June 1983. The second volume of the proposal comprised a detailed technical description of the patented brakes and indicated that the product had been fully tested.

In its memorandum opinion denying defendants' motion for summary judgment, the Court held that the referenced sales attempt did not take place "in this country" for purposes of the on-sale bar. At trial, defendants modified their argument on this point to incorporate allegations that BFG's proposal to Airbus included an offer to sell the invention to "all of Airbus's airline customers, which included airlines in the United States." (D.I. 372 at 172) "Thus, BFG's claimed invention was on-sale in the United States when, before July 2, 1983, Airbus offered to sell the A310-300 to Pan Am, Eastern and American." (D.I. 372 at 172-72) In addition, BFG in its proposal offered to sell spare brakes for the A310-300 "FOB Dayton, Ohio USA International Airport." (D.I. 372 at 173) Delivery and transfer of title for all such sales would thus have occurred in the United States. Defendants argue that these circumstances render the proposal on-sale activity "in this country" for purposes of the on-sale bar. Defendants also offer further authority for their summary judgment contention that BFG's pre-sale activity in the United States warrants application of the on-sale bar. Defendants now rely on the *Manual of Patent Examining Procedure* ("MPEP") and a recent study, W. Rooklidge, "The On Sale and Public Use Bars to Patentability: The Policies Reexamined", 4 Fed.Cir.B.J. 7 (1991). The former provides in relevant part that:
   An offer for sale, made or originating in this country, may be sufficient prefatory activity to bring the offer within the terms of the statute, even though sale and delivery take place in a foreign country.
MPEP,       2125.04 (7/80 rev.) (emphasis added). The latter posits that "[a] pre-application offer or sale from the United States by an inventor ... is an impermissible attempt to commercialize the invention.... [The inventor's] mere situs in the United States should be enough to satisfy the 'in this country' limitation." W. Rooklidge, 4 Fed.Cir.B.J. at 33.

Plaintiff counters that the policy espoused in the Rooklidge article is misguided and that BFG's assembly of the proposal documents in the United States and the prospect that in future it would build and overhaul brakes and train personnel in the United States do not constitute "substantial prefatory activity" under the MPEP. The MPEP, plaintiff points out, relies upon *Robbins Co. v. Lawrence Mfg. Co.,* 482 F.2d 426, 434 (9th Cir.1973), which established the "substantial prefatory activity" test and found it satisfied where an "offer for sale" was made in the United States. BFG's prefatory activity does not rise to the level of an offer of sale.

**\*33** In its opinion denying defendants' motion for summary judgment, this Court followed the interpretation of "substantial prefatory activity" adopted by the court in *Synair Corp. v. American Indus. Tire, Inc.,* 223 USPQ 1021 (S.D.Tex.1983), which confined the *Robbins* test proscription to sales activity, excluding product development. The Court declines to accord the MPEP any wider scope than it previously accorded the *Robbins* test. The Court further declines to amend its earlier holding on the scope of the "in this country" requirement on the basis of the Rooklidge article.

Nevertheless, because defendants have made new factual allegations, the Court must extend the analysis it enunciated at the summary judgment stage. The purported offer to sell the brake to Airbus's American customers appears at page 2 of Attachment A to Volume I of BFG's "Engineering Equipment Proposal EEP-8448" dated May 25, 1983, which comprises BFG's "Commercial Proposal for the A310-300 Aircraft Main Landing Gear Wheel and Carbon Brake." (DX 64) The "offer" is expressed as follows: "BFG is prepared to offer a range of operating costs to end users depending on the allowable maximum worn brake axle temperature." This "range" is thereafter set out. (DX 64 at 655)

The problem with the allegation that this "offer" to "end users" constituted an offer to sell "in this

Not Reported in F.Supp.
Not Reported in F.Supp., 1994 WL 16019986 (D.Del.)
**(Cite as: 1994 WL 16019986 (D.Del.))**

Page 24

country" is that as of the date of the proposal, no American airline had agreed to buy the A310-300. Based on the evidence presented, it appears that the first American airline to contract to purchase the A310-300 was Pan American World Airways, which did not place an order until 1985. (D.I. 372 at 40-42) The offer is thus doubly conditional: if Airbus accepts the proposal, and if American carriers agree to purchase the aircraft, then BFG will provide the brake at the specified prices.

The Court, mindful of the policies behind the bar, finds the circumstance too attenuated to constitute an "offer to sell in this country." The policy most clearly potentially implicated under the facts of this case is that "to prevent the inventor from commercially exploiting the exclusivity of his invention substantially beyond the statutorily authorized 17-year period." Here, BFG offered the brake for sale to a foreign company, while offering to offer certain price terms to any American customers who might in future purchase aircraft utilizing the brake. Were the Court to find that this constituted "commercial exploitation of ... exclusivity" within the United States, it is difficult to see why all offers of sale to foreign customers likely to resell to American customers would not run afoul of the on-sale bar. Were the resale certain, or likely to take place within the period during which commercial exploitation is proscribed, the Court might be willing to identify a distinction. The nature of the aircraft industry is such, however, that no American customer signed on for the A310-300 until 1985, long after the critical date. No evidence was presented to suggest that BFG directly contacted any American carrier during this period with an offer to sell its brakes for the A310-300.

