IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

MCKESSON INFORMATION SOLUTIONS LLC,

        Plaintiff,

        v.

THE TRIZETTO GROUP, INC.,

        Defendant.

)
)
)
)
)
)
)
)
)
)
)
)

C.A. No. 04-1258 (SLR)

**REDACTED VERSION**

## THE TRIZETTO GROUP INC.'S ANSWERING BRIEF
## IN OPPOSITION TO MCKESSON'S MOTION FOR SUMMARY JUDGMENT
## <u>RE: ANTICIPATION AND OBVIOUSNESS</u>

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Jack B. Blumenfeld (#1014)
Rodger D. Smith, II (#3778)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200

*Attorneys for Defendant The TriZetto Group, Inc.*

OF COUNSEL:

Jeffrey T. Thomas
David A. Segal
Michael A. Sitzman
GIBSON, DUNN & CRUTCHER LLP
Jamboree Center
4 Park Plaza
Irvine, CA 92614-8557
(949) 451-3800

Original Filing Date: June 15, 2006
Redacted Filing Date: June 22, 2006

# TABLE OF CONTENTS

Page

Table of Authorities ......................................................................................................... iii

I.      NATURE AND STAGE OF THE PROCEEDING ............................................... 1

II.     SUMMARY OF ARGUMENT ............................................................................ 2

III.    STATEMENT OF FACTS ................................................................................... 4

        A.      Background of the '164 Patent ................................................................ 4

        B.      McKesson's New Interpretations of Claims 1 and 2 ............................. 5

                1.      Claim 1 – Code Validation ......................................................... 6

                2.      Claim 2 – Eliminating Double Billing ....................................... 8

IV.     ARGUMENT ..................................................................................................... 10

        A.      McKesson's Motion Does Not Address The Merits Of TriZetto's
                Invalidity Case ...................................................................................... 10

        B.      McKesson Is Not Entitled To Judgment On Anticipation ................... 12

                1.      Expert Opinion Is Not Required To Prove Anticipation ......... 12

                2.      In Light Of McKesson's New Claim Interpretations At Trial,
                        TriZetto's Expert Can Confirm That Claims 1 And 2 Are
                        Anticipated .............................................................................. 15

        C.      McKesson Is Not Entitled To Judgment On Obviousness ................... 17

                1.      Dr. Davis Compared The Prior Art References To The Elements
                        Of Claims 1 and 2 ................................................................... 18

                2.      Dr. Hawley's Report Addresses The Obviousness Of The
                        Appendix B "Metarules" .......................................................... 25

                3.      TriZetto's Experts Have Shown Substantial Motivation To Modify
                        And/Or Combine The Prior Art References To Perform The
                        Methods Of Claims 1 and 2 ..................................................... 26

                4.      Secondary Considerations Are Not Relevant In This Case ...... 29

        D.      McKesson And Its Predecessors Have Known About The AMS Prior Art
                System For More Than 10 Years ............................................................ 31

TABLE OF CONTENTS (Continued)

<u>Page</u>

E.    All Prior Art Systems On Which TriZetto Relies Are Sufficiently
      Corroborated ............................................................................................. 35

V.    CONCLUSION .................................................................................................. 37

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Avia Group Int'l, Inc. v. L.A. Gear California, Inc.*,
    853 F.2d 1557 (Fed. Cir. 1988) ................................................................................. 11, 15

*Chore-Time Equip., Inc. v. Cumberland Corp.*,
    713 F.2d 774 (Fed. Cir. 1983) ..................................................................................... 11

*Intel Corp. v. Broadcom Corp.*,
    2003 U.S. Dist. LEXIS 2372 (D. Del. 2003) ............................................................. 32

*Petersen Mfg. Co. v. Central Purchasing, Inc.*,
    740 F.2d 1541 (Fed. Cir. 1984) ................................................................................. 11, 15

*Princeton Biochemicals, Inc. v. Beckman Coulter, Inc.*,
    2004 U.S. Dist. LEXIS 11918 (D.N.J. 2004) ........................................................... 22

*Richdel, Inc. v. Sunspool Corp.*,
    714 F.2d 1573 (Fed. Cir. 1983) ................................................................................. 26, 27

*SIBIA Neurosciences, Inc. v. Cadus Pharm. Corp.*,
    225 F.3d 1349 (Fed. Cir. 2000) ................................................................................. 17, 18

*Union Carbide Corp. v. American Can Corp.*,
    724 F.2d 1567 (Fed. Cir. 1984) ................................................................................. 11, 15

**Statutes**

35 U.S.C. § 112 ................................................................................................................. 27

**Rules**

Fed. R. Civ. P. 26 ............................................................................................................. 3, 29

## I.    NATURE AND STAGE OF THE PROCEEDING

On September 13, 2004, plaintiff McKesson Information Solutions, LLC ("McKesson") filed this suit against The TriZetto Group, Inc. ("TriZetto"), alleging that three of TriZetto's products (Facets, ClaimFacts and QicLink) infringe U.S. Patent No. 5,253,164 ("the '164 patent"). On October 1, 2004, McKesson amended its Complaint. On November 1, 2004, TriZetto answered and filed a counterclaim seeking a declaratory judgment of invalidity, unenforceability, and non-infringement.

Fact and expert discovery were completed in late 2005. The Court construed the patent claims in its Order of April 5, 2006 (D.I. 307), which was later amended by the Order of April 11, 2006. D.I. 320. Also on April 5, 2006, the Court granted TriZetto's motion for summary judgment of non-infringement as to Claims 3-6 and 8-15. D.I. 301. A jury trial on infringement of the remaining claims – Claims 1, 2 and 16 – commenced on April 17, 2006. The jury returned a verdict finding literal infringement of Claims 1 and 2, but no infringement of Claim 16. D.I. 358. Hence, only Claims 1 and 2 remain in the case.

Trial on the issues of willfulness, damages, invalidity, laches, equitable estoppel, and inequitable conduct is set for October 3, 2006. Pursuant to the Court's order, TriZetto filed a motion for summary judgment of invalidity on grounds of anticipation and obviousness (D.I. 379), based on seven prior art systems and several other invalidity arguments, on June 1, 2006. On the same day, McKesson filed a preemptive motion for summary judgment arguing that there was no prior art that would render its patent anticipated or obvious. D.I. 376. This is TriZetto's answering brief in opposition to McKesson's motion for summary judgment.

## II.    SUMMARY OF ARGUMENT

McKesson is asking the Court to grant judgment on TriZetto's anticipation and obviousness defenses without ever examining the merits of TriZetto's case. Indeed, McKesson makes no effort to defend the supposed novelty of the methods of Claims 1 and 2, the only remaining claims in the case. Instead, McKesson's motion completely avoids the merits of TriZetto's invalidity case and focuses on alleged defects in TriZetto's expert reports and purported disclosure and corroboration problems. McKesson's motion also ignores the positions McKesson itself has taken in this case. In order to support its infringement claim, McKesson was forced to assert that Claims 1 and 2 are extremely broad and cover any software of any type that performs the very general functions described in those claims. Now that the issue is validity, McKesson has reversed course and contends that prior art software systems that perform the same functions are somehow different from the software described in Claims 1 and 2. For example, after contending that the "means for operating" element is not limited by anything in the patent's specification, McKesson now argues that TriZetto must link the prior art with specific structure found in the specification. McKesson should not be allowed to play this game of bait-and-switch.

The bulk of McKesson's motion is devoted to criticizing the work of TriZetto's experts. Even if these criticisms were valid (which they are not), it would not entitle McKesson to judgment. The Federal Circuit has repeatedly held that expert testimony is not required to support invalidity defenses, especially where, as here, the prior art clearly anticipates the simple "invention" advocated by McKesson throughout claim construction and the infringement phase. Accordingly, TriZetto's anticipation and obviousness defenses are meritorious with or without supporting expert opinions.

2

In any event, contrary to McKesson's arguments, TriZetto's expert testimony fully supports its anticipation and obviousness defenses. First, all three of TriZetto's experts have offered proper obviousness opinions that support TriZetto's invalidity position. Second, TriZetto's experts should be allowed to offer invalidity opinions in response to McKesson's new interpretations of Claims 1 and 2 proffered at trial. TriZetto's expert, Dr. Randall Davis, has opined that the simple functions of Claims 1 and 2, as newly interpreted by McKesson at trial, are anticipated and/or rendered obvious by several prior art references.

