# EXHIBIT C

1    IN THE UNITED STATES DISTRICT COURT
2    FOR THE DISTRICT OF DELAWARE
3
4    MCKESSON INFORMATION          )
     SOLUTIONS, LLC,          )
5                             )
          PLAINTIFF,  )
6    vs.                ) Case No. 04-1258-SLR
                        )
7    THE TRIZETTO GROUP, INC.,   )
                        )
8         DEFENDANT.   )
     ───────────────────────────)
9
10
11
12
13
14    VIDEO DEPOSITION OF MARK MUSEN, M.D., PH.D.
15    Held at Skadden, Arps, Slate, Meagher & Flom
16       525 University Avenue, 11th Floor
17          Palo Alto, California
18    Tuesday, November 22, 2005, 9:11 a.m.
19
20
21
22
23
24    REPORTED BY:  CHRIS DE GEORGE, CSR. NO. 7069
25

Page 1

---

1         A P P E A R A N C E S
2
3    For the Plaintiff:
4       Skadden, Arps, Slate, Meagher & Flom,  LLP
5       BY: MICHAEL HENDERSHOT and JON SWENSON,
6       Attorneys at Law
7       525 University Avenue, 11th Floor
8       Palo Alto, California 94301
9       (650) 470-4500
10
11   For the Defendant:
12      GIBSON, DUNN & CRUTCHER LLP
13      BY: MICHAEL A. SITZMAN and DANIEL MUINO,
14      Attorneys at Law
15      One Montgomery Street
16      San Francisco, California 94104-4505
17      (415) 393-8221
18      msitzman@gibsondunn.com
19
20
21   Also present: Michael Barber,
22   Videographer
23
24
25

Page 2

---

1              I N D E X
2
3    EXAMINATION                    PAGE
4      BY: MR. SITZMAN             5, 292
5      BY: MR. HENDERSHOT          277
6
7
          INDEX OF EXHIBITS
9    NUMBER        DESCRIPTION        PAGE
10   MM-1    Multi-page Expert Report of Mark      5
             A. Musen, M.D., Ph.D.
11
        MM-2    Rebuttal Expert Report of Mark     5
12           A. Musen, M.D., Ph.D.; 37 pages
13   MM-3    United States Patent Number      15
             5,253,164
14
        MM-4    Paper entitled "An Access-oriented    72
15           Negotiated Fee Schedule, The
             Caterpillar Experience," pages
16           349-357
17   MM-5    Memorandum Order; 4 pages        109
18   MM-6    PEW Conference Presentation      173
             Managing Physician Fees; 4 pages
19
        MM-7    Vendor Comparison dated 1-18-88;    180
20           1 page
21   MM-8    Exhibit C, Materials Examined;    193
             9 pages
22
        MM-9    Expert Report of Dr. Margaret      298
23           L. Johnson, Ph.D; 30 pages
24
25

Page 3

---

1         BE IT REMEMBERED that, pursuant to Notice, and
2    on Tuesday, November 22, 2005, commencing at the hour of
3    9:11 a.m. thereof, at the Law Offices of Skadden, Arps,
4    Slate, Meagher & Flom, LLP, 525 University Avenue, 11th
5    Floor, Palo Alto, California, before me, Chris De
6    George, CSR #7069, State of California, there personally
7    appeared
8              MARK MUSEN, M.D., PH.D.,
9    called as a witness herein by Defendant, who, being
10   first duly sworn, was examined as is
11   hereinafter set forth.
02:27 12             --oOo--
08:39 13
09:10 14         THE VIDEOGRAPHER: Good morning.  My name is
09:10 15   Michael Barber.  I am a videographer associated with
09:10 16   Barkley Court Reporters located at 222 Front Street,
09:11 17   Suite 600, San Francisco, California 94111.  The date is
09:11 18   November 22nd, 2005.  The time is 9:11 a.m.
09:11 19         This deposition is taking place at Skadden,
09:11 20   Arps, Slate, Meagher & Flom, LLP, 525 University Avenue,
09:11 21   Palo Alto, California 94301 in the matter of McKesson
09:11 22   Information Solutions, LLC, versus the TriZetto Group,
09:11 23   Inc., Case Number 04-1258-SLR.
09:11 24         This is the videotape deposition of Mark
09:11 25   Musen, M.D., Ph.D. being taken on behalf of the defense.

Page 4

---

1 (Pages 1 to 4)

MARK MUSEN, M.D., PH.D.

11:03 1  would have a bearing on -- on this situation that you're
11:03 2  describing for me.
11:03 3      Q.  Okay.  But if -- I hate to repeat myself, but
11:03 4  if the appendectomy were not thrown in, I -- I'm going
11:03 5  back to your comment that it -- you know, a computer
11:03 6  system can't be clairvoyant --
11:03 7      A.  Right.
11:03 8      Q.  -- and I'm looking just really just at the
11:03 9  claims of the '164 patent.  Are there any claims of the
11:03 10 '164 patent that would enable somebody to create a
11:03 11 system that would know that the constituent pieces had
11:03 12 been.
11:03 13     A.  Ab- --
11:04 14     Q.  -- unbundled?
11:04 15     A.  Absolutely, because if I were receiving a
11:04 16 claim for a procedure like laparotomy, which is a
11:04 17 perfectly legitimate procedure, and I also receive
11:04 18 claims for procedures that were, in your terms, children
11:04 19 of the laparotomy, the '164 patent would determine that
11:04 20 those need to be bundled for -- for a different kind of
11:04 21 reimbursement.
11:04 22         Now, what -- what -- what no computer would
11:04 23 know is whether the laparotomy was really the central
11:04 24 focus of the surgeon's procedure.  All the computer
11:04 25 system would be able to do is deal with the fact that

Page 81

11:04 1  here comes a code for a laparotomy and other associated
11:04 2  codes which really should be bundled into that procedure
11:04 3  code.
11:04 4      Q.  And if I -- if I understand you correctly, the
11:04 5  computer system described, enabled, disclosed, claimed
11:04 6  in the '164 patent requires as a -- as a -- as a primary
11:04 7  element, because it can't be clairvoyant, as you're
11:04 8  saying, that the fundamental feature, the laparotomy or
11:04 9  the appendectomy, whatever one you want to choose, has
11:04 10 to be part of that initial claim; otherwise, it can't
11:04 11 take action.
11:04 12         MR. HENDERSHOT:  Objection.  Misstates his
11:04 13 testimony.
11:04 14         THE WITNESS:  Yeah.  It -- it certainly has
11:04 15 the ability to reject the entire claim if -- if -- if
11:05 16 the constellation of codes don't make any sense.
11:05 17 BY MR. SITZMAN:
11:05 18     Q.  But on the unbundling-rebundling process, it
11:05 19 has to have at least that parent.
11:05 20     A.  No, because when we deal with other situations
11:05 21 such as the CT scan with contrast, CT scan without
11:05 22 contrast, that's a situation where there -- the parent
11:05 23 is not specified but it's pretty obvious that those get
11:05 24 bundled into a composite.  Those are sibs.
11:05 25     Q.  The hypothetical is, is that there's two

Page 82

11:05 1  claims or two codes, one with and one without contrast.
11:05 2      A.  Correct.
11:05 3      Q.  And your comment is, is that the '164 patent
11:05 4  would see those and, what, rebundle them as to just
11:05 5  plain old CT?
11:05 6      A.  No.  It would rebundle them as CT scan with
11:06 7  and without contrast.
11:06 8      Q.  And that would rebundle it to a code that had
11:06 9  not been submitted.
11:06 10     A.  That's correct.
11:06 11     Q.  A number that had not been submitted.
11:06 12     A.  That's correct.
11:06 13     Q.  All right.  In that hypothetical, where in the
11:06 14 claims of the '164 patent is that described?
11:06 15     A.  What the patent specification describes in the
11:06 16 R rules in Appendix B is a way of doing a substitution.
11:06 17 The claims themselves deal with identifying the
11:06 18 offending situation, not necessarily with rectifying the
11:06 19 problem.
11:06 20     Q.  Okay.  So let's -- let's work with the CT
11:06 21 scan.  Let's -- let's go to Appendix B and maybe you can
11:06 22 help me with where you would see that rule.  "R"
11:06 23 standing for replace, right?
11:06 24     A.  Yeah, exactly.  If I can find Appendix B.
11:07 25     Q.  I think it begins on page -- on Column 47.

Page 83

11:07 1      A.  Okay.
11:07 2      Q.  And I think you were referring to Rules R1
11:07 3  through R4.
11:07 4      A.  Yep.  Exactly.
11:07 5      Q.  And I guess what I would draw -- I would draw
11:07 6  your attention -- I don't want to presuppose, but I
11:07 7  think you were describing something that looked like R2.
11:07 8      A.  Yeah.
11:07 9      Q.  But -- but I don't want -- you know.
11:07 10     A.  Let me just have a chance to look at it.
11:07 11     Q.  Please.
11:07 12     A.  Precisely.
11:07 13     Q.  All right.  So if A code CT code, which we can
11:07 14 say --
11:07 15         THE REPORTER:  Say it again, please.
11:07 16         THE WITNESS:  So in this -- in this situation,
11:08 17 A code would be CT with contrast, B code would be C code
11:08 18 without contrast, and the computer would substitute C
11:08 19 code, which is CT scan with and without contrast.
11:08 20 BY MR. SITZMAN:
11:08 21     Q.  Okay.  All right.  Now let's jump to the end
11:08 22 of the patent where the claims are.  Where in the
11:08 23 claims, starting at Column 117, where would that rule --
11:08 24 which claim or where in the claims would that rule be
11:08 25 carried out, or where is that rule embodied?

Page 84

21 (Pages 81 to 84)

MARK MUSEN, M.D., PH.D.

11:08 1    MR. HENDERSHOT: And do you mean is the entire
11:08 2 rule, every element of rule carried out, or which claims
11:08 3 are necessary to implement that rule?
11:08 4    MR. SITZMAN: I -- I don't know what my
11:08 5 choices were.
11:08 6    MR. HENDERSHOT: Are -- are you asking which
11:08 7 claims describe every -- every step in that rule, or
11:08 8 which claims are -- are necessarily practiced to -- to
11:08 9 implement that rule?
11:08 10    MR. SITZMAN: Which claims express that rule.
11:09 11    THE WITNESS: The claims are not orthogonal to
11:09 12 the embodiment but they form the embodiment.
11:09 13    Claim 2, for example, is essential for that
11:09 14 particular rule that we just discussed. It deals with
11:09 15 rejecting medical service codes, which are mutually
11:09 16 exclusive due to non-medical criteria. And I don't know
11:09 17 if you agree with me, but I would say that in this
11:09 18 situation, billing for the two types of CT scans is not
11:09 19 related to patient care. It's an artifact of the
11:09 20 billing process. Therefore, I view that as a
11:09 21 non-medical criterion. And I have the reasoning which
11:09 22 allows me in the R2 rule to identify that those two
11:09 23 codes are mutually exclusive, and I can use the -- the
11:09 24 computation supported by the claim -- by Claim Number 2
11:09 25 ultimately to bill Rule 2. But I -- but Claim 2 doesn't

Page 85

11:10 1 necessarily specify what to do about what -- what to do
11:10 2 about the infringing situation when it's detected.
11:10 3 BY MR. SITZMAN:
11:10 4    Q. Okay. Let me break down a couple things that
11:10 5 you said. First of all, the -- the non-medical
11:10 6 criteria, what is the actual criterion that you were
11:10 7 just applying that makes, as we've said, CT scan with
11:10 8 contrast, CT scan without contrast, what makes those
11:10 9 either mutually exclusive, or what is the non-medical
11:10 10 criterion that's applied?
11:11 11    A. To state it informally, it would be that the
11:11 12 patient is undergoing a single procedure in one sitting
11:11 13 that happens to have two components where the, in this
11:11 14 case, has been determined that those components
11:11 15 need to be considered as a unit and, therefore, not paid
11:11 16 separately.
11:11 17    It's non-medical because it's -- it's a
11:11 18 function of how the payer has decided to manage
11:11 19 reimbursement. It has nothing to do with the state of
11:11 20 the patient. The patient is not even informed,
11:11 21 necessarily, of what -- of how the procedure is billed.
11:11 22    Q. Okay. So let's walk through the steps. This
11:11 23 is a -- this is one of the method claims -- of how this
11:11 24 would work, the steps of -- first step, receiving at
11:11 25 least one claim. So the claim that we're talking about

Page 86

11:11 1 in this hypothetical is a claim that has two codes on
11:11 2 it, one for CT with contrast and one without.
11:11 3    A. Yes.
11:11 4    Q. Okay. Then going to the next step,
11:11 5 "ascertaining whether the at least one claim contains a
11:11 6 plurality of medical services codes," well, it contains
11:11 7 two, right?
11:11 8    A. Right.
11:11 9    Q. So we've got to say that's a plurality.
11:11 10    A. Correct.
11:11 11    Q. Anything more than one, right?
11:11 12    A. That's my understanding.
11:11 13    Q. Okay.
11:11 14    MR. HENDERSHOT: We've skipped over the
11:11 15 preamble. Are we assuming that all of that's present in
11:11 16 the process as well, or are we just going through the
11:11 17 steps?
11:11 18    MR. SITZMAN: I think we have to assume that
11:12 19 it is a computer system that has means for operating on
11:12 20 a predetermined basis.
11:12 21    MR. HENDERSHOT: Okay.
11:12 22 BY MR. SITZMAN:
11:12 23    Q. Let's assume that's the system.
11:12 24    A. Okay.
11:12 25    Q. All right. Next step: "determining whether

Page 87

11:12 1 one of the medical service codes in the at least one
11:12 2 claim is mutually exclusive due to non-medical criteria
11:12 3 with any other medical service code in the at least one
11:12 4 claim." All right. So explain how that happens with
11:12 5 the example that we've got. We've got the two CT codes.
11:12 6    A. Right. And what did we say that was? That
11:12 7 was Rule R2 --
11:12 8    Q. Right.
11:12 9    A. -- in Appendix B? That defines relationships
11:12 10 in the database among CT scan with contrast, CT scan
11:12 11 without contrast. It indicates that those two claims or
11:12 12 those two service -- corresponding service codes are
11:12 13 mutually exclusive.
11:12 14    Q. Okay. They're mutually exclusive due to the
11:12 15 non-medical criteria, the non-medical criteria being --
11:13 16    A. That the payer has decided that those two
11:13 17 service codes need to be reimbursed as a unit.
11:13 18    Q. And that's non-medical because the decision
11:13 19 was made by the payer?
11:13 20    A. It -- it does not deal with the procedure
11:13 21 performed by the practitioner but, rather, is a -- is an
11:13 22 artifact of the reimbursement process, yes.
11:13 23    Q. Okay. So -- so it -- they're mutually
11:13 24 exclusive.
11:13 25    Then we go to the next step which is:

Page 88

22 (Pages 85 to 88)

MARK MUSEN, M.D., PH.D.

11:32 1  set forth or carried out in Claim 2 or any of the other
11:32 2  claims set forth here?
11:32 3      MR. HENDERSHOT:  In all possible scenarios or
11:32 4  just generally speaking?
11:32 5      MR. SITZMAN:  Well, I was using all those
11:32 6  various verbs --
11:32 7      MR. HENDERSHOT:  Okay.
11:32 8      MR. SITZMAN:  -- to cover all of your
11:32 9  concerns.
11:32 10     MR. HENDERSHOT:  I guess my question is does
11:32 11 every possible embodiment of EP have to fall within
11:32 12 Claim 2?  Is that your question?
11:32 13     MR. SITZMAN:  Oh, no, no, no.
11:32 14     MR. HENDERSHOT:  Okay.
11:32 15     MR. SITZMAN:  No.
11:32 16     Q.  Can you find -- can you find the EP rule in
11:32 17 any of the claims that we've got here, in any of the 16
11:32 18 claims?
11:32 19     A.  Yes.
11:32 20     Q.  Okay.
11:32 21     A.  And I think in Claim 2, in a particular
11:32 22 situation where a particular service code was mutually
11:33 23 incompatible with another service code based on the
11:33 24 place of service, that represents that kind of a
11:33 25 relationship.

Page 97

11:33 1      Q.  Okay.
11:33 2      A.  That presumably would be non-medical.
11:33 3      Q.  Okay.  Place of service would be non-medical?
11:33 4      A.  Well, again, it -- it's a function of the
11:33 5  artifact of billing rather than a procedure as applied
11:33 6  directly to the patient.  The -- the constraint is one
11:33 7  that deals with the -- with the setting of care and what
11:33 8  is reimbursable in one setting versus another, as -- as
11:33 9  I read the rule at least --
11:33 10     Q.  Okay.
11:33 11     A.  -- rather than what is a -- an intrinsic
11:33 12 constituent of the procedure that's performed on the
11:33 13 patient, which would be medical.
11:33 14     Q.  Okay.  But at -- looking at Rule -- sorry --
11:33 15 Claim 2, it -- it does talk about that mutual
11:33 16 exclusivity, but as I look at the rule set forth in EP,
11:34 17 it's the -- the issue is not one of mutual exclusivity
11:34 18 amongst the codes but whether or not the POS, the place
11:34 19 of service, occurs at some place or -- or another as to
11:34 20 the exclusion.
11:34 21     A.  Okay.  The point is well taken, and the place
11:34 22 of service is not a service code.
11:34 23     Q.  And I did not see place of service in any of
11:34 24 the other claims, but I didn't know if you had in mind
11:34 25 one of the claims that -- that might embrace that.

Page 98

11:34 1      A.  As I said earlier, reading the patent, it's
11:34 2  clear that the specific claims that are made are -- are
11:34 3  more limited than the capabilities described in the
11:34 4  embodiment.
11:34 5      Q.  Okay.  The same similar question with -- with
11:34 6  regard to Rule EA which focuses -- focuses -- it
11:34 7  mentions age as one of the criteria.  Same response,
11:35 8  that's not -- or my same comment, I don't see age
11:35 9  being --
11:35 10     A.  Age -- age is not a medical service.  Just as
11:35 11 before the break when we talked about the sex of the
11:35 12 patient, that's obviously not a medical service code
11:35 13 either.
11:35 14     Q.  Okay.  What about, let me ask you, the --
11:35 15 there are three Q rules here:  QM, QS, and QB.  Are
11:35 16 those embraced or set forth in any of the claims, or is
11:35 17 that part of some other process that one could use?
11:35 18     A.  Again, just looking on the left-hand side of
11:36 19 the rule, which is all the -- the claims deal with,
11:36 20 there is a determination of whether, in this case of QM,
11:36 21 ACODE is incompatible with codes in the range of B to D.
11:36 22     Q.  Right.
11:36 23     A.  So that certainly seems to be governed by the
11:36 24 claims.
11:36 25     Q.  But carrying out the remaining portion of the

Page 99

11:36 1  rule, that's not in the claims, the -- that there's a
11:36 2  question about the combination of the codes.
11:36 3      MR. HENDERSHOT:  All the independent claims or
11:36 4  including the dependent ones as well?  There might be
11:36 5  one that we're overlooking.
11:36 6      MR. SITZMAN:  I don't know.  I want to look at
11:36 7  all 16, I guess, except for 7.
11:36 8      MR. HENDERSHOT:  Okay.
11:36 9      THE WITNESS:  I mean, the -- the -- the claims
11:36 10 talk about means for rejecting codes but I -- that's
11:36 11 rather open-ended as to what that means could be.  And
11:36 12 so I think it's -- it's fair to say again that the
11:36 13 left-hand side is -- is -- is covered, the right-hand
11:37 14 side is a particular implementation detail.
11:37 15     BY MR. SITZMAN:
11:37 16     Q.  Okay.  And finally, L1 at the top, that's a
11:37 17 limit of payment, if I read the -- that -- that code
11:37 18 there, that rule does not appear fully, you know, the
11:37 19 entire rule anyway, in any of the 16 claims.
11:37 20     A.  I agree.
11:37 21     Q.  Okay.  All right.  Let's -- let's turn now to
11:37 22 the claims themselves, starting at Column 117.  It's
11:37 23 like that last page, and I want to ask you about the
11:38 24 means -- the "means for" language that appears there.
11:38 25     Let's take the first one on Claim 1.

Page 100

MARK MUSEN, M.D., PH.D.

11:38 1   A. Yeah.
11:38 2   Q. In a computer system having, and it says
11:38 3   "means for." You see that?
11:38 4   A. Yeah.
11:38 5   Q. And then there's a bunch of language after
11:38 6   that. Is it your understanding that the language
11:38 7   appearing after the "means for" phrase, that that
11:38 8   language is the functional language of the claim?
11:38 9   A. Yes.
11:38 10      MR. HENDERSHOT: Just the following clause or
11:38 11  all the language in the claim? I assume it's
11:38 12  the following clause.
11:38 13      MR. SITZMAN: The following clause.
11:38 14      MR. HENDERSHOT: Okay.
11:38 15      THE WITNESS: Yes.
11:38 16      MR. SITZMAN: The following clause is the
11:38 17  functional aspect of the clause. Okay.
11:38 18  Q. Does -- does the three products from TriZetto
11:38 19  perform that identical function that's described? Let's
11:39 20  take the first one, "the operating on a predetermined
11:39 21  database containing medical service codes and a set of
11:39 22  relationships among the medical service codes defining
11:39 23  whether selected ones of the medical service codes are
11:39 24  valid when input with other selected ones of the medical
11:39 25  service codes."

Page 101

11:39 1   A. Yes.
11:39 2   Q. Okay. How do you know that it performs that
11:39 3   identical function?
11:39 4   A. I know that by looking at the product
11:39 5   literature that I've been -- been given and by reviewing
11:39 6   the testimony of all those who were deposed in this
11:39 7   case.
11:39 8   Q. Okay. Where in your report, MM-1, is the
11:39 9   structure identified that corresponds to the function
11:39 10  that I just read into the record?
11:40 11  A. The structure is software. My understanding
11:40 12  in this case is that it is sufficient to say that the
11:40 13  function is implemented in software.
11:40 14  Q. Is -- is there any particular software or are
11:40 15  you just saying software?
11:40 16  A. Well, the patent specification gives a
11:40 17  particular embodiment for how that software might be
11:40 18  constructed, but at issue is whether software is used to
11:40 19  perform this particular function, a function which,
11:40 20  until this patent, had been done only manually.
11:40 21  Q. Okay. So software is used. Can you identify
11:40 22  then -- well, let -- let's be clear. Your report
11:40 23  does-- doesn't call out exactly what software is used.
11:40 24  A. That's correct.
11:40 25  Q. Okay. Can you identify for me, though, in the

Page 102

11:40 1   patent where the exact software that is used is
11:40 2   identified?
11:40 3      MR. HENDERSHOT: Objection. Vague and
11:40 4   ambiguous, the "exact software that is used."
11:40 5   BY MR. SITZMAN:
11:40 6   Q. Okay. Well, let's start with code. Does --
11:41 7   is there code identified?
11:41 8      (Witness sneezes.)
11:41 9      MR. SITZMAN: Bless you.
11:41 10     MR. HENDERSHOT: Bless you.
11:41 11     THE WITNESS: I'm fine.
11:41 12     Well, certainly. Obviously, there is the
11:41 13  Clipper listing in the back of the patent which is
11:41 14  really, from my perspective, more annotation than
11:41 15  anything else, but it gives an example of how code can
11:41 16  be written to achieve the claims of the patent. I think
11:41 17  most specifically what would be most important to -- to
11:41 18  one skilled in the arts to -- to create such an
11:41 19  invention is the information given in Appendix B and --
11:41 20  and the database structure in -- in Appendix C.
11:41 21  BY MR. SITZMAN:
11:41 22  Q. Let me just see if I clarify. The -- the
11:41 23  exact structure that's identified in the patent that
11:42 24  performs the function that we were just talking about,
11:42 25  the operating on a predetermined database along with

Page 103

11:42 1   that other language that I won't repeat --
11:42 2   A. Right, right, right.
11:42 3   Q. -- that I won't repeat, the structure that's
11:42 4   identified in the patent is the Clipper language that
11:42 5   appears in the, I think it's Appendix D of the patent,
11:42 6   the rules that appear in Appendix B, and the database
11:42 7   structure that appears in Appendix C.
11:42 8      MR. HENDERSHOT: Well, objection. Misstates
11:42 9   his testimony.
11:42 10     MR. SITZMAN: Okay.
11:42 11     THE WITNESS: Okay. Again, I'm -- I'm -- I'm
11:42 12  not an attorney so I want to be careful here.
11:42 13     My understanding is that the patent simply
11:42 14  states that the structure is software and gives each of
11:42 15  those as examples of how one might embody software to
11:42 16  have the function.
11:42 17  BY MR. SITZMAN:
11:42 18  Q. Does the patent give, you know, like the
11:43 19  actual algorithm that one would use to do that, to -- to
11:43 20  sort of create that functionality that we're talking
11:43 21  about, the means for operating that we're talking about?
11:43 22  A. Sure.
11:43 23     MR. HENDERSHOT: Oh. It may be vague and
11:43 24  ambiguous as to algorithm. As long as you guys are on
11:43 25  the same page.

Page 104

26 (Pages 101 to 104)

MARK MUSEN, M.D., PH.D.

02:02  1  try the approach that Dr. --
02:02  2      Q.  Hertenstein.
02:02  3      A.  -- Hertenstein had used but, rather, to
02:02  4  finesse the problem by using the DRG approach.
02:02  5      Q.  All right.
02:02  6      MR. SITZMAN:  Can we take a quick break?  Do
02:02  7  you mind?
02:02  8      MR. HENDERSHOT:  Yeah, that's fine.
02:02  9      THE VIDEOGRAPHER:  This is the end of
02:02 10  Videotape Number 2, Volume 1, in the deposition of Mark
02:03 11  Musen, M.D., Ph.D.
02:03 12      The time is 2:02 p.m., and we are off the
02:03 13  record.
02:03 14      (Recess taken.)
02:10 15      THE VIDEOGRAPHER:  Back on the record. This
02:10 16  is the beginning of Videotape Number 3, Volume 1, in the
02:10 17  deposition of Mark Musen, Ph.D., M.D. The time is
02:10 18  2:10 p.m. on November 22nd, 2005.
02:11 19  BY MR. SITZMAN:
02:11 20      Q.  Back to MM-4 --
02:11 21      A.  Okay.
02:11 22      Q.  -- and Table 4, I just want to make sure we're
02:11 23  clear on a couple things.
02:11 24      Writing a computer program or writing a
02:11 25  knowledge-based system --

Page 165

02:11  1      A.  Right.
02:11  2      Q.  -- or using a knowledge-based system to get to
02:11  3  a solution, any of those three, that dealt with the
02:11  4  bundling problem set forth in Table 4 only, would have
02:11  5  been obvious to one of ordinary skill of the art, given
02:11  6  the Egdahl-Hertenstein disclosure.
02:11  7      A.  I -- I'm not trying to be difficult, but
02:11  8  the -- the information in Table 4 provides one result of
02:11  9  the millions and millions of possible combinations of
02:11 10  claim codes. So it would be obvious that there would be
02:12 11  a way of solving this one particular case out of the
02:12 12  many millions, but I'm not sure why anybody would want
02:12 13  to begin to try to solve a case that actually might
02:12 14  never occur again, given this particular combination.
02:12 15      Q.  Right. No, I -- I understand. So this -- but
02:12 16  it would have been obvious given this disclosure to deal
02:12 17  -- you could deal with this one. Sorry. I'll make it
02:12 18  more specific.
02:12 19      You could write a program to deal with this
02:12 20  one, even though there are -- are millions of other
02:12 21  relationships and issues and even though this one
02:12 22  exclusivity or unbundling problem may never ever come
02:12 23  along again.
02:12 24      A.  People would question your sanity but, yes,
02:12 25  you could do it.

Page 166

02:12  1      Q.  You could do it, though. You could do it at
02:12  2  the time that the article was written. That -- that was
02:12  3  the important part there.
02:12  4      A.  You could recognize this one situation, yes.
02:13  5      Q.  In a computerized system.
02:13  6      A.  If you had a means for acquiring the claim,
02:13  7  which obviously is the first step, but yes.
02:13  8      Q.  Okay. Now, returning to the patent for a
02:13  9  second and comparing Rule E2 to what is in Table 4 --
02:13 10      A.  What column are you on?
02:13 11      Q.  Oh, it's Column 47.
02:13 12      A.  Okay.
02:13 13      Q.  Isn't Rule E2 a rule designed to carry out
02:13 14  what is set forth in Table 4?
02:13 15      MR. HENDERSHOT:  Objection. Vague and
02:13 16  ambiguous as to "designed to."
02:13 17      THE WITNESS:  The procedure represented by
02:14 18  Rule E2 would carry out the step that Hertenstein did in
02:14 19  this one example, yes. It would obviously apply in
02:14 20  multiple other examples, and being able to come up with
02:14 21  a general rule and know its applicability is, obviously,
02:14 22  the interesting part of the patent.
02:14 23  BY MR. SITZMAN:
02:14 24      Q.  So -- right. So you could come up with
02:14 25  Rule E2 to deal with Table 4, but the beauty is E2 also

Page 167

02:14  1  could deal with other things.
02:14  2      A.  Right. And you could imagine other frame --
02:14  3  other formulations of rules that would match the editing
02:14  4  processing being done in Table 4 that would have a
02:14  5  representation different from Rule E2 which would seem
02:14  6  to be sufficient for the problem that the figure
02:14  7  identifies, and only with experimentation would you
02:14  8  realize that either you had been too general or too
02:14  9  specific and would want to recast the way in which you
02:14 10  were dealing with the situation in Table 4 in some other
02:15 11  way.
02:15 12      Q.  Okay. Now, we've already talked, again, just,
02:15 13  sort of looking at the rules now on the patent side, we
02:15 14  know that Rules R1 through R4 are not in the patent
02:15 15  claims.
02:15 16      A.  That's not true. The -- certainly the
02:15 17  left-hand sides of those rules are.
02:15 18      Q.  Okay. The entirety of those rules, those
02:15 19  rules are not express from start to finish --
02:15 20      A.  [Simultaneously] That's correct.
02:15 21      Q.  -- in any of the patent claims.
02:15 22      Okay. E2 is, and we've just talked about the
02:15 23  fact that that was a rule that would deal with the
02:15 24  Table 4 problem in the Hertenstein article. E1, E1 is
02:15 25  in the patent claims, right?

Page 168

42 (Pages 165 to 168)

MARK MUSEN, M.D., PH.D.

04:46 1  method for processing input claims" --
04:46 2      THE REPORTER: "A method for processing input
04:46 3  claims" --
04:46 4      THE WITNESS: -- "containing at least one
04:46 5  medical service codes, comprising the steps of:
04:46 6  receiving at least one claim; determining whether any
04:47 7  medical service code contained in the at least one claim
04:47 8  is not present in the predetermined database; and
04:47 9  informing a user that a medical service code is not
04:47 10  contained in the predetermined database."
04:47 11      The first point is that a system that does DRG
04:47 12  grouping is completely unrelated to the claims
04:47 13  processing task. The Doyle patent mentions the
04:47 14  identification of fictitious codes, but the preamble to
04:47 15  the claim describes specifically that what follows is in
04:47 16  the context of the unbundling problem.
04:47 17  BY MR. SITZMAN:
04:47 18      Q.  Is it your belief that Claim 1 deals with the
04:47 19  unbundling problem?
04:47 20      A.  Claim 1 describes the context in -- in many
04:47 21  ways for what follows, describing specifically the idea
04:47 22  of automated claims processing where there exists a
04:47 23  database that provides the information needed to address
04:48 24  unbundling. It -- Claim 1 does not provide the specific
04:48 25  functionality --

Page 265

04:48 1      THE REPORTER: "Does not provide the specific
04:48 2  functionality" and whatever you said after that.
04:48 3      THE WITNESS: For unbundling.
04:48 4  BY MR. SITZMAN:
04:48 5      Q.  Okay.  So Claim 1 doesn't provide the
04:48 6  functionality for unbundling, but it does receive at
04:48 7  least one claim, it determines whether any medical
04:48 8  service code contained in that claim is present in the
04:48 9  data- -- in a predetermined database, and then informs
04:48 10  the user whether or not the code is contained in the
04:48 11  base or not, the database or not.  Is that a fair
04:48 12  characterization?
04:48 13      A.  That's -- that's fair.  I guess it's a legal
04:48 14  matter as to whether we ignore the preamble.
04:48 15      Q.  Okay.  What does the preamble add in terms of
04:48 16  the function of Claim 1?
04:49 17      A.  It states that the database of claims, which
04:49 18  allows the invalidity check, also contains structures
04:49 19  which are relevant for the future claims to be specified
04:49 20  that deal with the unbundling task.
04:49 21      Q.  Okay.  But the future claims meaning Claims 2
04:49 22  through 16.
04:49 23      A.  Correct.  And so Claim 1 is saying that we can
04:49 24  perform the validity check and use the same structures
04:49 25  that ultimately will be useful for those other claims.

Page 266

04:49 1      Q.  All right.  Let's assume this patent only had
04:49 2  one claim in it.
04:49 3      A.  You do like making assumptions.
04:49 4      Q.  Well, you know, I'm trying to understand as
04:49 5  much as I can, and assumptions are one way to do it.  If
04:49 6  we say only Claim 1 exists in this patent, and we're
04:49 7  only looking at Claim 1, isn't the reference, the Doyle
04:49 8  reference or the Nathan- -- Nathanson reference, aren't
04:50 9  those -- don't those disclose the claim limitations that
04:50 10  are in Claim 1?
04:50 11      MR. HENDERSHOT:  Objection.  Asked and
04:50 12  answered.  Well, strike that.  Actually, not in the
04:50 13  context of having only one claim.  I apologize.
04:50 14      THE WITNESS:  Nathanson seems irrelevant to
04:50 15  me.  You'll have to help me understand how you think
04:50 16  that applies.
04:50 17      Doyle, obviously, does some degree of claims
04:50 18  checking, and -- and inasmuch as the -- the claim made
04:50 19  in Claim 1 addresses claim checking, then there is --
04:50 20  there is relevance there.  As I said previously, I --
04:50 21  my -- my interpretation of the claims is that the
04:50 22  motivation for Claim 1 is to clarify that the task
04:50 23  performed for claim validity checking can be handled
04:50 24  using the same structures that are ultimately used for
04:50 25  the other components of the -- of the -- of the patent.

Page 267

04:51 1      Q.  Right.  But if we just focus in on claim
04:51 2  validity checking, which I think is a fair
04:51 3  characterization of Claim 1.
04:51 4      A.  Yes.
04:51 5      Q.  I mean, will you agree with me that --
04:51 6      A.  Yes.
04:51 7      Q.  I -- I think that was your phraseology was
04:51 8  claimed validity checking.  Claimed validity checking
04:51 9  was not something, by itself, that was novel at the time
04:51 10  of this, the filing of this patent application.
04:51 11      MR. HENDERSHOT:  I -- I'm going to object and
04:51 12  assert that it's vague and ambiguous, at least to me, as
04:51 13  to whether or not claimed validity means the -- valid as
04:51 14  in appropriate for payment or some sort of --
04:51 15      I'm going to object to the question as vague
04:51 16  and ambiguous as to what "claimed validity" means.  I
04:51 17  understand -- I don't believe that I follow what's
04:51 18  being -- what's being used, and I apologize for that if
04:51 19  I don't.
04:51 20      MR. SITZMAN:  Oh, I'm sorry.  Did I say --
04:51 21  code validity checking.  Sorry.
04:52 22      MR. HENDERSHOT:  All right.
04:52 23  BY MR. SITZMAN:
04:52 24      Q.  Code validity checking.
04:52 25      A.  And I guess my -- my response is that,

Page 268

67 (Pages 265 to 268)

MARK MUSEN, M.D., PH.D.

04:52 1 clearly, the Doyle patent has a component of code
04:52 2 validity checking which is provided functionally in
04:52 3 Claim 1. The structure is -- is -- is obviously
04:52 4 different.
04:52 5    Q. Okay. And -- and how is the structure
04:52 6 different?
04:52 7    A. The structure is different in that the
04:52 8 database for validity checking is designed in a way to
04:52 9 support that task, as well as the other tasks which we
04:52 10 don't want to talk about. If we were willing to talk
04:52 11 about the other claims in the patent, then I think in
04:52 12 that context it -- it makes sense that Claim 1 is an
04:52 13 advance over what's claimed in Doyle.
04:52 14    Q. It's an advance but a functional equivalent.
04:52 15    A. It's a functional equivalent in the context of
04:52 16 a system that also does unbundling.
04:53 17    Q. Right. Okay. Claim 13, same series of
04:53 18 questions, and -- and we can -- we can narrow it to
04:53 19 Doyle in that I also consider, and I wanted to know
04:53 20 whether or not you consider, Claim 13 a claim -- sorry,
04:53 21 a code validity checking claim.
04:53 22    A. Yes, I do.
04:53 23    Q. Okay. And you would have the same responses
04:53 24 vis-a-vis the Doyle patent with regard to Claim 13?
04:53 25       MR. HENDERSHOT: I want to interpose an

Page 269

04:53 1 objection to this line, again, about validity. I've
04:53 2 heard "valid" used in the context of the database with
04:53 3 relationships to finding whether or not a code is valid
04:53 4 with other codes. I'm also aware implicitly in the
04:53 5 conversation there is a -- may be another meaning from
04:53 6 the computer science standpoint. And to the extent that
04:53 7 the -- the questions don't delineate really which one or
04:53 8 the other, I object to it as vague and ambiguous.
04:54 9       THE WITNESS: As I read Claim 13 --
04:54 10 BY MR. SITZMAN:
04:54 11    Q. Right.
04:54 12    A. -- I view that as a means for determining
04:54 13 whether the code is in the database, meaning whether the
04:54 14 code is valid in a computer science sense. The other
04:54 15 claims in the -- in the patent use the term "valid" and
04:54 16 there it seems to mean valid for payment.
04:54 17    Q. Right. But -- but, again, let's just focus on
04:54 18 13.
04:54 19    A. Okay.
04:54 20    Q. And wouldn't you -- would you agree with me,
04:54 21 then, that the Doyle patent also discloses a -- that
04:54 22 same functionality in that it checks to see -- I'm
04:54 23 looking at your characterization -- checked to see if
04:54 24 diagnosis and procedure codes are "fictitious" by
04:54 25 looking them up in a database much like that described

Page 270

04:54 1 in Claim 13?
04:54 2    A. Okay. Take-- taking the claim completely
04:54 3 out of context, yes.
04:54 4    Q. Okay. Out of context in the sense of looking
04:54 5 at it by itself?
04:55 6    A. Yes.
04:55 7       MR. HENDERSHOT: And looking at every
04:55 8 limitation?
04:55 9       MR. SITZMAN: Yes.
04:55 10       MR. HENDERSHOT: Okay.
04:55 11 BY MR. SITZMAN:
04:55 12    Q. I want to turn your attention to Advanced
04:55 13 MedLogic, pages 24 and 25 of your report.
04:55 14    I think I'm going to skip that. Hold on. I
04:55 15 think we covered a lot of that.
04:55 16    Now, Doctor, doesn't -- getting back to the
04:55 17 Hawley report, doesn't the fact that Dr. Hawley was
04:55 18 working on a similar solution, the unbundling task and
04:56 19 solution, at the same time as the assignee and patentees
04:56 20 of the '164 patent -- and they were doing it on opposite
04:56 21 coasts, by the way -- doesn't the fact that he was
04:56 22 working on it at the same time and coming to a solution
04:56 23 suggest the obviousness of the '164 patent?
04:56 24       MR. HENDERSHOT: Objection. Assumes facts not
04:56 25 in evidence with respect to them working at the same

Page 271

04:56 1 time and to the extent that it implies that it was
04:56 2 completely independent.
04:56 3 BY MR. SITZMAN:
04:56 4    Q. Let -- let's assume that it was completely
04:56 5 independent, and let's assume that it was at the same
04:56 6 time.
04:56 7    A. All I can say is that it might be obvious to
04:56 8 try.
04:56 9    Q. Okay. But you would agree with me, though,
04:56 10 if -- if you think about, you know, multiple people at
04:56 11 multiple places all trying independently.
04:56 12    A. Right.
04:56 13    Q. You know, with no coordination, coordination
04:56 14 with each other, to come up with a solution and they
04:56 15 come up with probably various solutions to the same
04:57 16 task, doesn't that indicate to you, though, that the
04:57 17 solution may have been obvious, especially if multiple
04:57 18 people were independently developing it at the same
04:57 19 time?
04:57 20       MR. HENDERSHOT: Objection. Asked and
04:57 21 answered.
04:57 22       THE WITNESS: I look at the questions that
04:57 23 appeared after the -- the Egdahl-Hertenstein article
04:57 24 that we discussed --
04:57 25 BY MR. SITZMAN:

Page 272

68 (Pages 269 to 272)

MARK MUSEN, M.D., PH.D.

1   State of CALIFORNIA            )

2   County of  Santa Clara       )

3

4

5

6

7           I, the undersigned, declare under penalty of

8   that I have read the foregoing transcript, and I have

9   made any corrections, additions or deletions that I was

10  desirous of making; that the foregoing is a true and

11  correct transcript of my testimony therein.

12          EXECUTED this ____ 17 day of  December ,

13  2005, at  Stanford ,    CA    .

                (City)              (State)

14

15

16

17

18      _____  M. PhD

            MARK MUSEN, M.D., PH.D.

19

20

21

22

23

24

25

                        326

BARKLEY
Court Reporters

EXHIBIT D

| | |
|---|---|
| 1     IN THE UNITED STATES DISTRICT COURT | 1   APPEARANCES: |
| 2     FOR THE DISTRICT OF DELAWARE | 2   On behalf of the Plaintiff: |
| 3     CIVIL ACTION NO. 04-1258 SLR | 3     BERNARD SHEK, ESQ. |
| 4 | 4     Skadden, Arps, Slate, Meagher & Flom, LLP |
| 5  -----------------------X | 5     525 University Avenue, Suite 1100 |
| 6  MCKESSON INFORMATION   : | 6     Palo Alto, California 94301 |
| 7  SOLUTIONS, LLC,      : | 7     (650) 470-4500 |
| 8     Plaintiff,    : | 8   On behalf of Defendant: |
| 9  vs.       : | 9     MICHAEL A. SITZMAN, ESQ. |
| 10  THE TRIZETTO GROUP, INC., : | 10    Gibson, Dunn & Crutcher, LLP |
| 11     Defendant.    : | 11    One Montgomery Street |
| 12  -----------------------X |      Telesis Tower, Suite 31 |
| 13 | 12    San Francisco, California 94104-4505 |
| 14     Durham, North Carolina | 13    (415) 393-8221 |
| 15     Friday, September 23, 2005 | 14 |
| 16 | 15    BRENT TROUBLEFIELD, VIDEOGRAPHER |
| 17     VIDEOTAPE DEPOSITION OF KELLI A. DUGAN, | 16 |
| 18  a witness herein, called for examination by counsel | 17 |
| 19  for the Defendant, in the above-entitled matter, | 18 |
| 20  pursuant to notice, the witness being duly sworn by | 19 |
| 21  DARLENE M. BRYANT, Registered Professional Reporter | 20 |
| 22  and Notary Public in and for the State of North | 21 |
| 23  Carolina, taken at the offices of Interactive World, | 22 |
| 24  1000 Park Forty Plaza, Suite 300, Durham, North | 23 |
| 25  Carolina, at 8:06 a.m., September 23, 2005, and the | 24 |
| | 25 |
| Page 1 | Page 3 |

| | |
|---|---|
| 1  proceedings being taken down by Stenotype by DARLENE | 1       C O N T E N T S |
| 2  M. BRYANT and transcribed under her direction. | 2 |
| 3 | 3  THE WITNESS     EXAMINATION BY COUNSEL FOR |
| 4 | 4  KELLI A. DUGAN:    Plaintiff    Defendant |
| 5 | 5  By Mr. Sitzman:        7, 180 |
| 6 | 6  By Mr. Shek:     177 |
| 7 | 7 |
| 8 | 8 |
| 9 | 9      E X H I B I T S |
| 10 | 10 |
| 11 | 11  EXHIBIT NO.          PAGE NO. |
| 12 | 12   1  7-29-87, Holloway to Fager     53 |
| 13 | 13   2  10-14-87 Holloway to Fager     55 |
| 14 | 14   3  US Patent 5, 253,164     66 |
| 15 | 15   4  Subpoena         103 |
| 16 | 16   5  Article, The Caterpillar Experience   105 |
| 17 | 17   6  Memo, 1-29-88, Holloway to Egdahl    108 |
| 18 | 18   7  5-20-88, Holloway to Egdahl    121 |
| 19 | 19   8  RICS         122 |
| 20 | 20   9  Flow Charting Worksheet     124 |
| 21 | 21  10  Memo, To HPR Staff, 1-17-89    127 |
| 22 | 22  11  CRW, 1-25-89       129 |
| 23 | 23  12  1-26-89, Holloway To Bolz    130 |
| 24 | 24  13  2-13-89, Don & Kelli To PDT    132 |
| 25 | 25  14  12-12-89, Goldberg to Dugan    136 |
| Page 2 | Page 4 |

1  speculation.
2      Q.  And when you say, doing it, are you referring
3  to the Hertenstein manual process, or are you
4  referring to code review, the automated process?
5      **A.  You -- well, if you -- can we go back and see**
6  **a question -- a couple of questions ago, I was**
7  **referring to what you had said.  So now you've got me**
8  **confused and lost.**
9      Q.  Okay.
10     **A.  I'm sorry.**
11     Q.  All right.  Let me -- let me break it down.
12         I --
13     **A.  You asked me something about whether Don --**
14  **that -- what people were doing; what Bob had been**
15  **doing.**
16     Q.  Well, let's -- let's back up.  While you were
17  at HPI --
18     **A.  Yes.**
19     Q.  -- I think you've testified that you did not
20  do any investigation into finding out whether or not
21  there were other entities that were manually
22  processing claims like Dr. Hertenstein?
23     **A.  That's correct.**
24     Q.  Okay.  And did you do anything while at HPI to
25  ascertain whether there were any companies or entities

1      **A.  Okay.  Just HPI?**
2      Q.  It -- it was helpful for me, but it doesn't
3  sound like it's helpful for you.  So why don't we talk
4  about prior to filing the patent application; is that
5  any --
6      **A.  That's even more difficult.**
7      Q.  That's more difficult?
8      **A.  HP -- HP -- if you stick with HPI, I think I**
9  **can -- and you really mean while I was at HPI?**
10     Q.  Why -- can we -- can we focus on the pre-1989
11  time frame?
12     **A.  Sure.**
13     Q.  Okay.  So any -- at any time prior to 1989,
14  did you do anything to ascertain whether or not anyone
15  else, other than HPI and HPR, were working on an
16  automated system, much like the system you were
17  working on, that would handle claims that -- like
18  Dr. Hertenstein was doing manually?
19     **A.  No.**
20     Q.  Were you aware of any other companies or
21  entities that had software that was capable of
22  automatically processing med -- medical claims?
23     **A.  No.  Processing in the way in which**
24  **Dr. Hertenstein had been doing manually?**
25     Q.  Yes.  I'm sorry.

1  who had automated a process like you were attempting
2  to do for Dr. Hertenstein?
3      **A.  Could you repeat the question?  And I just --**
4  **for -- for reference, you keep saying HPI.  Can we**
5  **lump HPI and HPR together, since I can't tell you**
6  **exactly when I moved over to HPR?  And so it's hard**
7  **for me to make the distinction when you're limiting me**
8  **to the HPI time or the HPR time.**
9      Q.  Okay.
10     **A.  Unless you specifically want to know about**
11  **when I was a BU employee.**
12     Q.  Well, that's what I'm trying to drive at.
13  What --
14     **A.  Okay.**
15     Q.  -- I'm -- I'm trying to find out, because what
16  happened in response to several questions ago, all of
17  a sudden you went forward with HPR, and then also went
18  into sales of code review while you were at HPR, which
19  took us well-beyond the period that I really wanted to
20  focus on.
21     **A.  Uh-huh.**
22     Q.  And I understand that -- that it's difficult
23  to cross over between HPI and HPR, but I really kind
24  of want to focus on a time period that's much
25  earlier --

1      **A.  Yes.**
2      Q.  Did you do anything to determine what software
3  programs were being used by payers that examined in
4  any way CPT-4 codes being submitted on medical claims?
5      **A.  Could you repeat that again?  I'm so sorry.**
6      Q.  No.  That's okay.  I think I'm just trying to
7  cover way too much ground in way too much short of
8  time here.
9          At some point in time, you went to work on
10  creating software that ultimately became known as
11  CodeReview, correct?
12     **A.  Correct.**
13     Q.  Okay.  When is the earliest time you can
14  recall working on that software program?
15     **A.  Some time in '87.**
16     Q.  When you went to go work -- sorry.
17         At any time during your work on that software
18  program, did you ever do anything to find out what
19  other software programs existed that examined CPT-4
20  codes in any manner?
21     **A.  Yes.**
22     Q.  What did you do?
23     **A.  GMIS came to HPI and demonstrated Autocoder.**
24     Q.  Can you recall when they came to HPI?
25     **A.  No.**

1    Q.   Did they come at your request or their
2    request?
3    A.   I don't know.
4    Q.   Did you get a chance to see the -- the program
5    that they had in action?
6    A.   Yes.
7    Q.   And can you generally describe for me that
8    program that you saw?
9    A.   The program was one where users would input
10   CPT-4 codes.
11   Q.   And what would -- what was the program
12   designed to do with those codes?
13   A.   My understanding of the program is that, at
14   that time, it only ensured that you had a valid code.
15   Q.   And how would it do that, or how would it
16   accomplish that based on your understanding?
17   A.   Again, it's only speculation, because I
18   didn't -- I don't know how they worked it.  But I
19   would assume they had a database of all the valid
20   codes, and it would just tell you, you know, that
21   code's invalid.
22       And I can't remember.  You may have had an
23   opportunity to type in the procedure name, to get a
24   valid code, but if you put in a code that was invalid,
25   it would tell you it was invalid.

Page 45

1    A.   Yes.
2    Q.   Is it fair to then assume that it occurred
3    prior to your employment at HPR?
4    A.   Not necessarily.  I can't tell.
5    Q.   Did GMIS share with you any of the technical
6    aspects of their computer program?
7    A.   No.
8    Q.   You laughed.  I didn't know -- was there a --
9    something you were thinking about?
10   A.   Yeah.  Yes.
11   Q.   What was that?
12   A.   Don had them put in one of our -- sort of --
13   our marque claims to see what it would do with it.
14   And, of course, it did nothing, because it only checks
15   the validity of the code.  And then John -- Don
16   continues to ask questions, and I just -- I just
17   remember at the end of the meeting saying to Don,
18   you're giving the store away, just he -- because Don
19   was so excited.  But, anyway, that's -- that's why I
20   remember that meeting so clearly.
21   Q.   It sounds like -- I don't want to overstate or
22   understate it, but would it be fair to say that Dr. --
23   I keep wanting to refer to him as Dr. Holloway.  Do --
24   A.   You can.  He's a Ph.D.
25   Q.   Yeah.  No.  I know that.  Is it fair to say

Page 47

1    Q.   At the time you saw the odor -- Autocoder
2    system --
3    A.   Uh-huh.
4    Q.   -- had you completed your work on the
5    automated system known as CodeReview?
6    A.   Completed?  Do you mean the first prototype?
7    I mean, certainly the entire time I worked on
8    CodeReview, and even after I left from HPR, it wasn't
9    complete.  A software program is continually --
10   Q.   Okay.  Did --
11   A.   -- maintained.
12   Q.   Okay.  Did you have a working prototype of the
13   software code?
14   A.   I believe that we did.
15   Q.   Okay.  Had you filed for the patent
16   application?
17   A.   I do not know.
18   Q.   Do you recall who else was involved in the
19   meeting where GMIS came to HPI?
20   A.   It was held in Dick Egdahl's actual office,
21   which was rare, and Dr. Egdahl and Don Holloway and I
22   are those that I remember.  There may have been
23   somebody else.  I don't know.
24   Q.   And you said Dr. Egdahl's office; was this an
25   office at HPI?

Page 46

1    Dr. Holloway was sort of the lead guy; I want to say
2    almost, father, of this creation?  Is that a fair
3    characterization in your mind?  Or if it's unfair, let
4    me know?
5    A.   In my mind, that's a fair characterization.
6    Q.   Okay.  So, Autocoder, if I can classify that,
7    that program from GMIS, was being used, or that
8    software program had been created, to determine the
9    accuracy of the code or the validity of the code;
10   whether or not it was a valid code or not.
11   A.   That -- yes.
12   Q.   Okay.  Okay.  By the way, now knowing what you
13   know today, or later would learn, about Expert
14   Systems --
15   A.   Uh-huh.
16   Q.   -- is it fair also to characterize the
17   Autocoder system as an Expert System?
18   A.   No.
19   Q.   Why not?
20   A.   It was simply a numerical check, to check that
21   you had -- as you can imagine, a doctor's office may
22   just put in the -- a wrong digit, transpose some
23   digits.  It was simply to get the code correct.  So it
24   had no thought.  It was just a -- like a spell check;
25   auto -- you know, CPT-4 check.

Page 48

12 (Pages 45 to 48)

KELLI A. DUGAN

1  at Caterpillar in Peoria, may have only contained a
2  few of the first rules that we'd developed. It was
3  done in a modular way. And if you think of each rule
4  as being its own sort of entity, we worked
5  rule-by-rule, and the prototype did not have all the
6  rules.
7      Q. Additional rules would have to be created in
8  order to reach some of the results that
9  Dr. Hertenstein would otherwise have reached himself;
10  is that correct?
11     A. Related to the prototype?
12     Q. Yes.
13     A. Yes.
14     Q. Were you aware any attempts by others to
15  create their own software that would perform this
16  function?
17     A. No.
18     Q. Are you aware today of any other companies
19  that have created their own software to do this?
20     A. No.
21     Q. Is it your belief that HPR and their -- and
22  their successors, are the only people that have such
23  software?
24     A. I have no knowledge of that.
25     Q. While you were working at HPR, and then

Page 89

1      Q. You can answer.
2      A. Autocoder, when -- when I saw it demonstrated
3  in Dick Egdahl's office?
4      Q. Yes.
5      A. My understanding of what I saw in Dick
6  Egdahl's office, this is what Autocoder did, yes.
7      Q. Let me have you to turn to Claim 14.
8         Now, let's see. I'm sorry. Actually, let's
9  look at Claim 2. Sorry to jump back.
10        Let me have you read Claim 2, and I have
11  questions about that, too.
12        (Pause.)
13     A. Okay.
14     Q. You look puzzled.
15     A. I'll probably have to read it again to really
16  get it.
17     Q. Okay.
18        (Pause.)
19     A. Okay. I've read it twice.
20     Q. You still look troubled.
21     A. We can proceed, however.
22     Q. All right. You see -- you see the setoff
23  there where it says, Comprising the steps of, and then
24  it lists one --
25     A. Yes.

Page 91

1  consulting for HPR, did you ever learn of any
2  competing software that competed with CodeReview?
3      A. I don't think so.
4      Q. Did you learn of any companies that were in --
5  that were competitors of -- to HPR?
6      A. I have a memory that there was the thought
7  that GMIS may have been trying to develop something
8  that was related to this. As I told you before, they
9  had already had the Autocoder system, and I think they
10  were aware of what we were doing. And I -- and I
11  think that there was a -- a thought amongst some at
12  HPR that GMIS was -- was trying -- or wanted to create
13  something similar.
14        But, again, it's sort of speculation on my
15  part.
16     Q. Let me -- if you would, turn to Claim 1 of the
17  patent.
18     A. Can you tell me the page?
19     Q. I'm sorry, it's MCK65.
20        I'm going to have you read Claim 1 for me.
21        (Pause.)
22     A. Yes.
23     Q. Okay. Isn't that the function of Autocoder?
24        MR. SHEK: Objection; vague and ambiguous.
25        BY MR. SITZMAN: (RESUMED.)

Page 90

1      Q. -- it lists one, two, three, four, five steps,
2  all of them starting with a verb; receiving,
3  ascertaining, determining, authorizing and rejecting;
4  do you see that?
5      A. Uh-huh.
6      Q. I just wanted you to look at the steps here
7  and confirm for me that these steps, manually, is what
8  Dr. Hertenstein and his staff were doing when they
9  received claims at Caterpillar.
10        MR. SHEK: Objection; vague and ambiguous.
11  Also calls for speculation.
12        BY MR. SITZMAN: (RESUMED.)
13     Q. You can go ahead and respond.
14     A. And I will have to speculate.
15     Q. Based -- based on whatever you know or
16  learned, is it your belief that that is what they were
17  doing with the claims they received manually?
18     A. Probably on some occasions, yes, but I'm not
19  completely sure.
20     Q. What's causing you to hesitate there?
21     A. Because that has such specificity, I'm not --
22  I don't know exactly what their manual method was or
23  how whomever was reviewing the claims, be it
24  Dr. Hertenstein or Peggy Saal, prior to CodeReview,
25  how they thought about exactly what they did.

Page 92

23 (Pages 89 to 92)

1  Q.  Of CodeReview.
2     And -- but for the fact, then, in responding
3  to his question about Autocoder --
4  A.  Uh-huh.
5  Q.  -- is it -- is it your belief, then, that --
6  strike that.
7     MR. SITZMAN:  Can I get her last question read
8  back to me for -- in response to Mr. Shek's last
9  question?
10    THE REPORTER:  "Question:  Do you know whether
11  or not Autocoder had such a predetermined database?"
12    "Answer:  I do not."
13    BY MR. SITZMAN:  (RESUMED.)
14  Q.  Is it clear, though, from your review of
15  Autocoder during that formal demonstration and through
16  your observations that you saw it in use at various
17  customers' facilities or you may --
18  A.  I may have seen it.
19  Q.  -- have seen it --
20  A.  Uh-huh.
21  Q.  -- that it did have the capability or ability
22  to determine whether or not the CPT-4 codes were valid
23  when input by a -- either manually or automatically by
24  the claims processing?
25    MR. SHEK:  Objection; vague and ambiguous.

Page 181

1  entered --
2  A.  Uh-huh.
3  Q.  -- that Autocoder had a database that
4  consisted of all the valid CPT-4 codes, to check that
5  code against?
6     MR. SHEK:  Objection; calls for speculation;
7  incomplete hypothetical.
8     THE WITNESS:  I don't know.  I would suspect
9  that they probably -- they had some sort of database,
10  but I don't know.  I don't know what their system
11  was.
12    BY MR. SITZMAN:  (RESUMED.)
13  Q.  And I understand Mr. Shek was -- wanted to
14  make sure that you had not seen their code, you've not
15  been given source code; you've not seen their manuals
16  and all of that?
17  A.  No.
18  Q.  But based on your experience, your expertise,
19  the work you did do on CodeReview, the coding and
20  everything else --
21  A.  Uh-huh.
22  Q.  -- is it at least based on that experience,
23  your belief that there must have been a database from
24  which the Autocoder system could check to see if it
25  was valid or not valid, the CPT-4 code?

Page 183

1     BY MR. SITZMAN:  (RESUMED.)
2  Q.  In other words, going back to the earlier
3  testimony --
4  A.  Yes.
5  Q.  -- what did you understand the purpose of
6  Autocoder to -- was?
7  A.  Autocoder would allow -- as you can expect,
8  physicians are sending in their claim forms; their
9  office staff is typing up these claim forms, and
10  they're not always going to get the code correct.
11  They may send in a claim that doesn't have a code.  It
12  may only have language.  So, what Autocoder did, was
13  if you typed in a code that was not valid, it would
14  tell you it was invalid.  And it would probably ask
15  you to -- I can't -- you know, I can't remember, but I
16  do know -- my recollection is that it was limited to
17  getting the code, the individual code for the
18  individual procedure correct.
19  Q.  Okay.
20  A.  So that it matched with an actual CPT-4 code.
21  Q.  Based on your knowledge and your expertise and
22  the work that you did on CodeReview --
23  A.  Uh-huh.
24  Q.  -- is it your belief that in order to
25  determine whether or not a valid code had been

Page 182

1  A.  I'm making an -- a guess would be, yes, they
2  had to have something in order to compare the input
3  with, to something that told them whether it was a
4  code or not a code, whether it was -- and it more than
5  likely existed in the form of a database, but I don't
6  know.
7  Q.  Are there other things that it could have
8  existed in?  You saw --
9  A.  Unfortunately, I --
10  Q.  Oh.
11  A.  -- I'm probably un -- as limited as you are in
12  terms of what I know, at least now, about computers,
13  which is pretty pathetic since my name's on this
14  patent.  But I would never be one to presume that I
15  know the universe of possibility in any field, and I
16  certainly didn't then or now.  So, I -- I don't know.
17  Q.  Okay.
18  A.  What I'm saying is, it's most likely that
19  would be the simple way to have done it.
20  Q.  Okay.
21    (Pause.)
22    MR. SITZMAN:  I'm just going to ask one more
23  other follow-up and then --
24    THE WITNESS:  Okay.
25    MR. SITZMAN:  No.  No.  No, not of you.

Page 184

46 (Pages 181 to 184)

EXHIBIT E

REDACTED

EXHIBIT F

# EXPERT REPORT OF RANDALL DAVIS

*McKesson Information Solutions LLC v. The Trizetto Group, Inc*

October 24, 2005

## I.  INTRODUCTION

My name is Randall Davis. I am a Professor of Computer Science at the Massachusetts Institute of Technology. Exhibit A contains a resume providing details of my technical background and experience. I received my undergraduate degree from Dartmouth, graduating summa cum laude, Phi Beta Kappa in 1970, and a Ph.D. from Stanford University in artificial intelligence in 1976.

While at Stanford I was a member of the Heuristic Programming Project, the research group that invented expert systems and produced the first such programs, including DENDRAL, a program for chemistry, and MYCIN, the first medical expert system. My PhD thesis work specified some of the foundational concepts in expert systems, including the notions of explanation and knowledge acquisition.

I came to MIT in 1978, served for five years as Associate Director of the MIT Artificial Intelligence Laboratory, and currently serve as a Research Director in the newly formed 850-person MIT Computer Science and Artificial Intelligence Laboratory.

I have published some 55 articles on issues related to artificial intelligence and have served on several editorial boards, including *Artificial Intelligence*, *AI in Engineering,* and the MIT Press series in AI. I am a co-author of *Knowledge-Based Systems in AI.*

In recognition of my research in artificial intelligence, I was selected in 1984 as one of America's top 100 scientists under the age of 40 by *Science Digest*. In 1986 I received the *AI Award* from the Boston Computer Society for contributions to the field. In 1990 I was named a Founding Fellow of the American Association for AI and in 1995 was elected to a two-year term as President of the Association. In 2003 I received MIT's Frank E. Perkins Award for graduate advising. From 1995–1998 I served on the Scientific Advisory Board of the U. S. Air Force.

In addition to my work with artificial intelligence, I have also been active in the area of intellectual property and software. Among other things, I have served as a member of the Advisory Board to the US Congressional Office of Technology Assessment study on software and intellectual property, published in 1992 as *Finding a Balance: Computer Software, Intellectual Property, and the Challenge of Technological Change*. I have published a number of articles on the topic, including co-authoring an article in the *Columbia Law Review* in 1994 entitled "A Manifest Concerning Legal Protection of Computer Programs" and an article in the *Software Law Journal* in 1992 entitled "The Nature of Software and its Consequences for Establishing and Evaluating Similarity."

From 1998-2000 I served as the chairman of the National Academy of Sciences study on intellectual property rights and the emerging information infrastructure entitled *The Digital Dilemma: Intellectual Property in the Information Age,* published by the National Academy Press in February, 2000.

I have been retained as an expert in over thirty cases dealing with misappropriation of intellectual property, such as the allegations raised in this case. I have been retained by plaintiffs who have asked me to investigate violations of intellectual property, by defendants who have asked me to investigate allegations made against them, and by both sides to serve as the sole arbiter of a binding arbitration. A list of cases in which I have been involved is attached as Exhibit B.

In 1990 I served as expert to the Court (Eastern District of NY) in *Computer Associates v. Altai*, a software copyright infringement case whose decision was upheld by the Appeals Court for the 2nd Circuit in June 1992, resulting in the articulation of the abstraction, filtration, comparison test for software. In the early 1990's I was retained by the Department of Justice for

its investigation of the INSLAW matter. In 1992 (and later in 1995) my task in that engagement

was to investigate alleged copyright theft and subsequent cover-up by the Federal Bureau of

Investigation, the National Security Agency, the Drug Enforcement Agency, the United States

Customs Service, and the Defense Intelligence Agency.

## II. OPINION

I was retained by The TriZetto Group, Inc. ("TriZetto") on September 19, 2005 and have

been asked to perform a detailed analysis of the 5,253,164 patent ("the '164 patent") and any

available prior art.

The opinions I report here are based on the documents I have reviewed (a full list is given

in Exhibit C), and on my knowledge, background, and experience in the field of computer

science and artificial intelligence.

Based on the prior art cited and discussed in detail below, it is my firm opinion that each and

every asserted claim in the '164 patent would have been anticipated by the relevant prior art and

obvious at the time of invention to a person having ordinary skill in the art.[1]

## III. THE '164 PATENT: OVERVIEW

The '164 patent has an effective filing date of September 30, 1988.  Accordingly, the

critical prior art date for purposes of patent invalidity under 35 U.S.C. § 102(b) is September 30,

1987.  The '164 patent recites an application of expert systems technology to the processing of

medical claims expressed in terms of medical service codes. For the purposes of this case an

expert system can be thought of simply as a specific style of computer program: Expert systems

are programs designed to do one specific task (in this case reviewing medical claims), using

---

[1] I take a person of ordinary skill in the art to be someone with an undergraduate degree in Computer Science with at least one course in artificial intelligence, and  at least one year of experience in building expert systems.

(typically) a set of rules that specify the knowledge necessary to do that task, and having that set of rules represented in the system in a way that is distinct from the code that examines the rules and applies them to the task. It is this focus on task-specific knowledge (the rules) and their representation distinct from the code that characterizes expert systems as a specific class of computer program.

The '164 patent contains both method (1, 2, and 16) and apparatus claims (3-15). I begin by considering the method claims. In each case the analysis below focuses on selected language in the claim.

**III.A.  Method Claims**

*III.A.1.        Claim 1*

I take the "predetermined database…containing medical service codes" recited in claim 1 to be a fixed set of service codes containing every code known to be valid at the time the program is run. The remainder of the claim then recites a straightforward check of each code in a claim to determine whether it is not present in the predetermined database, and informing the user if a code is not contained in the database.  Although the claim also includes "relationships among the medical service codes" in the predetermined database, it does not appear that these relationships are utilized to perform the code-checking function described in the claim.

Checking the validity of input data by comparing it against a list of known good values is one of the most fundamental techniques taught in every introductory programming course. It is one way of dealing with a phenomenon that has been recognized since at least the 1960's-era of computing: "Garbage in, garbage out." In other words, if your input data is not good, the results will not be good either; hence the first step always is to check the input to be sure it is good, and reject it otherwise.

This claim appears to recite nothing more than this time-honored aphorism, which is known to be universally applicable to every computer program, including those further specified by the claim elements of a database of medical service codes and a set of relationships.

*III.A.2.     Claim 2*

Claim two recites the means for "determining whether one of the medical service codes in the at least one claim is mutually exclusive due to non-medical criteria with any other medical service code in the at least one claim." The term "non-medical criteria" is not to my understanding a term of art, nor does it appear anywhere in the patent other than the claims.

Appendix B of the patent gives 12 generic categories of "if/then" rules that are applied to multiple codes; Appendix A offers 9 concrete examples of these rules (two examples illustrate two categories of rules each, one category of rule – R4 – has no example). None of these rules relies on anything that may sensibly be termed "non-medical criteria."

Example 1 of Appendix A shows an "Example of 'E1/E2' Rule;" this is clearly a medical criterion for exclusion as it depends on knowing about appropriate uses of local anesthesia. Example 2 relies on a medical criterion involving understanding gynecological procedures. Example 3 relies on a medical criterion involving understanding what a cystoscopy is. Example 4 relies on a medical criterion involving understanding heart catheterization procedures. Example 5 relies on a medical criterion involving understanding the laparoscopy procedure. Example 6 relies on a medical criterion involving understanding the possible complications of a coronary artery bypass procedure. (Examples 7 – 15 involve rules applied to each code individually and hence are not relevant to this claim, which is limited to  "determining whether one of the medical service codes in the at least one claim is mutually exclusive due to non-medical criteria with any other medical service code in the at least one claim.") Example 16 relies on a medical criterion involving understanding the steps involved in repairing a stomach lesion. Example 17 relies on a

medical criterion involving understanding electrocardiograms and their interpretation. Finally, Example 18 relies on a medical criterion involving an understanding of heart catheterization procedures.

As the patent text provides no guidance, I turn to ordinary language. The Oxford English Dictionary has no entry for *non-medical*, except under the generic definition of the prefix *non-*. For *medical* it suggests, among several definitions, the first of which is "Of, relating to, or designating the science or practice of medicine in general, or its practitioners." So presumably a non-medical criteria would be something not relating to the science or practice of medicine.

One possibility is the sort of check found in other medical service code review programs, which check such things as patient gender against gender-specific procedures (e.g., hysterectomy). But this is not covered by claim 2, as it calls specifically for "determining whether *one of the medical service codes* in the at least one claim is mutually exclusive due to non-medical criteria *with any other medical service code* in the at least one claim." That is, it specifies mutual exclusion between medical service codes, not exclusion of a medical service code based on information about the patient.

As the term "non-medical criteria" is not a term of art, and as the claim specifies exclusion between non-medical service codes, claim 2 cannot in my opinion, be sensibly interpreted based on the record available. I reserve the right to supplement my opinion if and at such time as the Court determines the proper construction of claim 2.

### III.A.3.     Claim 16

Claim 16 appears to be quite general, specifying "a set of relationships among the medical service codes defining whether selected ones of the medical service codes are valid when received with other selected ones of the medical service codes" and a method involving "determining whether one of the medical service codes in the plurality of medical service codes

is valid or invalid by interacting with the database and the set of relationships contained in the database"  It does not further specify the form in which those relationships are embodied or on what grounds a code might be considered valid in the context of another code.  I interpret the claim with reference to the body of the patent, which indicates that the "set of relationships" is in fact a set of rules of the form shown in Appendix B, and that the grounds on which a code might be considered valid or invalid include appearing (or not) in the database of all known good codes, and appearing (or not) in one of actual the rules whose general form is shown in Appendix B.

I note also that where claims 1-14 recite the authorizing or rejecting of specific medical procedure *codes*, claim 16 refers to the authorization or rejection of the *claim* in which the medical procedure codes are found.

## III.B.  Apparatus Claims

### III.B.1.    Claim 3

Claim 3 is parallel to claim 16, recited in apparatus form, and focused on acceptance and rejection of medical service codes (rather than claims).

### III.B.2.    Claims 4-9

Claims 4 through 9 are dependent on claim 3, and specify further:

claim 4: means for revising a claim to delete an invalid medical service code

claim 5: means for informing why a claim was revised

claim 6: that the database may contain medical service codes described by CPT codes

claim 7: that the database may contain medical service codes described by CRVS codes[2]

claim 8: means for requesting further information from the user

---

[2] I understand this is the only claim not being asserted by McKesson in this litigation.

claim 9: that the relationships among the medical service codes include medically

determined relationships.

I take the phrase "medically determined relationships" in claim 9 to be any relation

among medical service codes that could have been written only by someone with knowledge of

medicine, in keeping with the analysis above of claim 2.

### III.B.3.     *Claims 10-11*

Claim 10 recites a general means for "determining whether one of the medical service

codes in the at least one claim is included in any other medical service code in the at least one

claim." Example 3 in the body of the patent appears to be one example of such inclusion.

Claim 11 is dependent on 10 and further specifies a means for revising a claim to not

include a rejected medical service code.

### III.B.4.     *Claim 12*

Claim 12 recites a means for determining whether one medical service code is "medically

exclusive with any other medical service code," and the means for rejecting such codes. I take

this to refer to Examples 1, 17, and 18 in Appendix A, as these are the only rules that act on

multiple codes to *exclude* (i.e., reject) a code (rather than, for example, *replacing* it with another

code).

It is unclear how "determining whether one of the medical service codes . . . is medically

exclusive with any other medical service code" differs from the determining element of certain

other claims, particularly Claims 3 and 16 ("determining whether one of the medical service

codes . . . is valid or invalid") and Claim 9 ("relationships among the medical service codes

include medically determined relationships"). These claims appear to significantly overlap in

their functionality.

*III.B.5.*        *Claim 13*

Claim 13 is the apparatus version of claim 1.

*III.B.6.*        *Claim 14*

Claim 14 is the apparatus version of claim 2.

*III.B.7.*        *Claim 15*

Claim 15 is the apparatus version of claim 16, and like claim 15 recites rejecting claims

rather than service codes.


## IV. PRIOR ART

I consider next a number of prior art publications and systems and point out their

relevance to various aspects of the '164 patent, starting with references relevant to expert systems

in general, then turning to those relevant to processing medical claims.[3]

## IV.A.   Expert Systems Prior Art

*IV.A.1.*        *Davis77: Davis, Buchanan, Shortliffe, Production Rules as a Representation for a
Knowledge-Based Consultant Program,* Artificial Intelligence*, 8:15-45, 1977.*[4]

This paper, which I published in 1977, was one of the first expositions of the fundamental

concept and architecture for expert systems. It established several basic concepts, including the

basic architecture (Fig 3 from the paper, reproduced below), the use of simple if/then rules as a

way of capturing non-trivial expertise in a domain (Section 3.2 of the paper), the ability to revise

the rules in the knowledge base (Section 6.3 of the paper), and the concept and mechanism for

having the program explain its results (Section 6.2 of the paper).

---

[3] In the course of preparing this report, I considered prior art references from among a large collection of
publications related to the subject matter of the '164 patent.  *See* Exhibit C.  I also considered textbooks and articles
known to me from my experience in the expert system field and materials uncovered through my own investigation.
[4] For ease of reference later, cited references are given a label composed of the first author's last name and (for
papers) the year of publication appended.

The architecture in Davis Fig 3 specifies the fundamental components of an expert system; the components in Fig 1 of '164 correspond closely. The consultation program of Fig 3 provided the functionality of what the '164 patent calls the user interface and knowledge base interpreter (#2 and #5 in Fig 1 of '164), the knowledge base is labeled identically in both figures, while the task of knowledge acquisition program of Fig 3 is to update and refine the knowledge base, a functionality provided by the history database, #7 in '164 Fig 1.



FIG. 3. The six components of the system: four programs, the knowledge base, and the patient data base. All of the system's knowledge of infectious disease is contained within the knowledge base. Data about a specific patient collected during a consultation is stored in the patient data base. Arrows indicate the direction of information flow.

*Artificial Intelligence* **8** (1977), 15–45

**Fig 3 from Davis 1977.**

The explanation program in Fig 3 above reads directly on claim 5 of '164.

*IV.A.2.*       *vanMelle79: van Melle, W. A domain-independent production rule system for consultation programs, in* Proc. IJCAI-79, *923-925, Tokyo, August, 1979.*

This paper presented a report on what became van Melle's 1980 PhD thesis (Stanford University Computer Science Department). It offered the first concrete demonstration of the idea that expert systems could be built by starting with a "shell," i.e., a system with all of the

components shown in Davis Fig 3 except the knowledge base. The task of building an expert system then became a far simpler one of creating a knowledge base and "plugging it in" to the shell. This was the genesis of the expert system shell business; by 1986 shells were used widely enough to account for a market estimated at $63 million a year.[5]

IV.A.3.     *McDermott82: McDermott, R1: A Rule-Based Configurer of Computer Systems, Artificial Intelligence,* **19**:39-88, 1982.

This paper reported on a very successful and widely known rule-based expert system that had been extensively used in a commercial setting at Digital Equipment Corporation.[6]  The job of this program was to analyze orders being placed for Digital's VAX-11/780 computer systems. These computers were among the first to be highly configurable, i.e., there were a great many user-selectable options (as used to be the case for automobiles). The problem was that there were also numerous interrelations among the options and these interrelations had to be checked in order to ensure that a system built to that specification would actually work. R1 automated this task, doing it considerably faster and eventually more accurately than the human experts who checked orders.

For our purposes here the important elements are the explicit use of a set of relationships, captured as rules, that (among other things) specify tests for whether the objects being analyzed (the options in the order) were compatible, and in the event of conflicts, the system would modify the order so as to resolve the conflict. Consider these excerpts from the paper:

> [Someone checking an order] must have rules that enable him to associate components to form partial configurations and to associate partial configurations to form a functionally acceptable system configuration. These rules must indicate what

---

[5] Artificial Intelligence Market Set To Boom Worldwide, *Software Markets*, 5/23/1986, available from Lexis/Nexis.
[6] The R1 system was well-known in the expert system community during the 1980s and was widely cited in expert system patents and literature.  For example, the Bennett patent, another prior art reference discussed herein, cites to the R1 paper as prior art.  I knew Mr. McDermott and others who worked on R1 at the time they were developing the system and was personally familiar with their work.

components can (or must) be associated and what constraints must be satisfied in order for these associations to be acceptable; I will call this knowledge *constraint knowledge*.

[McDermott 1982 at 41; emphasis in original]

…all of the domain specific that R1 requires to do the task – including domain-specific control knowledge – is contained in productions. Each of R1's productions (rules) embodies a piece of constraint knowledge.

[McDermott 1982 at 45]

[Describing the processing of an order:] It next determines whether all of the components on the order have compatible voltage and frequency requirements, and if not, substitutes components of the appropriate voltage and frequency.

[McDermott 1982 at 50]

The first of these makes it clear that R1 had a set of relationships among the components that it examined, just as '164 has its relationships among medical service codes. Hence this reference reads on all claims of '164 involving a set of relations. The second paragraph above makes it clear R1 captured that knowledge in a set of rules, just as '164 does. The third makes it clear that R1 had rules about and an ability to deal with components that were mutually exclusive; it detected such exclusion and then rejected such components based on its rules, just as '164 deals with mutually exclusive medical service codes. This reads directly on claims 2, 3, 10, 12, and 16 of '164).

The system and technology described in the R1 paper is in my opinion clear prior art to the '164 patent. After R1 the general notion of "order checking" became a widespread application of expert systems technology; among others NCR and Motorola initiated major efforts to build such systems for their product lines in 1984 and 1985.

The R1 paper so directly reads on claim 3 in particular that simply by substituting "computer order" for "claim," and "computer component" for "medical service code," claim 3 would read as a remarkably accurate description of R1:

A computer system including a central processing unit and associated memory for processing input *computer orders* containing at least one *computer component*, comprising:

a predetermined database stored in the associated memory, the database containing *computer components* and a set of relationships among the *computer components* defining whether selected ones of the *computer components* are valid when received with other selected ones of the *computer components*;

means for receiving at least one *computer order*;

means for ascertaining whether the at least one *computer order* contains a plurality of *computer components*;

means for determining whether one of the *computer components* in the plurality of *computer components* is valid or invalid by interacting with the database and the set of relationships contained in the database;

means for authorizing *computer components* which are valid in response to the means for determining; and

means for rejecting *computer components* which are invalid in response to the means for determining.

### IV.A.4.    Bennett Patent: 4,591,983 (filed June, 1984)

The patent describes a particular architecture for an expert system (or knowledge system, a virtually synonymous term), one particularly well suited to describing "things" that can naturally be described in terms of a hierarchy of related components. I say "things" because, while (like R1) the patent uses computer systems as the motivating example, the concept is more general and encompasses other things describable hierarchically, including both tangible things (e.g., cars) and intangible things (e.g., the coverage of an insurance policy). It is for this reason that the patent claims are phrased in terms of "objects" and "assemblies." Like R1, the system described here checks the consistency of the components and if a conflict is detected, either modifies the order or warns the user of the conflict.

Several extracts from the body of the patent make clear its use of these concepts:

In accordance with a preferred embodiment of the invention, a knowledge-based configuration system has separate portions encoding a configuration checking strategy, a description of hierarchical functions of the product to be configured, a catalog of the parts and components which implement those functions, assembly constraints that

check whether a given set of components will successfully implement their respective hierarchical functions. The configuration system applies the assembly constraints during configuration checking and if necessary, warns the user or modifies the given set of components to insure compliance with the assembly constraints.

Col 4, lines 4-16

Once the order is received by the knowledge system 10, the parts in the order are checked for consistency by applying the constraints in the knowledge base (Appendix IV (D))

Col 11, lines 26-29

The constraints also specify the particular action that should be taken in response to whether the conditions are satisfied when the constraints are applied. For the MINI-1000 minicomputer, the order must include at least one RAM-1000 random access memory board, at least one ROM-1000 read only memory board, at least one TERMINAL-1000 computer terminal, and at least one IF-1000 interface board. The action to take when any of these parts is found to be missing is to add one of the respective missing parts, since these parts are essential to the operation of the minicomputer.

Col 11 lines 31-41

If the number of RAM-1000 cards plus the number of ROM-1000 cards exceeds seven, the user must be told that he has ordered too many memory cards. This kind of constraint is called a warning constraint in contrast to the previous modification constraints which require the working configuration of parts to be changed.

Col 11, lines 55-61

For constraints that modify the contents of the current bin, the system provides a special form for specifying a list of parts to add to, delete from, or replace the contents of a bin

Col 23, lines 62-65

As the quotes make clear, the Bennett patent describes a system that:

1. reviews the configuration of something (as '164 does)

2. uses a database of components that can be part of a configuration (cf. the medical service codes in the database in '164)

3. uses a set of rules that specify relationships among the components (as in '164)

4. is capable of adding or removing components from the configuration (as in claims 4 and 11 of '164)

5. is capable of warning the user when a necessary relationship among the components is not satisfied (as in claims 1 and 13 of '164).

*IV.A.5.*      *Hardy Patent: 4,803,641 ( effective date June 6, 1984) (cited during patent prosecution)*

This patent describes some of the basic technology for an expert system building tool, i.e., a program whose task is to aid in building an expert system. A physician, for example, might use this tool to allow him/her to construct an expert system to diagnose a class of diseases, without having to learn to be a programmer.

For our purposes here the central element of interest appears in Figs 9-12 of the patent, described at Col 10, line 18-33. This is the format of an IF/THEN rule of the sort widely used in expert systems, and detailed earlier in Section 3.2 of the Davis 1977 reference discussed above. Both of these references demonstrate that both the structure and function of IF/THEN rules in expert systems had been well established long before the '164 patent.

*IV.A.6.*      *Gallant Patent: 4,730,259 (filed Mar 1, 1985)*

The Gallant patent describes an expert system in which the inference engine is controlled by a matrix of learning coefficients (i.e., a set of numbers) that can be learned from examples. The intent here is to ease the task of constructing an expert system, because:

> In the prior art, rules are generally constructed for an expert system by either having a human expert provide the rules in a form suitable for the rule base or by having another person generally known as a knowledge engineer convert the information from an expert into appropriate rules. It is often the case that a human expert in a particular area has difficulty formulating his or her knowledge as a set of rules. The process of generating and perfecting a set of rules has been universally recognized as the most time consuming, difficult, and expensive process involved in building an expert system. It is frequently difficult to reduce expertise to a set of rules.

> Various approaches have been tried to ameliorate the problem of generating rules for a expert system. One approach is to create a "user friendly" interface to ease the human task of adding new rules as described in Buchanan, B. and Shortliffe, Rule-Based Expert Systems, Addison Wesley, 1984, Chapter 9.

> Col 1, line 63 – Col 2, line 10.

Chapter 9 of Buchanan and Shortliffe is an abbreviated version of an article I wrote, it explains the traditional process of knowledge acquisition as "interactive transfer of expertise," essentially the relationship between a mentor and student.

Both of these references (i.e., the patent and the Davis article it cites) establish that the task of building expert systems was widely understood by the early 1980's as one of as collecting knowledge from human experts.

*IV.A.7.     Dormond Patent: 4,839,822 ( filed Aug 13, 1987)*

This patent covers an expert system that provides suggestions for treatment for physical trauma (e.g., broken bones). For our purposes here the most relevant element is the patent's recitation of the standard architecture for expert systems:

> The expert system in accordance with the present invention provides the user with one or more suggested treatments for a patient with physical trauma. The system includes a computing device having a memory, a plurality of databases in the memory, an application program and an inference engine program.
>
> Col 2, lines 57-60

While the terms of art have changed slightly over the years, the "consultation program" mentioned in Davis 1977 (above), the "knowledge interpreter" in the '164 patent, and the "inference engine" mentioned in '822 all refer to the same thing: the core component of an expert system that uses the knowledge in the knowledge base, applying it to the example at hand. The term "inference engine" has come to be the dominant term and is now the standard way to refer to this component.

Given that understanding, this patent, like Davis 1977 cited above, indicates that the basic architecture of an expert system was well established in the years before the '164 patent.

**IV.B.  Medical Claims Processing Prior Art**

*IV.B.1.*      *Egdahl87: Egdahl, Hertenstein, An Access-oriented Negotiated Fee Schedule: The Caterpillar Experience*, Annals of Surgery, **206**:349-357, *Sept 1987 (also presented at meeting of the American Surgical Assn, Palm Beach, Fl, 21-23 April 1987)*[7]

This paper, co-authored by one of the inventors of the '164 patent, Dr. Hertenstein, describes in detail the system used by Caterpillar Corp. to reimburse surgeons.[8]  The article describes the background and motivation for the approach Caterpillar uses, the details of the process, the savings it produces, and the larger policy issues surrounding the impact such a system can have on both patients and the willingness of surgeons to participate.

For our purposes the important thing is the discussion in the section entitled "Continual audit and recoding of physician bills." This section lays out in detail the process used by Caterpillar in auditing claims and possibly revising the medical service codes they contain. While the system described in this article is a manual system, the article discloses almost every important element found in the '164 claims.

Consider the following excepts (pages 349, 351-352):

CAT claims processors subject each incoming physician bill to a coding analysis of CPT-4 codes as a first step, and recode claims where irregularities are found. Obvious simple coding errors are corrected first.

This reads directly on claims 1 and 13, as the most obvious simple coding error is to use a medical service code not found in the database. "Recoding" implies that codes were changed,

---

[7] It is my understanding that the Egdahl87 and AMS references (described below) were in the possession of the patentee at the time the patent was filed.  It is my expert opinion that these references are highly material to the subject matter of the patent.  I have been informed that such material references should have been disclosed by the patentee in connection with the patent application.

[8] In his deposition in this case, Dr. Hertenstein testified regarding Egdahl87 and confirmed that the components of his manual process are discussed in the article.  Hertenstein Deposition, pp. 45, 51-52.  Dr. Hertenstein also confirmed that the tables in the article show CPT-4 codes which had been rejected due to unbundling or upcoding errors.  Hertenstein Deposition, pp. 58-59.

meaning some could be added while others were deleted; hence this reads on claims 4 and 11 of '164.

> …the patient is informed of CAT's review decision.

This reads directly on claims 1, 5, and 13, insofar as those claims deal with informing a user of the system's changes to the claim.

> …operative reports are requested for most surgical claims and follow-up calls to provider offices for clarifying information are common.

This reads directly on claim 8, "means for requesting further information from a user regarding the at least one claim."

> Individuals with clinical knowledge and judgment then compare the provider's description of services with submitted codes…

This reads on all claims containing the phrase "a set of relationships among the medical service codes defining whether selected ones of the medical service codes are valid when received with other selected ones of the medical service codes," as this is precisely what is supplied by the "clinical knowledge and judgment" possessed by those individuals. It also reads on claims 9 and 12 of '164, as the "clinical knowledge and judgment" is of course medical information concerning the relationship among codes.

> CPT-4 codes are recoded for greater accuracy, when indicated, surgical services that have been incorrectly bundled are rebundled, and the appropriateness of surgical assistance charges is reviewed

This reads on claims containing the phrase "determining whether one of the medical service codes in the plurality of medical service codes is valid or invalid by interacting with the database and the set of relationships contained in the database," (namely claims 3, 15, and 16) , as is exactly the action carried out by the CAT personnel doing the recoding. This excerpt also

reads on claims containing more specific versions of the same phrase, including: claim 2, "determining whether one of the medical service codes in the at least one claim is mutually exclusive due to non-medical criteria;" claim 10, "determining whether one of the medical service codes in the at least one claim is included in any other medical service code;" claim 12, "determining whether one of the medical service codes in the at least one claim is medically exclusive with any other medical service code;" and claim 14, "determining whether one of the medical service codes in the at least one claim is mutually exclusive due to non-medical criteria." Finally, the explicit mention of CPT-4 codes reads on claim 6 of '164.

The article then goes on to supply several concrete examples of the process, showing how recoding can be done effectively by using clinical knowledge and judgment in the form of knowledge about relations between medical service codes:

> In Table 4, the appropriate payment is $1000 for code 38100. The patient was hospitalized for an elective splenectomy. The CAT reviewer would disallow codes and charges for all except the splenectomy: a charge for laparaotomy and incidental appendectomy is warranted only if done as a separate procedure and preoperative check and postoperative care are conventionally part of the global surgery fee.

> Under most conditions, one surgeon can perform a brea[s]t biopsy. The operative report indicates no unusual circumstances. The assistant surgeon is not reimbursed, and the patient is informed of CAT's review decision.

> In Table 6 … The procedure was actually a simply wart removal. The operative report described a 0.25 inch plantar wart on one foot. Excision combined with the use of the laser constitutes excessive treatment for this common condition. Wart removal is most accurately coded as 17100 ("destruction by any method of benign skin lesion").

Finally, the paper offers examples of rules used by CAT personnel to limit the payment amounts for various procedures, illustrating exactly the sort of rules shown in Example 16, Appendix A of the patent, an example of a type L1 rule:

> Once the claim reviewer is satisfied that enough information is available to code the bill consistent with CAT procedures, recoding is finalized, and the correct codes are compared with established regional fee schedules.

A charge of $1000 for the splenectomy is in line with the regional fee schedule and is the amount ultimately approved.

CAT knows that four local experienced, board-certified cardiac surgeons will carry out a three-vessel coronary artery bypass for $5000, assuring that access can be achieved for that fee (Table 7).

In Table 5, the appropriate payment is $750 to the primary surgeon for code 19121 (excision biopsy, breast, bilateral).

There is no question that virtually all of the fundamental elements in the patent are revealed in this paper. While the Caterpillar system described is manual, it contains the core of the matter covered in the patent, for the entirely plausible reason that it was written by one of the inventors, describing the very system that they automated.

In addition, given the state of the art of expert systems in the mid-1980's – namely a well-known and routine technology -- the paper provides all it would take for someone with routine skill to have created the system described in the patent.

*IV.B.2.        AMS: Advanced Medlogic Systems, from The Health Data Institute*

AMS, as it was known, was developed by The Health Data Institute ("HDI"), then of Lexington, MA in the early 1980's, and by 1986 was being marketed and sold to insurance companies to enhance their claims processing systems.  One of the inventors of the '164 patent, Dr. George Goldberg ("Goldberg"), testified at his deposition in this case that he had worked with AMS while employed by HDI in 1985 and 1986.  Goldberg Deposition, pp. 51-52, 62-63. He described AMS as "a series of computerized tables, lookup tables, that received, processed and paid claims."  Goldberg Deposition, p. 51-52.  Dr. Goldberg stated that the tables reported discrepancies such as "age/procedure discrepancies, age/diagnosis discrepancies, sex/procedure discrepancies, sex/diagnosis discrepancies."  *Id.*, pp. 63-65.  Dr. Goldberg also stated that AMS was a "system . . . for looking for the occurrence of certain codes or code combinations" (*Id.*, p.

265), but observed that the "tables could have been modified to have two procedure codes and a lookup table that would indicate some unbundling." *Id.*, p. 389.

A marketing pamphlet describing AMS, entitled "Setting a New Standard," contains the following relevant descriptions of the AMS system:[9]

> Beginning at the individual claim level, AMS organizes and evaluates provider claims, *first checking for the validity of values* and then *cross-checking for consistency of information and accuracy* of data items.
>
> An AMS accuracy edit at the individual claim level, for example, flags a claim with a rare combination of procedure and age – such as a coronary artery bypass performed on a 12-year-old – and investigates it for possible coding errors.
>
> At subsequent levels, AMS merges hospital and physician claims for both in patient and outpatient procedures related to an illness.
>
> If, for example, the hospital's diagnoses are pneumonia and diabetes and the physician's diagnosis is a stroke, *AMS automatically flags the claim for further review* to determine which diagnoses are correct.
>
> … *AMS reviews the case automatically and a payment decision is made based on clinical data and medically accepted standards* of care.
>
> *AMS also merges and evaluates ambulatory care claims for volume and appropriateness of services.* A patient with gall gladder disease, for example, who has had a complete set of X-rays prior to elective hospitalization for gall bladder surgery does not need to have them performed again upon admission.
>
> *If AMS flags a claim, a number of review methods can be used to resolve and eventually adjudicate the claim.*
>
> *An AMS accuracy edit under review may require a telephone query to the appropriate physician or hospital, for example.*
>
> [emphases added]

As these quotes make clear, the AMS system:

- checked the validity of the codes entered: "checking for the validity of values" (cf. '164 claims 1 and 13)

---

[9] HDI was acquired by Caremark in 1985, then in mid-1987 Caremark was in turn acquired by Baxter, Inc. While the pamplet is not dated, the last page describes HDI as "a Caremark company," indicating it was written in and describes AMS as of the 1985 to mid-1987 time period. I obtained this pamphlet and the other AMS documents referenced herein through my own investigative efforts undertaken while preparing this report. I understand that additional AMS documents have been produced in this litigation. *See* MCK 047505-047606, MCK 047608-047619.

- had a set of relationships among the codes it examined that defined whether one of the codes was valid when input with other codes: "cross-checking for consistency of information" (cf. '164 claim 3 and all others relying on a set of relationships)

- automatically reviews the claim and applies knowledge about medical relations among the codes: "AMS reviews the case automatically and a payment decision is made based on clinical data and medically accepted standards," "AMS also… evaluates ambulatory care claims for volume and appropriateness of services." (cf. all '164 claims involving medically determined relations)

- can request additional information from the user: "An AMS accuracy edit under review may require a telephone query" (cf. '164 claim 8).

An extract from a June 1986 HDI document describes in detail the claim editing rules that were the heart of AMS's expertise. The page labeled 1 in the document shows the basic rule for validating the accuracy of data; note that the system "Checks individual data elements and compares each with a list of acceptable single numbers, letters, and/or ranges. Values outside these ranges are not acceptable," and "For each variable listed, a specified set of acceptable values is provided" (cf. '164 claims 1 and 13).

The pages labeled 6-7 in the document shows an editing rule that (a) deals with multiple medical procedure codes in a claim ("there must be at least two procedures on the claim to perform this edit"), and (b) uses a set of relationships among the medical procedure codes to accept or reject the claim (cf. '164 claims 15 and 16).

The page labeled 8 in the document shows another example of a set of relationships among medical procedure codes being used to accept or reject a claim, in this case relying on

medical knowledge about the relation between surgical procedures and diagnoses (cf. '164 claims 9 and 12).

The page labeled 12 in the document shows an editing rule for comparing the diagnosis and the patient's age, showing the use of a rule of the sort classified in the '164 patent as an EA or Q7 rule. The page labeled 13 in the document shows an editing rule that compares procedures and patient age, almost an exact match to the EA and Q7 classes of rules in the '164 patent.

Pages labeled 14 and 15 in the document show AMS checked for medical relations between procedures (or diagnoses) and patient age. To the extent the claim 2 of '164 is regarded as dealing with patient age (as a "non-medical" criterion), this shows a prior system using that concept.

Pages labeled 17 and 18 in the document show AMS checked the procedure and diagnosis against place of service, a rule almost identical to the EP and Q5 classes of rules shown in Appendix B of '164.

Additional examples in the document show AMS used medical knowledge to check length of stay (pages labeled 20-27).

Pages labeled 28-30 show AMS used medical knowledge to check charges to ensure that they were within the expected range, an example of what the '164 patent calls an L1 or a Q3 rule.

Page 31 of the document explicitly mentions the use of CPT codes "(Only CPT-4 procedure codes will be edited"), (cf. '164 claim 6).

Page 32 shows yet another use of medically determined relationships among procedure codes being used to authorize or reject a claim, in this case "procedures and tests which should only occur once in a claim" (cf. '164 claim 3 and others referring to "a set of relationships").

Finally, page 33 shows the AMS system could accept or reject part of a claim based on its medical knowledge about the number of practitioners necessary for uncomplicated procedures, yet another example of medically determined relationships among procedure codes.

A letter from a Senior Scientist at HDI, written May 28, 1987, following up on a marketing call to the Health Claims Division of State Farm Insurance demonstrates that the AMS system was being actively marketed and sold in mid-1987, and that both the marketing pamphlet and an AMS Product Overview, dated May 1986, were openly distributed ("Please feel free to share this information with anyone in your organization who might be interested in them.")

The documents from HDI describing the AMS system provide what I believe to be compelling evidence of prior art that anticipates or renders obvious many of the claims of the '164 patent.

*IV.B.3.*      *Doyle Patent: 5,070,452 (effective date June 30, 1987)*
         *Mohlenbrock Patent: 5,018,067 (filed Feb 16, 1984)*

These two patents describe systems that deal with medical codes and offer some basic ability to accept or reject those codes. For our purposes here the important part of the Doyle patent is its description of a system that allows the physician to enter both diagnosis codes and procedure codes, which it then checks in some basic ways, illustrating the general concept of checking both claims and medical codes:

> Block 95 indicates that the physician enters a code identifying the diagnosis (sprained wrist). Block 97 indicates that the physician enters up to ten "procedure codes", which refer to the treatments for a sprained wrist selected by the physician. Blocks 101 and 104 indicate that the diagnosis and procedure codes are now transmitted via a local telephone call to the administration computer 3. Block 106 indicates that a check is made to verify that the codes received are actually existing, and not fictitious, codes. Block 109 indicates that the administration computer searches the data base for plan ABC and calculates the reimbursement specified by the employer for each treatment. Block 112 indicates that these reimbursements are under the employer's control, and will be discussed later in more detail.

Col 5, lines 42-58

The sentence "Block 106 indicates that a check is made to verify that the codes received are actually existing, and not fictitious, codes" reads directly on claims 1 and 13 of '164 ("determining whether any medical service code contained in the at least one claim is not present in the predetermined database").

The sentence "Block 109 indicates that the administration computer searches the data base for plan ABC and calculates the reimbursement specified by the employer for each treatment" illustrates the idea of a system that knows the appropriate level of reimbursement, as illustrated in Example 16 of Appendix A of the '164 patent.

The Mohlenbrock patent describes a system that aids a doctor in selecting an appropriate diagnostic related group (DRG), a form of encoding that aggregates the more than 10,000 ICD (International Classification of Diseases) codes into several hundred codes that describe patients with similar diagnoses and similar hospital resource usage. For our purposes the important part of the patent is its description of rejecting DRGs that are inappropriate, and the notion that claims editing can be automated. The first of these is found at Col 10 Line 60 – Col 11, line 2:

> …the processing steps 47-65 of FIG. 2 examine the list of related DRGs that are in the DRG database record for the current Working DRG. Those related DRGs that cannot fit this patient because the sex or age do not match are eliminated. Also, any DRGs with the same Content Code as the working DRG are eliminated since only one DRG of a doublet or triplet can be relevant.

This reads on claims in '164 that recite the notion of "a set of relationships among the medical service codes defining whether selected ones of the medical service codes are valid when input with other selected ones of the medical service codes."

The second is found at Col 12, lines 37-66:

> Once discharged, the patient chart and the physician determined DRG number are sent to the medical records clerical department of the hospital where ICD-9 codes are

identified for all the diagnoses and procedures in accordance with usual techniques. But the medical records clerk now has the physician determined DRG with which to compare. Additionally, form A1 will alert the medical records clerk to additional C.C.s that may be relevant. Further, if the DRG text in the DRG database is expanded, the medical records clerk has the text of the Working DRG as an aid.

In fact, this comparison can be automated, as shown in FIG. 5 wherein a comparator 91 receives as one input 93 the DRG number determined by the physician in accordance with the procedure of FIG. 4 using the computer system of this invention. The second input 95 is a DRG number determined by running a prior art Grouper program 97 which operates from a plurality of ICD-9 code numbers identified by the medical records clerk. A system can even be used that would respond directly to each ICD-9 code inputted to it by the medical records clerk and indicate at the output of the comparator 91 when enough ICD-9 codes have been entered so that the DRG that is calculated by the Grouper program is the same as that determined by the attending physician.

This provides background indicating that the notion of automating the claims editing process was a part of the prior art as of 1984.

IV.B.4.    *Bernier86: Bernier, Clinical Evaluation: The Next Step in Claims Processing,* Best's Review Life/Health Insurance Edition, *April 1986, pp 106-127*

This article lays out a plan for clinical evaluation of claims and anticipates several central elements in the '164 patent. It begins by describing the overall organization of a system to manage hospitalization:

An automated system designed to monitor and manage a hospitalization encounter with the goal of controlling costs would be divide into three stages: automated pre-certification, concurrent utilization review and automated claims editing.

We are of course interested here in the automated claims editing component:

The final module, automated claims editing, would audit the claim prior to payment to assure that clinical, resource utilization and financial components are within bounds and reasonable. Clinical edits evaluate the interrelationships among age, sex, principal and secondary diagnoses and procedures.

This reads on the '164 claims using the phrase "a set of relationships among the medical service codes defining whether selected ones of the medical service codes are valid when input with other selected ones of the medical service codes."

The article goes on to say

Thus, clinical editing would identify clinical inconsistencies in a claim and cause removal from the claims adjudication process prior to payment.

This reads on the claims of '164 involving any form of inconsistency among the medical service codes (patent claims 2, 10, 12, 14, 15, and 16), as well as those indicating rejection of medical service codes (patent claims 2, 3, 4, 10, 14) or medical claims (patent claims 15 and 16).

The article makes the case that clinical editing is a crucial function, highlighting the value of creating such a system:

The clinical-editing function is critical because the determination of appropriate comparative norms will be based on the clinical information. … Further, … clinical editing is essential in order to determine the appropriate DRG assignment.

The article also suggests that clinical editing is already being done, in 1986:

Sophisticated clinical editing systems exist which identify problems such as:
- Conflicts between a patient's age and sex and their diagnosis or procedures
- Procedures performed which are not justified by the patient's diagnosis
- Noncovered procedures
- Diagnosis indicating surgery, in which no surgery was performed
- Clinically unreasonable length of stay.

The article also points out that

The system optionally could produce an initial DRG, length-of-stay limitations, reasonable charge limits for room, board and ancillary charges that are specific to that hospital… Based upon the results of this analysis, a reviewer could approve or deny the admission or request additional information.

This reads on claim 8 of '164, the means for requesting additional information from the user. Finally, the article indicates that

> The automated system described here could exist as an integrated system, or each module could be utilized separately. It could run on microcomputers in individual claims offices or be integrated into an existing claims-payment system on a large mainframe computer. Sufficient technological alternatives exist today to accommodate the needs of organizations of any size.

This makes it clear that the functionality for claims editing that the functionality for claims editing outlined earlier in the article could easily be built as a standalone system, as suggested in '164.

*IV.B.5.      Numerous Brief Articles Dealing with Claims Editing*

Eight short articles from trade publications are briefly relevant to the analysis of the '164 claims. I lump them together for the sake of simplicity and extract from each just the relevant quote(s).

Anon85: ____, Enhancing Accuracy and Timeliness is Integral to the Claims Adjudication Process, *Employee Benefit Plan Review,* Dec 1985, pp 10-12.

This article describes the process of clinical editing, giving several examples:

> …when data on age, sex, effective dates, and cancellation date are entered into the computer system certain red flags can be built into the system to warn that a covered individual is near or past eligibility status.
>
> Age edits will alert claims adjusters to those participants who are over age 65 and eligible for Medicare, and will identify students age 19 to 23 or whatever limitations might be under the plan.
>
> It will identify X-ray and lab work that is not consistent with the diagnosis, which is an indication of preventative medicine, or defensive medicine, or financing a Rolls Royce.

To the extent that '164 claim 2 is interpreted to mean taking into account such things as age, gender, etc. (which I have argued against above), this reference demonstrates that such

accounting of age, etc., was an established concept in the prior art in 1985. The example above concerning X-rays and lab work also indicates that the concept of "a set of relationships among the medical service codes defining whether selected ones of the medical service codes are valid when received with other selected ones of the medical service codes" is also present in this article. The article also mentions a variety of different coding systems, including CPT, RVS, ICD, and DRG, demonstrating that dealing with all of these codes was anticipated in 1985.

Snyder87: Snyder, The leading edge of expert systems, Software Review, **12**:22-30, Autumn 1987.

    This article reviews applications of expert systems in the insurance industry, notably mentioning the ExClaim system by Policy Management Systems Corporation, which

> …completely automates the health claims adjudication process.
>
> The claims examiner prompts ExClaim by entering basic claim information, such as the claimant's name and address, dates of service, amounts of charges, provider information, diagnoses, procedures performed, and category of service (office visits, inpatient or outpatient surgery, etc.). Based on all that data, ExClaim then determines the resultant payment or final reconciliation of the claim…
>
> The system contains an underlying base of knowledge regarding how to operate in the claims industry.

    The article thus indicates that there was another system similar to that described in '164 already in use no later than Autumn 1987.

Stachura87: Stachura, Software reference guide: DRG assignment, J American Medical Record Assn, **58**:33-40, January 1987.

    This article provides a brief list of systems that fall in the general category of DRG assignment software. Examples with particular relevance to '164 include:

> PQDM contains a DRG grouper and is design to provide complete and accurate information for coding and grouping purposes. The system promotes coding accuracy by *detecting selection errors, determining the potential for more specific codes,*

*prompting for additional clinical data*, and presenting legitimate reporting options. *As many as 600 edit checks per case are conducted* to ensure that codes conform to coding principles, UHDDS definitions, Medicare edit checks, and clinical concepts.

P. 34 (emphasis added). The emphasized text above indicates that this system appears to have had the ability to check for codes not in the set of approved codes (cf. claims 1 and 13 of '164); replace one code with another based on a set of relationships among the codes, in this case a relation of generality/specificity (cf. claim 3 of '164); asking for additional data (cf. claim 8 of '164). The reference to 600 edits also makes it clear that this was a substantial system, even in January, 1987.

A second relevant system in the list is Clinical Data Editor by Honeywell Information Systems: "The Clinical Data Editor system evaluates the consistency of coded data via more than 25 code edits and assigns DRGs based on edited data." P. 37. This illustrates another system capable of editing medical codes that was operational in prior to January 1987. While the description is brief, the claim that the system "evaluates the consistency of coded data via more than 25 code edits" reads on claims 1, 3, 8, and 13.

Huertas88: Huertas-Cortocarrero, Concurrent clinical review: Using microcomputer-based DRG software, Health Policy, **9**:211-217, 1988. (Also presented at the October 1987 EHPF-WHO Meeting in Brussels.)

The relevant portions of this paper describe the Clinical Review System (CRS), pointing out that it had the following properties:

An on-line DRG Grouper *calculates DRG assignments from the ICD9-CM codes*.

*CRS points out when a non-specific code must be replaced by an ICD-9-CM code of greater specificity, and when the presence of a complication/co-morbidity code affects the DRG.*

The system can help improve the accuracy and completeness of medical records. *Problems with clinical data (e.g., diagnoses inconsistent with sex) and DRG assignment*

*(e.g., manifestation code listed as principal diagnosis) are found by the CRS clinical data editor.*

[emphasis added]

The text emphasized above makes it clear that:

- CRS worked on and manipulated medical codes,

- CRS had a set of relationships among medical codes that it used to replace codes that were too general with codes that were more specific (cf. '164 claim 3 and others)

- that it had a set of relationships among medical codes that it used to recognize complications that affected the choice of DRG code (cf. '164 claim 3 and others)

- that it could recognize codes inconsistent with patient data (cf. '164 claims 2 and 14, assuming "non-medical" refers to issues such as patient gender, age, etc.) and

- that it could recognize codes that were medically exclusive with other codes (cf. '164 claim 12)

Nathanson85: Nathanson, Experts: More research needed to set value of code programs, Modern Healthcare, **15**:98-102, June 21, 1985

This article discusses a number of coding programs. Relevant observations include:

Code editor software *checks codes to ensure they're appropriate for Medicare reimbursement, detecting diagnoses that aren't specific and finding procedures and diagnoses that don't match* and would be rejected by Medicare.

[emphasis added]

The highlighted text makes it clear that when this article was written in 1985 there already existed programs doing medical code editing, checking code validity (cf. '164 claims 1 and 13), checking code specificity (cf. '164 claim 3 and others), and detecting codes that were mutually exclusive (cf. '164 claim 12).

Gonnella84: Gonnella, Staging of Disease, A Case-Mix Measurement, JAMA, **251**:637-644, February 3, 1984.

This article provides an overview of a research effort aimed at "staging" diseases, i.e., categorizing the severity of a disease. For our purposes the interesting information concerns their software:

> A computer software system has been developed to employ staging on large-scale databases. An individual patient record from a computerized discharge abstract file is read by the program and systematically searched for the principal and associated diagnoses. … the software *will overrule the principal diagnosis* listed *if it is a complication or manifestation of a secondary diagnosis*, *according to the medical criteria.* For example, neuropathy is considered a manifestation of diabetes mellitus by the software when both conditions are listed on a discharge abstract, regardless of the order in which they appear.
>
> [emphasis added]

The emphasized text shows that this program had and used a sizable body of knowledge about the medical relationship between medical conditions (cf. '164 claims 9 and 12).

Dornfest84: Dorenfest, Computers can figure out DRGs, if you can figure out computer market, Modern Healthcare,**14**:130-136, February 15, 1984.

This brief article provides a snapshot of the confusing state of the medical software market in early 1984 as the effects of changes in Medicare regulations was being felt. For our purposes the important point appears in this text:

> But even using Code Finder, a hospital isn't assured of the *consistency of clinical data* and the resulting diagnosis. For this purpose *a hospital can acquire the Clinical Data Editor* marketed by Health Systems International. *This product identifies erroneous or missing diagnosis and procedure codes.*
>
> [emphasis added]

The highlighted text above makes it clear that as of February 1984 when this article was written, there already existed a program capable of detecting erroneous procedure codes (cf. '164 claims 1 and 13.

Carter, End of PIP will prompt hospitals to try software to speed billing, Modern Healthcare, **17**: 62-68, Feb 13, 1987.

This brief trade article describes yet another system, operational in early 1987, capable of modifying medical codes by relying on knowledge about the relationships among the medical codes:

> …ENSEMBLE lets hospitals collect information for billing while the patient is in the hospital receiving treatment… The software keeps track of the patient's DRG throughout his stay and *alerts the hospital if his case should be classified under another DRG*.
>
> [emphasis added]

While somewhat general, the emphasized text indicates the existence of a system in early 1987 that, like the '164 patent, examined medical records and reasoned about codes.

## V.  CLAIM CHART

The chart below summarizes the discussion above of prior art.

| Asserted Claims of the '164 patent | Relevant Prior Art Reference |
|---|---|
| 1 | Bennett patent, Egdahl, AMS Brochure, AMS rules, Doyle patent, Stachura84, Nathanson85, Dornfest84 |
| 2 | Egdahl87, McDermott82, AMS rules, Bernier86, Anon85, Huerta88 |
| 3 | McDermott82, Bennett patent, Egdahl87, AMS brochure, Bernier86, Stachura84, Huertas88, Nathanson85 |
| 4 | Bennett patent, Egdahl87, Bernier86 |
| 5 | Davis77, Egdahl87 |
| 6 | Egdalh87, AMS rules, Anon85 |
| 8 | Egdahl87, AMS brochure, Bernier86, Stachura84 |
| 9 | Egdahl87, AMS rules, Hertas88, Gonella84 |
| 10 | Egdahl87, AMS rules, Bernier86, Huertas88, Nathanson85, McDermott82 |
| 11 | McDermott82, Bennett patent, Egdalh87 |
| 12 | Egdahl87, AMS rules, Bernier86, Huertas88, Nathanson85, Gonella84 |
| 13 | Egdahl87, AMS brochure, AMS rules, Doyle patent, Stachura84, Bennett patent, Nathanson85, Dornfest84 |
| 14 | McDermott82, Egdahl87, Bernier86, Huertas88 |
| 15 | Egdahl87, AMS rules, Bernier86 |
| 16 | Egdahl87, AMS rules, Bernier86 |

## VI.  THE STATE OF THE ART OF EXPERT SYSTEMS CIRCA 1986.

As my CV suggests, I have been involved in the field of expert systems in general and expert systems applications in medicine roughly from the time that work first began in the mid 1970's. My PhD thesis and subsequent publications helped to establish some of the fundamental properties of expert systems, and over the years since I have been involved creating systems in a variety of areas, including medicine, geology, financial planning, and others. For the decade from 1980 to 1990 I routinely consulted to variety of commercial companies in their efforts to

build expert systems, giving lectures that taught them about the technology and aiding in system construction.

Based on this extensive background and participation in the field from the earliest days I can offer a number of opinions with considerable confidence. First, by the mid 1980's expert systems technology was well understood and widely used: A 1985 paper by Buchanan (Buchanan85) lists 46 commercial applications of expert systems in a variety fields and more than 350 research papers from the field, without including articles in the popular press or trade magazines. While a plethora of research papers may not by itself establish that a field is well understood, the abundant commercial application of the technology establishes clearly that it was well understood and that its application was routine.

Second, as dates in the references in Buchanan85 imply, medical applications of expert systems were among the very first.  Hence the notion of applying expert systems to problems in medicine was a routine notion by the early 1980's. A paper I wrote in 1986 (Davis86), describing the variety of fields to which the technology has been applied indicates "Medicine has been a rich source of examples and challenging problems for these systems." A 1984 book by Clancey and Shortliffe (Clancey84) , entitled *Readings In Medical Artificial Intelligence: The First Decade,* provides additional evidence of the early (from 1974 onward) and important role of medical applications as a domain and provides 20 papers describing computerized medical systems.

Third, some of the medical applications that had been built by 1986 were considerably more difficult technologically than medical claims processing. Programs like Mycin and Internist (see Clancey84, chapters 5 and 8) aimed at doing medical diagnosis, a task that was not nearly as well understood as medical claims processing.  Building systems like Mycin and Internist

required basic research into understanding how doctors reasoned and how (and perhaps whether) a computer could be made to reason similarly.

Fourth, after the creation of R1 (McDermott82), the notion of configuration checking was understood to be an important, tractable task, as evidenced by the number of commercial companies that built systems variously termed configuration checking or order checking. It was also understood to be a broadly applicable task, as illustrated by the interest in it by companies as diverse as NCR (computers) and AIG (insurance) (Buchanan85). Indeed, as noted above, R1 as a system maps so well into the subject matter of '164 that with the slightest of word substitutions, one of the claims of '164 becomes an accurate description of R1.

Fifth, in terms of methodology, it was routine practice to find a task that people knew how to do and build an expert system to automate that task.[10]  This was so routine a methodology that I came to call it "intellectual cloning" in the numerous talks I gave to consulting clients in the early 1980's describing expert systems. The idea was to ensure that the task of building the system involved only the (smaller) technical challenge of creating the knowledge base, not the (sometimes) major challenge of trying to understand a process no one yet understood (e.g., how physicians manage to diagnose an illness).

Sixth, the references cited earlier, notably Egdahl87 and Bernier86, make it abundantly clear that claims processing and editing was one of those tasks that was in fact well understood, as indeed it would have to have been in order to put to work the staff tasked with reading, evaluating, and revising claims.

Seventh, as a consequence of the routine character of expert system applications, the well-understood nature of claims processing and editing, and the standard methodology of the

time, combining claims editing of the kind disclosed in Egdahl87 and expert systems technology would have been obvious to anyone having ordinary skill in the art at the time.  Automation of a well-described manual claims editing process, such as the one disclosed in Egdahl87, would have been obvious to a person skilled in the art.

Eighth, even absent the methodology, several references suggest combining the clinical editing process with computing in general and expert systems in particular:

| | |
|---|---|
| Snyder, C., *From research to reality: the leading edge of expert systems,* Insurance Software Review, **12**, Autm., 1987, 22-4, 26-7, 30 | States the benefits of automation:  "ExClaim increases productivity in a number of areas.  One of these is volume. . . Another benefit is a reduction in errors and an increase in consistency among examiners, due to the fact that the system makes the same decisions the same way every time.  Further . . . 'the need for high-level examiners should be reduced and an examiner with less experience should be able to do a higher volume and quality of work than before.'  Finally, productivity gains are achieved through the product's PC orientation."  P. 26-27.<br><br>Describes impact of workstation environment on future of insurance data processing:  "The workstation environment [of PALLM, Inc.] . . . will instead address the administration that currently takes place at the desks of clerks and managers.  It will serve to gather intelligence, guide the user through company procedures, and make routine decisions automatically. . . When PALLM's workstation environment evolves from research to reality, its impact on insurance data processing is expected to be dramatic."  P. 30. |
| Egdahl, M.D. and Hertenstein, M.D., *An Access-oriented Negotiated Fee Schedule:  The Caterpillar Experience*, Ann Surg., 206(3), pp. 349-57 (Sept. | "[The CAT process] can also be used (after eligibility is certified and benefits are coordinated) by claims processing systems."  P. |

---

[10] For example:  "A refrain that occurs over and over in the current literature on building commercial knowledge-based systems is to select a problem and a design that can be solved using available technology. . ." Weitzel, J.R., et al., *A Company / University Joint Venture to build a knowledge-based system,* MIS Quarterly, **12:**23-24, Mar1988.

| 1987). | 353. |
| --- | --- |
| U.S. Pat. No. 4,667,292 (Mohlenbrock patent) | "One technique for increasing the likelihood of accuracy and cost-effectiveness in working with the new Medicare DRGs is to incorporate it into a computer system."  Col. 3, lines 42-45.<br><br>Suggests automated comparison of two DRG numbers from different sources:  "In fact, this comparison can be automated, as shown in FIG. 5 wherein a comparator 91 receives as one input 93 the DRG number determined by the physician in accordance with the procedure of FIG. 4 using the computer system of this invention.  The second input 95 is a DRG number determined by running a prior art Grouper program 97 which operates from a plurality of ICD-9 code numbers identified by the medical records clerk.  A system can even be used that would respond directly to each ICD-9 code inputted to it by the medical records clerk and indicate at the output of the comparator 91 when enough ICD-9 codes have been entered so that the DRG that is calculated by the Grouper program is the same as that determined by the attending physician."  Col. 12, lines 48-62. |
| Gibbons PS, Pishotta FT, Stepto RC, *A system for reporting gynecologic procedures.  A linguistic-logical approach,* Journal of Reproductive Medicine, March 1983, Vol. 28 (3), pp. 201-5 | Suggests potential for accuracy in automated system in encoding and reporting:  "The automated system for encoding gynecologic procedures developed at Chicago Lying-In Hospital represents a step in the direction of 'softening' and yet controlling entry of technical medical information by standard input personnel.  The use of a logical-linguistic network, allowing each procedure to be characterized in a number of ways, offers great flexibility to local managers as well as the potential for accuracy in procedure encoding and reporting."  P. 205. |
| Miller KM, Wisnicki HJ, Buchman JP. Riley MJ, Repka MX, Taylor HR, Guyton DL, *The Wilmer Information System.  A classification and retrieval system for information on diagnosis and* | Suggests future development of interactive error checking software:  "Maryland Medicare and Blue Cross/Blue Shield implemented policy changes in July 1986 to automate and expedite the processing of claims.  The most noteworthy |

| | |
|---|---|
| *therapy in ophthalmology,* Ophthalmology, March 1988, Vol. 95 (3), pp. 403-9 | requirement was that all submitted claims would have to include an ICD-9 code before being processed . . . Interactive error checking software, similar to that used for direct entry, also will be developed.  Until then, a data entry operator receives one copy of the customized coding sheet and enters the data manually."  P. 408.<br><br>Discusses importance of coding scheme: "[T]he trend in future years is likely to be in the direction of consolidation.  This trend will permit a greater pooling of resources at the hardware/software level, and provide better access to information for all those involved in patient care.  The key to the success or failure of any medical information system is its coding scheme."  P. 409 |
| U.S. Pat. No. 4,730,259 (Gallant patent) | Suggests the need for human experts in prior art:  "In the prior art, rules are generally constructed for an expert system by either having a human expert provide the rules in a form suitable for the rule base or by having another person generally known as a knowledge engineer convert the information from an expert into appropriate rules.  It is often the case that a human expert in a particular area has difficulty formatting his or her knowledge as a set of rules.  The process of generating and perfecting a set of rules has been universally recognized as the most time consuming, difficult, and expensive process involved in building an expert system.  It is frequently difficult to reduce expertise to a set of rules."  Col. 1, line 63 – Col. 2, line 6. |

Ninth, once the general idea has been suggested, Bernier86 and Egdahl87 between them

offer almost a roadmap for implementing such a system.  Bernier86 lays out the ideas in general,

explaining what such a system should do and why, while Egdahl87 describes the types of claim editing rules used in the '164 patent.[11]

Tenth, the software written to implement the patented invention (a portion of which is disclosed in Appendix D of the '164 patent) was not, in itself, novel. Ms. Kelli Dugan, one of the inventors of the '164 patent, testified that two programs were used to create the patented product: a programming language called Clipper and a database program called dBase III. Dugan Deposition, pp. 71, 76. Both of these were well-known, commercially available software programs and would have been obvious choices for creating an automated claims editing system. On my initial review of the software in Appendix D of the patent, it appears to be a straightforward implementation of an expert system.

Eleventh, as of 1986 there was at least one other system in commercial use doing what appears to be the identical task, namely the AMS system from HDI cited earlier. The description in the brochure ("Beginning at the individual claim level, AMS organizes the evaluates provider claims, first checking for the validity of values and then cross-checking for consistency of information and accuracy of data items. … AMS uses medical protocols to clinically identify inconsistent claims…") and the detailed claims editing rules contained in the June 1986 document indicate that AMS did what the '164 patent describes.

---

[11] It should be noted that the full set of specific claim editing rules that is supposed to reside in the predetermined database is never disclosed anywhere in the '164 patent. The patent discloses only some general types of claim editing rules, supported by a few examples. Much of the same information is found in Egdahl87.

## VII.    THE INVENTOR TESTIMONY SUPPORTS MY CONCLUSIONS

The testimony of the named inventors of the '164 patent supports the conclusions in this report.  During their depositions, the inventors Donald Holloway ("Holloway"), Robert Hertenstein ("Hertenstein"), George Goldberg ("Goldberg") and Kelli Dugan ("Dugan") each testified as follows:[12]

Novelty

The inventors testified that many aspects of the patented system were covered by the manual process used by Dr. Hertenstein.  Dr. Hertenstein himself testified that his manual process covered all the steps of Claims 1, 2, 3 and 10.  *See* Hertenstein Deposition, pp. 195-198, 199-204, 205-207, 208.[13]  Hertenstein also testified that the "claims in this patent generally describe using a computer and a database to do what [I] did manually at Caterpillar." Hertenstein Deposition, pp. 209-210.

In discussing whether the claims reflected Hertenstein's manual process, Holloway also testified that the "determining" steps of Claims 1, 2, 3 and 10 were all a part of Hertenstein's manual process.  See Holloway Deposition, pp. 268-270.  Holloway further testified that Hertenstein's manual process covered all the steps in Claim 10, and that these steps were not novel because they were part of Hertenstein's manual process.  Holloway Deposition, pp. 276-277, 279-281.

---

[12] Depending on how the Court construes the patent claims, there may be issues as to whether each of the named inventors actually contributed to at least one patent claim.  I reserve the right to supplement my report should inventorship become an issue in view of the Court's claim construction.

[13] Goldberg also testified that the steps described in Claims 2 and 3 were covered by Hertenstein's manual process. Goldberg Deposition, pp. 300-303, 311-313.  Dugan further testified that Claim 1 covered the function of Autocoder.  Dugan Deposition, pp. 90-91.

Goldberg stated in a letter to an Aetna employee that "anybody can go through the coding book [CPT-4 Manual] and identify a large number of decision rules."[14]  Goldberg Deposition, p. 230.

<u>Knowledge by Others of System and Functionality</u>

Several other companies and persons were aware of Hertenstein's system for processing claims.[15]  Holloway testified that the concepts of unbundling code checks and incorrect code checks were presented to others at a Pew conference in mid-1986.  See Holloway Deposition, p. 76.  Holloway also testified that as early as March of 1986, the idea of creating software to catch CPT-4 coding errors had been discussed.  See id, at p. 62.

Aetna was another company that knew about the system.  Hertenstein testified that "we had a meeting with Aetna later in 1987 where we had a prototype of what we were developing and showed it to them. . ."  Hertenstein Deposition, p. 102;  see also, Holloway Deposition, pp. 28-30.[16]  Hertenstein also testified that Armco knew about the system, based upon HPI's proposal to Armco in March of 1987 and Armco's acceptance of that proposal.[17]  See Hertenstein Deposition, p. 150, and Exhibit No. 139 to Hertenstein Deposition, Volume I.[18]

---

[14] Goldberg also agreed that as of January 1988, there were "many self-evident, logical examples of procedure codes that could be identified by going through the coding book."  Goldberg Deposition, p. 231.

[15] Hertenstein also testified that he gave talks or presentations describing unbundling or other coding errors during the 1985-1987 time period.  Hertenstein Deposition, p. 43.

[16] Hertenstein also testified that in July of 1987, HPI was talking to Aetna about creating software that would essentially replicate Hertenstein's manual claims processing system.  Hertenstein Deposition, p. 104.

[17] Another company that knew about Hertenstein's manual system was Blue Cross Blue Shield of Michigan ("BCBS-MI").  Hertenstein further discussed the work done for BCBS-MI in analyzing their claims, and his interaction with Wally Maher, benefits manager for Chrysler and BCBS in Detroit.  Hertenstein Deposition, pp. 142-143; see also, Holloway Deposition, pp. 28-30.

[18] See also, Holloway Deposition, p. 307, discussing proposals to Armco and Weyerhauser.

## VIII.  CONCLUSION

As a consequence of all of the above, it is my firm opinion that each and every claim in the '164 patent would have been anticipated by the prior art cited herein and obvious at the time to a personal having ordinary skill in the art.

I reserve the right to modify or supplement my views stated herein in the event any information is brought to my attention relating to this matter of which I am not currently aware.

_____

Randall Davis

October 2005

# EXHIBITS

Exhibit A: Davis Resume

Exhibit B: List of prior cases and publications

Exhibit C: Materials Examined

**EXHIBIT A**

**RANDALL DAVIS RESUME**

Randall Davis received his undergraduate degree from Dartmouth, graduating summa cum laude, Phi Beta Kappa in 1970, and received a PhD from Stanford in artificial intelligence in 1976.

In 1978 he joined the faculty of the Electrical Engineering and Computer Science Department at MIT, where from 1979-1981 he held an Esther and Harold Edgerton Endowed Chair. He later served for 5 years as Associate Director of the Artificial Intelligence Laboratory. He is currently a Full Professor in the Department, and a Research Director of CSAIL, the newly-formed Computer Science and Artificial Intelligence Laboratory that resulted from the merger of the AI Lab and the Lab for Computer Science. He and his research group are developing advanced tools that permit natural multi-modal interaction with computers by creating software that understands users as they sketch, gesture, and talk.

Dr. Davis has been one of the seminal contributors to the field of knowledge-based systems, publishing some 50 articles and playing a central role in the development of several systems. He serves on several editorial boards, including Artificial Intelligence, AI in Engineering, and the MIT Press series in AI. He is the co-author of Knowledge-Based Systems in AI, and was selected in 1984 as one of America's top 100 scientists under the age of 40 by Science Digest. In 1986 he received the AI Award from the Boston Computer Society for his contributions to the field. In 1990 he was named a Founding Fellow of the American Association for AI and in 1995 was elected to a two-year term as President of the Association. In 2003 he received MIT's Frank E. Perkins Award for graduate advising. From 1995–1998 he served on the Scientific Advisory Board of the U. S. Air Force.

Dr. Davis has been a consultant to several major organizations, including Digital Equipment Corp, IBM, Aetna, and Schlumberger, and has been involved in the founding of three software companies.

Dr. Davis has also been active in the area of intellectual property and software. In 1990 he served as expert to the Court in Computer Associates v. Altai, (775 F. Supp. 544 (E.D.N.Y. 1991); 982 F 2d 693) a case that produced the abstraction, filtration, comparison test for software copyright. He served on the panel run by the Computer Science and Telecommunications Board (CSTB) of the National Academy of Science in 1991 that resulted in Intellectual Property Issues in Software, and served as a member of the Advisory Board to the US Congressional Office of Technology Assessment study on software and intellectual property that was published in 1992 as Finding a Balance: Computer Software, Intellectual Property, and the Challenge of Technological Change. A 1994 paper in the Columbia Law Review analyzed the difficulties in applying intellectual property law to software and proposed a number of remedies.

He has served as an expert in a variety of cases involving software, including the investigation by the Department of Justice of the Inslaw matter (40 Fed. Cl. 843; 1998 U.S. Claims), where he investigated allegations of copyright theft and cover-up by the Federal Bureau of Investigation, the National Security Agency, the Drug Enforcement Agency, the United States Customs Service, and the Defense Intelligence Agency.

From 1998-2000 he served as the chairman of the National Academy of Sciences study on intellectual property rights and the information infrastructure entitled The Digital Dilemma: Intellectual Property in the Information Age, published by the National Academy Press in February, 2000.

Dr. Davis has appeared on *The Macneil/Lehrer Report* and *Innovations* (WNET, NY), and played a major role in *This Computer Thing*, a pilot for an educational series (WGBH, Boston) about personal computers. He has been quoted in articles in *The New York Times, The Wall Street Journal, Business Week, The Economist, The Boston Globe, High Technology*, and *Psychology Today*. Interviews have appeared in *Computerworld* and on National Public Radio's *All Things Considered*.

# EXHIBIT B

## RANDALL DAVIS:  CASES, IP PUBLICATIONS, AND TECHNICAL

## PUBLICATIONS

*Computer Associates v. Altai*, CV 89-011 EDNY
775 F. Supp. 544 (E.D.N.Y. 1991); 982 F 2d 693
Rule 706 expert to the court (testified)
copyright concerning IBM operating systems software.
Case appealed; appeal court decision create the Abstraction, Filtration, Comparison test.

*Daly et. al v. IECA et al.*, 90 CIV 0588 NY
consultant to plaintiff; settled
copyright concerning proxy vote counting software

*Quotron v. ADP*, 91 CIV 6526, NY
consultant to defendant, settled
software copyright concerning brokerage office software

*Goal Systems v. J. W. Bennett Co.*, C2-90-681 SD Ohio
consultant to plaintiff (deposed); settled
copyright involving mainframe job scheduling software

*Gates Rubber, Inc., v. Bando American, Inc.*, 92-S-136 CO
expert for plaintiff (deposed, testified)
copyright and trade secret involving industrial belt design software

US Department of Justice investigation, 1994
consultant to the DOJ on its re-investigation of the INSLAW matter
investigated alleged copyright theft and cover-up by the FBI

*International Business Machines Corporation vs. Fujitsu Limited*
American Arb. Assoc. Case No. 13T-117-0636-85
consultant to plaintiff
copyright concerning IBM operating systems

*Logica North America v. Intelsat*, AAA Case No. 16 117 00084 92M
expert for plaintiff (testified)
breach of contract involving satellite communications scheduling software

*American Airlines, Inc. v. ICOT Corporation*, CA-4-91-305-A; Dallas TX
consultant to plaintiff
copyright involving terminal control software

*Unix Systems Laboratories, Inc., v. Berkeley Systems Design, Inc.,* Civ. 92-1667, CA
consultant to defendant
copyright of Unix operating system software


*Bitstream, Inc., et al. v. SWFTE Int'l Ltd*, CV93-11068H, Boston MA
consultant to plaintiff
copyright concerning computerized type face software


*Data General Corp. v. Grumman Data Systems Corp*., Civ 93-40087-GN, NY
consultant to defendant
copyright concerning hardware diagnostic software


*Systems Engineering Associates v. IMED Corp*, CV91 3583, AL
consultant to defendant
copyright involving medical instrumentation software


*Lotus v. Borland,* 90-11662K Boston, MA
consultant to defendant
copyright concerning the Key Reader capability in Quattro


*Mitek Holdings, Inc. v. Arce Engineering*, 91-2629 SD FL
expert for plaintiff (deposed, testified)
copyright concerning architectural and structural design software


*Mitek Holdings, Inc v. Merlyn Industries, Inc.,* 91-2631 Dallas, TX
consultant to plaintiff; settled
copyright concerning architectural and structural design software


*Fonar Corp v. Deccaid, et al*., CV 91-3805, NY
consultant to defendant (deposed)
copyright concerning medical instrumentation software


*Star Technology, Inc v. Tultex Corporation, et al*., 3-91-CV-1067-X, Dallas, TX
consultant to defendant (deposed)
copyright concerning factory automation software


Re-examination of Compton's New Media Patent 5,241,671
consultant to patent holder
patent concerning multimedia presentation


*Florida Software Services Inc., v Citicorp Information Resources Inc, et al.*,
Seminole County, FL, 91-893-CA-16-K
consultant for defendant; settled
trade secret and copyright concerning retail banking software

*Quarterdeck Office Systems, Inc. v. Weinstein et al.,* CD of CA, 95-1564 LGB
consultant to defendant; settled
copyright and trade secret regarding Internet navigation software


*E. S. Cadd, Inc., v. Greiner, Inc*., Middle District of FL, 94-1829-CIV-T-24C
consultant to defendant
copyright of engineering software for air traffic control

*Trilogy Development Group v. Teknowledge Corp*, CA
consultant to defendant, settled
software patent concerning configuration software

*Sitrick v. Nintendo of America*, Inc, N D Illinois 94 C5515
consultant to defendant (deposed); settled
software patent concerning game software

*INSLAW Inc., v. The United States of America*, Court of Federal Claims 95-338X
expert for the defendant (deposed, testified)
copyright concerning database software
investigated alleged copyright theft by the FBI, National Security Agency, Drug
Enforcement Agency, US Customs Service, and the Defense Intelligence Agency.

*Cadence Design Systems, Inc., v. Avanti! Inc*, C 95-20828 RMW, CA
expert for plaintiff (deposed, filed under seal); case settled in 2002 for $265 million
software copyright concerning computer aided design software

*Automated Tracking Systems v. Great American Insurance Company*
American Arbitration Association Case 53 195 00090 95
consultant to plaintiff
software copyright concerning database software

*MicroStar v. Formgen Inc, et al*., 96-3435h(CM), SD of CA
consultant to defendant; appeal affirmed defendant
software copyright concerning game software

*Computer Aid v Hewlett Packard Company*
consultant to defendant; deposed
software copyright and trade secret regarding network analysis software

*Commonwealth of MA v. Ellis*
consultant to defendant; testified in evidentiary hearing
criminal case; issues involving electronic search and seizure

*Boron LePore & Associates Inc., v. DigiNet LLC, Miller, Freed, Crooks, Wood and Lilley*
Sole arbitrator in binding arbitration.

Trade secret regarding meeting planning software

*Computer Sciences Corp et al. v Policy Management Systems Corp et al.*
Expert witness for defendant; testified in arbitration hearing
Trade secret concerning software for analysis of bodily injury insurance claims

Excelergy Corporation v. OPG EBT Holdco Inc., and EBT Express
consultant to plaintiff
copyright and reverse engineering of software for the electric power industry
settled

*IMS Health, Inc. v. Vality Technology, Inc.*
consultant to plaintiff; deposed; case settled
copyright and trade secret regarding database cleaning software

GUS v Boaz et al., *Case No. H-01-1674*
consultant to defendant
copyright regarding freight forwarding software

Norwest Corporation v. IRS Commissioner
expert witness for IRS, testified
research and experimentation tax credit for software

*LinkCo v. Fujitsu*, 00 Civ 7242 (SAS)
expert witness for defendant, deposed, testified at trial
trade secret issues in investor relations/corporate disclosure software

*Florida Power and Light v IRS Commissioner*, Docket No. 5271-96
consultant to IRS; case settled
research and experimentation tax credit for software

*Amadeus Global Travel v. Orbitz, LLC et al.,* C.A. No. 02-1542-SLR
consultant to defendant; case settled
software for the travel industry

*J. D. Edwards World Solutions Company, et al., v. Mayer Electric Supply Company*
AAA Case 30-181-0018403
consultant to plaintiff; testified at arbitration
supply chain management software

*Nastel Technologies, Inc., v. BMC Software, Inc.,* AAA Case 70-117-00306-01
consultant to plaintiff; deposed, testified at arbitration
copyright regarding middleware

*The SCO Group, Inc, v. International Business Machines,* 2:03CV0294 DAK (Utah)
expert for defendant; ongoing

Davis Exhibit B                                                                B–4

copyright regarding operating systems

## Intellectual Property Publications

Davis R, The Digital Dilemma, *Communications of the ACM*, February, 2001, pp.77-83. Overview of the report cited below.

Davis R, et al, *The Digital Dilemma: Intellectual Property in the Information Age*, National Academy Press, Washington DC, 2000.
A 340-page report and study prepared for the National Academy of Science's Computer Science and Telecommunications Board. I served as chair of the committee that produced the report.

Samuelson P, Davis R, Kapor M, Reichman J, A Manifesto Concerning the Legal Protection of Computer Programs, *Columbia Law Review*, Vol 94, December 1994, pp.1401-1524.

Davis R, The nature of software and its consequences for establishing and evaluating similarity, *Software Law Journal*, **V**:299-330, April 1992.

Davis R, Viewing Intellectual Property as Design, *Chemical Design Automation News*, Vol. 6, Number 6 (Part I) and Vol. 6, Number 7 (Part II), June 1991.

Davis R, Intellectual Property and Software: The Assumptions are Broken, *Proceedings of the World Intellectual Property Organization Worldwide Symposium on the Intellectual Property Aspects of AI*, pp.101-119, March 1991, Stanford, CA

## Technical Publications

### 1. Books

Davis R, and Lenat D B, *Knowledge-based Systems in Artificial Intelligence,* McGraw-Hill, 1982.
English reprint in Taiwan, 1984.
Japanese language edition, 1992.

Davis R, et al., *The Digital Dilemma: Intellectual Property in the Information Age*, National Academy Press, 2000.

### 2. Papers in Refereed Journals

1. King A, and Davis R, The Curious Bands of Talbot, Amer J *Physics* **139**:1195-1198, Oct 1971.
   This paper reported work done as a senior thesis while an undergraduate at Dartmouth.

2. Shortliffe E H, Davis R, Axline S, Buchanan B G, and Cohen S, "Computer-Based Consultations in Clinical Therapeutics: Explanation and Rule Acquisition Capabilities of the MYCIN System," *Comp and Biomed Research*, **18**:303-320, August 1975.
   **Reprinted in:**
   *Cognitive Science,* Sheehy and Chapman (eds.), Edward Elgar Publishing Ltd, 1994.

3. Wraith S, Aikins J, Buchanan B, Clancey W, Davis R, Fagan L, Hannigan W, Scott A, Shortliffe E, vanMelle W, Yu V, Axline S, and Cohen S.,"Computerized Consultation System for Selection of Antimicrobial Therapy," *American Journal of Hospital Pharmacy*, **33**:1304-1308, December 1976.

4. Scott A C, Clancey W, Davis R, and Shortliffe, E H, Explanation "Capabilities of Rule-Based Consultation Systems" *Am Jnl of Computational Linguistics*, Microfiche 62, 1977.
   **Reprinted in:**
   *Rule-Based Expert Systems*, Shortliffe & Buchanan(eds.), Addison Wesley, 1984.

5. Davis R, Buchanan B G, and Shortliffe E H, "Production Rules as a Representation in a Knowledge-based Consultation System," Artificial Intelligence, **8**:15-45, February 1977.
   **Reprinted in:**
   *Context-Directed Pattern Recognition and Machine Intelligence Techniques,*Pao & Ernst, eds., IEEE Press, 1982.
   *Readings in Medical AI,* Clancey & Shortliffe (eds.), Addison Wesley, 1984.*Readings in Knowledge Representation,* Brachman & Levesque, eds., 1985.
   *Computer-Assisted Medical Decision Making,* (Vol 2), Reggia & Tuhrim (eds.), Springer-Verlag, 1985.

6. Yu V, Shortliffe S, Wraith S, Davis R, Scott A, Buchanan B, Axline S, and Cohen S, "Evaluating the Performance of a Computer-Based Consultant," *Computer Programs in Biomedicine,* **9**:95-102, 1979.

7. Davis R, "Interactive Transfer of Expertise:  Acquisition of New Inference Rules," *Artificial Intelligence,***12**:121-157, 1979.

**Reprinted in:**
*Readings in Artificial Intelligence,* Webber & Nilsson, eds., Tioga Press. *Rule-Based Expert Systems* Shortliffe & Buchanan (eds.),  Addison Wesley, 1984.

8. Davis R, "Meta-rules: Reasoning about Control," *Artificial Intelligence,* **15**:179-222, 1980.
   **Reprinted in:**
   *Comtex Scientific Database,* four different subject-based collections.

9. Davis R, "Content-reference: Reasoning about Rules," *Artificial Intelligence,*  **15**:223-240, 1980.

10. Smith R G, Davis R, "Frameworks for Cooperation in Distributed Problem-Solving," IEEE Transactions on SMC, pp. 61-70, January 1981.
    **Reprinted in:**
    *Readings in Distributed AI,* Bond & Gasser (eds.), Morgan Kaufman Pub.

11. Davis R, Smith R G, "Negotiation as a Metaphor for Distributed Problem-Solving *Artificial Intelligence,* **20**:63-109, 1983
    **Reprinted in:**
    *Readings in Distributed AI,* Bond & Gasser (eds.), Morgan Kaufman Pub.

12. Davis R, "Reasoning from First Principles in Electronic Troubleshooting," *Intl Jnl Man-Machine Studies,*  **19**:403-423, 1983.
    **Reprinted in:**
    Developments in Expert Systems, Coomb (ed.), Academic Press, 1984.

13. Davis R, Shrobe H E, "Representing Structure and Behavior of Digital Hardware," *IEEE Computer,* Special Issue on Knowledge Representation, pp. 75-82, Oct 1983.

14. Davis R, "Diagnostic Reasoning Based on Structure and Behavior," *Artificial Intelligence,* 24:347-410, December 1984.
    **Reprinted in:**
    *Qualitative Reasoning About Physical Systems,* Bobrow (ed.), North Holland, 1984.*Tutorial:* VLSI Testing &Validation Techniques, Reghbati (ed.), IEEE Computer Society Press, 1985.*Building Blocks of AI,* Feigenbaum (ed.), Addison Wesley, to appear.

14. Davis R, "Knowledge-Based Systems," Science," **231**:957-963, 28 February 1986.

15. Davis R (ed.), "Expert Systems: How Far Can They Go," *AI Magazine,*  Part I—**10**:1, Spring 1989, pp61–68; Part II— **10**:2, Summer 1989, pp. 365–78.

16. Buchanan B, Bobrow D, Davis R, McDermott J, Shortliffe E, Knowledge-based systems, *Advances in Computer Science 1989,* J. Traub (eb.), volume 4, pp.  395–416,  Annual Reviews Inc., Palo Alto, CA.

17. Davis R, "A Tale of Two Knowledge Servers," *AI Magazine,*12:3, Fall 1991, pp.  118-120.
    **Reprinted in:**
    *Nikkei AI,* 1991 (Japanese translation)

18. Davis R, Shrobe H, Szolovits P, "What is a Knowledge Representation," *AI Magazine,*  14, #1, Spring 1993, pp.  17–33.

20. Davis R, "Retrospective on `Diagnostic reasoning based on structure and behavior," *Artificial Intelligence,* 59(1993)139–157.

21. Davis R, Buchanan B, Shortliffe E, "Retrospective on 'Production rules as a representation for a knowledge-based consultation program'," *Artificial Intelligence,* 59(1993)181–189.

22. Trice A, Davis R, Heuristics for reconciling independent knowledge bases, *Information Systems Research,* Vol 4, #3, pp. 262–288, September 1993.

23. Stahovich T, Davis R, Shrobe H, Generating multiple new designs from a sketch, *Artificial Intelligence* (104)1-2 (1998) pp. 211-264.

24. Stahovich T, Davis R, Shrobe H, Qualitative Rigid Body Mechanics, *Artificial Intelligence* (119) 2000 pp. 19-60

### 3. Proceedings of Refereed Conferences

1. Davis R, "Knowledge Acquisition in Rule-Based Systems: Knowledge about Representations as a Basis for System Construction and Maintenance," Proceedings of Workshop on Pattern-directed Inference Systems, published as *Pattern Directed Inference Systems,* Waterman & Hayes-Roth (Eds), Academic Press, 1978, pp. 99-134.
   **Reprinted in:**
   Context-Directed Pattern Recognition and Machine Intelligence Techniques, Pao & Ernst, (eds.) IEEE Press., 1982.

2. Davis R, "Interactive Transfer of Expertise: Acquisition of New Inference Rules," *Proc 5th IJCAI,* pp. 321-328, August 1977.

3. Davis R, Buchanan B G, "Meta-level Knowledge: Overview and Applications," *Proc 5th IJCAI,* pp. 920-928, August 1977.
   **Reprinted in:**
   *Rule-Based Expert Systems,* Shortliffe & Buchanan (eds.), Addison Wesley, 1984.*Readings in Knowledge Representation,* Brachman & Levesque, (eds.), 1985.

4. Davis R, "Generalized Procedure Calling and Content-Directed Invocation,"*Proceedings of Symposium on Artificial Intelligence and Programming Languages,* SIGART–SIGPLAN combined issue, pp. 45-54, August 1977.
   **Reprinted in:**
   *Comtex Scientific Database*

5. Davis R, "A Decision Support System for Medical Diagnosis and Therapy Selection," *Proc of Conf on Decision Support Systems,* appearing as Data Base (SIGBDP Newsletter), **8**:58-72, Winter 1977.
   **Reprinted in:**
   *Comtex Scientific Database*

6. Buchanan B G, Davis R, Yu V, Cohen S N, "Rule-Based Medical Decision Making by Computer," *Proc MEDINFO,* 1977.

7.  Smith R G, Davis R, "Distributed Problem Solving: The Contract Net Approach," Proc of the 2nd Nat'l Conf of the Canadian Soc for Computatnl Studies of Intelligence, pp. 278-287, July 1978.

8.  Smith R G, Davis R, "Cooperation in Distributed Problem Solving," *Proc of the IEEE Int'l Conf on Cybernetics and Society,* pp. 366-371, October 1979.

9.  Davis R, "Dealing with Uncertainty Chairman's abstract for invited panel," *Proc 6th IJCAI,* pp. 1101-1102, August 1979.

10. Davis R, Austin H, Carlbom I, Frawley B, Prucknik P, Sneiderman R, Gilreath J A, "The Dipmeter Advisor: Intepretation of Geological Signals," *Proc 7th IJCAI,*    Vancouver, Canada, pp. 846-849, 1981.

11. Davis R, Shrobe H, Hamscher W, Wieckert K, Shirley M, Polit S, "Diagnosis Based on Structure and Function," *Proc AAAI-82,* Pittsburgh, PA, pp. 137-142, August 1982.
    **Reprinted in:**
    *Artificial Intelligence in Maintenance,* J. Richardson (ed.), Noyes Publications, Park Ridge, NJ, 1985.

12. Dove W, Meyers C, Oppenheim A, Davis R, Kopec G, "Knowledge Based Pitch Detection," *Proc ICASSP-83,* pp. 1348-1351, April 1983.

13. Simmons R, Davis R, "Representing and Reasoning about Change," *Proc. ACM SIGART Conference on Motion: Representation and Perception,* Toronto, April 1983.

14. Shirley M, Davis R, "Generating Distinguishing Tests from Hierarchical Models and Symptom Information," *Proc. IEEE Int'l Conf on Computer Design,* Oct 1983.

15. Davis R, "Diagnosis via Causal Reasoning: Paths of Interaction and the Locality Principle," Proc AAAI-83, pp. 88-94.  August 1983. Nominated as Best Paper of the conference.
    **Reprinted in:**
    *Artificial Intelligence in Maintenance,* J.  Richardson (ed.), Noyes Publications, Park Ridge, NJ, 1985.  Qualitative Reasoning About Physical Systems, Weld and deKleer (eds.), Morgan Kaufman, San Mateo, CA, 1990.

16. Hamscher W, Davis R, "Diagnosing Circuits with State: An Inherently Underconstrained Problem," Proc AAAI-84, pp. 142-147, August 1984.

17. Davis R, "Expert Systems: What To Do Until the Theory Arrives," *Proc IJCAI-85*, pp. 1306-1307, August 1985.

18. Davis R, "Robustness and Transparency in Intelligent Systems in National Academy of Sciences report:," *Human Factors in Automated and Robotic Space Systems,* pp. 211-233, February, 1987.
    **Reprinted in:**
    *Proceedings of Third Australian Conference on Applications of Expert Systems,* pp. 143-164, New South Wales Institute of Technology, Sydney, Australia, May 1987.

19. Shirley M H, Wu P, Davis R, Robinson G, "A Synergistic Combination of Test IEEE Generation and Design for Testability," *Proceedings 1987 International Test Conference,* Computer Society Press, September 1987, pp. 701-711.

20. Simmons R G , Davis R, "Generate, Test, and Debug: Combining Associational Rules and Causal Models in," Proc IJCAI--87, Morgan Kaufman Pub, August 1987, pp. 1071-1078.

21. vanBaalen J and Davis R, "Overview of an approach to representation design," *Proc AAAI-88,* August 1988, pp. 392-397.

22. Davis R, Form and Content in Model-Based Reasoning, Proceedings IJCAI-89 Workshop on Model-Based Reasoning, August 1989.

23. Davis R, Viewing Intellectual Property as Design, *Chemical Design Automation News,* Vol. 6, Number 6 (Part I) and Vol. 6, Number 7 (Part II), June 1991.

24. Trice, A, and Davis, R, "Consensus Knowledge Acquisition," *Proc 6th Banff Knowledge Acquisition for Knowledge-Based Systems Workshop,* pp. 33.1-33.20. (Available through SRDG Publications, Dept. of Computer Science, University of Calgary, Calgary, Alberta, Canada, T2N 1N4)

26. Davis R, Resnick P, "Multiple dimensions of generalization in model-based troubleshooting," *Proc AAAI-93,* July 1993, pp. 160--166.

27. Stahovich T, Davis R, Shrobe H, "Turning skeches into working geometry," Seventh International ASME Conference on Design Theory and Methodology, DE- Vol 93, 1995, pp. 603–610.

28. Stahovich T, Davis R, Shrobe H, Generating multiple designs from a single sketch, *Proc AAAI-96*
.

29. Christine Alvarado and Randall Davis. Preserving the Freedom of Sketching to Create a Natural Computer-Based Sketch Tool. In Human Computer Interaction International Proceedings. 2001.

30. Christine Alvarado and Randall Davis. Resolving Ambiguities to Create a Natural Sketch Based Interface. In Proceedings. of IJCAI-2001. August 2001.

31. Mark Foltz and Randall Davis. Query By Attention: Visually Searchable Information Maps. In Proceedings of Fifth International Conference on Information Visualization (InfoVis 2001). 2001.

32. Michael Oltmans and Randall Davis. Naturally Conveyed Explanations of Device Behavior. In Workshop on Perceptive User Interfaces. 2001.

33. Tevfik Metin Sezgin, Thomas Stahovich, and Randall Davis. Sketch Based Interfaces: Early Processing for Sketch Understanding. Workshop on Perceptive User Interfaces, Orlando FL. 2001.

34. Tracy Hammond and Randall Davis. Tahuti: A Geometrical Sketch Recognition System for UML Class Diagrams. AAAI Spring Symposium on Sketch Understanding, pp.59-68. Stanford, California, March 25-27 2002.

35. Christine Alvarado, Michael Oltmans, and Randall Davis. A Framework for Multi-Domain Sketch Recognition. AAAI Spring Symposium on Sketch Understanding, pp.1-8. Stanford, California, March 25-27 2002.

36. Randall Davis. Sketch Understanding in Design: Overview of Work at the MIT AI Lab. Sketch Understanding, Papers from the 2002 AAAI Spring Symposium, pp.24-31. Stanford, California, March 25-27 2002.

37. Tracy Hammond, Krzysztof Gajos, Randall Davis, and Howard Shrobe. An Agent-Based System For Capturing and Indexing Software Design Meetings. In Proceedings of International Workshop on Agents In Design, WAID'02. 2002.

38. Jacob Eisenstein and Randall Davis. Natural Gesture in Descriptive Monologues. In Supplementary Proceedings of the ACM Symposium on User Interface Software and Techology (UIST'03), pp.69-70. New York, New York, November 2-5 2003.

39. Tracy Hammond and Randall Davis. LADDER: A Language to Describe Drawing, Display, and Editing in Sketch Recognition. Proceedings of the 2003 Internaltional Joint Conference on Artificial Intelligence (IJCAI). Acapulco, Mexico, 2003

40. Jacob Eisenstein and Randall Davis. Visual and Linguistic Information in Gesture Classification. In International Conference on Multimodal Interfaces (ICMI'04), pp.113-120. New York, New York, October 14-15 2004.

41. Tracy Hammond and Randall Davis. Automatically Transforming Symbolic Shape Descriptions for Use in Sketch Recognition. Proceedings of the Nineteenth National Conference on Artificial Intelligence (AAAI-04). San Jose, CA, 2004.

42. Tracy Hammond and Randall Davis. Shady: A Shape Description Debugger for Use in Sketch Recognition. AAAI Fall Symposium on Making Pen-Based Interaction Intelligent and Natural. 2004.

43. Michael Oltmans, Christine Alvarado, and Randall Davis. ETCHA Sketches: Lessons Learned from Collecting Sketch Data. In Making Pen-Based Interaction Intelligent and Natural. 2004.

44. Tevfik Metin Sezgin and Randall Davis. Handling Overtraced Strokes in Hand-Drawn Sketches. In Making Pen-Based Interaction Intelligent and Natural. 2004.

45. Tevfik Metin Sezgin and Randall Davis. Scale-space Based Feature Point Detection for Digital Ink. In Making Pen-Based Interaction Intelligent and Natural. 2004.

46. Olya Veselova and Randall Davis. Perceptually Based Learning of Shape Descriptions. Proceedings of the Nineteenth National Conference on Artificial Intelligence (AAAI-04). San Jose, CA, 2004.

47. Christine Alvarado and Randall Davis. SketchREAD: A Multi-Domain Sketch Recognition Engine. In Proceedings of UIST 2004. 2004.

48. Sonya Cates and Randall Davis. New Approach to Early Sketch Processing. In Making Pen-Based Interaction Intelligent and Natural, pp.29-34. Menlo Park, California, October 21-24 2004.

49. Aaron Adler, Jacob Eisenstein, Michael Oltmans, Lisa Guttentag, and Randall Davis. Building the Design Studio of the Future. In Making Pen-Based Interaction Intelligent and Natural, pp.1-7. Menlo Park, California, October 21-24 2004.

50. Aaron Adler and Randall Davis. Speech and Sketching for Multimodal Design. In Proceedings of the 9th International Conference on Intelligent User Interfaces, pp.214--216. 2004.

51. Christine Alvarado and Randall Davis. Dynamically Constructed Bayes Nets for Multi-Domain Sketch Understanding. In Proceedings of IJCAI-05. 2005.

52. Tevfik Metin Sezgin and Randall Davis. HMM-Based Efficient Sketch Recognition. In Proceedings of the International Conference on Intelligent User Interfaces (IUI'05), pp.www. New York, New York, January 9-12 2005.

# EXHIBIT C

# MATERIALS EXAMINED

In addition to the documents explicitly cited in the body of the report, I also examined:

- The '164 patent application and other information contained in the file history.

- *Proceedings of the Innovative Applications of AI* for several years.

- Buchanan and Shortliffe, *Rule-Based Expert Systems*, Addison-Wesley, 1984.

- Clancey and Shortliffe, *Readings in Medical Artificial Intelligence: The First Decade*, Addison-Wesley, 1984.

- Davis R, Knowledge-Based Systems, *Science, 231:*957-963, Feb 28, 1986.

- Documents detailing Advanced Medlogic Systems from The Health Data Institute, including (1) a marketing pamphlet, entitled "Setting a New Standard," (2) an extract from a June 1986 HDI document, entitled "Claim Level Edits," (3) a letter from a Senior Scientist at HDI, written May 28, 1987, following up on a marketing call to the Health Claims Division of State Farm Insurance, and (4) an AMS Product Overview, dated May 1986.

I considered prior art references known to me from my experience in the expert system field and prior art references uncovered through my own investigation. These references are cited in the body of the report.

I also considered prior art references from among a large collection of publications related to the subject matter of the '164 patent, which collection is listed below:

| Author, Title & Source |
|---|
| Marva J. Crouff, *Automating Claims Processing, Insurance Software Review*, Autumn 1988, pp. 52, 54. |
| *Enhancing Accuracy and Timeliness is Integral to the Claims Adjudication Process*, Employee. Benefit Plan Review, Anonymous, Dec. 1985, pp. 10-12. |
| Healthstar, Health Benefits Management System, Product Description, v. 1.024 (Insurance Software Packages, Inc.). |
| *System validates medical fee schedules*, Best Review: Life/Health, June 1987, 92 [Insurance Software Packages, Inc. Medical C Schedule and Audit System]. |
| *Expert System identifies miscoded health claims*, Bests Review: Life/Health, November 1990, 60. |
| *Claims editing software runs coding rule checks*, Bests Review: Life/Health, November 1990, 62. |

| Author, Title & Source |
|---|
| Woolsey, C., *Employer spots inflated medical bills*, Business Insurance, June 25, 1990, 3. |
| Weitzel, J.R., et al., *A Company / University Joint Venture to build a knowledge-based system*, MIS Quarterly, Vol. 12, No. 1, March 1988, 23-34 |
| Leary, E., *SSA applies expertise to develop expert systems (Spotlight on AI-expert systems, Social Security Administration)*, Government Computer News, Vol. 6, No. 17, August 28, 1987, 49(3). |
| Beard, P., *Blue Cross develops insurance claim ES*, AIWeek, Vol. 6, No. 7, April 1, 1989, 3. |
| Sullivan-Trainor, M., *Catching new clients*, Computerworld, Vol. 21, No. 50, December 14, 1987, 95, 99. |
| Snyeder, C., *From research to reality: the leading edge of expert systems*, Insurance Software Review, Vol. 12, No. 3, Autumn 1987, 22-4, 26-7, 30 |
| Christensen, J., *Insuring*, High Technology Business, Vol. 8, No. 10, October 1988, 47-8. |
| *Expert Systems In the Insurance Industry: 1987 Survey Report Update*, Coopers and Lybrand, 1987. |
| Pallatto, J., *Expert system cures the blues (Blue Cross develops insurance claims analysis system NERSys)*, PC Week, Vol. 5, No. 50, December 12, 1988, 35, 44. |
| Gladwell, Malcolm, *Computer Firm Finds the Link for Health Care*, Washington Business, December 5, 1988, 5-6. |
| Kerschberg, L. "A Proposal for the Development of an Expert System for Medical Claims Processing: MEDCLAIM," Institute of Information Management, Technology and Policy, College of Business Administration, University of South Carolina, Columbia, SC, (July 1985). |
| Weitzel, J.R. and Kerschberg, L., "Developing Knowledge- Based Systems: Reorganizing the System Development Life Cycle," working paper, University of South Carolina, Columbia, SC and George Mason University, Fairfax, VA (December 1986). <br><br> Final Publication, April 1989 in Communications of the ACM, Vol. 32, No. 4. |
| Ronald Hurst, *Cost Containment - The Caterpillar Experience*, The Psychiatric Hospital, Vol. 13, No. 3 (1982). |
| Egdahl, M.D. and Hertenstein, M.D., *An Access-oriented Negotiated Fee Schedule: The Caterpillar Experience*, Ann Surg., 206(3), pp. 349-57 (Sept. 1987). |
| Bauer JW, Cassidy TG, DeBord JR, Hart RD, Lee RH, Maher JE, Montgomery CE, Neufeld GK, Rivan RJ, Soderstrom CW, et al., Related Articles, *An access-oriented negotiated fee schedule: the Caterpillar experience*, Ann Surg., 208(5), pp. 667-8 (Nov. 1988). |
| Waterman, Donald A. (The Rand Corporation), *A Guide to Expert Systems*, Addison Wesley Publishing, Inc. (1985). |
| McDermott, John, *Artificial Intelligence Applications for Business: Building Expert Systems*, Proceedings of the NYU Symposium (May 1983). |

| Author, Title & Source |
|---|
| Gerson, Elihu and Star, Susan Leigh, *Analyzing Due Process in the Workplace*, ACM Transactions on Office Information systems, Vol. 4, No. 3 (July 1986). |
| Hayes-Roth, Frederick, *et. al., Building Expert Systems: An Overview of Expert Systems*, Addison-Wesley Publishing, Inc. (1985). |
| Taylor, Edward, *Developing A Knowledge Engineering Capability in the TRW Defense Systems Group*, The AI Magazine (Summer 1985). |
| Bobrow, Daniel, *et. al., Expert Systems: Perils and Promise*, Computing Practices, Communications of the ACM, Vol. 29, No. 9 (Sept. 1986). |
| Bhide, Amar and Mohan, Brian, *Marcia Radosevich and Health Payment Review: 1989(A)*, Harvard Business School, 9-394-204 (Feb. 1999). |
| Genesereth, Michael, Ginsberg, Matthew, *Logic Programming*, Communications of the ACM, Vol. 28, No. 9 (Sept. 1985). |
| Yasdi, Ramin, *Modeling Database Based Expert Systems at the Conceptual Level*, Proceedings of the 1985 ACM Computer Science Conference (March 1985). |
| Freudenheim, Milt, *Insurers vs. Doctors: A Software Battleground*, New York Times (Nov. 15, 1989). |
| Riordan, Teresa, Patents: *A software-technology infringement case against Microsoft goes to trial in Federal Court*, New York Times (Jan. 24, 1994). |
| Colmerauer, Alain, *Prolog in 10 Figures*, Communications of the ACM, Vol. 28, No. 12 (Dec. 1985). |
| Hayes-Roth, Frederick, *Rule-Based Systems*, Communications of the ACM, Vol. 28, No. 9 (Sept. 1985). |
| Weitzel, J.R. and Kerschberg, L. *A System Development Methodology for Knowledge Based Systems*, IEEE Transactions on Systems, Man and Cybernetics, Vol. 19, No. 3 (May/June 1989). |
| Winston,, Patrick H., Prendergast, Karen A., *The AI Business: The Commercial Uses of Artificial Intelligence*, The MIT Press (1984). |
| Mack, Barbara, *A Prescription for Cutting Corporate Health Expenses*, Wall Street Journal (Jul. 18, 1983). |
| U.S. Pat. No. 4,591,983 (Bennett patent) |
| U.S. Pat. No. 4,667,292 (Mohlenbrock patent) |
| U.S. Pat. No. 5,018,067 (Mohlenbrock 2 patent) |
| U.S. Pat. No. 5,070,452 (Doyle patent) |
| U.S. Pat. No. 4,858,121 (Barber patent) |
| U.S. Pat. No. 4,658,370 (Erman patent) |
| U.S. Pat, No. 4,803,641 (Hardy patent) |

| Author, Title & Source |
| --- |
| Turner JM, *DRG compliance measurement in the future*, Software in Healthcare, August-September 1985, Vol. 3 (4), p. 48. |
| Mohlenbrock WC, *Getting the most out of DRG 's*, Group Practice Journal, September October 1985, Vol. 34 (5), pp. 27-32. |
| Gibbons PS, Pishotta FT, Stepto RC, *A system for reporting gynecologic procedures. A linguistic-logical approach*, Journal of Reproductive Medicine, March 1983, Vol. 28 (3), pp. 201-5 |
| Studney DR, Hakstian AR, *Effect of a computerized ambulatory medical record system on the validity of claims data*, Medical Care, April 1983, Vol. 21 (4), pp. 463-7. |
| Poulson GP, *Detailed costing system nets efficiency*, savings, Hospitals, October 1, 1984, Vol. 58 (19), pp. 106-8, 111. |
| *Medical coding*, Medical Record and Health Care Information Journal, February 1988, Vol. 29 (1), pp. 20-2. |
| Johnson KF, *Integrated system brings hospital data together*, Health Progress, October 1987, Vol. 68 (8), pp. 46-9, 82. |
| Tauber J, Lahav M, *Simplified diagnostic coding sheet for computerized data storage and analysis in ophthalmology*, Ophthalmic Surgery, November 1987, Vol. 18 (11), pp. 846-9 |
| Miller KM, Wisnicki HJ, Buchman JP. Riley MJ, Repka MX, Taylor HR, Guyton DL, *The Wilmer Information System. A classification and retrieval system for information on diagnosis and therapy in ophthalmology*, Ophthalmology, March 1988, Vol. 95 (3), pp. 403-9 |
| Carter K, *PCs can tap databanks for costs*, Modern Healthcare, June 20 1986, Vol. 16 (13), p. 52. |
| Ohnsson J, *GMIS (Gabrieli Medication Information Systems) software flags inappropriate billings, medical procedures*, Contract Healthcare, May 1988, pp. 28-9. |
| Cimino JJ, *Review paper: coding systems in health care*, Methods of Information in Medicine, December 1996, Vol. 35 (4-5), pp. 273-84. |
| Gabrieli ER, Speth DJ, Casiraghi E, *Knowledge bases*, Journal of Clinical Computing, 1985, Vol. 13 (5), pp. 150-4. |
| Gabrieli ER, Saumby JA, *Computer-based coding of medical data*, Topics in Health Record Management, March 1982, Vol. 2 (3), pp. 51-9. |
| Ely RM, *Savings through claims audits*, Topics in Health Care Financing, Summer 1986, Vol. 12 (4), pp. 61-7. |
| U.S. Pat. No. 4,347,568 (Giguere patent) |
| U.S. Pat. No. 4,491,725 (Pritchard patent) |
| U.S. Pat. No. 4,730,259 (Gallant patent) |
| U.S. Pat. No. 4,839,822 (Dormond patent) |
| U.S. Pat. No. 4,937,743 (Rassman patent) |

| Author, Title & Source |
| --- |
| U.S. Pat. No. 4,975,840 (De Tore patent) |
| U.S. Pat. No. 4,991,091 (Allen patent) |
| Buchanan Bruce G., *Expert Systems*, Journal of Automated Reasoning, Vol. 1, No. 1, 1985, pp. 28-35. |
| Hao Kuo, *MEDCLAIM: An Expert Support System for Medical Claims Review*, Thesis Submitted in Department of Computer Science, University of South Carolina (1986). |
| Horn SD,. Horn RA., *The computerized severity index: a new tool for case-mix management*, J Med Syst, February 1986, Vol. 10 (10), pp. 73-78. |
| Cebrian, Gil et al, *APACHE II*, Intensive Care med., 1987, Vol. 13 (2), p. 143. |
| Robinson, ML, *Hospitals look to "severity of illness" indexes*, Healthspan, June 1986, Vol. 3 (6), pp. 19-22. |
| Nestler, WB et al, *Case-mix reimbursement and clinical management....,* Ind Health Care (Cambridge Ma), 1985, Vol. 2, pp. 117-130. |
| Bates, SW et al, *Case mix management systems*, Mich. Hosp., August 1984, Vol. 20 (8), pp. 24-29. |
| Zak, EJ et al; *Financial modeling: an administrative tool of the highest. ..*, Computers in Healthcare, June 1984, Vol. 5(6), pp. 24-26. |
| Huhn, C et al, *Evaluating the new case-mix systems: a systematic approach*, Hospitals, January 1984, Vo. 58 (2), pp. 92, 94, 96. |
| Lewis, J et al, *Development of a case mix information system*, Computers in Healthcare, February 1983, Vol. 4 (2), pp. 36-41 |
| Shaffer, VM, *Case mix analysis*, Osteopathic hospital leadership, September-October 1985, pp. 8-9. |
| Braithwaite, WR, *The effect of Medicare legislation on medical records system*, Software in Healthcare, August-September 1985, Vol. 3 (4), pp. 26-27. |
| Myers, TF et al, *A modification of the international classification of diseases for uniform...* , AM J Perinatol, July 1985, Vol. 2 (3), pp. 240-241. |
| Barnard, C., *How to select and implement case-mix (product-line analysis). ..*, Hosp. Forum, January – February, 1985 Vol. 28 (1), pp. 25-30. |
| Jones, R, *Case-mix and computers: there's a micro-mainframe connection. ..*, Computers in Healthcare, October 1984, Vol. 5 (10), pp. 36-39. |
| Jones, R., *Case-mix and computers: there's a micro-mainframe connection...* , Computers in Healthcare, August 1984, Vol. 5 (8), pp. 44-45. |
| Schumacher, DN, *A practical guide to reviewing case mix financial date*, The Hospital Medical Staff, August 1984, Vol. 13 (8), p. 170. |

| Author, Title & Source |
|---|
| Jones, R., *Case-mix and computers. Part one: a look at computer delivery. ..*, Computers in Healthcare, June 1984, Vol. 5 (5), pp. 42-45. |
| Jaggar, FM et al, *A PPS essential: case-mix management systems*, Hospitals, May 1, 1984, Vol. 58 (9), pp. 71-76. |
| Dorenfest SI, *Computers can figure out DRGs, if you can figure out computer market*, Modern Healthcare, February 15, 1984, Vol. 14 (3), pp. 130, 134, 136 |
| Fedorowicz, J., *Will your computer meet your case-mix informational. ..*, Nurs Health Care, November 1983, Vol. 4 (9), pp. 493-497. |
| Fedorowicz, J., *Hospital information systems: are we ready for case mix applications*, Health Care Manage Rev., Fall 1983, Vol. 8 (4), pp. 33-41. |
| Gillette, PE., *Hospital information systems: computer must rack patient costs*, Modern Healthcare, September 1983, Vol. 13 (9), pp. 154, 156, 158. |
| Nathanson, M., *Hospital information systems: computers crank out DRG... *, Modern Healthcare, September 19833, Vol. 13, (9), pp. 160, 162, 164. |
| McLaughlin, DB et al., *Personal computers provide advantages and frustrations... *, Hospitals, July 1983, Vol. 57 (14), p. 94. |
| Barnard, C., *System strategies for case mix*, Computers in Healthcare, June 1983, Vol., 4 (6), pp. 28-32. |
| Mitchell WA., *An automated APACHE II scoring system*, Intensive care nursing, 1987, Vol. 3 (1), pp. 14-18. |
| Packer, CL., *Automation in the medical records department*, Hospitals, March 1, 1985, Vol. 59 (5), pp. 100, 102, 104. |
| Kramer, DJ., *Medicare billing goes electronic,* Software in Healthcare, February March 1986, Vol. 5 (1), pp. 31-32. |
| Gardner, E., *Coding changes delay reimbursement*, Modem Healthcare, December 4, 1987, Vol. 17 (25), p. 11. |
| King, M., *How can case mix work for long-term care providers*, Contemporary Longterm Care, November 1988, Vol. 11 (11), pp. 48, 50. |
| Couch, JB., *Assessing medical care on the basis of its value*, Physician executive, July August 1987, Vol. 13 (4), pp. 7-10. |
| Peterson, RN et al., *Congress to decide Medicare matters; final PPS rules. .. *, Health Law Vigil, September 20, 1985, Vol. 8 (19), pp. 6-8. |
| Terenzio J., *Preparing for the future today -product line management... *, Healthcare, Computing & communications, September 1985, Vol. 2 (9), pp. 56-58. |
| Sovie, MD et al., *Amalgam of nursing acuity*, DRGs and costs... *, Nursing Management, March 1985, Vol. 16 (3), pp. 22-42. |

| Author, Title & Source |
|---|
| Sleight, S. et al., *Addressing case mix management in the smaller hospital...*, Computers in Healthcare, February 1985, Vol. 6 (2), pp. 22-24. |
| Nathanson, M., *Hospitals struggling to develop standards*, Modern Healthcare, September 1984, Vol. 14 (12), p. 140. |
| Llaurado, JG, *Computing disease severity: staging*, Int J Biomed Comput, July-August 1984, Vol. 15 (4), pp. 243-248. |
| Christensen, B., *"Staging" software measures severity of patient's illness*, Hospitals, May 1, 1984, Vol. 58 (9), pp. 45-46. |
| Dambro, MR et al., *An unsuccessful experience with computerized medical. ..* , Journal of Medical Education, August 1988, Vol. 63 (8), pp. 617-623. |
| Wheeler, JT, *Hospital's six-point program clears up financial picture*, Health Progress, July-August 1988, Vol. 69 (6), pp. 78-81 |
| DiMauro, ME, *Information systems for cost-effective management*, Topics in Health Care Financing, Winter 1987, Vol. 14 (2), pp. 28-34. |
| Dombi, WA, *Home care denials: computerization and Medicare home care appeals*, Caring: National Association for Home Care Magazine, June 1987, Vol. 6 (6), pp. 16, 19. |
| Crownover, KR, *Shrinking the demand of home care documentation*, Caring: National Association for Home Care Magazine, June 1987, Vol. 6 (6), pp. 20-22. |
| Sabin, P., *Hospital cost accounting and the new imperative*, Health Progress, May 1987, Vol. 68 (4), pp. 52-57. |
| Carter, K., *End of PIP will prompt hospitals to try software to speed billing*, Modern Healthcare, February 13, 1987, Vol. 17 (4), pp. 62, 64, 68 |
| Woodward, RS, *Teaching DRG reimbursement with VisiCalc.*, The Journal of Health Administration Education, Winter 1985, Vol. 3 (1), pp. 91-97. |
| Landais P. et al., ARCANE. *A new medical patient information system*, Medical Information=Medecine et informatique, April-June 1988, Vol. 13 (2), pp. 105-116. |
| Carter K., *New reimbursement for outpatient services will mean more...* , Modern Healthcare, August 28, 1987, Vol. 17 (18), p. 78. |
| None Listed, *Computerization in the medical record department at Pioneer Valley...* , J Am Med Rec Assoc, February 1985, Vol. 56 (2), pp. 42-43. |
| Gabrieli, ER, *Automated medical office records*, Journal of Medical Systems, February 1987, Vol. 11 (1), pp. 59-68. |
| Gabrieli, ER, et al., *Computerized discharge summaries: a new window...* , Journal of Clinical Computing, 1987, Vol. 16 (1-2), pp. 47-62. |
| Gabrieli, ER, et al., *Automated analysis of the discharge summary*, Journal of Clinical Computing, 1986, Vol. 15 (1), p. 128. |

| Author, Title & Source |
|---|
| Jap. Appl. No. 55-107352, entitled "Medical business system" (Yoshikuni App.) |
| U.S. Trademark No. 1,583,416 (ClaimCheck Mark) |
| U.S. Trademark No. 1,624,579 (CodeReview Mark) |
| U.S. Trademark No. 2,165,159 (Code Advisor Mark) |
| Stachura CT, *Software reference guide: case-mix management*, Journal of the American Medical Record Association [J Am Med Rec Assoc] February 1987, Vol. 58 (2), pp. 42-6. |
| Stachura CT, *Software reference guide: DRG assignment*, J Am Med Rec Assoc, January 1987, Vol. 58, (1), pp. 33-40 |
| Stachura CT, *Software reference guide: encoding*, J Am Med Rec Assoc, November 1986, Vol. 57 (11), pp. 25-8. |
| Wilkinson R, *Does your grouper 'over-maximize' reimbursement?*, Hospitals, October 20, 1986, Vol. 60 (20), p. 88. |
| Huertas-Cortocarrero D, Ruiz PP, Marmol JP, *Concurrent clinical review: using microcomputer-based DRG-software*, Health Policy 1988, Vol. 9 (2), pp, 211-7 |
| Nathanson M, *Medical records. Experts: more research needed to set value of code programs*, Modem Healthcare, June 21, 1985, Vol. 15 (13), pp. 98, 102. |
| Caterinicchio RP, *Implementing a DRG-driven acuity system for nurse staffing under prospective hospital payment*, Hospital Topics, May-June 1985, Vol. 63 (3), pp. 6-7, 13. |
| Jackson B, Jensen J, *Hospitals turn to new software, hardware to cope with DRG 's*, Modern Healthcare, September 1984, Vol. 14 (12), pp. 109-12. |
| Nathanson M, *New software helps hospitals watch costs, profit under DRG*, Modern Healthcare, September 1984, Vol. 14 (12), pp. 132, 136-8. |
| *DRG helper makes it easy for doctors to maximize reimbursement*, Hospital Forum, July-August 1984, Vol. 27 (4), pp. 62-3. |
| Burda D, *Health care market experiences grouper software explosion*, J Am Med Rec Assoc, May 1984, Vol. 55 (5), pp. 35-7. |
| *Health care executive's guidebook to automation in the 1980s: health care information systems and DRG's*, Hospital Forum, Jan-Feb 1984, Vol. 27 (1), pp. 23-30. |
| Gonnella JS, Hornbrook MC, Louis DZ, *Staging of disease. A case mix measurement*, Journal of the American Medical Association [JAMA], February 3, 1984, Vol. 251 (5), pp. 637 44 |
| Ray WJ, Johnstone J, *Using medical records to ensure fair DRG reimbursement*, Computer in Healthcare, December 1983, Vol. 4 (12), pp. 32-6, 40. |
| Heck S, Esmond T, *Financial modeling/case-mix analysis*, Computers in Healthcare, June 1983, Vol. 4 (6), pp. 50-1, 54. |
| Moliver M, *Computers and reimbursement*, Contemporary longterm care, April 1986, Vol. 9 (4), pp. 46-7. |

| Author, Title & Source |
|---|
| Gabrieli, ER, et al., *Standardization of medical informatics*, Journal of Clinical Computing, 1986, Vol. 14 (6), pp. 179-198. |
| Gabrieli, ER, et al., *A center for medical informatics; modern methods of information...*, Topics in Health Record Management, September 1985, Vol. 6 (1), pp. 12-15. |
| Gabrieli, ER, et al., *Cognitive processing for computerized new knowledge*, Journal of Clinical Computing, 1985, Vol. 13 (4), pp. 113-116. |
| Gabrieli, ER, et al., *Computer-based knowledge banks for clinical medicine*, Journal of Clinical Computing, 1983, Vol. 11 (5-6), pp. 195-200. |
| Gabrieli, ER, et al., *Computer-oriented coding of medical data*, Journal of Clinical Computing, 1981, Vol. 10 (1), pp. 1-18. |
| Gabrieli, ER, et al., *A proposal for a computer-based national medical information ....,* Journal of Clinical Computing, Vol. 10 (1), pp. 19-52. |
| Gabrieli, ER, et al., *Computer-oriented nomenclature, automated classification ....,* Journal of Clinical Computing, 1980, Vol. 9 (2), pp. 54-66. |
| Gabrieli, ER, *Medical information system, health records, and knowledge...* , Medical Instrumentation, July-August 1978, Vol. 12 (4), pp. 245-247. |
| Gabrieli, ER, *Computer-assisted assessment of patient care in the hospital*, Journal of Medical Systems. June 1988, Vol. 12 (3), pp. 135-146. |
| Bernier, RP, *Clinical evaluation:  the next step in claims processing*, Best Rev Life Health Insur Ed, April 1986, Vol. 86 (12), pp. 106-110, 127 |
| Robinson, Michele L., *AHA voices concerns about HCFA's severity index*, Hospitals, October 5, 1988, p. 26. |
| Barnard, C., *Preparing for case-mix: the role of data processing*, Healthcare financial management: journal of the Healthcare Financial Management Association, June 1983, Vol. 37 (6), pp. 57-70. |
| McDermott, John, *R1: A Rule-Based Configurer of Computer Systems, Artificial Intelligence*, 1982, No. 19, pp. 39-88. |
| David Leinweber, *Knowledge-Based Systems for Financial Applications*, IEEE Expert, Fall 1988, pp. 18-31. |
| Fagan, Lawrence Marvin, *VM: Representing Time-Dependent Relations in a Medical Setting*, Ph.D Thesis Submitted at Stanford University (1980) |

EXHIBIT G

1

2  DISTRICT OF DELAWARE

3

4  McKESSON INFORMATION SOLUTIONS, LLC,

5        Plaintiff

6  v.        CA NO. 04-1258 (SLR)

7  THE TRIZETTO GROUP, INC.,

8        Defendant

9

10

11

---

12        VOLUME 1

13    VIDEOTAPED DEPOSITION OF RANDALL

14  DAVIS, Ph.D., a witness called on behalf of

15  the Plaintiff, pursuant to the Federal Rules

16  of Civil Procedure, before Jessica L.

17  Williamson, Registered Merit Reporter,

18  Certified Realtime Reporter and Notary

19  Public in and for the Commonwealth of

20  Massachusetts, at the Offices of Skadden,

21  Arps, Slate, Meagher & Flom LLP, One Beacon

22  Street, Boston, Massachusetts, on Wednesday,

23  November 30, 2005, commencing at 9:27 a.m.

24  JOB NO. 41297

25

Page 1

---

1  DEPONENT                      PAGE
2
3  RANDALL DAVIS, Ph.D.
4  Examination By Mr. Randall        5, 310
5  Examination By Mr. Segal          297
6
7        E X H I B I T S
8  NO.                           PAGE
9  1 Copy of '164 patent            11
10 2 Expert Report dated October    22
   24, 2005
11
12 3 Expert Report dated November   22
   14, 2005
13 4 Article entitled "Enhancing     28
   Accuracy and Timeliness is
14   Integral to the Claims
   Adjudication Process"
15
16 5 Document relating to AMS       141
   entitled "Setting a New
   Standard"
17
18 6 Document bearing Bates stamp   142
   Nos. RD000314 - 324
19 7 Document entitled "AMS June     142
   1986 HDI-Proprietary"
20
21 8 One-page document bearing      142
   Bates stamp No. RD000420
22
23
24
25

Page 3

---

1  A P P E A R A N C E S

2

3  SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

4      (By Jeff Randall, Esq.)

5      525 University Avenue

6      Palo Alto, California 94301

7      (650) 470-4500

8      jrandall@skadden.com

9      Counsel for the Plaintiff

10

11 GIBSON, DUNN & CRUTCHER LLP

12     (By David A. Segal, Esq.)

13     4 Park Plaza

14     Irvine, California 92614-8557

15     (949) 451-3973

16     dsegal@gibsondunn.com

17     Counsel for the Defendant

18

19 ALSO PRESENT:

20

21     George Dobrentey, Videographer

22

23

24

25

Page 2

---

09:10:46  1          P R O C E E D I N G S
09:27:22  2          THE VIDEOGRAPHER:  Good morning.
09:27:33  3  We are recording and are now on the record.
09:27:35  4  Today's date is November the 30th, 2005, and
09:27:38  5  the time is 9:27 a.m.  My name is George
09:27:42  6  Dobrentey.  I'm a legal videographer for G &
09:27:46  7  M Court Reporters, Ltd.  Our business
09:27:46  8  address is 42 Chauncy Street, Suite 1A,
09:27:50  9  Boston, Massachusetts 02111.
09:27:51 10          This is the deposition of Randall
09:27:55 11  Davis in the matter of McKesson Information
09:28:00 12  Solutions vs. TriZetto Group in the United
09:28:04 13  States District Court in the District of
09:28:06 14  Delaware, Civil Action No. 04-1258 (SLR).
09:28:11 15          This deposition is being taken at One
09:28:15 16  Beacon Street in Boston, Massachusetts on
09:28:17 17  behalf of the plaintiff.  The court reporter
09:28:18 18  is Jessica Williamson.  The counsel will
09:28:19 19  state their appearances, and the court
09:28:21 20  reporter will administer the oath.
09:28:22 21          MR. RANDALL:  Jeff Randall
09:28:24 22  representing plaintiff, McKesson.
09:28:26 23          MR. SEGAL:  David Segal on behalf
09:28:27 24  of the TriZetto Corp.
         25

Page 4

---

1 (Pages 1 to 4)

11:58:21  1  dated October 24, Exhibit 2, specifically
11:59:02  2  dated October 24, Exhibit 2, specifically
11:59:07  3  Exhibit C and Page C-1.
11:59:23  4  A.  I have it.
11:59:23  5  Q.  These four AMS documents that you testified
11:59:27  6  about earlier, do you see that?
11:59:28  7  A.  Yes.
11:59:35  8  Q.  Can you describe how and when you collected
11:59:37  9  those documents?
11:59:39 10  A.  Yes.  I talked to a number of colleagues and
11:59:51 11  former colleagues about whether they knew of
11:59:55 12  any systems in roughly the time period of
12:00:00 13  the patent, the relevant time period, that
12:00:07 14  were similar in some fashion to the system
12:00:11 15  described in the patent.  One of the
12:00:12 16  pointers that I got was to a system
12:00:14 17  called -- or, sorry, a system built by a
12:00:17 18  company called GMIS.
12:00:22 19       So I went searching on the Web for
12:00:24 20  pointers to GMIS, and it turns out that
12:00:28 21  someone who once worked for GMIS also worked
12:00:33 22  at the company that created the AMS system.
12:00:41 23  I'm blocking on their name at the moment.
12:00:43 24  HDI, I think.  He also had worked -- he had
12:00:46 25  formerly worked at GMIS, I believe, and then

Page 89

12:00:51  1  came to work at HDI.
12:00:53  2       And I went to talk to him because it
12:00:54  3  turns out he lives about a mile from where I
12:00:58  4  live at home.  So I talked to him about
12:01:02  5  GMIS, and then we got to talking about the
12:01:03  6  AMS system, and he had the documents in his
12:01:06  7  possession.
12:01:09  8  Q.  And what's his name?
12:01:10  9  A.  Dr. Robert Bargar, B-A-R-G-A-R.  He -- it's
12:01:17 10  his signature that shows up in the letter
12:01:19 11  that's one of the AMS documents.
12:01:37 12  Q.  How did you -- did TriZetto's attorneys
12:01:41 13  provide you the information regarding -- any
12:01:47 14  information regarding the AMS system?
12:01:49 15  A.  No.
12:01:49 16  Q.  Did they provide you any information
12:01:52 17  regarding the former employee of GMIS that
12:02:00 18  went to work for the company that
12:02:04 19  developed --
12:02:04 20  A.  No.  I found him on my own.  My recollection
12:02:07 21  is that they were surprised when I mentioned
12:02:10 22  this.  I think they had independently
12:02:15 23  discovered the material -- not the material,
12:02:18 24  the existence of the system, but I don't
12:02:19 25  recall that detail.  I do know that I found

Page 90

12:02:21  1  this on my own.
12:02:25  2  Q.  How did you find it?
12:02:25  3  A.  In the manner I just described.  I asked a
12:02:29  4  colleague about previous systems that they
12:02:32  5  knew about in the mid-1980s that did any
12:02:35  6  form of claim review.  One of them mentioned
12:02:39  7  GMIS.  I started doing Web search on GMIS.
12:02:43  8  I covered a number of references and
12:02:45  9  documents to it, but by the chance of Google
12:02:50 10  also discovered this individual who had
12:02:53 11  something written about himself describing
12:02:54 12  his work at both GMIS and at HDI.  And since
12:03:01 13  he was quite nearby, I called him up.
12:03:03 14  Q.  So you were doing Web searches regarding
12:03:07 15  GMIS to determine when they had a system
12:03:14 16  that may invalidate the claims of the
12:03:17 17  patent; is that right?
12:03:18 18  A.  It was part of a prior art search, and I
12:03:22 19  didn't know very much about them except
12:03:24 20  someone had pointed me to them as possibly
12:03:26 21  relevant.
12:03:27 22  Q.  So you were doing a prior art search to
12:03:29 23  determine if GMIS had potential prior art to
12:03:33 24  the '164; is that right?
12:03:35 25  A.  No.

Page 91

12:03:39  1  Q.  No?
12:03:40  2  A.  No.
12:03:40  3  Q.  Why were you doing a Web search regarding
12:03:47  4  GMIS?
12:03:48  5  A.  But that wasn't the only thing I was doing.
12:03:51  6  I was trying to determine what previous
12:03:52  7  systems, if any, might be relevant.  One of
12:03:54  8  the things I was looking for -- your
12:03:56  9  question seemed to constrain it too
12:03:58 10  narrowly.  It wasn't that I was looking for
12:04:01 11  GMIS specifically.  At that point I was
12:04:03 12  looking at GMIS I was also looking at a
12:04:06 13  number of other systems.
12:04:07 14  Q.  And you could have been drinking coffee at
12:04:10 15  the time, too.  I don't know what else you
12:04:11 16  were doing, but I am saying that while --
12:04:13 17  when you decided to sit down at your
12:04:16 18  computer and search the Internet regarding
12:04:19 19  GMIS, you were doing so to determine perhaps
12:04:23 20  whether GMIS was an invalidating system,
12:04:28 21  right?
12:04:28 22  A.  Fair enough.  For that specific search.  I
12:04:30 23  misunderstood the question perhaps.  That
12:04:31 24  specific search was addressed to that issue.
12:04:40 25  Q.  And as you were doing that, you came across

Page 92

23 (Pages 89 to 92)

**SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES**
**877.955.3855**

12:04:44 1 What, something on the Internet that

12:04:46 2 suggested that a former GMIS employee went

12:04:48 3 to work subsequently for HDI?

12:04:52 4 A. Plus some reference to HDI, and I'm not

12:04:59 5 sure, possibly to AMS.

12:05:01 6 Q. And did you print that information out?

12:05:10 7 A. I don't know if I printed out the very first

12:05:13 8 thing that I found. I don't recall

12:05:14 9 having -- doing so, but I can't swear to it.

12:05:20 10 Q. Well, you came across this Dr. Robert

12:05:22 11 Bargar, right?

12:05:23 12 A. Bargar.

12:05:23 13 Q. And did you print out any information

12:05:26 14 regarding him that you discovered during

12:05:28 15 your search?

12:05:28 16 A. I wrote down his name -- his name, address

12:05:31 17 and phone number.

12:06:10 18 Q. When did you do this Internet search

12:06:12 19 regarding GMIS?

12:06:13 20 A. I can't narrow it down very much for you

12:06:24 21 except to say it would have been fairly

12:06:25 22 early on in my involvement in this, clearly

12:06:28 23 before writing the report, but I can't from

12:06:32 24 memory narrow it down any further than that.

12:06:37 25 Q. Well, clearly it took a significant amount

Page 93

12:06:41 1 of time, did it not, for you to do this

12:06:43 2 searching on the Internet regarding GMIS in

12:06:46 3 order to come up with Dr. Robert Bargar

12:06:48 4 from -- that worked on the AMS system,

12:06:54 5 right?

12:06:54 6 A. No. That's the marvel of Google. It did

12:06:59 7 not take very long.

12:07:00 8 Q. How long did it take? How long did it take,

12:07:03 9 approximately?

12:07:03 10 A. To find this once I started looking?

12:07:05 11 Q. Yes.

12:07:05 12 A. Oh, it was all within the same day.

12:07:07 13 Q. But it took an entire day, eight hours?

12:07:09 14 A. Oh, no. God, no. No, no, no. No. To find

12:07:17 15 this -- to find him once I started looking

12:07:19 16 for background on GMS -- GMIS, no, clearly

12:07:25 17 not a day.

12:07:26 18 Q. Four hours?

12:07:27 19 A. I don't believe so. I'm tempted to say it

12:07:32 20 was one of the first things I tripped over,

12:07:34 21 but I can't swear to that. It's, I don't

12:07:36 22 know, maybe an hour or so.

12:07:38 23 Q. So are you suggesting, then, that you

12:07:41 24 just -- you were doing some investigation of

12:07:43 25 GMIS to see invalidating art, and that led

Page 94

12:07:49 1 you directly to Robert Bargar and his work

12:07:51 2 in the MI -- work on the AMS system?

12:07:54 3 A. If we take "directly" to mean within an hour

12:07:57 4 or so, yes, that's exactly what happened.

12:08:02 5 Q. But then once you found his name, how long

12:08:04 6 did it take you searching to determine his

12:08:07 7 address and phone number?

12:08:08 8 A. It was on the document. It's, as I said,

12:08:14 9 one of the wonders of Google. One of the

12:08:16 10 documents that I found was his name, address

12:08:18 11 and -- it was essentially a short -- if

12:08:22 12 memory serves, it was a short sort of mini

12:08:27 13 resume that he had posted on the Web for

12:08:29 14 some reason.

12:08:30 15 Q. And -- well, how many hours did you spend

12:08:32 16 working on locating him, getting in contact

12:08:36 17 with him and actually retrieving the

12:08:40 18 documents that you have identified here in

12:08:43 19 Exhibit C?

12:08:43 20 A. Locating him, as I said, it was a matter --

12:08:49 21 an interval of time measured in minutes,

12:08:51 22 perhaps 60 minutes, but I doubt it. I'm

12:08:54 23 sorry, the other words that you used were

12:08:56 24 what?

12:08:56 25 Q. Well, how much time did you then spend

Page 95

12:08:59 1 actually getting in contact with him and

12:09:02 2 meeting with him to get the documents that

12:09:04 3 you have included in your report in Exhibit

12:09:07 4 C?

12:09:07 5 A. If memory serves, I called him that day,

12:09:12 6 told him what I was interested in. He

12:09:15 7 agreed to meet. My recollection was it was

12:09:21 8 either a Friday or on a Saturday morning

12:09:25 9 that I called, and we agreed to meet either

12:09:29 10 on Sunday or Monday. And as I said, he

12:09:32 11 lives about a mile away, so I drove to his

12:09:35 12 house, and we probably spent -- I might have

12:09:43 13 spent two hours sitting with him going over

12:09:44 14 some of the documents that he had, looking

12:09:46 15 at them. And he made some copies for me at

12:09:50 16 that point.

12:09:53 17 Q. And so when you -- you spent what, you said,

12:09:56 18 a couple hours with him?

12:09:57 19 A. My recollection is, yeah, on the order of a

12:10:00 20 couple hours.

12:10:00 21 Q. So when you left, you had the documents in

12:10:02 22 your hand?

12:10:03 23 A. I had some documents in my hand. After

12:10:05 24 further reading the documents and talking to

12:10:07 25 him again by phone -- let me back up. He

Page 96

24 (Pages 93 to 96)

12:10:11 1  was bringing very nice and photocopy, you know,
12:10:14 2  home photocopy machine a bunch of pieces of
12:10:16 3  paper. I was trying to be nice and not
12:10:18 4  saying, "Take this box and copy it for me,"
12:10:21 5  so I got some samples.
12:10:24 6      When it became clear to me that this
12:10:26 7  would be particularly relevant, I then asked
12:10:28 8  him to take the documents that are cited
12:10:30 9  here (indicating) and have them scanned in
12:10:33 10  somewhere methodically to include all the
12:10:35 11  pages. And I think he went to a local
12:10:37 12  Kinko's and got them scanned in, and that's
12:10:39 13  the form of the documents that we have.
12:10:43 14  Q. Did he have any -- to your knowledge, does
12:10:47 15  he have any other documents at all that
12:10:49 16  relate to the AMS system, other than the
12:10:52 17  ones -- the four that you've included in
12:10:54 18  your report?
12:11:04 19  A. It's possible, but I can't swear to it one
12:11:08 20  way or the other. I know I was trying to
12:11:08 21  look through -- let me back up.
12:11:09 22      This is one of those circumstances
12:11:10 23  where the first thing he said was "I think
12:11:13 24  I've got some boxes of documents still down
12:11:14 25  in the basement. They might have been

Page 97

12:11:16 1  ruined when my oil tank sprang a leak. I'll
12:11:20 2  check for you." So he came a couple days
12:11:22 3  later, and he found the box -- a box or two
12:11:24 4  of documents, but it was a jumbled
12:11:26 5  collection of things having to do with a
12:11:28 6  variety of different things that he would be
12:11:29 7  involved in. Some of them were GMIS. Some
12:11:33 8  of them where AMS. And I was at that point
12:11:36 9  focusing mostly on AMS, though I believe I
12:11:40 10  looked at some GMIS documents because at
12:11:42 11  that point I didn't know the timing of GMIS
12:11:45 12  and put it aside for later.
12:11:47 13      It's a longwinded question (sic), but
12:11:49 14  I'm trying to give you the context for the
12:11:51 15  answer that says I can't be sure of whether
12:11:53 16  he had other AMS documents. I know the ones
12:11:56 17  that I have.
12:11:56 18  Q. Well, did you ever ask him? Did you ever
12:12:00 19  say, "Robert, do you have any more documents
12:12:03 20  than the four you've given me?"
12:12:05 21  A. He didn't give me the documents. We were
12:12:07 22  looking through some boxes together, and
12:12:09 23  these are the ones that I picked out as we
12:12:11 24  looked through the two boxes of documents.
12:12:15 25  Q. Well, when you were looking through the two

Page 98

12:12:17 1  boxes of documents, did you see any other
12:12:19 2  documents that related to the AMS system?
12:12:21 3  A. Again, I say I don't believe so, but I can't
12:12:24 4  be positive, as I sit here.
12:12:44 5  Q. And you said this was early on in your
12:12:45 6  engagement in this case. That would have
12:12:48 7  been in early September; is that right?
12:12:48 8  A. Mid-September, somewhere around there, yeah.
12:12:51 9  Q. But you concealed both your discovery of Mr.
12:12:55 10  Bargar and the AMS system and your meeting
12:12:57 11  with him from TriZetto's lawyers, right?
12:13:03 12      MR. SEGAL: Objection, vague.
12:13:06 13  A. No. In fact, I did just the opposite. What
12:13:08 14  do you mean I concealed it?
12:13:09 15  Q. Did you tell them right away?
12:13:12 16  A. I can't swear that it was the moment I found
12:13:14 17  him, but as soon as I realized that the
12:13:17 18  material was relevant, yes, I told them.
12:13:18 19  Q. Within a matter of days?
12:13:20 20  A. I don't remember, but concealing is
12:13:26 21  certainly an entirely inappropriate term. I
12:13:30 22  would have no motivation or desire to
12:13:32 23  conceal it.
12:13:33 24  Q. Did you receive any authorization whatsoever
12:13:35 25  from TriZetto's attorneys to go meet with

Page 99

12:13:39 1  Mr. Bargar?
12:13:40 2  A. It never occurred to me I would need an
12:13:43 3  authorization. I was doing background
12:13:44 4  research.
12:13:45 5  Q. Did you ask for authorization?
12:13:46 6  A. It did not occur to me, and I did not ask
12:13:49 7  for authorization.
12:13:51 8  Q. Did you at least let them know that you were
12:13:53 9  going over to meet with this potential prior
12:13:56 10  art witness?
12:13:56 11  A. No, because I had no idea whether it was
12:13:59 12  relevant.
12:13:59 13  Q. Within a matter of days after meeting with
12:14:01 14  him you did let them know about this and
12:14:04 15  sent them the documents, correct?
12:14:06 16  A. No, within --
12:14:06 17  Q. And when I say "them," it's the TriZetto
12:14:08 18  attorneys.
12:14:09 19  A. I remembered mentioning it to them
12:14:12 20  reasonably soon after I discovered it. I
12:14:15 21  don't recall sending the documents at that
12:14:18 22  point.
12:14:18 23  Q. They never asked for them?
12:14:20 24  A. If they had asked, I would have sent them,
12:14:30 25  so I don't recall them asking.

Page 100

25 (Pages 97 to 100)

12:14:31 1  Q.  Didn't you tell them "I met with Robert
12:14:34 2      Bargar, who had some information regarding
12:14:36 3      this potential prior art system, AMS, and
12:14:40 4      I've got some documents. How about if I
12:14:43 5      send them to you?" Did that happen?
12:14:45 6          MR. SEGAL: Objection,
12:14:46 7      argumentative.
12:14:46 8  A.  I called to tell them I spoke with Mr. -- I
12:14:53 9      forget, I think it was Dan Muino, told them
12:14:57 10     I had discovered this system. I don't
12:15:05 11     remember if I mentioned Dr. Bargar -- no, I
12:15:07 12     must have, because that's where I got the
12:15:08 13     documents from. Now, your question was, did
12:15:15 14     I offer to send them the documents, yes?
12:15:17 15 Q.  Did you offer? Did they ask?
12:15:20 16 A.  I don't recall offering. I don't recall
12:15:22 17     them asking.
12:15:22 18 Q.  But you did tell them that you had the
12:15:24 19     documents?
12:15:24 20 A.  I don't remember what I said in that
12:15:30 21     conversation. It was a couple of months
12:15:31 22     ago. I don't remember to that level of
12:15:33 23     detail. I know I told them that I had
12:15:35 24     discovered this system.
12:15:36 25 Q.  And I still -- I've got some additional

Page 101

12:15:38 1      questions on this subject, but we have to
12:15:41 2      change the videotapes. Why don't we change
12:15:43 3      it, and then we'll continue on.
12:15:45 4  A.  Sure.
12:15:46 5          THE VIDEOGRAPHER: The time is
12:15:50 6      12:15. This is the end of Tape 2, and we
12:15:52 7      are off the record.
12:15:54 8          (Discussion off the record.)
12:16:57 9          THE VIDEOGRAPHER: Stand by. The
12:16:58 10     time is 12:16. This is the beginning of
12:17:01 11     Tape 3, and we are back on the record.
12:17:02 12 A.  May I augment an earlier answer?
12:17:05 13 Q.  Sure.
12:17:05 14 A.  I'm trying to remember the timing, and I
12:17:08 15     have the sense that I visited him on a
12:17:11 16     Monday that was a holiday, which means it
12:17:13 17     might actually have been in October. It
12:17:15 18     might have been Columbus Day holiday. I'm
12:17:19 19     not positive. I might be able to figure it
12:17:21 20     out from records somewhere, but it's
12:17:24 21     possible it was as late as the October
12:17:27 22     Columbus Day holiday.
12:17:29 23 Q.  Or Labor Day?
12:17:30 24 A.  Labor Day? Early September?
12:17:33 25 Q.  Yeah.

Page 102

12:17:35 1  A.  No, that's not possible.
12:17:36 2  Q.  You're positive?
12:17:37 3  A.  It was not Labor Day, yes, I'm positive.
12:17:39 4  Q.  And you're now positive it was in October
12:17:42 5      and not September?
12:17:43 6  A.  No, I'm positive it was not Labor Day. I
12:17:47 7      hadn't done any work as of Labor Day.
12:17:49 8  Q.  So you don't know -- at this point are you
12:17:52 9      telling me that you don't know whether it
12:17:54 10     was in mid-September or in -- sometime in
12:17:58 11     October?
12:17:58 12 A.  Early October, that's correct. As I sit
12:18:00 13     here, I can't tell you exactly when I met
12:18:03 14     him.
12:18:03 15 Q.  And I'm not asking for exactly. I'm asking
12:18:06 16     for -- it was only a few weeks ago if it's
12:18:08 17     October, right?
12:18:09 18 A.  To the best of my recollection, it was
12:18:10 19     somewhere between mid-September and Columbus
12:18:14 20     Day in October. That's as narrowly as I can
12:18:18 21     define it right now.
12:18:22 22 Q.  Have you spoken with any other potential
12:18:26 23     prior art witnesses other than perhaps the
12:18:29 24     experts that were disclosed by TriZetto's
12:18:32 25     counsel and Mr. Bargar?

Page 103

12:18:36 1  A.  No.
12:18:39 2  Q.  After your meeting with Mr. Bargar, did you
12:18:45 3      ever have any additional discussions with
12:18:48 4      him?
12:18:49 5  A.  Yes.
12:18:49 6  Q.  How many?
12:18:55 7  A.  Two, one concerning logistics and one
12:18:57 8      concerning some details of the system.
12:18:59 9  Q.  And the one concerning logistics, was that
12:19:01 10     all that was discussed, no substance?
12:19:03 11 A.  It was about getting the electronic copy of
12:19:05 12     the document. So just to be clear --
12:19:16 13 Q.  By getting the electronic copy of the
12:19:19 14     document, what do you mean by that?
12:19:21 15 A.  I'm sorry, let me start again. It's what I
12:19:23 16     meant a few moments ago when I said I asked
12:19:26 17     him to get the documents scanned in so that
12:19:31 18     I could have a complete copy of a document
12:19:33 19     that I had taken only a couple of pages
12:19:37 20     copied of at his house. As I said, I was
12:19:40 21     trying to be nice and not ask him to copy a
12:19:42 22     document extensively on his home copier.
12:19:45 23     And then when I realized it was important,
12:19:47 24     asked him to in some fashion get a copy of
12:19:50 25     the document to me, the complete copies of

Page 104

26 (Pages 101 to 104)

12:19:54 1 ... the documents you have in my possession and a fair amount of material

12:19:55 2 And it turns out the easiest way for

12:19:57 3 him to do that was to go to a Kinko's, have

12:20:00 4 it scanned in and e-mail me the resulting

12:20:04 5 file. That was his decision about how to do

12:20:04 6 it. And that's what I mean by "electronic,"

12:20:06 7 simply that it was scanned in and sent to me

12:20:08 8 electronically.

12:20:09 9 Q. So as of today's date, neither you nor, to

12:20:15 10 your knowledge, TriZetto's counsel has ever

12:20:16 11 asked Mr. Bargar whether he has additional

12:20:18 12 documents relating to this system; is that

12:20:20 13 right?

12:20:20 14 A. I don't -- well, I know that I didn't ask

12:20:27 15 the question because I think I had the sense

12:20:30 16 that I had what he had. Having gone through

12:20:32 17 the boxes, I had the impression that I had

12:20:36 18 whatever documents he had that I had seen

12:20:40 19 them, but I did not subsequently say, "Do

12:20:43 20 you have anything else?"

12:20:57 21 Q. Do you have a record of the documents that

12:20:59 22 TriZetto gave you -- TriZetto's counsel gave

12:21:02 23 you to review in connection with this case?

12:21:05 24 A. I made a hard copy binder of them, so in

12:21:09 25 that sense I have a record of them.

12:21:13 1 Q. So every time they send you something you've

12:21:16 2 kept it? You've got a record of what

12:21:18 3 they've given you to review, right?

12:21:20 4 A. I believe that to be true.

12:21:27 5 Q. And there are no -- there's no substantive

12:21:29 6 analysis or commentary by TriZetto's

12:21:33 7 attorneys with respect to prior art or

12:21:36 8 infringement issues in any of the materials

12:21:38 9 they gave you?

12:21:39 10 A. I'm going to have to think back. I think

12:21:44 11 the answer to that is no, but let me think

12:21:47 12 back and make sure.

12:22:03 13 Sitting here, I don't recall any.

12:22:12 14 Q. You were given in connection with your work

12:22:20 15 in this case documents relating to the AMS

12:22:24 16 system that were produced by McKesson in

12:22:27 17 this case, correct?

12:22:28 18 A. It's possible. I don't remember, sitting

12:22:41 19 here. Ah, the McKesson production, yes. I

12:22:53 20 can't -- I don't have a mental picture of

12:22:54 21 the specific document, but I know I got

12:22:56 22 some -- some amount of McKesson production

12:22:58 23 in electronic form also, in PDF files.

12:23:05 24 Q. Relating to the AMS system, correct?

12:23:07 25 A. I believe so, but I'm not positive as I sit

12:23:10 1 here. There was a fair amount of material

12:23:12 2 that I have been given over the course of

12:23:13 3 this case.

12:23:15 4 Q. Other than the few references relating to

12:23:19 5 the work by other TriZetto-designated

12:23:21 6 experts, you did review the materials that

12:23:24 7 were provided to you by TriZetto's

12:23:26 8 attorneys, right?

12:23:26 9 A. Yes.

12:23:27 10 Q. And you recall reviewing McKesson production

12:23:30 11 documents relating to the AMS system,

12:23:32 12 correct?

12:23:32 13 A. No. Actually, for some reason I'm drawing a

12:23:40 14 blank sitting here thinking about AMS

12:23:44 15 documents from the McKesson production.

12:23:45 16 It's possible I did, but I don't remember.

12:23:52 17 Q. Well, didn't you -- when you came across the

12:23:54 18 AMS system with Mr. Bargar, didn't you

12:23:56 19 say -- didn't it spark a recollection in

12:24:00 20 your mind that, in fact, TriZetto's

12:24:03 21 attorneys had given you McKesson production

12:24:06 22 documents related to AMS?

12:24:07 23 A. At that point I don't think so. I don't

12:24:09 24 think I had looked at the McKesson

12:24:10 25 production documents yet, so it wouldn't

12:24:13 1 have sparked a memory.

12:24:21 2 Q. But you do, sitting here today, recall -- at

12:24:25 3 least your best recollection is that you

12:24:28 4 have received from TriZetto's attorneys

12:24:32 5 McKesson production documents relating to

12:24:34 6 the AMS system, right?

12:24:35 7 A. As I've said, and I will say it carefully, I

12:24:40 8 believe that to be the case, but I cannot

12:24:42 9 recall specific documents as I sit here. I

12:24:45 10 can't conjure up a specific picture of the

12:24:48 11 documents. I would have to go back and

12:24:49 12 check.

12:24:54 13 Q. And how would you check to determine either

12:24:59 14 when you received those documents or when

12:25:00 15 you reviewed them?

12:25:01 16 A. I don't think I can determine when I

12:25:03 17 reviewed them. Probably the file date on my

12:25:09 18 computer will tell me when I put them on the

12:25:11 19 machine, and then I'll rereview them.

12:25:14 20 Q. After getting these AMS documents from Mr.

12:25:19 21 Bargar, didn't you go back and look at and

12:25:28 22 review the McKesson production documents

12:25:30 23 relating to the same system?

12:25:33 24 MR. SEGAL: Objection, lacks

12:25:34 25 foundation, vague.

**SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES**
**877.955.3855**

12:25:35 1    A.  Now, I had a great deal of material to go
12:25:41 2        through and time was starting to get short,
12:25:43 3        so I did not specifically say I'm going to
12:25:46 4        go looking for this.
12:26:08 5    Q.  Did you assist TriZetto's attorneys in any
12:26:10 6        way in preparing discovery responses
12:26:15 7        regarding prior art or infringement issues?
12:26:24 8    A.  Only -- I'm not sure I understand the
12:26:27 9        question, but only in the sense that I cited
12:26:31 10       certain things in my report.  I don't think
12:26:34 11       I was part of the formal discovery response
12:26:39 12       mechanism.  They asked me when I put
12:26:41 13       together this report to supply documents,
12:26:45 14       which I supplied to them.  The copies of,
12:26:49 15       for instance, any of the articles that I had
12:26:50 16       found that they hadn't supplied to me I made
12:26:53 17       sure to send them a copy of.  Is that the
12:26:55 18       kind of thing that you're talking about?
12:26:57 19   Q.  Fair enough.  Have you -- to your knowledge,
12:27:01 20       have TriZetto's lawyers talked with Mr.
12:27:03 21       Bargar about the AMS system?
12:27:05 22   A.  To my knowledge, I guess I don't know one
12:27:10 23       way or the other.  I don't know that they
12:27:15 24       have, and I don't know that they haven't.
12:27:16 25   Q.  You mentioned that you met with him for

Page 109

12:27:19 1        about two hours, correct?
12:27:20 2    A.  Correct.
12:27:21 3    Q.  Then you had a telephone conference with him
12:27:23 4        about it, the system; is that right?
12:27:27 5    A.  Correct.
12:27:28 6    Q.  How long did that telephone conference last?
12:27:30 7    A.  That was relatively brief.  I would say it
12:27:33 8        was on the order of about a half hour.
12:27:35 9    Q.  And other than those two communications and
12:27:38 10       the one logistical, strictly logistical
12:27:42 11       communication that you had with him, were
12:27:43 12       there any other communications between you
12:27:44 13       and Mr. Bargar regarding the potential prior
12:28:04 14       art?
12:28:04 15   A.  I don't recall any others, as I sit here.
12:28:06 16   Q.  Did you -- what did you and Mr. Bargar
12:28:08 17       discuss during this -- during the meeting
12:28:14 18       you had with him?
12:28:14 19   A.  When I was at his house?
12:28:16 20   Q.  Yes.
12:28:22 21   A.  It was primarily focused around going
12:28:24 22       through the box of documents with me trying
12:28:27 23       to decide which ones I felt were conceivably
12:28:31 24       relevant to the task, and I probably asked
12:28:37 25       him some basic questions about both AMS and

Page 110

12:28:42 1        the GMIS system.  I don't recall in detail,
12:28:45 2        but I'm sure I must have asked some basic
12:28:47 3        questions about what they were and how they
12:28:50 4        worked.
12:28:50 5    Q.  Do you recall what he said?  Well, let me
12:29:01 6        back up for a minute.  Do you recall what
12:29:03 7        you asked him?
12:29:03 8    A.  Not in any finer level of detail than I've
12:29:06 9        just characterized for you.
12:29:07 10   Q.  Do you recall what he said?
12:29:14 11   A.  No, I don't recall specifically what I said.
12:29:17 12       What I'm --
12:29:18 13   Q.  What he said.
12:29:19 14   A.  I'm sorry, that's what I meant.  I don't
12:29:21 15       recall specifically what he said.  What I
12:29:23 16       remember is that what I was listening for was a
12:29:25 17       sense of is this stuff going to be relevant,
12:29:28 18       as best I can tell sitting here talking
12:29:30 19       about this.  So the sense I came -- I know I
12:29:35 20       came away with was, yes, this is potentially
12:29:38 21       relevant material, because there were
12:29:40 22       documents he put on the table that seemed to
12:29:42 23       me not relevant, and so, you know, those
12:29:44 24       were set aside.  They had to do with other
12:29:47 25       companies, other systems.

Page 111

12:29:48 1        So I was being selective about what we
12:29:52 2        picked out and trying to get a sense from
12:29:54 3        him as to whether the system seemed
12:29:57 4        relevant.  That's the level at which I was
12:29:59 5        listening, and that's what I recall.
12:30:00 6    Q.  Did you tell him that you were working for
12:30:03 7        TriZetto and were specifically looking at
12:30:06 8        whether or not you could invalidate
12:30:09 9        McKesson's patent?
12:30:10 10   A.  I don't recall if I mentioned TriZetto.  I
12:30:11 11       did in the very first phone call tell him
12:30:14 12       that I was working as an expert witness in a
12:30:17 13       lawsuit.  I don't recall whether I
12:30:18 14       identified the parties.  I might have, but I
12:30:21 15       told him at the very beginning the rationale
12:30:24 16       for the inquiry.
12:30:33 17   Q.  And in your subsequent discussions with Mr.
12:30:35 18       Bargar did you make him aware of the fact
12:30:39 19       that you were working to attempt to
12:30:43 20       invalidate McKesson's patent, '164 patent?
12:30:46 21           MR. SEGAL:  Objection, vague and
12:30:47 22       misstates his testimony.
12:30:55 23   A.  I told him that the material he had was
12:30:57 24       potentially relevant prior art.  I don't
12:30:59 25       know if I mentioned the '164 patent.  I did

Page 112

28 (Pages 109 to 112)

**Page 113**

12:31:03  1    speak clear to him, as I said, from the very
12:31:05  2    very -- excuse me.  I did make it clear to
12:31:08  3    him, as I said, from the very beginning that
12:31:11  4    I was working in a case that involved
12:31:14  5    depending against -- defending against a
12:31:15  6    charge of patent infringement.
12:31:17  7  Q.  Did he mention to you that GMIS attempted to
12:31:25  8    invalidate but couldn't the McKesson '164
12:31:28  9    patent?
12:31:29 10  A.  I think that's where I heard it.  I can't
12:31:31 11    recall.  I know either in my discussion with
12:31:33 12    him or soon thereafter I discovered that
12:31:37 13    fact, and I can't separate it out as I sit
12:31:40 14    here when I discovered that.
12:31:41 15  Q.  You discovered that GMIS failed to
12:31:44 16    invalidate in litigation the McKesson
12:31:46 17    patent, right?
12:31:47 18  A.  Yes, correct.
12:31:47 19        MR. SEGAL:  Objection.
12:31:48 20        THE WITNESS:  I'm sorry.
12:31:49 21  Q.  And did you learn that from Mr. Bargar?
12:31:52 22  A.  As I say, I don't recall, because I know
12:31:55 23    I -- I do believe I learned that fact close
12:32:01 24    to the time at which I was discussing the
12:32:04 25    AMS documents with him, but I don't recall

**Page 114**

12:32:06  1    whether he told me or whether I found that
12:32:08  2    out separately in part of the Web search,
12:32:12  3    perhaps.
12:32:12  4  Q.  Did you take any notes during or following
12:32:14  5    any of your communications with Mr. Bargar?
12:32:16  6  A.  Meeting at his house I just collected the
12:32:24  7    documents.  The answer is no there.  In the
12:32:28  8    subsequent telephone conversation that I
12:32:29  9    mentioned, the non-logistical one, I believe
12:32:31 10    I took a few notes on a single sheet of
12:32:34 11    paper.
12:32:35 12  Q.  Did you -- do you still have those notes?
12:32:39 13  A.  I do still have that.
12:32:41 14  Q.  And did you summarize either in an e-mail or
12:32:44 15    any other writing to TriZetto's lawyers your
12:32:50 16    communications with Mr. Bargar?
12:32:53 17  A.  No.
12:32:53 18  Q.  What city does Mr. Bargar live in?
12:33:02 19  A.  Newton.
12:33:02 20  Q.  Do you know his address?
12:33:05 21  A.  Not by heart.  He's in the phone book.
12:33:14 22  Q.  Have you reimbursed him for any of his time
12:33:17 23    or expenses?
12:33:17 24  A.  No.  He did ask whether -- he did raise that
12:33:21 25    issue, and I referred him to TriZetto's

**Page 115**

12:33:22  1    lawyers.  What was discussed transpired after
12:33:26  2    that I wasn't privy to.
12:33:29  3  Q.  What did he inquire about?
12:33:31  4  A.  Whether he could be paid for the time he was
12:33:33  5    putting in, copying documents and so forth.
12:33:36  6  Q.  He knew you were being paid for your time?
12:33:38  7  A.  He did.  That's another thing I disclosed in
12:33:41  8    the initial conversation.  I wanted to be
12:33:44  9    fair with him.
12:33:44 10  Q.  Did he know you were getting paid $650 an
12:33:48 11    hour or maybe $700 an hour for --
12:33:51 12  A.  I do not routinely disclose that, no.
12:33:53 13  Q.  Did he say he would like to be paid for his
12:33:55 14    time?
12:33:55 15  A.  I never got around to discussing it.  I
12:33:57 16    didn't see it as my responsibility or
12:33:59 17    concern.  He seemed --
12:34:01 18  Q.  But he asked you about it, right?
12:34:03 19  A.  Yes.  It seemed to me to be a perfectly
12:34:06 20    reasonable request.  In fact, I was not at
12:34:09 21    all surprised when he asked about that.  I
12:34:10 22    also knew it was not up to me to negotiate
12:34:13 23    with him on that issue.
12:34:14 24  Q.  No, I understand that.  But nonetheless he
12:34:16 25    expressed an interest you in being paid for

**Page 116**

12:34:20  1    helping, right?
12:34:21  2  A.  For the time he was putting in, he expressed
12:34:23  3    that interest, yes.
12:34:25  4  Q.  And you said -- you put him in touch with
12:34:29  5    who, Mr. Segal?
12:34:30  6  A.  I believe I put him in touch with Mr. Muino.
12:34:39  7        MR. RANDALL:  Mr. Segal, has
12:34:41  8    TriZetto retained Mr. Bargar?
12:34:43  9        MR. SEGAL:  I don't know.
12:34:43 10        MR. RANDALL:  Do you have any
12:34:44 11    agreement with him to pay any money?
12:34:45 12        MR. SEGAL:  I don't know.  I
12:34:48 13    honestly do not know.
12:34:48 14        MR. RANDALL:  So you don't mind if
12:34:50 15    we go ahead and contact him?
12:34:51 16        MR. SEGAL:  I can check before the
12:34:53 17    end of the day with Mr. Muino and find out
12:34:55 18    if he's been retained or not.
12:34:56 19        MR. RANDALL:  Well, why don't
12:34:58 20    you -- at the lunch break why don't you find
12:34:59 21    out.  I think that would be something you'd
12:35:00 22    know.
12:35:00 23        MR. SEGAL:  Well, I don't know
12:35:02 24    offhand because I wasn't the one dealing
12:35:04 25    with him, but I can check with Mr. Muino

29 (Pages 113 to 116)

03:33:37 1    necessary. I know it was certainly useful.
03:33:39 2 Q.  All right. Other than this McDermott
03:33:42 3    reference, you did not find it necessary to
03:33:45 4    review any source code for any of the other
03:33:49 5    prior art references or systems that you --
03:33:52 6    that form the basis for your validity
03:33:54 7    opinions, correct?
03:33:55 8 A.  Yes, that's correct. Part of the things I
03:34:02 9    opined about concerning those previous
03:34:03 10   systems were based on information and
03:34:08 11   descriptions of the systems as opposed to
03:34:10 12   information gleaned from reading the source
03:34:12 13   code.
03:34:18 14 Q.  And you were able to reach the conclusion
03:34:19 15   and opinions that you reached, namely that
03:34:24 16   the prior art practiced all of the elements
03:34:26 17   of all of the asserted claims, without the
03:34:29 18   necessity of ever looking at any source code
03:34:34 19   for those references or systems other than
03:34:36 20   this McDermott reference, correct?
03:34:38 21       MR. SEGAL: Objection, vague and
03:34:41 22   ambiguous, mischaracterizes the testimony.
03:34:43 23 A.  I think it's necessary to be explicit and
03:34:48 24   say that the prior art, along with knowledge
03:34:55 25   of practice at that point in time, renders

Page 197

03:34:59 1    these things obvious. It wasn't just the
03:35:01 2    articles themselves. And you keep saying
03:35:03 3    just the articles. And I want to be clear
03:35:06 4    that it's those articles in the context of
03:35:08 5    experience in the art as of that point in
03:35:11 6    time which rendered them obvious.
03:35:15 7 Q.  And you were able to reach those conclusions
03:35:18 8    without the necessity of reviewing any
03:35:24 9    source code with respect to the prior art
03:35:27 10   referenced in your reports, right, other
03:35:30 11   than this McDermott reference?
03:35:31 12       MR. SEGAL: Objection, vague.
03:35:32 13 A.  Other than the McDermott reference.
03:35:37 14 Q.  The answer's yes?
03:35:38 15 A.  Yes.
03:35:38 16 Q.  So just to be clear, you were able to, based
03:35:46 17   on someone that you considered to be of
03:35:50 18   ordinary skill in the art at the relevant
03:35:54 19   time, look at just the references and the
03:35:56 20   materials cited in your report and conclude
03:35:59 21   that they disclosed all the elements of the
03:36:05 22   asserted claims without ever having to look
03:36:08 23   at the source code, correct?
03:36:09 24       MR. SEGAL: Objection,
03:36:10 25   mischaracterizes the record, vague.

Page 198

03:36:12 1 A.  I'm sorry, I'm losing it. If you could just
03:36:23 2    read that back.
03:36:23 3 Q.  I'll rephrase it.
03:36:24 4 A.  Okay. Sorry.
03:36:26 5 Q.  The basis for your opinions that the
03:36:29 6    asserted claims are invalid -- strike that.
03:36:34 7       It was not necessary for the basis of
03:36:39 8    your opinions that each and every asserted
03:36:44 9    claim was invalid for you to review the
03:36:49 10   source code for the references and systems
03:36:52 11   that you relied upon in your report,
03:36:54 12   correct?
03:36:54 13       MR. SEGAL: Vague.
03:36:55 14 A.  It was not necessary for me to review the
03:36:57 15   source code of every system described in the
03:37:00 16   report in order to arrive at the opinions I
03:37:02 17   arrived at.
03:37:03 18 Q.  And, in fact, it wasn't necessary for you to
03:37:05 19   review any source code other than, aside
03:37:08 20   from the source code, perhaps, that was
03:37:10 21   referenced in the McDermott article,
03:37:13 22   correct?
03:37:13 23 A.  There was enough material in the articles
03:37:16 24   and in my knowledge of the prior art.
03:37:20 25 Q.  Without the necessity of having to rely on a

Page 199

03:37:22 1    review of the source code, correct?
03:37:24 2 A.  For most of them, except for McDermott.
03:37:27 3 Q.  Is it your opinion, sir, that any individual
03:37:43 4    reference or system anticipates any one
03:37:49 5    claim of the -- strike that.
03:37:53 6       Is it your opinion that any one
03:37:55 7    reference or system anticipates all asserted
03:38:00 8    claims of the '164 patent?
03:38:04 9 A.  As I understand the term "anticipates," the
03:38:07 10   answer is no.
03:38:08 11 Q.  Is it your opinion that any one reference or
03:38:13 12   system anticipates any claim of the '164
03:38:19 13   patent?
03:38:24 14       (Witness reviews document.)
03:38:24 15 A.  Okay. So the question is, again, is there
03:39:05 16   any one reference that anticipates any claim
03:39:09 17   of the '164 patent? Do I have it right?
03:39:13 18 Q.  Reference or system, yes.
03:39:15 19 A.  No.
03:39:19 20 Q.  So it's your opinion, sir, that you have not
03:39:24 21   found any one reference or any one system
03:39:29 22   that you believe anticipates any asserted
03:39:32 23   claim of the '164 patent, correct?
03:39:36 24 A.  I guess I would want to -- as I sit here, I
03:39:49 25   would want to give a little more thought --

Page 200

50 (Pages 197 to 200)

04:22:02 1    adequate by themselves, okay? But there may
04:22:06 2    also be ones where, as you say, a claim
04:22:09 3    element was missing. I did not examine
04:22:13 4    these to see if they suggested combining in
04:22:16 5    such a fashion as to cover all the claim
04:22:18 6    elements in the cases where a claim element
04:22:21 7    might have been missing.
04:22:23 8  Q.  Okay. So to draw an analogy, you looked at,
04:22:27 9    for instance, any given claim and the
04:22:29 10   elements that are contained in that claim as
04:22:32 11   a puzzle, for instance, with each element
04:22:35 12   representing a piece to the puzzle? Do you
04:22:38 13   follow me so far?
04:22:39 14        MR. SEGAL: Objection, vague.
04:22:39 15 A.  I follow the analogy. I'm not sure I
04:22:43 16   believe it, but I follow it.
04:22:44 17 Q.  And so did you then look at the prior art
04:22:47 18   and determine what pieces of prior art would
04:22:50 19   satisfy the elements and then combine them
04:22:52 20   to render the claim obvious?
04:22:56 21 A.  No, I don't think that's how I thought about
04:22:58 22   it. I think I was looking at these prior
04:23:03 23   art references as things that rendered the
04:23:08 24   claim obvious; that is, they had all of the
04:23:15 25   elements of the claim.

04:23:16 1        Now, I would have to go back and see
04:23:18 2    whether I want to take any of those out on
04:23:20 3    that standard, but I believe they cover --
04:23:26 4    I'm hesitating because I would have to go
04:23:28 5    back and look. Let me back up. I did not
04:23:32 6    approach this as if it were a puzzle of
04:23:34 7    independent pieces.
04:23:35 8  Q.  All right. Looking -- well, let me just ask
04:23:37 9    you a few questions about this. I'll just
04:23:40 10   take, for instance, Claim 1 on the chart on
04:23:43 11   Page 34. Did you examine, for instance, the
04:23:46 12   Bennett patent to determine if it suggested
04:23:49 13   in any way that you should combine it with
04:23:55 14   the Doyle patent to solve a problem that was
04:23:59 15   solved by Claim 1 of the '164 patent?
04:24:03 16 A.  No. I think I can say in general I did not
04:24:07 17   try to look at these to see if they
04:24:09 18   suggested combining among themselves.
04:24:12 19 Q.  And that's true of any of the asserted
04:24:15 20   claims with respect to your opinions in your
04:24:19 21   expert report, correct?
04:24:19 22 A.  That's correct. But keep in mind that I
04:24:24 23   believe many of these cover the -- all the
04:24:27 24   elements of the claim. So the combination
04:24:29 25   would not be necessary. Where the

04:24:35 1    combination is necessary I haven't come up
04:24:37 2    with the subset and the motivations for
04:24:40 3    combining, but I did not approach this as if
04:24:43 4    it were independent pieces of a jigsaw
04:24:46 5    puzzle.
04:24:49 6  Q.  Well, in order to support your opinion that
04:24:52 7    the asserted -- any one of the asserted
04:24:54 8    claims is invalid, you are relying on a
04:24:57 9    combination of art or systems, correct?
04:24:59 10 A.  No. This takes us back to a little earlier.
04:25:05 11   I tried to say it carefully, so let me say
04:25:08 12   it again, that this is an exhaustive list --
04:25:13 13   let's take Row No. 1. It's an exhaustive
04:25:16 14   list of all the prior art references that
04:25:18 15   seem to have an impact on Claim No. 1,
04:25:22 16   okay? I did not analyze -- I did not report
04:25:25 17   them down to the level of individual
04:25:27 18   elements, but this row (indicating), for
04:25:30 19   example, is not there to suggest that eight
04:25:37 20   different things are needed in order to
04:25:40 21   cover Claim No. 1. That wouldn't even make
04:25:42 22   sense, because Claim No. 1 only had, you
04:25:46 23   know, three or four elements to it. So this
04:25:49 24   is a list of any of the prior art references
04:25:55 25   that had an impact on -- that by itself had

04:25:58 1    an impact on Claim No. 1.
04:26:00 2  Q.  On any one of the elements of Claim No. 1?
04:26:03 3  A.  What I haven't done is make sure that they
04:26:05 4    have an impact on either all of the elements
04:26:07 5    or if they didn't, to specify at that next
04:26:11 6    level of detail. I agreed with that
04:26:13 7    earlier. I haven't reported that here.
04:26:15 8  Q.  Actually, what you testified to is it's 13
04:26:18 9    references that should be included in Box
04:26:20 10   No. 1, correct?
04:26:21 11 A.  Fair enough. Because -- well, Egdahl needs
04:26:33 12   one of the five things we listed from the
04:26:35 13   box on Page 37 to establish the suggestion
04:26:38 14   to combine, okay? So that's -- it's Egdahl
04:26:41 15   that needs the suggestion to combine
04:26:43 16   reference.
04:26:44 17        So it's more like -- what is it? -- so
04:26:53 18   it's nine things that would be in there but
04:26:55 19   not because nine things are needed to be
04:26:58 20   combined to cover Claim No. 1. That's not
04:27:01 21   what that's intended to represent. So it
04:27:04 22   shouldn't be read that way. There aren't
04:27:08 23   nine things to be accounted for in Claim
04:27:09 24   No. 1.
04:27:10 25 Q.  But you have not expressed in your report

58 (Pages 229 to 232)

Page 314

1

2

3

4

5

6

7

8

9          I, RANDALL DAVIS, Ph.D., do hereby declare under

10    penalty of perjury that I have read the foregoing

11    transcript; that I have made any corrections as appear

12    noted, in ink, initialed by me, or attached hereto; that

13    my testimony as contained herein, as corrected, is true

14    and correct.

15          EXECUTED this  3rd  day of  January  ,

16    20 06 , at  Cambridge  ,  Mass  .
                      (City)                    (State)

17

18

19

20    _____
                RANDALL DAVIS, Ph.D.

21

22

23

24

25

EXHIBIT H

# REPORT OF EXPERT WITNESS

Pursuant to Federal Rule of Civil Procedure 26(a)(2)(B)

Dr. Larry Kerschberg

_____

In the United States District Court

District of Delaware

McKesson Information Solutions LLC v. The TriZetto Group, Inc.

Case No. 04-01258-SLR

_____

Report on Invalidity of '164 Patent

October 24, 2005

_____

## I.     Professional Background

I received my B.S. in Engineering Science with Honors from Case Institute of Technology in Cleveland Ohio in 1964.  I then obtained an M.S. in Electrical Engineering from the University of Wisconsin — Madison in 1966.  I received my PhD in Systems Engineering in 1969 from Case Western Reserve University.

I have worked and taught at the Federal University and the Catholic University, both in Rio de Janeiro, Brazil (1969-1976), the University of Maryland — College Park (1976-1977), Bell Telephone Laboratories (1977-1981), the University of South Carolina (USC) — Columbia (1981-1986), and George Mason University (1986-Present).

I am currently Professor of Information and Software Engineering, Director of the M.S. in E-Commerce program and Director of the E-Center for E-Business at George Mason University.  I am also a founding editor and serve as an Editor-in-Chief of the *Journal of Intelligent Information Systems: Integrating AI and Database Technologies*, published by Springer Publishing Company.  Springer publishes six issues of the journal per year.  I am an Associate Editor for the Data Mining and Knowledge Discovery Journal, also published by Springer.  I am also a member of the Editorial Board for the *Journal of Data Semantics*, published by Springer.

During the 1970's, while in Brazil, I co-created with Mr. Joao Pacheco, the Functional Data Model, which can be used to specify a conceptual model for a database application.  This model is still being used world-wide in research prototypes and has gained popularity in specifying applications that exploit the infrastructure provided by the

1

Internet and the World Wide Web. I served as an editor for a book on the Functional Approach to Data Management [1] that was published recently by Springer.

During the 1980s, I recognized that the fusion of Artificial Intelligence and Database Management concepts would lead to new tools and system architectures to build systems containing large rule bases (knowledge bases) and which access very large databases. I organized and served as Program Chairman for the Workshop on Expert Database Systems (EDS) (1984), followed by two International EDS Conferences held at Charleston, SC and Tysons Corner, VA in 1986 and 1988, respectively. Three books on the subject have been published [2-4]. These events also led to the creation of the Journal of Intelligent Information Systems in 1992. I also worked on a Knowledge/Data Model [5] to incorporate both data and knowledge into a specification for an expert database system.

During the 1990s, I served as Principal Investigator on a DARPA-sponsored project on the Intelligent Integration of Information (I*3). In 1994, I led the Computer and Information Science team in the NASA Independent Architecture Study for the Earth Observing and Data Information System (EOSDIS). The GMU Study proposed a performance-oriented federated approach to this data-intensive system; NASA has since funded the development of such a federated approach.

I have published numerous papers in journals and conferences, have edited six books, and have served on international program committees. In 1998, I was a Fellow of the Japan Society for the Promotion of Science, and performed research at Kyoto University. I also traveled extensively in Japan, giving lectures at major universities on the topics of agent-based systems and knowledge management. In 2001 I served as Program Chair for the International Conference on Scientific and Statistical Database Management, held at GMU. In April 2005, I organized and co-chaired the Workshop on Information Just-in-Time and was the keynote speaker at the Conference on Professional Knowledge Management. The title of my paper was "Just-in-Time Knowledge Management" [6].

Since joining George Mason University I have been involved in teaching and research in the areas of Expert Database Systems, Intelligent Information Integration, Knowledge Discovery and Data Mining and Knowledge Management. One of the major themes throughout my research career has been Knowledge Management. The creation, representation and processing of data/knowledge is one of the main themes of my teaching, research and consulting. My work has been funded by NASA, the Defense Advanced Research Projects Agency (DARPA), the National Geospatial-Intelligence Agency (NGA), Software Productivity Consortium, and the National Reconnaissance Office (NRO). I have consulted for Lockheed-Martin Advanced Information Systems, Global InfoTek, and several law firms on patent- and intellectual-property issues.

A current copy of my curriculum vitae is attached to this report as Appendix A. My curriculum vitae includes a list of all my publications. I have not previously testified as an expert witness at deposition or trial in any cases.

2

## II.    Summary of Activity

I have been asked by attorneys for The TriZetto Group, Inc. ("TriZetto") to examine and assess certain prior art references and systems and to present my opinions on patent validity issues raised in the above-referenced action.

This report describes my analysis, conclusions, and opinions regarding the validity of the asserted claims of U.S. Patent 5,253,164 (the "'164 patent"), asserted by plaintiff McKesson Information Solutions LLC ("McKesson") in this case. I expect to offer testimony at trial conveying the opinions set forth in this report, as well as to provide background testimony on technology pertinent to this case. I anticipate that my testimony may include exhibits and demonstrations to illustrate or otherwise support the opinions expressed in this report.

The views expressed herein are offered in light of my current understanding of the meaning of the claims of the patent. I understand that the Court will construe select terms in the patent claims, but has not yet done so as of the date of this report. I reserve the right to supplement my opinions once the Court has provided a claim construction.

I also reserve the right to supplement my opinions in response to any additional material or differing claim interpretations provided by McKesson, expert reports provided by McKesson, or additional thoughts I have after submitting this expert report or performing additional investigation.

## III.    Compensation

I am being compensated at the rate of $300 per hour, plus expenses.

## IV.    Materials Reviewed

In forming the opinions presented in this report, I have reviewed the '164 patent, several prior art references, and pertinent information from textbooks and technical papers. I also reviewed portions of the depositions provided by the inventors, that is, Drs. Goldberg, Hertenstein, Holloway, and Ms. Dugan [7-10]. A list of the materials that I reviewed in the course of preparing this report is attached as Appendix B.

## V.    Summary of Opinions

I have been informed by the attorneys for TriZetto that a patent is invalid "if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." 35 U.S.C. § 103(a).

It is my opinion that the system and method of the '164 patent would have been obvious to one of ordinary skill in the art at the time of the invention.[1]  Specifically, the

---

[1] I define a person of ordinary skill as having a baccalaureate in either Management Information Systems or Computer Science, has taken a course in Business Expert Systems or Artificial Intelligence, and one year of experience in developing such systems. This person would be able to work with application domain experts — doctors or people with claims processing experience — to create the system and method as a expert system program  for surgical claims processing, based on the '164 patent.

paper by Egdahl and Hertenstein provides the motivation, context, and the outline of a method that could be used to build an automated system to process medical claims. The motivation for such a system was to contain rising medical costs for surgical procedures. The context for this study was that physicians — in order to increase revenue under increasing pressure from insurance companies and Medicare and Medicaid to hold down costs — had begun to 'unbundle' surgical codes and charging for them separately. Oftentimes, they might perform additional unwarranted surgery and bill for them in addition to the required surgery. The process discussed in the Egdahl/Hertenstein article is "The Caterpillar Method" to define a set of rules that can detect when claims contain 'unbundled' codes, and provide a means to 'rebundle' them for proper payment. Other rules could be used to determine if unneeded surgery was being billed. Finally they discuss the need for rules that are not of a medical nature, for example a rule called Geographic Multipliers that would adjust the payment schedule based on the city or region of the country where the procedure was performed. The Caterpillar (CAT) Method consists of a number of steps involving the CAT claims processor who rewrites the codes and if needed, consults with the physician's office to clarify certain charges or to obtain additional information. The article states, in the second column of page 352, in the 'Employee communication' section, "CAT has a program of employee communication that defines the employees' responsibilities and options when payment is less that the fee charged by a surgeon. A letter of explanation is *automatically generated* [my italics] to the employee where there has been a payment reduction."

The Caterpillar Method and the processing steps in the Egdahl/Hertenstein paper provide an outline for designing and implementing an automated system such as the patented system and method described in the '164 patent.

The MEDCLAIM project, for which I served at Project Manager, was implemented in the 1985-1986 time frame. An actual prototype was created to process medical claims. The motivation for MEDCLAIM came from the increasing claims volume for home health care. Rather than hire more Registered Nurses (RNs) to handle these additional claims, Blue Cross/Blue Shield of South Carolina funded the research and development of an expert database system to automatically process the medical claims. The context for MEDCLAIM is the area of Home Health Care, in which health service providers visit patients at home, administer prescribed treatments and bill BC/BS for payment. The method used in MEDCLAIM consists of applying rules on how to process medical claims for home health care, for instance, 1) to determine if the patient qualifies as being 'homebound', 2) the medical necessity of the treatments administered as compared with the physician's diagnosis of the patient's illnesses, and 3) whether all the services rendered should be paid. These rules for medical claims processing access an associated database of illnesses and their typical treatment plans over a specified recuperation period. The database was constructed with the help of the MEDCLAIM resident expert, the chief Registered Nurse. The database uses ICD-9 codes to refer to an illness and its associated treatment plans. The MEDCLAIM system would accept or reject a claim based on its analysis of the various conditions it tested for, that is, homeboundedness of patient, medical necessity of treatments based on the diagnosis, and the number of treatments billed during the recuperation time period. MEDCLAIM also had a rule which advised it to refer a claim to a nurse, if the claim was too difficult for it to process automatically.

4

It is my opinion that the Egdahl/Hertenstein paper together with the MEDCLAIM system prototype render obvious the system and method of the '164 patent. The architecture and components of MEDCLAIM are very similar to those of the '164 patent, and the Egdahl/Hertenstein paper provides the outline for the design and implementation of a system for medical claims processing of surgical procedures.

## VI.    Introduction to Expert Systems

In this section, I present a general background of the concepts contained in the '164 patent and the related field of technology.

The goal of expert systems is to capture and represent the "expertise" of experts in a computer program. An expert's 'expertise' is obtained over many years from real-world experiences in a particular application domain. That expertise may take the form of rules of thumb that an expert gains from years of experience in his field. Thus, an expert can give a reasoned opinion on a topic in his area of expertise because he has been able to capture his experiences in these rules of thumb and reason about the problem to come up with his opinion. For example, in the medical domain, an expert rule might be "If a person is over 90 years old, open heart bypass surgery is not indicated." An expert knows that an older person runs the risk of not surviving such an invasive procedure. Another explanation might be this procedure would not be paid by Medicaid or Medicare, precisely because of the person's age.

An expert's knowledge may be both tacit (closely-held internalized knowledge that comes from experience) or explicit (compiled knowledge that has been published in journal articles and books). The former might be best expressed in rules, while the latter could be expressed as either as rules or as data in a database. One of the challenges is to be able to represent an expert's expertise in a computer program, and the field of Knowledge Engineering focuses on this challenge. The expert's knowledge, or expertise, may be represented as a collection of rules; and reasoning techniques apply the rules to the facts in a case to derive new facts and to draw conclusions regarding that case.

Once the expert's knowledge has been represented in a computer program, then the program can interact with a person to accept a collection of "facts" about a particular case in an application domain, and use the "expertise" to reason with these facts to draw conclusions. For example, one could imagine consulting an "expert system physician" that would ask a series of questions regarding a person's symptoms, would reason about those symptoms (facts) using rules stored in its rule base, and would derive a diagnosis for that person, and prescribe appropriate medications. One such system is the MYCIN System developed at Stanford University during the period 1972 to 1982 by Bruce G. Buchanan, Edward H. Shortliffe, Randall Davis and others [11].

Moreover, given that we are dealing with a computer program that is reasoning as a human expert would, we would like to be able to trace through the reasoning process to see the intermediate steps taken in deriving a conclusion, for example a medical diagnosis from symptoms, or the explanation of medical claims benefits paid based on surgical procedures billed. We would also like to ask for a rationale for those decisions. In expert systems theory, this is called the 'Explanation Function' of the expert system. This explanation function is part of expert system theory and practice and most such applications provide an explanation function.

5

As expert system technology matured, several companies began selling expert system shells. These shells were programs that embodied the concepts, architecture and reasoning techniques proposed by the leading researchers and practitioners in the field. In this way, "knowledge engineers" could use these shells to build expert system applications in a chosen application domain.  The shell provided an environment to develop an expert system application.  It included components to represent and store rules in a rule base, to accept facts from the user, to reason about the set of facts using the rules, and to explain the reasoning process to the knowledge engineer and also to the users of the system.   Several companies began marketing these shells, including Teknowledge, Inc., which introduced a shell called M1 in 1985.  This is the shell that was used to build the MEDCLAIM system discussed in section VIII.

## VII.    Overview of the Patent Claims

In this section, I provide a general description of the system and method of the '164 patent, followed by a short summary of each patent claim.  Additional analysis of each claim can be found in Section XI: Claim Chart in which the text of a claim is followed by my opinion regarding that claim.

The '164 patent indicates that the system and method was developed to address skyrocketing health care costs and the need to control spending by self-insured companies and the Federal Government. They talk about the increased importance of Health Maintenance Organizations (HMOs) and Preferred Provider Organizations (PPOs) and how physicians reduce their fees through negotiated fee schedules with these organizations (See column 1, lines 39-54). In order to compensate for these reduced fees, physicians greatly increase their fee-for-services charges and do what is known as upcoding in which they charge a higher paying code than that for the procedure performed. Another approach is called unbundling of each surgical procedure rather than billing for them as a group, when they are components of an overarching procedure (See column 2, lines 5-16). It was this environment that motivated the development of the system and method. The practices of upcoding, bundling and unbundling is discussed in the Egdahl and Hertenstein paper [12] (See Egdahl/Hertenstein, page 349 (Abstract), page 351 (Section on "Continual audit and recoding of physician claims")).

The system and method of the '164 patent is a computer system consisting of a central processing unit and associated memory that allows it to process medical claims consisting of medical service codes.  The system interacts with a human user to assist in processing the medical claims. Part of that interaction with a user may be to inform the user that a claim has been revised or that additional information is needed to determine whether a claim may be authorized (Column 4, lines 23-68; column 5, lines 1-3).

In order to determine whether the medical claim should be authorized, the system and method accepts the claim and the medical service codes present in the claim, it then examines the service codes to first verify that the codes are valid (Column 5, lines 5-25). This is done by accessing a predetermined database of codes to verify that the billed codes are present in the database.  Next, the system and method may apply several types of rules to examine whether the service codes have specific relationships among themselves.  For example, the system and method looks for codes that have been listed separately, when in fact they are part of a more general surgical procedure (this is known

6

as 'unbundling'). It has the ability to reject the separately listed code (Column 5, lines 26-68; column 6, lines 1-65).

The system and method may also look for mutually exclusive codes, which I interpret to mean that one code may be billed and not the other, and vice-versa. It may also invalidate certain service codes based on mutual exclusion due to non-medical rules. There are additional rules to determine whether the billed service codes are appropriate for the surgical procedure that was performed. The system and method may delete inappropriate service codes and may replace them with the medically appropriate service codes. The system and method accesses the predetermined database to verify the relationships among the codes. The system and method has the ability to interact with the user to obtain additional information and to explain to the user why certain actions were taken in the claim processing process (Column 7, lines 1-10).

The patent abstract describes the system and method as an "expert computer system for processing medical claims." The medical claims are submitted to the system and are interpreted according to "specific rules and a predetermined database" to ascertain whether the services billed on the medical claims are appropriate (Title Page, second column).

This statement is important in that it refers to the system and method as an 'expert' computer system, so I conclude that the system and method designers were influenced by Expert System theory and practice, as exemplified by [11, 13-16]. In fact, the '164 patent references the Weitzel and Andrews paper that describes the joint-venture between Blue Cross/Blue Shield of South Carolina and the University of South Carolina to build an expert system for medical claims review in the area of Home Health Care. [14] (See Title Page, second column).

Figure 1 of the system and method provides an overview of the system which I paraphrase here. The numbers refer to the components indicated on the diagram. Generally, the user (2) will enter into the computer system (2) a description of the medical claims for which reimbursement of payments is requested or the codes associated with such claims or both. The appropriate codes are then sent to the knowledge base interpreter (5) for its assessment of the coded claims. The interpreter (5) uses the rules of the CodeReview system, interacts with the knowledge base (6) and returns to the user: 1) either a recommendation as to the code(s) for which payment is proper, or 2) requests that the user provide more information, or obtain additional information from the entity requesting payment, or 3) refers the claim to trained medical personnel for assessment (Column 4, lines 23-68; column 5, lines 1-3).

When the knowledge base interpreter (5) has recommended approval of payment of a particular type, the user (3) may authorize payment to the provider of the processed claim or may forward that information via input into the computer system (4). A history database (7) is used to refine and update the knowledge base interpreter (6) and to monitor savings associated with the recommendation, that is, a comparison of the costs associated with the original service codes on the claim, as compared with the revised service codes. (Column 4, lines 23-68; column 5, lines 1-3).

Figures 2 through 7 of the '164 patent provide schematics (flow charts) of the workflow for processing medical claims. The '164 patent includes some additional detail on the various database files that contain data relevant to processing the service codes.

They include the following: ALLCODE, SUPERSEDE, PROCESS, INTERACT, BYITSELF, etc. Each database is used to assess the appropriateness of the codes appearing in a medical claim. However, the actual contents of these databases are not disclosed, except for the 21 rule templates of the INTERACT and BYITSELF databases (Columns 5-10).

Now I review the '164 patent claim by claim.

Claim 1: This claim describes the basic method with the capabilities of operating on a predefined database, receiving at least one claim, determining whether any medical service code is present in the database, and informing the user if the code is not present.

**Note**: The claim does not use the complete apparatus of Claim 1a. (See Section XI, below, Claim Chart). For example it does not use the relationships among the database codes. Rather, it compares the claim code on the submitted form to verify whether it is contained in the database.

Claim 2: This claim describes the basic method and focuses on receiving at least one claim, determining if the claim has several (a plurality) medical services codes, determining whether there exist mutually exclusive codes due to non-medical reasons, and rejecting those mutually-exclusive service codes, and authorizing those valid service codes that are not mutually exclusive due to non-medical criteria for the surgical procedure.

**Note**: I think the terminology, "mutually exclusive codes due to non-medical criteria" is quite vague, and can be open to various interpretations. I was not able to find a formal definition of this concept in the '164 patent.

In his deposition Dr. Goldberg admits that he does not know precisely the meaning of the term "mutual exclusion due to non-medical criteria" (Goldberg Deposition, page 305).

On page 199 lines 12-23 and page 200 lines 1-23 of his deposition, Dr. Hertenstein discusses the term 'mutually exclusive due to non-medical criteria' and he gives an example of Breast Enlargement as perhaps not being covered by a plan. Another example he states might be a 'valid' operation, a breast reconstruction some time after a mastectomy and on the same claim also plastic surgery, say a face lift. "And non-medical would mean that the second one would be excluded because it's not something covered."

However, on Page 200 lines 22-23 of his deposition, Dr. Hertenstein states "I don't know what mutually exclusive means. Okay?" This shows that the concept is confusing, even to the expert who helped to create the rules in the '164 patent.

Claim 3: This claim is similar to Claim 2 but distinguishes itself by stating that the system determines whether one medical service code on the claim is valid or invalid when received on a claim with other codes. This is done by consulting the predetermined database of medical service codes and their relationships with other codes, means for authorizing the valid codes obtained from database consultation, and either authorizing valid service codes or rejecting invalid service codes obtained from database consultation.

**Note**: The notion of valid or invalid service codes is very ambiguous. It appears that the term 'valid' in Claim 1 is used to denote whether the billed service code is also in the database of codes. In Claim 3, a code is valid and remains in the medical claim if it

8

passes a number of tests, based on its relationship with other codes on the claim form and after a database access to assess the code's relationships to other codes in the database. The term 'valid' is ambiguous and needs a more precise definition and interpretation.

Also, there is no indication in Claim 3 as to which rules are used to determine the valid or invalid service codes.

Claim 4:  Claim 4 is similar to Claim 3, and allows for revising a claim by deleting 'invalid' medical service codes.

**Note**: The same ambiguity regarding the terms 'valid' and 'invalid' in the note for Claim 3 also holds for Claim 4.

Claim 5:  Claim 5 is similar to Claim 4, and in addition incorporates a way of informing a user as to why the claim has been revised.

Claim 6:  Claim 6 is similar to Claim 3 but in addition specifies that the database includes medical service codes described by CPT-4 codes.

Claim 7:  I understand that McKesson is not asserting Claim 7 in this litigation.

Claim 8:  Claim 8 is similar to Claim 3 but also stipulates that the user may be asked to provide additional information regarding the claim.

Claim 9: Claim 9 is similar to Claim 3 but also provides additional information regarding the contents of the database, namely, that the relationships among the medical service codes include medically determined relationships.

**Note**: The concept of medically determined relationships may be subject to interpretation, and I have trouble understanding how these would be represented in the database.  I would think that Claim 3 would suffice in determining the 'validity' of a medical service code, so that Claim 9 seems unnecessary, unless the database has other relationships among the codes that are not medically determined.  Here again, we have an ambiguous term being used in a Claim, and it is the only thing that distinguishes it from Claim 3.

Claim 10:  Claim 10 describes the basic system, the associated database of medical service codes and a set of relationships among the service codes, and more specific features related to determining bundling, means for rejecting unbundled medical service codes and means "for authorizing medical service codes which are not contained in any other service code."

**Note**: I interpret the statement in quotes as referring to those medical services codes that are valid, and not bundled with other medical service codes.

Claim 11:  Claim 11 is similar to Claim 10 with the additional feature that the medical claim can be revised to not include the rejected medical service code.

Claim 12:  Claim 12 follows the basic system and adds a clause which uses new wording to compare medical codes, namely, "means for determining whether one of the medical services codes in the at least one claim is medically exclusive with any other medical service code in the at least one claim.

**Note**:  Other claims use the term 'mutually exclusive' among services codes. This is the first instance of the term 'medically exclusive.'  It is not clear how the terms 'mutually exclusive' and 'medically exclusive' differ.

Pages 29-31 of Dr. Hertenstein's deposition gives an example of mutually-exclusive codes (and presumably medically exclusive codes): a hysterectomy is mutually exclusive from removing an ovary and a tube.

Claim 13:  Claim 13 is very similar to Claim 1.  Whereas Claim 1 describes a method, Claim 13 describes an apparatus.

Claim 14:  Claim 14 is similar to Claim 2.  Whereas Claim 2 describes a method, Claim 14 describes an apparatus

Claim 15:  Claim 15 is straightforward in that it receives a claim, checks whether codes are valid by consulting the database, and either authorizes or rejects the medical claim.

Claim 16:  Claim 16 is a method claim similar to Claim 15 in that the medical services codes on the medical claim are checked for validity, and the medical claim is authorized or rejected.

Appendix C of the patent provides portions of the program code for the system and method.  It is not clear to me whether all the code is provided, nor could I find the rule databases of CPT-4 codes anywhere in the patent.

I note that from the deposition of Ms. Kelli Dugan, the programming tools used to implement CodeReview were a program called Clipper and a database program called dBase III (See Page 71 line 22 and Page 76 lines 14-15).

## VIII.    The MEDCLAIM System

In 1982, while at USC, I became interested in the then-emerging area of expert systems.  I sat in on a course on Building Expert Systems, offered by the Electrical Engineering department, using a book by the same name [13].

Until that time my background, research interests and publications were in the area of database management, that is, how to organize corporate data to be captured, stored and retrieved from the database.  The database management area was also relatively new and several companies were beginning to market Database Management Systems, which were the database equivalent of "shells" for the construction and management of large databases.  Some companies at the time were Oracle (now the Industry leader), Relational Technology, makers of Ingres (now part of Computer Associates), and Aston-Tate (makers of dBase II for personal computers).  I noticed the need to have expert systems "talk" to database systems so that we could take advantage of their relative strengths while mitigating their weaknesses.

One of the shortcomings of expert system shells was that all the facts and rules had to reside in main memory (small and costly at that time), while databases were adept at handling large collections of facts stored in secondary, or associated, storage on disk.  Database systems would benefit from having rules "close" to the data, in the form of alerts or triggers.  Several architectural concepts emerged at that time, including the notions of loosely-coupled and tightly-coupled Expert Database Systems.

In 1984, following the success of the EDS Workshop, sponsored by USC's Institute for Information Management, Technology and Policy, I met with a Senior Vice President of Blue Cross/Blue Shield of South Carolina, and he mentioned the trouble they were having in handling the sharp increase in medical claims for home health care.  He

was concerned that the only way to address this increase in claims volume would be to hire more Registered Nurses. I suggested that an expert system approach might be beneficial and he solicited a proposal. I proposed the MEDCLAIM System project, a joint initiative between USC's Institute for Information Management, Technology and Policy and BC/CS of South Carolina. The project was considered a success and various aspects of the project were published in journals [14-16] and as an .M.S Thesis [17] by Mr. Hao Kuo, who was one of the Graduate Research Assistants working on MEDCLAIM under my supervision. The three journal papers discussed the methodology used to analyze, design and implement MEDCLAIM, together with the inter-organization cultural issues as well as project risks encountered during the course of the projects. The MEDCLAIM thesis goes into detail regarding the actual knowledge base and database formats for rules and facts for the system.

The MEDCLAIM System prototype ran on an IBM Person Computer and used the expert system shell M1 from Teknowledge and a database system Dbase II from Ashton-Tate. The application domain was Home Health Care claims filed by providers, and MEDCLAIM used the chief RN's expertise to reason about the treatments being billed on the claim as they pertained to the homeboundedness of the patient, the diagnosis and treatment plan prescribed by the physician, the severity of the illness, and the appropriateness of the treatment with respect to the time of onset of the illness and the period for which services were rendered. The claim rules were represented in a goal-tree structure that M1 understood and could reason about, together with our expert's expertise on illnesses (ICD-9 codes) and the appropriate and allowable treatments for those illnesses over a recuperation time period. These latter rules regarding ICD-9 codes and their relationship to treatments were stored in tabular form in a database. It is interesting to note that the RN's tacit knowledge was made explicit during the process of capturing her knowledge in the time-based treatment patterns for each illness and groups of illnesses. During one of our knowledge engineering sessions, our expert said she could not continue filling out the treatment tables without introducing a new concept, the severity of an illness. Our knowledge engineer, Mr. Hao Kuo, was able to modify both the rule base and the database to incorporate the concept within 45 minutes. This shows the power of Expert System Shell architecture in separating the rule specification phase, part of Knowledge Engineering, from the processing of those rules during system operation.

The MEDCLAIM system architecture is virtually identical to the system and method of the '164 patent because they share the same expert database system approach. Both have a rule base that accesses an associated database of codes — ICD-9 codes for MEDCLAIM and CPT-4 codes for CodeReview — together with relationships among the codes.[2] Both systems allow for interaction with a user, and both have an explanation function that can explain the rules used and the rationale for the computer program's recommendation or actions. MEDCLAIM has the ability to authorize services that are covered and reject those services that if finds are not relevant to the medical diagnosis or

---

[2] There are of course differences in the application areas — Home Health Care for MEDCLAIM and Surgical Medical Claims for CodeReview — so the rules for each would be different and so would the database entries.

treatment plan. It also explains its decisions to the user. From the architectural point-of-view MEDCLAIM and CodeReview are essentially identical.

Section XI, the Claims Chart, provides a table mapping the sixteen claims of the '164 patent to the Egdahl/Hertenstein article and the MEDCLAIM thesis.

## IX.    The Egdahl/Hertenstein Reference

Dr. Egdahl and Dr. Hertenstein [12], in their paper entitled "An Access-oriented Negotiated Fee Schedule," note that their approach is motivated by the need to reduce the costs of health care, in particular the fees charged by surgeons for operations. They discuss the need to bring down the costs of surgical procedures by negotiating fees with surgeons and physicians based on a common understanding of the surgical procedures, their components, and the associated services rendered during an operation.

The authors cite that physicians had benefited from a generous fee-for-service system of payment but that system was under pressure to reduce expenditures. For example, from 1965 to 1985, national expenditures for physician services increased from $8.5 billion in 1965 to $82.8 billion in 1985. Several measures were put into place to reduce Medicare and Medicaid expenses. The goal was to reduce the fees paid to physicians. This is spelled out very well in the paper.

Egdahl and Hertenstein go on to say that charges may vary for *non-medical reasons* such as the location of the patient. In Table 1 on page 350 of the article, they show how the Medicare fee structure varies for the same operation, for example, cataract surgery, which in 1984 cost $1,547 in New York state as compared to $825 in Michigan and $928 in Rhode Island. They indicated that cost-of-living multipliers can be used to vary reimbursement fees. They go on to note that the fees paid to physicians vary widely in the private sector.

The Boston University Health Policy Institute, home of the first author, performed a study involving a group of twelve Massachusetts surgeons who developed a 'complexity-severity index (C/S index) of surgical services, *based on the professional judgment* (note my emphasis), that could provide a basis for a relative value scale.' The authors note that the development of the index is time-consuming and raises questions of antitrust. However, a similar study was developed by Caterpillar Corporation (CAT) using the concept of degree of difficulty relative value scales (DODRVS).

In 1983, CAT implemented a negotiated fee schedule approach to physician fees for surgical and invasive and invasive fee procedures. 'The system implemented at CAT emphasizes the following: 1) Employee access to a wide range of qualified surgeons, 2) fees negotiated with local surgeons that are considered reasonable and consistent with local market forces, and 3) billing practices review applied consistently to all incoming claims.'

Further, the features of the CAT approach 1) establish a fair fee cap, 2) use geographic multipliers, 3) continually audit and recode physician bills, 4) negotiate with physicians on a claim-by-claim basis as needed. Note that item 3 is of particular interest in this case.

It has been noted in the paper that physicians, in an effort to maximize their reimbursement for services rendered, resort to a practice called *unbundling*, in which

surgical procedures, although related, would be charged separately. The CAT system would bundle an unbundled bill and oftentimes would not pay for all the billed procedures if they were deemed inappropriate or inadmissible.

The paper cites Tables 4-7 on pages 351-352 as examples of how the CAT system would handle different cases. These cases can be generalized into *rule templates* and *procedure substitution rules* that can be applied to similar medical situations. The CAT system uses CPT-4 codes to describe surgical procedures.

Table 4 provides an example of how unbundled surgical codes are bundled based on expert knowledge of physicians. "The patient was hospitalized for an elective splenectomy. The CAT reviewer would disallow codes and charges for all except the splenectomy; a charge for laparotomy and incidental appendectomy is warranted only if done as a separate procedure and preoperative check and postoperative care are conventionally part of the global surgery fee. A charge of $1000 for the splenectomy is in line with the regional fee schedule and is the amount ultimately approved."

Table 4: Bundling of "Unbundled" Bill

| Procedure | CPT Code | Charge |
|-----------|----------|--------|
| Splenectomy | 38100 | $1000 |
| Laparotomy | 49000 | 600 |
| Appendectomy | 44950 | 600 |
| Preoperative check (in hospital | 90215 | 125 |
| Suture removal | 90270 | 100 |
| Total Charge | | $2425 |
| Amount paid | | $1000 |

This example, and four others in the paper, indicate that in order to perform claim recoding, one must be knowledgeable about both the details of coding surgical services and the content of various surgical procedures, as stated by the authors on page 352, column 1 of [12].

These examples address a number of issues related to rule processing:

First, CAT claims processor must verify that the CPT codes are valid and correct;

Second, the CAT claims processor verifies the billed fees are appropriate for the indicated surgical procedures;

If there are surgical procedures that are unbundled, they should be rebundled and the fee is the standard fee for that procedure;

Knowledge of the surgical procedures billed, their relationship to one another and to the surgeon's diagnosis are evaluated as to their appropriateness, and only those that pertain are paid. (The CAT claims processor may interact with the physician to obtain additional information if needed to explain the surgeon's rationale for the billing.)

The CAT claims processor can also apply non-medical rules such as cost-of-living allowances based on the region in which the procedures were performed.

13

On page 352 column 2 of the paper, it states in the section on Employee Communication, is states that a letter of explanation is *automatically generated* to the employee when there has been a payment reduction. I could not ascertain whether the CAT system had been computer automated at the time of the writing of the paper in 1987.

In summary, the Egdahl/Hertenstein paper provides an outline for designing and implementing a system and method for reviewing surgical medical claims, and discusses one actually implemented and in use at Caterpillar Corporation, citing its success in bringing down the cost of surgical procedures for its self-insured plan.  Through a series of examples, the paper depicts the various types of rules needed to process a claim; these include assessing whether the surgical codes on a claim are valid, whether they correspond to the operation performed, whether some medical codes do not pertain to the billed operation, and whether certain codes have been unbundled and need to be rebundled.  They also provide a method to have the Caterpillar agent edit the claim by interacting with the physician's office to clarify charges and to negotiate changes in the claim.

It is my opinion that this paper provides an outline for the implementation of the system and method of the '164 patent.

## X.    Automation of Medical Claims Processing

The MEDCLAIM thesis was published in 1986, and the Egdahl and Hertenstein paper was published in 1987. Both point to the need to use computer-based tools and methods to process medical claims. The former was motivated by an internal requirement at Blue Cross/Blue Shield, while the latter was created by Caterpillar in an effort to control rising surgical expenses.

Egdahl points out that the CAT approach and methodology could be adopted by public plans such as Medicare and Medicaid. Both the MEDCLAIM and CAT approaches rely on expert knowledge regarding diagnoses, medical treatments and surgical procedures.

The encoding of the rules will depend on the expert system shell or some other program used to develop the system.  It should be pointed out that in the late 1970s to mid-1980s, there was great excitement regarding this new type of system, the expert system, that could capture an expert's expertise in a set of rules and associated relationships, codify the rules in a computer program, and reason about a case presented to the system using those rules.  The Egdahl/Hertenstein paper provided the outline for the '164 patent.  The MEDCLAIM system, a precursor to the '164 patent, has the same architecture as the system and method, but a different rule base and database, one pertaining to medical claims processing in the area of Home Health Care.  I see the '164 patent as yet another application of the well-known concepts, methods and tools of expert systems to a particular application area, that of claims processing of surgical procedures, which has its particular rules based on the criteria of validity, necessity, bundling and unbundling, mutual-exclusivity based on non-medical criteria as well as medically-determined criteria, as described very concisely in the Egdahl/Hertenstein article [12].  It is my opinion that the system and method represents the well-understood combination

14

and synthesis of existing technology and applies it to the domain of surgical medical claims processing.

In July 1987, the Health Policy Institute of Boston University submitted a proposal [18] to Aetna Life and Casualty Insurance Company, as a follow-on to a previous study they had completed in May 1987 for Sun Company and Caterpillar, Inc. That study showed that while the current claims processing at Sun Company reduced insurance claim charges by 3.5 percent, the increased coding accuracy of CPT-4 procedure coding could yield savings of 11.5%. The proposal notes that over 50% of the sampled claims involved inaccurate or absent payment codes, and as many as 38% of claims remained inaccurately coded after further review by the claims processing unit.

In the proposal the Health Policy Institute (HPI) recognizes the strength of the Autocoder program in taking as input the medical terminology on a billing line of a medical claim, and producing the appropriate CPT-4 code. However, HPI notes a weakness of Autocoder in that it cannot examine the codes on the entire claim, which might require combining codes into a 'single, all-inclusive code'. They also claim that Autocoder does not give assistance as to when it is cost effective to produce an 'operative report'.

At a follow-up meeting held on July 2, 1987, concerns were raised about: 1) how the sample size of medical claims from the SUN claims processing unit might affect the study results, 2) whether the study findings unique to SUN or might they be company-wide, 3) why were claims improperly coded, even though staff members were trained in CPT-4 coding, and 4) what were alternative solutions for improving the accuracy of coding that could be 'readily integrated into Aetna's processing system'.

The paragraph on page 2 is interesting in that HPI states: "This proposal is designed to answer these questions, and provide the basis for the Health Policy Institute to submit a follow-on proposal for assisting in improving the accuracy of CPT-4 coding. Based on preliminary results, we anticipate that this will involve the Health Policy Institute in building clinical decision rules for software that will assist the claims processing units in 1) assigning accurate codes to the combination of procedure codes in a claim, and 2) deciding when it is cost effective to request an operative report."

This is an indication that in July 1987, more than a year before the '164 patent application was filed on September 30, 1988, the HPI members, Drs. Egdahl, Goldberg, Hertenstein and Holloway, were proposing to automate a rule-based approach to medical claims processing. This indicates a motivation to create a software program to automate the review of CPT codes on medical claims, in the manner described in the Egdahl/Hertenstein article.

## XI.    Claim Chart

This section presents a claim-by-claim comparison of the claims of the '164 patent to the MEDCLAIM and Egdahl/Hertenstein references.

| Claim No. | Text of Claim[3] | Expert Opinion of Claim |
|---|---|---|
| 1 | a) In a computer system having means for operating on a predetermined database containing medical service codes and a set of relationships among the medical service codes defining whether selected ones of the medical service codes are valid when input with other selected ones of the medical service codes, a method for processing input claims containing at least one medical service code, comprising the steps of: | This element describes the computer system and the predetermined database containing medical services codes. This is very similar to the architecture of the MEDCLAIM system as depicted in Figure 4.4 on Page 34 of the MEDCLAIM thesis by Mr. Hao Kuo [17].<br><br>We note that both CodeReview and MEDCLAIM are based on the concepts of expert systems and therefore share the same architectural components. |
| | b) receiving at least one claim; | The MEDCLAIM system has a mechanism to obtain claims from the mainframe computer. (See Figure 4.4 on Page 34 of the MEDCLAIM thesis [17]). |
| | c) determining whether any medical service code contained in the at least one claim is not present in the predetermined database; and | The determination if a medical service code is not in the database is a common way of enforcing data integrity. This is a simple table lookup that does not involve examining relationships in the database.<br><br>This step is outlined in the Egdahl/Hertenstein paper, page 351 column 2, in the "Continual audit and recoding of physician bills" section. |
| | d) informing a user that a medical service code is not contained in the predetermined database. | This mode of interaction is common in expert systems, and is used to obtain information from and |

---

[3] Please refer to Section VII, Overview of Patent Claims, for discussions of ambiguities in the claim language.

| | | | |
|---|---|---|---|
| | | | communicate with users.  If the system has no knowledge of the service code, it cannot process the claim. The user can then be informed that the service code is missing. |
| | | | This step is outlined in the Egdahl/Hertenstein paper, page 351 column 2, in the "Continual audit and recoding of physician bills" section. |
| 2 | | a) In a computer system having means for operating on a predetermined database containing medical service codes and a set of relationships among the medical service codes defining whether selected ones of the medical service codes are valid when input with other selected ones of the medical service codes, a method for processing input claims containing at least one medical service code, comprising the steps of: | The Egdahl and Hertenstein paper (see abstract, p. 349) and MEDCLAIM thesis indicate that medical service codes CPT-4 and ICD-9 (see p. 3, second paragraph of MEDCLAIM thesis) codes can be used for claims review, respectively. |
| | | b) receiving at least one claim; | The MEDCLAIM system has a mechanism to obtain claims from the mainframe computer. (See Figure 4.4 on Page 34 of [17]). |
| | | c) ascertaining whether the at least one claim contains a plurality of medical service codes; | MEDCLAIM processes information from two forms: HCFA 485 and 486 (See Figures 4.1 and 4.2 on pages 19 and 20 of MEDCLAIM [17]).  These are the Health Certification and Plan of Treatment and the Medical Update and Patient Information forms, respectively.  The service codes for treatments rendered appear on these forms and if several services are listed they are processed by MEDCLAIM. |
| | | d) determining whether one of the medical service codes in the at least one claim is mutually exclusive due to non-medical criteria with any other medical service code in the at least one claim; | I have stated — see Section VII, page 8 in my discussion of Claim 2 — that the definition of the 'mutually exclusive due to non-medical criteria' is vague and needs clarification. Non-medically related mutual |

17

| | | |
|---|---|---|
| | | exclusion arises in MEDCLAIM when overriding conditions not related to an illness may grant the payment of a claim.  For example, company policy might indicate that if the patient were over 85 years of age, the claim should be paid immediately. |
| | | The Egdahl and Hertenstein paper contains examples in Tables 4-7 on pages 351-352, dealing with instances of bundling of unbundled billing codes (Table 4); excessive fee reduction (Table 5); recoding of unnecessary procedure; excessive fee reduction, non-medical (region where service performed) (Table 6); and fee adjustment based on negotiated fee for service (Table 7).  They show the basis of some of the rules in the '164 patent claims. |
| | e) authorizing medical service codes which are not mutually exclusive due to non-medical criteria with any other medical service codes contained in the at least one claim in response to the determining step; and | MEDCLAIM can authorize payment of service codes (see MEDCLAIM thesis, page 34.) |
| | f) rejecting medical service codes which are mutually exclusive due to non-medical criteria with any other medical service codes contained in the at least one claim in response to the determining step | MEDCLAIM can reject payment of service codes and explain why (see MEDCLAIM thesis, page 34.) The Egdahl and Hertenstein paper, page 352 column 2 on 'Employee communication' states that CAT automatically generates a letter of explanation if payments for services are reduced. |
| 3 | a) A computer system including a central processing unit and associated memory for processing input claims containing at least one medical service code, comprising: | MEDCLAIM comprises a personal computer with random-access memory and disk storage (associated memory). MEDCLAIM determines whether a plurality of medical service codes exist on a claim. It consults the database to determine if all a medically appropriate with respect to the diagnosis, and a recuperation |

| | | |
|---|---|---|
| | | profile (see pages 23-25 for a discussion) |
| | | This approach is also outlined in the Egdahl and Hertenstein paper, page 351 [12]. |
| | b) a predetermined database stored in the associated memory, the database containing medical service codes and a set of relationships among the medical service codes defining whether selected ones of the medical service codes are valid when received with other selected ones of the medical service codes; | The MEDCLAIM expert's medical knowledge was contained in a rule base and a database stored in associated memory. The knowledge base used ICD-9 codes to identify each illness and an 'expectation table' containing the causal relationships among illnesses and surgical procedures. See pages 24-25 of [17]. |
| | c) means for receiving at least one claim; | The MEDCLAIM system has a mechanism to obtain claims from the mainframe computer. (See Figure 4.4 on Page 34 of [17]. |
| | d) means for ascertaining whether the at least one claim contains a plurality of medical service codes; | MEDCLAIM processes information from two forms: HCFA 485 and 486 (See Figures 4.1 and 4.2 on pages 19 and 20 of MEDCLAIM [17]). These are the Health Certification and Plan of Treatment and the Medical Update and Patient Information forms, respectively. The service codes for treatments rendered appear on these forms and if several services are listed they are processed by MEDCLAIM. |
| | | This approach is also outlined in the Egdahl and Hertenstein paper, pages 351-352 Tables 4 through 7 [12]. |
| | e) means for determining whether one of the medical service codes in the plurality of medical service codes is valid or invalid by interacting with the database and the set of relationships contained in the database; | MEDCLAIM consults a database of medical disease and treatment codes to determine if medical claim codes are valid for the diagnosed illnesses. See page 35 of [17]. |
| | | This approach is also outlined in the Egdahl and Hertenstein paper, pages 351-352 Tables 4 through 7 [12]. |
| | f) means for authorizing medical service codes which are valid in response to the means for determining; | MEDCLAIM can authorize medical service codes for those approved medical services rendered (see pages |

19

| | and | 32-35 of the MEDCLAIM thesis). |
|---|---|---|
| | g) means for rejecting medical service codes which are invalid in response to the means for determining. | MEDCLAIM can reject medical service codes that it deems to be invalid for a particular claim (see pages 32-35 of the MEDCLAIM thesis). This approach is also outlined in the Egdahl and Hertenstein paper, pages 351-352 Tables 4 through 7 [12]. |
| 4 | The apparatus of claim 3, further comprising means for revising the at least one claim to delete invalid medical service codes. | Egdahl and Hertenstein paper [12] in the abstract on page 349 indicates that unbundled codes can be rebundled and how certain codes may be deleted for a claim. See also Table 4 on page 351. MEDCLAIM can revise the billed services to reflect the allowable services as obtained from the database of recuperation expectation table (database) See page 27 of [17]. |
| 5 | The apparatus of claim 4, further comprising means for informing a user why the at least one claim was revised. | This is the "explanation function" that is common to all expert system shells. The Egdahl and Hertenstein paper on page 352 indicates that a CPT reviewer can interact with a physician regarding a fee, and the CAT system automatically notifies the employee if not all fees are to be paid. MEDCLAIM also provides an explanation that summarizes those billed services that can be paid, those that can be partially paid, and those that have been rejected. See page 45 of [17]. |
| 6 | The apparatus of claim 3, wherein the database containing medical service codes includes medical service codes described by CPT codes. | MEDCLAIM uses ICD-9 codes which are appropriate to Home Health Care claims. This is a well-accepted coding system. See pages 3 and 19 of [17]. |
| 7 | The apparatus of claim 3, wherein the database containing medical service codes includes medical service codes described by CRVS codes. | I understand that McKesson is not asserting Claim 7 in this litigation. |

20

| 8 | The apparatus of claim 3, further comprising means for requesting further information from a user regarding the at least one claim. | Both the Egdahl and Hertenstein paper (page 352) and MEDCLAIM discuss facilities for the system to interact with user to request further input (pages 38 and 46) of MEDCLAIM thesis). |
|---|---|---|
| 9 | The apparatus of claim 3, wherein the relationships among the medical service codes include medically determined relationships. | The MEDCLAIM system architecture has a knowledge/database of medical service codes and relationships among them. (See page 40 and 41 of [17] for a discussion of some relationships among services). |
| 10 | a) A computer system including a central processing unit and associated memory for processing input claims containing at least one medical service claim, comprising: | MEDCLAIM comprises a personal computer with random-access memory and disk storage (associated memory).

MEDCLAIM determines whether a plurality of medical service codes exist on a claim. It consults the database to determine if all a medically appropriate with respect to the diagnosis, and a recuperation profile (see pages 23-25 for a discussion)

This approach is also outlined in the Egdahl and Hertenstein paper, page 351 [12]. |
| | b) a predetermined database stored in the associated memory, the database containing medical service codes and a set of relationships among the medical service codes defining whether selected ones of the medical service codes are valid when received with other selected ones of the medical service codes; | The MEDCLAIM expert's medical knowledge was contained in a rule base and a database stored in associated memory. The knowledge base used ICD-9 codes to identify each illness and an 'expectation table' containing the causal relationships among illnesses and surgical procedures. See pages 24-25 of [17]. |
| | c) means for receiving at least one claim; | The MEDCLAIM system has a mechanism to obtain claims from the mainframe computer. (See Figure 4.4 on Page 34 of [17]). |
| | d) means for ascertaining whether the at least one claim contains a plurality of medical service codes; | MEDCLAIM processes information from two forms: HCFA 485 and 486 (See Figures 4.1 and 4.2 on pages 19 and 20 of MEDCLAIM [17]). These |

21

| | | |
|---|---|---|
| | | are the Health Certification and Plan of Treatment and the Medical Update and Patient Information forms, respectively. The service codes for treatments rendered appear on these forms and if several services are listed they are processed by MEDCLAIM. |
| | e) means for determining whether one of the medical service codes in the at least one claim is included in any other medical service code in the at least one claim; | The Egdahl and Hertenstein paper on page 349, discusses the bundling of medical service codes in a claim. See Table 4 on pages 351-352 |
| | f) means for authorizing medical service codes which are not contained in any other medical service code; and | MEDCLAIM allows appropriate individual services to be authorized (see pages 32-35 of [17] . |
| | g) means for rejecting medical service codes which are contained in any other medical service code. | The MEDCLAIM system allows treatment plans to have different aspects of a treatment, for example, physical therapy, psychological counseling, medications, skilled nursing visits, etc., to be bundled together. Inappropriately billed services would be rejected (See page 40 of [17]). |
| 11 | The apparatus of claim 10, further comprising means for revising the at least one claim to not include a rejected service code. | This allows the revision of a medical service claim to exclude a service code which has been rejected by the system.  The MEDCLAIM system also supports the rejection of billed services if these are not appropriate to the treatment plan (See page 40 of [17]). |
| 12 | a) A computer system including a central processing unit and associated memory for processing input claims containing at least one medical service code, comprising: | This claim is similar to Claim 3 above except for the clauses dealing with service codes which are 'medically exclusive'. MEDCLAIM had the capability of rejecting billed services that are deemed inappropriate. Page 44 of the thesis [17] provides an example. |
| | b) a predetermined database stored in the associated memory, the database containing medical service codes and a | The MEDCLAIM expert's medical knowledge was contained in a rule base and a database stored in |

| | |
|---|---|
| set of relationships among the medical service codes defining whether selected ones of the medical service codes are valid when received with other selected ones of the medical service codes; | associated memory. The knowledge base used ICD-9 codes to identify each illness and an 'expectation table' containing the causal relationships among illnesses and surgical procedures. See pages 24-25 of [17]. |
| c) means for receiving at least one claim; | The MEDCLAIM system has a mechanism to obtain claims from the mainframe computer. (See Figure 4.4 on Page 34 of [17]). |
| d) means for ascertaining whether the at least one claim contains a plurality of medical service codes; | MEDCLAIM processes information from two forms: HCFA 485 and 486 (See Figures 4.1 and 4.2 on pages 19 and 20 of MEDCLAIM [17]). These are the Health Certification and Plan of Treatment and the Medical Update and Patient Information forms, respectively. The service codes for treatments rendered appear on these forms and if several services are listed they are processed by MEDCLAIM. |
| e) means for determining whether one of the medical service codes in the at least one claim is medically exclusive with any other medical service code in the at least one claim; | The terminology 'medically exclusive' is unclear and needs to be clarified. See my notes on Claim 12 on page 9-10 above. MEDCLAIM consults a database of medical disease and treatment codes to determine if medical claim codes are valid for the diagnosed illnesses. See page 35 of [17]. This approach is also outlined in the Egdahl and Hertenstein paper, pages 351-352 Tables 4 through 7 [12]. |
| f) means for authorizing medical service codes which are not medically exclusive with any other medical service codes contained in the at least one claim in response to the means for determining; and | The terminology 'medically exclusive' is unclear and needs to be clarified. See my notes on Claim 12 on page 9-10 above. The MEDCLAIM system [17] claim authorization process involves processing workflow expressed in the rules which access the facts contained on the HCFA forms 485 and 486. The rules also access the database of |

23

| | | |
|---|---|---|
| | | ICD-9 codes and the relationships among treatment plans. Once the workflow is completed the authorized and rejects claim codes are explained to the user, a Registered Nurse. (See pages 32-42 of the MEDCLAIM thesis [17] for a detailed view of the rules. |
| | g) means for rejecting medical service codes which are medically exclusive with any other medical service codes contained in the at least one claim in response to the determining step. | The terminology 'medically exclusive' is unclear and needs to be clarified. See my notes on Claim 12 on page 9-10 above. |
| | | The MEDCLAIM system allows treatment plans to have different aspects of a treatment, for example, physical therapy, psychological counseling, medications, skilled nursing visits, etc., to be bundled together. Inappropriately billed services would be rejected (See page 40 of [17]). |
| 13 | a) A computer system including a central processing unit and associated memory for processing input claims containing at least one medical service code, comprising: | This claim is similar to Claim 1 and allows the system to determine that all the service codes on an input claim are valid, in that they are contained in the database of service codes. If not, the user is informed that the service code is not contained in the predetermined database. |
| | | This approach is standard in systems that check the validity of input values. For example, MEDCLAIM has this feature. |
| | b) a predetermined database stored in the associated memory, the database containing medical service codes and a set of relationships among the medical service codes defining whether selected ones of the medical service codes are valid when received with other selected ones of the medical service codes; | This element describes the computer system and the predetermined database containing medical services codes.  This is similar to the architecture of the MEDCLAIM system as depicted in Figure 4.4 on Page 34 of [17]. |
| | c) means for receiving at least one claim; | The MEDCLAIM system has a mechanism to obtain claims from the mainframe computer. (See Figure 4.4 on Page 34 of [17]). |

| | | |
|---|---|---|
| | d) means for determining whether any medical service code contained in the at least one claim is not present in the predetermined database; and | The determination if a medical service code is not in the database is a common way of enforcing data integrity. |
| | e) means for informing a user that a medical service code is not contained in the predetermined database. | This mode of interaction is common in expert systems, and is used to obtain information from and communicate with users.  If the system has no knowledge of the service code, it cannot process the claim. The user can then be informed that the service code is missing. |
| 14 | a) A computer system including a central processing unit and associated memory for processing input claims containing at least one medical service code, comprising: | This claim is similar to Claim 2 above except that it looks for the case in which there is one service code that is mutually exclusive (from the other service codes) due to a non-medical criteria.  This is an apparatus claim similar to Claim 2.<br><br>If so, the program determines the codes which are not mutually exclusive due to non-medical criteria and authorizes payment of those services.  It also rejects medical services which are mutually-exclusive due to non-medical criteria. |
| | b) a predetermined database stored in the associated memory, the database containing medical service codes and a set of relationships among the medical service codes defining whether selected ones of the medical service codes are valid when received with other selected ones of the medical service codes; | The MEDCLAIM expert's medical knowledge was contained in a rule base and a database stored in associated memory. The knowledge base used ICD-9 codes to identify each illness and an 'expectation table' containing the causal relationships among illnesses and surgical procedures. See pages 24-25 of [17]. |
| | c) means for receiving at least one claim; | The MEDCLAIM system has a mechanism to obtain claims from the mainframe computer. (See Figure 4.4 on Page 34 of [17]. |
| | d) means for ascertaining whether the at least one claim contains a plurality of medical service codes; | MEDCLAIM processes information from two forms: HCFA 485 and 486 (See Figures 4.1 and 4.2 on pages 19 and 20 of MEDCLAIM [17]). These are the Health Certification and Plan |

25

|  |  | of Treatment and the Medical Update and Patient Information forms, respectively. The service codes for treatments rendered appear on these forms and if several services are listed they are processed by MEDCLAIM. |
|---|---|---|
|  | e) means for determining whether one of the medical service codes in the at least one claim is mutually exclusive due to non-medical criteria with any other medical service code in the at least one claim; | Non-medically related mutual exclusion arises in MEDCLAIM when overriding conditions not related to an illness may grant the payment of a claim. For example, company policy might indicate that if the patient were over 85 years of age, the claim should be paid immediately. |
|  | f) means for authorizing medical service codes which are not mutually exclusive due to non-medical criteria with any other medical service codes contained in the at least one claim in response to the means for determining; and | MEDCLAIM can authorize medical service codes for those approved medical services rendered (see page 34 of the MEDCLAIM thesis [17]). |
|  | g) means for rejecting medical service codes which are mutually exclusive due to non-medical criteria with any other medical service codes contained in the at least one claim in response to the means for determining. | I would like clarification on examples of mutually-exclusive codes for non-medical criteria.<br><br>The MEDCLAIM system allows treatment plans to have different aspects of a treatment, for example, physical therapy, psychological counseling, medications, skilled nursing visits, etc., to be bundled together. Inappropriately billed services would be rejected (See page 40 of [17]). |
| 15 | a) A computer system including a central processing unit and associated memory for processing input claims containing at least one medical service code, comprising: | MEDCLAIM comprises a personal computer with random-access memory and disk storage (associated memory).<br><br>MEDCLAIM determines whether a plurality of medical service codes exist on a claim. It consults the database to determine if all a medically appropriate with respect to the diagnosis, and a recuperation profile (see pages 23-25 for a |

| | | |
|---|---|---|
| | | discussion) |
| | | This approach is also outlined in the Egdahl and Hertenstein paper, page 351 [12]. |
| | b) a predetermined database stored in the associated memory, the database containing medical service codes and a set of relationships among the medical service codes defining whether selected ones of the medical service codes are valid when received with other selected ones of the medical service codes; | The MEDCLAIM expert's medical knowledge was contained in a rule base and a database stored in associated memory. The knowledge base used ICD-9 codes to identify each illness and an 'expectation table' containing the causal relationships among illnesses and surgical procedures. See pages 24-25 of [17] |
| | c) means for receiving at least one claim; | The MEDCLAIM system has a mechanism to obtain claims from the mainframe computer. (See Figure 4.4 on Page 34 of [17]). |
| | d) means for ascertaining whether the at least one claim contains a plurality of medical service codes; | MEDCLAIM processes information from two forms: HCFA 485 and 486 (See Figures 4.1 and 4.2 on pages 19 and 20 of MEDCLAIM [17]). These are the Health Certification and Plan of Treatment and the Medical Update and Patient Information forms, respectively. The service codes for treatments rendered appear on these forms and if several services are listed they are processed by MEDCLAIM. |
| | e) means for determining whether one of the medical service codes in the plurality of medical service codes is valid or invalid by interacting with the database and the set of relationships contained in the database; | MEDCLAIM interacts with the database to determine whether a service code appearing on a claim is valid.  This is done by consulting the database of ICD-9 codes and their relationships (see page 35 of MEDCLAIM thesis [17]). |
| | | The Egdahl and Hertenstein paper contains examples in Tables 4-7 on pages 351-352, dealing with instances of bundling of unbundled billing codes (Table 4); excessive fee reduction (Table 5); recoding of unnecessary procedure; excessive fee reduction, non-medical (region where service performed) (Table 6); and fee |

27

| | | |
|---|---|---|
| | | adjustment based on negotiated fee for service (Table 7). They show the basis of some of the rules in the '164 patent claims. |
| | f) means for authorizing the at least one claim in response to the means for determining; and | MEDCLAIM can authorize medical service codes for those approved medical services rendered. It can also authorize the entire claim (see pages 32-35 of MEDCLAIM thesis [17]). |
| | g) means for rejecting the at least one claim in response to the means for determining. | MEDCLAIM can reject the entire claim (see pages 32-35 of MEDCLAIM thesis [17]). |
| 16 | a) In a computer system having means for operating on a predetermined database containing medical service codes and a set of relationships among the medical service codes defining whether selected ones of the medical service codes are valid when input with other selected ones of the medical services codes, a method for processing input claims containing at least one medical service code, comprising the steps of: | The MEDCLAIM system does precisely what is claimed here.<br><br>It has a predetermined database containing medical service codes (ICD-9 codes) with relationships defined among them, and a method for determining if those are valid service codes when input with other selected medical service codes, and a method for processing input claims. (see pages 34-35 of MEDCLAIM thesis [17]) |
| | b) receiving at least one claim; | The MEDCLAIM system has a mechanism to obtain claims from the mainframe computer. (See Figure 4.4 on Page 34 of [17]). |
| | c) ascertaining whether the at least one claim contains a plurality of medical service codes; | MEDCLAIM processes information from two forms: HCFA 485 and 486 (See Figures 4.1 and 4.2 on pages 19 and 20 of MEDCLAIM [17]). These are the Health Certification and Plan of Treatment and the Medical Update and Patient Information forms, respectively. The service codes for treatments rendered appear on these forms and if several services are listed they are processed by MEDCLAIM. |
| | d) determining whether one of the medical service codes in the plurality of medical service codes is valid or invalid by interacting with the database | MEDCLAIM interacts with the database to determine whether a service code appearing on a claim is valid. This is done by consulting the |

28

| | | |
|---|---|---|
| | and the set of relationships contained in the database; | database of ICD-9 codes and their relationships. The Egdahl and Hertenstein paper contains examples in Tables 4-7 on pages 351-352, dealing with instances of bundling of unbundled billing codes (Table 4); excessive fee reduction (Table 5); recoding of unnecessary procedure; excessive fee reduction, non-medical (region where service performed) (Table 6); and fee adjustment based on negotiated fee for service (Table 7). They show the basis of some of the rules in the '164 patent claims. |
| | e) authorizing the at least one claim in response to the means for determining step; and | MEDCLAIM can authorize the entire claim as indicated on pages 23-25,37-42, and 51-52 of [17]. |
| | f) rejecting the at least one claim in response to the determining step. | MEDCLAIM can authorize the entire claim as indicated on pages 23-25,37-42, and 51-52 of [17]. |

Dated:  October 24, 2005

Larry Kerschberg, PhD

# Appendix A

**CURRICULUM VITAE**

*Larry Kerschberg*

| **University Address** | **Business Address** |
|---|---|
| Department of Information and Software Engineering | KRM, Inc. |
| MS 4A4, George Mason University | 10600 Vennard Place |
| 4400 University Drive | Fairfax, Virginia 22032 |
| Fairfax, Virginia 22030 | (703) 425-8035 |
| E-mail: kersch@gmu.edu | |
| http://eceb.gmu.edu/ | |

# 1.    Education

Ph.D. in Engineering, Case Western Reserve University, 1969.

MS. in Electrical Engineering, University of Wisconsin, 1966.

B.Sc. in Engineering Science with Honors, Case Institute of Technology, 1964.[4]

# 2.    Languages Spoken

Fluent in both Spanish and Portuguese.

# 3.    Honors and Fellowships

TAU BETA PI, Case Engineering Fellowship, U.S. Steel Fellowship, NDEA Fellowship.

University of South Carolina, College of Business Administration Research Fellow (two semesters).

Society for Information Management Research Grant, with G. Powers and D.A. Marchand, to research Videotex and Information Utilities.

Fellow of the Japan Society for the Promotion of Science, at Kyoto University, February 27 through April 26, 1998.  This fellowship was awarded based on the recommendation of the National Science Foundation

# 4.    Professional Society Membership

IEEE and IEEE Computer Society — Past Chair, Technical Committee on Data Engineering.

Association for Computing Machinery:  Special interest groups on Management of Data (SIGMOD), Artificial Intelligence (SIGART), Information Retrieval (SIGIR).

---

[4]    Junior year spent at Instituto Technologico y de Estudios Superiores de Monterrey (ITESM), Monterrey, Mexico.

# 5.    Professional Experience

## *5.1.  Positions Held*

**George Mason University**

August, 2005 - Present

Director, MS in E-Commerce Program, http://ite.gmu.edu/msecomm/
Director, E-Center for E-Business, http://eceb.gmu.edu/

September, 1986 - Present

Professor of Information and Software Engineering
School of Information Technology and Engineering
George Mason University

June, 1989 - June 1997

Chairman, Department of Information and Software Systems Engineering
School of Information Technology and Engineering
George Mason University

September, 1991 - Present

Professor and Member of Executive Committee
School of Computational Sciences
George Mason University

May, 1994 - May, 2001

Director, Center for Information Systems Integration and Evolution
Director, Knowledge Rover Lab for Logistics and Commerce
School of Information Technology and Engineering
George Mason University

July, 2001 - Present

Co-Director, E-Center for E-Business
George Mason University
http://eceb.gmu.edu/


**KRM, Inc.**

January, 1987 - Present

President, Knowledge Resource Management, Inc. (KRM, Inc.)
10600 Vennard Place
Fairfax, Virginia 22032

**University of South Carolina**

August 1981 - August 1986:

Associate Professor of Management Science,
College of Business Administration,
University of South Carolina,
Columbia, South Carolina, 29208

Associate Professor of Computer Science (courtesy appointment), University of South Carolina.

Faculty Associate, Institute of Information Management, Technology and Policy, College of Business Administration, University of South Carolina.

Teaching and research in Management Information Systems, Enterprise Modeling, Database Management, Office Information Systems, Expert Database Systems, Business Expert Systems — Artificial Intelligence for Business Decision-Making.

**Bell Laboratories**

June 1977 - August 1981:

Member Technical Staff, Research Division
Bell Laboratories, Holmdel, New Jersey.

Research in Database Management: Data Models, Distributed Query Processing, Performance Evaluation, and Distributed Databases.

**University of Maryland**

August 1976 - June 1977:

Assistant Professor
Department of Information Systems Management,
University of Maryland, College Park, Maryland.

Teaching and research in Information Systems, Database Management, and Data Models.

**University of Toronto**

January 1976 - May 1976:

Visiting Research Professor
Computer Systems Research Group,
University of Toronto, Toronto, Canada.

Research in Data Models and Query Languages, Sponsored by a grant from IBM of Brazil grant.

**Pontifical Catholic University of Rio de Janeiro**

August 1970 - July 1976:

Associate Professor, Computer Science Department,
Pontifical Catholic University of Rio de Janeiro (PUC-RJ).

Nine students completed M. Sc. theses under my direction.

One of these students subsequently completed his Ph.D. at UCLA.

August 1973 - June 1975:

Chief of a Performance Evaluation Project within a minicomputer software development project.

February 1971 - June 1972

Joint Appointment with the Computer Center as Chief of the Computer Applications Division.

Responsible for User Services and Special Projects.

The division offered programming assistance, short courses, and edited a number of application program manuals, including the user's manual for the center's IBM 370/165.

The Special Projects Group developed a jurisprudence information system and terminal-based, on-line, key-word retrieval system for scientific abstracts.

**COPPE, Federal University of Rio de Janeiro**

August 1969 - July 1970:

Visiting Professor

COPPE, the engineering graduate school of the Federal University of Rio de Janeiro, under contract with the Organization of American States (OAS).

Two students completed M. Sc. theses under my direction.  Both obtained their Ph.D. degrees from the University of California at Berkeley.

**Corning Glass Works**

June 1966 - September 1966:

Research Engineer, Corning Glass Works, Corning, New York.

June 1965 - September 1965:

Engineer-Research, Data Systems Division of Autonetics,

North American Aviation (now Rockwell International), Anaheim, California.

**Instituto Technologico y de Estudios Superiores de Monterrey (ITESM), Monterrey, Mexico.**

June 1964 - July 1964

Taught high school algebra in Spanish at the Instituto Technologico y de Estudios Superiores de Monterrey (ITESM), Monterrey, Mexico.

## *5.2.  Courses Taught*

**George Mason University**

Systems Analysis and Design (INFS 622)

Data Communications and Distributed Processing (INFS 612)

Introduction to E-Commerce (INFS 640)

Knowledge Management for E-Business (INFS 770)

Scientific and Statistical Databases (CSI 810/IT 864)

Expert Database Systems (IT 960)

**University of South Carolina**

Decision Support Systems and Business Expert Systems (BADM 896)

Distributed Processing Systems (BADM 891)

Data Structures and File Organizations (BADM 880)

Business Information Structures and Design (BADM 596)

Information Systems (BADM 796) and (BADM 796T), T for Television.

Information Systems in the Masters in International Business Studies Program (MIBS) (BADM 702)

Introduction to Business Data Processing (BADM 190)

Data Structures (CSCI 500)

**University of Maryland**

Electronic Data Processing

Management Information Systems:  Conceptual Foundations, Structure and Development.

**Pontifical Catholic University of Rio de Janeiro (PUC/RJ)**

General Systems Theory

Graph Theory and Algorithms

Introduction to Discrete Structures and Logic

Algebraic Structures

Simulation

Introduction to Database Management Systems

**COPPE, Graduate Engineering School, Federal University of Rio de Janeiro**

Modern Algebra

Optimal Control Theory

General Systems Theory

## 5.3.   Sponsored Research

**George Mason University**

**Knowledge Sifter: Ontology-Based Search over Corporate and Open Sources using Agent-Based Knowledge Services.**

Sponsor: National Geospatial-Intelligence Agency

Co-Principal Investigators:  Dr. Larry Kerschberg and Dr. Daniel Menascé

Date: October 1, 2003  – September 31, 2008

Funding Amount: $640,000

Knowledge Sifter is a scaleable agent-based system that supports access to heterogeneous information resources such as the Web, open-source repositories, XML-databases and the emerging Semantic Web. User query specification is supported by a user agent that accesses multiple ontologies using a conceptual model expressed in the Web Ontology Language. A collection of cooperating agents supports interactive query specification and refinement, query decomposition, query processing, integration, as well as result ranking and presentation. The Knowledge Sifter architecture is general and modular so that new ontologies and new information resources can be easily incorporated.

The Knowledge Sifter agent architecture has three layers: User Layer, Knowledge Management Layer, and Data Layer.  Specialized agents reside at the various layers and perform well-defined functions. The User Agent interacts with the user to elicit user preferences that are managed by the Preferences Agent.  These preferences include the relative importance attributed to terms used to pose queries, the perceived authoritativeness of Web search engine results, and other preferences to be used by the Integration Agent. The user indicates an initial query to the Query Formulation Agent.  This agent, in turn, consults the Ontology Agent to refine or generalize the query based on the semantic mediation provided by the ontology services available. The Ontology Agent provides a conceptual model for the domain by means of the OWL schema specification. In this example, there are two such services: Princeton University's WordNet and USGS's GNIS.  Other sources can be added in a modular fashion, and the OWL schema would be updated to accommodate new concepts. The Web Services Agent accepts a refined user query, that has been decomposed by the Query Formulation Agent, and transforms the subqueries into SOAP requests to the databases and open Web sources (e.g., TerraServer and Yahoo!) that have Web Service published interfaces; this is the case for the TerraServer, while Yahoo! provides an HTTP interface.

The Web Services Agent uses domain knowledge regarding the data sources, such as quality of services attributes, authoritativeness, and image sizes, to choreograph the execution of subqueries in an optimal fashion. The Integration Agent is responsible for compiling the sub-query results from the various sources, ranking them according to user preferences, as supplied by the Preferences Agent, for such attributes as: 1) the weight associated with the user's perception of the authoritativeness of a source, or 2) the weight associated with a term used in a query.

A proof-of-concept prototype has been implemented demonstrating Knowledge Sifter searching both geo-spatial ontology services such as the USGS Geographic Names Information System (GNIS) and cognitive science ontologies such as Princeton University's WordNet, as well as image databases including Lycos and TerraServer. Finally, each Knowledge Sifter agent is implemented as a Web Service and the external sources are also accessed via Web Service protocols. Knowledge Sifter's design and concepts will be adapted so that they can be used in support of CoMiDII's cognitive M-object discovery services.

**Secure Metadata**

Sponsor: TASC (The Analytical Sciences Corporation)

Co-Principal Investigators:  Dr. Ravi Sandhu and Dr. Larry Kerschberg

Date: August 1, 2001 – December 31, 2001

This project investigates the use of secure metadata to describe the characteristics of objects at various security levels and the use of such metadata for information assurance.

**E-Center for Excellence in Research and Education in E-Business**

Sponsor: Virginia Center for Innovative Technology (CIT), companies and government.

Dr. Larry Kerschberg and Dr. Daniel Menascé

Funding amount: $75,000 (CIT), $60,000 (Companies)

Dates: July 14, 2000 – July 14, 2001

The E-Center for E-Business performs R&D in areas related to E-Business, including, methodologies, scalability and performance, intelligent agents and search, data mining and e-marketplaces. (Visit http://eceb.gmu.edu)

**Secure Objects in a Business to Business Environment**

Sponsor: The National Reconnaissance Office (NRO)

Co-Principal Investigators:   Dr. Ravi Sandhu, Dr. Edgar Sibley, and Dr. Larry Kerschberg

Funding amount: $250,000

Dates: June 1, 2000 – May 31, 2001

The research explores NRO's security object requirements in the context of emerging commercial e-commerce marketplace in areas such as secure object access and dissemination, the use of XML.XMI (eXtensible Markup Language / eXtensible Metadata Interchange) for object sharing, secure electronic transactions, and secure collaboration environments.  We evaluate these requirements to commercial systems such as Oracle 8 and Broadvision, GOTS and custom (Role Based Access Control) RBAC components, to demonstrate secure object concepts.

**Software Capability Process improvement for Vistronix**

Sponsor: Virginia Center for Innovative Technology and Vistronix

Co-Principal Investigators:  Dr. Larry Kerschberg and Dr. Richard Bechtold

Dates: July 1, 1999 to December 31, 2000

This project was designed to provide support services to Vistronix, Inc. to achieve the SEI Capability Maturity Model Level 2 maturity.

**Flat-Sat Vision Project**

Sponsor: NASA

Co-Principal Investigators: Dr. Hassan Gomaa and Dr. Larry Kerschberg

Funding amount: $62,862

Dates: February 1, 1998 - January 31, 1999

The Flat-Sat Vision Project combines domain-modeling with agent-based systems to investigate the automatic design and configuration of a space mission including the spacecraft, hardware and software simulators, instruments, and flight control software.

**Knowledge Rovers:  A Family of Intelligent Software Agents for Logistics and Commere**

Sponsor: DARPA through the Advance Logistics Program
Principal Investigator and Project Manager:  Dr. Larry Kerschberg
Co-Principal Investigators:  Drs. Hassan Gomaa, Sushil Jajodia, and Ami Motro
Funding amount:  $450,000 plus several options
Dates:  August 1996 - August 1998

The knowledge rovers represent a *family* of cooperating intelligent agents that may be configured to support a collection of scenarios, decision-makers and tasks.  These rovers play specific roles within the KLAD, supporting users, maintaining complex views, refining data into knowledge, and roaming the Global Information Infrastructure seeking, locating, negotiating for and retrieving data and knowledge specific to their mission.  We will specify the Knowledge Rover architecture and several scenarios for the LAD which show the cooperation among agents in problem-solving.  We propose to create a Knowledge Rover Laboratory (KRL) in which our proof-of-concept prototypes will be designed and implemented.

**Knowledge Rovers to Support the Virtual Enterprise**

Sponsor: DARPA through the Advance Logistics Program
Principal Investigator and Project Manager:  Dr. Larry Kerschberg
Co-Principal Investigators:  Drs. Hassan Gomaa, Sushil Jajodia, and Ami Motro
Funding amount:  $45,000, Subcontract from AMS.
Dates:  August 1996 - August 1998

The GMU team researched the Knowledge Rover concept as it pertains to the Virtual Enterprise Concept of the Defense Personnel Supply Center of DoD.  Research in the Intelligent Integration of Information, Data Warehousing, and Data Quality will be applied in this research and development effort.

**Information Integration and Interchange (I$^3$) :  A Federated Systems Approach**

Sponsor: ARPA through Office of Naval Research
Principal Investigator:  Dr. Larry Kerschberg
Co-Principal Investigators:  Drs. Hassan Gomaa, Sushil Jajodia, and Ami Motro
Funding amount:  $840,000.
Dates:  August 1992 - August 1995

This research focused on the interchange and integration of information residing in a

federation of heterogeneous knowledge base and database systems. A federated architecture is studied in which a Federation Manager, consisting of an active data/knowledge dictionary directory and support tools such as an Intelligent Thesaurus, Query Formulator, and Query Processor, will interact with federation-level users in elaborating and processing queries to the constituents.

Object-oriented domain modeling tools and techniques will be used to provide high-level specifications of the structure and behavior of constituent systems. These specifications will be used to characterize the information requirements and services of the constituents to be made available to the federation. The federation specifications will be stored in the active data/knowledge dictionary for use by federation-level tools described above.

Of particular importance to this research is the characterization and handling of uncertainty information. This uncertainty arises when two systems report on the same event, but the information is inconsistent. This may occur when the systems use differing measures of time, or when they are reasoning based on distinct rules of inference. Temporal reasoning techniques will be developed to handle different time scales and temporal events. Knowledge discovery tools and techniques will be used to determine the "quality" of an information source, based on previous performance as well as inferred intentions.

### The Knowledge Discovery in Databases

Sponsor: ARPA
Principal Investigator: Dr. Ryszard Michalski
Co-Principal Investigator: Dr. Larry Kerschberg
Funding amount: $1,285,000.
Dates: July 1992 - June 1995

This project is concerned with the development of a large-scale multi-strategy reasoning system, called INLEN, for extracting knowledge from databases. The system assists a user in discovering general patterns or trends, meaningful relationships, conceptual or numerical regularities or anomalies in large databases. The volume of information in a database is often too vast for a data analyst to be able to detect such patterns or regularities. INLEN integrates symbolic learning and statistical techniques with database and knowledge base technologies. It provides a user with "knowledge generation operators" (KGO) for discovering rules characterizing sets of data, generating meaningful conceptual classifications, detecting similarities and formulating explanations for the rules, generating rules and equations characterizing data, selecting and/or generating new relevant variables or representative examples, and testing the discovered rules on new data.

### The PROGEN Advisory System for Process Modeling

Sponsor: Software Productivity Consortium/ Virginia Center of Excellence in Software Reuse,
                     and Center for Innovative Technology, Hernden, Virginia
Principal Investigator: Dr. Larry Kerschberg
Co-Principal Investigator: Dr. Hassan Gomaa
Funding amount: Approximately $100,000.
Dates: September - December 1993.

This research addresses the modeling and representation of expertise for process knowledge associated with the development of software systems. A software life cycle model, the Evolutionary Development Life-Cycle Model (EDLC), is used to model the events, activities, and products associated with the various phases in the specification, design and implementation and evolution of a complex software system. In particular, a domain model of the Evolutionary Spiral Process Model (ESPM) is used to specify the *family* of process models.

A prototype software "expert system" called PROGEN has been implemented and serves as a project manager's assistant. The manager interacts with PROGEN to input process drivers for a project, and PROGEN reasons about these process drivers to tailor the ESPM domain model so as to generate the appropriate process model for that project.

This research also focuses on further refining the domain model of the ESPM, incorporating new process drivers associated with the SEI Capability Maturity Model. In order to handle larger numbers of process drivers, PROGEN supports the concept of process-driver *packages*.

### Independent Architecture Study of Earth Observing System Data and Information System (EOSDIS)

Sponsor: Hughes Applied Information Systems
Principal Investigator: Menas Kafatos, Institute for Computational Sciences and Informatics
Co-Principal Investigators: Dr. Larry Kerschberg, Daniel Menascé, Hassan Gomaa
Funding amount: $322,000.
Dates: March - September 1994.

NASA asked Hughes Applied Information Systems to fund Independent Architecture Studies for EOSDIS. George Mason University put together an *interdisciplinary team* consisting of Earth, Information and Computer Scientists to provide end-to-end architecture (hardware, software, communications, information, and data) for EOSDIS.

The GMU-led team consisted of Earth Scientists from the University of New Hampshire, University of Delaware, the Center for Ocean, Land and Atmosphere (COLA), and the Institute for Computational Sciences and Informatics located at GMU.

Dr. Kerschberg was the leader of the Information and Computer Science group from the School of Information Technology and Engineering at GMU. This group provided the architectural principles, concept-of-operations, federated client-server software architecture, information and data architecture, and a summary of existing approaches to very large databases and hierarchical files systems for EOSDIS.

The complete architecture document was over 450 pages long, and was presented to a review panel consisting of scientists and engineers from NASA and Hughes. Other studies were performed by the Sequoia 2000 group led by the University of California—Berkeley, and the University of North Dakota.

### The NASA Evolutionary Domain Life Cycle (EDLC) Project

Sponsor:  NASA Goddard Space Flight Center, Greenbelt, MD
Co-Principal Investigators:  Dr. Hassan Gomaa and Dr. Larry Kerschberg
Funding amount:  $503,560.
Dates:  September 1989 - June 1994

The Software Systems Engineering Center, of which Dr. Gomaa and Dr. Kerschberg are members, has been conducting research for the past three years in the area of domain modeling for software reuse.  The project centers on the concept of an Evolutionary Domain Life Cycle (EDLC) Model, which is a highly iterative software life cycle model that eliminates the distinction between development and maintenance and addresses the development of a family of systems.  The EDLC involves domain analysis, domain specification, and domain design for a *family* of systems.  A first attempt at developing a domain analysis and specification method has been completed; the results are being applied to developing the software architecture for the NASA Payload Operations Control Center (POCC) domain.

We have *implemented* a proof-of-concept demonstration of the Evolutionary Domain Life Cycle Model using both commercial-off-the-shelf software (COTS) as well as custom-developed software.  The configuration uses:  1) Software through Pictures as the multiple viewpoint graphical editor, 2) an Eiffel-based Object Repository which provides a persistent object store and checks for consistency among object specifications, 3) a Feature/Object Editor that allows the Domain Analyst to represent the dependencies among features and the objects supporting those features, and 4) a knowledge-based requirements elicitation tool, implemented in NASA's CLIPS shell, to assist the target system requirements engineer in selecting those features and objects that will constitute the target system.

The Object Repository manages the evolution of the object specifications, maintains consistency according to the information model, and provides data/knowledge translation services to other knowledge-based tools.  One such tool is the knowledge-based requirements elicitation tool (KBRET), which elicits target system requirements by having users select desired features and object types from the domain model.  KBRET accesses the object repository to obtain the knowledge required for its reasoning.  In addition, KBRET has several domain-independent knowledge sources for browsing, for selecting target system features, and for generating a target system.  In particular, KBRET has special reasoning methods for non-monotonic reasoning; users may select a feature and its dependent object types, and then retract that feature, causing many dependent objects to be retracted from the target system specification.  The Target System Specification is stored in the object repository, and another translator provides the appropriate knowledge representation for a program to tailor the multiple viewpoints of the domain model to reflect the object types in the target system specification.

### The Active Data/Knowledge Dictionary

Sponsor:  Rome Labs
Principal Investigator:  Dr. Larry Kerschberg, KRM, Inc.
Project Director:  Mr. John Dove, Dove Electronics, Rome, NY
Funding amount:  $180,000
Dates:  August 1989 - May 1991

The Active Data/Knowledge Dictionary (ADKD) project examined the areas of data, knowledge, meta-data and meta-knowledge needed to support the concept of an *active* data/knowledge dictionary.  The ADKD concept suggests the need for an environment to assist users such as Database and Knowledgebase Administrators to specify, design, build and evolve both data- and knowledge-based applications.   The project specified a functional architecture for the ADKD, including an array of services and tools needed to support the environment.

The major issues addressed were:   1) The adequacy of the Information Resource Dictionary System (IRDS) for object-oriented database systems support, the role of the IRDS to support advanced systems development projects and databases, 2) A conceptual architecture for the Active Data/Knowledge Dictionary System based on the requirements of advanced application areas, 3) Query processing in heterogeneous database systems, 4) Schema evolution in object-oriented database systems, 5) Active data/knowledge management in object-oriented systems, 6) Coordinated problem solving with multiple heterogeneous knowledge sources, and 7)   Hypermedia requirements for active dictionaries.

### The MCI Telecommunications Network Project

Sponsor:  MCI Corporation
PI:  Dr. Larry Kerschberg
Funding amount $139, 500
Dates:  September 1989 to January, 1990

There are enterprises that depend on integrating heterogeneous, autonomous database systems.  MCI Corporation is the provider of long-distance, telecommunications network support.  It has databases that describe the physical constitution of the network; the repeaters, switches, cables, and so forth.  MCI also has databases that describe virtual aspects of the network; routing tables, for example.  Moreover, it has databases that describe the condition of the network; alarm tables, for example.

Managers of these networks must continually reason with information from what is equivalent to a heterogeneous, often inconsistent, database system.  In our recent project with MCI, we interviewed MCI network managers, analyzed MCI network management, established a need for intelligent network management, and developed a functional architecture to perform this intelligent network management by integrating heterogeneous knowledge sources and reasoning paradigms via a blackboard control model.

### A Knowledge-Based Architecture for Requirements Gathering, Analysis, and Subsequent Prototyping

Sponsor:    Software Productivity Consortium and Virginia Center for Innovative Technology
PI:  Dr. Edgar H. Sibley
Research Associate: Dr. Larry Kerschberg
Funding amount $250,000
Dates:  June 1987 to December 1988

The objectives of this research are to obtain improvements in the information systems analysis and design process by using knowledge-based tools and techniques to support multiple viewpoints with potentially conflicting perspectives of an application domain.

### University of South Carolina

### Knowledge-Based Systems:  The MEDCLAIM Project

Project Director, "MEDCLAIM: A Decision Support System for Medical Claims Review," (with D.A. Marchand, and J. Weitzel), sponsored by Blue Cross/Blue Shield of South Carolina, ($120,000), September 1, 1985 to July 30, 1986.

This project explored the use of Expert System shells on the IBM/AT Personal Computer to create a decision support system to aid Registered Nurses in medical claims review. The project involved the evaluation of a number of ES shells, the Knowledge Engineering of decision-making rules, and the construction of a prototype system.  The project was so successful that BC/BS plans to implement a production version as the third phase of MEDCLAIM.

### Society for Information Management

"Videotex and Information Utilities," (with D.A. Marchand and G. Powers), a research grant ($5,000) from the Society for Information Management (SIM), June 1983 to May 1985.

This research project resulted in Mr. Powers' M.Sc. thesis, "SC-INFONET:  A Videotex Network to Enhance Business and Economic Development.

We published an article, "Internal Corporate Videotex Systems," which was published in the *Spectrum*, the Newsletter of the Society for Information Management, November 1985.

43

## 6.    Consulting

July 2005 - Present

Dr. Kerschberg has been retained by two prominent law firms to consult on two separate cases involving patent lawsuits.  Since these are ongoing cases, he is not at liberty to comment on them.

February 2005 - Present

Dr. Kerschberg serves on an Expert Panel for the US Department of Transportation's, Federal Highway Administration (FHWA) project entitled "Electronic Freight Manifest." The goal of the project is to define, design and deploy a web-services based virtual enterprise to track freight shipments from their point-of-origin to their destination, across multiple carriers and diverse modes of transportation, by enabling the sharing and interoperation of information among all stakeholders in the shipping transaction.

February 2005 to Present

KRM is working with Global InfoTek, Inc., on the COORDINATOR project for the Defense Advanced Projects Agency (DARPA).  Dr. Kerschberg will be responsible for the ORACLE subsystem that computes all possible solutions of coordinator tasks schedules, as well as metrics and systems engineering concepts.

October 2002 – August 2004

KRM was a subcontractor to Global InfoTek, Inc., providing knowledge management and agent-based architectural guidelines, specifications and designs for the OmniSeer system sponsored by the Intelligence Community.

June 2001 – June 2002

Consultant to Communication Technology, Inc., writing papers on topics such as Network Convergence and Network Planning.

January 2000 – June 2000

Dr. Kerschberg served as a consultant and expert witness for the law firm of Arder and Hadden on an Intellectual Property case involving the theft and reuse of a database schema from one client to another by a software development firm.  Dr. Kerschberg provided expert advice on the database schema, its role in the development of applications, and how it can be reused from one project to another.  Dr. Kerschberg also sat in on depositions and provided advice as to the questions that were asked during the deposition.  The case was settled out of court.

October 1999 – June 2001

Consultant to Lockheed Martin Management and Data Systems in the area of Knowledge Management.  KRM developed new knowledge management concepts and proposed a Knowledge Management Framework.

April 1997 – July 2002

Board of Regents, State of Louisiana, Consultant and Mentor to the NSF-sponsored EPSCOR Program.  I advise the joint project between the University of Southwestern Louisiana (USL), Lafayette, LA, and historically-black Southern University, Baton

Rouge, in a joint faculty and research program in "Harnessing Diverse Information Sources."

October 1997

EDS, Electronic Data Systems.  Member of the "Kitchen Cabinet" for the Chief Information Officer of the Central Intelligence Agency.  Advising on Information Architectures and Knowledge Management.

September 1996- September 1997

Tax Systems Modernization Institute (TSMI), providing consulting services, writing reports and reviewing documents.  The major efforts were the Systems Development Life Cycle document for the IRS, A report on the Migration and Modernization of Legacy Systems, the Treasury Information System Architecture Framework (Version 1.0), and Architectural Design Guidance Document for the Department of Treasury.

November 1995

TASC, The Analytical Sciences Corporation.  Consultant in Data Mining and Knowledge Discovery.

August 1989 - May 1991

Dove Electronics, Rome New York.  Consultant to Dove Electronics on "The Active Data/Knowledge Dictionary" project.  Technical director of contract to evaluate architectures for active data/knowledge dictionary environments for facilitate the specification, design, and development of applications using both data-based and knowledge-based technologies.

June 1987 - July 1989

Consultant to the Software Productivity Consortium of Reston, Virginia.  Studying architectures for Knowledge-Based Requirements Gathering, Specification, and Design.

January 1987 - December 1990

Consultant to Computer Sciences Corporation, Falls Church, Virginia.  Studying the issues of ADA$^{TM}$ Interoperability, Enterprise Analysis and Modeling, and Knowledge/Data Integration.

September 1983 - May 1984

Project Member,  An Information Locator System for South Carolina State Government," Institute of Information Management, Technology and Policy, University of South Carolina.

This study was done for the Division of Information Resources of the South Carolina State Government.  The idea was to study the feasibility of creating a dictionary/directory of State Agency information resources, holdings and services with the goal of providing various degrees of access to  information.

September 1982 - January 1983

Consultant to Ellett Bros., Chapin, SC in Information Resources Management.

Performed systems analysis of the Sales Department and recommended an on-line system for monitoring sales promotions. The system has been implemented and is operational.

March 1980 - September 1980

Internal consultant at Bell Laboratories to a development organization that used the Functional Data Model to model the semantics of telephone connections to central offices.

September 1976 - May 1977

Participated in a research grant as a consultant to the Navy Bureau of Personnel (BUPERS) in the development of a simulation model of their on-line teleprocessing network.

May 1975 - December 1975

Data Processing Company of the Banco Real (Royal Bank) of Sao Paulo, Brazil.

Developed the Functional Data Base Model (see Publications). This model has received considerable attention in the literature, and the Computer Corporation of America in Cambridge, MA, has developed a prototype called DAPLEX.

August 1973 - December 1975

American School of Rio de Janeiro.

Developed and taught "Introduction to Computing" to high school juniors and seniors.

# 7.    Professional Activities

## 7.1.    Tutorial Presentations

Tutorial Speaker on Web Services, Web Information Systems Engineering (WISE) Conference, Kyoto, Japan, December 2001.

Tutorial Speaker on Knowledge Management, Entity-Relationship Conference, November 2001, Yokohama Japan.

Tutorial Speaker on "Knowledge Management: Managing Knowledge Resources for the Intelligent Enterprise." XXIII Congress on Systems Engineering, University of Chile, July 18-21, 2000, Santiago, Chile.

Tutorial Speaker on "The Role of Intelligent Agents in Advanced Information Systems," XXI Congress on Systems Engineering, University of Chile, June 2-5, 1998.

EDBT Summer School, Short Course on Active Information Architectures and Systems, Isle of Capri, Italy, September 8-13, 1997.

Tutorial Speaker on "Expert Database Systems," International Conference on Data Engineering, Kobe, Japan, April, 1991.

Tutorial Speaker on "Expert Database Systems," International Symposium on Intelligent Network Management, Washington D.C., April, 1991.

Speaker on "Data and Knowledge Engineering," IBM Television Education Center, Thornwood, NY, January, 1991.

Tutorial Speaker on "Expert Database Systems," CIPS Edmonton, Edmonton, Alberta, Canada, October, 1990.

Tutorial Speaker on "Expert Database Systems," Canadian Conference on Artificial Intelligence, Ottawa, Canada, April, 1990.

Speaker on "Expert Database Systems," IBM Television Education Center, Thornwood, NY, January, 1989.

Tutorial Speaker on "Expert Database Systems," International Conference on Data Engineering, Los Angeles California, February, 1990.

Tutorial Speaker on "Expert Database Systems," IEEE Systems, Man and Cybernetics Conference, Alexandria, Virginia,  October, 1987.

Tutorial Speaker on "Expert Database Systems," International Conference on Very Large Data Bases , Brighton, England, September, 1987.

Presented a 15-hour, 5 day short course on "Building Expert Systems" for the IBM Latin American Systems Research Institute, Rio de Janeiro, Brazil, February 25 - March 1, 1985.

## 7.2. Professional Organization Activities

### Chairmanships

Workshop Co-Chair, Workshop on Information Just-in-Time (WIJIT 2005), Kaiserslautern, Germany, April 10-13, 2005.

Program Chairman, International Conference on Scientific and Statistical Database Management, Fairfax, Virginia, July 18-21, 2001.

Program Co-Chairman, International Workshop on Cooperative Information Agents (CIA-2000), Boston, July 7-9, 2000.

General Chairman, International Workshop on Advanced Transaction Models and Architectures (ATMA) Goa, India August 31-September 2, 1996

General Chairman, ACM SIGMOD Conference, held in Washington D.C., May 1993.

Chairman, IEEE Computer Society's Technical Committee on Data Engineering.(1989 - 1991)

Program Chairman and Organizer, *Second International Conference on Expert Database Systems,*. April 25-27, 1988, Sheraton Premiere Hotel, Tysons Corner, Virginia.

This event was sponsored by George Mason University in cooperation with the Association for Computing Machinery (ACM), American Association for Artificial Intelligence (AAAI), and the IEEE Computer Society.

Program Chairman and Organizer, *First International Conference on Expert Database Systems*, April 1-4, 1986, Charleston, South Carolina.

The conference was sponsored by the Institute of Information Management, Technology and Policy, University of South Carolina, in cooperation with the Association for Computing Machinery (ACM), American Association for Artificial Intelligence (AAAI), IEEE Computer Society, and the Agence de l'Informatique, France.

### Editorial Responsibilities

Founding Editor-in-Chief, *International Journal on Intelligent Information Systems: Integrating AI and Database Technologies*, Kluwer Publishing, Boston and Amsterdam, 1992- Present.[5]

Editorial Board Member, *Journal of Data Mining and Knowledge Discovery*, Kluwer Academic Publishers.

Guest Editor, Database Track, *IEEE Expert,* IEEE Computer Society Publication.

Referee for: *Journal of the ACM, ACM Transactions on Database Systems, ACM Computing Surveys, IEEE Transactions on Software Engineering, Data and Knowledge Engineering, Decision Sciences.*

Proposal Reviewer, National Science Foundation, 1985, 1987, 1988, 1989, 1990, 1991, 1992

Member, IFIP Working Group 2.6 on Knowledge Representation.

---

[5] The journal is now published by Springer.

## Panel and Program Committee Activities

Program Committee Member, International Conference on Data Warehousing and Knowledge Discovery, DaWaK 2004, Zaragoza, Spain, September 1-3, 2004.

Program Committee Member, Workshop on Theory and Applications of Knowledge Management, TAKMA 2004, Zaragoza, Spain, August 30 - September 3, 2004.

Program Committee Member, 2004 IEEE/WIC/ACM International Conference on Intelligent Agent Technology (IAT 2004), Beijing, China, September 20-24, 2004.

Program Committee Member, RIDE Workshop (Research in Data Engineering), Theme of Engineering E-Commerce/E-Business Systems, February 2002.

Program Co-Chair, International Workshop on Cooperative Information Agents, Modena, Italy, September, 2001.

Program Committee Member, Workshop on Open Enterprise Solutions, Italy, September 2001.

Program Committee Member, CODAS (Cooperative Database Systems for Advanced Applications, Beijing, April 2001.

Program Committee Member, Data Warehousing and Knowledge Discovery Conference, September 2000.

Program Co-Chair, Second International Workshop on Cooperative Information Agents (CIA-98), Cite de Sciences - La Vilette, Paris, France, July 3-8, 1998.

Panel Organizer, AFCEA First Federal Data Mining Symposium, "Data Mining and the Government: Are they Ready for a Relationship?" December 17, 1997.

Kerschberg, L., Scientific Databases: A Challenge in Interdisciplinary Education, International Conference on Statistical and Scientific Database Management, SSDBM, Olympia, WA, IEEE Computer Society Press.

Program Committee Member, 1998 International Conference on Statistical and Scientific Database Management, Isle of Capri, Italy, 1998.

Program Committee Member, International Conference on Knowledge and Information Management, Baltimore, Maryland, 1996.

Program Committee Member, International Conference on Knowledge Discovery in Databases, Portland, Oregon, 1996.

Program Committee Member, International Conference on Knowledge Discovery in Databases, Montreal, Canada, 1995.

Program Committee Member, IFIP DS-6 Conference, Atlanta, Georgia, May 1995.

Program Committee Member, IEEE Workshop on Research Issues in Data Engineering -- Active Database Systems, April 1994.

Program Committee Member, Workshop on Knowledge Discovery in Databases, Washington, D.C., 1993.

Program Committee Member and Panel Coordinator, ACM Conference on the Management of Data, SIGMOD, 1992.

Program Committee Member, Data Engineering Conferences, IEEE Computer Society, 1988-1992.

Program Committee Member, Entity-Relationship Conferences, 1989, 1990, and 1991.

Program Committee Member, International Workshop on Interoperability in Database Systems, Kyoto, Japan, April, 1991.

Panel Member, "Does Loose Coupling Stand a Chance," International Conference on Data Engineering, Los Angeles, February 6-10, 1989.

Panel Organizer and Chairman, "Expert Database Systems," *Expert Systems in Government Conference*, Washington D.C., October 21, 1987.

Panel Member, "Experiences With Knowledgebases," *1987 SIGMOD International Conference on Management of Data*, San Francisco, California, May 28, 1987.

Panel Member, "Future Information Systems," *IFIP Congress 1986*, Dublin, Ireland, September 1-5, 1986.

Program Committee Member, *1988 IFIP Conference on the Role of Artificial Intelligence in Database Systems and Information Systems,* Canton , China, July 1988.

Program Committee Member, *1988 Avignon Workshop on Expert Systems and Their Applications,* Avignon, France, May 1987.

Program Committee Member, *1987 Avignon Workshop on Expert Systems and Their Applications,* Avignon, France, May 1987.

Program Committee Member, *1986 ACM SIGMOD International Conference on Management of Data.,* Washington, D.C., May 1986.

Program Chairman and organizer, *First International Workshop on Expert Database Systems*, October 24-27, 1984, Kiawah Island, South Carolina.

Panel Member, "Issues in New Technologies," *Conference on Information Systems,* Tucson AZ, December, 1984.

Program Committee Member, *1985 ACM SIGMOD International Conference on Management of Data,* Austin, Texas, May 1985.

Panel Organizer and Chairman, "Expert Database Systems - Report of the Workshop on Expert Database Systems," *1985 ACM SIGMOD International Conference on Management of Data,* Austin, Texas, May 1985.

Program Committee Member, *Eleventh Very Large Data Base Conference,* Stockholm, Sweden, September 1985.

Program Committee Member, *1984 ACM SIGMOD International Conference on Management of Data,* Boston, MA, May 1984.

Program Committee Member, *Eighth Very Large Data Base Conference,* Mexico City, Mexico, September, 1982.

Panel Organizer and Chairman, "The Data Dictionary - Database System Interface," *Eighth Very Large Data Base Conference,* Mexico City, Mexico, September, 1982.

Program Committee Member, *Second International Conference on Computer Science,* Santiago, Chile, August, 1982.

Working Group Leader for "Logical Design and Information Modeling," *Data Base Directions III Workshop,* sponsored by ACM and NBS, Fort Lauderdale, Florida, October 20-22, 1980. The final report appears in "Data Base Directions: Information Resource Management - Strategies and Tools," (A.H. Goldfine, editor), NBS Special Publication 500-92, September, 1982.

Program Committee Member, *Sixth Very Large Data Base Conference,* Rio de Janeiro, Brazil, 1979.

Panel Member for "The Future of Database Systems," *NYU Symposium on Database Design,* New York City, 1978.

Panel Member for "The Operating System - Database Management System Interface," *National Computer Conference,* New York City, 1978.

Panel Organizer for "Performance Modeling and Evaluation of Database Management Systems," *National Computer Conference,* New York City, 1978.

### 7.3.  Invited Presentations

**General Invited Talks**

Keynote Speaker, "Just-in-Time Knowledge Management," 3rd Conference on Professional Knowledge Management, April 10-13, 2005, Kaiserslautern, Germany.

"A Service-oriented Knowledge Management Framework over Heterogeneous Sources," invited talk at NASA's Information Science and Technology Colloquium Series, Goddard Space Flight Center, Greenbelt MD, March 10, 2004

Keynote Speaker, "Knowledge Management in Heterogeneous Data Warehouse Environments," Conference on Data Warehousing and Knowledge Discovery, Munich, Germany, September 6, 2001.

"Establishing Scientific Databases for Forensic Laboratories," *International Symposium on Setting Quality Standards for the Forensic Science Community*, Sponsored by the Federal Bureau of Investigation, US Department of Justice, San Antonio, Texas, May 3-7, 1999.

**Invited Talks During JSPS Fellowship in Japan, February 27 to April 27, 1998**

"The Role of Intelligent Agents in Advanced Information Systems," Kyushu University, Professor Setuo Arikawa (host), April 6, 1998.

"The Role of Intelligent Agents in Advanced Information Systems," Hiroshima City University, Professors Matatoshi Arikawa and Shaoying Liu (hosts), April 7, 1998.

"The Role of Intelligent Agents in Advanced Information Systems," Hiroshima University, Professor Tadao Ichikawa (host), April 8, 1998.

"The Engineering of Large-Scale Scientific Databases," NARA Institute of Technology, Professors Syunsuke Uemura and Masatoshi Yoshikawa (hosts), April 14, 1998.

"The Role of Intelligent Agents in Advanced Information Systems," Kyoto University, Professor Yahiko Kambayashi (host), April 17, 1998.

"The Role of Intelligent Agents in Advanced Information Systems," Tsukuba University, Professor Hiroyuki Kitagawa (host), April 21, 1998.

**General Invited Talks.**

 "The Engineering of Large-Scale Scientific Databases," Tokyo University, Professor Masaru Kitsuregawa (host), April 23, 1998.

"Knowledge Rovers: Configurable Agents to Support Enterprise Information Infrastructures," Proceedings of the Data Mining Summit, Miller-Freeman Publishing Co., San Francisco, CA, February 21, 1997.

Kerschberg, L. (1997). Knowledge Rovers: Cooperative Intelligent Agent Support for Enterprise Information Architectures, International Workshop on Cooperative Information Agents, Kiel, Germany, February 26-28, 1997.

 "Knowledge Rovers: Configurable Agents to Support Enterprise Information Infrastructures," 1997 MITRE Software Engineering and Economics Conference, April 2-3, 1997.

Keynote Lecture, "The Role of Intelligent Agents in Advanced Information Systems" 15th British National Conference on Databases, BNCOD 15, London, July 7-9, 1997

Invited Talk, "Expert Database Support for Distributed Materials Properties Databases," Workshop on Materials and Processes Research and the Information Highway, Sponsored by the National Materials Advisory Board, National Research Council, Stanford, University,  April 12-13, 1996.

Invited Talk, "The Engineering of Large-Scale Data-Intensive Information Systems," TRW, March 1996.

Invited Talk, "Architectures for Intelligent Information Systems," TASC Technology Council, December 5, 1995.

Invited Talk, "The Engineering of Large-Scale Data-Intensive Information Systems," Distinguished Speaker Series, Center for Applied Information Technology, NIST (National Institute for Standards and Technology), Gaithersburg, MD, April 21, 1995

Invited Talk, "The Engineering of Large-Scale Data-Intensive Information Systems," Distinguished Lecture Series on Data-Intensive Systems, Data-Intensive Systems Research Center, Oregon Graduate Institute and Portland State University, Portland Oregon, March 10, 1995.

Invited Talk, "Distributed Heterogeneous Information Systems:  Data Heterogeneity -- Research Issues and Solutions," at the Defense Information Systems Agency Workshop on Heterogeneous Distributed Information Systems, 1993.

Invited Talk, "Information Integration and Interchange in the Modern Enterprise," at the Data Administration Manager's Association's annual symposium, held May 17-18, 1994 at NIST.

Invited Lecture, "Multi-Paradigm Reasoning for Database Query Optimization," *Conference on Artificial Intelligence and Symbolic Mathematical Computations*, Karlsruhe, Germany, August 3-6, 1992.

Invited Speaker, "Knowledge-Based Approach for Generating Target System Specifications from a Domain Model," 25th Anniversary Celebration of the founding of the Computer Science Department, Pontifical Catholic University of Rio de Janeiro, Brazil, August 1992.

Inaugural Symposium Speaker, "A Multiparadigm Approach to Query Optimization using Structural, Behavioral and Historical Sources of Information," Intelligent Systems Cluster of the University of North Dakota, Fargo, ND, March 1992.

Invited Symposium Speaker, "A Multiparadigm Approach to Query Optimization using Structural, Behavioral and Historical Sources of Information," Computer Science Department, University of New Mexico, Albuquerque, NM, March 1992.

Invited Speaker, "Methodologies for Data/Knowledge/Information Engineering: Will the Twain Meet?," *International Symposium on Methodologies for Intelligent Systems,* ISMIS'91, Charlotte, North Carolina, October, 1991.

"A Methodology for Building Expert Database Applications," UMIACS Lecture Series on Modern Databases, March 25, 1988, University of Maryland, College Park.

Invited Seminar Speaker, "A Methodology for Building Expert Database Applications," Artificial Intelligence Center, George Mason University, April, 1988.

Speaker and respondent, "The Role of Artificial Intelligence in Libraries," *The Library Catalog: Bringing Order the Universe of Knowledge*, a symposium sponsored by the Gelman Library of George Washington University, September 23, 1987.

"Knowledge-Based Systems," Distinguished Lecturer Series, Florida Atlantic University, Boca Raton, FL, June 20, 1985.

**Keynote Address**, "Expert Database Systems: Evolutionary and Revolutionary Approaches," *Fifth International Workshop on Expert Systems and Their Applications,* Avignon, France, May 13-15, 1985.

"Building Expert Systems," Distinguished Speaker Series, IBM Scientific Center, Brasilia, Brazil, March 11, 1985.

"Query Optimization in Distributed Relational Databases," Invited Speaker, *1984 Colloquium Series on Distributed Processing,* Centre de Recherche Informatique de Montreal, McGill University, Montreal, Canada, March 9, 1984.

"Database Design," Invited Tutorial Lecturer, *First International Conference on Computer Science,* Santiago, Chile, August 22-24, 1981.

"Update Semantics for the Functional Data Model," Computer Science Seminar, Princeton University, Princeton, New Jersey, February 1981.

"A Taxonomy of Data Models," *International Symposium on Methodologies for the Specification of Hardware and Software Systems,* Rio de Janeiro, July 1976.

"Synthetic English: A Query Language for the Functional Data Model," Computer Science Seminar, University of California at Los Angeles, 1976.

"The Functional Data Model," *Symposium on Computational Linguistics*, University of Campinas, Sao Paulo, Brazil, 1975.

# 8.    Publications

## 8.1.  Books

P. M. D. Gray, L. Kerschberg, P. King, and A. Poulovassilis (Editors), "The Functional Approach to Data Management: Modeling, Analyzing, and Integrating Heterogeneous Data." Heidelberg, Germany: Springer-Verlag, 2003.

L. Kerschberg and M. Kafatos (Editors), "International Conference on Scientific and Statistical Database Management." George Mason University, Fairfax, VA: IEEE Computer Society, 18-20 July 2001, pp. 277.

M. Klusch and L. Kerschberg (Editors), "Cooperative Information Agents IV: The Future of Information Agents in Cyberspace, Fourth International Workshop," in *Lecture Notes in Artificial Intelligence*, vol. 1860. Boston: Springer, 2000, pp. 283.

 S. Jajodia and L. Kerschberg (Editors), "*Advanced Transaction Models and Architectures*," Norwall, MA: Kluwer Academic Publishers, 1997.

*Expert Database Systems: Proceedings from the Second International Conference* (L. Kerschberg, editor), The Benjamin/Cummings Publishing Company, Menlo Park, CA, December 1988.

*Expert Database Systems: Proceedings from the First International Conference* (L. Kerschberg, editor), The Benjamin/Cummings Publishing Company, Menlo Park, CA, July 1987.

*Expert Database Systems: Proceedings from the First International Workshop*, (L. Kerschberg, editor), The Benjamin/Cummings Publishing Company, Menlo Park, CA, February 1986.

## 8.2   Chapters in Books

L. Kerschberg, M. Chowdhury, A. Damiano, H. Jeong, S. Mitchell, J. Si, and S. Smith, "Knowledge Sifter: Agent-Based Ontology-Driven Search over Heterogeneous Databases using Semantic Web Services," in *Semantics for a Networked World, Semantics for the Grid Databases, LNCS 3226*, vol. 276-293, *Lecture Notes in Computer Science*, M. Bouzeghoub, C. Goble, V. Kashyap, and S. Spaccapietra, Eds., LNCS 3226 Paris, France: Springer, 2004, pp. 278-295.

J. Yoon and L. Kerschberg, "A Functional Approach to XML-Based Dynamic Negotiation in E-Business," in *The Functional Approach to Data Management*, P. M. D. Gray, L. Kerschberg, P. King, and A. Poulovassilis, Eds. Heidelberg: Springer, 2003, pp. 393-416.

L. Kerschberg, W. Kim, and A. Scime, "A Semantic Taxonomy-Based Personalizable Meta-Search Agent," in *Innovative Concepts for Agent-Based Systems*, vol. LNAI 2564, *Lecture Notes in Artificial Intelligence*, W. Truszkowski, Ed. Heidelberg: Springer-Verlag, 2003, pp. 3-31.

L. Kerschberg, "Functional Approach to in Internet-Based Applications: Enabling the Semantic Web, E-Business, Web Services and Agent-Based Knowledge Management,"

in *The Functional Approach to Data Management*, P. M. D. Gray, L. Kerschberg, P. King, and A. Poulovassilis, Eds. Heidelberg: Springer, 2003, pp. 369-392.

L. Kerschberg, "Knowledge Management in Heterogeneous Data Warehouse Environments," in *Third International Conference on Data Warehousing and Knowledge Discovery, DaWaK 2001, LNCS 2114*, Y. Kambayashi, W. Winiwarter, and M. Arikawa, Eds., 2114 ed. Munich, Germany: Springer-Verlag, 5-7 September 2001, pp. 1-10.

Larry Kerschberg, "Knowledge Rovers: Cooperative Intelligent Agent Support for Enterprise Information Architectures," in *Cooperative Information Agents*, vol. 1202, *Lecture Notes in Artificial Intelligence*, P. Kandzia and M. Klusch, Eds. Berlin: Springer-Verlag, 1997, pp. 79-100.

Larry Kerschberg, "The Role of Intelligent Agents in Advanced Information Systems," in *Advanced in Databases*, vol. 1271, *Lecture Notes in Computer Science*, C. Small, P. Douglas, R. Johnson, P. King, and N. Martin, Eds. London: Springer-Verlag, 1997, pp. 1-22.

Jongpil Yoon and Larry Kerschberg, "Semantic Update Optimization in Active Databases," *Proceedings IFIP WG2.6 Working Conference on Database Semantics* (DS-6), Chapman, Atlanta, 1995.

Chris Bosch, Hassan Gomaa and Larry Kerschberg, "Design and Construction of a Software Engineering Environment: Experiences with Eiffel." *In Readings in Object-Oriented Systems and Applications*, (Rine, D. editor), IEEE Computer Society Press, 1995.

Seligman, L. and Kerschberg, L. , "Federated Knowledge and Database Systems: A New Architecture for Integrating of AI and Database Systems," In *Advances in Databases and Artificial Intelligence, Vol. 1: The Landscape of Intelligence in Database and Information Systems* (L. Delcambre and F. Petry, editors). JAI Press (1995).

Kaufman, K.A., Michalski, R.S. and Kerschberg, L., "Mining for Knowledge in Databases: Goals and General Description of the INLEN System," *Knowledge Discovery in Databases,* G. Piatetski-Shapiro and W.J. Frawley, (Eds.), AAAI Press / The MIT Press, Menlo Park, CA l991.

Kerschberg, L., Baum, R., and Hung, J., "KORTEX: An Expert Database System Shell for a Knowledge-based Entity Relationship Model," in *Entity- Relationship Approach to Database Design and Querying*, F.H. Lochovsky (Editor), North Holland, 1990, pp. 255-268.

Kerschberg, L., "Expert Database Systems," *Concise Encyclopedia of Information Processing in Systems and Organizations*, Pergamon Press, England, 1989.

Kerschberg, L., Foreword to the book, *Expert Database Systems*, edited by Keith Jeffries, 1991.

Potter, W.D. and Kerschberg, L., "The Knowledge/Data Model: An Integrated Approach to Modeling Knowledge and Data," in *Data and Knowledge (DS-2)*, (R.A. Meersman and A.C. Sernadas, editors), North Holland, 1988.

Kerschberg, L and Dickinson, J., "FINEX: A Personal Computer-Based Expert Support System for Financial Analysis, in *Management Expert Systems ,* C. Ernst (editor), Addison-Wesley, Ltd., December, 1988.

Kerschberg, L and Dickinson, J., "Un système expert d'aide à l'analyse financière," in *Les Systemes Experts de Gestion: Banque, Finance, Marketing*, C Ernst (editor), Eyrolles, Paris, France, 1988.

### 8.3.  Invited Papers

Peter M.D. Gray, Peter J.H. King and Larry Kerschberg, Foreword: Functional Approach to Intelligent Information Systems, *Journal of Intelligent Information Systems,* vol 12 issues 2/3, 1999.

L. Kerschberg, Foreword to the book, *Intelligent Information Agents.* (Matthias Klusch, editor), Springer-Verlag, ISBN 3-540-65112-8, March, 1999 (to appear).

I. Imam and L. Kerschberg, "Adaptive Intelligent Agents; Guest Editor Introduction," *Journal of Intelligent Information Systems*, vol. 9, pp. 211-214, 1997.

"Expert Database Systems," Guest Editor Introduction, *IEEE Expert,* Fall 1988.

"Expert Database Systems," *The Computer Bulletin*, The British Computer Society, June, 1987, pp.7-9.

### 8.4.  Refereed Publications

#### Journal Papers

R. Howard and L. Kerschberg, "A Framework for Dynamic Semantic Web Services Management," *International Journal of Cooperative Information Systems, Special Issue on Service Oriented Modeling*, vol. 13, 2004.

W. Kim, L. Kerschberg, and A. Scime, "Learning for Automatic Personalization in a Semantic Taxonomy-Based Meta-Search Agent," *Electronic Commerce Research and Applications (ECRA)*, vol. 1, 2002.

J. P. Yoon, V. Raghavan, V. Chakilam, and L. Kerschberg, "BitCube: A Three - Dimensional Bitmap Indexing for XML Documents," *Journal of Intelligent Information Systems*, vol. 17, pp. 241-254, 2001.

L. Kerschberg and D. Weishar, "Conceptual Models and Architectures for Advanced Information Systems," *Applied Intelligence*, vol. 13, pp. 149-164, 2000.

H. Gomaa, L. Kerschberg, V. Sugumaran, I. Tavakoli, and L. O'Hara, "A Knowledge-Based Software Environment for Reusable Software Requirements and Architectures," *Journal of Automated Software Engineering*, vol. 3, 1996.

L. Seligman and L. Kerschberg, "A Mediator for Approximate Consistency: Supporting "Good Enough" Materialized Views," *Journal of Intelligent Information Systems*, vol. 8, pp. 203 - 225, 1997.

H. Gomaa, D. Menascé, and L. Kerschberg, "A Software Architectural Design Method for Large-Scale Distributed Information Systems," *Journal of Distributed Systems Engineering*, 1996.

Yoon, J.P. and Kerschberg, L., "A Framework for Knowledge Discovery and Evolution in Databases," *IEEE Transactions on Knowledge and Data Engineering*, 5(6), December 1993.

Seligman, L. and Kerschberg, L. "An Active Database Approach to Consistency Management in Heterogeneous Data- and Knowledge-based Systems," *International Journal of Cooperative and Intelligent Systems*, 2(2), October, 1993.

Kerschberg, L., Baum, R., Waisanen, A., Yoon, J., Huang, I., "A Taxonomy of

Knowledge-Based Approaches to Fault Management for Telecommunications Networks," *Journal of Computers and Electrical Engineering*, 1993.

Michalski, R.S., Kerschberg, L., Kaufman, K. and Ribeiro, J., "Mining for Knowledge in Databases: The INLEN Architecture, Initial Implementation and First Results" *International Journal of Intelligent Information Systems*, Kluwer Academic Publishers, August 1992.

Gomaa, H., Kerschberg, L. and Sugumaran, V., "Knowledge-Based Approach to Domain Modeling: Application to NASA's Payload Operations Control Centers," *Telematics and Informatics*, Vol 9, Nos 3/4, Pergamon Press, pp. 281-296, 1992.

Kerschberg, L., "Expert Database Systems: Knowledge/Data Management Environments for Intelligent Information Systems," *Information Systems*, Vol. 15, No. 1, Pergamon Press, 1990, pp. 151-160.

Weitzel, J.R. and Kerschberg, L., "Developing Knowledge-Based Systems: Reorganizing the System Development Life Cycle," *Communications of the ACM*, Vol. 32, No. 4, April 1989.

Weitzel, J.R. and Kerschberg, L., "A System Development Methodology for Knowledge-Based Systems, Special Issue on Knowledge Engineering," *IEEE Systems, Man, and Cybernetics*, Vol 19, No. 3, May/June 1989.

Sen, A., and Kerschberg, L., "Enterprise Modeling for Database Specification and Design," *Data and Knowledge Engineering*, Number 2, 1987.

Navathe, S, and Kerschberg, L., "The Role of Data Dictionary Systems in Logical Database Design," *Information and Management*, Vol. 10, No. 1, January 1986.

Powers, G., Kerschberg, L., and Marchand, D.A., "Internal Corporate Videotex Systems," *Spectrum*, Society for Information Management, Chicago, Illinois, November, 1985.

Kerschberg, L., Ting, P.D., and Yao, S.B., "Query Optimization in Star Computer Networks," *ACM Transactions on Database Systems*, December, 1982.

## 8.5    Refereed Conference Proceedings

R. Morikawa and L. Kerschberg, "MAKO-PM: Just-in-Time Process Model," presented at Professional Knowledge Management: Workshop on Information Just-in-Time, Kaiserslautern, Germany, 2005.

L. Kerschberg, H. Jeong, and W. Kim, "Emergent Semantics in Knowledge Sifter: An Evolutionary Search Agent based on Semantic Web Services," Technical Report, George Mason University, Fairfax June 2005 (Submitted for publication).

L. Kerschberg and H. Jeong, "Just-in-Time Knowledge Management," presented at Third Conference on Professional Knowledge Management, Kaiserslautern, Germany, 2005.

L. Kerschberg and H. Jeong, "Ubiquitous Data Management in Knowledge Sifter via Data-DNA," presented at Workshop on Ubiquitous Data Management, Tokyo, Japan, 2005.

J. Cheng, R. Emami, L. Kerschberg, E. Santos, Jr., Q. Zhao, H. Nguyen, H. Wang, M. Huhns, M. Valtorta, J. Dang, H. Goradia, J. Huang, and S. Xi, "OmniSeer: A Cognitive

Framework for User Modeling, Reuse of Prior and Tacit Knowledge, and Collaborative Knowledge Services," presented at Hawaii International Conference on Systems Science (HICSS-38), Island of Hawaii, 2005.

L. Kerschberg, M. Chowdhury, A. Damiano, H. Jeong, S. Mitchell, J. Si, and S. Smith, "Knowledge Sifter: Ontology-Driven Search over Heterogeneous Databases," presented at SSDBM 2004, International Conference on Scientific and Statistical Database Management, Santorini Island, Greece, 2004.

R. Morikawa and L. Kerschberg, "MAKO: Multi-Ontology Analytical Knowledge Organization based on Topic Maps," presented at Fifth International Workshop on Theory and Applications of Knowledge Management, Zaragoza, Spain, 2004.

R. Howard and L. Kerschberg, "A Knowledge-based Framework for Dynamic Semantic Web Services Brokering and Management," presented at International Workshop on Web Semantics - WebS 2004, Zaragoza, Spain, 2004.

R. Howard and L. Kerschberg, "Brokering Semantic Web Services via Intelligent Middleware Agents within a Knowledge-Based Framework," presented at Intelligent Agent Technology (IAT 2004), Beijing, China, 2004.

R. Howard and L. Kerschberg, "Using Facets of Security within a Knowledge-based Framework to Broker and Manage Semantic Web Services," presented at Workshop on Secure Knowledge Management (SKM 2004), Amherst, New York, 2004.

R. Howard and L. Kerschberg, "Dynamically Managing the Delivery of Web Services via Workflow and Feedback," presented at International Conference on Information Systems, Workshop on E-Business (Web2004), Washington, DC, 2004.

L. Kerschberg, W. Kim, and A. Scime, "Intelligent Web Search via Personalizable Meta-Search Agents," presented at International Conference on Ontologies, Databases and Applications of Semantics (ODBASE 2002), Irvine, CA, 2002.

W. Kim, L. Kerschberg, and A. Scime, "Personalization in a Semantic Taxonomy-based Meta-Search Engine," presented at International Conference on Electronic Commerce, Vienna, Austria, October 2001.

S. H. Lee, J. S. Hong, and L. Kerschberg, "A Popularity-Driven Caching Scheme for Meta-search Engines: An Empirical Study," in *Database and Expert Systems Applications, DEXA 2001*, vol. LNCS 2113, H. C. Mayr, J. Lazansky, and G. Quirchmayr, Eds. Munich, Germany: Springer, 3-5 September 2001, pp. 877-886.

J. P. Yoon and L. Kerschberg, "An Aggressive Aggregation of XML Documents for Summary Data Generation," presented at Fifth World Multi-Conference on Systemics, Cybernetics and Informatics, SCI 2001, Orlando, Florida, 22-25 July 2001.

L. Kerschberg, W. Kim, and A. Scime, "WebSifter II: A Personalizable Meta-Search Agent Based on Semantic Weighted Taxonomy Tree," *The 2001 International Conference on Internet Computing*, IC 2001, Las Vegas, Nevada, 25-28 June 2001.

A. Scime and L. Kerschberg, "WebSifter: An Ontological Web-Mining Agent for E-Business," *Proceedings of the 9th IFIP 2.6 Working Conference on Database Semantics (DS-9): Semantic Issues in e-Commerce Systems*, Hong Kong, 25-28 April 2001.

A. Scime and L. Kerschberg, "WebSifter: An Ontology-Based Personalizable Search Agent for the Web," *2000 Kyoto International Conference on Digital Libraries: Research and Practice*, Kyoto University, 13-16 November 2000.

H. Gomaa, L. Kerschberg, and G. K. Farrukh, "Domain Modeling of Software Process Models," presented at *IEEE International Conference on Engineering of Complex Computer Systems*, Tokyo, Japan, 11-14 September 2000.

L. Kerschberg and S. Banerjee, "An Agency-based Framework for Electronic Business," in *Cooperative Information Agents III*, vol. 1652, *Lecture Notes in Artificial Intelligence*, M. Klusch, O. Shehory, and G. Weiss, Eds. Berlin, et al.: Springer-Verlag, 1999, pp. 254-279.

A. Brodsky, L. Kerschberg, and S. Varas, "Resource Management in Agent-based Distributed Environments," in *Cooperative Information Agents III*, vol. 1652, *Lecture Notes in Artificial Intelligence*, M. Klusch, O. Shehory, and G. Weiss, Eds. Berlin, et al.: Springer-Verlag, 1999, pp. 50-74.

Jongpil Yoon and Larry Kerschberg, "Query-Initiated Discovery of Interesting Association Rules," *International Conference on Discovery Science*, Fukuoka, Japan, December 14-16, 1998.

Seok-Won Lee and Larry Kerschberg, "A Methodology and Life Cycle Model for Data Mining and Knowledge Discovery in Precision Agriculture," Proceedings of the IEEE International Conference on Systems, Man and Cybernetics (SMC '98), San Diego CA, October 1998.

B. Zeeberg, K. Wantanabe, S. Goto, R. Overbeek, L. Kerschberg, and G. Michaels, "Metabolic Pathway Interface to Molecular Biology Databases," ," *International Conference on Statistical and Scientific Database Management,* Isle of Capri, Italy, 1998.

J. Ribeiro, K. Kaufman, and L. Kerschberg, "Knowledge Discovery in Multiple Databases," Proceedings First International Conference on Knowledge Discovery and Data Mining, Montreal, CA, 1995.

J. Ribeiro, K. Kaufman, and L. Kerschberg, "Knowledge Discovery in Multiple Databases," presented at ISMM International Conference on Intelligent Information Management Systems, Washington D.C., 1995.

L. J. Milask, T. Guynup, C. Hammel, L. Kerschberg, and G. Michaels, "An Integrated Scientific Database System and Value-Added Support Center: Application to Ecological Research of the Forest Canopy and Biosphere Interface," *International Conference on Statistical and Scientific Database Management*, SSDBM, Olympia, WA, 1997.

K. Massey, L. Kerschberg, and G. Michaels, "VANILLA: A Dynamic Data Model for a Generic Scientific Database," *International Conference on Statistical and Scientific Database Management*, SSDBM, Olympia, WA, 1997.

Kerschberg, L., Gomaa, H., Menascé, D., and Yoon, J.P., "Data and Information Architectures for Large-Scale Distributed Data Intensive Systems" Eighth International Conference on Scientific and Statistical Database Management, Stockholm, Sweden, June 18-20, 1996.

Menascé, D., H. Gomaa, and L. Kerschberg, "A Performance-Oriented Design Methodology for Large-Scale Distributed Data Intensive Information Systems," *Proc. First IEEE International Conference on Engineering of Complex Computer Systems*, November 7-10, 1995, Fort Lauderdale, FL (Outstanding Paper Award in Systems Engineering Track).

Gomaa, H. and Kerschberg, L., "Domain Modeling for Software Reuse and Evolution." *Proc. Computer Assisted Software Engineering Workshop* (CASE 95), Toronto, July 1995.

Yoon, J.P. and Kerschberg, L. "Semantic Update Optimization in Active Databases," *Proceedings IFIP DS-6 Conference*, Atlanta, Georgia, May 1995.

Hassan Gomaa, Larry Kerschberg, Vijay Sugumaran, Chris Bosch, Iraj Tavakoli, "A Prototype Domain Modeling Environment for Reusable Software Architectures." *IEEE International Conference on Software Reuse*, Rio de Janeiro, Brazil, November 1994.

Yoon, J.P. and Kerschberg, L., "Semantic Query Reformulation in Object-Oriented Systems," *Proc. International Conference on Deductive and Object-Oriented Databases*, Phoenix, AZ, Dec. 1993. (Also, Springer-Verlag *Lecture Notes in Computer Science*, Vol. 760).

Seligman, L., and Kerschberg, L., "Knowledge-base/Database Consistency in a Federated Multidatabase Environment," *IEEE RIDE-IMS '93 Workshop*, Vienna, Austria, April 1993.

Seligman, L., and Kerschberg, L., "Approximate Knowledge-base/Database Consistency: An Active Database Approach," *Proceedings of the ISMM International Conference on Information and Knowledge Management*, Baltimore, MD, November 1992.

Yoon, J.P. and Kerschberg, L. "A Framework for Constraint Management in Object-Oriented Databases," *Proceedings of the ISMM International Conference on Information and Knowledge Management*, Baltimore, MD, November 1992.

Gomaa, H., Kerschberg, L. and V. Sugumaran, "A Knowledge-Based Approach to Generating Target Systems Specifications from a Domain Model," in Algorithms, Software, Architecture, J. van Leeuwen (Editor), *Information Processing 92*, Volume I, Elsevier Science Publishers, Amsterdam, September 1992.

Weishar, D. and Kerschberg, L., "An Intelligent Heterogeneous Autonomous Database Architecture for Semantic Heterogeneity Support," *IEEE Workshop on Interoperability in Multidatabase Systems*, Kyoto, Japan, April l991.

Gomaa H and L. Kerschberg , "An Evolutionary Domain Life Cycle for Domain Modeling and Target System Generation", *Proc. Workshop on Domain Modeling for Software Engineering*, International Conference on Software Engineering, Austin, Texas, May 1991.

Kaufman, K., Michalski, R.S. and Kerschberg, L., "An Architecture for Integrating Machine Learning and Discovery Programs into a Data Analysis System," *Proceedings of the AAAI-91 Workshop on Knowledge Discovery in Databases*, July l991.

Sugumaran, V., Gomaa, H., and Kerschberg, L., "Generating Target System Specifications from a Domain Model Using CLIPS," *Proc. of Second Annual Clips Conference*, Houston, TX., September 1991

Kaufman, K., Michalski, R.S. and Kerschberg, L., "Knowledge Extraction from Databases: Design Principles of the INLEN System," *Proceedings of the Sixth International Symposium on Methodologies for Intelligent Systems (ISMIS'91)*, October 1991.

Kerschberg, L., Baum, R., et al., "A Taxonomy of Knowledge-Based Approaches to

61

Fault Management for Telecommunications Networks," *IEEE Conference on Systems, Man and Cybernetics*, Charlottesville, VA, October l991.

Gomaa, H., Kerschberg, L., Bosch, C., Sugumaran, V., and Tavakoli, I.. "A Prototype Software Engineering Environment for Domain Modeling and Reuse,", *Proc. Fourth Annual Workshop on Methods and Tools for Reuse*.  Herndon, VA., November 1991.

Gomaa, H., Kerschberg, L., et al., "A Prototype Software Engineering Environment for Domain Modeling and Reuse," *NASA/Goddard Sixteenth Annual Software Engineering Workshop*, December l991.

Weishar, D. and Kerschberg, L., "Data/Knowledge Packets as a Means of Supporting Semantic Heterogeneity in Multidatabase Systems," *ACM SIGMOD Record*, December l991.

Kerschberg, L., Baum, R., DeJong, K., Waisanen, A., Yoon, J., Huang, I., "Intelligent Network Management: A Heterogeneous Knowledge Source Approach," *IEEE Conference on Systems, Man and Cybernetics*, Los Angeles, CA, October 1990.

Kerschberg, L., Baum, R., DeJong, K., Waisanen, A., Yoon, J., Huang, I., Eisgruber, K, Utz, B., "Knowledge and Data Engineering of a Telecommunications Network," *1990 Entity-Relationship Conference*, Lausanne, Switzerland, 1990.

Gomaa H, R. Fairley and L. Kerschberg , "Towards an Evolutionary Domain Life Cycle Model", *Proc. Workshop on Domain Modeling for Software Engineering*, at OOPSLA 89, New Orleans, October 1989.

Shepherd, A. and Kerschberg, L.,  "Constraint Management in Expert Database Systems," *Expert Database Systems: Proceedings from the First International Workshop*, (L. Kerschberg, editor), The Benjamin/Cummings Publishing Co., Menlo Park, CA, 1986.

Muthuswamy, B. and Kerschberg, L., "A Detailed Database Statistics Model for Relational Query Optimization," *1985 ACM Annual Conference*, Denver, CO, October 14-16, 1985.

Kerschberg, L. and Dickinson, J., "FINEX: An Expert Support System for Financial Analysis," *Fifth International Workshop on Expert Systems and Their Applications*, Avignon, France, May 13-15, 1985.

Shepherd, A. and Kerschberg, L., "PRISM: A Knowledge-Based Approach to Semantic Integrity Specification and Enforcement in Database Systems," *Proceedings ACM SIGMOD International Conference on Management of Data,* Boston, MA, June 18-21, 1984.

Kerschberg, L., Marchand, D.A., and Sen, A., "Information System Integration: A Metadata Management Approach," *Proceedings International Conference on Information Systems*, Houston, Texas, December 15-17, 1983.

Hsu, P.L., and Kerschberg, L., "The Role of Personal Information Systems in Office Information Systems," *Proceedings 1983  American Institute of Decision Sciences Conference*, San Antonio, Texas, November, 1983.

Trueblood, R.P., Lin, T.Y., and Kerschberg, L., "Analyzing Computer Security Using Petri Net Theory," *Proc. Second International Conference on Computer Science*, Santiago, Chile, August, 1982.

Sibley, E.H., and Kerschberg, L., "Data Architecture and Data Model Considerations," *Proc. NCC*, AFIPS Press, Dallas, Texas, pp. 85-96, 1977.

This paper was included in the tutorial volume, Data Management in the 1980's, (Larson and Freeman, editors) IEEE Computer Society, 1983.

Furtado, A.L., and Kerschberg, L., "An Algebra of Quotient Relations," *Proceedings of the International Conference of Management of Data (SIGMOD)*, Toronto, June 1-8, 1977.

Kerschberg, L., Ozkarahan, E.A., and Pacheco, J.E.S., "A Synthetic English Query Language for a Relational Associative Processor," *Proc. Second International Conference on Software Engineering*, San Francisco, Calif., pp. 505-519, October 1976.

Kerschberg, L., Klug, A., and Tsichritzis, D., "A Taxonomy of Data Models," in *Systems for Large Data Bases*, Proceedings of the Conference on Very Large Data Bases, Brussels, Belgium, 1976, P. C. Lockemann and E. J. Neuhold, editors, North-Holland Publishing Co., Amsterdam, pp. 44-64, 1976.

Kerschberg, L., "The Characteristic Polynomial of Graph Products, *Proc. Seventh Asilomar Conference of Circuits, Systems, and Computers*, Pacific Grove, CA, November 1973.

Skandera, R., and Kerschberg, L., "Urban Traffic Under Computer Control," *Journal of Public Administration*, Getulio Vargas Foundation, Rio de Janeiro, June 1972.

Kerschberg, L., "Multilinear Systems: Theory and Applications," *Proc. First Iberian-American Conference on Informatics*, Buenos Aires, Argentina, 1972.

Saboia, J., and Kerschberg, L., "A Method for Canonically Decoupling Multivariable Linear Systems," *Proc. IEEE Conf. on Computers, Systems, and Networks*, Oaxtepec, Mexico, 1971.

Veloso, P.A.S., and Kerschberg, L., "A Decomposition for a Class of Multilinear Systems," *Proc. IEEE Conf. on Computers, Systems, and Networks*, Oaxtepec, Mexico, 1971.

Kerschberg, L., and Happ, W.W., "Eigenfunction Propagation in Interconnected Systems," *Proc. Allerton Conf. on Circuit and System Theory*, Allerton, Illinois, 1970.

# 9.    Research Supervision

## 9.1.  Ph.D. Students

**George Mason University**

Below are the names and dissertation topics of students I have directed.

Anthony Waisanen, "An Approach to Query Processing by Integrating Historical, Structural, and Behavioral Sources of Information" Defended March 18, 1992, at Shaw Air Force Base.

Vijayan Sugumaran, "A Knowledge-Based Approach for Generating Target System Specifications from a Domain Model," Defended March 9, 1993.

Jongpil Yoon, "Constraint Management in Active Database Systems," Defended Spring 1993, now JFAP Assistant Professor at University of Louisiana at Lafayette and Southern University, Baton Rouge.

Doyle Weishar, "A Knowledge Based Architecture for Query Formulation and Processing in Federated Heterogeneous Databases," Defended Spring 1994, now at SAIC.

Leonard Seligman, "A Mediated Approach to Consistency Management among Distributed, Heterogeneous Information Systems," Defended Fall 1994, Lead Scientist at the MITRE Corporation..

Richard Bechtold, "Model-Compliant Process Engineering using Knowledge Repositories," Defended Fall, 1995, now Instructor, ISE Department, George Mason University.

Wiput Phijaisanit, "Dynamic Meta-Data Support for Information Integration and Sharing Across Heterogeneous Databases," Defended 1997 and employed at UUNET Technologies.

Anthony Scime, "Taxonomic Information Retrieval (TAXIR) from the World Wide Web: Site Ranking Based on User Preferences," Defended Spring 1997, Assistant Professor, SUNY-Brockport.

Stanley Wozniak, "Knowledge Evolution in Active Database Systems via Fuzzy Constraint Management," Defended May 1998 and currently employed at The Analytical Sciences Corporation (TASC).

Samuel Varas, (Co-director Dr. Alexander Brodsky) "On Optimal Constraint Decomposition, Monitoring, and Management in Distributed Environments", July 28, 1998, at the University of Chile, Santiago, Chile.

Willa Pickering, "Assessing the Role and Conduct of Online Collaborative Projects in E-Learning", July 24, 2003, now at Lockheed Martin Corporation.

Riki Morikawa, A Framework for an Advanced XML Topic Map Knowledge Base, July 26, 2004, now at Research Division, Central Intelligence Agency.

Randy Howard, "A Knowledge Based Framework for Dynamic Semantic Web Services within Virtual Organizations", October 31, 2004, now Director of Information Architecture, at Techi2 Corporation.

**University of South Carolina**

Mr. Balakrishnan Muthuswamy, "A Detailed Database Statistics Model for Relational Query Optimization," Defended December, 1984.

## 9.2.  M.Sc. Students

**University of South Carolina**

Mr. Ju-Hung Hung (Computer Science), "KORTEX: A Methodology for Data and Knowledge Modeling," Defended March, 1987.

Mr. Hao Kuo (Computer Science), "MEDCLAIM: An Expert Support System for Medical Claims Review," Defended August 8, 1986.

Mr. Tim Ammons, "XPC -- A Personal  Computer Diagnostic Advisor," Defended July 10, 1986.

Mr. Walter Johnstone, "An Expert Loan Advisor," Defended, July 11, 1986.

Ms. Jane Thesing, "Information Retrieval and the User Interface in Videotex Home Information Systems:  A System Review Approach," Defended July, 1985.

Mr. Wuu-Yueh Tasy, "A PROLOG-Based Expert Database System that Supports the Relational Data Model," Defended May, 1984.

Mr. George Powers, "A South Carolina Information Resource Strategy: A Videotex Network to Enhance Economic and Business Development," Defended April, 1984.

Mr. Allan Shepherd (Computer Science), "PRISM:  A Constraint-Based Prototyping Information Systems Manager," Defended December, 1983, at Hewlett-Packard, Palo Alto, CA.

# 10.   Administrative and Committee Duties

**Community at Large**

Panel Member for NSF's IGERT Interdisciplinary Research Program, September 10-11, 1998.

Member, ACM SIGMOD Advisory Panel, 1993 - 1998

Review Panel Member, "Networks and Database Research Programs," Rome Laboratory, US Air Force, Rome NY, October 1993.

Review Panel Member, Artificial Intelligence Doctoral Program Proposal, University of Georgia, Athens, Georgia, October 1993.

Review Panel Member, National Science Foundation, Presidential Young Investigators Awards, 1992.

**George Mason University**

August 2005 - Present
Director, E-Center for E-Business, http://eceb.gmu.edu/
Director, MS in E-Commerce Program, http://ite.gmu.edu/msecomm/

June 2001 – August 2005

Co-Director, E-Center for E-Business, George Mason University, http://eceb.gmu.edu/.

June 1999 – Present

PhD. Coordinator for INFT Program, Department of Information and Software Engineering.

June 1989 - June 1997

Chairman, Department of Information and Software Systems Engineering, School of Information Technology and Engineering, George Mason University.

September 1996 - 1998

GMU Federal Relations Committee

September 1992 - Present

Member of Core Faculty and Executive Committee, School of  Computational Sciences and Informatics (CSI).

May 1994 - 2001

Director, Center for Information Systems Integration and Evolution, School of Information Technology and Engineering, George Mason University.

January 1995 - Present

Chairman, Research Policy Committee, Institute for Computational Sciences and Informatics.

February 1989 - April 1989

Member, Search Committee, Graduate Dean position.

March 1988 - June 1988

Member of the Instructional Methods Planning Group for the Prince William Center for Higher Education.  This planning group was set up by the Office of the President at George Mason University.  The Prince William Institute is now in operation.

June, 1987 - May, 1990:

Member, Advisory Committee, Washington Research Library Consortium.

September 1987 - June, 1989:

Tenure and Promotion Committee, School of Information Technology and Engineering, George Mason University.

September 1986 - August 1987:

Committee on Committees, School of Information Technology and Engineering, George Mason University.

**University of South Carolina**

August 1983 - May 1986:

Faculty Senate

April 1984 - January 1985:

Management Science representative for the IBM Proposal writing committee on "Teaching and Research in the Management of Information Systems."

The College of Business Administration was awarded a Planning Grant of $12,000 from IBM based on a pre-proposal that was submitted.  However, the College was not one of the thirteen schools (of the 250 that applied) awarded a final grant.

September 1983 - May 1984:

Coordinator of the Management Science Colloquium Series (weekly).

September 1982 - May 1983:

Committee on Ethics of Research Involving Human Subjects

September 1981 - May 1982:

Self-study Committee for the Masters in International Business Studies.

# Appendix B:  Materials Reviewed

[1]    P. M. D. Gray, L. Kerschberg, P. King, and A. Poulovassilis, "The Functional Approach to Data Management: Modeling, Analyzing, and Integrating Heterogeneous Data." Heidelberg, Germany: Springer-Verlag, 2003.

[2]    L. Kerschberg, *Proceedings of the First International Workshop on Expert Database Systems*: Benjamin-Cummings Publishing Co., 1987.

[3]    L. Kerschberg, *Proceedings of the First International Conference on Expert Database Systems*: Benjamin-Cummings Publishing Co., 1988.

[4]    L. Kerschberg, *Proceedings of the Second International Conference on Expert Database Systems*: Benjamin-Cummings Publishing Co., 1989.

[5]    W. D. Potter and L. Kerschberg, "The Knowledge/Data Model: An Integrated Approach to Modeling Knowledge and Data," in *Data and Knowledge (DS-2)*, R. A. Meersman and A. C. Sernadas, Eds.: Amsterdam: North Holland, 1988.

[6]    L. Kerschberg and H. Jeong, "Just-in-Time Knowledge Management," in *WM 2005*, vol. LNAI 3782, K.-D. Althoff, A. Dengel, R. Bergmann, M. Nick, and T. Roth-Berghofer, Eds. Berlin Heidelberg: Springer, 2005, pp. 1-18.

[7]    G. A. Goldberg, "Deposition of Dr. George A. Goldberg." Gibson Dunn Offices, Washington DC, 2005.

[8]    R. A. Hertenstein, "Deposition of Dr. Robert A. Hertenstein." Gibson, Dunn & Crutcher, Irvine, CA, 2005.

[9]    D. Holloway, "Deposition of Dr. Donald Holloway." Reimer & Braunstein, LLP, Boston, MA, 2005.

[10]   K. Dugan, "Deposition of Ms. Kelli Dugan." Interactive World, Durham, NC, 2005.

[11]   B. G. Buchanan and E. H. Shortliffe, *Rule-Based Expert Systems: The MYCIN Experiments of the Stanford Heuristic Programming Project*. Reading, MA: Addison-Wesley Publishing Company, 1984.

[12]   R. H. Egdahl and R. D. Hertenstein, "An Access-oriented Negotiated Fee Schedule: The Caterpillar Experience," *Ann. Surg*, vol. 206, pp. 349-357, 1987.

[13]   F. Hayes-Roth, D. A. Waterman, and D. B. Lenat, *Building Expert Systems*. Reading, MA: Addison-Wesley Publishing Company, 1983.

[14]   J. R. Weitzel and K. R. Andrews, "A Company/University Joint Venture to Build a Knowledge-Based System," *MIS Quarterly*, 1988.

[15]   J. R. Weitzel and L. Kerschberg, "Developing Knowledge-Based Systems: Re-organizing the System Development Life Cycle," *Communications of the ACM*, vol. 32, 1989.

[16]   J. R. Weitzel and L. Kerschberg, "A System Development Methodology for Knowledge-Based Systems," *IEEE Systems, Man, and Cybernetics*, vol. 19, 1989.

[17]   H. Kuo, "MEDCLAIM: An Expert Support System for Medical Claims Review," in *Computer Science*. Columbia, SC: University of South Carolina, 1986, pp. 58.

[18]   D. Holloway, "Proposal to AETNA Life and Casualty Insurance Company for Evaluating Potential Savings from Increased Accuracy in CPT-4 Coding," Health Policy Institute, Boston University, July 1987 (MCK 047992-048002).

EXHIBIT I

**AN EXPERT OPINION IN THE MATTER OF:**

# McKesson Information Solutions, LLC v. The TriZetto Group, Inc.

**RE: U.S. Patent No. 5,253,164**

**SYSTEM AND METHOD FOR DETECTING FRAUDULENT MEDICAL CLAMS VIA EXAMINATION OF SERVICE CODES**

OPINION PREPARED BY:

**Philip M. Hawley, Jr., MD**

October 24, 2005

**Section One:**    Qualifications    1

**Section Two:**    Disclosures    3

**Section Three:**    Health Insurance Industry Trends, Medical Billing Practices, & Claim Auditing Prior To September 30, 1987    4

**Section Four:**    Claims Of The '164 patent    8

**Section Five:**    Opinions Concerning The '164 Patent    13

**Appendix A:**    Curriculum Vitae – Philip M. Hawley, Jr., MD    30

## SECTION ONE:  QUALIFICATIONS

A summary of my educational background and employment history are presented in my curriculum vitae in Appendix A of this report.

My qualifications for offering an opinion in this matter include the following:

1. Two years as Executive Vice President and the senior medical officer of AMI Group Health Services, Inc., a health insurance company that performed auditing of CPT-coded medical claims.

2. Twelve years as a consultant with Pace Healthcare Management, the managed care consulting that firm I founded in 1986. [1]  I regularly worked on projects involving medical claim adjudication, medical claim auditing, clinical data reporting and other issues requiring an in-depth knowledge of CPT-coding. During the 12-year period of my association with Pace Healthcare Management, I provided consulting services to health insurance companies and HMOs on matters pertaining to medical cost management, including claim auditing.  Our firm's medical claim auditing clients included:

   - Federal programs, including the U.S. Health Care Financing Administration (H.C.F.A., which administers the Medicare program) and the U.S. Government Employee Healthcare Association

   - Large corporate healthcare purchasers, including John Deere, Walgreens, and Southern California Edison

   - The health insurance divisions of companies such as Northwestern National Life and New York Life

   - Zenith Insurance Company (a Worker's Compensation insurer)

   In addition, and on behalf of large self-insured employers (i.e., corporate purchasers such as AT&T), our firm performed operational evaluations of the medical claim auditing programs at several health insurance companies and HMOs, including Aetna, CIGNA, Prudential, U.S. Healthcare, Capital Blue

---

[1]   Pace Healthcare Management refers to the consulting firm that was variably known throughout its existence as Pace Healthplan Management, Inc., Pace Healthcare Management, Inc., Pace Healthcare Management, LP, and Pace Healthcare Management, LLC.

Cross, Blue Cross of California, Health Net, PacifiCare, and Travelers Life
Insurance Company.

3.  My experience working with one of my consulting clients, Erisco Systems
(now The TriZetto Group, Inc.), to create a computer-based system for
auditing CPT-coded medical claims, detecting aberrant billing practices, and
amending improperly billed claims.

## SECTION TWO:  DISCLOSURES

I am being reimbursed at an hourly rate of $325 for my work in connection with this case.

I have served as an expert witness on approximately three other occasions.  In each instance that I was called upon as an expert, the issues pertained to managed healthcare.

In forming my opinions about this case, I reviewed the following materials:

- U.S. Patent No. 5,253,164 (System and Method for Detecting Fraudulent Medical Claims via Examination of Service Codes);
- Physicians Current Procedural Terminology Fourth Edition, 1985, American Medical Association (Discovery Document labeled "Appendix A — CPT-4 Manual," MCK 053146 through 053392);
- The deposition of George A. Goldberg, MD, in connection with McKesson Information Solutions, LLC v. The TriZetto Group, Inc. (Case No. 04-1258 SLR), dated September 13 and 28, 2005;
- Articles and documents that are recorded in the footnotes of this document (with URLs where available).

I asked to review my Pace Healthcare Management files containing records from my consulting work for Erisco Systems (now The TriZetto Group) in connection with ClinicaLogic—a computer-based system for auditing CPT-coded medical claims.  I understand that those files are now in the possession of Deloitte & Touche, the consulting firm that acquired Pace in 2000.  I did not receive copies of those files in sufficient time to review them and discuss them in my report.  There may be documents in those files that would refresh my recollection about contextual issues important to this case.  I will supplement this report should I discover information that is relevant to this case.

**SECTION THREE:  HEALTH INSURANCE INDUSTRY TRENDS, MEDICAL
BILLING PRACTICES, & CLAIM AUDITING PRIOR TO SEPTEMBER 30, 1987**

Coincident with the advent of Medicare and Medicaid in 1965, and against the backdrop of the then-increasing prevalence of employer-sponsored health insurance programs, U.S. healthcare costs began rising at a rate that has consumed an ever-larger share of the U.S. Gross Domestic Product (GDP)—climbing steadily from 5.7% of GDP in 1965 to 14.1% in 2001. [2]  Throughout this period, trends in healthcare spending for physician services reveal an inflationary trend consistently and significantly above the U.S economy's underlying Consumer Price Index (CPI). [3]

As Drs. Egdahl and Hertenstein wrote in their 1987 article, *An Access-oriented Negotiated Fee Schedule*, "between 1965 and 1985, national expenditures for physicians' services have increased almost tenfold, from $8.5 billion in 1965 to $82.8 billion in 1985." [4]

There are many reasons for this—including legislative trends toward more universal healthcare coverage, the explosion of new and costly medical therapies and technologies, so-called defensive medicine during an era of increasing malpractice litigation, to name but a few—but the relevance of this fact to the current litigation involving the '164 patent lies in noting that these cost trends, and their effects, were well underway by the late-1970s.

Concerns about rising healthcare costs and affordability gave rise to the HMO Act of 1973, which ushered in the era of "managed care."  By the early 1980s, health maintenance organizations (HMOs), preferred provider organizations (PPOs), and other managed care programs were commonplace, if not yet the norm for most Americans.

By 1984, the majority of commercial health plans—be they traditional health insurance plans, PPOs, or HMOs—had medical cost control programs in place.  Many of the larger health insurers used multiple cost control strategies, including utilization review (i.e.,

---

[2]  Source: U.S. Bureau of the Census; and U.S Department of Commerce, Bureau of Economic Analysis (2003). URL to chart (National Health Care Trends in Public versus Private Funding): http://63.241.27.79/researchers/pubs/datacompendium/2003/03pg14.pdf

[3]  Source: National Medical Price Indicators, 1965 – 2002, U.S. Department of Labor, Bureau of Labor Statistics (November, 2003).  URL to chart (National Medical Care Price Indicators): http://www.cms.hhs.gov/researchers/pubs/datacompendium/2003/03pg1718.pdf

[4]  Richard H. Egdahl, M.D. and Robert D. Hertenstein, M.D., *An Access-Oriented Negotiated Fee Schedule*, <u>Ann. Surgery</u> September, 1987; 206(3):349-57

the pre-treatment authorization of medical services) and audits of both non-CPT-coded medical claims (e.g., inpatient hospital claims) and CPT-coded claims (CPT is an acronym for the American Medical Association's "Current Procedural Terminology"). [5]

In this context, I use the term "audit" to denote the pre- and/or post-payment examination of medical claims to detect improperly billed services or charges.  Hereinafter, all references to "claims," "medical claims," "physician bills," and similar terms refer to CPT-coded claims, except where otherwise noted.

By 1984, the audit of medical claims was a common practice among health insurance companies and HMOs.  I know this because, as one of the founding executives and senior medical officer of AMI Group Health Services—a health insurance company that marketed both PPOs and HMOs—I surveyed then-current (1984) industry practices as part of our initial market research.

By that time, CPT was the prevailing coding convention used by health insurance companies and HMOs when adjudicating and paying claims for medical services and procedures.  Occasionally, insurers added their own unique codes for services not included in the CPT coding system (such as durable medical equipment), but this did not change the fact that CPT had become the standard for medical coding and billing by virtue of its prevalence. [6] Because CPT coding conventions had become the industry standard, it followed that medical claims comprising services and procedures for which a CPT code existed would also be judged against that standard.  And as I describe below, that is exactly what was occurring.

For insurers and HMOs, the CPT coding system had several advantages.  First created in 1966, it is maintained and updated by expert physician panels of the American Medical Association (AMA) and, thus, is generally accepted by physicians and other healthcare providers. [7]  It is comprehensive, encompassing all non-experimental physician services as

---

[5] Throughout this report, I used the terms CPT and CPT-4 interchangeably.  During the 1980s, CPT coding encompassed the following categories of medical services:  Medicine (e.g., physician office visits), Surgery, Anesthesia, Radiology, Pathology and Laboratory.

[6] In 1983, the Health Care Financing Administration, HCFA, formally adopted CPT codes as the basis for Medicare's HCPCS coding system (HCPCS is an acronym for *HFCA Common Procedural Coding System).*

[7] CPT codes are assigned by the AMA's CPT Editorial Panel.

well as laboratory and radiology services. [8]  And finally, the CPT coding system offers explicit rules that can be used to audit medical claims. [9]

Many improperly coded medical claims were simply the result of unintentional errors. But by 1984, health insurance companies and HMOs were also aware that some physicians, laboratories, and other medical practioners were "gaming the system."  The techniques were many and varied, and included those methods described in the Specification and Appendices of the '164 patent.  Examples include:

- Unbundling—breaking down a service or procedure into its component parts and submitting a bill with several CPT codes, rather than properly using a single CPT code that encompasses all of the rendered services.

- Fragmentation—billing for incidental procedures performed as part of a larger procedure, or for services that are integral to a larger procedure (e.g., billing for an appendectomy when performing a colectomy – removal of the colon).

- Redundant codes—billing multiple times for the same procedure or service.

- Upcoding—using a CPT code that represents a more complex service than the one that was actually performed.

- Incompatible services—procedures that are inconsistent with, or unnecessary, in light of: the patient's diagnosis, age, or gender; other procedures listed on the medical claim.

- Outdated or nonexistent codes—using obsolete or fictitious codes (e.g., to sidestep the automated fee-determining algorithms built into claim processing software).

- Inappropriate place-of-service—rendering care in a setting that results in unnecessary costs (e.g., admitting an otherwise healthy patient to the hospital for cataract surgery), or duplicate billing.

One might ask: Why did physicians and other healthcare providers engage in these aberrant billing practices, and why was the prevalence of such practices increasing during the

---

[8]  There are currently over 8,500 CPT codes, significantly more than existed in the mid 1980s.  The number of codes grows each year as new services and procedures are accepted into the coding terminology.

[9]  A discussion of the process and criteria for creating CPT codes can be viewed on the web site of the American Medical Association (AMA).  URL to article (CPT Process — How a code becomes a code): http://www.ama-assn.org/ama/pub/category/3882.html

early 1980s?  Ironically, most physicians with whom I discussed this issue at that time did not view their "creative" billing as an attempt to defraud insurers, but rather as a means of achieving what they considered fair and just compensation for their services.  With the advent of managed care, physicians were subjected to increasing amounts of paper work for which they were not reimbursed, and had negotiated reduced per-service fee rates in exchange for the promise of increased patient volume that in many cases never materialized.  For many physicians, the cost of managing their offices was rising while their incomes were stagnating or declining.  Furthermore, many physicians felt that public and private payors were unfairly targeting doctors, as when, in 1984, Medicare temporarily froze physician fees.  Unbundling and similarly irregular billing practices were, in the view of some physicians, simply a means of earning what they considered equitable reimbursement for their services.

Moreover, an entire cottage industry relating to physician billing had sprung up by the mid 1980s.  Several so-called consulting firms specialized in training the billing personnel in physicians' offices how to maximize their reimbursement by using unorthodox billing techniques.  By 1985, it had become a classic game of cat-and-mouse, and some insurance companies sent their supervising claim examiners and/or claim auditing staff to these seminars (as I did) to identify trends in what we considered clearly deceptive billing practices.

During this period, pre-payment medical claim auditing practices varied from company to company, just as business practices do in most industries.  Some insurance companies had a defined audit initiation procedure with specific criteria for triggering a medical claim audit, while others relied on the coding knowledge and judgment of their claim examiners to trigger an audit. [10]

Many of the larger insurers had one or more physicians on staff (and, often, some registered nurses) who were proficient in coding and billing practices.  In addition, many insurers had a formal or informal panel of physician auditors—practicing physicians in various specialties who, for a fee, would audit claims when the coding and billing issues required specialty-matched review.

By the mid 1980s, medical claim auditing (using CPT coding conventions) by health insurance companies and HMOs was a commonplace activity.

---

[10] In this context, claim examiners are non-medical personnel trained to process medical claims.

## SECTION FOUR:  CLAIMS OF THE '164 PATENT

The claims of the '164 patent describe a computer system and a database comprising a process for: (1) receiving medical claims containing medical service codes and applying auditing (fraud detection) rules to those medical claims, and (2) authorizing or rejecting one or more of the code(s) and/or claim(s).  Hereinafter, I will refer to this general description as the "basic system and method" of the '164 patent.

The claims of the '164 patent appear to refer to medical claims that include codes for medical services performed by physicians and other licensed medical practitioners (such as chiropractors and audiologists), as well as certain facility-based services (e.g., lab tests and x-rays).

What follows is my understanding of the claims of the '164 patent, including any ambiguities contained within the language of the claims (my numbering coincides with the numbering of the patent claims in the '164 patent):

1. A method for: receiving medical claims (single or multiple); interacting with a database of codes to determine and inform the user whether the billed code(s) are contained in the database; informing the user that a medical code is not contained in the database. [11]

   This patent claim also describes the computer system on which these methods are applied, a computer with a "predetermined" database that contains relationships for defining whether one medical service code is valid when it appears on the same claim(s) with another code from the same database.

   The term "predetermined" is never defined in the '164 patent.  The term hints at something that is fixed and unchanging, but the term is never clarified.  While the Specification and Appendices provide examples of the codes and relationships within the predetermined database, the specific contents of this database are never fully disclosed.

---

[11] Throughout the claims of the '164 patent, I assume that the terms "input claim" and "claim" refer to a bill (invoice) for medical services.

2.  The basic system and method, and a method for determining whether any code contained in the claim(s) is mutually exclusive of another code appearing on the same claim(s) due to non-medical reasons.

The terms "mutually exclusive" and "non-medical" are not defined in the '164 patent.  Are the gender and age of a patient non-medical issues, or medical issues?  Certainly, they are medical facts.  The patent does not provide sufficient information for me to determine the meaning of these terms in this patent claim.  Further, this patent claim refers to one code being mutually exclusive with respect to another code, not with respect to a demographic factor such as the patient's gender or age.  Ultimately, the audit method contemplated in patent claim #2 is not specifically identified.

Also, please see my discussion of the predetermined database under patent claim #1.

3.  The basic system and method, and a system for determining whether one of multiple billed codes is valid or invalid.

The terms "valid" and "invalid" are not defined, and one may choose to construe their meaning broadly or narrowly.  It is not clear whether the terms "valid" and "invalid" were used with the intent of: (a) encompassing all audit detection methods and systems described in the Specification and Appendices; (b) encompassing only some of the audit detection methods and systems described in the Specification and Appendices; or (c) broadly encompassing all of the audit detection methods and systems described in the Specification and Appendices, as well as any future audit detection methods and systems.

Whatever the case, the terms "valid" and "invalid" do not summon to mind specific audit detection techniques, but rather the general concept of improperly billed codes and claims.

Also, please see my discussion of the predetermined database under patent claim #1.

4. The apparatus of patent claim #3, with a system for removing invalid medical codes from the medical claim(s).

Please see my discussion of "valid" and "invalid" under patent claim #3.

5. The apparatus of patent claim #4, with a system for informing the user why codes were deleted from the medical claim(s).

6. The apparatus of patent claim #3, noting that the database of medical service codes refers to CPT codes.

Please see my discussion of "valid" and "invalid" under patent claim #3.

7. I understand that patent claim #7 is not being asserted.

8. The apparatus of patent claim #3, with a system for requesting additional information from the user of the system.

Please see my discussion of "valid" and "invalid" under patent claim #3.

9. The apparatus of patent claim #3, noting that there are medically determined relationships among the medical service codes in the database.

Please see my discussion of the predetermined database under patent claim #1.

Also, please see my discussion of "valid" and "invalid" under patent claim #3.

10. The basic system and method, with a system for determining whether a single billed code among multiple billed codes is part of ("included in") one of the other billed codes.

Please see my discussion of the predetermined database under patent claim #1.

11. The apparatus of patent claim #10, with a system for removing the rejected code(s) from the medical claim(s).

12. The basic system and method, with a system for determining whether any code contained in the claim(s) is exclusive of another code appearing on the same claim(s) for medical reasons.

The term "medically exclusive" is not defined. Therefore, there is no way to determine how this audit detection issue—medically exclusive—differs from a code being "invalid by interacting with the database" (patent claim #3). Also, nowhere in the '164 patent did I find a discussion of the distinction between "non-medical" (as used in patent claims #2 and #14) and "medical" (as used in patent claim #12).

PAGE 10

Please also see my discussion of the predetermined database under patent claim #1.

13. The basic system and method, with a system for determining and informing the user whether the billed code(s) are contained in the database.

Please also see my discussion of the predetermined database under patent claim #1.

14. The basic system and method, with a system for determining whether any code contained in the claim(s) is mutually exclusive of another code appearing on the same claim(s) due to non-medical reasons.

The terms "mutually exclusive" and "non-medical" are not defined (please see my discussion under patent claim #2, above). Also, please see my discussion of the predetermined database under patent claim #1.

15. The basic system and method, with a system for determining whether a single billed code among the multiple billed codes is valid or invalid, and rejecting or authorizing the claim(s).

Please see my discussion of "valid" and "invalid" under patent claim #3. Also, please see my discussion of the predetermined database under patent claim #1.

16. The basic system and method, with a method for determining whether a single billed code among the multiple billed codes is valid or invalid, and rejecting or authorizing the claim(s).

Please see my discussion of "valid" and "invalid" under patent claim #3. Also, please see my discussion of the predetermined database under patent claim #1.

Only three of the 16 patent claims are described in a manner that one can reasonably correlate to audit detection techniques described in the Specification and Appendices. Those are the method and apparatus claims (patent claims #1 and #13, respectively) that describe a method and computer system for determining whether a code appearing on a medical claim (or claims) is contained in the predetermined database, and the apparatus-only claim (patent claim #10) that describes a computer system for determining whether one code among multiple billed codes is part of ("included in") any of the other billed codes appearing on a medical claim or claims.

None of the other medical claim auditing methods and apparatuses described in the Specification, or rendered as examples in the Appendices, are specifically identified in the claims of the '164 patent.

I understand that the Court has not yet interpreted the claims of the '164 patent or identified the required structure.  I may supplement this opinion once the Court renders its claim construction.

## SECTION FIVE:  OPINIONS CONCERNING THE '164 PATENT

During the 12-year period of my association with Pace Healthcare Management, I regularly worked on consulting projects involving medical claim adjudication, medical claim auditing, clinical data reporting and other issues requiring an in-depth knowledge of CPT-coding.  From 1986 through 1998, I provided consulting services to health insurance companies and HMOs on matters pertaining to claim auditing.  I am familiar with computer-based claim auditing systems because of my consulting work with health insurance companies and HMOs, and my consulting role in developing The TriZetto Group's ClinicaLogic product.

It is based on this experience and knowledge—coupled with my training, education, and work experience outlined above—that I offer my opinions concerning the '164 patent.  In forming my opinions, I relied on my reading of the '164 patent as well as my understanding and expertise in coding rules that govern medical billing practices.  To the best of my knowledge and recollection, all comments and opinions are framed within the context of industry conditions that existed prior to the summer of 1987 (which I understand to be the date claimed by McKesson as the date of conception of the '164 patent).

As previously discussed, with the exception of patent claims #1, #10, and #13, the claims of the '164 patent do not disclose the specific nature of the claim auditing methods and apparatuses (hereinafter referred to as the "claim auditing process") described in the Specification and Appendices.  However, I understand that the claims of the '164 patent are intended to describe a system and method that performs some number of the claim auditing methods described in the Specification and Appendices of the '164 patent.  Thus, my opinions are in reference to the claim auditing process described in the patent claims, Specification and Appendices of the '164 patent.

**The claim auditing process described in the '164 patent was known and would have been obvious to a person of ordinary skill in the art.**

I have been informed by counsel for TriZetto that, as set forth in 35 U.S.C. § 102, an invention is not novel if "the invention was known or used by others in this country, or patented or described in a printed publication in this or a foreign country, before the invention

thereof by the applicant for patent."  I have also been informed by counsel for TriZetto that, as set forth in 35 U.S.C § 103, "a patent may not be obtained…if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains."  **I conclude that the claim auditing process described in the asserted claims of the '164 patent was known and would have been obvious at the time the invention was made to a person having ordinary skill in the art, for the reasons described below.**

The '164 patent states the following about the claim auditing rules described in the patent: "Each of the rules was developed as a result of reviewing medical procedures by expert medical personnel and is consistent with the CPT-4 classification system.  However, expert medical personnel also applied clinical judgment to situations where the CPT-4 classification system is not explicit or non-existent." (Col. 6, lines 7-13)

This statement identifies the information sources for the claim auditing rules disclosed in the patent: (1) CPT coding conventions, and (2) the clinical judgment(s) of expert medical personnel.  Having myself used these same two information sources when working as a consultant to Erisco (now TriZetto) and developing auditing rules and the database for a computer-based claim auditing system with comparable functionality—ClinicaLogic—I am very familiar with the developmental process and information sources to which the '164 patent refers.

In fact, it is in part owing to my experience with ClinicaLogic that I conclude the claim auditing process of the '164 patent was not novel.  As the '164 patent acknowledges (Col. 6, lines 7-13), the auditing rules described in the '164 patent are "consistent with the CPT-4 classification system," meaning that, in effect, many of the rules were drawn directly from CPT coding conventions, as discussed in more detail below.  Certainly, methods drawn from a long-existing publication would fail any test of novelty. [12]

That leaves the second source of information disclosed in the '164 patent—the judgments of expert medical personnel.  What exactly does this comprise?  It is true that,

_____

[12] Dr. George A. Goldberg, one of the inventors of the '164 patent, agreed that many of the claim auditing rules contained in the '164 patent could be discerned from the CPT-4 Manual.  On page 230 of his deposition, he acknowledged that, in 1988, he had written, "'anybody' can go through the coding book [CPT-4 Manual] and identify a large number of decision rules."

while the AMA rendered then-current coding conventions in their CPT manual, some related clinical issues were not explicitly addressed.  For example, the AMA did not address place-of-service issues (the setting in which a procedure would normally be performed), age and gender issues (at what age is a specific service or procedure likely to be performed, and is the procedure gender-specific?), or incompatible diagnoses (procedures that are inconsistent with, or unnecessary, in light of: the patient's diagnosis, age, or gender; or other procedures listed on the medical claim).

However, there was no reason to explicitly address these concepts in the CPT coding manual because they were already known to physicians and many medical claim auditors by virtue of their training.  Physicians and nurses who worked as claim auditors knew that most cataract surgery is done as an outpatient, and they knew that seventy-year-old women do not typically give birth.  The issue of incompatible services (related to diagnosis) could raise valid questions in a pre-payment claim audit, but a specialty-matched physician claim auditor would readily know which diagnoses are appropriate for each of the procedures performed by specialists in his or her field.

To be fair, there were also occasional ambiguities in the CPT coding conventions as they related to specific medical procedures.  However, these ambiguities were infrequent and were readily filled in: (1) by way of analogy (i.e., if a certain coding convention applied to urological procedures, it reasonably also applied to gynecologic procedures), or (2) by seeking the judgment of expert medical personnel (generally, the consensus opinion of specialty-matched physicians).

Ultimately, then, these judgments by expert medical personnel were either: (a) knowledge widely known to physician claim auditors (e.g., incompatible diagnosis, age, and gender); (b) analogous applications of already-existing CPT coding conventions (i.e., to address infrequent ambiguities); or (c) a simple consensus opinion.  As such, the claim auditing process described in the claim, Specification and Appendices was not based on novel ideas or methods.

Moreover, for the invention to be accepted by healthcare insurance companies and medical providers, it had to be based on some acceptable pre-existing standards.  In this instance, those standards were:

        1.   The CPT coding conventions.

2. The judgment of expert medical personnel.

While the '164 patent does not disclose the full set of claim auditing rules, I think it is instructive to examine the types of claim auditing rules revealed in the Specification and Appendices of the '164 patent because doing so reveals pre-existing sources—sources that existed prior to the summer of 1987—for the methods comprising those auditing rules.

Under the "Description of the Preferred Embodiment" (Col. 4-10), the '164 patent describes a process that begins with the user entering information from the medical claim. This is followed by a series of steps that include:

(1) Determining whether medical service code(s) appearing on a medical claim are contained within the predetermined database (Col. 7, lines 16-22).

This step corresponds to the method and computer system described in patent claims #1 and #13. Ultimately, though, determining whether a code that appears on the medical claim is contained in the invention's database is a mundane task and not something that rises to the level of a novel claim auditing process. In any case, this process element would have been obvious to a person having ordinary skill in the art.

(2) Identifying and replacing any code appearing in the medical claim that has been superseded by "another code entry in an updated version of the CPT-4 classification" (Col. 5, lines 26-34).

I could find no patent claim that corresponds to this step. In any case, Appendix B of the CPT-4 Manual (See MCK 053333-053337, 1985 CPT-4 Manual) contains a listing of new codes, deleted codes, and revised codes. Wherever applicable, Appendix B also identifies which CPT code should be used in place of a deleted (superseded) code. Clearly, replacing obsolete CPT codes with newer CPT codes is not something that rises to the level of a novel claim auditing process. This process element was known to claim auditors and would have been obvious to a person having ordinary skill in the art.

(3) Eliminating duplicate codes not considered "valid" by the '164 invention (Col 5, lines 34-41).

PAGE 16

This claim auditing method is implicit in the CPT coding conventions. (See MCK 053147-053392, 1985 CPT-4 Manual). CPT code 38100 in the 1985 CPT-4 Manual offers an example of this auditing rule. [13] The description of code 38100 reads, "Splenectomy; total." In everyday English, this code describes surgery to remove a patient's spleen. Since humans have only one spleen, it is reasonable to conclude that listing code 38100 twice on a medical claim for the same patient would be invalid, and the second listing of code 38100 should be removed. The claim auditing rule described in this section of the Specification was known to claim auditors and would have been obvious to a person having ordinary skill in the art.

The remainder of the '164 patent Specification describes how "a set of rules developed for use of this program is now invoked" (Col 5, lines 67-68). The alphanumeric designation (E1, R1, L1, etc) of the rules described in the remainder of the Specification corresponds to the list of rules appearing in Appendix B ("Rules Descriptions," Col. 47-52). The rules listed in Appendix B (some of which are rendered as examples in Appendix A), are grouped into the following categories:

<u>Rules Applied to Multiple Codes</u>
- R1, R2, R3, and R4 (rules that result in the replacement of a code). [14]
- E1, E2, EA, EP, (rules that result in the exclusion of a code).
- L1 (rule that limits payment of a code). [15]
- QM, QS, QB (rules that alert the user that the coding issue(s) cannot be dealt with programmatically, and human intervention is required).

<u>Rules Applied to Each Code Individually</u>
- Q1 through Q9 (rules that generate a request for more information).

---

[13] I found no example of this claim auditing rule in the '164 patent.

[14] I found no patent claim(s) that appear to correspond to rules R1, R2, R3 or R4.

[15] I found no patent claim(s) that appear to correspond to the L1 rule.

**Rules R1, R2, R3, and R4.** Based on the descriptions provided in Appendix B and the examples rendered in Appendix A, rules R1 through R4 (rules that result in the replacement of a code) appear to detect: (A) <u>Unbundling</u> (breaking down a service or procedure into its component parts and submitting a bill with several CPT codes, rather than properly using a single CPT code that encompasses all of the rendered services); and (B) <u>Upcoding</u> (using a CPT code that represents a more complex service than the one that was actually performed). The following examples from Appendix A of the '164 patent reveal the nature of these claim auditing rules.

(A) <u>Unbundling.</u> Example #2 in Appendix A of the '164 patent (Col. 11 through 14)—the R2 rule—renders an example of unbundling. When CPT codes 58260 (hysterectomy – removal of the uterus) and 57250 (colporrhaphy – repair of the vagina) both appear on the same medical claim, these codes are replaced by code 58265 because 58265 includes both procedures—a hysterectomy and colporrhaphy. The following descriptions of these codes from the 1985 CPT-4 Manual provide the information needed to make this claim audit determination (underlining is mine):

58260  <u>Vaginal hysterectomy</u>

57250  <u>Posterior colporrhaphy</u>, repair of rectocele with or without perineorrhaphy

The above codes represent unbundling and are replaced by the following single code:

58265  <u>Vaginal hysterectomy; with</u> plastic repair of vagina, anterior and/or <u>posterior colporrhaphy</u>

Even without understanding all of the medical terms, one can see that 58265 includes the primary surgical elements of codes 57250 and 58260. The words appearing after the comma in the description of code 57250 are simply an explanation of the reason for the colporrhaphy (to repair a rectocele), and clarify that this code also encompasses a perineorrhaphy (if done).

This claim auditing rule follows implicitly from the CPT code descriptions. As such, the claim auditing rule depicted in this example from Appendix A of

the '164 patent would have been obvious to a person having ordinary skill in the art.

(B) <u>Upcoding</u>.  Example #3 in Appendix B of the '164 patent (Col. 13 through 16)—the R1 rule—renders an example of upcoding.  When CPT codes 52283 and 52281 both appear on the same medical claim, 52283 is authorized but code 52281 is replaced by code 51600 because 52281 represents a more complex service than the one actually performed.  The descriptions of these codes from the 1985 CPT-4 Manual offer the information needed to make this claim audit determination (underlining is mine):

> 52283  <u>Cystourethroscopy</u>, with steroid injection into <u>stricture</u>
>
> 52281  <u>Cystourethroscopy</u>, with calibration and/or dilation of urethral <u>stricture</u> or stenosis, with or without meatotomy and <u>injection procedure for cystography</u>, male or female

The logic of this audit rule is as follows:  The physician has billed for the cystourethroscopy, as well as opening the stricture (i.e., narrowing or stenosis), using code 52283.  The next code, 52281, duplicates these two elements that already appear on the medical claim, and thus, is largely redundant (the minor element of a meatotomy, if done, is considered merely incidental).  The only additional element encompassed by code 52281 is the injection procedure for cystography.  Thus, code 52281 describes a more complex service than what was actually performed when considered in combination with code 52283.  Since the only additional service identified in code 52281 is an injection procedure or cystography, code 52281 is replaced by the code for an injection procedure only (CPT code 51600).

Again, the CPT code descriptions themselves provide the information required to execute this claim auditing rule.  As such, the claim auditing rule depicted in this example from Appendix A of the '164 patent would have been obvious to a person having ordinary skill in the art.

To the limited extent that they were disclosed in the '164 patent, claim auditing rules R1, R2, R3, and R4 encompass a claim auditing process that was implicit in the CPT coding

conventions.  These claim auditing rules were not novel and would have been obvious to a person having ordinary skill in the art.

**Rules E1, E2, EA, and EP.**  Based on the descriptions provided in Appendix B and the examples rendered in Appendix A, rules E1, E2, EA, and EP (rules that result in the exclusion of a code) appear to detect <u>Fragmentation</u> (billing for incidental procedures performed as part of a larger procedure, or for services that are integral to a larger procedure).  The following example from Appendix A of the '164 patent reveals the nature of these claim auditing rules.

Example #1 in Appendix A of the '164 patent (Col. 11 and 12)—the E1/E2 rule—renders an example of fragmentation.  When CPT codes 10120 (removal of a foreign body that is lodged in the skin) and 64450 (injection of a local anesthetic) both appear on the same medical claim, code 10120 is authorized but 64450 is excluded (i.e., rejected).

The descriptions of these codes from the 1985 CPT-4 Manual are as follows:

10120  Incision and removal of foreign body, subcutaneous tissues; simple
64450  Injection, anesthetic agent; other peripheral nerve or branch

Code 64450 is rejected because of an explicit CPT coding rule that appeared on page 57 of the 1985 CPT-4 Manual (see MCK 053187).  With regard to surgical procedures, it states, "Listed surgical procedures include the operation per se, <u>local infiltration, digital block or topical anesthesia</u> when used, and the normal uncomplicated followup care." (underlining mine).  This concept is referred to as a 'package' for surgical procedures." The underlined words refer to all common forms of local anesthetic and are, by CPT coding convention, included as part of the surgical procedure.  Thus, in this example the physician should not have listed code 64450 (injection of an anesthetic) on the medical claim.

In other words, the claim auditing rule depicted in this example is taken directly from the CPT Manual.  The claim auditing rule depicted in this example from Appendix A of the '164 patent would have been obvious to a person having ordinary skill in the art.

To the limited extent that they were disclosed in the '164 patent, claim auditing rules E1, E2, EA, and EP encompass a claim auditing process that was implicit or explicit in the CPT coding conventions. These claim auditing rules were not novel and would have been obvious to a person having ordinary skill in the art.

**The L1 Rule.** The L1 rule (a rule that limits payment of a code) is disclosed only in a general sense in Appendix B, and by way of one example (# 16) in Appendix A (Col. 41 and 42). Example #16 shows how one of two billed surgical procedures should be paid at a lesser dollar amount because it is a secondary procedure (a lesser procedure done at the same time as the primary surgical procedure).

The medical claim in Example #16 contains two CPT codes:

43840  Gastrorrhaphy, suture of perforated duodenal or gastric ulcer, wound, or injury

43830  Gastrostomy, temporary (tube, rubber or plastic)

Code 43840 (gastrorrhaphy – repair of the stomach) is authorized with no change, but it is recommended that payment for code 43830 (gastrostomy – placement of a feeding tube) be limited to $150.

As stated above, the common term for this rule within the health insurance industry is a "secondary surgical procedure" (a procedure for which payment is reduced when it is done at the same time as another surgical procedure). This claim auditing rule was common to virtually every health insurance company when the 1985 CPT-4 Manual was published. The claim auditing rule depicted in this example from Appendix A of the '164 patent would have been obvious to a person having ordinary skill in the art.

Claim auditing rule L1 encompasses a claim auditing process that was widely known throughout the health insurance industry. This claim auditing rule was not novel and would have been obvious to a person having ordinary skill in the art.

**Rules QM, QS, and QB.** Based on the descriptions provided in Appendix B and the examples rendered in Appendix A, rules QM, QS, and QB (rules that generate a question about the billed codes and alert the user that human intervention is required) appear to detect: (A) Unbundling (breaking down a service or procedure into its component parts and

submitting a bill with several CPT codes, rather than properly using a single CPT code that encompasses all of the rendered services); and (B) <u>Fragmentation</u> (billing for incidental procedures performed as part of a larger procedure, or for services that are integral to a larger procedure). The following examples from Appendix A of the '164 patent reveal the nature of these claim auditing rules.

(A) <u>Unbundling.</u> Example #5 in Appendix A of the '164 patent (Col. 17 and 18)—the QM rule—renders an example of unbundling. When CPT codes 58980 (laparoscopy of the pelvis) and 44000 (enterolysis – freeing of intestinal adhesions) both appear on the same medical claim, these codes are replaced by code 58265 because 58265 includes both procedures—a hysterectomy and enterolysis. The descriptions of these codes from the 1985 CPT-4 Manual offer the information needed to make this claim audit determination (underlining is mine):

58980  <u>Laparoscopy</u> for visualization of pelvic viscera;

44000  <u>Enterolysis</u>, freeing of intestinal <u>adhesion</u> (separate procedure)

The above codes represent unbundling and are replaced by the following code:

58985  <u>Laparoscopy</u> for visualization of pelvic viscera; <u>with lysis of adhesions</u>

Even without understanding all of the medical terms, one can see that 58985 includes both a pelvic laparoscopy (code 58980) and lysis (enterolysis) of adhesions (code 44000). Note that code 44000 includes the parenthetical— "(separate procedure)"—indicating that this code should be used only when the procedure was done separately. Thus, codes 58980 and 44000 are an unbundled form of code 58985.

The claim auditing rule depicted in this example from Appendix A of the '164 patent would have been obvious to a person having ordinary skill in the art.

(B) <u>Fragmentation.</u> Example #6 in Appendix A of the '164 patent (Col. 17 through 20)—the QS/QB rule—renders an example of fragmentation. When CPT codes 33512 (triple coronary artery bypass surgery) and 35820 (surgery to

control postoperative bleeding) both appear on the same medical claim, code 33512 is authorized but 35820 generates a request for further information before being authorized.

The descriptions of these codes from the 1985 CPT-4 Manual are as follows:

    33512  Coronary artery bypass, autogenous graft, eg, saphenous vein or internal mammary artery; three coronary arteries

    35820  Exploration for postoperative hemorrhage or thrombosis; chest

Authorization of code 35820 is deferred (pending further information) until it can be determined whether the bleeding (hemorrhage) actually occurred during the postoperative period and required a separate surgical procedure, or was simply part of the coronary bypass surgery (and thus, should not have been listed on the medical claim). There was an explicit CPT coding rule that dealt with this issue, which appeared on page 58 of the 1985 CPT-4 Manual (see MCK 053188). With regard to surgical procedures, it states, "Some of the listed procedures are commonly carried out as an <u>integral part of the total service</u>, and as such do no warrant a separate identification." Thus, in this example, the physician should not have listed code 35820 if the bleeding was an intra-operative difficulty that occurred during the coronary artery bypass surgery.

In other words, the claim auditing method depicted in this example is taken directly from the CPT Manual. As such, the claim auditing rule depicted in this example from Appendix A of the '164 patent would have been obvious to a person having ordinary skill in the art.

To the limited extent that they were disclosed in the '164 patent, claim auditing rules QM, QS, and QB encompass a claim auditing process that was implicit or explicit in the CPT coding conventions. These claim auditing rules were not novel and would have been obvious to a person having ordinary skill in the art.

**Rules Q1 through Q9.** Based on the descriptions provided in Appendix B and the examples rendered in Appendix A, rules Q1 through Q9 (rules that generate a request for more information) appear to detect: (A) <u>Upcoding</u> (using a CPT code that represents a more

complex service than the one that was actually performed); (B) <u>Incompatible Services</u> (procedures that are inconsistent with, or unnecessary, in light of: the patient's diagnosis, age, or gender; other procedures listed on the medical claim); (C) <u>Inappropriate Place-Of-Service</u> (rendering care in a setting that results in unnecessary costs, or duplicate billing); and (D) <u>Billed Dollar Amounts That Exceed Certain Limits</u>. The following examples from Appendix A of the '164 patent reveal the nature of these claim auditing rules.

    (A) <u>Upcoding.</u>  Example #12 in Appendix A of the '164 patent (Col. 31 through 34)—the Q6 rule—renders an example of upcoding.  Code 92502 (ear-nose-and-throat exam under general anesthesia) appears on a medical claim.  If the medical claim contains no indication that anesthesia was used, code 95202 is rejected.

    The CPT code description itself, which includes the words "under general anesthesia," provides the information required to execute this claim auditing rule.  As such, the claim auditing rule depicted in this example from Appendix A of the '164 patent would have been obvious to a person having ordinary skill in the art.

    (B) <u>Incompatible Services.</u>  Example #15 in Appendix A of the '164 patent (Col. 39 through 42)—the Q9 rule—renders an example of incompatible services.  Code 58605 (ligation or transection of fallopian tubes during the postpartum period—after giving birth, and while still hospitalized) appears on a medical claim with no other codes.  Code 58605 is rejected because, presumably, there should be other information or procedure codes on the claim indicating that the patient had recently given birth.  The following action is recommended.

        *Replace the code appearing on the medical claim*:

        58605  Ligation or transection of fallopian tube(s), abdominal or vaginal approach, postpartum, unilateral or bilateral, during same hospitalization

        *With the following code* (which is used when the patient is <u>not</u> hospitalized following childbirth):

        58600  Ligation or transection of fallopian tube(s), abdominal or vaginal approach, unilateral or bilateral

The CPT code descriptions themselves provide the information required to execute this claim auditing rule. As such, the claim auditing rule depicted in this example from Appendix A of the '164 patent would have been obvious to a person having ordinary skill in the art.

(C) <u>Inappropriate Place of Service.</u> Example #11 in Appendix A of the '164 patent (Col. 29 through 32)—the Q5 rule—renders an example of this auditing issue. A medical claim (presumably submitted by a physician) for code 93220 (vectorcardiogram, testing and interpretation) is rejected and replaced with code 93222 (vectorcardiogram, interpretation only) if the patient was hospitalized at the time of the test. This is done because hospitals generally provide the equipment and perform the test—and submit a medical claim for these services—while the physician who interprets the test submits a bill (medical claim) only for his or her service (interpretation and reporting).

This billing practice—hospitals performing and billing for tests like vectorcardiograms, and physicians billing for interpreting the test—was a very well known convention throughout the health insurance industry when the 1985 CPT-4 Manual was published. The claim auditing rule depicted in this example from Appendix A of the '164 patent would have been obvious to a person having ordinary skill in the art.

(D) <u>Billed Dollar Amounts That Exceed Certain Limits</u>. Example #9 in Appendix A of the '164 patent (Col. 25 through 28)—the Q3 rule—renders an example of this auditing issue. If the billed charge for code 38500 (biopsy and excision of a lymph node, unspecified body location) is $300 or more, authorization is deferred until further information is known about the procedure.

As in the prior example, this claim auditing issue was well known throughout the health insurance industry. As compared to the CPT codes immediately following it in the CPT Manual, code 38500 was not specific or precise as to body location, as shown here:

    38500  Biopsy or excision of lymph node, unspecified
    38510  Biopsy or excision of lymph node, deep cervical node

38530  Biopsy or excision of lymph node, internal mammary gland

The use of vague CPT codes was a well-known "red flag" among claim examiners and claim auditors alike.  In addition, methods for detecting billed dollar amounts that exceed certain limits were an already robust element of most claim processing software systems at that time.  The claim auditing rule depicted in this example from Appendix A of the '164 patent would have been obvious to a person having ordinary skill in the art.

To the limited extent that they were disclosed in the '164 patent, claim auditing rules Q1 through Q9 encompass a claim auditing process that was implicit in the CPT coding conventions and known to persons skilled in claim auditing.  These claim auditing rules were not novel and would have been obvious to a person having ordinary skill in the art.

**Concluding Opinions**

From personal experience, I can attest to the tedious and painstaking effort involved in reducing coding conventions to a database and a set of logical rules.  But the claim auditing process described in the '164 patent was not novel, as explained above.

I believe a very close analogy can be drawn between this case and the accounting profession.  The Financial Accounting Standards Board (FASB) promulgates accounting rules just as the AMA defines CPT coding rules.  And just as a financial auditor scrutinizes the financial records of a corporation using FASB rules and simple arithmetic relationships (e.g., credits and debits must balance), so too the auditing rules described in the Specification and Appendices of the '164 patent are basic rules of logic applied to knowledge that already existed in the form of CPT coding conventions and medical knowledge common to physicians and others who use those codes.

In my opinion, the '164 patent is akin to some enterprising accountant having patented FASB regulations and the basic arithmetic rules of accounting.  As improbable and unsupportable as that hypothetical scenario may be, I believe it is an apt analogy for what happened in this case.

Earlier in this report, while describing the context and background of managed care in the 1980s, I explained that health insurance companies and HMOs were well aware of the

aberrant billing practices some physicians used to "game the system." By 1985, medical claim auditing was a common practice among health insurance companies and HMOs.

In their 1987 article, *An Access-oriented Negotiated Fee Schedule*, Drs. Egdahl and Hertenstein discuss their then-current practice of "auditing and recoding" physician medical claims. [16] Nowhere in their description do they suggest that their auditing practices were exclusive to Caterpillar Corporation—because they were not.

Three years prior to the initial application for the '164 patent on September 30, 1988, the health insurance company that I helped found (AMI Group Health Services) regularly audited medical claims against billing and CPT coding criteria that were similar to those found in the '164 patent. And AMI was not an aberration in the mid-1980s. We had an ambitious audit program, but most large health insurance companies had similar capabilities to a greater or lesser extent, depending upon how significant they perceived the problem to be in their particular geographic markets.

Who staffed these pre-payment audit programs? It was generally a tiered effort, with claim examiners, claim supervisors, nurses, and physicians each playing a role. The point is, there were not just a handful of persons skilled in the art of coding and auditing medical claims in accordance with CPT conventions. Rather, there were skilled practitioners throughout the country because, for reasons described earlier, the tools used to audit medical claims comprised primarily two components: (1) CPT coding conventions, which were published in booklet form and electronic media, and (2) knowledge common to medical personnel who use those codes, including physician claim auditors.

As such, the claim auditing process described in the claim, Specification and Appendices of the '164 patent was already known to those skilled in this art. Moreover, if one breaks down the claim auditing rules into their component parts, one is left with simple "if-then" rules of logic (similar to what was contained in ClinicaLogic). The algorithms themselves are quite simple. And as discussed above, the coding rules are either an explicit application of CPT conventions, an analogous application of those conventions, or a byproduct of common medical knowledge.

---

[16] Richard H. Egdahl, M.D. and Robert D. Hertenstein, M.D., *An Access-Oriented Negotiated Fee Schedule*, <u>Ann. Surgery</u> September, 1987; 206(3):349-57

True, this is a technical subject, but the claim auditing process described in the '164 patent would have been obvious to a person having ordinary skill in the art.  The auditing rules were not a new invention, but rather a rendering of pre-existing knowledge and methods into an automated form.

Date:  October 24, 2005

Philip M. Hawley, Jr., M.D.

## APPENDIX A:  CURRICULUM VITAE – PHILIP M. HAWLEY, JR, MD

**PROFESSIONAL EXPERIENCE**

2000 - Present   **Attending Pediatrician**                    **Childrens Hospital Los Angeles**

Attending pediatrician at this southern California pediatric medical center.

1986 - 1999   **President and Chief Executive**        **Pace Healthcare Management, LLC**

Founded and managed this consulting firm specializing in health insurance operations, medical cost management and medical quality assurance.  Worked with healthcare purchasers and payors to develop innovative managed care programs.  Scope of projects included operational consulting on issues including provider networks, utilization management, and health plan administration.  Developed financial modeling tools, statistical modeling tools, and patient management systems for clients that included HMOs and PPOs, indemnity insurers, large corporate purchasers, and several specialty firms within the managed care industry.

1984 – 1986   **Executive Vice President**                **AMI Group Health Services, Inc.**

Created and managed over 20 HMOs and PPOs in 10 states throughout the country with more than $200 million in annual revenue.  Held profit and loss responsibility for this all aspects of medical management and provider networks.

1982 – 1984   **Director of Operational Analysis**        **Occidental Petroleum Corporation**

Reporting to the Executive Vice President of Science & Technology, responsibilities included operational and financial analyses of investment opportunities, as well as the negotiation and sale of several business units.

1979 – 1980   **Pediatric Resident**                          **Childrens Hospital Los Angeles**
1999 – 2000   Completed General Pediatric residency.  Responsible for inpatient and outpatient care, as well as the education of interns and medical students.

1978 – 1979   **Pediatric Intern**                              **Childrens Hospital Los Angeles**

Completed General Pediatric internship, comprising inpatient and outpatient care.

**EDUCATION & TRAINING**

1980 - 1982   **Harvard Graduate School of Business**          **Boston, Massachusetts**

Master in Business Administration degree

1974 - 1978   **University of Southern California**            **Los Angeles, California**

Doctor of Medicine degree

1970 - 1974   **University of Notre Dame**                      **South Bend, Indiana**

Bachelor of Science degree

**CERTIFICATIONS**

2000   **American Board of Pediatrics**

1987   **American Board of Quality Assurance & Utilization Review**

EXHIBIT J

REDACTED

# EXHIBIT K

Page 1

```
 1        IN THE UNITED STATES DISTRICT COURT
 2           FOR THE DISTRICT OF DELAWARE
 3
 4  MCKESSON INFORMATION SOLUTIONS, LLC,
 5           Plaintiff,
 6      vs.           No. 04-1258-SLR
 7  THE TRIZETTO GROUP, INC.,
 8           Defendant.
 9
10
11
   _____
12
13
14
15    DEPOSITION OF PHILIP M. HAWLEY, JR., M.D.
16           Los Angeles, California
17         Wednesday, November 30, 2005
18
19
20
21  Reported by:
    RENEE A. PACHECO, RPR
22  CSR NO. 11564
23  JOB NO. 41623
24
25
```

Page 2

```
 1        IN THE UNITED STATES DISTRICT COURT
 2           FOR THE DISTRICT OF DELAWARE
 3
 4  MCKESSON INFORMATION SOLUTIONS, LLC,
 5           Plaintiff,
 6      vs.           No. 04-1258-SLR
 7  THE TRIZETTO GROUP, INC.,
 8           Defendant.
 9
10
   _____
11
12
13
14
15      Deposition of PHILIP M. HAWLEY, JR., M.D., taken on
16  behalf of Plaintiff, at 333 South Grand Avenue,
17  Los Angeles, California, beginning at 9:13 a.m. and
18  ending at 4:59 p.m. on Wednesday, November 30, 2005,
19  before RENEE A. PACHECO, RPR, Certified Shorthand
20  Reporter No. 11564.
21
22
23
24
25
```

Page 3

```
 1  APPEARANCES:
 2
 3  For Plaintiff:
 4     SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLC
        BY:  MICHAEL HENDERSHOT
 5     Attorney at Law
        525 University Avenue
 6     Suite 1100
        Palo Alto, California  94301
 7     (650) 470-4500
 8  For Defendant and the Witness:
 9     GIBSON, DUNN & CRUTCHER
        BY:  THEODORE KEVIN ROOSEVELT
10     Attorney at Law
        333 South Grand Avenue
11     Los Angeles, California  90071-3197
        (213) 229-7000
12
    Videographer:
13
        MAX BUSHMAN
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1              INDEX
 2  WITNESS                    EXAMINATION
 3  PHILIP M. HAWLEY, JR., M.D.
 4
 5
    BY MR. HENDERSHOT               6
 6
    AFTERNOON SESSION              136
 7
 8
              EXHIBITS
 9
    HAWLEY                    PAGE
10
    1  Dr. Hawley's Report         47
11
    2  U.S. Patent No. 5,253,164    118
12
    3  Article by Richard Egdahl, M.D. and
13     Robert Hertenstein, M.D.      158
14
15
16
         INFORMATION REQUESTED
17
           NONE.
18
19
20
21
       INSTRUCTION NOT TO ANSWER
22
           NONE.
23
24
25
```

**SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES**
**877.955.3855**

Page 133

1  Claim 7, is obvious in light of the prior art; is that
2  correct?
3     A  That's correct.
4     Q  You don't offer an opinion in your report that
12:48 5  any of the claims are rendered invalid by a single piece
6  of prior art?
7     A  That's correct.
8     Q  Okay.  And your opinion that the claims of the
9  '164 patent are obvious, in view of the prior -- strike
12:48 10  that.
11        And is it a fair statement that your opinion of
12  the claims of the '164 patent are obvious is based on
13  your opinion that -- the underlying claims auditing
14  process that they implement was done and known on a
12:49 15  manual basis in the prior art?
16     A  Correct.  That -- that's correct.
17     Q  Okay.  You're not asserting anywhere in your
18  report that any of the claims of the '164 patent are
19  obvious or not novel, because there was a preexisting
12:49 20  software application that performed that functionality,
21  the claims auditing functionality; is that correct?
22     A  Actually, I'm quite confident, as I said before,
23  with regard to Claim 1 and -- Claim 1 and Claim 13, that
24  there was a prior art form that performed that -- those
12:50 25  functions.

Page 134

1     Q  Those functions within the context of all of the
2  elements of those claims?
3     A  No.  I'm sorry.  I thought you had said, if you
4  read back the question, each of the claims are --
12:50 5     Q  Yeah.  Okay.
6        And do you name that system, any of those
7  systems in the report, or do you reference them in your
8  report?
9        I didn't see them when I was reviewing it before
12:50 10  today?
11     A  No.  No.  I -- I didn't -- I didn't attempt to
12  describe it or reference it.  I think it was actually a
13  fairly common capability at that time for reasons that I
14  can explain.
12:50 15     Q  So we're clear, the opinions you set forth in
16  your report that you're prepared to testify about in this
17  case, are premised upon the claims of the '164 patent
18  being obvious, in view of the manual clinical auditing
19  practices that you discuss in your report; is that
12:51 20  correct?
21     A  That is correct.
22        MR. HENDERSHOT:  I think we can break for lunch,
23  if this is a good time for you guys.
24        MR. ROOSEVELT:  Sure.
12:51 25        THE VIDEOGRAPHER:  Going off the record.  The

Page 135

1  time is 12:51 p.m.
2        (Whereupon, at the hour of 12:51 p.m.,
3        a luncheon recess was taken, the
4        deposition to be resumed at 1:47 p.m.)
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 136

1  Los Angeles, California; Wednesday, November 30, 2005
2        1:47 p.m.
3
4        THE VIDEOGRAPHER:  We are back on the record.
01:47 5  The time is 1:47 p.m.
6
7        PHILIP M. HAWLEY, JR., M.D.,
8  having been previously duly sworn, was examined
9        and testified as follows:
10
11        EXAMINATION
12  BY MR. HENDERSHOT:
13     Q  How's lunch?
14     A  Just fine.  Thank you.
01:47 15     Q  Made it back.  I'm impressed.
16        Did you talk about your testimony during lunch
17  with anybody?
18     A  I -- we -- I spoke briefly with Kevin Roosevelt.
19     Q  And what did you guys talk about, with respect
01:48 20  to your testimony?
21     A  We spoke primarily about the -- the fact that
22  the nature of the questions -- and this was me
23  speaking -- weren't bringing out my -- my opinions that,
24  you know, the nature of the questions were such that my
01:48 25  opinions were not being expressed.

34 (Pages 133 to 136)

**Hawley, Philip**

1

2

3

4

5

6

7

8        I, PHILIP M. HAWLEY, JR., M.D., do hereby

9    declare under penalty of perjury that I have read the

10    foregoing transcript; that I have made any corrections as

11    appear noted, in ink, initialed by me, or attached

12    hereto; that my testimony as contained herein, as

13    corrected, is true and correct.

14        EXECUTED this _7th_ day of _January_,

15    _2006_, at _Los Angeles_, _California_

                (City)              (State)

16

17

18

19

PHILIP M. HAWLEY, JR., M.D.

20

21

22

23

24

25