# EXHIBIT L

# An Access-oriented Negotiated Fee Schedule
## The Caterpillar Experience


PLAINTIFF'S
EXHIBIT
8

RICHARD H. EGDAHL, M.D. and ROBERT D. HERTENSTEIN, M.D.

From the Department of Surgery and Health Policy Institute,
Boston University Medical Center, Boston, Massachusetts,
and Caterpillar Corporation, Peoria, Illinois

This paper describes the system used by Caterpillar Corporation (CAT) in Peoria, Illinois, to reimburse surgeons. The CAT system assures access for Caterpillar employees and their families to a selection of qualified surgeons, while achieving cost savings through improvements in processing of surgical claims and negotiation of selected fees. CPT-4 codes are recoded for greater accuracy, when indicated, surgical services that have been incorrectly unbundled are rebundled, and the appropriateness of surgical assistant charges is reviewed. A "degree of difficulty" relative value scale (DODRVS) of surgical services is periodically revised as technology changes. The DODRVS multiplied by a regional factor, determined by local market research, establishes the fee that CAT will pay the surgeon. Balance billing is permitted if the patient (1) is informed in advance by the surgeon that the fee will be higher than CAT will pay, and (2) knows that the service can be obtained from other local surgeons who will accept the CAT fee. The goal of the CAT method of surgeon reimbursement is to gain physician support for an access-oriented, market-driven negotiated fee schedule. Compared with a resource-based relative value scale (RBRVS) methodology, the CAT system is not formula-driven and depends on physician acceptance.

For more than 25 years, physicians have benefited from a generous fee-for-service system of payment. However, between 1965 and 1985, national expenditures for physicians' services have increased almost tenfold, from $8.5 billion in 1965 to $28 billion in 1985.[1] As a result, several possible physician payment reforms are being considered. Prospective payment by diagnostic-related groups (DRGs), put in place to control Medicare hospital expenditures, is a fact of life for hospitals. Medicare and Medicaid are now pushing for changes in the way they pay physicians. Managed care programs are negotiating discounts from all types of health care providers.

Reform activity can be identified on many fronts: (1) Congress has frozen Medicare fees, effective June 1984 through January 1987. Congress' intent is now to shift the burden of effectively constraining the growth of Medicare Part B costs to providers rather than Medicare beneficiaries. (2) The Physician Payment Review Commission, created by Congress, has issued a recent major report, outlining ways that physicians could be reimbursed under Medicare in the future.[2] (3) In fall 1985, the Health Care Financing Administration (HCFA) contracted with Harvard University to conduct a 30-month study of resource-based relative value scales (RBRVS) for physician services.[3] This system is being developed under the direction of William Hsiao, Ph.D., Harvard School of Public Health. The American Medical Association is a subcontractor on the study for HCFA. The study is scheduled to be completed in July 1988. (4) The Massachusetts Rate Setting Commission is revising its Medicaid fee schedule, based on the RBRVS, for planned application in mid-1987. (5) The Massachusetts Insurance Commissioner asked Blue Shield to consider reforms in physician payment, with an emphasis on developing an RBRVS, as a condition of his approving a Blue Shield rate increase in 1987. (6) Congressional hearings on physician fee schedules continue, and congressionally sponsored studies of physician fees have recently been published.[4,5]

Within the administration in Washington, proponents of physician fee reform are calling for an expanded use of capitation in the long term, or some form of physician DRGs.[6] But these changes are not imminent. During the next several years, fee payment modifications will be based in fee-for-service recalculations. If the revised physician fee schedules achieve acceptable levels

Presented at the 107th Annual Meeting of The American Surgical Association, Palm Beach, Florida, April 21–23, 1987.
Reprint requests: Richard H. Egdahl, M.D., Boston University Medical Center, 720 Harrison Avenue (1107), Boston, MA 02118.
Submitted for publication: April 24, 1987.

000006

MCK 035619
04-CV-1258-SLR (D.Del.)

Confidential Information
Subject to D. Del. LR 26.2

TABLE 1. *Medicare Prevailing Fees (S, 1984)*[*]

| State | CABG | Appendectomy | Cataract |
|-------|------|--------------|----------|
| New York | 6000 | 1134 | 1547 |
| Michigan | 3100 | 399 | 825 |
| Rhode Island | 2587 | 516 | 928 |

[*] The charges indicated are for specialists and for the large urban areas within the states listed.

From the U.S. Department of Health and Human Services, Health Care Financing Administration, Medicare Directory of Prevailing Charges 1984. Washington DC: U.S. Government Printing Office, 1984.

of patient access and physician support, they will be part of the blueprint for future health care delivery in both private and public arenas.

## Background

Medicare's "customary, prevailing, and reasonable" (CPR) payment system is, by general consensus, unsatisfactory in today's competitive market in health services. There are many problems associated with CPR. It tends to be inflationary and slow to respond to alternatives in technology and changes in both availability of physicians and need for services. Some charges appear excessive to most observers, even taking into account geographic cost-of-living variations and other variables. For example, under Medicare, the cost of a triple vessel CABG (coronary artery bypass graft) in New York in 1984 was $5500. The cost of this same procedure in Michigan was $3100 and $2587 in Rhode Island (Table 1).

Similar variations are found in fees from the private sector. For example, unexplained fee variations exist in managed health care models such as independent practice associations (IPAs). Hip replacement at three different IPAs in the eastern part of the country ranged from $2808 to $4274 (see Table 2).

Noting these wide discrepancies, the federal government and a number of large private purchasers of health services have turned their attention to the ways physicians are compensated for the care they provide. Fundamental changes in the methodology of physician reimbursement are being discussed. Serious consideration

TABLE 2. *Fee Variations in 3 IPAs, 1986 Fees (S)*[*]

| Operation | Plan #1 | Plan #2 | Plan #3 |
|-----------|---------|---------|---------|
| Appendectomy | 645 | 950 | 1111 |
| Cholecystectomy | 1055 | 1465 | 1710 |
| Cataract removal | 1280 | 1650 | 1980 |
| Hip replacement | 2808 | 3666 | 4274 |
| CABG (3-vessel) | 4690 | 6123 | 7139 |

[*] Plan names withheld because fees were given in confidence to Health Policy Institute by IPA executives.

is being given to systems that would pay physicians by capitation or by including the physician payment within the hospital DRG payment. However, both options represent a radical departure from the current system and are viewed as politically unrealistic, at least in the short term.

Several interim remedies are being devised, however. One approach adjusts a few fees that are grossly out of line. Invoking "inherent reasonableness" authority, HCFA uses this approach to reduce payments for "overpriced" procedures. Although corrections have been made for a few services such as cataract removal and installation of pacemakers, most physician payments currently are based on historic trends.

Another approach used by HCFA to control "runaway" costs involves a recalculation of the Medicare Economic Index (MEI), an inflation index for increases in physician office expenses that result from inflation. HCFA estimates that this downward modification in the MEI will save Medicare an increasing amount of money.

Another approach, more far-reaching in conception than the interim measures described previously, but less radical than capitation and physician DRGs, was taken by the Boston University Health Policy Institute (BUHPI) in the fall of 1984.[1] BUHPI compiled a group of 11 Massachusetts surgeons in a pilot effort to develop a complexity-severity index (C/S index) of surgical services, based on professional judgment, that could provide the basis for a relative value scale.

