EXHIBIT Q

| | |
|---|---|
| 1      UNITED STATES DISTRICT COURT | 1        P R O C E E D I N G S |

1      UNITED STATES DISTRICT COURT
2      FOR THE DISTRICT OF DELAWARE
3
4
5  ------------------------------x
6  MC KESSON INFORMATION SYSTEMS, :
7     Plaintiff,   :  Case No.
8     vs.       :  04-1258 SLR
9  THE TRIZETTO GROUP,   :
10     Defendant.   :
11  ------------------------------x
12
13
14  VIDEOTAPED DEPOSITION OF GEORGE A. GOLDBERG
15
16
17      Washington, D.C.
18      Tuesday, September 13, 2005
19
20
21
22
23
24  REPORTED BY:
25    CARMEN SMITH

Page 1

1        P R O C E E D I N G S
2     VIDEO OPERATOR: This is the deposition of
3  Mr. George A. Goldberg, taken on behalf of Defendant
4  in the matter of McKesson Information Systems LLC,
5  Plaintiff, versus Trizetto Group, Inc., Defendant,
6  Case Number 04-1258 SLR, for the U.S. District
7  Court, District of Delaware.
8     This deposition is being taken at the
9  offices of Gibson Dunn, 1050 Connecticut Avenue,
10  Washington, D.C. The time is approximately 9:03
11  a.m. The date is September 13, 2005.
12     The court reporter is Carmen Smith, on
13  behalf of Barkley Court Reporters, 2040 Main Street,
14  Suite 250, Irvine, California. I am the video
15  operator, Larry Flowers, also on behalf of Barkley.
16     The reporter may now swear the witness.
17  Whereupon,
18      GEORGE A. GOLDBERG
19  was called as a witness and, having first been duly
20  affirmed, was examined and testified as follows:
21     VIDEO OPERATOR: Will counsel identify
22  themselves and who they represent.
23     MR. SEGAL: David Segal of Gibson, Dunn &
24  Crutcher on behalf of the Trizetto Group, Inc.
25     MR. SHEK: Bernard Shek for Plaintiff,

Page 3

1    Deposition of GEORGE A. GOLDBERG, called for
2  examination pursuant to notice of deposition, on
3  Tuesday, September 13, 2005, in Washington, D.C. at
4  the offices of Gibson Dunn & Crutcher, 1050
5  Connecticut Avenue Northwest, at 9:03 a.m. before
6  CARMEN SMITH, a Notary Public within and for the
7  District of Columbia, when were present on behalf of
8  the respective parties:
9
10    BERNARD SHEK, ESQ.
11    Skadden, Arps, Slate, Meagher & Flom LLP
12    525 University Avenue, Suite 1100
13    Palo Alto, California 94301
14    650-470-4500
15    On behalf of Plaintiff and Witness
16
17    DAVID A. SEGAL, ESQ.
18    Gibson, Dunn & Crutcher LLP
19    4 Park Plaza, Suite 1400
20    Irvine, California 92614-8557
21    949-451-3973
22    On behalf of Defendant
23
24  Also present:
25    LARRY FLOWERS, Video Operator

Page 2

1  also representing the witness, Dr. Goldberg, at this
2  deposition.
3        EXAMINATION
4     BY MR. SEGAL:
5   Q  Good morning.
6   **A  Good morning.**
7   Q  Can you please state your full name for
8  the record?
9   **A  George Ansbach Goldberg.**
10   Q  Can you spell the middle name for the
11  court reporter?
12   **A  A-n-s-b-a-c-h.**
13   Q  Have you ever had your deposition taken
14  before, Dr. Goldberg?
15   **A  Which deposition?**
16   Q  Any time, have you ever been deposed in a
17  deposition before?
18   **A  Yes.**
19   Q  How many times?
20   **A  I believe once.**
21   Q  And have you ever testified in court
22  before?
23   **A  No.**
24   Q  Now, you've had your deposition taken
25  before, and we'll go back and visit about that

Page 4

1    A    Computers became so much more powerful is
2  the other piece. You can't conceive of how basic
3  they were in the old days. Nobody in this room,
4  given their age, can remember that as well as I can
5  fuzzily remember that.
6        MR. SEGAL: We've been going a little over
7  an hour, so we will take a short break.
8        THE WITNESS: I'd appreciate that.
9        MR. SEGAL: Thank you.
10       VIDEO OPERATOR: We're off the record.
11  The time is approximately 10:12 a.m.
12       (Recess.)
13       VIDEO OPERATOR: We are back on the
14  record. The time is approximately 10:26 a.m.
15       BY MR. SEGAL:
16    Q    You understand you're still under oath?
17    A    Yes, I do.
18    Q    In connection with your work on the Health
19  Insurance Experiment, did you have the opportunity
20  to learn what other insurance companies or claims
21  processors -- let me rephrase the question.
22       In connection with your work at The RAND
23  Corporation, did you have the opportunity to learn
24  what health insurance companies -- or how health
25  insurance companies were processing claims?

Page 49

1        MR. SHEK: Objection; vague and ambiguous.
2        THE WITNESS: Did you say -- would you
3  repeat the question, please, the rephrased question?
4        BY MR. SEGAL:
5    Q    In connection with your work at The RAND
6  Corporation, did you have the opportunity to learn
7  how health insurance companies were processing
8  claims?
9    A    No, other than Glenn Slaughter &
10  Associates, which is not -- which was not -- which
11  although it was doing that function, is actually a
12  pension plan -- was a pension plan company, not a
13  health insurance company.
14    Q    If I refer to "payors," p-a-y-o-r-s, to
15  refer to individuals that take -- or companies that
16  take care of claims processing, is that a term that
17  you are comfortable with?
18    A    Yes.
19    Q    In connection with your work at The RAND
20  Corporation, did you have an opportunity to learn
21  what payors other than Glenn Slaughter were doing in
22  connection with claims processing?
23    A    No.
24    Q    And I believe your CV indicates that in
25  about 1985, you left The RAND Corporation; is that

Page 50

1  correct?
2    A    That is what my CV shows, and it's
3  correct.
4    Q    Why did you leave The RAND Corporation?
5    A    The Health Insurance Experiment had ended.
6    Q    Any other reasons?
7    A    It was time to move -- I thought it was
8  time to move back to the East Coast to be near my
9  aging parents.
10    Q    And you -- from your CV, it looks like you
11  joined a company Health Data Institute in Lexington,
12  Massachusetts; is that correct?
13    A    That is correct.
14    Q    And it references developmental work on an
15  Advanced MedLogic, M-e-d, cap L-o-g-i-c, System?
16    A    Yes, it does.
17    Q    Which indicates that it does cost/quality
18  procedure code based claims review.
19    A    That's what it says.
20    Q    Can you provide a more detailed
21  explanation what the Advanced MedLogic System was?
22    A    The Advanced MedLogic System was a series
23  of computerized tables, lookup tables, that
24  received, processed and paid claims. In other
25  words, it was post-payment claims databases, and

Page 51

1  reviewed them to perform single-code edits of
2  various kinds. Post-process, post-payment.
3    Q    There's also a notation on your CV about a
4  prospective payment system?
5    A    The prospective payment system is the
6  government's DRG system.
7    Q    And does that -- did that system deal with
8  claims processing prior to payment?
9    A    The DR -- the answer is yes and no.
10    Q    Can you explain?
11    A    The DRG system, which is performed --
12  which applies to hospital claims only, or certainly
13  did in those days, the DRG system, diagnosis related
14  groups. Groups diagnoses with some on hospital
15  discharge claims, with attention as well to ICD9
16  procedure-coded procedures on hospital claims, and
17  assigns every hospital discharged claim to one and
18  only one DRG, a number that at that time went
19  somewhere between 001 and 4XX. There were
20  400-some-odd DRGs.
21        And it functions for payment purposes
22  because at some point, Medicare and Medicaid and the
23  occasional private insurer paid for a hospital stay
24  on the basis of the DRG to which a hospital
25  discharge claim was assigned.

Page 52

13 (Pages 49 to 52)

GEORGE A. GOLDBERG

1    A   HPR?  No, but I believe there was talk
2  about it.  But I don't recall if they ever did.
3    Q   Were you involved -- are you familiar with
4  Bloodhound, a company named as Bloodhound?
5    A   Bloodhound, yes.
6    Q   What is your knowledge of what Bloodhound
7  is?
8    A   I was contacted a few years ago in the
9  1990s in the second -- I assume in the second half
10 of the 1990s, but I don't recall the exact date, by
11 a company called "Bloodhound."  Oh, wait a minute.
12 No, I think originally I was contact -- originally,
13 they were a client of either Value -- I think
14 ProtoCare Sciences, the successor company to Value
15 Health Sciences.  You're testing my memory in ways
16 I'm not sure about.
17     Bloodhound was a client of one of the
18 companies I worked for.  I met them at the time.
19 Later on they approached me privately, and for a
20 while, I was a consultant to them, probably short
21 enough and embarrassing enough that I never put it
22 on my resume.
23    Q   What was the nature of your consulting
24 services with Bloodhound?
25    A   They were using a rebundling system, and

1  they came to it might have been MEDecision, Inc.,
2  MEDecision, Inc., which I have never been an
3  employee of but I've been a -- my company has sold
4  -- that's it.  My company has sold my time to
5  MEDecision, Inc.  It's M-E-D is capital, and then
6  the rest of the word, decision.  So there's only one
7  D in MEDecision, Inc.
8      Whether it was Constella -- I don't mean
9  Constella.  What was the name of the next company?
10 ProtoCare.  If I said Constella before, that was not
11 relevant.  It was either ProtoCare Sciences or
12 MEDecision that had Bloodhound as a client, and I
13 met them through that.  I met them through that --
14 the company I was working for.
15    Q   And did you ever discuss the '164 patent
16 with Bloodhound?
17    A   What is the '164 patent?
18    Q   It's the patent on which you are named as
19 an inventor.
20    A   I don't recall if I did or not.
21    Q   Did you ever provide any private
22 consulting to HBOC or HBO and company?
23    A   Not that I recall.  HBOC, not that I
24 recall.
25    Q   Did you ever provide any private

1  consulting to GMIS?
2    A   Not that I recall.  I think the answer is
3  no, but that was enough years ago that I'm saying
4  "not that I recall" instead of "no."
5      MR. SEGAL:  Probably a good time to break
6  for lunch.
7      VIDEO OPERATOR:  We're off the record.
8  The time is approximately 11:58 a.m.
9      (Whereupon, at 11:58 a.m., the deposition
10 was recessed, to be reconvened at 12:45 p.m. this
11 same day.)

1      AFTERNOON SESSION     (12:46 p.m.)
2  Whereupon,
3      GEORGE A. GOLDBERG
4  resumed the stand and, having been previously duly
5  affirmed, was examined and testified further as
6  follows:
7      VIDEO OPERATOR:  We are back on the
8  record.  The time is approximately 12:46 p.m.
9  BY MR. SEGAL:
10   Q   Good afternoon.
11   A   Good afternoon.
12   Q   Are you familiar with the Pew Fellows
13 Conference, P-e-w?
14   A   When I was at the Health Policy Institute,
15 there was something called the Pews Fellow or
16 Fellows Conference, yes.
17   Q   Can you tell us what it was?
18   A   My understanding is that it was a
19 coming-together of various corporate employees whom
20 Richard Egdahl, head of the Health Policy Institute,
21 could attract because of his connections.  And they
22 came together, I don't recall the periodicity, to --
23 came together just to talk amongst themselves for a
24 few days and to educate themselves as to what the
25 other corporations were doing all in the area, I

1 believe, of benefits, corporate benefits. Maybe
2 only in health, but I don't even recall that it was
3 limited to health.
4    Q   Did you ever attend any of the Pew Fellows
5 Conferences?
6    A   Yes.
7    Q   Do you recall which ones?
8    A   No. The reason I know I did and the
9 reason I'm so sure I did is I remember at one I was
10 having bad back trouble and had to spend most of the
11 time getting up -- standing at the back of the room
12 instead of sitting. And that's why I'm -- and it
13 was a Pew conference, so that's why I'm sure I was
14 at one. And I think I was at more than one, but I
15 don't recall them.
16    Q   Do you recall any of the locations for any
17 of the conferences you went to of the Pew Fellows?
18    A   I think every one I went to was in the
19 Boston area. I believe the one where I had -- there
20 was one meeting that we had at a fancy hotel facing
21 the Boston Public Gardens or Boston Commons, one of
22 the two, though I'm not sure that was a Pew Fellows
23 meeting, but that was an HPI-sponsored meeting at
24 that hotel. And I believe there was another hotel
25 where we also met.

Page 109

1       So I think it was typically at hotels in
2 the Boston area.
3    Q   At any of the conferences that you
4 attended, do you recall anyone from HPI or HPR
5 giving any presentations?
6    A   I don't recall it. I'm sure they did, but
7 I would not be able to point to it.
8    Q   And what period of time, to the best of
9 your recollections, were the Pew Fellows Conferences
10 taking place?
11    A   I think they were underway from the time I
12 came to HPI, throughout my time there. So
13 roughly '86 to '90. That's -- sorry -- yeah, '86
14 through '89. But I don't remember any precise
15 dates. They happened.
16       MR. SEGAL: I'm going to ask the court
17 reporter to mark as Exhibit 2 to your deposition a
18 multipage document, Bates numbered GG 0006 through
19 17.
20       (Deposition Exhibit 2 identified.)
21       THE WITNESS: Here are my publications,
22 thank you.
23       BY MR. SEGAL:
24    Q   I'll ask you if you recognize that
25 document.

Page 110

1       (Witness reviewed the document.)
2    A   Yes, I recognize this document.
3    Q   Can you tell us what it is?
4    A   This is what I would -- this is either --
5 yes, this is in my view part of my resume, even when
6 it's presented separately or -- that's what it is,
7 uh-huh.
8    Q   And to the best of your knowledge, was
9 this document which we've marked as Exhibit 2
10 complete up and to including January 2005?
11    A   I would have tried to make it complete
12 through that time. I'm looking, of course, at the
13 end, which actually -- the first few pages are
14 called "selected publications," so there's clearly
15 no -- just the opposite of intending to have it be
16 complete.
17       The next one in the old-fashioned type
18 that comes from an old text file program I still use
19 was attempting to be complete up to, it appears to
20 be, '05. It's an attempt to be complete.
21    Q   Did you ever give any presentations at any
22 Pew conferences?
23    A   I would think I did, but I took the
24 opportunity to look here, as I was paging through,
25 making sure this was all mine, I took particular --

Page 111

1 made a particular look at this page 6 of the old
2 type, 6 on top. And when I see the time period, I
3 don't see -- I don't see anything that
4 particularly -- that specifically names a Pew
5 conference. That's a surprise to me.
6       The answer is I think I did give a
7 presentation, but I don't see it here.
8    Q   Do you recall what you gave a presentation
9 on to the Pew Fellows Conference?
10    A   No. I note that the presentations I gave
11 here in that time period all dealt with quality, as
12 you can see for yourself.
13    Q   In doing your work on --
14    A   There is one on utilization.
15    Q   -- quality and utilization during the
16 mid-1980s, did you review electronic claims data?
17       MR. SHEK: Objection; vague as to form.
18 Objection as to form; vague and ambiguous.
19       THE WITNESS: I'm not sure what you mean
20 by "review," so please help me. Did you review
21 claims data -- electronic -- would you please --
22       BY MR. SEGAL:
23    Q   Why don't you tell me what you mean by
24 "review" and we'll try and use your word, so that we
25 have no confusion and I don't try and impose a

Page 112

GEORGE A. GOLDBERG

1  suddenly, so many of these observations which
2  heretofore had looked contradictory suddenly fit
3  into the system.
4      And we needed to understand what pieces a
5  system and method would require, and we had to find
6  those underlying principles that would suddenly have
7  everything click into place.
8      Q   Prior to --
9      A   I think that's more than what you
10  described.
11      Q   Prior to October 1993, did you ever
12  disclose to any party the detailed operation and
13  description of rules that were in CodeReview?
14      A   I don't know if I -- I think on every
15  sales -- at every sales meeting, those rather few
16  sales meetings that I was involved in, I personally
17  disclosed these things, which once they had been
18  elucidated seemed very obvious, the way gravity and
19  planetary motion seem obvious to us.
20      Q   And what were the principles that you
21  recall elucidating at every sales meeting?
22      A   The ones I can recall at this moment,
23  which are only a subset, I would imagine, were --
24  was that rebundling of codes which when seen
25  together were -- reflected incorrect coding could

Page 161

1      Q   To any third party, anyone outside HPR.
2      A   A third party.  Aside from the fact that
3  it was in the late 1980s, I don't recall.
4      Q   Do you recall to whom you disclosed the
5  specifics of the small number of rules to which the
6  rebundling statements could be boiled down to?
7      A   To a third party?  To a third party?
8      Q   To a third party.
9      A   I don't remember.  My guess is first to
10  Caterpillar, Inc., as separate from Robert
11  Hertenstein, an employee of Caterpillar, Inc., and
12  probably to potential customers, to I think the
13  modern word is "qualified" customers, customers who
14  have been qualified.  Yeah.  Potential customers who
15  have been qualified as being serious customers.
16      Q   Prior to the issuance of the '164 patent,
17  did you hear of any other companies that did not
18  have access to your small number -- specific small
19  number of rules that had developed computer software
20  that would address the problem of code rebundling?
21      A   Yes.
22      Q   Can you tell me who?
23      A   I remember that there were two others.
24  That's how many I knew of.  And one of them I don't
25  recall the name of the company, but I know it was

Page 163

1  be -- rebundling could be achieved by an automated
2  system that would rebundle reliably and
3  reproducibly.  It would provide output that made
4  sense to payors and providers.
5      It could achieve this because there were
6  not 147 or 9000 different recoding -- excuse me,
7  that was incorrect, rebundling statements, but in
8  fact, that things boiled down to a very small
9  number, which meant that a computer application --
10  and I'm not even sure the word "application" existed
11  in those days, that a computer application could be
12  developed, and not only that, we had developed it.
13      Q   Did you ever disclose the small number of
14  rules that the rebundling statements could be boiled
15  down to prior to the issuance of the '164 patent?
16      A   When was the patent issued?
17      Q   October 12, 1993.
18      A   Then I would say the answer is yes.
19      Q   Okay.  When do you first recall revealing
20  the specifics of the small number of rules to which
21  the rebundling statements could be boiled down to?
22      A   Re --
23      Q   I'm trying to use your words so --
24      A   I understand.  I appreciate that.
25  Revealed to whom?

Page 162

1  headed by Dr. Leslie Levy, and I believe that was
2  headquartered in the Hartford -- somewhere in the
3  Hartford, Connecticut area.  And the other I guess
4  was GMIS.  I don't know the exact name, but there
5  was another company, and I believe -- my best
6  recollection would be that it was GMIS.
7      So the barriers of entry I mentioned
8  seemed to be fairly high, if there were three and
9  only three companies working on this, of which we
10  were one.
11      Q   And so the barriers to entry were, one,
12  the amount of effort to come up with the specific
13  rules for the rules database; is that correct?
14      A   I call that number seven, but okay, it's
15  one of the elements.
16      Q   Well, you gave me two elements.  So if you
17  have seven elements, I would like to know what they
18  are.
19      A   I -- yes.
20      Q   What are the barriers that you viewed to
21  entry?
22      A   I thought I gave you three -- I thought I
23  mentioned three barriers.  Number one was the state
24  of computers at the time.
25      Q   Okay.

Page 164

41 (Pages 161 to 164)

GEORGE A. GOLDBERG

1   Peoria that I remember making.
2      Q   And the second paragraph refers to a
3   presentation on Health Bills that Mr. Moore was
4   scheduled to make on Friday morning?
5      A   Uh-huh.
6      Q   Do you recall attending a Pew conference
7   in early June 1986 at which Mr. Moore made a
8   presentation on managing physician fees?
9      A   I don't recall attending the Pew
10  conference you mention.
11     Q   Do you have any reason to believe that
12  Mr. Moore did not use his outline in giving a
13  presentation at the Pew conference in early June
14  1986?
15     A   I think it's highly likely that Charlie
16  gave a presentation at the Pew -- at the -- at a
17  subsequent Pew conference mentioned in his letter,
18  though I have no idea of the date of that
19  conference. You have mentioned June twice, but I
20  don't know that.
21        But I really don't know if he used this
22  outline or not, and I have -- I really don't know if
23  he did or not.
24     Q   Do you recall attending a Pew conference
25  at which Mr. Moore discussed bundling and unbundling

Page 213

1   and implementing a model approach to physician fee
2   review that was implemented and tested by
3   Caterpillar?
4      A   I don't recall attending that.
5      Q   Do you recall which individuals were
6   general attendees at Pew conferences in the '86 time
7   frame?
8      A   I think I do.
9      Q   Can you tell me who that would be?
10     A   It would be all -- the goal would have
11  been to have all Health Policy Institute employees
12  other than support staff attending the Pew
13  conference, and then the Pew fellows as well.
14     Q   Do you recall who the Pew fellows were in
15  the mid-1986 time frame?
16     A   They were various corporate employees.
17  They were employees -- let me rephrase that, though
18  I'm not trying to change the meaning. I'm just
19  trying to clarify.
20        They were employees of various
21  corporations who were concerned with the health
22  and/or benefit program of that corporation, and they
23  attended the Pew conferences in their role as Pew
24  fellows, which I believe was a time-limited
25  designation. So there was regular turnover.

Page 214

1      Q   Do you recall a great roast beef dinner in
2   Peoria?
3      A   I do not, but it really fits, in that
4   Robert Hertenstein would have done that, would have
5   found us a great roast beef dinner in Peoria, before
6   and after his heart attack.
7      Q   Do you know -- does seeing Exhibit 74 --
8      A   Yes.
9      Q   -- help you determine whether or not
10  discussions regarding using software to check claims
11  for rebundling or unbundling -- let me rephrase the
12  question,
13        Does reviewing Exhibit 74 help you
14  determine whether or not HPI disclosed the concept
15  of using software to check claims for rebundling
16  codes appearing on claims was occurring in 1986?
17     A   I still don't understand the question.
18  The "was occurring" doesn't seem to fit, so please,
19  maybe I'm just not -- I'm not -- let me not look at
20  this and you'll repeat or rephrase, your option.
21     Q   I will do both.
22     A   Okay.
23     Q   Or a combination of both.
24     A   Okay.
25     Q   Does reviewing Exhibit 74 lead you to

Page 215

1   believe that in the 1986 time period, HPI was
2   disclosing to third parties the concept of using
3   software to deal with the issue of unbundling codes
4   or rather rebundling codes that appeared on medical
5   claims?
6      A   No. Wait a minute. I see now I have
7   completed only -- I now see that the outline, I was
8   looking only at Roman I. So let me continue.
9      Q   And carefully review the document to see.
10     A   Thank you.
11        (Witness reviewed the document.)
12        In item 5 on what you would call page
13  638 --
14     Q   You're getting good at this.
15     A   I'm trying. You see a few examples and
16  then you can do it. I see at the end of number 5
17  the words "and build into software." And on number
18  6 I see "enter into computer."
19        So I don't remember what was disclosed at
20  this meeting or at any other Pew meeting, unless
21  perhaps you can remind -- jog my -- refresh my
22  memory in some way. But it looks to me as if the
23  words "computer" and "software" are in this outline.
24  And of course, we have no idea -- once again,
25  "software" as people would have thought of it in

Page 216

54 (Pages 213 to 216)

GEORGE A. GOLDBERG

1  from Dr. Hert -- to Dr. Hertenstein from Mr. Moore,
2  and you are indicated as receiving a blind copy?
3  A  That's correct.
4  Q  Do you recall receiving this document?
5  A  I do not.
6  Q  Do you have any reason to believe that you
7  did not receive it?
8  A  I don't remember if I received it or not.
9  I have no reason to believe that I did not receive
10  it, though I can't -- I don't know if I received it
11  or not.
12      MR. SEGAL: I actually need to use the
13  restroom, so I apologize. Off the record, sorry.
14      VIDEO OPERATOR: We're off the record.
15  The time is approximately 4:36 p.m.
16      (Recess.)
17      VIDEO OPERATOR: Back on the record. The
18  time is approximately 4:42 p.m.
19      BY MR. SEGAL:
20  Q  Do you agree that a rules database of some
21  sort is required to practice the system and method
22  disclosed in the '164 patent?
23  A  Please repeat the question.
24      (The reporter read the record as
25  requested.)

Page 225

1      THE WITNESS: I agree that a rebundling
2  rules database is necessary for a system and method
3  to work on.
4      BY MR. SEGAL:
5  Q  And do you believe that a specific system,
6  the one that's disclosed and claimed in the '164
7  patent, for that system and method, you need to have
8  a rules database about -- that contains information
9  about rebundling rules for CPT codes?
10  A  I do believe that you have to have a
11  lookup table of -- not of rebundling rules but of
12  code combinations, which when encountered on claims
13  will require rebundling.
14  Q  Would it be fair to describe these -- this
15  lookup table of code combinations as a rules
16  database?
17  A  I'm willing to call it a rebundling
18  rules -- yeah, I think I've called it rebundling
19  rules database earlier today. I don't know if it's
20  fair or not, but I'm willing to call it that.
21  Q  I was -- I would have called it "knowledge
22  base," but I'm going to use your earlier
23  definition -- your earlier terminology so that the
24  record is clear and you have an understanding of
25  what we're talking about.

Page 226

1  A  Thank you. That expression, "knowledge
2  base," I discovered at some point that I was a
3  knowledge engineer. I had never heard of such a
4  phrase before. That was one of the things I was.
5  Q  Before the filing of the original
6  application for the '164 patent -- let me rephrase.
7      Before the filing of the patent
8  application for the -- start this again, it's
9  getting late for everyone, I think.
10      Before the filing of the application that
11  ultimately matured into the '164 patent, did you
12  learn that other companies were offering software to
13  automate bundling of codes?
14  A  Oh, yes.
15  Q  When do you first recall learning that
16  there were other companies that were offering
17  software products to deal with bundling of codes?
18  A  I now have to distinguish, I realize,
19  between offering and developing. As I mentioned
20  earlier today, I do understand that -- did
21  understand that there were two companies that were
22  developing software to handle -- to perform code
23  rebundling on claims that needed it.
24      But as for offering, I'm not sure. I
25  don't remember if either of those two or any other

Page 227

1  were offering them before we did, because I don't
2  remember the dates well enough.
3  Q  Did you ever determine whether or not
4  those companies were developing a product before you
5  started developing the CodeReview product?
6  A  I can answer this, but I need to remember
7  what you -- would you repeat the question, please?
8      (The reporter read the record as
9  requested.)
10      THE WITNESS: Not only did I not determine
11  that those companies were developing a product
12  before we developed our product, but also I am under
13  the impression, and was at the time and still am,
14  that there was essentially independent development
15  going on at these two companies and our company,
16  based on the tenor of the times and the emerge --
17  continually, gradually emerging improving power of
18  automation.
19      MR. SEGAL: I'd like to ask madam court
20  reporter to please mark as Exhibit 9 a multipage
21  document Bates numbered MCK 119819 through 922.
22      (Deposition Exhibit 9 identified.)
23      BY MR. SEGAL:
24  Q  I'll ask you to take a look at that
25  document.

Page 228

57 (Pages 225 to 228)

GEORGE A. GOLDBERG

1    A    A little easier to read, thank you.
2       (Witness reviewed the document.)
3       I've finished my general review of this
4    letter.
5    Q    This purports to be a letter sent by you
6    to Dr. Howard Bailit of Aetna Life Insurance
7    Company.
8    A    Yes.
9    Q    On January 12, 1988?
10    A    Okay.  Yes, it does purport.
11    Q    Do you recall it to be that -- do you
12    recognize the document?
13    A    I do not recognize the document.
14    Q    Do you have any reason to believe that
15    this is not a letter that you sent to Mr. Bailit on
16    January 12, 1988?
17    A    No, meaning I have no reason to believe
18    that it is not a letter I wrote and sent to
19    Dr. Bailit on approximately January 12, 1988.
20    Q    And in drafting a letter to Dr. Bailit,
21    would you have been careful to make sure what you
22    were representing or stating in the letter was
23    accurate?
24       MR. SHEK:  Objection as to form.
25       THE WITNESS:  I always attempt to be

Page 229

1    careful.  What I see here is George Goldberg in
2    sales mode, a situation I had essentially never
3    experienced before.  I didn't need it during
4    college, medical school, residency or my 11-year
5    tenure at The RAND Corporation, nor had I to my
6    recollection been involved in the one year I was in
7    the private sector at Health Data Institute, nor at
8    the start of my tenure at the Health Policy
9    Institute.  But I certainly would have tried to be
10    careful.  I always try.
11       BY MR. SEGAL:
12    Q    And you wouldn't have intentionally
13    misrepresented anything to Dr. Bailit?
14    A    I would not have intentionally
15    represented, but I might have engaged in emphasis of
16    certain factors, as opposed to others which at that
17    time was my understanding was one of the things that
18    was necessary for sales.
19    Q    Okay.  At the bottom of the first page,
20    you state, "'anybody' can go through the coding book
21    and identify a large number of decision rules."  Do
22    you see that?
23    A    I do see that.
24    Q    Is that a statement that you made to
25    Dr. Bailit on January 12, 1988?

Page 230

1    A    I'd say the odds are essentially 100
2    percent that I made that statement and want to point
3    out, I'm very happy to say that that word "anybody"
4    is in quotation marks.
5    Q    What did you mean by putting "anybody" in
6    quotation marks?
7    A    It's what I explained, I believe, earlier
8    today, and I'm happy to repeat that a large number
9    of people, given some orientation to the way this
10    AMA's CPT code book is organized, would be able to
11    understand certain codes that trump other codes.
12    And I give two examples there, not all that
13    different from the one I gave in a more theoretical
14    form earlier today, when I talked about, I believe,
15    procedure A plus something as opposed to procedure A
16    alone.
17    Q    And on the top of page 2, you note that
18    "there are many such self-evident, logical
19    examples."  Do you see that?
20    A    I see that.
21    Q    Did you believe that there were many
22    self-evident, logical examples of procedure codes
23    that could be identified by going through the coding
24    book?
25    A    As of January 1988, I believe I did.

Page 231

1    Q    And did you believe that on September 30,
2    1988?
3    A    I have no idea what I believed on
4    September 30, 1988.  Is there a reason you're
5    choosing that date?
6    Q    It's just the filing date of the patent.
7    A    Oh, thank you.
8    Q    Do you have any reason to believe that
9    your opinion about whether there were many
10    self-evident, logical examples of rules that could
11    be gleaned from the coding book --
12    A    I believe I would say that it's
13    essentially certain that on -- that for all of the
14    year of 1988, at least from January 12 on, I
15    believed that where there were a number of coding
16    combinations, that anybody, in quotation marks, who
17    understood the organization of the CPT code book
18    could -- could deduce.
19    Q    Okay.  And you tell Dr. Bailit that the
20    decision rules that would be included in HPR's
21    product go far beyond the self-evident rules; is
22    that correct?
23    A    That's what it says.  "However, our
24    decision rules go far beyond the self-evident
25    rules."

Page 232

```
 1        IN THE UNITED STATES DISTRICT COURT
 2             for the District of Delaware
 3
 4   - - - - - - - - - - - - - - - x
 5                                 :
 6   McKESSON INFORMATION SYSTEMS,    :
 7                                 :
 8        Plaintiffs,              :
 9                      : Case No.
10   v.              : 04-1258 SLR
11                                 :
12   THE TRIZETTO GROUP,           :
13                                 :
14        Defendant.     :
15                                 :
16   - - - - - - - - - - - - - - - x
17             Washington, D.C.
18             Volume II
19             September 28, 2005
20
21
22
23   REPORTED BY:
24        DANIEL W. HAWKINS
25
```

Page 257

```
 1   Video Deposition of
 2
 3        GEORGE A. GOLDBERG, M.D.
 4
 5   called for examination pursuant to notice of deposition, at
 6   the law offices of Gibson, Dunn & Crutcher, 1050 Connecticut
 7   Avenue, Northwest, 2nd Floor, Conference Room 3B,
 8   Washington, D.C., beginning at 9:21 a.m., before DANIEL W.
 9   HAWKINS, a Notary Public within and for the District of
10   Columbia, when were present on behalf of the respective
11   parties:
12
13        BERNARD SHEK, ESQ.
14        Skadden, Arps, Slate, Meagher & Flom LLP
15        528 University Avenue, Suite 1100
16        Palo Alto, California 94301
17        Phone  650.470.4500
18        Fax 650.470.4570
19        E-mail bshek@skadden.com
20        On behalf of Plaintiff and Witness
21
22
23
24
25
```

Page 258

```
 1   APEARENCES (continued)
 2
 3        DAVID A. SEGAL, ESQ.
 4        Gibson, Dunn & Cructher LLP
 5        4 Park Plaza, Suite 1400
 6        Irvine, California 92614-8557
 7        Phone 949.451.3973
 8        Fax 949.475.4663
 9        E-mail dsegal@gibsondunn.com
10        On behalf of Defendant
11
12
13   Also present:  T.J. O'Toole, CLVS, Videographer
14
15
16                C O N T E N T S
17
18   Witness:         Examination by:
19
20   Dr. Goldberg          Mr. Segal: 261, 389
21                         Mr. Shek: 382, 391
22
23
24
25
```

Page 259

```
 1                E X H I B I T S
 2
 3   Deposition Exhibit          Marked
 4
 5        10               268
 6        11               270
 7        12               276
 8        13               276
 9        14               325
10        15               327
11        16               330
12        17               338
13        18               345
14        19               348
15        20               351
16        21               357
17        22               367
18        23               380
19
20        (Exhibits attached.)
21
22
23
24
25
```

Page 260

1    P R O C E E D I N G S
2        (Announcement by the Videographer.)
3    Thereupon,
4            GEORGE A. GOLDBERG, M.D.
5    a Witness, called for examination by counsel for the
6    Defendant and, after having been first duly sworn, was
7    examined and testified as follows:
8        EXAMINATION BY COUNSEL FOR THE DEFENDANT
9        BY MR. SEGAL:
10   Q    Good morning.
11   A    Good morning.
12   Q    Welcome back.
13   A    Welcome back to you.
14   Q    You understand that you are still under oath?
15   A    Yes.
16   Q    Just to be safe, because we have a different
17   court reporter, and we had you sworn again this morning.
18       Did you have an opportunity at all to review your
19   transcript from your first deposition?
20   A    No, I did not.
21   Q    Have you had the opportunity to prepare any more
22   for your deposition since our last session?
23   A    I've had the opportunity, but I did not do any
24   such preparation.
25   Q    In thinking about your testimony if you've done

Page 261

1    so, have you realized you made any errors in your testimony?
2    A    I haven't thought about my testimony, and if
3    parts of it have popped into my head, I haven't noted any
4    errors.
5    Q    In your last deposition, we were discussing a
6    system known as Advanced MedLogic? Do you recall that.
7    A    Yes, Advanced MedLogic.
8    Q    And that was a system that was used by Health
9    Data Institute, I believe? HDI.
10   A    I'm not sure I would call Advanced MedLogic a
11   system, at least not today. I don't know what I said two
12   weeks ago. I'd call it a review mechanism, and it was
13   developed by HDI, Health Data Institute.
14   Q    And actually, the system name was Advanced
15   MedLogic System.
16   A    I don't recall.
17   Q    Let me show you what was previously marked as
18   Exhibit 1 to your deposition, which was your c.v. And I
19   would trust that you've made an effort in preparing your
20   c.v. to make sure it's accurate and complete?
21   A    Yes, I have. And understandable to a person who
22   would read it.
23   Q    If you look on the first page under point 3,
24   where it refers to Health Data Institute.
25   A    Yes, I see that.

