IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

MCKESSON INFORMATION SOLUTIONS LLC,

            Plaintiff,

            v.

THE TRIZETTO GROUP, INC.,

            Defendant.

)
)
)
)
)
)
)
)
)
)
)

C.A. No. 04-1258 (SLR)

**REDACTED VERSION**


**DEFENDANT THE TRIZETTO GROUP INC.'S ANSWERING
BRIEF IN OPPOSITION TO PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT RE DEFENSES UNDER 35 U.S.C. § 112**

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Jack B. Blumenfeld (#1014)
Rodger D. Smith, II (#3778)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200

*Attorneys for Defendant The TriZetto Group, Inc.*

OF COUNSEL:

Jeffrey T. Thomas
David A. Segal
Michael A. Sitzman
GIBSON, DUNN & CRUTCHER LLP
Jamboree Center
4 Park Plaza
Irvine, CA  92614-8557
(949) 451-3800

Original Filing Date:  June 15, 2006
Redacted Filing Date:  June 22, 2006

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES .......................................................... iii

I.      NATURE AND STAGE OF PROCEEDINGS ...................................1

II.     SUMMARY OF ARGUMENT .............................................................1

        A.      Best Mode ...............................................................................2

        B.      Indefiniteness .........................................................................4

III.    STATEMENT OF FACTS ...................................................................6

        A.      Background ..............................................................................6

        B.      The Inventors Believed There Was A Best Mode For Carrying
                Out Their Claimed Invention Prior To Filing The '164 Patent
                Application .............................................................................6

        C.      The Inventors Concealed The Predetermined Database From
                The PTO And The Public At Large .........................................8

        D.      The Predetermined Database Is Part Of The Claimed Subject
                Matter .....................................................................................9

        E.      Claim 2 Of The '164 Patent And The Term "Non-Medical
                Criteria" .................................................................................9

IV.     ARGUMENT .....................................................................................11

        A.      At The Time The Inventors Filed The '164 Patent Application,
                They Knew Of, But Concealed, A Best Mode Of Practicing
                Their Claimed Invention .......................................................11

                1.      Legal   Standards   Governing   The   Best   Mode
                        Requirement ...............................................................11

                2.      HPR's Customers' Beliefs Are Irrelevant .....................11

                3.      Compliance With The Best Mode Requirement Is
                        Judged At The Time Of Filing The Patent Application.................14

                4.      The Inventors Thought The Predetermined Database
                        Containing Hertenstein's Rules Was The Best................15

Page

5.  The Predetermined Database Is Part Of The Claimed Subject Matter ..................................................................16

6.  McKesson Does Not Dispute That The Inventors Concealed The Inventors' Preferred Database .........................17

B.  Claim 2 Is Invalid For Indefiniteness ........................................................18

1.  The Court Has Not Construed The Term "Non-Medical Criteria" ...........................................................................18

2.  TriZetto Has Not Conceded That The Term "Non-Medical Criteria" Is Susceptible To Construction .........................21

3.  The Term "Non-Medical Criteria" Is Indefinite As A Matter Of Law ......................................................................22

V.  CONCLUSION ..........................................................................................25

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Arthrocare Corp. v. Smith & Nephew, Inc.*,
   2003 WL 1856436 (D. Del. Apr. 9, 2003) ................................................................. 20

*Chemcast Corp. v. Arco, Indus.*,
   913 F.2d 923 (Fed. Cir. 1990).................................................................................. passim

*Chiron Corp. v. Genentech*,
   2002 U.S. Dist LEXIS 19150 (E.D. Cal. June 24, 2002)....................................... 19, 20

*Datamize LLC v. Plumtree Software, Inc.*,
   417 F.3d 1342 (Fed. Cir. 2005)............................................................................ 5, 22, 24

*Exxon Research & Eng'g. Co. v. United States*,
   265 F.3d 1371 (Fed. Cir. 2001).................................................................................. 20

*Mycogen Plant Sci., Inc. v. Monsanto Co.*,
   61 F. Supp. 2d 199 (D. Del. 1999)........................................................................ 11, 14

*Northern Telecom, Inc. v. Datacom Corp.*,
   908 F.2d 931 (Fed. Cir. 1990).................................................................................. 11

*Pharmastem Therapeutics, Inc. v. Viacell, Inc.*,
   2003 U.S. Dist. LEXIS 877 (D. Del., Jan. 13, 2003)....................................... 5, 19, 20

*Praxair, Inc. v. ATMI, Inc.*,
   2005 WL 2989767 (D. Del. Nov. 8, 2005) .............................................................. 20

*SDS Inc. v. Ken Specialities*,
   122 F. Supp. 2d 533 (D.N.J. 2000) ...................................................................... 11, 13

*Semmler v. American Honda Motor Co., Inc.*,
   990 F. Supp. 967 (S.D. Ohio 1997) ......................................................................... 24

*Soitec, S.A. v. Silicon Genesis Corp.*,
   2002 U.S. Dist. LEXIS 16841 (D. Mass. Aug. 23, 2002).......................................... 20

*Spectra-Physics, Inc. v. Coherent, Inc.*,
   827 F.2d 1524 (Fed. Cir. 1987)................................................................................... 2

*U.S. Gypsum Co. v. Nat'l Gypsum Co.*,
   74 F.3d 1209 (Fed. Cir. 1996).......................................................................... 2, 12, 17

*Union Pac. Res. Co. v. Chesapeake Energy Corp.*,
   236 F.3d 684 (Fed. Cir. 2001)................................................................................... 20

Page(s)

## Statutes

35 U.S.C. § 112(1) ................................................................................ 2

37 C.F.R. § 1.71(b) ................................................................................ 2

## Other Authorities

2 DONALD S. CHISUM, CHISUM ON PATENTS § 7.05[2] .................................................. 14

## I.    NATURE AND STAGE OF PROCEEDINGS

On September 13, 2004, plaintiff McKesson Information Solutions, LLC ("McKesson") filed this suit alleging infringement of U.S. Patent No. 5,253,164 (the "'164 patent") against The TriZetto Group, Inc. ("TriZetto").  On October 1, 2004, McKesson amended its Complaint.  On November 1, 2004, TriZetto answered and filed a counterclaim seeking a declaratory judgment of invalidity, unenforceability, and non-infringement.

