# EXHIBIT F

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

McKESSON INFORMATION          )
SOLUTIONS, LLC,               )
                              )
        PLAINTIFF,   )
                              )
  -vs-               ) No. 04-1258 SLR
                              )
THE TRIZETTO GROUP, INC.,     )
                              )
        DEFENDANT.   )

DEPOSITION
OF: ROBERT HERTENSTEIN, M.D.

The deposition of ROBERT HERTENSTEIN, M.D., called as a witness pursuant to notice and pursuant to the provisions of the Federal Rules of Civil Procedure; taken before BRENDA KAY LAUNIUS, CSR, RPR, a Notary Public in and for the County of LaSalle, State of Illinois, at 1928 War Memorial Drive, Peoria, Illinois, commencing at the hour of 9:45 a.m., on the 13th day of September, 2005.

---

APPEARANCES:

SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP
Attorneys at Law
BY: MR. DAVID W. HANSEN
525 University Avenue, Suite 1100
Palo Alto, California  94301
(650) 470-4500

        appearing on behalf of the Plaintiff;

GIBSON, DUNN & CRUTCHER
Attorneys at Law
BY: MR. JEFFREY T. THOMAS
4 Park Plaza, Suite 1400
Irvine, California  92614-8557
(949) 451-3800

        appearing on behalf of the Defendant.

ALSO PRESENT: GREG CLEMONS, Videographer

| INDEX | PAGE |
| --- | --- |
| WITNESS: | |
| ROBERT HERTENSTEIN | |
| Direct Examination by Mr. Thomas | 4 |
| | |
| EXHIBITS: | |
| Exhibit No. 115 marked | 45 |
| Exhibit No. 116 marked | 51 |
| Exhibit No. 117 marked | 65 |
| Exhibit No. 118 marked | 68 |
| Exhibit No. 119 marked | 77 |
| Exhibit No. 120 marked | 80 |
| Exhibit No. 121 marked | 84 |

---

| EXHIBITS (Cont'd.) | PAGE |
| --- | --- |
| Exhibit No. 122 marked | 87 |
| Exhibit No. 123 marked | 94 |
| Exhibit No. 124 marked | 96 |
| Exhibit No. 125 marked | 101 |
| Exhibit No. 126 marked | 103 |
| Exhibit No. 127 marked | 106 |
| Exhibit No. 128 marked | 110 |
| Exhibit No. 129 marked | 116 |
| Exhibit No. 130 marked | 121 |
| Exhibit No. 131 marked | 123 |
| Exhibit No. 132 marked | 125 |
| Exhibit No. 133 marked | 128 |
| Exhibit No. 134 marked | 131 |
| Exhibit No. 135 marked | 135 |
| Exhibit No. 136 marked | 140 |
| Exhibit No. 137 marked | 144 |
| Exhibit No. 138 marked | 146 |
| Exhibit No. 139 marked | 150 |
| Exhibit No. 140 marked | 152 |
| Exhibit No. 141 marked | 154 |
| Exhibit No. 142 marked | 156 |

---

THE VIDEOGRAPHER:  All right.  I'm Greg Clemons, videographer working for Barkley Court Reporters in California, Irvine, California.  Today is September 13th, 2005.  It is 9:45 in the morning.  We are at the Marriott in Peoria, Illinois.  This is McKesson Information Solutions, LLC, Plaintiff, versus The Trizetto Group, Incorporated, Defendant, Civil Action Number 04-1258 SLR, and this is the deposition of Dr. Robert Hertenstein.  Present we have Jeffrey Thomas, Gibson, Dunn and Crutcher, and David Hansen with Skadden, Arps, Slate, Meagher & Flom, LLP.  Our court reporter is Brenda Launius.

        And, Brenda, if you could swear in the witness.

        ROBERT HERTENSTEIN, called as a witness herein, upon being first duly sworn on oath, was examined and testified as follows:

        (Witness sworn.)

DIRECT EXAMINATION

BY MR. THOMAS:

    Q    Good morning, Dr. Hertenstein.

    A    Morning.

    Q    My name is Jeff Thomas, and I represent The Trizetto Group, who is the defendant in this lawsuit that we are here to talk about today.  You understand that the lawsuit that you're here about today is a patent case

---

1 (Pages 1 to 4)

ROBERT HERTENSTEIN, M.D.

1  that has been filed by McKesson against Trizetto?
2  **A  Yes.**
3  Q   Have you had your deposition taken before?
4  **A  Yes.**
5  Q   Okay.  I understand you were deposed some years
6  ago in the litigation between HPR and GMIS?
7  **A  That's correct.**
8  Q   Have you been deposed on additional occasions?
9  **A  Yes, I have, but not on this subject.**
10  Q   Okay.  How many depositions have you given in
11  your life?
12  **A  Perhaps three or four.**
13  Q   Let me go over just a couple of the ground
14  rules here today, although you may already be familiar
15  with them from your past experience.  The oath that the
16  court reporter just gave you is the same oath that you
17  would take in a court of law if you were testifying in
18  court, and therefore carries with it the same obligation
19  to give complete and accurate testimony.  Do you
20  understand that?
21  **A  Yes.**
22  Q   Now, the court reporter will take down
23  everything that's said in the room today and prepare it
24  into a booklet called a transcript, which will be made
25  available for your review, and at that time you can

Page 5

1  Q   You are represented here today by Mr. Hansen;
2  is that correct?
3  **A  That's correct.**
4  Q   Is there any reason because of illness or
5  medication or otherwise that you don't feel able to give
6  complete testimony today?
7  **A  Not that I know of.**
8  Q   Okay.  Other than meeting with Mr. Hansen, did
9  you do anything else to prepare for today's deposition?
10  **A  No, not really.**
11  Q   Okay.  Did you review any documents in
12  preparation for today?
13  **A  I had -- did review very briefly the patent**
14  **application.  I hadn't looked at that for a long time.  I**
15  **didn't read it thoroughly though.**
16  Q   Anything else?
17  **A  No, I didn't.**
18  Q   Sir, as I understand it, you graduated from
19  medical school in 1957?
20  **A  That's correct.**
21  Q   And you then did an internship and some
22  residencies?
23  **A  Yes.**
24  Q   And following completion of your residencies,
25  did you then go into private practice?

Page 7

1  correct the transcript if you think that's necessary.
2  What's important for today though is that if you do make
3  changes to your transcript, that could be commented on at
4  the trial in this case, and that might affect your
5  credibility.  And so it is important that you give us
6  complete -- as complete and accurate testimony here today
7  as possible.  Do you understand that?
8  **A  I understand, yes.**
9  Q   Okay.  I may ask bad questions today,
10  ambiguous, confusing questions.  If I do, just ask me to
11  clarify or change my question, and I'll be happy to do
12  so.  If you answer a question without asking for a
13  clarification, the assumption will be that you understood
14  the question before you answered it.  Do you understand
15  that?
16  MR. HANSEN:  Your assumption will be that.
17  BY MR. THOMAS:
18  Q   Do you understand that, sir?
19  **A  I understand, yes.**
20  Q   As we discussed before we got started, this is
21  not an endurance contest of any kind.  If you'd like to
22  take a break for any reason, to speak with your counsel,
23  stretch your legs, whatever, please just let us know, and
24  we'll take a break.
25  **A  Very well.**

Page 6

1  **A  Yes.**
2  Q   And in what area?
3  **A  General surgery.**
4  Q   And for how long were you -- after completion
5  of your residency, how long were you in private practice
6  in general surgery?
7  **A  Sixteen years.**
8  Q   Until what year?
9  **A  1981.**
10  Q   And at that point, is that when you joined the
11  Caterpillar company?
12  **A  That's correct.**
13  Q   Prior to joining Caterpillar in 1981, had
14  you -- was it part of your occupation to review in any
15  way claims for payment by physicians or hospitals?
16  **A  No.**
17  Q   So Caterpillar was your first experience with
18  that?
19  **A  Correct.**
20  Q   And you stayed at Caterpillar for how long,
21  sir?
22  **A  Thirteen years.**
23  Q   Until 1994?
24  **A  Yes.**
25  Q   Did you retire at that point?

Page 8

1  A  Yes.
2  Q  Have you been working in any way during your
3  retirement?
4  A  For four years after that I was a mayor of my
5  city, but -- if you call that working.
6  Q  I'm sure it was.
7      Anything -- any other occupation or work since
8  1994?
9  A  No.
10  Q  Now, you're familiar with a company by the name
11  of HPR?
12  A  Correct.
13  Q  Okay.  What affiliation have you had in the
14  past with HPR?
15  A  I became involved with HPR after my involvement
16  with the Health Policy Institute of Boston University,
17  starting with the Health Policy Institute in about 1982
18  or -3.  HPR was not a company until approximately 1987, I
19  think, and at that time I served on the board of
20  directors.
21  Q  Were you ever an employee of HPR?
22  A  No.
23  Q  Did you ever receive any sort of compensation
24  for your work at HPR?
25  A  I own stock in the company, but I did not

Page 9

1  development of CodeReview?
2  A  Yes.
3  Q  Other than that work and serving on the board
4  of directors, did you have any other role with HPR?
5  A  After HPR became a functioning business, I did
6  once or twice a year help with the upgrading of codes
7  because of the changes in CPT-4, the manual, each year.
8  Q  That's CPT-4?
9  A  Yes.
10  Q  It's all caps.
11      Okay.  Thank you.  Anything else that you did
12  at HPR?
13  A  Not that I remember.
14  Q  Now, did you become a -- or did you remain a
15  shareholder of HPR after the initial public offering?
16  A  Yes.
17  Q  And for how long did you remain a shareholder?
18  A  I think that at the time that HPR was purchased
19  by HBO, I still maintained some stock in the company.
20  Q  At the time of the sale to HBO, do you know
21  what percentage of the HPR stock you owned?
22  A  There were multiple dilutions of the stock as
23  it went along, and I really couldn't quantify a percent
24  of the total.
25  Q  Do you know what percentage of the stock you

Page 11

1  receive a salary.
2  Q  Did you go onto the board of directors at HPR
3  when it was first formed?
4  A  Yes.
5  Q  And how long did you remain a member of the
6  board of directors?
7  A  Until just before it went public, and I can't
8  remember the exact date of that.
9  Q  Was that the initial public offering?
10  A  Yes.
11  Q  Other than serving on the board of directors,
12  did you do anything else for HPR?
13  A  Yes.  I was extensively involved with the
14  formation of a computer system to evaluate medical
15  claims.
16  Q  And that was a computer system that was later
17  marketed by HPR?
18  A  Correct.
19  Q  And I believe that by the time it was actually
20  brought to market that system was called CodeReview; is
21  that right?
22  A  That's right.
23  Q  That's the system that you're referring to?
24  A  Yes.
25  Q  Okay.  So you helped extensively in the

Page 10

1  received initially when HPR was first formed?
2  A  Yes.
3  Q  What was that?
4  A  15 percent.
5  Q  And did you sell some of your HPR stock before
6  it was acquired by HBO?
7  A  Yes, I did.
8  Q  In addition to being on the board of directors
9  of HPR, were you also an officer of the company?
10  A  Originally I had a title as vice-president, but
11  later that -- it never really had any responsibilities,
12  direct responsibilities, and as the company grew, I no
13  longer held that post.
14  Q  Is it fair to say that your primary role at HPR
15  was to assist in creating and updating the database for
16  CodeReview?
17  A  Yes, I think.
18  Q  Did you have any role or responsibilities on
19  the business side in terms of creating business plans,
20  doing marketing, that sort of thing?
21  A  Only with the general discussions we had in our
22  board meetings.
23  Q  And how often were board meetings held?
24  A  About every four months, I believe.
25  Q  Do you know if minutes of those board meetings

Page 12

3 (Pages 9 to 12)

ROBERT HERTENSTEIN, M.D.

