EXHIBIT Q

REDACTED

EXHIBIT R

REDACTED

EXHIBIT S

REDACTED

EXHIBIT T

03-18-05   03:22pm   From-                                                    T-118   P.01/10   F-279

# SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

525 UNIVERSITY AVENUE
PALO ALTO, CALIFORNIA 94301

TELEPHONE NO : (650) 470-4500
FACSIMILE NO.: (650) 470-4570

EMAIL· mhenders@skadden.com

## FACSIMILE TRANSMITTAL SHEET

| | |
|---|---|
| FROM  Michael C. Hendershot | DATE  March 18, 2005 |
| DIRECT DIAL  (650) 470-4618 | FLOOR/OFFICE NO  9-314 |
| DIRECT FACSIMILE  (888) 329-7976 | REFERENCE NO:  224040/98 |

THIS FACSIMILE IS INTENDED ONLY FOR USE OF THE ADDRESSEE(S) NAMED HEREIN AND MAY CONTAIN LEGALLY PRIVILEGED AND/OR CONFIDENTIAL INFORMATION.  IF YOU ARE NOT THE INTENDED RECIPIENT OF THIS FACSIMILE, YOU ARE HEREBY NOTIFIED THAT ANY DISSEMINATION, DISTRIBUTION OR COPYING OF THIS FACSIMILE IS STRICTLY PROHIBITED.   IF YOU HAVE RECEIVED THIS FACSIMILE IN ERROR, PLEASE IMMEDIATELY NOTIFY US BY TELEPHONE AND RETURN THE ORIGINAL FACSIMILE TO US AT THE ADDRESS ABOVE VIA THE LOCAL POSTAL SERVICE   WE WILL REIMBURSE ANY COSTS YOU INCUR IN NOTIFYING US AND RETURNING THE FACSIMILE TO US

TOTAL NUMBER OF PAGES INCLUDING COVER(S):   10

PLEASE DELIVER THE FOLLOWING PAGE(S) TO:

| | | | |
|---|---|---|---|
| 1 | NAME  Matthew C. Lapple, Esq. | FIRM:  Paul, Hastings, Janofsky & Walker LLP | |
| | CITY  Costa Mesa | TELEPHONE NO. | |
| | FACSIMILE NO  714.979.1921 | | |
| 2 | NAME  Jack B. Blumenfeld, Esq. | FIRM:  Morris, Nichols, Arsht & Tunnell | |
| | CITY  Wilmington | TELEPHONE NO.: | |
| | FACSIMILE NO ·  302.425.3012 | | |

MESSAGE  **PLAINTIFF MCKESSON'S SECOND SUPPLEMENTAL RESPONSE TO DEFENDANT TRIZETTO'S FIRST SET OF INTERROGATORIES (1-20)** follows.

## IN THE UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF DELAWARE

MCKESSON INFORMATION SOLUTIONS )
LLC,                           )
                               )        CIVIL ACTION NO. 04-1258-SLR
                Plaintiff,     )
        v.                     )
                               )
THE TRIZETTO GROUP, INC.,      )
                               )
                Defendant.     )
                               )

### PLAINTIFF MCKESSON'S SECOND SUPPLEMENTAL RESPONSE
### TO DEFENDANT TRIZETTO'S
### FIRST SET OF INTERROGATORIES (1-20)

Plaintiff, McKesson Information Solutions LLC ("McKesson"), hereby

supplements its responses as follows to Interrogatory Nos. 6-8, 15-18, and 20 of the First

Set of Interrogatories by defendant, The TriZetto Group, Inc. ("TriZetto").

### GENERAL OBJECTIONS

McKesson incorporates by reference as if fully set forth herein the General

Objections set forth in its January 13, 2005 Responses to TriZetto's First Set of

Interrogatories (1-20) and its February 18, 2005 Supplemental Responses to Defendant

TriZetto's First Set of Interrogatories (1-20).

## RESPONSES

### INTERROGATORY NO. 6:

For each asserted claim of the '164 PATENT, describe any disclosures of the subject matter thereof prior to the date on which the application for the '164 PATENT was filed (including but not limited to, all prior written publications, all sales, all offers to sell, and/or public uses of any product or system embodying or practicing any claimed invention of the '164 PATENT, the dates of any such disclosures, sales, offers for sale and/or public uses, an identification of the products or systems sold, offered for sale and/or publicly used, and an identification of the PERSONS involved in the disclosure, sale, offer, and/or public use and all documents relating thereto).

### RESPONSE TO INTERROGATORY NO. 6:

McKesson incorporates by reference as if fully set forth herein its original response to this interrogatory, including objections. Subject to and without waiving the foregoing objections, McKesson supplements its response to this interrogatory as follows:

On February 18, 1988, at least Dr. Robert Hertenstein, Dr. Don Holloway, and Kelli Dugan demonstrated a computer system, an early version of what later became known as CodeReview, embodying subject matter of the '164 Patent to Caterpillar, Inc. Non-privileged documents within McKesson's possession, custody, or control relating to this demonstration have been or will be produced.

On March 22, 1988, at least Dr. Robert Hertenstein, Dr. Don Holloway, and Dr. George Goldberg demonstrated a computer system, an early version of what later became known as CodeReview, embodying subject matter of the '164 Patent to Aetna Life Insurance Company. Non-privileged documents within McKesson's possession, custody, or control relating to this demonstration have been or will be produced.

2

On April 26, 1988, at least Dr. Robert Hertenstein, Dr. Don Holloway, and Kelli Dugan demonstrated a computer system, an early version of what later became known as CodeReview, embodying subject matter of the '164 Patent to Blue Cross Blue Shield of Michigan. Non-privileged documents within McKesson's possession, custody, or control relating to this demonstration have been or will be produced.

On June 8, 1988, a computer system, an early version of what later became known as CodeReview, embodying subject matter of the '164 Patent was installed at Caterpillar, Inc. in Peoria, Illinois. Non-privileged documents within McKesson's possession, custody, or control relating to this system have been or will be produced.

On June 16, 1988, Dr. Don Holloway offered to implement a computer system, an early version of what later became known as CodeReview, embodying subject matter of the '164 Patent for ARMCO, Inc. Non-privileged documents within McKesson's possession, custody, or control relating to this offer have been or will be produced.

McKesson's investigation into information responsive to this interrogatory is ongoing and McKesson reserves the right to supplement this response as discovery continues or as circumstances otherwise warrant.

## INTERROGATORY NO. 7:

IDENTIFY each product or system ever made, sold, or licensed by YOU, by YOUR predecessor-in-interest, by the named inventors of the '164 PATENT, or by any owner, assignee, or licensee of the '164 PATENT that embodies, practices, or uses any of the alleged inventions claimed in the '164 PATENT including the specific claim(s) of the '164 PATENT that are embodied, practiced, or used in or by each such product or system and the product name, model number, trade name, trademark or other indicia and the dates each product or system was made, sold, or licensed.

3

**RESPONSE TO INTERROGATORY NO. 7:**

McKesson incorporates by reference as if fully set forth herein its original

response to this interrogatory, including objections. Subject to and without waiving the

foregoing objections, McKesson supplements its response to this interrogatory as

follows:

McKesson has made and licensed CodeReview and ClaimCheck. Value Health

Sciences, Inc. has developed and marketed Medical Review System. Solucient, LLC has

developed and licensed Auto-Audit and Auto-Query.

McKesson's investigation into information responsive to this interrogatory is

ongoing and McKesson reserves the right to supplement this response as discovery

continues or as circumstances otherwise warrant.

**INTERROGATORY NO. 8:**

For each product or system, the identification of which is sought by Interrogatory
No. 7, IDENTIFY the PERSONS most knowledgeable about that product or system and
state when it was first described in a printed publication, publicly disclosed, or offered for
sale and sold anywhere in the world:

**RESPONSE TO INTERROGATORY NO. 8:**

McKesson incorporates by reference as if fully set forth herein its original

response to this interrogatory, including objections. Subject to and without waiving the

foregoing objections, McKesson supplements its response to this interrogatory as

follows:

CodeReview was first installed at Caterpillar, Inc. in Peoria, Illinois on June 8,

1988. ClaimCheck was first shipped on a pilot basis in June 1989. Value Health

Sciences, Inc. developed and marketed Medical Review System on or before October 21,

4

1994. Solucient, LLC first marketed Auto-Audit and Auto-Query on or before July 1,

2002.

McKesson's investigation into information responsive to this interrogatory is

ongoing and McKesson reserves the right to supplement this response as discovery

continues or as circumstances otherwise warrant.

## INTERROGATORY NO. 15:

IDENTIFY all reference materials, including without limitation books,
publications, and computer software, that were used or relied upon by any of the
inventors of the '164 patent during its conception, development or reduction to practice.

## RESPONSE TO INTERROGATORY NO. 15:

McKesson incorporates by reference as if fully set forth herein its original

response to this interrogatory, including objections. Subject to and without waiving the

foregoing objections, McKesson supplements its response to this interrogatory as

follows:

The American Medical Association's Current Procedural Terminology, Fourth

Edition (CPT-4) manual, software entitled "Clipper" and "dBASE III," and expert shell

software marketed by Texas Instruments were used in the development and reduction to

practice of the subject matter of the '164 Patent.

