IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| MCKESSON INFORMATION SOLUTIONS LLC, | ) ) ) | |
| Plaintiff, | ) ) | CIVIL ACTION NO. 04-1258-SLR |
| v. | ) ) | PUBLIC VERSION |
| THE TRIZETTO GROUP, INC., | ) ) | |
| Defendant. | ) ) | |

**DECLARATION OF MICHAEL A. BARLOW IN SUPPORT OF
PLAINTIFF MCKESSON INFORMATION SOLUTIONS LLC'S
OPPOSITION TO TRIZETTO'S MOTION FOR SUMMARY JUDGMENT
OF INVALIDITY FOR INDEFINITENESS AND FAILURE TO
ADEQUATELY DESCRIBE THE CLAIMED INVENTION**

I, Michael A. Barlow, pursuant to 28 U.S.C. § 1746, declare as

follows:

1.    I am an attorney of the Bar of the State of Delaware and of the

firm of Skadden, Arps, Slate, Meagher & Flom LLP, attorneys for plaintiff

McKesson Information Solutions LLC in the above-captioned action.  I submit this

declaration in support of the Plaintiff's Opposition to Defendant's Motion for

Summary Judgment of Invalidity for Indefiniteness and Failure to Adequately

Describe the Claimed Invention, and to transmit to the Court true and correct copies

of the following documents attached as exhibits hereto:

| Description | Exhibit No. |
|---|---|
| Excerpts from the Deposition of Mark A. Musen, M.D., Ph.D. taken on November 22, 2005 | 1 |
| Excerpts from the Deposition of Phillip M. Hawley, Jr., M.D. taken on November 30, 2005 | 2 |
| *Warrior Lacrosse, Inc. v. STX, LLC*, No. 04-70363, 2005 WL 1378752 (E.D. Mich. June 2, 2005) | 3 |
| *Hesston Corp. v. Sloop*, 1988 U.S.Dist. LEXIS 1573 (D. Kan. Feb. 4, 1988) | 4 |
| *Stambler v. RSA Security, Inc.*, 2003 WL 252149 (D. Del. Jan. 29, 2003) | 5 |
| *Arthocare Corp. v. Smith & Nephew, Inc.*, No. 01-504-SLR, 2003 WL 1856436, at *5 (D. Del. Apr. 9, 2003) | 6 |

I declare under penalty of perjury that the foregoing is true and correct.

Executed:  June 15, 2006

Michael A. Barlow (I.D. # 3928)

2

# EXHIBIT 1

1          IN THE UNITED STATES DISTRICT COURT

2             FOR THE DISTRICT OF DELAWARE

3

4    MCKESSON INFORMATION            )

     SOLUTIONS, LLC,                 )

5                                    )

                   PLAINTIFF,        )

6    vs.                             )  Case No. 04-1258-SLR

                                     )

7    THE TRIZETTO GROUP, INC.,       )

                                     )

8              DEFENDANT.            )

     _____)

9

10

11

12

13

14      VIDEO DEPOSITION OF MARK MUSEN, M.D., PH.D.

15     Held at Skadden, Arps, Slate, Meagher & Flom

16        525 University Avenue, 11th Floor

17            Palo Alto, California

18     Tuesday, November 22, 2005, 9:11 a.m.

19

20

21

22

23

24   REPORTED BY:  CHRIS DE GEORGE, CSR. NO. 7069

25                        1

MARK MUSEN, M.D., PH.D.

BARKLEY
Court Reporters

| 11:07 | 1 | A. Okay. |
| 11:07 | 2 | Q. And I think you were referring to Rules R1 |
| 11:07 | 3 | through R4. |
| 11:07 | 4 | A. Yep. Exactly. |
| 11:07 | 5 | Q. And I guess what I would draw -- I would draw |
| 11:07 | 6 | your attention -- I don't want to presuppose, but I |
| 11:07 | 7 | think you were describing something that looked like R2. |
| 11:07 | 8 | A. Yeah. |
| 11:07 | 9 | Q. But -- but I don't want -- you know. |
| 11:07 | 10 | A. Let me just have a chance to look at it. |
| 11:07 | 11 | Q. Please. |
| 11:07 | 12 | A. Precisely. |
| 11:07 | 13 | Q. All right. So if A code CT code, which we can |
| 11:07 | 14 | say -- |
| 11:07 | 15 | THE REPORTER: Say it again, please. |
| 11:07 | 16 | THE WITNESS: So in this -- in this situation, |
| 11:08 | 17 | A code would be CT with contrast, B code would be C code |
| 11:08 | 18 | without contrast, and the computer would substitute C |
| 11:08 | 19 | code, which is CT scan with and without contrast. |
| 11:08 | 20 | BY MR. SITZMAN: |
| 11:08 | 21 | Q. Okay. All right. Now let's jump to the end |
| 11:08 | 22 | of the patent where the claims are. Where in the |
| 11:08 | 23 | claims, starting at Column 117, where would that rule -- |
| 11:08 | 24 | which claim or where in the claims would that rule be |
| 11:08 | 25 | carried out, or where is that rule embodied? |

84

MARK MUSEN, M.D., PH.D.

BARKLEY
Court Reporters

| 11:08 | 1 | MR. HENDERSHOT: And do you mean is the entire |
|---|---|---|
| 11:08 | 2 | rule, every element of rule carried out, or which claims |
| 11:08 | 3 | are necessary to implement that rule? |
| 11:08 | 4 | MR. SITZMAN: I -- I don't know what my |
| 11:08 | 5 | choices were. |
| 11:08 | 6 | MR. HENDERSHOT: Are -- are you asking which |
| 11:08 | 7 | claims describe every -- every step in that rule, or |
| 11:08 | 8 | which claims are -- are necessarily practiced to -- to |
| 11:08 | 9 | implement that rule? |
| 11:08 | 10 | MR. SITZMAN: Which claims express that rule. |
| 11:09 | 11 | THE WITNESS: The claims are not orthogonal to |
| 11:09 | 12 | the embodiment but they form the embodiment. |
| 11:09 | 13 | Claim 2, for example, is essential for that |
| 11:09 | 14 | particular rule that we just discussed. It deals with |
| 11:09 | 15 | rejecting medical service codes, which are mutually |
| 11:09 | 16 | exclusive due to non-medical criteria. And I don't know |
| 11:09 | 17 | if you agree with me, but I would say that in this |
| 11:09 | 18 | situation, billing for the two types of CT scans is not |
| 11:09 | 19 | related to patient care. It's an artifact of the |
| 11:09 | 20 | billing process. Therefore, I view that as a |
| 11:09 | 21 | non-medical criterion. And I have the reasoning which |
| 11:09 | 22 | allows me in the R2 rule to identify that those two |
| 11:09 | 23 | codes are mutually exclusive, and I can use the -- the |
| 11:09 | 24 | computation supported by the claim -- by Claim Number 2 |
| 11:09 | 25 | ultimately to bill Rule 2. But I -- but Claim 2 doesn't |

85

BARKLEY
Court Reporters

| | | |
|---|---|---|
| 11:10 | 1 | necessarily specify what to do about what -- what to do |
| 11:10 | 2 | about the infringing situation when it's detected. |
| 11:10 | 3 | BY MR. SITZMAN: |
| 11:10 | 4 | Q.  Okay.  Let me break down a couple things that |
| 11:10 | 5 | you said.  First of all, the -- the non-medical |
| 11:10 | 6 | criteria, what is the actual criterion that you were |
| 11:10 | 7 | just applying that makes, as we've said, CT scan with |
| 11:10 | 8 | contrast, CT scan without contrast, what makes those |
| 11:10 | 9 | either mutually exclusive, or what is the non-medical |
| 11:10 | 10 | criterion that's applied? |
| 11:10 | 11 | A.  To state it informally, it would be that the |
| 11:10 | 12 | patient is undergoing a single procedure in one sitting |
| 11:10 | 13 | that happens to have two components where the, in this |
| 11:10 | 14 | case, the payer has determined that those components |
| 11:10 | 15 | need to be considered as a unit and, therefore, not paid |
| 11:10 | 16 | separately. |
| 11:10 | 17 | It's non-medical because it's -- it's a |
| 11:11 | 18 | function of how the payer has decided to manage |
| 11:11 | 19 | reimbursement.  It has nothing to do with the state of |
| 11:11 | 20 | the patient.  The patient is not even informed, |
| 11:11 | 21 | necessarily, of what -- of how the procedure is billed. |
| 11:11 | 22 | Q.  Okay.  So let's walk through the steps.  This |
| 11:11 | 23 | is a -- this is one of the method claims -- of how this |
| 11:11 | 24 | would work, the steps of -- first step, receiving at |
| 11:11 | 25 | least one claim.  So the claim that we're talking about |

86

| 11:11 | 1 | in this hypothetical is a claim that has two codes on |
|---|---|---|

11:11  1  in this hypothetical is a claim that has two codes on

11:11  2  it, one for CT with contrast and one without.

11:11  3      A.   Yes.

11:11  4      Q.   Okay.  Then going to the next step,

11:11  5  "ascertaining whether the at least one claim contains a

11:11  6  plurality of medical services codes," well, it contains

11:11  7  two, right?

11:11  8      A.   Right.

11:11  9      Q.   So we've got to say that's a plurality.

11:11  10     A.   Correct.

11:11  11     Q.   Anything more than one, right?

11:11  12     A.   That's my understanding.

11:11  13     Q.   Okay.

11:11  14         MR. HENDERSHOT:  We've skipped over the

11:11  15  preamble.  Are we assuming that all of that's present in

11:11  16  the process as well, or are we just going through the

11:11  17  steps?

11:11  18         MR. SITZMAN:  I think we have to assume that

11:12  19  it is a computer system that has means for operating on

11:12  20  a predetermined basis.

11:12  21         MR. HENDERSHOT:  Okay.

11:12  22  BY MR. SITZMAN:

11:12  23     Q.   Let's assume that that's the system.

11:12  24     A.   Okay.

11:12  25     Q.   All right.  Next step: "determining whether

87

MARK MUSEN, M.D., PH.D.

BARKLEY
Court Reporters

| 11:12 | 1 | one of the medical service codes in the at least one |
| 11:12 | 2 | claim is mutually exclusive due to non-medical criteria |
| 11:12 | 3 | with any other medical service code in the at least one |
| 11:12 | 4 | claim." All right. So explain how that happens with |
| 11:12 | 5 | the example that we've got. We've got the two CT codes. |
| 11:12 | 6 | A.    Right. And what did we say that was? That |
| 11:12 | 7 | was Rule R2 -- |
| 11:12 | 8 | Q.    Right. |
| 11:12 | 9 | A.    -- in Appendix B? That defines relationships |
| 11:12 | 10 | in the database among CT scan with contrast, CT scan |
| 11:12 | 11 | without contrast. It indicates that those two claims or |
| 11:12 | 12 | those two service -- corresponding service codes are |
| 11:12 | 13 | mutually exclusive. |
| 11:12 | 14 | Q.    Okay. They're mutually exclusive due to the |
| 11:12 | 15 | non-medical criteria, the non-medical criteria being -- |
| 11:13 | 16 | A.    That the payer has decided that those two |
| 11:13 | 17 | service codes need to be reimbursed as a unit. |
| 11:13 | 18 | Q.    And that's non-medical because the decision |
| 11:13 | 19 | was made by the payer? |
| 11:13 | 20 | A.    It -- it does not deal with the procedure |
| 11:13 | 21 | performed by the practitioner but, rather, is a -- is an |
| 11:13 | 22 | artifact of the reimbursement process, yes. |
| 11:13 | 23 | Q.    Okay. So -- so it -- they're mutually |
| 11:13 | 24 | exclusive. |
| 11:13 | 25 | Then we go to the next step which is: |

88

MARK MUSEN, M.D., PH.D.

