IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| MCKESSON INFORMATION SOLUTIONS LLC, | ) ) ) | CIVIL ACTION NO. 04-1258-SLR |
| Plaintiff, | ) ) | |
| v. | ) ) | REDACTED PUBLIC VERSION |
| THE TRIZETTO GROUP, INC., | ) ) ) | |
| Defendant. | ) | |

**DECLARATION OF MICHAEL A. BARLOW IN SUPPORT OF
PLAINTIFF MCKESSON INFORMATION SOLUTIONS LLC'S
MEMORANDUM IN SUPPORT OF ITS MOTION FOR
SUMMARY JUDGMENT RE: ANTICIPATION AND OBVIOUSNESS**

I, Michael A. Barlow, pursuant to 28 U.S.C. § 1746, declare as

follows:

1.    I am an attorney of the Bar of the State of Delaware and of the

firm of Skadden, Arps, Slate, Meagher & Flom LLP, attorneys for plaintiff

McKesson Information Solutions LLC in the above-captioned action.  I submit this

declaration in support of the Plaintiff's Memorandum in Support of its Motion for

Summary Judgment Re: Anticipation and Obviousness, and to transmit to the Court

true and correct copies of the following documents attached as exhibits hereto:

| **Description** | **Exhibit No.** |
|---|---|
| TriZetto's Fourth Supplemental Response To Plaintiff's Interrogatory No. 6 dated September 13, 2005 | 1 |
| Expert Report of Randall Davis dated October 24, 2005 | 2 |
| Expert Report of Larry Kerschberg dated October 24, 2005 | 3 |
| Expert Report of Philip Hawley dated October 24, 2005 | 4 |
| Excerpts from the deposition of Randall Davis taken on November 30, 2005 | 5 |
| Excerpts from the deposition of Philip Hawley taken on November 30, 2005 | 6 |
| Excerpts from the deposition of Larry Kerschberg taken on November 21, 2005 | 7 |
| Davis, Randall *"Expert System: Where Are We? And Where Do We Go From Here?"* The AI Magazine Spring 1982 pp. 3-22 | 8 |
| Rebuttal Expert Report of Mark Musen dated November 24, 2005 | 9 |
| Expert Report of David Wilson dated November 14, 2005 | 10 |
| *Moore North America, Inc., v. Poser Business Forms, Inc.*, C.A. No. 97-712-SLR, 2001 WL 253117 (D. Del. Mar. 8, 2001) | 11 |
| *Praxair, Inc. v. ATMI, Inc.*, C.A. No. 03-1158-SLR, 2005 WL 3159054 (D. Del. Nov. 28, 2005) | 12 |
| Excerpts from McKesson Information Solutions LLC's First Set Of Interrogatories, dated December 22, 2004 | 13 |
| Excerpts from the deposition of George Goldberg taken on September 13, 2005 | 14 |
| Excerpts from the deposition of Eric King taken on October 4, 2005 | 15 |
| *Intel Corp. v. Broadcom Corp.*, C.A. No. 00-796-SLR, 2003 U.S. Dist. Lexis 2372 (D. Del. Feb. 13, 2003) | 16 |

AMS Claim Level Edits prepared by The Health Data Institute dated June          17
1986 bearing Bates Nos. RD000325 – RD000419

Excerpts from Trial Transcripts, Volume D before Honorable Sue L.              18
Robinson dated April 20, 2006

I declare under penalty of perjury that the foregoing is true and

correct.

Executed: June 1, 2006

_____
Michael A. Barlow (I.D. # 3928)

# EXHIBIT 1

REDACTED

# EXHIBIT 2

REDACTED

# EXHIBIT 3

REDACTED

EXHIBIT 4

**AN EXPERT OPINION IN THE MATTER OF:**

# McKesson Information Solutions, LLC v. The TriZetto Group, Inc.

**RE: U.S. Patent No. 5,253,164**

SYSTEM AND METHOD FOR DETECTING FRAUDULENT MEDICAL CLAMS VIA EXAMINATION OF SERVICE CODES

OPINION PREPARED BY:

**Philip M. Hawley, Jr., MD**

October 24, 2005

| | | |
|---|---|---|
| **Section One:** | Qualifications | 1 |
| **Section Two:** | Disclosures | 3 |
| **Section Three:** | Health Insurance Industry Trends, Medical Billing Practices, & Claim Auditing Prior To September 30, 1987 | 4 |
| **Section Four:** | Claims Of The '164 patent | 8 |
| **Section Five:** | Opinions Concerning The '164 Patent | 13 |
| **Appendix A:** | Curriculum Vitae – Philip M. Hawley, Jr., MD | 30 |

## SECTION ONE:  QUALIFICATIONS

A summary of my educational background and employment history are presented in my curriculum vitae in Appendix A of this report.

My qualifications for offering an opinion in this matter include the following:

1. Two years as Executive Vice President and the senior medical officer of AMI Group Health Services, Inc., a health insurance company that performed auditing of CPT-coded medical claims.

2. Twelve years as a consultant with Pace Healthcare Management, the managed care consulting that firm I founded in 1986. [1] I regularly worked on projects involving medical claim adjudication, medical claim auditing, clinical data reporting and other issues requiring an in-depth knowledge of CPT-coding. During the 12-year period of my association with Pace Healthcare Management, I provided consulting services to health insurance companies and HMOs on matters pertaining to medical cost management, including claim auditing.  Our firm's medical claim auditing clients included:

   - Federal programs, including the U.S. Health Care Financing Administration (H.C.F.A., which administers the Medicare program) and the U.S. Government Employee Healthcare Association

   - Large corporate healthcare purchasers, including John Deere, Walgreens, and Southern California Edison

   - The health insurance divisions of companies such as Northwestern National Life and New York Life

   - Zenith Insurance Company (a Worker's Compensation insurer)

   In addition, and on behalf of large self-insured employers (i.e., corporate purchasers such as AT&T), our firm performed operational evaluations of the medical claim auditing programs at several health insurance companies and HMOs, including Aetna, CIGNA, Prudential, U.S. Healthcare, Capital Blue

---

[1] Pace Healthcare Management refers to the consulting firm that was variably known throughout its existence as Pace Healthplan Management, Inc., Pace Healthcare Management, Inc., Pace Healthcare Management, LP, and Pace Healthcare Management, LLC.

Cross, Blue Cross of California, Health Net, PacifiCare, and Travelers Life Insurance Company.

3. My experience working with one of my consulting clients, Erisco Systems (now The TriZetto Group, Inc.), to create a computer-based system for auditing CPT-coded medical claims, detecting aberrant billing practices, and amending improperly billed claims.

