# EXHIBIT 6

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE


MCKESSON INFORMATION SOLUTIONS, LLC,

          Plaintiff,

     vs.                              No. 04-1258-SLR

THE TRIZETTO GROUP, INC.,

          Defendant.

CERTIFIED COPY


DEPOSITION OF PHILIP M. HAWLEY, JR., M.D.

Los Angeles, California

Wednesday, November 30, 2005


Reported by:
RENEE A. PACHECO, RPR
CSR NO. 11564

JOB NO. 41623

www.sarnoffcourtreporters.com
Irvine • Los Angeles • San Francisco
phone 877.955.3855 • fax 949.955.3854


SARNOFF
Court Reporters and
Legal Technologies

1    do in some fashion with claim auditing.

2          Q    Okay.  You didn't mention it in your report, did

3    you?

4          A    I'm sorry?

11:29    5    Q    Did you mention it in your report?

6          A    Mention the --

7          Q    The Blue -- the Blue Cross.

8          A    No.  I don't believe I did, no.

9          Q    Okay.

11:29   10    A    No.

11          Q    So all of the practices you were talking about

12    in your report that you were familiar with, through your

13    involvement in the industry and your -- the survey done

14    at AMI, were -- were not software-based claim auditing,

11:29   15    they were done by -- manually by a staff of reviewers?

16          A    To the best of my recollection, with the

17    exception of that Blue Shield effort, I -- I believe

18    that's a correct statement.

19          Q    And all the ones you ref- -- are referencing in

11:30   20    your report were manual?

21          A    Yes.  Yes.

22                Let me clarify.  With one clear and obvious

23    exception, outdated and nonexistence codes where, by the

24    time I was with AMI, it was commonplace for claim systems

11:30   25    to have some automated means of identifying whether a

83

```
           1              began work on ClinicaLogic, again, I
           2              can't say with certainty, but I did
           3              become aware sometime during that time
           4              period.")
11:33      5    BY MR. HENDERSHOT:
           6        Q    So just maybe I can clarify this.  So none of
           7    the opinions in your report that the '164 claims are
           8    invalid -- when I say "'164," I mean the '1 -- claims of
           9    the '164 patent in this case -- are based upon the
11:33     10    existence of a -- a prior art software product for
          11    handling claims editing and auditing?
          12              MR. ROOSEVELT:  Objection; vague and ambiguous.
          13              THE WITNESS:  Can you repeat the question one
          14    more time?
11:33     15              MR. HENDERSHOT:  Can I hear it back.  Maybe I
          16    can fix it.
          17              (The previous question was read back by
          18              the court reporter as follows:
          19                  "QUESTION:  So none of the opinions
11:33     20              that your report that the '164 claims
          21              are invalid -- when I say ''164,' I
          22              mean the claims of the '164 patent in
          23              this case -- are based upon the
          24              existence of a prior art software
11:33     25              product for handling claims editing and
```

86

1           auditing?")

2                THE WITNESS:  I would agree with that statement.

3      BY MR. HENDERSHOT:

4           Q    So it's a fair statement that the opinions in

11:34  5      your report that the '164 claims are invalid are based on

6      your opinion that the underlying clinical editing process

7      that's implemented in a computer system in the '164

8      claims was known.

9                Is that a fair statement?

11:34  10          A    I would agree with that statement.

11          Q    With respect to the development of ClinicaLogic,

12     do you recall -- I think I'd assumed this earlier, I just

13     want to make sure it's clear -- did Erisco approach Pace

14     requesting their assistance in developing the product?

11:35  15     "The product" being the ClinicaLogic product.

16                MR. ROOSEVELT:  Asked and answered.

17                THE WITNESS:  Yes.  They approached Pace about

18     developing that.

19     BY MR. HENDERSHOT:

11:35  20          Q    Did they contact you -- "they" being Erisco, did

21     they contact you personally?

22          A    I would have been the first person they

23     contacted, yeah.

24          Q    Do you recall the context of their contacting

11:35  25     you or what --

87

         1    claims that limits it to a certain programming language.

         2        Q    In review of the '164 -- and when I say the

         3    specification, I refer to sort of everything in the

         4    patent other than the claims, the figures, the

12:13    5    appendices, the prose.

         6             Did you see anything in the '164 specifications

         7    that indicated to you that the claims are limited to a

         8    certain programming language?

         9        A    I don't recall seeing anything that limits it to

12:13   10    a certain programming language.

        11        Q    And then on Page 4 of your report, and in

        12    Footnote 4, you cite to the access -- an access-oriented

        13    negotiated fee schedule article by Drs. Egdahl and

        14    Hertenstein?

12:13   15        A    Yes.

        16        Q    Did you review all of that article?

        17        A    I did.

        18        Q    More than once?

        19        A    I don't recall whether I reviewed it more than

12:14   20    once or not.

        21        Q    Okay.  On the bottom of Page 7 -- sorry to make

        22    you flip around.

        23        A    No.  That's fine.

        24        Q    -- there's a reference -- the -- the last

12:14   25    paragraph it says "By the mid-1980s."

