EXHIBIT 11

Westlaw.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2001 WL 253117 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

**H**
Only the Westlaw citation is currently available.
United States District Court, D. Delaware.
MOORE NORTH AMERICA, INC., Plaintiff,
Counter-Defendant,
v.
POSER BUSINESS FORMS, INC., Defendant,
Counter-Claimant.
**No. Civ.A. 97-712-SLR.**

March 8, 2001.

Thomas P. Preston, of Reed, Smith, Shaw & McClay, Wilmington, Delaware, for plaintiff, counter-defendant.
Robert A. Vanderhye, James D. Berquist, Robert A. Rowan, and Jonathon Reavill, of Nixon & Vanderhye, Arlington, Virginia, for plaintiff, counter-defendant, of counsel.
N. Richard Powers, and Patricia Smink Rogowski, of Connolly, Bove, Lodge & Hutz, Wilmington, Delaware, for defendant, counter-claimant.
Thomas H. Young, Stephen D. Bell, and W. Robinson H. Clark, of Dorsey & Whitney, Denver, Colorado, for defendant, counter-claimant, of counsel.

MEMORANDUM OPINION

ROBINSON, Chief J.

I. INTRODUCTION

*1 Plaintiff Moore North America, Inc. filed this patent infringement action on December 30, 1997 against defendant Poser Business Forms, Inc., alleging that defendant infringes U.S. Patent No. 4,918,128 ("the '128 patent"); U.S. Patent No. 5,201,464 ("the '464 patent"); and U.S. Patent No. 5,253,798 ("the '798 patent"). Both plaintiff and defendant are engaged in the business of manufacturing and selling preformed, paper mailers. (D.I.158) Both the '464 and '798 patents

are directed to the construction of a "one-piece mailer" which is a single sheet of paper that can be printed, folded, sealed, and mailed without the need for a separate envelope. (D.I. 139 at 4) The '128 patent is directed toward a pressure-sensitive adhesive that holds different mailers together.

Defendant denied infringement of all three patents-in-suit and filed a counterclaim for declaratory judgment of noninfringement, invalidity, and unenforceability. Defendant subsequently filed additional unfair competition counterclaims. The court has previously issued several orders in this case relating to claim construction and summary judgment motions.

Currently before the court are several motions for partial summary judgment submitted by both parties regarding the '128 patent. Both parties submitted extensive briefs on these issues, and oral argument was heard on February 28, 2001. The court decides the various motions as follows.

II. BACKGROUND

Both parties filed cross motions for summary judgment on the issues of infringement and validity. Poser challenges the validity of the '128 patent under various theories, including anticipation under 35 U.S.C. § 102, obviousness under 35 U.S.C. § 103, and lack of enablement and failure to describe the best mode under 35 U.S.C. § 112 ¶ 1.[FN1] Poser also claims the '128 patent is unenforceable due to inequitable conduct. (D.I.281) Moore filed a motion for summary judgment that the claims of the '128 patent were not invalid for lack of enablement, indefiniteness, and adding new matter under 35 U.S.C. § 132. (D.I.286) Poser did not oppose the motions based on indefiniteness and adding new matter. Therefore, plaintiff's corresponding motions are granted with respect to those defenses.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 2

Not Reported in F.Supp.2d, 2001 WL 253117 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

FN1. Poser's best mode defense is addressed in the court's decisions to the motions in limine.

Claims 1 and 3 of the '128 patent, the only claims at issue, provide:
1. A pressure-sensitive adhesive which comprises in admixture:
(a) natural rubber graft copolymerized with styrene and methyl methacrylate in the form of a latex; and
(b) a finely divided hard particulate matter having no thermoplasticity dispersed in the latex.
3. The pressure-sensitive adhesive as claimed in claim 1 wherein the finely divided particulate material having no thermoplasticity is a silica gel powder or a zeolite powder.

On February 14, 2001, the court issued a claim construction order defining the term " pressure-sensitive adhesive" to mean a " composition which allows adhesion to be initiated through the application of pressure." (D.I.353) The court reserved ruling on other disputed claim terms.

A. VALIDITY

1. Anticipation

*2 Poser points to four prior art references that allegedly anticipate claims 1 and 3 under 35 U.S.C. § 102(b). The references include: GB patent no. 788,651 ("GB '651"); EP patent application no. 0043512 A1 ("EP '512"); U.S. patent no. 4,495,324 ("the '324 patent"); and GB patent no. 936,666 (" GB '666"). Moore argues that none of these references contain each claim limitation of the claims in dispute.

2. Obviousness

Poser cites fourteen additional prior art references [FN2] and asserts that the '128 patent would have been obvious to one of ordinary skill in the art at the time of the invention. Poser posits three obviousness theories. First, Poser argues that the

claims are anticipated by the four prior art references described above. Second, Poser asserts that both (1) a graft copolymer of MMA, styrene, and natural rubber and (2) silica were known in the adhesive art, as were their effects, making their combination in an adhesive obvious. Finally, it would have been obvious to substitute styrene for some of the MMA found in prior art adhesives that describe adhesive mixtures of MMA/natural rubber graft copolymer and silica. (D.I. 283 at 9) Moore and its experts disagree on the scope and content of the prior art references and whether there was a motivation to combine any of the fourteen references.

FN2. The references include Canadian patent no. 647, 530; U.S. patent nos. 3,644,584; 3,956,217; 3,925,271; 4,782,106; and Japanese patent and/or abstract nos. JP 57-28178; JP 50-80330; JP 59-164377; JP 61-35279; JP 62-158771; JP 158772; JP 62-158773; JP 57-192474; and JP 57-192475.

3. Enablement

Both parties filed cross motions for summary judgment on the issue of enablement. Poser asserts that the '128 patent is invalid because the claimed invention is not enabled. Specifically, Poser contends that the '128 patent does not disclose details enabling one skilled in the art to make the claimed graft copolymer. Moore contends that those of skill in the art have known for forty years how to create a graft copolymer of natural rubber, MMA, and styrene.

The issue of enablement came up during prosecution. After the applicant submitted the original claim language, the examiner queried:
How is the graft-copolymerization performed? It is the Examiner's position that applicants have not provided an enabling disclosure of the graft copolymerization of natural rubber with styrene and methyl methacrylate.

(D.I. 138 at B19) The applicant responded:[A]pplicant submits that graft

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2001 WL 253117 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

polymerization techniques are well known in the art, as are emulsion polymerization, suspension polymerization, and the like. One skilled in the art would have no difficulty in finding suitable conditions for such graft polymerization without undue experimentation.

(*Id.* at B21) The examiner allowed all the claims following that explanation. (*Id.* at B24-25)

## B. INFRINGEMENT

The accused product in this case is known by its trade designation, "KHP-300." KHP-300 contains MMA, styrene, natural rubber, and silica. The parties agree that MMA is grafted to natural rubber. The parties also agree that silica is present in the accused product. The parties disagree on whether styrene is grafted to the natural rubber.

