IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| MCKESSON INFORMATION SOLUTIONS LLC, | ) ) ) | |
| Plaintiff, | ) ) | CIVIL ACTION NO. 04-1258-SLR |
| v. | ) ) ) | PUBLIC VERSION |
| THE TRIZETTO GROUP, INC., | ) ) | |
| Defendant. | ) | |

**DECLARATION OF MICHAEL A. BARLOW IN SUPPORT OF PLAINTIFF
MCKESSON INFORMATION SOLUTIONS LLC'S REPLY BRIEF IN
SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT RE:
<u>ANTICIPATION AND OBVIOUSNESS</u>**

I, Michael A. Barlow, pursuant to 28 U.S.C. § 1746, declare as

follows:

1.      I am an attorney of the Bar of the State of Delaware and of the

firm of Skadden, Arps, Slate, Meagher & Flom LLP, attorneys for plaintiff

McKesson Information Solutions LLC in the above-captioned action.  I submit this

declaration in support of the Plaintiff's Reply Brief in Support of Its Motion for

Summary Judgment re: Anticipation and Obviousness, and to transmit to the Court

true and correct copies of the following documents attached as exhibits hereto:

| **Description** | **Exhibit No.** |
|---|---|
| 31 References Abandoned by TriZetto | 1 |
| *Carrion v. City of Wilmington*, Civ. A. No. 03-613-KAJ, 2005 U.S. Dist. LEXIS 787 (D. Del. Jan. 7, 2005) | 2 |
| *Hackett v. Cmty. Behavioral Health*, Civ. A. No. 03-6254, 2005 U.S. Dist. LEXIS 8410 (E.D. Pa. May 6, 2005) | 3 |
| *Primos, Inc. v. Hunter's Specialties, Inc.*, 05-1001 and 05-1376, 2006 U.S. App. LEXIS 14525 (Fed. Cir. June 14, 2006) | 4 |
| Excerpts of Trial Transcripts from April 18, 2006 | 5 |
| Correspondence from M. Lapple to M. Hendershot, dated January 28, 2005 | 6 |
| Correspondence from T. K. Roosevelt to M. Hendershot, dated April 11, 2005 | 7 |
| Correspondence from T. K. Roosevelt to D. Hansen, dated June 2, 2005 | 8 |
| Excerpts from the Deposition of David A. Wilson, taken on November 23, 2005 | 9 |

I declare under penalty of perjury that the foregoing is true and correct.

Executed: June 22, 2006

_____
Michael A. Barlow (I.D. # 3928)

# EXHIBIT 1

**31 References Abandoned By TriZetto**

| | |
|---|---|
| 1. | *Enhancing Accuracy and Timeliness is Integral to the Claims Adjudication Process,* Employee. Benefit Plan Review, Anonymous, Dec. 1985, pp. 10-12. |
| 2. | Weitzel, J.R., et al., *A Company / University Joint Venture to build a knowledge-based system,* MIS Quarterly, Vol. 12, No. 1, March 1988, 23-34. |
| 3. | Snyeder, C., *From research to reality: the leading edge of expert systems,* Insurance Software Review, Vol. 12, No. 3, Autumn 1987, 22-4, 26-7, 30. |
| 4. | Weitzel, J.R. and Kerschberg, L., "Developing Knowledge- Based Systems: Reorganizing the System Development Life Cycle, "working paper, University of South Carolina, Columbia, SC and George Mason University, Fairfax, VA (December 1986).<br><br>Final Publication, April 1989 in Communications of the ACM, Vol. 32, No. 4. |
| 5. | Egdahl, M.D. and Hertenstein, M.D., *An Access-oriented Negotiated Fee Schedule: The Caterpillar Experience,* Ann Surg., 206(3), pp. 349-57 (Sept. 1987). |
| 6. | U.S. Pat. No. 4,591,983 (Bennett patent). |
| 7. | U.S. Pat. No. 4,667,292 (Mohlenbrock patent). |
| 8. | U.S. Pat. No. 5,018,067 (Mohlenbrock 2 patent). |
| 9. | U.S. Pat. No. 4,803,641 (Hardy patent). |
| 10. | Stachura CT, *Software reference guide: DRG assignment,* J Am Med Rec Assoc, January 1987, Vol. 58, (1), pp. 33-40. |
| 11. | Huertas-Cortocarrero D, Ruiz PP, Marmol JP, *Concurrent clinical review: using microcomputer-based DRG-software,* Health Policy 1988, Vol. 9 (2), pp, 211-7. |
| 12. | Nathanson M, *Medical records. Experts: more research needed to set value of code programs,* Modern Healthcare, June 21, 1985, Vol. 15 (13), pp. 98, 102. |
| 13. | Gonnella JS, Hornbrook MC, Louis DZ, *Staging of disease. A case mix measurement,* Journal of the American Medical Association [JAMA], February 3, 1984, Vol. 251 (5), pp. 637 44. |
| 14. | Gibbons PS, Pishotta FT, Stepto RC, *A system for reporting gynecologic procedures. A linguistic-logical approach,* Journal of Reproductive Medicine, March 1983, Vol. 28 (3), pp. 201-5. |
| 15. | Miller KM, Wisnicki HJ, Buchman JP. Riley MJ, Repka MX, Taylor HR, Guyton DL., *The Wilmer Information system. A classification and retrieval system for information on diagnosis and therapy in ophthalmology,* Ophthalmology, March 1988, Vol. 95 (3), pp. 403-9. |

| 16. | U.S. Pat. No. 4,730,259 (Gallant patent). |
|-----|-------------------------------------------|
| 17. | U.S. Pat. No. 4,839,822 (Dormond patent). |
| 18. | Hao Kuo, MEDCLAIM: *An Expert Support system for Medical Claims Review,* Thesis Submitted in Department of Computer Science, University of South Carolina (1986). |
| 19. | AccuCode (HCIA/Solucient) |
| 20. | ClinicaLogic for ClaimFacts (Erisco) |
| 21. | Clinical Review System a/k/a Chart 'N Coder (Ernst & Young) |
| 22. | CODEFINDER/DRGFINDER or Clinical Claims Editor (Code 3 Health Information Systems/3M) |
| 23. | Codemaster PLUS (Care Communications) |
| 24. | Discorp Software (Novalis) |
| 25. | ExClaim (Policy Management Systems Corporation) |
| 26. | Interactive DRG Grouper (Radle Computer Systems, Inc.) |
| 27. | MedChec (Lockheed Martin) |
| 28. | MedClaim |
| 29. | Medical Policy (Advanced Systems Application joint venture with Blue Cross Blue Blue Shield North Carolina ("BCBS-NCA") |
| 30. | QGROUPER (Quality Data Systems) |
| 31. | Wilmer Information Systems |

# EXHIBIT 2

LEXSEE 2005 U.S. DIST. LEXIS 787

**AUGUSTINE CARRION, Plaintiff, v. CITY OF WILMINGTON, a political subdivision of the State of Delaware, and MONICA GONZALEZ–GILLESPIE, in her individual and official capacity, Defendants.**

**Civil Action No. 03–613–KAJ**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

*2005 U.S. Dist. LEXIS 787*

**January 7, 2005, Decided**

**DISPOSITION:** Defendants' Motion for Summary Judgment was granted in part.

**COUNSEL:** [*1] Gary W. Aber, Esquire, Aber, Goldlust, Baker & Over, Wilmington, Delaware, for Plaintiff.

Alex J. Mili, Jr., Esq., Assistant City Solicitor, City of Wilmington Law Department, Wilmington, Delaware, for Defendants.

**JUDGES:** JORDAN, District Judge.

**OPINIONBY:** Kent A. Jordan

**OPINION:**

**MEMORANDUM OPINION**

January 7, 2005

Wilmington, Delaware

**JORDAN, District Judge**

**I. INTRODUCTION**

Before me is a Motion for Summary Judgment (Docket Items ["D.I."] 71; the "Motion") filed by the City of Wilmington (the "City") and Monica Gonzalez–Gillespie, in her individual and official capacities ("Gonzalez–Gillespie") (collectively "Defendants"). Augustine Carrion ("Plaintiff"), a former equipment operator for Wilmington, brought this suit against the Defendants pursuant both to the Americans with Disabilities Act, *42 U.S.C. §§ 12101, et seq.* (the "ADA"), and to *42 U.S.C. § 1983*; he also asserts various state law claims. I have jurisdiction pursuant to *28 U.S.C. §§ 1331* and *1367*. For the reasons that follow, the Motion is

granted.

**II. BACKGROUND** n1

    n1 The following rendition of the background information is cast in the light most favorable to the non-moving party and does not constitute findings of fact.

[*2]

    Plaintiff was hired as an equipment operator by the City in 1990. (D.I. 1 at P 6.) In 1993, Plaintiff transferred to the City's Department of Public Works. (*Id.* at P 7.) From 1993 through 1996, Plaintiff was, at various times, out of work on disability. (*Id.* at P 8.) During that period, Plaintiff underwent surgery on his neck to repair a cervical disk. (*Id.* at P 9.) On May 14, 1998, Plaintiff injured his neck on the job and, on November 4, 1999, again underwent cervical disc surgery. (*Id.* at P 12.) From at least January of 1999, Plaintiff was unable to return to his former position because of his physical condition. (See D.I. 75 at A–43.)

    In March 2002, the City informed Plaintiff that he was terminated because, it said, he repeatedly refused to cooperate in providing information on his medical condition. (*Id.*) The Plaintiff then filed a discrimination complaint with the Equal Employment Opportunities Commission through the Delaware Department of Labor, asserting that the City had violated the ADA. (D.I. 1 at P 17–18.) Shortly thereafter, on or about April 15, 2002, the City rescinded its termination letter, citing as its reason the Plaintiff's beginning to cooperate [*3] in providing medical information. (See *id.* at P 19; D.I. 75 at A–47.) The City then scheduled an appointment for the Plaintiff to meet with its recruiting coordinator to assist in finding a job that would be suitable for the Plaintiff. (See D.I. 75 at A–47.) On April 23, 2002, that meeting took place and the Plaintiff was given a list of jobs to consider, including, among oth-

ers, electronics technician, sanitation worker, and another equipment operator position. (D.I. 75 at A-139-A-140; A-147c.) Plaintiff never responded to that list of options. (*Id.* at A-140, A-143.) On June 13, 2002, through certified mail, Plaintiff was offered the job of school crossing guard. (*Id.* at A-50.) Plaintiff did not respond to the City's offer and, on August 19, 2002, the City again terminated Plaintiff's employment. (*Id.* at A-53.)

During the time Plaintiff was on disability, the City paid Plaintiff the difference between his worker's compensation pay and his previous salary, as required under Section 40-80(h) and Section 9.8 of the Union Contract governing Plaintiff's employment relationship with the City. (D.I. 1 at P 29.) After his termination, Plaintiff no longer received those [*4] supplemental payments. (*See id.* at P31.)

### III. STANDARD OF REVIEW

*Rule 56 of the Federal Rules of Civil Procedure* provides that summary judgment shall be entered if "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." "The availability of summary judgment turn[s] on whether a proper jury question ... [has been] presented." *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986).* "The judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* In making that determination, the Court is required to accept the non-moving parties' evidence and draw all inferences from the evidence in the non-moving parties' favor. *Id. at 255; Eastman Kodak Co. v. Image Technical Servs., Inc., 504 U.S. 451, 456, 119 L. Ed. 2d 265, 112 S. Ct. 2072 (1992).* Nevertheless, the party bearing the burden of persuasion in the litigation, must, in opposing a summary judgment motion, "identify those facts of record which would contradict the facts identified by the movant." *Port Authority of New York and New Jersey v. Affiliated FM Ins. Co., 311 F.3d 226, 233 (3d Cir. 2002)* [*5] (internal quotes omitted).

