# EXHIBIT 5

**Page 242**

```
 1              VOLUME B
      IN THE UNITED STATES DISTRICT COURT
 2
          IN AND FOR THE DISTRICT OF DELAWARE
 3
                    - - -
 4
   McKESSON INFORMATION SOLUTIONS  :   CIVIL ACTION
 5   LLC,                          :
         Plaintiff                 :
 6                                 :
         vs.                       :
 7                                 :
   THE TRIZETTO GROUP, INC.,       :
 8        Defendant                :   NO. 04-01258 (SLR)
 9                    - - -
10              Wilmington, Delaware
                Tuesday, April 18, 2006
11              9:30 o'clock, a.m.
12                    - - -
13
   BEFORE:  HONORABLE SUE L. ROBINSON, Chief Judge, and a jury
14                    - - -
15
   APPEARANCES:
16
         SKADDEN, ARPS, SLATE, MEAGHER & FLOM
17       BY:  MICHAEL BARLOW, ESQ.
18             -and-
19       SKADDEN, ARPS, SLATE, MEAGHER & FLOM
         BY:  JEFF RANDALL, ESQ.,
20            BERNARD SHEK, ESQ. and
              MICHAEL HENDERSHOT, ESQ.
21            (Palo Alto, California)
22            Counsel for Plaintiff
23                     Valerie J. Gunning and
                       Leonard A. Dibbs,
24                     Official Court Reporters
25
```

**Page 243**

```
 1   APPEARANCES (Continued):
 2
         MORRIS, NICHOLS, ARSHT & TUNNELL
 3       BY:  JACK B. BLUMENFELD, ESQ.
 4             -and-
 5
         GIBSON, DUNN & CRUTCHER LLP
 6       BY:  JEFFREY THOMAS, ESQ. and
              DAVID SEGAL, ESQ.
 7            (Irvine, California)
 8             -and-
 9
         GIBSON, DUNN & CRUTCHER LLP
10       BY:  MICHAEL SITZMAN, ESQ.
11            (San Francisco, California)
12            Counsel for Defendant
13                    - - -
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 244**

PROCEEDINGS

4    (Proceedings convened at 8:30 a.m., and the
5  following occurred without the presence of the jury.)
6         THE COURT: Good morning, counsel.
7         (Counsel respond "Good morning, your Honor.)
8         THE COURT: I guess you can lay out what
9  issues we need to address in what order. I have an idea
10  of what we need to address today, but I will let you be
11  the ringmasters here.
12         Are we all set with depositions? I
13  understand from the e-mail that at least some of these
14  depositions are going to go forward, consistent, I hope,
15  with my guidelines.
16         Mr. Randall?
17         MR. RANDALL: Yes, your Honor. We have --
18  we've gone through the transcripts and we have at least
19  done our best to take out questions that referenced
20  either the patent or the claims in the questions, also
21  any questions that referenced the term predetermined
22  database.
23         We have done our best to remove those and
24  have made our designations and have given them to the
25  other side. With respect to proceeding this morning

**Page 245**

1  in terms of the witnesses, we'd like to call our expert,
2  Dr. Musen, to the stand. The only issues with respect
3  to his testimony are the submission within the Court's
4  guidelines prior to 48 hours before he took the stand,
5  we sent over screen shots that were previously disclosed
6  to counsel and videos of what are represented by the
7  screen shots. Basically, the screen shots fading into
8  each other.
9         So we provided those. The only objection
10  we got was we're objecting to the extent that you
11  intend to go beyond the scope of his report. It's
12  really just a restatement of the rule that you made
13  very clear to both sides. We don't intend to violate
14  that rule, so we -- they really didn't make any
15  objection to the substance of those documents.
16         And then the other issues that we would
17  like to bring up would be, one, a brief, brief argument
18  regarding Document J issue. And then raise issues with
19  respect to Trizetto's attempts to put witnesses and
20  evidence on during their case. Specifically, Ms.
21  Wukitch, who is here regarding our infringement case.
22  She is an employee of McKesson. She really does not
23  have any information relating to the operation of the
24  products.
25         We've asked them if there's anything that's

Page 378

1  Q. Is out biking again?
2  A. Yes.
3  Q. It appears he's had an unfortunate fall?
4  A. That's what I see in the slide, yes.
5  Q. Okay.
6  A. I think we're going to assume, though, he sustained
7  a different kind of injury this time.
8  Q. What can we assume happened this time?
9  A. This time he fell and, instead of abrading his arm,
10  now he has lacerated his back in at least two places.
11  Q. When you say lacerated --
12  A. A laceration is a cut that requires surgical
13  repair.
14  Q. He might have landed in a bush?
15  A. Whatever.
16      MR. HENDERSHOT: Can we pull up Exhibit 1122?
17  BY MR. HENDERSHOT:
18  Q. And, Dr. Musen, the backdrop you've just given for
19  an example, were you able to -- strike that.
20      Did you use that in any way in performing
21  your analysis in this case?
22  A. Well, the idea of dealing with proper coding for
23  the repair of lacerations is actually a thorny issue
24  for medical billing and it was certainly appropriate to
25  try it in all three TriZetto products.

Page 379

1  Q. Now, you say the coding conventions or procedures
2  for billing for multiple lacerations is a thorny issue.
3  I hope that's not a reference to the bush.
4      Could you explain what you mean by that?
5  A. It's a difficult issue because surgeons, when they
6  repair lacerations, effectively get reimbursed by the
7  inch, but it's not quite that simple, because built into
8  the reimbursement for every code for repair of a
9  laceration is an assumption that there's a certain
10  cost to apply the anesthesia. So just to repair the
11  laceration assumes an anesthetic, removal of a foreign
12  body assumes an anesthetic, there's a setup that is
13  required. You have to assume suture material. When
14  you are done, you have to clean up.
15      So bundled if you will or built into the
16  charge is the notion that there's going to be a setup
17  cost and a cleanup cost. And so the CPT manual says
18  explicitly that for non-medical reasons, if there are
19  multiple lacerations, the doctor doesn't just simply
20  include the cost of each individual laceration, but
21  instead determines the total amount of cut skin that
22  needs to be sewn up. And that helps to determine what
23  the appropriate charge is.
24      So rather than simply billing per laceration,
25  one has to submit a claim with a composite code for the

Page 380

1  total linear length of lacerated skin that was repaired.
2  Q. So just so I follow it, if I fall and I have
3  three cuts on my back, the doctor is actually going to
4  treat those three cuts?
5  A. Yes.
6  Q. Hopefully?
7  A. Yes.
8  Q. But --
9  A. And provide anesthesia.
10  Q. But will the doctor bill for those three cuts
11  separately?
12  A. No, because the billing is based on the assumption
13  it's one very long cut. So in a sense, for non-medical
14  reasons, we bill for the length of the injury rather
15  than for the anatomical repair that's done.
16  Q. So the injury that's being billed for actually does
17  not exist medically on the anatomical site being treated?
18  A. There is no relationship between the codes on the
19  claim and actual anatomical cuts if -- if there's more
20  than one laceration.
21  Q. Dr. Musen, you had used the term bundled a moment
22  ago. Do you understand bundled or unbundling to be
23  related terms of art in the field of claims processing?
24  A. Yes.
25  Q. Could you explain briefly for the jury what you

Page 381

1  mean by that?
2  A. When we say the codes are bundled, that means
3  there may be several procedures that are performed, such
4  as the anesthesia and the removal of the foreign body
5  that will be bundled in a way such that it is only one
6  code that is on the claim form. For example, the
7  surgery.
8      In the case of the laceration example, it is
9  appropriate to bundle all of the individual laceration
10  repairs into a code for the sum total of the length of
11  the laceration, and that's the charge that appears on
12  the form.
13  Q. So unbundling may relate to submitting too many
14  medical service codes?
15  A. Right. And the whole purpose of the patented
16  invention as well as the TriZetto products when they do
17  their clinical editing is to identify situations where
18  there may be multiple codes that appropriately should
19  be bundled into one or at least fewer codes.
20  Q. If I could direct your attention, Dr. Musen, to
21  Trial Exhibit 1122.
22  A. That's correct.
23  Q. Do you recognize what this is?
24  A. Yes. That is the Facets system receiving a claim.
25  Q. And there appear to be two medical service codes

Jury Trial - Volume B      CondenseIt™      Tuesday, April 18, 2006

**Page 382**

1  on this claim based on your explanation earlier?
2  A. That's correct.
3  Q. And is one of them 12036?
4  A. Right. 12036 is a particular code for repair of
5  a laceration. I believe 20 to 31 centimeters and I
6  don't have it memorized.
7  Q. Okay. I forgive you that.
8       There's an arrow on what has been labeled
9  Line 2?
10 A. Line 2 refers to a different procedure code for
11 12037, which is the cost of repairing a really big
12 laceration. As I recall, it's more than 31 centimeters.
13 Q. Okay. So if you -- I believe you discussed this
14 description as to the procedure here under the line item
15 table.
