## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| MCKESSON INFORMATION SOLUTIONS LLC, | |
| Plaintiff, | |
| v. | C.A. No. 04-1258 (SLR) |
| THE TRIZETTO GROUP, INC., | **REDACTED VERSION** |
| Defendant. | |

## REPLY BRIEF IN SUPPORT OF THE TRIZETTO GROUP INC.'S
## MOTION FOR SUMMARY JUDGMENT OF INVALIDITY
## BASED ON THE ON-SALE BAR (35 U.S.C. § 102(b))

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Jack B. Blumenfeld (# 1014)
Rodger D. Smith II (# 3778)
1201 N. Market Street
Wilmington, Delaware 19899
(302) 658-9200

Attorneys for Defendant The TriZetto Group, Inc.

OF COUNSEL:

GIBSON, DUNN & CRUTCHER LLP
Jeffrey T. Thomas
David A. Segal
Michael A. Sitzman
Jamboree Center, 4 Park Plaza
Irvine, CA 92614

Original Filing Date: June 22, 2006

Redacted Filing Date: June 28, 2006

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................................ ii

I.    INTRODUCTION ........................................................................................................ 1

II.   ARGUMENT ................................................................................................................ 2

    A.    The Evidence Demonstrates That HPI Made A Commercial Offer For
        Sale Of The Patented Invention To Aetna Before The Critical Date ................... 2

        1.    The July 1987 Proposal And The "Set Of Interactions"
            Between Aetna And HPI Establish HPI's Intent To Be Bound ................ 3

        2.    The "Set of Interactions" Between HPI And Aetna Following
            The July 1987 Proposal Further Establish That A Commercial
            Offer To Sell The Patented Invention Was Made Prior To The
            Critical Date ............................................................................................. 9

    B.    The Evidence Demonstrates That The '164 Invention Was Ready For
        Patenting Before The Critical Date ..................................................................... 13

        1.    Prior To The Critical Date, The Inventors Described The
            Invention In Sufficiently Specific Detail To Enable A Person
            Skilled In The Art To Practice The Invention, And Claims 1
            And 2 In Particular .................................................................................. 13

        2.    Additionally, The Patented Invention Appears To Have Been
            Reduced To Practice Before The Critical Date ....................................... 16

III.  CONCLUSION ........................................................................................................... 18

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Barmag Barmer Masch. AG v. Murata Mach., Ltd.,*
   731 F.2d 831 (Fed. Cir. 1984) ......................................................................... 12

*Group One, Ltd. v. Hallmark Cards, Inc.,*
   254 F.3d 1041 (Fed. Cir. 2001) ............................................................... 2, 3, 5

*Linear Technology Corporation v. Micrel, Inc.,*
   275 F.3d 1040 (Fed. Cir. 2001) ............................................................. 5, 8, 11

*MLMC, Ltd. v. Airtouch Communications, Inc.,*
   215 F. Supp. 2d 464 (D. Del. 2002)........................................................... passim

*Pechiney Rhenalu v. Alcoa Inc.,*
   224 F. Supp. 2d 773 (D. Del. 2002)....................................................... 3, 6, 12

*Pfaff v. Wells Elecs.,* 525 U.S. 55 (1998)................................................................ 6, 9

*Robotic Vision Systems v. View Eng'g,*
   249 F.3d 1307 (Fed. Cir. 2001) ........................................................ 9, 13, 16

*Scaltech, Inc. v. Retec/Tetra, L.L.C.,*
   269 F.3d 1321 (Fed. Cir. 2001) .............................................................. 6, 15

*W.L. Gore & Assoc., Inc. v. Garlock, Inc.,*
   842 F.2d 1275 (Fed. Cir. 1988) ................................................................... 14

**Statutes**

UCC § 2-204 ........................................................................................................... 6

**Other Authorities**

Corbin on Contracts (Rev. ed. 1993) .................................................................. 3, 6

Restatement (Second) of Contracts (1981) ........................................................ 2, 3

## I.    **INTRODUCTION**

It is undisputed that in July 1987 – two months before the critical date – HPI made a written proposal to Aetna to build

REDACTED                                              REDACTED

The series of interactions and communications between HPI and Aetna prior to the critical date — before and after the July 1987 proposal — firmly establish that HPI made a commercial offer to sell the patented invention to Aetna prior to the critical date. The numerous enabling disclosures made by HPI to Aetna (and others) demonstrate that the patented invention (as it has been defined by McKesson herein) was ready for patenting prior to the critical date.

