IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

MCKESSON INFORMATION SOLUTIONS
LLC,

                    Plaintiff,

          v.                                              C.A. No. 04-1258 (SLR)

THE TRIZETTO GROUP, INC.,                    **REDACTED VERSION**

                    Defendant.

**THE TRIZETTO GROUP, INC.'S REPLY BRIEF IN SUPPORT OF ITS
MOTION FOR SUMMARY JUDGMENT OF INVALIDITY
<u>ON GROUNDS OF ANTICIPATION AND OBVIOUSNESS</u>**

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Jack B. Blumenfeld (# 1014)
Rodger D. Smith II (# 3778)
1201 N. Market Street
Wilmington, Delaware 19899
(302) 658-9200

Attorneys for Defendant The TriZetto Group, Inc.

OF COUNSEL:

GIBSON, DUNN & CRUTCHER LLP
Jeffrey T. Thomas
David A. Segal
Michael A. Sitzman
Jamboree Center, 4 Park Plaza
Irvine, CA  92614

Original Filing Date:  June 22, 2006

Redacted Filing Date:  June 29, 2006

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ............................................................................................ ii

I.    SUMMARY OF ARGUMENT .......................................................................... 1

II.   ARGUMENT ...................................................................................................... 4

   A.   The Metarules of Appendix B, Which McKesson Admits Are The
        "Heart Of The Invention," Are Completely Missing From Claims 1 and 2 .......... 4

   B.   The "Predetermined Database," Devoid Of Any Specific Content, Cannot
        Save The Claims From A Finding Of Invalidity ...................................... 6

        1.   The "Predetermined Database" Was Present In At Least Three
             Prior Art Systems .................................................................................. 7

        2.   The "Predetermined Database" Is Not Required To Perform The
             Methods Of Claims 1 And 2 ............................................................... 9

   C.   The Prior Art References Were Properly Disclosed, Corroborated, And
        Presented In TriZetto's Motion .............................................................. 11

        1.   Erisco's ClaimFacts .............................................................................. 11

        2.   Doyle Patent .......................................................................................... 13

        3.   GMIS's AutoCoder ............................................................................... 14

        4.   HDI's Advanced MedLogic System ("AMS") ..................................... 16

        5.   Blue Cross/Blue Shield of New Jersey's IBM 7070 System
             (the "7070 System") ............................................................................. 17

        6.   Cortron's Health Care Processing System ("HCPS") ......................... 17

        7.   Health Systems International's Clinical Data Editor ........................... 17

        8.   The Prior Art Invalidates Claims 1 And 2 Even If Some Trivial
             Element Is Missing ............................................................................... 18

   D.   Expert Opinion Is Not Required To Prove Invalidity, But TriZetto Does
        Have Substantial Expert Support ............................................................ 18

   E.   Claims 1 And 2 Are Obvious Automations Of Simple Manual Techniques ....... 20

III.  CONCLUSION ................................................................................................... 20

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Avia Group Int'l, Inc. v. L.A. Gear California, Inc.,*
    853 F.2d 1557 (Fed. Cir. 1988)..................................................................................... 18

*Butler v. Helms,*
    550 F.2d 954 (4th Cir. 1977) .......................................................................... 10, 12, 17

*Eaton Corp. v. Rockwell Int'l Corp.,*
    323 F.3d 1332 (Fed. Cir. 2003)..................................................................................... 10

*In re Bisley,*
    197 F.2d 355 (C.C.P.A. 1952) ...................................................................................... 18

*In re Harmon,*
    222 F.2d 743 (C.C.P.A. 1955) ...................................................................................... 18

*In Re Venner,*
    46 C.C.P.A. 754 (C.C.P.A. 1958) ................................................................................ 20

*Petersen Mfg. Co. v. Central Purchasing, Inc.,*
    740 F.2d 1541 (Fed. Cir. 1984)..................................................................................... 19

*Polaroid Corp. v. Eastman Kodak Co.,*
    789 F.2d 1556 (Fed. Cir. 1986)..................................................................................... 12

*Union Carbide Corp. v. American Can Corp.,*
    724 F.2d 1567 (Fed. Cir. 1984)..................................................................................... 19

*W.L. Gore & Assoc., Inc. v. Garlock, Inc.,*
    842 F.2d 1275 (Fed. Cir. 1988)....................................................................................... 5

## I.     SUMMARY OF ARGUMENT

McKesson admits that the metarules of Appendix B of the '164 patent were the "heart" of the claimed invention.  Those metarules were a distillation of Dr. Hertenstein's manual code-checking rules, the very expert knowledge on which the "invention" is based.  The patent inventors testified that the metarules were the essence of the expert system they built, the primary focus of their labor, and the sole point of novelty in the purported invention. Nonetheless, in its zeal to establish infringement, McKesson strenuously insisted during claim construction that Claims 1 and 2 were not limited by anything in the patent specification – not the Appendix B metarules, software algorithms or anything else.  The Court accepted this approach with regard to Claims 1 and 2 and did not limit those claims to any particular structure. McKesson presented its infringement case during the April 2006 trial without ever mentioning the Appendix B metarules or trying to establish their presence in the accused products.

Now, McKesson seeks to reverse position and save Claims 1 and 2 from a finding of invalidity by pointing to the alleged novelty of the Appendix B metarules.  As a matter of law, McKesson is forbidden from using a different claim construction now than the one set forth in the Court's order and used at the April 2006 trial.  McKesson must face the consequences of having stripped the patent claims of any specific structure that might have made them novel. The patent inventors admitted that the mere idea of using software to perform the simple functions of Claims 1 and 2 was not novel.  And McKesson itself argued that software for performing those functions was "commercially available" and known to those of skill in the art in the 1980s.  Having discarded the only part of Claims 1 and 2 that could even arguably have been novel, McKesson is left with two rudimentary software methods that McKesson and the inventors conceded were already known to those of skill in the art.  On this basis alone, the Court should grant summary judgment of invalidity as to Claims 1 and 2.

