EXHIBIT 22

```
 1        IN THE UNITED STATES DISTRICT COURT
 2           FOR THE DISTRICT OF DELAWARE
 3
 4  MCKESSON INFORMATION      )
    SOLUTIONS, LLC,           )
 5                            )
          PLAINTIFF,          )
 6  vs.                       ) Case No. 04-1258-SLR
                              )
 7  THE TRIZETTO GROUP, INC., )
                              )
 8       DEFENDANT.           )
    _____)
 9
10
11
12
13
14    VIDEO DEPOSITION OF MARK MUSEN, M.D., PH.D.
15    Held at Skadden, Arps, Slate, Meagher & Flom
16          525 University Avenue, 11th Floor
17                Palo Alto, California
18         Tuesday, November 22, 2005, 9:11 a.m.
19
20
21
22
23
24  REPORTED BY: CHRIS DE GEORGE, CSR. NO. 7069
25
                        Page 1
```

```
 1                 APPEARANCES
 2
 3  For the Plaintiff:
 4     Skadden, Arps, Slate, Meagher & Flom, LLP
 5     BY: MICHAEL HENDERSHOT and JON SWENSON,
 6     Attorneys at Law
 7     525 University Avenue, 11th Floor
 8     Palo Alto, California 94301
 9     (650) 470-4500
10
11  For the Defendant:
12     GIBSON, DUNN & CRUTCHER LLP
13     BY: MICHAEL A. SITZMAN and DANIEL MUINO,
14     Attorneys at Law
15     One Montgomery Street
16     San Francisco, California 94104-4505
17     (415) 393-8221
18     msitzman@gibsondunn.com
19
20
21  Also present: Michael Barber,
22                Videographer
23
24
25
                        Page 2
```

```
 1                    I N D E X
 2
 3  EXAMINATION                          PAGE
 4    BY: MR. SITZMAN                    5, 292
 5    BY: MR. HENDERSHOT                 277
 6
 7
                INDEX OF EXHIBITS
 9  NUMBER        DESCRIPTION            PAGE
10  MM-1   Multi-page Expert Report of Mark    5
           A. Musen, M.D., Ph.D.
11
    MM-2   Rebuttal Expert Report of Mark      5
12         A. Musen, M.D., Ph.D.; 37 pages
13  MM-3   United States Patent Number         15
           5,253,164
14
    MM-4   Paper entitled "An Access-oriented  72
15         Negotiated Fee Schedule, The
           Caterpillar Experience," pages
16         349-357
17  MM-5   Memorandum Order; 4 pages           109
18  MM-6   PEW Conference Presentation         173
           Managing Physician Fees; 4 pages
19
    MM-7   Vendor Comparison dated 1-18-88;    180
20         1 page
21  MM-8   Exhibit C, Materials Examined;      193
           9 pages
22
    MM-9   Expert Report of Dr. Margaret       298
23         L. Johnson, Ph.D; 30 pages
24
25
                        Page 3
```

```
 1          BE IT REMEMBERED that, pursuant to Notice, and
 2  on Tuesday, November 22, 2005, commencing at the hour of
 3  9:11 a.m. thereof, at the Law Offices of Skadden, Arps,
 4  Slate, Meagher & Flom, LLP, 525 University Avenue, 11th
 5  Floor, Palo Alto, California, before me, Chris De
 6  George, CSR #7069, State of California, there personally
 7  appeared
 8              MARK MUSEN, M.D., PH.D.,
 9  called as a witness herein by Defendant, who, being
10  first duly sworn, was examined as is
11  hereinafter set forth.
02:27 12              --oOo--
08:39 13
09:10 14          THE VIDEOGRAPHER: Good morning. My name is
09:10 15  Michael Barber. I am a videographer associated with
09:10 16  Barkley Court Reporters located at 222 Front Street,
09:11 17  Suite 600, San Francisco, California 94111. The date is
09:11 18  November 22nd, 2005. The time is 9:11 a.m.
09:11 19          This deposition is taking place at Skadden,
09:11 20  Arps, Slate, Meagher & Flom, LLP, 525 University Avenue,
09:11 21  Palo Alto, California 94301 in the matter of McKesson
09:11 22  Information Solutions, LLC, versus the TriZetto Group,
09:11 23  Inc., Case Number 04-1258-SLR.
09:11 24          This is the videotape deposition of Mark
09:11 25  Musen, M.D., Ph.D. being taken on behalf of the defense.
                        Page 4
```

1 (Pages 1 to 4)

MARK MUSEN, M.D., PH.D.

