# EXHIBIT 26

# (PART 1)

Page 242

```
1              VOLUME B
2        IN THE UNITED STATES DISTRICT COURT
3         IN AND FOR THE DISTRICT OF DELAWARE
                      - - -
4
   McKESSON INFORMATION SOLUTIONS  :    CIVIL ACTION
   LLC,                           :
5             Plaintiff           :
6      vs.                        :
7  THE TRIZETTO GROUP, INC.,      :
8             Defendant           :    NO. 04-01258 (SLR)
9                     - - -
10              Wilmington, Delaware
11              Tuesday, April 18, 2006
                8:30 o'clock, a.m.
12
                      - - -
13
   BEFORE:  HONORABLE SUE L. ROBINSON, Chief Judge, and a jury
14
15
   APPEARANCES:
16
17        SKADDEN, ARPS, SLATE, MEAGHER & FLOM
          BY:  MICHAEL BARLOW, ESQ.
18               -and-
19        SKADDEN, ARPS, SLATE, MEAGHER & FLOM
          BY:  JEFF RANDALL, ESQ.,
20            BERNARD SHEK, ESQ. and
              MICHAEL HENDERSHOT, ESQ.
21            (Palo Alto, California)
22             Counsel for Plaintiff
23                    Valerie J. Gunning and
24                    Leonard A. Dibbs,
                      Official Court Reporters
25
```

Page 243

```
1  APPEARANCES (Continued):
2
3        MORRIS, NICHOLS, ARSHT & TUNNELL
          BY:  JACK B. BLUMENFELD, ESQ.
4
5                -and-
6        GIBSON, DUNN & CRUTCHER LLP
          BY:  JEFFREY THOMAS, ESQ. and
7            DAVID SEGAL, ESQ.
              (Irvine, California)
8
9                -and-
10       GIBSON, DUNN & CRUTCHER LLP
          BY:  MICHAEL SITZMAN, ESQ.
11           (San Francisco, California)
12             Counsel for Defendant
13                    - - -
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 244

2            P R O C E E D I N G S

3

4        (Proceedings convened at 8:30 a.m., and the

5   following occurred without the presence of the jury.)

6        THE COURT:  Good morning, counsel.

7        (Counsel respond "Good morning, your Honor.)

8        THE COURT:  I guess you can lay out what

9   issues we need to address in what order.  I have an idea

10  of what we need to address today, but I will let you be

11  the ringmasters here.

12       Are we all set with depositions?  I

13  understand from the e-mail that at least some of these

14  depositions are going to go forward, consistent, I hope,

15  with my guidelines.

16       Mr. Randall?

17       MR. RANDALL:  Yes, your Honor.  We have --

18  we've gone through the transcripts and we have at least

19  done our best to take out questions that referenced

20  either the patent or the claims in the questions, also

21  any questions that referenced the term predetermined

22  database.

23       We have done our best to remove those and

24  have made our designations and have given them to the

25  other side.  With respect to proceeding this morning

Page 245

1   in terms of the witnesses, we'd like to call our expert,

2   Dr. Musen, to the stand.  The only issues with respect

3   to his testimony are the submission within the Court's

4   guidelines prior to 48 hours before he took the stand,

5   we sent over screen shots that were previously disclosed

6   to counsel and videos of what are represented by the

7   screen shots.  Basically, the screen shots fading into

8   each other.

9        So we provided those.  The only objection

10  we got was we're objecting to the extent that you

11  intend to go beyond the scope of his report.  It's

12  really just a restatement of the rule that you made

13  very clear to both sides.  We don't intend to violate

14  that rule, so we -- they really didn't make any

15  objection to the substance of those documents.

16       And then the other issues that we would

17  like to bring up would be, one, a brief, brief argument

18  regarding Document J issue.  And then raise issues with

19  respect to Trizetto's attempts to put witnesses and

20  evidence on during their case.  Specifically, Ms.

21  Wukitch, who is here regarding our infringement case.

22  She is an employee of McKesson.  She really does not

23  have any information relating to the operation of the

24  products.

25       We've asked them if there's anything that's

Page 274

1    Are we ready to go forward at 9:30?  What are
2  we doing at 9:30?
3    MR. RANDALL:  Dr. Musen will take the stand,
4  your Honor.
5    THE COURT:  All right.
6    MR. RANDALL:  And so I don't know how long
7  the cross will be.  The direct, I sure hope it gets in in
8  about an hour and a half.  It could go longer, and then I
9  don't know about the cross.  And then, after that,
10  probably play the videos.
11    THE COURT:  All right.  We'll take a break,
12  then, and we'll come back at 9:30 with the jury.
13    Thank you.
14    (Short recess taken.)
15         - - -
16
17
18
19
20
21
22
23
24
25

Page 275

1
2    (Court resumed after the recess, and the
3  following occurred without the presence of the jury.)
4
5    THE COURT:  All right.  Before we go on, I
6  have reviewed the entire Document J, and actually, in
7  context, I agree that it is a privileged document, so
8  nothing will be produced to TriZetto.  So that ends the
9  saga of the privilege log.
10    All right.  Let's bring the jury in.
11    MR. RANDALL:  Your Honor, one thing.  I am
12  going to read a couple RFAs that I've already talked to
13  counsel about that there's no objection to and then
14  we'll put Musen on.  I just want to let you know that.
15    THE COURT:  All right.  I'm always glad to
16  hear about things to which there are no objections.
17  Keep filling my days with those.
18    MR. RANDALL:  I enjoy it as well.
19    (At this point the jury entered the courtroom
20  and took their seats in the box.)
21    THE COURT:  Good morning, ladies and gentlemen.
22  Mr. Randall?
23    MR. RANDALL:  Thank you, your Honor.
24    First, I'd like to read a few request for
25  admissions into the record as evidence and specifically

Page 276

1  I will read Admissions 10, 19, 20 and 21 of Trizetto
2  Group's responses to plaintiff's first set of requests
3  for admissions.
4    Request for Admission No. 10:  Erisco knew
5  of the '164 patent at least as early as January 1995?
6    Answer:  Admitted.
7    Request No. 19.  TriZetto instructs its
8  facts -- I'm sorry.
9    TriZetto instructs its Facets customers on
10  how to use Facets to perform clinical editing or auditing
11  of medical payments?
12    Answer:  Admitted.
13    No. 20:  TriZetto instructs its ClaimFacts
14  customers on how to use ClaimFacts to perform clinical
15  editing or auditing of medical payment claims?
16    Answer:  Admitted.
17    Request No. 21:  TriZetto instructs its
18  QicLink customers on how to use QicLink to perform
19  clinical editing or auditing of medical payment claims?
20    Answer:  Admitted.
21    And this is Exhibit 317 to which there is
22  no objection, your Honor.  I would offer it into
23  evidence.
24    THE COURT:  All right.
25    MR. THOMAS:  No objection, your Honor.

Page 277

1    THE COURT:  Thank you.
2  ***    (Plaintiff's Exhibit No. 317 was received into
3  evidence.)
4    MR. RANDALL:  Our next witness, your Honor,
5  is our expert witness for McKesson regarding the
6  infringement by TriZetto of ClaimFacts, Facets and
7  QicLink, and his name is Dr. Musen.
8    THE COURT:  All right.  Thank you.
9         - - -
10    PLAINTIFF'S TESTIMONY
11    CONTINUED
12
13    ... MARK ALLEN MUSEN, having been
14    duly sworn as a witness, was examined
15    and testified as follows ...
16  BY MR. HENDERSHOT:
17  Q.  Good morning, Dr. Musen.
18  A.  Good morning.
19  Q.  How are you today?
20  A.  Fine.
21  Q.  Would you please explain or describe your
22  educational background since high school?
23  A.  Sure.  I went to college at Brown University,
24  where I received an undergraduate degree in biology.  I
25  received a medical degree from Brown in 1980 and

CondenseIt™

## Page 278

1 from 1980 to 1983, I served as an intern and as a
2 resident in internal medicine at Stanford University
3 Hospital.
4 Q. So you're a medical doctor?
5 A. That is correct.
6        I'm board-certified to practice internal
7 medicine.
8        Subsequent to my residency, I became a Fellow
9 in general internal medicine. At the same time I became
10 a Ph.D. candidate at Stanford University in a field,
11 which at that time it was called medical information
12 sciences.
13 Q. Could you briefly describe what medical
14 information sciences are?
15 A. Sure. Now we would call it biomedical infomatics
16 and it's the study of how knowledge and data are used
17 in computers to perform a lot of tasks, but effectively
18 to improve physician decision-making.
19 Q. And where are you currently employed?
20 A. I'm a Professor at Stanford University.
21 Q. And what are you a professor of at Stanford?
22 A. I'm a Professor both of Medicine and Computer
23 Science.
24 Q. Are you involved with any research or academic
25 groups within Stanford?

## Page 279

1 A. Yes. I'm appointed within a group called
2 Stanford Medical Infomatics and I'm actually head of
3 that group.
4 Q. So in your work as a physician, were you ever
5 involved in the preparation or submission of billing
6 forms or medical claims?
7 A. Physicians typically don't submit the claims
8 themselves, but certainly once I was in a position
9 where I was legally responsible for patients, I was in
10 a position to indicate services that I had done for
11 patients and to communicate to the staff in charge of
12 billing what services ought to be billed for.
13 Q. And in the course of those activities, were you
14 ever -- did you ever have any experience in working
15 with medical service codes?
16 A. Certainly.
17 Q. And what form of medical service codes?
18 A. Those -- uniformly were CPT codes. That's the
19 current procedural terminology that is used throughout
20 the nation for medical billing.
21 Q. And have you ever received any formal training
22 or continuing education with respect to billing
23 practices?
24 A. Well, certainly not in medical school, but
25 subsequently, once I was responsible for filling out

## Page 280

1 the forms necessary to ensure billing, I received
2 informal training. There was, in fact, a period of
3 time in the early nineties when there was a lot of
4 concern about academic medical centers that might have
5 been overbilling Medicare and suddenly Stanford and
6 other facilities gave training in how to select certain
7 codes for certain services.
8 Q. So we've dealt with your experience as a physician
9 briefly. Could you briefly describe your experience in
10 computer science? Do you have any area of focus within
11 that field?
12 A. Sure. My work is in the area of medical
13 knowledge-based systems. Throughout my career, I've been
14 working
15 on the problem of how to take clinical knowledge and
16 represent it within computers to get computers to do
17 things that people would call intelligent and to use
18 those computer systems to help doctors do better work.
19 Q. And the areas in which your work and professional
20 experience have focused, in your opinion, do they have
21 any particular relevance to the technical fields
22 implicated by the '164 patent?
23 A. Oh, quite coincidentally, my area of work is in
24 expert systems, which is clearly the topic of the
25 patent. I also have obviously substantial background

## Page 281

1 in medicine. And so this patent sort of fits very
2 nicely in the kind of work that I do.
3 Q. And I don't mean to embarrass you or put you on
4 the spot, but have you been recognized with any awards
5 or other recognitions in your work in medical
6 infomatics?
7 A. Yes.
8 Q. Could you briefly list a few significant ones?
9 A. In 1989, I received from the American Society for
10 Medical Systems and Infomatics a career -- a career
11 award known as the Award for Research in Knowledge-based
12 Systems. I received a Young Investigator Award from the
13 National Science Foundation in 1992. That was the last
14 Young Investigator Award I guess I will ever get.
15        I received election to something called the
16 American Society of Clinical Investigation, which is an
17 honor society for physician scientists.
18        I was elected to become a fellow of the
19 American College of Medical Infomatics, which is an
20 honor society for people in both academia and industry
21 who are concerned with medical knowledge and medical
22 data processing and computers.
23 Q. And how did you become involved with this case,
24 Dr. Musen?
25 A. I received a call from Skadden and was told that I

Jury Trial – Volume B                CondenseIt™                Tuesday, April 18, 2006

Page 282

1  had expertise that was particularly well suited for this
2  case and, in fact, when the case was described to me, it
3  seemed interesting to me.
4  Q.  And for what purpose were you retained?
5  A.  As a consultant to McKesson's counsel, to provide
6  advice regarding the original '164 patent and to look
7  at the TriZetto products and their functions.
8  Q.  And during your work in this case, did you review
9  materials regarding the TriZetto products?
10  A.  Yes, I did.
11  Q.  And did you review the '164 patent?
12  A.  Yes, I did.
13  Q.  Did you study the patent?
14  A.  Many times.
15  Q.  Okay.  Analyze it?
16  A.  Many times.
17  Q.  And you feel you have an understanding of the '164
18  patent?
19  A.  Yes, I do.
20  Q.  Did you prepare an expert report for disclosure to
21  TriZetto in this case?
22  A.  Yes, I did.
23        MR. HENDERSHOT:  Your Honor, at this point
24  McKesson offers Dr. Mark Musen as an expert in computer
25  science, medical expert systems and medical coding and

Page 283

1  computer science.
2        THE COURT:  Any objection?
3        MR. SITZMAN:  No objection, your Honor.
4        THE COURT:  All right.
5              - - -
6  BY MR. HENDERSHOT:
7  Q.  Dr. Musen, did you say that you had a chance to
8  review the '164 patent in this case?
9  A.  Yes.
10  Q.  You understand that it's been marked as Exhibit A
11  and entered into evidence already?
12  A.  Yes.
13        MR. HENDERSHOT:  May it please the Court,
14  may I approach the witness and give him a copy of the
15  patent?
16        THE COURT:  Yes, you may.
17  BY MR. HENDERSHOT:
18  Q.  Dr. Musen, I'm going to hand you Trial Exhibit 1,
19  the '164 patent in this case.
20  A.  Thank you.
21  Q.  Is that the same patent you looked at?
22  A.  Yes, many times.
23              - - -
24
25

Page 284

1
2  Q.  All right.  Which -- do you understand that the '164
3  patent includes claims?
4  A.  Yes, I do.
5  Q.  Which claims of the patent do you understand to be
6  at issue at this point in the case?
7  A.  Claims 1, 2 and 16.
8  Q.  And have you analyzed Claims 1, 2 and 16?
9  A.  Yes, I did.
10  Q.  In preparing your opinions, did you interpret the
11  meaning of the terms within Claims 1, 2 and 16?
12  A.  Yes.
13  Q.  Did you reach any conclusions as to their meaning?
14  A.  At the time that my original report was filed, I
15  assumed that they took on their ordinary meaning.  I
16  know that the Court subsequently has construed them as
17  well.
18  Q.  Since preparing your report, have you had an
19  opportunity to review the Court's interpretation of
20  those terms?
21  A.  Yes, I have.
22  Q.  Did your review of those rulings and those
23  decisions change the opinions expressed in your report
24  regarding Trizetto's infringement?
25  A.  Not at all.

Page 285

1  Q.  All right.  So aside from the patent which has
2  been marked Exhibit 1 and the Court's interpretation of
3  the meaning of the claims, have you had an opportunity
4  to review other materials in this case?
