# EXHIBIT 26

# (PART 2)

Jury Trial - Volume B        CondenseIt™        Tuesday, April 18, 2006

Page 390

1   Q. Is this from the QicLink system?
2   A. Yes.
3   Q. And is this from the example that you observed?
4   A. Yes. This is the example that I observed at
5   QicLink.
6   Q. All right. I believe we discussed earlier that
7   the medical service codes are -- that have been received
8   are indicated on the bottom half of the screen?
9   A. That is correct.
10   Q. Could you explain what's indicated here for this
11   claim?
12   A. Right. There are two -- it turns out two entries
13   for Code 12032, which is a small laceration. One for
14   the intermediate laceration of 12035 and one for the
15   big laceration, which is 12036, but not for the code
16   that corresponds to lacerations greater than 30
17   centimeters.
18   Q. All right.
19   A. You'll notice each one has a particular charge as
20   well, and the total charge for the unbundled bill is
21   $838.75.
22   Q. So to this point in the processing, has QicLink
23   received a claim?
24   A. Yes.
25   Q. It has a -- has it numbered the codes?

Page 391

1   A. It has numbered the codes.
2   Q. But they've yet to be processed?
3   A. That is correct.
4       MR. HENDERSHOT: Would you bring up Exhibit
5   1268?
6   BY MR. HENDERSHOT:
7   Q. Do you recognize this screen, Dr. Musen?
8   A. Yes, I do.
9   Q. Could you explain what's being displayed in the
10   ClinicaLogic messages?
11   A. Right. It's the same kind of message we've seen
12   previously from QicLink and the other TriZetto products.
13   It says when performed on the same lesion or site,
14   Code 12032 is usually considered part of a more
15   comprehensive procedure and billed using Code 12037.
16   If in doubt, have the physician review the claim.
17       So it's beginning to bundle up those codes
18   into the code for the large laceration.
19   Q. And that's based on the billing convention you
20   discussed?
21   A. That's right. It's not the patient's laceration
22   has disappeared, it's just the way it's billed.
23       MR. HENDERSHOT: Can we bring up Exhibit
24   1269?
25

Page 392

1   BY MR. HENDERSHOT:
2   Q. Dr. Musen, it says the procedure being explained
3   here is 12035.
4   A. We're going pretty fast.
5   Q. Yes. Go back to Exhibit 1269.
6       So, again, do you see the original procedure
7   number here, Dr. Musen?
8   A. That's correct.
9   Q. What does that indicate to you?
10   A. That the -- that the Procedure 12035 has been
11   determined to be invalid and been rejected and it's
12   going to ultimately be bundled with the 12037 code we
13   mentioned earlier.
14   Q. It's the same sort of determination?
15   A. Same sort of determination.
16   Q. Can we pull up Exhibit 1270? That's the one we
17   were getting a glimpse of.
18   A. And so we see the same logic being applied to Code
19   12036.
20   Q. Okay. So in your view of the processing of this
21   claim and the QicLink system, could you explain what
22   happened to the claim and the processing?
23   A. Right. The patient had four separate lacerations.
24   The provider billed separately for each of the four
25   lacerations, was able to generate a bill for over $800.

Page 393

1   The QicLink product -- all the TriZetto products were
2   able to see through this unbundling of the bills,
3   recognized that it was appropriate not to issue payment
4   for each laceration, but to give the appropriate payment
5   for the sum total, and replace the codes that were on
6   the claim form with 12037, which is a code for any
7   laceration repair involving a sum total of more than
8   30 inches of suturing.
9   Q. And were you able to draw any conclusions
10   regarding the relationship between the processing of
11   the three systems?
12   A. Well, the three systems operate on the same
13   database that we saw for the example of the foreign
14   body and the anesthesia. In all examples, it was able
15   to identify codes that should be mutually exclusive.
16       They were mutually exclusive because
17   non-medical criterias, essentially how one does the
18   billing, not what the anatomy of the patient is, and in
19   all cases they rejected the initial claim, made edits
20   to the claim and then approved the claim as it was
21   reconstituted.
22   Q. So, Dr. Musen, you've had the opportunity to review
23   and analyze Claim 2 of the '164 patent?
24   A. Yes, I have.
25   Q. Have you reached any conclusions as to whether or

Page 394

1 not the TriZetto products infringe that claim?
2 A. Yes. All three products infringe.
3 Q. And what is that opinion based upon?
4 A. It's based on my observation of the videotapes
5 and first-hand experience with the products, looking
6 at the product literature, looking at the depositions.
7      MR. HENDERSHOT: I'd like to put up the
8 charts similar to the one we did for 16 of Claim 2.
9      (Mr. Hendershot placed a chart on the easel.)
10     MR. HENDERSHOT: Turn the projector off.
11 BY MR. HENDERSHOT:
12 Q. While a little askew, this board represents the
13 language of Claim 2?
14 A. Yes.
15 Q. Do you recognize the elements disclosed in Claim 2?
16 A. Yes. This is the language of Claim 2 verbatim.
17 Q. This is the claim you analyzed whether or not
18 TriZetto infringed?
19 A. Yes.
20 Q. Or one of the three claims?
21 A. Yes.
22 Q. And you expressed your opinion -- strike that.
23 You've reached an opinion as to whether or not TriZetto
24 infringes this claim?
25 A. Yes, they do.

Page 395

1 Q. Do you mind if I walk through with you as we did
2 similarly with Claim 16 the elements of the claims?
3 A. Yes.
4 Q. With respect to the Facets product, which I will
5 put in the left-hand column as we did on the last chart,
6 have we seen evidence that Facets operates in a computer
7 system?
8 A. I have seen computers operate Facets, yes.
9 Q. Okay. We've addressed that element in connection
10 with Claim 16 as well?
11 A. Yes.
12 Q. And we discussed earlier there was some relation
13 between some of the elements in Claim 2 and some of the
14 elements in Claim 16?
15 A. That's correct.
16 Q. Could you explain what that is?
17 A. Actually, I think all of the elements up to the
18 determining step are identical in Claim 2 and in Claim
19 16.
20 Q. So the first element in the computer system, the
21 means for operating, the method for processing, receiving
22 at least one claim and ascertaining?
23 A. That language is identical in both claims.
24 Q. So is your opinion equally applicable to these
25 elements in Claim 2 as it was in 16?

Page 396

1 A. Yes, it is, for the same reasons.
2 Q. And what's that opinion?
3 A. That TriZetto infringes in all three products.
4 Q. I'm going to go ahead and put an F, C and a Q and
5 start checking these off, if that's all right.
6      You said for each one of these, it's your
7 opinion that each of the TriZetto products infringes
8 each term of these limitations?
9 A. That is correct.
10 Q. And then down through here (indicating)?
11 A. Yes.
12 Q. For each product?
13 A. For each product.
14 Q. So getting to the next element, the determining
15 step --
16 A. Yes.
17 Q. -- it says, determining whether one of the medical
18 service codes in the at least one claim is mutually
19 exclusive due to non-medical criteria with any other
20 medical service code in the at least one claim.
21 A. Yes.
22 Q. Do you have an understanding of what that requires?
23 A. Yes. It requires that the computer be able to
24 identify a grouping of codes where at least one of
25 those codes is not payable with all the other codes.

Page 397

1 Q. In your opinion, does the Facets product make
2 such a determination?
3      - - -
4 A. We've seen that, yes.
5 Q. Where did we see it?
6 A. We've seen it in the example of the administration
7 anesthesia with the surgical foreign body. We've seen it
8 with the rebundling of the individual laceration repair
9 service code into a single laceration repair service
10 code.
11 Q. So it's your opinion -- strike that.
12      Would you explain how the Facets system
13 processing of the multiple laceration example is mutually
14 exclusive?
15 A. The facets original determining step here, it's
16 okay to check that code, but that --
17      - - -
18
19
20
21
22
23
24
25

Page 398

1
2 A. It does so by, for example. looking at the individual
3 codes for the laceration subsets and recognizing that the
4 coding convention is that one will code for the maximum
5 laceration length rather than any individual codes and
6 therefore determines that the individual codes are
7 mutually exclusive.
8 Q. Okay. And that's based on what sort of criteria?
9 A. Non-medical criteria. It's a function of the
10 billing.
11 Q. So in your view, Facets infringes the orange
12 determine step here?
13 A. Yes.
14 Q. So it's okay to check that off?
15 A. Yes.
16 Q. And did we see -- strike that.
17        Did we see similar determinations in the
18 ClaimFacts and QicLink products?
19 A. Yes. We saw them again with the example of the
20 anesthesia associated with the removal of a foreign
21 body. The anesthesia is medically indicated, but for
22 non-medical reasons, it's mutually exclusive with the
23 surgery.
24        We saw it with the way in which the
25 laceration repairs of service codes were billed. For

Page 399

1 non-medical reasons we don't enumerate the actual
2 lacerations of the patient but instead give the total
3 length of lacerations repaired.
4 Q. Is it your opinion that the ClaimFacts and QicLink
5 products also infringe this element?
6 A. Yes.
7 Q. Is it okay to be checked off?
8 A. Yes.
9 Q. And with respect to the last two elements, it
10 refers to authorizing medical service codes which are
11 not mutually exclusive due to non-medical criteria with
12 any other medical service codes in the at least one
13 claim?
14 A. Yes.
15 Q. Do we see any evidence of that today?
16 A. Sure. In the example of the biker in the first
17 instance, we saw the code for the removal of the
18 foreign body was authorized. We saw the code for the
19 anesthesia was rejected. In the case of laceration
20 repair, we've seen that all of those codes were rejected
21 and they were replaced by more appropriate code.
22 Q. So, in your opinion, Facets infringes this element?
23 A. Yes.
24 Q. Was that opinion informed or based upon any
25 TriZetto product literature as well?

Page 400

1 A. Sure. The product literature in the deposition
2 testimony certainly helped inform that opinion.
3 Obviously, most convincing was seeing the systems in
4 action.
5 Q. And is that true of all of your opinions?
6 A. That is correct.
7 Q. And when I say it's true, clarify it a little bit.
8 Could you explain what types of information and what
9 sorts of information you relied upon in informing your
10 expert opinion that TriZetto infringes?
11 A. Okay. I can be more expansive. I was given the
12 pile of product literature and user manuals that have
13 been admitted into evidence.
14        I've had access to the depositions of the
15 TriZetto senior staff, TriZetto staff, TriZetto customers.
16        I had Dr. Johnson's report on the operations
17 of the TriZetto systems.
18        And I had the opportunity to interact
19 directly with Facets and to see the videotapes of
20 ClaimFacts and QicLink.
21 Q. And your review of those sorts of information are --
22 informed your infringement opinions as to every element
23 we've been discussing?
24 A. There was no evidence in any of those sources that
25 I reviewed to suggest otherwise.

Page 401

1 Q. All right. And when you say suggest otherwise,
2 what are you referring to?
3 A. That there was no infringement.
4 Q. All right. So with respect to the ClaimFacts and
5 QicLink products?
6 A. They also infringe.
7 Q. The green element?
8 A. Yes.
9 Q. And moving onto the red one, just rejecting medical
10 service codes which are mutually exclusive due to
11 non-medical criteria, have we seen any evidence of that?
12 A. Yes. As I said a minute ago, we've seen codes
13 rejected because of the same --
14 Q. So what is your opinion with respect to those
15 elements?
16 A. That all three products infringe.
17 Q. So I should check those off?
18 A. Yes.
19 Q. So we've hit every square in this claim?
20 A. That's correct.
21 Q. For each three products?
22 A. That's correct.
23 Q. Does that accurately represent your opinions as to
24 the operation of Trizetto's Facets, ClaimFacts and
25 QicLink products?

Page 402

1  A. Yes.
2  Q. What is that opinion?
3  A. That the products infringe Claim 2.
4  Q. I'm going to show you a handful of more slides,
5  Dr. Musen.
6        MR. HENDERSHOT: Can we bring up Exhibit
7  1120, please?
8        I will move this.
9  BY MR. HENDERSHOT:
10 Q. Dr. Musen, did you have an opportunity in this case
11 to review Claim 1 of the '164 patent?
12 A. Yes, I did.
13 Q. And do you have an understanding as to whether or
14 not McKesson has asserted that Trizetto's products
15 infringe Claim 1?
16 A. Yes.
17 Q. And have you reached an opinion as to whether or
18 not Trizetto's products infringe Claim 1?
19 A. Yes. Yes, they infringe.
20 Q. All right. Is your opinion that Trizetto's
21 products inform Claim 1 at all based upon or informed by
22 the operations of Trizetto's products?
23 A. Yes.
24 Q. On the screen is trial Exhibit 1120. Do you
25 recognize that exhibit?

Page 403

1  A. Yes.
2  Q. What do you recognize it as?
3  A. That is a screen shot of the Facets system in
4  operation.
5  Q. And what is being illustrated here on the screen?
6  A. Well, if you look at the procedure code heading --
7  rather, the column headed with the characters PROC, we
8  see that the user has blindly typed in the procedure
9  Code 12345, which is, of course, not a real PTC-4 code
10 and Facets looks it up in its database and determines
11 that the procedure code is not found.
12 Q. So what determination does Facets make in this
13 example?
14 A. That the entry code does not exist in the database.
15 Q. And there's a box that is indicated by error
16 messages here in the center of the screen?
17 A. That's correct.
18 Q. What does that indicate?
19 A. That says that the procedure code that was entered,
20 12345, is not in the database.
21 Q. So Facets received Code 12345?
22 A. Yes.
23 Q. And determined that it wasn't in the database?
24 A. Yes.
25 Q. And provided this prompt message?

