IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| MCKESSON INFORMATION SOLUTIONS LLC, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | C.A. No. 04-1258 (SLR) |
| THE TRIZETTO GROUP, INC., | ) ) | |
| Defendant. | ) | |

**THE TRIZETTO GROUP, INC.'S ANSWERING BRIEF IN OPPOSITION TO
MCKESSON'S MOTION TO STRIKE ALLEGED PRIOR USES
FIRST ASSERTED AFTER THE CLOSE OF DISCOVERY**

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Jack B. Blumenfeld (#1014)
Rodger D. Smith II (#3778)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200

*Attorneys for Defendant The TriZetto Group, Inc.*

OF COUNSEL:

Jeffrey T. Thomas
David A. Segal
Michael A. Sitzman
GIBSON, DUNN & CRUTCHER LLP
Jamboree Center
4 Park Plaza
Irvine, CA 92614-8557
(949) 451-3800

June 30, 2006

<u>**TABLE OF CONTENTS**</u>

<u>Page</u>

TABLE OF AUTHORITIES .......................................................................................... ii

I.      NATURE AND STAGE OF THE PROCEEDING............................................. 1

II.     SUMMARY OF ARGUMENT ........................................................................... 1

III.    STATEMENT OF FACTS ................................................................................... 3

        A.     Prior Art Systems Asserted By TriZetto ................................................. 3

        B.     McKesson Misrepresents The History Of The Discovery Proceedings In
               This Case................................................................................................. 4

IV.     ARGUMENT ....................................................................................................... 6

        A.     TriZetto Disclosed ClaimFacts And HCPS During Fact Discovery...................... 6

               1.     Erisco's ClaimFacts ..................................................................... 6

               2.     Cortron's Health Care Processing System ("HCPS")................................ 8

        B.     McKesson Violated Its Discovery Obligations By Failing To Disclose
               AMS And AutoCoder ............................................................................. 8

               1.     HDI's Advanced MedLogic System ("AMS") ......................................... 9

               2.     GMIS's AutoCoder ..................................................................... 12

        C.     McKesson Offered New Interpretations of Claims 1 and 2 At Trial................... 13

V.      CONCLUSION .................................................................................................. 17

## <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

**Cases**

*Eaton Corp. v. Appliance Valves Corp.*,
    790 F.2d 874 (Fed. Cir. 1986) ................................................................................... 9

*Praxair, Inc. v. ATMI, Inc.*,
    231 F.R.D. 457 (D. Del. 2003) ................................................................................... 9

*Primos, Inc. v. Hunter's Specialties, Inc.*,
    2006 U.S. App. LEXIS 14525 (Fed. Cir. June 14, 2006) ........................................... 9

**Rules**

Fed. R. Civ. P. 26(e) ..................................................................................................... 5

## I.    NATURE AND STAGE OF THE PROCEEDING

On September 13, 2004, plaintiff McKesson Information Solutions, LLC ("McKesson") filed this suit against The TriZetto Group, Inc. ("TriZetto"), alleging that three of TriZetto's products (Facets, ClaimFacts, and QicLink) infringe U.S. Patent No. 5,253,164 ("the '164 patent"). On October 1, 2004, McKesson amended its Complaint. On November 1, 2004, TriZetto answered and filed a counterclaim seeking a declaratory judgment of invalidity, unenforceability, and non-infringement.

Fact and expert discovery were completed in late 2005. The Court issued its Claim Construction Order on April 5, 2006 (D.I. 307), which was later amended on April 11, 2006 (D.I. 32). Also on April 5, 2006, the Court granted TriZetto's motion for summary judgment of non-infringement as to Claims 3-6 and 8-15. D.I. 301. A jury trial on infringement of the remaining claims – Claims 1, 2 and 16 – commenced on April 17, 2006. The jury returned a verdict finding literal infringement of Claims 1 and 2, but no infringement of Claim 16. D.I. 358. Hence, only Claims 1 and 2 remain in the case.

Trial on all of the remaining issues is scheduled to commence on October 3, 2006. On June 1, 2006, TriZetto filed its motion for summary judgment of invalidity on grounds of anticipation and obviousness (D.I. 379), based on, *inter alia*, seven prior art systems. On June 16, 2006, McKesson moved to strike four of the prior art systems that anticipate Claim 1 and 2. D.I. 416. This is TriZetto's answering brief in opposition to McKesson's motion to strike.

## II.    SUMMARY OF ARGUMENT

Unable to defend Claims 1 and 2 against the prior art on the merits, McKesson relies on procedural arguments in an effort to preclude TriZetto from presenting prior art that clearly invalidates Claims 1 and 2. McKesson contends that four prior art systems – ClaimFacts, HCPS, AMS and AutoCoder – were not disclosed by TriZetto during fact discovery and should be excluded from consideration in the invalidity phase of this case. McKesson is mistaken.

