EXHIBIT 3

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

MCKESSON INFORMATION SOLUTIONS LLC,        )
                                           )
                    Plaintiff,             )        CIVIL ACTION NO. 04-1258-SLR
                                           )
          v.                               )
                                           )
THE TRIZETTO GROUP, INC.,                  )
                                           )
                    Defendant.             )
                                           )

## PLAINTIFF MCKESSON'S SIXTH SUPPLEMENTAL RESPONSES TO DEFENDANT TRIZETTO'S FIRST SET OF INTERROGATORIES (1-20)

Plaintiff, McKesson Information Solutions LLC ("McKesson") hereby supplements its response as follows to Interrogatory No. 2 of the First Set of Interrogatories by defendant, The TriZetto Group, Inc. ("TriZetto").

### GENERAL OBJECTIONS

McKesson incorporates by reference as if fully set forth herein the General Objections set forth in its January 13, 2005 Responses to TriZetto's First Set of Interrogatories (1-20), its February 18, 2005 Supplemental Responses to Defendant TriZetto's First Set of Interrogatories (1-20), its March 18, 2005 Second Supplemental Responses to Defendant TriZetto's First Set of Interrogatories (1-20), its April 20, 2005 Third Supplemental Responses to Defendant TriZetto's First Set of Interrogatories (1-20), its June 13, 2005 Fourth Supplemental Responses to

Defendant TriZetto's First Set of Interrogatories (1-20), and its September 15, 2005 Fifth

Supplemental Responses to Defendant TriZetto's First Set of Interrogatories (1-20).

## SUPPLEMENTAL RESPONSES

### INTERROGATORY NO. 2:

Describe in detail how each asserted claim of the '164 PATENT has been infringed by TRIZETTO (including, for each system or product accused of being infringed, stating in detail, by means of a claim chart, YOUR contention as to where each limitation of the asserted claim is found in the accused infringing TRIZETTO system or product and whether YOU are asserting literal infringement or infringement under the doctrine of equivalents).

### SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 2:

McKesson incorporates by reference as if fully set forth herein all prior responses to this

interrogatory, including objections. Subject to and without waiving the foregoing objections,

McKesson supplements its response to this interrogatory as follows:

Based on the information and documents currently available, including TriZetto's

document production in this case and the recent deposition testimony of TriZetto's employees,

corporate witnesses, and customers, McKesson provides the claim chart attached hereto showing

TriZetto's known and admitted infringement of claims 1, 2, 3, 4, 5, 6, 8, 9, 10, 11, 12, 13, 14, 15

and 16 of the '164 patent based on the manufacture, use, sale, and offer for sale of ClaimFacts,

Facets and QicLink.

McKesson's investigation is continuing, including its ongoing depositions of TriZetto's

employees and corporate witnesses, its review of product manuals and other documentation that

TriZetto failed to produce until shortly before the close of fact discovery, and its analysis of the

accused products – of which TriZetto still has not provided complete working copies and/or

sufficient instructions to enable to proper installation and operation of those products.

2

McKesson reserves the right to supplement this response as its investigation continues or as circumstances otherwise warrant.

DATED:  September 21, 2005

By:  _J. Randall_____

Jeffrey G. Randall
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
525 University Avenue, Suite 1100
Palo Alto, CA  94301

Attorneys for Plaintiff
McKesson Information Solutions LLC

3

<u>**PROOF OF SERVICE**</u>
**(FRCP 5)**

I am a citizen of the United States and a resident of the State of California.  I am

employed in Santa Clara County, State of California, in the office of a member admitted *pro hac*

to the bar of this Court, at whose direction the service was made.  I am over the age of eighteen

years, and not a party to the within action.  My business address is 525 University Avenue, Suite

1100, Palo Alto, CA 94301.

On September 21, 2005, I served **PLAINTIFF MCKESSON'S SIXTH**

**SUPPLEMENTAL RESPONSES TO DEFENDANT TRIZETTO'S FIRST SET OF**

**INTERROGATORIES (1-20)** in the manner described below:

> (BY ELECTRONIC MAIL)  I am personally and readily familiar with the
> business practice of Skadden, Arps, Slate, Meagher & Flom LLP for collection
> and processing of document(s) to be transmitted by electronic mail, and I
> caused such document(s) on this date to be transmitted by electronic mail to the
> offices of addressee(s) at the numbers listed below.
>
> and
>
> (BY U.S. MAIL)  I am personally and readily familiar with the business
> practice of Skadden, Arps, Slate, Meagher & Flom LLP for collection and
> processing of correspondence for mailing with the United States Postal Service,
> and I caused such envelope(s) with postage thereon fully prepaid to be placed in
> the United States Postal Service at Palo Alto, California.

on the following parties in this action:

Jeffrey Thomas, Esq.                Jack B. Blumenfeld, Esq.
Gibson, Dunn & Crutcher LLP          Morris, Nichols, Arsht & Tunnell
Jamboree Center                     1201 N. Market Street
4 Park Plaza, Suite 1400            P.O. Box 1347
Irvine, CA 92614-8557               Wilmington, DE 19899
Facsimile: (949) 475-4670           Facsimile: (302) 425-3012

Executed on September 21, 2005 in Palo Alto, California.

_____
Lindsay Coleman

4

# McKesson v. TriZetto
# INFRINGEMENT CLAIM CHART

| CLAIM | FACETS | CLAIMFACTS | QICLINK |
|---|---|---|---|
| 1. In a computer system having means for operating on a predetermined database containing medical service codes and a set of relationships among the medical service codes defining whether selected ones of the medical service codes are valid when input with other selected ones of the medical service codes, a method for processing input claims containing at least one medical service code, comprising the steps of: | Erisco's Facets and Healthweb at MCK 002352 (figure with "Facets Client" connected to "*DBMS*")

Facets Product Overview (Spr 1996) at MCK 002312 ("*Facets* uses ... the client/server platform, which links individual personal computers to high performance relational database servers ... ").

Facets Product Overview (Spr 1996) at MCK 002319 ("**Clinical Edits**. Every claim you process is automatically edited by Erisco's proprietary clinical editing software, with tens of thousands of clinical rules and recommendations. ... *Facets* clinical editing clearly identifies potential problems, such as unbundled surgical procedures, claims billed incorrectly due to coding errors, unacceptable procedures and potentially fraudulent information. It also checks for invalid data relationships (like an inconsistency between diagnosis and procedure codes) and patterns of outpatient and inpatient utilization that deviate from the accepted standards of clinical practice.")

Erisco Facets Overview (webpage) at MCK 002308 ("**Clinical Claims Audit** Facets automatically edits every claim that you process with *Erisco's proprietary clinical editing software, with tens of thousands of clinical rules and recommendations*. This allows you to identify billing problems and eliminate significant overpayment of claims, and to consistently catch fraudulent, erroneous or inconsistent billing practices, a significant factor in cost containment.")

Facets Product Overview (Spr 1996) at MCK 002316 ("**Claims Processing** ... Claims processing utilizes diagnosis codes and procedure codes to read *service based rules* ...")

McKPlan Provider Perspective (Spr 2004) at MCK 002355 ("the PACE clinical editing system ... will encompass a comprehensive set of clinical claims editing criteria that will allow for the | Erisco ClaimFacts Marketing Brochure at TRZ 032141 ("You can implement ClaimFacts in one of two ways... You can either implement the software at your site, or subscribe to our remote service. ... If you choose to license ClaimFacts, our professional support staff will work with you to implement the system on your IBM or equivalent hardware.")

Id. at TRZ 032143 ("*Intelligent Processing* ... ClaimFacts is backed by an expert staff of board-certified physicians. Their combined clinical experience forms an *expert knowledge database*, updated regularly as *medical criteria change*.")

Erisco ClinicaLogic Marketing Brochure (targeted at ClaimFacts customers) at MCK 034224 ("**An Expert Knowledge-based System** ... ClinicaLogic is backed by a staff of board-certified physicians [whose] expertise forms the medical logic and review criteria database, the core of ClinicaLogic. This expert knowledge database is updated regularly as medical criteria change, making ClinicaLogic the most comprehensive claims editor available today.")

ClaimFacts ClinicaLogic System Overview (January 2004) at TRZ 092356 ("**Team of Specialists** the medical database that forms the core of ClinicaLogic [has] over 90,000 clinical rules for claim checking. These rules apply to surgical, laboratory, radiological, anesthesia and other medical procedures as well as to diagnoses. Each rule for a procedure includes medical data that indicate either an appropriate way to adjudicate the procedure or a proper relationship between the procedure and information such as the patient's age and sex.")

30(b)(6) deposition of Karen Lampe

Deposition of Harrington Benefits | TriZetto Product Announcement: Introduction of ClinicaLogic Module in QicLink (March 2002) at TRZ 277700-01 ("Since the claim editing logic is embedded within the [QicLink] Claims Adjudication program ... ")

Id. at TRZ 277700 ("the *medical database* that forms the core of ClinicaLogic. ... [B]ased on [] collective medical knowledge and extensive claim checking experience [contains] over 90,000 clinical rules for claim checking. These rules apply to surgical, laboratory, radiological, anesthesia and other medical procedures as well as to diagnoses.")

30(b)(6) deposition of John Danza |

| | | |
|---|---|---|
| evaluation of medical billing information and CPT coding accuracy.'") | | |
| receiving at least one claim; | **Erisco Facets Overview** (webpage) at MCK 002308 ("**Clinical Claims Audit** Facets automatically edits every claim that you process with Erisco's proprietary clinical editing software ....") <br><br> **Facets Product Overview** (Spr 1996) at MCK 002316 ("**Claims Entry** Claims can be entered online or electronically via proprietary format or the industry standard ...."), <br><br> **MPlan Provider Perspective** (Spr 2004) at MCK 002355 ("the PACE clinical editing system ... will be implemented on claims with dates of service beginning May 1, 2004") <br><br> Deposition of Providence Health Plan | **Erisco ClaimFacts Marketing Brochure** at TRZ 032143 ("***Intelligent Processing***... Clinical Logic is ClaimFacts' integrated medical claim editor. It automatically examines each claim instantly on-line, as it is processed.") <br><br> **Id.** ("Duplicate work is eliminated because you only have to enter date once. ClaimFacts automatically captures and stores original and medical edit information as it is entered on-line.") <br><br> **Erisco ClinicaLogic Marketing Brochure** (targeted at ClaimFacts customers) at MCK 034224 ("**A Flexible, Integrated Solution** ... With ClinicaLogic you can screen existing claims data instantly as they are entered online or batch-processed ... **How ClinicaLogic Works** When a claim is entered, ClinicaLogic compares . . .") <br><br> 30(b)(6) deposition of Karen Lampe <br><br> Deposition of Harrington Benefits | **TriZetto Product Announcement: Introduction of ClinicaLogic Module in QicLink** (March 2002) at TRZ 27699 ("ClinicaLogic is a comprehensive, knowledge-based module designed to automatically check medical claims *before payment*. . . . ClinicaLogic . . . checks claims as they are entered manually on-line or in batch mode . . .") <br><br> **ClinicaLogic User Guide** (2004) at TRZ 154738 ("ClinicaLogic runs seamlessly with QicLink claim processing by verifying claim data as it is entered.") <br><br> 30(b)(6) deposition of John Danza |
| Deposition of Providence Health Plan | | |

| | | |
|---|---|---|
| determining whether any medical service code contained in the at least one claim is not present in the predetermined database; and informing a user that a medical service code is not contained in the predetermined database. | | |
| Erisco Facets Overview at MCK 002308 ("**Clinical Claims Audit** . . . This allows you to identify billing problems and eliminate significant overpayment of claims, and to consistently catch fraudulent, *erroneous* or inconsistent billing practices, a significant factor in cost containment") | Erisco ClaimFacts Marketing Brochure at TRZ 032143 ("*Intelligent Processing* . . . ClaimLogic warns you of questionable provider fees *before* disbursement. And it corrects "unbundling," unacceptable procedures, *coding errors* and more. It even checks for inadvertent or potentially fraudulent deviations from accepted clinical standards.") | TriZetto Product Announcement: Introduction of ClinicaLogic Module in QicLink (March 2002), at TRZ 277699 ("ClinicaLogic . . . checks claims as they are entered manually on-line or in batch mode . . . to identify: . . . CPT/HCPCS *procedure coding errors.*") |
| Facets Product Overview (Spr 1996) at MCK 002319 ("**Clinical Edits** . . . *Facets* clinical editing clearly identifies potential problems, such as unbundled surgical procedures, *claims billed incorrectly due to coding errors,* unacceptable procedures and potentially fraudulent information. . . .") | Erisco ClinicaLogic Marketing Brochure (targeted at ClaimFacts customers) at MCK 034224 ("[ClinicaLogic] corrects 'unbundling,' unacceptable procedures and incorrectly billed claims due to *coding errors* or invalid data relationships. And it checks for inadvertent or potentially fraudulent deviations from generally accepted standards of clinical practice.") | ClaimFacts ClinicaLogic System Overview (January 2004) at TRZ 092354-55 ("**ClaimFacts ClinicaLogic Subsystem** [ClinicaLogic] checks claims as they are entered on-line or in batch mode to identify: . . . CPT/HCPCS *procedure coding errors.*") |
| M<sup>c</sup>Plan Provider Perspective (Spr 2004) at MCK 002355 ("the PACE clinical editing system also *checks for . . . outdated or invalid codes*") | | |
| Deposition of Providence Health Plan | 30(b)(6) deposition of Karen Lampe | 30(b)(6) deposition of John Danza |
| | Deposition of Harrington Benefits | |

3

| CLAIM | FACETS | CLAIMFACTS | QICLINK |
|---|---|---|---|
| 2. In a computer system having means for operating on a predetermined database containing medical service codes and a set of relationships among the medical service codes defining whether selected ones of the medical service codes are valid when input with other selected ones of the medical service codes, a method for processing input claims containing at least one medical service code, comprising the steps of: | Erisco's Facets and Healthweb at MCK 002352 (figure with "Facets Client" connected to "*DBMS*"). <br><br> Facets Product Overview (Spr 1996) at MCK002312 ("*Facets* uses ... the client/server platform, which links individual personal ClaimFacts, our professional support staff will work with computers to high performance relational database servers ....."). <br><br> Facets Product Overview (Spr 1996) at MCK 002319 ("**Clinical Edits** Every claim you process is automatically edited by Erisco's proprietary clinical editing software, with tens of thousands of clinical rules and recommendations. ... *Facets* clinical editing clearly identifies potential problems, such as an unbundled surgical procedures, claims billed incorrectly due to coding errors, unacceptable procedures and potentially fraudulent information. It also checks for invalid data relationships (like an inconsistency between diagnosis and procedure codes) and patterns of outpatient and inpatient utilization that deviate from the accepted standards of clinical practice."). <br><br> Erisco Facets Overview (webpage) at MCK 002308 ("**Clinical Claims Audit** Facets automatically edits every claim that you process with *Erisco's proprietary clinical editing software, with tens of thousands of clinical rules and recommendations.* This allows you to identify billing problems and eliminate significant overpayment of claims, and to consistently catch fraudulent, erroneous or inconsistent billing practices, a significant factor in cost containment."). <br><br> Facets Product Overview (Spr 1996) at MCK 002316 ("**Claims Processing.** ... Claims processing utilizes diagnosis codes and procedure codes to read *service based rules* ...."). <br><br> McPlan Provider Perspective (Spr 2004) at MCK 002355 ("the PACE clinical editing system ... will encompass a comprehensive set of clinical claims editing criteria that will allow for the evaluation of medical billing information and CPT coding accuracy.") | Erisco ClaimFacts Marketing Brochure at TRZ 032141 ("You can implement ClaimFacts in one of two ways. . . . You can either implement the software at your site, or subscribe to remote service. . . . If you choose to license ClaimFacts, our professional support staff will work with you to implement the system on your IBM or equivalent hardware."). <br><br> *Id.* at TRZ 032143 ("**Intelligent Processing**. . . . ClaimLogic is backed by an expert staff of board-certified physicians. Their combined clinical experience forms an *expert-knowledge database*, updated regularly as *medical criteria change*."). <br><br> Erisco ClinicaLogic Marketing Brochure (targeted at ClaimFacts customers) at MCK 034224 ("**An Expert Knowledge-based System**. . . . ClinicaLogic is backed by a staff of board-certified physicians [whose] expertise forms the medical logic and review criteria database, the core of ClinicaLogic. This expert knowledge database is updated regularly as medical criteria change, making ClinicaLogic the most comprehensive claims editor available today."). <br><br> ClaimFacts ClinicaLogic System Overview (January 2004) at TRZ 092356 ("**Team of Specialists** the medical database that forms the core of ClinicaLogic [has] over 90,000 clinical rules for claim checking. These rules apply to surgical, laboratory, radiological, anesthesia and other medical procedures as well as to diagnoses. Each rule for a procedure includes medical data that indicate either an appropriate way to adjudicate the procedure or a proper relationship between the procedure and information such as the patient's age and sex."). <br><br> 30(b)(6) deposition of Karen Lampe <br><br> Deposition of Harrington Benefits | TriZetto Product Announcement: Introduction of ClinicaLogic Module in QicLink (March 2002) at TRZ 277/00-01 ("Since the claim editing logic is embedded within the [QicLink] Claims Adjudication program. . . ."). <br><br> *Id.* at TRZ 277/00 ("the *medical database* that forms the core of ClinicaLogic. . . . [b]ased on [] collective medical knowledge and extensive claim checking experience [contains] over 90,000 clinical rules for claim checking. These rules apply to surgical, laboratory, radiological, anesthesia and other medical procedures as well as to diagnoses."). <br><br> 30(b)(6) deposition of John Danza |

| | Deposition of Providence Health Plan | | |
|---|---|---|---|
| receiving at least one claim; | Erisco Facets Overview (webpage) at MCK 002308 ("**Clinical Claims Audit** Facets automatically edits every claim that you process with Erisco's proprietary clinical editing software . . . .")<br><br>Deposition of Providence Health Plan<br><br>Facets Product Overview (Spr 1996) at MCK 002316 ("**Claims Entry** Claims can be entered online or electronically via proprietary format or the industry standard . . . .").<br><br>M+Plan Provider Perspective (Spr 2004) at MCK 002355 ("the PACE clinical editing system . . . will be implemented on claims with dates of service beginning May 1, 2004")<br><br>Deposition of Providence Health Plan | Erisco ClaimFacts Marketing Brochure at TRZ 032143 ("**Intelligent Processing** . . . Clinical Logic is ClaimFacts' integrated medical claim editor. It automatically examines each claim instantly on-line, as it is processed.")<br><br>Id. ("Duplicate work is eliminated because you only have to enter date once. ClaimFacts automatically captures and stores original and medical edit information as it is entered on-line.") | TriZetto Product Announcement: Introduction of ClinicaLogic Module in QicLink (March 2002) at TRZ 277699 ("ClinicaLogic is a comprehensive, knowledge-based module designed to automatically check medical claims *before payment*. . . . ClinicaLogic . . . checks claims as they are entered manually on-line or in batch mode . . .")<br><br>ClinicaLogic User Guide (2004) at TRZ 154738 ("ClinicaLogic runs seamlessly with QicLink claim processing by verifying claim data as it is entered.")<br><br>30(b)(6) deposition of John Danza |
| ascertaining whether the at least one claim contains a plurality of medical service codes; | M+Plan Provider Perspective (Spr 2004) at MCK 002355 ("The PACE clinical editing system is designed to detect . . . **Unbundling/Rebundling** – Billing under several CPT codes . . . .")<br><br>Facets Product Overview (Spr 1996) at MCK 002319 ("**Clinical Edits** *Facets* clinical editing clearly identifies potential problems, such as unbundled surgical procedures . . . .")<br><br>Deposition of Providence Health Plan | Erisco ClaimFacts Marketing Brochure (targeted at ClaimFacts customers) at MCK 034224 ("**A Flexible, Integrated Solution** . . . With ClaimFacts you can screen existing claims data instantly as they are entered online or batch-processed. . . . **How ClaimFacts Works** When a claim is entered, ClinicaLogic compares . . .")<br><br>ClaimFacts ClinicaLogic System Overview (January 2004) at TRZ 092364 ("**How ClinicaLogic Operates** Claims entered to ClaimFacts are first examined . . .")<br><br>30(b)(6) deposition of Karen Lampe<br><br>Deposition of Harrington Benefits | TriZetto Product Announcement: Introduction of ClinicaLogic Module in QicLink (March 2002) at TRZ 277699 ("ClinicaLogic . . . checks claims as they are entered manually on-line or in batch mode . . . to identify: "unbundled" procedures (i.e., procedures covered by one comprehensive CPT/HCPCS procedure code that are itemized on the provider's bill, possibly resulting in an overstatement of charges)")<br><br>30(b)(6) deposition of John Danza |
| determining whether one of the | M+Plan Provider Perspective (Spr 2004) at MCK 002355 ("The PACE clinical editing system is designed to detect irregularities in | ClaimFacts ClinicaLogic System Overview (January 2004) at TRZ 092354-55 ("**ClaimFacts ClinicaLogic Subsystem** | TriZetto Product Announcement: Introduction of ClinicaLogic Module in QicLink (March 2002) at TRZ |

| | | | |
|---|---|---|---|
| medical service codes in the at least one claim is mutually exclusive due to non-medical criteria with any other medical service code in the at least one claim; | medical billings, such as ... **Mutually Exclusive/Redundant Procedures** – Defined as the billing of two or more procedures that, by medical practice standards, would not be billed on the same date of service. ... the PACE clinical editing system also checks for ... assistant surgeon eligibility ... and appropriateness of ... place of service.'")<br><br>Facets Product Overview (Spr 1996) at MCK 002319 ('Clinical Edits ... Facets clinical editing ... checks for ... patterns of outpatient and inpatient utilization that deviate from accepted standards of clinical practice.')<br><br>Deposition of Providence Health Plan | [ClinicaLogic] checks claims as they are entered on-line or in batch mode to identify; ... CPT/HCPCS procedure coding errors or invalid data relationship (e.g., the procedure coding errors or invalid data relationships (e.g., the procedure is inconsistent with the patient's sex); ... patterns of outpatient and inpatient utilization deviation from common standards of clinical practice; ... diagnoses that may be inappropriate for the sex and/or age of the patient, or that may require case management.')<br><br>30(b)(6) deposition of Karen Lampe | 277699 ('ClinicaLogic ... checks claims as they are entered manually on-line or in batch mode ... to identify; ... CPT/HCPCS procedure coding errors or invalid data relationships (e.g., the procedure is inconsistent with the patient's sex); ... patterns of outpatient and inpatient utilization deviating from common standards of clinical practice; ... diagnoses that may be inappropriate for the sex and/or age of the patient that may require case management.'")<br><br>30(b)(6) deposition of John Danza |
| authorizing medical service codes which are not mutually exclusive due to non-medical criteria with any other medical service codes contained in the at least one claim in response to the determining step; and | Erisco Facets Overview at MCK 002308 ('**Clinical Claims Audit** Facets *automatically edits every claim that you process* with Erisco's proprietary clinical editing software, with tens of thousands of clinical rules and recommendations. *This allows you to identify billing problems and eliminate significant overpayment of claims*, and to consistently catch fraudulent, erroneous or inconsistent billing practices, a significant factor in cost containment.')<br><br>Deposition of Providence Health Plan | Erisco ClinicaLogic Marketing Brochure (targeted at ClaimFacts customers) at MCK 034224 ('**How ClinicaLogic Works** ... As ClinicaLogic detects inconsistencies online, it displays clear instructions on the Claims Processing Screen, *enabling the examiner to make appropriate decisions. An edit may be accepted or overridden, or the original claim may be pended for review*.')<br><br>30(b)(6) deposition of Karen Lampe | TriZetto Product Announcement: Introduction of ClinicaLogic Module in QicLink (March 2002) at TRZ 277700 ('Some edits detect and, in certain situations, automatically correct commonly encountered coding errors. Other edits identify potential improprieties regarding claim procedures and diagnoses. ClinicaLogic's flexibility allows the user to utilize any or all of the edits. . .')<br><br>30(b)(6) deposition of John Danza |
| rejecting medical service codes which are mutually exclusive | Erisco Facets Overview at MCK 002308 ('**Clinical Claims Audit** Facets *automatically edits every claim that you process* with Erisco's proprietary clinical editing software, with tens of thousands of clinical rules and recommendations. *This allows you*<br><br>Deposition of Harrington Benefits | Erisco ClinicaLogic Marketing Brochure (targeted at ClaimFacts customers) at MCK 034224 ('**How ClinicaLogic Works** ... As ClinicaLogic detects inconsistencies online, it displays clear instructions on the | TriZetto Product Announcement: Introduction of ClinicaLogic Module in QicLink (March 2002) at TRZ 277700 ('Some edits detect and, in certain situations, automatically correct commonly encountered coding errors, |

6

| CLAIM | FACETS | CLAIMFACTS | QICLINK |
|---|---|---|---|
| due to non-medical criteria with any other medical service codes contained in the at least one claim in response to the determining step. | *to identify billing problems and eliminate significant overpayment of claims, and to consistently catch fraudulent, erroneous or inconsistent billing practices, a significant factor in cost containment.")*<br><br>Deposition of Providence Health Plan | Claims Processing Screen, *enabling the examiner to make appropriate decisions. An edit may be accepted or overridden,* or the original claim may be pended for review.")<br><br>ClaimFacts ClinicaLogic System Overview (January 2004) at TRZ 092364 (**"How ClinicaLogic Operates** As ClinicaLogic detects inconsistencies and billing problems on-line, clear instructions will display on the claims processing screen, enabling the examiner to make appropriate decisions. Claim examiners will have the capability to accept the claim for payment, *override* edits on any or all of the line items or pend the claim for review.")<br><br>30(b)(6) deposition of Karen Lampe<br><br>Deposition of Harrington Benefits | Other edits identify potential improprieties regarding claim procedures and diagnoses. ClinicaLogic's flexibility allows the user to utilize any or all of the edits. . .")<br><br>30(b)(6) deposition of John Danza |
| **3.** A computer system including a central processing unit and associated memory for processing input claims containing at least one medical service code, comprising: | Facets Product Overview (Spr 1996) at MCK 002312 ("*Facets* uses ... the client/server platform, which links individual personal computers to high performance relational database servers ....");<br><br>Deposition of Providence Health Plan<br><br>Deposition of Craig Luftig<br><br>30(b)(6) deposition of Karen Lampe<br><br>Deposition of Harrington Benefits | Erisco ClaimFacts Marketing Brochure at TRZ 032141 ("You can implement ClaimFacts in one of two ways.... You can either implement the software at your site, or subscribe to remote service.... If you choose to license ClaimFacts, our professional support staff will work with you to implement the system on your IBM or equivalent hardware.")<br><br>30(b)(6) deposition of John Danza | TriZetto Product Announcement: Introduction of ClinicaLogic Module in QicLink (March 2002) at TRZ 27700-01 ("Since the claim editing logic is embedded within the [QicLink] Claims Adjudication program. . . .")<br><br>30(b)(6) deposition of John Danza |
| a predetermined database stored in the associated memory, the database containing medical service codes and a set of | Erisco's Facets and Healthweb at MCK 002352 (figure with "Facets Client connected to "**DBMS**")<br><br>Facets Product Overview (Spr 1996) at MCK 002312 ("*Facets* uses ... the client/server platform, which links individual personal computers to high performance relational database servers ....");<br><br>Erisco Facets Product Overview (Spr 1996) at 002319 ("**Clinical Edits** | Erisco ClaimFacts Marketing Brochure at TRZ 032143 ("*Intelligent Processing.* . . . ClinicaLogic is backed by an expert staff of board-certified physicians. Their combined clinical experience forms an *expert-knowledge database,* updated regularly as *medical criteria* change.")<br><br>Erisco ClinicaLogic Marketing Brochure (targeted at ClaimFacts customers) at MCK 034224 ("**An Expert** | TriZetto Product Announcement: Introduction of ClinicaLogic Module in QicLink (March 2002) at TRZ 27700 ("the *medical database* that forms the core of ClinicaLogic. . . . [b]ased on [] collective medical knowledge and extensive claim checking experience [contains] over 90,000 clinical rules for claim checking. These rules apply to surgical, laboratory, radiological, anesthesia and other medical procedures as well as to |

| | | |
|---|---|---|
| relationships among the medical service codes defining whether selected ones of the medical service codes are valid when received with other selected ones of the medical service codes; | Every claim you process is automatically edited by Erisco's proprietary clinical editing software, with tens of thousands of clinical rules and recommendations. ... *Facets* clinical editing clearly identifies potential problems, such as unbundled surgical procedures, claims billed incorrectly due to coding errors, unacceptable procedures and potentially fraudulent information. It also checks for invalid data relationships (like an inconsistency between diagnosis and procedure codes) and patterns of outpatient and inpatient utilization that deviate from the accepted standards of clinical practice.")<br><br>Erisco Facets Overview (webpage) at MCK 002308 ("**Clinical Claims Audit** Facets automatically edits every claim that you process with *Erisco's proprietary clinical editing software, with tens of thousands of clinical rules and recommendations.* This allows you to identify billing problems and eliminate overpayment of claims, and to consistently catch fraudulent, erroneous or inconsistent billing practices, a significant factor in cost containment.")<br><br>Erisco Facets Overview (webpage) at MCK 002308 ("**Clinical Claims Audit** Facets automatically edits every claim that you process with *Erisco's proprietary clinical editing software, with tens of thousands of clinical rules and recommendations.* This allows you to identify billing problems and eliminate significant evaluation of medical billing information and CPT coding accuracy.")<br><br>M*Plan Provider Perspective (Spr 2004) at MCK 002355 ("the PACE clinical editing system ... will encompass a comprehensive set of clinical claims editing criteria that will allow for the evaluation of medical billing information and CPT coding accuracy.")<br><br>Deposition of Providence Health Plan<br><br>Facets Product Overview (Spr 1996) at MCK 002316 ("**Claims Processing** ... Claims processing utilizes diagnosis codes and procedure codes to read *service based rules* ....") | **Knowledge-based System** ... ClinicalLogic is backed by a staff of board-certified physicians [whose] expertise forms the medical logic and review criteria database, the core of ClinicalLogic. This expert knowledge database is updated regularly as medical criteria change, making ClinicalLogic the most comprehensive claims editor available today.")<br><br>ClaimFacts ClinicalLogic System Overview (January 2004) at TRZ 092356 ("**Team of Specialists** the medical database that forms the core of ClinicalLogic [has] over 90,000 clinical rules for claim checking. These rules apply to surgical, laboratory, radiological, anesthesia and other medical procedures as well as to diagnoses. Each rule is for a procedure and includes medical data that indicate either an appropriate way to adjudicate the procedure or a proper relationship between the procedure and information such as the patient's age and sex.")<br><br>30(b)(6) deposition of Karen Lampe<br><br>Deposition of Harrington Benefits<br><br>Erisco ClaimFacts Marketing Brochure at TRZ 032143 ("**Intelligent Processing** ... Clinical Logic is ClaimFacts' integrated medical claim editor. It automatically examines each claim instantly on-line, as it is processed.")<br><br>Id. ("Duplicate work is eliminated because you only have to enter date once. ClaimFacts automatically captures and stores original and medical edit information as it is entered | diagnoses.")<br><br>30(b)(6) deposition of John Danza<br><br>TriZetto Product Announcement: Introduction of ClinicalLogic Module in QicLink (March 2002) at TRZ 277699 ("ClinicalLogic is a comprehensive, knowledge-based module designed to automatically check medical claims *before payment*. ... ClinicalLogic . . . checks claims as they are entered manually on-line or in batch mode . . .")<br><br>ClinicalLogic User Guide (2004) at TRZ 154738 |
| means for receiving at least one claim; | Erisco Facets Overview (webpage) at MCK 002308 ("**Clinical Claims Audit** Facets automatically edits every claim that you process with Erisco's proprietary clinical editing software ...")<br><br>Facets Product Overview (Spr 1996) at MCK 002316 ("**Claims Entry** Claims can be entered online or electronically via proprietary format or the industry standard ...") | 30(b)(6) deposition of John Danza | |

