EXHIBIT 7

Page 242

```
 1              VOLUME B
            IN THE UNITED STATES DISTRICT COURT
 2
            IN AND FOR THE DISTRICT OF DELAWARE
 3
                   - - -
 4
   McKESSON INFORMATION SOLUTIONS   :    CIVIL ACTION
 5   LLC,
              Plaintiff             :
 6
          vs.                       :
 7
   THE TRIZETTO GROUP, INC.,        :
 8
              Defendant             :    NO. 04-01258 (SLR)
 9
                   - - -
10
                      Wilmington, Delaware
11                    Tuesday, April 18, 2006
                      8:30 o'clock, a.m.
12
                   - - -
13
   BEFORE:  HONORABLE SUE L. ROBINSON, Chief Judge, and a jury
14
                   - - -
15
   APPEARANCES:
16
          SKADDEN, ARPS, SLATE, MEAGHER & FLOM
17          BY:  MICHAEL BARLOW, ESQ.

18               -and-

19          SKADDEN, ARPS, SLATE, MEAGHER & FLOM
            BY:  JEFF RANDALL, ESQ.,
20               BERNARD SHEK, ESQ. and
                 MICHAEL HENDERSHOT, ESQ.
21               (Palo Alto, California)

22               Counsel for Plaintiff

23                    Valerie J. Gunning and
                      Leonard A. Dibbs,
24                    Official Court Reporters

25
```

Page 243

```
 1  APPEARANCES (Continued):

 2
          MORRIS, NICHOLS, ARSHT & TUNNELL
 3          BY:  JACK B. BLUMENFELD, ESQ.

 4
               -and-

 5
          GIBSON, DUNN & CRUTCHER LLP
 6          BY:  JEFFREY THOMAS, ESQ. and
                 DAVID SEGAL, ESQ.
 7               (Irvine, California)

 8
               -and-
 9

10        GIBSON, DUNN & CRUTCHER LLP
          BY:  MICHAEL SITZMAN, ESQ.
11               (San Francisco, California)

12               Counsel for Defendant

13                 - - -

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 244

P R O C E E D I N G S

(Proceedings convened at 8:30 a.m., and the following occurred without the presence of the jury.)

THE COURT: Good morning, counsel.

(Counsel respond "Good morning, your Honor.")

THE COURT: I guess you can lay out what issues we need to address in what order. I have an idea of what we need to address today, but I will let you be the ringmasters here.

Are we all set with depositions? I understand from the e-mail that at least some of these depositions are going to go forward, consistent, I hope, with my guidelines.

Mr. Randall?

MR. RANDALL: Yes, your Honor. We have -- we've gone through the transcripts and we have at least done our best to take out questions that referenced either the patent or the claims in the questions, also any questions that referenced the term predetermined database.

We have done our best to remove those and have made our designations and have given them to the other side. With respect to proceeding this morning

Page 245

in terms of the witnesses, we'd like to call our expert, Dr. Musen, to the stand. The only issues with respect to his testimony are the submission within the Court's guidelines prior to 48 hours before he took the stand, we sent over screen shots that were previously disclosed to counsel and videos of what are represented by the screen shots. Basically, the screen shots fading into each other.

So we provided those. The only objection we got was we're objecting to the extent that you intend to go beyond the scope of his report. It's really just a restatement of the rule that you made very clear to both sides. We don't intend to violate that rule, so we -- they really didn't make any objection to the substance of those documents.

And then the other issues that we would like to bring up would be, one, a brief, brief argument regarding Document J issue. And then raise issues with respect to Trizetto's attempts to put witnesses and evidence on during their case. Specifically, Ms. Wukitch, who is here regarding our infringement case. She is an employee of McKesson. She really does not have any information relating to the operation of the products.

We've asked them if there's anything that's

Page 362

1  A. Yes.
2  Q. At the top it says ClinicaLogic, clinical edits
3  maintenance?
4  A. Yes.
5  Q. Next to procedure it has 10120. Again, we see the
6  one two --
7  A. Yes.
8  Q. Can you explain how this illustrates to what we've
9  seen earlier?
10  A. We're seeing a snippet of the ClinicaLogic database
11  for Code 10120 and we're seeing Subset 1 relationships
12  for that code. And under the Subset 1 heading are all
13  of the codes that would be disallowed if they appear on
14  a claim form in conjunction with Code 10120.
15              - - -
16  Q. And those relationships play a part in the claims
17  processing?
18  A. This is the database that continues in the medical
19  service code, and the relationship among codes that the
20  QicLink product uses to identify those two codes we
21  showed earlier which were not to be billed together.
22  Q. Is there any relationship between the database and
23  the QicLink product and Facets and ClaimFax products?
24              - - -
25

Page 363

1
2  A. Right. They're all the database called ClinicaLogic.
3  Q. All right.
4          MR. HENDERSHOT: Pull up Slide 12.
5  BY MR. HENDERSHOT:
6  Q. Dr. Musen, we've discussed the claims of the '164
7  patent earlier?
8  A. Yes.
9  Q. You've had an opportunity to analyze Claim 16?
10  A. Yes.
11  Q. Did you have an opportunity to analyze the Court's
12  construction of Claim 16?
13  A. Yes, I have.
14  Q. And you understand that to prove infringement,
15  McKesson has to show each element of the claim is present
16  in the products?
17  A. Yes.
18  Q. Have you reached an opinion as to whether or not
19  TriZetto infringes Claim 16?
20  A. Yes, I have.
21  Q. And have you reached an opinion as to each of the
22  three products?
23  A. Yes.
24  Q. And what's that opinion?
25  A. That each of the three products infringes.

Page 364

1          MR. HENDERSHOT: Bring that slide down.
2      Do you mind if I bring over a board, your
3  Honor?
4          THE COURT: If you are starting something
5  new, I'm wondering if this might not be a good time for
6  our 15-minute morning break.
7          MR. HENDERSHOT: This is a good time.
8          THE COURT: All right. Members of the jury,
9  15 minutes.
10      (At this point the jury was excused for a short
11  recess.)
12          THE COURT: All right. 15 minutes.
13      (Short recess taken.)
14              - - -
15
16
17
18
19
20
21
22
23
24
25

Page 365

1
2      (Court resumed after the recess.
3
4          THE COURT: All right. Let's bring the jury
5  in.
6      (Pause.)
7      (At this point the jury entered the courtroom
8  and took their seats in the box.)
9          THE COURT: All right. You may proceed.
10  BY MR. HENDERSHOT:
11  Q. Dr. Musen, you had testified earlier that you
12  reviewed manuals and various product literature
13  describing the three TriZetto products; is that correct?
14  A. That's correct.
15  Q. I'd like to show you a series of documents, see if
16  you recognize them (handing documents to the witness).
17      I realize it's a sizable stack, Dr. Musen,
18  but could you just peruse and see if you recognize those
19  and see if you recognize any documents as things that
20  you did not rely upon.
21      (Pause.)
22          MR. SITZMAN: Your Honor, I'm sorry. If we
23  could just identify the trial exhibit he's looking at for
24  the record...
25          MR. HENDERSHOT: These are Trial Exhibits 30,

Page 438

1  exist in the system, whether it's turned on, whether
2  it's turned off. It makes no difference?
3  A. Obviously, the determination is made for the
4  purpose of understanding whether the code exists in the
5  database. But that predetermined database doesn't need
6  to be used.
7  Q. Okay. Switching over to the Elmo, this morning,
8  counsel used this screen shot with you. It's trial
9  Exhibit 1120.
10       Do you recall that screen shot?
11  A. Yes, I do.
12  Q. Okay. And do you recall what you were describing
13  here in terms of the function of that particular screen?
14  A. Yes.
15  Q. Okay. And this was an example of a situation where
16  the code was not found; isn't that correct?
17  A. That's correct.
18  Q. And the code you entered was the 12345?
19  A. Correct.
20  Q. And it returned a message that says, Line Item 1
21  procedure code not found?
22  A. Correct.
23  Q. And you have no idea, based on your testimony,
24  what database the Facets software went to to check and
25  return that message; correct?

Page 439

1  A. I'm not clueless. I mean, I would assume that
2  if the program were created in a reasonable way, there
3  would be an index into the ClinicaLogic database and
4  it would use that index to find the answer. But I don't
5  know for sure.
6  Q. You don't know for sure, and you don't know
7  whether or not that database contains the medical rules
8  and relationships; is that correct?
9  A. That's correct.
10       - - -
11       MR. SITZMAN: Can I have Graphic 13, please?
12       - - -
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 440

1
2  BY MR. SITZMAN:
3  Q. I want to move on to Claims 2 and 16.
4  A. Okay.
5  Q. And I heard your testimony this morning of your
6  description of Claim 2. I want to focus for a moment on
7  the ascertaining step.
8  A. Okay.
9  Q. Okay. What happens when the program of Claim 2
10  ascertains that there is more than one code?
11  A. In that ascertaining step by itself, all it does is
12  do that ascertain if nothing else follows.
13  Q. Okay. And what happens with the process, the
14  method? These are the steps of Claim 2. What happens
15  after it ascertains that there's more than one?
16  A. Well, there's a determining step.
17  Q. It moves on?
18  A. Yes.
19  Q. And it moves on to the other remaining steps?
20  A. That's correct.
21  Q. And what happens -- well, strike that.
22       So if it does not determine that there is
23  more than one code, it stops?
24  A. Not actually as the claim is written. I don't view
25  the claim as defining a specific algorithm.

Page 441

1  Q. So --
2  A. I believe the claim has a series of components,
3  but I don't think there's a strict ordering of those
4  components.
5  Q. Are you suggesting, Doctor, that Claim 2 has
6  process functionality on a medical claim that only
7  contains a single code?
8  A. The -- the system that incorporates Claim 2
9  certainly is able to process claims that have only a
10  single code.
11  Q. Again, I don't want to talk about the system. I
12  want to talk about the claim.
13  A. Right.
14  Q. Because remember you told me right at the outset
15  that to infringe a claim, you have to complete each step
16  of the process that's identified in the claim.
17  A. Okay. So even if the case where a claim has only
18  one element, one service code, both the patented system
19  and the TriZetto products are able to say there's
20  exactly one code.
21  Q. But is claim --
22  A. And that claim is process able.
23  Q. You'll agree with me, won't you, Doctor, that
24  Claim 2 cannot be infringed if there is only one code that
25  is processed by the system?

Page 486

1  used with Dr. Musen that there was no objection.
2          MR. RANDALL: You did move it in. You
3  walked up and said I'm going to move it in, there's no
4  objection.
5          THE COURT: Well, I don't know that that was
6  a formal --
7          MR. SITZMAN: May I move?
8          THE COURT: Yes, you certainly may.
9          MR. SITZMAN: Thank you, your Honor.
10         THE COURT: All right. Let's bring our jury
11 in, then.
12         (Pause.)
13         (At this point the jury entered the courtroom
14 and took their seats in the box.)
15         THE COURT: All right. You may continue.
16 Redirect? Are we having redirect?
17         MR. HENDERSHOT: My colleague is a little
18 eager.
19              REDIRECT EXAMINATION
20 BY MR. HENDERSHOT:
21 Q. Dr. Musen, I'd like to talk to you about a few
22 minutes that has just been raised in cross-examination.
23 A. Sure.
24 Q. Can we pull up Slide 14, which is Claim 1 of the
25 '465?

Page 487

1          While he's doing that, Dr. Musen, I'd like to
2  ask you a few questions.
3          You reviewed Claim 1 and understand it?
4  A. Yes.
5  Q. What is your understanding of the determining step
6  in Claim 1 of the '164 patent as to what it requires?
7  A. It requires a means to determine whether a code is
8  absent from the database.
9  Q. And does it require a means or just that that
10 function be performed?
11 A. That the function be performed.
12 Q. Have you reviewed the courts claim construction of
13 that element?
14 A. Yes.
15 Q. Do you understand it to be limited to any
16 particular way of performing that function?
17 A. I don't read that at all.
18 Q. And the function in that step requires that the
19 computer system determine whether a code is not in the
20 predetermined database, not that it's in the
21 predetermined database; is that correct?
22 A. That's correct.
23 Q. And you had suggested that one way to perform that
24 step -- strike that.
25      You said there were multiple ways that step

Page 488

1  could be performed?
2  A. That's right.
3  Q. Could you describe just a few or one or two?
4  A. Yes. I think I did for Mr. Sitzman.
5          One could exhaustively go through the
6  database codes to see if the code was there, and if he
7  didn't find it, he would report that it was missing.
8          One could have an index that would be a
9  list of all the possible codes in the database that would
10 be maintained separately. Some modern database systems
11 would automatically create such indices that such things
12 would exist without actual programming effort on the
13 part of the end user.
14 Q. Okay. Looking at Claim 1 here, just up on the
15 screen, can you see that all right?
16 A. Yes, I do.
17 Q. The determining step says, determining whether any
18 medical service code contained in the at least one claim
19 is not present in the predetermined database.
20 A. Right.
21 Q. Do you read anything in that limitation that's
22 requiring that the predetermined database be used to
23 make that determination?
24 A. Nothing at all.
25 Q. You had identified looking in a separate index as

Page 489

1  a possibility of doing that?
2  A. That's right.
3  Q. In your view, in your expert opinion, could that
4  element be satisfied by looking at an index of all
5  possible codes in the predetermined database?
6  A. That's -- that is the way most people would
7  program that step.
8  Q. Can you analogize looking in the index to determine
9  if something is present in another set of information?
10 A. Yes. I mean, it's the difference between going to
11 the card catalogue in the library and seeing if the book
12 is there versus spending your afternoon looking at every
13 book in the stacks and it would make much more sense to
14 go to an index to do that.
15         Having the index available would make life
16 much simpler.
17 Q. And that's a way to verify that a piece of
18 information is not present in a collection; is that
19 correct?
20 A. Well, failure to find something would be a way of
21 determining that it's not there.
22 Q. All right. Mr. Sitzman also asked you a number of
23 questions about other functionality in Facets and other
24 applications, so forth. Do you recall that discussion?
25 A. Yes, I do.

Page 535

