EXHIBIT 16

Redacted

EXHIBIT 17

Redacted

EXHIBIT 18

1  DISTRICT OF DELAWARE
2
3
4  McKESSON INFORMATION SOLUTIONS, LLC,
5        Plaintiff
6  v.              CA NO. 04-1258 (SLR)
7  THE TRIZETTO GROUP, INC.,
8        Defendant
9
10
11

12        VOLUME 1
13    VIDEOTAPED DEPOSITION OF RANDALL
14  DAVIS, Ph.D., a witness called on behalf of
15  the Plaintiff, pursuant to the Federal Rules
16  of Civil Procedure, before Jessica L.
17  Williamson, Registered Merit Reporter,
18  Certified Realtime Reporter and Notary
19  Public in and for the Commonwealth of
20  Massachusetts, at the Offices of Skadden,
21  Arps, Slate, Meagher & Flom LLP, One Beacon
22  Street, Boston, Massachusetts, on Wednesday,
23  November 30, 2005, commencing at 9:27 a.m.
24  JOB NO. 41297
25

Page 1

---

1  A P P E A R A N C E S
2
3  SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
4     (By Jeff Randall, Esq.)
5     525 University Avenue
6     Palo Alto, California 94301
7     (650) 470-4500
8     jrandall@skadden.com
9     Counsel for the Plaintiff
10
11  GIBSON, DUNN & CRUTCHER LLP
12     (By David A. Segal, Esq.)
13     4 Park Plaza
14     Irvine, California 92614-8557
15     (949) 451-3973
16     dsegal@gibsondunn.com
17     Counsel for the Defendant
18
19  ALSO PRESENT:
20
21     George Dobrentey, Videographer
22
23
24
25

Page 2

---

1             DEPONENT              PAGE
2
3  RANDALL DAVIS, Ph.D.
4  Examination By Mr. Randall      5, 310
5  Examination By Mr. Segal        297
6
7        E X H I B I T S
8  NO.                             PAGE
9  1  Copy of '164 patent          11
10 2  Expert Report dated October   22
        24, 2005
11
12 3  Expert Report dated November  22
        14, 2005
13 4  Article entitled "Enhancing   28
        Accuracy and Timeliness is
14      Integral to the Claims
        Adjudication Process"
15
16 5  Document relating to AMS      141
        entitled "Setting a New
        Standard"
17
18 6  Document bearing Bates stamp  142
        Nos. RD000314 - 324
19 7  Document entitled "AMS June   142
        1986 HDI-Proprietary"
20
21 8  One-page document bearing     142
        Bates stamp No. RD000420
22
23
24
25

Page 3

---

1                P R O C E E D I N G S
09:10:46  1
09:27:22  2        THE VIDEOGRAPHER:  Good morning.
09:27:33  3  We are recording and are now on the record.
09:27:35  4  Today's date is November the 30th, 2005, and
09:27:38  5  the time is 9:27 a.m.  My name is George
09:27:42  6  Dobrentey.  I'm a legal videographer for G &
09:27:46  7  M Court Reporters, Ltd.  Our business
09:27:46  8  address is 42 Chauncy Street, Suite 1A,
09:27:50  9  Boston, Massachusetts 02111.
09:27:51  10       This is the deposition of Randall
09:27:55  11  Davis in the matter of McKesson Information
09:28:00  12  Solutions vs. TriZetto Group in the United
09:28:04  13  States District Court in the District of
09:28:06  14  Delaware, Civil Action No. 04-1258 (SLR).
09:28:11  15       This deposition is being taken at One
09:28:15  16  Beacon Street in Boston, Massachusetts on
09:28:17  17  behalf of the plaintiff.  The court reporter
09:28:18  18  is Jessica Williamson.  The counsel will
09:28:19  19  state their appearances, and the court
09:28:21  20  reporter will administer the oath.
09:28:22  21       MR. RANDALL:  Jeff Randall
09:28:24  22  representing plaintiff, McKesson.
09:28:26  23       MR. SEGAL:  David Segal on behalf
09:28:27  24  of the TriZetto Corp.
          25

Page 4

---

1 (Pages 1 to 4)

| | |
|---|---|
| 11:58:21 1 | Q. Some direct you back to your report, |
| 11:59:02 2 | dated October 24, Exhibit 2, specifically |
| 11:59:07 3 | Exhibit C and Page C-1. |
| 11:59:23 4 | A. I have it. |
| 11:59:23 5 | Q. These four AMS documents that you testified |
| 11:59:27 6 | about earlier, do you see that? |
| 11:59:28 7 | A. Yes. |
| 11:59:35 8 | Q. Can you describe how and when you collected |
| 11:59:37 9 | those documents? |
| 11:59:39 10 | A. Yes. I talked to a number of colleagues and |
| 11:59:51 11 | former colleagues about whether they knew of |
| 11:59:55 12 | any systems in roughly the time period of |
| 12:00:00 13 | the patent, the relevant time period, that |
| 12:00:07 14 | were similar in some fashion to the system |
| 12:00:11 15 | described in the patent. One of the |
| 12:00:12 16 | pointers that I got was to a system |
| 12:00:14 17 | called -- or, sorry, a system built by a |
| 12:00:17 18 | company called GMIS. |
| 12:00:22 19 | So I went searching on the Web for |
| 12:00:24 20 | pointers to GMIS, and it turns out that |
| 12:00:28 21 | someone who once worked for GMIS also worked |
| 12:00:33 22 | at the company that created the AMS system. |
| 12:00:41 23 | I'm blocking on their name at the moment. |
| 12:00:43 24 | HDI, I think. He also had worked -- he had |
| 12:00:46 25 | formerly worked at GMIS, I believe, and then |

Page 89

| | |
|---|---|
| 12:00:51 1 | came to work at HDI. |
| 12:00:53 2 | And I went to talk to him because it |
| 12:00:54 3 | turns out he lives about a mile from where I |
| 12:00:58 4 | live at home. So I talked to him about |
| 12:01:02 5 | GMIS, and then we got to talking about the |
| 12:01:03 6 | AMS system, and he had the documents in his |
| 12:01:06 7 | possession. |
| 12:01:09 8 | Q. And what's his name? |
| 12:01:10 9 | A. Dr. Robert Bargar, B-A-R-G-A-R. He -- it's |
| 12:01:17 10 | his signature that shows up in the letter |
| 12:01:19 11 | that's one of the AMS documents. |
| 12:01:37 12 | Q. How did you -- did TriZetto's attorneys |
| 12:01:41 13 | provide you the information regarding -- any |
| 12:01:47 14 | information regarding the AMS system? |
| 12:01:49 15 | A. No. |
| 12:01:49 16 | Q. Did they provide you any information |
| 12:01:52 17 | regarding the former employee of GMIS that |
| 12:02:00 18 | went to work for the company that |
| 12:02:04 19 | developed -- |
| 12:02:04 20 | A. No. I found him on my own. My recollection |
| 12:02:07 21 | is that they were surprised when I mentioned |
| 12:02:10 22 | this. I think they had independently |
| 12:02:15 23 | discovered the material -- not the material, |
| 12:02:18 24 | the existence of the system, but I don't |
| 12:02:19 25 | recall that detail. I do know that I found |

