# An Access-oriented Negotiated Fee Schedule

## *The Caterpillar Experience*

RICHARD H. EGDAHL, M.D. and ROBERT D. HERTENSTEIN, M.D.

*From the Department of Surgery and Health Policy Institute, Boston University Medical Center, Boston, Massachusetts, and Caterpillar Corporation, Peoria, Illinois*

**This paper describes the system used by Caterpillar Corporation (CAT) in Peoria, Illinois, to reimburse surgeons. The CAT system assures access for Caterpillar employees and their families to a selection of qualified surgeons, while achieving cost savings through improvements in processing of surgical claims and negotiation of selected fees. CPT-4 codes are recoded for greater accuracy, when indicated, surgical services that have been incorrectly unbundled are rebundled, and the appropriateness of surgical assistant charges is reviewed. A "degree of difficulty" relative value scale (DODRVS) of surgical services is periodically revised as technology changes. The DODRVS multiplied by a regional factor, determined by local market research, establishes the fee that CAT will pay the surgeon. Balance billing is permitted if the patient (1) is informed in advance by the surgeon that the fee will be higher than CAT will pay, and (2) knows that the service can be obtained from other local surgeons who will accept the CAT fee. The goal of the CAT method of surgeon reimbursement is to gain physician support for an access-oriented, market-driven negotiated fee schedule. Compared with a resource-based relative value scale (RBRVS) methodology, the CAT system is not formula-driven and depends on physician acceptance.**

FOR MORE THAN 25 years, physicians have benefited from a generous fee-for-service system of payment. However, between 1965 and 1985, national expenditures for physicians' services have increased almost tenfold, from $8.5 billion in 1965 to $82.8 billion in 1985.[1] As a result, several possible physician payment reforms are being considered. Prospective payment by diagnostic-related groups (DRGs), put in place to control Medicare hospital expenditures, is a fact of life for hospitals. Medicare and Medicaid are now pushing for changes in the way they pay physicians. Managed care programs are negotiating discounts from all types of health care providers.

Presented at the 107th Annual Meeting of The American Surgical Association, Palm Beach, Florida, April 21–23, 1987.

Reprint requests: Richard H. Egdahl, M.D., Boston University Medical Center, 720 Harrison Avenue (1107), Boston, MA 02118.

Submitted for publication: April 24, 1987.

Reform activity can be identified on many fronts: (1) Congress has frozen Medicare fees, effective June 1984 through January 1987. Congress' intent is now to shift the burden of effectively constraining the growth of Medicare Part B costs to providers rather than Medicare beneficiaries. (2) The Physician Payment Review Commission, created by Congress, has issued a recent major report, outlining ways that physicians could be reimbursed under Medicare in the future.[2] (3) In fall 1985, the Health Care Financing Administration (HCFA) contracted with Harvard University to conduct a 30-month study of resource-based relative value scales (RBRVS) for physician services.[3] This system is being developed under the direction of William Hsiao, Ph.D., Harvard School of Public Health. The American Medical Association is a subcontractor on the study for HCFA. The study is scheduled to be completed in July 1988. (4) The Massachusetts Rate Setting Commission is revising its Medicaid fee schedule, based on the RBRVS, for planned application in mid-1987. (5) The Massachusetts Insurance Commissioner asked Blue Shield to consider reforms in physician payment, with an emphasis on developing an RBRVS, as a condition of his approving a Blue Shield rate increase in 1987. (6) Congressional hearings on physician fee schedules continue, and congressionally sponsored studies of physician fees have recently been published.[4,5]

Within the administration in Washington, proponents of physician fee reform are calling for an expanded use of capitation in the long term, or some form of physician DRGs.[6] But these changes are not imminent. During the next several years, fee payment modifications will be based in fee-for-service recalculations. If the revised physician fee schedules achieve acceptable levels

MCK 052198

04-CV-1258-SLR (D.Del.)

TABLE 1. *Medicare Prevailing Fees* ($, 1984)*

| State | CABG | Appendectomy | Cataract |
|---|---|---|---|
| New York | 6000 | 1134 | 1547 |
| Michigan | 3100 | 399 | 825 |
| Rhode Island | 2587 | 516 | 928 |

* The charges indicated are for specialists and for the large urban areas within the states listed.

From the U.S. Department of Health and Human Services, Health Care Financing Administration. Medicare Directory of Prevailing Charges 1984. Washington DC: U.S. Government Printing Office, 1984.

of patient access and physician support, they will be part of the blueprint for future health care delivery in both private and public arenas.

## Background

Medicare's "customary, prevailing, and reasonable" (CPR) payment system is, by general consensus, unsatisfactory in today's competitive market in health services. There are many problems associated with CPR. It tends to be inflationary and slow to respond to alternatives in technology and changes in both availability of physicians and need for services. Some charges appear excessive to most observers, even taking into account geographic cost-of-living variations and other variables. For example, under Medicare, the cost of a triple vessel CABG (coronary artery bypass graft) in New York in 1984 was $5500. The cost of this same procedure in Michigan was $3100 and $2587 in Rhode Island (Table 1).

Similar variations are found in fees from the private sector. For example, unexplained fee variations exist in managed health care models such as independent practice associations (IPAs). Hip replacement at three different IPAs in the eastern part of the country ranged from $2808 to $4274 (see Table 2).