*34 Accordingly, the Court cannot find that the policies behind the on-sale bar--in particular, that guarding against exploitation of exclusivity--were disturbed by BFG's offer to offer to eventual end users a specified range of prices. Defendants have not met their burden of proving "by clear and convincing evidence" that by incorporating these terms BFG violated 7 102(b). For these reasons, the Court declines to expand the scope of the *Robbins* test to find the patent invalid by reason of this alleged offer.

The same proposal provides that BFG "shall establish a spares catalog indicating the prices applicable to the equipment ordered.... The catalog prices of spares of equipment shall be as follows: (FOB International Airport ... ) ... See Attachment 'A'." (DX 64 at 63) Attachment "A" lists a "spares assembly" unit price for "Main Brake Assembly PD499-1492[,] FOB Dayton, Ohio USA International Airport." (DX 64 at 654) The FOB provision is incidental to the doubly conditional offer discussed above. For the reasons adduced above, the Court cannot find that this provision "clearly and convincingly" evidences a violation of 7 102(b).

Accordingly, the Court declines to find claims 2 and 3 of the '895 patent and claims 1, 2, 3, and 4 of the '017 patent invalid based on BFG's activities in connection with the 1983 A310-300 proposal.

C. Inequitable Conduct.

Defendants lastly argue that BFG's patents, even if valid, are unenforceable because of BFG's inequitable conduct before the Patent and Trademark Office ("PTO").

Each individual associated with a patent prosecution owes a duty of candor to the Patent Office. *See* 37 C.F.R. 7 1.56(a); *A.B. Dick Co. v. Burroughs Corp., 798 F.2d 1392, 1396 (Fed.Cir.1986)*. This duty of candor requires disclosure of all information that a reasonable patent examiner, when reviewing the patent application, would have considered "important." *Merck & Co., Inc. v. Danbury Pharmacal, Inc., 873 F.2d 1418, 1421 (Fed.Cir.1989); A.B. Dick Co., 798 F.2d at 1397*. Failure to disclose material information with an intent to mislead violates the duty of candor, constitutes inequitable conduct and renders a patent unenforceable. *See Merck* at 420; *Precision Instrument Mfg. Co. v. Automotive Maintenance Machinery Co., 324 U.S. 806, 818 (1945); Paragon Podiatry*, 984 F.2d at 1191-93; *Beckman Instruments, Inc. v. Chemtronics, Inc., 439 F.2d 1369, 1378-80 (5th Cir.), cert. denied, 400 U.S. 956 (1970)*. The existence of inequitable conduct by any one person associated with a patent prosecution as to any one claim renders all claims of the patent and all related patents unenforceable. 37 C.F.R. 7 1.56(a); *Hewlett-Packard Co. v. Bausch & Lomb Inc., 882 F.2d 1556, 1563 (Fed.Cir.1989), cert. denied, 493 U.S. 1076 (1990)*.

" 'Inequitable conduct requires proof by clear and convincing evidence. A threshold showing of both materiality and intent to mislead or deceive must be first established, and then those fact-findings are balanced to make the determination whether 'the scales tilt to a conclusion that inequitable conduct occurred.' " *Manville Sales Corp. v. Paramount Systems, Inc., 917 F.2d 544, 551 (Fed.Cir.1990), quoting J.P. Stevens & Co., Inc. v. Lex Tex Ltd., 747 F.2d 1553, 1560, 223 USPQ 1089, 1092*

Not Reported in F.Supp. Page 25
Not Reported in F.Supp., 1994 WL 16019986 (D.Del.)
**(Cite as: 1994 WL 16019986 (D.Del.))**

(Fed.Cir.1984), cert. denied, 474 U.S. 822 (1985).

*35 Defendants allege that BFG willfully violated the duty of candor by failing to disclose the existence and teachings of the Dunlop Paper, the Concorde manual, the Lallemant patent, BFG's own steel-brake prior art and other pertinent prior art, and BFG's prior on-sale activities. (D.I 376 at 30) Because the Court finds unconvincing defendants' allegations of intent to mislead, it finds that the patents are not invalid on grounds of inequitable conduct.