Additionally, McKesson argues that the Advanced MedLogic System ("AMS") (which completely anticipates every element of Claims 1 and 2) should be excluded from consideration due to its allegedly late disclosure. There is no justification for excluding this important prior art system. AMS was fully addressed in both sides' expert reports and at the depositions of the experts. The AMS documents upon which TriZetto relies were produced by McKesson. McKesson failed to disclose AMS in its discovery responses, despite having been aware of the system throughout this litigation and well before. McKesson and its predecessors have known about AMS for more than 10 years, since at least the 1994 litigation between HPR and GMIS (both subsequently acquired by McKesson). In fact, McKesson's predecessor-in-interest, GMIS, asserted AMS as a prior art system in the 1994 litigation. Yet, McKesson failed to disclose AMS in response to TriZetto's interrogatories. Moreover, one of the inventors of the '164 patent, who was represented by McKesson's counsel herein, actually worked on AMS. The Court's consideration of AMS would impose no conceivable prejudice on McKesson, while to exclude so relevant a reference would be severely prejudicial to TriZetto and reward McKesson for violating its discovery obligations under Fed. R. Civ. P. 26.

3

McKesson also argues that the AMS and MedClaim prior art systems are not adequately corroborated by documents, but that is simply untrue. Both systems are supported by lengthy documents thoroughly disclosing the relevant features, and further corroborated by credible witness testimony.

Finally, McKesson cannot obtain summary judgment without addressing the merits of TriZetto's defenses. The core of TriZetto's invalidity case is presented in its motion for summary judgment of invalidity on grounds of anticipation and obviousness. D.I. 379, 380. TriZetto's motion analyzes seven prior art systems that anticipate Claims 1 and 2 or render them obvious, as well as several additional bases for finding Claims 1 and 2 invalid. Because it has made no effort to substantively address TriZetto's core invalidity contentions, McKesson cannot obtain judgment on TriZetto's anticipation and obviousness defenses. To the contrary, TriZetto is entitled to summary judgment of invalidity on Claims 1 and 2, as set forth in TriZetto's motion. *Id.*

## III.    STATEMENT OF FACTS

The '164 patent claims an expert computer system for processing medical claims containing medical service codes. Ex. A, Abstract. The patent was issued on October 12, 1993, to Health Payment Review, Inc. ("HPR"), and is now owned by McKesson. The patent has an effective filing date of September 30, 1988. The inventors named on the '164 patent are Dr. Donald Holloway, Dr. Robert Hertenstein, Dr. George Goldberg, and Kelli Dugan.

### A.    Background of the '164 Patent

The technology described in the '164 patent pertains to physician billing. Physicians receive payment for their medical services by submitting bills (known as "medical claims") to insurance companies, health maintenance organizations (HMOs), preferred provider

4

organizations (PPOs), and other health benefit providers. *See* Ex. A, Cols. 1-2. The physician will list on a medical claim certain "medical service codes" which indicate the particular services or procedures performed for that patient. The medical service codes most commonly used are the CPT codes, developed by the American Medical Association ("AMA"). *Id.*, Cols. 2:21-23. The CPT code set contains numerous codes reflecting a wide range of medical services and procedures (e.g., "exploration of the abdomen," "partial colectomy"). *Id.*, Col. 3:38-68.

From time to time, some physicians submit medical claims with improper code combinations, either "assigning a higher paying code than a procedure merits, or [] unpackaging services that were intended to be bundled into a single code." *Id.*, Col. 2:8-14. In some instances, these code combinations reflect an inadvertent error. In other cases, the physician deliberately submits the code combination in order to secure greater reimbursement for his or her services. *Id.*

In response to these coding problems, computerized systems and manual techniques were created to allow medical claim reviewers to catch and correct the coding errors in submitted medical claims. *See, id.,* Col. 3:25-29. One such manual code-checking technique was developed into a computer system called CodeReview, by HPR, the assignee of the '164 patent. *Id.*, Col. 3:17-29. CodeReview is the basis for the purported invention of the '164 patent. *See* D.I. 365 at 4.

B. <u>McKesson's New Interpretations of Claims 1 and 2</u>

Claims 1 and 2 are the only claims of the '164 patent still remaining in this case. As McKesson requested, the Court's claim construction order of April 5, 2006 did not limit Claims 1 and 2 to any particular coding rules, software algorithms, or anything else in the patent specification. D.I. 307. Moreover, at the April 2006 trial, in order to prove infringement,

5

McKesson offered new, expanded interpretations of Claims 1 and 2 that were different from those used by McKesson's expert before trial. TriZetto's expert, Dr. Randall Davis, who attended and testified at the infringement trial, has appropriately responded to McKesson's new interpretations. D.I. 385 at ¶¶ 7, 12-14.

       1.   <u>Claim 1 – Code Validation</u>

Claim 1 describes a method for performing medical code validation – i.e., determining whether a medical code on a submitted claim is a valid CPT code contained in the computer's database. The steps of Claim 1 are as follows:

1) receiving a medical claim;

2) determining if the medical codes listed on that claim are not present in a "predetermined database" – defined by the Court as "a set of decision-making rules that incorporate a medical code classification system and expert medical clinical judgment" (D.I. 307 at 3); and

3) informing the user that a medical code is not present in the predetermined database.

In its effort to establish infringement at the April 2006 trial, McKesson argued that the steps of Claim 1 do not require actually using the predetermined database. McKesson's expert, Dr. Mark Musen, testified that Claim 1 could be performed by checking *any* database or list of all CPT codes – the predetermined database itself need not be checked or used in any way. Ex. B (Trial Tr.), at 487:25-489:7 (Musen Testimony: "Q. Do you read anything in [Claim 1] that's requiring that the predetermined database be used to make that determination? A. Nothing at all."). McKesson was compelled to make this argument to prove infringement, because the undisputed evidence established that the TriZetto products do not perform code validation by checking the predetermined database – they use an entirely separate database

6

containing all of the CPT codes recognized by the AMA. *Id.* at 851:5-852:23, 859:19-860:7. McKesson's counsel argued in closing that TriZetto infringes Claim 1 by checking codes against this separate CPT database. *Id.* at 1291:1-17 ("They look in the all codes database. They determine it's not there."). The jury obviously accepted that argument.

The new interpretation of Claim 1 that Dr. Musen offered at trial was not disclosed during discovery. In fact, Dr. Musen's on-the-stand interpretation directly conflicts with the construction he used at his deposition, where he testified that the method of Claim 1 *must* use the predetermined database to perform the code validation function in order to be valid over the Doyle Patent, a prior art reference:

> Q.  [Doesn't the Doyle reference] disclose the claim limitations that are in Claim 1?
>
> . . .
>
> A.  Doyle, obviously, does some degree of claims checking, and inasmuch as the claim made in Claim 1 addresses claim checking, then there is relevance there.  As I said previously, *my interpretation of the claims is that the motivation for Claim 1 is to clarify that the task performed for claim validity checking can be handled using the same structures that are ultimately used for the other components of the patent.*
>
> . .
>
> Q.  [Code] validity checking was not something, by itself, that was novel at the time of this, the filing of this patent application.
>
> . . .
>
> A.  And I guess my response is that, clearly, the Doyle patent has a component of code validity checking which is provided functionally in Claim 1.  The structure is obviously different.
>
> Q.  Okay.  And how is the structure different?
>
> A.  The structure is different in that the database for validity checking is designed in a way to support that task, as well as the other tasks which we don't want to talk about.  If we were willing to talk about the other claims in

the patent, then I think in that context it makes sense that Claim 1 is an advance over what's claimed in Doyle.

Q. It's an advance but a functional equivalent.

A. It's a functional equivalent in the context of a system that also does unbundling.

Ex. C (Musen Dep.), at 267:4-269:16 (emphasis added). Hence, Dr. Musen's only ground for defending the validity of Claim 1 over the prior art was that Claim 1 actually checks the "same structure" – i.e., the "predetermined database" – to perform code validation. *Id.* Yet, faced with the evidence that TriZetto's systems check an entirely separate and independent database, McKesson and Dr. Musen took a new approach at trial, contending that the predetermined database need not be checked or used at all to perform Claim 1. Ex. B (Trial Tr.), at 487:25-489:7; 1291:1-17. McKesson cannot have it both ways.