Building this kind of index, although intuitively appealing, proved time consuming and cumbersome. It also raised questions of antitrust. The Federal Trade Commission has barred professional groups from developing relative values guides on the grounds that such guides ". . . established by competitors in a commercial context, probably would constitute illegal price fixing because the dissemination of information and agreement on establishment of price structures usually leads to price uniformity and stabilization."[9]

In this pilot study, BUHPI identified a private corporation that had captured the essence of the C/S index claims and developed a practical way to convert it to a physician payment management system. The approach developed for Caterpillar Corporation (CAT), based in Peoria, Illinois, has resulted in the evolution of "degree of difficulty" Act relative value scales (DODRVS) and regional multipliers that appear to accomplish a pragmatic fee scale reform. Access to physicians is achieved for CAT employees and their families, and local physician acceptance of the overall CAT process is maximized. Since CAT is not a dominant payer in any geographic area and CAT is not a provider, the potential for antitrust challenges is minimal.

MCK 035620
04-CV-1258-SLR (D.Del.)

Confidential Information
Subject to D. Del. LR 26.2

ysician █ Table 3 shows the close correlation between the C/S
█ment █ n numbers, arrived at through the BUHPI study,
ptions █ CAT's DODRVS, reached by consultation with re-
system █ ul students. This striking correlation between the
n the █ processes suggested to the BUHPI that CAT was on
█t in its surgical fee activities, and led to the collabo-
l, howe █ project described in this paper.
ssly ou █
author █ *Caterpillar Method*
ments █ CAT is an international manufacturer of earthmoving
ions █ chinery and equipment, employing an estimated
t remo █ 000 employees in 15 domestic and 13 foreign plants.
cian █ CAT health benefits cover employees and dependents,
trol "█ wall as 21,000 retirees. The benefit package includes
Medic █ hospitalization, physicians' services, laboratory, x-ray,
increa █ emption drugs, and dental and eye care. The CAT
inflatio █ plan is self-insured and self-administered.
ion to █ In 1983, CAT implemented for its U.S. employees a
nount d █ negotiated fee schedule approach to physician fees for
cept th █ surgical and invasive procedures. The CAT physician
less r █ payment system emphasizes (1) employee access to a
tned l █ range of qualified surgeons, (2) fees negotiated with
(BUHP █ local surgeons that are considered reasonable and con-
up of █ sistent with local market forces, and (3) billing practices
evelop █ applied consistently to all incoming claims. Par-
█cal█ ts of these features of this approach are described below.
█ld████ *Establish a fair fee cap.* With input from respected
█vely █ community physicians in locations with a large number
some █ of CAT employees, CAT establishes a fair fee cap for
█ Tra█ surgical services. The CAT method involves convening
n dev█ a limited number of meetings with selected representa-
█ot su█ tives of the surgical community and the CAT medical
merc█ director for group insurance (CAT M.D.). Where it
e fu█ makes the most efficient use of time, the CAT M.D.
█ agre█ meets with individual specialty groups. Operating under
lead█ a "physician friendly" philosophy and the assumption
█ that physician education and involvement help achieve
█ a mutually agreeable solution, the CAT M.D. describes
█the situation from CAT's point of view: (1) there are
█ide variations in fees and billing practices; (2) there is
com█ often insufficient documentation to properly process
5 inde█ claims; (3) a way is needed to compare the difficulty of
phys█ various services so their "relative value" can be consid-
nach █ ered for payment decisions; and (4) a reassessment of
Illino█ fees for surgical assistants is needed.
iculty █ Actual claims received are used as examples (with pa-
mult█ tient and provider identities protected). The CAT M.D.
sch█ also solicits provider input on how problems can be
· CAT█ corrected. General consensus is gained on reasonable
accep█ billing practices and relative degree of difficulty of var-
Sinc█ ious procedures, based on recommendations by the
co and █ CAT M.D. and discussions with physician groups.
ges █ *Use of geographic multipliers.* CAT's DODRVS is
█ combined with a regional dollar multiplier to calculate

TABLE 3  BUHPI C/S Index Compared with CAT DODRVS

|                                          | C/S Index | DODRVS |
| ---------------------------------------- | --------- | ------ |
| Thoracentesis                            | 3         | 3.4    |
| Appendectomy                             | 24        | 26.4   |
| Cholecystectomy (with common bile duct exploration) | 48 | 47.7 |
| Total thyroid lobectomy                  | 40        | 41.8   |
| Modified radical mastectomy              | 45        | 45.7   |
| Colectomy, partial                       | 55        | 54.5   |
| Pancreatoduodenectomy                    | 100       | 100.0  |

the actual dollar payment limit. The regional multiplier
is based on market research by the CAT M.D. Where
there are unusual market conditions for certain special-
ties, CAT may adjust the multiplier up or down for
some services rather than changing the entire region's
multiplier. This system allows CAT to take into account
the local health care market, legitimate variations in
provider billing and medical practices, and variations in
the cost of living.

*Continual audit and recoding of physician bills.* CAT
claims processors subject each incoming physician bill
to a coding analysis of CPT-4 codes as a first step, and
recode claims where irregularities are found. Obvious
simple coding errors are corrected first. Individuals with
clinical knowledge and judgment then compare the pro-
vider's description of services with submitted codes; op-
erative reports are requested for most surgical claims
and follow-up calls to provider offices for clarifying in-
formation are common. Once the claim reviewer is sat-
isfied that enough information is available to code the
bill consistent with CAT procedures, recoding is final-
ized, and the correct codes are compared with estab-
lished regional fee schedules. Reviewers with clinical ex-
perience consult the CAT M.D. as needed, assuring that
a high level of understanding of the surgical experience
is applied in the review process.

Tables 4–7 illustrate some features of the CAT pro-
cess. They are representative of some claims received
by CAT.

In Table 4, the appropriate payment is $1000 for code
38100. The patient was hospitalized for an elective sple-
nectomy. The CAT reviewer would disallow codes and

TABLE 4  Bundling of "Unbundled" Bill

| Procedure                       | CPT Code | Charge |
| ------------------------------- | -------- | ------ |
| Splenectomy                     | 38100    | $1000  |
| Laparotomy                      | 49000    | 600    |
| Appendectomy                    | 44950    | 600    |
| Preoperative check (in hospital) | 90215   | 125    |
| Suture removal                  | 90270    | 100    |
| Total charge                    |          | $2425  |
| Amount paid                     |          | $1000  |

000008

MCK 035621
04-CV-1258-SLR (D.Del.)


Confidential Information
Subject to D. Del. LR 26.2

Ann. Surg. • January 19... No. 3

TABLE 5. *Excessive Fee Reduced, Assistant Surgeon Claim Denied as Not Medically Necessary*

| Procedure | CPT Code | Charge |
|---|---|---|
| Excision biopsy, breast (R) | 19120 | $1500 |
| Excision biopsy, breast (L) | 19120-50 | 1500 |
| Charge | | $3000 |
| Assistant surgeon fee (R) | 19120-80 | $1200 |
| Assistant surgeon fee (L) | 19120-50-80 | 1200 |
| Charge | | $2400 |
| Total charge | | $5400 |
| Amount paid | | $ 750 |

TABLE 7. *Fee Adjustment*

| Procedure | CPT Code | ... |
|---|---|---|
| Coronary artery bypass graft, 3 vessel | 33512 | |
| Total charge | | |
| Amount paid | | |

charges for all except the splenectomy: a charge for laparotomy and incidental appendectomy is warranted only if done as a separate procedure and preoperative check and postoperative care are conventionally part of the global surgery fee. A charge of $1000 for the splenectomy is in line with the regional fee schedule and is the amount ultimately approved.

In Table 5, the appropriate payment is $750 to the primary surgeon for code 19121 (excision biopsy, breast, bilateral). Under most conditions, one surgeon can perform a breast biopsy. The operative report indicates no unusual circumstances. The assistant surgeon is not reimbursed, and the patient is informed of CAT's review decision.