Page 262

1    Q    And under that you list your development work?
2    A    On Advanced MedLogic System. Yes, I see that.
3    Q    So the Advanced MedLogic System was the name of
4    the system that you worked on?
5    A    It is probable that that was the original name of
6    the system; that is, that the Health Data Institute, in its
7    marketing wisdom, decided to call it the Advanced MedLogic
8    System.
9    Q    And the Advanced MedLogic System was a program
10   that ran on computers?
11   A    Not in the sense that today we consider it a
12   program. Advanced MedLogic System was a series of lookup
13   tables and reports got produced off a computer.
14   Q    And there were instructions that the computer
15   followed to know how to look up information in the tables,
16   and compare claims data with information in the tables?
17       MR. SHEK: Object as to form.
18       THE WITNESS: I have actually no idea how it was
19   done.
20       BY MR. SEGAL:
21   Q    Do you know if it operated on a computer?
22   A    I know that computers were used in the Advanced -
23   - what seems to be called the Advanced MedLogic System.
24   Q    And you spoke about the lookup tables that you
25   some input in, of that system. Is that correct?

Page 263

1    A    Yes. I helped, I mostly reviewed those tables
2    that had been developed by a group of nurses.
3    Q    And the last time we established that those
4    tables had things such as procedure codes and diagnoses
5    codes, or procedure codes and gender. Is that correct?
6    A    They were a series of edits designed to -- edits
7    in the old fashioned sense of the word. Yes, they were
8    looking for mismatches between age and diagnosis, age and
9    procedure, sex and diagnosis, sex and procedure, or just
10   diagnoses that were so unusual you wouldn't expect to see
11   them in the United States; although they might be perfectly
12   common in parts of Africa, for example.
13   Q    And the lookup tables were used in conjunction
14   with reviewing claims data, is that correct?
15   A    Please repeat the question.
16   Q    The lookup tables were used in connection with
17   the Advanced MedLogic System, and in reviewing claims data.
18   A    Those lookup tables were used in the review of
19   batches of already paid claims data.
20   Q    The claims data, you're talking about medical
21   claims data. Is that correct?
22   A    Yes, what you would call medical claims data,
23   what I would break down and call facility claims data and
24   professional claims data.
25   Q    How many different of these edits were in the

Page 264

2 (Pages 261 to 264)

GEORGE A. GOLDBERG, M.D. - VOLUME II

1  lookup tables in the Advanced MedLogic System?
2      A    Well, of course the real answer is I don't know
3  the number; but I think there were somewhere between 10 and
4  20 lookup tables, and I guess that there were anywhere from
5  20 to several hundred elements in each table.
6      Q    Do you have any knowledge as to what type of
7  rules were applied in the program that utilized those lookup
8  tables?
9          MR. SHEK: Objection as to form. Vague and
10 ambiguous. Also lacks foundation.
11         BY MR. SEGAL:
12     Q    Do you have any understanding as to whether any
13 rules were used by a program in utilizing the lookup tables
14 as part of the Advanced MedLogic System?
15     A    Well, I'll answer that with the understanding
16 that the word 'rules' is a loaded word that can mean ten
17 different things.
18         This system was looking for the occurrence of
19 certain codes or code combinations, and whenever it saw one
20 thing, my understanding is, because I was neither
21 responsible -- I was not responsible for -- I was just
22 giving input, consulting input to the nurses. It counted
23 them, it counted -- it was a counter of finding certain
24 combinations of code code, code sex, code age, and basically
25 produced counts.

Page 265

1          I'm not sure I call those rules. Period.
2      Q    Were there programmers that worked at HDI on the
3  Advanced MedLogic System?
4      A    There must have been, but I can't be any more
5  specific than that, because it wasn't part of what I did.
6      Q    In December 1986, were you part of the Product
7  Development Group at HPI, the Health Policy Institute?
8      A    I don't remember that exact -- I don't recall
9  that exact name, but it's highly likely that I was -- I was
10 in fact a part of a group of people at Health Policy
11 Institute who were trying to develop a product, a commercial
12 product.
13     Q    I'm going to show you what was previously marked
14 in a deposition as Exhibit 81. It's a multipage document
15 bearing Bates numbers MCK 119 650 through 654, and ask you
16 to take a look at that, and I'll ask you whether you
17 recognize it.
18     A    (Viewing document.).
19     Q    The first question is, do you recognize this
20 document as a document you would have received in December
21 1986 while you were at HPI.
22     A    I do not recognize this document. I don't
23 recognize this document; it surely is a matter of memory,
24 but I do not recognize it.
25     Q    Let me see if -- I'm trying to refresh your

Page 266

1  recollection. In the second paragraph it says coding. Do
2  you see that?
3      A    I sure do.
4      Q    It says Aetna's claims processors re-code
5  procedures when they determine there is justification.
6          Do you recall learning in about December 1986
7  that Aetna's claims processors re-coded procedures when they
8  determined there is justification?
9      A    I don't recall learning that in December 1986.
10     Q    Did you know that in 1986 that Aetna had claims
11 processors that re-coded procedures when they determined
12 there was justification?
13     A    I don't remember if I knew that in 1986.
14     Q    Further in that paragraph it says: They bundled
15 the surgeon's hospital visits into the overall surgical fee.
16 They use a similar formula as CAT, for combining multiple
17 procedures.
18         Do you see that?
19     A    I do see that.
20     Q    First question is, is it your understanding that
21 c a t CAT refers to Caterpillar?
22     A    Yes. That is my understanding.
23     Q    Do you recall learning that Aetna's claims
24 processors bundled the surgeon's hospital visits into the
25 overall surgical fee, and that they used a similar formula

Page 267

1  as CAT for combining multiple procedures, in 1986?
2      A    I do not recall learning that in 1986 or in any
3  other year. I don't doubt for a second that at some point I
4  learned it, but I don't recall learning it, and I don't
5  recall that it was in 1986.
6          MR. SEGAL: Okay, let me ask the court reporter
7  to mark as Exhibit 10 to your deposition a multipage
8  document bearing Bates numbers MCK 11 9935 through 46.
9              (Goldberg Deposition Exhibit No.
10             10 was marked for identification.)
11
12         (Document handed to witness.)
13         BY MR. SEGAL:
14     Q    I'll ask you to take a look at what we've had
15 marked as Exhibit 10.
16     A    Okay, I have Exhibit 10. What would you like me
17 to do?
18     Q    Is this a document you recognize from your days
19 at Health Policy Institute?
20     A    (Viewing document.)
21         Well, it's actually easy to answer your direct
22 question. I do not recognize this document.
23     Q    Did you have any involvement in a report given to
24 Caterpillar and Sun Company on the evaluation of negotiated
25 surgeon claims in or about February 1987?

Page 268

1    MR. SHEK: Object as to form.
2    THE WITNESS: It is a complicated question, all
3 right?
4        In this document, I, "little old me" in quotation
5 marks, merely an M.D., do not know what authorizing means,
6 and I do not know what nonmedical criteria mean fully. I
7 can guess, but I don't know.
8        BY MR. SEGAL:
9    Q    As one of the inventors on this patent, you don't
10 know what authorized or nonmedical criteria mean, as used in
11 this claim?
12    A    On September 28, 2005, I am not sure of what
13 these words meant to us or to me in 198—whatever, when this
14 patent was first — I see it was approved in — dated 1993.
15 It says filed 1991, after I had left the company. I can
16 make very good guesses, but this is not my wording; I think
17 it was not my wording, and that many years later I am not
18 certain.
19    Q    What is your best understanding of what
20 'nonmedical criteria' refers to?
21    A    My best understanding is that nonmedical criteria
22 refers to coding criteria. The rules of coding, as
23 enunciated by the owner of CPT procedure codes, the American
24 Medical Association, at any particular time.
25    Q    What do you mean by the coding criteria?

Page 305

1    A    The American Medical Association's CPT procedure
2 book describes, in introductory sections; not only at the
3 beginning of the book but at the beginning of many
4 subsections, not only in many subsections, but also before
5 individual codes, how coding is supposed to be carried out,
6 how codes are supposed to be used; the comments are most
7 often general and especially in the 1980s, rarely specific.
8 And over the years, there have been, there has been an
9 evolution in that area.
10        But there are rules of coding that are printed in
11 AMA procedure books going back to the early years.
12    Q    Now are those rules of coding based on any
13 medical criteria?
14        MR. SHEK: Object as to form.
15        THE WITNESS: The rules of coding are not based
16 on medical criteria; some of the rules about when to use --
17 period.
18        BY MR. SEGAL:
19    Q    I'm going back to your explanation. These
20 explanations, would they be based on things about medical
21 treatment? Or would they be based on what's nonmedical
22 criteria, is my question.
23    A    That if you -- one example is that if you have a
24 code that is indented under another code, you should not be
25 using both those codes. That is an example, but I am not

Page 306

1 telling you that it's in fact a real example. That would be
2 the example of a nonmedical instruction regarding the use of
3 codes.
4        Another one is that a physician of any specialty
5 can use any code in the CPT book no matter what it's
6 location. So that a specialist in internal medicine, if he
7 or she wants to, can use a code in the orthopedic section.
8 That's an example of a coding criterion, and in that sense
9 it's a nonmedical criteria, and it just says anybody can
10 submit a code from the book; a code in one section doesn't
11 belong to the specialty that typically uses the codes in
12 that section.
13    Q    What would make a code mutually exclusive due to
14 nonmedical criteria?
15    A    The example I gave you is one of those where
16 there's an indentation of one code under another, and one --
17 that indented code clearly says 'with something.' And it's
18 not a medical, in my view, not a medical criterion to
19 understand that the word with means that the indented code
20 includes what was in the non-indented code; it has something
21 else extra. In particular because the CPT manual explains
22 indented codes as including everything up to the semicolon
23 in the non-indented code.
24    Q    And the CPT book that explains that the indented
25 codes are included in the non-indented code was publicly

Page 307

1 available prior to 1987?
2    A    It's that the non-indented code is included in
3 the indented code.
4    Q    I'm sorry?
5    A    That book, so far as I know, has been available;
6 it's updated annually since sometime in the 1970s.
7    Q    And it would include the information about the
8 non-indented codes being --
9    A    Well, about the relationship between non-
10 indented codes and indented codes? It might have. The book
11 developed over time, and additional language of this nature.
12 In other words, coding rules. I'm sorry, you're right, I'm
13 now the one who's using 'rule' as opposed -- I chided you
14 the first day for using 'rules' in a different way.
15        These coding criteria, nonmedical criteria, I
16 call these coding guidelines, directives, nonmedical
17 criteria. If I'm having trouble answering this, all I can
18 say is that I started by saying that I wrote, myself, only a
19 certain -- very key, but relatively limited portion of this
20 patent.
21    Q    Back to Claim 2. Talks about rejecting the
22 medical service codes that were mutually exclusive due to
23 the nonmedical criteria. Do you see that?
24    A    I see that.
25    Q    Do you have an understanding of whether the

Page 308

13 (Pages 305 to 308)

GEORGE A. GOLDBERG, M.D. - VOLUME II

1   individuals at Caterpillar prior to 1987 rejected medical
2   service codes which were mutually exclusive due to
3   nonmedical criteria in connection with their claims
4   processing at Caterpillar?
5   **A   I do believe they rejected medical service codes**
6   **which are mutually exclusive, in a method that bore a**
7   **relationship to the method we built.**
8   Q   You indicated that you didn't know what
9   authorizing meant?  That you might have some general concept
10   of what it might mean?  Is that right.
11   **A   I don't like the word authorizing, and had**
12   **anybody asked me, I would have said it even I believe at**
13   **that time because the word 'authorizing' in the world of**
14   **claims has so many different meanings, including the very**
15   **common phrase, 'prior authorization' where authorizing means**
16   **that an insurance company says in advance that if this**
17   **procedure is done on this patient, the insurance company**
18   **will pay for the procedure; and that's called prior**
19   **authorization.**
20   **That's not the sense in which authorizing is used**
21   **here.  So I would have preferred another word.  But here,**
22   **authorizing medical service codes, I think I can say with**
23   **insurance means letting them pass — no, I'm not going to**
24   **say letting them pass — means presenting medical service**
25   **codes as being recommended for payment.**

Page 309

1   **So that an initially-submitted code either passes**
2   **through unchanged, and that is why I used the word passed**
3   **initially, but there's another example where a code which**
4   **did not exist originally is substituted for one or more**
5   **codes that were submitted originally; and that substituted**
6   **code is also "authorized" -- in quotation marks. So yes, I**
7   **think I do understand what authorizing means, I just would**
8   **have preferred a different word.**
9   Q   In connection with your reading of these steps in
10   Claim 2, do you read them to include the replacement of a
11   code that was not on the original claim?
12   MR. SHEK: Object as to form.
13   THE WITNESS: It says authorizing medical service
14   codes.  It doesn't make any comment, at least not right
15   there, as to whether that was an original code or not.  By
16   original code, I mean a code originally submitted on a
17   claim.
18   BY MR. SEGAL:
19   Q   The determining step refers to the medical
20   service codes in the claim being mutually exclusive with any
21   other medical service code in the claim.
22   **A   Yes.**
23   Q   And so that step is limited to just looking at
24   the codes on the claim?
25   MR. SHEK: Object as to form.

Page 310

1   MR. SEGAL: In your best understanding?
2   THE WITNESS: Yes, that is.  And I note that in
3   the authorizing, you've got a clause, paragraph -- in the
4   authorizing portion, that the words 'in the at least one
5   claim' those words do occur in the second half, but not in
6   the first half.  It does not say: authorizing medical
7   service codes in the at least one claim, which are not
8   mutually exclusive to the nonmedical criteria with any other
9   medical service codes contained in the at least one claim.
10   So I'm not saying that my position is proved, but
11   it is not disproved.
12   BY MR. SEGAL:
13   Q   And the rejecting also doesn't include reference
14   so it can reject all other codes?  Is that how you read the
15   rejecting step?
16   MR. SHEK: Object as to form.
17   THE WITNESS: I'm not sure I understand the
18   question.  Can you repeat it, please.
19   BY MR. SEGAL:
20   Q   And what medical service codes get rejected, in
21   the language, by looking at the language of the rejecting
22   step of Claim 2?
23   **A   It doesn't specify, except to say that they are**
24   **the ones considered mutually exclusive.**
25   Q   Looking at Claim 3.

Page 311

1   **A   Okay.**
2   Q   And reading through that, do you have an
3   understanding of what it means for a medical service code to
4   be valid or invalid?
5   **A   I believe so, but give me a chance to read it.**
6   **I'm going to have to read some more, because I**
7   **see that the word 'and valid' appears at the end, as well as**
8   **'valid' at the beginning.  So I'm going to have to read the**
9   **whole thing and not just the first piece.**
10   **I have now looked at the use of the word valid**
11   **and invalid in Claim 3.  So what's your question.**
12   Q   What is your understanding that valid or invalid
13   means?
14   **A   It means if they bear a medically-plausible**
15   **relationship to other codes, or not.**
16   Q   And if they bear a medically plausible
17   relationship, they are valid?
18   **A   That's my interpretation in 2005 of these words,**
19   **yes.**
20   Q   And if it doesn't have a medically plausible
21   relationship, it would be invalid?
22   **A   Yes, that's the way it appears to me in 2005.**
23   Q   Can you think of anything other than a medically
24   plausible relationship that would make a code valid or
25   invalid as it's used in Claim 3?

Page 312

EXHIBIT R

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| GMIS, INC., a corporation of<br>the state of Delaware, | ) | |
| | ) | Civil Action No.<br>94-CV-0576 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| HEALTH PAYMENT REVIEW, INC.,<br>a corporation of the state<br>of Delaware, | ) | |
| | ) | |
| Defendant, | ) | **PRE-TRIAL MEMORANDUM** |
| HEALTH PAYMENT REVIEW, INC.,<br>a corporation of the state<br>of Delaware, | ) | |
| | ) | |
| Counterclaimant, | ) | |
| | ) | |
| v. | ) | |
| GMIS, INC., a corporation of<br>the state of Delaware, | ) | |
| | ) | |
| Counterclaim<br>Defendant. | ) | |

MCK  117113

04-CV-1258-SLR  (D.Del.)

## INTRODUCTION

This pre-trial memorandum is being submitted on behalf of plaintiff GMIS, Inc. (hereinafter GMIS) in accordance with the pre-trial and trial procedures set forth by this Court.

## SUMMARY OF THE CASE

This action was commenced on January 31, 1994 by Plaintiff GMIS, Inc. against Defendant Health Payment Review, Inc. (hereinafter HPR) for, inter alia, tortuous misuse of U.S. Patent No. 5,253,164 ('164 patent) and a declaration of invalidity of this patent.. This action is a result of:

 1. HPR threatening GMIS with a suit for infringement of the '164 patent;

 2. HPR using the '164 patent in an effort to divert customers and business from GMIS to HPR; and

 3. HPR advising stock analysts who cover the GMIS stock of the existence of the '164 patent and its intent-to-assert the '164 patent against GMIS, all of which caused significant damage to the value of GMIS stock.

Rather than being put at a competitive disadvantage in the market place by reason of the actions of HPR complained of herein, GMIS initiated the present suit seeking, not only a declaration of invalidity and non-infringement of the HPR patent, but also relief under the common law of the state of Pennsylvania for interference with GMIS' business relations.

2

MCK 117114

04-CV-1258-SLR (D.Del.)

With respect to the patent in suit, it is plaintiff's position that the patent in suit is invalid, unenforceable and not infringed for the following reasons:

1. The claims of the '164 patent are invalid for failure to comply with the best mode requirement of 35 U.S.C. §112, ¶ 1.

2. The claims of the '164 patent are invalid for failure to distinctly claim the subject matter which applicants regard as their invention as required by 35 U.S.C. §112.

3. The claims of the '164 patent are invalid as being obvious over the prior art (35 U.S.C. §103).

4. The claims of the '164 patent are invalid as not reciting subject matter which is statutory as required by 35 U.S.C. §101.

5. The claims of the '164 patent are not infringed because the accused system of GMIS does not meet the limitations of the claims of the '164 patent either literally or by the doctrine of equivalents.

6. Does HPR have standing to assert the '164 patent.

7. The '164 patent is unenforceable because of inequitable conduct on the part of applicants.

With respect to the charge of tortious interference with business relations, GMIS will show that HPR interfered with GMIS' business relationships by improperly asserting its patent to potential GMIS customers driven solely by a desire to divert sales from GMIS to HPR when HPR knew, or should have known, that the patent did not cover the GMIS

3

MCK 117115

04-CV-1258-SLR (D.Del.)

product. GMIS will also show that HPR improperly advised stock analysts that the GMIS claimcheck product infringed the '164 patent when this was not the case, all in an effort to lower the value of the GMIS stock in the market.

A counterclaim has been filed by HPR asserting infringement of the '164 patent.

<u>PLAINTIFF'S WITNESSES</u>

1.    Dr. Shimon Schroken - Dr. Schroken is an expert witness skilled in the computer sciences art. Briefly, Dr. Schroken will testify with respect to the matters raised in his expert's report, a copy of which is attached hereto as Exh. A.

2.    James Reisman - Mr. Reisman is a patent expert and will testify on the matters raised in his expert's report, a copy of which is attached hereto as Exh. B.

3.    Thomas R. Owens - Mr. Owens is the chief executive of plaintiff GMIS and will testify to the business of GMIS' and the damages thereto as a result of threats made by defendant to stock analysts when the patent issued that a law suit would be commenced against GMIS.

4.    Dr. Robert Hertenstein, a named inventor of the '164 patent - Dr. Hertenstein will testify by way of deposition as to the background of the '164 patent, what the patent discloses and what it fails to disclose.

5.    Dr. Don Holloway, a named inventor of the '164 patent - Dr. Holloway will testify by way of deposition as to the background of the '164 patent, what the patent discloses and what it fails to disclose.

4

6.    Kelly Dugan, a named inventor of the '164 patent - Ms. Dugan will testify by way of deposition concerning the background of the '164 patent with respect to the subject matter of the patent and what she did and what the patent discloses and does not disclose.

7.    Virginia Klenske - Ms. Klenske is a technical person employed by GMIS and will testify with respect to the accused GMIS system demonstrating why there is no infringement.

8.    Michael Stare - Mr. Stare is employed by defendant and will testify by way of deposition concerning threats made on behalf of defendant to GMIS customers with respect to the '164 patent.

9.    George Goldberg, a named inventor of the '164 patent - Dr. Goldberg will testify by way of deposition concerning his work on the subject matter of the '164 patent in and what the patent does and does not disclose, and prior art.

10.    Marsha Radosevich - Ms. Radosevich is the chief executive of defendant and will testify concerning communications made by and on behalf of defendant with respect to the patent in suit.

11.    Garry Frazier - Mr. Frazier is a stock analyst and will testify concerning communications he received from representatives of defendant concerning the '164 patent and its effect on plaintiff.

5

MCK 117117

04-CV-1258-SLR (D.Del.)

<u>PLAINTIFF'S EXHIBITS</u>

A list of plaintiff's exhibits is attached hereto.

PLAINTIFF'S ITEMIZED STATEMENT OF
<u>DAMAGES OR OTHER RELIEF SOUGHT</u>

1.    Judgment that the '164 patent is invalid, not infringed and unenforceable.

2.    An injunction against defendant advising third parties that GMIS is infringing the '164 patent.

3.    An injunction against HPR using the '164 patent to divert business from GMIS to HPR.

4.    Punitive and compensory damages of $12,000,000 by reason of the acts of HPR complained of in the second count.

5.    Attorneys fees and such other and further relief as the Court deems just and proper.

STATEMENT OF ANTICIPATED LEGAL ISSUES
<u>ON WHICH THE COURT WILL BE REQUIRED TO RULE</u>

It is anticipated that Defendant HPR will attempt, as part of its damage case, to assert a claim for damages based on the activities of GMIS prior to the issuance of the '164 patent. This Court in *Mixing Equipment Co., Inc. v. Innova-Tech, Inc.*, 2 U.S.P.Q. 1212 (E.D.P.A. 1986), held that a cause of action for patent infringement may be maintained against a defendant for inducement of infringement arising out of actions occurring prior to the issuance of the patent. However, this ruling was predicated on the

6

fact that an infringer "having access to the inventor's forthcoming patent" can not escape liability for infringement by acts immediately prior to the patent's issuance that result in post issuance infringement. The Court's concern was that the "intentional, tactical violations of an inventor's patent...[would] not go uncompensated as a result of a sterile reading of the patent laws." Id. at 1214. Here, of course, GMIS had no knowledge of the existence of a pending application by HPR and thus, it can not be held liable for purported acts of infringement occurring prior to the issue date of the '164 patent. As such, all evidence that will be offered by HPR as to purported infringing acts of GMIS prior to the issue date of the '164 patent should be excluded.

THEODORE A. YOUNG
I.D. No. 09976
ROBERT F. ZIELINSKI
I.D. No. 48393
FRANK G. MURPHY
I.D. No. 65886
FOX, ROTHSCHILD, O'BRIEN & FRANKEL
2000 Market Street, 10th Floor
Philadelphia, PA  19103
(215) 299-2000

Attorneys for Plaintiff
GMIS, Inc.

7

MCK 117119

04-CV-1258-SLR (D.Del.)

Of Counsel
Richard I. Samuel
Peter T. Cobrin
David A. Jacobs
Richard M. Lehrer
COBRIN GITTES & SAMUEL
750 Lexington Avenue
New York, New York 10022
(212) 486-4000

f:\wpdata\lucy\gmis\pretrial.mem

8

MCK 117120

04-CV-1258-SLR (D.Del.)

UNITED STATES DISTRICT COURT
**FOR:   EASTERN DISTRICT OF PENNSYLVANIA**
(Judge Newcomer's Courtroom)

Admitted By:

Plaintiff(s)  _X_

or                                     Case No. 94-CV-0576

Defendant(s)  ____

| EXHIBIT LIST | | | | |
|---|---|---|---|---|
| Exhibit Number | Date Identified | Date Admitted | Witness | Description |
| 1 | | | | U.S. Patent No. 5,253,164 |
| 2 | | | | File Wrappers for Serial Nos. 07/252,307, 07/566,841, 07/648,314 |
| 3 | | | | GMIS AUTOCODER Promotional Brochure, An Automated System for Coding Medical Terms, 1985 |
| 4 | | | | AUTOCODER Brochure, Artificial Intelligence that Sets Free Your Human Intelligence, © 1986 |
| 5 | | | | GMIS AUTOCODER User's Manual for IBM OS Operating Systems (July 1986) |
| 6 | | | | Hertenstein et al., Article presented at the 107th Annual Meeting of the American Surgical Association, Palm Beach Florida, April 21-23, 1987 (reprinted in Ann. Surg., September 1987 "An Access-oriented Negotiated Fee Schedule – The Caterpillar Experience" |

1

MCK 117121

04-CV-1258-SLR  (D.Del.)

| EXHIBIT LIST | | | | |
|---|---|---|---|---|
| Exhibit Number | Date Identified | Date Admitted | Witness | Description |
| 7 | | | | January 28, 1994 fax from Judy Griffith to Michael J. Stare regarding "Health Payment Review's Codereview® Product Awarded U.S. Patent" |
| 8 | | | | Article on PR Newswire ("Companies are Controlling Health Care Cost Increases", dateline September 11, 1987) |
| 9 | | | | U.S. Patent No. 4,491,725 to Pritchard, issued January 1, 1985 |
| 10 | | | | January 6, 1994 letter to Thomas Owens from Marcia Radosevich regarding U.S. Patent No. 5,353,164 |
| 11 | | | | "GMIS Files Complaint Against HPR" January 31, 1994 - Release |
| 12 | | | | Article on PR Newswire ("Tracking claims cost trends; data-processing application", February 1985) |
| 13 | | | | Article in Nations Business (May 1985, "Slimming Health Costs; Companies Turn to Outside Administrators to Check Fees and Charges from Doctors and Hospitals; Includes Related Article on Bypassing Heart Surgery") |
| 14 | | | | AMS December 1986, Claim Level Edits (103 page manual) |
| 15 | | | | Advanced MedLogic Systems Product Overview (May 1987) |

2

| EXHIBIT LIST | | | | |
|---|---|---|---|---|
| Exhibit Number | Date Identified | Date Admitted | Witness | Description |
| 16 | | | | CHAMPVA Center (Response to Request for Proposal with accompanying letter to Kimberly Miller, June 7, 1994) |
| 17 | | | | IMS Instructions for Installation of the Version 13 Database for Version 3.0 Clients |
| 18 | | | | March 1994 letter to ClaimCheck® Technical Contact from GMIS Technical Support enclosing installation package for Version 13 of the ClaimCheck database (13MFLET.DOC) |
| 19 | | | | Group Health - Custom Code or Non-Standard Client Installations (custom.doc) |
| 20 | | | | Software Migration and Delivery Procedures for Mainframe ClaimCheck (swdel.doc) |
| 21 | | | | Contact Report - January 25, 1994 |
| 22 | | | | TURNOVER; Subject: Bad account in integration (6/23/94) (1923.doc) |
| 23 | | | | Letter to Mary Alice Hickey from Carolyn Staudenmeier, date July 22, 1994 along with ClaimCheck Customer Support Services (Hickey.doc) |
| 24 | | | | Letter to Jan Costa from Carolyn Staudenmeier, date July 22, 1994 along with ClaimCheck Customer Support Services (Hickey.doc) |

3

MCK  117123

04-CV-1258-SLR (D.Del.)

| EXHIBIT LIST | | | | |
|---|---|---|---|---|
| Exhibit Number | Date Identified | Date Admitted | Witness | Description |
| 25 | | | | (shenandh.ppt)<br>- Data Filtering Process for Shenandoah Life Insurance Company<br>- Dental Code Manipulation Savings<br>- Dental Code Manipulation Savings for Codes Adding During Rebundling<br>- Additional Code Manipulation Savings,<br>- Provider Profile<br>- Savings Potential for Single Code Editing<br>- Total Annual "Hard Dollar" Savings |
| 26 | | | | Dental Payment Analysis, Prepared for Shenandoah Life Insurance Company, date July 12, 1994 (shenandh.doc) |
| 27 | | | | ClaimCheck Dental Clinical Logic Diagnostic (dnxrexpd.doc) |
| 28 | | | | Letter to Ms. Kathleen Hadley, July 12, 1994 and attachments |
| 29 | | | | Letter to Jim Jacobson, July 18, 1994 and attachments |
| 30 | | | | Letter to Mr. Buddy Dye, July 14, 1994 |
| 31 | | | | INCTST.DOC examples |
| 32 | | | | GMIS Proposal for IBP, Inc., November 1, 1993 |
| 33 | | | | R3.2 Dental System Test Plan |

4

MCK 117124

04-CV-1258-SLR (D.Del.)

| EXHIBIT LIST | | | | |
|---|---|---|---|---|
| Exhibit Number | Date Identified | Date Admitted | Witness | Description |
| 34 | | | | Preliminary Product Strategy (ClaimCheck Group Health 1994, prepared by Carolyn Staudenmeier, October 1, 1993) |
| 35 | | | | ClaimCheck Group Health Competitive Analysis (3/1/94) |
| 36 | | | | Memo from Terry Lunny to Lori Megni and Mike Cesarz, Re: Reports, Request for change (6/30/94) |
| 37 | | | | ClaimCheck P&C Product Strategy (prepared by: Debi Johnson, October 1, 1993, revised: October 15, 1993 |
| 38 | | | | Letters to Robert Calamavi, Laura Shotberger, Gerald Mele, Geri Zimmerman and Roger Rheeling with enclosures from Michael Stare, March 11, 1994 and January 24, 1994 |
| 39 | | | | Fax to Carolyn Bannister from Michael Stare, January 25, 1994 |
| 40 | | | | Article in New York Times, January 24, 1994, "Health Care System Finds Overpayment" |
| 41 | | | | Dow Jones/New Retrieve - Patent Relates to ClaimCheck by Jonathan Mahler |
| 42 | | | | Volpe Welty & Co. Memo to All Sales & Trading from Paul W. Brown regarding GMIS, January 20, 1994 |

5

MCK 117125

04-CV-1258-SLR (D.Del.)

| EXHIBIT LIST | | | | |
|---|---|---|---|---|
| Exhibit Number | Date Identified | Date Admitted | Witness | Description |
| 43 | | | | ClaimCheck Enhancements & Bugs (8/9/94) |
| 44 | | | | Articles written by Donald Holloway, George Goldberg, Kelli Dugan and/or Robert Hertenstein |
| 45 | | | | Articles written by Paul Gertman |
| 46 | | | | Articles written by Richard Egdahl |
| 47 | | | | Analysts Report: Ben Rooks/Adams Harkenss & Hill, January 21, 1994 report announcing/predicting effect of HPR patent |
| 48 | | | | Analyst Report: Gary Frazier - January 24, 1994 Discussing Four Seasons conversation with Hertenstein |
| 49 | | | | Letter from Radosevich to Owens regarding infringement |
| 50 | | | | Examples set forth in patent run through claimcheck product showing different results |
| 51 | | | | WordPerfect Version 4.1 (1982) showing implementation of Spell Checking Feature |
| | | | | |
| | | | | |

t:\wpdata\lucy\gmis\exhibit.lst

6

MCK 117126

04-CV-1258-SLR (D.Del.)

EXHIBIT S

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

MCKESSON INFORMATION SOLUTIONS, )
LLC,                            )
                                )
            Plaintiff,          )
                                )
    v.                          )        C.A. No. 04-1258 (SLR)
                                )
THE TRIZETTO GROUP, INC.,       )
                                )
            Defendant.          )
                                )

# DEFENDANT THE TRIZETTO GROUP, INC.'S RESPONSE
# TO MCKESSON INFORMATION SOLUTIONS, LLC'S
# FIRST SET OF INTERROGATORIES

MORRIS, NICHOLS, ARSHT & TUNNEL
Jack B. Blumenfeld (#1014)
Rodger D. Smith, II (#3778)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
Attorneys for Defendant
The TriZetto Group, Inc.

OF COUNSEL:

John M. Benassi
Jessica R. Wolff
Paul, Hastings, Janofsky & Walker LLP
3579 Valley Centre Drive
San Diego, CA 92130
(858) 720-2500

Matthew C. Lapple
Paul, Hastings, Janofsky & Walker LLP
695 Town Center Drive., 17th Floor
Costa Mesa, CA 92626
(714) 668-6200

s 1/20/05

limitation: identify each prior art reference you contend anticipates any claim of the '164 patent under 35 U.S.C. § 102 and each prior art reference or combination of references you contend renders any claim of the '164 patent obvious under 35 U.S.C. § 103; state in complete detail, by means of a claim chart, where TriZetto contends each limitation of any allegedly invalid claim of the '164 patent is disclosed by each reference or combination of references; and state in complete detail the basis for TriZetto's assertion that one of ordinary skill in the art at the time of the '164 patent's invention would have been motivated to combine or modify any prior art reference or combination of references TriZetto contends is invalidating under 35 U.S.C. § 103.

RESPONSE TO INTERROGATORY NO. 6:

TriZetto objects to this interrogatory as vague, ambiguous and compound.

TriZetto objects to this interrogatory as overbroad, unduly burdensome and not calculated to lead to the discovery of admissible evidence. The interrogatory purports to require TriZetto to provide a claim construction for every term of every claim in the '164 patent in the context of providing TriZetto's invalidity contentions. To date, McKesson has not identified which claims of the '164 patent it is asserting, thus requiring TriZetto to state its claim construction and invalidity contentions for every claim of the '164 patent is unreasonable.

TriZetto objects to this interrogatory on the grounds that it calls for the disclosure of information protected by the attorney client communications privilege and/or the attorney work product doctrine. To the extent that TriZetto claims privilege for any information responsive to this interrogatory and withholds on the basis of privilege, TriZetto will prepare and provide a privilege log in accordance with the Federal Rules of Civil Procedure at a future date.

TriZetto objects to this interrogatory on the grounds that it contains multiple sub-parts and purports to require TriZetto to respond to several different interrogatories through the use of sub-parts.