McKesson alleged that three of TriZetto's products (Facets, ClaimFacts and QicLink) infringed fifteen claims (Claims 1-6 and 8-16) of the '164 patent.  Fact and expert discovery have been completed.  The Court construed the patent claims in its Order of April 5, 2006, D.I. 307, which was later amended by the Order of April 11, 2006.  D.I. 320.  The Court did not construe the term "non-medical criteria," which appears in Claims 2 and 14, or address TriZetto's contention that the term was indefinite.  Also on April 5, 2006, the Court granted TriZetto's Motion for Summary Judgment of Non-Infringement as to Claims 3-6 and 8-15.  D.I. 301.

On April 26, 2006, a jury returned a verdict of literal infringement of Claims 1 and 2, but found that TriZetto did not infringe Claim 16.  D.I. 358.  A trial on the issues of willfulness, damages, invalidity, laches, equitable estoppel, and inequitable conduct is scheduled to commence October 3, 2006.

On June 1, 2006, McKesson filed a Motion for Summary Judgment re TriZetto's defenses under 35 U.S.C. § 112.  This is TriZetto's Answering Brief in support of its Opposition to McKesson's motion.

## II.    SUMMARY OF ARGUMENT

The '164 patent discloses a system and method, embodied by the inventors' CodeReview product, whereby a claims processor can enter medical claims containing CPT codes into a computer, and the computer processes those medical claims by using a software program and predetermined database (or knowledge base).  The predetermined database includes CPT codes and relationships among those codes.

In its Opening Brief, McKesson argues that it is entitled to summary judgment on TriZetto's defenses under 35 U.S.C. § 112, ¶ 1 (best mode) and ¶ 2 (indefiniteness). For the reasons set forth below and in TriZetto's own motions for summary judgment under 35 U.S.C. § 112, ¶¶ 1 and 2 (D.I. 365 and 374),[1] TriZetto respectfully submits that the Court should not only deny McKesson's motion, but should enter judgment in favor of TriZetto.

## A.   Best Mode

Paragraph 1 of Section 112 of the Patent Act requires that a patent applicant "set forth the best mode contemplated by the inventor of carrying out his invention." 35 U.S.C. § 112(1); *see also* 37 C.F.R. § 1.71(b). Failure to satisfy the best mode requirement results in a patent being invalid. *See, e.g., U.S. Gypsum Co. v. Nat'l Gypsum Co.*, 74 F.3d 1209, 1216 (Fed. Cir. 1996) (affirming the district court's grant of summary judgment of patent invalidity for failure to disclose best mode); *Spectra-Physics, Inc. v. Coherent, Inc.*, 827 F.2d 1524, 1535-36 (Fed. Cir. 1987) (declaring two patents invalid for failure to comply with best mode requirement). There is a two-part test for determining if an inventor has complied with the best mode requirement. First, the inventor must have known of a better mode of carrying out the claimed invention than was disclosed in the patent specification. Second, the inventor must have concealed that better mode. *Chemcast Corp. v. Arco, Indus.*, 913 F.2d 923, 927-28 (Fed. Cir. 1990).

In its motion, McKesson does not dispute that the inventors concealed the details of their predetermined database. Nor does it dispute that the database is needed to carry out the invention. Instead, McKesson only asserts that the inventors did not violate the best mode requirement because the specific contents of the predetermined database could be modified and some customers may have wanted to make modifications. That is not, as a matter of law, sufficient to defeat TriZetto's best mode challenge to the '164 patent.

---

[1]   Although directed to "TriZetto's Section 112 defenses," McKesson's motion does not address TriZetto's Section 112 written description defense. *See* D.I. 374, at 25-28. (TriZetto's Motion for Summary Judgment of Invalidity for Indefiniteness and Failure to Adequately Describe the Claimed Invention).

The inventors of the '164 patent have acknowledged that the disclosed computer system was designed to match precisely a perceived "unique" manual system for editing medical claims that Dr. Robert Hertenstein had developed while working at Caterpillar Corporation in the 1980s.

REDACTED

McKesson now argues that the inventors' "vastly superior" database was not the best mode of carrying out their claimed invention "because the inventors changed the contents of the database *based on the needs and policies of their customers*." *See generally* D.I. 371, at 7-10. McKesson's argument misses the mark entirely. First, a patent is invalid if the inventor had a mode that was *better* than what was disclosed; that mode need not be the *only* mode that could be used to practice the claims. Clearly, the inventors here believed that they had a database that was far better than anything disclosed in the patent, and so the fact that some customers modified that database is irrelevant to the best mode analysis. Second, the law is clear that the first prong of the best mode test – whether the inventors knew of a better mode of practicing their invention than was disclosed – is "wholly subjective," focusing on *the inventor's* state of mind at the time the patent application is filed. *Chemcast Corp. v. Arco, Indus.,* 913 F.3d 923, 928 (Fed. Cir. 1990). Thus, McKesson's focus on HPR's *customers' beliefs* – as opposed to the inventors' beliefs – is misdirected. Third, McKesson's argument is based entirely on customer beliefs and impressions *after the inventors filed the '164 patent application*. For purposes of the best mode defense, however, the relevant inquiry is the inventor's state of mind *at the time the patent application is filed*. As such, the facts set forth in McKesson's Opening Brief do not raise a

triable issue of fact as to TriZetto's best mode defense, let alone establish that McKesson is entitled to a ruling in its favor on that defense.