1 were created?
2    A  I don't know.
3    Q  Were any documents created in connection with
4 those board meetings in terms of agendas or presentations
5 or minutes that you recall?
6    A  Usually there was an agenda before the meetings
7 that we received, but what they developed afterwards I
8 don't know.
9    Q  And you mentioned CPT-4 codes. Before you went
10 to work for Caterpillar in 1981, were you familiar with
11 CPT-4 codes?
12    A  Yes.
13    Q  And how so?
14    A  It was used in the billing of our surgical
15 group. CPT-4 codes were used when you'd submit your bill
16 to the insurance company, so I had to be familiar with
17 what procedures you performed.
18    Q  And for how many years prior to 1981 had your
19 surgical group been using CPT codes in your bills?
20    A  Well, it was required by the insurance
21 companies. I don't know what year that began, but it was
22 a fair length of time before I left general practice.
23    Q  Was it common practice as you understand it for
24 physician groups and hospitals in the '70s to use CPT
25 codes in their billing?

Page 13

1    A  Yes, it was required.
2    Q  And so did you have a working knowledge of the
3 CPT codes prior to coming to Caterpillar?
4    A  In the area in which I was involved, I did,
5 yes.
6    Q  In the surgical area you mean?
7    A  Yes.
8    Q  And when you were in private practice, who was
9 it that decided which codes would go onto a particular
10 bill?
11    A  I did. I was the manager of our group.
12    Q  So as a result of your private practice of
13 medicine and your management responsibilities in your
14 group, you had a thorough understanding of the CPT codes
15 in the surgical area?
16    A  I believe so.
17    Q  And did that include knowledge as to which
18 codes were included in other codes?
19    A  Yes.
20    Q  And that also included a knowledge as to what
21 was the appropriate code to assign to a particular type
22 of surgical procedure?
23    A  Yes.
24    Q  And do you believe that other surgeons had a
25 similar type of knowledge?

Page 14

1    A  I think in my group I probably knew more than
2 the other three members of my group. They kind of left
3 me -- that responsibility to me. I can't judge what
4 their knowledge was.
5    Q  Did -- was it your understanding that most
6 hospitals and physician groups had somebody whose
7 responsibility it was to know the details of the CPT
8 system?
9    A  I'm aware of several instances where their
10 billing clerk did the assignment of the codes instead of
11 a physician.
12    Q  So is it -- was it your understanding that some
13 hospitals and groups had physicians who were doing it,
14 and others had clerks who were doing it?
15    A  Yes.
16    Q  Other than what you learned about CPT codes as
17 a result of being in private practice and having -- and
18 managing your group, did you receive any special training
19 or education of any kind in the CPT code system?
20    A  In private practice?
21    Q  Yes, sir.
22    A  No.
23    Q  Okay. Now, in 1981 when you joined
24 Caterpillar, what was your job?
25    A  Initially I was a physician in the general

Page 15

1 industrial medicine section of Caterpillar for about six
2 months before I became the medical director of insurance.
3    Q  And during those six months what were your
4 responsibilities?
5    A  Part of my time was spent helping the payment
6 center with claims that they didn't understand.
7    Q  And how did you go about doing that?
8    A  I examined the claims.
9    Q  Now, you left -- this was a full-time job
10 beginning in 1981?
11    A  Yes.
12    Q  So you left private practice entirely?
13    A  Yes.
14    Q  Now, in -- about six months into your work at
15 Caterpillar, you became the medical director?
16    A  Of insurance.
17    Q  Medical director of insurance?
18    A  Yes, which was not with the industrial medicine
19 portion. It was with a compensation department of
20 Caterpillar.
21    Q  And what does the compensation department do?
22    A  That was the term that oversaw the pensions and
23 the medical benefits and dental benefits for Caterpillar
24 employees and retirees.
25    Q  And did that include reviewing, correcting if

Page 16

1  necessary and paying claims for payment that came in from
2  doctors and hospitals?
3  A  Yes. We, of course, had a large group of
4  clerks who originally took the claims as they came in,
5  and then we had a system by which we evaluated the claims
6  depending upon their level of expertise.
7  Q  That group who reviewed these claims, did it
8  have a name of any kind?
9  A  Just the payment center, but I don't -- no, it
10  did not have a specific name, no.
11  Q  Was there someone who was in charge of this
12  group?
13  A  I was.
14  Q  When you became medical director?
15  A  Yes. The group was not present before I became
16  medical director. The level of payment of the claims, we
17  improved the quality of evaluation during that period of
18  time and the years after, too.
19  Q  When did this process to improve the processing
20  of the claims begin?
21  A  When I became medical director of the medical
22  insurance.
23  Q  That was in 1981?
24  A  '82.
25  Q  '82, okay. And when you took over in 1982, how

Page 17

1  many people -- how many Caterpillar employees were
2  involved in reviewing claims, processing claims?
3  A  Oh, I would guess -- I can't tell you the exact
4  number, but we had a large section in a separate
5  building. There must have been at least 40.
6  Q  And were these folks all clerks, or did any of
7  them have any sort of medical training?
8  A  When I arrived at Caterpillar, they were all
9  clerks, but I hired surgical technicians who had a direct
10  knowledge of surgery and the general medical care more
11  specifically than any of the clerks I had. And I hired
12  them because of their knowledge and the fact that I could
13  train them. They understood the terminology.
14  Q  And when did you start hiring these surgical
15  technicians?
16  A  In 1982.
17  Q  How many technicians did you hire?
18  A  Three.
19  Q  And what sort of background did these people
20  have?
21  A  They had all worked in the operating rooms for
22  at least ten years prior to their switching to doing what
23  they did at Caterpillar.
24  Q  And when they were hired by Caterpillar, what
25  were their responsibilities?

Page 18

1  A  They reported to me.
2  Q  Did the clerks report to them?
3  A  It was a rather loose arrangement. I'm not
4  sure they did. They weren't directly responsible to
5  them, but they cooperated with them, of course.
6  Q  Now, did these surgical technicians have any
7  background with the CPT code system?
8  A  They were trained mostly after they went to
9  work for Caterpillar.
10  Q  What kind of training did they receive in that
11  area?
12  A  Well, mostly this came from myself, and it was
13  an informal training. It was not a rigid form of
14  training, but they were exposed every single day to
15  claims and CPT-4 codes until they became quite proficient
16  at them.
17  Q  And when you say they became quite proficient,
18  do you mean they became quite proficient in determining
19  whether the code or codes on the claim were appropriate
20  for the procedure that had been performed?
21  A  That's correct.
22  Q  And the training that they received in that
23  area was based on your background and experience with the
24  codes that you had received in private practice?
25  A  Well, it was -- no, it was expanded far beyond

Page 19

1  what I knew in private practice. I became familiar with
2  all the areas of the CPT codes.
3  Q  You mean outside the surgical area?
4  A  Yes.
5  Q  So you -- did you educate yourself in the CPT
6  coding for areas outside of surgery so that you
7  understood those other areas like you already did for the
8  surgical area?
9  A  Yes.
10  Q  And then you passed along that knowledge to the
11  technicians that you had hired?
12  A  As they were able to be utilized in certain
13  specialized areas. There was usually always claims that
14  they couldn't handle, too, and they were brought to me,
15  so...
16  Q  Now, did -- was there some process in place to
17  determine what claims the technicians would look at?
18  A  Well, they -- they filtered from the most
19  inexperienced payor to a more sophisticated to the
20  supervisor, and then the supervisor would in turn, who
21  couldn't handle the claim or didn't understand the claim
22  completely or had questions about it, would refer it to
23  the surgical technicians. And then after them, if they
24  had questions about it, then I reviewed them myself. And
25  I reviewed claims almost every day, so...

Page 20

1  document bearing control numbers MCK119901 through 911.
2        (Whereupon, Exhibit No. 118
3              was marked for
4              identification.)
5  BY MR. THOMAS:
6     Q  Sir, this is entitled Savings From Accurate
7  Coding of Surgical Claims, the Caterpillar Method, and it
8  appears to have been authored by Don Holloway, yourself
9  and Richard Egdahl.  Is this, in fact, an article that
10  the three of you wrote?
11     A  Oh, I don't know.  I had several articles
12  during that time.  I assume so if it says so on the
13  cover.
14     Q  Do you recall submitting an article for
15  publication in Business and Health in 1987?
16     A  I don't recall that.  It's been 17 years ago,
17  so...
18     Q  If you'd turn to the first page, please, of the
19  article, under the heading Abstract, and the third
20  sentence reads, Caterpillar has achieved significant
21  savings using a unique system for assigning accurate
22  codes to surgeons' claims.
23     A  Yep.
24     Q  Do you see that?
25     A  Yes.

Page 69

1     Q  Is it true that when this article was written,
2  you were working with the Health Policy Institute on
3  artificial intelligence software?
4     A  No, it was not artificial intelligence.
5     Q  Okay.  What were you working on with -- in the
6  way of software with the Health Policy Institute -- when
7  this article was written?
8     A  We had -- had explored the possibility of being
9  able to present a software program or system that could
10  be used with a computer to utilize the system that we had
11  been doing manually, and we did in the beginning have a
12  consultant from -- on artificial intelligence from MIT to
13  explore the possibility of this being done.  And so this
14  was early in the -- when we were just beginning to think
15  about it and discovered after a short period of time that
16  artificial intelligence was not a workable solution to
17  this problem.  So this was very, very early in our
18  attempt to develop such a system.
19     Q  Now, just a moment ago you said you were
20  discussing the idea of using a computer to do what you
21  were doing as part of your manual process; is that right?
22     A  To transfer the manual process to a computer
23  system.
24     Q  To try to get the same results you were getting
25  from your manual process using a computer?

Page 71

1     Q  That's a true statement, isn't it?
2     A  Yes.
3     Q  And the unique system is the system that you
4  put into place beginning in 1982?
5     A  Yes, and matured over a period of time then.
6     Q  Dropping down, going down one paragraph, it
7  reads, The Health Policy Institute is working with the
8  surgeon reviewers at Caterpillar to make this system
9  available to other corporations through the use of an
10  expert system shell, an artificial intelligence software
11  that allows the surgeon reviewers rules of thumb to be
12  made available to claims processors.  Do you see that?
13     A  I didn't catch that.
14     Q  Okay.  I'm sorry.
15     A  On the background or where?
16     Q  It's still under the abstract.
17     A  Oh, okay.
18     Q  The heading, Abstract.
19     A  There's no paragraph.  It's all the same
20  paragraph here.
21     Q  Right, just one sentence down from where we
22  were looking before, the sentence that begins, The Health
23  Policy Institute is working with the surgeon reviewers at
24  Caterpillar?
25     A  Yes.  Okay.

Page 70

1     A  Essentially, yes.
2     Q  Now, if you would turn over, please, to the
3  fifth page of the article, which in the lower right-hand
4  corner has the number ending 906.  Do you have that, sir?
5  There is a heading there, number two, A surgeon controls
6  the processing of surgeons' claims?
7     A  Yes.
8     Q  And it states, since 1983, the surgeon
9  reviewers employed by Caterpillar to review claims have
10  reviewed thousands of surgeons' claims.  Based on this
11  experience, they have developed rules of thumb for when
12  codes can be accepted or changed based on available
13  information or when an operative report must be used.  Is
14  that a true statement?
15     A  Yes.  I don't know that for sure -- the term
16  rules of thumb is a little awkward, but we have developed
17  a system, yes, that we have discussed earlier.
18     Q  And that -- you had been using that system
19  since 1983?
20     A  Yes.  I guess it took that long to get the
21  system.
22     Q  And if you'd turn over, please, to the second
23  to the last page of the article, there is a heading there
24  that says, Discussion.  Do you see that?
25     A  Yes.