McKesson's investigation into information responsive to this interrogatory is

ongoing and McKesson reserves the right to supplement this response as discovery

continues or as circumstances otherwise warrant.

## INTERROGATORY NO. 16:

IDENTIFY all PERSONS, in addition to the inventors, who may have contributed
to the conception, development or reduction to practice of the invention claimed in the
'164 PATENT.

5

**RESPONSE TO INTERROGATORY NO. 16:**

McKesson incorporates by reference as if fully set forth herein its original
response to this interrogatory, including objections. Subject to and without waiving the
foregoing objections, McKesson supplements its response to this interrogatory as
follows:

McKesson is unaware of any persons who contributed to the conception of the
claims of the '164 Patent other than the named inventors who, as a matter of law, are
presumed to have conceived the inventions claimed in the '164 Patent. In addition to the
named inventors, Peggy Saal, Clifford Alper, Denise Konicek, Richard Adler, and Lenore
Tracey may have contributed to the development and reduction to practice of the subject
matter of the '164 Patent.

McKesson's investigation into information responsive to this interrogatory is
ongoing and McKesson reserves the right to supplement this response as discovery
continues or as circumstances otherwise warrant.

**INTERROGATORY NO. 17:**

IDENTIFY all PERSONS involved with the conception, development or
commercialization of Health Payment Review, Inc.'s CodeReview product.

**RESPONSE TO INTERROGATORY NO. 17:**

McKesson incorporates by reference as if fully set forth herein its original
response to this interrogatory, including objections. Subject to and without waiving the
foregoing objections, McKesson supplements its response to this interrogatory as
follows:

Dr. Robert Hertenstein, Dr. George Goldberg, Dr. Don Holloway, Kelli Dugan,
Dr. Richard Egdahl, Clifford Alper, Richard Adler, Lenore Tracey, Denise Konicek,

6

Marcia Radosevich, and Peggy Saal were involved with the development and

commercialization of Health Payment Review, Inc.'s CodeReview product.

McKesson's investigation into information responsive to this interrogatory is

ongoing and McKesson reserves the right to supplement this response as discovery

continues or as circumstances otherwise warrant.

### INTERROGATORY NO. 18:

Identify all materials used which were the basis of the CodeReview product,
including all prior software, medical device codes and sets of relationships among the
medical device codes.

### RESPONSE TO INTERROGATORY NO. 18:

McKesson incorporates by reference as if fully set forth herein its original

response to this interrogatory, including objections.  Subject to and without waiving the

foregoing objections, McKesson supplements its response to this interrogatory as

follows:

The American Medical Association's Current Procedural Terminology, Fourth

Edition (CPT-4) manual, software entitled "Clipper" and "dBASE III," and expert shell

software marketed by Texas Instruments were used in Health Payment Review, Inc.'s

development of the CodeReview product.

McKesson's investigation into information responsive to this interrogatory is

ongoing and McKesson reserves the right to supplement this response as discovery

continues or as circumstances otherwise warrant.

### INTERROGATORY NO. 20:

Describe in detail the basis for YOUR allegation that TriZetto's alleged
infringement of the '164 patent has been willful and wanton.

7

**RESPONSE TO INTERROGATORY NO. 20:**

McKesson incorporates by reference as if fully set forth herein its original response to this interrogatory, including objections. Subject to and without waiving the foregoing objections, McKesson supplements its response to this interrogatory as follows:

In its January 20, 2005 responses to McKesson's First Set of Interrogatories, TriZetto admits that it knew of "the '164 patent at least as early as 1995." *See, e.g.,* TriZetto Responses at 26. TriZetto also previously marketed and distributed ClaimCheck software that TriZetto knew was covered by claims of the '164 Patent. TriZetto then acquired Erisco and began marketing the FACETS product, knowing it infringed claims of the '164 Patent, without obtaining a license from McKesson.

McKesson's investigation into information responsive to this interrogatory is ongoing and McKesson reserves the right to supplement this response as discovery continues or as circumstances otherwise warrant.

DATED:  March 18, 2005

By:  _Randall_

Jeffery G. Randall
SKADDEN, ARPS, SLATE MEAGHER
  & FLOM LLP
525 University Avenue, Suite 1100
Palo Alto, CA 94301

Attorneys for Plaintiff,
McKesson Information Solutions LLC

8

## PROOF OF SERVICE
### (FRCP 5)

I am a citizen of the United States and a resident of the State of California. I am

employed in Santa Clara County, State of California, in the office of a member of the bar of this

Court, at whose direction the service was made. I am over the age of eighteen years, and not a

party to the within action. My business address is 525 University Avenue, Suite 1100, Palo Alto,

CA 94301.

On March 18, 2005, I served **PLAINTIFF MCKESSON'S SECOND**

**SUPPLEMENTAL RESPONSE TO DEFENDANT TRIZETTO'S FIRST SET OF**

**INTERROGATORIES(1-20)** in the manner described below:

> (BY FACSIMILE)  I am personally and readily familiar with the business
> practice of Skadden, Arps, Slate, Meagher & Flom LLP for collection and
> processing of document(s) to be transmitted by facsimile, and I caused such
> document(s) on this date to be transmitted by facsimile to the offices of
> addressee(s) at the numbers listed below.

> (BY U.S. MAIL)  I am personally and readily familiar with the business
> practice of Skadden, Arps, Slate, Meagher & Flom LLP for collection and
> processing of correspondence for mailing with the United States Postal Service,
> and I caused such envelope(s) with postage thereon fully prepaid to be placed in
> the United States Postal Service at Palo Alto, California.

on the following party in this action:

Matthew C. Lapple, Esq.                    Jack B. Blumenfeld, Esq.
Paul, Hastings, Janofsky, Walker LLP       Morris, Nichols, Arsht & Tunnell
695 Town Center Drive                      1201 N. Market Street
Costa Mesa, CA 92626                       P.O. Box 1347
Facsimile: 714.979.1921                    Wilmington, DE 19899
                                           Facsimile: 302.425.3012

Executed on March 18, 2005 in Palo Alto, California.

                                    _Pamela Carrier_
                                    Pamela Carrier

EXHIBIT U

REDACTED

# EXHIBIT V

SAVINGS FROM ACCURATE CODING

OF SURGICAL CLAIMS: THE

CATERPILLAR METHOD

Don C. Holloway, Ph.D. 1

Robert D. Hertenstein, M.D. 2

Richard H. Egdahl, M.D. 1

1 From the Health Policy
  Institute, Boston University,
  Boston, Massachusetts

2 From Caterpillar, Inc.
  Peoria, Illinois

Reprint requests:
  Don C. Holloway, Ph.D.
  Health Policy Institute
  Boston University
  53 Bay State Road
  Boston, MA 02215

(For publication in Business and Health, Fall 1987)

HBB000043

CONFIDENTIAL



MCK 119901

04-CV-1258-SLR (D.Del.)

ABSTRACT

Current attempts to modify the physician fee-for-service payment method focus on only a portion of the equation: the price. Evidence is accumulating that, while many errors are inadvertent, some physicians are increasing their reimbursement by focusing on the other component of the equation: the codes describing the procedures performed. Caterpillar has achieved significant savings using a unique system for assigning accurate codes to surgeons' claims. The system results in a 10-12% reduction in surgeon payments, in comparison to the coding method used for two other large corporations. The Health Policy Institute is working with the surgeon reviewers at Caterpillar to make this system available to other corporations through the use of an "expert system shell", an artificial intelligence software that allows the surgeon reviewers' "rules of thumb" to be made available to claims processors. The process for achieving additional savings by negotiating and applying "access-oriented" surgical fees at a local level is described elsewhere. (See Egdahl and Hertenstein, Annals of Surgery, in press)

BACKGROUND

The declines in inpatient care and physician visits of the past five years have been more than offset by the increase in prices of all providers. The net result has been an actual increase in the rate of real growth in health care expenditures over the past ten years, after consideration of lower general inflation. Cost containment efforts, having focused on reducing unnecessary use, are only beginning to address price. Additionally, the focus has been on hospitals more than physicians, and yet the cost for physician services, the second largest component of health care costs, is projected at 19.8% of total costs for 1986, up from 18.9% in 1980. These costs for

HCE000064
CONFIDENTIAL

MCK 119902
04-CV-1258-SLR (D.Del.)

-2-

physician services are projected to increase to 20.3% of total costs in 1990.

In an effort to retain their current volume of patients, physicians are negotiating agreements with managed care programs such as Health Maintenance Organizations (HMOs) and Preferred Provider Organizations (PPOs). Physicians give price concessions to these organizations through a negotiated fee schedule or a discount from historic charges. In addition, physicians agree to strong utilization controls to reduce unnecessary use. As a consequence, unless total patient volume increases, physicians' best option for maintaining their income is to increase dramatically their charges to "unmanaged" fee-for-service patients whose benefit plans currently often pay the price that is "customary" in the physician community, and/or to increase their charges to managed care programs by the indirect method of "upcoding" the procedures they charge for.

The pressure for reform in the method of physician payment for Medicare and Medicaid is evident in the level of activity in Washington. While alternative methods of payment are being considered, widespread implementation of capitation or physician diagnosis-related groups (DRGs) is not imminent. Instead, modifications to the fee-for-service payment system are likely in the next several years. If such modifications can maintain satisfactory levels of patient access while gaining physician support, a modified fee-for-service method will remain the major payment method in both the private and public sectors.