BARKLEY
Court Reporters

| | | |
|---|---|---|
| 11:32 | 1 | set forth or carried out in Claim 2 or any of the other |
| 11:32 | 2 | claims set forth here? |
| 11:32 | 3 | MR. HENDERSHOT:  In all possible scenarios or |
| 11:32 | 4 | just generally speaking? |
| 11:32 | 5 | MR. SITZMAN:  Well, I was using all those |
| 11:32 | 6 | various verbs -- |
| 11:32 | 7 | MR. HENDERSHOT:  Okay. |
| 11:32 | 8 | MR. SITZMAN:  -- to cover all of your |
| 11:32 | 9 | concerns. |
| 11:32 | 10 | MR. HENDERSHOT:  I guess my question is does |
| 11:32 | 11 | every possible embodiment of EP have to fall within |
| 11:32 | 12 | Claim 2?  Is that your question? |
| 11:32 | 13 | MR. SITZMAN:  Oh, no, no, no. |
| 11:32 | 14 | MR. HENDERSHOT:  Okay. |
| 11:32 | 15 | MR. SITZMAN:  No. |
| 11:32 | 16 | Q.   Can you find -- can you find the EP rule in |
| 11:32 | 17 | any of the claims that we've got here, in any of the 16 |
| 11:32 | 18 | claims? |
| 11:32 | 19 | A.   Yes. |
| 11:32 | 20 | Q.   Okay. |
| 11:32 | 21 | A.   And I think in Claim 2, in a particular |
| 11:32 | 22 | situation where a particular service code was mutually |
| 11:33 | 23 | incompatible with another service code based on the |
| 11:33 | 24 | place of service, that represents that kind of a |
| 11:33 | 25 | relationship. |

97

BARKLEY
Court Reporters

| | | |
|---|---|---|
| 11:33 | 1 | Q.   Okay. |
| 11:33 | 2 | A.   That presumably would be non-medical. |
| 11:33 | 3 | Q.   Okay.  Place of service would be non-medical? |
| 11:33 | 4 | A.   Well, again, it -- it's a function of the |
| 11:33 | 5 | artifact of billing rather than a procedure as applied |
| 11:33 | 6 | directly to the patient.  The -- the constraint is one |
| 11:33 | 7 | that deals with the -- with the setting of care and what |
| 11:33 | 8 | is reimbursable in one setting versus another, as -- as |
| 11:33 | 9 | I read the rule at least -- |
| 11:33 | 10 | Q.   Okay. |
| 11:33 | 11 | A.   -- rather than what is a -- an intrinsic |
| 11:33 | 12 | constituent of the procedure that's performed on the |
| 11:33 | 13 | patient, which would be medical. |
| 11:33 | 14 | Q.   Okay.  But at -- looking at Rule -- sorry -- |
| 11:33 | 15 | Claim 2, it -- it does talk about that mutual |
| 11:33 | 16 | exclusivity, but as I look at the rule set forth in EP, |
| 11:34 | 17 | it's the -- the issue is not one of mutual exclusivity |
| 11:34 | 18 | amongst the codes but whether or not the POS, the place |
| 11:34 | 19 | of service, occurs at some place or -- or another as to |
| 11:34 | 20 | the exclusion. |
| 11:34 | 21 | A.   Okay.  The point is well taken, and the place |
| 11:34 | 22 | of service is not a service code. |
| 11:34 | 23 | Q.   And I did not see place of service in any of |
| 11:34 | 24 | the other claims, but I didn't know if you had in mind |
| 11:34 | 25 | one of the claims that -- that might embrace that. |

98

MARK MUSEN, M.D., PH.D.

BARKLEY<br>Court Reporters

| 05:14 | 1 | claim of the '164 patent includes the term "comprising"? |
| 05:14 | 2 | A.   That's correct. |
| 05:14 | 3 | Q.   If you could flip back to Appendix B for me, |
| 05:14 | 4 | please, of the '164 patent which is marked as MM-3, |
| 05:14 | 5 | Mr. Sitzman had asked you a number of questions about |
| 05:14 | 6 | which -- which rules were -- from Appendix B were |
| 05:14 | 7 | described or recited or described to their full extent, |
| 05:14 | 8 | I believe, in the claims of the '164 patent.  Do you |
| 05:14 | 9 | recall that? |
| 05:14 | 10 | A.   Yes, I do. |
| 05:14 | 11 | Q.   With respect to the R rules in Columns 47 and |
| 05:14 | 12 | 48 of Appendix B of MM-3, is there any way to implement |
| 05:14 | 13 | any of the R rules without infringing one of the claims |
| 05:14 | 14 | of the '164 patent? |
| 05:14 | 15 | A.   No.  But by definition, what's in the |
| 05:15 | 16 | left-hand side of those rules requires a processing |
| 05:15 | 17 | defined by the functionality of those claims. |
| 05:15 | 18 | Q.   So while the claims of the '164 patent may not |
| 05:15 | 19 | describe all of the text corresponding to the R rules in |
| 05:15 | 20 | the '164 patent, they, nonetheless, cover an |
| 05:15 | 21 | implementation of the R rules. |
| 05:15 | 22 | A.   Yes. |
| 05:15 | 23 | Q.   If you could turn to Appendix A, I believe |
| 05:15 | 24 | that Example 17 Mr. Sitzman had spoken about, or you and |
| 05:15 | 25 | Mr. Sitzman had spoken about the EP rule. |

279

MARK MUSEN, M.D., PH.D.

BARKLEY
Court Reporters

| 05:15 | 1 | A.    Yes. |
| 05:15 | 2 | Q.    Actually, strike that.  Could you -- strike |
| 05:15 | 3 | that. |
| 05:15 | 4 | If you flip to Appendix B again, because I |
| 05:15 | 5 | believe his question was actually directed to the |
| 05:15 | 6 | discussion of the EP rule in Appendix B, could you |
| 05:15 | 7 | describe for me what you understand the EP rule listed |
| 05:16 | 8 | on -- in Columns 49 and 50 to describe? |
| 05:16 | 9 | A.    It states that if there's a code that appears |
| 05:16 | 10 | with another code in some range and there is a |
| 05:16 | 11 | particular place of service defined by yet another code, |
| 05:16 | 12 | then the initial code is excluded and the subsequent |
| 05:16 | 13 | codes are kept.  It's an example of a non-medical |
| 05:16 | 14 | constraint. |
| 05:16 | 15 | Q.    And I believe earlier you had testified, and |
| 05:16 | 16 | correct me if I'm wrong, that the place of service was |
| 05:16 | 17 | not something represented by a medical service code on a |
| 05:16 | 18 | claim. |
| 05:16 | 19 | A.    It's not represented as a medical service |
| 05:16 | 20 | code, but it is a non-medical condition -- |
| 05:16 | 21 | Q.    So is it your under- -- |
| 05:16 | 22 | A.    -- with respect to the claims of the patent. |
| 05:16 | 23 | Q.    Okay. |
| 05:16 | 24 | MR. SITZMAN:  I'm sorry.  Can I hear that last |
| 05:16 | 25 | response there? |

280

BARKLEY
Court Reporters

| 05:16 | 1 | (Record read.) |
| 05:16 | 2 | BY MR. HENDERSHOT: |
| 05:17 | 3 | Q. So it's your opinion that -- strike that. |
| 05:17 | 4 | So you would -- just so I understand, the rule |
| 05:17 | 5 | described in EP of Appendix B of the '164 patent defines |
| 05:17 | 6 | a situation where two codes would be mutually exclusive |
| 05:17 | 7 | to one another in a claim based on a non-medical |
| 05:17 | 8 | criteria where the non-medical criteria is the place of |
| 05:17 | 9 | service? |
| 05:17 | 10 | A. Precisely. |
| 05:17 | 11 | Q. Okay. We have talked a few times today, |
| 05:17 | 12 | probably more than a few, if you would recall, about the |
| 05:17 | 13 | term "algorithm." Could you explain to me what one of |
| 05:17 | 14 | skill in the art would understand an algorithm to be? |
| 05:17 | 15 | A. An algorithm is an abstraction that provides a |
| 05:17 | 16 | procedure for performing some computation which may then |
| 05:18 | 17 | be implemented in software. |
| 05:18 | 18 | Q. So software is an implementation of an |
| 05:18 | 19 | algorithm which is a -- would be understood to be a |
| 05:18 | 20 | broader logical abstraction? |
| 05:18 | 21 | A. That's right, but one can choose -- |
| 05:18 | 22 | THE REPORTER: I need that again. |
| 05:18 | 23 | THE WITNESS: One can choose a variety of |
| 05:18 | 24 | programming languages to implement the algorithm and the |
| 05:18 | 25 | algorithm is still preserved. |

281

MARK MUSEN, M.D., PH.D.

BARKLEY
Court Reporters

1  State of CALIFORNIA        )

2  County of Santa Clara      )

3

4

5

6

7       I, the undersigned, declare under penalty of

8  that I have read the foregoing transcript, and I have

9  made any corrections, additions or deletions that I was

10  desirous of making; that the foregoing is a true and

11  correct transcript of my testimony therein.

12       EXECUTED this ___17___ day of __December__,

13  2005, at __Stanford__, __CA__.

                (City)              (State)

14

15

16

17

18  _____ Musen, M. PhD

         MARK MUSEN, M.D., PH.D.

19

20

21

22

23

24

25

                        326

                MARK MUSEN, M.D., PH.D.

BARKLEY
Court Reporters

# EXHIBIT 2

1              IN THE UNITED STATES DISTRICT COURT

2               FOR THE DISTRICT OF DELAWARE

3

4    MCKESSON INFORMATION SOLUTIONS, LLC,

5              Plaintiff,

6         vs.                        No. 04-1258-SLR

7    THE TRIZETTO GROUP, INC.,

8              Defendant.

9

10    _____

11

12

13

14

15       Deposition of PHILIP M. HAWLEY, JR., M.D., taken on

16   behalf of Plaintiff, at 333 South Grand Avenue,

17   Los Angeles, California, beginning at 9:13 a.m. and

18   ending at 4:59 p.m. on Wednesday, November 30, 2005,

19   before RENEE A. PACHECO, RPR, Certified Shorthand

20   Reporter No. 11564.

21

22

23

24

25

1    terms of those relationships you would apply in

2    processing them; is that correct?

3        A   When you're talking about the -- the question of

4    incompatibility; in other words, A doesn't fit with B,

04:16    5    you know, it's a medically inconsistent fact.

6            I mean, I -- I think you may be reading more

7    into my statement --

8        Q   Okay.

9        A   -- than -- than -- than I intend.  I mean I --

04:16    10    I -- I -- it's -- it's -- it's certainly is not -- this

11    is not an issue that comes anywhere close to affecting my

12    opinion on this -- regarding this patent.

13        Q   Okay.  So -- so maybe we'll short-circuit all of

14    this.  There -- there was no term anywhere in any of the

04:16    15    '164 claims you looked at that prevented you from

16    ascertaining sort of the scope of that claim in a

17    sufficient manner to enable you to prepare your

18    invalidity opinion?

19        A   Correct.

04:16    20        Q   So you were able to determine for yourself the

21    meets and bounds of each claim so you could decide

22    whether what falls within those meets and bounds would be

23    obvious?

24        A   Correct.

04:17    25        Q   Okay.  And that's true for every claim in the

224

```
 1    '164 patent that you reviewed?

 2         A    Yes.   Yes.

 3              MR. HENDERSHOT:  Do you mind if we go off the

 4    record for about five minutes?  I just want to take a

 5    look through my notes.

 6              MR. ROOSEVELT:  Sure.

 7              MR. HENDERSHOT:  Is that okay with you?

 8              THE WITNESS:  That's fine.

 9              THE VIDEOGRAPHER:  Going off -- excuse me.

10    Going off the record.  The time is 4:17 p.m.

11              (Recess.)

12              THE VIDEOGRAPHER:  And we are back on the

13    record.  The time is 4:25 p.m.

14    BY MR. HENDERSHOT:

15         Q    Dr. Hawley, in formulating your opinions that

16    are set forth in your report, did you review McKesson's

17    proposed construction of the claims in this case?

18         A    I -- I don't -- no, I don't believe I did.

19         Q    Did you -- do you know if you reviewed

20    TriZetto's proposed construction of the claims in this

21    case?

22         A    No.  I -- I know I didn't review either, in

23    fact, as I think about it, no.

24         Q    Okay.  And just so I'm clear, your -- the

25    practices within the industry, prior to 1987, that you
```

Time stamps in left margin:
04:17 — line 5
04:17 — line 10
04:26 — line 15
04:26 — line 20
04:26 — line 25

225

Hawley, Philip

1
2
3
4
5
6
7
8     I, PHILIP M. HAWLEY, JR., M.D., do hereby
9     declare under penalty of perjury that I have read the
10    foregoing transcript; that I have made any corrections as
11    appear noted, in ink, initialed by me, or attached
12    hereto; that my testimony as contained herein, as
13    corrected, is true and correct.
14    EXECUTED this 7th day of January,
15    2006, at Los Angeles, California,
              (City)                (State)
16
17
18
19

PHILIP M. HAWLEY, JR., M.D.

20
21
22
23
24
25

238

# EXHIBIT 3

Westlaw.

Not Reported in F.Supp.2d                                                                    Page 1
Not Reported in F.Supp.2d, 2005 WL 1378752 (E.D.Mich.)
(Cite as: 2005 WL 1378752 (E.D.Mich.))

**H**

Motions, Pleadings and Filings

Only the Westlaw citation is currently available.

United States District Court,
E.D. Michigan, Southern Division.
WARRIOR LACROSSE, INC., Plaintiff,
v.
STX, LLC, Defendant.
No. 04-70363.

June 2, 2005.

John A. Artz, John S. Artz, Robert P. Renke, Artz &
Artz, Southfield, MI, for Plaintiff.

Lawrence J. Gotts, Pillsbury, Winthrop, McLean, VA,
Lawrence R. Jordan, Jaffe, Raitt, Ann Arbor, MI,
Scott R. Torpey, George A. Sumnik, Jaffe, Raitt,
Southfield, MI, for Defendant.

*ORDER*

COOK, J.

*1 The attorneys who represent Defendant STX, LLC
are:

Lawrence Gotts
Aslan Baghdadi
Brett C. Martin
PILLSBURY WINTHROP SHAW PITTMAN LLP
1650 Tysons Boulevard
McLean, VA 22102-4859
The attorneys who represented the Plaintiff Warrior
Lacrosse, Inc., are:

John A. Artz
John S. Artz
Robert P. Renke
Artz & Artz, P.C.
28333 Telegraph Road, Suite 250
Southfield, MI 48034
In this law suit, the Plaintiff, Warrior Lacrosse, Inc.
("Warrior"), has charged the Defendant, STX, LLC
("STX") with infringing three of its patents; namely,
U.S. Patent Nos. RE 38, 216 ("the '216 patent"),
6,561,932 ("the '932 patent"), and 6,676,547 ("the '547
patent"). Each of these patents relates generally to

technological advances in lacrosse heads.

On April 18, 2005, this Court conducted a hearing
pursuant to *Markman v. Westview Instruments, Inc.,*
517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996).
Now before the Court is the task of construing certain
claim terms over which the parties remain in dispute.

I.