## SECTION TWO:  DISCLOSURES

I am being reimbursed at an hourly rate of $325 for my work in connection with this case.

I have served as an expert witness on approximately three other occasions.  In each instance that I was called upon as an expert, the issues pertained to managed healthcare.

In forming my opinions about this case, I reviewed the following materials:

- U.S. Patent No. 5,253,164 (System and Method for Detecting Fraudulent Medical Claims via Examination of Service Codes);

- Physicians Current Procedural Terminology Fourth Edition, 1985, American Medical Association (Discovery Document labeled "Appendix A — CPT-4 Manual," MCK 053146 through 053392);

- The deposition of George A. Goldberg, MD, in connection with McKesson Information Solutions, LLC v. The TriZetto Group, Inc. (Case No. 04-1258 SLR), dated September 13 and 28, 2005;

- Articles and documents that are recorded in the footnotes of this document (with URLs where available).

I asked to review my Pace Healthcare Management files containing records from my consulting work for Erisco Systems (now The TriZetto Group) in connection with ClinicaLogic—a computer-based system for auditing CPT-coded medical claims.  I understand that those files are now in the possession of Deloitte & Touche, the consulting firm that acquired Pace in 2000.  I did not receive copies of those files in sufficient time to review them and discuss them in my report.  There may be documents in those files that would refresh my recollection about contextual issues important to this case.  I will supplement this report should I discover information that is relevant to this case.

## SECTION THREE:  HEALTH INSURANCE INDUSTRY TRENDS, MEDICAL BILLING PRACTICES, & CLAIM AUDITING PRIOR TO SEPTEMBER 30, 1987

Coincident with the advent of Medicare and Medicaid in 1965, and against the backdrop of the then-increasing prevalence of employer-sponsored health insurance programs, U.S. healthcare costs began rising at a rate that has consumed an ever-larger share of the U.S. Gross Domestic Product (GDP)—climbing steadily from 5.7% of GDP in 1965 to 14.1% in 2001. [2]  Throughout this period, trends in healthcare spending for physician services reveal an inflationary trend consistently and significantly above the U.S economy's underlying Consumer Price Index (CPI). [3]

As Drs. Egdahl and Hertenstein wrote in their 1987 article, *An Access-oriented Negotiated Fee Schedule*, "between 1965 and 1985, national expenditures for physicians' services have increased almost tenfold, from $8.5 billion in 1965 to $82.8 billion in 1985." [4]

There are many reasons for this—including legislative trends toward more universal healthcare coverage, the explosion of new and costly medical therapies and technologies, so-called defensive medicine during an era of increasing malpractice litigation, to name but a few—but the relevance of this fact to the current litigation involving the '164 patent lies in noting that these cost trends, and their effects, were well underway by the late-1970s.

Concerns about rising healthcare costs and affordability gave rise to the HMO Act of 1973, which ushered in the era of "managed care." By the early 1980s, health maintenance organizations (HMOs), preferred provider organizations (PPOs), and other managed care programs were commonplace, if not yet the norm for most Americans.

By 1984, the majority of commercial health plans—be they traditional health insurance plans, PPOs, or HMOs—had medical cost control programs in place.  Many of the larger health insurers used multiple cost control strategies, including utilization review (i.e.,

---

[2]  Source: U.S. Bureau of the Census; and U.S Department of Commerce, Bureau of Economic Analysis (2003). URL to chart (National Health Care Trends in Public versus Private Funding): http://63.241.27.79/researchers/pubs/datacompendium/2003/03pg14.pdf

[3]  Source: National Medical Price Indicators, 1965 – 2002, U.S. Department of Labor, Bureau of Labor Statistics (November, 2003).  URL to chart (National Medical Care Price Indicators): http://www.cms.hhs.gov/researchers/pubs/datacompendium/2003/03pg1718.pdf

[4]  Richard H. Egdahl, M.D. and Robert D. Hertenstein, M.D., *An Access-Oriented Negotiated Fee Schedule*, Ann. Surgery September, 1987; 206(3):349-57

the pre-treatment authorization of medical services) and audits of both non-CPT-coded medical claims (e.g., inpatient hospital claims) and CPT-coded claims (CPT is an acronym for the American Medical Association's "Current Procedural Terminology"). [5]

In this context, I use the term "audit" to denote the pre- and/or post-payment examination of medical claims to detect improperly billed services or charges. Hereinafter, all references to "claims," "medical claims," "physician bills," and similar terms refer to CPT-coded claims, except where otherwise noted.

By 1984, the audit of medical claims was a common practice among health insurance companies and HMOs. I know this because, as one of the founding executives and senior medical officer of AMI Group Health Services—a health insurance company that marketed both PPOs and HMOs—I surveyed then-current (1984) industry practices as part of our initial market research.

By that time, CPT was the prevailing coding convention used by health insurance companies and HMOs when adjudicating and paying claims for medical services and procedures. Occasionally, insurers added their own unique codes for services not included in the CPT coding system (such as durable medical equipment), but this did not change the fact that CPT had become the standard for medical coding and billing by virtue of its prevalence. [6] Because CPT coding conventions had become the industry standard, it followed that medical claims comprising services and procedures for which a CPT code existed would also be judged against that standard. And as I describe below, that is exactly what was occurring.

For insurers and HMOs, the CPT coding system had several advantages. First created in 1966, it is maintained and updated by expert physician panels of the American Medical Association (AMA) and, thus, is generally accepted by physicians and other healthcare providers. [7] It is comprehensive, encompassing all non-experimental physician services as

---

[5] Throughout this report, I used the terms CPT and CPT-4 interchangeably. During the 1980s, CPT coding encompassed the following categories of medical services: Medicine (e.g., physician office visits), Surgery, Anesthesia, Radiology, Pathology and Laboratory.

[6] In 1983, the Health Care Financing Administration, HCFA, formally adopted CPT codes as the basis for Medicare's HCPCS coding system (HCPCS is an acronym for *HFCA Common Procedural Coding System*).

[7] CPT codes are assigned by the AMA's CPT Editorial Panel.

well as laboratory and radiology services. [8] And finally, the CPT coding system offers explicit rules that can be used to audit medical claims. [9]

Many improperly coded medical claims were simply the result of unintentional errors. But by 1984, health insurance companies and HMOs were also aware that some physicians, laboratories, and other medical practiioners were "gaming the system." The techniques were many and varied, and included those methods described in the Specification and Appendices of the '164 patent. Examples include:

- Unbundling—breaking down a service or procedure into its component parts and submitting a bill with several CPT codes, rather than properly using a single CPT code that encompasses all of the rendered services.