1          Do you see that?

2     A    Yes.

3     Q    You reference commonplace activity by health

4  insurance companies?

12:15  5     A    Right.

6     Q    Are you referring -- what's -- what was the

7  basis for that statement?  Was it the survey and sort of

8  your industry knowledge that we talked about earlier?

9     A    Correct.

12:15  10    Q    And just -- just so I got this, can you recall

11  specifically what aspects of claim auditing any of these

12  insurance companies were doing at the time, the time you

13  did the survey in 1984?

14         MR. ROOSEVELT:  Objection; vague and ambiguous

12:15  15  as to the term "aspects of claim auditing."

16  BY MR. HENDERSHOT:

17    Q    Do you understand the question?

18    A    Well, as I sit here today, I can't itemize what

19  they were doing, if that's what you're asking.

12:15  20    Q    So as you sit here today, you couldn't say

21  Company A was definitely doing unbundling, but Company B

22  was definitely doing upcoding and this?

23    A    What I can say of the -- of the types of

24  auditing issues that -- that I described on Page 6, it

12:16  25  was common to -- I'm -- I'm making the -- the assertion

1    that it is common -- it was common among health insurance

2    companies to be looking at these issues in the context of

3    claim auditing.

4         What proportioned to each one, you know, and

12:16    5    starting to asking, you know, and looking at the issue of

6    specific percentages and -- and prevalences, I -- I can't

7    get that specific, but --

8         Q    Yeah.  And I'm not looking for percentage or

9    prevalences.  I'm just wondering if there's a single

12:16    10   company where you can recall this is what they were

11   doing, they were definitely doing this out of these

12   companies that you mentioned.

13        A    No.  I can't -- I can't give you that detail.

14        Q    And just so the record is clear, there are no

12:17    15   documents or exhibits attached to your report describing

16   what any of those companies were doing in the mid-1980s?

17        A    That's correct.

18        Q    Can I direct your attention to pages -- the

19   bottom of Page 13 of your report.

12:18    20        A    Yes.

21        Q    Could you review the paragraph -- and if I were

22   you I would just take -- take a moment to read it -- the

23   paragraph carrying over from the bottom of Page 13 and

24   finishing on the top of Page 14.

12:18    25        And you don't need to do it aloud.

116

1    the '164 patent, and a form of clinical edit that you

2    were aware of?

3         A    Yes, as I stated in my report.

4         Q    Is it your understanding that each claim of the

12:25  5    '164 patent had to describe only a single clinical edit?

6         A    No.

7         Q    So just so we're clear, are you offering an

8    opinion in your report, to your understanding, that any

9    claim of the '164 patent is -- strike that.

12:26  10         To your understanding, are you offering any

11   opinion in your report that every element of the claim of

12   the '164 patent is disclosed by a single piece of prior

13   art?

14        MR. ROOSEVELT:  That's been asked and answered

12:26  15   twice now.

16        MR. HENDERSHOT:  I don't know that it has.

17        THE WITNESS:  I have not in my report

18   affirmatively offered the opinion that every element of

19   the '164 claims are contained in a prior piece of art.

12:26  20        I'm -- I'm not offering that opinion.  Part of

21   the reason I'm not offering that opinion is what I've

22   just described.

23        Or one of the reasons that I -- I can't express

24   an opinion, we'll put it that way, affirmatively or

12:26  25   otherwise is for the reason I just described.

121

1              But, no, I'm not offering the opinion that the

2      '164 claims were contained in a prior piece of art.

3      BY MR. HENDERSHOT:

4          Q    With respect to the teachings of the prior --

12:27    5      outside of those three claims that you're referring to,

6      do you have any opinion regarding the prior art as it

7      relates to the other claims that you set forth here in

8      your report?

9          A    Any opinion about?

12:27   10          Q    Whether they're invalid in view of the prior

11     art.

12          A    And, again, to clarify, you're asking me to

13     restrict my comments to the claims themselves, to the

14     '164 claims?

12:27   15          Q    Yeah.

16          A    Okay.

17              MR. ROOSEVELT:  Can I have that question

18     repeated.

19              (The previous question was read back by

12:27   20              the court reporter as follows:

21                  What started this whole line was:

22                  "QUESTION:  With respect to the

23              teachings of the prior outside" -- let

24              me start over.  "With respect to the

12:27   25              teachings of the prior -- outside of

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
877.955.3855

1    Claim 7, is obvious in light of the prior art; is that

2    correct?

3        A    That's correct.

4        Q    You don't offer an opinion in your report that

12:48    5    any of the claims are rendered invalid by a single piece

6    of prior art?

7        A    That's correct.

8        Q    Okay.  And your opinion that the claims of the

9    '164 patent are obvious, in view of the prior -- strike

12:48    10    that.

11            And is it a fair statement that your opinion of

12    the claims of the '164 patent are obvious is based on

13    your opinion that the -- the underlying claims auditing

14    process that they implement was done and known on a

12:49    15    manual basis in the prior art?

16        A    Correct.  That -- that's correct.

17        Q    Okay.  You're not asserting anywhere in your

18    report that any of the claims of the '164 patent are

19    obvious or not novel, because there was a preexisting

12:49    20    software application that performed that functionality,

21    the claims auditing functionality; is that correct?