## III. STANDARD OF REVIEW

**\*3** A court shall grant summary judgment only if " the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party bears the burden of proving that no genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 n. 10 (1986). "Facts that could alter the outcome are ' material,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." *Horowitz v. Federal Kemper Life Assurance Co.,* 57 F.3d 300, 302 n. 1 (3d Cir.1995) (internal citations omitted). If the moving party has demonstrated an absence of material fact, the nonmoving party then "must come forward with 'specific facts showing that there is a genuine issue for trial." ' *Matsushita,* 475 U.S. at 587 (quoting Fed.R.Civ.P. 56(e)). The court will " view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." *Pennsylvania Coal*

*Ass'n v. Babbitt,* 63 F.3d 231, 236 (3d Cir.1995). The mere existence of some evidence in support of the nonmoving party, however, will not be sufficient for denial of a motion for summary judgment; there must be enough evidence to enable a jury reasonably to find for the nonmoving party on that issue. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986). If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986).

## IV. DISCUSSION

### A. VALIDITY

#### 1. Anticipation

Poser's first invalidity contention is that claims 1 and 3 are anticipated. A claim is anticipated if each and every limitation is found either expressly or inherently in a single prior art reference. *Celeritas Techs., Ltd. v. Rockwell Int'l Corp.,* 150 F.3d 1354, 1361 (Fed.Cir.1998); *see also PPG Indus., Inc. v. Guardian Indus. Corp.,* 75 F.3d 1558, 1566 (Fed.Cir.1996); *Scripps Clinic & Research Found. v. Genentech, Inc.,* 927 F.2d 1565, 1576 (Fed.Cir.1991). "There must be no difference between the claimed invention and the reference disclosure, as viewed by a person of ordinary skill in the field of the invention." *Id.* at 1576. Thus, the factual inquiry relevant to the anticipation analysis is whether a single prior art reference discloses every element of the challenged claim and enables one skilled in the art to make the anticipatory subject matter. *See, e.g., PPG Indus.,* 75 F.3d at 1566.

Poser contends that GB '651 anticipates the claims because it describes a combination of (1) a graft copolymer of methyl methacrylate ("MMA"), styrene, and natural rubber and (2) hard particulate filler. Based on the current record, however, GB '651 is not directed toward a composition which

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                              Page 4

Not Reported in F.Supp.2d, 2001 WL 253117 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

allows adhesion to be initiated through the application of pressure, which is a limitation of claim 1.[FN3] GB '651 does not disclose every element of the challenged claim and, therefore, does not anticipate under 35 U.S.C. § 102(b).

> FN3. The court is mindful that "it is contrary to the letter of the patent laws that patents should be granted for old compositions of matter based upon new uses." *In re Shoenwald*, 964 F.2d 1122, 1123 (Fed.Cir.1992), citing *In re Thuau*, 135 F.2d 344, 346, (C .C.P.A.1943). The '128 patent is directed to a composition of matter that allows adhesion to be initiated through the application of pressure. Being capable of adhering to a surface through the application of pressure is a characteristic of a composition rather than a new use. If a prior art reference does not disclose such an adhesive, it cannot anticipate the claims of the '128 patent.

*4 Two of the remaining three prior art references, EP '512 and the '124 patent, likewise contain no mention of being a composition which allows adhesion to be initiated through the application of pressure. Thus, those references do not anticipate based on the current record. Unless Poser can present evidence at trial that the pressure-sensitive limitation is inherently found in GB '651, EP '512, or the '124 patent, Poser is precluded from proffering these references as anticipatory.

The final anticipatory reference, GB '666, "relates to a process for uniting natural or synthetic elastomers with elastomers or other materials." (D.I. 285 at D-12888) The invention provides:
[A] process for uniting synthetic resins, leather, textiles, natural or synthetic elastomers or vulcanisates with natural or synthetic elastomers wherein a graft polymer of an elastomeric polymer ... and an ester of acrylic or methacrylic acid with a monohydric saturated aliphatic alcohol containing from 1 to 4 carbon atoms is used as a bonding agent.

Advantageously methyl methacrylate is used as the ester component for the formation of the graft polymer.

From a technical point of view, it may be advantageous in many cases to use the polymer in the form of a latex.

The natural or synthetic elastomers to be united with the materials ... may be the co-polymers of butadiene and styrene.... These elastomers are used as vulcanisable mixture containing ... fillers, for example furnace black, channel black, clay, silica and pigment dyes.
The production bond between the materials to be united can be effected in known manner by the cold-sticking method, i.e., by coating both parts with a solution or latex of graft polymers and thereafter pressing them together.

(*Id.* at D-12888-89) (emphasis added). Poser submits that GB '666 contains each claim limitation and, therefore, anticipates the '128 patent. Moore contends that while GB '666 is directed to a process for joining different elastomers with a bonding agent, the silica filler described in the specification is only present in the elastomer materials being bonded and not the adhesive. Poser disagrees. (D.I. 317 at 6) After carefully studying GB '666 and the other evidence of record, the court finds that there is a genuine issue of material fact regarding whether GB '666 teaches a single pressure-sensitive adhesive which contains MMA, styrene, natural rubber, and silica as required by the claims. The court, therefore, denies the motion for summary judgment of invalidity based on anticipation.

### 2. Obviousness

Even if the claims are not anticipated, Poser argues that the claims would have been obvious at the time of the application. A patent is invalid for obviousness
if the differences between the subject matter sought

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2001 WL 253117 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains.

**\*5** 35 U.S.C. § 103. The ultimate determination of obviousness is a question of law based on underlying factual inquiries. *See Richardson-Vicks Inc. v. Upjohn Co.,* 122 F.3d 1476, 1479 (Fed.Cir.1997). Those factual inquiries involve consideration of the four so-called Graham factors: (1) the scope and content of the prior art; (2) the differences between the claims and the prior art; (3) the level of ordinary skill in the pertinent art; [FN4] (4) and any secondary considerations of nonobviousness, such as commercial success. *See Graham v. John Deere Co. of Kansas City,* 383 U.S. 1, 17-18 (1966); *B.F. Goodrich Co. v. Aircraft Braking Sys. Corp.,* 72 F.3d 1577, 1582 (Fed.Cir.1996). The existence of each element of a claim in the prior art does not, by itself, demonstrate obviousness. Instead, there must be a "reason, suggestion, or motivation in the prior art that would lead one of ordinary skill in the art to combine the references, and that would also suggest a reasonable likelihood of success." *Smith Indus. Med. Sys., Inc. v.. Vital Signs, Inc.,* 183 F.3d 1347, 1353 (Fed.Cir.1999). "Such a suggestion or motivation may come from the references themselves, from knowledge by those skilled in the art that certain references are of special interest in a field, or even from the nature of the problem to be solved." *Id.* at 1356.

> FN4. The factfinder must evaluate the invention, "not through the eyes of the inventor, who may have been of exceptional skill, but as by one of ' ordinary skill." ' *Interconnect Planning Corp. v. Feil,* 774 F.2d 1132, 1138 (Fed.Cir.1985).

Because the court cannot conclude, based on the current record, whether one of ordinary skill in the art would have been motivated to combine the above references or would otherwise conclude that the claims of the '128 patent were obvious at the

time of the application, the court denies the motion for summary judgment of obviousness.