### IV. DISCUSSION

In Counts I and II of the Complaint, Plaintiff alleges that Defendants terminated his employment in violation of the ADA. In his Answering Brief in Response to Defendants' Motion for Summary Judgment ("Answering Brief"), however, Plaintiff does not respond to any of the arguments made by Defendants in support of their assertion that they did not violate the ADA. (D.I. 80.) Furthermore, in a letter to the court from Plaintiff's counsel, Plaintiff acknowledges that he did not respond with respect to those claims and that he informed defense coun-

sel that he was amenable to a dismissal of them. (D.I. 88.) Therefore, I will dismiss those claims with prejudice.

In Counts III and IV, respectively, Plaintiff alleges that Defendants Gonzalez-Gillespie and the City violated his constitutional rights and are liable under *42 U.S.C. § 1983.* As with Counts I and II, Plaintiff did not respond to any arguments made by Defendants with respect to Count IV. (D.I. 80.) Also as with Counts I and II, Plaintiff has stated that he agrees that Count IV should be dismissed. (D.I. 88.) Consequently, I will dismiss Count IV with prejudice. [*6]

The only remaining federal issue is Count III. In Count III, Plaintiff alleges that Gonzalez-Gillespie's "actions in depriving Plaintiff of his employment, and the attendant benefits, amounts to a deprivation of his property rights without due process of law in violation of this United States Constitution subjecting her to liability under *42 U.S.C. § 1983.*" (D.I. 1 at P 52.)

Plaintiff has not responded to any of the arguments made by Defendants on the lawfulness of the termination of his employment. Therefore, Plaintiff has conceded there is no liability on that basis and judgment in favor of the Defendant is appropriate on that aspect of Count III. *See FED. R. CIV P. 56* (stating that "when a motion for summary judgment is made and supported [by sworn affidavits], an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response ... must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party").

There is a second aspect of Count III, however, which [*7] Plaintiff addresses at length, namely the question of whether he had a constitutionally protected property interest in receiving the supplemental payments that made up the difference between his workers compensation benefits and his former salary. n2 In that regard, Defendants argue that "Plaintiff's bargained-for due process rights are exclusively set forth in Article IV of his union's collective bargaining agreement." (D.I. 73 at 30; D.I. 75 at 1-15, 19.) Section 4.16 of that agreement authorizes the union to grieve any employment decisions, an avenue the Plaintiff did not elect to pursue. (D.I. 73 at 30; D.I. 75 at A-4.) Additionally, a copy of the termination letter was sent to the head of Plaintiff's union, who also did not initiate a grievance on Plaintiff's behalf. (*See* D.I. 73 at 30; D.I. 75 at A-53-A-54.) Plaintiff has not responded to the Defendants' argument and evidence, thus failing in his obligation to "set forth specific facts showing that there is a genuine issue for trial." *See FED. R. CIV P. 56.* Because Plaintiff has not rebutted in any way the argument and evidence presented by Defendants to show that his due

process rights were not violated, judgment for [*8] the Defendants is also warranted on this aspect of Count III. n3

> n2 For purposes of this decision, I will assume that Plaintiff has a protectable property interest in the supplemental payments; however, I need not and do not decide that such is the case.

> n3 In Plaintiff's Answering Brief, he also argues that the City violated the constitutional prohibition against the impairment of contracts. (D.I. 80 at 18-22.) Such a claim was never raised in the Complaint, and any attempt to now amend the Complaint is inappropriate. *See Fatir v. Dowdy, C.A. No. 95-667-GMS, 2002 U.S. Dist. LEXIS 16480 at \*23 (D. Del. Sept. 4, 2002)* ("Belated attempts at amendment are disfavored with good reason. If parties were allowed to repeatedly amend their complaints, even after summary judgment motions had been filed, not only the opponent, but the courts, would be prejudiced by the never–ending litigation"). The argument is not properly before the court and justifies no further consideration.

The last two claims [*9] in the Complaint, Counts V and VI (the "State Claims"), are State law claims for wrongful termination and violation of the contractual provision requiring the City to supplement Plaintiff's pay. The only basis for me to consider those claims is the supplemental jurisdiction provided in *28 U.S.C. 1367*. Since I have decided that the Plaintiff's federal claims must be dismissed, it is within my discretion whether to retain jurisdiction over the State Claims. *See 28 U.S.C. 1367(c)(3)* ("The district courts may decline to exercise supplemental jurisdiction over a claim ... if ... the district court has dismissed all claims over which it has original jurisdiction ... ."); *Queen City Pizza, Inc. v. Domino's Pizza, Inc., 124 F.3d 430, 444 (3d Cir. 1997)* (decision to exercise supplemental jurisdiction "is committed to the sound discretion of the district court").

To the extent any resources have been invested by the parties in developing the record regarding the State Claims, that investment will not be lost simply because the issues are to be addressed in a state court of competent jurisdiction. It is therefore neither wasteful [*10] nor unfair to decline to exercise supplemental jurisdiction in this matter. *Queen City Pizza, 124 F.3d at 444* (district court's decision to decline the exercise of supplemental jurisdiction was proper since it "would not be unfair to the litigants or result in waste of judicial resources"). Declining jurisdiction allows the Plaintiff's claims under Delaware law to be addressed, as is proper, by the courts of Delaware. Accordingly, the State Claims will be dismissed without prejudice.

**V. CONCLUSION**

Accordingly, Counts I, II and IV will be dismissed with prejudice; summary judgment for Defendants will be entered on Count III; and Counts V and VI will be dismissed without prejudice. An appropriate order will follow.

Kent A. Jordan

UNITED STATES DISTRICT JUDGE

**ORDER**

For the reasons set forth in the Court's Memorandum Opinion of today's date in this matter,

IT IS HEREBY ORDERED that Defendants' Motion for Summary Judgment (D.I. 71) is GRANTED in part, to the extent that judgment is hereby entered for Defendants and against Plaintiff on Count III of the Complaint (D.I. 1); it is further ORDERED that Counts I, II and IV of the Complaint are dismissed [*11] with prejudice, and Counts V and VI are dismissed without prejudice.

Kent A. Jordan

UNITED STATES DISTRICT JUDGE

January 7, 2005

Wilmington, Delaware

# EXHIBIT 3

LEXSEE 2005 U.S. DIST. LEXIS 8410

**CHERIE HACKETT, Plaintiff, v. COMMUNITY BEHAVIORAL HEALTH, et al., Defendants.**

**CIVIL ACTION No. 03-6254**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

*2005 U.S. Dist. LEXIS 8410*

**May 6, 2005, Decided**

**SUBSEQUENT HISTORY:** Affirmed by Hackett v. Cmty. Behavioral Health, 2006 U.S. App. LEXIS 6520 (3d Cir. Pa., Mar. 16, 2006)

**COUNSEL:** [*1] For CHERIE HACKETT, Plaintiff: EMANUEL A. COKER, PHILADELPHIA, PA.

For COMMUNITY BEHAVIORAL HEALTH, et al., Defendants: ALAN B. EPSTEIN, JENNIFER L. MYERS, SPECTOR GADON & ROSEN, PC, PHILADELPHIA, PA.

**JUDGES:** Robert F. Kelly, Sr. J.

**OPINIONBY:** Robert F. Kelly

**OPINION: MEMORANDUM**

**ROBERT F. KELLY, Sr. J.**

The Plaintiff, Cherie Hackett ("Hackett"), brings this action alleging violations of Title VII of the Civil Rights Act of 1964 ("Title VII"), *42 U.S.C. § 2000e et seq.*, the Family and Medical Leave Act ("FMLA"), *29 U.S.C. § 2601 et seq.*, the Pennsylvania Human Relations Act ("PHRA"), *43 Pa.C.S. § 951 et seq.* and the Pennsylvania Workers' Compensation Act ("Workers' Compensation Act"), *77 P.S. § 1 et seq.* in connection with her employment with Defendant, Community Behavioral Health ("CBH"). n1 Before this Court is a Motion for Summary Judgment filed by Defendants and Plaintiff's response thereto. Upon consideration of the parties' respective filings, the Motion for Summary Judgment is granted.

> n1 CBH is a non-profit organization responsible for planning and coordinating the delivery of mental health and substance abuse treatment services to the uninsured, underinsured and Medicaid eligible residents of the City of Philadelphia.

CBH operates under a contract with the City of Philadelphia to serve these behavioral health needs and contracts with approximately 300 area treatment providers offering a full array of behavioral health services. CBH is an equal opportunity employer with a diverse staff of approximately 300 employees.

[*2]

**I. BACKGROUND n2**

> n2 The following material facts are either undisputed or are based upon allegations made by Hackett and accepted by Defendants as true for purposes of this Motion only.

**A. Work History with CBH**

Hackett, an African-American female, was hired by CBH on March 2, 1998 as a Help Desk Support Administrator in its Information Services ("IS") department. n3 At the time of her hire, Hackett had not graduated from high school, but she had obtained her General Equivalency Diploma. Hackett attended business communication courses at the Orlands Institute and received an Associates Degree in Computer Technology from the Computer Learning Center. At the beginning of her employment, Hackett did not experience any problems and she received a positive performance appraisal in September 1998.

> n3 During her tenure at CBH from March 1998 until May 2003, Hackett claims that she was the only African-American female technician employed in the IS department. Hackett estimates that seven of the twenty-five to thirty people employed in the IS Department were African-American.

[*3]

In November of 1998, the Help Desk Support Administrator position merged with the Technical Support Specialist position. Upon this merger, Hackett's job title changed to Technical Support Specialist. At the time of her title change, Hackett believes that Defendant, Troy Pearsall ("Pearsall"), became her supervisor. Pearsall, an African-American male, was employed by CBH as a Senior Technical Support Specialist. Hackett alleges that Pearsall gave her problems from 1998 through 1999 when she worked as a Technical Support Specialist. Hackett believes that her problems with Pearsall stem from his being threatened by her because of "[her] determination and [her] drive and [her] relentlessness, and diligent work habits." (Pl.'s Dep. I, Defs.' Ex. 1, p. 51). Hackett also claims that Pearsall treated her unfairly and differently than the other five technicians because she was a woman. n4 (Id., p. 134-35). Hackett bases her claim upon the following incidents:

> Pearsall stated that he could not believe that Hackett was crying when she broke her nail;

> Pearsall told Hackett that she should be like the rest of the technicians and remember what he was saying;

> Pearsall [*4] stated "just like a dumb woman" after Hackett stated that she wanted to use her notes; n5 and

> Pearsall referred to Hackett as dumb, stupid and ignorant.

(Id., p. 134-39). Although Hackett claims that Pearsall treated her differently because she is a female, she acknowledges that he also had problems with Jonathan Lee, an African-American male, and Thomas Rodriguez, a Hispanic male. Additionally, Hackett acknowledges that Pearsall had an altercation with Joseph Kincaid, a Caucasian male. According to Defendant, Wayne Lepp ("Lepp"), who was the Technical Services Director and Pearsall's supervisor, Pearsall had a difficult personality and experienced difficulties with many of the technicians, and he had received complaints that Persall had belittled a male technician. (Lepp Aff., Defs.' Ex. 10, PP 6-7). Without any documentary evidence, Hackett claims that she complained to Lepp about Pearsall's harassment and claims that she informed him that Pearsall was discriminating against her because she was a female. Hackett claims that she told Lepp that the harassment was solely on the basis of her gender, and not based upon her race. Hackett admits that she never put in writing, [*5] dur-

ing the years of 1998 or 1999, that she felt that she was being discriminated against because she was a female. (Pl.'s Dep. I, Defs.' Ex. 1, p. 172). Even after she complained, Hackett received positive evaluations from Lepp from 1998 through 2001. Also, Hackett was not subject to any adverse action or loss of any benefits during 1998 and 1999.