16 A. Yes. Okay. Oh, that is very helpful.
17      So Line 2 is, indeed, repair of a laceration
18 of the scalp or trunk or extremity and that's over 37
19 centimeters in length.
20 Q. So this is a situation where you, as you had
21 discussed, multiple lacerations, repair of multiple
22 lacerations are being submitted on a claim?
23 A. That's correct.
24 Q. And this slide is taken from an example you were
25 able to run at Facets?

**Page 383**

1  A. Exactly.
2       MR. HENDERSHOT: Would you bring up Exhibit
3  1125?
4  BY MR. HENDERSHOT:
5  Q. Dr. Musen, do you recognize what Exhibit 1125 is?
6  A. Yes. It's an example of Facets doing the right
7  thing.
8  Q. It --
9  A. It shows you the two codes, 12036 and 12037, and
10 generates the error message that tells you the two
11 codes appropriately should be bundled into a single
12 code.
13 Q. In this example, one did 12036 represent?
14 A. 12036 was repair of a smaller size laceration and
15 according to CPT coding convention, when you have two
16 lacerations and you repair both of them, then you only
17 get credit for the total length or, in this case, you
18 get credit for a very large laceration greater than 30
19 centimeters.
20 Q. So the doctor in this example treated two
21 lacerations?
22 A. That's correct.
23 Q. But should have billed for one?
24 A. That is correct.
25 Q. Which corresponds to this 12037?

**Page 384**

1  A. Right. And we have to be a little bit careful
2  about the language. It's not that the doctor should
3  have billed for one laceration. The one laceration on
4  the form doesn't really exist anatomically. It's not
5  a medical reality of the patient. It's simply the way
6  that one bills when there are multiple injuries and one
7  does multiple repairs.
8  Q. All right. So the billing convention as an example
9  is divorced from the medical condition of the patient?
10 A. Right.
11 Q. The patient?
12 A. Exactly.
13      MR. HENDERSHOT: Could you pull up Slide
14 1126?
15 BY MR. HENDERSHOT:
16 Q. Do you recognize this screen?
17 A. Yes.
18 Q. Is this also from your example?
19 A. It's also from my example and also from Facets.
20 Q. Okay. It says clinical editing criteria indicative
21 for 12037?
22 A. Correct.
23 Q. We also see the subset category again?
24 A. Yes.
25 Q. Have we discussed that before today?

**Page 385**

1  A. Yes.
2  Q. Is there any relevant information with respect to
3  this information underneath that tab?
4  A. Yes. The same Subset 1 relationship exists between
5  the ten medical service codes that we see in that open,
6  open box, dialogue box that we saw in relationship to
7  the code for the surgical excision of the foreign body.
8  In other words, whenever a clinician bills for repair
9  of a laceration that is over 30 centimeters, then any
10 other lacerations that might be on that patient do not
11 justify a separate bill, they should all be bundled
12 into the same charge.
13      It's not that the lacerations don't exist,
14 but the billing should be for one big one.
15 Q. So it's a non-medical criteria?
16 A. It's non-medical.
17 Q. Did any of these play into the process we saw by
18 Facets?
19 A. Absolutely. Any of those other codes on the claim
20 form would be disallowed and the one that we approved
21 would be the one for the laceration greater than 30
22 centimeters.
23 Q. Okay. So -- and because 12036 is included on this
24 list of relationships?
25 A. That's correct.

McKesson v. Trizetto, CA No. 04-1258 (SLR)      **Page 382 - Page 385**

Page 386

1 Q. We saw the results that we did?

2 A. Right. We saw Facets edit out that 12306 code.

3 Q. All right. Did you also have an opportunity to

4 analyze how ClaimFacts would process a similar claim?

5 A. Yes, I did.

6 Q. Did you have prepared or prepare at your direction

7 screen shots illustrating that example?

8 A. Yes, I did.

9     MR. HENDERSHOT: Would you bring up Exhibit

10 1187?

11     (Pause.)

12 BY MR. HENDERSHOT:

13 Q. Dr. Musen, stepping back -- we don't have it on

14 the screen, but stepping back to the example we just

15 discussed, you said Facets would edit out the code for

16 the smaller laceration; is that correct?

17 A. That's correct.

18 Q. When you say edit out, what do you mean by that?

19 A. It would declare that the codes for this medical

20 services pertaining to those smaller lacerations would

21 be deemed invalid. And it would be -- it would disallow

22 the code and allow the code for the large laceration.

23 Q. You ran a similar example in the ClaimFacts example

24 you said?

25 A. And we see it on the screen now.

Page 387

1 Q. All right. I believe we discussed earlier the

2 ClaimFacts medical processing screen where about

3 halfway down you see the medical service codes that are

4 entered; is that correct?

5 A. That's correct.

6 Q. And here are those -- what codes are those?

7 A. Those are codes from CPT-4 for repair of lacerations

8 of different sizes.

9 Q. And -- and one two zero three --

10 A. I think two of them for lacerations under, I'm

11 guessing, six centimeters. Three five is for a bigger

12 one, I'm guessing on the order of 15 to 20 centimeters

13 and the 12036 code I'm guessing again is on the order

14 of 20 to 30 centimeters.

15 Q. And you're guessing at the lengths corresponding

16 to those codes?

17 A. That's correct.

18 Q. Not what the codes actually represent in terms of

19 lacerations?

20 A. I'm not sure of the question.

21 Q. Do you understand those codes to represent repair

22 of lacerations on the trunk?

23 A. Correct.

24 Q. And you're just taking an educated guess at what

25 the length is?

Page 388

1 A. Without having the CPT manual in front of me, I

2 couldn't tell you what the actual codes are, but they

3 are all medical service codes, repairs of lacerations

4 that are of different lengths.

5 Q. Okay.

6 A. The largest of which is going to be between, I'm

7 guessing, 25 to 30 centimeters.

8     MR. HENDERSHOT: Could we bring up Exhibit

9 1189?

10 BY MR. HENDERSHOT:

11 Q. Dr. Musen, this, again, says ClaimFacts medical

12 processing at the stop. I think we've seen a similar

13 screen with our first example?

14 A. That's correct.

15 Q. Could you explain what's happening here?

16 A. ClaimFacts has done the right thing. It has

17 taken those four separate codes for the four separate

18 lacerations that were repaired and bundled them up

19 into a single code, 12037 that we see down at the bottom

20 of the column labeled PROC. That single code is for

21 repair of a laceration of greater than 30 centimeters

22 in length and, again, to emphasize, this patient may not

23 have a laceration that's greater than 30 centimeters in

24 length. There's no medical relationship between what's

25 billed and what actually exists in the patient. This

Page 389

1 is a way that one has to bill for multiple lacerations

2 to the coding that's appropriate.

3 Q. So the computer system has made some determination

4 as to the Codes 12032, 2035 and 2036?

5 A. Precisely.

6 Q. What determination has it made?

7 A. It has determined that all four of those codes are

8 invalid and disallowed them and it has replaced them

9 with code 12037.

10 Q. Okay. And I believe you said that that

11 determination was based on a non-medical reason?

12 A. Yes. It's the coding convention for how one deals

13 with billing for laceration repair.

14 Q. Did you also get an opportunity to run a similar

15 example or observe the processing of a similar example

16 in the QicLink system?

17 A. Yes, I did.

18 Q. Did you prepare screens from the video that you

19 observed?

20 A. Yes.

21     MR. HENDERSHOT: Bring up Exhibit 1267.

22     (Pause.)

23 BY MR. HENDERSHOT:

24 Q. Do you recognize this screen, Dr. Musen?

25 A. Yes, I do.

Page 390

1  Q. Is this from the QicLink system?
2  A. Yes.
3  Q. And is this from the example that you observed?
4  A. Yes. This is the example that I observed at
5  QicLink.
6  Q. All right. I believe we discussed earlier that
7  the medical service codes are -- that have been received
8  are indicated on the bottom half of the screen?
9  A. That is correct.
10 Q. Could you explain what's indicated here for this
11 claim?
12 A. Right. There are two -- it turns out two entries
13 for Code 12032, which is a small laceration. One for
14 the intermediate laceration of 12035 and one for the
15 big laceration, which is 12036, but not for the code
16 that corresponds to lacerations greater than 30
17 centimeters.
18 Q. All right.
19 A. You'll notice each one has a particular charge as
20 well, and the total charge for the unbundled bill is
21 $838.75.
22 Q. So to this point in the processing, has QicLink
23 received a claim?
24 A. Yes.
25 Q. It has a -- has it numbered the codes?

Page 391

1  A. It has numbered the codes.
2  Q. But they've yet to be processed?
3  A. That is correct.
4      MR. HENDERSHOT: Would you bring up Exhibit
5  1268?