For the most part, McKesson chooses to ignore the evidence, focusing instead on post-critical date evidence and a misapplication of Federal Circuit precedent. McKesson admits that: (i) Aetna did make an offer *to buy* the patented invention *before* the critical date; and (ii) HPI did make an offer *to sell* the patented invention two weeks *after* the critical date. By making such concessions, McKesson hopes that the Court will ignore the pre-critical date evidence and the entire series of interactions between HPI and Aetna for the 15 months preceding the critical date. Despite the evidence to the contrary, McKesson contends there was no offer to sell until the formal proposal containing all the final details of the project was sent to Aetna two weeks after the critical date. That is simply not true.

To avoid the pre-critical date enabling disclosures, McKesson also takes the dramatic step of arguing that Claims 1 and 2 of the '164 patent have been construed by the Court to include the decision-making rules found in Appendix B. No such construction has been made and this interpretation is completely contrary to the "any commercially available software" approach that McKesson has taken throughout these proceedings. Accordingly, TriZetto's motion for summary judgment of invalidity based on the on-sale bar should be granted.

1

## II.    ARGUMENT

### A.    The Evidence Demonstrates That HPI Made A Commercial Offer For Sale Of The Patented Invention To Aetna Before The Critical Date

In determining whether a commercial offer has been made under Section 102(b), courts generally "look to the Uniform Commercial Code ("UCC") to define whether . . . a communication or series of communications rises to the level of a commercial offer for sale." *Group One, Ltd. v. Hallmark Cards, Inc.*, 254 F.3d 1041, 1048 (Fed. Cir. 2001) (finding that the Supreme Court's formulation of a "commercial offer for sale" in *Pfaff* supports consulting the UCC, and observing that the Supreme Court has also cited the Restatement of Contracts with approval in the commercial contract law context). In analyzing the facts presented in *Group One*, the Federal Circuit cautioned:

> We do not mean to suggest that it will always be easy to ascertain whether a set of interactions between parties constitutes a commercial offer to sell. Nor do we propose to offer rules or even binding guidance for making such determinations, which offer would be little more than *obiter dicta*. We do note in passing that contract law traditionally recognizes that mere advertising and promoting of a product may be nothing more than an invitation for offers, while responding to such an invitation may itself be an offer.

*Id.* (citing the Restatement (Second) of Contracts § 26 (1981)).

The law does not require that a single document or communication contain the commercial offer that is the subject of the Section 102(b) prohibition. *See, e.g., Group One, Ltd.*, 254 F.3d at 1047-48 ("Courts are quite accustomed to and comfortable with determining whether a particular communication or **series of communications** amounts to an offer in the contract sense . . ." (emphasis added)). In determining whether such communications constitute a commercial offer, this Court has considered "the ordinary meaning of the language; the context of any prior communications between the parties; whether the communication was private or to the general public; any previous course of dealings between the parties; local usage or usage of the trade; the relative completeness of the terms (the more complete, the more likely it is an offer); the subject matter of the offer; and whether it is foreseeable that the recipient would rely upon it." *MLMC, Ltd. v. Airtouch Communications, Inc.* ("*Airtouch*"), 215 F. Supp. 2d 464, 477

2

(D. Del. 2002) (*citing* Corbin on Contracts § 2.2, at 106 (Rev. ed. 1993)); *Pechiney Rhenalu v. Alcoa Inc.*, 224 F. Supp. 2d 773, 802 (D. Del. 2002).