McKesson's only substantive effort at distinguishing the prior art is to emphasize the "predetermined database" recited in Claims 1 and 2.  Of course, the "predetermined database" is not a specific structure with particular code-checking rules and metarules, but a hollow concept

with no inventive content. The Court defined "predetermined database" as "a set of decision-making rules that incorporate a medical code classification system and expert medical clinical judgment." D.I. 307 at 3. In other words, it is *any* database containing *any* group of medical decision-making rules. McKesson cannot deny that at least three prior art systems – AMS, HCPS, and Blue Cross/Blue Shield of New Jersey's ICS System – all had a database of this kind. In fact, even a simple electronic version of the AMA's CPT Manual would be such a database.

In its opposition, McKesson argues "the claims are not devoid of meaning or any connection to the decision-making rules of Appendix B." D.I. 414 at 16. McKesson also relies on the fact that the inventors "worked for over half a year creating a model of decision-making rules." *Id.* at 5. In another recent brief, McKesson went so far as to claim "the Court construed [Appendix B] to be part of the infringed claims." D.I. 410 at 24. All of this, of course, is a clear contradiction of what has occurred herein, and shows the weakness of McKesson's reliance on the "predetermined database" element.

Moreover, in light of the new interpretations offered by McKesson at trial, the methods of Claims 1 and 2 do not require a "predetermined database." McKesson does not dispute that Claim 1, as presently interpreted, is a method for validating medical codes using *any* database – the "predetermined database" need not be checked or used at all. Likewise, there is no dispute that Claim 2, as interpreted by McKesson, is a method for eliminating duplicate codes on a claim "without reference to the predetermined database." As a matter of law, McKesson cannot rely on a structural feature that plays no part in the methods of Claims 1 and 2 to save those claims from a finding of invalidity. All seven prior art systems recited by TriZetto included the simple code validation method described in Claim 1, and at least four of the systems performed the duplicate code checking method of Claim 2.

McKesson argues that its interpretation of Claim 1 at trial was the same interpretation it used all along, but that is belied by the fact that its own expert used the *opposite* interpretation at his deposition (i.e., the predetermined database *must* be checked). Indeed, the Court itself expressed "shock" at McKesson's interpretation of Claim 1 at trial. As for Claim 2, McKesson

2

never suggested that it be construed to cover duplicate code checking and that is hardly the natural reading of the claim language. Moreover, while McKesson purports to have disclosed its new interpretations in the claim construction briefs filed in December 2005 and January 2006, TriZetto's experts had obviously not seen those briefs when they submitted their reports and gave deposition testimony in October and November 2005. McKesson did not disclose its new interpretations of Claims 1 and 2 *during discovery*, thereby depriving TriZetto's experts of an opportunity to respond to those interpretations in their reports and at deposition.

Lacking any substantive argument to support the novelty of the claims, McKesson resorts to procedural arguments in an effort to preclude TriZetto from relying on prior art that clearly invalidates Claims 1 and 2. First, McKesson argues that several references were not disclosed during fact discovery, but that is flatly wrong as to ClaimFacts and HCPS, both of which were disclosed during fact discovery. As for AMS and AutoCoder, those were systems that should have been disclosed by *McKesson* during fact discovery. McKesson absolutely knew that AMS and AutoCoder were prior art systems, since its own predecessor had asserted them as such in earlier litigation. Yet, McKesson did not disclose those prior art systems in response to TriZetto's interrogatories. Second, McKesson contends that the prior art systems are not adequately corroborated by documents, but, in fact, all but one of the systems are supported by ample documentation. Third, McKesson observes that TriZetto's experts did not opine on four of the systems, but, as a matter of law, expert testimony is not required to support an anticipation or obviousness defense.

Nothing that McKesson says in its opposition saves Claims 1 and 2 from a finding of invalidity, especially given that: (1) ClaimFacts, a system that was found to infringe the methods of Claims 1 and 2, was performing those same methods in the same way seven years before the patent application was filed; (2) the patent inventors themselves admitted that Claim 1 was covered by the AutoCoder system; and (3) McKesson's own expert, Dr. Musen, admitted that Claim 1 was covered by the Doyle Patent. For all the reasons presented in TriZetto's motion,

3

TriZetto respectfully requests that the Court grant summary judgment of invalidity as to Claims 1 and 2 on grounds of anticipation and obviousness.

## II.    ARGUMENT

**A.    The Metarules of Appendix B, Which McKesson Admits Are The "Heart Of The Invention," Are Completely Missing From Claims 1 and 2**

McKesson does not dispute that the Appendix B "metarules" are the "heart of the invention" of the '164 patent.  The parties each tell the same story as to how the purported invention was developed:

(1)   In the mid-1980s, inventor Dr. Robert Hertenstein was utilizing a manual technique at Caterpillar, Inc. for editing code combinations on medical claims. D.I. 380 at 5-6; D.I. 414 at 4.

(2)   Dr. Hertenstein worked with the other patent inventors to develop his manual technique into a computerized "expert system" known as CodeReview, upon which the '164 patent is based.  D.I. 380 at 5-6; D.I. 414 at 4-5.