## Page 53

10:13 1 database implementer has available a structure provided
10:13 2 by the patent that allows mutual exclusivity among
10:13 3 conditions to be represented in the database. It is
10:13 4 really immaterial to the desi- -- to the entry of the
10:13 5 codes into the database as to whether they are
10:13 6 specifically medical or non-medical, but the developer
10:13 7 can take advantage of both non-medical and medical
10:13 8 relationships in building the database.
10:13 9     Q. I think what you're saying is it doesn't
10:13 10 matter what the definition is of medical/non-medical.
10:13 11 It's -- frankly, it can be anything because it's really
10:13 12 just a relationship of the codes that's important.
10:13 13     MR. HENDERSHOT: Objection. Vague and
10:13 14 ambiguous as to -- I think that misstates his testimony.
10:14 15 I think he said in -- in developing a system, an
10:14 16 automatic system.
10:14 17     THE WITNESS: It certainly matters for
10:14 18 reimbursement. It certainly matters in terms of
10:14 19 building the database in terms of its logical content.
10:14 20 From a computational perspective, it doesn't matter, is
10:14 21 what I'm saying.
10:14 22 BY MR. SITZMAN:
10:14 23     Q. How do you distinguish between those products
10:14 24 or methods that infringe this claim and those that don't
10:14 25 if you don't have a definition of non-medical criteria

## Page 54

10:14 1 in which to say, oh, that system infringes and this
10:14 2 system doesn't?
10:14 3     A. Well, I -- I provided a definition which I
10:14 4 think is reasonable and I think is -- would be assumed
10:14 5 by -- by -- by most -- most people that a medical claim,
10:14 6 rather, a criterion which is medical deals with the
10:15 7 procedure applied to the patient as a -- and is a
10:15 8 consequence of the medical condition of the patient as
10:15 9 opposed to a non-medical criterion which is a function
10:15 10 of the mechanics of setting up the procedure or of
10:15 11 billing.
10:15 12     Q. You had a chance to review the depositions of
10:15 13 the inventors in this case.
10:15 14     A. Yes.
10:15 15     Q. Were you at all startled to find out that each
10:15 16 of the inventors had no idea what non-medical criteria
10:15 17 meant?
10:15 18     MR. HENDERSHOT: Objection. Vague and
10:15 19 ambiguous as to "startled" and misstates the testimony
10:15 20 of the inventors.
10:15 21 BY MR. SITZMAN:
10:15 22     Q. Well, you read them. Please ascribe whatever
10:15 23 adjective you want. But wasn't it interesting at all to
10:15 24 you that each of the inventors had no idea what
10:15 25 non-medical criteria meant?

## Page 55

10:15 1     A. It was interesting. I wasn't startled. I
10:15 2 would say that, again, you have to take the claims in
10:15 3 context, and I believe that the attorneys who wrote the
10:16 4 claims were trying to make a statement that the universe
10:16 5 of criteria, both non-medical and medical, applied in
10:16 6 this case. And so I was not startled that the inventors
10:16 7 may not have been completely clear about where the --
10:16 8 the boundary line is, but I have a -- I mean I, and I'm
10:16 9 sure the inventors, have good intuition about what the
10:16 10 differences are.
10:16 11     Q. What about others, other people reading the
10:16 12 patent and trying to figure out what medical and
10:16 13 non-medical means?
10:16 14     A. I guess as I read it in the context of the
10:16 15 overall set of claims, I view this as a way of the
10:16 16 author of the claims communicating that the universe of
10:16 17 conditions is covered by the -- the criteria of which
10:16 18 the database is capable of representing relationships.
10:16 19 I did not read this as a way of necessarily defining
10:16 20 rigid boundaries between what is medical and what is
10:17 21 non-medical.
10:17 22     Q. And I think you used the phrase for that
10:17 23 reason, that last point, in terms of a functional
10:17 24 perspective, it doesn't matter, then, what the
10:17 25 definition or the boundary is between medical and

## Page 56

10:17 1 non-medical.
10:17 2     MR. HENDERSHOT: Objection. Misstates his
10:17 3 testimony as to -- and it's vague and ambiguous as to
10:17 4 from a functional perspective.
10:17 5     THE WITNESS: From a computational
10:17 6 perspective, it doesn't make a difference.
10:17 7 BY MR. SITZMAN:
10:17 8     Q. And explain to me from the computational
10:17 9 perspective. What do you mean when you say from a
10:17 10 computational -- from a -- well, why don't you explain
10:17 11 computational?
10:17 12     A. [Simultaneously] Okay. That the database that
10:17 13 the McKesson product provides allows one to specify
10:18 14 relationships among claims that could be classified in a
10:18 15 variety of ways, including medical and non-medical. And
10:18 16 so in terms of the processing that's necessary to
10:18 17 determine whether claims need to be excluded or edited
10:18 18 or whatever, the computations are the same.
10:18 19     Now, obviously, when you say functional, that
10:18 20 has a legal implication, and whether one wants to
10:18 21 include non-medical or medical claims in a particular
10:18 22 system as implemented at the site of a particular payer
10:18 23 is a matter of the policies of the organization that
10:18 24 purchases a system and how it wants claims to be
10:18 25 adjusted. So that -- that's -- those are -- those are

```
 1  State of CALIFORNIA          )
 2  County of  Santa Clara       )
 3
 4
 5
 6
 7         I, the undersigned, declare under penalty of
 8  that I have read the foregoing transcript, and I have
 9  made any corrections, additions or deletions that I was
10  desirous of making; that the foregoing is a true and
11  correct transcript of my testimony therein.
12         EXECUTED this  17  day of  December ,
13  2005, at   Stanford  ,   CA   .
                (City)            (State)
14
15
16
17
18         _____, MD, PhD
               MARK MUSEN, M.D., PH.D.
19
20
21
22
23
24
25
                       326
```

MARK MUSEN, M.D., PH.D.