5  A.  Yes.
6  Q.  Have you reviewed materials relating to Trizetto's
7  products?
8  A.  Yes.
9  Q.  Could you briefly list the sort of documents that
10  you reviewed?
11  A.  Yes.  I received a suitcase full of user manuals,
12  product literature, sales information and any requests
13  that TriZetto had made in response to a request for
14  proposals.
15  Q.  Have you also reviewed marketing materials?
16  A.  Yes.  Product literature.
17  Q.  And when I say the TriZetto products, what products
18  do you understand me to be referring to?
19  A.  The three products that we'll be talking about:
20  Facets, ClaimFacts and QicLink.
21  Q.  Have you also had an opportunity to review the
22  products in operation?
23  A.  I've had a chance to interact with Facets in a
24  laptop.  The other two products I've not actually
25  interacted with, but I've seen videotapes of their

Page 286

1  interaction.
2  Q.  And have you reviewed deposition transcripts of
3  the sworn testimony of witnesses in this case?
4  A.  Yes.  I've reviewed depositions of TriZetto
5  employees and several users of the TriZetto products.
6  Q.  Have you reviewed the transcripts of any TriZetto
7  executives?
8  A.  Yes.
9  Q.  And have you had the opportunity to review any
10  other expert reports in this case?
11  A.  Yes.  Doctor Margaret Johnson, my colleague at
12  Stanford, prepared a report on the workings of the
13  Facets and other of the TriZetto products.  I've
14  certainly read the expert reports that TriZetto has
15  submitted as well.
16  Q.  In your review of the patent and analysis of it and
17  the materials produced in this case, have you come to an
18  understanding of what field the patent is directed to?
19  A.  Yes.
20  Q.  Could you generally describe to the jury what field
21  that is?
22  A.  It's the field of medical claims processing, the
23  field of providing a mechanism for health care providers
24  to seek reimbursement for the services that they perform
25  when they take care of patients.

Page 287

1  Q.  Have you had the opportunity to prepare a
2  demonstrative illustrating the field?
3  A.  Yes, I have.
4      MR. HENDERSHOT:  Would you bring up Slide 1,
5  please?
6  BY MR. HENDERSHOT:
7  Q.  Do you recognize this slide, Dr. Musen?
8  A.  Yes, I do.
9  Q.  Was this prepared by your or at your direction?
10  A.  Yes.
11  Q.  Are you prepared to explain what you are
12  illustrating here?
13  A.  This slide demonstrates in a very simple way the
14  three major classes of players, if you will, in the
15  health care process when it comes to reimbursement.
16      The patient, who seeks medical care.  The
17  provider, the doctor, who provides the services and
18  hopefully makes the patient better.  And payment
19  company, typically an insurance company or Medicare or
20  Medicaid, who ultimately provide the payment to the
21  doctor for what he does to help the patient.
22  Q.  Have you prepared a slide -- slides in addition to
23  this one?
24  A.  Yes.
25      MR. HENDERSHOT:  Bring up the next slide,

Page 288

1  please.  Slide 2.
2  BY MR. HENDERSHOT:
3  Q.  What are you illustrating here, Dr. Musen?
4  A.  That communication between the doctor's office and
5  the payment company takes place by what's called a
6  medical claim.  In this graphic, we use the idea of a
7  universal paper-based claim form, which is sometimes
8  used.  More often, the claims are actually submitted
9  electronically, but that does not really matter.
10  Q.  All right.  If I could stop you for a minute, the
11  medical claim that you referred to, those are -- those
12  are items or documents that you were involved with or
13  had experience with in your practice as a physician?
14  A.  I never actually filled out the claim forms that
15  were submitted to the insurance companies.  I filled
16  out forms which ultimately would inform the people who
17  prepared the claims.
18  Q.  Okay.  Were those claims prepared by physicians?
19  A.  No.  No.  By people who are trained to actually
20  deal with medical claims processing and medical claims
21  creation.
22  Q.  Okay.  Continue on.  I didn't mean to interrupt.
23  A.  Sure.  Well, the medical claim is basically a bill.
24  It says who the patient is, what's wrong with the
25  patient, what the doctor did, and each kind of procedure

Page 289

1  that the doctor did in taking care of the patient is
2  noted by using a particular code, which says very
3  specifically what happened during the patient encounter
4  with the physician.
5  Q.  And what sort of codes are used to represent the
6  services provided?
7  A.  Well, they are rather arcane looking codes.
8  They're numbers that come out of a coding system called
9  current procedural terminology, which right now is
10  maintained by the American Medical Association.  We're
11  now in the fourth revision of this, fourth major
12  revision of this current procedural terminology.
13  Sometimes we just call this CPT codes for short.
14      MR. HENDERSHOT:  Could you bring up Slide 4?
15  BY MR. HENDERSHOT:
16  Q.  Dr. Musen, there's a graphic on the screen now.
17  Is that -- is that a medical claim form?
18  A.  Right.  That's a universal medical claim form that
19  sometimes is used.  It provides blanks for doctors and
20  their staff to put out -- put in information concerning
21  the patient, demographic data, the diagnoses for the
22  patient.  And at the very bottom of the form, the
23  particular medical service codes that comprise what happen
24  to the patient during the visit.
25      MR. HENDERSHOT:  May we see the next slide?

Jury Trial - Volume B                ConDenseIt™                Tuesday, April 18, 2006

Page 290

1  BY MR. HENDERSHOT:
2  Q.  You had mentioned the CPT codes, Dr. Musen. In
3  fact, they come in a manual?
4  A.  That's right. It's a big book. It's over 10,000
5  different codes that are specific descriptions of just
6  about everything you could imagine a doctor could do.
7  They go from very general codes to the idea of an office
8  visit that is, say, of limited duration or intermediate
9  duration. They include every possible surgery on every
10  possible part of the body you can ever imagine.
11  Basically, anything that a doctor might do for which he
12  might submit a bill is included in the CPT manual.
13  Q.  Okay. So you said a medical claim is analogous to
14  a bill?
15  A.  That's correct.
16  Q.  And the medical service codes which you're
17  discussing here on this slide are the line items for
18  which payment is being requested?
19  A.  Exactly. Exactly.
20  Q.  All right. And those medical service codes are
21  commonly the CPT codes?
22  A.  United States -- in the United States, they are
23  uniformly CPT codes.
24  Q.  All right. We've talked about the -- the field of
25  the invention in general, some of the relevant

Page 291

1  terminology. You also had an opportunity to prepare an
2  illustration of a more specific example of this process?
3  A.  Yes, I did.
4     MR. HENDERSHOT: Bring up Slide 5.
5  BY MR. HENDERSHOT:
6  Q.  Did you prepare this slide, Dr. Musen?
7  A.  Yes, I did. I thought it would be good to actually
8  provide an example of how the whole process works in a
9  very simple way.
10  Q.  You indicate here this is a potential patient?
11  A.  That's right. This slide shows a potential patient.
12  You'll see that on the next slide, it's more than a
13  potential patient.
14     MR. HENDERSHOT: Bring up the next slide.
15     THE WITNESS: We're assuming we have a
16  mountain biker who has fallen off his bike. Just in a
17  simple scenario, we'll assume the mountain biker
18  sustained an abrasion to his forearm. An abrasion is a
19  scrape. More than a simple abrasion. This one has
20  gravel in the arm. There's pieces of gravel, foreign
21  bodies, that the doctor will have to remove.
22  Q.  This is a fall down the trail?
23  A.  Yes.
24     MR. HENDERSHOT: Bring up the next slide.
25

Page 292

1  BY MR. HENDERSHOT:
2  Q.  What are you illustrating here?
3  A.  These are the same players we saw earlier. The
4  doctor who sees the patient to remove the gravel to have
5  the abrasion taken care of and ultimately the payment
6  company, who insures the doctor will get paid for his
7  services.
8     MR. HENDERSHOT: Bring up the next slide,
9  please.
10  BY MR. HENDERSHOT:
11  Q.  Now, Dr. Musen, you had discussed earlier how a
12  medical claim is akin to a bill?
13  A.  That's right.
14  Q.  And the medical service codes, I think are
15  illustrated here on this slide at 1 and 2, are akin to
16  the line items for which charges are being requested?
17  A.  Correct.
18  Q.  Would you explain to us how those medical service
19  codes fit into the claim here in this example?
20  A.  Right. Well, the doctor on his clipboard or her
21  clipboard, presumably, it's hard to tell, is filling out
22  the claim. Not the claim itself, but the documentation
23  required for the medical care of the patient. Someone
24  in the doctor's office will ultimately transcribe that
25  information either electronically or on paper onto this

Page 293

1  claim, which ultimately will arrive in the payment
2  company's files and the payment company will be
3  responsible for looking at the claim and deciding how
4  to reimburse for the services the doctor has done.
5     In this case, the claim or the bill says the
6  doctor has done two things: There has been an injection
7  of an anesthetic and there has been the removal of the
8  gravel.
9     And the claim that gets submitted to the
10  insurance company doesn't say anesthetic injection or
11  removal of gravel. What it does, it says the very
12  specific code from the CPT form coding manual that
13  corresponds to what the doctor did.
14     So in this case, the doctor will say that,
15  or the claim will say that Code 64450, which is removal
16  of a foreign body from the subcutaneous tissue under
17  the skin, was one thing that was done. I'm sorry, 64450
18  is the anesthetic injection and then Code 10120 is
19  removal of the gravel. And as you can see from the way
20  I tripped up, when a claim form has just a whole series
21  of numbers, sometimes it gets a bit complicated to
22  figure out what the claim is actually all about.
23  Q.  And just to take a step back, at the doctor's
24  office, could you describe briefly the process by which
25  the services that are rendered by the physician are

McKesson v. Trizetto, CA No. 04-1258 (SLR)                Page 290 - Page 293

Page 294

1  eventually captured and included on a claim form that's
2  submitted to a payment company?
3  A.  Right.  So the doctor is going to bring the
4  patient into the surgical office room.  This procedure
5  doesn't really require an operating room.  The doctor
6  is going to first inject the patient with an anesthetic
7  so that there's no sensation in the area.  The doctor
8  will then clean up and scrub up and remove all the dirt.
9         The doctor will then do the surgery to remove
10  the foreign bodies, the gravel that's imbedded in the
11  arm and address the wound and send the patient on his
12  way, presumably.
13         At that point, the doctor will write a note
14  saying exactly what he did in English, and then the
15  doctor will presumably fill out a form, which will then
16  allow his staff to submit the claim form to the insurance
17  company.
18  Q.  So the form is filled out by the physician?
19  A.  Well, the physician fills out a form, indicating
20  generically what happened.  The actual claim is prepared
21  by other staff.
22  Q.  So the process of selecting the medical service
23  codes in a physician's office requires deciphering the
24  notes that the doctor jotted down?
25  A.  Yes.  The doctor's notes or the form that's given

Page 295

1  to the staff may actually enumerate certain kinds of
2  service codes.  But sometimes the doctor may not know
3  the service code for what he or she does, in which case
4  a doctor will simply write in English what took place
5  and it's really up to the person that's responsible for
6  coding the claim form to go to the CPT form manual or
7  perhaps just know what the right code is and to include
8  it on the claim form that goes to the insurance company.
9  Q.  So in your illustration here, the physician has
10  treated the patient, administered an injection into the
11  patient's arm, removed the gravel from the skin or the
12  subcutaneous tissue?
13  A.  Correct.
14  Q.  And the claim has been prepared with a corresponding
15  Code 64450 and 10120?
16  A.  That's correct.
17  Q.  And it has been submitted to the payment company?
18  A.  That's correct.
19  Q.  Could you explain what happens from here?
20  A.  Well, if all goes well from the physician's
21  perspective, the payment company will receive the bill,
22  will see that the total charges are $159.89, and issue a
23  payment to the doctor for that amount.
24         There may be other things that take place.
25  The patient may have deductibles.  There may be

Page 296

1  co-insurance.  Things can be complicated but,
2  fundamentally, that's what happens.
3         MR. HENDERSHOT:  Could you bring up the next
4  slide, please?
5  BY MR. HENDERSHOT:
6  Q.  So in this example, Dr. Musen, could you explain
7  what happened to the claim?
8  A.  Yes.  The insurance company received the claim.  It
9  has paid a certain amount for the anesthetic injection,
10  which is denoted by Claim 64450.  It has paid a similar
11  amount for the removal of the gravel, Code 10120, and
12  issued a payment for the total amount of $159.89 to the
13  doctor.
14  Q.  And so we've seen the overall process and the
15  specific example.
16         Have you had an opportunity to analyze and
17  develop an opinion as to where the '164 patented
18  invention fits in this process?
19  A.  It fits right in the middle.  The '164 patent is
20  concerned with medical claims processing, and
21  particularly if the claims that are of most interest to
22  us concern how to deal with the situation when a bill
23  from a doctor contains more than one code.
24  Q.  Okay.  In the example we've seen, with 64450 and
25  10120, is there any potential inappropriate coding here?

Page 297

1  A.  Yes, there is.
2  Q.  Could you explain briefly what that is?
3  A.  Well, if you were actually to look at the CPT form
4  manual, you would be able to see, where it's also
5  described very cleanly in the first example of the
6  situation of the patent itself.
7         It turns out that akin to the convention is
8  that when one performs a local surgical operation, the
9  cost of the anesthesia is included in the cost of the
10  whole procedure.
11         So ordinarily, when one has a small surgical
12  procedure, of course, there's anesthesia.  The anesthesia
13  is medically required.  But the doctor should not be
14  billing the patient for the anesthesia that's included in
15  the whole procedure.
16         It's like going to the supermarket and buying
17  some groceries and having somebody charge you for the
18  bag.  You assume when you buy the groceries the bag is
19  included.
20         In this kind of a situation, you assume that
21  if you are paying for the surgical procedure, that cost
22  includes the anesthesia, which is medically indicated.
23         MR. HENDERSHOT:  Bring up the next slide,
24  please.
25         Go back to the previous slide.

Page 298

1          Thank you.
2    BY MR. HENDERSHOT:
3    Q.  So in this example, Dr. Musen, the physician
4    administered an anesthetic agent?
5    A.  That's right.
6    Q.  Is that a good idea if someone has something
7    imbedded in their arm?
8    A.  It's essential.
9    Q.  All right.
10   A.  Most people prefer anesthesia.
11   Q.  Okay.  So they administer the anesthesia.  So for
12   medical purposes, the anesthesia was necessary?
13   A.  Absolutely.
14   Q.  But because of some billing convention, there's
15   some other non-medical reason it shouldn't be paid?
16   A.  Right.  The billing convention, the cost of the
17   anesthesia is included in the overall service.
18   Q.  There are circumstances where codes may accurately
19   in general describe and appear to describe what services
20   were administered to a patient that would have been
21   completely medically appropriate but nonetheless shouldn't
22   be paid for some reason?
23   A.  Right.  Indeed, the physician, when he writes his
24   note that describes what happens in the office will
25   describe in great detail what kind of anesthesia was

Page 299

1    administered.  Will indicate that there was a nerve block
2    that was performed to numb up the area before surgery
3    was done.  So the medical documentation includes all the
4    information about the anesthesia.  It's just not an
5    appropriate billing code for the form that gets submitted
6    to the anesthesia.