Page 404

1  A. That's correct.
2  Q. The error message?
3  A. Right.
4        MR. HENDERSHOT: Would you bring up Exhibit
5  1195?
6  BY MR. HENDERSHOT:
7  Q. Did you have an opportunity to run this or a
8  similar example or observe the processing of a similar
9  example in a ClaimFacts system?
10 A. Yes, I did.
11 Q. Did you observe a similar result?
12 A. Yes, I did.
13        MR. HENDERSHOT: 1195.
14        (Pause.)
15 BY MR. HENDERSHOT:
16 Q. And the example that you observed, did it also
17 involve a Code 12345?
18 A. It involved the same bogus code and the same
19 error message appeared, indicating that the code was
20 bogus.
21 Q. All right. Do you recognize trial Exhibit 1195?
22 A. Yes, I do. This is a screen shot of the ClaimFacts
23 system in operation. Down towards the lower third of
24 the screen, we see under the PROC heading, again in red,
25 someone is entering 12345 as a medical service code.

Page 405

1  Q. And is there a display on the screen at the bottom
2  here in white, Dr. Musen?
3  A. Yes. We see in white where it says, record not
4  found.
5  Q. What does that mean?
6  A. That means ClaimFacts has attempted to look up the
7  bogus Claim 12345 in the database, not found it and
8  provided the appropriate error message.
9  Q. Does that determination bear on your relation to
10 the example we saw in Facets?
11 A. Yes, same kind of procedure.
12 Q. Did you also get an opportunity to observe a
13 similar claim processing in QicLink?
14 A. Yes.
15        MR. HENDERSHOT: Could you bring up Exhibit
16 1265?
17 BY MR. HENDERSHOT:
18 Q. And could you briefly describe that example you ran
19 in QicLink as well?
20 A. As you might guess, the code 12345 was entered into
21 QicLink and QicLink displayed a similar message.
22 Q. Do you recognize the screen that's marked as Trial
23 Exhibit 1265?
24 A. Yes, I do.
25 Q. What is that, Dr. Musen?

Jury Trial - Volume B      CondenseIt™      Tuesday, April 18, 2006

Page 406

1  A.  This is a screen shot of QicLink in operation.
2  Q.  And about halfway down the screen, it says CBX.
3  PROC?
4  A.  Right.  That's the procedure code.
5  Q.  When you say procedure code, does that correspond
6  to the medical service code?
7  A.  Yes.
8  Q.  What's the code that's being entered?
9  A.  12345.
10  Q.  Okay.
11      MR. HENDERSHOT:  Could we bring up Slide
12  1266?
13  BY MR. HENDERSHOT:
14  Q.  That's a little difficult to see with the contrast
15  here, Dr. Musen.
16  A.  That's right.
17  Q.  But, again, there's a CBX Procedure Code 12345?
18  A.  That's right.
19  Q.  What is this screen we're looking at?
20  A.  We're looking at a screen shot, again, from QicLink
21  in operation.
22      We've just entered 12345 as a candidate CPT
23  code and we get an error message because the computer
24  has tried to find that code in the database, determined
25  that it's absent and printed out a message to the user

Page 407

1  saying that the code is invalid.
2  Q.  Was this part of the same claim that you processed,
3  we saw from the previous slide?
4  A.  Yes, it was.
5  Q.  And there's a message at the bottom?
6  A.  Right.  Invalid CPT-4 procedure, not on file.
7  Q.  And what does that indicate?
8  A.  That means that the database does not contain that
9  medical service code.
10  Q.  And does this example bear any relation to the
11  examples we saw for Facets and ClaimFacts?
12  A.  That's right.  It's the same method being applied.
13  Q.  All right.  I'd like to show you a chart similar to
14  the two we've done previously for Claim 16 and Claim 2
15  for Claim 1.
16  A.  Okay.
17  Q.  Have you had an opportunity to read Claim 1 in this
18  case?
19  A.  Yes.
20  Q.  I believe you've established you've analyzed it?
21  A.  Yes.
22  Q.  Have you reached any opinion as to whether or not
23  this claim is infringed by Trizetto's products?
24  A.  Yes.  I believe all three products infringe Claim 1.
25  Q.  Okay.  If you don't mind, it's a little askew, I'm

Page 408

1  not a master of the easel.  I apologize.
2      Could we walk through the elements of Claim 1
3  and sort of explain your infringement opinion?
4  A.  Sure.
5  Q.  With respect to the first element, in a computer
6  system having, have we seen that element before?
7  A.  Yes, we have.  All the products run on a computer
8  system.
9  Q.  Are there any other elements in this claim that
10  are common to the other claims we've discussed?
11  A.  Yes.  Indeed, everything that is above the line
12  where it says determining step is repeated in the other
13  claims.
14  Q.  And you -- you reached opinions as to those
15  other -- the elements in those other claims?
16  A.  Right.  Identified that all of those elements
17  infringe in the other claims.
18  Q.  And does that opinion apply here in Claim 1?
19  A.  Yes, it does.
20  Q.  So it's okay for me to check off those boxes down
21  to the orange step?
22  A.  Yes.
23  Q.  So this box?
24  A.  Yes.
25  Q.  All of those terms are present in each product?

Page 409

1  A.  That is correct.  Same database.
2  Q.  Same for ClaimFacts?
3  A.  Yes.
4  Q.  Same for QicLink?
5  A.  Yes.
6  Q.  Same for this line?
7  A.  Yes.
8  Q.  Same for receiving at least one claim?
9  A.  They all receive at least one claim.
10  Q.  And do you want me to stop there; right?
11  A.  Yes.
12  Q.  Okay.  So the next step is determining whether any
13  medical service code contained in the at least one claim
14  is not present in the predetermined database.
15      Do you see that?
16  A.  Yes.
17  Q.  And do we see any evidence of Trizetto's products
18  doing that today?
19  A.  We just saw examples where a bogus CPT-4 code was
20  entered and they printed out the appropriate error
21  message.
22  Q.  You say a bogus CPT-4 code.  Which code was that?
23  A.  12345.
24  Q.  These last three examples we saw?
25  A.  Exactly.

McKesson v. Trizetto, CA No. 04-1258 (SLR)      Page 406 - Page 409

Jury Trial - Volume B                    CondenseIt™                    Tuesday, April 18, 2006

Page 410

1  Q.  With respect to the Facets example, which is the
2  first example, is it your opinion that we saw -- strike
3  that.
4           Is it your opinion that Facets describes
5  whether codes are contained in the predetermined database?
6  A.  Yes.
7  Q.  And so it's your opinion that this element is
8  infringed by Facets?
9  A.  That's correct.
10  Q.  And was that confirmed by what we saw today?
11  A.  That's correct.
12  Q.  May I check that off?
13  A.  Yes.
14  Q.  Given the similarity between the displays we saw
15  in the three systems, is it true to say your opinion
16  carries forth in the other two products?
17  A.  Yes.
18  Q.  So it's your expert opinion that ClaimFacts and
19  QicLink also infringe that element?
20  A.  Yes.  We've seen all three products print out the
21  error message as indicated by the last element.
22  Q.  So I should check these last five?
23  A.  Yes.
24  Q.  Is that everything there, Dr. Musen?
25  A.  That's the entire claim.

Page 411

1  Q.  Does that accurately reflect your opinion
2  regarding Trizetto's products infringement of the '164
3  patent's Claim 1?
4  A.  Yes.
5  Q.  And what is that opinion?
6  A.  That all three products infringe Claim 1.
7  Q.  Okay.  So we've discussed that there are three
8  claims at issue in this case?
9  A.  That's correct.
10  Q.  Claim 1?
11  A.  Yes.
12  Q.  Claim 2?
13  A.  Yes.
14  Q.  And Claim 16?
15  A.  That's correct.
16  Q.  And have you reached an opinion that Trizetto's
17  products infringe?
18  A.  Yes.
19  Q.  And we discussed what that opinion was based upon?
20  A.  That's correct.
21  Q.  And we've seen elements of each of these boxes on
22  the screen here today?
23  A.  Yes, we have.
24  Q.  And each of these claims describe a method; is that
25  correct?

Page 412

1  A.  That's correct.
2  Q.  In what context is that method implemented? )
3  A.  In the context of the software that's used to
4  inform the basis for the systems.
5  Q.  Is it in a computer system?
6  A.  That's correct.
7  Q.  As to these steps recited in the Claims 1, 2 and
8  16, those are -- are each of those performed within a
9  computer system?
10  A.  That is correct.
11  Q.  So have you reached -- strike that.
12           And as the charts illustrated, is it your
13  opinion -- strike that.
14           Is it your opinion that each of the
15  products infringe each element of each of these claims?
16  A.  Yes, it is.
17  Q.  And that -- and you've had a chance in formulating
18  that opinion to review TriZetto product literature?
19  A.  Yes.
20  Q.  Does the literature reviewed include instructions
21  or guidance that TriZetto describes to its customers?
22  A.  Yes.
23  Q.  Could you describe the literature?
24  A.  The literature describes how the customers can use
25  the system, interact with the system, how they may want

Page 413

1  to turn or turn off features in the system and how they
2  can use the clinical editing capabilities.
3  Q.  So the infringement we've established as to Claims
4  1, 2 and 16, is that consistent, in your opinion, with
5  the directions and instructions provided in Trizetto's
6  manuals?
7  A.  That's right.  And as we saw earlier with Facets,
8  it's impossible to even submit a claim without turning on
9  the clinical editing.
10  Q.  Have you also reviewed any marketing materials?
11  A.  Yes, I have.
12  Q.  And the marketing materials you've reviewed for
13  the three products, has TriZetto made any representation
14  or statement about the results of the clinical editing
15  and their products?
16  A.  Well, they -- they claim to their potential
17  customers that they believe there's a 5 to 15 percent
18  cost savings.
19  Q.  So on some level they tout this sort of
20  functionality in their advertisements?
21  A.  Absolutely.
22  Q.  Those advertisements are documents you've reviewed?
23  A.  Yes.
24  Q.  So the direct infringement or the infringement
25  we've established here of these three claims, in your

McKesson v. Trizetto, CA No. 04-1258 (SLR)                    Page 410 - Page 413

Jury Trial – Volume B                    CondenseIt™                    Tuesday, April 18, 2006

| Page 414 | Page 416 |
|---|---|

**Page 414**

1  opinion, is consistent with the instructions that
2  TriZetto provides to customers or potential customers?
3  A. Yes.
4  Q. And that's based upon your review of what?
5  A. My review of the product literature and the sales
6  information.
7  Q. Okay.
8      MR. HENDERSHOT: No further questions.
9      THE COURT: All right. Cross-examination.
10      MR. SITZMAN: Your Honor, do you want to begin
11  or break for lunch?
12      THE COURT: Well, the jury's lunches are here,
13  I believe. If you'd like to take a short break before
14  we start cross, we can do that.
15      MR. SITZMAN: I think we should let them break.
16      THE COURT: All right. All right. Always
17  pay attention to the jury.
18      All right. Half an hour, ladies and gentlemen.
19      (At this point the jury was excused for a
20  luncheon recess.)
21      (Luncheon recess taken.)
22          - - -
23
24
25

**Page 416**

1  cross-examination.
2      MR. SITZMAN: Thank you, your Honor.
3      Before I begin my cross-examination, I did
4  not introduce myself yesterday. I apologize, but I'm
5  Mike Sitzman, one of the attorneys that represents the
6  Trizetto Group. And I will be beginning my cross-
7  examination of Dr. Owen.
8      Thank you.
9      Dr. Musen. Sorry. I did Dr. Owen yesterday.
10      CROSS-EXAMINATION
11  BY MR. SITZMAN:
12  Q. Dr. Musen, we've got three method claims at issue
13  in this case; right?
14  A. Correct.
15  Q. And to infringe a method claim, you understand that
16  the infringing product must perform each step exactly the
17  way it is set forth in the patent claim; correct?
18  A. That's correct.
19  Q. If one of the steps is missing, the product does
20  not infringe; correct?
21  A. That's correct.
22  Q. And if the product performs a similar function but
23  in a different way than what is exactly set forth in the
24  patent claim, it, too, doesn't infringe literally?
25  A. It needs to replicate the method.

| Page 415 | Page 417 |
|---|---|

**Page 415**

1
2      AFTERNOON SESSION
3
4      (Proceedings resumed at 1:00 p.m.)
5
6      THE COURT: It's a bit chillier in here than
7  it was moments ago. All right. Keep us all on our toes.
8      All right. Are we all set to bring the jury
9  in?
10      MR. SITZMAN: Yes, I believe so.
11      (Pause.)
12      (At this point the jury entered the courtroom
13  and took their seats in the box.)
14      THE COURT: Somehow or other, the powers that
15  be decided to make this courtroom really cold. You all
16  can be seated.
17      In order to get a change of temperature, we
18  have to call emergency New Jersey. That's the way the
19  Federal Government works. And if we call them to get
20  it warmer, it will be stiffling by tomorrow.
21      So we have to temper these. If you are
22  really uncomfortable, I will make the call. You have
23  to let Francesca know. I hope we can have a moment
24  sometime this week where the temperature is right.
25      All right. You may proceed with your

**Page 417**

1  Q. Well, but more than just replicating the method,
2  it has to do it exactly the way it is specified in the
3  patent claim; right?
4  A. That's my understanding, but I am not an attorney.
5  Q. Okay. Earlier today, during your direct
6  examination, you talked about an example from the patent,
7  Example 1.
8  A. Correct.
9  Q. Now, the example is part of the patent specification
10  that we heard about yesterday. It's not part of the
11  claims; correct?
12  A. That is correct.
13  Q. And to infringe a patent, you have to infringe the
14  claims, not the examples?
15  A. Right.
16  Q. Okay. But if I understood you correctly -- and
17  please correct me if I'm wrong -- the examples were
18  helpful to you to understand the patent and to understand
19  the claims?
20  A. Examples of the entire specification, yes.
21  Q. And the specification, which the Court has seen
22  and the jurors have seen, very long, it has a lot of
23  detail in it, but all of that generally helps understand
24  the patent claims?
25  A. Correct.