As an initial matter, McKesson is wrong in contending that TriZetto did not disclose its intent to rely on ClaimFacts and HCPS – both of those systems *were disclosed* by TriZetto

1

during fact discovery. Moreover, McKesson cannot possibly claim prejudice from TriZetto's assertion of ClaimFacts, when that system has been subject to complete discovery in this litigation and was one of the accused products presented at the April 2006 trial.

Furthermore, as for AMS and AutoCoder, those systems were known to and should have been disclosed by *McKesson* during fact discovery. McKesson knew that AMS and AutoCoder were prior art systems, because its own predecessor had asserted them as such in earlier litigation. Yet, McKesson did not disclose those prior art systems in response to TriZetto's interrogatories on that subject, but instead attempted to bury the information about the systems in 150,000 pages of documents. McKesson now moves to exclude from consideration the same prior art systems that it neglected to disclose, blaming TriZetto for not uncovering those systems sooner. It would be manifestly unjust to block TriZetto from relying on prior art that McKesson withheld in violation of its discovery obligations. Moreover, TriZetto's presentation of AMS and AutoCoder is almost entirely based on documents *in McKesson's own production* and on testimony from the patent inventors themselves. There is no justification for preventing TriZetto from using McKesson's own documents and the inventors' testimony to invalidate the patent claims.

Additionally, McKesson's new interpretations of Claims 1 and 2 at trial have expanded the range of prior art applicable to those claims. At the April 2006 trial, McKesson interpreted Claim 1 to cover code validation using any database (not necessarily a "predetermined database") and Claim 2 to cover duplicate code checking without need for a "predetermined database." McKesson insists that its interpretation of Claim 1 at trial was the same one it used all along, but that is belied by the fact that its own expert used the *opposite* interpretation at his deposition (i.e., the predetermined database *must* be used). Indeed, the Court itself expressed "shock" at McKesson's interpretation of Claim 1 at trial. As for Claim 2, McKesson never identified during discovery that duplicate code checking was covered by the claim, and that is hardly the natural reading of the patent or the claim language. McKesson cannot demand that TriZetto be held strictly to its prior art disclosures when McKesson has offered new, post-

discovery interpretations of the claims in order to secure an infringement verdict. McKesson's motion to strike TriZetto's prior art should be denied.

## III. STATEMENT OF FACTS

### A. Prior Art Systems Asserted By TriZetto

In its motion for summary judgment of invalidity on grounds of anticipation and obviousness, TriZetto presented seven prior art systems that anticipate and/or render obvious Claims 1 and 2 of the '164 patent. D.I. 380 at 21-33. Among those prior art systems are the following four:

1) *Erisco's ClaimFacts*: ClaimFacts is one of the accused TriZetto products found to infringe Claims 1 and 2. ClaimFacts is a computer software product that provides automated processing of medical claims. D.I. 382 at ¶ 4. It was launched in 1980 by Erisco Managed Care Technologies, Inc. ("Erisco"), a predecessor of TriZetto. *Id.* at ¶¶ 2, 4. Since 1980, ClaimFacts has performed the identical medical code validation and duplicate medical code checking methods that McKesson asserted infringe Claims 1 and 2 of the '164 patent, respectively. *Id.* at ¶¶ 5, 8.

2) *Cortron's Health Care Processing System ("HCPS")*: In 1983 and 1984, Cortron Corporation developed an automated claims processing system called Health Care Processing System ("HCPS"). D.I. 388 at ¶ 4. In February 1986, a company called Digital Insurance Systems Corp. ("DISCorp") obtained the rights to sell HCPS to its customers. *Id.* at ¶ 13. Beginning in 1984, HCPS performed medical code validation (Claim 1) and checked for and corrected duplicate medical codes (Claim 2).

3) *HDI's Advanced MedLogic System ("AMS")*: Developed by the Health Data Institute ("HDI") in 1986, AMS was a software system for editing medical claims. D.I. 383 at ¶ 4. Beginning in 1986, AMS performed medical code validation (Claim 1) and detection of double billing (Claim 2). D.I. 380 at 25-27, 31-32.

3

    *4) GMIS's AutoCoder*:    AutoCoder was a software product developed by GMIS
    (McKesson's predecessor) and used to perform CPT code validation (Claim 1).
    D.I. 380 at 24-25.

These are the four systems that McKesson seeks to exclude from consideration.

**B.    McKesson Misrepresents The History Of The Discovery Proceedings In This Case**

McKesson accuses TriZetto of violating the Court's discovery orders by presenting ClaimFacts, HCPS, AMS and AutoCoder in its summary judgment motion.  But the Court's orders have not excluded any prior art systems from consideration.  Instead, the Court deferred ruling on the specific disclosure issues until the validity phase of the case, which opened on June 1, 2006.  TriZetto believes there is no justification for excluding any of the prior art systems.  As the Court previously stated, now is the appropriate time for resolving the disclosure issues.