8

| Claim Term | | | |
|---|---|---|---|
| | M*Plan Provider Perspective (Spr 2004) at MCK 002355 ("the PACE clinical editing system ... will be implemented on claims with dates of service beginning May 1, 2004")<br><br>Deposition of Providence Health Plan | on-line.")<br><br>Enisco ClinicaLogic Marketing Brochure (targeted at ClaimFacts customers) at MCK 034224 ("**A Flexible, Integrated Solution** . . . With ClinicaLogic you can screen existing claims data instantly as they are entered online or batch-processed. . . . **How ClinicaLogic Works** When a claim is entered, ClinicaLogic compares . . .")<br><br>ClaimFacts ClinicaLogic System Overview (January 2004) at TRZ 092364 ("**How ClinicaLogic Operates** Claims entered to ClaimFacts are first examined . . .")<br><br>30(b)(6) deposition of Karen Lampe<br><br>Deposition of Harrington Benefits | ("ClinicaLogic runs seamlessly with QicLink claim processing by verifying claim data as it is entered.")<br><br>30(b)(6) deposition of John Danza |
| means for ascertaining whether the at least one claim contains a plurality of medical service codes; | M*Plan Provider Perspective (Spr 2004) at MCK 002355 ("The PACE clinical editing system is designed to detect. . . . **Unbundling/Rebundling** – Billing under several CPT codes ....")<br><br>Facets Product Overview (Spr 1996) at MCK 002319 ("*Facets* clinical editing clearly identifies potential problems, such as unbundled surgical procedures ....")<br><br>Deposition of Providence Health Plan | Enisco ClinicaLogic Marketing Brochure (targeted at ClaimFacts customers) at MCK 004812 ("When a claim is entered, ClinicaLogic compares procedure codes from multiple services, flagging potential problems.")<br><br>30(b)(6) deposition of Karen Lampe<br><br>Deposition of Harrington Benefits | TriZetto Product Announcement: Introduction of ClinicaLogic Module in QicLink (March 2002) at TRZ 277699 ("ClinicaLogic. . . checks claims as they are entered manually on-line or in batch mode . . . to identify: "unbundled" procedures (i.e., procedures covered by a comprehensive CPT/HCPCS procedure code that are itemized on the provider's bill, possibly resulting in an overstatement of charges).")<br><br>30(b)(6) deposition of John Danza |
| means for determining whether one of the medical service codes in the plurality of medical service codes is valid or invalid by interacting with the database and the set of clinical practice. | Facets Product Overview (Spr 1996) at MCK 002319 ("**Clinical Edits** Every claim you process is automatically edited by Enisco's proprietary clinical editing software, with tens of thousands of clinical rules and recommendations. ... *Facets* clinical editing clearly identifies potential problems, such as unbundled surgical procedures, claims billed incorrectly due to coding errors, unacceptable procedures and potentially fraudulent information. It also checks for invalid data relationships (like an inconsistency between diagnosis and procedure codes) and patterns of outpatient and inpatient utilization that deviate from the accepted standards of clinical practice.")<br><br>Deposition of Providence Health Plan | Enisco ClaimFacts Marketing Brochure at TRZ 032143 ("**Intelligent Processing** . . . ClinicaLogic warns you of questionable provider fees *before* disbursement. And it corrects "unbundling," "unacceptable procedures, coding errors and more. It even checks for inadvertent or potentially fraudulent deviations from accepted clinical standards.")<br><br>30(b)(6) deposition of Karen Lampe | TriZetto Product Announcement: Introduction of ClinicaLogic Module in QicLink (March 2002) at TRZ 277699 ("ClinicaLogic is a comprehensive, knowledge-based module designed to automatically check medical claims *before payment*. . . . ClinicaLogic . . . checks claims as they are entered manually on-line or in batch mode . . .")<br><br>30(b)(6) deposition of John Danza |

| | | | |
|---|---|---|---|
| relationships contained in the database; | M**Plan Provider Perspective (Spr 2004) at MCK 002355 ("the PACE clinical editing system ... will allow for the evaluation of medical billing information and CPT coding accuracy. ... The PACE clinical editing system is designed to detect irregularities in medical billings, such as: **Incidental Procedures** – Procedures which are carried out at the same time as a primary procedure, require little additional physician resources, are clinically integral to the performance of the primary procedure, and therefore, should not be reimbursed separately. **Mutually Exclusive/Redundant Procedures** – Defined as the billing of two or more procedures that, by medical practice standards, would not be billed on the same date of service. **Unbundling/Rebundling** – Billing under several CPT codes that should be combined under a single charge.")<br><br>Deposition of Providence Health Plan | Erisco ClinicalLogic Marketing Brochure (targeted at ClaimFacts customers) at MCK 034224 ("**How ClinicaLogic Works** ... As ClinicaLogic detects inconsistencies online, it displays clear instructions on the Claims Processing Screen, *enabling the examiner to make appropriate decisions. An edit may be accepted or overridden, or the original claim may be pended for review.*")<br><br>30(b)(6) deposition of Karen Lampe<br><br>Deposition of Harrington Benefits | TriZetto Product Announcement: Introduction of ClinicaLogic Module in QicLink (March 2002) at TRZ 277/00 ("Some edits detect and, in certain situations, automatically correct commonly encountered coding errors. Other edits identify potential improprieties regarding claim procedures and diagnoses. ClinicaLogic's flexibility allows the user to utilize any or all of the edits. . . .")<br><br>30(b)(6) deposition of John Danza<br><br>TriZetto Product Announcement: Introduction of |
| means for authorizing medical service codes which are valid in response to the means for determining; and | Erisco Facets Overview at MCK 002308 ("**Clinical Claims Audit** Facets *automatically edits every claim that you process with* Erisco's proprietary clinical editing software, with tens of thousands of clinical rules and recommendations. *This allows you to identify billing problems and eliminate significant overpayment of claims,* and to consistently catch fraudulent, erroneous or inconsistent billing practices, a significant factor in cost containment.")<br><br>Deposition of Providence Health Plan | ClaimFacts ClinicaLogic System Overview (January 2004) at TRZ 092264 ("**How ClinicaLogic Operates** As ClinicaLogic detects inconsistencies and billing problems on-line, clear instructions will display on the claims processing screen, enabling the examiner to make the appropriate decisions. Claim examiners will have the capability to *accept* the claim for payment, override edits on any or all of the line items to pend the claim for review.")<br><br>Deposition of Harrington Benefits | |
| means for | Erisco Facets Overview at MCK 002308 ("**Clinical Claims Audit** | Erisco ClinicalLogic Marketing Brochure (targeted at | TriZetto Product Announcement: Introduction of |

| | | |
|---|---|---|
| rejecting medical service codes which are invalid in response to the means for determining. | | |
| Facets *automatically edits every claim that you process* with Erisco's proprietary clinical editing software, with tens of thousands of clinical rules and recommendations. *This allows you to identify billing problems and eliminate significant overpayment of claims*, and to consistently catch fraudulent, erroneous or inconsistent billing practices, a significant factor in cost containment.") | ClaimFacts customers) at MCK 034224 ("**How ClinicaLogic Works** . . . As ClinicaLogic detects inconsistencies online, it displays clear instructions on the Claims Processing Screen, *enabling the examiner to make appropriate decisions. An edit may be accepted or overridden*, or the original claim may be pended for review.") | ClinicaLogic Module in OneLink (March 2002) at TRZ 277700 ("Some edits detect and, in certain situations, automatically correct commonly encountered coding errors. Other edits identify potential improprieties regarding claim procedures and diagnoses. ClinicaLogic's flexibility allows the user to utilize any or all of the edits. . . ") |
| Deposition of Providence Health Plan | ClaimFacts ClinicaLogic System Overview (January 2004) at TRZ 092364 ("**How ClinicaLogic Operates** As ClinicaLogic detects inconsistencies and billing problems on-line, clear instructions will display on the claims processing screen, enabling the examiner to make the appropriate decisions. Claim examiners will have the capability to accept the claim for payment, *override* edits on any or all of the line items or pend the claim for review.") | 30(b)(6) deposition of John Danza |
| | 30(b)(6) deposition of Karen Lampe | |
| | Deposition of Harrington Benefits | |

11

| CLAIM | FACETS | CLAIMFACTS | QICLINK |
|---|---|---|---|
| 4. The apparatus of claim 3, further comprising means for revising the at least one claim to delete invalid medical service codes. | Facets Product Overview (Spr 1996) at MCK 002319 ("Clinical **Edits** Every claim you process is automatically edited by Erisco's proprietary clinical editing software . . . .")<br><br>Deposition of Providence Health Plan | Erisco ClinicaLogic Marketing Brochure (targeted at ClaimFacts customers) at MCK 034224 ("**How ClinicaLogic Works** . . . As ClinicaLogic detects inconsistencies online, it displays clear instructions on the Claims Processing Screen, *enabling the examiner to make appropriate decisions. An edit may be accepted or overridden*, or the original claim may be pended for review.")<br><br>ClaimFacts ClinicaLogic System Overview (January 2004) at TRZ 092364 ("**How ClinicaLogic Operates** As ClinicaLogic detects inconsistencies and billing problems on-line, clear instructions will display on the claims processing screen, enabling the examiner to make the appropriate decisions. Claim examiners will have the capability to *accept* the claim for payment, override edits on any or all of the line items or pend the claim for review.")<br><br>30(b)(6) deposition of Karen Lampe | TriZetto Product Announcement: Introduction of ClinicaLogic Module in QicLink (March 2002) at TRZ 277700 ("Some edits detect and, in certain situations, automatically correct commonly encountered coding errors. Other edits identify potential improprieties regarding claim procedures and diagnoses. ClinicaLogic's flexibility allows the user to utilize any or all of the edits. . . .")<br><br>30(b)(6) deposition of John Danza |
| 5. The apparatus of claim 4, further comprising means for informing a user why the at least one claim was revised. | Facets Product Overview (Spr 1996) at MCK 002319 ("Clinical **Edits** Every claim you process is automatically edited by Erisco's proprietary clinical editing software . . . .")<br><br>Deposition of Providence Health Plan | Erisco ClinicaLogic Marketing Brochure (targeted at ClaimFacts customers) at MCK 034224 ("**How ClinicaLogic Works** . . . As ClinicaLogic detects inconsistencies online, it displays clear instructions on the Claims Processing Screen, *enabling the examiner to make appropriate decisions. An edit may be accepted or overridden*, or the original claim may be pended for review.")<br><br>ClaimFacts ClinicaLogic System Overview (January 2004) at TRZ 092364 ("**How ClinicaLogic Operates** As ClinicaLogic detects inconsistencies and billing problems on-line, clear instructions will display on the claims | TriZetto Product Announcement: Introduction of ClinicaLogic Module in QicLink (March 2002) at TRZ 277700 ("Some edits detect and, in certain situations, automatically correct commonly encountered coding errors. Other edits identify potential improprieties regarding claim procedures and diagnoses. ClinicaLogic's flexibility allows the user to utilize any or all of the edits. . . .")<br><br>30(b)(6) deposition of John Danza |

| CLAIM | FACETS | CLAIMFACTS | QICLINK |
|---|---|---|---|
| | | processing screen, enabling the examiner to make the appropriate decisions. Claim examiners will have the capability to *accept* the claim for payment, override edits on any or all of the line items or pend the claim for review.")<br><br>Deposition of Harrington Benefits | TriZetto Product Announcement: Introduction of ClinicalLogic Module in QicLink (March 2002) at TRZ 277699 ("The ability of ClinicalLogic to detect and correct billing problems makes it a valuable tool to identify routine CPT/HCPCS and ICD-9 coding errors and coding strategies some providers use to circumvent reasonable and customary limits.")<br><br>30(b)(6) deposition of John Danza |
| 6. The apparatus of claim 3, wherein the database containing medical service codes includes medical service codes described by CPT codes. | MPPlan Provider Perspective (Spr 2004) at MCK 002355 ("the PACE clinical editing system .... will encompass a comprehensive set of clinical claims editing criteria that will allow for the evaluation of medical billing information and *CPT coding* accuracy.")<br><br>Deposition of Providence Health Plan | Erisco ClinicaLogic Marketing Brochure (targeted at ClaimFacts customers) at MCK 004813 ("The ClinicaLogic medical editor screens claims for surgical, laboratory, radiological, and other medical procedures based on *CPT-4 codes.*")<br><br>Erisco ClinicaLogic System Overview (January 2004) at TRZ 092356 ("Deloitte & Touche assigned clinical rules to over 8,900 *CPT/HCPCS procedure codes.*")<br><br>30(b)(6) deposition of Karen Lampe | TriZetto Product Announcement: Introduction of ClinicalLogic Module in QicLink (March 2002) at TRZ 277700 ("Some edits detect and, in certain situations, automatically correct commonly encountered coding errors. Other edits identify potential improprieties regarding claim procedures and diagnoses. ClinicalLogic's flexibility allows the user to utilize any or all of the edits. . .")<br><br>30(b)(6) deposition of John Danza |
| 8. The apparatus of claim 3, further comprising means for requesting further information from a user regarding the at least one claim. | Facets Product Overview (Spr 1996) at MCK 002319 ("**Clinical Edits** Every claim you process is automatically edited by Erisco's proprietary clinical editing software ....") | Erisco ClinicaLogic Marketing Brochure (targeted at ClaimFacts customers) at MCK 034224 ("**How ClinicaLogic Works** . . . As ClinicaLogic detects inconsistencies online, it displays clear instructions on the Claims Processing Screen, *enabling the examiner to make appropriate decisions. An edit may be accepted or overridden,* or the original claim may be pended for review.")<br><br>ClaimFacts ClinicaLogic System Overview (January 2004) at TRZ 092364 ("**How ClinicaLogic Operates.** As | |

| CLAIM | FACTS | CLAIM/FACTS | QICLINK |
|---|---|---|---|
| | | ClinicaLogic detects inconsistencies and billing problems on-line, clear instructions will display on the claims processing screen, enabling the examiner to make the appropriate decisions. Claim examiners will have the capability to *accept* the claim for payment, override edits on any or all of the line items or pend the claim for review.")<br><br>30(b)(6) deposition of Karen Lampe<br><br>Deposition of Harrington Benefits | |
| 9. The apparatus of claim 3, wherein the relationships among the medical service codes include medically determined relationships. | Erisco Facets Overview (webpage) at MCK 002308 ("**Clinical Claims Audit** Facets automatically edits every claim that you process with Erisco's proprietary clinical editing software, with tens of thousands of clinical rules and recommendations.")<br><br>Facets Product Overview (Spr 1996) at MCK 002319 ("**Clinical Edits** Every claim you process is automatically edited by Erisco's proprietary clinical editing software, with tens of thousands of clinical rules and recommendations.")<br><br>Deposition of Providence Health Plan<br><br>M²Plan Provider Perspective (Spr 2004) at MCK 002355 ("the medical PACE clinical editing system . . . will encompass a comprehensive set of clinical claims editing criteria that will allow for the evaluation of medical billing information and CPT coding accuracy.")<br><br>Deposition of Harrington Benefits | Erisco Clinical Logic Marketing Brochure (targeted at ClaimFacts customers) at MCK 034224 ("**An Expert Knowledge-based System** . . . ClinicaLogic is backed by a staff of board-certified physicians [whose] expertise forms the medical logic and review criteria database, the core of ClinicaLogic. This expert knowledge database is updated regularly as medical criteria change, making ClinicaLogic the most comprehensive claims editor available today.")<br><br>ClaimFacts ClinicaLogic System Overview (January 2004) at TRZ 092356 ("**Team of Specialists** the medical database that forms the core of ClinicaLogic [has] over 90,000 clinical rules for claim checking. These rules apply to surgical, laboratory, radiological, anesthesia and other medical procedures as well as to diagnoses. Each rule for a procedure includes medical data that indicate either an appropriate way to adjudicate the procedure or a proper relationship between the procedure and information such as the patient's age and sex.")<br><br>30(b)(6) deposition of Karen Lampe<br><br>Deposition of Harrington Benefits | TriZetto Product Announcement, Introduction of ClinicaLogic Module in QicLink (March 2002) at TRZ 277700 ("the *medical database* that forms the core of ClinicaLogic . . . [b]ased on [] collective medical knowledge and extensive claim checking experience [contains] over 90,000 clinical rules for claim checking. These rules apply to surgical, laboratory, radiological, anesthesia and other medical procedures as well as to diagnoses.")<br><br>30(b)(6) deposition of John Danza |

| CLAIM | FACETS | CLAIMFACTS | QICLINK |
|---|---|---|---|
| 10. A computer system including a central processing unit and associated computers to high performance relational database servers …; | Facets Product Overview (Spr 1996) at MCK 002312 ("*Facets* uses … the client/server platform, which links individual personal computers to high performance relational database servers …").

Deposition of Providence Health Plan | Erisco ClaimFacts Marketing Brochure at TRZ 032141 ("You can implement ClaimFacts in one of two ways. … You can either implement the software at your site, or subscribe to remote service. … If you choose to license ClaimFacts, our professional support staff will work with you to implement the system on your IBM or equivalent hardware.")

30(b)(6) deposition of Karen Lampe | TriZetto Product Announcement: Introduction of ClinicaLogic Module in QicLink (March 2002) at TRZ 277700-01 ("Since the claim editing logic is embedded within the [QicLink] Claims Adjudication program …") |
| a predetermined memory for processing input claims containing at least one medical service claim, comprising: | | Deposition of Harrington Benefits | |
| a set of database stored in the associated memory, the database containing medical service codes and relationships among the medical service codes defining whether selected ones of the medical service codes are valid when received with other selected ones of the medical service codes; | Facets Product Overview (Spr 1996) at MCK 002352 (figure with "Facets Client" connected to "*DBMS*")

Facets Product Overview (Spr 1996) at MCK 002312 ("*Facets* uses … the client/server platform, which links individual personal computers to high performance relational database servers …").

Facets Product Overview (Spr 1996) at MCK 002319 ("Clinical Facts … Every claim you process is automatically edited by Erisco's proprietary clinical editing software, with tens of thousands of clinical rules and recommendations. … *Facets* clinical editing clearly identifies potential problems, such as unbundled surgical procedures, claims billed incorrectly due to coding errors, unacceptable procedures and potentially fraudulent information. It also checks for invalid data relationships (like an inconsistency between diagnosis and procedure codes) and patterns of outpatient and inpatient utilization that deviate from the accepted standards of clinical practice.")

Erisco Facets Overview (webpage) at MCK 002308 ("Clinical Claims Audit. Facets automatically edits every claim that you process with *Erisco's proprietary clinical editing software, with tens of thousands of clinical rules and recommendations.* This allows you to identify billing problems and eliminate significant overpayment of claims, and to consistently catch fraudulent, erroneous or inconsistent billing practices, a significant factor in | Erisco ClaimFacts Marketing Brochure at TRZ 032143 ("**Intelligent Processing** … ClinicaLogic is backed by an expert staff of board-certified physicians. Their combined clinical experience forms an *expert-knowledge database,* updated regularly as *medical criteria* change.")

Erisco ClaimFacts Marketing Brochure (targeted at ClaimFacts customers) at MCK 034224 ("**An Expert Knowledge-based System** … ClinicaLogic is backed by a staff of board-certified physicians [whose] expertise forms the medical logic and review criteria database, the core of ClinicaLogic. This expert knowledge database is updated regularly as medical criteria change, making ClinicaLogic the most comprehensive claims editor available today.")

ClaimFacts ClinicaLogic System Overview (January 2004) at TRZ 092356 ("**Team of Specialists** the medical database that forms the core of ClinicaLogic [has] over 90,000 clinical rules for claim checking. These rules apply to surgical, laboratory, radiological, anesthesia and other medical procedures as well as to diagnoses. Each rule for a procedure includes medical data that indicate either an appropriate way to adjudicate the procedure or a proper relationship between the procedure and information such as the patient's age and sex.") | TriZetto Product Announcement: Introduction of ClinicaLogic Module in QicLink (March 2002) at TRZ 277700 ("the *medical database* that forms the core of ClinicaLogic … [b]ased on [] collective medical knowledge and extensive claim checking experience [contains] over 90,000 clinical rules for claim checking. These rules apply to surgical, laboratory, radiological, anesthesia and other medical procedures as well as to diagnoses.")

30(b)(6) deposition of John Danza |

15

| means for receiving at least one claim; | cost containment'")<br><br>Deposition of Providence Health Plan<br><br>M<sup>c</sup>Plan Provider Perspective (Spr 2004) at MCK 002355 ("the PACE clinical editing system ... will encompass a comprehensive set of clinical claims editing criteria that will allow for the evaluation of medical billing information and CPT coding accuracy'")<br><br>**Facets Product Overview** (Spr 1996) at MCK 002316 ("**Claims Processing** ... Claims processing utilizes diagnosis codes and procedure codes to read *service based rules* ...") | Deposition of Providence Health Plan<br><br>M<sup>c</sup>Plan Provider Perspective (Spr 2004) at MCK 002355 ("the PACE clinical editing system ... will be implemented on claims with dates of service beginning May 1, 2004")<br><br>**Facets Product Overview** (Spr 1996) at MCK 002316 ("**Claims Entry** Claims can be entered online or electronically via proprietary format or the industry standard ... .")<br><br>Erisco Facets Overview (webpage) at MCK 002308 ("**Clinical Claims Audit** Facets automatically edits every claim that you process with Erisco's proprietary clinical editing software ...") | 30(b)(6) deposition of Karen Lampe<br><br>Deposition of Harrington Benefits | 30(b)(6) deposition of Karen Lampe<br><br>Deposition of Harrington Benefits<br><br>Erisco ClinicalLogic Marketing Brochure (targeted at ClaimFacts customers) at MCK 034224 ("**A Flexible, Integrated Solution** ... With ClinicalLogic you can screen existing claims data instantly as they are entered online or batch processed ... **How ClinicalLogic Works** When a claim is entered, ClinicalLogic compares ...")<br><br>ClaimFacts ClinicalLogic System Overview (January 2004) at TRZ 092364 ("**How ClinicalLogic Operates** Claims entered to ClaimFacts are first examined ...")<br><br>Erisco ClaimFacts Marketing Brochure at TRZ 032143 ("***Intelligent Processing*** ... Clinical Logic is ClaimFacts' integrated medical claim editor. It automatically examines each claim instantly on-line, as it is processed.")<br><br>Id. ("Duplicate work is eliminated because you only have to enter date once. ClaimFacts automatically captures and stores original and medical edit information as it is entered on-line.") | TriZetto Product Announcement: Introduction of ClinicalLogic Module in QicLink (March 2002) at TRZ 277699 ("ClinicalLogic is a comprehensive, knowledge-based module designed to automatically check medical claims *before payment*. ... ClinicalLogic ... checks claims as they are entered manually on-line or in batch mode ...")<br><br>ClinicalLogic User Guide (2004) at TRZ 154738 ("ClinicalLogic runs seamlessly with QicLink claim processing by verifying claim data as it is entered.")<br><br>30(b)(6) deposition of John Danza |
| means for | M<sup>c</sup>Plan Provider Perspective (Spr 2004) at MCK 002355 ("The | Deposition of Providence Health Plan | | 30(b)(6) deposition of Karen Lampe<br><br>Deposition of Harrington Benefits<br><br>Erisco ClinicalLogic Marketing Brochure (targeted at | TriZetto Product Announcement: Introduction of |

| Claim Language | | | | | |
|---|---|---|---|---|---|
| ascertaining whether the at least one claim contains a plurality of medical service codes; | PACE clinical editing system is designed to detect . . . **Unbundling/Rebunding** – Billing under several CPT codes . . . .")<br><br>Deposition of Providence Health Plan | ClaimFacts customers) at MCK 004812 ("When a claim is entered, ClinicaLogic compares procedure codes from multiple services, flagging potential problems.")<br><br>30(b)(6) deposition of Karen Lampe<br><br>Deposition of Harrington Benefits | ClaimFacts customers) at MCK 004812 ("ClinicaLogic corrects unbundling . . . For example, an obstetrician may bill separately for prenatal care and delivery and post-partum care. ClinicaLogic detects and properly combines these codes as one, less costly, comprehensive procedure for complete obstetrical care. This leads to substantial savings.")<br><br>30(b)(6) deposition of John Danza | ClinicaLogic Module in QicLink (March 2002) at TRZ 277699 ("ClinicaLogic . . . checks claims as they are entered manually on-line or in batch mode . . . to identify; "unbundled" procedures (i.e., procedures covered by one comprehensive CPT/HCPCS procedure code that are itemized on the provider's bill, possibly resulting in an overstatement of charges.") | TriZetto Product Announcement: Introduction of ClinicaLogic Module in QicLink (March 2002) at TRZ 277699 ("ClinicaLogic . . . checks claims as they are entered manually on-line or in batch mode . . . to identify; "unbundled" procedures (i.e., procedures covered by one comprehensive CPT/HCPCS procedure code that are itemized on the provider's bill, possibly resulting in an overstatement of charges.")<br><br>30(b)(6) deposition of John Danza |
| means for determining whether one of the medical service codes in the at least one claim is included in any other medical service code in the at least one claim; | Facets Product Overview (Spr 1996) at MCK 002319 ("Clinical Edits *Facets* clinical editing clearly identifies potential problems, such as . . .")<br><br>Deposition of Providence Health Plan | Deposition of Harrington Benefits | ClaimFacts ClinicaLogic System Overview (January 2004) at TRZ 092354-55 ("**ClaimFacts ClinicaLogic Subsystem** [ClinicaLogic] checks claims as they are entered on-line or in batch mode to identify: . . . "unbundled" procedures (i.e., procedures covered by one comprehensive CPT/HCPCS procedure code that are itemized on the provider's bill, possibly resulting in an overstatement of charges.")<br><br>30(b)(6) deposition of Karen Lampe | | 30(b)(6) deposition of John Danza |
| means for authorizing medical service codes which are not contained in any other medical service code; and | McKlan Provider Perspective (Spr 2004) at MCK 002355 ("The PACE clinical editing system is designed to detect irregularities in medical billings, such as: . . . **Unbundling/Rebundling** – Billing under several CPT codes that should be combined under a single charge.")<br><br>Deposition of Providence Health Plan | Erisco Clinical Logic Marketing Brochure (targeted at ClaimFacts customers) at MCK 034224 ("**How ClinicaLogic Works** . . . As ClinicaLogic detects inconsistencies online, it displays clear instructions on the Claims Processing Screen, *enabling the examiner to make appropriate decisions. An edit may be accepted or* override, or the original claim may be pended for review.")<br><br>Deposition of Harrington Benefits<br><br>ClaimFacts ClinicaLogic System Overview (January 2004) | Deposition of Karen Lampe | | TriZetto Product Announcement: Introduction of ClinicaLogic Module in QicLink (March 2002) at TRZ 277700 ("Some edits detect and, in certain situations, automatically correct commonly encountered coding errors. Other edits identify potential improprieties regarding claim procedures and diagnoses. ClinicaLogic's flexibility allows the user to utilize any or all of the edits. . . ")<br><br>30(b)(6) deposition of John Danza |
|  | Erisco Facets Overview at MCK 002308 ("**Clinical Claims Audit** — Facets *automatically edits every claim that you process with* Erisco's proprietary clinical editing software, with tens of thousands of clinical rules and recommendations. *This allows you to identify billing problems and eliminate significant overpayment of claims, and to consistently catch fraudulent, erroneous or inconsistent* billing practices, a significant factor in cost containment.") | | | | |

| CLAIM | FACTS | CLAIMFACTS | QICLINK |
|---|---|---|---|
| | | at TRZ 092364 ("**How ClinicaLogic Operates** As ClinicaLogic detects inconsistencies and billing problems on-line, clear instructions will display on the claims processing screen, enabling the examiner to make the appropriate decisions. Claim examiners will have the capability to *accept* the claim for payment, override edits on any or all of the line items or pend the claim for review.")<br><br>30(b)(6) deposition of Karen Lampe<br><br>Deposition of Harrington Benefits | Ericso ClinicaLogic Marketing Brochure (targeted at ClaimFacts customers) at MCK 034224 ("**How ClinicaLogic Works** . . . As ClinicaLogic detects inconsistencies online, it displays clear instructions on the Claims Processing Screen, *enabling the examiner to make appropriate decisions. An edit may be accepted or overridden*, or the original claim may be pended for review.")<br><br>ClaimFacts ClinicaLogic System Overview (January 2004) at TRZ 092364 ("**How ClinicaLogic Operates** As ClinicaLogic detects inconsistencies and billing problems on-line, clear instructions will display on the claims processing screen, enabling the examiner to make the appropriate decisions. Claim examiners will have the capability to accept the claim for payment, *override* edits on any or all of the line items or pend the claim for review.")<br><br>30(b)(6) deposition of Karen Lampe<br><br>Deposition of Harrington Benefits | TriZetto Product Announcement: Introduction of ClinicaLogic Module in QicLink (March 2002) at TRZ 277700 ("Some edits detect and, in certain situations, automatically correct commonly encountered coding errors. Other edits identify potential improprieties regarding claim procedures and diagnoses. ClinicaLogic's flexibility allows the user to utilize any or all of the edits. . .")<br><br>30(b)(6) deposition of John Danza |
| **11.** The apparatus of claim 10, further | Faces Product Overview (Spr 1996) at MCK 002319 ("**Clinical Edits** Every claim you process is automatically edited by Ericso's proprietary clinical editing software . . .") | | |
| means for rejecting medical service codes which are contained in any other medical service code. | Ericso Faces Overview at MCK 002308 ("**Clinical Claims Audit** Faces *automatically edits every claim that you process* with Ericso's proprietary clinical editing software, with tens of thousands of clinical rules and recommendations. *This allows you to identify billing problems and eliminate significant overpayment of claims, and to consistently catch fraudulent, erroneous or inconsistent* billing practices, a significant factor in cost containment.")<br><br>Deposition of Providence Health Plan | | |

| CLAIM | FACETS | CLAIMFACTS | QICLINK |
|---|---|---|---|
| comprising means for revising the at least one claim to not include a rejected medical service code. | Deposition of Providence Health Plan | inconsistencies online, it displays clear instructions on the Claims Processing Screen, *enabling the examiner to make appropriate decisions. An edit may be accepted or overridden, or the original claim may be pended for review.* If you accept the edit, ClaimFacts stores the original and edited claim in the Claim File to establish a complete audit trail, as ClaimFacts adjudicates the corrected claim. If you override the edit, ClaimFacts stores the suggested correction data for reporting purposes.") <br><br> 30(b)(6) deposition of Karen Lampe <br><br> Deposition of Harrington Benefits <br><br> ClaimFacts ClinicaLogic System Overview (January 2004) at TRZ 092364 ("**How ClinicaLogic Operates** As ClinicaLogic detects inconsistencies and billing problems on-line, clear instructions will display on the claims processing screen, enabling the examiner to make the appropriate decisions. Claim examiners will have the capability to *accept* the claim for payment, override edits on any or all of the line items or pend the claim for review.") <br><br> 30(b)(6) deposition of John Danza | automatically correct commonly encountered coding errors. Other edits identify potential improprieties regarding claim procedures and diagnoses. ClinicaLogic's flexibility allows the user to utilize any or all of the edits....") <br><br> 30(b)(6) deposition of John Danza |
| 12. A computer system including a central processing unit and associated memory for processing input claims containing at least one medical service code, comprising: a predetermined database stored in | Facets Product Overview (Spr 1996) at MCK 002312 ("*Facets* uses ... the client/server platform, which links individual personal computers to high performance relational database servers ... "). <br><br> Deposition of Providence Health Plan <br><br> Deposition of Craig Luftig <br><br> 30(b)(6) deposition of Karen Lampe <br><br> Deposition of Harrington Benefits <br><br> Erisco's Facets and Healthweb at MCK 002352 (figure with "Facets Client" connected to "*DBMS*") | Erisco ClaimFacts Marketing Brochure at TRZ 032141 ("You can implement ClaimFacts in one of two ways.... You can either implement the software at your site, or subscribe to remote service.... If you choose to license ClaimFacts, our professional support staff will work with you to implement the system on your IBM or equivalent hardware.") <br><br> Deposition of Harrington Benefits <br><br> 30(b)(6) deposition of Karen Lampe <br><br> Erisco ClaimFacts Marketing Brochure at TRZ 032143 ("*Intelligent Processing* ... ClaimFacts is backed by an | TriZetto Product Announcement: Introduction of ClinicaLogic Module in QicLink (March 2002) at TRZ 277700-01 ("Since the claim editing logic is embedded within the [QicLink] Claims Adjudication program ...") <br><br> TriZetto Product Announcement: Introduction of ClinicaLogic Module in QicLink (March 2002) at TRZ |

19

| | | | |
|---|---|---|---|
| the associated memory, the database containing medical service codes and a set of relationships among the medical service codes defining whether selected ones of the medical service codes are valid when received with other selected ones of the medical service codes; | Facets Product Overview (Spr 1996) at MCK 002312 ("*Facets* uses ... the client/server platform, which links individual personal computers to high performance relational database servers ...."). Facets Product Overview (Spr 1996) at MCK 002319 ("**Clinical Edits** Every claim you process is automatically edited by Erisco's proprietary clinical editing software, with tens of thousands of clinical rules and recommendations. ... *Facets* clinical editing clearly identifies potential problems, such as unbundled surgical procedures, claims billed incorrectly due to coding errors, unacceptable procedures and potentially fraudulent information. It also checks for invalid data relationships (like an inconsistency between diagnosis and procedure codes) and patterns of outpatient and inpatient utilization that deviate from the accepted standards of clinical practice.") Erisco Facets Overview (webpage) at MCK 002308 ("**Clinical Claims Audit** Facets automatically edits every claim that you process with *Erisco's proprietary clinical editing software, with tens of thousands of clinical rules and recommendations.* This allows you to identify billing problems and eliminate significant overpayment of claims, and to consistently catch fraudulent, erroneous or inconsistent billing practices, a significant factor in cost containment.") Facets Product Overview (Spr 1996) at MCK 002316 ("**Claims Processing** ... Claims processing utilizes diagnosis codes and procedure codes to read *service based rules* ....") M²Plan Provider Perspective (Spr 2004) at MCK 002355 ("the PACE clinical editing system ... will encompass a comprehensive set of clinical claims editing criteria that will allow for the evaluation of medical billing information and CPT coding accuracy.") Deposition of Providence Health Plan Deposition of Craig Luftig | expert staff of board-certified physicians. Their combined clinical experience forms an *expert-knowledge database*, updated regularly as *medical criteria change*.") Erisco ClinicaLogic Marketing Brochure (targeted at ClaimFacts customers) at MCK 034224 ("**An Expert Knowledge-based System** . . . ClinicaLogic is backed by a staff of board-certified physicians [whose] expertise forms the medical logic and review criteria database, the core of ClinicaLogic. This expert knowledge database is updated regularly as medical criteria change, making ClinicaLogic the most comprehensive claims editor available today.") ClaimFacts ClinicaLogic System Overview (January 2004) at TRZ 092356 ("**Team of Specialists** the medical database that forms the core of ClinicaLogic [has] over 90,000 clinical rules for claim checking. These rules apply to surgical, laboratory, radiological, anesthesia and other medical procedures as well as to diagnoses. Each rule for a procedure includes medical data that indicate either an appropriate way to adjudicate the procedure or a proper relationship between the procedure and information such as the patient's age and sex.") 30(b)(6) deposition of Karen Lampe | 277700 ("the *medical database* that forms the core of ClinicaLogic. . . . [b]ased on [] collective medical knowledge and extensive claim checking experience [contains] over 90,000 clinical rules for claim checking. These rules apply to surgical, laboratory, radiological, anesthesia and other medical procedures as well as to diagnoses.") Deposition of Harrington Benefits |