```
               - VOLUME C -
         IN THE UNITED STATES DISTRICT COURT

      IN AND FOR THE DISTRICT OF DELAWARE

                    - - -

McKESSON INFORMATION SOLUTIONS  :    CIVIL ACTION
LLC,
          Plaintiff            :

     vs.                       :

THE TRIZETTO GROUP, INC.,      :

          Defendant            :    NO. 04-01258 (SLR)

                    - - -

                         Wilmington, Delaware
                         Wednesday, April 19, 2006
                         9:22 o'clock, a.m.

                    - - -

BEFORE:  HONORABLE SUE L. ROBINSON, Chief Judge, and a jury

                    - - -

APPEARANCES:

     SKADDEN, ARPS, SLATE, MEAGHER & FLOM
     BY:  MICHAEL BARLOW, ESQ.

          -and-

     SKADDEN, ARPS, SLATE, MEAGHER & FLOM
     BY:  JEFF RANDALL, ESQ.,
          BERNARD SHEK, ESQ. and
          MICHAEL HENDERSHOT, ESQ.
          (Palo Alto, California)

               Counsel for Plaintiff

                    Valerie J. Gunning and
                    Leonard A. Dibbs,
                    Official Court Reporters
```

Page 536

```
APPEARANCES (Continued):

     MORRIS, NICHOLS, ARSHT & TUNNELL
     BY:  JACK B. BLUMENFELD, ESQ.

          -and-

     GIBSON, DUNN & CRUTCHER LLP
     BY:  JEFFREY THOMAS, ESQ.,
          DAVID SEGAL, ESQ. and
          T. KEVIN ROOSEVELT, ESQ.
          (Irvine, California)

          -and-

     GIBSON, DUNN & CRUTCHER LLP
     BY:  MICHAEL SITZMAN, ESQ.
          (San Francisco, California)

               Counsel for Defendant

                    - - -
```

Page 537

PROCEEDINGS

(Proceedings convened at 9:22 a.m.)

THE COURT: All right. For purposes of the record, I'm going to read in my decisions about the two deposition designations. If there are any other depositions that are going to be read or played for the jury, I need to have those transcripts as soon as possible.

Kempe deposition, the objections were sustained on Page 29, Lines 8 through 14, Page 87, Lines 4 through 24. Page 91, Lines 3 to 6.

The objections were overruled on Page 90, Lines 22 to 23 and the objections on Pages 97 to 99. I actually didn't understand the grounds for the objections on Pages 38 to 9, 59 and 97 to 98. So if someone from TriZetto wants to fill me in on why those were objectionable, I might consider them.

MR. ROOSEVELT: Your Honor, we'll withdraw those objections.

THE COURT: With respect to the Keplinger deposition, the objections were sustained on Pages 55 through 8, 62 through 4, 87, 94, 161 to 62.

Page 538

The objections were overruled on Pages 68, 72 to 3, 78 to 80 and 83.

With respect to the missives I got from McKesson's counsel, this whole business of inducement, I don't recall having this kind of controversy before. No matter how long you're on the bench, I guess you always find something. I actually went through all the pattern jury instructions I have in my office. And in the interest of making this case as clean a record as possible, I have decided to embrace the jury instruction from the Federal RAM Circuit Bar Association on inducing infringement. Accordingly, it means that plaintiff must prove four things by the more probable than not standard.

First, that defendant encouraged or instructed another person how to use a product or perform a process in a manner that you, the jury, find infringes the patent claims.

Second, that defendant knew of the patent.

Third, that defendant knew or should have known that his or her encouragement or instructions would likely result in the other person doing that which you find to be infringement of the patent.

And, fourth, the other person infringed the patent. I.e., I am not going towards the specific

Page 543

1  witnesses slash designations and -- well, that's the
2  only one I can address at this point because there's
3  really nothing else that's ripe.
4       So, Mr. Randall?
5       MR. RANDALL: Your Honor, I heard counsel
6  say here that the ClinicaLogic knowledge products is
7  the same. Can we get a stipulation on that? I mean,
8  that would be at least helpful because you can say it
9  all you want, but if you can stipulate to it, let's do
10 it, and maybe you can consider that now. But with
11 respect to 30(b)(6) witnesses, I do not intend to ask
12 them any questions that would violate the orders that
13 you have laid out so far. You -- I understand what
14 you have done and I'm not going to ask them about the
15 claim language that has been construed.
16      However, I would like to have them. Miss
17 Lampe is just in New Jersey. I did inform counsel
18 shortly after getting your order on Monday evening
19 that I would like to have their availability, and I
20 didn't get any response, and then again last night I
21 asked again and said is there any way we can get this
22 done informally, without the Court ordering you to
23 produce them. Again, I got no response to that.
24      And I simply would like Ms. Lampe and Mr.
25 Danza to come and testify briefly, and I am willing

Page 544

1  to close -- I think that based on the videotapes that
2  we have, we would close our case sometime this
3  afternoon conditionally and the condition would be
4  subject to receiving the testimony from those two
5  individuals.
6       They are important because while TriZetto
7  continues to maintain that we're only accusing
8  ClinicaLogic of infringing, it's a system that we're
9  accusing of infringement. The three systems are the
10 broader systems that we have talked about and those
11 two witnesses in particular are 30(b)(6) witnesses
12 from TriZetto regarding -- most knowledgeable regarding
13 the operation of two of the systems, QicLink and
14 ClaimFacts.
15      And so we would like them to come testify.
16 I am not going to duplicate anything. With respect to
17 their videotaped testimony, I, you know -- what I could
18 do is play the videotaped testimony. I would not ask
19 them any of those questions when they take the stand.
20 But if you say no, that's fine.
21      THE COURT: Never, never.
22      MR. RANDALL: Okay.
23      THE COURT: Depositions can be used for
24 impeachment, but you choose: One or the other.
25      MR. RANDALL: That's fine. I will take the

Page 545

1  live testimony from both.
2       THE COURT: All right. And you understand
3  McKesson will be responsible for the costs?
4       MR. RANDALL: That's fine. That's fine.
5       And I did say on Monday evening, I'm willing
6  to be flexible about when you bring them and I tried to
7  give them as much notice as I could. And I'm willing,
8  if they -- if they can make it tomorrow, great. If
9  they can make it Monday, if this phase extends over
10 that period, that's fine. I will take them any time
11 I can and I just want to close my case subject to
12 receiving that testimony.
13      THE COURT: All right. Well, I will get
14 their schedules.
15      MR. RANDALL: And then with respect to Mr.
16 Bellomo, the only issue there, we were trying to notify
17 the Court that we'd like to make sure that the rules
18 with respect to testifying about claim elements are
19 applied equally to Mr. Bellomo.
20      THE COURT: Well, I'm happy to hear that
21 you don't think I'm capable of doing that on my own.
22 All right. That's fine.
23      MR. RANDALL: No, your Honor.
24      THE COURT: I'm joking.
25      MR. RANDALL: All right.

Page 546

1       THE COURT: Kind of.
2       All right.
3       MR. THOMAS: Your Honor, a couple things.
4  We do have Mr. Randall provided us last night a list of
5  people, additional people, that he may be showing
6  deposition video for today and so last night we did
7  prepare the color-coded objections the same way we did
8  before, so I can hand those up before we get started
9  this morning.
10      THE COURT: All right.
11      MR. THOMAS: In terms of the inventor
12 testimony, we do have those that we can give to you.
13 The only thing is I had asked McKesson if they wanted
14 to do the same thing that we did in terms of marking
15 their objections. I don't know if they intend to do
16 that, but we certainly have the designations and
17 counter-designations for the inventors that can be
18 provided.
19      THE COURT: Well, unless there are specific
20 objections, then I am not going to review the deposition
21 just for the fun of it. So McKesson has to present
22 specific objections.
23      MR. THOMAS: That's fine, your Honor.
24      Lastly, I do want to clarify one thing. Mr.
25 Randall just said I did not respond to his e-mail of

Page 707

1    "Answer: I was a regional supervisor for a
2  claims office in Detroit, Michigan.
3      "Question: You reviewed insurance claims?
4      "Answer: Health claims.
5      "Question: Health claims. Insurance health
6  claims?
7      "Answer: Yes.
8      "Question: What did that entail?
9      "Answer: It entailed reviewing and paying
10 medical and disability claims to policyholders.
11     "Question: You did that manually? You read
12 documents?
13     "Answer: It was a manual process, yes.
14     "Question: How many did those people that
15 you supervised review a day?
16     "Answer: Probably 30 to 40.
17     "Question: What was the purpose of the review
18 of those claims?
19     "Answer: To determine if they should or
20 should not be paid.
21     "Question: How did you determine if the
22 occurrence was for an accident or injury that was covered
23 by the policy?
24     "Answer: By virtue of the diagnosis
25 identified on the claim form.

Page 708

1      "Question: And you just accepted that
2  without question?
3      "Answer: It was provided by a physician, so,
4  yes, we did.
5      "Question: Which company did you work at
6  next?
7      "Answer: Fireman's Fund Life Insurance
8  Company.
9      "Question: Where was that?
10     "Answer: New York City.
11     "Question: What did you do at Fireman's
12 Fund? What was your position at Fireman's Fund?
13     "Answer: Regional Manager.
14     "Question: Responsible for doing what?
15     "Answer: Reviewing and processing
16 authorization of life, health and disability claims.
17     "Question: How long did you work there?
18     "Answer: Approximately four years.
19     "Question: What did you do after you left
20 Fireman's Fund?
21     "Answer: I went to State Mutual Life
22 Assurance Company.
23     "Question: Where?
24     "Answer: They were in Union, New Jersey.
25     "Question: How long did you work there?

Page 709

1      "Answer: A little under two years.
2      "Question: What was your title there?
3      "Answer: Regional Manager for Claims
4  Administration.
5      "Question: What type of claims?
6      "Answer: Had health and disability claims.
7      "Question: What did you do after you left
8  State Mutual Life Insurance Company?
9      "Answer: I went to work for Erisco,
10 E-r-i-s-c-o.
11     "Question: In 1984?
12     "Answer: Yes.
13     "Question: So from '84 to '85 or '86 at
14 Erisco, you didn't supervise anybody; right?
15     "Answer: No.
16     "Question: And you learned how to use the
17 system and how to implement the system at a customer
18 site, right, and you assisted in the implementation of
19 the systems at customer sites; right?
20     "Answer: That's correct.
21     "Question: Okay. What did you do as senior
22 consultant in '85 through -- strike that.
23     "How long were you in that position? Senior
24 consultant?
25     "Answer: Two years.

Page 710

1      "Question: Until when?
2      "Answer: About 1988.
3      "Question: What did you do as a senior
4  consultant at Erisco from '85 or '86 till 1988?
5      "Answer: I worked with more complex customers,
6  larger implementations, as well as being responsible for
7  training new consultants.
8      "Question: What was your next position at
9  Erisco after you were senior consultant from approximately
10 '85/86 through 1988?
11     "Answer: In approximately 1988 I transferred
12 out of the ClaimFacts product and began working as a
13 product specialist with our ClinicaLogic product. I
14 don't recall exactly when that was.
15     "Question: Could it have been 1989?
16     "Answer: No. It was '88 or sooner.
17     "Question: When you said to work with your
18 ClinicaLogic product in 1988, was there a commercial
19 version of ClinicaLogic at Erisco?
20     "Answer: To the best of my recollection,
21 it was completed, design and testing, and ready to be
22 implemented at customer sites, because when I began
23 working with it, it had pretty much been fully developed,
24 and my job was to implement it.
25     "Question: Okay. How long were you a

Page 769