Page 90

| | |
|---|---|
| 12:02:21 1 | this on my own. |
| 12:02:25 2 | Q. How did you find it? |
| 12:02:25 3 | A. In the manner I just described. I asked a |
| 12:02:29 4 | colleague about previous systems that they |
| 12:02:32 5 | knew about in the mid-1980s that did any |
| 12:02:35 6 | form of claim review. One of them mentioned |
| 12:02:39 7 | GMIS. I started doing Web search on GMIS. |
| 12:02:43 8 | I covered a number of references and |
| 12:02:45 9 | documents to it, but by the chance of Google |
| 12:02:50 10 | also discovered this individual who had |
| 12:02:53 11 | something written about himself describing |
| 12:02:54 12 | his work at both GMIS and at HDI. And since |
| 12:03:01 13 | he was quite nearby, I called him up. |
| 12:03:03 14 | Q. So you were doing Web searches regarding |
| 12:03:07 15 | GMIS to determine when they had a system |
| 12:03:14 16 | that may invalidate the claims of the |
| 12:03:17 17 | patent; is that right? |
| 12:03:18 18 | A. It was part of a prior art search, and I |
| 12:03:22 19 | didn't know very much about them except |
| 12:03:24 20 | someone had pointed me to them as possibly |
| 12:03:26 21 | relevant. |
| 12:03:27 22 | Q. So you were doing a prior art search to |
| 12:03:29 23 | determine if GMIS had potential prior art to |
| 12:03:33 24 | the '164; is that right? |
| 12:03:35 25 | A. No. |

Page 91

| | |
|---|---|
| 12:03:39 1 | Q. No? |
| 12:03:40 2 | A. No. |
| 12:03:40 3 | Q. Why were you doing a Web search regarding |
| 12:03:47 4 | GMIS? |
| 12:03:48 5 | A. But that wasn't the only thing I was doing. |
| 12:03:51 6 | I was trying to determine what previous |
| 12:03:52 7 | systems, if any, might be relevant. One of |
| 12:03:54 8 | the things I was looking for -- your |
| 12:03:56 9 | question seemed to constrain it too |
| 12:03:58 10 | narrowly. It wasn't that I was looking for |
| 12:04:01 11 | GMIS specifically. At that point I was |
| 12:04:03 12 | looking at GMIS I was also looking at a |
| 12:04:06 13 | number of other systems. |
| 12:04:07 14 | Q. And you could have been drinking coffee at |
| 12:04:10 15 | the time, too. I don't know what else you |
| 12:04:11 16 | were doing, but I am saying that while -- |
| 12:04:13 17 | when you decided to sit down at your |
| 12:04:16 18 | computer and search the Internet regarding |
| 12:04:19 19 | GMIS, you were doing so to determine perhaps |
| 12:04:23 20 | whether GMIS was an invalidating system, |
| 12:04:28 21 | right? |
| 12:04:28 22 | A. Fair enough. For that specific search. I |
| 12:04:30 23 | misunderstood the question perhaps. That |
| 12:04:31 24 | specific search was addressed to that issue. |
| 12:04:40 25 | Q. And as you were doing that, you came across |

Page 92

23 (Pages 89 to 92)

12:04:44  1    what, something on the Internet that
12:04:46  2    suggested that a former GMIS employee went
12:04:48  3    to work subsequently for HDI?
12:04:52  4  A.  Plus some reference to HDI, and I'm not
12:04:59  5    sure, possibly to AMS.
12:05:01  6  Q.  And did you print that information out?
12:05:10  7  A.  I don't know if I printed out the very first
12:05:13  8    thing that I found.  I don't recall
12:05:14  9    having -- doing so, but I can't swear to it.
12:05:20 10  Q.  Well, you came across this Dr. Robert
12:05:22 11    Bargar, right?
12:05:23 12  A.  Bargar.
12:05:23 13  Q.  And did you print out any information
12:05:26 14    regarding him that you discovered during
12:05:28 15    your search?
12:05:28 16  A.  I wrote down his name -- his name, address
12:05:31 17    and phone number.
12:06:10 18  Q.  When did you do this Internet search
12:06:12 19    regarding GMIS?
12:06:13 20  A.  I can't narrow it down very much for you
12:06:24 21    except to say it would have been fairly
12:06:25 22    early on in my involvement in this, clearly
12:06:28 23    before writing the report, but I can't from
12:06:32 24    memory narrow it down any further than that.
12:06:37 25  Q.  Well, clearly it took a significant amount

12:06:41  1    of time, did it not, for you to do this
12:06:43  2    searching on the Internet regarding GMIS in
12:06:46  3    order to come up with Dr. Robert Bargar
12:06:48  4    from -- that worked on the AMS system,
12:06:54  5    right?
12:06:54  6  A.  No.  That's the marvel of Google.  It did
12:06:59  7    not take very long.
12:07:00  8  Q.  How long did it take?  How long did it take,
12:07:03  9    approximately?
12:07:03 10  A.  To find this once I started looking?
12:07:05 11  Q.  Yes.
12:07:05 12  A.  Oh, it was all within the same day.
12:07:07 13  Q.  But it took an entire day, eight hours?
12:07:09 14  A.  Oh, no.  God, no.  No, no, no.  No.  To find
12:07:17 15    this -- to find him once I started looking
12:07:19 16    for background on GMS -- GMIS, no, clearly
12:07:25 17    not a day.
12:07:26 18  Q.  Four hours?
12:07:27 19  A.  I don't believe so.  I'm tempted to say it
12:07:32 20    was one of the first things I tripped over,
12:07:34 21    but I can't swear to that.  It's, I don't
12:07:36 22    know, maybe an hour or so.
12:07:38 23  Q.  So are you suggesting, then, that you
12:07:41 24    just -- you were doing some investigation of
12:07:43 25    GMIS to see invalidating art, and that led