Noting these wide discrepancies, the federal government and a number of large private purchasers of health services have turned their attention to the ways physicians are compensated for the care they provide. Fundamental changes in the methodology of physician reimbursement are being discussed. Serious consideration

TABLE 2. *Fee Variations in 3 IPAs, 1986 Fees ($)**

| Operation | Plan #1 | Plan #2 | Plan #3 |
|---|---|---|---|
| Appendectomy | 645 | 950 | 1111 |
| Cholecystectomy | 1055 | 1465 | 1710 |
| Cataract removal | 1280 | 1650 | 1980 |
| Hip replacement | 2808 | 3666 | 4274 |
| CABG (3-vessel) | 4690 | 6123 | 7139 |

* Plan names withheld because fees were given in confidence to Health Policy Institute by IPA executives.

is being given to systems that would pay physicians by capitation or by including the physician payment with the hospital DRG payment. However, both options represent a radical departure from the current system and are viewed as politically unrealistic, at least in the short term.

Several interim remedies are being devised, however. One approach adjusts a few fees that are grossly out of line. Invoking "inherent reasonableness" authority, HCFA uses this approach to reduce payments for "overpriced" procedures. Although corrections have been made for a few services such as cataract removal and installation of pacemakers, most physician payments currently are based on historic trends.

Another approach used by HCFA to control "runaway" costs involves a recalculation of the Medicare Economic Index (MEI), an inflation index for increases in physician office expenses that result from inflation.[7] HCFA estimates that this downward modification in the MEI will save Medicare an increasing amount of money.

Another approach, more far-reaching in concept than the interim measures described previously, but less radical than capitation and physician DRGs, was tried by the Boston University Health Policy Institute (BUHPI) in the fall of 1984.[8] BUHPI compiled a group of 12 Massachusetts surgeons in a pilot effort to develop a complexity-severity index (C/S index) of surgical services, based on professional judgment, that could provide the basis for a relative value scale.

Building this kind of index, although intuitively appealing, proved time consuming and cumbersome. It also raised questions of antitrust. The Federal Trade Commission has barred professional groups from developing relative values guides on the grounds that such guides ". . . established by competitors in a commercial context, probably would constitute illegal price fixing because the dissemination of information and agreement on establishment of price structures usually lead to price uniformity and stabilization."[9]

In this pilot study, BUHPI identified a private corporation that had captured the essence of the C/S index and developed a practical way to convert it to a physician payment management system. The approach of Caterpillar Corporation (CAT), based in Peoria, Illinois, has resulted in the evolution of "degree of difficulty" relative value scales (DODRVS) and regional multipliers that appear to accomplish a pragmatic fee schedule reform. Access to physicians is achieved for CAT employees and their families, and local physician acceptance of the overall CAT process is maximized. Since CAT is not a dominant payer in any geographic area and is not a provider, the potential for antitrust challenges is minimal.

Table 3 s
index numl
and CAT's
gional surg
two process
target in its
rative proje

*The Caterp.*

CAT is a
machinery
54,000 emp
CAT healt
as well as 2
hospitaliza
prescriptio
health plan
. In 1983,
negotiated
surgical an
payment s
wide range
local surge
sistent wit
review app
ticular feat
*Establish*
communit
of CAT e
surgical se
a limited
tives of th
director f
makes the
meets with
a "physic
that physi
a mutuall
the situati
wide varia
often insu
claims; (3)
various se
ered for pa
need for s
Actual c
tient and
then solic
corrected.
billing pra
ious proc
CAT M.D
*Use of*
combined

MCK 052199

04-CV-1258-SLR (D.Del.)

Table 3 shows the close correlation between the C/S index numbers, arrived at through the BUHPI study, and CAT's DODRVS, reached by consultation with regional surgeons. This striking correlation between the two processes suggested to the BUHPI that CAT was on target in its surgical fee activities, and led to the collaborative project described in this paper.

### *The Caterpillar Method*

CAT is an international manufacturer of earthmoving machinery and equipment, employing an estimated 54,000 employees in 15 domestic and 13 foreign plants. CAT health benefits cover employees and dependents, as well as 21,000 retirees. The benefit package includes hospitalization, physicians' services, laboratory, x-ray, prescription drugs, and dental and eye care. The CAT health plan is self-insured and self-administered.

In 1983, CAT implemented for its U.S. employees a negotiated fee schedule approach to physician fees for surgical and invasive procedures. The CAT physician payment system emphasizes (1) employee access to a wide range of qualified surgeons, (2) fees negotiated with local surgeons that are considered reasonable and consistent with local market forces, and (3) billing practices review applied consistently to all incoming claims. Particular features of this approach are described below.

*Establish a fair fee cap.* With input from respected community physicians in locations with a large number of CAT employees, CAT establishes a fair fee cap for surgical services. The CAT method involves convening a limited number of meetings with selected representatives of the surgical community and the CAT medical director for group insurance (CAT M.D.). Where it makes the most efficient use of time, the CAT M.D. meets with individual specialty groups. Operating under a "physician friendly" philosophy and the assumption that physician education and involvement help achieve a mutually agreeable solution, the CAT M.D. describes the situation from CAT's point of view: (1) there are wide variations in fees and billing practices; (2) there is often insufficient documentation to properly process claims; (3) a way is needed to compare the difficulty of various services so their "relative value" can be considered for payment decisions; and (4) a reassessment of the need for surgical assistants is needed.

Actual claims received are used as examples (with patient and provider identities protected). The CAT M.D. then solicits provider input on how problems can be corrected. General consensus is gained on reasonable billing practices and relative degree of difficulty of various procedures, based on recommendations by the CAT M.D. and discussions with physician groups.

*Use of geographic multipliers.* CAT's DODRVS is combined with a regional dollar multiplier to calculate the actual dollar payment limit. The regional multiplier is based on market research by the CAT M.D. Where there are unusual market conditions for certain specialties, CAT may adjust the multiplier up or down for some services rather than changing the entire region's multiplier. This system allows CAT to take into account the local health care market, legitimate variations in provider billing and medical practices, and variations in the cost of living.