The principal alleged culprit in defendants' inequitable conduct count is BFG's Wesley Perry. In February 1986 Perry, in support of a petition to overturn the Patent Examiner's final rejection of the initial patent application on grounds of obviousness, signed and submitted an affidavit stating in relevant part:
> That ... he has not seen or heard of the brake construction and method shown and described in the BFG patent application ...;
> That as Director of Engineering he had the responsibility for reading the literature and trade journals on aircraft brakes;
> That at no time in the literature or at seminars and trade shows he has attended, has the brake construction and method shown and described in the application been suggested; ...
> That the common practice in overhauling carbon brakes is to replace all the brake disks after they are substantially completely worn with full thickness disks and that it would not be obvious to replace one set of stators or rotors with a new or refurbished set of full thickness disks while the other set is half worn at overhaul intervals shorter than the refurbished interval for the disks as taught and shown in the ... application; ... [and]
> That based on his observation and knowledge of the ordinary skilled worker overhauling carbon brakes, the ordinary skilled worker would not have found it expedient through routine experimentation to arrange the rotors and stators of a carbon disk brake with different available wear portions so that after a predetermined number of brake applications said available wear portion of a first group of disks are substantially worn away at an intermediate overhaul time and said available wear portions of a second group of disks are not worn away....

(DX 145 at 622-623)

According to defendants, Perry signed and submitted this affidavit in full knowledge of the Dunlop Paper, the Concorde brakes, the prior steel brake art, BFG's prior practice, and BFG's on-sale activities, of the last of which Perry had been expressly advised in the text of Bok's Invention Record form. (D.I. 372 at 65) The affidavit is therefore contended to be intentionally misleading.

Plaintiff argues that Perry--and by extension, BFG--was not required to disclose the Dunlop Paper, steel brake prior art (including BFG's prior art) or on-sale activities because they were all immaterial, and that nothing in the affidavit misstates the truth.

The Court is troubled by BFG's failure to present to the Patent Examiner evidence of the Dunlop Paper and its on-sale activities, and finds the Perry affidavit, if not misleading, then very close to being so. BFG's arguments against a finding of materiality, however, are not so farfetched as to persuade this Court to find them disingenuous. The application of the on-sale bar in 7 102(b) and the factors determining obviousness under 7 103 is by no means a certain enterprise, and the fact that the Court has found the patents invalid on these grounds does not mean that BFG's failure to submit this art and information in connection with its patent applications was intentionally misleading.

*36 The patent system depends upon the open submission of prior art to the Patent Examiner, and the failure to submit material prior art with the intent to mislead is accordingly grounds for invalidation. Our system of equity depends on the fair allocation of the benefit of the doubt, and in the present case, the Court is not convinced that BFG acted with an intent to mislead or deceive. For this reason, the Court declines to find the patents invalid on grounds of inequitable conduct.

IV. CONCLUSION

In summary, the Court finds that defendant Allied-Signal in making its Multi-Tour brake infringed Claims 2 and 3 of the '895 patent and Claims 1-4 of the '017 patent in violation of Section 271(a) of Title 35, United States Code. On all other counts of infringement the Court finds for the defendants.

Further, the Court finds that the '895 patent and the '017 patent are invalid under Section 103 of Title 25, United States Code, because the patents were obvious in light of the prior art and under section 102(b) of Title 35, United States Code, because BFG placed the patented invention on sale more than one year prior to the date of the patent application.

Because it finds the patents invalid, the Court declines to rule on the damages to which BFG would

Not Reported in F.Supp.  
Not Reported in F.Supp., 1994 WL 16019986 (D.Del.)  
**(Cite as: 1994 WL 16019986 (D.Del.))**

Page 26

have been entitled for Allied-Signal's infringement of the '895 and '017 patents had the patents been found valid, and declines to issue the requested injunction against further infringement by Allied-Signal.

Because the Court finds that plaintiff's failure to provide the PTO with relevant prior art was not with intent to mislead or deceive, it declines to find this an "exceptional case" under 35 U.S.C. 7 285, and denies defendants' request for attorneys' fees.

An appropriate order shall issue.



FIG. 7

FIG. 8

Not Reported in F.Supp. Page 27
Not Reported in F.Supp., 1994 WL 16019986 (D.Del.)
**(Cite as: 1994 WL 16019986 (D.Del.))**



Carbon Brake Inspection Schedule

Figure 14

**FIGURE 2**

ORDER

At Wilmington this 10th day of November, 1994, for the reasons stated in the court's Opinion issued this date;

Not Reported in F.Supp.
Not Reported in F.Supp., 1994 WL 16019986 (D.Del.)
**(Cite as: 1994 WL 16019986 (D.Del.))**

Page 28

IT IS ORDERED that judgment is entered in favor of defendants Aircraft Braking Systems Corporation and Allied-Signal Incorporated and against plaintiff The B.F. Goodrich Company on the court's finding of invalidity of United States Patent Nos. 4,472,895 and 4,613,017.

Not Reported in F.Supp., 1994 WL 16019986 (D.Del.)

**Motions, Pleadings and Filings (Back to top)**

• 1:91cv00515 (Docket) (Sep. 19, 1991)

END OF DOCUMENT

2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Page 28