Based on McKesson's interpretation at trial, Claim 1 is simply a method for performing code validation using *any* database or list of medical codes. According to McKesson's own expert, this is a "functional equivalent" of the technique taught in the Doyle Patent.

2.    Claim 2 – Eliminating Double Billing

At the April 2006 trial, McKesson characterized Claim 2, in one example, as a method for eliminating double billing – i.e., correcting medical claims containing duplicate codes or other forms of double billing. The steps of Claim 2 are as follows:

1)   receiving a medical claim;

2)   ascertaining whether the claim contains more than one medical code;

3)   determining whether a code on the claim is "mutually exclusive due to non-medical criteria" with another code on the claim;

4)   authorizing codes that are not "mutually exclusive";

5)   rejecting codes that are "mutually exclusive."

8

Given that the patent specification never defines the terms "mutually exclusive" or "non-medical criteria," as used in Claim 2, it is not surprising that McKesson struggled at trial to find examples that allegedly fell within the scope of Claim 2. *See* D.I. 374 at 10-12. Subsequently, McKesson's counsel questioned TriZetto employee Karen Lampe regarding certain MediCare edits, called "mutually exclusive" edits, incorporated into TriZetto's products. Ex. B (Trial Tr.), at 1033:18-1036:12. One example of those "mutually exclusive" edits is a rule that initial and subsequent medical services should not be billed at the same time. *Id.* at 1039:17-21. Counsel characterized that situation as "double billing." *Id.* at 1039:22-25.

In closing argument, McKesson's counsel told the jury that identifying "double billing" was a "concrete" example of Claim 2:

> We don't need a doctor to tell us that it's not exclusively a medical criteria to say that when you go visit a doctor, you should only be charged once for that visit. All right? We all know that. We don't – in life we don't want to be double-billed for anything, but that's not a medical issue. It is a strictly administrative billing issue. Let's not bill twice. Let's not bill the insurance companies. Let's not bill the patients. Let's not bill anybody twice. That's a simple non-medical issue, and there are others, like Dr. Musen testified to as well. . . .
>
> [W]e've talked about the double billing. I mean, I asked, if you need a doctor or medical judgment to determine that you shouldn't be double-billed, and [Ms. Lampe] said no, and you don't. . . . [T]he determining step [of Claim 2] [is] satisfied.

*Id.* at 1202:14-25, 1228:21-1229:2.

McKesson's "double billing" interpretation for Claim 2 was not found in its claim construction statement or briefing. D.I. 148, 170, 255. Nor did Dr. Musen use the "double billing" interpretation at his deposition. Instead, Dr. Musen explained Claim 2 as a method for determining the mutual exclusivity of *different* codes based on "non-medical criteria." Ex. C (Musen Dep.), at 84:21-86:2, 97:16-98:13. At trial, however, McKesson ignored this

9

interpretation of Claim 2 in favor of its "double billing" example, apparently based on its conclusion that it had to do so to obtain an infringement verdict. The problem for McKesson is that although it prevailed on infringement with this new interpretation, it walked itself right into a substantial and undeniable validity problem.

## IV.   ARGUMENT

### A.   McKesson's Motion Does Not Address The Merits Of TriZetto's Invalidity Defenses

McKesson is asking the Court to grant judgment in McKesson's favor on TriZetto's anticipation and obviousness defenses without ever examining the merits of TriZetto's case. On June 1, 2006, TriZetto filed its own motion for summary judgment of invalidity on grounds of anticipation and obviousness. D.I. 379. TriZetto's motion presents seven prior art systems that anticipate Claims 1 and 2 or render them obvious, as well as several additional bases for finding Claims 1 and 2 invalid. *Id.* Any one of these prior art systems or other invalidity grounds is sufficient to invalidate the remaining claims. McKesson's motion does not substantively tackle these issues. Instead, McKesson focuses on alleged deficiencies in the reports of TriZetto's experts and purported disclosure and corroboration problems with a few of TriZetto's references. These contentions, however, do not impact the bulk of TriZetto's invalidity case, as presented in TriZetto's motion. McKesson cannot possibly obtain judgment on TriZetto's anticipation and obviousness defenses without addressing TriZetto's primary supporting arguments.

TriZetto's motion for summary judgment on grounds of anticipation and obviousness presents the following arguments:

10

- Claim 1 is anticipated and/or obvious in view of at least seven prior art systems: (1) Erisco's ClaimFacts, (2) the Doyle Patent, (3) GMIS's AutoCoder, (4) HDI's Advanced MedLogic System ("AMS"), (5) Blue Cross/Blue Shield of New Jersey's IBM 7070 System, (6) Cortron's Health Care Processing System, and (7) Health Systems International's Clinical Data Editor. D.I. 379 at 21-30, 34-36.

- Claim 2 is anticipated and/or obvious in view of at least four prior art systems: (1) Erisco's ClaimFacts, (2) HDI's Advanced MedLogic System, (3) Blue Cross/Blue Shield of New Jersey's IBM 7070 System, and (4) Cortron's Health Care Processing System. *Id.* at 30-36.

- Claims 1 and 2 are invalid based on McKesson's contention during claim construction proceedings that software for performing the claimed functions was known to those of ordinary skill in the art at the time of the patent application. *Id.* at 19-21.

- As McKesson has interpreted the '164 patent herein, the purported "invention" of the patent was merely the general idea of automating a pre-existing, well-known, manual code-checking technique used by '164 patent inventor Dr. Robert Hertenstein. As a matter of law, simply automating a pre-existing manual technique is not a patentable "invention." *Id.* at 36-39.

- The purported "invention" of the '164 patent was publicly disclosed at conferences, in published articles, and in customer proposals more than one year before the patent application was filed. These disclosures, together with the many available prior art systems, would have provided a person of ordinary skill with sufficient motivation and knowledge to implement the methods of Claims 1 and 2. *Id.* at 39-40.

McKesson's motion does not deal with any of these invalidity arguments on their merits. Accordingly, McKesson has not carried its burden of demonstrating that it is entitled to judgment on TriZetto's anticipation and obviousness defenses.

11

**B.**    <u>McKesson Is Not Entitled To Judgment On Anticipation</u>

McKesson seeks to preclude TriZetto from asserting an anticipation defense because TriZetto's expert witnesses allegedly did not opine on the subject of anticipation. D.I. 377 at 6-8. But expert opinion is not actually required to support an invalidity case, especially where the purported invention is simple and clear, as McKesson advocated at the infringement trial. Furthermore, TriZetto's experts should be allowed to respond to McKesson's new claim interpretations. In light of those interpretations, TriZetto's expert Dr. Randall Davis has opined that Claims 1 and 2 are anticipated by one or more of the references Dr. Davis discussed in his invalidity report.

1.    <u>Expert Opinion Is Not Required To Prove Anticipation</u>

The Federal Circuit has repeatedly held that the question of patent invalidity can be resolved without resort to expert opinion. *Avia Group Int'l, Inc. v. L.A. Gear California, Inc.*, 853 F.2d 1557, 1562 (Fed. Cir. 1988) ("a judge may decide the legal issue of validity unaided by expert opinion"); *Union Carbide Corp. v. American Can Corp.*, 724 F.2d 1567, 1573 (Fed. Cir. 1984) ("the references and appellant's invention are easily understandable without the need for expert explanatory testimony"); *Petersen Mfg. Co. v. Central Purchasing, Inc.*, 740 F.2d 1541, 1548 (Fed. Cir. 1984) (alleged infringer is not required "to submit an expert's opinion on obviousness"); *see also Chore-Time Equip., Inc. v. Cumberland Corp.*, 713 F.2d 774, 779 (Fed. Cir. 1983) ("an invention may be held to have been either obvious (or nonobvious) without a specific finding of a particular level of skill or the reception of expert testimony on the level of skill"). Accordingly, as a matter of law, McKesson cannot overcome TriZetto's anticipation and obviousness defenses merely by asserting an absence of expert opinion.