In Table 6, the appropriate regional payment is $60 for code 17100. The procedure was actually a simple wart removal. The operative report describes a 0.25-inch plantar wart on one foot. Excision combined with use of the laser constitutes excessive treatment for this common condition. Wart removal is most accurately coded as 17100 ("destruction by any method of benign skin lesion").

CAT knows that four local experienced, board-certified cardiac surgeons will carry out a three-vessel coronary artery bypass for $5000, assuring that access can be achieved for that fee (Table 7).

Tables 4–7 demonstrate that complete and knowledgeable recoding of claims requires familiarity with both the content of various surgical procedures and the details of coding surgical services.

*Physician negotiations.* Individual physician negotiations are carried out for selected claims. After establishing an overall fee schedule with local physician representatives, CAT continues its negotiations on a ... claim-by-claim basis. If the amount charged for ... rected codes significantly exceeds the regional fee ... CAT contacts the billing physician, giving informa... on the corrected codes and the amount allowed ... CAT M.D. makes many of these calls. Usually the ... vider is willing to accept CAT's recoding and red... fee. Discussions of claims with physicians have re... that providers enter practice largely ignorant of ... mon billing practices. Most admit they do not ... what various procedures are worth. At best the ... sionally may ask other providers what they ch... Those who use an RVS have access only to a wide ... ety of unstandardized sources. Some are advised ... charging high rates to get a high fee profile. Often, ... sician offices have an office clerk coding claims w... been trained in medical terms or coding, whereas ... physicians rely on central billing services that prom... "maximize reimbursement," often with "creative" ... coding or unbundling of services.

*Employee communication.* CAT has a program ... ployee communication that defines the employee's ... sponsibilities and options when payment is less than ... fee charged by a surgeon. A letter of explanation is ... matically generated to the employee when there ... been a payment reduction. It states that if the emp... has discussed the fee with the physician before the ... cedure, the employee is responsible for the amou... excess of CAT's fee cap. Also, employees are told ... their provider has agreed to accept CAT's reim... ment as payment in full.

*Patient held harmless.* If a physician bills an emp... for the amount that exceeds the fee cap, the emplo... instructed to contact CAT, and a CAT provider ... tions specialist discusses the situation with the ... cian. Patients are not required to pay the physic... balance bill above the CAT payment (that is, the... "held harmless") if the physicians have not inform... patients of the higher-than-cap fee before the proc... CAT intervenes on the patient's behalf when the ... cian refuses to lower his/her fee to the established ... On average, of about 20,000 physician claims rec... per year, CAT has less than a dozen instances in w... providers insist on trying to obtain reimburseme... above the CAT fee through claims court. In over ...

TABLE 6. *Recoding of Unnecessary Procedure, Excessive Fee Reduced*

| Provider Description | CPT Code | Charge |
|---|---|---|
| Excision benign lesion, foot and use of $CO_2$ laser | 11421 | $450 |
| Total charge | | $450 |
| Amount paid | | $ 60 |

MCK 035622
04-CV-1258-SLR (D.Del.)

Confidential Information
Subject to D. Del. LR 26.2

...five cases, the judge has agreed that CAT's payment is reasonable for the services, based on local surgeon input.

### Savings with CAT Method

CAT's internal calculations indicate that it achieves significant savings with its surgeon bill review process by reducing fees that otherwise would have been paid in full. The BUHPI is conducting an external evaluation of the CAT process for managing surgeon fees. Standard representative surgical fee processing by large insurance companies for contracted third-party administrators is being compared with fee caps. potential cost savings of the CAT process. The information BUHPI has obtained samples of consecutively filed ... claims for surgical services that have been processed for the several large self-insured corporations that administer reduced their claims through major insurance carriers. The benefits revealed plans establish payment caps at a percentile of usual of customary and customary fees, and the carriers' auditing of codes not known representative of current industry standards. CAT's recoding and bundling procedures, as well as payment charges were applied to these claims, with the goal of finding evidence if the savings from payment reduction significantly to standard exceeded those achieved by these carriers.

Hard copies of the providers' originally submitted claims were processed by CAT staff without information about changes from charges that had been made by the carriers before these claims had been paid. Confounding variables of payment due to copayments, deductibles, or coordination of benefits were eliminated.

The total charges included in the sample claims were over $140,000. The carriers adjusted 13 to 15% of their claims and paid 4.3 to 35% less than total charges. CAT adjusted 35 to 40% of these same claims and reduced payment from charges by 22 to 43%. Therefore, CAT would have achieved an additional savings of 8 to 17.9% by CAT's procedures and the lower of CAT or the administrator's fee schedule were used. One third of the additional savings came from coding changes in the original submittal and two thirds by the application of the CAT negotiated fee schedule. In some instances providers submitted an incorrect code that significantly *undervalued* the procedure that was done. If the provider's code had been used, the payment would have been cut to an unreasonable level. In these instances, the CAT reviewer "upcoded" to the correct code and allowed the more appropriate fee; the savings potential includes these corrections in favor of billing savings.

### Discussion

The CAT system for managing surgeons' fees has been developed by a progressive benefit department in a large American corporation. The system depends on detailed knowledge of surgical practice so that recoding and bundling of procedures categorized by CPT-4 codes

can be accurately carried out. It requires contact with local surgeons in regions with a high concentration of employees so that market forces can be taken into account in determining an appropriate level of local fees.

An access-oriented negotiated fee schedule can have many permutations. In areas with a surgeon surplus, a corporation may be able to negotiate lower fees with surgeons than those previously paid. In areas with few surgeons, fees lower than customary are more likely to create patient access problems should the surgeons resist reductions negotiated elsewhere. Still, modified versions of CAT's approach would be similar to processes already used by the government in establishing "inherent reasonableness" for cataract extraction and pacemaker installation fees.

The key concern about any new surgeon payment approach should be the ability to attract a good representation of local surgeons who will accept it. Ensuring employees' access to qualified surgeons is the paramount goal. All other considerations, even inherent reasonableness of lower fees because of technological advantages or cost containment, should remain secondary.

Based on the BUHPI's analysis, the CAT process is a workable and market-tested solution to the need to balance access and cost management. It is suitable for large corporations such as CAT with both self-funded and self-administered health benefits. It can also be used (after eligibility is certified and benefits are coordinated) by claims processing systems. Accurate implementation of the CAT process requires (1) hard copies of the CPT-4 codes submitted by the surgeon and availability of the operative notes, to reconcile discrepancies between CPT-4 codes and the surgical service, and (2) access-oriented negotiated fee schedules obtained by applying a geographic multiplier to an RVS, such as CAT's DODRVS.

State and federal governments can modify the CAT process for Medicaid and Medicare, with the same goals that motivate the private sector: access and cost management. Regional fee schedules could be established with national DODRVS values and regional multipliers based on market forces. Balance billing is optional, using the CAT model. However, its effectiveness as a cost management approach is strengthened with its "hold harmless" provision. In the CAT system, if a patient knows a surgeon is charging a fee higher than the negotiated fee, the patient is responsible for the balance. If no discussion has occurred, the patient is held harmless for bills in excess of the fee cap.