TriZetto objects on the basis that discovery and investigation are on-going and it continues to gather evidence which may affect its answer to this interrogatory. Thus, TriZetto reserves the right to amend, modify or add to its respons to this interrogatory during the course of this lawsuit.

Subject to these objections, and TriZetto's General Objections, which are incorporated herein, TriZetto will produce copies of all invalidating prior art of which it is currently aware, or becomes aware, and that it will provide a claim construction chart setting forth its invalidity contentions at the appropriate time required by the Court's Scheduling Order.

INTERROGATORY NO. 7:

State in complete detail each and every basis for your assertion that the claims of the '164 patent are invalid because they do not particularly point out and distinctly claim the subject matter of the invention.

RESPONSE TO INTERROGATORY NO. 7:

TriZetto objects to this interrogatory as vague, ambiguous and compound.

TriZetto objects to this interrogatory as overbroad, unduly burdensome and not calculated to lead to the discovery of admissible evidence. The interrogatory purports to require TriZetto to provide a claim construction for every term of every claim in the '164 patent in the context of providing TriZetto's invalidity contentions. To date, McKesson has not identified which claims of the '164 patent it is asserting, thus requiring TriZetto to state

TriZetto further objects to this interrogatory as overbroad and unduly burdensome given the fact that McKesson has failed to identify any TriZetto product or system that allegedly infringes any claim of its '164 patent or make any effort to set forth a prima facie case that any TriZetto product or system infringes. Accordingly, TriZetto is under no obligation to disclose such confidential business information. However, TriZetto reserves the right to do so in the future and, to the extent it understands this interrogatory, will produce documents evidencing McKesson's communications to TriZetto.

Dated:  January 20, 2005                By: _____
                                        Matthew C. Lapple
                                        PAUL, HASTINGS, JANOFSKY & WALKER
                                        LLP

                                        Jack B. Blumenfeld
                                        MORRIS, NICHOLS, ARSHT & TUNNEL

                                        Attorneys for Defendant
                                        THE TRIZETTO GROUP, INC.,
                                        a Delaware corporation,

OF COUNSEL:
John M. Benassi
Jessica R. Wolff
Matthew C. Lapple
PAUL, HASTINGS, JANOFSKY & WALKER LLP

1                              **PROOF OF SERVICE**

2    STATE OF CALIFORNIA                    )
                                            ) ss:
3    CITY AND COUNTY OF ORANGE              )

4           I am employed in the City and County of Orange, State of California.  I am
     over the age of 18, and not a party to the within action.  My business address is 695 Town
5    Center Drive, Seventeenth Floor, Costa Mesa, California  92626-1924.

6           On January 20, 2005, I served the foregoing document(s) described as:

7    DEFENDANT THE TRIZETTO GROUP, INC.'S RESPONSE TO MCKESSON
     INFORMATION SOLUTIONS, LLC'S FIRST SET OF INTERROGATORIES
8
     on the interested parties by placing  thereof in a sealed envelope(s) addressed as follows:
9
10      Jeffrey G. Randall                      Thomas J. Allingham II
        David W. Hansen                         Skadden, Arps, Slate, Meagher &
11      Michael Hendershot                      Flom LLP
        Skadden, Arps, Slate, Meagher &         One Rodney Square
12      Flom LLP                                P.O. Box 636
        525 University Ave., Suite 1100         Wilmington, DE  19899
13      Palo Alto, CA 94301

14      Allan Soobert
        Skadden, Arps, Slate, Meagher &
15      Flom LLP
        1440 New York Ave., N.W.
16      Washington, D.C. 20005

17
         ☒      **VIA U.S. MAIL:**
18
                I am readily familiar with the firm's practice of collection and processing of
19       correspondence for mailing.  Under that practice such sealed envelope(s) would be
         deposited with the U.S. postal service on January 20, 2005 with postage thereon fully
20       prepaid, at Costa Mesa, California.

21          I declare under penalty of perjury under the laws of the United States that
     the above is true and correct.
22
23          Executed on January 20, 2005, at Costa Mesa, California.

24
25
26                                           Rebecca Lepinski
27
28

     OC/367229.1                              FIRST SET OF INTERROGATORIES

EXHIBIT T

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF DELAWARE**

MCKESSON INFORMATION SOLUTIONS,
LLC,

        Plaintiff,

    v.

THE TRIZETTO GROUP, INC.,

        Defendant.

Civil Action No. 04-1258 SLR

---

### THE TRIZETTO GROUP, INC.'S FOURTH SUPPLEMENTAL RESPONSE TO PLAINTIFF'S INTERROGATORY NO. 6 AND FIRST SUPPLEMENTAL RESPONSE TO PLAINTIFF'S INTERROGATORY NO. 21

Pursuant to Rule 33 of the Federal Rules of Civil Procedure, defendant The TriZetto Group, Inc. ("TriZetto") hereby provides the following fourth supplemental response and objections to plaintiff McKesson Information Solutions, LLC's ("McKesson") Interrogatory No. 6 ("Interrogatory No. 6") and first supplemental response and objections to McKesson's Interrogatory No. 21 ("Interrogatory No. 21"). Interrogatory No. 6 was propounded in McKesson's First Set of Interrogatories ("First Set") and Interrogatory No. 21 was propounded in McKesson's Second Set of Interrogatories ("Second Set") (collectively, the "Interrogatories").

### GENERAL OBJECTIONS

1.     TriZetto has not concluded its investigation of the facts relating to this case, formal discovery, or preparation for trial. For that reason, TriZetto's responses to the Interrogatories may be incomplete. Moreover, there is a possibility that upon further investigation, certain details set forth in the responses may be altered or amended. These responses represent TriZetto's reasonable efforts to provide the information requested based upon documents or information in its possession, custody, or control, and based upon its current knowledge. TriZetto reserves its right to produce evidence of any subsequently discovered facts

and documents, and to alter or amend its factual and legal contentions as additional facts are ascertained, analyses are made, and legal research is completed.

2.    TriZetto objects to McKesson's definition of the term "TriZetto" on the grounds that such definition is overbroad, unduly burdensome, vague, ambiguous, and causes the Interrogatories to seek information that is not relevant to the claims, defenses or subject matter of this litigation. As such, TriZetto will interpret "TriZetto" to include The TriZetto Group, Inc. and its present or former officers, directors and employees.

3.    TriZetto further objects to McKesson's "Definitions" to the extent that they attempt to place burdens upon TriZetto beyond those required by Rule 33 of the Federal Rules of Civil Procedure. TriZetto will not comply with any "Definitions" that attempt to impose obligations upon TriZetto not required by Rule 33.

4.    TriZetto objects to the Interrogatories to the extent that they request information protected from disclosure by any privilege, including the attorney-client privilege or the work product doctrine. TriZetto and its counsel hereby assert such privileges.

5.    TriZetto objects to each Interrogatory to the extent it seeks information not in TriZetto's possession, custody, or control on the grounds that it is unduly burdensome and oppressive.

6.    To the extent that any Interrogatory calls for information already in the possession of McKesson or its counsel, TriZetto objects on the grounds that the Interrogatory is unnecessary, unduly burdensome and oppressive, and constitutes annoyance, harassment, and oppression of TriZetto.

7.    TriZetto objects to these Interrogatories to the extent that they seek information concerning any party or third party which is subject to the right of privacy of that party as guaranteed by the United States Constitution, any applicable state constitution, or any combination of the foregoing.

8.    TriZetto will make reasonable efforts to respond to each Interrogatory, to the extent that no objection is made, as TriZetto understands and interprets the Interrogatory. If

2

McKesson subsequently asserts an interpretation of any Interrogatory that differs from that of TriZetto, TriZetto reserves the right to supplement its objections and responses.

9.    Without waiving any of the foregoing general objections, TriZetto responds to the Interrogatories, subject to the following additional express reservation of rights:

a.    The right to object on any ground whatsoever to the admission into evidence or other use of any Interrogatory Responses in any subsequent step or proceeding in this action or any other action;

b.    The right to object on any and all grounds, at any time, to any other discovery requests or other discovery procedures involving or relating to the subject matter of these Interrogatories; and

c.    The right at any time to revise, correct, add to or clarify any of the responses propounded herein.

The foregoing general objections and qualifications shall be deemed incorporated in full in the Responses to each specific Interrogatory set forth below.

## SUPPLEMENTAL RESPONSES

### INTERROGATORY NO. 6:

State in complete detail each and every basis for your assertion that the claims of the '164 patent are invalid under 35 U.S.C. §§ 102 or 103. Your response should, without limitation: identify each prior art reference you contend anticipates any claim of the '164 patent under 35 U.S.C. § 102 and each prior art reference or combination of references you contend renders any claim of the '164 patent obvious under 35 U.S.C. § 103; state in complete detail, by means of a claim chart, where TriZetto contends each limitation of any allegedly invalid claim of the '164 patent is disclosed by each reference or combination of references; and state in complete detail the basis for TriZetto's assertion that one of ordinary skill in the art at the time of the '164 patent's invention would have been motivated to combine or modify any prior art reference or combination of references TriZetto contends is invalidating under 35 U.S.C. § 103.

3

## RESPONSE TO INTERROGATORY NO. 6: (January 20, 2005)

TriZetto objects to this interrogatory as vague, ambiguous and compound.

TriZetto objects to this interrogatory as overbroad, unduly burdensome and not calculated to lead to the discovery of admissible evidence. The interrogatory purports to require TriZetto to provide a claim construction for every term of every claim in the '164 patent in the context of providing TriZetto's invalidity contentions. To date, McKesson has not identified which claims of the '164 patent it is asserting, thus requiring TriZetto to state its claim construction and invalidity contentions for every claim of the '164 patent is unreasonable.

TriZetto objects to this interrogatory on the grounds that it calls for the disclosure of information protected by the attorney client communications privilege and/or the attorney work product doctrine. To the extent that TriZetto claims privilege for any information responsive to this interrogatory and withholds on the basis of privilege, TriZetto will prepare and provide a privilege log in accordance with the Federal Rules of Civil Procedure at a future date.

TriZetto objects to this interrogatory on the grounds that it contains multiple sub-parts and purports to require TriZetto to respond to several different interrogatories through the use of sub-parts.

TriZetto objects on the basis that discovery and investigation are on-going and it continues to gather evidence which may affect its answer to this interrogatory. Thus, TriZetto reserves the right to amend, modify or add to its response to this interrogatory during the course of this lawsuit.

Subject to these objections, and TriZetto's General Objections, which are incorporated herein, TriZetto will produce copies of all invalidating prior art of which it is currently aware, or becomes aware, and that it will provide a claim construction chart setting forth its invalidity contentions at the appropriate time required by the Court's Scheduling Order.

## SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 6: (May 5, 2005)

TriZetto reasserts and reincorporates by reference herein its previous response to Interrogatory No. 6, and the general objections set forth above. Additionally, claim construction

4

in this action has not occurred, and discovery has only just begun with no depositions having been conducted to date. The information contained in this response is based on information that is reasonably available to TriZetto at the present time. TriZetto's identification of prior art is as specific as is possible at this time. Accordingly, TriZetto reserves the right to supplement, amend and augment its response to this interrogatory as new, additional and different information is learned and discovered and when the claims at issue are construed by the Court. Subject to and without waiving those objections, TriZetto supplements its previous response as follows:

First, the claims of the '164 patent are invalid and unenforceable against TriZetto because at least three references cited by the patent examiner during prosecution of the '164 patent and 23 additional prior art references together completely disclose and describe the apparatus and methods claimed and described by the '164 patent, rendering the patent invalid as either anticipated or obvious under 35 U.S.C. §§ 102 & 103. Set forth below is a chart of the prior art references that TriZetto presently contends anticipate one or more claims of the patent in suit or render one or more claims obvious.

| | Author, Title & Source | Anticipates/Renders Obvious |
|---|---|---|
| 1. | *System validates medical fee schedules*, Best Review: Life/Health, June 1987, 92 | Anticipates/Renders Obvious |
| 2. | Weitzel, J.R., et al., *A Company / University Joint Venture to build a knowledge-based system*, MIS Quarterly, Vol. 12, No. 1, March 1988, 23-34 | Anticipates/Renders Obvious |
| 3. | Kerschberg, L. "A Proposal for the Development of an Expert System for Medical Claims Processing: MEDCLAIM," Institute of Information Management, Technology and Policy, College of Business Administration, University of South Carolina, Columbia, SC, (July 1985). | Anticipates/Renders Obvious |
| 4. | Weitzel, J.R. and Kerschberg, L. "Developing Knowledge-Based Systems: Reorganizing the System Development Life Cycle," working paper, University of South Carolina, Columbia, SC and George Mason University, Fairfax, VA (December 1986). | Renders Obvious |

5

| | Author, Title & Source | Anticipates/Renders Obvious |
|---|---|---|
| 5. | Ronald Hurst, *Cost Containment - The Caterpillar Experience*, The Psychiatric Hospital, vol. 13, no. 3 (1982). | Renders Obvious |
| 6. | Egdahl, M.D. and Hertenstein, M.D., *An Access-oriented Negotiated Fee Schedule: The Caterpillar Experience*, Ann Surg., 206(3), pp. 349-57 (Sept. 1987). | Renders Obvious |
| 7. | Bauer JW, Cassidy TG, DeBord JR, Hart RD, Lee RH, Maher JE, Montgomery CE, Neufeld GK, Rivan RJ, Soderstrom CW, et al., Related Articles, *An access oriented negotiated fee schedule: the Caterpillar experience*, Ann Surg., 208(5), pp. 667-8 (Nov. 1988). | Renders Obvious |
| 8. | Waterman, Donald A. (The Rand Corporation), *A Guide to Expert Systems*, Addison-Wesley Publishing, Inc. (1985). | Renders Obvious |
| 9. | McDermott, John, *Artificial Intelligence Applications for Business: Building Expert Systems*, Proceedings of the NYU Symposium (May 1983). | Renders Obvious |
| 10. | Gerson, Elihu and Star, Susan Leigh, *Analyzing Due Process in the Workplace, ACM Transactions on Office Information systems*, vol. 4, no. 3 (July 1986). | Renders Obvious |
| 11. | Hayes-Roth, Frederick, *et. al., Building Expert Systems: An Overview of Expert Systems*, Addison Wesley Publishing, Inc. (1985). | Renders Obvious |
| 12. | Taylor, Edward, *Developing A Knowledge Engineering Capability in the TRW Defense Systems: Group*, The AI Magazine (Summer 1985) | Renders Obvious |
| 13. | Bobrow, Daniel, *et. al., Expert Systems: Perils and Promise*, Computing Practices, Communications of the ACM, vol. 29, no. 9 (Sept. 1986) | Renders Obvious |
| 14. | Genesereth, Michael, Ginsberg, Matthew, *Logic Programming*, Communications of the ACM, vol. 28, no. 9 (Sept. 1985). | Renders Obvious |
| 15. | Yasdi, Ramin, *Modeling Database Based Expert Systems at the Conceptual Level*, Proceedings of the 1985 ACM Computer Science Conference (March 1985). | Renders Obvious |

| | Author, Title & Source | Anticipates/Renders Obvious |
|---|---|---|
| 16. | Colmerauer, Alain, *Prolog in 10 Figures*, Communications of the ACM, vol. 28, no. 12 (Dec. 1985). | Renders Obvious |
| 17. | Hayes-Roth, Frederick, *Rule-Based Systems*, Communications of the ACM, vol. 28, no. 9 (Sept. 1985). | Renders Obvious |
| 18. | Weitzel, J.R. and Kerschberg, L. *A System Development Methodology for Knowledge-Based Systems*, IEEE Transactions on Systems, Man and Cybernetics, vol. 19, no. 3 (May/June 1989). | Renders Obvious |
| 19. | Winston, Patrick H., Prendergast, Karen A., *The AI Business: The Commercial Uses of Artificial Intelligence*, The MIT Press (1984) | Renders Obvious |
| 20. | Mack, Barbara, *A Prescription for Cutting Corporate Health Expenses*, Wall Street Journal (Jul. 18, 1983). | Renders Obvious |
| 21. | U.S. Pat. No. 4,591,983, issued May 27, 1986 (Bennett patent) | Anticipates/Renders Obvious |
| 22. | U.S. Pat. No. 4,667,292, issued May 19, 1987 (Mohlenbrock patent) | Anticipates/Renders Obvious |
| 23. | U.S. Pat. No. 5,018,067, issued May 21, 1991 (Mohlenbrock 2 patent) | Renders Obvious |
| 24. | U.S. Pat. No. 5,070,452, issued Dec. 3, 1991 (Doyle patent) | Renders Obvious |
| 25. | U.S. Pat. No. 4,803,641, issued Feb. 7, 1989 (Hardy patent) | Renders Obvious |
| 26. | Jap. Appl. No. 55-107352, entitled " Medical business system," published Feb. 24, 1982 (Yoshikuni App.) | Anticipates/Renders Obvious |

In addition, the following references in combination with those cited and referenced above render one or more claims of the '164 patent obvious.

1.   Marva J. Crouff, *Automating Claims Processing*, Insurance Software Review, Autumn 1988, pp. 52, 54.

2.   *Enhancing Accuracy and Timeliness is Integral to the Claims Adjudication Process*, Employee Benefit Plan Review, Anonymous, Dec. 1985, pp. 10-12.

3.   *Expert System identifies miscoded health claims*, Bests Review: Life/Health, November 1990,60

4.    *Claims editing software runs coding rule checks*, Bests Review: Life/Health, November 1990, 62

5.    Woolsey, C., *Employer spots inflated medical bills*, Business Insurance, June 25, 1990, 3

6.    Leary, E., *SSA applies expertise to develop expert systems (Spotlight on AI-expert systems, Social Security Administration)*, Government Computer News, Vol. 6, No. 17, August 28, 1987, 49(3)

7.    Beard, P., *Blue Cross develops insurance claim ES*, AIWeek, Vol. 6, No. 7, April 1, 1989, 3

8.    Sullivan-Trainor, M., *Catching new clients*, Computerworld, Vol. 21, No. 50, December 14, 1987, 95, 99

9.    Snyeder, C., *From research to reality: the leading edge of expert systems*, Insurance Software Review, Vol. 12, No. 3, Autumn 1987, 22-4, 26-7, 30

10.    Christensen, J., *Insuring*, High Technology Business, Vol. 8, No. 10, October 1988, 47-8

11.    *Expert Systems In the Insurance Industry: 1987 Survey Report Update*, Coopers and Lybrand, 1987

12.    Pallatto, J., *Expert system cures the blues (Blue Cross develops insurance claims analysis system NERSys)*, PC Week, Vol. 5, No. 50, December 12, 1988, 35, 44.

13.    Gladwell, Malcolm, *Computer Firm Finds the Link for Health Care*, Washington Business, December 5, 1988, 5-6

14.    Freudenheim, Milt, *Insurers vs. Doctors: A Software Battleground*, New York Times (Nov. 15, 1989)

15.    Riordan, Teresa, *Patents: A software-technology infringement case against Microsoft goes to trial in Federal Court*, New York Times (Jan. 24, 1994).

16.    U.S. Pat. No. 4,858,121, issued Aug. 15, 1989 (Barber patent)

17.    U.S. Pat. No. 4,658,370, issued Apr. 14, 1987 (Erman patent)

Second, the '164 patent is invalid under 35 U.S.C. § 102(b), because the CodeReview product from McKesson's predecessor in interest was in public use and/or on-sale more than one year prior to the date that the priority application was filed. This is evidenced by at least the following publicly available references: (1) U.S. Trademark No. 1,624,579, registered November

8

27, 1990 (CodeReview Mark); and (2) Bhide, Amar and Mohan, Brian, *Marcia Radosevich and Health Payment Review: 1989(A)*, Harvard Business School, 9-394-204 (Feb. 1999). Additional documents produced by McKesson reveal that prior to the CodeReview product being finalized, a "prototype" was being sold, offered for sale and/or given away to customers and prospects well before the priority application was filed.

Third, the '164 patent is invalid under 35 U.S.C. §§ 102(a) & 102(g), insofar as the invention disclosed and claimed therein was made by others and in use by others prior to the date of invention for the '164 patent. Specifically, Medical C Schedule and Audit System and MediStar from Insurance Software Packages, Inc., and Code Advisor and ClaimCheck from Gabrieli Medical Information Systems, Inc. These systems were used and offered for sale by others before the date of invention of the '164 patent.

Fourth, the '164 patent is invalid under 35 U.S.C. § 102(f). The invention described, disclosed and claimed in the '164 patent was not conceived by the inventors listed in the patent. The claims of the '164 patent each describe and claim a "computer system" that depends upon and interacts with a "predetermined database stored in the associated memory." TriZetto is informed and believes that the named inventors lacked sufficient knowledge and detail so as to conceive and/or reduce to practice a "predetermined database stored in the associated memory." Others, who were not identified in the patent were the persons who conceived and reduced this invention to practice.

## SECOND SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 6: (June 20, 2005)

TriZetto reasserts and reincorporates by reference herein its responses to Interrogatory No. 6 from January 20, 2005 and May 5, 2005, except for the lists of prior art references from the May 5, 2005 supplemental response, which are superseded by the list of prior art references in this response. TriZetto also reasserts and reincorporates by reference herein the general objections set forth above.

Claim construction in this action has not occurred, and discovery has only just begun with no depositions having been conducted to date. The information contained in this response is

9

based on information that is reasonably available to TriZetto at the present time. TriZetto's identification of prior art is as specific as is possible at this time. Accordingly, TriZetto reserves the right to supplement, amend and augment its response to this interrogatory as new, additional and different information is learned and discovered and when the claims at issue are construed by the Court. Subject to and without waiving those objections, TriZetto supplements its previous response as follows:

Claims 1, 2, 3, 4, 6, 9, 10, 11, 12, 13 and 14 of the '164 patent, which McKesson accuses TriZetto of infringing, are invalid and unenforceable against TriZetto because at least 15 references cited in the '164 patent and 71 additional prior art references together completely disclose and describe the apparatus and methods claimed and described in the asserted claims of the '164 patent, rendering the patent invalid as either anticipated or obvious under 35 U.S.C. § § 102 & 103. Set forth below is a chart of the prior art references that TriZetto presently contends anticipate one or more claims of the patent in suit or render one or more claims obvious. This chart supersedes the lists of prior art references provided in TriZetto's May 5, 2005 supplemental response.

| Tab | Author, Title & Source | Anticipates/Renders Obvious |
|---|---|---|
| 1. | Marva J. Crouff, *Automating Claims Processing*, Insurance Software Review, Autumn 1988, pp. 52, 54. | Renders Obvious |
| 2. | *Enhancing Accuracy and Timeliness is Integral to the Claims Adjudication Process*, Employee Benefit Plan Review, Anonymous, Dec. 1985, pp. 10-12. | Renders Obvious |
| 3. | Healthstar, Health Benefits Management System, Product Description, v. 1.024 (Insurance Software Packages, Inc.) | Renders Obvious |
| 4. | *System validates medical fee schedules*, Best Review: Life/Health, June 1987, 92 [Insurance Software Packages, Inc. Medical C Schedule and Audit System] | Anticipates/Renders Obvious |
| 5. | *Expert System identifies miscoded health claims*, Bests Review: Life/Health, November 1990,6&) | Renders Obvious |

| Title | Author, Title & Source | Anticipates/Renders Obvious |
|---|---|---|
| 6. | *Claims editing software runs coding rule checks*, Bests Review: Life/Health, November 1990, 62 | Renders Obvious |
| 7. | Woolsey, C., *Employer spots inflated medical bills*, Business Insurance, June 25, 1990, 3 | Renders Obvious |
| 8. | Weitzel, J.R., et al., *A Company / University Joint Venture to build a knowledge-based system*, MIS Quarterly, Vol. 12, No. 1, March 1988,23-34 | Anticipates/Renders Obvious |
| 9. | Leary, E., *SSA applies expertise to develop expert systems (Spotlight on AI-expert systems, Social Security Administration)*, Government Computer News, Vol. 6, No. 17, August 28, 1987, 49(3) | Renders Obvious |
| 10. | Beard, P., *Blue Cross develops insurance claim ES*, AIWeek, Vol. 6, No. 7, April 1, 1989, 3 | Renders Obvious |
| 11. | Sullivan-Trainor, M., *Catching new clients*, Computerworld, Vol. 21, No. 50, December 14, 1987, 95, 99 | Renders Obvious |
| 12. | Snyeder, C., *From research to reality: the leading edge of expert systems*, Insurance Software Review, Vol. 12, No. 3, Autumn 1987,22-4,26-7,30 | Renders Obvious |
| 13. | Christensen, J., *Insuring*, High Technology Business, Vol. 8, No. 10, October 1988, 47-8 | Renders Obvious |
| 14. | *Expert Systems In the Insurance Industry: 1987 Survey Report Update*, Coopers and Lybrand, 1987 | Renders Obvious |
| 15. | Pallatto, J., *Expert system cures the blues (Blue Cross develops insurance claims analysis system NERSys)*, PC Week, Vol. 5, No. 50, December 12, 1988, 35, 44. | Renders Obvious |
| 16. | Gladwell, Malcolm, *Computer Firm Finds the Link for Health Care*, Washington Business, December 5, 1988, 5-6 | Renders Obvious |
| 17. | Kerschberg, L., "A Proposal for the Development of an Expert System for Medical Claims Processing: MEDCLAIM," Institute of Information Management, Technology and Policy, College of Business Administration, University of South Carolina, Columbia, SC, (July 1985). | Anticipates/Renders Obvious |

| Tab | Author, Title & Source | Anticipates/Renders Obvious |
|---|---|---|
| 18. | Weitzel, J.R. and Kerschberg, L., "Developing Knowledge- Based Systems: Reorganizing the System Development Life Cycle," working paper, University of South Carolina, Columbia, SC and George Mason University, Fairfax, VA (December 1986).<br>Final Publication, April 1989 in Communications of the ACM, Vol. 32, No. 4. | Renders Obvious |
| 19. | Ronald Hurst, *Cost Containment - The Caterpillar Experience*, The Psychiatric Hospital, vol. 13, no. 3 (1982). | Renders Obvious |
| 20. | Egdahl, M.D. and Hertenstein, M.D., *An Access-oriented Negotiated Fee Schedule: The Caterpillar Experience*, Ann Surg., 206(3), pp. 349-57 (Sept. 1987). | Anticipates/Render Obvious |
| 21. | Bauer JW, Cassidy TG, DeBord JR, Hart RD, Lee RH, Maher JE, Montgomery CE, Neufeld GK, Rivan RJ, Soderstrom CW, et al., Related Articles, *An access-oriented negotiated fee schedule: the Caterpillar experience*, Ann Surg., 208(5), pp. 667-8 (Nov. 1988). | Renders Obvious |
| 22. | Waterman, Donald A. (The Rand Corporation), *A Guide to Expert Systems*, Addison-Wesley Publishing, Inc. (1985). | Renders Obvious |
| 23. | McDermott, John, *Artificial Intelligence Applications for Business: Building Expert Systems*, Proceedings of the NYU Symposium (May 1983). | Renders Obvious |
| 24. | Gerson, Elihu and Star, Susan Leigh, *Analyzing Due Process in the Workplace*, ACM Transactions on Office Information systems, vol. 4, no. 3 (July 1986). | Renders Obvious |
| 25. | Hayes-Roth, Frederick, *et. al., Building Expert Systems: An Overview of Expert Systems*, Addison-Wesley Publishing, Inc. (1985). | Renders Obvious |
| 26. | Taylor, Edward, *Developing A Knowledge Engineering Capability in the TRW Defense Systems Group*, The Al Magazine (Summer 1985) | Renders Obvious |
| 27. | Bobrow, Daniel, *et. al., Expert Systems: Perils and Promise*, Computing Practices, Communications of the ACM, vol. 29, no. 9 (Sept. 1986) | Renders Obvious |

| Tab | Author, Title & Source | Anticipates/Renders Obvious |
|---|---|---|
| 28. | Bhide, Amar and Mohan, Brian, *Marcia Radosevich and Health Payment Review: 1989(A)*, Harvard Business School, 9-394-204 (Feb. 1999) | Renders Obvious |
| 29. | Genesereth, Michael, Ginsberg, Matthew, *Logic Programming*, Communications of the ACM, vol. 28, no. 9 (Sept. 1985). | Renders Obvious |
| 30. | Yasdi, Ramin, *Modeling Database Based Expert Systems at the Conceptual Level*, Proceedings of the 1985 ACM Computer Science Conference (March 1985). | Renders Obvious |
| 31. | Freudenheim, Milt, *Insurers vs. Doctors: A Software Battleground*, New York Times (Nov. 15, 1989) | Renders Obvious |
| 32. | Riordan, Teresa, *Patents: A software-technology infringement case against Microsoft goes to trial in Federal Court*, New York Times (Jan. 24, 1994). | Renders Obvious |
| 33. | Colmerauer, Alain, *Prolog in 10 Figures*, Communications of the ACM, vol. 28, no. 12 (Dec. 1985). | Renders Obvious |
| 34. | Hayes-Roth, Frederick, *Rule-Based Systems*, Communications of the ACM, vol. 28, no. 9 (Sept. 1985). | Renders Obvious |
| 35. | Weitzel, J.R. and Kerschberg, L., *A. System Development Methodology for Knowledge-Based Systems*, IEEE Transactions on Systems, Man and Cybernetics, vol. 19, no. 3 (May/June 1989). | Renders Obvious |
| 36. | Winston, Patrick H., Prendergast, Karen A., *The AI Business: The Commercial Uses of Artificial Intelligence*, The MIT Press (1984) | Renders Obvious |
| 37. | Mack, Barbara, *A Prescription for Cutting Corporate Health Expenses*, Wall Street Journal (Jul. 18, 1983). | Renders Obvious |
| 38. | U.S. Pat. No. 4,591,983 (Bennett patent) | Anticipates/Renders Obvious |
| 39. | U.S. Pat. No. 4,667,292 (Mohlenbrock patent) | Anticipates/Renders Obvious |
| 40. | U.S. Pat. No. 5,018,067 (Mohlenbrock 2 patent) | Anticipates/Renders Obvious |
| 41. | U.S. Pat. No. 5,070,452 (Doyle patent) | Anticipates/Renders Obvious |
| 42. | U.S. Pat. No. 4,858,121 (Barber patent) | Renders Obvious |
| 43. | U.S. Pat. No. 4,658,370 (Erman patent) | Renders Obvious |
| 44. | U.S. Pat. No. 4,803,641 (Hardy patent) | Anticipates/Renders Obvious |

| Tab | Author, Title & Source | Anticipates/Renders Obvious |
|---|---|---|
| 45. | Jap. Appl. No. 55-107352, entitled "Medical business system" (Yoshikuni App.) | Anticipates/Renders Obvious |
| 46. | U.S. Trademark No. 1,583,416 (ClaimCheck Mark) | Renders Obvious |
| 47. | U.S. Trademark No. 1,624,579 (CodeReview Mark) | Renders Obvious |
| 48. | U.S. Trademark No. 2,165,159 (Code Advisor Mark) | Renders Obvious |
| 49. | Stachura CT, *Software reference guide: case-mix management*, Journal of the American Medical Record Association [J Am Med Rec Assoc] February 1987, Vol. 58 (2), pp. 42-6. | Renders Obvious |
| 50. | Stachura CT, *Software reference guide: DRG assignment*, J Am Med Rec Assoc, January 1987, Vol. 58, (1), pp. 33-40 | Renders Obvious |
| 51. | Stachura CT, *Software reference guide: encoding*, J Am Med Rec Assoc, November 1986, Vol. 57 (11), pp. 25-8 | Renders Obvious |
| 52. | Wilkinson R, *Does your grouper 'over-maximize' reimbursement?*, Hospitals, October 20, 1986, Vol. 60 (20), pp. 88 | Renders Obvious |
| 53. | Huertas-Cortocarrero D, Ruiz PP, Marmol JP, *Concurrent clinical review: using microcomputer-based DRG-software*, Health Policy 1988, Vol. 9 (2), pp. 211-7 | Renders Obvious |
| 54. | Nathanson M, *Medical records. Experts: more research needed to set value of code programs*, Modern Healthcare, June 21, 1985, Vol. 15 (13), pp. 98, 102. | Renders Obvious |
| 55. | Caterinicchio RP, *Implementing a DRG-driven acuity system for nurse staffing under prospective hospital payment*, Hospital Topics, May-June 1985, Vol. 63 (3), pp. 6-7, 13 | Renders Obvious |
| 56. | Jackson B, Jensen J, *Hospitals turn to new software, hardware to cope with DRG 's*, Modern Healthcare, September 1984, Vol. 14 (12), pp. 109-12 | Renders Obvious |
| 57. | Nathanson M, *New software helps hospitals watch costs, profit under DRG*, Modern Healthcare, September 1984, Vol. 14 (12), pp. 132, 136-8 | Renders Obvious |
| 58. | *DRG helper makes it easy for doctors to maximize reimbursement*, Hospital Forum, July-August 1984, Vol. 27 (4), pp. 62-3 | Renders Obvious |

| Tab | Author, Title & Source | Interpreted Teach-Away/Reason |
|---|---|---|
| 59. | Burda D, *Health care market experiences grouper software explosion*, J Am Med Rec Assoc, May 1984, Vol. 55 (5), pp. 35-7 | Renders Obvious |
| 60. | *Health care executive's guidebook to automation in the 1980s: health care information systems and DRG's*, Hospital Forum, Jan-Feb 1984, Vol. 27 (1), pp. 23-30 | Renders Obvious |
| 61. | Gonnella JS, Hornbrook MC, Louis DZ, *Staging of disease. A case mix measurement*, Journal of the American Medical Association [JAMA], February 3, 1984, Vol. 251 (5), pp. 637-44 | Renders Obvious |
| 62. | Ray WJ, Johnstone J, *Using medical records to ensure fair DRG reimbursement*, Computer in Healthcare, December 1983, Vol. 4 (12), pp. 32-6, 40 | Renders Obvious |
| 63. | Heck S, Esmond T, *Financial modeling/case-mix analysis*, Computers in Healthcare, June 19:x?:, Vol. 4 (6), pp. 50-1, 54 | Renders Obvious |
| 64. | Moliver M, *Computers and reimbursement*, Contemporary longterm care, April 1986, Vol. 9 (4), pp. 46-7 | Renders Obvious |
| 65. | Turner JM, *DRG compliance measurement in the future*, Software in Healthcare, August-September 1985, Vol. 3 (4), pp. 48 | Renders Obvious |
| 66. | Mohlenbrock WC, *Getting the most out of DRG's*, Group Practice Journal, September-October 1985, Vol. 34 (5), pp. 27-32 | Renders Obvious |
| 67. | Gibbons PS, Pishotta FT, Stepto RC, *A system for reporting gynecologic procedures. A linguistic-logical approach*, Journal of Reproductive Medicine, March 1983, Vol. 28 (3), pp. 201-5 | Renders Obvious |
| 68. | Studney DR, Hakstian AR, *Effect of a computerized ambulatory medical record system on the validity of claims data*, Medical Care, April 1983, Vol. 21 (4), pp. 463-7 | Renders Obvious |
| 69. | Poulson GP, *Detailed costing system nets efficiency, savings*, Hospitals, October 1, 1984, Vol. 58 (19), pp. 106-8, 111 | Renders Obvious |

| Tab | Author, Title & Source | Anticipates, Renders Obvious |
|---|---|---|
| 70. | *Medical coding*, Medical Record and Health Care Information Journal, February 1988, Vol. 29 (1), pp. 20-2 | Renders Obvious |
| 71. | Johnson KF, *Integrated system brings hospital data together*, Health Progress, October 1987, Vol. 68 (8), pp. 46-9, 82 | Renders Obvious |
| 72. | Tauber J, Lahav M, *Simplified diagnostic coding sheet for computerized data storage and analysis in ophthalmology*, Ophthalmic Surgery, November 1987, Vol. 18 (11), pp. 846 9 | Renders Obvious |
| 73. | Miller KM, Wisnicki HJ, Buclunan JP. Paley MJ, Repka MX, Taylor HR, Guyton DL, *The Wilmer Information System. A classification and retrieval system for information on diagnosis and therapy in ophthalmology*, Ophthalmology, March 1988, Vol. 95 (3), pp. 403-9 | Renders Obvious |
| 74. | Carter K, PCs *can tap databanks for costs*, Modern Healthcare, June 20 1986, Vol. 16 (13), pp. 52 | Renders Obvious |
| 75. | Ohnsson J, GMIS (*Gabrieli Medication Information Systems) software flags inappropriate billings, medical procedures*, Contract Healthcare, May 1988, pp. 28-9 | Renders Obvious |
| 76. | Cimino JJ, *Review paper: coding systems in health care*, Methods of Information in Medicine, December 1996, Vol. 35 (4-5), pp. 273-84 | Renders Obvious |
| 77. | Gabrieli ER, Speth DJ, Chsieaghi E, *Knowledge bases*, Journal of Clinical Computing, 1985, Vol. 13 (5), pp. 150-4 | Renders Obvious |
| 78. | Gabrieli ER, Saumby JA, *Computer-based coding of medical data*, Topics in Health Record Management, March 1982, Vol. 2 (3), pp. 51-9 | Renders Obvious |
| 79. | Ely RM, *Savings through claims audits*, Topics in Health Care Financing, Summer 1986, Vol. 12 (4), pp. 61-7 | Renders Obvious |
| 80. | U.S. Pat. No. 4,347,568 (Giguere patent) | Renders Obvious |
| 81. | U.S. Pat. No. 4,491,725 (Pritchard patent) | Renders Obvious |
| 82. | U.S. Pat. No. 4,730,259 (Gallant patent) | Renders Obvious |
| 83. | U.S. Pat. No. 4,839,822 (Dormond patent). | Renders Obvious |

| File | Author, Title & Source | Anticipates/Renders Obvious |
|---|---|---|
| 84. | U.S. Pat. No. 4,937,743 (Rassman patent) | Renders Obvious |
| 85. | U.S. Pat. No. 4,975,840 (De Tore patent) | Renders Obvious |
| 86. | U.S. Pat. No. 4,991,091 (Allen patent) | Renders Obvious |