McKesson also argues that TriZetto cannot prove its best mode defense because there is no evidence that "the inventors possessed a best mode specific to claim 1 or 2 of the '164 patent." D.I. 371, at 10-11. In making this argument, McKesson ignores that the inventors' predetermined database is part of the claimed subject matter of the claimed invention.[2] The preambles of Claims 1 and 2 both include "a computer system with means for operating on" "a predetermined database containing medical service codes and a set of relationships among the medical service codes" to check and edit the medical service codes on a claim. Ex. D ('164 patent), Claims 1, 2. Furthermore, the identical "predetermined database" is used in *all* of the claims – there is not a separate or different database that is used only with Claims 1 and/or 2. *See id.* Cols. 117-120. Accordingly, McKesson's argument that there is no evidence that the inventors possessed a best mode with regard to "the specific claims" at issue is completely without merit.

**B.**    **Indefiniteness**

McKesson also argues that the term "non-medical criteria," which appears in Claim 2, is not indefinite. Specifically, McKesson asserts that that term is not indefinite "because the Court has already concluded that Claim 2 is amenable to construction." D.I. 371, at 11-14. Contrary to McKesson's assertion, this Court's Claim Construction Order *did not* provide *any* construction for the determining step of Claim 2, much less a specific construction for the term "non-medical criteria." *See generally* D.I. 307 (Mem. Order, April 5, 2006). Nor did the Court address, let alone reject, TriZetto's indefiniteness defense. *See id.* McKesson's motion also blatantly misstates the history of this litigation when it claims that "TriZetto effectively conceded that the term 'non-medical criteria' is susceptible to construction." D.I. 371, at 13-14. Contrary to

---

[2] If McKesson were to avoid a best mode determination by asserting the predetermined database is not part of the claims, McKesson would admit that Claims 1 and 2 are anticipated by the prior art.

REDACTED

McKesson's assertion, TriZetto has *repeatedly* argued that the term "non-medical criteria" is indefinite, and the Court simply has not yet decided the issue.

McKesson is also wrong when it states that "if a court is able to construe a claim's terms, the claim is not indefinite as a matter of law." D.I. 371, at 12.  Indeed, this Court has ruled that its practice is precisely the opposite: "The Court's position at [claim construction] does not . . . represent an actual adjudication on the defendant's indefiniteness defense . . . the court is merely holding that the claim is sufficiently definite to survive claim construction." *Pharmastem Therapeutics, Inc. v. Viacell, Inc.*, 2003 U.S. Dist. LEXIS 877, at *2 n.1 (D. Del. Jan. 13, 2003). Thus, even if the Court had construed the term "non-medical criteria" for *Markman* purposes, which it did not, that construction would not preclude the Court from determining that the term is indefinite.

Moreover, assuming *arguendo* that McKesson's interpretation of the Court's Claim Construction Order was correct, McKesson's conduct at trial provides new support for TriZetto's indefiniteness position.  During trial, McKesson greatly expanded the alleged scope of "non-medical criteria" from its pre-discovery cutoff disclosures – and took positions that directly contradict the scope of Claim 2 asserted by HPR, the original patent owner and McKesson's predecessor-in-interest, in 1994.

Finally, and perhaps most telling, McKesson still does not (presumably because it cannot) articulate the "ordinary meaning" of the term "non-medical criteria."  As set forth more fully in TriZetto's Motion for Summary Judgment for Indefiniteness and Failure to Adequately Describe the Claimed Invention (D.I. 374), the term "non-medical criteria" fails to "delineate the scope of the invention using language that adequately notifies the public of the patentee's right to exclude" – the essential function of 35 U.S.C. § 112's definiteness requirement.  *Datamize LLC v. Plumtree Software, Inc.*, 417 F.3d 1342, 1347 (Fed. Cir. 2005).  Thus, the term "non-medical criteria" is indefinite as a matter of law and McKesson's motion should be denied.

5

## III.    STATEMENT OF FACTS

### A.    <u>Background</u>

The grandparent patent application that resulted in the '164 patent was filed on September 30, 1988, by McKesson's predecessor, HPR. *See* Ex. D ('164 Patent), at 1. The patent issued on October 12, 1993. It is directed to computer software used for reviewing claims for payment submitted by medical care providers to health care insurance companies. Specifically, the patent describes software used to determine whether "procedure codes" (codes used to designate what medical treatment was performed) on claims for payment are accurate. These procedure codes, also known as CPT-4 codes, are numerical codes that were developed by the American Medical Association.

The named inventors on the '164 patent are Donald Holloway, Robert Hertenstein, George Goldberg and Kelli Dugan. Ex. D, at 1.

### REDACTED

### B.    **The Inventors Believed There Was A Best Mode For Carrying Out Their Claimed Invention Prior To Filing The '164 Patent Application**

Dr. Hertenstein joined Caterpillar Corporation in 1981. Ex. F (Hertenstein Dep.), at 8:4-12. At the time, Caterpillar was self-insured and Hertenstein's responsibilities were to assist the medical payment center with medical claims that they did not understand. *Id.* at 15:23-16:8. Six months later, Hertenstein became the medical director of insurance, and he developed a system to review medical insurance claims submitted on behalf of Caterpillar's employees. *Id.* at 16:14-17:6.

In 1986, Hertenstein made a presentation to several Fortune 500 companies at Boston University's Health Policy Institute ("HPI"), at which he demonstrated examples of the system he developed to review for coding errors. Ex. F (Hertenstein Dep.), at 77:12-78:21. Thereafter, he was contacted by individuals affiliated with HPI, including Holloway and Goldberg, "who suggested that Hertenstein's mental rule book for evaluating claims be put on a computer and

sold to other companies." *Id.* at 79:3-20. The idea was to develop software "that could be used with a computer to utilize the system that [Hertenstein] had been doing manually" at Caterpillar. *Id.* at 71:5-72:1.


REDACTED


By September 1987, HPR had developed prototype computer software, which was originally called MedReview and later CodeReview.