Page 72

18 (Pages 69 to 72)

ROBERT HERTENSTEIN, M.D.

THE VIDEOGRAPHER: All right. We're going off the record at 11:55.

(Whereupon, a lunch break was taken.)

THE VIDEOGRAPHER: All right. We are going back on the record. It's 1:02.

BY MR. THOMAS:

Q Dr. Hertenstein, I'm going to show you what we'll mark as Exhibit 119, which is an article entitled, Doc's Knowledge Translates to Cost Reduction, has control number CAT0861.

(Whereupon, Exhibit No. 119 was marked for identification.)

BY MR. THOMAS:

Q Sir, this at least appears to be an article that appeared in a Caterpillar publication of some kind; is that right?

A Yes, the Caterpillar Post is a company magazine -- or paper.

Q And do you recall this article appearing in the Caterpillar magazine?

A No, but I see it was there.

Q Okay. It -- do you see in the beginning it says, When Caterpillar hired Dr. Robert Hertenstein to

help with problem medical claims, the company perhaps got more than it bargained for?

A Yes.

Q And then it goes on to discuss your work doing claims review. And dropping down to the last paragraph there in the left-hand column, it says, Caterpillar's cost savings success in claim review went largely unnoticed outside the company until 1986 when Hertenstein attended a meeting at Boston University. Representatives from several Fortune 500 companies had shown up to discuss concerns over healthcare costs. During a presentation, Hertenstein showed examples of upcoding and unbundling, two practices he had encountered, that if undetected, result in higher than actual medical fees. Do you see that?

A Yes.

Q Do you recall making such a presentation in 1986 at Boston University?

A Well, that would be the HPI meeting, and as I said earlier, I wasn't sure whether it was early '87 or late '86 that that occurred, so...

Q Okay. And was that -- is this a PEW conference or some other kind of meeting?

A No, that was a PEW conference.

Q And was that the first presentation you had

made at Boston University about upcoding and unbundling?

A Yes.

Q Over in -- the third column over, the second full paragraph, it says, Hertenstein declined a request to process those companies' future claims. Caterpillar is not in that business. But he was intrigued by an idea brought forth by a Boston University staff member who suggested that Hertenstein's mental rule book for evaluating claims be put on computer and sold to other companies. Do you see that?

A Um-hum.

Q Is that what happened? Did someone from Boston University approach you after your presentation with that idea?

A Well, the, um, group contacted Egdahl after the conference, and then they talked to me after that, so...

Q Had -- before you made this presentation at Boston University, had you had any discussions with BU or HPI about putting your system onto a computer?

A No.

Q And who -- who from Boston University first approached you after that presentation on that idea?

A I believe it was Holloway probably.

Q Don Holloway?

A Um-hum.

MR. THOMAS: Let me mark as Exhibit 120 a document that bears control numbers MCK119610 through 623.

(Whereupon, Exhibit No. 120 was marked for identification.)

BY MR. THOMAS:

Q Dr. Hertenstein, this is an HPI document. In the lower left corner you see it says, Draft 6, 3/17/86?

A Yes.

Q And the first -- under part one, Current Status and Recommendations to Proceed, it says, The February 12th meeting in Peoria with Hertenstein and other Caterpillar representatives was most positive, and then it goes on to discuss something called health bills. Do you recall having discussions with HPI in February of 1986 on a collaboration regarding your claim review process?

A Yes. This was before the HPI PEW representation. One of the individuals in the compensation department had talked to -- because they knew that we had saved an appreciable amount of money using our more close review of claims, and perhaps that might be something that they could propose to other companies if we -- if we processed their claims.

Q Okay. So before you made this presentation at

1    A    To see whether or not the process that we used
2  at Caterpillar had the same savings that the other
3  companies perhaps were overlooking.
4    Q   And as I understand it -- we'll get to this in
5  a minute or two -- but as I understand it, the first
6  group of claims from outside Caterpillar that you looked
7  at were from the Sun Company that were being processed by
8  Aetna; is that right?
9    A   I think that was the case, yes.
10   Q   Now, before you actually sat down and used your
11 system to review those claims, did -- did HPI do anything
12 to study your system or to better understand what it was
13 you were doing?
14   A   No.  They just simply wanted to know the
15 comparison.
16   Q   Were you told that one of the reasons why they
17 wanted you to look at these other claims was to determine
18 whether the pro- -- your process could potentially be
19 sold to other companies?
20   A   That using my -- our process, if it saved
21 money, was it feasible then to think about starting a
22 business that would process other people's claims.
23   Q   Was that why they wanted you to review these
24 other claims?
25   A   Yes.

Page 93

1  claims contained appropriate CPT-4 codes?
2    A   Yes.
3    Q   And where you determined that the CPT-4 codes
4  were not appropriate, did you make changes?
5    A   Yes.
6    Q   And in doing that, did you analyze the claims
7  for unbundling and upcoding?
8    A   Yes.
9    Q   Did Aetna or Sun pay anything to have you
10 perform this process on these claims?
11   A   I believe that the fee from HPI was something
12 like $12,000 to do that, but that's been a long time ago.
13 But my memory was that that is what it was, something
14 like that.
15   Q   Do you know where that money came from?  Did it
16 come from Aetna or Sun or --
17   A   No, it came from Sun.
18   Q   Okay.  And as a result of doing this claim, it
19 appears that you determined that had Aetna used your
20 Caterpillar process, less money would have been paid on
21 these claims?
22   A   Correct.
23   Q   And what happened next after you completed this
24 review?  You reported your results back to HPI?
25   A   Yes.

Page 95

1    MR. THOMAS:  Let's mark as Exhibit 123 a document
2  with control number MCK113281.
3         (Whereupon, Exhibit No. 123
4             was marked for
5             identification.)
6  BY MR. THOMAS:
7    Q   Sir, this has your name in the lower left
8  corner on January 6, 1987.  Would you take a look at it
9  and tell me if this is a memo that you wrote at that
10 point?
11   A   Yes, um-hum.
12   Q   And the first paragraph states, We have
13 completed our first study of Health Bills' potential
14 savings.  Boston University withdrew 135 consecutive
15 procedural medical claims that were processed and paid by
16 Aetna at their Reading, Pennsylvania, payment center for
17 Sun Oil Company.  Do you see that?
18   A   Yes.
19   Q   So by January of 1987, you had completed this
20 review of these claims from Aetna?
21   A   Yes.
22   Q   And did you review those claims using the same
23 rules and process that you used at Caterpillar?
24   A   Yes.
25   Q   And did that include analyzing whether the

Page 94

1    Q   Okay.  Do you know what they did with it?
2    A   Well, they wanted to see if this could be
3  replicated with the other people who had made a request.
4  Chrysler was one, as mentioned in this memo, and I
5  remember Iramco was one, and then Weyerhauser Insurance.
6  I don't know how many we did, but I know of at least
7  those four.
8    Q   And did you do those other reviews --
9    A   Early in 1987.
10   Q   Okay.  And I assume you followed the same
11 process we just talked about?
12   A   Yes.
13   MR. THOMAS:  Could you mark as Exhibit 124 a
14 document with control numbers MCK119935 through 946.
15         (Whereupon, Exhibit No. 124
16             was marked for
17             identification.)
18 BY MR. THOMAS:
19   Q   Sir, this is entitled, Final Report to
20 Caterpillar, Inc., and Sun Company on Evaluation of
21 Negotiated Surgeon Claims.  Were you aware in early 1987
22 that HPI was preparing a report for Aetna and Sun on the
23 work that you had done?
24   A   Yes.
25   Q   And this says final report to Caterpillar,

Page 96

24 (Pages 93 to 96)

ROBERT HERTENSTEIN, M.D.

1  Inc., and Sun Company. Was Caterpillar also --
2  management at Caterpillar informed of what you -- the
3  outcome of your review of the Aetna and Sun claims?
4      A  It was just in our own department. A generic
5  term, Caterpillar, I think there.
6      Q  If you would turn over to page four of the
7  report, there is a heading there that reads, Study
8  Design. Do you see that? It has page four at the top of
9  the page.
10     A  Oh, yes.
11     Q  And it says, The purpose of this study is to
12  compare the payments for surgical procedures authorized
13  by Aetna on Sun's behalf with the payments that would
14  have been authorized by the surgeon bill review program
15  implemented at Caterpillar. Do you had understand the
16  surgeon bill review program to be your system for
17  reviewing claims at Caterpillar?
18     A  Yes.
19     Q  Since we studied two questions in particular,
20  one, what is the savings due to applying Caterpillar's
21  regional negotiated fee schedules, assuming no changes to
22  Aetna's CPT-4 codes; and, two, what is the additional
23  savings due to physician-directed recoding of Aetna CPT-4
24  codes when appropriate, assuming the physician negotiated
25  fee schedule is applied. Were those the two things you

Page 97

1  were looking at when you reviewed these Aetna bills?
2      A  No. I -- again, the -- HPI had several times
3  wanted me to consider making part of this -- our program
4  a national fee schedule, and I told them I never wanted
5  anything to do with a fee schedule. That was too
6  difficult, and there was too much variation in the way
7  fees -- the level of fees in different cities, that it
8  just couldn't be done. I told them to forget that. So I
9  don't know how they thought they were going to use it,
10  because I kept saying, no, I won't do it. Okay?
11     Q  But the aspect of your system that you thought
12  could be applied to other companies was your analysis of
13  the coding?
14     A  Of the coding, yes.
15     Q  If you'd turn over to page eight, please, there
16  is a heading there at the top, Process?
17     A  Um-hum.
18     Q  And the second paragraph down, second sentence
19  reads, Aetna's claims processors review the physician's
20  submitted CPT-4 code and either accept the code, correct
21  the code or refer the claim to the cost containment unit
22  where a nurse, sometimes in consultation with a
23  physician, corrects the code. Do you see that?
24     A  Yes.
25     Q  Did you -- as part of this process, did you

Page 98

1  receive any information about Aetna -- the recoding
2  system that Aetna had in place?
3      A  No.
4      Q  Okay. Were you aware that Aetna had nurses and
5  physicians who were involved in reviewing the codes that
6  were on claims?
7      A  I -- well, we assumed that they would, but even
8  with that assumption, we found that we had a significant
9  amount of savings more closely scrutinizing the claims.
10     Q  Do you know the extent to which in early 1987
11  or 1986, the extent to which Aetna was recoding claims
12  before they were paid?
13     A  Specifically with Aetna I couldn't say. I
14  think as a general rule for the entire industry I could
15  see that very few of them were closely correcting any
16  coding errors.
17     Q  And do you know whether Aetna in 1986 was
18  recoding claims where it was discovering unbundling or
19  upcoding?
20     A  I really don't know.
21     Q  After the report was given to Aetna on your
22  review of their claims, did Aetna or Sun then ask that
23  you do anything else for them?
24     A  We had a meeting at the Sun corporate offices
25  in Philadelphia in which Sun Oil Company was a little bit