In attempting to modify the fee-for-service payment method, most current attention is being given to only one component of the equation, the method for establishing the price. Examples of such efforts include: 1) Medicare fees were frozen by Congress from June, 1984, through January, 1987, 2) a resource-based relative value scale for use in establishing relative prices of

HBB000045
CONFIDENTIAL

MCK 119903

-3-

physician services is being developed by Hsiao and colleagues at Harvard with funding from the Health Care Financing Administration, 3) Massachusetts' Medicaid fee schedule is being revised by the Rate Setting Commission, and 4) fees paid by Blue Shield in Massachusetts will be based on a revised relative value scale at the request of the Insurance Commisssioner as a condition for approving a rate increase in 1987.

While the payment <u>amount</u> needs to be established, it is only a portion of the equation. There are two independent components that determine the fees that physicians are paid:

> 1) the code specifying the service provided, and
>
> 2) the corresponding price.

This article focuses on the significance of accurate coding regardless of the payment level. Evidence is accumulating that, while many errors are inadvertent, some physicians are increasing their reimbursement by "upcoding", or by "unpackaging" services that were intended to be bundled into a single code. The administrative systems that are currently available and we have studied are not adequate to control for most of these errors.

In 1986, Caterpillar, Inc. approached the Health Policy Institute of Boston University for assistance in evaluating its process for managing surgeon claims. Caterpillar had been self-administering health claims since the early 1950's, and believed it had achieved significant savings with a surgeon bill review process implemented in 1983. The Health Policy Institute conducted a comparison of Caterpillar's process for assuring accurate codes to those used by claims administrators for two other large corporations. The results are described in this paper.

H■■000046
CONFIDENTIAL

MCK 119904

04-CV-1258-SLR (D.Del.)

-4-

CURRENT CONTROLS ON ACCURATE CODING

Standard industry practice allows claims processors to enter the codes submitted on surgeon claims into a computer system. Fee screens are applied to these codes, establishing the maximum amount that will be paid. One of two coding methods is most frequently used: either the American Medical Association's Current Procedural Terminology, Fourth Edition , (CPT-4), or the California Relative Value Studies (CRVS). Some claims administrators allow their claims processors to assign a code if it is absent from the claim; others return the claim to the physician's office for a code. Once entered into the claims processing system, the code is typically edited for consistency with the age and sex of the patient (for example, no obstetric payments for a male, or for a woman over 44 years old). Some administrators have edits for assuring that the most obvious rules in the coding manuals are being followed. After this step, if there is still a perceived problem with either the code or the fee, the claim is removed from the production process and sent to staff with clinical background for review. This staff may request an operative report, and/or call for a physician to review the claim. A payment for the claim is established, and the claim is returned to the claims processor for payment. Emphasis throughout the industry is on rapid turnaround of a claim, rather than on accuracy of the claim, in order to minimize the time between when a claim is received and when it is paid.

CATERPILLAR'S APPROACH

After observing the claims processing systems of several administrators as well as Caterpillar, and interviewing key individuals at these facilities, five features of the Caterpillar process emerged as different from routine

HBB000047

CONFIDENTIAL

MCK 119905

04-CV-1258-SLR (D.Del.)

-5-

industry practice.  Each feature will be discussed separately.

1.  Systems and procedures in claims processing are designed assuming that
100% of the claims will be submitted with inaccurate codes.

Based on a random sample of over 350 claims for surgery and invasive
procedures, over 50% of claims are submitted with inaccurate or absent codes.
Rather than return claims to the surgeons' offices for coding, Caterpillar
assigns an accurate code using its expert staff.

2.  A surgeon controls the processing of surgeons' claims.

Since 1983, the surgeon reviewers employed by Caterpillar to review claims
have reviewed thousands of surgeons' claims.  Based on this experience, they
have developed "rules of thumb" for when codes can be accepted or changed
based on the available information, or when an operative report must be used.

The surgeon reviewers' "rules of thumb" are passed on to a surgical
technician to reduce the number of claims which subsequently require a surgeon
reviewer's personal attention.  Similarly, some of the rules can be passed on
to claims processors, thereby reducing dependence on the surgical technician.
However, each week the chief surgeon reviewer examines a sample of the
decisions made by the claims processors and surgical technician to assure that
the rules are being applied properly.

In contrast, the standard industry practice among administrators we
reviewed is to use very little professional input in coding decisions.
Physicians are involved at the discretion of the claims processing staff,
rather than in an integrated, structured manner as part of the flow of the
claim.

HBB000048
CONFIDENTIAL

MCK 119906

-6-

3.  Caterpillar's claim forms have a clause requesting physicians to submit "operative reports for unusual or complicated services or procedures".

In order to assure an accurate surgical code, it is necessary to review the operative report. In practice, some surgeons always send an operative report, thereby eliminating delays in payment. However, only 10% of all surgeon claims are initially submitted with operative reports. An additional 10% of surgeon claims processed by Caterpillar require operative reports before they can be paid. The remaining 80% are audited based on the narrative description of the procedures written on the claim because the coding decision is unlikely to change even if an operative report were available.

In contrast, over 97% of the claims were paid without an operative report by the administrators for the other two corporations. One administrator does not even require a narrative description and, therefore, has very little information to make coding decisions.

4.  Codes are assigned to the "claim" rather than to the line items for each procedure.

While the code for each procedure on a claim may be accurate, the claim itself may be inaccurately coded. To illustrate the point, the four codes in Example 1. are accurately assigned to line items.

Example 1

| Line Item Description | CPT-4 Code | | Fee |
|---|---|---|---|
| Splenectomy | 38100 | | $1,000 |
| Laparotomy | 49000 | | $ 600 |
| Gastrectomy | 43620 | | $2,200 |
| Lysis of Adhesions | 44005 | | $ 700 |
| | | Total | $4,500 |
| | | | |
| Correct Code for Claim: | 43620 | | $2,200 |

However, one claim could be submitted with all four codes. While the services are accurately coded, the claim is not. The accurate code for the claim is

H██████000049

CONFIDENTIAL

MCK 119907

04-CV-1258-SLR (D.Del.)

-7-

43620, Gastrectomy, and the appropriate fee is $2,200. Services need to be packaged, and the CPT-4 manual is often not explicit as to the rules for these packages. For this reason, a surgeon's judgment is applied to Caterpillar's claims.

5. <u>Significant changes to codes are explained to the surgeons' offices.</u>

While surgeons are taking an increasingly more active interest in coding, untrained staff in their offices are usually responsible for assigning the submitted code. In order to establish the best provider relations possible, Caterpillar contacts physicians' offices and explains why the code has been changed, if the change is going to result in a payment reduction.

SAVINGS ESTIMATE

A random sample of over 350 claims for surgery and invasive procedures was obtained from claims administrators for two large corporations. Hard copies of the claims and any accompanying operative reports were sent to Caterpillar without the coding decisions made by the claims administrators. Caterpillar processed the claims using its normal process.

Physicians at the Health Policy Institute reviewed the accuracy of Caterpillar's codes. The claims administrators provided their total fees for the accurate codes, and the Health Policy Institute calculated the difference in payment that would have resulted from using the accurate codes.

For both corporations, the savings that would have resulted from accurate coding is 10-12% of submitted charges. The two administrators were making reductions of 4.3% and 35.0% of charges, respectively, and would have made another 10-12% reduction had the coding been accurate. Occasionally surgeons submit incorrect codes that undervalue the procedures done; if those codes had been used, payments would have been reduced even further. For these claims,

HBB000050
CONFIDENTIAL

MCK 119908
04-CV-1258-SLR (D.Del.)

-8-

the Caterpillar surgeon reviewer assigned the correct code and allowed the higher payment; the 10-12% savings estimate also includes those corrections in favor of the billing surgeons.

The following three examples illustrate the types of problems that are not routinely being corrected by claims administrators. The first two examples illustrate how difficult it is to apply the CPT-4 rules correctly, even when the rules are explicit. The last example illustrates a case where there are no explicit CPT-4 rules. Example 1 above also illustrated this point. These cases require review by a surgeon, or the application of a surgeon's "rule of thumb".

Example 2:

| Date | Code | Description | Charges |
|------|------|-------------|---------|
| 8/28/86 | 58120 | Dilation and Curettage (D&C) | $400 |
| 8/28/86 | 57505 | Endocervical Curettage | $400 |
| | | Total | $800 |

Example 2 illustrates that, while each line is coded accurately, the accurate code for the claim is 58120. The CPT-4 manual explicitly states that 57505 is to be used only when it is "not done as part of a dilation and curettage." This physician was inappropriately paid for a presumably separate operation. Given the complexity of the task, and the qualifications of claims processors, it is not surprising that this rule is not routinely applied.

Another case is shown in Example 3.

Example 3:

| Date | Code | Description | Charges |
|------|------|-------------|---------|
| 8/13/86 | 64450 | Peripheral Nerve Block | $ 54 |
| 8/13/86 | 10120 | Subcutaneous Foreign Body Removal-Simple | $ 70 |
| | | Total | $124 |

The CPT-4 manual explicitly states that "listed surgical procedures include the operation per se, local infiltration, digital block or topical anesthesia when used, and normal, uncomplicated follow-up care." A peripheral nerve

HBBG00051
CONFIDENTIAL

MCK 119909

04-CV-1258-SLR (D.Del.)