In 1995, the Federal Circuit Court of Appeals
declared that a trial court should undertake a two step
process when attempting to determine if a patent
infringement has occurred; namely, (1) construe all of
the disputed claims, and (2) then determine if the
accused product infringes upon any of the claims as
properly construed. *Markman v. Westview
Instruments, Inc.,* 52 F.3d 967, 976 (Fed.Cir.1995),
*aff'd,* 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577
(1996).

Claim construction is a matter of law which is the
responsibility of the trial court. *Cybor v. FAS Techs.,
Inc.,* 138 F.3d 1448, 1456 (Fed.Cir.1998). It is "the
process of giving proper meaning to the claim
language." *Abtox, Inc. v. Exitron Corp.,* 122 F.3d 1019,
1023 (Fed.Cir.1997). As such, this process is designed
to "define the scope of the protected invention." *Id.*

When construing claims, a court should initially
consider the language of the patent claim. *Teleflex, Inc.
v. Ficosa North America Corp.,* 299 F.3d 1313, 1324
(Fed.Cir.2002). In the absence of an express intent to
impart a novel meaning to a term within the claim,
there is a "heavy presumption" that a term carries its
ordinary and customary meaning to a person of
ordinary skill in the relevant art. *Teleflex,* 299 F.3d at
1325. Thus, when "construing claims, the analytical
focus must begin and remain centered on the language
of the claims themselves, for it is that language that the
patentee chose to use to 'particularly point out and
distinctly claim the subject matter which the patentee
regards as his own invention." ' *Interactive Gift
Express, Inc. v. Compuserve Inc.,* 256 F.3d 1323, 1331
(Fed.Cir.2001) (quoting 35 U.S.C. 7   112). Often,
dictionaries are useful resources to assist the court in
determining the ordinary and customary meanings of
claim terms, as well as the meanings that would have
been ascribed to technical terms by those of skill in the
relevant art. *Texas Digital Sys., Inc., v. Telegentx, Inc.,*
308 F.3d 1193, 1202 (Fed.Cir.2002).

Not Reported in F.Supp.2d                                                                                    Page 2
Not Reported in F.Supp.2d, 2005 WL 1378752 (E.D.Mich.)
(Cite as: 2005 WL 1378752 (E.D.Mich.))

**\*2** The trial courts are also encouraged to examine the intrinsic record in every case in order to "determine whether the presumption of ordinary and customary meaning is rebutted." *Texas Digital,* 308 F.3d at 1209. Although words in a claim are generally given their ordinary and customary meaning, "a patentee may choose to be his own lexicographer" and assign special definitions to the words in the claim, as long as those definitions are clearly stated in the patent specification or file history. *Hoecsht Celanese Corp. v. BP Chems, Ltd.,* 78 F.3d 1575, 1578 (Fed.Cir.1996). Thus, intrinsic evidence can provide much needed "context and clarification about the meaning of claim terms." *Telefex,* 299 F.3d at 1325.

Of all the intrinsic evidence, the Federal Circuit has indicated that the specification is the "single best guide to the meaning of a disputed term." *Vitronics Corp. v. Conceptronic, Inc.,* 90 F.3d 1576, 1582 (Fed.Cir.1996). In fact, the specification is usually "dispositive." *Id.* The trial court may consult the specification in order to (1) resolve an ambiguity if the ordinary and customary meanings of the words within the claims are not sufficiently clear to allow its scope to be determined from the words alone, or (2) reveal limitations to the scope of the claim. *Teleflex,* 299 F.3d at 1325. Thus, claims "must be read in view of the specification, of which they are a part." *Markman,* 52 F.3d at 979.

However, it would be improper to read a limitation from the specification into the claims. *Liebel-Flarsheim Co. v. Medrad, Inc. ,* 358 F.3d 898, 904 (Fed.Cir.2004). For example, if a specification contains only one embodiment, the scope of the claim must not be limited to the embodiment in the specification. *Teleflex, Inc., 299 F.3d at 1326.*

In evaluating the intrinsic record, the trial court is encouraged to consider the prosecution history of the patent. *Vitronics,* 90 F.3d at 1582. During the course of these proceedings, the applicant may have made express representations regarding the scope of the invention. Thus, the prosecution history is "often of critical importance to determining the meaning of the claims." *Id.* at 1582 (citing *Markman,* 52 F.3d at 980). This history may demonstrate that the claims do not cover some matters which would otherwise be encompassed by the plain meaning of the words used or may limit an interpretation of the terms within the claim. *Southwall Tech., Inc. v. Cardinal IG Co.,* 54 F.3d 1570, 1576 (Fed.Cir.1995).

Finally, although trial courts may examine extrinsic evidence, including inventor and expert testimony,

such an approach should be utilized only in rare cases. *Frank's Casing Crew & Rental Tools, Inc. v. PMR Techs., Ltd.,* 292 F.3d 1363, 1374 (Fed.Cir.2002). The Federal Circuit has held that a trial court may consult extrinsic evidence only for the limited purpose of (1) allowing it to acquire an understanding of the claim terminology or (2) to resolve an ambiguity in a disputed claim term on the basis of the intrinsic evidence. *Markman,* 52 F.3d at 986. Significantly, extrinsic evidence "cannot be used to alter a claim construction dictated by a proper analysis of the intrinsic evidence." *On-Line Tech. v. Bodenseewerk Perkin-Elmer GmbH,* 386 F.3d 1133, 1139 (Fed.Cir.2004).

**\*3** In fashioning a claim construction, a court should define terms that may be readily understood by lay persons. One district judge recently noted that "claim construction is essentially the crafting of a jury instruction, so the term definition must be comprehensible by a lay juror as well as one skilled in the art." *Leighton Tech. LLC v. Oberthur Card Systems, S.A.,* 2005 WL 589333 (S.D.N.Y, Mar.9, 2005) (unpublished).

## II.

The parties have identified twenty six claims from the '216 Patent that require construction by the Court; namely, 58, 59, 61, 62, 69-71, 77, 81-86, 88, 89, 91-96, and 98-101. Many of the disputed terms appear in several of the claims. At the *Markman* hearing on April 18, 2005, the parties agreed on the construction of three terms that had been previously disputed: (1) "offset from said plane," (2) "handle/head axis," and (3) "below said plane." [FN1] Hence, the four remaining terms that require construction are (1) "adjacent," (2) "half of the lengths of said sidewalls," (3) "socket," and (4) "defining a plane" and "which defines a plane."

> FN1. The parties agree that the term "offset from said plane" should be construed as "lowered with respect to the plane by an appreciable amount." Addressing the term, "handle/head axis," the parties have agreed to construe this term as "a straight line coaxial with the opening in the projection and the portion of the handle inside the opening." For the term, "below said plane," the parties have assigned the same construction to this term as "offset from said plane;" namely, "lowered with respect to the plane by an appreciable amount."

A. "Adjacent"

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 1378752 (E.D.Mich.)
(Cite as: 2005 WL 1378752 (E.D.Mich.))

The word, "adjacent," appears in Claims 58, 70, 77, 81, 83-85, 88, 91, 94, 96, 98, and 100 of the '216 Patent. Claim 85 is a good example of how this word is used: "A head for a lacrosse stick comprising: ....said front side of said sidewalls, beginning adjacent said base, curving downwardly to a point below said plane as to impart a curved geometry when viewed in side elevation."

Warrior submits that "adjacent" should be construed to mean "close to or near," whereas STX asserts that this word means "next to." The ordinary meaning of "adjacent" supports both parties' proposed constructions. Warrior cites a dictionary definition of "adjacent" as "to lie near ... near or close to, adjoining ... Next to; adjoining." Webster's New World College Dictionary 16 (3d ed. 1997) ("Webster's"). STX, by contrast, cites Webster's as well as the American Heritage Dictionary, which defines "adjacent" as "close to; lying near ... Next to; adjoining." American Heritage Dictionary 79 (2d ed. 1991) ("American Heritage").

During their prosecution, the patent applicants ("Applicants") added the word, "adjacent," to the claims in order to distinguish this patent over prior art; namely, the MacNeil patent. Initially, the Patent Examiner had rejected the Applicants' Claims 58, 59, 75, and 76, as anticipated by the MacNeil patent. The Examiner wrote that the MacNeil patent presented "a front side of said sidewalls curving generally downwardly to a point below said plane beginning adjacent said base so as to impart a curved geometry when viewed in side elevation." Pl.'s Ex. 6, p. W08328. Following the Examiner's initial rejection, the Applicants amended their claims, noting that "[a]ny curving in MacNeil does not begin adjacent the base, but instead begins remote from the base." *Id.*, p. W08288. The Examiner ultimately accepted this argument. *Id.*, p. W08367.

*4 Warrior argues that this prosecution history illustrates that by adding "adjacent," the Applicants were attempting to distinguish their '216 patent from the MacNeil patent which requires a lowering of the sidewalls near the scoop, but not near the base. According to Warrior, to limit this word to a definition other than "close to or near" would contradict the plain meaning of the term, as well as the specification and prosecution history.

STX counters by asserting that the prosecution history supports its proposed construction. In its brief, STX reproduced a figure of the MacNeil lacrosse head

and argued that a measurement of the length of the head clearly demonstrates that the lowering of the sidewalls actually occurs closer to the base than to the scoop of the lacrosse head. STX submits that, inasmuch as the lowering in the MacNeil head is actually "near[er]" or "close[r] to" the base (instead of the scoop), the Applicants must have intended "adjacent" to mean "next to." Otherwise, STX argues that the Applicants would not have been able to distinguish the '216 patent from the prior art.

In the opinion of this Court, neither the prosecution history nor the specification resolves the claim construction for "adjacent." Warrior's contention that the Applicants had used "adjacent" to mean "close to or near" in an effort to distinguish the prior art is without merit. Because "near or close to" is a much broader term than "next to," the Applicants could have successfully distinguished the MacNeil patent if they had used "adjacent" to mean "next to." On the other hand, the prosecution history does not conclusively support the application of "next to" as a viable alternative definition, as STX argues. As the illustration of the MacNeil patent shows, the lowering of the sidewalls in this patent occurs almost halfway the length of the sidewall. *See* STX Resp. Br., at 11. Since the lowering of the sidewalls in the '216 patent does occur "close[r] to" the base than in the MacNeil patent, the Applicants may very well have intended "adjacent" to mean "close to" or "near."

Since the intrinsic record does not shed any light on whether "adjacent" should be defined as "close to or near" or "next to," the Court must choose between equally applicable dictionary definitions. In this context, the Federal Circuit has instructed that,

[b]ecause words often have multiple dictionary definitions ... the intrinsic record must always be consulted to identify which of the different possible dictionary meanings of the claim terms in issue is most consistent with the use of the words by the inventor....If more than one dictionary definition is consistent with the use of the words in the intrinsic record, the claim terms may be construed to encompass all such consistent meanings.

*Texas Digital*, 308 F.3d at 1203; *see also Bilstad v. Wakalopulos*, 385 F.3d 1112, 1116 (Fed.Cir.2004). Here, both proffered dictionary definitions are consistent with the use of the word "adjacent." Inasmuch as Warrior's proposed claim construction is broader and encompasses both definitions of adjacent as "close to or near" *and* "next to," the Court will adopt Warrior's proposed claim construction and construe this word to mean as "close to or near."

Not Reported in F.Supp.2d                                    Page 4
Not Reported in F.Supp.2d, 2005 WL 1378752 (E.D.Mich.)
(Cite as: 2005 WL 1378752 (E.D.Mich.))

## B. "Half of the lengths of said sidewalls"

**\*5** The term, "half of the lengths of said sidewalls," is used in Claims 62, 70, 71, 77-80, and 91. For example, Claim 62 indicates that the sidewalls "are of uniform thickness between said front and back sides thereof for about one-half of the overall length of said sidewalls."

Warrior proposes that this term should be construed as being "one part of the sidewall that is approximately equal to the other part." STX, by contrast, contends that this term is incapable of construction and must be rendered invalid under 35 U.S.C. ¶ 112. *See Honeywell Int'l, Inc. v. Int'l Trade Com'n*, 341 F.3d 1332, 1338 (Fed.Cir.2003) ("If the court determines that a claim is not 'amenable to construction,' then the claim is invalid as indefinite under 35 U.S.C. ¶ 112, ¶ 2") (internal citations omitted). STX posits that since neither the jury nor an ordinary person who is skilled in the art can identify where the sidewalls begin or end, this term lacks the requisite specificity.

The Court disagrees. Warrior's proposed construction tracks the ordinary meaning of the words "half" and "length." Moreover, the term "half the lengths of said sidewalls" does not require strict mathematical precision. Indeed, the prosecution history reveals that the Patent Examiner fully understood "sidewall" and its metes and boundaries. As such, the Court concludes that any one who is possessed of the ordinary skill in the art can identify the halfway point in the lengths of the sidewalls. [FN2]

> FN2. The Court notes that the extrinsic evidence also supports Warrior's argument on this issue. In support of its position, Warrior has proffered the declaration of Jesse Hubbard--the inventor of the '216 patent--who asserts that (1) the word "sidewall" is well known to those in the industry and, in his judgment, (2) the boundaries of a sidewall are identifiable *See* Pl.'s Br., Ex. 43, ¶ 7(b).