- Fragmentation—billing for incidental procedures performed as part of a larger procedure, or for services that are integral to a larger procedure (e.g., billing for an appendectomy when performing a colectomy – removal of the colon).

- Redundant codes—billing multiple times for the same procedure or service.

- Upcoding—using a CPT code that represents a more complex service than the one that was actually performed.

- Incompatible services—procedures that are inconsistent with, or unnecessary, in light of: the patient's diagnosis, age, or gender; other procedures listed on the medical claim.

- Outdated or nonexistent codes—using obsolete or fictitious codes (e.g., to sidestep the automated fee-determining algorithms built into claim processing software).

- Inappropriate place-of-service—rendering care in a setting that results in unnecessary costs (e.g., admitting an otherwise healthy patient to the hospital for cataract surgery), or duplicate billing.

One might ask: Why did physicians and other healthcare providers engage in these aberrant billing practices, and why was the prevalence of such practices increasing during the

---

[8] There are currently over 8,500 CPT codes, significantly more than existed in the mid 1980s. The number of codes grows each year as new services and procedures are accepted into the coding terminology.

[9] A discussion of the process and criteria for creating CPT codes can be viewed on the web site of the American Medical Association (AMA). URL to article (CPT Process — How a code becomes a code): http://www.ama-assn.org/ama/pub/category/3882.html

early 1980s? Ironically, most physicians with whom I discussed this issue at that time did not view their "creative" billing as an attempt to defraud insurers, but rather as a means of achieving what they considered fair and just compensation for their services. With the advent of managed care, physicians were subjected to increasing amounts of paper work for which they were not reimbursed, and had negotiated reduced per-service fee rates in exchange for the promise of increased patient volume that in many cases never materialized. For many physicians, the cost of managing their offices was rising while their incomes were stagnating or declining. Furthermore, many physicians felt that public and private payors were unfairly targeting doctors, as when, in 1984, Medicare temporarily froze physician fees. Unbundling and similarly irregular billing practices were, in the view of some physicians, simply a means of earning what they considered equitable reimbursement for their services.

Moreover, an entire cottage industry relating to physician billing had sprung up by the mid 1980s. Several so-called consulting firms specialized in training the billing personnel in physicians' offices how to maximize their reimbursement by using unorthodox billing techniques. By 1985, it had become a classic game of cat-and-mouse, and some insurance companies sent their supervising claim examiners and/or claim auditing staff to these seminars (as I did) to identify trends in what we considered clearly deceptive billing practices.

During this period, pre-payment medical claim auditing practices varied from company to company, just as business practices do in most industries. Some insurance companies had a defined audit initiation procedure with specific criteria for triggering a medical claim audit, while others relied on the coding knowledge and judgment of their claim examiners to trigger an audit. [10]

Many of the larger insurers had one or more physicians on staff (and, often, some registered nurses) who were proficient in coding and billing practices. In addition, many insurers had a formal or informal panel of physician auditors—practicing physicians in various specialties who, for a fee, would audit claims when the coding and billing issues required specialty-matched review.

By the mid 1980s, medical claim auditing (using CPT coding conventions) by health insurance companies and HMOs was a commonplace activity.

---

[10] In this context, claim examiners are non-medical personnel trained to process medical claims.

## SECTION FOUR:  CLAIMS OF THE '164 PATENT

The claims of the '164 patent describe a computer system and a database comprising a process for: (1) receiving medical claims containing medical service codes and applying auditing (fraud detection) rules to those medical claims, and (2) authorizing or rejecting one or more of the code(s) and/or claim(s).  Hereinafter, I will refer to this general description as the "basic system and method" of the '164 patent.

The claims of the '164 patent appear to refer to medical claims that include codes for medical services performed by physicians and other licensed medical practitioners (such as chiropractors and audiologists), as well as certain facility-based services (e.g., lab tests and x-rays).

What follows is my understanding of the claims of the '164 patent, including any ambiguities contained within the language of the claims (my numbering coincides with the numbering of the patent claims in the '164 patent):

1.  A method for: receiving medical claims (single or multiple); interacting with a database of codes to determine and inform the user whether the billed code(s) are contained in the database; informing the user that a medical code is not contained in the database. [11]

This patent claim also describes the computer system on which these methods are applied, a computer with a "predetermined" database that contains relationships for defining whether one medical service code is valid when it appears on the same claim(s) with another code from the same database.

The term "predetermined" is never defined in the '164 patent.  The term hints at something that is fixed and unchanging, but the term is never clarified. While the Specification and Appendices provide examples of the codes and relationships within the predetermined database, the specific contents of this database are never fully disclosed.

---

[11] Throughout the claims of the '164 patent, I assume that the terms "input claim" and "claim" refer to a bill (invoice) for medical services.

2.  The basic system and method, and a method for determining whether any code contained in the claim(s) is mutually exclusive of another code appearing on the same claim(s) due to non-medical reasons.

The terms "mutually exclusive" and "non-medical" are not defined in the '164 patent. Are the gender and age of a patient non-medical issues, or medical issues? Certainly, they are medical facts. The patent does not provide sufficient information for me to determine the meaning of these terms in this patent claim. Further, this patent claim refers to one code being mutually exclusive with respect to another code, not with respect to a demographic factor such as the patient's gender or age. Ultimately, the audit method contemplated in patent claim #2 is not specifically identified.

Also, please see my discussion of the predetermined database under patent claim #1.

3.  The basic system and method, and a system for determining whether one of multiple billed codes is valid or invalid.

The terms "valid" and "invalid" are not defined, and one may choose to construe their meaning broadly or narrowly. It is not clear whether the terms "valid" and "invalid" were used with the intent of: (a) encompassing all audit detection methods and systems described in the Specification and Appendices; (b) encompassing only some of the audit detection methods and systems described in the Specification and Appendices; or (c) broadly encompassing all of the audit detection methods and systems described in the Specification and Appendices, as well as any future audit detection methods and systems.

Whatever the case, the terms "valid" and "invalid" do not summon to mind specific audit detection techniques, but rather the general concept of improperly billed codes and claims.

Also, please see my discussion of the predetermined database under patent claim #1.

4. The apparatus of patent claim #3, with a system for removing invalid medical codes from the medical claim(s).

   Please see my discussion of "valid" and "invalid" under patent claim #3.

5. The apparatus of patent claim #4, with a system for informing the user why codes were deleted from the medical claim(s).

6. The apparatus of patent claim #3, noting that the database of medical service codes refers to CPT codes.

   Please see my discussion of "valid" and "invalid" under patent claim #3.