22        A    Actually, I'm quite confident, as I said before,

23    with regard to Claim 1 and -- Claim 1 and Claim 13, that

24    there was a prior art form that performed that -- those

12:50    25    functions.

133

1    Q    Those functions within the context of all of the
2    elements of those claims?
3    A    No.  I'm sorry.  I thought you had said, if you
4    read back the question, each of the claims are --
12:50    5    Q    Yeah.  Okay.
6        And do you name that system, any of those
7    systems in the report, or do you reference them in your
8    report?
9        I didn't see them when I was reviewing it before
12:50    10    today?
11    A    No.  No.  I -- I didn't -- I didn't attempt to
12    describe it or reference it.  I think it was actually a
13    fairly common capability at that time for reasons that I
14    can explain.
12:50    15    Q    So we're clear, the opinions you set forth in
16    your report that you're prepared to testify about in this
17    case, are premised upon the claims of the '164 patent
18    being obvious, in view of the manual clinical auditing
19    practices that you discuss in your report; is that
12:51    20    correct?
21    A    That is correct.
22        MR. HENDERSHOT:  I think we can break for lunch,
23    if this is a good time for you guys.
24        MR. ROOSEVELT:  Sure.
12:51    25        THE VIDEOGRAPHER:  Going off the record.  The

134

1    that correct?

2            MR. ROOSEVELT:  Objection; vague and ambiguous.

3    BY MR. HENDERSHOT:

4        Q    You can answer.

01:53    5        A    Not only the logic or what I'll call the rules,

6    but the rendering of that in an automated form would have

7    been obvious.

8        Q    Would have been obvious in your opinion to a

9    person of ordinary skill in the art?

01:54    10        A    Correct.

11        Q    Who would have been a person of ordinary skill

12    in the art, in your opinion?

13        A    Typically a person who had -- who had medical

14    training, not exclusively, but typically a person of

01:54    15    medical training; for example, a nurse or a physician who

16    has sufficient experience in claim auditing work

17    experience to understand the sorts of concepts that I

18    describe in my report.

19            And that might be someone who has had at least

01:54    20    six months of -- half a year of full-time or a few years

21    of part-time experience auditing claims is how I'd

22    characterize someone of ordinary skill in the art.

23        Q    Do you set forth that definition or any

24    definition of a person of ordinary skill in the art in

01:55    25    your report?

140

1       A    I didn't.  I did not.

2       Q    Okay.  Let's circle back to a topic we were

3  talking about earlier.

4            You had mentioned -- we discussed a survey that

01:55  5  was conducted while you were at AMI of claim -- medical

6  claim processing in 1984; is that correct?

7       A    All administrative functions of insurance

8  companies, yes.

9       Q    Okay.  And AMI's discussions with any of those

01:55  10  third parties, did any of those third parties require AMI

11  to sign a confidentiality agreement or a nondisclosure

12  agreement?

13       A    I don't recall.  I don't recall whether they did

14  or did not.

01:56  15       Q    But some of the administrative cost containment

16  measures these companies were taking were not things that

17  they would advertise or make publicly available, were

18  they?

19       A    Can I ask you to define what you mean by

01:56  20  "publicly available"?  I mean --

21       Q    I mean, would they write papers on them?  Would

22  they --

23       A    In some cases.  I mean, you know, it's -- it's

24  an industry like most that has its share of conferences

01:56  25  and, you know, issues are discussed, operational elements

141

1    BY MR. HENDERSHOT:

2        Q    Did you consider anything other than what you

3    said here?

4            MR. ROOSEVELT:  Again, vague and ambiguous.

01:58    5        THE WITNESS:  Consider it for the purpose of

6    determining novelty and obviousness?

7    BY MR. HENDERSHOT:

8        Q    Yes.

9        A    It's fair to say that I used these definitions

01:58    10    when considering those issues.

11        Q    Okay.  And you testified before the lunch break

12    that your opinions regarding the claims of the '164

13    patent were not that any of the individual claims of the

14    '164 patent that are asserted in this case are not novel,

01:59    15    but rather your opinion is that they're all obvious?

16        A    I am asserting that the -- the claims -- all

17    claims, within the '164 patent, taken as a whole they

18    describe a claim auditing process that someone of

19    ordinary skill would deem -- at that time would have

01:59    20    deemed to be obvious.  I'm saying that.

21            And I don't recall your exact words, but I think

22    it misstated my testimony in one respect, and that is, I

23    am saying that I believe there were likely, when you

24    refer to each of the claims, as in individually, as I've

02:00    25    said before, I think there likely was at least some piece

1    of art, let's call it automated system, for executing

2    Claims 1 and 13.

3        Q    But you don't mention any such piece of art in

4    your report; is that correct?

02:00  5        A    I don't.  I don't.  That's correct.

6        Q    So with respect to the opinions set forth in

7    your report, you don't offer any opinion that any of the

8    claims of the '164 patent are not novel; is that correct?

9            MR. ROOSEVELT:  Objection; vague and ambiguous.

02:00  10            MR. HENDERSHOT:  As to what?