### 3. Enablement

The last invalidity contention addressed by this memorandum opinion is enablement. Both parties moved for summary judgment on this issue. Under the enablement requirement, a patent must teach those skilled in the art how to make and use the full scope of the claimed invention without undue experimentation. *See In re Wright,* 999 F.2d 1557, 1561 (Fed.Cir.1993). As apparent from § 112, a patent specification is required to contain a disclosure, either through illustrative examples or written description, that is sufficient to teach one skilled in the art how to make and use the invention as broadly as it is claimed. *Id.* "[I]t is not necessary that a patent applicant test all the embodiments of his invention; what is necessary is that he provide a disclosure sufficient to enable one skilled in the art to carry out the invention commensurate with the scope of his claims." *Amgen, Inc. v. Chugai Pharm. Co., Ltd.,* 927 F.2d 1200, 1213 (Fed.Cir.1991) (internal citation omitted); accord *In re Vaeck,* 947 F.2d 488, 496 (Fed.Cir.1991) ("It is well settled that patent applicants are not required to disclose every species encompassed by their claims, even in an unpredictable art."). Furthermore, a patent need not teach, and preferably omits, that which is well known in the art. *See Ajinomoto Co. v. Archer-Daniels-Midland Co.,* 228 F.3d 1338, 1345 (Fed.Cir.2000), citing, *Hybritech, Inc. v. Monoclonal Antibodies, Inc.,* 802 F.2d 1367, 1384 (Fed.Cir.1986).

**\*6** Poser's expert witness, Dr. Ray L. Hauser, points to seven different ways to make a graft copolymer with natural rubber, methyl methacrylate, and styrene. For example, different polymerization conditions may include:
a. Natural rubber latex + methyl methacrylate + styrene with sufficient time for dissolution, followed by uniform polymerization.
b. Natural rubber latex + methyl methacrylate with sufficient time for dissolution, followed by uniform polymerization, followed by addition of styrene monomer with sufficient time for dissolution,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2001 WL 253117 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

followed by secondary polymerization.

(D.I. 285 at tab 5, p. 7) Dr. Hauser points to five more possibilities and concludes that "[t]he following polymerization conditions could provide very different products." (*Id.*) Based on that evidence, Poser argues that one of ordinary skill in the art would not know, based on the disclosure, how to make and use the invention.

Poser's other expert, Dr. H. James Harwood, gave a similar opinion on lack of enablement. Dr. Harwood said:

There are a number of different ways to make graft copolymers. For instance, one can attach multiple monomers simultaneously onto a single base polymer to achieve copolymer side chains. Alternatively, one can graft monomers sequentially onto the base polymer to achieve homopolymer side chains. Furthermore, the length of these grafted chains is determined by the rate in which the graft polymerization is initiated. This will depend on initiator concentration, initiator type, and the temperature of the reaction. Graft copolymers with side chains of different lengths can exhibit markedly different properties. Also, the average number of grafts per chain can be influenced by polymerization conditions. The method employed by [the patent applicant] is not identified. Therefore, the '128 patent is invalid because it does not provide one of ordinary skill in the art with sufficient information to practice the invention.

(D.I. 185 at tab 6, p. 4)

Neither Dr. Hauser's nor Dr. Harwood's statement meets the clear and convincing threshold required for summary judgment of invalidity. Dr. Hauser says that the different possible polymerization conditions could provide very different products. Dr. Hauser does not say, however, that these very different products would not be pressure-sensitive adhesives made of a graft copolymer of natural rubber, MMA, and styrene with a hard particulate dispersed in the latex. Likewise, Dr. Harwood says that different techniques can result in "markedly different properties;" but he never says that these different properties fall outside the scope of the claims.

The '128 patent is directed toward a composition of matter that has the characteristic of being a pressure-sensitive adhesive. Since the patentee did not claim the process used to make the pressure-sensitive adhesive, merely saying that there are multiple ways of making the claimed composition is insufficient to sustain an lack of enablement defense. Poser's motion for summary judgment of lack of enablement is denied.

*7 Moore's motion for summary judgment of enablement is granted. A patent is presumed to be valid. 35 U.S.C. § 282. Poser has the burden of proving lack of enablement by clear and convincing evidence. *Apple Computer, Inc. v. Articulate Sys., Inc.,* 234 F.2d 14, 20 (Fed.Cir.2000). Poser's defense to Moore's motion for summary judgment of enablement is supported only by the statements of Drs. Hauser and Harwood. (D.I. 283 at 16-18; D.I. 317 at 14) If the issue of enablement were to go to trial, the testimony of Poser's expert witnesses would be limited to the information contained in their expert reports. Because their expert reports contain nothing that indicates that one of ordinary skill in the art would not know how to make a pressure-sensitive adhesive that falls within the claims of the patent, Poser will not be permitted to go forward with this defense.

### B. INFRINGEMENT

Because the parties and their experts disagree on whether styrene is grafted to natural rubber, the court finds that there is a genuine issue of material fact for trial. Namely, are styrene and methyl methacrylate, and not substances made from styrene and methyl methacrylate, grafted on a common natural rubber backbone in the form of a latex? The court, therefore, denies both Moore's motion for partial summary judgment of infringement of claims 1 and 3 of the '128 patent (D.I.237) and Poser's motion for partial summary judgment of infringement of the '128 patent (D.I.255).

### V. CONCLUSION

For the foregoing reasons, the court denies Poser's

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 12

Westlaw.

Slip Copy

Slip Copy, 2005 WL 3159054 (D.Del.)
**(Cite as: Slip Copy)**

**H**
Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court,D. Delaware.
PRAXAIR, INC. and Praxair Technology, Inc.,
Plaintiffs,
v.
ATMI, INC. and Advanced Technology Materials,
Inc., Defendants.
**No. Civ. 03-1158-SLR.**

Nov. 28, 2005.

Jack B. Blumenfeld, Rodger Dallery Smith, II,
Morris, Nichols, Arsht & Tunnell, Wilmington, DE,
for Plaintiffs.
Frederick L. Cottrell, III, Robert H. Richards, III,
Alyssa M. Schwartz, Richards, Layton & Finger,
Keith A. Walter, Jr., Fish & Richardson P.C.,
Nicholas L. Coch, Theodore J. Mlynar, Kramer
Levin Naftalis & Frankel LLP, New York, NY, for
Defendants.