> n4 Hackett admits that she does not believe that Pearsall engaged in any unpleasant behavior towards her because of her race. (Pl.'s Dep. I, Defs.' Ex. 1, p. 138-44).

> n5 Hackett admits that she never advised any individual at CBH that Pearsall call her "a dumb woman." (Id., p. 139).

## 1. Novell Network Administrator Position

On December 3, 1999, Defendant, Lance Groff ("Groff"), the Chief Information Officer, approved Hackett's promotion to the position of Novell Network Administrator ("Network Administrator") effective December 13, 1999. Hackett was the only individual employed as the Network Administrator and the position held an EP Grace Level of 22 [*6] which increased Hackett's salary from $24,456.00 to $39,621.00. As the Network Administrator, Hackett was responsible for overseeing operations of the systems network and monitoring the computer system which included the following: performing network user maintenance; maintaining server disk space; upgrading and updating the system; performing security auditing and system refining; and implementing data recovery/protection and back-up procedures. As the Network Administrator, Hackett directly reported to Lepp and Pearsall was not her supervisor. Prior to Hackett's promotion, Lepp had reservations about giving Hackett full responsibilities for administering the network because of her lack of experience. (Leff Aff., Defs.' Ex. 10, P 9). Lepp expressed his concern to Groff regarding whether Hackett would be able to handle the position. (Id.; Groff Aff., Defs.' Ex. 6, P 6). Lepp and Groff expressed their concerns to Hackett regarding whether she would be able to handle the position and she advised that she was willing to take the risk and that she should be demoted if she failed. (Id. PP 9-10; Groff Aff., Defs.' Ex. 6, P 7). In 2000 through 2001, while Network Administrator, [*7] Hackett claims that Pearsall harassed her and treated her improperly in front of people. Hackett alleges that Pearsall stated that "she would not last 6 months as network administrator." n6 (Am. Compl., PP 22-25). Hackett also alleges that she was denied access to equipment and supplies, as well as necessary information regarding technical and policy changes. Although

2005 U.S. Dist. LEXIS 8410, *7

employed as the only Network Administrator, Hackett contends that her male counterparts were given more access to equipment, supplies and information.

> n6 Although Pearsall was not Hackett's supervisor, Lepp spoke to Pearsall about Hackett's allegation that Pearsall was attempting to hold her back from advancing. (Lepp Aff., Defs.' Ex. 10, P 12).

On March 1, 2000, Hackett complained to Lepp about Pearsall's treatment of her. During their conversation, Pearsall entered Lepp's office and a dispute erupted between Hackett and Pearsall. n7 Hackett states that she reported the incident to the Human Resources department ("HR") in March 2000. n8 Hackett [*8] continued to receive good performance evaluations in 2000 and 2001 from Lepp. She received salary increases on March 28, 2000 and November 27, 2000, and salary adjustment increases on January 1, 2001, January 3, 2001 and January 3, 2002, as well as an annual increase on January 4, 2002.

> n7 In a memo dated March 3, 2000, Lepp wrote that he individually met with Hackett and Pearsall on March 2, 2000 to discuss the incident. (Lepp Memo, Defs.' Ex. 14).

> n8 Hackett claims that she filed a complaint with HR Director, Peter Bezrucik ("Bezrucik"), but he never responded to her complaint. Hackett also alleges that her profile from HR was tampered with and, as a result, the complaint that she filed regarding Pearsall in 2000 was missing.

On March 19, 2002, Hackett and Pearsall had a verbal altercation when she asked him to perform tasks that he believed she should have been able to perform. n9 On March 21, 2002, Hackett submitted a written complaint regarding the incident. Hackett's complaint includes allegations [*9] against Pearsall, Lepp and Groff. The allegations primarily focus upon Pearsall's demeaning attitude, including verbal attacks, against Hackett's skills and qualifications. The allegations against Lepp focus on his lack of support of Hackett. As for the allegations against Groff, Hackett asserts that in November 2001 she requested a meeting with Groff, in which Lepp also attended, and Groff told Hackett that he was not impressed with her work and that she would have to prove herself to him. Hackett's complaint does not include any claims of discrimination or retaliation by Pearsall, Lepp or Groff. Sometime after the March 19, 2002 dispute, Lepp met with Hackett and Pearsall to discuss the dispute and any issues. On April 2, 2002, Lepp issued written disciplinary warnings concerning the incident to both Hackett and Pearsall.

> n9 For the interim two year period, Hackett presents no evidence of any altercations or allegations concerning Pearsall.

Hackett initially performed satisfactorily as the Network Administrator. [*10] In 2001, she received an Improvement Needed in job knowledge on her job appraisal. (Dec. 13, 2001 Performance Appraisal, Defs.' Ex. 18). According to Lepp, he assigned Hackett an Improvement Needed because her knowledge of the Network System started to stagnate. (Lepp Aff., Defs.' Ex. 10, P 16). During Hackett's tenure as Network Administrator, Groff detected the following various deficiencies in her performance: a continual crashing of ARC (the back up system installed by Hackett); the incorrect installation of ADP; difficulties with Great Plains (the finance program used by CBH); difficulties with the Hermes Server; unsuccessful installation of the Windows 2000 Test Bed; and unnecessary reliance upon outside consultants. n10 (Groff Aff., Defs.' Ex. 6, P 8).

> n10 Groff was advised by two outside consultants that Hackett was "in above her head" because of her lack of experience. (Groff Aff., Defs.' Ex. 6, P 9; Defs.' Ex. 19).

In the middle of 2001, CBH decided to change its operating system and it began the process [*11] of migrating from the Novell System to Microsoft. The migration process was facilitated by Phillip S. Rohrbach, a Network Engineer and Microsoft Certified Systems Engineer who was employed by Versalign, Inc. (the outside consulting company utilized by CBH). Since Hackett was not a Microsoft Certified Systems Engineer, CBH sent her for training in certain Microsoft courses to assist her with the upcoming changes. Hackett was not comfortable with the Microsoft System and repeatedly requested a separate computer to practice the skills that she learned. In May/June 2002, Groff, after discussing his concerns with Lepp regarding the deficiencies of Hackett's performance over the past year, decided that she could not continue as the Network Administrator under the new system based upon her lack of experience and the deficiencies in her performance. (Groff Aff., Defs.' Ex. 6, PP 11-12).

**2. FMLA Leave**

On June 19, 2002, Hackett requested a family medical leave as a result of major depression. CBH granted Hackett's family medical leave request. While out on FMLA leave, Hackett sent a letter dated June 24, 2002 to Nancy Lucas, the CEO of CBH, complaining about

2005 U.S. Dist. LEXIS 8410, *11

problems with the migration [*12] process. The letter also included complaints concerning Pearsall, Groff and Lepp. The letter did not contain any allegations regarding discrimination or retaliation. On July 31, 2002, Hackett returned to work from her FMLA leave. Hackett was assigned to the position of Data Integrity and Recovery Administrator. n11 Groff and Lepp created the position after Groff had made the decision to remove Hackett as Network Administrator. (Groff Aff., Defs.' Ex. 6, PP 12–13; Lepp Aff., Defs.' Ex. 10, P 22). The position was at the same EP level as the Network Administrator position, and Hackett's salary, work location and hours remained the same. Hackett continued reporting to the Director of Technical Services and she was responsible for ensuring that all network servers and PC backups were functioning properly. The Data Integrity and Recovery Administrator position was created for Hackett in order to allow her to continue in the capacity of an administrator while restricting her access to certain systems based upon concerns regarding her lack of experience. (Groff Aff., Defs.' Ex. 6, P 13; Lepp Aff., Defs.' Ex. 10, P 22). Apparently, the differences between the two positions were that Hackett [*13] had restricted access to certain systems and did not have a laptop or private internet access. As a result of being denied access to certain systems on the Network, Hackett complained that she was unable to perform her job duties. Through a letter dated August 30, 2002, Hackett complained to Bezrucik that she was unable to perform her functions as Data Integrity and Recovery Administrator. Hackett set forth the following three reasons as the causes for her inability to perform: lack of access to the Network; duties gradually being directed to male counterparts; and security concerns being ignored. Hackett did not make any complaints about discrimination or retaliation in her letter.

> n11 Initially, this position was going to be identified as Data Integrity and Recovery Specialist; however, the title of Data Integrity and Recovery Administrator was agreed upon pursuant to Hackett's request.

At the time Hackett's position was created, Groff and Lepp believed that they could restrict Hackett's access to certain [*14] secure systems on the network while allowing her access to other systems in order to perform her job. (Groff Aff., Defs.' Ex. 6, P 14; Lepp Aff., Defs.' Ex. 10, P 23). While Hackett was acting as the Data Integrity and Recovery Administrator, Groff and Lepp learned that the they could not restrict Hackett's access to certain systems while permitting her access to other systems. (Id. P 15). Groff was unwilling to allow Hackett the needed access to the secured system because of the potential damage

that could result from allowing her such access. (Id. P 16; Lepp Aff., Defs.' Ex. 10, P 24). Since Hackett was unable to continue as the Data Integrity and Recovery Administrator without access to the secured systems, she was transferred to the position of Senior Technical Support Specialist. (Id. P 17; Lepp Aff., Defs.' Ex. 10, P 25). In a memo dated September 3, 2002, Groff explained to Hackett that he questioned her job knowledge, skills and judgment. Groff listed five pages of instances in which he questioned Hackett's job knowledge and conduct. Groff concluded the memo by stating that he did not have the high degree of confidence in Hackett's skills and judgment to grant her [*15] the access needed to perform in the Data Integrity and Recovery Administrator position. As a result, Groff informed Hackett that she was being transferred to the position of Senior Technical Support Specialist.

### 3. Senior Technical Support Specialist Position

As a Senior Technical Support Specialist, Hackett was to report to Orlando Rivera. The Senior Technical Support Specialist position was an EP level of 16 with a salary of $42,478.00. After the transfer, Hackett filed a complaint with the Department of Labor in September 2002 alleging that CBH failed to reinstate her to an equivalent position. On September 12, 2002, Hackett, through her representative Clarence Allen ("Allen"), also submitted a complaint of discrimination to the Equal Employment Opportunity Commission ("EEOC"). n12 On September 16, 2002, Hackett submitted her Allegations of Employment Discrimination Questionnaire Response to the EEOC, and filed a Verified Charge of Discrimination with the Pennsylvania Commission on Human Relations.

> n12 Allen is Hackett's friend who informed her that he knew how to write a complaint. Hackett did not know, and was not concerned, if Allen had any qualification to write a complaint. Allen also initially assisted Hackett in the beginning stages of the instant action.

[*16]

### 4. Workers' Compensation Benefits Claim

On October 4, 2002, Hackett fell backwards at work while carrying a computer and filed a Workers' Compensation Benefits claim that was approved by CBH's Workers' Compensation Insurer. Due to this injury, Hackett was absent from work from October 4, 2002 until November 5, 2002, when her physician released her back to work with lifting restrictions. n13 Due to the lifting restriction, Hackett was reinstated in the position of Help Desk Operator, which did not require any lifting, and was paid the same compensation.