6  BY MR. HENDERSHOT:
7  Q. Do you recognize this screen, Dr. Musen?
8  A. Yes, I do.
9  Q. Could you explain what's being displayed in the
10 ClinicaLogic messages?
11 A. Right. It's the same kind of message we've seen
12 previously from QicLink and the other TriZetto products.
13 It says when performed on the same lesion or site,
14 Code 12032 is usually considered part of a more
15 comprehensive procedure and billed using Code 12037.
16 If in doubt, have the physician review the claim.
17     So it's beginning to bundle up those codes
18 into the code for the large laceration.
19 Q. And that's based on the billing convention you
20 discussed?
21 A. That's right. It's not the patient's laceration
22 has disappeared, it's just the way it's billed.
23     MR. HENDERSHOT: Can we bring up Exhibit
24 1269?
25

Page 392

1  BY MR. HENDERSHOT:
2  Q. Dr. Musen, it says the procedure being explained
3  here is 12035.
4  A. We're going pretty fast.
5  Q. Yes. Go back to Exhibit 1269.
6      So, again, do you see the original procedure
7  number here, Dr. Musen?
8  A. That's correct.
9  Q. What does that indicate to you?
10 A. That the -- that the Procedure 12035 has been
11 determined to be invalid and been rejected and it's
12 going to ultimately be bundled with the 12037 code we
13 mentioned earlier.
14 Q. It's the same sort of determination?
15 A. Same sort of determination.
16 Q. Can we pull up Exhibit 1270? That's the one we
17 were getting a glimpse of.
18 A. And so we see the same logic being applied to Code
19 12036.
20 Q. Okay. So in your view of the processing of this
21 claim and the QicLink system, could you explain what
22 happened to the claim and the processing?
23 A. Right. The patient had four separate lacerations.
24 The provider billed separately for each of the four
25 lacerations, was able to generate a bill for over $800.

Page 393

1  The QicLink product -- all the TriZetto products were
2  able to see through this unbundling of the bills,
3  recognized that it was appropriate not to issue payment
4  for each laceration, but to give the appropriate payment
5  for the sum total, and replace the codes that were on
6  the claim form with 12037, which is a code for any
7  laceration repair involving a sum total of more than
8  30 inches of suturing.
9  Q. And were you able to draw any conclusions
10 regarding the relationship between the processing of
11 the three systems?
12 A. Well, the three systems operate on the same
13 database that we saw for the example of the foreign
14 body and the anesthesia. In all examples, it was able
15 to identify codes that should be mutually exclusive.
16     They were mutually exclusive because
17 non-medical criterias, essentially how one does the
18 billing, not what the anatomy of the patient is, and in
19 all cases they rejected the initial claim, made edits
20 to the claim and then approved the claim as it was
21 reconstituted.
22 Q. So, Dr. Musen, you've had the opportunity to review
23 and analyze Claim 2 of the '164 patent?
24 A. Yes, I have.
25 Q. Have you reached any conclusions as to whether or

Page 394

1  not the TriZetto products infringe that claim?
2  A.  Yes.  All three products infringe.
3  Q.  And what is that opinion based upon?
4  A.  It's based on my observation of the videotapes
5  and first-hand experience with the products, looking
6  at the product literature, looking at the depositions.
7         MR. HENDERSHOT:  I'd like to put up the
8  charts similar to the one we did for 16 of Claim 2.
9         (Mr. Hendershot placed a chart on the easel.)
10        MR. HENDERSHOT:  Turn the projector off.
11 BY MR. HENDERSHOT:
12 Q.  While a little askew, this board represents the
13 language of Claim 2?
14 A.  Yes.
15 Q.  Do you recognize the elements disclosed in Claim 2?
16 A.  Yes.  This is the language of Claim 2 verbatim.
17 Q.  This is the claim you analyzed whether or not
18 TriZetto infringed?
19 A.  Yes.
20 Q.  Or one of the three claims?
21 A.  Yes.
22 Q.  And you expressed your opinion -- strike that.
23 You've reached an opinion as to whether or not TriZetto
24 infringes this claim?
25 A.  Yes, they do.

Page 395

1  Q.  Do you mind if I walk through with you as we did
2  similarly with Claim 16 the elements of the claims?
3  A.  Yes.
4  Q.  With respect to the Facets product, which I will
5  put in the left-hand column as we did on the last chart,
6  have we seen evidence that Facets operates in a computer
7  system?
8  A.  I have seen computers operate Facets, yes.
9  Q.  Okay.  We've addressed that element in connection
10 with Claim 16 as well?
11 A.  Yes.
12 Q.  And we discussed earlier there was some relation
13 between some of the elements in Claim 2 and some of the
14 elements in Claim 16?
15 A.  That's correct.
16 Q.  Could you explain what that is?
17 A.  Actually, I think all of the elements up to the
18 determining step are identical in Claim 2 and in Claim
19 16.
20 Q.  So the first element in the computer system, the
21 means for operating, the method for processing, receiving
22 at least one claim and ascertaining?
23 A.  That language is identical in both claims.
24 Q.  So is your opinion equally applicable to these
25 elements in Claim 2 as it was in 16?

Page 396

1  A.  Yes, it is, for the same reasons.
2  Q.  And what's that opinion?
3  A.  That TriZetto infringes in all three products.
4  Q.  I'm going to go ahead and put an F, C and a Q and
5  start checking these off, if that's all right.
6         You said for each one of these, it's your
7  opinion that each of the TriZetto products infringes
8  each term of these limitations?
9  A.  That is correct.
10 Q.  And then down through here (indicating)?
11 A.  Yes.
12 Q.  For each product?
13 A.  For each product.
14 Q.  So getting to the next element, the determining
15 step --
16 A.  Yes.
17 Q.  -- it says, determining whether one of the medical
18 service codes in the at least one claim is mutually
19 exclusive due to non-medical criteria with any other
20 medical service code in the at least one claim.
21 A.  Yes.
22 Q.  Do you have an understanding of what that requires?
23 A.  Yes.  It requires that the computer be able to
24 identify a grouping of codes where at least one of
25 those codes is not payable with all the other codes.

Page 397

1  Q.  In your opinion, does the Facets product make
2  such a determination?
3         - - -
4  A.  We've seen that, yes.
5  Q.  Where did we see it?
6  A.  We've seen it in the example of the administration
7  anesthesia with the surgical foreign body.  We've seen it
8  with the rebundling of the individual laceration repair
9  service code into a single laceration repair service
10 code.
11 Q.  So it's your opinion -- strike that.
12        Would you explain how the Facets system
13 processing of the multiple laceration example is mutually
14 exclusive?
15 A.  The facets original determining step here, it's
16 okay to check that code, but that --
17        - - -
18
19
20
21
22
23
24
25

# EXHIBIT 6

# Paul Hastings
ATTORNEYS

Paul, Hastings, Janofsky & Walker LLP
Seventeenth Floor • 695 Town Center Drive • Costa Mesa, CA 92626-1924
telephone 714 668 6200 • facsimile 714 979 1921 • www.paulhastings.com

Atlanta
Beijing
Brussels
Hong Kong
London
Los Angeles
New York
Orange County
Paris
San Diego
San Francisco
Shanghai
Stamford
Tokyo
Washington, D.C.

(714) 668-6234
matthewlapple@paulhastings.com

January 28, 2005                                                            36473.00019

VIA U.S. MAIL AND FACSIMILE (650) 470-4750

Michael C. Hendershot, Esq.
Skadden, Arps, Slate, Meagher & Flom LLP
525 University Avenue
Palo Alto, CA 94301

Re: .  *McKesson Information Solutions, LLC v. The TriZetto Group, Inc.* --
McKesson's Inadequate Interrogatory Responses

Dear Mr. Hendershot:

TriZetto has conducted a preliminary review of McKesson's Responses to TriZetto's First
Set of Interrogatories. McKesson's responses are seriously deficient and TriZetto requests
that McKesson make an immediate supplementation. To further explain these
deficiencies, TriZetto provides, without limitation, the following.

Interrogatories 1 and 2

These interrogatories request McKesson to identify the patent claims it is asserting,
identify the TriZetto products it is accusing of infringement, provide a claim construction
for the asserted patent claims and then apply that claim construction to the accused
products. McKesson's response fails to identify any particular patent claim it is asserting.
McKesson also identifies the TriZetto products in only the vaguest of terms, providing an
identification of only "FACETS." Although the proposed scheduling order contemplates
specific dates for the disclosure of detailed proposed claim constructions, McKesson's
ongoing failure to state such basic information as which patent claims it believes are
infringed, and by what products, is unacceptable.

Simply put, prior to filing suit McKesson should have performed a reasonable and
competent inquiry and thereby had some notion of what products allegedly infringe the
'164 patent, which claims are supposedly infringed and why it believes there is
infringement. TriZetto demands that McKesson set forth the basic facts underlying its
cause of action. If it cannot do so, TriZetto will seek relief from the Court, including, if
necessary, sanctions.