McKesson argues that the July 1987 proposal is not a commercial offer to sell the patented invention, but instead constitutes a proposal for a study of additional work. D.I. 410 at 13-15. McKesson's argument ignores both the language of the proposal itself and the "series of interactions" between the parties beginning back in 1986 and culminating with the internal HPI memorandum outlining the terms of a deal between HPR and Aetna.

**1.     The July 1987 Proposal And The "Set Of Interactions" Between Aetna And HPI Establish HPI's Intent To Be Bound**

"An offer is the manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it." Restatement (Second) of Contracts § 24 (1981). In order to rise to the level of a commercial offer for sale under Section 102(b), the offer must be "one which the other party could make into a binding contract by simple acceptance (assuming consideration)." *Group One,* 254 F.3d at 1048.

HPI's intention to make a commercial offer for sale to Aetna prior to the critical date is clear from the facts and circumstances here. Although McKesson disputes the significance of the underlying events, there is no dispute that each of the following took place in advance of HPI issuing the July proposal:

- In June 1986, HPI announced at a Pew Conference, where "executives and medical directors from 50 Fortune 500 employers meet semi-annually to discuss health care problems," HPI's intention to

REDACTED

REDACTED

Ex. 24 at MCK 044712;

- REDACTED

REDACTED

3

REDACTED                          REDACTED

- In late 1986 and early 1987, HPI undertook a comparison study for Aetna comparing the results of medical claims Aetna processed for its client Sun Company to those obtained when the same claims were processed using Dr. Hertenstein's manual process.

REDACTED                          REDACTED

- On July 2, 1987, representatives from HPI and Aetna met to discuss the details of the incompatible surgery project and the Sun claims study. Aetna had specific

---

[1] In its answering brief, McKesson accuses TriZetto of "clearly manufactur[ing]" "The First Step" project name as a nickname, "even though none of the documents or witnesses ever referred to the project by this name." D.I. 410 at 10 n.4. Serving only to underscore its careless handling of the relevant facts, McKesson overlooks the fact that

REDACTED                          REDACTED

4

questions that they asked HPI to address.

REDACTED                          REDACTED

Three weeks later, HPI responded with a written proposal to Aetna explaining that

REDACTED                          REDACTED

REDACTED                          REDACTED

This was not an advertisement or a promotional offer.  This was a clear manifestation by HPI of an intent to be bound to Aetna to          REDACTED

REDACTED          The July 1987 proposal constitutes a commercial offer that Aetna could have made into a binding contract by simple acceptance (*i.e.*, signing on the blank line).  *See Group One*, 254 F.3d at 1048.  This was not an unfamiliar practice between these parties. Indeed, the September 1986 incompatible surgery project contained the same acceptance signature line and the same ninety-day duration period.          REDACTED

REDACTED                          As the Federal Circuit observed, the "intent to be bound [is the] *sine qua non* of an offer." *Linear Technology Corporation v. Micrel, Inc.*, 275 F.3d 1040, 1051 (Fed. Cir. 2001) (concluding that preliminary product data sheets do not reveal the requisite intent to be bound).  The statements made by HPI in the July 1987 proposal inviting "acceptance" by Aetna unequivocally demonstrate HPI's intent to be bound.

5

The July 1987 proposal contains focused, targeted and definite contracting terms.

REDACTED                              REDACTED

, *See*

*Airtouch*, 215 F. Supp. 2d at 477; *Pechiney*, 224 F. Supp. 2d at 802 (finding no commercial offer because the letter and proposal "do not contain sufficient specific terms (quantity, time and place of delivery) to warrant consideration as commercial offers for sale"). These sufficiently definite terms create an enforceable contract upon acceptance under the UCC. *See* UCC § 2-204; Corbin on Contracts § 2.5, at 125 (Rev. ed. 1993) ("Of course, if it contains language of commitment and detailed terms, it is an offer."). The fact that Aetna did not sign on the acceptance line and decided instead to negotiate further with HPI for a more expansive implementation (*see infra*, Secn. II.A.2) does not alter the undisputable fact that HPI made a valid and enforceable commercial offer to Aetna. *Scaltech, Inc. v. Retec/Tetra, L.L.C.*, 269 F.3d 1321, 1328 (Fed. Cir. 2001) ("An offer for sale does not have to be accepted to implicate the on-sale bar." (citing *UMC Elecs. Co. v. United States*, 816 F.2d 647 (Fed. Cir. 1987) (overruled on other grounds by *Pfaff v. Wells Elecs.*, 525 U.S. 55 (1998))).