(3)   The inventors entered all of Dr. Hertenstein's specific code-checking rules into a database and then grouped those rules into broad categories – known as "metarules" – that could be implemented by the computer system.  D.I. 380 at 7; D.I. 414 at 5.  As explained by McKesson:  "[T]he inventors worked for over half a year creating a model of decision-making rules that could be implemented by a computer to effectively detect improper code combinations on medical claims. . . . The inventors disclosed their decision-making rules in Appendix B of the patent."  D.I. 414 at 5.

According to McKesson and the patent inventors, the Appendix B metarules were the "heart" of the CodeReview expert system – in other words, those metarules (together with the specific code-checking rules) *were the actual expert knowledge* in the expert system.

**REDACTED**          **REDACTED**

REDACTED            REDACTED            The metarules are the

only feature of the patented expert system that are even arguably novel.

To secure a construction broad enough to establish infringement, McKesson insisted during claim construction that Claims 1 and 2 were not limited by anything in the patent specification, including the metarules of Appendix B. At McKesson's urging, the Court's claim construction did not incorporate the Appendix B metarules or any other limitations into Claims 1 and 2. D.I. 307. At the April 2006 trial, McKesson did not even mention the Appendix B metarules, much less attempt to prove their presence in the TriZetto products. Consequently, McKesson is stuck with a construction of Claims 1 and 2 that omits the Appendix B metarules, the only feature that might have been novel.

In its opposition brief, McKesson faintly suggests that the Appendix B metarules have been incorporated into Claims 1 and 2: "[T]he claims are not devoid of meaning or any connection to the decision-making rules of Appendix B. Every '164 claim includes the predetermined database element, which the Court has construed to require a set of 'decision-making rules' such as those described in Appendix B for the preferred embodiment." D.I. 414 at 16. This is plainly wrong, as the Court can discern by consulting its claim construction order. D.I. 307.

The Court defined "predetermined database" as "a set of decision-making rules that incorporate a medical code classification system and expert medical clinical judgment," but did not limit the claims to the Appendix B metarules or any other specific "decision-making rules." D.I. 307 at 3. Nor did McKesson make an effort at trial to demonstrate the Appendix B metarules in the TriZetto products. As a matter of law, McKesson is prohibited from using a different construction in the validity phase than it did to establish infringement. *W.L. Gore & Assoc., Inc. v. Garlock, Inc.*, 842 F.2d 1275, 1279 (Fed. Cir. 1988) ("[h]aving construed the claims one way for determining their invalidity, it is *axiomatic* that the claims must be construed in the same way for infringement").

5

By reading the Appendix B metarules and all other specific structure out of Claims 1 and 2, McKesson no longer has an expert system containing inventive expert knowledge. Instead, McKesson is left with the simplest imaginable medical coding functions – determining if a code is not in a database and dealing with duplicate codes – completely divorced from the substantive content of the expert system the inventors created.

REDACTED

REDACTED                          REDACTED

And McKesson itself conceded during claim construction that the steps of Claims 1 and 2 were performed using "commercially available" hardware and software *known* to those of ordinary skill in the art in the 1980s. D.I. 170 at 18, 21, 22, 25, 39; D.I. 255 at 9, 19. Indeed, with respect to Claim 1, McKesson stated:

> [A]nyone of ordinary skill in the art would understand that such "commercially available database management software programs" correspond to the particular function of "determining whether any medical service code . . . is not present in the predetermined database." Indeed, TriZetto's own expert has opined that "[c]hecking the validity of input data by comparing it against a list of known good values is one of the most fundamental techniques taught by every introductory programming course."

D.I. 255 at 19.

Without the Appendix B metarules (the only arguably original part of the patented invention), there can be no doubt that Claims 1 and 2 are invalid for lack of novelty. On this basis alone, the Court should grant summary judgment of invalidity on Claims 1 and 2.

**B.     The "Predetermined Database," Devoid Of Any Specific Content, Cannot Save The Claims From A Finding Of Invalidity**

McKesson's only effort to defend the validity of Claims 1 and 2 on the merits is to tout the supposed novelty of the "predetermined database," which McKesson insists is a necessary element of Claims 1 and 2. D.I. 414 at 14-16. McKesson emphasizes that a few of the prior art

6

systems do not contain a predetermined database. *Id.* at 22. But McKesson cannot deny that several other prior art systems *do* have such a database, based on the Court's construction. Furthermore, by McKesson's own admission, the predetermined database *is not required* to perform the methods of Claims 1 and 2. As a matter of law, McKesson cannot save Claims 1 and 2 from a finding of invalidity by relying on a feature that plays no role in the claimed methods, when the methods themselves are clearly present in the prior art.

### 1.    The "Predetermined Database" Was Present In At Least Three Prior Art Systems

The Court has defined "predetermined database" as "a set of decision-making rules that incorporate a medical code classification system and expert medical clinical judgment." D.I. 307 at 3. As previously discussed, this database does not require particular "decision-making rules," under the Court's construction. The database can contain *any* rules incorporating medical codes and expert medical judgment. Since the claims are not limited by the quantity or quality of the rules in the database, prior art that includes any such database is invalidating.

At least three prior art systems presented in TriZetto's motion included such a "predetermined database" – AMS, HCPS, and Blue Cross/Blue Shield of New Jersey's ICS System. *See* D.I. 380 at 25-29. TriZetto's motion describes the relevant functionality of each system in detail. *Id.* McKesson does not substantively challenge the described functionality, but complains generally that the systems are "vague" and uncorroborated. D.I. 414 at 26-29. In reality, the evidence submitted with TriZetto's motion makes perfectly clear that these three systems included a "predetermined database."