BARKLEY Court Reporters

# EXHIBIT 23

```
 1        UNITED STATES DISTRICT COURT
 2        FOR THE DISTRICT OF DELAWARE
 3
 4
 5   -----------------------------x
 6   MC KESSON INFORMATION SYSTEMS, :
 7       Plaintiff,          : Case No.
 8       vs.                 : 04-1258 SLR
 9   THE TRIZETTO GROUP,     :
10       Defendant.          :
11   -----------------------------x
12
13
14      VIDEOTAPED DEPOSITION OF GEORGE A. GOLDBERG
15
16
17            Washington, D.C.
18            Tuesday, September 13, 2005
19
20
21
22
23
24   REPORTED BY:
25      CARMEN SMITH
                    Page 1
```

```
 1             PROCEEDINGS
 2       VIDEO OPERATOR: This is the deposition of
 3   Mr. George A. Goldberg, taken on behalf of Defendant
 4   in the matter of McKesson Information Systems LLC,
 5   Plaintiff, versus Trizetto Group, Inc., Defendant,
 6   Case Number 04-1258 SLR, for the U.S. District
 7   Court, District of Delaware.
 8       This deposition is being taken at the
 9   offices of Gibson Dunn, 1050 Connecticut Avenue,
10   Washington, D.C. The time is approximately 9:03
11   a.m. The date is September 13, 2005.
12       The court reporter is Carmen Smith, on
13   behalf of Barkley Court Reporters, 2040 Main Street,
14   Suite 250, Irvine, California. I am the video
15   operator, Larry Flowers, also on behalf of Barkley.
16       The reporter may now swear the witness.
17   Whereupon,
18             GEORGE A. GOLDBERG
19   was called as a witness and, having first been duly
20   affirmed, was examined and testified as follows:
21       VIDEO OPERATOR: Will counsel identify
22   themselves and who they represent.
23       MR. SEGAL: David Segal of Gibson, Dunn &
24   Crutcher on behalf of the Trizetto Group, Inc.
25       MR. SHEK: Bernard Shek for Plaintiff,
                    Page 3
```

```
 1       Deposition of GEORGE A. GOLDBERG, called for
 2   examination pursuant to notice of deposition, on
 3   Tuesday, September 13, 2005, in Washington, D.C. at
 4   the offices of Gibson, Dunn & Crutcher, 1050
 5   Connecticut Avenue Northwest, at 9:03 a.m. before
 6   CARMEN SMITH, a Notary Public within and for the
 7   District of Columbia, when were present on behalf of
 8   the respective parties:
 9
10       BERNARD SHEK, ESQ.
11       Skadden, Arps, Slate, Meagher & Flom LLP
12       525 University Avenue, Suite 1100
13       Palo Alto, California 94301
14       650-470-4500
15       On behalf of Plaintiff and Witness
16
17       DAVID A. SEGAL, ESQ.
18       Gibson, Dunn & Crutcher LLP
19       4 Park Plaza, Suite 1400
20       Irvine, California 92614-8557
21       949-451-3973
22       On behalf of Defendant
23
24   Also present:
25       LARRY FLOWERS, Video Operator
                    Page 2
```

```
 1   also representing the witness, Dr. Goldberg, at this
 2   deposition.
 3              EXAMINATION
 4   BY MR. SEGAL:
 5       Q   Good morning.
 6       A   Good morning.
 7       Q   Can you please state your full name for
 8   the record?
 9       A   George Ansbach Goldberg.
10       Q   Can you spell the middle name for the
11   court reporter?
12       A   A-n-s-b-a-c-h.
13       Q   Have you ever had your deposition taken
14   before, Dr. Goldberg?
15       A   Which deposition?
16       Q   Any time, have you ever been deposed in a
17   deposition before?
18       A   Yes.
19       Q   How many times?
20       A   I believe once.
21       Q   And have you ever testified in court
22   before?
23       A   No.
24       Q   Now, you've had your deposition taken
25   before, and we'll go back and visit about that
                    Page 4
```

1 (Pages 1 to 4)

GEORGE A. GOLDBERG

**Page 21**

1  Q  During any part of the meeting, was any
2  other individual present in the room besides you and
3  Mr. Shek?
4  A  Yesterday, no. And the previous meeting,
5  I think also no. I'm only wondering if somebody
6  came in to clear something away, but I think not.
7  No.
8  Q  I'm going to hand you a document which I'm
9  going to ask the court reporter to mark as Exhibit 1
10 to your deposition. It is a multipage document,
11 Bates stamped GG 0001 through 0005.
12     (Deposition Exhibit 1 identified.)
13     BY MR. SEGAL:
14 Q  Do you recognize this document?
15 A  I just have to check the inner pages. I
16 do.
17 Q  And is this a current copy of your CV?
18 A  Well, I don't know how current it is, but
19 it's a copy of my CV and -- it usually has a date at
20 the end, but this one does not. So I would say it
21 still looks pretty -- it seems to be within the last
22 year, because it says "part-time employee at
23 Ingenix."
24 Q  And that is your position today -- your
25 status today, I should say?