7          MR. HENDERSHOT:  Let's go back one slide,
8    please.  Go back one more.
9          Actually, go back four.  Sorry about that.
10   BY MR. HENDERSHOT:
11   Q.  So in this example, Dr. Musen, there are two
12   medical service codes submitted on the claim?
13   A.  That's correct.
14   Q.  And there's a charge associated with the entire
15   claim, which is $159, I believe you saw in the example?
16   A.  That's correct.
17   Q.  Where did that total charge come from?
18   A.  There was a line item for the anesthesia and a line
19   item for the removal of the foreign body.
20   Q.  So each item on a claim or medical service code on
21   a claim will have a corresponding charge with it; is that
22   correct?
23   A.  That's correct.
24   Q.  And the sum of those charges result in the total
25   claim that's being submitted?

Page 300

1    A.  Right.  It's like going to a restaurant and getting
2    a bill.  You get a bill for your salad.  You get a bill
3    for your entree.  You get a bill for desert.  That's
4    just what a medical claim is.
5    Q.  So each of the items correlate in that example to
6    a medical service code whereas the entire bill for the
7    meal is the claim?
8    A.  That's right.
9    Q.  In this instance, the restaurant tried to charge
10   for the silverware?
11   A.  Yes.  That's part of the deal.  You don't expect
12   to pay for silverware rental when you go to a restaurant.
13   Q.  So in this example, one of the codes should have
14   been paid, one of them shouldn't?
15   A.  Exactly.
16   Q.  What is the end effect of that in this example?
17   A.  What ultimately happens is that the insurance
18   company ends up paying more for the service than is
19   appropriate and we assume that means the premium of
20   the patient would go up in the grand scheme of things.
21   Q.  So who, in general, bears the cost of increased
22   health care expenses like this additional payment here?
23   A.  Well, we all do because it means either the cost
24   of Medicare goes up or the cost of private insurance
25   goes up and, in every case, that gets passed on to the

Page 301

1    recipients in terms of more taxes or more premiums.
2    Q.  Now, we've seen a single example with two codes
3    here?
4    A.  That's correct.
5    Q.  You mention there are 10,000 codes or so, roughly,
6    in the CPT manual?
7    A.  That's right.
8    Q.  That sounds like millions of combinations to me?
9    A.  That's right.  That's why coding is so complicated
10   and that's why it takes specialists to do it.
11   Q.  So we've seen one example.  Is the potential for
12   overpayment due to miscoding, is that a significant risk
13   to the national health care industry?
14   A.  Well, in Trizetto's product or sales literature, it
15   says that customers can expect a 5 to 15 percent savings
16   if they can identify these kinds of situations.
17   Q.  5 to 15 percent, if you apply that to national health
18   care costs generally, do you have any ball park
19   where that would get us?
20   A.  I'm not a health economist.  If you think health
21   care costs 14, 15 percent of the gross domestic product
22   annually, that's millions or billions of dollars that
23   might be saved.
24   Q.  That's millions or billions of dollars that might
25   be saved and passed on to patients and people like us?

Page 302

1  A.  That's right.

2  Q.  All right.

3  A.  It's more than that because we certainly take in

4  the cost of all of our commodities.  The health care

5  insurance that manufacturers have to pay for their

6  employees.  That's why automobiles are so expensive.  We

7  pay more for the health care of GM employees when we buy

8  a GM car.

9  Q.  Is it fair to say the health costs generally have

10  a significant impact on the economy?

11  A.  Absolutely.

12      MR. SITZMAN:  Your Honor, I object.  This is

13  outside the scope for which this expert was qualified.

14  We're getting into health care reform and other health

15  care policies.

16      THE COURT:  All right.  Thank you for your

17  objection.

18  BY MR. HENDERSHOT:

19  Q.  So, Dr. Musen, we talked in general about the

20  problem addressed by the '164 patent and some of the

21  benefits that it confers.

22      Have you had an opportunity to sort of

23  understand and analyze how it provides those benefits?

24  A.  Yes, I have.

25  Q.  Does the '164 patent provide any examples or

Page 303

1  illustrations as to how it would address these problems?

2  A.  Yes.

3  Q.  Miscoded claims being the problems?

4  A.  Yes.  It has an appendix that gives several traces

5  of how the system actually solves problems.

6  Q.  And in your review of the patent, did you review

7  this appendix with these examples?

8  A.  Extensively.

9  Q.  You did so in preparing your opening report?

10  A.  Yes.

11  Q.  And did you rely on those examples in forming your

12  opinions that were set forth in your report?

13  A.  Of course.

14  Q.  All right.  This is almost a silly question, but

15  I assume you read Example 1, the first example?

16  A.  It was the first one I read.

17  Q.  All right.  Have you prepared some slides

18  illustrating how Example 1 generally depicts the invention

19  of the '164 patent?

20  A.  Yes, I have.

21      MR. SITZMAN:  Your Honor, I just would like to

22  make a standing objection to this area, as we've talked

23  about before.

24      THE COURT:  All right.  Thank you.

25      MR. SITZMAN:  Thank you.

Page 304

1      MR. HENDERSHOT:  Bring up Slide 16, please.

2  Okay.

3  BY MR. HENDERSHOT:

4  Q.  Dr. Musen, do you recognize what's on the slide?

5  A.  Yes.

6  Q.  What do you recognize it as?

7  A.  I recognize it as a bad photocopy of a poorly

8  printed patent specification.  And this is the beginning

9  of the discussion of examples of the use of the patented

10  invention.

11  Q.  Now, you have a copy of the '164 patent in front

12  of you; correct?

13  A.  Yes.

14  Q.  It doesn't have an electronic interface or anything

15  in that stack of paper?

16  A.  No.

17  Q.  You understand when you are representing electronic

18  images in a patent, you're somewhat limited by the

19  physical medium?

20  A.  That's right.  It's a type script of what would

21  occur as what would be interactive with the invention.

22  Q.  Would you walk us briefly through what Example 1 of

23  the patent is?

24  A.  Sure.  As we can see, it says at the top, there's

25  a prompt from the computer that says please enter all

Page 305

1  CPT-4 procedure codes appearing on the claim, or, if a

2  code is absent, look up the code using the CPT-4

3  procedure manual.

4      The user entered two codes.  These are the

5  two codes we talked about previously, Code 64450, which

6  is the code for a nerve block and regional anesthetic

7  and Code 10120, which is the code for the actual

8  removal of the foreign body from the forearm of our

9  bicyclist.

10  Q.  So Example 1 of the '164 patent illustrates the

11  processing of the codes that we just used in our

12  mountain biking example?

13  A.  What a coincidence, yes.

14      MR. HENDERSHOT:  Could we see the next slide,

15  please?

16      THE WITNESS:  So what we see here is the

17  computer actually verifies that those are legitimate

18  CPT-4 codes and confirms their meaning by looking the

19  codes up in the database and saying that 64450 is indeed

20  injection for the nerve block and Code 10120 is removal

21  of the foreign body.

22  BY MR. HENDERSHOT:

23  Q.  You said this indicates the computer looked up

24  the codes in the database, determined that they were

25  legitimate?

## Page 306

1 A. Yes, because the user just typed in the numbers
2 and the computer comes back with the actual English
3 description.
4 Q. Those are the words to the right of the numbers in
5 the box there?
6 A. That's correct.
7 Q. And there are also some numbers added there?
8 A. Right. The computer has also counted up the number
9 of codes and it puts each one on a separate line.
10 Q. Okay.
11      MR. HENDERSHOT: Let's see the next slide,
12 please.
13      THE WITNESS: We see the heart of the
14 invention because what the computer has done is said,
15 look, Code 10120, the removal of the foreign body, is
16 the code that should be assigned for payment because
17 that actually is the surgical procedure at issue, and
18 the code for the anesthesia is 64450, has been rejected,
19 allegedly, as we'll see in a moment because that should
20 be bundled in the cost of the actual operation.
21 BY MR. HENDERSHOT:
22 Q. So as you discussed before, the submission of the
23 anesthetic agent with the overall surgical procedure
24 that requires an anesthetic agent is inappropriate?
25 A. That's correct.

## Page 307

1 Q. And that's what's being illustrated here?
2 A. That's right.
3 Q. You say that 10120, which is the removal of the
4 foreign body or gravel, has been authorized here?
5 A. Yes.
6 Q. And 64450 has been rejected?
7 A. Right.
8 Q. What on the screen indicates that to you?
9 A. The computer response says that the code has been
10 assigned for payment.
11 Q. Okay. So the original claim that's submitted by
12 the physician was, I've administered an anesthetic
13 agent. I removed from gravel from the patient's arm.
14 I want to get paid for the anesthetic agent and removing
15 the gravel, and represents that in two codes?
16 A. That's right. And that's the claim that's
17 rejected.
18 Q. Okay. So the claim is rejected as submitted. And
19 then apparently the charge of the codes are revised, as
20 illustrated here?
21 A. That's right.
22 Q. It says, assign the following codes for payment:
23      What do you understand that to indicate?
24 A. It means that the original claim is rejected. A
25 new claim is created and that one is assigned for

## Page 308

1 payment.
2 Q. You say a new claim.
3 A. It's not a new claim. It's a revision of the one
4 that was submitted.
5 Q. The improper claim that's received is rejected,
6 the request for the two codes and then the claim is
7 corrected based on a detection by the system?
8 A. That's right.
9 Q. And the corrected claim is authorized?
10 A. Right and it's all done automatically without
11 having to send the claim back to the doctor to have it
12 redone or whatever. It just takes place at the time of
13 the claims processing.
14 Q. All right. Could you go onto the next slide,
15 please?
16      And what does this illustrate, Dr. Musen?
17 A. Well, that's the explanation provided by the
18 computer to explain what happened.
19      It says that 64450, the code for the
20 anesthesia, is excluded because it's inappropriate to
21 bill for that in the context of the surgery.
22      And Code 10120 has been accepted with no
23 change, and that's the code that will appear on the
24 revised bill.
25 Q. And that's consistent with your explanation earlier

## Page 309

1 about the -- the medical necessity of administering an
2 anesthetic agent but the billing impropriety of it?
3 A. Right. The computer is not saying that people
4 should not get anesthesia. The computer is simply
5 saying that there is a reason that it has to deal with
6 coding system, that one should not be billing separately
7 for anesthesia here.
8 Q. All right. The slide we walked through is Example
9 1.
10      In your view, does that relate or in some
11 way illustrate the patented invention?
12 A. Yes. And the people that filed the patent thought
13 it was the best example, too.
14      MR. SITZMAN: Your Honor, we also want to
15 raise a substantive objection here. There is -- relevance.
16      THE COURT: Thank you. But we're still going
17 to proceed.
18      MR. SITZMAN: Okay.
19 BY MR. HENDERSHOT:
20 Q. So, Dr. Musen, you've explained the background of
21 the invention and provided sort of a general overview
22 now of the desired goal of the invention here in this
23 example; is that correct?
24 A. Yes.
25 Q. Have you also had an opportunity to analyze and

Jury Trial - Volume B                CondenseIt™                Tuesday, April 18, 2006

1  reach a conclusion as to how the '164 patent achieves
2  that goal?
3  A.  Absolutely.
4  Q.  Have you prepared some slides illustrating that?
5  A.  Yes, I have.
6        MR. HENDERSHOT:  Could we bring up Slide 11,
7  please?
8        Not that one.  Bring it down, please.
9        Bring it down from the screen and pull up the
10  invention overview, please.
11  BY MR. HENDERSHOT:
12  Q.  Do you recognize this slide, Dr. Musen?
13  A.  Yes, I do.
14  Q.  Were you involved in the preparation of the slide?
15  A.  Yes, I was.
16  Q.  Would you explain what you are illustrating here?
17  A.  This is a way of providing a sketch of the major
18  components of the patented invention.
19  Q.  Okay.  So these are components of the patented
20  invention illustrated in some general level, some
21  specific level or what?
22  A.  Well, this uses wording, which is not identical to
23  that in the patent because the patent wording is more
24  legal in its form.  It uses understandable English.  It
25  uses colors that identify the various components of the

1  device.  And it uses icons that clearly define some of
2  the functions.
3  Q.  All right.  You understand that it's the claims
4  of the '164 patent that McKesson needs to prove are
5  practiced by Trizetto's products to prove infringement?
6  A.  Yes.
7  Q.  This is not one of those claims?
8  A.  This is not one of those claims.
9              - - -
10  Q.  Okay.  Do you want to walk us through the examples
11  here?
12  A.  Sure.
13        Just to be clear, the patented invention is
14  a computer and processes medical claims.
15  Q.  Okay.  That's the first line?
16  A.  Yes.
17  Q.  Within that computer system it looks like you have
18  a yellow bar underneath it?
19  A.  Right.
20  Q.  That's a database that identifies inappropriate
21  medical service code combinations?
22  A.  Yes.
23              - - -
24
25

1
2  Q.  Could you explain briefly what you mean by that?
3  A.  There's a database that includes decision rules
4  that are made of medical service codes and relationships
5  and it's used to help identify inappropriate combinations
6  of those codes.
7  Q.  Have we seen any inappropriate combinations of
8  codes that might perhaps be included in that database
9  here today?
10  A.  Exactly.  We saw the example of the code for the
11  local anesthetic and the code for this general -- for the
12  surgery to remove the foreign body as codes that should
13  not appear individually on a claim form.
14  Q.  Okay.
15  A.  And the relationship between those codes would
16  be --
17  Q.  We've got a computer system with a database that
18  identifies inappropriate coding combinations?
19  A.  That's right.
20  Q.  Move on to the next step, please.
21  A.  Not the next slide.
22  Q.  I'm sorry.  The next bar on this slide, the
23  computer system and the database, indicates that the
24  system receives a claim with medical service codes?
25  A.  That's right.  The whole purpose of the computer

1  system is to input claims, process them and authorize
2  payment.  So one of the important components is the
3  ability to accept data that are included in the medical
4  claim form.
5  Q.  Okay.  And then the -- can we take a step back?
6        The yellow bar, the database bar, has an
7  icon over the right?
8  A.  Yes.
9  Q.  Can you explain why you selected that icon?
10  A.  Most store data.
11  Q.  On the blue bar, the receiving a claim, why did
12  you select that icon?
13  A.  Well, it's easiest for us to understand intuitively
14  the idea of a paper claim form being entered into a
15  computer system.  In the real world, that does happen,
16  but also claims may be submitted electronically and we
17  don't really see the paper.  But it gives us the essence
18  of the data that are created in the office of the
19  provider being transferred into the memory of the
20  computer.
21  Q.  Okay.  And then the next line is a purple line
22  that says ascertaining whether a claim has multiple
23  codes?