Jury Trial – Volume B                    CondenseIt™                    Tuesday, April 18, 2006

---

**Page 418**

1  Q. Okay. The example -- sorry.
2       The CPT code manual or the CPT or collection
3  of codes that you referred to earlier, and we actually
4  saw a slide of a 2006 edition earlier as part of your
5  direct examination. I would like to show you an older
6  version of the CPT code dating back to 1988, when this
7  patent was filed.
8  A. Okay.
9  Q. And see if you recognize it. I've shown it to
10 counsel.
11      MR. SITZMAN: May I approach, your Honor?
12      THE COURT: Yes.
13      MR. SITZMAN: Thank you.
14      (Mr. Sitzman handed an exhibit to the
15 witness.)
16 BY MR. SITZMAN:
17 Q. Just for purposes of identification, we've marked
18 it as Defendant's Exhibit 860, but I'm not moving for
19 its introduction at this time.
20      I'm holding the actual live copy of it. I
21 think we've photocopied one for your use.
22      Do you recognize this book?
23 A. I recognize the book generically. I've never seen
24 the 1988 version.
25 Q. Okay. But this is the collection we were talking

**Page 419**

1  about of all the medical service codes that is published
2  yearly or bi-yearly by the American Medical Association?
3  A. Correct.
4  Q. Okay.
5  Q. And these are where all these code numbers come
6  from, the numbers we were using, or you were using in
7  your direct examination, they come out of this book; is
8  that right?
9  A. Right.
10 Q. Now, medical codes, this -- this book and all the
11 tens of thousands of codes in it, codes are not medical
12 claims, though; right?
13 A. Correct.
14 Q. Medical claims are very different?
15 A. Yes.
16 Q. Okay.
17      MR. SITZMAN: Can I have Graphic 3 from their
18 presentation?
19 BY MR. SITZMAN:
20 Q. I think we used this this morning on direct
21 examination. This was a medical claim form and it has
22 a lot of information on it and it's only in that yellow
23 box where the codes are actually put in; right?
24 A. Correct.
25 Q. The patient's name goes on this, the Social

**Page 420**

1  Security number, the employer, all of the other
2  information on the form; right?
3  A. Right.
4  Q. And there's a host of reasons or other reasons
5  other than just the medical codes for why a medical claim
6  may be rejected?
7  A. Sure.
8  Q. Right? The benefits could have lapsed for that
9  particular patient?
10 A. The claim could be blank.
11 Q. Or a wrong Social Security number?
12 A. Sure.
13 Q. Or maybe they didn't meet their deductible?
14 A. Right. Those are outside the patent.
15 Q. Right. And they -- they might result in a
16 rejection of the medical claim and have nothing to do
17 with the medical service codes?
18 A. Agreed.
19 Q. Okay. We also talked on direct examination about
20 diagnosis codes. Do you remember ICD-9 codes?
21 A. Yes.
22 Q. Okay. Are you aware that the TriZetto programs
23 perform a function related to the diagnosis codes,
24 check those diagnosis codes relative to the service
25 codes?

**Page 421**

1  A. Yes.
2  Q. Okay. And that's not part of the claims; right?
3  A. No. That's external.
4  Q. That's totally external. But you do know, because
5  of the suitcase of information that you were given, that
6  the TriZetto programs, one of the many things it does,
7  is it checks to see if the diagnosis code matches up with
8  the service code?
9  A. As does McKesson's product.
10 Q. Okay. But focusing for a moment on the TriZetto
11 one --
12 A. Yes.
13 Q. Okay. And is it also your understanding that if
14 the diagnosis code doesn't match the service code, that
15 might be a grounds for rejecting the claim?
16 A. Sure.
17 Q. Now, getting briefly down to the suitcase of
18 information you received, many of which was introduced
19 into your direct examination, that described all three
20 of the TriZetto products at issue; correct?
21 A. Correct.
22 Q. And you still have those exhibits in front of you?
23 A. Yes.
24              - - -
25 Q. All right. We may need them.

---

McKesson v. Trizetto, CA No. 04-1258 (SLR)                    Page 418 - Page 421

Jury Trial - Volume D      CondenseIt™      Thursday, April 20, 2006

Page 769

```
                    - VOLUME D -
              IN THE UNITED STATES DISTRICT COURT

             IN AND FOR THE DISTRICT OF DELAWARE

                         - - -

MCKESSON INFORMATION SOLUTIONS     :   CIVIL ACTION
LLC,                               :
            Plaintiff              :
                                   :
       vs.                         :
                                   :
THE TRIZETTO GROUP, INC.,          :
            Defendant              :   NO. 04-01258 (SLR)
                         - - -

                         Wilmington, Delaware
                         Thursday, April 20, 2006
                         10:27 o'clock, a.m.


BEFORE:  HONORABLE SUE L. ROBINSON, Chief Judge, and a jury
                         - - -

APPEARANCES:

        SKADDEN, ARPS, SLATE, MEAGHER & FLOM
        BY:  MICHAEL BARLOW, ESQ.

             -and-

        SKADDEN, ARPS, SLATE, MEAGHER & FLOM
        BY:  JEFF RANDALL, ESQ.,
             BERNARD SHEK, ESQ. and
             MICHAEL HENDERSHOT, ESQ.
             (Palo Alto, California)

        Counsel for Plaintiff

                    Valerie J. Gunning and
                    Leonard A. Dibbs
                    Official Court Reporters
```

Page 770

```
APPEARANCES (Continued):

        MORRIS, NICHOLS, ARSHT & TUNNELL
        BY:  JACK B. BLUMENFELD, ESQ.

             -and-

        GIBSON, DUNN & CRUTCHER LLP
        BY:  JEFFREY THOMAS, ESQ. and
             DAVID SEGAL, ESQ. and
             T. KEVIN ROOSEVELT, ESQ.
             (Irvine, California)

             -and-

        GIBSON, DUNN & CRUTCHER LLP
        BY:  MICHAEL SITZMAN, ESQ.
             (San Francisco, California)

        Counsel for Defendant
                    - - -
```

Page 771

## PROCEEDINGS

(Proceedings convened at 10:27 a.m., and the following occurred without the presence of the jury.)

THE COURT: All right. Do we have issues with the first presentation of evidence? Not with the entire case, just with what's happening first thing.

MR. RANDALL: We do, your Honor.

With respect to the demonstratives that Mr. Davis intends to testify about, we have objections as to most of the demonstratives. I have a copy set of them right here, if I could hand them up?

THE COURT: All right.

(Mr. Randall handed documents to the Court.)

MR. RANDALL: The first, not necessarily in order, but I just want to cover one right away. At 4-8, they're numbered at the bottom right-hand corner, there's a demonstrative with up in the upper left-hand corner, it references Dr. Johnson's expert report. I don't think that's appropriate. She didn't testify.

THE COURT: I agree, and reports aren't part of the case, ever, so that should not be shown.

MR. RANDALL: With respect to the second

Page 772

slide, 4-2, and on forward through 4-6, what Mr. Davis is attempting to testify about is that the step of ascertaining whether at least one claim contains a plurality of medical service codes is limited to the structure in the Figure 2. That's what all of those slides are about. They are going to present to the jury their theory that the reasonable interpretation of that term is that it's limited to the structure and that's simply contrary to what your Honor ruled at Markman. That's what they advanced with respect to the Markman hearing and they didn't receive that construction properly. And they are going to advance it in front of the jury.

It's simply error to permit them to present an argument that is directly contrary to your Honor's ruling, and there's no other purpose for that for all of those figures.

With respect to 4-10 -- I'm sorry, 4-9, no objections.

4-10, Dr. Davis did not opine on anything regarding predetermined database that is relevant to your Honor's construction. His construction of predetermined database was that it required user -- it precluded user modification, and so there are a series of slides that he's going to testify about regarding

Page 785

1  rejected the step plus function construction they
2  offered with regard to this method claim, there is no
3  way that that term is limited to this issue, and so --
4      THE COURT: Well, and they are not saying
5  that they're going to argue that it's limited. They
6  are saying that this is the only illustration and this
7  explains it.
8      I just --
9      MR. RANDALL: But that's the point. When
10  they get up there and say that you are to construe
11  this, jury, pursuant to the specification and when I
12  look at it as one of ordinary skill in the art, and I
13  look at the specification, specifically Figure 2 in
14  terms of this term, what does it mean to me? It means
15  you compare this to one.
16      THE COURT: Well, I don't know how that's
17  different than what you did with your witness on what
18  the determining step was. Actually, that was a huge
19  shock to me, about how your witness construed that.
20      So I think, quite frankly, you all are just
21  getting to know your cases here in the courtroom, and
22  I'm not at this point in time going to preclude
23  testimony any more than I have to, so your objection
24  is noted and you are going to live with my ruling.
25      MR. RANDALL: Fine.

Page 786

1      THE COURT: All right. Let's bring the jury
2  in if there's nothing else.
3      (Pause.)
4      (At this point the jury entered the courtroom
5  and took their seats in the box.)
6      THE COURT: Good morning, ladies and gentlemen.
7  Mr. Thomas?
8      MR. THOMAS: Thank you.
9      Good morning, ladies and gentlemen. It's now
10  our turn, and so we'll be starting to call our witnesses.
11      Our first witness this morning -- you'll be
12  hearing at least two live witnesses -- our first witness
13  is Dr. Hawley.
14      Dr. Hawley is a physician with Los Angeles
15  Children's Hospital or, more relevantly, he is the
16  creator of the ClinicaLogic database that contains all
17  of the rules and relationships for these CPT codes.
18      Following Dr. Hawley, you'll be hearing
19  Professor Davis, who's an expert on computer systems
20  of this type.
21      So first we'll call Dr. Hawley, and Mr.
22  Sitzman is going to conduct the examination of Dr.
23  Hawley.
24      MR. SITZMAN: Good morning. I'm calling
25  Dr. Hawley to the stand, your Honor.

Page 787

1      - - -
2      DEFENDANT'S TESTIMONY
3
4      ... PHILIP METSCHAN HAWLEY, JR.,
5      having been duly sworn as a witness,
6      was examined and testified as follows ...
7      DIRECT EXAMINATION
8  BY MR. SITZMAN:
9  Q. Good morning, Dr. Hawley.
10  A. Good morning.
11  Q. You're familiar with the ClinicaLogic database?
12  A. Yes, I am.
13  Q. You understand that's a component of the TriZetto
14  systems?
15  A. I do.
16  Q. Did you play a role in the creation of ClinicaLogic?
17  A. As was, I think, just mentioned, I was the creator
18  of the clinical database for ClinicaLogic.
19  Q. Okay. I'm going to ask you a lot more questions
20  about ClinicaLogic, but I want to just quickly go
21  through your background.
22      Can you describe for the jury your
23  educational background?
24  A. I attended University of Southern California Medical
25  School, from which I graduated in 1978. I then went to

Page 788

1  Children's Hospital Los Angeles, where I began my
2  residency in pediatrics. I was there for two years,
3  after which I moved to Boston and took an MBA, a Master's
4  in Business Administration, from Harvard.
5  Q. At some point in time, either during your education
6  or shortly thereafter, did you learn about medical
7  service codes?
8  A. I did.
9  Q. Okay. Can you describe generally what you learned
10  and where you did that?
11  A. Well, it would have been initially sometime during
12  my medical training, whether it was late medical school
13  or early in my internship or residency that I would have
14  been exposed to medical codes, describing diagnoses or
15  manage codes describing medical services and procedures.
16  But as a physician in training at that point, I would
17  say I was exposed. I wasn't using them to any great
18  degree in my hour to hour work. And it wasn't until I
19  went to work for a company called AMI that I became
20  very, very deeply involved in medical code.
21  Q. And, Doctor, what is AMI?
22  A. AMI, at that time, was a hospital company. When
23  I joined them, that's what they did. They ran and
24  operated hospitals throughout the United States.
25  Q. And when you joined AMI, did you have any

Jury Trial - Volume E                CondenseIt™                McKesson v. TriZetto

```
1                    - VOLUME E -
              IN THE UNITED STATES DISTRICT COURT
2
              IN AND FOR THE DISTRICT OF DELAWARE
3
                       - - -
4
   McKESSON INFORMATION SOLUTIONS    :    CIVIL ACTION
5  LLC,
              Plaintiff             :
6
          vs.                       :
7
   THE TRIZETTO GROUP, INC.,        :
8
              Defendant             :    NO. 04-01258 (SLR)
9
                       - - -
10
                       Wilmington, Delaware
11                     Monday, April 24, 2006
                       8:30 o'clock, a.m.
12
13
   BEFORE:  HONORABLE SUE L. ROBINSON, Chief Judge, and a jury
14
                       - - -
15
   APPEARANCES:
16
          SKADDEN, ARPS, SLATE, MEAGHER & FLOM
17        BY:  MICHAEL BARLOW, ESQ.
18            -and-
19        SKADDEN, ARPS, SLATE, MEAGHER & FLOM
          BY:  JEFF RANDALL, ESQ.,
20             BERNARD SHEK, ESQ. and
               MICHAEL HENDERSHOT, ESQ.
21             (Palo Alto, California)
22             Counsel for Plaintiff
23                     Valerie J. Gunning and
                       Leonard A. Dibbs
24                     Official Court Reporters
25
```

```
1  APPEARANCES (Continued):
2
          MORRIS, NICHOLS, ARSHT & TUNNELL
3         BY:  JACK B. BLUMENFELD, ESQ.
4
              -and-
5
   GIBSON, DUNN & CRUTCHER LLP
6  BY:  JEFFREY THOMAS, ESQ. and
        DAVID SEGAL, ESQ. and
7       T. KEVIN ROOSEVELT, ESQ.
        (Irvine, California)
8
9
              -and-
10
   GIBSON, DUNN & CRUTCHER LLP
11 BY:  MICHAEL SITZMAN, ESQ.
        (San Francisco, California)
12
13            Counsel for Defendant
              - - -
14
15
16
17
18
19
20
21
22
23
24
25
```

```
1
2              P R O C E E D I N G S
3
4       (Proceedings convened at 8:30 a.m., and the
5  following occurred without the presence of the jury.)
6
7       THE COURT: Not surprisingly, I've got all
8  sorts of papers in my folder, which I really have not had
9  a chance to look at.
10      Our purpose this morning is to go through the
11 jury instructions, so that is what we'll do first. I
12 also have not had a chance to look at the proposals you
13 have for changing them, but I guess we will get to those
14 as we get to the instructions you want to change.
15      So as is normal for what I do in a charge
16 conference, we'll go you through the instructions page
17 by page and find out where you have your objections or
18 suggestions for changes.
19      The first set of instructions are my standard
20 instructions.
21      Does anyone have any problems through Page 12?
22      You don't have to come to the podium, Mr.
23 Thomas.
24      MR. THOMAS: Okay. Thank you.
25      MR. THOMAS: Not really, your Honor. Page
```

```
1  12, it's a nit and probably not important, but the name
2  ClinicaLogic.
3       THE COURT: Maybe you don't have the same
4  Page 12 I do.
5       MR. THOMAS: It's entitled Plaintiff's
6  Contentions.
7       THE COURT: Oh, no. My page 12 is deposition
8  testimony.
9       MR. RANDALL: As is mine.
10      MR. THOMAS: Okay. That would be Page 11 in
11 my set, your Honor.
12      Page 13, I suppose, plaintiff's contentions.
13      THE COURT: Well, Page 13 is the parties.
14 Maybe we should go by the title. Any changes with the
15 parties?
16      MR. THOMAS: Plaintiff's contentions?
17      THE COURT: All right. Which is Page 14. All
18 right.
19      MR. THOMAS: It's simply that the name
20 ClinicaLogic is not used with the Facets system. It's
21 used with ClaimFacts and QicLink.
22      THE COURT: All right.
23      MR. THOMAS: But I don't think it really makes
24 a big difference.
25      THE COURT: Well, it should be -- if that's
```