During fact discovery, TriZetto diligently disclosed all the prior art it uncovered. TriZetto first responded to McKesson's interrogatory concerning prior art references in January 2005, disclosing all the references known to TriZetto at that point. Ex. 1 (Resp. to McKesson's Interrog. No. 6), at 12-13.  TriZetto, in good faith, supplemented its response four times with additional information it learned during fact discovery.  *See* Ex. 2 (4th Supp. Resp. to McKesson's Interrog. No. 6).  TriZetto's last supplementation was served on September 13, 2005.  *Id.*[1]  Rule 26 only requires a party to supplementally disclose what it knows at the time, which is precisely what TriZetto did in all of its supplemental responses, including the one from

---

[1]    At all times, TriZetto's invalidity contentions naturally were based on McKesson's assertions regarding TriZetto's alleged infringement.  McKesson, however, only provided detailed infringement charts on September 21, 2005 – after the close of fact discovery.  *See* Ex. 3 (6th Supp. Resp. to TriZetto's Interrogs. 1-20).  As of September 22, 2005, the Court was considering the status of the validity issues, which ultimately were bifurcated.  Thus, TriZetto had no basis to supplement its interrogatory responses further until the issues arose in expert discovery and, ultimately, once the Court reopened the validity phase following the infringement trial.

September 2005. *See* Fed. R. Civ. P. 26(e). TriZetto disclosed its intent to rely on ClaimFacts and HCPS in that response (as described below in Section IV.A).

Due to McKesson's failure to disclose AMS to TriZetto during discovery (discussed in Section IV.B.1, below), TriZetto did not learn about AMS until it came up at the deposition of '164 patent inventor Dr. George Goldberg, which started on September 13, 2005 (three days before fact discovery closed) and finished on September 28, 2005 (after the close of fact discovery). Ex. 4 (Goldberg Dep.), at 1-2, 257-58. Naturally, TriZetto was not able to include AMS in its final supplemental response served on September 13, 2005, the same day that Dr. Goldberg's deposition began. Nor was TriZetto able to supplement its response after the close of Dr. Goldberg's deposition on September 28, as the Court was still considering how to handle the issue of prior art disclosures at that time. On October 20, 2005, the Court gave TriZetto the option of bifurcating the issues of infringement and validity, "with completion of discovery and trial on invalidity at some point in the future." D.I. 132 at 2. TriZetto opted for bifurcation and promptly and fully disclosed the AMS prior art system in the expert report of Dr. Randall Davis, served on October 24, 2005. *See* Ex. 5 (Davis Report), at 20-24.

At the November 7, 2005 discovery conference, the Court did not order AMS or any other prior art system excluded from consideration. Instead, the Court deferred ruling on the admissibility of AMS. Ex. 6 (Nov. 7, 2005 Tr.), at 41:24-42:3 ("No, you are not moving now [to exclude AMS] because I'm not going to resolve it now. . . . You can bring that up in motion practice when we move forward with validity."). The Court specifically noted that AMS may be admissible if McKesson had failed to respond to TriZetto's interrogatories regarding the prior art: "[I]f you are claiming that somehow or other this information was only accessible to plaintiff and plaintiff failed to respond accurately and truthfully to your interrogatories, then that is a possible exception to my order." *Id*. at 16:15-19. As described below, that is what has occurred with AMS and AutoCoder in this case. Despite the fact that McKesson's own predecessor, GMIS, had asserted both of those systems as prior art during earlier litigation

concerning the '164 patent, McKesson failed to disclose those systems in response to TriZetto's interrogatories.

Also at the November 7, 2005 conference, the Court clarified that its bifurcation order was intended to stay expert discovery on the issue of validity until the admissibility of the prior art was determined. Ex. 6 (Nov. 7, 2005 Tr.), at 36:25-37:2 ("the issue of validity is stayed until – stayed to the extent that we're not going forward with expert discovery until this whole issue of what prior art references are going to be admissible is resolved"). McKesson, however, insisted that expert discovery proceed on all subjects. *Id.* at 38:2-8. Accordingly, the Court ordered McKesson to respond to TriZetto's expert reports and all asserted prior art references, including AMS. *Id.* at 41:17-20. Hence, at McKesson's insistence, expert discovery on AMS was completed, with experts from both sides addressing that system in their reports and at deposition.

## IV.    ARGUMENT

### A.    TriZetto Disclosed ClaimFacts And HCPS During Fact Discovery

McKesson erroneously contends that ClaimFacts and HCPS were not disclosed during fact discovery. D.I. 417 at 2, 4-5, 11-12. In actuality, TriZetto *did* disclose its intent to rely on both of those prior art systems in its discovery responses of September 13, 2005.

#### 1.    Erisco's ClaimFacts

There can be no clearer prior art in this case than ClaimFacts, one of the accused TriZetto products found to infringe Claims 1 and 2. McKesson argues that TriZetto did not disclose ClaimFacts during fact discovery and should be precluded from presenting it as prior art. This is simply wrong.