20

| | | | |
|---|---|---|---|
| means for receiving at least one claim; | Ericsco Facets Overview (webpage) at MCK 002308 ("**Clinical Claims Audit** Facets automatically edits every claim that you process with Ericsco's proprietary clinical editing software ....")<br><br>Facets Product Overview (Spr 1996) at MCK 002316 ("**Claims Entry** Claims can be entered online or electronically via proprietary format or the industry standard. ...").<br><br>Deposition of Providence Health Plan<br><br>Deposition of Craig Luftig | Ericsco ClaimFacts Marketing Brochure at TRZ 032143 ("***Intelligent Processing*** . . . Clinical Logic is ClaimFacts' integrated medical claim editor. It automatically examines each claim instantly on-line, as it is processed.")<br><br>*Id.* ("Duplicate work is eliminated because you only have to enter data once. ClaimFacts automatically captures and stores original and medical edit information as it is entered on-line.") | TriZetto Product Announcement: Introduction of ClinicaLogic Module in QicLink (March 2002) at TRZ 277699 ("ClinicaLogic is a comprehensive, knowledge-based module designed to automatically check medical claims *before payment*. . . . ClinicaLogic . . . checks claims as they are entered manually on-line or in batch mode . . .")<br><br>ClinicaLogic User Guide (2004) at TRZ 154738 ("ClinicaLogic runs seamlessly with QicLink claim processing by verifying claim data as it is entered") |
| means for ascertaining whether the at least one claim contains a plurality of medical service codes; | McPlan Provider Perspective (Spr 2004) at MCK 002355 ("the PACE clinical editing system ... will be implemented on claims with dates of service beginning May 1, 2004")<br><br>Deposition of Providence Health Plan<br><br>Deposition of Craig Luftig | Ericsco ClinicaLogic Marketing Brochure (targeted at ClaimFacts customers) at MCK 034224 ("**A Flexible, Integrated Solution** . . . With ClinicaLogic you can screen existing claims data instantly as they are entered online or batch-processed. . . . **How ClinicaLogic Works** When a claim is entered, ClinicaLogic compares . . .")<br><br>ClaimFacts ClinicaLogic System Overview (January 2004) at TRZ 092364 ("**How ClinicaLogic Operates** Claims entered to ClaimFacts are first examined . . .")<br><br>30(b)(6) deposition of Karen Lampe | TriZetto Product Announcement: Introduction of ClinicaLogic Module in QicLink (March 2002) at TRZ 277699 ("ClinicaLogic . . . checks claims as they are entered manually on-line or in batch mode . . . to identify; 'unbundled' procedures (i.e., procedures covered by one comprehensive CPT/HCPCS procedure code that are itemized on the provider's bill, possibly resulting in an overstatement of charges)") |
| means for determining whether one of the | Facets Product Overview (Spr 1996) at MCK 002319 ("**Clinical Edits** *Facets* clinical editing clearly identifies potential problems, such as unbundled surgical procedures ....")<br><br>Deposition of Providence Health Plan<br><br>Facets Product Overview (Spr 1996) at MCK 002319 ("**Clinical Edits** Every claim you process is automatically edited by Ericsco's proprietary clinical editing software, with tens of thousands of | McPlan Provider Perspective (Spr 2004) at MCK 002355 ("The PACE clinical editing system is designed to detect ... **Unbundling/Rebundling** – Billing under several CPT codes. ...")<br><br>Deposition of Harrington Benefits<br><br>30(b)(6) deposition of Karen Lampe<br><br>Deposition of Harrington Benefits<br><br>ClaimFacts ClinicaLogic System Overview (January 2004) at TRZ 092354-55 ("**ClaimFacts ClinicaLogic Subsystem** [ClinicaLogic] checks claims as they are entered on-line or | TriZetto Product Announcement: Introduction of ClinicaLogic Module in QicLink (March 2002) at TRZ 277699 ("ClinicaLogic Module in QicLink . . . checks claims as they are |

| medical service codes in the at least one claim is medically exclusive with any other medical service code in the at least one claim; | clinical rules and recommendations. . . . *Facets* clinical editing clearly identifies potential problems, such as unbundled surgical procedures, claims billed incorrectly due to coding errors, unacceptable procedures and potentially fraudulent information."")<br><br>Deposition of Providence Health Plan<br><br>Deposition of Craig Luftig | Erisco Facets Overview at MCK 002308 ("**Clinical Claims Audit** . . . Erisco's proprietary clinical editing software, with tens of thousands of clinical rules and recommendations. This allows you to identify *billing problems and eliminate significant overpayment of claims,* and to consistently catch fraudulent, erroneous or inconsistent billing practices, a significant factor in cost containment.")<br><br>Deposition of Providence Health Plan<br><br>Deposition of Craig Luftig | in batch mode to identify: . . . "unbundled" procedures (i.e., "unbundled" procedures (i.e., procedures covered by one comprehensive CPT/HCPCS procedure code that are itemized on the provider's bill, possibly resulting in an overstatement of charges; CPT/HCPCS procedure coding errors or invalid data relationship (e.g., the procedure is inconsistent with the patient's sex); . . . anesthesia services that *are not* applicable to specific surgical procedures; . . . patterns of outpatient and inpatient utilization deviating from common standards of clinical practice; . . . diagnoses that may be inappropriate for the sex and/or age of the patient, or that may require case management.")<br><br>30(b)(6) deposition of Karen Lampe<br><br>Deposition of Harrington Benefits | Erisco Clinical Logic Marketing Brochure (targeted at ClaimFacts customers) at MCK 034224 ("**How ClinicaLogic Works** . . . As ClinicaLogic detects inconsistencies online, it displays clear instructions on the Claims Processing Screen, *enabling the examiner to make appropriate decisions. An edit may be accepted or overridden, or the original claim may be pended for review.*")<br><br>ClaimFacts ClinicaLogic System Overview (January 2004) at TRZ 092364 ("**How ClinicaLogic Operates**  As ClinicaLogic detects inconsistencies and billing problems on-line, clear instructions will display on the claims processing screen, enabling the examiner to make the appropriate decisions. Claim examiners will have the capability to *accept* the claim for payment, override edits on any or all of the line items or pend the claim for review.")<br><br>30(b)(6) deposition of Karen Lampe<br><br>Deposition of Harrington Benefits | entered manually on-line or in batch mode . . . to identify; "unbundled" procedures (i.e., procedures covered by one comprehensive CPT/HCPCS procedure code that are itemized on the provider's bill, possibly resulting in an overstatement of charges); CPT/HCPCS procedure coding errors or invalid data relationship (e.g., the procedure is inconsistent with the patient's sex); . . . anesthesia services that *are not* applicable to specific surgical procedures; . . . patterns of outpatient and inpatient utilization deviating from common standards of clinical practice; . . . diagnoses that may be inappropriate for the sex and/or age of the patient, or that may require case management.")<br><br>TriZetto Product Announcement: Introduction of ClinicaLogic Module in QicLink (March 2002) at TRZ 277700 ("Some edits detect and, in certain situations, automatically correct commonly encountered coding errors. Other edits identify potential improprieties regarding claim procedures and diagnoses. ClinicaLogic's flexibility allows the user to utilize any or all of the edits. . . .") |
|---|---|---|---|---|---|
| means for authorizing medical service codes which are not medically exclusive with any other medical service code contained in the at least one claim in response to the means for determining; and | Deposition of Providence Health Plan<br><br>Deposition of Craig Luftig | *Facets automatically edits every claim that you process* with billing problems and eliminate significant overpayment of claims. *This allows you to identify billing problems and eliminate significant overpayment of claims,* and to consistently catch fraudulent, erroneous or inconsistent billing practices, a significant factor in cost containment.")<br><br>Deposition of Providence Health Plan<br><br>Deposition of Craig Luftig<br><br>Deposition of Harrington Benefits | CPT/HCPCS procedure coding errors or invalid data relationship (e.g., the procedure is inconsistent with the patient's sex); . . . anesthesia services that *are not* applicable to specific surgical procedures; . . . patterns of outpatient and inpatient utilization deviating from common standards of clinical practice; . . . diagnoses that may be inappropriate for the sex and/or age of the patient, or that may require case management.")<br><br>30(b)(6) deposition of Karen Lampe | *enabling the examiner to make appropriate decisions. An edit may be accepted or overridden, or the original claim may be pended for review.*")<br><br>ClaimFacts ClinicaLogic System Overview (January 2004) at TRZ 092364 ("**How ClinicaLogic Operates**  As ClinicaLogic detects inconsistencies and billing problems on-line, clear instructions will display on the claims processing screen, enabling the examiner to make the appropriate decisions. Claim examiners will have the capability to *accept* the claim for payment, override edits on any or all of the line items or pend the claim for review.")<br><br>30(b)(6) deposition of Karen Lampe<br><br>Deposition of Harrington Benefits | oversatement of charges); CPT/HCPCS procedure coding errors or invalid data relationship (e.g., the procedure is inconsistent with the patient's sex); . . . anesthesia services that *are not* applicable to specific surgical procedures; . . . patterns of outpatient and inpatient utilization deviating from common standards of clinical practice; . . . diagnoses that may be inappropriate for the sex and/or age of the patient, or that may require case management.") |
| means for | Erisco Facets Overview at MCK 002308 ("Clinical Claims Audit | Deposition of Harrington Benefits | 30(b)(6) deposition of Karen Lampe<br><br>Deposition of Harrington Benefits | Erisco Clinical Logic Marketing Brochure (targeted at | TriZetto Product Announcement: Introduction of |

| CLAIM | FACETS | CLAIMFACTS | QIC LINK |
|---|---|---|---|
| rejecting medical service codes which are medically exclusive with any other medical service codes contained in the at least one claim in response to the determining step. | Facets *automatically edits every claim that you process* with Erisco's proprietary clinical editing software, with tens of thousands of clinical rules and recommendations. *This allows you to identify billing problems and eliminate significant overpayment of claims*, and to consistently catch fraudulent, erroneous or inconsistent billing practices, a significant factor in cost containment.")<br><br>Deposition of Providence Health Plan<br><br>Deposition of Craig Luftig | ClaimFacts customers) at MCK 034224 ("How **ClinicalLogic Works** . . . As ClinicalLogic detects inconsistencies online, it displays clear instructions on the Claims Processing Screen, *enabling the examiner to make appropriate decisions. An edit may be accepted or overridden*, or the original claim may be pended for review.")<br><br>ClaimFacts ClinicalLogic System Overview (January 2004) at TRZ 092364 ("**How ClinicalLogic Operates** As ClinicalLogic detects inconsistencies and billing problems on-line, clear instructions will display on the claims processing screen, enabling the examiner to make the appropriate decisions. Claim examiners will have the capability to accept the claim for payment, *override* edits on any or all of the line items or pend the claim for review.")<br><br>30(b)(6) deposition of Karen Lampe<br><br>Deposition of Harrington Benefits | ClinicalLogic Module in QicLink (March 2002) at TRZ 277700 ("Some edits detect and, in certain situations, automatically correct commonly encountered coding errors. Other edits identify potential improprieties regarding claim procedures and diagnoses. ClinicalLogic's flexibility allows the user to utilize any or all of the edits . . .") |
| **CLAIM** | **FACETS** | **CLAIMFACTS** | **QICLINK** |
| 13. A computer system including a central processing unit and associated memory for processing input claims containing at least one medical service code, comprising: | Facets Product Overview (Spr 1996) at MCK 002312 ("*Facets* uses . . . the client/server platform, which links individual personal computers to high performance relational database servers . . .").<br><br>Deposition of Providence Health Plan<br><br>Deposition of Craig Luftig | Erisco ClaimFacts Marketing Brochure at TRZ 032141 ("You can implement ClaimFacts in one of two ways, . . . You can either implement the software at your site, or subscribe to remote service. . . . If you choose to license ClaimFacts, our professional support staff will work with you to implement the system on your IBM or equivalent hardware.")<br><br>30(b)(6) deposition of Karen Lampe | TriZetto Product Announcement: Introduction of ClinicalLogic Module in QicLink (March 2002) at TRZ 277700-01 ("Since the claim editing logic is embedded within the [QicLink] Claims Adjudication program . . .")<br><br>30(b)(6) deposition of John Danza |
| a predetermined database stored in | Erisco's Facets and Healthweb at MCK 002352 (figure with "Facets Client" connected to "*DBMS*" | Erisco ClaimFacts Marketing Brochure at TRZ 032143 ("*Intelligent Processing* . . . ClinicalLogic is backed by an | TriZetto Product Announcement: Introduction of ClinicalLogic Module in QicLink (March 2002) at TRZ |

23

| | | | |
|---|---|---|---|
| the associated memory, the database containing medical service codes and a set of relationships among the medical service codes defining whether selected ones of the medical service codes are valid when received with other selected ones of the medical service codes; | Facets Product Overview (Spr 1996) at MCK 002312 ("Facets uses ... the client/server platform, which links individual personal computers to high performance relational database servers ....")<br><br>Facets Product Overview (Spr 1996) at MCK 002319 ("Clinical Edits Every claim you process is automatically edited by Erisco's proprietary clinical editing software, with tens of thousands of clinical rules and recommendations. ... Facets clinical editing clearly identifies potential problems, such as unbundled surgical procedures, claims billed incorrectly due to coding errors, unacceptable procedures and potentially fraudulent information. It also checks for invalid data relationships (like an inconsistency between diagnosis and procedure codes) and patterns of outpatient and inpatient utilization that deviate from the accepted standards of clinical practice.")<br><br>Erisco Facets Overview (webpage) at MCK 002308 ("**Clinical Claims Audit** Facets automatically edits every claim that you process with *Erisco's proprietary clinical editing software, with tens of thousands of clinical rules and recommendations.* This allows you to identify billing problems and eliminate significant overpayment of claims, and to consistently catch fraudulent, erroneous or inconsistent billing practices, a significant factor in cost containment.")<br><br>Facets Product Overview (Spr 1996) at MCK 002316 ("**Claims Processing.** ... Claims processing utilizes diagnosis codes and procedure codes to read *service based rules* ....")<br><br>M*Plan Provider Perspective (Spr 2004) at MCK 002355 ("the PACE clinical editing system ... will encompass a comprehensive set of clinical claims editing criteria that will allow for a evaluation of medical billing information and CPT coding accuracy.")<br><br>Deposition of Providence Health Plan<br><br>Deposition of Craig Luftig | expert staff of board-certified physicians. Their combined clinical experience forms an *expert-knowledge database*, updated regularly as *medical criteria change*.")<br><br>Erisco ClinicaLogic Marketing Brochure (targeted at ClaimFacts customers) at MCK 034224 ("**An Expert Knowledge-based System.** ... ClinicaLogic is backed by a staff of board-certified physicians [whose] expertise forms the medical logic and review criteria database, the core of ClinicaLogic. This expert knowledge database is updated regularly as medical criteria change, making ClinicaLogic the most comprehensive claims editor available today.")<br><br>ClaimFacts ClinicaLogic System Overview (January 2004) at TR2 092356 ("**Team of Specialists** the medical database that forms the core of ClinicaLogic [has] over 90,000 clinical rules for claim checking. These rules apply to surgical, laboratory, radiological, anesthesia and other medical procedures as well as to diagnoses. Each rule for a procedure includes medical data that indicate either an appropriate way to adjudicate the procedure or a proper relationship between the procedure and information such as the patient's age and sex.")<br><br>30(b)(6) deposition of Karen Lampe<br><br>Deposition of Harrington Benefits | 277/00 ("the *medical database* that forms the core of ClinicaLogic. ... [b]ased on [] collective medical knowledge and extensive claim checking experience [contains] over 90,000 clinical rules for claim checking. These rules apply to surgical, laboratory, radiological, anesthesia and other medical procedures as well as to diagnoses.")<br><br>30(b)(6) deposition of John Danza |

| means for receiving at least one claim; | Eriso Facets Overview (webpage) at MCK 002308 ("**Clinical Claims Audit** Facets automatically edits every claim that you process with Eriso's proprietary clinical editing software . . . .")<br><br>Facets Product Overview (Spr 1996) at MCK 002316 ("**Claims Entry** Claims can be entered online or electronically via proprietary format or the industry standard. . . .").<br><br>McKPlan Provider Perspective (Spr 2004) at MCK 002355 ("the PACE clinical editing system . . . will be implemented on claims with dates of service beginning May 1, 2004")<br><br>Deposition of Providence Health Plan<br><br>Deposition of Craig Luftig | Eriso ClaimFacts Marketing Brochure at TRZ 032143 ("***Intelligent Processing*** . . . ClinicalLogic is ClaimFacts' integrated medical claim editor. It automatically examines each claim instantly on-line, as it is processed.")<br><br>Id. ("Duplicate work is eliminated because you only have to enter date once. ClaimFacts automatically captures and stores original and medical edit information as it is entered on-line.")<br><br>Eriso ClinicalLogic Marketing Brochure (targeted at ClaimFacts customers) at MCK 034224 ("**A Flexible, Integrated Solution** . . . With ClinicalLogic you can screen existing claims data instantly as they are entered online or batch-processed . . . **How ClinicalLogic Works** When a claim is entered, ClinicalLogic compares . . .")<br><br>ClaimFacts ClinicalLogic System Overview (January 2004) at TRZ 092364 ("**How ClinicalLogic Operates** Claims entered to ClaimFacts are first examined . . .")<br><br>300(b)(6) deposition of Karen Lampe<br><br>Deposition of Harrington Benefits | TriZetto Product Announcement: Introduction of ClinicalLogic Module in QicLink (March 2002) at TRZ 277699 ("ClinicalLogic is a comprehensive, knowledge-based module designed to automatically check medical claims *before payment*. . . . ClinicalLogic . . . checks claims as they are entered manually on-line or in batch mode . . .")<br><br>ClinicalLogic User Guide (2004) at TRZ 154738 ("ClinicalLogic runs seamlessly with QicLink claim processing by verifying claim data as it is entered.")<br><br>300(b)(6) deposition of John Danza |
| means for determining whether any medical service code contained in the at least one claim is not present in the predetermined database; and means for informing a user that a medical service code is not contained in the *codes*") | Eriso Facets Overview at MCK 002308 ("**Clinical Claims Audit** . . . This allows you to identify billing problems and eliminate significant overpayment of claims, and to consistently catch fraudulent, *erroneous* or inconsistent billing practices, a significant factor in cost containment.")<br><br>Facets Product Overview (Spr 1996) at MCK 002319 ("**Clinical Edits** . . . Facets clinical editing clearly identifies potential problems, such as unbundled surgical procedures, *claims billed incorrectly due to coding errors*, unacceptable procedures and potentially fraudulent information. . . .")<br><br>McKPlan Provider Perspective (Spr 2004) at MCK 002355 ("the PACE clinical editing system also *checks for . . . outdated or invalid coding errors*") | Eriso ClaimFacts Marketing Brochure at TRZ 032143 ("***Intelligent Processing*** . . . ClinicalLogic warns you of questionable provider fees *before* disbursement. And it corrects "unbundling," "unacceptable procedures, *coding errors* and more. It even checks for inadvertent or potentially fraudulent deviations from accepted clinical standards.")<br><br>Eriso ClaimFacts ClinicalLogic System Overview (January 2004) at TRZ 092354-55 ("**ClaimFacts ClinicalLogic Subsystem** [ClinicalLogic] checks claims as they are entered on-line or in batch mode to identify: . . . CPT/HCPCS procedure coding errors.")<br><br>Eriso ClinicalLogic Marketing Brochure (targeted at | TriZetto Product Announcement: Introduction of ClinicalLogic Module in QicLink (March 2002) at TRZ 277700 ("Some edits detect and, in certain situations, automatically correct commonly encountered coding errors. Other edits identify potential improprieties regarding claim procedures and diagnoses. ClinicalLogic's flexibility allows the user to utilize any or all of the edits. . . .") |

25

| CLAIM | FACETS | CLAIMFACTS | QICLINK |
|---|---|---|---|
| predetermined database. | Deposition of Providence Health Plan<br><br>Deposition of Craig Luftig | ClaimFacts customers) at MCK 034224 ("**How ClinicaLogic Works** . . . As ClinicaLogic detects inconsistencies online, *it displays clear instructions on the Claims Processing Screen*, enabling the examiner to make appropriate decisions. An edit may be accepted or overridden, or the original claim may be pended for review.")<br><br>30(b)(6) deposition of Harrington Benefits | 30(b)(6) deposition of John Danza |
| 14. A computer system including a central processing unit and associated memory for processing input claims containing at least one medical service code, comprising:<br><br>a predetermined database stored in memory, the associated database containing medical service codes and a set of relationships among the medical service codes defining whether selected ones of | Facets Product Overview (Spr 1996) at MCK 002312 ("*Facets* uses ... the client/server platform, which links individual personal computers to high performance relational database servers ...").<br><br>Facets Product Overview (Spr 1996) at MCK 002319 ("**Clinical Edits** Every claim you process is automatically edited by Eriso's proprietary clinical editing software, with tens of thousands of clinical rules and recommendations. ... *Facets* clinical editing clearly identifies potential problems, such as unbundled surgical procedures, claims billed incorrectly due to coding errors,<br><br>Eriso's Facets and Healthweb at MCK 002352 (figure with "Facets Client" connected to "*DBMS*")<br><br>Deposition of Harrington Benefits | Eriso ClaimFacts Marketing Brochure at TRZ 032141 ("You can implement ClaimFacts in one of two ways. ... You can either implement the software at your site, or subscribe to remote service. ... If you choose to license ClaimFacts, our professional support staff will work with you to implement the system on your IBM or equivalent hardware.")<br><br>30(b)(6) deposition of Karen Lampe<br><br>Eriso ClaimFacts Marketing Brochure at TRZ 032143 ("*Intelligent Processing* ... ClinicaLogic is backed by an expert staff of board-certified physicians. Their combined clinical experience forms an *expert-knowledge database*, updated regularly as *medical criteria change*.")<br><br>Eriso ClinicalLogic Marketing Brochure (targeted at ClaimFacts customers) at MCK 034224 ("**An Expert Knowledge-based System** ... ClinicaLogic is backed by a staff of board-certified physicians [whose] expertise forms the medical logic and review criteria database, the core of ClinicaLogic. This expert knowledge database is updated regularly as medical criteria change, making ClinicaLogic | TriZetto Product Announcement: Introduction of ClinicaLogic Module in QicLink (March 2002) at TRZ 277700-01 ("Since the claim editing logic is embedded within the [QicLink] Claims Adjudication program. ...")<br><br>30(b)(6) deposition of John Danza<br><br>TriZetto Product Announcement: Introduction of ClinicaLogic Module in QicLink (March 2002) at TRZ 277700 ("the *medical database* that forms the core of ClinicaLogic ... [b]ased on [] collective medical knowledge and extensive claim checking experience [contains] over 90,000 clinical rules for claim checking. These rules apply to surgical, laboratory, radiological, anesthesia and other medical procedures as well as to diagnoses.")<br><br>30(b)(6) deposition of John Danza |

| Claim limitation | Facets | ClinicaLogic | ClaimFacts | QicLink ClinicaLogic |
|---|---|---|---|---|
| the medical service codes are valid when received with other selected ones of the medical service codes; | unacceptable procedures and potentially fraudulent information. It also checks for invalid data relationships (like an inconsistency between diagnosis and procedure codes) and patterns of outpatient and inpatient utilization that deviate from the accepted standards of clinical practice.") <br> Erisco Facets Overview (webpage) at MCK 002308 ("**Clinical Claims Audit** Facets automatically edits every claim that you process with *Erisco's proprietary clinical editing software, with tens of thousands of clinical rules and recommendations.* This allows you to identify billing problems and eliminate significant overpayment of claims, and to consistently catch fraudulent, erroneous or inconsistent billing practices, a significant factor in cost containment.") <br> Deposition of Providence Health Plan | the most comprehensive claims editor available today.") <br> ClaimFacts ClinicaLogic System Overview (January 2004) at TRZ 092356 ("**Team of Specialists** the medical database that forms the core of ClinicaLogic [has] over 90,000 clinical rules for claim checking. These rules apply to surgical, laboratory, radiological, anesthesia and other medical procedures as well as to diagnoses. Each rule for a procedure includes medical data that indicate either an appropriate way to adjudicate the procedure or a proper relationship between the procedure and information such as the patient's age and sex.") <br> 30(b)(6) deposition of Karen Lampe | | |
| means for receiving at least one claim; | McPlan Provider Perspective (Spr 2004) at MCK 002355 ("the PACE clinical editing system ... will encompass a comprehensive set of clinical claims editing criteria that will allow for the evaluation of medical billing information and CPT coding accuracy.") <br> Facets Product Overview (Spr 1996) at MCK 002316 ("**Claims Processing** ... Claims processing utilizes diagnosis codes and procedure codes to read *service based rules* ....") <br> Erisco Facets Overview (webpage) at MCK 002308 ("**Clinical Claims Audit** Facets automatically edits every claim that you process with Erisco's proprietary clinical editing software ....") <br> McPlan Provider Perspective (Spr 2004) at MCK 002355 ("the PACE clinical editing system ... will be implemented on claims with dates of service beginning May 1, 2004") <br> Facets Product Overview (Spr 1996) at MCK 002316 ("**Claims Entry** Claims can be entered online or electronically via proprietary format or the industry standard ... "). <br> McPlan Provider Perspective (Spr 2004) at MCK 002355 ("the PACE clinical editing system ... will be implemented on claims with dates of service beginning May 1, 2004") <br> Deposition of Providence Health Plan | Deposition of Harrington Benefits | Erisco ClaimFacts Marketing Brochure at TRZ 032143 ("**Intelligent Processing** ... Clinical Logic is ClaimFacts' integrated medical claim editor. It automatically examines each claim instantly on-line, as it is processed.") <br> Id. ("Duplicate work is eliminated because you only have to enter date once. ClaimFacts automatically captures and stores original and medical edit information as it is entered on-line.") <br> Erisco ClinicaLogic Marketing Brochure at MCK 034224 ("**A Flexible, Integrated Solution** ... With ClinicaLogic you can screen | TriZeto Product Announcement: Introduction of ClinicaLogic Module in QicLink (March 2002) at TRZ 277699 ("ClinicaLogic is a comprehensive, knowledge-based module designed to automatically check medical claims *before payment.* ... ClinicaLogic ... checks claims as they are entered manually on-line or in batch mode ... ") <br> ClinicaLogic User Guide (2004) at TRZ 154738 ("ClinicaLogic runs seamlessly with QicLink claim processing by verifying claim data as it is entered.") <br> 30(b)(6) deposition of John Danza |

| | | | |
|---|---|---|---|
| **means for ascertaining whether the at least one claim contains a plurality of medical service codes;** | M*Plan Provider Perspective (Spr 2004) at MCK 002355 ("The PACE clinical editing system is designed to detect . . . **Unbundling/Rebundling** – Billing under several CPT codes . . . .")<br><br>Facets Product Overview (Spr 1996) at MCK 002319 ("**Clinical Edits** *Facets* clinical editing clearly identifies potential problems, such as unbundled surgical procedures . . . .")<br><br>Deposition of Providence Health Plan | existing claims data instantly as they are entered online or batch-processed . . . . **How ClinicaLogic Works** When a claim is entered, ClinicaLogic compares . . . .")<br><br>ClaimFacts ClinicaLogic System Overview (January 2004) at TRZ 092364 ("**How ClinicaLogic Operates** Claims entered to ClaimFacts are first examined . . . .")<br><br>30(b)(6) deposition of Karen Lampe<br><br>Deposition of Harrington Benefits<br><br>Erisco ClinicaLogic Marketing Brochure (targeted at ClaimFacts customers) at MCK 004812 ("When a claim is entered, ClinicaLogic compares procedure codes from multiple services, flagging potential problems.")<br><br>ClaimFacts ClinicaLogic System Overview (January 2004) at TRZ 092364 ("**How ClinicaLogic Operates** Claims entered to ClaimFacts are first examined . . . .")<br><br>30(b)(6) deposition of Karen Lampe<br><br>Deposition of Harrington Benefits | 30(b)(6) deposition of John Danza<br><br>TriZetto Product Announcement: Introduction of ClinicaLogic Module in QicLink (March 2002) at TRZ 277699 ("ClinicaLogic . . . checks claims as they are entered manually on-line or in batch mode . . . to identify; . . . "unbundled" procedures (i.e., procedures covered by one comprehensive CPT/HCPCS procedure code that are itemized on the provider's bill, possibly resulting in an overstatement of charges).")<br><br>30(b)(6) deposition of John Danza |
| **means for determining whether one of the medical service codes in the at least one claim is mutually exclusive due to non-medical criteria with any other medical service code in the at least one claim;** | Facets Product Overview (Spr 1996) at MCK 002319 ("**Clinical Edits** Every claim you process is automatically edited by Erisco's proprietary clinical editing software, with tens of thousands of clinical rules and recommendations. . . . *Facets* clinical editing clearly identifies potential problems, claims billed incorrectly due to coding errors, procedures, claims billed incorrectly due to coding errors, unacceptable procedures and potentially fraudulent information.")<br><br>Deposition of Providence Health Plan | ClaimFacts ClinicaLogic System Overview (January 2004) at TRZ 092354-55 ("**ClaimFacts ClinicaLogic Subsystem** [ClinicaLogic] checks claims as they are entered on-line or in batch mode to identify; . . . CPT/HCPCS procedure coding errors or invalid data relationship (e.g., the procedure is inconsistent with the patient's sex; . . . patterns of outpatient and inpatient utilization deviation from common standards of clinical practice; . . . diagnoses that may be inappropriate for the sex and/or age of the patient, or that may require case management.")<br><br>30(b)(6) deposition of Karen Lampe<br><br>Deposition of Harrington Benefits | TriZetto Product Announcement: Introduction of ClinicaLogic Module in QicLink (March 2002) at TRZ 277699 ("ClinicaLogic . . . checks claims as they are entered manually on-line or in batch mode . . . to identify; . . . CPT/HCPCS procedure coding errors or invalid data relationship (e.g., the procedure is inconsistent with the patient's sex); . . . patterns of outpatient and inpatient utilization deviation from common standards of clinical practice; . . . diagnoses that may be inappropriate for the sex and/or age of the patient, or that may require case management.")<br><br>30(b)(6) deposition of John Danza |
| **means for authorizing** | Facets Product Overview (Spr 1996) at MCK 002308 ("**Clinical Claims Audit** Facets *automatically edits every claim that you process* with | Erisco ClinicaLogic Marketing Brochure (targeted at ClaimFacts customers) at MCK 034224 ("**How** | TriZetto Product Announcement: Introduction of ClinicaLogic Module in QicLink (March 2002) at TRZ |

| | | | |
|---|---|---|---|
| medical service codes which are not mutually exclusive due to non-medical criteria with any other medical service codes contained in the at least one claim in response to the means for determining; and | Erisco's proprietary clinical editing software, with tens of thousands of clinical rules and recommendations. *This allows you to identify billing problems and eliminate significant overpayment of claims,* and to consistently catch fraudulent, erroneous or inconsistent billing practices, a significant factor in cost containment.")<br><br>Deposition of Providence Health Plan | ClinicalLogic Works . . . As ClinicalLogic detects inconsistencies online, it displays clear instructions on the Claims Processing Screen, *enabling the examiner to make appropriate decisions. An edit may be accepted or* overridden, or the original claim may be pended for review.")<br><br>30(b)(6) deposition of Harrington Benefits | 277/00 ("Some edits detect and, in certain situations, automatically correct commonly encountered coding errors. Other edits identify potential improprieties regarding claim procedures and diagnoses. ClinicalLogic's flexibility allows the user to utilize any or all of the edits. . .")<br><br>30(b)(6) deposition of John Danza |
| means for rejecting medical service codes which are mutually exclusive due to non-medical criteria with any other medical service codes contained in the at least one medical service codes contained in the at least one claim in response to the means for determining. | Erisco Facets Overview at MCK 002308 ("Clinical Claims Audit Facets *automatically edits every claim that you process* with Erisco's proprietary clinical editing software, with tens of thousands of clinical rules and recommendations. *This allows you to identify billing problems and eliminate significant overpayment of claims,* and to consistently catch fraudulent, erroneous or inconsistent billing practices, a significant factor in cost containment.")<br><br>Deposition of Providence Health Plan | Erisco ClinicalLogic Marketing Brochure (targeted at ClaimFacts customers) at MCK 034224 ("**How ClinicalLogic Works** . . . As ClinicalLogic detects inconsistencies online, it displays clear instructions on the Claims Processing Screen, *enabling the examiner to make appropriate decisions. An edit may be accepted or* overridden, or the original claim may be pended for review.")<br><br>30(b)(6) deposition of Karen Lampe<br><br>ClaimFacts ClinicalLogic System Overview (January 2004) at TRZ 092364 ("**How ClinicalLogic Operates** As ClinicalLogic detects inconsistencies and billing problems on-line, clear instructions will display on the claims processing screen, enabling the examiner to make the appropriate decisions. Claim examiners will have the capability to *accept* the claim for payment, *override* edits on any or all of the line items or pend the claim for review.")<br><br>30(b)(6) deposition of Karen Lampe | TriZetto Product Announcement: Introduction of ClinicalLogic Module in QicLink (March 2002) at TRZ 277/00 ("Some edits detect and, in certain situations, automatically correct commonly encountered coding errors. Other edits identify potential improprieties regarding claim procedures and diagnoses. ClinicalLogic's flexibility allows the user to utilize any or all of the edits. . .")<br><br>30(b)(6) deposition of John Danza |

| CLAIM | FACETS | CLAIMFACTS | QICKLINK |
|---|---|---|---|
| 15. A computer system including a central processing unit and associated memory for processing input claims containing at least one medical service code, comprising: | Facets Product Overview (Spr 1996) at MCK 002312 ("Facets uses ... the client/server platform, which links individual personal computers to high performance relational database servers ....").<br><br>Deposition of Providence Health Plan | Erisco ClaimFacts Marketing Brochure at TRZ 032141 ("You can implement ClaimFacts in one of two ways, ... You can either implement the software at your site, or subscribe to remote service. ... If you choose to license ClaimFacts, our professional support staff will work with you to implement the system on your IBM or equivalent hardware.")<br><br>30(b)(6) deposition of Karen Lampe | TriZetto Product Announcement: Introduction of ClinicalLogic Module in QicLink (March 2002) at TRZ 277700-01 ("Since the claim editing logic is embedded within the [QicLink] Claims Adjudication program ...")<br><br>30(b)(6) deposition of John Danza |
| a predetermined database stored in the associated memory, the database containing medical service codes and a set of relationships among the medical service codes defining whether selected ones of the medical service codes are valid when received with other selected ones of the medical service codes; | Facets Product Overview (Spr 1996) at MCK 002312 ("Facets uses ... the client/server platform, which links individual personal computers to high performance relational database servers ....").<br><br>Erisco's Facets and Healthweb at MCK 002352 (figure with "Facets Client" connected to "DBMS")<br><br>Facets Product Overview (Spr 1996) at MCK 002319 ("Clinical Edits Every claim you process is automatically edited by Erisco's proprietary clinical editing software, with tens of thousands of clinical rules and recommendations. ... *Facets* clinical editing clearly identifies potential problems, such as unbundled surgical procedures, claims billed incorrectly due to coding errors, unacceptable procedures and potentially fraudulent information. It also checks for invalid data relationships (like an inconsistency between diagnosis and procedure codes) and patterns of outpatient and inpatient utilization that deviate from the accepted standards of clinical practice.")<br><br>Erisco Facets Overview (webpage) at MCK 002308 ("**Clinical Claims Audit** Facets automatically edits every claim that you process with *Erisco's proprietary clinical editing software, with tens of thousands of clinical rules and recommendations.* This | Erisco ClaimFacts Marketing Brochure at TRZ 032143 ("*Intelligent* Processing. ... ClaimLogic is backed by an expert staff of board-certified physicians. Their combined clinical experience forms an *expert-knowledge database*, updated regularly as *medical criteria change*.")<br><br>Erisco ClinicalLogic Marketing Brochure (targeted at ClaimFacts customers) at MCK 034224 ("**An Expert Knowledge-based System**. ... ClinicalLogic is backed by a staff of board-certified physicians [whose] expertise forms the medical logic and review criteria database, the core of ClinicalLogic. This expert knowledge database is updated regularly as medical criteria change, making ClinicalLogic the most comprehensive claims editor available today.")<br><br>ClaimFacts ClinicalLogic System Overview (January 2004) at TRZ 092356 ("**Team of Specialists** the medical database that forms the core of ClinicalLogic [has] 90,000 clinical rules for claim checking. These rules apply to surgical, laboratory, radiological, anesthesia and other medical procedures as well as to diagnoses. Each rule for a procedure includes medical data that indicate either an appropriate way to adjudicate the procedure or a proper | TriZetto Product Announcement: Introduction of ClinicalLogic Module in QicLink (March 2002) at TRZ 277700 ("the *medical database* that forms the core of ClinicalLogic ... [based on [] collective medical knowledge and extensive claim checking experience [contains] over 90,000 clinical rules for claim checking. These rules apply to surgical, laboratory, radiological, anesthesia and other medical procedures as well as to diagnoses.")<br><br>30(b)(6) deposition of John Danza |