```
  1             - VOLUME D -
          IN THE UNITED STATES DISTRICT COURT

  2        IN AND FOR THE DISTRICT OF DELAWARE

  3               - - -

  4
     McKESSON INFORMATION SOLUTIONS    :    CIVIL ACTION
  5  LLC,
              Plaintiff               :
  6
              vs.                     :
  7
     THE TRIZETTO GROUP, INC.,        :
  8
              Defendant               :    NO. 04-01258 (SLR)
  9
                  - - -
 10
                  Wilmington, Delaware
 11               Thursday, April 20, 2006
                  10:27 o'clock, a.m.
 12
                  - - -
 13
 14  BEFORE:  HONORABLE SUE L. ROBINSON, Chief Judge, and a jury

 15               - - -

 16  APPEARANCES:

 17        SKADDEN, ARPS, SLATE, MEAGHER & FLOM
           BY:  MICHAEL BARLOW, ESQ.
 18
                  -and-
 19
           SKADDEN, ARPS, SLATE, MEAGHER & FLOM
 20        BY:  JEFF RANDALL, ESQ.,
                BERNARD SHEK, ESQ. and
 21             MICHAEL HENDERSHOT, ESQ.
                (Palo Alto, California)
 22
                  Counsel for Plaintiff
 23
                             Valerie J. Gunning and
 24                          Leonard A. Dibbs,
                             Official Court Reporters
 25
```

Page 770

```
  1  APPEARANCES (Continued):

  2
           MORRIS, NICHOLS, ARSHT & TUNNELL
  3        BY:  JACK B. BLUMENFELD, ESQ.

  4
                  -and-
  5
  6        GIBSON, DUNN & CRUTCHER LLP
           BY:  JEFFREY THOMAS, ESQ. and
  7             DAVID SEGAL, ESQ. and
                T. KEVIN ROOSEVELT, ESQ.
  8             (Irvine, California)

  9
                  -and-
 10
 11        GIBSON, DUNN & CRUTCHER LLP
           BY:  MICHAEL SITZMAN, ESQ.
 12             (San Francisco, California)

 13             Counsel for Defendant

 14               - - -

 15
 16
 17
 18
 19
 20
 21
 22
 23
 24
 25
```

Page 771

```
  1
  2                 P R O C E E D I N G S
  3
  4        (Proceedings convened at 10:27 a.m., and the
  5  following occurred without the presence of the jury.)
  6
  7        THE COURT:  All right.  Do we have issues
  8  with the first presentation of evidence?  Not with the
  9  entire case, just with what's happening first thing.
 10        MR. RANDALL:  We do, your Honor.
 11        With respect to the demonstratives that Mr.
 12  Davis intends to testify about, we have objections as to
 13  most of the demonstratives.  I have a copy set of them
 14  right here, if I could hand them up?
 15        THE COURT:  All right.
 16        (Mr. Randall handed documents to the Court.)
 17        MR. RANDALL:  The first, not necessarily in
 18  order, but I just want to cover one right away.  At 4-8,
 19  they're numbered at the bottom right-hand corner,
 20  there's a demonstrative with up in the upper left-hand
 21  corner, it references Dr. Johnson's expert report.  I
 22  don't think that's appropriate.  She didn't testify.
 23        THE COURT:  I agree, and reports aren't
 24  part of the case, ever, so that should not be shown.
 25        MR. RANDALL:  With respect to the second
```

Page 772