12:07:49  1    you directly to Robert Bargar and his work
12:07:51  2    in the MI -- work on the AMS system?
12:07:54  3  A.  If we take "directly" to mean within an hour
12:07:57  4    or so, yes, that's exactly what happened.
12:08:02  5  Q.  But then once you found his name, how long
12:08:04  6    did it take you searching to determine his
12:08:07  7    address and phone number?
12:08:08  8  A.  It was on the document.  It's, as I said,
12:08:14  9    one of the wonders of Google.  One of the
12:08:16 10    documents that I found was his name, address
12:08:18 11    and -- it was essentially a short -- if
12:08:22 12    memory serves, it was a short sort of mini
12:08:27 13    resume that he had posted on the Web for
12:08:29 14    some reason.
12:08:30 15  Q.  And -- well, how many hours did you spend
12:08:32 16    working on locating him, getting in contact
12:08:36 17    with him and actually retrieving the
12:08:40 18    documents that you have identified here in
12:08:43 19    Exhibit C?
12:08:43 20  A.  Locating him, as I said, it was a matter --
12:08:49 21    an interval of time measured in minutes,
12:08:51 22    perhaps 60 minutes, but I doubt it.  I'm
12:08:54 23    sorry, the other words that you used were
12:08:56 24    what?
12:08:56 25  Q.  Well, how much time did you then spend

12:08:59  1    actually getting in contact with him and
12:09:02  2    meeting with him to get the documents that
12:09:04  3    you have included in your report in Exhibit
12:09:07  4    C?
12:09:07  5  A.  If memory serves, I called him that day,
12:09:12  6    told him what I was interested in.  He
12:09:15  7    agreed to meet.  My recollection was it was
12:09:21  8    either a Friday or on a Saturday morning
12:09:25  9    that I called, and we agreed to meet either
12:09:29 10    on Sunday or Monday.  And as I said, he
12:09:32 11    lives about a mile away, so I drove to his
12:09:35 12    house, and we probably spent -- I might have
12:09:43 13    spent two hours sitting with him going over
12:09:44 14    some of the documents that he had, looking
12:09:46 15    at them.  And he made some copies for me at
12:09:50 16    that point.
12:09:53 17  Q.  And so when you -- you spent what, you said,
12:09:56 18    a couple hours with him?
12:09:57 19  A.  My recollection is, yeah, on the order of a
12:10:00 20    couple hours.
12:10:00 21  Q.  So when you left, you had the documents in
12:10:02 22    your hand?
12:10:03 23  A.  I had some documents in my hand.  After
12:10:05 24    further reading the documents and talking to
12:10:07 25    him again by phone -- let me back up.  He

**SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES**
**877.955.3855**

**Page 97**

```
12:10:11  1   home photocopy machine a bunch of pieces of
12:10:14  2   paper. I was trying to be nice and not
12:10:16  3   saying, "Take this box and copy it for me,"
12:10:18  4   so I got some samples.
12:10:21  5        When it became clear to me that this
12:10:24  6   would be particularly relevant, I then asked
12:10:26  7   him to take the documents that are cited
12:10:28  8   here (indicating) and have them scanned in
12:10:30  9   somewhere methodically to include all the
12:10:33 10   pages. And I think he went to a local
12:10:35 11   Kinko's and got them scanned in, and that's
12:10:37 12   the form of the documents that we have.
12:10:39 13
12:10:43 14   Q.   Did he have any -- to your knowledge, does
12:10:47 15        he have any other documents at all that
12:10:49 16        relate to the AMS system, other than the
12:10:52 17        ones -- the four that you've included in
12:10:54 18        your report?
12:11:04 19   A.   It's possible, but I can't swear to it one
12:11:08 20        way or the other. I know I was trying to
12:11:08 21        look through -- let me back up.
12:11:09 22        This is one of those circumstances
12:11:10 23        where the first thing he said was "I think
12:11:13 24        I've got some boxes of documents still down
12:11:14 25        in the basement. They might have been
```

**Page 98**

```
12:11:16  1   ruined when my oil tank sprang a leak. I'll
12:11:20  2   check for you." So he came a couple days
12:11:22  3   later, and he found the box -- a box or two
12:11:24  4   of documents, but it was a jumbled
12:11:26  5   collection of things having to do with a
12:11:28  6   variety of different things that he would be
12:11:29  7   involved in. Some of them were GMIS. Some
12:11:33  8   of them where AMS. And I was at that point
12:11:36  9   focusing mostly on AMS, though I believe I
12:11:40 10   looked at some GMIS documents because at
12:11:42 11   that point I didn't know the timing of GMIS
12:11:45 12   and put it aside for later.
12:11:47 13        It's a longwinded question (sic), but
12:11:49 14   I'm trying to give you the context for the
12:11:51 15   answer that says I can't be sure of whether
12:11:53 16   he had other AMS documents. I know the ones
12:11:56 17   that I have.
12:11:56 18   Q.   Well, did you ever ask him? Did you ever
12:12:00 19        say, "Robert, do you have any more documents
12:12:03 20        than the four you've given me?"
12:12:05 21   A.   He didn't give me the documents. We were
12:12:07 22        looking through some boxes together, and
12:12:09 23        these are the ones that I picked out as we
12:12:11 24        looked through the two boxes of documents.
12:12:15 25   Q.   Well, when you were looking through the two
```

**Page 99**

```
12:12:17  1   boxes of documents, did you see any other
12:12:19  2   documents that related to the AMS system?
12:12:21  3   A.   Again, I say I don't believe so, but I can't
12:12:24  4        be positive, as I sit here.
12:12:44  5   Q.   And you said this was early on in your
12:12:45  6        engagement in this case. That would have
12:12:48  7        been in early September; is that right?
12:12:48  8   A.   Mid-September, somewhere around there, yeah.
12:12:51  9   Q.   But you concealed both your discovery of Mr.
12:12:55 10        Bargar and the AMS system and your meeting
12:12:57 11        with him from TriZetto's lawyers, right?
12:13:03 12        MR. SEGAL:  Objection, vague.
12:13:06 13   A.   No. In fact, I did just the opposite. What
12:13:08 14        do you mean I concealed it?
12:13:09 15   Q.   Did you tell them right away?
12:13:12 16   A.   I can't swear that it was the moment I found
12:13:14 17        him, but as soon as I realized that the
12:13:17 18        material was relevant, yes, I told them.
12:13:18 19   Q.   Within a matter of days?
12:13:20 20   A.   I don't remember, but concealing is
12:13:26 21        certainly an entirely inappropriate term. I
12:13:30 22        would have no motivation or desire to
12:13:32 23        conceal it.
12:13:33 24   Q.   Did you receive any authorization whatsoever
12:13:35 25        from TriZetto's attorneys to go meet with
```