*Continual audit and recoding of physician bills.* CAT claims processors subject each incoming physician bill to a coding analysis of CPT-4 codes as a first step, and recode claims where irregularities are found. Obvious simple coding errors are corrected first. Individuals with clinical knowledge and judgment then compare the provider's description of services with submitted codes; operative reports are requested for most surgical claims and follow-up calls to provider offices for clarifying information are common. Once the claim reviewer is satisfied that enough information is available to code the bill consistent with CAT procedures, recoding is finalized, and the correct codes are compared with established regional fee schedules. Reviewers with clinical experience consult the CAT M.D. as needed, assuring that a high level of understanding of the surgical experience is applied in the review process.

Tables 4–7 illustrate some features of the CAT process. They are representative of some claims received by CAT.

In Table 4, the appropriate payment is $1000 for code 38100. The patient was hospitalized for an elective splenectomy. The CAT reviewer would disallow codes and

TABLE 3. *BUHPI C/S Index Compared with CAT DODRVS*

| | C/S Index | DODRVS |
|---|---|---|
| Thoracentesis | 3 | 3.4 |
| Appendectomy | 24 | 26.4 |
| Cholecystectomy (with common bile duct exploration) | 48 | 47.7 |
| Total thyroid lobectomy | 40 | 41.8 |
| Modified radical mastectomy | 45 | 47.7 |
| Colectomy, partial | 55 | 54.5 |
| Pancreatoduodenectomy | 100 | 100.0 |

TABLE 4. *Bundling of "Unbundled" Bill*

| Procedure | CPT Code | Charge |
|---|---|---|
| Splenectomy | 38100 | $1000 |
| Laparotomy | 49000 | 600 |
| Appendectomy | 44950 | 600 |
| Preoperative check (in hospital) | 90215 | 125 |
| Suture removal | 90270 | 100 |
| Total charge | | $2425 |
| Amount paid | | $1000 |

TABLE 5. *Excessive Fee Reduced. Assistant Surgeon Claim Denied as Not Medically Necessary*

| Procedure | CPT Code | Charge |
|---|---|---|
| Excision biopsy, breast (R) | 19120 | $1500 |
| Excision biopsy, breast (L) | 19120-50 | 1500 |
| Charge | | $3000 |
| Assistant surgeon fee (R) | 19120-80 | $1200 |
| Assistant surgeon fee (L) | 19120-50-80 | 1200 |
| Charge | | $2400 |
| Total charge | | $5400 |
| Amount paid | | $ 750 |

charges for all except the splenectomy: a charge for laparotomy and incidental appendectomy is warranted only if done as a separate procedure and preoperative check and postoperative care are conventionally part of the global surgery fee. A charge of $1000 for the splenectomy is in line with the regional fee schedule and is the amount ultimately approved.

In Table 5, the appropriate payment is $750 to the primary surgeon for code 19121 (excision biopsy, breast, bilateral). Under most conditions, one surgeon can perform a breat biopsy. The operative report indicates no unusual circumstances. The assistant surgeon is not reimbursed, and the patient is informed of CAT's review decision.

In Table 6, the appropriate regional payment is $60 for code 17100. The procedure was actually a simple wart removal. The operative report describes a 0.25-inch plantar wart on one foot. Excision combined with use of the laser constitutes excessive treatment for this common condition. Wart removal is most accurately coded as 17100 ("destruction by any method of benign skin lesion").

CAT knows that four local experienced, board-certified cardiac surgeons will carry out a three-vessel coronary artery bypass for $5000, assuring that access can be achieved for that fee (Table 7).

Tables 4–7 demonstrate that complete and knowledgeable recoding of claims requires familiarity with both the content of various surgical procedures and the details of coding surgical services.

*Physician negotiations.* Individual physician negotiations are carried out for selected claims. After establishing an overall fee schedule with local physician representatives, CAT continues its negotiations on a selected claim-by-claim basis. If the amount charged for corrected codes significantly exceeds the regional fee cap, CAT contacts the billing physician, giving information on the corrected codes and the amount allowed. The CAT M.D. makes many of these calls. Usually the provider is willing to accept CAT's recoding and reduced fee. Discussions of claims with physicians have revealed that providers enter practice largely ignorant of common billing practices. Most admit they do not know what various procedures are worth. At best they occasionally may ask other providers what they charge. Those who use an RVS have access only to a wide variety of unstandardized sources. Some are advised to start charging high rates to get a high fee profile. Often, physician offices have an office clerk coding claims who is not trained in medical terms or coding, whereas other physicians rely on central billing services that promise to "maximize reimbursement," often with "creative" upcoding or unbundling of services.

TABLE 6. *Recoding of Unnecessary Procedure, Excessive Fee Reduced*

| Provider Description | CPT Code | Charge |
|---|---|---|
| Excision, benign lesion, foot and use of $CO_2$ laser | 11421 | $450 |
| Total charge | | $450 |
| Amount paid | | $ 60 |

TABLE 7. *Fee Adjustment*

| Procedure | CPT Code | Charge |
|---|---|---|
| Coronary artery bypass graft, 3 vessel | 33512 | $8000 |
| Total charge | | $8000 |
| Amount paid | | $5000 |

*Employee communication.* CAT has a program of employee communication that defines the employees' responsibilities and options when payment is less than the fee charged by a surgeon. A letter of explanation is automatically generated to the employee when there has been a payment reduction. It states that if the employee has discussed the fee with the physician before the procedure, the employee is responsible for the amount in excess of CAT's fee cap. Also, employees are told when their provider has agreed to accept CAT's reimbursement as payment in full.