McKesson acknowledges this law, but contends (in stark contrast to its claim construction position) that the '164 patent is too "complicated" to be understood without expert assistance.[1]  D.I. 377 at 24.  In actuality, in light of the Court's claim construction and McKesson's interpretations at trial, Claims 1 and 2 are exceedingly simple.  During claim construction, McKesson insisted that the language of Claims 1 and 2 was self-explanatory and could be read to the jury with virtually no construction.  *See* D.I. 170 at 7-11.  The Court largely embraced McKesson's suggested approach, providing a construction for the phrase "predetermined database containing medical service codes and a set of relationships . . . ," but otherwise leaving Claims 1 and 2 unconstrued.[2]  D.I. 307 at 3.  As McKesson requested, the Court's claim construction did not limit Claims 1 and 2 to any particular code-checking rules, software algorithms, or any other details from the patent specification.  *Id.*  Subsequently, the simplified interpretations McKesson offered at trial made Claims 1 and 2 even easier to grasp.  Thus, both the Court and a jury can easily comprehend the patent claims (at least pursuant to McKesson's interpretations), and can certainly understand the Court's own claim construction, without the help of experts.

Indeed, if ever there was a case where patent claims are easily understood, this is it.  McKesson has locked itself into the position that Claims 1 and 2 merely describe using *any*

---

[1]    McKesson asserts that expert testimony is required to understand the '164 patent claims, citing to the Court's April 17, 2006 Order concerning the admissibility of lay witness testimony. D.I. 340.  But the Court did not say that expert testimony was needed to understand the claims, only that lay witnesses who had "no prior knowledge of the patent" and had not seen the Court's claim construction could not opine on patent infringement.  *Id.* at 1-2.  Regardless of whether an issue requires expert opinion, it is always the case that lay witnesses should not be asked to give expert opinion testimony.

[2]    Although TriZetto requested construction of certain terms in Claims 1 and 2 (e.g., "ascertaining a plurality"), the Court did not construe these terms prior to the infringement trial. D.I. 307.

13

software (including software that was commercially available at the time the invention was made) to determine (1) if a code is in *any* database or list of codes, and (2) if two codes are duplicative or inconsistent for a reason that does *not* involve any expert medical judgment. Given this interpretation, an expert is clearly not needed to understand the purported "invention."

Likewise, the prior art systems presented in TriZetto's summary judgment motion can be easily understood without an opinion on anticipation from TriZetto's experts. After all, the only question about those systems is whether they are software and whether they perform the general functions McKesson has ascribed to Claims 1 and 2. The prior art systems are amply and clearly explained by documents and witnesses:

- A thorough description of Erisco's ClaimFacts was presented at the April 2006 trial through product documents, the testimony of several TriZetto employees, and expert witness testimony from both sides. The relevant details are explained in the Declaration of Anthony Bellomo (D.I. 382), TriZetto's executive vice-president and a participant in the early development of ClaimFacts.

- The applicability of the Doyle Patent as an anticipating reference was confirmed by McKesson's expert, Dr. Musen. Ex. C (Musen Dep.), at 267:4-269:13.

- The function of GMIS's AutoCoder and its applicability as an anticipating reference was verified by '164 patent inventors **REDACTED** Kelli Dugan. Ex. D (Dugan Dep.), at 44:17-45:25, 48:6-11, 181:14-182:18;

   **REDACTED**

- Blue Cross/Blue Shield of New Jersey's IBM 7070 System is explained in the Declaration of Gunter Siemsen (D.I. 384), who was involved with the development and implementation of the system and its successor systems for over 20 years.

14

- Cortron's Health Care Processing System is described in the Declaration of Donald Demers (D.I. 388), who was the developer of that system, and corroborated by a system manual.

- Dr. Davis has analyzed the details of the Doyle Patent, AMS, and the Clinical Data Editor, all of which he discussed in his expert report. Ex. F (Davis Report), at 20-25, 32.

For all of these reasons, TriZetto's anticipation defense is legally appropriate and perfectly robust with or without an anticipation opinion from its experts.

2.    In Light Of McKesson's New Claim Interpretations At Trial, TriZetto's Expert, Dr. Davis, Has Opined That Claims 1 And 2 Are Anticipated

TriZetto's expert, Dr. Davis, testified at deposition that none of the prior art references considered in his report anticipated the patent claims. Ex. G (Davis Dep.), at 200:6-19.  Instead, Dr. Davis's opinions were based on obviousness.  That, however, was before McKesson advanced its new interpretations of Claims 1 and 2 at trial.

In order to establish infringement, McKesson and its expert, Dr. Musen, were forced to argue that Claim 1 does not require actually checking or using the predetermined database to perform the code validation function.  *See* Section III.B.1, *supra*; Ex. B (Trial Tr.), at 487:25-489:7.   This new interpretation contradicted the one that Dr. Musen used at his deposition, where he testified that the method of Claim 1 checks the predetermined database to perform code validation. Ex. C (Musen Dep.), at 266:15-269:13.

Up until the April 2006 trial, Dr. Davis had assumed that Claim 1 required the predetermined database to be checked, as Dr. Musen had testified at his deposition. D.I. 385 at ¶ 13.  Dr. Davis believed that this was the most natural reading of Claim 1.  *Id.* at ¶ 7.  The invalidity opinions Dr. Davis offered in his invalidity report and at deposition were premised on

15

this understanding of Claim 1. Ex. F (Davis Report), at 4. Based on McKesson's new interpretation of Claim 1 – medical code validation performed using *any* database – Dr. Davis has opined that the Doyle Patent, AMS and the Clinical Data Editor each anticipate the method of Claim 1. D.I. 385 at ¶¶ 8-10, 13.

As for Claim 2, McKesson characterized that claim, in one example given at trial, as a method for eliminating double billing – i.e., correcting medical claims containing duplicate codes or other forms of double billing. Ex. B (Trial Tr.), at 1202:14-25, 1228:21-1229:2. This interpretation did not appear in McKesson's claim construction briefing. D.I. 148, 170, 255. Nor did McKesson's expert, Dr. Musen, use that interpretation at his deposition. *See* Ex. C (Musen Dep.), at 84:21-86:2, 97:16-98:13.

Dr. Davis was previously uncertain about the meaning of "mutually exclusive due to non-medical criteria," as used in Claim 2. D.I. 385 at ¶ 14. That language is nowhere defined in the patent specification and has not been defined by the Court.[3] McKesson never provided Dr. Davis with an interpretation of that phrase at his deposition. Dr. Davis opined on "non-medical criteria" based on various single-code edits referenced in the patent specification, the same type of edits relied upon by McKesson's expert in dealing with Claim 2.

## REDACTED

Based on McKesson's new interpretation of Claim 2 (assuming it survives judicial scrutiny), Dr. Davis has opined that AMS anticipates the method of Claim 2 – i.e., AMS checks for double billing in precisely the same manner as Claim 2. D.I. 385 at ¶¶ 8-9, 14.

---

[3]     TriZetto observed during claim construction that the term "non-medical criteria" is indefinite, and has now moved for summary judgment of invalidity on Claim 2 on that ground. D.I. 374.

C.      <u>McKesson Is Not Entitled To Judgment On Obviousness</u>

McKesson asks for judgment in its favor on TriZetto's obviousness defense because of several alleged defects in the obviousness analysis of TriZetto's experts. D.I. 377 at 9. McKesson's motion should be denied for several reasons.

First, even without expert testimony, TriZetto can still maintain its obviousness defense. As previously explained, the Federal Circuit has held that patent invalidity (including obviousness) can be proven without supporting expert opinions. *Avia Group*, 853 F.2d at 1562 ("a judge may decide the legal issue of validity unaided by expert opinion"); *Union Carbide*, 724 F.2d at 1573; *Petersen*, 740 F.2d at 1548. This is especially true where, as here, the patentee has taken the position that the patent is extremely broad and simple. For example, McKesson's interpretation of Claim 1 (any software that determines if a CPT code is on a list of CPT codes) is hardly a concept that only an expert can grasp. Accordingly, McKesson cannot obtain judgment on TriZetto's obviousness defense simply by attacking the propriety of TriZetto's expert testimony.

Second, given the new interpretations of Claims 1 and 2 that McKesson championed at trial, TriZetto's experts should have the opportunity to respond to those interpretations. McKesson cannot hope to bind TriZetto's experts to their reports, when McKesson itself dramatically changed its positions regarding the alleged scope of the claims at trial.

Third, for the reasons discussed below, TriZetto's experts provided sufficient analysis in their reports to support their obviousness opinions.