If adequate access is to be preserved without the need for balance billing, payments must be established so that a majority of qualified surgeons in each region will accept the negotiated fee as payment in full. If this acceptance is not achieved, then access problems will arise, as

000010

Confidential Information
Subject to D. Del. LR 26.2

354    EGDAHL AND HERTENSTEIN    Ann. Surg • January

TABLE 8. *Comparison of "Resource-based Relative Value Scale" (RBRVS) and "Access-oriented Negotiated Fee Schedule" (AONFS) for Physician Reimbursement**

| | RBRVS (Hsiao) | AONFS (CAT) |
|---|---|---|
| Goal | A "comparable worth" reform for physicians, a group with high incomes relative to most other occupations. | Patient access to local physicians at a negotiated price. |
| Methodology | Complex formula determines RBRVS; time is a major determinant. | Revision of fees is based on negotiations. M.D. fee acceptance patterns (market forces, not payment of charges). |
| Application | Two basic problems: (1) RBRVS is not a fee, and knowledge is needed of regional situations to use multiplier effectively. (2) when applied in Massachusetts, shown to need extensive modification to get support of, and access to, local surgeons. | In routine use. CAT knows that well-qualified local physicians will accept the AONFS. |

* AONF = DODRVS × regional multiplier.

occurred in 1986 for the Massachusetts Medicaid program. That program was forced to increase significantly its fees for normal deliveries. As stated in the *Boston Globe*, ". . . responding to a crisis in access to obstetrical care in many areas of the state, the panel hiked the all-inclusive fee for pregnancy care and childbirth from $508 to as much as $1,200."[10] This is a good example of the futility of a fee schedule that does not build on knowledge of physicians' availability at different fee levels in each region. The Massachusetts Medicaid program had a previous experience with attempting to introduce a fee schedule based on a "resource-based" formula.

In July 1983, the *Boston Globe* described a new strategy that was suggested by the Massachusetts Rate Setting Commission for the Medicaid program and workers compensation.[11] Based on the 1979 study by Drs. Hsiao and Stason from the Harvard School of Public Health,[12] the Rate Setting Commission proposed that the fees for 21 common surgical procedures should be cut by amounts ranging from 4% to 59%. At the same time, physicians seeing patients in their office were to get 71% more for initial visits. These proposed changes were the estimated relative resource requirements of different physician services, with a strong focus on the time involved. The formulas were established in the Hsiao/Stason analysis of physician practices.

These changes were adopted in September 1983, but on August 23, 1984, the Rate Setting Commission raised the fees that the state Medicaid program paid to doctors for surgical procedures. As stated in the *Boston Globe*, "no prior hearing was held or public notice given before the August reversal because the Commission subsequently said physician resignations from Medicaid had reached the level of a public health emergency. Most striking of these defections were obstetricians/gynecologists."[13] This experience suggests that fees ultimately paid by Medicaid were primarily driven by the need to get access to Medicaid patients to physicians, and not by a formula for "resource costs."

The American Society of Internal Medicine and the American Medical Association have supported an elaborate study of the Hsiao methodology commissioned by HCFA, and there is much speculation about the possible use of an RBRVS for the determination of Medicare fees when it becomes available in the summer of 1988. The investigators of the BUHPI originally believed that a consensus process to determine a C/S index could be developed as the basis for fee reform that would be acceptable and perceived as fair by physicians. However, as the consensus approach is laborious, and much time would have been necessary to interrelate all specialties and resolve potential conflicts. It was then that the BUHPI began to study the CAT system, and found that it involved a process with appropriate goals, methodology, and application for cost management and market acceptance.

Table 8 outlines the basic differences between a "resource based" RVS and an access-oriented negotiated fee schedule, as used by CAT. A basic goal of the RBRVS is to "reform" physician reimbursement in the direction of more equity between procedure-oriented specialists and generalists. However, as the evidence suggests, this goal will be in conflict with realities of the marketplace and will result in paying fees that are either unnecessarily high or too low to get ready access by insurees to local physicians.

The methodology of the RBRVS is based on a formula unrelated to local market forces, whereas the access-oriented negotiated fee schedule used by CAT builds on negotiations and local fee acceptance patterns to gain access. The CAT system's ability to adjust for regional differences in the market is the essential difference in the two approaches. The CAT system is in routine use and will continue to be modified by changes in local physician manpower and other factors such as increases in malpractice premiums. We suggest that an access-oriented negotiated fee schedule such as the CAT system deserves consideration as the preferred method of fee reform.

MCK 035624
04-CV-1258-SLR (D.Del.)

Confidential Information
Subject to D. Del. LR 26.2

AN ACCESS-ORIENTED NEGOTIATED FEE SCHEDULE                                    255

## References

DR. Levit KR, Lazenby H. National health expenditures, 1985. Health Care Financing Review 1986: 8:14.

... Payment Review Commission. Medicare Physician Payment: an Agenda for Reform. Annual Report to Congress. Washington DC: U.S. Government Printing Office, March 1, 1987.

... RA. Study on Equalizing Medicare Bills Begins. The Boston Globe, September 13, 1985; 4.

...gress of the United States. Physician Reimbursement Under Medicare: Options for Change. Washington DC: Congressional Budget Office, April 1986.

...gress of the United States. Payment for Physician Services: strategies for Medicare. Washington DC: Office of Technology Assessment, February 1986.

...ris SF, Dobson A. Strategies for reforming medicare's physician payments: physician diagnosis-related groups and other approaches. N Engl J Med 1985; 312:1492–1499.

7  Dutton BL, McMenamin P. The medicare economic index: its background and beginnings. Health Care Financing Review September 1981; 3:137–139.

8  Egdahl RH, Manuel B. A consensus process to determine the relative complexity-severity of frequently performed surgical services. Surg Gynecol Obstet 1985; 160:403–406.

9  Pollard MR. Anti-trust and Physician Payment: Reforming Physician Payment 1984. Institute of Medicine: Report of a Conference. Washington DC: National Academy Press, 1984; 75–86.

10. Knox RA. Proposal Would Raise Medicaid Fees. The Boston Globe, April 17, 1986; 27.

11. Knox RA. Medicaid Fee Shifts Adopted. The Boston Globe, September 16, 1983; 17.

12. Hsiao WC, Stason WB. Toward developing a relative value scale for medical and surgical services. Health Care Financing Review, Fall 1979; 1:23–38.

13. Knox RA. State Shifts on Medicaid Fee Cuts. The Boston Globe, September 27, 1984; 1.

## DISCUSSION

... W. GERALD AUSTEN (Boston, Massachusetts): I congratulate ... Egdahl and Hertenstein on an excellent and stimulating paper. ... have worked long and hard on physician payment reform, and ... recognized early the importance of physician acceptance in any ... would have ... participation of the physicians. Thus, a major element of the current proposal involves the active participation of the physicians.

... and a half years ago, the Regents of the American College of ... created a Committee on Physician Reimbursement of which I ... was Chairman. This committee, with much input from the ... specialty societies, has developed recommendations for the ... reform of the Medicare physician payment program, and these recommendations were approved by the Regents in October 1986.

... aim of the College, like the approach presented today, is to ... with ways to achieve a more rational payment system with cost ... control and at the same time ensuring adequate access to quality care. ... the ACS approach has a number of similarities to the program ... presented this morning: the ACS proposal includes the creation of a ... relative relative value scale based on physician charge data and with ... modifiers based on geographic differences in practice costs, the definition ... payment units with emphasis on a global fee and the creation of ... standards and guidelines to determine when an assistant at surgery for ... payment purposes is necessary.

... have one question for the authors. The Caterpillar Corporation has ... approximately 50,000 employees in 13 domestic plants, and it also has ... a persuasive, sensible medical director. How would you expand ... proposal from one company to a national program?

... I would like to add that it is crucial that surgery be involved ... as possible in the current debate on physician reimbursement ... and we need to be able to present sensible and fair approaches ... based on solid data. The next year and a half is probably going to be ...