Set forth below is an element-by-element chart mapping the prior art references listed above to each element of the asserted claims of the '164 patent,

| '164 PATENT CLAIM | PRIOR ART REFERENCES THAT ANTICIPATE OR RENDER OBVIOUS |
|---|---|
| 1.      In a computer system having means for operating on a predetermined database containing medical service codes and a set of relationships among the medical service codes defining whether selected ones of the medical service codes are valid when input with other selected ones of the medical service codes, | 2 (pp. 10-12); 3 (pp. 3-4, 8); 4; 5; 6; 8 (pp. 28-30); 10; 12 (p. 26); 15; 18 (pp. 483, 485); 20 (pp. 351-353); 39 (cols. 9-12); 40 (cols. 5-6, 9-10); 41(cols. 2-6). |
| a method for processing input claims containing at least one medical service code, comprising the steps of: | 2 (pp. 10-12); 3 (pp. 3-4, 8); 4; 5; 6; 8 (pp. 28-30); 10; 12 (p. 26); 15; 18 (pp. 483, 485); 20 (pp. 351-353); 39 (cols. 9-12); 40 (cols. 5-6, 9 10); 41 (cols. 2-6). |
| receiving at least one claim; | 2 (pp. 10-12); 3 (pp. 3-4, 8); 4; 5; 6; 8 (pp. 28-30); 10; 12 (p. 26); 15; 18 (pp. 483, 485); 20 (pp. 351-353); 22; 27 (p. 882); 34; 38 (cols. 3-8, 11-16, 20-24); 39 (cols. 9-12); 40 (cols. 5-6, 9-10); 41 (cols. 2-6); 43 (cols. 5-6); 44 (col. 10); 85. |
| determining whether any medical service code contained in the at least one claim is not present in the predetermined database; and informing a user that a medical service code is not contained in the predetermined database. | 3 (pp. 3-4, 8); 4; 5; 6; 8 (pp. 28-30); 10; 12 (p. 26); 15; 18 (pp. 483, 485); 20 (pp. 351-353); 22; 27 (p. 882); 34; 38 (cols. 3-8, 11-16, 20-24); 39 (cols. 9-12); 40 (cols. 5-6, 9-10); 41 (cols. 2-6); 43 (cols. 5-6); 44 (col. 10); 85. |

| '164 PATENT CLAIM | PRIOR ART REFERENCES THAT ANTICIPATE OR RENDER OBVIOUS |
|---|---|
| 2.      In a computer system having means for operating on a predetermined database containing medical service codes and a set of relationships among the medical service codes defining whether selected ones of the medical service codes are valid when input with other selected ones of the medical service codes, | 2 (pp. 10-12); 3 (pp. 3-4, 8); 4; 5; 6; 8 (pp. 28-30); 10; 12 (p. 26); 15; 18 (pp. 483, 485); 20 (pp. 351-353); 39 (cols. 9-12); 40 (cols. 5-6, 9-10); 41 (cols. 2-6). |
| a method for processing input claims containing at least one medical service code, comprising the steps of: | 2 (pp. 10-12); 3 (pp. 3-4, 8); 4; 5; 6; 8 (pp. 28-30); 10; 12 (p. 26); 15; 18 (pp. 483, 485); 20 (pp. 351-353); 39 (cols. 9-12); 40 (cols. 5-6, 9-10); 41 (cols. 2-6). |

| | |
|---|---|
| receiving at least one claim; | 2 (pp. 10-12); 3 (pp. 3-4, 8); 4; 5; 6; 8 (pp. 28-30); 10; 12 (p. 26); 15; 18 (pp. 483, 485); 20 (pp. 351-353); 22; 27 (p. 882); 34; 38 (cols. 3-8, 11-16, 20-24); 39 (cols. 9-12); 40 (cols. 5-6, 9-10); 41 (cols. 2-6); 43 (cols. 5-6); 44 (col. 10); 85. |
| ascertaining whether the at least one claim contains a plurality of medical service codes; | 2 (pp. 10-12); 3.(pp. 3-4, 8); 4; 5; 6; 8 (pp. 28-30); 10; 12 (p. 26); 15; 18 (pp. 483, 485); 20 (pp. 351-353); 22; 27 (p. 882); 34; 38 (cols. 3-8, 11-16, 20-24); 39 (cols. 9-12); 40 (cols. 5-6, 9-10); 41 (cols. 2-6); 43 (cols. 5-6); 44 (col. 10); 85. |
| determining whether one of the medical service codes in the at least one claim is mutually exclusive due to non-medical criteria with any other medical service code in the at least one claim: | 2 (pp. 10-12); 3 (pp. 3-4, 8); 4; 5; 6; 8 (pp. 28-30); 10; 12 (p. 26); 15; 18 (pp. 483, 485); 20 (pp. 351-353); 22; 27 (p. 882); 34; 38 (cols. 3-8, 11-16, 20-24); 39 (cols. 9-12); 40 (cols. 5-6, 9-10); 41 (cols. 2-6); 43 (cols. 5-6); 44 (col. 10); 85. |
| authorizing medical service codes which are not mutually exclusive due to non-medical criteria with any other medical service cades contained in the at least one claim in response to the determining step; and rejecting medical service codes which are mutually exclusive due to non-medical criteria with any other medical service codes contained in the at least one claim in response to the determining step. | 2 (pp. 10-12); 3 (pp. 3-4, 8); 4; 5; 6; 8 (pp. 28-30); 10; 12 (p. 26); 15; 18 (pp. 483, 485); 20 (pp. 351-353); 22; 27 (p. 882); 34; 38 (cols. 3-8, 11-16, 20-24); 39 (cols. 9-12); 40 (cols. 5-6, 9-10); 41 (cols. 2-6); 43 (cols. 5-6); 44 (col. 10); 85. |

| '164 PATENT CLAIMS | PRIOR ART REFERENCES THAT ANTICIPATE OR RENDER OBVIOUS |
|---|---|
| 3.    A computer system including a central processing unit and associated memory for processing input claims containing at least one medical service claim, comprising: | 2 (pp. 10-12); 3 (pp. 3-4, 8); 4; 5; 6; 8 (pp. 28-30); 10; 12 (p. 26); 15; 18 (pp. 483, 485); 20 (pp. 351-353); 39 (cols. 9-12); 40 (cols. 5-6, 9-10); 41 (cols. 2-6). |
| a predetermined database stored in the associated memory, the database containing medical service codes and a set of relationships among the medical service codes defining whether selected ones of the medical service codes are valid when received with other selected ones of the medical service codes; | 2 (pp. 10-12); 3 (pp. 3-4, 8); 4; 5; 6; 8 (pp. 28-30); 10; 12 (p. 26); 15; 18 (pp. 483, 485); 20 (pp. 351-353); 39 (cols. 9-12); 40 (cols. 5-6, 9-10); 41 (cols. 2-6). |
| means for receiving at least one claim; | 2 (pp. 10-12); 3 (pp. 3-4, 8); 4; 5; 6; 8 (pp. 28-30); 10; 12 (p. 26); 15; 18 (pp. 483, 485); 20 (pp. 351-353); 22; 27 (p. 882); 34; 38 (cols. 3-8, 11-16, 20-24); 39 (cols. 9-12); 40 (cols. 5-6, 9-10); 41 (cols. 2-6); 43 (cols. 5-6); 44 (col. 10); 85. |
| means for ascertaining whether the at least one claim contains a plurality of medical service codes; | 2 (pp. 10-12); 3 (pp. 3-4, 8); 4; 5; 6; 8 (pp. 28-30); 10; 12 (p. 26); 15; 18 (pp. 483, 485); 20 (pp. 351-353); 22; 27 (p. 882); 34; 38 (cols. 3-8, 11-16, 20-24); 39 (cols. 9-12); 40 (cols. 5-6, 9-10); 41 (cols. 2-6); 43 (cols. 5-6); 44 (col. 10); 85. |
| means for determining whether one of the medical service codes in the plurality of | 2 (pp. 10-12); 3 (pp. 3-4, 8); 4; 5; 6; 8 (pp. 28-30); 10; 12 (p. 26); 15; 18 (pp. 483, 485); 20 (pp. 351-353); 22; 27 (p. 882); 34; 38 (cols. 3-8, |

| medical service codes is valid or invalid by interacting with the database and the set of relationships contained in the database: | 11-16, 20-24); 39 (cols. 9-12); 40 (cols. 5-6, 9-10); 41 (cols. 2-6); 43 (cols. 5-6); 44 (col. 10); 85. |
| --- | --- |
| means for authorizing medical service codes which are valid in response to the means for determining; and means for rejecting medical service codes which are invalid in response to the means for determining. | 2 (pp. 10-12); 3 (pp. 3-4, 8); 4; 5; 6; 8 (pp. 28-30); 10; 12 (p. 26); 15; 18 (pp. 483, 485); 20 (pp. 351-353); 22; 27 (p. 882); 34; 38 (cols. 3-8, 11-16, 20-24); 39 (cols. 9-12); 40 (cols. 5-6, 9-10); 41 (cols. 2-6); 43 (cols. 5-6); 44 (col. 10); 85. |

| '170 PATENT CLAIM 4 | PRIOR ART REFERENCES THAT ANTICIPATE OR RENDER OBVIOUS |
| --- | --- |
| 4.      The apparatus of claim 3, further comprising means for revising the at least one claim to delete invalid medical service codes. | 2 (pp. 10-12); 3 (pp. 3-4, 8); 4; 5; 6; 8 (pp. 28-30); 10; 12 (p. 26); 15; 18 (pp. 483, 485); 20 (pp. 351-353); 22; 27 (p. 882); 34; 38 (cols. 3-8, 11-16, 20-24); 39 (cols. 9-12); 40 (cols. 5-6, 9-10); 41 (cols. 2-6); 43 (cols. 5-6); 44 (col. 10); 85. |

| '170 PATENT CLAIM 6 | PRIOR ART REFERENCES THAT ANTICIPATE OR RENDER OBVIOUS |
| --- | --- |
| 6.      The apparatus of claim 3, wherein the database containing medical service codes includes medical service codes described by CPT codes. | 2 (pp. 10-12); 3 (pp. 3-4, 8); 4; 5; 6; 8 (pp. 28-30); 10; 12 (p. 26); 15; 18 (pp. 483, 485); 20 (pp. 351-353); 39 (cols. 9-12); 40 (cols. 5-6, 9-10); 41 (cols. 2-6). |

| '170 PATENT CLAIM 9 | PRIOR ART REFERENCES THAT ANTICIPATE OR RENDER OBVIOUS |
| --- | --- |
| 9.      The apparatus of claim 3, wherein the relationships among the medical service codes include medically determined relationships. | 2 (pp. 10-12); 3 (pp. 3-4, 8); 4; 5; 6; 8 (pp. 28-30); 10; 12 (p. 26); 15; 18 (pp. 483, 485); 20 (pp. 351-353); 39 (cols. 9-12); 40 (cols. 5-6, 9-10); 41 (cols. 2-6). |

| '170 PATENT CLAIM 10 | PRIOR ART REFERENCES THAT ANTICIPATE OR RENDER OBVIOUS |
| --- | --- |
| 10.      A computer system including a central processing unit and associated memory for processing input claims containing at least one medical service claim, comprising: | 2 (pp. 10-12); 3 (pp. 3-4, 8); 4; 5; 6; 8 (pp. 28-30); 10; 12 (p. 26); 15; 18 (pp. 483, 485); 20 (pp. 351-353); 39 (cols. 9-12); 40 (cols. 5-6, 9-10); 41 (cols. 2-6). |
| a predetermined database stored in the associated memory, the database containing medical service codes and a set of relationships among the medical service codes defining whether selected ones of the medical service codes are valid when received with other selected ones of the | 2 (pp. 10-12); 3 (pp. 3-4, 8); 4; 5; 6; 8 (pp. 28-30); 10; 12 (p. 26); 15; 18 (pp. 483, 485); 20 (pp. 351-353); 39 (cols. 9-12); 40 (cols. 5-6, 9-10); 41 (cols. 2-6). |

| medical service codes; | |
|---|---|
| means for receiving at least one claim; | 2 (pp. 10-12); 3 (pp. 3-4, 8); 4; 5; 6; 8 (pp. 28-30); 10; 12 (p. 26); 15; 18 (pp. 483, 485); 20 (pp. 351-353); 22; 27 (p. 882); 34; 38 (cols. 3-8, 11-16, 20-24); 39 (cols. 9-12); 40 (cols. 5-6, 9-10); 41 (cols. 2-6); 43 (cols. 5-6); 44 (col. 10); 85. |
| means for ascertaining whether the at least one claim contains a plurality of medical service codes; | 2 (pp. 10-12); 3 (pp. 3-4, 8); 4; 5; 6; 8 (pp. 28-30); 10; 12 (p. 26); 15; 18 (pp. 483, 485); 20 (pp. 351-353); 22; 27 (p. 882); 34; 38 (cols. 3-8, 11-16, 20-24); 39 (cols. 9-12); 40 (cols. 5-6, 9-10); 41 (cols. 2-6); 43 (cols. 5-6); 44 (col. 10); 85. |
| means for determining whether one of the medical service codes in the at least one claim is included in any other medical service code in the at least one claim; | 2 (pp. 10-12); 3 (pp. 3-4, 8); 4; 5; 6; 8 (pp. 28-30); 10; 12 (p. 26); 15; 18 (pp. 483, 485); 20 (pp. 351-353); 22; 27 (p. 882); 34; 38 (cols. 3-8, 11-16, 20-24); 39 (cols. 9-12); 40 (cols. 5-6, 9-10); 41 (cols. 2-6); 43 (cols. 5-6); 44 (col. 10); 85. |
| means for authorizing medical service codes which are not contained in any other medical service code; and means for rejecting medical service codes which axe contained in any other medical service code. | 2 (pp. 10-12); 3 (pp. 3-4, 8); 4; 5; 6; 8 (pp. 28-30); 10; 12 (p. 26); 15; 18 (pp. 483, 485); 20 (pp. 351-353); 22; 27 (p. 882); 34; 38 (cols. 3-8, 11-16, 20-24); 39 (cols. 9-12); 40 (cols. 5-6, 9-10); 41 (cols. 2-6); 43 (cols. 5-6); 44 (col. 10); 85. |

| '78 PATENT CLAIM 11 | PRIOR ART REFERENCES THAT ANTICIPATE OR RENDER OBVIOUS |
|---|---|
| 11.    The apparatus of claim 10, further comprising means for revising the at least one claim to not include a rejected medical service code. | 2 (pp. 10-12); 3 (pp. 3-4, 8); 4; 5; 6; 8 (pp. 28-30); 10; 12 (p. 26); 15; 18 (pp. 483, 485); 20 (pp. 351-353); 22; 27 (p. 882); 34; 38 (cols. 3-8, 11-16, 20-24); 39 (cols. 9-12); 40 (cols. 5-6, 9-10); 41 (cols. 2-6); 43 (cols. 5-6); 44 (col. 10); 85. |

| '78 PATENT CLAIM 12 | PRIOR ART REFERENCES THAT ANTICIPATE OR RENDER OBVIOUS |
|---|---|
| 12.    A computer system including a central processing unit and associated memory for processing input claims containing at least one medical service code, comprising: | 2 (pp. 10-12); 3 (pp. 3-4, 8); 4; 5; 6; 8 (pp. 28-30); 10; 12 (p. 26); 15; 18 (pp. 483, 485); 20 (pp. 351-353); 39 (cols. 9-12); 40 (cols. 5-6, 9-10); 41 (cols. 2-6). |
| a predetermined database. stored in the associated memory, the database containing medical service codes and a set of relationships among the medical service codes defining whether selected ones of the medical service codes are valid when received with other selected ones of the medical service codes; | 2 (pp. 10-12); 3 (pp. 3-4, 8); 4; 5; 6; 8 (pp. 28-30); 10; 12 (p. 26); 15; 18 (pp. 483, 485); 20 (pp. 351-353); 39 (cols. 9-12); 40 (cols. 5-6, 9-10); 41 (cols. 2-6). |
| means for receiving at least one claim; | 2:(pp. 10-12); 3 (pp. 3-4, 8); 4; 5; 6; 8 (pp. 28-30); 10; 12 (p. 26); 15; 18 (pp. 483, 485); 20 (pp. 351-353); 22; 27 (p. 882); 34; 38 (cols. 3-8, 11-16, 20-24); 39 (cols. 9-12); 40 (cols. 5-6, 9-10); 41 (cols. 2-6); 43 (cols. 5-6); 44 (col. 10); 85. |
| means for ascertaining whether the at least | 2 (pp. 10-12); 3 (pp. 3-4, 8); 4; 5; 6; 8 (pp. 28-30); 10; 12 (p. 26); 15; |

| | |
|---|---|
| one claim contains a plurality of medical service codes; | 18 (pp. 483, 485); 20 (pp. 351-353); 22; 27 (p. 882); 34; 38 (cols. 3-8, 11-16, 20-24); 39 (cols. 9-12); 40 (cols. 5-6, 9-10); 41 (cols. 2-6); 43 (cols. 5-6); 44 (col. 10); 85. |
| means for determining whether one of the medical service codes in the at least one claim is medically exclusive with any other medical service code in the at least one claim; | 2 (pp. 10-12); 3 (pp, 3-4, 8); 4; 5; 6; 8 (pp. 28-30); 10; 12 (p. 26); 15; 18 (pp. 483, 485); 20 (pp. 351-353); 22; 27 (p. 882); 34; 38 (cols. 3-8, 11-16, 20-24); 39 (cols. 9-12); 40 (cols. 5-6, 9-10); 41 (cols. 2-6); 43 (cols. 5-6); 44 (col. 10); 85. |
| means for authorizing medical service codes which are not medically exclusive with any other medical service codes contained in the at least one claim in response to the means for determining; | 2 (pp. 10-12); 3 (pp. 3-4, 8); 4; 5; 6; 8 (pp. 28-30); 10; 12 (p. 26); 15; 18 (pp. 483, 485); 20 (pp. 351-353); 22; 27 (p. 882); 34; 38 (cols. 3-8, 11-16, 20-24); 39 (cols. 9-12); 40 (cols. 5-6, 9-10); 41 (cols. 2-6); 43 (cols. 5-6); 44 (col. 10); 85. |
| and means for rejecting medical service codes which are medically exclusive with any other medical service codes contained in the at least one claim in response to the determining step. | 2 (pp. 10-12); 3 (pp. 3-4, 8); 4; 5; 6; 8 (pp. 28-30); 10; 12 (p. 26); 15; 18 (pp. 483, 485); 20 (pp. 351-353); 22; 27 (p. 882); 34; 38 (cols. 3-8, 11-16, 20-24); 39 (cols. 9-12); 40 (cols. 5-6, 9-10); 41 (cols. 2-6); 43 (cols. 5-6); 44 (col. 10); 85. |

| '164 PATENT CLAIM 13 | PRIOR ART REFERENCES THAT ANTICIPATE OR RENDER OBVIOUS |
|---|---|
| 13.    A computer system including a central processing unit and associated memory for processing input claims containing at least one medical service code, comprising: | 2 (pp. 10-12); 3 (pp. 3-4, 8); 4; 5; 6; 8 (pp. 28-30); 10; 12 (p. 26); 15; 18 (pp. 483, 485); 20 (pp. 351-353); 39 (cols. 9-12); 40 (cols. 5-6, 9-10); 41 (cols. 2-6). |
| a predetermined database stored in the associated memory, the database containing medical service codes and a set of relationships among the medical service codes defining whether selected ones of the medical service codes axe valid when received with other selected ones of the medical service codes; | 2 (pp. 10-12); 3 (pp. 3-4, 8); 4; 5; 6; 8 (pp. 28-30); 10; 12 (p. 26); 15; 18 (pp. 483, 485); 20 (pp. 351-353); 39 (cols. 9-12); 40 (cols. 5-6, 9-10); 41 (cols. 2-6). |
| means for receiving at least one claim; | 2 (pp. 10-12); 3 (pp. 3-4, 8); 4; 5; 6; 8 (pp. 28-30); 10; 12 (p. 26); 15; 18 (pp. 483, 485); 20 (pp. 351-353); 22; 27 (p. 882); 34; 38 (cols. 3-8, 11-16, 20-24); 39 (cols. 9-12); 40 (cols. 5-6, 9-10); 41 (cols. 2-6); 43 (cols. 5-6); 44 (col. 10); 85. |
| means for determining whether any medical service code contained in the at least one claim is not present in the predetermined database; and means for informing a user that a medical service code is not contained in the predetermined database. | 2 (pp. 10-12); 3 (pp. 3-4, 8); 4; 5; 6; 8 (pp. 28-30); 10; 12 (p. 26); 15; 18 (pp. 483, 485); 20 (pp. 351-353); 22; 27 (p. 882); 34; 38 (cols. 3-8, 11-16, 20-24); 39 (cols. 9-12); 40 (cols. 5-6, 9-10); 41 (cols. 2-6); 43 (cols. 5-6); 44 (col. 10); 85. |

| '164 PATENT CLAIM 14 | PRIOR ART REFERENCES THAT ANTICIPATE OR RENDER OBVIOUS |
|---|---|

| | |
|---|---|
| 14.       A computer system including a central processing unit and associated memory for processing input claims containing at least one medical service code, comprising: | 2 (pp. 10-12); 3 (pp. 3-4, 8); 4; 5; 6; 8 (pp. 28-30); 10; 12 (p. 26); 15; 18 (pp. 483, 485); 20 (pp. 351-353); 39 (cols. 9-12); 40 (cols. 5-6, 9-10); 41 (cols. 2-6). |
| a predetermined database stored in the associated memory, the database containing medical service codes and a set of relationships among the medical service codes defining whether selected ones of the medical service codes are valid when received with other selected ones of the medical service codes; | 2 (pp. 10-12); 3 (pp. 3-4, 8); 4; 5; 6; 8 (pp. 28-30); 10; 12 (p. 26); 15; 18 (pp. 483, 485); 20 (pp. 351-353); 39 (cols. 9-12); 40 (cols. 5-6, 9-10); 41 (cols. 2-6). |
| means for receiving at least one claim; | 2 (pp. 10-12); 3 (pp. 3-4, 8); 4; 5; 6; 8 (pp. 28-30); 10; 12 (p. 26); 15; 18 (pp. 483, 485); 20 (pp. 351-353); 22; 27 (p. 882); 34; 38 (cols. 3-8, 11-16, 20-24); 39 (cols. 9-12); 40 (cols. 5-6, 9-10); 41 (cols. 2-6); 43 (cols. 5-6); 44 (col. 10); 85. |
| means for ascertaining whether the at least one claim contains a plurality of medical service codes;. | 2 (pp. 10-12); 3 (pp. 3-4, 8); 4; 5; 6; 8 (pp. 28-30); 10; 12 (p. 26); 15; 18 (pp. 483, 485); 20 (pp. 351-353); 22; 27 (p. 882); 34; 38 (cols. 3-8, 11-16, 20-24); 39 (cols. 9-12); 40 (cols. 5-6, 9-10); 41 (cols. 2-6); 43 (cols. 5-6); 44 (col. 10); 85. |
| means for determining whether one of the medical service codes in the at least one claim is mutually exclusive due to non-medical criteria with any other medical service code in the at least one claim: | 2 (pp. 10-12); 3 (pp. 3-4, 8); 4; 5; 6; 8 (pp. 28-30); 10; 12 (p. 26); 15; 18 (pp. 483, 485); 20 (pp. 351-353); 22; 27 (p. 882); 34; 38 (cols. 3-8, 11-16, 20-24); 39 (cols. 9-12); 40 (cols. 5-6, 9-10); 41 (cols. 2-6); 43 (cols. 5-6); 44 (col. 10); 85. |
| means for authorizing medical service codes which are not mutually exclusive due. to non-medical criteria with any other medical service codes contained in the at least one claim in response to the means for determining; and means for rejecting medical service codes which are mutually exclusive due to non-medical criteria with any other medical service codes contained in the at least one claim in response to the means for determining. | 2 (pp. 10-12); 3 (pp. 3-4, 8); 4; 5; 6; 8 (pp. 28-30); 10; 12 (p. 26); 15; 18 (pp. 483, 485); 20 (pp. 351-353); 22; 27 (p. 882); 34; 38 (cols. 3-8, 11-16, 20-24); 39 (cols. 9-12); 40 (cols. 5-6, 9-10); 41 (cols. 2-6); 43 (cols. 5-6); 44 (col. 10); 85. |

## THIRD SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 6:  (July 27, 2005)

TriZetto reasserts and reincorporates by reference herein its responses to Interrogatory No. 6 from January 20, 2005, May 5, 2005, and June 20, 2005, except for the lists of prior art references from those previous responses, which are superseded by the lists of prior art references in this response.  TriZetto also reasserts and reincorporates by reference herein the general objections set forth above.

Claim construction in this action has not occurred, and discovery has only just begun. The information contained in this response is based on information that is reasonably available to TriZetto at the present time. TriZetto's identification of prior art is as specific as possible at this time. Accordingly, TriZetto reserves the right to supplement, amend and augment its response to this interrogatory as new, additional and different information is learned and discovered and when the claims at issue are construed by the Court. Subject to and without waiving those objections, TriZetto supplements its previous response as follows:

Claims 1, 2, 3, 4, 6, 9, 10, 11, 12, 13 and 14 of the '164 patent, which McKesson accuses TriZetto of infringing, are invalid and unenforceable against TriZetto because at least 19 prior art references together completely disclose and describe the apparatus and methods claimed in the asserted claims of the '164 patent, rendering the patent invalid as either anticipated or obvious under 35 U.S.C. §§ 102 & 103. Set forth below is a chart of the prior art references that TriZetto presently contends anticipate one or more claims of the patent in suit or render one or more claims obvious. This chart supersedes the lists of prior art references provided in TriZetto's previous supplemental responses.

| Tab | Author, Title & Source | Anticipates/Renders Obvious |
|---|---|---|
| 2. | *Enhancing Accuracy and Timeliness is Integral to the Claims Adjudication Process*, Employee. Benefit Plan Review, Anonymous, Dec. 1985, pp. 10-12. | Renders Obvious |
| 8. | Weitzel, J.R., et al., *A Company / University Joint Venture to build a knowledge-based system*, MIS Quarterly, Vol. 12, No. 1, March 1988, 23-34 | Anticipates/Renders Obvious |
| 12. | Snyeder, C., *From research to reality: the leading edge of expert systems*, Insurance Software Review, Vol. 12, No. 3, Autumn 1987, 22-4, 26-7, 30 | Renders Obvious |
| 18. | Weitzel, J.R. and Kerschberg, L., "Developing Knowledge- Based Systems: Reorganizing the System Development Life Cycle," working paper, University of South Carolina, Columbia, SC and George Mason University, Fairfax, VA (December 1986). Final Publication, April 1989 in Communications of the ACM, Vol. 32, No. 4. | Renders Obvious |

| Tab | Author, Title & Source | Anticipates/Renders Obvious |
|---|---|---|
| 20. | Egdahl, M.D. and Hertenstein, M.D., *An Access-oriented Negotiated Fee Schedule: The Caterpillar Experience*, Ann Surg., 206(3), pp. 349-57 (Sept. 1987). | Anticipates/Renders Obvious |
| 38. | U.S. Pat. No. 4,591,983 (Bennett patent) | Anticipates/Renders Obvious |
| 39. | U.S. Pat. No. 4,667,292 (Mohlenbrock patent) | Anticipates/Renders Obvious |
| 40. | U.S. Pat. No. 5,018,067 (Mohlenbrock 2 patent) | Anticipates/Renders Obvious |
| 41. | U.S. Pat. No. 5,070,452 (Doyle patent) | Anticipates/Renders Obvious |
| 44. | U.S. Pat, No. 4,803,641 (Hardy patent) | Anticipates/Renders Obvious |
| 50. | Stachura CT, *Software reference guide: DRG assignment*, J Am Med Rec Assoc, January 1987, Vol. 58, (1),-pp. 33-40 | Renders Obvious |
| 53. | Huertas-Cortocarrero D, Ruiz PP, Marmol JP, *Concurrent clinical review: using microcomputer-based DRG-software*, Health Policy 1988, Vol. 9 (2), pp, 211-7 | Renders Obvious |
| 54. | Nathanson M, *Medical records. Experts: more research needed to set value of code programs*, Modem Healthcare, June 21, 1985, Vol. 15 (13), pp. 98, 102. | Renders Obvious |
| 61. | Gonnella JS, Hornbrook MC, Louis DZ, *Staging of disease. A case mix measurement*, Journal of the American Medical Association [JAMA], February 3, 1984, Vol. 251 (5), pp. 637-44 | Renders Obvious |
| 67. | Gibbons PS, Pishotta FT, Stepto RC, *A system for reporting gynecologic procedures. A linguistic-logical approach*, Journal of Reproductive Medicine, March 1983, Vol. 28 (3), pp. 201-5 | Renders Obvious |
| 73. | Miller KM, Wisnicki HJ, Buchman JP. Riley MJ, Repka MX, Taylor HR, Guyton DL, *The Wilmer Information System. A classification and retrieval system for information on diagnosis and therapy in ophthalmology*, Ophthalmology, March 1988, Vol. 95 (3), pp. 403-9 | Renders Obvious |
| 82. | U.S. Pat. No. 4,730,259 (Gallant patent) | Renders Obvious |
| 83. | U.S. Pat. No. 4,839,822 (Dormond patent) | Renders Obvious |

| Tab | Author, Title & Source | Anticipates/Renders Obvious |
|---|---|---|
| 88. | Hao Kuo, MEDCLAIM: *An Expert Support System for Medical Claims Review*, Thesis Submitted in Department of Computer Science, University of South Carolina (1986). | Anticipates/Renders Obvious |

Set forth below is an element-by-element chart mapping the prior art references listed above to each element of the asserted claims of the '164 patent.