REDACTED


The database consisted of Hertenstein's expertise and the rules that he had developed at Caterpillar concerning what CPT-4 codes could be combined with other codes. Ex. F

(Hertenstein Dep.) at 111:23-112:23.   Hertenstein devoted approximately one thousand hours explaining and passing on his rules to Goldberg, who then placed them in the database.   *Id.* at 112:24-113:13.   By the time the process had ended, Hertenstein estimated that the knowledge base contained 45,000 rules that were based on his experience at Caterpillar in reviewing medical claims.   *Id.* at 113:14-21; 120:6-22.

By early 1988, the inventors were touting their predetermined database as being the best.

REDACTED

**C.     The Inventors Concealed The Predetermined Database From The PTO And The Public At Large**

REDACTED

REDACTED

**D.**    **The Predetermined Database Is Part Of The Claimed Subject Matter**

The preambles of Claims 1 and 2 both include "a computer system with means for operating on" "a predetermined database containing medical service codes and a set of relationships among the medical service codes" to check and edit the medical service codes on a claim. Ex. D ('164 patent), Claims 1, 2. This Court construed the term "predetermined database" to mean "a set of decision-making rules that incorporate a medical code classification system and expert medical clinical judgment." D.I. 320, at 2-3. McKesson does not dispute that the predetermined database is part of the claimed subject matter of the '164 patent. *See generally* D.I. 371, at 5-10.

**E.**    **Claim 2 Of The '164 Patent And The Term "Non-Medical Criteria"**

Claim 2 (originally claim 18) was added to the patent by a January 29, 1991 Preliminary Amendment to the second continuation application of the original 1988 patent application. Ex. O (1991 Amend.), at 5. This was the first time the concept of comparing codes based on "non-medical criteria" was mentioned at all in connection with the '164 patent. In the original 1988 patent application, the claims only covered a computer system and method for determining whether medical codes were "inappropriate" when received together. Ex. P (Original Application), at 24-25.

As described in the specification, the disclosed system and method "examine the multiple codes presented to determine whether payment or payment authorization for each of the stated codes is ***medically appropriate***, or whether one or more of the codes is ***medically inappropriate***, or whether one or all of the multiple codes should be replaced by other code(s)." Ex. D ('164 patent), col. 5:60-65 (emphasis added). That is, the inventors claimed that they had invented a system and method that made determinations based only on *medical* appropriateness.

The inventors' original limitation of their invention to *medical* determinations is also consistent with the other portions of the specification and this Court's construction of the predetermined database. In particular, throughout the specification, the inventors repeatedly emphasized that the database of the invention – which contained the detailed rules as to which codes should remain on a claim and which should be rejected – "was developed as a result of reviewing *medical* procedures by expert *medical* personnel and is consistent with the CPT-4 classification system," the medical procedures of which "were examined classified, and possible combinations of procedures assessed by expert medical specialists," based on the "application of *clinical* judgment" by such "expert medical personnel." Ex. D ('164 patent), col. 5:68-6:13 (emphasis added). The phrase "non-medical criteria" does not appear anywhere in the '164 patent's specification, and when Claim 2 was added by amendment, no definition was provided to the PTO.

Faced with no support for any construction of the phrase "non-medical criteria," McKesson has never attempted – even in its current motion premised on the assumption that the phrase has some discernible meaning – to define the phrase, and instead simply argued that the phrase should be given its "ordinary meaning." D.I. 170 (McKesson's Opening Claim Construction Brief), at 11. As set forth in detail in TriZetto's Summary Judgment Motion, the phrase "non-medical criteria" is so indefinite that it cannot be given any reasonable construction. D.I. 374, at 9-24.

## IV.     ARGUMENT

A.     **At The Time The Inventors Filed The '164 Patent Application, They Knew Of, But Concealed, A Best Mode Of Practicing Their Claimed Invention**

### 1.     Legal Standards Governing The Best Mode Requirement

McKesson correctly states that invalidity for failure to comply with the best mode requirement of 35 U.S.C. § 112, ¶ 1 requires proof by clear and convincing evidence that the inventors [1] knew of and [2] concealed a better mode of carrying out the invention than was set forth in the patent specification. *Northern Telecom, Inc. v. Datacom Corp.*, 908 F.2d 931, 935 (Fed. Cir. 1990); D.I. 371, at 5. McKesson also correctly asserts that the first inquiry is subjective, and focuses on the inventor's state of mind as of the time he or she filed the patent application. *Chemcast Corp. v. Arco, Indus.*, 913 F.3d 923, 928 (Fed. Cir. 1990); D.I. 371, at 5.

Despite setting forth the correct standard, McKesson completely ignores the requirements of the first inquiry. Specifically, McKesson ignores that the inquiry focuses on the *inventors'* state of mind – it "has nothing to do with sales to customers having particular requirements, or commercial embodiments." *SDS Inc. v. Ken Specialities*, 122 F. Supp. 2d 533, 548-49 (D.N.J. 2000). McKesson also ignores the fact that the critical date with regard to disclosing the best mode is "at the time [the inventors] filed their patent application, not at some later time." *Mycogen Plant Sci., Inc. v. Monsanto Co.*, 61 F. Supp. 2d 199, 253 (D. Del. 1999).

### 2.     HPR's Customers' Beliefs Are Irrelevant

McKesson contends that the inventors of the '164 patent did not have a best mode for practicing their claimed invention because "the inventors changed the contents of the database based on the needs and policies of their customers." D.I. 371, at 7. In support of this contention, McKesson relies entirely on testimony from the inventors who state that HPR's *customers* sometimes requested some variations to the rules and relationships among medical service codes that were contained in the inventors' preferred, or default, predetermined database. For example, McKesson quotes Holloway who testified that "not all customers wanted all of Bob

11

[Hertenstein's] rules." *Id.* Holloway further testified that "[a] customer could tailor CodeReview for its own policies and benefits plans." *Id.* at 8. This argument fails for three reasons.