Page 99

1  irritated that -- what they had thought was Aetna had not
2  closely scrutinized their claims, and they were a little
3  bit irritated with them, and we had a meeting in which
4  there was several comments made on that basis.
5      Q  Once your study of the Aetna claims showed that
6  your process could lead to additional savings, did you
7  and HPI have further discussions about moving forward
8  with a business?
9      A  Well, what it showed us was that the original
10  business plan which was simply claims processing, other
11  people's claims, that we did have a significant savings
12  and that we could have a viable business entity, and we
13  didn't really have a business of any kind at that time to
14  offer to anybody and were conducting further studies to
15  see if this was replicated, so...
16     Q  Further studies, you mean to look at claims
17  from other companies?
18     A  Yes, um-hum.
19     Q  And those further studies were done in early
20  1987?
21     A  Yes.
22     Q  And did they again show that if you used your
23  system, further savings could be achieved?
24     A  Yes.
25     Q  And at that point then did you and HPI discuss

Page 100

1  We will calculate the potential savings from increased
2  accuracy in coding of claims with and without the use of
3  Auto Coder.  Do you know what Auto Coder is?
4  **A   I have a general idea what it does.**
5  Q   What does it do, or what did it do back in
6  1987?
7  **A   You typed in a diagnosis, and it gave you a**
8  **code that corresponded with it.**
9  Q   A CPT-4 code?
10  **A   Yes.**
11  Q   And would it also tell you whether a CPT-4 code
12  was actually a valid code that was in the AMA manual?
13  **A   I think it only had the CPT codes in it.**
14  Q   And so if you typed in a code that didn't
15  exist, that was not a valid CPT-4 code, would it tell you
16  that?
17  **A   I don't know.**
18  Q   Did Caterpillar ever use Auto Coder?
19  **A   No.**
20  Q   Now, going back up to the paragraph above where
21  it says, Coding audits are our first step toward building
22  clinical decision rules, what do you understand clinical
23  decision rules to be?
24  **A   I think it probably could mean different things**
25  **to different people.**

Page 105

1  Q   Does it mean anything to you?
2  MR. HANSEN:  As used in this letter or generally?
3  MR. THOMAS:  What does he -- does he have an
4  understanding based on his background and expertise as to
5  what clinical decision rules are.
6  MR. HANSEN:  Again, as used in this letter or
7  generally?
8  MR. THOMAS:  Generally.
9  MR. HANSEN:  Object to the form.
10  THE WITNESS:  I would say professional input into a
11  code or the audit.
12  BY MR. THOMAS:
13  Q   Professional input into whether the code was
14  appropriate?
15  **A   Yes.**
16  Q   And that's one of the things that you did at
17  Caterpillar, right?
18  **A   Yes.**
19  Q   It goes on to say, for building clinical
20  decision rules for software that will assist the claims
21  processing units in assigning codes using all available
22  information.  Do you understood codes to be a reference
23  to CPT-4 codes?
24  **A   Yes.**
25  MR. THOMAS:  Let's mark as Exhibit 127 a document

Page 106

1  bearing control numbers MCK120112 through 122.
2          (Whereupon, Exhibit No. 127
3          was marked for
4          identification.)
5  BY MR. THOMAS:
6  Q   Sir, this is entitled, Proposal to Aetna Life
7  and Casualty Insurance Company for Evaluating Potential
8  Savings for Increased Accuracy in CPT-4 Coding, and it's
9  dated July 1987.  Do you see that?
10  **A   Yes.**
11  Q   And do you recall a proposal being made to
12  Aetna in the summer of 1987?
13  **A   I don't think I was involved with that.  It**
14  **might have been HPI.**
15  Q   Turn to the third page, control number 120114.
16  In the first paragraph, it says, In May 1987, the Health
17  Policy Institute of Boston University, in cooperation
18  with Aetna Life and Casualty Insurance Company, completed
19  a study for Sun Company and Caterpillar, Inc., that
20  evaluated the potential savings from increased accuracy
21  of CPT-4 codes on physician claims for surgery and all
22  other invasive procedures.  That's the study that you
23  performed that we have already discussed, right?
24  **A   Yes.**
25  Q   And then turn over to page two, the next page,

Page 107

1  excuse me, the document says, This proposal is designed
2  to answer these questions and provide the basis for the
3  Health Policy Institute to submit a follow on proposal
4  for assisting and improving the accuracy of CPT-4 coding.
5  Based on preliminary results, we anticipate that this
6  will involve the Health Policy Institute in building
7  clinical decision rules for software that will assist the
8  claims processing units in, one, assigning accurate codes
9  to the combination of procedure codes on a claim; and,
10  two, deciding when it is cost effective to request an
11  operative report.  Do you understand the reference to
12  codes here being CPT-4 codes?
13  **A   Yes.**
14  Q   And were you aware in July of 1987 that HPI was
15  talking to Aetna about creating software that would
16  assign accurate codes to the combination of proper codes
17  on a claim?
18  **A   Yes, that was their plan.**
19  Q   And the idea that a computer and software could
20  be used for that purpose had been disclosed to Aetna by
21  July of 1987?
22  **A   That the possibility of having that was**
23  **possible.  We didn't have that, of course.**
24  Q   But the concept, the idea that a computer could
25  be used to perform your process had been disclosed to

Page 108

27 (Pages 105 to 108)

ROBERT HERTENSTEIN, M.D.

1   Aetna?
2       A   I assume that that is what they interpret it
3   as.
4       Q   And these discussions were being had in
5   connection with the possibility of Aetna providing
6   funding or ultimately purchasing that software?
7       A   I can't remember what that reasoning was behind
8   that.
9       Q   As of July of 1987 were the Health Policy
10  Institute people looking for funding for this project?
11      A   Yes.
12      Q   And was Aetna one possible source of the
13  funding?
14      A   I guess, but I know Caterpillar was also a
15  possibility.
16      Q   Now, speaking of Caterpillar, in 1987 did it
17  become interested in getting software of this type?
18      A   Yes.
19      Q   Okay.  And I understand you had a heart attack
20  in the summer of 1987?
21      A   Yes.
22      Q   And was that -- did that contribute to
23  Caterpillar's interest?
24      A   Yes.
25      Q   How come?

1       A   They didn't want to lose my expertise.
2       Q   So Cat -- when you had your heart attack,
3   Caterpillar became concerned that the claim review
4   process that you were performing, that the savings from
5   that might be lost?
6       A   Yes.
7       Q   And so were they -- did they become interested
8   in getting software that would replicate what you were
9   doing?
10      A   Yes.
11      Q   And is that what you and HPI set out to do was
12  create software that would replicate your manual process?
13      A   Yes.
14          MR. THOMAS: Let's mark as Exhibit 128 a document
15  with control number 119729 through 736.
16              (Whereupon, Exhibit No. 128
17                  was marked for
18                  identification.)
19  BY MR. THOMAS:
20      Q   Sir, this is a memorandum dated September 14,
21  1987, from Mr. Holloway to yourself and a couple of other
22  gentlemen.  Do you see that?
23      A   Yes.
24      Q   Do you recall receiving this memorandum from
25  Mr. Holloway?

1       A   No, I don't.
2       Q   In the first paragraph he writes, In order to
3   prepare for obtaining legal assistance, I am submitting
4   this outline of the issues for structuring a deal with
5   Aetna or other funding source for your consideration and
6   feedback.  This is what we were just talking about,
7   right, that at this time HPI was looking for funding to
8   develop the HPI project?
9       A   Yes.
10      Q   Under product description, the document states,
11  We have a software product, paren, Medreview, close
12  paren, and an annual subscription service for receiving
13  updates to Medreview.  Was Medreview a name that was used
14  for what later became CodeReview?
15      A   Yes.
16      Q   And by September 14 of 1987, was there a
17  software product in existence?
18      A   No.
19      Q   Do you know what Mr. Holloway is referring to
20  when he says, We have a software product?
21      A   I think what he should have said was, We will
22  have a software product.
23      Q   Dropping down a little bit, he says, Medreview,
24  therefore, has four components.  The first is a knowledge
25  base, a listing of the information required to review the

1   appropriateness of each CPT-4 surgical procedure code,
2   paren, for example, other procedures assumed under the
3   given code, the allowed diagnosis, the accepted location
4   of service, et cetera.  This knowledge base, is this what
5   you helped to develop?
6       A   Yes, over the next several months after this
7   time, I spent a good bit of time giving them the
8   information they needed.
9       Q   And the information that went into this
10  knowledge base was your expertise on what codes could be
11  combined with other codes?
12      A   Yes, part of it.
13      Q   What else?
14      A   Well, there are many things.  Place of service,
15  as is stated above, appropriateness of coding two codes
16  together, and then bundling codes that would fit into one
17  that had been separately brought, whether or not a
18  procedure could be performed in the setting that they
19  submitted the bill from, et cetera.  There were many
20  facets to it.
21      Q   And these were -- these many rules were the
22  rules that you were using manually at Caterpillar?
23      A   Yes.
24      Q   And you spent -- as I understand, you spent a
25  great deal of time explaining and passing those rules on

ROBERT HERTENSTEIN, M.D.

1  to the HPI people?
2     A   Yes. I estimated a thousand hours between then
3  and the next fall of '8- -- what, '88.
4     Q   And as I understand it, most of that time was
5  spent with Dr. Goldberg?
6     A   He was the knowledge engineer as we called him,
7  yes.
8     Q   Okay. Did you -- and you understood that they
9  were compiling all of these rules to go into the
10 knowledge base?
11    A   Yes, they were finding out how they could
12 submit these rules and the knowledge base into a computer
13 system.
14    Q   And by the time you got all done providing all
15 of this information to HPI, was it your understanding
16 that there were literally thousands of these rules?
17    A   Yeah. The estimate was 45,000 rules, yes.
18    Q   Now, did you understand that once this
19 knowledge base was completed, that it would be accessed
20 by using a computer and software?
21    A   Yes.
22    Q   Did you have any input at all into the software
23 itself?
24    A   No, I did not.
25    Q   Your input was on the knowledge base side?

Page 113

1     A   Yes.
2     Q   And this Medreview software that's being
3  discussed here that would include the knowledge base,
4  this was the type of software that was being discussed
5  with Aetna?
6     A   I don't -- I didn't understand what the
7  computer system was, so I couldn't answer that as -- I
8  don't know for sure.
9     Q   Well, was -- the software that was being
10 discussed with Aetna in the summer of 1987, it's the same
11 thing we're talking about now, right, with the knowledge
12 base?
13    A   Except there was no software at that time.
14    Q   I understand, but the conceptual software that
15 was being discussed is the software that would include a
16 knowledge base and software to access it?
17    A   Yes.
18    Q   Do you know whether Aetna ultimately elected to
19 fund the creation of the software, or purchase it?
20    A   No, they decided against it, so...
21    Q   Do you know whether they developed or purchased
22 some alternative kind of software?
23    A   Well, there wasn't any other software
24 available, so they couldn't have bought it, but I do know
25 that they were interested in developing their own product

Page 114

1  of some type.
2     Q   Do you know whether they did that?
3     A   Yes.
4     Q   What did they develop, if you know?
5     A   A system called GMIS, that Code Check I guess
6  is the name of it.
7     Q   Did they, Aetna I mean, purchase that software
8  from GMIS as you understand it?
9     A   My impression was GMIS was owned by Aetna.
10    Q   Prior to September of 1987, do you know whether
11 HPI disclosed the idea that it would be possible to
12 develop this kind of software to anyone else in addition
13 to Aetna?
14    MR. HANSEN: Can you read it back? I missed the
15 beginning. Sorry.
16    (Record read.)
17    MR. HANSEN: Object to the form.
18    THE WITNESS: I'm not sure, you know, precisely --
19 what we presented to Aetna was just a concept of a
20 product at the time, and I don't remember anybody else
21 having a discussion with us on that.
22 BY MR. THOMAS:
23    Q   By September of 1987, you had performed
24 analysis of claims for these other companies you
25 mentioned, Chrysler, Iramco, Weyerhauser, right?