-9-

block, 64450, is therefore included in 10120.  Again, the physician was inappropriately paid separately for a component part of the primary procedure.

The final example (Example 4) illustrates a case where a surgeon's "rule of thumb" is required.  The claim is for a simple wart removal.  According to the operative report, a 0.25-inch plantar wart on one foot was removed. Removing the wart using the combination of an excision (removing the wart with a knife) <u>and</u> a CO2 (carbon dioxide) laser is excessive treatment.  One or the other would have done the job.  Using the surgeon reviewers' "rules of thumb," simple wart removals are most accurately coded as 17100. The more expensive alternative was unnecessary.

Example 4:

| Line Item Description | CPT-4 Code | Fee |
|---|---|---|
| Excision, benign lesion, foot and use of CO2 laser | 11421 | $ 400 |
| Total | | $ 400 |

| Correct Code | | |
|---|---|---|
| "Destruction by any method of benign skin lesion" | 17100 | $  60 |

DISCUSSION

Caterpillar has achieved significant savings using a manual system of review, and several large corporations and claims administrators have expressed interest in gaining access to this expertise.  The Health Policy Institute is working with the chief surgeon reviewer at Caterpillar to make explicit the "rules of thumb" he and his staff carry in their heads.  These rules are well suited to incorporation in software generically called "expert system shells."  Expert system shells have evolved from research on artificial intelligence.  This type of software provides a vehicle for widespread distribution of an expert's "rules of thumb."  However, a surgeon will always

HSE000052
CONFIDENTIAL

MCK  119910

04-CV-1258-SLR (D.Del.)

-10-

be required to make coding decisions on those claims that are submitted with a combination of codes that have not as yet been seen by the surgeon, and therefore, not programmed into the software.

Unfortunately, it is not possible to evaluate the performance of claims administrators in achieving the potential savings due to accurate coding without an audit of claims. Although reductions from charges made by the administrator are available on management reports, one part of the reduction is the result of lowering excessive fees. The portion due to correcting inaccurate codes cannot be determined without an audit of the claim itself. Periodic audits of claims by an external agency are required in order to ensure that the claims administrator is achieving the full savings potential.

HBB000053

**CONFIDENTIAL**

MCK 119911

04-CV-1258-SLR (D.Del.)

EXHIBIT W

1     UNITED STATES DISTRICT COURT
2     FOR THE DISTRICT OF DELAWARE
3
4
   MCKESSON INFORMATION   )
5  SOLUTIONS,       )
               )
6    Plaintiff,  )
               )
7  vs.        ) No. 04-1258 SLR
               )
8  THE TRIZETTO GROUP,    )
               )
9    Defendant.   )
10
11
12
13        DEPOSITION OF

14    DAVID A. WILSON, Ph.D.

15    PALO ALTO, CALIFORNIA

    Wednesday, November 23, 2005
16
17
18
19
20
21
22
23
24  REPORTED BY:  JANE H. STULLER, CSR NO. 7223
25  (211471)

Page 1

---

1     UNITED STATES DISTRICT COURT
2     FOR THE DISTRICT OF DELAWARE
3
4
   MCKESSON INFORMATION   )
   SOLUTIONS,       )
5               )
    Plaintiff,  )
6               )
  vs.       ) No. 04-1258 SLR
7               )
   THE TRIZETTO GROUP,   )
8               )
    Defendant.   )
9
10
11
12
13
14    Deposition of DAVID A. WILSON, Ph.D., taken
15  on behalf of Defendant, at the Law Offices of
16  Skadden Arps, 525 University Avenue, Suite 1100,
17  Palo Alto, California, commencing at 9:11 a.m., on
18  Wednesday, November 23, 2005, before Jane H.
19  Stuller, CSR #7223.
20
21
22
23
24
25

Page 2

---

1       A P P E A R A N C E S
2
3  FOR THE PLAINTIFF:
4  SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP
5  BY:  BERNARD SHEK, ESQUIRE
6     JON V. SWENSON, ESQUIRE
7  525 University Avenue
8  Suite 1100
9  Palo Alto, California 94301
10  (650) 470-4500
11  bshek@skadden.com
12
13
14  FOR THE DEFENDANT:
15  GIBSON, DUNN & CRUTCHER, LLP
16  BY:  MICHAEL A. SITZMAN, ESQUIRE
17     DANIEL L. MUINO, ESQUIRE
18  One Montgomery Street
19  San Francisco, California 94104-4505
20  (415) 393-8221
21  msitzman@gibsondunn.com
22
23  ALSO PRESENT:
24  MICHAEL BARBER, VIDEOGRAPHER
25

Page 3

---

1        I N D E X
2
3  WITNESS:  DAVID A. WILSON, Ph.D.
4
5  EXAMINATION:         PAGE
6    BY MR. SITZMAN      6
7
8  AFTERNOON SESSION      153
9
10  EXHIBITS:
11       DEFENDANT'S
    NUMBER    DESCRIPTION     PAGE
12
13  1  Dr. Wilson's expert report    5
14  2  '164 Patent       5
15  3  Egdahl/Hertenstein article delivered
16    in April of '87      133
17  4  Article, Savings from Accurate
18    Coding of Surgical Claims, the
19    Caterpillar Method    178
20  5  Document, LK 37 to LK 145    236
21  6  Vendor comparison sheet    241
22  7  Dr. Davis's October 24, 2005, report   262
23
24
25

Page 4

---

1 (Pages 1 to 4)

1    Q. Capturing Detailed Expert Knowledge.
2       Before the inventors captured detailed
3   expert knowledge -- and I presume in this respect it
4   is starting to work with Dr. Hertenstein and Dr.
5   Goldberg and others?
6    A. Right.
7    Q. Weren't others in the field capturing
8   detailed expert knowledge about all kinds of other
9   aspects in the world?
10      MR. SHEK: Objection, vague and ambiguous.
11      THE WITNESS: Certainly there were other
12  inventions developed where part of the process was
13  capturing expert knowledge, yes.
14  BY MR. SITZMAN:
15   A. Okay. Determine Rules.
16      Again, same question. Clearly before the
17  patentees or the inventors developed or determined
18  the rules for this invention, others out there were
19  developing rules and determining rules for the
20  expert knowledge they were capturing?
21   A. Yes.
22   Q. And the same thing with Designing Databases
23  to Store Facts. Others were out there designing
24  databases to store the facts that they were
25  developing?

Page 89

1    A. Yes.
2    Q. And the same thing with Designing a User
3   Interface?
4    A. Yes.
5    Q. And the same thing with Determining Control
6   Flow?
7    A. Yes.
8    Q. And the same thing with Choosing
9   Algorithms?
10   A. Yes. Because this is a process. After
11  all, I started with Figure 1, which is a general
12  process for developing almost any kind of software,
13  so it would certainly apply in wide range of areas
14  in terms of the diagram. The actual solution to
15  each of these problems is different for every
16  problem.
17   Q. Okay. So the process that was undertaken
18  was not new or novel, but the solution, as you're
19  saying, was the novel aspect?
20   A. Certainly you could apply the steps, as you
21  just stated, to numerous patented inventions. There
22  are hundreds of inventions involving expert systems.
23  And I -- I think, from some of them I've looked at,
24  they probably went through a process something like
25  this.

Page 90

1    Q. Okay. So the invention in our case or the
2   novelty, what -- what separates the '164 patent from
3   all the others, is not the process that was
4   undertaken to develop it, but it was the result?
5    A. Yes.
6       MR. SHEK: Objection, vague and ambiguous.
7       THE WITNESS: It was exactly which expert
8   knowledge did you capture, how did you figure out
9   the rules, how did you design the database, how did
10  you design the user interface, how did you design
11  the control flow. What are -- what do you have to
12  do to make this thing actually work.
13      In other words, the engineering
14  requirements say do what you want to do. The design
15  and the prototyping lead you to how to do it.
16  BY MR. SITZMAN:
17   Q. Okay.
18   A. Which is where you are actually inventing
19  something.
20   Q. Okay. Where in the patent claims is the
21  expert knowledge that was captured in this first
22  point under No. 3? Where is that set forth in the
23  patent claims?
24   A. Well, that expert knowledge, certainly some
25  of it resides in the predetermined database and the

Page 91

1   set of relationships. Some of it resides in the
2   means for ascertaining, for example -- or means for
3   determining whether the medical codes in one claim
4   is included in another code in another claim. So
5   you use the knowledge as a starting point to
6   eventually figure out facts and relationships and
7   rules and logic.
8       Now, the initial expert knowledge, for
9   example, did not contain a database design. So you
10  don't get that from the experts. What you get from
11  the experts is a bunch of these are the things I
12  think about when I'm solving this problem. And then
13  you have to invent the design of a database, and you
14  have to decide what facts should I put in the
15  database.
16      Dr. Hertenstein didn't know either one of
17  those things. Dr. Hertenstein -- certainly you
18  didn't get control flow in the algorithms from Dr.
19  Hertenstein. So you -- you got some -- you got his
20  knowledge and you used it to build a computer
21  system.
22      He didn't know anything about building
23  computer systems or databases or program logic or
24  Clipper. So it's not like the knowledge you
25  extracted from Dr. Hertenstein was the answer to the

Page 92

23 (Pages 89 to 92)

DAVID A. WILSON, Ph.D.