In order to demonstrate that this claim is sufficiently indefinite as to be invalid under 35 U.S.C. ¶ 112, a party must demonstrate by clear and convincing evidence that it "is insolubly ambiguous, and no narrowing construction can properly be adopted[.]" *Exxon Research & Eng'g Co. v. United States*, 265 F.3d 1371, 1375 (Fed.Cir.2001). STX has failed to make this requisite showing. As the Federal Circuit has instructed, "[w]hen claims are amenable to more than one construction, they should, when reasonably

possible, be interpreted so as to preserve their validity ." *Process Control Corp. v. HydReclaim Corp.*, 190 F.3d 1350, 1356 (Fed.Cir.1999), *cert. denied*, 529 U.S. 1037, 120 S.Ct. 1531, 146 L.Ed.2d 346 (2000).

Since Warrior's proposed definition of "half of the lengths of said sidewalls" as "one part of the sidewall that is approximately equal to the other part" is consistent with the language of the claim, specification, and prosecution history, the Court will adopt this proposed claim construction.

## C. "Socket"

The word, "socket," appears in Claims 85, 88, 91, 96, and 98. Claims 85, 88, 91 require "a socket extending from said base for attachment of a handle." Claims 96 and 98 require "a socket exteriorly projecting from said base for attachment of a handle."

Warrior proposes that the word, "socket," should be construed as "a portion of the frame having an opening for receiving a part." STX offers its own construction as "a hollow structure open at one end for receiving a handle." Despite their differences of opinion, both parties agree that the word, "socket," requires an opening for receiving a lacrosse handle. Thus, the key dispute is whether a "socket" demands a hollow structure.

**\*6** The ordinary meaning of the word, "socket," supports both parties' constructions. A "socket" is defined as "a hollow piece or part into which something fits," Webster's at 1273; or as "an opening or a cavity into which an inserted part is designed to fit," American Heritage at 1292. Moreover, the specification--standing alone--does not resolve the construction of this word by the Court. Although STX has correctly noted that all of patent drawings in the '216 patent illustrate the socket as a hollow opening, Warrior has argued that it is error to limit the claims to the preferred embodiment within the specification. *See Teleflex*, 299 F.3d at 1328.

Since more than one dictionary definition is consistent with the use of the words in the intrinsic record, the claim terms must be construed to encompass all such consistent meanings. *Bilstad*, 386 F.3d at 1116. Therefore, the Court will not limit the definition of "socket" to require a "hollow structure," as STX has argued. However, since the specification and the claim language only refer to a "socket" that connects to a handle, the Court will not fully adopt Warrior's proposed construction. Rather, the Court

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 1378752 (E.D.Mich.)
(Cite as: 2005 WL 1378752 (E.D.Mich.))

will construe "socket" as "a portion of the frame open at one end for receiving a handle."

D. "Defining a plane" and "which defines a plane"

The term, "defining a plane," appears in Claims 58, 70, 83, 88, 96, and 98, whereas the term, "which defines a plane," appears in Claims 81, 85, 91, and 100. Claim 81 is representative of the use of the term in the patent: "A head of a lacrosse stick, comprising: ..... a projection extending from said base for attachment of a handle so as to define a handle/head axis, said projections having an upper surface which defines a plane parallel to handle/head axis."

Warrior proposes that this term should be construed as "when viewed from the side, a reference plane that is parallel to the handle/head axis is disposed at the front side edge of the frame." STX opts for a simpler construction as "distinctly specifying a plane."

The ordinary meaning of "define" is "to specify distinctly," American Heritage at 364, or to "fix or mark the limits of," Webster's at 362. Thus, the ordinary meaning of the word, "defines," supports STX's proposed construction.

Warrior nevertheless submits that its proposed definition is consistent with the '216 patent claim language and specification. Warrior cites the specification which reads, in relevant part: "The front side edge 46 of that portion of the base 28 immediately adjacent to said socket 40 defines a plane 48 (FIG.6) that is offset from but parallel to handle/head axis." '216 patent, col. 4., lines 20-22. According to Warrior, the specification indicates that the plane is a "reference plane from which the locations of other components of the head are measured." Pl.'s Opening Br. at 26.

In its counter-argument, STX contends that Warrior's definition gives rise to multiple planes:

*7 [T]here can be an infinite number of "theoretical" reference planes located on the surface of a base or a projection. Being "located" is not enough, if the surface does not actually *define* the reference plane. For the term to "particularly point out and distinctly claim" what the applicants "regard" as their invention, as required by 35 U.S.C. ¶ 112, ¶ 2, the surface must *distinctly specify* the plane, as pointed out by STX.

Def.'s Resp. Br., at 14 (emphasis original).

The Court finds STX's arguments on this issue to be persuasive. Nothing in the intrinsic record expressly rebuts the ordinary and customary meaning of the terms "which defines a plane" or "defining a plane." *Texas Digital*, 308 F.3d at 1209. Although the specification makes reference to the creation of a plane that "is offset from but parallel to handle/head axis," the language within the claim incorporates the "parallel to handle/head axis" phrase. *See, e.g.*, '216 Patent, claim 81. [FN3] Consequently, if this Court adopted Warrior's proposed construction, the language of the '216 patent claims would contain meaningless surplusage.

> FN3. Every claim that makes reference to the terms, "which defines a plane" or "defining a plane," also contains a reference to the term, "parallel to said handle/head axis."

The terms, "which defines a plane" and "defining a plane," are ordinary terms. Since STX's proposed definition comports with the ordinary meaning of the word, "define," and is consistent with the specification, the Court will construe these two terms as "distinctly specifying a plane."

III.

Claims 1-15, 31, 32, 34, 37, 42-49, and 52-57 of the '932 patent are at issue in this case. Of these claims, the parties have identified seven independent claims (1, 7, 31, 42, 44, and 49) which contain language that requires construction by the Court. During the *Markman* hearing, the parties represented to the Court that they had agreed on the construction of two disputed terms: (1) "bend" and "outward bend" and (2) "smaller radius of curvature." [FN4] Nevertheless, fourteen terms remain, all of which require construction: (1) "upper portion" or "upper section," (2) "lower portion" or "lower section," (3) "forward portion" or "forward section," (4) "rear portion" or "rear section," (5) "inclined," (6) "diverge," (7) "substantially from said base towards said scoop," (8) "recessed channel," (9) "recessed outwardly," (10) "adjacent," (11) "disposed further inwardly," (12) "integrally formed," (13) "stepped back," and (14) "socket."

> FN4. The parties are in agreement that the terms, "bend" and "outward bend," have their ordinary meaning and do not require construction by the Court. The parties have also agreed that the term, "smaller radius of curvature," means "bends more sharply."

A. "Upper portion" and "upper section"

The term, "upper portion," appears in Claims 1 and 49;

and the term, "upper section," appears in Claims 31
and 48. For example, Claim 1 sets forth
> a pair of spaced apart sidewalls, which diverge from
> said base toward said scoop and define a ball
> receiving area, wherein said sidewalls each have an
> upper portion and a lower portion with said
> sidewalls being progressively outwardly inclined
> substantially from said base towards said scoop
> whereby said upper portion is disposed further
> outwardly with respect to said axis than said lower
> portion.

*8 Warrior proposes that the terms, "upper portion"
and "upper section," should be construed as "the
portion of the sidewall adjacent the upper rim." [FN5]
By contrast, STX argues that, inasmuch as the parties
have reached an agreement with regard to the terms,
"upper," "lower," "forward," and "rear," these terms
are unambiguous and do not require construction.

> FN5. The parties agree that there should be a
> consistency in the construction of these terms.
> See Pl.'s Resp. Br. at 13,

Warrior relies primarily upon the intrinsic record to
support its proposed construction, citing the following
language from the specification as an example::
> The catching area of the lacrosse head 10 is the area
> defined by the upper rims 34 of the sidewalls 16, 18,
> the upper rim 30 of the base 14, and the upper rim of
> the scoop 20. The catching area is functionally the
> portion of the head 10 where the lacrosse ball can be
> received and maintained within the head 10. *The
> catching area is generally defined by the upper
> portion of the frame.*
'932 patent, col. 5, lines 44-50 (emphasis added).
Hence, the upper portion of the sidewall is structurally
the part of the sidewall lying near (or adjacent to) the
sidewall upper rim. Warrior also cites the prosecution
history of a subsequent patent application, the
10'414,178 patent, in which the Applicants responded
to the Examiner's objection to the phrase, "upper
portion," by maintaining that "one of ordinary skill in
the art would understand the meaning of the term
'upper portion' as used in the claims to include the
portion of the sidewall located adjacent to and
including the upper rim." Pl.'s Br., Ex. 48, W08721.

The Court concludes that the terms, "upper portion"
and "upper section," are unambiguous and therefore
do not require construction. *See, e.g., ICU Medical,
Inc. v. B. Braun Medical, Inc.,* 344 F.Supp.2d 663, 673
(N.D.Cal.2004). Because the term, "upper portion," is
unambiguous on its face, the specification and
prosecution history of the '932 patent will be consulted

only to determine if the patentee intended to deviate
from the ordinary meaning of the disputed term. *See
Metabolite Laboratories, Inc. v. Laboratory Corp. of
America Holdings,* 370 F.3d 1354, 1374
(Fed.Cir.2004). Warrior fails to point to any language
in the specification which represents a clear disavowal
of the ordinary and plain meaning of these terms.
Significantly, the specification reads, "the catching
area is generally defined by the upper portion of the
frame." '932 Patent, Col. 5, lines 49-50. This language
defines the catching area *by reference* to the upper
portion of frame. Contrary to Warrior's position on
this issue, the specification does not define the "upper
portion" of the frame. Similarly, Warrior's citation to
the prosecution of a related patent does not displace
the ordinary and plain meaning of the terms, "upper
portion" or "upper section." [FN6]

> FN6. Warrior cites *Elkay Mfg. Co. v. Ebco
> Mfg., Co.,* 192 F.3d 973, 52 U.S.P.Q .2d
> 1109 (Fed.Cir.1999) for the proposition that
> "the interpretation and scope of the language of
> the '932 patent should be construed
> consistently with the same terms in related
> patents and applications." Pl.'s Resp. Br. at
> 13, n. 11. Warrior misreads *Elkay.* In *Elkay,*
> the court made a narrower statement than that
> advanced by Warrior: "When multiple
> patents derive from the *same initial
> application,* the prosecution history
> regarding a claim limitation in any patent that
> has issued with equal force to *subsequently
> issued patents* that contain the same claim
> limitation." *Elkay,* 192 F.3d 973, 52
> U.S.P.Q.2d at 1114 (emphasis added). Here,
> the prosecution history cited by Warrior
> relates to an application for the 10'414,178
> patent. The '932 patent precedes the 10'
> 414,178 patent. Because the prosecution
> history cited by Warrior follows-- rather than
> precedes--the initial '932 patent application,
> it cannot be read as persuasive authority that
> the Applicants used the term "upper section"
> to mean "portion of the sidewall located
> adjacent to and including the upper rim" with
> respect to the '932 patent.

In sum, Warrior has failed to present any clear
statement of disavowal in the specification or the
prosecution history that would require the "adjacent to
the upper rim" language to be included in the
construction of this claim. The Court declines to
define this term.

B: "Lower portion" and "lower section"

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 1378752 (E.D.Mich.)
(Cite as: 2005 WL 1378752 (E.D.Mich.))

Page 7

**\*9** The term, "lower portion," appears in Claims 1 and 49; whereas the term, "lower section," appears in Claims 31 and 48.

The parties' arguments here are similar to those that were advanced by them regarding the construction of the "upper section" and "upper portion" terms. Warrior proposes that these terms should be construed as "the portion of the sidewall adjacent the lower rim." STX takes a different position, contending that these terms do not require any construction.

This Court agrees with STX on this issue, and concludes that no construction is necessary for this term. Like "upper section" and "upper portion," these terms should be interpreted and understood according to their ordinary meaning, consistent with the parties' agreement. Inasmuch as Warrior has failed to point to a clear disavowal of these terms in the intrinsic record, the Court declines to construe them.

**C. "Forward section" and "forward portion"**

The term, "forward section," appears in Claim 5. The term, "forward portion," appears in Claims 7, 15, 31 and 44. Claim 44, for example, reads as follows:

A lacrosse head for attachment to a lacrosse handle comprising:
.... wherein the head includes a forward portion and a rear portion and wherein said ball possession area has a substantially uniform width throughout said rear section and said ball receiving area comprises a progressively increasing width from said base towards said scoop.

Warrior's proposed construction for these two terms is "the portion of the head adjacent the scoop where the ball typically enters and where the sidewalls are spaced apart a larger distance for increased catching capabilities." STX reiterates its argument that no construction is necessary for this term. In addition, STX offers an alternative construction for this term as "the part of the frame adjacent the scoop."

Like "upper portion" and "lower portion," the term, "forward portion," is, on its face, unambiguous. Unlike "upper portion" and "lower portion," however, the term, "forward portion," is explicitly defined in the specification, as follows:

The forward portion 62 generally is defined by the location where the pocket or ball retaining area significantly increases. In the forward portion 62, the upper rims 34 curve outwardly with respect to the centerline $C_L$ of the stick and also outwardly

with respect to the lower rims 36 to form a bend 64 in each sidewall 16, 18.
'932 patent, col. 6, lines 33-35.

Here, Warrior has provided intrinsic evidence which demonstrates that the patentee deviated from the ordinary meaning of the word, "forward," to include some reference to the ball retaining capabilities of this area of the lacrosse head. *See Interactive Gift Express,* 256 F.3d at 1331 ("If the claim language is clear on its face, then our consideration of the rest of the intrinsic evidence is restricted to determining if a deviation from the clear language of the claims is specified").