7. I understand that patent claim #7 is not being asserted.

8. The apparatus of patent claim #3, with a system for requesting additional information from the user of the system.

   Please see my discussion of "valid" and "invalid" under patent claim #3.

9. The apparatus of patent claim #3, noting that there are medically determined relationships among the medical service codes in the database.

   Please see my discussion of the predetermined database under patent claim #1.

   Also, please see my discussion of "valid" and "invalid" under patent claim #3.

10. The basic system and method, with a system for determining whether a single billed code among multiple billed codes is part of ("included in") one of the other billed codes.

    Please see my discussion of the predetermined database under patent claim #1.

11. The apparatus of patent claim #10, with a system for removing the rejected code(s) from the medical claim(s).

12. The basic system and method, with a system for determining whether any code contained in the claim(s) is exclusive of another code appearing on the same claim(s) for medical reasons.

    The term "medically exclusive" is not defined. Therefore, there is no way to determine how this audit detection issue—medically exclusive—differs from a code being "invalid by interacting with the database" (patent claim #3). Also, nowhere in the '164 patent did I find a discussion of the distinction between "non-medical" (as used in patent claims #2 and #14) and "medical" (as used in patent claim #12).

Please also see my discussion of the predetermined database under patent claim #1.

13. The basic system and method, with a system for determining and informing the user whether the billed code(s) are contained in the database.

Please also see my discussion of the predetermined database under patent claim #1.

14. The basic system and method, with a system for determining whether any code contained in the claim(s) is mutually exclusive of another code appearing on the same claim(s) due to non-medical reasons.

The terms "mutually exclusive" and "non-medical" are not defined (please see my discussion under patent claim #2, above). Also, please see my discussion of the predetermined database under patent claim #1.

15. The basic system and method, with a system for determining whether a single billed code among the multiple billed codes is valid or invalid, and rejecting or authorizing the claim(s).

Please see my discussion of "valid" and "invalid" under patent claim #3. Also, please see my discussion of the predetermined database under patent claim #1.

16. The basic system and method, with a method for determining whether a single billed code among the multiple billed codes is valid or invalid, and rejecting or authorizing the claim(s).

Please see my discussion of "valid" and "invalid" under patent claim #3. Also, please see my discussion of the predetermined database under patent claim #1.

Only three of the 16 patent claims are described in a manner that one can reasonably correlate to audit detection techniques described in the Specification and Appendices. Those are the method and apparatus claims (patent claims #1 and #13, respectively) that describe a method and computer system for determining whether a code appearing on a medical claim (or claims) is contained in the predetermined database, and the apparatus-only claim (patent claim #10) that describes a computer system for determining whether one code among multiple billed codes is part of ("included in") any of the other billed codes appearing on a medical claim or claims.

None of the other medical claim auditing methods and apparatuses described in the Specification, or rendered as examples in the Appendices, are specifically identified in the claims of the '164 patent.

I understand that the Court has not yet interpreted the claims of the '164 patent or identified the required structure. I may supplement this opinion once the Court renders its claim construction.

## SECTION FIVE:  OPINIONS CONCERNING THE '164 PATENT

During the 12-year period of my association with Pace Healthcare Management, I regularly worked on consulting projects involving medical claim adjudication, medical claim auditing, clinical data reporting and other issues requiring an in-depth knowledge of CPT-coding.  From 1986 through 1998, I provided consulting services to health insurance companies and HMOs on matters pertaining to claim auditing.  I am familiar with computer-based claim auditing systems because of my consulting work with health insurance companies and HMOs, and my consulting role in developing The TriZetto Group's ClinicaLogic product.

It is based on this experience and knowledge—coupled with my training, education, and work experience outlined above—that I offer my opinions concerning the '164 patent.  In forming my opinions, I relied on my reading of the '164 patent as well as my understanding and expertise in coding rules that govern medical billing practices.  To the best of my knowledge and recollection, all comments and opinions are framed within the context of industry conditions that existed prior to the summer of 1987 (which I understand to be the date claimed by McKesson as the date of conception of the '164 patent).

As previously discussed, with the exception of patent claims #1, #10, and #13, the claims of the '164 patent do not disclose the specific nature of the claim auditing methods and apparatuses (hereinafter referred to as the "claim auditing process") described in the Specification and Appendices.  However, I understand that the claims of the '164 patent are intended to describe a system and method that performs some number of the claim auditing methods described in the Specification and Appendices of the '164 patent.  Thus, my opinions are in reference to the claim auditing process described in the patent claims, Specification and Appendices of the '164 patent.

**The claim auditing process described in the '164 patent was known and would have been obvious to a person of ordinary skill in the art.**

I have been informed by counsel for TriZetto that, as set forth in 35 U.S.C. § 102, an invention is not novel if "the invention was known or used by others in this country, or patented or described in a printed publication in this or a foreign country, before the invention

thereof by the applicant for patent." I have also been informed by counsel for TriZetto that, as set forth in 35 U.S.C § 103, "a patent may not be obtained…if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." **I conclude that the claim auditing process described in the asserted claims of the '164 patent was known and would have been obvious at the time the invention was made to a person having ordinary skill in the art, for the reasons described below.**

The '164 patent states the following about the claim auditing rules described in the patent: "Each of the rules was developed as a result of reviewing medical procedures by expert medical personnel and is consistent with the CPT-4 classification system. However, expert medical personnel also applied clinical judgment to situations where the CPT-4 classification system is not explicit or non-existent." (Col. 6, lines 7-13)

This statement identifies the information sources for the claim auditing rules disclosed in the patent: (1) CPT coding conventions, and (2) the clinical judgment(s) of expert medical personnel. Having myself used these same two information sources when working as a consultant to Erisco (now TriZetto) and developing auditing rules and the database for a computer-based claim auditing system with comparable functionality—ClinicaLogic—I am very familiar with the developmental process and information sources to which the '164 patent refers.