11            MR. ROOSEVELT:  I don't understand what you're

12    saying.

13            MR. HENDERSHOT:  Could you read the question

14    back.

02:00  15            (The previous question was read back by

16            the court reporter as follows:

17            "QUESTION:  So with respect to the

18            opinions set forth in your report, you

19            don't offer any opinion that any of the

02:00  20            claims of the '164 patent are not

21            novel; is that correct?")

22            MR. ROOSEVELT:  And he just told you what his

23    opinion was.

24            THE WITNESS:  I was trying to explain that --

02:01  25    that I believe I have expressed the discrete opinion that

144

| | |
|---|---|
| 1 | Claims 1 and 13 do describe -- I'm sorry -- that -- that |
| 2 | assertion is not made in my report, and I understand your |
| 3 | distinction. |
| 4 | With respect to the other claims, if I |
| 02:01  5 | incorporate the examples and the specification I have, in |
| 6 | my opinion, you will see in certain places expressed the |
| 7 | explicit opinion that this claim audit technique is not |
| 8 | novel -- it's not only obvious, but it's not novel. |
| 9 | So I have made that statement about certain |
| 02:02  10 | claim audit processes techniques.  My opinion is not |
| 11 | expressed relative to a specific claim, because, as I |
| 12 | said earlier, the claims themselves are rather broad and |
| 13 | vague, but -- |
| 14 | BY MR. HENDERSHOT: |
| 02:02  15 | Q    You nonetheless could -- could interpret them |
| 16 | after looking at the specification; is that what you |
| 17 | testified to earlier? |
| 18 | A    In the aggregate, as stated in my report, I -- I |
| 19 | used the claims and view them in light of what I read in |
| 02:02  20 | the specification and examples, and developed, then, an |
| 21 | image of what the '164 patent is describing, in terms of |
| 22 | an automated claim auditing system. |
| 23 | Q    What prior art are you relying upon for your |
| 24 | opinions in this report? |
| 02:02  25 | A    The prior art of claim auditing as it existed at |

145

1    that time.

2        Q    Okay.  So the generalized state of the art of

3    claims auditing is what you're relying on --

4        A    Correct.

02:03  5        Q    -- as the prior art?

6             Not a single system or any article about

7    something or a source; is that correct?

8        A    That's correct, no single system or article.

9        Q    Okay.  So let me see if I can short-circuit

02:03  10   this.

11       A    Okay.  If the law requires -- assume this.  If

12   the law requires every element recited in an individual

13   patent claim to be disclosed in a single piece of prior

14   art for that claim to lack novelty, under Section 102, do

02:03  15   you offer any opinion in your report under that standard

16   that a claim of the '164 patent is not novel?

17            MR. ROOSEVELT:  Objection; that's vague, and

18   it's also compound.

19            If you want to go through each of the specific

02:03  20   claims and ask these questions, I think that you'd be

21   able to get to what you're trying to get at a lot easier.

22            MR. HENDERSHOT:  Can you read my question back,

23   please.

24            (The previous question was read back by

02:04  25            the court reporter as follows:

146

```
 1                "QUESTION:  If the law requires --
 2            assume this.  If the law requires every
 3            element recited in an individual patent
 4            claim to be disclosed in a single piece
02:03  5            of prior art for that claim to lack
 6            novelty, under Section 102, do you
 7            offer any opinion in your report under
 8            that standard that a claim of the '164
 9            patent is not novel?")
02:04 10            THE WITNESS:  No.  I don't offer an opinion on
11   that specific question.
12   BY MR. HENDERSHOT:
13       Q    Okay.  And with respect to what's set forth in
14   your report, other than your recollection of the state of
02:04 15   the art, do you include any other evidence of the
16   practices that you're referring to and relying upon?
17            MR. ROOSEVELT:  Objection; vague and ambiguous.
18            THE WITNESS:  Are you asking is there other
19   evidence not described here that I'm using to form my
02:05 20   opinions, or --
21   BY MR. HENDERSHOT:
22       Q    No.
23       A    -- are you asking something different than that.
24            I apologize.  I'm just not understanding.
02:05 25       Q    Other than your recollection of what was going
```

147

1    on in the field at the time that you set forth here in

2    your report --

3        A    Yes.

4        Q    -- do you point to anything else in your report

02:05    5    other than that as the basis for your opinion that this

6    stuff was going on in the art?

7        MR. ROOSEVELT:    You mean other than all the

8    documents that are listed?    Vague and ambiguous.

9        THE WITNESS:    I think the CPT book -- the 1985

02:05   10    version of the CPT book is, by inference, a significant

11    piece of evidence that supports my views, as they're

12    expressed in -- in this report, which goes beyond my

13    recollection.    It goes to a tangible book containing

14    codes and rules and so forth.

02:06   15    BY MR. HENDERSHOT:

16        Q    Other than your recollection, is there any other

17    piece of evidence in your report that's cited to or

18    described, that states that anyone in the industry was

19    addressing unbundling?

02:07   20        A    May I leaf through my report quickly?