**MEMORANDUM ORDER**
ROBINSON, J.

## I. INTRODUCTION

*1 Praxair, Inc. and Praxair Technology Inc. ("
plaintiffs") filed this patent infringement action on
January 9, 2004 against ATMI, Inc. and Advanced
Technology Materials, Inc. ("defendants"). (D.I.1)
A pretrial conference was held on November 9,
2005 in which several issues from the Joint Pretrial
Order (D.I.230) were addressed. (D.I.239) The
court requested brief memoranda from defendants
on three of these issues by November 16, with
replies by plaintiffs due on November 23. (D.I.239)

## II. BACKGROUND

Plaintiffs sued defendants for infringement of

certain claims of United States Patent Nos.
6,045,115 ("the '115 patent"), 6,007,609 ("the '609
patent") and 5,937,895 ("the '895 patent"). (D.I.1)
The patents in suit disclose embodiments of an
apparatus, which safely controls the discharge of
pressurized fluids from the outlet of pressurized
tanks. (D.I. 131 at 7) The inventions disclosed by
the patents help control the handling, storage and
delivery of toxic fluids and constrain the flow of gas
during normal operating, as well as during any kind
of valve mishandling or downstream failure. *Id.* at 8

On November 8, 2005, the court granted partial
summary judgment to defendants that claim 1, and
all depending claims, of the '895 patent were invalid
as indefinite. (D.I.233) The remaining claims at
issue are claims 1, 2, 6, 7 and 8 of the '609 patent
and claims 18 and 20 of the '115 patent. The court
also granted plaintiffs' motion to exclude several
belatedly-identified prior art references. (D.I.233)

During the pretrial conference, the court ruled on
several discovery and evidentiary disputes. The
court decided that Mr. Sackett of Swagelok, who
was not identified by name during discovery, is
precluded from testifying regarding the identity of
the filter disclosed in the Zang reference.[FN1] (D.I.
239 at 52) The court also ruled that any documents
inadvertently disclosed by plaintiffs need not be
returned because plaintiffs did not properly follow
the provisions of the protective order to regain
possession of the documents. (D.I. 239 at 56) The
court ruled that no legal impediment exists for
defendants to assert that any of the remaining
claims at issue are indefinite. (D.I. 239 at 57)
Finally, the court concluded that Dr. Sherman's
expert testimony is admissible because defendants
were given the name of every past case in which Dr.
Sherman testified, even though they were not given
the actual trial or deposition testimony. (D.I. 239 at
67)

FN1. Defendants did disclose Swagelok

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                    Page 2

Slip Copy, 2005 WL 3159054 (D.Del.)
(Cite as: Slip Copy)

during discovery and that a representative would be testifying pursuant to the scheduling order. The representative was identified by topic and document discovery was performed. However, the document discovery had nothing to do with Mr. Sackett's testimony regarding the type of filter disclosed in the Zhang patent.

The remaining issues, on which the court did not rule, were: whether defendants can present evidence of plaintiffs' commercial product and its prototypes; whether defendants timely disclosed the issue of simultaneous invention during the discovery phase of the trial; whether Dr. Karvelis' supplement to his expert report of the proper testing protocol prejudiced defendants and, therefore, should be excluded; [FN2] whether capillary action in sintered metal filters is excluded from the case; and whether the Skousgaard and Miller references were timely identified.

> FN2. Defendants no longer assert the need to rebut the supplement to Dr. Karvelis' expert report because the testing relates only to the '895 patent, which is no longer in the case. (D.I.235)

### III. DISCUSSION

#### A. Definiteness of Construed Claims

*2 As an initial matter, the court revisits a ruling made on the bench during the pretrial conference. In light of *Bancorp Servs., L.L.C. v. Hartford Life Ins. Co.*, 359 F.3d 1367 (Fed.Cir.2004), the construed claims are definite as a matter of law. "We have held that a claim is not indefinite merely because it poses a difficult issue of claim construction; if the claim is subject to construction, i.e., it is not insolubly ambiguous, it is not invalid for indefiniteness. *Id.* at 1371. (citing *Honeywell Int'l, Inc. v. Int'l Trade Comm'n*, 341 F.3d 1332, 1338-39 (Fed.Cir.2003). "That is, if the meaning of the claim is discernible, 'even though the task may be formidable and the conclusion may be one over which reasonable persons will disagree, we have

held the claim sufficiently clear to avoid invalidity on indefiniteness grounds.' *Exxon Research & Eng'g Co. v. United States*, 265 F.3d 1371, 1375 (Fed.Cir.2001)." *Id.* Because the court was able to construe the limitation "at about the axial midpoint," the claims are definite, as a matter of law. *Id.* at 1371.

#### B. Commercial Embodiment of Claimed Invention

Defendants argue that evidence of plaintiffs' commercial embodiment of the claimed invention, UpTime, and "events leading up to the filing of the patents-in-suit" are relevant to the issues of noninfringement and the reverse doctrine of equivalents. (D.I.237) The court concludes, however, that such evidence shall be excluded in the infringement determination.[FN3]

> FN3. While evidence leading up to the filing of the patents may have been relevant evidence, the court notes that the earliest date noted on any of the documents produced was 1999, by which time all the patents in issue had been filed. Therefore, even though defendants' brief states " events leading up to the filing of the patents " (D.I. 237 at 4), the documents instead relate to events leading up to the commercial embodiment.

The Federal Circuit has been very clear that "it is error for a court to compare in its infringement analysis the accused product or process with the patentee's commercial embodiment or other version of the product or process; the only proper comparison is with the claims of the patent," as construed by the court. *Zenith Laboratories, Inc. v. Bristol-Myers Squibb Co.*, 19 F.3d 1418, 1423 (Fed.Cir.1994). Defendants argue that, because the UpTime product has both a "flow restrictor" and a " filter," plaintiffs referred to, and considered, a flow restrictor as separate from a filter. The claims, as construed by this court, define a flow restrictor as something that "serve[s] to restrict the rate of flow [of gas]." (D.I.234) Whether or not a filter serves to restrict the flow of gas is a question for the jury and

Slip Copy

Slip Copy, 2005 WL 3159054 (D.Del.)
(Cite as: Slip Copy)

does not require analysis of the UpTime product.[FN4] Therefore, the court declines to allow as evidence of noninfringement the UpTime product or the events in its development. The risks of jury confusion and prejudice far outweigh the probative value of such evidence.

> FN4. The only evidence of this kind that could be relevant is evidence that plaintiffs admitted in some tests or prototypes that the filters did not restrict the rate of flow of the gas.

### C. Disclosure of Simultaneous Invention

Plaintiffs assert that any testimony [FN5] or evidence regarding when defendants designed the inventions claimed in defendants' U.S. Patent Nos. 6,101,816 (the '816 patent) and 6,089,027 (the '027 patent) should be excluded because the '816 and '027 patents cannot be considered prior art and the evidence will only confuse the jury. In this case, witnesses (including Luping Wang) were made available to plaintiffs for discovery regarding the time of conception and reduction to practice of the claimed inventions of the '816 and '027 patents. These patents disclose the use of a membrane [FN6] (D.I. 236 at 1) and plaintiffs assert that a membrane can be a flow restrictor, as defined in the patents at issue.

> FN5. Specifically, plaintiffs contest the testimony of Luping Wang.

> FN6. The parties apparently had an agreement to consolidate deposition discovery in this Delaware action and in a New York law suit involving the '816 and '027 patents. An interrogatory was answered by defendants on August 19, 2004 in the New York action disclosing the relevant information.