Hackett claimed that she could not sit at the help desk due to her injuries. When Hackett's treating physician, Neil Kahanovitz, M.D. ("Dr. Kahanovitz "), released her to return to her pre-injury position, Hackett was returned to the Senior Technical Support Specialist position on November 27, 2002. Upon her release, Dr. Kahanovitz restricted Hackett to working four hours per day. On January 13, 2003, Dr. Kahanovitz restricted Hackett to working three days a week for eight hours and CBH permitted her to work on a part-time basis as directed by her physicians. On January 24, 2003, Bezrucik offered Hackett the opportunity to advance [*17] to the position of Microsoft Network Administrator provided that she attended and completed training to allow her to become a Microsoft Certified Systems Administrator. CBH offered to pay for the training and did condition this offer upon any release of Hackett's pending claims before the Pennsylvania Commission on Human Relations ("PCHR"). By letter dated January 25, 2003, Hackett rejected the position. Hackett explained that the she was promised the position of Network Administrator following the migration from Novell to Microsoft. Hackett further explained that she completed most of the Microsoft training courses. Hackett then set forth a proposal containing a list of conditions including, but not limited to, the following: full and complete reinstatement to Network Administrator with retroactive salary effective July 31, 2002; letters of apologies from Pearsall, Groff and Bezrucik; and immediate compensatory/punitive payment in the amount equivalent to two years salary. In her deposition, Hackett stated that she rejected the offer due to her need to be out on Workers' Compensation; however, Hackett's letter did not include any mention of issues with Workers' Compensation as a basis [*18] for her rejection.

n13 On October 17, 2002, Leslie Edwards, the Benefits Manager at CBH, advised Hackett that her absence from work due to her Workers' Compensation injury would be designated as Family Medical Leave.

On April 9, 2003, Bezrucik advised Hackett that she needed to return to work full-time without any restrictions by May 12, 2003 or else her employment would be terminated. CBH requires that Technical Support Specialists work full-time and does not employ any part-time Technical Support Specialists on a permanent basis. n14 Hackett claims that she was unable to return to full-time work by May 12, 2003 as a result of continued restrictions. On April 23, 2003, Hackett's Workers' Compensation attorney advised Bezrucik that she was unable to return to work full-time and requested that her Workers' Compensation Benefits be immediately re-instated to total disability. On May 12, 2003, Hackett was terminated based upon her inability to return to full-time work. Immediately after her termination, Hackett petitioned [*19] the Workers' Compensation Board to reinstate her benefits to total disability. On June 24, 2003, she also filed an Amended Charge of Discrimination with the PCHR.

n14 Hackett admits that she does not know of any Technical Support Specialist employed part-time.

Hackett has continued to receive full Workers' Compensation benefits subsequent to her termination. On January 27, 2004, Hackett signed a Verification to the Pennsylvania Department of Labor and Industry Bureau of Workers' Compensation verifying that she has been unable to work in her former position because her physician has not released her to return to work and she is totally disabled. At her deposition on December 20, 2004, Hackett stated that she has not made any real effort to obtain employment.

**B. Procedural History**

Hackett filed her *pro se* Complaint on January 5, 2003, and filed an Amended Complaint on May 3, 2004. Additionally, she filed a second Civil Action Complaint (Civ. A. 04–2806) based upon similar grounds on June 25, 2004. This [*20] second action was consolidated with her pending action on August 13, 2004. On September 23, 2004, Emanuel A. Coker, Esq. ("Coker") entered his appearance on Hackett's behalf. Defendants filed their Motion for Summary Judgment on February 18, 2005. Hackett's Response in opposition to the Motion was filed on April 1, 2005.

**II. STANDARD**

Pursuant to *Rule 56 (c) of the Federal Rules of Civil Procedure,* summary judgment is proper "if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *FED. R. CIV. P. 56 (c).* Essentially, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251–52, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986).* The moving party has the initial burden of informing the court of the basis for the motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett, 477 U.S. 317, 323, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986).* [*21] An issue is genuine only if there is a sufficient evidentiary basis on which a reasonable jury

2005 U.S. Dist. LEXIS 8410, *21

could find for the non-moving party. *Anderson, 477 U.S. at 249*. A factual dispute is material only if it might affect the outcome of the suit under governing law. *Id. at 248*.

To defeat summary judgment, the non-moving party cannot rest on the pleadings, but rather that party must go beyond the pleadings and present "specific facts showing that there is a genuine issue for trial." *FED. R. CIV. P. 56(e)*. Similarly, the non-moving party cannot rely on unsupported assertions, conclusory allegations, or mere suspicions in attempting to survive a summary judgment motion. *Williams v. Borough of W. Chester, 891 F.2d 458, 460 (3d Cir. 1989)*(citing *Celotex, 477 U.S. at 325 (1986)*). Further, the non-moving party has the burden of producing evidence to establish *prima facie* each element of its claim. *Celotex, 477 U.S. at 322–23*. If the court, in viewing all reasonable inferences in favor of the non-moving party, determines that there is no genuine issue of material fact, then [*22] summary judgment is proper. *Id. at 322; Wisniewski v. Johns-Manville Corp., 812 F.2d 81, 83 (3d Cir. 1987)*.

### III. DISCUSSION

Hackett's Amended Complaint involves claims pursuant to numerous legal grounds and statutes. n15 In their Motion for Summary Judgment, Defendants note the confusion engendered by Hackett's voluminous Amended Complaint which fails to separately list her numerous claims and their supporting allegations. Additionally, Defendants note that Coker has failed to clarify Hackett's claims after making his appearance in this action. In response to Defendants' Motion for Summary Judgment, Coker clarified that this action is being pursued upon the following grounds: (1) race and gender discrimination under Title VII and the PHRA; (2) violation of rights under the FMLA; and (3) retaliation for Hackett's exercise of her rights under Title VII, PHRA, FMLA and the Workers' Compensation Act. Accordingly, it appears that Hackett has abandoned most of her claims except for the claims based upon the aforementioned three grounds.

n15 Hackett's Amended Complaint asserts the following grounds: Title VII of the Civil Rights Act of 1964; the Civil Rights Act of 1991; Deprivation of Rights Under 1983; the FMLA; the Pennsylvania Equal Rights Amendment; the *Pennsylvania Equal Pay Act*; PHRA; the *Pennsylvania Whistleblower Act*; the *Pennsylvania Workers' Compensation Act*; Breach of Contract; Breach of the CBH Personnel Policy and Procedures Manuel; Gender, Age, Race and Retaliatory Discrimination; Slander; Libel; Defamation; Harassment; Adverse Employment Action; Hostile Work Environment; Constructive Termination; Wrongful Termination

and/or Discharge; Deprivation of Property Interest Without Due Process; Loss of Enjoyment of Life; Intentional Infliction of Emotional Distress; Negligent Infliction of Emotional Distress; Deprivation of Rights Under the Due Process and the *Equal Protection Clauses* of the *Fifth* and *Fourteenth Amendments of the United States Constitution* and the Pennsylvania Constitution. (See Am. Compl.). Hackett's Amended Complaint further alleges that "her unjustified demotions and subsequent termination appear to be part of a company pattern of discrimination, the purpose of which is to eliminate Black heterosexual women employed in excess of two years and earning more than forty thousand dollars annually, via either demotions, forced resignations, or outright terminations and to have them replaced with other persons not of her (their) racial, gender, or age class." (Id. at 2).

[*23]

Although Hackett's response to Defendants' Motion for Summary Judgment clarifies the claims that she is asserting, the response only addresses Plaintiff's retaliation claims. Thus, the response does not defend the viability of Hackett's claims based upon race and gender discrimination under Title VII and the PHRA, or the claim of a violation of her rights under the FMLA. As a result, it appears that Hackett has also abandoned these claims. n16 See *Ankele v. Hambrick, 286 F. Supp. 2d 485, 496 (E.D. Pa. 2003)*(granting summary judgment based upon the premise that plaintiff's failure to respond to one of the defendant's arguments in his summary judgment motion results in his waiver of the opportunity to contest summary judgment on that ground); see also *Evans v. Nine West Group, Inc., 2002 U.S. Dist. LEXIS 6427, No. 00–4850, 2002 WL 550477, at *4 (E.D. Pa. Apr. 15, 2002)*(finding that plaintiff abandoned one of her claims by failing to defend the claim's viability in her opposition to defendant's summary judgment motion: "Under analogous circumstances, courts both within and beyond the Third Circuit routinely have held the claim at issue to have been abandoned."). Accordingly, [*24] summary judgment is granted in Defendants' favor regarding all of Hackett's abandoned claims. The only remaining claims in this action are retaliation claims based upon the exercise of Hackett's rights under Title VII, PHRA, FMLA and the Workers' Compensation Act.

n16 Even disregarding the abandonment issue pertaining to Hackett's claims based upon race and gender discrimination under Title VII and the PHRA and violation of her rights under the

2005 U.S. Dist. LEXIS 8410, *24

FMLA, summary judgment would be granted in Defendants' favor because the claims fail as a matter of law. Regarding Hackett's Title VII and PHRA claims, she fails to make out a *prima facie* case of discrimination and fails to provide any evidence to rebut the Defendants' legitimate nondiscriminatory reasons for her change in position and salary decrease by a showing of pretext.

As for the FMLA claim, Hackett contends that Defendants violated the FMLA by failing to return her the same position that she had prior to her FMLA leave. "The FMLA entitles eligible employees to reinstatement at the end of their FMLA leave to the position held before taking leave or an equivalent position." *Bearley v. Friendly Ice Cream Corp., 322 F. Supp. 2d 563, 571 (M.D. Pa. 2004)*(citation omitted). "Under an interference claim, it is plaintiff's burden to demonstrate that she was entitled to a benefit under the FMLA, but was denied that entitlement." Id. (citations omitted). "If the plaintiff meets this burden, then it is defendant's burden to demonstrate that she would have been denied reinstatement even if she had not taken FMLA leave." *Id.* (citation omitted). CBH has shown, and the evidence supports, that Hackett was not going to be restored to Network Administrator irrespective of whether she took FMLA leave. Regarding Hackett's termination, CBH has shown, and the record supports, that Hackett was terminated because of her inability to work full-time.

[*25]

## A.    McDonnell    Douglas    Burden–Shifting Framework

The parties do not dispute that the McDonnell Douglas burden-shifting framework is the appropriate mechanism with which to analyze Hackett's claims that she was the victim of unlawful retaliation under Title VII, PHRA, FMLA and the Workers' Compensation Act. n17 See *McDonnell Douglas Corp. v. Green, 411 U.S. 792, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973)*. Summarized briefly, the *McDonnell Douglas* analysis proceeds in the following three stages:

first, the plaintiff must establish a *prima facie* case of discrimination. If the plaintiff succeeds in establishing a *prima facie* case, the burden shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the employee's rejection. Finally, should the defendant carry this burden, the plaintiff then must have an opportunity to prove by a

preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.