Paul Hastings
ATTORNEYS

Michael Hendershot
January 28, 2005
Page 2

Interrogatories 3 and 4

These interrogatories request detailed information regarding the alleged conception and reduction to practice of the claimed invention. McKesson responds that the dates of conception and reduction to practice are September 30, 1988, as a matter of law, based on the filing of patent application number 252,307 on that date. McKesson further objects that TriZetto has not produced any prior art establishing the relevance of an earlier date of conception or reduction to practice. This is incorrect. At least as early as December 7, 2004, TriZetto provided McKesson with relevant prior art, namely the "Caterpillar Experience" article written by named inventors Hertenstein and Egdahl. This, in and of itself, makes McKesson's objections inappropriate. Further, on January 21, 2005, TriZetto served McKesson with a document production that included a large number of other relevant prior art documents which place the validity of the '164 patent in serious doubt. Accordingly, TriZetto requests that McKesson either immediately provide a full and complete response to these interrogatories, or confirm that it will rely upon the September 30, 1988 filing date as the earliest date of alleged conception and reduction to practice for the claimed inventions.

Interrogatory 5

This interrogatory seeks information regarding the earliest date and circumstances surrounding McKesson's discovery or awareness of any TriZetto product or system alleged to infringe the '164 patent. McKesson has provided no substantive response. Instead McKesson refers TriZetto to McKesson's response to Interrogatory 2. The inadequacy of McKesson's response to Interrogatory 2 is explained above. Moreover, in response to Interrogatory 2, McKesson states that "TriZetto's systems, services, and product offerings, including without limitation FACETS, infringe and have infringed the '164 patent as long as they have included the elements of the claimed inventions." Although TriZetto disputes that this is a complete and appropriate response to Interrogatory 2, TriZetto demands that McKesson provide a full and complete answer to Interrogatory 5 with respect to the accused "systems, services and product offerings" that McKesson had in mind when it answered Interrogatory 2.

Interrogatory 6

This interrogatory seeks information regarding any disclosures of public uses, sales, offers for sale, or publication of the subject matter of the patent prior to the date of filing. McKesson objects, in part, that it is not required to respond to the extent the interrogatory seeks information regarding and disclosures after September 30, 1987 "as such information does not constitute prior art to the claims of the '164 patent." Even if McKesson's assertion is correct, which TriZetto does not accept, that simply does not mean that the requested information is irrelevant or that providing it is unduly burdensome. In fact, such information may be applicable to issues of indefiniteness,

OC/367790.1

**Paul**Hastings
ATTORNEYS

Michael Hendershot
January 28, 2005
Page 3

enablement, best mode, or inequitable conduct, to name a few. Thus, TriZetto asks that
McKesson withdraw this inappropriate and unilateral limitation on the temporal scope of
interrogatory 6.

McKesson also states that "Neither TriZetto nor any third-party have identified a
disclosure, publication, sale, offer for sale, or public use that invalidates any claim of the
'164 patent and McKesson is not aware of any such disclosure, publication, sale, offer for
sale, or public use." This is incorrect. As explained above, TriZetto provided copies of
the "Caterpillar Experience" article, an invalidating prior art reference, to McKesson in
early December. Further, on January 21, 2005, TriZetto served McKesson with a
document production that included a large number of other relevant prior art documents
which place the validity of the '164 patent in serious doubt.

Moreover, it is clear that McKesson's opinion regarding what constitutes invalidating prior
art is irrelevant to this interrogatory. The interrogatory does not merely ask for McKesson
to identify prior disclosures of the patented subject matter that McKesson considers to be
invalidating. The interrogatory asks for all disclosures of the subject matter of the patent
prior to the filing date. Accordingly, TriZetto asks that McKesson provide a full and
complete answer to this interrogatory.

Interrogatories 7 and 8

Interrogatory 7 requests detailed information about any product or system sold or licensed
by McKesson or its predecessors, or a licensee, which allegedly practices the '164 patent.
McKesson objects that because the claims of the patent have not been construed, it
cannot answer. McKesson also seems to object that it may require expert analysis to
determine the answer to this interrogatory because of its impact upon both the issues of
claim construction and damages. McKesson also objects that TriZetto has not identified
any sale or offer for sale that would invalidate the patent. McKesson's answer is non-
responsive and illogical.

Is McKesson actually taking the position that it is so uncertain of the scope of the '164
patent claims that McKesson does not know whether any of McKesson's own products
are allegedly covered by the '164 patent? Does McKesson not know whether its alleged
predecessors-in-interest claimed to have practiced the '164 patent? Further, is McKesson
actually stating that it does not know if the '164 patent has ever been licensed or whether
the '164 patent has been allegedly practiced by a licensee? If this is the case, please let us
know. Otherwise, provide a complete and responsive answer to this interrogatory.

Interrogatory 8 asks McKesson to identify the persons most knowledgeable about each
product identified in response to Interrogatory 7 and to state the date when it was first
publicly disclosed, sold or offered for sale. McKesson simply refers TriZetto to its

OC/367790.1

Paul*Hastings*
ATTORNEYS

Michael Hendershot
January 28, 2005
Page 4

response to Interrogatory 7 and fails to identify any person or any dates. This is
unacceptable. Please provide a complete and responsive answer.

Interrogatory 11

This interrogatory asks McKesson to provide a detailed description of any investigation or
analysis as to why it believes TriZetto has infringed the '164 patent and asks for an
identification of all persons involved in any such efforts and details regarding their efforts
and conclusions. McKesson fails to identify any individual or provide any explanation of
its investigation and analysis. McKesson merely says it gave TriZetto a copy of the patent
on October 9, 2001 and then engaged in licensing negotiations with TriZetto in 2003.

From this, a reasonable inference can be drawn that someone at McKesson did something
prior to October 9, 2001 to cause McKesson to send TriZetto a copy of the '164 patent,
yet McKesson's response is silent as to who did what. A further reasonable inference can
be drawn that McKesson believes someone did something between 2001 and the filing of
the lawsuit in September 2004 which caused McKesson to believe that TriZetto infringed,
yet McKesson's response is again silent. McKesson's refusal to disclose these basic facts
is improper. Please provide a full and complete answer to this interrogatory.

Interrogatory 12

This interrogatory asks for an identification and description of all secondary
considerations or objective evidence that McKesson contends supports the alleged
nonobviousness of the '164 patent. McKesson has objected that TriZetto has not
produced any prior art demonstrating the invalidity of the '164 patent and that McKesson
is therefore not obligated to provide a substantive answer. This is incorrect. At least as
early as December 7, 2004, TriZetto provided McKesson with relevant prior art, namely
the "Caterpillar Experience" article written by named inventors Hertenstein and Egdahl.
This, in and of itself, makes McKesson's objection inappropriate. Further, on January 21,
2005, TriZetto served McKesson with a document production that included a large
number of other relevant prior art documents which place the validity of the '164 patent
in serious doubt. McKesson does state that once TriZetto has made a prima facie case of
obviousness, McKesson will substantively respond. Because TriZetto has done so,
TriZetto requests that McKesson either immediately provide a full and complete response
to these interrogatories or waive its right to assert the existence of any secondary
considerations or objective evidence of nonobviousness.

Interrogatories 15-18

These interrogatories seek to obtain information about who was involved in the
conception and reduction to practice of the claimed invention, the development and
commercialization of HPR's CodeReview software, which is referenced in the '164 patent,

OC/367790.1

**Paul**Hastings
ATTORNEYS

Michael Hendershot
January 28, 2005
Page 5

and what reference materials, computer programs or databases were used or relied on by those persons. McKesson objects and provides no substantive response to any of these interrogatories, other than to say that, as a matter of law, the named inventors are the persons involved in conception and reduction to practice, the dates of conception and reduction to practice are September 30, 1988 because that was when the patent application was filed, and that TriZetto has supposedly failed to produce any invalidating prior art making any answer to these interrogatories premature. In response to Interrogatories 17-18 McKesson also makes the unsupportable objection that because "the CodeReview product has not been accused of infringement in this action," requesting the disclosure of information regarding it is somehow unduly burdensome or overbroad.

As you are aware, per the admissions of Marcia Radosevich, one or more employees or consultants for HPR, including William Ryker, utilized a book on expert systems to write HPR's CodeReview software, which is referenced in the '164 patent. (Marcia Radosevich and Health Payment Review: 1989(A), p. 5, ". . . William Ryker, who's brilliant, decided he wanted to be vice president for software development. He went to the BU bookstore, bought a book on expert systems, and decided how to build the system.") This quote also admits that at least one person other than the named inventors, e.g. William Ryker, was involved in the development of CodeReview. These admissions clearly raise questions about inventorship, the alleged conception and reduction to practice and any prior art or reference materials upon which the claimed inventions of the '164 were based. Accordingly, please provide full and complete responses to these interrogatories.

We look forward to McKesson's prompt supplementation.