While it is certainly true that the July 1987 proposal included a further manual review of Sun/Aetna claims, it also included HPI's agreement to develop clinical editing software that would replicate the manual process. After all, HPI was trying to start a software company and was looking for funding for that company. The '164 patent inventors testified that HPI was seeking immediate funds to develop the patented software.

REDACTED                              REDACTED

6

REDACTED                            REDACTED

*. See Airtouch,*
215 F. Supp. 2d at 480 (testimony from other parties to the negotiations is relevant, in the absence of testimony from recipient, to determine whether budgetary quotations should be viewed as commercial offers). Thus, from the language of the proposal itself and the clear intention of the offeror, there can be no doubt that the July 1987 proposal was an offer to develop the software.

When the reality of the situation here is considered, McKesson's position becomes puzzling. It claims the early Health Bills project is irrelevant because it involved the idea of creating a company that would manually review claims, which was abandoned in favor of a software company before HPI had its negotiations with Aetna. *See* D.I. 410 at 3-5. It is certainly true that in the second half of 1987 HPI planned to start a software company and was looking for funding, including from Aetna, for that company. Thus, McKesson's other contention — that the July-September 1987 discussions between HPI and Aetna did not pertain to a software deal — ignores the reality of the situation.

REDACTED

REDACTED

REDACTED                    REDACTED

In its Answering Brief, McKesson argues that the July 1987 proposal was "nothing more than a proposal to take prepatory steps toward making a subsequent offer for sale" (D.I. 410 at 15), and cites *Linear*, 275 F.3d at 1050, as support. McKesson, however, ignores the evidence cited above and mischaracterizes the holding in *Linear* by partially omitting essential language, which shows the context of the Federal Circuit's conclusion:

> [Plaintiff's] mere publication of preliminary data sheets and promotional information for the LT1070 communicates nothing to customers about plaintiff's intent, and thus cannot be an offer for sale. Such activities only indicate preparation to place the LT1070 on sale. Preparation alone cannot give rise to an on-sale bar under *Group One*.

*Linear*, 275 F.3d at 1050. In contrast to the *Linear* plaintiff, HPI clearly manifested its intent to be bound to develop REDACTED the time of the July 1987 proposal, Aetna had already seen first-hand the savings that could be achieved with Dr. Herteinstein's manual process during the Sun claims study. To suggest, as McKesson does, that the July 1987 proposal was nothing more than a proposal to conduct another manual audit, completely ignores the language of the proposal itself, the "set of interactions" between the parties that resulted in the July 1987 proposal and the testimony from the '164 patent inventors.

McKesson does acknowledge that Aetna was invited to accept HPI's July 1987 proposal. McKesson argues, however, that acceptance would not have obligated HPI to sell software to Aetna, because no software existed at that time. D.I. 410 at 15. But that argument is contrary to

8

the Federal Circuit's decision in *Robotic Vision Systems v. View Eng'g*, 249 F.3d 1307, 1312 n.2 (Fed. Cir. 2001), holding that actual completion of the patented software is not required under the holding in *Pfaff*. And although *Robotic Systems* is a "ready for patenting" case, it would be a perverse interpretation of Federal Circuit precedent to conclude that the existence of actual software is somehow required to satisfy the commercial offer prong of *Pfaff*, but not the ready for patenting prong. Completion of the patented software is not required by *Pfaff*, *Robotic Systems* or any of their progeny to establish that a commercial offer for sale has been made.