TriZetto's motion illustrates the functionality of AMS through extensive quotations from the more than 100 pages of AMS documents. D.I. 380 at 25-27. In relevant part, the documents reveal that:

- "[AMS] is a computer-based medical utilization management tool . . . [which] can be used either prospectively or retrospectively to evaluate the validity of health insurance claims." D.I. 381, Ex. 17 at MCK 047610.

7

- "AMS embodies a true 'expert system' – the knowledge of medical experts which is synthesized into a programmable form." *Id.* at MCK 047610.

- "Working from the Uniform Billing claims form or the Health Care Finance Administration claim form data, AMS edits check for valid values, internal consistency, and appropriateness of services and charges." *Id.*

- AMS had more than 50 medical claim edits to determine the validity of medical claims and codes. D.I. 381, Ex. 18 at MCK 047505-606. These included "Outmoded or Obsolete Procedures/Tests" (checking CPT-4 codes on a claim to catch outmoded procedure codes) and "Procedure Ordering, Temporal Sequencing" (checking combinations of ICD-9 codes to "validate the accuracy of the listed procedures"). *Id.* at MCK 047512, 047538.

The cited portions of the AMS documents clearly demonstrate the elements of the "predetermined database": (1) "a set of decision-making rules" – the AMS medical claim edits, (2) "that incorporate a medical code classification system" – the AMS edits operated on CPT-4 and ICD-9 medical codes, and (3) "expert medical clinical judgment" – AMS included "the knowledge of medical experts." That is precisely what is required for a "predetermined database," under the Court's construction.

Likewise, HCPS included a "predetermined database." As explained by HCPS developer Donald Demers: "[T]he HCPS users maintained a database that contained rules associated with the CPT codes that defined when a code was appropriate . . . The system was upgraded to allow it to compare two different procedure service codes on a single claim, or across multiple claims, based on whether the two codes represented procedures that could be performed at the same time or within a certain number of days of each other." D.I. 388 at ¶ 7, 10. This functionality is corroborated by the HCPS manual, which explained, "The Procedure/Procedure Relationships screen . . . will not allow certain procedures to be performed, if another related procedure has been performed within a specified period of time." *Id.* at Exh. A, p. 5.1.901. The HCPS database matches the definition of "predetermined database" provided by the Court.

8

Finally, the ICS System used by Blue Cross/Blue Shield of New Jersey also contained a "predetermined database." As described by Gunter Siemsen, a Blue Cross employee who worked with the ICS System in the early 1980s: "Additional functionality was also provided in the ICS System, including expanded medical policy rules, which would be applied to the medical claims in order to detect incompatible or inconsistent CPT codes that appeared within a single medical claim." D.I. 384 at ¶ 10. This collection of medical policy rules fits squarely within the Court's definition of a "predetermined database."

**2.    The "Predetermined Database" Is Not Required To Perform The Methods Of Claims 1 And 2**

McKesson does not dispute that Claims 1 and 2 describe very simple medical code-checking methods:

- Claim 1 is a method for determining whether a medical code on a submitted claim is a valid CPT code contained in any database of CPT codes. As explained by McKesson: "Claim 1 recites the step of determining whether a code is not in the predetermined database – a determination that may be made by checking the predetermined database directly or checking a separate database of all codes that could possibly be in the predetermined database." D.I. 414 at 16.

- Claim 2, in one example, is a method for eliminating duplicate codes or other forms of double billing on a medical claim. As described by McKesson: "[C]laim 2 covers the detection of duplicate codes or double billing." D.I. 414 at 18.

McKesson also plainly admits that the "predetermined database" is not required to perform the methods of Claims 1 and 2:

- "[Claim 1] does not require the utilization of the predetermined database to perform the determining step." D.I. 414 at 16.

- "[N]othing in [Claim 2] requires that the predetermined database be utilized to perform the determining step in all cases." *Id.* at 18. "McKesson never asserted that infringement of claim 2 is limited to determinations based on the predetermined

9

> database." *Id.* "[T]he preferred embodiment of the '164 patent discloses that this
> determination [of Claim 2] may be made . . . without reference to the predetermined
> database, such as the detection of duplicate codes using a separate 'DUPS' database."
> *Id.* at 6.

McKesson still insists that the "predetermined database" is "a necessary element" of the claims
(D.I. 414 at 16-18), but it concedes that the database need not be used to perform the claimed
methods. Because we are dealing only with method claims, the focus must be on the steps of the
methods and the results achieved. McKesson claims that the predetermined database is not
relevant to either – it is not required for any steps in the method and the contents of the database
do not affect the result. Nevertheless, McKesson claims the predetermined database is the key to
the validity of Claims 1 and 2.

As a matter of law, McKesson cannot rescue Claims 1 and 2 from a finding of invalidity
by pointing to a feature that is unnecessary to the claimed methods, when the methods
themselves are clearly disclosed in the prior art. *See Butler v. Helms*, 550 F.2d 954, 956-57 (4th
Cir. 1977) ("a merely extraneous structural feature recited in a claim, which has no function with
respect to the invention claimed, should not prevent invalidity for anticipation if all of the
requirements of anticipation are otherwise met"). This is particularly true for Claim 2, in which
the "predetermined database" is only mentioned in the preamble, never in the steps of the
method. *See Eaton Corp. v. Rockwell Int'l Corp.*, 323 F.3d 1332, 1339 (Fed. Cir. 2003) ("'if the
body of the claim sets out the complete invention,' then the language of the preamble may be
superfluous").