**Page 22**

1  A  That is correct.
2  Q  And when did you first become a part-time
3  employee at Ingenix?
4  A  The moment I was hired by Ingenix.
5  Q  Was that going back to Ingenix's
6  predecessors in 1990 or --
7  A  No.
8  Q  Was it correct that in 2004 when the
9  company that you worked for became Ingenix, you
10 became a part-time employee?
11 A  I was already a part-time -- yes, I was
12 already a part-time employee.
13 Q  Do you recall approximately what year you
14 first became a part-time employee?
15 A  Yes, I do.
16 Q  What year was that?
17 A  Let's see. It was when my elderly ill
18 mother moved to Washington, D.C., so that was
19 probably 1997, give or take six months. That's when
20 I became a part-time employee.
21 Q  And it indicates on your CV that we've
22 marked as Exhibit 1 that you also do private
23 consulting?
24 A  Yes, it indicates that.
25 Q  Approximately how many hours a year do you

**Page 23**

1  provide private consulting?
2  A  Oh, my. Let's see. If we do it in
3  increments of hundreds of hours, approximately 100
4  to 150 hours per year.
5  Q  Can you tell me the entities for whom you
6  provided private consulting in the past year?
7  A  Yes.
8  Q  And what are they?
9  A  Pfizer Health Solutions, Inc.
10 P-f-i-z-e-r.  Cerner, Inc., C-e-r-n-e-r. Pfizer and
11 Cerner. That's all I remember now.
12 Q  Have you been asked to provide any private
13 consulting to McKesson Solutions?
14 A  No.
15 Q  Can you briefly describe the nature of
16 your private consulting for Pfizer Health Solutions?
17 A  Yes.
18 Q  Can you do that for me, please?
19 A  I helped them decide how to analyze claims
20 data for their disease management programs, when
21 requested, and similarly, when requested, I provide
22 them with codes -- the procedure for diagnosis or --
23 procedure, diagnosis or DME, durable medical
24 equipment, codes for their analyses related to their
25 disease management programs.

**Page 24**

1  Q  Are the -- is the disease management
2  program a program for Pfizer Health Solutions
3  employees?
4     MR. SHEK:  Object to the form of the
5  question.
6     BY MR. SEGAL:
7  Q  Let me rephrase the question.
8  A  Please. It's not --
9  Q  Are the claims that you're analyzing
10 claims that are filed by Pfizer Health Solutions
11 employees in connection with health benefits
12 provided to them?
13 A  No.
14 Q  Okay. What are the claims that you
15 analyze for Pfizer Health Solutions, Inc. related
16 to?
17 A  I do not analyze the claims. That's not
18 what I said I did.
19 Q  Okay. Let me try -- you provide codes for
20 certain claims?
21 A  I provide codes that can be used in Pfizer
22 Health Solutions' analysis of claims for disease --
23 their disease management program.
24 Q  Okay. The claims that are used in the
25 analysis, are those claims by Pfizer Health

```
 1      I HEREBY CERTIFY that I have read this
 2   transcript of my deposition and that this transcript
 3   accurately states the testimony given by me, with
 4   the changes or corrections, if any, as noted.
 5
 6
 7           x  /s/ George A. Goldberg
 8                  10/18/2005
 9
10
11   Subscribed and sworn to before me this        day of
12                , 20     .
13
14
15
16              x
17              Notary Public
18
19
20
21   My commission expires:
22
23
24
25
```