24  A.  Right.  One of the things that the invention does
25  is to identify whether a claim has one code or a number

Page 314

1  of codes and, as we've seen in the examples, it numbers
2  them.
3  Q.  Okay.  And that's represented by -- it looks to be
4  items on a form or some data being numbered?
5  A.  One, two, three, that's right.
6  Q.  And the next element is an orange element which
7  says, determining whether the medical service codes on
8  a claim are appropriate.
9       And in terms of that element of this graphic,
10  what do you mean by that?
11  A.  Well, that's a real novelty in the invention.  In
12  terms of being able to identify the relationships among
13  codes and to determine whether the codes are appropriate
14  for payment.
15  Q.  Okay.  So we've got up to this point, we have a
16  computer system that has a database that includes
17  inappropriate code combinations?
18  A.  That's right.
19  Q.  And in that system we're going to implement a
20  method that whereby the claim -- a claim is received by
21  the computer?
22  A.  That's right.
23  Q.  The computer will determine whether there are
24  multiple codes on a claim?
25  A.  Yes.

Page 315

1  Q.  And the computer will determine whether the codes
2  on a claim are appropriate or inappropriate in
3  combination?
4  A.  That's correct.
5  Q.  And that last step, that orange step, you have an
6  icon here, which is either a lollypop or a magnifying
7  glass.  Which one do you think that is?
8  A.  I would vote for the magnifying glass.
9  Q.  Okay.
10  A.  It's ascertaining, rather, determining whether the
11  medical service codes are appropriate.
12  Q.  So the software is inspecting the codes on a claim
13  and making a determination about them?
14  A.  Exactly.
15  Q.  I gather that's why the magnifying glass is there?
16  A.  Yes.
17  Q.  Not because the codes are small?
18  A.  They are kind of small, yes.
19  Q.  All right.  The last two steps are in green and red
20  at the bottom?
21  A.  Right.
22  Q.  The first one says authorizing appropriate codes
23  and claims?
24  A.  Right.  If the code is okay and the claim is okay,
25  it gets authorized for payment.  If the codes or claims

Page 316

1  are not okay, then as we saw earlier, the computer may
2  try to apply some edits to make it okay and that may be
3  authorized for payment or if it can't apply edits that
4  make it okay, then the claim is rejected.
5  Q.  So to tie those elements back to the Example 1
6  that we discussed earlier, the claim was originally
7  submitted -- it contained inappropriate code for the
8  anesthetic and appropriate code for the surgical removal?
9  A.  That's right.
10  Q.  The computer would determine that the original
11  claim as submitted should be rejected because it's a
12  bad combination?
13  A.  That's right.
14  Q.  It's going to disallow or reject the inappropriate
15  code?
16  A.  That's correct.
17  Q.  And then authorize the appropriate code and
18  authorize the claim to that limited form?
19  A.  Yes.
20  Q.  Okay.  And those are represented, those last two
21  elements, it looks to be a check mark and an X mark?
22  A.  Yes.
23  Q.  I gather that means they're being authorized and
24  rejected?
25  A.  Very good.

Page 317

1  Q.  Okay.  So have you had an opportunity to -- or you
2  discussed, I believe, you had an opportunity to examine
3  the Claims of 1, 2 and 16 of the '164 patent?
4  A.  Yes, I have.
5  Q.  Do -- have you had an opportunity to analyze
6  whether the claims have some general relation to the
7  structure that you illustrated here?
8  A.  Yes.
9  Q.  By structure, I mean just general layout?
10  A.  Yes.
11  Q.  Okay.  Have you prepared some slides illustrating
12  that?
13  A.  Yes.  Using the same icons and the same colors.
14       MR. HENDERSHOT:  Okay.  Can we bring up Slide
15  12?
16  BY MR. HENDERSHOT:
17  Q.  All right.  The title of the slide says overview of
18  the invention, but I believe what we're discussing here
19  is Claim 16 of the '164 patent?
20  A.  That's meant to say Claim 16, yes.
21  Q.  All right.  So there are a lot of words here
22  compared to the last slide.  Do you mind if we walk
23  through it and sorted of explain what we're seeing here?
24  A.  Sure.
25  Q.  And you understand that to prove infringement of

Page 318

1  this claim, McKesson has to demonstrate that each of
2  these elements are present in the accused products?
3  A. That's correct.
4  Q. So while the words are somewhat long and lengthy,
5  we'll take a moment to walk through it and sort of
6  explain it, if that's all right.
7      In the first line, we see in a computer
8  system having.
9  A. Correct.
10 Q. Is that similar to what we saw in the previous
11 slide?
12 A. That's right. All these systems have to be
13 computer systems.
14 Q. So Claim 16 is directed to doing something in a
15 computer system?
16 A. Correct.
17 Q. The next slide, the next bar on the slide is a
18 yellow bar. We'll break this up, if you don't mind.
19 Somewhat wordy.
20     It says means for operating on a
21 predetermined database.
22     Do you see that?
23 A. Yes.
24 Q. Do you have an understanding as to what that means?
25 A. Yes. It means that the computer has memory. It

Page 319

1  has data processing capabilities. It has software which
2  allows it to operate on databases.
3  Q. Okay. And it says the -- that means that software,
4  data processing capabilities and memory is used to operate
5  on a predetermined database?
6  A. Correct.
7  Q. Do you see that?
8  A. Yes.
9  Q. Do you have an understanding as to what
10 predetermined database mean?
11 A. It's a database that's set up to have relationship
12 among those codes that are able to encode clinical
13 judgment.
14 Q. All right. It says the database contains medical
15 service codes, which I think you just discussed?
16 A. Yes.
17 Q. A set of relationships among the medical service
18 codes?
19 A. Yes.
20 Q. Defining whether selected medical ones of the
21 service codes are valid when input with other selected
22 ones of the medical service codes?
23 A. Precisely.
24 Q. That's a mouthful.
25 A. It was written by a lawyer.

Page 320

1  Q. Paid by the word perhaps.
2      Do you see the term valid there?
3  A. Yes.
4  Q. Do you have an understanding of what valid means?
5  A. Yes. That means valid for payment.
6  Q. Okay. So this element, which again is represented
7  by the table, I think we saw on the last slide?
8  A. Correct.
9  Q. In a nutshell, it's hardware in the computer that's
10 capable of operating on the database you discussed
11 earlier? That includes relationships and rules
12 identifying inappropriate code combinations?
13 A. Yes.
14 Q. All right. So we move on to the next line, which
15 is a method for processing --
16 A. Yes.
17 Q. Would you understand what that means?
18 A. The whole -- it's pointless if we can't take the
19 data out of at least one claim. Hopefully, many claims.
20 Q. At this point we've described computer system
21 with a database that identifies inappropriate codes
22 through rules and relationships and in that computer
23 system we're going to implement a method of medical
24 process codes?
25 A. Exactly.

Page 321

1  Q. You describe -- describe the next step?
2  A. Has to be a means for receiving at least one
3  claim. There has to be a means by which the data can
4  get entered into the memory of the computer.
5  Q. That's represented by the icon you mentioned
6  earlier?
7  A. That's right, which -- the icon shows paper-based
8  and transcription leading to the computer monitor.
9  Obviously, that's only one way of doing it.
10 Q. Do you have an understanding as to whether or not
11 this claim is limited to a particular way of receiving
12 a claim?
13 A. No. You could receive the claim into the computer
14 any way that's feasible.
15 Q. As to the next step, ascertaining whether the at
16 least one claim contains a plurality of medical service
17 codes?
18 A. Yes.
19 Q. Could you explain what a plurality is?
20 A. Plurality means more than one.
21 Q. So the computer system, after -- computer system
22 receives claims and it determines whether there's more
23 than one code on a claim?
24 A. That's correct.
25 Q. And that's what's represented by this purple line

Jury Trial - Volume B                CondenseIt™                Tuesday, April 18, 2006

Page 322

1  here?
2  A.  Yes.
3  Q.  The icon you chose for that is...
4  A.  The numbering.
5  Q.  Okay.  You understand this claim to be limited to
6  any particular way of doing that?
7  A.  No.  It just says that it has to know.
8  Q.  Okay.
9  A.  Rather than ascertain.
10  Q.  It just needs to ascertain whether there's more
11  than one code on the claim?
12  A.  We like to think the computer has thinking ability.
13  Q.  All right.  The next step, determining whether one
14  of the medical service codes in the plurality of medical
15  service codes is valid or invalid by interacting with
16  the database and the set of relationships contained in
17  the database.  Again, it's somewhat wordy.
18      Could you possibly distill down what that
19  step means?
20  A.  Sure.  Well, we're assuming we have a plurality of
21  codes and we're going to interact with the database as
22  we saw in the example a minute ago in the case of the
23  anesthetic and the surgical procedure.  And determine
24  whether that particular grouping of codes is valid,
25  meaning it's okay for payment.

Page 323

1  Q.  And this step does so by interacting with the
2  database of inappropriate code combinations you
3  discussed?
4  A.  That's correct.
5  Q.  And then the last two elements:  Authorizing and
6  rejecting?
7  A.  Right.  So if the combination of codes in that
8  grouping is legitimate for payment, then the code will
9  be authorized.  If that combination of codes is not
10  appropriate for payment, then that claim as submitted
11  will be rejected and the claim leaves open that other
12  processing steps may then take place.
13  Q.  Okay.
14      MR. HENDERSHOT:  Pull up the next slide.
15  BY MR. HENDERSHOT:
16  Q.  Dr. Musen, this looks somewhat similar in terms of
17  the text and the structure of it.
18      You understand this to be Claim 2 of the '164
19  patent?
20  A.  That's correct.
21  Q.  You understand this slide to include all the terms
22  and elements of the claim of the patent?
23  A.  That's right.  It's the original language.
24  Q.  Okay.  There looks to be some similarity as to at
25  least I'd say the first few elements.

Page 324

1      Is there any relation to the first element to
2  this claim and the element of Claim 16 we just discussed?
3  A.  It's identical.
4  Q.  Is the same true for the next element?
5  A.  Yes.
6  Q.  And by identical, you don't just mean it says the
7  same thing?  It's the exact same words?
8  A.  It's the precise text, yes.
9  Q.  As to the next line, is that true?
10  A.  Yes.
11  Q.  And then as to the receiving of at least one claim?
12  A.  Yes.
13  Q.  And determining whether there are multiple codes?
14  A.  Yes.
15  Q.  All right.  So that gets us to the first one, two,
16  three, four, five elements of this claim and our
17  discussion of Claim 16?
18  A.  Right.
19  Q.  So is there a difference between the next element,
20  the determining step in Claim 2?
21  A.  Yes.  Definitely.
22  Q.  Could you highlight what that difference is for the
23  jury?
24  A.  The text here says, determining whether one of the
25  medical service codes in the at least one claim is

Page 325

1  mutually exclusive due to non-medical criteria with any
2  of the other medical service codes in at least one
3  claim.  I realize I just editorialized a little bit as
4  I read that.
5  Q.  All right.  What do you understand the language,
6  the exact language of the claim term to mean?
7  A.  That's right.  It's meant for lawyers, not doctors.
8      But what it's saying is that the
9  determination being made is in the constellation of
10  codes on the claim, is there a situation where there
11  are codes that are mutually exclusive, meaning codes
12  that should not be paid together.
13  Q.  And then the next elements are authorizing and
14  rejecting codes that pass that check?
15  A.  That's right.  So if a code is mutually exclusive
16  with codes that should be paid, that code will be
17  rejected.
18  Q.  All right.  Have we seen an example of those three
19  steps here today?
20  A.  Absolutely.  We saw in the case of Example 1 in
21  the patent, and we saw it in the case of our mountain
22  biker.
23  Q.  Okay.  Could you explain that?
24  A.  Sure.  Well, the code for the operation, removal of
25  the foreign body, and the code for the injection of the

Page 326

1 local anesthetic are mutually exclusive because only
2 one should be paid. And the one that's appropriate to
3 be paid is the one for the surgical procedure.
4 Q. And does that cover all the elements of Claim 2?
5 A. Yes, it does.
6        MR. HENDERSHOT: Could we bring up Claim 1,
7 please?
8 BY MR. HENDERSHOT:
9 Q. So, Dr. Musen, did you prepare this slide?
10 A. Yes, I did.
11 Q. Do you understand this to represent all the language
12 of Claim 1 of the '164 patent?
13 A. Yes.
14 Q. And that's the third and final patent at issue?
15 A. Yes.
16 Q. Third and final claim?
17 A. Claim.
18 Q. So there appears to be, again, some similarity
19 between some of the elements. And we see the in a --
20 we've seen the in a computer system element before?
21 A. Yes.
22 Q. The operated on a predetermined database element
23 before?
24 A. Yes.
25 Q. The method and the receiving?

Page 327

1 A. Yes.
2 Q. So all those are identical in language and meaning
3 to the similar elements we saw in the prior two claims?
4 A. Absolutely.
5 Q. And is that why you illustrated those with the
6 same icons?
7 A. Yes. The same icons.
8 Q. So getting down to the magnifying glass, the
9 inspection of the codes --
10 A. Right.
11 Q. -- could you explain what determination we're
12 making about codes in this claim?
13 A. Well, this is a different determination. This is
14 determining whether there are any medical service codes
15 that are not present in the database. So basically
16 where there's a bogus code that has been entered.
17 Q. Why is that important in the context of an
18 invention that accesses rules in the database?
19 A. Well, the whole purpose of the invention is to
20 facilitate the billing process for medical care and
21 if by mistake or intentionally or because of a
22 transmission problem, there's an error on the bill and
23 it corresponds to a procedure which is not in the book,
24 which means it's not a legitimate CPT-4 code, then that
25 is a code that should not be reimbursed.

Page 328

1 Q. And that's significant. So the input should be
2 right if you are trying to input something and do a
3 database of rules?
4 A. Yes. It's like getting a charge on your Visa and
5 not knowing what it is. You want to immediately find
6 what the problem is.
7 Q. That's what this element does?
8 A. Yes.
9 Q. Could you look at the next element which is in
10 white? It appears to be represented by a computer
11 monitor?
12 A. This informs a user that a medical service code is
13 not contained in the predetermined database.
14 Q. I take it to mean that you made a determination
15 that it's bogus?
16 A. Right.
17 Q. Is there any way in which the claims of the '164
18 patent have to do any of those steps?
19 A. No. It just has to do it.
20 Q. Are there multiple ways to determine whether
21 something is in the database?
22 A. It doesn't specify how it does that.
23 Q. In practice in real life, are there ways?
24 A. Yes. You could search the database one element
25 at a time. You could have an index. You could phone

Page 329

1 a friend. You can do lots of things.
2 Q. Okay. So we've been through every element of
3 Claims 1, 2 and 16 of the '164 patent?
4 A. That's correct.
5 Q. And you understand those are the claims to which
6 McKesson has asserted TriZetto infringes?
7 A. Yes.
8 Q. And you understand that to prove infringement of
9 one of those claims, McKesson needs to prove that each
10 and every element of that claim is present in Trizetto's
11 product?
12 A. That's my understanding.
13 Q. And you understand that there are three TriZetto
14 products at issue?