Monday, April 24, 2006                                     Page 977 - Page 980

Page 1085

1
2          (Court resumed after the recess.)
3
4          THE COURT: All right. Let's bring our jury
5  in.
6          (At this point the jury entered the courtroom
7  and took their seats in the box.)
8          THE COURT: All right. Mr. Randall?
9                    REDIRECT EXAMINATION
10 BY MR. RANDALL:
11 Q. Ms. Lampe, while I examined you, do you recall my
12 questions about the mutually exclusive code errors and
13 rules database?
14 A. Yes.
15 Q. And one of them, one of the examples was, you can't
16 bill for the same service twice; right?
17 A. The same service twice?
18 Q. Right.
19 A. No, I don't remember that.
20 Q. Well, do you remember the example given, where you
21 can't bill for an initial and a subsequent service at
22 the same time on the same claims?
23 A. Yes.
24 Q. Okay. And I said that's basically an example of
25 double billing and you can't double bill; right?

Page 1086

1  A. Yes.
2  Q. Okay. And you said during cross-examination by
3  your counsel that all of these rules are medically
4  related; right?
5  A. Yes.
6  Q. Okay. It does not take a doctor to determine that
7  you shouldn't be double-billed for something, does it?
8  A. It depends on what the procedure code is. So, yes,
9  it would take a doctor to determine that.
10 Q. That you shouldn't be billed twice for the same
11 visit?
12 A. Well --
13 Q. Does it take a doctor to figure that out?
14 A. For the same visit?
15 Q. Yes.
16 A. The same procedure code? The same date of service?
17 Same everything?
18 Q. Yes.
19 A. That would be a duplicate billing for -- for the
20 same procedure.
21 Q. And it does not take a doctor to tell you that,
22 does it?
23 A. But that would probably edit out in the duplicate --
24 in the duplicate edits in ClaimFacts if it made it
25 through those edits because of whatever parameters were

Page 1087

1  set up. There's what we call the redundant edit setup
2  in the medical criteria database that says when a
3  procedure can be billed more than once a day than when
4  it can't be.
5  Q. The question is simply, does it take a doctor to
6  tell you that you shouldn't be billed for the same
7  visit twice? Yes or no? In your opinion?
8  A. No.
9  Q. Okay.
10        MR. RANDALL: No further questions.
11        THE COURT: All right. You may step down.
12              (Witness excused)
13                    - - -
14        THE COURT: Mr. Thomas?
15        MR. THOMAS: Thank you, your Honor. We call
16 Mr. Tony Bellomo.
17        Mr. Bellomo, will you take the stand?
18                    - - -
19        ... ANTHONY BELLOMO, having been
20        duly sworn as a witness, was examined
21        and testified as follows ...
22              DIRECT EXAMINATION
23 BY MR. THOMAS:
24 Q. Good morning, Mr. Bellomo.
25 A. Good morning.

Page 1088

1  Q. Where do you work?
2  A. I work at TriZetto.
3  Q. And what is your role at TriZetto?
4  A. I'm an Executive Vice President, generally in charge
5  of the software applications.
6  Q. Software applications such as Facets?
7  A. Yes, sir.
8  Q. How long have you been working at TriZetto?
9  A. I've been there since 2000.
10 Q. Where did you work before you became a TriZetto
11 employee?
12 A. I worked at Erisco prior to that.
13 Q. Did you become a TriZetto employee when TriZetto
14 acquired Erisco?
15 A. Yes, that's correct.
16 Q. That's how you became a TriZetto employee?
17 A. Exactly.
18 Q. How long did you work at Erisco before 2000?
19 A. I joined in 1977, so I've been there almost 28 years
20 or so.
21 Q. What was your role when you first joined Erisco back
22 in 1977?
23 A. I was the Manager of Systems and Programming and, as
24 such, I had the programming team reporting up through me.
25 Q. At that time, were you a hands-on programmer, you

Page 1093

1 system, have a database made up of rules for how codes
2 should be reported?
3 A. Yes, it does.
4 Q. Is the database the same, the medical rules
5 database the same in all three products, Facets, QicLink
6 and ClaimFacts?
7 A. Yes, it is.
8 Q. Now, let's talk about the Facets product. We've
9 heard some about that, but we need to get some background.
10        What company developed Facets?
11 A. That would have been Erisco.
12 Q. And what is Facets used for?
13 A. Facets is used to handle most of the administrative
14 functions of the health client, so it's controlling and
15 keeping track of the members, keep track of the coverages
16 that they have, the physicians that are in or out of the
17 network, how they should be reimbursed and compensated,
18 how brokers should be paid, pretty much how many claims should
19 be paid, you know, medical and dental. So pretty much
20 all of the back office operations for a health plan is
21 what Facets does.
22 Q. Is there a claims processing module or one part
23 of Facets that's a claims processing system?
24 A. Yes, there is a claims processing module in Facets.
25 Q. Are there other modules, other parts of Facets

Page 1094

1 other than claims processing?
2 A. Yes, there are.
3 Q. Could you give us, can you describe that for us?
4 A. Sure. It's an eligibility module that keeps track
5 of what benefits people are eligible for. It keeps
6 track of people and their dependents. You know, whether
7 you have other coverage by a different insurance carrier.
8 Keep track of the providers, you know, provide the
9 reimbursement part of it.
10        There's a billing component, so that we can
11 bill employer groups and individuals for their coverage.
12        There's a commission system so we can pay
13 brokers commission on the business they sell.
14        Claims processing is one application amongst
15 many that exist within Facets.
16 Q. Now, you mentioned that within just -- within the
17 claims processing part of Facets, you have the clinical
18 editing software?
19 A. That's correct.
20 Q. Is clinical editing and claims processing the same
21 thing?
22 A. No, it's not.
23 Q. Could you explain why not?
24 A. Clinical editing is a component. It's a part of
25 claims processing. It's one part where you -- claims

Page 1095

1 processing is made up of a lot of different pieces, and
2 you can determine someone's eligibility, do they have
3 medical coverage, what is that coverage, what kind of
4 benefits, is it an HMO, is it a PPO, which physicians are
5 in the plan, how the payment should be made, who to pay.
6 There's a lot of processing that goes on to adjudicate
7 a medical claim and clinical editing is just one piece
8 of it.
9 Q. You keep saying adjudicate a medical claim. What
10 does that mean?
11 A. I'm sorry. Adjudicate is really the term that we
12 use. It's an industry term. It really means process
13 the claim and bring it to resolution, so to process the
14 claim, that's to adjudicate the claim.
15 Q. Now, are there some customers who use the Facets
16 claim processing module that don't use your clinical
17 editing software?
18 A. Yes.
19 Q. Why is that?
20 A. There's a few reasons for it. In some cases, they
21 could be dental only claims that they're processing, in
22 which case clinical editing really does not apply.
23        They could be using some of the other modules
24 that I spoke about earlier, such as enrollment in billing,
25 and not your outside claims processing application at all.

Page 1096

1        In some cases, we've sold the product to
2 international companies and, for example, a company in
3 Portugal that uses it. They don't use the same CPT
4 coding system that we do, so therefore clinical editing
5 would not be appropriate for them.
6 Q. In terms of, if you look at the big Facets product,
7 the entire system itself, and focusing you on the amount
8 of software code that's in there, what percentage of
9 that code is represented by the ClinicaLogic, clinical
10 editing software?
11 A. Clinical editing is less than one-half of one
12 percent of the code that's in Facets. What that means
13 is that over 99 percent of the code in Facets has had
14 nothing to do with clinical editing.
15 Q. Sir, are you also familiar with the ClaimFacts
16 product?
17 A. Yes, I am.
18 Q. What company developed that?
19 A. Erisco developed the ClaimFacts product.
20 Q. When was ClaimFacts introduced?
21 A. It was introduced in 1980.
22 Q. Is it an older system than Facets?
23 A. Yes, it is.
24 Q. Can you describe for me how, today, ClaimFacts is
25 actually used by the customers?

Page 1097

1   A.  It's a similar weigh that Facets is used.  It does
2   many of the same functions.  It's not quite as large.
3   It does not have as many modules, but it processes, you
4   know, medical claims, dental claims, short-term and long-
5   term disability claims.  Does similar functions.
6   Q.  Used for similar purposes as Facets?
7   A.  Yes, it is.
8   Q.  Like Facets, does it also have a claims processing
9   module?
10  A.  Yes.
11  Q.  And like Facets, does it also have other modules
12  for things other than claims processing?
13  A.  Yes, it does.
14  Q.  Now, again, for claims facts, the ClinicaLogic would
15  be part of the claims processing module?
16  A.  Yes, it would.
17  Q.  Like Facets, do you have ClaimFacts customers who
18  use ClaimFacts for claims processing but don't use your
19  ClinicaLogic software at all?
20  A.  Yes, we do.
21  Q.  For similar reasons?
22  A.  Similar reasons, and also because we sold ClaimFacts
23  as a separate module.  There was a separate licensing
24  fee, in addition to which ClinicaLogic came out many
25  years after ClaimFacts, so not all of the customers of

Page 1098

1   ClaimFacts have, you know, licensed the ClinicaLogic
2   application.
3   Q.  Okay.  And let's tic off the last of three
4   products.  QicLink.  Are you familiar with QicLink?
5   A.  Yes, I am.
6   Q.  What is that?
7   A.  QicLink is another similar system.  It's a little
8   larger than ClaimFacts, but not quite as large as
9   Facets.  It's primarily intended for the benefits
10  administration and TPA market.
11          You know, it's a little bit different, but it
12  essentially does most of the same things that Facets and
13  ClaimFacts do.
14  Q.  And like the other two systems, are there QicLink
15  customers who use QicLink for claims processing but don't
16  use the ClinicaLogic software?
17  A.  That's correct.
18  Q.  Sir, I'd like to focus you now on the ClinicaLogic
19  software itself, that piece.
20          Were you working at Erisco when ClinicaLogic
21  was developed?
22  A.  Yes, I was.
23  Q.  And when was it developed?
24  A.  In 1989.
25  Q.  Could you tell us generally what was involved in

Page 1099

1   the building of ClinicaLogic?
2   A.  Sure.  We first had to understand the high-level
3   business requirements.  You know, what the market was
4   looking for, what the customers were looking for.  And
5   then we essentially had to do two other things.  We
6   had to create the programs, write the programs, if you
7   will, design them, and then we had to design the
8   database and have the contents of the database, all of
9   the hundreds of thousands of rules that are in the
10  database, that had to be constructed as well.
11  Q.  Were those two separate projects, the database and
12  the software?
13  A.  They were interlinked.  We designed the database
14  and wrote the software at the same time, but a different
15  group of people wrote the software than the ones that
16  actually wrote the criteria, the medical criteria,
17  that's contained in the database.
18  Q.  How did you go about creating that medical
19  criteria database?
20  A.  We contracted with an outside company, Dr. Phil
21  Hawley.  He had a company called PACE Health Care
22  Management and they were a company that was made up
23  of physicians and other medical professionals, and we
24  contracted with them to construct the database for us.
25  Q.  Why did you hire PACE and its group of doctors to

Page 1100

1   build a database instead of doing it yourself?
2   A.  Because that was not the expertise that we had.
3   We were a software development company.  We were very
4   good at developing software, but since the clinical
5   rules, if you will, are medically based, that certainly
6   was not our expertise and we had to go outside for that
7   to a company that specialized in it.
8   Q.  When the database was first created by PACE, did
9   all of the rules in the database come from PACE?
10  A.  Yes, they did.
11  Q.  Did anyone from Erisco come up with any of the
12  rules that went into the medical criteria database?
13  A.  No, we did not.
14  Q.  What -- what's that database called?  What's your
15  term for it?
16  A.  We can call it the clinical criteria database.
17  Q.  Now, since that clinical criteria database was
18  first created, has it been updated?
19  A.  Yes, it has.
20  Q.  Can you describe that process?
21  A.  Yes.  Each year, the A.M.A. introduces new codes,
22  new CPT codes and, as a result, we have to have the --
23  you know, our medical consultants review the database
24  and update it for whatever is appropriate relative to
25  the new codes that may have been introduced or deleted

Jury Trial - Volume E                  CondenseIt™                  McKesson v. TriZetto

Page 1101

1  or other areas of the product that we wanted to, you
2  know, strengthen.
3  Q.  So who has been responsible for updating the
4  database, changing the rules, tweaking the rules, that
5  sort of thing?
6  A.  In the early years, it continued to be PACE Health
7  Care and Dr. Hawley's team.  Some years later, he sold
8  the company to Deloitte & Touche and, you know, many of
9  the same people that were involved originally are still
10 involved and so they continue to update the database for
11 us.
12 Q.  So did Deloitte take over the updating work because
13 it acquired PACE?
14 A.  Yes.  That's correct.
15 Q.  Okay.  And did a number of the same doctors who are
16 working on the database at PACE, are they still working
17 on it today from Deloitte?
18 A.  Yes, that's correct.
19 Q.  Since Deloitte -- since PACE got sold to Deloitte,
20 has the database been updated or changed in any way that
21 was different from how it was done before?
22 A.  No.  The process is really the same.
23 Q.  Do all of the updates and rules that have been
24 changed or added to the database over the years since
25 Deloitte took over the work, do all of those rules still

Page 1102

1  come from doctors and medical specialists?
2  A.  Yes, they do.
3          MR. RANDALL:  Objection.  Lacks foundation,
4  your Honor.
5          THE COURT:  Overruled.
6  BY MR. THOMAS:
7  Q.  You can answer.
8  A.  Yes.  All of the database updates come from PACE
9  and medical doctors, yes, and their staff.
10 Q.  Now, at any time, from way back when up until
11 today, have any rules -- let me step back for a minute.
12          How many -- can you give us some feel for
13 how many rules are in this clinical criteria database?
14 A.  It's about a hundred thousand.
15 Q.  Over the years, since the database was first
16 created and right up to today, have any rules been added
17 that did not come from your medical consultants?
18 A.  No.  The rules come from the interpretation of the
19 CPT book, which comes from the A.M.A., and that
20 interpretation is done by the medical group and we do
21 not add anything to the database.  It comes purely from
22 our medical consultants.
23 Q.  Have you ever put rules into the database that
24 come directly from customers?
25 A.  No, we do not.