TriZetto disclosed its intent to rely on ClaimFacts in its September 13, 2005 response to McKesson's Interrogatory No. 6, in which TriZetto listed "ClinicaLogic for ClaimFacts (Erisco)" as a prior art system. D.I. 381, Ex. 24 at 62. McKesson cannot assert that this disclosure pertains only to ClinicaLogic, and not ClaimFacts, when it has consistently argued that ClinicaLogic is inextricably connected to ClaimFacts and that the entire system infringes the patent claims. Ex. 7 (Trial Tr.), at 924:22-25 (McKesson's counsel: "The accused systems are,

just for your information, are QicLink, Facets and ClaimFacts. Those products in their entirety are the infringing systems."); 544:6-10 (McKesson's counsel: "[W]hile TriZetto continues to maintain that we're only accusing ClinicaLogic of infringing, it's a system that we're accusing of infringement. The three systems are the broader systems . . .").

Indeed, it was ClinicaLogic *within the full ClaimFacts system* that was found to infringe Claims 1 and 2. While the "predetermined database" of "decision-making rules" was found in ClinicaLogic (Ex. 7 (Trial Tr.), at 362:8-363:2), the code validation and duplicate code checking methods found to infringe take place outside of ClinicaLogic. *Id*. at 1054:2-14 ("Q. Does ClaimFacts have an ability . . . to determine if a particular code is valid or not? . . . A. Yes. . . . And that happens outside of ClinicaLogic."); 1086:6-24 ("Q. It does not take a doctor to determine that you shouldn't be double-billed for something, does it? . . . A. That would be duplicate billing for the same procedure. . . . But that would probably edit out in the duplicate edits in ClaimFacts."). Given that ClinicaLogic operates as part of ClaimFacts, TriZetto's interrogatory response put McKesson on notice of TriZetto's intent to rely on its own product, ClaimFacts, as prior art.

Moreover, McKesson has already obtained full discovery on ClaimFacts, including all ClaimFacts documents in TriZetto's possession, a working version of ClaimFacts from which screenshots were created for presentation at trial (*see* Ex. 8 (Trial Exhs. 1180-1200)), and depositions of the TriZetto employees most knowledgeable about ClaimFacts. Among other TriZetto witnesses, McKesson deposed:

- TriZetto Executive Vice-President Anthony Bellomo, who has worked with ClaimFacts since 1980 (D.I. 382 at ¶ 4);

- TriZetto employee Karen Lampe, the person most knowledgeable about ClinicaLogic for ClaimFacts (Ex. 7 (Trial Tr.), at 1027:25-1028:16); and

- TriZetto employee Craig Luftig, who had worked with ClaimFacts in the 1980s (*id*. at 710:8-13).

The primary purpose of a disclosure deadline is to assure that the opposing party has adequate opportunity for discovery. The inclusion of ClaimFacts in the validity phase of this case poses no conceivable prejudice to McKesson, when all possible discovery regarding ClaimFacts has already been conducted and the relevant features fully presented at trial.

### 2. **Cortron's Health Care Processing System ("HCPS")**

McKesson maintains that TriZetto did not disclose its reliance on HCPS during fact discovery, but that is not true. TriZetto disclosed HCPS in two disclosure documents during fact discovery. First, TriZetto disclosed Donald Demers, the developer of HCPS, as a third party witness in its September 13, 2005 supplemental initial disclosure. D.I. 381, Ex. 23 at 4. Mr. Demers was identified as "the Founder and President of Discorp Software" and a person likely to have information concerning the "Health Claims Processing System" (TriZetto mistakenly wrote "Health Claims" rather than "Health Care"). *Id.* That is the HCPS prior art system. In support of TriZetto's summary judgment motion, Mr. Demers has provided a declaration describing the relevant functionality of HCPS and attaching a product manual. D.I. 388.

Second, TriZetto disclosed the "Discorp Software" as a prior use in its September 13, 2005 interrogatory response. D.I. 381, Ex. 24 at 63. As explained by Mr. Demers in his declaration, the "Discorp Software" is the same thing as HCPS. D.I. 388 at ¶ 13. Digital Insurance Systems Corp. ("DISCorp") was founded by Mr. Demers in 1985. *Id.* DISCorp obtained the rights to sell HCPS to its customers in 1986. *Id.* Indeed, the HCPS manual attached to the Demers declaration names DISCorp on its cover page. *Id.* at Exh. A. There can be no doubt that TriZetto adequately disclosed HCPS during fact discovery.

### B. **McKesson Violated Its Discovery Obligations By Failing To Disclose AMS And AutoCoder**

McKesson accuses TriZetto of neglecting to disclose the AMS and AutoCoder prior art systems during fact discovery, but it is *McKesson* that should have disclosed those systems during discovery and failed to do so. There is no doubt that McKesson and its predecessors had

been aware of those prior art systems for more than 10 years, given that McKesson's own predecessor asserted them as prior art in earlier litigation involving the '164 patent. Yet, McKesson did not reveal those prior art systems in response to TriZetto's interrogatories. McKesson now seeks to exclude the very systems that it failed to disclose, blaming TriZetto for not spotting them earlier. McKesson's discovery misconduct should not be rewarded.