Deposition of Harrington Benefits

| | | | |
|---|---|---|---|
| means for | allows you to identify billing problems and eliminate significant overpayment of claims, and to consistently catch fraudulent, erroneous or inconsistent billing practices, a significant factor in cost containment.")<br><br>Deposition of Providence Health Plan<br><br>M*Plan Provider Perspective (Spr 2004) at MCK 002355 ("the PACE clinical claims editing criteria that will allow for the evaluation of medical billing information and CPT coding accuracy.")<br><br>Facets Product Overview (Spr 1996) at MCK 002316 ("**Claims Processing**. ... Claims processing utilizes diagnosis codes and procedure codes to read *service based rules* ....") | relationship between the procedure and information such as the patient's age and sex.")<br><br>30(b)(6) deposition of Karen Lampe<br><br>Erisco ClaimFacts Marketing Brochure at TRZ 032143 ("*Intelligent Processing* ... Clinical Logic is ClaimFacts' integrated medical claim editor. It automatically examines each claim instantly on-line, as it is processed.") | TriZetto Product Announcement: Introduction of ClinicaLogic Module in QicLink (March 2002) at TRZ 277699 ("ClinicaLogic is a comprehensive, knowledge-based module designed to automatically check medical claims *before payment*. ... ClinicaLogic ... checks claims as they are entered manually on-line or in batch mode . . .") |
| means for receiving at least one claim; | Erisco Facets Overview (webpage) at MCK 002308 ("**Clinical Claims Audit** Facets automatically edits every claim that you process with Erisco's proprietary clinical editing software ....")<br><br>Facets Product Overview (Spr 1996) at MCK 002316 ("**Claims Entry** Claims can be entered online or electronically via proprietary format or the industry standard ... .").<br><br>M*Plan Provider Perspective (Spr 2004) at MCK 002355 ("the PACE clinical editing system ... will be implemented on claims with dates of service beginning May 1, 2004")<br><br>Deposition of Providence Health Plan<br><br>M*Plan Provider Perspective (Spr 2004) at MCK 002355 ("The | *Id.* ("Duplicate work is eliminated because you only have to enter date once. ClaimFacts automatically captures and stores original and medical edit information as it is entered on-line.")<br><br>Erisco ClaimFacts Marketing Brochure (targeted at ClaimFacts customers) at MCK 034224 ("**A Flexible, Integrated Solution**. ... With ClinicaLogic you can screen existing claims data instantly as they are entered online or batch-processed. ... **How ClinicaLogic Works** When a claim is entered, ClinicaLogic compares . . .")<br><br>ClaimFacts ClinicaLogic System Overview (January 2004) at TRZ 092364 ("**How ClinicaLogic Operates** Claims entered to ClaimFacts are first examined . . .")<br><br>30(b)(6) deposition of Karen Lampe<br><br>Erisco ClinicaLogic Marketing Brochure (targeted at | ClinicaLogic User Guide (2004) at TRZ 154738 ("ClinicaLogic runs seamlessly with QicLink claim processing by verifying claim data as it is entered.")<br><br>30(b)(6) deposition of John Danza<br><br>TriZetto Product Announcement: Introduction of |

| | | | |
|---|---|---|---|
| ascertaining whether the at least one claim contains a plurality of medical service codes; | PACE clinical editing system is designed to detect .... **Unbundling/Rebundling** – Billing under several CPT codes .... "<br><br>Facets Product Overview (Spr 1996) at MCK 002319 ("**Clinical Edits** *Facets* clinical editing clearly identifies potential problems, such as unbundled surgical procedures ....")<br><br>Deposition of Providence Health Plan | ClaimFacts customers) at MCK 004812 ("When a claim is entered, ClinicaLogic compares procedure codes from multiple services, flagging potential problems.")<br><br>30(b)(6) deposition of Karen Lampe | ClinicaLogic Module in QicLink (March 2002) at TRZ 277699 ("ClinicaLogic ... checks claims as they are entered manually on-line or in batch mode ... to identify; "unbundled" procedures (i.e., procedures covered by one comprehensive CPT/HCPCS procedure code that are itemized on the provider's bill, possibly resulting in an overstatement of charges).")<br><br>30(b)(6) deposition of John Danza |
| means for determining whether one of the medical service codes in the plurality of medical service codes is valid or invalid by interacting with the database and the set of relationships contained in the database; | Facets Product Overview (Spr 1996) at MCK 002319 ("**Clinical Edits** Every claim you process is automatically edited by Erisco's proprietary clinical editing software, with tens of thousands of clinical rules and recommendations. ... *Facets* clinical editing clearly identifies potential problems, such as unbundled surgical procedures, claims billed incorrectly due to coding errors, unacceptable procedures and potentially fraudulent information. It also checks for invalid data relationships (like an inconsistency between diagnosis and procedure codes) and patterns of outpatient and inpatient utilization that deviate from the accepted standards of clinical practice.")<br><br>M*Plan Provider Perspective (Spr 2004) at MCK 002355 ("the PACE clinical editing system ... will allow for the evaluation of medical billing information and CPT coding accuracy. ... The PACE clinical editing system is designed to detect irregularities in medical billings, such as: **Incidental Procedures** – Procedures which are carried out at the same time as a primary procedure, require little additional physician resources, are clinically integral to the performance of the primary procedure, and therefore, should not be reimbursed separately. **Mutually Exclusive/Redundant Procedures** – Defined as the billing of two or more procedures that, by medical practice standards, would not be billed on the same date of service. **Unbundling/Rebundling** – Billing under several CPT codes that should be combined under a single charge.")<br><br>Deposition of Providence Health Plan | Erisco ClaimFacts Marketing Brochure at TRZ 032143 ("***Intelligent Processing*** ... ClinicaLogic warns you of questionable provider fees *before* disbursement. And it corrects "unbundling," "unacceptable procedures, coding errors and more. It even checks for inadvertent or potentially fraudulent deviations from accepted clinical standards.")<br><br>30(b)(6) deposition of Karen Lampe | TriZetto Product Announcement: Introduction of ClinicaLogic Module in QicLink (March 2002) at TRZ 277699 ("ClinicaLogic Module in QicLink (March 2002) at TRZ 277699 ("ClinicaLogic is a comprehensive, knowledge-based module designed to automatically check medical claims *before payment*. ... ClinicaLogic ... checks claims as they are entered manually on-line or in batch mode ....")<br><br>30(b)(6) deposition of John Danza |
| means for authorizing the at | Erisco Facets Overview at MCK 002308 ("**Clinical Claims Audit** *Facets automatically edits every claim that you process with* | Erisco ClinicaLogic Marketing Brochure at MCK 034224 ("**How** | TriZetto Product Announcement: Introduction of ClinicaLogic Module in QicLink (March 2002) at TRZ |

| | | | |
|---|---|---|---|
| least one claim in response to the billing problems and to consistently catch fraudulent, erroneous or inconsistent billing practices, a significant factor in cost containment; and. | Erisco's proprietary clinical editing software, with tens of thousands of clinical rules and recommendations. *This allows you to identify billing problems and eliminate significant overpayment of claims,* and to consistently catch fraudulent, erroneous or inconsistent billing practices, a significant factor in cost containment.")<br><br>Deposition of Providence Health Plan | **ClinicaLogic Works** . . . As ClinicaLogic detects inconsistencies online, it displays clear instructions on the Claims Processing Screen, *enabling the examiner to make appropriate decisions. An edit may be accepted or* overridden, or the original claim may be pended for review.")<br><br>**ClaimFacts ClinicaLogic System Overview** (January 2004) at TRZ 092364 ("**How ClinicaLogic Operates**  As ClinicaLogic detects inconsistencies and billing problems on-line, clear instructions will display on the claims processing screen, enabling the examiner to make the appropriate decisions.  Claim examiners will have the capability to *accept* the claim for payment, override edits on any or all of the line items or pend the claim for review.")<br><br>30(b)(6) deposition of Karen Lampe | 277700 ("Some edits detect and, in certain situations, automatically correct commonly encountered coding errors. Other edits identify potential improprieties regarding claim procedures and diagnoses. ClinicaLogic's flexibility allows the user to utilize any or all of the edits. . . .") |
| means for rejecting the at least one claim in response to the billing problems and to consistently catch fraudulent, erroneous or inconsistent billing practices, a significant factor in cost containment.")<br><br>means for determining. | Erisco Facets Overview at MCK 002308 ("**Clinical Claims Audit** Facets *automatically edits every claim that you process* with Erisco's proprietary clinical editing software, with tens of thousands of clinical rules and recommendations. *This allows you to identify billing problems and eliminate significant overpayment of claims,* and to consistently catch fraudulent, erroneous or inconsistent billing practices, a significant factor in cost containment.")<br><br>Deposition of Providence Health Plan | Erisco ClinicaLogic Marketing Brochure (targeted at ClaimFacts customers) at MCK 034224 ("**How ClinicaLogic Works** . . . As ClinicaLogic detects inconsistencies and billing problems on-line, it displays clear instructions on the Claims Processing Screen, *enabling the examiner to make appropriate decisions. An edit may be accepted or overridden,* or the original claim may be pended for review.")<br><br>**ClaimFacts ClinicaLogic System Overview** (January 2004) at TRZ 092364 ("**How ClinicaLogic Operates**  As ClinicaLogic detects inconsistencies and billing problems on-line, clear instructions will display on the claims processing screen, enabling the examiner to make the appropriate decisions.  Claim examiners will have the capability to accept the claim for payment, override edits on any or all of the line items or pend the claim for review.")<br><br>30(b)(6) deposition of Karen Lampe | TriZeto Product Announcement:  Introduction of ClinicaLogic Module in QicLink (March 2002) at TRZ 277700 ("Some edits detect and, in certain situations, automatically correct commonly encountered coding errors. Other edits identify potential improprieties regarding claim procedures and diagnoses.  ClinicaLogic's flexibility allows the user to utilize any or all of the edits. . .")<br><br>30(b)(6) deposition of John Danza |

| CLAIM | FACETS | CLAIMFACTS | QICKLINK |
|---|---|---|---|
| 16. In a computer system having means for operating on a predetermined database containing medical service codes and a set of relationships among the medical service codes defining whether selected ones of the medical service codes are valid when input with other selected ones of the medical services codes, a method for processing input claims containing at least one medical service code, comprising the steps of: | Erisco's Facets and Healthweb at MCK 002352 (figure with "Facets Client" connected to "DBMS")<br><br>Facets Product Overview (Spr 1996) at MCK 002312 ("*Facets* uses ... the client/server platform, which links individual personal computers to high performance relational database servers ....").<br><br>Facets Product Overview (Spr 1996) at MCK 002319 ("**Clinical Edits**. Every claim you process is automatically edited by Erisco's proprietary clinical editing software, with tens of thousands of clinical rules and recommendations. ... *Facets* clinical editing clearly identifies potential problems, such as unbundled surgical procedures, claims billed incorrectly due to coding errors, unacceptable procedures and potentially fraudulent information. It also checks for invalid data relationships (like an inconsistency between diagnosis and procedure codes) and patterns of outpatient and inpatient utilization that deviate from the accepted standards of clinical practice.")<br><br>Erisco Facets Overview (webpage) at MCK 002308 ("**Clinical Claims Audit** Facets automatically edits every claim that you process with *Erisco's proprietary clinical editing software, with tens of thousands of clinical rules and recommendations.* This allows you to identify billing problems and eliminate significant overpayment of claims, and to consistently catch fraudulent, erroneous or inconsistent billing practices, a significant factor in cost containment.")<br><br>Facets Product Overview (Spr 1996) at MCK 002316 ("**Claims Processing.** ... Claims processing utilizes diagnosis codes and procedure codes to read *service based rules* ....")<br><br>M'Plan Provider Perspective (Spr 2004) at MCK 002355 ("the PACE clinical editing system ... will encompass a comprehensive set of clinical claims editing criteria that will allow for the evaluation of medical billing information and CPT coding accuracy.") | Erisco ClaimFacts Marketing Brochure at TRZ 032141 ("You can implement ClaimFacts in one of two ways, ... (You can either implement the software at your site, or subscribe to remote service. ... If you choose to license ClaimFacts, our professional support staff will work with you to implement the system on your IBM or equivalent hardware.")<br><br>Id. at TRZ 032143 ("*Intelligent Processing*. ... ClinicaLogic is backed by an expert staff of board-certified physicians. Their combined clinical experience forms an *expert-knowledge database*, updated regularly as *medical criteria change*.")<br><br>Erisco ClinicaLogic Marketing Brochure (targeted at ClaimFacts customers) at MCK 034224 ("**An Expert Knowledge-based System**. ... ClinicaLogic is backed by a staff of board-certified physicians [whose] expertise forms the medical logic and review criteria database, the core of ClinicaLogic. This expert knowledge database is updated regularly as medical criteria change, making ClinicaLogic the most comprehensive claims editor available today.")<br><br>ClaimFacts ClinicaLogic System Overview (January 2004) at TRZ 092356 ("**Team of Specialists** the medical database that forms the core of ClinicaLogic [has] over 90,000 clinical rules for claim checking. These rules apply to surgical, laboratory, radiological, anesthesia and other medical procedures as well as to diagnoses. Each rule for a procedure includes medical data that indicate either an appropriate way to adjudicate the procedure or a proper relationship between the procedure and information such as the patient's age and sex.")<br><br>30(b)(6) deposition of Karen Lampe | TriZetto Product Announcement: Introduction of ClinicaLogic Module in QicLink (March 2002) at TRZ 277700-01 ("Since the clinical editing logic is embedded within the [QicLink] Claims Adjudication program ....")<br><br>Id. at TRZ 277700 ("the *medical database* that forms the core of ClinicaLogic. ... [B]ased on [] collective medical knowledge and extensive claim checking experience [contains] over 90,000 clinical rules for claim checking. These rules apply to surgical, laboratory, radiological, anesthesia and other medical procedures as well as to diagnoses.") |

Deposition of Harrington Benefits

| | | | | |
|---|---|---|---|---|
| receiving at least one claim; | Deposition of Providence Health Plan | Erisco Facets Overview (webpage) at MCK 002308 ("**Clinical Claims Audit** Facets automatically edits every claim that you process with Erisco's proprietary clinical editing software ....")<br><br>Facets Product Overview (Spr 1996) at MCK 002316 ("**Claims Entry.** Claims can be entered online or electronically via proprietary format or the industry standard ....").<br><br>M*Plan Provider Perspective (Spr 2004) at MCK 002355 ("the PACE clinical editing system . . . will be implemented on claims with dates of service beginning May 1, 2004")<br><br>Deposition of Providence Health Plan | Erisco ClaimFacts Marketing Brochure at TRZ 032143 ("*Intelligent Processing* . . . Clinical Logic is ClaimFacts' integrated medical claim editor. It automatically examines each claim instantly on-line, as it is processed.")<br><br>Id. ("Duplicate work is eliminated because you only have to enter date once. ClaimFacts automatically captures and stores original and medical edit information as it is entered on-line.")<br><br>Erisco ClinicaLogic Marketing Brochure (targeted at ClaimFacts customers) at MCK 034224 ("**A Flexible, Integrated Solution** . . . With ClinicaLogic you can screen existing claims data instantly as they are entered online or batch-processed. . . . **How ClinicaLogic Works** When a claim is entered, ClinicaLogic compares . . .")<br><br>30(b)(6) deposition of Karen Lampe<br><br>Deposition of Harrington Benefits | TriZetto Product Announcement:  Introduction of ClinicaLogic Module in QicLink (March 2002) at TRZ 277699 ("ClinicaLogic . . . is a comprehensive, knowledge-based module designed to automatically check medical claims *before payment*. . . . ClinicaLogic . . . checks claims as they are entered manually on-line or in batch mode . . .")<br><br>ClinicaLogic User Guide (2004) at TRZ 154738 ("ClinicaLogic runs seamlessly with QicLink claim processing by verifying claim data as it is entered.") |
| ascertaining whether the at least one claim contains a plurality of medical service codes; | Deposition of Providence Health Plan | M*Plan Provider Perspective (Spr 2004) at MCK 002355 ("The PACE clinical editing system is designed to detect . . . **Unbundling/Rebundling** – Billing under several CPT codes . . . .")<br><br>Facets Product Overview (Spr 1996) at MCK 002319 ("**Clinical Edits** *Facets* clinical editing clearly identifies potential problems, such as unbundled surgical procedures . . . .")<br><br>30(b)(6) deposition of Karen Lampe<br><br>Deposition of Harrington Benefits | Erisco ClinicaLogic Marketing Brochure (targeted at ClaimFacts customers) at MCK 004812 ("When a claim is entered, ClinicaLogic compares procedure codes from multiple services, flagging potential problems.")<br><br>30(b)(6) deposition of Karen Lampe<br><br>Deposition of Harrington Benefits | TriZetto Product Announcement:  Introduction of ClinicaLogic Module in QicLink (March 2002) at TRZ 277699 ("ClinicaLogic . . . checks claims as they are entered manually on-line or in batch mode; . . . to identify "unbundled" procedures (i.e., procedures covered by one comprehensive CPT/HCPCS procedure code that are itemized on the provider's bill, possibly resulting in an overstatement of charges).") |
| determining whether one of the medical service codes in the plurality of medical service codes is valid or codes is valid or | | Facets Product Overview (Spr 1996) at MCK 002319 ("**Clinical Edits**. Every claim you process is automatically edited by Erisco's proprietary clinical editing software, with tens of thousands of clinical rules and recommendations. . . . *Facets* clinical editing clearly identifies potential problems, such as unbundled surgical procedures, claims billed incorrectly due to coding errors, procedures and potentially fraudulent information.  It | Erisco ClaimFacts Marketing Brochure at TRZ 032143 ("*Intelligent Processing* . . . ClinicaLogic warns you of questionable provider fees *before* disbursement. And it corrects "unbundling," unacceptable procedures, coding errors and more. It even checks for inadvertent or potentially fraudulent deviations from accepted clinical standards.") | TriZetto Product Announcement:  Introduction of ClinicaLogic Module in QicLink (March 2002) at TRZ 277699 ("ClinicaLogic is a comprehensive, knowledge-based module designed to automatically check medical claims *before payment*. . . . ClinicaLogic . . . checks claims as they are entered manually on-line or in batch mode . . .") |

| | | | |
|---|---|---|---|
| invalid by interacting with the database and between the database and the set of relationships contained in the database; | also checks for invalid data relationships (like an inconsistency between diagnosis and procedure codes) and patterns of outpatient and inpatient utilization that deviate from the accepted standards of clinical practice.") <br><br> M*Plan Provider Perspective (Spr 2004) at MCK 002355 ("the PACE clinical editing system . . . will allow for the evaluation of medical billing information and CPT coding accuracy. . . . The PACE clinical editing system is designed to detect irregularities in medical billings, such as: **Incidental Procedures** – Procedures which are carried out at the same time as a primary procedure, require little additional physician resources, are clinically integral to the performance of the primary procedure, and therefore, should not be reimbursed separately. **Mutually Exclusive/Redundant Procedures** – Defined as the billing of two or more procedures that, by medical practice standards, would not be billed on the same date of service. **Unbundling/Rebundling** – Billing under several CPT codes that should be combined under a single charge.") <br><br> Deposition of Providence Health Plan | 30(b)(6) deposition of Karen Lampe <br><br> Deposition of Harrington Benefits | |
| authorizing the at least one claim in response to the determining step; and | Erisco Facets Overview at MCK 002108 ("Clinical Claims Audit Facets *automatically edits every claim that you process* with Erisco's proprietary clinical editing software, with tens of thousands of clinical rules and recommendations. *This allows you to identify billing problems and eliminate significant overpayment of claims*, and to consistently catch fraudulent, erroneous or inconsistent billing practices, a significant factor in cost containment.") <br><br> Deposition of Providence Health Plan | Erisco ClinicaLogic Marketing Brochure (targeted at ClaimFacts customers) at MCK 034224 ("**How ClinicaLogic Works** . . . As ClinicaLogic detects inconsistencies online, it displays clear instructions on the Claims Processing Screen, *enabling the examiner to make appropriate decisions. An edit may be accepted or overridden, or the original claim may be pended for review*.") <br><br> ClaimFacts ClinicaLogic System Overview (January 2004) at TRZ 092364 ("**How ClinicaLogic Operates** As ClinicaLogic detects inconsistencies and billing problems on-line, clear instructions will display on the claims processing screen, enabling the examiner to make the appropriate decisions. Claim examiners will have the capability to *accept* the claim for payment, override edits on any or all of the line items or pend the claim for review.") | TriZetto Product Announcement: Introduction of ClinicaLogic Module in QicLink (March 2002) at TRZ 277700 ("Some edits detect and, in certain situations automatically correct commonly encountered coding errors. Other edits identify potential improprieties regarding claim procedures and diagnoses. ClinicaLogic's flexibility allows the user to utilize any or all of the edits. . . .") |

| | | | |
|---|---|---|---|
| rejecting the at least one claim in response to the determining step. | | | |
| Erisco Facets Overview at MCK 002308 ("Clinical Claims Audit Facets *automatically edits every claim that you process with* Erisco's proprietary clinical editing software, with tens of thousands of clinical rules and recommendations. *This allows you to identify billing problems and eliminate significant overpayment of claims,* and to consistently catch fraudulent, erroneous or inconsistent billing practices, a significant factor in cost containment.")<br><br>Deposition of Providence Health Plan | 300(b)(6) deposition of Karen Lampe<br><br>Deposition of Harrington Benefits | Erisco ClinicalLogic Marketing Brochure (targeted at ClaimFacts customers) at MCK 034224 ("**How ClinicalLogic Works** . . . As ClinicalLogic detects inconsistencies online, it displays clear instructions on the Claims Processing Screen, *enabling the examiner to make appropriate decisions. An edit may be accepted or overridden*, or the original claim may be pended for review.")<br><br>ClaimFacts ClinicalLogic System Overview (January 2004) at TRZ 092364 ("**How ClinicalLogic Operates** As ClinicalLogic detects inconsistencies and billing problems on-line, clear instructions will display on the claims processing screen, enabling the examiner to make the appropriate decisions. Claim examiners will have the capability to accept the claim for payment, *override* edits on any or all of the line items on pend the claim for review.")<br><br>300(b)(6) deposition of Karen Lampe<br><br>Deposition of Harrington Benefits | TriZetto Product Announcement: Introduction of ClinicalLogic Module in QicLink (March 2002) at TRZ 27700 ("Some edits detect and, in certain situations, automatically correct commonly encountered coding errors. Other edits identify potential improprieties regarding claim procedures and diagnoses. ClinicalLogic's flexibility allows the user to utilize any or all of the edits. . .") |

37

# EXHIBIT 4

1  UNITED STATES DISTRICT COURT
2  FOR THE DISTRICT OF DELAWARE
3
4
5  ----------------------------x
6  MC KESSON INFORMATION SYSTEMS, :
7     Plaintiff,   :  Case No.
8     vs.    :  04-1258 SLR
9  THE TRIZETTO GROUP,    :
10    Defendant.   :
11 ----------------------------x
12
13
14 VIDEOTAPED DEPOSITION OF GEORGE A. GOLDBERG
15
16
17    Washington, D.C.
18    Tuesday, September 13, 2005
19
20
21
22
23
24 REPORTED BY:
25    CARMEN SMITH

Page 1

---

1     Deposition of GEORGE A. GOLDBERG, called for
2  examination pursuant to notice of deposition, on
3  Tuesday, September 13, 2005, in Washington, D.C. at
4  the offices of Gibson, Dunn & Crutcher, 1050
5  Connecticut Avenue Northwest, at 9:03 a.m. before
6  CARMEN SMITH, a Notary Public within and for the
7  District of Columbia, when were present on behalf of
8  the respective parties:
9
10    BERNARD SHEK, ESQ.
11    Skadden, Arps, Slate, Meagher & Flom LLP
12    525 University Avenue, Suite 1100
13    Palo Alto, California 94301
14    650-470-4500
15    On behalf of Plaintiff and Witness
16
17    DAVID A. SEGAL, ESQ.
18    Gibson, Dunn & Crutcher LLP
19    4 Park Plaza, Suite 1400
20    Irvine, California 92614-8557
21    949-451-3973
22    On behalf of Defendant
23
24 Also present:
25    LARRY FLOWERS, Video Operator

Page 2

---

1       P R O C E E D I N G S
2     VIDEO OPERATOR:  This is the deposition of
3  Mr. George A. Goldberg, taken on behalf of Defendant
4  in the matter of McKesson Information Systems LLC,
5  Plaintiff, versus Trizetto Group, Inc., Defendant,
6  Case Number 04-1258 SLR, for the U.S. District
7  Court, District of Delaware.
8     This deposition is being taken at the
9  offices of Gibson Dunn, 1050 Connecticut Avenue,
10 Washington, D.C.  The time is approximately 9:03
11 a.m.  The date is September 13, 2005.
12    The court reporter is Carmen Smith, on
13 behalf of Barkley Court Reporters, 2040 Main Street,
14 Suite 250, Irvine, California.  I am the video
15 operator, Larry Flowers, also on behalf of Barkley.
16    The reporter may now swear the witness.
17 Whereupon,
18      GEORGE A. GOLDBERG
19 was called as a witness and, having first been duly
20 affirmed, was examined and testified as follows:
21    VIDEO OPERATOR:  Will counsel identify
22 themselves and who they represent.
23    MR. SEGAL:  David Segal of Gibson, Dunn &
24 Crutcher on behalf of the Trizetto Group, Inc.
25    MR. SHEK:  Bernard Shek for Plaintiff,

Page 3

---

1  also representing the witness, Dr. Goldberg, at this
2  deposition.
3       EXAMINATION
4     BY MR. SEGAL:
5     Q  Good morning.
6     **A  Good morning.**
7     Q  Can you please state your full name for
8  the record?
9     **A  George Ansbach Goldberg.**
10    Q  Can you spell the middle name for the
11 court reporter?
12    **A  A-n-s-b-a-c-h.**
13    Q  Have you ever had your deposition taken
14 before, Dr. Goldberg?
15    **A  Which deposition?**
16    Q  Any time, have you ever been deposed in a
17 deposition before?
18    **A  Yes.**
19    Q  How many times?
20    **A  I believe once.**
21    Q  And have you ever testified in court
22 before?
23    **A  No.**
24    Q  Now, you've had your deposition taken
25 before, and we'll go back and visit about that

Page 4

---

1 (Pages 1 to 4)

GEORGE A. GOLDBERG

1     A    Computers became so much more powerful is
2  the other piece. You can't conceive of how basic
3  they were in the old days. Nobody in this room,
4  given their age, can remember that as well as I can
5  fuzzily remember that.
6     MR. SEGAL: We've been going a little over
7  an hour, so we will take a short break.
8     THE WITNESS: I'd appreciate that.
9     MR. SEGAL: Thank you.
10    VIDEO OPERATOR: We're off the record.
11 The time is approximately 10:12 a.m.
12    (Recess.)
13    VIDEO OPERATOR: We are back on the
14 record. The time is approximately 10:26 a.m.
15    BY MR. SEGAL:
16    Q    You understand you're still under oath?
17    A    Yes, I do.
18    Q    In connection with your work on the Health
19 Insurance Experiment, did you have the opportunity
20 to learn what other insurance companies or claims
21 processors -- let me rephrase the question.
22    In connection with your work at The RAND
23 Corporation, did you have the opportunity to learn
24 what health insurance companies -- or how health
25 insurance companies were processing claims?

Page 49

1     MR. SHEK: Objection; vague and ambiguous.
2     THE WITNESS: Did you say -- would you
3  repeat the question, please, the rephrased question?
4     BY MR. SEGAL:
5     Q    In connection with your work at The RAND
6  Corporation, did you have the opportunity to learn
7  how health insurance companies were processing
8  claims?
9     A    No, other than Glenn Slaughter &
10 Associates, which is not -- which was not -- which
11 although it was doing that function, is actually a
12 pension plan -- was a pension plan company, not a
13 health insurance company.
14    Q    If I refer to "payors," p-a-y-o-r-s, to
15 refer to individuals that take -- or companies that
16 take care of claims processing, is that a term that
17 you are comfortable with?
18    A    Yes.
19    Q    In connection with your work at The RAND
20 Corporation, did you have an opportunity to learn
21 what payors other than Glenn Slaughter were doing in
22 connection with claims processing?
23    A    No.
24    Q    And I believe your CV indicates that in
25 about 1985, you left The RAND Corporation; is that

Page 50

1  correct?
2     A    That is what my CV shows, and it's
3  correct.
4     Q    Why did you leave The RAND Corporation?
5     A    The Health Insurance Experiment had ended.
6     Q    Any other reasons?
7     A    It was time to move -- I thought it was
8  time to move back to the East Coast to be near my
9  aging parents.
10    Q    And you -- from your CV, it looks like you
11 joined a company Health Data Institute in Lexington,
12 Massachusetts; is that correct?
13    A    That is correct.
14    Q    And it references developmental work on an
15 Advanced MedLogic, M-e-d, cap L-o-g-i-c, System?
16    A    Yes, it does.
17    Q    Which indicates that it does cost/quality
18 procedure code based claims review.
19    A    That's what it says.
20    Q    Can you provide a more detailed
21 explanation what the Advanced MedLogic System was?
22    A    The Advanced MedLogic System was a series
23 of computerized tables, lookup tables, that
24 received, processed and paid claims. In other
25 words, it was post-payment claims databases, and

Page 51

1  reviewed them to perform single-code edits of
2  various kinds. Post-process, post-payment.
3     Q    There's also a notation on your CV about a
4  prospective payment system?
5     A    The prospective payment system is the
6  government's DRG system.
7     Q    And does that -- did that system deal with
8  claims processing prior to payment?
9     A    The DR -- the answer is yes and no.
10    Q    Can you explain?
11    A    The DRG system, which is performed --
12 which applies to hospital claims only, or certainly
13 did in those days, the DRG system, diagnosis related
14 groups. Groups diagnoses with some on hospital
15 discharge claims, with attention as well to ICD9
16 procedure-coded procedures on hospital claims, and
17 assigns every hospital discharged claim to one and
18 only one DRG, a number that at that time went
19 somewhere between 001 and 4XX. There were
20 400-odd-odd DRGs.
21    And it functions for payment purposes
22 because at some point, Medicare and Medicaid and the
23 occasional private insurer paid for a hospital stay
24 on the basis of the DRG to which a hospital
25 discharge claim was assigned.

Page 52

13 (Pages 49 to 52)

GEORGE A. GOLDBERG

1  IN THE UNITED STATES DISTRICT COURT
2      for the District of Delaware
3
4  - - - - - - - - - - - - - - - - - - x
5                                    :
6  McKESSON INFORMATION SYSTEMS,      :
7                                    :
8      Plaintiffs,              :
9                        : Case No.
10 v.                : 04-1258 SLR
11                                   :
12 THE TRIZETTO GROUP,                :
13                                   :
14     Defendant.          :
15                                   :
16 - - - - - - - - - - - - - - - - - - x
17              Washington, D.C.
18              Volume II
19              September 28, 2005
20
21
22
23 REPORTED BY:
24     DANIEL W. HAWKINS
25

Page 257

1  Video Deposition of
2
3      GEORGE A. GOLDBERG, M.D.
4
5  called for examination pursuant to notice of deposition, at
6  the law offices of Gibson, Dunn & Crutcher, 1050 Connecticut
7  Avenue, Northwest, 2nd Floor, Conference Room 3B,
8  Washington, D.C., beginning at 9:21 a.m., before DANIEL W.
9  HAWKINS, a Notary Public within and for the District of
10 Columbia, when were present on behalf of the respective
11 parties:
12
13     BERNARD SHEK, ESQ.
14     Skadden, Arps, Slate, Meagher & Flom LLP
15     528 University Avenue, Suite 1100
16     Palo Alto, California 94301
17     Phone  650.470.4500
18     Fax 650.470.4570
19     E-mail bshek@skadden.com
20     On behalf of Plaintiff and Witness
21
22
23
24
25

Page 258

1  APEARENCES (continued)
2
3      DAVID A. SEGAL, ESQ.
4      Gibson, Dunn & Cructher LLP
5      4 Park Plaza, Suite 1400
6      Irvine, California 92614-8557
7      Phone 949.451.3973
8      Fax 949.475.4663
9      E-mail dsegal@gibsondunn.com
10     On behalf of Defendant
11
12
13 Also present:  T.J. O'Toole, CLVS, Videographer
14
15
16           C O N T E N T S
17
18 Witness:          Examination by:
19
20 Dr. Goldberg        Mr. Segal: 261, 389
21                     Mr. Shek: 382, 391
22
23
24
25

Page 259

1           E X H I B I T S
2
3  Deposition Exhibit              Marked
4

| Deposition Exhibit | Marked |
| --- | --- |
| 10 | 268 |
| 11 | 270 |
| 12 | 276 |
| 13 | 276 |
| 14 | 325 |
| 15 | 327 |
| 16 | 330 |
| 17 | 338 |
| 18 | 345 |
| 19 | 348 |
| 20 | 351 |
| 21 | 357 |
| 22 | 367 |
| 23 | 380 |

20     (Exhibits attached.)
21
22
23
24
25

Page 260

1    P R O C E E D I N G S
2        (Announcement by the Videographer.)
3    Thereupon,
4            GEORGE A. GOLDBERG, M.D.
5    a Witness, called for examination by counsel for the
6    Defendant and, after having been first duly sworn, was
7    examined and testified as follows:
8        EXAMINATION BY COUNSEL FOR THE DEFENDANT
9        BY MR. SEGAL:
10   Q    Good morning.
11   A    Good morning.
12   Q    Welcome back.
13   A    Welcome back to you.
14   Q    You understand that you are still under oath?
15   A    Yes.
16   Q    Just to be safe, because we have a different
17   court reporter, and we had you sworn again this morning.
18       Did you have an opportunity at all to review your
19   transcript from your first deposition?
20   A    No, I did not.
21   Q    Have you had the opportunity to prepare any more
22   for your deposition since our last session?
23   A    I've had the opportunity, but I did not do any
24   such preparation.
25   Q    In thinking about your testimony if you've done

Page 261

1    so, have you realized you made any errors in your testimony?
2    A    I haven't thought about my testimony, and if
3    parts of it have popped into my head, I haven't noted any
4    errors.
5    Q    In your last deposition, we were discussing a
6    system known as Advanced MedLogic? Do you recall that.
7    A    Yes, Advanced MedLogic.
8    Q    And that was a system that was used by Health
9    Data Institute, I believe? HDI.
10   A    I'm not sure I would call Advanced MedLogic a
11   system, at least not today. I don't know what I said two
12   weeks ago. I'd call it a review mechanism, and it was
13   developed by HDI, Health Data Institute.
14   Q    And actually, the system name was Advanced
15   MedLogic System.
16   A    I don't recall.
17   Q    Let me show you what was previously marked as
18   Exhibit 1 to your deposition, which was your c.v. And I
19   would trust that you've made an effort in preparing your
20   c.v. to make sure it's accurate and complete?
21   A    Yes, I have. And understandable to a person who
22   would read it.
23   Q    If you look on the first page under point 3,
24   where it refers to Health Data Institute.
25   A    Yes, I see that.