```
  1  slide, 4-2, and on forward through 4-6, what Mr.
  2  Davis is attempting to testify about is that the step
  3  of ascertaining whether at least one claim contains a
  4  plurality of medical service codes is limited to the
  5  structure in the Figure 2.  That's what all of those
  6  slides are about.  They are going to present to the
  7  jury their theory that the reasonable interpretation
  8  of that term is that it's limited to the structure and
  9  that's simply contrary to what your Honor ruled at
 10  Markman.  That's what they advanced with respect to
 11  the Markman hearing and they didn't receive that
 12  construction properly.  And they are going to advance
 13  it in front of the jury.
 14        It's simply error to permit them to present
 15  an argument that is directly contrary to your Honor's
 16  ruling, and there's no other purpose for that for all
 17  of those figures.
 18        With respect to 4-10 -- I'm sorry, 4-9,
 19  no objections.
 20        4-10, Dr. Davis did not opine on anything
 21  regarding predetermined database that is relevant to
 22  your Honor's construction.  His construction of
 23  predetermined database was that it required user -- it
 24  precluded user modification, and so there are a series
 25  of slides that he's going to testify about regarding
```

Page 785

1  rejected the step plus function construction they
2  offered with regard to this method claim, there is no
3  way that that term is limited to this issue, and so --
4      THE COURT: Well, and they are not saying
5  that they're going to argue that it's limited. They
6  are saying that this is the only illustration and this
7  explains it.
8      I just --
9      MR. RANDALL: But that's the point. When
10 they get up there and say that you are to construe
11 this, jury, pursuant to the specification and when I
12 look at it as one of ordinary skill in the art, and I
13 look at the specification, specifically Figure 2 in
14 terms of this term, what does it mean to me? It means
15 you compare this to one.
16     THE COURT: Well, I don't know how that's
17 different than what you did with your witness on what
18 the determining step was. Actually, that was a huge
19 shock to me, about how your witness construed that.
20     So I think, quite frankly, you all are just
21 getting to know your cases here in the courtroom, and
22 I'm not at this point in time going to preclude
23 testimony any more than I have to, so your objection
24 is noted and you are going to live with my ruling.
25     MR. RANDALL: Fine.

Page 786

1      THE COURT: All right. Let's bring the jury
2  in if there's nothing else.
3      (Pause.)
4      (At this point the jury entered the courtroom
5  and took their seats in the box.)
6      THE COURT: Good morning, ladies and gentlemen.
7  Mr. Thomas?
8      MR. THOMAS: Thank you.
9      Good morning, ladies and gentlemen. It's now
10 our turn, and so we'll be starting to call our witnesses.
11     Our first witness this morning -- you'll be
12 hearing at least two live witnesses -- our first witness
13 is Dr. Hawley.
14     Dr. Hawley is a physician with Los Angeles
15 Children's Hospital or, more relevantly, he is the
16 creator of the ClinicaLogic database that contains all
17 of the rules and relationships for these CPT codes.
18     Following Dr. Hawley, you'll be hearing
19 Professor Davis, who's an expert on computer systems
20 of this type.
21     So first we'll call Dr. Hawley, and Mr.
22 Sitzman is going to conduct the examination of Dr.
23 Hawley.
24     MR. SITZMAN: Good morning. I'm calling
25 Dr. Hawley to the stand, your Honor.

Page 787

1          - - -
2      DEFENDANT'S TESTIMONY
3
4      ... PHILIP METSCHAN HAWLEY, JR.,
5      having been duly sworn as a witness,
6      was examined and testified as follows ...
7      DIRECT EXAMINATION
8  BY MR. SITZMAN:
9  Q. Good morning, Dr. Hawley.
10 A. Good morning.
11 Q. You're familiar with the ClinicaLogic database?
12 A. Yes, I am.
13 Q. You understand that's a component of the TriZetto
14 systems?
15 A. I do.
16 Q. Did you play a role in the creation of ClinicaLogic?
17 A. As was, I think, just mentioned, I was the creator
18 of the clinical database for ClinicaLogic.
19 Q. Okay. I'm going to ask you a lot more questions
20 about ClinicaLogic, but I want to just quickly go
21 through your background.
22     Can you describe for the jury your
23 educational background?
24 A. I attended University of Southern California Medical
25 School, from which I graduated in 1978. I then went to

Page 788

1  Children's Hospital Los Angeles, where I began my
2  residency in pediatrics. I was there for two years,
3  after which I moved to Boston and took an MBA, a Master's
4  in Business Administration, from Harvard.
5  Q. At some point in time, either during your education
6  or shortly thereafter, did you learn about medical
7  service codes?
8  A. I did.
9  Q. Okay. Can you describe generally what you learned
10 and where you did that?
11 A. Well, it would have been initially sometime during
12 my medical training, whether it was late medical school
13 or early in my internship or residency that I would have
14 been exposed to medical codes, describing diagnoses or
15 manage codes describing medical services and procedures.
16 But as a physician in training at that point, I would
17 say I was exposed. I wasn't using them to any great
18 degree in my hour to hour work. And it wasn't until I
19 went to work for a company called AMI that I became
20 very, very deeply involved in medical code.
21 Q. And, Doctor, what is AMI?
22 A. AMI, at that time, was a hospital company. When
23 I joined them, that's what they did. They ran and
24 operated hospitals throughout the United States.
25 Q. And when you joined AMI, did you have any

Page 849

1 the brain of a human?
2 A. Yes, I recall that.
3 Q. Do you agree with that statement?
4 A. No, I don't.
5 Q. Why not?
6 A. I understand that McKesson's -- I'm sorry,
7 TriZetto's software can and is used without clinical
8 editing at all. That is one can purchase the product
9 without the clinical editing functionality or you can
10 purchase the product and turn off the clinical editing
11 functional, and if a customer were to do either one of
12 those things, one would have to ask if the analogy were
13 true, why they would want a piece of brain-dead software.
14     So I don't think the analogy is apt. That
15 is, there's substantial additional functionality in the
16 software, which is much beyond the clinical editing.
17 Otherwise, customers would not want the software without
18 the clinical editing. So that's why the analogy just
19 seems inappropriate to me.
20 Q. All right. So we're going to start out with Claim
21 1. I'm going to put up aboard with the three claims so
22 we can follow as we go through and make some progress.
23     The jury also, I believe, has the patent in
24 their book and Claim 1 is on the second-to-last page of
25 Trial Exhibit 1, which is in evidence (placing chart on

Page 850

1 the easel).
2     The first question to you, Professor Davis:
3 Does TriZetto's software practice -- perform the steps
4 of Claim 1 of the '164 patent?
5 A. No, I do not believe it does.
6 Q. All right. Do you recall yesterday McKesson
7 showing their trial Exhibit 1120?
8     MR. SEGAL: If we can get that up, please...
9 BY MR. SEGAL:
10 Q. And explaining -- this is the screen that shows
11 there's an invalid procedure code when Dr. Musen entered
12 one two three four in the system.
13     There we go.
14     And I believe this was from the Facets
15 software and Dr. Musen showed a similar message comes up
16 in TriZetto's other software.
17     Do you recall that testimony?
18 A. I do.
19 Q. And Dr. Musen used the screen shot to say that
20 the steps of Claim 1 were performed by TriZetto's
21 software?
22 A. In particular, all the steps of Claim 1 were
23 performed by the software.
24 Q. As initial matter, when is the first time you
25 saw --

Page 851

1     MR. SEGAL: Something happened to that.
2 BY MR. SEGAL:
3 Q. When is the first time you heard any support --
4 let me rephrase the question. Sorry.
5     I thought Dr. Musen, in his testimony, said
6 that TriZetto could infringe Claim 1 even if it didn't
7 look up codes in the predetermined database, but instead
8 used an index.
9     Do you recall that?
10 A. I recall that.
11 Q. Is he correct?
12 A. In principle, it is arguable. I don't know if
13 it's correct, but it's certainly arguable that if the
14 TriZetto code actually used an index into the
15 predetermined database, then I suppose one could argue
16 that a program that performed that way was, indeed,
17 carrying out the determining step in Claim 1. The
18 important point, however, is that's not how the
19 TriZetto software works. It does not use an index into
20 the predetermined database.
21 Q. Okay. Upon hearing Dr. Musen's testimony in court,
22 did you ask that some graphics be prepared to explain
23 what your opinion is about how TriZetto does not
24 infringe Claim 1?
25 A. Yes.

Page 852

1     MR. SEGAL: And if we can have Graphic 10
2 up, please...
3     And if we start the graphic...
4 BY MR. SEGAL:
5 Q. And if you can explain to the jury what this graphic
6 is intended to depict...
7 A. The important point here is that there are two
8 separate and distinct databases in the Facets software
9 and the other programs as well. There is a database
10 called, labeled up there, the CPT code list, which
11 contains an exhaustive list of all of the CPT codes
12 taken as suggested by the little animation here taken
13 directly from a publication provided by the American
14 Medical Association. That's all the codes that the
15 program is supposed to know about.
16 Q. And what is the second list?
17 A. On the right-hand side of the screen is something
18 labeled clinical editing rules. That is the
19 predetermined database that we have been talking about
20 in this case. And as you can see there, the company
21 called Deloitte & Touche provides the clinical editing
22 rules, and those are loaded into what has been called in
23 this case the predetermined database.
24 Q. But isn't the CPT code list just an index of the
25 codes, of all the codes that are in the rules?

Page 857

1       In fact, do the next part of it. We don't
2 get an error. Why? Because where we look is in the
3 CPT code list, which is separate, distinct and
4 disconnected from the predetermined database.
5       Having removed that editing rule in that code
6 from the predetermined database, if that's where the
7 TriZetto code looked, it would have to say, it would have
8 to determine that that medical service code is not present
9 in the predetermined database. That's not the behavior of
10 the program, so we've demonstrated that that is not where
11 the TriZetto code is looking to make that determination.
12 Q. Are these graphics that you had prepared not only
13 consistent with the demonstration you saw in the live
14 Facets software, but also consistent with your review of
15 the source code and database tables in the program?
16 A. Yes.
17 Q. By the way, did you see anything in the code that
18 said to call a friend or phone a friend to determine
19 whether a code is not in the database?
20 A. No. After Dr. Musen suggested the code might do
21 that, I took another look and I did not find anything
22 like that.
23 Q. I would like to show you on the Elmo some trial
24 testimony from Dr. Musen's testimony. I've highlighted
25 it.

Page 858

1       In connection with this testimony, Dr. Musen
2 was testifying about how he thought the index would have
3 to work. And he said, I find it inconceivable that Dr.
4 Johnson would get it wrong when she, although it says
5 he there, evaluated the software.
6       Question: If Dr. Johnson got it wrong, if
7 there, in fact, is two databases, and if, in fact, the
8 TriZetto programs do go to a different database to do
9 the validity check, that would change -- will change
10 your opinion, won't it?
11      Answer: Validity of the combination of
12 codes or --
13      Question: Just the codes.
14      Answer: In Claim 1?
15      Question: Yes. Just whether the code is a
16 valid code.
17      Answer: I'm sorry.
18      Did Dr. Johnson make a determination as to
19 whether or not the TriZetto software used a separate
20 database to check and give that invalidity check?
21 A. Yes. In her deposition, she indicated that there
22 was, indeed, a second database used to the invalidity
23 check.
24 Q. Did she refer to it as a separate database? Do
25 you recall?

Page 859

1 A. I believe she did. I don't -- I don't recall the
2 precise language, but I'm fairly sure that she referred
3 to it as a separate database.
4 Q. So Dr. Johnson agrees with your opinion; is that
5 right?
6 A. That's correct.
7 Q. I would also like to -- do you generally recall
8 Dr. Musen also testifying about his assumptions to
9 support his opinion that TriZetto used an index of
10 codes of the predetermined database to validate
11 procedure codes?
12 A. I remember -- I generally remember that testimony.
13 Q. I'd like to read to you from Page 438 of the
14 trial transcript from Tuesday.
15      MR. SEGAL: And if we can put up 1120,
16 because that was the exhibit that was up and about
17 which Dr. Musen was testifying.
18 BY MR. SEGAL:
19 Q. Question: And you have no idea, based on your
20 testimony, what database the Facets software went to
21 check and return that message; correct?
22      Answer: I'm not clueless. I mean, I would
23 assume that if the program were created in a reasonable
24 way, there would be an index into the ClinicaLogic
25 database and it would use that index to find the answer,

Page 860

1 but I don't know for sure.
2       Dr. Davis, do you know for sure whether a
3 separate database is used by TriZetto in performing the
4 validity check?
5 A. Yes. From having examined the behavior of the
6 program and from having examined the software, I do know
7 for sure, and there is a separate database used.
8 Q. Does that mean TriZetto's software was created in
9 an unreasonable way?
10 A. No. Dr. Musen is making a reasonable presumption
11 about the possibility that there might have been an
12 index. That would have been a second sensible way to
13 do this, but it turns out there's more than one sensible
14 way to have designed this program and his answer about
15 the claim, the element of the Claim No. 1 just happens
16 to depend on an assumption that the program is designed
17 in a way in which it is not, in fact, designed.
18              - - -
19 A. (Continuing) The program is designed and built
20 differently such that it doesn't carry out that element
21 of that claim.
22 Q. So you testimony is not based on an assumption?
23 A. That's correct. It's based on looking at the
24 code.
25 Q. Did you also learn anything about the history of

Page 921

1  Q. They just determine that there's five or four or
2  three?
3  A. Because it's all they need to do and because it's
4  perfectly consistent with the steps they carry out.
5  They do not need the additional step of ascertaining
6  whether there's a plurality. And, in fact, those
7  products do not want to take that step.
8  Q. Let me show you Claim 16.
9      Let me back up a minute. Where do the
10  accused systems, the three accused systems, where do
11  they ascertain how many medical service codes are in
12  a claim? Where do they do that?
13  A. Give me a moment to think about this, so I can
14  explain that.
15      (Pause.)
16      THE WITNESS: I guess the easiest way to
17  say it is near the beginning of where the clinical
18  editing rules are actually started to be applied.
19  BY MR. RANDALL:
20  Q. Definitely within the Facets, QicLink and
21  ClaimFacts product that step is performed, ascertaining
22  the number of medical service codes; right?
23  A. It is within the product, yes.
24  Q. And one of the reasons why you gave your opinion
25  earlier today that that step wasn't performed is

Page 922

1  because you said it wasn't performed within ClinicaLogic;
2  is that right?
3  A. No. I'm sorry. Either I misunderstood your
4  question or you mischaracterized what I've said.
5  Q. All right.
6  A. Would you just repeat that, please?
7  Q. Yes. So then the fact that that step is
8  performed, ascertaining the number of medical service
9  codes outside of ClinicaLogic does not mean that the
10  actual products, Facets, ClaimFacts and ClaimFacts do
11  not infringe; right?
12  A. There's a couple of things misstated in your
13  question, so if I may correct it...
14      Counting the -- ascertaining the number of
15  codes on the claim is done within the scope of the
16  clinical editing process, just at the very beginning
17  of the clinical editing process. So my belief is
18  the three TriZetto products don't infringe the claim
19  is because they don't ascertain whether there's a
20  plurality. It's just that simple.
21  Q. Well, we've talked about that.
22  A. Yes. I want to make it clear that that is the
23  grounds for the -- my belief.
24  Q. Here's Claim 16. I want to direct your attention
25  to the authorizing step. Do you see that?

Page 923

1  A. I do.
2  Q. Is it your testimony that TriZetto's products do
3  not authorize a claim in response to the determining
4  step that is in response to the step that determines
5  whether codes are valid or invalid when received
6  together?
7  A. It's my response that the TriZetto clinical editing
8  code, which I understand to be the claimed infringing
9  code, does not authorize claims, period. That's elsewhere
10  in the product.
11  Q. Do TriZetto's products authorize a claim even
12  though the codes are invalid? So, for instance, if
13  a claim goes through any one of the accused products,
14  is that claim authorized even though the clinical
15  editing portion of the product determines that the
16  codes are valid?
17  A. If it determined that they were all invalid, for
18  example? Is that what you are saying?
19  Q. Correct.
20  A. I'm just trying to understand the scenario. So
21  we put in a claim where all of the codes are, and I
22  guess I need to understand what invalid means. Does
23  invalid mean not even in the CPT code book?
24  Q. If, for whatever reason, within clinical editing,
25  the accused products determine that the codes within a

Page 924

1  claim are invalid, does the TriZetto -- the TriZetto
2  products, nonetheless, authorize those claims?
3  A. Well, first of all, it wouldn't be ClinicaLogic,
4  the clinical editing product which authorizes a claim.
5  Let's be clear about that.
6      Second, if you are asking me about what
7  the rest of the TriZetto product does, I don't know
8  that it could authorize a claim on which all of the
9  codes have been rejected. I believe claims like that
10  are what's called pendant, put aside for further
11  evaluation.
12  Q. So the accused products do not approve claims when,
13  for whatever reason, the clinical editing portion
14  determines that those codes are invalid; right?
15  A. I think we need to be very careful about what you
16  mean by the accused products. My understanding is, and
17  my analysis concerned the clinical editing part of
18  these systems. I am prepared to answer questions
19  about the clinical editing --
20  Q. I'm asking the accused systems are, and I talked
21  to you about this earlier, this is one of the first
22  questions I asked you. The accused systems are, just
23  for your information, are QicLink, Facets and
24  ClaimFacts. Those products in their entirety are the
25  infringing systems.

Page 977