**Page 100**

```
12:13:39  1        Mr. Bargar?
12:13:40  2   A.   It never occurred to me I would need an
12:13:43  3        authorization. I was doing background
12:13:44  4        research.
12:13:45  5   Q.   Did you ask for authorization?
12:13:46  6   A.   It did not occur to me, and I did not ask
12:13:49  7        for authorization.
12:13:51  8   Q.   Did you at least let them know that you were
12:13:53  9        going over to meet with this potential prior
12:13:56 10        art witness?
12:13:56 11   A.   No, because I had no idea whether it was
12:13:59 12        relevant.
12:13:59 13   Q.   Within a matter of days after meeting with
12:14:01 14        him you did let them know about this and
12:14:04 15        sent them the documents, correct?
12:14:06 16   A.   No, within --
12:14:06 17   Q.   And when I say "them," it's the TriZetto
12:14:08 18        attorneys.
12:14:09 19   A.   I remembered mentioning it to them
12:14:12 20        reasonably soon after I discovered it. I
12:14:15 21        don't recall sending the documents at that
12:14:18 22        point.
12:14:18 23   Q.   They never asked for them?
12:14:20 24   A.   If they had asked, I would have sent them,
12:14:30 25        so I don't recall them asking.
```

12:14:31 1  Q.  Didn't you tell them, "I met with Robert
12:14:34 2     Bargar, who has some information regarding
12:14:36 3     this potential prior art system, AMS, and
12:14:40 4     I've got some documents. How about if I
12:14:43 5     send them to you?" Did that happen?
12:14:45 6        MR. SEGAL: Objection,
12:14:46 7     argumentative.
12:14:46 8  A.  I called to tell them I spoke with Mr. -- I
12:14:53 9     forget, I think it was Dan Muino, told them
12:14:57 10    I had discovered this system. I don't
12:15:05 11    remember if I mentioned Dr. Bargar -- no, I
12:15:07 12    must have, because that's where I got the
12:15:08 13    documents from. Now, your question was, did
12:15:15 14    I offer to send them the documents, yes?
12:15:17 15  Q.  Did you offer? Did they ask?
12:15:20 16  A.  I don't recall offering. I don't recall
12:15:22 17    them asking.
12:15:22 18  Q.  But you did tell them that you had the
12:15:24 19    documents?
12:15:24 20  A.  I don't remember what I said in that
12:15:30 21    conversation. It was a couple of months
12:15:31 22    ago. I don't remember to that level of
12:15:33 23    detail. I know I told them that I had
12:15:35 24    discovered this system.
12:15:36 25  Q.  And I still -- I've got some additional

Page 101

12:15:38 1    questions on this subject, but we have to
12:15:41 2    change the videotapes. Why don't we change
12:15:43 3    it, and then we'll continue on.
12:15:45 4  A.  Sure.
12:15:46 5       THE VIDEOGRAPHER: The time is
12:15:50 6    12:15. This is the end of Tape 2, and we
12:15:52 7    are off the record.
12:15:54 8       (Discussion off the record.)
12:16:57 9       THE VIDEOGRAPHER: Stand by. The
12:16:58 10    time is 12:16. This is the beginning of
12:17:01 11    Tape 3, and we are back on the record.
12:17:02 12  A.  May I augment an earlier answer?
12:17:05 13  Q.  Sure.
12:17:05 14  A.  I'm trying to remember the timing, and I
12:17:08 15    have the sense that I visited him on a
12:17:11 16    Monday that was a holiday, which means it
12:17:13 17    might actually have been in October. It
12:17:15 18    might have been Columbus Day holiday. I'm
12:17:19 19    not positive. I might be able to figure it
12:17:21 20    out from records somewhere, but it's
12:17:24 21    possible it was as late as the October
12:17:27 22    Columbus Day holiday.
12:17:29 23  Q.  Or Labor Day?
12:17:30 24  A.  Labor Day? Early September?
12:17:33 25  Q.  Yeah.

Page 102

12:17:35 1  A.  No, that's not possible.
12:17:36 2  Q.  You're positive?
12:17:37 3  A.  It was not Labor Day, yes, I'm positive.
12:17:39 4  Q.  And you're now positive it was in October
12:17:42 5    and not September?
12:17:43 6  A.  No, I'm positive it was not Labor Day. I
12:17:47 7    hadn't done any work as of Labor Day.
12:17:49 8  Q.  So you don't know -- at this point are you
12:17:52 9    telling me that you don't know whether it
12:17:54 10    was in mid-September or in -- sometime in
12:17:58 11    October?
12:17:58 12  A.  Early October, that's correct. As I sit
12:18:00 13    here, I can't tell you exactly when I met
12:18:03 14    him.
12:18:03 15  Q.  And I'm not asking for exactly. I'm asking
12:18:06 16    for -- it was only a few weeks ago if it's
12:18:08 17    October, right?
12:18:09 18  A.  To the best of my recollection, it was
12:18:10 19    somewhere between mid-September and Columbus
12:18:14 20    Day in October. That's as narrowly as I can
12:18:18 21    define it right now.
12:18:22 22  Q.  Have you spoken with any other potential
12:18:26 23    prior art witnesses other than perhaps the
12:18:29 24    experts that were disclosed by TriZetto's
12:18:32 25    counsel and Mr. Bargar?

Page 103

12:18:36 1  A.  No.
12:18:39 2  Q.  After your meeting with Mr. Bargar, did you
12:18:45 3    ever have any additional discussions with
12:18:48 4    him?
12:18:49 5  A.  Yes.
12:18:49 6  Q.  How many?
12:18:55 7  A.  Two, one concerning logistics and one
12:18:57 8    concerning some details of the system.
12:18:59 9  Q.  And the one concerning logistics, was that
12:19:01 10    all that was discussed, no substance?
12:19:03 11  A.  It was about getting the electronic copy of
12:19:05 12    the document. So just to be clear --
12:19:16 13  Q.  By getting the electronic copy of the
12:19:19 14    document, what do you mean by that?
12:19:21 15  A.  I'm sorry, let me start again. It's what I
12:19:23 16    meant a few moments ago when I said I asked
12:19:26 17    him to get the documents scanned in so that
12:19:31 18    I could have a complete copy of a document
12:19:33 19    that I had taken only a couple of pages
12:19:37 20    copied of at his house. As I said, I was
12:19:40 21    trying to be nice and not ask him to copy a
12:19:42 22    document extensively on his home copier.
12:19:45 23    And then when I realized it was important,
12:19:47 24    asked him to in some fashion get a copy of
12:19:50 25    the document to me, the complete copies of

Page 104

26 (Pages 101 to 104)

12:19:54  1    the documents you have in my report
12:19:55  2        And it turns out the easiest way for
12:19:57  3    him to do that was to go to a Kinko's, have
12:20:00  4    it scanned in and e-mail me the resulting
12:20:04  5    file.  That was his decision about how to do
12:20:04  6    it.  And that's what I mean by "electronic,"
12:20:06  7    simply that it was scanned in and sent to me
12:20:08  8    electronically.
12:20:09  9  Q.  So as of today's date, neither you nor, to
12:20:15 10    your knowledge, TriZetto's counsel has ever
12:20:16 11    asked Mr. Bargar whether he has additional
12:20:18 12    documents relating to this system; is that
12:20:20 13    right?
12:20:20 14  A.  I don't -- well, I know that I didn't ask
12:20:27 15    the question because I think I had the sense
12:20:30 16    that I had what I had.  Having gone through
12:20:32 17    the boxes, I had the impression that I had
12:20:36 18    whatever documents he had that I had seen
12:20:40 19    them, but I did not subsequently say, "Do
12:20:43 20    you have anything else?"
12:20:57 21  Q.  Do you have a record of the documents that
12:20:59 22    TriZetto gave you -- TriZetto's counsel gave
12:21:02 23    you to review in connection with this case?
12:21:05 24  A.  I made a hard copy binder of them, so in
12:21:09 25    that sense I have a record of them.