*Patient held harmless.* If a physician bills an employee for the amount that exceeds the fee cap, the employee is instructed to contact CAT, and a CAT provider relations specialist discusses the situation with the physician. Patients are not required to pay the physicians' balance bill above the CAT payment (that is, they are "held harmless") if the physicians have not informed the patients of the higher-than-cap fee before the procedure. CAT intervenes on the patient's behalf when the physician refuses to lower his/her fee to the established cap. On average, of about 20,000 physician claims received per year, CAT has less than a dozen instances in which providers insist on trying to obtain reimbursement above the CAT fee through claims court. In over 95% of

MCK 052201
04-CV-1258-SLR (D.Del.)

these cases, the judge has agreed that CAT's payment is reasonable for the services, based on local surgeon input.

*Study of Savings with CAT Method*

CAT's internal calculations indicate that it achieves significant savings with its surgeon bill review process by reducing fees that otherwise would have been paid in full. The BUHPI is conducting an external evaluation of the CAT process for managing surgeon fees. Standard surgical fee processing by large insurance companies and third-party administrators is being compared with the potential cost savings of the CAT process. The BUHPI has obtained samples of consecutively filed claims for surgical services that have been processed for several large self-insured corporations that administer their claims through major insurance carriers. The benefit plans establish payment caps at a percentile of usual and customary fees, and the carriers' auditing of codes was representative of current industry standards. CAT's recoding and bundling procedures, as well as payment caps, were applied to these claims, with the goal of finding if the savings from payment reduction significantly exceeded those achieved by these carriers.

Hard copies of the providers' originally submitted claims were processed by CAT staff without information about changes from charges that had been made by the carriers before these claims had been paid. Confounding variables of payment due to copayments, deductibles, or coordination of benefits were eliminated.

The total charges included in the sample claims were over $140,000. The carriers adjusted 13 to 15% of their claims and paid 4.3 to 35% less than total charges. CAT adjusted 35 to 40% of these same claims and reduced payment from charges by 22 to 43%. Therefore, CAT would have achieved an additional savings of 8 to 17.7% if CAT's procedures and the lower of CAT or the administrator's fee schedule were used. One third of the additional savings came from coding changes in the original bills and two thirds by the application of the CAT negotiated fee schedule. In some instances providers submitted an incorrect code that significantly *undervalued* the procedure that was done. If the provider's code had been used, the payment would have been cut to an unreasonable level. In these instances, the CAT reviewer "upcoded" to the correct code and allowed the more appropriate fee; the savings potential includes these corrections in favor of billing surgeons.

## Discussion

The CAT system for managing surgeons' fees has been developed by a progressive benefit department in a large American corporation. The system depends on detailed knowledge of surgical practice so that recoding and bundling of procedures categorized by CPT-4 codes can be accurately carried out. It requires contact with local surgeons in regions with a high concentration of employees so that market forces can be taken into account in determining an appropriate level of local fees.

An access-oriented negotiated fee schedule can have many permutations. In areas with a surgeon surplus, a corporation may be able to negotiate lower fees with surgeons than those previously paid. In areas with few surgeons, fees lower than customary are more likely to create patient access problems should the surgeons resist reductions negotiated elsewhere. Still, modified versions of CAT's approach would be similar to processes already used by the government in establishing "inherent reasonableness" for cataract extraction and pacemaker installation fees.

The key concern about any new surgeon payment approach should be the ability to attract a good representation of local surgeons who will accept it. Ensuring employees' access to qualified surgeons is the paramount goal. All other considerations, even inherent reasonableness of lower fees because of technological advantages or cost containment, should remain secondary.

Based on the BUHPI's analysis, the CAT process is a workable and market-tested solution to the need to balance access and cost management. It is suitable for large corporations such as CAT with both self-funded and self-administered health benefits. It can also be used (after eligibility is certified and benefits are coordinated) by claims processing systems. Accurate implementation of the CAT process requires (1) hard copies of the CPT-4 codes submitted by the surgeon and availability of the operative notes, to reconcile discrepancies between CPT-4 codes and the surgical service, and (2) access-oriented negotiated fee schedules obtained by applying a geographic multiplier to an RVS, such as CAT's DODRVS.

State and federal governments can modify the CAT process for Medicaid and Medicare, with the same goals that motivate the private sector: access and cost management. Regional fee schedules could be established with national DODRVS values and regional multipliers based on market forces. Balance billing is optional, using the CAT model. However, its effectiveness as a cost management approach is strengthened with its "hold harmless" provision. In the CAT system, if a patient knows a surgeon is charging a fee higher than the negotiated fee, the patient is responsible for the balance. If no discussion has occurred, the patient is held harmless for bills in excess of the fee cap.

If adequate access is to be preserved without the need for balance billing, payments must be established so that a majority of qualified surgeons in each region will accept the negotiated fee as payment in full. If this acceptance is not achieved, then access problems will arise, as

*Table 8. Comparison of "Resource-based Relative Value Scale" (RBRVS) and "Access-oriented Negotiated Fee Schedule" (AONFS) for Physician Reimbursement**

| | RBRVS (Hsiao) | AONFS (CAT) |
|---|---|---|
| Goal | A "comparable worth" reform for physicians, a group with high incomes relative to most other occupations. | Patient access to local physicians at a negotiated price. |
| Methodology | Complex formula determines RBRVS; time is a major determinant. | Revision of fees is based on negotiations, M.D. fee acceptance patterns (market forces, not payment of charges). |
| Application | Two basic problems: (1) RBRVS is not a fee, and knowledge is needed of regional situations to use multiplier effectively, (2) when applied in Massachusetts, shown to need extensive modification to get support of, and access to, local surgeons. | In routine use. CAT knows that well-qualified local physicians will accept the AONFS. |

* AONF = DODRVS × regional multiplier.

occurred in 1986 for the Massachusetts Medicaid program. That program was forced to increase significantly its fees for normal deliveries. As stated in the *Boston Globe*, ". . . responding to a crisis in access to obstetrical care in many areas of the state, the panel hiked the all-inclusive fee for pregnancy care and childbirth from $508 to as much as $1,200."[10] This is a good example of the futility of a fee schedule that does not build on knowledge of physicians' availability at different fee levels in each region. The Massachusetts Medicaid program had a previous experience with attempting to introduce a fee schedule based on a "resource-based" formula.