17

1.    Dr. Davis Compared The Prior Art References To The
      Elements Of Claims 1 and 2

McKesson complains that Dr. Davis did not include some kind of formulaic claim chart in his invalidity report. D.I. 377 at 9-11. In so doing, McKesson ignores all of the substance in Dr. Davis's report – the patent claim chart, the figures, the quotes and extensive analysis contained therein. McKesson cannot seriously dispute that Dr. Davis did connect the elements of Claims 1 and 2 to the prior art references through a detailed discussion of each reference.

Dr. Davis's report contains a claim chart matching the patent claims to each of the relevant prior art references. Ex. F (Davis Report), at 34. Claim 1 is matched to the Doyle Patent, AMS, and the Clinical Data Editor (i.e., "Dornfest84), among other references. *Id.* Claim 2 is connected, *inter alia*, to AMS. *Id.* Dr. Davis's claim chart alone does not examine the claims on an element-by-element basis (D.I. 377 at 10), but Dr. Davis's report does provide that very analysis in the detailed discussions of each prior art reference.

Dr. Davis' discussion of AMS explains that the system contained all the elements of Claims 1 and 2, including:

- *A "predetermined database"*: "[AMS] had a set of relationships among the codes it examined that defined whether one of the codes was valid when input with other codes." Ex. F (Davis Report), at 22. This is consistent with the Court's definition of "predetermined database." D.I. 307 at 3 ("a set of decision-making rules that incorporate a medical code classification system and expert medical clinical judgment").
- *Receiving a claim*: "AMS [was] 'a series of computerized tables, lookup tables, that received, processed and paid claims.'" Ex. F (Davis Report), at 20 (quoting Dr. Goldberg's testimony).

18

- *Ascertaining a plurality of codes*:  "[AMS] deals with multiple medical procedure codes in a claim." *Id.* at 22.

- *Determining step of Claim 1 (code validation)*:  "[AMS] checked the validity of codes entered." *Id.* at 21.

- *Determining step of Claim 2 (double billing)*:  "[AMS checks] 'procedures and tests which should only occur once in claim.'" *Id.* at 23.

- *Accepting and rejecting codes*:  "[T]he AMS system could accept or reject part of a claim . . ." *Id.* at 24.

Likewise, Dr. Davis explained that the Doyle Patent and the Clinical Data Editor cover the method of Claim 1:

- "[T]he important part of the Doyle patent is its description of a system that allows the physician to enter both diagnosis codes and procedure codes, which it then checks in some basic ways." *Id.* at 24.

- "The sentence [from Doyle] reads directly on claims 1 and 13 of '164 ('determining whether any medical service code contained in the at least one claim is not present in the predetermined database')." *Id.* at 25.

- "The highlighted text [describing the Clinical Data Editor] makes it clear that as of February 1984 when this article was written, there already existed a program capable of detecting erroneous procedure codes (cf. '164 claims 1 and 13)." *Id.* at 32.

McKesson also complains that Dr. Davis did not identify combinations of prior art references that cover the claims.  D.I. 377 at 10-11.  But as Dr. Davis explained at his deposition, most of the prior art references in his report independently contain all of the claimed elements or render them obvious. Ex. G (Davis Dep.), at 229:22-25 ("I think I was looking at these prior art references as things that rendered the claim obvious; that is, they had all of the elements of the claim").  Combinations of references are not always necessary to make a claim

19

obvious.  A single prior art reference can render a claim obvious if a motivation can be shown to modify the teaching of the reference to match all elements of the patent claim.  *See SIBIA Neurosciences, Inc. v. Cadus Pharm. Corp.*, 225 F.3d 1349, 1356 (Fed. Cir. 2000) ("[i]n appropriate circumstances, a single prior art reference can render a claim obvious . . . [with] a showing of a suggestion or motivation to modify the teachings of that reference to the claimed invention in order to support the obviousness conclusion").  The motivation "may be derived from the prior art reference itself, from the knowledge of one of ordinary skill in the art, or from the nature of the problem to be solved."  *Id.*  Establishing such motivation will surely be easier if the missing element is not a novel feature of the invention, but something already known to those of skill in the art.

Dr. Davis's report makes clear that the features of Claims 1 and 2 are fully covered by the prior art.  However, even if the Doyle Patent, AMS, or the Clinical Data Editor are missing a description of a trivial element of the patent claims (such as "receiving a claim" or "informing a user"), they still render the claims obvious, since a person of ordinary skill would have had sufficient motivation to add such known, non-novel features.  McKesson admitted during claim construction that the simple features of the patent claims were known in the industry at the time.  D.I. 255 at 3 ("Claimed functions, such as 'operating on a database,' 'receiving at least one claim,' or 'determining whether a code is not present in a database,' need not be supported by or limited to specific, expressly disclosed algorithms where the specification expressly states that skilled artisans would understand how to implement these functions in 'commercially available' software").

Moreover, it is clear from McKesson's motion that there are only two elements in Claims 1 and 2 that McKesson contends are novel – "means for operating on a predetermined

database" in Claims 1 and 2, and the "determining" step of Claim 2. No other elements are alleged to be non-obvious. D.I. 377 at 13-17. Dr. Davis adequately explained how the prior art distinctly discloses those elements. And given McKesson's position regarding these elements during claim construction, they would have been obvious to anyone skilled in the art. D.I. 255 at 9 ("[T]he specification expressly links 'database management software programs' to the [means for operating] and discloses that such programs are commercially available – i.e., known to those of skill in the art. Nothing more is required."); *Id.* at 28-29 ("It is disclosed or otherwise inferred that one skilled in the art would know what specific software/algorithm(s) could be used to perform the [determining steps]").

Apparently with a straight face, McKesson argues that TriZetto's experts' opinions on the "means for operating" elements are inadequate because they "did not identify any structure disclosed in the '164 patent for performing the function of 'operating on a predetermined database.'" D.I. 377 at 14. This is quite an amazing reversal of position. McKesson previously convinced the Court that this element in Claims 1 and 2 is not limited by any structure disclosed in the patent.[4] Instead, McKesson successfully argued that the corresponding structure was simply "commercially available" software that was well known to those of skill in the art. Thus, according to McKesson's own definition of the corresponding structure, this element is found in the prior art.

_____

[4]      This itself is a far departure from the construction of "means for operating" offered by McKesson's predecessor, HPR, in the 1994 litigation against GMIS. HPR actually incorporated the source code of Appendix D as supporting structure for the "means for operating." Ex. DD (HPR's Interrogatory Responses), at 2-3. By contrast, McKesson has successfully argued in this case that no specific structure is incorporated into the "means for operating."

McKesson's own experts did not perform a structural analysis of the "means for operating" limitation. McKesson's expert, Dr. Musen, testified that the structure for the "means for operating" limitation was simply "software":

> Q. Let's take the first one, the "operating on a predetermined database" . . . Where in your report, MM-1, is the structure identified that corresponds to the function that I just read into the record?
>
> A. The structure is software. My understanding in this case is that it is sufficient to say that the function is implemented in software.

Ex. C (Musen Dep.), at 101:19-102:13. Claims 1 and 2 survived because the Court effectively construed "means for operating on a predetermined database" to be supported by any software: "data processing capabilities, memory and software capable of managing a database." D.I. 307 at 2.

Since McKesson's expert was permitted to use the "any software" approach to the "means for operating" limitation during the infringement phase, TriZetto's experts cannot be held to a higher standard in the validity phase. TriZetto's experts, Dr. Davis and Dr. Kerschberg, both identified "software" for managing a database in the prior art. Dr. Davis explained that AMS was a software system with a database of decision-making rules: "[AMS] had a set of relationships among the codes it examined that defined whether one of the codes was valid when input with other codes." Ex. F (Davis Report), at 22. Dr. Kerschberg described the MedClaim prior art system as including "a database system Dbase II from Ashton-Tate." Ex. H (Kerschberg Report), at 11. This is more than sufficient to satisfy the structural requirement for the "means for operating" limitations, especially in light of McKesson's position that the structure for this element was well-known, commercially available software programs.

It is certainly curious that McKesson is focusing its attention on the "means for operating" element of Claims 1 and 2, when McKesson has admitted that this is not a novel feature of the purported invention. D.I. 255 at 3 ("Claimed functions, such as 'operating on a

database,' . . . need not be supported by or limited to specific, expressly disclosed algorithms where the specification expressly states that skilled artisans would understand how to implement these functions in 'commercially available' software."). McKesson should not be allowed to save Claims 1 and 2 from a finding of invalidity by invoking a feature that was admittedly well known in the industry.