... I would urge Drs. Egdahl and Hertenstein to continue to gather ... information and to make every effort to present their data and recommendations to the appropriate congressional committees and to the ... administration.

... DR. OLIVER H. BEAHRS (Rochester, Minnesota): Drs. Egdahl and Hertenstein have done us a favor by developing and reporting a modification of the CPR fee for service reimbursement for surgical services. ... appreciate the opportunity to have read the manuscript.

... Their program, which is a negotiated access RVS, is in contrast to the Harvard–AMA resource based RVS, and is being developed under a ... grant from HCFA. This RVS is of concern because of the inordinate ... given to time as a factor and the methodology being used.

There is great anticipation regarding this study in Washington and ... are thinking of it as the only game in town.

The Physician Payment Review Commission (PhysPRC) established by Congress in 1986 made its first report to Congress on March 1, 1987. The Commission supports a fee scale based on a national RVS with appropriate regional multipliers to determine fees. The basis for the RVS has not been determined, but hopefully it might be based somewhat on historic charges and not the strictly resourced criteria of the based parameters used in the Harvard Study.

The use of the CPT-4 Code has come under criticism: first a dictionary of 2000 codes, and now 7000 and with multipliers 48,000. It was established primarily for medical record keeping not to establish charges. It has led to unbundling of services and upcoding to establish fee for services. This practice has led to excessively high fees in at least 10% of cases because of unbundling or upcoding.

I would be interested in the author's suggestions how the CPT-4 codes might be collapsed or bundled and what policy could be established to prevent these abuses.

A long-term program for physician payment is probably several years away and may be a fee scale hopefully, but there is administrative and congressional support for capitation or voucher arrangement, possibly DRGs. Congress is looking for a near-term solution to its budget problem for 1988.

The budget mark-up will be in the next few weeks and the recommendations to meet the cuts almost certain in physician reimbursement will be in place by September.

The reduction in reimbursement might be another freeze, a shaving downward of the medical economic index, selecting the high-cost outliers such as coronary artery bypass, hip reconstruction, and/or TUR for across-the-board decreases as was done to cataract surgery in 1986 and 1987, or selective decrease in the high rollers or by addressing the reduction by using the inherent reasonable rule that is already in legislation.

My second question to Dr. Egdahl and Dr. Hertenstein is: what are your recommendations in the next month or two to meet the 1988 budget limits?

DR. MARTIN ALLGOWER (Basel, Switzerland): I appreciate the invitation to look "with a Swiss eye" at the presentation of Dr. Egdahl.

In Switzerland it is said that the surgeon goes through two stages. At the beginning of his career, collecting a fee, he gets red in the face. Later on his face reddens when he does not get paid!

The Swiss economic system is a rather complex mixture of free enterprise and institutions run almost exclusively by public bodies. We consider many of the things you do not as public responsibilities. These include post and telephone services, railway services, schooling and university formation, and most hospitals are run by local government agencies. The health care system is furthermore complicated by the fact that insurance conditions for accidents are very different from

000012

MCK 035625
04-CV-1258-SLR (D.Del.)

Confidential Information
Subject to D. Del. LR 26.2

356                    EGDAHL AND HERTENSTEIN

those for diseases. It is obvious that this difficult distinction keeps our lawyers busy!

Basically, surgeons are mostly employed on a geographical full-time basis in a state hospital. These state hospitals, however, have private, semiprivate, and general wards. This, I believe, is a rather favorable arrangement, combining a salaried position for the administrative obligations as well as for the care of the general patient with a fee-for-service system for the private patients. Now, comparing this with the cap system, we find great similarities because the Union of Swiss Surgical Societies, including all specialties, has set up a range of fees that may be reasonably asked from a patient or from the insurance, i.e., the third party paying. Those ranges, just to give you an idea, would range from 400 to 1000 francs for an appendectomy, for a gallbladder from 1000 to 2000 francs, and for major operations such as a total gastrectomy, a Whipple, an acetabular repair or a resection of an abdominal aneurysm, from 3000 to 6000 Swiss francs. That is about the maximum fee we are allowed to ask or, at least, that the Union will support. If it is contested in court. You may divide the figures by 2 to arrive at dollar values, because that is about the realistic comparison in terms of buying power.

It is a fairly democratic self-regulating peer controlled system. What we dislike in Switzerland is the "big brother" state watching us and telling us what to do.

We have one advantage over you. The contingency system is unacceptable and the one party who loses "the battle" usually has to pay the other's legal expenses. That often prevents people from going to court, although there has been a definite increase in liability claims in recent years.

Overall our system results in an average income of some 300,000 to 400,000 francs for a Swiss surgeon. Out of that he pays some 50% in taxes. Our rather democratic system is similar to what Dr. Egdahl has just presented. It is based on a fee for service "common sense scale," the majority of surgeons working in a geographical full-time scheme.

DR. WILLIAM R. DRUCKER (Rochester, New York): I appreciate the opportunity I had to review this paper. Dr. Egdahl has given us a clear presentation of an industry-sponsored plan that attempts to gain physician compliance with a method of reducing costs of medical care through reduction in fees.

It is a very clear example that in addition to government today, our health care system is being strongly influenced by industry.

I have a couple of editorial comments and then a couple of questions. The major factor in the rise in health care costs is not physician fees. This is simply illustrated by a look at the average fees of physicians across the country, somewhere in the range of $50,000–$150,000? I realize that others make considerably more, but each physician can be estimated to cost the health care system something in the order of three quarters of a million dollars per year by the exercise of his physician rights in doing his job of taking care of patients. Therefore, the major target that needs to be addressed is physician behavior, not physician fees. Nevertheless, fees are perceived as a problem that is going to be addressed whether we like it or not.

I wonder whether this paper is simply the expression of a last gasp hope that current physician fees and the fee for service system will continue. I sincerely hope this is not its purpose and I believe Dr. Egdahl agrees based on the way he has presented the paper. My reading from the paper is that Dr. Egdahl is presenting a plan that is asking clearly for physicians to get together and plan to help solve the problem of fees rather than having it done for us by external agencies; that means industry and government.

My questions are these. They are straightforward, I believe, and can be answered simply. What will happen in the case of an emergency when one of the patients in the system under the cap must have an emergency operation and they seek a doctor who does not agree with the system: would this be settled in claims court?

What about quality? Does the system depend on the physician participants to ensure quality or do they have other ways to ensure that their employees are obtaining the quality of care that they would under the current system of free selection?

How about comparison with other systems? Has there been enough experience to date to show that this system is gaining popularity? Is

there any way to compare this system with others in terms of factors: physician acceptance to work in the system, and real acceptance of this system for their health insurance?

Then there is a question of cost. This is a very complex issue that seems very costly if one reads carefully. What is the cost? Is this estimate of what the cost would be of setting up and maintaining a system that requires close scrutiny of all bills that come to a complex system of monitoring these bills? Is the billing method set to CAT or can other insurance systems do this too? Is this wholesale? Do other insurance companies look at claims this carefully?

DR. BENSON B. ROE (San Francisco, California): Dr. Egdahl is thanked for bringing to our attention a sensible proposal to a serious threat to the fee-for-service system. I believe we finally are aware of this threat, and I am delighted that we are prepared to get our forces to get behind something positive.

About 8 years ago I became aware of the enormity of the impact of the current system that were taking place, perhaps not by the most able members of our profession but by an alarming number of those who did the kind of unbundling and some of the things that I warned you. I published an article that was intended to stir us to take initiative in this problem rather than hoping it would go away. Today it is not too late.