| '164 PATENT CLAIM 1 | PRIOR ART REFERENCES THAT ANTICIPATE OR RENDER OBVIOUS |
|---|---|
| 1.     In a computer system having means for operating on a predetermined database containing medical service codes and a set of relationships among the medical service codes defining whether selected ones of the medical service codes are valid when input with other selected ones of the medical service codes, | 8 (pp. 28-30); 18 (pp. 483, 485); 38 (cols. 3-8, 11-16, 20-24); 39 (cols. 9-12); 40 (cols. 5-6, 9-10); 41 (cols. 2-6); 44 (col. 10); 61 (pp. 639-640); 73 (pp. 403-405, 408); 82 (cols. 1-4); 83 (cols. 2-3, 7-8); 88 (pp. 2-3, 26, 30-40, 44, 52). |
| a method for processing input claims containing at least one medical service code, comprising the steps of: | 2 (pp. 10-12); 8 (pp. 28-30); 12 (p. 26); 18 (pp. 483, 485); 20 (pp. 351-353); 38 (cols. 3-8, 11-16, 20-24); 39 (cols. 9-12); 40 (cols. 5-6, 9-10); 41 (cols. 2-6); 44 (col. 10); 50 (pp. 34, 37, 39-40); 53 (p. 216); 54 (p. 98); 61 (pp. 639-640); 67 (pp. 201-202); 73 (pp. 403-405, 408); 82 (cols. 1-4); 83 (cols. 2-3, 7-8); 88 (pp. 2-3, 26, 30-40, 44, 52). |
| receiving at least one claim; | 2 (pp. 10-12); 8 (pp. 28-30); 12 (p. 26); 18 (pp. 483, 485); 20 (pp. 351-353); 38 (cols. 3-8, 11-16, 20-24); 39 (cols. 9-12); 40 (cols. 5-6, 9-10); 41 (cols. 2-6); 44 (col. 10); 50 (pp. 34, 37, 39-40); 53 (p. 216); 54 (p. 98); 61 (pp. 639-640); 67 (pp. 201-202); 73 (pp. 403-405, 408); 82 (cols. 1-4); 83 (cols. 2-3, 7-8); 88 (pp. 2-3, 26, 30-40, 44, 52). |
| determining whether any medical service code contained in the at least one claim is not present in the predetermined database; and informing a user that a medical service code is not contained in the predetermined database. | 2 (pp. 10-12); 8 (pp. 28-30); 12 (p. 26); 18 (pp. 483, 485); 20 (pp. 351-353); 38 (cols. 3-8, 11-16, 20-24); 39 (cols. 9-12); 40 (cols. 5-6, 9-10); 41 (cols. 2-6); 44 (col. 10); 50 (pp. 34, 37, 39-40); 53 (p. 216); 54 (p. 98); 61 (pp. 639-640); 67 (pp. 201-202); 73 (pp. 403-405, 408); 82 (cols. 1-4); 83 (cols. 2-3, 7-8); 88 (pp. 2-3, 26, 30-40, 44, 52). |

| '164 PATENT CLAIM 2 | PRIOR ART REFERENCES THAT ANTICIPATE OR RENDER OBVIOUS |
|---|---|
| 2.     In a computer system having means for operating on a predetermined database containing medical service codes and a set of relationships among the medical service codes defining whether selected ones of the medical service codes are valid when input with other selected ones of the medical service codes, | 8 (pp. 28-30); 18 (pp. 483, 485); 38 (cols. 3-8, 1-16, 20-24); 39 (cols. 9-12); 40 (cols. 5-6, 9-10); 41 (cols. 2-6); 44 (col. 10); 61 (pp. 639-640); 73 (pp. 403-405, 408); 82 (cols. 1-4); 83 (cols. 2-3, 7-8); 88 (pp. 2-3, 26, 30-40, 44, 52). |
| a method for processing input claims | 2 (pp. 10-12); 8 (pp. 28-30); 12 (p. 26); 18 (pp. 483, 485); 20 (pp. 351- |

| | |
|---|---|
| containing at least one medical service code, comprising the steps of: | 353); 38 (cols. 3-8, 11-16, 20-24); 39 (cols. 9-12); 40 (cols. 5-6, 9-10); 41 (cols. 2-6); 44 (col. 10); 50 (pp. 34, 37, 39-40); 53 (p. 216); 54 (p. 98) 61 (pp. 639-640); 67 (pp. 201-202); 73 (pp. 403-405, 408); 82 (cols. 1-4); 83 (cols. 2-3, 7-8); 88 (pp. 2-3, 26, 30-40, 44, 52). |
| receiving at least one claim; | 2 (pp. 10-12); 8 (pp. 28-30); 12 (p. 26); 18 (pp. 483, 485); 20 (pp. 351-353); 38 (cols. 3-8, 1-16, 20-24); 39 (cols. 9-12); 40 (cols. 5-6, 9-10); 41 (cols. 2-6); 44 (col. 10); 50 (pp. 34, 37, 39-40); 53 (p. 216); 54 (p. 98); 61 (pp. 639-640); 67 (pp. 201-202); 73 (pp. 403-405, 408); 82 (cols. 1-4); 83 (cols. 2-3, 7-8); 88 (pp. 2-3, 26, 30-40, 44-52). |
| ascertaining whether the at least one claim contains a plurality of medical service codes; | 2 (pp. 10-12); 8 (pp. 28-30); 12 (p. 26); 18 (pp. 483, 485); 20 (pp. 351-353); 38 (cols. 3-8, 11-16, 20-24); 39 (cols. 9-12); 40 (cols. 5-6, 9-10); 41 (cols. 2-6); 44 (col. 10); 50 (pp. 34, 37, 39-40); 53 (p. 216); 54 (p. 98); 61 (pp. 639-640); 67 (pp. 201-202); 73 (pp. 403-405, 408); 82 (cols. 1-4); 83 (cols. 2-3, 7-8); 88 (pp. 2-3, 26, 30-40, 44, 52). |
| determining whether one of the medical service codes in the at least one claim is mutually exclusive due to non-medical criteria with any other medical service code in the at least one claim; | 2 (pp. 10-12); 8 (pp. 28-30); 12 (p. 26); 18 (pp. 483, 485); 20 (pp. 351-353); 38 (cols. 3-8, 11-16, 20-24); 39 (cols. 9-12); 40 (cols. 5-6, 9-10); 41 (cols. 2-6); 44 (col. 10); 50 (pp. 34, 37, 39-40); 53 (p. 216); 54 (p. 98); 61 (pp. 639-640); 73 (pp. 403-405, 408); 82 (cols. 1-4); 83 (cols. 2-3, 7-8); 88 (pp. 2-3, 26, 30-40, 44, 52). |
| authorizing medical service codes which are not mutually exclusive due to non-medical criteria with any other medical service cades contained in the at least one claim in response to the determining step; and rejecting medical service codes which are mutually exclusive due to non-medical criteria with any other medical service codes contained in the at least one claim in response to the determining step. | 2 (pp. 10-12); 8 (pp. 28-30); 12 (p. 26); 18 (pp. 483, 485); 20 (pp. 351-353); 38 (cols. 3-8, 11-16, 20-24); 39 (cols. 9-12); 40 (cols. 5-6, 9-10); 41 (cols. 2-6); 44 (col. 10); 50 (pp. 34, 37, 39-40); 53 (p. 216); 54 (pp. 98); 61 (pp. 639-640); 73 (pp. 403-405, 408); 82 (cols. 1-4); 83 (cols. 2-3, 7-8); 88 (pp. 2-3, 26, 30-40, 44, 52). |

| '194 PATENT CLAIMS | PRIOR ART REFERENCES THAT ANTICIPATE OR RENDER OBVIOUS |
|---|---|
| 3.    A computer system including a central processing unit and associated memory for processing input claims containing at least one medical service claim, comprising: | 8 (pp. 28-30); 18 (pp. 483, 485); 38 (cols. 3-8, 11-16, 20-24); 39 (cols. 9-12); 40 (cols. 5-6, 9-10); 41 (cols. 2-6); 44 (col. 10); 61 (pp. 639-640); 73 (pp. 403-405, 408); 82 (cols. 1-4); 83 (cols. 2-3, 7-8); 88 (pp. 2-3, 26, 30-40, 44, 52). |
| a predetermined database stored in the associated memory, the database containing medical service codes and a set of relationships among the medical service codes defining whether selected ones of the medical service codes are valid when received with other selected ones of the medical service codes; | 2 (pp. 10-12); 8 (pp. 28-30); 12 (p. 26); 18 (pp. 483, 485); 20 (pp. 351-353); 38 (cols. 3-8, 11-16, 20-24); 39 (cols. 9-12); 40 (cols. 5-6, 9-10); 41 (cols. 2-6); 44 (col. 10); 61 (pp. 639-640); 73 (pp. 403-405, 408); 82 (cols. 1-4); 83 (cols. 2-3, 7-8); 88 (pp. 2-3, 26, 30-40, 44, 52). |
| means for receiving at least one claim; | 2 (pp. 10-12); 8 (pp. 28-30); 12 (p. 26); 18 (pp. 483, 485); 20 (pp. 351-353); 38 (cols. 3-8, 11-16, 20-24); 39 (cols. 9-12); 40 (cols. 5-6, 9-10); 41 (cols. 2-6); 44 (col. 10); 50 (pp. 34, 37, 39-40); 53 (p. 216); 54 (p. 98); 61 (pp. 639-640); 67 (pp. 201-202); 73 (pp. 403-405, 408); 82 (cols. 1-4); 83 (cols. 2-3, 7-8); 88 (pp. 2-3, 26, 30-40, 44, 52). |

| | |
|---|---|
| means for ascertaining whether the at least one claim contains a plurality of medical service codes; | 2 (pp. 10-12); 8 (pp. 28-30); 12 (p. 26); 18 (pp. 483, 485); 20 (pp. 351-353), 38 (cols. 3-8, 11-16, 20-24); 39 (cols. 9-12); 40 (cols. 5-6, 9-10); 41 (cols. 2-6); 44 (col. 10); 50 (pp. 34, 37, 39-40); 53 (p. 216); 54 (p. 98); 61 (pp. 639-640); 67 (pp. 201-202); 73 (pp. 403-405, 408); 82 (cols. 1-4); 83 (cols. 2-3, 7-8); 88 (pp. 2-3, 26, 30-40, 44, 52). |
| means for determining whether one of the medical service codes in the plurality of medical service codes is valid or invalid by interacting with the database and the set of relationships contained in the database; | 2 (pp. 10-12); 8 (pp. 28-30); 12 (p. 26); 18 (pp. 483, 485); 20 (pp. 351-353); 38 (cols. 3-8, 11-16, 20-24); 39 (cols. 9-12); 40 (cols. 5-6, 9-10); 41 (cols. 2-6); 44 (col. 10); 50 (pp. 34, 37, 39-40); 53 (p. 216); 54 (p. 98); 61 (pp. 639-640); 73 (pp. 403-405, 408); 82 (cols. 1-4); 83 (cols. 2-3, 7-8); 88 (pp. 2-3, 26, 30-40, 44, 52). |
| means for authorizing medical service codes which are valid in response to the means for determining; and means for rejecting medical service codes which are invalid in response to the means for determining. | 2 (pp. 10-12); 8 (pp. 28-30); 12 (p. 26); 18 (pp. 483, 485); 20 (pp. 351-353); 38 (cols. 3-8, 11-16, 20-24); 39 (cols. 9-12); 40 (cols. 5-6, 9-10); 41 (cols. 2-6); 44 (col. 10); 50 (pp. 34, 37, 39-40); 53 (p. 216); 54 (p. 98); 61 (pp. 639-640); 73 (pp. 403-405, 408); 82 (cols. 1-4); 83 (cols. 2-3, 7-8); 88 (pp. 2-3, 26, 30-40, 44, 52). |

| '164 PATENT CLAIM 4 | PRIOR ART REFERENCES THAT ANTICIPATE OR RENDER OBVIOUS |
|---|---|
| 4.     The apparatus of claim 3, further comprising means for revising the at least one claim to delete invalid medical service codes. | 2 (pp. 10-12); 8 (pp. 28-30); 12 (p. 26); 18 (pp. 483, 485); 20 (pp. 351-353); 38 (cols. 3-8, 11-16, 20-24); 39 (cols. 9-12); 40 (cols. 5-6, 9-10); 41 (cols. 2-6); 44 (col. 10); 50 (pp. 34, 37, 39-40); 53 (p. 216); 54 (p. 98); 61 (pp. 639-640); 73 (pp. 403-405, 408); 82 (cols. 1-4); 83 (cols. 2-3, 7-8); 88 (pp. 2-3, 26, 30-40, 44, 52). |

| '164 PATENT CLAIM 6 | PRIOR ART REFERENCES THAT ANTICIPATE OR RENDER OBVIOUS |
|---|---|
| 6.     The apparatus of claim 3, wherein the database containing medical service codes includes medical service codes described by CPT codes. | 2 (pp. 10-12); 8 (pp. 28-30); 12 (p. 26); 18 (pp. 483, 485); 20 (pp. 351-353); 38 (cols. 3-8, 1-16, 20-24); 39 (cols. 9-12); 40 (cols. 5-6, 9-10); 41 (cols. 2-6); 44 (col. 10); 50 (pp. 34, 37, 39-40); 53 (p. 216); 54 (p. 98); 61 (pp. 639-640); 67 (pp. 201-202); 73 (pp. 403-405, 408); 82 (cols. 1-4); 83 (cols. 2-3, 7-8); 88 (pp. 2-3, 26, 30-40, 44, 52). |

| '164 PATENT CLAIM 9 | PRIOR ART REFERENCES THAT ANTICIPATE OR RENDER OBVIOUS |
|---|---|
| 9.     The apparatus of claim 3, wherein the relationships among the medical service codes include medically determined relationships. | 2 (pp. 10-12); 8 (pp. 28-30); 12 (p. 26); 18 (pp. 483, 485); 20 (pp. 351-353); 38 (cols. 3-8, 11-16, 20-24); 39 (cols. 9-12); 40 (cols. 5-6, 9-10); 41 (cols. 2-6); 44 (col. 10); 50 (pp. 34, 37, 39-40); 53 (p. 216); 54 (p. 98); 61 (pp. 639-640); 67 (pp. 201-202); 73 (pp. 403-405, 408); 82 (cols. 1-4); 83 (cols. 2-3, 7-8); 88 (pp. 2-3, 26, 30-40, 44, 52). |

| '164 PATENT CLAIM 10 | PRIOR ART REFERENCES THAT ANTICIPATE OR RENDER OBVIOUS |
|---|---|
| 10.     A computer system including a central processing unit and associated | 8 (pp. 28-30); 18 (pp. 483, 485); 38 (cols. 3-8, 11-16, 20-24); 39 (cols. 9-12); 40 (cols. 5-6, 9-10); 41 (cols. 2-6); 44 (col. 10); 61 (pp. 639- |

| | |
|---|---|
| memory for processing input claims containing at least one medical service claim, comprising: | 640); 73 (pp. 403-405, 408); 82 (cols. 1-4); 83 (cols. 2-3, 7-8); 88 (pp. 2-3, 26, 30-40, 44, 52). |
| a predetermined database stored in the associated memory, the database containing medical service codes and a set of relationships among the medical service codes defining whether selected ones of the medical service codes are valid when received with other selected ones of the medical service codes; | 8 (pp. 28-30); 18 (pp. 483, 485); 38 (cols. 3-8, 11-16, 20-24); 39 (cols. 9-12); 40 (cols. 5-6, 9-10); 41 (cols. 2-6); 44 (col. 10); 61 (pp. 639-640); 73 (pp. 403-405, 408); 82 (cols. 1-4); 83 (cols. 2-3, 7-8); 88 (pp. 2-3, 26, 30-40, 44, 52). |
| means for receiving at least one claim; | 2 (pp. 10-12); 8 (pp. 28-30); 12 (p. 26); 18 (pp. 483, 485); 20 (pp. 351-353); 38 (cols. 3-8, 11-16, 20-24); 39 (cols. 9-12); 40 (cols. 5-6, 9-10); 41 (cols. 2-6); 44 (col. 10); 50 (pp. 34, 37, 39-40); 53 (p. 216); 54 (p. 98); 61 (pp. 639-640); 67 (pp. 201-202); 73 (pp. 403-405, 408); 82 (cols. 1-4); 83 (cols. 2-3, 7-8); 88 (pp. 2-3, 26, 30-40, 44, 52). |
| means for ascertaining whether the at least one claim contains a plurality of medical service codes; | 2 (pp. 10-12); 8 (pp. 28-30); 12 (p. 26); 18 (pp. 483, 485); 20 (pp. 351-353); 38 (cols. 3-8, 11-16, 20-24); 39 (cols. 9-12); 40 (cols. 5-6, 9-10); 41 (cols. 2-6); 44 (col. 10); 50 (pp. 34, 37, 39-40); 53 (p. 216); 54 (p. 98); 61 (pp. 639-640); 67 (pp. 201-202); 73 (pp. 403-405, 408); 82 (cols. 1-4); 83 (cols. 2-3, 7-8); 88 (pp. 2-3, 26, 30-40, 44, 52). |
| means for determining whether one of the medical service codes in the at least one claim is included in any other medical service code in the at least one claim; | 2 (pp. 10-12); 8 (pp. 28-30); 12 (p. 26); 18 (pp. 483, 485); 20 (pp. 351-353); 38 (cols. 3-8, 11-16, 20-24); 39 (cols. 9-12); 40 (cols. 5-6, 9-10); 41 (cols. 2-6); 44 (col. 10); 50 (pp. 34, 37, 39-40); 53 (p. 216); 54 (p. 98); 61 (pp. 639-640); 67 (pp. 201-202); 73 (pp. 403-405, 408); 82 (cols. 1-4); 83 (cols. 2-3, 7-8); 88 (pp. 2-3, 26, 30-40, 44, 52). |
| means for authorizing medical service codes which are not contained in any other medical service code; and means for rejecting medical service codes which are contained in any other medical service code. | 2 (pp. 10-12); 8 (pp. 28-30); 12 (p. 26); 18 (pp. 483, 485); 20 (pp. 351-353); 38 (cols. 3-8, 11-16, 20-24); 39 (cols. 9-12); 40 (cols. 5-6, 9-10); 41 (cols. 2-6); 44 (col. 10); 50 (pp. 34, 37, 39-40); 53 (p. 216); 54 (p. 98); 61 (pp. 639-640); 73 (pp. 403-405, 408); 82 (cols. 1-4); 83 (cols. 2-3, 7-8); 88 (pp. 2-3, 26, 30-40, 44, 52). |

| '208 PATENT CLAIM 11 | PRIOR ART REFERENCES THAT ANTICIPATE OR RENDER OBVIOUS |
|---|---|
| 11.    The apparatus of claim 10, further comprising means for revising the at least one claim to not include a rejected medical service code. | 2 (pp. 10-12); 8 (pp. 28-30); 12 (p. 26); 18 (pp. 483, 485); 20 (pp. 351-353); 38 (cols. 3-8, 11-16, 20-24); 39 (cols. 9-12); 40 (cols. 5-6, 9-10); 41 (cols. 2-6); 44 (col. 10); 50 (pp. 34, 37, 39-40); 53 (p. 216); 54 (p. 98); 61 (pp. 639-640); 67 (pp. 201-202); 73 (pp. 403-405, 408); 82 (cols. 2-3, 7-8); 88 (pp. 2-3, 26, 30-40, 44, 52). |

| '208 PATENT CLAIM 12 | PRIOR ART REFERENCES THAT ANTICIPATE OR RENDER OBVIOUS |
|---|---|
| 12.    A computer system including a central processing unit and associated memory for processing input claims containing at least one medical service code, comprising: | 8 (pp. 28-30); 18 (pp. 483, 485); 38 (cols. 3-8, 11-16, 20-24); 39 (cols. 9-12); 40 (cols. 5-6, 9-10); 41 (cols. 2-6); 44 (col. 10); 61 (pp. 639-640); 73 (pp. 403-405, 408); 82 (cols. 1-4); 83 (cols. 2-3, 7-8); 88 (pp. 2-3, 26, 30-40, 44, 52). |

| | |
|---|---|
| a predetermined database stored in the associated memory, the database containing medical service codes and a set of relationships among the medical service codes defining whether selected ones of the medical service codes are valid when received with other selected ones of the medical service codes; | 8 (pp. 28-30); 18 (pp. 483, 485); 38 (cols. 3-8, 11-16, 20-24); 39 (cols. 9-12); 40 (cols. 5-6, 9-10); 41 (cols. 2-6); 44 (col. 10); 61 (pp. 639-640); 73 (pp. 403-405, 408); 82 (cols. 1-4); 83 (cols. 2-3, 7-8); 88 (pp. 2-3, 26, 30-40, 44, 52). |
| means for receiving at least one claim; | 2 (pp. 10-12); 8 (pp. 28-30); 12 (p. 26); 18 (pp. 483, 485); 20 (pp. 351-353); 38 (cols. 3-8, 11-16, 20-24); 39 (cols. 9-12); 40 (cols. 5-6, 9-10); 41 (cols. 2-6); 44 (col. 10); 50 (pp. 34, 37, 39-40); 53 (p. 216); 54 (p. 98); 61 (pp. 639-640); 67 (pp. 201-202); 73 (pp. 403-405, 408); 82 (cols. 1-4); 83 (cols. 2-3, 7-8); 88 (pp. 2-3, 26, 30-40, 44, 52). |
| means for ascertaining whether the at least one claim contains a plurality of medical service codes; | 2 (pp. 10-12); 8 (pp. 28-30); 12 (p. 26); 18 (pp. 483, 485); 20 (pp. 351-353); 38 (cols. 3-8, 11-16, 20-24); 39 (cols. 9-12); 40 (cols. 5-6, 9-10); 41 (cols. 2-6); 44 (col. 10); 50 (pp. 34, 37, 39-40); 53 (p. 216); 54 (p. 98); 61 (pp. 639-640); 67 (pp. 201-202); 73 (pp. 403-405, 408); 82 (cols. 1-4); 83 (cols. 2-3, 7-8); 88 (pp. 2-3, 26, 30-40, 44, 52). |
| means for determining whether one of the medical service codes in the at least one claim is medically exclusive with any other medical service code in the at least one claim; | 2 (pp. 10-12); 8 (pp. 28-30); 12 (p. 26); 18 (pp. 483, 485); 20 (pp. 351-353); 38 (cols. 3-8, 11-16, 20-24); 39 (cols. 9-12); 40 (cols. 5-6, 9-10); 41 (cols. 2-6); 44 (col. 10); 50 (pp. 34, 37, 39-40); 53 (p. 216); 54 (p. 98); 61 (pp. 639-640); 73 (pp. 403-405, 408); 82 (cols. 1-4); 83 (cols. 2-3, 7-8); 88 (pp. 2-3, 26, 30-40, 44, 52).□ |
| means for authorizing medical service codes which are not medically exclusive with any other medical service codes contained in the at least one claim in response to the means for determining; | 2 (pp. 10-12); 8 (pp. 28-30); 12 (p. 26); 18 (pp. 483, 485); 20 (pp. 351-353); 38 (cols. 3-8, 11-16, 20-24); 39 (cols. 9-12); 40 (cols. 5-6, 9-10); 41 (cols. 2-6); 44 (col. 10); 50 (pp. 34, 37, 39-40); 53 (p. 216); 54 (p. 98); 61 (pp. 639-640); 73 (pp. 403-405, 408); 82 (cols. 1-4); 83 (cols. 2-3, 7-8); 88 (pp. 2-3, 26, 30-40, 44, 52). |
| and means for rejecting medical service codes which are medically exclusive with any other medical service codes contained in the at least one claim in response to the determining step. | 2 (pp. 10-12); 8 (pp. 28-30); 12 (p. 26); 18 (pp. 483, 485); 20 (pp. 351-353); 38 (cols. 3-8, 11-16, 20-24); 39 (cols. 9-12); 40 (cols. 5-6, 9-10); 41 (cols. 2-6); 44 (col. 10); 50 (pp. 34, 37, 39-40); 53 (p. 216); 54 (p. 98); 61 (pp. 639-640); 73 (pp. 403-405, 408); 82 (cols. 1-4); 83 (cols. 2-3, 7-8); 88 (pp. 2-3, 26, 30-40, 44, 52). |

| '164 PATENT CLAIMS | PRIOR ART REFERENCES THAT ANTICIPATE OR RENDER OBVIOUS |
|---|---|
| 13.    A computer system including a central processing unit and associated memory for processing input claims containing at least one medical service code, comprising: | 18 (pp. 28-30); 18 (pp. 483, 485); 38 (cols. 3-8, 11-16, 20-24); 39 (cols. 9-12); 40 (cols. 5-6, 9-10); 41 (cols. 2-6); 44 (col. 10); 61 (pp. 639-640); 73 (pp. 403-405, 408); 82 (cols. 1-4); 83 (cols. 2-3, 7-8); 88 (pp. 2-3, 26, 30-40, 44, 52). |
| a predetermined database stored in the associated memory, the database containing medical service codes and a set of relationships among the medical service codes defining whether selected ones of the medical service codes are valid when received with other selected ones of the medical service codes; | 8 (pp. 28-30); 8 (pp. 483, 485); 38 (cols. 3-8, 11-16, 20-24); 39 (cols. 9-12); 40 (cols. 5-6, 9-10); 41 (cols. 2-6); 44 (col. 10); 61 (pp. 639-640); 73 (pp. 403-405, 408); 82 (cols. 1-4); 83 (cols. 2-3, 7-8); 88 (pp. 2-3, 26, 30-40, 44, 52). |

| | |
|---|---|
| means for receiving at least one claim; | 2 (pp. 10-12); 8 (pp. 28-30); 12 (p. 26); 18 (pp. 483, 485); 20 (pp. 351-353); 38 (cols. 3-8, 11-16, 20-24); 39 (cols. 9-12); 40 (cols. 5-6, 9-10); 41 (cols. 2-6); 44 (col. 10); 50 (pp. 34, 37, 39-40); 53 (p. 216); 54 (p. 98); 61 (pp. 639-640); 67 (pp. 201-202); 73 (pp. 403-405, 408); 82 (cols. 1-4); 83 (cols. 2-3, 7-8); 88 (pp. 2-3, 26, 30-40, 44, 52). |
| means for determining whether any medical service code contained in the at least one claim is not present in the predetermined database; and means for informing a user that a medical service code is not contained in the undetermined database. | 2 (pp. 10-12); 8 (pp. 28-30); 12 (p. 26); 18 (pp. 483, 485); 20 (pp. 351-353); 38 (cols. 3-8, 11-16, 20-24); 39 (cols. 9-12); 40 (cols. 5-6, 9-10); 41 (cols. 2-6); 44 (col. 10); 50 (pp. 34, 37, 39-40); 53 (p. 216); 54 (p. 98); 61 (pp. 639-640); 67 (pp. 201-202); 73 (pp. 403-405, 408); 82 (cols. 1-4); 83 (cols. 2-3, 7-8); 88 (pp. 2-3, 26, 30-40, 44, 52). |

| APPLICATION CLAIMS | PRIOR ART REFERENCES THAT ANTICIPATE OR RENDER OBVIOUS |
|---|---|
| 14.    A computer system including a central processing unit and associated memory for processing input claims containing at least one medical service code, comprising: | 8 (pp. 28-30); 18 (pp. 483, 485); 38 (cols. 3-8, 11-16, 20-24); 39 (cols. 9-12); 40 (cols. 5-6, 9-10); 41 (cols. 2-6); 44 (col. 10); 61 (pp. 639-640); 73 (pp. 403-405, 408); 82 (cols. 1-4); 83 (cols. 2-3, 7-8); 88 (pp. 2-3, 26, 30-40, 44, 52). |
| a predetermined database stored in the associated memory, the database containing medical service codes and a set of relationships among the medical service codes defining whether selected ones of the medical service codes are valid when received with other selected ones of the medical service codes; | 8 (pp. 28-30); 18 (pp. 483, 485); 38 (cols. 3-8, 11-16, 20-24); 39 (cols. 9-12); 40 (cols. 5-6, 9-10); 41 (cols. 2-6); 44 (col. 10); 61 (pp. 639-640); 73 (pp. 403-405, 408); 82 (cols. 1-4); 83 (cols. 2-3, 7-8); 88 (pp. 2-3, 26, 30-40, 44, 52). |
| means for receiving at least one claim; | 2 (pp. 10-12); 8 (pp. 28-30); 12 (p. 26); 18 (pp. 483, 485); 20 (pp. 351-353); 38 (cols. 3-8, 11-16, 20-24); 39 (cols. 9-12); 40 (cols. 5-6, 9-10); 41 (cols. 2-6); 44 (col. 10); 50 (pp. 34, 37, 39-40); 53 (p. 216); 54 (p. 98); 61 (pp. 639-640); 67 (pp. 201-202); 73 (pp. 403-405, 408); 82 (cols. 1-4); 83 (cols. 2-3, 7-8); 88 (pp. 2-3, 26, 30-40, 44, 52). |
| means for ascertaining whether the at least one claim contains a plurality of medical service codes; | 2 (pp. 10-12); 8 (pp. 28-30); 12 (p. 26); 18 (pp. 483, 485); 20 (pp. 351-353); 38 (cols. 3-8, 11-16, 20-24); 39 (cols. 9-12); 40 (cols. 5-6, 9-10); 41 (cols. 2-6); 44 (col. 10); 50 (pp. 34, 37, 39-40); 53 (p. 216); 54 (p. 98); 61 (pp. 639-640); 67 (pp. 201-202); 73 (pp. 403-405, 408); 82 (cols. 1-4); 83 (cols. 2-3, 7-8); 88 (pp. 2-3, 26, 30-40, 44, 52). |
| means for determining whether one of the medical service codes in the at least one claim is mutually exclusive due to non-medical criteria with any other medical service code in the at least one claim; | 2 (pp. 10-12); 8 (pp. 28-30); 12 (p. 26); 18 (pp. 483, 485); 20 (pp. 351-353); 38 (cols. 3-8, 11-16, 20-24); 39 (cols. 9-12); 40 (cols. 5-6, 9-10); 41 (cols. 2-6); 44 (col. 10); 50 (pp. 34, 37, 39-40); 53 (p. 216); 54 (p. 98); 61 (pp. 639-640); 73 (pp. 403-405, 408); 82 (cols. 1-4); 83 (cols. 2-3, 7-8); 88 (pp. 2-3, 26, 30-40, 44, 52). |
| means for authorizing medical service codes which are not mutually exclusive due to non-medical criteria with any other medical service codes contained in the at least one claim in response to the means for determining; and means for rejecting medical service codes which are mutually | 2 (pp. 10-12); 8 (pp. 28-30); 12 (p. 26); 18 (pp. 483, 485); 20 (pp. 351-353); 38 (cols. 3-8, 11-16, 20-24); 39 (cols. 9-12); 40 (cols. 5-6, 9-10); 41 (cols. 2-6); 44 (col. 10); 50 (pp. 34, 37, 39-40); 53 (p. 216); 54 (p. 98); 61 (pp. 639-640); 73 (pp. 403-405, 408); 82 (cols. 1-4); 83 (cols. 2-3, 7-8); 88 (pp. 2-3, 26, 30-40, 44, 52). |

| exclusive due to non-medical criteria with any other medical service codes contained in the at least one claim in response to the means for determining. | |

To the extent that the above-cited references establish obviousness in combination with other references, the motivation to combine such references is found in the references themselves or will be established through the introduction of expert testimony at the appropriate time.

Additionally, TriZetto discloses the following references that may partly or completely describe the apparatus and methods of the asserted claims of the '164 patent, rendering the patent invalid as either anticipated or obvious under 35 U.S.C. §§ 102 & 103. At the time of this response, TriZetto is still in the process of examining these references to determine their applicability. The applicability of these references may depend on the construction of the asserted claims, which has not yet occurred and the opinions of experts, whose disclosures are not required at this time. Accordingly, TriZetto reserves the right to assert these references if and when it determines that one or more of the references is applicable. At such time, TriZetto will update its response to this interrogatory.