First, the fact that the inventors' database was modified at customers' request in no way addresses the crucial inquiry: Did the inventors have a database that was better than what is disclosed in the patent? An inventor cannot avoid the best mode requirement by creating multiple versions of the invention and not disclosing any of them. Instead, disclosure is required if an inventor "knew of a mode of practicing his claimed invention that he considered to be *better than any other.*" *Chemcast Corp.*, 913 F.2d at 927 (emphasis added). In other words, an inventor must disclose the best mode he or she is aware of, and cannot ignore this requirement by developing more than one way to practice the invention. *See U.S. Gypsum Co.*, 74 F.3d at 1215 ("'the sole purpose of [the best mode] requirement is to restrain inventors from applying for patents while at the same time concealing from the public preferred embodiments of their inventions which they have in fact conceived'" (citations omitted)). Here, the inventors clearly had a database far better than what was disclosed, and the fact that that database could be modified did not relieve them of their obligation to disclose it.

Second, as noted above, the law is clear that the first prong of the best mode test is "wholly subjective," focusing on *the inventor's* state of mind. *Chemcast Corp.,* 913 F.3d at 928. McKesson, however, mistakenly argues that it is *the customers'* beliefs that determines whether there was a best mode of practicing the claimed invention. D.I. 371, at 7-10. But whether "all customers wanted all of Hertenstein's rules" is immaterial to the Court's best mode analysis in this case as a matter of law.

Third, McKesson's recitation of the facts is misleading. Although the rules and relationships among medical service codes that were contained in the inventors' predetermined database "could be tailored or turned off for certain customers" by HPR, it is indisputable that HPR's CodeReview product had a *standard predetermined database that the inventors preferred.*

REDACTED

REDACTED

3 Thus, whether a customer could "turn [a] rule off" or "some of [the rules] were questionably objectionable by some physicians" does not alter the fact that *the inventors* had a standard preferred predetermined database that they considered the best. *See SDS, Inc.*, 122 F. Supp. 2d at 548-49 ("[p]laintiff advertises machines that accommodate only one thickness of ribbon stock [citation] because most customers only require a bending system that bends one size. [citation] Their interchangeability feature is relevant only to the needs of a particular segment of customers and has nothing to do with the claimed invention. [citation] .... Best mode has nothing to do with sales to customers having particular requirements, or commercial embodiments").

In sum, the best mode inquiry requires the Court to examine the inventors' subjective beliefs at the time they filed their patent application. Here, the fact that the inventors' database could later be modified to suit a customer's specifications does nothing to establish that the inventors had no preferred embodiment of their own. As demonstrated in TriZetto's own motion for summary judgment, the inventors believed that the code-specific relationships included in CodeReview were the superior and preferred mode of practicing the claimed invention. *See generally* D.I. 374, at 14-17.

---

3  As discussed in more detail below, the evidence cited in McKesson's Opening Brief is irrelevant to a best mode analysis because the evidence did not come into existence until *after* the inventors filed their patent application on September 30, 1988. TriZetto, therefore, merely references the evidence from the same time period in response to McKesson's arguments to demonstrate that, even during the period on which McKesson relies for its evidence and argument, there was a default database that the inventors and HPR preferred.

### 3. Compliance With The Best Mode Requirement Is Judged At The Time Of Filing The Patent Application

The law also is clear that the inventors' knowledge of a best mode for practicing their claimed invention is judged *as of the filing date of the patent application. Chemcast Corp.*, 913 F.2d at 926 ("The best mode inquiry focuses on the inventor's state of mind as of the time he filed his application – a subjective, factual question."). "The question . . . is what the inventors thought at the time they filed their patent application, not at some later time." *Mycogen Plant Science, Inc.*, 61 F. Supp. 2d at 253; *see also* 2 DONALD S. CHISUM, CHISUM ON PATENTS § 7.05[2] ("'[i]t is well established that the 'critical date with regard to disclosing the best mode contemplated is the date of the filing of the application.'"). The evidence cited in McKesson's Opening Brief is therefore irrelevant because the evidence only concerns customers' preferences from the period *after* the inventors filed their patent application.

The '164 patent application was filed on September 30, 1988. The *one and only* document cited in McKesson's Opening Brief, however, was created after September 30, 1988. D.I. 371, at 9 (referencing "CodeReview product information from 1989"); D.I. 372 (Barlow Decl.), Ex. 3 at MCK051657 (attaching a sample activity report for the period 1/01/89-02/28/89).

Similarly, the testimony relied on by McKesson in its Opening Brief discusses opinions from after September 30, 1988.[4] In all of the cited testimony, the inventors are discussing the notion that the customers who purchased CodeReview could "turn on and off" certain of the rules in the predetermined database depending on their "policies and requirements." D.I. 371, at 7-9. The first customer to have CodeReview installed was Caterpillar, and that installation occurred on June 8, 1988. Ex. T (McKesson 2nd Supp. Resp. to Interrog. No. 6).

REDACTED

---

[4] Moreover, all of Dr. Holloway's testimony cited in McKesson's Opening Brief is speculative.

REDACTED

14

REDACTED

Time Insurance Company, however, only implemented CodeReview in March 1989 – five months after the application for the '164 patent was filed. Thus, the testimony by the inventors cited in McKesson's Opening Brief that the customers who purchased CodeReview could request modifications to the default database is obviously recounting events that took place at an irrelevant time – after the '164 patent application was filed on September 30, 1988. McKesson has not pointed to any *pre-filing evidence* refuting TriZetto's best mode defense. As a result, McKesson has failed to create a triable issue of fact, let alone establish that McKesson is entitled to a judgment in its favor.

### 4.    The Inventors Thought The Predetermined Database Containing Hertenstein's Rules Was The Best

REDACTED

George Goldberg testified in his deposition that "our decision rules <u>go far beyond</u> the self-evident rules . . . in ways that are medically and financially important, because they are based on experience with thousands upon thousands of actual claims." Ex. L (Goldberg Dep.), at 232-233:9 (emphasis added). Furthermore, Goldberg testified that "the rules database acted upon in CodeReview was better because of 'long-term claims experience and medical expertise.'" Ex. L (Goldberg Dep.), at 251:1-5.