Page 115

1     A   Yes.
2     Q   Do you know whether the concept that a computer
3  could be used to replicate your process was discussed
4  with any of those companies?
5     A   No, it was not.
6     Q   Do you know why it was discussed with Aetna but
7  not those other companies?
8     A   No, I don't.
9     MR. THOMAS: Let's mark as Exhibit 128 --
10    THE REPORTER: 129.
11    MR. THOMAS: -- 129, excuse me, a document bearing
12 control number MCK119737.
13          (Whereupon, Exhibit No. 129
14          was marked for
15          identification.)
16 BY MR. THOMAS:
17    Q   Sir, this appears to be a letter dated
18 September 22, 1987, from Dr. Egdahl at HPI to Richard
19 Wright at Caterpillar with a copy to you. Do you see
20 that?
21    A   Yes, um-hum.
22    Q   And Mr. Wright was in charge of the benefits
23 department at Caterpillar?
24    A   I'm sorry, would -- you asked what?
25    Q   Yeah. Was Mr. Wright in charge of the benefits

Page 116

29 (Pages 113 to 116)

ROBERT HERTENSTEIN, M.D.

1  department at Caterpillar?
2      A  He had -- no. He had a supervisory role. I
3  don't know whether I'd say he was in charge of the
4  benefits department or not.
5      Q  By the way, when you were medical director at
6  Caterpillar, who did you report to?
7      A  The director of compensation.
8      Q  And who was that?
9      A  There were several of them. The last one was
10  Jerry Kenny (phonetic), but when this was going on it was
11  a man -- I can't think of his name right now.
12      Q  Okay. Dr. Egdahl writes to Mr. Wright in this
13  letter, We appreciate your continued interest in the
14  development of a software package that would assist
15  claims processors in applying medical decision rules to
16  the selection of appropriate codes for surgeons' claims.
17  Again, do you understand the codes here to be CPT-4
18  codes?
19      A  Yes, um-hum.
20      Q  And he writes, Since the software is in the
21  early stages of development, we are preparing a proposal
22  to work with Caterpillar for your consideration. As of
23  this point, September 22, 1987, had there been some
24  discussions between HPI and Caterpillar about Caterpillar
25  funding or purchasing this software?

Page 117

1      A  Yes.
2      Q  And when did those discussions start?
3      A  After I had my coronary, so...
4      Q  And when was that exactly?
5      A  In June of -- or July of '87.
6      Q  And had HPI informed Caterpillar that they
7  thought it would be possible to create this software?
8      A  They wanted to have the funds to be able to
9  decide whether it was possible to develop it.
10      Q  I assume that would Caterpillar that they
11  thought if they got sufficient funding, they could do it?
12      A  They thought they could, and Caterpillar would
13  be the beneficiary of the software program, so...
14      Q  And so from HPI's end, the reason they were
15  talking to Caterpillar about creating this software was
16  to get funding from Caterpillar?
17      A  Yes, and also to make sure that they agreed
18  that I could spend the time doing it, too.
19      Q  Did Caterpillar accept HPI's proposal and
20  provide the funding?
21      A  Yes.
22      Q  When did that happen?
23      A  In the fall. I'm not sure of the exact dates,
24  but --
25      Q  In the fall of 1987?

Page 118

1      A  Yes, um-hum.
2      Q  As we just looked at, Dr. Egdahl said that the
3  software was in the early stages of development. Do you
4  know as of September 22 1987 how far along that work was?
5      A  Not very far, because I hadn't worked for six
6  weeks or so after that, and we had only done a very short
7  portion of it prior to the time I had my coronary, so...
8      Q  Okay. So prior to the time that you had your
9  coronary, had you begun your work with HPI to help them
10  build the knowledge base?
11      A  Well, we really were trying to decide whether
12  or not they could transpose what I was saying into any
13  type of a useful product in a computer sense, and I don't
14  think we had established that exactly at that time,
15  because my initial impression was that it probably
16  couldn't be done, but...
17      Q  By September 22, had enough work been done to
18  determine that it was feasible?
19      A  I don't know.
20      Q  Now, in this work that you did to help them
21  build the knowledge base, you gave them very specific
22  information about -- code by code about which codes were
23  appropriate to be combined, correct?
24      A  Well, I recalled instances where there was
25  improper coding with the codes in the -- on a code, so it

Page 119

1  wasn't necessarily just which combining of codes. It was
2  whether or not I saw someone had used a code to upcode in
3  order to enhance a payment and that sort of thing that I
4  had looked at over the years, which was quite a number of
5  claims.
6      Q  So these rules, if you will, that you provided
7  to go into the knowledge base, these were based on your
8  actual experience at Caterpillar in reviewing claims?
9      A  By and large, yes, um-hum.
10      Q  Did you give them any rules that for any reason
11  you would not have followed at Caterpillar as part of the
12  manual process?
13      A  I don't understand that question.
14      Q  Yeah, that's a bad question. Were there any
15  rules that you provided them to go into the database that
16  you felt would have been inappropriate for Caterpillar to
17  use as part of the manual process?
18      A  No.
19      Q  Because what you were trying to do was create a
20  knowledge base that replicated what you were doing?
21      A  Yes, and I would assume that we would be a
22  little more strict than some people might, so...
23      Q  Did you have any discussions with the folks
24  from HPI about what would be involved in creating a
25  software itself that would be used to access the

Page 120

REDACTED

EXHIBIT G

REDACTED

EXHIBIT H

REDACTED

# EXHIBIT I

REDACTED

# EXHIBIT J

REDACTED

# EXHIBIT K

1    IN THE UNITED STATES DISTRICT COURT
2    FOR THE DISTRICT OF DELAWARE
3    CIVIL ACTION NO. 04-1258 SLR
4
5    -----------------------X
6    MCKESSON INFORMATION    :
7    SOLUTIONS, LLC,         :
8        Plaintiff,          :
9    vs.                     :
10   THE TRIZETTO GROUP, INC., :
11       Defendant.          :
12   -----------------------X
13
14           Durham, North Carolina
15           Friday, September 23, 2005
16
17       VIDEOTAPE DEPOSITION OF KELLI A. DUGAN,
18   a witness herein, called for examination by counsel
19   for the Defendant, in the above-entitled matter,
20   pursuant to notice, the witness being duly sworn by
21   DARLENE M. BRYANT, Registered Professional Reporter
22   and Notary Public in and for the State of North
23   Carolina, taken at the offices of Interactive World,
24   1000 Park Forty Plaza, Suite 300, Durham, North
25   Carolina, at 8:06 a.m., September 23, 2005, and the

Page 1

1    proceedings being taken down by Stenotype by DARLENE
2    M. BRYANT and transcribed under her direction.

Page 2

1    APPEARANCES:
2    On behalf of the Plaintiff:
3        BERNARD SHEK, ESQ.
4        Skadden, Arps, Slate, Meagher & Flom, LLP
5        525 University Avenue, Suite 1100
6        Palo Alto, California 94301
7        (650) 470-4500
8    On behalf of Defendant:
9        MICHAEL A. SITZMAN, ESQ.
10       Gibson, Dunn & Crutcher, LLP
11       One Montgomery Street
         Telesis Tower, Suite 31
12       San Francisco, California 94104-4505
13       (415) 393-8221
14
15       BRENT TROUBLEFIELD, VIDEOGRAPHER

Page 3

CONTENTS

THE WITNESS          EXAMINATION BY COUNSEL FOR
KELLI A. DUGAN:      Plaintiff      Defendant
By Mr. Sitzman:                     7, 180
By Mr. Shek:         177

EXHIBITS

| EXHIBIT NO. | | PAGE NO. |
|---|---|---|
| 1 | 7-29-87, Holloway to Fager | 53 |
| 2 | 10-14-87 Holloway to Fager | 55 |
| 3 | US Patent 5, 253,164 | 66 |
| 4 | Subpoena | 103 |
| 5 | Article, The Caterpillar Experience | 105 |
| 6 | Memo, 1-29-88, Holloway to Egdahl | 108 |
| 7 | 5-20-88, Holloway to Egdahl | 121 |
| 8 | RICS | 122 |
| 9 | Flow Charting Worksheet | 124 |
| 10 | Memo, To HPR Staff, 1-17-89 | 127 |
| 11 | CRW, 1-25-89 | 129 |
| 12 | 1-26-89, Holloway To Bolz | 130 |
| 13 | 2-13-89, Don & Kelli To PDT | 132 |
| 14 | 12-12-89, Goldberg to Dugan | 136 |

Page 4

KELLI A. DUGAN

1    Q.  All right.  Well, let's just walk through this
2  real quickly.
3    A.  Okay.
4    Q.  Is it your belief and understanding that they
5  would receive a medical claim?
6    A.  Yes.
7    Q.  Was it your belief and understanding that one
8  of the -- one of the things that they were to do is to
9  find out if there were more than one service -- CPT-4
10  code on that claim?
11    A.  Yes.
12    Q.  Okay.  Was it your knowledge and understanding
13  that they would also look at those codes when there
14  were more than one, to determine whether or not those
15  codes were mutually exclusive due to some nonmedical
16  criteria?
17    A.  I guess that's where I'm being tripped up,
18  nonmedical criteria.  It's -- I -- they don't -- my
19  understanding is that -- for instance, this is an
20  example.  Yes, that they -- that Bob and/or Peggy,
21  would look at certain claims that had more than one
22  code, and perhaps they would deny any payment on a
23  particular code because of its relation to the other
24  one, or more, that appeared on that same claim.
25    Q.  Okay.  And then they would -- based on your
Page 93

1  knowledge and understanding, they would authorize
2  those codes that were not mutually exclusive?
3    A.  Yes, I believe so.
4    Q.  And they would reject those that were?
5    A.  Yes, I believe so.
6    Q.  Can you recall your early conversations with
7  Cliff Alper, and what the general task was that was
8  given to him?
9    A.  In the beginning, I believe I wanted him to
10  make the user interface more user-friendly.  My
11  prototype was a little bit rudimentary in terms of
12  user interface.  So he did a lot of work on that, at
13  the beginning.
14    Q.  Okay.  At some point in time it sounds like
15  you then had him refine, maybe, the computer program
16  itself.
17    A.  Refine -- he -- yes, because with the onset of
18  Cliff's work with the HPR group, we moved from
19  strictly Dbase 3 to Clipper group.
20    Q.  Right.
21    A.  Which gained us a lot of speed and a lot of
22  more functionality in terms of user interface.
23    Q.  The code -- strike that.  Let me see if I can
24  get back.
25     The rules that you and Don created --
Page 94

1    A.  Uh-huh.
2    Q.  -- and the databases --
3    A.  Yes.
4    Q.  -- were two separate things?
5    A.  Yes.
6    Q.  The software code that you developed in Dbase
7  and then later Cliff developed in Clipper, or the
8  Clipper compiler on top of Dbase --
9    A.  That we -- yes, that he and I worked with,
10  yes.
11    Q.  -- was code that was designed simply to
12  interact between the rule interact; use the rules and
13  the database, and get them to function together; is
14  that a fair assessment?
15    A.  The computer code -- just one more time.
16  Repeat.
17    Q.  Okay.  The computer code that was created --
18    A.  Yes.
19    Q.  -- first by you in Dbase --
20    A.  Uh-huh.
21    Q.  -- then --
22    A.  -- with Clipper --
23    Q.  Right.
24    A.  -- with Cliff --
25    Q.  -- was code that was designed simply to get
Page 95