1

2

3

4          I, David A. Wilson, Ph.D.  do hereby

5   declare under penalty of perjury that I have read

6   the foregoing transcript; that I have made any

7   corrections as appear noted, in ink, initialed by

8   me; that my testimony as contained herein, as

9   corrected, is true and correct.

10

11  EXECUTED this __13__ day of __December__, 2005, at

12  __Palo Alto_____, __CA_____.
              (City)              (State)

13

14
        _David A. Wilson_____

15      David A. Wilson, Ph.D.

16

17

18

19

20

21

22

23

24

25
                    294

DAVID A. WILSON, Ph.D.

BARKLEY
Court Reporters

EXHIBIT X

92654-00006

RECEIVED

OCT 0 ? 2005    *DISC*

JEFFREY T. THOMAS

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

MCKESSON INFORMATION SOLUTIONS LLC, )
                                         )
                Plaintiff,          )     CIVIL ACTION NO. 04-1258-SLR
                                           )
                v.                    )
                                         )
THE TRIZETTO GROUP, INC.,          )
                                         )
                Defendant.      )
                                         )

## PLAINTIFF MCKESSON'S SUPPLEMENTAL RESPONSE TO DEFENDANT TRIZETTO'S SECOND SET OF INTERROGATORIES (21-22)

Pursuant to Federal Rule of Civil Procedure 33, plaintiff, McKesson Information Solutions LLC ("McKesson"), hereby supplements its response as follows to the Second Set of Interrogatories by defendant, The TriZetto Group, Inc. ("TriZetto").

### GENERAL OBJECTIONS

McKesson incorporates by reference the General Objections set forth in its Responses to Defendant TriZetto's First and Second Sets of Interrogatories.

### SUPPLEMENTAL RESPONSES

### INTERROGATORY NO. 21:

For each limitation of each asserted claim of the '164 Patent that YOU contend must be construed in accordance with 35 U.S.C. § 112, ¶ 6, identify the structure in the specification corresponding to that limitation (by column(s) and line number(s) or column(s) and identified rule(s) or procedure(s) and all equivalents thereto that YOU contend existed at the time of the filing of the '164 Patent).

10|3|05 (S)

**SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 21:**

McKesson incorporates by reference as if fully set forth herein all prior responses to this interrogatory including objections. Subject to and without waiving the foregoing objections, McKesson supplements its response to this interrogatory as follows:

The structures corresponding to the means-plus-function elements of the asserted claims are set forth in McKesson's Supplemental Proposed Claim Terms and Constructions.

**INTERROGATORY NO. 22:**

If YOU contend that the preambles of claims 1, 2, and 16 of the '164 Patent are not limitations of the respective claims, state in detail the basis for YOUR contention.

**SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 22:**

McKesson incorporates by reference as if fully set forth herein all prior responses to this interrogatory including objections. Subject to and without waiving the foregoing objections, McKesson supplements its response to this interrogatory as follows:

McKesson does not contend that the preambles of claims 1, 2 and 16 of the '164 patent are not elements of the respective claims.

DATED:  October 3, 2005

By: _____

Jeffery G. Randall
SKADDEN, ARPS, SLATE MEAGHER
 & FLOM LLP
525 University Avenue, Suite 1100
Palo Alto, CA  94301

Attorneys for Plaintiff,
McKesson Information Solutions LLC

## PROOF OF SERVICE
### (FRCP 5)

I am a citizen of the United States and a resident of the State of California. I am employed in Santa Clara County, State of California, in the office of a member admitted *pro hac* to the bar of this Court, at whose direction the service was made. I am over the age of eighteen years, and not a party to the within action. My business address is 525 University Avenue, Suite 1100, Palo Alto, CA 94301.

On October 3, 2005, I served **PLAINTIFF McKESSON'S SUPPLEMENTAL RESPONSE TO DEFENDANT TRIZETTO'S SECOND SET OF INTERROGATORIES (21-22)** in the manner described below:

> (BY FACSIMILE)  I am personally and readily familiar with the business practice of Skadden, Arps, Slate, Meagher & Flom LLP for collection and processing of document(s) to be transmitted by facsimile, and I caused such document(s) on this date to be transmitted by facsimile to the offices of addressee(s) at the numbers listed below.

> and

> (BY U.S. MAIL)  I am personally and readily familiar with the business practice of Skadden, Arps, Slate, Meagher & Flom LLP for collection and processing of correspondence for mailing with the United States Postal Service, and I caused such envelope(s) with postage thereon fully prepaid to be placed in the United States Postal Service at Palo Alto, California.

on the following parties in this action:

| | |
|---|---|
| Jeffrey Thomas, Esq. | Jack B. Blumenfeld, Esq. |
| Gibson, Dunn & Crutcher LLP | Morris, Nichols, Arsht & Tunnell |
| Jamboree Center | 1201 N. Market Street |
| 4 Park Plaza, Suite 1400 | P.O. Box 1347 |
| Irvine, CA 92614-8557 | Wilmington, DE 19899 |
| Facsimile: (949) 475-4670 | Facsimile: (302) 425-3012 |

Executed on October 3, 2005 in Palo Alto, California.

_____
Yvonne Chen

EXHIBIT Y

Page 242

```
 1                  VOLUME B
              IN THE UNITED STATES DISTRICT COURT
 2
              IN AND FOR THE DISTRICT OF DELAWARE
 3
                      - - -
 4
    McKESSON INFORMATION SOLUTIONS  :   CIVIL ACTION
 5  LLC,
                 Plaintiff          :
 6
           vs.                      :
 7
    THE TRIZETTO GROUP, INC.,       :
 8
                 Defendant          :   NO. 04-01258 (SLR)
 9
                      - - -
10
                        Wilmington, Delaware
11                      Tuesday, April 18, 2006
                        8:30 o'clock, a.m.
12
                      - - -
13
    BEFORE:  HONORABLE SUE L. ROBINSON, Chief Judge, and a jury
14
                      - - -
15
    APPEARANCES:
16
           SKADDEN, ARPS, SLATE, MEAGHER & FLOM
17           BY:  MICHAEL BARLOW, ESQ.
18                -and-
19           SKADDEN, ARPS, SLATE, MEAGHER & FLOM
             BY:  JEFF RANDALL, ESQ.,
20                BERNARD SHEK, ESQ. and
                  MICHAEL HENDERSHOT, ESQ.
21                (Palo Alto, California)
22                Counsel for Plaintiff
23                        Valerie J. Gunning and
                          Leonard A. Dibbs,
24                        Official Court Reporters
25
```