**\*10** However, the intrinsic evidence does not fully support Warrior's proposed construction. There is no language in the specification or the prosecution history which identifies the location of "where the ball typically enters and where the sidewalls are spaced apart a larger distance." In addition, this suggested wording is not clear.

Under these circumstances, the Court must return to the specification, which offers the following guidance: "each sidewall 16, 18 and the area between each sidewall is broadly divisible into a rear portion 60 adjacent the base and a *forward portion 62 adjacent the scoop 20."* '932 patent, col. 5, lines 26-28 (emphasis added). Because the specification explicitly makes reference to the forward portion of the head as being "adjacent the scoop," the Court will construe it as meaning "the part of the frame adjacent the scoop where the ball retaining area increases."

**D. "Rear section" and "rear portion"**

The word, "rear section," appears in Claim 5, whereas the term, "rear portion," is used in Claims 7, 15, 31, and 44. As stated in the previous section, Claim 44 offers representative language on the use of the term, "rear portion." *See* '932 patent, claim 44.

Warrior urges the Court to adopt a definition of "rear portion" as reflecting "the portion of the head adjacent the base where the ball typically resides during possession and where the sidewalls are spaced apart a smaller distance for increased ball retention." On the other hand, STX contends that either no construction is necessary for these unambiguous terms or, as an alternative, these terms should be construed as "the part of the frame adjacent the scoop."

These arguments are identical to those positions that were taken by the parties with regard to "forward portion" or "forward section." Warrior cites several

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 1378752 (E.D.Mich.)
(Cite as: 2005 WL 1378752 (E.D.Mich.))

portions of the specification to demonstrate that the "rear portion" is defined by a location near the base where the sidewalls are narrow. For example, the specification provides:

> The distance between the upper rims 34 preferably slightly diverges to define a catching area that is larger than the pocket area defined by the lower rims 36. Thus, the rear portion 60 is configured to define a narrow pocket area which will facilitate retention of the ball because of the minimal width between the lower rims 36 and the lower portion 58 of the inner surfaces of the sidewalls.

'932 patent, col. 6, lines 12-19.

As with "forward portion," the terms, "rear portion" and "rear section," should be construed with reference to the language within the specification. Hence, Warrior's proposed construction will be adopted, in part. The Court finds no language within the specification or the prosecution history that would warrant an adoption of the "where the ball typically resides during possession" language. Thus, the Court will construe this term as "the part of the frame adjacent the base where the sidewalls are spaced apart a smaller distance for increased ball retention."

### E. "Incline"

\*11 The word, "incline," is used in Claims 1,2,12, 32, 43, and 46 of the '932 patent. Claim 2 reads, for example, that "[t]he lacrosse head of claim 1 wherein said sidewalls are uniformly progressively outwardly inclined."

STX argues that this term does not require any construction. STX also submits that, in the alternative, if the Court deems construction to be necessary, this term should be construed as "sloped." Warrior agrees with the "sloped" suggestion, but asserts that "inclined" alternatively means "flared."

The definition of "inclined" is "to deviate from a horizontal or vertical position, course, etc.; lean; slope; slant." Webster's at 682. Thus, the ordinary meaning of the word, "inclined," is "sloped." The term "sloped" is also consistent with the language of the claim itself, the specification, and the prosecution history.

A closer question remains with Warrior's proposed construction of "inclined" as "flared." Unlike "sloped," the word, "flared," is not synonymous with "inclined." [FN7] Warrior nevertheless claims that the intrinsic record supports a definition of "inclined" as "flared." The specification states:

_____

FN7. "Flared" means, "[t]o expand or open outward in shape." American Heritage at 517.

In the rear portion 60 of the head, the upper rims 34 are flared outwardly a smaller distance with respect to the lower rims 36 than the upper rims 34 are flared outwardly with respect to the lower rims 36 in the forward portion. This also helps created the "pinched" configuration. In other words, the upper rims 34 in the forward portion 62 are flared outwardly more than the upper rims 34 in the rear portion 60.

'932 patent, col. 5, lines 33-40. Warrior also cites the prosecution history, in which the Examiner

> acknowledge[d] that the intent of the claim modifications is to more clearly define that the flaring of the sidewalls is not constant but progressively increases as the sidewalls extend from the base to the scoop....The applicant may wish to ....formulate claim language that more clearly defines the "flaring" of the sidewalls....

Pl.'s Br., Ex. 19, W0141-0142. Since the specification and the prosecution history make reference to the "flaring" of the sidewalls, Warrior asserts that the meaning of "incline" should incorporate "flared." STX, in arguing that its position should be adopted, notes that Warrior, in failing to introduce any "flaring" language in the claim, maintained the "inclined" term and added other limitations to it. *See* Pl.'s Br., Ex. 29, p. W0159.

In the opinion of this Court, Warrior has presented sufficient intrinsic evidence to demonstrate that the patentee assigned a "special definition" to the word, "inclined," in the specification and file history. *Vitronics,* 90 F.3d at 1582. Hence, the Court will adopt Warrior's proposed construction for this term and construe the word, "inclined," as "sloped or flared."

### F. "Diverge"

This word, "diverge," which refers to the movement of the sidewalls from the base of the lacrosse head to the scoop, is used in Claims 1, 31 and 57. Using Claim 57 as an example, the specification identifies the sidewalls as those which "generally diverge from said base to said scoop."

\*12 Warrior proposes that this word be construed as "sidewalls that move away from one another such that the portions adjacent the scoop are further away from one another than the middle portions, i.e. the sidewalls are not arced or convex which results in a 'spoon shaped' frame configuration." STX focuses its

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 1378752 (E.D.Mich.)
(Cite as: 2005 WL 1378752 (E.D.Mich.))

argument on the ordinary and the commonly accepted meaning of "diverge" to create a simpler construction as "extend continuously outwardly." In its opposition, STX posits that Warrior's construction is flawed because the common point from which the sidewalls diverge must be the base, rather than the midpoint of the sidewalls.

The ordinary meaning of "diverge" is "to go or move in different directions from a common point or from each other; branch off." Webster's at 20. Although STX's construction is simpler and more consistent with the ordinary definition of "diverge," the proposed constructions which have been submitted by both parties are supported by the ordinary meaning of the word.

In its argument, Warrior urges the Court to construe this word on the basis of the intrinsic record. The specification provides that "the upper rims 34 of each of the sidewalls 16, 18 extend forwardly from the base 14 in a more diverging manner than the lower rims 36." '932 patent, col. 6, lines 5-7. However, this specification is devoid of any language that references the "spoon shaped" frame configuration of a goalie head. Moreover, the specification does not make any reference to "continuously," as suggested by STX in conjunction with its proposed construction of "diverge." Thus, the specification does not conclusively support either party's construction.

The prosecution history, on the other hand, does provide substantial support for Warrior's construction of "diverge." During the prosecution of the patent, the Applicants attempted to distinguish its patent from prior art goalie heads, which had a spoon shaped configuration. In attempting to make this distinction, the Applicants issued the following disclaimer:

> Most, if not all, goalie lacrosse heads have a "spoon shaped" configuration. In other words, as the sidewalls travel from the base toward the scoop they form an arc. The sidewalls [in the '932 patent] thus converge from their widest point apart, which is located generally *in the middle of the head*, toward the scoop.

Pl.'s Ex. 19, p. W0127 (emphasis added). Warrior's proposed construction-- which focuses on the movement of the sidewalls and which explicitly refers to the middle portions of the sidewalls--tracks the language in the prosecution history. Moreover, it is clear from this prosecution history that the patentee intended to disclaim any reference to prior art goalie heads. Thus, it offers unequivocal evidence that the word, "diverge," should take on a meaning that is different from its ordinary dictionary definition.

*Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1323 (Fed.Cir.2003). Accordingly, the Court adopts Warrior's proposed construction for "diverge" as "sidewalls that move away from one another such that the portions adjacent the scoop are further away from one another than the middle portions, i.e. the sidewalls are not arced or convex which results in a 'spoon shaped' frame configuration."

### G. "Substantially"

*13 The word, "substantially," appears in Claims 1, 5, 44, and 45. Claim 1, for example, provides that "wherein said sidewalls each have an upper portion and a lower portion with said sidewalls being progressively outwardly inclined substantially from said base to said scoop...." Claim 45, reads, in pertinent part, as follows: "The lacrosse head of claim 44, wherein said substantially uniform width throughout said rear section is slightly larger than a lacrosse ball.".

Warrior proposes that "substantially" should be construed as "to a large or considerable degree." STX, while concurring with this construction for Claims 5, 44, and 45, argues that "substantially" should be construed in Claim 1 as meaning "essentially." Since the parties have limited their disagreement over the language in Claim 1, the Court will now focus its attention to the parties' arguments for this claim.

Both of the constructions that have been proffered by the parties are consistent with the ordinary meaning of the term, "substantially." American Heritage at 1354; Webster's at 1336. The Court thus turns to the intrinsic record for additional guidance on the meaning of this term. In an attempt to distinguish the prior art (the "Morrow" patent), the Applicants stated that their invention in Claim 1 required an outward inclination of the sidewalls along the "length or substantially the length of the sidewall." In so doing, they declared:

> [T]he *Morrow* reference does not disclose sidewalls that are outwardly inclined from the base toward the scoop, i.e., along the length of the sidewall. Figure 3 of the *Morrow* reference appears to disclose some outward inclination of the sidewalls, i.e. the upper rims are spread further apart than the lower rims. However, any inclination in *Morrow* does not extend along the length or *substantially* the entire length of the sidewall.

Pl.'s Ex. 19, W0093 (emphasis added). According to STX, the inclusion of the language "the entire length of the sidewall" indicates that this claim refers to *essentially* the entire length of the sidewall. Since the Applicants did not say "substantially the length of the

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 1378752 (E.D.Mich.)
(Cite as: 2005 WL 1378752 (E.D.Mich.))

Page 10

sidewalls," STX posits that it was the Applicants' intention to present their invention as having sidewalls inclined "essentially" the entire length of the sidewalls, not just a "large" or "considerable" extent.

The Court is not persuaded by this argument. The reference to the Morrow patent discloses a sidewall that has outward flaring or inclination along less than half of the length of the sidewall. By adding the term "substantially" to Claim 1, the Applicants sought to distinguish Morrow by demonstrating that the sidewalls of the '932 patent were outwardly flared or inclined *more than* half the length of the sidewall. The construction that most closely parallels this distinction is "to a large or considerable degree." Moreover, there is no reason for this Court to construe "substantially the entire length of the sidewall" to read "essentially the entire length of the sidewall" given the other uses of the word, "substantially," in Claims 5, 44, and 45. In making this determination, the Court is mindful that the "same term or phrase should be interpreted consistently where it appears in claims of common ancestry." *Epcon Gas Sys. Inc. v. Bauer Compressors, Inc.,* 279 F.3d 1022, 1031 (Fed.Cir.2002).

*14 Therefore, this Court will interpret the term "substantially" throughout the patent as meaning "to a large or considerable degree ."

H. "Recessed channel"

The term "recessed channel" appears in Claims 6, 34, 37, 42, 47, and 54. Claim 42, for example, reads as follows:
The lacrosse head comprising:
... a pair of spaced apart sidewalls extending between said scoop and said base defining a ball receiving area, at least one of said pair of sidewalls having a recessed channel formed in a lower portion of an inner side thereof to assist in retaining a lacrosse ball therein.

Warrior submits that this term should be construed as "a groove formed in the interior of the sidewall that is of sufficient size to assist in retaining a lacrosse ball in the head." STX counters by offering the following construction: "portion that is set back from the interior surface of the sidewall."

The word, "recessed," means "a receding or hollow place, as in a surface, wall, etc., niche," Webster's at 1120, or "an indentation or small hollow," American Heritage at 1140. The ordinary meaning of the word, "channel," is "a long groove or furrow," Webster's at 234, or "a trench, furrow, or groove," American

Heritage at 234. The proposed constructions by both parties are supported by the ordinary meaning of "recessed channel."

STX, however, argues that Warrior's proposed construction of channel as a "groove" is flawed because "[t]here is no way for a narrow groove in a 2.0" or 1.8" sidewall to 'assist in retaining' a 2.5" ball, because the ball is too big to fit into the groove or to be affected by the groove." Def.'s Resp. Br. at 19. Warrior concedes as much, and states that it would agree with STX's proposal if the "portion set back from the interior surface of the sidewall" was of "sufficient length and depth to act as a ball retention mechanism." Pl.'s Resp. Br. at 21-22.

The language "of sufficient length and depth to assist in retaining a lacrosse ball in the head" is consistent with the specification and prosecution history which reads:
In addition to protecting the stringing, the recessed channel 38 also acts as a seat for the ball when it is in the netting. The recessed channel 38 thus enhances the ability of the player to retain and secure the ball in the lacrosse head 10 while also facilitating play of the ball from the head 10.
'932 patent, col. 4, lines 17-22. This specification makes explicit reference to the ball retention capabilities of the "recessed channel." In 1998, the Federal Circuit declared that "[w]hen the meaning of a term is sufficiently clear in the patent specification, that meaning shall apply." *Multiform Desiccants, Inc. v. Medzam, Ltd.,* 133 F.3d 1473, 1477 (Fed.Cir.1998). Similarly, the prosecution history provides that the recessed channel is "configured such that the ball can be retained within the head as a portion of sidewall lies over the ball." Pl.'s Ex. 19, p. W0095. Since the prosecution history reflects a modification of the ordinary meaning of the term, "recessed channel," the Court will incorporate the "ball retaining" language into its construction of this term.