In fact, it is in part owing to my experience with ClinicaLogic that I conclude the claim auditing process of the '164 patent was not novel. As the '164 patent acknowledges (Col. 6, lines 7-13), the auditing rules described in the '164 patent are "consistent with the CPT-4 classification system," meaning that, in effect, many of the rules were drawn directly from CPT coding conventions, as discussed in more detail below. Certainly, methods drawn from a long-existing publication would fail any test of novelty. [12]

That leaves the second source of information disclosed in the '164 patent—the judgments of expert medical personnel. What exactly does this comprise? It is true that,

---

[12] Dr. George A. Goldberg, one of the inventors of the '164 patent, agreed that many of the claim auditing rules contained in the '164 patent could be discerned from the CPT-4 Manual. On page 230 of his deposition, he acknowledged that, in 1988, he had written, "'anybody' can go through the coding book [CPT-4 Manual] and identify a large number of decision rules."

while the AMA rendered then-current coding conventions in their CPT manual, some related clinical issues were not explicitly addressed. For example, the AMA did not address place-of-service issues (the setting in which a procedure would normally be performed), age and gender issues (at what age is a specific service or procedure likely to be performed, and is the procedure gender-specific?), or incompatible diagnoses (procedures that are inconsistent with, or unnecessary, in light of: the patient's diagnosis, age, or gender; or other procedures listed on the medical claim).

However, there was no reason to explicitly address these concepts in the CPT coding manual because they were already known to physicians and many medical claim auditors by virtue of their training. Physicians and nurses who worked as claim auditors knew that most cataract surgery is done as an outpatient, and they knew that seventy-year-old women do not typically give birth. The issue of incompatible services (related to diagnosis) could raise valid questions in a pre-payment claim audit, but a specialty-matched physician claim auditor would readily know which diagnoses are appropriate for each of the procedures performed by specialists in his or her field.

To be fair, there were also occasional ambiguities in the CPT coding conventions as they related to specific medical procedures. However, these ambiguities were infrequent and were readily filled in: (1) by way of analogy (i.e., if a certain coding convention applied to urological procedures, it reasonably also applied to gynecologic procedures), or (2) by seeking the judgment of expert medical personnel (generally, the consensus opinion of specialty-matched physicians).

Ultimately, then, these judgments by expert medical personnel were either: (a) knowledge widely known to physician claim auditors (e.g., incompatible diagnosis, age, and gender); (b) analogous applications of already-existing CPT coding conventions (i.e., to address infrequent ambiguities); or (c) a simple consensus opinion. As such, the claim auditing process described in the claim, Specification and Appendices was not based on novel ideas or methods.

Moreover, for the invention to be accepted by healthcare insurance companies and medical providers, it had to be based on some acceptable pre-existing standards. In this instance, those standards were:

      1.  The CPT coding conventions.

2. The judgment of expert medical personnel.

While the '164 patent does not disclose the full set of claim auditing rules, I think it is instructive to examine the types of claim auditing rules revealed in the Specification and Appendices of the '164 patent because doing so reveals pre-existing sources—sources that existed prior to the summer of 1987—for the methods comprising those auditing rules.

Under the "Description of the Preferred Embodiment" (Col. 4-10), the '164 patent describes a process that begins with the user entering information from the medical claim. This is followed by a series of steps that include:

(1) Determining whether medical service code(s) appearing on a medical claim are contained within the predetermined database (Col. 7, lines 16-22).

This step corresponds to the method and computer system described in patent claims #1 and #13. Ultimately, though, determining whether a code that appears on the medical claim is contained in the invention's database is a mundane task and not something that rises to the level of a novel claim auditing process. In any case, this process element would have been obvious to a person having ordinary skill in the art.

(2) Identifying and replacing any code appearing in the medical claim that has been superseded by "another code entry in an updated version of the CPT-4 classification" (Col. 5, lines 26-34).

I could find no patent claim that corresponds to this step. In any case, Appendix B of the CPT-4 Manual (See MCK 053333-053337, 1985 CPT-4 Manual) contains a listing of new codes, deleted codes, and revised codes. Wherever applicable, Appendix B also identifies which CPT code should be used in place of a deleted (superseded) code. Clearly, replacing obsolete CPT codes with newer CPT codes is not something that rises to the level of a novel claim auditing process. This process element was known to claim auditors and would have been obvious to a person having ordinary skill in the art.

(3) Eliminating duplicate codes not considered "valid" by the '164 invention (Col 5, lines 34-41).

This claim auditing method is implicit in the CPT coding conventions. (See MCK 053147-053392, 1985 CPT-4 Manual). CPT code 38100 in the 1985 CPT-4 Manual offers an example of this auditing rule. [13] The description of code 38100 reads, "Splenectomy; total." In everyday English, this code describes surgery to remove a patient's spleen. Since humans have only one spleen, it is reasonable to conclude that listing code 38100 twice on a medical claim for the same patient would be invalid, and the second listing of code 38100 should be removed. The claim auditing rule described in this section of the Specification was known to claim auditors and would have been obvious to a person having ordinary skill in the art.

The remainder of the '164 patent Specification describes how "a set of rules developed for use of this program is now invoked" (Col 5, lines 67-68). The alphanumeric designation (E1, R1, L1, etc) of the rules described in the remainder of the Specification corresponds to the list of rules appearing in Appendix B ("Rules Descriptions," Col. 47-52). The rules listed in Appendix B (some of which are rendered as examples in Appendix A), are grouped into the following categories:

Rules Applied to Multiple Codes

- R1, R2, R3, and R4 (rules that result in the replacement of a code). [14]
- E1, E2, EA, EP, (rules that result in the exclusion of a code).
- L1 (rule that limits payment of a code). [15]
- QM, QS, QB (rules that alert the user that the coding issue(s) cannot be dealt with programmatically, and human intervention is required).

Rules Applied to Each Code Individually

- Q1 through Q9 (rules that generate a request for more information).

---

[13] I found no example of this claim auditing rule in the '164 patent.

[14] I found no patent claim(s) that appear to correspond to rules R1, R2, R3 or R4.

[15] I found no patent claim(s) that appear to correspond to the L1 rule.

**Rules R1, R2, R3, and R4.**  Based on the descriptions provided in Appendix B and the examples rendered in Appendix A, rules R1 through R4 (rules that result in the replacement of a code) appear to detect: (A) Unbundling (breaking down a service or procedure into its component parts and submitting a bill with several CPT codes, rather than properly using a single CPT code that encompasses all of the rendered services); and (B) Upcoding (using a CPT code that represents a more complex service than the one that was actually performed).  The following examples from Appendix A of the '164 patent reveal the nature of these claim auditing rules.

(A) Unbundling.  Example #2 in Appendix A of the '164 patent (Col. 11 through 14)—the R2 rule—renders an example of unbundling.  When CPT codes 58260 (hysterectomy – removal of the uterus) and 57250 (colporrhaphy – repair of the vagina) both appear on the same medical claim, these codes are replaced by code 58265 because 58265 includes both procedures—a hysterectomy and colporrhaphy.  The following descriptions of these codes from the 1985 CPT-4 Manual provide the information needed to make this claim audit determination (underlining is mine):

   58260  Vaginal hysterectomy
   57250  Posterior colporrhaphy, repair of rectocele with or without
            perineorrhaphy

   The above codes represent unbundling and are replaced by the following
   single code:

   58265  Vaginal hysterectomy; with plastic repair of vagina, anterior and/or
            posterior colporrhaphy

Even without understanding all of the medical terms, one can see that 58265 includes the primary surgical elements of codes 57250 and 58260.  The words appearing after the comma in the description of code 57250 are simply an explanation of the reason for the colporrhaphy (to repair a rectocele), and clarify that this code also encompasses a perineorrhaphy (if done).