21        Q    Please.

22            (Document reviewed by the witness.)

23            THE WITNESS:    One item in particular that I'm

24    reminded of is -- and this can be independently verified

02:08   25    I suspect -- is the existence of those unbundling or --

148

1    or I should say courses offered to physician offices and

2    their billing departments specifically designed to teach

3    what I'll kindly call creative billing practices.

4    Independent of my recollection, I believe that evidence

02:08   5    of that can be found.

6    BY MR. HENDERSHOT:

7         Q    But no documentary evidence of that is attached

8    to your report?

9         A    No documentary evidence is attached regarding

02:08   10   that particular issue, no.

11        Q    In your discussions with TriZetto's attorneys,

12   did they ever discuss with you the process by which a

13   patent application is examined by the United States

14   Patent and Trademark Office?

02:09   15        A    That was described very briefly for me.  I mean,

16   at the beginning of this road back in late September,

17   early October, and I -- you know, my recollection is it

18   was described in very few words.  So I don't --

19        Q    Okay.  So it's fair to say that in formulating

02:09   20   your opinions that are set forth in this report, you did

21   not consider or base those opinions upon -- strike that.

22             Is it fair to say, in formulating the opinions

23   that are set forth in this report, you did not rely upon

24   any consideration of the examination of the '164 patent

02:09   25   at the United States Patent and Trademark Office?

149

         1          A    Can I ask you to clarify what you mean by the

         2    "examination of"?

         3          Do you mean are there documents that exist

         4    describe their deliberation about it or --

02:10    5          Q    Yeah.  I think that's typically referred to as a

         6    prosecution history.  I'll -- we can refer to it as that.

         7          A    Okay.

         8          Q    When I say that -- and I'll oftentimes -- I may

         9    refer to the patent's prosecution, which is the process

02:10   10    by which a patent applicant seeks a patent from the

        11    patent office.

        12          A    I see.

        13          Q    And they keep a record of that.  That's publicly

        14    available, a history of that, if you will.  So they call

02:10   15    it the prosecution history.

        16          And given this, I take it you -- you didn't take

        17    a look at the prosecution history?

        18          A    I did not.

        19          Q    You weren't provided with a copy?

02:10   20          A    I -- I was not.

        21          Q    Okay.  Would it affect your opinion in any way

        22    if you found out that the patent office was told, in the

        23    examination of the '164 patent, that the claims auditing

        24    rules that you reviewed in the '164 patent specification

02:11   25    were, in fact, performed on a manual basis before the

                                                                    150

1    application?

2        A   No, it wouldn't.

3        Q   Would it effect your opinion in any way if,

4    after hearing that, the patent office nonetheless

02:11   5    concluded the claims of the '164 patent were novel and

6    not obvious?

7        A   No, it would not.

8        Q   Why is that?

9        A   I think given my reasoning, I -- I think in --

02:11   10   in my opinion I analogize to the world of accounting.

11          And it -- it seems as if as though this patent,

12   the '164 patent, to my mind, appears very similar to sort

13   of a hypothetical wherein somebody runs to the patent

14   office and patents basic arithmetic rules.  And I mean

02:12   15   very basic arithmetic rules.  And they're called the FASB

16   accounting regulations.

17          And I can only believe, getting to the point of

18   your question, that someone at the patent office did not

19   understand really what they were approving in this case.

02:12   20   That's my -- that's my opinion.

21       Q   And your opinion -- okay.

22          That opinion is not based on any review you've

23   ever seen what went on before the patent office in

24   examining this patent?

02:12   25       A   It's not based on any review of the prosecution

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
877.955.3855

1    history.

2         Q    Okay.  Because you weren't provided with a copy

3    of that?

4         A    That's correct.

02:12    5    Q    So with respect to -- just so I'm clear.  With

6    respect to your opinions regarding the claims of the '164

7    patent, the prior art that you're relying upon is the

8    general state of the claims processing or auditing art

9    prior to 1987?

02:13   10    A    Correct.

11         Q    And you had said earlier, and I want to make

12    sure -- correct me if I'm wrong -- that you're -- you're

13    not offering any opinion or holding yourself out as an

14    expert on the development of a computer software system?

02:13   15    A    That's correct.  I am not holding myself out as

16    an expert in that.

17         Q    So none of your opinions are directed to the

18    difficulty or patentability of implementing something in

19    a computer system?

02:14   20         MR. ROOSEVELT:  Objection; vague and ambiguous.

21    BY MR. HENDERSHOT:

22         Q    You can answer.

23         A    Actually, my opinions do reflect that, because I

24    lived through it myself.  I'm hoping to develop

02:14   25    ClinicaLogic and have, I think, a very good sense for the

152

1    process of developing an automated claim auditing system.

2        Q    But you're not offering an opinion as an expert

3    on that topic, on the --

4            MR. ROOSEVELT:   On what topic?

02:15  5            MR. HENDERSHOT:   I think he said two questions

6    ago that he's not -- wasn't holding himself out as an

7    expert on the development of a software or a computer

8    system.

9    BY MR. HENDERSHOT:

02:15  10        Q    Is that correct?