*3 Evidence of simultaneous invention is relevant to the issue of obviousness, as a factor in the determination of the level of skill in the art. *Ecolochem, Inc. v. S. Cal. Edison Co.*, 227 F.3d

1361, 1379 (Fed.Cir.2000) ("The fact of near-simultaneous invention, though not determinative of statutory obviousness, is strong evidence of what constitutes the level of ordinary skill in the art.... [T]he possibility of near simultaneous invention by two or more equally talented inventors working independently, ... may or may not be an indication of obviousness when considered in light of all the circumstances." )(internal citations omitted). However, in the case at bar, defendants repudiated their claim to an early conception date; in the New York litigation, defendants did not dispute that the inventors of plaintiffs' patents were first to invent. Therefore, plaintiffs had no reason to conduct discovery on the issue of first to invent. Furthermore, the disclosure of the invention dates of the '816 and '027 patents contains no mention of a simultaneous invention argument, giving plaintiffs no reason to conduct discovery on the issue of simultaneous invention. To avoid unfair surprise, the testimony of Luping Wang is inadmissible as evidence of simultaneous invention.

### D. Capillary Action

The claims at issue use the term "capillary" to describe tubes and passageways. Plaintiffs argued, during the claim construction phase of the case, that "capillary passages" must be construed to mean " passages that exhibit capillary action." (D.I. 234 at 8) The court concluded that, as used in the specification and the claims, the term "capillary" means "pertaining to or resembling a hair; fine and slender." (D.I. 234 at 9) Plaintiffs assert that capillary action is still relevant to the issues at bar in that it is a test for the existence of capillary tubes, as properly construed. Plaintiffs contend that placing a filter into a liquid is one way to test for the existence of fine and slender tubes. If the liquid disappears, the filter must have fine and slender tubes into which the liquid is flowing.[FN7] If the liquid does not disappear, no such tubes exists.

> FN7. This phenomenon is called capillary action.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

Slip Copy, 2005 WL 3159054 (D.Del.)
(Cite as: Slip Copy)

The court finds that evidence of capillary action will be unduly confusing to the jury. Capillary action is not required in the claim construction. Presenting the jury with this test and calling it "capillary action" and then reading the claims which require "capillary passageways" will confuse and mislead the jury. Furthermore, the phenomenon of upward movement of a liquid through a narrow tube is not relevant to the invention at issue. The invention, as claimed and construed, is related to the restriction of gas flow through fine and slender tubes. The court concludes that evidence of the phenomenon of capillary action is excluded under Fed.R.Evid. 403 because its probative value, as one way to prove the existence of thin and slender tubes, is outweighed by the danger of unfair prejudice, confusion of the proper claim construction and the potential for misleading the jury.

### E. Prior Art References

*4 Defendants have raised reargument on the issue of excluding United States Patent Nos. 2,666,297 (the "Skousgaard patent") and 3,245,583 (the "Miller patent"). The court declines to change its prior ruling regarding the two prior art references. (D.I.233) Prior art references must be disclosed during fact discovery and the parties must disclose their intent to rely thereon, regardless of whether or not the opposing party is aware of the reference. It is undisputed that the two references at issue, and the intent to rely on them for invalidating the asserted claims, were not disclosed to plaintiffs by defendants until after the close of fact discovery. Therefore, these references are excluded from defendants' invalidity case.

### IV. CONCLUSION

At Wilmington this 28th day of November, 2005, having reviewed the evidentiary disputes raised at the pretrial conference; [FN8]

> FN8. The evidentiary disputes are detailed in the transcript for the pretrial conference. (D.I.239)

IT IS SO ORDERED that:

1. Defendants are precluded, as a matter of law, from raising the issue of indefiniteness as it relates to claims that have been construed.

2. Evidence of the commercial embodiment of the claimed invention is not admissible for the infringement analysis, but may be used for the reverse doctrine of equivalents analysis.

3. Testimony by Luping Wang regarding simultaneous invention is inadmissible.

4. Evidence of capillary action is excluded.

5. The Skousgaard and Miller references are excluded.

D.Del.,2005.
Praxair, Inc. v. ATMI, Inc.
Slip Copy, 2005 WL 3159054 (D.Del.)

Briefs and Other Related Documents (Back to top)

• 2006 WL 1182413 (Trial Motion, Memorandum and Affidavit) ATMI's Reply Brief in Support of its Inequitable Conduct Case (Mar. 17, 2006) Original Image of this Document (PDF)
• 2006 WL 1182414 (Trial Motion, Memorandum and Affidavit) ATMI's Reply Brief in Support of its Renewed Motion for Judgment as A Matter of Law (Mar. 17, 2006) Original Image of this Document (PDF)
• 2006 WL 1182415 (Trial Motion, Memorandum and Affidavit) Reply Brief in Support of Atmi's Motion for A New Trial (Mar. 17, 2006) Original Image of this Document (PDF)
• 2006 WL 1182410 (Trial Motion, Memorandum and Affidavit) Praxair's Answering Brief in Opposition to ATMP's Motion for Judgment as a Matter of Law (Mar. 2, 2006) Original Image of this Document (PDF)
• 2006 WL 1182411 (Trial Motion, Memorandum and Affidavit) Praxair's Answering Brief in Opposition to Atmps Post-Trial Motion Concerning Inequitable Conduct (Mar. 2, 2006) Original Image of this Document (PDF)
• 2006 WL 1182412 (Trial Motion, Memorandum

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

Slip Copy, 2005 WL 3159054 (D.Del.)
(Cite as: Slip Copy)

and Affidavit) Praxair's Answering Brief in
Opposition to ATMI's Motion for a New Trial
(Mar. 2, 2006) Original Image of this Document
(PDF)
• 2006 WL 809089 (Trial Motion, Memorandum
and Affidavit) Atmi's Reply Brief in Support of its
Motion to Compel Production of Documents from
Praxair and Uop Based on Waiver of
Attorney-Client Privilege and Work Product
Immunity (Feb. 3, 2006)
• 2006 WL 809088 (Trial Motion, Memorandum
and Affidavit) Atmi's Amended Opening Brief in
Support of its Renewed Motion for Judgment as A
Matter of Law (Feb. 1, 2006)
• 2006 WL 819615 (Trial Motion, Memorandum
and Affidavit) Atmi's Amended Opening Brief in
Support of its Inequitable Conduct Case (Feb. 1,
2006)
• 2006 WL 819620 (Trial Motion, Memorandum
and Affidavit) Amended Opening Brief in Support
of Atmi's Motion for A New Trial (Feb. 1, 2006)
• 2005 WL 3667341 (Trial Motion, Memorandum
and Affidavit) Praxair's Discovery Designations,
Atmi's Counter Designations and Objections to
Praxair's Discovery Designations and Praxair's
Objections to Atmi's Counter Designations (Nov. 4,
2005)
• 2005 WL 3666787 (Trial Motion, Memorandum
and Affidavit) Praxair's Motion to Strike Another
New Witness and more New Documents Identified
by Atmi and to Preclude Atmi from Relying on
them at Trial (Oct. 31, 2005)
• 2005 WL 2867905 (Trial Motion, Memorandum
and Affidavit) Praxair's Reply Brief in Support of
its Motion to Strike the Declarations of Philip Chen
and Christopher Jones (Sep. 19, 2005)
• 2003 WL 24229530 (Trial Pleading) Complaint
for Patent Infringement (Dec. 22, 2003)
• 1:03cv01158 (Docket) (Dec. 22, 2003)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 13

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

MCKESSON INFORMATION SOLUTIONS LLC, )
      )
      )
      Plaintiff, )
      )
      v. )     CIVIL ACTION NO. 04-1258-SLR
      )
THE TRIZETTO GROUP, INC., )
      )
      Defendant. )
      )

## MCKESSON INFORMATION SOLUTIONS LLC'S
## FIRST SET OF INTERROGATORIES

Plaintiff, McKesson Information Solutions LLC, pursuant to Rule 33 of the Federal Rules of Civil Procedure, propounds the following Interrogatories to defendant, The TriZetto Group, Inc., to be answered in writing and under oath within the time and in the manner set forth in Rule 33.