*Jones v. Sch. Dist. of Phila., 198 F.3d 403, 410 (3d Cir. 1999)*(citations omitted). "Most cases turn on the third stage, i.e., can [*26] the plaintiff establish pretext." Id. "While the burden of production may shift, 'the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'" Id. (quoting *Texas Dep't of Cmty Affairs v. Burdine, 450 U.S. 248, 252–53, 67 L. Ed. 2d 207, 101 S. Ct. 1089 (1981)*).

n17 See *Knabe v. Boury Corp., 114 F.3d 407, 410 n.5 (3d Cir. 1997)*(stating "employer liability under the [PHRA] follows the standards set out for employer liability under Title VII"); *Christman v. Cigas Mach. Shop, Inc., 293 F. Supp. 2d 538, 543 (E.D. Pa. 2003)*(under the Workers' Compensation Act, "the Pennsylvania Supreme Court has not yet set forth the elements of a *prima facie* case of retaliatory discharge, so courts in this district borrow the analytical structure used in Title VII retaliation claims"); *Sherrod v. Phila. Gas Works, 209 F. Supp. 2d 443, 450 (E.D. Pa. 2002)*(claims of unlawful retaliation under the PHRA and FMLA may be proved through the McDonnell Douglas analysis); *Ryales v. Phoenixville Sch. Dist., 177 F. Supp. 2d 391, 395 (E.D. Pa. 2001)*(stating "when evaluating retaliation claims under Title VII, courts apply the well-known burden shifting framework first set forth in McDonnell Douglas"). All four of Hackett's claims, therefore, will be viewed in accordance with the *McDonnell Douglas* analytical framework.

[*27]

## B. Analysis of Claims

### 1. Title VII and the PHRA

#### a.) Prima Facie Case

Under Title VII and the PHRA, in order to advance a *prima facie* case of retaliation, "a plaintiff must show that (1) the employee engaged in a protected employee activity; (2) the employer took an adverse employment action after or contemporaneous with the employee's protected activity; and (3) a causal link exists between the employee's protected activity and the employer's adverse action." n18 *Shesko v. City of Coatesville, 292 F. Supp. 2d 719, 727 (E.D. Pa. 2003)*(quotation and internal quotation

marks omitted). I will assume for purposes of this Motion only that Hackett has met the first and second elements of her *prima facie* case of retaliation based upon race and gender discrimination. Even with this assumption, Hackett's claims fail because she cannot show the final element; namely, the existence of a causal link between her protected activity and the employer's adverse action.

n18 "Preliminarily, it is important to note that there are several jurisdictional prerequisites to the valid assertion of a claim under Title VII," such as administrative exhaustion requirements. *Schouten v. CSX Transp., Inc., 58 F. Supp. 2d 614, 616 (E.D. Pa. 1999)*(citations omitted). "The PHRA also requires the exhaustion of administrative remedies before suit may be filed in court." *Id. at 617* (citation omitted). In this action, there are various and multiple questions concerning administrative exhaustion issues (i.e., whether Hackett's numerous filings were timely, whether Hackett filed the instant action within the applicable time limits, whether the filings sufficiently named/included the current Defendants). Such questions cannot be definitively answered due to the confusing manner in which this action has been initiated and pursued from the administrative filings to the present court filings. From Hackett's filing in response to Defendants' Summary Judgment Motion, it appears that she premises her Title VII and PHRA claims solely based upon the issuance of the disciplinary warning resulting from the March 19, 2002 altercation with Pearsall. For the sake of expediency, I conclude that Hackett has satisfied all prerequisites in order to validly assert her claims based upon the aforementioned premise.

[*28]

The only analysis presented by Hackett regarding her Title VII and PHRA claims is the following:

in this instance, Hackett filed two internal complaints, one in March 2000 and the other in March 2002. No action was taken on her first complaint. On her second complaint, no one conducted an investigation. However, Hackett was given a written disciplinary warning. This adverse action was the result of her filing an internal complaint.

(Pl.'s Mem. Opp'n Defs.' Mot. Summ. J. at 5). Thus, it appears that Hackett's *prima facie* retaliation claim is solely based upon her internal complaints and the disciplinary warning issued to her after she filed her second internal

complaint. As for the causal connection element, Hackett conclusively argues, without pointing to any evidence or materials of record, that the disciplinary warning was a result of her filing the internal complaint. Conclusory allegations, without more, are insufficient to withstand summary judgment. See *FED. R. CIV. P. 56 (e); Smith v. Hartford Ins. Group, 6 F.3d 131, 137 (3d Cir. 1993)*. The record shows that the issuance of Hackett's disciplinary [*29] warning was the result of March 19, 2002 altercation with Pearsall. Both Hackett and Pearsall were individually addressed pertaining to the incident and both were separately issued similar disciplinary warnings. As for Hackett's second internal complaint, it included allegations against Pearsall, Lepp and Groff regarding general work-related issues and did not include any claims of discrimination or retaliation. Thus, the evidence in the record belies Hackett's unsupported conclusory allegation that a causal connection exists between the filing of her internal complaints and the disciplinary warning issued after she filed her second internal complaint. Viewing the evidence in a light most favorable to Hackett, I conclude that she has not shown a *prima facie* case because she had failed to show the requisite existence of a causal link. Consequently, summary judgment is granted in Defendants' favor pertaining to Hackett's retaliation claims under Title VII and PHRA.

*b.) Legitimate, Nondiscriminatory Reason*

Even if Hackett successfully established a *prima facie* case, her claims would fail because she has not proffered any argument or evidence concerning the requisite [*30] showing of pretext to rebut Defendants' asserted legitimate, nondiscriminatory reasons. Supported by the record, Defendants proffer legitimate, nondiscriminatory reasons for transferring Hackett from the position of Data Integrity and Recovery Administrator to Senior Technical Support Specialist and for thereafter terminating her employment. Concerning Hackett's transfer from the position of Data Integrity and Recovery Administrator to Senior Technical Support Specialist, Defendants argue that it is undisputed that she was transferred because she needed access to security systems in order to perform her duties as Data Integrity and Recovery Administrator, and Defendants did not authorize such access based upon Hackett's prior performance. As for the termination of Hackett's employment, Defendants argue that they terminated Hackett because she held a full-time position and she was unable to work full-time. I conclude that Defendants have met their burden of production because their contentions are sufficiently supported by the record through affidavits and other documentation.

*c.) Pretext*

Since Defendants have proffered legitimate, nondis-

criminatory reasons for their actions, [*31] Hackett must meet her "burden of persuasion by proving that the defendant's proffered reasons are not the 'true reasons' for its decision, but instead are merely a pretext for discrimination." *Jones v. WDAS FM/AM Radio Stations, 74 F. Supp. 2d 455, 461 (E.D. Pa. 1999)*(citation omitted). "[A] plaintiff may . . . survive summary judgment by submitting evidence from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Stanziale v. Jargowsky, 200 F.3d 101, 105 (3d Cir. 2000)*(citations omitted). Hackett fails to met her burden by neither arguing, nor presenting evidence, that Defendants' articulated reasons are untrue, but are merely pretext for discrimination. As explained earlier, the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff. By failing to address the pretext issue in anyway, Hackett fails to satisfy her burden of production by presenting evidence [*32] such that a factfinder could reasonably either disbelieve Defendants' articulated legitimate reason or believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action. In light of Defendants' arguments and the objective evidence presented in the record, no reasonable factfinder could conclude that Defendants' articulated reasons for transferring, and eventually terminating Hackett, were pretextual. As a result, Hackett's retaliation claims under Title VII and the PHRA fail. Accordingly, Defendants' Motion for Summary Judgment will be granted.

**2. FMLA**

*a.) Prima Facie Case*

Hackett's retaliation claim under the FMLA also fails under the *McDonnell Douglas* burden-shifting framework. Similar to Title VII and the PHRA, under the FMLA, in order "to prove a *prima facie* case of retaliation, [plaintiff] must show that: 1) he is protected under the FMLA, 2) he suffered an adverse employment action and 3) a causal connection exists between the adverse decision and plaintiff's exercise of his or her FMLA rights." *Baluskonis v. US Airways, Inc., 60 F. Supp. 2d 445, 448 (E.D. Pa. 1999)*(citations [*33] omitted). I will assume for purposes of this Motion only that Hackett has met her burden of establishing a *prima facie* case of retaliation under the FMLA. n19

n19 There is no question that Hackett is protected under the FMLA; however, there are significant issues concerning whether she suffered

an adverse employment action when she was returned to work as the Data Integrity and Recovery Administrator and whether she has shown the requisite causal connection. Upon her return from FMLA leave, Hackett claims that she was placed in a lower position and, when she complained, she was again demoted and paid a lesser salary. Defendants argue that Hackett was returned to an equivalent position based upon the following: she did not suffer any change in salary and benefits; her hours remained the same; she was returned to the same work location; her supervisor remained the same; and she continued to perform some of the same responsibilities as her previous position. Acknowledging that Hackett did have restricted access to certain systems and did not have a laptop or private internet access, Defendants argue that such differences are akin to sharing work space and are *de minimus*. For purposes of expediency, I will not address the issues of whether Hackett was reinstated in an equivalent position and whether a causal connection exists because her claim fails on other grounds.

[*34]

*b.) Legitimate Nondiscriminatory Reason*

Assuming that Hackett has shown her *prima facie* case, her claim fails because she has not presented any argument or evidence to show that Defendants' proffered legitimate, nondiscriminatory reasons for their actions were pretext for FMLA discrimination. The legitimate, nondiscriminatory reasons asserted by Defendants concerning Hackett's FMLA retaliation claim are the following: Hackett was reinstated to the position of Data Integrity and Recovery Administrator as a result of her performance, and that this decision was made prior to Hackett taking her FMLA leave; Hackett's transfer to the position of Senior Technical Support Specialist was because Defendants could not authorize her to have access to certain secured systems; and Hackett was ultimately terminated because she was unable to return to full-time work. I conclude that Defendants have met their burden of production because their contentions are sufficiently supported by the record through affidavits and other documentation.

*c.) Pretext*

Since Defendants have successfully met their burden of proffering legitimate, nondiscriminatory reasons for their actions, [*35] Hackett must prove by a preponderance of the evidence that the legitimate reasons offered by the Defendants were not their true reasons, but were a pretext for discrimination. The sole analysis presented by Hackett regarding her FMLA retaliation claim is the

following:

> in this instance, Hackett returned to work after a six week FMLA leave. She was transferred to a lower position without explanation. When she complained about the position, she was again demoted and her salary was reduced. One month after Hackett returned from her FMLA leave, Defendant produced a document stating that her work was substandard. Up until that time, all of Hackett's performance appraisals were positive.

(Pl.'s Mem. Opp'n Defs.' Mot. Summ. J. at 6). Viewing this analysis, upon which Hackett's entire claim rests, it is clear that a showing of pretext has not been made. As with the previous analysis of Hackett's retaliation claims under Title VII and the PHRA, Hackett fails to meet her burden of showing pretext because she neither addresses, nor presents any evidence, that Defendants' proffered reasons are not true, but are merely pretext for discrimination. In failing to address Defendants' [*36] articulated legitimate reasons, Hackett presents no evidence from which a factfinder could reasonably either disbelieve Defendants' articulated legitimate reasons or believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action. Although Hackett acknowledges that the burden of persuasion rests with her at all times, she has woefully failed to present any argument, or pointed to any evidence, to satisfy her burden of showing pretext in the instant action. In light of Defendants' arguments and the objective evidence presented in the record, no reasonable factfinder could conclude that Defendants' articulated reasons were pretextual. As a result, Hackett's retaliation claim under the FMLA fails. Defendants' Motion for Summary Judgment will be granted.