Very truly yours,

Matthew C. Lapple
for PAUL, HASTINGS, JANOFSKY & WALKER LLP

MCL:la

cc:     Jeffrey G. Randall
        Thomas J. Allingham, II

OC/367790.1

# EXHIBIT 7

APR. 11. 2005  9:48AM    GD&C  OC                    NO. 2019   P. 2

# GIBSON, DUNN & CRUTCHER LLP

### LAWYERS

A REGISTERED LIMITED LIABILITY PARTNERSHIP
INCLUDING PROFESSIONAL CORPORATIONS

4 Park Plaza  Irvine, California 92614-8557
(949) 451-3800
www.gibsondunn.com

kroosevelt@gibsondunn.com

April 11, 2005

Direct Dial                                                    Client No.
(949) 451-3932                                            T 92654-00006

Fax No.
(949) 475-4744

VIA FACSIMILE AND U.S. MAIL

Michael C. Hendershot, Esq.
Skadden, Arps, Slate, Meagher & Flom LLP
525 University Avenue, Suite 1100
Palo Alto, California 94301

  Re: *McKesson Information Solutions, LLC v. The TriZetto Group, Inc.*

Dear Mr. Hendershot:

  As you know, Gibson, Dunn & Crutcher, LLP now represents The TriZetto Group, Inc. ("TriZetto") in the above-captioned litigation. We have received and reviewed McKesson Information Solutions, LLC's ("McKesson") responses to the First Set of Interrogatories (the "Interrogatories") and the First Set of Requests for Admissions (the "RFAs") propounded by TriZetto. We have also reviewed McKesson's supplemental response to the Interrogatories and the communications you have had with Mr. Lapple concerning the responses. Unfortunately, McKesson's responses, including its supplemental response to the Interrogatories, are patently inadequate. Accordingly, we are requesting a conference in order to eliminate the need for a hearing, or to eliminate as many of our disputes as possible, regarding the following issues.

## The Interrogatories

### A. Responses to Interrogatories Nos. 1 and 2

  These Interrogatories ask McKesson to identify the patent claims it is asserting, the TriZetto products it is accusing of infringement and to provide a claim construction for the asserted patent claims and then apply that claim construction to the accused products. We recognize that the Scheduling Order issued by the Court sets forth the specific dates for the disclosure of detailed claim constructions. McKesson's original responses to these

LOS ANGELES   NEW YORK   WASHINGTON, D.C.   SAN FRANCISCO   PALO ALTO

APR. 11, 2005  9:46AM     GD&C GC                                    NO. 2013   P. 5

## GIBSON, DUNN & CRUTCHER LLP

Michael C. Hendershot, Esq.
April 11, 2005
Page 2

Interrogatories, however, failed to even set forth such basic information as which of the '164 patent claims it believes are infringed and by what TriZetto product.

In its supplemental response, McKesson identifies claims 1, 2, 3, 4, 6, 9, 10, 11, 12, 13, and 14 of the '164 patent as infringed by TriZetto. Nevertheless, the supplemental response does not adequately identify which of TriZetto's products have allegedly infringed those claims. Instead, McKesson simply states that "TriZetto's systems, services, and product offerings, including, without limitation, FACETS, infringe and have infringed claims 1, 2, 3, 4, 6, 9, 10, 11, 12, 13, and 14 of the '164 patent."

Obviously, TriZetto is entitled to know which of its products have allegedly infringed the '164 patent. *See Fresenius Medical Care Holding Inc. v. Baxter International, Inc.*, 224 F.R.D. 644, 652 (N.D. Cal. 2004) (holding that the patent holder was required to definitively state all products which embodied any invention claimed by the patents in suit). Therefore, we request that you supplement McKesson's responses to these Interrogatories by stating whether FACETS is the only product that you allege to be infringing. If it is not, specify which other TriZetto products you believe are infringing. Also, for each product that you do identify, state which claims of the '164 patent are allegedly infringed. Finally, for each product, state the basis for your contention that the product infringes the '164 patent.

**B.      Interrogatories Nos. 3 and 4**

These Interrogatories ask McKesson to set forth detailed information regarding the alleged conception and reduction to practice of the claimed invention. McKesson simply responds by stating that the dates of conception and reduction to practice are September 30, 1988, as a matter of law, based on the filing of patent application number 252,307 on that date. In your letter to Mr. Lapple dated February 18, 2005, you refuse to provide a full and complete response to these Interrogatories or confirm that McKesson will rely upon the September 30, 1998 filing date as the earliest date of alleged conception and reduction to practice for the claimed invention. Your refusal to provide a supplemental response is based entirely on the assertion that TriZetto has not identified any alleged prior art that it is relying upon in connection with its defenses.

As set forth in Mr. Lapple's letter to you dated January 25, 2005, your assertion that TriZetto has not identified any alleged prior art is incorrect. Regardless, McKesson is required to provide a full and complete response to these Interrogatories. *Lamoureux v. Genesis Pharmacy Services, Inc.*, 226 F.R.D. 154 (D. Conn. 2004) is on point. There, the defendant sought to compel a response to an interrogatory that asked the plaintiff to "state the earliest dates upon which each invention claimed in the patent-in-suit is contended . . . to have been conceived and reduced to practice, and identify all facts, documents and witnesses which support each such date." *Id.* at 157 As you do in your February 18, 2005 letter, the plaintiff objected to the interrogatory as irrelevant based on the assertion that "defendant has not made known its

APR. 11. 2005  9:49AM    GD&C DC                                    NO. 2015    P. 4

## GIBSON, DUNN & CRUTCHER LLP

Michael C. Hendershot, Esq.
April 11, 2005
Page 3

defenses, if any, based upon prior art, nor has defendant identified any alleged prior art it is relying upon in connection with those defenses." *Id.* The court chastised the plaintiff for his argument and ordered the plaintiff to provide a full and complete response:

> The dates in question -- when the plaintiffs conceived and reduced to practice the invention claimed with regard to the '760 Patent -- are incontrovertibly relevant to defenses and counterclaims based upon statutes which turn almost exclusively on such dates. *Frankly, the court is surprised that the plaintiffs would attempt to assert otherwise.* While not without their limits, requests for information are afforded a broad and liberal construction. [citation]. To hold that the information sought by Interrogatory No. 1 is irrelevant to the defendant's defenses and/or counterclaims would go beyond even a narrow and conservative construction. The court finds that the information is patently relevant.

*Id.* at 160 (emphasis added).

Based on this authority, TriZetto demands that McKesson provide full and complete responses to Interrogatories Nos. 3 and 4 without objections.

**C.      Interrogatory No. 5**

This Interrogatory seeks information regarding the earliest date, and the circumstances surrounding, McKesson's discovery or awareness of any TriZetto product or system alleged to infringe the '164 patent. In your letter to Mr. Lapple dated February 18, 2005, you refuse to provide a full and complete response to this Interrogatory on the grounds that it seeks irrelevant information and/or information protected by the attorney client privilege.

Contrary to your assertion, "the dates upon which [McKesson] first believed, determined or concluded that each claim had been infringed" is "relevant to the subject matter involved in the pending action." *See Chubb Integrated Sys. Ltd. v. National Bank of Washington*, 103 F.R.D. 52, 61 (D.C. 1984). For example, such information "is central to the defense of laches proffered by [TriZetto]." *Id.*

Therefore, TriZetto demands that McKesson provide a full and complete response to Interrogatory No. 5.

**D.      Interrogatory No. 6**

This Interrogatory seeks information regarding any disclosures of public uses, sales, offers for sale or publication of the subject matter of the '164 patent prior to the date of filing. McKesson's response states in part that "[w]ith respect to other parties' activities, the Federal Rules of Civil Procedure do not require McKesson to perform TriZetto's pre-trial investigation." It also objects to the Interrogatory "to the extent it seeks documents and/or information regarding

pero

APR. 11. 2005  9:49AM    GD&C 0C                          NO. 2019  P. 9

# GIBSON, DUNN & CRUTCHER LLP

Michael C. Hendershot, Esq.
April 11, 2005
Page 4

any disclosure by the named inventors or HPR, Inc. after September 30, 1987, as such information does not constitute prior art to the claims of the '164 patent." By these objections, it appears that McKesson is refusing to identify any disclosures by third parties of the subject matter of the '164 patent. Any disclosures by third parties of the subject matter of the '164 patent that McKesson is aware of, however, are obviously relevant regardless of whether those disclosures took place after September 30, 1987.

In your letter to Mr. Lapple dated February 18, 2005, you also complain that the Interrogatory is "impossibly overbroad" because it uses the term "subject matter thereof." You state that this term would require McKesson to identify every prior disclosure of a "computer system" or "database." Obviously the term "subject matter thereof" refers to the subject matter of the claims of the '164 patent. If your contention is that the claims of the '164 patent cover *all* "computer systems" and "databases," that is fine. But we request that you say so in a verified response to Interrogatory No. 6. Otherwise, we request that you provide a supplemental response to the Interrogatory.