Furthermore, McKesson's interpretation of the invention herein shows that the actual software need not have existed for the invention to have been offered for sale. Since the invention is merely the general idea of using any kind of software to check for the accuracy of codes on medical claims, an offer to develop software that can perform that function is an offer to sell the invention.

Thus, the set of interactions between HPI and Aetna culminating in the July 1987 proposal, makes clear HPI's intent to be bound to

REDACTED                    REDACTED

**2.    The "Set of Interactions" Between HPI And Aetna Following The July 1987 Proposal Further Establish That A Commercial Offer To Sell The Patented Invention Was Made Prior To The Critical Date**

In the ninety-day period following the July 1987 proposal, Aetna and HPI engaged in further discussions and negotiations concerning the scope, price and timing of the project. In an internal memorandum dated September 14, 1987, two weeks before the critical date, Dr. Holloway outlined the terms of a                    REDACTED

In the memo, Dr. Holloway describes the state of product development as follows:

REDACTED                    REDACTED

9

REDACTED                              REDACTED

The September memo establishes several undeniable and critical facts.  First, there can be no doubt that between the July 1987 proposal and September 14, 1987, a commercial offer to sell Medreview, or software to accomplish the tasks of Medreview, had been made to Aetna.  The July 1987 proposal contains at least a reference to this offer, which, by September 14, 1987, had developed into a detailed proposal to Aetna.

Second, the detailed discussions concerning the July 1987 proposal and the Medreview product, which are reflected in the September memo, demonstrate that that this was not a mere advertisement or blanket offering of a product.  These were detailed discussions concerning, *inter alia,* the integration of Medreview software into Aetna's current claims processing system, the restrictions that would be imposed on the proprietary knowledge base and expert system, and the various pricing options.  Clearly the context of these discussions between the parties, the previous course of dealings between them, and the relative completeness of the terms and considerations evidences that a commercial offer that Aetna would rely on was made.  *See Airtouch,* 215 F. Supp. 2d at 477.  This is further demonstrated by the fact that

REDACTED                              REDACTED

10

McKesson relies on *Linear*, 275 F.3d at 1050, to argue that HPI's actions do not constitute a commercial offer for sale. D.I. 410 at 15-18. McKesson's reliance is completely misplaced.   In *Linear*, the plaintiff published preliminary data sheets and promotional information on the patented product in the form of advertisements extolling the virtues of the patented product in a newsletter that was distributed generally, without addressing specific recipients, to domestic sales representatives and some international distributors. *Linear*, 275 F.3d at 1049-51.   Unlike *Linear*, HPI's series of communications with Aetna were always targeted and directed specifically to Aetna, and HPI's early proposals to Aetna contained terms far more specific than "mere publication of preliminary data sheets and promotional information."   **REDACTED**              Unlike the case in *Linear*, HPI had the specific intent to raise money from Aetna by providing it with the software while the plaintiff in *Linear* had no specific intent to sell to a particular customer by way of its simple newsletter article praising the product.   *See Linear*, 275 F.3d at 1050 (mere publication of data sheets and promotional information "communicates nothing to customers about [plaintiff's] intent, and thus cannot be an offer for sale").   In *Linear*, all the evidence that was found insufficient to show a commercial offer for sale of the patented invention was general promotional materials. *See id.* at 1049-52.   Here, in contrast, HPI's negotiations and discussions with Aetna were far more concrete.