McKesson admits that the methods of Claims 1 and 2 can be performed without the
"predetermined database." Indeed, the TriZetto products were found to infringe Claims 1 and 2
despite the fact that those products *do not use* the "predetermined database" to perform the
simple functions of code validation and eliminating duplicate codes. D.I. 381, Ex. 11 (Trial Tr.),
at 851:5-852:23, 859:19-860:7, Ex. 26 (Trial Tr.) at 1086:6-1087:4. Accordingly, any prior art

10

system that discloses the methods of Claims 1 and 2 will anticipate those methods, with or without the optional "predetermined database."

**C.    The Prior Art References Were Properly Disclosed, Corroborated, And Presented In TriZetto's Motion**

TriZetto's motion presents seven prior art systems that disclose the simple method of Claim 1 – checking to see if medical codes on a claim are found in a database of valid codes. D.I. 380 at 21-30.   Four of those prior art systems also disclose the method of Claim 2 – eliminating duplicate codes and other forms of double billing on a medical claim. D.I. 380 at 30-33.   Unable to deny the dispositive force of these references on their merits, McKesson resorts to a host of flawed procedural arguments in an effort to avoid the prior art altogether.   McKesson complains that various references were not properly disclosed, corroborated, or otherwise supported. D.I. 414 at 2, 22-29.   McKesson's arguments are unavailing and, in some instances, flatly wrong.

**1.    Erisco's ClaimFacts**

There can be no clearer prior art in this case than ClaimFacts, one of the accused TriZetto products found to infringe Claims 1 and 2.   McKesson has the audacity to argue that ClaimFacts might not include every element of Claims 1 and 2, even though it was found to infringe those claims.   D.I. 414 at 24.   McKesson also suggests that ClaimFacts lacks documentary corroboration, despite the fact that McKesson itself introduced numerous ClaimFacts documents at trial.   McKesson's arguments regarding ClaimFacts are simply absurd.

Preliminarily, McKesson contends that TriZetto did not disclose ClaimFacts during fact discovery and should be precluded from presenting it as prior art.   This is simply wrong. TriZetto did disclose its intent to rely on ClaimFacts in its September 13, 2005 interrogatory response, in which it listed "ClinicaLogic for ClaimFacts (Erisco)" as a prior art system. D.I. 381, Ex. 24 at 62.   McKesson cannot assert that this disclosure pertains only to ClinicaLogic, and not ClaimFacts, when it has consistently argued that ClinicaLogic is

inextricably connected to ClaimFacts and the entire system infringes the patent claims. TriZetto clearly disclosed its intent to rely on its own product as prior art.[1]

Next, McKesson observes that ClaimFacts did not have a "predetermined database" prior to 1989. D.I. 414 at 24. But that does not prevent ClaimFacts from anticipating or rendering obvious the methods of Claims 1 and 2, which McKesson admits do not require the "predetermined database." *Id.* at 14. McKesson cannot defend the claimed methods by pointing to an "extraneous structural feature" unnecessary to those methods. *See Butler*, 550 F.2d at 956-57. Indeed, ClaimFacts was found to infringe the code validation method of Claim 1 even though it makes no use of a "predetermined database" to perform that method (it uses an entirely separate database). ClaimFacts has been performing precisely the same code validation technique since 1980. D.I. 382 at ¶ 5. Likewise, ClaimFacts has performed the method of Claim 2 – eliminating duplicate codes – since 1980, even before the "predetermined database" was added. *Id.* at ¶ 8. There can be no doubt that ClaimFacts anticipates the very methods it was found to infringe. *Polaroid Corp. v. Eastman Kodak Co.*, 789 F.2d 1556, 1573 (Fed. Cir. 1986) ("that which infringes if later anticipates if earlier").

McKesson also argues that ClaimFacts lacks sufficient documentary corroboration. D.I. 414 at 24.[2] This is a bizarre complaint, given that McKesson itself introduced numerous documents at trial corroborating the functionality of ClaimFacts, including product manuals and

---

[1] Moreover, McKesson has already obtained full discovery on ClaimFacts, including all ClaimFacts documents in TriZetto's possession and depositions of the TriZetto employees most knowledgeable about ClaimFacts. The main point of a disclosure deadline is to assure that the opposing party has adequate opportunity for discovery, which McKesson has had with respect to ClaimFacts.

[2] McKesson accuses TriZetto of failing to show that the prior art systems were accessible to the public for purposes of 35 U.S.C. § 102(a). D.I. 414 at 23. But TriZetto has demonstrated that each of the prior art systems (ClaimFacts, AutoCoder, AMS, HCPS, IBM 7070 System) were on sale and actually sold more than one year prior to the patent application filing, which more than satisfies the requirements of 35 U.S.C. § 102(b).

screenshots of ClaimFacts in operation. Ex. 27 (Trial Exhs. 97, 99, 419, 1180-1200). The ClaimFacts functionality was confirmed at trial by TriZetto's Executive Vice-President Anthony Bellomo, who was personally involved in the design and development of ClaimFacts since 1980. Ex. 26 (Trial Tr.), at 1087:24-1153:11. Mr. Bellomo has again verified the ClaimFacts functionality in his declaration supporting TriZetto's motion. D.I. 382.

Finally, McKesson contends that TriZetto has offered "no expert analysis of whether one skilled in the art would understand ClaimFacts to include every element of claims 1 and 2." D.I. 414 at 24. But McKesson has already *proven at trial* that ClaimFacts includes every element of Claims 1 and 2, using the testimony of its own expert. *See* Ex. 26 (Trial Tr.), at 277:17-414:6. McKesson cannot deny that a system found to infringe Claims 1 and 2 certainly anticipates those claims when it pre-dates the patent application by seven years. *See* Exhibit A, hereto.