254

GEORGE A. GOLDBERG

BARKLEY
Court Reporters

# EXHIBIT 24

Case 1:04-cv-01258-SLR  Document 453-2  Filed 06/29/2006  Page 9 of 18

# REDACTED

# EXHIBIT 25

Case 1:04-cv-01258-SLR    Document 453-2    Filed 06/29/2006    Page 11 of 18

```
 1       IN THE UNITED STATES DISTRICT COURT
 2          FOR THE DISTRICT OF DELAWARE
 3
 4   McKESSON INFORMATION      )
     SOLUTIONS, LLC,           )
 5                             )
          PLAINTIFF,   )
 6                     )
         -vs-          ) No. 04-1258 SLR
 7                     )
     THE TRIZETTO GROUP, INC., )
 8                     )
          DEFENDANT.   )
 9
10              DEPOSITION
11        OF: ROBERT HERTENSTEIN, M.D.
12
13       The deposition of ROBERT HERTENSTEIN, M.D.,
14   called as a witness pursuant to notice and pursuant to
15   the provisions of the Federal Rules of Civil Procedure;
16   taken before BRENDA KAY LAUNIUS, CSR, RPR, a Notary
17   Public in and for the County of LaSalle, State of
18   Illinois, at 1928 War Memorial Drive, Peoria, Illinois,
19   commencing at the hour of 9:45 a.m., on the 13th day of
20   September, 2005.
21
22
23
24
25
                         Page 1
```

```
 1       APPEARANCES:
 2   SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP
       Attorneys at Law
 3   BY: MR. DAVID W. HANSEN
       525 University Avenue, Suite 1100
 4     Palo Alto, California 94301
       (650) 470-4500
 5
         appearing on behalf of the Plaintiff;
 6
 7   GIBSON, DUNN & CRUTCHER
       Attorneys at Law
 8   BY: MR. JEFFREY T. THOMAS
       4 Park Plaza, Suite 1400
 9     Irvine, California 92614-8557
       (949) 451-3800
10
         appearing on behalf of the Defendant.
11
12   ALSO PRESENT: GREG CLEMONS, Videographer
13          INDEX                 PAGE
14   WITNESS:
15   ROBERT HERTENSTEIN
16   Direct Examination by Mr. Thomas       4
17
18   EXHIBITS:
19   Exhibit No. 115 marked              45
20   Exhibit No. 116 marked              51
21   Exhibit No. 117 marked              65
22   Exhibit No. 118 marked              68
23   Exhibit No. 119 marked              77
24   Exhibit No. 120 marked              80
25   Exhibit No. 121 marked              84
                         Page 2
```

```
 1   EXHIBITS (Cont'd.)              PAGE
 2   Exhibit No. 122 marked           87
 3   Exhibit No. 123 marked           94
 4   Exhibit No. 124 marked           96
 5   Exhibit No. 125 marked          101
 6   Exhibit No. 126 marked          103
 7   Exhibit No. 127 marked          106
 8   Exhibit No. 128 marked          110
 9   Exhibit No. 129 marked          116
10   Exhibit No. 130 marked          121
11   Exhibit No. 131 marked          123
12   Exhibit No. 132 marked          125
13   Exhibit No. 133 marked          128
14   Exhibit No. 134 marked          131
15   Exhibit No. 135 marked          135
16   Exhibit No. 136 marked          140
17   Exhibit No. 137 marked          144
18   Exhibit No. 138 marked          146
19   Exhibit No. 139 marked          150
20   Exhibit No. 140 marked          152
21   Exhibit No. 141 marked          154
22   Exhibit No. 142 marked          156
23
24
25
                         Page 3
```

```
 1       THE VIDEOGRAPHER: All right. I'm Greg Clemons,
 2   videographer working for Barkley Court Reporters in
 3   California, Irvine, California. Today is September 13th,
 4   2005. It is 9:45 in the morning. We are at the Marriott
 5   in Peoria, Illinois. This is McKesson Information
 6   Solutions, LLC, Plaintiff, versus The Trizetto Group,
 7   Incorporated, Defendant, Civil Action Number 04-1258 SLR,
 8   and this is the deposition of Dr. Robert Hertenstein.
 9   Present we have Jeffrey Thomas, Gibson, Dunn and
10   Crutcher, and David Hansen with Skadden, Arps, Slate,
11   Meagher & Flom, LLP. Our court reporter is Brenda
12   Launius.
13       And, Brenda, if you could swear in the witness.
14       ROBERT HERTENSTEIN, called as a witness herein,
15   upon being first duly sworn on oath, was examined and
16   testified as follows:
17          (Witness sworn.)
18          DIRECT EXAMINATION
19   BY MR. THOMAS:
20   Q  Good morning, Dr. Hertenstein.
21   A  Morning.
22   Q  My name is Jeff Thomas, and I represent The
23   Trizetto Group, who is the defendant in this lawsuit that
24   we are here to talk about today. You understand that the
25   lawsuit that you're here about today is a patent case
                         Page 4
```

1 (Pages 1 to 4)
ROBERT HERTENSTEIN, M.D.

**Page 17**

1  necessary and paying claims for payment that came in from
2  doctors and hospitals?
3  A  Yes. We, of course, had a large group of
4  clerks who originally took the claims as they came in,
5  and then we had a system by which we evaluated the claims
6  depending upon their level of expertise.
7  Q  That group who reviewed these claims, did it
8  have a name of any kind?
9  A  Just the payment center, but I don't -- no, it
10 did not have a specific name, no.
11 Q  Was there someone who was in charge of this
12 group?
13 A  I was.
14 Q  When you became medical director?
15 A  Yes. The group was not present before I became
16 medical director. The level of payment of the claims, we
17 improved the quality of evaluation during that period of
18 time and the years after, too.
19 Q  When did this process to improve the processing
20 of the claims begin?
21 A  When I became medical director of the medical
22 insurance.
23 Q  That was in 1981?
24 A  '82.
25 Q  '82, okay. And when you took over in 1982, how

**Page 18**

1  many people -- how many Caterpillar employees were
2  involved in reviewing claims, processing claims?
3  A  Oh, I would guess -- I can't tell you the exact
4  number, but we had a large section in a separate
5  building. There must have been at least 40.
6  Q  And were these folks all clerks, or did any of
7  them have any sort of medical training?
8  A  When I arrived at Caterpillar, they were all
9  clerks, but I hired surgical technicians who had a direct
10 knowledge of surgery and the general medical care more
11 specifically than any of the clerks I had. And I hired
12 them because of their knowledge and the fact that I could
13 train them. They understood the terminology.
14 Q  And when did you start hiring these surgical
15 technicians?
16 A  In 1982.
17 Q  How many technicians did you hire?
18 A  Three.
19 Q  And what sort of background did these people
20 have?
21 A  They had all worked in the operating rooms for
22 at least ten years prior to their switching to doing what
23 they did at Caterpillar.
24 Q  And when they were hired by Caterpillar, what
25 were their responsibilities?