15 A. That's correct.
16 Q. Could you list those?
17 A. Facets, ClaimFacts and QicLink.
18 Q. Okay. With respect to the Facets product, have you
19 had an opportunity to review materials?
20 A. Yes, I did.
21 Q. Have you had an opportunity to review it in
22 operation?
23 A. Yes.
24 Q. Have you actually operated Facets?
25 A. Yes, on a laptop.

Page 330

1 Q. Okay. Could you briefly summarize what Facets
2 does for the jury? Is it directed to a similar problem
3 in the field?
4 A. Yes. Facets is directed at precisely the problem
5 area of the patented invention. It works in medical
6 claims processing. It receives claims. It processes
7 claims. It edits claims for the kinds of errors that
8 we've just been talking about and it authorizes payment.
9 Q. And does it do so in a computer system?
10 A. Absolutely.
11 Q. Okay. And, in addition to the manuals and product
12 materials you reviewed about Facets and the actual
13 operations of Facets you conducted, have you reviewed
14 any other evidence regarding Facets?
15 A. I've looked at the user manuals. I've looked at
16 the depositions of people who are familiar with the
17 operation of the system. I've looked at Dr. Johnson's
18 report.
19 Q. You say you've reviewed the depositions of people
20 that are familiar with the system. Did you review
21 depositions of individuals designated by TriZetto as
22 most knowledgeable regarding Facets?
23 A. Yes, I did.
24 Q. Did you also review deposition transcripts of
25 individuals designated by Trizetto's customers as

Page 331

1 most knowledgeable regarding the products?
2 A. Yes, I did.
3 Q. Did you also review deposition transcripts from
4 Trizetto's executives?
5 A. Yes, I did.
6 Q. So the people whose depositions were reviewed
7 should know something about the product?
8 A. Yes.
9      MR. SITZMAN: Objection. Calls for
10 speculation.
11      MR. HENDERSHOT: Withdrawn.
12 BY MR. HENDERSHOT:
13 Q. We've talked about Example 1 of the '164 patent?
14 A. Yes.
15 Q. How it's illustrative of some of the examples that
16 the '164 patent implements and operates with.
17      Have you had a chance to examine Facets in
18 operation?
19 A. Yes.
20 Q. Have you prepared a video of that?
21 A. Yes.
22      MR. HENDERSHOT: May I bring up 1320?
23      THE WITNESS: Before we show the video, may
24 I have a glass of water?
25      MR. HENDERSHOT: I'm not going to deny you.

Page 332

1 Is there some water?
2      THE WITNESS: Is there any?
3      THE COURT: I don't know. I hope we do. I
4 generally tell folks to bring water.
5      (Pause.)
6      THE WITNESS: Thank you very much.
7      (Pause.)
8 BY MR. HENDERSHOT:
9 Q. So, Dr. Musen, you say you had a chance to run
10 claims. Have you had an opportunity to run medical
11 claims through Facets?
12 A. Well, not real medical claims, but to play around
13 with it at least.
14 Q. Was the information used -- you were able to use
15 sufficient to illustrate the operations of the product?
16 A. I believe so.
17 Q. All right. Did -- was -- was one of the code
18 combinations you ran through Facets is the 64450/10120
19 combination we've seen today?
20 A. It's my favorite combination.
21 Q. All right. Were you able to run other code
22 combinations?
23 A. Certainly.
24 Q. Did you -- were you involved in the preparation of
25 any screen shots capturing the operations of the products

Page 333

1 as to those?
2 A. Yes.
3 Q. I'm going to hand you a set of slides that have
4 been marked as Trial Exhibit 1100 through 1126 (handing
5 exhibits to the witness).
6      Take a look at those for me.
7      (Pause.)
8      THE WITNESS: Okay.
9 BY MR. HENDERSHOT:
10 Q. Do you recognize those exhibits?
11 A. Yes, I do.
12 Q. What you do you recognize them as?
13 A. These are static screen captures from an exercise
14 that I entered into the Facets system, which was captured
15 on videotape at one point.
16 Q. All right. I'd like to walk through some of the
17 screen shots with you, if that's all right.
18 A. Okay. Sure.
19      MR. HENDERSHOT: Can we pull up Exhibit No.
20 1112?
21 BY MR. HENDERSHOT:
22 Q. Dr. Musen, do you recognize what's on the screen?
23 A. Yes, I do.
24 Q. Could you explain what it is?
25 A. Sure. This is one of the forms and one of the

Page 334

1 systems within Facets that is used to enter a medical
2 claim manually into the system. And what we see is the
3 initial entry of the basic demographic data and the
4 diagnosis code.
5 Q. So this is a screen by which Facets is receiving
6 claims data?
7 A. That is correct.
8 Q. And what is the subscriber I.D.?
9 A. The subscriber I.D. is a number that -- this is
10 obviously not real patient data, but in the real world,
11 would be the number of the person who would have the
12 insurance policy that was -- that would ultimately be
13 providing payment. So it's the subscriber to the policy.
14 Q. All right. And then the relationship slash name
15 on the right?
16 A. Right.
17 Q. Self?
18 A. That's the person that had the same policy.
19 Q. So the person who fell off the dirt bike is the
20 person with the policy?
21 A. Right.
22 Q. The provider I.D.?
23 A. Right. That's the I.D. of the provider, the
24 physician. Indeed, there's a box right below provider
25 I.D. where you can see the name and address of the

Page 335

1 physician as Facets has looked it up in its database.
2         - - -
3 Q. And this is a diagnosis code here. Would you
4 explain what that is?
5 A. Right. That's not a medical service code. It's
6 not a CPT code. It's a code in a coding system called
7 DSM/ICD, which is international classification diseases.
8 Q. What does that represent in general in terms of
9 the process?
10             - - -
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 336

1
2 A. The diagnosis is the reason for which the patient
3 sought medical attention and the justification with the
4 procedures that are done.
5 Q. All right.
6     MR. HENDERSHOT: Bring up the next slide,
7 please, which is Exhibit 1113.
8 BY MR. HENDERSHOT:
9 Q. Do you recognize this slide?
10 A. Yes, I do.
11 Q. Can you explain what's going on here?
12 A. This slide shows how the actual procedure
13 information gets entered into the Facets system.
14 Q. Okay. So these are procedure codes?
15 A. That is correct. We see at the top the same
16 provider number. We see that in the element that
17 you've highlighted, there are two lines. The first
18 line -- the first line numbered one shows that there's --
19 there's a service that took place that began on March
20 16th and ended on March 16th. There's a POS, or a
21 place of service, which is the surgical outpatient
22 facility. And there's particular -- a particular
23 procedure that has taken place. That's what PROC is.
24 Q. There's a column that says PROC and that's the
25 procedure you just said?

Page 337

1 A. That's right.
2 Q. What does 64450 represent?
3 A. 64450 is the CPT-4 code that designates the
4 anesthesia that's performed by regional nerve block.
5 Q. Have we seen that once or twice here today?
6 A. Yes. That's the example that's used in Appendix
7 A of the patent and we saw it in the example of the
8 mountain biker.
9 Q. Okay.
10 Q. Okay. There's a second line that's indicated by
11 the arrow?
12 A. Yes. There's a second procedure that's being
13 entered in the claim manually. Procedure number two
14 also took place on March 16th. The place of service
15 was the same, the outpatient facility, and the procedure
16 code is CPT-4 Code 10120. That is for the removal of
17 the foreign body from the subcutaneous tissue.
18 Q. If I could ask you a question about something at
19 the bottom of the screen here, Dr. Musen?
20 A. Sure.
21 Q. There's a tab here that indicates line item?
22 A. Yes.
23 Q. And there appear to be some entries over here to
24 the left-hand side of the screen at the bottom. For
25 example, it says procedure and then it has some text to

Page 338

1 the right?
2 A. Right.
3 Q. Could you explain how this text got here on the
4 claim?
5 A. Right. It says incision and removal of foreign
6 body of the skin simple. Simple means not complicated
7 procedure. And it's doing exactly what we saw the
8 device in the patented situation perform. The computer
9 looked into its database, verified that 10120, in fact,
10 was a valid CPT form code, and to show that it's valid,
11 prints out the English language translation of that code
12 for the user.
13 Q. When you say valid there, what do you mean by
14 valid?
15 A. I mean valid in the sense that it is an
16 appropriate non-bogus legitimate CPT-4 code from the book.
17 Q. All right. And that's what is this text describing
18 the code?
19 A. Yes.
20 Q. There are all sorts of numbers next to the codes.
21 Were those generated by the Facets software?
22 A. Right. The numbers referring to the considered
23 charge and allowed charges and so on?
24 Q. We're back up to the top. I apologize. I'm
25 jumping around.

Page 339

1 A. There's a number next to the procedure, for example.
2 Q. Yes.
3 A. That's the ICD code, international classification
4 of diseases code, that defines a diagnosis, which in
5 this case is residual foreign body and soft tissue.
6 And there's a charge that's associated with each of the
7 codes that has been entered, so there's a code that has
8 been assigned by the physician to the anesthesia of
9 $71.62, and a charge assigned to the actual surgical
10 operation of $88.27.
11 Q. Okay.
12     MR. HENDERSHOT: Bring up Exhibit No. 1114.
13 BY MR. HENDERSHOT:
14 Q. Dr. Musen, do you recognize what's on the slide?
15 A. Yes, I do.
16 Q. What is the slide indicating?
17 A. Well, this is a screen that one can get to from
18 the previous screen you saw a moment ago. It allows
19 the users to take a look at the underlying database of
20 codes and their relationships.
21 Q. So is the screen we're seeing here displaying
22 information from the TriZetto Facets database?
23 A. Yes. It's not the whole database. It's just a
24 small view on that database.
25 Q. If we see the full screen again. That's good

Page 340

1 there. Which part of the database are we looking at?
2 A. The database that relates to procedure Code
3 10120. That's the procedure code for removal of the
4 foreign body.
5 Q. We've seen that procedure code throughout our
6 example?
7 A. Multiple times.
8 Q. There's a tab that says Subset 1?
9 A. Yes.
10 Q. Could you explain what the tabs are under Subset 1?
11 A. There's a relationship between the Procedure Code
12 10120 and several other codes that are in the Facets
13 database. In fact, the highlighted code on that screen,
14 64450, we've also seen several times this morning, that's
15 the CPT-4 code for the injection of the anesthetic, the
16 regional nerve block.
17 Q. That indicates there's some Subset 1 relationship?
18 A. Yes. That says explicitly that when one is paying
19 for 10120, the removal of the foreign body, one should
20 not pay for 64450, the anesthesia, because that charge
21 is already included in the charge for the surgery.
22 Q. So this is a relationship making some definition
23 about the two codes?
24 A. That's right. Effectively, it's a rule.
25 Q. Okay. There are some other codes under Subset 1

Page 341

1 here, Dr. Musen?
2 A. That's correct.
3 Q. What do these codes from 7 to 11 indicate?
4 A. All of the codes that you see here are codes for
5 services that might be present on a claim form, and,
6 indeed, all of these are medically indicated services,
7 but none of them should be included in the bill
8 because of non-medical reasons.
9     So, for example, Code 99211 on Line 7 is a
10 code for an established outpatient -- outpatient visit,
11 without physical examination. Actually, I would hope
12 that a doctor would look at a foreign body, would do
13 a physical examination. But for whatever reason, that
14 code is not to be included in a claim that includes a
15 surgical procedure as are the codes for other kinds of
16 established outpatient visits.
17     So the codes that you see on Line 7 through
18 9 are all codes for office visits. There is no question
19 medically that if I have to have surgery, I would like
20 it done in the operating room or in the office, but
21 there's no reason to bill for an office visit if you
22 are already billing for the surgical procedure.
23 Q. So it's like going to dinner and getting charged
24 for the chair?
25 A. Kind of like that. You assume that you are paying

Page 342

1  for certain services, that other things -- by the nature
2  of the service, bundled in.
3         There may be situations when a patient should
4  be charged explicitly for an office visit, but one should
5  not be charged for an office visit at the same time that
6  the surgery takes place because the surgical code
7  includes the amount of reimbursement that the physician
8  should receive for allowing the patient to come into the
9  office.
10         MR. HENDERSHOT: Could we pull up Slide 1116?
11  Trial Exhibit 1116?
12  BY MR. HENDERSHOT:
13  Q.  And these relationships we see here, Dr. Musen,
14  between these two codes, do they come into play at all
15  in the processing of a claim in the Facets system?
16  A.  Absolutely. These are the relationships in the
17  database that Facets uses in order to do its clinical
18  editing.
19  Q.  All right.
20         MR. HENDERSHOT: Could we see Slide 1116?
21  BY MR. HENDERSHOT:
22  Q.  So what are we seeing on this screen, Dr. Musen?
23  A.  We're seeing the screen we saw a moment ago, where
24  on the upper left we see Lines 1 and 2, where the
25  procedure codes have been entered for the particular

Page 343

1  claim, the 64450 code for the anesthesia and the 10120
2  code for the surgery. And what we see is that there
3  has been a process that has taken place whereby Facets
4  has indicated that there's a subset procedure detected
5  on Line 1, that clinical edits exist. I'm reading the
6  warning message you see on the upper right.
7         And this is essentially how Facets informs
8  the user the same way that the patented product did
9  that the code for the anesthetic should not be billed
10  at the same time that there's a code on the form for
11  the surgical procedure.
12  Q.  So there's an arrow to the left of Line 1 there,
13  Dr. Musen?
14  A.  That's correct.
15  Q.  What does that indicate?
16  A.  That means that the computer is viewing Line 1
17  and that the warning message applies to Line 1 and
18  actually, if we also go down to the bottom of the
19  screen, where it says N-O 1, we also see the message
20  subset procedure disallowed.
21  Q.  So that means -- what does that indicate to you
22  about this code on Line 1?
23  A.  That the code has been rejected, and if we look at
24  the actual dollar numbers, we see that the considered
25  charge for the anesthesia in Line 1 is $71.62.

Page 344

1  Q.  Are you referring to the considered charge right
2  here, Dr. Musen?
3  A.  That's correct.
4         And that the allowed -- the allowed charge is
5  zero.
6  Q.  And does it indicate over here (indicating) $71.62
7  next to disallow?
8  A.  That's correct. So the charge for the anesthetic
9  has been disallowed because the code has been rejected
10  because the code for the surgery should include all the
11  costs that the physician incurred for which he's to be
12  reimbursed.
13         MR. HENDERSHOT: Can we bring up Exhibit
14  1117?
15  BY MR. HENDERSHOT:
16  Q.  Now, Dr. Musen, the arrow here on this slide is now
17  on what looks to Line 2?
18  A.  That's correct.
19  Q.  I guess the system numbers the line items in the
20  medical service codes?
21  A.  That's correct.
22  Q.  So what is the arrow being on Line 2 indicate to
23  you?
24  A.  Well, it gives us context for what we see in the
25  screen that's below and you'll see the considered charge

Page 345

1  for the surgical component of the visit, the $88.27,
2  refers to the removal of the foreign body, and all of
3  that charge has been allowed.