Page 1103

1  Q.  Do your customers ever ask you to expand the
2  database in any way?
3  A.  They sometimes give us feedback on areas that they
4  might want us to, you know, expand, if you will, and when
5  that happens, we, you know, take that into consideration.
6  We confer with our, you know, internal folks.  We confer
7  with our panel of experts, our medical criteria company,
8  if you will.  And if it's appropriate, then they will add
9  additional rules.
10         At no time do we take those rules from
11 customers.  They are not equipped to put that kind of
12 data in.
13 Q.  Okay.  That's the database piece of it.  Could you
14 just briefly describe what was involved in developing
15 the software part of ClinicaLogic?
16 A.  Sure.  The software, you know, part of it was much
17 like developing, you know, many other programs.  You
18 basically have to understand the business requirements
19 and, you know, our challenge at the time was because we
20 wanted to develop a system that was integrated with our
21 claims processing application.  So that's a little bit
22 different than the challenges that were out there in
23 general.
24         So we were trying to solve a different
25 business problem whereby we wanted to have clinical

Page 1104

1  editing work in conjunction in the background, if you
2  will, as to when our claim system was processing the
3  claim, it has many, many steps that it does.  We wanted
4  one of those steps to be clinical editing.
5          So we had to write the code that performs
6  the clinical editing function and then also figure out
7  how to incorporate it into the claims processing
8  application in general.
9  Q.  Now, when you built ClinicaLogic, did you give it
10 the ability to look at both current claims that had come
11 in and older or historical claims for the same patient?
12 A.  Yes, we did.  When we were able to do that -- we
13 were able to do that because at the time that we're
14 processing the claim, we have both the current claim
15 information available to us as well as all of the
16 history for that patient.  So we are able to take both
17 into account and that was one of the things that we did
18 when we first introduced the product.
19 Q.  Let me change subjects for a minute.
20         Does TriZetto do something that you refer to
21 as hosting in the area of claims processing?
22 A.  Yes, we do.
23 Q.  What is hosting?
24 A.  Hosting is essentially when we, you know, rent a
25 customer space on one of our computers and we actually

Page 1109

1   different things.
2   Q.  Now, when -- getting back to my example, when a
3   claim comes in with a code on it, Facets does check to
4   see if that's a real A.M.A. CPT code?
5   A.  That's correct.
6   Q.  What database or place in the system does it go to
7   to figure that out?
8   A.  It would go to the procedure code table to figure
9   that out.
10  Q.  Okay.  So if a claim came in, it would check this
11  first (indicating)?
12  A.  Yes, it would check that.
13               - - -
14      Q.  Does this database over here that has all the rules
15  and relationships, is that used in any way, the way the
16  process actually works, is that used in any way to figure out
17  when a code is really an A.M.A. Code?
18  A.  No, it is not.
19               - - -
20
21
22
23
24
25

Page 1110

1
2   Q.  Is this database used for anything other than the
3   clinical editing process?
4   A.  No, it is not.
5   Q.  If a claim comes in with a code that is not even a
6   real A.M.A. code, it checks this; is that right?
7   A.  That's correct.
8   Q.  Does it then move on over here (indicating)?
9   A.  No, it does not.
10  Q.  Why not?
11  A.  Because if it's not a valid A.M.A. code, then the
12  process is going to stop at that point, and you really
13  can't go on until you, you know, correct that code.  So
14  it never gets to that.
15  Q.  Now, you mentioned that there's some -- there are
16  some customers that don't have this at all; right?
17  A.  That's correct.
18  Q.  There's no -- there's no ClinicaLogic and they --
19  do they have this database?
20  A.  No.  They wouldn't have it.
21  Q.  For those customers, does the system still have
22  this (indicating)?
23  A.  Yes.
24  Q.  And does it still check to see if a code on a claim
25  is a real A.M.A. code?

Page 1111

1   A.  Yes, it does.
2   Q.  Now, is there -- first of all, is this -- this
3   procedure code table has all the A.M.A. codes on it.  Is
4   it indexed -- is it an index of this database?
5   A.  No, it is not.
6   Q.  Is there any process at TriZetto, either automatic,
7   using the software, or manually, to make sure that these
8   two databases contain the exact same codes?
9   A.  No, there is not.
10  Q.  Do you know whether these two databases actually do
11  contain the exact same codes?
12  A.  I know that in many cases, they don't.
13  Q.  Why would that be?
14  A.  Well, as an example, the clinical criteria database
15  is not -- does not contain any codes for anesthesia.
16  Those are valid A.M.A. codes, but we don't have any
17  clinical rules associated with anesthesia.  So in that
18  case, you'll still have -- there are still valid CPT
19  codes.  They'll be in the procedure code database.
20  They'll be valid when they're entered, but they don't
21  exist in the clinical editing criteria database.  The
22  program will assume there was just no clinical criteria
23  for it and move on.
24  Q.  So if a claim came in with a code, it gets checked
25  here and the system says, yes, that's a valid A.M.A.

Page 1112

1   code.  It's in the book.  It's okay for it to move on.
2   Okay?
3   A.  Yes.
4   Q.  At that point in time, do you know for sure, one
5   way or another, whether that code is in this database?
6   A.  No, we do not.
7   Q.  Okay.  I'm going to try something.  I'm going to
8   try and actually let the jury see clinical Facets with
9   the clinical editing software work.
10  A.  Okay.
11  Q.  Real time.  And I will move this.
12          And seated back here, would you introduce the
13  gentleman seated at the laptop?
14  A.  That's Matt Slewinski.  He's a Facets employee that
15  is generally used to demonstrates Facets to prospects
16  and customers.  That's the role that he plays.
17  Q.  And what does Matt have loaded on his computer?
18  A.  Matt has a version of Facets, the entire application
19  loaded on his computer.
20  Q.  Okay.  Let's see what happens.
21  A.  Mr. Thomas, do you have a pointer?
22  Q.  Oh, yes.
23          MR. THOMAS:  May I approach, your Honor?
24          THE COURT:  Yes, you may.
25          MR. THOMAS:  Don't shine it in any jurors'

Page 1105

1  run our applications for them, where we're running the
2  software, if you will, providing them access through
3  communications lines for their users so that they can
4  pay the claims, they can do all of the functions that
5  any company normally would accept that where they're
6  running them out of our data center, renting space from
7  us.
8  Q. Where are the actual claims processing people?
9  Who is processing the claims in a hosting situation? Is
10 it your opinion or the customers people?
11 A. It's the customer's people. It's the same
12 employees that would process them. Typically employees
13 of the health line.
14 Q. In a hosting situation, do any TriZetto people
15 ever touch the keyboard that's done in the actual running
16 of the system and processing claims?
17 A. No, we do not.
18 Q. Now, separate from hosting, do you also do something
19 called BPO?
20 A. BPO, business process outsourcing. Yes, we do
21 that.
22 Q. What is that?
23 A. It's essentially where we actually would perform
24 the functions. Instead of the health claim staff, it's
25 going to be TriZetto's staff that will be, you know,

Page 1106

1  processing the billing, enrollment, customer service,
2  entering claims, if you will.
3      So we're doing the work on behalf of our
4  customers.
5  Q. And is that for a large or small percentage of your
6  customers?
7  A. It's a very small percentage of our customers.
8  Q. Okay. Let's talk a little bit more about
9  ClinicaLogic, clinical editing software.
10     Are you familiar with the A.M.A. manual that
11 contains all of these codes?
12 A. Yes, I am.
13 Q. Those are called CPT codes?
14 A. Yes.
15 Q. Are they -- are the CPT codes in the American
16 Medical Association manual the basis or starting point
17 for ClinicaLogic?
18 A. Yes, they are.
19 Q. Now, when a claim comes in that has a code on it --
20 let's talk about Facets for a minute.
21 A. Okay.
22 Q. Is there any part of Facets, the big system, that
23 checks to see if a code on a claim is an actual real
24 A.M.A. code that's in the book?
25 A. Yes, there is.

Page 1107

1  Q. And how does it do that?
2  A. It compares the code that is being submitted on
3  the claim against the CPT table, and Facets itself does
4  that pretty early in the claims process.
5  Q. You just said CPT table. What is a CPT table?
6  A. CPT table is essentially the place that contains
7  all of the valid codes as loaded from the, essentially
8  the book. We get -- we get a copy of the book on file.
9  We load it to a CPT table and that is where we check to
10 see if a code is valid against that table.
11     MR. THOMAS: Your Honor, may I move this a
12 little closer to the jury?
13     Is that okay?
14     THE COURT: Yes.
15 BY MR. THOMAS:
16 Q. Mr. Bellomo, I want to understand how this actually
17 works.
18 A. Sure.
19 Q. So could you assume for me that this whole sheet is
20 the entire Facets system?
21 A. Okay.
22 Q. Okay? All the modules. And you explained to us
23 that one of the modules is claims processing; right?
24 A. Correct.
25 Q. This is claims processing.

Page 1108

1      And is there -- the rules database that has
2  the hundreds of thousands of rules, is that in claims --
3  well, first of all, is ClinicaLogic in claims processing?
4  A. Yes, it is.
5  Q. Okay. So that's ClinicaLogic. I'm sure my scale
6  isn't good.
7  A. No, it's not.
8  Q. It's not that important.
9      Now, within ClinicaLogic, is this where the
10 rules, with all the hundreds of thousands of data -- the
11 database, hundred thousand rules are?
12 A. The clinical criteria database is within
13 ClinicaLogic, yes.
14 Q. So we will call this the clinical criteria
15 database.
16     Okay. Now, you just mentioned the CPT table
17 that's used. Where is the CPT table?
18 A. The procedure code table, CPT table, is outside
19 of claims processing and in Facets, if you will.
20 Q. So it's in Facets, but it's outside of claims
21 processing?
22 A. Yes.
23 Q. All right.
24 A. We call that the procedure code table. It's also
25 known as the IP table sometimes. You can call it

Page 1113

1  eyes (handing pointer to the witness).
2  BY MR. THOMAS:
3  Q.  Okay.  What I'd like you to do first, Mr. Bellomo,
4  could we have a demonstration of what happens when you
5  enter an invalid code, a code that's not even an A.M.A.
6  code?
7  A.  Okay.  So what you have in front of you is the
8  claims processing application, and I'm going to have
9  Matt put in a claim for someone, and so he's entering
10  data that's on the claim.  That's the member I.D.
11  relationship, the provider I.D., the diagnosis code.
12  These are things that happen once per claim.  And then
13  he's going to go down and enter in the line item, the
14  place where the medical codes go.
15       So he enters in the data service.  This
16  happened on January 1st.  And then he enters in, you know,
17  a couple of other things:  Where it happened.  And
18  eventually, he's going to enter 12345.  You can see him
19  doing that right there, which is an invalid procedure
20  code.
21  Q.  Now, is -- where it says PROC. is that where you
22  enter the CPT code?
23  A.  Yes.  Right there.  That's the procedure code
24  (indicating).
25  Q.  All right.  And what has popped up?

Page 1114

1  A.  Well, you can see down here, there's an error
2  message.  That error message is generated by Facets.
3  It's called, you know, what it says is Line Item 1,
4  procedure code not found.
5  Q.  Okay.  And does that -- is that telling us that
6  it's not a real A.M.A. code?
7  A.  It's telling us that that code does not exist in
8  the procedure code table, which means it's not a real
9  A.M.A. code.
10  Q.  Now, at this point in time, when that message pops
11  up, has the system gone to ClinicalLogic at all?
12  A.  No, it has not.
13  Q.  Has it accessed the database with all the rules and
14  relationships in it?
15  A.  No.  The checking for valid codes is one of the
16  first steps in the process.  There are many steps in the
17  claims adjudication process.  That checking for the valid
18  CPT code is very early on and the checking for clinical
19  editing is toward the back.
20       So once it stops here, it doesn't go any
21  further.  It doesn't access the clinical criteria database.
22  It doesn't do any of those things.
23  Q.  But, sir, you do, don't you, in the ClinicalLogic
24  database, one that has all the rules, do you try to only
25  have valid A.M.A. codes in that database?