The Court has previously observed that "the exclusion of otherwise admissible testimony because of a party's failure to meet a timing requirement is a harsh measure and should be avoided where possible." *Praxair, Inc. v. ATMI, Inc.*, 231 F.R.D. 457, 463 (D. Del. 2003). Courts will exclude relevant prior art only in circumstances involving "unfair and prejudicial surprise." *See Eaton Corp. v. Appliance Valves Corp.*, 790 F.2d 874, 879 (Fed. Cir. 1986) ("The boundaries of the district court's discretion are defined by unfair, prejudicial harm to a party deprived of an adequate opportunity to present its case. . . . [Patentee] makes no effort to persuade us that the court's decision to admit the Ostrowski patent into evidence resulted in surprise or rendered Eaton incapable of adequately responding to the prior art."). For example, in a recent Federal Circuit decision cited by McKesson in another brief, the court upheld the exclusion of a prior art reference that was not disclosed until "shortly before trial commenced," observing that such last-minute disclosure imposed "unfair and prejudicial surprise" on the patentee. *Primos, Inc. v. Hunter's Specialties, Inc.*, 2006 U.S. App. LEXIS 14525, at *23-26 (Fed. Cir. June 14, 2006). As explained below, the inclusion of AMS in this case would not subject McKesson to "unfair and prejudicial surprise," when McKesson and its predecessors have known of AMS for more than 10 years, the AMS documents on which TriZetto relies were produced by McKesson itself, and AMS was fully examined and discussed in the reports and at the depositions of both sides' experts.

## 1.    HDI's Advanced MedLogic System ("AMS")

As explained in TriZetto's motion for summary judgment on grounds of anticipation and obviousness, the AMS prior art system completely anticipates every aspect of Claims 1 and 2 – the code validation technique of Claim 1, the elimination of double billing described in Claim 2,

and the "predetermined database" of both claims.  D.I. 380 at 25-27, 31-32.  It is not surprising that McKesson would like to avoid such a clearly invalidating prior art system.  But there is no justification for excluding AMS from this case.

McKesson undeniably knew about AMS throughout this litigation and well before. McKesson itself produced the AMS documents on which TriZetto relies in this case.  Ex. 9 (MCK 047608-619 – AMS Product Overview); Ex. 10 (MCK 047505-606 – AMS list of medical claim edits).  Additionally, one of the inventors of the '164 patent, Dr. George Goldberg, testified at deposition regarding his experience with AMS when he worked at HDI (the maker of AMS) in the mid-1980's.  Ex. 4 (Goldberg Dep.), at 51:10-52:2, 262:5-265:25.  Marcia Radosevich, the CEO of HPR (the patent assignee and McKesson's predecessor), also worked at HDI (together with Dr. Goldberg) prior to joining HPR.  Ex. 11 (Radosevich Dep.), at 232:22-233:22.

Moreover, AMS was actually asserted as prior art during the litigation in 1994-1995 between McKesson's predecessor HPR (the original patent assignee) and McKesson's predecessor GMIS.  *See* Ex. 12 (GMIS discovery responses), at MCK 035883.  GMIS asserted AMS as prior art in that case.  *Id*.  McKesson subsequently acquired both HPR and GMIS. Accordingly, McKesson is the successor of a party that asserted AMS as prior art in litigation.

Despite McKesson's clear knowledge of the AMS prior art system, McKesson failed to disclose AMS to TriZetto in this litigation.  In December 2004, TriZetto served interrogatories on McKesson requesting disclosure of any prior art systems known to McKesson:

- TriZetto's Interrogatory No. 6:  "For each asserted claim of the '164 PATENT, describe any disclosures of the subject matter thereof prior to the date on which the application for the '164 PATENT was filed . . ."  Ex. 13 (TriZetto's Interrogs, 1-20) at 6).

- TriZetto's Interrogatory No. 7:  "IDENTIFY each product or system ever made, sold, or licensed by YOU, by YOUR predecessor-in-interest, by the named inventors of the

'164 PATENT . . . that embodies, practices, or uses any of the alleged inventions claimed in the '164 PATENT . . ." *Id.*

- TriZetto's Interrogatory No. 9: "IDENTIFY all prior art to the '164 PATENT (including publications, patents, patent applications, inventions by others, uses, sales or offers for sale, and disclosures) which YOU, the named inventors of the '164 PATENT . . . were aware prior to filing the '164 patent." *Id.* at 7.

Although McKesson listed a few prior art systems in response, it did not mention AMS. *See* Ex. 14 (2nd Supp. Resp. to TriZetto's Interrogs. Nos. 6-7), at 2-4; Ex. 15 (5th Supp. Resp. to TriZetto's Interrog. No. 7), at 3.

There can be no doubt that McKesson knew AMS was a prior art reference, because its own predecessor, GMIS, had asserted AMS as such in the 1994 litigation. Additionally, AMS was a system known to Dr. Goldberg, one of the '164 patent inventors, from his employment at HDI (the manufacturer of AMS) in the mid-1980's. Ex. 4 (Goldberg Dep.), at 51:10-52:2, 262:5-265:25. Hence, AMS falls squarely within TriZetto's Interrogatory No. 9, which asked for "all prior art" known to the named inventors prior to the filing of the patent application. There is no excuse for McKesson's failure to disclose AMS during discovery.