Page 262

1    Q    And under that you list your development work?
2    A    On Advanced MedLogic System. Yes, I see that.
3    Q    So the Advanced MedLogic System was the name of
4    the system that you worked on?
5    A    It is probable that that was the original name of
6    the system; that is, that the Health Data Institute, in its
7    marketing wisdom, decided to call it the Advanced MedLogic
8    System.
9    Q    And the Advanced MedLogic System was a program
10   that ran on computers?
11   A    Not in the sense that today we consider it a
12   program. Advanced MedLogic System was a series of lookup
13   tables and reports got produced off a computer.
14   Q    And there were instructions that the computer
15   followed to know how to look up information in the tables,
16   and compare claims data with information in the tables?
17       MR. SHEK: Object as to form.
18       THE WITNESS: I have actually no idea how it was
19   done.
20       BY MR. SEGAL:
21   Q    Do you know if it operated on a computer?
22   A    I know that computers were used in the Advanced -
23   - what seems to be called the Advanced MedLogic System.
24   Q    And you spoke about the lookup tables that you
25   some input in, of that system. Is that correct?

Page 263

1    A    Yes. I helped, I mostly reviewed those tables
2    that had been developed by a group of nurses.
3    Q    And the last time we established that those
4    tables had things such as procedure codes and diagnoses
5    codes, or procedure codes and gender. Is that correct?
6    A    They were a series of edits designed to -- edits
7    in the old fashioned sense of the word. Yes, they were
8    looking for mismatches between age and diagnosis, age and
9    procedure, sex and diagnosis, sex and procedure, or just
10   diagnoses that were so unusual you wouldn't expect to see
11   them in the United States; although they might be perfectly
12   common in parts of Africa, for example.
13   Q    And the lookup tables were used in conjunction
14   with reviewing claims data, is that correct?
15   A    Please repeat the question.
16   Q    The lookup tables were used in connection with
17   the Advanced MedLogic System, and in reviewing claims data.
18   A    Those lookup tables were used in the review of
19   batches of already paid claims data.
20   Q    The claims data, you're talking about medical
21   claims data. Is that correct?
22   A    Yes, what you would call medical claims data,
23   what I would break down and call facility claims data and
24   professional claims data.
25   Q    How many different of these edits were in the

Page 264

2 (Pages 261 to 264)

1    lookup tables in the Advanced MedLogic System?
2       A    Well, of course the real answer is I don't know
3    the number; but I think there were somewhere between 10 and
4    20 lookup tables, and I guess that there were anywhere from
5    20 to several hundred elements in each table.
6       Q    Do you have any knowledge as to what type of
7    rules were applied in the program that utilized those lookup
8    tables?
9       MR. SHEK: Objection as to form.  Vague and
10   ambiguous.  Also lacks foundation.
11      BY MR. SEGAL:
12      Q    Do you have any understanding as to whether any
13   rules were used by a program in utilizing the lookup tables
14   as part of the Advanced MedLogic System?
15      A    Well, I'll answer that with the understanding
16   that the word 'rules' is a loaded word that can mean ten
17   different things.
18          This system was looking for the occurrence of
19   certain codes or code combinations, and whenever it saw one
20   thing, my understanding is, because I was neither
21   responsible -- I was not responsible for -- I was just
22   giving input, consulting input to the nurses.  It counted
23   them, it counted -- it was a counter of finding certain
24   combinations of code code, code sex, code age, and basically
25   produced counts.

Page 265

1          I'm not sure I call those rules.  Period.
2       Q    Were there programmers that worked at HDI on the
3    Advanced MedLogic System?
4       A    There must have been, but I can't be any more
5    specific than that, because it wasn't part of what I did.
6       Q    In December 1986, were you part of the Product
7    Development Group at HPI, the Health Policy Institute?
8       A    I don't remember that exact -- I don't recall
9    that exact name, but it's highly likely that I was -- I was
10   in fact a part of a group of people at Health Policy
11   Institute who were trying to develop a product, a commercial
12   product.
13      Q    I'm going to show you what was previously marked
14   in a deposition as Exhibit 81.  It's a multipage document
15   bearing Bates numbers MCK 119 650 through 654, and ask you
16   to take a look at that, and I'll ask you whether you
17   recognize it.
18      A    (Viewing document.).
19      Q    The first question is, do you recognize this
20   document as a document you would have received in December
21   1986 while you were at HPI.
22      A    I do not recognize this document.  I don't
23   recognize this document; it surely is a matter of memory,
24   but I do not recognize it.
25      Q    Let me see if -- I'm trying to refresh your

Page 266

1    recollection.  In the second paragraph it says coding.  Do
2    you see that?
3       A    I sure do.
4       Q    It says Aetna's claims processors re-code
5    procedures when they determine there is justification.
6          Do you recall learning in about December 1986
7    that Aetna's claims processors re-coded procedures when they
8    determined there is justification?
9       A    I don't recall learning that in December 1986.
10      Q    Did you know that in 1986 that Aetna had claims
11   processors that re-coded procedures when they determined
12   there was justification?
13      A    I don't remember if I knew that in 1986.
14      Q    Further in that paragraph it says:  They bundled
15   the surgeon's hospital visits into the overall surgical fee.
16   They use a similar formula as CAT, for combining multiple
17   procedures.
18          Do you see that?
19      A    I do see that.
20      Q    First question is, is it your understanding that
21   c a t CAT refers to Caterpillar?
22      A    Yes.  That is my understanding.
23      Q    Do you recall learning that Aetna's claims
24   processors bundled the surgeon's hospital visits into the
25   overall surgical fee, and that they used a similar formula

Page 267

1    as CAT for combining multiple procedures, in 1986?
2       A    I do not recall learning that in 1986 or in any
3    other year.  I don't doubt for a second that at some point I
4    learned it, but I don't recall learning it, and I don't
5    recall that it was in 1986.
6       MR. SEGAL: Okay, let me ask the court reporter
7    to mark as Exhibit 10 to your deposition a multipage
8    document bearing Bates numbers MCK 11 9935 through 46.
9          (Goldberg Deposition Exhibit No.
10          10 was marked for identification.)
11
12          (Document handed to witness.)
13      BY MR. SEGAL:
14      Q    I'll ask you to take a look at what we've had
15   marked as Exhibit 10.
16      A    Okay, I have Exhibit 10.  What would you like me
17   to do?
18      Q    Is this a document you recognize from your days
19   at Health Policy Institute?
20      A    (Viewing document.)
21          Well, it's actually easy to answer your direct
22   question.  I do not recognize this document.
23      Q    Did you have any involvement in a report given to
24   Caterpillar and Sun Company on the evaluation of negotiated
25   surgeon claims in or about February 1987?

Page 268

3 (Pages 265 to 268)

GEORGE A. GOLDBERG, M.D. - VOLUME II

1      I HEREBY CERTIFY that I have read this

2   transcript of my deposition and that this transcript

3   accurately states the testimony given by me, with

4   the changes or corrections, if any, as noted.

5

6

7          x _George A. Goldberg_____

8                  10/18/2005

9

10

11  Subscribed and sworn to before me this       day of

12              , 20        .

13

14

15

16          X

17          Notary Public

18

19

20

21  My commission expires:

22

23

24

25


                        254

            GEORGE A. GOLDBERG

BARKLEY
Court Reporters

1          I HEREBY CERTIFY that I have read this transcript

2   of my deposition and that this transcript accurately states

3   the testimony given by me, with the changes or corrections,

4   if any, as noted.

5

6

7

8   x _George A. Goldberg_____

9          10/18/2005

10

11  Subscribed and sworn to before me this        day of

12              20  .

13

14

15

16  _____

17

18  Notary Public

19

20  My commission expires:

21

22

23

24

25

392

GEORGE A. GOLDBERG, M.D. - VOLUME II

BARKLEY
Court Reporters

EXHIBIT 5

# EXPERT REPORT OF RANDALL DAVIS

*McKesson Information Solutions LLC v. The Trizetto Group, Inc*

October 24, 2005

## I. INTRODUCTION

My name is Randall Davis. I am a Professor of Computer Science at the Massachusetts Institute of Technology. Exhibit A contains a resume providing details of my technical background and experience. I received my undergraduate degree from Dartmouth, graduating summa cum laude, Phi Beta Kappa in 1970, and a Ph.D. from Stanford University in artificial intelligence in 1976.

While at Stanford I was a member of the Heuristic Programming Project, the research group that invented expert systems and produced the first such programs, including DENDRAL, a program for chemistry, and MYCIN, the first medical expert system. My PhD thesis work specified some of the foundational concepts in expert systems, including the notions of explanation and knowledge acquisition.

I came to MIT in 1978, served for five years as Associate Director of the MIT Artificial Intelligence Laboratory, and currently serve as a Research Director in the newly formed 850-person MIT Computer Science and Artificial Intelligence Laboratory.

I have published some 55 articles on issues related to artificial intelligence and have served on several editorial boards, including *Artificial Intelligence*, *AI in Engineering,* and the MIT Press series in AI. I am a co-author of *Knowledge-Based Systems in AI*.

In recognition of my research in artificial intelligence, I was selected in 1984 as one of America's top 100 scientists under the age of 40 by *Science Digest*. In 1986 I received the *AI Award* from the Boston Computer Society for contributions to the field. In 1990 I was named a Founding Fellow of the American Association for AI and in 1995 was elected to a two-year term as President of the Association. In 2003 I received MIT's Frank E. Perkins Award for graduate advising. From 1995–1998 I served on the Scientific Advisory Board of the U. S. Air Force.

In addition to my work with artificial intelligence, I have also been active in the area of intellectual property and software. Among other things, I have served as a member of the Advisory Board to the US Congressional Office of Technology Assessment study on software and intellectual property, published in 1992 as *Finding a Balance: Computer Software, Intellectual Property, and the Challenge of Technological Change*. I have published a number of articles on the topic, including co-authoring an article in the *Columbia Law Review* in 1994 entitled "A Manifest Concerning Legal Protection of Computer Programs" and an article in the *Software Law Journal* in 1992 entitled "The Nature of Software and its Consequences for Establishing and Evaluating Similarity."

From 1998-2000 I served as the chairman of the National Academy of Sciences study on intellectual property rights and the emerging information infrastructure entitled *The Digital Dilemma: Intellectual Property in the Information Age,* published by the National Academy Press in February, 2000.

I have been retained as an expert in over thirty cases dealing with misappropriation of intellectual property, such as the allegations raised in this case. I have been retained by plaintiffs who have asked me to investigate violations of intellectual property, by defendants who have asked me to investigate allegations made against them, and by both sides to serve as the sole arbiter of a binding arbitration. A list of cases in which I have been involved is attached as Exhibit B.

In 1990 I served as expert to the Court (Eastern District of NY) in *Computer Associates v. Altai*, a software copyright infringement case whose decision was upheld by the Appeals Court for the 2nd Circuit in June 1992, resulting in the articulation of the abstraction, filtration, comparison test for software. In the early 1990's I was retained by the Department of Justice for

its investigation of the INSLAW matter. In 1992 (and later in 1995) my task in that engagement

was to investigate alleged copyright theft and subsequent cover-up by the Federal Bureau of

Investigation, the National Security Agency, the Drug Enforcement Agency, the United States

Customs Service, and the Defense Intelligence Agency.

## II. OPINION

I was retained by The TriZetto Group, Inc. ("TriZetto") on September 19, 2005 and have

been asked to perform a detailed analysis of the 5,253,164 patent ("the '164 patent") and any

available prior art.

The opinions I report here are based on the documents I have reviewed (a full list is given

in Exhibit C), and on my knowledge, background, and experience in the field of computer

science and artificial intelligence.

Based on the prior art cited and discussed in detail below, it is my firm opinion that each and

every asserted claim in the '164 patent would have been anticipated by the relevant prior art and

obvious at the time of invention to a person having ordinary skill in the art.[1]

## III. THE '164 PATENT: OVERVIEW

The '164 patent has an effective filing date of September 30, 1988.  Accordingly, the

critical prior art date for purposes of patent invalidity under 35 U.S.C. § 102(b) is September 30,

1987.  The '164 patent recites an application of expert systems technology to the processing of

medical claims expressed in terms of medical service codes. For the purposes of this case an

expert system can be thought of simply as a specific style of computer program: Expert systems

are programs designed to do one specific task (in this case reviewing medical claims), using

---

[1] I take a person of ordinary skill in the art to be someone with an undergraduate degree in Computer Science with at
least one course in artificial intelligence, and  at least one year of experience in building expert systems.

(typically) a set of rules that specify the knowledge necessary to do that task, and having that set of rules represented in the system in a way that is distinct from the code that examines the rules and applies them to the task. It is this focus on task-specific knowledge (the rules) and their representation distinct from the code that characterizes expert systems as a specific class of computer program.

The '164 patent contains both method (1, 2, and 16) and apparatus claims (3-15). I begin by considering the method claims. In each case the analysis below focuses on selected language in the claim.

### III.A.  Method Claims

*III.A.1.      Claim 1*

I take the "predetermined database…containing medical service codes" recited in claim 1 to be a fixed set of service codes containing every code known to be valid at the time the program is run. The remainder of the claim then recites a straightforward check of each code in a claim to determine whether it is not present in the predetermined database, and informing the user if a code is not contained in the database.  Although the claim also includes "relationships among the medical service codes" in the predetermined database, it does not appear that these relationships are utilized to perform the code-checking function described in the claim.

Checking the validity of input data by comparing it against a list of known good values is one of the most fundamental techniques taught in every introductory programming course. It is one way of dealing with a phenomenon that has been recognized since at least the 1960's-era of computing: "Garbage in, garbage out." In other words, if your input data is not good, the results will not be good either; hence the first step always is to check the input to be sure it is good, and reject it otherwise.

This claim appears to recite nothing more than this time-honored aphorism, which is known to be universally applicable to every computer program, including those further specified by the claim elements of a database of medical service codes and a set of relationships.

*III.A.2.*    *Claim 2*

Claim two recites the means for "determining whether one of the medical service codes in the at least one claim is mutually exclusive due to non-medical criteria with any other medical service code in the at least one claim." The term "non-medical criteria" is not to my understanding a term of art, nor does it appear anywhere in the patent other than the claims.

Appendix B of the patent gives 12 generic categories of "if/then" rules that are applied to multiple codes; Appendix A offers 9 concrete examples of these rules (two examples illustrate two categories of rules each, one category of rule – R4 – has no example). None of these rules relies on anything that may sensibly be termed "non-medical criteria."

Example 1 of Appendix A shows an "Example of 'E1/E2' Rule;" this is clearly a medical criterion for exclusion as it depends on knowing about appropriate uses of local anesthesia. Example 2 relies on a medical criterion involving understanding gynecological procedures. Example 3 relies on a medical criterion involving understanding what a cystoscopy is. Example 4 relies on a medical criterion involving understanding heart catheterization procedures. Example 5 relies on a medical criterion involving understanding the laparoscopy procedure. Example 6 relies on a medical criterion involving understanding the possible complications of a coronary artery bypass procedure. (Examples 7 – 15 involve rules applied to each code individually and hence are not relevant to this claim, which is limited to "determining whether one of the medical service codes in the at least one claim is mutually exclusive due to non-medical criteria with any other medical service code in the at least one claim.") Example 16 relies on a medical criterion involving understanding the steps involved in repairing a stomach lesion. Example 17 relies on a

medical criterion involving understanding electrocardiograms and their interpretation. Finally, Example 18 relies on a medical criterion involving an understanding of heart catheterization procedures.

As the patent text provides no guidance, I turn to ordinary language. The Oxford English Dictionary has no entry for *non-medical*, except under the generic definition of the prefix *non-*. For *medical* it suggests, among several definitions, the first of which is "Of, relating to, or designating the science or practice of medicine in general, or its practitioners." So presumably a non-medical criteria would be something not relating to the science or practice of medicine.

One possibility is the sort of check found in other medical service code review programs, which check such things as patient gender against gender-specific procedures (e.g., hysterectomy). But this is not covered by claim 2, as it calls specifically for "determining whether *one of the medical service codes* in the at least one claim is mutually exclusive due to non-medical criteria *with any other medical service code* in the at least one claim." That is, it specifies mutual exclusion between medical service codes, not exclusion of a medical service code based on information about the patient.

As the term "non-medical criteria" is not a term of art, and as the claim specifies exclusion between non-medical service codes, claim 2 cannot in my opinion, be sensibly interpreted based on the record available.  I reserve the right to supplement my opinion if and at such time as the Court determines the proper construction of claim 2.

*III.A.3.      Claim 16*

Claim 16 appears to be quite general, specifying "a set of relationships among the medical service codes defining whether selected ones of the medical service codes are valid when received with other selected ones of the medical service codes" and a method involving "determining whether one of the medical service codes in the plurality of medical service codes

is valid or invalid by interacting with the database and the set of relationships contained in the database" It does not further specify the form in which those relationships are embodied or on what grounds a code might be considered valid in the context of another code. I interpret the claim with reference to the body of the patent, which indicates that the "set of relationships" is in fact a set of rules of the form shown in Appendix B, and that the grounds on which a code might be considered valid or invalid include appearing (or not) in the database of all known good codes, and appearing (or not) in one of actual the rules whose general form is shown in Appendix B.

I note also that where claims 1-14 recite the authorizing or rejecting of specific medical procedure *codes*, claim 16 refers to the authorization or rejection of the *claim* in which the medical procedure codes are found.

## III.B.  Apparatus Claims

*III.B.1.    Claim 3*

Claim 3 is parallel to claim 16, recited in apparatus form, and focused on acceptance and rejection of medical service codes (rather than claims).

*III.B.2.    Claims 4-9*

Claims 4 through 9 are dependent on claim 3, and specify further:

claim 4: means for revising a claim to delete an invalid medical service code

claim 5: means for informing why a claim was revised

claim 6: that the database may contain medical service codes described by CPT codes

claim 7: that the database may contain medical service codes described by CRVS codes[2]

claim 8: means for requesting further information from the user

---

[2] I understand this is the only claim not being asserted by McKesson in this litigation.

claim 9: that the relationships among the medical service codes include medically

determined relationships.

I take the phrase "medically determined relationships" in claim 9 to be any relation among medical service codes that could have been written only by someone with knowledge of medicine, in keeping with the analysis above of claim 2.

### III.B.3.    *Claims 10-11*

Claim 10 recites a general means for "determining whether one of the medical service codes in the at least one claim is included in any other medical service code in the at least one claim." Example 3 in the body of the patent appears to be one example of such inclusion.

Claim 11 is dependent on 10 and further specifies a means for revising a claim to not include a rejected medical service code.

### III.B.4.    *Claim 12*

Claim 12 recites a means for determining whether one medical service code is "medically exclusive with any other medical service code," and the means for rejecting such codes. I take this to refer to Examples 1, 17, and 18 in Appendix A, as these are the only rules that act on multiple codes to *exclude* (i.e., reject) a code (rather than, for example, *replacing* it with another code).

It is unclear how "determining whether one of the medical service codes . . . is medically exclusive with any other medical service code" differs from the determining element of certain other claims, particularly Claims 3 and 16 ("determining whether one of the medical service codes . . . is valid or invalid") and Claim 9 ("relationships among the medical service codes include medically determined relationships"). These claims appear to significantly overlap in their functionality.

*III.B.5.    Claim 13*

Claim 13 is the apparatus version of claim 1.

*III.B.6.    Claim 14*

Claim 14 is the apparatus version of claim 2.

*III.B.7.    Claim 15*

Claim 15 is the apparatus version of claim 16, and like claim 15 recites rejecting claims rather than service codes.

## IV. PRIOR ART

I consider next a number of prior art publications and systems and point out their relevance to various aspects of the '164 patent, starting with references relevant to expert systems in general, then turning to those relevant to processing medical claims.[3]

### IV.A.   Expert Systems Prior Art

*IV.A.1.    Davis77: Davis, Buchanan, Shortliffe, Production Rules as a Representation for a Knowledge-Based Consultant Program,* Artificial Intelligence*, 8:15-45, 1977.*[4]

This paper, which I published in 1977, was one of the first expositions of the fundamental concept and architecture for expert systems. It established several basic concepts, including the basic architecture (Fig 3 from the paper, reproduced below), the use of simple if/then rules as a way of capturing non-trivial expertise in a domain (Section 3.2 of the paper), the ability to revise the rules in the knowledge base (Section 6.3 of the paper), and the concept and mechanism for having the program explain its results (Section 6.2 of the paper).

---

[3] In the course of preparing this report, I considered prior art references from among a large collection of publications related to the subject matter of the '164 patent.  *See* Exhibit C.  I also considered textbooks and articles known to me from my experience in the expert system field and materials uncovered through my own investigation.
[4] For ease of reference later, cited references are given a label composed of the first author's last name and (for papers) the year of publication appended.

The architecture in Davis Fig 3 specifies the fundamental components of an expert system; the components in Fig 1 of '164 correspond closely. The consultation program of Fig 3 provided the functionality of what the '164 patent calls the user interface and knowledge base interpreter (#2 and #5 in Fig 1 of '164), the knowledge base is labeled identically in both figures, while the task of knowledge acquisition program of Fig 3 is to update and refine the knowledge base, a functionality provided by the history database, #7 in '164 Fig 1.



FIG. 3. The six components of the system: four programs, the knowledge base, and the patient data base. All of the system's knowledge of infectious disease is contained within the knowledge base. Data about a specific patient collected during a consultation is stored in the patient data base. Arrows indicate the direction of information flow.

*Artificial Intelligence* **8** (1977), 15–45

**Fig 3 from Davis 1977.**

The explanation program in Fig 3 above reads directly on claim 5 of '164.

*IV.A.2.*    *vanMelle79: van Melle, W. A domain-independent production rule system for consultation programs, in* Proc. IJCAI-79, *923-925, Tokyo, August, 1979.*

This paper presented a report on what became van Melle's 1980 PhD thesis (Stanford University Computer Science Department). It offered the first concrete demonstration of the idea that expert systems could be built by starting with a "shell," i.e., a system with all of the

components shown in Davis Fig 3 except the knowledge base. The task of building an expert system then became a far simpler one of creating a knowledge base and "plugging it in" to the shell. This was the genesis of the expert system shell business; by 1986 shells were used widely enough to account for a market estimated at $63 million a year.[5]

IV.A.3.        *McDermott82: McDermott, R1: A Rule-Based Configurer of Computer Systems,* Artificial Intelligence, **19**:39-88, 1982.

This paper reported on a very successful and widely known rule-based expert system that had been extensively used in a commercial setting at Digital Equipment Corporation.[6]  The job of this program was to analyze orders being placed for Digital's VAX-11/780 computer systems. These computers were among the first to be highly configurable, i.e., there were a great many user-selectable options (as used to be the case for automobiles). The problem was that there were also numerous interrelations among the options and these interrelations had to be checked in order to ensure that a system built to that specification would actually work. R1 automated this task, doing it considerably faster and eventually more accurately than the human experts who checked orders.

For our purposes here the important elements are the explicit use of a set of relationships, captured as rules, that (among other things) specify tests for whether the objects being analyzed (the options in the order) were compatible, and in the event of conflicts, the system would modify the order so as to resolve the conflict. Consider these excerpts from the paper:

[Someone checking an order] must have rules that enable him to associate components to form partial configurations and to associate partial configurations to form a functionally acceptable system configuration. These rules must indicate what

---

[5] Artificial Intelligence Market Set To Boom Worldwide, *Software Markets*, 5/23/1986, available from Lexis/Nexis.
[6] The R1 system was well-known in the expert system community during the 1980s and was widely cited in expert system patents and literature.  For example, the Bennett patent, another prior art reference discussed herein, cites to the R1 paper as prior art.  I knew Mr. McDermott and others who worked on R1 at the time they were developing the system and was personally familiar with their work.

components can (or must) be associated and what constraints must be satisfied in order for these associations to be acceptable; I will call this knowledge *constraint knowledge*.

[McDermott 1982 at 41; emphasis in original]

…all of the domain specific that R1 requires to do the task – including domain-specific control knowledge – is contained in productions. Each of R1's productions (rules) embodies a piece of constraint knowledge.

[McDermott 1982 at 45]

[Describing the processing of an order:] It next determines whether all of the components on the order have compatible voltage and frequency requirements, and if not, substitutes components of the appropriate voltage and frequency.

[McDermott 1982 at 50]

The first of these makes it clear that R1 had a set of relationships among the components that it examined, just as '164 has its relationships among medical service codes. Hence this reference reads on all claims of '164 involving a set of relations. The second paragraph above makes it clear R1 captured that knowledge in a set of rules, just as '164 does. The third makes it clear that R1 had rules about and an ability to deal with components that were mutually exclusive; it detected such exclusion and then rejected such components based on its rules, just as '164 deals with mutually exclusive medical service codes. This reads directly on claims 2, 3, 10, 12, and 16 of '164).

The system and technology described in the R1 paper is in my opinion clear prior art to the '164 patent. After R1 the general notion of "order checking" became a widespread application of expert systems technology; among others NCR and Motorola initiated major efforts to build such systems for their product lines in 1984 and 1985.

The R1 paper so directly reads on claim 3 in particular that simply by substituting "computer order" for "claim," and "computer component" for "medical service code," claim 3 would read as a remarkably accurate description of R1:

A computer system including a central processing unit and associated memory for processing input *computer orders* containing at least one *computer component*, comprising:

a predetermined database stored in the associated memory, the database containing *computer components* and a set of relationships among the *computer components* defining whether selected ones of the *computer components* are valid when received with other selected ones of the *computer components*;

means for receiving at least one *computer order*;

means for ascertaining whether the at least one *computer order* contains a plurality of *computer components*;

means for determining whether one of the *computer components* in the plurality of *computer components* is valid or invalid by interacting with the database and the set of relationships contained in the database;

means for authorizing *computer components* which are valid in response to the means for determining; and

means for rejecting *computer components* which are invalid in response to the means for determining.

### IV.A.4.       Bennett Patent: 4,591,983 (filed June, 1984)

The patent describes a particular architecture for an expert system (or knowledge system, a virtually synonymous term), one particularly well suited to describing "things" that can naturally be described in terms of a hierarchy of related components. I say "things" because, while (like R1) the patent uses computer systems as the motivating example, the concept is more general and encompasses other things describable hierarchically, including both tangible things (e.g., cars) and intangible things (e.g., the coverage of an insurance policy). It is for this reason that the patent claims are phrased in terms of "objects" and "assemblies." Like R1, the system described here checks the consistency of the components and if a conflict is detected, either modifies the order or warns the user of the conflict.

Several extracts from the body of the patent make clear its use of these concepts:

In accordance with a preferred embodiment of the invention, a knowledge-based configuration system has separate portions encoding a configuration checking strategy, a description of hierarchical functions of the product to be configured, a catalog of the parts and components which implement those functions, assembly constraints that

check whether a given set of components will successfully implement their respective hierarchical functions. The configuration system applies the assembly constraints during configuration checking and if necessary, warns the user or modifies the given set of components to insure compliance with the assembly constraints.

Col 4, lines 4-16

Once the order is received by the knowledge system 10, the parts in the order are checked for consistency by applying the constraints in the knowledge base (Appendix IV (D))

Col 11, lines 26-29

The constraints also specify the particular action that should be taken in response to whether the conditions are satisfied when the constraints are applied. For the MINI-1000 minicomputer, the order must include at least one RAM-1000 random access memory board, at least one ROM-1000 read only memory board, at least one TERMINAL-1000 computer terminal, and at least one IF-1000 interface board. The action to take when any of these parts is found to be missing is to add one of the respective missing parts, since these parts are essential to the operation of the minicomputer.

Col 11 lines 31-41

If the number of RAM-1000 cards plus the number of ROM-1000 cards exceeds seven, the user must be told that he has ordered too many memory cards. This kind of constraint is called a warning constraint in contrast to the previous modification constraints which require the working configuration of parts to be changed.

Col 11, lines 55-61

For constraints that modify the contents of the current bin, the system provides a special form for specifying a list of parts to add to, delete from, or replace the contents of a bin

Col 23, lines 62-65

As the quotes make clear, the Bennett patent describes a system that:

1. reviews the configuration of something (as '164 does)

2. uses a database of components that can be part of a configuration (cf. the medical service codes in the database in '164)

3. uses a set of rules that specify relationships among the components (as in '164)

4. is capable of adding or removing components from the configuration (as in claims 4 and 11 of '164)

5. is capable of warning the user when a necessary relationship among the components is not satisfied (as in claims 1 and 13 of '164).

*IV.A.5.*    *Hardy Patent: 4,803,641 ( effective date June 6, 1984) (cited during patent prosecution)*

This patent describes some of the basic technology for an expert system building tool, i.e., a program whose task is to aid in building an expert system. A physician, for example, might use this tool to allow him/her to construct an expert system to diagnose a class of diseases, without having to learn to be a programmer.

For our purposes here the central element of interest appears in Figs 9-12 of the patent, described at Col 10, line 18-33. This is the format of an IF/THEN rule of the sort widely used in expert systems, and detailed earlier in Section 3.2 of the Davis 1977 reference discussed above. Both of these references demonstrate that both the structure and function of IF/THEN rules in expert systems had been well established long before the '164 patent.

*IV.A.6.*    *Gallant Patent: 4,730,259 (filed Mar 1, 1985)*

The Gallant patent describes an expert system in which the inference engine is controlled by a matrix of learning coefficients (i.e., a set of numbers) that can be learned from examples. The intent here is to ease the task of constructing an expert system, because:

> In the prior art, rules are generally constructed for an expert system by either having a human expert provide the rules in a form suitable for the rule base or by having another person generally known as a knowledge engineer convert the information from an expert into appropriate rules. It is often the case that a human expert in a particular area has difficulty formulating his or her knowledge as a set of rules. The process of generating and perfecting a set of rules has been universally recognized as the most time consuming, difficult, and expensive process involved in building an expert system. It is frequently difficult to reduce expertise to a set of rules.

> Various approaches have been tried to ameliorate the problem of generating rules for a expert system. One approach is to create a "user friendly" interface to ease the human task of adding new rules as described in Buchanan, B. and Shortliffe, Rule-Based Expert Systems, Addison Wesley, 1984, Chapter 9.

> Col 1, line 63 – Col 2, line 10.

Chapter 9 of Buchanan and Shortliffe is an abbreviated version of an article I wrote, it explains the traditional process of knowledge acquisition as "interactive transfer of expertise," essentially the relationship between a mentor and student.

Both of these references (i.e., the patent and the Davis article it cites) establish that the task of building expert systems was widely understood by the early 1980's as one of as collecting knowledge from human experts.

*IV.A.7.      Dormond Patent: 4,839,822 ( filed Aug 13, 1987)*

This patent covers an expert system that provides suggestions for treatment for physical trauma (e.g., broken bones). For our purposes here the most relevant element is the patent's recitation of the standard architecture for expert systems:

> The expert system in accordance with the present invention provides the user with one or more suggested treatments for a patient with physical trauma. The system includes a computing device having a memory, a plurality of databases in the memory, an application program and an inference engine program.
>
> Col 2, lines 57-60

While the terms of art have changed slightly over the years, the "consultation program" mentioned in Davis 1977 (above), the "knowledge interpreter" in the '164 patent, and the "inference engine" mentioned in '822 all refer to the same thing: the core component of an expert system that uses the knowledge in the knowledge base, applying it to the example at hand. The term "inference engine" has come to be the dominant term and is now the standard way to refer to this component.

Given that understanding, this patent, like Davis 1977 cited above, indicates that the basic architecture of an expert system was well established in the years before the '164 patent.

**IV.B.   Medical Claims Processing Prior Art**

*IV.B.1.*        *Egdahl87: Egdahl, Hertenstein, An Access-oriented Negotiated Fee Schedule: The Caterpillar Experience*, Annals of Surgery, **206**:349-357, *Sept 1987 (also presented at meeting of the American Surgical Assn, Palm Beach, Fl, 21-23 April 1987)*[7]

This paper, co-authored by one of the inventors of the '164 patent, Dr. Hertenstein, describes in detail the system used by Caterpillar Corp. to reimburse surgeons.[8]  The article describes the background and motivation for the approach Caterpillar uses, the details of the process, the savings it produces, and the larger policy issues surrounding the impact such a system can have on both patients and the willingness of surgeons to participate.

For our purposes the important thing is the discussion in the section entitled "Continual audit and recoding of physician bills." This section lays out in detail the process used by Caterpillar in auditing claims and possibly revising the medical service codes they contain. While the system described in this article is a manual system, the article discloses almost every important element found in the '164 claims.

Consider the following excepts (pages 349, 351-352):

CAT claims processors subject each incoming physician bill to a coding analysis of CPT-4 codes as a first step, and recode claims where irregularities are found. Obvious simple coding errors are corrected first.

This reads directly on claims 1 and 13, as the most obvious simple coding error is to use a medical service code not found in the database. "Recoding" implies that codes were changed,

---

[7] It is my understanding that the Egdahl87 and AMS references (described below) were in the possession of the patentee at the time the patent was filed.  It is my expert opinion that these references are highly material to the subject matter of the patent.  I have been informed that such material references should have been disclosed by the patentee in connection with the patent application.
[8] In his deposition in this case, Dr. Hertenstein testified regarding Egdahl87 and confirmed that the components of his manual process are discussed in the article.  Hertenstein Deposition, pp. 45, 51-52.  Dr. Hertenstein also confirmed that the tables in the article show CPT-4 codes which had been rejected due to unbundling or upcoding errors.  Hertenstein Deposition, pp. 58-59.

meaning some could be added while others were deleted; hence this reads on claims 4 and 11 of '164.