```
 1              - VOLUME E -
                IN THE UNITED STATES DISTRICT COURT
 2
                IN AND FOR THE DISTRICT OF DELAWARE
 3
                      - - -
 4
    McKESSON INFORMATION SOLUTIONS   :      CIVIL ACTION
 5  LLC,
              Plaintiff             :
 6
         vs.                        :
 7
    THE TRIZETTO GROUP, INC.,       :
 8
              Defendant             :      NO. 04-01258 (SLR)
 9
                      - - -
10
                Wilmington, Delaware
11              Monday, April 24, 2006
                8:30 o'clock, a.m.
12
                      - - -
13
    BEFORE:  HONORABLE SUE L. ROBINSON, Chief Judge, and a jury
14
                      - - -
15
    APPEARANCES:
16
          SKADDEN, ARPS, SLATE, MEAGHER & FLOM
17        BY:  MICHAEL BARLOW, ESQ.
18               -and-
19        SKADDEN, ARPS, SLATE, MEAGHER & FLOM
          BY:   JEFF RANDALL, ESQ.,
20              BERNARD SHEK, ESQ. and
                MICHAEL HENDERSHOT, ESQ.
21              (Palo Alto, California)
22             Counsel for Plaintiff
23                        Valerie J. Gunning and
                          Leonard A. Dibbs,
24                        Official Court Reporters
25
```

Page 978

```
 1  APPEARANCES (Continued):
 2
 3        MORRIS, NICHOLS, ARSHT & TUNNELL
          BY:  JACK B. BLUMENFELD, ESQ.
 4
                 -and-
 5
 6  GIBSON, DUNN & CRUTCHER LLP
      BY:   JEFFREY THOMAS, ESQ. and
 7          DAVID SEGAL, ESQ. and
            T. KEVIN ROOSEVELT, ESQ.
 8          (Irvine, California)
 9
                 -and-
10
11  GIBSON, DUNN & CRUTCHER LLP
      BY:  MICHAEL SITEMAN, ESQ.
12         (San Francisco, California)
13             Counsel for Defendant
14                    - - -
15
16
17
18
19
20
21
22
23
24
25
```

Page 979

```
 1
 2               P R O C E E D I N G S
 3
 4        (Proceedings convened at 8:30 a.m., and the
 5  following occurred without the presence of the jury.)
 6
 7        THE COURT:  Not surprisingly, I've got all
 8  sorts of papers in my folder, which I really have not had
 9  a chance to look at.
10        Our purpose this morning is to go through the
11  jury instructions, so that is what we'll do first.  I
12  also have not had a chance to look at the proposals you
13  have for changing them, but I guess we will get to those
14  as we get to the instructions you want to change.
15        So as is normal for what I do in a charge
16  conference, we'll go you through the instructions page
17  by page and find out where you have your objections or
18  suggestions for changes.
19        The first set of instructions are my standard
20  instructions.
21        Does anyone have any problems through Page 12?
22        You don't have to come to the podium, Mr.
23  Thomas.
24        MR. THOMAS:  Okay.  Thank you.
25        MR. THOMAS:  Not really, your Honor.  Page
```

Page 980