Page 105

12:21:13  1  Q.  So every time they send you something you've
12:21:16  2    kept it?  You've got a record of what
12:21:18  3    they've given you to review, right?
12:21:20  4  A.  I believe that to be true.
12:21:27  5  Q.  And there are no -- there's no substantive
12:21:29  6    analysis or commentary by TriZetto's
12:21:33  7    attorneys with respect to prior art or
12:21:36  8    infringement issues in any of the materials
12:21:38  9    they gave you?
12:21:39 10  A.  I'm going to have to think back.  I think
12:21:44 11    the answer to that is no, but let me think
12:21:47 12    back and make sure.
12:22:03 13        Sitting here, I don't recall any.
12:22:12 14  Q.  You were given in connection with your work
12:22:20 15    in this case documents relating to the AMS
12:22:24 16    system that were produced by McKesson in
12:22:27 17    this case, correct?
12:22:28 18  A.  It's possible.  I don't remember, sitting
12:22:41 19    here.  Ah, the McKesson production, yes.  I
12:22:53 20    can't -- I don't have a mental picture of
12:22:54 21    the specific document, but I know I got
12:22:56 22    some -- some amount of McKesson production
12:22:58 23    in electronic form also, in PDF files.
12:23:05 24  Q.  Relating to the AMS system, correct?
12:23:07 25  A.  I believe so, but I'm not positive as I sit

Page 106

12:23:10  1    here.  There was a fair amount of material
12:23:12  2    that I have been given over the course of
12:23:13  3    this case.
12:23:15  4  Q.  Other than the few references relating to
12:23:19  5    the work by other TriZetto-designated
12:23:21  6    experts, you did review the materials that
12:23:24  7    were provided to you by TriZetto's
12:23:26  8    attorneys, right?
12:23:26  9  A.  Yes.
12:23:27 10  Q.  And you recall reviewing McKesson production
12:23:30 11    documents relating to the AMS system,
12:23:32 12    correct?
12:23:32 13  A.  No.  Actually, for some reason I'm drawing a
12:23:40 14    blank sitting here thinking about AMS
12:23:44 15    documents from the McKesson production.
12:23:45 16    It's possible I did, but I don't remember.
12:23:52 17  Q.  Well, didn't you -- when you came across the
12:23:54 18    AMS system with Mr. Bargar, didn't you
12:23:56 19    say -- didn't it spark a recollection in
12:24:00 20    your mind that, in fact, TriZetto's
12:24:03 21    attorneys had given you McKesson production
12:24:06 22    documents related to AMS?
12:24:07 23  A.  At that point I don't think so.  I don't
12:24:09 24    think I had looked at the McKesson
12:24:10 25    production documents yet, so it wouldn't

Page 107

12:24:13  1    have sparked a memory.
12:24:21  2  Q.  But you do, sitting here today, recall -- at
12:24:25  3    least your best recollection is that you
12:24:28  4    have received from TriZetto's attorneys
12:24:32  5    McKesson production documents relating to
12:24:34  6    the AMS system, right?
12:24:35  7  A.  As I've said, and I will say it carefully, I
12:24:40  8    believe that to be the case, but I cannot
12:24:42  9    recall specific documents as I sit here.  I
12:24:45 10    can't conjure up a specific picture of the
12:24:48 11    documents.  I would have to go back and
12:24:49 12    check.
12:24:54 13  Q.  And how would you check to determine either
12:24:59 14    when you received those documents or when
12:25:00 15    you reviewed them?
12:25:01 16  A.  I don't think I can determine when I
12:25:03 17    reviewed them.  Probably the file date on my
12:25:09 18    computer will tell me when I put them on the
12:25:11 19    machine, and then I'll rereview them.
12:25:14 20  Q.  After getting these AMS documents from Mr.
12:25:19 21    Bargar, didn't you go back and look at and
12:25:28 22    review the McKesson production documents
12:25:30 23    relating to the same system?
12:25:33 24        MR. SEGAL:  Objection, lacks
12:25:34 25    foundation, vague.

Page 108

27 (Pages 105 to 108)

12:25:35  1   A.  Now, I had a great deal of material to go
12:25:41  2       through and time was starting to get short,
12:25:43  3       so I did not specifically say I'm going to
12:25:46  4       go looking for this.
12:26:08  5   Q.  Did you assist TriZetto's attorneys in any
12:26:10  6       way in preparing discovery responses
12:26:15  7       regarding prior art or infringement issues?
12:26:24  8   A.  Only -- I'm not sure I understand the
12:26:27  9       question, but only in the sense that I cited
12:26:31 10       certain things in my report.  I don't think
12:26:34 11       I was part of the formal discovery response
12:26:39 12       mechanism.  They asked me when I put
12:26:41 13       together this report to supply documents,
12:26:45 14       which I supplied to them.  The copies of,
12:26:49 15       for instance, any of the articles that I
12:26:50 16       found that they hadn't supplied to me I made
12:26:53 17       sure to send them a copy of.  Is that the
12:26:55 18       kind of thing that you're talking about?
12:26:57 19   Q.  Fair enough.  Have you -- to your knowledge,
12:27:01 20       have TriZetto's lawyers talked with Mr.
12:27:03 21       Bargar about the AMS system?
12:27:05 22   A.  To my knowledge, I guess I don't know one
12:27:10 23       way or the other.  I don't know that they
12:27:15 24       have, and I don't know that they haven't.
12:27:16 25   Q.  You mentioned that you met with him for