In July 1983, the *Boston Globe* described a new strategy that was suggested by the Massachusetts Rate Setting Commission for the Medicaid program and workers compensation.[11] Based on the 1979 study by Drs. Hsiao and Stason from the Harvard School of Public Health,[12] the Rate Setting Commission proposed that the fees for 21 common surgical procedures should be cut by amounts ranging from 4% to 59%. At the same time, physicians seeing patients in their office were to get 71% more for initial visits. These proposed changes were the estimated relative resource requirements of different physician services, with a strong focus on the time involved. The formulas were established in the Hsiao/Stason analysis of physician practices.

These changes were adopted in September 1983, but on August 23, 1984, the Rate Setting Commission raised the fees that the state Medicaid program paid to doctors for surgical procedures. As stated in the *Boston Globe*, "no prior hearing was held or public notice given before the August reversal because the Commission subsequently said physician resignations from Medicaid had reached the level of a public health emergency. Most striking of these defections were obstetricians/gynecologists."[13] This experience suggests that fees ultimately paid by Medicaid were primarily driven by the need to get access to Medicaid patients to physicians, and not by a formula for "resource costs."

The American Society of Internal Medicine and the American Medical Association have supported an elaborate study of the Hsiao methodology commissioned by HCFA, and there is much speculation about the possible use of an RBRVS for the determination of Medicare fees when it becomes available in the summer of 1988. The investigators of the BUHPI originally believed that the consensus process to determine a C/S index could be developed as the basis for fee reform that would be acceptable and perceived as fair by physicians. However, the consensus approach is laborious, and much time would have been necessary to interrelate all specialties and resolve potential conflicts. It was then that the BUHPI began to study the CAT system, and found that it involved a process with appropriate goals, methodology, and application for cost management and market acceptance.

Table 8 outlines the basic differences between a "resource based" RVS and an access-oriented negotiated fee schedule, as used by CAT. A basic goal of the RBRVS is to "reform" physician reimbursement in the direction of more equity between procedure-oriented specialists and generalists. However, as the evidence suggests, this goal will be in conflict with realities of the marketplace and will result in paying fees that are either unnecessarily high or too low to get ready access for insurees to local physicians.

The methodology of the RBRVS is based on a formula unrelated to local market forces, whereas the access-oriented negotiated fee schedule used by CAT builds on negotiations and local fee acceptance patterns to gain access. The CAT system's ability to adjust for regional differences in the market is the essential difference in the two approaches. The CAT system is in routine use and will continue to be modified by changes in local physician manpower and other factors such as increases in malpractice premiums. We suggest that an access-oriented negotiated fee schedule such as the CAT system deserves consideration as the preferred method of fee reform.

## References

1. Waldo DR, Levit KR, Lazenby H. National health expenditures, 1985. Health Care Financing Review 1986; 8:14.
2. Physician Payment Review Commission. Medicare Physician Payment: an Agenda for Reform. Annual Report to Congress. Washington DC: U.S. Government Printing Office, March 1, 1987.
3. Knox RA. Study on Equalizing Medicare Bills Begins. The Boston Globe, September 13, 1985; 4.
4. Congress of the United States. Physician Reimbursement Under Medicare: Options for Change. Washington DC: Congressional Budget Office, April 1986.
5. Congress of the United States. Payment for Physician Services: Strategies for Medicare. Washington DC: Office of Technology Assessment, February 1986.
6. Jencks SF, Dobson A. Strategies for reforming medicare's physician payments: physician diagnosis-related groups and other approaches. N Engl J Med 1985; 312:1492–1499.
7. Dutton BL, McMenamin P. The medicare economic index: its background and beginnings. Health Care Financing Review September 1981; 3:137–139.
8. Egdahl RH, Manuel B. A consensus process to determine the relative complexity-severity of frequently performed surgical services. Surg Gynecol Obstet 1985; 160:403–406.
9. Pollard MR. Anti-trust and Physician Payment. Reforming Physician Payment 1984. Institute of Medicine: Report of a Conference. Washington DC: National Academy Press, 1984; 75–86.
10. Knox RA. Proposal Would Raise Medicaid Fees. The Boston Globe, April 17, 1986; 27.
11. Knox RA. Medicaid Fee Shifts Adopted. The Boston Globe, September 16, 1983; 17.
12. Hsiao WC, Stason WB. Toward developing a relative value scale for medical and surgical services. Health Care Financing Review, Fall 1979; 1:23–38.
13. Knox RA. State Shifts on Medicaid Fee Cuts. The Boston Globe, September 27, 1984; 1.

## Discussion

DR. W. GERALD AUSTEN (Boston, Massachusetts): I congratulate Drs. Egdahl and Hertenstein on an excellent and stimulating paper. They have worked long and hard on physician payment reform, and they recognized early the importance of physician acceptance in any proposed reform. Thus, a major element of the current proposal includes the active participation of the physicians.