As for the "determining" step in Claim 2, McKesson now complains about the fact that TriZetto's experts noted in their reports that "mutually exclusive due to non-medical criteria" is a vague, undefined term. At the infringement trial, however, McKesson conceded that most of the rules used by software of this type do involve medical criteria, and offered a hodge-podge of examples of what it claimed were non-medical rules without ever providing a definition of "non-medical criteria." It also argued that "non-medical" rules are those where no expertise is required to determine that two codes are inconsistent, such as double-billing situations. As McKesson's counsel argued at trial: "We don't need a doctor to tell us that it's not exclusively a medical criteria to say that when you go visit a doctor, you should only be charged once for that visit. All right? We all know that." Ex. B (Trial Tr.), at 1202:14-17. Thus, again by McKesson's own definition, this is a function that would be obvious to even non-experts.

In support of its position that Claims 1 and 2 are not obvious, McKesson has pointed to only two elements in those Claims – the "means for operating" and "determining" steps – and yet those are the elements that it previously claimed are not limited by any novel type of software.

23

TriZetto does not deny that its experts found the language of Claim 2 to be indefinite – indeed, TriZetto has moved for summary judgment on indefiniteness. D.I. 374.[5] But the experts' position on the phrase "mutually exclusive due to non-medical criteria" does not preclude them from offering invalidity opinions based on McKesson's new interpretation of Claim 2 proffered at trial. While TriZetto and its experts believe that Claim 2 is indefinite, if McKesson's interpretation is ultimately upheld, TriZetto's experts should be permitted to offer invalidity opinions on the claim as so construed.[6]

In one example offered at trial, McKesson defined Claim 2 as a method for eliminating double billing on a medical claim – i.e., correcting medical claims containing duplicate codes or other forms of double billing. Ex. B (Trial Tr.), at 1202:14-25, 1228:21-1229:2. This interpretation was not found in McKesson's claim construction statement or briefing, and was not used by Dr. Musen at his deposition. In light of this new interpretation, Dr. Davis has opined that the elements of Claim 2, including the "determining" step, are anticipated or rendered obvious by the AMS prior art system. D.I. 385 at ¶ 8.

---

[5]    McKesson suggests that the Court "disagreed that the phrase 'non-medical criteria' is indefinite." D.I. 377 at 15. In reality, the Court did not comment on the phrase "non-medical criteria," apparently reserving that issue for the validity phase. D.I. 307. Accordingly, the indefiniteness of Claim 2 is pending resolution by the Court.

[6]    As McKesson acknowledges, Dr. Davis and Dr. Kerschberg did offer opinions on the "determining" step of Claim 2 based on various single-code edits pertaining to age, gender, or place of service. D.I. 377 at 15-17. McKesson criticizes Drs. Davis and Kerschberg for focusing on such single-code edits.

**REDACTED**

24

2.    Dr. Hawley Addressed The Obviousness Of The Appendix
B "Metarules" And The Anticipation Of Claim 1

The primary purpose of Dr. Hawley's expert report was to establish the obviousness of the "metarules" in Appendix B of the '164 patent. *See* Ex. I (Hawley Report), at 14-26. Dr. Hawley explained that the code-checking rules used manually by Dr. Hertenstein and then automated in the CodeReview system (the software on which the patent is based) were obvious rules drawn directly from the explicit instructions of the AMA's CPT Manual. *Id.*

McKesson's criticism of Dr. Hawley's report is misplaced. Dr. Hawley did not opine that the patent claims were obvious based on prior art systems, but rather that the code-checking rules apparently underlying those claims were obvious based on the AMA's CPT Manual. *Id.* at 14 ("the auditing rules described in the '164 patent are 'consistent with the CPT-4 classification system,' meaning that, in effect, many of the rules were drawn directly from CPT coding conventions"). Since McKesson has abandoned the Appendix B metarules in its construction of Claims 1 and 2 (which the Court largely embraced – D.I. 307), Dr. Hawley's opinion concerning the metarules will not be necessary to establish the invalidity of Claims 1 and 2.[7]

Notwithstanding, Dr. Hawley unequivocally and repeatedly testified at his deposition that Claim 1 (and Claim 13) were anticipated by the prior art:

---

[7]    However, TriZetto may still rely on Dr. Hawley's testimony to establish that Dr. Hertenstein's manual code-checking technique was obvious and well-known at the time. Since the invention is merely an automation of Dr. Hertenstein's well-known manual technique, the patent is invalid for lack of a patentable subject matter. *See Princeton Biochemicals, Inc. v. Beckman Coulter, Inc.,* 2004 U.S. Dist. LEXIS 11918, at * 63-64 (D.N.J. 2004) ("[i]t has been well-established that the obvious automation of a known manual process is not patentable"). Additionally, TriZetto may call Dr. Hawley as a fact witness concerning the development of ClaimFacts and the state of the medical claims adjudication business in the 1980's.

> Q.  You're not asserting anywhere in your report that any of the claims of the
> '164 patent are obvious or not novel, because there was a preexisting
> software application that performed that functionality, the claims auditing
> functionality; is that correct?
>
> A.  Actually, I'm quite confident, as I said before, with regard to Claim 1 and
> Claim 13, that there was a prior art form that performed that – those functions.

Ex. K (Hawley Dep.), at 133:17-25.  McKesson conveniently omits reference to the foregoing

testimony.  Clearly, Dr. Hawley, who was independently developing a clinical editing system for

PACE, was a person of ordinary skill in the art at the time.  His testimony and expert opinion

that Claim 1 of the '164 patent is anticipated and that the remaining claims were obvious cannot

be ignored.[8]

>     3.    TriZetto's Experts Have Shown Substantial Motivation To
>           Modify And/Or Combine The Prior Art References

McKesson alleges that TriZetto's experts failed to show a motivation to combine

or modify the prior art references to perform the methods of Claims 1 and 2.  D.I. 377 at 18-22.

Each of TriZetto's experts, however, discussed a crucial motivating reference actually written by

one of the '164 patent's inventors on the subject of the patent's basic code-checking technology.

Specifically, TriZetto's three experts discussed the article publicly presented in

April 1987 by '164 patent inventor Dr. Robert Hertenstein, entitled *"An Access-oriented*

*Negotiated Fee Schedule: The Caterpillar Experience."*  Ex. L (MCK 035619-627); *see* Ex. F

(Davis Report), at 17-20; Ex. H (Kerschberg Report), at 12-14; Ex. I (Hawley Report), at 27.

That article contained a detailed explanation of Dr. Hertenstein's manual code-checking

---

[8]    Dr. Hawley's opinion is consistent with the testimony of '164 patent inventor Dr. George
Goldberg, who recalled that at least two other companies were independently developing
software for catching medical coding errors in the 1980's contemporaneous with HPR's
development.  Ex. Q (Goldberg Dep.), at 163:16-164:6, 228:3-18 ("[T]here was essentially
independent development going on at these two companies and our company, based on the tenor
of the times and the emerge – continually, gradually emerging improving power of automation").

technique that was later developed into the CodeReview product (the basis of the '164 patent).

*See* Ex. M ("In 1987, through his association with Boston University's Health Policy Institute, an opportunity to automate Dr. Hertenstein's system was identified. The automation of Dr. Hertenstein's work led to the development of CodeReview."). The article provided clear motivation to create the purported invention of the '164 patent by explaining that Dr. Hertenstein's technique could be integrated into computerized claims processing systems already in use:

> [T]he CAT process is a workable and market-tested solution to the need to balance access and cost management. It is suitable for large corporations such as CAT with both self-funded and self-administered health benefits. It can also be used (after eligibility is certified and benefits are coordinated) by claims processing systems.

Ex. L at MCK 035623. Dr. Davis confirmed that this article suggested "combining the clinical editing process with computing in general and expert systems in particular." Ex. F (Davis Report), at 37.