It is equally important that we get behind some system that establishes fiscal integrity so that we do not jeopardize the precious and unique privilege that we have of self-governance. This is being threatened by the behavior of some of our colleagues who have abused the system and brought this problem to our attention.

In addition to the proposals that Dr. Egdahl has made, I think we should place emphasis on the magnitude of responsibility to treat only accessory procedures but complications. No one can tell whether my complication was part of the patient's underlying illness or could possibly be one from some flaw in my technique or management. We should accept as a part of our primary responsibility the scope of managing a patient from start to finish without these extra for everything that can be imagined. If we had done this, we would have reduced our total cost to the public by at least 30%.

DR. JAMES R. JUDE (Miami, Florida): I rise because I am one of the patients who are faced with billing problems after having a charge. One of the problems is the unbundling that Dr. Egdahl brought up.

Ten years ago on an Ethics Committee of our local medical society, we, out of hand, tossed unbundling out as a complicit approach to any type of billing. I did not believe it even could exist any more, but there is more of a problem than just the rest together of the surgical fee. This problem is much greater than that. I always keep our office open to speak to any patients about any items, and it is very common for them to present with bills really amounts to an unbundling of the bills of other physicians who were involved in their treatment.

Most commonly this has applied to anesthesiology, which approaches 50% of the surgical fee. It is not, however, only the anesthesiologist, it is also the internist, the radiologist, the pathologist, possibly the cardiologists who are reading electrocardiograms, receive an enormous number of bills from physicians, and the total physician unbundling and not just a surgical fee unbundling is occurring.

Some way or other we have to approach the problem so there will be some type of bundling together of all physicians' fees in a package.

As our President presented yesterday in his Presidential address, many treatments that we do are not all surgical any more, but the blending over into medicine, and medicine is delivering surgery. Surgery is delivering medicine. Therefore, we should give a consideration to the total care and the total charge.

Dr. Egdahl, what if anything have you considered about these fees in respect to a global cap or other industry approaches and the cost of care in surgery?

MCK 035626
04-CV-1258-SLR (D.Del.)

Confidential Information
Subject to D. Del. LR 26.2



JONATHAN E. RHOADS (Philadelphia, Pennsylvania): I listened ... with a great deal of interest. I would emphasize that if ... have a 50% overhead, that a 15% reduction in fee is a 30% ... in take-home remuneration. That is well to keep in mind. ... is one aspect of the overhead that has gotten bigger and that is ... insurance. This in a way is the loose cannon on the deck, and ... have a fee schedule set, whether by government or by con... ... this expense is assumed to be something that the physician ... you have an unpredictable situation.

... the question and ask the authors if there is any precedent for ... lice insurance being billed on a per case basis or a percentage of ... No doubt this would require the insurance company to have ... one's tax returns and so forth to be sure that it was honest, but ... have certain great advantages. It would permit the young ... starting out to start out on his own, pay his share of the ... costs, but not be expected to pay immediately the same ... that a person would be paying who is doing 10 times as much ... the middle of his career.

... the far greater advantage in my belief is that this could ... and should appear as a separate item on the bill.

... of no way that would educate more of the public as to the ... of liability insurance than to have a bill (operation $300, ... $125, or whatever it might come to).

... to raise this issue and to ask the authors if they knew if there ... precedent for such a plan and to ask whether they believe there ... way this could be tried out before we get tied into a fee schedule ... with an unpredictable cost for liability insurance.

RICHARD H. EGDAHL (Closing discussion): Dr. Austen's question ... about the possibility of expanding the Caterpillar program as it ... goes to a national level is an important one. The problem is that ... national programs such as Medicare necessarily involve a large ... ..., whereas a private self-administered company such as ... does not require the same degree of routinization of opera... ... and an easily replicated methodology. The country could be ... divided into 6–12 regions, each consisting of several states. I ... know whether approximate flexibility could be built into the ... and technical components of the administrative struc... ... which would be part of a national program.

... Austen raises questions about the future use of CPT-4 codes and ... what we can do in the short range to control outlier Medicare fees. ... we can use CPT-4 as long as we understand the basis for ... up the procedures that actually were carried out with the ... and have some way to ratchet downward those charges that ... appropriate. Certainly there are a few groups selling systems ... goal of achieving code creep, which is basically dishonest. On ... hand, the majority of codes that are incorrect represent ... errors based on the difficulty of each doctor's office knowing all ... of coding. We can stick with CPT-4, but must match ... note with the CPT-4 code, using physician judgment to ... if the code is appropriate. The short-term answer for HCFA ... the principle of inherent reasonableness, which thus far ... limited to a few surgical conditions. Another 20–30 big-ticket ... that appear to be out of line could be revised downward or

Dr. Martin Allgöwer from Basel talked about the Swiss system and the apparent success of physician-sickness fund negotiations. This type of negotiation, with the government playing a catalyst role, might have relevance to the U.S. system in the private sector. However, Medicare will probably demand a closer involvement in the process than exists in Switzerland, since the government is paying the bill directly.

Dr. Drucker asked a key question about what happens in emergencies under the Caterpillar system. Usually Caterpillar pays charges in emergencies, but also has a strategy involving clearance for appropriateness of treatment in emergencies, when there is time. If gross overcharges are billed, even for emergency situations, and local surgeons support that the charges are unreasonable, then payment of those charges can be challenged.

Dr. Roe discussed his analysis of fees, and raised the question about possible antitrust issues if physicians are in the position of commenting on the appropriateness of their fees. Industry does not want to see private medicine nationalized, but could turn on us if we do not cooperate in developing a rational method of physician reimbursement. The key to not raising antitrust issues is for surgeons to act as individual consultants to payers who determine those fees, such as large industry.

Dr. Jude asked about how to get our internin colleagues involved in the process of fee negotiations. We found in our complexity/severity work with the Massachusetts Chapter of the American College of Surgeons that we could relatively easily get consensus on the "relative value" or "complexity/severity" of surgical services among that group. We then talked to internists and achieved some preliminary agreements; for example, an "intermediate acute myocardial infarction," from the time a patient comes into the emergency room, is taken into the critical care unit, and discharged, appeared to be similar in complexity/severity to an uncomplicated cholecystectomy, from initial diagnosis through discharge from the hospital after surgery. Reimbursement for some general medical conditions can be converted into a global fee, but for many medical conditions it is a more difficult process than for surgical cases.

Finally, Dr. Rhoads talked about malpractice problems associated with surgery. I return to the principal goal of Caterpillar and its fee process, which is access for their employees and their families to a significant number of high-quality local surgeons. Overall, malpractice problems will probably get worse before they get better. A solution will flow from severe access problems in different parts of the country, and a realization by both legislators and the public that the ordinary rigors of surgical practice are being compounded manyfold by additional financial and psychological pressures from the omnipresent danger of malpractice suits. We suggest that the Caterpillar process of negotiating access-oriented maximal fees with local surgical groups represents a reasonable compromise between paying charges, on the one hand, and accepting a formulaic-driven fee schedule not negotiated with some local physicians with access as a goal, on the other hand.

Increases in malpractice premiums will result in increased surgical fees, or the public will not have available the surgeons that they want in the variety of practice sites and numbers of specialties that are desired. We have only a modest amount of time before HCFA and the Congress will take some kind of action on fees, as they have on hospital reimbursement under Medicare. Industry can be our strongest ally in achieving a workable system of access-oriented negotiated fees.

000014

MCK 035627
04-CV-1258-SLR (D.Del.)