| | Author, Title & Source |
|---|---|
| 1. | Marva J. Crouff, *Automating Claims Processing, Insurance Software Review*, Autumn 1988, pp. 52, 54. |
| 3. | Healthstar, Health Benefits Management System, Product Description, v. 1.024 (Insurance Software Packages, Inc.) |
| 4. | *System validates medical fee schedules*, Best Review: Life/Health, June 1987, 92 [Insurance Software Packages, Inc. Medical C Schedule and Audit System] |
| 5. | *Expert System identifies miscoded health claims*, Bests Review: Life/Health, November 1990,60 |
| 6. | *Claims editing software runs coding rule checks*, Bests Review: Life/Health, November 1990, 62 |
| 7. | Woolsey, C., *Employer spots inflated medical bills*, Business Insurance, June 25, 1990, 3 |
| 9. | Leary, E., *SSA applies expertise to develop expert systems (Spotlight on AI-expert systems, Social Security Administration)*, Government Computer News, Vol. 6, No. 17, August 28, 1987, 49(3) |

| | Author, Title & Source |
|---|---|
| 10. | Beard, P., *Blue Cross develops insurance claim ES*, AIWeek, Vol. 6, No. 7, April 1, 1989, 3 |
| 11. | Sullivan-Trainor, M., *Catching new clients*, Computerworld, Vol. 21, No. 50, December 14, 1987, 95, 99 |
| 13. | Christensen, J., *Insuring*, High Technology Business, Vol. 8, No. 10, October 1988, 47-8 |
| 14. | *Expert Systems In the Insurance Industry: 1987 Survey Report Update*, Coopers and Lybrand, 1987 |
| 15. | Pallatto, J., *Expert system cures the blues (Blue Cross develops insurance claims analysis system NERSys)*, PC Week, Vol. 5, No. 50, December 12, 1988, 35, 44. |
| 16. | Gladwell, Malcolm, *Computer Firm Finds the Link for Health Care*, Washington Business, December 5, 1988, 5-6 |
| 17. | Kerschberg, L. "A Proposal for the Development of an Expert System for Medical Claims Processing: MEDCLAIM," Institute of Information Management, Technology and Policy, College of Business Administration, University of South Carolina, Columbia, SC, (July 1985). |
| 19. | Ronald Hurst, *Cost Containment - The Caterpillar Experience*, The Psychiatric Hospital, vol. 13, no. 3 (1982). |
| 21. | Bauer JW, Cassidy TG, DeBord JR, Hart RD, Lee RH, Maher JE, Montgomery CE, Neufeld GK, Rivan RJ, Soderstrom CW, et al., Related Articles, *An access-oriented negotiated fee schedule: the Caterpillar experience*, Ann Surg., 208(5), pp. 667-8 (Nov. 1988). |
| 22. | Waterman, Donald A. (The Rand Corporation), *A Guide to Expert Systems*, Addison Wesley Publishing, Inc. (1985). |
| 23. | McDermott, John, *Artificial Intelligence Applications for Business: Building Expert Systems*, Proceedings of the NYU Symposium (May 1983). |
| 24. | Gerson, Elihu and Star, Susan Leigh, *Analyzing Due Process in the Workplace*, ACM Transactions on Office Information systems, vol. 4, no. 3 (July 1986). |
| 25. | Hayes-Roth, Frederick, *et. al., Building Expert Systems: An Overview of Expert Systems*, Addison-Wesley Publishing, Inc. (1985). |
| 26. | Taylor, Edward, *Developing A Knowledge Engineering Capability in the TRW Defense Systems Group*, The AI Magazine (Summer 1985) |
| 27. | Bobrow, Daniel, *et. al., Expert Systems: Perils and Promise*, Computing Practices, Communications of the ACM, vol. 29, no. 9 (Sept. 1986). |
| 28. | Bhide, Amar and Mohan, Brian, *Marcia Radosevich and Health Payment Review: 1989(A)*, Harvard Business School, 9-394-204 (Feb. 1999) |

| | Author, Title & Source |
|---|---|
| 29. | Genesereth, Michael, Ginsberg, Matthew, *Logic Programming*, Communications of the ACM, vol. 28, no. 9 (Sept. 1985). |
| 30. | Yasdi, Ramin, *Modeling Database Based Expert Systems at the Conceptual Level*, Proceedings of the 1985 ACM Computer Science Conference (March 1985). |
| 31. | Freudenheim, Milt, *Insurers vs. Doctors: A Software Battleground*, New York Times (Nov. 15, 1989) |
| 32. | Riordan, Teresa, Patents: *A software-technology infringement case against Microsoft goes to trial in Federal Court*, New York Times (Jan. 24, 1994). |
| 33.. | Colmerauer, Alain, *Prolog in 10 Figures*, Communications of the ACM, vol. 28, no. 12 (Dec. 1985). |
| 34. | Hayes-Roth, Frederick, *Rule-Based Systems*, Communications of the ACM, vol. 28, no. 9 (Sept. 1985). |
| 35. | Weitzel, J.R. and Kerschberg, L. *A System Development Methodology for Knowledge Based Systems*, IEEE Transactions on Systems, Man and Cybernetics, vol. 19, no. 3 (May/June 1989). |
| 36. | Winston,, Patrick H., Prendergast, Karen A., *The AI Business: The Commercial Uses of Artificial Intelligence*, The MIT Press (1984) |
| 37. | Mack, Barbara, *A Prescription for Cutting Corporate Health Expenses*, Wall Street Journal (Jul. 18, 1983). |
| 42. | U.S. Pat. No. 4,858,121 (Barber patent) |
| 43. | U.S. Pat. No. 4,658,370 (Erman patent) |
| 45. | Jap. Appl. No. 55-107352, entitled "Medical business system" (Yoshikuni App.) |
| 46. | U.S. Trademark No. 1,583,416 (ClaimCheck Mark) |
| 47. | U.S. Trademark No. 1,624,579 (CodeReview Mark) |
| 48. | U.S. Trademark No. 2,165,159 (Code Advisor Mark) |
| 49. | Stachura CT, *Software reference guide: case-mix management*, Journal of the American Medical Record Association [J Am Med Rec Assoc] February 1987, Vol. 58 (2), pp. 42-6. |
| 51. | Stachura CT, *Software reference guide: encoding*, J Am Med Rec Assoc, November 1986, Vol. 57 (11), pp. 25-8 |
| 52. | Wilkinson R, *Does your grouper 'over-maximize' reimbursement?*, Hospitals, October 20, 1986, Vol. 60 (20), pp. 88 |
| 55. | Caterinicchio RP, *Implementing a DRG-driven acuity system for nurse staffing under prospective hospital payment*, Hospital Topics, May-June 1985, Vol. 63 (3), pp. 6-7, 13 |
| 56. | Jackson B, Jensen J, *Hospitals turn to new software, hardware to cope with DRG 's*, Modern Healthcare, September 1984, Vol. 14 (12), pp. 109-12 |

| | Author, Title & Source |
|---|---|
| 57. | Nathanson M, *New software helps hospitals watch costs, profit under DRG*, Modern Healthcare, September 1984, Vol. 14 (12), pp. 132, 136-8 |
| 58. | *DRG helper makes it easy for doctors to maximize reimbursement*, Hospital Forum, July-August 1984, Vol. 27 (4), pp. 62-3 |
| 59. | Burda D, *Health care market experiences grouper software explosion*, J Am Med Rec Assoc, May 1984, Vol. 55 (5), pp. 35-7 |
| 60. | *Health care executive's guidebook to automation in the 1980s: health care information systems and DRG's*, Hospital Forum, Jan-Feb 1984, Vol. 27 (1), pp. 23-30 |
| 62. | Ray WJ, Johnstone J, *Using medical records to ensure fair DRG reimbursement*, Computer in Healthcare, December 1983, Vol. 4 (12), pp. 32-6, 40 |
| 63. | Heck S, Esmond T, *Financial modeling/case-mix analysis*, Computers in Healthcare, June 1983, Vol. 4 (6), pp. 50-1, 54 |
| 64. | Moliver M, *Computers and reimbursement*, Contemporary longterm care, April 1986, Vol. 9 (4), pp. 46-7 |
| 65. | Turner JM, *DRG compliance measurement in the future*, Software in Healthcare, August-September 1985, Vol. 3 (4), pp. 48 |
| 66. | Mohlenbrock WC, *Getting the most out of DRG 's*, Group Practice Journal, September October 1985, Vol. 34 (5), pp. 27-32 |
| 68. | Studney DR, Hakstian AR, *Effect of a computerized ambulatory medical record system on the validity of claims data*, Medical Care, April 1983, Vol. 21 (4), pp. 463-7 |
| 69. | Poulson GP, *Detailed costing system nets efficiency*, savings, Hospitals, October 1, 1984, Vol. 58 (19), pp. 106-8, 111 |
| 70. | *Medical coding*, Medical Record and Health Care Information Journal, February 1988, Vol. 29 (1), pp. 20-2 |
| 71. | Johnson KF, *Integrated system brings hospital data together*, Health Progress, October 1987, Vol. 68 (8), pp. 46-9, 82 |
| 72. | Tauber J, Lahav M, *Simplified diagnostic coding sheet for computerized data storage and analysis in ophthalmology*, Ophthalmic Surgery, November 1987, Vol. 18 (11), pp. 846-9 |
| 74. | Carter K, *PCs can tap databanks for costs*, Modern Healthcare, June 20 1986, Vol. 16 (13), pp. 52 |
| 75. | Ohnsson J, *GMIS (Gabrieli Medication Information Systems) software flags inappropriate billings, medical procedures*, Contract Healthcare, May 1988, pp. 28-9 |
| 76. | Cimino JJ, *Review paper: coding systems in health care*, Methods of Information in Medicine, December 1996, Vol. 35 (4-5), pp. 273-84 |
| 77. | Gabrieli ER, Speth DJ, Casiraghi E, *Knowledge bases*, Journal of Clinical Computing, 1985, Vol. 13 (5), pp. 150-4 |

| | Authority Title & Source |
|---|---|
| 78. | Gabrieli ER, Saumby JA, *Computer-based coding of medical data*, Topics in Health Record Management, March 1982, Vol. 2 (3), pp. 51-9 |
| 79. | Ely RM, *Savings through claims audits*, Topics in Health Care Financing, Summer 1986, Vol. 12 (4), pp. 61-7 |
| 80. | U.S. Pat. No. 4,347,568 (Giguere patent) |
| 81. | U.S. Pat. No. 4,491,725 (Pritchard patent) |
| 84. | U.S. Pat. No. 4,937,743 (Rassman patent) |
| 85. | U.S. Pat. No. 4,975,840 (De Tore patent) |
| 86. | U.S. Pat. No. 4,991,091 (Allen patent) |
| 87. | Buchanan Bruce G., *Expert Systems*, Journal of Automated Reasoning, Vol. 1, No. 1, 1985, pp. 28-35 |
| 88. | Hao Kuo, *MEDCLAIM: An Expert Support System for Medical Claims Review*, Thesis Submitted in Department of Computer Science, University of South Carolina (1986). |
| 89. | Horn SD,. Horn RA., *The computerized severity index: a new tool for case-mix management*, J Med Syst, February 1986, Vol. 10 (10), pp. 73-78. |
| 90. | Cebrian, Gil et al, *APACHE II*, Intensive Care med., 1987, Vol. 13 (2), p. 143 |
| 91. | Robinson, ML, *Hospitals look to "severity of illness" indexes*, Healthspan, June 1986, Vol. 3 (6), pp. 19-22 |
| 92. | Nestler, WB et al, *Case-mix reimbursement and clinical management....,* Ind Health Care (Cambridge Ma), 1985, Vol. 2, pp. 117-130 |
| 93. | Bates, SW et al, *Case mix management systems*, Mich. Hosp., August 1984, Vol. 20 (8), pp. 24-29 |
| 94. | Zak, EJ et al; *Financial modeling: an administrative tool of the highest. ..*, Computers in Healthcare, June 1984, Vol. 5(6), pp. 24-26 |
| 95. | Huhn, C et al, *Evaluating the new case-mix systems: a systematic approach*, Hospitals, January 1984, Vo. 58 (2), pp 92, 94, 96 |
| 96. | Lewis, J et al, *Development of a case mix information system*, Computers in Healthcare, February 1983, Vol. 4 (2), pp. 36-41 |
| 97. | Shaffer, VM, *Case mix analysis*, Osteopathic hospital leadership, September-October 1985, pp. 8-9 |
| 98. | Braithwaite, WR, *The effect of Medicare legislation on medical records system*, Software in Healthcare, August-September 1985, Vol. 3 (4), pp. 26-27 |
| 99. | Myers, TF et al, *A modification of the international classification of diseases for uniform...* , AM J Perinatol, July 1985, Vol. 2 (3), pp 240-241 |

| | Author, Title & Source |
|---|---|
| 100. | Barnard, C., *How to select and implement case-mix (product-line analysis). ..*, Hosp. Forum, January - February 1985 Vol. 28 (1), pp 25-30 |
| 101. | Jones, R, *Case-mix and computers: there's a micro-mainframe connection. ..*, Computers in Healthcare, October 1984, Vol. 5 (10), pp. 36-39 |
| 102. | Jones, R., *Case-mix and computers: there's a micro-mainframe connection... ,* Computers in Healthcare, August 1984, Vol. 5 (8), pp. 44-45 |
| 103. | Schumacher, DN, *A practical guide to reviewing case mix financial date*, The Hospital Medical Staff, August 1984, Vol. 13 (8), pp. 170 |
| 104. | Jones, R., *Case-mix and computers. Part one: a look at computer delivery. ..*, Computers in Healthcare, June 1984, Vol. 5 (5), pp. 42-45 |
| 105. | Jaggar, FM et al, *A PPS essential: case-mix management systems*, Hospitals, May 1, 1984, Vol. 58 (9), pp. 71-76 |
| 106. | Dorenfest SI, *Computers can figure out DRGs, if you can figure out computer market*, Modern Healthcare, February 15, 1984, Vol. 14 (3), pp. 130, 134, 136 |
| 107. | Fedorowicz, J., *Will your computer meet your case-mix informational. ..*, Nurs Health Care, November 1983, Vol. 4 (9), pp. 493-497 |
| 108. | Fedorowicz, J., *Hospital information systems: are we ready for case mix applications*, Health Care Manage Rev., Fall 1983, Vol. 8 (4), pp. 33-41 |
| 109. | Gillette, PE., *Hospital information systems: computer must rack patient costs*, Modern Healthcare, September 1983, Vol. 13 (9), pp. 154, 156, 158 |
| 110. | Nathanson, M., *Hospital information systems: computers crank out DRG... ,* Modern Healthcare, September 19833, Vol. 13, (9), pp. 160, 162, 164 |
| 111. | McLaughlin, DB et al., *Personal computers provide advantages and frustrations... ,* Hospitals, July 1983, Vol. 57 (14), pg. 94 |
| 112. | Barnard, C., *System strategies for case mix*, Computers in Healthcare, June 1983, Vol., 4 (6), pp. 28-32 |
| 113. | Mitchell WA., *An automated APACHE II scoring system*, Intensive care nursing, 1987, Vol. 3 (1), pp. 14-18 |
| 114. | Packer, CL., *Automation in the medical records department*, Hospitals, March 1, 1985, Vol. 59 (5), pp. 100, 102,104 |
| 115. | Kramer, DJ., *Medicare billing goes electronic,* Software in Healthcare, February March 1986, Vol. 5 (1), pp. 31-32 |
| 116. | Gardner, E., *Coding changes delay reimbursement*, Modern Healthcare, December 4, 1987, Vol. 17 (25), pp. 11 |
| 117. | King, M., *How can case mix work for long-term care providers*, Contemporary Longterm Care, November 1988, Vol. 11 (11), pp. 48, 50 |

| | Author, Title & Source |
|---|---|
| 118. | Couch, JB., *Assessing medical care on the basis of its value*, Physician executive, July August 1987, Vol. 13 (4), pp. 7-10 |
| 119. | Peterson, RN et al., *Congress to decide Medicare matters; final PPS rules. ..* , Health Law Vigil, September 20, 1985, Vol. 8 (19), pp. 6-8 |
| 120. | Terenzio J., *Preparing for the future today -product line management...* , Healthcare, Computing & communications, September 1985, Vol. 2 (9), pp. 56-58 . |
| 121. | Sovie, MD et al., *Amalgam of nursing acuity*, DRGs and costs... , Nursing Management, March 1985, Vol. 16 (3), pp. 22-42 |
| 122. | Sleight, S. et al., *Addressing case mix management in the smaller hospital...*, Computers in Healthcare, February 1985, Vol. 6 (2), pp. 22-24 |
| 123. | Nathanson, M., *Hospitals struggling to develop standards*, Modern Healthcare, September 1984, Vol. 14 (12), pp. 140 |
| 124. | Llaurado, JG, *Computing disease severity: staging*, Int J Biomed Comput, July-August 1984, Vol. 15 (4), pp. 243-248 |
| 125. | Christensen, B., *"Staging" software measures severity of patient's illness*, Hospitals, May 1, 1984, Vol. 58 (9), pp. 45-46 |
| 126. | Dambro, MR et al., *An unsuccessful experience with computerized medical. ..* , Journal of Medical Education, August 1988, Vol. 63 (8), pp. 617-623 |
| 127. | Wheeler, JT, *Hospital's six point program clears up financial picture*, Health Progress, July-August 1988, Vol. 69 (6), pp. 78-81 |
| 128. | DiMauro, ME, *Information systems for cost-effective management*, Topics in Health Care Financing, Winter 1987, Vol. 14 (2), pp. 28-34 |
| 129. | Dombi, WA, *Home care denials: computerization and Medicare home care appeals*, Caring: National Association for Home Care Magazine, June 1987, Vol. 6 (6), pp. 16 19 |
| 130. | Crownover, KR, *Shrinking the demand of home care documentation*, Caring: National Association for Home Care Magazine, June 1987, Vol. 6 (6), pp. 20-22 |
| 131. | Sabin, P., *Hospital cost accounting and the new imperative*, Health Progress, May 1987, Vol. 68 (4), pp. 52-57 |
| 132. | Carter, K., *End of PIP will prompt hospitals to try software to speed billing*, Modern Healthcare, February 13, 1987, Vol. 17 (4), pp. 62, 64, 68 |
| 133. | Woodward, RS, *Teaching DRG reimbursement with VisiCalc.*, The Journal of Health Administration Education, Winter 1985, Vol. 3 (1), pp. 91-97 |
| 134. | Landais P. et al., ARCANE. *A new medical patient information system*, Medical Information=Medecine et informatique, April-June 1988, Vol. 13 (2), pp. 105-116 |
| 135. | Carter K., *New reimbursement for outpatient services will mean more...* , Modern Healthcare, August 28, 1987, Vol. 17 (18), pp. 78 |

| | Author, Title & Source |
|---|---|
| 136. | None Listed, *Computerization in the medical record department at Pioneer Valley...* , J Am Med Rec Assoc, February 1985, Vol. 56 (2), pp. 42-43 |
| 137. | Gabrieli, ER, *Automated medical office records*, Journal of Medical Systems, February 1987, Vol. 1'1 (1), pp. 59-68 |
| 138. | Gabrieli, ER et al., *Computerized discharge summaries: a new window...* , Journal of Clinical. Computing, 1987, Vol. 16 (1-2), pp. 47-62 |
| 139. | Gabrieli, ER et al., *Automated analysis of the discharge summary*, Journal of Clinical Computing, 1986, Vol. 15 (1), pr. 128 |
| 140. | Gabrieli, ER et al., *Standardization of medical informatics*, Journal of Clinical Computing, 1986, Vol. 14 (6), pp. 179-198 |
| 141. | Gabrieli, ER et al., *A center for medical informatics; modern methods of information...*, Topics in Health Record Management, September 1985, Vol. 6 (1), pp. 12-15 |
| 142. | Gabrieli, ER et al., *Cognitive processing for computerized new knowledge*, Journal of Clinical Computing, 1985, Vol. 13 (4), pp., 113-116 |
| 143. | Gabrieli, ER et al., *Computer-based knowledge banks for clinical medicine*, Journal of Clinical Computing, 1983, Vol. 11 (5-6), pp. 195-200 |
| 144. | Gabrieli, ER et al., *Computer-oriented coding of medical data*, Journal of Clinical Computing, 1981, Vol. 10 (1), pp. 1-18 |
| 145. | Gabrieli, ER et al., *A proposal for a computer-based national medical information ....*, Journal of Clinical Computing, Vol. 10 (1), 19-52 |
| 146. | Gabrieli, ER et al., *Computer-oriented nomenclature, automated classification ....*, Journal of Clinical Computing, 1980, Vol. 9 (2), pp. 54-66 |
| 147. | Gabrieli, ER, *Medical information system, health records, and knowledge...* , Medical Instrumentation, July-August 1978, Vol. 12 (4), pp. 245-247 |
| 148. | Gabrieli, ER, *Computer-assisted assessment of patient care in the hospital*, Journal of Medical Systems. June 1988, Vol. 12 (3), pp. 135-146 |
| 149. | Bernier, RP, *Clinical evaluation: the next step in claims processing*, Best Rev Life Health Insur Ed, April 1986, Vol. 86 (12), pp. 106-110, 127 |
| 150. | Robinson, Michele L., *AHA voices concerns about HCFA's severity index*, Hospitals, October 5,.1988, p. 26 |
| 151. | Barnard, C., *Preparing for case-mix: the role of data processing*, Healthcare financial management: journal of the Healthcare Financial Management Association, June 1983, Vol. 37 (6), pp. 57-70 |

**FOURTH SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 6:** (September 13, 2005)

TriZetto reasserts and reincorporates by reference herein its responses to Interrogatory No. 6 from January 20, 2005, May 5, 2005, June 20, 2005, and July 27, 2005, except for the lists of prior art references from those previous responses, which are superseded by the lists of prior art references in this response. TriZetto also reasserts and reincorporates by reference herein the general objections set forth above.

Claim construction in this action has not occurred, and discovery is continuing. The information contained in this response is based on information that is reasonably available to TriZetto at the present time. TriZetto's identification of prior art is as specific as possible at this time. Accordingly, TriZetto reserves the right to supplement, amend and augment its response to this interrogatory as new, additional and different information is learned and discovered and when the claims at issue are construed by the Court. Subject to and without waiving those objections, TriZetto supplements its previous response as follows:

Claims 1, 2, 3, 4, 6, 9, 10, 11, 12, 13 and 14 of the '164 patent, which McKesson accuses TriZetto of infringing, are invalid and unenforceable against TriZetto because at least 27 prior art references together completely disclose and describe the apparatus and methods claimed in the asserted claims of the '164 patent, rendering the patent invalid as either anticipated or obvious under 35 U.S.C. §§ 102 & 103. Set forth below is a chart of the prior art references that TriZetto presently contends anticipate one or more claims of the patent in suit or render one or more claims obvious. This chart supersedes the lists of prior art references provided in TriZetto's previous supplemental responses.

| Ref. No. | Author, Title & Source | Anticipates/Renders Obvious |
|---|---|---|
| 2. | *Enhancing Accuracy and Timeliness is Integral to the Claims Adjudication Process*, Employee. Benefit Plan Review, Anonymous, Dec. 1985, pp. 10-12. | Renders Obvious |
| 8. | Weitzel, J.R., et al., *A Company / University Joint Venture to build a knowledge-based system*, MIS Quarterly, Vol. 12, No. 1, March 1988, 23-34 | Anticipates/Renders Obvious |

| Ref. No. | Author, Title & Source | Anticipates/Renders Obvious |
|---|---|---|
| 12. | Snyeder, C., *From research to reality: the leading edge of expert systems*, Insurance Software Review, Vol. 12, No. 3, Autumn 1987, 22-4, 26-7, 30 | Renders Obvious |
| 18. | Weitzel, J.R. and Kerschberg, L., "Developing Knowledge- Based Systems: Reorganizing the System Development Life Cycle," working paper, University of South Carolina, Columbia, SC and George Mason University, Fairfax, VA (December 1986). Final Publication, April 1989 in Communications of the ACM, Vol. 32, No. 4. | Renders Obvious |
| 20. | Egdahl, M.D. and Hertenstein, M.D., *An Access-oriented Negotiated Fee Schedule: The Caterpillar Experience*, Ann Surg., 206(3), pp. 349-57 (Sept. 1987). | Anticipates/Renders Obvious |
| 38. | U.S. Pat. No. 4,591,983 (Bennett patent) | Anticipates/Renders Obvious |
| 39. | U.S. Pat. No. 4,667,292 (Mohlenbrock patent) | Anticipates/Renders Obvious |
| 40. | U.S. Pat. No. 5,018,067 (Mohlenbrock 2 patent) | Anticipates/Renders Obvious |
| 41. | U.S. Pat. No. 5,070,452 (Doyle patent) | Anticipates/Renders Obvious |
| 44. | U.S. Pat, No. 4,803,641 (Hardy patent) | Anticipates/Renders Obvious |
| 50. | Stachura CT, *Software reference guide: DRG assignment*, J Am Med Rec Assoc, January 1987, Vol. 58, (1), pp. 33-40 | Renders Obvious |
| 53. | Huertas-Cortocarrero D, Ruiz PP, Marmol JP, *Concurrent clinical review: using microcomputer-based DRG-software*, Health Policy 1988, Vol. 9 (2), pp, 211-7 | Renders Obvious |
| 54. | Nathanson M, *Medical records. Experts: more research needed to set value of code programs*, Modem Healthcare, June 21, 1985, Vol. 15 (13), pp. 98, 102. | Renders Obvious |
| 61. | Gonnella JS, Hornbrook MC, Louis DZ, *Staging of disease. A case mix measurement*, Journal of the American Medical Association [JAMA], February 3, 1984, Vol. 251 (5), pp. 637 44 | Renders Obvious |

| Ref. No. | Author, Title & Source | Anticipates/Renders Obvious |
|---|---|---|
| 67. | Gibbons PS, Pishotta FT, Stepto RC, *A system for reporting gynecologic procedures. A linguistic-logical approach*, Journal of Reproductive Medicine, March 1983, Vol. 28 (3), pp. 201-5 | Renders Obvious |
| 73. | Miller KM, Wisnicki HJ, Buchman JP. Riley MJ, Repka MX, Taylor HR, Guyton DL, *The Wilmer Information System. A classification and retrieval system for information on diagnosis and therapy in ophthalmology*, Ophthalmology, March 1988, Vol. 95 (3), pp. 403-9 | Renders Obvious |
| 82. | U.S. Pat. No. 4,730,259 (Gallant patent) | Renders Obvious |
| 83. | U.S. Pat. No. 4,839,822 (Dormond patent) | Renders Obvious |
| 88. | Hao Kuo, MEDCLAIM: *An Expert Support System for Medical Claims Review*, Thesis Submitted in Department of Computer Science, University of South Carolina (1986). | Anticipates/Renders Obvious |
| 96. | Lewis, J et al, *Development of a case mix information system*, Computers in Healthcare, February 1983, Vol. 4 (2), pp. 36-41 | Renders Obvious |
| 106. | Dorenfest SI, *Computers can figure out DRGs, if you can figure out computer market*, Modern Healthcare, February 15, 1984, Vol. 14 (3), pp. 130, 134, 136 | Renders Obvious |
| 127. | Wheeler, JT, *Hospital's six-point program clears up financial picture*, Health Progress, July-August 1988, Vol. 69 (6), pp. 78-81 | Renders Obvious |
| 132. | Carter, K., *End of PIP will prompt hospitals to try software to speed billing*, Modern Healthcare, February 13, 1987, Vol. 17 (4), pp. 62, 64, 68 | Renders Obvious |
| 149. | Bernier, RP, *Clinical evaluation: the next step in claims processing*, Best Rev Life Health Insur Ed, April 1986, Vol. 86 (12), pp. 106-110, 127 | Renders Obvious |
| 152. | McDermott, John, *R1: A Rule-Based Configurer of Computer Systems, Artificial Intelligence*, 1982, No. 19, pp. 39-88. | Anticipates/Renders Obvious |
| 153. | David Leinweber, *Knowledge-Based Systems for Financial Applications*, IEEE Expert, Fall 1988, pp. 18-31. | Anticipates/Renders Obvious |

41

| Ref. No. | Author, Title & Source | Anticipates/Renders Obvious |
|---|---|---|
| 154. | Fagan, Lawrence Marvin, *VM: Representing Time-Dependent Relations in a Medical Setting*, Ph.D Thesis Submitted at Stanford University (1980) | Renders Obvious |

Set forth below is an element-by-element chart mapping the prior art references listed above to each element of the asserted claims of the '164 patent.

| '164 PATENT CLAIM 1 | PRIOR ART REFERENCES THAT ANTICIPATE OR RENDER OBVIOUS |
|---|---|
| 1.      In a computer system having means for operating on a predetermined database containing medical service codes and a set of relationships among the medical service codes defining whether selected ones of the medical service codes are valid when input with other selected ones of the medical service codes, | 8 (pp. 28-30); 18 (pp. 483, 485); 38 (cols. 3-8, 11-16, 20-24); 39 (cols. 9-12); 40 (cols. 5-6, 9-10); 41 (cols. 2-6); 44 (col. 10); 61 (pp. 639-640); 73 (pp. 403-405, 408); 82 (cols. 1-4); 83 (cols. 2-3, 7-8); 88 (pp. 2-3, 26, 30-40, 44, 52); 96 (pp. 36, 41); 152 (pp. 45, 50, 57, 62, 68); 153 (p. 23). |
| a method for processing input claims containing at least one medical service code, comprising the steps of: | 2 (pp. 10-12); 8 (pp. 28-30); 12 (p. 26); 18 (pp. 483, 485); 20 (pp. 351-353); 38 (cols. 3-8, 11-16, 20-24); 39 (cols. 9-12); 40 (cols. 5-6, 9-10); 41 (cols. 2-6); 44 (col. 10); 50 (pp. 34, 37, 39-40); 53 (p. 216); 54 (p. 98); 61 (pp. 639-640); 67 (pp. 201-202); 73 (pp. 403-405, 408); 82 (cols. 1-4); 83 (cols. 2-3, 7-8); 88 (pp. 2-3, 26, 30-40, 44, 52); 96 (pp. 36, 41); 106 (p. 134); 127 (pp. 79-80); 132 (p. 62); 149 (pp. 106, 108, 110); 152 (pp. 45, 50, 57, 62, 68); 153 (p. 23). |
| receiving at least one claim; | 2 (pp. 10-12); 8 (pp. 28-30); 12 (p. 26); 18 (pp. 483, 485); 20 (pp. 351-353); 38 (cols. 3-8, 11-16, 20-24); 39 (cols. 9-12); 40 (cols. 5-6, 9-10); 41 (cols. 2-6); 44 (col. 10); 50 (pp. 34, 37, 39-40); 53 (p. 216); 54 (p. 98); 61 (pp. 639-640); 67 (pp. 201-202); 73 (pp. 403-405, 408); 82 (cols. 1-4); 83 (cols. 2-3, 7-8); 88 (pp. 2-3, 26, 30-40, 44, 52); 96 (pp. 36, 41); 106 (p. 134); 127 (pp. 79-80); 132 (p. 62); 149 (pp. 106, 108, 110); 152 (pp. 45, 50, 57, 62, 68); 153 (p. 23). |
| determining whether any medical service code contained in the at least one claim is not present in the predetermined database; and informing a user that a medical service code is not contained in the predetermined database. | 2 (pp. 10-12); 8 (pp. 28-30); 12 (p. 26); 18 (pp. 483, 485); 20 (pp. 351-353); 38 (cols. 3-8, 11-16, 20-24); 39 (cols. 9-12); 40 (cols. 5-6, 9-10); 41 (cols. 2-6); 44 (col. 10); 50 (pp. 34, 37, 39-40); 53 (p. 216); 54 (p. 98); 61 (pp. 639-640); 67 (pp. 201-202); 73 (pp. 403-405, 408); 82 (cols. 1-4); 83 (cols. 2-3, 7-8); 88 (pp. 2-3, 26, 30-40, 44, 52); 96 (pp. 36, 41); 106 (p. 134); 127 (pp. 79-80); 132 (p. 62); 149 (pp. 106, 108, 110); 152 (pp. 45, 50, 57, 62, 68); 153 (p. 23). |

| '164 PATENT CLAIM 1 | PRIOR ART REFERENCES THAT ANTICIPATE OR RENDER OBVIOUS |
|---|---|
| 2.      In a computer system having means for operating on a predetermined database containing medical service codes and a set of relationships among the medical service codes defining whether | 8 (pp. 28-30); 18 (pp. 483, 485); 38 (cols. 3-8, 1-16, 20-24); 39 (cols. 9-12); 40 (cols. 5-6, 9-10); 41 (cols. 2-6); 44 (col. 10); 61 (pp. 639-640); 73 (pp. 403-405, 408); 82 (cols. 1-4); 83 (cols. 2-3, 7-8); 88 (pp. 2-3, 26, 30-40, 44, 52); 96 (pp. 36, 41); 152 (pp. 45, 50, 57, 62, 68); 153 (p. 23). |

| | |
|---|---|
| selected ones of the medical service codes are valid when input with other selected ones of the medical service codes, | |
| a method for processing input claims containing at least one medical service code, comprising the steps of: | 2 (pp. 10-12); 8 (pp. 28-30); 12 (p. 26); 18 (pp. 483, 485); 20 (pp. 351-353); 38 (cols. 3-8, 11-16, 20-24); 39 (cols. 9-12); 40 (cols. 5-6, 9-10); 41 (cols. 2-6); 44 (col. 10); 50 (pp. 34, 37, 39-40); 53 (p. 216); 54 (p. 98) 61 (pp. 639-640); 67 (pp. 201-202); 73 (pp. 403-405, 408); 82 (cols. 1-4); 83 (cols. 2-3, 7-8); 88 (pp. 2-3, 26, 30-40, 44, 52); 96 (pp. 36, 41); 106 (p. 134); 127 (pp. 79-80); 132 (p. 62); 149 (pp. 106, 108, 110); 152 (pp. 45, 50, 57, 62, 68); 153 (p. 23). |
| receiving at least one claim; | 2 (pp. 10-12); 8 (pp. 28-30); 12 (p. 26); 18 (pp. 483, 485); 20 (pp. 351-353); 38 (cols. 3-8, 1-16, 20-24); 39 (cols. 9-12); 40 (cols. 5-6, 9-10); 41 (cols. 2-6); 44 (col. 10); 50 (pp. 34, 37, 39-40); 53 (p. 216); 54 (p. 98); 61 (pp. 639-640); 67 (pp. 201-202); 73 (pp. 403-405, 408); 82 (cols. 1-4); 83 (cols. 2-3, 7-8); 88 (pp. 2-3, 26, 30-40, 44-52); 96 (pp. 36, 41); 106 (p. 134); 127 (pp. 79-80); 132 (p. 62); 149 (pp. 106, 108, 110); 152 (pp. 45, 50, 57, 62, 68); 153 (p. 23). |
| ascertaining whether the at least one claim contains a plurality of medical service codes; | 2 (pp. 10-12); 8 (pp. 28-30); 12 (p. 26); 18 (pp. 483, 485); 20 (pp. 351-353); 38 (cols. 3-8, 11-16, 20-24); 39 (cols. 9-12); 40 (cols. 5-6, 9-10); 41 (cols. 2-6); 44 (col. 10); 50 (pp. 34, 37, 39-40); 53 (p. 216); 54 (p. 98); 61 (pp. 639-640); 67 (pp. 201-202); 73 (pp. 403-405, 408); 82 (cols. 1-4); 83 (cols. 2-3, 7-8); 88 (pp. 2-3, 26, 30-40, 44, 52); 96 (pp. 36, 41); 106 (p. 134); 127 (pp. 79-80); 132 (p. 62); 149 (pp. 106, 108, 110); 152 (pp. 45, 50, 57, 62, 68); 153 (p. 23). |
| determining whether one of the medical service codes in the at least one claim is mutually exclusive due to non-medical criteria with any other medical service code in the at least one claim; | 2 (pp. 10-12); 8 (pp. 28-30); 12 (p. 26); 18 (pp. 483, 485); 20 (pp. 351-353); 38 (cols. 3-8, 11-16, 20-24); 39 (cols. 9-12); 40 (cols. 5-6, 9-10); 41 (cols. 2-6); 44 (col. 10); 50 (pp. 34, 37, 39-40); 53 (p. 216); 54 (p. 98); 61 (pp. 639-640); 73 (pp. 403-405, 408); 82 (cols. 1-4); 83 (cols. 2-3, 7-8); 88 (pp. 2-3, 26, 30-40, 44, 52); 96 (pp. 36, 41); 106 (p. 134); 127 (pp. 79-80); 132 (p. 62); 149 (pp. 106, 108, 110); 152 (pp. 45, 50, 57, 62, 68); 153 (p. 23); 154 (pp. 158-161). |
| authorizing medical service codes which are not mutually exclusive due to non-medical criteria with any other medical service cades contained in the at least one claim in response to the determining step; and rejecting medical service codes which are mutually exclusive due to non-medical criteria with any other medical service codes contained in the at least one claim in response to the determining step. | 2 (pp. 10-12); 8 (pp. 28-30); 12 (p. 26); 18 (pp. 483, 485); 20 (pp. 351-353); 38 (cols. 3-8, 11-16, 20-24); 39 (cols. 9-12); 40 (cols. 5-6, 9-10); 41 (cols. 2-6); 44 (col. 10); 50 (pp. 34, 37, 39-40); 53 (p. 216); 54 (p. 98); 61 (pp. 639-640); 73 (pp. 403-405, 408); 82 (cols. 1-4); 83 (cols. 2-3, 7-8); 88 (pp. 2-3, 26, 30-40, 44, 52); 96 (pp. 36, 41); 106 (p. 134); 127 (pp. 79-80); 132 (p. 62); 149 (pp. 106, 108, 110); 152 (pp. 45, 50, 57, 62, 68); 153 (p. 23); 154 (pp. 158-161). |

| '164 PATENT CLAIMS | PRIOR ART REFERENCES THAT ANTICIPATE OR RENDER OBVIOUS |
|---|---|
| 3.     A computer system including a central processing unit and associated memory for processing input claims containing at least one medical service claim, comprising: | 8 (pp. 28-30); 18 (pp. 483, 485); 38 (cols. 3-8, 11-16, 20-24); 39 (cols. 9-12); 40 (cols. 5-6, 9-10); 41 (cols. 2-6); 44 (col. 10); 61 (pp. 639-640); 73 (pp. 403-405, 408); 82 (cols. 1-4); 83 (cols. 2-3, 7-8); 88 (pp. 2-3, 26, 30-40, 44, 52); 152 (pp. 45, 50, 57, 62, 68); 153 (p. 23). |
| a predetermined database stored in the | 2 (pp. 10-12); 8 (pp. 28-30); 12 (p. 26); 18 (pp. 483, 485); 20 (pp. 351- |