REDACTED

15

REDACTED

In fact, according to McKesson's own invalidity expert, the only feature of CodeReview that allegedly set it apart from the prior art was the quantity and quality of the code-specific relationships in the database. *See* Ex. W (Wilson Dep.), at 91:1-9 (capturing detailed expert knowledge is what separates the '164 patent from all others).[5]  Accordingly, the inventors' failure to disclose their superior set of code-specific relationships clearly establishes the first-prong of a best mode violation.

**5.    The Predetermined Database Is Part Of The Claimed Subject Matter**

McKesson also argues that "TriZetto cannot establish that any of the inventors possessed a best mode specific to claim 1 or 2 of the '164 patent." D.I. 371, at 10-11.  In making this argument, McKesson ignores that it itself has contended that the predetermined database is an

---

[5]    *See also* Ex. O (Prelim. Amend., Jan. 29, 1991), at 15-16 ("Unlike Weitzel et al., the present invention does not assess the patient's prognosis to determine whether or not the medical service claims are appropriate for the patient's condition.  The present invention uses and claims a set of rules that describe the relationship between medical service codes (which correspond to particular medical services or procedures) to determine whether or not there are improper medical service codes in a particular claim").

element of the claimed subject matter of both Claims 1 and 2.  Ex. X (McKesson's Supp. Resp. to

TriZetto's Interrog. 21-22), at 2 ("McKesson does not contend that the preambles of claims 1, 2,

and 16 of the '164 patent are not elements of the respective claims."); *see also* Ex. Y (Trial Tr.),

at 370:14-372:4 (McKesson's infringement expert identifying the predetermined database as an

element of method Claim 16); *id.* at 394:7-396:1 (same for Claim 2); *id.* at 408:5-13 (same for

Claim 1).  Indeed, both Claim 1 and Claim 2 include the predetermined database as an element in

the preamble:

> a computer system having means for operating on a **predetermined database**
> containing medical service codes and a set of relationships among the medical
> service codes defining whether selected ones of the medical service codes are
> valid when input with other selected ones of the medical service codes...[Ex. 1
> ('164 patent), col. 117:2-40 (emphasis added)]

REDACTED

Thus, McKesson's argument that

TriZetto cannot demonstrate that the inventors had a best mode specific to Claim 1 or 2 simply

makes no sense.  *See, e.g., U.S. Gypsum Co.*, 74 F.3d at 1216, n.9 ("Although 'each claim must

be considered individually for compliance with the best mode requirement,' [citation], and it is

unclear whether the district court conducted a claim-by-claim validity analysis, we find no error.

Silicone-treated expanded perlite was an essential limitation of all the claims, which covered a

single invention").

### 6.    McKesson Does Not Dispute That The Inventors Concealed The Inventors' Preferred Database

The second inquiry under a best mode analysis – concealment – is an objective inquiry

and compares what the inventors knew at the time of filing the application with what was

actually disclosed in the patent.  *Chemcast Corp.*, 913 F.2d at 926.  McKesson does not refute

that the inventors concealed the code-specific relationships included in the CodeReview

database.   Nor could it.

REDACTED

REDACTED

Thus, it is undisputed that the inventors and HPR concealed the details that they believed made their claimed invention better than any other clinical editing system that was available at the time they filed the '164 patent application.

**B.      Claim 2 Is Invalid For Indefiniteness**

McKesson's argument with respect to "non-medical criteria" rests not on law or evidence, but on a procedural trap that McKesson apparently believes that it has laid for TriZetto; i.e., because the Court completed claim construction, it is now impossible for a claim term to be found indefinite.  McKesson's efforts fail for two reasons.  First, the issuance of a *Markman* Order does not foreclose a subsequent indefiniteness challenge, especially where, as here, no definition has been assigned to the term in question.  Second, as set forth more fully in TriZetto's Motion for Summary Judgment, *the evidence* – which McKesson's motion conveniently ignores – shows that the term "non-medical criteria" is indefinite as a matter of law.  TriZetto, not McKesson, is entitled to summary judgment on this issue.

**1.      The Court Has Not Construed The Term "Non-Medical Criteria"**

McKesson argues that "TriZetto cannot prove that claim 2 is indefinite as a matter of law because the Court has already found that the challenged claim term – 'non-medical criteria' – is to be given its ordinary meaning."  D.I. 371, at 13.  The Court's April 5, 2006 Claim Construction Order did not construe, however, the term "non-medical criteria," which appears in Claims 2 and 14, or address TriZetto's contention that the term was indefinite.  The Court's Claim Construction Order does not reference "non-medical criteria" as a stand alone term, nor does it state that any term that is not construed is to be given its ordinary meaning.  D.I. 307  The Court did construe

the structure of the corresponding means-plus-function claim (Claim 14) with similar language to Claim 2 as "software programmed to perform the algorithms disclosed in the specifications performing the function of determining whether two medical service codes are exclusive due to non-medical criteria." *Id.*, ¶ 23. Thus, the algorithm, if identified by McKesson, may have defined the term "non-medical criteria." But McKesson never identified a relevant algorithm, and there is no description of structure in the specification that includes a definition of "non-medical criteria." The Court granted summary judgment of non-infringement of Claim 14 in TriZetto's favor, thereby presumably leaving the issue of indefiniteness of the term "non-medical criteria" to be decided in connection with this invalidity phase of the case. *See Chiron Corp. v. Genentech*, 2002 U.S. Dist LEXIS 19150, at \*6 (E.D. Cal. June 24, 2002) (considering motion for summary judgment based on indefiniteness after claim construction, where court had heard, but not expressly considered or rejected arguments that a term was indefinite in its *Markman* Order).