1  the databases and the rules to work together.
2     MR. SHEK:  Objection; vague and ambiguous.
3     THE WITNESS:  There were certainly not mutually
4  exclusive.  There were certain aspects -- of the code,
5  I believe -- you're -- what you're explaining is
6  probably the primary function of the code; is to take
7  the information that was in the databases, and with
8  the information from the incoming claim, it would take
9  all of that information and the code would work
10  through the numbers to come up with an answer.
11     BY MR. SITZMAN:  (RESUMED.)
12    Q.  Okay.  Let me see if I understand this.
13    A.  Okay.
14    Q.  I'm getting lost.
15    A.  Okay.
16    Q.  As I see CodeReview, it had three components?
17    A.  Okay.
18    Q.  It had rules, it had a database, and it had
19  software code.  Am I missing something?
20    A.  The --
21    Q.  All right.  Let me --
22    A.  -- the database -- the rules aren't really a
23  separate entity exclusive of either the database or
24  the software code.
25    Q.  Okay.  Okay.  All right.  So that's where
Page 96

24 (Pages 93 to 96)

KELLI A. DUGAN

1   A.  Yes.
2   Q.  Page after page after page?
3   A.  Yes.
4   Q.  I didn't participate in the development of
5   CodeReview?
6   A.  Yes.
7   Q.  And my name doesn't appear anywhere on the
8   patent?
9   A.  Uh-huh.
10  Q.  So what I'm interested in --
11  A.  Uh-huh.
12  Q.  -- is from your prospective --
13  A.  Yes.
14  Q.  -- somebody who did work on the code --
15  A.  Yes.
16  Q.  -- somebody who developed the code --
17  A.  Uh-huh.
18  Q.  -- somebody who is an inventor on the
19  patent --
20  A.  Yes.
21  Q.  -- and whose name does appear --
22  A.  Yes.
23  Q.  -- what is Appendix D?  What -- what --
24  A.  I believe that Appendix D is the -- the code,
25  uncompiled code from CodeReview.

Page 145

1   Q.  You think it's the uncompiled code from
2   CodeReview?
3   A.  Correct.  It's the code.
4   Q.  It does not contain any of the information
5   that is in any of the knowledge bases, the knowledge
6   base databases?
7   A.  Correct.
8   Q.  All right.  So I think -- if I gave this to a
9   computer programmer --
10  A.  Uh-huh.
11  Q.  -- he could almost make CodeReview, but he
12  wouldn't have the database, the knowledge -- he
13  wouldn't have the information in the knowledge base
14  databases necessary to run CodeReview?
15  MR. SHEK:  Objection; vague and ambiguous.
16  THE WITNESS:  Correct.
17  BY MR. SITZMAN:  (RESUMED.)
18  Q.  I'd like to turn to the flow charts in the
19  back real quickly, for example, MCK184.
20  A.  Okay.
21  Q.  The handwriting is slightly different than the
22  flow charting I saw earlier.  Can you -- do you
23  recognize this handwriting?
24  A.  I -- I could speculate that this is Don
25  Holloway's handwriting, perhaps.  I'm speculating;

Page 146

1   Don's.
2   Q.  Is it safe to say that it's not yours?
3   A.  Yes, I think so.
4   THE VIDEOGRAPHER:  We have about five
5   minutes.
6   MR. SITZMAN:  Let's do one quickie, and then
7   we'll --
8   (The document referred to was
9   marked KD Exhibit No. 17
10  for identification.)
11  BY MR. SITZMAN:  (RESUMED.)
12  Q.  Before I ask you any questions about KD-17, do
13  you have any knowledge that KD-16, the application
14  that we were just looking at, the big thick -- that
15  this was abandoned, that the prosecution of this was
16  abandoned before the Patent and Trademark Office?
17  A.  I don't know.
18  Q.  Okay.  KD-17.  I ask you to just take a brief
19  look at that.
20  Is that your signature on the last page,
21  MCK198?
22  A.  Yes, it is.
23  Q.  And do you recall reviewing and signing this
24  document in connection with the filing of the patent
25  application?

Page 147

1   A.  No, I do not.
2   Q.  You don't recall it?
3   A.  No.
4   Q.  Okay.  On page MCK197, the Power of
5   Attorney --
6   A.  Uh-huh.
7   Q.  -- a Jason Mirabito and Jason Honeyman; do you
8   see that?
9   A.  Uh-huh.
10  Q.  Are those the lawyers that you can recall
11  meeting with, I think you testified earlier about two
12  or three times, during the prosecution of the patent?
13  A.  Yes.
14  MR. SITZMAN:  Okay.  All right.  You want to
15  change tapes?
16  THE VIDEOGRAPHER:  This concludes Tape 3 of
17  the deposition of Kelli Dugan.  The time is 12:26 p.m.
18  (Whereupon, at 12:26 p.m., a recess was taken
19  until 12:34 p.m.)
20  THE VIDEOGRAPHER:  This is Tape 4 of the
21  deposition of Kelli Dugan.  The time is 12:34 p.m.
22  FURTHER EXAMINATION BY COUNSEL FOR DEFENDANT
23  BY MR. SITZMAN:  (RESUMED.)
24  Q.  Ms. Dugan, returning back to KD-17 and KD-16,
25  I believe, the patent application and the inventor's

Page 148

```
 1              THE VIDEOGRAPHER:  This concludes the

 2     deposition of Kelli Dugan.  The time is 1:29 p.m.

 3              (Discussion off the record.)

 4              (Whereupon, at 1:29 p.m., the taking of the

 5     instant deposition ceased.)

 6              (Whereupon, the reading and signing by the

 7     witness is hereby reserved.)

 8                                _____

 9                                SIGNATURE OF THE WITNESS

10              SUBSCRIBED AND SWORN to before me this

11     _____ day of _____, 2005.

12                                _____

13                                        NOTARY PUBLIC

14     My Commission Expires:

15

16

17

18

19

20

21

22

23

24

25
```

186

KELLI A. DUGAN

BARKLEY
Court Reporters

EXHIBIT L

**Page 1**

1    UNITED STATES DISTRICT COURT
2    FOR THE DISTRICT OF DELAWARE
3
4
5    ------------------------------x
6    MC KESSON INFORMATION SYSTEMS, :
7        Plaintiff,    :   Case No.
8        vs.          :   04-1258 SLR
9    THE TRIZETTO GROUP,    :
10        Defendant.    :
11    ------------------------------x
12
13
14    VIDEOTAPED DEPOSITION OF GEORGE A. GOLDBERG
15
16
17        Washington, D.C.
18        Tuesday, September 13, 2005
19
20
21
22
23
24    REPORTED BY:
25        CARMEN SMITH

*Page 1*

**Page 2**

1        Deposition of GEORGE A. GOLDBERG, called for
2    examination pursuant to notice of deposition, on
3    Tuesday, September 13, 2005, in Washington, D.C. at
4    the offices of Gibson, Dunn & Crutcher, 1050
5    Connecticut Avenue Northwest, at 9:03 a.m. before
6    CARMEN SMITH, a Notary Public within and for the
7    District of Columbia, when were present on behalf of
8    the respective parties:
9
10        BERNARD SHEK, ESQ.
11        Skadden, Arps, Slate, Meagher & Flom LLP
12        525 University Avenue, Suite 1100
13        Palo Alto, California 94301
14        650-470-4500
15        On behalf of Plaintiff and Witness
16
17        DAVID A. SEGAL, ESQ.
18        Gibson, Dunn & Crutcher LLP
19        4 Park Plaza, Suite 1400
20        Irvine, California 92614-8557
21        949-451-3973
22        On behalf of Defendant
23
24    Also present:
25        LARRY FLOWERS, Video Operator

*Page 2*

**Page 3**

1            P R O C E E D I N G S
2        VIDEO OPERATOR: This is the deposition of
3    Mr. George A. Goldberg, taken on behalf of Defendant
4    in the matter of McKesson Information Systems LLC,
5    Plaintiff, versus Trizetto Group, Inc., Defendant,
6    Case Number 04-1258 SLR, for the U.S. District
7    Court, District of Delaware.
8        This deposition is being taken at the
9    offices of Gibson Dunn, 1050 Connecticut Avenue,
10    Washington, D.C. The time is approximately 9:03
11    a.m. The date is September 13, 2005.
12        The court reporter is Carmen Smith, on
13    behalf of Barkley Court Reporters, 2040 Main Street,
14    Suite 250, Irvine, California. I am the video
15    operator, Larry Flowers, also on behalf of Barkley.
16        The reporter may now swear the witness.
17    Whereupon,
18            GEORGE A. GOLDBERG
19    was called as a witness and, having first been duly
20    affirmed, was examined and testified as follows:
21        VIDEO OPERATOR: Will counsel identify
22    themselves and who they represent.
23        MR. SEGAL: David Segal of Gibson, Dunn &
24    Crutcher on behalf of the Trizetto Group, Inc.
25        MR. SHEK: Bernard Shek for Plaintiff,

*Page 3*

**Page 4**

1    also representing the witness, Dr. Goldberg, at this
2    deposition.
3            EXAMINATION
4        BY MR. SEGAL:
5        Q    Good morning.
6        A    **Good morning.**
7        Q    Can you please state your full name for
8    the record?
9        A    **George Ansbach Goldberg.**
10        Q    Can you spell the middle name for the
11    court reporter?
12        A    **A-n-s-b-a-c-h.**
13        Q    Have you ever had your deposition taken
14    before, Dr. Goldberg?
15        A    **Which deposition?**
16        Q    Any time, have you ever been deposed in a
17    deposition before?
18        A    **Yes.**
19        Q    How many times?
20        A    **I believe once.**
21        Q    And have you ever testified in court
22    before?
23        A    **No.**
24        Q    Now, you've had your deposition taken
25    before, and we'll go back and visit about that

*Page 4*

1 (Pages 1 to 4)

GEORGE A. GOLDBERG

1    (The reporter read the record as
2  requested.)
3        THE WITNESS: That a system could be
4  constructed that would embody the principles that we
5  were discovering and could be applied on an
6  automated basis consistently and reproducibly to
7  submitted claims.
8        Furthermore, we needed to -- we needed to
9  produce output in a comprehensible format that would
10  be understood by both the payors and the providers.
11  Period.
12        BY MR. SEGAL:
13    Q   Once you told someone that there was this
14  problem with incorrectly coding procedures on
15  medical claims and that you really should do this on
16  an automated system, with that information and
17  having that kernel of knowledge, would it be
18  possible for someone to come up with a system that
19  would review medical claims and not in all cases but
20  in some cases rebundle?
21        MR. SHEK: Objection; vague and ambiguous,
22  also lacks foundation.
23        THE WITNESS: It certainly was a long
24  question, that's for sure, and I got lost in it.
25  First of all, until I was in the sales mode, which

Page 157

1    Q   What would I be missing that I would need
2  in addition?
3    A   Even today, you would not have -- not have
4  discovered -- you would have to launch a tremendous
5  effort to discover the basic principles of the --
6  the basic principles that could underlie the
7  solution, underlie the system and method. And in
8  those days, to add to that problem -- that's one.
9        Secondly, you would have to launch quite
10  an effort to induce -- to work on a rules database
11  which, although secondary, would require tremendous
12  amount of effort just to develop. So there would be
13  a significant barrier to entry, even today --
14  barriers to entry, even today.
15        And in addition, in 19 -- in the 1980s,
16  you would face an additional tremendous barrier of
17  figuring out how a computer could do this in an
18  efficient manner at a time when using the computer
19  basically meant, huh, here's something that used to
20  be on paper, now I've got it in the computer so I
21  can look it up easily.
22    Q   What are the basic principles that
23  underlie the system and method that you would need
24  to know other than those that were identified in my
25  question?