Page 243

```
 1  APPEARANCES (Continued):
 2
           MORRIS, NICHOLS, ARSHT & TUNNELL
 3           BY:  JACK B. BLUMENFELD, ESQ.
 4                -and-
 5
           GIBSON, DUNN & CRUTCHER LLP
 6           BY:  JEFFREY THOMAS, ESQ. and
                  DAVID SEGAL, ESQ.
 7                (Irvine, California)
 8
 9                -and-
10
           GIBSON, DUNN & CRUTCHER LLP
11           BY:  MICHAEL SITZMAN, ESQ.
                  (San Francisco, California)
12
                  Counsel for Defendant
13                    - - -
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 244

## P R O C E E D I N G S

(Proceedings convened at 8:30 a.m., and the following occurred without the presence of the jury.)

THE COURT: Good morning, counsel.

(Counsel respond "Good morning, your Honor.")

THE COURT: I guess you can lay out what issues we need to address in what order. I have an idea of what we need to address today, but I will let you be the ringmasters here.

Are we all set with depositions? I understand from the e-mail that at least some of these depositions are going to go forward, consistent, I hope, with my guidelines.

Mr. Randall?

MR. RANDALL: Yes, your Honor. We have -- we've gone through the transcripts and we have at least done our best to take out questions that referenced either the patent or the claims in the questions, also any questions that referenced the term predetermined database.

We have done our best to remove those and have made our designations and have given them to the other side. With respect to proceeding this morning

Page 245

in terms of the witnesses, we'd like to call our expert, Dr. Musen, to the stand. The only issues with respect to his testimony are the submission within the Court's guidelines prior to 48 hours before he took the stand, we sent over screen shots that were previously disclosed to counsel and videos of what are represented by the screen shots. Basically, the screen shots fading into each other.

So we provided those. The only objection we got was we're objecting to the extent that you intend to go beyond the scope of his report. It's really just a restatement of the rule that you made very clear to both sides. We don't intend to violate that rule, so we -- they really didn't make any objection to the substance of those documents.

And then the other issues that we would like to bring up would be, one, a brief, brief argument regarding Document J issue. And then raise issues with respect to Trizetto's attempts to put witnesses and evidence on during their case. Specifically, Ms. Wukitch, who is here regarding our infringement case. She is an employee of McKesson. She really does not have any information relating to the operation of the products.

We've asked them if there's anything that's

Page 298

1    Thank you.
2  BY MR. HENDERSHOT:
3  Q. So in this example, Dr. Musen, the physician
4  administered an anesthetic agent?
5  A. That's right.
6  Q. Is that a good idea if someone has something
7  imbedded in their arm?
8  A. It's essential.
9  Q. All right.
10 A. Most people prefer anesthesia.
11 Q. Okay. So they administer the anesthesia. So for
12 medical purposes, the anesthesia was necessary?
13 A. Absolutely.
14 Q. But because of some billing convention, there's
15 some other non-medical reason it shouldn't be paid?
16 A. Right. The billing convention, the cost of the
17 anesthesia is included in the overall service.
18 Q. There are circumstances where codes may accurately
19 in general describe and appear to describe what services
20 were administered to a patient that would have been
21 completely medically appropriate but nonetheless shouldn't
22 be paid for some reason?
23 A. Right. Indeed, the physician, when he writes his
24 note that describes what happens in the office will
25 describe in great detail what kind of anesthesia was

Page 299

1  administered. Will indicate that there was a nerve block
2  that was performed to numb up the area before surgery
3  was done. So the medical documentation includes all the
4  information about the anesthesia. It's just not an
5  appropriate billing code for the form that gets submitted
6  to the anesthesia.
7      MR. HENDERSHOT: Let's go back one slide,
8  please. Go back one more.
9      Actually, go back four. Sorry about that.
10 BY MR. HENDERSHOT:
11 Q. So in this example, Dr. Musen, there are two
12 medical service codes submitted on the claim?
13 A. That's correct.
14 Q. And there's a charge associated with the entire
15 claim, which is $159, I believe you saw in the example?
16 A. That's correct.
17 Q. Where did that total charge come from?
18 A. There was a line item for the anesthesia and a line
19 item for the removal of the foreign body.
20 Q. So each item on a claim or medical service code on
21 a claim will have a corresponding charge with it; is that
22 correct?
23 A. That's correct.
24 Q. And the sum of those charges result in the total
25 claim that's being submitted?

Page 300

1  A. Right. It's like going to a restaurant and getting
2  a bill. You get a bill for your salad. You get a bill
3  for your entree. You get a bill for desert. That's
4  just what a medical claim is.
5  Q. So each of the items correlate in that example to
6  a medical service code whereas the entire bill for the
7  meal is the claim?
8  A. That's right.
9  Q. In this instance, the restaurant tried to charge
10 for the silverware?
11 A. Yes. That's part of the deal. You don't expect
12 to pay for silverware rental when you go to a restaurant.
13 Q. So in this example, one of the codes should have
14 been paid, one of them shouldn't?
15 A. Exactly.
16 Q. What is the end effect of that in this example?
17 A. What ultimately happens is that the insurance
18 company ends up paying more for the service than is
19 appropriate and we assume that means the premium of
20 the patient would go up in the grand scheme of things.
21 Q. So who, in general, bears the cost of increased
22 health care expenses like this additional payment here?
23 A. Well, we all do because it means either the cost
24 of Medicare goes up or the cost of private insurance
25 goes up and, in every case, that gets passed on to the

Page 301

1  recipients in terms of more taxes or more premiums.
2  Q. Now, we've seen a single example with two codes
3  here?
4  A. That's correct.
5  Q. You mention there are 10,000 codes or so, roughly,
6  in the CPT manual?
7  A. That's right.
8  Q. That sounds like millions of combinations to me?
9  A. That's right. That's why coding is so complicated
10 and that's why it takes specialists to do it.
11 Q. So we've seen one example. Is the potential for
12 overpayment due to miscoding, is that a significant risk
13 to the national health care industry?
14 A. Well, in Trizetto's product or sales literature, it
15 says that customers can expect a 5 to 15 percent savings
16 if they can identify these kinds of situations.
17 Q. 5 to 15 percent, if you apply that to national health
18 care costs generally, do you have any ball park
19 where that would get us?
20 A. I'm not a health economist. If you think health
21 care costs 14, 15 percent of the gross domestic product
22 annually, that's millions or billions of dollars that
23 might be saved.
24 Q. That's millions or billions of dollars that might
25 be saved and passed on to patients and people like us?

Page 370

1 a database.
2 Q. And in your opinion, does Facets include such
3 capabilities?
4 A. Yes.
5 Q. Does Facets include such software and memory?
6 A. Yes.
7 Q. Is the same true for the ClaimFacts product?
8 A. Yes.
9 Q. And QicLink product?
10 A. Yes.
11 Q. Have we seen evidence of that today?
12 A. Yes. We've seen the database of the systems and
13 we've seen how the systems operate on the database.
14 Q. The next phrase in the element is a predetermined
15 database. Do you have an understanding of what that
16 means in terms of Claim 16?
17 A. Yes, I do.
18 Q. What's that?
19 A. That means a database containing medical service
20 codes and relationships among those codes. That
21 includes decision rules based on expert clinical medical
22 expertise.
23 Q. And in your opinion, does Facets include such a
24 database?
25 A. Yes, it does.

Page 371

1 Q. Does ClaimFacts?
2 A. It has the same database.
3 Q. Does QicLink?
4 A. Yes.
5 Q. And does that database include a set of relationships
6 among medical service codes?
7 A. Yes.
8 Q. And does it include medical service codes as well?
9 A. Absolutely.
10 Q. In your expert opinion, do those relationships --
11 strike that.
12     In your expert opinion, do the relationships
13 satisfy the remaining element of this claim?
14 A. Yes.
15 Q. The remaining language of this element?
16     So is it okay for me to check off Facets?
17 A. Yes.
18 Q. Facets has every one of these terms in this element
19 here?
20 A. That's right. We saw the database. We saw the
21 relationships among the service codes. We saw how the
22 decision roles were used to render determination of
23 whether they were valid or invalid.
24 Q. I'm going to check this off?
25 A. Yes.

Page 372

1 Q. The same for ClaimFacts?
2 A. Yes.
3 Q. The same for QicLink?
4 A. Yes.
5 Q. With respect to the next almost, a method for
6 processing input claims, do you have an understanding of
7 what that term means?
8 A. Yes.
9 Q. In your opinion, does the Facets product in
10 operation practice a method for processing the input
11 claims containing at least one medical service code?
12 A. That's the whole point of the system.
13 Q. We saw evidence of that today?
14 A. Yes.
15 Q. Do you see evidence of that for ClaimFacts as well?
16 A. Yes.
17 Q. And for QicLink?
18 A. Yes.
19 Q. In your expert opinion, do the three TriZetto
20 products include this next element?
21 A. Yes.
22 Q. Is it okay for me to check those?
23 A. Yes.
24 Q. With respect to the next element, receiving at
25 least one claim?

Page 373

1 A. Yes.
2 Q. In your opinion, does Facets in operation receive
3 at least one claim?
4 A. Absolutely.
5 Q. Have we seen evidence of that here today?
6 A. We saw them processing the claim of the alleged --
7 motorbike accident.
8 Q. Does the same hold true for the ClaimFacts and
9 QicLink products?
10 A. Yes.
11 Q. It's okay for me to check those as well?
12 A. Yes.
13 Q. With respect to the next element, ascertaining
14 whether the at least one claim contains a plurality of
15 medical service codes, in your expert opinion, does
16 Facets ascertain whether the claims it receives contain
17 a plurality of medical codes?
18 A. Yes.
19 Q. Have we seen any evidence of those?
20 A. We've seen the claims enumerated on the screen.
21 Q. When you say enumerated, what do you mean by that?
22 A. That Facets counts up the claims.
23 Q. All right.
24 A. I'm sorry. The codes.
25 Q. In your opinion, that satisfies the ascertaining

Page 382

1 on this claim based on your explanation earlier?
2 A. That's correct.
3 Q. And is one of them 12036?
4 A. Right. 12036 is a particular code for repair of