*15 Accordingly, the term, "recessed channel," shall be construed as being "a portion that is set back from the interior surface of the sidewall that is of sufficient length and depth to assist in retaining a lacrosse ball in the head."

I. "Recessed outwardly"

The term, "recessed outwardly," appears in Claim 8 as follows: "The lacrosse head of claim 7, wherein each of said pair of sidewalls has an inner surface and an outer surface and at least a portion of said lower rim of each of said sidewalls is recessed outwardly with

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 1378752 (E.D.Mich.)
(Cite as: 2005 WL 1378752 (E.D.Mich.))

respect to said inner surface of said sidewalls."

Warrior proposes that the construction of this term reads: "the lower rim of the sidewall disposed away from the pocket with respect to an adjacent surface of the sidewall." STX, by contrast, suggests that this term should be construed as "set back outwardly."

As stated with respect to the previous term, "recessed" means "a receding or hollow place, as in a surface, wall, etc., niche," Webster's at 1120, or "an indentation or small hollow." American Heritage at 1140. Neither of the parties' proposed constructions fully comport with the ordinary meaning of the word "recessed." Contrary to STX's argument, the term, "outwardly," is ambiguous, especially when used in conjunction with the term, "recessed." [FN8] Accordingly, this Court must examine the intrinsic record to furnish a meaning for this term.

> FN8. STX argues that the "outward" direction may be illustrated with the labels on the patent drawings, as shown in the Def.'s Ex. E. However, a literal description of this concept may be helpful for the jury.

The specification reads: "The lower rims 36 of each of the sidewalls 16, 18 are preferably recessed with respect to the sidewalls 16, 18 to form a recessed channel. The recessed channel 38 is recessed outwardly with respect to an inner surface 39, 51 of each sidewall 16, 18." '932 patent, Col. 3, 56-60. According to the specification, the lower rims may be "recessed outwardly" from an adjacent part of the inner surface of the sidewall. Thus, a portion of the inner surface of the sidewall can lie over a lacrosse ball to assist in retaining the ball in the head, that is, to create the "recessed channel." Figure 1 of the '932 patent illustrates this configuration.

The Court will construe this term as "set back away from the pocket. Although the term, "recessed," when narrowly defined, does not strictly mean "set back," it is fully consistent with (1) the other disputed claim terms ("recessed channel"), (2) the language of the claim, and (3) the intrinsic record. The phrase, "with respect to an adjacent surface of the sidewall," is redundant and facially confusing given the specific language of Claim 8.

## J. "Adjacent"

This term appears in Claim 9, which reads: "The lacrosse head of claim 7, wherein at least one of said plurality of attachment structures is formed adjacent

said recessed lower rim."

At the *Markman* hearing, the parties agreed that the term, "adjacent," should be construed consistently in the '216 and the '932 patents. Accordingly, the Court will construe this term as "close or near to."

## K. "Disposed further inwardly"

*16 This term appears in Claim 31, which reads, in part, that " ....wherein at least a portion of each of said lower sections [of the sidewalls] in said rear portion are disposed further inwardly than a corresponding portion of said upper sections." Warrior's proposed construction for this term is "the upper portions of the sidewalls flare outwardly with respect to the lower portions." STX, on the other hand, argues that no construction is necessary for this term.

The ordinary meaning of the word, "dispose," is "to place or set in a particular order; arrange." American Heritage at 401. The Webster's definition for "disposed" is "inclined; having a certain tendency." Webster's at 396.

Consistent with the plain meaning of this term, the Court will construe "disposed further inwardly" as "placed further inwardly." The Court agrees with STX's argument that Warrior's proposed construction eviscerates the plain meaning of the claim terms. Warrior's construction fails because the claim makes reference to the lower sections of the sidewalls. The subject of Warrior's proposed construction, by contrast, is the upper section of the sidewalls, which "flare outwardly." Furthermore, the specification does not support Warrior's suggested definition. The specification reads:

> As shown, each sidewall 16, 18 is preferably configured such that it extends outwardly or flares from the lower rim 36 to the upper rim 38. This flaring creates a "pinched" configuration of the sidewalls. The degree to which each sidewall 16, 18 tapers or flares may be entirely uniform from the base 14 to the scoop 20, may progressively increase, may progressively decrease, or take on a variety of other configurations.

'932 patent, col. 4, line 65--col. 6, line 5. Nothing in the specification refers to the lower section of the sidewalls moving "inwardly." In the absence of any evidence from the intrinsic record to support Warrior's construction, the Court construes this term in a manner that is consistent with the ordinary meaning of the words as "placed further outwardly."

## K. "Integrally formed"

Not Reported in F.Supp.2d                                                                    Page 12
Not Reported in F.Supp.2d, 2005 WL 1378752 (E.D.Mich.)
(Cite as: 2005 WL 1378752 (E.D.Mich.))

The term, "integrally formed," appears in Claims 34 and 35. Claim 34 recites that "[t]he lacrosse head stick of claim 31 wherein lower section includes an integrally formed recessed channel ." The parties vigorously dispute the meaning of this term. Warrior argues that "integrally formed" means "a recess channel is formed in the sidewall such that they form a complete structure and are not readily separable." STX urges the Court to adopt a construction of this term as "made in a single manufacturing process." Essentially, the parties dispute whether the recessed channel and the sidewall can be created separately and then fused together (as advocated by Warrior) or whether they must be formed together as a part of a single molding or manufacturing process (as STX argues).

As always, the Court must initiate its analysis with the ordinary meaning of the disputed term. "Integral" is defined as "whole or complete; [ ] made up of parts forming a whole." Webster's at 701. The word, "integral," is defined by another dictionary source as "a complete unit; a whole." American Heritage at 706. The ordinary meaning of this word does not assist the Court in determining whether the recessed channel must be formed in the same manufacturing process as the sidewall in which it is formed. However, the addition of the word, "formed," suggests that the channel and the sidewall were created during a "single manufacturing process." As STX argues, the term, "integrally formed," can only mean that the recessed channel and the sidewall are "integral"--that is, completely whole--when they are formed together as part of a single molding process.

*17 Unfortunately, neither the specification nor the prosecution history answers this question. [FN9] Instead, Warrior focuses its argument on the extrinsic evidence; namely, STX's own patent, U.S. Patent No. 6,723,134 ("the '134 patent") entitled "Multi-Component Lacrosse Stick Head." Warrior points out that, although STX's describes the ball stop of its head as being "integral," it was not formed in a separate manufacturing process. Warrior argues that STX should be precluded from offering a different definition of the term "integral," given its own construction of the '134 patent. However, the Court notes that the '134 patent did not contain the term, "integrally formed." The addition of the word, "formed," sufficiently distinguishes the ' 932 patent from the '134 patent.

FN9. The specification merely recites that the "recessed channel 38 is preferably

integrally formed in the lower portion of the sidewall 16, 18." '932 patent, col. 4, lines 16-17. Although the drawings in the specification illustrate a recessed channel and sidewall created in a single molding process, it is error to limit the claim terms to the preferred embodiment. *Teleflex, Inc.,* 299 F.3d at 1326.

Although this is a close question, the Court will adopt STX's proposed construction. The plain language of the claim supports STX's argument that the recessed channel and the sidewall, in which it is formed, must be created during a single manufacturing process. In making this determination, the Court notes the '547 patent also contains the word, "integral." As described below, STX's proposed construction of "integral" as "formed during the manufacture of the lacrosse head in a single manufacturing process" is supported by the ordinary meaning of the claim language, the specification, and the prosecution history.

Accordingly, the Court will construe the term "integrally formed" as "made during a single manufacturing process."

L. "Stepped back"

The term, "stepped back," appears in Claim 37, which reads, "[t]he lacrosse stick of claim 37, wherein said recessed channel is stepped back from said inner surfaces of said sidewalls." Both parties agree that the construction of this term by the Court should include the phrase "set back from." However, Warrior suggests that this term should be construed as "set back from the inside surface of the sidewall such that a ledge is formed." STX, on the other hand, contends that, inasmuch as the ordinary meaning of "step," when applied to structures, necessarily implies the creation of 90 corners, the Court should construe this contested term to mean "set back from said inner surface such that a corner is formed on the inner surface."

The specification provides:

The recessed channel 38 in each sidewall preferably has a top surface 42, which extends outwardly from and generally perpendicular to each of the sidewalls 16, 18 and an outer surface 44, which extends generally downwardly from and generally perpendicular to the top surface 42 towards the lower rim 32. This provides a generally *stepped back* configuration.

'932 patent, col. 4, lines 10-16. STX submits that the conjunction of the top surface of the recessed channel

Not Reported in F.Supp.2d                                                                    Page 13
Not Reported in F.Supp.2d, 2005 WL 1378752 (E.D.Mich.)
(Cite as: 2005 WL 1378752 (E.D.Mich.))

and the sidewalls and outer surface created a perpendicular configuration. Because the two surfaces form a 90 degree angle, STX's proposed construction which refers to the formation of a "corner," is appropriate.

**\*18** The key word from the specification, however, is "preferably." There is nothing in the specification that mandates the use of the term "corner." *See Playtex Products, Inc. v. Procter & Gamble Co.., 400 F.3d 901, 906 (Fed.Cir.2005)* ("The court must take care in its analysis, when locating in the written description the context for a disputed term, not to import a limitation from that written description. It must use the written description for enlightenment and not to read a limitation from the specification").

Thus, the Court agrees with Warrior that the term, "ledge," properly encompasses other "stepped back" configurations which include "slopes, corners, and rounded edges." Thus, the Court will construe this term as "set back form the inside surface of the sidewall such that a ledge is formed."

### M. "socket"

The word, "socket" appears in Claim 7 of the '932 patent, which states, in relevant part, "..a throat projecting rearwardly from said open frame and having a socket for receipt of the lacrosse handle therein; ..." The parties have expressed the collective belief that "socket" should be interpreted consistently with the '216 patent. Consequently, this word will be construed as "a portion of the frame open at one end for receiving a handle."

### IV.

The parties have a disagreement with regard to certain terms, all of which appear in Claims 19-26 of the '547 patent.

19. A lacrosse head comprising:
a pair of opposing sidewall portions each having a top end and a bottom end;
a base portion extending between and connecting said bottom ends of said pair of opposing sidewall portions; and
a scoop portion extending between and connecting said top ends of said pair of opposing sidewalls portions;
wherein at least one of said pair of opposing sidewall portions, said base portion, or said scoop portion has a *integral raised non-skid textured surface* thereon to create friction between said non-skid surface and a lacrosse ball and thereby decrease spin resulting in improved player control,

22. The lacrosse head of claim 19, wherein said non-skid surface includes a plurality of surface structures formed therein for *decreasing spin between said plurality of structures and said lacrosse ball.*
'547 patent (emphasis added).

### A. "Integral"

Warrior offers the following construction for the word, "integral": "a unitary structure that is not readily separable, including overmoldings and coatings." STX proposes a different construction: "formed during the manufacture of the lacrosse head in a single manufacturing process (*i.e.,* excluding a surface attached in a post-manufacturing process, such as by using adhesives or by overmolding)."

The central dispute between the two parties is whether the "non-skid raised surface" created at the intersection of the sidewalls, the base, and the scoop includes "overmolded" lacrosse heads. [FN10] Warrior argues that it does. STX maintains that it does not.

> FN10. Overmolding is a "form of plastic injection molding whereby a substrate part is formed first, and, in a subsequent molding process, features are molded over, onto or around portions of the substrate part. Typically, the second process molds a softer plastic onto portions on the firmer substrate." Pl.'s Resp. Br. at 28. For an image of overmolding, *see* Pl.'s Resp. Br. at 28.

**\*19** The ordinary meaning of the word, "integral," has been addressed with respect to the '932 patent. As described above, "integral" has been variously defined as "[ ] whole or complete; [or] made up of parts forming a whole," Webster's at 701 or "a complete unit; a whole," American Heritage at 706. The ordinary meaning of this word does not conclusively support either of the parties' respective definitions.

A critical passage within the specification reads as follows:
The scoop portion 16 preferably includes a non-skid surface formed thereon for gripping a lacrosse ball that comes in contact with it. Preferably the non-skid surface is a plurality of nubs 20 formed on the scoop portion 16. However, it is understood that various types of textured surfaces and materials may be employed for providing friction between the lacrosse ball and the scoop portion 16. For example, the non-skid surface can be created by application

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 1378752 (E.D.Mich.)
(Cite as: 2005 WL 1378752 (E.D.Mich.))

Page 14

of a separate coating or the no-skid surface may result from the material for which the head is manufactured. It will also be understood that the non-skid surface can be located anywhere on the head, including the ball stop area or the sidewalls. Moreover, the non-skid surface may be applied by an overmolding process.
The nubs 20 preferably are *integral* parts of the scoop portion 16 of the lacrosse head 10, but may be otherwise as desired. For example, a strip of plastic having nubs formed thereon may be attached or otherwise adhered to existing scoop portions of lacrosse heads....Further, the non-skid structures can be created by post manufacturing processes, such as by overmolding.
'547 patent, col. 4., lines 3-33 (emphasis added).

The first paragraph identifies two embodiments of the invention: (1) one in which the non-skid surface is created by the application of a separate coating, and (2) another in which the non-skid surface is created as a result of a single manufacturing process. STX notes that there is no other modifier-- namely, the word, "integral,"--which describes either of these two embodiments.