This claim auditing rule follows implicitly from the CPT code descriptions.  As such, the claim auditing rule depicted in this example from Appendix A of

the '164 patent would have been obvious to a person having ordinary skill in the art.

(B) <u>Upcoding</u>. Example #3 in Appendix B of the '164 patent (Col. 13 through 16)—the R1 rule—renders an example of upcoding. When CPT codes 52283 and 52281 both appear on the same medical claim, 52283 is authorized but code 52281 is replaced by code 51600 because 52281 represents a more complex service than the one actually performed. The descriptions of these codes from the 1985 CPT-4 Manual offer the information needed to make this claim audit determination (underlining is mine):

52283    <u>Cystourethroscopy</u>, with steroid injection into <u>stricture</u>

52281    <u>Cystourethroscopy</u>, with calibration and/or dilation of urethral <u>stricture</u> or stenosis, with or without meatotomy and <u>injection procedure for cystography</u>, male or female

The logic of this audit rule is as follows: The physician has billed for the cystourethroscopy, as well as opening the stricture (i.e., narrowing or stenosis), using code 52283. The next code, 52281, duplicates these two elements that already appear on the medical claim, and thus, is largely redundant (the minor element of a meatotomy, if done, is considered merely incidental). The only additional element encompassed by code 52281 is the injection procedure for cystography. Thus, code 52281 describes a more complex service than what was actually performed when considered in combination with code 52283. Since the only additional service identified in code 52281 is an injection procedure or cystography, code 52281 is replaced by the code for an injection procedure only (CPT code 51600).

Again, the CPT code descriptions themselves provide the information required to execute this claim auditing rule. As such, the claim auditing rule depicted in this example from Appendix A of the '164 patent would have been obvious to a person having ordinary skill in the art.

To the limited extent that they were disclosed in the '164 patent, claim auditing rules R1, R2, R3, and R4 encompass a claim auditing process that was implicit in the CPT coding

conventions. These claim auditing rules were not novel and would have been obvious to a person having ordinary skill in the art.

  **Rules E1, E2, EA, and EP.** Based on the descriptions provided in Appendix B and the examples rendered in Appendix A, rules E1, E2, EA, and EP (rules that result in the exclusion of a code) appear to detect <u>Fragmentation</u> (billing for incidental procedures performed as part of a larger procedure, or for services that are integral to a larger procedure). The following example from Appendix A of the '164 patent reveals the nature of these claim auditing rules.

    Example #1 in Appendix A of the '164 patent (Col. 11 and 12)—the E1/E2 rule—renders an example of fragmentation. When CPT codes 10120 (removal of a foreign body that is lodged in the skin) and 64450 (injection of a local anesthetic) both appear on the same medical claim, code 10120 is authorized but 64450 is excluded (i.e., rejected).

  The descriptions of these codes from the 1985 CPT-4 Manual are as follows:

    10120 Incision and removal of foreign body, subcutaneous tissues; simple
    64450 Injection, anesthetic agent; other peripheral nerve or branch

  Code 64450 is rejected because of an explicit CPT coding rule that appeared on page 57 of the 1985 CPT-4 Manual (see MCK 053187). With regard to surgical procedures, it states, "Listed surgical procedures include the operation per se, <u>local infiltration, digital block or topical anesthesia</u> when used, and the normal uncomplicated followup care." (underlining mine). This concept is referred to as a 'package' for surgical procedures." The underlined words refer to all common forms of local anesthetic and are, by CPT coding convention, included as part of the surgical procedure. Thus, in this example the physician should not have listed code 64450 (injection of an anesthetic) on the medical claim.

  In other words, the claim auditing rule depicted in this example is taken directly from the CPT Manual. The claim auditing rule depicted in this example from Appendix A of the '164 patent would have been obvious to a person having ordinary skill in the art.

To the limited extent that they were disclosed in the '164 patent, claim auditing rules E1, E2, EA, and EP encompass a claim auditing process that was implicit or explicit in the CPT coding conventions. These claim auditing rules were not novel and would have been obvious to a person having ordinary skill in the art.

**The L1 Rule.** The L1 rule (a rule that limits payment of a code) is disclosed only in a general sense in Appendix B, and by way of one example (# 16) in Appendix A (Col. 41 and 42). Example #16 shows how one of two billed surgical procedures should be paid at a lesser dollar amount because it is a secondary procedure (a lesser procedure done at the same time as the primary surgical procedure).

The medical claim in Example #16 contains two CPT codes:

43840  Gastrorrhaphy, suture of perforated duodenal or gastric ulcer, wound, or injury

43830  Gastrostomy, temporary (tube, rubber or plastic)

Code 43840 (gastrorrhaphy – repair of the stomach) is authorized with no change, but it is recommended that payment for code 43830 (gastrostomy – placement of a feeding tube) be limited to $150.

As stated above, the common term for this rule within the health insurance industry is a "secondary surgical procedure" (a procedure for which payment is reduced when it is done at the same time as another surgical procedure). This claim auditing rule was common to virtually every health insurance company when the 1985 CPT-4 Manual was published. The claim auditing rule depicted in this example from Appendix A of the '164 patent would have been obvious to a person having ordinary skill in the art.

Claim auditing rule L1 encompasses a claim auditing process that was widely known throughout the health insurance industry. This claim auditing rule was not novel and would have been obvious to a person having ordinary skill in the art.

**Rules QM, QS, and QB.** Based on the descriptions provided in Appendix B and the examples rendered in Appendix A, rules QM, QS, and QB (rules that generate a question about the billed codes and alert the user that human intervention is required) appear to detect: (A) Unbundling (breaking down a service or procedure into its component parts and

submitting a bill with several CPT codes, rather than properly using a single CPT code that encompasses all of the rendered services); and (B) <u>Fragmentation</u> (billing for incidental procedures performed as part of a larger procedure, or for services that are integral to a larger procedure). The following examples from Appendix A of the '164 patent reveal the nature of these claim auditing rules.