11            MR. ROOSEVELT:   Objection; misstates his

12    testimony.

13            THE WITNESS:   I may have misunderstood your

14    question --

02:15  15    BY MR. HENDERSHOT:

16        Q    Okay.

17        A    -- but I thought your question went to whether I

18    was holding myself out as an expert at developing a

19    software product.

02:15  20            I'm not a programmer, for instance.  That's what

21    I mean by saying no, I'm not holding myself out as an

22    expert in the development of a software product.

23        Q    Okay.  I think to be fair, you reviewed the

24    Egdahl and Hertenstein article; is that correct?

02:16  25        A    I did.

153

1          Q    Okay.  But you're not relying upon that as prior

2    art for any of your opinions -- bless you -- you're just

3    relying upon the state of the art claims processing in

4    the mid to late 1980s?

02:16    5          MR. ROOSEVELT:  Objection to the extent -- I

6    mean, what definition of prior art are we using now?

7    Because I think there's --

8    BY MR. HENDERSHOT:

9          Q    Are you -- are you aware of multiple --

02:16   10          MR. ROOSEVELT:  Well, there's been a lot of

11    confusion as to -- as we just discussed right before

12    lunch, you're saying prior art.

13          The concept he has of it is -- are two different

14    things based on the two different kind of definitions

02:17   15    that you've given.

16          MR. HENDERSHOT:  What definitions have I given?

17          MR. ROOSEVELT:  You gave one definition that --

18    when you used the term "prior art," at one point you were

19    referring to a single unified prior art for purposes of

02:17   20    anticipation.

21          Then you continued to use the term "prior art"

22    to have -- the collective prior art for -- for your

23    discussion of obviousness.

24          And he was obviously -- didn't understand the

02:17   25    distinction between the two for a period of time, as you

154

1    were using them.

2         And so that's what I'm asking you to clarify in

3    your question.

4    BY MR. HENDERSHOT:

02:17    5    Q    Okay.  In your report -- let's -- let's take a

6    step back -- are you offering any opinion that the claims

7    of the '164 patent are not patentable or invalid as --

8    strike that.

9         Do you understand what invalid means when I'm

02:17    10    saying that?

11    A    It would be -- it would be helpful to have you

12    define that for purposes of discussion.

13    Q    Okay.

14         MR. ROOSEVELT:  And we've already been through

02:18    15    this.

16    BY MR. HENDERSHOT:

17    Q    Are you opining on the validity of the '164

18    patent claims in this report?

19    A    Yes.

02:18    20    Q    Okay.  And your opinion is that they're not

21    valid?

22    A    Correct.

23    Q    Okay.  And you're relying upon prior art in

24    support of that opinion?

02:18    25    A    Prior art and novelty in certain cases as

1    described in my opinions.   There are certain edits --

2    claim auditing processes that preexisted this invention.

3        Q   On a manual basis?

4        A   Correct.

02:18  5    Q   Are you relying upon for your -- for your

6    opinion that's -- that's set forth in this report, that

7    the claims of the '164 patent are obvious, any piece of

8    prior art other than your understanding of the general

9    state of the art?

02:19  10            MR. ROOSEVELT:  And what else is set forth in

11    his report?

12            THE WITNESS:  I would say the other pieces of

13    prior art include the conventions, both explicit and

14    implicit, contained in the CPT manuals.  So I'm -- I'm

02:19  15    also relying on those in -- in forming my opinion, but

16    I've stated that before.

17    BY MR. HENDERSHOT:

18        Q   Is that it, is that all the prior art that

19    you're relying upon?

02:19  20            MR. ROOSEVELT:  Objection; vague and ambiguous

21    as to the term "prior art."

22            THE WITNESS:  I mean there's a --

23    BY MR. HENDERSHOT:

24        Q   Are there any other pieces of prior art that

02:19  25    you're relying upon?

156

|      |    |                                                        |
|------|----|--------------------------------------------------------|
|      | 1  | MR. ROOSEVELT:  Same objection.                        |
|      | 2  | THE WITNESS:  Let -- let me just briefly               |
|      | 3  | describe -- excuse me.                                  |
|      | 4  | When you say am I relying on anything else, for        |
| 02:20 | 5 | example, I don't -- I don't think in this discussion go |
|      | 6  | into the experiences and knowledge of the many physician |
|      | 7  | auditors that I've worked with over the years.         |
|      | 8  | It's implicit in a few of my statements, but           |
|      | 9  | their experiences, not just with -- working with me, but |
| 02:20 | 10 | working with insurance companies around the country is |
|      | 11 | evidence of that prior art.  I did not train my physician |
|      | 12 | auditors to be able to audit claims.                   |
|      | 13 | Quite the contrary.  I sought out people who           |
|      | 14 | were highly experienced as claim auditors.  And they were |
| 02:20 | 15 | easy to locate, easy to find.                          |
|      | 16 | And that fact in itself is quite substantial           |
|      | 17 | evidence of the existence of the prior art.  The fact  |
|      | 18 | that these people were -- and I mention this in my     |
|      | 19 | report -- not -- not difficult to locate and -- and    |
| 02:21 | 20 | retain as -- as -- as claim auditors.  So I'm also     |
|      | 21 | relying on those experiences and relationships.        |
|      | 22 | BY MR. HENDERSHOT:                                      |
|      | 23 | Q    What, if any, documents are you relying upon in   |
|      | 24 | support of your opinions that any of -- any of the claims |
| 02:21 | 25 | of the '164 patent are obvious?                        |

157

1          A    The CPT manual is one document.

2               I think Dr. Goldberg provides at least one piece

3     of evidence in his testimony, in his deposition, where he

4     says, frankly, people could go through that book and

02:21   5     discern most and many, I think is the word he used, of

6     the auditing rules.  So I'd call that another piece of

7     evidence.