## DEFINITIONS AND INSTRUCTIONS

Without limiting the scope of the Local Rules or the Federal Rules of Civil Procedure, the following instructions shall also apply to these Interrogatories:

1. These Interrogatories shall be deemed continuing in character so as to require further and supplemental responses if you obtain or discover further or different information with respect to any Interrogatory.

2. Each prior art patent identified by you in response to these Interrogatories shall be identified by the patent number, country of origin, and date of issue. Each prior art publication identified by you in response to these Interrogatories shall be identified by its title, date of publication, and where feasible, author and publisher.

3. In accordance with Federal Rule of Civil Procedure 26(b)(5), where any information is not provided in response to any Interrogatory based on a claim of

the patent that corresponds to the recited element), state whether or not each claim element is present in or practiced by the products, systems, or services identified in response to Interrogatory No. 2, and, if not, an explanation of how each product, system, or service identified in response to Interrogatory No. 2 operates or functions differently than, and does not include a substantial equivalent of, any such claim element.

**INTERROGATORY NO. 4:**

For each claim of the '164 patent, state whether TriZetto relies or will rely at trial on the doctrine of prosecution history estoppel as a basis for non-infringement under the doctrine of equivalents and explain in detail each fact that supports or refutes or otherwise relates to TriZetto's allegation of prosecution history estoppel for each such claim and explain in detail why such facts would or would not support a finding of non-infringement.

**INTERROGATORY NO. 5:**

For each product, system, or service identified in response to Interrogatory No. 2, state in complete detail the steps and functions performed by that product, system, or service in performing clinical editing or auditing of medical payment claims (including, without limitation, the detection or correction of unbundled medical procedures or claims billed incorrectly due to coding errors).

**INTERROGATORY NO. 6:**

State in complete detail each and every basis for your assertion that the claims of the '164 patent are invalid under 35 U.S.C. §§ 102 or 103. Your response should, without limitation: identify each prior art reference you contend anticipates any claim of the '164 patent under 35 U.S.C. § 102 and each prior art reference or combination of references you contend renders any claim of the '164 patent obvious under 35 U.S.C. § 103; state in complete detail, by means of a claim chart, where TriZetto contends each limitation of any allegedly invalid claim of the '164 patent is disclosed by each

5

reference or combination of references; and state in complete detail the basis for TriZetto's assertion that one of ordinary skill in the art at the time of the '164 patent's invention would have been motivated to combine or modify any prior art reference or combination of references TriZetto contends is invalidating under 35 U.S.C. § 103.

**INTERROGATORY NO. 7:**

State in complete detail each and every basis for your assertion that the claims of the '164 patent are invalid because they do not particularly point out and distinctly claim the subject matter of the invention.

**INTERROGATORY NO. 8:**

State in complete detail each and every basis for your assertion that the '164 patent is unenforceable because McKesson comes into Court with unclean hands and has committed patent misuse.

**INTERROGATORY NO. 9:**

State in complete detail each and every basis for your assertion that the '164 patent is unenforceable due to inequitable conduct. Your response should include, without limitation, an identification of any information allegedly withheld from the Patent Office and a detailed description of the basis for TriZetto's contentions that such information: would have been material to the examination of the '164 patent; was not cumulative to information before the '164 patent examiner (including an identification of each limitation of the '164 patent claims that TriZetto contends is disclosed by the allegedly withheld information and not by the information before the '164 patent examiner); and was withheld with an intent to deceive the Patent Office.

**INTERROGATORY NO. 10:**

State in complete detail each and every basis for your assertion that McKesson's claims are barred by the doctrine of estoppel.

6

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

MCKESSON INFORMATION SOLUTIONS )
LLC,                                                    )
                                                        )
                                                        )
                    Plaintiff,                          )
                                                        )     CIVIL ACTION NO. 04-1258-SLR
          v.                                            )
                                                        )
THE TRIZETTO GROUP, INC.                                )
                                                        )
                                                        )
_____ Defendant. _____        )

### NOTICE OF SERVICE

The undersigned, as counsel for Plaintiff McKesson Information Solutions LLC,

certifies that on December 21, 2004, copies of McKesson Information Solutions LLC's

First Set of Requests for the Production of Documents and Things, and McKesson

Information Solutions LLC's First Set of Interrogatories were served by hand on the

following counsel:

Jack B. Blumenfeld, Esq.
Rodger D. Smith, II, Esq.
MORRIS NICHOLS ARSHT
  & TUNNELL
1201 North Market Street
P.O. Box 1347
Wilmington, Delaware 19899

Thomas J. Allingham II (#0476)
Michael A. Barlow (#3928)
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
One Rodney Square
P.O. Box 636
Wilmington, Delaware 19899

Attorneys for Plaintiff McKesson
  Information Solutions LLC

OF COUNSEL:
Jeffery G. Randall
David W. Hansen
Michael Hendershot
Donna Hill
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
525 University Avenue, Suite 1100
Palo Alto, California 94301

- and -

Allan M. Soobert
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
1440 New York Avenue, N.W.
Washington, D.C. 20005-2111

DATED:  December 22, 2004

# EXHIBIT 14

**CERTIFIED COPY**

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

MCKESSON INFORMATION SOLUTIONS,      )
                                     )
                    Plaintiff,       )
                                     )
        vs.                          )  CASE NO.
                                     )  04-1258 SLR
THE TRIZETTO GROUP,                  )
                                     )
                    Defendant.       )
_____)

DEPOSITION OF GEORGE A. GOLDBERG

September 13, 2005

206921

**BARKLEY**
Court Reporters

| Los Angeles | Orange County | San Francisco | San Diego | Inland Empire | Palm Springs | San Fernando Valley | San Jose |
|---|---|---|---|---|---|---|---|
| (310) 207.8000 | (949) 955.0400 | (415) 433.5777 | (858) 455.5444 | (951) 686.0606 | (760) 322.2240 | (818) 702.0202 | (408) 885.0550 |

1  correct?

2      A    That is what my CV shows, and it's

3  correct.

4      Q    Why did you leave The RAND Corporation?

5      A    The Health Insurance Experiment had ended.

6      Q    Any other reasons?

7      A    It was time to move -- I thought it was

8  time to move back to the East Coast to be near my

9  aging parents.

10     Q    And you -- from your CV, it looks like you

11  joined a company Health Data Institute in Lexington,

12  Massachusetts; is that correct?

13     A    That is correct.

14     Q    And it references developmental work on an

15  Advanced MedLogic, M-e-d, cap L-o-g-i-c, System?

16     A    Yes, it does.

17     Q    Which indicates that it does cost/quality

18  procedure code based claims review.