### 3. Workers' Compensation Claim

#### a.) Prima Facie Case

Like her previous claims, Hackett's Workers' Compensation retaliation claim also does not survive summary judgment. As with the other claims, in order to present a *prima facie* case for retaliation under the Workers' Compensation Act, "a plaintiff must show that: (1) the employee engaged in a protected [*37] employee activity; (2) the employer took an adverse employment action after or contemporaneous with the employee's protected activity; and (3) a causal link exists between the employee's protected activity and the employer's adverse action." *Christman, 293 F. Supp. 2d at 543* (quotation and internal quotation marks omitted). It is clear that the first

two elements have been met. Hackett engaged in the projected activity of filing a Workers' Compensation claim and her employer took the adverse action of terminating her after she engaged in that protected activity. As for the third element of causation, Hackett fails to make the requisite showing of a causal link between the two events.

Regarding her Workers' Compensation retaliation claim, the only analysis presented by Hackett is the following:

> again Hackett was on restricted duty and was only able to work part time. After demoting Hackett to her original entry level position, CBH informed her that if she was not able to return to work full time, then her employment would be terminated. CBH could have accommodated her disability, but chose not to because Hackett had filed a workers compensation claim.

(Pl. [*38] 's Mem. Opp'n Defs.' Mot. Summ. J. at 7). Hackett conclusively argues, without pointing to any evidence or materials of record, that CBH could have accommodated her disability, but chose not to, and her termination was a result of the filing of her Workers' Compensation claim. By only proffering a conclusory assertion, without providing any support through the record, Hackett fails to satisfy her burden of demonstrating a causal link between the filing of her claim or her receipt of Workers' Compensation and her termination. "The mere fact that an alleged discharge occurs subsequent to the filing of a claim is insufficient to satisfy the plaintiff's burden of demonstrating a causal link between the two events." *Christman, 293 F. Supp. 2d at 544* (citations omitted). As explained,

> [a] plaintiff must produce at least some evidence that connects the dots between her claim for workers' compensation and her termination, such as adverse personnel action promptly after her workers' compensation claim was made, statements by supervisors referencing her claim, documents from the employer discussing her claim with respect to her termination, etc.

*Id.* (quoting [*39] *Landmesser v. United Air Lines, Inc., 102 F. Supp. 2d 273, 278 (E.D. Pa. 2000)).* Hackett does not connect any of the dots between her claim or receipt of Workers' Compensation and her termination through any evidence or materials of record. She merely conclusively asserts that such a connection exists. As previously

explained, conclusory allegations, without more, are insufficient to withstand summary judgment. See *FED. R. CIV. P. 56 (e)*; *Smith v. Hartford Ins. Group, 6 F.3d 131, 137 (3d Cir. 1993)*. Viewing the evidence in Hackett's favor, I do not find any evidence that suggests a connection between her Workers' Compensation claim or her receipt of Workers' Compensation benefits and her termination. Thus, Hackett has not established her *prima facie* case and her claim fails as a matter of law.

### b.) Legitimate Nondiscriminatory Reason

Assuming that Hackett has successfully shown a *prima facie* case, her claim fails because she has not proffered any argument or evidence to show that Defendants' proffered legitimate, nondiscriminatory reason for their actions were pretext for discrimination. [*40] The legitimate, nondiscriminatory reason asserted by Defendants for Hackett's termination is that she was unable to work full-time and her position required full-time employment. Defendants' contention is sufficiently supported by the record through affidavits and other documentation. The record supports Defendants' contention; therefore, they have met their burden of production.

### c.) Pretext

In light of Defendants successfully meeting their burden of production, Hackett must prove by a preponderance of the evidence that the legitimate reason offered by the Defendants were not their true reason, but were a pretext for discrimination. As with all of the previous claims, Hackett neither addresses, nor presents any evidence, concerning the pretext issue. Thus, Hackett does not dispute Defendants' contention that Hackett's position required full-time employment and that she was unable to meet that requirement of the job. Other than the aforementioned conclusory statement by Hackett that she was terminated because of the filing of her Workers' Compensation claim, Hackett does not respond to, or dispute, Defendants' asserted legitimate reason that she was terminated due to her [*41] inability to work full-time. By failing to address the pretext issue in anyway, Hackett fails to satisfy her burden

of production by presenting evidence such that a factfinder could reasonably either disbelieve Defendants' articulated legitimate reason or believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action. In light of Defendants' arguments and the objective evidence presented in the record, no reasonable factfinder could conclude that Defendants' articulated reasons for terminating Hackett were pretextual. Consequently, Defendants' Motion for Summary Judgment will be granted.

### IV. CONCLUSION

Summary judgment is granted in Defendants' favor regarding all of Hackett's abandoned claims. Even disregarding the abandonment issue pertaining to Hackett's claims based upon race and gender discrimination under Title VII and the PHRA and violation of her rights under the FMLA, Defendants are entitled to summary judgment because the claims fail as a matter of law. They fail because Hackett has not adduced sufficient evidence in support of the claims. Summary judgment is also appropriate in relation [*42] to Hackett's remaining retaliation claims based upon the exercise of her rights under Title VII, PHRA, FMLA and the Workers' Compensation Act. The record establishes that Defendants are entitled to summary judgment. Hackett bears the burden of proof, and has failed to adduce sufficient evidence to support her claims. Therefore, Defendants are entitled to judgment as a matter of law.

An appropriate Order follows.

### ORDER

**AND NOW,** this 6th day of May, 2005, upon consideration of Defendants' Motion for Summary Judgment (Doc. No. 33), and Plaintiff's Response thereto, it is hereby **ORDERED** that the Motion is **GRANTED.**

BY THE COURT:

/s/ Robert F. Kelly, Sr. J.

# EXHIBIT 4

LEXSEE 2006 U.S. APP. LEXIS 14525

**PRIMOS, INC., Plaintiff-Appellee, v. HUNTER'S SPECIALTIES, INC. and DAVID FORBES, Defendants-Appellants, and WAYNE CARLTON and CARMEN FORBES, Defendants.**

05-1001,-1376

**UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT**

*2006 U.S. App. LEXIS 14525*

**June 14, 2006, Decided**

**PRIOR HISTORY:** [*1] Appealed from: United States District Court for the Northern District of Iowa. Chief Magistrate Judge John A. Jarvey. *Primos, Inc. v. Hunter's Specialties, Inc., 159 Fed. Appx. 997, 2005 U.S. App. LEXIS 28122 (2005)*

**DISPOSITION:** AFFIRMED.

**COUNSEL:** Brett L. Foster, Holland & Hart LLP, of Salt Lake City, Utah, argued for plaintiff-appellee. With him on the brief were L. Grant Foster and Mark A. Miller.

Edmund J. Sease, McKee, Voorhees & Sease, P.L.C., of Des Moines, Iowa, argued for defendants-appellants. With him on the brief was Jeffrey D. Harty.

**JUDGES:** Before NEWMAN, LOURIE, and PROST, Circuit Judges.

**OPINIONBY:** LOURIE

**OPINION:** LOURIE, Circuit Judge.

Hunter's Specialties, Inc. and David Forbes (collectively "Hunter's Specialties") appeal from the judgment of the United States District Court for the Northern District of Iowa of literal infringement, willfulness, and inducement of infringement as to U.S. Patent 5,520,567 and infringement under the doctrine of equivalents as to *U.S. Patent 5,415,578*. Hunter's Specialties also appeals from the court's decision denying a motion for a new trial. Primos, Inc. v. Hunter's Specialties, Inc., No. C01-004 (N.D. Iowa Sept. 9, 2004) ("Final Judgment"). Because we affirm the district court's claim construction of the term "engaging," we also affirm [*2] the court's judgment of literal infringement of the '567 patent. Because we conclude that the application of the doctrine of equivalents was proper, we affirm the court's judgment of infringement of the *'578 patent* under the doctrine of equivalents.

Because the court did not abuse its discretion in excluding evidence, and the court's adverse-inference jury instruction did not constitute prejudicial error, we affirm the court's decision denying a new trial on those issues.

BACKGROUND

This appeal involves the *'578 patent* and its continuation, the '567 patent, which are assigned to Primos, Inc. ("Primos") and entitled "Game Call Apparatus." The patents disclose a diaphragm mouth call that hunters use to simulate animal sounds. Figure 1, shown below, is an embodiment of the invention:

GET DRAWING SHEET 1 OF 4.

As depicted in that figure, the diaphragm mouth call 10 consists of a frame 18, a membrane 22 that vibrates to produce sound, a flexible peripheral edge 12, and a shelf or plate 15 extending above the membrane. The diaphragm mouth call is placed completely within the user's mouth, with the free-end of the membrane positioned near the opening of the [*3] mouth. *'578 patent*, col. 2, ll. 62-64. The user holds the diaphragm in place with his or her tongue, while forcing air to travel through a gap between the tongue and the membrane. The air causes the membrane to vibrate and to emit a sound that replicates a particular animal. Id. at col. 1, ll. 31-38. The sound produced by the call is affected by the tongue pressure applied to the membrane and the distance between the membrane and the roof of the mouth. Id. at col. 1, ll. 38-40. The patented diaphragm mouth call claims an improvement over prior mouth call devices in that the shelf or plate provides a constant distance above the membrane and resists upward pressure by the tongue. Id. at col. 2, ll. 15-26.

Relevant to this appeal are claim 2 of the *'578 patent* and claim 21 of the '567 patent. Claim 2 of the *'578 patent* reads as follows:

A game call apparatus to be completely in-

2006 U.S. App. LEXIS 14525, *3

serted inside a person's mouth for calling game, comprising:

> a frame;
> a membrane of material stretched over the frame;
> a flexible and moldable peripheral edge extending outwardly from the frame; and
> a plate having a length, the plate extending generally upward from the frame and over [*4] a portion of the membrane, the plate being differentially spaced above the portion of the membrane at various locations along the length of the plate.

*'578 patent,* col. 4, ll. 45–55 (emphases added). Claim 21 of the *'567 patent* reads as follows:

> A game call for use inside a person's mouth, comprising:
>
> > a U-shaped frame;
> > a yieldable reed spanning across the U-shaped frame;
> > a first roof-of-mouth engaging yieldable sealing portion carried by the frame;
> > a second roof-of-mouth engaging portion extending upwardly from the frame, the second portion being spaced away from the first portion, the first and second portions defining a predetermined orientation of the U-shaped frame insider the mouth relative to the roof of mouth.

*'567 patent,* col. 6, ll. 20–32 (emphases added).

On January 24, 2001, Primos filed suit against its competitor, Hunter's Specialties, alleging that Hunter's Specialties's accused device, known as the Tone Trough, infringed Primos's patents. The accused Tone Trough is a diaphragm mouth call device that, among other features, contains a dome extending above the membrane, instead of a shelf or plate, as claimed in Primos's [*5] patents. Primos subsequently amended its complaint, alleging that individual defendant David Forbes induced infringement of its patents. n1

n1 The amended complaint also included allegations against individuals Carman Forbes and Wayne Carlton for inducing infringement. The court dismissed Carman Forbes from the case prior to trial, and it ultimately vacated judgment against Wayne Carlton. Thus, only David Forbes and Hunter's Specialties remain as parties to this appeal.