E.    Interrogatories Nos. 7 and 8

As you acknowledge in your letter to Mr. Lapple dated February 18, 2005, Interrogatory No. 7 requests detailed information about any product or system sold or licensed *by McKesson*, its predecessors and/or licensees, which embody, practice or use any invention claimed in the '164 patent. Interrogatory No. 8 asks McKesson to identify the persons most knowledgeable about each product identified in response to Interrogatory No. 7.

McKesson's response states that "[n]either TriZetto nor any third-party have identified a sale or offer for sale that invalidates any claim of the '164 patent and McKesson is not aware of any such sale or offer for sale." The response goes on to state that the "inventors and prosecuting attorneys disclosed all material prior art of which they were aware . . . during the prosecution of the '164 patent."

It is apparent that McKesson is misreading the information requested by Interrogatories Nos. 7 and 8. As stated above, the Interrogatories seek information concerning *McKesson's own products* that embody, practice or use any invention claimed in the '164 patent. They also seek information concerning whether McKesson's predecessors-in-interest practiced the '164 patent. Lastly, they seek information regarding whether McKesson has licensed the '164 patent and, if it has, whether or not a licensee has practiced the '164 patent. McKesson's response fails to identify any of this information.

Obviously, TriZetto is entitled to seek discovery on products that McKesson, its predecessors-in-interest, and/or its licensees sold that embody, practice or use any invention claimed in the '164 patent. Therefore, we request that you provide full and complete responses to Interrogatories Nos. 7 and 8.

APR. 11. 2005  9:49AM    GD&C UC                                      NO. 2019   P. 0

## GIBSON, DUNN & CRUTCHER LLP

Michael C. Hendershot, Esq.
April 11, 2005
Page 5

**F.     Interrogatory No. 11**

This Interrogatory asks McKesson to provide a detailed description of any investigation or analysis as to why it believes TriZetto has infringed the '164 patent and asks McKesson to identify all persons involved in any such efforts and details regarding their efforts and conclusions. McKesson objects on attorney-client privilege grounds and simply states that "McKesson sent TriZetto a copy of the '164 patent on October 9, 2001 and engaged in licensing negotiations with TriZetto." If these are the *only* actions that McKesson took to investigate or analyze whether TriZetto has infringed the '164 patent, other than at the behest of counsel, please confirm in a verified supplemental response. Otherwise, we request that you supplement McKesson's response to Interrogatory No. 11.

**G.     Interrogatory No. 12**

This Interrogatory asks for an identification and description of all secondary considerations or objective evidence that McKesson contends supports the alleged nonobviousness of the '164 patent. McKesson refuses to respond to this Interrogatory until "TriZetto provides evidence establishing a prima facie case of obviousness of the claims of the '164 patent."

McKesson's position that TriZetto is required to establish a prima facie case of obviousness before McKesson is required to respond to this Interrogatory is untenable. *See Edward Lowe Industries, Inc. v. Oil-Dri Corp. of America*, 1995 WL 399712 at * 3 (N.D. Ill. July 7, 1995) (rejecting the argument that a patentee does not need to provide responses to discovery seeking evidence of "secondary considerations" including need, commercial success, and other attempts to solve the problem addressed by the patent until the alleged infringer makes a *prima facie* showing of invalidity). Accordingly, TriZetto requests that McKesson provide a full and complete response to Interrogatory No. 12.

**H.     Interrogatory No. 15**

Interrogatory No. 15 asks McKesson to identify all reference materials, including without limitation, books, publications, and computer software, that were used or relied upon by any of the inventors of the '164 patent during its conception, development or reduction to practice. After asserting numerous boilerplate objections, McKesson responds by stating that "the inventors and prosecuting attorneys of the '164 patent disclosed all material prior art of which they were aware . . . during the '164 patent's prosecution. Those prior art references are identified in the prosecution of the '164 patent."

Is it McKesson's position that the *only* reference materials that were used or relied upon by any of the inventors of the '164 patent during its conception, development or reduction to practice are identified in the prosecution history of the '164 patent? If so, please provide a

APR. 11. 2005  9:15AM    GD&C DC                    NO. 2015    P. 7

# GIBSON, DUNN & CRUTCHER LLP

Michael C. Hendershot, Esq.
April 11, 2005
Page 6

supplemental response stating as such.  If that is not McKesson's position, then please provide a full and complete response to Interrogatory No. 15 identifying all other reference materials that were used or relied upon by any of the inventors of the '164 patent during its conception, development or reduction to practice.

We understand from the inventors' responses to the subpoenas issued by TriZetto that Skadden, Arps, Slate, Meagher & Flom LLP ("Skadden") is representing the inventors individually.  Therefore, your assertion that "the information TriZetto has requested may be beyond McKesson's possession, custody, or control" because "none of the '164 patent's inventors . . . are affiliated with or employed by McKesson" is no longer tenable.

I.     **Interrogatory No. 16**

This Interrogatory asks McKesson to identify all persons, in addition to the inventors, who contributed to the conception, development or reduction to practice of the inventions claimed in the '164 patent.  After asserting numerous boilerplate objections, McKesson responds by stating "McKesson is unaware of any persons who contributed to the conception of the claims of the '164 patent other than the named inventors . . . ."

First, the response fails to identify who contributed to the development or reduction to practice of the inventions claimed in the '164 patent.  Second, as noted above, Skadden is now representing the inventors individually.  Therefore, your assertion that "the information TriZetto has requested may be beyond McKesson's possession, custody, or control" because "none of the '164 patent's inventors . . . are affiliated with or employed by McKesson" is no longer tenable.  To the extent that McKesson's response is in any way limited by this objection, we request that you supplement the response accordingly.

J.     **Interrogatory No. 17**

This Interrogatory asks McKesson to identify all persons involved with the conception, development or commercialization of Health Payment Review, Inc.'s CodeReview product.  After asserting numerous boilerplate objections, McKesson refuses to provide a response.  Based on your February 18, 2004 letter to Mr. Lapple, your main concern is that there is "no limitation to a specific time period."  As a compromise, we are willing to limit this Interrogatory to all persons who were involved with the conception, development or commercialization of Health Payment Review, Inc.'s CodeReview product prior to the date of filing of the '164 patent.

Again, Skadden is now representing the inventors individually.  Therefore, your assertion that "the information TriZetto has requested may be beyond McKesson's possession, custody, or control" because "none of the '164 patent's inventors . . . are affiliated with or employed by McKesson" is no longer tenable.

APR. 11. 2005  9:50AM    GD&C UC                                    NU. 2019    r. 8

## GIBSON, DUNN & CRUTCHER LLP

Michael C. Hendershot, Esq.
April 11, 2005
Page 7

**K.**    **Interrogatory No. 18**

This Interrogatory asks McKesson to identify all materials, including all prior software, medical device codes and sets of relationships among the medical devise codes, that were used as the basis of the CodeReview product.  After asserting numerous boilerplate objections, McKesson responds that "no medical device codes or sets of relationships of medical device codes were used as a basis for the CodeReview product."  McKesson fails, however, to identify any software that was used as a basis for the CodeReview product.

Please identify all software that was used in any way as the basis for CodeReview. Again, Skadden is now representing the inventors individually.  Therefore, your assertion that "the information TriZetto has requested may be beyond McKesson's possession, custody, or control" because "none of the '164 patent's inventors . . . are affiliated with or employed by McKesson" is no longer tenable.  To the extent that McKesson's original response is in any way limited by this objection, we request that you supplement the response accordingly.

**The Requests for Admissions**

**A.**    **RFA No. 6**

RFA No. 6 asks McKesson to "admit that HPR's software produce CodeReview embodied all of the claim limitations of the independent claims of the '164 patent."  McKesson refuses to provide a response based on several objections.  All of McKesson's objections are without merit.

First, the RFA obviously contains a typo:  "produce" should be "product."  Second, we find it hard to believe that McKesson does not understand the phrase "embodied all of the claim limitations."  Finally, RFA No. 6 does not ask McKesson to provide a claim construction. McKesson must have had some construction of the '164 patent in mind when it filed a complaint alleging that TriZetto infringed the patent.  Therefore, McKesson should be able to admit or deny whether CodeReview practices the claims of the '164 patent.

**B.**    **RFA No. 12**

RFA No. 12 asks McKesson to "admit that, apart from the examples provided therein, there is no disclosure in the '164 patent of the structure of the knowledge base or of medical service codes and the relationship among the codes contained therein."  McKesson refuses to provide a response based on several objections.  Again, all of McKesson's objections are without merit.

First, we find it hard to believe that McKesson does not understand the word "examples." That word refers to the "examples" listed in the '164 patent.  If you need more specification, please refer to columns 11 through 46 of the patent.  Second, the phrases "structure of the

APR. 11. 2005  9:50AM    GD&C DC                                    NO. 2015   P. 9

## GIBSON, DUNN & CRUTCHER LLP

Michael C. Hendershot, Esq.