Third, Aetna had not made an unsolicited offer to buy Medreview unconnected to an offer to sell as McKesson suggests in its Answering Brief. D.I. 410 at 18. From the discussion contained in the September memo, it is clear that Aetna's proposed offer to buy Medreview was in response to negotiations and discussions between HPI and Aetna that began with the initial commercial offer in July.   McKesson contends that Aetna's offer to buy does not constitute an offer to sell.   D.I. 410 at 18 (citing *Linear* that "such offers to buy **standing by themselves** are not proof of a previous offer to sell." 275 F.3d at 1050 (emphasis added)).   Although an offer to buy standing alone may not constitute evidence of a prior offer to sell, *Linear* does not hold that an offer to buy **in response to** an offer to sell is not evidence that a commercial offer to sell

11

under Section 102(b) has been made. Indeed, a later offer to purchase may confirm that earlier activity between the parties did in fact constitute an offer to sell. *See Barmag Barmer Masch. AG v. Murata Mach., Ltd.*, 731 F.2d 831 (Fed. Cir. 1984) (affirming summary judgment of on-sale bar based on third party's later offer to purchase patented machine). Although McKesson admits that the proposal by Aetna was an offer to buy the patented invention, it ignores the evidence that precipitated the offer to buy.

Finally, the completeness of the September memo and its discussion of all the constituent parts of a    REDACTED         REDACTED         further demonstrate HPI's intent and willingness to enter into a binding agreement with Aetna to sell the patented invention.

(a knowle\      REDACTED                                  REDACTED

described i\                        *Compare*              · *with* D.I. 369, Ex. 1, Col. 4:23-25; Fig. 1 (Figure 1 diagrams "a preferred embodiment of the present invention," comprising a "Knowledge Base; Knowledge Base Interpreter; and User Interface Computer System"). McKesson argues that the September memo should be disregarded because it is only an HPI "internal memo." That makes no sense. What better evidence that an offer to sell had been made than a written statement by the offeror that an offer had been made and a response received? That memo is an admission by HPI itself that an offer had been made.

The whole series of communications between HPI and Aetna regarding the claims auditing project (detailed above), including the July 1987 meeting and proposal and the further communications leading up to the September memo, demonstrates both the context of the prior communications and the extensive course of dealings between HPI and Aetna. *Airtouch*, 215 F. Supp. 2d at 477; *Pechiney*, 224 F. Supp. 2d at 802.[2]

---

[2] McKesson takes issue with TriZetto's citation of two cases premised on the old *RCA* standard for commercial offer. D.I. 410 at 16. McKesson ignores, however, TriZetto's discussion of *Group One* and its progeny or the limited purpose for which the pre-*Group One*

[Footnote continued on next page]

In an attempt to distinguish HPI's pre-critical date interactions with Aetna, McKesson argues that HPI's "follow-on" proposal two weeks after the critical date (October 14, 1987) did in fact constitute a commercial offer to sell the patented invention Medreview.  D.I. 410 at 9-10. But there is nothing contained in the "follow-on" proposal concerning Medreview that is in any way different than that set forth in the September memo outlining the terms of a deal with Aetna. Based on the completeness of the September memo and the entire series of interactions between the parties, it is clear that a commercial offer for sale had been made by HPI to Aetna prior to the critical date.

**B.    The Evidence Demonstrates That The '164 Invention Was Ready For Patenting Before The Critical Date**

    **1.    Prior To The Critical Date, The Inventors Described The Invention In Sufficiently Specific Detail To Enable A Person Skilled In The Art To Practice The Invention, And Claims 1 And 2 In Particular**

Contrary to the position taken by McKesson throughout its Answering Brief, the existence of the actual software product is not required to qualify as an on-sale bar.  A prior commercial offer for sale and a subsequent enabling disclosure that demonstrated that the invention was ready for patenting prior to the critical date is sufficient.  *Robotic Systems*, 249 F.3d at 1313.  "[W]hether or not the software needed to implement the claimed method existed at the time of the disclosure is irrelevant, provided that the disclosure of the invention was made prior to the critical date and was sufficiently specific to enable a person skilled in the art to practice the invention."  *Id.*  Without citing to or distinguishing *Robotic Systems*, McKesson simply argues that none of its pre-critical date disclosures were enabling.  This is because, according to McKesson, none of the pre-critical date disclosures taught "how to construct a system with the decision-making rules of the type found in Appendix B of the patent, [] which the Court construed to be part of the infringed claims."  D.I. 410 at 24.  Desperate to avoid an on-