### 2. <u>Doyle Patent</u>

McKesson's sole argument against the Doyle Patent is to observe that it does not include a "predetermined database." D.I. 414 at 24-25. As previously discussed, the "predetermined database" is not required to perform the method of Claim 1, by McKesson's own admission. Indeed, TriZetto's products were found to infringe Claim 1 even though they make no use of a "predetermined database" to perform code validation. D.I. 381, Ex. 11 (Trial Tr.), at 851:5-852:23, 859:19-860:7. Code validation as disclosed in the Doyle Patent is no different from what the TriZetto products practice and what was found to infringe. There can be no doubt that this anticipates Claim 1 or renders it obvious. *See* Exhibit A, hereto.

Moreover, McKesson's own expert, Dr. Mark Musen, admitted that the Doyle Patent discloses the code validation method of Claim 1. D.I. 381, Ex. 13 (Musen Dep.), at 267:4-269:16. McKesson maintains that Dr. Musen believed Claim 1 was an advance over Doyle merely because Claim 1 recites a "predetermined database." D.I. 414 at 25. But that is *not* what Dr. Musen said. He testified that Claim 1 was an advance over Doyle if you interpret Claim 1 to *actually use* the "predetermined database" to check the validity of codes:

Q. If we say only Claim 1 exists in this patent, and we're only looking at Claim 1, [doesn't] the reference, the Doyle reference . . . disclose the claim limitations that are in Claim 1?

A. . . . Doyle, obviously, does some degree of claims checking, and inasmuch as the claim made in Claim 1 addresses claim checking, then there is relevance there. As I said previously, *my interpretation of the claims is that the motivation for Claim 1 is to clarify that the task performed for claim validity checking can be handled using the same structures that are ultimately used for the other components of the patent*. . . . [C]learly, the Doyle patent has a component of code validity checking which is provided functionally in Claim 1. The structure is obviously different.

Q. Okay. And how is the structure different?

A. *The structure is different in that the database for validity checking is designed in a way to support that task, as well as the other tasks which we don't want to talk about.* If we were willing to talk about the other claims in the patent, then I think in that context it makes sense that Claim 1 is an advance over what's claimed in Doyle.

Q. It's an advance but a functional equivalent.

A. It's a functional equivalent in the context of a system that also does unbundling.

D.I. 381, Ex. 13 (Musen Dep.), at 267:4-269:16 (emphasis added). Now that McKesson has embraced the opposite interpretation of Claim 1 – i.e., Claim 1 does *not* use the predetermined database – Dr. Musen's admission is dispositive as to Claim 1.

### 3.    GMIS's AutoCoder

McKesson complains that TriZetto did not disclose its intent to rely on AutoCoder during fact discovery. D.I. 414 at 25. In actuality, it is *McKesson* that should have disclosed AutoCoder during discovery and failed to do so. There is no doubt that McKesson was aware of AutoCoder since well before this litigation. In 1994, McKesson's predecessor HPR, Inc. (the original patent assignee) sued McKesson's predecessor GMIS, Inc. for patent infringement. GMIS asserted AutoCoder as prior art in that case. Ex. 32 (GMIS discovery responses), at MCK 035883. McKesson subsequently acquired both HPR and GMIS. Accordingly, McKesson is the successor of a party that actually asserted AutoCoder as prior art in litigation.

TriZetto served several interrogatories on McKesson requesting disclosure of any prior art systems known to McKesson. Ex. 29 (TriZetto's Interrogatories Nos. 6-7 & 9). While

14

McKesson listed a few prior art systems in response, it did not mention AutoCoder. Ex. 30 (McKesson's Responses to Interrogatories Nos. 6-7 & 9). McKesson certainly knew AutoCoder was prior art, since its own predecessor had asserted AutoCoder as such in the 1994 litigation.

Additionally, the relevance of AutoCoder only became clear when McKesson revealed its positions at trial. AutoCoder admittedly does not have a "predetermined database," but it does validate codes without using such a database. As the Court is aware, McKesson did not argue that a system could infringe Claim 1 without using a "predetermined database" until trial.

McKesson suffers no prejudice by the inclusion of AutoCoder in this case. Documents describing AutoCoder were produced *by McKesson* in this litigation. Ex. 31 (MCK 47860-47863, MCK 115920-938, MCK 115944-945, MCK 115946-950, MCK 115951-953). Those documents confirm that AutoCoder contained "ICD-9-CM and CPT-4 databases" used to perform "code-to-English" translation – i.e., translating a medical code to its English description, *if* the code was found in the databases. *Id.* at MCK 115933.

AutoCoder's functionality was also described by two of the inventors of the '164 patent, **REDACTED**         and Kelli Dugan, both of whom had knowledge of AutoCoder from when they worked at HPI in the mid-1980s. *See* D.I. 381, Ex. 15 (Dugan Dep.), at 44:17-45:25 ("GMIS came to HPI and demonstrated AutoCoder"); **REDACTED** McKesson tries to discredit their testimony (D.I. 414 at 25-26), but it cannot deny that both inventors independently verified AutoCoder's code validation functionality and *expressly admitted* that it performed the method of Claim 1:

> *Ms. Dugan:* "[W]hat AutoCoder did, was if you typed in a code that was not valid, it would tell you it was invalid." D.I. 381, Ex. 15 at 182:12-14. "[Claim 1] is what AutoCoder did, yes." *Id.* at 90:20-91:6.