**Page 19**

1  A  They reported to me.
2  Q  Did the clerks report to them?
3  A  It was a rather loose arrangement. I'm not
4  sure they did. They weren't directly responsible to
5  them, but they cooperated with them, of course.
6  Q  Now, did these surgical technicians have any
7  background with the CPT code system?
8  A  They were trained mostly after they went to
9  work for Caterpillar.
10 Q  What kind of training did they receive in that
11 area?
12 A  Well, mostly this came from myself, and it was
13 an informal training. It was not a rigid form of
14 training, but they were exposed every single day to
15 claims and CPT-4 codes until they became quite proficient
16 at them.
17 Q  And when you say they became quite proficient,
18 do you mean they became quite proficient in determining
19 whether the code or codes on the claim were appropriate
20 for the procedure that had been performed?
21 A  That's correct.
22 Q  And the training that they received in that
23 area was based on your background and experience with the
24 codes that you had received in private practice?
25 A  Well, it was -- no, it was expanded far beyond

**Page 20**

1  what I knew in private practice. I became familiar with
2  all the areas of the CPT codes.
3  Q  You mean outside the surgical area?
4  A  Yes.
5  Q  So you -- did you educate yourself in the CPT
6  coding for areas outside of surgery so that you
7  understood those other areas like you already did for the
8  surgical area?
9  A  Yes.
10 Q  And then you passed along that knowledge to the
11 technicians that you had hired?
12 A  As they were able to be utilized in certain
13 specialized areas. There was usually always claims that
14 they couldn't handle, too, and they were brought to me,
15 so...
16 Q  Now, did -- was there some process in place to
17 determine what claims the technicians would look at?
18 A  Well, they -- they filtered from the most
19 inexperienced payor to a more sophisticated to the
20 supervisor, and then the supervisor would in turn, who
21 couldn't handle the claim or didn't understand the claim
22 completely or had questions about it, would refer it to
23 the surgical technicians. And then after them, if they
24 had questions about it, then I reviewed them myself. And
25 I reviewed claims almost every day, so...

```
 1              IN THE UNITED STATES DISTRICT COURT

 2                  FOR THE DISTRICT OF DELAWARE

 3

   McKESSON INFORMATION           )
 4 SOLUTIONS, LLC,                )
                                  )
 5         Plaintiff,             )
                                  )
 6      vs.                       ) No. 04-1258-SLR
                                  )
 7 THE TRIZETTO GROUP, INC.,      )
                                  )
 8         Defendant.             )

 9

10            I have read the foregoing

11 deposition, and the questions asked and the

12 answers given are correct and accurate except as

13 listed on the Statement of Change or Correction.

14

15                    [signature]
16                    ROBERT HERTENSTEIN, M.D.

17

18

19

20

21

22

23
```

                              256

ROBERT HERTENSTEIN, M.D. - VOLUME II                  BARKLEY
                                                      Court Reporters

EXHIBIT 26

```
                                                Page 535
 1                    - VOLUME C -
          IN THE UNITED STATES DISTRICT COURT
 2
          IN AND FOR THE DISTRICT OF DELAWARE
 3
                          - - -
 4
     McKESSON INFORMATION SOLUTIONS  :   CIVIL ACTION
 5   LLC,                            :
                Plaintiff            :
 6                                   :
          vs.                        :
 7                                   :
     THE TRIZETTO GROUP, INC.,       :
 8                                   :
                Defendant            :   NO. 04-01258 (SLR)
 9                          - - -
10
                                Wilmington, Delaware
11                              Wednesday, April 19, 2006
                                9:22 o'clock, a.m.
12
                          - - -
13
     BEFORE:  HONORABLE SUE L. ROBINSON, Chief Judge, and a jury
14
                          - - -
15
     APPEARANCES:
16
                SKADDEN, ARPS, SLATE, MEAGHER & FLOM
17              BY:  MICHAEL BARLOW, ESQ.

18                   -and-

19              SKADDEN, ARPS, SLATE, MEAGHER & FLOM
                BY:  JEFF RANDALL, ESQ.,
20                   BERNARD SHEK, ESQ. and
                     MICHAEL HENDERSHOT, ESQ.
21                   (Palo Alto, California)

22                   Counsel for Plaintiff

23                              Valerie J. Gunning and
                                Leonard A. Dibbs,
24                              Official Court Reporters
25
```

```
                                                Page 536
 1   APPEARANCES (Continued):
 2
              MORRIS, NICHOLS, ARSHT & TUNNELL
 3            BY:  JACK B. BLUMENFELD, ESQ.
 4
                   -and-
 5
 6            GIBSON, DUNN & CRUTCHER LLP
              BY:  JEFFREY THOMAS, ESQ.,
 7                 DAVID SEGAL, ESQ. and
                   T. KEVIN ROOSEVELT, ESQ.
 8                 (Irvine, California)
 9
                   -and-
10
11            GIBSON, DUNN & CRUTCHER LLP
              BY:  MICHAEL SITZMAN, ESQ.
12                 (San Francisco, California)
13                 Counsel for Defendant
14                          - - -
```

Page 537

PROCEEDINGS

(Proceedings convened at 9:22 a.m.)