4         It turns out that Facets has determined
5  there's a co-pay of $25 and so actually the benefit to
6  the patient is $63.27. But fundamentally what we see is
7  that the first code has been rejected and the second
8  code has been accepted.
9  Q.  Is that consistent with the examples you've been
10  explaining earlier today?
11  A.  That's exactly what the patented invention did. We
12  saw that one.
13         MR. HENDERSHOT: Could we see the next exhibit
14  in sequence?
15         The next exhibit?
16         How about 1115? 1115, please.
17  BY MR. HENDERSHOT:
18  Q.  Now, Dr. Musen, we're taking a step back in time
19  here in the process, as I understand it. Do you
20  understand, have an understanding as to where in the
21  stage of process --
22  A.  Yes, I do. We've just gone back to before the
23  clinical edits were applied.
24  Q.  And what's being indicated on the screen here?
25  A.  Well, the user is attempting to save the claim as

Page 346

1  it's entered and then authorize its ultimate payment.
2  And what we see is that if you go to the save menu on
3  the file menu, the save entry on the file menu, then
4  go over to the indented menu, you -- what you would
5  like to be able to do if you were ready to pay the
6  claim would be to select accept, which you'll notice
7  that that has been grayed out and it has been grayed
8  out because Facets prevents the user from actually
9  accepting the claim until the processing takes place,
10  to make sure that all of the codes are legitimate.
11  Q. So Facets requires some determination about the
12  codes on the claim before it will let you proceed?
13  A. That's right.
14  Q. All right.
15  A. And so if you were then to proceed as we did a
16  moment ago and actually perform the edit and disallow
17  the code for the anesthesia, magically, you would then
18  be able to accept the claim.
19  Q. So we've seen -- do the slides we've looked at
20  here, Dr. Musen, illustrate accurately your opinion the
21  operations of Facets in processing a claim?
22  A. Yes. These are direct screen captures of the
23  example that we ran through.
24  Q. Did we miss anything running through this?
25  A. No.

Page 347

1  Q. All right. Did you also have an opportunity to
2  review the ClaimFacts product?
3  A. Yes, I did.
4  Q. Could you briefly summarize for the jury what the
5  ClaimFacts product does?
6  A. Sure. ClaimFacts is an older system from Facets
7  but basically performs many of the same functions. It
8  is essentially a medical claim processing system that
9  receives claims, performs the same kinds of clinical
10  edits that we've been talking about, determines what
11  should be paid, what shouldn't be paid and then
12  authorizes the claim for payment.
13  Q. Did you also have an opportunity to witness the
14  operations of the ClaimFacts system?
15  A. Yes. I wasn't able to play with it first-hand,
16  but I watched a videotape of its operation.
17  Q. And did you prepare or have prepared at your
18  direction screen shots of that video illustrating its
19  operation?
20  A. Yes, I did.
21  Q. Have you seen any of those in front of you today?
22  A. Not yet.
23  Q. All right. Are some included in the stack of
24  exhibits?
25  A. The stack of incidents that I have included, only

Page 348

1  screen captures from Facets.
2  Q. Those are the Facets?
3  A. Only.
4  Q. I will ask you to hand onto those, if you don't
5  mind. I will present to you what has been marked as
6  Trial Exhibits 1180 through Trial Exhibit 1200.
7  A. Okay.
8      (Mr. Hendershot handed exhibits to the
9  witness.)
10      THE COURT: And I take it at this point these
11  are demonstratives?
12      MR. HENDERSHOT: We're using them to
13  illustrate the operations of the system, but given that
14  they came directly from a working version of their system
15  set up by TriZetto, McKesson has offered them as
16  evidentiary exhibits.
17      THE COURT: All right. Well, generally, we
18  don't allow exhibits to be shown to the jury until
19  they've been admitted. So if these intend to be
20  exhibits, then you need to admit them. Otherwise, they
21  will be deemed demonstratives and will not go back to
22  the jury.
23      MR. HENDERSHOT: Okay.
24  BY MR. HENDERSHOT:
25  Q. Dr. Musen, you reviewed the Facets slides on the

Page 349

1  documents I put in front of you; is that correct?
2  A. Yes.
3  Q. And those are slides that you prepared or were
4  prepared at your direction?
5  A. Yes.
6  Q. And did you review and rely upon those in
7  formulating your opinion?
8  A. Yes.
9  Q. Or providing your opinion in this case?
10  A. Yes.
11      MR. HENDERSHOT: We'd like to move Facets
12  slides numbered --
13  BY MR. HENDERSHOT:
14  Q. Would you mind giving us the number of those
15  exhibits, please?
16  A. Sure. 1100 through 1126.
17      MR. HENDERSHOT: McKesson would like to move
18  those exhibits into evidence, your Honor.
19      MR. SITZMAN: Your Honor, no objection,
20  subject to the standing objection we've had.
21      THE COURT: That's the first packet we saw?
22      MR. HENDERSHOT: Yes.
23  BY MR. HENDERSHOT:
24  Q. Do the same answers hold true for the second packet,
25  ClaimFacts exhibits?

Jury Trial - Volume B                CondenseIt™                Tuesday, April 18, 2006

Page 350

1 A. Yes.

2 Q. So those were prepared at your direction?

3 A. Yes.

4 Q. Those in your opinion reflect the operations of the

5 system?

6 A. Yes.

7     MR. HENDERSHOT: If there are no objections,

8 we'd like to move them into evidence as well.

9     THE COURT: Could you identify them by exhibit

10 numbers for the record?

11    THE WITNESS: The first slide is Exhibit 1180.

12 The final one is 1200.

13    MR. HENDERSHOT: We'd like to move 1180 through

14 1200 into evidence, your Honor.

15    MR. SITZMAN: Subject to the standing

16 objection, that's no problem.

17    THE COURT: All right.

18 ***    (Documents referred to above were received into

19 evidence.)

20 BY MR. HENDERSHOT:

21 Q. So, Dr. Musen, we've just moved into evidence a

22 number of screen shots with blank screens and

23 multi-colored font?

24 A. Yes.

25 Q. Have you seen those screens before?

Page 351

1 A. Yes, I have.

2 Q. Could you explain what they are?

3 A. These are screen captures from a videotaped

4 demonstration of the ClaimFacts system in operation.

5 Q. All right.

6     MR. HENDERSHOT: Could we pull up Exhibit

7 1199?

8     Can we pull up Exhibit 1197?

9 BY MR. HENDERSHOT:

10 Q. Do you recognize this screen, Dr. Musen?

11 A. Yes, I do.

12 Q. And what is being illustrated at the top of this

13 screen under ClaimFacts medical processing?

14 A. Right. What we see is the I.D. of the claim. The

15 claim I.D. is C-L-I-D. There's a member and that's the

16 subscriber. The patient is the member. And we see the

17 date when the claim was received.

18 Q. And this screen shot is taken from what system?

19 A. This is from ClaimFacts.

20 Q. And there's some green lines underneath this blue

21 heading here at the middle of the screen. Could you

22 explain what we're looking at here, Dr. Musen?

23 A. Those green lines show the entry of the codes on

24 the claim, just as they were entered in the Facets

25 system, and we see that just as in the Facets system,

Page 352

1 there's a service date or start date and an end date.

2 There's a place of service and there are procedures that

3 are performed.

4 Q. Okay. And those procedures look familiar. Could

5 you explain what those are?

6 A. Right. The procedures are in the column labeled

7 PROC, and they're entered using CPT-4 codes, as before.

8 There are procedures 64450, which is the anesthetic

9 with regional nerve block and there's 10120, which is

10 the surgical procedure for the removal of the foreign

11 bodies.

12    MR. HENDERSHOT: Could we bring up Exhibit

13 1198?

14 BY MR. HENDERSHOT:

15 Q. Do you recognize this slide, Dr. Musen?

16 A. Yes, I do.

17 Q. Could you briefly explain what we're seeing on this

18 slide?

19 A. We're seeing an error message or a warning at the

20 top of the screen, which is similar to what we've seen

21 previously. So the ClaimFacts system is telling the

22 user when performing at the same time, Code 64450 is

23 considered a part of or incidental to Code 10120, and

24 should not be billed separately.

25 Q. Is that similar or vary in relation to the

Page 353

1 description we saw in the Facets system?

2 A. Yes, it is.

3 Q. So if we bring up -- if we bring up Slide 1199...

4     Do you recognize this screen?

5 A. Yes, I do.

6 Q. There appear to be numbered line items for the

7 two codes you were just discussing, 64450 and 10120?

8 A. Correct.

9 Q. Could you explain what we're seeing on the first

10 line with respect to 64450?

11 A. Right. The formatting is not ideal. The first

12 line refers to the Code 64450, which is the anesthetic,

13 and it says that there has been a Subset 1 disallow for

14 that particular code. It does not suggest that the

15 anesthetic is not medically necessary. It's just

16 saying that for purposes of billing, the anesthesia

17 should not be charged. And the -- the payment to be made

18 is zero.

19    In Line 2, there's also a surgical procedure

20 10120. That's removal of the foreign body. In that

21 case there's no note and the allowed payment is $88.27.

22 Q. So with respect to the claim that was received,

23 what has happened here?

24 A. The original claim has been rejected, and it has

25 been revised such that the code for the anesthetic has

## Page 354

1 been rejected and the revised claim is authorized for
2 payment.
3 Q. And a similar response to what we saw in Facets?
4 A. Exactly. Even.
5        MR. HENDERSHOT: Could you bring up the next
6 exhibit, 1200?
7 BY MR. HENDERSHOT:
8 Q. Do you recognize this screen, Dr. Musen?
9 A. Yes, I do.
10 Q. At the top of the screen, it says clinical edits
11 maintenance screen one?
12 A. Rights.
13 Q. With the No. 10120 next to the procedure code?
14 A. Right.
15 Q. What do you understand that to indicate?
16 A. This is a screen shot of what one would see when
17 using the ClaimFacts system to be able to view that
18 same portion of the database that we saw with Facets.
19        We don't see the whole database. We just
20 see the database for Code 10120. In fact, we're just
21 seeing some of its relationships. We're seeing that
22 Code 10120 has Subset 1 relationships with the codes
23 that we see towards the middle of the screen. The first
24 code we see under Subset 1 procedure code is 64450.
25 That's the code for the anesthesia.

## Page 355

1 Q. And we've seen the Subset 1 title before?
2 A. Absolutely. That is the relationship of the
3 database that Facets uses to know that codes that are
4 in that grouping should not be included on claims that
5 include the primary code. In this case, 10120.
6 Q. There appears to be some similarity between the
7 Facets and ClaimFacts.
8 A. The product literature says they're identical.
9 Q. We see on the screen a number of medical service
10 codes that are related to 10120; is that correct?
11 A. That's correct.
12 Q. And how do these codes listed under the Subset 1
13 and Subset 2, how do their relationships to the Code
14 10120 play under the claims processing of ClaimFacts?
15 A. Again, it's the same kind of procedure that we've
16 been talking about. The ClaimFacts system, at the time
17 that the code is received, looks for clusters of codes,
18 uses the relationships in the database to identify
19 whether there are clusters that are inappropriate by
20 looking at these kinds of relationships.
21        And in the example that we've been talking
22 about, says that the physician should bill for the
23 surgery, but the reimbursement for the surgery already
24 includes a reimbursement for anesthesia, and therefore
25 the code for the anesthesia should not be paid separately.

## Page 356

1 Q. So it's consistent with our discussion of the codes
2 today?
3 A. Exactly.
4 Q. Have you also had an opportunity to review
5 Trizetto's QicLink product?
6 A. Yes.
7 Q. Have you reviewed literature about the product?
8 A. Yes.
9 Q. Have you reviewed it in operation?
10 A. I've not reviewed it directly in operation. I've
11 reviewed videotapes of the operation.
12 Q. Have you prepared or had prepared at your direction
13 screen shots with some indication of that operation?
14 A. Yes.
15 Q. I'd like to show to you, Dr. Musen, a series of
16 documents (handing exhibits to the witness).
17 A. These are Exhibits 1250 through 1275.
18 Q. Thank you.
19        Do you recognize those documents?
20 A. Yes, I do.
21 Q. What do you recognize them as?
22 A. These are screen captures from the videotape that
23 was made when we examined the QicLink system.
24        MR. HENDERSHOT: At this point McKesson would
25 like to move Exhibits 1250 through 1275 into evidence.

## Page 357

1        MR. SITZMAN: No objection subject to the
2 standing objection we've had.
3        THE COURT: Thank you.
4        DEPUTY CLERK: So marked.
5 ***        (Exhibits No. 1250 through 1275 were received
6 into evidence.)
7        MR. HENDERSHOT: Can we pull up Exhibit 1260,
8 please?
9 BY MR. HENDERSHOT:
10 Q. Dr. Musen, I ski there's a lot of information on
11 the screen. I will point you to a little bit after we've
12 established what the slide is. Do you recognize what the
13 slide is?
14 A. Yes.
15 Q. What you recognize it as?
16 A. This is a screen capture from the videotape of the
17 QicLink product in operation.
18 Q. Is this one of the screen captures that was prepared
19 at your direction?
20 A. Yes.
21 Q. Were all of the exhibits that we've just put into
22 evidence, Numbers 1250 through 1275, screens that were
23 prepared at your direction?
24 A. Yes.
25 Q. Okay. It appears to me we have an enrollee and a

Jury Trial - Volume B                 CondenseIt™                 Tuesday, April 18, 2006

Page 358

1 claimant named Dolly Cookies?
2 A. We were getting punchy.
3 Q. Moving down, there's a white bar across the screen
4 here with some information underneath that. Do you see
5 that?
6 A. Yes, I do.
7 Q. There's a line 01 with a code next to it?
8 A. Yes.
9 Q. Could you explain what's indicated on this line?
10 A. Line 1 indicates Medical code 64450, which is the
11 code for the administration of anesthetic regional
12 nerve block with a charge of $71.62. In the original
13 version of this claim, it's to be paid.
14 Q. When you say the original version of this claim --
15 A. This is a claim that's submitted.
16 Q. It says to be processed?
17 A. That's correct.
18 Q. And if you could do me a favor and explain
19 briefly what's being illustrated on Line 2?
20 A. Okay. We see that the system has counted the codes
21 and numbered them and the second code is 10120, which is
22 the code for the surgical procedure to remove the
23 foreign body and it has a charge of $88.27. The total
24 charge is what we've seen before, 159.89.
25 Q. So the original claim is for both medical service

Page 359

1 codes?
2 A. That's correct.
3    MR. HENDERSHOT: Could you bring up Exhibit
4 1261?
5 BY MR. HENDERSHOT:
6 Q. Again, there's a good bit of information on the
7 screen, Dr. Musen, but do you recognize what it is
8 A. Yes.
9 Q. Is it a screen shot of the QicLink system?
10 A. Yes.
11 Q. I direct your attention to this block that says
12 ClinicaLogic messages.
13 A. Yes. It
14 Q. It says clinical edit: 9. Subset procedure. Line
15 action deny.