Page 1115

1  A.  Absolutely.  I mean, generally speaking, those are
2  all valid A.M.A. codes, yes.
3  Q.  So if you know that this is not, hopefully if you
4  set up the database right over on the ClinicalLogic side,
5  if something is not a valid CPT code, hopefully, it's
6  not in that medical rules database; right?
7  A.  Yes, that's correct.
8  Q.  All right.
9  A.  Probably not there.
10  Q.  But in terms of the way the system works, the
11  process, the method it goes through, has the -- that
12  database, the clinical criteria database with all the
13  rules, has that been checked to figure out whether this
14  12345 is there?
15  A.  Absolutely not.
16  Q.  Now, would you now have Matt put in what is a
17  valid --
18  A.  Okay.  What I'm going to have Matt do is change
19  that invalid procedure code, 12345, and I'm going to have
20  him put in 44950, which is an appendectomy.
21       So what we have is an appendectomy, 44950.
22  You see the field next to it?  It's the appendectomy.
23  250 is a diagnosis code for diabetes.  That means the
24  person that came in to see the physician has diabetes and
25  the physician performed an appendectomy.

Page 1116

1       We're going to process that.  Now we're going
2  through the adjudication process and what came out with
3  this -- this is a warning message.  And what it says,
4  Procedure/diagnosis conflict exists on Line Item 1,
5  clinical edits exist.
6       And if you go here to clinical notes, I
7  don't know if you can read that or not, but what it says
8  is, diagnosis 250, diabetes, is not usually associated
9  with procedure 44950, appendectomy.
10       So what clinical editing is doing is saying
11  that under normal circumstances, we're flagging, we're
12  flagging as a warning that you shouldn't be doing an
13  appendectomy with someone with diabetes.  A clinical --
14  clinical editing performed that function.
15  Q.  So the system has gone now to the clinical
16  criteria database that has all the rules in it to figure
17  out that there's a disconnect here between diagnosis
18  and procedure?
19  A.  Yes, it has.
20  Q.  Now, has -- do we know, since we've got a clinical
21  criteria message, we know that 44950 is a -- a real
22  A.M.A. code; right?
23  A.  Yes, we do.
24  Q.  Let's -- what I'd like to do now, sir, is just
25  figure out how the system would work without ClinicalLogic

Page 1117

1 at all.
2 A. Okay. So what we're going to do, you can notice
3 on top, it says ClinicaLogic gone. We're going to
4 change that. We're going to go back -- go back and
5 close this out, Matt. And let's go and process a claim
6 for a member that has clinical editing turned off.
7      So he's going to change the member I.D.
8 He's going to put exactly the same claim in. We're
9 still putting in an appendectomy for someone with a --
10 with a diabetes diagnosis. It's still not, you know,
11 the right thing to do, if you will. It's still not
12 appropriate.
13      So you can see appendectomy. You can see
14 diagnosis.
15      And, Matt, go ahead and process this claim.
16 See the hourglass? Now we're finished.
17 Q. We didn't get any edits.
18 A. We didn't. Clinical edits is off, as you see at
19 the top, and the fact is that Matt was able to process
20 this line item all the way through. Because clinical
21 editing is not turned on (period), we did not identify
22 that condition. So you can see that clinical editing
23 is, indeed, off.
24 Q. So it didn't catch the problem we saw before
25 because ClinicaLogic is out of the picture?

Page 1118

1 A. That's correct.
2 Q. Would you now -- while it's still off, would you
3 have him enter the invalid code?
4 A. Sure. So what we're going to do, we're going to
5 change that valid code, 44950, to 12345. That's the
6 identical code we used before.
7      What you can see, what came up is that exact
8 same error message: Procedure code not found. So what
9 this is showing you, whether clinical editing is on and
10 off, you still get the exact same message. So that
11 message is done independently of clinical editing.
12 Q. So even though the system can't even go to the
13 database that has all the rules and relationships in it,
14 it still checked to see if it was a real code?
15 A. That's correct.
16 Q. Now, let's do one last one. With clinical editing
17 turned on --
18 A. Okay.
19 Q. -- could we enter a code that may or may not be in
20 the clinical criteria database, the database of the
21 rules?
22 A. Matt, put in -- put ClinicaLogic back on again,
23 clinical editing on, and let's put in code for
24 anesthesia, 0100. And you can use that same diagnosis
25 code.

Page 1119

1      And what you will see -- so he's entering
2 that information, the date. This is the line item,
3 procedure code data. 0100 is an anesthesia procedure
4 code.
5      And you can go ahead and process it.
6 Q. Okay. We don't have the message that says this is
7 an invalid code.
8 A. Correct.
9 Q. So has the system gone to the procedure code table
10 outside ClinicaLogic and verified that that is a good
11 code?
12 A. Yes. We edit against the procedure code table. It
13 got by that point and now we've gone all the way through
14 the adjudication process. We've done clinical editing,
15 but it didn't -- you know, it didn't do anything, if you
16 will. It didn't flag anything as being invalid.
17 Q. So are we sure that 00100 is a real A.M.A. code
18 now?
19 A. Yes, it is. If it weren't, it would have stopped
20 and you would have gotten that message that we got before.
21 Q. Do you know for sure whether it is or isn't in the
22 clinical criteria database with all the rules?
23 A. We know that it's not in there because no rules
24 came out of it.
25 Q. Can --

Page 1120

1 A. It could have been in there with no rules assigned
2 to it or it could actually not be there.
3 Q. So this alone doesn't tell us one way or another
4 whether it's in the clinical criteria database?
5 A. No, it doesn't.
6 Q. Can we look, actually go in inside and look in the
7 clinical database and see if it's there?
8 A. Yes. We have a facility that will able you to view
9 the criteria in the clinical database.
10      So, Matt, will you bring up that screen,
11 please?
12      What Matt is going to do, he's in the clinical
13 criteria database maintenance and he's going to look up
14 that same procedure code, 0100, you can see that he's
15 entering that. And what you've got out here is open
16 failed. That means that that code is not in the
17 clinical criteria database.
18 Q. So is this an example of a code that is over in
19 the procedure code table, but it's not in the clinical
20 criteria table?
21 A. Yes, it is.
22 Q. Okay. Let's move on to a different subject.
23      Mr. Bellomo, does -- the way ClinicaLogic
24 works, does it check a code that comes in on a claim all
25 by itself and any -- in any different way than it checks

## Page 1121

1  a code that comes in in combination with other codes on
2  the same claim?
3  A.  No, it does not.
4  Q.  Why not?
5  A.  Because when we built this, we built it in
6  combination with the claims processing system and there's
7  a variety of reasons, but one of them is that we want to
8  check that code that's on the claim against all of the
9  prior codes that exist in history for this particular
10  patient.
11       So we're checking it not only against other
12  codes on the claim, but against other our history tables
13  that contain all of the prior claims that were submitted
14  for this patient.
15  Q.  So why does that mean you have to check a code
16  that comes in all by itself in the same way you would
17  check a code that came in with other codes?
18  A.  Because it could very well, you know, have a problem
19  with one of the codes that have already been paid on a
20  prior claim, and therefore make it ineligible for payment
21  here.
22       So that logic really needs to do the same
23  thing whether it's one code or more than one.  You've got
24  to check history to do the same process.
25  Q.  Is a code that comes in by itself get checked in

## Page 1122

1  any way at any time differently than if that code came in
2  in combination with other codes?
3  A.  No, it does not.
4  Q.  Let me go back to this real quickly and look at
5  the clinical criteria database we were talking about,
6  the database that has all the rules, this one here
7  (indicating).
8       So let's make that a little bit bigger.
9  We'll come down here and make this -- this is the clinical
10  criteria database with all of the rules.  Okay?
11  A.  Okay.
12  Q.  Now, does this have rules for checking codes in
13  combination with other codes as well as rules for
14  checking codes by themselves?
15  A.  Yes, it does.
16  Q.  Okay.  What are the rules called that compare codes
17  to each other?
18  A.  We call them multi-code edits.
19  Q.  And what are the rules called that check codes by
20  themselves against other things?
21  A.  Call them single code.
22  Q.  And can you give us an example of a single code
23  edit?
24  A.  Cosmetic surgery.  The one I showed you earlier,
25  where the procedure code of appendectomy was inconsistent

## Page 1123

1  with diagnosis code of diabetes, a code where, you know,
2  maybe this procedure should only be performed on a female.
3  You know, perhaps there's an age restriction in it.
4  Q.  Now, when a claim comes in with just one code on
5  it, does that code get checked using both the multi-code
6  rules and the single code rules?
7  A.  Yes, it does.
8  Q.  Every time?
9  A.  Every time.
10  Q.  Is that because you want to check that code against
11  codes on older claims?
12  A.  That's correct.  We want to make sure that that
13  code doesn't interfere with anything from an older claim.
14  Q.  So in the way that the software is written and the
15  system actually works, is there any step in that process
16  that asks how many codes are there on the claim in order
17  to figure out how that code ought to be checked?
18  A.  No, there was not.
19  Q.  Now, does the computer system -- when a claim comes
20  in with multiple codes, is there a record kept of how
21  many codes there were on that claim?
22  A.  Yes, there is.
23  Q.  Why?
24  A.  Well, because we need to store that information in
25  the system.  So we keep a record of everything that

## Page 1124

1  happened.
2  Q.  Okay.  So no matter what happened with the -- with
3  the codes, you know how many there were when it was
4  first received?
5  A.  That's correct.
6  Q.  For recordkeeping purposes?
7  A.  Yes.  We know how many were received, yes.
8  Q.  So the system does know how many codes there are
9  on a claim?  It creates a record of that?
10  A.  Creates a record.  Also, if you noticed on the
11  visuals and screen you saw before, there are line items
12  up there.  We'll number those line items.
13       So there are things that we do to make it
14  easier for the user and for the computer itself to
15  allocate the storage properly.  But we don't make any
16  logic decisions based upon that.
17  Q.  Does making that record, just making a record of
18  what the claim looked like when it was first received,
19  does the process of making that record, does that play
20  any role in how the codes are processed or reviewed?  Is
21  that a step in the process in any way?
22  A.  No, it's not.
23  Q.  Okay.  We'll do one more demonstration about how
24  the system would check a code on a claim against
25  historical --

Jury Trial - Volume E                CondenseIt™                McKesson v. TriZetto

Page 1125

1  A.  Okay.
2  Q.  -- codes.  Would you have Matt do that?
3  A.  Yes.  So what I'm going to do is have Matt enter
4  in a claim.  I will ask him to go slow now, so I can
5  explain it to you.
6          He's putting in a claim.  He's putting in
7  the member I.D. with edits so clinical editing is turned
8  on and he's entering some of that same information as
9  before.
10         I'm going to ask him to add in a claim for
11 a fetal monitoring.  Okay?  Now, what you don't see here
12 is that a few days ago, we put in a claim for this same
13 individual, the same patient, for a Cesarian section, a
14 C section.  And that has already been processed and
15 history.
16         A C section normally includes a fetal
17 monitoring, so when Matt puts in the code for fetal
18 monitoring here, what you are going to see, and go
19 ahead and enter that, Matt.  So this is a fetal
20 monitoring code.  That's the only code on this
21 particular claim.  Go ahead and process it.
22         And what you can see is that clinical editing,
23 once again, protected a problem.  It says that subset
24 procedure detected in history on line number one,
25 clinical edits exist.  And it also says, if you read that

Page 1126

1  little message, which may be a little tough to read, but
2  I will read it for you:  Code 59050 on this claim is
3  considered a part or incidental in Code 59514 on Claim
4  061080000200.  That's a claim we entered the other day.
5  It should not be billed separately.  If doubt, have the
6  claim reviewed by a physician.
7                     - - -
8  A.  (Continuing)  What this is showing you is that a
9  single line item goes through the same exact process, and
10 the reason it does it because we want to do the same
11 degree of editing of all the claims that are in history
12 and all the lineups that are in issue.
13 Q.  So this claim has come in, it's only got one code
14 on it, right, the 59050; is that correct?
15 A.  That's correct.
16 Q.  The system went ahead and checked that one code
17 against using the multi-code rules against prior claims?
18 A.  That's exactly correct.
19                     - - -
20
21
22
23
24
25

Page 1127

1
2  Q.  Because of this functionality, does the system care,
3  in terms of how the codes are processed and looked and
4  handled, does the system care whether it's one or more
5  than one code on a claim?
6  A.  No, it does not.
7  Q.  Sir, we've talked a little bit about the rules
8  database itself, the database that has these hundreds
9  of thousands of medical rules, and you explained to me
10 those rules come from the A.M.A. and the doctors,
11 consultants?
12 A.  That's correct.
13         MR. THOMAS:  I'd like to look, please, at
14 Exhibit 96, which is already in evidence.  Page 5.
15 BY MR. THOMAS:
16 Q.  What is this, sir?
17 A.  That is the -- it's a piece of documentation.  It's
18 called the Facets clinical editing overview.
19 Q.  I would like you to look at this paragraph under
20 team of specialists.
21         MR. THOMAS:  If we can pull that up, please...
22 Just the first paragraph.
23         Thank you.
24 BY MR. THOMAS:
25 Q.  Mr. Bellomo, would you read that?

Page 1128

1  A.  Sure.  Deloitte & Touche, a physician staffed
2  consulting firm experienced in all aspects of medical
3  cost management, has designed the database that contains
4  the medical criteria necessary for editing procedures
5  and forms the core of Facets clinical editing.  To build
6  this database, D&T assembled an interdisciplinary team
7  of board-certified doctors with expertise in the area of
8  utilization review and quality assurance.  Several of
9  these physicians hold faculty positions at prominent
10 U.S. medical schools.  Working in conjunction with
11 utilization review nurses, this team served as the
12 central analytical group responsible for developing and
13 reviewing all of the medical criteria.
14 Q.  Is this an accurate description of how the database
15 was created, what it contains?
16 A.  Yes, it is.
17 Q.  And is it your understanding that the database
18 contains medical -- the medical criteria provided by your
19 consultants?
20 A.  Yes.
21 Q.  Okay.  Let me change subjects with you.
22         We have had some testimony about the difference
23 between codes and claims.  I think it's pretty clear.
24         Could you very briefly describe the difference
25 between a code and a claim?