TriZetto admits that it did not appreciate the significance of AMS until Dr. Goldberg's deposition, which started on September 13, 2005 (three days before fact discovery closed) and was completed on September 28, 2005. This did not allow TriZetto sufficient time to disclose AMS by the close of fact discovery on September 16, 2005. By contrast, McKesson clearly knew about AMS and yet failed to disclose it to TriZetto.

TriZetto did fully disclose its intent to rely on AMS in the October 24, 2005 expert report of Dr. Davis, which contained extensive discussion of AMS. Ex. 5 (Davis Report), at 20-24. McKesson's invalidity experts, Dr. Musen and Dr. Wilson, responded with their own discussions of AMS in their expert reports. Ex. 16 (Wilson Report), at 39-46; Ex. 17 (Musen Rebuttal

Report), at 24-25.  McKesson had the opportunity to question Dr. Davis regarding AMS during his deposition, and it did so.  *See* Ex. 18 (Davis Dep.), at 89:5-116:6.[2]

The inclusion of AMS in this case would cause no prejudice to McKesson.  McKesson and its predecessors have known about AMS for more than 10 years.  The AMS documents on which TriZetto is relying were in McKesson's possession and produced by McKesson in this litigation.  The experts on both sides have already analyzed AMS.  By contrast, TriZetto would be severely prejudiced if it cannot rely on documents in McKesson's own production (that were not specifically disclosed in response to written discovery requests) that clearly invalidate the remaining claims of the '164 patent.  The exclusion of AMS would also serve to reward McKesson for its discovery misconduct – withholding disclosure of AMS in response to TriZetto's interrogatories.  TriZetto respectfully maintains that there is no basis for the Court to exclude AMS from this case.

### 2.  GMIS's AutoCoder

McKesson also asks the Court to exclude AutoCoder from consideration because TriZetto did not disclose its intent to rely on that system during fact discovery.  But AutoCoder should be admitted as prior art for the same reason as AMS – it was a prior art system that McKesson's own predecessor, GMIS, asserted in earlier litigation (Ex. 12 at MCK 035883), and yet McKesson failed to disclose it in response to TriZetto's interrogatories.

McKesson has a direct connection to AutoCoder, given that the system was manufactured by McKesson's predecessor GMIS.  TriZetto's interrogatories expressly asked McKesson to "IDENTIFY each product or system ever made . . . by YOUR predecessor-in-interest . . . that

---

[2]  Dr. Davis disclosed during his deposition his communications with Dr. Robert Bargar, a physician who was employed at HDI from 1986 to 1988 and worked directly on the development, marketing and sales of AMS.  *Id.*  McKesson and its predecessors have known of Dr. Bargar since at least the GMIS litigation in 1994, when GMIS put Dr. Bargar on its trial witness list.  Ex. 19 (Amended Witness List), at MCK 046091.  TriZetto included Dr. Bargar on its trial witness list in this case.  Ex. 20 (TriZetto's Designation of Trial Witnesses).

embodies, practices, or uses any of the alleged inventions claimed in the '164 PATENT." Ex. 13 (TriZetto's Interrogs. 1-20) at 6. But McKesson ignored this query and did not disclose AutoCoder to TriZetto. *See* Ex. 14 (2nd Supp. Resps. to TriZetto's Interrogs. Nos. 6-7), at 2-4; Ex. 15 (5th Supp. Resp. to TriZetto's Interrog. No. 7), at 3.

Additionally, the relevance of AutoCoder only became clear when McKesson revealed its positions at trial. AutoCoder admittedly does not have a "predetermined database," but it does practice the steps of the method (as interpreted by McKesson) of validating codes without using such a database. As the Court is aware, McKesson did not argue that a system could infringe Claim 1 without using or referencing an index of the "predetermined database" until near the end of trial.

McKesson suffers no prejudice by the inclusion of AutoCoder in this case. Documents describing AutoCoder were produced *by McKesson* in this litigation. Ex. 21 (MCK 47860-47863, MCK 115920-938, MCK 115944-945, MCK 115946-950, MCK 115951-953). AutoCoder was also described by two of the inventors of the '164 patent, Dr. Donald Holloway and Kelli Dugan, both of whom had knowledge of AutoCoder from when they worked at HPI in the mid-1980s. *See* D.I. 381, Ex. 15 (Dugan Dep.), at 44:17-45:25 ("GMIS came to HPI and demonstrated AutoCoder"); D.I. 381, Ex. 4 (Holloway Dep.), at 27:4-16. It is TriZetto that would be severely prejudiced if it cannot rely on the direct admissions of the patent inventors confirming that AutoCoder performed the method of Claim 1.