> …the patient is informed of CAT's review decision.

This reads directly on claims 1, 5, and 13, insofar as those claims deal with informing a user of the system's changes to the claim.

> …operative reports are requested for most surgical claims and follow-up calls to provider offices for clarifying information are common.

This reads directly on claim 8, "means for requesting further information from a user regarding the at least one claim."

> Individuals with clinical knowledge and judgment then compare the provider's description of services with submitted codes…

This reads on all claims containing the phrase "a set of relationships among the medical service codes defining whether selected ones of the medical service codes are valid when received with other selected ones of the medical service codes," as this is precisely what is supplied by the "clinical knowledge and judgment" possessed by those individuals. It also reads on claims 9 and 12 of '164, as the "clinical knowledge and judgment" is of course medical information concerning the relationship among codes.

> CPT-4 codes are recoded for greater accuracy, when indicated, surgical services that have been incorrectly bundled are rebundled, and the appropriateness of surgical assistance charges is reviewed

This reads on claims containing the phrase "determining whether one of the medical service codes in the plurality of medical service codes is valid or invalid by interacting with the database and the set of relationships contained in the database," (namely claims 3, 15, and 16) , as is exactly the action carried out by the CAT personnel doing the recoding. This excerpt also

reads on claims containing more specific versions of the same phrase, including: claim 2, "determining whether one of the medical service codes in the at least one claim is mutually exclusive due to non-medical criteria;" claim 10, "determining whether one of the medical service codes in the at least one claim is included in any other medical service code;" claim 12, "determining whether one of the medical service codes in the at least one claim is medically exclusive with any other medical service code;" and claim 14, "determining whether one of the medical service codes in the at least one claim is mutually exclusive due to non-medical criteria." Finally, the explicit mention of CPT-4 codes reads on claim 6 of '164.

The article then goes on to supply several concrete examples of the process, showing how recoding can be done effectively by using clinical knowledge and judgment in the form of knowledge about relations between medical service codes:

> In Table 4, the appropriate payment is $1000 for code 38100. The patient was hospitalized for an elective splenectomy. The CAT reviewer would disallow codes and charges for all except the splenectomy: a charge for laparaotomy and incidental appendectomy is warranted only if done as a separate procedure and preoperative check and postoperative care are conventionally part of the global surgery fee.

> Under most conditions, one surgeon can perform a brea[s]t biopsy. The operative report indicates no unusual circumstances. The assistant surgeon is not reimbursed, and the patient is informed of CAT's review decision.

> In Table 6 … The procedure was actually a simply wart removal. The operative report described a 0.25 inch plantar wart on one foot. Excision combined with the use of the laser constitutes excessive treatment for this common condition. Wart removal is most accurately coded as 17100 ("destruction by any method of benign skin lesion").

Finally, the paper offers examples of rules used by CAT personnel to limit the payment amounts for various procedures, illustrating exactly the sort of rules shown in Example 16, Appendix A of the patent, an example of a type L1 rule:

> Once the claim reviewer is satisfied that enough information is available to code the bill consistent with CAT procedures, recoding is finalized, and the correct codes are compared with established regional fee schedules.

A charge of $1000 for the splenectomy is in line with the regional fee schedule and is the amount ultimately approved.

CAT knows that four local experienced, board-certified cardiac surgeons will carry out a three-vessel coronary artery bypass for $5000, assuring that access can be achieved for that fee (Table 7).

In Table 5, the appropriate payment is $750 to the primary surgeon for code 19121 (excision biopsy, breast, bilateral).

There is no question that virtually all of the fundamental elements in the patent are revealed in this paper. While the Caterpillar system described is manual, it contains the core of the matter covered in the patent, for the entirely plausible reason that it was written by one of the inventors, describing the very system that they automated.

In addition, given the state of the art of expert systems in the mid-1980's – namely a well-known and routine technology -- the paper provides all it would take for someone with routine skill to have created the system described in the patent.

### IV.B.2.        AMS: Advanced Medlogic Systems, from The Health Data Institute

AMS, as it was known, was developed by The Health Data Institute ("HDI"), then of Lexington, MA in the early 1980's, and by 1986 was being marketed and sold to insurance companies to enhance their claims processing systems.  One of the inventors of the '164 patent, Dr. George Goldberg ("Goldberg"), testified at his deposition in this case that he had worked with AMS while employed by HDI in 1985 and 1986.  Goldberg Deposition, pp. 51-52, 62-63. He described AMS as "a series of computerized tables, lookup tables, that received, processed and paid claims."  Goldberg Deposition, p. 51-52.  Dr. Goldberg stated that the tables reported discrepancies such as "age/procedure discrepancies, age/diagnosis discrepancies, sex/procedure discrepancies, sex/diagnosis discrepancies."  *Id*., pp. 63-65.  Dr. Goldberg also stated that AMS was a "system . . . for looking for the occurrence of certain codes or code combinations" (*Id*., p.

265), but observed that the "tables could have been modified to have two procedure codes and a lookup table that would indicate some unbundling." *Id.*, p. 389.

A marketing pamphlet describing AMS, entitled "Setting a New Standard," contains the following relevant descriptions of the AMS system:[9]

> Beginning at the individual claim level, AMS organizes and evaluates provider claims, *first checking for the validity of values* and then *cross-checking for consistency of information and accuracy* of data items.
>
> An AMS accuracy edit at the individual claim level, for example, flags a claim with a rare combination of procedure and age – such as a coronary artery bypass performed on a 12-year-old – and investigates it for possible coding errors.
>
> At subsequent levels, AMS merges hospital and physician claims for both in patient and outpatient procedures related to an illness.
>
> If, for example, the hospital's diagnoses are pneumonia and diabetes and the physician's diagnosis is a stroke, *AMS automatically flags the claim for further review* to determine which diagnoses are correct.
>
> … *AMS reviews the case automatically and a payment decision is made based on clinical data and medically accepted standards* of care.
>
> *AMS also merges and evaluates ambulatory care claims for volume and appropriateness of services*. A patient with gall gladder disease, for example, who has had a complete set of X-rays prior to elective hospitalization for gall bladder surgery does not need to have them performed again upon admission.
>
> *If AMS flags a claim, a number of review methods can be used to resolve and eventually adjudicate the claim.*
>
> *An AMS accuracy edit under review may require a telephone query to the appropriate physician or hospital, for example.*
>
> [emphases added]

As these quotes make clear, the AMS system:

- checked the validity of the codes entered: "checking for the validity of values" (cf.

    '164 claims 1 and 13)

---

[9] HDI was acquired by Caremark in 1985, then in mid-1987 Caremark was in turn acquired by Baxter, Inc. While the pamplet is not dated, the last page describes HDI as "a Caremark company," indicating it was written in and describes AMS as of the 1985 to mid-1987 time period. I obtained this pamphlet and the other AMS documents referenced herein through my own investigative efforts undertaken while preparing this report. I understand that additional AMS documents have been produced in this litigation. *See* MCK 047505-047606, MCK 047608-047619.

- had a set of relationships among the codes it examined that defined whether one of the codes was valid when input with other codes: "cross-checking for consistency of information" (cf. '164 claim 3 and all others relying on a set of relationships)

- automatically reviews the claim and applies knowledge about medical relations among the codes: "AMS reviews the case automatically and a payment decision is made based on clinical data and medically accepted standards," "AMS also… evaluates ambulatory care claims for volume and appropriateness of services." (cf. all '164 claims involving medically determined relations)

- can request additional information from the user: "An AMS accuracy edit under review may require a telephone query" (cf. '164 claim 8).

An extract from a June 1986 HDI document describes in detail the claim editing rules that were the heart of AMS's expertise.  The page labeled 1 in the document shows the basic rule for validating the accuracy of data; note that the system "Checks individual data elements and compares each with a list of acceptable single numbers, letters, and/or ranges. Values outside these ranges are not acceptable," and "For each variable listed, a specified set of acceptable values is provided" (cf. '164 claims 1 and 13).

The pages labeled 6-7 in the document shows an editing rule that (a) deals with multiple medical procedure codes in a claim ("there must be at least two procedures on the claim to perform this edit"), and (b) uses a set of relationships among the medical procedure codes to accept or reject the claim (cf. '164 claims 15 and 16).

The page labeled 8 in the document shows another example of a set of relationships among medical procedure codes being used to accept or reject a claim, in this case relying on

medical knowledge about the relation between surgical procedures and diagnoses (cf. '164 claims 9 and 12).

The page labeled 12 in the document shows an editing rule for comparing the diagnosis and the patient's age, showing the use of a rule of the sort classified in the '164 patent as an EA or Q7 rule. The page labeled 13 in the document shows an editing rule that compares procedures and patient age, almost an exact match to the EA and Q7 classes of rules in the '164 patent.

Pages labeled 14 and 15 in the document show AMS checked for medical relations between procedures (or diagnoses) and patient age. To the extent the claim 2 of '164 is regarded as dealing with patient age (as a "non-medical" criterion), this shows a prior system using that concept.

Pages labeled 17 and 18 in the document show AMS checked the procedure and diagnosis against place of service, a rule almost identical to the EP and Q5 classes of rules shown in Appendix B of '164.

Additional examples in the document show AMS used medical knowledge to check length of stay (pages labeled 20-27).

Pages labeled 28-30 show AMS used medical knowledge to check charges to ensure that they were within the expected range, an example of what the '164 patent calls an L1 or a Q3 rule.

Page 31 of the document explicitly mentions the use of CPT codes "(Only CPT-4 procedure codes will be edited"), (cf. '164 claim 6).

Page 32 shows yet another use of medically determined relationships among procedure codes being used to authorize or reject a claim, in this case "procedures and tests which should only occur once in a claim" (cf. '164 claim 3 and others referring to "a set of relationships").

Finally, page 33 shows the AMS system could accept or reject part of a claim based on its medical knowledge about the number of practitioners necessary for uncomplicated procedures, yet another example of medically determined relationships among procedure codes.

A letter from a Senior Scientist at HDI, written May 28, 1987, following up on a marketing call to the Health Claims Division of State Farm Insurance demonstrates that the AMS system was being actively marketed and sold in mid-1987, and that both the marketing pamphlet and an AMS Product Overview, dated May 1986, were openly distributed ("Please feel free to share this information with anyone in your organization who might be interested in them.")

The documents from HDI describing the AMS system provide what I believe to be compelling evidence of prior art that anticipates or renders obvious many of the claims of the '164 patent.

IV.B.3.     *Doyle Patent: 5,070,452 (effective date June 30, 1987)*
            *Mohlenbrock Patent: 5,018,067 (filed Feb 16, 1984)*

These two patents describe systems that deal with medical codes and offer some basic ability to accept or reject those codes. For our purposes here the important part of the Doyle patent is its description of a system that allows the physician to enter both diagnosis codes and procedure codes, which it then checks in some basic ways, illustrating the general concept of checking both claims and medical codes:

> Block 95 indicates that the physician enters a code identifying the diagnosis (sprained wrist). Block 97 indicates that the physician enters up to ten "procedure codes", which refer to the treatments for a sprained wrist selected by the physician. Blocks 101 and 104 indicate that the diagnosis and procedure codes are now transmitted via a local telephone call to the administration computer 3. Block 106 indicates that a check is made to verify that the codes received are actually existing, and not fictitious, codes. Block 109 indicates that the administration computer searches the data base for plan ABC and calculates the reimbursement specified by the employer for each treatment. Block 112 indicates that these reimbursements are under the employer's control, and will be discussed later in more detail.

Col 5, lines 42-58

The sentence "Block 106 indicates that a check is made to verify that the codes received are actually existing, and not fictitious, codes" reads directly on claims 1 and 13 of '164 ("determining whether any medical service code contained in the at least one claim is not present in the predetermined database").

The sentence "Block 109 indicates that the administration computer searches the data base for plan ABC and calculates the reimbursement specified by the employer for each treatment" illustrates the idea of a system that knows the appropriate level of reimbursement, as illustrated in Example 16 of Appendix A of the '164 patent.

The Mohlenbrock patent describes a system that aids a doctor in selecting an appropriate diagnostic related group (DRG), a form of encoding that aggregates the more than 10,000 ICD (International Classification of Diseases) codes into several hundred codes that describe patients with similar diagnoses and similar hospital resource usage. For our purposes the important part of the patent is its description of rejecting DRGs that are inappropriate, and the notion that claims editing can be automated. The first of these is found at Col 10 Line 60 – Col 11, line 2:

> …the processing steps 47-65 of FIG. 2 examine the list of related DRGs that are in the DRG database record for the current Working DRG. Those related DRGs that cannot fit this patient because the sex or age do not match are eliminated. Also, any DRGs with the same Content Code as the working DRG are eliminated since only one DRG of a doublet or triplet can be relevant.

This reads on claims in '164 that recite the notion of "a set of relationships among the medical service codes defining whether selected ones of the medical service codes are valid when input with other selected ones of the medical service codes."

The second is found at Col 12, lines 37-66:

> Once discharged, the patient chart and the physician determined DRG number are sent to the medical records clerical department of the hospital where ICD-9 codes are

identified for all the diagnoses and procedures in accordance with usual techniques. But the medical records clerk now has the physician determined DRG with which to compare. Additionally, form A1 will alert the medical records clerk to additional C.C.s that may be relevant. Further, if the DRG text in the DRG database is expanded, the medical records clerk has the text of the Working DRG as an aid.

In fact, this comparison can be automated, as shown in FIG. 5 wherein a comparator 91 receives as one input 93 the DRG number determined by the physician in accordance with the procedure of FIG. 4 using the computer system of this invention. The second input 95 is a DRG number determined by running a prior art Grouper program 97 which operates from a plurality of ICD-9 code numbers identified by the medical records clerk. A system can even be used that would respond directly to each ICD-9 code inputted to it by the medical records clerk and indicate at the output of the comparator 91 when enough ICD-9 codes have been entered so that the DRG that is calculated by the Grouper program is the same as that determined by the attending physician.

This provides background indicating that the notion of automating the claims editing process was a part of the prior art as of 1984.

IV.B.4.    *Bernier86: Bernier, Clinical Evaluation: The Next Step in Claims Processing,* Best's Review Life/Health Insurance Edition*, April 1986, pp 106-127*

This article lays out a plan for clinical evaluation of claims and anticipates several central elements in the '164 patent. It begins by describing the overall organization of a system to manage hospitalization:

An automated system designed to monitor and manage a hospitalization encounter with the goal of controlling costs would be divide into three stages: automated pre-certification, concurrent utilization review and automated claims editing.

We are of course interested here in the automated claims editing component:

The final module, automated claims editing, would audit the claim prior to payment to assure that clinical, resource utilization and financial components are within bounds and reasonable. Clinical edits evaluate the interrelationships among age, sex, principal and secondary diagnoses and procedures.

This reads on the '164 claims using the phrase "a set of relationships among the medical service codes defining whether selected ones of the medical service codes are valid when input with other selected ones of the medical service codes."

The article goes on to say

> Thus, clinical editing would identify clinical inconsistencies in a claim and cause removal from the claims adjudication process prior to payment.

This reads on the claims of '164 involving any form of inconsistency among the medical service codes (patent claims 2, 10, 12, 14, 15, and 16), as well as those indicating rejection of medical service codes (patent claims 2, 3, 4, 10, 14) or medical claims (patent claims 15 and 16).

The article makes the case that clinical editing is a crucial function, highlighting the value of creating such a system:

> The clinical-editing function is critical because the determination of appropriate comparative norms will be based on the clinical information. … Further, … clinical editing is essential in order to determine the appropriate DRG assignment.

The article also suggests that clinical editing is already being done, in 1986:

> Sophisticated clinical editing systems exist which identify problems such as:
> - Conflicts between a patient's age and sex and their diagnosis or procedures
> - Procedures performed which are not justified by the patient's diagnosis
> - Noncovered procedures
> - Diagnosis indicating surgery, in which no surgery was performed
> - Clinically unreasonable length of stay.

The article also points out that

> The system optionally could produce an initial DRG, length-of-stay limitations, reasonable charge limits for room, board and ancillary charges that are specific to that hospital… Based upon the results of this analysis, a reviewer could approve or deny the admission or request additional information.

This reads on claim 8 of '164, the means for requesting additional information from the user. Finally, the article indicates that

> The automated system described here could exist as an integrated system, or each module could be utilized separately. It could run on microcomputers in individual claims offices or be integrated into an existing claims-payment system on a large mainframe computer. Sufficient technological alternatives exist today to accommodate the needs of organizations of any size.

This makes it clear that the functionality for claims editing that the functionality for claims editing outlined earlier in the article could easily be built as a standalone system, as suggested in '164.

*IV.B.5.*        *Numerous Brief Articles Dealing with Claims Editing*

Eight short articles from trade publications are briefly relevant to the analysis of the '164 claims. I lump them together for the sake of simplicity and extract from each just the relevant quote(s).

Anon85: _____, Enhancing Accuracy and Timeliness is Integral to the Claims Adjudication Process, *Employee Benefit Plan Review,* Dec 1985, pp 10-12.

This article describes the process of clinical editing, giving several examples:

> …when data on age, sex, effective dates, and cancellation date are entered into the computer system certain red flags can be built into the system to warn that a covered individual is near or past eligibility status.

> Age edits will alert claims adjusters to those participants who are over age 65 and eligible for Medicare, and will identify students age 19 to 23 or whatever limitations might be under the plan.

> It will identify X-ray and lab work that is not consistent with the diagnosis, which is an indication of preventative medicine, or defensive medicine, or financing a Rolls Royce.

To the extent that '164 claim 2 is interpreted to mean taking into account such things as age, gender, etc. (which I have argued against above), this reference demonstrates that such

accounting of age, etc., was an established concept in the prior art in 1985. The example above

concerning X-rays and lab work also indicates that the concept of "a set of relationships among

the medical service codes defining whether selected ones of the medical service codes are valid

when received with other selected ones of the medical service codes" is also present in this

article. The article also mentions a variety of different coding systems, including CPT, RVS,

ICD, and DRG, demonstrating that dealing with all of these codes was anticipated in 1985.

Snyder87: Snyder, The leading edge of expert systems, Software Review, **12**:22-30, Autumn
    1987.

   This article reviews applications of expert systems in the insurance industry, notably

mentioning the ExClaim system by Policy Management Systems Corporation, which

> …completely automates the health claims adjudication process.
>
> The claims examiner prompts ExClaim by entering basic claim information, such as the claimant's name and address, dates of service, amounts of charges, provider information, diagnoses, procedures performed, and category of service (office visits, inpatient or outpatient surgery, etc.). Based on all that data, ExClaim then determines the resultant payment or final reconciliation of the claim…
>
> The system contains an underlying base of knowledge regarding how to operate in the claims industry.

   The article thus indicates that there was another system similar to that described in '164

already in use no later than Autumn 1987.

Stachura87: Stachura, Software reference guide: DRG assignment, J American Medical Record
    Assn, **58**:33-40, January 1987.

   This article provides a brief list of systems that fall in the general category of DRG

assignment software. Examples with particular relevance to '164 include:

> PQDM contains a DRG grouper and is design to provide complete and accurate information for coding and grouping purposes. The system promotes coding accuracy by *detecting selection errors, determining the potential for more specific codes,*

*prompting for additional clinical data*, and presenting legitimate reporting options. *As many as 600 edit checks per case are conducted* to ensure that codes conform to coding principles, UHDDS definitions, Medicare edit checks, and clinical concepts.

P. 34 (emphasis added). The emphasized text above indicates that this system appears to have had the ability to check for codes not in the set of approved codes (cf. claims 1 and 13 of '164); replace one code with another based on a set of relationships among the codes, in this case a relation of generality/specificity (cf. claim 3 of '164); asking for additional data (cf. claim 8 of '164). The reference to 600 edits also makes it clear that this was a substantial system, even in January, 1987.

A second relevant system in the list is Clinical Data Editor by Honeywell Information Systems: "The Clinical Data Editor system evaluates the consistency of coded data via more than 25 code edits and assigns DRGs based on edited data." P. 37. This illustrates another system capable of editing medical codes that was operational in prior to January 1987. While the description is brief, the claim that the system "evaluates the consistency of coded data via more than 25 code edits" reads on claims 1, 3, 8, and 13.


Huertas88: Huertas-Cortocarrero, Concurrent clinical review: Using microcomputer-based DRG software, Health Policy, **9**:211-217, 1988. (Also presented at the October 1987 EHPF-WHO Meeting in Brussels.)

The relevant portions of this paper describe the Clinical Review System (CRS), pointing out that it had the following properties:

An on-line DRG Grouper *calculates DRG assignments from the ICD9-CM codes*.

*CRS points out when a non-specific code must be replaced by an ICD-9-CM code of greater specificity, and when the presence of a complication/co-morbidity code affects the DRG.*

The system can help improve the accuracy and completeness of medical records. *Problems with clinical data (e.g., diagnoses inconsistent with sex) and DRG assignment*

*(e.g., manifestation code listed as principal diagnosis) are found by the CRS clinical data editor.*

[emphasis added]

The text emphasized above makes it clear that:

- CRS worked on and manipulated medical codes,

- CRS had a set of relationships among medical codes that it used to replace codes that were too general with codes that were more specific (cf. '164 claim 3 and others)

- that it had a set of relationships among medical codes that it used to recognize complications that affected the choice of DRG code (cf. '164 claim 3 and others)

- that it could recognize codes inconsistent with patient data (cf. '164 claims 2 and 14, assuming "non-medical" refers to issues such as patient gender, age, etc.) and

- that it could recognize codes that were medically exclusive with other codes (cf. '164 claim 12)

Nathanson85: Nathanson, Experts: More research needed to set value of code programs, Modern Healthcare, **15**:98-102, June 21, 1985

This article discusses a number of coding programs. Relevant observations include:

Code editor software *checks codes to ensure they're appropriate for Medicare reimbursement, detecting diagnoses that aren't specific and finding procedures and diagnoses that don't match* and would be rejected by Medicare.

[emphasis added]

The highlighted text makes it clear that when this article was written in 1985 there already existed programs doing medical code editing, checking code validity (cf. '164 claims 1 and 13), checking code specificity (cf. '164 claim 3 and others), and detecting codes that were mutually exclusive (cf. '164 claim 12).

Gonnella84: Gonnella, Staging of Disease, A Case-Mix Measurement, JAMA, **251**:637-644, February 3, 1984.

This article provides an overview of a research effort aimed at "staging" diseases, i.e., categorizing the severity of a disease. For our purposes the interesting information concerns their software:

> A computer software system has been developed to employ staging on large-scale databases. An individual patient record from a computerized discharge abstract file is read by the program and systematically searched for the principal and associated diagnoses. … the software *will overrule the principal diagnosis* listed *if it is a complication or manifestation of a secondary diagnosis, according to the medical criteria.* For example, neuropathy is considered a manifestation of diabetes mellitus by the software when both conditions are listed on a discharge abstract, regardless of the order in which they appear.
>
> [emphasis added]

The emphasized text shows that this program had and used a sizable body of knowledge about the medical relationship between medical conditions (cf. '164 claims 9 and 12).

Dornfest84: Dorenfest, Computers can figure out DRGs, if you can figure out computer market, Modern Healthcare,**14**:130-136, February 15, 1984.

This brief article provides a snapshot of the confusing state of the medical software market in early 1984 as the effects of changes in Medicare regulations was being felt. For our purposes the important point appears in this text:

> But even using Code Finder, a hospital isn't assured of the *consistency of clinical data* and the resulting diagnosis. For this purpose *a hospital can acquire the Clinical Data Editor* marketed by Health Systems International. *This product identifies erroneous or missing diagnosis and procedure codes.*
>
> [emphasis added]

The highlighted text above makes it clear that as of February 1984 when this article was written, there already existed a program capable of detecting erroneous procedure codes (cf. '164 claims 1 and 13.

Carter, End of PIP will prompt hospitals to try software to speed billing, Modern Healthcare, **17**: 62-68, Feb 13, 1987.

This brief trade article describes yet another system, operational in early 1987, capable of modifying medical codes by relying on knowledge about the relationships among the medical codes:

> …ENSEMBLE lets hospitals collect information for billing while the patient is in the hospital receiving treatment… The software keeps track of the patient's DRG throughout his stay and *alerts the hospital if his case should be classified under another DRG*.

> [emphasis added]

While somewhat general, the emphasized text indicates the existence of a system in early 1987 that, like the '164 patent, examined medical records and reasoned about codes.

## V.  CLAIM CHART

The chart below summarizes the discussion above of prior art.

| Asserted Claims of the '164 patent | Relevant Prior Art Reference |
|---|---|
| 1 | Bennett patent, Egdahl, AMS Brochure, AMS rules, Doyle patent, Stachura84, Nathanson85, Dornfest84 |
| 2 | Egdahl87, McDermott82, AMS rules, Bernier86, Anon85, Huerta88 |
| 3 | McDermott82, Bennett patent, Egdahl87, AMS brochure, Bernier86, Stachura84, Huertas88, Nathanson85 |
| 4 | Bennett patent, Egdahl87, Bernier86 |
| 5 | Davis77, Egdahl87 |
| 6 | Egdalh87, AMS rules, Anon85 |
| 8 | Egdahl87, AMS brochure, Bernier86, Stachura84 |
| 9 | Egdahl87, AMS rules, Hertas88, Gonella84 |
| 10 | Egdahl87, AMS rules, Bernier86, Huertas88, Nathanson85, McDermott82 |
| 11 | McDermott82, Bennett patent, Egdalh87 |
| 12 | Egdahl87, AMS rules, Bernier86, Huertas88, Nathanson85, Gonella84 |
| 13 | Egdahl87, AMS brochure, AMS rules, Doyle patent, Stachura84, Bennett patent, Nathanson85, Dornfest84 |
| 14 | McDermott82, Egdahl87, Bernier86, Huertas88 |
| 15 | Egdahl87, AMS rules, Bernier86 |
| 16 | Egdahl87, AMS rules, Bernier86 |

## VI.  THE STATE OF THE ART OF EXPERT SYSTEMS CIRCA 1986.

As my CV suggests, I have been involved in the field of expert systems in general and expert systems applications in medicine roughly from the time that work first began in the mid 1970's. My PhD thesis and subsequent publications helped to establish some of the fundamental properties of expert systems, and over the years since I have been involved creating systems in a variety of areas, including medicine, geology, financial planning, and others. For the decade from 1980 to 1990 I routinely consulted to variety of commercial companies in their efforts to

build expert systems, giving lectures that taught them about the technology and aiding in system construction.

Based on this extensive background and participation in the field from the earliest days I can offer a number of opinions with considerable confidence. First, by the mid 1980's expert systems technology was well understood and widely used: A 1985 paper by Buchanan (Buchanan85) lists 46 commercial applications of expert systems in a variety fields and more than 350 research papers from the field, without including articles in the popular press or trade magazines. While a plethora of research papers may not by itself establish that a field is well understood, the abundant commercial application of the technology establishes clearly that it was well understood and that its application was routine.

Second, as dates in the references in Buchanan85 imply, medical applications of expert systems were among the very first.  Hence the notion of applying expert systems to problems in medicine was a routine notion by the early 1980's. A paper I wrote in 1986 (Davis86), describing the variety of fields to which the technology has been applied indicates "Medicine has been a rich source of examples and challenging problems for these systems." A 1984 book by Clancey and Shortliffe (Clancey84) , entitled *Readings In Medical Artificial Intelligence: The First Decade,* provides additional evidence of the early (from 1974 onward) and important role of medical applications as a domain and provides 20 papers describing computerized medical systems.

Third, some of the medical applications that had been built by 1986 were considerably more difficult technologically than medical claims processing. Programs like Mycin and Internist (see Clancey84, chapters 5 and 8) aimed at doing medical diagnosis, a task that was not nearly as well understood as medical claims processing.  Building systems like Mycin and Internist

required basic research into understanding how doctors reasoned and how (and perhaps whether) a computer could be made to reason similarly.

Fourth, after the creation of R1 (McDermott82), the notion of configuration checking was understood to be an important, tractable task, as evidenced by the number of commercial companies that built systems variously termed configuration checking or order checking. It was also understood to be a broadly applicable task, as illustrated by the interest in it by companies as diverse as NCR (computers) and AIG (insurance) (Buchanan85). Indeed, as noted above, R1 as a system maps so well into the subject matter of '164 that with the slightest of word substitutions, one of the claims of '164 becomes an accurate description of R1.

Fifth, in terms of methodology, it was routine practice to find a task that people knew how to do and build an expert system to automate that task.[10]  This was so routine a methodology that I came to call it "intellectual cloning" in the numerous talks I gave to consulting clients in the early 1980's describing expert systems. The idea was to ensure that the task of building the system involved only the (smaller) technical challenge of creating the knowledge base, not the (sometimes) major challenge of trying to understand a process no one yet understood (e.g., how physicians manage to diagnose an illness).

Sixth, the references cited earlier, notably Egdahl87 and Bernier86, make it abundantly clear that claims processing and editing was one of those tasks that was in fact well understood, as indeed it would have to have been in order to put to work the staff tasked with reading, evaluating, and revising claims.

Seventh, as a consequence of the routine character of expert system applications, the well-understood nature of claims processing and editing, and the standard methodology of the

time, combining claims editing of the kind disclosed in Egdahl87 and expert systems technology would have been obvious to anyone having ordinary skill in the art at the time. Automation of a well-described manual claims editing process, such as the one disclosed in Egdahl87, would have been obvious to a person skilled in the art.

Eighth, even absent the methodology, several references suggest combining the clinical editing process with computing in general and expert systems in particular:

| | |
|---|---|
| Snyder, C., *From research to reality: the leading edge of expert systems,* Insurance Software Review, **12**, Autm., 1987, 22-4, 26-7, 30 | States the benefits of automation: "ExClaim increases productivity in a number of areas. One of these is volume. . . Another benefit is a reduction in errors and an increase in consistency among examiners, due to the fact that the system makes the same decisions the same way every time. Further . . . 'the need for high-level examiners should be reduced and an examiner with less experience should be able to do a higher volume and quality of work than before.' Finally, productivity gains are achieved through the product's PC orientation." P. 26-27.

Describes impact of workstation environment on future of insurance data processing: "The workstation environment [of PALLM, Inc.] . . . will instead address the administration that currently takes place at the desks of clerks and managers. It will serve to gather intelligence, guide the user through company procedures, and make routine decisions automatically. . . When PALLM's workstation environment evolves from research to reality, its impact on insurance data processing is expected to be dramatic." P. 30. |
| Egdahl, M.D. and Hertenstein, M.D., *An Access-oriented Negotiated Fee Schedule: The Caterpillar Experience*, Ann Surg., 206(3), pp. 349-57 (Sept. | "[The CAT process] can also be used (after eligibility is certified and benefits are coordinated) by claims processing systems." P. |

---

[10] For example: "A refrain that occurs over and over in the current literature on building commercial knowledge-based systems is to select a problem and a design that can be solved using available technology. . ." Weitzel, J.R., et al., *A Company / University Joint Venture to build a knowledge-based system,* MIS Quarterly, **12**:23-24, Mar1988.

| 1987). | 353. |
|---|---|
| U.S. Pat. No. 4,667,292 (Mohlenbrock patent) | "One technique for increasing the likelihood of accuracy and cost-effectiveness in working with the new Medicare DRGs is to incorporate it into a computer system."  Col. 3, lines 42-45.<br><br>Suggests automated comparison of two DRG numbers from different sources:  "In fact, this comparison can be automated, as shown in FIG. 5 wherein a comparator 91 receives as one input 93 the DRG number determined by the physician in accordance with the procedure of FIG. 4 using the computer system of this invention.  The second input 95 is a DRG number determined by running a prior art Grouper program 97 which operates from a plurality of ICD-9 code numbers identified by the medical records clerk.  A system can even be used that would respond directly to each ICD-9 code inputted to it by the medical records clerk and indicate at the output of the comparator 91 when enough ICD-9 codes have been entered so that the DRG that is calculated by the Grouper program is the same as that determined by the attending physician."  Col. 12, lines 48-62. |
| Gibbons PS, Pishotta FT, Stepto RC, *A system for reporting gynecologic procedures. A linguistic-logical approach,* Journal of Reproductive Medicine, March 1983, Vol. 28 (3), pp. 201-5 | Suggests potential for accuracy in automated system in encoding and reporting:  "The automated system for encoding gynecologic procedures developed at Chicago Lying-In Hospital represents a step in the direction of 'softening' and yet controlling entry of technical medical information by standard input personnel.  The use of a logical-linguistic network, allowing each procedure to be characterized in a number of ways, offers great flexibility to local managers as well as the potential for accuracy in procedure encoding and reporting."  P. 205. |
| Miller KM, Wisnicki HJ, Buchman JP. Riley MJ, Repka MX, Taylor HR, Guyton DL, *The Wilmer Information System. A classification and retrieval system for information on diagnosis and* | Suggests future development of interactive error checking software:  "Maryland Medicare and Blue Cross/Blue Shield implemented policy changes in July 1986 to automate and expedite the processing of claims.  The most noteworthy |

| | |
|---|---|
| *therapy in ophthalmology,* Ophthalmology, March 1988, Vol. 95 (3), pp. 403-9 | requirement was that all submitted claims would have to include an ICD-9 code before being processed . . . Interactive error checking software, similar to that used for direct entry, also will be developed.  Until then, a data entry operator receives one copy of the customized coding sheet and enters the data manually."  P. 408.<br><br>Discusses importance of coding scheme:  "[T]he trend in future years is likely to be in the direction of consolidation.  This trend will permit a greater pooling of resources at the hardware/software level, and provide better access to information for all those involved in patient care.  The key to the success or failure of any medical information system is its coding scheme."  P. 409 |
| U.S. Pat. No. 4,730,259 (Gallant patent) | Suggests the need for human experts in prior art:  "In the prior art, rules are generally constructed for an expert system by either having a human expert provide the rules in a form suitable for the rule base or by having another person generally known as a knowledge engineer convert the information from an expert into appropriate rules.  It is often the case that a human expert in a particular area has difficulty formatting his or her knowledge as a set of rules.  The process of generating and perfecting a set of rules has been universally recognized as the most time consuming, difficult, and expensive process involved in building an expert system.  It is frequently difficult to reduce expertise to a set of rules."  Col. 1, line 63 – Col. 2, line 6. |

Ninth, once the general idea has been suggested, Bernier86 and Egdahl87 between them

offer almost a roadmap for implementing such a system.  Bernier86 lays out the ideas in general,

explaining what such a system should do and why, while Egdahl87 describes the types of claim editing rules used in the '164 patent.[11]

Tenth, the software written to implement the patented invention (a portion of which is disclosed in Appendix D of the '164 patent) was not, in itself, novel. Ms. Kelli Dugan, one of the inventors of the '164 patent, testified that two programs were used to create the patented product: a programming language called Clipper and a database program called dBase III. Dugan Deposition, pp. 71, 76. Both of these were well-known, commercially available software programs and would have been obvious choices for creating an automated claims editing system. On my initial review of the software in Appendix D of the patent, it appears to be a straightforward implementation of an expert system.