```
 1  12, it's a nit and probably not important, but the name
 2  ClinicaLogic.
 3        THE COURT:  Maybe you don't have the same
 4  Page 12 I do.
 5        MR. THOMAS:  It's entitled Plaintiff's
 6  Contentions.
 7        THE COURT:  Oh, no.  My page 12 is deposition
 8  testimony.
 9        MR. RANDALL:  As is mine.
10        MR. THOMAS:  Okay.  That would be Page 11 in
11  my set, your Honor.
12        Page 13, I suppose, plaintiff's contentions.
13        THE COURT:  Well, Page 13 is the parties.
14  Maybe we should go by the title.  Any changes with the
15  parties?
16        MR. THOMAS:  Plaintiff's contentions?
17        THE COURT:  All right.  Which is Page 14.  All
18  right.
19        MR. THOMAS:  It's simply that the name
20  ClinicaLogic is not used with the Facets system.  It's
21  used with ClaimFacts and QicLink.
22        THE COURT:  All right.
23        MR. THOMAS:  But I don't think it really makes
24  a big difference.
25        THE COURT:  Well, it should be -- if that's
```

Page 1025

1  will you -- if it's appropriate --
2          THE COURT: I don't want to talk about second
3  phase.
4          MR. RANDALL: All right.
5          THE COURT: And I will look at Mr. Bellomo's --
6  I have not had time to do that.
7          MR. RANDALL: All right. Thank you.
8          THE COURT: All right. Are we set to bring
9  the jury in or would you all like a short, since we're
10  going to go for at least an hour and a half, should we
11  take ten minutes?
12          MR. RANDALL: That would be great.
13          THE COURT: All right.
14          MR. THOMAS: Thank you, your Honor.
15          (Short recess taken.)
16              - - -
17
18
19
20
21
22
23
24
25

Page 1026

1
2          (Court resumed after the recess, and the
3  following occurred without the presence of the jury.)
4
5          THE COURT: All right. Let's bring the jury
6  in.
7          Do we have a witness?
8          MR. THOMAS: Yes, your Honor. Do you want
9  her to take the stand?
10          THE COURT: I think so.
11          MR. THOMAS: Don't sit down yet. You still
12  have to be sworn in.
13          (At this point the jury entered the courtroom
14  and took their seats in the box.)
15          THE COURT: Good morning, ladies and gentlemen.
16  So happy to see you all back. Very, very grateful.
17          Let's swear our witness in.
18              - - -
19          DEFENDANT'S TESTIMONY
20              CONTINUED
21
22          ... KAREN LAMPE, having been
23          duly sworn as a witness, was examined
24          and testified as follows ...
25          THE COURT: Mr. Randall, are you going to

Page 1027

1  explain why you're up and not Mr. Thomas?
2          MR. RANDALL: I will, your Honor. May I
3  proceed?
4          THE COURT: Yes.
5          MR. RANDALL: All right. We are calling Ms.
6  Lampe because she is now available to testify, so she
7  is testifying providing evidence in our case, McKesson's
8  case, regarding infringement, and Ms. Lampe was
9  designated by TriZetto as the person most knowledgeable
10  about their clinical editing functionality in the accused
11  products. And so I will be taking her testimony even
12  though she is a TriZetto employee regarding our case on
13  infringement.
14          DIRECT EXAMINATION
15  BY MR. RANDALL:
16  Q. Ms. Lampe, you've worked in the health care industry
17  for approximately 25 years; correct?
18  A. Correct.
19  Q. You've worked at Erisco and then later TriZetto
20  since 1998; correct?
21  A. Yes.
22  Q. You are currently a business analyst specialist at
23  TriZetto; correct?
24  A. Yes.
25  Q. You were designated by TriZetto to testify in this

Page 1028

1  case as its person most knowledgeable regarding ClaimFacts
2  and the clinical editing functional; correct?
3  A. The ClinicaLogic functionality in ClaimFacts, yes.
4  Q. And you were designated by the company to testify --
5  you've had responsibility for ClaimFacts products since
6  you began working at Erisco; correct?
7  A. For the ClinicaLogic portion of it, yes.
8  Q. And you are the only employee at TriZetto that
9  works on the clinical editing functionality full-time;
10  correct?
11  A. Yes.
12  Q. All right. And you've been in charge of this
13  clinical editing portion of the product since you began
14  working for TriZetto approximately, and Erisco, in
15  approximately 1998; is that right?
16  A. Yes.
17  Q. The TriZetto products include a, what's called a
18  subset edit; correct?
19  A. Yes.
20          MR. RANDALL: Can you pull up Exhibit 30,
21  Page 12, please?
22  BY MR. RANDALL:
23  Q. So, for instance, at the top of the page, and this
24  is from the ClinicaLogic user guide, it states, subset
25  edit procedure.

Page 1029

1    Do you see that?
2  A.  Yes.
3  Q.  It detects claim procedures that should not be
4  billed separately; right?
5  A.  Yes.
6  Q.  And it determines -- strike that.  The subset edit
7  determines that the subset code should not be paid and
8  the larger code is kept and paid; correct?
9  A.  Yes.
10  Q.  And so Item 3 on the right-hand side -- strike that.
11    Item 1 indicates that the program disallows
12  the charges for the subset procedures; right?
13  A.  Depending on how the customer has it set up, it can
14  disallow.
15  Q.  Okay.  And Item 3 indicates that the edit combines
16  the charges for the subset procedures with the listed
17  procedure; right?
18  A.  Yes.
19  Q.  So, for instance, the subset code is mutually
20  exclusive with the larger code and will be rejected;
21  right?
22  A.  Well, mutually exclusive isn't a term we use.  We
23  don't actually have an edit called that.  But if you're --
24  if you are referring to -- if you are defining a mutually
25  exclusive as a subset edit, then, yes.

Page 1030

1  Q.  All right.  Well, the code -- strike that.  The
2  clinical editor determines that one code should not be
3  paid with the other code; correct?
4  A.  Yes.  Should not be billed or reported with the
5  other code.
6  Q.  Right.  And so it disallows for payment one code
7  and allows for payment the other code; is that correct?
8  A.  Well, it allows it to go through to the rest of
9  the adjudication process.
10  Q.  Okay.  You also -- TriZetto products also include
11  a rebundling edit; correct?
12  A.  Yes.
13  Q.  Can we go to Exhibit 30, Page 7?  Yes.
14    And the rebundling edit also identifies
15  codes that should not be paid separately; right?
16  A.  Yes.
17  Q.  And the rebundle claim -- strike that.
18    In the rebundled edit, two or more codes are
19  rejected and replaced by another code; correct?
20  A.  No, I couldn't call them rejected.
21  Q.  They're disallowed for payment; right?
22  A.  No.  They are replaced by another code.
23  Q.  For instance, if two codes are detected, the
24  system determines that they should not be paid together;
25  correct?

Page 1031

1  A.  I don't know if I explained it that way.
2  Q.  All right.  Let me go to the document.
3    If there are -- the procedure for the
4  rebundling edit determines that rebundled claim
5  procedures that should not be billed separately.  Do you
6  see that?
7  A.  Yes.
8  Q.  So the systems determine that two codes should not
9  be billed separately?
10  A.  Separately.
11  Q.  Right?
12  A.  Correct.
13  Q.  And the program will, the action it will take, it
14  condenses the related procedures into a single
15  comprehensive procedure code that is new to the claim;
16  correct?
17  A.  Correct.
18  Q.  So the code disallows payment for the two
19  procedures that should not be billed separately and
20  inserts a procedure code that is new to the claim and
21  then moves on to adjudication; right?
22  A.  I still don't know that I'd call it rejected, but
23  it does allow the claim to move through with the
24  adjudication by replacing it with the new code.
25  Q.  Did anybody tell you not to use the term rejected?

Page 1032

1  A.  No.  No.  But the codes themselves, if they're
2  reported correctly, aren't ineligible codes.
3  Q.  Okay.
4  A.  They just shouldn't be billed together.  There's
5  a -- there's a better way to bill that using one code.
6  Q.  All right.  But so, for instance, if two codes that
7  are determined by this procedure rebundling edit are
8  found in a claim, then the system will disallow for
9  payment those codes and insert for possible payment
10  another new code to the claim; correct?
11    - - -
12  A.  Yes, I would say that would be correct.
13    - - -
14
15
16
17
18
19
20
21
22
23
24
25

Page 1033

1
2  MR. RANDALL: Can you pull up Exhibit 419,
3  Page 1?
4  BY MR. RANDALL:
5  Q. This is the clinical editing reference database
6  user guide for 2003.
7     Do you see that?
8  A. Yes.
9  Q. I direct your attention to the first paragraph.
10 This is a tool -- this document is a tool designed to
11 give TriZetto's customers greater information on the
12 sources and rationale of edits built into the systems;
13 correct?
14 A. Yes.
15 Q. And I'd like to -- can you move to Page 20 of
16 Exhibit 19? Yes.
17    Blow up that bottom paragraph.
18    So you mentioned that there are no mutually
19 exclusive procedures in your systems. There are mutually
20 exclusive procedures, are there not?
21 A. There are no -- there isn't a mutually -- there
22 isn't an edit called mutually exclusive. These
23 mutually exclusive procedures are part of the national
24 correct coding initiative. And that's the Medicare
25 edits and those are reviewed by our medical consultants

Page 1034

1  and the ones that are appropriate to be placed in the
2  database for editing purposes are. However, we don't
3  call them mutually exclusive edits. They're inserted
4  into our subset tables.
5  Q. Well, this is a manual that is produced by TriZetto
6  and provided to its customers as a tool to assist them
7  in working, in using your products; is that correct?
8  A. Yes.
9  Q. All right. And in the user guide that you present
10 to your customers to assist them in using your products,
11 you refer to mutually exclusive procedures; correct?
12 A. Yes. This --
13 Q. All right.
14 A. This is the definition from NCCI. It's taken right
15 out of the public use files. It's a cut and paste. It
16 wasn't created by us. We did not word it that way.
17 It's strictly to give our customers the information as
18 to what national correct coding initiative determined an
19 edit to be.
20 Q. Well, your systems, Ms. Lampe, detect mutually
21 exclusive procedures, both through subset edits and
22 rebundle edits; correct?
23 A. Based on this definition here?
24 Q. Yes.
25 A. Yes, I would agree with that.

Page 1035

1  Q. All right.
2     THE COURT: And, Mr. Randall, has this exhibit
3  been admitted?
4     MR. RANDALL: Well, there's no objection to it.
5     THE COURT: All right. Well, let's admit it,
6  though, just to stay consistent with my rules as Exhibit
7  419.
8     MR. RANDALL: Thank you, your Honor.
9     THE COURT: All right.
10 ***    (Exhibit No. 419 was received into evidence.)
11 BY MR. RANDALL:
12 Q. So this document states, there are numerous
13 procedure codes that should not be reported together
14 because they are mutually exclusive of each other.
15    Do you see that?
16 A. Yes.
17 Q. And the clinical editing functionality of TriZetto
18 detects these numerous procedure codes that should not
19 be reported together because they are mutually exclusive
20 of each other; correct?
21 A. Could you repeat the first part of that question,
22 please?
23 Q. Sure. The clinical editing or clinical edit,
24 ClinicaLogic, we'll call it, detects that there are
25 these numerous procedure codes that should not be

Page 1036

1  reported together because they are mutually exclusive of
2  each other; correct?
3  A. Yes.
4  Q. And in some instances, it disallows both codes and
5  inserts a new comprehensive code, and that's called the
6  rebundle edit; right?
7  A. Yes.
8  Q. And in some instances it detects the two mutually
9  exclusive codes and it passes one of them on for further
10 adjudication and disallows for payment the other, and
11 that's called the subset edit; correct?
12 A. Yes.
13 Q. All right.
14 A. But I don't know that you can separate out calling
15 the rebundle mutually exclusive and not referring to the
16 subset as mutually exclusive as well.
17 Q. They both are; correct?
18 A. I would think a subset is a more proper definition
19 of mutually exclusive based on this than the rebundle.
20 Q. Well, in the rebundle example, there are two codes
21 that are detected by the accused products that should
22 not be reported together and in that instance, both of
23 them are disallowed for payment and a new -- a new code
24 is inserted for further adjudication; correct? Is that
25 a fair statement?

Page 1037

1  A. It's fair. I mean, I've agreed to it, but I
2  still don't like disallowed. I still don't like the
3  codes are rejected or disallowed.
4       I'm not -- that's not the way I see the --
5  the rebundle has happened.
6  Q. Your documents, your documents say that the codes
7  are disallowed, don't they, ma'am?
8  A. I don't believe -- does it say that for the
9  rebundle, that those two codes are disallowed? I --
10 Q. I'm asking you.
11 A. I don't think it did.
12 Q. Do your documents indicate and state that codes
13 are disallowed?
14 A. That codes in general can be disallowed? Yes, it
15 does.
16 Q. All right. So this document goes on to state,
17 mutually exclusive codes are those codes that cannot
18 reasonably be done in the same session.
19      Do you see that?
20 A. Yes.
21 Q. That's the definition for mutually exclusive codes
22 as detected by your products; is that correct?
23 A. For the NCCI edits that are included in our -- in
24 our criteria, yes.
25 Q. And that's the national correct coding initiative;

Page 1038

1  correct?
2  A. Yes.
3  Q. And your systems are compliant with that; correct?
4  A. Not a hundred percent.
5  Q. They are compliant with it with respect to
6  detecting mutually exclusive codes?
7  A. The ones our medical consultants have determined
8  are appropriate to be put in the criteria.
9  Q. Okay.
10      MR. RANDALL: Can you go to Exhibit 419,
11 Page 21? The upper -- the upper paragraph.
12      There we go.
13 BY MR. RANDALL:
14 Q. Now, you recognize this, Ms. Lampe, as a list of
15 examples of these mutually exclusive procedures; correct?
16 A. Yes.
17 Q. All right. And this is Exhibit 419, Page 20, Page
18 21.
19      So this goes on to state that a third example
20 is the reporting of an initial service and a subsequent
21 service. It is contrary for a service to be classified
22 as an initial and a subsequent service at the same time.
23      Do you see that?
24 A. Yes.
25 Q. All right. So some of the mutually exclusive edits

Page 1039

1  that are detected by your systems are detected because
2  you can't report an initial -- you can't have a code
3  that bills for an initial service with a subsequent
4  service at the same time in the same claim; right?
5  A. Well, that would depend on whether or not the
6  consultants, the medical consultants put those edits into
7  our system. I don't know off the top of my head if they
8  did.
9  Q. You have no idea whether or not the one of three
10 examples provided by the national correct coding
11 initiative is actually implemented in your system?
12 A. No, because they're not all in our system.
13 Q. I understand they are not all, but this is the one
14 of three examples that the national correct coding
15 initiative provides. Would you agree with me there?
16 A. Yes.
17 Q. Okay. And one of the three examples of a mutually
18 exclusive code is that initial service and subsequent
19 service shouldn't be billed at the same time on the same
20 claim; right?
21 A. Yes.
22 Q. All right. And that's basically double billing,
23 isn't it? You shouldn't bill for the first visit, the
24 second visit at the same time on the same claim; right?
25 A. Correct.

Page 1040

1  Q. Okay.
2       (Pause.)
3       MR. RANDALL: Can you move down to the next
4  paragraph, please? Thank you.
5  BY MR. RANDALL:
6  Q. You also say to your customers that CPT codes
7  which are mutually exclusive of one another based
8  either on the CPT definition or the medical
9  impossibility/improbability that the procedures could
10 be performed at the same session can be identified as
11 code pairs; correct?
12 A. Yes, based on the Medicare NCCI. Again, this is
13 all part of that definition.
14 Q. Well, you include this in what you tell your
15 customers you can detect; right?
16 A. This is how Medicare created these edits and our
17 medical consultants review them and decide if they
18 should be in our database. So if one of these edits
19 happens to come up and a customer needs more information,
20 this is the information that is supplied, because it's
21 added because it's a Medicare national correct coding
22 initiative.
23 Q. All right. But this document is a tool for your
24 customers and in this document you're telling them,
25 your customers, that these mutually exclusive codes,

Page 1053

1  Q. Well, who maintains your database?
2  A. You mean the IP records?
3  Q. No. Well, sure.
4  A. The IP records? Nobody. That's -- that's our
5  customer's responsibility. We don't supply -- as far as
6  I know, we don't supply any criteria or information for
7  them to load into that IP record.
8  Q. When there are changes in the CPT codes, for
9  instance, a particular code, we'll call it Code X, Code X
10 is determined it's obsolete, no longer exists, no longer
11 will be used, what does TriZetto do when it receives
12 that notification?
13 A. In regards to which records?
14 Q. Anything in ClaimFacts or ClinicaLogic.
15 A. The -- the information regarding the changes with
16 A.M.A. are reviewed by our medical consultants at
17 Deloitte and any changes are incorporated into the
18 clinical editing medical criteria database. And that's
19 how that's handled.
20 Q. Okay. And so, for instance, the list of all the
21 possible CPT codes is updated to reflect that X no
22 longer exists; right?
23 A. Well, but we don't have a list. We don't have a
24 list that gets loaded. It's not a separate load. All
25 of the CE records are loaded to our system with the

Page 1054

1  edits attached to them. There's no separate table.
2  Q. Does ClaimFacts have an ability when a claim comes
3  in to ClaimFacts, does it have an ability to determine
4  if a particular code is valid or not?
5  A. You mean an A.M.A. valid code?
6  Q. Yes.
7  A. Yes.
8  Q. How does it do that?
9  A. It does that by reading the procedure code
10 maintenance table, or what I've referred to as the IP
11 record.
12 Q. Okay.
13 A. And that happens outside of ClinicaLogic, before --
14 you can't even get to ClinicaLogic until that's done.
15 Q. Right. And this, you call it the IP what?
16 A. IP record.
17 Q. IP record. And that contains a list of CPT codes;
18 right?
19 A. Yes.
20 Q. And does that contain a list of all CPT codes that
21 may -- may be found in the ClinicaLogic database listing
22 rules to which edits are applied?
23 A. It may. It may contain the same ones.
24 Q. All right. And so, for instance, if ClaimFacts
25 looks at the IP record and determines that the code is

Page 1055

1  not on the IP record, you then know that that code is not
2  in that ClinicaLogic database listing all of the various
3  improper code errors; right?
4  A. No.
5  Q. Why not?
6  A. Well, because those two records don't talk to each
7  other in the program as far as I know. The IP records
8  are -- it's the responsibility of our customers to
9  maintain those. And the clinical editing records are
10 the criteria that we supply to our customers.
11        So I don't -- I don't run any kind of a
12 compare between the two.
13 Q. It wouldn't make any sense whatsoever to have a
14 database containing relationships and rules among codes
15 if those codes were not at least listed on the IP
16 record; correct?
17 A. Yes. They would have to be listed on the IP
18 record. You couldn't get to the medical rules without --
19 Q. That's right. Okay.
20        So, for instance, all of the codes that are
21 listed in the database containing the rules and
22 relationships and so forth, those have to be listed in
23 the IP record, right, for the product to operate
24 properly?
25 A. Yes.

Page 1056

1  Q. Okay. So, then, for instance, if you check a code,
2  Code X, comes in and you check the IP list and it's not
3  on the IP list, then you're pretty sure it's not in the
4  database containing all the rules and edits; right?
5  A. Not -- no. I don't agree with that.
6  Q. Okay. Let me back up for a minute. We're clear on
7  this: That the IP list -- strike that.
8        The IP list would contain and list all of the
9  codes that are listed in the database with all the rules
10 and relationships; right?
11 A. No. I'm sorry. Say it again, please.
12 Q. Sure. The IP list contains a list of all of the
13 codes that could possibly be in the database that
14 contains the rules and relationships; right?
15 A. It should.
16 Q. Okay. And ClinicaLogic makes a check to determine
17 if any particular code is on the IP list; correct?
18 A. No. As far as I know, they don't talk to each
19 other. That would happen at the source code.
20 Q. That's not my question. When a claim comes in and
21 contains Claim X, ClinicaLogic checks to see if Code X
22 is on the IP list; right?
23 A. No. ClaimFacts checks that.
24 Q. ClaimFacts?
25 A. Yes.

Page 1085

1
2          (Court resumed after the recess.)
3
4          THE COURT: All right. Let's bring our jury
5    in.
6          (At this point the jury entered the courtroom
7    and took their seats in the box.)
8          THE COURT: All right. Mr. Randall?
9          REDIRECT EXAMINATION
10   BY MR. RANDALL:
11   Q. Ms. Lampe, while I examined you, do you recall my
12   questions about the mutually exclusive code errors and
13   rules database?
14   A. Yes.
15   Q. And one of them, one of the examples was, you can't
16   bill for the same service twice; right?
17   A. The same service twice?
18   Q. Right.
19   A. No, I don't remember that.
20   Q. Well, do you remember the example given, where you
21   can't bill for an initial and a subsequent service at
22   the same time on the same claims?
23   A. Yes.
24   Q. Okay. And I said that's basically an example of
25   double billing and you can't double bill; right?

Page 1086

1    A. Yes.
2    Q. Okay. And you said during cross-examination by
3    your counsel that all of these rules are medically
4    related; right?
5    A. Yes.
6    Q. Okay. It does not take a doctor to determine that
7    you shouldn't be double-billed for something, does it?
8    A. It depends on what the procedure code is. So, yes,
9    it would take a doctor to determine that.
10   Q. That you shouldn't be billed twice for the same
11   visit?
12   A. Well --
13   Q. Does it take a doctor to figure that out?
14   A. For the same visit?
15   Q. Yes.
16   A. The same procedure code? The same date of service?
17   Same everything?
18   Q. Yes.
19   A. That would be a duplicate billing for -- for the
20   same procedure.
21   Q. And it does not take a doctor to tell you that,
22   does it?
23   A. But that would probably edit out in the duplicate --
24   in the duplicate edits in ClaimFacts if it made it
25   through those edits because of whatever parameters were

Page 1087

1    set up. There's what we call the redundant edit setup
2    in the medical criteria database that says when a
3    procedure can be billed more than once a day than when
4    it can't be.
5    Q. The question is simply, does it take a doctor to
6    tell you that you shouldn't be billed for the same
7    visit twice? Yes or no? In your opinion?
8    A. No.
9    Q. Okay.
10         MR. RANDALL: No further questions.
11         THE COURT: All right. You may step down.
12         (Witness excused)
13         - - -
14         THE COURT: Mr. Thomas?
15         MR. THOMAS: Thank you, your Honor. We call
16   Mr. Tony Bellomo.
17         Mr. Bellomo, will you take the stand?
18         - - -
19         ... ANTHONY BELLOMO, having been
20         duly sworn as a witness, was examined
21         and testified as follows ...
22         DIRECT EXAMINATION
23   BY MR. THOMAS:
24   Q. Good morning, Mr. Bellomo.
25   A. Good morning.

Page 1088

1    Q. Where do you work?
2    A. I work at TriZetto.
3    Q. And what is your role at TriZetto?
4    A. I'm an Executive Vice President, generally in charge
5    of the software applications.
6    Q. Software applications such as Facets?
7    A. Yes, sir.
8    Q. How long have you been working at TriZetto?
9    A. I've been there since 2000.
10   Q. Where did you work before you became a TriZetto
11   employee?
12   A. I worked at Erisco prior to that.
13   Q. Did you become a TriZetto employee when TriZetto
14   acquired Erisco?
15   A. Yes, that's correct.
16   Q. That's how you became a TriZetto employee?
17   A. Exactly.
18   Q. How long did you work at Erisco before 2000?
19   A. I joined in 1977, so I've been there almost 28 years
20   or so.
21   Q. What was your role when you first joined Erisco back
22   in 1977?
23   A. I was the Manager of Systems and Programming and, as
24   such, I had the programming team reporting up through me.
25   Q. At that time, were you a hands-on programmer, you

Page 1195