Page 109

12:27:19  1       about two hours, correct?
12:27:20  2   A.  Correct.
12:27:21  3   Q.  Then you had a telephone conference with him
12:27:23  4       about it, the system; is that right?
12:27:27  5   A.  Correct.
12:27:28  6   Q.  How long did that telephone conference last?
12:27:30  7   A.  That was relatively brief.  I would say it
12:27:33  8       was on the order of about a half hour.
12:27:35  9   Q.  And other than those two communications and
12:27:38 10       the one logistical, strictly logistical
12:27:42 11       communication that you had with him, were
12:27:43 12       there any other communications between you
12:27:44 13       and Mr. Bargar regarding the potential prior
12:28:04 14       art?
12:28:04 15   A.  I don't recall any others, as I sit here.
12:28:06 16   Q.  Did you -- what did you and Mr. Bargar
12:28:08 17       discuss during this -- during the meeting
12:28:14 18       you had with him?
12:28:14 19   A.  When I was at his house?
12:28:16 20   Q.  Yes.
12:28:22 21   A.  It was primarily focused around going
12:28:24 22       through the box of documents with me trying
12:28:27 23       to decide which ones I felt were conceivably
12:28:31 24       relevant to the task, and I probably asked
12:28:37 25       him some basic questions about both AMS and

Page 110

12:28:42  1       the OMS system.  I don't recall in detail,
12:28:45  2       but I'm sure I must have asked some basic
12:28:47  3       questions about what they were and how they
12:28:50  4       worked.
12:28:50  5   Q.  Do you recall what he said?  Well, let me
12:29:01  6       back up for a minute.  Do you recall what
12:29:03  7       you asked him?
12:29:03  8   A.  Not in any finer level of detail than I've
12:29:06  9       just characterized for you.
12:29:07 10   Q.  Do you recall what he said?
12:29:14 11   A.  No, I don't recall specifically what I said.
12:29:17 12       What I'm --
12:29:18 13   Q.  What he said.
12:29:19 14   A.  I'm sorry, that's what I meant.  I don't
12:29:21 15       recall specifically what he said.  What I
12:29:23 16       remember is that what I was listening for was a
12:29:25 17       sense of is this stuff going to be relevant,
12:29:28 18       as best I can tell sitting here talking
12:29:30 19       about this.  So the sense I came -- I know I
12:29:35 20       came away with was, yes, this is potentially
12:29:38 21       relevant material, because there were
12:29:40 22       documents he put on the table that seemed to
12:29:42 23       me not relevant, and so, you know, those
12:29:44 24       were set aside.  They had to do with other
12:29:47 25       companies, other systems.

Page 111

12:29:48  1       So I was being selective about what we
12:29:52  2       picked out and trying to get a sense from
12:29:54  3       him as to whether the system seemed
12:29:57  4       relevant.  That's the level at which I was
12:29:59  5       listening, and that's what I recall.
12:30:00  6   Q.  Did you tell him that you were working for
12:30:03  7       TriZetto and were specifically looking at
12:30:06  8       whether or not you could invalidate
12:30:09  9       McKesson's patent?
12:30:10 10   A.  I don't recall if I mentioned TriZetto.  I
12:30:11 11       did in the very first phone call tell him
12:30:14 12       that I was working as an expert witness in a
12:30:17 13       lawsuit.  I don't recall whether I
12:30:18 14       identified the parties.  I might have, but I
12:30:21 15       told him at the very beginning the rationale
12:30:24 16       for the inquiry.
12:30:33 17   Q.  And in your subsequent discussions with Mr.
12:30:35 18       Bargar did you make him aware of the fact
12:30:39 19       that you were working to attempt to
12:30:43 20       invalidate McKesson's patent, '164 patent?
12:30:46 21           MR. SEGAL:  Objection, vague and
12:30:47 22       misstates his testimony.
12:30:55 23   A.  I told him that the material he had was
12:30:57 24       potentially relevant prior art.  I don't
12:30:59 25       know if I mentioned the '164 patent.  I did

Page 112

28 (Pages 109 to 112)

**Page 113**

```
12:31:03  1   ... talked to me on this Stark, from the
12:31:05  2   very -- excuse me.  I did make it clear to
12:31:08  3   him, as I said, from the very beginning that
12:31:11  4   I was working in a case that involved
12:31:14  5   depending against -- defending against a
12:31:15  6   charge of patent infringement.
12:31:17  7   Q.  Did he mention to you that GMIS attempted to
12:31:25  8       invalidate but couldn't the McKesson '164
12:31:28  9       patent?
12:31:29 10   A.  I think that's where I heard it.  I can't
12:31:31 11       recall.  I know either in my discussion with
12:31:33 12       him or soon thereafter I discovered that
12:31:37 13       fact, and I can't separate it out as I sit
12:31:40 14       here when I discovered that.
12:31:41 15   Q.  You discovered that GMIS failed to
12:31:44 16       invalidate in litigation the McKesson
12:31:46 17       patent, right?
12:31:47 18   A.  Yes, correct.
12:31:47 19           MR. SEGAL:  Objection.
12:31:48 20           THE WITNESS:  I'm sorry.
12:31:49 21   Q.  And did you learn that from Mr. Bargar?
12:31:52 22   A.  As I say, I don't recall, because I know
12:31:55 23       I -- I do believe I learned that fact close
12:32:01 24       to the time at which I was discussing the
12:32:04 25       AMS documents with him, but I don't recall
```

**Page 114**

```
12:32:06  1       whether he told me or whether I found that
12:32:08  2       out separately in part of the Web search,
12:32:12  3       perhaps.
12:32:12  4   Q.  Did you take any notes during or following
12:32:14  5       any of your communications with Mr. Bargar?
12:32:16  6   A.  Meeting at his house I just collected the
12:32:24  7       documents.  The answer is no there.  In the
12:32:28  8       subsequent telephone conversation that I
12:32:29  9       mentioned, the non-logistical one, I believe
12:32:31 10       I took a few notes on a single sheet of
12:32:34 11       paper.
12:32:35 12   Q.  Did you -- do you still have those notes?
12:32:39 13   A.  I do still have them.
12:32:41 14   Q.  And did you summarize either in an e-mail or
12:32:44 15       any other writing to TriZetto's lawyers your
12:32:50 16       communications with Mr. Bargar?
12:32:53 17   A.  No.
12:32:53 18   Q.  What city does Mr. Bargar live in?
12:33:02 19   A.  Newton.
12:33:02 20   Q.  Do you know his address?
12:33:05 21   A.  Not by heart.  He's in the phone book.
12:33:14 22   Q.  Have you reimbursed him for any of his time
12:33:17 23       or expenses?
12:33:17 24   A.  No.  He did ask whether -- he did raise that
12:33:21 25       issue, and I referred him to TriZetto's
```