Three and a half years ago, the Regents of the American College of Surgeons created a Committee on Physician Reimbursement of which I have been Chairman. This committee, with much input from the surgical specialty societies, has developed recommendations for the reform of the Medicare physician payment program, and these recommendations were approved by the Regents in October 1986.

The aim of the College, like the approach presented today, is to identify ways to achieve a more rational payment system with cost savings and at the same time ensuring adequate access to quality care.

The ACS approach has a number of similarities to the program presented this morning; the ACS proposal includes the creation of a Medicare relative value scale based on physician charge data and with modifiers based on geographic differences in practice costs, the definition of payment units with emphasis on a global fee and the creation of definitions and guidelines to determine when an assistant at surgery for Medicare payment purposes is necessary.

I have one question for the authors. The Caterpillar Corporation has approximately 50,000 employees in 15 domestic plants, and it also has a very persuasive, sensible medical director. How would you expand your proposal from one company to a national program?

Finally, I would like to add that it is crucial that surgery be involved as much as possible in the current debate on physician reimbursement reform, and we need to be able to present sensible and fair approaches backed by solid data. The next year and a half is probably going to be crucial.

I would urge Drs. Egdahl and Hertenstein to continue to gather information and to make every effort to present their data and recommendations to the appropriate congressional committees and to the Administration.

DR. OLIVER H. BEAHRS (Rochester, Minnesota): Drs. Egdahl and Hertenstein have done us a favor by developing and reporting a modification of the CPR fee for service reimbursement for surgical services. I appreciate the opportunity to have read the manuscript.

Their program, which is a negotiated access RVS, is in contrast to the Harvard-AMA resource based RVS, and is being developed under contract from HCFA. This RVS is of concern because of the inordinate weight given to time as a factor and the methodology being used.

There is great anticipation regarding this study in Washington and some are thinking of it as the only game in town.

The Physician Payment Review Commission (PhysPRC) established by Congress in 1986 made its first report to Congress on March 1, 1987. The Commission supports a fee scale based on a national RVS with appropriate regional multipliers to determine fees. The basis for the RVS has not been determined, but hopefully it might be based somewhat on historic charges and not the strictly resourced criteria of the based parameters used in the Harvard Study.

The use of the CPT-4 Code has come under criticism: first a dictionary of 2000 codes, and now 7000 and with multipliers 48,000. It was established primarily for medical record keeping not to establish charges. It has led to unbundling of services and upcoding to establish fee for services. This practice has led to excessively high fees in at least 10% of cases because of unbundling or upcoding.

I would be interested in the author's suggestions how the CPT-4 codes might be collapsed or bundled and what policy could be established to prevent these abuses.

A long-term program for physician payment is probably several years away and may be a fee scale hopefully, but there is administrative and congressional support for capitation or voucher arrangement, possibly DRGs. Congress is looking for a near-term solution to its budget problem for 1988.

The budget mark-up will be in the next few weeks and the recommendations to meet the cut almost certain in physician reimbursement will be in place by September.

The reduction in reimbursement might be another freeze, a shaving downward of the medical economic index, selecting the high-cost outliers such as coronary artery bypass, hip reconstruction, and/or TUR for across-the-board decreases as was done to cataract surgery in 1986 and 1987, or selective decrease in the high rollers or by addressing the reduction by using the inherent reasonable rule that is already in legislation.

My second question to Dr. Egdahl and Dr. Hertenstein is: what are your recommendations in the next month or two to meet the 1988 budget limits?

DR. MARTIN ALLGOWER (Basel, Switzerland): I appreciate the invitation to look "with a Swiss eye" at the presentation of Dr. Egdahl.

In Switzerland it is said that the surgeon goes through two stages. At the beginning of his career, collecting a fee, he gets red in the face. Later on his face reddens when he does not get paid!

The Swiss economic system is a rather complex mixture of free enterprise and institutions run almost exclusively by public bodies. We consider many of the things you do not as public responsibilities. These include post and telephone services, railway services, schooling and university formation, and most hospitals are run by local government agencies. The health care system is furthermore complicated by the fact that insurance conditions for accidents are very different from

those for diseases. It is obvious that this difficult distinction keeps our lawyers busy!

Basically, surgeons are mostly employed on a geographical full-time basis in a state hospital. Those state hospitals, however, have private, semiprivate, and general wards. This, I believe, is a rather favorable arrangement, combining a salaried position for the administrative obligations as well as for the care of the general patient with a fee-for-service system for the private patients. Now, comparing this with the cap system, we find great similarities because the Union of Swiss Surgical Societies, including all specialties, has set up a range of fees that may be reasonably asked from a patient or from the insurance, *i.e.*, the third party paying. Those ranges, just to give you an idea, would range from 400 to 1000 francs for an appendectomy, for a gallbladder from 1000 to 2000 francs, and for major operations such as a total gastrectomy, a Whipple, an acetabular repair or a resection of an abdominal aneurysm, from 3000 to 6000 Swiss francs. That is about the maximum fee we are allowed to ask or, at least, that the Union will support, if it is contested in court. You may divide the figures by 2 to arrive at dollar values, because that is about the realistic comparison in terms of buying power.

It is a fairly democratic self-regulating peer controlled system. What we dislike in Switzerland is the "big brother" state watching us and telling us what to do.

We have one advantage over you. The contingency system is unacceptable and the one party who loses "the battle" usually has to pay the other's legal expenses. That often prevents people from going to court, although there has been a definite increase in liability claims in recent years.

Overall our system results in an average income of some 300,000 to 400,000 francs for a Swiss surgeon. Out of that he pays some 50% in taxes. Our rather democratic system is similar to what Dr. Egdahl has just presented. It is based on a fee for service "common sense scale," the majority of surgeons working in a geographical full-time scheme.