Additionally, as Dr. Davis discussed in his report, HPR's presentation at the 1986 Pew Conference and HPR's proposals to Aetna Insurance in 1987 disclosed much of the concept and details of the patented "invention." Ex. F (Davis Report), at 42. Furthermore, patent inventor Dr. Goldberg recalled that at least two other companies were actually developing software for catching medical coding errors at the same time as HPR. Ex. Q (Goldberg Dep.), at 163:16-164:6, 228:3-18. Based on Dr. Hertenstein's article, the Pew Conference presentation, the Aetna proposals, and the independent and simultaneous development of the invention by others, a person of ordinary skill would have had motivation and knowledge to modify any of the available computerized medical code-checking systems (such as AMS, Doyle and the Clinical Data Editor) to perform the simple functions of Claims 1 and 2.

27

Moreover, as Dr. Davis explained at his deposition, very little (if any) modification or combination of prior art references would be needed to cover the simple functions of Claims 1 and 2. Ex. G (Davis Dep.), at 229:22-25 ("I think I was looking at these prior art references as things that rendered the claim obvious; that is, they had all of the elements of the claim."). Dr. Davis has confirmed that the Doyle Patent, AMS and the Clinical Data Editor completely anticipate or render obvious Claims 1 and 2 without any need for modification or combination. D.I. 385 at ¶ 8. To the extent that any of those references omit a feature, a person of ordinary skill could easily have filled that gap, since McKesson has admitted that software for performing the functions of the patent claims was known in the industry at the time. D.I. 255 at 3.

McKesson also argues that TriZetto's experts have not established that a person of ordinary skill would have perceived a likelihood of success in combining prior art references to perform the claimed invention. D.I. 377 at 21-22. But the prior art references reveal that others *had already succeeded* in performing the simple methods of Claims 1 and 2, since the references completely anticipate Claims 1 and 2. There would have been no need to speculate about the likelihood of success when the references showed the claimed methods already being performed.

**REDACTED**


**REDACTED**

. . .

28

REDACTED

REDACTED

REDACTED

REDACTED

McKesson suggests that anyone attempting to develop the methods of Claims 1 and 2 would have faced "disincentives and uncertainty." D.I. 377 at 21. In support of this contention, McKesson refers to the views expressed by TriZetto's experts concerning the difficulty of building expert systems. *Id.* at 21-22. But building an expert system, as described by TriZetto's experts, is not the same as developing the simple techniques described in Claims 1 and 2. At McKesson's urging, Claims 1 and 2 have been stripped of any specific code-checking rules, metarules, software algorithms or any other substantive details that might make them novel. Instead, the claims cover the most basic computer code-checking functions – code validation and eliminating duplicate codes – performed in any manner. McKesson cannot invoke the developmental complexities of a full-scale expert system to preserve the stripped-down methods of Claims 1 and 2 that it advanced during the infringement trial.

4.    Secondary Considerations Are Not Relevant In This Case

McKesson asks for "judgment" regarding the secondary considerations of obviousness, because TriZetto's experts did not opine on those considerations. D.I. 377 at 22-23. McKesson's request should be rejected for three reasons. First, the lack of expert testimony on secondary considerations does not entitle the opposing party to judgment on that subject,

29

given that expert testimony is not required for any part of an obviousness defense. *Petersen*, 740 F.2d at 1548 (alleged infringer is not required "to submit an expert's opinion on obviousness").

Second, secondary factors cannot rescue the claims from invalidity if the claims are clearly obvious, as in this case. *Richdel, Inc. v. Sunspool Corp.*, 714 F.2d 1573, 1579 (Fed. Cir. 1983) ("where a patent is obvious, it cannot be saved from invalidity by resorting to secondary factors").

Third, McKesson has not shown any nexus between the secondary considerations its experts discuss and Claims 1 and 2. Whatever commercial success the CodeReview product may have enjoyed was surely not attributable to the simple functions of Claims 1 and 2. The code validation function of Claim 1 was merely a preliminary step executed at the start of the code-checking process, not the core function of CodeReview. Indeed, in 1987, patent assignee HPR attempted to distinguish its CodeReview product from the AutoCoder prior art

REDACTED        REDACTED

*see also* Ex. D (Dugan Dep.), at 48:6-11, 182:12-14 (AutoCoder only performed code validation). Any commercial success for the CodeReview product could not be attributable to the functionality that already existed in the marketplace.

As for Claim 2, it only covers code combinations that are "mutually exclusive due to non-medical criteria," which McKesson admits is a small portion of any clinical editing system. *See* Ex. B (Trial Tr.), at 1228:9-12 (McKesson's counsel: "I would admit that most of the relationships in these databases are medically related, but a number of them are billing related."). As discussed in TriZetto's motion for summary judgment under 35 U.S.C. § 112, the key to the CodeReview product was the database containing thousands of code-specific rules.

30

Only that particular database distinguished CodeReview from much older systems that validated codes and checked for duplicate codes, including ClaimFacts itself. But that database is not disclosed in the patent, Claims 1 and 2 are not limited to that database (or any other database), and McKesson has not asserted that the "predetermined database" is an element of those claims that is non-obvious.[9]

As such, McKesson cannot establish a nexus between the methods of Claims 1 and 2 and any alleged commercial success of the CodeReview product. *See Richdel*, 714 F.2d at 1579 (patentee must show that "the patented improvement contributed to the commercial success"). Likewise, McKesson has not alleged that the secondary considerations of "long felt need" and "industry skepticism" pertain to the simple functions of Claims 1 and 2, as opposed to the entire CodeReview product.

    D.    **McKesson And Its Predecessors Have Known About The AMS Prior Art System For More Than 10 Years, Yet Failed To Disclose It To TriZetto**

As explained in TriZetto's motion for summary judgment on grounds of anticipation and obviousness, the AMS prior art system completely anticipates every aspect of Claims 1 and 2 – the code validation technique of Claim 1, the elimination of double billing described in Claim 2, and the "predetermined database" of both claims (assuming that is required). D.I. 380 at 25-27, 31-32. Given the strength of AMS as an invalidating prior art

---

[9]    Nor could McKesson so assert. Since this element supposedly includes *any* database containing rules for comparing codes to one another, it amounts to nothing more than an obvious automation of the AMA's CPT manual itself. *See* Ex. BB (Product Description for CodeReview), at MCK 118835 ("The instructions in the CPT-4 Manual require flipping back and forth between different pages in the book. It is time-consuming and difficult to remember the applicable instructions of the specific codes being evaluated. Therefore, CodeReview has automated the rules that have been provided in the Manual.").

system, McKesson's efforts to exclude it from consideration are understandable. D.I. 377 at 24-27. But there is no justification for excluding this system, which McKesson and its predecessors have known about for more than 10 years.

There is no question that the AMS prior art system was known to McKesson throughout this litigation and well before. As McKesson admits in its motion (D.I. 377 at 26), McKesson itself produced the AMS documents on which TriZetto relies. Ex. O (MCK 047608-619 – AMS Product Overview); Ex. P (MCK 047505-606 – AMS list of medical claim edits). Additionally, one of the inventors of the '164 patent, Dr. George Goldberg, testified at deposition in this case regarding his experience with AMS when he worked at HDI (the maker of AMS) in the mid-1980's.  Ex. Q (Goldberg Dep.), at 51:10-52:2, 262:5-265:25.

REDACTED         REDACTED

Moreover, AMS was actually asserted as prior art during the litigation in 1994-1995 between McKesson's predecessor HPR, Inc. (the original patent assignee) and McKesson's predecessor GMIS, Inc.  *See* Ex. R (GMIS Pre-Trial Memorandum), at MCK 117122.  GMIS asserted AMS as prior art in that case and produced both of the AMS documents on which TriZetto now relies.  *Id.*  McKesson subsequently acquired both HPR and GMIS, inheriting the litigation documents from those parties.  Accordingly, McKesson is the successor of a party that actually asserted AMS as prior art in litigation.

McKesson is attempting to use these facts to show that *TriZetto* had knowledge of AMS and should have disclosed it in TriZetto's responses to McKesson's interrogatories.  D.I. 377 at 26.  In reality, these facts prove that *McKesson* knew about AMS and should have disclosed it in response to TriZetto's interrogatories.  TriZetto candidly admits that it did not

appreciate the significance of AMS until Dr. Goldberg's deposition was completed on September 13, 2005 (three days before fact discovery closed) and TriZetto began working with its expert, Dr. Davis, in October 2005. Early in the case, TriZetto dutifully responded to McKesson's interrogatory concerning prior art references with all relevant information that TriZetto knew at the time. Ex. S (January 20, 2005 Response to McKesson's Interrogatory No. 6), at 12-13. TriZetto supplemented its response four times with additional information it learned during fact discovery. *See* Ex. T (4th Supplemental Response to McKesson's Interrogatory No. 6). But TriZetto did not recognize the full importance of AMS until Dr. Davis brought it to TriZetto's attention in October 2005. Rule 26 only requires a party to supplementally disclose what it knows at the time, which is precisely what TriZetto did in its September 2005 supplementation. *See* Fed. R. Civ. P. 26(e).