Confidential Information
Subject to D. Del. LR 26.2

EXHIBIT M

### Development of CodeReview(TM)'s Medical Knowledge Base

CodeReview initially evolved from Dr. Robert Hertenstein's work at Caterpillar. During his seven years of reviewing Caterpillar claims, Dr. Hertenstein recognized that many physicians were submitting claims with inappropriate coding. He used this opportunity to discuss these patterns with other physicians, many of whom are recognized as leading experts in their fields. Dr. Hertenstein compiled this information and was implementing it manually on behalf of Caterpillar.

In 1987, through his association with Boston University's Health Policy Institute, an opportunity to automate Dr. Hertenstein's system was identified. The automation of Dr. Hertenstein's work lead to the development of CodeReview. It was recognized immediately that in order for the product to have credibility and to gain national acceptance by physicians and health care payors, the physician input to the product would have to be widely expanded and incorporate national practice patterns. This lead to the development of physician panels in each the surgical sub-specialties. The purpose of these panels is to review the rule base in their specialty and to determine the consensus for implementation. For those rules where a clear-cut consensus can not be reached, an optional rule is created. This allows the customer to determine how their organization will address the specific issue. Finally, prior to marketing CodeReview, the product was demonstated to groups of physicians to gain their feedback. CodeReview is the only product of its kind to be reviewed by the American College of Surgeons. Although these demonstrations did not allow for the detailed feedback of the consensus panels, they did result in resounding approval of CodeReview's Medical Knowledge Base.

In order to maintain its clinical credibility and physician accept-ance, CodeReview must have on-going physician input. This is accomp-lished in three ways. The first is through our client base. The CodeReview Decision History File offers a wealth of information, not only on CodeReview's performance, but also on new coding patterns that are being devised. This leads to the creation of new rules, which are developed according to the steps outlined in the paragraph above. Secondly, Medical Directors with each of our clients are also a valuable source of information for product enhancements. Many client requests lead to the generation of new CodeReview rules. Thirdly, the annual publication of the AMA's CPT Manual results in modifications to CodeReview's Knowledge Base. Each year's first quarterly release of CodeReview contains new rules to conform with the AMA's most recent standards.

HPR is committed to maintaining our standard of physician involve-ment in CodeReview. We recognize that the integrity of our product lies within the richness of our physician contribution, and that a pro-duct without this validation risks repudiation by physician leadership. HPR believes there is no similar product on the market that can approach the breadth and depth of physician input that exists in CodeReview.

H000748

MCK 050516

04-CV-1258-SLR (D.Del.)

EXHIBIT N

REDACTED

EXHIBIT O

**Advanced MedLogic Systems**™

Product Overview

May 1987

The Health Data Institute™
20 Maguire Road
Lexington, MA  02173
(617) 863-2000

000086

MCK 047608

Confidential Information Subject to D. Del. LR 26.2

Advanced MedLogic Systems (AMS)

Introduction

The Advanced MedLogic System™ (AMS) is a computer-based medical utilization management tool developed by The Health Data Institute™ (HDI) for use with claims administration and payment systems. AMS can be used either prospectively or retrospectively to evaluate the validity of health insurance claims and determine the medical necessity of services. The system's edits also validate Diagnosis Related Group (DRG) assignments and examine the quality of care provided in a prospective payment system.

Used prospectively by insurers, third party administrators, self-insureds and other claims payers, AMS can save dollars by approving only valid claims for medically necessary services. By applying comprehensive, automated logic to medical and hospital claims, the system identifies medically unnecessary services so that payments can be denied outright or negotiated with providers. AMS can also provide additional savings by delaying the payment of inaccurate claims pending the outcome of the review process. Applied retrospectively, AMS can identify problems and target areas for corrective action.

000087

- 1 -

Confidential Information Subject to D. Del. LR 26.2
04-CV-1258-SLR (D.Del.)

Overview

AMS evaluates physician and hospital services from claims or discharge
abstracts.  The medical logic system organizes and evaluates this data at four
levels:

1.  Individual claim.

2.  Basic episode, such as an episode of hospitalization or ongoing outpatient
    therapy over a defined time period.

3.  Extended episode, a longer time frame such as before and after a
    hospitalization.

4.  Disease episode, a history of illness such as chronic heart disease over a
    one year time span.

AMS edits are logical sequences which examine submitted claims in part, in
whole or in aggregate.  This process evaluates data for validity, internal
consistency (such as comparing gender with diagnosis) and medical necessity.
AMS embodies a true "expert system" -- the knowledge of medical experts which
is synthesized into a programmable form.

Since medical services generally entail multiple claims submissions, the edit
levels incorporate a method for cross-checking all provider claims.  Working
from the Uniform Billing claims form (UB-82) or the Health Care Finance
Administration claim form (HCFA 1500) data, AMS edits check for valid values,
internal consistency, and appropriateness of services and charges.  AMS can
use other data sources to perform these verifications as well such as
discharge abstracts.

000088

- 2 -

MCK 047610

Confidential Information Subject to D. Del. LR 26.2

Description of Evaluation Levels

   o  Individual Claim

The individual claim level is a single billing submission for a delivered service to a covered policyholder or dependent.. AMS will edit claims submitted by hospitals, outpatient facilities, practitioners and other suppliers such as social workers and physical therapists.

Within the claim level function, edits exist for both data accuracy and medical necessity.  Each claim is evaluated independently based on the information provided.  For example, a claim level edit for age/diagnosis which identifies a 65-year-old woman with a diagnosis of Normal Delivery should result in an investigation for possible coding errors.  Similarly, edits at the claim level verify procedure sequence.  For example, a breast biopsy should always be done prior to a mastectomy.

   o  Basic Episode

The basic episode level defines a group of services or events to be considered as a single entity and edited together.  A basic episode is the principal form of information cross-checking in AMS.  To create an episode, AMS merges temporally linked claims for the same individual.  All claims for a specific individual's episode of care are accumulated to construct a basic episode. Each claim must pass AMS claim level edits to be eligible for inclusion in a basic episode.  AMS contains three types of basic episodes:  hospital confinement, outpatient facility, and practitioner.

000089

- 3 -

MCK 047611

Confidential Information Subject to D. Del. LR 26.2

For example, a basic episode level edit compares the diagnosis submitted by the hospital to the diagnosis submitted by the practitioner for the same patient during one hospitalization. If the hospital diagnoses are pneumonia and diabetes and a practitioner's diagnosis is stroke, the episode is flagged for further review to determine which diagnoses were correct.

o <u>Extended Episode</u>

Like a basic episode, the extended episode level defines a group of services or events that are considered a single entity for editing purposes. But, an extended episode also integrates all out-of-hospital experience which occurs prior to or following the hospitalization. Each claim that has passed all pertinent AMS claim level edits is eligible for inclusion in an extended episode.

Extended episodes cover hospital confinement, outpatient facility, and practitioner claims or services. These episodes can also include "lone" tests (i.e., procedures or tests that are not associated with a hospitalization or an outpatient visit).

An extended episode level edit, for instance, is constructed to validate the accuracy of pre- and postadmission ancillary charges. AMS incorporates claims data for any outpatient services supplied 21 days prior to a hospital admission or seven days after discharge. In this way, any preadmission testing or follow-up services will be included in the review.

000090

- 4 -

MCK 047612

o <u>Disease Episode</u>

The disease episode level groups claims that represent a summary of an individual's health problems over a specified time period. Disease episode edits examine submitted claims as they relate to a specific patient's health care history over the previous year and a lifetime.

Central to the notion of a disease episode is the concept of a register, a file for each individual containing such pertinent information as hospitalization, procedures undergone, and diagnoses. This account of health problems forms the basis for two types of registers: disease and procedure.