| | |
|---|---|
| associated memory, the database containing medical service codes and a set of relationships among the medical service codes defining whether selected ones of the medical service codes are valid when received with other selected ones of the medical service codes; | 353); 38 (cols. 3-8, 11-16, 20-24); 39 (cols. 9-12); 40 (cols. 5-6, 9-10); 41 (cols. 2-6); 44 (col. 10); 61 (pp. 639-640); 73 (pp. 403-405, 408); 82 (cols. 1-4); 83 (cols. 2-3, 7-8); 88 (pp. 2-3, 26, 30-40, 44, 52); 96 (pp. 36, 41); 106 (p. 134); 127 (pp. 79-80); 132 (p. 62); 149 (pp. 106, 108, 110); 152 (pp. 45, 50, 57, 62, 68); 153 (p. 23). |
| means for receiving at least one claim; | 2 (pp. 10-12); 8 (pp. 28-30); 12 (p. 26); 18 (pp. 483, 485); 20 (pp. 351-353); 38 (cols. 3-8, 11-16, 20-24); 39 (cols. 9-12); 40 (cols. 5-6, 9-10); 41 (cols. 2-6); 44 (col. 10); 50 (pp. 34, 37, 39-40); 53 (p. 216); 54 (p. 98); 61 (pp. 639-640); 67 (pp. 201-202); 73 (pp. 403-405, 408); 82 (cols. 1-4); 83 (cols. 2-3, 7-8); 88 (pp. 2-3, 26, 30-40, 44, 52); 96 (pp. 36, 41); 106 (p. 134); 127 (pp. 79-80); 132 (p. 62); 149 (pp. 106, 108, 110); 152 (pp. 45, 50, 57, 62, 68); 153 (p. 23). |
| means for ascertaining whether the at. least one claim contains a plurality of medical service codes; | 2 (pp. 10-12); 8 (pp. 28-30); 12 (p. 26); 18 (pp. 483, 485); 20 (pp. 351-353), 38 (cols. 3-8, 11-16, 20-24); 39 (cols. 9-12); 40 (cols. 5-6, 9-10); 41 (cols. 2-6); 44 (col. 10); 50 (pp. 34, 37, 39-40); 53 (p. 216); 54 (p. 98); 61 (pp. 639-640); 67 (pp. 201-202); 73 (pp. 403-405, 408); 82 (cols. 1-4); 83 (cols. 2-3, 7-8); 88 (pp. 2-3, 26, 30-40, 44, 52); 96 (pp. 36, 41); 106 (p. 134); 127 (pp. 79-80); 132 (p. 62); 149 (pp. 106, 108, 110); 152 (pp. 45, 50, 57, 62, 68); 153 (p. 23). |
| means for determining whether one of the medical service codes in the plurality of medical service codes is valid or invalid by interacting with the database and the set of relationships contained in the database; | 2 (pp. 10-12); 8 (pp. 28-30); 12 (p. 26); 18 (pp. 483, 485); 20 (pp. 351-353); 38 (cols. 3-8, 11-16, 20-24); 39 (cols. 9-12); 40 (cols. 5-6, 9-10); 41 (cols. 2-6); 44 (col. 10); 50 (pp. 34, 37, 39-40); 53 (p. 216); 54 (p. 98); 61 (pp. 639-640); 73 (pp. 403-405, 408); 82 (cols. 1-4); 83 (cols. 2-3, 7-8); 88 (pp. 2-3, 26, 30-40, 44, 52); 96 (pp. 36, 41); 106 (p. 134); 127 (pp. 79-80); 132 (p. 62); 149 (pp. 106, 108, 110); 152 (pp. 45, 50, 57, 62, 68); 153 (p. 23); 154 (pp. 158-161). |
| means for authorizing medical service codes which are valid in response to the means for determining; and means for rejecting medical service codes which are invalid in response to the means for determining. | 2 (pp. 10-12); 8 (pp. 28-30); 12 (p. 26); 18 (pp. 483, 485); 20 (pp. 351-353); 38 (cols. 3-8, 11-16, 20-24); 39 (cols. 9-12); 40 (cols. 5-6, 9-10); 41 (cols. 2-6); 44 (col. 10); 50 (pp. 34, 37, 39-40); 53 (p. 216); 54 (p. 98); 61 (pp. 639-640); 73 (pp. 403-405, 408); 82 (cols. 1-4); 83 (cols. 2-3, 7-8); 88 (pp. 2-3, 26, 30-40, 44, 52); 96 (pp. 36, 41); 106 (p. 134); 127 (pp. 79-80); 132 (p. 62); 149 (pp. 106, 108, 110); 152 (pp. 45, 50, 57, 62, 68); 153 (p. 23); 154 (pp. 158-161). |

| '631 PATENT CLAIM 4 | PRIOR ART REFERENCE IN WHICH ANTICIPATORY DISCLOSURE OR RELEVANT CITATION |
|---|---|
| 4.    The apparatus of claim 3, further comprising means for revising the at least one claim to delete invalid medical service codes. | 2 (pp. 10-12); 8 (pp. 28-30); 12 (p. 26); 18 (pp. 483, 485); 20 (pp. 351-353); 38 (cols. 3-8, 11-16, 20-24); 39 (cols. 9-12); 40 (cols. 5-6, 9-10); 41 (cols. 2-6); 44 (col. 10); 50 (pp. 34, 37, 39-40); 53 (p. 216); 54 (p. 98); 61 (pp. 639-640); 73 (pp. 403-405, 408); 82 (cols. 1-4); 83 (cols. 2-3, 7-8); 88 (pp. 2-3, 26, 30-40, 44, 52); 96 (pp. 36, 41); 106 (p. 134); 127 (pp. 79-80); 132 (p. 62); 149 (pp. 106, 108, 110); 152 (pp. 45, 50, 57, 62, 68); 153 (p. 23). |

| '631 PATENT CLAIM 6 | PRIOR ART REFERENCE IN WHICH ANTICIPATORY DISCLOSURE OR RELEVANT CITATIONS |
|---|---|
| 6.    The apparatus of claim 3, wherein | 2 (pp. 10-12); 8 (pp. 28-30); 12 (p. 26); 18 (pp. 483, 485); 20 (pp. 351- |

| the database containing medical service codes includes medical service codes described by CPT codes. | 353); 38 (cols. 3-8, 1-16, 20-24); 39 (cols. 9-12); 40 (cols. 5-6, 9-10); 41 (cols. 2-6); 44 (col. 10); 50 (pp. 34, 37, 39-40); 53 (p. 216); 54 (p. 98); 61 (pp. 639-640); 67 (pp. 201-202); 73 (pp. 403-405, 408); 82 (cols. 1-4); 83 (cols. 2-3, 7-8); 88 (pp. 2-3, 26, 30-40, 44, 52); 96 (pp. 36, 41); 106 (p. 134); 127 (pp. 79-80); 132 (p. 62); 149 (pp. 106, 108, 110); 152 (pp. 45, 50, 57, 62, 68); 153 (p. 23). |

| '764 PATENT CLAIM 9 | PRIOR ART REFERENCES THAT ANTICIPATE OR RENDER OBVIOUS |
|---|---|
| 9.    The apparatus of claim 3, wherein the relationships among the medical service codes include medically determined relationships. | 2 (pp. 10-12); 8 (pp. 28-30); 12 (p. 26); 18 (pp. 483, 485); 20 (pp. 351-353); 38 (cols. 3-8, 11-16, 20-24); 39 (cols. 9-12); 40 (cols. 5-6, 9-10); 41 (cols. 2-6); 44 (col. 10); 50 (pp. 34, 37, 39-40); 53 (p. 216); 54 (p. 98); 61 (pp. 639-640); 67 (pp. 201-202); 73 (pp. 403-405, 408); 82 (cols. 1-4); 83 (cols. 2-3, 7-8); 88 (pp. 2-3, 26, 30-40, 44, 52); 96 (pp. 36, 41); 106 (p. 134); 127 (pp. 79-80); 132 (p. 62); 149 (pp. 106, 108, 110); 152 (pp. 45, 50, 57, 62, 68); 153 (p. 23); 154 (pp. 158-161). |

| '764 PATENT CLAIM 10 | PRIOR ART REFERENCES THAT ANTICIPATE OR RENDER OBVIOUS |
|---|---|
| 10.    A computer system including a central processing unit and associated memory for processing input claims containing at least one medical service claim, comprising: | 8 (pp. 28-30); 18 (pp. 483, 485); 38 (cols. 3-8, 11-16, 20-24); 39 (cols. 9-12); 40 (cols. 5-6, 9-10); 41 (cols. 2-6); 44 (col. 10); 61 (pp. 639-640); 73 (pp. 403-405, 408); 82 (cols. 1-4); 83 (cols. 2-3, 7-8); 88 (pp. 2-3, 26, 30-40, 44, 52); 152 (pp. 45, 50, 57, 62, 68); 153 (p. 23). |
| a predetermined database stored in the associated memory, the database containing medical service codes and a set of relationships among the medical service codes defining whether selected ones of the medical service codes are valid when received with other selected ones of medical service codes; | 8 (pp. 28-30); 18 (pp. 483, 485); 38 (cols. 3-8, 11-16, 20-24); 39 (cols. 9-12); 40 (cols. 5-6, 9-10); 41 (cols. 2-6); 44 (col. 10); 61 (pp. 639-640); 73 (pp. 403-405, 408); 82 (cols. 1-4); 83 (cols. 2-3, 7-8); 88 (pp. 2-3, 26, 30-40, 44, 52); 96 (pp. 36, 41); 152 (pp. 45, 50, 57, 62, 68); 153 (p. 23). |
| means for receiving at least one claim; | 2 (pp. 10-12); 8 (pp. 28-30); 12 (p. 26); 18 (pp. 483, 485); 20 (pp. 351-353); 38 (cols. 3-8, 11-16, 20-24); 39 (cols. 9-12); 40 (cols. 5-6, 9-10); 41 (cols. 2-6); 44 (col. 10); 50 (pp. 34, 37, 39-40); 53 (p. 216); 54 (p. 98); 61 (pp. 639-640); 67 (pp. 201-202); 73 (pp. 403-405, 408); 82 (cols. 1-4); 83 (cols. 2-3, 7-8); 88 (pp. 2-3, 26, 30-40, 44, 52); 96 (pp. 36, 41); 106 (p. 134); 127 (pp. 79-80); 132 (p. 62); 149 (pp. 106, 108, 110); 152 (pp. 45, 50, 57, 62, 68); 153 (p. 23). |
| means for ascertaining whether the at least one claim contains a plurality of medical service codes; | 2 (pp. 10-12); 8 (pp. 28-30); 12 (p. 26); 18 (pp. 483, 485); 20 (pp. 351-353); 38 (cols. 3-8, 11-16, 20-24); 39 (cols. 9-12); 40 (cols. 5-6, 9-10); 41 (cols. 2-6); 44 (col. 10); 50 (pp. 34, 37, 39-40); 53 (p. 216); 54 (p. 98); 61 (pp. 639-640); 67 (pp. 201-202); 73 (pp. 403-405, 408); 82 (cols. 1-4); 83 (cols. 2-3, 7-8); 88 (pp. 2-3, 26, 30-40, 44, 52); 96 (pp. 36, 41); 106 (p. 134); 127 (pp. 79-80); 132 (p. 62); 149 (pp. 106, 108, 110); 152 (pp. 45, 50, 57, 62, 68); 153 (p. 23). |
| means for determining whether one of the medical service codes in the at least one claim is included in any other medical | 2 (pp. 10-12); 8 (pp. 28-30); 12 (p. 26); 18 (pp. 483, 485); 20 (pp. 351-353); 38 (cols. 3-8, 11-16, 20-24); 39 (cols. 9-12); 40 (cols. 5-6, 9-10); 41 (cols. 2-6); 44 (col. 10); 50 (pp. 34, 37, 39-40); 53 (p. 216); 54 (p. |

| | |
|---|---|
| service code in the at least one claim; | 98); 61 (pp. 639-640); 67 (pp. 201-202); 73 (pp. 403-405, 408); 82 (cols. 1-4); 83 (cols. 2-3, 7-8); 88 (pp. 2-3, 26, 30-40, 44, 52); 96 (pp. 36, 41); 106 (p. 134); 127 (pp. 79-80); 132 (p. 62); 149 (pp. 106, 108, 110); 152 (pp. 45, 50, 57, 62, 68); 153 (p. 23); 154 (pp. 158-161). |
| means for authorizing medical service codes which are not contained in any other medical service code; and means for rejecting medical service codes which are contained in any other medical service code. | 2 (pp. 10-12); 8 (pp. 28-30); 12 (p. 26); 18 (pp. 483, 485); 20 (pp. 351-353); 38 (cols. 3-8, 11-16, 20-24); 39 (cols. 9-12); 40 (cols. 5-6, 9-10); 41 (cols. 2-6); 44 (col. 10); 50 (pp. 34, 37, 39-40); 53 (p. 216); 54 (p. 98); 61 (pp. 639-640); 73 (pp. 403-405, 408); 82 (cols. 1-4); 83 (cols. 2-3, 7-8); 88 (pp. 2-3, 26, 30-40, 44, 52); 96 (pp. 36, 41); 106 (p. 134); 127 (pp. 79-80); 132 (p. 62); 149 (pp. 106, 108, 110); 152 (pp. 45, 50, 57, 62, 68); 153 (p. 23); 154 (pp. 158-161). |

| '164 PATENT CLAIM 11 | PRIOR ART REFERENCES THAT ANTICIPATE OR RENDER OBVIOUS |
|---|---|
| 11.    The apparatus of claim 10, further comprising means for revising the at least one claim to not include a rejected medical service code. | 2 (pp. 10-12); 8 (pp. 28-30); 12 (p. 26); 18 (pp. 483, 485); 20 (pp. 351-353); 38(cols. 3-8, 11-16, 20-24); 39 (cols. 9-12); 40 (cols. 5-6, 9-10); 41 (cols. 2-6); 44 (col. 10); 50 (pp. 34, 37, 39-40); 53 (p. 216); 54 (p. 98); 61 (pp. 639-640); 67 (pp. 201-202); 73 (pp. 403-405, 408); 82 (cols. 1-4); 83 (cols. 2-3, 7-8); 88 (pp. 2-3, 26, 30-40, 44, 52); 96 (pp. 36, 41); 106 (p. 134); 127 (pp. 79-80); 132 (p. 62); 149 (pp. 106, 108, 110); 152 (pp. 45, 50, 57, 62, 68); 153 (p. 23). |

| '164 PATENT CLAIM 12 | PRIOR ART REFERENCES THAT ANTICIPATE OR RENDER OBVIOUS |
|---|---|
| 12.    A computer system including a central processing unit and associated memory for processing input claims containing at least one medical service code, comprising: | 8 (pp. 28-30); 18 (pp. 483, 485); 38 (cols. 3-8, 11-16, 20-24); 39 (cols. 9-12); 40 (cols. 5-6, 9-10); 41 (cols. 2-6); 44 (col. 10); 61 (pp. 639-640); 73 (pp. 403-405, 408); 82 (cols. 1-4); 83 (cols. 2-3, 7-8); 88 (pp. 2-3, 26, 30-40, 44, 52); 152 (pp. 45, 50, 57, 62, 68); 153 (p. 23). |
| a predetermined database stored in the associated memory, the database containing medical service codes and a set of relationships among the medical service codes defining whether selected ones of the medical service codes are valid when received with other selected ones of the medical service codes; | 8 (pp. 28-30); 18 (pp. 483, 485); 38 (cols. 3-8, 11-16, 20-24); 39 (cols. 9-12); 40 (cols. 5-6, 9-10); 41 (cols. 2-6); 44 (col. 10); 61 (pp. 639-640); 73 (pp. 403-405, 408); 82 (cols. 1-4); 83 (cols. 2-3, 7-8); 88 (pp. 2-3, 26, 30-40, 44, 52); 96 (pp. 36, 41); 152 (pp. 45, 50, 57, 62, 68); 153 (p. 23). |
| means for receiving at least one claim; | 2 (pp. 10-12); 8 (pp. 28-30); 12 (p. 26); 18 (pp. 483, 485); 20 (pp. 351-353); 38 (cols. 3-8, 11-16, 20-24); 39 (cols. 9-12); 40 (cols. 5-6, 9-10); 41 (cols. 2-6); 44 (col. 10); 50 (pp. 34, 37, 39-40); 53 (p. 216); 54 (p. 98); 61 (pp. 639-640); 67 (pp. 201-202); 73 (pp. 403-405, 408); 82 (cols. 1-4); 83 (cols. 2-3, 7-8); 88 (pp. 2-3, 26, 30-40, 44, 52); 96 (pp. 36, 41); 106 (p. 134); 127 (pp. 79-80); 132 (p. 62); 149 (pp. 106, 108, 110); 152 (pp. 45, 50, 57, 62, 68); 153 (p. 23). |
| means for ascertaining whether the at least one claim contains a plurality of medical service codes; | 2 (pp. 10-12); 8 (pp. 28-30); 12 (p. 26); 18 (pp. 483, 485); 20 (pp. 351-353); 38 (cols. 3-8, 11-16, 20-24); 39 (cols. 9-12); 40 (cols. 5-6, 9-10); 41 (cols. 2-6); 44 (col. 10); 50 (pp. 34, 37, 39-40); 53 (p. 216); 54 (p. 98); 61 (pp. 639-640); 67 (pp. 201-202); 73 (pp. 403-405, 408); 82 (cols. 1-4); 83 (cols. 2-3, 7-8); 88 (pp. 2-3, 26, 30-40, 44, 52); 96 (pp. |

| | |
|---|---|
| | 36, 41); 106 (p. 134); 127 (pp. 79-80); 132 (p. 62); 149 (pp. 106, 108, 110); 152 (pp. 45, 50, 57, 62, 68); 153 (p. 23). |
| means for determining whether one of the medical service codes in the at least one claim is medically exclusive with any other medical service code in the at least one claim; | 2 (pp. 10-12); 8 (pp. 28-30); 12 (p. 26); 18 (pp. 483, 485); 20 (pp. 351-353); 38 (cols. 3-8, 11-16, 20-24); 39 (cols. 9-12); 40 (cols. 5-6, 9-10); 41 (cols. 2-6); 44 (col. 10); 50 (pp. 34, 37, 39-40); 53 (p. 216); 54 (p. 98); 61 (pp. 639-640); 73 (pp. 403-405, 408); 82 (cols. 1-4); 83 (cols. 2-3, 7-8); 88 (pp. 2-3, 26, 30-40, 44, 52); 96 (pp. 36, 41); 106 (p. 134); 127 (pp. 79-80); 132 (p. 62); 149 (pp. 106, 108, 110); 152 (pp. 45, 50, 57, 62, 68); 153 (p. 23); 154 (pp. 158-161). |
| means for authorizing medical service codes which are not medically exclusive with any other medical service codes contained in the at least one claim in response to the means for determining; | 2 (pp. 10-12); 8 (pp. 28-30); 12 (p. 26); 18 (pp. 483, 485); 20 (pp. 351-353); 38 (cols. 3-8, 11-16, 20-24); 39 (cols. 9-12); 40 (cols. 5-6, 9-10); 41 (cols. 2-6); 44 (col. 10); 50 (pp. 34, 37, 39-40); 53 (p. 216); 54 (p. 98); 61 (pp. 639-640); 73 (pp. 403-405, 408); 82 (cols. 1-4); 83 (cols. 2-3, 7-8); 88 (pp. 2-3, 26, 30-40, 44, 52); 96 (pp. 36, 41); 106 (p. 134); 127 (pp. 79-80); 132 (p. 62); 149 (pp. 106, 108, 110); 152 (pp. 45, 50, 57, 62, 68); 153 (p. 23); 154 (pp. 158-161). |
| and means for rejecting medical service codes which are medically exclusive with any other medical service codes contained in the at least one claim in response to the determining step. | 2 (pp. 10-12); 8 (pp. 28-30); 12 (p. 26); 18 (pp. 483, 485); 20 (pp. 351-353); 38 (cols. 3-8, 11-16, 20-24); 39 (cols. 9-12); 40 (cols. 5-6, 9-10); 41 (cols. 2-6); 44 (col. 10); 50 (pp. 34, 37, 39-40); 53 (p. 216); 54 (p. 98); 61 (pp. 639-640); 73 (pp. 403-405, 408); 82 (cols. 1-4); 83 (cols. 2-3, 7-8); 88 (pp. 2-3, 26, 30-40, 44, 52); 96 (pp. 36, 41); 106 (p. 134); 127 (pp. 79-80); 132 (p. 62); 149 (pp. 106, 108, 110); 152 (pp. 45, 50, 57, 62, 68); 153 (p. 23); 154 (pp. 158-161). |

| '164 PATENT CLAIM 6 | PRIOR ART REFERENCE THAT ANTICIPATES OR RENDERS OBVIOUS |
|---|---|
| 13.    A computer system including a central processing unit and associated memory for processing input claims containing at least one medical service code, comprising: | 18 (pp. 28-30); 18 (pp. 483, 485); 38 (cols. 3-8, 11-16, 20-24); 39 (cols. 9-12); 40 (cols. 5-6, 9-10); 41 (cols. 2-6); 44 (col. 10); 61 (pp. 639-640); 73 (pp. 403-405, 408); 82 (cols. 1-4); 83 (cols. 2-3, 7-8); 88 (pp. 2-3, 26, 30-40, 44, 52); 152 (pp. 45, 50, 57, 62, 68); 153 (p. 23). |
| a predetermined database stored in the associated memory, the database containing medical service codes and a set of relationships among the medical service codes defining whether selected ones of the medical service codes are valid when received with other selected ones of medical service codes; | 8 (pp. 28-30); 8 (pp. 483, 485); 38 (cols. 3-8, 11-16, 20-24); 39 (cols. 9-12); 40 (cols. 5-6, 9-10); 41 (cols. 2-6); 44 (col. 10); 61 (pp. 639-640); 73 (pp. 403-405, 408); 82 (cols. 1-4); 83 (cols. 2-3, 7-8); 88 (pp. 2-3, 26, 30-40, 44, 52); 96 (pp. 36, 41); 152 (pp. 45, 50, 57, 62, 68); 153 (p. 23). |
| means for receiving at least one claim; | 2 (pp. 10-12); 8 (pp. 28-30); 12 (p. 26); 18 (pp. 483, 485); 20 (pp. 351-353); 38 (cols. 3-8, 11-16, 20-24); 39 (cols. 9-12); 40 (cols. 5-6, 9-10); 41 (cols. 2-6); 44 (col. 10); 50 (pp. 34, 37, 39-40); 53 (p. 216); 54 (p. 98); 61 (pp. 639-640); 67 (pp. 201-202); 73 (pp. 403-405, 408); 82 (cols. 1-4); 83 (cols. 2-3, 7-8); 88 (pp. 2-3, 26, 30-40, 44, 52); 96 (pp. 36, 41); 106 (p. 134); 127 (pp. 79-80); 132 (p. 62); 149 (pp. 106, 108, 110); 152 (pp. 45, 50, 57, 62, 68); 153 (p. 23). |
| means for determining whether any medical service code contained in the at least one claim is not present in the predetermined database; and means for | 2 (pp. 10-12); 8 (pp. 28-30); 12 (p. 26); 18 (pp. 483, 485); 20 (pp. 351-353); 38 (cols. 3-8, 11-16, 20-24); 39 (cols. 9-12); 40 (cols. 5-6, 9-10); 41 (cols. 2-6); 44 (col. 10); 50 (pp. 34, 37, 39-40); 53 (p. 216); 54 (p. 98); 61 (pp. 639-640); 67 (pp. 201-202); 73 (pp. 403-405, 408); 82 |

| | |
|---|---|
| informing a user that a medical service code is not contained in the undetermined database. | (cols. 1-4); 83 (cols. 2-3, 7-8); 88 (pp. 2-3, 26, 30-40, 44, 52); 96 (pp. 36, 41); 106 (p. 134); 127 (pp. 79-80); 132 (p. 62); 149 (pp. 106, 108, 110); 152 (pp. 45, 50, 57, 62, 68); 153 (p. 23). |

| '164 PATENT CLAIM 14 | PRIOR ART REFERENCES THAT ANTICIPATE OR RENDER OBVIOUS |
|---|---|
| 14.    A computer system including a central processing unit and associated memory for processing input claims containing at least one medical service code, comprising: | 8 (pp. 28-30); 18 (pp. 483, 485); 38 (cols. 3-8, 11-16, 20-24); 39 (cols. 9-12); 40 (cols. 5-6, 9-10); 41 (cols. 2-6); 44 (col. 10); 61 (pp. 639-640); 73 (pp. 403-405, 408); 82 (cols. 1-4); 83 (cols. 2-3, 7-8); 88 (pp. 2-3, 26, 30-40, 44, 52); 152 (pp. 45, 50, 57, 62, 68); 153 (p. 23). |
| a predetermined database stored in the associated memory, the database containing medical service codes and a set of relationships among the medical service codes defining whether selected ones of the medical service codes are valid when received with other selected ones of the medical service codes; | 8 (pp. 28-30); 18 (pp. 483, 485); 38 (cols. 3-8, 11-16, 20-24); 39 (cols. 9-12); 40 (cols. 5-6, 9-10); 41 (cols. 2-6); 44 (col. 10); 61 (pp. 639-640); 73 (pp. 403-405, 408); 82 (cols. 1-4); 83 (cols. 2-3, 7-8); 88 (pp. 2-3, 26, 30-40, 44, 52); 96 (pp. 36, 41); 152 (pp. 45, 50, 57, 62, 68); 153 (p. 23). |
| means for receiving at least one claim; | 2 (pp. 10-12); 8 (pp. 28-30); 12 (p. 26); 18 (pp. 483, 485); 20 (pp. 351-353); 38 (cols. 3-8, 11-16, 20-24); 39 (cols. 9-12); 40 (cols. 5-6, 9-10); 41 (cols. 2-6); 44 (col. 10); 50 (pp. 34, 37, 39-40); 53 (p. 216); 54 (p. 98); 61 (pp. 639-640); 67 (pp. 201-202); 73 (pp. 403-405, 408); 82 (cols. 1-4); 83 (cols. 2-3, 7-8); 88 (pp. 2-3, 26, 30-40, 44, 52); 96 (pp. 36, 41); 106 (p. 134); 127 (pp. 79-80); 132 (p. 62); 149 (pp. 106, 108, 110); 152 (pp. 45, 50, 57, 62, 68); 153 (p. 23). |
| means for ascertaining whether the at least one claim contains a plurality of medical service codes; | 2 (pp. 10-12); 8 (pp. 28-30); 12 (p. 26); 18 (pp. 483, 485); 20 (pp. 351-353); 38 (cols. 3-8, 11-16, 20-24); 39 (cols. 9-12); 40 (cols. 5-6, 9-10); 41 (cols. 2-6); 44 (col. 10); 50 (pp. 34, 37, 39-40); 53 (p. 216); 54 (p. 98); 61 (pp. 639-640); 67 (pp. 201-202); 73 (pp. 403-405, 408); 82 (cols. 1-4); 83 (cols. 2-3, 7-8); 88 (pp. 2-3, 26, 30-40, 44, 52); 96 (pp. 36, 41); 106 (p. 134); 127 (pp. 79-80); 132 (p. 62); 149 (pp. 106, 108, 110); 152 (pp. 45, 50, 57, 62, 68); 153 (p. 23). |
| means for determining whether one of the medical service codes in the at least one claim is mutually exclusive due to non-medical criteria with any other medical service code in the at least one claim; | 2 (pp. 10-12); 8 (pp. 28-30); 12 (p. 26); 18 (pp. 483, 485); 20 (pp. 351-353); 38 (cols. 3-8, 11-16, 20-24); 39 (cols. 9-12); 40 (cols. 5-6, 9-10); 41 (cols. 2-6); 44 (col. 10); 50 (pp. 34, 37, 39-40); 53 (p. 216); 54 (p. 98); 61 (pp. 639-640); 73 (pp. 403-405, 408); 82 (cols. 1-4); 83 (cols. 2-3, 7-8); 88 (pp. 2-3, 26, 30-40, 44, 52); 96 (pp. 36, 41); 106 (p. 134); 127 (pp. 79-80); 132 (p. 62); 149 (pp. 106, 108, 110); 152 (pp. 45, 50, 57, 62, 68); 153 (p. 23); 154 (pp. 158-161). |
| means for authorizing medical service codes which are not mutually exclusive due. to non-medical criteria with any other medical service code contained in the at least one claim in response to the means for determining; and means for rejecting medical service codes which are mutually exclusive due to non-medical criteria with any other medical service codes contained in the at least one claim in response to the | 2 (pp. 10-12); 8 (pp. 28-30); 12 (p. 26); 18 (pp. 483, 485); 20 (pp. 351-353); 38 (cols. 3-8, 11-16, 20-24); 39 (cols. 9-12); 40 (cols. 5-6, 9-10); 41 (cols. 2-6); 44 (col. 10); 50 (pp. 34, 37, 39-40); 53 (p. 216); 54 (p. 98); 61 (pp. 639-640); 73 (pp. 403-405, 408); 82 (cols. 1-4); 83 (cols. 2-3, 7-8); 88 (pp. 2-3, 26, 30-40, 44, 52); 96 (pp. 36, 41); 106 (p. 134); 127 (pp. 79-80); 132 (p. 62); 149 (pp. 106, 108, 110); 152 (pp. 45, 50, 57, 62, 68); 153 (p. 23); 154 (pp. 158-161). |

| means for determining. | |
|---|---|

To the extent that the above-cited references establish obviousness in combination with other references, the motivation to combine such references is found in the references themselves or will be established through the introduction of expert testimony at the appropriate time. The relevant language from the above-cited references establishing a motivation to combine includes, but is not limited to, the following excerpts:

| | Author, Title & Source | Motivation to Combine |
|---|---|---|
| 8. | Weitzel, J.R., et al., *A Company / University Joint Venture to build a knowledge-based system,* MIS Quarterly, Vol. 12, No. 1, March 1988, 23-34 | "A refrain that occurs over and over in the current literature on building commercial knowledge-based systems is to select a problem and a design that can be solved using available technology. . . [T]he knowledge engineering team discussed processing natural language and modeling the patient's diagnoses and recuperative potential. Little is known about solving problems using these approaches. From the very first, the expert reviewer explained how decisions were made in 'if-then' terms, a clue that the problem involved surface knowledge. By deciding to stay within the limitations of the available technology, an approach that found relevant indicators in the medical records, a common pattern to their use, and a constrained representation schema was discovered." P. 31. |
| 12. | Snyeder, C., *From research to reality: the leading edge of expert systems,* Insurance Software Review, Vol. 12, No. 3, Autumn 1987, 22-4, 26-7, 30 | States the benefits of automation: "ExClaim increases productivity in a number of areas. One of these is volume. . . Another benefit is a reduction in errors and an increase in consistency among examiners, due to the fact that the system makes the same decisions the same way every time. Further . . . 'the need for high-level examiners should be reduced and an examiner with less experience should be able to do a higher volume and quality of work than before.' Finally, |

49

| | Author, Title & Source | Motivation to Combine |
|---|---|---|
| | | productivity gains are achieved through the product's PC orientation." P. 26-27. |
| | | Describes impact of workstation environment on future of insurance data processing: "The workstation environment [of PALLM, Inc.] . . . will instead address the administration that currently takes place at the desks of clerks and managers. It will serve to gather intelligence, guide the user through company procedures, and make routine decisions automatically. . . When PALLM's workstation environment evolves from research to reality, its impact on insurance data processing is expected to be dramatic." P. 30. |
| 20. | Egdahl, M.D. and Hertenstein, M.D., *An Access-oriented Negotiated Fee Schedule: The Caterpillar Experience*, Ann Surg., 206(3), pp. 349-57 (Sept. 1987). | "[The CAT process] can also be used (after eligibility is certified and benefits are coordinated) by claims processing systems." P. 353. |
| | | A series of questions is asked by several doctors, and Dr. Egdahl addresses each one in turn. Parts of these discussions suggest a need for an automated matching system. |
| | | Dr. Austen asks: "The Caterpillar Corporation has approximately 50,000 employees in 15 domestic plants . . . How would you expand your proposal from one company to a national program?" Dr. Egdahl answers: "The problem is that major national programs such as Medicare necessarily involve a large bureaucracy, whereas a private self-administered company such as Caterpillar does not require the same degree of routinization of operations and an easily replicated methodology." PP. 355, 357. |
| | | Dr. Beahrs asks: "I would be interested in the author's suggestions how the CPT-4 codes might be collapsed or bundled and what policy could be established to |

| | Author, Title & Source | Motivation to Combine |
|---|---|---|
| | | prevent these abuses." Dr. Egdahl answers: "I believe we can use CPT-4 as long as we understand the basis for matching up the procedures that actually were carried out with the codes, and have some way to ratchet downward those charges that seem inappropriate . . . We can stick with CPT-4, but must match the operative note with the CPT-4 code, using physician judgment to determine if the code is appropriate." PP. 355, 357. |
| | | Dr. Drucker asks: "This is a very complex system. It seems very costly if one reads carefully. What is the cost? Is there any estimate of what the cost would be of setting up and maintaining this system that requires close scrutiny of all bills that come in; a very complex system of monitoring these bills?" P. 356. |

51

| Author, Title & Source | Motivation to Combine |
|---|---|
| 39. | U.S. Pat. No. 4,667,292 (Mohlenbrock patent) | "One technique for increasing the likelihood of accuracy and cost-effectiveness in working with the new Medicare DRGs is to incorporate it into a computer system." Col. 3, lines 42-45.<br><br>Suggests automated comparison of two DRG numbers from different sources: "In fact, this comparison can be automated, as shown in FIG. 5 wherein a comparator 91 receives as one input 93 the DRG number determined by the physician in accordance with the procedure of FIG. 4 using the computer system of this invention. The second input 95 is a DRG number determined by running a prior art Grouper program 97 which operates from a plurality of ICD-9 code numbers identified by the medical records clerk. A system can even be used that would respond directly to each ICD-9 code inputted to it by the medical records clerk and indicate at the output of the comparator 91 when enough ICD-9 codes have been entered so that the DRG that is calculated by the Grouper program is the same as that determined by the attending physician." Col. 12, lines 48-62. |
| 67. | Gibbons PS, Pishotta FT, Stepto RC, *A system for reporting gynecologic procedures. A linguistic-logical approach,* Journal of Reproductive Medicine, March 1983, Vol. 28 (3), pp. 201-5 | Suggests potential for accuracy in automated system in encoding and reporting: "The automated system for encoding gynecologic procedures developed at Chicago Lying-In Hospital represents a step in the direction of 'softening' and yet controlling entry of technical medical information by standard input personnel. The use of a logical-linguistic network, allowing each procedure to be characterized in a number of ways, offers great flexibility to local managers as well as the potential for accuracy in procedure encoding and reporting." P. 205. |

| | Author, Title & Source | Motivation to Combine |
|---|---|---|
| 73. | Miller KM, Wisnicki HJ, Buchman JP. Riley MJ, Repka MX, Taylor HR, Guyton DL, *The Wilmer Information System. A classification and retrieval system for information on diagnosis and therapy in ophthalmology,* Ophthalmology, March 1988, Vol. 95 (3), pp. 403-9 | Suggests future development of interactive error checking software: "Maryland Medicare and Blue Cross/Blue Shield implemented policy changes in July 1986 to automate and expedite the processing of claims. The most noteworthy requirement was that all submitted claims would have to include an ICD-9 code before being processed . . . Interactive error checking software, similar to that used for direct entry, also will be developed. Until then, a data entry operator receives one copy of the customized coding sheet and enters the data manually." P. 408. <br><br> Discusses importance of coding scheme: "[T]he trend in future years is likely to be in the direction of consolidation. This trend will permit a greater pooling of resources at the hardware/software level, and provide better access to information for all those involved in patient care. The key to the success or failure of any medical information system is its coding scheme." P. 409 |

| Author, Title & Source | Motivation to Combine |
|---|---|
| 82. | U.S. Pat. No. 4,730,259 (Gallant patent) | Suggests the need for human experts in prior art: "In the prior art, rules are generally constructed for an expert system by either having a human expert provide the rules in a form suitable for the rule base or by having another person generally known as a knowledge engineer convert the information from an expert into appropriate rules. It is often the case that a human expert in a particular area has difficulty formatting his or her knowledge as a set of rules. The process of generating and perfecting a set of rules has been universally recognized as the most time consuming, difficult, and expensive process involved in building an expert system. It is frequently difficult to reduce expertise to a set of rules." Col. 1, line 63 – Col. 2, line 6. |
| 88. | Hao Kuo, *MEDCLAIM: An Expert Support System for Medical Claims Review*, Thesis Submitted in Department of Computer Science, University of South Carolina (1986). | Suggesting full automation of medical claims review process: "Using the heuristic knowledge and expectation table coded in the prototype and the extended database, MEDCLAIM can be reimplemented in a procedural language on the mainframe, and the entire medical claims review process can be fully automated." P. 54. |