The Court's previous orders clearly provide that now is the proper time for dispositive motions regarding invalidity. On November 22, 2005, the Court ordered that "[m]otion practice and trial on the issue of invalidity shall be stayed until further order of this Court." D.I. 145 (Mem. Order, Nov. 22, 2005), at ¶ 4. After the jury trial on infringement, the Court ordered "[a]ll summary judgment motions involving invalidity shall be filed on or before June 1, 2006." D.I. 362 (Mem. Order, May 4, 2006), at ¶ 2. Thus, TriZetto could not have brought a motion for summary judgment based on the indefiniteness of the term "non-medical criteria" until now. *See, e.g., Pharmastem Therapeutics, Inc.*, 2003 U.S. Dist. LEXIS 877, at \*2 n.1 (criticizing defendant's indefiniteness arguments during claim construction as "an attempt at and end-run around the court's scheduling order . . .").

The cases relied upon by McKesson in its Opening Brief are distinguishable because the Court's Claim Construction Order in this case did not construe the term "non-medical criteria" or address TriZetto's argument that the term is indefinite. In *Praxair*, for example, the Court's claim construction order had given the challenged term a specific meaning – "The tube of claim 1 has

an inlet located near the center of the container, when looking at the container from its top or bottom." *Praxair, Inc. v. ATMI, Inc.*, 2005 WL 2989767, *4 (D. Del. Nov. 8, 2005). In *Arthrocare*, the Court refused to consider indefiniteness only because it had specifically "found that the claim limitations at issue are to be given their ordinary meaning," and the Court was able to articulate the ordinary meaning of the term at issue. *Arthrocare Corp. v. Smith & Nephew, Inc.*, 2003 WL 1856436, at *5 (D. Del. Apr. 9, 2003) (holding that the terms "not in contact," "spacing . . . away," and "minimize direct contact" were not indefinite because the patent in suit "requires that the return electrode not contact the body structure during the performance of each of the three steps of the claimed methods"). As explained below, no one – including McKesson – has been able to articulate the asserted "ordinary meaning" for the term "non-medical criteria."

Even if the Court had construed the term "non-medical criteria," that would not preclude TriZetto from arguing that the term is indefinite. As this Court has noted, "[t]he Court's position at [claim construction] does not . . . represent an actual adjudication on the defendant's indefiniteness defense . . . the court is merely holding that the claim is sufficiently definite to survive claim construction." *Pharmastem*, 2003 U.S. Dist. LEXIS 877, at *2 n.1. In fact, "it is not uncommon for courts to find a claim term invalid for indefiniteness after construing the term." *Chiron Corp.*, 2002 U.S. Dist LEXIS 19150, at *6. "The mere fact that this Court was capable of construing the claims at issue for *Markman* purposes does not necessarily preclude a finding of indefiniteness." *Soitec, S.A. v. Silicon Genesis Corp.*, 2002 U.S. Dist. LEXIS 16841, at *22-*23 (D. Mass. Aug. 23, 2002), (citing *Exxon Research & Eng'g. Co. v. United States*, 265 F.3d 1371, 1377-79 (Fed. Cir. 2001) (undertaking separate analysis of claim as construed by trial court to determine indefiniteness)); *see also Union Pac. Res. Co. v. Chesapeake Energy Corp.*, 236 F.3d 684, 692 (Fed. Cir. 2001) (accepting a construction of term "comparing" but nonetheless holding it to be indefinite). The Federal Circuit's decision in *Exxon Research* stated the general standard for indefiniteness, but did not bar post-*Markman* order indefiniteness challenges. *Chiron Corp.*, 2002 U.S. Dist. LEXIS 19150, at *6.

Moreover, as detailed below, McKesson's "examples" of alleged "non-medical criteria," which were only proffered after the close of discovery and even *during trial*, would warrant the Court's reconsideration of any pretrial *Markman* construction. Thus, TriZetto is not precluded from arguing that the term "non-medical criteria" is indefinite at this stage of the proceedings.

### 2. TriZetto Has Not Conceded That The Term "Non-Medical Criteria" Is Susceptible To Construction

The only other argument in the indefiniteness portion of McKesson's Opening Brief is that "TriZetto has effectively conceded that the term 'non-medical criteria' is susceptible to construction." D.I. 371, at 13. McKesson bases its argument solely on the fact that the Court instructed the jury *during the infringement phase of the trial* that "[t]he parties have agreed that the remaining language should be construed consistently with its ordinary meaning." *Id.* Contrary to McKesson's argument, TriZetto did unambiguously contend that the term "non-medical criteria" is indefinite, and the Court did not decide the issue, during the parties' discussions of proposed jury instructions. For example, in its response to McKesson's Proposed Revisions to the Jury Instructions, TriZetto noted that it had requested construction of the "determining" and "ascertaining" steps of "the claims at issue," but the Court had not construed them. *See* D.I. 352, at 1 n.1. McKesson *itself* recognized that TriZetto had not abandoned its indefiniteness position when it proposed changing the sentence "[t]he *parties have agreed* that the remaining language should be construed consistent with its ordinary meaning" to read "[t]he *court has decided* that the remaining language should be construed with its ordinary meaning." D.I. 345, App. A, at A-6 (emphasis added).[6]

In fact, TriZetto's position that the term "non-medical criteria" is indefinite has not changed since this case began. *See* D.I. 148 (Joint Statement of Disputed Claim Terms and Claim Constructions), at 2; D.I. 158 (TriZetto's Opening Claim Construction Brief), at 24 n.2;

---

[6] The fact that the jury did not ask a question about the term "non-medical criteria" does not show the term has any fixed meaning. As explained below, McKesson advanced many conflicting examples of alleged "non-medical criteria." The jury must have simply picked one or more of those examples in rendering a verdict.

D.I. 257 (TriZetto's Answering Claim Construction Brief), at 32.  TriZetto has never conceded that the term "non-medical criteria" is susceptible to construction.

### 3. The Term "Non-Medical Criteria" Is Indefinite As A Matter Of Law

The reason McKesson relies solely on procedural arguments is plain – nobody, including McKesson, has ever been able to articulate a definitive meaning for the term "non-medical criteria."  Even now, in arguing to the Court that the term is sufficiently definite as a matter of law, McKesson does not articulate any alleged "ordinary meaning" of the term.  As set forth more fully in TriZetto's Motion for Summary Judgment for Indefiniteness and Failure to Adequately Describe the Claimed Invention, the term "non-medical criteria" fails to "delineate the scope of the invention using language that adequately notifies the public of the patentee's right to exclude" – the essential function of Section 112's definiteness requirement.  *Datamize LLC*, 417 F.3d at 1347.