Page 159

1  was much later, I never told any -- I don't like the
2  verb "told." So if you will repeat -- no, I don't
3  know what the right verb is, so if you will rephrase
4  that part of the question, let's go from there.
5        BY MR. SEGAL:
6    Q   I want to assume for purposes of my
7  question that I publish an article and I say there's
8  this problem with incorrect coding, and I give some
9  examples of incorrect codes based on procedure
10  codes, okay. I also want you to assume that I
11  tell -- that I publish an article that says, gee,
12  this problem of incorrect coding exists. It would
13  be nice to be able to create a software program
14  that, while processing claims, would fix some of
15  these coding problems. Okay?
16    A   Yes.
17    Q   If I had that information, would I readily
18  be able to create a system and method to perform the
19  same functions that CodeReview did, even if it
20  didn't necessarily have all the rules that
21  CodeReview had?
22        MR. SHEK: Objection; vague and ambiguous,
23  also calls for speculation.
24        THE WITNESS: No.
25        BY MR. SEGAL:

Page 158

1    A   Well, I'd have to bone up for many hours,
2  which we do not have, before I could answer that
3  question properly. It's -- I'm going to go back to
4  my analogy of how the planet -- or planetary motion
5  this time -- I'm sticking with Sir Isaac Newton,
6  though he obviously had some predecessors so I'm not
7  pushing this analogy all the way.
8        There were all these observations, and he
9  was looking for a certain number of underlying
10  principles, in his case mathematical equations or
11  expressions, that, in fact, could explain the
12  observations.
13        And to say that there is a -- there are
14  rebundling problems and there's a way of correcting
15  codes is like saying the theories of Aristotle, not
16  to mention the newer ones from Copernicus and Tyco
17  Brahe, B-r-a-h-e, notwithstanding those changes,
18  those modifications, do not describe these
19  observations, is where I think we were. If there
20  were articles -- were an article or comment as you
21  described.
22        And as you know, by following -- I know
23  this sounds ridiculous to compare us to Sir Isaac
24  Newton, but I'm continuing the analogy, that once
25  Newton found the basic underlying elements,

Page 160

40 (Pages 157 to 160)

GEORGE A. GOLDBERG

1    A    A little easier to read, thank you.
2        (Witness reviewed the document.)
3        I've finished my general review of this
4    letter.
5    Q    This purports to be a letter sent by you
6    to Dr. Howard Bailit of Aetna Life Insurance
7    Company.
8    A    Yes.
9    Q    On January 12, 1988?
10   A    Okay.  Yes, it does purport.
11   Q    Do you recall it to be that -- do you
12   recognize the document?
13   A    I do not recognize the document.
14   Q    Do you have any reason to believe that
15   this is not a letter that you sent to Mr. Bailit on
16   January 12, 1988?
17   A    No, meaning I have no reason to believe
18   that it is not a letter I wrote and sent to
19   Dr. Bailit on approximately January 12, 1988.
20   Q    And in drafting a letter to Dr. Bailit,
21   would you have been careful to make sure what you
22   were representing or stating in the letter was
23   accurate?
24       MR. SHEK:  Objection as to form.
25       THE WITNESS:  I always attempt to be

Page 229

1    careful.  What I see here is George Goldberg in
2    sales mode, a situation I had essentially never
3    experienced before.  I didn't need it during
4    college, medical school, residency or my 11-year
5    tenure at The RAND Corporation, nor had I to my
6    recollection been involved in the one year I was in
7    the private sector at Health Data Institute, nor at
8    the start of my tenure at the Health Policy
9    Institute.  But I certainly would have tried to be
10   careful.  I always try.
11       BY MR. SEGAL:
12   Q    And you wouldn't have intentionally
13   misrepresented anything to Dr. Bailit?
14   A    I would not have intentionally
15   represented, but I might have engaged in emphasis of
16   certain factors, as opposed to others which at that
17   time was my understanding was one of the things that
18   was necessary for sales.
19   Q    Okay.  At the bottom of the first page,
20   you state, "'anybody' can go through the coding book
21   and identify a large number of decision rules."  Do
22   you see that?
23   A    I do see that.
24   Q    Is that a statement that you made to
25   Dr. Bailit on January 12, 1988?

Page 230

1    A    I'd say the odds are essentially 100
2    percent that I made that statement and want to point
3    out, I'm very happy to say that that word "anybody"
4    is in quotation marks.
5    Q    What did you mean by putting "anybody" in
6    quotation marks?
7    A    It's what I explained, I believe, earlier
8    today, and I'm happy to repeat that a large number
9    of people, given some orientation to the way this
10   AMA's CPT code book is organized, would be able to
11   understand certain codes that trump other codes.
12   And I give two examples there, not all that
13   different from the one I gave in a more theoretical
14   form earlier today, when I talked about, I believe,
15   procedure A plus something as opposed to procedure A
16   alone.
17   Q    And on the top of page 2, you note that
18   "there are many such self-evident, logical
19   examples."  Do you see that?
20   A    I see that.
21   Q    Did you believe that there were many
22   self-evident, logical examples of procedure codes
23   that could be identified by going through the coding
24   book?
25   A    As of January 1988, I believe I did.

Page 231

1    Q    And did you believe that on September 30,
2    1988?
3    A    I have no idea what I believed on
4    September 30, 1988.  Is there a reason you're
5    choosing that date?
6    Q    It's just the filing date of the patent.
7    A    Oh, thank you.
8    Q    Do you have any reason to believe that
9    your opinion about whether there were many
10   self-evident, logical examples of rules that could
11   be gleaned from the coding book --
12   A    I believe I would say that it's
13   essentially certain that on -- that for all of the
14   year of 1988, at least from January 12 on, I
15   believed that where there were a number of coding
16   combinations, that anybody, in quotation marks, who
17   understood the organization of the CPT code book
18   could -- could deduce.
19   Q    Okay.  And you tell Dr. Bailit that the
20   decision rules that would be included in HPR's
21   product go far beyond the self-evident rules; is
22   that correct?
23   A    That's what it says.  "However, our
24   decision rules go far beyond the self-evident
25   rules."

Page 232

1    Q   And that "they go beyond them in ways that
2  are medically and financially important, because
3  they are based on experience with thousands upon
4  thousands of actual claims"; correct?
5    A   That's what this letter says.
6    Q   Do you believe that's not a truthful
7  statement of your opinion as it existed during 1988?
8    A   I believe that that was my opinion in
9  1988.
10   Q   And then you go on in this letter, and you
11 identify four examples --
12   A   Representative examples.
13   Q   Representative --
14   A   Excuse me, I didn't mean to interrupt you.
15   Q   No, that's fine.  I apologize.  I don't
16 want to misquote either and cause my question -- let
17 me start over.
18       And then you go on in the letter to
19 provide a series, four, representative examples that
20 illustrate your point of decision rules that go far
21 beyond the self-evident; is that correct?
22   A   It appears to be correct.  I'd have to
23 read every one of these literally word for word, but
24 it certainly appears to be correct at this moment.
25   Q   Okay.  And you believe that using these

Page 233

1  examples would be rules that you would want to
2  include in a system and method for -- let's get the
3  right title here, system and method for detecting
4  fraudulent medical claims via examination of service
5  codes?
6    A   I'm going to -- please repeat the question
7  so I know whether I want to say yes or no.  I know
8  what I want to say, but I'm not sure how the
9  question was phrased.
10   Q   Let me just re-ask it.  Did you believe in
11 1988 that a system and method for detecting
12 fraudulent medical claims via examination of service
13 codes should include each of the examples set forth
14 in your letter to Dr. Bailit?
15   A   No, because I don't consider these
16 rules -- rebundling rules, as crucial as they are,
17 as you have -- you and I have already discussed, are
18 part of the system and method.  I don't -- you
19 needed the system and method to act using these
20 rules, but I am saying they weren't part of the
21 system and method.
22   Q   I understand.  Let me try and rephrase --
23   A   It sounds like a basic disagreement.
24   Q   Well, we went back, and I think at the
25 beginning of this questioning, you agreed with me

Page 234

1  that a system and method for detecting fraudulent
2  claims via examination of service codes would
3  include what you called a rebundling rules database.
4    A   Yes, the system and method -- well, the
5  system and method could not function without a
6  rebundling rules database, and I guess some people
7  would conclude from that that it's part of the
8  system and method.  And I may have said that a few
9  minutes ago, but I'm not convinced it's correct.
10   Q   Do you believe that the CodeReview product
11 that you were trying to sell Dr. Bailit on was
12 better than other companies' systems and methods for
13 detecting fraudulent claims because your system and
14 method included each of these representative
15 examples in its rules database?
16   A   Again, your premise is that the system and
17 method includes the rules.  I'm saying that the
18 CodeReview -- I'd like to suggest that the system
19 and method needed rebundling rules to act on and if
20 you had better rules, it would act better, and that
21 these better rules were part of the product
22 differentiation of CodeReview.
23       But it sounds to me as if you are
24 attempting to equate the patent with the CodeReview
25 product.  And I find viscerally that I don't want to

Page 235

1  equate the two, that the system and method we
2  patented was certainly necessary for the
3  CodeReview -- certainly necessary for the CodeReview
4  product.
5        But the CodeReview product -- and the
6  CodeReview product used the system and method, but
7  it was more than that, and perhaps maybe if I think
8  about this more, I would -- I'll change my mind, but
9  that the rebundling rules database was part of
10 CodeReview but not of the system and method.
11   Q   Okay.  First, I think your microphone is
12 off, so why don't we -- or too low perhaps.  Usually
13 they have them move it up.  I just want to make
14 sure.  I also didn't see it on your tie.
15   A   Well, I'm very glad that it worked,
16 because I'd have trouble repeating that thought in
17 the same way again.
18   Q   If you had no entries in the rebundling
19 rules database, would you have a system and method
20 for detecting fraudulent claims via examination of
21 service codes, as set forth in the '164 patent?
22   A   I believe we would.  It just couldn't find
23 any examples, but I believe -- but I believe we
24 would have the system and method.
25   Q   But it would never recode any of the

Page 236

59 (Pages 233 to 236)

GEORGE A. GOLDBERG

1    (The reporter read the record as
2  requested.)
3    THE WITNESS: I do not know, and I would
4  like to point out that this is not a rebundling
5  rule. This class of problems, as I call it in the
6  final sentence of the paragraph, had to do with the
7  questioning of an individual code. And although
8  that certainly -- I believe that was part of the
9  original CodeReview product, it's not what I call
10  rebundling.
11    Having made that comment, this is -- this
12  is also an example of something -- this class of
13  problems would never be captured. I still believe
14  that comment. But this particular example at some
15  point in the future after January 12, 1988 would be
16  captured by others, just the way that Galileo when
17  he looked through a microscope at the heavens and
18  saw the rings of Saturn, at that time no one else
19  knew about them. But within X years thereafter, a
20  lot of people knew about the rings of Saturn.
21    In the -- I mention the needed medical
22  sophistication that over time, more and more people
23  learned about this. So I can't tell you how many
24  people knew about this -- this particular example on
25  the 12th of January '88, the 13th, any other date

Page 249

1  **on January 12, 1988. Uniquely qualified to**
2  **provide -- I hoped and thought it was highly likely**
3  **that we had -- that our -- the rules database acted**
4  **upon in CodeReview was better because of "long-term**
5  **claims experience and medical expertise," but I**
6  **believe I was engaging in market -- sales hyperbole.**
7   Q  Do you have any specific recollection of
8  learning in 1988 that example 1 was no longer -- was
9  knowledge that was available through a logical
10  review of the coding book?
11   **A  Please repeat the question.**
12   Q  I'll give you -- do you have any specific
13  recollection of learning in 1988 that example 1 was,
14  in fact, knowledge that was available through a
15  purely logical review of the coding book?
16   **A  I have no specific or nonspecific**
17  **recollection that I learned that in 1988.**
18    MR. SEGAL: Let's go off the record.
19    VIDEO OPERATOR: We're off the record.
20  The time is approximately 5:27 p.m.
21    (Discussion off the record.)
22    (Recess.)
23    VIDEO OPERATOR: We're back on the record.
24  The time is approximately 5:41 p.m. We are now off
25  the record. The time is approximately 5:41 p.m.