5 a laceration. I believe 20 to 31 centimeters and I
6 don't have it memorized.
7 Q. Okay. I forgive you that.
8      There's an arrow on what has been labeled
9 Line 2?
10 A. Line 2 refers to a different procedure code for
11 12037, which is the cost of repairing a really big
12 laceration. As I recall, it's more than 31 centimeters.
13 Q. Okay. So if you -- I believe you discussed this
14 description as to the procedure here under the line item
15 table.
16 A. Yes. Okay. Oh, that is very helpful.
17      So Line 2 is, indeed, repair of a laceration
18 of the scalp or trunk or extremity and that's over 37
19 centimeters in length.
20 Q. So this is a situation where you, as you had
21 discussed, multiple lacerations, repair of multiple
22 lacerations are being submitted on a claim?
23 A. That's correct.
24 Q. And this slide is taken from an example you were
25 able to run at Facets?

Page 383

1 A. Exactly.
2      MR. HENDERSHOT: Would you bring up Exhibit
3 1125?
4 BY MR. HENDERSHOT:
5 Q. Dr. Musen, do you recognize what Exhibit 1125 is?
6 A. Yes. It's an example of Facets doing the right
7 thing.
8 Q. It --
9 A. It shows you the two codes, 12036 and 12037, and
10 generates the error message that tells you the two
11 codes appropriately should be bundled into a single
12 code.
13 Q. In this example, one did 12036 represent?
14 A. 12036 was repair of a smaller size laceration and
15 according to CPT coding convention, when you have two
16 lacerations and you repair both of them, then you only
17 get credit for the total length or, in this case, you
18 get credit for a very large laceration greater than 30
19 centimeters.
20 Q. So the doctor in this example treated two
21 lacerations?
22 A. That's correct.
23 Q. But should have billed for one?
24 A. That is correct.
25 Q. Which corresponds to this 12037?

Page 384

1 A. Right. And we have to be a little bit careful
2 about the language. It's not that the doctor should
3 have billed for one laceration. The one laceration on
4 the form doesn't really exist anatomically. It's not
5 a medical reality of the patient. It's simply the way
6 that one bills when there are multiple injuries and one
7 does multiple repairs.
8 Q. All right. So the billing convention as an example
9 is divorced from the medical condition of the patent?
10 A. Right.
11 Q. The patient?
12 A. Exactly.
13      MR. HENDERSHOT: Could you pull up Slide
14 1126?
15 BY MR. HENDERSHOT:
16 Q. Do you recognize this screen?
17 A. Yes.
18 Q. Is this also from your example?
19 A. It's also from my example and also from Facets.
20 Q. Okay. It says clinical editing criteria indicative
21 for 12037?
22 A. Correct.
23 Q. We also see the subset category again?
24 A. Yes.
25 Q. Have we discussed that before today?

Page 385

1 A. Yes.
2 Q. Is there any relevant information with respect to
3 this information underneath that tab?
4 A. Yes. The same Subset 1 relationship exists between
5 the ten medical service codes that we see in that open,
6 open box, dialogue box that we saw in relationship to
7 the code for the surgical excision of the foreign body.
8 In other words, whenever a clinician bills for repair
9 of a laceration that is over 30 centimeters, then any
10 other lacerations that might be on that patient do not
11 justify a separate bill, they should all be bundled
12 into the same charge.
13      It's not that the lacerations don't exist,
14 but the billing should be for one big one.
15 Q. So it's a non-medical criteria?
16 A. It's non-medical.
17 Q. Did any of these play into the process we saw by
18 Facets?
19 A. Absolutely. Any of those other codes on the claim
20 form would be disallowed and the one that we approved
21 would be the one for the laceration greater than 30
22 centimeters.
23 Q. Okay. So -- and because 12036 is included on this
24 list of relationships?
25 A. That's correct.

Page 386

1  Q. We saw the results that we did?
2  A. Right. We saw Facets edit out that 12306 code.
3  Q. All right. Did you also have an opportunity to
4  analyze how ClaimFacts would process a similar claim?
5  A. Yes, I did.
6  Q. Did you have prepared or prepare at your direction
7  screen shots illustrating that example?
8  A. Yes, I did.
9       MR. HENDERSHOT: Would you bring up Exhibit
10  1187?
11      (Pause.)
12  BY MR. HENDERSHOT:
13  Q. Dr. Musen, stepping back -- we don't have it on
14  the screen, but stepping back to the example we just
15  discussed, you said Facets would edit out the code for
16  the smaller laceration; is that correct?
17  A. That's correct.
18  Q. When you say edit out, what do you mean by that?
19  A. It would declare that the codes for this medical
20  services pertaining to those smaller lacerations would
21  be deemed invalid. And it would be -- it would disallow
22  the code and allow the code for the large laceration.
23  Q. You ran a similar example in the ClaimFacts example
24  you said?
25  A. And we see it on the screen now.

Page 387

1  Q. All right. I believe we discussed earlier the
2  ClaimFacts medical processing screen where about
3  halfway down you see the medical service codes that are
4  entered; is that correct?
5  A. That's correct.
6  Q. And here are those -- what codes are those?
7  A. Those are codes from CPT-4 for repair of lacerations
8  of different sizes.
9  Q. And -- and one two zero three --
10  A. I think two of them for lacerations under, I'm
11  guessing, six centimeters. Three five is for a bigger
12  one, I'm guessing on the order of 15 to 20 centimeters
13  and the 12036 code I'm guessing again is on the order
14  of 20 to 30 centimeters.
15  Q. So you're guessing at the lengths corresponding
16  to those codes?
17  A. That's correct.
18  Q. Not what the codes actually represent in terms of
19  lacerations?
20  A. I'm not sure of the question.
21  Q. Do you understand those codes to represent repair
22  of lacerations on the trunk?
23  A. Correct.
24  Q. And you're just taking an educated guess at what
25  the length is?

Page 388

1  A. Without having the CPT manual in front of me, I
2  couldn't tell you what the actual codes are, but they
3  are all medical service codes, repairs of lacerations
4  that are of different lengths.
5  Q. Okay.
6  A. The largest of which is going to be between, I'm
7  guessing, 25 to 30 centimeters.
8       MR. HENDERSHOT: Could we bring up Exhibit
9  1189?
10  BY MR. HENDERSHOT:
11  Q. Dr. Musen, this, again, says ClaimFacts medical
12  processing at the stop. I think we've seen a similar
13  screen with our first example?
14  A. That's correct.
15  Q. Could you explain what's happening here?
16  A. ClaimFacts has done the right thing. It has
17  taken those four separate codes for the four separate
18  lacerations that were repaired and bundled them up
19  into a single code, 12037 that we see down at the bottom
20  of the column labeled PROC. That single code is for
21  repair of a laceration of greater than 30 centimeters
22  in length and, again, to emphasize, this patient may not
23  have a laceration that's greater than 30 centimeters in
24  length. There's no medical relationship between what's
25  billed and what actually exists in the patient. This

Page 389

1  is a way that one has to bill for multiple lacerations
2  to the coding that's appropriate.
3  Q. So the computer system has made some determination
4  as to the Codes 12032, 2035 and 2036?
5  A. Precisely.
6  Q. What determination has it made?
7  A. It has determined that all four of those codes are
8  invalid and disallowed them and it has replaced them
9  with code 12037.
10  Q. Okay. And I believe you said that that
11  determination was based on a non-medical reason?
12  A. Yes. It's the coding convention for how one deals
13  with billing for laceration repair.
14  Q. Did you also get an opportunity to run a similar
15  example or observe the processing of a similar example
16  in the QicLink system?
17  A. Yes, I did.
18  Q. Did you prepare screens from the video that you
19  observed?
20  A. Yes.
21       MR. HENDERSHOT: Bring up Exhibit 1267.
22      (Pause.)
23  BY MR. HENDERSHOT:
24  Q. Do you recognize this screen, Dr. Musen?
25  A. Yes, I do.

Page 394

1  not the TriZetto products infringe that claim?
2  A. Yes. All three products infringe.
3  Q. And what is that opinion based upon?
4  A. It's based on my observation of the videotapes
5  and first-hand experience with the products, looking
6  at the product literature, looking at the depositions.
7        MR. HENDERSHOT: I'd like to put up the
8  charts similar to the one we did for 16 of Claim 2.
9        (Mr. Hendershot placed a chart on the easel.)
10        MR. HENDERSHOT: Turn the projector off.
11  BY MR. HENDERSHOT:
12  Q. While a little askew, this board represents the
13  language of Claim 2?
14  A. Yes.
15  Q. Do you recognize the elements disclosed in Claim 2?
16  A. Yes. This is the language of Claim 2 verbatim.
17  Q. This is the claim you analyzed whether or not
18  TriZetto infringed?
19  A. Yes.
20  Q. Or one of the three claims?
21  A. Yes.
22  Q. And you expressed your opinion -- strike that.
23  You've reached an opinion as to whether or not TriZetto
24  infringes this claim?
25  A. Yes, they do.

Page 395

1  Q. Do you mind if I walk through with you as we did
2  similarly with Claim 16 the elements of the claims?
3  A. Yes.
4  Q. With respect to the Facets product, which I will
5  put in the left-hand column as we did on the last chart,
6  have we seen evidence that Facets operates in a computer
7  system?
8  A. I have seen computers operate Facets, yes.
9  Q. Okay. We've addressed that element in connection
10  with Claim 16 as well?
11  A. Yes.
12  Q. And we discussed earlier there was some relation
13  between some of the elements in Claim 2 and some of the
14  elements in Claim 16?
15  A. That's correct.
16  Q. Could you explain what that is?
17  A. Actually, I think all of the elements up to the
18  determining step are identical in Claim 2 and in Claim
19  16.
20  Q. So the first element in the computer system, the
21  means for operating, the method for processing, receiving
22  at least one claim and ascertaining?
23  A. That language is identical in both claims.
24  Q. So is your opinion equally applicable to these
25  elements in Claim 2 as it was in 16?

Page 396

1  A. Yes, it is, for the same reasons.
2  Q. And what's that opinion?
3  A. That TriZetto infringes in all three products.
4  Q. I'm going to go ahead and put an F, C and a Q and
5  start checking these off, if that's all right.
6        You said for each one of these, it's your
7  opinion that each of the TriZetto products infringes
8  each term of these limitations?
9  A. That is correct.
10  Q. And then down through here (indicating)?
11  A. Yes.
12  Q. For each product?
13  A. For each product.
14  Q. So getting to the next element, the determining
15  step --
16  A. Yes.
17  Q. -- it says, determining whether one of the medical
18  service codes in the at least one claim is mutually