In the second paragraph, however, the specification clearly demarcates the non-skid surfaces that are created as a result of single manufacturing process: "The nubs 20 are preferably *integral* parts of the scoop portion of the lacrosse head 10, but may be *otherwise* as desired." *Id.*, col. 4, lines 18- 21 (emphasis added). Significantly, the specification then goes on to describe how these "otherwise" created non-skid surfaces may be created--by attaching a strip of plastic nubs or by overmolding non-skid surfaces. Significantly, the specification explicitly distinguishes "integral" non-skid surfaces from other non-skid surfaces that are created by adhering a strip of plastic to the scoop or by using a post-manufacturing process such as overmolding. Thus, the specification supports STX's view that "integral" non-skid surfaces do not cover overmolding or separately affixed adhesives.

*20 STX's proposed construction is also consistent with the prosecution history. During its prosecution of the '547 patent, the Applicants petitioned the Examiner to advance the prosecution of its patent because it believed that the STX products were infringing its claims. In a document submitted to the PTO, the Applicants asserted that the "STX lacrosse heads include a non-skid overmolded elastomer material integrated on the sidewall portions and the base portion of the lacrosse head." Pl.'s Ex. 34, p. STX 0969. Inasmuch as the petition was granted by the

Examiner, Warrior asserts that limiting the word, "integral," to STX's proposed definition would be contrary to the prosecution history.

This argument is without merit. As STX points out, when the Applicants made their statement to the Examiner, these claims were not limited to "integral" structures. In fact, the then-pending claims recited only "non-skid surface"-- not an "integral non-skid textured surface" (as Claim 19 now recites). [FN11] *See* Pl.'s Ex 34, p. STX 0930-0931. Furthermore, the Court is not convinced that the use of the word, "integrated," in the prosecution history is dispositive for the construction of the word, "integral." Thus, STX is correct when it argues that Warrior cannot use the Examiner's statements to support its proposed construction that "integral" includes overmolding.

> FN11. STX claims that the word, "integral," was added to an Examiner Amendment following a telephone interview with Warrior's counsel.

The thrust of Warrior's argument in support of its proposed construction centers on the language of the other '547 patent claims. Claim 19 explicitly mentions an "integral raised non-skid textured surface," and then later references "said non-skid surface." Claim 20 refers to the "lacrosse head of claim 19, wherein said non-skid surface consists of a separate coating that is applied to said frame element." Claim 21, likewise, references the lacrosse head Claim 19, wherein "said non-skid surface is applied to said frame element through an overmolding process." Because Claim 19 is independent, it must embody at least the non-skid surfaces of Claims 20 and 21, both of which are dependent. As such, the word, "integral," embodies a(1) separate coating and (2) an overmolding process. In 2003, the Federal Circuit opined that "[a]n independent claim usually covers a scope broader than the preferred embodiment, especially if the dependent claims recite the precise scope of the preferred embodiment." *RF Delaware Inc. v. Pacific Keystone Tech., Inc.*, 326 F.3d 1255, 1264 (Fed.Cir.2003).

In support of its argument, Warrior points to the principle of claim differentiation which presumes that there is "a difference in meaning and scope when different words or phrases are used in separate claims." *Comark Communications, Inc. v. Harris Corp.*, 156 F.3d 1182, 1187 (Fed.Cir.1998) (internal citations omitted). Similarly, when the same terms or phrases are used in separate claims, those terms or phrases must be interpreted consistently throughout the patent. *Southwall Tech.*, 54 F.3d at 1579. Since the

Not Reported in F.Supp.2d                                                    Page 15
Not Reported in F.Supp.2d, 2005 WL 1378752 (E.D.Mich.)
(Cite as: 2005 WL 1378752 (E.D.Mich.))

term "non-skid surface" refers to "integral raised non-skid textured surface." Warrior maintains that the word, "integral," must incorporate the overmolding processes. Consequently, to exclude "overmolding" from the definition of integral would render Claim 21 superfluous. [FN12]

> FN12. STX counters that Claims 20 and 21, as originally filed, were within the scope of Claim 19, which only recited "non-skid surfaces ." According to STX, when the Examiner amended Claim 19 by adding the word, "integral," he failed to modify the dependent claims for consistency. STX submits that Warrior should have corrected these claims.

*21 However, it is also axiomatic that "the doctrine of claim differentiation creates only a presumption that each claim in a patent has a different scope that 'cannot broaden claims beyond their correct scope.' " *Fantasy Sports Properties, Inc. v. Sportsline.com, Inc., et al.,* 287 F.3d 1108, 1115 (Fed.Cir.2002) (citing *Kraft Foods, Inc. v. Int'l Trading Co.,* 203 F.3d 1362, 1368 (Fed.Cir.2000). Although Warrior's proposed use of "integral" in Claim 19 comports with the language of the other claims in the ' 547 patent, the presumption of identical claims is overcome by the Applicants' disclaimer of the subject matter in the specification and the prosecution history. See *Fantasy Sports,* 287 F.3d at 1116. Thus, the word, "integral," must be limited to only those non-skid textured surfaces that are created as a result of a single manufacturing process. This, in turn, has the practical effect of excluding those surfaces that were created as a result of overmolding or the affixation of a plastic strip.

Based on its review of the claim language and the intrinsic record, the Court will construe the word, "integral," with respect to the '547 patent as "formed during the manufacture of the lacrosse head in a single manufacturing process."

B. "Raised non-skid textured surface"

Warrior argues that the term, "raised non-skid textured surface," should be construed as "a raised surface that inhibits sliding contact with a lacrosse ball and which includes distinctive surface characteristics."

The Court finds that the word, "raised," is unambiguous and does not require further construction. However, the other terms are ambiguous, all of which must be construed by the Court. In doing

so, the Court must look first to the ordinary meaning of these words.. The definition of skid is "the act of sliding or slipping over a surface, often sideways," American Heritage at 1276, or "to slide without turning ... To slide or slip sideways," Webster's at 1257. Thus, when incorporating these definitions, a "non-skid" surface could be logically defined as one that inhibits sliding contact. Among the definitions of texture is "distinctive or identifying character or characteristics." American Heritage at 1403. Warrior's proposed definition satisfies the ordinary meaning of the terms in the claim. Although STX's definition has the benefit of simplicity, it does not address the terms "non-skid" or "texture."

The specification also supports Warrior's construction. The specification describes the function of the claimed surface and the advantages it provides:

> The scoop portion 16 preferably includes a *non-skid surface formed thereon for gripping* a lacrosse ball that comes in contact with it. Preferably, the non-skid surface is a plurality of nubs 20 formed on the scoop portion 16. However, it is understood that various types of *textured surfaces and materials* may be employed for *providing friction* between the lacrosse ball and the scoop portion 16....Moreover, while nubs 20 are the preferred *surface deformity, other surface deformities or irregularities* may be utilized including dimples ... the *non-skid surface* provides a *better grip* for the lacrosse ball. This is because of the friction applied to the ball causing it to rotate into the head *instead of skidding.*

*22 '547 patent, col. 4, lines 4-67 (emphasis added). The language of the specification clearly supports Warrior's proposed construction. Although the non-skid surface preferably includes a "plurality of nubs," it can also incorporate "various types of textured surfaces and materials," including dimples.

Thus, Warrior's proposed definition is consistent with the ordinary meaning of the disputed term and the specification. Accordingly, the Court will construe this term as "a raised surface that inhibits sliding contact with a lacrosse ball and which includes distinctive surface characteristics."

C. "For decreasing spin between said plurality of structures and said lacrosse ball"

Warrior contends that this claim language should be construed as "that the surface structures must have the ability to create friction with a contacting lacrosse ball to reduce spin on the ball." STX, in arguing that Claim 22 is invalid, submits that no construction is possible for this term because it is scientifically impossible to

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 1378752 (E.D.Mich.)
(Cite as: 2005 WL 1378752 (E.D.Mich.))

Page 16

create spin *between* a structure and a lacrosse ball.

The specification reads:

The nubs 20 or other surface unevenness are interspersed across the scoop portion 16 to allow for increased gripping on a lacrosse ball thrown off the scoop portion 16. In other words, the nubs 20 impart friction to the lacrosse ball, which can prevent it from slipping as well as imparting spin thereto....

As the user throws a lacrosse ball off the scoop portion 16, the nubs 20 grip the lacrosse ball and prevent it from sliding off the scoop portion 16 as well as prevent it from sliding laterally or side-to-side. Instead, the nubs 20 cause the lacrosse ball to roll off the scoop portion 16 with a substantial amount of spin.

'547 patent, col. 4, lines 34-58. As STX correctly points out in its pleadings, the specification makes no mention of the nubs decreasing the spin on a lacrosse ball. Rather, the specification only refers to the nubs creating or "imparting" spin.

STX also maintains that the claim language is illogical because spin cannot be created between objects. STX submits: "Whereas the lacrosse ball may be spinning, there is no such a thing [sic] as a spin 'between' a ball and a structure." Def.'s Opening Br. at 28.

Warrior's proposed construction, which makes reference to the creation of friction "to reduce spin on the ball," is not consistent with the language of the claim, which refers to decreasing spin between the ball and "the said plurality surface structures." Thus, Warrior's construction is impermissible because it seeks to implicitly exclude "the said plurality surface structures" from the claim. *See Exxon Chemical Patents, Inc. v. Lubrizol Corp.*, 64 F.3d 1553, 1557 (Fed.Cir.1995) (court must "give meaning to all the words in [the] claims"); *see also International Rectifier Corp. v. IXYS Corp.*, 361 F.3d 1363, 1372 (Fed.Cir.2004) ("district court was not free to attribute new meaning to the term or to excuse the patentee from the consequences of its own word choice.")

**\*23** In support of its proposed construction, Warrior has submitted an unsigned declaration from Jesse Hubbard, the inventor of the '547 patent, who states that one of the ordinary skill would understand the meaning "for decreasing spin between said plurality of structures and said lacrosse ball." Hubbard Decl., Pl.'s Ex 43,    10. He further asserts that "if the non-skid surface is on the scoop, it will grab the lacrosse ball as it is leaving the head and impart spin thereto. Similarly, if the non-skid surface is on the sidewalls or the base,

it will grip the ball and decrease spin or reduce sliding when a lacrosse ball contacts the surface when it enters the head." *Id.,*    10-11.

Although Hubbard's declaration represents extrinsic evidence that may be used by the Court, *see Advanced Cardiovascular Sys., Inc. v. Scimed Life Sys., Inc.* 887 F.2d 1070, 1073 (Fed.Cir.1989), it is not consistent with the language of the claim or the specification. As the Federal Circuit stated in 1996, "extrinsic evidence in general, and expert testimony in particular, may be used only to help the court come to the proper understanding of the claims; it may not be used to vary or contradict the claim language. Nor may it contradict the import of other parts of the specification ." *Vitronics, Inc.*, 90 F.3d at 1584. Moreover, although he states that one of ordinary skill would understand the term "decreasing spin between said plurality of structures and said lacrosse ball," Hubbard has not provided the Court with an adequate explanation to support Warrior's proposed construction. Thus, Hubbard's declaration will not be given any weight by the Court on this narrow issue.

Although Warrior's proposed construction for this term must be rejected, the Court concludes that STX has failed to present clear and convincing evidence to support its claim of invalidity. In order for a term to be rendered invalid under 35 U.S.C. ₇ 112, ¶ 2, a party must demonstrate by clear and convincing evidence that the claim "is insolubly ambiguous, and no narrowing construction can properly be adopted[.]" *Exxon Research & Eng'g Co. v. United States*, 265 F.3d 1371, 1375 (Fed.Cir.2001). STX has failed to make the requisite showing at the claim construction stage. Significantly, STX has not presented any expert testimony or scientific analysis to support its view that spin cannot exist between a surface and a ball.

Accordingly, the Court declines at this stage to determine that this term is invalid under 35 U.S.C. ₇ 112, ¶ 2. The Court directs the parties to submit a short brief, not in excess of ten (10) pages, to address the validity of this term and any potential alternative constructions for this term. This brief should be submitted to the Court by the dispositive motion deadline (to wit, July 11, 2005).

IT IS SO ORDERED.

*Certificate of Service*
The undersigned certifies that a copy of the foregoing order was served on the attorneys of record by electronic means or U.S. Mail on June 2, 2005.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 1378752 (E.D.Mich.)
(Cite as: 2005 WL 1378752 (E.D.Mich.))

Page 17

Not Reported in F.Supp.2d, 2005 WL 1378752
(E.D.Mich.)