    (A) <u>Unbundling.</u> Example #5 in Appendix A of the '164 patent (Col. 17 and 18)—the QM rule—renders an example of unbundling. When CPT codes 58980 (laparoscopy of the pelvis) and 44000 (enterolysis – freeing of intestinal adhesions) both appear on the same medical claim, these codes are replaced by code 58265 because 58265 includes both procedures—a hysterectomy and enterolysis. The descriptions of these codes from the 1985 CPT-4 Manual offer the information needed to make this claim audit determination (underlining is mine):

      58980  <u>Laparoscopy</u> for visualization of pelvic viscera;

      44000  <u>Enterolysis</u>, freeing of intestinal <u>adhesion</u> (separate procedure)

      The above codes represent unbundling and are replaced by the following code:

      58985  <u>Laparoscopy</u> for visualization of pelvic viscera; <u>with lysis of adhesions</u>

Even without understanding all of the medical terms, one can see that 58985 includes both a pelvic laparoscopy (code 58980) and lysis (enterolysis) of adhesions (code 44000). Note that code 44000 includes the parenthetical—"(separate procedure)"—indicating that this code should be used only when the procedure was done separately. Thus, codes 58980 and 44000 are an unbundled form of code 58985.

The claim auditing rule depicted in this example from Appendix A of the '164 patent would have been obvious to a person having ordinary skill in the art.

    (B) <u>Fragmentation.</u> Example #6 in Appendix A of the '164 patent (Col. 17 through 20)—the QS/QB rule—renders an example of fragmentation. When CPT codes 33512 (triple coronary artery bypass surgery) and 35820 (surgery to

control postoperative bleeding) both appear on the same medical claim, code 33512 is authorized but 35820 generates a request for further information before being authorized.

The descriptions of these codes from the 1985 CPT-4 Manual are as follows:

- 33512  Coronary artery bypass, autogenous graft, eg, saphenous vein or internal mammary artery; three coronary arteries
- 35820  Exploration for postoperative hemorrhage or thrombosis; chest

Authorization of code 35820 is deferred (pending further information) until it can be determined whether the bleeding (hemorrhage) actually occurred during the postoperative period and required a separate surgical procedure, or was simply part of the coronary bypass surgery (and thus, should not have been listed on the medical claim). There was an explicit CPT coding rule that dealt with this issue, which appeared on page 58 of the 1985 CPT-4 Manual (see MCK 053188). With regard to surgical procedures, it states, "Some of the listed procedures are commonly carried out as an integral part of the total service, and as such do no warrant a separate identification." Thus, in this example, the physician should not have listed code 35820 if the bleeding was an intra-operative difficulty that occurred during the coronary artery bypass surgery.

In other words, the claim auditing method depicted in this example is taken directly from the CPT Manual. As such, the claim auditing rule depicted in this example from Appendix A of the '164 patent would have been obvious to a person having ordinary skill in the art.

To the limited extent that they were disclosed in the '164 patent, claim auditing rules QM, QS, and QB encompass a claim auditing process that was implicit or explicit in the CPT coding conventions. These claim auditing rules were not novel and would have been obvious to a person having ordinary skill in the art.

**Rules Q1 through Q9.** Based on the descriptions provided in Appendix B and the examples rendered in Appendix A, rules Q1 through Q9 (rules that generate a request for more information) appear to detect: (A) Upcoding (using a CPT code that represents a more

complex service than the one that was actually performed); (B) <u>Incompatible Services</u> (procedures that are inconsistent with, or unnecessary, in light of: the patient's diagnosis, age, or gender; other procedures listed on the medical claim); (C) <u>Inappropriate Place-Of-Service</u> (rendering care in a setting that results in unnecessary costs, or duplicate billing); and (D) <u>Billed Dollar Amounts That Exceed Certain Limits</u>. The following examples from Appendix A of the '164 patent reveal the nature of these claim auditing rules.

(A) <u>Upcoding.</u> Example #12 in Appendix A of the '164 patent (Col. 31 through 34)—the Q6 rule—renders an example of upcoding. Code 92502 (ear-nose-and-throat exam under general anesthesia) appears on a medical claim. If the medical claim contains no indication that anesthesia was used, code 95202 is rejected.

The CPT code description itself, which includes the words "under general anesthesia," provides the information required to execute this claim auditing rule. As such, the claim auditing rule depicted in this example from Appendix A of the '164 patent would have been obvious to a person having ordinary skill in the art.

(B) <u>Incompatible Services.</u> Example #15 in Appendix A of the '164 patent (Col. 39 through 42)—the Q9 rule—renders an example of incompatible services. Code 58605 (ligation or transection of fallopian tubes during the postpartum period—after giving birth, and while still hospitalized) appears on a medical claim with no other codes. Code 58605 is rejected because, presumably, there should be other information or procedure codes on the claim indicating that the patient had recently given birth. The following action is recommended.

*Replace the code appearing on the medical claim:*

58605  Ligation or transection of fallopian tube(s), abdominal or vaginal approach, postpartum, unilateral or bilateral, during same hospitalization

*With the following code* (which is used when the patient is <u>not</u> hospitalized following childbirth):

58600  Ligation or transection of fallopian tube(s), abdominal or vaginal approach, unilateral or bilateral

The CPT code descriptions themselves provide the information required to execute this claim auditing rule. As such, the claim auditing rule depicted in this example from Appendix A of the '164 patent would have been obvious to a person having ordinary skill in the art.

(C) <u>Inappropriate Place of Service.</u>  Example #11 in Appendix A of the '164 patent (Col. 29 through 32)—the Q5 rule—renders an example of this auditing issue. A medical claim (presumably submitted by a physician) for code 93220 (vectorcardiogram, testing and interpretation) is rejected and replaced with code 93222 (vectorcardiogram, interpretation only) if the patient was hospitalized at the time of the test. This is done because hospitals generally provide the equipment and perform the test—and submit a medical claim for these services—while the physician who interprets the test submits a bill (medical claim) only for his or her service (interpretation and reporting).

This billing practice—hospitals performing and billing for tests like vectorcardiograms, and physicians billing for interpreting the test—was a very well known convention throughout the health insurance industry when the 1985 CPT-4 Manual was published. The claim auditing rule depicted in this example from Appendix of the '164 patent would have been obvious to a person having ordinary skill in the art.

(D) <u>Billed Dollar Amounts That Exceed Certain Limits.</u>  Example #9 in Appendix A of the '164 patent (Col. 25 through 28)—the Q3 rule—renders an example of this auditing issue. If the billed charge for code 38500 (biopsy and excision of a lymph node, unspecified body location) is $300 or more, authorization is deferred until further information is known about the procedure.