8               Let me look at the document -- the complete list

9     of documents.  And I -- I would say that would cover it.

02:22  10          Q    Okay.  And to circle back, you had read the

11    article by Drs. Egdahl and Hertenstein; right?

12         A    I -- I did, yes.

13         Q    And did you understand that to describe a -- at

14    least in a small portion of the article, an example of

02:22  15    manual rebundling?

16         A    Yes.  It's been seven, eight weeks since I've

17    read the article so I don't remember the details.

18         Q    Yeah.  I'll give -- I'm not trying to test your

19    memory.  Let me get you a copy of the article.

02:23  20               I'd like to mark as Exhibit Hawley 3, an article

21    by Richard Egdahl and Robert Hertenstein.

22               (Hawley Exhibit 3 was marked

23               for identification by the court

24               reporter and is attached hereto.)

02:24  25               MR. ROOSEVELT:  It just appears that part of the

158

```
 1    while the -- while none of the '164 claims that are at

 2    issue in this case were described or present in a single

 3    piece of prior art that you're relying upon in your

 4    report, they are nonetheless obvious in view of the

02:53   5    considerations you discuss in your report?

 6        A    Correct.

 7        Q    Okay.  And we discussed earlier in reaching your

 8    conclusion that the '16 -- strike that.

 9            I believe we discussed earlier that in

02:54  10    formulating the opinion set forth in this report, you

11    never considered the commercial success of automated

12    claims auditing systems; is that correct?

13        A    That's correct.

14        Q    In formulating your opinion that's set forth in

02:54  15    this report, that the asserted claims of the '164 patent

16    were obvious, did you consider or rely upon the fact that

17    the '164 patent has been licensed?

18        A    No.  I did not consider that fact.

19        Q    Are you aware that it has been licensed --

02:54  20    strike that.

21            Are you aware that companies have paid to take

22    licenses to practice what's described in the '164 patent?

23        A    Could you clarify the licensing statement?  I'm

24    aware that there are users of the HPR code review product

02:55  25    or were at that time.
```

1    Q    It's a -- it's a slightly different kind of

2  license.

3    A    Okay.

4    Q    So are -- are you aware that there are companies

02:55  5  that market products, software claims editing products,

6  that have paid to -- paid for permission to practice the

7  claims of the '164 patent; i.e., taken a license to the

8  patent, not to some software?

9    A    No.  I was -- I was not aware of that.

02:55 10    Q    Would it affect your opinion if you were aware

11  of it?

12    A    I -- I don't -- I can't think of how it would.

13  I don't believe so.

14    Q    Okay.  So in your definition of obvious that

02:56 15  you're applying, that -- that factor wouldn't have been

16  relevant to it?

17    A    Correct.

18    Q    The same with commercial success?

19    A    Correct.

02:56 20    Q    In formulating your opinion that the asserted

21  claims of the '164 patent are obvious, as set forth in

22  your report, did you consider whether anyone in the

23  industry was skeptical about whether or not the invention

24  could be built?

02:56 25    A    I don't remember wonder -- you know, posing that

171

1    question to myself.

2        Q    It didn't factor into your analysis?

3        A    No.  Because I was involved in -- in -- in

4    creating a product of similar functionality so I didn't

02:57    5    really need to rely on other people's thoughts about how

6    difficult or easy it might be.

7            I -- I lived through the process so I had a very

8    strong basis for my opinion.

9        Q    So you didn't consider what other people would

02:57    10    have thought about whether or not it could be built?

11        A    I did not.

12        Q    Okay.

13            THE COURT REPORTER:  Are you saying built,

14    b-u-i-l-t?

02:57    15            MR. HENDERSHOT:  Yes.

16            THE COURT REPORTER:  Thank you.

17    BY MR. HENDERSHOT:

18        Q    In formulating your opinion that the asserted

19    claims of the '164 patent are obvious, as set forth in

02:57    20    your report, did you consider whether or not the -- there

21    was a long felt need for automated clinical auditing

22    software?

23        A    Whether it impacted my opinion, I -- I can't

24    think of how it did.  I'm certainly aware of, you know,

02:58    25    at that time various industry needs, this being one of

172

1    them.

2         But the -- whether -- I don't believe it

3    factored into my opinion about the obviousness of -- of

4    the claims.

02:58   5         Q    Okay.  So there was a need, but it wasn't -- it

6    wasn't relative to the definition of obviousness you were

7    applying?