19     A    That's what it says.

20     Q    Can you provide a more detailed

21  explanation what the Advanced MedLogic System was?

22     A    The Advanced MedLogic System was a series

23  of computerized tables, lookup tables, that

24  received, processed and paid claims.  In other

25  words, it was post-payment claims databases, and

51

GEORGE A. GOLDBERG

1    reviewed them to perform single-code edits of

2    various kinds.  Post-process, post-payment.

3        Q    There's also a notation on your CV about a

4    prospective payment system?

5        A    The prospective payment system is the

6    government's DRG system.

7        Q    And does that -- did that system deal with

8    claims processing prior to payment?

9        A    The DR -- the answer is yes and no.

10       Q    Can you explain?

11       A    The DRG system, which is performed --

12   which applies to hospital claims only, or certainly

13   did in those days, the DRG system, diagnosis related

14   groups.  Groups diagnoses with some on hospital

15   discharge claims, with attention as well to ICD9

16   procedure-coded procedures on hospital claims, and

17   assigns every hospital discharged claim to one and

18   only one DRG, a number that at that time went

19   somewhere between 001 and 4XX.  There were

20   400-some-odd DRGs.

21            And it functions for payment purposes

22   because at some point, Medicare and Medicaid and the

23   occasional private insurer paid for a hospital stay

24   on the basis of the DRG to which a hospital

25   discharge claim was assigned.

52

BARKLEY

1          Q     In connection with the Advanced MedLogic

2     System, did that review procedure codes that would

3     have been inappropriate for some other criteria,

4     such as gender or age?

5               MR. SHEK:  Objection as to form, also

6     vague and ambiguous.

7               THE WITNESS:  Would you repeat the

8     question, please?  Or would you rephrase the

9     question, please?

10              BY MR. SEGAL:

11         Q     Sure, sure.  I'm trying to go -- we

12    previously -- you cautioned me you didn't want to

13    jumble all code editing or claims editing together,

14    and we had talked about three or four different

15    types of claims edits.

16         A     Yes, sir.

17         Q     So what I'm trying to determine is whether

18    Advanced MedLogic looked at claims data to determine

19    whether a procedure code was inappropriate for the

20    patient -- for some other criteria, such as the

21    patient's gender or age.

22              MR. SHEK:  Object to form again, also

23    vague and ambiguous.

24              THE WITNESS:  One of the functions of the

25    Advanced MedLogic System was to review procedures in

53

GEORGE A. GOLDBERG

BARKLEY

1    relation to such things as the patient's age or sex.

2            BY MR. SEGAL:

3        Q    And what would happen if the claims data

4    you were looking at as part of the Advanced MedLogic

5    System showed a CPT code that was inappropriate for

6    some other criteria, such as the gender or age of a

7    patient?

8        A    The code -- first of all, I don't know.

9    Excuse me.  That depended on the client, for with

10   some clients, nothing would happen, we would merely

11   count these discrepancies and report the

12   discrepancies.  Remember, these were post-payment,

13   post-processed claims.  And in other cases, we might

14   exclude the procedure -- it has nothing to do with

15   payment.  We might exclude the procedure from a

16   count of such procedures.

17           In other words, this had to do with

18   analysis, data analysis.

19       Q    And was H -- is it okay if I refer to

20   Health Data Institute as "HDI"?  Is that an acronym

21   you used?

22       A    Yes, for both questions.

23       Q    Okay.  Good.  So just to try and shorten

24   up.

25       A    HDI is what we called it.

                              54

BARKLEY

1     Q   Okay.  Did HDI sell its services using the

2  Advanced MedLogic System?

3     A   They --

4        MR. SHEK:  Objection as to form; vague as

5  to time.

6        THE WITNESS:  They tried to sell it.

7        BY MR. SEGAL:

8     Q   Okay.  So they went to companies and said

9  give us your claims data and we'll process it

10  through our system, our computer program, and

11  provide some reports to you or some analysis to you.

12  Is that fair?

13     A   My guess is that happened, but I was never

14  involved in any of those sales trips.

15     Q   Okay.  Do you recall any of the other

16  individuals that worked with you at HDI?

17     A   Yes, I do.

18     Q   Can you tell me the names that you recall?

19     A   I recall the name Paul Gertman,

20  G-e-r-t-m-a-n.  I recall Lance Lazo, I think it's

21  L-a-z-o.  I'm not sure.  I recall Breck, and I don't

22  remember his last name.  I recall Mayde Rosen,

23  M-a-y-d-e.  I recall Elizabeth Pappius,

24  P-a-p-p-i-u-s.  I recall Larry Shor, and I don't

25  remember how -- there's no E at the end, but I don't

GEORGE A. GOLDBERG

BARKLEY

1    System?

2           MR. SHEK:   Object as to form.

3           THE WITNESS:   Can you rephrase the

4    question, please?

5           BY MR. SEGAL:

6    Q    Sure.   You indicated that Advanced

7    MedLogic had lookup tables; is that correct?

8    A    That's correct.

9    Q    And that you reviewed those tables and

10   commented on them; is that correct?

11   A    That's correct.

12   Q    Okay.   Can you describe what the contents

13   of the lookup tables were for the Advanced MedLogic

14   System?

15   A    Well, for the ones I remember I can.

16   Q    That would be all I can ask for.   And if

17   there are others that you don't recall, if you just

18   let us know that.

19   A    Okay.   There are some that I do not

20   recall.

21   Q    Okay.   And then why don't you tell us the

22   contents of the tables that you do recall.

23   A    There was one table that would -- that

24   listed diagnoses that could not be right for certain

25   age groups.   There could be more -- could have been

63

GEORGE A. GOLDBERG

BARKLEY

1    more than one of those tables.  One form of table

2    was if it's this age, you can't -- if it's this --

3    if it's this diagnosis, only this age range can have

4    it.

5          There was another table, if it's this

6    sex -- if it's this procedure, only this sex can

7    have it.  Another table, if it's this age -- if it's

8    this -- did I do that -- diagnoses and another one

9    for procedures.  If it's this age, you can't -- I

10   don't know if the tables were -- probably -- I don't

11   know if they were done negatively or positively, but

12   they basically, one of them looked at age versus

13   diagnosis, another one or group of them for age

14   versus procedure, another one for sex versus

15   diagnosis, another one for -- for example, you're

16   not going to see a heart attack in a 3-year-old, or

17   if you do, it's a suspect claim.

18         Another one would have been age against

19   procedure.  Then there was a list of weird --

20   geographically unlikely diagnoses for the United

21   States.  And at the moment, those are -- those are

22   the tables I recall.

23   Q    Do you recall what type of discrepancies

24   were identified for the reports that would have --

25   that were provided to clients of HDI?

64

GEORGE A. GOLDBERG

BARKLEY

1       A     Do you mean discrepancies as in the way I

2  used the word a while back?

3       Q     Yeah, I am referring to you indicated that

4  Advanced MedLogic would either report discrepancies

5  to the client or exclude the procedure from some

6  count.