Primos initially moved for summary judgment of literal infringement and for a preliminary injunction against Hunter's Specialties. Hunter's Specialties filed several cross-motions, including for summary judgment of noninfringement, both literally and under the doctrine of equivalents. On July 24, 2002, the court denied all the motions filed by both parties. In its decision, the court construed the term "plate" in claim 2 of the *'578 patent* to mean "a structural element of relatively uniform thickness and flatness which may also have some moderate curvature to it." Primos v. Hunter's Specialties, No. C01-004 MJM (N.D. Iowa July 24, 2002) ("Summary Judgment Order"). Relying on that construction [*6] of the term "plate," the court found that "reasonable minds could differ as to the presence or absence of a 'plate' in the Tone Trough" and thus denied all summary judgment motions relating to infringement of the *'578 patent.* Id. Regarding claim 21 of the '567 patent, the court noted that while the term "second-roof-of-mouth engaging portion" is not in dispute, it stated that "it is clear that this language requires that a portion of the claimed device . . . come into contact with the roof of the user's mouth while in use." Id., slip op. at 43. The court then determined that there were genuine issues of material fact relating to whether the Tone Trough device operates when touching the roof of a user's mouth, and therefore denied the summary judgment motions relating to infringement of the '567 patent.

Hunter's Specialties then requested a Markman hearing to interpret the term "engaging" in claim 21 of the '567 patent. On March 15, 2004, the court construed that term to mean to "come into contact with." Primos v. Hunter's Specialties, No. C01-004 (N.D. Iowa Mar. 15, 2004) ("Claim Construction Order"). The court rejected Hunter's Specialties' construction of the [*7] term "engaging" as "interlocking," noting that while the word "interlocking," as defined in a standard dictionary, may be appropriate in the context of a transmission or a latch, it is not appropriate in the context of the roof of one's mouth. The court also observed that the specification of the '567 patent did not support a construction of "engaging" to mean "interlocking" because the figures in the patent did not provide any means with which the diaphragm mouth call could interlock in the roof of a mouth. According to the court, it had previously interpreted "engaging" to

2006 U.S. App. LEXIS 14525, *7

mean "to come into contact with," and it saw no reason to modify that construction.

Hunter's Specialties again moved for summary judgment, asserting that prosecution history estoppel barred the application of the doctrine of equivalents as to the *'578 patent* in light of our intervening decision in *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., Ltd., 344 F.3d 1359 (Fed. Cir. 2003).* The court determined that the term "plate" was amended during prosecution by describing it as "having a length," but that that amendment did not narrow the scope of the claim because "all physical objects have [*8] a length." Primos v. Hunter's Specialties, No. C01-004MJM (N.D. Iowa Mar. 12, 2004) ("Prosecution History Estoppel Order"). The court also observed that the term "plate" was amended to require that it be "differentially spaced" above the membrane, which narrowed the scope of the claim. Id. According to the court, the subject matter surrendered by that amendment involved "objects that are not differentially spaced above the membrane." Because the Tone Trough contained a dome that was spaced above the membrane and therefore arguably did not fall within that surrendered area, the court denied summary judgment of no infringement under the doctrine of equivalents as to the *'578 patent.*

Finally, before trial, Primos filed a motion requesting that a device known as the Aluminum Flap Call not be introduced as evidence during trial. The court granted that motion, and noted in its order that, throughout discovery, Hunter's Specialties never identified the Aluminum Flap Call as invalidating prior art. Primos v. Hunter's Specialties, No. C01-004 MJM (N.D. Iowa Mar. 12, 2004) ("Aluminum Flap Call Order"). Hunter's Specialties had sought to introduce the Aluminum Flap Call device [*9] when it claimed it had found the device, which was approximately three months prior to trial and several months after discovery had closed. However, Hunter's Specialties failed to offer any explanation why it could not locate the Aluminum Flap Call during discovery. In light of those circumstances, the court determined that allowing the Aluminum Flap Call to be introduced as evidence during trial would result in unfair surprise to Primos, and thus the court granted Primos's motion to exclude the Aluminum Flap Call as evidence.

A jury trial commenced on March 15, 2004. In the jury instructions concerning inducement of infringement against individual defendants Wayne Carlton and David Forbes, the court instructed the jury that it could consider several factors and stated that "the assertion of the attorney-client privilege with respect to a non-infringement opinion may support an inference that the withheld advice of counsel was adverse to that party." As for willful infringement against Hunter's Specialties, the court did

not instruct the jury as to an adverse inference but rather stated that the jury must consider the "totality of the circumstances." After a three-and-a-half week [*10] trial, the jury found that Hunter's Specialties' Tone Trough device literally infringed the '567 patent, and infringed the *'578 patent* under the doctrine of equivalents. The jury also found that Hunter's Specialties willfully infringed the '567 patent and that David Forbes and Wayne Carlton induced infringement of that patent.

Hunter's Specialties and Wayne Carlton moved for judgment as a matter of law ("JMOL"), arguing that the court improperly construed the claim term "engaging" in claim 21 of the '567 patent and that the "all limitations rule" and prosecution history estoppel barred the application of the doctrine of equivalents as to the *'578 patent.* Those defendants also moved for a new trial, arguing that the court erred in excluding the Aluminum Flap Call as evidence, and that the court's adverse-inference instruction resulted in prejudicial error. The court denied the motion for JMOL and the motion for a new trial. Primos v. Hunter's Specialties, No. C01-004 (N.D. Iowa Mar. 31, 2005). ("Post-Trial Order"). In its decision, the court first reaffirmed its construction of the claim term "engaging" in claim 21 of the '567 patent, noting that it had addressed the same issue in [*11] previous decisions. The court next determined that the "all limitations rule" did not preclude the application of the doctrine of equivalents for the *'578 patent,* reasoning that the only disputed term was "plate" in claim 2, and that determining that a dome was equivalent to a plate did not vitiate that claim limitation. The court also held that prosecution history estoppel did not prevent the application of the doctrine of equivalents as to the *'578 patent* because the Tone Trough did not fall within the area surrendered during prosecution. In addition, the court denied Hunter's Specialties's motion for a new trial, reaffirming its prior decision that the Aluminum Flap Call device could not be introduced as invalidating prior art because it was produced after the period for discovery had closed. Although the court determined that its "adverse inference" instruction to the jury was not in error, the court later vacated judgment against Wayne Carlton, the only defendant who had asserted the attorney-client privilege, in light of our decision in *Knorr-Bremse Systeme Fuer Nutzfahrzeuge GMBH v. Dana Corp., 383 F.3d 1337 (Fed. Cir. 2004)* (en banc).

Hunter's Specialties [*12] timely appealed to this court, and we have jurisdiction pursuant to *28 U.S.C. § 1295(a)(1).*

## DISCUSSION

We review a district court's denial of a motion for JMOL de novo by reapplying the JMOL standard. *Markman v. Westview Instruments, Inc., 52 F.3d 967, 975*

*(Fed. Cir. 1995)* (en banc). We also review the legal standards that the jury applied in reaching its verdict to determine whether they were correct as a matter of law. *Id. at 975.* JMOL is appropriate when "there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." *Fed. R. Civ. P. 50(a)(1).* The denial of a motion for a new trial is an issue not unique to patent law; thus, we apply the law of the regional circuit in which the district court sits—in this case, the Eighth Circuit. In the Eighth Circuit, the decision to deny a motion for a new trial is reviewed under an abuse of discretion standard. *Blair v. Wills, 420 F.3d 823, 829 (8th Cir. 2005).*

### I. Claim Construction

The question of literal infringement of claim 21 of the '567 patent turns entirely on the [*13] district court's construction of the term "engaging." Claim construction is a question of law reviewed de novo. *Cybor Corp. v. FAS Techs., Inc. 138 F.3d 1448, 1454–56 (Fed. Cir. 1998)* (en banc). Hunter's Specialties argues that the court erred in construing the term "engaging" in the phrase "second roof-of-mouth engaging yieldable sealing portion" to mean "to come into contact with." According to Hunter's Specialties, the proper construction of the term "engaging" is "sealing" or "interlocking." As support for its construction, Hunter's Specialties notes that claim 21 uses the word "engaging" to describe a seal created between the edge of the frame and the roof of the user's mouth. Also, Hunter's Specialties observes that the specification describes the edge as "sealing" against the roof of a mouth. In addition, Hunter's Specialties finds support for its construction in a dictionary definition that describes "engaging" as "to come together and interlock." Hunter's Specialties points out that this definition is consistent with the way the term is used throughout the patent.

Primos responds that the district court correctly construed "engaging" as "to come into contact [*14] with." According to Primos, the intrinsic evidence does not support the selective dictionary definition put forth by Hunter's Specialties. In particular, the claims use both terms, "engaging" and "sealing," and thus each term is presumed to have a distinct meaning. Also, Primos asserts that to construe "engaging" as "sealing" or "interlocking" would exclude a preferred embodiment of the patent because the figures in the patent show the membrane as not interlocking with the roof of a mouth. In addition, Primos observes that while "interlocking" might be an appropriate construction of "engaging" for an invention relating to mechanical machinery with gears, it is not appropriate in the context of diaphragm mouth calls.

We agree with Primos that the district court correctly construed the term "engaging" to mean "to come into

contact with." As this court explained in Phillips v. AWH Corp., we ordinarily construe claim terms to have their customary meaning as understood by a person of ordinary skill in the art. *415 F.3d 1303, 1312–17 (Fed. Cir. 2005)* (en banc). In ascertaining the ordinary and customary meaning of a claim term, a court's primary focus should be on the intrinsic [*15] evidence of record, viz., the claims, the specification, and, if in evidence, the prosecution history. Id. Starting with the language of claim 21, the terms "engaging" and "sealing" are both expressly recited in the claim and therefore "engaging" cannot mean the same thing as "sealing"; if it did, one of the terms would be superfluous.

Turning to the specification, although the word "engaging" is not expressly mentioned in the specification, figures 1 and 3 aid our understanding of that term. Figure 3, as depicted below, shows a call device positioned in a user's mouth.

GET DRAWING SHEET 2 OF 4.

As shown in the figure above, there are several points of contact between the roof of a user's mouth (the top striped structure in the figure above) and the diaphragm mouth call—one such point is with the plate 24 and another is with the peripheral edge of the frame 12. That figure shows the plate touching the roof of the mouth, but does not reveal an interlocking relationship because there is no depicted means from which the frame can "interlock" with the roof of a user's mouth. The figure therefore supports a construction of "engaging" as to "come [*16] into contact with," while discouraging a construction of "interlocking." While we are mindful that we cannot import limitations from the preferred embodiments into the claim, we also should not normally interpret a claim term to exclude a preferred embodiment. See *Burke, Inc. v. Bruno Indep. Living Aids, Inc., 183 F.3d 1334, 1341 (Fed. Cir. 1999).* Interpreting "engaging" to mean "interlocking" would exclude the embodiment shown in the figure and is not consistent with the rest of the specification which does not suggest an interlocking relationship between the roof of a mouth and the mouth call. n2 We therefore agree that the district court's construction of the term "engaging" to mean "to come into contact with" is supported by the intrinsic record and is correct.

> n2 We do not discuss the prosecution history here because it is not relevant to the construction of the term "engaging."

### II. Doctrine of Equivalents

Hunter's Specialties challenges the application of the doctrine of equivalents on the ground that prosecution

history estoppel applies to the term "plate." Hunter's Specialties specifically asserts that amendments to the term "plate" [*17] narrowed the scope of the claim and were made for reasons relating to patentability. According to Hunter's Specialties, prosecution history estoppel therefore barred the doctrine of equivalents for that claim term. Primos responds that the district court properly applied the doctrine of equivalents. It reasons that the *first amendment* made to the term "plate"—that it include a "length"—did not narrow the scope of the claim. As to the *second amendment* made to the term "plate"—that it be "differentially spaced" above the membrane—that amendment bears no more than a tangential relationship to the accused Tone Trough. In particular, Primos contends that the territory surrendered by that amendment consists of objects that are not differentially spaced above the membrane. Because the accused device's "dome" is differentially spaced above the membrane, Primos asserts that the "differentially spaced" amendment does not pertain to the disputed element in the accused device and it is therefore merely tangential to the accused device. According to Primos, prosecution history estoppel thus does not apply to prevent the application of the doctrine of equivalents here.