April 11, 2005
Page 8

knowledge base" and "structure . . . of medical service codes and the relationships among the codes" are contained in the claims of the '164 patent. Therefore, those phrases should not be vague and ambiguous to McKesson. Finally, RFA No. 12 does not ask for a claim construction. It merely asks what is disclosed in the '164 patent. McKesson should be able to admit or deny RFA No. 12

* * *

We look forward to McKesson's prompt supplementation to the foregoing discovery requests. In the interim, please do not hesitate to contact me if you have any questions.

Very truly yours,

T. Kevin Roosevelt

TKR/map
30367538_1.DOC

# EXHIBIT 8

# GIBSON, DUNN & CRUTCHER LLP

### LAWYERS

A REGISTERED LIMITED LIABILITY PARTNERSHIP
INCLUDING PROFESSIONAL CORPORATIONS

4 Park Plaza  Irvine, California 92614-8557
(949) 451-3800
www.gibsondunn.com

kroosevelt@gibsondunn.com

June 2, 2005

Client No.
T 92654-00006

Direct Dial
(949) 451-3932
Fax No.
(949) 475-4744

## VIA FACSIMILE AND U.S. MAIL

David W. Hansen, Esq.
Skadden, Arps, Slate, Meagher & Flom LLP
525 University Avenue, Suite 1100
Palo Alto, California 94301

Re:  *McKesson Information Solutions, LLC v. The TriZetto Group, Inc.*

Dear David:

On April 11, 2005, we sent your firm a meet-and-confer letter concerning McKesson Information Solutions, LLC's ("McKesson") responses to the First Set of Interrogatories (the "Interrogatories") and the First Set of Requests for Admissions (the "RFAs") propounded by The TriZetto Group, Inc. ("TriZetto") in the above-captioned matter. The letter also addressed McKesson's supplemental response to the Interrogatories and the communications your firm had with TriZetto's former counsel concerning the responses. As noted in the letter, many of McKesson's responses, including its supplemental response to the Interrogatories, are patently inadequate.

We have yet to receive a response to our April 11, 2005 meet-and-confer letter. Accordingly, we are again requesting that you supplement the responses in order to eliminate as many of our disputes as possible regarding the following issues.

## The Interrogatories

### A.  Response to Interrogatory No. 2

This Interrogatory asks McKesson to identify the patent claims it is asserting, the TriZetto products it is accusing of infringement and to provide a claim construction for the asserted patent claims and then apply that claim construction to the accused products. Pursuant

LOS ANGELES  NEW YORK  WASHINGTON, D.C.  SAN FRANCISCO  PALO ALTO
LONDON  PARIS  MUNICH  ORANGE COUNTY  CENTURY CITY  DALLAS  DENVER

GIBSON, DUNN & CRUTCHER LLP

David W. Hansen, Esq.
June 2, 2005
Page 2

to Court order, McKesson served a supplemental response to the Interrogatory No. 2 on April 20, 2005. McKesson's supplemental response relates solely to TriZetto's Facets product. TriZetto has subsequently identified two additional products – Claimfacts and Quicklink – that are capable of, or include a component capable of, performing clinical editing or auditing of medical payment claims.

Therefore, we request that you supplement McKesson's response to this Interrogatory by stating whether Facets is the only product that you allege to be infringing the '164 Patent. If it is not, specify which other TriZetto products you believe are infringing. For each product that you do identify, please provide a preliminary claim chart containing at least as much detail as you did in your April 20, 2005 supplemental response concerning TriZetto's Facets product.

The Interrogatory also asks McKesson to state whether it is asserting literal infringement or infringement under the doctrine of equivalents. We therefore further request that you supplement your response to the Interrogatory No. 2 by stating for each product whether McKesson is asserting literal infringement or infringement under the doctrine of equivalents.

**B.    Interrogatories Nos. 3 and 4**

These Interrogatories ask McKesson to set forth detailed information regarding the alleged conception and reduction to practice of the claimed invention. McKesson simply responds by stating that the dates of conception and reduction to practice are September 30, 1988, as a matter of law, based on the filing of patent application number 252,307 on that date. In your firm's letter to TriZetto's prior counsel dated February 18, 2005, you refuse to provide a full and complete response to these Interrogatories or confirm that McKesson will rely upon the September 30, 1998 filing date as the earliest date of alleged conception and reduction to practice for the claimed invention. Your refusal to provide a supplemental response is based entirely on the assertion that TriZetto has not identified any alleged prior art that it is relying upon in connection with its defenses.

Your assertion at the time that TriZetto had not identified any prior art was incorrect. And that assertion is most certainly incorrect now given TriZetto's supplemental responses to McKesson's interrogatories. Regardless, McKesson is required to provide a full and complete response to these Interrogatories. *Lamoureux v. Genesis Pharmacy Services, Inc.*, 226 F.R.D. 154 (D. Conn. 2004) is on point. There, the defendant sought to compel a response to an interrogatory that asked the plaintiff to "state the earliest dates upon which each invention claimed in the patent-in-suit is contended . . . to have been conceived and reduced to practice, and identify all facts, documents and witnesses which support each such date." *Id.* at 157 As you do in your February 18, 2005 letter, the plaintiff objected to the interrogatory as irrelevant based on the assertion that "defendant has not made known its defenses, if any, based upon prior art, nor has defendant identified any alleged prior art it is relying upon in connection with those

# GIBSON, DUNN & CRUTCHER LLP

David W. Hansen, Esq.
June 2, 2005
Page 3

defenses." *Id.* The court chastised the plaintiff for his argument and ordered the plaintiff to provide a full and complete response:

> The dates in question – when the plaintiffs conceived and reduced to practice the invention claimed with regard to the '760 Patent – are incontrovertibly relevant to defenses and counterclaims based upon statutes which turn almost exclusively on such dates. *Frankly, the court is surprised that the plaintiffs would attempt to assert otherwise.* While not without their limits, requests for information are afforded a broad and liberal construction. [citation]. To hold that the information sought by Interrogatory No. 1 is irrelevant to the defendant's defenses and/or counterclaims would go beyond even a narrow and conservative construction. The court finds that the information is patently relevant.

*Id.* at 160 (emphasis added).

Based on this authority, TriZetto requests that McKesson provide full and complete responses to Interrogatories Nos. 3 and 4 without objections. In doing so, please take note that the Interrogatories request the following information:

- The date each claimed invention was first conceived and/or reduced to practice (either actually or constructively);

- The names of all persons who participated in the conception and/or reduction to practice of the claimed invention;

- The contribution made by each person who participated in the conception and/or reduction to practice of the claimed invention;

- The identity of any documents that relate to the conception and/or reduction to practice of the claimed invention; and

- A detailed description of the circumstances surrounding the first reduction to practice (either actual or constructive) of each claimed invention.

This information should include details concerning how the named inventors, as well as Peggy Saal, Clifford Alper, Denise Konicek, Richard Adler and Lenore Tracey, contributed to the development and reduction to practice of the subject matter of the '164 Patent. *See* McKesson's March 18, 2005 Supplemental Response to Interrogatory No. 16. It should also include the identities of the individuals who wrote the software code that is contained in the '164 Patent. In addition, as requested by the Interrogatories, please state whether the individuals identified are current McKesson employees, and if they are not, provide last known contact information.

# GIBSON, DUNN & CRUTCHER LLP

David W. Hansen, Esq.
June 2, 2005
Page 4

### C.  Interrogatory No. 5

This Interrogatory seeks information regarding the earliest date, and the circumstances surrounding, McKesson's discovery or awareness of any TriZetto product or system alleged to infringe the '164 Patent. In your firm's letter to TriZetto's former counsel dated February 18, 2005, you refuse to provide a full and complete response to this Interrogatory on the grounds that it seeks irrelevant information and/or information protected by the attorney client privilege.

Contrary to your assertion, "the dates upon which [McKesson] first believed, determined or concluded that each claim had been infringed" is "relevant to the subject matter involved in the pending action." *See Chubb Integrated Sys. Ltd. v. National Bank of Washington*, 103 F.R.D. 52, 61 (D.C. 1984). For example, such information "is central to the defense of laches proffered by [TriZetto]." *Id.*

Therefore, TriZetto demands that McKesson provide a full and complete response to Interrogatory No. 5. In doing so, please take note that the Interrogatory requests the following information:

- The date upon which McKesson (or its predecessor-in-interest) first became aware of TriZetto's product(s);

- The date upon which McKesson (or its predecessor-in-interest) first became aware that such product(s) allegedly infringed the '164 Patent;

- The names of all persons who discovered that TriZetto's product(s) allegedly infringed the '164 Patent; and

- A description of the circumstances surrounding McKesson's (or its predecessor-in-interest's) discovery that TriZetto's product(s) allegedly infringed the '164 Patent.