---

[Footnote continued from previous page]
    cases were cited.  D.I. 368 at 23, *citing Group One*, 254 F. 3d at 1048 (first sentence of section).

sale bar, McKesson is attempting to rewrite history and ignore its prior claim construction positions in this case

Prior to the April infringement trial, McKesson argued that the '164 patent was not limited by anything in the patent specification, including the metarules of Appendix B. *See, e.g.,* D.I. 170. As a result, the Court's claim construction did not incorporate the Appendix B metarules or any other limitations into Claims 1 and 2. D.I. 307. At the infringement trial, McKesson successfully argued that Claims 1 and 2 were not limited to any specific software or algorithm or any specific structure or content of the "predetermined database." *See* D.I. 369, Ex. 2 at 487:25-489:7; 1202:14-25; 1228:21-1229:2. McKesson took this position because it knew it could not prove the Appendix B metarules are present in the TriZetto systems. It is beyond disingenuous for McKesson to now claim "the Court construed [Appendix B] to be part of the infringed claims." *See* D.I. 410 at 24.

McKesson cannot argue one claim interpretation for infringement and another for invalidity. The law requires a consistent claim construction for purposes of infringement and invalidity. *W.L. Gore & Assoc., Inc. v. Garlock, Inc.,* 842 F.2d 1275, 1279 (Fed. Cir. 1988) ("Having construed the claims one way for determining their invalidity, it is axiomatic that the claims must be construed in the same way for infringement."). McKesson's attempt to twist the claim interpretation here serves only to show it has no valid argument, in light of the law and the procedural facts of this case, including the Court's own orders.[3] McKesson's attempt to save

---

[3] McKesson addresses the entire issue of the interpretation of Claims 1 and 2 by attempting to summarily dismiss the "axiomatic requirements," and does so only in a footnote: "Although not relevant to its on-sale bar motion, as with its other motions TriZetto misrepresents the scope of claims 1 and 2 of the '164 patent by among other things attempting to read out the 'predetermined database' claim element." D.I. 410 at 2 n.2. As discussed above, TriZetto does no such thing, and it is in fact McKesson that is now (having obtained its infringement verdict) trying to read additional limitations – including the Appendix B rules – into the claims. As a matter of black-letter law, this is not allowed. *W.L. Gore,* 842 F.2d at 1279.

14

itself from the admissions of its expert, Dr. Musen, by rewriting the claims to include the Appendix B limitations should not be permitted.

The relevant testimony from Dr. Musen on this point admits that anyone skilled in the art in 1987 could carry out the simple functions of Claims 1 and 2. D.I. 369, Ex. 22 at 141:22-142:2 ("Q. I think you also testified this morning that a person of ordinary skill in the art, looking at that functionality, would need nothing more because they could write the software program to carry out that functionality. A. That's correct."); 147:22-148:10. Furthermore, Dr Musen admits that the Pew Conference presentation reflects the invention of the '164 patent. *Id.* at 174:19-25. Dr. Musen also admits that the Egdahl/Hertenstein article discloses all of the steps of the '164 patent except for the computer automation. *Id.* at 261:21-262:4. And Dr. Musen admits that it would have been obvious to a person of ordinary skill in the art to write a software program to address the CPT coding example presented in the article. *Id.* at 141:22-142:2; 147:22-148:10; 245:20-246:6. If McKesson had acknowledged that some structure is tied to Claims 1 and 2, and that structure did not exist when the offer to sell was made, the invention may not have been ready for patenting. However, that is not the case. Claims 1 and 2 are not limited by any structure; they merely describe the general idea of using automation, including any software and a set of relationships, to perform the general functions of the claims. Thus, under McKesson's claim construction, once the inventors had that general idea, the "invention" was ready for patenting. Clearly, the inventors had that idea before the discussions with Aetna beginning in July 1987.[4]

McKesson also ignores the content of the disclosures made to Aetna in connection with the incompatible screen project and the Sun claims review. Set forth in the resulting reports to

---

[4] The law does not require that an inventor have a "high level of certainty" regarding the success of his inventions. Indeed, there is no requirement that the patentee must have recognized the significance of his inventions and claim limitations. *See, e.g., Scaltech Inc. v. Retec/Tetra L.L.C.*, 269 F.3d 1321, 1326 (Fed. Cir. 2001).