**REDACTED**                    **REDACTED**

4.    **HDI's Advanced MedLogic System ("AMS")**

McKesson demands that TriZetto be precluded from relying on AMS for failure to disclose its intended reliance during fact discovery. D.I. 414 at 26. But AMS should be admitted as prior art for the same reason as AutoCoder – it was a prior art system that McKesson's own predecessor, GMIS, asserted in earlier litigation (Ex. 32 at MCK 035883), and yet McKesson failed to disclose it in response to TriZetto's interrogatories.

Furthermore, McKesson will suffer no conceivable prejudice by the admission of AMS. AMS was fully addressed throughout expert discovery, including in both sides' expert reports and at the expert depositions. D.I. 381, Ex. 19 (Davis Report), at 20-24; **REDACTED**

**REDACTED**         **REDACTED**         McKesson itself produced the AMS documents on which TriZetto relies. D.I. 381, Ex. 17 (MCK 047608-619 – AMS Product Overview); D.I. 381, Ex. 18 (MCK 047505-606 – AMS list of medical claim edits).

McKesson inexplicably contends that TriZetto did not "point to the particular parts of the documentation that invalidate claims 1 or 2" (D.I. 414 at 26), but that is exactly what TriZetto did in its motion, quoting extensively from the AMS documents. D.I. 380 at 26-28, 31-32; *see also* Exhibit A, hereto. TriZetto also offered a declaration from Dr. Robert Bargar, a physician who worked directly with AMS from 1986 to 1988, confirming that the system had been marketed and sold during that time (a fact that is reflected in the documents as well). D.I. 383 at ¶¶ 7-8.[3] McKesson vaguely states that its own experts denied the patent claims were anticipated or rendered obvious by AMS, but it offers no specific explanation as to why the language quoted by TriZetto does not disclose the simple functions of Claims 1 and 2. D.I. 414 at 27. For

---

[3] TriZetto's expert, Dr. Davis, disclosed during his deposition his communications with Dr. Bargar. D.I. 381, Ex. G (Davis Dep.), at 89:5-116:6. McKesson and its predecessors have known of Dr. Bargar since at least the GMIS litigation in 1994, when GMIS put Dr. Bargar on its trial witness list. Ex. 32 (Amended Witness List), at MCK 046091. Dr. Bargar was on TriZetto's witness list herein as well.

example, McKesson does not (and cannot) deny that AMS included the precise same double billing rule used by McKesson at trial as an example of Claim 2. *See* D.I. 380 at 32.

### 5. Blue Cross/Blue Shield of New Jersey's IBM 7070 System (the "7070 System")

McKesson argues that the 7070 System is not adequately corroborated, but the exceedingly simple functions described in the Declaration of Gunter Siemsen hardly require corroboration. D.I. 384. Mr. Siemsen was the Assistant Vice-President of Systems Development for Blue Cross/Blue Shield of New Jersey from 1963 to 1986 and worked with the 7070 System and its successors the entire time. *Id.* at ¶ 1. His testimony is more than sufficient to establish that code validation and duplicate code checking were performed by the 7070 System and related systems.

### 6. Cortron's Health Care Processing System ("HCPS")

McKesson maintains that TriZetto did not disclose its reliance on HCPS during fact discovery, but that is simply false. Donald Demers, the developer of HCPS, was disclosed in TriZetto's September 13, 2005 supplemental initial disclosure as a witness with knowledge of prior art technology. *See* D.I. 381, Ex. 23 at 4. He has provided a declaration and a product manual describing the relevant functionality of HCPS. D.I. 388. Additionally, in its September 13, 2005 interrogatory response, TriZetto disclosed the "Discorp Software" as a prior use. D.I. 381, Ex. 24 at 63. As explained by Mr. Demers, the "Discorp Software" is the same thing as HCPS – Discorp (which was founded by Mr. Demers) obtained rights to HCPS in 1986. D.I. 388 at ¶ 13. Indeed, the HCPS manual attached to the Demers declaration names Discorp on its cover page. *Id.* at Exh. A.

### 7. Health Systems International's Clinical Data Editor

McKesson argues that the Clinical Data Editor does not include a "predetermined database." D.I. 414 at 29. As previously explained, a "predetermined database" is not required to perform the method of Claim 1 (by McKesson's own admission), and so is not needed to invalidate that claim. *Butler*, 550 F.2d at 956-57. The article disclosing the Clinical Data Editor

17

sufficiently reveals the extremely simple code validation method of Claim 1: "Clinical Data Editor . . . identifies erroneous or missing diagnosis and procedure codes." Ex. 25 at p. 134. TriZetto's expert, Dr. Davis, has opined that this disclosure is enough to anticipate and render obvious the method of Claim 1. D.I. 381, Ex. 19 (Davis Report), at 32; D.I. 385 at ¶¶ 8, 10.

### 8. The Prior Art Invalidates Claims 1 And 2 Even If Some Trivial Element Is Missing

McKesson suggests that the prior art systems may lack certain elements of Claims 1 and 2. *See* D.I. 414 at 24-29. As described above and in TriZetto's opening brief (D.I. 380 at 21-34), there is no doubt that the prior art reveals the simple methods of Claims 1 and 2 in their entirety. However, even if a particular prior art system misses some trivial element of Claims 1 and 2 (such as "receiving a claim" or "informing a user"), it still anticipates those claims if the missing element is not novel. *In re Harmon*, 222 F.2d 743, 747 (C.C.P.A. 1955) ("[t]he recitation of structure in the claims for accomplishing a non-inventive function will not cause the claims to be patentable over the prior art notwithstanding that these non-inventive features are not shown in the prior art"); *In re Bisley*, 197 F.2d 355 (C.C.P.A. 1952) ("[s]ince we are of the opinion that what claim 25 calls for that is not shown in the reference is not inventive, recitation of this matter does not make the claim patentable over the disclosure of the prior art"). Patent inventor Dr. Holloway admitted that the rudimentary steps of Claims 1 and 2 were not novel and McKesson itself acknowledged that software for performing those steps was "commercially available" and known to those of skill in the art. *See supra*, Section II.A. McKesson cannot rely on trivial, non-inventive features to defend the validity of Claims 1 and 2.