THE COURT: All right. For purposes of the record, I'm going to read in my decisions about the two deposition designations. If there are any other depositions that are going to be read or played for the jury, I need to have those transcripts as soon as possible.

Kempe deposition, the objections were sustained on Page 29, Lines 8 through 14, Page 87, Lines 4 through 24. Page 91, Lines 3 to 6.

The objections were overruled on Page 90, Lines 22 to 23 and the objections on Pages 97 to 99. I actually didn't understand the grounds for the objections on Pages 38 to 9, 59 and 97 to 98. So if someone from TriZetto wants to fill me in on why those were objectionable, I might consider them.

MR. ROOSEVELT: Your Honor, we'll withdraw those objections.

THE COURT: With respect to the Keplinger deposition, the objections were sustained on Pages 55 through 8, 62 through 4, 87, 94, 161 to 62.

Page 538

The objections were overruled on Pages 68, 72 to 3, 78 to 80 and 83.

With respect to the missives I got from McKesson's counsel, this whole business of inducement, I don't recall having this kind of controversy before. No matter how long you're on the bench, I guess you always find something. I actually went through all the pattern jury instructions I have in my office. And in the interest of making this case as clean a record as possible, I have decided to embrace the jury instruction from the Federal RAM Circuit Bar Association on inducing infringement. Accordingly, it means that plaintiff must prove four things by the more probable than not standard.

First, that defendant encouraged or instructed another person how to use a product or perform a process in a manner that you, the jury, find infringes the patent claims.

Second, that defendant knew of the patent.

Third, that defendant knew or should have known that his or her encouragement or instructions would likely result in the other person doing that which you find to be infringement of the patent.

And, fourth, the other person infringed the patent. I.e., I am not going towards the specific

Page 587

```
 1  approximately 17,000 claims per hour?
 2       "Answer: No. Actually, I didn't understand
 3  that. I understood this to say that when I'm running
 4  claims through a nightly batch cycle -- which includes
 5  clinical editing, as well as many other things -- that
 6  I could assume that approximately 17,000 claims per hour
 7  would go through that cycle.
 8       "Question: Wouldn't each of the 17,000
 9  claims require some form of clinical editing of medical
10  service codes?
11       "Answer: I don't think so. It depends on
12  what is being -- what's contained in that claim, what
13  service codes are in that claim.
14       "Question: Given this statement by TriZetto
15  that its Facets system could process 17,000 claims per
16  hour, what was your understanding with respect to
17  approximately how many claims containing medical
18  service codes it could provide clinical editing to per
19  hour?
20       "Answer: I don't know that I considered
21  that at all, actually, so -- question.
22       "Answer: No, we didn't look at it -- don't
23  look at it that way when it comes to the processing of
24  the claims.
25       "Question: Ms. Drini, did you assist at all
```

Page 588

```
 1  or participate in the implementation of the Facets
 2  system at Providence?
 3       "Answer: Yes.
 4       "Question: And during that process, I want
 5  to ask you some questions specifically about the
 6  clinical editing of the medical service codes; okay?
 7       "Answer: Okay.
 8       "Question: Did TriZetto employees assist
 9  Providence in setting up the Facets system so that it
10  could operate?
11       "Answer: The Facets system?
12       "Question: Yes.
13       "Answer: I believe so.
14       "Question: And did they -- did TriZetto
15  assist Providence in making sure that the database
16  operated properly?
17       "Answer: I really can't answer that.
18       "Question: Is it your understanding that
19  the Facets system contains relationships between
20  medical service codes?
21       "Answer: Are you talking about clinical
22  editor?
23       "Question: Yes.
24       "Answer: Yes.
25       "Question: Okay. And do you understand that
```

Page 589

```
 1  Facets operates to compare, for instance, one medical
 2  service code within a claim with others that may be
 3  present in the claim?
 4       "Answer: I would say so, yes.
 5       "Question: I want to take you through a
 6  couple of examples of processing a claim; all right?
 7       "Answer: Okay.
 8       "Question: So Facets operates to receive a
 9  medical claim; is that right?
10       "Answer: Right.
11       "Question: Do you understand that Facets
12  operates to receive at least one medical claim?
13       "Answer: Yes.
14       "Question: Okay.
15       "Answer: I believe so.
16       "Question: Do you believe that Facets --
17  strike that.
18       "Do you understand the Facets system to
19  operate to determine whether, for instance, a
20  particular medical service code is valid, based on
21  its relationship with other medical service codes that
22  are submitted within the claim?
23       "Answer: Yes.
24       "Question: Do you understand the Facets
25  system to operate to determine whether to disallow
```