16 A. Yes.
17 Q. You don't have to read the explanation. Just
18 explain what's going on there.
19 A. The same kind of arrow we've seen before. It's
20 not saying anesthesia is not medically necessary or
21 medically inappropriate, it's just saying for purposes
22 of billing, anesthesia should not be charged as a
23 separate line item. Therefore, that code has been
24 removed from the new claim.
25 Q. There are some lines down at the bottom of the

Page 360

1 screen where it says, what looks to be original
2 procedure. Is that what you understand that to be?
3 A. Yes, that's what I understand.
4 Q. And then current procedure?
5 A. That's correct.
6 Q. Can you explain what these numbers associated with
7 these two lines illustrate to you?
8 A. It's telling us for the indicated number procedure,
9 that the original charge of $71.62 is not allowed and so
10 we see under the current claim as it exists in the
11 computer that the same is zero for that particular line
12 item.
13 Q. So that code has been rejected?
14 A. That code has been rejected.
15    MR. HENDERSHOT: Can you bring up Exhibit
16 1263?
17 BY MR. HENDERSHOT:
18 Q. Dr. Musen, this is a -- is this also another screen
19 shot from QicLink?
20 A. Yes.
21 Q. Again, there's the heading LN with numbers
22 underneath it and what look to be the procedure codes
23 you've been discussing next to it?
24 A. Yes.
25 Q. Could you explain what we're seeing here with the

Page 361

1 charge and payment numbers?
2 A. Right. We are seeing that initially, the charge
3 for the Code 64450 was the $71.62. We also see that
4 that charge has been rejected, the code has been rejected,
5 and the payment there is zero.
6    The charge for 10120, the surgery, is allowed,
7 and the total payment is $88.27.
8    So we have what the original charges would
9 be, $159.89 and the amount that will actually be paid to
10 the physician is $88.27.
11 Q. So what happened to the claim as originally
12 submitted here?
13 A. The claim as originally submitted was rejected.
14 Q. That's indicated by what?
15 A. The fact that we have new payments.
16 Q. Okay. And the new payments indicate that -- there
17 are new payments. I assume something has happened to
18 the claim in the process?
19 A. That's right. The claim has been revised and new
20 claim is then authorized for payment.
21 Q. Okay.
22    MR. HENDERSHOT: Could we bring up Exhibit No.
23 1264?
24 BY MR. HENDERSHOT:
25 Q. Dr. Musen, do you recognize this exhibit?

Jury Trial - Volume B                 CondenseIt™                 Tuesday, April 18, 2006

Page 362

1  A.  Yes.
2  Q.  At the top it says ClinicaLogic, clinical edits
3  maintenance?
4  A.  Yes.
5  Q.  Next to procedure it has 10120.  Again, we see the
6  one two --
7  A.  Yes.
8  Q.  Can you explain how this illustrates to what we've
9  seen earlier?
10  A.  We're seeing a snippet of the ClinicaLogic database
11  for Code 10120 and we're seeing Subset 1 relationships
12  for that code.  And under the Subset 1 heading are all
13  of the codes that would be disallowed if they appear on
14  a claim form in conjunction with Code 10120.
15                      - - -
16  Q.  And those relationships play a part in the claims
17  processing?
18  A.  This is the database that continues in the medical
19  service code, and the relationship among codes that the
20  QicLink product uses to identify those two codes we
21  showed earlier which were not to be billed together.
22  Q. Is there any relationship between the database and
23  the QicLink product and Facets and ClaimFax products?
24                      - - -
25

Page 363

1
2  A.  Right.  They're all the database called ClinicaLogic.
3  Q.  All right.
4        MR. HENDERSHOT: Pull up Slide 12.
5  BY MR. HENDERSHOT:
6  Q.  Dr. Musen, we've discussed the claims of the '164
7  patent earlier?
8  A.  Yes.
9  Q.  You've had an opportunity to analyze Claim 16?
10  A.  Yes.
11  Q.  Did you have an opportunity to analyze the Court's
12  construction of Claim 16?
13  A.  Yes, I have.
14  Q.  And you understand that to prove infringement,
15  McKesson has to show each element of the claim is present
16  in the products?
17  A.  Yes.
18  Q.  Have you reached an opinion as to whether or not
19  TriZetto infringes Claim 16?
20  A.  Yes, I have.
21  Q.  And have you reached an opinion as to each of the
22  three products?
23  A.  Yes.
24  Q.  And what's that opinion?
25  A.  That each of the three products infringes.

Page 364

1        MR. HENDERSHOT: Bring that slide down.
2        Do you mind if I bring over a board, your
3  Honor?
4        THE COURT: If you are starting something
5  new, I'm wondering if this might not be a good time for
6  our 15-minute morning break.
7        MR. HENDERSHOT: This is a good time.
8        THE COURT: All right.  Members of the jury,
9  15 minutes.
10        (At this point the jury was excused for a short
11  recess.)
12        THE COURT: All right.  15 minutes.
13        (Short recess taken.)
14                      - - -
15
16
17
18
19
20
21
22
23
24
25

Page 365

1
2        (Court resumed after the recess.
3
4        THE COURT: All right.  Let's bring the jury
5  in.
6        (Pause.)
7        (At this point the jury entered the courtroom
8  and took their seats in the box.)
9        THE COURT: All right.  You may proceed.
10  BY MR. HENDERSHOT:
11  Q.  Dr. Musen, you had testified earlier that you
12  reviewed manuals and various product literature
13  describing the three TriZetto products; is that correct?
14  A.  That's correct.
15  Q.  I'd like to show you a series of documents, see if
16  you recognize them (handing documents to the witness).
17        I realize it's a sizable stack, Dr. Musen,
18  but could you just peruse and see if you recognize those
19  and see if you recognize any documents as things that
20  you did not rely upon.
21        (Pause.)
22        MR. SITZMAN: Your Honor, I'm sorry.  If we
23  could just identify the trial exhibit he's looking at for
24  the record...
25        MR. HENDERSHOT: These are Trial Exhibits 30,

McKesson v. Trizetto, CA No. 04-1258 (SLR)                 Page 362 - Page 365

Page 366

1  71, 80, 85, 87, 94, 95, 96, 97, 98, 99, 100, and 339.
2      (Pause.)
3      MR. RANDALL: Your Honor, we discussed these
4  during the break. There were no objections to them.
5      MR. SITZMAN: There is no objection.
6      THE COURT: Are they being offered at this
7  point?
8      MR. HENDERSHOT: We'd like to move these in
9  evidence, your Honor.
10      THE COURT: All right.
11 BY MR. HENDERSHOT:
12 Q. Dr. Musen, you also testified you had videos
13 prepared at your direction of the examples we just
14 witnessed?
15 A. Yes.
16 Q. At this point I'd like to show you three CDs which
17 are marked as Trial Exhibits 1320, 1340 and 1355,
18 containing the videos of those.
19      MR. HENDERSHOT: If there are no objections,
20 we'd like to move those into evidence as well, your Honor.
21      THE COURT: Any objection to those?
22      MR. SITZMAN: Well, there's no foundation that
23 has been laid for them.
24      THE COURT: These are what?
25      MR. HENDERSHOT: These are the videos prepared

Page 367

1  of the operations of the three accused products that Dr.
2  Musen observed and based his opinions upon.
3      MR. SITZMAN: I guess my objection, we have
4  not seen it. He has not reviewed it, he hasn't seen it,
5  he hasn't seen anything else.
6      From what I understand, he's handed him blank
7  CDs and said are these the videos that -- I don't think
8  Dr. Musen has even laid any foundation that what's on
9  there are the videos he has actually seen.
10      THE COURT: I mean, generally, documents
11 are admitted as they are discussed so I make sure they
12 are actually going to be discussed by the witness. So
13 let's wait on those until you tell me they are coming
14 up. All right?
15      MR. HENDERSHOT: All right. And the videos
16 are videos just connecting the examples we witnessed
17 discussed in the --
18      THE COURT: I think if counsel for defendant
19 has not actually seen the videos, that they need to be
20 reviewed before we have any further discussion.
21      MR. HENDERSHOT: Okay.
22 BY MR. HENDERSHOT:
23 Q. Dr. Musen, you've reviewed the claims -- have you
24 reviewed Claims 1, 2 and 16 of the '164 patent?
25 A. Yes, I have.

Page 368

1  Q. I've put up on this board here the text of Claim 16
2  of the '164 patent.
3      Can you see it from where you are?
4  A. Yes, I can.
5  Q. And I believe you testified before the break --
6  correct me if I'm wrong -- that you reached an opinion
7  as to whether or not TriZetto infringed Claim 16?
8  A. Yes.
9  Q. I'd like to walk you through your opinion element
10 by element, if you don't mind, and if you get to a
11 point where if you -- if you indicate to me that you
12 have -- you are offering an opinion that they infringe
13 that element, I'm going to go ahead and check it off
14 for the three products, if that's all right with you?
15 A. Okay.
16 Q. With respect to the first element of Claim 16, in
17 a computer system having, have we seen any evidence
18 today that Facets operates in a computer system?
19 A. Yes, we have.
20 Q. Have we seen evidence that QicLink and ClaimFacts
21 also operate in a computer system?
22 A. Yes.
23 Q. And what is that evidence?
24 A. We've seen screen shots.
25 Q. So I'm going to mark an F in this first column for

Page 369

1  Facets?
2  A. Okay.
3  Q. The same for ClaimFacts?
4  A. Yes.
5  Q. I will put a C here.
6  A. I can barely read that from here.
7  Q. I will do bigger checkmarks after this. How about
8  that?
9      And then is the same true for QicLink?
10 A. Yes.
11 Q. So is it okay for me to put a Q here?
12 A. Yes.
13 Q. So move on to the next element. This is one of the
14 longer elements we've been discussing.
15      I want to break down a few elements, if you
16 don't mind.
17 A. Sure.
18 Q. Start with a means for operating.
19 A. Yes.
20 Q. Do you have an understanding as to what means for
21 operating means?
22 A. Yes.
23 Q. And what's that?
24 A. That the computers have data processing
25 capabilities, associated memory and software property on

Page 370

1  a database.
2  Q.  And in your opinion, does Facets include such
3  capabilities?
4  A.  Yes.
5  Q.  Does Facets include such software and memory?
6  A.  Yes.
7  Q.  Is the same true for the ClaimFacts product?
8  A.  Yes.
9  Q.  And QicLink product?
10  A.  Yes.
11  Q.  Have we seen evidence of that today?
12  A.  Yes.  We've seen the database of the systems and
13  we've seen how the systems operate on the database.
14  Q.  The next phrase in the element is a predetermined
15  database.  Do you have an understanding of what that
16  means in terms of Claim 16?
17  A.  Yes, I do.
18  Q.  What's that?
19  A.  That means a database containing medical service
20  codes and relationships among those codes.  That
21  includes decision rules based on expert clinical medical
22  expertise.
23  Q.  And in your opinion, does Facets include such a
24  database?
25  A.  Yes, it does.

Page 371

1  Q.  Does ClaimFacts?
2  A.  It has the same database.
3  Q.  Does QicLink?
4  A.  Yes.
5  Q.  And does that database include a set of relationships
6  among medical service codes?
7  A.  Yes.
8  Q.  And does it include medical service codes as well?
9  A.  Absolutely.
10  Q.  In your expert opinion, do those relationships --
11  strike that.
12      In your expert opinion, do the relationships
13  satisfy the remaining element of this claim?
14  A.  Yes.
15  Q.  The remaining language of this element?
16      So is it okay for me to check off Facets?
17  A.  Yes.
18  Q.  Facets has every one of these terms in this element
19  here?
20  A.  That's right.  We saw the database.  We saw the
21  relationships among the service codes.  We saw how the
22  decision roles were used to render determination of
23  whether they were valid or invalid.
24  Q.  I'm going to check this off?
25  A.  Yes.

Page 372

1  Q.  The same for ClaimFacts?
2  A.  Yes.
3  Q.  The same for QicLink?
4  A.  Yes.
5  Q.  With respect to the next almost, a method for
6  processing input claims, do you have an understanding of
7  what that term means?
8  A.  Yes.
9  Q.  In your opinion, does the Facets product in
10  operation practice a method for processing the input
11  claims containing at least one medical service code?
12  A.  That's the whole point of the system.
13  Q.  We saw evidence of that today?
14  A.  Yes.
15  Q.  Do you see evidence of that for ClaimFacts as well?
16  A.  Yes.
17  Q.  And for QicLink?
18  A.  Yes.
19  Q.  In your expert opinion, do the three TriZetto
20  products include this next element?
21  A.  Yes.
22  Q.  Is it okay for me to check those?
23  A.  Yes.
24  Q.  With respect to the next element, receiving at
25  least one claim?

Page 373

1  A.  Yes.
2  Q.  In your opinion, does Facets in operation receive
3  at least one claim?
4  A.  Absolutely.
5  Q.  Have we seen evidence of that here today?
6  A.  We saw them processing the claim of the alleged --
7  motorbike accident.
8  Q.  Does the same hold true for the ClaimFacts and
9  QicLink products?
10  A.  Yes.
11  Q.  It's okay for me to check those as well?
12  A.  Yes.
13  Q.  With respect to the next element, ascertaining
14  whether the at least one claim contains a plurality of
15  medical service codes, in your expert opinion, does
16  Facets ascertain whether the claims it receives contain
17  a plurality of medical codes?
18  A.  Yes.
19  Q.  Have we seen any evidence of those?
20  A.  We've seen the claims enumerated on the screen.
21  Q.  When you say enumerated, what do you mean by that?
22  A.  That Facets counts up the claims.
23  Q.  All right.
24  A.  I'm sorry.  The codes.
25  Q.  In your opinion, that satisfies the ascertaining

Jury Trial – Volume B                CondenseIt™                Tuesday, April 18, 2006

Page 374

1 element?
2 A. Yes.
3 Q. Is the same true of the ClaimFacts product?
4 A. Yes. It counts the codes, too.
5 Q. You say it counts the codes. Is counting the codes
6 sufficient to ascertain whether a claim contains a
7 plurality of medical service codes?
8 A. For purposes of the computer, if it knows the
9 number of codes, it knows whether it has more than one.
10 Q. And is that used in the processing of claims we've
11 seen?
12 A. It may -- it may or may not be used directly, but
13 certainly it's used indirectly to know whether there's a
14 cluster of codes.
15 Q. So, in your opinion, is this element satisfied with
16 the three systems?
17 A. Yes.
18 Q. It's okay to check Facets?
19 A. Yes.
20 Q. ClaimFacts?
21 A. Yes.
22 Q. And QicLink?
23 A. Yes.
24 Q. The next element is determining whether one of the
25 medical service codes in the plurality of medical service

Page 375

1 codes is valid or invalid by interacting with the
2 database and the set of relationships contained in the
3 database.
4        Do you have an understanding as to what that
5 element means?
6 A. Yes.
7 Q. What's that understanding?
8 A. That the system is able to look at the cluster of
9 medical service codes and determine on the basis of
10 the relationships in the database whether one of those
11 codes should be included or not in an appropriate claim.