Monday, April 24, 2006                                    Page 1125 - Page 1128

Jury Trial - Volume E                    CondenseIt™                    McKesson v. TriZetto

Page 1129

1  A.  Sure.  A claim is a submission by an insured to an
2  insurance company to try and get reimbursed, so if you
3  notice, the claim is the big picture.  A code is what
4  actually happened.  There are multiple codes that are on
5  the claim.  The code describes what the physician did in
6  detail.
7           I can give you an example if it would be
8  helpful.
9  Q.  Sure.
10 A.  You know, if you take your daughter to the
11 pediatrician and, you know, at that time they do a well
12 baby visit.  Maybe they give you an immunization shot,
13 they do a strep test.  All three of those things would
14 be codes.  The doctor performed three services, three
15 codes, but it's one claim that you are giving to the
16 insurance company for reimbursement.  So three codes on
17 one claim.  The claim gets submitted, gets processed.
18 That's the difference.
19 Q.  Are there things that go into the final decision
20 to approve or reject a claim other than checking the
21 CPT codes on it in the clinical editing process?
22 A.  Yes.  Absolutely.
23 Q.  Could you give us some examples of it?
24 A.  Sure.  You need to find out if someone is eligible
25 for benefits, as I mentioned earlier.  You'll need to

Page 1130

1  find out what those benefits are.  Are there pre-existing
2  conditions?  Are these particular medical things covered?
3  Are you in an HMO plan?  Did you go to the right
4  physician?  If you're in a PPO plan, did you go out of
5  network?  Is this doctor covered?  Do you have particular
6  limits?  Did you hit your deductibles?
7           The insurance companies will find a whole
8  variety of ways not to pay a claim.  There's plenty of
9  things that have to be done before it's approved.
10 Q.  Now, when a claim comes in, does the system, the
11 claims, the big claims processing system check each of
12 the line items on the claim?
13 A.  Yes, it does.
14 Q.  For example, is there a line item for Social
15 Security number?
16 A.  There is -- there is a field for Social Security
17 number on the claim, yes.
18 Q.  And before the claim gets to clinical editing,
19 does it -- does the system check to see if the Social
20 Security number is the right one for that patient?
21 A.  Yes, it does.
22 Q.  And if it verifies it, the claim moves on?
23 A.  Yes, it does.
24 Q.  Is that -- does -- does the claim -- does a claim
25 get authorized or paid or approved in any way in

Page 1131

1  response to figuring out that the Social Security number
2  is right?
3  A.  No, not at all.  It just moves to the next step.
4  It doesn't approve it at that point.
5  Q.  Is that true at the ClinicaLogic step as well?
6  A.  Same thing.  If you get past the clinical editing
7  step and the code is a valid code, if the code is a code
8  that passes the criteria, so we validate it was on the
9  CPT code book, clinical editing took over, it did all of
10 its edits against the clinical criteria database.  If
11 that's appropriate, then it moves on to the next step.
12 Q.  Okay.
13          MR. THOMAS:  If we could have Exhibit 80,
14 please, which is also already in evidence...
15 BY MR. THOMAS:
16 Q.  Mr. Bellomo, what is this?
17 A.  That's a piece of documentation that describes the
18 claims processing.  It's an overview of claims processing,
19 if you will.
20          MR. THOMAS:  May I have Page 23, please?
21 BY MR. THOMAS:
22 Q.  What do we see here starting here?
23 A.  That is the claims flow.  It gets into the details
24 of, you know, at a high level, the steps that go into
25 processing a claim.

Page 1132

1  Q.  So this is a list of all the steps when -- when a
2  claim first arrives in the claims processing until it's
3  done?
4  A.  That's correct.  At a high level, yes.
5  Q.  High level.  Lots of things go into each one?
6  A.  Lots of things go into each one of these steps.
7  Q.  At a high level, how many steps are there?
8  A.  You'd have to go to the second page.  I believe
9  it's 12.
10 Q.  Okay.  So we have a total of 12?
11 A.  I believe so.  12-step process.
12 Q.  We talked earlier about checking the procedure
13 code table to see if it's a real A.M.A. code.
14          What step in the process does that happen?
15 A.  I believe -- I -- you've probably got to go back.
16 Q.  The prior page?
17 A.  I believe it's step two.  If you highlight that
18 , you'll see it.
19 Q.  So one of things that happens in step two is they
20 check to see if it's a real procedure code?
21 A.  Yes.
22 Q.  Table?  I mean real code.
23          Okay.  And so that happens at step two.
24          What step in the process is clinical editing?
25 A.  That would be Step eight.

Monday, April 24, 2006                                    Page 1129 - Page 1132

Page 1133

1 MR. THOMAS: Let's go to the next page,
2 please.
3 BY MR. THOMAS:
4 Q. Okay. So we're now at step eight.
5 A. That's correct.
6 Q. After step eight, even if all the codes are still --
7 are they fine, the codes get edited or there's no need to
8 edit the codes, passes through this step, can the claim
9 still be denied or disapproved?
10 A. If the line item has still many things to be done,
11 we have to still go through and price this particular,
12 you know, line item, particular service. We have to go
13 through and look at the status of the deductibles. We
14 have to see if this was issued in or out of network, to
15 see how it should be paid.
16         There are many steps left to go that could
17 cause this particular, you know, code to be denied, if
18 you will.
19 Q. So is it true that if a claim comes in and it's
20 perfect from a clinical editing point of view, the codes
21 are just right, no changes need to be made, a claim
22 could still be rejected?
23 A. Yes. It could still be denied for payment, yes.
24 Q. And when a claim comes in with codes that do need
25 to be edited, that's what ClinicaLogic does. It fixes

Page 1134

1 the codes; right?
2 A. Yes.
3 Q. And after the codes are fixed or edited, if you
4 will, if there's nothing, even though there were problems
5 from a coding perspective, that claim would still be paid
6 if there weren't other problems with it?
7 A. It would still be paid if there were no other
8 problems and similar to the other example, if there
9 were problems, for example, you didn't meet your
10 deductible, then even though it's a valid, even though,
11 you know, it got past the clinical editing step, it's
12 still, you know, appropriate that we might not pay
13 anything on it.
14      So it's multiple steps in the process.
15 Q. If a claim gets edited in ClinicaLogic and then
16 moves on, is it still the same claim or has a new claim
17 been created?
18 A. No. It's still the same claim.
19 Q. Does the clinical editing process ever cause a
20 claim to be split into two so that one can be approved
21 and one rejected?
22 A. No, it does not.
23 Q. Is a single claim -- regardless of how many codes
24 it's got on it, when a claim comes in, is the same claim
25 ever both approved and denied?

Page 1135

1 A. No, it is not.
2 Q. Does that make any sense in the way your system
3 works?
4 A. Not the way our system works, no.
5     MR. THOMAS: No further questions, your
6 Honor.
7     THE COURT: Cross-examination.
8     MR. RANDALL: Your Honor, may I approach the
9 witness?
10     THE COURT: Yes.
11     (Mr. Randall handed documents to the witness.)
12     (Pause.)
13           CROSS-EXAMINATION
14 BY MR. RANDALL:
15 Q. Mr. Bellomo, you testified during your direct
16 examination about hosting services by TriZetto?
17 A. Yes, I did.
18 Q. And you mentioned that the hosting services was a
19 small part of your business; is that right?
20 A. No, I didn't.
21 Q. All right. Hosting services is a significant part
22 of your business; correct, sir?
23 A. Hosting services is an important part of our
24 business, yes.
25 Q. A third of your business; right?

Page 1136

1 A. 25, 30 percent, I believe.
2 Q. All right. And so, for instance, when TriZetto
3 operates and runs the Facets, QicLink links, QicLink and
4 ClaimFacts products for its customers, including both
5 hosting and BPO services, that's a significant part of
6 your business; right?
7 A. The hosting services are very significant. The BPO
8 services we don't have as many customers on that.
9 Q. But the combined use by TriZetto of -- strike that.
10     The combined service by TriZetto to run and
11 operate ClaimFacts, Facets and QicLink for its customers
12 is a significant part of your business; is that correct?
13 A. The hosting service is. The BPO services have a
14 limited number of customers on it, yes.
15     MR. RANDALL: Can you pull up Exhibit 107?
16 BY MR. RANDALL:
17 Q. This is your 10-K. It's marked as Exhibit 107.
18     MR. THOMAS: There is no objection to this,
19 your Honor. I would move it into evidence.
20     THE COURT: Any objection?
21     MR. THOMAS: No objection.
22     THE COURT: Thank you.
23 ***     (Exhibit No. 107 was received into evidence.)
24     MR. RANDALL: Specifically, this is for the
25 period ending 2004.

CondenseIt™

## Page 1137

1       Could you go to Page 9, please? And this is
2 actually five pages in the document.
3 BY MR. RANDALL:
4 Q. So, for instance, here, right underneath the heading,
5 the top third of the page, it says outsourced business
6 services. In 2004, we derived approximately 33 percent
7 of our total revenue from outsourced business services.
8 Our outsourced business services fall into two
9 categories, described in more detail below: Software
10 hosting and application management and business process
11 management.
12       Do you see that?
13 A. Yes.
14 Q. All right. Underneath the software hosting and
15 application management, you state in your SEC filing
16 that software hosting services include integrating,
17 hosting, monitoring, and managing our proprietary
18 software applications alongside other software
19 applications from third-party vendors.
20       Do you see that?
21 A. Yes, sir.
22 Q. That is a description of your outsourced business
23 services, both hosting, software hosting and business
24 process management; correct?
25 A. That is a description of software hosting and

## Page 1138

1 application management, yes.
2 Q. All right.
3       MR. RANDALL: Can you move down to the
4 bottom third of the page to the heading business process
5 management?
6       And if you can just highlight the bottom
7 third... There we go.
8 BY MR. RANDALL:
9 Q. Now, here you state to the public through your SEC
10 filings that your business process management component
11 of your business is to complement our software hosting
12 services, we also provide health plans and benefit
13 administrators with transaction processing services for
14 tip back back office functions, including claims, billing
15 and enrollment.
16       Do you see that?
17 A. Yes, I do.
18 Q. That's accurate; right?
19 A. Yes, it is.
20 Q. And below, where it states, our business process
21 services include, do you see that?
22 A. Can you highlight it? Yes. Okay.
23 Q. All right. So your business processing services
24 include: Benefit and provider configuration rule setup.
25       You state, we configure and can maintain

## Page 1139

1 the customer's software, according to the customer's
2 specific benefit plans, and provider payment arrangements.
3       Do you see that?
4 A. Yes.
5 Q. And then below that, under the medical, dental and
6 specialty claims processing, you state, we process claims
7 submitted for services under a variety of products and
8 lines of business, adjust payments, and coordinate
9 benefits. We also generate, print and distribute claims
10 payment checks and remittance notices.
11       Do you see that?
12 A. Yes, I do.
13 Q. All right. Now, we've gone over, have we not, in
14 your SEC filing a summary of your hosting and business
15 process management operations at TriZetto; right?
16 A. Yes, we have.
17 Q. All right. And those are all part of the
18 outsourced business services component of your business
19 that represents, at least at the end of 2004, 33 percent
20 of your business; right?
21 A. Correct.
22 Q. And those services provide the operational services
23 to your customers for Facets, ClaimFacts and QicLink;
24 correct?
25 A. Correct.

## Page 1140

1 Q. Let me show you --
2       MR. RANDALL: Can you pull up the 10-K for
3 the year ending 2005? Specifically, can you go to Page
4 9 again, which is actually Page 5 of the document?
5 BY MR. RANDALL:
6 Q. Sir, here you describe your enterprise
7 administration software.
8       Do you see that?
9 A. Yes.
10 Q. And do you see where you indicate at the bottom of
11 this insert, Facets is available to customers on a license
12 or hosted basis.
13       Do you see that?
14 A. Yes.
15 Q. All right. If you can go to the next page, which
16 would be Page 10 in the document and Page 6.
17       At the top of the page, you state, at
18 December 31st, 2005, we had 71 implementations of Facets
19 at customers comprising 58 million member lives under
20 contract.
21       Do you see that?
22 A. Yes.
23 Q. That's an accurate statement; correct?
24 A. Yes.
25 Q. And below that, under the heading facts, the last

Jury Trial – Volume E        CondenseIt™        McKesson v. TriZetto

## Page 1141

1  sentence under that section says, at December 31, 2005,
2  we had 36 facts customers comprising 42 million lives.
3       Correct?
4  A.  That is correct.
5  Q.  And that's a correct statement, isn't it?
6  A.  Yes.
7  Q.  And falling down under QicLink, at the middle of
8  this paragraph, it says that QicLink is available to
9  customers on a licensed or hosted basis; correct?
10  A.  Correct.
11  Q.  That's the fourth line slightly over the right in
12  the middle.
13       And at the bottom of your QicLink description
14  in your SEC filing, it states that at December 31st, 2005,
15  we had 147 QicLink customers, comprising ten million lives.
16  Those are correct statements?
17  A.  Yes.
18  Q.  The next page which would be 11, end of the document,
19  or Page 7, you describe your outsourced business services;
20  correct?
21  A.  Correct.
22       - - -
23  Q.  And on the first paragraph you mentioned, In 2000,
24  we derived approximately 27 percent of our total revenue
25  from outsourcing business services; correct?

## Page 1142

1  A.  Yes.
2  Q.  That would cover software hosting and application
3  management below?
4  A.  Yes.  Outsourcing services.
5  Q.  Below that, the last paragraph there, through our
6  data center in Colorado, we host, operate and maintain
7  software solutions for our customers on most of the
8  widely-used computing networking and operating platforms.
9       True statement; right?
10       - - -
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

## Page 1143

1
2  A.  Yes.
3  Q.  Okay.  Next page, which would be Page 12, end of
4  the document, Page 8 of the document, direct your
5  attention to the top third of the page, which says
6  business process outsourcing BPO.
7       If you could grab BPO and then the top
8  three bullet points as well...
9       Again, there, you state in your SEC filing,
10  year ending 2005, that your business process outsourcing
11  is to complement our software hosting services, we also
12  provide health plans and benefit administrators with
13  transaction processing services for typical back office
14  functions, including claims, billing and enrollment.
15       Do you see that?
16  A.  Yes.
17  Q.  That's an accurate statement; correct?
18  A.  Yes.
19  Q.  And you state, customers typically outsource to us
20  for the following reasons:  To improve or maintain
21  service, for more predictable costs, to take advantage
22  of our larger scale, to reduce risk through our
23  performance guarantees, to gain access to our technical
24  and health care business expertise.
25       Do you see that?