## C.     McKesson Offered New Interpretations of Claims 1 and 2 At Trial

At the April 2006 trial, McKesson offered new interpretations of Claims 1 and 2 that were not disclosed during fact discovery and differed from the interpretations used by McKesson's expert before trial. Under the new interpretations, Claim 1 does not require using the predetermined database to perform the code validation function, and Claim 2 is simply a method for eliminating duplicate codes without need for a predetermined database.

In its motion, McKesson tries to pretend that its trial interpretations were the same ones it has used all along. D.I. 417 at 6-8. That is not true. McKesson's new interpretation of Claim 1

is the *opposite* of the one used by its own expert, Dr. Mark Musen, at his deposition – he testified that Claim 1 *did actually use* the predetermined database to perform code validation.  D.I. 381, Ex. 13 (Musen Dep.), at 266:15-269:13.  Dr. Musen then changed his approach at the April 2006 trial, realizing that TriZetto's products do not use the predetermined database to validate codes (they use an entirely separate database).  *See* Ex. 7 (Trial Tr.), at 851:5-852:23, 859:19-860:7.  At trial, Dr. Musen testified that the predetermined database need not be used to perform Claim 1. *Id.* at 487:25-489:7 (Musen Testimony:  "Q.  Do you read anything in [Claim 1] that's requiring that the predetermined database be used to make that determination?  A.  Nothing at all.").  He speculated that the TriZetto products probably use an index of the predetermined database to perform the code validation function.  *Id.* at 438:23-439:5.  Subsequently, when it became clear that the TriZetto products do not use an index (*id.* at 851:5-20), McKesson again changed its position to say that checking *any* database of CPT codes was enough to infringe Claim 1.  *Id.* at 1291:1-17.  McKesson cannot, using the guise of alleged "ordinary meaning," deny the many fluctuations in its interpretation of Claim 1 that occurred at trial.  Indeed, the Court itself expressed "shock" at McKesson's trial interpretation of Claim 1.  Ex. 7 (Trial Tr.), at 785:16-19 ("Well, I don't know how that's different than what you did with your witness on what the determining step [of Claim 1] was.  Actually, that was a huge shock to me, about how your witness construed that.").

As for Claim 2, McKesson never disclosed during discovery that the claim was simply a method for eliminating duplicate codes.  McKesson notes that Dr. Musen's expert report refers to duplicate code edits in connection with Claim 2, but that reference pertains to the "rejecting" step of Claim 2 (not the distinctive "determining" step) and is actually repeated for nearly all the patent claims.  *See* Ex. 22 (Musen Report), Ex. 2 at 12-14, 17, 29, 31, 35, 37, 39.  Indeed, Dr. Musen's report used the duplicate code edits as an example for Claim 12, which deals with "medically exclusive" codes.  *Id.* at 31-32.  The report did not link the duplicate code edits with the determination of Claim 2 involving codes that are "mutually exclusive due to non-medical criteria."  Instead, the "determining" step of Claim 2 was correlated, in Dr. Musen's chart, to

"Cosmetic Procedure Edit," a single-code edit.  *Id.* at Ex. 2 at 12.  There was nothing in Dr. Musen's report or McKesson's discovery disclosures, including those served after discovery closed, to indicate that checking duplicate codes was the function of Claim 2.  *See* Ex. 3 (6th Supp. Resps. to TriZetto's Interrogs.), Claim Chart at 3, 5-6.  Nor did Dr. Musen mention duplicate code checking in his deposition or trial testimony.  Only when McKesson began struggling to find an example of codes that are "mutually exclusive due to non-medical criteria" did it interpret Claim 2 to cover duplicate code checking.  Ex. 7 (Trial Tr.), at 1033:18-1036:12, 1039:17-25, 1202:14-25, 1228:21-1229:2.[3]

Furthermore, McKesson's trial interpretations of Claims 1 and 2 do not arise from the "ordinary meaning" of those claims, as McKesson contends.  Claim 1 involves "determining whether any medical service code . . . is not present in the predetermined database."  It is hardly an "ordinary" interpretation to assume that the claim does not actually use the predetermined database expressly recited.  McKesson's further contention that its interpretation of Claim 1 is found in the patent specification is simply wrong.  D.I. 416 at 7.  The patent specification does not state that checking the "ALLCODES" database is the same as determining whether a code is not in the predetermined database and does not describe any "informing" of the user that a code is not in the database.  *See generally* D.I. 373 at Ex. 1 ('164 Patent).  Instead, if a code is not found in the ALLCODES database, the patent actually runs a lookup program to find the right code based on the description of the service.  *Id.,* col. 5:11-20, 10:17-27.  In any event, unlike TriZetto's systems, the INTERACT database (i.e., the "predetermined database") described in the patent specification apparently contained all of the valid CPT codes, so that it could be

---

[3]   McKesson also suggests that its deposition questions regarding duplicate codes somehow put TriZetto on notice that it was linking duplicate codes with Claim 2.  But none of the questions asked by McKesson at deposition clearly linked duplicate code checking with Claim 2.  Moreover, McKesson cannot argue that mere questions asked at deposition are sufficient to disclose its claim interpretations, when it strongly denies that questions and discussions of AMS and AutoCoder at several depositions were sufficient to disclose those systems.

checked directly for valid codes, just as Claim 1 suggests. *See id.,* col. 8:44-46 (explaining that "[i]t must be appreciated that not all codes will be in the [single code edit] BYITSELF database," thereby implying the INTERACT database contains all valid codes when no such disclaimer is made). *But see* Ex. 7 (Trial Tr.), at 1109:14-1111:23 (TriZetto's "predetermined database" "does not contain any codes for anesthesia. Those are valid A.M.A. codes, but we don't have any clinical rules associated with anesthesia.").