Eleventh, as of 1986 there was at least one other system in commercial use doing what appears to be the identical task, namely the AMS system from HDI cited earlier. The description in the brochure ("Beginning at the individual claim level, AMS organizes the evaluates provider claims, first checking for the validity of values and then cross-checking for consistency of information and accuracy of data items. … AMS uses medical protocols to clinically identify inconsistent claims…") and the detailed claims editing rules contained in the June 1986 document indicate that AMS did what the '164 patent describes.

---

[11] It should be noted that the full set of specific claim editing rules that is supposed to reside in the predetermined database is never disclosed anywhere in the '164 patent. The patent discloses only some general types of claim editing rules, supported by a few examples. Much of the same information is found in Egdahl87.

## VII.    THE INVENTOR TESTIMONY SUPPORTS MY CONCLUSIONS

The testimony of the named inventors of the '164 patent supports the conclusions in this report.  During their depositions, the inventors Donald Holloway ("Holloway"), Robert Hertenstein ("Hertenstein"), George Goldberg ("Goldberg") and Kelli Dugan ("Dugan") each testified as follows:[12]

Novelty

The inventors testified that many aspects of the patented system were covered by the manual process used by Dr. Hertenstein.  Dr. Hertenstein himself testified that his manual process covered all the steps of Claims 1, 2, 3 and 10.  *See* Hertenstein Deposition, pp. 195-198, 199-204, 205-207, 208.[13]  Hertenstein also testified that the "claims in this patent generally describe using a computer and a database to do what [I] did manually at Caterpillar." Hertenstein Deposition, pp. 209-210.

In discussing whether the claims reflected Hertenstein's manual process, Holloway also testified that the "determining" steps of Claims 1, 2, 3 and 10 were all a part of Hertenstein's manual process.  See Holloway Deposition, pp. 268-270.  Holloway further testified that Hertenstein's manual process covered all the steps in Claim 10, and that these steps were not novel because they were part of Hertenstein's manual process.  Holloway Deposition, pp. 276-277, 279-281.

---

[12] Depending on how the Court construes the patent claims, there may be issues as to whether each of the named inventors actually contributed to at least one patent claim.  I reserve the right to supplement my report should inventorship become an issue in view of the Court's claim construction.

[13] Goldberg also testified that the steps described in Claims 2 and 3 were covered by Hertenstein's manual process. Goldberg Deposition, pp. 300-303, 311-313.  Dugan further testified that Claim 1 covered the function of Autocoder.  Dugan Deposition, pp. 90-91.

Goldberg stated in a letter to an Aetna employee that "anybody can go through the coding book [CPT-4 Manual] and identify a large number of decision rules."[14]  Goldberg Deposition, p. 230.

<u>Knowledge by Others of System and Functionality</u>

Several other companies and persons were aware of Hertenstein's system for processing claims.[15]  Holloway testified that the concepts of unbundling code checks and incorrect code checks were presented to others at a Pew conference in mid-1986.  See Holloway Deposition, p. 76.  Holloway also testified that as early as March of 1986, the idea of creating software to catch CPT-4 coding errors had been discussed.  See id, at p. 62.

Aetna was another company that knew about the system.  Hertenstein testified that "we had a meeting with Aetna later in 1987 where we had a prototype of what we were developing and showed it to them. . ."  Hertenstein Deposition, p. 102;  see also, Holloway Deposition, pp. 28-30.[16]  Hertenstein also testified that Armco knew about the system, based upon HPI's proposal to Armco in March of 1987 and Armco's acceptance of that proposal.[17]  See Hertenstein Deposition, p. 150, and Exhibit No. 139 to Hertenstein Deposition, Volume I.[18]

---

[14] Goldberg also agreed that as of January 1988, there were "many self-evident, logical examples of procedure codes that could be identified by going through the coding book."  Goldberg Deposition, p. 231.

[15] Hertenstein also testified that he gave talks or presentations describing unbundling or other coding errors during the 1985-1987 time period.  Hertenstein Deposition, p. 43.

[16] Hertenstein also testified that in July of 1987, HPI was talking to Aetna about creating software that would essentially replicate Hertenstein's manual claims processing system.  Hertenstein Deposition, p. 104.

[17] Another company that knew about Hertenstein's manual system was Blue Cross Blue Shield of Michigan ("BCBS-MI").  Hertenstein further discussed the work done for BCBS-MI in analyzing their claims, and his interaction with Wally Maher, benefits manager for Chrysler and BCBS in Detroit.  Hertenstein Deposition, pp. 142-143; see also, Holloway Deposition, pp. 28-30.

[18] See also, Holloway Deposition, p. 307, discussing proposals to Armco and Weyerhauser.

**VIII.   CONCLUSION**

As a consequence of all of the above, it is my firm opinion that each and every claim in the '164 patent would have been anticipated by the prior art cited herein and obvious at the time to a personal having ordinary skill in the art.

I reserve the right to modify or supplement my views stated herein in the event any information is brought to my attention relating to this matter of which I am not currently aware.


Randall Davis

October 2005

## EXHIBITS

Exhibit A: Davis Resume

Exhibit B: List of prior cases and publications

Exhibit C: Materials Examined

**EXHIBIT A**

**RANDALL DAVIS RESUME**

Randall Davis received his undergraduate degree from Dartmouth, graduating summa cum laude, Phi Beta Kappa in 1970, and received a PhD from Stanford in artificial intelligence in 1976.

In 1978 he joined the faculty of the Electrical Engineering and Computer Science Department at MIT, where from 1979-1981 he held an Esther and Harold Edgerton Endowed Chair. He later served for 5 years as Associate Director of the Artificial Intelligence Laboratory. He is currently a Full Professor in the Department, and a Research Director of CSAIL, the newly-formed Computer Science and Artificial Intelligence Laboratory that resulted from the merger of the AI Lab and the Lab for Computer Science. He and his research group are developing advanced tools that permit natural multi-modal interaction with computers by creating software that understands users as they sketch, gesture, and talk.

Dr. Davis has been one of the seminal contributors to the field of knowledge-based systems, publishing some 50 articles and playing a central role in the development of several systems. He serves on several editorial boards, including Artificial Intelligence, AI in Engineering, and the MIT Press series in AI. He is the co-author of Knowledge-Based Systems in AI, and was selected in 1984 as one of America's top 100 scientists under the age of 40 by Science Digest. In 1986 he received the AI Award from the Boston Computer Society for his contributions to the field. In 1990 he was named a Founding Fellow of the American Association for AI and in 1995 was elected to a two-year term as President of the Association. In 2003 he received MIT's Frank E. Perkins Award for graduate advising. From 1995–1998 he served on the Scientific Advisory Board of the U. S. Air Force.

Dr. Davis has been a consultant to several major organizations, including Digital Equipment Corp, IBM, Aetna, and Schlumberger, and has been involved in the founding of three software companies.

Dr. Davis has also been active in the area of intellectual property and software. In 1990 he served as expert to the Court in Computer Associates v. Altai, (775 F. Supp. 544 (E.D.N.Y. 1991); 982 F 2d 693) a case that produced the abstraction, filtration, comparison test for software copyright. He served on the panel run by the Computer Science and Telecommunications Board (CSTB) of the National Academy of Science in 1991 that resulted in Intellectual Property Issues in Software, and served as a member of the Advisory Board to the US Congressional Office of Technology Assessment study on software and intellectual property that was published in 1992 as Finding a Balance: Computer Software, Intellectual Property, and the Challenge of Technological Change. A 1994 paper in the Columbia Law Review analyzed the difficulties in applying intellectual property law to software and proposed a number of remedies.

He has served as an expert in a variety of cases involving software, including the investigation by the Department of Justice of the Inslaw matter (40 Fed. Cl. 843; 1998 U.S. Claims), where he investigated allegations of copyright theft and cover-up by the Federal Bureau of Investigation, the National Security Agency, the Drug Enforcement Agency, the United States Customs Service, and the Defense Intelligence Agency.

From 1998-2000 he served as the chairman of the National Academy of Sciences study on intellectual property rights and the information infrastructure entitled The Digital Dilemma: Intellectual Property in the Information Age, published by the National Academy Press in February, 2000.

Dr. Davis has appeared on *The Macneil/Lehrer Report* and *Innovations* (WNET, NY), and played a major role in *This Computer Thing*, a pilot for an educational series (WGBH, Boston) about personal computers. He has been quoted in articles in *The New York Times, The Wall Street Journal, Business Week, The Economist, The Boston Globe, High Technology*, and *Psychology Today*. Interviews have appeared in *Computerworld* and on National Public Radio's *All Things Considered*.

**EXHIBIT B**

**RANDALL DAVIS:  CASES, IP PUBLICATIONS, AND TECHNICAL**

**PUBLICATIONS**

*Computer Associates v. Altai*, CV 89-011 EDNY
775 F. Supp. 544 (E.D.N.Y. 1991); 982 F 2d 693
Rule 706 expert to the court (testified)
copyright concerning IBM operating systems software.
Case appealed; appeal court decision create the Abstraction, Filtration, Comparison test.

*Daly et. al v. IECA et al.*, 90 CIV 0588 NY
consultant to plaintiff; settled
copyright concerning proxy vote counting software

*Quotron v. ADP*, 91 CIV 6526, NY
consultant to defendant, settled
software copyright concerning brokerage office software

*Goal Systems v. J. W. Bennett Co.*, C2-90-681 SD Ohio
consultant to plaintiff (deposed); settled
copyright involving mainframe job scheduling software

*Gates Rubber, Inc., v. Bando American, Inc.*, 92-S-136 CO
expert for plaintiff (deposed, testified)
copyright and trade secret involving industrial belt design software

US Department of Justice investigation, 1994
consultant to the DOJ on its re-investigation of the INSLAW matter
investigated alleged copyright theft and cover-up by the FBI

*International Business Machines Corporation vs. Fujitsu Limited*
American Arb. Assoc. Case No. 13T-117-0636-85
consultant to plaintiff
copyright concerning IBM operating systems

*Logica North America v. Intelsat*, AAA Case No. 16 117 00084 92M
expert for plaintiff (testified)
breach of contract involving satellite communications scheduling software

*American Airlines, Inc. v. ICOT Corporation*, CA-4-91-305-A; Dallas TX
consultant to plaintiff
copyright involving terminal control software

*Unix Systems Laboratories, Inc., v. Berkeley Systems Design, Inc.,* Civ. 92-1667, CA
consultant to defendant
copyright of Unix operating system software


*Bitstream, Inc., et al. v. SWFTE Int'l Ltd*, CV93-11068H, Boston MA
consultant to plaintiff
copyright concerning computerized type face software


*Data General Corp. v. Grumman Data Systems Corp*., Civ 93-40087-GN, NY
consultant to defendant
copyright concerning hardware diagnostic software


*Systems Engineering Associates v. IMED Corp*, CV91 3583, AL
consultant to defendant
copyright involving medical instrumentation software


*Lotus v. Borland,* 90-11662K Boston, MA
consultant to defendant
copyright concerning the Key Reader capability in Quattro


*Mitek Holdings, Inc. v. Arce Engineering*, 91-2629 SD FL
expert for plaintiff (deposed, testified)
copyright concerning architectural and structural design software


*Mitek Holdings, Inc v. Merlyn Industries, Inc.,* 91-2631 Dallas, TX
consultant to plaintiff; settled
copyright concerning architectural and structural design software


*Fonar Corp v. Deccaid, et al*., CV 91-3805, NY
consultant to defendant (deposed)
copyright concerning medical instrumentation software


*Star Technology, Inc v. Tultex Corporation, et al*., 3-91-CV-1067-X, Dallas, TX
consultant to defendant (deposed)
copyright concerning factory automation software


Re-examination of Compton's New Media Patent 5,241,671
consultant to patent holder
patent concerning multimedia presentation


*Florida Software Services Inc., v Citicorp Information Resources Inc, et al.*,
Seminole County, FL, 91-893-CA-16-K
consultant for defendant; settled
trade secret and copyright concerning retail banking software

*Quarterdeck Office Systems, Inc. v. Weinstein et al.,* CD of CA, 95-1564 LGB
consultant to defendant; settled
copyright and trade secret regarding Internet navigation software


*E. S. Cadd, Inc., v. Greiner, Inc*., Middle District of FL, 94-1829-CIV-T-24C
consultant to defendant
copyright of engineering software for air traffic control

*Trilogy Development Group v. Teknowledge Corp*, CA
consultant to defendant, settled
software patent concerning configuration software

*Sitrick v. Nintendo of America*, Inc, N D Illinois 94 C5515
consultant to defendant (deposed); settled
software patent concerning game software

*INSLAW Inc., v. The United States of America*, Court of Federal Claims 95-338X
expert for the defendant (deposed, testified)
copyright concerning database software
investigated alleged copyright theft by the FBI, National Security Agency, Drug
Enforcement Agency, US Customs Service, and the Defense Intelligence Agency.

*Cadence Design Systems, Inc., v. Avanti! Inc*, C 95-20828 RMW, CA
expert for plaintiff (deposed, filed under seal); case settled in 2002 for $265 million
software copyright concerning computer aided design software

*Automated Tracking Systems v. Great American Insurance Company*
American Arbitration Association Case 53 195 00090 95
consultant to plaintiff
software copyright concerning database software

*MicroStar v. Formgen Inc, et al*., 96-3435h(CM), SD of CA
consultant to defendant; appeal affirmed defendant
software copyright concerning game software

*Computer Aid v Hewlett Packard Company*
consultant to defendant; deposed
software copyright and trade secret regarding network analysis software

*Commonwealth of MA v. Ellis*
consultant to defendant; testified in evidentiary hearing
criminal case; issues involving electronic search and seizure

*Boron LePore & Associates Inc., v. DigiNet LLC, Miller, Freed, Crooks, Wood and Lilley*
Sole arbitrator in binding arbitration.

Davis Exhibit B                                                                                    B–3

Trade secret regarding meeting planning software

*Computer Sciences Corp et al. v Policy Management Systems Corp et al.*
Expert witness for defendant; testified in arbitration hearing
Trade secret concerning software for analysis of bodily injury insurance claims

Excelergy Corporation v. OPG EBT Holdco Inc., and EBT Express
consultant to plaintiff
copyright and reverse engineering of software for the electric power industry
settled

*IMS Health, Inc. v. Vality Technology, Inc.*
consultant to plaintiff; deposed; case settled
copyright and trade secret regarding database cleaning software

GUS v Boaz et al., *Case No. H-01-1674*
consultant to defendant
copyright regarding freight forwarding software

Norwest Corporation v. IRS Commissioner
expert witness for IRS, testified
research and experimentation tax credit for software

*LinkCo v. Fujitsu*, 00 Civ 7242 (SAS)
expert witness for defendant, deposed, testified at trial
trade secret issues in investor relations/corporate disclosure software

*Florida Power and Light v IRS Commissioner*, Docket No. 5271-96
consultant to IRS; case settled
research and experimentation tax credit for software

*Amadeus Global Travel v. Orbitz, LLC et al.,* C.A. No. 02-1542-SLR
consultant to defendant; case settled
software for the travel industry

*J. D. Edwards World Solutions Company, et al., v. Mayer Electric Supply Company*
AAA Case 30-181-0018403
consultant to plaintiff; testified at arbitration
supply chain management software

*Nastel Technologies, Inc., v. BMC Software, Inc.,* AAA Case 70-117-00306-01
consultant to plaintiff; deposed, testified at arbitration
copyright regarding middleware

*The SCO Group, Inc, v. International Business Machines,* 2:03CV0294 DAK (Utah)
expert for defendant; ongoing

copyright regarding operating systems

## Intellectual Property Publications

Davis R, The Digital Dilemma, *Communications of the ACM*, February, 2001, pp.77-83. Overview of the report cited below.

Davis R, et al, *The Digital Dilemma: Intellectual Property in the Information Age*, National Academy Press, Washington DC, 2000.
A 340-page report and study prepared for the National Academy of Science's Computer Science and Telecommunications Board. I served as chair of the committee that produced the report.

Samuelson P, Davis R, Kapor M, Reichman J, A Manifesto Concerning the Legal Protection of Computer Programs, *Columbia Law Review*, Vol 94, December 1994, pp.1401-1524.

Davis R, The nature of software and its consequences for establishing and evaluating similarity, *Software Law Journal*, **V**:299-330, April 1992.

Davis R, Viewing Intellectual Property as Design, *Chemical Design Automation News*, Vol. 6, Number 6 (Part I) and Vol. 6, Number 7 (Part II), June 1991.

Davis R, Intellectual Property and Software: The Assumptions are Broken, *Proceedings of the World Intellectual Property Organization Worldwide Symposium on the Intellectual Property Aspects of AI*, pp.101-119, March 1991, Stanford, CA

## Technical Publications

### 1. Books

Davis R, and Lenat D B, *Knowledge-based Systems in Artificial Intelligence,* McGraw-Hill, 1982.
English reprint in Taiwan, 1984.
Japanese language edition, 1992.

Davis R, et al., *The Digital Dilemma: Intellectual Property in the Information Age*, National
Academy Press, 2000.

### 2. Papers in Refereed Journals

1.  King A, and Davis R, The Curious Bands of Talbot, Amer J *Physics* **139**:1195-1198, Oct
    1971.
    This paper reported work done as a senior thesis while an undergraduate at Dartmouth.

2.  Shortliffe E H, Davis R, Axline S, Buchanan B G, and Cohen S, "Computer-Based
    Consultations in Clinical Therapeutics: Explanation and Rule Acquisition Capabilities of the
    MYCIN System," *Comp and Biomed Research*, **18**:303-320, August 1975.
    **Reprinted in:**
    *Cognitive Science,* Sheehy and Chapman (eds.), Edward Elgar Publishing Ltd, 1994.

3.  Wraith S, Aikins J, Buchanan B, Clancey W, Davis R, Fagan L, Hannigan W, Scott A,
    Shortliffe E, vanMelle W, Yu V, Axline S, and Cohen S.,"Computerized Consultation
    System for Selection of Antimicrobial Therapy," *American Journal of Hospital Pharmacy*,
    **33**:1304-1308, December 1976.

4.  Scott A C, Clancey W, Davis R, and Shortliffe, E H, Explanation "Capabilities of Rule-Based
    Consultation Systems" *Am Jnl of Computational Linguistics*, Microfiche 62, 1977.
    **Reprinted in:**
    *Rule-Based Expert Systems*, Shortliffe & Buchanan(eds.), Addison Wesley, 1984.

5.  Davis R, Buchanan B G, and Shortliffe E H, "Production Rules as a Representation in a
    Knowledge-based Consultation System," Artificial Intelligence, **8**:15-45, February 1977.
    **Reprinted in:**
    *Context-Directed Pattern Recognition and Machine Intelligence Techniques,*Pao & Ernst,
    eds., IEEE Press, 1982.
    *Readings in Medical AI,* Clancey & Shortliffe (eds.), Addison Wesley, 1984.*Readings in
    Knowledge Representation,* Brachman & Levesque, eds., 1985.
    *Computer-Assisted Medical Decision Making,* (Vol 2), Reggia & Tuhrim (eds.), Springer-
    Verlag, 1985.

6.  Yu V, Shortliffe S, Wraith S, Davis R, Scott A, Buchanan B, Axline S, and Cohen S,
    "Evaluating the Performance of a Computer-Based Consultant," *Computer Programs in
    Biomedicine,* **9**:95-102, 1979.

7.  Davis R, "Interactive Transfer of Expertise:  Acquisition of New Inference Rules," *Artificial
    Intelligence,***12**:121-157, 1979.

**Reprinted in:**
*Readings in Artificial Intelligence,* Webber & Nilsson, eds., Tioga Press. *Rule-Based Expert Systems* Shortliffe & Buchanan (eds.),  Addison Wesley, 1984.

8. Davis R, "Meta-rules: Reasoning about Control," *Artificial Intelligence,* **15**:179-222, 1980.
**Reprinted in:**
*Comtex Scientific Database,* four different subject-based collections.

9. Davis R, "Content-reference: Reasoning about Rules," *Artificial Intelligence,*  **15**:223-240, 1980.

10. Smith R G, Davis R, "Frameworks for Cooperation in Distributed Problem-Solving," IEEE Transactions on SMC, pp. 61-70, January 1981.
**Reprinted in:**
*Readings in Distributed AI,* Bond & Gasser (eds.), Morgan Kaufman Pub.

11. Davis R, Smith R G, "Negotiation as a Metaphor for Distributed Problem-Solving *Artificial Intelligence,* **20**:63-109, 1983
**Reprinted in:**
*Readings in Distributed AI,* Bond & Gasser (eds.), Morgan Kaufman Pub.

12. Davis R, "Reasoning from First Principles in Electronic Troubleshooting," *Intl Jnl Man-Machine Studies,*  **19**:403-423, 1983.
**Reprinted in:**
Developments in Expert Systems, Coomb (ed.), Academic Press, 1984.

13. Davis R, Shrobe H E, "Representing Structure and Behavior of Digital Hardware," *IEEE Computer,* Special Issue on Knowledge Representation, pp. 75-82, Oct 1983.

14. Davis R, "Diagnostic Reasoning Based on Structure and Behavior," *Artificial Intelligence,* 24:347-410, December 1984.
**Reprinted in:**
*Qualitative Reasoning About Physical Systems,* Bobrow (ed.), North Holland, 1984.*Tutorial:* VLSI Testing &Validation Techniques, Reghbati (ed.), IEEE Computer Society Press, 1985.*Building Blocks of AI,* Feigenbaum (ed.), Addison Wesley, to appear.

14. Davis R, "Knowledge-Based Systems," Science," **231**:957-963, 28 February 1986.

15. Davis R (ed.), "Expert Systems: How Far Can They Go," *AI Magazine,*  Part I—**10**:1, Spring 1989, pp61–68; Part II— **10**:2, Summer 1989, pp. 365–78.

16. Buchanan B, Bobrow D, Davis R, McDermott J, Shortliffe E, Knowledge-based systems, *Advances in Computer Science 1989,* J. Traub (eb.), volume 4, pp.  395–416,  Annual Reviews Inc., Palo Alto, CA.

17. Davis R, "A Tale of Two Knowledge Servers," *AI Magazine,*12:3, Fall 1991, pp.  118-120.
**Reprinted in:**
*Nikkei AI,* 1991 (Japanese translation)

18. Davis R, Shrobe H, Szolovits P, "What is a Knowledge Representation," *AI Magazine,*  14, #1, Spring 1993, pp.  17–33.

20. Davis R, "Retrospective on `Diagnostic reasoning based on structure and behavior," *Artificial Intelligence,* 59(1993)139–157.

21. Davis R, Buchanan B, Shortliffe E, "Retrospective on 'Production rules as a representation for a knowledge-based consultation program'," *Artificial Intelligence,* 59(1993)181–189.

22. Trice A, Davis R, Heuristics for reconciling independent knowledge bases, *Information Systems Research,* Vol 4, #3, pp. 262–288, September 1993.

23. Stahovich T, Davis R, Shrobe H, Generating multiple new designs from a sketch, *Artificial Intelligence* (104)1-2 (1998) pp. 211-264.

24. Stahovich T, Davis R, Shrobe H, Qualitative Rigid Body Mechanics, *Artificial Intelligence* (119) 2000 pp. 19-60

### 3. Proceedings of Refereed Conferences

1. Davis R, "Knowledge Acquisition in Rule-Based Systems: Knowledge about Representations as a Basis for System Construction and Maintenance," Proceedings of Workshop on Pattern-directed Inference Systems, published as *Pattern Directed Inference Systems,* Waterman & Hayes-Roth (Eds), Academic Press, 1978, pp. 99-134.
   **Reprinted in:**
   Context-Directed Pattern Recognition and Machine Intelligence Techniques, Pao & Ernst, (eds.) IEEE Press., 1982.

2. Davis R, "Interactive Transfer of Expertise: Acquisition of New Inference Rules," *Proc 5th IJCAI,* pp. 321-328, August 1977.

3. Davis R, Buchanan B G, "Meta-level Knowledge: Overview and Applications," *Proc 5th IJCAI,* pp. 920-928, August 1977.
   **Reprinted in:**
   *Rule-Based Expert Systems,* Shortliffe & Buchanan (eds.), Addison Wesley, 1984.*Readings in Knowledge Representation,* Brachman & Levesque, (eds.), 1985.

4. Davis R, "Generalized Procedure Calling and Content-Directed Invocation,"*Proceedings of Symposium on Artificial Intelligence and Programming Languages,* SIGART–SIGPLAN combined issue, pp. 45-54, August 1977.
   **Reprinted in:**
   *Comtex Scientific Database*

5. Davis R, "A Decision Support System for Medical Diagnosis and Therapy Selection," *Proc of Conf on Decision Support Systems,* appearing as Data Base (SIGBDP Newsletter), **8**:58-72, Winter 1977.
   **Reprinted in:**
   *Comtex Scientific Database*

6. Buchanan B G, Davis R, Yu V, Cohen S N, "Rule-Based Medical Decision Making by Computer," *Proc MEDINFO,* 1977.

7.  Smith R G, Davis R, "Distributed Problem Solving: The Contract Net Approach," Proc of the 2nd Nat'l Conf of the Canadian Soc for Computatnl Studies of Intelligence, pp. 278-287, July 1978.

8.  Smith R G, Davis R, "Cooperation in Distributed Problem Solving," *Proc of the IEEE Int'l Conf on Cybernetics and Society,* pp. 366-371, October 1979.

9.  Davis R, "Dealing with Uncertainty Chairman's abstract for invited panel," *Proc 6th IJCAI,* pp. 1101-1102, August 1979.

10. Davis R, Austin H, Carlbom I, Frawley B, Pruchnik P, Sneiderman R, Gilreath J A, "The Dipmeter Advisor: Intepretation of Geological Signals," *Proc 7th IJCAI,*    Vancouver, Canada, pp. 846-849, 1981.

11. Davis R, Shrobe H, Hamscher W, Wieckert K, Shirley M, Polit S, "Diagnosis Based on Structure and Function," *Proc AAAI-82,* Pittsburgh, PA, pp. 137-142, August 1982.
    **Reprinted in:**
    *Artificial Intelligence in Maintenance,* J. Richardson (ed.), Noyes Publications, Park Ridge, NJ, 1985.

12. Dove W, Meyers C, Oppenheim A, Davis R, Kopec G, "Knowledge Based Pitch Detection," *Proc ICASSP-83,* pp. 1348-1351, April 1983.

13. Simmons R, Davis R, "Representing and Reasoning about Change," *Proc. ACM SIGART Conference on Motion: Representation and Perception*, Toronto, April 1983.

14. Shirley M, Davis R, "Generating Distinguishing Tests from Hierarchical Models and Symptom Information," *Proc. IEEE Int'l Conf on Computer Design,* Oct 1983.

15. Davis R, "Diagnosis via Causal Reasoning: Paths of Interaction and the Locality Principle," Proc AAAI-83, pp. 88-94.  August 1983. Nominated as Best Paper of the conference.
    **Reprinted in:**
    *Artificial Intelligence in Maintenance,* J.  Richardson (ed.), Noyes Publications, Park Ridge, NJ, 1985.  Qualitative Reasoning About Physical Systems, Weld and deKleer (eds.), Morgan Kaufman, San Mateo, CA, 1990.

16. Hamscher W, Davis R, "Diagnosing Circuits with State: An Inherently Underconstrained Problem," Proc AAAI-84, pp. 142-147, August 1984.

17. Davis R, "Expert Systems: What To Do Until the Theory Arrives," *Proc IJCAI-85*, pp. 1306-1307, August 1985.

18. Davis R, "Robustness and Transparency in Intelligent Systems in National Academy of Sciences report:," *Human Factors in Automated and Robotic Space Systems,* pp. 211-233, February, 1987.
    **Reprinted in:**
    *Proceedings of Third Australian Conference on Applications of Expert Systems,* pp. 143-164, New South Wales Institute of Technology, Sydney, Australia, May 1987.

19. Shirley M H, Wu P, Davis R, Robinson G, "A Synergistic Combination of Test IEEE Generation and Design for Testability," *Proceedings 1987 International Test Conference,* Computer Society Press, September 1987, pp. 701-711.

20. Simmons R G , Davis R, "Generate, Test, and Debug: Combining Associational Rules and Causal Models in," Proc IJCAI--87, Morgan Kaufman Pub, August 1987, pp. 1071-1078.

21. vanBaalen J and Davis R, "Overview of an approach to representation design," *Proc AAAI-88,* August 1988, pp. 392-397.

22. Davis R, Form and Content in Model-Based Reasoning, Proceedings IJCAI-89 Workshop on Model-Based Reasoning, August 1989.

23. Davis R, Viewing Intellectual Property as Design, *Chemical Design Automation News,* Vol. 6, Number 6 (Part I) and Vol. 6, Number 7 (Part II), June 1991.

24. Trice, A, and Davis, R, "Consensus Knowledge Acquisition," *Proc 6th Banff Knowledge Acquisition for Knowledge-Based Systems Workshop,* pp. 33.1-33.20. (Available through SRDG Publications, Dept. of Computer Science, University of Calgary, Calgary, Alberta, Canada, T2N 1N4)

26. Davis R, Resnick P, "Multiple dimensions of generalization in model-based troubleshooting," *Proc AAAI-93,* July 1993, pp. 160--166.

27. Stahovich T, Davis R, Shrobe H, "Turning skeches into working geometry," Seventh International ASME Conference on Design Theory and Methodology, DE- Vol 93, 1995, pp. 603–610.

28. Stahovich T, Davis R, Shrobe H, Generating multiple designs from a single sketch, *Proc AAAI-96*
.

29. Christine Alvarado and Randall Davis. Preserving the Freedom of Sketching to Create a Natural Computer-Based Sketch Tool. In Human Computer Interaction International Proceedings. 2001.

30. Christine Alvarado and Randall Davis. Resolving Ambiguities to Create a Natural Sketch Based Interface. In Proceedings. of IJCAI-2001. August 2001.

31. Mark Foltz and Randall Davis. Query By Attention: Visually Searchable Information Maps. In Proceedings of Fifth International Conference on Information Visualization (InfoVis 2001). 2001.

32. Michael Oltmans and Randall Davis. Naturally Conveyed Explanations of Device Behavior. In Workshop on Perceptive User Interfaces. 2001.

33. Tevfik Metin Sezgin, Thomas Stahovich, and Randall Davis. Sketch Based Interfaces: Early Processing for Sketch Understanding. Workshop on Perceptive User Interfaces, Orlando FL. 2001.

34. Tracy Hammond and Randall Davis. Tahuti: A Geometrical Sketch Recognition System for UML Class Diagrams. AAAI Spring Symposium on Sketch Understanding, pp.59-68. Stanford, California, March 25-27 2002.

35. Christine Alvarado, Michael Oltmans, and Randall Davis. A Framework for Multi-Domain Sketch Recognition. AAAI Spring Symposium on Sketch Understanding, pp.1-8. Stanford, California, March 25-27 2002.

36. Randall Davis. Sketch Understanding in Design: Overview of Work at the MIT AI Lab. Sketch Understanding, Papers from the 2002 AAAI Spring Symposium, pp.24-31. Stanford, California, March 25-27 2002.

37. Tracy Hammond, Krzysztof Gajos, Randall Davis, and Howard Shrobe. An Agent-Based System For Capturing and Indexing Software Design Meetings. In Proceedings of International Workshop on Agents In Design, WAID'02. 2002.

38. Jacob Eisenstein and Randall Davis. Natural Gesture in Descriptive Monologues. In Supplementary Proceedings of the ACM Symposium on User Interface Software and Techology (UIST'03), pp.69-70. New York, New York, November 2-5 2003.

39. Tracy Hammond and Randall Davis. LADDER: A Language to Describe Drawing, Display, and Editing in Sketch Recognition. Proceedings of the 2003 Internaltional Joint Conference on Artificial Intelligence (IJCAI). Acapulco, Mexico, 2003

40. Jacob Eisenstein and Randall Davis. Visual and Linguistic Information in Gesture Classification. In International Conference on Multimodal Interfaces (ICMI'04), pp.113-120. New York, New York, October 14-15 2004.

41. Tracy Hammond and Randall Davis. Automatically Transforming Symbolic Shape Descriptions for Use in Sketch Recognition. Proceedings of the Nineteenth National Conference on Artificial Intelligence (AAAI-04). San Jose, CA, 2004.

42. Tracy Hammond and Randall Davis. Shady: A Shape Description Debugger for Use in Sketch Recognition. AAAI Fall Symposium on Making Pen-Based Interaction Intelligent and Natural. 2004.

43. Michael Oltmans, Christine Alvarado, and Randall Davis. ETCHA Sketches: Lessons Learned from Collecting Sketch Data. In Making Pen-Based Interaction Intelligent and Natural. 2004.

44. Tevfik Metin Sezgin and Randall Davis. Handling Overtraced Strokes in Hand-Drawn Sketches. In Making Pen-Based Interaction Intelligent and Natural. 2004.

45. Tevfik Metin Sezgin and Randall Davis. Scale-space Based Feature Point Detection for Digital Ink. In Making Pen-Based Interaction Intelligent and Natural. 2004.

46. Olya Veselova and Randall Davis. Perceptually Based Learning of Shape Descriptions. Proceedings of the Nineteenth National Conference on Artificial Intelligence (AAAI-04). San Jose, CA, 2004.

47. Christine Alvarado and Randall Davis. SketchREAD: A Multi-Domain Sketch Recognition Engine. In Proceedings of UIST 2004. 2004.

48. Sonya Cates and Randall Davis. New Approach to Early Sketch Processing. In Making Pen-Based Interaction Intelligent and Natural, pp.29-34. Menlo Park, California, October 21-24 2004.

49. Aaron Adler, Jacob Eisenstein, Michael Oltmans, Lisa Guttentag, and Randall Davis. Building the Design Studio of the Future. In Making Pen-Based Interaction Intelligent and Natural, pp.1-7. Menlo Park, California, October 21-24 2004.

50. Aaron Adler and Randall Davis. Speech and Sketching for Multimodal Design. In Proceedings of the 9th International Conference on Intelligent User Interfaces, pp.214--216. 2004.

51. Christine Alvarado and Randall Davis. Dynamically Constructed Bayes Nets for Multi-Domain Sketch Understanding. In Proceedings of IJCAI-05. 2005.