```
                                    - VOLUME F -
                    IN THE UNITED STATES DISTRICT COURT

                  IN AND FOR THE DISTRICT OF DELAWARE

                              - - -

McKESSON INFORMATION SOLUTIONS    :    CIVIL ACTION
LLC,
          Plaintiff              :

          vs.                    :

THE TRIZETTO GROUP, INC.,        :

          Defendant             :    NO. 04-01258 (SLR)

                              - - -

                         Wilmington, Delaware
                         Tuesday, April 25, 2006
                         9:30 o'clock, a.m.

                              - - -

BEFORE:  HONORABLE SUE L. ROBINSON, Chief Judge, and a jury

                              - - -

APPEARANCES:

          SKADDEN, ARPS, SLATE, MEAGHER & FLOM
          BY:  MICHAEL BARLOW, ESQ.

                    -and-

          SKADDEN, ARPS, SLATE, MEAGHER & FLOM
          BY:  JEFF RANDALL, ESQ.,
               BERNARD SHEK, ESQ. and
               MICHAEL HENDERSHOT, ESQ.
               (Palo Alto, California)

                    Counsel for Plaintiff

                              Valerie J. Gunning and
                              Leonard A. Dibbs,
                              Official Court Reporters
```

Page 1196

```
APPEARANCES (Continued):

          MORRIS, NICHOLS, ARSHT & TUNNELL
          BY:  JACK B. BLUMENFELD, ESQ.

                    -and-

          GIBSON, DUNN & CRUTCHER LLP
          BY:  JEFFREY THOMAS, ESQ. and
               DAVID SEGAL, ESQ. and
               T. KEVIN ROOSEVELT, ESQ.
               (Irvine, California)

                    -and-

          GIBSON, DUNN & CRUTCHER LLP
          BY:  MICHAEL SITTMAN, ESQ.
               (San Francisco, California)