**Page 115**

```
12:33:22  1       lawyers.  That discussion transpired after
12:33:26  2       that I wasn't privy to.
12:33:29  3   Q.  What did he inquire about?
12:33:31  4   A.  Whether he could be paid for the time he was
12:33:33  5       putting in, copying documents and so forth.
12:33:36  6   Q.  He knew you were being paid for your time?
12:33:38  7   A.  He did.  That's another thing I disclosed in
12:33:42  8       the initial conversation.  I wanted to be
12:33:44  9       fair with him.
12:33:44 10   Q.  Did he know you were getting paid $650 an
12:33:48 11       hour or maybe $700 an hour for --
12:33:51 12   A.  I do not routinely disclose that, no.
12:33:53 13   Q.  Did he say he would like to be paid for his
12:33:55 14       time?
12:33:55 15   A.  I never got around to discussing it.  I
12:33:57 16       didn't see it as my responsibility or
12:33:59 17       concern.  He seemed --
12:34:01 18   Q.  But he asked you about it, right?
12:34:03 19   A.  Yes.  It seemed to me to be a perfectly
12:34:06 20       reasonable request.  In fact, I was not at
12:34:09 21       all surprised when he asked about that.  I
12:34:10 22       also knew it was not up to me to negotiate
12:34:13 23       with him on that issue.
12:34:14 24   Q.  No, I understand that.  But nonetheless he
12:34:16 25       expressed an interest you in being paid for
```

**Page 116**

```
12:34:20  1       helping, right?
12:34:21  2   A.  For the time he was putting in, he expressed
12:34:23  3       that interest, yes.
12:34:25  4   Q.  And you said -- you put him in touch with
12:34:29  5       who, Mr. Segal?
12:34:30  6   A.  I believe I put him in touch with Mr. Muino.
12:34:39  7           MR. RANDALL:  Mr. Segal, has
12:34:41  8       TriZetto retained Mr. Bargar?
12:34:43  9           MR. SEGAL:  I don't know.
12:34:43 10           MR. RANDALL:  Do you have any
12:34:44 11       agreement with him to pay any money?
12:34:45 12           MR. SEGAL:  I don't know.  I
12:34:48 13       honestly do not know.
12:34:48 14           MR. RANDALL:  So you don't mind if
12:34:50 15       we go ahead and contact him?
12:34:51 16           MR. SEGAL:  I can check before the
12:34:53 17       end of the day with Mr. Muino and find out
12:34:55 18       if he's been retained or not.
12:34:56 19           MR. RANDALL:  Well, why don't
12:34:58 20       you -- at the lunch break why don't you find
12:34:59 21       out.  I think that would be something you'd
12:35:00 22       know.
12:35:00 23           MR. SEGAL:  Well, I don't know
12:35:02 24       offhand because I wasn't the one dealing
12:35:04 25       with him, but I can check with Mr. Muino
```

**SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES**
**877.955.3585**

Page 314

1

2

3

4

5

6

7

8

9      I, RANDALL DAVIS, Ph.D., do hereby declare under

10   penalty of perjury that I have read the foregoing

11   transcript; that I have made any corrections as appear

12   noted, in ink, initialed by me, or attached hereto; that

13   my testimony as contained herein, as corrected, is true

14   and correct.

15      EXECUTED this _3rd_ day of _January_,

16   20_06_, at _Cambridge_, _Mass_.
                (City)         (State)

17

18

19

20   _____
         RANDALL DAVIS, Ph.D.

21

22

23

24

25

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
877.955.3855

eda2d3aa-55e7-49a7-af58-effb2c1a122e

EXHIBIT 19

LAW OFFICES

# COBRIN GITTES & SAMUEL

PATENTS, TRADEMARKS AND COPYRIGHTS

PETER T. COBRIN
MARVIN S. GITTES
RICHARD I. SAMUEL

DAVID A. JACOBS
KERRY P.L. MILLER
EILEEN M. EBEL
RICHARD M. LEHRER
JAMES E. BRANDT
JILL C. GREENWALD
DAVID J. GARROD, Ph.D.*

*REGISTERED U S PATENT AGENT ONLY

750 LEXINGTON AVENUE
NEW YORK, N Y. 10022

TELEPHONE (212) 446-4000
TELECOPIER (212) 446-4007

NEW JERSEY OFFICE
1271 COOPER ROAD
SCOTCH PLAINS, NJ 07076
TELEPHONE (908) 756-7406
TELECOPIER (908) 754-5930

January 18, 1995

**Via Federal Express**

Honorable Clarence C. Newcomer
United States District Court
  for the Eastern District of Pennsylvania
U.S. Courthouse - Room 13614
601 Market Street
Philadelphia, PA 19106

        Re:   GMIS, Inc. v. Health Payment Review, Inc.
              No. 94-CV-056
              <u>AMENDED WITNESS LIST</u>

Dear Judge Newcomer:

        Plaintiff GMIS hereby respectfully files the following amended list of witnesses which it intends to call at the Trial of this Action:

        1.    Dr. Shimon Schocken is a fact and expert witness skilled in the computer science arts. Dr. Schocken will testify as to facts concerning the state of the art as of the date of invention of the '164 Patent, the skill in the art as of that date, and with respect to the matters raised in his expert report.

        2.    James Reisman is a fact and expert witness who will testify as to facts relating to the United States Patent and Trademark Office, who will explain the file history of the patent in suit and will also testify with respect to matters raised in his expert report.

        3.    Mr. Thomas Owens is Chief Executive Officer of Plaintiff GMIS, Inc., who will testify as to the business and products of GMIS, as to statements made by Defendant's agents to others after the patent issued and as to overall knowledge of the claims processing industry prior to the date of invention of the '164 patent. In particular, Mr. Owens will also testify with regard to the initial development of the GMIS ClaimCheck



EXHIBIT
H-118

MCK 046088

Confidential Information Subject to D. Del. LR 26.2

COBRIN GITTES & SAMUEL

Honorable Clarence C. Newcomer
January 18, 1995
Page 2

product, GMIS' AUTOCODER product which was sold by GMIS prior to the date of
invention of the '164 patent, and his prior employment at HSI (Health Systems
International) where he was involved with the sale of *inter alia*, the MCMS (Medical Claims
Monitoring System) computer system which detected fraudulent medical claims via
examination of service codes prior to the date of invention of the '164 patent. Mr. Owens
will identify and discuss the User's Guide for the MCMS system, and the December 23,
1994 letter from Ms. Linda Ayr to Mr. Garrard Kramer and the MCMS brochure attached
thereto.

4.    Dr. Robert Hertenstein, a named inventor of the '164 patent - Dr. Hertenstein
will testify by way of deposition as already submitted to the Court, as to the background
of the '164 patent, what the patent discloses and what it fails to disclose.

5.    Dr. Don Holloway, a named inventor of the '164 patent - Dr. Holloway will
testify by way of deposition as already submitted to the Court, as to the background of
the '164 patent, what the patent discloses and what it fails to disclose.

6.    Virginia Klenske - Ms. Klenske is a technical person employed by GMIS and
will testify with respect to the GMIS products accused of infringement, demonstrating facts
which form the basis of a conclusion of non-infringement. Ms. Klenske will also testify as
to information relating to GMIS' AUTOCODER product.