Dr. William R. Drucker (Rochester, New York): I appreciate the opportunity I had to review this paper. Dr. Egdahl has given us a clear presentation of an industry-sponsored plan that attempts to gain physician compliance with a method of reducing costs of medical care through reduction in fees.

It is a very clear example that in addition to government today, our health care system is being strongly influenced by industry.

I have a couple of editorial comments and then a couple of questions. The major factor in the rise in health care costs is not physician fees. This is simply illustrated by a look at the average fees of physicians across the country, somewhere in the range of $50,000–$150,000. I realize that others make considerably more, but each physician can be estimated to cost the health care system something in the order of three quarters of a million dollars per year by the exercise of his physician rights in doing his job of taking care of patients. Therefore, the major target that needs to be addressed is physician behavior, not physician fees. Nevertheless, fees are perceived as a problem that is going to be addressed whether we like it or not.

I wonder whether this paper is simply the expression of a last gasp hope that current physician fees and the fee for service system will continue. I sincerely hope this is not its purpose and I believe Dr. Egdahl agrees based on the way he has presented the paper. My reading from the paper is that Dr. Egdahl is presenting a plan that is asking clearly for physicians to get together and plan to help solve the problem of fees rather than having it done for us by external agencies; that means industry and government.

My questions are these. They are straightforward, I believe, and can be answered simply. What will happen in the case of an emergency when one of the patients in the system under the cap must have an emergency operation and they seek a doctor who does not agree with the system: would this be settled in claims court?

What about quality? Does the system depend on the physician participants to ensure quality or do they have other ways to ensure that their employees are obtaining the quality of care that they would under the current system of fee selection.

How about comparison with other systems? Has there been enough experience to date to show that this system is gaining popularity? Is there any way to compare this system with others in terms of two factors: physician acceptance to work in the system, and employee acceptance of this system for their health insurance?

Then there is a question of cost. This is a very complex system. It seems very costly if one reads carefully. What is the cost? Is there any estimate of what the cost would be of setting up and maintaining this system that requires close scrutiny of all bills that come in; a very complex system of monitoring these bills? Is the billing method unique to CAT or can other insurance systems do this too? Is this system for sale? Do other insurance companies look at claims this carefully?

Dr. Benson B. Roe (San Francisco, California): Dr. Egdahl is to be thanked for bringing to our attention a sensible proposal to address a serious threat to the fee-for-service system. I believe we finally are all aware of this threat, and I am delighted that we are prepared to gather our forces to get behind something positive.

About 8 years ago I became aware of the enormity of the abuses to the current system that were taking place, perhaps not by the respectable members of our profession but by an alarming number of those who did the kind of unbundling and some of the things that he showed you. I published an article that was intended to stir us to take some initiative in this problem rather than hoping it would go away. I hope it is not too late.

It is equally important that we get behind some system that establishes fiscal integrity so that we do not jeopardize the precious and unique privilege that we have of self-governance. This privilege is threatened by the behavior of some of our colleagues who have abused the system and brought this problem to our attention.

In addition to the proposals that Dr. Egdahl has made, I believe we should place emphasis on the magnitude of responsibility to cover not only accessory procedures but complications. No one can tell me whether my complication was part of the patient's underlying disease or could possibly be one from some flaw in my technique or management. We should accept as a part of our primary responsibility the full scope of managing a patient from start to finish without throwing in extra for everything that can be imagined. If we had done that, we would have reduced our total cost to the public by at least 20%.

Dr. James R. Jude (Miami, Florida): I rise because I am confronted by patients who are faced with billing problems after hospital discharge. One of the problems is the unbundling that Dr. Egdahl has brought up.

Ten years ago on an Ethics Committee of our local medical society we, out of hand, tossed unbundling out as a completely immoral approach to any type of billing. I did not believe it even could possibly exist any more, but there is more of a problem than just the bundling together of the surgical fee. The problem is much greater than that. We always keep our office open to speak to any patients about any problems, and it is very common for them to present with bills of what really amounts to an unbundling of the bills of other physicians who were involved in their treatment.

Most commonly this has applied to anesthesiology, which frequently approaches 50% of the surgical fee. It is not, however, only the anesthesiologists, it is also the internists, the radiologists, the pathologists, and possibly the cardiologists who are reading electrocardiograms. Patients receive an enormous number of bills from physicians, and so it is a total physician unbundling and not just a surgical fee unbundling that is occurring.

Some way or other we have to approach the problem whereby there will be some type of bundling together of all physician fees as a package.

As our President presented yesterday in his Presidential Address many treatments that we do are not all surgical anymore, but rather a blending over into medicine, and medicine is delivering surgery and surgery is delivering medicine. Therefore, we should give a great consideration to the total care and the total charge.

Dr. Egdahl, what if anything have you considered about these other fees in respect to a global cap or other industry approaches to the total cost of care in surgery?

Dr. Jonath
to this paper w
most people ha
reduction in ta
There is one
liability insura
when you have
ust, and this e
will pay, you h
I raise the qu
malpractice ins
the fee. No dou
access to one's
it would have
physician starti
liability costs,
amount that a p
work in the mic
Perhaps the
appear and sho
I can think of
true cost of lia
insurance $125,
I rose to raise
was any precede
is any way this c
system with an

Dr. Richard
tion about the
now exists to a
major national
bureaucracy, w
Caterpillar does
ions and an ea
mainly be divide
do not know w
management an
are which woul
Dr. Beahrs rai
asks what we can
I believe we car
matching up the
codes, and have
tems inappropri
with the goal of
the other hand,
simple errors has
the technicalities
the operative no
determine if the
is to expand the
has been limited
items that appea
upward.