By contrast, McKesson and its predecessors *did know* of AMS since at least the GMIS litigation in 1994, when its predecessor GMIS asserted AMS as a prior art system.[10] Ex. R (GMIS Pre-Trial Memorandum), at MCK 117122. Yet, McKesson failed to disclose AMS to TriZetto in this litigation. TriZetto served several interrogatories on McKesson requesting disclosure of any prior art systems known to McKesson. Ex. U (TriZetto's Interrogatories Nos. 6-7 & 9). While McKesson listed a few prior art systems in response, it did not mention AMS. Ex. V (McKesson's Responses to Interrogatories Nos. 6-7 & 9). There can be no doubt that McKesson knew AMS was a prior art reference, because its own predecessor, GMIS, had asserted AMS as such in the 1994 litigation. By McKesson's actions, TriZetto was kept in the

---

[10]    Even before 1994, McKesson's predecessor HPR should have been aware of AMS, due to the fact that patent inventor Dr. Goldberg knew about the system from when he worked at HDI (the developer of AMS) in the mid-1980's. *See* Ex. Q (Goldberg Dep.), at 51:10-52:2. Indeed, AMS should have been disclosed to the PTO when HPR filed its patent application in September 1988. HPR's failure to do so constitutes inequitable conduct.

dark about the significance of AMS. Additionally, TriZetto did not learn of Dr. Goldberg's knowledge concerning AMS until his deposition on September 13, 2005, a mere three days before fact discovery closed on September 16, 2005. Consequently, thanks in large part to McKesson, TriZetto was unable to disclose its intended reliance on AMS by the close of fact discovery.

TriZetto did fully disclose its intent to rely on AMS in the October 24, 2005 expert report of Dr. Davis, which contained extensive discussion of AMS. Ex. F (Davis Report), at 20-24.

**REDACTED**          **REDACTED**

McKesson had the opportunity to question Dr. Davis regarding AMS during his deposition, and it did so. *See* Ex. G (Davis Dep.), at 89:5-116:6.[11]

At the hearing held herein on November 7, 2005, counsel for McKesson asked that expert discovery go forward on validity at that time. D.I. 138 at 39:17-41:20. Based on that request, the Court ordered McKesson's experts to respond to all prior art references in the expert reports TriZetto had already served (including AMS). *Id.* Thereafter, McKesson's experts did address AMS in their reports and the experts were deposed on that system. In short, AMS was fully addressed throughout expert discovery, including in both sides' reports and at the depositions. Also during expert discovery, Dr. Robert Barger, a witness knowledgeable about AMS, was disclosed, and TriZetto included Dr. Bargar on its witness list. Ex. Y (TriZetto's

---

[11]    Dr. Davis disclosed during his deposition his communications with Dr. Robert Bargar, a physician who was employed at HDI from 1986 to 1988 and worked directly on the development, marketing and sales of AMS. *Id.* McKesson and its predecessors have known of Dr. Bargar since at least the GMIS litigation in 1994, when GMIS put Dr. Bargar on its trial witness list. Ex. Z (Amended Witness List), at MCK 046091.

Designation of Trial Witnesses). According to the Scheduling Order herein, McKesson had the opportunity to take Dr. Bargar's deposition at that time, but chose not to do so.

There is no conceivable prejudice to McKesson or hardship imposed on the Court by TriZetto's reliance on AMS. McKesson and its predecessors have known about AMS for more than 10 years. The AMS documents on which TriZetto is relying were in McKesson's possession and produced by McKesson in this litigation. The experts on both sides have already analyzed AMS. By contrast, TriZetto would be severely prejudiced if it cannot rely on documents in McKesson's own production that clearly invalidate the remaining claims of the '164 patent. As such, TriZetto submits there is no basis for the Court to exclude AMS from this case.

> **E.    All Prior Art Systems On Which TriZetto Relies Are Sufficiently Corroborated**

McKesson contends that the prior uses TriZetto has identified, particularly AMS and MedClaim, are not adequately corroborated by documentary evidence. This contention is puzzling, given that both systems are evidenced by hefty documents and credible witness testimony.

AMS is disclosed in two documents (totaling more than 100 pages) *produced by McKesson* in this litigation. *See* Ex. O (MCK 047608-619 – AMS Product Overview); Ex. P (MCK 047505-606 – AMS list of medical claim edits).[12] As discussed in TriZetto's motion for

---

[12]    TriZetto's expert, Dr. Davis, obtained several other documents concerning AMS from Dr. Robert Bargar, a physician who worked directly on AMS from 1986 to 1988. Ex. G (Davis Dep.), at 89:1-105:20, 109:25-113:6. McKesson criticizes the AMS documents that Dr. Davis obtained (D.I. 377 at 28-29), but TriZetto need not rely on those documents, since the two documents produced by McKesson clearly and completely explain the relevant features of AMS. *See* D.I. 380 at 26-28, 31-32.

summary judgment on grounds of anticipation and obviousness, the AMS documents completely

disclose the simple methods of Claims 1 and 2 – code validation and eliminating double billing.

*Id.* Indeed, AMS even has one of the precise examples of Claim 2 used by McKesson at the

April 2006 trial – an edit specifying that initial and follow-up medical services should not be

billed on the same day. *Id.* at 32. AMS is further supported by the testimony of Dr. Bargar, who

worked directly on the development, marketing and sales of AMS from 1986 to 1988. D.I. 383

at ¶¶ 3, 4, 7.

Similarly, the MedClaim prior art system is supported by a lengthy thesis

describing the system, plus the testimony of Dr. Kerschberg, who was personally involved with

the development of MedClaim in the mid-1980's. *See* Ex. H (Kerschberg Report), at 10-11.

The primary concern underlying the corroboration requirement is to avoid having

prior art systems evidenced only by oral testimony. *See Intel Corp. v. Broadcom Corp.*, 2003

U.S. Dist. LEXIS 2372, at *51 (D. Del. 2003). AMS and MedClaim clearly do not have a

corroboration problem, as they are supported by both documents and witness testimony.

McKesson erroneously asserts that another prior art system, Health Systems

International's Clinical Data Editor, has no corroborating documents. D.I. 377 at 5. In fact, the

Clinical Data Editor was disclosed in an article in the February 15, 1984 edition of *Modern

Healthcare* magazine. Ex. AA (RD000504-RD000511) at p.134.

## V.    CONCLUSION

For the reasons set forth herein, McKesson's motion for summary judgment on TriZetto's anticipation and obviousness defenses should be denied.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Rodger D. Smith, II (#3778)*
Jack B. Blumenfeld (No. 1014)
Rodger D. Smith II (No. 3778)
1201 N. Market Street
Wilmington, DE  19899
(302) 658-9200

*Attorneys for Defendant The TriZetto Group, Inc.*

Of Counsel:

GIBSON, DUNN & CRUTCHER LLP
Jeffrey T. Thomas
David A. Segal
Michael A. Sitzman
Jamboree Center, 4 Park Plaza
Irvine, CA  92614
(949) 451-3800

June 15, 2006

525050

37

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on June 22, 2006, I caused a copy of the foregoing to be electronically filed with the Clerk of the Court using CM/ECF, which will send notification of such filing(s) to the following:

Michael A. Barlow
Skadden, Arps, Slate, Meagher & Flom LLP

I also certify that copies were caused to be served on June 22, 2006, upon the following in the manner indicated:

### BY EMAIL AND HAND

Michael A. Barlow
Skadden, Arps, Slate, Meagher & Flom LLP
One Rodney Square
Wilmington, DE  19801

### BY EMAIL AND FEDERAL EXPRESS

Jeffrey G. Randall
Skadden, Arps, Slate, Meagher & Flom LLP
525 University Avenue
Suite 1100
Palo Alto, CA  94301

*/s/     Rodger D. Smith II (#3778)*
Morris, Nichols, Arsht & Tunnell LLP
1201 N. Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
rsmith@mnat.com