If an adjuster, for example, records a claim for a diagnosis of chronic ischemic heart disease, AMS would examine both the disease and procedure registers to validate the claim. Because "chronic" implies a long-standing illness, the patient should have a previous entry of heart disease on the disease register. If no previous entry exists, AMS would flag this episode for medical review.

Also, the procedure register tracks performance of procedures over time. For example, it is not expected that a patient would have more than three cardiac catheterizations within one year. A claim for a fourth catheterization within the same year would be flagged for further review.

000091

- 5 -

Confidential Information Subject to D. Del. LR 26.2

MCK 047613

04-CV-1258-SLR (D.Del.)

DRG Edits

As prospective payment systems based on Diagnosis Related Groups (DRGs) become more prevalent, payers will need some standardized method to edit DRG claims to ensure validity. In many ways the DRG reimbursement system encourages providers to place patients in higher DRGs through manipulation of information. Within AMS and interspersed among the claim, basic, and disease levels are several edits designed specifically to address DRGs and their inherent potential problems.

AMS edits claim information for overt errors, misrepresented DRGs, subtle alterations in diagnoses, and patterns of readmission. AMS also checks the validity of assigned DRGs using any complications or comorbid conditions that are present. For example, if a claimant's DRG assignment is pneumonia with complications or comorbidity, the claimant's disease register should contain such a history, e.g., hypertension, heart disease, or diabetes mellitus. Under new methods of reimbursement the importance of validating coding practices is vital.

000092

- 6 -

MCK 047614

Confidential Information Subject to D. Del. LR 26.2                    04-CV-1258-SLR (D.Del.)

USER OPTIONS

The Advanced MedLogic System provides users with maximum flexibility when applying AMS to claims data. Users can select tolerance levels for editing ancillary charges. Full AMS capability can be applied to a claims system simultaneously, or AMS can be phased in. For example, data quality edits can be used initially, while medical necessity edits can be activated at a later time.

For greater flexibility, users can set the AMS ancillary tables at an aggressive, moderate, or conservative level. The level selected would depend upon the current level of community acceptance of cost containment measures, and the minimum amount at which a user feels that questioning a claim is cost effective.

An aggressive level edit for a given ancillary category such as physical therapy could be set at $50, but this would identify a large number of cases for review. A large percentage of these could turn out to be justified and, therefore, may not result in significant savings. At a moderate edit level of $100, fewer cases would be identified for review. A percentage of these may be justified, but because the unjustified cases represent higher costs, they may accrue bigger dollar savings. At a conservative level of $500, it would be extremely rare for flagged charges to be justified, and investigated cases would almost always result in cost savings. However, setting such a high dollar level would then result in unjustified charges at lower rates going undetected, i.e., those below $500.

000093

- 7 -

MCK 047615

Confidential Information Subject to D. Del. LR 26.2

## MEDICAL REVIEW

When a claim or an episode fails an AMS edit it should be reviewed so that
1) misinformation can be corrected, 2) medical necessity can be validated,
3) conflicts can be resolved, and 4) quality of-care can be evaluated.  In the
case of claim level medical necessity edits a chart review must take place to
comply with the rule, mentioned earlier, that makes passing of all claim level
edits mandatory prior to entry into the basic episode level.

Chart review can be performed either on- or off-site.  On-site reviews may
take place at a 1) hospital, 2) medical office, or 3) outpatient facility.
Off-site reviews are performed utilizing chart copies.  These can be audited
by the HDI Medical Review team of nurses or HDI would be happy to train
client-designated personnel.

The process detailed above represents the foundation upon which AMS is based.
Corrective Action Plans are then mutually developed and implemented based on
the results of the chart audit.

000094

- 8 -

MCK 047616

REPORTING

AMS is capable of providing reports at various levels.  The four report types most commonly used by clients are:

1) A statistical overview of claims passing and failing all edits.

Example 1

| | |
|---|---:|
| Total Number of Claims | 12,938 |
| Number of Claims Failing At Least One Edit | 1,109 |
| Percent of Claims Failing At Least One Edit | 8.6% |

2) An analysis of claim passes/failures by edit level - individual claim, basic episode, extended episode and disease episode.

Example 2

Total Number of Claims        12,938

| | Number of Claims | Percentage of Failure |
|---|---:|---:|
| Claims Failing At Least One Edit, Claim Level | 340 | 2.6% |
| Claims Failing At Least One Edit, Basic Episode | 306 | 2.4 |
| Claims Failing At Least One Edit, Extended Episode | 249 | 1.9 |
| Claims Failing At Least One Edit, Disease Episode | 214 | 1.7 |

3) A compilation of claim results by provider and facility.  This technique can prove useful for PPO selection or problem provider identification.

Example 3

Number of Claim Submissions and Failures, Any Level, By Hospital

| Hospital | Claim Submissions | Claim Failures | Percentage of Failure |
|---|---:|---:|---:|
| A | 1,133 | 244 | 21.5% |
| B | 3,440 | 231 | 6.7 |
| C | 2,578 | 254 | 9.8 |
| D | 902 | 143 | 15.8 |
| E | 4,885 | 237 | 4.8 |
| Total Number of Claims | 12,938 | | |

000095

- 9 -

MCK 047617

Confidential Information Subject to D. Del. LR 26.2                    04-CV-1258-SLR (D.Del.)

Example 3 (con't)

Number of Claim Submissions and Claim Failures, Any Level, By Physician

| Physician | Claim Submissions | Claim Failures | Percentage of Failure |
|---|---|---|---|
| A | 67 | 11 | 16.4% |
| B | 32 | 7 | 21.8 |
| C | 103 | 14 | 13.6 |
| D | 82 | 5 | 6.1 |
| Total Number of Physician Claims | 284 | | |

4) A detailed breakdown of claims for each edit at all levels.

Example 4

| Data Accuracy Edits | FAILURES Number | FAILURES Percent | PASSES Number | PASSES Percent |
|---|---|---|---|---|
| HCFA 1500 | | | | |
| CL1B-Valid But Rare Diagnoses | 64 | 0.10% | 66,759 | 99.90% |
| CL5A-Diagnosis/Age | 134 | 1.36 | 9,751 | 98.64 |
| CL5B-Procedure/Age | 18 | 2.81 | 622 | 97.19 |
| CL5C-Diagnosis/Sex | 115 | 1.75 | 6,436 | 98.25 |
| CL5D-Procedure/Sex | 3 | 0.50 | 595 | 99.50 |
| CL6A-Type of Service-Procedure/ Diagnosis | 40 | 0.06 | 61,336 | 99.94 |
| CL6B-Place of Service-Procedure/ Diagnosis | 64 | 0.10 | 65,239 | 99.90 |
| CL30A-Outmoded or Obsolete Procedure/Tests | 45 | 0.07 | 66,778 | 99.93 |
| TOTAL | 483 | | 277,516 | |

Medical Necessity Edit

| CL4A-Procedure/Diagnoses | | | | |
|---|---|---|---|---|
| -Acceptable Match | 410 | 14.3% | 2,463 | 85.7% |

Custom analyses are available to best suit a client's needs. Customized reports can include charges summarized by previous quarters, cost saving potential calculated from claims flagged, and recommendations on improving accuracy of claim submissions. While a client in the initial phases of AMS

000096

- 10 -

MCK 047618

Confidential Information Subject to D. Del. LR 26.2

04-CV-1258-SLR (D.Del.)

implementation may need only percentages of claims failed overall as an
initial gauge of data quality, pinpointing potential problem providers may be
helpful in later stages of application.  Virtually any combination of
statistics can be calculated for every edit individually or within its level.

000097

- 11 -

MCK 047619