Additionally, TriZetto discloses the following references that may partly or completely describe the apparatus and methods of the asserted claims of the '164 patent, rendering the patent invalid as either anticipated or obvious under 35 U.S.C. §§ 102 & 103. At the time of this response, TriZetto is still in the process of examining these references to determine their applicability. The applicability of these references may depend on the construction of the asserted claims, which has not yet occurred and the opinions of experts, whose disclosures are not required at this time. Accordingly, TriZetto reserves the right to assert these references if

and when it determines that one or more of the references is applicable. At such time, TriZetto will update its response to this interrogatory.

| Ref. No. | Author, Title & Source |
|---|---|
| 1. | Marva J. Crouff, *Automating Claims Processing, Insurance Software Review*, Autumn 1988, pp. 52, 54. |
| 3. | Healthstar, Health Benefits Management System, Product Description, v. 1.024 (Insurance Software Packages, Inc.). |
| 4. | *System validates medical fee schedules*, Best Review: Life/Health, June 1987, 92 [Insurance Software Packages, Inc. Medical C Schedule and Audit System]. |
| 5. | *Expert System identifies miscoded health claims*, Bests Review: Life/Health, November 1990, 60. |
| 6. | *Claims editing software runs coding rule checks*, Bests Review: Life/Health, November 1990, 62. |
| 7. | Woolsey, C., *Employer spots inflated medical bills*, Business Insurance, June 25, 1990, 3. |
| 9. | Leary, E., *SSA applies expertise to develop expert systems (Spotlight on AI-expert systems, Social Security Administration)*, Government Computer News, Vol. 6, No. 17, August 28, 1987, 49(3). |
| 10. | Beard, P., *Blue Cross develops insurance claim ES*, AIWeek, Vol. 6, No. 7, April 1, 1989, 3. |
| 11. | Sullivan-Trainor, M., *Catching new clients*, Computerworld, Vol. 21, No. 50, December 14, 1987, 95, 99. |
| 13. | Christensen, J., *Insuring*, High Technology Business, Vol. 8, No. 10, October 1988, 47-8. |
| 14. | *Expert Systems In the Insurance Industry: 1987 Survey Report Update*, Coopers and Lybrand, 1987. |
| 15. | Pallatto, J., *Expert system cures the blues (Blue Cross develops insurance claims analysis system NERSys)*, PC Week, Vol. 5, No. 50, December 12, 1988, 35, 44. |
| 16. | Gladwell, Malcolm, *Computer Firm Finds the Link for Health Care*, Washington Business, December 5, 1988, 5-6. |
| 17. | Kerschberg, L. "A Proposal for the Development of an Expert System for Medical Claims Processing: MEDCLAIM," Institute of Information Management, Technology and Policy, College of Business Administration, University of South Carolina, Columbia, SC, (July 1985). |
| 19. | Ronald Hurst, *Cost Containment - The Caterpillar Experience*, The Psychiatric Hospital, Vol. 13, No. 3 (1982). |

| Ref. No. | Author, Title & Source |
|---|---|
| 21. | Bauer JW, Cassidy TG, DeBord JR, Hart RD, Lee RH, Maher JE, Montgomery CE, Neufeld GK, Rivan RJ, Soderstrom CW, et al., Related Articles, *An access-oriented negotiated fee schedule: the Caterpillar experience*, Ann Surg., 208(5), pp. 667-8 (Nov. 1988). |
| 22. | Waterman, Donald A. (The Rand Corporation), *A Guide to Expert Systems*, Addison Wesley Publishing, Inc. (1985). |
| 23. | McDermott, John, *Artificial Intelligence Applications for Business: Building Expert Systems*, Proceedings of the NYU Symposium (May 1983). |
| 24. | Gerson, Elihu and Star, Susan Leigh, *Analyzing Due Process in the Workplace*, ACM Transactions on Office Information systems, Vol. 4, No. 3 (July 1986). |
| 25. | Hayes-Roth, Frederick, *et. al., Building Expert Systems: An Overview of Expert Systems*, Addison-Wesley Publishing, Inc. (1985). |
| 26. | Taylor, Edward, *Developing A Knowledge Engineering Capability in the TRW Defense Systems Group*, The AI Magazine (Summer 1985). |
| 27. | Bobrow, Daniel, *et. al., Expert Systems: Perils and Promise*, Computing Practices, Communications of the ACM, Vol. 29, No. 9 (Sept. 1986). |
| 28. | Bhide, Amar and Mohan, Brian, *Marcia Radosevich and Health Payment Review: 1989(A)*, Harvard Business School, 9-394-204 (Feb. 1999). |
| 29. | Genesereth, Michael, Ginsberg, Matthew, *Logic Programming*, Communications of the ACM, Vol. 28, No. 9 (Sept. 1985). |
| 30. | Yasdi, Ramin, *Modeling Database Based Expert Systems at the Conceptual Level*, Proceedings of the 1985 ACM Computer Science Conference (March 1985). |
| 31. | Freudenheim, Milt, *Insurers vs. Doctors: A Software Battleground*, New York Times (Nov. 15, 1989). |
| 32. | Riordan, Teresa, Patents: *A software-technology infringement case against Microsoft goes to trial in Federal Court*, New York Times (Jan. 24, 1994). |
| 33. | Colmerauer, Alain, *Prolog in 10 Figures*, Communications of the ACM, Vol. 28, No. 12 (Dec. 1985). |
| 34. | Hayes-Roth, Frederick, *Rule-Based Systems*, Communications of the ACM, Vol. 28, No. 9 (Sept. 1985). |
| 35. | Weitzel, J.R. and Kerschberg, L. *A System Development Methodology for Knowledge Based Systems*, IEEE Transactions on Systems, Man and Cybernetics, Vol. 19, No. 3 (May/June 1989). |
| 36. | Winston,, Patrick H., Prendergast, Karen A., *The AI Business: The Commercial Uses of Artificial Intelligence*, The MIT Press (1984). |

| Ref. No. | Author, Title & Source |
|---|---|
| 37. | Mack, Barbara, *A Prescription for Cutting Corporate Health Expenses*, Wall Street Journal (Jul. 18, 1983). |
| 42. | U.S. Pat. No. 4,858,121 (Barber patent) |
| 43. | U.S. Pat. No. 4,658,370 (Erman patent) |
| 45. | Jap. Appl. No. 55-107352, entitled "Medical business system" (Yoshikuni App.) |
| 46. | U.S. Trademark No. 1,583,416 (ClaimCheck Mark) |
| 47. | U.S. Trademark No. 1,624,579 (CodeReview Mark) |
| 48. | U.S. Trademark No. 2,165,159 (Code Advisor Mark) |
| 49. | Stachura CT, *Software reference guide: case-mix management*, Journal of the American Medical Record Association [J Am Med Rec Assoc] February 1987, Vol. 58 (2), pp. 42-6. |
| 51. | Stachura CT, *Software reference guide: encoding*, J Am Med Rec Assoc, November 1986, Vol. 57 (11), pp. 25-8. |
| 52. | Wilkinson R, *Does your grouper 'over-maximize' reimbursement?*, Hospitals, October 20, 1986, Vol. 60 (20), p. 88. |
| 55. | Caterinicchio RP, *Implementing a DRG-driven acuity system for nurse staffing under prospective hospital payment*, Hospital Topics, May-June 1985, Vol. 63 (3), pp. 6-7, 13. |
| 56. | Jackson B, Jensen J, *Hospitals turn to new software, hardware to cope with DRG 's*, Modern Healthcare, September 1984, Vol. 14 (12), pp. 109-12. |
| 57. | Nathanson M, *New software helps hospitals watch costs, profit under DRG*, Modern Healthcare, September 1984, Vol. 14 (12), pp. 132, 136-8. |
| 58. | *DRG helper makes it easy for doctors to maximize reimbursement*, Hospital Forum, July-August 1984, Vol. 27 (4), pp. 62-3. |
| 59. | Burda D, *Health care market experiences grouper software explosion*, J Am Med Rec Assoc, May 1984, Vol. 55 (5), pp. 35-7. |
| 60. | *Health care executive's guidebook to automation in the 1980s: health care information systems and DRG's*, Hospital Forum, Jan-Feb 1984, Vol. 27 (1), pp. 23-30. |
| 62. | Ray WJ, Johnstone J, *Using medical records to ensure fair DRG reimbursement*, Computer in Healthcare, December 1983, Vol. 4 (12), pp. 32-6, 40. |
| 63. | Heck S, Esmond T, *Financial modeling/case-mix analysis*, Computers in Healthcare, June 1983, Vol. 4 (6), pp. 50-1, 54. |
| 64. | Moliver M, *Computers and reimbursement*, Contemporary longterm care, April 1986, Vol. 9 (4), pp. 46-7. |
| 65. | Turner JM, *DRG compliance measurement in the future*, Software in Healthcare, August-September 1985, Vol. 3 (4), p. 48. |

| Ref. No. | Author, Title & Source |
|---|---|
| 66. | Mohlenbrock WC, *Getting the most out of DRG 's*, Group Practice Journal, September October 1985, Vol. 34 (5), pp. 27-32. |
| 68. | Studney DR, Hakstian AR, *Effect of a computerized ambulatory medical record system on the validity of claims data*, Medical Care, April 1983, Vol. 21 (4), pp. 463-7. |
| 69. | Poulson GP, *Detailed costing system nets efficiency*, savings, Hospitals, October 1, 1984, Vol. 58 (19), pp. 106-8, 111. |
| 70. | *Medical coding*, Medical Record and Health Care Information Journal, February 1988, Vol. 29 (1), pp. 20-2. |
| 71. | Johnson KF, *Integrated system brings hospital data together*, Health Progress, October 1987, Vol. 68 (8), pp. 46-9, 82. |
| 72. | Tauber J, Lahav M, *Simplified diagnostic coding sheet for computerized data storage and analysis in ophthalmology*, Ophthalmic Surgery, November 1987, Vol. 18 (11), pp. 846-9 |
| 74. | Carter K, *PCs can tap databanks for costs*, Modern Healthcare, June 20 1986, Vol. 16 (13), p. 52. |
| 75. | Ohnsson J, *GMIS (Gabrieli Medication Information Systems) software flags inappropriate billings, medical procedures*, Contract Healthcare, May 1988, pp. 28-9. |
| 76. | Cimino JJ, *Review paper: coding systems in health care*, Methods of Information in Medicine, December 1996, Vol. 35 (4-5), pp. 273-84. |
| 77. | Gabrieli ER, Speth DJ, Casiraghi E, *Knowledge bases*, Journal of Clinical Computing, 1985, Vol. 13 (5), pp. 150-4. |
| 78. | Gabrieli ER, Saumby JA, *Computer-based coding of medical data*, Topics in Health Record Management, March 1982, Vol. 2 (3), pp. 51-9. |
| 79. | Ely RM, *Savings through claims audits*, Topics in Health Care Financing, Summer 1986, Vol. 12 (4), pp. 61-7. |
| 80. | U.S. Pat. No. 4,347,568 (Giguere patent) |
| 81. | U.S. Pat. No. 4,491,725 (Pritchard patent) |
| 84. | U.S. Pat. No. 4,937,743 (Rassman patent) |
| 85. | U.S. Pat. No. 4,975,840 (De Tore patent) |
| 86. | U.S. Pat. No. 4,991,091 (Allen patent) |
| 87. | Buchanan Bruce G., *Expert Systems*, Journal of Automated Reasoning, Vol. 1, No. 1, 1985, pp. 28-35. |
| 88. | Hao Kuo, *MEDCLAIM: An Expert Support System for Medical Claims Review*, Thesis Submitted in Department of Computer Science, University of South Carolina (1986). |

| Ref. No. | Author, Title & Source |
|---|---|
| 89. | Horn SD,. Horn RA., *The computerized severity index: a new tool for case-mix management*, J Med Syst, February 1986, Vol. 10 (10), pp. 73-78. |
| 90. | Cebrian, Gil et al, *APACHE II*, Intensive Care med., 1987, Vol. 13 (2), p. 143. |
| 91. | Robinson, ML, *Hospitals look to "severity of illness" indexes*, Healthspan, June 1986, Vol. 3 (6), pp. 19-22. |
| 92. | Nestler, WB et al, *Case-mix reimbursement and clinical management....,* Ind Health Care (Cambridge Ma), 1985, Vol. 2, pp. 117-130. |
| 93. | Bates, SW et al, *Case mix management systems*, Mich. Hosp., August 1984, Vol. 20 (8), pp. 24-29. |
| 94. | Zak, EJ et al; *Financial modeling: an administrative tool of the highest. ..*, Computers in Healthcare, June 1984, Vol. 5(6), pp. 24-26. |
| 95. | Huhn, C et al, *Evaluating the new case-mix systems: a systematic approach*, Hospitals, January 1984, Vo. 58 (2), pp. 92, 94, 96. |
| 97. | Shaffer, VM, *Case mix analysis*, Osteopathic hospital leadership, September-October 1985, pp. 8-9. |
| 98. | Braithwaite, WR, *The effect of Medicare legislation on medical records system*, Software in Healthcare, August-September 1985, Vol. 3 (4), pp. 26-27. |
| 99. | Myers, TF et al, *A modification of the international classification of diseases for uniform...* , AM J Perinatol, July 1985, Vol. 2 (3), pp. 240-241. |
| 100. | Barnard, C., *How to select and implement case-mix (product-line analysis). ..*, Hosp. Forum, January – February, 1985 Vol. 28 (1), pp. 25-30. |
| 101. | Jones, R, *Case-mix and computers: there's a micro-mainframe connection. ..*, Computers in Healthcare, October 1984, Vol. 5 (10), pp. 36-39. |
| 102. | Jones, R., *Case-mix and computers: there's a micro-mainframe connection...* , Computers in Healthcare, August 1984, Vol. 5 (8), pp. 44-45. |
| 103. | Schumacher, DN, *A practical guide to reviewing case mix financial date*, The Hospital Medical Staff, August 1984, Vol. 13 (8), p. 170. |
| 104. | Jones, R., *Case-mix and computers. Part one: a look at computer delivery. ..*, Computers in Healthcare, June 1984, Vol. 5 (5), pp. 42-45. |
| 105. | Jaggar, FM et al, *A PPS essential: case-mix management systems*, Hospitals, May 1, 1984, Vol. 58 (9), pp. 71-76. |
| 107. | Fedorowicz, J., *Will your computer meet your case-mix informational. ..*, Nurs Health Care, November 1983, Vol. 4 (9), pp. 493-497. |
| 108. | Fedorowicz, J., *Hospital information systems: are we ready for case mix applications*, Health Care Manage Rev., Fall 1983, Vol. 8 (4), pp. 33-41. |

| Ref. No. | Author, Title & Source |
|---|---|
| 109. | Gillette, PE., *Hospital information systems: computer must rack patient costs*, Modern Healthcare, September 1983, Vol. 13 (9), pp. 154, 156, 158. |
| 110. | Nathanson, M., *Hospital information systems: computers crank out DRG...* , Modern Healthcare, September 19833, Vol. 13, (9), pp. 160, 162, 164. |
| 111. | McLaughlin, DB et al., *Personal computers provide advantages and frustrations...* , Hospitals, July 1983, Vol. 57 (14), p. 94. |
| 112. | Barnard, C., *System strategies for case mix*, Computers in Healthcare, June 1983, Vol., 4 (6), pp. 28-32. |
| 113. | Mitchell WA., *An automated APACHE II scoring system*, Intensive care nursing, 1987, Vol. 3 (1), pp. 14-18. |
| 114. | Packer, CL., *Automation in the medical records department*, Hospitals, March 1, 1985, Vol. 59 (5), pp. 100, 102, 104. |
| 115. | Kramer, DJ., *Medicare billing goes electronic,* Software in Healthcare, February March 1986, Vol. 5 (1), pp. 31-32. |
| 116. | Gardner, E., *Coding changes delay reimbursement*, Modem Healthcare, December 4, 1987, Vol. 17 (25), p. 11. |
| 117. | King, M., *How can case mix work for long-term care providers*, Contemporary Longterm Care, November 1988, Vol. 11 (11), pp. 48, 50. |
| 118. | Couch, JB., *Assessing medical care on the basis of its value*, Physician executive, July August 1987, Vol. 13 (4), pp. 7-10. |
| 119. | Peterson, RN et al., *Congress to decide Medicare matters; final PPS rules. ..* , Health Law Vigil, September 20, 1985, Vol. 8 (19), pp. 6-8. |
| 120. | Terenzio J., *Preparing for the future today -product line management...* , Healthcare, Computing & communications, September 1985, Vol. 2 (9), pp. 56-58. |
| 121. | Sovie, MD et al., *Amalgam of nursing acuity*, DRGs and costs... , Nursing Management, March 1985, Vol. 16 (3), pp. 22-42. |
| 122. | Sleight, S. et al., *Addressing case mix management in the smaller hospital...*,  Computers in Healthcare, February 1985, Vol. 6 (2), pp. 22-24. |
| 123. | Nathanson, M., *Hospitals struggling to develop standards*, Modern Healthcare, September 1984, Vol. 14 (12), p. 140. |
| 124. | Llaurado, JG, *Computing disease severity: staging*, Int J Biomed Comput, July-August 1984, Vol. 15 (4), pp. 243-248. |
| 125. | Christensen, B., *"Staging" software measures severity of patient's illness*, Hospitals, May 1, 1984, Vol. 58 (9), pp. 45-46. |
| 126. | Dambro, MR et al., *An unsuccessful experience with computerized medical. ..* , Journal of Medical Education, August 1988, Vol. 63 (8), pp. 617-623. |

| Ref. No. | Author, Title & Source |
|---|---|
| 128. | DiMauro, ME, *Information systems for cost-effective management*, Topics in Health Care Financing, Winter 1987, Vol. 14 (2), pp. 28-34. |
| 129. | Dombi, WA, *Home care denials: computerization and Medicare home care appeals*, Caring: National Association for Home Care Magazine, June 1987, Vol. 6 (6), pp. 16, 19. |
| 130. | Crownover, KR, *Shrinking the demand of home care documentation*, Caring: National Association for Home Care Magazine, June 1987, Vol. 6 (6), pp. 20-22. |
| 131. | Sabin, P., *Hospital cost accounting and the new imperative*, Health Progress, May 1987, Vol. 68 (4), pp. 52-57. |
| 133. | Woodward, RS, *Teaching DRG reimbursement with VisiCalc.*, The Journal of Health Administration Education, Winter 1985, Vol. 3 (1), pp. 91-97. |
| 134. | Landais P. et al., ARCANE. *A new medical patient information system*, Medical Information=Medecine et informatique, April-June 1988, Vol. 13 (2), pp. 105-116. |
| 135. | Carter K., *New reimbursement for outpatient services will mean more...* , Modern Healthcare, August 28, 1987, Vol. 17 (18), p. 78. |
| 136. | None Listed, *Computerization in the medical record department at Pioneer Valley...* , J Am Med Rec Assoc, February 1985, Vol. 56 (2), pp. 42-43. |
| 137. | Gabrieli, ER, *Automated medical office records*, Journal of Medical Systems, February 1987, Vol. 11 (1), pp. 59-68. |
| 138. | Gabrieli, ER, et al., *Computerized discharge summaries: a new window...* , Journal of Clinical Computing, 1987, Vol. 16 (1-2), pp. 47-62. |
| 139. | Gabrieli, ER, et al., *Automated analysis of the discharge summary*, Journal of Clinical Computing, 1986, Vol. 15 (1), p. 128. |
| 140. | Gabrieli, ER, et al., *Standardization of medical informatics*, Journal of Clinical Computing, 1986, Vol. 14 (6), pp. 179-198. |
| 141. | Gabrieli, ER, et al., *A center for medical informatics; modern methods of information...*, Topics in Health Record Management, September 1985, Vol. 6 (1), pp. 12-15. |
| 142. | Gabrieli, ER, et al., *Cognitive processing for computerized new knowledge*, Journal of Clinical Computing, 1985, Vol. 13 (4), pp. 113-116. |
| 143. | Gabrieli, ER, et al., *Computer-based knowledge banks for clinical medicine*, Journal of Clinical Computing, 1983, Vol. 11 (5-6), pp. 195-200. |
| 144. | Gabrieli, ER, et al., *Computer-oriented coding of medical data*, Journal of Clinical Computing, 1981, Vol. 10 (1), pp. 1-18. |
| 145. | Gabrieli, ER, et al., *A proposal for a computer-based national medical information ....*, Journal of Clinical Computing, Vol. 10 (1), pp. 19-52. |

| Ref. No. | Author, Title & Source |
|---|---|
| 146. | Gabrieli, ER, et al., *Computer-oriented nomenclature, automated classification ....,* Journal of Clinical Computing, 1980, Vol. 9 (2), pp. 54-66. |
| 147. | Gabrieli, ER, *Medical information system, health records, and knowledge...* , Medical Instrumentation, July-August 1978, Vol. 12 (4), pp. 245-247. |
| 148. | Gabrieli, ER, *Computer-assisted assessment of patient care in the hospital*, Journal of Medical Systems. June 1988, Vol. 12 (3), pp. 135-146. |
| 150. | Robinson, Michele L., *AHA voices concerns about HCFA's severity index*, Hospitals, October 5, 1988, p. 26. |
| 151. | Barnard, C., *Preparing for case-mix: the role of data processing*, Healthcare financial management: journal of the Healthcare Financial Management Association, June 1983, Vol. 37 (6), pp. 57-70. |

Furthermore, the '164 patent is invalid under 35 U.S.C. §§ 102(a), 102(b), 102(f) & 102(g), insofar as the invention disclosed and claimed therein was made by others, known by others, invented by others and/or in use by others prior to the date of invention or filing for the '164 patent. The following is a list of prior art systems which may have been developed and used by others before the date of invention of the '164 patent:

| System (Company) | Description |
|---|---|
| **AccuCode (HCIA/Solucient)** | In the mid-80's, Solucient developed a product called AccuCode that edited DRG codes and outpatient surgical procedures for coding accuracy. |
| **Blue Cross Blue Shield New Jersey** | Developed in 1969, the Blue Shield system denied and/or edited payments for same day surgeries. The system also edited claims for place of service and denied services that were inappropriate. |
| **Clinical Data Editor developed (Health Systems International)** | As early as February 15, 1984, the Clinical Data Editor evaluated the consistency of coded data via more than 25 code edits and assigned DRGs based on edited data. The Clinical Data Editor also identified erroneous or missing diagnosis and procedure codes. |
| **ClinicaLogic for ClaimFacts (Erisco)** | Beginning as early as late 1987 and finishing in 1988, Erisco developed the ClinicaLogic clinical editing module for its ClaimFacts product. ClinicaLogic used medical criteria created by physicians at Pace Healthcare Management, under the direction of Dr. Philip Hawley. |

| System (Company) | Description |
|---|---|
| **Clinical Review System a/k/a Chart 'N Coder (Ernst & Young)** | By at least February 5, 1988, CRS/Chart 'N Coder monitored costs, charges, and lengths of stay. The Chart 'N Coder system was primarily a look-up system that collected demographic information and flashed a warning that a code was incorrect. The code editing portion of the system used ICD codes. Clinical Review System identifies when a non-specific code must be replaced by an ICD-9-CM code of greater specificity, and when the presence of a complication or co-morbidity code affects the DRG. |
| **CODEFINDER/ DRGFINDER or Clinical Claims Editor (Code 3 Health Information Systems/3M)** | As early as February 15, 1984, Code 3 developed a system called the CODEFINDER/DRGFINDER or the Clinical Claims Editor which was a COBOL based product that evaluates claims to assign DRG codes, evaluate the accuracy of the data, and identify coding errors. |
| **Codemaster PLUS (Care Communications)** | By at least January 1987, Care Communications provided an automated ICD-9-CM encoder, a code editor, a DRG grouper, and a DRG optimizer. The system assigns DRGs and alerts users to various appropriate options (pathways) for increasing the amount of reimbursement. |
| **Discorp Software (Novalis)** | Founded in 1985, Discorp Software provided medical code checking and verified the accuracy of codes. |
| **ExClaim (Policy Management Systems Corporation)** | In use in 1987, the ExClaim software works by allowing a claims examiner to enter basic claim information such as the name, address, and dates of service, procedures performed, and category of service. Based on that data, ExClaim determines the resultant payment or reconciliation of the claim. |
| **Interactive DRG Grouper (Radle Computer Systems, Inc.)** | By at least 1987, Radle Computer Systems, Inc. had developed the Interactive DRG Grouper. The Interactive DRG Grouper determines DRG assignment based on patient data. Up to five diagnostic codes and five procedural codes may be entered for each patient. DRG assignment may be computed on the basis of the principal diagnosis or several DRG assignments may be calculated using each entered diagnosis as the principal diagnosis. |

| System (Company) | Description |
|---|---|
| **MedChec (Lockheed Martin)** | Designed to detect overcharging and fraud in medical insurance programs administered by Lockheed by at least Fall 1988, MedChec used rules to return a report identifying two categories of suspicious-looking records – over billings that will result in refunds, and suspect billings that must be paid but that result in warnings to providers that they avoid a recurrence. |
| **MedClaim** | MedClaim is a product of a joint venture formed in 1985 between the University of South Carolina and BCBS South Carolina to develop a knowledge-based system to perform medical review of health insurance claims. The system would review the claims, assemble justification for its recommendation, and send a result indicator and the justification to the main claims system. |
| **Medical Policy (Advanced Systems Application joint venture with Blue Cross Blue Shield North Carolina ("BCBS-NCA")** | Initially designed in late 1986, medical staff from BCBS-NCA developed the Medical Policy product rules while Advanced Systems Application developers worked on the design, coding, and testing. The rules included age, sex, and place of service editing, rebundling and repricing for the rebundled services. This was an add-on to ASA's claims processing software. |
| **QGROUPER (Quality Data Systems)** | In use by at least January 1987, QGROUPER determined MDCs and DRGs on an interactive or batch-mode basis. When used in an interactive mode, diagnosis parameters affecting DRG assignment can be changed and a new DRG can be calculated immediately. |
| **Wilmer Information Systems** | By March 1988, Wilmer Information Systems ("WIS") had for sale a computerized medical information system used for the storage and retrieval of patient demographics, diagnosis and therapy. WIS used a master code list containing all of the diagnosis and treatment codes recognized by the system. |

In addition to the prior art systems developed by third parties listed above, TriZetto identifies the following described activities of McKesson more than one year prior to the date of application for the '164 patent sufficient to render the '164 patent invalid and unenforceable under 35 U.S.C. § 102(b) and/or § 103. Specifically, prior to the critical date of September 30, 1987, Caterpillar Tractor, Inc. ("Caterpillar") and McKesson's predecessor-in-interest, Health Payment Review ("HPR") have, among other items, disclosed and offered for sale the claims review process in both a manual and software embodiment for sale to third parties. As early as

1985, employees of Caterpillar developed the patented process. Sometime prior to February 1986, representatives of Caterpillar approached individuals at the Health Policy Institute of Boston University with the idea of developing software that would automatically perform this process. In these discussions, individuals at Caterpillar disclosed the patented process to individuals at Boston University in their effort to obtain funding and establish HPR. Also in 1986, individuals from Caterpillar and the Health Policy Institute collaborated on a lecture entitled "Managing Physician Fees" presented at a publicly attended conference. This presentation described the patented process, including unbundling and rebundling claims to manage the cost of physician fees. Additionally at this conference, the presenters described the automation of the patented process using computerized software and requested advice from the audience regarding marketing the resulting software package.

From 1986 to 1987, individuals from the Health Policy Institute and/or HPR sent correspondence and detailed proposals offering to sell, promote and disclose the patented system to various companies such as Aetna Insurance Company, Chrysler Corporation, Sun Oil Company, Armco, Inc., and the Weyerhauser Company. These proposals and correspondence contained disclosures of the steps of the manual process, offers for sale of the manual version of the patented process, or offers to develop a software-based version of the patented process for a fee. On information and belief, sometime in 1987, Marcia Radosevich of HPR met with personnel of Erisco to offer HPR's clinical editing product to Erisco.

**INTERROGATORY NO. 21:**

To the extent not otherwise detailed in response to other McKesson interrogatories in this case, state in complete detail all bases for TriZetto's assertion that the '164 patent is invalid or unenforceable, and identify all persons with knowledge of, and all communications relating to, this assertion.

**RESPONSE TO INTERROGATORY NO. 21: (August 16, 2005)**

TriZetto objects to this interrogatory on the grounds that it calls for the disclosure of communications protected by the attorney-client privilege and/or the attorney work product

65

doctrine. To the extent that TriZetto claims privilege and withholds any communications responsive to this interrogatory, TriZetto will provide a privilege log in accordance with the Federal Rules of Civil Procedure at a future date.

TriZetto further objects that claim construction in this action has not yet occurred, and depositions have not yet been taken. The information contained in this response is based on information that is reasonably available to TriZetto at the present time. TriZetto's identification of the facts, basis and evidence supporting its claim of invalidity are as complete as possible at this time. Accordingly, TriZetto reserves the right to supplement, amend and augment its response to this interrogatory as new, additional and different information is learned and discovered and when the claims at issue are construed by the Court. Subject to and without waiving these objections and the General Objections stated at the outset, TriZetto responds to this interrogatory as follows:

The '164 patent is invalid or unenforceable for the reasons stated in TriZetto's responses (including all supplemental responses) to McKesson's Interrogatories Nos. 6-9 and 18-20.

## FIRST SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 21:
**(September 13, 2005)**

TriZetto reasserts and reincorporates by reference herein its previous response to Interrogatory No. 21, and the general objections set forth above. Additionally, claim construction in this action has not occurred, and discovery is continuing. The information contained in this response is based on information that is reasonably available to TriZetto at the present time. TriZetto's identification of prior art is as specific as is possible at this time. Accordingly, TriZetto reserves the right to supplement, amend and augment its response to this interrogatory as new, additional and different information is learned and discovered and when the claims at issue are construed by the Court. Subject to and without waiving those objections, TriZetto supplements its previous response as follows:

The '164 patent is invalid or unenforceable for the reasons stated in TriZetto's responses (including all supplemental responses) to McKesson's Interrogatories Nos. 6-9 and 18-20,

66

including TriZetto's Fourth Supplemental Response to McKesson's Interrogatory No. 6, as set forth above.

Dated:  September 13, 2005

GIBSON, DUNN & CRUTCHER LLP

Michael A. Sitzman /amo

Michael A. Sitzman
One Montgomery Street
31st Floor
San Francisco, California 94104
(415) 393-8200

– and –

MORRIS, NICHOLS, ARSHT & TUNNELL
Jack B. Blumenfeld (No. 1014)
Rodger D. Smith, II (No. 3778)
1201 N. Market Street
Wilmington, Delaware 19899
(302) 658-9200

Attorneys for Defendant
The TriZetto Group, Inc.

## DECLARATION OF SERVICE

I, the undersigned, declare that I am employed in the County of San Francisco, State of California; I am over the age of eighteen years and am not a party to this action; my business address is 1 Montgomery St, San Francisco, California 94104, in said County. and State, and on the date indicated below, I served the within:

### THE TRIZETTO GROUP, INC.'S FOURTH SUPPLEMENTAL RESPONSE TO PLAINTIFF'S INTERROGATORY NO. 6 AND FIRST SUPPLEMENTAL RESPONSE TO PLAINTIFF'S INTERROGATORY NO. 21

by placing a true copy thereof in an envelope addressed to each of the persons named below at the address shown:

☑ **BY MAIL:** I placed a true copy in a sealed envelope addressed as indicated above, on the above-mentioned date. I am familiar with the firm's practice of collection and processing correspondence for mailing. It is deposited with the U.S. Postal Service on that same day in the ordinary course of business. I am aware that on motion of party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

☐ **BY PERSONAL SERVICE:** I placed a true copy in a sealed envelope addressed to each person[s] named at the address[es] shown and giving same to a messenger for personal delivery before 5:00 p.m. on the above-mentioned date.

☑ **BY FACSIMILE:** From facsimile machine telephone number (415) 986-5309, on the abovementioned date, I served a full and complete copy of the above-referenced document[s] by facsimile transmission to the person[s] at the number[s] indicated.

☐ **BY FEDERAL EXPRESS:** I placed a true copy in a sealed envelope addressed as indicated above, on the above-mentioned date. I am familiar with the firm's practice of collection and processing correspondence for delivery by Federal Express. Pursuant to that practice, envelopes placed for collection at designated locations .during designated hours are delivered to Federal Express with a fully completed airbill, under which all delivery charges are paid by Gibson, Dunn & Crutcher, that same day in the ordinary course of business.

☐ **(STATE)** I declare under penalty of perjury under the laws of the State of California that the above is true and correct and that the foregoing document(s) were printed on recycled paper.

☑ **(FEDERAL)** I declare that I am employed in the office of a member of the bar of this court or who has been admitted *pro hac vice* at whose direction the service was made.

Executed on September 13, 2005, at San Francisco, California

Michael V. Bresso

## SERVICE LIST

By U.S. Mail:
Jeffrey G. Randall
David W. Hansen
Michael C. Hendershot
Donna Hill
SKADDEN, ARPS, SLATE, MEAGHER &
FLOM LLP
525 University Avenue, Suite 1100
Palo Alto, CA 94301

Telephone: (650) 470-4500
Facsimile: (650) 470-4570

By Email:
jrandall@dden.com
dhansen@skadden.com
mhenders@skadden.com
dhill@skadden.com

By U.S. Mail:
Thomas J. Allingham II
SKADDEN, ARPS, SLATE, MEAGHER &
FLOM LLP
One Rodney Square
P.O. Box 636
Willimington, DE 19899

Telephone: (302) 651-3000
Facsimile: (302) 651-3001

By Email:
tallina@skadden.com

40216250_1.DOC

69