Indeed, the owners of the '164 patent have continuously shifted the meaning of the term "non-medical criteria," and thus the scope of Claim 2, to suit their needs over the life of the '164 patent and during this litigation.

REDACTED

During this litigation, however, McKesson abandoned HPR's position and assigned a myriad of examples to the term "non-medical criteria" – examples that were often contradictory, but always shifting even during the infringement trial.

REDACTED

22

REDACTED

Of course, as McKesson now admits, these single code edits are by definition not based on exclusivity *between* medical service codes, as is required for Claim 2. D.I. 377 (McKesson's Motion for Summary Judgment re Anticipation and Obviousness), at 16-17. That is, whether a procedure code is cosmetic and thus not covered by an insurance policy does not involve a comparison between codes, but rather a determination of whether a particular procedure (*i.e.*, one code) is cosmetic.[7]

By the time of trial, Dr. Musen had abandoned his single code editing examples of "non-medical," and testified that "unbundling" rules were non-medical. Ex. Y (Trial Tr.), at 298:14-23.[8] Dr. Musen also relied on Example 1 from the patent and multiple wound repair "unbundling" as alleged examples of "non-medical criteria." Ex. Y (Trial Tr.), at 298:14-23, 385:2-16.

REDACTED

---

[7]       REDACTED

*see also* D.I. 377 (McKesson's Motion for Summary Judgment re Anticipation and Obviousness), at 16-17 (McKesson now admitting that these examples are single code edits); D.I. 380 (TriZetto's Motion for Summary Judgment of Invalidity for Indefiniteness and Failure to Adequately Describe the Claimed Invention), at 16-17.

[8] As explained in TriZetto's Indefiniteness Motion for Summary Judgment, Dr. Musen's trial definition of non-medical is inconsistent with the '164 patent specification. *Compare* Ex. Y (Trial Tr.), at 298:14-23 (relying on Example 1 of Appendix A as an example of a "billing convention" and thus non-medical criteria), *with* Ex. D ('164 patent), col. 11-12 (listing the reason for the edit in Example 1 A as based on medical criteria). Specifically, Example 1 explains that the edit was made because the procedure represented by the rejected code 64550 [nerve block] *is inappropriate to use for local anesthesia*" Ex. D ('164 patent), col. 11-12. That is, according to the specification, the example involves a comparison between the code on the claim and the procedure that was actually appropriate to perform, e.g. local anesthesia versus a nerve block. Thus, the specification defines this example as being based on medical, not non-medical criteria.

23

REDACTED

To preclude such continuous modifications of the scope of a patent is precisely the reason Section 112 requires that a patentee "*particularly point[] out*" and "*distinctly claim[]*" the subject matter of its invention.   A patent must give the public reasonable notice of its scope so that infringement can be avoided, even where the claims of the patent use terms that are non-technical in nature.  *See, e.g., Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342 (Fed. Cir. 2005) (term "aesthetically pleasing" indefinite); *Semmler v. American Honda Motor Co., Inc.*, 990 F. Supp. 967 (S.D. Ohio 1997) (term "substantial fuel savings" indefinite).  One of skill in the art must be able to apply an objective meaning to the terms used in a patent's claims so that they can determine definite bounds to the limitations of the invention.

Here, there is simply no way for a company like TriZetto to determine which of the edits performed by its system are "non-medical."  All the examples McKesson has offered could be removed, but because there is no definition to work with, there would be no certainty that all the remaining edits are based on "medical criteria."  Therefore, as more fully set forth in TriZetto's

---

9   TriZetto's Motion for Summary Judgment on this issue sets forth more fully the myriad of conflicting and changing examples that McKesson's attorneys, witnesses and publications have attempted to assign to the term "non-medical criteria" through the pendency of this litigation. *See* D.I. 373, at 20–23.

Motion, the evidence renders the term "non-medical criteria" indefinite as a matter of law. Summary judgment for McKesson on this issue is clearly inappropriate.

## V.    CONCLUSION

For the foregoing reasons, TriZetto respectfully requests that the Court deny McKesson's Motion for Summary Judgment Regarding TriZetto's Defenses Under 35 U.S.C. § 112.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Rodger D. Smith II (#3778)*
Jack B. Blumenfeld (#1014)
Rodger D. Smith II (#3778)
1201 North Market Street
P.O. Box 1347
Wilmington, Delaware 19899-1347
(302) 658-9200

*Attorneys for Defendant The Trizetto Group, Inc.*

OF COUNSEL:

Jeffrey T. Thomas
David A. Segal
Michael A. Sitzman
GIBSON, DUNN & CRUTCHER LLP
Jamboree Center, 4 Park Plaza
Irvine, California 92614-8557
(949) 451-3800

Original Filing Date: June15, 2006
Redacted Filing Date: June 22, 2006

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on June 22, 2006, I caused a copy of the foregoing to be electronically filed with the Clerk of the Court using CM/ECF, which will send notification of such filing(s) to the following:

> Michael A. Barlow
> Skadden, Arps, Slate, Meagher & Flom LLP

I also certify that copies were caused to be served on June 22, 2006, upon the following in the manner indicated:

### BY EMAIL AND HAND

Michael A. Barlow
Skadden, Arps, Slate, Meagher & Flom LLP
One Rodney Square
Wilmington, DE  19801

### BY EMAIL AND FEDERAL EXPRESS

Jeffrey G. Randall
Skadden, Arps, Slate, Meagher & Flom LLP
525 University Avenue
Suite 1100
Palo Alto, CA  94301

*/s/     Rodger D. Smith II (#3778)*
Morris, Nichols, Arsht & Tunnell LLP
1201 N. Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
rsmith@mnat.com