Page 251

1  in '88 or as -- when this became known to more and
2  more people.
3    But I don't dis -- so this particular
4  example could -- did become known over time, not
5  among "everybody," but among more and more people in
6  the field, just like the rings of Saturn. But there
7  is a class of these problems that would -- that did
8  exist, and I agree that there's a class that still
9  probably exists. It's now very small as the
10  knowledge has disseminated.
11   Q  Going back to example 1, which was a
12  rebundling rule, did you believe that knowledge of
13  the example set forth in example 1 was one
14  representative example that you believed, whether or
15  not it was true, made HPR uniquely qualified to
16  provide a system and method to detect fraudulent
17  claims?
18   **A  I don't believe I ever said that HPR**
19  **was -- oh, wait, I may have said it right in here,**
20  **may have used some marketing language like "uniquely**
21  **qualified." But do you see that?**
22   Q  If you go to the last -- the
23  second-to-last paragraph in your letter.
24   **A  There it is. The word "unique." "We are**
25  **uniquely qualified." Thank you. I did believe that**

Page 250

1    MR. SEGAL: We are off the video record
2  but we are on the transcript, just to note that
3  pursuant to the court order, we get the honor of
4  spending 14 hours of testimony time with
5  Dr. Goldberg, and as of now, it looks like given the
6  number of documents I still need to go through and
7  the number of pages in my outline, we are going to
8  need another full day. We were hopeful we might
9  actually complete within a day.
10    So we are going to work with counsel for
11  the witness and McKesson to schedule another date
12  when Dr. Goldberg and counsel can be in town and
13  complete his deposition.
14    At this time would you like to close this
15  volume so the court reporter can process it and it
16  can get out, or would you like to wait for the
17  second day?
18    MR. SHEK: You mean in terms of sending
19  off the first day? So long as I can get a rough of
20  the first day's transcript.
21    MR. SEGAL: The court reporter advised me
22  we could get a rough, so there's no reason to --
23    MR. SHEK: Just to note for the record, I
24  will have questions that I would like to ask. And
25  as we've done with other nonparties, if you give me

Page 252

| | |
|---|---|
| 1 | IN THE UNITED STATES DISTRICT COURT |
| 2 | for the District of Delaware |
| 3 | |
| 4 | - - - - - - - - - - - - - - - - - x |
| 5 | : |
| 6 | McKESSON INFORMATION SYSTEMS,    : |
| 7 | : |
| 8 |     Plaintiffs,        : |
| 9 | : Case No. |
| 10 | v.        : 04-1258 SLR |
| 11 | : |
| 12 | THE TRIZETTO GROUP,        : |
| 13 | : |
| 14 |     Defendant.    : |
| 15 | : |
| 16 | - - - - - - - - - - - - - - - - - x |
| 17 | Washington, D.C. |
| 18 | Volume II |
| 19 | September 28, 2005 |
| 20 | |
| 21 | |
| 22 | |
| 23 | REPORTED BY: |
| 24 |     DANIEL W. HAWKINS |
| 25 | |

Page 257

---

1    Video Deposition of
2
3    GEORGE A. GOLDBERG, M.D.
4
5    called for examination pursuant to notice of deposition, at
6    the law offices of Gibson, Dunn & Crutcher, 1050 Connecticut
7    Avenue, Northwest, 2nd Floor, Conference Room 3B,
8    Washington, D.C., beginning at 9:21 a.m., before DANIEL W.
9    HAWKINS, a Notary Public within and for the District of
10   Columbia, when were present on behalf of the respective
11   parties:
12
13       BERNARD SHEK, ESQ.
14       Skadden, Arps, Slate, Meagher & Flom LLP
15       528 University Avenue, Suite 1100
16       Palo Alto, California 94301
17       Phone  650.470.4500
18       Fax 650.470.4570
19       E-mail bshek@skadden.com
20       On behalf of Plaintiff and Witness
21
22
23
24
25

Page 258

---

1    APEARENCES (continued)
2
3        DAVID A. SEGAL, ESQ.
4        Gibson, Dunn & Cructher LLP
5        4 Park Plaza, Suite 1400
6        Irvine, California 92614-8557
7        Phone 949.451.3973
8        Fax 949.475.4663
9        E-mail dsegal@gibsondunn.com
10       On behalf of Defendant
11
12
13   Also present:  T.J. O'Toole, CLVS, Videographer
14
15
16            C O N T E N T S
17
18   Witness:        Examination by:
19
20   Dr. Goldberg        Mr. Segal: 261, 389
21                Mr. Shek: 382, 391
22
23
24
25

Page 259

---

1            E X H I B I T S
2
3    Deposition Exhibit            Marked
4
5        10            268
6        11            270
7        12            276
8        13            276
9        14            325
10       15            327
11       16            330
12       17            338
13       18            345
14       19            348
15       20            351
16       21            357
17       22            367
18       23            380
19
20       (Exhibits attached.)
21
22
23
24
25

Page 260

GEORGE A. GOLDBERG, M.D. - VOLUME II

Page 325

1  claims review and claims editing, to some program or system
2  that worked; whether or not it worked great or was a salable
3  product, or had some things with it, but sort of would just
4  do the steps.
5       Is there some point which you believe you reached
6  --?
7  **A  Yes, there was such a point.**
8  Q  And when was that?
9  **A  I don't know when. I don't remember when.**
10  Q  Do you recall any -- approximately when?
11  **A  I do not. I can figure out, you know, by looking**
12  **at things, when it might have been, but that would be a**
13  **matter of logic, not a matter of anything I recall.**
14      MR. SEGAL: I'm going to ask the court reporter
15  to mark as Exhibit 14 to the deposition a multipage
16  document, Bates number MCK 113292 to 295.
17       (Goldberg Deposition Exhibit No.
18       14 was marked for identification.)
19
20      (Document handed to witness.)
21      BY MR. SEGAL:
22  Q  Is this a document you recognize?
23  **A  This one looks very familiar.**
24  Q  Would this be a document that you created?
25  **A  Although I don't remember it, I would say this**

Page 326

1  **appears to be a document -- yes, this appears to be a**
2  **document I created.**
3  Q  And as you sit here today, do you believe that it
4  accurately reflects the amount of time devoted into the
5  development of the code review rules and options as of
6  February 1989?
7      MR. SHEK: Object as to form.
8      THE WITNESS: Oh, February '89, which now I see
9  is the date of this document.
10      I love seeing these names from the past; excuse
11  me.
12      I will not vouch for the accuracy of the number
13  of hours, because I already think that at this time a bit of
14  marketing, or as I in my inexperience might have thought of
15  marketing, might have entered into the development of this
16  document.
17      BY MR. SEGAL:
18  Q  So it may have been puffed up a bit? Is that
19  what your testimony is?
20  **A  Although I think there's a general approximation**
21  **here that probably bears an approximation to the truth, I**
22  **don't remember if I puffed up some stuff or not.**
23  Q  It is correct that the entire knowledge base that
24  you developed as it existed as of September 30, 1988, is not
25  set forth in Exhibit 107, right?

Page 327

1  **A  Ah, the knowledge base, the thing I call the**
2  **rebundling rules database, and the --?**
3  Q  Right.
4  **A  The entirety is not in this patent, which is**
5  **Exhibit 107, that is true.**
6      MR. SEGAL: I'm going to ask the court reporter
7  to mark as Exhibit 16 to your deposition, a multipage
8  document bearing Bates number MCK 050304 to 313, and ask you
9  to look at that document.
10       (Goldberg Deposition Exhibit No.
11       15 was marked for identification.)
12
13      (Document handed to witness.)
14      BY MR. SEGAL:
15  Q  For the record, it is Exhibit 15, I apologize;
16  Bates number MCK 050304 through 313, and ask you if you
17  recognize this document.
18  **A  I do not recognize this document.**
19  Q  Is it your handwriting on this document?
20  **A  This is my handwriting on this document.**
21  Q  Can you tell us, by looking at this document, do
22  you have any idea what this document is?
23  **A  Yes; I can figure out what it is. This is a**
24  **document I wrote, and this is a document that provides ten**
25  **pages of what I would call rules for the database.**

Page 328

1  Q  So these are rules --?
2  **A  For the -- excuse me. For what you're calling**
3  **the knowledge base.**
4  Q  So these would be what we've also referred to as
5  detailed edits? Is that accurate?
6  **A  Almost all of them appear, if not all of them,**
7  **appear to be what we would call detailed edits, yes.**
8  Q  Can you tell me how this document was created?
9  **A  That would actually be speculation. Do you want**
10  **to hear my speculation?**
11  Q  Well, it's your document, so if you have any
12  basis from looking at it how you believe you would have
13  created the document.
14  **A  Well, the fact that this -- okay. I notice that**
15  **in the upper left hand corner of page 1 it says Goldberg**
16  **Rules with Goldberg in quotation marks. And that suggests**
17  **to me that I was the author of these detailed edits without**
18  **-- and that this did not represent an example of**
19  **interviewing Dr. Hertenstein for these detailed edits. And**
20  **I use the word 'suggests' advisedly, because I don't**
21  **remember precisely, of course. So that is a clue.**
22  **And just as the word Medical Services above the**
23  **words Goldberg Rules suggests that part of the CPT book that**
24  **these -- that section of the CPT coding book that is**
25  **involved, and with my knowledge I look through these rules,**

1        I HEREBY CERTIFY that I have read this

2    transcript of my deposition and that this transcript

3    accurately states the testimony given by me, with

4    the changes or corrections, if any, as noted.

5

6

7        X _____George A. Goldberg_____

8                    10/18/2005

9

10

11   Subscribed and sworn to before me this        day of

12                    , 20          .

13

14

15

16            X

17            Notary Public

18

19

20

21   My commission expires:

22

23

24

25

                          254

                GEORGE A. GOLDBERG

BARKLEY
Court Reporters

1        I HEREBY CERTIFY that I have read this transcript

2  of my deposition and that this transcript accurately states

3  the testimony given by me, with the changes or corrections,

4  if any, as noted.

5

6

7

8  x _____George A. Goldberg_____

9        10/18/2005

10

11  Subscribed and sworn to before me this      day of

12        20  .

13

14

15

16  _____

17

18  Notary Public

19

20  My commission expires:

21

22

23

24

25

GEORGE A. GOLDBERG, M.D. - VOLUME II

BARKLEY Court Reporters

# EXHIBIT M

REDACTED

EXHIBIT N

REDACTED