19  exclusive due to non-medical criteria with any other
20  medical service code in the at least one claim.
21  A. Yes.
22  Q. Do you have an understanding of what that requires?
23  A. Yes. It requires that the computer be able to
24  identify a grouping of codes where at least one of
25  those codes is not payable with all the other codes.

Page 397

1  Q. In your opinion, does the Facets product make
2  such a determination?
3        - - -
4  A. We've seen that, yes.
5  Q. Where did we see it?
6  A. We've seen it in the example of the administration
7  anesthesia with the surgical foreign body. We've seen it
8  with the rebundling of the individual laceration repair
9  service code into a single laceration repair service
10  code.
11  Q. So it's your opinion -- strike that.
12        Would you explain how the Facets system
13  processing of the multiple laceration example is mutually
14  exclusive?
15  A. The facets original determining step here, it's
16  okay to check that code, but that --
17        - - -
18
19
20
21
22
23
24
25

Page 406

1  A. This is a screen shot of QicLink in operation.
2  Q. And about halfway down the screen, it says CBX,
3  PROC?
4  A. Right. That's the procedure code.
5  Q. When you say procedure code, does that correspond
6  to the medical service code?
7  A. Yes.
8  Q. What's the code that's being entered?
9  A. 12345.
10 Q. Okay.
11     MR. HENDERSHOT: Could we bring up Slide
12 1266?
13 BY MR. HENDERSHOT:
14 Q. That's a little difficult to see with the contrast
15 here, Dr. Musen.
16 A. That's right.
17 Q. But, again, there's a CBX Procedure Code 12345?
18 A. That's right.
19 Q. What is this screen we're looking at?
20 A. We're looking at a screen shot, again, from QicLink
21 in operation.
22     We've just entered 12345 as a candidate CPT
23 code and we get an error message because the computer
24 has tried to find that code in the database, determined
25 that it's absent and printed out a message to the user

Page 407

1  saying that the code is invalid.
2  Q. Was this part of the same claim that you processed,
3  we saw from the previous slide?
4  A. Yes, it was.
5  Q. And there's a message at the bottom?
6  A. Right. Invalid CPT-4 procedure, not on file.
7  Q. And what does that indicate?
8  A. That means that the database does not contain that
9  medical service code.
10 Q. And does this example bear any relation to the
11 examples we saw for Facets and ClaimFacts?
12 A. That's right. It's the same method being applied.
13 Q. All right. I'd like to show you a chart similar to
14 the two we've done previously for Claim 16 and Claim 2
15 for Claim 1.
16 A. Okay.
17 Q. Have you had an opportunity to read Claim 1 in this
18 case?
19 A. Yes.
20 Q. I believe you've established you've analyzed it?
21 A. Yes.
22 Q. Have you reached any opinion as to whether or not
23 this claim is infringed by Trizetto's products?
24 A. Yes. I believe all three products infringe Claim 1.
25 Q. Okay. If you don't mind, it's a little askew, I'm

Page 408

1  not a master of the easel. I apologize.
2      Could we walk through the elements of Claim 1
3  and sort of explain your infringement opinion?
4  A. Sure.
5  Q. With respect to the first element, in a computer
6  system having, have we seen that element before?
7  A. Yes, we have. All the products run on a computer
8  system.
9  Q. Are there any other elements in this claim that
10 are common to the other claims we've discussed?
11 A. Yes. Indeed, everything that is above the line
12 where it says determining step is repeated in the other
13 claims.
14 Q. And you -- you reached opinions as to those
15 other -- the elements in those other claims?
16 A. Right. Identified that all of those elements
17 infringe in the other claims.
18 Q. And does that opinion apply here in Claim 1?
19 A. Yes, it does.
20 Q. So it's okay for me to check off those boxes down
21 to the orange step?
22 A. Yes.
23 Q. So this box?
24 A. Yes.
25 Q. All of those terms are present in each product?

Page 409

1  A. That is correct. Same database.
2  Q. Same for ClaimFacts?
3  A. Yes.
4  Q. Same for QicLink?
5  A. Yes.
6  Q. Same for this line?
7  A. Yes.
8  Q. Same for receiving at least one claim?
9  A. They all receive at least one claim.
10 Q. And do you want me to stop there; right?
11 A. Yes.
12 Q. Okay. So the next step is determining whether any
13 medical service code contained in the at least one claim
14 is not present in the predetermined database.
15     Do you see that?
16 A. Yes.
17 Q. And do we see any evidence of Trizetto's products
18 doing that today?
19 A. We just saw examples where a bogus CPT-4 code was
20 entered and they printed out the appropriate error
21 message.
22 Q. You say a bogus CPT-4 code. Which code was that?
23 A. 12345.
24 Q. These last three examples we saw?
25 A. Exactly.

EXHIBIT Z

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| GMIS, Inc.. | : | |
| Plaintiff-Counterclaim Defendant. | : | No. 94-CV-576 |
| v. | : | |
| HEALTH PAYMENT REVIEW, INC., | : | |
| Defendant-Counterclaim Plaintiff. | : | |

## DECLARATION OF THOMAS J. BOYLE

I, THOMAS J. Boyle, Systems Architect for defendant, counterclaim plaintiff Health Payment Review, Inc. ("HPR"), present this declaration in support of Health Payment Review, Inc.'s Brief in Opposition to GMIS, Inc.'s Third Motion for Partial Summary Judgment (the "Indefiniteness" Motion).

1.  I am employed as a Systems Architect by HPR.

2.  I have been employed by HPR since February, 1992.

3.  Prior to February, 1992, I was employed for twelve years by Pansophic Systems, Inc. ("Pansophic"), Quincy, MA, a company that develops software products for computer programmers. My last position with Pansophic was as a Systems Architect.

4.  I received a B.A. in Mathematics from St. Mary's College in Winona, Minnesota, in 1968.

21941.1 - December 14, 1994 (8:44am)

MCK 049003

04-CV-1258-SLR (D.Del.)

5.    My responsibilities at HPR consist primarily of the high level design and analysis of computer software.

6.    My responsibilities at HPR with respect to HPR's product CodeReview include assessing the feasibility of enhancements for future releases of the product, program estimating, and evaluating the effect of other HPR product enhancements upon CodeReview, and vice versa.

7.    I am familiar with United States Patent Number 5,253,164 (the "'164 Patent").

8.    I am familiar with the predetermined database recited in the '164 Patent.

9.    The structure of the predetermined database is determined by the rules set forth in the '164 Patent and is exemplified by the examples set forth in the '164 Patent.

10.    The contents of the predetermined database include:

    (a)    a knowledge base of medical procedure codes such as CPT or CRVS codes; and

    (b)    a set of instructions or rules on how combinations of such codes should be treated.

11.    In order to understand the invention disclosed in the '164 Patent and the claims made for that invention, it would be necessary to form a team of those skilled in the art, and this team would consist of a computer systems specialist such as myself and a small number of physicians with a general familiarity with medical procedure codes.

MCK 049004

04-CV-1258-SLR (D.Del.)

12.     With respect to building the contents of the predetermined database, the process would involve reviewing combinations of medical procedure codes and systematizing them as provided by the rules and examples set forth in the patent.

13.     The instructions or rules on how combinations of codes are treated in the predetermined database are based upon both medical and non-medical criteria.

14.     Regarding medical criteria, for example, it might be determined that selected combinations of codes appearing together in claims are medically inappropriate because the procedures involved are in fact subsumed within larger, inclusive procedures and should not be charged for separately.

15.     Regarding non-medical -- or non-clinical -- criteria, for example, it might be determined that selected combinations of codes are inappropriate when the procedures are performed in a hospital as opposed to in a doctor's office.  Additionally, among other things, various cost factors unrelated to clinical criteria may effect selected combinations of codes.

16.     By examining the claims set forth in the '164 Patent in light of the patent's specification, including particularly the examples set forth therein, the team of those skilled in the art would understand how to determine the instructions or rules on how combinations of codes should be treated in the predetermined database.

17.     Specifically, the team would understand the process by which both medical and non-medical criteria are applied to determine those instructions and rules.

18.     The team would definitely understand the meaning of the term "non-medical criteria" as that term is used in claims 2 and 14 and explained above.

21941 1 - December 14, 1994 (8:44am)                      3

19. The team would also definitely understand the meaning of the term "valid" as that term is used in the patent.

20. The term "valid" is used in two contexts in the '164 Patent: first, with respect to whether a selected code appears in the database; second, with respect to whether a selected combination of codes is appropriate.

21. In each context, the term is ascribed its ordinary meaning, and in each context the meaning is clear and unambiguous to those skilled in the art.

22. Each claim of the patent specifically uses the term "valid" with respect to the appropriateness of selected combinations of codes.

23. The term "valid" is not used in the claims with respect to whether a selected code appears in the database. Instead, claim 1 refers to this process without using the term "valid".

24. Thus, the term "valid" appears in the claims section of the patent only with respect to the appropriateness of selected combinations of codes, whereas in the specification the term is used both with respect to the appropriateness of selected combinations of codes and with respect to whether selected codes appear in the database.

25. The use of the terms "valid" and "non-medical criteria" in the '164 Patent is clear and understandable to those skilled in the art and does not in any way limit or prevent those skilled in the art from understanding the invention as claimed in the patent.

26. A team of those skilled in the art, which is described above, would understand both the nature and scope of the '164 Patent's claims as well as the specification, and

21941.1 - December 14, 1994 (8:44am)                    4

MCK 049006

04-CV-1258-SLR (D.Del.)

based upon the claims and specification, this team would be able to build and use the invention without undue experimentation.

I declare under penalty of perjury that the foregoing is true and correct.

THOMAS J. BOYLE

Executed on _Dec. 16, 1994_ .

5

MCK 049007

04-CV-1258-SLR (D.Del.)