**Motions, Pleadings and Filings (Back to top)**

• 2006 WL 1035660 (Trial Motion, Memorandum and Affidavit) STX's Reply to STX's Response to STX's Motion for Order Declassifying or Reclassifying Certain Information Warrior Has Designated "Attorneys and Outside Experts Only" and/or "Attorneys Eyes Only" That Does Not Qualify for Those Designations (Mar. 30, 2006)Original Image of this Document (PDF)

• 2006 WL 1035694 (Trial Motion, Memorandum and Affidavit) STX's Reply to Warrior's Response to STX's Motion for Order Declassifying or Reclassifying Certain Information Warrior Has Designated "Attorneys and Outside Experts Only" and/or "Attorneys Eyes Only" That Does Not Quality for Those Designations (Mar. 30, 2006)Original Image of this Document (PDF)

• 2006 WL 1035659 (Trial Motion, Memorandum and Affidavit) Warrior's Response to Stx's Motion for Order Declassifying or Reclassifying Certain Information Warrior has Designated "Attorneys and Outside Experts Only" and/or Attorneys' Eyes Only" that Does not Qualify for Those Designations (Mar. 16, 2006)Original Image of this Document (PDF)

• 2006 WL 1035693 (Trial Motion, Memorandum and Affidavit) Warrior's Response to STX's Motion for Order Declassifying or Reclassifying Certain Information Warrior Has Designated "Attorneys and Outside Experts Only" and/or "Attorneys' Eyes Only" That Does Not Qualify for Those Designations (Mar. 16, 2006)Original Image of this Document (PDF)

• 2006 WL 1035658 (Trial Motion, Memorandum and Affidavit) Warrior's Opposition to Stx's Supplemental Memorandum Regarding Warrior's Motion to Strike the Expert Report of Mr. Gerald Bjorge (Mar. 10, 2006)Original Image of this Document (PDF)

• 2006 WL 1035692 (Trial Motion, Memorandum and Affidavit) Warrior's Opposition to STX's Supplemental Memorandum Regarding Warrior's Motion to Strike the Expert Report of Mr. Gerald Bjorge (Mar. 10, 2006)Original Image of this Document (PDF)

• 2006 WL 352016 (Trial Motion, Memorandum and

Affidavit) Warrior's Reply to its Motion to Strike the Expert Report of Mr. Gerald Bjorge (Jan. 26, 2006)Original Image of this Document (PDF)

• 2006 WL 352030 (Trial Motion, Memorandum and Affidavit) Warrior's Reply to its Motion to Strike the Expert Report of Mr. Gerald Bjorge (Jan. 26, 2006)Original Image of this Document (PDF)

• 2006 WL 352028 (Trial Motion, Memorandum and Affidavit) Defendant STX, L.L.C.'s Opposition to Plaintiff Warrior's Motion to Strike the Expert Report of Mr. Gerald Bjorge (Jan. 12, 2006)Original Image of this Document (PDF)

• 2006 WL 352029 (Trial Motion, Memorandum and Affidavit) Defendant STX, L.L.C.'s Opposition to Plaintiff Warrior's Motion to Strike the Expert Report of Mr. Gerald Bjorge (Jan. 12, 2006)Original Image of this Document (PDF)

• 2006 WL 352504 (Trial Motion, Memorandum and Affidavit) Defendant STX, L.L.C.'s Opposition to Plaintiff Warrior's Motion to Strike the Expert Report of Mr. Gerald Bjorge (Jan. 12, 2006)Original Image of this Document (PDF)

• 2006 WL 352505 (Trial Motion, Memorandum and Affidavit) Defendant STX, L.L.C.'s Opposition to Plaintiff Warrior's Motion to Strike the Expert Report of Mr. Gerald Bjorge (Jan. 12, 2006)Original Image of this Document (PDF)

• 2005 WL 3841750 (Partial Expert Testimony) (Partial Testimony) (Dec. 21, 2005)

• 2005 WL 3841752 (Partial Expert Testimony) (Partial Testimony) (Dec. 21, 2005)

• 2005 WL 3816924 (Expert Report and Affidavit) Supplemental Expert Report of Gerald Bjorge (Dec. 20, 2005)

• 2005 WL 3817488 (Expert Report and Affidavit) Supplemental Expert Report of Gerald Bjorge (Dec. 20, 2005)

• 2005 WL 3817490 (Expert Report and Affidavit) Supplemental Expert Report of Gerald Bjorge (Dec. 20, 2005)

• 2005 WL 3721761 (Trial Motion, Memorandum and Affidavit) Defendant Stx, L.L.C.'s Opposition to Warrior's Motion for Summary Judgment of Infringement of U.S. Patent No. re 38,216 (Nov. 8,

Not Reported in.F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 1378752 (E.D.Mich.)
(Cite as: 2005 WL 1378752 (E.D.Mich.))

2005)Original Image of this Document (PDF)

• 2005 WL 3721762 (Trial Motion, Memorandum and Affidavit) Warrior's Opposition to Stx's Motion for Partial Summary Judgment of Non-Infringement of U.S. Patent No. re 38,216 (Nov. 8, 2005)Original Image of this Document (PDF)

• 2005 WL 3721764 (Trial Motion, Memorandum and Affidavit) Warrior's Opposition to Stx's Motion for Partial Summary Judgment that Claims 58-101 of the '216 Patent are Invalid (Nov. 8, 2005)Original Image of this Document (PDF)

• 2005 WL 3721766 (Trial Motion, Memorandum and Affidavit) Warrior's Opposition to Stx's Motion for Partial Summary Judgement of Unenforceability of the %2C216 Patent Due to Inequitable Conduct (Nov. 8, 2005)Original Image of this Document (PDF)

• 2005 WL 3721768 (Trial Motion, Memorandum and Affidavit) Defendant Stx, L.L.C.'s Brief in Support of its Opposition to Warrior's Motion for Summary Judgement that the %2C216 Patent is not Invalid or Unenforceable in View of any Purported Activities of Robert J. Rule (Nov. 8, 2005)Original Image of this Document (PDF)

• 2005 WL 3721769 (Trial Motion, Memorandum and Affidavit) Stx, L.L.C.'s Memorandum in Opposition to Warrior's Motion for Summary Judgment of Infringement of U.S. Patent No. 6,561,932 (Nov. 8, 2005)Original Image of this Document (PDF)

• 2005 WL 3721771 (Trial Motion, Memorandum and Affidavit) Stx, L.L.C.'s Memorandum in Opposition to Warrior's Motion for Partial Summary Judgment Concerning the Validity of U.S. Patent No. 6,561,932 (Nov. 8, 2005)Original Image of this Document (PDF)

• 2005 WL 3721818 (Trial Motion, Memorandum and Affidavit) Defendant Stx, L.L.C.'s Opposition to Warrior's Motion for Summary Judgment of Infringement of U.S. Patent No. re 38, 216 (Nov. 8, 2005)Original Image of this Document (PDF)

• 2005 WL 3721819 (Trial Motion, Memorandum and Affidavit) Warrior's Opposition to Stx's Motion for Partial Summary Judgment of Non-Infringement of U.S. Patent No. re 38,216 (Nov. 8, 2005)Original Image of this Document (PDF)

• 2005 WL 3721821 (Trial Motion, Memorandum and Affidavit) Warrior's Opposition to Stx's Motion for Partial Summary Judgment that Claims 58-101 of the

'216 Patent are Invalid (Nov. 8, 2005)Original Image of this Document (PDF)

• 2005 WL 3721822 (Trial Motion, Memorandum and Affidavit) Warrior's Opposition to Stx's Motion for Partial Summary Judgement of Unenforceability of the '216 Patent Due to Inequitable Conduct (Nov. 8, 2005)Original Image of this Document (PDF)

• 2005 WL 3721823 (Trial Motion, Memorandum and Affidavit) Defendant Stx, L.L.C.'s Brief in Support of its Opposition to Warrior's Motion for Summary Judgment that the '216 Patent is not Invalid or Unenforceable in View of any Purported Activities of Robert J. Rule (Nov. 8, 2005)Original Image of this Document (PDF)

• 2005 WL 3721825 (Trial Motion, Memorandum and Affidavit) Stx, L.L.C.'s Memorandum in Opposition to Warrior's Motion for Summary Judgment of Infringement of U.S. Patent No. 6,561,932 (Nov. 8, 2005)Original Image of this Document (PDF)

• 2005 WL 3721826 (Trial Motion, Memorandum and Affidavit) Stx, L.L.C.'s Memorandum in Opposition to Warrior's Motion for Partial Summary Judgment Concerning the Validity of U.S. Patent No. 6,561,932 (Nov. 8, 2005)Original Image of this Document (PDF)

• 2005 WL 3817489 (Expert Report and Affidavit) Declaration of Paul Kolada in Support of Stx's Opposition to Warrior's Motion for Summary Judgment of Infringement of the '932 Patent (Nov. 8, 2005)

• 2005 WL 3817636 (Expert Report and Affidavit) Declaration of Paul Kolada in Support of Stx's Opposition to Warrior's Motion for Summary Judgment of Infringement of the '932 Patent (Nov. 8, 2005)

• 2005 WL 3817641 (Expert Report and Affidavit) Expert Rebuttal Report of Gerald Bjorge (Oct. 25, 2005)

• 2005 WL 3817637 (Expert Report and Affidavit) Expert Rebuttal Report of Gerald Bjorge (Oct. 2005)

• 2005 WL 3817661 (Expert Report and Affidavit) Declaration of Richard D. Grauer in Support of Plaintiffs Opposition to Defendant's Motion for Partial Summary Judgment of Unenforceability of '216 Patent Due to Inequitable Conduct (Sep. 21, 2005)

• 2005 WL 3817662 (Expert Report and Affidavit)

2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 1378752 (E.D.Mich.)
(Cite as: 2005 WL 1378752 (E.D.Mich.))

Report of Plaintiffs Expert Witness Richard D. Grauer under Rule 26(a)(2)(B), Fed. R. Civ. P. (Sep. 21, 2005)

• 2005 WL 2142133 (Trial Motion, Memorandum and Affidavit) Warrior's Opposition to Six L.L.C.'S Motion to Compel Discovery (Jul. 28, 2005)Original Image of this Document (PDF)

• 2005 WL 2142483 (Trial Motion, Memorandum and Affidavit) Warrior's Opposition to Stx L.L.C.'s Motion to Compel Discovery (Jul. 28, 2005)Original Image of this Document (PDF)

• 2005 WL 2142479 (Trial Motion, Memorandum and Affidavit) Warrior's Reply to Its Motion to Exclude (Jul. 25, 2005)Original Image of this Document (PDF)

• 2005 WL 2142128 (Trial Motion, Memorandum and Affidavit) Defendant STX, LLC's Opposition to Plaintiff Warrior Lacrosse, Inc.'s Motion to Exclude (Jul. 11, 2005)Original Image of this Document (PDF)

• 2005 WL 2142130 (Trial Motion, Memorandum and Affidavit) Defendant STX, L.L.C.'s Motion to Compel Discovery (Jul. 11, 2005)Original Image of this Document (PDF)

• 2005 WL 2142471 (Trial Motion, Memorandum and Affidavit) Defendant Stx, LLC's Opposition to Plaintiff Warrion Lacrosse, Inc.'s Motion to Exclude (Jul. 11, 2005)Original Image of this Document (PDF)

• 2005 WL 2142475 (Trial Motion, Memorandum and Affidavit) Defendant Stx, L.L.C.'s Motion to Compel Discovery (Jul. 11, 2005)Original Image of this Document (PDF)

• • 2005 WL 3817491 (Expert Report and Affidavit) Declaration of Jesse Hubbard (Mar. 2005)

• • 2005 WL 3817635 (Expert Report and Affidavit) Declaration of Jesse Hubbard (Mar. 2005)

• 2004 WL 2627404 (Trial Motion, Memorandum and Affidavit) Warrior's Reply to Its Motion (1) Pursuant to Fed. R. Civ. P. 37(a) and (c) for an Order Compelling Interrogatory Answers and Documents and (2) Pursuant to Fed. R. Civ. P. 36(a) to Determine the Sufficiency of STX's Objections to Certain Admission Re quests (Aug. 27, 2004)Original Image of this Document (PDF)

• 2004 WL 2627396 (Trial Motion, Memorandum and Affidavit) Defendant STX, L.L.C.'s Opposition to

Warrior's Motion (1) Pursuant to Fed. R. Civ. P. 37(a) and (c) for an Order Compelling Interrogatory Answers and Documents and (2) Pursuant to Fed. R. Civ. P. 36(a) to Determine the Sufficiency of STX's Objection s to Certain Admission Requests (Aug. 13, 2004)Original Image of this Document with Appendix (PDF)

• • 2004 WL 2627383 (Trial Motion, Memorandum and Affidavit) STX's Reply to Warrior's Opposition to STX's Motion to Consolidate (Jun. 28, 2004)Original Image of this Document (PDF)

• 2004 WL 2627373 (Trial Motion, Memorandum and Affidavit) Warrior's Opposition to Stx's Motion to Consolidate (Jun. 17, 2004)Original Image of this Document with Appendix (PDF)

• 2004 WL 2627365 (Trial Motion, Memorandum and Affidavit) Reply to Amended Answer and Counter Complaint, Affirmative Defenses and Jury Demand (May 26, 2004)Original Image of this Document (PDF)

• 2004 WL 2627354 (Trial Pleading) Amended Answer, Affirmative Defenses, Counterclaims and Jury Demand (May 3, 2004)Original Image of this Document with Appendix (PDF)

• 2004 WL 2627340 (Trial Motion, Memorandum and Affidavit) Reply to Answer and Counter Complaint, Affirmative Defenses and Jury Demand (Apr. 22, 2004)Original Image of this Document (PDF)

• 2004 WL 2627331 (Trial Pleading) Amended Answer and Counterclaims (Apr. 19, 2004)Original Image of this Document with Appendix (PDF)

• 2004 WL 2627321 (Trial Pleading) Answer, Counterclaims and Demand for Jury Trial (Mar. 31, 2004)Original Image of this Document (PDF)

• 2004 WL 2627308 (Trial Pleading) Complaint and Demand for Jury Trial (Jan. 30, 2004)Original Image of this Document with Appendix (PDF)

• 2:04cv70363 (Docket) (Jan. 30, 2004)

• 2001 WL 34886466 (Expert Report and Affidavit) Declaration of Richard D. Grauer in Support of Plaintiff's Opposition to Defendant's Motion for Partial Summary Judgment of Unenforceability of '216 Patent Due to Inequitable Conduct (Feb. 5, 2001)

END OF DOCUMENT

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 1378752 (E.D.Mich.)
(Cite as: 2005 WL 1378752 (E.D.Mich.))

2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.