As in the prior example, this claim auditing issue was well known throughout the health insurance industry. As compared to the CPT codes immediately following it in the CPT Manual, code 38500 was not specific or precise as to body location, as shown here:

38500  Biopsy or excision of lymph node, unspecified

38510  Biopsy or excision of lymph node, deep cervical node

38530  Biopsy or excision of lymph node, internal mammary gland

The use of vague CPT codes was a well-known "red flag" among claim examiners and claim auditors alike.  In addition, methods for detecting billed dollar amounts that exceed certain limits were an already robust element of most claim processing software systems at that time.  The claim auditing rule depicted in this example from Appendix A of the '164 patent would have been obvious to a person having ordinary skill in the art.

To the limited extent that they were disclosed in the '164 patent, claim auditing rules Q1 through Q9 encompass a claim auditing process that was implicit in the CPT coding conventions and known to persons skilled in claim auditing.  These claim auditing rules were not novel and would have been obvious to a person having ordinary skill in the art.

### Concluding Opinions

From personal experience, I can attest to the tedious and painstaking effort involved in reducing coding conventions to a database and a set of logical rules.  But the claim auditing process described in the '164 patent was not novel, as explained above.

I believe a very close analogy can be drawn between this case and the accounting profession.  The Financial Accounting Standards Board (FASB) promulgates accounting rules just as the AMA defines CPT coding rules.  And just as a financial auditor scrutinizes the financial records of a corporation using FASB rules and simple arithmetic relationships (e.g., credits and debits must balance), so too the auditing rules described in the Specification and Appendices of the '164 patent are basic rules of logic applied to knowledge that already existed in the form of CPT coding conventions and medical knowledge common to physicians and others who use those codes.

In my opinion, the '164 patent is akin to some enterprising accountant having patented FASB regulations and the basic arithmetic rules of accounting.  As improbable and unsupportable as that hypothetical scenario may be, I believe it is an apt analogy for what happened in this case.

Earlier in this report, while describing the context and background of managed care in the 1980s, I explained that health insurance companies and HMOs were well aware of the

aberrant billing practices some physicians used to "game the system." By 1985, medical claim auditing was a common practice among health insurance companies and HMOs.

In their 1987 article, *An Access-oriented Negotiated Fee Schedule*, Drs. Egdahl and Hertenstein discuss their then-current practice of "auditing and recoding" physician medical claims. [16] Nowhere in their description do they suggest that their auditing practices were exclusive to Caterpillar Corporation—because they were not.

Three years prior to the initial application for the '164 patent on September 30, 1988, the health insurance company that I helped found (AMI Group Health Services) regularly audited medical claims against billing and CPT coding criteria that were similar to those found in the '164 patent. And AMI was not an aberration in the mid-1980s. We had an ambitious audit program, but most large health insurance companies had similar capabilities to a greater or lesser extent, depending upon how significant they perceived the problem to be in their particular geographic markets.

Who staffed these pre-payment audit programs? It was generally a tiered effort, with claim examiners, claim supervisors, nurses, and physicians each playing a role. The point is, there were not just a handful of persons skilled in the art of coding and auditing medical claims in accordance with CPT conventions. Rather, there were skilled practitioners throughout the country because, for reasons described earlier, the tools used to audit medical claims comprised primarily two components: (1) CPT coding conventions, which were published in booklet form and electronic media, and (2) knowledge common to medical personnel who use those codes, including physician claim auditors.

As such, the claim auditing process described in the claim, Specification and Appendices of the '164 patent was already known to those skilled in this art. Moreover, if one breaks down the claim auditing rules into their component parts, one is left with simple "if-then" rules of logic (similar to what was contained in ClinicaLogic). The algorithms themselves are quite simple. And as discussed above, the coding rules are either an explicit application of CPT conventions, an analogous application of those conventions, or a byproduct of common medical knowledge.

---

[16] Richard H. Egdahl, M.D. and Robert D. Hertenstein, M.D., *An Access-Oriented Negotiated Fee Schedule,* Ann. Surgery September, 1987; 206(3):349-57

True, this is a technical subject, but the claim auditing process described in the '164 patent would have been obvious to a person having ordinary skill in the art. The auditing rules were not a new invention, but rather a rendering of pre-existing knowledge and methods into an automated form.

Date:  October 24, 2005

Philip M. Hawley, Jr., M.D.

## APPENDIX A:  CURRICULUM VITAE – PHILIP M. HAWLEY, JR, MD

### PROFESSIONAL EXPERIENCE

**2000 - Present**  **Attending Pediatrician**                **Childrens Hospital Los Angeles**
Attending pediatrician at this southern California pediatric medical center.

**1986 - 1999**  **President and Chief Executive**        **Pace Healthcare Management, LLC**
Founded and managed this consulting firm specializing in health insurance operations, medical cost management and medical quality assurance.  Worked with healthcare purchasers and payors to develop innovative managed care programs.  Scope of projects included operational consulting on issues including provider networks, utilization management, and health plan administration.  Developed financial modeling tools, statistical modeling tools, and patient management systems for clients that included HMOs and PPOs, indemnity insurers, large corporate purchasers, and several specialty firms within the managed care industry.

**1984 – 1986**  **Executive Vice President**               **AMI Group Health Services, Inc.**
Created and managed over 20 HMOs and PPOs in 10 states throughout the country with more than $200 million in annual revenue.  Held profit and loss responsibility for this all aspects of medical management and provider networks.

**1982 – 1984**  **Director of Operational Analysis**       **Occidental Petroleum Corporation**
Reporting to the Executive Vice President of Science & Technology, responsibilities included operational and financial analyses of investment opportunities, as well as the negotiation and sale of several business units.

**1979 – 1980**  **Pediatric Resident**                     **Childrens Hospital Los Angeles**
**1999 – 2000**  Completed General Pediatric residency.  Responsible for inpatient and outpatient care, as well as the education of interns and medical students.

**1978 – 1979**  **Pediatric Intern**                       **Childrens Hospital Los Angeles**
Completed General Pediatric internship, comprising inpatient and outpatient care.

### EDUCATION & TRAINING

**1980 - 1982**  **Harvard Graduate School of Business**      **Boston, Massachusetts**
Master in Business Administration degree

**1974 - 1978**  **University of Southern California**         **Los Angeles, California**
Doctor of Medicine degree

**1970 - 1974**  **University of Notre Dame**                  **South Bend, Indiana**
Bachelor of Science degree

### CERTIFICATIONS

**2000**      **American Board of Pediatrics**

**1987**      **American Board of Quality Assurance & Utilization Review**