8         A    It was not relevant to the definition of

9    obviousness, no.

02:59   10        Q    In preparing your -- strike that.

11             In formulating your opinions that are set forth

12    in your report, that the asserted claims of the '164

13    patent are obvious, did any of TriZetto's attorneys

14    mention to you the term "secondary consideration"?

03:00   15        A    Not that I recall.

16        Q    Do you recall any of them mentioning the term

17    "objective evidence"?

18        A    Not that I recall, no.

19        Q    "Objective indicia"?

03:00   20        A    I probably would remember if that term had been

21    used, but I don't recall.

22        Q    Did any of TriZetto's attorneys -- strike that.

23             Your understanding of the obviousness standard

24    came from your discussions with TriZetto's attorneys;

03:00   25    correct?

173

1      A    That's correct.

2      Q    Did any of TriZetto's attorneys, in those

3    discussions that led to your understanding of the

4    obviousness standard that you applied in your report,

03:00  5    provide a list of considerations that play into the

6    obviousness determination other than what's set forth in

7    your report?

8              MR. ROOSEVELT:  Objection; vague and ambiguous.

9              THE WITNESS:  I don't have any recollection of

03:01  10    receiving a list, you know.  I have a recollection of

11    discussing that -- that statement and what it means.

12    BY MR. HENDERSHOT:

13      Q    And if they had told you, and they said it was

14    relevant to the analysis, you would have -- you would

03:01  15    have listed it in your report?

16      A    Yes.

17      Q    Okay.  In your discussions with TriZetto's

18    counsel that led to your understanding of the legal

19    principles you applied as -- in setting forth your

03:02  20    opinion in your report, did any of them mention the term

21    "means plus function" to you?

22      A    I don't recall hearing that term.

23      Q    Did any of TriZetto's attorneys, in those

24    discussions, indicate that certain elements of the '164

03:02  25    patent claims required special interpretation that other

174

1    that time is what I mean to say.

2        Q   A couple of real quick questions as well as to

3    tie up a loose end or two.

4            In formulating the opinions that you set forth

04:32    5    in your report, that the claims of the '164 patent are

6    obvious, did you consider whether the inventions claimed

7    in the '164 patent had been praised in the industry?

8            MR. ROOSEVELT:  Had been what?

9            MR. HENDERSHOT:  Praised.

04:32   10            THE WITNESS:  Praised, as in laudatory praise?

11   BY MR. HENDERSHOT:

12        Q   Yes.

13        A   Oh.  No.  No, I didn't.

14        Q   In formulating your opinions that are set forth

04:33   15   in your report, that the claims of the '164 patent are

16   obvious, did you consider whether any other entities

17   copied the inventions described in the '164 patent?

18        A   No.  No, I didn't.

19        Q   So I take it since you didn't consider them, you

04:33   20   wouldn't consider either of those factors relevant to the

21   definition of obviousness since you applied in your

22   opinion?

23        A   No.  Because when I formed my opinion, I'm --

24   I'm -- I'm conjuring again a person of ordinary skill in

04:33   25   the art.

229

|        | 1  | So it's not in the form of a -- an invention |
|--------|----|
|        | 2  | that I'm -- I'm -- you know, or a piece of prior art. |
|        | 3  | It's -- it's in the form of the knowledge of those who |
|        | 4  | were, you know, of ordinary skill in the art of claim |
| 04:34  | 5  | auditing at this time, prior to 1987.  It's -- that's |
|        | 6  | what I imagine in trying to form my opinion. |
|        | 7  | Q    Nothing about your opinion has changed since you |
|        | 8  | wrote the report? |
|        | 9  | A    That's correct. |
| 04:35  | 10 | Q    So you would still agree that it's a tedious and |
|        | 11 | painstaking effort that's involved in reducing coding |
|        | 12 | conventions to a database instead of logical rules? |
|        | 13 | A    I would. |
|        | 14 | Q    That's borne from your personal experience? |
| 04:35  | 15 | A    Yes.  Correct. |
|        | 16 | Q    Just circling back to your -- your accounting |
|        | 17 | example, you had mentioned the FASB? |
|        | 18 | A    Yes. |
|        | 19 | What page are we on here? |
| 04:36  | 20 | Q    26 of your report. |
|        | 21 | A    26, okay. |
|        | 22 | Q    In your opinion, if a -- strike that. |
|        | 23 | In your opinion, if a claim in a patent |
|        | 24 | describes a method of automating a process that was done |
| 04:36  | 25 | on a manual basis before and was documented in writing |

230

Hawley, Philip

1

2

3

4

5

6

7

8       I, PHILIP M. HAWLEY, JR., M.D., do hereby

9    declare under penalty of perjury that I have read the

10   foregoing transcript; that I have made any corrections as

11   appear noted, in ink, initialed by me, or attached

12   hereto; that my testimony as contained herein, as

13   corrected, is true and correct.

14       EXECUTED this _7th_ day of _January_

15   _2006_, at _Los Angeles_ , _California_

              (City)              (State)

16

17

18

19       _[signature]_

         PHILIP M. HAWLEY, JR., M.D.

20

21

22

23

24

25