7       A     That's -- I do recall saying that.

8       Q     Okay.  So I'm trying to go back to your

9  words and testimony so that the record is as clear

10  as possible.

11          In connection with reporting

12  discrepancies --

13       A     Yes.

14       Q     -- do you recall what types of

15  discrepancies were reported to clients of HDI?

16       A     You know, I'm not sure I ever saw an

17  Advanced MedLogic report.  My speculation is that it

18  would have been the number of age/procedure

19  discrepancies, age/diagnosis discrepancies,

20  sex/procedure discrepancies, sex/diagnosis

21  discrepancies, literally a count of the number of

22  times something on the table had registered, so to

23  speak.

24          But I never saw an Advanced MedLogic

25  report, interesting -- amazingly enough, that I

GEORGE A. GOLDBERG                    BARKLEY

1  that you can put a time frame on when you would have

2  learned that -- when you learned that HDI had gone

3  out of business?

4      A    Nothing that I remember.

5      Q    Okay.  If someone were to ask you when HDI

6  went out of business and asked you to find the

7  person who would know that, who would you call?

8  Sort of the lifeline on the game show.

9      A    Paul Gertman.

10     Q    Did you take any documents with you from

11 HDI when you left?

12     A    Probably.  Yes, yes.

13     Q    What do you recall taking with you from

14 HDI?

15     A    I recall taking some final reports.

16     Q    Do you recall if those final reports were

17 Advanced MedLogic Systems reports?

18     A    I do not recall -- no, I don't.  And I

19 don't think they were, but I don't recall.

20     Q    So you don't know one way or the other

21 whether or not some Advanced MedLogic reports were

22 among the materials you took with you when you left

23 HDI; is that correct?

24     A    That is correct.

25     Q    In connection with your work at HDI and

GEORGE A. GOLDBERG

BARKLEY

1    Advanced MedLogic, was there ever any discussion

2    about performing the analysis prior to paying

3    claims?

4        A    Not that I remember.

5        Q    Who were some of the clients, to the best

6    you can recall, of Advanced MedLogic System?

7        A    I remember clients of HDI, but I do not --

8    cannot recall one client that I am sure was a client

9    of the Advanced MedLogic System.

10        Q    Why don't you give us the names of the

11    clients that you recall that were clients of HDI.

12        A    Ford, Chrysler, General Motors.  Those are

13    the only ones I recall with certainty.  No, that

14    probably was for one of the motors.

15        Q    And did you perform any work for either

16    Ford, Chrysler or GM in connection with your work at

17    HDI?

18        A    Oh, I'm sure I did.

19        Q    Did you directly work with anyone from

20    either Ford, Chrysler or GM during your time at HDI?

21        A    I don't remember doing that.  That's the

22    role of the lead analyst.

23        Q    Do you recall whether there were any

24    lookup tables in Advanced MedLogic System that had

25    multiple procedure codes?

68

GEORGE A. GOLDBERG

BARKLEY

1              MR. SHEK:  Objection as to form; vague and

2      ambiguous.

3              THE WITNESS:  I don't recall any such

4      table in Advanced MedLogic.

5              BY MR. SEGAL:

6        Q    You don't recall one way or the other

7      whether or not there was a table that had more than

8      one procedure code in a sort of line of the table?

9              MR. SHEK:  Objection as to form; vague and

10     ambiguous.

11             THE WITNESS:  We had never conceived of

12     it, but of course, I don't remember the table --

13     such a table either way.  But we had never conceived

14     of the idea.

15             BY MR. SEGAL:

16       Q    So you don't know if, in fact, there was a

17     table?  You just have no recollection of whether or

18     not there was one or wasn't one; is that correct?

19       A    I believe there was none.  If I remember

20     it with certainty, thinking back 20 years, there's

21     very little I remember with certainty, except names

22     of people and meals I've eaten.

23             (Laughter.)

24       Q    Hopefully, this deposition won't knock it

25     down to the meals you've eaten, but I appreciate you

                              69

                    GEORGE A. GOLDBERG

                                              BARKLEY

1    I HEREBY CERTIFY that I have read this

2  transcript of my deposition and that this transcript

3  accurately states the testimony given by me, with

4  the changes or corrections, if any, as noted.

5

6

7         X _George A. Goldberg_____

8              10/18/2005

9

10

11  Subscribed and sworn to before me this       day of

12              , 20     .

13

14

15

16         X

17         Notary Public

18

19

20

21  My commission expires:

22

23

24

25

254

GEORGE A. GOLDBERG

BARKLEY
Court Reporters

McKesson Information Solutions LLC v. The TriZetto Group, Inc.
District of Delaware Case No. 04-1258 SLR

Deposition of George Goldberg
Date of Deposition: September 13, 2005

## TRANSCRIPT ERRATA

| PAGE:LINE(S) | CURRENT VERSION | CHANGE TO | REASON FOR CHANGE |
|---|---|---|---|
| 10:16 | in | and | — |
| 11:3,5,6 | Buzz | Buz | — |
| 23:19 | helped | help | — |
| 23:22 | for diognosis | or diognosis | — |
| 44:14 | Royal | ROIL | — |
| 48:11 | available | aware | — |
| 57:24 | Received, processed and paid claims | Received processed and paid claims (no comma after Received) | The claims it received had already been processed & paid! |
| 57:25 | was | received | Clarity |

| PAGE:LINE(S) | CURRENT VERSION | CHANGE TO | REASON FOR CHANGE |
|---|---|---|---|
| 52:14 | with some | (delete) | clarity |
| 57:25 | Friedman | Friedman | Make change in multiple places, please |
| 65:24 – 66-1 | report, interesting | report while I was an employee of HDI — interesting | clarification |
| 75:8-9 | and it was always a 'she | (delete) | See lines 10 & 11 |
| 77:12 | enduring | during | — |
| 77:24 | see | do | I mis-spoke. |
| 94:20 | a | (delete) | clarity |
| 97:9 | not | now | clarity |
| 99:10 | relationship | relationships | — |
| 101:14 | automated | automate | — |

Deposition of George Goldberg

| PAGE:LINE(S) | CURRENT VERSION | CHANGE TO | REASON FOR CHANGE |
|---|---|---|---|
| 108:15 | Pews | Pew | — |
| 116:20 | to ask | asked | — |
| 135:7 | had | (delete) | clarity |
| 147:22-23 | Jack Lemmon | Walter Matthau | correction |
| 151:12 | Woundsocket | Woonsocket | — |
| 172:14 | visiting | reviewing | — |
| 176:19-20 | absence of quote marks | Place quote mark before use and after necessary. | |
| 198:2 | annunciate | enunciate | |
| 219:2 | dictate | dictated | — |

Deposition of George Goldberg

| PAGE:LINE(S) | CURRENT VERSION | CHANGE TO | REASON FOR CHANGE |
|---|---|---|---|
| 221:11 | can | can't | mis-transcription? |
| 230:15 | Represented | misRepresented | correction |
| 231:3 | say | see | I believe I said "see" given the context. |
| 242:73 | different | differentiation | — |
| 243:6 | and | but | a better word producing the contrast I intended to show |
| 244:9 | goal than | goal, than | — |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

Deposition of George Goldberg