We agree with Primos [*18] that the district court correctly determined that prosecution history estoppel does not apply here to preclude the application of the doctrine of equivalents. As the Supreme Court explained in Festo, when a patent claim is amended during prosecution for reasons relating to patentability, there is a presumption that the patentee surrendered all the territory between the original claim limitation and the amended claim limitation. *535 U.S. 722, at 740, 122 S. Ct. 1831, 152 L. Ed. 2d 944.* There are situations, however, in which a patentee may overcome that presumption. Id. One such situation is when the "rationale underlying the amendment may bear no more than a tangential relation to the equivalent in question." *Id. at 740–41.*

The term "plate" in claim 2 of the *'578 patent* was amended in two ways: (1) by requiring that it have a "length" and (2) by adding the limitation that the plate be "differentially spaced" above the membrane. The district court correctly recognized that the addition of the term "length" did not narrow the scope of the claim because every physical object has a length. The district court also determined that adding the limitation that the plate be "differentially spaced" [*19] above the membrane did narrow the scope of the claim, and the court assumed that the reason for the amendment was a substantial one relating to patentability. We agree with the district court, however, that the territory surrendered by the "differentially spaced" amendment comprises plates that are not differentially spaced above the membrane. That conclu-

sion is consistent with the prosecution history. The patentee added the "differentially spaced" limitation to distinguish the diaphragm mouth call from a prior art device that consisted of a shelf-like structure positioned on top of the membrane without any spacing. The accused device, however, includes a dome that is spaced above the membrane. Because the accused device's dome includes the spacing, the amendment was merely tangential to the contested element in the accused device, and thus prosecution history estoppel does not apply to prevent the application of the doctrine of equivalents.

Hunter's Specialties also argues that the court should not have allowed the application of the doctrine of equivalents because, by doing so, the claim limitation "plate" in claim 2 of the *'578 patent* was vitiated. According to Hunter's Specialties, [*20] the court's construction of the term "plate" requires a specific structure "of relatively uniform thickness and flatness which may also have some moderate curvature to it. Hunter's Specialties asserts that allowing a "dome" to be considered an equivalent to a "plate" would eliminate that limitation from the claim. Primos responds that the "all limitations rule" is not applicable to the circumstances in this case. According to Primos, the term "plate" does not convey a definitive, geometric shape or structure, and thus that claim limitation was not vitiated. Primos asserts that the district court properly allowed the jury to consider whether a "dome" was equivalent to a "plate" and that in doing so, no claim limitation was eliminated.

We agree with Primos that application of the doctrine of equivalents was not improper in this case. Under the doctrine of equivalents, "a product or process that does not literally infringe upon [sic] the express terms of a patent claim may nonetheless be found to infringe if there is 'equivalence' between the elements of the accused product or process and the claimed elements [sic] of the patented invention." *Warner–Jenkinson Co., Inc. v. Hilton Davis Chem. Co., 520 U.S. 17, 21, 117 S. Ct. 1040, 137 L. Ed. 2d 146 (1997)* [*21] (citation omitted). The "all limitations rule" restricts the doctrine of equivalents by preventing its application when doing so would vitiate a claim limitation. *Warner–Jenkinson, 520 U.S. at 29* (stating that the doctrine of equivalents cannot be applied broadly so as to "effectively eliminate that [claim] element in its entirety"); *Lockheed Martin Corp., 324 F.3d 1308, at 1321* ("[I]f a court determines that a finding of infringement under the doctrine of equivalents 'would entirely vitiate a particular claim element,' then the court should rule that there is no infringement under the doctrine of equivalents." (citation omitted)).

On appeal, Hunter's Specialties argues that we should reverse the jury's finding of equivalence because the sub-

stitution of the accused dome for the claimed "plate" would vitiate the "plate" limitation and thereby violate the all limitations rule. As the district court recognized, Hunter's Specialties is essentially contending that there can be no equivalent to the claimed "plate." Our precedent has recognized that "[t]here is no set formula for determining whether a finding of equivalence would vitiate a claim limitation, [*22] and thereby violate the all limitations rule. Rather, courts must consider the totality of the circumstances of each case and determine whether the alleged equivalent can be fairly characterized as an insubstantial change from the claimed subject matter without rendering the pertinent limitation meaningless." *Freedman Seating Co. v. Am. Seating Co., 420 F.3d 1350, 1359 (Fed. Cir. 2005)* (citations omitted). Thus, because Primos's theory of equivalence (i.e., that a dome is equivalent to the claimed "plate") does not "effectively eliminate . . . [the 'plate' limitation] in its entirety, "it does not violate the all limitations rule. Noting that Hunter's Specialties has not challenged whether the jury's finding is supported by substantial evidence, we affirm the jury's finding that the accused dome is equivalent to the claimed "plate."

### III. Exclusion of Evidence

Hunter's Specialties next argues that the district court abused its discretion in excluding a prior art device, the Aluminum Flap Call, from evidence because admitting it would have resulted in prejudicial surprise. According to Hunter's Specialties, even though the device itself was not located until [*23] shortly before trial began, Primos was aware of it as being potential prior art throughout discovery. For example, Hunter's Specialties asserts that defendant Wayne Carlton was extensively questioned by Primos on the Aluminum Flap Call device. Hunter's Specialties also asserts that Primos waited until shortly before the commencement of trial to claim prejudicial surprise, even though it knew about the device much earlier. In addition, Hunter's Specialties argues that there is a strong public policy in favor of allowing the Aluminum Flap Call as evidence because the public interest requires consideration of any invalidating prior art device.

Primos responds that the district court properly excluded the Aluminum Flap Call because Hunter's Specialties never identified that device as potentially invalidating prior art during discovery. In addition, Primos asserts that the defendants did not provide an explanation as to why they could not locate that device during discovery. According to Primos, to permit the Aluminum Flap Call to be introduced as evidence during trial, after years of discovery during which that device was not identified, would result in prejudicial surprise. Also, although [*24] the Aluminum Flap Call may have been mentioned during discovery, its origin could not be authenticated, and the

testimony revealed that the prototypes were experimental in nature. Thus, there was no reason for Primos to believe that the Aluminum Flap Call was prior art and would be introduced as evidence.

We agree with Primos that the district court did not abuse its discretion in excluding the Aluminum Flap Call from evidence. The record reflects that the Aluminum Flap Call was not located until after discovery had closed. Moreover, although the Aluminum Flap Call may have been mentioned during discovery, it was never identified to the court as an invalidating prior art device. The district court prevented Hunter's Specialties from introducing the Aluminum Flap Call into evidence because it "did not demonstrate diligence in attempting to locate the call during discovery" and because during discovery Hunter's Specialties did not assert that it was claiming the Aluminum Flap Call as invalidating prior art. That determination was not an abuse of discretion. It was well within the district court's province to determine that because the Aluminum Flap Call was not identified as potential [*25] prior art until after discovery had closed and shortly before trial commenced, it would then be unfair to permit its introduction into evidence.

We reject Hunter's Specialties' argument that policy concerns should override the district court's decision to exclude the Aluminum Flap Call as evidence. First, and most importantly, the court never determined whether the Aluminum Flap Call was in fact invalidating prior art, and the parties dispute whether the device was in public use— it was asserted that its use was experimental and occurred only in Canada. Thus, the Aluminum Flap Call may in fact not have been invalidating prior art at all. Second, as the district court pointed out, the purpose of discovery is to enable parties to obtain the factual information needed to prepare their cases for trial. The district court must therefore consider the "unfair and prejudicial surprise" to a party that may result from allowing evidence to be presented during trial. See *ATD Corp. v. Lydall, Inc., 159 F.3d 534, 551 (Fed. Cir. 1998)* (stating that the purpose of both the Federal Rules of Civil Procedure and *35 U.S.C. § 282* is to prevent unfair and prejudicial [*26] surprise and not to permit last-minute production of evidence). The district court determined that Hunter's Specialties had ample opportunity to introduce the Aluminum Flap Call during the two and a half year discovery phase. Because it did not do so, the district court was entitled to decide that Hunter's Specialties may not then introduce disputed evidence beyond the time allotted for discovery.

### IV. Adverse–Inference Jury Instruction

Finally, Hunter's Specialties asserts that under *Knorr– Bremse, 383 F.3d at 1337*, the district court erred in instructing the jury that it could draw an adverse–inference

ǁ

2006 U.S. App. LEXIS 14525, *26

from an opinion withheld due to the assertion of the attorney–client privilege. Although Hunter's Specialties recognizes that the only defendant to assert the attorney–client privilege was Wayne Carlton, it argues that the adverse–inference jury instruction prejudiced all defendants because the infringement claim involved all defendants and was tried to one jury. Primos responds that the court vacated the judgment against Wayne Carlton, the only individual who asserted the attorney–client privilege and therefore the only person who was potentially prejudiced by [*27] the jury instruction. Primos points out that Hunter's Specialties waived the attorney–client privilege and thus was not affected by the adverse jury instruction. In addition, Primos contends that Hunter's Specialties did not present any evidence on how it was prejudiced by the jury's instruction.

We agree with Primos that the jury instruction did not prejudice Hunter's Specialties. A party seeking to alter a judgment based on erroneous jury instructions must establish that "those instructions were legally erroneous," and that "the errors had prejudicial effect." *Advanced Display Sys., Inc. v. Kent State Univ., 212 F.3d 1272, 1281 (Fed. Cir. 2000)*. Legal error in an erroneous jury instruction is prejudicial when it is "inconsistent with substantial justice." *Fed. R. Civ. P. 61*. The jury's instruction for inducement of infringement against individual defendants David Forbes and Wayne Carlton provided that "the assertion of the attorney–client privilege with respect to a non-infringement opinion may support an inference that the withheld advice of counsel was adverse to that party." That jury instruction thus permitted an adverse [*28] inference to be drawn against the party that asserted the attorney–client privilege. The only individual who asserted the attorney–client privilege, however, was Wayne Carlton,

and the court vacated the judgment of inducement of infringement against him. The only individual therefore potentially prejudiced by the adverse–inference instruction was Wayne Carlton, not Hunter's Specialties. In addition, in the jury's instruction as to willful infringement against individual defendant Hunter's Specialties, the express adverse inference language was absent. Rather, the instruction stated that the jury must consider the totality of the circumstances and may rely on a number of factors to support a finding of willfulness. There was therefore no adverse–inference instruction as to willfulness against Hunter's Specialties. Thus, we conclude that the jury's instruction was not legally erroneous and did not result in prejudicial error against either individual defendants Hunter's Specialties or David Forbes.

We have considered Hunter's Specialties other arguments and find them to be unpersuasive.

CONCLUSION

Because the court properly construed the term "engaging," we affirm the court's judgment [*29] of literal infringement. Because the claim term "plate" is a structure that was not vitiated by substitution of a dome, we affirm the court's conclusion that applying the doctrine of equivalents was not improper. Also, because the amendment was merely tangential to the contested element in the accused device, we affirm the court's determination that prosecution history estoppel did not preclude the application of the doctrine of equivalents. Finally, because the court did not abuse its discretion in excluding the Aluminum Flap Call as evidence and because its adverse–inference instruction did not constitute prejudicial error, we affirm the court's decision denying a new trial.

AFFIRMED.