### D.  Interrogatory No. 6

This Interrogatory seeks information regarding any disclosures or public uses, sales, offers for sale or publication of the subject matter of the '164 patent prior to the date of filing. McKesson's supplemental response consists of a brief list of entities to whom the subject matter of the '164 Patent was disclosed, the names of the persons who made the disclosure and the dates of disclosure. For each, McKesson states that "non-privileged documents within McKesson's possession, custody, or control relating to this [demonstration/system/offer] have been or will be produced.

As you state in your May 27, 2005 letter to Jeffrey T. Thomas, "[t]o the extent that [McKesson] chooses to rely on documents produced in this case in connection with the . . . responses [to interrogatories], the documents must be clearly and specifically identified. *See*

# GIBSON, DUNN & CRUTCHER LLP

David W. Hansen, Esq.
June 2, 2005
Page 5

Fed. R. Civ. P., Rule 33(d). Moreover, a response consisting . . . of the identification of documents is only appropriate if 'the burden of deriving or ascertaining the answer [to the interrogatory] is substantially the same for' [TriZetto] as for [McKesson].'' Given your statements, we expect that McKesson will supplement its response to this Interrogatory by clearly and specifically identifying the documents McKesson is referring to in its response.

## E.    Interrogatories Nos. 7 and 8

As you acknowledge in your letter to TriZetto's former counsel dated February 18, 2005, Interrogatory No. 7 requests detailed information about any product or system sold or licensed by McKesson, its predecessors and/or licensees, which embody, practice or use any invention claimed in the '164 patent. Interrogatory No. 8 asks McKesson to identify the persons most knowledgeable about each product identified in response to Interrogatory No. 7.

McKesson's supplemental response to Interrogatory No. 7 states that "McKesson has made and licensed CodeReview and ClaimCheck. Value Health Sciences, Inc. has developed and marketed Medical Review System. Solucient, LLC has developed and licensed Auto-Audit and Auto-Query." In addition to the name of the products, however, the Interrogatory asks McKesson to identify the "specific claim(s) of the '164 Patent that are embodied, practiced, or used in or by each such product or system . . ." Please provide a supplemental response to Interrogatory No. 7 that includes this information.

McKesson's supplemental response to Interrogatory No. 8 states that "CodeReview was first installed at Caterpillar, Inc. in Peoria, Illinois on June 8, 1988. ClaimCheck was first shipped on a pilot basis in June 1989. Value Health Sciences, Inc. developed and marketed Medical Review System on or before October 21, 1994. Solucient, LLC first marketed Auto-Audit and Auto-Query on or before July 1, 2002." In addition to this information, however, the Interrogatory asks McKesson to identify the persons most knowledgeable about each product or system. Please provide a supplemental response to Interrogatory No. 8 that includes this information.

## F.    Interrogatory No. 11

This interrogatory asks McKesson to provide a detailed description of any investigation or analysis as to why it believes TriZetto has infringed the '164 patent and asks McKesson to identify all persons involved in any such efforts and details regarding their efforts and conclusions. McKesson objects on attorney-client privilege grounds and simply states that "McKesson sent TriZetto a copy of the '164 patent on October 9, 2001 and engaged in licensing negotiations with TriZetto." If these are the *only* actions that McKesson took to investigate or analyze whether TriZetto has infringed the '164 patent, other than at the behest of counsel, please confirm in a verified supplemental response. Otherwise, we request that you supplement McKesson's response to Interrogatory No. 11.

GIBSON, DUNN & CRUTCHER LLP

David W. Hansen, Esq.
June 2, 2005
Page 6

### G.  Interrogatory No. 12

This Interrogatory asks for an identification and description of all secondary considerations or objective evidence that McKesson contends supports the alleged nonobviousness of the '164 patent. McKesson refuses to respond to this Interrogatory until "TriZetto provides evidence establishing a prima facie case of obviousness of the claims of the '164 patent."

McKesson's position that TriZetto is required to establish a prima facie case of obviousness before McKesson is required to respond to this Interrogatory is untenable. *See Edward Lowe Industries, Inc. v. Oil-Dri Corp. of America*, 1995 WL 399712 at * 3 (N.D. Ill. July 7, 1995) (rejecting the argument that a patentee does not need to provide responses to discovery seeking evidence of "secondary considerations" including need, commercial success, and other attempts to solve the problem addressed by the patent until the alleged infringer makes a *prima facie* showing of invalidity). Accordingly, TriZetto requests that McKesson provide a full and complete response to Interrogatory No. 12.

### The Requests for Admissions

### A.  RFA No. 6

RFA No. 6 asks McKesson to "admit that HPR's software produce CodeReview embodied all of the claim limitations of the independent claims of the '164 patent." McKesson refuses to provide a response based on several objections. All of McKesson's objections are without merit.

First, the RFA obviously contains a typo: "produce" should be "product." Second, we find it hard to believe that McKesson does not understand the phrase "embodied all of the claim limitations." Finally, RFA No. 6 does not ask McKesson to provide a claim construction. McKesson must have had some construction of the '164 patent in mind when it filed a complaint alleging that TriZetto infringed the patent. Therefore, McKesson should be able to admit or deny whether CodeReview practices the claims of the '164 patent.

### B.  RFA No. 12

RFA No. 12 asks McKesson to "admit that, apart from the examples provided therein, there is no disclosure in the '164 patent of the structure of the knowledge base or of medical service codes and the relationship among the codes contained therein." McKesson refuses to provide a response based on several objections. Again, all of McKesson's objections are without merit.

First, we find it hard to believe that McKesson does not understand the word "examples." That word refers to the "examples" listed in the '164 patent. If you need more specification,

# GIBSON, DUNN & CRUTCHER LLP

David W. Hansen, Esq.
June 2, 2005
Page 7

please refer to columns 11 through 46 of the patent. Second, the phrases "structure of the knowledge base" and "structure . . . of medical service codes and the relationships among the codes" are contained in the claims of the '164 patent. Therefore, those phrases should not be vague and ambiguous to McKesson. Finally, RFA No. 12 does not ask for a claim construction. It merely asks what is disclosed in the '164 patent. McKesson should be able to admit or deny RFA No. 12.

* * *

We look forward to McKesson's prompt supplementation to the foregoing discovery requests. In the interim, please do not hesitate to contact me if you have any questions.

Very truly yours,

T. Kevin Roosevelt

TKR/map
30370877_1.DOC

# EXHIBIT 9

1              UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF DELAWARE

3

4

MCKESSON INFORMATION           )

5    SOLUTIONS,                      )
                                     )

6          Plaintiff,               )
                                     )

7    vs.                            )    No. 04-1258 SLR
                                     )

8    THE TRIZETTO GROUP,            )
                                     )

9          Defendant.              )

10

11

12

                    DEPOSITION OF

13

              DAVID A. WILSON, Ph.D.

14

              PALO ALTO, CALIFORNIA

15

          Wednesday, November 23, 2005

16

17

18

19

20

21

22

23

24   REPORTED BY:  JANE H. STULLER, CSR NO. 7223

25   (211471)

                         1

DAVID A. WILSON, Ph.D.

BARKLEY
Court Reporters

1    is that a fair characterization?

2         A.  Well, there were a number of issues I had.

3    I didn't see evidence that it did the multi

4    procedure, multiple procedure code detection of

5    unbundling or up coding or fragmentation.  Also, the

6    documentation we had that described all the edits

7    was marked HDI proprietary, which means there is no

8    evidence it was actually even public knowledge at

9    the time.

10        And I don't have any evidence that the

11   marketing literature describes the product they were

12   actually shipping.  So we were actually quite short

13   of solid evidence about it at all.

14        MR. SITZMAN:  Okay.  I'll mark this as DW

15   6.    (Whereupon, Plaintiff's Exhibit 6

16        was marked for identification.)

17   BY MR. SITZMAN:

18        Q.  I had the court reporter mark --

19        A.  Vendor comparison.

20        Q.  I had the court reporter mark, as Exhibit

21   DW -- I'm sorry, 6, 8?

22        A.  Six.

23        Q.  Sorry.  A vendor comparison sheet that is

24   dated January 18, '88.  And it is marked as McKesson

25   155748.

                         241

              DAVID A. WILSON, Ph.D.

BARKLEY
Court Reporters

1

2

3

4          I, David A. Wilson, Ph.D.  do hereby

5    declare under penalty of perjury that I have read

6    the foregoing transcript; that I have made any

7    corrections as appear noted, in ink, initialed by

8    me; that my testimony as contained herein, as

9    corrected, is true and correct.

10

11   EXECUTED this _13_ day of _December_, 2005, at

12   _Palo Alto_____, _CA_____

              (City)              (State)

13

14

         _David A. Wilson_____

15       David A. Wilson, Ph.D.

16

17

18

19

20

21

22

23

24

25

                        294

BARKLEY
Court Reporters