Aetna were

REDACTED                    REDACTED

*see also* D.I. 368 at 13, 15.  As confirmed by Dr. Musen, the tools necessary to build into software (any "commercially available software") were available and publicly known in 1987. D.I. 369, Ex. 22 at 186:14-187:1.  Thus, based on the disclosures made by HPI and the admissions of McKesson's own infringement and validity expert, there can be no doubt that the disclosures of Claims 1 and 2 were "sufficiently specific to enable a person skilled in the art to write the necessary source code to implement the claimed method." *Robotic Systems*, 249 F.3d at 1312 n.2.

**2.    Additionally, The Patented Invention Appears To Have Been Reduced To Practice Before The Critical Date**

In its Answering Brief, McKesson argues that the inventors confirmed that there was no software product or prototype before the critical date. D.I. 410 at 21.  As support, McKesson cites to the deposition testimony of Dr. Hertenstein and Kelli Dugan that the prototype software shown to *Caterpillar* did not exist until sometime after the critical date. *Id.* McKesson ignores, however, the deposition testimony of Dr. Hertenstein

REDACTED                    REDACTED

REDACTED                          REDACTED

REDACTED                          REDACTED

Medreview, which was later renamed CodeReview due to trademark restrictions, was the software product claimed in the '164 patent. *See* D.I. 368 at 10 n.1.

McKesson ignores this evidence and argues instead that the Court should look beyond the pre-critical date evidence to the proposal HPR delivered to Aetna two weeks after the critical date to infer that the software had not yet been reduced to practice.  D.I. 410 at 21.  Such an inference would be improper, however, in light of the September memo

REDACTED

REDACTED                          It is not surprising that a follow-on proposal to modify Medreview was issued subsequent to the critical date.  But that does not eliminate the undisputed facts and evidence that the patented invention was reduced to practice before the critical date.

17

### III.     CONCLUSION

For the reasons set forth herein and in TriZetto's Opening Brief, summary judgment of invalidity based on the on-sale bar of Section 102(b) should be granted as to Claims 1 and 2 of the '164 patent.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Rodger D. Smith II*

Jack B. Blumenfeld (# 1014)
Rodger D. Smith II (# 3778)
1201 N. Market Street
Wilmington, Delaware 19899
(302) 658-9200
Attorneys for Defendant
The TriZetto Group, Inc.

OF COUNSEL:

GIBSON, DUNN & CRUTCHER LLP
Jeffrey T. Thomas
David A. Segal
Michael A. Sitzman
Jamboree Center, 4 Park Plaza
Irvine, CA  92614

June 22, 2006
526080

18

### CERTIFICATE OF SERVICE

The undersigned hereby certifies that on June 28, 2006, I caused a copy of the foregoing to be electronically filed with the Clerk of the Court using CM/ECF, which will send notification of such filing(s) to the following:

Michael A. Barlow
Skadden, Arps, Slate, Meagher & Flom LLP

I also certify that copies were caused to be served on June 28, 2006, upon the following in the manner indicated:

### BY EMAIL AND HAND

Michael A. Barlow
Skadden, Arps, Slate, Meagher & Flom LLP
One Rodney Square
Wilmington, DE  19801

### BY EMAIL AND FEDERAL EXPRESS

Jeffrey G. Randall
Skadden, Arps, Slate, Meagher & Flom LLP
525 University Avenue
Suite 1100
Palo Alto, CA  94301

*/s/    Rodger D. Smith II (#3778)*
Morris, Nichols, Arsht & Tunnell LLP
1201 N. Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
rsmith@mnat.com