### D. Expert Opinion Is Not Required To Prove Invalidity, But TriZetto Does Have Substantial Expert Support

McKesson complains throughout its opposition that TriZetto lacks expert analysis to support various prior art systems. D.I. 414 at 2, 22, 24, 26, 28-30. But the Federal Circuit has held that expert opinion is not required to support an invalidity case, particularly with claims as simple as Claims 1 and 2. *Avia Group Int'l, Inc. v. L.A. Gear California, Inc.*, 853 F.2d 1557, 1562 (Fed. Cir. 1988) ("a judge may decide the legal issue of validity unaided by expert

opinion"); *Union Carbide Corp. v. American Can Corp.*, 724 F.2d 1567, 1573 (Fed. Cir. 1984) ("the references and appellant's invention are easily understandable without the need for expert explanatory testimony"); *Petersen Mfg. Co. v. Central Purchasing, Inc.*, 740 F.2d 1541, 1548 (Fed. Cir. 1984) (alleged infringer is not required "to submit an expert's opinion on obviousness").

In any event, TriZetto does have ample expert opinions from Dr. Davis that AMS, the Doyle Patent, and the Clinical Data Editor each anticipate and/or render obvious Claim 1, and that AMS anticipates or renders obvious Claim 2. D.I. 381, Ex. 19 (Davis Report), at 20-25, 32. Although Dr. Davis testified at deposition that none of these references anticipated the patent claims, that was before McKesson advanced its new interpretations of Claims 1 and 2 at trial.

Under the new interpretations, Claim 1 does not require using the predetermined database to perform the code validation function, and Claim 2 is simply a method for eliminating duplicate codes without need for a predetermined database. McKesson tries to pretend these were the positions it has taken all along, but that is untrue. McKesson's new interpretation of Claim 1, for example, is the *opposite* of the one used by its own expert, Dr. Musen, at his deposition (he testified that Claim 1 *did actually use* the predetermined database to perform code validation). D.I. 381, Ex. 13 (Musen Dep.), at 266:15-269:13. Indeed, the Court itself expressed "shock" at McKesson's interpretation of Claim 1 at trial. Ex. 26 (Trial Tr.), at 785:16-19 ("Well, I don't know how that's different than what you did with your witness on what the determining step [of Claim 1] was. Actually, that was a huge shock to me, about how your witness construed that.").

Moreover, while McKesson purports to have disclosed its new interpretations in the claim construction briefs filed in December 2005 and January 2006 (D.I. 414 at 16-19), TriZetto's experts obviously did not have those briefs when they submitted their reports and provided deposition testimony in October and November 2005. McKesson never disclosed its new claim interpretations *during discovery*, depriving TriZetto's experts of a chance to respond. In light of McKesson's changes to Claims 1 and 2, Dr. Davis has opined that both claims are

19

anticipated by the cited prior art. D.I. 385 at ¶¶ 8-10, 13-14; *see also* D.I. 406 at 13-15. Furthermore, Dr. Davis and TriZetto's other experts have said from day one that Claims 1 and 2 were obvious in light of the prior art.

**E.    Claims 1 And 2 Are Obvious Automations Of Simple Manual Techniques**

In response to TriZetto's observation that Claims 1 and 2 are obvious automations of known manual techniques, McKesson argues that "creating an expert system such as the '164 patent was an inventive process and hardly obvious." D.I. 414 at 33. But the two remaining claims in this case are not even close to the full expert system that the inventors created. Due to the Court's claim construction and McKesson's interpretations, Claims 1 and 2 contain no expert knowledge whatsoever – no specific code-checking rules, no metarules from Appendix B, no particular software algorithms. They do not even require use of the "predetermined database," itself a mere hollow concept devoid of inventive content. McKesson points to inventor and expert testimony regarding the difficulties of developing an actual expert system (D.I. 414 at 34-36), but Claims 1 and 2 are basic, rudimentary functions, not expert systems. McKesson cannot invoke the developmental complexities of a full-scale expert system to preserve the stripped-down methods of Claims 1 and 2 that it advanced during the infringement trial.

The inventors clearly testified that Dr. Hertenstein was performing the limited functions of Claims 1 and 2 manually.

REDACTED    REDACTED

REDACTED

Given this testimony, and the fact that Claims 1 and 2 simply recite the general idea of using a computer to perform those functions, Claims 1 and 2 are merely computer automations of known manual techniques – not patentable inventions, as a matter of law. *See In Re Venner*, 46 C.C.P.A. 754, 758 (C.C.P.A. 1958).

**III.    CONCLUSION**

For the reasons set forth herein and in TriZetto's opening brief, summary judgment of invalidity should be granted to TriZetto on Claims 1 and 2.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

/s/ Rodger D. Smith II

Jack B. Blumenfeld (# 1014)
Rodger D. Smith II (# 3778)
1201 N. Market Street
Wilmington, Delaware 19899
(302) 658-9200

Attorneys for Defendant The TriZetto Group, Inc.

OF COUNSEL:

GIBSON, DUNN & CRUTCHER LLP
Jeffrey T. Thomas
David A. Segal
Michael A. Sitzman
Jamboree Center, 4 Park Plaza
Irvine, CA  92614

June 22, 2006
526084

21