Page 590

```
 1  certain medical service codes for reasons other than
 2  medical service codes for reasons other than medical
 3  reasons? For instance, limits on pricing or other
 4  non-medical reasons.
 5       "Answer: I'm not sure how to answer that.
 6  If we're talking about clinical editor, those are
 7  predominantly based on medical reasons or coding rules.
 8       "Question: Or what?
 9       "Answer: Coding rules.
10       "Question: Coding rules.
11       "Do you understand that Facets also
12  disallows some medical service codes contained in a claim
13  for non-medical reasons?
14       "Answer: I'm -- not that I'm aware of.
15       "Question: Are you aware of any
16  relationships that are predetermined in the database
17  regarding, for instance, price limits or eligibility for
18  payment criteria?
19       "Answer: All of those are a part of the
20  Facets system, and those are set up based on contracted
21  rates or benefits, so yes.
22       "Question: Okay. So the Facets system, at
23  least as you understand it, does operate to disallow
24  medical service codes that -- based on benefit criteria
25  that may not be medical; is that right?
```

Page 591

1   "Answer: I would say no. I'm not sure I
2   clearly understand what you mean by medical.
3       "Question: All right. Well, there are
4   certain medical reasons for disallowing claims. Like,
5   for instance, you couldn't amputate the right leg twice;
6   right?
7       "Answer: Right.
8       "Question: Okay. And there are relationships
9   in the Facets database that will disallow claims for
10  medical reasons like that; correct?
11      "Answer: There could be, correct.
12      "Question: Are you aware of limitations on
13  paying medical service codes with the Facets system,
14  like, for instance, cosmetic services?
15      "Answer: Yes.
16      "Question: Okay. For instance, with respect
17  to a cosmetic medical service code, there's no particular
18  medical reason why that service could not have been
19  performed in connection with other medical services;
20  right?
21      "Answer: Right.
22      "Question: Well, do you understand that a
23  medical -- strike that -- a cosmetic medical procedure
24  could be performed with other medical procedures?
25      "Answer: Yes.

Page 592

1       "Question: And do you understand the Facets
2   system, for instance, to disallow medical -- strike
3   that -- cosmetic medical service codes that are submitted
4   in a claim with other medical service codes?
5       "Answer: Yes.
6       "Question: Even though the medical services
7   that were cosmetic and non-cosmetic could have been
8   performed at the same time?
9       "Answer: They could have been performed at
10  the same time, yes.
11      "Question: Okay. So when I talk about
12  non-medical, at least, I'm talking about some procedures
13  within a claim that could be performed at the same time,
14  could legitimately have been performed, but were
15  disallowed for reasons other than medical reasons.
16      "Do you understand that?
17      "Answer: Could be disallowed for not a
18  benefit or not medically indicated.
19      "Question: That's right.
20      "So do you understand -- without
21  understanding, do you understand that Facets operates
22  to disallow some medical service codes within a claim
23  based on non-medical reasons?
24      "Answer: It adjudicates the claim based on
25  the benefits or the -- yes.

Page 593

1       "Question: Okay. And so it adjudicates the
2   claim based on predominantly medical reasons, but also
3   some non-medical reasons; is that right?
4       "Answer: I don't think I can answer that
5   for non-medical reasons, even though you've explained
6   your definition, I'm not sure I'm comfortable answering
7   that.
8       "Question: Ms. Pierson?
9       "Answer: Well, I couldn't answer if it's
10  predominantly for medical reasons or not.
11      "Question: Okay. I won't ask you to
12  quantify it.
13      "I will just ask, the Facets system does
14  operate, as you understand it, to disallow some medical
15  service codes within a claim based on non-medical
16  reasons; correct?
17      "Answer: Yes. The Facets system --
18      "Mr. Kennedy: Objection. Leading. I
19  apologize.
20      "Answer: The Facets system allows for
21  configuration of our business rules for claims to be
22  denied for non-medical reasons.
23      "Question: So you understand Facets at
24  Providence to operate to disallow some medical service
25  codes within a claim based on non-medical reasons; is

Page 594

1   that right?
2       "Answer: I would say that Providence would
3   allow some claims to be disallowed for non-medical
4   reasons. I don't know that I would say it would allow
5   some medical service codes to be disallowed for
6   non-medical reasons, if that --
7       "Question: Well, let's say, for instance,
8   if a claim were submitted to Providence's Facets system,
9   and that claim contained both legitimate medical service
10  codes and medical service codes that would be rejected
11  for non-medical reasons, you wouldn't -- Providence's
12  Facets system wouldn't reject the entire claim, would it?
13      "Answer: There are times when just certain
14  line items are rejected, but your question was about
15  denying certain medical service codes, and what I'm
16  saying is I don't know if outside the clinical edits if
17  there are instances where Facets would deny a claim
18  based on the medical service code.
19      "Question: Which other medical service
20  codes?
21      "Answer: HCPS codes.
22      "Question: Can you spell that?
23      "Answer: That's H-C-P-S, all in caps.
24      "Question: And what are those codes?
25      "Answer: They are codes that predominantly