12 Q. And have we seen that in the examples we've seen
13 today in different screen shots?
14              - - -
15 A.      Yes. For all three systems we've seen how the
16 products eliminate the code for the anesthesia, but when
17 it's not an inappropriate relationship with the code.
18 Q. Does that satisfy the valid and invalid
19 requirement?
20 A. It identifies that the anesthesia code is invalid.
21 Q. In your expert opinion, does the QicLink product
22 include this operation?
23 Q. The Facets?
24              - - -
25

Page 376

1
2 A. Yes, it does.
3 Q. Can I check this?
4 A. Yes.
5 Q. The same with ClaimFacts?
6 A. Yes.
7 Q. The same with QicLink?
8 A. Yes.
9 Q. Now, turning to the last two elements, Dr. Musen,
10 the first one is authorizing the at least one claim in
11 response to the determining step and the next one is
12 and rejecting the at least one claim in response to
13 the determining step.
14 A. Yes.
15 Q. Have we seen any evidence today that Facets, in
16 fact, performs these steps?
17 A. Yes, we have.
18 Q. Can you describe that evidence?
19 A. We've seen Facets acquire the claim that includes
20 the two mutually exclusive codes, rejecting that claim
21 and then revising it to a form where it accepts it.
22 Q. All right. So in your expert opinion, the Facets
23 product infringes these two elements?
24 A. Yes, it does.
25 Q. So I check those off?

Page 377

1 A. Yes.
2 Q. And does the same hold true for ClaimFacts?
3 A. Yes.
4 Q. So I check those?
5 A. Yes.
6 Q. And QicLink?
7 A. Yes.
8 Q. Okay. So, Dr. Musen, we've got checks for every
9 element of Claim 16 for each of the three products.
10 Does that accurately represent your opinion regarding
11 those claims?
12 A. Yes, it does.
13 Q. And that opinion is what?
14 A. That all three TriZetto products infringe Claim 16.
15 Q. And they infringe every element of Claim 16?
16 A. Every element.
17        MR. HENDERSHOT: Can you bring up Slide 6?
18 I'm going to move the board.
19        (Pause.)
20 BY MR. HENDERSHOT:
21 Q. So, Dr. Musen, this looks to be the figure from
22 the mountain bike accident illustration we were walking
23 through earlier?
24 A. We assume he's recovered from the foreign bodies
25 in his arm and has done it again.

McKesson v. Trizetto, CA No. 04-1258 (SLR)                Page 374 - Page 377

Page 378

1  Q.  Is out biking again?
2  A.  Yes.
3  Q.  It appears he's had an unfortunate fall?
4  A.  That's what I see in the slide, yes.
5  Q.  Okay.
6  A.  I think we're going to assume, though, he sustained
7  a different kind of injury this time.
8  Q.  What can we assume happened this time?
9  A.  This time he fell and, instead of abrading his arm,
10  now he has lacerated his back in at least two places.
11  Q.  When you say lacerated --
12  A.  A laceration is a cut that requires surgical
13  repair.
14  Q.  He might have landed in a bush?
15  A.  Whatever.
16       MR. HENDERSHOT:  Can we pull up Exhibit 1122?
17  BY MR. HENDERSHOT:
18  Q.  And, Dr. Musen, the backdrop you've just given for
19  an example, were you able to -- strike that.
20       Did you use that in any way in performing
21  your analysis in this case?
22  A.  Well, the idea of dealing with proper coding for
23  the repair of lacerations is actually a thorny issue
24  for medical billing and it was certainly appropriate to
25  try it in all three TriZetto products.

Page 379

1  Q.  Now, you say the coding conventions or procedures
2  for billing for multiple lacerations is a thorny issue.
3  I hope that's not a reference to the bush.
4       Could you explain what you mean by that?
5  A.  It's a difficult issue because surgeons, when they
6  repair lacerations, effectively get reimbursed by the
7  inch, but it's not quite that simple, because built into
8  the reimbursement for every code for repair of a
9  laceration is an assumption that there's a certain
10  cost to apply the anesthesia.  So just to repair the
11  laceration assumes an anesthetic, removal of a foreign
12  body assumes an anesthetic, there's a setup that is
13  required.  You have to assume suture material.  When
14  you are done, you have to clean up.
15       So bundled if you will or built into the
16  charge is the notion that there's going to be a setup
17  cost and a cleanup cost.  And so the CPT manual says
18  explicitly that for non-medical reasons, if there are
19  multiple lacerations, the doctor doesn't just simply
20  include the cost of each individual laceration, but
21  instead determines the total amount of cut skin that
22  needs to be sewn up.  And that helps to determine what
23  the appropriate charge is.
24       So rather than simply billing per laceration,
25  one has to submit a claim with a composite code for the

Page 380

1  total linear length of lacerated skin that was repaired.
2  Q.  So just so I follow it, if I fall and I have
3  three cuts on my back, the doctor is actually going to
4  treat those three cuts?
5  A.  Yes.
6  Q.  Hopefully?
7  A.  Yes.
8  Q.  But --
9  A.  And provide anesthesia.
10  Q.  But will the doctor bill for those three cuts
11  separately?
12  A.  No, because the billing is based on the assumption
13  it's one very long cut.  So in a sense, for non-medical
14  reasons, we bill for the length of the injury rather
15  than for the anatomical repair that's done.
16  Q.  So the injury that's being billed for actually does
17  not exist medically on the anatomical site being treated?
18  A.  There is no relationship between the codes on the
19  claim and actual anatomical cuts if -- if there's more
20  than one laceration.
21  Q.  Dr. Musen, you had used the term bundled a moment
22  ago.  Do you understand bundled or unbundling to be
23  related terms of art in the field of claims processing?
24  A.  Yes.
25  Q.  Could you explain briefly for the jury what you

Page 381

1  mean by that?
2  A.  When we say the codes are bundled, that means
3  there may be several procedures that are performed, such
4  as the anesthesia and the removal of the foreign body
5  that will be bundled in a way such that it is only one
6  code that is on the claim form.  For example, the
7  surgery.
8       In the case of the laceration example, it is
9  appropriate to bundle all of the individual laceration
10  repairs into a code for the sum total of the length of
11  the laceration, and that's the charge that appears on
12  the form.
13  Q.  So unbundling may relate to submitting too many
14  medical service codes?
15  A.  Right.  And the whole purpose of the patented
16  invention as well as the TriZetto products when they do
17  their clinical editing is to identify situations where
18  there may be multiple codes that appropriately should
19  be bundled into one or at least fewer codes.
20  Q.  If I could direct your attention, Dr. Musen, to
21  Trial Exhibit 1122.
22  A.  That's correct.
23  Q.  Do you recognize what this is?
24  A.  Yes.  That is the Facets system receiving a claim.
25  Q.  And there appear to be two medical service codes

Jury Trial – Volume B                    CondenseIt™                    Tuesday, April 18, 2006

Page 382

1  on this claim based on your explanation earlier?
2  A. That's correct.
3  Q. And is one of them 12036?
4  A. Right. 12036 is a particular code for repair of
5  a laceration. I believe 20 to 31 centimeters and I
6  don't have it memorized.
7  Q. Okay. I forgive you that.
8      There's an arrow on what has been labeled
9  Line 2?
10 A. Line 2 refers to a different procedure code for
11 12037, which is the cost of repairing a really big
12 laceration. As I recall, it's more than 31 centimeters.
13 Q. Okay. So if you -- I believe you discussed this
14 description as to the procedure here under the line item
15 table.
16 A. Yes. Okay. Oh, that is very helpful.
17     So Line 2 is, indeed, repair of a laceration
18 of the scalp or trunk or extremity and that's over 37
19 centimeters in length.
20 Q. So this is a situation where you, as you had
21 discussed, multiple lacerations, repair of multiple
22 lacerations are being submitted on a claim?
23 A. That's correct.
24 Q. And this slide is taken from an example you were
25 able to run at Facets?

Page 383

1  A. Exactly.
2      MR. HENDERSHOT: Would you bring up Exhibit
3  1125?
4  BY MR. HENDERSHOT:
5  Q. Dr. Musen, do you recognize what Exhibit 1125 is?
6  A. Yes. It's an example of Facets doing the right
7  thing.
8  Q. It --
9  A. It shows you the two codes, 12036 and 12037, and
10 generates the error message that tells you the two
11 codes appropriately should be bundled into a single
12 code.
13 Q. In this example, one did 12036 represent?
14 A. 12036 was repair of a smaller size laceration and
15 according to CPT coding convention, when you have two
16 lacerations and you repair both of them, then you only
17 get credit for the total length or, in this case, you
18 get credit for a very large laceration greater than 30
19 centimeters.
20 Q. So the doctor in this example treated two
21 lacerations?
22 A. That's correct.
23 Q. But should have billed for one?
24 A. That is correct.
25 Q. Which corresponds to this 12037?

Page 384

1  A. Right. And we have to be a little bit careful
2  about the language. It's not that the doctor should
3  have billed for one laceration. The one laceration on
4  the form doesn't really exist anatomically. It's not
5  a medical reality of the patient. It's simply the way
6  that one bills when there are multiple injuries and one
7  does multiple repairs.
8  Q. All right. So the billing convention as an example
9  is divorced from the medical condition of the patent?
10 A. Right.
11 Q. The patient?
12 A. Exactly.
13     MR. HENDERSHOT: Could you pull up Slide
14 1126?
15 BY MR. HENDERSHOT:
16 Q. Do you recognize this screen?
17 A. Yes.
18 Q. Is this also from your example?
19 A. It's also from my example and also from Facets.
20 Q. Okay. It says clinical editing criteria indicative
21 for 12037?
22 A. Correct.
23 Q. We also see the subset category again?
24 A. Yes.
25 Q. Have we discussed that before today?

Page 385

1  A. Yes.
2  Q. Is there any relevant information with respect to
3  this information underneath that tab?
4  A. Yes. The same Subset 1 relationship exists between
5  the ten medical service codes that we see in that open,
6  open box, dialogue box that we saw in relationship to
7  the code for the surgical excision of the foreign body.
8  In other words, whenever a clinician bills for repair
9  of a laceration that is over 30 centimeters, then any
10 other lacerations that might be on that patient do not
11 justify a separate bill, they should all be bundled
12 into the same charge.
13     It's not that the lacerations don't exist,
14 but the billing should be for one big one.
15 Q. So it's a non-medical criteria?
16 A. It's non-medical.
17 Q. Did any of these play into the process we saw by
18 Facets?
19 A. Absolutely. Any of those other codes on the claim
20 form would be disallowed and the one that we approved
21 would be the one for the laceration greater than 30
22 centimeters.
23 Q. Okay. So -- and because 12036 is included on this
24 list of relationships?
25 A. That's correct.

McKesson v. Trizetto, CA No. 04-1258 (SLR)                    Page 382 - Page 385

Jury Trial – Volume B      CondenseIt™      Tuesday, April 18, 2006

**Page 386**

1 Q. We saw the results that we did?
2 A. Right. We saw Facets edit out that 12306 code.
3 Q. All right. Did you also have an opportunity to
4 analyze how ClaimFacts would process a similar claim?
5 A. Yes, I did.
6 Q. Did you have prepared or prepare at your direction
7 screen shots illustrating that example?
8 A. Yes, I did.
9      MR. HENDERSHOT: Would you bring up Exhibit
10 1187?
11      (Pause.)
12 BY MR. HENDERSHOT:
13 Q. Dr. Musen, stepping back -- we don't have it on
14 the screen, but stepping back to the example we just
15 discussed, you said Facets would edit out the code for
16 the smaller laceration; is that correct?
17 A. That's correct.
18 Q. When you say edit out, what do you mean by that?
19 A. It would declare that the codes for this medical
20 services pertaining to those smaller lacerations would
21 be deemed invalid. And it would be -- it would disallow
22 the code and allow the code for the large laceration.
23 Q. You ran a similar example in the ClaimFacts example
24 you said?
25 A. And we see it on the screen now.

**Page 387**

1 Q. All right. I believe we discussed earlier the
2 ClaimFacts medical processing screen where about
3 halfway down you see the medical service codes that are
4 entered; is that correct?
5 A. That's correct.
6 Q. And here are those -- what codes are those?
7 A. Those are codes from CPT-4 for repair of lacerations
8 of different sizes.
9 Q. And -- and one two zero three --
10 A. I think two of them for lacerations under, I'm
11 guessing, six centimeters. Three five is for a bigger
12 one, I'm guessing on the order of 15 to 20 centimeters
13 and the 12036 code I'm guessing again is on the order
14 of 20 to 30 centimeters.
15 Q. And you're guessing at the lengths corresponding
16 to those codes?
17 A. That's correct.
18 Q. Not what the codes actually represent in terms of
19 lacerations?
20 A. I'm not sure of the question.
21 Q. Do you understand those codes to represent repair
22 of lacerations on the trunk?
23 A. Correct.
24 Q. And you're just taking an educated guess at what
25 the length is?

**Page 388**

1 A. Without having the CPT manual in front of me, I
2 couldn't tell you what the actual codes are, but they
3 are all medical service codes, repairs of lacerations
4 that are of different lengths.
5 Q. Okay.
6 A. The largest of which is going to be between, I'm
7 guessing, 25 to 30 centimeters.
8      MR. HENDERSHOT: Could we bring up Exhibit
9 1189?
10 BY MR. HENDERSHOT:
11 Q. Dr. Musen, this, again, says ClaimFacts medical
12 processing at the stop. I think we've seen a similar
13 screen with our first example?
14 A. That's correct.
15 Q. Could you explain what's happening here?
16 A. ClaimFacts has done the right thing. It has
17 taken those four separate codes for the four separate
18 lacerations that were repaired and bundled them up
19 into a single code, 12037 that we see down at the bottom
20 of the column labeled PROC. That single code is for
21 repair of a laceration of greater than 30 centimeters
22 in length and, again, to emphasize, this patient may not
23 have a laceration that's greater than 30 centimeters in
24 length. There's no medical relationship between what's
25 billed and what actually exists in the patient. This

**Page 389**

1 is a way that one has to bill for multiple lacerations
2 to the coding that's appropriate.
3 Q. So the computer system has made some determination
4 as to the Codes 12032, 2035 and 2036?
5 A. Precisely.
6 Q. What determination has it made?
7 A. It has determined that all four of those codes are
8 invalid and disallowed them and it has replaced them
9 with code 12037.
10 Q. Okay. And I believe you said that that
11 determination was based on a non-medical reason?
12 A. Yes. It's the coding convention for how one deals
13 with billing for laceration repair.
14 Q. Did you also get an opportunity to run a similar
15 example or observe the processing of a similar example
16 in the QicLink system?
17 A. Yes, I did.
18 Q. Did you prepare screens from the video that you
19 observed?
20 A. Yes.
21      MR. HENDERSHOT: Bring up Exhibit 1267.
22      (Pause.)
23 BY MR. HENDERSHOT:
24 Q. Do you recognize this screen, Dr. Musen?
25 A. Yes, I do.