## Page 1144

1  A.  Yes.
2  Q.  Those are true statements; is that right?
3  A.  Yes.
4  Q.  Part of the services that you provide, and I'm
5  looking specifically at the paragraph that says, our
6  business process outsourcing services include:
7       Do you see that?
8  A.  Yes, I do.
9  Q.  Part of the services that you provide are the
10  benefit and provider configuration rule setup.
11       Do you see that?
12  A.  Yes.
13  Q.  So you state that we configure and maintain the
14  customer's software according to the customer's specific
15  benefit plans and provider payment arrangements.
16       Do you see that?
17  A.  Yes.
18  Q.  And that is a true statement; is that right?
19  A.  Yes.
20  Q.  And the next third bullet down, medical claims
21  processing, it states, we process claims submitted for
22  services.
23       Do you see that?
24  A.  Yes.
25  Q.  So there's no doubt whatsoever, sir, in your mind,

Page 1145

1  is there, that TriZetto actually processes claims and
2  utilizes its own three systems that we've been referring
3  to to process claims with ClinicaLogic and that is a
4  significant portion of your business; correct?
5  A.  That's incorrect.
6  Q.  Do you process claims for your customers?
7  A.  Yes.
8  Q.  Is that -- do you do so using the three products,
9  including ClinicaLogic?
10  A.  No.
11  Q.  Do you do so using ClaimFacts -- QicLink --
12  A.  Yes.
13  Q.  And Facets?
14  A.  Yes.
15  Q.  So for QicLink and Facets, you process claims for
16  your customers using the clinical editing functionality
17  that we've described and that is a large and significant
18  portion of your business; correct?
19  A.  Yes.
20  Q.  All right.
21        MR. RANDALL:  Your Honor, I would move and
22  I've marked -- this is cross-examination -- I have
23  marked at the end of -- that the 10-K ending 2005 as a
24  new exhibit, which would be Exhibit 486.  It is the same
25  as the other exhibit, which was 107, and I would move

Page 1146

1  them both into evidence.
2        THE COURT:  Any objection to that?
3        MR. THOMAS:  No.
4        THE COURT:  All right.  Thank you.
5        DEPUTY CLERK:  So marked.
6  ***        (Exhibits referred to above were received
7  into evidence.)
8        (Pause.)
9  BY MR. RANDALL:
10  Q.  You mentioned on your direct examination that
11  your -- the three systems, QicLink, ClaimFacts and
12  Facets, all have a list of valid CPT codes; correct?
13  A.  That's correct.
14  Q.  All right.  And the clinical criteria database, it
15  has a subset of the codes that are on the, I will call it
16  the all codes list.  Is that fair?
17  A.  Okay.
18  Q.  Is that true?
19  A.  It's got a different set.  Mostly subset, yes.
20  Q.  Well, it's a subset, isn't it?  When the products --
21  let me ask this:  When the products are operating
22  correctly as intended, then the codes that are listed
23  in the criteria, the rules criteria database, as you
24  refer to it, are a subset of the list of all of the
25  codes maintained by each of those three systems;

Page 1147

1  correct?
2  A.  When things are operating correctly, correct.
3  Q.  All right.  And so, for instance, when things are
4  operating correctly and as intended, all of the codes
5  that are listed in the rules criteria database should be
6  listed on the list of all of the CPT, valid CPT codes;
7  correct?
8  A.  Correct.
9  Q.  All right.
10        (Pause.)
11  BY MR. RANDALL:
12  Q.  Let me ask you a few questions.  So if you have --
13  if that circle right there is all of the valid CPT codes,
14  I think you mentioned it could be an IP list; right?
15  A.  Yes.
16  Q.  I'm going to write all codes.  Okay?
17  A.  Okay.
18  Q.  Okay.  And they could be, let's just say --
19  A.  That's the CPT codes; right?
20  Q.  That's right.  Those are all the valid CPT codes.
21  Okay?  That's A through Z.  Okay?
22  A.  So I get it clear, can you just write CPT code on
23  it?
24  Q.  Sure.  Absolutely.
25  A.  Thank you.

Page 1148

1  Q.  Okay?
2  A.  Mm-hmm.
3  Q.  That's that list.
4        The criteria, the codes that are in the
5  criteria database, that is a subset, and I will call
6  that -- what do you want me to call it?  Criteria
7  database?
8  A.  Sure.
9  Q.  Okay.  And maybe that is A, B, C.
10        So --
11  A.  That's not a correct representation, though.
12  Q.  Let me just get this straight.
13  A.  Sure.
14  Q.  All of the valid -- when your systems are operating
15  correctly, all of the valid CPT codes are on this list,
16  we'll call the CPT list, the all codes list or the IP
17  list; right?
18  A.  Yes.
19  Q.  When it's operating correctly.  And when it's
20  operating correctly, that list should contain or
21  should list all of the codes that are in the criteria
22  database list.  These are the same questions I just asked
23  you a minute ago; right?  Correct?
24  A.  Correct.
25  Q.  Okay.  Now, I will grant you -- strike that.

Jury Trial - Volume E      CondenseIt™      McKesson v. TriZetto

Page 1149

1     If, for example, you wanted to determine, if
2  you wanted to determine whether or not a code was not in
3  here (indicating), not in here, for instance, A, B, C,
4  it was not in this criteria database, you could, if you
5  wanted to, check the CPT list, and if it's not on the
6  CPT list, for example, A through Z, if it's not there,
7  you know it's not in here (indicating); right?
8  A. It's probably not, that's correct, when the system
9  is operating correctly.
10  Q. Well, when the system is operating correctly,
11  you've checked the CPT list, the all codes list, and
12  that code is not on that list. You know when the
13  systems are operating correctly that it's not on the
14  criteria database; is that right?
15  A. It's a high probability that it's not there.
16  Q. All right. Now, one other thing. I'm not asking
17  you the converse question. Okay? The converse question
18  is: If you want to know what is in the criteria
19  database, if you've got A, B and C there, do you see
20  that?
21  A. Yes.
22  Q. Since this is a subset, if you looked in here and
23  found Code Z, Z in the all codes database, it might not
24  be in the criteria database; is that correct?
25  A. That's correct.

Page 1150

1  Q. All right. Now, this is a subset, this criteria
2  database is a subset of the all codes database because
3  not all codes in your system have rules and relationships
4  attached to them; is that correct?
5  A. That's one of the reasons, yes.
6  Q. All right.
7    (Pause.)
8  BY MR. RANDALL:
9  Q. You mentioned in your direct examination that you
10  developed this ClinicaLogic capability in 1989; right?
11  A. Correct.
12  Q. It was done in the fall of '89, wasn't it?
13  A. We began to work on it earlier than that. I think
14  we introduced it in the fall. We actually did
15  development work, I believe it was the spring through
16  the summer.
17  Q. Spring of 1989, you started. In the fall of '89,
18  you completed; is that right?
19  A. I believe so, yes.
20  Q. All right. And prior to 1989, Erisco had not
21  engaged in any development efforts for an automated
22  system for providing clinical editing for medical
23  service codes; is that correct?
24  A. That's correct.
25  Q. And by the end of 1989, when you say that Erisco

Page 1151

1  made available this functionality to customers, which
2  other companies were providing -- strike that -- which
3  other companies were providing automated systems for
4  clinical edits of medical service codes?
5  A. I don't understand the question.
6  Q. All right. When I asked you that question in the
7  deposition that we took, by the end of '89, when you
8  say Erisco made available this functionality to
9  customers, which other companies were providing automated
10  systems for clinical edits of medical service codes, you
11  said there were a handful. I don't remember all of them.
12  I said, can you name any? And you said certainly GMIS,
13  HPR, and there were others.
14    Correct?
15  A. That is correct.
16  Q. That's a correct statement; is that right?
17  A. Yes.
18  Q. All right. So when you first introduced your
19  clinical editing functionality in 1989, GMIS and HPR
20  already had that functionality automated on the market;
21  right?
22  A. That's correct.
23  Q. You mentioned also on direct that these three
24  products with the clinical editing have not really
25  changed much, have not had any significant changes in

Page 1152

1  the last several years; right?
2  A. That's correct.
3  Q. And you know this because you were President of
4  Erisco from at least 1995 through 2000, when it was
5  acquired by TriZetto; is that right?
6  A. That's correct.
7  Q. And you, sir, have personally known of the existence
8  of this patent since at least 1995, haven't you?
9    MR. THOMAS: Objection. Relevance.
10    MR. RANDALL: It's a fact that's at issue that
11  we have to prove.
12    THE COURT: The objection is overruled.
13    THE WITNESS: Repeat the question, sir.
14  BY MR. RANDALL:
15  Q. You, sir, personally, have been aware of this
16  patent, McKesson '164 patent that we're litigating now,
17  since at least 1995, haven't you, sir?
18  A. That's correct.
19    MR. RANDALL: No further questions.
20    THE COURT: Redirect, Mr. Thomas.
21    REDIRECT EXAMINATION
22  BY MR. THOMAS:
23  Q. I just want to clear up one small thing, Mr.
24  Bellomo. Mr. Randall asked you about hosting services
25  and BPO services.

## Page 1153

1      Do you recall that?

2   A.   Yes, I do.

3   Q.   All right. And in hosting -- is hosting the bigger

4 part of the -- you have hosting, BPO. Is hosting the

5 bigger part of the two?

6   A.   It's more customers are in in hosting than BPO,

7 yes.

8   Q.   And under hosting situation, does any TriZetto

9 person actually use the system to process claims or is it

10 the customers who do that?

11   A.   It's the customers that do that.

12      MR. THOMAS: Nothing further, your Honor.

13      THE COURT: All right. Is this a good time

14 to take our lunch break?

15      MR. THOMAS: Yes.

16      MR. RANDALL: It is, your Honor.

17      THE COURT: All right.

18      MR. RANDALL: I just want to hand up the

19 exhibits to your Clerk when we get a chance.

20      THE COURT: We will do so.

21      Let's take half an hour for lunch.

22      THE WITNESS: Am I excused?

23      THE COURT: Yes.

24      (Witness excused)

25      - - -

## Page 1154

1      (At this point the jury was excused for a

2 luncheon recess, and the following occurred without the

3 presence of the jury.)

4      THE COURT: All right.

5      MR. THOMAS: Your Honor, a couple things.

6      THE COURT: Yes?

7      MR. THOMAS: We are, I think we may be done,

8 because we're going to rest. I have not -- we've not

9 received notice from -- of any rebuttal witnesses. I

10 think your Honor has ruled on the deposition designations

11 that they wanted to do in rebuttal, so I don't think

12 there's a rebuttal case.

13      The other two procedural things, your Honor,

14 is we do have a motion as a matter of law on

15 noninfringement based on what was and was not put in

16 during McKesson's case, focusing heavily on what Dr.

17 Musen did and did not say. So we're filing that and

18 would ask your Honor to take a look.

19      Lastly, while Ms. Lampe was on the stand and

20 in front of the jury, Mr. Randall said, your Honor, I

21 have deposition testimony from this witness on a number

22 of these subjects that Mr. Thomas has gone into and I

23 just want to at least make the Court aware that I would

24 like to go in on cross-examination with this witness

25 and correct some of these statements because he has gone

## Page 1155

1 into detail to a number of these claim elements and

2 cited testimony from the witness. I would like to go

3 into it. And that was done in front of the jury, your

4 Honor, so I would just ask whether -- ask you to consider

5 whether or not a corrective instruction or statement to

6 the jury is necessary on that point.

7      THE COURT: All right. Well, as usual, as is

8 my practice, if anyone believes any kind of corrective

9 instruction is appropriate, I ask for their views on what

10 the corrected instruction should be. So if you believe

11 it's appropriate, I would be happy to consider it.

12      MR. THOMAS: Thank you, your Honor.

13      THE COURT: With respect to the rebuttal

14 case, Mr. Randall, I believe I have declined to

15 reconsider all of the deposition designations having to

16 do with references to the patent. There is Mr. Bellomo's

17 deposition designation. And I take it all of this

18 evidence you believe is relevant to the inducement charge?

19      I guess I'm just not sure what the relevance

20 of this is and I think that's why I declined to allow it

21 the first time.

22      MR. RANDALL: Well, the Bellomo testimony,

23 it is brief, from Volume 2 that we've asked to be

24 admitted in our case in chief, is -- relates to direct

25 infringement. That would be TriZetto's hosting

## Page 1156

1 information, their inducement of their customers through

2 the advertised savings that the customers can receive

3 by using clinical editing and the contributory

4 infringement by TriZetto supplying the Facets software

5 containing the edits already set up.

6      And that's what the testimony that we have

7 proffered would be relevant to, and we would like it to

8 come in in our case in chief.

9      THE COURT: Mr. Thomas?

10      MR. THOMAS: Your Honor, you're correct.

11 Our objection was relevance and I think it may also be

12 cumulative at this point, not necessary in rebuttal.

13      THE COURT: Did TriZetto have

14 counter-designations --

15      MR. THOMAS: Pardon?

16      THE COURT: Did TriZetto have

17 counter-designations?

18      MR. THOMAS: Your Honor, if your Honor is

19 going to allow this, then it should probably be allowed

20 on its own rather than with counters. I just don't

21 think it's relevant necessarily.

22      MR. RANDALL: And we have that all cued up.

23      But I think I heard him correct, and I'm not

24 sure whether he wants to bring a motion or not, but he

25 said that it was cumulative, so I take it that his