Additionally, McKesson improperly contends that TriZetto acknowledged during claim construction that the preferred embodiment of Claim 1 checks the ALLCODE database, not the predetermined database. D.I. 417 at 6 (citing D.I. 158, at 20). Contrary to McKesson's contention, TriZetto actually argued the exact opposite. In its *Markman* brief, TriZetto explained that "[t]he problem presented is that the ALLCODE database is *not* a 'predetermined database containing medical service codes and a set of relationships among the medical service codes,' as required by the claims" and, as such, the checking of a database of all of the CPT codes could *not* be the embodiment of the determining step of Claim 1. D.I. 158, at 20-21.

Likewise, the language of Claim 2 – "determining whether one of the medical service codes . . . is mutually exclusive due to non-medical criteria with any other medical service code" – does not suggest that the claimed method is actually just checking for duplicate codes. If checking duplicate codes is what the claim was intended to cover, it would surely have been written in simpler terms. As with Claim 1, McKesson again tries to mislead the Court when it contends that the patent specification clearly identifies duplicate checking as an embodiment of Claim 2. D.I. 416 at 8. As an initial matter, the patent specification never states that duplicate codes are "mutually exclusive" codes. *See generally* D.I. 373 at Ex. 1 ('164 Patent). In fact, although the "DUPES" database is never disclosed, the patent specification implies that whether a duplicate code is eliminated depends on some unexplained, unknown criteria. *Id.,* col. 5:35-42. Additionally, unlike the express steps of Claim 2, the patent specification discloses that duplicate codes are eliminated without ever performing an "ascertaining step." *Id.,* Fig. 3, boxes 15 ("Eliminate Duplicate Codes"), 18 ("Count No Of Codes"), col. 5:36-47 (explaining that

duplicates are eliminated before the step in which the number of codes are counted or other multiple code edits are performed); *see also* D.I. 170 (McKesson's Opening *Markman* Brief), at 25 (asserting that box 18 was the corresponding structure for the "ascertaining step"); D.I. 373 at Ex. 1 ('164 Patent), Claim 2 (the ascertaining step necessarily comes before the determining step because the determining step requires more than one code be present).

McKesson's new interpretations of Claims 1 and 2 certainly had an impact on the prior art systems that TriZetto has chosen to assert in its summary judgment motion.  Most particularly, the direct applicability of prior art systems that performed the simple methods of Claims 1 and 2 but did not contain a predetermined database only became apparent when McKesson interpreted the claims not to require use of the predetermined database.  It would be inequitable to hold TriZetto to pre-trial prior art disclosure requirements while permitting McKesson to alter its claim interpretations on the fly in order to secure its infringement verdict.

## V.    CONCLUSION

For the reasons stated herein, McKesson's motion to strike TriZetto's highly relevant and amply disclosed prior art should be denied.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Rodger D. Smith II (#3778)*
Jack B. Blumenfeld (#1014)
Rodger D. Smith II (#3778)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200

Attorneys for Defendant The TriZetto Group, Inc

OF COUNSEL:

Jeffrey T. Thomas
David A. Segal
Michael A. Sitzman
GIBSON, DUNN & CRUTCHER LLP
Jamboree Center
4 Park Plaza
Irvine, CA  92614-8557
(949) 451-3800

June 30, 2006
527299

## CERTIFICATE OF SERVICE

I, Rodger D. Smith II, hereby certify that on June 30, 2006 I caused to be electronically filed the foregoing with the Clerk of the Court using CM/ECF, which will send notification of such filing(s) to the following:

> Michael A. Barlow
> Skadden, Arps, Slate, Meagher & Flom LLP

I also certify that copies were caused to be served on June 30, 2006 upon the following in the manner indicated:

### BY E-MAIL AND HAND DELIVERY

Michael A. Barlow
Skadden, Arps, Slate, Meagher & Flom LLP
One Rodney Square
P.O. Box 636
Wilmington, DE  19899

### BY E-MAIL AND FEDERAL EXPRESS

Jeffrey G. Randall
Skadden, Arps, Slate, Meagher & Flom LLP
525 University Avenue
Suite 1100
Palo Alto, CA  94301

*/s/  Rodger D. Smith II (#3778)*
Rodger D. Smith II (#3778)
rsmith@mnat.com