52. Tevfik Metin Sezgin and Randall Davis. HMM-Based Efficient Sketch Recognition. In Proceedings of the International Conference on Intelligent User Interfaces (IUI'05), pp.www. New York, New York, January 9-12 2005.

## EXHIBIT C

## MATERIALS EXAMINED

In addition to the documents explicitly cited in the body of the report, I also examined:

- The '164 patent application and other information contained in the file history.

- *Proceedings of the Innovative Applications of AI* for several years.

- Buchanan and Shortliffe, *Rule-Based Expert Systems*, Addison-Wesley, 1984.

- Clancey and Shortliffe, *Readings in Medical Artificial Intelligence: The First Decade*, Addison-Wesley, 1984.

- Davis R, Knowledge-Based Systems, *Science, 231:*957-963, Feb 28, 1986.

- Documents detailing Advanced Medlogic Systems from The Health Data Institute, including (1) a marketing pamphlet, entitled "Setting a New Standard," (2) an extract from a June 1986 HDI document, entitled "Claim Level Edits," (3) a letter from a Senior Scientist at HDI, written May 28, 1987, following up on a marketing call to the Health Claims Division of State Farm Insurance, and (4) an AMS Product Overview, dated May 1986.

I considered prior art references known to me from my experience in the expert system field and prior art references uncovered through my own investigation. These references are cited in the body of the report.

I also considered prior art references from among a large collection of publications related to the subject matter of the '164 patent, which collection is listed below:

| Author, Title & Source |
|---|
| Marva J. Crouff, *Automating Claims Processing, Insurance Software Review*, Autumn 1988, pp. 52, 54. |
| *Enhancing Accuracy and Timeliness is Integral to the Claims Adjudication Process*, Employee. Benefit Plan Review, Anonymous, Dec. 1985, pp. 10-12. |
| Healthstar, Health Benefits Management System, Product Description, v. 1.024 (Insurance Software Packages, Inc.). |
| *System validates medical fee schedules*, Best Review: Life/Health, June 1987, 92 [Insurance Software Packages, Inc. Medical C Schedule and Audit System]. |
| *Expert System identifies miscoded health claims*, Bests Review: Life/Health, November 1990, 60. |
| *Claims editing software runs coding rule checks*, Bests Review: Life/Health, November 1990, 62. |

| Author, Title & Source |
|---|
| Woolsey, C., *Employer spots inflated medical bills*, Business Insurance, June 25, 1990, 3. |
| Weitzel, J.R., et al., *A Company / University Joint Venture to build a knowledge-based system*, MIS Quarterly, Vol. 12, No. 1, March 1988, 23-34 |
| Leary, E., *SSA applies expertise to develop expert systems (Spotlight on AI-expert systems, Social Security Administration)*, Government Computer News, Vol. 6, No. 17, August 28, 1987, 49(3). |
| Beard, P., *Blue Cross develops insurance claim ES*, AIWeek, Vol. 6, No. 7, April 1, 1989, 3. |
| Sullivan-Trainor, M., *Catching new clients*, Computerworld, Vol. 21, No. 50, December 14, 1987, 95, 99. |
| Snyeder, C., *From research to reality: the leading edge of expert systems*, Insurance Software Review, Vol. 12, No. 3, Autumn 1987, 22-4, 26-7, 30 |
| Christensen, J., *Insuring*, High Technology Business, Vol. 8, No. 10, October 1988, 47-8. |
| *Expert Systems In the Insurance Industry: 1987 Survey Report Update*, Coopers and Lybrand, 1987. |
| Pallatto, J., *Expert system cures the blues (Blue Cross develops insurance claims analysis system NERSys)*, PC Week, Vol. 5, No. 50, December 12, 1988, 35, 44. |
| Gladwell, Malcolm, *Computer Firm Finds the Link for Health Care*, Washington Business, December 5, 1988, 5-6. |
| Kerschberg, L. "A Proposal for the Development of an Expert System for Medical Claims Processing: MEDCLAIM," Institute of Information Management, Technology and Policy, College of Business Administration, University of South Carolina, Columbia, SC, (July 1985). |
| Weitzel, J.R. and Kerschberg, L., "Developing Knowledge- Based Systems: Reorganizing the System Development Life Cycle," working paper, University of South Carolina, Columbia, SC and George Mason University, Fairfax, VA (December 1986).<br><br>Final Publication, April 1989 in Communications of the ACM, Vol. 32, No. 4. |
| Ronald Hurst, *Cost Containment - The Caterpillar Experience*, The Psychiatric Hospital, Vol. 13, No. 3 (1982). |
| Egdahl, M.D. and Hertenstein, M.D., *An Access-oriented Negotiated Fee Schedule: The Caterpillar Experience*, Ann Surg., 206(3), pp. 349-57 (Sept. 1987). |
| Bauer JW, Cassidy TG, DeBord JR, Hart RD, Lee RH, Maher JE, Montgomery CE, Neufeld GK, Rivan RJ, Soderstrom CW, et al., Related Articles, *An access-oriented negotiated fee schedule: the Caterpillar experience*, Ann Surg., 208(5), pp. 667-8 (Nov. 1988). |
| Waterman, Donald A. (The Rand Corporation), *A Guide to Expert Systems*, Addison Wesley Publishing, Inc. (1985). |
| McDermott, John, *Artificial Intelligence Applications for Business: Building Expert Systems*, Proceedings of the NYU Symposium (May 1983). |

| Author, Title & Source |
| --- |
| Gerson, Elihu and Star, Susan Leigh, *Analyzing Due Process in the Workplace*, ACM Transactions on Office Information systems, Vol. 4, No. 3 (July 1986). |
| Hayes-Roth, Frederick, *et. al., Building Expert Systems: An Overview of Expert Systems*, Addison-Wesley Publishing, Inc. (1985). |
| Taylor, Edward, *Developing A Knowledge Engineering Capability in the TRW Defense Systems Group*, The AI Magazine (Summer 1985). |
| Bobrow, Daniel, *et. al., Expert Systems: Perils and Promise*, Computing Practices, Communications of the ACM, Vol. 29, No. 9 (Sept. 1986). |
| Bhide, Amar and Mohan, Brian, *Marcia Radosevich and Health Payment Review: 1989(A)*, Harvard Business School, 9-394-204 (Feb. 1999). |
| Genesereth, Michael, Ginsberg, Matthew, *Logic Programming*, Communications of the ACM, Vol. 28, No. 9 (Sept. 1985). |
| Yasdi, Ramin, *Modeling Database Based Expert Systems at the Conceptual Level*, Proceedings of the 1985 ACM Computer Science Conference (March 1985). |
| Freudenheim, Milt, *Insurers vs. Doctors: A Software Battleground*, New York Times (Nov. 15, 1989). |
| Riordan, Teresa, Patents: *A software-technology infringement case against Microsoft goes to trial in Federal Court*, New York Times (Jan. 24, 1994). |
| Colmerauer, Alain, *Prolog in 10 Figures*, Communications of the ACM, Vol. 28, No. 12 (Dec. 1985). |
| Hayes-Roth, Frederick, *Rule-Based Systems*, Communications of the ACM, Vol. 28, No. 9 (Sept. 1985). |
| Weitzel, J.R. and Kerschberg, L. *A System Development Methodology for Knowledge Based Systems*, IEEE Transactions on Systems, Man and Cybernetics, Vol. 19, No. 3 (May/June 1989). |
| Winston,, Patrick H., Prendergast, Karen A., *The AI Business: The Commercial Uses of Artificial Intelligence*, The MIT Press (1984). |
| Mack, Barbara, *A Prescription for Cutting Corporate Health Expenses*, Wall Street Journal (Jul. 18, 1983). |
| U.S. Pat. No. 4,591,983 (Bennett patent) |
| U.S. Pat. No. 4,667,292 (Mohlenbrock patent) |
| U.S. Pat. No. 5,018,067 (Mohlenbrock 2 patent) |
| U.S. Pat. No. 5,070,452 (Doyle patent) |
| U.S. Pat. No. 4,858,121 (Barber patent) |
| U.S. Pat. No. 4,658,370 (Erman patent) |
| U.S. Pat, No. 4,803,641 (Hardy patent) |

| Author, Title & Source |
|---|
| Turner JM, *DRG compliance measurement in the future*, Software in Healthcare, August-September 1985, Vol. 3 (4), p. 48. |
| Mohlenbrock WC, *Getting the most out of DRG 's*, Group Practice Journal, September October 1985, Vol. 34 (5), pp. 27-32. |
| Gibbons PS, Pishotta FT, Stepto RC, *A system for reporting gynecologic procedures. A linguistic-logical approach*, Journal of Reproductive Medicine, March 1983, Vol. 28 (3), pp. 201-5 |
| Studney DR, Hakstian AR, *Effect of a computerized ambulatory medical record system on the validity of claims data*, Medical Care, April 1983, Vol. 21 (4), pp. 463-7. |
| Poulson GP, *Detailed costing system nets efficiency*, savings, Hospitals, October 1, 1984, Vol. 58 (19), pp. 106-8, 111. |
| *Medical coding*, Medical Record and Health Care Information Journal, February 1988, Vol. 29 (1), pp. 20-2. |
| Johnson KF, *Integrated system brings hospital data together*, Health Progress, October 1987, Vol. 68 (8), pp. 46-9, 82. |
| Tauber J, Lahav M, *Simplified diagnostic coding sheet for computerized data storage and analysis in ophthalmology*, Ophthalmic Surgery, November 1987, Vol. 18 (11), pp. 846-9 |
| Miller KM, Wisnicki HJ, Buchman JP. Riley MJ, Repka MX, Taylor HR, Guyton DL, *The Wilmer Information System. A classification and retrieval system for information on diagnosis and therapy in ophthalmology*, Ophthalmology, March 1988, Vol. 95 (3), pp. 403-9 |
| Carter K, *PCs can tap databanks for costs*, Modern Healthcare, June 20 1986, Vol. 16 (13), p. 52. |
| Ohnsson J, *GMIS (Gabrieli Medication Information Systems) software flags inappropriate billings, medical procedures*, Contract Healthcare, May 1988, pp. 28-9. |
| Cimino JJ, *Review paper: coding systems in health care*, Methods of Information in Medicine, December 1996, Vol. 35 (4-5), pp. 273-84. |
| Gabrieli ER, Speth DJ, Casiraghi E, *Knowledge bases*, Journal of Clinical Computing, 1985, Vol. 13 (5), pp. 150-4. |
| Gabrieli ER, Saumby JA, *Computer-based coding of medical data*, Topics in Health Record Management, March 1982, Vol. 2 (3), pp. 51-9. |
| Ely RM, *Savings through claims audits*, Topics in Health Care Financing, Summer 1986, Vol. 12 (4), pp. 61-7. |
| U.S. Pat. No. 4,347,568 (Giguere patent) |
| U.S. Pat. No. 4,491,725 (Pritchard patent) |
| U.S. Pat. No. 4,730,259 (Gallant patent) |
| U.S. Pat. No. 4,839,822 (Dormond patent) |
| U.S. Pat. No. 4,937,743 (Rassman patent) |

| Author, Title & Source |
| --- |
| U.S. Pat. No. 4,975,840 (De Tore patent) |
| U.S. Pat. No. 4,991,091 (Allen patent) |
| Buchanan Bruce G., *Expert Systems*, Journal of Automated Reasoning, Vol. 1, No. 1, 1985, pp. 28-35. |
| Hao Kuo, *MEDCLAIM: An Expert Support System for Medical Claims Review*, Thesis Submitted in Department of Computer Science, University of South Carolina (1986). |
| Horn SD,. Horn RA., *The computerized severity index: a new tool for case-mix management*, J Med Syst, February 1986, Vol. 10 (10), pp. 73-78. |
| Cebrian, Gil et al, *APACHE II*, Intensive Care med., 1987, Vol. 13 (2), p. 143. |
| Robinson, ML, *Hospitals look to "severity of illness" indexes*, Healthspan, June 1986, Vol. 3 (6), pp. 19-22. |
| Nestler, WB et al, *Case-mix reimbursement and clinical management....,* Ind Health Care (Cambridge Ma), 1985, Vol. 2, pp. 117-130. |
| Bates, SW et al, *Case mix management systems*, Mich. Hosp., August 1984, Vol. 20 (8), pp. 24-29. |
| Zak, EJ et al; *Financial modeling: an administrative tool of the highest. ..*, Computers in Healthcare, June 1984, Vol. 5(6), pp. 24-26. |
| Huhn, C et al, *Evaluating the new case-mix systems: a systematic approach*, Hospitals, January 1984, Vo. 58 (2), pp. 92, 94, 96. |
| Lewis, J et al, *Development of a case mix information system*, Computers in Healthcare, February 1983, Vol. 4 (2), pp. 36-41 |
| Shaffer, VM, *Case mix analysis*, Osteopathic hospital leadership, September-October 1985, pp. 8-9. |
| Braithwaite, WR, *The effect of Medicare legislation on medical records system*, Software in Healthcare, August-September 1985, Vol. 3 (4), pp. 26-27. |
| Myers, TF et al *A modification of the international classification of diseases for uniform... ,* AM J Perinatol, July 1985, Vol. 2 (3), pp. 240-241. |
| Barnard, C., *How to select and implement case-mix (product-line analysis). ..*, Hosp. Forum, January – February, 1985 Vol. 28 (1), pp. 25-30. |
| Jones, R, *Case-mix and computers: there's a micro-mainframe connection. ..*, Computers in Healthcare, October 1984, Vol. 5 (10), pp. 36-39. |
| Jones, R., *Case-mix and computers: there's a micro-mainframe connection... ,* Computers in Healthcare, August 1984, Vol. 5 (8), pp. 44-45. |
| Schumacher, DN, *A practical guide to reviewing case mix financial date*, The Hospital Medical Staff, August 1984, Vol. 13 (8), p. 170. |

| Author, Title & Source |
|---|
| Jones, R., *Case-mix and computers. Part one: a look at computer delivery. ..*, Computers in Healthcare, June 1984, Vol. 5 (5), pp. 42-45. |
| Jaggar, FM et al, *A PPS essential: case-mix management systems*, Hospitals, May 1, 1984, Vol. 58 (9), pp. 71-76. |
| Dorenfest SI, *Computers can figure out DRGs, if you can figure out computer market*, Modern Healthcare, February 15, 1984, Vol. 14 (3), pp. 130, 134, 136 |
| Fedorowicz, J., *Will your computer meet your case-mix informational. ..*, Nurs Health Care, November 1983, Vol. 4 (9), pp. 493-497. |
| Fedorowicz, J., *Hospital information systems: are we ready for case mix applications*, Health Care Manage Rev., Fall 1983, Vol. 8 (4), pp. 33-41. |
| Gillette, PE., *Hospital information systems: computer must rack patient costs*, Modern Healthcare, September 1983, Vol. 13 (9), pp. 154, 156, 158. |
| Nathanson, M., *Hospital information systems: computers crank out DRG...* , Modern Healthcare, September 19833, Vol. 13, (9), pp. 160, 162, 164. |
| McLaughlin, DB et al., *Personal computers provide advantages and frustrations...* , Hospitals, July 1983, Vol. 57 (14), p. 94. |
| Barnard, C., *System strategies for case mix*, Computers in Healthcare, June 1983, Vol., 4 (6), pp. 28-32. |
| Mitchell WA., *An automated APACHE II scoring system*, Intensive care nursing, 1987, Vol. 3 (1), pp. 14-18. |
| Packer, CL., *Automation in the medical records department*, Hospitals, March 1, 1985, Vol. 59 (5), pp. 100, 102, 104. |
| Kramer, DJ., *Medicare billing goes electronic,* Software in Healthcare, February March 1986, Vol. 5 (1), pp. 31-32. |
| Gardner, E., *Coding changes delay reimbursement*, Modem Healthcare, December 4, 1987, Vol. 17 (25), p. 11. |
| King, M., *How can case mix work for long-term care providers*, Contemporary Longterm Care, November 1988, Vol. 11 (11), pp. 48, 50. |
| Couch, JB., *Assessing medical care on the basis of its value*, Physician executive, July August 1987, Vol. 13 (4), pp. 7-10. |
| Peterson, RN et al., *Congress to decide Medicare matters; final PPS rules. ..* , Health Law Vigil, September 20, 1985, Vol. 8 (19), pp. 6-8. |
| Terenzio J., *Preparing for the future today -product line management...* , Healthcare, Computing & communications, September 1985, Vol. 2 (9), pp. 56-58. |
| Sovie, MD et al., *Amalgam of nursing acuity*, DRGs and costs... , Nursing Management, March 1985, Vol. 16 (3), pp. 22-42. |

| Author, Title & Source |
|---|
| Sleight, S. et al., *Addressing case mix management in the smaller hospital...*,  Computers in Healthcare, February 1985, Vol. 6 (2), pp. 22-24. |
| Nathanson, M., *Hospitals struggling to develop standards*, Modern Healthcare, September 1984, Vol. 14 (12), p. 140. |
| Llaurado, JG, *Computing disease severity: staging*, Int J Biomed Comput, July-August 1984, Vol. 15 (4), pp. 243-248. |
| Christensen, B., *"Staging" software measures severity of patient's illness*, Hospitals, May 1, 1984, Vol. 58 (9), pp. 45-46. |
| Dambro, MR et al., *An unsuccessful experience with computerized medical. ..* , Journal of Medical Education, August 1988, Vol. 63 (8), pp. 617-623. |
| Wheeler, JT, *Hospital's six-point program clears up financial picture*, Health Progress, July-August 1988, Vol. 69 (6), pp. 78-81 |
| DiMauro, ME, *Information systems for cost-effective management*, Topics in Health Care Financing, Winter 1987, Vol. 14 (2), pp. 28-34. |
| Dombi, WA, *Home care denials: computerization and Medicare home care appeals*, Caring: National Association for Home Care Magazine, June 1987, Vol. 6 (6), pp. 16, 19. |
| Crownover, KR, *Shrinking the demand of home care documentation*, Caring: National Association for Home Care Magazine, June 1987, Vol. 6 (6), pp. 20-22. |
| Sabin, P., *Hospital cost accounting and the new imperative*, Health Progress, May 1987, Vol. 68 (4), pp. 52-57. |
| Carter, K., *End of PIP will prompt hospitals to try software to speed billing*, Modern Healthcare, February 13, 1987, Vol. 17 (4), pp. 62, 64, 68 |
| Woodward, RS, *Teaching DRG reimbursement with VisiCalc.*, The Journal of Health Administration Education, Winter 1985, Vol. 3 (1), pp. 91-97. |
| Landais P. et al., ARCANE. *A new medical patient information system*, Medical Information=Medecine et informatique, April-June 1988, Vol. 13 (2), pp. 105-116. |
| Carter K., *New reimbursement for outpatient services will mean more...* , Modern Healthcare, August 28, 1987, Vol. 17 (18), p. 78. |
| None Listed, *Computerization in the medical record department at Pioneer Valley...* , J Am Med Rec Assoc, February 1985, Vol. 56 (2), pp. 42-43. |
| Gabrieli, ER, *Automated medical office records*, Journal of Medical Systems, February 1987, Vol. 11 (1), pp. 59-68. |
| Gabrieli, ER, et al., *Computerized discharge summaries: a new window...* , Journal of Clinical Computing, 1987, Vol. 16 (1-2), pp. 47-62. |
| Gabrieli, ER, et al., *Automated analysis of the discharge summary*, Journal of Clinical Computing, 1986, Vol. 15 (1), p. 128. |

| Author, Title & Source |
|---|
| Jap. Appl. No. 55-107352, entitled "Medical business system" (Yoshikuni App.) |
| U.S. Trademark No. 1,583,416 (ClaimCheck Mark) |
| U.S. Trademark No. 1,624,579 (CodeReview Mark) |
| U.S. Trademark No. 2,165,159 (Code Advisor Mark) |
| Stachura CT, *Software reference guide: case-mix management*, Journal of the American Medical Record Association [J Am Med Rec Assoc] February 1987, Vol. 58 (2), pp. 42-6. |
| Stachura CT, *Software reference guide: DRG assignment*, J Am Med Rec Assoc, January 1987, Vol. 58, (1), pp. 33-40 |
| Stachura CT, *Software reference guide: encoding*, J Am Med Rec Assoc, November 1986, Vol. 57 (11), pp. 25-8. |
| Wilkinson R, *Does your grouper 'over-maximize' reimbursement?*, Hospitals, October 20, 1986, Vol. 60 (20), p. 88. |
| Huertas-Cortocarrero D, Ruiz PP, Marmol JP, *Concurrent clinical review: using microcomputer-based DRG-software*, Health Policy 1988, Vol. 9 (2), pp, 211-7 |
| Nathanson M, *Medical records. Experts: more research needed to set value of code programs*, Modem Healthcare, June 21, 1985, Vol. 15 (13), pp. 98, 102. |
| Caterinicchio RP, *Implementing a DRG-driven acuity system for nurse staffing under prospective hospital payment*, Hospital Topics, May-June 1985, Vol. 63 (3), pp. 6-7, 13. |
| Jackson B, Jensen J, *Hospitals turn to new software, hardware to cope with DRG 's*, Modern Healthcare, September 1984, Vol. 14 (12), pp. 109-12. |
| Nathanson M, *New software helps hospitals watch costs, profit under DRG*, Modern Healthcare, September 1984, Vol. 14 (12), pp. 132, 136-8. |
| *DRG helper makes it easy for doctors to maximize reimbursement*, Hospital Forum, July-August 1984, Vol. 27 (4), pp. 62-3. |
| Burda D, *Health care market experiences grouper software explosion*, J Am Med Rec Assoc, May 1984, Vol. 55 (5), pp. 35-7. |
| *Health care executive's guidebook to automation in the 1980s: health care information systems and DRG's*, Hospital Forum, Jan-Feb 1984, Vol. 27 (1), pp. 23-30. |
| Gonnella JS, Hornbrook MC, Louis DZ, *Staging of disease. A case mix measurement*, Journal of the American Medical Association [JAMA], February 3, 1984, Vol. 251 (5), pp. 637 44 |
| Ray WJ, Johnstone J, *Using medical records to ensure fair DRG reimbursement*, Computer in Healthcare, December 1983, Vol. 4 (12), pp. 32-6, 40. |
| Heck S, Esmond T, *Financial modeling/case-mix analysis*, Computers in Healthcare, June 1983, Vol. 4 (6), pp. 50-1, 54. |
| Moliver M, *Computers and reimbursement*, Contemporary longterm care, April 1986, Vol. 9 (4), pp. 46-7. |

| Author, Title & Source |
|---|
| Gabrieli, ER, et al., *Standardization of medical informatics*, Journal of Clinical Computing, 1986, Vol. 14 (6), pp. 179-198. |
| Gabrieli, ER, et al., *A center for medical informatics; modern methods of information...*, Topics in Health Record Management, September 1985, Vol. 6 (1), pp. 12-15. |
| Gabrieli, ER, et al., *Cognitive processing for computerized new knowledge*, Journal of Clinical Computing, 1985, Vol. 13 (4), pp. 113-116. |
| Gabrieli, ER, et al., *Computer-based knowledge banks for clinical medicine*, Journal of Clinical Computing, 1983, Vol. 11 (5-6), pp. 195-200. |
| Gabrieli, ER, et al., *Computer-oriented coding of medical data*, Journal of Clinical Computing, 1981, Vol. 10 (1), pp. 1-18. |
| Gabrieli, ER, et al., *A proposal for a computer-based national medical information ....*, Journal of Clinical Computing, Vol. 10 (1), pp. 19-52. |
| Gabrieli, ER, et al., *Computer-oriented nomenclature, automated classification ....*, Journal of Clinical Computing, 1980, Vol. 9 (2), pp. 54-66. |
| Gabrieli, ER, *Medical information system, health records, and knowledge...* , Medical Instrumentation, July-August 1978, Vol. 12 (4), pp. 245-247. |
| Gabrieli, ER, *Computer-assisted assessment of patient care in the hospital*, Journal of Medical Systems. June 1988, Vol. 12 (3), pp. 135-146. |
| Bernier, RP, *Clinical evaluation: the next step in claims processing*, Best Rev Life Health Insur Ed, April 1986, Vol. 86 (12), pp. 106-110, 127 |
| Robinson, Michele L., *AHA voices concerns about HCFA's severity index*, Hospitals, October 5, 1988, p. 26. |
| Barnard, C., *Preparing for case-mix: the role of data processing*, Healthcare financial management: journal of the Healthcare Financial Management Association, June 1983, Vol. 37 (6), pp. 57-70. |
| McDermott, John, *R1: A Rule-Based Configurer of Computer Systems, Artificial Intelligence*, 1982, No. 19, pp. 39-88. |
| David Leinweber, *Knowledge-Based Systems for Financial Applications*, IEEE Expert, Fall 1988, pp. 18-31. |
| Fagan, Lawrence Marvin, *VM: Representing Time-Dependent Relations in a Medical Setting*, Ph.D Thesis Submitted at Stanford University (1980) |

# EXHIBIT 6

1                  IN THE UNITED STATES DISTRICT COURT

2                  IN AND FOR THE DISTRICT OF DELAWARE

3                              - - -

4    McKESSON INFORMATION SOLUTIONS      :    CIVIL ACTION
     LLC,                                :
5                   Plaintiff            :
                                         :
6            vs.                         :
                                         :
7    THE TRIZETTO GROUP, INC.,           :
                                         :
8                   Defendant            :    NO. 04-01258 (SLR)

9                              - - -

10                               Wilmington, Delaware
                                 Monday, November 7, 2005
11                               5:05 o'clock, p.m.

12                             - - -

13   BEFORE:  HONORABLE SUE L. ROBINSON, Chief Judge

14                             - - -

15   APPEARANCES:

16           SKADDEN, ARPS, SLATE, MEAGHER & FLOM
             BY:  MICHAEL A. BARLOW, ESQ.
17
                     -and-
18
             SKADDEN, ARPS, SLATE, MEAGHER & FLOM
19           BY:  JEFF RANDALL, ESQ.
                  (Palo Alto, California)
20
                 Counsel for Plaintiff
21

22

23

24                               Valerie J. Gunning
                                 Official Court Reporter
25

1  documents, held on to the documents for a month, and then

2  sent them back to DeLoitte & Touche, claiming that they are

3  not relevant.

4           In addition, your Honor, as you know, you

5  referred this case over to the special master and we have

6  met with him and there are a lot, hundreds of documents on

7  Skadden's privilege log relevant to this prior art issue.

8           THE COURT:  Well, I will tell you what.  I'm

9  going to send the prior art issue to the special master

10  and I will specifically set out in my order what the

11  issue is.

12           When I bifurcated, I did not mean to open

13  discovery.  If, however, you are claiming that a prior

14  use was not public, but was known -- I'm not exactly sure

15  what you are claiming, but if you are claiming that somehow

16  or other this information was only accessible to plaintiff

17  and plaintiff failed to respond accurately and truthfully

18  to your interrogatories, then that is a possible exception

19  to my order.  Other than that kind of special -- that kind of

20  prior art, however, I will not allow further discovery.  We

21  had a discovery cutoff date.  I was giving you the

22  opportunity to try the prior art identified before the close

23  of discovery.

24           So I will set that out specifically.  I will

25  send that to a special master.  I am not going to deal with

1  you know, phase of the trial we're going to deal with those

2  defenses.

3           THE COURT:  Well, those are bench issues.  I do

4  not take them to a jury, so I assume that we will do this in

5  the second stage.

6           MR. THOMAS:  Okay.  And then the -- the -- we are

7  doing, as you know, validity, prior art expert discovery,

8  expert exchange and discovery right now, and so if you are

9  going to bifurcate that issue for a second phase, should we

10  wait and complete that expert discovery on the Phase 2 issues

11  later or go ahead and finish it up now?

12           THE COURT:  All right.  Now, I have enough cases,

13  so you'll have to refresh my recollection.  In my order, I

14  said on or before October 31, defendant shall file a notice

15  of whether it intends to go forward just with the limited

16  prior art or whether it wants to bifurcate.

17           I take it defendant, as I recall vaguely, said it

18  wanted to bifurcate?

19           MR. THOMAS:  That's right, your Honor.

20           THE COURT:  All right.  Well, then, we are going

21  to bifurcate, so the question is what we do.  When I said

22  bifurcate, I did not mean necessarily for you to go forward

23  with issues relating to validity until we have the discovery

24  straightened out.

25           So as far as I'm concerned, the issue of validity

1    is stayed until -- stayed to the extent that we're not going

2    forward with expert discovery until this whole issue of what

3    prior art references are going to be admissible is resolved

4    by the special master.

5                    MR. THOMAS:  Thank you, your Honor.  Fine.

6                    And then just the one last information item in

7    terms of not reopening discovery, I did just want to let you

8    know, we do have a hearing tomorrow with the special master

9    and Skadden is asking for reopening of depositions.  And we

10   received, as I said, over 5,000 pages of additional documents

11   from Skadden last week, Thursday of last week, which we are

12   now looking at, to determine whether we need to request the

13   special master reopen depositions as well.

14                   So I just wanted your Honor to be aware of that.

15                   MR. RANDALL:  Your Honor, we're not asking to

16   reopen discovery.  What you said earlier in the order when

17   you referred the matter to the special master is that if

18   TriZetto took inappropriate objections, instructed witnesses

19   inappropriately not to answer questions, then the special

20   master could consider whether or not those questions need to

21   be answered and whether or not to impose costs associated

22   with that.

23                   So we brought that issue to the special master's

24   attention and he will decide it in due course.  And we do

25   think they took inappropriate positions, but that's another

1    matter for him to decide.

2            And with respect -- your Honor, one issue.  With

3    respect to staying the invalidity case, as we understood it,

4    you simply said that would be bifurcated, but they've already

5    given us their expert report on invalidity.  They've -- we've

6    already completed discovery.  They've given us the expert

7    report.  We were going to give them their rebuttal report.

8    We could complete the expert depositions.

9            THE COURT:  How can you do that when discovery

10   isn't even resolved yet because you're still arguing about

11   it?

12           MR. RANDALL:  I think the only issue that is left

13   for your Honor to resolve regarding prior art discovery is,

14   are they allowed to rely on the AMS system and the new two

15   prior art references that they first disclosed after your

16   order?  Are they allowed to do that or not?

17           If not, then they simply aren't part of the case,

18   but they've already included them in their expert report.

19           MR. THOMAS:  Your Honor --

20           THE COURT:  Wait, wait, wait.  So with all this

21   background, what we're talking about is three prior art

22   references that you're objecting to at this point?

23           MR. RANDALL:  Well, yes.  You know that we

24   previously said that they had 19 --

25           THE COURT:  Don't go over the history because

1    that's what's confusing to me.

2                    MR. RANDALL:  Okay.

3                    THE COURT:  When I said we would bifurcate so

4    that full and fair discovery could go forward on all of these

5    new prior art references that were identified before the

6    close of discovery, now, that was on September 16th.

7                    Now, what since September 16th -- there has

8    been how much new prior art disclosed?

9                    MR. RANDALL:  Since that date, two prior art

10   references and one prior public use.  And when they served

11   their expert reports on invalidity, they relied on the 19

12   charted prior art references from some time ago, but they

13   also threw in these new two references and one prior public

14   use.  And we are asking the Court to preclude them from

15   relying on that because they never relied on it previously,

16   ever.

17                   THE COURT:  So at this point, you want to go

18   forward with the expert discovery, and I take it, so as not

19   to inconvenience you, you want me to make the decision about

20   these new prior art references before your expert rebuttal

21   report is due?

22                   MR. RANDALL:  Well, you know, that would be --

23   yes, that would be great, but I understand that you may

24   not be able to do it.  But, in any event, your order will

25   be retroactive.  They either get to rely on it or they

1    don't.

2              THE COURT:  And this makes sense even though at

3    this point we're not trying the case sooner rather than

4    later?

5              MR. RANDALL:  Yes.

6              THE COURT:  And why does it make sense?

7              MR. RANDALL:  It makes sense because we're almost

8    done.

9              You would be rewarding them for simply delaying

10   the production of prior art and relying on prior art.  This

11   case was scheduled for a long time.  They've known about this

12   patent for over ten years and they've known about that.

13   They've known about the case.  They should have just

14   disclosed it.

15             And so we're done, your Honor.  I mean, they've

16   already produced their opening invalidity reports, and so

17   there's only one issue:  Can they, after your order was

18   issued, can they spring on us new prior public use and two

19   new references?  And that's it.

20             MR. THOMAS:  Your Honor --

21             MR. RANDALL:  Otherwise, we're done.

22             THE COURT:  What you do, you go forward.  You

23   rely on whatever you want to rely on at this point and

24   you have to respond to whatever they rely on just in case

25   I decide to let them rely on it, and we will take this

1    up via a pretrial conference or through your motion

2    practice on validity.  But at this point, so I agree at

3    this point.  If you, if the defendant, you have already

4    incorporated all of this new prior art in your expert

5    report; is that correct?

6              MR. THOMAS:  Yes, your Honor.  We did.  We

7    felt like we had to serve our reports on time because this

8    bifurcation issue was up in the air and we did not want to

9    miss a deadline.

10             MR. RANDALL:  Judge, when you say they can rely

11   on anything they want, they can't rely on anything that's not

12   in that report.

13             THE COURT:  Well, no.

14             MR. RANDALL:  Right.

15             THE COURT:  The book is closed at this point.

16             MR. RANDALL:  Thank you.

17             THE COURT:  But there's no need to bother the

18   special master at this point, but Skadden Arps will have to

19   respond to the expert, to the prior art references, respond

20   in full to the expert report.

21             MR. RANDALL:  And we will do that.  But, however,

22   we are moving now for that -- for the exclusion of the two

23   references plus the prior public use AMS.

24             THE COURT:  No.  No, you are not moving now

25   because I'm not going to resolve it now.  And that will be a

1   motion that will be hanging over my head.

2              You can bring that up in a motion practice when

3   we move forward with validity.  You're the ones who want to

4   move forward and close this.  That means you file your expert

5   report.

6              Motion practice on those expert reports is stayed

7   until I open up the case on validity again.  All right?

8              MR. RANDALL:  All right.

9              MR. THOMAS:  So except for completing the expert

10  reports, is validity stayed or should we go forward with the

11  depositions of the validity experts?

12             THE COURT:  It sounds like plaintiff wants to go

13  forward and close that.

14             MR. RANDALL:  Yes.

15             THE COURT:  So go forward with the depositions as

16  well.

17             MR. RANDALL:  Thank you, your Honor.

18             MR. THOMAS:  Thank you.  That's fine with us as

19  well.

20             THE COURT:  All right.  Let me make sure I know

21  where we are.

22             Oh, I wanted, Mr. Randall, you to respond to the

23  fact that you cannot present an expert on willfulness because

24  you have missed the expert report deadline and therefore

25  there truly is no reason to expose an expert to all of the