                    Counsel for Defendant

                              - - -
```

Page 1197

P R O C E E D I N G S

(Proceedings convened at 9:30 a.m., and the following occurred without the presence of the jury.)

THE COURT: Before we bring the jury in, I've been thinking about how we're going to manage the rest of this trial. I truly don't think we will have the time to try both willfulness and damages, so I'm going to -- I think we can only try one of those issues, and I will leave it to the plaintiff which of the issues it wants to go forward with: Damages or willfulness.

All right. Let's bring the jury in for closings.

(At this point the jury entered the courtroom and took their seats in the box.)

THE COURT: Good morning and welcome back, ladies and gentlemen.

Mr. Randall?

MR. RANDALL: Thank you, your Honor.

May it please the Court, ladies and gentlemen of the jury, this is an interesting case because the facts about the operation of the accused system are really not in dispute. We don't dispute how they

Page 1198

operate. What has happened here is that McKesson has presented overwhelming evidence about how the accused products operate. We presented that evidence through their own witnesses, TriZetto's witnesses, and we presented it through the documents and we presented it through credible, straightforward testimony from our qualified expert, Dr. Musen.

They can't dispute that. So their defense has been reduced in this case to contorting and twisting the English language to suit their purpose. It is as if they are an octopus and see -- octopus, they don't have a defense mechanism. They don't have much. What they do have is this ink; right? So they spew ink all over the place when they feel threatened and due to that confusion, they escape. That's what happened in this case.

They had relied on their computer science, their MIT expert, to come in here and say that certain words, plain, simple English, doesn't mean what we all know it means. They have said that, for instance, ascertaining that there's more than one medical code on a claim, they've said ascertaining the number of codes does not mean ascertaining there's more than one. Ascertaining, as Ms. Lampe testified yesterday, they ascertained that there's a code on the claim that they

Page 1199

1  have to process. They ascertained that there is another
2  one and another one and they know when to stop and they
3  know when to go forward but, she said, I don't know how
4  we do it, but we know.
5        They know that there's multiple codes on
6  that claim to process and that's how they process it.
7  But they said that's not determine that there are
8  multiple codes on a claim. That's not determining that
9  there's a plurality of codes on a claim.
10       They talk about mutually exclusive. Their
11 expert and a number of their witnesses said we just don't
12 know what mutually exclusive means, but in the manual, in
13 the user manual itself, it gives the definition. It
14 means two codes that can't be billed together. That's
15 what it means.
16       Now, they know that because they've read the
17 manuals. Dr. Davis was supposed to have read all the
18 manuals. This is a claim term. You would think he
19 would have gone through everything.
20       Ms. Lampe works with the product. She has
21 worked with the product since 1998. She knows it well.
22 She knew that that definition existed and she said, well,
23 that's just a Government definition.
24       Just a Government definition? It's just for
25 Medicare and Medicaid? That's it? That's a pretty big

Page 1200

1  part of their business.
2        They knew that the definition exists and they
3  knew it's simple. You've got two codes, they can't be
4  billed together, they're mutually exclusive. And they
5  treat them in some ways, sometimes they will disallow
6  both the codes and reinsert another third code, which is
7  called rebundling. Sometimes they'll call it a subset.
8  They'll take one of the mutually exclusive codes,
9  disallow it, and pay the other one.
10       But they knew what that meant.
11       Ms. Lampe had a real tough time saying that
12 codes and claims were rejected; right? And the reason
13 for that is that is what the claim language says. But
14 their documents are laden with, and we'll go through
15 them, and we went through some with her. She ultimately
16 admitted, right, after I showed her a few, she
17 ultimately admitted, all right, fine. We disallow claims
18 for payment. We disallow codes. We disallow claims.
19 Yes, we do that. But somehow disallowing codes and
20 claims for payment does not mean rejecting it for
21 payment.
22       That's nonsense.
23       The other part of that, by the way, is how in
24 the world do you come in here and you tout your product
25 as saving billions and billions of dollars. They say

Page 1201

1  this product, you use our clinical editing portion of
2  our product, you use that, you will save a ton of money.
3  You'll save this percentage, you'll save that percentage.
4        How in the world do you ever save any money
5  if you never reject any claims? If you never reject
6  any codes, you never reject any codes, how in the world
7  can you tell the world and the customers that you do
8  save money by doing that?
9        And so Dr. Davis' testimony, we went around
10 and around and around. Finally, I said, does the product,
11 do these accused products ever, ever reject any claims?
12 Reject any codes? He sat there for a long time and said,
13 no. Well, that would have saved me a lot of time; right?
14 I would have gotten that out of him and just moved on.
15       He's wrong. These products, they reject
16 codes, they reject claims. They report and save --
17 they report a savings report on that and they report to
18 the customers. The customers can run a savings report
19 and we'll go through this. They can run a savings
20 report and they can show how much money they saved by
21 rejecting certain codes and how much money they saved by
22 rejecting certain claims.
23       You don't save money if you don't reject
24 these things. It's a difference between what you, the
25 claim that comes in and the claim that is paid. That's

Page 1202

1  the savings. That's what they've testified to. And you
2  only get there by rejecting codes and claims.
3        The other issue, medical and non-medical.
4  Albeit, the database, the predetermined database, it
5  absolutely contains a whole host of medical relationships.
6  I'm not going to tell you it doesn't. It does, no doubt
7  about it, but it also contains billing issues. It
8  contains, Dr. Musen told you, he said a number of those
9  relationships are billing-related. They are. It makes
10 sense. Doctors want to get paid for what they do, and
11 I don't blame them for it. They should get paid for
12 what they do; right? But some of those relationships
13 in there are for billing reasons, like the double billing
14 issue. We don't need a doctor to tell us that and it's
15 not exclusively a medical criteria to say that when you
16 go visit a doctor, you should only be charged once for
17 that visit. All right? We all know that. We don't --
18 in life we don't want to be double-billed for anything,
19 but that's not a medical issue. It is a strictly
20 administrative billing issue.
21       Let's not bill twice. Let's not bill the
22 insurance companies. Let's not bill the patients. Let's
23 not bill anybody twice. That's a simple non-medical
24 issue, and there are others, like Dr. Musen testified
25 to as well. For instance, the idea that you should add

Page 1227

1  guide. I'm sorry. It's at Page 20 of the document,
2  actually.
3         And hear it makes it very clear what
4  mutually exclusive procedures are. There are numerous
5  procedures that should not be reported together because
6  they are mutually exclusive of each other. Mutually
7  exclusive codes are those codes that cannot reasonably
8  be done in the same session.
9      That's it. And they determine the codes
10 are mutually exclusive all the time. They do it through
11 a number of their edits.
12        Can you go to the next page, Page 21?
13        They set forth in their user guide, and this
14 is a TriZetto user guide, they set forth the examples of
15 non -- I'm sorry, of mutually exclusive codes.
16                    - - -
17        MR. RANDALL (Continuing): And the third
18 example here is -- would you highlight the last sentence
19 or two of the top paragraph?
20        Thank you.
21        The third example is reporting of an initial
22 service and a subsequent service. It is contradictory
23 for a service to be classified as an initial and a
24 subsequent service at the same time.
25                    - - -

Page 1228

1
2         MR. RANDALL (Continuing): That's not a
3  medical reason. That's a simple, simple billing concept.
4  And Dr. Musen went through why physicians want to be,
5  and should be paid for what they do. And there are
6  certain billing issues.
7      Dr. Hawley said that Erisco and customers
8  of Erisco periodically made suggestions based on cost.
9         If there is no doubt that most -- I would
10 admit that most of the relationships in these databases
11 are medically related, but a number of them are billing
12 related. There's no doubt about that either. And
13 that's the whole purpose of breaking down every possible
14 thing that a doctor does into a code. Right?
15      I mean, the reason why you break it down,
16 just like mechanics break it down, just like a whole host
17 of service industries break down into the smallest detail
18 what they do. They do it because they want to get paid
19 for it. I think they should be paid for it, but that is
20 why they do it.
21        And that last issue, we've talked about the
22 double billing. I mean, I asked, if you need a doctor
23 or medical judgment to determine that you shouldn't be
24 double-billed, and she said no, and you don't. So that
25 element -- can we go back to the claim? So both the

Page 1229

1  ascertaining step we already talked about and the
2  determining step are both satisfied.
3         Now, these next two elements talk about
4  authorizing codes and rejecting codes. And we'll talk
5  about that. And we went through it. The dispute there
6  is that when you allow codes and you disallow codes for
7  payment, and you generate savings based on those,
8  somehow that's not rejecting or authorizing. That's a
9  silly argument, too.
10        And their documents are just laden with the
11 language of allowing and disallowing claims.
12        So can you go to Exhibit 30-10?
13        Go to the second box in the far left-hand
14 corner. No, I'm sorry. It's the second box on the
15 top. Yes, that one.
16        So, by the way, this is, as I mentioned,
17 this is ClinicaLogic user guide. It's Exhibit 30, and
18 that's at Page 2. And this is a conceptual diagram of
19 the -- of ClinicaLogic. And right there, it says,
20 define system action, deny. So they can deny whether
21 to code or a claim, they can deny it if it's
22 inappropriate.
23        Let's talk about the reports that they
24 generate.
25        Can you go back and show the main diagram?

Page 1230

1         The bottom left-hand box, and you can do the
2  whole box.
3         So these are the reports that it generates.
4         And it can generate -- it can print savings data by
5  claim or edit. All right?
6         So what is printing is it's printing the
7  savings that you achieve by rejecting, you pick a word,
8  rejecting, disallowing, denying claims and codes. You
9  can print a report and say how much money have we saved
10 by denying this one particular edit. How much money
11 have we saved denying claims, rejecting them.
12        Let's go to the next page of there document,
13 Page 3. I'm sorry. Page -- one more page. It's
14 probably Page 12. Okay.
15        So I'm going to just talk about the right-
16 hand side of these boxes. Item number one. Just the
17 right-hand side of the boxes. The system responses.
18 I'm sorry. The other side. Yes.
19        If you take a look at this, and this is at
20 Page 4 of the document that you have, it is Trial
21 Exhibit 30. You go down to system responses. It says,
22 disallow the charges. Go down to the next box. Many
23 the same thing: Disallows the charges. Go down to
24 the next box. Disallows the charges. Go down to
25 the next box. Disallows the charges, and on and on and on.

Page 1291

1    They look in the all codes database. They
2 determine it's not there. There are two ways to determine
3 something is not in the predetermined database. Two ways
4 to determine, at least two ways, maybe more, to determine
5 it's not in there. One is to look in there, just like
6 you'd look in your local library for the book. That's
7 one way.
8    The other way is to look in the all codes
9 database. You can do that. You can look in the Library
10 of Congress index to determine if the book is not there.
11 There are two ways to do it. You will not receive
12 instructions saying that we have -- that in order to
13 infringe, it has to be done in a certain way. It simply
14 has to be done. And they do it. They determine that
15 the code, when a code comes in, they determine that it's
16 not in that database by looking at all of the codes list.
17 That's how they do it. That's one way to do it. It
18 happens to be the most efficient and effective way of
19 doing it, and that is why they do it. And there's no
20 question about it.
21    And we are not required to prove that they
22 actually look through this or look through the local
23 library for the book. Simply, that they determine that
24 it's not there. That is one of the stems in the claims.
25    And you won't see -- again, you won't find

Page 1292

1 an instruction requiring us, requiring that we show how
2 they determine that step. No way. It's not in there
3 because it's not required.
4    You've heard from Mr. Bellomo on this. And
5 Mr. Bellomo -- I hate to -- to touch this.
6    If, for example, you wanted to determine, if
7 you wanted to determine whether or not a code was in
8 here, the predetermined database, for instance, A, B, C,
9 it was not in the predetermined database, you could, if
10 you wanted to, check the CPT list, this list, and if
11 it's not on the CPT list, for example, A through Z, if
12 it's not there, you know it's not in this, the
13 predetermined database; right? The answer is, it's
14 probably not, that's correct, when the system is
15 operating correctly.
16    It's probably not. You know it's not.
17 It's absolutely not to a mathematical certainty if the
18 system is operating as intended and properly.
19    On Claim 2 -- by the way, that's the only
20 defense on noninfringement, on Claim 1.
21    On Claim 2, there were two issues. I wanted
22 to get -- mutually exclusive and non-medical criteria.
23    On the mutually exclusive, he readily
24 admitted it now, but throughout this trial, they didn't.
25 So throughout this trial, they fought that. They said

Page 1293

1 I don't know what that means. I don't know what it
2 means. Their expert didn't know what it means. Dr.
3 Hawley didn't know what it meant. Ms. Lampe didn't
4 know what it meant until I pulled the document out and
5 said, it's defined right here. It's a simple definition.
6 It means two codes shouldn't be billed together.
7    And counsel said, well, okay, fine. We want
8 to use their definition.
9    It's not our definition. It's theirs. It
10 came out of their user manual.
11    Now they say, okay, fine, you caught us. I
12 will admit that, we got that. Now they're still fighting
13 on medical, non-medical based relationships. Now he
14 says, okay, they are all billing relationships, but he
15 says they're all medical relationships. And I have said
16 and I will be honest and candid with you, there are a
17 number, and probably most of the relationships contained
18 in the predetermined database are based on medical
19 criteria. Whether one operation should be performed
20 with another, that's clear. There's no doubt about that,
21 but there's also no doubt that in that database of
22 thousands and hundreds of thousands of relationships,
23 there are also rules based on non-medical criteria.
24 Absolutely. And those rules are based on simple
25 billing things.

Page 1294

1    Even Dr. Hawley said, yes, we got some of
2 the rules from Erisco. We got some of the rules from
3 Erisco's customers. And one of the three examples used
4 by Medicare to show they are mutually exclusive codes,
5 one of the three examples they used, it's in the user
6 manual, is based on non-medical criteria.
7    And it says, you can't bill the initial and
8 subsequent visit at the same time. And I said that's
9 like double billing, and she said yes.
10    That's right, you can't do it. That's
11 common sense. So there are common-sense administrative
12 billing relationships built into the database and one
13 of the examples, a concrete example, one of three given
14 by Medicaid or Medicare was right there in their user
15 manual.
16    And, by the way, Dr. Musen testified
17 absolutely, a number of these relationships are based
18 on non-medical reasons, and he testified about that.
19    Who did they have to testify about it? They
20 had Dr. Davis, the computer scientist from MIT. He's
21 not qualified. He wasn't qualified by the Court to
22 testify about that, and he wasn't qualified to testify
23 in front of you on that issue, to say that he has
24 looked at all of them and he knows that they are all
25 medically related. He simply cannot do it.