7.    Michael Stare - Mr. Stare is employed by defendant and will testify by way
of deposition as already submitted to the Court, concerning communications made on
behalf of defendant to GMIS customers with respect to the '164 patent.

8.    George Goldberg, a named inventor of the '164 patent - Dr. Goldberg will
testify by way of deposition concerning his work on the subject matter of the '164 patent
with respect to what the patent does and does not disclose, and he will testify with regard
to prior art.

9.    Marcia Radosevich - Ms. Radosevich is the chief executive of defendant and
will testify either personally or by deposition as already submitted to the Court, concerning
communications made by and on behalf of defendant with respect to the patent in suit
and other matters contained in her deposition. Ms. Radosevich will also testify with
regard to prior art. In particular, Ms. radosevich will refer to an article in PR Newswire,
(June 24, 1986 relating to the computer program Unified Claims which incorporated

MCK 046089

Confidential Information Subject to D. Del. LR 26.2                                    04-CV-1258-SLR (D.Del.)

COBRIN GITTES & SAMUEL

Honorable Clarence C. Newcomer
January 18, 1995
Page 3


"Patterns of Treatment").

10.    Gary Frazier -- Mr. Frazier is a stock analyst and will testify by way of deposition concerning communications he received from representatives of defendant concerning the '164 patent and its effect on plaintiff.

11.    Michael Thurmond is the Chief Financial Officer of plaintiff GMIS and will testify as to financial information relevant to GMIS, its products and business.

12.    John Blaney is the founder of a company, ASA, which developed computer systems which detected fraudulent medical claims via examination of service codes prior to the date of invention of the '164 patent. *Inter alia*, ASA worked with Health Data Institute (HDI) in developing one such system. He will testify that Marcia Radosevich was HDI Project Manager for that system. Mr. Blaney will also testify as to these claims processing systems and other products which constitute prior art relevant to the patent in suit. In particular, Mr. Blaney will testify about information based on and concerning AMS December 1986, Claim Level Edits (103 page manual), and Advanced MedLogic Systems Product Overview (May 1987).

13.    Joanne Hilferty is President of Medical Intelligence, Inc., a subsidiary of GMIS, and Vice President of GMIS. She will testify concerning prior art relevant to the patent in suit, including work done at HDI in connection with computer systems which detected fraudulent medical claims via examination of service codes prior to the date of invention of the '164 patent. She will also testify with regard to facts indicating that Ms. Radosevich was aware of such activities prior to the date of invention. In particular, Ms. Hilferty will testify about information based on and concerning AMS December 1986, Claim Level Edits (103 page manual), and Advanced MedLogic Systems Product Overview (May 1987).

14.    Susan Fitzpatrick is Associate Director, Medical Management Programs, Metropolitan Life Insurance Company, Westport, Connecticut. Ms. Fitzpatrick will testify by way of video deposition as to computer systems of Metropolitan Life Insurance Company which detected fraudulent medical claims via examination of service codes prior to the date of invention. In particular, Ms. fitzpatrick will testify as to the prior art computer system that Metropolitan Life Insurance Company was using on a commercial basis called Unified Claims. Unified Claims incorporated "Patterns of Treatment" on an electronic basis prior to the date of invention of the '164 patent.

MCK 046090

# COBRIN GITTES & SAMUEL

Honorable Clarence C. Newcomer
January 18, 1995
Page 4


15.     Robert Goldscheider is an attorney and Chairman of The International Licensing Network, Ltd. Mr. Goldscheider is an expert on the subject of patent damages and will testify as to the issue of damages and other issues raised in his expert report which will be filed under separate cover.

16.     Robert Leif D.D.S. is a dentist and President of American Dental Examiners. Dr. Leif will testify with regard to prior art. In particular, Dr. Leif will testify as to the development of a computer system which embodied a database of dental service codes and a set of relationships among the codes which system was commercially available prior to the date of invention of the '164 patent and which system was developed in conjunction with ASA.

17.     Carin Carlson - Ms. Carlson is Vice President of GMIS, Inc. and will testify as to development of GMIS' ClaimCheck and as to claims processing systems and other products which constitute prior art relevant to the patent in suit.

18.     Bob Barger M.D. - Dr. Barger will testify as to the prior art. Particularly Dr. Barger will testify as to claims processing systems which were publicly known or commercially used prior to the date of invention of the '164 patent.

19.     Aetna Representatives - Representatives from Aetna will testify as to communications that took place Aetna and Health Payment Review Inc prior to the date of invention and communications that took place between Aetna and GMIS.

20.     U.S. Healthcare Representatives - Representatives from U.S. Healthcare will testify as to claims processing systems and other products which constitute prior art relevant to the patent in suit.

21.     Brian Cahill -- Mr. Cahill is the Chief Financial Officer of Health Payment Review, Inc. and will testify with respect to the patent application process as well as with respect to the business of Health Payment Review, Inc., its competition with GMIS and its damages.

22.     Systems Architects and members of the clinical affairs staff of Health Payment Review, Inc., Thomas J. Boyle, David J. Rullo, M.D. and Lawrence G.Miller, M.D. will testify with respect to Health Payment Review, Inc's CodeReview Product, with respect to how the product is manufactured, maintained and operated and the program disclosed

MCK 046091

COBRIN GITTES & SAMUEL

Honorable Clarence C. Newcomer
January 18, 1995
Page 5


in the '164 patent.

     23.    Sam Fager, M.D. - Dr. Fager will testify as to communications between Don Holloway and Aetna Life and Casualty Insurance Company. In particular, Dr. Fager will identify and discuss documents which Health Payment Review, Inc. produced to GMIS after the close of discovery.

     24.    Howard Bailit, M.D. - Dr. Bailit was Vice President of Aetna Life Insurance Company and will testify as to communications between the Health Policy Institute and Aetna Insurance Company. In particular, Dr. Fager will identify and discuss documents which Health Payment Review, Inc. produced to GMIS after the close of discovery.

     25.    Christine Stavarino - Ms. Stavarino will testify as to communications between Don Holloway and Aetna Insurance Company. In particular, Ms. Stavarino will identify and discuss documents which Health Payment Review, Inc. produced to GMIS after the close of discovery.

     26.    Richard Egdahl, M.D. - Dr. Egdahl will testify as to the prior art. In particular, Dr. Egdahl will testify as to claims processing systems and other products which constitute prior art relevant to the patent in suit.

               Very truly yours,

               Richard M. Lehrer, Esq.
               Counsel for Plaintiff GMIS, Inc.

RIS/IS/DAJ/RL
cc:   William T. Hangley, Esq.
      Joel S. Goldhammer, Esq.

**MCK 046092**

Confidential Information Subject to D. Del. LR 26.2