MCK 052205

04-CV-1258-SLR (D.Del.)

DR. JONATHAN E. RHOADS (Philadelphia, Pennsylvania): I listened to this paper with a great deal of interest. I would emphasize that if most people have a 50% overhead, that a 15% reduction in fee is a 30% reduction in take-home remuneration. That is well to keep in mind.

There is one aspect of the overhead that has gotten bigger and that is liability insurance. This in a way is the loose cannon on the deck, and when you have a fee schedule set, whether by government or by consent, and this expense is assumed to be something that the physician will pay, you have an unpredictable situation.

I raise the question and ask the authors if there is any precedent for malpractice insurance being billed on a per case basis or a percentage of the fee. No doubt this would require the insurance company to have access to one's tax returns and so forth to be sure that it was honest, but it would have certain great advantages. It would permit the young physician starting out to start out on his own, pay his share of the liability costs, but not be expected to pay immediately the same amount that a person would be paying who is doing 10 times as much work in the middle of his career.

Perhaps the far greater advantage in my belief is that this could appear and should appear as a separate item on the bill.

I can think of no way that would educate more of the public as to the true cost of liability insurance than to have a bill (operation $300, insurance $125, or whatever it might come to).

I rose to raise this issue and to ask the authors if they knew if there was any precedent for such a plan and to ask whether they believe there is any way this could be tried out before we get tied into a fee schedule system with an unpredictable cost for liability insurance.

DR. RICHARD H. EGDAHL (Closing discussion): Dr. Austen's question about the possibility of expanding the Caterpillar program as it now exists to a national level is an important one. The problem is that major national programs such as Medicare necessarily involve a large bureaucracy, whereas a private self-administered company such as Caterpillar does not require the same degree of routinization of operations and an easily replicated methodology. The country could certainly be divided into 6–12 regions, each consisting of several states. I do not know whether appropriate flexibility could be built into the management and technical components of the administrative structure which would be part of a national program.

Dr. Beahrs raises questions about the future use of CPT-4 codes and asks what we can do in the short range to control outlier Medicare fees. I believe we can use CPT-4 as long as we understand the basis for matching up the procedures that actually were carried out with the codes, and have some way to ratchet downward those charges that seem inappropriate. Certainly there are a few groups selling systems with the goal of achieving code creep, which is basically dishonest. On the other hand, the majority of codes that are incorrect represent simple errors based on the difficulty of each doctor's office knowing all the technicalities of coding. We can stick with CPT-4, but must match the operative note with the CPT-4 code, using physician judgment to determine if the code is appropriate. The short-term answer for HCFA is to expand the principle of inherent reasonableness, which thus far has been limited to a few surgical conditions. Another 20–30 big-ticket items that appear to be out of line could be revised downward or upward.

Dr. Martin Allgöwer from Basel talked about the Swiss system and the apparent success of physician-sickness fund negotiations. This type of negotiation, with the government playing a catalytic role, might have relevance to the U.S. system in the private sector. However, Medicare will probably demand a closer involvement in the process than exists in Switzerland, since the government is paying the bill directly.

Dr. Drucker asked a key question about what happens in emergencies under the Caterpillar system. Usually Caterpillar pays charges in emergencies, but also has a strategy involving clearance for appropriateness of treatment in emergencies, when there is time. If gross overcharges are billed, even for emergency situations, and local surgeons support that the charges are unreasonable, then payment of those charges can be challenged.

Dr. Roe discussed his analysis of fees, and raised the question about possible antitrust issues if physicians are in the position of commenting on the appropriateness of their fees. Industry does not want to see private medicine nationalized, but could turn on us if we do not cooperate in developing a rational method of physician reimbursement. The key to not raising antitrust issues is for surgeons to act as individual consultants to payers who determine those fees, such as large industry.

Dr. Jude asked about how to get our internist colleagues involved in the process of fee negotiations. We found in our complexity/severity work with the Massachusetts Chapter of the American College of Surgeons that we could relatively easily get consensus on the "relative value" or "complexity/severity" of surgical services among that group. We then talked to internists and achieved some preliminary agreements; for example, an "intermediate acute myocardial infarction," from the time a patient comes into the emergency room, is taken into the critical care unit, and discharged, appeared to be similar in complexity/severity to an uncomplicated cholecystectomy, from initial diagnosis through discharge from the hospital after surgery. Reimbursement for some general medical conditions can be converted into a global fee, but for many medical conditions it is a more difficult process than for surgical cases.

Finally, Dr. Rhoads talked about malpractice problems associated with surgery. I return to the principal goal of Caterpillar and its fee process, which is access for their employees and their families to a significant number of high-quality local surgeons. Overall, malpractice problems will probably get worse before they get better. A solution will flow from severe access problems in different parts of the country, and a realization by both legislators and the public that the ordinary rigors of surgical practice are being compounded manyfold by additional financial and psychological pressures from the omnipresent danger of malpractice suits. We suggest that the Caterpillar process of negotiating access-oriented maximal fees with local surgical groups represents a reasonable compromise between paying charges, on the one hand, and accepting a formulaic-driven fee schedule not negotiated with some local physicians with access as a goal, on the other hand.

Increases in malpractice premiums will result in increased surgical fees, or the public will not have available the surgeons that they want in the variety of practice sites and numbers of specialties that are desired. We have only a modest amount of time before HCFA and the Congress will take some kind of action on fees, as they have on hospital reimbursement under Medicare. Industry can be our strongest ally in achieving a workable system of access-oriented negotiated fees.